**DUSTIN HONKEN WITNESSES & PAGES WHERE HE/SHE TESTIFIED IN TRIAL TRANSCRIPT**

| WITNESS NAME | ATTORNEY | PAGE |
|---|---|---|
| Altimus, Anthony | Mr. Williams | 2016 |
| | Mr. Parrish | 2039 |
| | Mr. Williams | 2080 |
| | Mr. Parrish | 2085 |
| Amick, David | Mr. Parrish | 3027 |
| Asbe, Brittany | Mr. Williams | 3528 |
| Asbe, Lisa | Mr. Miller | 455 |
| Basler, William | Mr. Williams | 2701 |
| | Mr. Spies | 2751 |
| | Mr. Williams | 2769 |
| | Mr. Spies | 2770 |
| | Mr. Parrish | 3079 |
| | Mr. Williams | 3521 |
| | Mr. Spies | 3523 |
| | Mr. Williams | 3872 |
| | Mr. Spies | 3877 |
| Billick, Michael | Mr. Parrish | 2888 |
| | Mr. Williams | 2896 |
| Birkey, Colleen | Mr. Williams | 2106 |
| | Mr. Rogers | 2111 |
| Bregar, Terry | Mr. Williams | 1383 |
| | Mr. Spies | 1405 |
| | Mr. Williams | 1420 |
| | Mr. Spies | 1423 |
| Brumm, Dennis | Mr. Spies | 3603 |
| Buckley, Mary | Mr. Miller | 2459 |
| Bush, Paul | Mr. Miller | 501 |
| | Mr. Spies | 509 |
| | Mr. Miller | 512 |
| Cobeen, Daniel | Mr. Williams | 570 |
| | Mr. Parrish | 603 |
| Cunningham, Mark | Mr. Spies | 3717 |
| | Mr. Williams | 3771 |
| | Mr. Spies | 3780 |
| | Mr. Williams | 3781 |
| Cutkomp, Timothy | Mr. Williams | 676 |
| | Mr. Williams | 781 |
| | Mr. Parrish | 804 |
| | Mr. Parrish | 878 |
| | Mr. Williams | 981 |
| Dean, William | Mr. Williams | 1242 |

| | | |
|---|---|---|
| | Mr. Parrish<br>Mr. Williams | 1257<br>1274 |
| Degeus, Ashley | Mr. Miller<br>Mr. Williams | 533<br>3490 |
| Degeus, Brian | Mr. Miller<br>Mr. Parrish | 557<br>563 |
| Degeus, Joann | Mr. Miller<br>Mr. Rogers<br>Mr. Miller | 513<br>527<br>532 |
| Donaldson, Dean | Mr. Williams<br>Mr. Parrish<br>Mr. Parrish<br>Mr. Williams | 1086<br>1138<br>1172<br>1225 |
| Ferguson, Steven | Mr. Miller<br>Mr. Parrish<br>Mr. Miller<br>Mr. Miller | 1910<br>1938<br>1959<br>2001 |
| Fiems, Sandra | Mr. Spies<br>Mr. Williams | 3609<br>3617 |
| Formanek, Barb | Mr. Spies | 3534 |
| Francis, Ronda | Mr. Williams | 3473 |
| Frasco, John | Mr. Miller | 2465 |
| Friesenborg, Melissa | Mr. Williams<br>Mr. Spies<br>Mr. Williams | 355<br>373<br>379 |
| Frye, Daniel | Mr. Williams<br>Mr. Rogers<br>Mr. Williams<br>Mr. Rogers | 1425<br>1434<br>1451<br>1452 |
| Gahn, Scott Tracy | Mr. Miller<br>Mr. Parrish<br>Mr. Miller<br>Mr. Parrish<br>Mr. Miller<br>Mr. Parrish<br>Mr. Miller<br>Mr. Miller<br>Mr. Parrish<br>Mr. Miller<br>Mr. Parrish | 181<br>189<br>189<br>193<br>195<br>211<br>225<br>227<br>2989<br>2992<br>2995 |
| Gaubatz, Christi | Mr. Miller<br>Mr. Parrish<br>Mr. Miller<br>Mr. Parrish | 387<br>413<br>446<br>451 |
| Golden, Bruce | Mr. Parrish<br>Mr. Williams | 3016<br>3024 |

| | | |
|---|---|---|
| | Mr. Parrish | 3025 |
| Goodin, Julia | Mr. Miller<br>Mr. Spies | 2520<br>2536 |
| Graham, John | Mr. Williams<br>Mr. Spies<br>Mr. Williams<br>Mr. Williams<br>Mr. Spies<br>Mr. Williams | 626<br>664<br>673<br>2130<br>2193<br>2211 |
| Hansen, Kenneth | Mr. Williams<br>Mr. Spies | 3853<br>3856 |
| Held, Rick | Mr. Williams<br>Mr. Rogers<br>Mr. Williams<br>Mr. Rogers | 1054<br>1080<br>1084<br>1085 |
| Hicok, Cindy | Mr. Miller | 470 |
| Hochrein, Michael | Mr. Miller<br>Mr. Spies | 2380<br>2452 |
| Honken, Carol | Mr. Spies<br>Mr. Williams | 3541<br>3550 |
| Honken, David | Mr. Spies<br>Mr. Williams | 3552<br>3560 |
| Honken, Jeffrey | Mr. Williams<br>Mr. Parrish<br>Mr. Williams<br>Mr. Parrish | 276<br>310<br>351<br>353 |
| Huffman, Neel | Mr. Parrish<br>Mr. Parrish<br>Mr. Williams<br>Mr. Parrish<br>Mr. Williams<br>Mr. Parrish | 2996<br>3045<br>3065<br>3074<br>3078<br>3079 |
| Hyde, Marcy | Mr. Williams<br>Mr. Spies<br>Mr. Williams | 1001<br>1012<br>1021 |
| Jensen, Wendy | Mr. Miller<br>Mr. Spies<br>Mr. Williams | 541<br>545<br>3483 |
| Johnson, Alan | Mr. Williams<br>Mr. Spies | 3859<br>3862 |
| Johnson, Anthony | Mr. Williams<br>Mr. Spies<br>Mr. Williams | 2086<br>2099<br>2105 |
| Johnson, Mark | Mr. Williams<br>Mr. Spies<br>Mr. Williams | 3866<br>3868<br>3872 |

| | | |
|---|---|---|
| Kappelmann, Belen | Mr. Williams<br>Mr. Spies | 1022<br>1030 |
| Kisner, Wade | Mr. Miller<br>Mr. Spies<br>Mr. Miller | 2495<br>2514<br>2518 |
| Klein, Dennis | Mr. Miller<br>Mr. Spies<br>Mr. Miller | 2542<br>2585<br>2594 |
| Kluver, Michael | Mr. Miller<br>Mr. Parrish<br>Mr. Miller | 2287<br>2293<br>2294 |
| Lederman, Daniel | Mr. Williams | 1227 |
| Lewis, Lori | Mr. Miller<br>Mr. Spies<br>Mr. Miller<br>Mr. Spies | 984<br>995<br>2003<br>2013 |
| Licht, Gary | Mr. Miller<br>Mr. Spies | 2298<br>2305 |
| Loparo, David | Mr. Parrish<br>Mr. Williams<br>Mr. Parrish<br>Mr. Williams | 2947<br>2977<br>2985<br>2987 |
| McGee, Joseph | Mr. Miller<br>Mr. Parrish<br>Mr. Miller | 2214<br>2249<br>2286 |
| McIntosh, Ronald | Mr. Miller<br>Mr. Rogers<br>Mr. Rogers<br>Mr. Miller<br>Mr. Rogers<br>Mr. Miller | 1632<br>1660<br>1717<br>1749<br>1757<br>1758 |
| Merino, Michael | Mr. Williams | 2311 |
| Milbrath, Robert | Mr. Williams<br>Mr. Spies | 3505<br>3520 |
| Miller, Joshua | Mr. Williams | 3524 |
| Mizell, David | Mr. Williams<br>Mr. Spies | 98<br>128 |
| Mullin, Thomas | Mr. Parrish<br>Mr. Williams<br>Mr. Parrish | 3034<br>3037<br>3043 |
| Murillo, Victor | Mr. Miller<br>Mr. Spies<br>Mr. Miller | 2772<br>2810<br>2817 |
| Nelson, Alyssa | Mr. Parrish<br>Mr. Spies<br>Mr. Williams | 3082<br>3618<br>3645 |

| | | |
|---|---|---|
| Nicholson, Kathy | Mr. Williams | 3495 |
| Olson, Leslie | Mr. Williams<br>Mr. Rogers | 133<br>145 |
| Onoo, Sonny | Mr. Spies<br>Mr. Williams | 3561<br>3571 |
| Pals, Kevin | Mr. Miller | 380 |
| Putzier, Dennis | Mr. Williams<br>Mr. Parrish<br>Mr. Williams | 1275<br>1330<br>1382 |
| Redden, Lynette | Mr. Parrish<br>Mr. Williams<br>Mr. Parrish | 2902<br>2936<br>2944 |
| Ryerson, Aaron | Mr. Williams<br>Mr. Spies | 229<br>254 |
| Riepma, Robert | Mr. Williams<br>Mr. Rogers<br>Mr. Williams | 1034<br>1044<br>1053 |
| Smidt, Marvea | Mr. Parrish<br>Mr. Spies<br>Mr. Williams | 3087<br>3782<br>3850 |
| Smith, J.D. | Mr. Miller<br>Mr. Spies | 2333<br>2374 |
| Steadman, Dawnie | Mr. Miller<br>Mr. Spies<br>Mr. Miller | 2599<br>2653<br>2664 |
| Sterns, Frank | Mr. Williams<br>Mr. Spies | 42<br>86 |
| Tarasi, Frank | Mr. Miller<br>Mr. Spies<br>Mr. Miller | 2679<br>2693<br>2700 |
| Thinnes, David | Mr. Williams<br>Mr. Spies<br>Mr. Williams | 148<br>170<br>179 |
| Tokars, Fredric | Mr. Williams<br>Mr. Parrish<br>Mr. Williams<br>Mr. Parrish | 1459<br>1498<br>1624<br>1628 |
| Vest, Steve | Mr. Williams<br>Mr. Parrish<br>Mr. Williams<br>Mr. Parrish | 1764<br>1818<br>1897<br>1904 |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, Plaintiff, vs. DUSTIN LEE HONKEN, Defendant. /

No. CR01-3047

Sioux City, Iowa
September 9, 2004
8:13 a.m.

VOLUME 1

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
UNITED STATES DISTRICT JUDGE, and a jury.

♀

APPEARANCES:

For the Plaintiff:

C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant:

ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn
Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Okay. I'd like to go on the record for a few matters before we bring the jury in at 8:30. All the lawyers are present, and the defendant is also present. I understand the parties have reached a agreement that there will be another exception to the Rule 615 sequestration order. And, Mr. Williams or Mr. Parrish, why don't you state for us what that agreement is.

MR. PARRISH: Your Honor, we've agreed with the government that the families of the victims can, in fact, sit through both the openings and some of the testimony, and we have no objections to them sitting through that process. Mr. Honken has no objection to them sitting through that process even though they may be witnesses in both the merits phase and the -- if there's a penalty phase in that phase.

THE COURT: Okay. So the Rule 615 sequestration order will be waived with regard to those individuals. As long as the lawyers know who those individuals are, that's fine.

MR. PARRISH: We do, Your Honor. They are family members, and we have no problem.

THE COURT: Okay. Now, do you have any objection if I explain that to the jury, because I don't want them to be confused because it's a little bit inconsistent with the two exceptions that I told them about in jury selection?

MR. PARRISH: We agree it should be explained to the jury.

THE COURT: Okay. I'll do that first thing.

Now, with regard to exhibits that you think you'll reach today, my understanding is that the government is going to use the following exhibits to which I understand there is no objection, and if that's true, I'm going to go ahead and admit them: Exhibits 23, 24, 25, 26, 29, 30, 31, 32, 33, and 34. I understand there are no objections to those exhibits by the defense?

MR. SPIES: Your Honor, I misspoke. This is speaking on behalf of the defense. Number 32 is an opinion -- an order from Judge Melloy dismissing Mr. Honken's original criminal prosecution, and we objected on opinion testimony grounds. Judge Melloy makes a couple of comments in his order, but having reviewed that, on reflection, we're not going to object to Number 32. I think in the submission I gave to the prosecution last night or yesterday afternoon we said that we did have an objection. We're not -- I just wanted to clarify that with the government.

THE COURT: Okay. I appreciate that. So you don't have any objections to the exhibits that I've listed.

MR. SPIES: That's correct.

THE COURT: Okay. Those are -- then I'm going to go ahead and admit those at this time.

5

* * * *

(Government Exhibits 23, 24, 25, 26, 29, 30, 31, 32, 33, and 34 were admitted.)

* * * *

THE COURT: Now, I understand that you do have objections to Government's Exhibit 20, 21, 22, 27, and perhaps 45.

MR. SPIES: That's right, Your Honor. 45 I believe is Mr. Reinert's letter to Mr. Thinnes. Am I right, Mr. Williams?

MR. WILLIAMS: That's correct.

MR. SPIES: We're not objecting to that.

THE COURT: Okay. So 45 I'm going to go ahead and admit because there's no objection. 45's admitted.

* * * *

(Government Exhibit 45 was admitted.)

* * * *

THE COURT: But 20, 21, 22, and 27 you have objections, and I think those objections -- those exhibits were subject to a previous ruling of mine, so you need to make your objection -- actually I don't think you actually need to make your objection anymore because there was a change in the federal rules on that, but I don't take responsibility for parties making their record, so you can object all you want. Do you want to do that now, or do you want to do it in the presence of the jury?

♀

6

MR. SPIES: My preference, Your Honor, would be to make an objection in the presence of the jury as to each exhibit but not to make one objection as to each exhibit and testimony relating to that exhibit. If you're going to ask me if I'm asking for a standing objection, I guess that would be my preference. I don't want to needlessly interrupt either the questioning of the government's counsel or the testimony of the

witness.

My -- I think the rule concerning -- pretrial ruling by the Court on a motion in limine and your rulings were quite definitive as I recall on the exhibits in question and would preserve error, but I am in the abundance of caution going to object to each one, and I'll ask the Court spare me the necessity of repeated objections as to the exhibits and testimony concerning those exhibits.

THE COURT: Okay. You can have a standing objection to it to the extent that you think a standing objection is valid. I'm not taking a position on that.

MR. SPIES: I understand.

THE COURT: Okay. Anything else we need to take up before we bring the jury in at 8:30? Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: No, Your Honor.

THE COURT: Okay. Thank you.

♀

7

(Recess at 8:18 a.m.)

THE COURT: I understand there's another matter you want to raise before we bring the jury in?

MR. SPIES: We just resolved it, Your Honor.

THE COURT: Thank you. Just so that you know, I'm going to wait till after opening statements before I tell the jury about what exhibits are already admitted into evidence.

MR. WILLIAMS: Very good. Your Honor, Exhibit 28 was what we were discussing just to give you a heads-up on it. I had made a typo. I had 27 twice on my list. I meant to have 28. 28 is the file on Mr. Nicholson from the Cerro Gordo County

Courthouse. They have an objection to it. I understand their objections. The way we're going to handle it is I'm going to identify it, hand it to the witness so they can testify off the dates which is all we really need off of it, but I won't move it into evidence. They're okay with that, and that's how we're going to proceed on that one.

THE COURT: So 28 will not be offered.

MR. WILLIAMS: Correct.

THE COURT: Thanks. Anything else?

MR. WILLIAMS: No.

THE COURT: Okay. Thank you.

(Recess at 8:21 a.m.)

THE COURT: Counsel, ready to have the jury brought in?

♀

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: Yes, Your Honor.

THE COURT: Thank you.

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated. Members of the jury, you might notice that we are -- we're already missing one juror. Yesterday after the jury was empanelled, a situation came up yesterday afternoon, and I had to excuse Juror 589, nothing improper, nothing out of the ordinary, but we did have to do that, so we did lose one juror. And rather than have one person all by themselves in front there, even though we have an empty seat, I thought we'd go ahead and you'd have company this morning, and then, of course, next week you'll move to the back row, and we'll rotate in, and I'll have a new seating chart

for you when you come in on Monday.

Is the government ready to proceed?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Mr. Williams, you may give your opening statement on behalf of the United States at this time.

MR. WILLIAMS: Thank you, Your Honor. May it please the Court, counsel, members of the jury.

In 1992, 1993, the defendant, Dustin Honken, operated a meth manufacturing operation in Arizona producing pounds of methamphetamine that he shipped back up to Mason City, Iowa, to

two people: Greg Nicholson and Terry DeGeus, his only customers in Iowa.

In March of 1993, the defendant was arrested on federal charges for conspiring to distribute methamphetamine. He was arrested almost exclusively on the information and cooperation of one of his two customers, Greg Nicholson.

On July 25 of 1993, Greg Nicholson suddenly disappeared without a trace, never to be seen again until the fall of 2000 when his bullet-riddled skeleton was found in a shallow, hidden grave outside of Mason City, Iowa.

A few months later on November 5, 1993, the defendant's only other drug customer, Terry DeGeus, also suddenly disappeared without a trace, he also never to be seen again until his bullet-riddled skeleton was found in another shallow, hidden grave outside of Mason City, Iowa.

Ladies and gentlemen, this is a case about the destruction of evidence; the destruction of the lives of Greg Nicholson, of Terry DeGeus because they could link the defendant to drug operations; the destruction of the lives of Lori Duncan

and her two little girls, Kandi and Amber, because they could link the defendant to the murder of Greg Nicholson. This is the intentional, premeditated murder of five lives so the defendant could evade justice and sell more methamphetamine.

Ladies and gentlemen, my name is C.J. Williams. I represent the United States of America in this case along with

Tom Miller. Over the course of the next several weeks, we're going to be presenting evidence to you about these crimes. It's going to cover a variety of subjects and a variety of time frames. We're going to be talking primarily about the 1993 drug charges and the events surrounding those; 1996 drug charges against the defendant once the 1993 drug charges are dropped. And then we're ultimately going to talk about the 2001, 2000 murder charges in this case.

For you to understand the context these murders took place in, you need to understand a little bit about the drug operation that occurred back in 1992 and 1993.

The defendant is a man from Britt, Iowa -- it's a small town kind of northwest or west of Mason City, Iowa -- grew up there, went to high school in Britt, graduated from there with his best friend Tim Cutkomp. And he was at that point in the early 1990s a small-time drug dealer smelling small -- selling small quantities of marijuana, a little bit of cocaine, but he wanted to make it big.

And so he went to the North Iowa Area Community College where he took classes in chemistry where he got very good grades. And in the spring of 1992, he moves to Arizona where his brother Jeff Honken is living at the time. Together with Jeff Honken -- and then ultimately Tim Cutkomp, his best

friend, moves down to Arizona with him. Together they start up a meth operation using the knowledge the defendant gained in his

chemistry classes at college, and it's a very sophisticated meth operation. They are making 97 percent pure methamphetamine and producing over the course of a year pounds of methamphetamine.

Now, as I said, the defendant's originally from the Mason City, Iowa, area. That's where his customers were when he was in college for his small amounts of drugs, and that's where he goes back to to sell his methamphetamine to the two gentlemen, Greg Nicholson and Terry DeGeus.

Now, Mr. Nicholson and Mr. DeGeus first meet -- well, Mr. Nicholson first meets the defendant through Scott Gahn, one of the defendant's early customers for marijuana. Down in Arizona -- Melissa Friesenborg is a girlfriend he has at that point down in Arizona. Greg Nicholson, Terry DeGeus, as in the drug world, sell to other people, and then those people sell to other people and so forth down the line.

Among the people that Terry DeGeus involved in his end of the drug trade was a woman, an on-again, off-again girlfriend of his named Angela Johnson. Angela Johnson would sell drugs for Terry DeGeus and with Terry DeGeus. At one point Terry DeGeus makes a mistake. He sends Angela Johnson over to the defendant to make a delivery of cash owed to the defendant for a prior drug shipment. And Angela Johnson and the defendant become romantically involved to the point in the spring of 1993 that she is pregnant with his child.

Now, this meth operation comes to a temporary halt in

March of 1993. Law enforcement officers are able to make controlled buys of drugs from one of David Patrick's customers who then cooperates and gives up David Patrick. David Patrick is arrested. He then gives up Greg Nicholson, and in March of 1993, Greg Nicholson's house is searched by law enforcement officers in Mason City, Iowa. In that house they find large quantities of methamphetamine and large quantities of cash.

Greg Nicholson has a choice at that point too, and he chooses to cooperate with law enforcement authorities and give up his source of methamphetamine, the defendant in this case, Dustin Honken.

Mr. Nicholson decides in cooperating that he will wear a wire and record a conversation when he delivers $3,000 of cash proceeds to the defendant in this case. And so you're going to hear that recording of the defendant entering Greg Nicholson's house in the spring of 1993, in March of 1993, and making the delivery. During the conversation they talk about past drug deals. They talk about future drug deals, and they talk about the defendant's other customer in that area, his customer Terry DeGeus.

As the defendant is leaving Mr. Nicholson's house, he's arrested by law enforcement officers, and ultimately he is indicted by the federal government.

Mr. Honken is appointed an attorney after he's indicted by the federal government, and that attorney, David

13

Thinnes, does what an attorney should do. He comes to the U.S. Attorney's Office, and he reviews our file. We have what we call a discovery file. It's a compilation of all the agents'

reports and photographs of the search and all that type of stuff. It allows an attorney to understand what the case is against his client to be able to advise his client. And he does so in this case.

David Thinnes looks through the government's discovery file and advises the -- his client, Mr. Honken, about how the government caught the defendant, and so the defendant knows that Greg Nicholson is the person who gave him up.

Based on the review of the file, the defendant through his attorney notifies the court he intends to plead guilty to the charge against him, conspiracy to distribute methamphetamine, and so the court sets up a plea date for July 30 of 1993 when the defendant intends to come in and plead guilty.

Meanwhile, however, on July 7 of 1993, the defendant's girlfriend, woman pregnant with his child, Angela Johnson, goes to a pawn shop in Waterloo, Iowa, and buys an Intratec Tec-9. It's a large black handgun.

Also during July of 1993 the defendant and his girlfriend Angela Johnson seek out and search for Greg Nicholson. You see, Greg Nicholson's not living at home anymore. The home that the officers searched where he lived

14

with his wife at the time, Leslie Nic -- yeah, Leslie Nicholson, now Leslie Olson, she found out that he was dealing drugs, and they split up.

And so in the spring of 1993, Mr. Nicholson leaves the house he was in before, and in late July he moves in with a friend of his, a woman by the name of Lori Duncan. Lori Duncan doesn't have any involvement in drugs. She lives on a quiet

street in Mason City, Iowa, just a couple doors down from her parents. She has a couple young daughters there, little girl named Kandi and a little girl named Amber. Kandi's ten, and Amber is six years old. And Lori Duncan works in a factory and is a single mother to those girls.

Kandi is kind of a serious girl, quiet. Amber, on the other hand, is a rambunctious little girl, likes to play a lot, likes to laugh, very energetic, smiles all the time. And Amber has a little friend that lives kind of across the alley behind her house named Brittany Asbe. That's her little best friend, and they do a lot of things together, things that little girls do. They stay over at each other's house all the time. They exchange clothes. They play with Barbie dolls, and they like the little Slip N' Slide, you know, in the summer where you have the plastic and the water flows on. And they get in their swimsuits, and they can slide down on that.

On July 25 of 1993, Amber's over at Brittany's house almost all day. She goes over mid-morning, stays there until

about mid-afternoon, actually has lunch with her friend Brittany. They have hamburgers that day. Three o'clock when she leaves the Asbes', she tells them, I'm going home; I'm going to go on a picnic with my family.

Brittany Asbe will never see her best friend again. It's on July 25 of 1993 that Greg Nicholson, Lori Duncan, Kandi Duncan, and Amber Duncan all disappear. Greg Nicholson fails to show up on July 26 for his arraignment on his state drug charges that resulted from the search of his house.

Then on July 30, on July 30 when the defendant has told the court he's going to plead guilty, when he shows up at

the federal courthouse to plead guilty to the charges that resulted from Greg Nicholson's cooperation, the defendant tells the court he does not intend to go through with his plea anymore. He wants a trial.

And then in a conversation with the prosecutor at that time, a man by the name of Pat Reinert, either the defendant or his attorney tells him, Your case is not as good as you think.

Now, David Thinnes will tell the prosecutor that he has a videotape of Greg Nicholson purporting to exonerate the defendant, in other words, saying that the defendant really had no involvement with the drugs after all. Now, that videotape will never be produced to the government, but the attorney tells him he has that videotape.

The United States doesn't learn about Greg Nicholson's

disappearance until August 2, after the defendant has withdrawn his guilty plea or failed -- or said he's not going to go through with the guilty plea.

A warrant is issued for Greg Nicholson's arrest, and a search is conducted to try to locate Greg Nicholson but without success.

The government continues its investigation not only into the disappearance of Greg Nicholson but also into the defendant's drug activity because now the government's key witness is missing.

And so the government starts pulling in additional witnesses to the grand jury and questioning those witnesses before the grand jury to try to build a case.

On October 27 of 1993, the United States subpoenas the defendant's girlfriend, Angela Johnson, to appear before the

grand jury, and the defendant comes down to the courthouse with her. And during the grand jury testimony, she is questioned about the connection between Terry DeGeus and the defendant, Dustin Honken. That happened on October 27 of 1993.

On November 5 of 1993, Terry DeGeus has his little daughter Ashley. She's ten years old. He has joint custody of her, and he picked her up. This is a Friday. And on that night he takes her over to his mother's house, JoAnn DeGeus, and he tells his mother that Ashley needs to stay there for a little bit that night. He tells his daughter Ashley, he says, You can

stay up late tonight until I get home because I may not be home for a little while. But as a treat you can stay up until I get home.

And Ashley does stay up. Terry tells his mother that he's going to meet Angie Johnson that night. Well, Ashley stays up and stays up, but her father never comes home. In fact, that's going to be the last time Ashley ever sees her father alive.

Nine days, nine days after Angela Johnson, the defendant's girlfriend, is questioned before the grand jury about drug dealings between Terry DeGeus and the defendant in this case, Terry DeGeus disappears.

Now, the government's case is at a standstill. Greg Nicholson's gone. Our key witness is gone. Terry DeGeus, his only other customer, is missing. The searches are made. We learn later in December that Terry DeGeus is gone. An attempt is made to locate them, but the government's case is on hold, and it stays on hold for a long period of time.

Meanwhile, meanwhile, the defendant, his girlfriend

Angie Johnson, and Tim Cutkomp, his best friend, make trips back down to Arizona to recover the meth lab equipment that was set up down in Arizona. And they bring that back to Iowa.

Now, ultimately in 1995 the charges against the defendant are ordered dismissed by the court for lack of prosecution. At that point the defendant renews his meth

manufacturing operation. This time he does it in Mason City, Iowa, and he does it at his own house. Involved in this meth operation is still Angie Johnson and Tim Cutkomp, his best friend who's been involved from the beginning. And they begin the meth manufacturing operation in Mason City, Iowa, at the defendant's house.

The defendant, though, recruits another person, man by the name of Dan Cobeen. Dan Cobeen he meets at Kraft Foods. After the defendant is arrested in 1993, he and Tim Cutkomp get jobs at Kraft Foods in Mason City, and it's there that the defendant meets Dan Cobeen. Dan Cobeen is on work release. He's living in a halfway house because of some theft charges. He's a drug user, and they begin conversing. And over the course of time, the defendant determines that Dan Cobeen is a good person to recruit into this business with him.

What the defendant doesn't realize is that Dan Cobeen wants nothing to do with manufacturing methamphetamine. He, in fact, is concerned the defendant is setting him up, trying to get him revoked off his probation for some reason.

So what Dan Cobeen does is he goes to the police and tells the police about what's going on, tells him about the defendant's plans to make methamphetamine, and agrees to cooperate with law enforcement officers. Dan Cobeen provides

information to the law enforcement officers as the operation continues, as they go out and buy equipment, they go out and buy

ingredients to manufacture methamphetamine. He draws diagrams of the meth lab that's set up in the defendant's house, and it's very sophisticated, just like down in Arizona, beakers and triple-neck flasks and all kinds of equipment.

Ultimately based on that information on February 1 of 1996, a search warrant is conducted at the defendant's house, and the meth lab is seized. The defendant, Dustin Honken, and Tim Cutkomp are both arrested on federal drug charges. They're both released from jail pending trial, although the defendant at that point has some restrictions on him. He has a restriction in the form of an ankle bracelet, electronic monitoring device on his ankle, and he's restricted to his home or work at Kraft Foods.

Now, it's the second time the defendant's been arrested on drug charges. He doesn't stop. Instead he starts plotting the murder of witnesses against him this time. While Tim Cutkomp is out and released and he can go places, he starts talking to Tim Cutkomp about let's locate where Dan Cobeen lives. We need to find out where the government is keeping the evidence that's seized from my house. We need to find out what the chain of custody is between who seized the evidence and how it got to the lab. He starts talking about killing additional witnesses. Tim Cutkomp decides to cooperate. So he comes to the police, tells the government about the defendant's plans, and agrees to wear a recording device on the defendant.

There's four conversations recorded with the defendant by Tim Cutkomp, and you're going to hear large portions of those conversations. During those conversations, the defendant talks about murdering Dan Cobeen, finding out where he's at. He wants to find Special Agent John Graham because John Graham was the one who worked with Dan Cobeen in recording the conversations when Dan Cobeen was cooperating. He wants to find out who in the chain of custody from the seizure of the evidence in 1996 could be eliminated that would prevent the government from introducing that evidence against him at a trial.

He talks to Tim Cutkomp about locating these witnesses, about finding who the key witnesses are, and about eliminating them. He's, in fact, a little concerned about the timing because he realizes he's not going to have much time. He's got electronic monitoring. He's got to figure out how to defeat that, get out long enough to kill witnesses, and get back. So he may not have time to kill everybody he needs. So he's concerned, you're going to hear on this tape, about the order in which he needs to kill witnesses. He talks about having an automatic firearm that he can use for this purpose.

Now, Tim Cutkomp expresses concern, expresses concern about what happened in 1993. Is what happened in 1993 going to come up? Do we have to worry about what happened back then? And the defendant tells him on these tapes that, you know, why are you asking me about this now? You know, you know nothing

about that. Why do you want to know something about it now? Don't worry. Nothing's going to come up. I took care of it. Don't worry about it.

He tells Mr. Cutkomp that he can go through with this,

don't worry about it. He assures him, I can do what it takes. I will do anything it takes to get out from underneath these charges and get you out from underneath these charges so I'm not separated from my family. He assures, he tells Tim Cutkomp, Don't worry about it. You know, I thought I'd have nightmares about what happened before, he tells Tim, but I don't, don't even think about it, compares it to getting psyched up for a football game.

Based on those taped conversations, the defendant's pretrial release is revoked, and he's arrested and placed in the Woodbury County Jail pending trial. While in the Woodbury County Jail, the defendant doesn't stop. He's revoked, doesn't have bond, can't get out. But there are other inmates over at the Woodbury County Jail that are there on bond.

One of them is Dean Donaldson, guy in there for theft charges. The defendant meets him and starts talking to him about helping him out.

Defendant gets one of his other girlfriends, a woman by the name of Kathy Rick by whom he has another child, to put her house up for bond, for bond money to bond out Dean Donaldson, and he gives instructions to Dean Donaldson to kill

22

Tim Cutkomp. He gives him a map, draws a map to Tim Cutkomp's house, and actually gives instructions about where to set up out on the -- on a gravel road in order to kill Tim Cutkomp when he goes to work. He gives him Tim Cutkomp's work schedule at Kraft, said he knows what time he's going to and from work. And he actually bonds out Dean Donaldson.

Dean Donaldson doesn't go through with the plot, in fact, gets rearrested while he's out on release, and is put back

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 23 of 3636

in the Woodbury County Jail.

So then the defendant turns to a man by the name of Anthony Altimus. Anthony Altimus is also in jail on state charges, and he talks to Anthony Altimus about doing his bidding. At this point he doesn't have Kathy Rick's house to put up for bond, so he has to think of another way to come up with money to raise bond to get Anthony Altimus out, so he sells a methamphetamine recipe to another inmate there by the name of Tony Johnson, sells his meth recipe to him in jail, and Tony pays for it by having his girlfriend, Colleen Birkey, deliver a thousand dollars to Angela Johnson who then uses that money to try to bond out Anthony Altimus.

Now, ultimately it didn't work. It wasn't enough money. So Anthony Altimus never does get out of jail.

Now, finally in 1997 the defendant pleads guilty to conspiring to distribute methamphetamine from 1992 to 1996 and pleads guilty to attempting to manufacture methamphetamine in

♀

1996. Over the course of several days, a sentencing hearing takes place between December of 1997 and into February of 1998. And during the course of that sentencing hearing, the defendant testifies. He makes a number of statements during that testimony. He admits that everything that was recorded on that tape with Tim Cutkomp was accurately transcribed. He admits they talked about eliminating witnesses. He admits they talked about killing agents. He admits that they talked about destroying government evidence. He admits talking about an automatic firearm during those tapes.

His explanation during the sentencing hearing, though, is it was really Tim Cutkomp who was on this murderous rage, and

I was just telling him all these things to placate him, to make him so he wouldn't go out and murder people, and so while I said all those things on that tape, that's what I really meant.

During that sentencing hearing, he testifies under oath that there never was any videotape of Greg Nicholson exonerating him, that he just made it up, told his lawyer that one existed, never was such a tape. But you're going to hear testimony from Attorney Dave Thinnes who's going to tell you otherwise. He's going to testify that, in fact, the defendant did provide him with a videotape, that the man on there identified himself as Greg Nicholson and purported to claim that the defendant had no involvement with drug activity. Dave Thinnes will tell you that he ultimately returned that tape to

the defendant after the charges were dropped against him in 1995.

Now, one other event occurred that I didn't tell you about, and that is in 1993 after Greg -- I'm sorry, Terry DeGeus disappears in November of 1993, the defendant in the winter of 1993, 1994, probably in December of 1993, goes over to Tim Cutkomp's house, and he has a large black handgun, and he asks Tim Cutkomp to use his dad's torch, welding torch, to cut that gun up, melt it down into a bunch of pieces, and they do it together.

They melt this gun down, cut it into pieces. They do it against a big piece of galvanized steel, and then when they're all done, they drive out in the country, and they throw the pieces of the gun and the big piece of galvanized metal in various ditches around the Mason City, Iowa, area.

Now, during the sentencing hearing in 1998, the

defendant admits that he melted down a gun with Tim Cutkomp. He just claims it wasn't a small black hand -- or large black handgun. He says it was an SKS assault rifle that he had purchased some years before and he melted it down because he just didn't want to have it in the possession of his kids, around his kids. He thought that was a good way of getting rid of it.

Now, ultimately in 1998, the defendant is sentenced to 27 years in federal prison, and he is sent to Florence,

♀

25

Colorado, a federal prison in Florence, Colorado. The government's investigation into the disappearances of Greg Nicholson, Lori Duncan, Amber Duncan, Kandi Duncan, and Terry DeGeus never stops. And the continuation of that investigation results ultimately in July of 2000 in charges against Angela Johnson for aiding and abetting the murder of those five people.

She's placed in a local jail around Cedar Rapids, Benton County Jail, and while she's in that jail, she makes contact with another inmate there by the name of Bobby McNeese. Bobby McNeese tells her that he can help her get out from underneath these murder charges if he can find somebody to take the rap for it. Maybe he can find somebody doing life in prison that has nothing to lose. They can take the rap for the murder charges, but to do that he's going to need to be able to provide some key information to that person so that they can convince the authorities that, in fact, he's the one who murdered these five people.

And so he convinces her to give him the location of the bodies of the murder victims, and she does it in a couple notes that she sends to him while in jail. What Angie Johnson

doesn't know is that Bobby McNeese is cooperating with the authorities and he turns those maps over to the government.

So in the fall of 2000, a search takes place up in the Mason City, Iowa, area. They go to two sites based on the maps that are provided by Angie Johnson, the defendant's girlfriend.

♀

The first site they go to is off of Kildeer Avenue. It's out in the country on an abandoned farm site, and just into the field, into the farm field, where the farmer plows, the government finds a shallow grave. In that grave is the skeleton of Terry DeGeus. Forensics will show that Mr. DeGeus was shot multiple times in his body and once in the head.

A second search takes place at a site off of Lark Avenue just outside of Mason City, Iowa. It's off of a paved road. There's a gentle stream flowing through some woods, and in those woods is a single grave. In that grave are four bodies.

On top is Greg Nicholson. Forensics will show that he was shot at least once in the body and once in the back of the head.

Beneath him is Lori Duncan. She was shot at least once in the body and once in the head.

Both Nicholson and Lori Duncan are bound behind their back with rope, and they have rope around at least one of their ankles. And in each of their mouths is a little girl's sock with duct tape around their head.

Now, beneath Lori Duncan is her oldest daughter Kandi. Her skeleton is found next with a single bullet wound in the back of her head.

And at the bottom of that grave, bottom of the grave,

is little Amber Duncan, still in her bathing suit with a single

bullet wound in the back of her head.

Now, the defendant was charged in this case in August of 2001, charged with the murders of all five of those people because they're witnesses, for murdering those people in furtherance of a drug conspiracy and in furtherance of a continuing criminal enterprise, drug operation.

Over the course of the next few weeks, we're going to be presenting evidence of these crimes and of the crimes the defendant committed while he was on the 1996 charges plotting to kill additional witnesses when he's charged a second time.

When we get done with our evidence, with all the case, we're going to stand up before you at that time, and we're going to ask you that when you deliberate on this case that you find the defendant guilty; guilty of intentionally and with premeditation killing Greg Nicholson, Terry DeGeus, Lori Duncan, Kandi Duncan, and Amber Duncan; guilty of destroying evidence so the defendant could evade justice and continue to sell methamphetamine; guilty of plotting to kill additional witnesses when he's caught again in 1996 and of soliciting other inmates to kill his witnesses in that case.

Thank you very much.  Your Honor.

THE COURT:  Mr. Parrish, are you ready to proceed?

MR. PARRISH:  I am, Your Honor.

THE COURT:  Okay.  Thank you.

MR. PARRISH:  These are horrific killings that shock

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 28 of 3636

the conscience and rattle the soul. Yet the solution does not lie in finding Mr. Honken guilty of something he did not do.

Good morning. I want to thank you for sacrificing the time away from your family, your friends, your employment to participate in this most important process. As Judge Bennett related, our forebears and our relatives and family have risked the ultimate sacrifice in order for us to have the privilege to sit here today participating in one of the greatest gifts that democracy has to offer. Emerging nations raise their eyes in awe as they view the beauty of our jury system. Therefore, on behalf of Mr. Honken, my co-counsel Mr. Spies and Mr. Rogers, I want to thank you for being here.

Mr. Honken admitted his drug misconduct. You've heard the prosecution talk about how he detailed his admission in this courtroom. The evidence will show he was a young man infatuated with drug manufacturing, basically a nerd who was attracted to the drug manufacturing but no evidence other than these allegations with regard to his attraction to any part of the violence that goes with it. He walked into this courtroom. He accepted his responsibility for it. He went to prison for 27 years. He is now in prison serving that time.

As the prosecution pointed out, he was talented in the ability to manufacture drugs, and the evidence will show that it attracted several types of people, including people like Mr. DeGeus and Mr. Nicholson, to him. It's without question

♀

29

that they were also drug dealers.

The evidence will show that in this environment life is on the edge and is very dangerous for all participants. Each of them were dealing with many different type of people, often

hiding what they were doing from law enforcement officials, making deals. The interaction in all of these people and the people who were around them, including their friends and loved ones, was often treacherous.

The evidence will show that the lifestyle that all of these people led breeded deceit, danger, secrecy, addiction, heartbreak, and violence. As you can tell from the government's chart that was put up, there was not just a relationship between Angie Johnson and Mr. Honken, but it was also between Miss Johnson and Mr. DeGeus where she had a longstanding relationship that was stormy. And on occasion when he was arrested, he was held off and being held off, holding police off with firearms while Mr. Ryerson, one of the people with him, was putting drugs away in a bathroom and hiding in an attic the evidence is going to show you.

The evidence between Mr. DeGeus was alive on July 25 of 2003 (sic). He and Miss Johnson were lovers. They had a long-time relationship. They talked, and they had a mutual addiction to the use of methamphetamine.

There will be no eyewitnesses, no physical evidence that establishes any connection during the course of this trial

♀

30

between Mr. Honken, Lori Duncan, or her two beautiful children. No one on the planet will say that Mr. Honken ever knew Lori or her children, and no one will ever say that they saw them together at any point in time. And there will be no physical evidence to link them up in any way, shape, fashion, or form.

There will be evidence about a video referred to in the opening statement by the government. The evidence will show that a video was delivered to Mr. Thinnes' office, and you'll

hear a description of that video and the person that was on it, including the date it was delivered.

You will also see in that video that there was a person on it who sat in a relaxed manner and gave a description of Mr. Honken's lack of involvement in certain matters dealing with drugs. And in closing argument I will stand up and talk to you about the effect of that video and the folly of the reasoning as to why would a person who takes a video of a person would have sent that to his lawyer if that person had killed them.

There is no doubt that the evidence will show that Lori Duncan and her two children were horribly killed. The photos and descriptions that you will observe will cry out for resolution.

You, as you look at this evidence, must look at it, though, within the instructions that the Court will give you, in a dispassionate manner that each of you indicated you would do

♀

31

when we interviewed you during the voir dire process.

And as you review the evidence, you will also review physical evidence of a Duncan household where you will hear testimony about whether or not they were taken out of that house. And as you review that physical evidence and get beyond the photographs, what you're going to have to look at is is there any physical evidence that links Mr. Honken to that house. Is there any fibers, any blood? The rope that was found, does it in any way connect with Mr. Honken? The duct tape, does it connect back to him, the note, the fingerprints? This is what you're going to have to review as jurors as this evidence comes in. Were there footprints?

Then there will be evidence of horrible grave sites that you will have to review, and it's not going to be pleasant as you look at it. But as jurors you're obligated to look even further as you review this evidence that will be coming in. You have to look at the two different soil samples that were found, a soil sample that appeared after Mr. Honken had long been in jail and incarcerated in prison and also a buried animal carcass that was determined to be a dog at the grave site long after Mr. Honken was incarcerated.

And you're going to have to listen to the evidence about the soil samples that were found, when they were possibly placed there, the length of time that they had been there, the explanation as to why there were several different type of soil

♀

samples located at the grave site.

So you will have to get beyond the fact that these grave sites were horrible. And the images that they will project will be powerful. What I ask each of you to do, as you've indicated that you would do, as you review this evidence that comes in during the course of the trial, that you go back to the instructions, you review it with dispassionate review as you've indicated you would do and even at times when the temptation becomes too great, go back and look at the instruction and what the government's burden will be.

Something else will happen during the course of this trial. One of the procedures when a person like Mr. Honken is incarcerated that happens, except for letters to his lawyers, the evidence will show you, every single letter that he writes since the date he went into prison in 1996 was reviewed by law enforcement and the investigators in this case, every single

letter to friends, to family, to anyone else. It was copied. And he knew this.

Every single telephone call that he made other than to his counsel was monitored not only at the Woodbury County Jail but at Florence penitentiary and also at Marion where he was incarcerated later, and we'll talk about that in a few minutes.

Interesting to note, there's not one single admission regarding any involvement or killing of these people, and there were hundreds of letters that he wrote because Mr. Honken, you

will find from the evidence, was a prolific writer.

There's a song by a fella I'm sure you may have heard, Charlie Daniels, and it talks about the devil went down to Georgia, he was looking for a soul to steal, he was in a bind because he was way behind, and he was willing to make a deal.

Deals were made in this case. And the deals that the government chose to make were with people who were incarcerated. They will be people who we've already talked to you about who entered into plea bargains, who were government beneficiaries, who were cooperators, or some people will call them out and outright snitches.

And the deals were made to connect these people, and the Charlie Daniels song is significant when I say the part about because he was way behind in time. And let me tie this in briefly as to what you should look for as you see this evidence coming in. Let me give you an example of the type of people who they said Mr. Honken said he had some involvement with in order for the government to make the connection for us to get here today.

Fella by the name of Steve Vest, age 43, two-time

murderer, made a deal with the government in 1996 to avoid the death penalty. Then he tried to withdraw it, was involved in suffocating two people to death with duct tape and running an international drug conspiracy.

Well, they said Mr. Honken who now had never made a

statement to his best friends by their opening statement went to Mr. Vest and confessed to him while he was in prison. That's the connection that you should review as you look at the evidence that they will use to say Mr. Honken did this act.

And you will hear evidence about Mr. Vest having access to newspaper articles. Let me show you again why this Charlie Daniels song will come into play as this trial goes on.

Now, this man, Mr. Vest, is serving life, but he made a deal. So what do they make deals for in prison? What kind of deal when they're going to spend the rest of their lives there? Better food, better facility, better telephone privileges, to get closer to their families. This is what you will find what sophisticated people will do to some young man who goes in from Iowa who had a fantasy for manufacturing drugs, and that's not good, and he has accepted that.

Another person who will come into this courtroom, a Mr. Tokars, and the words are kind of appropriate there, the devil went down to Georgia. Well, Mr. Tokars happened to be a lawyer from Georgia who had his wife killed in front of his own children, then proceeded to go on vacation with his family and mourn. He was a lawyer who reviewed Mr. Honken's legal papers under the ruse of helping Mr. Honken who says now Mr. Honken confessed to him.

Well, they're going to bring Mr. Tokars in and say

Mr. Honken, who had never made a statement to anyone else in all

these letters and all these telephone conversations, somehow confessed to Mr. Tokars who ran an international drug conspiracy?

A Mr. Byerly who was also Mr. Vest's roommate -- and we'll talk and you'll hear evidence about the deals they made and the arrangements they made and the benefits they got and how they know how to work the system. You've heard the government in the opening statement talk about Mr. Cutkomp, and you've heard them make reference to the fact that Mr. Honken said those conversations took place, and for one second you will not hear us deny that the conversations took place. He said it in this courtroom that they took place. He's going to say it during the course of hearing the testimony come in with the transcripts, et cetera. You'll get a chance to see it again. And it's not disputed.

However, what you must look at with regard to this evidence about what he says is who these people are and at what point in time they're dealing with each other. Always when you listen to this evidence, put it in context. That's all we ask you to do, put it in context.

Now, let's put what we believe the evidence will show you about the context of this conversation that the government calls most important. Cutkomp was an individual who he had known, you will find out from the evidence, Mr. Honken since they were kindergarten friends. They shared secrets. They

shared money. They shared drugs. They shared lovers. They

shared trust until they were caught by law enforcement.

Yet you'll find out from the evidence that once law enforcement started closing in on both of them, both of them, mind you, and they both thought they were facing life, they then shared a mutual distrust of each other, and that's where you put the tapes in context.

This is what happened, and this is what the evidence will show you. They each told each other lies. They each tried to set the other one up. They each faked each other out. They each postured for each other. You must, as you review the evidence that comes in, listen to the tapes in that context. That's all we ask you to do, bearing in mind the evidence will show that Mr. Cutkomp was wired, and every time he had a conversation with Mr. Honken in 1996, they would have a prior conversation at Kraft where they both worked, and you won't hear those tapes or those conversations, but you will hear the ones after Mr. Cutkomp had set him up at work. You'll hear those tapes when he's moving in to close in.

The long and shorts of these tapes will be there, will be a dance of friendship that you must follow closely and put in the context of what they were all about and the circumstances that these two young men find themselves. And if you do that, that's all we ask you as you review the evidence in this case.

Now, Mr. Honken, the evidence will show you, went off

♀

37

to Florence, Colorado, to begin serving his prison time. It's a high-security prison. Bear in mind in this high-security prison as I've already outlined, his letters, et cetera, phone calls are monitored. But also his actions are monitored. They have security cameras all around. They can watch where he goes.

They watch who he meets with. They watch who he talks to. So if that evidence is going to come in, you'll see if it can be supported what these snitches will say, and so you keep that in context as each of these people testify as to what they said Mr. Honken said to them.

You'll also get an opportunity to review what Mr. Honken was like in those institutions, this young kid from Iowa, and you'll also see when he was transferred to Marion what his conduct was like. You'll have an opportunity to review that, and I ask you as the evidence comes in about it, you take a look about it. And what the government said in its opening statements about what his admissions were in this courtroom, you'll get a chance to hear whether or not you think his statements were credible or not credible.

Some of these photographs you will look at during the course of this trial will be ones you'll want to close your eyes and wish you weren't here. But as a juror you're not going to be at liberty to do that. Your eyes must be open. You have to look at the photos, no matter how horrible they look.

What you have to look at, though, as you look at these

photographs again is the context and see whether or not there's anything in these photographs once you get behind the horrific nature of them that in any way connects Mr. Honken to these photographs or the deaths.

And then to go to the heart of this matter and the physical evidence where human beings want to touch and feel and hold, the evidence will not show you any DNA that matches with Mr. Honken to any aspect of this crime. There will be no blood that matches Mr. Honken. There will be no hair samples that

connects Mr. Honken. There will be no footprints that connects Mr. Honken. There will be no eyewitnesses who connects Mr. Honken. There will be no clothing that connects Mr. Honken. There will be no connection of a rope to the rope found at the scenes, no connection of the tape that was found at the scene, no connection of any fibers found at the scene or in the home of Lori Duncan, of Greg Nicholson, not one single iota, no photographs, no weapons associated with the digging of the graves, no items used in any context with regard to the bodies that connects at all in any way to Mr. Honken, not one thing.

The gun registration form that you hear about, Mr. Honken was not connected with that. And bear in mind the relationship that Miss Johnson had to Mr. DeGeus. You're going to have to review all the evidence in this case. You as jurors indicated you would do that. You will have to get beyond the admission that Mr. Honken made with regard to his drug dealing.

39

You will then have to focus on the physical evidence.

And remember, in this day and age when we have the ability to fly a person to the planets, trace a microscopic fiber from a blown-up embassy to a suspect halfway around the world, and plant a camera that can take a photograph of organs inside the human body and circulate it in every TV screen in America, that these are the circumstances that you will be reviewing this physical evidence.

And in closing my opening, I want to tell you if you do that as your job as jurors and once you have undertaken one of the most difficult jobs you have ever undertaken as jurors or on any task in life, you will return the one and only verdict you can reach in this case. And it will be that Mr. Honken is

not guilty of killing Kandi Duncan, Mr. Honken is not guilty of killing Amber Duncan, Mr. Honken is not guilty of killing Lori Duncan, Mr. Honken is not guilty of killing Terry DeGeus, Mr. Honken is not guilty of killing Greg Nicholson.

Thank you for your time, and we welcome to you on Mr. Honken's journey for justice. It will be one of the greatest experiences of your lifetime.

THE COURT: Thank you, Mr. Parrish.

Carey, could you move the podium?

And members of the jury, I have two preliminary matters I wanted to discuss with you. Remember yesterday when I talked to you about this fancy term we have about the witnesses

being sequestered, and I mentioned that's Rule 615 of the Federal Rules of Evidence, and I told you that there were two exceptions, one for the defendant and one for Special Agent William Basler as the case agent.

The parties have agreed to another exception, and there are several members of the family of the victims who will probably be witnesses in the case, and the lawyers have agreed that they could stay in; and, in fact, they were in during opening statements. So if you see somebody in the back of the courtroom that ultimately winds up as a witness, you may wonder about the fact that I told you that wouldn't happen. I'm now explaining to you why that may happen in this case.

The other thing I wanted to talk to you about is the exhibits in this case. In order to try and speed up the process -- I've done this in every trial I've had for the ten years I've been a United States District Court judge -- I meet with the lawyers, and we try and work through the exhibits.

So it won't be like you see on TV where with regard to every exhibit they'll walk over and hand it to the other side and they'll examine it and that takes a few minutes and then they'll show it to a witness and then they formally offer the exhibit. That's going to happen some in this case, but it's not going to happen with regard to a lot of the exhibits.

And here's why. In every trial I have I meet with the lawyers, and most often they agree that many of the exhibits can

♀

just be admitted without any objection. Some exhibits there will be an objection, and so you'll see that happen. The lawyers will be objecting to an exhibit. But a lot of the exhibits I've just already admitted into evidence. So when that happens, they'll just refer to, you know, Exhibit 27 or whatever the number would be, and then you know it's already in evidence. So I just didn't want you to be confused if they don't go through the formal procedure that you sometimes see on television.

Why don't we go ahead and take our first stretch break. Everybody in the courtroom can stand up and stretch, and then the government will be calling its first witness.

Okay. Please be seated.

Mr. Williams, are you ready to call your first witness?

MR. WILLIAMS: I am, Your Honor. The United States calls Frank Stearns.

THE COURT: Good morning. If you'd please come up to our witness box, I'll swear you in.

FRANK STEARNS, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. Make yourself

comfortable. You can adjust that chair and kind of scoot it up a little bit. You can also adjust the microphones and pull those down. And when you're ready, would you state your full name, please, and spell your last name.

♀

THE WITNESS: Frank Stearns, S-t-e-a-r-n-s.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Stearns, can you tell the jury what do you do for a living, sir?

A. I'm a sergeant with the police department for the city of Mason City.

Q. How long have you been a law enforcement officer, sir?

A. Be 20 years this month.

Q. I want to take you back a portion of those 20 years to 1993. What position did you have with the police department at that time?

A. I was an investigator.

Q. And were you assigned to any particular task forces at that time?

A. Well, I was assigned to general crim., but part of those duties were -- involved working with the drug task force.

Q. I want to focus on your involvement with that drug task force. In 1993, can you explain to the jury what were your duties as part of that task force as an investigator working with the task force?

A. To investigate drug crimes in the city of Mason City.

Q. And as part of that, would you actually head up investigations yourself?
A. Yes, sir, I would.
Q. I want to talk about one particular investigation. Going back to 1993, did you become involved ultimately in the arrest of the defendant, Dustin Honken?
A. Yes, sir, I did.
Q. Could you relate to the jury how did that investigation start off?
A. There was a drug arrest in Freeborn County, Minnesota, that led to Carpenter, Iowa, that led to Mason City.
Q. Okay. Why don't we take that one step at a time. You say Freeborn, Minnesota. There may be jurors here who are not familiar with the geography of northern Iowa. Mason City is how far away from the Minnesota border, sir?
A. About 30 miles.
Q. And Freeport --
A. Freeborn County.
Q. Freeborn County, where is that located at in Minnesota?
A. The county seat I believe is Albert Lea.
Q. Can you explain -- you say an arrest up there led to -- ultimately down to Mason City. Can you walk the jury through how that happened.
A. There was a subject that was arrested in Albert Lea, Minnesota, that gave up his source who was Dave Patrick living

44

in Carpenter, Iowa. A search warrant was then done on

Carpenter's residence -- I mean Patrick's residence in Carpenter, Iowa, and he gave up his source which was Greg Nicholson in Mason City, Iowa.
Q. And how did he give up his source at that time? What happened that led to Greg Nicholson's . . .
A. David Patrick from Carpenter, Iowa, came down to Mason City and did a controlled buy from Greg Nicholson.
Q. Did that result in a search of Greg Nicholson's residence?
A. Yes, sir, it did.
Q. When did that take place?
A. I believe it was March 17.
Q. And were you present during that search?
A. Yes, sir, I was.
Q. Who was present in the house at that -- during that search when you made that search?
A. Greg Nicholson. I believe his wife Leslie came home for a few minutes and left.
Q. I'm going to show you Exhibit 34 which has already been admitted into evidence. Do you recognize that individual?
A. Yes, sir, I do. That's Greg Nicholson.
Q. Where was Greg Nicholson living at on March 17 of 1993 when you searched his house?
A. 920 North Filmore.
Q. Who was present other than Greg Nicholson in the house at

45

the time of the search?
A. There was other members of the drug task force.
Q. Was Greg Nicholson married at that time?
A. Yes, he was.
Q. And what was the name of his wife?

A. Leslie.

Q. Was she present during the search?

A. On and off.

Q. Did she come home at some point?

A. Yes.

Q. What did you find during the search of Mr. Nicholson's house?

A. Found weapons, found marijuana, found methamphetamine, cash, drug paraphernalia, scales.

Q. I want to show you a number of photographs here that have been admitted into evidence already. Exhibit 26B, can you describe for the jury what they're looking at in Exhibit 26B?

A. That'd be Greg Nicholson.

Q. And is that taken inside his house?

A. Yes, sir.

Q. 26A is what?

A. That'd be the large bag of marijuana that was found downstairs in the basement behind the bar.

Q. You had mentioned during your testimony you found a weapon during the search of Mr. Nicholson's house?

♀

46

A. Yes, sir.

Q. Showing you Exhibit 26D, what is that?

A. That's that 22-caliber gun that was found on the shelf on the headboard of his bed.

Q. Did you find any evidence that Mr. Nicholson also used controlled substances, in particular methamphetamine, during your search?

A. Yes, sir, we did.

Q. Showing you Exhibit 26G. Can you describe for the jury

what they're looking at in that photograph, please.

A. That's a personal use kit.

Q. What do you mean by personal use kit, sir?

A. Just like a syringe or a spoon. Oftentimes you'll find a razor blade, just a kit to carry around for personal use.

Q. And why don't we explain it a little bit. How can people use methamphetamine?

A. There are a number of different ways they can use it. They can snort it up through their nose. They can shoot it with a needle into their veins. They can swallow it. They can smoke it.

Q. Would you do me a favor and just pull that microphone down a little bit closer and pull your chair up just a little bit more? I want to make sure that Shelly doesn't have a hard time.

When you say you found drugs and scales and so forth, was there a particular place in the house where all of the

47

evidence of the drug activity was found?

A. Most of it was found down in the basement.

Q. Okay. Showing you Exhibit 26F, is that -- what's that a photograph of?

A. The pool table.

Q. And is that the basement, in the basement there?

A. I'm sorry. Yes, it is. That's the basement.

Q. As part of your search you indicated you found controlled substances. What type of controlled substance did you find?

A. Marijuana and methamphetamine.

Q. The methamphetamine you found, what was it contained in?

A. Glass jars.

Q. Is that unusual in your involvement in the narcotics

enforcement?
A. That's the first and probably the only time I've seen it in glass jars.
Q. Showing you Exhibit 26Q, what are they looking at at that point?
A. That would be the glass jars containing the methamphetamine that was hidden up in the ceiling of the basement.
Q. And the methamphetamine was actually inside those jars?
A. Yes, sir.
Q. In addition to finding the methamphetamine there, did you find any cash?
A. Yes, sir, we did.

48

Q. Showing you Exhibit 26J. What is that a picture of?
A. That's a picture of the cash that we located in the basement.
Q. Now, how much cash was found ultimately?
A. I believe it was approximately 4,700.
Q. $4,700?
A. Yes, sir.
Q. Once you conducted this search, the items that you found in those jars or the substances you found in the jars that you suspected to be methamphetamine, did you send them to some lab to determine if, in fact, it was methamphetamine?
A. Yes, sir, we did.
Q. Explain to the jury if you would when you or the law enforcement officers find suspected controlled substances, is there a particular lab in Iowa that you send the substances to for testing?
A. Yes, sir, it's the state lab. Division of Criminal

Investigations lab down in Des Moines.

Q. And when you send it down there, do they generate some type of report after they analyze the substances?

A. Yes, sir, they do.

Q. And then they ultimately send that report back to you?

A. Yes, sir, they do.

Q. I'm going to show you what's been admitted into evidence as Exhibit 25. Do you recognize Exhibit 25?

♀

A. Yes, sir, I do. That would be the lab report, the results of the methamphetamine that was sent down.

Q. And so this is the lab report that was generated by the DCI lab on the substances you seized from Mr. Nicholson's house?

A. Yes, sir.

Q. Does it indicate on there whether any of the substances were found to be positive for methamphetamine?

A. Yes, sir, it does.

Q. And where is that at?

A. I believe it says E1, second one from the bottom, E1.

Q. You're talking about right there? I'm sorry. Right above that blue line?

A. Yes, sir.

Q. Okay. Explain to the jury what they're trying to understand here. E1 is the exhibit number that was attached to the bottle that was submitted to the lab?

A. That's correct.

Q. Okay. The next thing is the net weight. Explain what it means by net weight.

A. The net weight is just the methamphetamine itself weighed 148.34 grams.

Q. And then over to the right of that it says percentage methamphetamine. Explain to the jury what that means.
A. That would be the purity of the methamphetamine that was tested.

Q. So the 148.34 grams was 97 percent pure methamphetamine?
A. That's correct.
Q. Did you calculate out the -- what the total amount of then pure methamphetamine is if you take the 97 percent pure times the 148?
A. Yes, sir, I did.
Q. And what is that number?
A. That's 143.88 grams.
Q. So 143.88 grams of pure methamphetamine was seized from Nicholson's house?
A. That's correct.
Q. Once you conducted the search of Mr. Nicholson's house, did you engage in conversations with him at that time?
A. Yes, sir.
Q. And did he start to provide you with information?
A. Yes, sir, he did.
Q. Before I move off Exhibit 25, the jury may wonder when they're back in the jury room, so I want to just cover something. There's a second page to Exhibit 25. Can you just explain to the jury what that second page is?
A. That was other bags that was also sent down to be tested.
Q. So this is just the complete lab report that was sent down for everything.
A. That's correct.
Q. All right. When Mr. Nicholson sat down with you, did he

provide you information about where he was getting his methamphetamine from?
A. Yes, sir, he did.
Q. And what did he tell you?
MR. SPIES: Objection, Your Honor. Hearsay, and this violates Mr. Honken's Sixth Amendment right to confront his accusers.
MR. WILLIAMS: Your Honor, we believe this is an exception under 804(6) of the Federal Rules of Evidence.
THE COURT: Objection's overruled. You may answer.
A. He told us he was getting his methamphetamine from Dustin Honken who lived in Arizona.
Q. Did he explain to you during the course of your interview with him how many times he was getting the methamphetamine, what kind of quantities he was getting the methamphetamine in?
MR. SPIES: Your Honor, the same objection.
THE COURT: Same ruling.
A. Yes, sir, he did.
Q. Why don't you relate what he told you.
A. I'm sorry?
Q. Could you tell the jury what did Mr. Nicholson tell you was the amount and timing, how often the defendant was delivering methamphetamine to him.
A. He told us he was getting six to ten ounces of methamphetamine six to ten times a year.

♀

52

Q. In similar quantity -- or similar packaging as well, in the bottles?

A. That's correct.

Q. And did he indicate whether it was the same type of purity as what you seized on that day?

A. He did not, no.

Q. Presumably somebody pays for this methamphetamine. Did he tell you about payments he made to the defendant?

A. Yes, sir, he did.

Q. And what did he tell you about that?

A. He told us that Mr. Honken was charging him $1,200 an ounce, and at the time that we did the search warrant at Mr. Nicholson's house, he was into Mr. Honken for $12,000.

Q. Into him meaning he owed Mr. Honken $12,000 for past deliveries of meth?

A. That's correct.

Q. Did Mr. Nicholson tell you whether he knew if the defendant had any other customers that he delivered methamphetamine to other than himself?

A. Yes, sir, he did.

Q. And what did he tell you about that?

A. He had a customer by the name of Terry DeGeus over in Clear Lake that he was also selling the methamphetamine to.

Q. Did he indicate whether he knew what kind of quantity was being delivered to Mr. DeGeus?

♀

53

A. The same amount that Mr. Nicholson was selling was being delivered to DeGeus also.

Q. And by who?

A. By Mr. Honken.

Q. Mr. Honken at this point is living where?

A. In Arizona.

Q. So how are these deals set up for these multiple deliveries of drugs and the payment of cash?
A. Well, the drugs were being delivered by ground delivery, UPS, Fed Ex, something like that. He'd also sometimes drive it up. The payments were being made personally to Mr. Honken. He'd fly in or drive in for the payments.
Q. How did they contact each other to set up these deliveries?
A. By the phone, in person, sometimes pager.
Q. Mr. Nicholson as he's telling you about his involvement in this drug trade with the defendant, does he tell you whether he has his own group of customers?
A. Yes, sir, he does.
Q. And who is he selling to?
A. David Patrick, Brent Logan, and Dennis Frerichson.
Q. Now, David Patrick was the one that -- ultimately that was arrested that gave him up.
A. That's correct, in Carpenter, Iowa.
Q. As a result of your investigation, did you determine if the defendant -- or I'm sorry, Mr. Nicholson's wife, Leslie

♀

54

Nicholson, now Leslie Olson, did she have any involvement as you later were able to determine in any of the drug distribution activities?
A. None that we could find.
Q. Ultimately did Mr. Nicholson agree to cooperate further by wearing a wire?
A. Yes, sir, he did.
Q. I want to take you to March 21 of 1993. Was Mr. Nicholson contacted by the defendant?
A. Yes, he was.

Q. And why don't you explain to the jury what happened that day.
A. Mr. Nicholson contacted me and told me that Mr. Honken was coming over to his house to receive payment for drugs that he delivered in the past.
Q. So what did you do?
A. I met with Mr. Nicholson, put a body mike, a transmitter, on him and called the members of the task force and set up surveillance on his house.
Q. Why don't you explain to the jury a little bit. You say you put a body mike and trans -- trans something?
A. Transmitter.
Q. Transmitter on him, thank you. Explain to the jury how that works.
A. It's a wireless transmitter that's put on a person

♀

55

somewhere on their body that sends out the conversation signal, conversation, to a receiver which was in my car that I was recording off of.
Q. And so as -- this is a hidden microphone someplace on Greg Nicholson?
A. That's correct.
Q. And as the conversation's taking place, is it recorded?
A. Yes, it is.
Q. And can you also hear it as it's taking place?
A. Yes, I can.
Q. Is -- once you make this contact, does the defendant, Dustin Honken, come to Mr. Nicholson's house?
A. Yes, he does.
Q. And this is while Mr. Nicholson is wearing the wire.

A. Yes, it is.
Q. Who all is home in Mr. Nicholson's house at that time if you recall?
A. Himself and Leslie I believe.
Q. What's the purpose of this meeting?
A. Is to pay Mr. Honken for methamphetamine he had dropped off in the past.
Q. Do you make any arrangements -- you seized all of Mr. Nicholson's cash that he had. Do you make arrangements to provide him with cash to deliver something to the defendant?
A. Yes, we did.

♀

Q. And what do you do?
A. We provided him with $3,000 in cash to pay Mr. Honken after I'd recorded the serial numbers.
Q. Why do you record the serial numbers, sir?
A. So we can -- so we can trail that money where it goes.
Q. So the meeting takes place in Mr. Nicholson's house.
A. Yes, sir.
Q. Approximately what time of day or night did that take place, sir?
A. Approximately around 1 p.m. in the afternoon.
Q. Did you and other law enforcement officers have surveillance set up around the house?
A. Yes, we did.
Q. Did you -- what happened after the defendant entered the house then?
A. They engaged in conversation, Mr. Honken, Mr. Nicholson.
Q. And that's the conversation you recorded.
A. Yes, sir.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Showing you Exhibit 20, do you recognize that?

A. Yes, sir, I do.

Q. What is that?

A. That would be the tape recording of the conversation that

♀

day.

Q. Have you listened to that recording?

A. Yes, sir, I have.

Q. Does it fairly and accurately record the conversation that took place on the day of the delivery, March 21, 1993?

A. Yes, sir, it does.

Q. Mr. Stearns, was a transcript typed up of this conversation that was recorded between the defendant and Mr. Nicholson on March 21, 1993?

A. Yes, it was.

MR. WILLIAMS: May I approach again, Your Honor?

THE COURT: You may. And you don't need to ask each time. Thank you.

BY MR. WILLIAMS:

Q. Showing you Exhibit 21, can you identify that for the jury, please?

A. That would be the transcript of the tape recording from that meet.

Q. Have you reviewed this transcript against the tape recording itself?

A. Yes, sir, I have.

Q. Does that transcript fairly and accurately reflect the

conversation that took place between the defendant and Mr. Nicholson on March 21 of 1993?

A. Yes, sir, it does.

♀

MR. WILLIAMS: Your Honor, with the Court's permission, I'd ask permission to play this tape and to pass out copies of the transcript for the jury so that they can review it as we go.

THE COURT: Before you do that, you need to offer Exhibit 20.

MR. WILLIAMS: I'm sorry. I would offer Exhibit 20 into evidence, Your Honor.

* * * *

(Government Exhibit 20 was offered.)

* * * *

THE COURT: Mr. Spies.

MR. SPIES: Your Honor, Mr. Honken objects to both Exhibits Number 20 and 21 on grounds that they constitute hearsay and on the further ground that they violate his Sixth Amendment right to confront his accusers.

THE COURT: Those objections are overruled. Thank you. You may proceed at this time.

MR. WILLIAMS: Thank you. Your Honor, we have both earphones for the jury and the transcripts. I'd ask the Court for the Court's clerk's assistance in passing these out?

THE COURT: Yes. Thank you.

Carey, would you pass out the transcripts? And are you asking that they use the headphones?

MR. WILLIAMS: Yes, Your Honor, if I could, please.

♀

THE COURT: Okay. Do we have enough?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay.

MR. SPIES: Your Honor, before the jurors review the transcript, may we ask the Court to instruct the jurors that they're the best evidence in determining what the tape says and the transcript, if it differs from what they believe it is, is --

THE COURT: Yes, I'd be happy to. Members of the jury, the best evidence of the tape recording is the tape recording itself and what you hear. The transcript is simply an aid to help you understand matters on the tape, and that's all it is is an aid, so if there's a difference between what you hear and what you read, you should go with what you hear.

MR. WILLIAMS: Your Honor, this may be one of those great times for a stretch break as your staff pulls out the headphones.

THE COURT: Okay. Thank you. Why doesn't everybody go ahead and take a stretch break. Thank you, Mr. Williams.

MR. WILLIAMS: Your Honor, in case nobody's used those before, they can just hang down underneath the chin.

THE COURT: Yep. Just put them on your ears, let them hang down. I think they're already -- have you turned them on for everybody? Looks like Rick is.

Okay. Would everybody please be seated.

♀

60

MR. WILLIAMS: Your Honor, just a moment. I think Rick is pulling out a few more for defense counsel.

THE COURT: Okay. Thank you.

MR. WILLIAMS: With the Court's permission?

THE COURT: You may.

MR. WILLIAMS: Thank you.

THE COURT: Mr. Williams, we could take our mid-morning recess.

MR. WILLIAMS: I think that would be great. I'm having a technical difficulty. I had it all queued up and ready to go.

THE COURT: Your timing with the technical difficulty is impeccable, because it's time to take our recess.

MR. WILLIAMS: Thank you very much.

THE COURT: Members of the jury, it is 5 minutes to 10. We'll be in recess for 25 minutes until about 20 minutes after 10. I won't give you this cautionary instruction every time, but because it's our first time once the evidence has started, please remember that it's very important to keep an open mind until you've heard all of the evidence in the case, had a chance to receive my final instructions, listen to the closing arguments of the lawyers, and, most importantly, go back into the jury room to review all of the evidence that's been admitted and to fully discuss this case among yourselves. Thank you very much. We'll be in recess.

♀

(The jury exited the courtroom.)

THE COURT: Is there anything we need to take up, counsel?

MR. WILLIAMS: No, Your Honor.

MR. SPIES: No, Your Honor.

THE COURT: Okay. Thank you. We'll be in recess.

(Recess at 9:55 a.m.)

THE COURT: Counsel, are you ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. SPIES: Yes.

THE COURT: Okay. Thank you.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Williams, are you ready to proceed?

MR. WILLIAMS: I am, Your Honor. We overcame the technical difficulty, so with your permission now, I'd go ahead and play that tape.

THE COURT: That'd be fine. Thank you.

(Government Exhibit 20 was played in open court.)

BY MR. WILLIAMS:

Q. I'd like to talk with you about a couple of the things that were said during the transcript that may be difficult for the jury to follow. There was talk about a bust up north. What bust was that that he was referencing?

♀

A. That was a large drug bust up in Freeborn County.

Q. And was that the one connected to this case?

A. Yes, sir, it was.

Q. At one point early on in the conversation there's a mention of a QP. What's that?

A. QP stands for quarter pound.

Q. Is that a term just used in the drug trade?

A. Yes, sir, it is.

Q. And at one point during the conversation there's talk about the methamphetamine being wetter and the need to dry it out. Do

you recall that part of the conversation?
A. Yes, sir, I do.
Q. Could you explain to the jury when methamphetamine is manufactured, does it come out wet?
A. Yes, sir, it does.
Q. Why don't you explain how that works. When it comes out wet, what do you mean by wet?
A. Kind of like pasty.
Q. And what happens for it to be ultimately used down the road?
A. It will dry out eventually and turn into a powder substance.
Q. So when they're talking about it being wetter this time, they're talking about it just being wet from the manufacturing process?

63

A. That's correct.
Q. Then there was a reference to crank in there. Do you recall that reference to crank?
A. Yes, sir.
Q. Can you explain to the jury what crank is?
A. Crank is just another slang name for methamphetamine.
Q. As a result of this meeting and Mr. Nicholson's cooperation, did he also write out a narrative of what happened while he was inside and you were outside during this meeting with the defendant?
A. Yes, sir, he did.
Q. Handing you Exhibit 22, can you identify that for the jury, please?
A. That would be Greg Nicholson's handwritten statement of the

transaction with Mr. Honken.

Q. Is that a two-page document, sir?

A. Yes, sir, it is.

Q. Does -- is there a signature on the second page?

A. Excuse me?

Q. Is there a signature on the second page?

A. Yes, sir, there is.

Q. Whose signature is that?

A. That would be Gregory Nicholson.

MR. WILLIAMS: United States would move to admit Exhibit 22 into evidence, Your Honor.

♀

64

* * * *

(Government Exhibit 22 was offered.)

* * * *

MR. SPIES: Your Honor, Exhibit 22 is hearsay. We object on those grounds and on Mr. Honken's Sixth Amendment confrontation rights.

THE COURT: 804(6)?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: The exhibit's admitted into evidence over defendant's objection. Thank you.

* * * *

(Government Exhibit 22 was admitted.)

* * * *

THE COURT: Let me just explain that. Members of the jury, I don't like to talk in code, you know, and keep secrets from you. It's just a shorthand way for lawyers to talk. When I said 804(6), we're referring to a specific rule of evidence. That's all it is. Thanks.

MR. WILLIAMS: Thank you, Your Honor.

BY MR. WILLIAMS:

Q. I'll tell you, this is not my day for technology. We'll do it the old-fashioned way.

THE COURT: Maybe it's because -- I think I turned it back to document camera.

MR. WILLIAMS: Well, my computer's not up. I don't

♀

know if it went into sleep mode or what, so I'll mess with it later, Your Honor. Thank you, though.

THE COURT: Thank you.

BY MR. WILLIAMS:

Q. Exhibit 22, is that the document you were just talking about?

A. Yes, sir, it is.

Q. And this is Mr. Nicholson's handwritten notes signed by him on the second page about what happened during that meeting?

A. Yes, sir, it is.

Q. Now, also at the bottom there's another entry here. It says, I gave money to Tim Cutkomp late last summer. I don't remember the amount. It was for Dustin. Do you see that entry there?

A. Yes, sir, I do.

Q. That wasn't part of what happened on March 21 of 1993, though.

A. No, sir, it was not.

Q. Very good. Once this recorded conversation takes place and Dustin Honken leaves the Nicholson house, what happens then?

A. He was stopped a short time later as he was going southbound down the alley approaching Ninth Street Northwest by

other members of the task force.
Q. And when he was stopped by the task force officers, who was in the car?

♀

A. It'd be Dustin was driving, and Timothy Cutkomp was a passenger.
Q. Whose car was it?
A. It was registered to a Russell Miller.
Q. Russell Miller?
A. Yes, sir.
Q. Once the law enforcement officers stopped the vehicle, what happened?
A. Both Mr. Honken and Cutkomp were taken out of the car and placed under arrest.
Q. Was Mr. Cutkomp searched pursuant to the arrest?
A. Yes, sir, he was.
Q. Were any drugs or weapons found on him?
A. No, sir.
Q. Was the defendant searched?
A. Yes, sir, he was.
Q. And what was found on Mr. Honken at that time?
A. Our $3,000 in cash that was marked that was bundled up in thousand-dollar bundles put in different pockets and also a drug note.
Q. I'm sorry. Also a what?
A. A drug note.
Q. A drug note, what do you mean by a drug note, sir?
A. It had initials and dollar amounts on the note.
Q. I show you what's previously been admitted into evidence as

♀

Government's Exhibit 33 and ask you if you can identify that document, sir.

A. Yes, sir, that would be the note I was referring to.

Q. And when you say it's a drug note, based on your experience as a narcotics investigator, can you explain to the jury the type of records that drug dealers keep?

A. Well, they're pretty loose records. They can't remember a whole lot. But you can see here under G man, the figures that have been crossed out were payments made.

Q. And so is this common to find these type of drug notes when you make arrests and searches during narcotics raids?

A. Yes, sir, it is.

Q. And based on your experience then, the crossing out of the figures, is that kind of like running totals of how much is owed and then amounts to be paid as more drugs are sold and so forth?

A. Yes, sir, it is.

Q. This was found on Dustin Honken during the search of his person on March 21 of 1993?

A. Yes, sir, it was.

Q. Did you find any hotel keys or anything else on him?

A. Yes, sir, we also found a key to the Highway House Hotel in Mason City.

Q. Based on -- let me back up. Did you search the car itself as well?

♀

68

A. Yes, sir.

Q. Did you find any receipts in the car?

A. We found a receipt for Fed Ex in the car.

Q. And do you remember -- it was for a package. Do you remember who had sent the package and who it was to?
A. Dustin Honken had sent the package to Russell Miller.
Q. You indicated you found this room key. Based on what you had uncovered so far in your investigation, what did you do at that point with the information you had and the fact you had a room key for a hotel in Mason City?
A. I applied for a search warrant for that room at the Highway Hotel.
Q. And did the judge grant you authorization to search that room?
A. Yes, sir, he did.
Q. And did you search it?
A. Yes, sir, I did.
Q. Was that that same day on March 21 of 1993?
A. Yes, sir, it was.
Q. Who was the room registered to if you recall?
A. The best I can recall, it was registered to Dustin.
Q. And when you went into the room, who was present there?
A. Russell Miller.
Q. And do you know Russell Miller?
A. I did not know him prior to then.

♀

69

Q. When you went into the room and Russell Miller was there, was he arrested, sir?
A. Yes, sir, he was.
Q. And was he searched?
A. Yes, sir, he was.
Q. Did you find any drugs or anything else incriminating on him?

A. No, sir, we did not.

Q. Did you then search the room?

A. Yes, sir, we did.

Q. Can you just describe for the jury, what are the types of things you found, first of all, in the room, you know, personal belongings, luggage, things like that?

A. Yes, there was luggage in the room.

Q. And did you search through that luggage?

A. Yes, sir, we did.

Q. Can you describe for the jury some of the things you found during your search?

A. Found $750 in cash, another personal use kit with a white powder substance in a vial that was in that kit that field tested positive for methamphetamine.

Q. Did you look into -- I'm assuming this hotel room had a bathroom in it?

A. Yes, sir, it did.

Q. Did you look in the bathroom as part of your search?

♀

70

A. Yes, sir, I did.

Q. Did you find anything interesting in there?

A. There was a large message written on the mirror. It appeared to be written in red lipstick.

Q. What did that message say?

A. It was something to the effect of "hope you had a happy birthday. Love, Angie."

Q. Now, based on the investigation you've done at this point and the recorded conversation with Mr. Nicholson in which he mentions Terry DeGeus and based upon what Mr. Nicholson had told you about Terry DeGeus's involvement in this, did you take any

efforts to try to search Terry DeGeus's house?
A. Yes, sir, we did.
Q. Could you explain what you did to the jury, please?
A. Worked up an application for the residence of Terry DeGeus in rural Britt, Iowa, took it in front of a judge, and he approved my search warrant.
Q. And did you execute that search then?
A. Yes, sir, we did.
Q. Who was present at the house when you arrived to execute that search?
A. Other than other members of law enforcement, Terry DeGeus.
Q. Were you able to execute the search at the house?
A. Yes, sir, we were.
Q. And did you have at least some type of a standoff at the

71

beginning of it?
A. Yes, sir, we did for a short time.
Q. Explain that for the jury, please.
A. We had problems entering -- forcibly entering the front door, so for officer safety reasons we backed off and attempted to talk Mr. DeGeus out of the house.
Q. And did that succeed?
A. Yes, sir, it did.
Q. And when you searched the house, were you able to find any other person in that house?
A. Yes, sir. During the search of the house, we found a subject by the name of Aaron Ryerson hiding up in the attic.
Q. Did you find any large quantities of controlled substances or any quantities of controlled substances during your search of the house?

A. No, sir, we did not.

Q. Did you find any evidence of a fire having been lit someplace in the house?

A. Yes, sir. Up on the second floor kind of towards the middle of the house -- there was a room in the middle of the house there on second floor -- there appeared to be remnants of burnt paper, freshly burned paper.

Q. Now, as part of Mr. Nicholson's continued cooperation on behalf of law enforcement, did he testify ultimately before a federal grand jury about his drug involvement with Dustin Honken

and other people?

A. Yes, sir, he did.

Q. Showing you what's been marked as Government's Exhibit 27. Can you identify that for the jury, please?

A. Yes, sir. This would be Greg Nicholson's grand jury testimony.

Q. And that's a transcript of that testimony?

A. Yes, sir. I'm sorry. It's a transcript of his testimony.

Q. And what date did that take place?

A. April 20, 1993.

MR. WILLIAMS: United States would move to admit Exhibit 27 into evidence, Your Honor.

* * * *

(Government Exhibit 27 was offered.)

* * * *

THE COURT: Mr. Spies?

MR. SPIES: Again, the defendant objects on hearsay grounds and on grounds that it violates Mr. Honken's Sixth Amendment right to confront his accusers.

MR. WILLIAMS: Same exception: Federal Rules of Evidence 804(6), Your Honor.

THE COURT: The objection's overruled. The exhibit is received into evidence.

* * * *

(Government Exhibit 27 was admitted.)

♀

* * * *

BY MR. WILLIAMS:

Q. What I'd like you to do -- and I'm not going to have you read the entire transcript here, but I want to go to specific parts of it; all right? So to begin with, I'd like you to turn to page 6 of the transcript. Was there a discussion with Mr. Nicholson while he was in the grand jury about how he was -- how he ultimately met the defendant in this case?

A. Yes, sir, there was.

Q. And looking at that line starting at 11, can you read to the jury what question was asked him and what he said?

A. And who introduced you to Dustin Honken? Answer, A friend of his, this Scott Gahn, which was a friend of mine at the time too.

Q. And was there further discussion a little bit farther down about why they were introduced and what was going on at the time, what relationship there was between Scott Gahn and Greg Nicholson and the defendant?

A. Yes, there was.

Q. And what was that discussion? What did Mr. Nicholson say in the grand jury?

A. That Mr. Honken had some marijuana he was trying to get rid of and he knew that I could probably turn it for him. He being

Dustin Honken had?

Q. And so Mr. Gahn introduced Greg Nicholson to Dustin Honken

♀

74

in order to facilitate the sale of marijuana?

A. Yes, sir.

Q. Turning to page 8 of the grand jury, it was explained just now that they started off with the sale of marijuana. At some point did that turn to other drugs as well? Do you see at the bottom of page 8 of the transcript?

A. Yes, sir.

Q. Can you explain to the jury what did Mr. Nicholson indicate about the movement from marijuana to other drugs?

A. It moved from marijuana to methamphetamine.

Q. And the bottom question there was, When did you first get methamphetamine from Dustin Honken? Do you see that question there?

A. Yes, sir.

Q. At the top of page 9, what was Mr. Nicholson's response, sir?

A. Last summer.

Q. And that would be the summer of 1992?

A. That's correct.

Q. Now, you had indicated earlier when I asked you about Mr. Nicholson's statements to you about how -- the quantities and so forth. Is there further discussion by Mr. Nicholson when he was under oath before the grand jury about the quantities of methamphetamine that were sold?

A. Yes, sir.

♀

75

Q. And do you see that on line 6? There's discussion about three to five ounces? Do you see that?
A. Yes, sir.
Q. Just relate to the jury -- it's kind of hard to read through that stamp on top of it. Essentially what is Mr. Nicholson telling the grand jury at that time?
A. That he was receiving three to five ounces of methamphetamine from Mr. Honken.
Q. Then there's a discussion about what it comes in. Could you relate to the jury what Mr. Nicholson said about that?
A. He'd bring it in a jar.
Q. And there was actually a mention here about a brown laboratory jar. Do you see that?
A. Yes, sir.
Q. Was that the same type of laboratory jar that you found the methamphetamine in on the day that you searched Mr. Nicholson's house?
A. Yes, sir, it was.
Q. Now, before I get to this next series of questions, I need to have you explain a little bit to the jury about the pure and mixture of methamphetamine. Is there something that drug dealers do once they manufacture methamphetamine, in this case 97 percent pure methamphetamine, to cut it or add to it in some way?
A. Yes, sir. They will use a cutting agent so that they had

76

more product.
Q. Why don't you explain that to the jury. When you say -- first of all, what's a cutting agent? What do you mean by that?

A.   It's basically a harmless powder substance, white powder, that has no effect.  It could be baking powder, for instance. It has no effect with the drug.  It just cuts the drug, makes the -- if you have an ounce, it will cut it into an ounce and a half or even step it up to two ounces so they have a larger quantity of drugs.
Q.   And what's the benefit to a drug dealer for doing that?
A.   More money.
Q.   And how does that result in more money?
A.   If they start out with an ounce, they cut it or step on it, they've now got two ounces; they double their money.
Q.   Is that because the people ultimately using the drug on the street, are they able to determine how pure the methamphetamine is they're buying?
A.   No, sir, they're not.
Q.   And this stepping on or cutting as you call it of the methamphetamine, does that occur at each level of the distribution chain?
A.   It can.  It usually does.
Q.   So in this grand jury testimony by Mr. Nicholson back in April of 1993, there's a discussion about this purity issue there.  Do you see that at the bottom of the page starting at

77

line 21?
A.   Yes, sir.
Q.   The question was asked, Did you have any discussion with Mr. Honken about whether that methamphetamine had been cut or any cut being added to it?  Do you see that?
A.   Yes, sir.
Q.   And what was Mr. Nicholson's response?

A. That he had sent some inositol with the methamphetamine so Mr. Nicholson could cut it.

Q. So the stuff that was coming up to him was pure methamphetamine.

A. That's correct.

Q. You asked -- or you testified earlier there was discussion and Mr. Nicholson provided you some information about how much he was being charged by the defendant for these drugs. Mr. Nicholson was also asked about that during his grand jury testimony again; is that correct?

A. That's correct.

Q. Do you see starting at line 10 of that transcript on page 10, what does Mr. Nicholson say at that point about how much he was being charged?

A. It started at 16 and came down -- $1,600 an ounce and came down to $1,200 an ounce.

Q. Explain to the jury, would there be a reason or do you see that in the drug trade where it starts off at a higher price and

it gets knocked down to a lower price over time?

A. It starts out at a higher price because they don't really know each other, and they don't know how much -- what the quantity of drugs that person's going to move. Once they get to know each other and they see the quantity of drugs that are being moved, they'll lower the price.

Q. Earlier in your testimony when you were relating what Mr. Nicholson told you about the number of transactions and so forth, was there further discussion about that with Mr. Nicholson when he was under oath at the grand jury?

A. Yes, there was.

Q. Directing your attention to page 11 of the transcript starting at line 9, is there a discussion with Mr. Nicholson on the record about how often he was receiving shipments and how many shipments he received?
A. Yes, sir, there is.
Q. And can you just summarize that for the jury?
A. Approximately every two weeks or once a month Dustin would bring him methamphetamine for a total of at least eight times that he received methamphetamine.
Q. In the relative scheme of things in your experience in the narcotics investigations in Mason City, Iowa, is that a small quantity of methamphetamine, or is that a large quantity of methamphetamine for your investigations?
A. For Mason City, Iowa, that's a large quantity of

♀

79

methamphetamine.
Q. Did Mr. Nicholson indicate whether he did anything other than distribute methamphetamine for Dustin Honken?
A. Whether he did anything other than distribute it for him?
Q. Yeah. In other words --
A. Yes, he did.
Q. -- was there a discussion -- and what else did he say he did on behalf of Dustin Honken?
A. He also stored some methamphetamine there at his house for Mr. Honken.
Q. And in the grand jury at page 12 of the transcript, does he talk about why he's storing methamphetamine for the defendant?
A. He'd store it there, come back a couple days later and get a little more.
Q. Now, was there somebody else -- you indicated before

Mr. Nicholson indicated he was selling methamphetamine to -- I'm sorry, that Mr. Nicholson indicated that Dustin Honken was selling methamphetamine to one other person in the Mason City, Iowa, area. Do you recall that?

A. Yes, sir.

Q. And who did he tell you that was?

A. Terry DeGeus.

Q. And did he again repeat that when he was under oath at page 13 of the grand jury transcript?

A. Yes, he did.

♀

80

Q. In the handwritten notes that we've previously looked at that Mr. Nicholson wrote, he made a reference to Tim Cutkomp. Did Mr. Nicholson relate to you and to the grand jury what Tim Cutkomp's role was that he knew in this organization?

A. Yes, sir, he did.

Q. And what did he tell you?

A. That Tim Cutkomp had come to his house a couple times and collected money for Dustin.

Q. And again, in the grand jury testimony of Mr. Nicholson at page 14 of that transcript starting at line 14, does he again indicate to the grand jury that that's what happened with Tim Cutkomp?

A. Yes, sir, he does.

Q. And how much money did he indicate Mr. Cutkomp collected from him on behalf of Dustin Honken?

A. Between four and six thousand.

Q. Now, Mr. Stearns, as part of your continuing investigation into this case, were you able to start to look into this operation that existed down in Arizona and start to investigate

chemicals that may have been used in that operation?
A. Yes, sir, I was.
Q. And as a result, did you ultimately obtain records from companies or seize documents from companies reflecting sales of chemicals used in the manufacturing of methamphetamine?
A. Yes, sir, I did.

Q. I'm going to put on the screen here what is marked as Government's Exhibit 23 which has previously been admitted into evidence. Could you tell the jury what that is, first of all?
A. That's a receipt for the Hill Brothers Chemical Company.
Q. And on this receipt this indicates who the -- first of all, what was sold pursuant to this receipt on the first page of Exhibit 23?
A. The cylinder of anhydrous ammonia.
Q. Is anhydrous ammonia a substance used in the manufacturing of methamphetamine?
A. Yes, sir, it is.
Q. It says that it was shipped to a certain location or to a certain entity there. What was it shipped to?
A. Printed Circuits Technology.
Q. And following that first page of Exhibit 23, there's a number of additional pages here. First of all, turning to the second page of Exhibit 23, that's entitled a cylinder agreement. Do you see that?
A. Yes, sir, I do.
Q. And it indicates that Hill Brothers Chemical Company is selling something to who there?
A. Printed Circuits.
Q. And do you know what Printed Circuits was?

A. That was a company that was supposedly owned by Steven Honken.

Q. I'm sorry? Owned by who?
A. Steve Honken.
Q. Steve Honken or do you remember -- take a look at the third page if you would of Exhibit 23. Is there a name down there for the name -- for the president of Printed Circuits Incorporated?
A. Jeff Honken.
Q. And this is dated what date?
A. 3-10-92.
Q. This is just shortly about a year before the seizure of the drugs from -- or the arrest of the defendant in Mason City, Iowa?
A. That's correct.
Q. And then the rest of the Exhibit 23 are those additional receipts then for other items.
A. Yes, sir.
Q. On this page 4 of Exhibit 23 there's a reference to chlorine gas. Based on your investigation and knowledge of the drug trade, is chlorine gas used in the manufacturing of methamphetamine?
A. Yes, sir.
Q. There is another receipt again for Printed Circuits Technology at page 5 of Exhibit 23 for chlorine gas; is that correct?
A. Yes, sir.
Q. There's another receipt in December of '92, Printed

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 76 of 3636

Circuits Technology again for chlorine gas?
A. Yes, sir.
Q. That's on page 6 of Exhibit 23. And then -- and there's a final receipt of some sort about an empty cylinder. Do you see that as the last page of Exhibit 7 (sic)?
A. Yes, sir, I do.
Q. Very good. Did you also obtain documents from a company called Adchemco Scientific, Inc., located in Tucson, Arizona?
A. That's correct.
Q. Showing you what's been admitted into evidence as Exhibit 24, can you identify that for the jury, please?
A. That's an envelope with the Adchemco Scientific Incorporated return address.
Q. Perhaps it's going to work better if I show you the entire document. Can you take a look at Exhibit 24 and just relate to the jury, first of all, is that a multi-page document, Exhibit 24?
A. Yes, it is.
Q. And what does that consist of, sir?
A. Receipts and payments from Printed Circuit Technology to Adchemco Scientific Incorporated.
Q. And what type of product is reflected as being sold to Printed Circuits Technology in these receipts?
A. There's denatured alcohol, acetone, tubing, anhydrous. That's basically all I see.

♀

84

Q. And, Mr. Stearns, the receipts on these items during this time period, is it fair to say that the dates cover -- for example, on page 2 of Exhibit 24, what's the date in the upper right-hand corner of this letter to Printed Circuits Technology?

A. January 12, 1993.

Q. And then if we go through these various receipts, we see, for example, on page 3 of 19 -- I'm sorry, page 3 of Exhibit 24 the date in the upper right-hand corner of that invoice?

A. 7-9 of '92.

Q. Now, just taking a look at this page as one example of the invoices that are contained in this Exhibit 24, if you look at the upper left-hand corner, there's a section here for who the items are billed to. And who is it billed to in this case?

A. PCI.

Q. And then below on a line right here, there's an entry for how the order was made; is that right?

A. That's correct.

Q. And what does it say on this receipt?

A. That was a verbal order from Dustin.

Q. As you went through the Exhibit 24 and previous to today when you've had an opportunity to take a look at Exhibit 24, are there numerous entries for orders of chemicals by Dustin?

A. Yes, sir, there is.

Q. Just as an example, going to the next page of Exhibit 24, page 4, there's an entry for Dustin there?

♀

85

A. Yes, sir, verbal again.

Q. Page 6 of Exhibit 24, another entry for Dustin?

A. Once again, verbal.

Q. And that's throughout Exhibit 24?

A. Yes, sir, it is.

Q. Now, Mr. Stearns, as part of your investigation, your ultimate arrest of Dustin Honken, did you have personal contact with him?

A. After the arrest?

Q. Yeah, after the arrest. In the process of arresting him, did you participate in the arrest of Dustin Honken?

A. Yes, sir, I did.

Q. The Dustin Honken that you arrested in 1993 based on the information that Greg Nicholson provided to you, do you see that Dustin Honken in the courtroom here today?

A. Yes, sir, I do.

Q. Can you describe for the jury where he's sitting and what he's wearing?

A. He's sitting at the table to my left in a cream-colored shirt.

Q. Ultimately when you arrested the defendant, you arrested him on state charges, sir?

A. That's correct.

Q. And what happened to those state charges against the defendant?

♀

86

A. Those were dismissed after the federal charges were brought against him.

MR. WILLIAMS: Thank you. I have no further questions, Your Honor.

THE COURT: Thank you.

Mr. Spies?

MR. SPIES: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SPIES:

Q. Good morning, Sergeant.

A. Good morning.

Q. I'd like to ask you just a few questions about your

testimony to the jury this morning. And first of all, I'd like to ask you some questions about the search of Greg Nicholson's residence back in March 1993; okay?
A. Okay.
Q. You've described for the jury what led you to Greg Nicholson's residence was information that you obtained from law enforcement sources in Minnesota and then by way of David Patrick; is that right?
A. That's correct.
Q. And when you got to the Greg Nicholson residence, you executed a search warrant; am I right?
A. That's correct.
Q. And could you tell the ladies and gentlemen of the jury

what you mean by executing a search warrant, what that process involves?
A. By physically going into the house and searching it room by room.
Q. Do you customarily when you get to a person's residence knock on the door, inform them that you have a search warrant?
A. Most of the time.
Q. And then you ask them to be allowed entry into the house so that you can then search the house.
A. Most of the time, that's correct.
Q. And you've told the jury this morning that when you got to the residence of the Nicholson place in March of 1993 that Mr. Nicholson and his wife Leslie were there?
A. That's correct.
Q. As you went about the search of the house, you've told us that you located a large quantity of marijuana; right?

A. That's correct.

Q. And you also found some methamphetamine in the house not only in the living quarters of the house but downstairs in the basement?

A. That's correct.

Q. Now, the methamphetamine that you found in the living quarters, you found methamphetamine in the basement of the house -- I'm sorry, the bedroom of the house.

A. That's correct, the personal use kit.

♀

Q. And this would be the master bedroom so-called where Greg Nicholson and his wife would have slept?

A. Yes, sir.

Q. Was it also in that bedroom, Sergeant, that you found a firearm?

A. Yes, sir, it was.

Q. And this would be a handgun that you found?

A. Yes, sir, it was.

Q. You found a large amount of cash that you've already described for us.

A. Could you repeat that, please?

Q. Excuse me?

A. Could you repeat that, please?

Q. You found a large amount of cash?

A. Yes, sir, downstairs.

Q. Now, based on what you found during the search of Greg Nicholson's house, you persuaded him to cooperate in the investigation.

A. Yes, sir, we did.

Q. And it was through his cooperation that you were eventually

led to Mr. Honken.
A. That's correct.
Q. Now, did you also ask Mr. Nicholson about Terry DeGeus during the time that you were attempting to persuade him to cooperate in your investigation?

♀

A. Yes, sir, we did.
Q. So you had some information about Terry DeGeus, and you thought that Mr. Nicholson might be a link to Terry DeGeus?
A. I don't know if we thought he was a link; he'd maybe have information about Terry DeGeus.
Q. Okay. Meaning Terry DeGeus's drug-dealing activities.
A. That's correct.
Q. And as I recall from your testimony based on what Mr. Nicholson told you, not only did you arrest Mr. Honken but you eventually got a search warrant for Terry DeGeus's house.
A. That's correct.
Q. Now, I'd like to ask you some questions, first of all, about the cooperation that you were able to obtain from Greg Nicholson. You searched his house, and was it during the time that you were searching the house that you persuaded him to help in your investigation?
A. Yes, sir.
Q. Okay. And then I understand from your investigation and from some of the reports that you prepared that Mr. Nicholson actually entered into what's called a cooperation agreement with the state?
A. Yes, sir, he did.
Q. And for the benefit of the jury, a cooperation agreement would be like a contract between the state prosecuting

authorities and Mr. Nicholson about how his case was going to be

handled.

A. That's correct.

Q. And it's your recollection, Sergeant, that the cooperation agreement with Greg Nicholson called for him to be charged in state court?

A. That's correct.

Q. Rather than in federal court.

A. That's correct.

Q. And the cooperation agreement also provided that he would be given certain charging concessions or breaks?

A. That's correct.

Q. In other words, even though there was a handgun found in his house during the search of his house, he was not going to be charged with any gun-related enhancement in any drug charges that he faced in state court.

A. That's correct.

Q. And it's your understanding of state law that a gun enhancement could ratchet up or increase the potential sentence that a person could face in state court.

A. Yes, sir, that's correct.

Q. And in addition to this cooperation agreement, Sergeant, it provided that no criminal charges would be brought against his wife Leslie.

A. That's also correct.

Q. Now, let's ask to have you just clarify a little bit about

after the search of Mr. Nicholson's house and after he agreed to cooperate in your investigation, gave you information about Mr. Honken, he agreed to wear a wire or a body -- a microphone and transmitter. We've heard the tape recording of the encounter that Mr. Nicholson had with Mr. Honken, and then that led, as Mr. Honken left Greg Nicholson's house on March 21, to Mr. Honken being arrested; right?

A. That's correct.

Q. Okay. Now, I would like to ask you just a couple of questions about the transcript and the tape recording that we heard this morning in court; okay?

A. All right.

Q. Now, specifically there were a couple instances in the transcript -- and I'll be glad to show it to you again if you need to remember -- where the subject of Terry came up, and we've I think already clarified that that was references to Terry DeGeus; correct?

A. Yes, sir.

Q. Now, did you ask Mr. Nicholson when he met with Mr. Honken on March 21 to clarify with Mr. Honken that the Terry referred to Terry DeGeus, or did you already know about Terry DeGeus?

A. My best recollection would be that we asked him to discuss Terry and Terry's last name.

Q. And the reason being is that you wanted to be sure that the Terry that Mr. Nicholson was referring to was the Terry DeGeus

92

that was already a subject of your investigation?

A. That's correct.

Q. Okay. And in the transcript specifically on page 2 of Government's Exhibit Number 21, there's a reference to

Mr. Nicholson saying, I better be careful. See, I don't have -- I don't have the stash here. I get -- got it hid next door so in case something happens here, that Terry guy. Was Mr. Nicholson apprehensive about that Terry guy?

MR. WILLIAMS: Objection, Your Honor. Asks for him to speculate. Sorry. Objection, Your Honor. Asking the witness to speculate.

THE COURT: Sustained.

BY MR. SPIES:

Q. But the Terry guy referred to on page 2 of the transcript refers to Terry DeGeus.

A. Yes, sir.

Q. And similarly, on page 8 of Government's Exhibit 21 about midway through, there's again a reference to Mr. Nicholson saying, I don't want it in my house, like I said, 'cuz I just didn't know about that Terry guy if he's going to come down on me or. Again, would that Terry be the reference to Terry DeGeus?

A. Yes, sir, it would be.

Q. Now, let me ask you just a couple of questions about what happened shortly after the transcript reveals that Mr. Honken

♀

left the house. You've told the ladies and gentlemen of the jury that Mr. Honken left the house, he got into a car. In the car was Mr. Cutkomp?

A. Did you say with Mr. Cutkomp?

Q. Yes.

A. Yes, sir, he did.

Q. All right. And then Mr. Honken was arrested, and tell us just briefly how that arrest took place.

A.    There was task force officers waiting at the end of the alley when they approached Ninth Street.  When they approached Ninth Street, the task force officers approached the car and ordered them out of the car.
Q.    Were you the officer that actually made the arrest of Mr. Honken on March 21, 1993?
A.    No, sir, I was not.
Q.    Okay.  Did you observe it?
A.    As I was coming up the alley.
Q.    Excuse me?
A.    As I was coming up the alley.
Q.    To your observation, did Mr. Honken offer any resistance to the arrest?
A.    No, sir, he did not.
Q.    Now, let's shift gears to just a couple of days down the line where you obtained a search warrant for the search of the Terry DeGeus residence, and you went to a state court judge with

♀

94

an application for a search warrant, presented that to the judge, and the judge issued a search warrant to you?
A.    Yes, sir, he did.
Q.    And where was Mr. DeGeus living when you obtained the search warrant?
A.    Rural Britt, Iowa.
Q.    And rural Britt, Iowa, would be about how far from where Mr. Nicholson lived?
A.    I'd say approximately 40 minutes to the west.
Q.    Okay.  And when you went to the DeGeus house, you told us how you ordinarily execute a search warrant.  Did you actually go to the door, knock on the door, inform the occupants of the

house that you had a search warrant?
A. Yes, sir, we did.
Q. And were you the one that actually went up to the door, knocked on it, told Mr. DeGeus that you had a search warrant?
A. I don't recall, but I believe I was one of them.
Q. All right. And what happened when you went to execute the warrant at Mr. DeGeus's house?
A. We demanded entry into the house, but we could not make entry into the house, and we backed off.
Q. You mean the door was actually blocked?
A. I don't know if it was blocked or -- there was something, a lock or something that wouldn't give, and we couldn't get into the house.

95

Q. And was there anything preventing you from just bashing through the door and going in and doing the search?
A. We attempted to do that.
Q. And you couldn't get through?
A. No, sir.
Q. Okay. Were you concerned about your safety in going through the door?
A. Yes, sir. We always are.
Q. And why was that?
A. You never know -- when you're doing a drug search warrant, you never know what's going to be on the other side.
Q. Were you, in fact, concerned about whether Mr. DeGeus had any firearms inside the house?
A. Yes, sir. We always are.
Q. And what was that based on?
A. Information that we had received.

Q. Namely what?

A. That he could possibly have firearms and could possibly shoot at law enforcement.

Q. All right. So you stood back and finally were able to persuade Mr. DeGeus to allow you into the house?

A. Yes, sir, we were.

Q. And during the search of the house, did you locate any substantial quantities of drugs?

A. No, sir, we did not.

♀

96

Q. Did you find any money?

A. No, sir, we did not.

Q. Did you find any scales?

A. I believe we did.

Q. And a scale would be used for weighing drugs in the drug trade?

A. Yes, sir.

Q. And did you find packaging materials, things that would be used to package up drugs for sale?

A. Yes, sir, we did.

Q. You talked about I think a burning smell that you observed when you came in the house. Were you able to locate the source of that burning smell?

A. Yes, sir, I believe I did, on the second floor of the house kind of towards the middle of the house in a room.

Q. Could you tell what had been burned?

A. Well, it -- there wasn't enough of it left, but it appeared to be paper, not like a newspaper paper, like paper like this or something that you would write on.

Q. And I think you also during the search found some shredded

documents.
A. Yes, sir, we did.
Q. And you did find some firearms, didn't you?
A. Yes, sir, we did.
Q. And were these long guns such as shotguns or handguns or

rifles? What did you find?
A. My best recollection is that they were both long guns.
Q. You referred to another occupant of the house. That was Aaron Ryerson who was found in the house?
A. Yes, sir.
Q. And again where was he found?
A. Hiding in the attic.
Q. Was Mr. DeGeus placed under arrest?
A. Yes, sir, he was, as soon as he came outside.
Q. And was Mr. Ryerson placed under arrest?
A. No, sir, I don't believe he was.

MR. SPIES: Thank you. Those are all the questions I have for you this morning.

THE COURT: Mr. Williams, any redirect?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Thank you. You may step down.

THE WITNESS: Thank you.

THE COURT: Members of the jury, why don't you take a stretch break.

And is the government ready to call its next witness?

MR. WILLIAMS: United States calls Dave Mizell.

DAVID MIZELL, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. Make yourself comfortable in the witness box. Try and adjust the chair and

the microphone so you can -- and scoot the chair up a little

bit. Thank you. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: David Mizell, M-i-z-e-l-l.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Mizell, could you explain to the jury what do you do for a living, sir

A. I am the -- I am employed by the Drug Enforcement Administration, and I am a resident agent in charge of the Maryville, Indiana, office.

Q. Where is that located at? You say Maryville, Indiana. Can you give another geographical reference the jury might be familiar with?

A. I am just outside of Chicago, Illinois.

Q. And when you say you're a resident agent in charge of a DEA office, can you explain what that means?

A. I am in charge of three groups. I have two group -- three group supervisors underneath me, and we investigate drug crimes in the Maryville area of responsibility.

Q. So you're in kind of a management position within the DEA?

A. Yes, sir.

Q. And how many agents do you have beneath you in your

operation?

A. I have 12 special agents and about 38 task force officers and 4 intelligence people.
Q. How long have you been a member of the Drug Enforcement Administration, the DEA?
A. Approximately 13 years.
Q. And at some point in your career, sir, did you work in Iowa?
A. Yes, I did.
Q. Can you relate to the jury what your history was of being employed in Iowa?
A. I joined the DEA in 1991, and after the academy, I was assigned to the Cedar Rapids -- posted duty in Cedar Rapids, Iowa, and I worked there until May of 2000.
Q. And in May of 2000 is when you received your promotion and went to the Indiana office?
A. Yes.
Q. Let's talk a little bit about the -- you say the Cedar Rapids office. What area? What geographic region does the Cedar Rapids office cover?
A. Basically covers the eastern half of Iowa running from the Minnesota border to Missouri and across to Illinois.
Q. And would that include the area of Mason City, Iowa?
A. Yes.
Q. Over the course of your employment with the DEA, could you

relate to the jury the type and nature of training you received in the area of narcotics enforcement, in particular in the area of methamphetamine?
A. Well, at the academy we learned about the different techniques in drug trafficking, methods, operations. Also I

received specialized training in the dismantlement and entry of clandestine laboratories, methamphetamine.

Q. And as part of that, were you taught how methamphetamine labs are set up, what chemicals are used, what equipment is used in those labs?

A. Yes.

Q. And then over the course of your work while you were with the DEA office in Cedar Rapids, Iowa, did you have an opportunity to conduct searches and seizures of methamphetamine labs?

A. Yes.

Q. How many times did you do that roughly if you have any idea?

A. During the entirety of my stay there would probably be about 10 to 15.

Q. And so through the course of your education with the DEA and training with DEA and the course of actual seizure of labs, you learned a little bit about how they operate and so forth. When you seized labs on occasion, I assume you arrested people as well?

♀

101

A. Yes.

Q. And in the federal system, are there motivations built into the system for people to cooperate?

A. Yes.

Q. And as a result of that, did you have an opportunity to talk with people involved in the meth trade and learn from them how it operates through their cooperation?

A. Yes.

Q. And did that happen multiple times during your career?

A. Yes, sir.

Q. And so as a result of your training and practical experience, sir, did you become familiar back in 1993 with the way that methamphetamine was trafficked in Iowa?

A. Yes.

Q. And did you become familiar with how it was manufactured, where it was manufactured and distributed in Iowa?

A. Yes.

Q. So let's talk a little bit about that. Methamphetamine -- the jury probably hears about it in the news a little bit -- are there a couple different sources for methamphetamine in Iowa?

A. Yes.

Q. And some of it come from outside and some from inside the state?

A. Yes, sir.

Q. Why don't you explain that to the jury, please.

♀

A. There are different organizations responsible for bringing methamphetamine to Iowa, some of our Hispanic organizations operating on the west coast where the man -- methamphetamine is manufactured and brought in, some as far as Washington state brought in that way, and some in Arizona.

Q. And when it's brought into Iowa, then it's further distributed at that point?

A. Yes.

Q. Now, we hear about clandestine labs in Iowa. Can you explain what they are?

A. Generally it's been my experience they're usually what we describe as mom-and-pop labs where somebody would gather the equipment and necessary chemicals to manufacture small amounts

of methamphetamine for their own use or for the use of a group of people they're associated with.

Q. And over your experience and training, are you familiar with different levels of sophistication in the meth labs that have been set up, some down in the southwest United States versus some of the ones set up in Iowa, the mom-and-pop type labs you talk about?

A. Yes.

Q. And is there a big variance in the degree of sophistication?

A. Oh, yes, there is.

Q. Can you explain that to the jury, please?

♀

A. Well, what we call super labs are more extensive labs that require larger equipment, glassware which is harder to obtain, more extensive knowledge in chemistry and the chemical process.

Q. Let's look at it from the standpoint of amount of production. A super lab, if you went through the process in manufacture, what's the typical amount of finished product that could be done in a single batch in a super lab, for example?

A. Pound quantities up to ten pounds.

Q. And versus the clandestine mom-and-pop type lab that you run into in Iowa, what's the typical batch there?

A. Ounces or less.

Q. Now, once the drug is manufactured, it's distributed through some type of structure. Can you explain that structure to the jury, please?

A. Generally if it's an organization, they'll employ people to transport the drugs from one area of the country, usually the west coast, to parts of Iowa or maybe bigger cities where it

could be then retransported to other areas of the country.
Q. And once it gets into, say, Iowa for distribution and comes to maybe a single dealer there, what happens to the methamphetamine at that point?
A. It's generally dropped off at a -- to a distributor in that area who's going to distribute it to his customers in that area.
Q. In the drug trade, is there some type of loaning, if you will, that takes place with the drugs when they're distributed?

♀

A. Occasionally, yes.
Q. And what -- is there a term used in the drug trade for that loaning?
A. It's fronting.
Q. Fronting drugs?
A. Yes.
Q. Can you explain how that works to the jury, please?
A. Well, because often these drugs cost a lot of money, dealers will give the money (sic) on consignment. I'll give you a certain amount of methamphetamine. In return you'll pay me back in a set amount of time for that methamphetamine.
Q. And why do they need that lead time?
A. So they can get enough assets together to actually purchase, make the purchase.
Q. And how do they get the assets together? By doing what with the methamphetamine?
A. Generally they're going to distribute it in smaller quantities to various different people, and sometimes they can -- they have to front it out because those persons don't have the required assets that they need, and they'll bring it back to them.

Q. What is the typical -- once the drugs are sold and payment is made up the chain of distribution, what is the form of payment usually that takes place?
A. Cash.

♀

Q. Don't write checks for drugs?
A. No, sir.
Q. In Iowa in 1993, what was the typical quantity distribution? And let's take it at the various levels of the chain. So if we have somebody bringing in large quantities of methamphetamine to a main dealer in Iowa before it gets broken out and distributed from there, what kind of quantities were we seeing in 1993 coming into the state?
A. About pound quantities.
Q. And then if you go down ultimately to the street level, to the street dealer selling to somebody who's the ultimate user of the drug, at what level was it being distributed back in 1993?
A. Gram to multi-gram quantities.
Q. And just for the jury to have an idea, back in 1993, a pound of methamphetamine was going for approximately how much?
A. Anywhere between five to eight thousand dollars or nine thousand dollars.
Q. And then at the street level, what was a gram being sold for?
A. Generally about a hundred dollars a gram.
Q. Now, let's talk a little bit about the manufacturing process. You indicated to the jury already in manufacturing methamphetamine there's various levels of sophistication. What are some of the types of chemicals that are necessary to manufacture methamphetamine?

A. Toluene, hydrochloric acid, methylamine.
Q. We hear in the newspapers and on TV and stuff about people getting pseudoephedrine tablets and so forth and punching those out. Can you explain how that's used in the manufacturing process?
A. Well, ephedrine, which is an ingredient in pseudoephedrine, is used to -- is converted into methamphetamine. So they would have to usually grind the tablets down and go through a process where they remove the binding ingredient in those pills so that they can have just pure ephedrine which they then can convert into methamphetamine.
Q. Now, this process of going out and buying or stealing the pseudoephedrine pills and so forth, is that the type of process used in these super labs, or is that the type of process used in the mom-and-pop labs?
A. To actually go out and buy the pills generally is the mom-and-pop labs. The super labs will obtain ephedrine directly from chemical sources.
Q. And then use that pure ephedrine in the manufacturing process?
A. Yes.
Q. Now, these super labs, are there special type of equipment, tubing, that type of stuff used in that process?
A. There is special glassware, usually bigger triple-neck flask or heating elements, tubing, such as that.

107

Q. And that's the type of stuff you don't see in the

mom-and-pop type operations?

A. Generally not.

Q. When methamphetamine is ultimately manufactured in one of these labs, how is it typically packaged for further distribution down the chain?

A. Usually it's placed into plastic Ziplock baggies. The bigger kind are wrapped in cellophane and packaged in pound quantities so it can be transported easier.

Q. In this case methamphetamine was found in jars, laboratory jars. First of all, you're familiar with this investigation, sir?

A. Yes.

Q. Other than this investigation and your experience with the DEA, have you come across the use of those type of jars in other distribution networks?

A. No, I have not.

Q. Let's talk just a minute about the purity level of methamphetamine. When methamphetamine is manufactured at these super labs, what type of purity do you typically see coming out of these super labs?

A. 90 to 99 percent pure. Some have a hundred percent purity.

Q. And how does that compare with some of the clan labs in Iowa?

A. The super labs would have a much higher purity than some of

108

the mom-and-pop labs.

Q. And then is there anything done in the distribution chain that dilutes the purity of the drugs as it goes down the chain of distribution?

A. Yes.

Q. And could you explain that to the jury, please?
A. Very often as the drugs are passed from one distributor to another, it's cut or diluted in a manner so -- the person is trying to make money, and he wants to enlarge the quantity. And if it becomes -- as it's pure, people don't use -- normally use 95 percent pure drugs, so they will dilute it and distribute it out to people.
Q. And so by the time it hits the streets, what's the typical purity level you're seeing at the end user?
A. I've seen anywhere between 2 percent to 17 percent.
Q. Now, I want to direct your attention back to the spring of 1993 and ask you if at that point in your capacity -- at that point you were a special agent with the Drug Enforcement Administration?
A. Yes, sir.
Q. Working out of Cedar Rapids?
A. Yes, sir.
Q. Did you become involved in the prosecution, investigation of Dustin Honken and his role in distributing methamphetamine?
A. Yes, I did.

♀

Q. Can you relate to the jury, at what point of the -- what stage of the investigation did you become involved, sir?
A. After the arrest of Gregory Nicholson.
Q. And what was your role? Why did you get involved?
A. I was contacted by authorities in Mason City and requested that we consider assisting them in bringing federal charges against a suspected source of supply for methamphetamine.
Q. And who was that source of supply?
A. Dustin Honken.

Q. And so did you actually then become involved in that investigation?
A. Yes.
Q. Did that result in federal charges against Dustin Honken?
A. Yes, it did.
Q. Directing your attention to March 23 of 1993, was a criminal complaint filed against the defendant charging him with distribution of controlled substances, methamphetamine in particular?
A. Yes.
Q. Now, why don't you explain if you could -- I used the term criminal complaint. What is a criminal complaint, sir?
A. It's a charging document that's filed with an affidavit alleging a crime. Then that charging document is filed in the district court which allows for a person to be kind of entered into the court system proceedings.

♀

110

Q. How's that differ from an indictment?
A. An indictment, generally you appear before a grand jury. You set out facts, circumstances concerning an investigation, and the grand jury would return an indictment or a true bill alleging a crime.
Q. Can you continue into court with just a criminal complaint pending against somebody?
A. No, generally not. You have to have an indictment, or there has to be some sort of agreement between the defense and the prosecutor, maybe filing an information as opposed to an indictment.
Q. So a charging -- a criminal complaint in the federal system is kind of like a temporary charging document that is only good

for a while until you indict the person?
A. Yes.
Q. All right. In the sense that it is an allegation of crime, it isn't different from an indictment which is also an allegation of the crime. Is that fair to say?
A. That's correct.
Q. All right. So at the time that the criminal complaint was filed against Dustin Honken on March 23 of 1993, where was he at at that point physically?
A. He was in the custody of the Cerro Gordo County Sheriff.
Q. And once the criminal -- the federal criminal complaint was filed against him, what happened with him physically then?

111

A. He was taken into federal custody, and he was transported to Cedar Rapids, Iowa, where he appeared before a judge.
Q. And who placed him in federal custody?
A. I did.
Q. The person that you placed in federal custody back in March of 1993, do you see him in the courtroom here today, sir?
A. Yes, I do.
Q. And can you describe for the jury where he's sitting and what he's wearing?
A. He's seated at the defense table. And he's wearing a cream-colored shirt.
Q. When you transported him back -- or down to Cedar Rapids, Iowa, you say he made an appearance before a judge there. I want to direct your attention to a hearing that took place on -- in March of 1993. Was there a hearing that ultimately resulted in the release of Dustin Honken pending trial?
A. Yes.

Q. I'm going to show you what's been already admitted into evidence as Government's Exhibit 31. Do you recognize that document, sir?
A. Yes, sir.
Q. And what is that?
A. That's an order setting the conditions of release which was filed on March 26, 1993.
Q. And that is for -- what's the name of the defendant?

♀

112

A. Mr. Dustin Honken.
Q. And so this is the formal document that's issued by the court releasing the defendant pending trial on his drug charges?
A. Yes.
Q. Now, on these orders setting conditions of release, by the very title of it, there are conditions placed on defendant's release?
A. Yes.
Q. Does that differ from case to case?
A. The conditions?
Q. The conditions.
A. Oh, yes.
Q. In this case were conditions placed on the defendant on what he -- who he could contact or have contact with while he was on pretrial release?
A. There was conditions setting forth who he should not contact.
Q. And does that appear at page 2 of Exhibit 31?
A. Yes.
Q. I'm going to direct your attention to the middle of that page. Do you see the entry right here?

A.    Yes.
Q.    Could you read that for the jury, please?
A.    Avoid all contact with the following named persons who are considered either alleged victims or potential witnesses:  Dave

Patrick, Greg Nicholson, Terry DeGeus, Russell Miller, Tim Cutkomp.
Q.    And was there an opportunity for the defendant to sign off on this document to acknowledge he'd been advised of that and advised of the conditions of his release?
A.    Yes.
Q.    And was that signed by the defendant?
A.    Yes.
Q.    And then the document as you indicated was entered on March 26 of 1993?
A.    Yes.
Q.    Now, as part of your involvement in this investigation, did you learn about whether Tim Cutkomp was also arrested as part of the arrest of the defendant in this case?
A.    Yes.
Q.    Was he arrested on state charges or federal charges?
A.    State charges.
Q.    And what happened with those charges against Mr. Cutkomp?
A.    They were dismissed.
Q.    Were any federal charges filed against Mr. Cutkomp as a result of his presence in the car during the arrest of the defendant in March of 1993?
A.    No.
Q.    Now, we talked a little bit before about the criminal complaint and ultimately an indictment.  Was an indictment

returned against the defendant in this case after the criminal complaint was filed?
A. Yes.
Q. Showing you what's been admitted into evidence already as Exhibit 30, can you identify that document for the jury, please.
A. That is the indictment that was filed April 20, 1993.
Q. There's a signature line for an assistant United States attorney; is that correct?
A. Yes.
Q. And just so we walk the jury through this a little bit here, is it fair to say that this section of the document contains what the actual allegation of the crime was that was committed?
A. Yes.
Q. And this is a one-page indictment in this case?
A. Yes.
Q. Down here there's a reference to a true bill. Could you just explain what that means?
A. That's the grand jury found that probable cause existed to file the indictment.
Q. And so what was the charge filed against the defendant in this indictment?
A. It's a conspiracy count. It alleged that the defendant engaged in a conspiracy to distribute a thousand grams or more of a mixture or substance containing methamphetamine and/or

♀

distribution of a hundred grams or more of pure methamphetamine.
Q. Can you explain to the jury why is it charged a mixture and

substance and then also pure methamphetamine?
A. That was based upon sentencing considerations. As you move through the process when you're -- if the defendant is ever found guilty, during the sentencing phase, it could affect how long a sentence the defendant could receive.
Q. And so those are contained in the federal sentencing guidelines at that time?
A. Yes.
Q. And the guidelines, it affects the sentence of a defendant ultimately on the quantity of controlled substance that was involved in a crime?
A. Yes.
Q. And so that's why that's alleged in the actual indictment then.
A. Yes.
Q. Based on your familiarity -- and I assume you were familiar with what penalties were imposed for various violations of federal narcotics law as part of your business?
A. Yes.
Q. As part of your familiarity with that, based on these charges in 1993, was the defendant facing any statutory mandatory minimum years in prison?
A. Yes.

116

Q. And how many years was that?
A. Ten years.
Q. And was there a maximum statutory possible penalty for this violation?
A. Yes.
Q. And what was that?

A. Life.

Q. Now, there's a statute -- statutory penalty that at the very minimum he was going to have to go to prison for ten years if convicted of this crime.

A. Correct.

Q. And was there in 1993 parole in the federal system?

A. No, there was not.

Q. So that would effectively be ten years in prison.

A. Yes.

Q. Okay. And then the statutory possible maximum penalty was life imprisonment.

A. Yes.

Q. Now, how is the guidelines -- the federal guidelines we just got done talking about, how did those interplay, if you will, with the statutory possible penalties?

A. There are calculations made on how long a person could eventually serve in prison based on quantity, role in the offense, other factors that may either enhance the sentence or be mitigating circumstances towards the sentence. So a range

117

would be formulated. A person could serve between 120 months in prison to 365 months, and that's where you present that to the judge who would make a decision.

Q. Okay. And so ultimately the defendant would have known at the time he was indicted that he was facing at least ten years in prison, could be up to life, and the actual sentence would have to be dictated ultimately by the judge after looking at the guidelines and making rulings.

A. Correct.

Q. Now, as part of your investigation in this case, did you

look into the drug operation as it existed down in Arizona that the defendant was involved in?
A. Yes.
Q. And did you learn that his brother, Jeff Honken, was somehow involved in this operation?
A. At that time the name Jeff Honken appeared on some documents. We believed he could be involved, but we weren't actually sure if it was just an alias used by Dustin Honken when acquiring the equipment.
Q. So back in 1993, were any charges filed against Jeff Honken in the case?
A. No, sir.
Q. Same thing -- we covered Mr. Cutkomp. Did you believe Mr. Cutkomp had some involvement in the defendant's operation?
A. Yes, I did.

118

Q. And were you able in 1993 to acquire sufficient evidence to justify charges against him at that time?
A. No.
Q. As this case then progressed after the defendant was indicted, did you learn that there was plea discussions or negotiations between the United States Attorney's Office, Pat Reinert who was the prosecutor in this case at that time, and the defendant concerning a possible plea in the case?
A. Yes.
Q. And was there notification by the defense counsel at some point that the defendant intended to plead guilty?
A. Yes.
Q. Approximately when did that take place if you recall?
A. Around July 22 there was a notice filed that the defendant

would appear in court on July 30 to enter a guilty plea.

Q. And so there was a hearing set for July 30, 1993, for the defendant to plead guilty?

A. Yes.

Q. Did that plea go through?

A. No.

Q. Now, were you present that day when the -- when he was supposed to plead guilty on July 30, 1993?

A. I don't believe I was present that date.

Q. At some point after July 30, 1993, did you come to learn that Greg Nicholson was missing?

♀

119

A. Yes.

Q. Describe for the jury -- in relation to this investigation and your case against the defendant, Dustin Honken, how significant was Greg Nicholson to the successful prosecution of Dustin Honken at that time?

MR. SPIES: Your Honor, I'm going to object to that question as calling for a matter that's not properly the subject of opinion testimony.

THE COURT: Overruled. You may answer.

A. I believed he was a significant witness and his testimony would be required in order to prosecute Mr. Honken.

Q. Was Mr. Nicholson's charges pursued in state court against him for his involvement in selling methamphetamine against the defendant -- with the defendant?

A. Yes.

Q. And as a result of those state proceedings, did Mr. Nicholson have various hearings he had to attend?

A. Yes.

Q. Was there any hearing scheduled for him to attend on July 26 of 1993?

A. Yes.

Q. What hearing was that?

A. I believe that was an arraignment based on a trial information that was filed on July 9.

Q. And did Mr. Nicholson show up for that hearing?

♀

A. No, he did not.

Q. What happened at that point?

A. A warrant was issued for his arrest through the Cerro Gordo County Sheriff's Office.

Q. Now, over the course of your involvement in narcotics investigations in Iowa, do you have contact with the state system to the point that you understand and have familiarity with how that operates as well?

A. I'm familiar with it, yes.

Q. And had you had other occasions when state-charged defendants were processed through the state court system?

A. Yes.

Q. Okay. And based on that familiarity that you have with the system, was it common or uncommon for defendants in state court to miss arraignments?

A. It wasn't -- I wouldn't say it was common, but it had happened in the past.

Q. And when it happened in the past, what's the process that follows naturally from that?

A. Generally they either forget or there's some sort of scheduling conflict and a person would just go get them, tell them, Hey, you forgot to appear in court or you missed your

court appearance and now you're going to sit in jail until you can appear before the judge.
Q. And in this case ultimately a warrant was issued for the

defendant's arrest?
A. Yes.
Q. Now, was that in state court to begin with?
A. Yes.
Q. At some point did you learn that Greg Nicholson had disappeared?
A. Yes.
Q. And approximately when did you find out on behalf of the federal government of Greg Nicholson's disappearance?
A. On or about August 2.
Q. Once you learned that Greg Nicholson had disappeared, what did you do?
A. I took steps to obtain a material witness warrant through the U.S. District Court so that he could be -- in case he had left Iowa and he was found in a different state, he could be transferred back to Iowa more expeditiously.
Q. Wasn't there already an arrest warrant for him issued by the state court?
A. Yes, there was.
Q. So why did you need a material witness warrant for him?
A. Again, if he was arrested outside of the state of Iowa, it could have taken a longer process to get him back, and I wanted to get him back sooner and in our custody so that he could appear for any trial proceedings.
Q. I'm going to show you what's been admitted into evidence as

Government's Exhibit 29. And first of all, can you identify that for us, please?

A. That is a bench warrant that was issued the 28th day of July, 1993, through Cerro Gordo County.

Q. And this was the state arrest warrant that we just talked about.

A. Yes, sir.

Q. And this is for his failure to appear on his arraignment on July 26 of 1993?

A. Yes.

Q. Once you learned that Mr. Nicholson was missing and you obtained the material witness warrant as well so you could cover outside the state of Iowa, did you undertake any efforts to try to locate Mr. Nicholson?

A. I travelled to Mason City. I spoke with Detective Stearns at the time. We tried to ascertain any possible locations where he might be. We looked through phone records, took some steps. Eventually the warrant was turned over to United States Marshal's Service so they could pursue Mr. Nicholson.

Q. At that point by issuing the warrant and taking these steps, did you believe Mr. Nicholson to be alive?

A. I had no information where he was not deceased, so I thought he might have just fled.

Q. In your experience, have you had other cooperating defendants who decide not to follow through with their

♀

123

cooperation and flee instead?

A. At that time?

Q. Yes, sir.
A. No, I did not, but I -- through other agents I had heard of that happening, yes.
Q. And so did you continue to try to look for Greg Nicholson for a period of time?
A. Yes.
Q. Did you ever have any success in locating him?
A. No, I did not.
Q. Did you know where he was even living at the time of his disappearance in July of 1993?
A. No, I did not learn that until afterward.
Q. Now, as a result of Mr. Nicholson disappearing, what's happening with the defendant's state -- I'm sorry, federal charges? He didn't go through with the plea on July 30, 1993, in federal court. So what's going on with his federal charges now?
A. Well, a trial would have been set. However, the U.S. Attorney's Office took steps to delay the trial so that we could attempt to locate Mr. Nicholson.
Q. In addition to the attempts to locate Mr. Nicholson, did you continue to investigate the drug case against the defendant?
A. Yes.
Q. And pursuant to that further investigation, did you -- were

124

additional witnesses called to appear before the grand jury and provide testimony?
A. Yes.
Q. I want to direct your attention to October 27 of 1993. Was Angela Johnson subpoenaed to testify before the federal grand jury at that time?

A. Yes.

Q. And when she was questioned in the grand jury, was she questioned about the drug connection between the defendant and Mr. DeGeus?

MR. SPIES: Your Honor, I'm going to object on hearsay grounds.

THE COURT: Sustained.

MR. WILLIAMS: It's not being introduced for the truth of the matter asserted, Your Honor; just was she questioned about the connection.

THE COURT: Okay. You may answer.

A. She was questioned, yes.

Q. About the connection, drug connection, between Greg Nichol -- I'm sorry, Terry DeGeus and the defendant, Dustin Honken.

A. Yes.

Q. At some point did you learn that Terry DeGeus disappeared as well?

A. Yes.

♀

125

Q. When did you find out?

A. December 8, 1993.

Q. And how did you first find out that Terry DeGeus was missing?

A. I contacted a Chief Doug Book of the Forest City Police Department and inquired about the status of Mr. DeGeus, and at that time I was told that he was missing also.

Q. Why were you interested in Mr. DeGeus at this point in time?

A. I considered him a -- either a witness or a defendant in

this case and that I wanted to talk to him and see if I could elicit his cooperation.

Q. And once you learned that Mr. DeGeus was missing as well, what happened at this stage now with the investigation?

A. It slowed, almost stopped.

Q. Did you have any further leads at that point that you were able to pursue?

A. Not at that time. We continued to try to subpoena different chemical companies to see if we could build a case for manufacturing, but we had pretty much all the documents that we could obtain.

THE COURT: Mr. Williams, speaking of stopping, that's a good segue. It's noon.

MR. WILLIAMS: Very good.

THE COURT: Do you have any problem if we take our

126

noon recess at this time?

MR. WILLIAMS: Not at all, Your Honor.

THE COURT: Members of the jury, it's noon. We'll be in recess until 12:45. You'll have lunch served to you in the jury room. Please remember my cautionary instruction about keeping an open mind until the end of the case and you have a chance to deliberate. Thank you.

(The jury exited the courtroom.)

THE COURT: Counsel, are there any matters we need to take up? Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: No, Your Honor.

THE COURT: Mr. Spies?

MR. SPIES: No, Your Honor.
THE COURT: Mr. Rogers.
MR. ROGERS: No, Your Honor.
THE COURT: Okay. Thank you.
(Lunch recess at 12:01 p.m.)
THE COURT: Ready to have the jurors brought in?
MR. WILLIAMS: Yes, Your Honor.
(The jury entered the courtroom.)
THE COURT: Please be seated. Members of the jury, I just wanted to remind you -- I did tell you I'd have a schedule for you today for the rest of the trial, and we'll have that for

127

you by the end of the day to pass out.
Mr. Williams, you're in your direct examination.
MR. WILLIAMS: Thank you, Your Honor.
BY MR. WILLIAMS:
Q. When we left off for lunch, Special Agent Mizell, we were just talking about that point in time in the investigation where you had learned that Mr. DeGeus had disappeared as well. And my question to you at this point is once Mr. DeGeus also disappeared, I think you were just about to say or maybe you had said but let's remind the jury, what happens to the investigation then at that point?
A. It stopped or slowed dramatically.
Q. And you had indicated there really wasn't anyplace else to go based on the investigation you had done at that point.
A. Correct.
Q. Ultimately what happened with the charges that arose from 1993 against the defendant, Dustin Honken?
A. They were dismissed.

Q. Showing you what's been admitted into evidence already as Exhibit 32, can you identify that for the jury, please.

A. It's an opinion and order issued by the district court judge dismissing the charges against Dustin Honken.

Q. And this was dated on March 21, 1995?

A. Yes, yes, sir.

Q. And so we can explain something on the last page of this

♀

exhibit, page 4 is the Court's conclusion. Do you see that?

A. Yes.

Q. The order indicates the defendant's motion to dismiss with prejudice is denied and the government's motion to dismiss pursuant to Rule 48(a), Federal Rules of Criminal Procedure, is granted. Do you understand the distinction there that the Court is making in its order?

A. Yes.

Q. Can you explain that to the jury, please?

A. If he granted the defendant's motion to dismiss with prejudice, we could never file charges against Mr. Honken pertaining to this violation.

Q. And as a result of granting the government's motion to dismiss pursuant to 48(a), what legal effect did that have?

A. We could continue the investigation and bring charges if we found more information or evidence against him.

MR. WILLIAMS: Thank you very much. I have no further questions, Your Honor.

THE COURT: Mr. Spies?

MR. SPIES: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SPIES:

Q. Good afternoon, Agent Mizell.

A. Good afternoon.

Q. I have just a very few questions for you this afternoon.

First of all, you described for the ladies and gentlemen of the jury this morning the expertise and information you have about methamphetamine trafficking in the United States and particularly back in the mid 1990s, and you referred to Hispanic organizations in the southwest United States. Do you remember that testimony?

A. Yes, sir.

Q. And that was just an illustration, wasn't it?

A. Yes.

Q. In other words, you have no information that Mr. Honken was connected with any Hispanic organizations in the southwest United States involved in trafficking methamphetamine.

A. Correct.

Q. All right. I just wanted to make sure that was clear.

You also used the expression super lab for the ladies and gentlemen of the jury. Super lab is just a nickname, isn't it?

A. Yes, sir.

Q. In other words, in your training and experience with the Drug Enforcement Administration, you don't use that expression in your reports. You don't use it in connection with court testimony, do you?

A. I would characterize it as a way to describe a lab, a lab setting. That's the best I could describe it as.

Q. All right.

A. It's not a technical term. It's more of a description.
Q. All right. Now, did you examine or inspect Mr. Honken's lab setup down in Arizona?
A. No, sir.
Q. Let me ask you some questions now about your testimony about the federal sentencing guidelines. You described for the ladies and gentlemen of the jury that the charges that Mr. Honken was facing back in 1993 involved accusations that under the federal criminal statutes of the United States could result in a mandatory minimum sentence of ten years; right?
A. Correct.
Q. And under the same federal criminal code could result in a maximum sentence of up to life imprisonment; correct?
A. Yes, sir.
Q. Now, it's also true under the federal sentencing guidelines that mandatory minimum sentences can actually not be minimum sentences if the prosecution with the blessing of the court asks that a person's sentence be below the mandatory minimum; right?
A. Yes, sir.
Q. So in other words, if a person cooperates in the investigation of other people and that cooperation is considered to be significant, the government can ask the judge to sentence a person below a mandatory minimum.
A. Yes, sir.
Q. You also described for us how the sentencing guidelines are

♀

131

a complicated cookbook or formula taking into account in drug cases drug quantity, role in the offense, number of participants, aggravating factors; right?

A. Yes, sir.

Q. And all of those ingredients in addition to a person's criminal record are mixed up together into this complicated formula to find out a sentencing range that a judge has to sentence a person in.

A. Correct.

Q. All right. And there are also all sorts of reductions from that sentencing range that might come into play?

A. Yes, sir.

Q. And included in possible reductions would be if the government asked the judge to sentence below that range based on a person's cooperation in the investigation or prosecution of other people.

A. Yes, sir.

Q. All right. You told us about the eventual dismissal of the criminal charge that was brought against Mr. Honken originally in 1993, and that dismissal was in 1995?

A. Yes, sir.

Q. And were you at the hearing on the motion to dismiss?

A. No, sir, I was not.

Q. All right. But you understand and you would tell this jury that the motion or the request to dismiss that charge was made

132

both by Mr. Honken's lawyer and by the government's lawyer?

A. Yes, sir.

Q. Okay. And the judge then made a determination based on the exhibit that you just described for us, Exhibit 32 I believe, that the dismissal would be based on the government's grounds and not on the grounds raised by Mr. Honken's lawyer.

A. Yes, sir.

Q. All right. You were involved in the arrest of Mr. Honken?
A. In 1993?
Q. No.
A. Yes. An additional arrest, yes.
Q. Yes. And during that arrest of Mr. Honken, was he cooperative with you and offer you any resistance?
A. He was very cooperative.
MR. SPIES: Thank you. Those are all the questions I have.
THE COURT: Mr. Williams, any redirect?
MR. WILLIAMS: No, Your Honor. Thank you.
THE COURT: Okay. You're excused. Thank you.
Ready to call your next witness?
MR. WILLIAMS: Yes, Your Honor. The United States calls Leslie Olson.

LESLIE OLSON, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated. Can you adjust the chair and scoot up a little bit and then -- so you can speak

♀

directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.
THE WITNESS: Leslie Olson, O-l-s-o-n.
THE COURT: Thank you.
Mr. Williams?
MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:
Q. Miss Olson, where are you from?
A. Clear Lake, Iowa.
Q. Did you grow up in that Clear Lake, Iowa, area?

A. No, Mason City.
Q. Okay. Could -- for those jurors who may not be familiar with that area, could you describe, is Clear Lake close to Mason City?
A. It's about seven miles away to the west.
Q. All right. So Clear Lake is to the west of Mason City.
A. Correct.
Q. And you're from that area pretty much all your life.
A. Mason City.
Q. Great. Where did you go to school at then?
A. Mason City.
Q. And how far did you go through school?
A. To my eleventh year, and then I got a GED and then my nursing.

♀

Q. And you're -- I'm sorry?
A. I'm a nursing assistant.
Q. And where did you go to school for that?
A. At NIACC.
Q. And that's -- what's NIACC stand for?
A. It's a community college in Mason City.
Q. North Iowa Area Community College?
A. Correct.
Q. And when did you get that degree?
A. In '82 I believe it was.
Q. Are you currently working in that field right now?
A. Yes, I am for the state of Iowa.
Q. And what do you do for the state of Iowa?
A. I do home care.
Q. Describe that for the jury if you would, please.

A. I take care of anybody that needs help in their home. Just I assist them in bathing and meals and anything they need taken care of in their homes.
Q. How long you been doing that?
A. About two and a half years.
Q. Do you have family, ma'am?
A. Yes, I do.
Q. And could you describe your family, please?
A. My entire family?
Q. Just do you have any children?

♀

135

A. I have one daughter.
Q. All right. And how old is she?
A. She'll be 16 in November.
Q. At some point in your personal life did you come to know somebody by the name of Greg Nicholson?
A. Yes, I did.
Q. Could you describe for the jury how did you come to know him?
A. I was introduced to him by a mutual friend. He played in a country-western band.
Q. And about when was this?
A. It was in the '80s I believe, in maybe '81 or '82, '83. I'm not quite sure.
Q. After you first met him, did you have continued contact with him from time to time after that?
A. No, not really until '90 -- around '90 I think, 1990.
Q. And what happened in 1990?
A. We started dating. He had a divorce, and we started seeing each other again.

Q. And at some point after you started dating him, did you get married?
A. In May of '92.
Q. You married Greg Nicholson.
A. Correct.
Q. And did you adopt his name for a while?

♀

A. Yes.
Q. Okay. And how long did you stay married?
A. Just a little over a year.
Q. Now, if you could describe for the jury at that point, first of all, did you and Mr. Nicholson have any children together?
A. No.
Q. You already had your child?
A. Correct.
Q. Did he have any children from a prior marriage?
A. He had two daughters.
Q. And did they stay with you from time to time?
A. Yes, we had visitation.
Q. Where did you live in 1992 into 1993 when you were married to Greg Nicholson?
A. At 920 North Filmore in Mason City.
Q. And was that an apartment, a house?
A. It was a house.
Q. And did you rent or own that house?
A. Greg was purchasing it.
Q. What was Greg doing for a living during this time period in 1992 when you first married him?
A. He was working at Curry's Manufacturing. It's a door and

window plant I believe.

Q. Located where?

A. In Mason City, Iowa.

Q. And did he continue to work at that location throughout your marriage?

A. No. He was fired from there. I can't quite remember when it was, but it was after we were married he was fired from there.

Q. Now, you had mentioned earlier in your testimony when you first met him he was playing in a country-western band.

A. That was what he was doing on the side. He was a musician, but he worked full time at Curry's.

Q. And did he continue to be a musician during the time period you were married to him?

A. Yes.

Q. Did you or Greg ever own a video camera?

A. No.

Q. In the early 1990s, were you aware whether Greg was using any controlled substances, any drugs?

A. I knew that he smoked pot and that he did methamphetamine here and there.

Q. And how did you know that?

A. I seen him do it.

Q. And during that time period, did you also use controlled substances?

A. I did on occasion.

Q. And what type of drugs did you use?

A. I used methamphetamine.
Q. In early 1990s when you were first married to Greg Nicholson, 1992, up until March of 1993, were you aware that Greg was involved in selling quantities of methamphetamine to other people?
A. No, I wasn't.
Q. At any point prior to March of 1993, did you meet somebody that you learned was Dustin Honken?
A. Yes, I did.
Q. Could you explain to the jury what were the circumstances where you met him?
A. I came home, and he was there at the house, and after he left, I asked who he was. I knew who he was there with, but I didn't know who he was. And Greg explained that he was a college kid from NIACC.
Q. From NIACC?
A. Right, community college.
Q. Okay. And do you recall approximately when that was you would have first met Dustin Honken?
A. I really can't give you a date. I'm not sure.
Q. And he was there visiting Greg.
A. Yes.
Q. After that first time, did you see any other visits by Dustin Honken to the house?
A. Yes, I did.

139

Q. How often would you see him?
A. I'm not quite sure because I worked nights. He could have been there more, but I seen him a few times. I know I answered

the door and he would go downstairs in the basement where Greg's band equipment was.

Q. Do you know what they were doing in the basement?

A. No. I was under the assumption it was something to do with the band equipment.

Q. Do you know somebody by the name of Scott Gahn?

A. Yes.

Q. And how do you know Scott Gahn?

A. I knew him as a kid through school and stuff. He was older than me, but I had a sister his age.

Q. Was there any friendship or acquaintanceship between Greg and Scott Gahn?

A. I think they knew each other because Scott followed different bands around our area.

Q. Was Scott involved at some point himself in the entertainment area at a night club or something like that?

A. I don't know if he ever did it professionally, but he would go on stage with different bands and play guitar and sing.

Q. So maybe through that connection they knew each other?

A. Right.

Q. I want to direct your attention now to March 17 of 1993. At that point you and Greg are still married.

♀

140

A. Correct.

Q. You're still living in the house in Mason City.

A. Correct.

Q. Is a search conducted of the house on that date?

A. Yes.

Q. Now, were you home when the police initially approached the house and started to conduct the search?

A. No, I was not. I was out birthday shopping for my sister.
Q. Did you come home at some point while it was still in progress?
A. Yes, I did.
Q. Did the police officers arrest you at that time?
A. I wasn't arrested, but I was held until they searched my vehicle and my purse and myself, and then they allowed me to take my daughter to my sister's house.
Q. When you arrived, was the search in progress at your house then?
A. Yes.
Q. And at some point after the search takes place, did you and Greg go down to the police station?
A. Yes, we were told we had to go to the police station within two hours.
Q. And did you guys go down together?
A. Yes.
Q. At some point does Greg talk to you about what's going on?

141

A. On the way down to the police station.
Q. And what does he tell you?
A. A great deal, that it had been going on for some time and that he didn't know what he was going to do when he got to the police station other than tell them I wasn't involved, you know, that he was sorry what he did and that it was a lot bigger than I probably seen sitting in the living room.
Q. Did he explain to you anything about where the drugs were coming from at all?
A. He told me from Dustin Honken and they were --
MR. ROGERS: Objection, Your Honor. We'll object on

hearsay and confrontation grounds.

MR. WILLIAMS: Rule 804(6) again, Your Honor, statements of Greg Nicholson.

THE COURT: Well, let me see the lawyers at sidebar.

(At sidebar on the record.)

THE COURT: What's your theory as to why 804(6) applies here because --

MR. WILLIAMS: 804(6) is forfeiture by wrongdoing.

THE COURT: I understand that.

MR. WILLIAMS: So any statement of the victim that was made the defendant waives any confrontation right and also waives hearsay objections to it. So she's repeating what her husband told her about Dustin Honken, and the forfeiture by wrongdoing would indicate that he's lost any right to complain

♀

142

that that's hearsay.

THE COURT: What's your view?

MR. ROGERS: This is a for-the-record kind of objection, quite frankly, and I believe that the forfeiture by wrongdoing rule and statute --

THE COURT: You have to speak up a little bit.

MR. ROGERS: I'm sorry. I believe that the forfeiture by wrongdoing rule and statute have been obviated by the Crawford decision in terms of the confrontation aspect. It may be an exception to the hearsay, but I think the confrontation clause is pretty explicit and does not provide for such an exception.

THE COURT: Okay. I'm going to overrule the objection.

(The sidebar was concluded.)

THE COURT: The objection's overruled.

You may answer if you remember. If not, either Mr. Williams can ask you a few question or we can have our court reporter read it back. Do you remember the question?

THE WITNESS: Yes, I do.

THE COURT: Okay.

A. He told me it was Dustin Honken and he got it -- they were coming from Phoenix.

Q. On this trip down to the police station, did Greg make any statements to you about having any concerns for his safety?

143

A. He said a little bit to the thing, I don't know what I'm going to do. When I get down there, I have to make a big decision I'm sure. I know how this works, and if they want to strike a deal with me, I've got a lot of concerns about that. And I said, Why? And he said because Dustin told him that if he needed to he could have him or anybody else taken out for 50 bucks or he could relocate him and give him a new identity.

Q. Once you get down to the police station, does Greg Nicholson decide to cooperate with law enforcement officers?

A. Yes, he did.

Q. And did he provide information to them?

A. Yes, he did.

Q. After this goes on and you get back home, what happens with your relationship with Greg?

A. It deteriorated because it got so stressful there. I worked nights, and I would come home, and all the lights would be off in the house. During the day when he wasn't working, all curtains had to be shut, and I had a young child, and it just -- we fought, and he was just paranoid. He said nobody could go by

the windows, nobody could go outside during the daytime and stuff, and I worked. And it deteriorated because of that, and then it deteriorated for other reasons.

Q. And did he express to you why he was concerned nobody could go by the windows, the curtains had to be drawn, all that stuff?

A. Because he was going to cooperate and turn in Dustin to the

♀

police station.

Q. How long did this activity go on that you observed?

A. I was there about two weeks after the initial search warrant.

Q. And then what happened?

A. I had a phone call from a friend of mine telling me that Greg was still involved in purchasing drugs and that I had better get myself out of that situation if I didn't want to be taken down with him.

Q. And so what did you do?

A. I grabbed clothes for me and my daughter and a bag, and I left, and I went into hiding.

Q. Now, ultimately at some point did you obtain a divorce from Greg Nicholson?

A. Yes, I did.

Q. And when did that go through?

A. I don't remember a date for sure. I filed, and it had to be put in our local paper, and that's how it was granted, through publication.

Q. Once you left the house, do you know what happened with where Greg was living after that? Did he continue to live at that house?

A. He did for a short time. And then he found me at my mom's

house. That's where I stayed, and nobody knew where I was, not even friends. And he came there, and he told me that he didn't

want to stay at the house without me, he was scared to stay there alone, that he was going to give the house back to the bank and move in with his parents in Osage.

Q. When was the last time you spoke with Greg Nicholson?

A. I believe it was the day -- it was a day or two before he was supposed to actually go to trial. He came to my mom's house and wanted all the keys to his vehicles.

Q. And how was he acting at that point?

A. Nervous, not quite as upset. He did say that he was hoping that he was going to get less of a sentence by cooperating.

Q. The Dustin Honken that you indicate you had seen come to your house a number of times to meet with your ex-husband Greg Nicholson, do you see him in the courtroom here today?

A. In the yellow shirt.

Q. And you're pointing to your left?

A. Yes.

MR. WILLIAMS: Thank you. I have no further questions.

THE COURT: Mr. Rogers?

MR. ROGERS: Thank you, Your Honor. I'm on my microphone.

CROSS-EXAMINATION

BY MR. ROGERS:

Q. How are you, ma'am?

A. Good.

Q. I'm going to move over there, but it's taking me a minute to get everything unplugged.

So the last time that you talked -- was this face to face or on the phone with Greg Nicholson?

A. The last time I spoke with him?

Q. Yes.

A. No. My mom lived in a security building, and he walked in behind somebody that had opened the door. It was actually at my mother's house.

Q. Okay. And that was in person.

A. Yes.

Q. And that was a day or two before he was supposed to appear in court?

A. If I remember right. He said the date he was supposed to go, and it sounded like it was just a few days before he was supposed to go to court.

Q. Well, and that's why I'm asking you because a few days before and a day or two before are kind of different; right?

A. It's been a lot of years. I can't tell you for sure.

Q. I understand that. The impression that you recall now from what you formed at the time is he was supposed to go to court within the next couple of days.

A. Yes.

Q. Okay. Now, in the time before his arrest, Greg's arrest, did he ever mention to you the name of Terry DeGeus?

147

A. I never heard of that name until after this all transpired.

Q. Did he ever mention to you the fact that he might be apprehensive or afraid about somebody named Terry?

A. No.

Q. So -- and during your trip to the police station on March the 17th --
A. March 17.
Q. -- when he was talking about his apprehension about the big choice he had to make, did he ever mention to you the name of Terry?
A. I had never heard that name till it was long afterward. I heard it from an agent.
Q. Okay. Did that agent happen to play for you the tape recording of the conversation between Greg Nicholson, your former husband, and Dustin Honken that was recorded there at your home?
A. No.
Q. Okay. And you've only seen Mr. Honken there a couple of times?
A. Yes.
Q. And the only thing that you thought he was there talking about was band equipment and things like that?
A. Right.

MR. ROGERS: I believe that's all the questions I have, Your Honor.

♀

148

THE COURT: Thank you. Any redirect?

MR. WILLIAMS: No, Your Honor.

THE COURT: You're excused.

THE WITNESS: Thank you.

THE COURT: Ready to call your next witness?

MR. MILLER: Government calls Scott Gahn.

MR. WILLIAMS: Your Honor, can we reverse that order? It was my screw-up. We'd like to call David Thinnes to the

stand instead.

THE COURT: That'd be fine. Thank you.

MR. WILLIAMS: Thank you.

DAVID THINNES, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in our witness box. Make yourself comfortable, and please adjust the chair and the microphones. And when you're settled in, would you state your full name, please, and spell your last name.

THE WITNESS: David Thinnes, T-h-i-n-n-e-s.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION.

BY MR. WILLIAMS:

Q. Good afternoon, Mr. Thinnes. Could you describe for the jury, please, what do you do for a living, sir?

A. I'm an attorney in Cedar Rapids, Iowa.

Q. How long have you been an attorney, sir?

A. Since 1987.

Q. Have you practiced in Cedar Rapids, Iowa, that entire time?

A. That's correct.

Q. I want to direct your attention back to 1993 and ask you if you could describe for the jury the nature of your practice back in 1993.

A. I've always been primarily real estate and family law and divorce, wills, that sort of thing. I do a little bit of criminal law work. And back in 1993, I was on the court-appointed list for the federal court system.

Q. And what does that mean?

A. I was on a list of private attorneys that would take court appointments for indigent defendants who needed representation.
Q. And indigent means what?
A. People that were unable to come up with a retainer for an attorney.
Q. Okay. And in that capacity did you represent people in federal court as well as state court?
A. That's correct.
Q. Did you at some point in 1993 come to be appointed to represent somebody by the name of Dustin Honken?
A. Yes, I did.
Q. And is that how you came to know him for the first time?
A. Yes.

150

Q. Do you recall approximately when you were appointed to represent him?
A. It would have been May or June of 1993.
Q. And at the time you were appointed to represent him, what was the nature of the charges against him as you understood them at that time?
A. I believe he was charged with conspiracy to distribute meth.
Q. You no longer represent Mr. Honken?
A. I don't believe so.
Q. I want to make sure the jury understands. Were you subpoenaed to appear here today?
A. Yes, I was, and I'd previously filed motions to set aside that subpoena, but ultimately a court ruled that I had to respond to your subpoenas.
Q. And the reason you were concerned is why, sir?

A. Well, our judicial system respects the attorney-client privilege, and so I had asserted the attorney-client privilege. I represented Dustin, and I thought that testifying would be perhaps a violation of the attorney-client privilege. But ultimately the Court ruled that my testimony falls under one of the exceptions to the attorney-client privilege.
Q. And so you're allowed to -- within your rules of conduct as an attorney, you're allowed to testify here today; is that correct?

A. That's correct.
Q. So going back to your representation of Dustin Honken back in 1993, as part of your representation, did you meet with him on occasion?
A. Yes, I did.
Q. Approximately how many times do you recall meeting with him?
A. I would say at least half a dozen.
Q. And where would you meet with him at, sir?
A. Usually at my office, sometimes at the courthouse maybe if we had a hearing or something.
Q. That Dustin Honken that you represented back in 1993, do you see him in the courtroom here today, sir?
A. Yes, I do.
Q. Can you describe for the jury where he's sitting and what he's wearing?
A. He's sitting at the table over here to my left. He's got an off-white sweater/shirt on.
Q. As part of your representation of the defendant in this case back in 1993, did you undertake to review the government's

file to determine the nature of the evidence against him?
A. Yes, I did.
Q. Could you describe for the jury what kind of access did you have to the government's file?
A. Generally your office makes available police reports, law

enforcement reports, notes, arrest reports, FBI reports. Various things go into what's called a discovery file, and the defense attorney is granted access to look at and review that file.
Q. And did you do that in this case when you represented Dustin Honken back in 1993?
A. Yes, I did.
Q. As a result of reviewing that file, did you become aware of what the case against the defendant was based on?
A. Yes.
Q. And did you learn that Gregory Nicholson was a person who had made a controlled delivery of drug money to the defendant?
A. Yes, I believe so.
Q. Now, as part of your duty to represent your client, did you pass on to the defendant the information you had learned from the review of the government's file?
A. Yes, I did.
Q. At some point was the decision reached -- without revealing the communication you had with your client, but ultimately was a decision reached to decide to enter a guilty plea to the government's charges?
A. We'd talked about it, and Dustin had decided that was the way he wanted to go, so I even -- I think I notified the U.S. Attorney's Office, and a hearing was set in that regard.

Q. And in response to contacting the U.S. Attorney's Office,

did -- who was representing the United States of America at that point in the case against Dustin Honken?

A. Pat Reinert from your office.

Q. He was another assistant United States attorney?

A. That's correct.

Q. And did he send you a letter reflecting that you'd had a conversation about the defendant's intent to plead guilty and what the status was of possible plea outcomes?

A. Yes, that's fair to say.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. I'm handing you Exhibit 45. Can you identify that for me, please.

A. This is a letter, a copy of a letter, that I would have received in July of 1993 from Pat Reinert from your office, and it sets forth basically his position on the case, not necessarily how we felt about it, but it definitely sets forth Pat's positions and feelings about the case and indicates in here that we've discussed about entering a guilty plea and sorts of things that Dustin can do to reduce his sentence if he wants to.

MR. WILLIAMS: That Exhibit 45 I believe, Your Honor, is already admitted into evidence?

THE COURT: It is.

MR. WILLIAMS: Thank you.

BY MR. WILLIAMS:

Q. If you take a look --

MR. WILLIAMS: Your Honor, if you could activate the . . .

Q. Do you see Exhibit 45 there on the screen, sir?

A. I do.

Q. Okay. On the first page of that letter, does it indicate there a conversation you had with the defendant -- I'm sorry, with Mr. Reinert concerning possible pleas?

A. Yes, it does.

Q. And I've brought out in larger type if you look at the screen there, there's a paragraph there that you had a conversation with Pat Reinert on July 8 of 1993?

A. Correct.

Q. Is that the first time you recall that you had indicated that the defendant was intending to plead guilty?

A. I don't have any personal recollection of that event, but I received a letter from Pat confirming our telephone conversation. I have no reason to dispute what's in this letter, at least the first two paragraphs.

Q. And taking a look at the second page of Exhibit 45, does Mr. Reinert give you at least his calculation of how the federal sentencing guidelines would come out if the defendant pled guilty with a reduction for acceptance of responsibility for

155

pleading guilty?

A. Yes. Again, these are Mr. Reinert's views and opinions on the case as it stood against Dustin.

Q. And based on Mr. Reinert's calculations, what did he advise

that he saw the defendant looking at as far as a sentence there looking at that -- if you look at the screen there, Mr. Thinnes?
A. 135 to 168 months according to Mr. Reinert.
Q. Now, a duty of an attorney includes the duty of an attorney to convey to their client any plea offers or plea negotiations by the government; is that fair to say?
A. Correct.
Q. And in this case did you pass along to him, whether you agree with it or not, Mr. Reinert's calculation of the actual sentence the defendant was looking at?
A. I'm sure we did. I'm sure we had conversations about these types of things.
Q. Now, at some point you indicated that the decision had been made and a hearing had actually been set for a guilty plea; is that correct?
A. That's correct.
Q. And was that on July 30 of 1993?
A. Yes.
Q. Prior -- let me just ask you, on July 30 of 1993, did that plea go through?
A. No, it did not.

♀

156

Q. Did the defendant show up at the courthouse?
A. I think so, yes.
Q. And then what happened then at that point?
A. I think we had a conversation probably in my office prior to court. He advised me that he'd heard a rumor that Mr. Nicholson had skipped town, and I called the -- I think it was the Cerro Gordo County clerk of court where Mr. Nicholson's criminal charges were pending to see what was going on in the

cases against Mr. Nicholson and turned out that a warrant had issued for Mr. Nicholson based on his failure to appear. So we knew that Mr. Nicholson wasn't attending his court dates. And so we had some discussions and decided at that point not to enter a guilty plea.

Q. So did you go to the courthouse then that day?

A. Yes.

Q. And what happened when you went to the courthouse?

A. I don't recall the specifics, but I'm sure I advised Mr. Reinert that we weren't going to be entering a guilty plea and that we needed to set the case for trial, and I may have advised Mr. Reinert that he had some uncooperative witnesses and that the case against Dustin wasn't as strong as he thought.

Q. And this is a conversation -- who all was present at this conversation with Mr. Reinert then?

A. I don't recall.

Q. At some point either before or after this guilty plea does

157

the defendant advise you that he has a videotape?

A. Yes, he did.

Q. Do you remember when in relation to the plea hearing date that did not go through when he advised you of that?

A. It may have been the day of the hearing, or it could have been the following day. I don't recall if I got it in the mail from Dustin or if he delivered it personally to me. But it would have been July 30 or August 1.

Q. And what did he tell you about this tape?

A. That somebody had placed this tape in his car; he wasn't sure who, but he had some ideas about who might have done it; that the tape is a tape that Mr. Nicholson made; and on the tape

Mr. Nicholson exonerates Dustin from the charges.
Q. Exonerate means?
A. Well, Dustin explained that the tape said that he was not guilty of the charges.
Q. You say that the defendant told you that he had some ideas who had dropped off the tape or put it in his car allegedly. Who did he tell you he thought did it?
A. He didn't. We didn't go into that. The reason I was asking was I was thinking about foundational issues in regards to introducing the videotape at a later time.
Q. Can you explain that to the jury? What do you mean by foundational issues?
A. Well, if there was ever going to be a trial and if

158

Mr. Nicholson testified, then we would use that videotape against Mr. Nicholson to make him look foolish, to make him look like he's changing his story. That's called impeaching a witness. In connection with the videotape, we may have had to lay a foundation for it, meaning who filmed it, when was it filmed, what kind of camera was used. Those are the kinds of things I was thinking about in connection with this videotape.
Q. And so did you ask the defendant those type of questions about if he knew how it was filmed and where it was filmed and so forth?
A. He didn't have -- he didn't have the slightest idea as to how it was filmed or where it was filmed. He just said he didn't know who put it in his car but he had a few ideas but nothing -- nothing concrete.
Q. And he never passed along to you what those ideas were at the time?

A. No.

Q. Can you just describe -- you ultimately got the tape. And as I understand your testimony, you don't recall whether you got it that day or whether it was later mailed to you. But when you ultimately -- you did ultimately receive a videotape.

A. That's correct.

Q. Can you describe for the jury what it looked like when you received it?

A. It was a VCR tape. It went into the, you know, VCR hooked

♀

159

up to the TV. It came in a little sliding pocket. There weren't any notations on it or anything. It was just a VCR tape.

Q. So it came in one of those cardboard boxes that the tape itself is in?

A. That's correct.

Q. No markings on the box or on the tape itself?

A. Not that I recall.

Q. And do you recall whether anybody else was present with you when the defendant was telling you about how he came into possession of this tape?

A. I'm sure there would have been no one present.

Q. Did the defendant tell you whether he viewed the tape?

A. My recollection is that he knew what was on the tape, so my -- I assumed that he had seen it, and we may have -- even have talked about him seeing it, but I don't recall. But clearly he knew that Mr. Nicholson was on the tape.

Q. Did he describe for you that you recall today anyway what was on the tape? In other words, did he describe to you the setting or what was said in any detail?

A. No. Basically he said he was somewhere and somebody placed this tape in his car, and it's a tape of Nicholson before he left town, and Nicholson is apologizing to Dustin and saying that he set him up improperly and that Dustin had nothing to do with this drug transaction and basically apologizing to Dustin.

♀

Q. So did the defendant state why he was giving you the tape at this point?

A. We talked obviously about it, that it was a positive for the case. You know, we could use it later to impeach Mr. Nicholson. You know, it ruins his credibility as a witness. We talked about whether or not we should share it with the U.S. Attorney's Office. I don't recall at that point whether or not there was a trial date set, but, you know, we were thinking about it in terms of using it at the trial if we needed to.

Q. Let's talk about one of the comments you said that you guys discussed whether to turn it over to the U.S. Attorney's Office. Can you share with us the nature of the conversation you had with the defendant about whether to turn it over or not?

A. Well, we knew this was pretty explosive stuff and doesn't happen every time somebody's going to exonerate you after accusing you of a crime, so I think Dustin and I talked about it, and we reached a decision that I would tell the U.S. Attorney's Office about the existence of the tape but I wouldn't show it to them unless we -- unless we were going to use it for sure at trial.

Q. And so at some point did you advise the assistant United States attorney Pat Reinert that you had such a tape?

A. Yes.

Q. And did you ever provide a copy of that to the U.S.

Attorney's Office?

A. I never did.
Q. Did you describe in any detail that you recall to the U.S. Attorney's Office what was on that tape?
A. I may have generally described it to Mr. Reinert.
Q. Now, you've been talking up to this point in the conversations you had with the defendant about how that tape could be used if Mr. Nicholson ultimately testified at the trial to use it to show he wasn't telling the truth. Did you have any conversations with the defendant about whether you could use the tape if the trial went forward without Mr. Nicholson testifying?
A. I think we might have had foundational issues, but I think my conclusion is probably without Mr. Nicholson there wouldn't be a trial.
Q. And explain -- I understand what you're talking about when you say you had additional foundational issues that you discussed with the defendant. Why don't you explain what you mean by that.
A. Well, if Mr. Nicholson isn't there to testify, then there isn't any reason really to rebut what it is he's got to say on the -- you know, the tape isn't going to be there to rebut anything because Mr. Nicholson won't be there to testify. If he's not there to testify, the case kind of dissolves. So we were planning on using the tape for rebuttal against the government's case. But the government's case was so weak, we weren't sure it was going to go to trial anyway, so that's why

we were holding off. But generally without -- if Mr. Nicholson

wasn't going to be there, we questioned whether or not we even needed the tape.

Q. Did you have any discussions with the defendant about whether you could even lay a proper foundation for admitting the tape in the event the case went forward without Mr. Nicholson?

A. I think I had to worry that we might not be able to get the tape in.

Q. And why don't you share with the jury, what worries would you have as an attorney about whether you could get that tape in.

A. Well, I would love to show the court or the jury a videotape of a man exonerating my client. I mean, that would have been wonderful. But again, the issues were who filmed this, where did it come from, is it credible, is it reliable? Those are the kinds of issues that the judge would have to rule on, and maybe, you know, without that kind of foundation, maybe the tape doesn't come into evidence.

Q. And did you have these kind of conversations with the defendant about that tape then?

A. Probably.

Q. At some point did you have an opportunity to review that tape yourself, sir?

A. I did.

Q. And could you describe for the jury the context under which

♀

163

you reviewed that tape?

A. I took the tape home over the lunch hour one day and plugged it in my VCR and watched it over and over several times. It was a pretty short tape, maybe two to five minutes. It was a man, a white man, sitting on a chair or a couch. Camera was

fairly well zoomed in on him. And there was a brief introduction I think. He identified himself as Greg Nicholson, indicated I think that he was going to be leaving or skipping town, indicated that he wanted to set the record straight and indicated that -- basically apologized to Dustin, indicated that he set him up, he needed to give the government somebody and so he gave the government Dustin. He apologized to Dustin for getting him involved in it, indicated on the tape that Dustin had nothing to do with it. That was the gist of what this man said on the tape.

Q. Approximately how long did that tape take to play?

A. Again, I think about three to five minutes.

Q. Do you recall when it was that you first reviewed that tape?

A. Yeah. I checked my records. It was August 2, 1993.

Q. And you said you watched it multiple times that day.

A. That's correct.

Q. The -- you indicated in your testimony that the camera was pretty well zoomed in on the person who identified himself as Greg Nicholson. Were you able to see his hands in the picture?

164

A. I don't recall.

Q. The camera when you first -- when it first came on, was the person sitting in the chair already?

A. Yes.

Q. So you didn't see an action where maybe somebody got up, turned on the camera, came back, and sat down in a chair?

A. No. The tape came on, and immediately there was Mr. Nicholson sitting in the chair or maybe it was a couch, a small couch.

Q. And likewise, when the tape ended, did Mr. Nicholson get up and go over and turn something off, or did it just end?
A. It just ended.
Q. Did you ever see him with any type of remote device in his hands that he could have used to operate the camera with?
A. I don't believe so.
Q. During the tape as you remember viewing it today, sir, were any questions asked of the person who identified himself as Mr. Nicholson on the tape?
A. No. It was just his conversation with the camera.
Q. To the best of your recollection, sir, can you recall and describe for the jury what was the background in the picture in which Mr. Nicholson was making these statements?
A. It was a solid background. It didn't look real homey. It wasn't an office setting, and it wasn't a real homey setting. It was a solid color. My impression is it wasn't real nice, but

♀

165

it definitely wasn't office, and it wasn't somebody's home. There wasn't any decorations behind him or anything like that.
Q. No bookshelves or windows or anything like that in the background?
A. Nothing.
Q. Describe -- you said he was sitting in a chair. Do you remember anything about that chair?
A. I think he was sitting fairly low. The man was very relaxed. I remember that. Might have had glasses, slightly balding, dressed -- you know, certainly not -- he was dressed casually, even kind of sloppy casual, certainly not business attire.
Q. Did you see -- at any point during the tape as it ran, did

you see anybody else in that picture?
A. No.
Q. Did you see whether Mr. Nicholson's hands were tied or whether he was tied in any way?
A. My -- it's been a long time since I viewed the tape. My impression is that you could see his entire body, but I'm not sure. I certainly didn't see his hands tied.
Q. And during the tape as he's talking on this tape, you said he appeared relaxed. Can you describe what you mean by that?
A. Well, yeah. He just seemed pretty low key, mellow. He wasn't excited or tense or anything like that.
Q. How did that strike you? Was there anything noteworthy to

166

you about how he was acting on this tape?
A. I would say just real calm.
Q. Was there any date or time displayed on the camera that you recall?
A. I don't recall a time or date on the screen.
Q. I want to go back now to the content. We've talked a little bit about just the image that appeared on there. I want to go back to the content which you summarized a minute ago. First of all, did you take any detailed notes about what was said on the tape as you were viewing it?
A. I did not.
Q. Did you ever make a copy of that tape?
A. No.
Q. And so your testimony today is based solely on your best

recollection of reviewing that tape multiple times. Is that fair to say?
A. That's correct.
Q. Great. You said that the person introduced himself or identified himself at the beginning as Greg Nicholson. Did he say anything about the setting or where he was filming the tape at all?
A. No.

♀

Q. Did you hear any background noises, trains going by or anything like that on the tape as it's playing?
A. Not that I recall.
Q. You indicated that he apologized at one point to Dustin Honken. The best you can recall, can you describe how that occurred? Was it as if he was addressing a court, or was it as if he was addressing a third party, or was it as if he was addressing the defendant in this case as he's making these statements?
A. He's looking into the camera. He may have said something about getting the tape to Dustin. I don't know. But he's talking to the camera. And he's also talking to Dustin saying, you know, Dustin, I'm sorry I set you up; you had nothing to do with this.
Q. The review of the tape you conducted you said multiple times on August 2?
A. That's correct.
Q. Did you ever review it again after that, sir, that you recall?
A. I don't recall.
Q. You said at one point in the tape that you recalled him

saying something about leaving. Can you repeat that again for the jury?

A. I think my general impression is that Nicholson said by way of background, I'm leaving or skipping town or something, and I

♀

wanted to let everybody know that Dustin has nothing to do with this drug case and I set him up and, hey, Dustin, I'm sorry.

Q. When Mr. Nicholson's making these statements on this tape, can you describe his facial expressions? Is he -- what do they look like that you recall?

A. He was just -- I thought he was sincere and apologetic and just real soft spoken and pretty low key.

Q. When he's making these statements, is the speech fairly free flowing? Does it look like he's speaking something that's been rehearsed? How did it appear to you?

A. It seemed pretty genuine. He obviously wasn't reading it. Just kind of a guy sitting in a chair talking off the top of his head. You know, I don't -- I never had the impression he was reading anything behind the camera or from -- he wasn't holding anything here to read. Just kind of off the top of his head talking for a couple minutes.

Q. Now, after you had the opportunity to review this tape, did you have any conversations with the defendant about what you had seen?

A. I'm sure I did, yes.

Q. And do you recall what those conversations would have been?

A. That this is pretty good evidence that -- and if they want to take you to trial, we can go to trial and, you know, this tape is good evidence that you're not guilty.

Q. What did the defendant say about that?

A. I think he had the same impressions, that the tape was a favorable thing.

Q. Can you describe for the jury, what was the defendant's general attitude both when he gave you the tape, and what was his demeanor when he suddenly comes up with this tape on the eve of the date that he's supposed to plead guilty?

A. I don't recall. I'm not exactly sure when I got the tape, if it came in the mail or if Dustin gave it to me directly. I'm just fuzzy on that. But I remember being -- I myself was excited with the prospect of the star witness missing his court dates and disappearing, so we knew that the government was going to have a tough time presenting its case, so I think he and I were both, you know, a little excited.

Q. At some point -- well, let me ask it this way. After you reviewed the tape, what happened with the tape?

A. I kept it. Eventually there was a trial date set and continued and possibly a second trial date set and continued, and then at some point in the case I made a motion to dismiss because the case was just sitting there and nothing was happening. And ultimately the case did get dismissed. And when the case was dismissed, my agreement -- at least as I recall it, my agreement with Dustin was to send him the tape back.

Q. And so did you do that, sir?

A. I did.

Q. You never retained a copy of it.

170

A. No.

Q. When you returned the tape to the defendant, do you remember how that was done?

A. I -- well, I was writing a letter to the U.S. attorney that day, and I did a little memo to the file saying grab that tape and send it to Dustin's address, and I think I might have dictated the address, and she put it in a manila envelope, and off it went.

Q. Do you remember when that was, sir?

A. That would have been probably March or April of '95 is roughly when the case was ultimately dismissed.

Q. Did the defendant at any point indicate to you whether he had ever made any copies of that tape?

A. I don't believe he did.

Q. Did you have any -- after you returned the tape to the defendant, did you have any further discussions with him concerning the tape?

A. I don't believe so.

MR. WILLIAMS: Thank you very much. I have no further questions.

THE COURT: Mr. Spies.

MR. SPIES: Thank you.

CROSS-EXAMINATION

BY MR. SPIES:

Q. Good afternoon.

171

A. Good afternoon.

Q. I'm not going to make any editorial comments about the opportunity to cross-examine a lawyer.

Mr. Thinnes, first of all, you've been practicing in Cedar Rapids since approximately the mid 1980s; is that right?

A. 1987, correct.

Q. And I'm sure the jury understands, but just to make it clear, there are laws and rules that govern the conduct of lawyers and the ethical responsibilities that all lawyers have; right?

A. Correct.

Q. And in representing any kind of a client, whether it's a criminal client, a civil client, a divorce client, all lawyers have an obligation to zealously represent that client within the bounds of the law, don't they?

A. Yes.

Q. And including in a criminal case, as you've just described for us here, one of the obligations is to carefully investigate the case as you did.

A. Correct.

Q. And to research the law where necessary if you're unfamiliar with the law.

A. Correct.

Q. And to advise the client of all the lawful options that the client might have to resolve his case or her case.

♀

172

A. Correct.

Q. Now, in Mr. Honken's case, you've described for us here that you went to the United States Attorney's Office, and you went through what's called the discovery file which is the summary of all the investigative reports that deal with the prosecution's case.

A. Correct.

Q. And you learned what evidence there was against Mr. Honken, and you discussed the case with him and what the evidence was

and what your assessment of the case was.
A. Correct.
Q. And was it your joint decision based on what you knew from the discovery file and from your conversations with Mr. Honken to pursue a plea agreement or at least try to negotiate a resolution of his case without a trial?
A. I think that's correct, yes.
Q. Okay. And you've described for the ladies and gentlemen of the jury and for us that Mr. Reinert from the United States Attorney's Office sent you a letter in early July kind of outlining his suggestion for settling Mr. Honken's case.
A. Correct.
Q. We've heard some testimony earlier today, Mr. Thinnes, and you've described for us a little bit this afternoon about the federal sentencing guidelines, and the sentencing guidelines are described in Mr. Reinert's letter?

♀

173

A. Yes.
Q. And you would have explained the sentencing guidelines and how they worked to Mr. Honken?
A. Yes.
Q. Okay. You mentioned for us just a moment ago that you interpreted Government's Exhibit Number 45, the letter, as kind of Mr. Reinert's position on how he thought the guidelines would apply; is that correct?
A. Right. This is Mr. Reinert's thoughts only. They weren't ours.
Q. Okay. And did you, as you remember, have a different interpretation of how you thought the guidelines might work in Mr. Honken's case?

A. I think I'd produced some notes I had in trying to calculate -- there were a couple of empty bottles maybe, and I was trying to calculate quantities, and I'm not very good with math, and my numbers were lower than Mr. Reinert's.

Q. Do you remember, Mr. Thinnes, whether even using your calculations of how the drug guidelines would work in Mr. Honken's case, whether he was looking at a substantial length of time in prison?

A. Can I look at this?

Q. Sure.

A. I was slightly lower I think than the government, but, you know, I was thinking 120 months, somewhere in there. Maybe 90

174

to 130 I think is what we talked about.

Q. Okay. And based on your assessment of Mr. Honken's case and your conversations with him about the guidelines, it was Mr. Honken's decision on your advice to plead guilty?

A. Correct.

Q. You mentioned for us this afternoon and we heard earlier that there was a date set for a guilty plea about July 30, and you said that you had heard that there were rumors that Mr. Nicholson had skipped town or had left. Do you remember whether or how you heard those rumors?

A. I don't. I wouldn't have heard of -- I don't. I'm supposing that I heard it through Dustin.

Q. Okay. Do you remember if Mr. Honken said he'd heard it from his dad or from Scott Gahn, or do any of those names ring a bell?

A. His father or who?

Q. Or Scott Gahn.

A. He may have. I don't know. I think the gist was that the courthouse rumors were that the guy didn't show and there were some rumors that he was going to skip to Mexico or that he'd taken off for Mexico or something like that.
Q. It's only been 11 years ago.
You then apparently followed up on this and called the clerk of court's office?
A. I did.

Q. And the clerk of court would have been in Cerro Gordo County?
A. Correct.
Q. And like all public offices, you can get public information from the clerk of court including what's happening in a criminal case or a civil case?
A. Correct.
Q. And I take it from your conversation, as you said, you learned that Mr. Nicholson had failed to appear for a court case.
A. Correct.
Q. Let's ask -- let me ask you some questions about the videotape; okay?
A. Uh-huh.
Q. Mr. Thinnes, you described for us that you, as I understand the sequence, viewed this videotape, actually looked at it, after the plea hearing that was scheduled on July 30.
A. Correct.
Q. And you described for us how Mr. Honken described to you how he had gotten this tape. And you knew from your investigation of the case that this was dynamite evidence.

A. I think that's fair to say.

Q. And you've told us that you discussed with Mr. Honken the admissibility of the tape and what it could possibly be used for?

A. Yes.

Q. And you described for us how it might be used as impeachment to cross-examine Mr. Nicholson if he testified in court.

A. Sure. If Mr. Nicholson was going to testify against Dustin, we'd have this -- these other statements that were made to impeach him or make him look silly or foolish or make him look like a liar or somebody who's changed his mind or -- you know, we could have had a lot of fun with Mr. Nicholson because he's got these prior inconsistent statements, so we would have completely shattered his testimony.

Q. Okay. And this was based on your experience as a trial lawyer and on your research of the rules of evidence.

A. Correct.

Q. Now, you also mentioned that you pondered whether you had a duty to disclose this to the prosecution, that is, the contents of the tape.

A. Correct.

Q. And just as there are rules of evidence that talk about how you can use an inconsistent statement to impeach or cross-examine a witness, there are also rules that govern whether lawyers have to disclose information to the other side; right?

A. Correct.

Q. Those are so-called discovery rules?

A.    Correct.
Q.    And based on your research of the discovery rules that applied to the cases in federal court, you thought that you did not have an obligation to turn over the tape itself to Mr. Reinert.
A.    Well, I remember looking at the Federal Rules of Evidence and discovery, and we wouldn't -- we'd be using this for rebuttal purposes, and so I made a distinction, and so I just told the U.S. Attorney's Office that they weren't going to get it, but I felt like I had a duty to tell them about this.  But that's the way I read the rule anyway, that we weren't going to give it to them unless we were going to use it for sure.
Q.    And that was based on your best professional judgment about what the rules required?
A.    Yes.
Q.    But as a courtesy to Mr. Reinert, you told him you had this evidence that you thought was going to undo the case.
A.    Yeah.
Q.    Now, you also described for us this afternoon how you went during your lunch break and you viewed the videotape, and you described for the ladies and gentlemen of the jury the appearance of the person you saw on the tape.  Mr. Williams asked you whether or not you saw the hands of Mr. Nicholson in the videotape, and my understanding is that you don't recall. You testified once before about this videotape.  Do you think

♀

looking at the transcript of your testimony in that case would help you remember whether you saw the hands of Mr. Nicholson in

the video?

A. I think that would help me, yes.

MR. SPIES: May I approach, Your Honor?

THE COURT: You may.

MR. SPIES: Page 44 of the grand jury transcript.

BY MR. SPIES:

Q. I'm going to ask you to look at what's page 44 in the lower right-hand corner of the transcript I've just shown you. Take a look at that portion there and see if that helps you remember what you saw in the video about the hands.

A. It doesn't help me with the video, but in '99 I was of the opinion that the hands were resting comfortably in his lap. I didn't see -- I certainly would have -- let me put it this way. If I saw his hands and they were bound or handcuffed, I would certainly have remembered that, so I just -- I guess my recollection is that they were probably here in front of him.

MR. SPIES: Mr. Thinnes, I appreciate your being here this afternoon.

I have no other questions, Your Honor.

THE COURT: Thank you, Mr. Spies.

Any redirect, Mr. Williams?

MR. WILLIAMS: Yes, Your Honor, one question.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. I'm just curious, Mr. Thinnes. Why was it that you watched the tape over and over and over again that day?

A. Well, I thought it was interesting. I'd never gotten a piece of evidence like that. It was, you know, dynamite evidence. I just wanted -- I was just looking, assessing. I

thought it was kind of fascinating.

Q. Did anything disturb you about the tape at all?

A. Not disturb, no. I thought it was pretty -- this guy was pretty cool, pretty calm and collected.

MR. WILLIAMS: Very good. Thank you.

THE COURT: Mr. Spies, any recross?

MR. SPIES: No, Your Honor. Thank you.

THE COURT: Thank you, Mr. Thinnes.

THE WITNESS: Thank you.

THE COURT: Members of the jury, why don't you take a stretch break.

MR. ROGERS: May we approach, Your Honor?

THE COURT: Pardon me?

MR. ROGERS: May we approach?

(At sidebar on the record.)

THE COURT: It better be good, because I don't do sidebars.

MR. ROGERS: Mr. Honken advises me he needs a restroom break urgently. I don't know how good that is.

♀

180

THE COURT: Well, we oughta put him in Depends.

(The sidebar was concluded.)

THE COURT: Members of the jury, we're going to take our afternoon break at this time, so we'll be in recess for 25 minutes until 10:25 -- I'm sorry, until 2:25. Thank you.

(The jury exited the courtroom.)

THE COURT: Could I see the lawyers for a second?

MR. WILLIAMS: Yes, sir.

(At sidebar off the record.)

THE COURT: Anything we need to talk about, counsel?

MR. WILLIAMS: No, Your Honor. Thank you.

MR. PARRISH: No, Your Honor. Thanks.

THE COURT: Thank you.

(Recess at 2 p.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. MILLER: Yes.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Those stairs are so steep, you're going to get some mighty good exercise during this trial.

Mr. Williams? Mr. Miller.

MR. MILLER: Your Honor, the United States calls Scott Gahn.

Mr. Gahn, if you'll please step forward and be sworn.

♀

181

SCOTT GAHN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Would you please adjust the chair and the microphones? You need to scoot up and get as close to those microphones as you can. And you can bend those microphones. And would you tell us your full name, please, and spell your last name.

THE WITNESS: My name is Scott Tracy Gahn. Last name is spelled G-a-h-n.

THE COURT: Thank you.

Mr. Miller.

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Your occupation, sir?

A. I'm a nurse's aide at a nursing facility in Mason City.
Q. Are you a resident of Mason City?
A. Yes.
Q. How long have you lived in that community?
A. All my life.
Q. How many years is that?
A. Forty-two.
Q. How long have you been a nurse's aide, sir?
A. It will be a year in November.
Q. Can you give us a little bit of employment history before?
A. Oh, I've done everything from deejaying at radio stations

♀

182

to selling advertising to running heavy equipment to brick laying.
Q. Your job as a nurse's aide, is that full-time employment?
A. Correct.
Q. What shift?
A. Third shift, night shift.
Q. Are you busy with any other activities at the moment besides work?
A. Yeah, I'm a student currently getting my med. aid certification. I've been accepted into R.N. school at NIACC in June.
Q. And you're taking classes at the moment, sir?
A. Yes.
Q. What classes?
A. The CMA certification.
Q. What is CMA?
A. Certified med. aid, pass meds.
Q. Your family consists of whom, sir?

A. I'm divorced, and I've got two teenage daughters.
Q. Their ages?
A. Fourteen and fifteen.
Q. Maintain contact with them, sir?
A. Regular basis when they're not on their cell phone with their boyfriends.
Q. Mr. Gahn, were you acquainted with a man by the name of

♀

Greg Nicholson?
A. Yes.
Q. When did you know Mr. Nicholson?
A. Oh, in the early '80s I started working at a plant called Curry's, and Greg worked there. And we became friends. He was a musician, and I ran around with a band a little bit and helped them out here and there.
Q. We've heard a little bit about Curry's before. Apparently they manufacture some doors or something?
A. Steel doors in Mason City, yeah.
Q. How long did you work at Curry's?
A. Just a year.
Q. When was that if you recall?
A. '84, '85.
Q. That's how you became acquainted with him.
A. Yeah.
Q. Did you become better acquainted with him than mere coworkers and acquaintances?
A. Oh, sure. Yeah, I was welcome in his home, and we went on the road together playing music, places like that.
Q. Describe that. Tell us about this musical business.
A. He was involved with a band called Relayer, just two-,

three-night stands mostly in Iowa and Minnesota, and I'd go along and haul the equipment and collect the money and pack up the stuff and get out of town.

♀

Q. Is that what they call a roadie?
A. That's a roadie, yeah.
Q. How long were you a roadie for that band?
A. Oh, on and off for six years.
Q. What age of a man were you back then?
A. I was in my early 20s and single and out doing my thing.
Q. How much time did you spend -- I assume you continued to work full time in addition to this music business that you were affiliated with?
A. Yeah, yeah.
Q. That wasn't successful enough to be -- support the band members full time.
A. No, it was a hobby for them. They all had full-time jobs during the day, and they just did this on weekends for fun.
Q. These were all amateur or semi-pro musicians?
A. Yeah. The equipment costs a lot more than what they made.
Q. But they'd charge something for their services.
A. Sure.
Q. How big a band?
A. Oh, anywhere between a four-piece and a six-piece depending on who was -- who showed up.
Q. Depending on who showed up?
A. Yeah.
Q. Some musicians aren't the most reliable, I take it.
A. Correct.

♀

Q. What sort of music, sir?
A. Relayer was classic rock, and there was one called Whiskey Business that was country, and there was a couple others in there.
Q. During the course of your relationship with Greg Nicholson, did you -- let me just ask you straight out. Controlled substances ever involved there, sir?
A. Sure. Greg was a small-time quarter-pound marijuana dealer, and when I wanted to smoke pot, I'd go to Greg's and get my bag, and that was it.
Q. That happen pretty much throughout the period that you were a roadie for that band?
A. Sure, yeah.
Q. How about after you quit being a roadie for the band?
A. That was about the time I got married and my girls were little, and going on the road just didn't work out, but still when I wanted grass or wanted to play some music, I'd still pop by Greg's. We still associated, yeah.
Q. You got married approximately when, sir?
A. I got married for the first time in '87.
Q. Your children were born approximately when, sir?
A. Tristan, '98, and Heather in, gosh, '92 I think.
Q. Kristen was born when?
A. I think Tristan -- she's 15 now, '98 -- or '89, I'm sorry.
Q. '89. Got those numbers backwards.

♀

186

A. Yeah.
Q. Dustin Honken, did you ever become acquainted with a man by

the name of Dustin Honken?
A. Did Greg get acquainted with Dustin? Yes.
Q. I want to know if you did.
A. Oh, yeah, yeah.
Q. When did you first meet Mr. Honken?
A. I first met Dustin at Wellborn when he was the plant manager there.
Q. What is Wellborn?
A. They made circuit boards for computers.
Q. When was this, sir?
A. To the best of my recollection, mid, late '80s, '88, '89 in there somewhere.
Q. Describe what you did there and what Mr. Honken did in that employment.
A. Dustin again was the -- pretty much ran the show, and he was scheduling the machines for the certain circuit board runs to try to use up the time efficiently.
Q. Did you work together?
A. Not directly very much, no.
Q. How much would you see of one another at Wellborn?
A. Daily.
Q. Did your relationship with Dustin Honken ever develop into anything more than simply coworkers and acquaintances?

♀

187

A. Yeah. We struck up a fledgling friendship I would guess. I was over at his girlfriend's house a couple times. He tried to set me up with a blind date once. I went to the apartment a couple times, and we drank beer and a few things over there, so yeah, it was more than just a coworker.
Q. Coworker and social acquaintance?

A. Sure.

Q. This was approximately when, sir?

A. Again, late '80s, early '90s, in that area.

Q. Were controlled substances involved at all in your relationship with Mr. Honken?

A. I'd answer that one no because I didn't know Dustin to use drugs. He had access to them, but I never seen him -- in fact, I don't think I ever seen him drink alcohol, and I never saw him use drugs.

Q. Did you ever have a conversation -- while working at Wellborn, did you ever have a conversation with Mr. Honken with regard to drugs?

A. Yeah. He had --

MR. PARRISH: Objection as to the date and time of this conversation for purposes of making a further --

MR. MILLER: I'll back up.

BY MR. MILLER:

Q. Before you describe this, tell us, please, the best you can the setting as far as where you were, who all were present, and

♀

188

the circumstances.

A. The very first time I remember talking to Dustin about drugs was I think we were at work in the scheduling room, and he asked me if I knew if anybody could get rid of some cocaine for him.

MR. PARRISH: Objection. Irrelevant as to the date that this conversation took place. I'm going to object to relevancy.

THE COURT: Overruled.

BY MR. MILLER:

Q. And first before you tell us what was stated, just tell us to the best of your ability the setting, and by that I mean where, when, and with whom present to the best of your recollection, sir.

A. To the best of my recollection, Dustin and I only talked about these things in private, him and I only. The first time he mentioned anything about drugs to me, he said something like --

Q. Excuse me. I apologize for interrupting you, but I just want to complete to the -- you indicated it was just the two of you present.

A. Yeah.

Q. It would have been to the best of your recollection where and when?

A. At work at Wellborn on the graveyard shift.

♀

189

Q. Go ahead. Please tell us.

MR. PARRISH: Objection. Move to voir dire the witness.

THE COURT: You may.

VOIR DIRE EXAMINATION

BY MR. PARRISH:

Q. What was the date that you had this conversation at Wellborn?

A. I don't recall.

MR. PARRISH: Objection. Relevancy.

THE COURT: Do you understand -- well, can you give any kind of time frame?

CONTINUED DIRECT EXAMINATION

BY MR. MILLER:

Q. When did you work at Wellborn, sir?
A. It was for a very short period of time, and without checking my W-4s or W-2s, I'm going to guess it was somewhere in '88 or '89.
MR. PARRISH: Objection. Relevance.
THE COURT: Sustained.
BY MR. MILLER:
Q. And as to your family situation, can you give us any key as to your family situation as to when this could have been?
A. That clicks something in. Patty was pregnant with Tristan. And if Tristan's 15 now, that'd take it back to '89, so I'm

190

going to say it was '88. And I'm going to say the spring, early summer of '88 to the best of my recollection.
MR. PARRISH: Your Honor, I move to strike prior testimony on this issue on the grounds of relevancy and the jury admonished to disregard it.
THE COURT: You need to be more specific because you're not timing --
MR. PARRISH: Any conversation with regard to drugs that fall within the time period that this witness has testified about.
THE COURT: I'll sustain the objection. Members of the jury, you need to disregard the answer of the witness with regard to any activity of Mr. Honken in the time period he testified to.
BY MR. MILLER:
Q. Mr. Gahn, did you ever develop a business-type relationship with the defendant?
A. Yes.

Q. Describe that relationship.
A. At one time Dustin asked me if I knew anybody that would sell some cocaine.
MR. PARRISH: Objection. I move to voir dire the witness.
THE COURT: Well, I'm going to sustain the objection. We're going to have -- we're going to need a time frame first

♀

before we get into any questions.
MR. MILLER: Let me just circle around and see if I can move on to a different matter, Your Honor.
THE COURT: That's fine. Thank you.
BY MR. MILLER:
Q. You've already told us that you were acquainted with Mr. Nicholson.
A. Uh-huh.
Q. Whose acquaintance did you make first? Mr. Nicholson's or Mr. Honken's?
A. Mr. Nicholson.
Q. You purchased controlled substances from Mr. Nicholson. I believe you described marijuana.
A. Yes.
Q. Anything else, sir?
A. One time the night before my bachelor party I got a quarter gram of crank. Back then it was crystal meth. It wasn't crank. But yeah, those two -- marijuana and that one time of crystal meth.
Q. That would have been late '80s on the crystal meth?
A. Yeah, that would have been in '87.
Q. To your knowledge, sir, did the defendant in this case,

Dustin Honken, and Greg Nicholson ever develop an acquaintanceship?
A. Yes.

Q. And how do you happen to have personal knowledge of that fact?
A. Because I delivered the money and the drugs.
Q. Describe that. When was this, sir? When was this? First just tell us when this was.
A. It was after I met Dustin at Wellborn and before '91. I know that for sure.
Q. And that relationship continued for about how long, sir?
A. The only thing that I'm aware of firsthand between Dustin and Greg was a sampling amount of cocaine and seven ounces of marijuana where I delivered those to Greg, picked up the money from Greg, gave the money back to Dustin.
Q. Were there any problems with that transaction, Mr. Gahn?
A. Not specifically, no. I wound up doing a bunch of the coke, and I had to pay Dustin off for that, and he was upset with that, but we squared it away.
Q. Can you describe how that got squared away, Mr. Gahn?
A. I paid him.
Q. Did he have any difficulty in collecting that payment?
A. Yeah, it took me some time to come up with the money.
Q. But you did pay him.
A. Yeah.
Q. Why?
A. I didn't feel that Dustin was anybody that you shortchanged. If you owed him the money, you paid him. He

wasn't the type of person that would just let it slide.

Q. I don't want any speculation as to what type of person he was. I just want to know what, if anything, he told you that encouraged you to pay him that cocaine debt.

A. One time we were out talking in front of my house --

MR. PARRISH: Objection. Time. My objection is to voir dire the witness as to the time this conversation took place.

THE COURT: That's fine.

MR. PARRISH: For purposes of making an objection.

THE COURT: You're being kind of argumentative so just --

MR. PARRISH: Oh, I don't mean to be.

THE COURT: Okay.

MR. PARRISH: That's my objection.

THE COURT: Okay. Objection's sustained. You may voir dire the witness.

MR. PARRISH: Thank you, Your Honor.

VOIR DIRE EXAMINATION

BY MR. PARRISH:

Q. Sir, Mr. Gahn, would you tell us the time this conversation took place, the year?

A. I can only narrow it down. This is 15 years ago. To the best of my recollection, it was '89, '90, or '91, and that's the best I can do.

194

MR. PARRISH: I'm going to object, move to strike, admonish the jury, Your Honor, to strike any and all testimony as irrelevant, immaterial, no probative value and 403.

THE COURT: Let me see the lawyers at sidebar.

(At sidebar on the record.)

THE COURT: The indictment alleges from July 1, 1993.

MR. PARRISH: Right.

THE COURT: And so I'm having a hard time understanding how a lot of the stuff that happened four or five years earlier is relevant.

MR. PARRISH: That's what I want -- we want to move for a mistrial on that basis that he's gone beyond --

THE COURT: Well, go ahead and move for your mistrial. That's denied. There's nothing prejudicial about it.

MR. PARRISH: I understand, but I just want to say it's before the date of the indictment, and we believe that it's prejudicial. It kills us on 403, and it also makes us now defend prior to the time of the indictment, and I believe it creates error we can't get around in terms of examining this witness.

THE COURT: You were going to stipulate that he was involved in a drug conspiracy.

MR. PARRISH: No, this is part of what we're fighting about.

THE COURT: How is this even -- well, I'm not arguing

195

with you. Your motion for mistrial is denied. I'm surprised it took you so long to --

MR. PARRISH: I just didn't want to stand up in front of the jury.

THE COURT: We just have a basic problem.

MR. MILLER: I'll move on. I just want to mention he's the man that introduced these two people together, and I

felt I needed to lay some context for the relationship is the reason I got into this.

THE COURT: But not into the drug stuff.

MR. MILLER: Well, that was, Your Honor --

(The sidebar was concluded.)

THE COURT: Thank you.

CONTINUED DIRECT EXAMINATION

BY MR. MILLER:

Q. You indicated that you are the one who introduced Mr. Nicholson to Mr. Honken.

A. That's correct.

Q. And without giving us the exact circumstances of the introduction, please tell us when to the best of your recollection this introduction occurred.

A. It was -- had to be in the spring when Dustin was finishing up NIACC. After he got fired from Wellborn, he went to NIACC, and he graduated straight A's, but I remember taking the money --

♀

196

MR. PARRISH: I move to strike. Irrelevant, immaterial, no probative value, have the jury admonished to disregard the comment about getting fired at Wellborn.

THE COURT: Just a second. I'm going to send the jury out for a minute but -- and I'll answer your -- I received a note from one of the jurors, and I'll answer it when we bring you back, but I'm going to have a matter I need to take up with the lawyers so we can try and get over these bumps that we're having right now. A little more exercise for you. Thank you.

(The jury exited the courtroom.)

THE COURT: Okay. Please be seated. Now why don't we

take up your last objection while I was reading the note from the juror. You objected to the witness indicating that your client was terminated from the job at Wellborn.

MR. PARRISH: That's correct, Your Honor. No date, no place on it. It's a 403 issue, and it's irrelevant. There's no timing on it. It's done to just dirty the client in terms of his character. His character's not even in evidence at this point, and we think it's objectionable, should never have been volunteered or asked, and we believe that the jurors should be admonished to disregard that statement, and our objection is made.

THE COURT: Well, it was volunteered. It wasn't asked by the direct examination question. It has virtually no probative value that I know of. It's not really relevant to

♀

197

anything.

On the other hand, all due respect to you, Mr. Parrish, when somebody's charged with killing five people, whether he got fired from a job or not is not all that probative. It's just not.

MR. PARRISH: I would agree it has no probative value, but it can create some issues.

THE COURT: I don't see how it's very prejudicial, but I'll advise the jury to -- if you want me to call attention to it by telling them to disregard the fact that he was terminated from the job at Wellborn or this witness claims he was, I'll be glad to do that.

MR. PARRISH: Well, Your Honor, it can be cumulative in the sense that it does go back to the discussions he had about drugs that precede the indictment which there is no

discovery -- there is some statements on it, but you -- if it keeps adding, it complicates our defense in this matter. That's the problem we're having with this witness.

THE COURT: I said I'll sustain your objection.

MR. PARRISH: Oh, no, I understand. I thought you were inviting me to tell you what the difficulty with the firing was.

THE COURT: Now, here's the note we got: Do we have to cross out notes we took if you say testimony is to be disregarded, question mark? Can you be specific what time frame

to disregard, question mark?

MR. PARRISH: That's the problem we're having.

THE COURT: I do appreciate that.

MR. PARRISH: There are some purposes for these rules of evidence that helps jurors understand a little bit better.

THE COURT: So I think I will instruct the jurors to cross out their notes or make some notation that that is testimony that they should disregard.

With regard to the time frame, there were several objections and several different time frames, but the time frames were all significantly prior to the date alleged in Count 7 when the conspiracy allegedly started which was July 1, 1993. Would that be correct, Mr. Williams? That's the date alleged in the conspiracy?

MR. WILLIAMS: I'd have to take a look at that. The relevance comes in, though, to the extent that the defendant pled guilty -- I'm sorry, was charged in the original charge that was dismissed with being involved in a conspiracy from 1991 to 1993, and that indictment's already been admitted into

evidence. And so to the extent that this conduct stretches back to 1991, I think the time frame goes back. The current charges -- you'd think I'd have this memorized.

THE COURT: Well, I said on page 18 of the preliminary instructions between about July 1, 1993, and continuing thereafter until about 2000 as a time frame for the conspiracy

that forms the basis of the substantive charges.

MR. WILLIAMS: That's correct, until about 2000. So on Count 7, that's correct, Your Honor. That is the correct date on the charge.

THE COURT: Now, in the '93 charge, the indictment alleged that the conspiracy existed from '91 to '93?

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: Okay. Well, are you offering it as 404(b) evidence with regard to the charges that the defendant is currently indicted on?

MR. WILLIAMS: I think it'd be proper 404(b) evidence. I think it'd also be relevant to show the context by which these people met and ultimately a drug relationship was formed between Greg Nicholson and the defendant, and to the extent that it's necessary to explain the context of the meeting and how drug transactions ultimately transpired, it makes sense that the jury be allowed to know that there was drug transactions involving Mr. Gahn, Nicholson, and the defendant that ultimately led to the connection between Nicholson and the defendant.

THE COURT: If it was in the time frame for the '93 charge that was indicted, that would be probative it seems to me.

MR. WILLIAMS: I think it's probative to show the

connection, to show why they got connected up. I mean, we could bring it in sanitized to the standpoint as it is right now, they

have been introduced at some point, but that doesn't necessarily explain the context by how these people met and formed a drug relationship, and so I think it's probative to show that connection, that it was a drug connection that started off the relationship between Nicholson and the defendant. And in the alternative, it's proper 404(b) evidence to show a pattern of conduct by the defendant that his later involvement with drug activity is not simply accidental, a mistake, or that he didn't have the full intent to distribute drugs.

THE COURT: Mr. Parrish?

MR. PARRISH: Well, I'm getting a little double teamed here.

THE COURT: That's okay, because, you know, I called on Mr. Williams, and it was Mr. Miller, so you can go ahead and double team because I opened the door to the World Federation of Wrestling rules.

MR. PARRISH: Well, first of all, it goes back before -- if you pull up the testimony, it went before even what Mr. Williams is saying, so his argument is flawed a little bit on that.

THE COURT: Yeah, but that's the stuff I told them to disregard, that I sustained your objection on.

MR. PARRISH: Exactly, when you go back to the dates. But -- excuse me just a second.

THE COURT: Sure.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 179 of 3636

MR. PARRISH: We would agree also, Your Honor, that it would not be -- it would be disingenuous to claim that it's 404(b) because we're conceding the drug activity. So what does it gain by arguing that it's 404(b) material that goes into show his --

THE COURT: Well, except that we don't have a stipulation, so, you know, I'm not betting on a stipulation that you all discussed that you've never been able to agree on, that you maybe can agree on it over the weekend, maybe you can't.

MR. PARRISH: And there was no 404(b) notice either with regard to that --

MR. WILLIAMS: We're not --

MR. PARRISH: -- before the period of the indictment. But the big problem as the Court knows and has noted -- and that's why I just pulled up a copy of the indictment -- it's 1992 to 2000 as the Court pointed out. He's going back to '88, '89, '90, and all before even the indictment Mr. Williams is alleging it falls in the category of. That creates a real problem with regard to witnesses and preparation, et cetera, that hampers us quite a bit.

THE COURT: Well, was this all disclosed? You know, I'm not -- I hope we don't get into what's disclosed in the discovery file and what isn't or we're going to be spending more time with the jury out than we are going to have them in the courtroom, and you know from prior experience I'm not going to

202

be happy.

MR. WILLIAMS: Absolutely.

THE COURT: We've already had more sidebars than I

intended to have in the whole trial, and we're on day one of testimony.

MR. WILLIAMS: Mr. Gahn's interview is in the discovery file, and the fact that they met through drug transactions that occurred back in 1991 is in Greg Nicholson's testimony that was already admitted into evidence.

THE COURT: In the grand jury testimony.

MR. WILLIAMS: In the grand jury testimony. And so full disclosure has been made that the way they got connected up was drug transactions. To the extent that we have an obligation to provide notice of 404(b), that's taken care under the stipulated discovery order in this case that as long as we make it available to them in the file that meets our notice requirements.

THE COURT: So what purpose are you offering it for?

MR. WILLIAMS: We're offering it to show that these guys hooked up and the nature of the way they hooked up was a drug transaction which then allows the jury to understand how it moved from Nichol -- I'm sorry, from the defendant to Mr. Gahn to Mr. Nicholson and the drug relationship ended up occurring. That's all we're trying to do is show the context of how this relationship developed.

♀

203

THE COURT: But how -- well --

MR. WILLIAMS: We don't intend to get into any details about how many transactions or what the quantities were and all that kind of stuff. All Mr. Miller is trying to do is establish that's how they got connected up, and so we don't plan on doing anything more than establishing the nature of the contact.

THE COURT: Okay. Did you have a pending objection,

Mr. Parrish?

MR. PARRISH: Just on the termination from Wellborn and the period that goes before the date of the indictment. Your Honor, we'd like at least an admonition that they don't go back into that area again, and they could probably just admon -- you know, tell the witness that that's not an area that should be testified to before the period of the indictment.

THE COURT: Well, I do agree with Mr. Williams that they're entitled to show the context in which they met.

MR. PARRISH: Absolutely. No one's disputing that. But to talk about drug activity that's not part of this conspiracy I think creates a real 404(b) problem and a 403 problem, and I disagree with Mr. Williams about notification of this. I went over his material. I went over it last night. Maybe Mr. Williams can point it out to me. But I don't know where Mr. Williams talks about drug dealing in 1988, 1989 than I do, but I went over this last night.

THE COURT: Well, I'm not getting into any more of

♀

204

this. Let's bring the jury back in.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated. I'll try and take these in order. Mr. Parrish objected to testimony by this witness about Mr. Honken allegedly losing a job at Wellborn. I'm sustaining that objection. You're instructed to disregard it which leads into the note that I received from one juror. And I'll just read you the note: Do we have to cross out notes we take if you say testimony is to be disregarded, question mark? Can you be specific about what time frame to disregard?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 182 of 3636

Let me take the first part of the question. I think it would be a very good idea -- actually I've been doing this for ten years. I've never received a note like this, and it's terrific that you were thinking about it because when you go back to review your notes, whenever this trial's going to be over, you're not going to remember what was told to disregard or not, so that's an excellent suggestion. I should have thought of it on my own, but I appreciate the suggestion. Now I'll incorporate it in future trials.

So you should indicate in your notes to the extent that any of you are taking notes -- and I know some of you are -- when I instruct you to disregard testimony. And I'm not going to be specific about what time frame, but each time I told you to disregard the testimony, it was a time frame earlier than

205

1991, and when I told you to disregard that testimony, you should disregard it.

We'll continue with the examination of the witness. Mr. Miller? Thank you.

MR. MILLER: Thank you, Your Honor.

BY MR. MILLER:

Q. Moving on, Mr. Gahn, I take it that you are no longer involved in any manner whatsoever in illegal drug trafficking.

A. No.

Q. Got out of that business years ago.

A. Never got into it really for real.

Q. Nevertheless, you are the man who introduced Greg Nicholson to Dustin Honken.

A. Correct.

Q. I want to go to 1993, spring of '93. Well, let me ask you

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 183 of 3636

this. Did you ever become aware of the fact that Greg Nicholson got busted?

A. Yes.

Q. And how did that information come to your attention?

A. I had a couple Ovation guitars that Greg was interested in purchasing, and I was speaking to him on the phone when I heard them at the door, Mason City Police Department; we're coming in.

Q. So you were actually talking to him on the phone when --

A. I was talking to him on the phone when they came through the door, yes.

♀

206

Q. And one thing I want to mention to you -- and I know you're simply trying to get your information out to us in response to my question, but it's very important that we try to wait until my question or Mr. Parrish's question is completed before you begin your answer. You and I understand each other, but it's very difficult for the court reporter to make an accurate record of it or for the jurors for that matter; okay?

A. Okay.

Q. And again, just please thank you for helping, and keep that in mind.

You were not involved in drug transactions yourself at that time or -- in '93?

A. No, no.

Q. Did you have any contact with Greg Nicholson in person following that phone conversation in which you heard him being busted?

A. Twice specifically. The first time I saw him face to face I just purchased a '93 Softail, and he was interested in seeing my bike, and this was after he had been popped by the Mason City

police, so I took my bike over there, and he checked it out, and he had mentioned that he cut a deal and all he had to do was six months in Beje Clark which I knew was a sweet deal for what he had going on.

The second time I --

Q. Hold on just a second. Before you mention the second time,

♀

207

you mentioned a couple terms I'm not familiar with. You mentioned a ninety -- some year of some kind of a bike?

THE COURT: Softail.

MR. MILLER: Softail.

THE COURT: '93.

MR. MILLER: Okay.

A. Big orange Harley.

Q. Pardon me?

A. Big orange Harley.

Q. That's a Harley.

A. Yeah.

Q. To people into motorcycles, that makes a difference, doesn't it?

A. Yes.

Q. Okay. Tell us about the second occasion.

A. The second occasion was about a month after my wife had filed for divorce, I was trying to open a dance club in downtown Mason City called the Club Excess, and I was kind of a silent partner with some money into it, and we were trying to purchase a sound system for the club, and at that time I couldn't get ahold of Greg directly because I didn't know where he was at. He had moved out of his house on Filmore, and that's the last I heard. A fellow band member of his gave him a call, told him I

was interested in purchasing the equipment, and Greg came down to the club.

MR. PARRISH: Objection, hearsay. Objection, hearsay of the band member.

MR. MILLER: I don't believe that's offered for the truth of the matter asserted.

THE COURT: Overruled.

BY MR. MILLER:

Q. Please continue.

A. For some reason Greg wouldn't invite me to his house or whatever, and he came down to the club and checked it out, and he said that he could possibly set me up with a few speakers but he was not interested in selling his entire system because once he got doing -- done with whatever punishment he was going to get he assumed that he would continue with live music. And so that was about the end of the conversation, and then he left.

Q. That was when and where, sir?

A. I know for sure that was in late June, early 'July of '93.

Q. And where was that, sir?

A. It was downtown Mason City.

Q. You were trying to get into the night club business?

A. Yeah.

Q. And you needed some sound equipment.

A. Yep.

Q. Unsuccessfully attempted to purchase some from Greg Nicholson.

A. And unsuccessful at the night club also.

Q. During that approximate same time frame, Mr. Gahn, did you have any contact with Dustin Honken?

A. Surprisingly, yes. A short time after Greg left the building -- which to my recollection wasn't a scheduled appointment or anything; he just kind of popped in.

Q. Same day?

A. Same day.

Q. After Greg Nicholson left?

A. After Greg Nicholson left, Dustin showed up.

Q. About how long later?

A. Best of my recollection, hour or two because I remember Greg was there around lunchtime and Dustin showed up mid afternoon.

Q. Please describe what happened.

A. Dustin was just real emphatic about finding out where Greg was, if I knew how to get ahold of him, where he was at, things like that. And Dustin's usually pretty calm and cool and collected, and he seemed really adamant, almost desperate to find out where he was. And at the time I did not know where he was. You know, I went through Tina to set up him coming down to the club. So I thought that was real strange. And for some reason he needed a ride to Clear Lake, and I gave him a ride to Clear Lake, and that was about the end of it.

Q. After your conversation at that club was over, you gave Mr. Honken a ride to Clear Lake.

210

A. Yeah.

Q. About how long was that conversation at the club, sir?

A. I honestly don't recall, but I'm going to say it was brief.

Q. About an hour after you'd seen Greg Nicholson that summer.

A. Correct.
Q. And the subject of the conversation, was there any subject other than where's Greg Nicholson?
A. No.
Q. That was the only subject brought up.
A. Correct.
Q. And you weren't expecting to see Dustin Honken.
A. No.
Q. He came there asking you to locate him.
A. Correct.
Q. Did he arrive there with anyone?
A. No.
Q. You gave him a ride from there?
A. Yes.
Q. Can you describe where you took him and what happened on the ride?
A. The only thing that was -- that I remember from it was that, one, his either girlfriend was -- I'm not even sure who his girlfriend was at the time -- was either behind us or in front of us, and they got pulled over by the fire department. The other thing was that he wanted to be dropped off at the

♀

211

Holiday Inn and not where he was staying.
Q. Holiday Inn in Clear Lake?
A. Yeah. Those are the only two things I found odd from the situation.
Q. Did you have any other contact with Mr. Honken after that?
A. To the best of my recollection, that was about it.
Q. Or with Greg Nicholson.
A. Nope.

Q. Mr. Gahn, the person that you had that conversation with in the summer of 1993 at your club downtown Mason City who came there seeking information about the whereabouts of Greg Nicholson, is that person present here in the courtroom?
A. Yes.
Q. And would you point him out and describe his location for us, please?
A. It's Dustin in the white sweater.
MR. MILLER: No further direct.
THE COURT: Mr. Parrish?
MR. PARRISH: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PARRISH:
Q. Good afternoon again.
A. Hello.
Q. Let me just ask a couple of questions of you. We've met before; is that correct?

212

A. That's correct.
Q. I'm Alfredo Parrish.
A. It was in '93, was it?
Q. We met just a few minutes ago in this courthouse again too, didn't we?
A. Yeah.
Q. Tell me if I'm correct on this. You were interviewed by Mr. Basler on February 22 of 2000; is that right? That's the gentleman seated right over here, Mr. Basler.
A. Yeah, I think that was in my apartment on Third Street.
Q. Right. It was at your house.
A. Yeah.

Q. He came back and reinterviewed you -- would that have been the same day -- to follow up on some information?

A. I thought they just stopped by once, but maybe they did, yeah.

Q. And you also testified before the grand jury August 27 of 1993; is that right?

A. That's correct.

Q. You also indicated, did you not, that Mr. Nicholson was dealing meth prior to 1992?

A. I'm sure of it because -- I'm not sure that he was dealing it for profit. I think it was more personal use. He always had a little on hand because I went there before my bachelor party to get a little crystal meth, and I got a quarter gram, yeah,

♀

213

but I didn't have any knowledge of him doing amounts, no.

Q. Well, if you went there to get some, are you telling the jury that he was not dealing or he was dealing? Which one?

A. I'm telling the jury that he probably cut me a little bit out of his stash.

Q. Did you pay for it, or was it free?

A. I think I paid for it, yeah.

Q. So he was dealing with you.

A. Yeah.

Q. And you indicate, did you not, that you bought drugs from him from 75 to 100 times?

A. Marijuana, at least, yeah.

Q. Just marijuana by itself you bought 75 to 100 times from Mr. Nicholson?

A. Sure, once or twice a week for years, yeah.

Q. And -- for years? How many years?

A. Two or three.
Q. And from -- crystal meth from him approximately how many times?
A. One time.
Q. And you told the grand jury, did you not, and you still state today that you bought this marijuana from him; is that right?
A. Correct.
Q. Did you buy cocaine from him too?

♀

A. No.
Q. You went to his house on numerous occasions; is that correct?
A. Correct.
Q. You went to his basement, this Mr. Nicholson's basement, on numerous occasions; is that correct?
A. Correct.
Q. He had people in his basement that frightened you; is that correct?
A. During the time where Greg had the band called Whiskey Business, there was people over in his basement that I'd never seen before of a different character than musicians that I was accustomed to seeing there.
Q. You indicated, did you not, to the grand jury that these people were people you thought were drug dealers or dealt business in dealing drugs with him? Isn't that your testimony that you gave before the grand jury?
A. That is correct, yes.
Q. And did you tell them that these people frightened you so much that you had some concerns about going there on Friday and

Saturday nights? Isn't that correct according to your testimony before the --

A. That's correct, yes.

Q. Describe for the jury these people who you saw in his basement. How tall are you?

♀

A. Six foot four.

Q. And describe these people who you saw in his basement that frightened you so much that you wouldn't go there on Friday and Saturday nights.

A. I guess the first thing that would come to mind is I didn't know who they were. I'd never seen them before. The second thing that would come to mind is they were very unkept. Their personal --

Q. How?

A. Very poor hygiene, long haired, dirty, bikers, just people that I wasn't accustomed to seeing.

Q. Bikers.

A. Yeah. The stereotype of a biker, yeah.

Q. Did you ever see bikes outside of his house before you would go in there on Friday and Saturday nights prior to your stopping, going in there?

A. Yes.

Q. And that frightened you too, didn't it?

A. When you're around a bunch of people you don't know and you don't know the circumstances, you're in the wrong place at the wrong time, anything can happen, you know, kind of make you a little edgy.

Q. This was prior to the time that Mr. Honken, according to your testimony, started dealing with Mr. Nicholson; isn't that

correct?

A. Prior and afterwards.

Q. It's true, is it not, from your knowledge on the periphery that when there's a rivalry between who's buying whose drugs that leads sometimes to dissension?

A. What's the question?

Q. Do you know what dissension means? Let me use a different word.

A. Okay.

Q. That leads sometimes to conflict when people are dealing with different people in buying drugs.

A. Okay.

Q. You agree with that from your understanding of the periphery; is that correct?

A. I guess I'd never been exposed to it, so I guess I wouldn't have an opinion on it.

Q. You'd never been exposed to it. Did you never collect any money for anyone?

A. Sure, yeah. There was no dissent or conflict. It was pretty much cut and dried.

Q. Being on the periphery you bought 75 to 100 times. You also collected money for people who were dealing drugs; is that right?

A. No, that's incorrect.

Q. That's incorrect.

A. That is way incorrect, yeah.

Q. Okay. Did you ever at any point in time before 19 -- this is June of 1993 -- stop going over to Mr. Nicholson's basement?
A. Yeah. When he got arrested by the Mason City Police Department, he kind of went into underground. He just kind of -- he didn't want anybody over. The only time he even wanted to talk to me was to check out my bike.
Q. This was in June of '93.
A. No, I showed him my bike in March of '93.
Q. But you had stopped going over by June of '93; is that accurate?
A. On a regular basis, sure, yeah.
Q. To your knowledge he had moved out of his house by July of '93; isn't that accurate?
A. I didn't have any knowledge that he moved out of his house. I didn't know where he went.
Q. So you have no idea from March forward of '93 where he went until he came over to your place? Would that be your testimony?
A. That'd be pretty close, yeah.
Q. Were you interviewed by law enforcement officials in '93?
A. Yes.
Q. Were you a cooperator in '93?
A. Yeah.
Q. Did you tell Mr. Honken that you were a cooperator in '93?
A. No.
Q. Do you recall an interview you had with Mr. Basler -- I

218

asked you about the dates -- in February of 2000 when he asked you that question as to whether or not you and Mr. Honken had a conversation back in '93 as to whether or not you were a cooperator or not?

A. The only time I ever had a conversation with Dustin Honken about whether I was cooperating with the police is after the grand jury testimony he came into Tractor Supply and asked me if I was the unidentified witness at the grand jury, and I told him no, I was not.
Q. You never told him yes, you were.
A. Correct.
Q. Did he ever have knowledge that you were cooperating?
A. I don't know.
Q. You came -- you testified that at one point Mr. Honken came over at the same time on the same date that Mr. Nicholson was visiting with you, is that correct, when you were opening up this new club?
A. Correct.
Q. Prior to today's date, have you told anyone that within an hour of Mr. Nicholson being there that Mr. Honken was there prior to today's date sitting here today?
A. Run that question by me one more time. You lost me.
Q. Prior to today's date and your testimony right here on direct examination, had you told anyone else that within an hour of Mr. Nicholson leaving your business that Mr. Honken showed

219

up?
A. Prior to today's date have I told anybody else that?
Q. Yes.
A. Yes.
Q. Who?
A. I told those guys in an interview a couple months ago.
Q. Was that the first time?
A. I was kind of privy (sic) with that information because it

didn't come up in casual conversation. I'd really have to think on that to answer that correctly.

Q. So is this what you were telling me is you were interviewed by the grand jury in 1993 -- you agree you never told the grand jury that in 1993.

A. I'd have to check the reading, but maybe I didn't.

Q. It's pretty short.

MR. PARRISH: Your Honor, may I show this to him, please?

THE COURT: You may.

BY MR. PARRISH:

Q. This is your testimony in 1993, sir.

A. Uh-huh.

Q. Could you find in there where you told them within an hour of Mr. Honken -- Mr. Nicholson leaving your business Mr. Honken showed up?

A. Boy, I don't know if I can or not.

♀

220

MR. PARRISH: Your Honor, I believe we could have a stipulation that he didn't tell them that in the grand jury.

THE COURT: Does the government stipulate to that?

MR. MILLER: Sure.

THE COURT: Members of the jury, you'll remember in one of my preliminary instructions I told you that evidence sometimes comes in by way of stipulation. That's simply when the two parties agree to something which just happened.

MR. PARRISH: Thank you.

BY MR. PARRISH:

Q. Mr. Gahn, we won't need you to go through that.

A. Is it in there?

Q. We've stipulated that it's not in there.
A. Okay.
Q. I want to ask you as to whether or not other than two months ago you can ever recall telling anyone else other than, as you say, these gentlemen right here that within an hour of Mr. Nicholson leaving your place that Mr. Honken showed up and asked for him.
A. I'm not sure.
Q. Okay. So if you're not sure, would you agree that it's possible that you went almost ten years without mentioning that fact?
A. I guess that would make complete sense because it wouldn't come up.

221

Q. And so it never came up with an interview with Mr. Basler, you would agree, and he came out asking you about when you'd seen Mr. Nicholson; is that true? It never came up with him.
A. You know, I'm trying to recall every conversation I've had in the last ten years, and I'm --
Q. We're just talking about three that you've had.
A. Okay. Well, I'm not sure who I may have told besides these people right here outside of wife and maybe a preacher.
Q. Well, let's not talk about your wife and preacher. I'm not privy to that information, but I am privy to what you told law enforcement officials.
Now, with regard to what you told law enforcement officials, did you ever tell them in the last ten years that within an hour of Mr. Nicholson leaving your place that Mr. Honken showed up?
A. I would like to think I had if it was asked.

Q. But unfortunately if they didn't ask you never told them.
A. That could be very correct until a couple months ago.
Q. Until a couple of months ago after ten years you never thought it was important; is that right?
A. I guess it never came up.
Q. So it's their fault.
A. All it was to me was Greg showed up, didn't want to sell his stuff; Dustin showed up, wanted to know where he was at. And I didn't. I didn't see any significance to it to remember

222

it.
Q. But this report that you -- this interview that you had in February of 2000 that you've already conceded that you had, you would agree it was focusing on what did Mr. Honken say when he came over asking about Mr. Nicholson; is that right? That was part of what they wanted to know.
A. The only time I recall talking to Bill in my apartment was prior to June of '93. Wasn't that February 22 of 2001?
Q. 2000, not 2001.
A. Dustin hadn't even -- that was two years before Dustin even came to the club and asked about Greg. Of course it wouldn't have come up.
Q. In the year 2000 it never would have come up.
A. No, because we're talking about a conversation that happened in 2003 -- or '93. I'm sorry.
Q. So do you want to restate that then?
A. Yeah, yeah.
Q. Okay. All right. If you're a little confused, that's okay.
A. The conversations I had with Frank Stearns and other DCI

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 198 of 3636

people before the grand jury, it probably didn't come up. If Bill and whoever was with him that day in 2000 didn't bring it up, I may not have thought enough about it to bring it up.

Q. Do you think your memory was better --

A. I got confused on my dates.

♀

Q. I'm sorry. Go ahead.

A. I'm done.

Q. Do you think your memory was better in 1993 when you were in front of the grand jury or would have been better two months ago when you met these gentlemen to tell them it was within an hour that you saw both of these men?

A. That's a tough question because since I've been interviewed and been subpoenaed for this trial, I've thought about a lot of things that I haven't thought about in a long time, and I have remembered some things that I had forgotten. But whether my memory was better in '93 or now, I'd hope not.

Q. You'd hope not.

A. I'd hope not.

Q. So we should rely on your memory back in 1993 when you didn't remember that information?

A. I think any testimony in the grand jury is accurate and true.

Q. Okay. You also told the grand jury that you did not know Angie Johnson or had not seen her before. Would that be accurate?

A. I'm going to say that's accurate because I remember being at a house in Clear Lake with Dustin and it was his girlfriend, but who the girl was, I don't recall.

Q. But you told them later in 2000 as the same thing you said

here that Angie was with Dustin when he came over and he was

asking about Greg Nicholson.

A. He said his girlfriend. He never said Angie.

Q. But didn't you say that you followed a car that you thought that might have been Angie but you're not sure now if that was Angie?

A. I couldn't recall if the car was in front of us or behind us, and I'm -- I honestly don't know if Dustin was dating Angie at the time when I knew him or not. I really don't.

Q. All right. Then which one is accurate then? The statement that in -- that Angie was with him or Angie was not with him?

A. Are you referring to the day that I gave Dustin a ride home from my club?

Q. I think that's the date that's the hour in question, isn't it?

A. Okay. The only thing I can say for truth is that Dustin said his girlfriend got pulled over. Who it was, I don't know.

Q. So then your later statement to Mr. Basler that it was Angie Johnson is possibly inaccurate also.

A. I don't know who Dustin was dating on that day in July.

Q. And so you can't say that it was Angie --

A. I cannot positively say it was Angela Johnson, no.

Q. So any statement that you may have made indicating that it was Angie Johnson, you will now retract that statement.

A. What do you mean by any statement?

Q. Any -- if you had made a statement earlier indicating that

it was Angie Johnson who was with Dustin on that date in 1993,

you're saying that statement was possibly inaccurate.

A. I could not look the judge and God in the eye and say I know for sure it was because that's not the truth. I'm not sure who Dustin was dating in '93.

Q. I just want to look at my notes one second. I might be through, sir.

I do have one last area with you. Would you agree that in 1993 you told the grand jury when they asked you about this that Mr. Honken when he did ask for Greg Nicholson just said, I want to talk to him?

A. Absolutely.

Q. And you would agree that when you testified here today you said -- some 11 years later, you said he was emphatic, he was insistent, he was almost desperate?

A. I know that to be true also.

MR. PARRISH: Thank you so much.

THE WITNESS: You're welcome.

THE COURT: Mr. Miller, anything further?

MR. MILLER: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. MILLER:

Q. How do you know that to be true?

A. There was two times that Dustin ever made me real nervous, and you get that gut feeling where you know something's a little

226

bit off. One was when he told me to pay up for the money -- pay him the money for the coke that I did. I had a little feeling that if I didn't pay this guy his money, it could be bad news. I had that same feeling the afternoon he was in my club looking for Greg Nicholson, and I know that's all opinion or whatever,

but that's how I know.

Q. And when you testified before the grand jury, you told them that he came looking for Greg Nicholson.

A. Correct.

Q. You just didn't add the timing that you gave us today.

A. Excuse me?

Q. You just didn't provide the timing, that one hour.

A. That could be possible.

MR. MILLER: Thank you. I have no further direct, Your Honor, redirect.

MR. PARRISH: No questions.

THE COURT: Gentlemen, we got a note from the jury, and I'm going to show you the note, so please approach, Mr. Parrish and Mr. Miller.

(At sidebar off the record.)

THE COURT: I received the following note from one of the jurors: Mr. Gahn said Honken showed one to two hours after Nicholson left. Now the time frame is within an hour. Which is it?

Here's the situation. I appreciate the note. In this

227

courtroom we don't allow jurors to ask questions, but I'm going to give the lawyers an opportunity to ask any follow-up questions because I have a duty to share any communication I have from a juror with the lawyers for both sides. It's just been my experience in trials that oftentimes there -- and I'm not making any comment on the testimony of this witness, but there are often times inconsistencies, and that's why we have a jury. You have to sort those out and do the best you can, and I know it's frustrating sometimes because lawyers don't ask the

questions you might want to ask. That's just part of the trial process.

They are experimenting with jurors asking questions in the state courts in Arizona, for example. I've followed the practice very carefully. I've talked to judges who allow it. And all I can tell you is that it's not allowed in this courtroom.

So would the lawyers like to ask any follow-up questions?

MR. MILLER: Yes, Your Honor.

THE COURT: Okay, Mr. Miller. You may.

CONTINUED REDIRECT EXAMINATION

BY MR. MILLER:

Q. Mr. Gahn, revisiting that day that Dustin Honken showed up at your club downtown Mason City, were you expecting him?

A. No.

♀

228

Q. So I trust you weren't watching the clock and timing how long it was before he showed up.

A. No.

Q. What's your best recollection? And again, I don't want you to guess about anything, but tell us to the best of your ability approximately how long it was if you can.

A. To the best of my ability, it was after lunch and well before supper. I'd put it somewhere between -- from the time Greg showed up and left, I'm going to say Greg was out of there by 1:30, 2:00, and by the time I dropped Dustin off in Clear Lake, it was before supper, 4, 5:00. That's the best I can recall.

Q. This all transpired that afternoon.

A. That afternoon.

MR. MILLER: Thank you, sir. No further redirect.

THE COURT: Mr. Parrish, anything further for this witness?

MR. PARRISH: No, Your Honor. Thank you.

THE COURT: Okay. You may step down. Thank you.

Government ready to call its next witness?

MR. WILLIAMS: Yes, Your Honor. The United States would call Aaron Ryerson. Your Honor, this is an incarcerated witness, so it's going to take a little bit of time for the marshals.

THE COURT: Okay. Why doesn't everybody take a

stretch break.

Okay. Can you raise your right hand the best you can? There you go.

AARON RYERSON, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in our witness box. Would you state your full name, please, and spell your last name.

THE WITNESS: Aaron Ryerson, Aaron Paul Ryerson, R-y-e-r-s-o-n.

THE COURT: Thank you.

Mr. Williams.

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Good afternoon, Mr. Ryerson.

A. Afternoon.

Q. Can you share with the jury where are you from originally,

sir?
A. From Britt, Iowa, originally.
Q. Did you grow up in Britt, Iowa?
A. Grew up in Forest City.
Q. Can you do me a favor if the marshals can assist? Move just a little bit closer to the microphones. As nice as they are, they only work if you're about four inches away from them.
Mr. Ryerson, how far did you go through school, sir?

♀

230

A. 12th grade.
Q. Graduated from high school?
A. Yes, sir.
Q. And how old are you today, sir?
A. Thirty-three.
Q. Currently you're incarcerated, and we're going to talk about that in a little bit. But when you're not incarcerated, do you have a trade or profession you practice, sir?
A. I worked at a recycling center the last job I had, but carpentry.
Q. Trained in carpentry?
A. Yes.
Q. Over the years have you worked in that area?
A. Yes, I have.
Q. Let's talk a little bit about the fact you're incarcerated at this point. What are you currently in jail for?
A. Currently in jail for third-degree burglary, two assaults on a peace officer, an eluding, and possession of firearm as a felon.
Q. Okay. Let's talk about that a little bit. You have kind of a history. You've been in and out of trouble with the law

over your life.

A. Yes, I have.

Q. And you have had theft charges in your past?

A. Yes, I have.

♀

Q. That resulted in you going to prison.

A. No.

Q. Okay. Did you get jail time?

A. Little bit of jail time, yeah.

Q. You had the felony charge you just mentioned there, the burglary third?

A. Yes, sir.

Q. When did you -- when were you convicted of that, sir?

A. 2002.

Q. Do you have a terrorism charge that was a felony count too?

A. Terrorism with intent.

Q. And when was that?

A. 1997.

Q. And was that a felony charge as well, sir?

A. Yes, it was.

Q. Did you do some prison time for that?

A. Yes, I did.

Q. Now, the burglary that you received, how much of a sentence did you get for the burglary in 2002?

A. Five-year sentence.

Q. And how long did you serve of that sentence initially, sir?

A. How long have I served on it?

Q. How long did you initially serve? Were you on parole or something for a while?

A. About a year and a half, yeah.

♀

Q. Then what happened after a year and a half, sir?
A. Then I went to the -- and I got a job, went to the halfway house, and then got my hand almost cut off and went to the hospital, got caught with a gun, went to prison for the gun.
Q. Okay. So you were working at this recycling center while you were on -- in the halfway house?
A. Yes, and when I was out.
Q. What recycling center was that, sir?
A. Mason City Recycling.
Q. And what halfway house were you in at the time?
A. Beje Clark.
Q. You mentioned a couple things I want to talk about. You said you almost cut off your hand. Can you explain what happened?
A. Industrial accident; somebody turned on the machine while I was lubricating a bearing and almost cut my hand. Had to be reattached.
Q. Which hand was that, sir?
A. Left hand.
Q. And are you still working through rehabilitation on that?
A. Rehabilitation, surgery, another surgery in the future, yeah.
Q. When your hand was almost cut off, did you end up going to the hospital then?
A. Yes, I did.

♀

233

Q. And is that where the gun was found?

A.    Yes, it was.
Q.    How did you have a gun on you when you went to the hospital?
A.    I had it in my possession, and it was on me, my person.
Q.    And you were a felon at the time, and that's a crime.
A.    Yes, sir.
Q.    And as a result of that, was your probation revoked on your burglary charge?
A.    Probation revoked, sent to prison on a firearms violation, yes.
Q.    And you're currently serving time on that now.
A.    Yes, I am.
Q.    And how long are you serving, sir?
A.    Five years.
Q.    As part of your testifying here today, you were writted out, in other words, a court order issued causing the marshals to bring you here today; is that accurate?
A.    That's an accurate statement, yes.
Q.    Is there some type of plea agreement that you have with the government that you're getting some benefit from testifying today?
A.    None whatsoever.
Q.    Are you going to get a reduction in your sentence for testifying?

234

A.    That's cut and dried, discharged sentence for state, so no.
Q.    Has anybody made any promises to you you're going to get some benefit for testifying here today?
A.    No, they haven't.
Q.    Do you even hope to get any benefit for testifying here

today?
A. I don't want it.
Q. Let's talk a little bit about Terry DeGeus. At some point in your past did you come to know Terry DeGeus?
A. Yes, I did.
Q. Can you just describe for the jury, how did you meet Mr. DeGeus?
A. I met Terry through Angie Johnson.
Q. Now, was Terry also from Britt, Iowa?
A. Terry's from Britt, yes.
Q. Did you know him growing up at all?
A. No, not really.
Q. And so was he older or younger than you?
A. He was a little bit older than I was.
Q. Okay. You indicated you met him through Angie Johnson. Do you remember approximately when that would have been?
A. Probably around '96 -- '90 -- well, no. It would have been around 1990 maybe.
Q. Okay. And can you explain to the jury how did you meet him through Angie Johnson? What was the circumstances?

235

A. I was over at Angie's in Clear Lake, and he was there, and we were having a few beers and talking.
Q. Did you know Angie from before?
A. Yes, I've known her for a while, yeah.
Q. And explain to the jury what knowledge or what relationship did you have with her in the past.
A. She used to own a bar in town there in Forest City, and I met her through the bar, and a couple of my friends had a band in the bar and met her through that.

Q. So in 1990 she was just a friend of yours?
A. Yeah.
Q. And you were over at her house one time, and that's how you met Mr. DeGeus.
A. That's correct.
Q. So explain to the jury, after you first met Mr. DeGeus, did you and Mr. DeGeus become friends in any way?
A. Yes, we did.
Q. Describe your friendship if you would, sir.
A. Terry was a loyal friend. I saw him at Angie's. He told me to stop by his house one day, and he told me he got a new house, you know, out in the country, and I swung by there, and it just so happened my vehicle broke down right in front of his place, and I pulled it in there, sat in the Morton building, and then I helped him move some stuff into his house. From there we just got to be friends, and I ended up staying there for a while

♀

236

off and on.
Q. And this would have been where at, sir?
A. This was in Britt, Iowa.
Q. And you stayed with him off and on during what time frame? You met him in 1990. How long did you continue to have this friendship with him?
A. I'd say for a few months in '92, '91, '92.
Q. So you stayed with him a few months in '91, '92?
A. Right.
Q. And did you continue to periodically be over at his house just as friends continuing up through '93?
A. That's correct.
Q. Tell us about Mr. DeGeus. Was he a married man when you

knew him in 1990 to 1993?
A. No, he was not.
Q. Did he have any children?
A. Yes, he did.
Q. How many children did he have?
A. One daughter.
Q. And what was her name?
A. Ashley Dawn. I think he had a boy in Oklahoma. I'm not sure. He talked about him.
Q. Did Mr. DeGeus have visitation with his daughter Ashley?
A. Yes, he did.
Q. And how often were you aware that he saw his daughter Ashley?

♀

A. It was quite frequent. I mean, he had her most -- any time he wanted her, and he frequently went and got his daughter and had her at the house.
Q. Let's talk a little bit about Angie Johnson and Terry DeGeus. And if I could just ask you to speak up just a little bit more, you're kind of a soft-spoken man.
At some -- what was -- let me start over. Was there a relationship between Angie Johnson and Terry DeGeus that you were aware of?
A. Yes, there was.
Q. And what type of relationship did they have?
A. Well, at one time I know that they were seeing each other. I knew they were friends and maybe seeing each other off and on.
Q. So they had kind of an off-and-on romantic relationship?
A. Yeah, from what Terry said, yeah.
Q. And this continued during the time period 1990 through --

for a while anyway?
A. I think it was sporadic also, probably off and on the way he talked about it.
Q. Let's talk a little bit about Mr. DeGeus and drugs. Were you aware that -- whether Mr. DeGeus was involved with drugs? Back in 1992 is the area I want to focus on.
A. Yes, he was.
Q. What kind of drugs was Mr. DeGeus involved with?

A. Methamphetamine.
Q. Was he a user of methamphetamine?
A. Yes, he was. So was I.
Q. Was he selling methamphetamine at that time?
A. Best of my knowledge he had to have been.
Q. And why do you say he had to have been?
A. Because of the substantial amounts that were there.
Q. All right. Let's talk about that a little bit. You indicated you were a user of methamphetamine as well at that time.
A. Yes, I was.
Q. What's the typical amount of methamphetamine that you or Mr. DeGeus would normally use?
A. Would use?
Q. Yeah. Just one time you were going to use some meth, what's the typical amount you'd use?
A. Over a gram of pure meth a day or whatever the purest it came, easily.
Q. Okay. So about a gram a day?
A. Easily at the minimum.
Q. Okay. And so the quantities you saw Mr. DeGeus with were

greater than that that made you believe he was selling it to somebody else?
A. There was more than a gram around, yeah.
Q. What kind of quantities of methamphetamine did you see

Mr. DeGeus with in 1992?
A. You know, I can't really -- I don't know because it wasn't measured, but it was -- it was in a peanut butter jar. I've seen that half full. I've seen it on the table being mixed, maybe 16 ounces. I don't know. I'm guessing.
Q. Okay.
A. Got down to about two ounces we started getting nervous because we had such bad habits.
Q. All right. So let's talk about that a little bit. You said you saw it in a peanut butter jar; is that right?
A. That's correct.
Q. And we're just talking about like a Skippy Peanut Butter jar of some sort?
A. Small one, yes.
Q. And during this time period you're saying you have ounces of methamphetamine or Mr. DeGeus had ounces of methamphetamine at his house, he was using some, you would use some; is that correct?
A. Yes, I would.
Q. Did you ever see him selling any to any other person?
A. No, I have not.
Q. Did he provide you with methamphetamine?
A. Yes, he did.
Q. On occasion were there friends of yours that were out looking for meth that you would introduce to Terry from time to

time?
A. Yes, sir.
Q. And did you ever have to pay for your methamphetamine that you got from Mr. DeGeus?
A. Never paid for it.
Q. At any point did you learn where the methamphetamine was coming from that Mr. DeGeus was getting in such large quantities?
A. I had a pretty good idea, but, you know, just by -- from when I was around.
Q. Okay. Let's talk about that. Did you ever see anybody delivering methamphetamine to Mr. DeGeus?
A. Never saw a hand-to-hand handing off.
Q. I'm sorry?
A. I never saw him hand it off to him but . . .
Q. Okay. Let's do it this way. Did you see somebody coming to Mr. DeGeus's house when Mr. DeGeus didn't have large quantities of methamphetamine and then when that person left he had large quantities of methamphetamine?
A. I could tell you about a time we went to Clear Lake.
Q. Okay. Why don't you tell us about the time you went to Clear Lake.
A. Well, Terry didn't have a license when I first met him, so I'd drive him around a little bit. Went to Clear Lake behind the True Value, and he told me to pull over. We didn't have any

meth that day and pulled over. I did. He told me to go to Carol's Bar. I went to Carol's Bar. And I saw, you know, the

person he got in with, and I saw the person that dropped him off there, and then he came in the bar, said, Let's go. We left the bar, went to Britt, went to his house, and, bam, there he had it.

Q. And what did he have?

A. Jar full of crank.

Q. A jar full of crank. A term for methamphetamine?

A. Methamphetamine.

Q. So how long was he in this car with this other person then before he met back up with you at the bar?

A. I would say a matter of five minutes, quick.

Q. Can you describe the person he got into the car with?

A. Blond hair, glasses, younger guy.

Q. That same guy, did you ever see him over at Mr. DeGeus's house?

A. Saw him pull in there a couple times, yes.

Q. And describe for the jury when you saw him come to Mr. DeGeus's house what would happen.

A. Terry would say, You want to excuse yourself and go in the other room for a second? He was real protective of his friends, real protective how he did things.

Q. All right.

A. And so I didn't know -- you know, I knew what was going on.

♀

242

I had a pretty good idea, but I didn't know who, what, where, when, but a couple times he had me excuse myself. I'd be sitting in the living room. I'd say, Hey, there's somebody here. Who is it? Gray car, blond hair, glasses pulling in. Hey, man, would you get in the other room for a second? I got some, you know, stuff I want to do. Need to be private. I'd

say, Sure, no problem. I'd head in the other room, and then he would have the crank, I mean, maybe 15 minutes, half an hour later.

Q. So let's just break that down just a little bit. On a couple occasions --

A. These people didn't even know I was there.

Q. All right. On a couple occasions you saw a man with blond hair and glasses come to Mr. DeGeus's house.

A. That's correct.

Q. And Mr. DeGeus would ask you to go into another room.

A. That's correct.

Q. You would go into the other room for -- I think you said 10 or 15 minutes?

A. Yeah, minimum.

Q. All right. And when you came back out of the room, was that person then gone?

A. Gone.

Q. And did Mr. DeGeus then have some more methamphetamine with him that he didn't have before that person arrived?

♀

243

A. Then he'd have a substantial amount of methamphetamine.

Q. And when you say a substantial amount of methamphetamine, what kind of quantities are we talking about here, sir?

A. Enough to fill this cup here, this white cup.

Q. Okay. The water cup in front of you, sir?

A. That's correct.

Q. And for a user of methamphetamine, is that a substantial amount of methamphetamine?

A. Depending on the quality.

Q. You indicated earlier that you saw the methamphetamine

being mixed up on a table. Do you remember saying something about that?

A. Yes.

Q. Can you describe for the jury what you mean by that?

A. Inositol would be mixed in with the pure -- the pure stuff wasn't sold. It was just what we did. And he'd mix it up, cut it.

Q. Okay. And you saw Mr. DeGeus doing that, cutting it up?

A. Saw him do it, yes.

Q. Did you ever see any drug activity between Angie Johnson and Terry DeGeus during this time frame?

A. No, I did not.

Q. Do you know whether she had any role in selling drugs with Mr. DeGeus?

A. I'm assuming, yeah.

♀

244

Q. Okay. And I don't want you to assume. I guess I need to ask it this way. Did you ever see her with methamphetamine during that time period of 1992?

A. Yeah.

Q. Okay. And where would you see her with methamphetamine at?

A. At her house.

Q. All right. And do you know where she was getting that methamphetamine from your own personal observations?

A. No, I do not. I would assume maybe Terry.

Q. Did Terry ever tell you anything about where he was -- what he was doing with his methamphetamine?

A. Terry told me once he gave --

MR. SPIES: Excuse me, Your Honor. I'm going to object on hearsay grounds.

MR. WILLIAMS: 804(6) again, Your Honor.

THE COURT: Objection's overruled.

A. Proceed?

Q. Please.

A. Terry told me that -- I helped him work one day. His dad had a construction, demolition business, and I helped him work one day. And we went to his house after work, and he was a little upset. The reason he was upset was because he told me that Angie -- he gave the key to the house to Angie to pick up some crank, and what Angie had done is told him that she had dropped the crank on the floor and only gotten an eight-ball

back. And so we went to the house, and he took it, and it was an ounce of crank she was picking up. So we went to the house, and he dumped the whole ounce -- did I say house or ounce?

Q. Ounce.

A. Went back to the house, and he dumped the whole ounce on the carpet, scooped it back up, and we found out she was lying because there was only an eight-ball missing.

Q. From that she was clearly getting methamphetamine from Mr. DeGeus.

A. From that story I would assume, yes.

Q. Did Mr. DeGeus ever tell you about --

MR. WILLIAMS: Would you like me to proceed, Your Honor?

THE COURT: I have no idea what's -- what a day. Carey, can you figure it out?

THE CLERK: I can't tell what it is. I'm trying to unplug this computer.

MR. WILLIAMS: I'd be glad to proceed, Your Honor, and

I think we can --

THE COURT: Well, I think it's a little distracting.

MR. WILLIAMS: Very good.

THE COURT: Why don't we take a ten-minute recess and we'll get our -- oh, excellent. Good recovery.

You may proceed. Thank you.

MR. WILLIAMS: Thank you, Your Honor.

♀

246

BY MR. WILLIAMS:

Q. We were just talking about Mr. DeGeus and having a drug connection with Angie Johnson. Did Mr. DeGeus ever tell you whether he was aware of any connection that was made between Angie Johnson and Dustin Honken?

A. The only thing he told me was that he screwed up.

Q. What did he say about screwing up?

A. That he sent a woman to do a man's job, that one day he thought he was being followed, and he sent Angie to go pick up the shipment of crank instead of him going himself, that she ended up hooking up with the guy he was picking it up for -- from.

Q. She hooked up with the guy that --

A. The supplier.

Q. I'm sorry?

A. She hooked up with the supplier.

Q. The supplier that had been supplying Mr. DeGeus with methamphetamine?

A. That's correct.

Q. When Mr. DeGeus was telling you this, she hooked up, if you will, with that supplier, what did he -- what was he telling you was going on with that? What do you mean by hooked up?

A. Well, he loved Angie, and so -- and so he was upset over that.

Q. And by hooked up, you mean they got romantically involved,

the supplier and Angie Johnson?

A. You know, it's -- that's what I'm assuming, you know.

Q. That's how you took the term?

A. That's how I took the term, yes.

Q. I want to talk to you and direct your attention to March 21 of 1993. Was that a time if you recall approximately when there was an arrest of Mr. DeGeus at his house and a search of the house?

A. Yes.

Q. And were you present at that time when the house was searched and Mr. DeGeus was arrested?

A. Yes, I was arrested with him.

Q. And tell the jury what you recall about that day. The police came to the house, and then what happened?

A. Police came to the house. We were both sleeping in the living room. And bam, bam, bam, knock on the door. We both got up and started yelling, and then they didn't think anybody was there. They went back to their vehicles and had about an hour hold-out with them.

Q. Had an hour hold-out with them?

A. Right.

Q. And what was happening during that time period?

A. Terry was burning some letters that Angie had written him. He'd taken them and burnt them in a trash barrel, and he dumped what was -- I know at least ten grams of pure meth and maybe a

substantial amount of cut or crank. I don't know.
Q. Dumped it where?
A. Right down the toilet.
Q. And in the meantime what's happening with the police then? Are they making entry into the house?
A. No. They backed off.
Q. And then what happened after Terry dumps the drugs and burns the letters from Angie?
A. Then he walked outside.
Q. Gave himself up?
A. Yeah.
Q. And were you found during the search as well?
A. I had a warrant for my arrest, and I was found during the search, yes.
Q. And what was that warrant for if you recall?
A. Probation violation.
Q. And were you hiding someplace in the house?
A. In the attic.
Q. Did anybody take a gun or try to shoot at the police or anything like that during this time period?
A. No, they didn't.
Q. Do you know were there some guns in the house?
A. That -- Terry said he had some guns. Later on I found out that he had some guns, said he got them back from his lawyer.
Q. What kind of guns were they if you recall?

249

A. Rifles I think they were.
Q. Hunting rifles?

A. Yeah.

Q. Not assault military-type rifles.

A. No.

Q. After this search and arrest on March 21 of 1993, do you recall or were you aware that there was an investigation into drug activity that involved Terry DeGeus that was being conducted by the federal government?

A. Yes.

Q. And I want to direct your attention to October 27 of 1993. Do you recall on that date you were subpoenaed to appear before a federal grand jury to provide testimony about your knowledge of drug activity involving Terry DeGeus?

A. Yes, I do.

Q. When you arrived at the courthouse to provide that testimony, was there a waiting room that you had to wait in prior to giving your testimony?

A. Yes, there was.

Q. Were there other people in that waiting room with you as you were waiting?

A. Yes, there was.

Q. And who was in there that you recognized, if anybody?

A. Angie Johnson; some guy from Ventura, bigger guy; and this fella right here.

♀

250

Q. Okay. I want you to describe the fella right here that you're talking about. What direction from you are you pointing at?

A. To my left.

Q. Okay. And can you describe what he's wearing?

A. White shirt.

Q. And that person was in the waiting room with Angie Johnson on the day -- on October 27, 1993?
A. He just popped in, took a good look at me, and popped out.
Q. Did you recognize that person as anybody you had seen before?
A. Yes, I had.
Q. And where had you seen him before?
A. When -- when I'd gotten -- when I took over the ve -- or in Clear Lake when Terry got in his vehicle, dome light was on, I was looking in the rear view mirror; when he dropped him off at Carol's Lounge; and that's the same person I saw pull in his driveway a couple times.
Q. So the person that you understood to be supplying Terry DeGeus the drugs, that's the defendant here in court that you've identified.
A. That's what I assumed later on after everything started -- after the investigation began and everything.
Q. It's the same man that you saw coming to Terry DeGeus's house and when he would leave Terry DeGeus would have drugs.

251

A. That's correct.
Q. Okay. When you were questioned in front of the grand jury, did you provide information to the grand jury about what you knew about these drug connections?
A. I was called down in 1992 and 1996, and I pled the Fifth both times.
Q. You pled your Fifth Amendment right to refuse to answer questions that could incriminate you?
A. That's correct.
Q. After you got done with your grand jury testimony, did you

go back and talk to Mr. DeGeus?

A. Yes, I did.

Q. And what did you tell him, if anything, about what had happened at the grand jury?

A. I just told him that I saw Angie there, she was pregnant, and that they subpoenaed me, that I pled the Fifth, and that -- that was about it. He got on the phone.

Q. He got on the phone at that time?

A. Yeah.

Q. Now, you were over at his house?

A. This is over at a girlfriend of his house.

Q. And when he got on the phone, do you recall what he said on the phone?

MR. SPIES: I'm going to object on hearsay grounds, Your Honor.

♀

252

THE COURT: You're talking about what?

MR. WILLIAMS: I'm talking about what Mr. DeGeus was saying on the phone, so 804(6) exception, Your Honor.

THE COURT: Objection's overruled.

A. I don't recall what was said on the phone, no.

Q. Do you recall him telling you who he was talking to?

A. After the fact.

Q. And what did he tell you after the fact who he was talking to?

MR. SPIES: Again, hearsay, Your Honor.

THE COURT: Same exception?

MR. WILLIAMS: Same exception, Your Honor.

THE COURT: Same ruling. Overruled.

A. I don't remember if it was before the fact or after the

fact or maybe it was both that he was on the phone with Angie.
Q. He told you he was on the phone with Angie.
A. But I knew he was on the phone with Angie.
Q. Finally, sir, I want to get to one last topic with you. After this appearance before the grand jury and you go back and you talk to Mr. DeGeus and you tell him what happened -- this was on October 27 of 1993 -- did you continue to have any other contact with Mr. DeGeus after that date, sir?
A. Yes, I did.
Q. And was it every day, periodically for a while?
A. It was periodic. I was doing some work in Britt, some

253

construction work. In between there and my -- and Forest City, I'd stop by and see him.
Q. Do you remember a time that was the last time that you saw Mr. DeGeus alive?
A. (Witness nodded head.)
Q. Approximately how long after the grand jury appearance was that that you recall, sir?
A. Several months.
Q. You think it was several months after that?
A. (Witness nodded head.)
Q. It was in the fall of 1993?
A. (Witness nodded head.)
Q. Yes?
A. Yes.
Q. Where was it at, sir? Take a moment if you need to, sir.
A. It was at Terry's house.
Q. Who all was present at the house at that time, sir?
A. Terry's daughter Ashley and a friend of Terry's named John.

Q. What was the name of the friend?
A. J. D.
Q. Okay. And was this daytime or nighttime that you were there?
A. This was nighttime.
Q. And did you have a conversation with Mr. DeGeus at that time?

♀

254

A. Yes, I did.
Q. Did he end up telling you what he was going to be doing that night?
A. Yes, he did.
Q. What did he tell you?
MR. SPIES: Excuse me, Your Honor. Again, objection on hearsay grounds and Sixth Amendment grounds.
MR. WILLIAMS: Same exception, Your Honor.
THE COURT: Same ruling. Overruled. You may answer.
A. Repeat the question.
Q. On the last night that you saw Terry DeGeus alive, did he tell you what he was going to be doing that night?
A. Yes.
Q. And what did he tell you?
A. He said he's going to Angie's.
MR. WILLIAMS: I have nothing further, Your Honor. Thank you.
THE COURT: Mr. Spies, one of the CSOs commented to me that one of the jurors commented that they would like you to speak more directly into the microphone and a little slower too.
MR. SPIES: All right. I'll do that.
THE COURT: Thank you.

CROSS-EXAMINATION

BY MR. SPIES:

Q. Mr. Ryerson, you're here before us this afternoon to talk

about what you remember. Do you have difficulty remembering things? Do you have any problems with your memory?

A. Sometimes. I'm human.

Q. Okay. Have you been treated for any mental or emotional problems during the time that you've been in custody?

A. Yes, I have.

Q. All right. And do those include memory problems?

A. No.

Q. Are you under the care of a doctor today?

A. I'm under the care of some specialists for my hand.

Q. For any mental, emotional problems, are you under the care of a doctor?

A. No, I'm not.

Q. Were you back in 2002?

A. I don't believe so, no.

Q. In Cerro Gordo County were you when you were charged up there?

A. For the burglary?

Q. With the assaulting-of-a-police-officer charges.

A. I don't believe so. I don't believe so, no.

Q. Mr. Ryerson, let me ask you, first of all, these comments that you made about the last time that you saw Mr. DeGeus and the phone conversation that he had that you were describing just a few moments ago, how many times have you described those to law enforcement people?

A. Thoroughly like this? This is the first --
Q. No, not necessarily in front of the jury but like to the police officers or to the prosecutors.
A. Thoroughly like this would be the first time. I mean, I've touched base with the prosecutor twice, and he's asked me the questions, and that was it.
Q. Okay. And we know, of course, that you did not tell this to the grand jury, right, when you appeared before the grand jury back in 1993?
A. No. I invoked my Fifth Amendment right.
Q. Now let me go back, and let's talk now about your relationship with Mr. DeGeus; okay?
A. Okay.
Q. You told us that you lived with Mr. DeGeus in 1991 or 1992, around then?
A. Right.
Q. And was anybody else living with Mr. DeGeus then?
A. No. His daughter periodically would be there.
Q. Excuse me?
A. His daughter would periodically be there.
Q. All right. And when you stopped living with Mr. DeGeus, did anybody move in with him?
A. He had a girl there. I don't remember her name.
Q. Was it Angie Johnson?
A. No, it wasn't.

♀

257

Q. All right. When did Mr. DeGeus have a relationship, a romantic relationship, with Angie Johnson?
A. I guess you'd have to ask Angie that.

Q. I'm going to have to ask you, sir. Can you tell us to your best recollection when Mr. DeGeus had a romantic relationship with Angie Johnson?
A. I know it went as far back as when she had her bar. That's what Terry -- I mean, to the best of my knowledge.
Q. And when do you think that romantic relationship ended with Angie Johnson?
A. Probably when she hooked up with the bigger drug dealer.
Q. That was upsetting to Mr. DeGeus?
A. I don't know. He loved her I guess.
Q. Excuse me?
A. I guess he loved her, had feelings for her like any man has with a woman that he's been with for a while.
Q. Did he tell you that he was upset that she had hooked up with somebody else?
A. It was common knowledge that she's going to do whatever she wanted to do anyway. You can't hold anybody down I guess. Wasn't trying to hold her down.
Q. My question was did he tell you that he was upset at losing Angie Johnson?
A. Yes.
Q. Did you think that he had become obsessed with Angie

♀

258

Johnson?
A. No.
Q. Did he get angry about losing Angie Johnson?
A. He didn't act angry.
Q. Excuse me?
A. He didn't act angry.
Q. Did he get tearful, sad?

A. Acted sad.

THE COURT: Mr. Ryerson, could we get you to get a little closer to the microphone?

THE WITNESS: Yes, you may.

THE COURT: Thank you. I know it's hard to remember to do that. Thank you.

BY MR. SPIES:

Q. Mr. Ryerson, when you were living with Mr. DeGeus, could you tell the ladies and gentlemen of the jury what kind of car or truck he drove?

A. He drove a Ford truck, and he had a old Ford car.

Q. And the Ford truck that he drove, did he have a topper on it?

A. Yes, he did. He had a topper on that Ford truck.

Q. And the Ford car that he drove, was this a full-sized, like a sedan kind of car?

A. It was a -- gosh, I don't know what year -- early '40s, '50s, antique.

♀

Q. So was it a full-sized car?

A. Had four doors.

Q. All right. Now let me ask you a few questions about the day that you were at Mr. DeGeus's house and Mr. DeGeus had police come to his house; okay?

A. Okay.

Q. You were there at the house with Mr. DeGeus; correct?

A. Yes, I was.

Q. And as I understand, you were sleeping, and you heard some banging at the door?

A. Yes.

Q. And did I understand that you started yelling?
A. We both -- we thought -- he thought maybe he was getting robbed, yeah, so we started yelling.
Q. And did the people outside say that they were police?
A. It was -- the door was so far away from the living room that he didn't hear the police, just heard the bang of the door.
Q. And when you heard the banging, where did you go in the house?
A. To the window.
Q. And what did you see outside the window?
A. Lot of police cars.
Q. And did Mr. DeGeus go to the window too?
A. He more -- he went towards the door.
Q. Did Mr. DeGeus say that he was going to kill anybody?

260

A. No, he did not.
Q. Or did he threaten the police?
A. No, not to my knowledge he didn't.
Q. And when did you go up to the attic?
A. After he said, I'm going out. I said, Well, I -- you know, I'm going to try to -- I'm going up. You're going out; I'm going up because I have a warrant for my arrest.
Q. Now, you told us that Mr. DeGeus got rid of some drugs; right?
A. Yes.
Q. Did you see him do that?
A. Yes, I did.
Q. Did you help him?
A. No, I didn't.
Q. You also told us that Mr. DeGeus burned up some papers;

right?

A. That's right.

Q. Did you help him do that?

A. No, I didn't.

Q. Did you see Mr. DeGeus shred some papers?

A. I don't recall if he shredded any or not.

Q. Did you help him shred papers?

A. I don't recall him shredding any papers.

Q. Excuse me?

A. I don't recall him shredding any papers.

♀

261

Q. So you're telling us that when Mr. DeGeus said that he was going to go outside, you went upstairs?

A. Correct.

Q. Did you know at the time that there were guns in the house?

A. No, I did not.

Q. Had you seen Mr. DeGeus with guns before?

A. Yes, I had.

Q. Tell us what kind of guns you'd seen Mr. DeGeus with.

A. Hunting rifle, shotgun.

Q. See him with any revolvers or pistols?

A. Revolver.

Q. Did you see him with a revolver in his car or in his truck?

A. Never.

Q. Excuse me?

A. Never, no.

Q. Just at his house?

A. Yeah. Never even saw any bullets with him.

Q. Let's talk about when you heard Mr. DeGeus on the phone with Angie Johnson; okay? You told us that you heard Mr. DeGeus

on the phone. Am I correct that you were assuming it was with Angie?

A. See, I don't remember if it was before the conversation on the phone or after the conversation on the phone. But I remember Terry telling me that that was Angie. And, you know, this woman hated me, just loathed me because I was doing a lot

♀

of the drugs and, you know, I'd -- after a while she -- you know what drugs do to you. They make you really selfish. And I was selfish myself in doing these drugs. And so if -- she hated me because it felt like I was getting her cut of the drugs when this is something that was given to me. So I remember him looking at me and going, It's Angie, and she's not -- you know, like she's not happy with you again like she wants your ass again. She hated me.

Q. So you gathered this either before he talked to her on the phone or after he talked to her on the phone, or you don't remember?

A. It was either/or. I can't remember. It might have been both.

Q. Now let's next talk about the last time that you saw Mr. DeGeus. You said it was several months after you appeared before the grand jury?

A. Excuse me? Can you repeat that?

Q. Did you say that you last saw Mr. DeGeus several months after you appeared before the grand jury?

A. That's correct.

Q. Could it have been Christmastime?

A. No, it wasn't.

Q. You don't remember when it was?

A. It was sometime in the fall, early fall.

Q. Okay.

♀

MR. SPIES: Thank you. I have no other questions, Your Honor.

THE COURT: Mr. Williams?

MR. WILLIAMS: No further questions, Your Honor. Thank you.

THE COURT: Okay. The witness is excused.

MR. WILLIAMS: We've run through our witnesses for today, Your Honor, I'm afraid to say.

THE COURT: I was going to send the jury home anyway, so good timing.

MR. WILLIAMS: Thank you.

THE COURT: We're going to pass -- I'm going to pass out to you -- I'm not going to. Carey's going to pass out to you the schedule going out several weeks, I think even months -- I'm not sure how far we went out with regard to the trial schedule -- so you can have that and take it home with you and plan accordingly. And if there are any changes in that -- undoubtedly there probably will be -- I'll let you know as soon as I know, but we'll try and hold to that schedule as best we can.

Members of the jury, that concludes the testimony for today and also the testimony for the week. We'll see you back here Monday morning. We'll start at 8:30 Monday morning.

Please remember my cautionary instruction: Keep an open mind until you've heard all of the evidence in the case;

♀

had a chance to receive my final instructions; hear the closing arguments of the lawyers; most importantly, until you've had an opportunity to go back into the jury room, review the evidence that has been admitted, the exhibits that have been admitted, and hear the views of your fellow jurors. Thank you very much. We got a lot accomplished today. And we'll see you Monday morning at 8:30. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated. Are there any other matters we need to take up?

MR. WILLIAMS: No, Your Honor, not on behalf of the United States.

MR. PARRISH: No, Your Honor. Thanks so much.

THE COURT: Mr. Williams and/or Mr. Miller, I'm going to assign you an additional task. I hate to do that because I know you're already burdened. But that is to remind me at the end of the trial that I need to make my 804(6) ruling along the lines of what I indicated in the motion in limine ruling using the same procedure as the Eighth Circuit has indicated under the 801 (d)(2)(E) co-conspirator hearsay exception and the Eighth Circuit decision in United States versus Bell.

MR. WILLIAMS: Yes, Your Honor. It's our burden. We'll make sure that we remind you.

THE COURT: Okay. I made a note, but it wouldn't be the first note I've overlooked. It ultimately is your burden.

265

MR. WILLIAMS: Absolutely.

THE COURT: And I'd appreciate it if you'd try and remind me. I'll try and remember on my own. It's an important

matter, and it's not something I want to overlook.

MR. WILLIAMS: We'll make sure it's not overlooked, Your Honor.

THE COURT: Do you know anything about the status of the exhibit list?

MR. WILLIAMS: I just asked my assistant to go downstairs to check on it, and I would anticipate it's going to be done.

THE COURT: Okay. And if it's not, I'll get it sometime tomorrow?

MR. WILLIAMS: We'll certainly get it to you just as soon as it's done and hopefully yet today.

THE COURT: Okay. Anything else you can think of?

MR. PARRISH: No, Your Honor. We can't. Thank you.

THE COURT: Okay. Why don't we plan on meeting at 8:15 Monday morning unless there are other matters that would take more than 15 minutes to resolve. You know I'll be here early. I always am. And we'll just -- if there are other matters that you know we'll need to meet earlier, I'd appreciate a heads-up. You can just always leave a message on my answering machine, and I check that periodically all weekend, and I'll be here a lot of the weekend. So we'll plan on 8:15 unless I get

266

notified otherwise.

MR. WILLIAMS: Very good, Your Honor.

THE COURT: Okay. Thank you. We'll be in recess.

(The foregoing trial was adjourned at 4:16 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR 11-1-04
Date

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| FRANK STEARNS | | |
| | MR. WILLIAMS | 42 |
| | MR. SPIES | 86 |
| DAVID MIZELL | | |
| | MR. WILLIAMS | 98 |
| | MR. SPIES | 128 |
| LESLIE OLSON | | |
| | MR. WILLIAMS | 133 |
| | MR. ROGERS | 145 |
| DAVID THINNES | | |
| | MR. WILLIAMS | 148 |
| | MR. SPIES | 170 |
| | MR. WILLIAMS | 179 |

VOLUME 1 9-9-04 witness testimony

SCOTT GAHN

| | | |
|---|---|---|
| | MR. MILLER | 181 |
| | MR. PARRISH | 189 |
| | MR. MILLER | 189 |
| | MR. PARRISH | 193 |
| | MR. MILLER | 195 |
| | MR. PARRISH | 211 |
| | MR. MILLER | 225 |
| | MR. MILLER | 227 |

AARON RYERSON

| | | |
|---|---|---|
| | MR. WILLIAMS | 229 |
| | MR. SPIES | 254 |

*****

EXHIBITS:

| | |
|---|---|
| 23, 24, 25, 26, 29, 30, 31, 32, 33, and 34 | 5 |
| 45 | 5 |
| 22 | 64 |
| 27 | 72 |

*****

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, Plaintiff, vs. DUSTIN LEE HONKEN, Defendant. /

No. CR01-3047
Sioux City, Iowa
September 13, 2004
8:15 a.m.

VOLUME 2

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
UNITED STATES DISTRICT JUDGE, and a jury.

♀

APPEARANCES:

For the Plaintiff:

C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant:

ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn
Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

(Proceedings reconvened outside the presence of the jury.)

THE COURT: I do have a few matters to take up this morning, and the record should reflect that all of the lawyers and the defendant are personally present this morning.

I did want to ask the government what your intent is with regard to Exhibit 21 which was the transcript, and then there are some other transcripts coming down the road. It appears that in the latest exhibit list the defendants have lodged an objection to admitting the transcript, and I wasn't sure if you were just marking it which the government often does in criminal cases and use it as kind of a demonstrative exhibit and you weren't intending that it actually go back to the jury, and so I was just trying to clarify what the U.S. attorney's position was on it.

MR. WILLIAMS: That's precisely correct with regard to Exhibit 21, Your Honor. The tape is the evidence, and the transcript is simply an aid to the jury to understand it.

We will run into that same issue with the transcripts on the Cutkomp tapes that are coming on. There are two transcripts, though, that are substantive evidence. The one is the grand jury testimony of Greg Nicholson which has already been admitted, and the other one will be the grand jury -- I'm sorry, the sentencing testimony of the defendant which will be substantive evidence, the transcript of that sentencing hearing,

his testimony.

THE COURT: Right, right. But I was talking about -- yeah, yeah. I used the word transcript in a broader sense than I intended. I meant transcript of tape-recorded conversations.

MR. WILLIAMS: Correct.

THE COURT: So what's the defendant's position? I didn't understand you to be objecting to using the transcript for demonstrative purposes.

MR. SPIES: Correct, yeah, subject to your instruction to the jury that they were to determine based on what they heard what the evidence was.

THE COURT: Okay. You don't really have any further objection to that.

MR. SPIES: No.

THE COURT: Okay.

MR. SPIES: I mean aside from the objection we already made about hearsay or whatever, but yes.

THE COURT: Okay. Now, with regard to the Exhibits 2 through 5, the organizational charts, are you trying to offer that as substantive evidence?

MR. WILLIAMS: No.

THE COURT: Or again, is that just demonstrative?

MR. WILLIAMS: Purely demonstrative.

THE COURT: Now, you've lodged objections to it, but I would assume that those objections were if they were trying to

♀

272

admit it as substantive evidence.

MR. SPIES: That's correct, Your Honor, yes.

THE COURT: So you don't have --

MR. SPIES: They're argumentative, but they're intended to be argumentative, so from that perspective we don't have any objection.

THE COURT: Okay. Now, I just passed out a very short memo dated September 9, 2004, from our Supervisory Deputy U.S. Marshal Duane Walhof concerning Juror Number 855, and this came about -- was the 9th on Friday?

THE CLERK: Thursday.

THE COURT: 9th was Thursday, okay. Here's what happened. He came to see me I think at the end of the day on Thursday. I believe the lawyers were all gone, or maybe it was on the afternoon break. I don't remember. And I just said, Put it in a memo, and I'll give it to the lawyers. And, of course, we didn't have trial on Friday, so this was my first opportunity to give it to you.

I would suggest unless there's any objection that we just bring up Juror 855 and just have a brief discussion with him because he's raised the issue, and I don't want to leave it unresolved. Does the government have any objection if we bring up Juror 855?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Spies?

273

MR. SPIES: No, we don't have any objection.

THE COURT: Okay. Anything else on the lawyers' agenda this morning? Mr. Williams, anything from the government?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: No, Your Honor.

THE COURT: Okay. I don't know if the jury's here or not. Do you know? They are? Why don't we ask Juror 855 to come up, please.

(Juror 855 entered the courtroom.)

THE COURT: Good morning. Why don't you just have a seat there, and, Don, could you grab the microphone, turn it on, and hand it to Juror 855? And actually would you hand this to Juror 855.

Please be seated, and why don't you take a minute and review that. That is a memo that I asked our supervisory deputy U.S. marshal to prepare.

JUROR 855: Okay.

THE COURT: Okay. And we're just bringing you up here to thank you, one, for raising the issue.

JUROR 855: Okay.

THE COURT: And then to just ask you a couple of questions. Do you know whether or not your brother-in-law met the defendant, Dustin Lee Honken, or not?

♀

274

JUROR 855: I do not. I just wanted to make -- I don't know of any facts that he knows him or knew of him or anything like that. Basically like this note states, just to let everybody know mainly.

THE COURT: Sure. And we appreciate that. And you'll be willing to follow my instruction not to talk to anybody including your brother-in-law until after the jury has reached a verdict in the case?

JUROR 855: Oh, yeah.

THE COURT: Okay. I'm going to see if any of the lawyers have any questions for you, Juror 855.

Mr. Williams, do you have any questions?

MR. WILLIAMS: Just one short question. Do you know exactly when it was your brother was in the Woodbury County Jail? You say within the last five years.

JUROR 855: It was periodically. I know there was like a month or two a couple times for drug possession. He was arrested and put in the Woodbury County Jail. He's now in an Iowa state prison. I don't know where exactly. It's my wife's sister's boyfriend. I mean, that's how I -- it's more of a know-of-him type thing. I'm not even related to him. It's just -- I just wanted to make sure everybody was aware of it.

MR. WILLIAMS: No. We appreciate it. And I was just trying to pin down because the timing on this would have -- if it was just the last five years, there's no way --

♀

275

JUROR 855: Yeah. Probably -- I mean, we've only been married three years, dating for three years, so five to six years, so, I mean, like you said, and I believe like some of the CSOs said, the timing's not even really in there, so it's no -- I don't think it's going to be a big deal. I just wanted to make . . .

MR. WILLIAMS: Great. I have nothing else, Your Honor.

THE COURT: Thank you, Mr. Williams.

Mr. Spies.

MR. SPIES: I don't have any questions.

THE COURT: Thank you. You can go back down. Thanks so much.

(Juror 855 exited the courtroom.)

THE COURT: See you at 8:30. We'll be in recess.

(Recess at 8:23 a.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. PARRISH: Yes, Your Honor.

THE COURT: Thank you.

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated. The seating rotation worked. Thank you.

Mr. Williams, are you ready to call your next witness?

MR. WILLIAMS: I am, Your Honor. The United States

♀

276

calls Jeff Honken.

THE COURT: Mr. Honken, if you'd just come up towards the witness box, I'll swear you in.

JEFFREY HONKEN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. And please pull up that chair much closer so you can speak directly into the microphones. You'll have to scoot it up even a little bit closer. And would you state your full name, please, and spell your last name.

THE WITNESS: Jeffrey Alan Honken, H-o-n-k-e-n.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Honken, I want to learn a little bit about your personal background, sir. Where are you from now?

A. Mesa, Arizona.

Q. And are you originally from Mesa, Arizona?

A. No, I'm not originally. I'm from Britt, Iowa.

Q. Do me a favor. These microphones only pick you up if you're about three inches away. There you go. Great.

You're originally from Britt, Iowa. Is that what you said?

A. That's correct.

♀

Q. Tell the jury a little bit about Britt, Iowa. How large of a town is that?

A. When I was in Britt, I think the population was about twenty-two, twenty-three hundred people.

Q. Where is that located in relation to the Clear Lake/Mason City, Iowa, area?

A. I believe it's about 40 miles west of Mason City.

Q. Does Britt have its own high school there?

A. Yes, it does.

Q. And is it just one high school in Britt, Iowa?

A. Yes, it is.

Q. How old are you, sir?

A. I am 42.

Q. And do you have a family down in Mesa?

A. Yes, I do.

Q. Do you have a wife, and do you have any children?

A. I have a wife and two children ages three and seven.

Q. I want to learn a little bit about your family background back in Britt. Do you have any brothers and sisters?

A. I do.

Q. And could you tell the jury who they are?

A. Yes. I have an older stepbrother by the name of Bruce Smidt. Then there's myself, and I have a stepsister by the name

of Carmen Smidt, and then I have my brother Dustin Honken, and then I have a sister Alyssa Honken.

Q. You're in Mesa, Arizona, now. How long have you lived in the state of Arizona?
A. Since approximately 1982.
Q. Let's talk a little bit about your background. You grew up in Britt, Iowa.
A. That's correct.
Q. And after you -- did you graduate from high school?
A. Yes, I did.
Q. After you graduated from high school, what happened with you?
A. After graduation from high school, I attended a year at North Iowa Area Community College which is in Mason City.
Q. And what did you study at North Iowa Area Community College?
A. Just general studies.
Q. Then what happened with your life?
A. I transferred to the University of Iowa for a year.
Q. And that's down in Iowa City, Iowa?
A. That's correct.
Q. What'd you study down there?
A. Again, just general studies.
Q. And then what?
A. And then I moved to Arizona.
Q. Now, at some point while you were attending college at North Iowa Area Community College -- NIACC is the acronym for

it -- were you working part time?
A. Yes, I was. When I went to high school, I got my EMT certification.
Q. What's an EMT certification?
A. Emergency medical technician.
Q. And what did you do with that EMT certification?
A. Initially I got my certification prior to being 18 years of age. You had to be 18 at the time. I don't know what it is now. You had to be 18 years of age to actually participate within the ambulance. When I turned 18, I volunteered on my hometown ambulance service. When I went to North Iowa Area Community College, I worked for the ambulance service there.
Q. And so that would have been what years if you recall roughly?
A. It would have been '81 time frame, '82 time frame.
Q. And how old is Dustin, your brother, in relation to you?
A. He's six years younger than I am.
Q. So you were doing this at what age? Seventeen, eighteen?
A. No. Well, when I first started taking my classes, that's correct.
Q. And when you were actually riding in the ambulances and serving as a volunteer EMT, how old were you, sir?
A. I would have been 18, so he would have been 12.
Q. Okay. Did the defendant, Dustin Honken, ever ride with you on these ambulance calls?

280

A. No.
Q. Never.
A. Never.

Q. Let's talk a little bit about once you got through your education. You said you moved down to Mesa. What took you down to Arizona to begin with?
A. I had a friend that was -- that also was from the Britt area, and he was living in Tucson, Arizona. He -- I was going -- like I said, I was going to school at the University of Iowa. He asked me to come down. I had never really been out of Iowa before. I agreed to come down to visit him. The -- I went down to visit him. I liked what was down there, and I moved down.
Q. So did you end up going into some type of business while you were down in Arizona?
A. Yes, I did. I initially started working for somebody, for a company, and I ended -- eventually ended up purchasing that company.
Q. What was the name of the company you ended up purchasing, sir?
A. It was -- we turned into -- the company name was Cadtek Corporation.
Q. C-a-d --
A. C-a-d-t-e-k.
Q. And what did Cadtek do?

281

A. We initially -- initially when we were -- the initial business was the engineering and design of print circuit boards.
Q. What's a print circuit board?
A. An electronic board that you'd have inside your computer or TV or anything electronic.
Q. By the late 1980s, early 1990s, can you tell the jury a little bit about the size of your company, how successful it

was?

A. Yeah. We started out with 3 people, and by the time we closed it down, we were at about 75 employees. Our major customers was -- we had Honeywell, Hughes Aircraft, Garrett Research were some of the major corporations that we worked for.

Q. Now, when you say when you closed it down, when was it that you closed it down?

A. It was approximately '90, '91 time frame, somewhere in there.

Q. So from the time period of the early 1980s up until you closed that company down in 1990, 1991, where in Arizona were you living?

A. I was living in Tucson, Arizona.

Q. What happened then with your career after Cadtek was shut down?

A. The company, we sold the assets to a company -- I believe it was up in Seattle. I still had a large customer base. I started another company called Printed Circuit Technology

282

that -- we did a small amount of fabrication but not much, primarily -- our primary goal was to purchase circuit boards from third-party vendors that came in through our door. We looked at the quality of them. We approved the quality, and then we sold it to the customers that I had prior, those that -- basically a brokerage-type system.

Q. Printed Circuit Technology was a company you started up approximately when, sir?

A. It must have been '91 time frame, something like that.

Q. And how long did that company last?

A. Let's see. I moved to Phoenix in '92 time frame, so I was

in it about a year, and then one of the ladies that I worked with showed an interest in taking it over, so she took it over, and I was offered a job in Phoenix, so I moved to Phoenix, Arizona.

Q. And when you moved to Phoenix, what did you do, sir?

A. I was -- I worked for a company called Varian Associates, and I was -- headed up their circuit board -- or their design department for circuit boards, their engineering department.

Q. And what do you do today?

A. I'm the chief information officer for IT Connections, Inc.

Q. And what type of company is that, sir?

A. We primarily specialize in software that aids medical firms such as a doctor's, provider's office in billing and scheduling.

Q. Now, you currently live in Mesa. For those not familiar

♀

with the Phoenix area, could you describe Mesa in relation to Phoenix?

A. Sure.

Can I drink this?

Q. Yes. That's for you.

A. Mesa's a suburb of Phoenix. There's a lot of suburbs of Phoenix. Phoenix has a whole -- we call it the valley, and the valley's actually very, very large. So Mesa's just a small chunk of the valley.

Q. So since 1992 you've lived in the Phoenix area then.

A. That's correct.

Q. All right. Let's talk a little bit about over that time period of a decade or so from the early 1980s until 1992. Were there times that your brother Dustin Honken came to Arizona and stayed with you for parts -- or periods of time?

A.    Yeah, he -- after graduation -- after he graduated from high school, he didn't really know what he wanted to do with his life, so he came down to Arizona and went to school down there and worked -- worked at a fast food establishment.
Q.    Let's talk about, first of all, some time frames.  When did Dustin Honken graduate from high school?
A.    Let's see, six years younger, '86 maybe.
Q.    He worked at a fast food restaurant down there?
A.    That's correct.
Q.    And that's in Tucson?

A.    That's correct.
Q.    And this would have been -- so roughly 1986, 1987 time frame?
A.    That would be correct.
Q.    What fast food restaurant did he work at?
A.    It was a Burger King.
Q.    At this point you're living in Tucson too.
A.    That's correct.
Q.    What's the living relationship between you and Dustin Honken?
A.    He lived with my wife and myself.
Q.    Did you have daily contact with him during this time period?
A.    Yes, I did.
Q.    How long did he continue to work at that Burger King and then go to school then?
A.    I don't know the exact time frames of when he did quit Burger King.  He eventually did come work for me.  I don't know the time frame, how long he was at that Burger King.

Q. Give your best estimate in a series of months, series of years.
A. Six months to a year.
Q. During that time period, you're having fairly daily -- fairly often daily contact with Dustin Honken?
A. Yes.

♀

Q. Okay. You're talking with him at dinner I suppose like brothers would?
A. Yes.
Q. During the time period he's working at that Burger King, anything traumatic happen to him did he tell you about?
A. No.
Q. Ever tell you about being a witness to any violent crime?
A. No.
Q. Let's talk about the time period you said he came working for you then, and this would have been roughly what? 1987 then?
A. '87 time frame probably.
Q. When he started working for you, what did he do for you?
A. He initially started just doing odd jobs, and he eventually ended up managing a big portion of the shop.
Q. And what portion of the shop did he end up managing?
A. He ended up managing most of production. He was in charge of the -- everything from what we call the wet floor to the quality control areas to . . .
Q. And was he making a decent salary doing that?
A. Well, depends upon if you talk to me or him.
Q. Okay. What -- do you have a recall of how much he was making on a yearly basis there?
A. No.

Q. Is he continuing living with you and your wife?
A. Yes.
♀

Q. Does that come to an end at some point?
A. Yes, it does. Yes.
Q. And do you remember approximately how long it was he was working for you before that came to an end?
A. No. I know he was -- this is just an estimate. I would say he probably worked there for maybe two years.
Q. And then what happened?
A. He notified me that he was moving back up to Iowa and he was taking a job at a fabrication facility in Mason City, Iowa.
Q. Do you remember the name of that fabrication facility?
A. I believe it was called Wellborn.
Q. Wellborn?
A. Wellborn.
Q. And what type of item was this company Wellborn fabricating?
A. Circuit boards.
Q. Did you lose any other employees about that same time?
A. Yes, I did.
Q. And who was that?
A. We had a valuable employee that was -- technically what he was doing is he screened the -- he screened circuit boards, extremely valuable to us, and he followed Dustin.
Q. Up to Wellborn.
A. That's correct.
Q. Did that cause any bad feelings between you and your
♀

brother?
A. Yes, it did.
Q. Wellborn from my understanding from your description basically did the same type of business that you guys did?
A. Yeah, they did the manufacturing. I don't know if they did the engineering aspects, but yes, I believe they did the manufacturing.
Q. So after your brother moves back to Iowa, what kind of contact do you maintain with him then?
A. Very little to none.
Q. Any other times that your brother ends up coming back down to Arizona?
A. Not specifically that I recall, no.
Q. Okay. In 1992 does the defendant Dustin Honken move back to Arizona?
A. Yes, he did.
Q. You're living where at this time?
A. I was living -- I owned a home, so I was living in the same house.
Q. Okay. In Tucson still.
A. In Tucson.
Q. And this would have been approximately what year would he have come back then?
A. Somewhere around '92 time frame.
Q. And what was the purpose for him coming back to Arizona at

288

that time?
A. He said that he was -- wanted to -- he was looking at two things. One is he was looking at -- he was always interested in chemistry. He was going to look at the schools for chemistry,

and also he had an idea that he wanted to attempt different -- to synthesize different types of drugs.

Q. What did you understand he meant when he said he had an idea of synthesizing different types of drugs? What does that mean to you?

A. It means that he would want to try to create different types of drugs out of chemicals.

Q. Like controlled substances.

A. Controlled substances, yes. Also he was very much into body building, and he had a lot of different ideas of what he wanted to . . .

Q. Now, did you have any knowledge of your brother being involved with any type of drug activity prior to this time?

A. No.

Q. Tell the jury a little bit, at the time that the defendant comes back down to Arizona in 1992, were you having some legal difficulties yourself because of your company?

A. Yes, I was. Like I said, we had a fairly large -- large company. We developed -- we dealt with a lot of different government agencies. It's a very long story, but we -- we had hired a consultant that allowed us -- that -- the consultant

came in. We got permissions to take a lot of our waste that was produced and actually put it into the landfill, our local landfill. After quite a few years of doing that, we found out that due to how our waste was produced we were not supposed to do that. The EPA tried to assess us very large sums of money for the -- basically the waste management fund.

Q. All right. So you had this company. It's producing some waste by-product.

A. Right.
Q. And you got into some financial problems with the EPA over the dumping or the discharge of that into a landfill.
A. That's correct.
Q. All right. Was it a significant financial difficulty for you at the time?
A. I had -- I hired a lawyer to defend myself, but there was -- there -- it never came to an assessment.
Q. Now, these weren't criminal charges. This is some type of civil assessment against you?
A. That's correct.
Q. When your brother talks to you about wanting to synthesize drugs, does he request any help from you?
A. The only help -- he requested financial help, financial help.
Q. And over the years had you loaned your brother money from time to time?

♀

290

A. Yes.
Q. And when he asked you for money again this time to help finance the synthesizing of drugs, did you loan him money?
A. Yes, I did.
Q. Do you remember approximately how much money you loaned him to begin with?
A. No. He -- Dustin was always borrowing money from me on a continuous flow, so I don't know exactly. I can't say this much he borrowed for this.
Q. Let's just get an idea, though. Are we talking hundreds of dollars or thousands of dollars that he would have borrowed from you to start this up?

A. Over time it would have been in the thousands of dollars.

Q. All right. So explain to the jury a little bit, when you initially have this conversation with your brother about him wanting to synthesize drugs, he asked to borrow money from you, and you loaned him some money.

A. That's correct.

Q. Where do things go from there?

A. He just mostly did -- he did a lot of research. He did some experimentation. After an amount of time, he was successful in producing what he said was methamphetamine. He told me it was a form of speed.

Q. Now, at the beginning when you're talking about him doing some experimentation, did that take place in your home for a

period of time?

A. He experimented very small amounts at my house. It wasn't anything -- it was mostly research; he was reading.

Q. At the time that he's doing this, are you aware that his goal is to manufacture some type of controlled substance for further sale?

A. Yes.

Q. All right. And you knowingly financed him knowing that that's what he was going to do at some point down the road.

A. That's correct.

Q. Did your wife know what was going on when this was taking place in your house in Tucson?

A. No.

Q. What was told to her about what kind of experimenting he was doing in the house at that time?

A. Like I said, he was on such a small scale that it wasn't

anything that even would be noticeable. It was mostly books.
Q. Did the experimenting or the location where he was manufacturing change then after a while?
A. Yes, it did. Him and a friend of his by the name of Timothy Cutkomp rented a place in southern Arizona.
Q. So let's talk about that for a minute. Tim Cutkomp, did you know him from before?
A. Yes, I did.
Q. And how did you know him?

♀

A. He was Dustin's friend from as long as I can remember.
Q. Was Tim Cutkomp around at the beginning when Dustin's talking to you about wanting to start up this operation and so forth?
A. I don't remember.
Q. Did he come down at some point?
A. Yes, he did.
Q. All right. And was Tim living with you and your wife?
A. No, I don't remember Tim living with us.
Q. Okay. Do you remember Tim having any independent location he was living until Tim and your brother opened -- or got this own apartment?
A. Tim had kids up in Iowa, and I think he was in Iowa, and then he came down once Dustin -- before -- while Dustin was -- while they moved down to southern Arizona, and I think he came at that point when they moved down to southern Arizona.
Q. All right. So it's at that point that he comes down.
A. That's what I recall, yeah.
Q. When Tim Cutkomp comes down, where in southern Arizona did your brother and Tim Cutkomp then set up an apartment?

A. Oh, it was a house.
Q. I'm sorry, a house.
A. It was way down in southern -- southern Arizona closer to -- between Tucson and Nogales. Probably 70 miles south of Tucson.

♀

Q. When they go down to that house, is the -- either of those guys working for you then at your company?
A. No.
Q. What are they doing for a living?
A. Dustin was mostly -- like I said, he had borrowed money from myself, and he had a girlfriend. I don't know what he was -- you know, he was getting from her as far as financial support. But mostly I think he was probably living off the money that I had given him.
Q. So who's paying the rent for this house down in southern Arizona?
A. I would assume that I was.
Q. And how were you paying for the rent?
A. Like I said, what I would do is I would borrow him money, and I would assume he would take that money to pay his rent.
Q. So explain this to the jury a little bit. Are you earmarking where your money is going? For example, if you loan him a couple thousand dollars, do you know this is going toward the methamphetamine operation and that's going toward the rent or anything like that?
A. No. He would just want to borrow money from me, X amount of dollars, and I would borrow him X amount of dollars.
Q. Once Tim Cutkomp and the defendant move down to this house in southern Arizona -- do you remember the name of the town by

the way?

A. I don't think it was a town. It was way out in the sticks.
Q. Out in the country someplace.
A. Yes.
Q. What happens with the methamphetamine operation at that point?
A. Like I said, you know, Dustin was able to actually produce methamphetamine. He produced some at that house. After was -- after -- like I said, I had moved to Phoenix. After him being down there for so much time, he called and said that he was moving back to Tucson with his girlfriend and Tim was moving back to Iowa.
Q. And this would have been in 1993 some time?
A. '93, yeah.
Q. So let's talk about that, the house for a while. Did you ever see the meth operation, the lab at that house?
A. Yes, I did.
Q. How often did you see it there?
A. They were quite a ways down. I didn't see it all that frequently. When I went down to visit, I would see it.
Q. And can you describe for the jury, I mean, what'd this look like to you?
A. If you took everything he had, you could probably put it on a table twice that size.
Q. Okay. And you're pointing to the table in front of some of the jurors over there?

A. That's correct.

Q. Were there -- and what did you see there? Beakers and things like that?

A. It was basically glassware, glass-type things, small amount -- smaller things of some chemicals.

Q. So what did the -- did your brother tell you that he successfully produced the methamphetamine?

A. Yes, he did.

Q. Did you ever see it?

A. Yes, I did.

Q. What did you see?

A. It was just a white crystalline powder.

Q. And how much did you see?

A. I don't even remember. It probably could fill this glass maybe twice.

Q. Now, were you using methamphetamine at all during that time frame?

A. No.

Q. Have you ever used methamphetamine?

A. No.

THE COURT: Mr. Williams, where is that sunlight coming from? Can you tell what window?

MR. WILLIAMS: On me?

THE COURT: Yeah.

MR. WILLIAMS: I can't, Your Honor. It's not

296

bothering me.

THE COURT: It's not bothering you?

MR. WILLIAMS: No.

THE COURT: I was worried it was bothering you.

MR. WILLIAMS: But thank you.

BY MR. WILLIAMS:

Q. So you're taking it from what he told you it was methamphetamine.

A. That's correct.

Q. What did he tell you he was doing with the methamphetamine?

A. He told me that he was -- that he had two connections in Iowa that he was distributing it to.

Q. And who did he tell you he was selling it to?

A. Terry DeGeus and a contact that he knew in Clear Lake or Mason City.

Q. In Clear Lake or Mason City? Did he ever tell you who that was?

A. No, he did not.

Q. Let's talk about Terry DeGeus for a minute. Did you know Terry DeGeus?

A. Yes, I did.

Q. How did you know him?

A. He was in my graduating high school class, although I don't think he graduated.

Q. From Britt, Iowa?

♀

297

A. That's correct.

Q. Do you know how your brother knew Terry DeGeus?

A. Yeah. Dustin was very good friends with his younger brother Brian, and Dustin was -- knew the DeGeuses very well.

Q. And when you say knew them very well, can you describe how well he knew them?

A. He would stay at their house. He -- like I said, Brian was a good friend of his.

Q. This is kind of back in high school time period?
A. That's correct.
Q. Did he give you any indication of how he was getting the methamphetamine to Terry DeGeus and this other contact of his up in Iowa?
A. He never really specified, no.
Q. Were you aware of him making trips back to Iowa?
A. I knew he went back to Iowa, but you never really knew if he was going -- what he -- what he was going back to Iowa for. I mean, he had girlfriends back here.
Q. As a result of manufacturing this methamphetamine, then ultimately distributing some to these two contacts he had back in Iowa, did that ever create income coming back from the sale of those -- from the sale of that methamphetamine?
A. I would assume it did.
Q. Did you ever receive money?
A. He did repay me back some of the money that I had lent him, yes.

298

Q. Approximately how much do you think you ever got back from him?
A. Approximately probably two-thirds of what he owed me.
Q. And that would be how many dollars?
A. Maybe $5,000.
Q. Let's talk a little bit about Tim Cutkomp. What was his role in this operation? I know he comes down about the time that the meth lab gets moved to this house in southern Arizona. What's his involvement otherwise?
A. Tim was just always a very good friend of Dustin's, and Tim just -- I think Tim just pretty much, you know, did what Dustin

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 264 of 3636

had him do.

Q. You indicated earlier in your testimony that your brother had a girlfriend down in Arizona.

A. Yes.

Q. What was her name?

A. I believe it was Missy or Melissa.

Q. And where was she living at when they had this house down in southern Arizona?

A. She was living in an apartment in Tucson.

Q. What, if any, involvement were you aware of that she had with the methamphetamine manufacturing operation?

A. I don't know of any involvement she ever had.

Q. You indicated that your brother had some girlfriends back

♀

299

in Iowa as well.

A. That's correct.

Q. Who were they?

A. He had one by the name of Kathy, and the other one, her name was Angela.

Q. Do you remember Angela's last name?

A. Johnson.

Q. Let's talk about that for a little bit. Do you know of any connection between Angela Johnson and Terry DeGeus?

A. Yes. Supposedly Angela dated Terry.

Q. And how do you know that?

A. Dustin told me.

Q. At some point you indicated that your brother had a relationship with Angela Johnson. When did that take place in relation to this relationship that she had with Terry DeGeus if you know?

A. I'm assuming that she had -- well, she would have had the relationship with Terry before she had the relationship with Dustin.

Q. Did your brother ever tell you about her involvement in the methamphetamine operation?

A. He only made one comment. At one time he said that Angela was -- had connections into the -- into the drug world.

Q. And connections in the drug world, how would that -- did he indicate what benefit that had to him and his operation?

♀

A. No, not really.

Q. Do you know whether he was distributing any through her?

A. No, I don't.

Q. Okay. He just tells you that she has some connections in the drug world.

A. That's correct.

Q. Do you remember whether he said anything about those drug connections, a lot of them, good, bad, anything like that?

A. No.

Q. All right. Let's talk about what happened then in 1992. You indicated at some point that the decision was made to -- the defendant tells you he's moving back to Tucson with his girlfriend and Tim Cutkomp is moving back to Iowa.

A. That's correct.

Q. And approximately when did that occur to the best of your recollection?

A. '93 time frame.

Q. And at some point about that time frame, what happened with regard to your brother back in Iowa?

A. Can you ask that question one more time?

Q. Yeah. It was a poorly worded question. I want to direct your attention to March of 1993. Did you hear about your brother being arrested back in Iowa?
A. Yes, I did.
Q. How did you find out about it?

A. I was at work, and my mother gave me a call and said that he was arrested.
Q. Did you receive any other calls then shortly thereafter?
A. Yes, I did.
Q. And who was that from?
A. From his girlfriend in Tucson.
Q. And what was her name again?
A. Missy or Melissa.
Q. And what did she tell you?
A. She told me that she had talked to Dustin and Dustin wanted her to convey a message to me to go down and to dispose of anything that he had left in one of my storage sheds and that he wanted me to pick up his stereo and sell it for him and not to get upset when I went down at what I seen.
Q. Let's talk about that a little bit. What storage shed was she referencing?
A. I had several storage sheds that I had business records and that in, and Dustin, when he closed -- when he moved, he asked if he could store things in my storage shed, and I said he could.
Q. And this was located where?
A. In Tucson, Arizona.
Q. And so when you got this call from Melissa, the reference was to the stuff that he had stored in some storage shed of

yours.

A. That's correct.
Q. And so what did you do?
A. I went down to Tucson. I disposed of what was in the storage shed that was his.
Q. Can you describe for the jury what you found in the storage shed?
A. He had five or six boxes that were taped up, just boxes.
Q. Cardboard boxes?
A. Cardboard boxes.
Q. And what did you do with them?
A. I threw them in the dumpster.
Q. And when you threw them in the dumpster, what did you hear?
A. I heard glass breakage because I just literally threw them in a dumpster.
Q. And you were instructed to do that basically through Melissa by your brother?
A. That's correct.
Q. And you were supposed to do something with the stereo as well?
A. I was to sell his stereo.
Q. After you destroyed the stuff that was in the storage shed, did you ever have a conversation with your brother about that later on?
A. It was years afterwards. He asked me if I truthfully destroyed everything in the storage shed. I said I did.

Q. Now, at some point -- this is now in March of 1993. Your

brother has been charged. Did you learn what he was charged with?

A. Yes, I did.

Q. And what was that? What was your understanding?

A. He was charged for the selling of methamphetamine.

Q. Did you have concerns yourself about whether you were going to get implicated in this then?

A. Not really.

Q. And why not?

A. Mostly from what I saw, everything was fairly small. I didn't feel that the -- I mean, like I said, I was continuously lending Dustin money. I didn't feel my involvement was that much.

Q. Okay. And do you ever have a conversation then with your brother about the pending charges against him?

A. No.

Q. Describe for the jury, after his arrest in March of 1993 in Iowa, what was your contact -- what was the nature of the contact with your brother until, you know, 1995?

A. Very little to none.

Q. And why was that?

A. I was upset with him.

Q. Why?

A. When I went down to Tucson and I went to pick up his stereo

♀

304

and that, I was surprised at what he had in his apartment.

Q. What do you mean?

A. I was surprised at what he physically had. He had a nice stereo, nice couch. He had put a deposit down for a diamond for his girlfriend. I was surprised he had that.

Q. And why were you surprised he had all those nice things?
A. Well, when somebody's still borrowing money from you to go out for dinner, it's kind of surprising that he would have those things.
Q. Did he ever fully pay you back all the money that you loaned him either for the meth operation or for any other purpose?
A. No.
Q. How much do you think at that point he owed you if you were to count it all up?
A. Roughly maybe a couple grand.
Q. Couple thousand dollars?
A. (Witness nodded head.)
Q. What -- in the little contact you had with your brother after the arrest in 1993 up until 1995, do you ever have any conversations with him about the fact that the witnesses against him disappeared?
A. No.
Q. Had you heard about that?
A. Yes.

♀

305

Q. Had you heard about it through your brother at all?
A. No.
Q. Did you ever have any conversations, either up until '95 or thereafter, with your brother about the disappearances of those witnesses?
A. No.
Q. After your brother was arrested in 1993, was there a subsequent trip that was made down by your brother to Arizona still in 1993?

A. In '93?

Q. Yes.

A. I don't know of the exact time frames, but he -- I know of two trips he made. One he made with Timothy Cutkomp, the other one with Angela Johnson.

Q. Okay. Let's talk about those two trips. Which one came first if you recall? The one with Tim or the one with Angie?

A. I would assume the one with Angie.

Q. And why would you assume that?

A. Because he came down to pick up a lot of his possessions.

Q. And do you remember just roughly how long after his arrest in Iowa that would have been?

A. No, I don't.

Q. And the one with Tim, do you recall when that was?

A. It was years after the fact, probably '95, '96 time frame.

Q. Let's move to the '95, '96 time frame then. At some point

306

are you aware that your brother is arrested for drug charges again?

A. Yes.

Q. And from the time frame of his arrest in Iowa in 1993 up until his arrest again in 1996, did you continue to loan him any money?

A. From various times he would ask for loans for various things, and I would, yeah.

Q. And did you loan him money during that time period?

A. Yes.

Q. Did he ever ask you for money specifically for -- to buy chemicals and things like that?

A. No.

Q. Back when he was operating the meth lab in 1993, were you aware that he was using the name Printed Circuits Technology to order chemicals?

A. No, but he very easily could have. I mean, Dustin had all the -- we bought -- in my business we bought large amounts of chemicals. Dustin was the one that purchased a lot of those chemicals, and he had all the connections to do it when he wanted to.

Q. When your brother's arrested ultimately in 1996, do you have any conversations with your brother about what was going on in 1996 that caused him to be arrested at that point?

A. No.

♀

Q. Now, at some point you were approached by law enforcement officers and asked questions much like I'm asking you today. Is that accurate?

A. That's correct.

Q. When you were initially approached by the officers, did you tell them the truth?

A. I was very elusive in what I was telling them. I didn't want to give them the facts.

Q. And were you visited by them again after that?

A. Yes. They told me two things. One is they told me that they wanted my cooperation. They told me that the statutes of limitations has -- had run out of anything that I might have borrowed him or any charges that could have been filed against myself. And they said that -- for testifying they would give me an immunity agreement.

Q. Okay. And when you say the statute of limitations, what did you understand that meant for you then if the statute of

limitations had run out?
A. It means that for -- if somebody wanted to prosecute me for lending him money that at that time they couldn't do it.
Q. All right. And you were provided ultimately with a letter of use immunity?
A. That's correct.
Q. And what did you understand that letter of use immunity did for you?

308

A. I didn't believe it did much, to be honest with you. I had full intentions of cooperating anyway so . . .
Q. Now, you're not -- are you getting anything for testifying here today?
A. No, I'm not.
Q. Let's talk a little bit about the 1998 sentencing. Ultimately you're aware that your brother was convicted and sentenced and sent to prison.
A. That's correct.
Q. All right. And in 1998 there was a sentencing hearing. Were you aware of that?
A. I know there was a grand jury. I don't know the legal terms but . . .
Q. All right. Did you ever attend any sentencing hearing for your brother?
A. No.
Q. Did you have contact thereafter with Angie Johnson?
A. There was only three times I've had contacts with Angie Johnson, one of those -- the latter part is what I think you're talking about -- at the latter time frame. And yes, she called my house.

Q. Let's talk about the three contacts you've had with Angie Johnson just so we cover all three of them. What are those three contacts starting with the first one?
A. Initially Dustin just -- I was up in Iowa, and Dustin

♀

wanted me to meet her. She was working at a restaurant in Clear Lake. We went to dinner there. She couldn't really talk to us because she was working, and she bought us dinner, and that was it.
Q. All right. And the second time?
A. The second time, I was up for a family event. I don't remember. It was some holiday, and she was at my mother's house.
Q. And that would have been approximately when if you recall in the '93-to-'98 time period?
A. Yeah. It would have been ninety -- guess, '94.
Q. Okay. And then the last time you said was a phone call.
A. It was a phone call. And that was after Dustin's trial.
Q. And what happened during that phone call?
A. She had -- she had talked to my mother. She had talked to me. She basically told us that she was extremely upset -- well, she didn't tell. She yelled. She yelled that we were not supporting Dustin, that he was not being supported by us, and that she was going to make sure that everybody paid a price for not supporting him and if he wasn't going to be able to see his kids, we weren't going to be able to see ours.
Q. And how did you take that from her?
A. I took it as a threat.

MR. WILLIAMS: I have no further questions. Thank you.

THE COURT: Members of the jury, why don't you take a stretch break. Everybody else in the courtroom can too.

Okay. Please be seated.

Mr. Parrish, you may cross-examine.

MR. PARRISH: Thank you, Your Honor. May it please the Court and counsel.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Morning, Mr. Honken. How are you?
A. Good.
Q. I'll reintroduce myself to you. My name is Alfredo Parrish. I'm representing your brother. I just want to -- one thing, I tell you, I don't know whether everybody else is having the problem, but your voice tends to drop.
A. Oh, I'm sorry.
Q. I have to really strain to hear you.
A. Oh, I'm sorry.
Q. And toward the end of your sentences, I honestly cannot hear a lot of what you're saying.
A. I'm sorry.
Q. Okay.
A. I'll try to speak up.
Q. So I would ask you to keep it up and project your voice over to the last juror over on your right-hand side, so that way I think we won't have a problem with everybody hearing you.

♀

311

A. Okay.

Q. You're six years older than Dustin; is that correct?
A. That's correct.
Q. You have how much education?
A. I have my bachelor's in management of information systems.
Q. Management and information systems?
A. That's correct.
Q. You have supervised at one point 75 employees? Is that your testimony?
A. That's correct.
Q. You owned your own company as early as when you were what age?
A. Twenty-two, twenty-three.
Q. You were 22, you owned your own company, and how many people did you supervise at age 22?
A. We started out with a few amount of people. It was maybe three to five people.
Q. And you were how old when you were supervising 75 people?
A. That was probably five years after being in business.
Q. So 27?
A. Twenty-seven, twenty-eight time frame.
Q. And Dustin was 21.
A. That's correct.
Q. And make sure I understand this. Dustin was 21. You were 27. You were supervising 75 people, and you owned your own home at that point?

312

A. That's correct.
Q. You were married?
A. That's correct.
Q. Did you have children?

A. No.
Q. Were you separated at that point when you were 27?
A. No. I got separated when I was 28.
Q. Twenty-eight, a year later you were separated.
A. That's correct.
Q. And what year are we talking about now?
A. When I got separated?
Q. Yes, sir.
A. Boy, I don't even remember when I got divorced. It would have been late '90s.
Q. And is that the same marriage you're in now, or is it a second marriage?
A. Late '80s, I'm sorry.
Q. Is that the same marriage you're in now, or is it a separate marriage?
A. No, I'm in my second marriage.
Q. Now, let's talk at the time Dustin came out the first time. What year is that?
A. It would have been after he graduated so --
Q. From high school.

313

A. From high school. Would have been the '86 time frame.
Q. He lived in your house.
A. That's correct.
Q. In a bedroom I take it in your house.
A. Yeah.
Q. Did you have your own company at that point?
A. Yes, I did.
Q. And what type work was your spouse doing?
A. She was an ophthalmologist's assistant.

Q. And you think that was the year 1987?
A. It would have been '86, '87 time frame after he graduated from high school, that's correct.
Q. He worked at Burger King for a couple of months you think, and then he started working for you.
A. I don't know the exact time frames of how long he worked at Burger King, but that's correct.
Q. You trained him at work.
A. Myself and probably a lot of other people, but correct.
Q. All right. And tell us what you trained him to do at work.
A. He learned all the aspects of circuit board manufacturing. He learned --
Q. I lost you right at the end.
A. He learned all the aspects of circuit board manufacturing.
Q. Okay. And what did that involve?
A. Everything from drilling the circuit boards to processing

314

the boards through a wet floor to screening them to the quality control aspects of them.
Q. So you supervised him.
A. That's correct.
Q. And you supervised him and paid his salary and monitored his work for what? Two years before he went back to Iowa?
A. I don't know the exact time frames but --
Q. But approximately two years.
A. Approximately.
Q. Is that right?
A. I would assume so, yeah.
Q. You were in control of his salary. You were in control of where he lived. You were in control of all of his finances.

MR. WILLIAMS: Objection, Your Honor. Compound question.

THE COURT: Why don't you break it up, Mr. Parrish. Sustained.

BY MR. PARRISH:

Q. You were in control of his finances.

A. To my knowledge, yeah.

Q. You were in control of his salary.

A. That's correct.

Q. You were in control of the place where he lived.

A. Well, he chose to live where he lived, but yes.

Q. Okay. Did he have a vehicle during that time?

♀

A. Yes, he did.

Q. What type vehicle?

A. It was a older -- I don't even know what make it was. It was an older vehicle.

Q. All right. So then he leaves after he's been trained how to do this work and moves back to Wellborn. Is that your testimony?

A. That's correct.

Q. He takes with him what person?

A. It was a screener that we had. In manufacture circuit boards screening, it's an art, and he was a very valuable employee to us at the time.

Q. Was Dustin a valuable employee to you at that time?

A. Very much.

Q. I assume he's 23 years old.

A. Very much. Very valuable, that's correct.

Q. Did he leave because of a dispute?

A. I don't remember totally why he left. I know that he didn't believe that there was places that he could grow more within the company. He needed more.

Q. Were you in trouble then with EPA at the time he left?

A. No.

Q. So there was no dispute and no assistance that he needed to provide you with with regard to your EPA problems that -- when you were dumping so-called items into the water in Phoenix. That

♀

316

was not a problem at that point.

A. That's correct.

Q. All right. So he goes back, but the problem as you describe it developed when he takes one of your valued employees with him to Wellborn; is that right?

A. That's correct.

Q. How did you express your displeasure with that?

A. I learned it over the -- initially I didn't know that that employee was going to Wellborn with him. I found out through other sources that that's where that employee went to. I had a conversation with him on the phone and got very upset at him.

Q. You knew Dustin was leaving.

A. Yes.

Q. You knew he was going to Wellborn.

A. I knew Dustin was going to Wellborn, that's correct.

Q. And you knew he was going back home to Iowa.

A. That's correct.

Q. Did he go to school in Phoenix when he was out there?

A. He was never in Phoenix.

Q. I'm sorry. When he was out with you in Tucson, did he ever go to school?

A. Yes, yes, he did.
Q. What classes did he take?
A. I don't remember.
Q. You didn't help -- didn't monitor or anything like that.

A. No.
Q. But you knew he went to what? Community college or something?
A. Community college.
Q. The entire time he was out there?
A. No, I don't think it was -- it definitely wasn't the entire time, but he definitely took classes while he was out there.
Q. Now he moves back to Iowa, and you have a so-called argument with the person he took, not with Dustin; is that accurate?
A. No, no, I had the argument with Dustin.
Q. What did you tell Dustin about this?
A. Well, initially I asked him if the person went to work with him, and initially he said no, and after I found out he did, I asked him, and he finally admitted that he was there working with him.
Q. All right. But you indicated and you acknowledged it was a different type of company that produced a different type of product; is that correct?
A. That's not correct.
Q. It's the exact same product then?
A. Appr -- yes. Both Wellborn and my company manufactured circuit boards. We did have an additional aspect of ours. We did the engineering of circuit boards.
Q. And they did not.

A. I don't know if they did or not. I don't think they did.
Q. So did his skills -- were his skills directly transferable to Wellborn?
A. Yes.
Q. And you then became upset with Dustin, and what did you tell him as a result of that?
A. I just couldn't believe that he would take one of my employees from me like that.
Q. And you said you were upset with him; and, therefore, you had a disagreement?
A. That's correct.
Q. You became upset with him.
A. That's correct.
Q. Did he become upset with you?
A. No.
Q. Did he ever yell at you?
A. No.
Q. Matter of fact, you've never seen him lose his temper; right?
A. I have never seen Dustin lose his temper, no.
Q. So you're mad with him, and then he stays here for two years. During those two years, just briefly tell us this company now that has 75 people, what happens to it?
A. Towards the end of it?
Q. Well, right before Dustin comes back.

♀

319

A. The company -- I had a partner. We decided that it would be best -- she wanted to move back out to California. We got an

offer for the assets of the company. We sold those assets of the company.

Q. The company was having problems, though; right?

A. Yes.

Q. Okay. Serious financial problems.

A. Serious financial problems.

Q. And the investigation that you stated to Mr. Williams earlier as only being civil did have criminal overtones; isn't that correct?

A. Not to my knowledge, no.

Q. You're saying there was nothing but civil fines that could have been assessed? There was absolutely nothing else dealing with any criminal prosecutions either in the state of Arizona or by the federal government? Is that your testimony?

A. That's my understanding, yes.

Q. Where did you get that understanding from?

A. Like I said, I had employed a lawyer, and they were -- what they were trying to do is they were trying to assess fines on us for the disposal of that waste.

Q. While you were dumping waste into the water system?

A. It wasn't the water system.

Q. It was eventually getting into the water system.

A. I don't know that. It went into a landfill.

320

Q. I'm sorry. It went into a landfill?

A. That's correct.

Q. That you thought you had the okay to do; is that right?

A. That's correct. We hired a consultant years prior. That consultant was in Phoenix, Arizona. He tested -- he tested our waste. It came back. After being tested, it came back, and he

gave the assessments to the city, the landfill people. They approved the dumping of the waste into the landfill. We did that for several years. And the -- we had an inspector. We had inspections -- inspectors that came out on a frequent basis, and one of the inspectors said, you know, What are you doing with your waste? And we said, Well, we're approved to take it out to the landfill. At that time he said no. He said, Due to the fact of how it's made, you can't do that according to the -- according to the EPA.

Q. Well, let's do this. Let's kind of if we can see if we can cut to the chase here. There was going to be an assessment, and you said no assessment was ever made, but you knew the potential assessment that you were facing at the time you were selling the company; is that correct?

A. That's correct.

Q. It was about $40,000; is that right?

A. Oh, it was a lot more than that.

Q. Well, how much was a lot more?

A. At one time they were talking literally in the millions.

♀

Q. Oh, they were talking about assessing you in the millions. You're selling the company, and how much did you sell the company for? You said the assets were left. How much?

A. The assets, I don't even remember what it was sold for. I think the assets probably sold for over a hundred thousand dollars.

Q. The assets sold for about 100,000. You were facing assessments of up into the millions at one time. You were under severe financial straits, would you agree, at that time right before Dustin is coming back out to Arizona? Would you agree

with that? It's two years later.

A. I mean, I still made -- I made a decent income. I did have the potential of a fine, but I always knew -- I mean, I was always advised that I could declare bankruptcy and that fine would be wiped out so . . .

Q. Let's put it this way. Before Dustin was coming back, would you agree that you had what could be termed as a pretty serious legal situation; your business was falling apart; and you had your own personal problems that you were trying to address? Would that be an accurate assessment of what your life looked like right before Dustin came back out to Phoenix or out to -- I keep calling it Phoenix. Out to Arizona.

A. The business was already sold prior to Dustin coming out. Like I said, you know, there was -- there was the potential of fees that could be assessed against me.

♀

Q. The 75-people business -- person business had basically fallen apart. And just follow me here for a second.

A. Okay.

Q. Was this your situation right before Dustin was coming back? Correct me if I'm wrong. Your 75-person business had basically fallen apart. You had personal problems of your own that you were trying to address. You were facing an assessment of fines by EPA in the millions of dollars.

MR. WILLIAMS: Objection, Your Honor. Compound question.

MR. PARRISH: It's a hypothetical based upon the factual situation.

THE COURT: Overruled. You may answer.

Q. Would that be a fairly accurate assessment?

A. It would be fairly accurate with the exception of millions, yes.

Q. What age are you at this point?

A. '92, I was born in '62. Thirty. No.

Q. Thirty?

A. Well, '92, '62, yeah.

Q. Dustin, the person you had then supervised for two years, had now gone to Wellborn, comes back to Arizona. Let me ask you this question. Did you ask him to come back?

A. No.

Q. He came back on his own.

♀

A. That's correct.

Q. He comes back on his own. He then moves into the house with you; is that right?

A. I can't remember if he moved into an apartment for a short amount of time or if he moved right into my house, but yes, there was --

Q. Eventually he gets into your house?

A. Eventually he gets into my house, that's correct.

Q. Is your wife living there?

A. Yes, she is.

Q. Have kids at this point?

A. No.

Q. Dustin is still six years younger than you.

A. That's correct.

Q. Do you employ him in your business at that point?

A. No, I do not.

Q. Where is he employed?

A. He's not.

Q. Does he have any income?
A. No, not to my knowledge, no.
Q. Do you have income?
A. Yes.
Q. How much?
A. I have no -- I don't remember.
Q. Okay. So Dustin has no income. You have income. He's

living in your house, and the year is 1992. Is that accurate?
A. Okay.
Q. Let me ask you this. Does Dustin have a car?
A. I don't remember him having a car at that time.
Q. No car, no income, living in your house. Let me ask you this. Considering your financial situation at that time, let me ask you, do you have other investments that are going to bring income into you?
A. Like I said, I owned a business.
Q. This new business?
A. What's that?
Q. This new business.
A. It was a new business. That was fairly lucrative.
Q. How many people employed there?
A. Three.
Q. Which eventually goes up to six?
A. We had -- I think the max was five.
Q. Does Dustin come in and work for that business?
A. No, he does not.
Q. He goes to school.
A. '92 time frame, no, he did not.
Q. Well, tell us what Dustin is doing in the '92 time frame

when you owned this lucrative business, he comes back to Arizona, he's living in the house with you, he does not own an automobile. Tell us exactly what Dustin is doing living in your

house.
A. He was mostly doing research to produce -- to synthesize any type of drug he could.
Q. Who buys his books for him?
A. I did.
Q. Where do you buy them from?
A. I don't know. I just give him -- when he asks me to borrow money, I give him money, and he buys what he needs to buy.
Q. Okay. So you're supporting him. You're buying his books. And what's your younger brother doing sitting there researching night and day, isn't he, in your house?
A. I don't know about night and day, but yes, that's what he was doing.
Q. Well, do you describe it as he's researching, he's reading, I'm getting books, and all he's doing is researching, researching, and researching? Do you describe it that way?
A. Dustin is -- has always --
Q. No, I didn't ask you -- I asked you, sir, is that how you have given a description? He was researching, researching, and researching, reading and reading and reading?
A. That's all Dustin normally does is read.
Q. That's all he was doing; is that right?
A. That's mostly what he was doing, that's correct.
Q. Okay. And how long does he do this?
A. Months. I don't know. I don't really remember.

Q. How is he eating?
A. He ate what we had in the house.
Q. He didn't eat very much, did he? He's not a big eater, is he?
A. No.
Q. Basically he was so concerned about his books and developing his research most of the time he spent all the time in his room reading?
A. Dustin -- that's correct.
Q. Did he go out much?
A. No.
Q. And he did this for months. Was that your testimony?
A. He did it for a long time, yeah.
Q. Okay. Now, at some point the two of you -- well, after he's been sitting there with no income, hardly eating, researching in your house, no income, at some point does some idea come up that he has with regard to synthesizing some drugs?
A. Can you restate that?
Q. Yeah. After he's sitting there all of this time as you have described what he was doing, does he come up with the idea of synthesizing drugs, or do you come up with the idea of synthesizing drugs?
A. No. He came up with -- I mean, before he came down, he had the idea that he was going to synthesize -- he wanted to synthesize some type of a drug. While he was there, he came up

327

with that he could synthesize methamphetamine.
Q. Okay. Does he do it in your house?

A. I don't remember him actually being successful in synthesizing anything at my house.
Q. But while he's doing that, he needs material to work with; is that right?
A. That's correct.
Q. He has no money, so where does he get the financing from his ideas to get the equipment to, first of all, start out in your house?
A. Like I said, he --
Q. No. Where?
A. From myself.
Q. Okay. Do you write him a check, or do you go out and spend cash for it?
A. I would just -- he would ask me to borrow so much money, and he'd want hundred dollars, five hundred dollars, and I'd just give him cash.
Q. What about communications? Do you have a telephone during this time?
A. We had a telephone in our house, yeah.
Q. He had access to that.
A. Sure.
Q. Now, after you lend him this money, where does he actually work on this first project?

328

A. I remember him experimenting in a very small, very small scale within our kitchen. After that --
Q. Your wife's home.
A. No.
Q. Where is she?
A. I suppose she was working. I mean, my wife didn't know

anything about what Dustin was doing.

Q. So when she'd leave in the day, he'd start working in the kitchen; is that right?

A. Well, we would both work during the day.

MR. PARRISH: Excuse me just a second. Your Honor, may we take a break, please? I'm sorry.

THE COURT: No.

MR. PARRISH: Okay. I think there's a little bit of a problem.

THE COURT: Well, why don't you approach.

MR. PARRISH: Okay.

(At sidebar on the record.)

MR. PARRISH: My client's got some kind of stomach problems or something. He's got to -- he's got a stomach problem.

THE COURT: Well --

MR. PARRISH: I don't know what's going on.

MR. WILLIAMS: It's your call, Judge. I mean, this is --

♀

329

THE COURT: Do you know any more about it than he's got a stomach problem?

MR. PARRISH: No. I'm just up there doing the examination, and they just sent a note up.

THE COURT: Okay.

MR. PARRISH: Sorry.

(The sidebar was concluded.)

THE COURT: Members of the jury, it's 20 to 10. We're going to take a 25-minute recess until 10:05. Thank you. Please remember my cautionary instruction about keeping an open

mind until you've heard all of the evidence in the case. Thank you.

(The jury exited the courtroom.)

THE COURT: Okay. Why don't we clear the courtroom of all members of the public except for the parties and the defendant.

THE WITNESS: Am I to stay or leave?

THE COURT: You can stay. You know what? You can leave, Mr. Honken. You're here under a subpoena.

THE WITNESS: Yeah.

THE COURT: Yeah, you're still under your subpoena because we're not done.

Okay. Please be seated. Well, first of all, I'm not going to stop the trial every time somebody has a stomach ache. I'm not going to do it.

♀

330

MR. PARRISH: Your Honor, I think he's been sick all weekend from what I understand. We probably would have alerted the Court had I known when I first started on this matter.

THE COURT: Well, you can make some kind of record, but I'm not stopping the trial unless I hear a lot more information. So based on what I know --

MR. PARRISH: We'll try to find out what the problem is and alert the Court.

THE COURT: But I'm just telling you, Mr. Honken, if you think I'm going to stop the trial because you have an upset stomach, you're mistaken.

THE DEFENDANT: I've been doing this for four weeks, and I've only had this problem once. I'm not trying to have problems to stop the trial.

THE COURT: Well, I'm not going to be stopping the trial if you have an upset stomach. So maybe you can find out. The marshals didn't report any problem to me, and so we'll take our mid-morning recess. Thank you.

(Recess at 9:42 a.m.)

THE COURT: Please be seated before we bring the jury in. Is the defense making any claim that the defendant is too ill to proceed with the trial this morning?

MR. PARRISH: We are not, Your Honor. I understand -- as I understand the situation a little bit better -- we talked a little bit during the break -- I think he gets breakfast about

♀

four o'clock in the morning or something like that, and we've kind of talked to them about seeing if we could alter his breakfast schedule in the morning, and I spoke with the marshals about it, and we're just going to --

THE COURT: I don't need to get into all that now. The question is, is he too ill to proceed? You said no.

MR. PARRISH: I don't think so. I think --

THE COURT: Then the answer's no. Let's bring the jury in.

MR. PARRISH: Right.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Parrish, you can continue your cross-examination.

MR. PARRISH: Thank you, Your Honor.

BY MR. PARRISH:

Q. I believe we left off, I had just asked you the question about the telephone, and you said that you had a telephone in your house, that Dustin had access to that telephone, and you

also I believe indicate that the first small experiment after Dustin came back and was taking place you thought in your kitchen when your wife would be gone during the day. I think that's where we left off.
A. I believe that's where we left off.
Q. Now let's continue with that one. So during the evening then when she would come back, he would clean up the kitchen?
♀

A. I don't remember the specifics.
Q. But you testified on direct examination that to your knowledge she had no idea what was going on in her house.
A. She definitely had no idea, that's correct.
Q. Well, then would the kitchen be cleaned up in the evening?
A. If he -- if he would have been experimenting with anything, he would have had it cleaned up.
Q. Okay. You said it was clean -- you said he was experimenting in the kitchen.
A. Right. But you're talking about such a small scale that you're not -- you're not talking about really anything hardly to clean up.
Q. I take it you observed it.
A. I saw him testing, doing testing.
Q. So when she would come home then you're telling us it wouldn't be there anymore.
A. Like I said, that was a long time ago. I don't really remember the specifics, but yes, there was nothing that he did that -- when she was present.
Q. So you would agree then that during this procedure in your home when your wife would be away you would make sure that when she would come home she would have no idea that anything had

taken place such as experimenting with drug production.
A. I don't know if I would say that I made sure because, like I said, it was something that was so small. Mostly what it was

was he was reading books and he was doing a very small amount of experimentation. So, you know, whatever he did, he was very cautious at what he did.
Q. And so were you.
A. I didn't -- no, I didn't even know exactly what he was doing, so I never cleaned anything up or anything like that.
Q. Well, these checks for the purchases of these items including books, material, et cetera, how would you pay --
A. There was never any checks.
Q. It was all cash.
A. When Dustin needed to borrow money from me, I just gave him cash.
Q. Okay. So the $5,000 was cash.
A. And that 5,000 times -- dollars was over a length of time.
Q. And he paid you the $5,000 back.
A. He -- I don't remember the exact amounts that he borrowed from me. But what he did, he paid me back about -- I roughly kept track in my head, and I figured he paid me back about two-thirds of what he owed me. I figured that he borrowed somewhere between 5,000 and 7,500 from me over a time span.
Q. Do you recall your testimony before the grand jury taken May 14, 1998, when you were asked the question he initially -- when you answered the question, What do you mean by X amount? Says, Initially he wanted to borrow -- it was like 5,000 from me, and that's what he wanted to borrow. And what was the

purpose of the loan? And you responded, At the time I was involved with some EPA litigation, he said that if he was able to do it, that is, manufacture the drugs, that he would assist in the payment of legal fees for that. That's on page 10 of the grand jury testimony for that day. Would that be accurate?

A. That would be accurate.

Q. So in other words, when he was starting his experimentation, you lent him the $5,000. You knew full well --

A. He knew.

Q. Excuse me. He knew that $5,000 was going to go back to repay your litigation expenses and other problems you were having with your business; isn't that correct? And isn't that what you told the grand jury?

A. I lent -- I lent him the money over time. What he said is that if he would -- if he could, if he was successful and he had profits, that he would help out if I had expenditures for the proceedings that I potentially could be up against, that's correct.

Q. So the answer is yes.

A. Re --

Q. You were financing this project for him that he was researching so you could benefit your business.

A. It wasn't -- yes, with the exception of benefiting my business.

Q. You're saying payment of the legal fees and the litigation

335

with EPA would not have been benefiting your business, Mr. Honken?

A. No, because that was a prior business, and they were trying

to assess me personally.

Q.   So simply because it was a prior business, it was not any benefit to you or your business; is that your testimony?

MR. WILLIAMS:  Objection, Your Honor.  It misstates his testimony.

THE COURT:  Overruled.  You may answer.

A.   The benefit would have been -- to me would have been if Dustin was successful that he would have had -- that he would have been able to help me if litigation came against me.

Q.   Now, let's move to the second phase of this.  He now has done something evidently to pique your interest because you moved to a larger -- you move him to a larger place, don't you?

A.   Yes, he moved to a larger place.

Q.   You move him to a larger place which is an apartment.  You finance that; isn't that correct?

MR. WILLIAMS:  Objection, Your Honor.  Misstates the evidence and is a compound question.

THE COURT:  Overruled.

Q.   You finance the move to the apartment, don't you?

A.   The finance was to a house, not to an apartment.

Q.   Well, this -- you said it went in three stages.  Do you remember your testimony to the grand jury?  You said it was in

336

three stages:  In your house, a small scale; then to an apartment; then to a house?

A.   And I cannot remember if it was apartment, house -- if it was apartment to my house to his house or if it was my house to an apartment to his house.  I don't remember the sequence.

Q.   Well, let's not quibble with the order.  Eventually he gets to a house; is that correct?

A. That's correct.
Q. That you finance.
A. That's correct.
Q. And as you finance this house, Tim Cutkomp comes out; is that correct?
A. That's correct.
Q. Who pays for Mr. Cutkomp's ticket?
A. I have no idea.
Q. Well, does Dustin have a car living in this rural area out in Arizona?
A. No, he doesn't. He borrows mine.
Q. Who brings him food? I'm sorry. I didn't mean to cut you off.
A. He either borrows my car, or else he borrows his girlfriend's.
Q. His girlfriend's not even there, is she? We're talking about when he first moves to the house.
A. Okay. He would have borrowed my car.

♀

337

Q. He's living out in the country. Tell us how far he is from the nearest store out there.
A. Ten miles.
Q. Does he have a bike?
A. No.
Q. So in order for Dustin to get to the store after he's done his first experiments in your house, he's gotta walk ten miles just to get to a store; is that right?
A. No. He would either borrow my car or --
Q. If he doesn't have a car, he has to walk ten miles.
A. If he -- yes.

Q. Okay. Does he have a telephone out there?
A. No, he does not.
Q. Does he have a walkie-talkie out there?
A. I don't know. I don't think so, no.
Q. Does he have utilities out there?
A. Yes.
Q. Who pays for the utilities?
A. I would assume I did.
Q. Okay. How do you pay for those? Cash?
A. I would -- like I said, I would just give him money, and he would pay whatever he had to pay for.
Q. Okay. And so he's buying equipment to expand his research that he's done into the drugs out in Arizona in this house that you are paying for; is that accurate?

338

A. That's correct.
Q. How does he get his food?
A. Either he would -- like I said, either he was borrowing -- either he would borrow my car and he would get groceries and take them out, or if I was going to go out there, I'd bring him something out.
Q. Give us some idea. How long -- he's in this house ten miles from the nearest store in a house you pay for, in a house you're paying the utilities on, and he has his friend out there without a vehicle. How long is he out there without these items?
A. I don't know exactly. Maybe two or three months.
Q. And what's he doing all of this time?
A. Well, he had -- one of his main interests was he had -- Dustin always had an interest in dog training, obedience

training. He had some dogs out there that he was -- that he was training.
Q. Where did he get the dogs from?
A. I think he got them from Tucson someplace.
Q. Who paid for those?
A. I have no idea. I would assume it came out of money he borrowed from me.
Q. What about his clothes? Did he have many clothes?
A. I didn't keep track of his clothes.
Q. Packed his clothes? Did he have a lot of clothes?

♀

339

A. I have no idea.
Q. Did he have more than one suitcase?
A. I have no idea.
Q. Okay. Did you ever go out to the house to visit?
A. Yes.
Q. And where was he living in this house?
A. He was living in a bedroom. He was living in the house.
Q. In a bedroom?
A. There was bedrooms in the house.
Q. And did Tim have a bedroom in there?
A. There -- I don't really remember the house, but I'm sure I think there was multiple bedrooms in the house.
Q. Now, during this period of time -- we're still in 1992, or have we moved to 1993 yet?
A. I have no idea.
Q. Okay. So during this time he's in this house in the country, does he ever get a car out there of his own?
A. I think later on he had his girlfriend's car.
Q. I said a car of his own.

A. Oh, no. He would -- to my knowledge in Arizona he did not have a car on his own.
Q. He does manage, does he not, to manufacture methamphetamine; is that right?
A. That's correct.
Q. You indicate that one of his customers was a fella named

♀

Terry DeGeus; is that right?
A. That's correct.
Q. Terry DeGeus was your high school classmate; is that right?
A. That's correct.
Q. You knew Terry DeGeus, and you knew he dealt drugs, did you not?
A. I did.
Q. Matter of fact, you knew the characters that Terry DeGeus hung around with; isn't that correct?
A. I did.
Q. You knew Terry DeGeus before Dustin knew Terry DeGeus; isn't that accurate?
A. Dustin knew Terry DeGeus better than I did.
Q. No, I said before.
A. Well, I'm older, so yes.
Q. And describe as best you can the type of people who ran around with Terry DeGeus.
A. I would classify them as the biker type.
Q. Biker types?
A. (Witness nodded head.)
Q. Is that right?
A. That's correct.
Q. And you knew that; is that right?

A. I knew that, yes.

Q. And you'd known that for how many years before Dustin was

out there in this house in Arizona trying to manufacture methamphetamine?

A. I knew that Terry had troubles in high school.

Q. And you testified on direct examination that you also knew that one of Dustin's customers or at least business people in Iowa was Terry DeGeus.

A. That's correct.

Q. Now, let me ask you this. In 1992, early 1993 when Dustin and Tim decide to close down the lab, do they do that on their own?

A. Yes, they do.

Q. They do it voluntarily; isn't that correct?

A. That's correct.

Q. Cops don't come in and make them do it; is that right?

A. That's correct.

Q. You don't tell them to close it down; is that right?

A. No.

Q. Dustin decides on his own, I don't want to do this; I want to pack it up; I want to head back to Iowa, doesn't he?

A. He says he wants to head back to Tucson to spend time with his girlfriend. Tim went back to Iowa.

Q. Well, do you remember what you told the grand jury about that, page 16 of the grand jury transcript, 1998, May 14? Both Tim and Dustin were -- both had problems with their family, and they chose to close down the lab. Is that accurate?

A. That's correct.
Q. And his family was back in Iowa; is that right?
A. Tim's family was back in Iowa. Dustin's -- Dustin went back to Tucson to be with his girlfriend.
Q. Well, that's the girlfriend whose apartment you say you walked in and you saw the stereo; is that right?
A. That's correct.
Q. You saw the stereo, and then you became alarmed because the stereo cost more than what you had in your pocket at the time.
A. Dustin, within the apartment that he had, had more than what I ever contemplated that he would have had.
Q. So he moved from the house in the country with no car to the place with his girlfriend.
A. He went from the house in southern Arizona to his girlfriend's house.
Q. Right.
A. Apartment.
Q. And you saw what you said bothered you. On direct examination at least you said this. He had the engagement ring receipt.
A. That's correct.
Q. How much was that?
A. I don't remember what it was. It was in the thousands.
Q. How high in the thousands?
A. Two, three thousand dollars.

343

Q. It was a deposit on it, though; right?
A. It was a deposit.
Q. And you saw the couch that bothered you a little bit.

A. He had a leather couch. He had a nice stereo, yes.
Q. Did he say it was his?
A. Missy -- the girl said it was his, yes.
Q. She told you it was his, but he never said it was his, and you never asked him?
A. No, I never asked him.
Q. What about the stereo? You gave the stereo to a business partner of yours?
A. It wasn't a business partner. I had a friend that was interested in buying it, so I gave it to him, yes, that's correct.
Q. You gave what you thought was Dustin's stereo away.
A. I didn't give it away. He gave me so much money for it, and I think I sent some of that up to either his -- I think it was his -- for his lawyer bill or something.
Q. What about the couch?
A. I didn't do anything with the couch.
Q. Did you get permission from Dustin to do this, or you just did this on your own?
A. For the stereo came from his girlfriend.
Q. You got Dustin's permission to do that, or you just did that on your own?

♀

344

A. She told me that it came from Dustin to sell the stereo.
Q. Okay. Did you sell or dispose of anything else in the apartment without talking to Dustin?
A. No.
Q. Just the stereo and what else?
A. That was it.
Q. Okay. Then Dustin leaves Arizona, closes down the lab. He

moves up to Tucson. Tim goes back to Iowa, and do you know how long Dustin stays there before he goes back to Iowa?
A. No, I don't recall.
Q. Do you and Dustin have any disagreement about anything?
A. No.
Q. And he moves back to Iowa, and is that --
A. Dustin never moved back to Iowa.
Q. Yes. In 1993. I mean you told us in the grand jury testimony that both he and Tim closed down the lab and moved back.
A. No, I said that Dustin -- that they both closed down the lab. Tim moved back with his family, and Dustin moved in with his girlfriend.
Q. Well, do you remember being asked, Well, what family does Dustin have? Do you remember stating that you said he had two children? Page 16 of the grand jury transcript, that he had two children?
A. Yes, he has two children.

345

Q. Well, did you say that in May 14, 1998, to the grand jury? Is that part of the reason he closed down the lab and he wanted to address his family problems?
A. I don't understand what you're . . .
Q. Well, he moved in with Melissa, and after he lived with Melissa, did he move back to Iowa to your knowledge?
A. Not to my knowledge, no.
Q. So he stayed in Arizona from 1993 until when?
A. To my knowledge till he got arrested.
Q. And he was -- he wasn't arrested in Arizona, was he?
A. No, he was arrested in Iowa.

Q. He was arrested in Iowa. Well, did you have any contact with him during that time?
A. No, not much. I was living in Phoenix.
Q. Didn't talk on the telephone.
A. I would talk to him on the telephone, and we'd go out for dinner every once in a while, but that was . . .
Q. Did he borrow any money from you anymore?
A. I really don't remember. Dustin -- always seemed like there was money that I was borrowing to him, so I don't know if he did or not.
Q. So is your testimony then from -- in 1993 after 1993 he continued to borrow money from you or not borrow money from you?
A. There was never a time that I remember that Dustin was not -- that he was not borrowing money from me.

♀

346

Q. All right. So then if I'm accurate -- and correct me if I'm wrong -- after he moved out of the house, he moved in the apartment with Melissa, he would go back and forth to Iowa I assume, is that right, to your knowledge from the conversations you had with him?
A. I would assume so, yes.
Q. All right. He continued to borrow money from you.
A. I don't know.
Q. Well, let me ask you this. Did you ever see him with a huge amount of money in 1993?
A. No.
Q. Did you ever see him with a fancy automobile?
A. No.
Q. Did you ever see him with a huge roll of money in any bank account that he would withdraw from?

A. No.
Q. Did you ever see him with any worldly possessions of substantial amount that brought notice to you other than this couch and this stereo?
A. No.
Q. So this younger brother of yours was living basically the same way in 1993 as he had been living in 1987 through '89. Would that be accurate in terms of finances?
A. He was living the same type of lifestyle, that's correct.
Q. Borrowing money from you in order to feed himself and

347

travel.
A. Well, at that time he also was living with his girlfriend, so I don't know what finances he got from her or what he did.
Q. Right. And you acknowledged you didn't know what finances he got from her; is that right?
A. No, I don't.
Q. Did you ever become upset because from 1993 forward he was continually borrowing money from you?
A. After he was arrested in '93 -- is that the reference you're speaking of?
Q. Yes, sir.
A. I can't really say that I was ever upset at him, no.
Q. You could say you were never upset? Did you ever call him on it and say, Hey, Dustin, what's the deal here? Why are you still borrowing money from me?
A. No, because at the time when he was borrowing money, either he was in jail and I was giving him money for books or whatever or he was -- he had a job in Mason City; he was making an income, so I wasn't giving him money at that time. So no.

Q. From 19 -- let's go back just one second, and you used that cup as a description when Mr. Williams asked you a question, and you said the most methamphetamine that you had ever seen Dustin make was twice the size of that cup? Your voice dropped toward the end of the conversation, and I didn't hear it. Is that what you're telling us?

♀

A. That's what I believe, yeah.

Q. So you're saying in all the time you've seen Dustin with the laboratory this is -- twice the size of this amount is the most you've ever seen him with.

A. That's correct.

Q. And where did you see that?

A. Down in his house in southern Arizona.

Q. And I believe you've indicated since you did not use methamphetamine you did not know whether or not it was a working product, so to speak.

A. Could have been baby powder to me.

Q. What did he tell you about it?

A. He said it was methamphetamine.

Q. Did he tell you it was a work in product (sic) and it would work just fine?

A. He just said it was methamphetamine, it was speed.

Q. Did he tell you how much of it he had produced?

A. No.

Q. Did he tell you whether or not he made any money off of it?

A. No.

Q. Did you ever see any money he'd made off of it?

A. He did pay me back money, so I'm assuming that he -- that it came from that, my assumption.

Q. In small increments; is that correct?
A. Small increments, correct.

Q. But as I understand it -- and correct me if I'm wrong -- even into 1995 you had not been paid back all your money.
A. That's correct.
Q. And there's money out of there of that five to seven thousand dollars that you initially loaned that you've never received back; would that be accurate?
A. I believe that's accurate, that's correct.
Q. Roughly how much?
A. Estimation, two, three thousand dollars maybe.
Q. To your knowledge and from your own observation, from 1993 up until 1995, did you ever see Dustin with a vehicle that he owned?
A. No.
Q. Did you ever see him purchase any substantial amount of clothing?
A. No.
Q. Did you ever see him purchase a substantial amount of furniture?
A. No.
Q. Did you ever see him purchase a home or invest in a home or any product such as that?
A. No.
Q. Did you ever see him use methamphetamine?
A. No.

MR. PARRISH: Let me look at my notes one second.

Q. When was the last time you saw Tim Cutkomp after he left in 1992 or early 1993?
A. Him and Dustin came down for a visit. I don't know the exact time frame. It would have been after then.
Q. Oh. And one -- yeah, there is one last question I want to ask you. And you indicated -- when Mr. Williams asked you on direct examination about the relationship between Dustin, Angie, and Mr. DeGeus, I believe you indicated that the relationship with Mr. DeGeus was over at the time the relationship with Dustin started. Was that your testimony on direct examination?
A. Yes, I'm hoping so.
Q. Do you recall indicating at one point you said that you were under the impression that the relationship between Angie, Mr. DeGeus, and Mr. Honken were all going on at one point at the same time?
A. When you are saying relationship, are you talking about --
Q. Yes, that Angie was seeing Mr. DeGeus and was also seeing your brother at the same time.
A. I don't think so. I don't know that for a fact, but I don't think so.
Q. But as I understand it, his relationship with Angie did not start until 1993 to your knowledge; is that correct?
A. I don't know when his relationship started with Angie.
Q. You met her in 1993 when he brought you back and took you to a place where she was working.

♀

351

A. Yeah, it would have been '93 time frame, but yes, that's when I met her.
Q. All right. And do you know at that time what her relationship with Mr. DeGeus was?

A. I do not.

Q. Okay. So you can't say with any degree of definitive knowledge that you knew her relationship with Mr. DeGeus had ended at the time her relationship with your brother started.

A. I have no idea, no.

MR. PARRISH: Okay. Thank you, Your Honor. I have no further questions.

THE COURT: Mr. Williams, redirect?

MR. WILLIAMS: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Just a clarification, back in '93 when the -- when your brother's arrested back in Iowa in March of 1993, did he have any children at that point?

A. I believe he had two at that point.

Q. Okay. Who gave birth to the two children he had?

A. Angie gave birth to Marvea, and Kathy gave birth to Ryan.

Q. Okay. And they were born roughly about the same time?

A. I believe so, yeah.

Q. Okay. And do you recall when they were born?

A. I do not.

♀

352

Q. All right. Talk to you for a minute about when the decision was made and Tim decided to move back to Iowa. Did your brother ever tell you what his plans were with the meth lab?

A. No.

Q. Never destroyed the meth lab equipment because you ended up destroying it when he called you to do that; right?

A. I believe so, yes, that's correct.

Q. All right. There was some discussion about where this meth lab was located various times. Did you ever tell your brother where to set up the meth lab at?
A. No.
Q. Did you ever direct him how he was supposed to set it up?
A. No. I don't know enough about chemistry to even do that.
Q. Did you ever get any inventory of how much methamphetamine was produced by your brother?
A. No.
Q. Did he ever give you an accounting of how much money he was making selling the methamphetamine up in Iowa?
A. No.

MR. WILLIAMS: I have nothing further, Your Honor. Thank you.

THE COURT: Mr. Parrish, anything further?

MR. PARRISH: Just a couple of questions, Your Honor.

RECROSS-EXAMINATION

♀

353

BY MR. PARRISH:

Q. It's true, is it not, in one of your businesses that were set up you had an operation that was supposed to be operating in Mexico, but you had actually set it up in rural Arizona -- would that be accurate -- where they were actually working out of as an address?
A. Yeah. What we were -- when we initially started Printed Circuit Technologies, what we wanted to do is we wanted to start what's called a maquiladora.
Q. I don't think they heard that. Would you say that a little bit louder?
A. When I first started Printed Circuit Technologies, we

wanted to start what was called a maquiladora. A maquiladora is what's called a twin plant, one in the United States and one in Mexico. There's good waiver savings as far as Mexico at the time to do that. And so we started up the U.S. side, but we investigated the Mexican side but found it was too expensive to do.

Q. But in investigating the Mexican side, you did investigate setting this business up in a rural part of Arizona where you actually had people working out of.

A. No, that's not correct at all.

Q. They didn't actually work out of a rural place in Arizona?

A. No, no. We had an office, industrial building in Tucson.

Q. That's the only place you had a business -- is that your

♀

354

testimony -- and any working area and storage?

A. That's correct.

Q. All in Tucson area, never anyplace outside of Tucson.

A. That's correct.

MR. PARRISH: All right. Nothing further.

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Honken, you may step down.

Everybody can take a stretch break.

Is the government ready to call its next witness?

MR. WILLIAMS: Yes, Your Honor. United States calls Melissa Friesenborg.

MELISSA FRIESENBORG, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. Make yourself comfortable. And can you scoot that chair up as far as you can? And you can pull down those microphones

so you can speak directly into the microphones? And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: Melissa Friesenborg, Melissa Marie Friesenborg. Last name, F-r-i-e-s-e-n-b-o-r-g.

THE COURT: Thank you.

Mr. Williams.

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

355

BY MR. WILLIAMS:

Q. Miss Friesenborg, where are you from now, ma'am?

A. From Tucson, Arizona.

Q. How long have you lived in the Tucson area?

A. Living, going on 12 years.

Q. Now, are you originally from Arizona?

A. No, I'm originally from Iowa.

Q. Where at in Iowa?

A. Where I graduated from was Swea City, Iowa.

Q. Swea City?

A. Uh-huh.

Q. Where is that located at?

A. Close to the Minnesota border, over by Algona, in that area.

Q. What do you do for a living?

A. I'm support services manager which I organize transportation and food for people living with HIV and AIDS.

Q. How long have you been doing that?

A. Four years.

Q. How far did you go through school?

A. Bachelor's in social work.
Q. And where did you get that bachelor's degree from?
A. Iowa State here in Ames, Iowa.
Q. When did you graduate from Iowa State?
A. '91.

Q. At some point 12 years ago you moved down to Arizona. What took you down there?
A. At the time I had met Dustin and decided to move down.
Q. Were you working someplace in Iowa before you moved down there?
A. Yeah, I was working at a nursing home in Urbandale, Iowa.
Q. And what were you doing there?
A. Medical discharge planner.
Q. Now, how did you end up meeting Dustin Honken?
A. I had met him when I was like 18 or 19. I met him through a mutual friend, Tim Cutkomp, and we kind of just dated distantly, and then after just a short amount of time, I guess we broke up.
Q. All right. And so you met him when you were 18. How old are you today, ma'am?
A. I'm 36.
Q. And so that would have been roughly when when you first met him?
A. I don't know. You do the math.
Q. Mid '80s?
A. That's correct.
Q. Let's talk about Tim Cutkomp. You said you met him through Tim Cutkomp, a mutual friend. How did you know Tim Cutkomp?
A. We went to community college together in Ankeny.

Q. And when was this approximately?

A. '86, '87. I think I met him in '87.
Q. And have you remained friends with Tim Cutkomp over the years?
A. No. I haven't spoken to him.
Q. Describe your relationship with Tim Cutkomp for the jury then. Was it friends? Was it romantic? How did that develop?
A. We were friends. We just hung out in school and studied together and stuff.
Q. Ever have a romantic relationship with Tim Cutkomp?
A. No, never.
Q. But it's through him that you met Dustin Honken.
A. Correct.
Q. And the Dustin Honken that you met back then, do you see him in the courtroom here today?
A. Yes.
Q. Can you describe for the jury where he's sitting and what he's wearing?
A. Sitting to my left and wearing a yellow polo.
Q. How did your relationship with the defendant in this case develop then? You said initially you dated for a period of time, then you broke up. Did it develop beyond that then?
A. Yeah. When I moved down to Tucson?
Q. Yes.
A. Yes.
Q. Why don't you describe for the jury how you developed to

the point where you moved down to Arizona.
A. I met him in the sum -- he recontacted me in the summer through a college roommate, and he was up here visiting I understand, and then we just reconnected and started seeing each other, and then in about September or October after just a few months of reconnecting, then I moved down there with him.
Q. What made you decide to move down to Arizona?
A. One was the weather. It was nice. And be able to be with him.
Q. When you went down to Arizona, did you get a job?
A. Not right away, but I did get a part-time job in another nursing home as a medical discharge planner also.
Q. And what city was this in?
A. Tucson, Arizona.
Q. Where did you live in Tucson?
A. Where did I live?
Q. Yes, in an apartment? In a house?
A. In an apartment.
Q. Anybody else living with you at that time?
A. No.
Q. Where was the defendant living at that time?
A. There was a house that they had outside of Tucson, and that's where him and Tim would also stay.
Q. Now, when was it that you moved down to Tucson, Arizona?
A. I believe it was September, October of '92.

359

Q. Okay. And where was this house located at?
A. It was out in the desert in a little town, not a huge town, but it was -- I think it was Arivaca or Aramacia. I can't remember the name. But it was outside of Tucson probably half

an hour, 45 minutes from where my apartment was.
Q. And describe the house if you would for the jury.
A. It was a house that -- it was small, and it was two bedrooms, a living room, and it was pretty secluded.
Q. When you moved down there, did you have your own vehicle?
A. Correct.
Q. And did you loan that to the defendant from time to time?
A. On occasion.
Q. Did he have his own car?
A. No. He would rent them at times through me or through -- but he didn't have his own car.
Q. He would rent them?
A. At times through, like I said, my name.
Q. And how about Tim Cutkomp? Did he have his own vehicle?
A. No.
Q. When you were down in Arizona then with the defendant, how did your relationship then develop up until March of 1993?
A. I suppose like any relationship would other than he was gone a lot, and I didn't get to see him a lot other than on weekends or if he'd come in during the nighttime, and I was alone a lot of the time by myself.

360

Q. Does he during this time period, the defendant, stay with you from time to time?
A. Yeah, just as any, you know, relationship that you're with with a boyfriend would do, stay over night and maybe stay a couple days but didn't live there.
Q. Wasn't living with you at the time.
A. No.
Q. And this continued in that manner from the time you moved

down, got your apartment up until March of 1993 roughly?
A. Correct.
Q. Okay. How about Tim Cutkomp? Does he ever stay with you at all?
A. No. He's mostly stayed out at the farm. He'd come in every once in a while, and he would stay in the den, but normally Dustin was there, so it wasn't -- it wasn't that often, and like I said, he stayed in the den.
Q. Now, who had a key to your apartment other than you?
A. Dustin had one. In December after I came out to visit my family here, he had one, but most of the time we were together or I was there if he came over.
Q. At some point during that roughly six- to nine-month period that you're down in Arizona and the defendant's living down there as well, how does he support you if at all during that time period?
A. Well, as I said, I had a part-time job, and so I did

♀

361

support myself some, but he did give me money on occasion.
Q. Did he have -- in your experience with him, did he have a ready source of cash most of the time?
A. Most of the time, yes.
Q. Did he ever buy you things while you were down there?
A. Yes.
Q. And what kind of things did he buy you?
A. He bought me a living room set and bedroom set and electronics.
Q. Do you know how he paid for that? With credit card, cash, check?
A. Cash.

Q. How do you know he paid for that with cash?
A. I'm sorry? What was the question?
Q. How do you know he paid for that with cash?
A. Because he had the cash with him.
Q. And you saw him actually pay for it?
A. Yes.
Q. What about did you take any trips with the defendant during this time period?
A. No, other than we would come back -- come back home, but that was just at Christmastime when we were up here together.
Q. So in Christmas of '92 you were both back in Iowa for a short period of time?
A. Correct.

♀

362

Q. Okay. You said that he was taking a number of trips, though.
A. Yes.
Q. Where was he going?
A. I was told different places throughout -- you know, I didn't really know. I just know that he was leaving for a couple days.
Q. What would he tell you he was doing?
A. He would work with his brother who was working with computers, and they would go and set them up. That's what I was told.
Q. And did he tell you some of the places he was going to set up the computers for his brother?
A. Not really. The only one I specifically knew was when -- in '93 when he said he was going to go to Texas, and that's the only place I really remember.

Q. And that's on the trip that he got arrested back in Iowa?
A. Correct, correct.
Q. During this time period that you have this relationship with the defendant down in Arizona, do you guys ever use any controlled substances together?
A. Used marijuana a couple times I think and then also methamphetamine, we only used -- he brought it to me once, and that was during like around New Year's.
Q. Tell the jury about that. He brought you some

363

methamphetamine one time. What happened on that occasion?
A. He just -- he brought it, and I didn't really know what it was. And he said, Do you want to try it? And I was -- didn't really want to and didn't have much of an interest in it, but I did it and didn't get anything out of it, didn't really see what the big deal was, so I never tried it again.
Q. And did he tell you where he got it?
A. If he did, I don't remember.
Q. Were you aware at this point that he had anything to do with manufacturing methamphetamine?
A. No.
Q. Were you aware at all that he was distributing any methamphetamine to anybody?
A. No.
Q. Were you even aware he was making trips back to Iowa?
A. No.
Q. What did you understand from what the defendant told you that he was doing for a living?
A. Well, I thought he was going to school because I would drop him off at the Pima Community College at times and working with

his brother, you know, with the computer business that I mentioned earlier.
Q. At some point did you understand that he had relationships with other women back in Iowa?
A. No.

♀

Q. You found that out later.
A. Yes.
Q. Describe if you would the relationship between Tim Cutkomp and the defendant, and Dustin Honken. What was their relationship like?
A. It was like best friends. They were a lot more like brothers I thought. They got along really well, and yeah, they were together all the time.
Q. At some point while you were down in Arizona, did you ever go out to this house that Tim and the defendant lived at?
A. Couple times I had gone out there primarily when I first moved down there because I didn't know anybody, didn't have anything else to do. So when I'd go out to the house, it was briefly, and I think I stayed overnight once.
Q. On any of the occasions, on either of the two occasions you went out there, did you ever see any laboratory equipment, beakers, tubes, things like that?
A. The only thing I remember seeing was like garbage cans. There was a little shed that was off the house or a little addition. I can't quite remember. But it wasn't in the house.
Q. And what did you see in the garbage cans?
A. I didn't really see a lot other than I know it was like a white substance. That's all I remember seeing. I didn't stay in there very long. I wasn't -- I was escorted back in the

house.

Q. Did you -- you were escorted back in the house?
A. Escorted might be a strong word. I was walked back in the house to go back in and, you know, not in here.
Q. Did you ask anybody what that was or what was going on there?
A. Not really.
Q. Anybody ever tell you what was going on?
A. No. There was some comment that they were making gold, whatever that meant.
Q. And who told you that?
A. Both of them did at different times.
Q. Do you remember, was there a distinctive smell that you recall from that time that you saw those garbage cans out by that shed?
A. Yes. It smelled like a burning Styrofoam cup, foul smell.
Q. At some point in March of 1993, did you become aware that the defendant was arrested back in Iowa?
A. Yes.
Q. And how did you find out about that?
A. I went to pick him up at the airport, and he wasn't there when I arrived, and they told me that he didn't actually get on the plane at all when I asked if he had been on the plane.
Q. And so then what's the next contact you have concerning the fact he was arrested back in Iowa?
A. I think it was later that night. In the middle of the

night I get a call from Tim telling me that they had gotten in

some trouble and that they were okay and to go look through the house, go to my apartment.

Q. And what did he tell you you're supposed to look for in your apartment?

A. He didn't really tell me to look for anything. He said, Just look through your apartment, go through your apartment and especially your freezer.

Q. And when he tells you that they're in trouble, did you understand that that meant with the police?

A. I assumed. I mean, I can't -- it's the only thing I could -- that both of them would be in trouble and that they weren't on the plane, they weren't coming home.

Q. All right. And so are you given any other messages to pass on to anybody else at that time?

A. I was asked to contact Jeff and tell him to contact Dustin or Dustin would be contacting Jeff.

Q. And was Jeff supposed to be doing anything?

A. Not that I was aware of. I was only told just to wait for Dustin's call.

Q. So did you actually then look through your apartment?

A. Yes.

Q. And what did you find?

A. I looked in the freezer, and behind some frozen items in there there was several little vials, little brown vials, and

they had a liquid in them, and they -- in the den there was some hoses and stuff that I know hadn't been in there, so I just collected all the stuff that didn't look like personal goods like clothing or anything and got rid of it.

Q. Okay. And you say tubing and hoses -- I'm sorry -- is what

you said, hosing and stuff like that. What was the stuff that you saw? Can you describe it?
A. It had the same smell that was on -- what I'd remembered smelling out at the farm or the house.
Q. So what did you do with all that stuff that you found that didn't belong?
A. I just bagged it up and took it out to the garbage.
Q. And why?
A. I didn't know what it was, didn't want it in my apartment. You know, I -- it just didn't belong there.
Q. Did you have concerns at that point your boyfriend's been arrested back in Iowa, you get this call you're supposed to look through your apartment? Do you have some concerns that maybe this stuff might be illegal or might get them in trouble?
A. I guess I don't know if I went to the level I was thinking it was illegal, but certainly if I was being told to look through my apartment, this must be what it is, and yeah, it probably could get them in trouble.
Q. And so you threw it away just in the dumpster outside your apartment building or something?

♀

A. Yes.
Q. Now, let's talk about the den there. At this point in March of 1993, was anybody living with you in your apartment?
A. No, just myself.
Q. Was there any plans for anybody to live with you in your apartment?
A. They had closed down the lab, and there was -- Dustin was talking about it, about moving in, you know, and staying there more permanently, but it didn't get to that point because of the

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 325 of 3636

incident in March.

Q. So how do you know they shut down the lab or closed down the lab? Who told you that?

A. I know that with Tim moving he was coming back to Iowa in December. He wanted to be with his family, so they were bringing more and more stuff in, and that's what was in the den. I didn't really look at it, didn't know what it was. I just figured it was their stuff, it wasn't mine.

Q. Who brought that stuff and put it in the den?

A. Both Tim and Dustin at different times.

Q. At some point after the stuff is -- after you throw this stuff away, what's happening with the defendant then at this point? Does he come back down to Arizona?

A. After -- I'm sorry?

Q. After his arrest in Iowa, does he come back to Arizona?

A. I got a call in the fall that -- because the furniture that

♀

we'd purchased, he'd purchased, he wanted to see if he could get some of that back.

Q. Okay. So let's get to that in a minute. That's in the fall of 1993?

A. (Witness nodded head.)

Q. Okay. So after his arrest in March of 1993 until the fall of 1993, are there any other times that the defendant comes down to Arizona then?

A. That was the only time is when he came down in the fall.

Q. Okay. Do you ever go up to Iowa during the time period after his arrest until the fall of 1993?

A. Yes, I go up a couple times after that, one in -- I believe it was in May and another time in July.

Q. Now, at this point in your relationship, is there talk of marriage?
A. There -- we had purchased a ring, and it wasn't something that I was wearing or anything like that, but there had been discussion of that.
Q. So you come back up to Iowa at this point to visit with the defendant while he's back in Iowa.
A. Just seeing how he's doing.
Q. Charges still pending against him?
A. Yes.
Q. Okay. And at what status of the case is it at this point as far as you know?

370

A. As far as I know, there's not much. I know that there was witnesses, and I'd asked, you know, because -- what are you going to do? There's witnesses.
Q. What was his response?
A. He goes, I'm taking care of it, and that was about -- I didn't ask any further what that meant but . . .
Q. He said he was taking care of it.
A. And not to worry.
Q. Did he ever tell you that, in fact, he had been running a methamphetamine operation?
A. No.
Q. When was this -- these visits you made to Iowa approximately?
A. May or beginning of July.
Q. And last time you would have been there would have been beginning of July of 1993?
A. Correct.

Q. Were you aware of who the witnesses were against the defendant?
A. I didn't know them personally, no.
Q. Did you know their names?
A. I had heard them, I think just the one, Nicholson.
Q. And at some point after a couple visits, the last one being in July of 1993, what happens with your relationship with the defendant then?

♀

A. At that time I don't know if I actually had said that we were going to break up, but I just realized that it was a situation I just couldn't be in.
Q. And why is that?
A. It -- I didn't see any future in it. I mean, he's seeing -- he was in trouble, and at this point I think I found out about one of the other women and just decided that it wasn't anything that I could be involved in.
Q. So you stayed in Arizona.
A. I stayed in Arizona.
Q. And you've been there since.
A. Correct.
Q. Let's move to that meeting in October of 1993. You said he had come back at some point and wanted to get some furniture from you?
A. Yes.
Q. Okay. Why don't you tell the jury about that. You think it was approximately when?
A. I think it was in October when he had come down. And he had called, and I didn't know that he was actually coming down there. I just got a call at work. And I was refusing to take

his phone calls. I just thought it would go away. And he was coming down. He had told me he brought a U-Haul down and wanted to pick up the living room furniture. And I didn't really -- I didn't see him. I had my neighbors help me move it outside when

♀

he came and picked it up. It was in the evening when he had arrived at my apartment.

Q. So did you have any contact with him finally when he was down there?

A. When he was down there? Other than, you know, I just asked him, you know, I'll give this to you and please don't contact me after this.

Q. Describe for the jury what was the -- how did that conversation go? Was it a friendly conversation or not?

A. By the time I got there and was able to talk to him, he had caught -- I took one of his phone calls or he wasn't happy with me that I had put him off so much during the day and that he -- really he had to get back for whatever reason, and I didn't -- I didn't respond the way he wanted me to as far as saying, Okay, just come on over and get it right now. He had another friend of -- well, I'm assuming it was a friend. He had Angela call me and talk to me and say, Just let us come over, and I was -- that surprised me because I had no idea why even Angela was down there, Angela Johnson, and so they came and picked up -- there was a male voice, and I never -- I never seen them, but it was him and Angela and then some other gentleman.

Q. Was there any yelling that took place during this contact with the defendant?

A. Other than on the phone just briefly of telling him don't call me anymore, I don't -- you know, why are you doing this and

angry of -- I didn't want to deal with it anymore.
Q. Were you yelling at him, or was he yelling at you at this point?
A. He was yelling at me.
Q. Did he make any statements to you that you took as a threat?
A. Towards the end when he was getting more frustrated with me, he said, you know, just -- you know, Just take care of it, just let me do this, and I'm sitting here trying to think exactly what he said, and I can't, but it was -- it was something that I took of seriousness that he could. I don't think he'd harm me, but it was an intent.
Q. You took it as a threat of some sort?
A. (Witness nodded head.)
MR. WILLIAMS: I have nothing further, Your Honor.
THE COURT: Mr. Spies?
MR. SPIES: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SPIES:
Q. Good morning. Miss Friesenborg, my name's Leon Spies. I'm one of Dustin's lawyers. I wanted to just clarify a couple of things about your testimony this morning. And first of all, you made it clear to us and you've made it clear to the jury that you had no role in making any methamphetamine or drugs, did you?
A. No. Correct.

Q. And you didn't distribute any drugs or methamphetamine, did

you?
A. No.
Q. You described going to the house out in the country where Mr. Honken and Mr. Cutkomp were living, and you said you went into a shed?
A. Uh-huh.
Q. Or you looked in a shed there?
A. Correct.
Q. And that's where you saw this garbage can with some tubes in it?
A. Correct.
Q. And did you know what that was?
A. No.
Q. It didn't look to you like any kind of sophisticated operation, did it?
A. In my nonscientific mind, probably not.
Q. You had no idea what it was.
A. No.
Q. And as you told us here this morning, you didn't know that Mr. Honken was selling drugs or making drugs.
A. Correct.
Q. Now, you told us after Mr. Honken was arrested up in Iowa in March of 1993 you got a call from Tim; right?
A. Correct.

375

Q. And Tim was a friend of yours from way back in community college days?
A. (Witness nodded head.)
Q. And you'd known Mr. Honken since you were 18 or 19 years old.

A. Right.

Q. And based on what Tim told you, you went and you went through the freezer, and you found some stuff and threw that away or flushed it down the toilet.

A. Correct.

Q. Now, I wanted to focus on what contact you had with Mr. Honken after he was arrested in March of '93; okay?

A. The contact I had with him was on the phone. I would -- and going up to visit him a couple times after that.

Q. All right. And when you came to visit him, you'd come up to his family's home in Britt?

A. Correct.

Q. And Mr. Honken was staying with his parents in Britt?

A. Yes.

Q. And actually when you came to see him, you came to see him in April and May of 1993, didn't you?

A. Did I come up in April and May -- is that what you're asking me -- or both times?

Q. Yeah, you came up to see him in April, and you came up to see him in May.

376

A. I know I came up and seen him in May. If I came up and seen him in April, if it says there, I did.

Q. Right. You remember testifying at Mr. Honken's sentencing hearing back in 1998 about your visits to him?

A. Uh-huh.

Q. And did you tell the Court at that time that you saw Mr. Honken a couple of times and that those travels were in April or May of 1993?

A. April or May, yes.

Q. All right. So your recollection back in 1998 was that you came to Iowa to see him in April or May.

A. Correct.

Q. And not in July.

A. No. Also in July.

Q. Pardon me?

A. Also in July.

Q. Also in July?

A. Yes.

Q. So how many times all together did you come up to see Mr. Honken at his home?

A. Twice.

Q. Now, you didn't really talk too much about his case or what was happening with him legally, did you?

A. Not really.

Q. Your purpose of coming up was kind of to size up what your

♀

377

relationship with Dustin was and how he was doing?

A. How he was doing, and, you know, we hadn't made any statement of not being together at that time.

Q. And you didn't really dwell on his legal problems as you came up here to see him.

A. No.

Q. Did you know he had a lawyer at that time?

A. Again, we didn't talk about it. I'm -- if he did, we didn't talk about it.

Q. But in any event, he reassured you that the case was being taken care of.

A. Correct.

Q. At that time did you still have some plans for the future

together?
A. Probably not what they were before March but still didn't know.
Q. But in any event, Mr. Honken tried to reassure you that his case was being taken care of. You knew he was represented by a lawyer.
A. Never mentioned the lawyer but, you know, assuming that if he was in legal trouble he would have a lawyer, but it was never discussed.
Q. Did Mr. Honken tell you that he was going to be going to prison?
A. Again, it was never discussed.

378

Q. Excuse me?
A. It was never discussed.
Q. It's just that the case was going on, it was going to be taken care of.
A. Yes.
Q. Now, Mr. Williams asked you some questions about when Dustin came down to Arizona to retrieve some of his property from your apartment in October; is that right?
A. As far as I can recollect, yes.
Q. And you were upset with him at this point? You didn't want to have any phone contact with him?
A. I -- we broke up some time in July, and I kind of thought it was done then.
Q. Okay. And you already told us that he had bought some furniture and some nice belongings for you.
A. Correct.
Q. And you were upset about losing those.

A. I wasn't upset about losing them. I was more upset the fact that he was in Arizona and it was kind of a surprise that he was there.
Q. Just kind of showing up unexpectedly to retrieve this property.
A. Correct.
Q. And he was in a hurry, and he was impatient with you.
A. Yes.

MR. SPIES: Thank you. Those are all the questions I have for you.
THE COURT: Anything further, Mr. Williams?
MR. WILLIAMS: Yes, Your Honor.

FURTHER REDIRECT EXAMINATION

BY MR. WILLIAMS:
Q. I just want to clarify, ma'am. It was in response to your question to him about what are you going to do about the witnesses or what about the witnesses that the defendant made a statement to you?
A. Correct.
Q. And what was that statement he made to you?
A. When it was asked, yeah, if there were witnesses, said that it's being taken care of.
MR. WILLIAMS: Nothing further, Your Honor.
THE COURT: Mr. Spies, any recross?
MR. SPIES: Nothing else, Your Honor. Thank you.
THE COURT: You may step down.
Everybody can take a stretch break. Is the government ready to call its next witness?
MR. MILLER: United States calls Kevin Pals.

KEVIN PALS, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Can you make yourself comfortable and, yeah, pull up that chair as close as you can to the microphones. That'd be great. And when

you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: Kevin Pals. Last name is P-a-l-s.

THE COURT: Thank you.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Good morning, sir.

A. Morning.

Q. Your occupation?

A. Sheriff of Cerro Gordo County.

Q. How long have you been the sheriff of that county, sir?

A. It's my first term, so I'm just finishing my fourth year.

Q. How long have you been in law enforcement, Sheriff Pals?

A. Twenty-six years total.

Q. And can you just briefly summarize for us your professional career?

A. I started out with the Clear Lake Police Department for two years; Winona, Minnesota, for two years; Mason City Police Department for 18 1/2; and then was elected sheriff in November of 2000, took office 2001; have an AA in law enforcement with community college in Mason City, Iowa, and a graduate of the Iowa Law Enforcement Academy and have taken several instructional courses over the 26 years for educational reasons.

Q. Now, there are a variety of responsibilities that go along with being sheriff of a county in Iowa; is that correct?
A. That's correct, there are several.
Q. In general they pertain to enforcing the laws of the state of Iowa.
A. Generally speaking, yes.
Q. And among those is the laws pertaining to acquisition of handguns.
A. That's correct. Iowa sheriffs are charged by the state code to issue permits to acquire pistols and revolvers and also permits to carry firearms.
Q. Would you please briefly describe for the jury the procedure involved in a person going about legally acquiring a handgun in the state of Iowa.
A. A person is required to come to the sheriff's office in the county that they reside in, and they come in with a photo ID or some kind of identification that would show their identifiers, present it to the office clerks. They have to fill out an application that would involve answering some questions yes, no, sign the application swearing that they're telling the truth on the application.
Our front office takes that application then with the personal identifiers and runs some local checks and some national checks on that person. Then the permit is either issued or not issued depending on those.

382

Q. Are there any substantial differences now in this procedure than what they were in 1993 to your knowledge?

A. Not substantial, no.
Q. Basically the same procedure was in effect in 1993.
A. That's correct.
Q. And I assume records are kept of such applications and permits?
A. Yes, they are.
MR. MILLER: If I may approach the witness, Your Honor?
THE COURT: You may.
BY MR. MILLER:
Q. Sheriff Pals, I'm showing you what is marked Government Exhibit 42 and ask if you can identify that document for us.
A. Both parts of the document?
Q. Yes.
A. One is the application for the permit to acquire a pistol or revolvers, and then the other is the actual permit that was issued.
Q. When and to whom?
A. It was dated June 30, 1993, to Angela J. Johnson of 5 South 19th Street, Clear Lake, Iowa.
Q. That was the application?
A. Yes, and also the permit is the same name and address.
MR. MILLER: United States offers Exhibit 42.

383

* * * *
(Government Exhibit 42 was offered.)
* * * *
THE COURT: Any objection?
MR. SPIES: Relevance, Your Honor.
THE COURT: Overruled. Government's Exhibit 42 is

admitted.

* * * *

(Government Exhibit 42 was admitted.)

* * * *

MR. MILLER: And with the Court's permission, I'd like to publish it to the jury at this time?

THE COURT: You may.

BY MR. MILLER:

Q. And directing your attention to the top of that document, sir, can you -- and again with the aid of our visual presenter -- describe for the jury the location of the name and address of the application?

A. The top line is last name, first name, middle initial, Johnson, Angela J. Second line is the address, street address, of 5 South Ninth (sic) Street, Clear Lake, Iowa. The next line down would be the county that the person resides in which is Cerro Gordo County, Iowa, with the ZIP Code of Clear Lake, 54028. And the last line is the personal identifiers with the Social Security Number, age, and date of birth of Angela J.

♀

384

Johnson.

Q. Now calling your attention to the lower right or the bottom half I guess of the document if we can have that magnified, are you able to tell us again by that record whether the application was approved or denied?

A. Yes, it was approved.

Q. And there bears the signature of the applicant and date?

A. Correct. On the lower right-hand corner of that document, it's Angela Johnson's signature with the date 6-30-93.

Q. So that application to acquire a handgun was, in fact,

approved.
A. That's correct.
Q. A permit was issued?
A. Yes, it was.
Q. And in regard to the permit itself if we can bring that up, I'll ask you to show the jury the name of the person to whom the permit was issued and the address.
A. Angela J. Johnson, and the address is the same as the application, 5 South 19th Street, Clear Lake, Iowa 50428, and it does show her Social Security Number, age, and date of birth at the time the application was issued.
Q. Does it also show the effective date of the permit?
A. Yes, the permit in Iowa, there's a three-day waiting period, so from June 30 when she made the application, the person acquiring the weapon would have to wait three days until

the permit is valid, and that would be July 3, 1993.
Q. Sheriff, I'm now handing you what is marked Government Exhibit 43 and ask if you can tell us what that is.
A. It's a record of a firearms transaction.
Q. And is that a government document, sir?
A. Yes, it is. It's certified by United States government. I think it's the ATF.
Q. And is that a certified record of a firearms transaction recorded in July of '93 by Angela Johnson?
A. Yes, it is.

MR. MILLER: Government offers Exhibit 43 in evidence.

* * * *

(Government Exhibit 43 was offered.)

* * * *

THE COURT: Any objection to 43?

MR. SPIES: On relevance grounds.

THE COURT: Overruled. Forty-three is admitted.

* * * *

(Government Exhibit 43 was admitted.)

* * * *

BY MR. MILLER:

Q. That is a several-page document; is that correct?

A. Yes, it is.

Q. Okay. Moving to the third and final page of that document -- and I'll ask the operator of our equipment if he can

show us -- and if you would, please describe for the jury the name and address of the person who is recorded as acquiring a handgun.

A. Once again, it's Angela J. Johnson, female. Then it gives her heighth, weight, and race, and her residence again is the same as the permit to purchase of 5 South 19th Street, Clear Lake, Iowa 50428 and gives her date of birth also on this document.

Q. In the middle of the document does it show the date of the transaction, sir?

A. Yes, it does. July 7, 1993.

Q. And the signature of the purchaser?

A. Yes, once again Angela Johnson's signature.

Q. The -- toward the bottom does the document show the name of the retailer from whom the firearm was purchased?

A. Yes. The firearm was purchased at Duey's Pawn Shop in Waterloo, Iowa.

Q. And does the record reflect a description of the firearm or

the handgun acquired, sir?
A. Yes, it does. It shows that Angela Johnson purchased a Tec-9, 9-millimeter pistol that was manufactured by Intratec.
Q. And again, this was a purchase recorded on July 7 of 1993 according to that record?
A. That's correct.
MR. MILLER: Thank you, sir. I have no further

direct.
MR. SPIES: We have no questions of this witness, Your Honor. Thank you.
THE COURT: Okay. You may step down.
Is the government ready to call its next witness?
MR. MILLER: Yes, Your Honor. The United States calls Christi Gaubatz.
THE COURT: Members of the jury, please feel free to take a stretch break while we're waiting for our next witness.
MR. MILLER: Step forward and be sworn, please.

CHRISTI GAUBATZ, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. Can you pull the chair all the way up so you can speak directly into the microphones, and you can pull those microphones down and adjust them so you get them as close as possible. And when you're ready, would you state your full name, please, and spell your last name.
THE WITNESS: Christi Marie Gaubatz, G-a-u-b-a-t-z.
THE COURT: Thank you.
Mr. Miller?

DIRECT EXAMINATION

BY MR. MILLER:

Q. Good morning, Mrs. Gaubatz.
A. Good morning.
Q. I believe that's fresh water in front of you. Feel free to

use that if you wish.
A. Okay.
Q. Your city of residence is where?
A. Rockwell.
Q. Rockwell, Iowa?
A. Yes.
Q. Where is Rockwell, Iowa?
A. About 12 miles south of Mason City.
Q. Your employment, ma'am?
A. Is at Good Shepherd Health Center.
Q. And what is -- can you describe Good Shepherd for us?
A. It's a nursing home.
Q. Is that there in Rockwell?
A. No, that's in Mason City.
Q. What do you do at Good Shepherd?
A. I do the laundry there.
Q. Pardon me?
A. I do the laundry there for the residents.
Q. Please just sit and speak into those microphones as closely as you can, and speak up good and loud so everybody on the jury can hear you; okay?
A. Okay.
Q. Do you have -- well, let me ask you this. Who do you live with?
A. I live with my husband and my youngest daughter.

Q. Your daughter's age?
A. She's 15.
Q. Do you have other children?
A. I have an older daughter, 19. She lives in Mason City.
Q. Is your current husband the father of these children?
A. No, he's not.
Q. These are two daughters by an earlier marriage?
A. Yes.
Q. Who was your first husband?
A. Brian Lewison.
Q. Who is your husband -- let me ask you this. Who's the father of your two children?
A. My oldest daughter, her father is Brian Lewison, and my youngest daughter, her father is Martin Cole.
Q. So Mr. Gaubatz is your third marriage.
A. Yes.
Q. I want just a little bit of background, please. You are a native of what community?
A. I was born in Mason City.
Q. Did you grow up there?
A. No, I didn't. I grew up in New Hampton and Nashua.
Q. Both northeast Iowa communities.
A. Yes.
Q. Are you a lifelong Iowa resident?
A. No. I lived for about six years in Florida around the

390

Orlando area.
Q. And when was this time?

A. This was 1986, '86, '87 until '92, early '92, January.
Q. When you were with Mr. Cole?
A. Yes.
Q. What brought you back to Iowa in '92?
A. I was sharing custody with my first husband of my oldest daughter, and it just got to be too much to go back and forth, so I relocated to Mason City where my mother lives.
Q. Did you separate from Mr. Cole about that time?
A. We were still together until about two or three months after we moved to Mason City.
Q. That marriage broke up in '92?
A. Yes, it did.
Q. Since relocating back to Iowa in '92, have you been an Iowa resident?
A. Yes.
Q. Mrs. Gaubatz, are you acquainted with an individual by the name of Angela Johnson?
A. Yes.
Q. When did you first meet Ms. Johnson?
A. In April of '92. We were working at the same restaurant, my husband, her, and myself.
Q. During that period of time, did you develop a relationship with Angela Johnson?

391

A. Yes.
Q. How close?
A. We were not very close at first, but we -- our friendship grew.
Q. During 1992 you became good friends?
A. Yes.

Q. How good of friends?
A. Like sisters.
Q. Very close.
A. Yes.
Q. Who were the other members of Ms. Johnson's family at that time?
A. Her daughter Alyssa.
Q. How old was Alyssa back in '92 if you know?
A. She was 10 or 11.
Q. And how old was that in relation to your two daughters?
A. She was about two years older than my oldest daughter.
Q. And where did Ms. Johnson reside in '92?
A. She lived on 19th Street in Clear Lake.
MR. MILLER: If I may approach this witness, Your Honor?
THE COURT: You may.
BY MR. MILLER:
Q. Mrs. Gaubatz, I'm showing you what is marked Government's Exhibit 1. Is that a map of the general area including both

392

Clear Lake and Mason City, Iowa? Yes or no.
A. Yes, yes.
Q. And does that also have indicated on it the location on 19th Street where Angela Johnson lived in 1992?
A. Yes.
MR. MILLER: Offer Exhibit 1.
* * * *
(Government Exhibit 1 was offered.)
* * * *
THE COURT: Exhibit 1 is admitted. There's no

objection.

* * * *

(Government Exhibit 1 was admitted.)

* * * *

MR. PARRISH: No.

MR. MILLER: And with the Court's permission, I'd like to publish it to the jury at this time?

THE COURT: You may.

BY MR. MILLER:

Q. And just so I'm keeping the record clear, the box on the -- the red box on the -- toward the left-hand side of that map points -- has an arrow pointing to the location of Angela Johnson's residence?

A. Yes.

Q. Please describe her residence for us if you would, please.

393

A. It was a white ranch-style house, three bedrooms, full basement.

Q. Just herself and her daughter Alyssa living there at the time?

A. At the time, yes.

Q. Where were you living?

A. I was living across town.

Q. Mason City or Clear Lake?

A. Clear Lake. I'm sorry.

Q. This was after your separation from Mr. Cole?

A. Yes, it was.

Q. During 1992 during the course of this close friendship between yourself and Angela Johnson, please describe for the jury what activities you and Angela Johnson shared.

A. We shared drugs. She shared drugs with me.

Q. What kind of drugs?

A. Methamphetamine.

Q. Any idea about how much you and your friend used?

A. I'm not sure how much.

Q. How often?

A. It was several times a week.

Q. Where did you do this?

A. At her residence and my residence.

Q. Did you pay her for those drugs?

A. No, I did not.

♀

394

Q. Who supplied the two of you with your drugs? Were they your drugs?

A. No, they weren't.

Q. Angela had these.

A. Angela had the drugs, and she was -- I didn't pay for them.

Q. The two of you shared them together.

A. Right.

Q. I take it since you used them frequently you were enjoying them.

A. Yes.

Q. You and Angela Johnson spent quite a bit of time together in 1992?

A. Yes.

Q. You were aware of her relationships with others?

A. I was aware of her relationship with Terry DeGeus.

Q. Describe that for us, please.

A. It was very volatile. He was very jealous, wanted to know where she was all the time, and he was very abusive.

Q. Go ahead and just describe as best you can the specifics of that relationship.

A. Terry and I became acquainted through a mutual friend of ours, and that's how I know that he was very possessive of her because he would share that with me.

Q. In late '92 what was Angela Johnson's attitude toward Terry DeGeus?

♀

A. She wanted to end the relationship.

Q. Was she having difficulty doing so?

A. Yes.

Q. What nature of difficulty?

A. She was afraid, very afraid that he would do something to her, harm her.

Q. Terry DeGeus was violent and possessive.

A. Yes.

Q. Fair statement?

A. (Witness nodded head.)

Q. Miss Gaubatz, did you ever become acquainted with an individual by the name of Dustin Honken?

A. Yes.

Q. And how did you first become acquainted with Mr. Honken?

A. She had -- Angela had first told me that she was meeting with --

MR. PARRISH: Objection, hearsay. Hearsay.

THE COURT: I heard you. What exception are you relying on?

MR. MILLER: Your Honor, I think it's transitional, and I also think it is under 80 -- co-conspirator statement, Your Honor.

THE COURT: Sustained.

BY MR. MILLER:

Q. When to your knowledge did Angela Johnson first develop a

relationship with Dustin Honken?

A. When I first heard about it, I believe --

MR. PARRISH: Objection, hearsay.

THE COURT: Overruled.

BY MR. MILLER:

Q. Approximately when did you first learn of a relationship?

A. December of '92.

Q. Did you ever personally meet Mr. Honken?

A. Yes, I did.

Q. And when did you meet him?

A. It was in early '93.

Q. And did you ever develop any personal knowledge of the fact Angela Johnson was seeing Dustin Honken?

A. I'm sorry? What?

Q. Did you become personally aware of the fact that they were seeing one another?

A. Yes.

Q. And when did you become aware of that and how?

A. That was when -- in February I think of '93 I knew that he had had some trouble, and that's when I knew of their close relationship.

Q. Well, you were seeing a lot of Angela Johnson during this period of time, I take it.

A. Yes.

Q. How much of Dustin Honken did you see?

A. Not very much.
Q. To your knowledge was he even living in the area at that point?
A. No.
Q. Mrs. Gaubatz, did you become aware at some point that Mr. Honken had become arrested, had been arrested?
A. Yes.
Q. And how did you become aware of that?
A. She had called me very --
MR. PARRISH: Objection, hearsay.
THE COURT: It's not being offered for the truth of the matter asserted. Overruled.
BY MR. MILLER:
Q. Please describe that.
A. She had called me very upset that he had been arrested at a motel, and she was crying, and she didn't know what to do.
Q. She was weeping?
A. Yes.
Q. Could you describe her tone of voice?
A. She was scared, worried.
Q. What'd she say to you?
MR. PARRISH: Objection, hearsay.
THE COURT: Depends upon what she says.
You can go ahead and answer.
A. Would you repeat the question?

♀

398

Q. What did she say to you?
MR. PARRISH: Same objection.
THE COURT: Overruled.

A. She said that she was scared, she didn't know what she was going to do, but she described what she saw. She had gone to the motel.
Q. And Dustin had been arrested.
A. Yes.
Q. And that was that day that she called you?
A. Yes.
Q. This was approximately when, Miss Gaubatz?
A. February of 1993.
Q. That's your best recollection.
A. Yes.
Q. It was in that time frame somewhere at least.
A. Yes.
Q. You're not claiming you know the precise date.
A. I don't know the exact date, no.
Q. Did you continue maintaining a relationship with Angela Johnson following Mr. Honken's arrest?
A. Yes.
Q. Continue to spend time together?
A. Yes.
Q. During that spring of 1993, did you ever make any trips on behalf of Mr. Honken or Ms. Johnson?

♀

399

A. Yes.
Q. Please describe that.
A. Dustin had asked me to accompany Tim Cutkomp to Arizona, Mesa, and pick up a parcel for him. And I was going along with Mr. Cutkomp.
Q. Did you make that trip?
A. Yes, I made the trip.

Q. And describe what you and Mr. Cutkomp did during that trip.
A. We went to a packaging company, and I attempted to pick up a package which I'm not sure of the contents, but I didn't have the proper authorization to do that, so they did not give it to me.
Q. Where was this?
A. This was in Mesa, Arizona.
Q. In the spring of '93.
A. Yes.
Q. At Mr. Honken's request.
A. Yes.
Q. Throughout the spring and into the summer of 1993, did you continue to maintain a close relationship with your friend Angela Johnson?
A. Yes.
Q. About how far away did the two of you live?
A. It took approximately ten minutes to get to each other's residence.

400

Q. Did you often spend time at her residence?
A. Yes.
Q. And she at yours?
A. Yes. We had keys to each other's homes.
Q. In addition to enjoying meth together, did you ever do other things together or for each other?
A. I did a lot of babysitting for her.
Q. For Alyssa who was 10 or 11 at the time?
A. Yes.
Q. And did those babysitting chores continue into the summer of 1993?

A. Yes.
Q. Any idea about how many times you babysat for Angela Johnson that summer?
A. It was quite often. I don't know the exact number of times.
Q. About what time of the day were these babysitting chores?
A. The times varied because she was working at the Mason City Country Club, and I was also working at a restaurant, so my hours also varied, day shift, night shift.
Q. In the summer of 1993 instead of -- excuse me, besides working at the Mason City Country Club, what else to your knowledge was Angela Johnson doing?
A. She was spending a lot of time with Dustin.
Q. Doing what?

♀

401

A. I'm not sure exactly.
Q. Did she tell you what they were doing?
A. I know that there was a lab.
MR. PARRISH: Objection, hearsay.
THE COURT: You need to tell me what exception you're relying on.
MR. MILLER: Your Honor, it's 801(d)(2)(E).
THE COURT: Objection's overruled.
BY MR. MILLER:
Q. What did Angela Johnson tell you they were doing?
A. Making methamphetamine.
Q. On occasions when you were babysitting for Angela Johnson in the summer of 1993, did she share with you any other purposes for your babysitting?
A. She said that they were looking for someone.

Q. They meaning Angela Johnson and Dustin Honken?
A. Yes.
Q. And who is it that Angela Johnson and Dustin Honken were looking for?
A. Greg Nicholson.
Q. Approximately how many such occasions did you babysit for them when they were doing this?
A. Maybe five or six.
Q. You would have your own two children with you when you were over there at her house babysitting her child?

402

A. Sometimes.
Q. Mrs. Gaubatz, do you recall the last such occasion when you babysat for Angela Johnson when she and her friend Dustin Honken were looking for Mr. Nicholson?
A. Yes.
Q. Please describe that for the jury.
A. On that occasion, once again, I was told that they were --
MR. PARRISH: Objection, hearsay.
MR. MILLER: Let me just rephrase that if I will.
BY MR. MILLER:
Q. Did you -- on that occasion did -- I assume one of the two asked you to babysit?
A. Yes.
Q. And which of the two asked you to babysit?
A. Angela did.
Q. And did she tell you why she wanted you to babysit?
A. She did.
Q. Please describe that.
A. She told --

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 355 of 3636

MR. PARRISH: Objection, hearsay.

THE COURT: Overruled.

BY MR. MILLER:

Q. Go ahead.

A. She told me that they had had trouble finding Greg Nicholson alone. She had told me that before, and she said once

♀

again they were going to attempt to find him.

Q. Alone.

A. Yes.

Q. On that evening did they ask you for any favors in addition to your babysitting services?

MR. PARRISH: Objection as to who is they.

MR. MILLER: And I'll withdraw that.

BY MR. MILLER:

Q. Did either of them, and if so --

A. Yes.

Q. -- who asked you?

A. Angela asked to borrow my car.

Q. And did you agree to that?

A. Yes.

Q. Was that the first such occasion when she had borrowed your car with Mr. Honken?

A. No, they had done it before.

Q. On this, that last such occasion -- first let me ask you to describe your car for us. What kind of a vehicle did you have in 1993?

A. It was a blue 1984 Toyota Tercel.

Q. That's a compact.

A. Yes.

Q. Can you describe the number of seats and how -- and doors and that?

A. It was a small car. It had a hatchback.
Q. Did Angela Johnson indicate to you why she wanted to use your vehicle?
A. So she wouldn't be --
MR. PARRISH: Objection, hearsay.
THE COURT: Overruled.
A. So they wouldn't be recognized.
Q. By whom?
A. By anyone.
Q. Well, who were they looking for?
A. They were looking for Greg Nicholson.
Q. Do you recall about what hour of the evening that Angela Johnson and Dustin Honken left on that last occasion?
A. It was about five o'clock in the evening.
Q. You babysat throughout that evening?
A. Yes, I did.
Q. Approximately when did you expect them home, if at all?
A. Usually it was about midnight.
Q. Did they get home by midnight that night?
A. No, they didn't.
Q. What happened?
A. It was about five o'clock in the morning, and I had fallen asleep on the couch.
Q. Go ahead and please describe what happened at that point.
A. I heard them -- her and Dustin walk in the front door, and

I pretended to be asleep. I had pulled the cover up to my face, and they stopped when they got in, shut the door. And I could hear whispering between them, but I couldn't hear what exactly they were saying. And I never said anything to either one of them when they came in, and they went right down to the bathroom, and I had a direct view of that from where I was on the couch. I could see them both go into the bathroom and shut the door, and then I turned -- I heard the shower turn on.

Q. While the two of them were in the bathroom.

A. Yes.

Q. This was about what hour of the day?

A. It was about five o'clock in the morning.

Q. I assume you returned -- you left shortly thereafter?

A. Yes, I did.

Q. They ever borrow your car again after that?

A. No.

Q. Or ever go looking for Dust -- or for Greg Nicholson again after that?

A. No.

Q. Mrs. Gaubatz, in 1993 did your friend Angela Johnson experience any significant change in her family situation?

A. She was pregnant.

Q. Did she tell you who the father was?

A. She told me the father was Dustin.

MR. PARRISH: Objection. I'll withdraw that.

406

Q. Father was whom?

A. Dustin.

Q. Are you aware of approximately when she became pregnant?

A. I think it was in the spring of '93.
Q. Did this cause her any concern in connection with her ex-boyfriend Terry DeGeus?
A. Yes, it did.
Q. Describe that for us.
A. She said that he would be extremely upset if he found out that she was pregnant.
Q. Did you accompany Angela Johnson on any meetings with Mr. DeGeus at any time in this -- in 1993?
A. Yes, I did.
Q. And when was that?
A. That was in the fall, September, September or October. She met him at a restaurant, at a fast food restaurant in Clear Lake.
Q. Let me just back up. It was sometime in the autumn, but you're not saying you know what month it was.
A. I don't know exactly what month, no.
Q. Please go ahead and describe what did occur.
A. She was just starting to show her pregnancy, and she was concerned that when they met that he would notice she was pregnant.
Q. Did she indicate why she wanted you along?

407

A. For support, but I stayed in the vehicle while she went inside.
Q. So you weren't personally present when any conversation occurred between the two.
A. Correct.
Q. Did you nevertheless observe anything?
A. I observed through the window that they were talking, and

then I could see Terry getting very upset. He was -- when he got upset, he was very physical, very -- it was very visible to me that he was upset.

Q. About how long did that last, that conversation?

A. About ten minutes.

Q. Then what happened?

A. And then she came out to where I was in the vehicle and was very scared and said that she thought he knew she was pregnant and that he just couldn't be around anymore.

Q. He meaning Terry DeGeus.

A. Terry, yes.

Q. And did you ever see Terry DeGeus afterwards?

A. I don't believe I did.

Q. Mrs. Gaubatz, you indicated earlier that you and Angela Johnson shared keys to one another's residences.

A. Yes.

Q. Did you use those keys from time to time?

A. Yes.

408

Q. Did that ever cause a problem between yourself and Ms. Johnson?

A. Yes, it did.

Q. And about when was that?

A. I'm not sure of the exact date, but I do know that it caused a problem.

Q. Was this in sequence? In other words, it was after that last meeting with Mr. DeGeus?

A. Yes, yes, it was.

Q. Sometime late '93 or early '94?

A. Early '94.

Q. What problem arose?
A. I was cleaning out an upstairs bedroom closet, and I came across a cosmetics bag, and I knew that it was hers because I had seen it before, and it was filled with cosmetics at one time. But on this particular day, there was a gun inside.
Q. How'd you happen to discover that?
A. I opened it up.
Q. What was your reaction, Mrs. Gaubatz?
A. Shock. I knew it was her bag, and, of course, I was very upset that it was in my closet.
Q. You had no knowledge that there was a gun in your home --
A. No, I didn't.
Q. -- before that point.
A. No, I did not.

♀

Q. Would you describe that weapon for us, please.
A. It was bigger than a regular handgun, like guns I had seen on TV. It was -- I picked it up, so I was holding it like this.
Q. With both hands.
A. Yes.
Q. Even though it was a handgun.
A. Yes.
Q. Do you recall the color?
A. It was black.
Q. Do you recall anything about its shape?
A. It had a silencer on it that was very big.
Q. Miss Gaubatz, I'm showing you what are marked Defendant's Exhibits 44A and 44B. Do you recognize that, ma'am?
A. Yes, I do.
Q. And what is shown in 44A and 44B?

A. The type of gun I found in the cosmetics bag except it was missing the clip there.

MR. MILLER: Your Honor, the United States offers 44A and 44B.

* * * *

(Government Exhibits 44A and 44B were offered.)

* * * *

THE COURT: You misspoke, Mr. Miller. You referred to them as defendant's exhibits earlier.

MR. MILLER: I apologize.

410

THE COURT: I think you meant --

MR. MILLER: Government's Exhibit 44A and 44B.

MR. PARRISH: Relevance on both, Your Honor, and 404(b).

THE COURT: Overruled. 44A and 44B are admitted.

* * * *

(Government Exhibits 44A and 44B were admitted.)

* * * *

MR. MILLER: And with the Court's permission, I'd like to publish 44B to the jury at this time?

THE COURT: You may, but you need -- you're on your computer, so you need to transfer it to --

MR. MILLER: Well, if it works with the computer, just go ahead with 44B if you would.

THE COURT: What do you want?

MR. WILLIAMS: Computer, Your Honor. We were going to pull it up on the computer.

MR. MILLER: Your Honor, I think it'd be just as well to work with the visual presenter.

BY MR. MILLER:

Q. And what appears now is 44B. Again, would you describe any differences between what you observed and what is shown to the jury now as Government Exhibit 44B?

THE COURT: Can you see it on the screen in front of you?

THE WITNESS: Yes, yes.

BY MR. MILLER:

Q. It's on the screen right in front of you.

A. It did not have this clip, and the silencer was on the end of the gun. It was still attached.

Q. Using that marker, would you circle what you've described as the clip that wasn't attached at the time?

A. (Witness complied.)

Q. With the exception that the fact that that clip wasn't attached, did it look just like that and the fact it had a silencer?

A. Yes, it did.

Q. There was -- where was the silencer?

A. It was attached there.

Q. What did you do when you found this handgun in your apartment, Mrs. Gaubatz?

A. I called Angela immediately and asked her what was the bag doing in my closet, and she said she would be right over.

Q. Please go ahead and continue. What happened?

A. She arrived shortly after that and told me to --

MR. PARRISH: Objection, hearsay.

THE COURT: Overruled.

A. She told me to calm down, that it would be taken care of.

She apologized that I had to find it, and that's all the information she offered.

Q. Did she tell you who would take care of it?

MR. PARRISH: Objection, hearsay.

THE COURT: Overruled.

A. She said Dustin would take care of it.

Q. Mrs. Gaubatz, you were questioned by law enforcement officers in 1997 regarding Mr. Honken and Mrs. Johnson; is that correct?

A. Yes.

Q. Were you truthful with them at that time?

A. No, I was not.

Q. In fact, you were questioned a couple times in '97.

A. Yes.

Q. And you were, in fact, also summoned before the grand jury in 1997 not once but twice; is that correct?

A. Yes.

Q. And were you truthful then?

A. No, I was not.

Q. Why not?

A. Because I was in fear for my life and the life of my family members.

Q. Did you nevertheless share information with any loved ones or confidants?

A. I had told a priest in Mason City, and I told my husband Scott, and eventually I told another -- a friend.

Q. And in the year 2000 were you again interviewed by law

enforcement officers?
A. Yes.
Q. And at that time did you, in fact, finally share the information that you've shared with us here today?
A. Yes.
Q. And also in 2000 were you again presented to the grand jury and corrected the testimony that you'd given in '97?
A. Yes, I did.
MR. MILLER: Thank you, ma'am. I have no further direct, Your Honor.
THE COURT: Who's going to cross-examine?
MR. PARRISH: I am, Your Honor. I just wanted to know if you wanted us to start.
THE COURT: Yeah, you can go ahead and start.
MR. PARRISH: That's fine.

CROSS-EXAMINATION

BY MR. PARRISH:
Q. Good morning. I don't think we've met. My name is Alfredo Parrish.
Do you recall getting a call from our investigator, fella by the name of Delbert King, a former homicide detective for the city of Urbandale, probably a year or so ago at your home?
A. I don't --
Q. His name is Mr. Delbert King?

414

A. Okay. I don't recall his name.
Q. No one told you you received several calls from him to talk with you so you could be interviewed on behalf of Mr. Honken?
A. I know there was an investigator that wanted to talk to me.

I didn't know who exactly he was.

Q. Did you talk with him?

A. No, I did not.

Q. Okay. Do you recall an investigator by the name of David Stewart who also called you a couple of years ago?

A. Yes.

Q. Before you even gave your other statement to the other grand jury to talk to you about Miss Johnson and Mr. Honken? Do you recall that?

A. Yes.

Q. Did you speak with him?

A. Just briefly over the phone.

Q. Well, matter of fact, you told them you did not want to talk with them; correct?

A. Yes.

Q. Matter of fact, you were contacted by them before you indicated to law enforcement officials that you wanted to change your story.

A. Yes.

Q. Okay. Matter of fact, you were contacted by them on more than one occasion to discuss the facts of Mr. Honken's case.

♀

415

A. I don't recall that.

Q. But on -- in any event, you would agree that on no occasion would you agree to do that.

A. I did not agree to do that.

Q. Matter of fact, you told your husband, your present husband, to tell them that you didn't want to talk to anyone for Mr. Honken.

A. That's correct.

Q. And as you sit here today you would agree that you have not talked to anyone representing Mr. Honken or either of his investigators.
A. That's correct.
Q. Now, you indicate that you and Angie were very close.
A. Yes.
Q. You never had a fist fight.
A. We did have a -- it wasn't a fist fight but . . .
Q. Well, did you describe it as a fist fight on February 11 of 1997?
A. No, I would not.
Q. What was your description that you gave in 1997 when you were talked to by law enforcement?
A. Her and I did not have a fist fight in 1997.
Q. No. When you gave the statement about it in 1997, you said you did not describe it as a fist fight. My question is how did you describe it if you did not describe it as a fist fight?

416

A. We were rolling on the ground.
Q. Oh, okay. And what did you describe that as then?
A. A fight I believe. I don't recall I said a fist fight.
Q. Did you also indicate in your relationship with Mr. Cole, your former husband, that you and Angie did, in fact, have a relationship with him at a time?
A. Yes.
Q. So when you talk about when you and Angie were very close, you're talking about the time when you were married to Mr. Cole, Angie Johnson had a relationship with Mr. Cole, you also had a relationship with Mr. Cole, your spouse, and you both were aware of that relationship; is that correct?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 367 of 3636

A. We eventually became aware.

Q. But that caused a substantial conflict between you and Angie Johnson; would you agree?

A. Yes, it did.

Q. And you would agree Mr. Honken had nothing to do with that. He was not involved in that at all.

A. He was not.

Q. And what year was that?

A. That was in 1992.

Q. What month?

A. I'm not sure exactly what month it was. It was during the summer.

Q. And the summer of '92 when Miss Johnson was involved in a

417

relationship with your spouse, Mr. Cole, she was also involved with another relationship, isn't that true, Terry DeGeus?

A. Yes.

Q. So when you described for this jury the relationship that she had with Mr. Honken and the fact that Mr. DeGeus would be terribly upset, you were aware when you made those statements on direct examination that Mr. Cole was involved in a relationship with Angie Johnson and also involved in a relationship with Mr. DeGeus that you were fully aware of in 1992.

A. Yes.

Q. Which was a year earlier than the relationship that you just described to this jury.

A. Yes.

Q. Well, I guess Mr. DeGeus did not have a problem with that.

A. He did have a problem with it.

Q. Well, describe his reaction and Angie's reaction to that.

A. He had threatened Mr. Cole on -- during a phone conversation he had with him, and I was present for that.

Q. Threatened him how?

A. Threatened him saying that Martin Cole should be looking over his shoulder because Terry would be there.

Q. And what did you take that threat to mean by Mr. DeGeus when he told him he should be looking -- told Mr. Cole he should be looking over his shoulder because Terry would be there?

A. I took that to mean he would do him physical harm.

♀

418

Q. So you would agree that the relationship you described on direct examination to the prosecutors in this matter was not the first confrontation that you had seen between Terry DeGeus and another individual.

A. That's correct.

Q. As a matter of fact, it was not the first confrontation you had seen between Terry DeGeus and any other individual in terms of a physical confrontation; isn't that true?

A. Yes.

Q. Angie Johnson told you, did she not, that she was fearful of Terry DeGeus?

A. Yes, she did.

Q. As a matter of fact, you personally observed him chasing her in a high speed chase; isn't that correct?

A. Yes, it is.

Q. What was the date of that?

A. I'm not sure of the exact date, but I was present when that chase took place.

Q. It was after 1992; isn't that correct?

A. Yes, it was.

Q. Angie Johnson also spoke to you about using a weapon to protect herself from Terry DeGeus, did she not?
A. Yes.
Q. When did she tell you that?
A. When did she tell me?

♀

Q. Yes, ma'am.
A. I'm not sure of the exact date.
Q. That was prior to the time that she had had a relationship with Dustin Honken; isn't that true?
A. Yes.
Q. You were also aware that Terry DeGeus knew Mr. Nicholson.
A. Yes.
Q. As a matter of fact, in 1993 you observed him pull out out of his back pocket a note with Mr. Nicholson's name written on it; isn't that true?
A. Yes.
Q. He pulled the name out of his back pocket. You observed the name Nicholson written on it.
A. Yes, I did.
Q. And after that -- he pulled the note out, you also on another occasion when you were riding with him saw him pull Mr. Nicholson's name out indicating that he was trying to find Mr. Nicholson.
A. That was the same occasion.
Q. Well, let's see if it's the same occasion. You have indicated in your testimony that it was the same occasion. Let's follow up on that. The occasion that you indicate was the same occasion, that same day he pulled the note out, Angie Johnson came over to your house, isn't that correct, that he had

the note in his back pocket and he pulled it out and he had a

name on it Greg Nicholson?
A. Yes, that was in my -- my vehicle.
Q. Right. Angie Johnson and he have a conversation later on that same day, isn't that true, Mr. DeGeus and Angie Johnson?
A. The two of them did, but I'm not sure of the date.
Q. Okay. Well, you say you're not sure of the date, but we're not talking about the date. We're talking about the incident because that was the incident that Mr. DeGeus starts bouncing off the wall of your bathroom like a pinball machine, doesn't he?
A. It was in her basement that he did that.
Q. And he is bouncing off the wall so much that you become distressed that you go down to the basement and you observe what appears to be Terry DeGeus so upset that he's in an epileptic fit you described?
A. Yes.
Q. And as he's in this epileptic fit that you give a description of and you told the grand jury about, he's in a state where he indicates he has not slept for nearly 12 days; would you agree?
A. Yes.
Q. He's stinking, isn't that correct, because you make observations by smelling him; right?
A. When he was in my vehicle, yes.
Q. And he's saying -- well, you said he's in your vehicle, but

you're also talking about the time in the bathroom occurring the same day.

A. No, I'm not.

Q. So would you agree now that it might have been two separate times that Mr. DeGeus pulls out the note with regard to Greg Nicholson?

A. No, I did not see him pull out a note at her residence in her basement. I did not. They were having a conversation, Terry and Angela were.

Q. About Mr. Nicholson.

A. I'm not sure what the conversation was about. It was in my vehicle that he pulled the note out of his pocket.

Q. So you're saying even though it might have occurred on the same day and it could have been a follow-up to the conversation, you're telling us now that possibly he did not pull the note out before he and Angie go down to the basement and he's bouncing off the wall like a pinball machine.

A. I don't know what their conversation was about that day.

Q. You describe Terry DeGeus's relationship with Angie Johnson as very jealous, very abusive, possessive, and later on you describe it I believe with another adjective I can't seem to find right now in my notes, but that's how you described the relationship all the way through; is that correct?

A. Yes.

Q. At one point Mr. Miller asked you on direct examination

♀

422

that Angie goes in to have a meeting -- and I believe it was the Kentucky Fried Chicken that the meeting was held. He didn't ask that question, but I believe that's what your notes reflect. And at the Kentucky Fried Chicken, he described her, Mr. Miller

did, at that time as her ex-boyfriend. When did the relationship end between Mr. DeGeus and Angie Johnson?

A. I'm not sure exactly when it ended because he was always around.

Q. And they were always in contact with each other, weren't they?

A. They were a lot, yes.

Q. And they were in contact in July; isn't that true?

A. Yes.

MR. PARRISH: Your Honor, do you want a -- I don't want to interfere.

THE COURT: Would this be a good time to take a break?

MR. PARRISH: It would be a great time. Thank you.

THE COURT: Okay. We'll be in recess until one o'clock. Thank you. Please remember my cautionary instruction. Keep an open mind until you've heard all the evidence, had a chance to go back to the jury room and begin your deliberations. Thank you.

(The jury exited the courtroom.)

THE COURT: Counsel, anything we need to take up?

MR. PARRISH: No, Your Honor. Your Honor, just feel

♀

423

free to interrupt me if I go on past -- I don't have a problem.

THE COURT: That's okay. I just wanted to let you get a little farther into it. It was a good time. Thank you. We'll be in recess.

(Lunch recess at 12:09 p.m.)

THE COURT: Ready to have the jury brought in?

MR. PARRISH: Yes, Your Honor.

MR. MILLER: Yes.

THE COURT: Okay. Do we have the witness back up here?

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Parrish, you can continue your cross-examination.

MR. PARRISH: Thank you, Your Honor. May it please the Court and counsel.

BY MR. PARRISH:

Q. I believe we were leaving off and we were just discussing a little bit about what you had observed about Mr. DeGeus and his relationship with other individuals, and correct me if I'm wrong. You indicated that the people you had seen him exhibit some type of physical violence toward or threaten physical violence, one was Angie's friend that she shared with you; is that right?

A. Yes.

Q. Okay. With Angie herself.

♀

424

A. Yes.

Q. And also you saw him express some physical reaction when he pulled a note out with Greg Nicholson's name on it and Angie -- he went over to Angie's house and he continued to go into what you described as an epileptic fit; is that right?

A. Yes.

Q. Okay. You also observed the high speed chase; is that right?

A. Yes, I did.

Q. Matter of fact, tell the jury where the high speed chase -- when Mr. DeGeus was chasing Angie where it ended up. And this was in 1993?

A. Yes.

Q. Okay. Where did it end up?

A. When we got in front of the Clear Lake Police Department, he turned off.

Q. And Angie at that point seeing Mr. DeGeus behind her from your observations proceeded on into the Clear Lake Police Department, and this was in 1993; is that accurate?

A. Yes.

Q. Okay. Do you know exactly if it was the same time that Angie was also seeing Mr. Honken?

A. It was not.

Q. Okay. Before or after?

A. It was after.

Q. It was after he had been seeing -- she had been seeing Mr. Honken you saw DeGeus chase her to the extent that she then had to go into the Clear Lake Police Department to get away from him; is that right?

A. Yes.

Q. And you were right there; is that correct?

A. Yes.

Q. You also described this incident when Mr. Miller asked you on direct examination of the time when she goes into Kentucky Fried Chicken. You don't hear the conversation, but you see the arms waving while you're sitting outside and when she came back and again distressed her fear -- expressed her fear of Mr. DeGeus; is that right?

A. Yes.

Q. Okay. What I'd like to do now is go to the night that you indicated among several nights that you babysat for Angie.

Angie's the individual who called you and asked you to babysit.
A. Yes.
Q. You came to her house.
A. Yes, I did.
Q. You babysat Alyssa.
A. Yes.
Q. She worked at the country club prior to this time when you babysat; is that right?
A. Yes, she did.

Q. The country club closed what? At one o'clock?
A. I'm not sure exactly when it closed.
Q. It was early in the morning.
A. Yes.
Q. All right. And so 1:00 would not have been late for you to babysit or 1:30 by the time she got home, et cetera?
A. That would have been a little late, yes.
Q. That would have been a little bit late but about the time normally?
A. It still would have been a little earlier.
Q. She had to close up her responsibilities, did she not?
A. Sometimes she did.
Q. Well, didn't you work there with her along with --
A. No, I did not.
Q. Was it a different place you worked with her?
A. I worked at a different restaurant.
Q. Okay. But this place you know she had some close-up responsibilities, and so sometimes she would be later than usual when you would babysit; is that right?
A. On a few occasions.

Q. All right. And you're not exactly sure how -- what was the latest you had babysat prior to the night you brought up on direct examination with Mr. Miller, are you? Are you sure about the times of all the other nights you babysat?
A. I know it was never past 1:30.

Q. Okay. It was never past 1:30, but several times it could have been up to 1:30.
A. It could have been.
Q. Did you share babysitting duties like sometimes she would babysit your kids or something like that too?
A. She did babysit a couple of times for me, but that -- it didn't end up working out.
Q. Okay. And you stayed over at her house sometimes overnight; is that right?
A. Sometimes, yes.
Q. And I assume sometimes she stayed over at your house overnight.
A. No, she did not.
Q. She never stayed at your house overnight?
A. No, she didn't.
Q. What's the latest she would stay?
A. That I would stay?
Q. No, that she would stay at your house.
A. About 1, 1, 1:30.
Q. She'd have her child with her.
A. No.
Q. By the way, prior to this time did you ever see Dustin Honken drive a vehicle?
A. Drive a vehicle?

Q. Yes.

A. Yes, I saw him drive mine.
Q. I mean other than your vehicle, did you ever see him drive another vehicle?
A. I saw him drive Angie's.
Q. And what type vehicle did she have?
A. She had a newer Toyota Tercel.
Q. Describe those Tercels for us. Are they big cars, tiny cars, or what?
A. Compact cars.
Q. Do they have a full front seat?
A. They have two bucket seats.
Q. Two bucket seats in the front.
A. Yes.
Q. Did hers have a back door, a front door?
A. It -- I believe it was a hatchback also.
Q. Okay. Now, correct me if I'm wrong. I happen to be a car nut in a way, but do the hatchbacks have a back -- a back door to them?
A. Yes, they do.
Q. They do have a back door.
A. Yes.
Q. And they have a full backseat. But the front seat are two bucket seats; is that right?
A. Yes.
Q. And they are these tiny vehicles; is that right?

A. They're compact.

Q. Yeah. And was yours automatic or a stick?
A. It was stick.
Q. Okay. And what color was it?
A. A light blue.
Q. And what color was Angie's?
A. Dark blue.
Q. So they were both blue.
A. Uh-huh.
Q. Is that right?
A. Yes.
Q. Was hers automatic or a stick?
A. Stick.
Q. And so yours was 1984. You said hers was a later model, so we only have '94 -- '84 to '93. What year was hers?
A. I believe it was a '91 or '92.
Q. Now, correct me if I'm wrong. Those vehicles look pretty similar?
A. No, they didn't.
Q. They really changed a lot between '84 and '91? Are you sure?
A. In my opinion they did change.
Q. And you're sure hers was a '91?
A. No, I'm not sure it was.
Q. Okay. Could hers have been a late '80s?

♀

430

A. I don't think so.
Q. But you don't know.
A. Right, I don't know.
Q. Okay. But you do know hers was blue, hers was a Toyota Tercel, hers also had bucket seats in the front, hers was also a

stick shift, hers also was a hatchback. Am I correct on all of those?

A. Yes.

Q. Okay. And I believe you said on your direct examination that the reason you thought she had switched cars with you, so people could not recognize that it was her car as opposed to your car.

A. Yes.

Q. Is that right?

A. Yes.

Q. And they were both Toyota Tercels.

A. But they did not look similar.

Q. Okay. Now, as I understand it -- and correct me if I'm wrong -- they borrowed your car about what time?

A. About what time of . . .

Q. Was your car borrowed.

A. What time of the day or --

Q. Yeah.

A. The first time Dustin had taken it, it was to fix my muffler.

♀

Q. Is that when he took the Mountain Dew can and put in your muffler?

A. Yes.

Q. You'd asked him to do that, though; right?

A. No. Angie told me that he would do that.

Q. But I thought you didn't like Dustin.

A. I didn't.

Q. Why would you let someone fix your car you didn't like?

A. Because he was going to do it for free.

Q. Oh, okay. So what he did, he takes your car. He goes out. He fixes it, and he puts a Mountain Dew can where the noise is coming out to try to keep the noise down a little bit?

A. Yes.

Q. Did he borrow it any other time other than to fix your car?

A. A second time to fix what he had done with the Mountain Dew can.

Q. To fix it correctly the next time.

A. Correct.

Q. So the second time he borrows the car to fix it for you as a favor; is that right?

A. Yes.

Q. Okay. What about the third time?

A. The third time that he was in my car was the night they went looking for Greg Nicholson.

Q. Do you recall what you said on direct examination when it

432

was asked of you about the vehicle, the Toyota Tercel, that he had borrowed prior to that date and each time he borrowed it was to go look for Mr. Nicholson? Do you recall saying that on direct examination today?

A. Yes, I do.

Q. That was a mistake, wasn't it?

A. No, it was not.

Q. So then he borrowed your car on the two prior occasions to fix the muffler and also go look for Mr. Nicholson; is that your testimony?

A. Yes, but she would -- she would ask me -- most of the time that my car was taken out, Angie was the one that asked.

Q. So in other words, you just forgot to mention that he fixed

the car the two other times when he went out to look for Mr. Nicholson. You just overlooked mentioning that when he asked you on direct examination?

A. No, I did not.

Q. Okay. You believe you mentioned that.

A. No. When he took my car, I believe it was to fix my car.

Q. Okay. Now, the third time then -- before I ask you about the third time, do you know anything about the dates of the other times that he borrowed your car to fix it?

A. I don't recall.

Q. Do you remember the months that he might have borrowed it?

A. I can't say for sure.

♀

433

Q. Do you remember the year that he might have borrowed it?

A. It was in 1993.

Q. Okay. And you have consistently told law enforcement through all your interviews that you had with them -- and I believe you had five -- that you did not have a specific recall of the dates, didn't you?

A. If that's what I said.

Q. Well, what do you say now sitting here in court in front of this jury?

A. I am sure of the year. I'm not sure of the months.

Q. And you told them consistently that you were never sure of the months when Angie and Dustin used your car; isn't that correct? You told them that consistently.

A. That's correct.

Q. And that's your testimony as you sit here today; isn't that correct?

A. Yes.

Q. And let me ask you a little bit more about that borrowing that you cannot remember the date of. As a matter of fact, would it be accurate to say that when you got in your car you saw nothing unusual about your car?
A. That's correct.
Q. You never found anything unusual about your car, the way it looked, the way it was, or anything like that.
A. No, I didn't.

434

Q. Debris or anything in the car, nothing; is that correct?
A. That's correct.
Q. And you've consistently told law enforcement officials that; isn't that correct?
A. Yes.
Q. You've also told them that you went back and double-checked to see whether or not there was anything unusual about the car; isn't that correct?
A. Yes.
Q. And had there been anything unusual about the car, the way it looked, any type of debris or anything in it, you would have taken it to law enforcement, wouldn't you?
A. I don't know if I would have taken it to law enforcement but . . .
Q. You would have checked it out.
A. I checked it out.
Q. And you did check it out.
A. Yes.
Q. And you found nothing.
A. Correct.
Q. And that's your testimony here today.

A. Yes.

Q. Now, on that date you indicate that they came in, did you have a watch there available for you?

A. A watch?

♀

Q. Yes, ma'am.

A. There was a clock, yes, on the wall.

Q. Where was it?

A. I could look at it. It was next to the hallway.

Q. Now, as I recall your testimony -- correct me if I'm wrong -- someone came over to try to talk to you; right?

A. Dustin had come over. I could see it was him. He just walked towards me to see if I was awake or asleep. I just --

Q. Now, you've agreed that you've told two different statements on this. In one you said you were asleep. The other one said you were pretending to be asleep. In the other one you said you were awake.

A. I was pretending to be asleep.

Q. So when you made the statement you were asleep at one point, that was not accurate.

A. No, it was not.

Q. Okay. And when you made the statement you were pretending to be asleep, that was accurate.

A. Yes.

Q. Did you ever make the statement that when they came in they woke you up?

A. I don't believe I did.

Q. So you had been awake then the entire evening?

A. I could hear the vehicle pull up at the driveway.

Q. Did you ever tell anyone that prior to today, that you

could hear the vehicle pull up in the driveway?
A. I don't recall.
Q. Well, did you ever tell the law enforcement in the five times you've been interviewed and the grand jury that you could hear the vehicle when it pulled up? Did you ever tell anyone that prior to today's date?
A. I don't recall.
Q. This might have been the first time you ever made that statement; isn't that right?
A. It could be.
Q. Eleven years later.
A. Yes.
Q. Now, you've already acknowledged that you did not tell the truth to law enforcement when you were first interviewed -- well, you were interviewed, first of all, in front of the grand jury; is that correct? Was that in 1993?
A. I'm not sure. I think it was 1997.
Q. 1997? You did not tell the truth; is that right?
A. That's right.
Q. And you were under oath at that time.
A. Yes.
Q. You were also interviewed 2-11 of '97, 2-13 of '97, and 2-15 of '97. Is that accurate also?
A. Yes.
Q. You did not tell the truth at either of those times, is

that correct, to law enforcement officials?

A. Correct.

Q. And you went back -- would you agree that you went in front of the grand jury twice, May 14, 1997, February 20, 1997, and both times you lied to them?

A. Yes.

Q. And you were under oath both times.

A. Yes.

Q. Now, did you also say that you peeked into the bathroom?

A. No, I did not. I was on the couch. I did not peek into the bathroom.

Q. So you never got up and peeked into the bathroom to see who was taking a shower.

A. No, I did not.

Q. Well, how did you know who was taking a shower?

A. I didn't know who was taking a shower. I said they both walked into the bathroom.

Q. So is it your statement then that you're now telling us today that you can't say that Mr. Honken took a shower and Miss Johnson took a shower?

A. I don't know who was taking a shower. I heard it turn on, and I knew they were both in the bathroom.

Q. Do you know if anyone took a shower?

A. No, I don't know that for sure.

Q. Did you ever offer as sworn testimony that they took a shower?

A. I don't recall.

Q. Did you see any clothes that appeared to be unusual to you when Mr. Honken walked over to you while you were laying on the couch?

A. No.

Q. Did you notice anything about Angie's clothes that appeared unusual to you when you saw her walk in when you were pretending to be asleep?

A. At five o'clock in the morning, it was still pretty dark in the living room.

Q. So you didn't see or notice anything unusual.

A. Nothing unusual, no.

Q. Did you smell anything unusual?

A. No, I did not.

Q. Of all the conversations -- well, the few conversations that you had with Dustin Honken, did you ever once hear him mention the name Mr. DeGeus?

A. I don't recall.

Q. Matter of fact, you were asked that specific question, and you indicated in your response in all the conversations you had with Dustin Honken, he never once mentioned the name Mr. DeGeus; isn't that accurate?

A. I don't recall if he did or not.

Q. Well, let me ask you this. You indicated to the jury on

439

direct examination that you had a very good relationship with Angie at some point. Now, you knew where Angie was living, is that right, and you had a key to her house?

A. Yes.

Q. Did you ever go to her house and notice whether or not Dustin Honken was living there through any of the times she had a relationship with Mr. DeGeus?

A. I didn't notice if he was living there.

Q. Matter of fact, when you would go -- as you described to

the prosecutors earlier, when you would go to her house and then you would go back to your house, you guys just had a habit of just going back and forth sometimes; is that right?

A. That's right.

Q. And on occasions you acknowledged that you did drugs sometimes at her house, sometimes at his house; is that right?

A. That's right.

Q. I mean at her house, sometimes at your house; is that right?

A. That's right.

Q. And you also indicate that there was a time when drugs were supplied like this LSD was supplied by Terry DeGeus; is that right?

A. He had given it to Angie.

Q. And that was during the time she was having the relationship both with both Mr. Honken and with Mr. DeGeus; is

that right?

A. She was not having a relationship with Terry DeGeus at that time.

Q. He was just giving her LSD.

A. True.

Q. And you don't consider that a relationship.

A. Wasn't a romantic one.

Q. Okay. All right. That's fair enough. But you would agree that they were having a relationship to the extent at the same time she was seeing Mr. Honken where he would provide or continue to provide her illicit drugs.

A. Yes.

Q. And you observed as late as July of 1993 that this

relationship between Angie and Mr. DeGeus continued at the same time she was having a relationship with Mr. Honken.
A. She was afraid of Terry.
Q. I understand that. She was afraid of him but at the same time getting drugs from him.
A. Correct.
Q. But also you noticed at the same time when you would go to her house straight on through including the month of October of 1993 that Mr. Honken was not even living with Angie; is that correct? You saw no evidence that he was living there.
A. I saw no evidence of that.
Q. And this was October of 1993; would that be accurate?

441

A. Correct.
Q. As a matter of fact, was it about that time that you went out with Mr. Cutkomp to Arizona?
A. On what date?
Q. I'm asking you was it about that time that you went out with Mr. Cutkomp to Arizona?
A. I believe that was earlier.
Q. And when do you believe that might have been?
A. Would have been in the spring of '93.
Q. That you went to Arizona?
A. Yes, but I'm not for sure.
Q. Let me just ask you something, and I know you've talked about this a little bit, and Mr. Miller referred to this. You would have to agree that the use of methamphetamine really affected your memory during that time; isn't that correct?
A. It could have.
Q. Would you also agree that your use of methamphetamine as

you described it sometimes three to four times a month or even more with Angie made you very confused about dates? Would you agree with that?
A. I don't think it made me very confused.
Q. Well, let's put it this way: Somewhat confused.
A. I don't think so.
Q. So you have an exact recall then of what was going on in your life at the rate you were using methamphetamine?

442

A. I don't have an exact recall.
Q. Okay. And would you agree that part of that time was affected by your use of methamphetamine?
A. I don't think so. It was just a long time ago.
Q. So I just want to be clear on this. Did the methamphetamine affect your ability to recall or had no effect on your ability to recall during the time that you were using it during the summer -- and I think you gave a description of how often you used it which appeared to be quite often?
A. A couple of times a week.
Q. Twice a week you used it?
A. Yes.
Q. So during the summer of 1993 beginning, say, with March, sometime like that, over a period of 20 weeks, 30 weeks, you used it 60 times?
A. Yes.
Q. And is it your testimony sitting here today that did not affect your memory?
A. I'm saying it could have.
Q. Okay. And all I was saying is is that affected to the extent that sometimes now -- and I realize it's been a long time

ago. But is it also affected when you try to recall certain dates? Those dates are kind of difficult to recall because when you were taking those type of drugs you know it kind of affected your ability to recall with specificity what was going on?

A. I don't believe that had anything to do with it.
Q. Okay. I just want to close with a couple of questions here and see if you recall these dates. If you don't, that's fine. On February 13 and February 15 in 1997, you agree those are dates you were interviewed.
A. Yes.
Q. April 19, 1999, you agree you were interviewed.
A. I believe it was in April. I'm not sure exactly what date.
Q. Okay. February 11, 1997, you were interviewed.
A. Yes.
Q. February 13, 1997, you were interviewed. I think I've asked -- yes, I've asked you that. Did I ask you about April 14, 1999?
A. I believe I was interviewed in April. I'm not sure of the date.
Q. Now, you and Miss Johnson had a separate disagreement on another matter involving your current spouse, is that correct, that you've told law enforcement officials about?
A. That we had a disagreement?
Q. Yes.
A. I'm not sure I understand the question.
Q. Do you recall telling them at some point that Miss Johnson tried to establish a relationship with your current spouse and that led to part of your breakup in the relationship with her?
A. That's not what ultimately led to my breakup with her.

Q. No. I said it was part of what led to the breakup with her. Not only has she had a relationship with Mr. Cole, but you also indicated, did you not, to law enforcement officials that you believe she attempted to start a relationship with your current spouse?
A. She had attempted to.
Q. Okay. And was this at the same time she had a relationship with Dustin Honken?
A. Yes.
Q. With regard to the weapon that you said you saw -- I believe you described that it had no clip in it. You saw no bullets for it; is that right?
A. Correct.
Q. Angie came over and picked up that weapon; is that correct? And that was in her bag; is that right?
A. Yes.
Q. Angie also stated to you that it was her gun.
A. No, she did not.
Q. You told law enforcement that you did not think your Toyota Tercel could hold six people; isn't that correct?
A. That's correct.
Q. I want to show you page 51 of the grand jury testimony, page (sic) 6 through 8.
MR. MILLER: Which transcript?
MR. PARRISH: Page 51 of April 11, 2000, beginning

445

with line 6.
BY MR. PARRISH:

Q. Answer, when they asked you that question, No, she never told me that, but when I asked her about the gun I found, she said it was registered to her, it was her gun.

I asked you that just a few minutes ago, and you told us no, she didn't. Would you like to see your sworn testimony before the grand jury on April 11 of 2000 to refresh?

A. Yes.

MR. PARRISH: Your Honor, may I show this?

THE COURT: You may.

BY MR. PARRISH:

Q. I refer you to page 51, again, lines 6 through 8, as to what she told you. Take a look at it. Tell me now if you want to change your testimony about what you just told this jury a minute ago as to what you said back then. Do you want to change your testimony?

A. I don't recall what . . .

Q. What did you tell the grand jury?

A. I told the grand jury that she said she registered it.

Q. Read the rest of it.

A. She said she purchased it at a pawn shop in Cedar Falls.

Q. What else?

A. She said it was her gun.

Q. Do you want to change your testimony you just told this jury a minute ago?

446

A. Yes.

Q. And what would that changed testimony be with regard to the gun? What did Angie tell you?

A. That she said it was her gun.

Q. Thank you.

MR. PARRISH: I have no further questions.

THE COURT: Mr. Miller, anything further?

MR. MILLER: Yes, Your Honor.

THE COURT: Thank you.

REDIRECT EXAMINATION

BY MR. MILLER:

Q. Mrs. Gaubatz, in '92, '93, and '94, were you keeping a journal or a diary?

A. No, I was not.

Q. Keeping track of exact dates back then and remembering them today I assume is a little bit more difficult than remembering the sequence of events.

A. Yes.

Q. At what point as in when approximately did -- and you can put it in sequence of events if you want to that we've talked about today -- did your relationship or your close friendship with Angela Johnson end? Approximately when?

A. It ended in '95.

Q. Back in '93 before Honken -- before Mr. Honken was arrested

447

and through the rest of that year, what was the nature of Angela Johnson's relationship with Terry DeGeus?

A. It was strictly over drugs. She was trying to end any romantic or physical involvement with him.

Q. They still had a drug relationship.

A. Yes.

Q. But no romantic relationship.

A. Correct.

Q. At least in her mind.

A. Yes.

Q. He was still pursuing her.
A. Yes.
Q. But that was not mutual on her part?
A. No.
Q. You've been questioned about an occasion in which Mr. DeGeus showed you a note that had Nicholson's name on it.
A. Yes.
Q. Tell us what you recall of that incident. I'm not sure I understand. When was this --
A. That was --
Q. -- in the sequence of events?
A. -- in probably August. It was very hot.
Q. Of what year?
A. Of '93. And he had --
Q. Before or after Greg Nicholson disappeared?

448

A. It was after.
Q. Describe that.
A. We had seen each other or he saw me on the -- on a road that connects Clear Lake to Mason City, and I could see in my rear view mirror that he was turning around to follow me, so I pulled over, and he got in my car, and that was the incident in which I noticed he -- there was an odor, and he said he had not slept in a long time and he was very upset, very nervous, and he pulled out a -- I don't know if it was a note. It was just a piece of paper, and it had Greg's name on it, and he asked me did I know who he was, and I said no. And he said, Well, I can't find him. He's been missing, and I said, I don't know what you're talking about, and he was just ranting.
Q. And this was after that night that you spent all night

babysitting.

A. Yes.

Q. I want to talk about that night. That was the last occasion that Ms. Johnson and Mr. Honken used your car?

A. Yes.

Q. I just want to be perfectly clear. You've mentioned there were a couple times when Mr. Honken borrowed the car?

A. Yes.

Q. But there were other occasions when Angela Johnson asked for it?

A. Yes.

♀

Q. And they both used it?

A. I'm assuming, yes.

Q. She indicated that was the purpose -- did she indicate the purpose for using --

A. To go look for Greg, yes.

Q. With whom?

A. With Dustin.

Q. On a number of occasions.

A. Yes.

Q. And on the very last such occasion you ended up waiting virtually all night for them to return.

A. Yes.

Q. In any of the times that you were questioned by officers or before the grand jury, did anybody specifically ask if you heard the car pull up if you recall?

A. No, I don't.

Q. And that car was a compact.

A. Yes, it was.

Q. Couldn't hold six people very comfortably, could it?
A. Not very comfortably, no.
Q. If two of them were tiny children, however, that would make a difference, wouldn't it?
A. If they were sitting on someone's lap.
Q. That could be done, couldn't it?
A. Yes.

♀

450

Q. And if people were tied up, that could make a difference.
A. Yes.
Q. Who was it that walked into that bathroom that morning after you'd spent all night babysitting?
A. Both of them did.
Q. Both of whom?
A. Angela and Dustin.
Q. You didn't look into that bathroom.
A. No.
Q. But you heard something.
A. I heard the shower turn on.
Q. None of this information was shared with authorities or the grand jury until 2000.
A. Correct.
Q. I think you've indicated to us that out of fear you concealed this information.
A. Yes.
Q. It was an emotional event for you to finally release it, however, wasn't it?
A. Yes.
Q. Took a burden off your shoulders.
A. Yes.

MR. MILLER: No further redirect, Your Honor.

THE COURT: Mr. Parrish, anything further?

MR. PARRISH: I do, Your Honor.

RECROSS-EXAMINATION

BY MR. PARRISH:

Q. Mr. Miller just asked you about your car and about two young kids being -- some people being tied up or two adults sitting in a Toyota Tercel. You're not some expert on cars, but just knowing the size of your car, that would have been something that would have been very difficult, and you've told them over and over that same answer, have you not, that it'd be too difficult you thought?

A. I have myself had the situation happen where I had two children sitting on adults' laps, though. It's difficult, but it can be done.

Q. Particularly if they were against their will, it'd be even more difficult, would you think?

A. I don't know.

Q. But that car's pretty tiny, a Toyota Tercel; would you agree?

A. It's pretty small, but it can be done.

Q. Let me just ask you -- but again, you said nothing was unusual about your car when you looked at it.

A. That's correct.

Q. Let me just ask you a couple other questions. Mr. Miller asked you did you keep a diary, you and Angie. You and Angie kept a diary of some of your activity, didn't you?

A. I'm not sure I know what you mean.

Q. She practiced witchcraft, did she not?
A. I'm not sure.
Q. What do you mean you're not sure? I thought she was your closest friend.
A. She was at the time.
Q. Well, what do you mean you weren't sure? What did you mean when you just answered the question --
A. She --
Q. Excuse me a second. When I asked you the question -- when Mr. Miller asked you on direct examination about keeping a diary, I asked you specifically whether or not you were close friends, were you aware she practiced witchcraft, and you said you were not sure. Explain to me what you meant when you answered my question you were not sure if you could.
A. I'm not sure because I don't know if tarot cards are considered witchcraft.
Q. So it's your testimony today as you sit here, you are not aware that Angie Johnson practiced witchcraft; is that your testimony?
A. She read tarot cards.
Q. That's all -- it's your testimony that's all she did? She dressed in black all the time, did she not?
A. I don't think that's an indication of witchcraft.
Q. She wore her hair very dark and dyed it to stay dark, did she not?

453

A. No, I don't think she did.
Q. She kept witchcraft material in her house, did she not?

A. She had a couple of statues of wizards.
Q. She proclaimed to you, her closest friend, that she was a witch, did she not? Did she not?
A. That was in a joke.
Q. So she joked all the time -- it's your testimony she joked all the time about being a witch?
A. No.
Q. Was she serious or was she joking, ma'am, as you sit here in court this afternoon?
A. She had dressed as a witch for Halloween and said to me, I'm a witch. That was at Halloween time.
Q. Is your testimony that the only time Angie Johnson dressed as a witch was one Halloween? Is that your testimony as you sit here today?
A. That is correct.
Q. She read tarot cards, and she kept two statues of wizards in her house that you had a key to; is that right?
A. That's correct.
Q. Other than that, is it your testimony as you sit here today you and she have never engaged in the practice of witchcraft?
A. That is correct.
Q. Has she alone practiced witchcraft?
A. I don't know if she did it alone.

454

Q. Did she keep diaries of it?
A. I don't have any idea.
Q. So is this news to you, these questions?
A. It's news about a diary.
Q. But it's not news about the witchcraft?
A. I didn't say she practiced witchcraft.

Q. Well, what did she do regarding witchcraft that you could explain to us the reason you changed your answers to "I'm not sure" to "well, maybe."

MR. MILLER: Objection, argument.

Q. If you know.

THE COURT: Overruled.

A. All she did with me was read tarot cards. I don't know if that's witchcraft or not.

Q. Well, what did she do with other people that you were aware of?

A. I don't know what she did with other people.

Q. She was your closest friend. You've described in direct examination and redirect in detail about the closeness of your relationship, the fact that on occasion you went to each other's houses, on occasion you had keys to each other's houses, you had access to all of her personal items, and is it your testimony here today -- and if it is, so be it -- that you had no knowledge that Angie Johnson practiced any type of witchcraft? Is that your testimony here today?

♀

A. That is.

Q. Just the things that you mentioned; is that right?

A. Yes.

MR. PARRISH: Thank you.

THE COURT: Mr. Miller?

MR. MILLER: No redirect, Your Honor.

THE COURT: Okay. You may step down.

THE WITNESS: Thank you.

THE COURT: You ready to call your next witness?

MR. MILLER: Yes, sir. United States calls Lisa Asbe.

LISA ASBE, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. And once you get settled in, would you try and adjust the chair and the microphone? Can you pull that chair up as close as you can get? And you can pull those microphones down. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: Lisa Ann Asbe, A-s-b-e.

THE COURT: Thank you.

Mr. Miller, whenever you're ready.

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Good afternoon, ma'am.

A. Hi.

♀

456

Q. Mrs. Asbe, where do you live, ma'am?

A. Mason City.

Q. Your occupation?

A. Surgical aide.

Q. Where do you work?

A. Mercy Medical Center, North Iowa.

Q. Mrs. Asbe, you have a soft voice, and that's just fine except that everybody here needs to hear what you're saying, so do try to project and stay as close to the microphone as possible. I appreciate it.

A. Okay.

Q. How long have you been a surgical age there -- aide there?

A. Four years.

Q. Okay. And that's North Iowa Mercy?

A. Right.
Q. With whom do you live there in Mason City?
A. My husband Brian.
Q. Do you have any children still at home?
A. Yes, I do.
Q. What are their names and ages?
A. Jason, 19, and Brittany, 16.
Q. Your husband's occupation?
A. He works at Curry's on the door line.
Q. What street do you live on in Mason City?
A. Our street address is 616 North Jackson Avenue.

Q. And what's the next street over to the west?
A. That would be Van Buren.
Q. You've been living at 616 North Jackson since when, Mrs. Asbe?
A. Since June 30, 1984.
Q. You one of the more longstanding residents of that neighborhood?
A. Yes.
Q. Seen families come and go.
A. Right.
Q. During the course of the years, you raised those two children in that neighborhood.
A. Yes.
Q. I assume you got acquainted with the other youngsters and families that had youngsters in the neighborhood.
A. We did.
Q. Did you ever become acquainted with a woman by the name of Lori Duncan?

A. I did.
Q. When?
A. Probably in '90, '91.
Q. And how did you become acquainted with Mrs. Duncan?
A. Through my daughter Brittany.
Q. How old was Brittany at the time?
A. Probably three when they first met.

♀

Q. How did Brittany happen to introduce you to the Duncan household?
A. She had a friend named Amber who she played with.
Q. How long did that go on?
A. Probably over two years.
Q. What was the difference in age, if any, between Amber Duncan and your daughter Brittany?
A. Just a little over one year.
Q. And who was the older?
A. Amber was.
Q. Can you give us a little bit of description of that neighborhood, North Jackson and North Filmore? What sort of a neighborhood is that?
A. Quiet, very quiet and reserved. Everybody watched out for everybody pretty much.
Q. Residential neighborhood?
A. Yes.
Q. All single-family homes, not apartment buildings?
A. There was no apartments.
Q. Okay. Just a lot of homes, some of which had children.
A. Right.
Q. Brand new neighborhood or an older neighborhood?

A. When we first moved in, it was mainly older people, and then gradually younger families moved in.

Q. How about the houses themselves? Were they -- any idea

about when they were built? They new homes or --

A. I'd say around '40, maybe '50.

Q. How close were your daughter Brittany and either of the Duncan children?

A. Very close.

Q. How much did you see of the Duncan children?

A. Probably every other day if not every day pretty much during the summer and throughout the school year.

MR. MILLER: With the Court's permission, I'd like to publish Exhibit 36 at this time.

THE COURT: You may. Are you going to do it off the computer?

BY MR. MILLER:

Q. Do you see the screen in front of you?

A. Yes.

Q. What is Exhibit 36, Mrs. Asbe?

A. That's Kandi Duncan.

Q. Kandi was how old in relation to her sister Amber if you knew?

A. There was four years' difference.

Q. Kandi was older?

A. Yes.

Q. And without going into great detail, could you just tell us just very briefly what kind of a child Kandi was?

A. She was a little more quieter of the two, but she always

had a smile on her face, very cute, very freckly, nice -- nice little girl.

Q. Did you see more of Kandi or Amber at your house?

A. More of Amber.

Q. Because of her friendship with Brittany?

A. Right.

Q. And the age difference?

A. Yes.

MR. MILLER: With the Court's permission, I'll ask that Exhibit 37 be published at this time.

THE COURT: Yes, you may.

BY MR. MILLER:

Q. What does Exhibit 37 show us, Mrs. Asbe?

A. That's Amber Duncan.

Q. And again, as with Kandi, can you tell us just very briefly a little bit about that little girl Amber Duncan?

A. She was very outgoing, very friendly, easy to get along with.

Q. She spent a lot more time with your daughter Brittany.

A. Yes, she did.

Q. What sort of things did those two girls do together?

A. They colored together. They played Barbie dolls together. They had sleepovers, Slip 'N Slides in our backyard, came over for little picnics, ate lunch with us once in a while.

Q. You mentioned sleepovers. How often would they do

461

sleepovers?

A. Usually on weekends, but sometimes two nights in a row, at least twice a week.

Q. I take it they were pretty close friends.
A. Yes.
Q. And in the summertime what sort of activities would they be doing?
A. Coming over, like Slip 'N Slide, playing in our -- we had like a little dirt pile in the backyard with a tire and stuff that they'd play with and stuff and the sand pile, barbecues, played dolls.
Q. Thank you. We'll take down the exhibit. Thank you.
So you saw a lot of the Duncan children and Amber in particular. Did that include through the summer of 1993?
A. Yes.
Q. At some point that summer, Mrs. Asbe, did -- let me ask you this. Did you become acquainted with their mother, I assume, Lori Duncan?
A. Somewhat, yes.
Q. And were you aware of the situation at least as far as -- well, let me just back up a second. Where was your home specifically in relation to the Duncan home?
A. Right directly behind theirs.
Q. Okay. Was that on Van Buren?
A. We lived on Jackson. They lived on Van Buren.

♀

462

Q. Is there just a fence between or an alley? What sort of -- what separates the homes in the back?
A. There was an alleyway.
Q. Most of the folks in that street garage their vehicles off the alley, or at least some of them?
A. At that time there really wasn't a whole lot of garages on that alley on Van Buren, so most of the approaches were from the

front.

Q. But the access between your residence and the Duncan residence was just right through the backyards across the alley.

A. Yes.

Q. What was your view of the Duncan home from your home?

A. Before the outgrowth of the trees and stuff, we could see directly from our back door to their back door, kitchen window.

Q. And I'm talking in early summer of 1993, for example. Could you see their back --

A. We could see the back of their house, yes.

Q. Okay. Well, whatever your interaction with the Duncan family, did you become aware at any point in 1993 that there was an addition to the household at the Duncan residence?

A. No.

Q. There was just the three of them there, Lori and her two daughters?

A. Yes. At one time he was -- she was living with Damian Duncan.

♀

463

Q. Damian Duncan or was the last name --

A. Or Damian Deegan.

Q. Just so we can back up, the Duncans -- Lori was divorced from her first husband, is that correct, to your knowledge?

A. As far as I know, yeah.

Q. And that was the children's father, somebody named Duncan.

A. Right.

Q. Now, she had a relationship with a Damian Deegan, but he'd moved?

A. Yes.

Q. After he moved out and before the disappearance of this

family, to your knowledge did anyone else move into the house?
A. Not that I was aware of at the time.
Q. Did you become aware at the time of anyone visiting the Duncan residence?
A. Just that we had heard that Greg Nicholson possibly might have moved.
MR. ROGERS: I'll object as hearsay. There's no foundation for where this came from.
MR. MILLER: I'll withdraw and move on, Your Honor.
THE COURT: Sustained.
BY MR. MILLER:
Q. Mrs. Asbe, I want to call your attention to Sunday, the 25th of July, 1993. You've been questioned about that date a number of times over the years, haven't you?

464

A. Yes.
Q. You know the day I'm referring to. That the last day you saw any of the Duncan family? Remember that day?
A. Very well, yes.
Q. What day of the week was that?
A. It was on a Sunday.
Q. What's the first time that day to your recollection that you had any contact with any member of the Duncan household?
A. Early that day Amber came over to our house.
Q. Any idea approximately what hour of the day?
A. It was before noon, between probably 10 and 12.
Q. Go ahead and just describe for us what went on that day after Amber came over.
A. She came over, asked if she could play with Brittany. I said that'd be fine. And then it got close to lunchtime. We

were barbecuing. And I asked if she wanted to stay for lunch because her mom wasn't home at the time. And she was getting kind of hungry, so we went ahead and fed her. And then they played --

Q. Was that at all uncommon?

A. No, no. I was pretty open to all the neighbor kids and stuff. If we were feeding them, I fed them too.

Q. That's like a lot of residential neighborhoods. The kids eat wherever they happen to be at meal time, huh?

A. Yes, yes.

♀

Q. Go ahead. Please describe what went on.

A. After that they played for a little while in the backyard. And then she said she had to go back home before her mom came back because they were planning on going on a picnic south of town near Rockwell.

Q. When you say she said that, you're referring to?

A. Amber. So she ran home across the alley, and then we proceeded to get ready to go to the races like we always did on Sunday.

Q. Just backing up briefly, Amber left at about what time in the afternoon?

A. Between three and four.

Q. So she'd been over there at your place for several hours.

A. Yes.

Q. Playing with Brittany.

A. Yes.

Q. In what kind of a mood if you recall?

A. Happy, very happy.

Q. That was typical of her.

A. Yes.

Q. She indicated that there were some plans for the family that afternoon?

A. Yes. She had said -- Amber had said that they were going to go on a picnic later that afternoon out of town.

Q. And so she went home.

♀

A. Yes.

Q. Across the alley.

A. Yes.

Q. What was the rest of your day that day, Mrs. Asbe?

A. Shortly after that we proceeded to do what we always did on Sunday afternoons and got ready to go to the races in Mason City with our family.

Q. That was a -- was that a common practice of yours and your family back then?

A. At that time, yes.

Q. Okay. That was a regular Sunday event?

A. It was.

Q. Okay. Before leaving that afternoon to go to the races, did you happen to observe any other activity at the Duncan residence?

A. Yes. About four o'clock or shortly after, we saw Greg Nicholson and Lori pulling up on the motorcycle in the back of the alley and pulling up in the back of the house by the garage.

Q. Anything unusual about that?

A. It kind of was, yes, because, I mean, I had never seen them pulling up on the motorcycle before that so . . .

Q. But you certainly took nothing out of place about it at the time.

A. No.

Q. Please go ahead and describe the rest of your day for us if

you would, please.

A. Well, after we saw them, then we got ready and took off to the races and were usually out there by 5:00, and then we stayed at the races and stuff till about 10:30. Sometimes 11:00 is when we usually got home, put the kids to bed, and went to bed ourselves because we had to get up early in the morning.

Q. Let me ask you this. When you got home from the races, it would have been around what hour?

A. Between 10:30 and 11.

Q. Would you have had any reason at all to observe your neighbors over at the Duncans' at that hour?

A. No.

Q. And do you even recall doing so at all?

A. No.

Q. That was the end of your Sunday.

A. That was the end of our Sunday, yes.

Q. What happened the next day, Mrs. Asbe?

A. Just went to work.

Q. Did you have any conversations with your daughter Brittany the following day?

A. I did, and she said she had called up to Amber's house and there was no answer, and so the recording came over the answering machine with her voice on it asking if Amber could come over and play. And, of course, she didn't have any answer.

Q. Brittany just left a message asking if Amber could come

over?

A. Right.

Q. Did you ever see any member of the Duncan household again?

A. No.

Q. Was Brittany worried about her friend?

A. She was very worried.

Q. For how long?

MR. ROGERS: Objection, Your Honor. Calls for hearsay, and that's irrelevant.

MR. MILLER: I'll withdraw the question.

THE COURT: I'll sustain the relevancy objection.

BY MR. MILLER:

Q. You never saw any member of the Duncan household again.

A. No.

MR. MILLER: With the Court's permission, I'd like to publish Exhibit 720.

THE COURT: 720?

MR. MILLER: 720.

THE COURT: You may.

BY MR. MILLER:

Q. Does the garment pictured in Exhibit 720 look at all familiar to you, Mrs. Asbe?

A. Yes.

Q. How so?

A. It looks like Kandi's outfit that she wore once in a while.

469

MR. MILLER: And with the Court's permission, I'd like to publish Exhibit 804.

THE COURT: You may.

MR. MILLER: Can you rotate that?

BY MR. MILLER:

Q. Does the garment pictured in Government Exhibit 804 look at all familiar to you? Hold on a second. We're trying to rotate that. There we go. Does that look familiar to you, Mrs. Asbe?

A. Yes.

Q. And how so?

A. That was a swimsuit that Amber wore once in a while.

Q. You're sure of that.

A. Yes.

Q. And how so?

A. I'd seen it on her a few times.

Q. Do you remember that little polka dotted bathing suit?

A. I do.

MR. MILLER: Thank you. I have no further direct.

THE COURT: Mr. Rogers?

MR. ROGERS: No questions, Your Honor. Thank you.

THE COURT: Thank you. You may step down.

Is the government ready to call its next witness?

MR. MILLER: Yes, sir.

THE COURT: You may.

MR. MILLER: United States calls Cindy Hicok.

470

CINDY HICOK, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box there. Make yourself comfortable. Please try and adjust the chair and the microphones so you can speak directly into the microphone. It'd be helpful if you could pull your chair, scoot it up a little bit. I know it's not easy to do. Thank you.

Would you state your full name, please, and spell your

last name.

THE WITNESS: Cynthia Ann Hicok. Last name's spelled H-i-c-o-k.

THE COURT: Thank you.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Good afternoon, ma'am. My name's Tom Miller. I'm a prosecutor for the federal government, and I and possibly one of the attorneys for Mr. Honken just have a few questions for you this afternoon; okay?

A. Yes, sir.

Q. Okay. And you've never been a witness before?

A. No.

Q. Okay. Let me just explain a couple things to you. We need for you to answer out loud as opposed to just shaking -- we all do that a lot, shake our heads and nod.

A. I'm very nervous.

Q. Okay. And I appreciate that as well. Please understand that. Water is there for you. And I don't expect this will take very long, and we'll bear with you if you need to take a break.

Where do you live, Miss Hicok?

A. Emporia, Kansas.

Q. How long have you lived in Emporia?

A. Approximately two years.

Q. And what do you do down there?

A. I work at a beef packing plant.

Q. Where did you live before moving to Emporia?

A. Mason City, Iowa.

Q. And how long did you live there, ma'am?

A. Since 1987 to 2002 I believe.

Q. And that's not your -- not where you grew up, though.

A. No.

Q. What town did you grow up in?

A. Osage, Iowa.

Q. Did you go to school there?

A. Yes, sir.

Q. While you went to school there, did you ever become acquainted with anyone by the name of Greg Nicholson?

A. Yes, sir.

Q. How did you know Mr. Nicholson?

♀

472

A. His first wife was my good friend, still is, and Greg and her were boyfriend and girlfriend all the years, and then they -- he was in a band with a boyfriend of mine at that time.

Q. So you knew him back from Osage days?

A. Yes.

Q. When you moved to Mason City in '87 as I recall?

A. Uh-huh.

Q. Did you maintain your acquaintance with Mr. Nicholson?

A. Yes. My husband and I bought a house across the street from Greg.

Q. What street was that on if you recall?

A. North Filmore.

Q. And being neighbors did you maintain contact with him then?

A. Yes.

Q. That would have been during what years if you recall?

A. From '87 till his disappearance.
Q. And can you describe the nature of your acquaintance with Mr. Nicholson anything more than just what you've described? Somebody you'd known all your life?
A. Yes, all the years since seventh grade at least.
Q. Considered him a friend?
A. Yes.
Q. Did you ever become acquainted with an individual by the name of Dustin Honken?
A. I had seen him once, twice that I remember, but I never had

spoken with him.
Q. Where did you see him?
A. At Greg's.
Q. And I realize you may not be able to give us specific dates, but can you tell us approximately when? And if not, that's fine. I just want to know what you can tell us.
A. No, I really couldn't tell -- say the year.
Q. Where at Greg Nicholson's did you --
A. Pardon?
Q. Where at Mr. Nicholson's house did you see --
A. In the basement.
Q. And were these on any particular occasions that you can recall?
A. No.
Q. Other persons present?
A. His wife at that time.
Q. Nicholson's wife?
A. Leslie.
Q. Did you ever become acquainted with an individual by the

name of Lori Duncan?
A. Yes.
Q. When and under what circumstances did you become acquainted with Mrs. Duncan?
A. We worked together, and we carpooled. One week she would drive. Next week I would drive to work.

♀

Q. Take your time, and that water is there for you. We simply need to visit with you for just a couple minutes more, Mrs. Hicok.
Where did you work?
A. Northwood, Fieldstone Cabinetry.
Q. Northwood's about how far from Mason City if you recall?
A. About 35-minute drive north.
Q. Was anybody else in that carpool or just the two of you?
A. Just me and Lori.
Q. What days of the week did you work?
A. Monday through Friday.
Q. What hours?
A. Sometimes we'd start at 6 or 7. It usually was 7 to 3:30.
Q. If you're going to be at work at seven o'clock, when did you two ordinarily leave Mason City?
A. Around 6, 6, 6:30. We'd go in, and we'd have coffee before we'd go on the floor.
Q. Tell us just a little bit about Fieldstone. What sort of work went on there?
A. It was a kitchen cabinetry place. We worked with spray guns finishing cabinets.
Q. For about what period of time did you and Lori Duncan carpool back and forth between Mason City and Northwood?

A. Months before her disappearance.
Q. And can you tell us approximately when this was?

A. Oh, I don't recall the exact time of year.
Q. Was that right up until her disappearance, ma'am?
A. Yes.
Q. You indicated that you alternated weeks on driving up there?
A. Yes.
Q. Was there ever any problem on punctuality with either of you?
A. No. Every morning she'd be ready. I would honk. I'd pull up, and she'd come out. Usually I didn't even have to honk because of the children in the house, you know; didn't want to wake them up. The neighbor lady, Phyllis, next door, she would watch the girls.
Q. Mrs. Hicok, Monday morning, the 26th of July, you've been questioned about that day a number of times; is that correct?
A. Yes.
Q. You remember that morning?
A. Yes.
Q. Tell us about that morning.
A. I went to pick her up. She didn't come out, so I knocked on her door. She didn't answer the door. It was getting late. I thought, well, I'm not going to be late to work. I figured she'd just wake up and go to work late. Well, I knocked, and she didn't come out, so I just went to work without her.
Q. Did you ever see her again?

A. No.
Q. At that point in time, Mrs. Hicok, to your knowledge did Lori Duncan have any sort of a relationship with Greg Nicholson?
A. Yes, she did.
Q. And how'd you happen to know that?
A. Because I introduced her to him.
Q. Approximately when?
A. A couple weeks or so before the disappearance.

MR. MILLER: Thank you, ma'am. I have no further direct.

MR. ROGERS: No questions, Your Honor.

Thank you, ma'am.

THE COURT: Thank you. You're excused.

THE WITNESS: Thank you.

THE COURT: Why don't we take our afternoon recess. We'll be in recess until 2:45. Thank you.

(The jury exited the courtroom.)

THE COURT: Counsel, any matters we need to take up?

MR. PARRISH: No, Your Honor.

MR. MILLER: Just -- Your Honor, just as a matter of scheduling, we have five more witnesses subpoenaed and present and ready to testify. I think I found my rhythm, and it's a quick one. I'm fearful we might not fill the afternoon. On the other hand, we very well may.

THE COURT: We'll just go as far as you have. That's

♀

477

fine. Jury's going to appreciate getting out early any day that happens, so don't worry about it.

MR. WILLIAMS: Thank you.

(Recess at 2:17 p.m.)

THE COURT: Ready for the jury?

MR. MILLER: Yes, sir.

MR. PARRISH: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Ready to call your next witness?

MR. MILLER: Yes, Your Honor. United States calls Marge Milbrath.

MARGE MILBRATH, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. Thank you. Can you pull that chair up as close as you can get, adjust the microphones, and when you're ready, could you state your full name, please, and spell your last name.

THE WITNESS: Marge M. Milbrath, M-i-l-b-r-a-t-h.

THE COURT: Okay. Thank you.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Mrs. Milbrath, you're doing just fine so far, but please be sure to keep close to that microphone; okay?

♀

478

A. Okay.

Q. You live in Mason City, ma'am.

A. Yes, I do.

Q. Have for about how long?

A. Forty-some years.

Q. Your occupation?

A. I'm a photo imager.

Q. Where do you work?

A. I work at Metalcraft.

Q. How long have you been doing that?

A. I've been there 25 years.

Q. What hours do you work there?

A. Most of the time it's 7:30 to 4 winter hours, and then we have summer hours. Just changes a half hour from 7 to 3:30.

Q. That's full-time employment there?

A. Yes, it is.

Q. They give you a watch when you hit 25 years there?

A. I get some diamonds.

Q. Really. What's your address there in Mason City?

A. 714 North Van Buren.

Q. And how long have you lived there at that particular address?

A. We've lived at that address for 43 years.

Q. And when you say we, who are you referring to?

A. My husband and I.

479

Q. Your husband's name is?

A. David.

Q. Did you and David raise a family there at that residence?

A. Yes, we did.

Q. And tell us about that.

A. We had three children. Our first one was Lori, and then we had Robert and Mary.

Q. Are you able to give me birth dates on those kids?

A. Lori was born November 22, 1961. Robert was born on May 31, 1963, and Mary was born on February 16, 1966.

Q. They bless you with some grandchildren?

A. Yes, they did.

Q. How many?
A. We had five beautiful grandchildren.
Q. And can you tell me who they are?
A. We had -- Lori had two girls, Kandi and Amber. Robert has a boy, Brock, and Mary has two children, Brad and Jada.
Q. What are their ages, Brad and Jacob (sic) and Brock?
A. Brad is 18, Brock is 14 I believe, and Jada is 9.
Q. And what's Brad doing this year as an 18-year-old? Is he still in high school?
A. He's still in high school and working.
Q. This is his senior year?
A. Yes, it is.
Q. Just a little more background about your first child, Lori.

♀

480

You folks lived on Van Buren when Lori was born?
A. No. We lived in an apartment on North Federal when Lori was born.
Q. How old was Lori when you moved to that residence?
A. She was three months.
Q. And you folks have lived there ever since.
A. Ever since.
Q. I take it she went through school there in Mason City?
A. Yes, she did.
Q. Graduated?
A. Yes, she did.
Q. What'd she do after graduation?
A. She worked just several odd jobs and then joined the service.
Q. What branch?
A. Navy.

Q. She serve out her tour?
A. Pardon?
Q. Did she serve out her tour of duty with the Navy?
A. Yes, she did.
Q. Did anything happen as far as her family relationship, her personal situation while she was in the Navy?
A. I'm not sure what you mean.
Q. Did she fall in love when she was in the Navy, meet a guy?
A. Apparently she met a guy in the service at some time or

♀

another.
Q. And who was that?
A. And that was Jay Duncan.
Q. They became married.
A. They were married.
Q. And had how many -- those two children you've already told us about.
A. They had two. The first one was born in Texas.
Q. Tell us again the names and the birth dates of the two children that your daughter Lori had.
A. Kandi was born on June 10, 1983, and she would be 21 I guess about now if my figures are right. And Amber was born July 16, 1987.
Q. How long did the marriage between your daughter and Mr. Duncan last?
A. I'm not sure how long it was. Amber was born, and she was still just a baby when they were divorced.
Q. Where were they living at that time?
A. Des Moines.
Q. At the time of separation, Lori returned to Mason City?

A. Yes, she did.
Q. And remained there after the divorce?
A. Yes, she did.
Q. Where did your daughter and her two little girls move to in Mason City when she returned to Mason City?

♀

A. They moved to 619 North Van Buren, just down the street from me.
Q. You mentioned you live on the 700 block of Van Buren, 714. Exactly where is 714 in relation to 619?
A. Oh, it'd be just like up the street half a block and across the street.
Q. Lori and her two daughters returned to Mason City approximately what year if you recall?
A. It would have been about 1990 I suppose it was, maybe a little -- maybe earlier than that.
Q. What did she do to support herself and her family?
A. She worked for Fieldstone Cabinetry.
Q. Any other members of your family work there?
A. Both my other kids Lori -- or Mary and Robert worked there also.
Q. Just a little bit about Mr. Duncan, what is Lori's ex-husband's situation physically?
A. Physically he is -- has meningitis and is paralyzed from the waist down and is unable to work.
Q. And mental, is there mental impairment as well?
A. And he has a mental problem. He can't remember what's going on.
Q. And was there a cause of this serious health problem?
A. The cause was he was being a good volunteer and helping

Des Moines during a flood and got a disease from the water.

Q. And he's been both physically and mentally disabled since then?
A. Ever since.
Q. That was the famous '93 floods, I take it.
A. Somewhere around there I believe it was, yeah.
Q. Returning to Lori and her schedule, she worked at Fieldstone there from around 1990 until the time of her disappearance?
A. Right.
Q. Full time?
A. Right.
Q. Were you acquainted with what her schedule was?
A. She normally worked -- I believe their hours were 7 to 3:30.
Q. Five days a week?
A. Five days a week.
Q. Who handled child care when she was working?
A. She had a next-door neighbor that would come over and see that they got up and dressed and ready to go to school, and then after school and they'd come home, she would watch them.
Q. Is that next-door neighbor, that child care person, still around?
A. No, she's not.
Q. Why not?
A. She passed away.

Q. Her name was?
A. Phyllis Proscovec.
Q. And she's now deceased?
A. She -- pardon?
Q. She is now deceased.
A. Yes.
Q. Mrs. Milbrath, I want to visit with you a little bit about the summer of 1993, that last summer.
A. Uh-huh.
Q. You remember that summer, I assume.
A. Yes, I do.
Q. In the weeks preceding the disappearance of your daughter and granddaughters, was there any change to your knowledge in your daughter's situation as far as who was living in the household?
A. Well, we had noticed that she had a friend that came over.
Q. A male friend.
A. A male friend. I didn't think much of it.
Q. She was a grown woman.
A. Grown woman.
Q. Had children. But was there any concern about the particular male friend that she had?
A. Well, after we had found out who he was, we asked her not to see him anymore.
Q. Now, when you say we, who are you talking about?
♀
485

A. My husband and I.
Q. And who actually had the conversation?
A. I did.
Q. Okay. Now, speaking for us men, we'll put it on the woman

to have that chat I suppose. Is that the case?
A. Yeah.
Q. And your daughter was a grown woman at that time.
A. Yes, she was.
Q. Why would you take it upon yourself to have a conversation with a grown daughter about the company she was keeping?
A. Because I had heard that Greg Nicholson was into drugs, and I'm very much against it, and so was she, and so I decided to just kind of make her aware of that situation and to think twice about getting involved with him.
Q. Approximately when was this?
A. This was probably about a week or two before she disappeared.
Q. How did she take your input?
A. Well, she told me that she was old enough to take care of herself and she knew what she was doing.
Q. She feel that she was -- did she make any comment to you about Mr. Nicholson in his defense?
A. She told me that -- well, I had told her first that she needed to just forget about him, and she told me that he was -- seemed to be a very nice person and was going through a drug

♀

486

rehabilitation and that he was okay.
Q. Her claim to you was that he was straightening himself out.
A. Right.
Q. Mrs. Milbrath, do you remember the weekend of the 24th and 25th of July, 1993?
A. Yes, I do.
Q. Tell us about that weekend. Were you home that weekend?
A. Yes, we were. I happened to see Lori. I didn't talk to

her. I just happened to see her on a Sunday afternoon step out on her porch at the same time when I was out in the front yard or something, and she just hollered up, Hi, Mom, and waved.

Q. Any other contact that weekend that you had?

A. I had no other contact with her.

Q. How about with the grandchildren, Lori and -- or excuse me, Kandi and Amber, if you recall?

A. I really didn't see them over the weekend.

Q. Now, that was a summer weekend. School was out.

A. (Witness nodded head.)

Q. I take it they'd spend most of the time outside playing with their friends.

A. Yeah, I might have seen them riding their bikes or something like that, but they didn't come over.

Q. Was it unusual for them to come over, however?

A. No, it wasn't unusual for them to come over being as I lived up the street, and Amber liked to talk so . . .

487

Q. She was the chatty one of the two.

A. She was a chatter box.

Q. What was the difference between her and Kandi in that regard?

A. Well, Amber would tell you anything you wanted to know, and Kandi was real quiet.

Q. What was Kandi's situation that summer as far as school?

A. Kandi had an awful lot of difficulty at school not because she didn't know her school work, but emotionally I believe it was hard on her. She was very close to her dad, and so she just kind of -- I think she would have rather have been with him than up here. She was bored, nobody to play with.

Q. And where was she in school?
A. You mean grade?
Q. Yes.
A. She would have been 4th grade.
Q. And Amber, had Amber started school?
A. She had done kindergarten is all.
Q. She was looking forward to being a first grader?
A. She was looking forward to being a first grader.
Q. And was she really looking forward to it?
A. Uh-huh.
Q. Do you recall whether or not you noticed them outside playing that weekend at all?
A. Not really because at that time there was quite a few kids

488

in the neighborhood, so we had lots of kids running up and down the street.
Q. You may or may not have.
A. Right.
Q. But you do recall exchanging greetings with your daughter.
A. Right.
Q. Hi, Mom.

I want to talk about Monday, the 26th. Do you remember that day?
A. Yes, I do.
Q. That a workday for you, Mrs. Milbrath?
A. Yes, it was.
Q. I believe you mentioned your hours.
A. In the summer they were 7 to 3:30.
Q. 7 to 3:30.
A. Uh-huh.

Q. So you would be on your way to work before seven o'clock in the morning.
A. Right.
Q. Does your route to work or did your route to work take you past your daughter's residence there on Van Buren?
A. Every day.
Q. At about what hour?
A. I would leave probably about ten minutes to seven.
Q. And on the morning of Monday, July 26, did you happen to

489

make any observations as you passed your daughter's house?
A. Yes, I did. On the way to work, I noticed that there were vehicles parked and curtains and stuff all drawn in the house, and I thought that was very unusual.
Q. Why was it unusual that the curtains --
A. Because she would have left for work way before me, and she always was a bright and bubbly person, so she had her curtains and stuff opened right away in the mornings.
Q. She liked that sunshine in her house?
A. She did.
Q. You made that observation but I assume continued on to work.
A. I went on to work, yes.
Q. Do you take a lunch break where you work?
A. Yes, I do.
Q. What do you ordinarily do for your lunch break?
A. I come home.
Q. Did you on that day Monday, the 26th of July, 1993?
A. Yes, I did.
Q. Did you on your way home that day pass your daughter's

house?
A. Yes, I did.
Q. And did you happen on your way home at lunch hour make any observations?
A. Yes, I did. I noticed that it was still all closed up, and

I thought -- I went home, and I told David, I said, It seems funny. I said, Lori hasn't gone to work yet, and the house is still closed up, or else they're sleeping in late and she had a day off. I didn't think any more of it, and I went back to work.
Q. Got off work at 3:30 that day?
A. Yes, I did.
Q. What'd you do after you got off work?
A. I came home, passed Lori's house again, and it was still all closed up, no sign of anybody around. Made me nervous, so I come home, and I told my husband, I said, We need to go down and check out the house because there's something wrong. It's still closed up.
Q. Did you do that?
A. Yes, we did.
Q. Please describe that.
A. We went down, and I realized that I couldn't get in the front door. So I went next door to see if Phyllis had a key which she didn't. So we got ahold of the landlord to come and open the house for us. And when we went to -- we tried the front door which he didn't have a key to for some reason. But we went to the back door, and the back door was open. We didn't try it when we were there the first time.
Q. Okay. When you say open, do you mean it was simply

unlocked?

A. It was simply unlocked.
Q. But it was actually closed?
A. It was not closed tight. It was closed so it looked like it was closed tight.
Q. But it wasn't actually --
A. It wasn't closed tight to where you could lock it.
MR. MILLER: Your Honor, with the Court's permission, I'd like to publish Government's Exhibits 46A through E at this time.
THE COURT: You may.
MR. WILLIAMS: Your Honor, if you can . . .
BY MR. MILLER:
Q. Mrs. Milbrath, on the monitor in front of you is a photograph that's marked Government Exhibit 46A. Would you tell us if you recognize it what it shows.
A. Yes, that's where my daughter lived.
Q. That's Lori's house?
A. That is Lori's house, yes.
Q. And at the -- on the afternoon of the 26th of July, 1993, were there any vehicles parked to your observation and recollection on the driveway?
A. Yes, there was.
Q. Describe that.
A. There was a truck which was Greg Nicholson's in the driveway, and Lori's car was out in front.

Q. Okay. Now, there should be a small white pen. I don't

know if that's in front of you. If you use that -- and before you do anything, just let me explain to you. If you draw a little -- any kind of a diagram, a square or rectangle or what have you, on that screen, it will show up, and the jury can see what you're trying to point out. Would you be able to use that to show us where Mr. Nicholson's pickup truck was when you saw it there that afternoon?

A. Mr. Nicholson's truck was sitting right up in here.

Q. How close to that garage was it?

A. It was -- well, actually it was close enough up here so if they wanted to bring something out they could load it right in the truck.

Q. It was right up close to that garage?

A. Right up close to the garage.

Q. Moving on to Exhibit 46B, what does 46B show, Mrs. Milbrath?

A. This is the back door to Lori's house.

Q. The one that you said was open?

A. The one that was open.

Q. And again, I want to be very clear about that. Sometimes I use the term open to mean that it's simply unlocked. What was the exact situation of the door as you --

A. This -- when we opened this door right here, the door on the inside was just brought to closing but not closed. You

couldn't see through the crack, but it was right up close.

Q. It was not only unlocked but not even fully latched closed.

A. No.

Q. Thank you. Please, Exhibit 46C. And what does 46C show?

A. This is Lori's garage and part of her backyard.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 434 of 3636

Q. And is that the garage that you've described Mr. Nicholson's pickup as being parked right up close to?
A. Yes, it is.
Q. Okay. 46D. Looking now at Government Exhibit 46D, what does that show?
A. This is the front of Lori's house.
Q. And finally 46E, showing that to yourself and the jury at this time, that yellow house on the left I take it is Lori's home?
A. Yes, this is Lori's house.
Q. Were there -- well, let me ask you this. Greg Nicholson had a pickup truck?
A. Yes.
Q. You've already described where you saw that up by the garage. Were there any other vehicles in this residence?
A. Yes. Lori's vehicle was pulled out here and parked on the street.
Q. What kind of a vehicle did your daughter Lori have?
A. She had a Nova, a red Nova, but I'm not sure what year that was.

♀

494

Q. And did you note anything unusual about the location or position in which it was parked?
A. Yes. It looked like somebody had been in a hurry to get it out on the street because it was not parked in a straight -- straight along the curb.
Q. Go ahead and use that pen to show us to the best of your ability where it was.
A. When they parked it, they had parked it with the back end, you know, sticking out kind of like this. It just -- it might

have been turned in towards the curb just a little more, but it was backed out in a hurry with the back end up against the curb and the front towards the street.

Q. Okay. And as we're looking at it, the top of that red rectangle would be the back of your daughter's car.

A. This is the back end, yeah.

Q. Thank you. I'm going to clear that now. Exhibit 11, please.

MR. MILLER: Excuse me. With the Court's permission, I'd like to publish Exhibit 11 to the jury at this time.

THE COURT: You may.

BY MR. MILLER:

Q. And this is page 1 of Exhibit 11. Again, would you, using that marker, locate where Mr. Nicholson's pickup truck was?

A. Mr. Nicholson's pickup truck was parked right up in here.

Q. Would you just make a rectangle where it actually was

♀

located.

A. It just sat like this right up in there.

Q. Now, that's a long skinny pickup truck.

A. Yeah, a long skinny pickup truck.

Q. How close to the garage was it if you can give us any idea of distance?

A. Well, there was room to get around in front of the truck.

Q. You could walk --

A. It was probably back away from the garage door.

Q. But you could walk between the garage and the truck?

A. Yes, yes.

Q. And your daughter's car was located where?

A. Her car was out here on the street.

Q. And again, its position and location?
A. It would have been -- well, if my drawing is right, it would have been down here on the street, you know, with the back end -- they'd come out like this and then parked it in a really weird angle.
Q. Up against the curb.
A. Up against the curb.
Q. With the back wheels.
A. With the back wheels.
Q. Thank you, ma'am. Now, you've indicated that you and the landlord -- was it just the two of you?
A. At the time, yes.

♀

496

Q. Okay. You entered that home?
A. Yes, we did.
Q. By what entrance?
A. We went in by the back door.
Q. What'd you find when you entered?
A. I found Lori's house to be quite messy.
Q. Hold on a second. If we can refer to page 2 of Exhibit 11, does that at least help in describing the layout of your daughter Lori's house?
A. Yes. When you come in the back door -- oh, my fingers work. When you come in the back door into the kitchen, then you can come right through here which there was an open doorway this way from the kitchen right here into the dining room and --
Q. Did that go under the stairs?
A. It went right in front of the stairs.
Q. In front of the stairs.
A. Right in front of the stairs. And on the dining room -- or

in the dining room, she had her table all set like they had just eaten or getting ready to eat, and there was food that was left sitting there for hours it looked like. It was all dried up and quite messy.

Q. Again, continuing to use that floor plan, Exhibit 11, as an aid if it will help you, go ahead and describe for the jury what observations you made when you entered the home that afternoon.

A. Well, when I looked at the dining room, I was really

♀

shocked because Lori was a very, very good housekeeper, and she never left dishes or food sitting around. And we went and we looked around the house, and as we decided to go upstairs, there was a dog upstairs. And we didn't know that till we got upstairs, and he started barking at us and the --

Q. I apologize for interrupting, but did your daughter have a dog?

A. No, she did not.

Q. Whose dog was it?

A. It was Greg Nicholson's.

Q. Please go ahead and describe what you found.

A. She had -- her beds were all made. Nothing was messed up upstairs, so it was like they had never been there that night except for cooking something to eat.

Q. So you noticed a mess in the dining room.

A. Yeah.

Q. How about the kitchen?

A. The kitchen, of course, had food pans and stuff sitting around like she was maybe going to clean up or get ready to do dishes or something, but she hadn't made any attempt to do that.

Q. Any other observations in the lower area, in the living

room, for example?
A. No. The living room, she had two living rooms, and they were both fairly neat.
Q. Okay. Do we have another page showing the upstairs? No.

Very good. Did you go upstairs?
A. Yes, we did go upstairs, and that's when this dog started barking at us, and we weren't just sure if we wanted to get near the dog or not. And we managed to coax him down. He had been in the house I'm not sure how long, but he had pooped and peed all over the house.
Q. What size dog was that?
A. It was a small beagle I believe.
Q. Was it like Lori to leave dirty dishes lying around?
A. No, it wasn't.
Q. Did you make any observations as far as the beds upstairs?
A. We noticed that nothing had been disturbed on the bed. It looked like they had not slept in it.
Q. How much time did you spend in the house that day?
A. We didn't spend very long because after we noticed that something was wrong we decided to contact the police.
Q. Did you at any point ever notice any missing clothing?
A. No, we didn't.
Q. Did you happen to check the laundry?
A. The dryer was full of clothes that she had dried.
Q. And was that unusual?
A. Well, no, not for her because she didn't fold them up right away.
Q. You contacted authorities yet that day?
A. Yes, we did.

Q. Please describe that.
A. We went up to the police department and made out a missing person report.
Q. Did you ever see your daughter Lori or your granddaughters Kandi and Amber again?
A. No, we never did after that Sunday.

MR. MILLER: With the Court's permission, I'd like to publish Exhibit 35 at this time.

THE COURT: You may.

BY MR. MILLER:
Q. And Exhibit 35 which the jury is now looking at shows what, Mrs. Milbrath?
A. This is my daughter Lori.
Q. Maiden name Lori Milbrath.
A. Lori Milbrath.
Q. And that shows her in life at approximately when?
A. Well, this is down at her house in Des Moines before she moved up to Mason.
Q. But within --
A. Before '93, within that -- well, I can't say exactly on that one. I'm not sure when that was.
Q. Taken during the last years of her life.
A. Right, right.
Q. And that shows her as she appeared in life.

MR. MILLER: Thank you, ma'am. I have no further

questions.

THE COURT: Mr. Rogers?

MR. ROGERS: No questions, Your Honor.

Thank you, ma'am.

THE COURT: Thank you. You may step down.

THE WITNESS: Thank you.

THE COURT: Is the government ready to call its next witness?

MR. MILLER: Yes, Your Honor. United States calls Paul Bush.

THE COURT: You giving Mr. Williams the day off?

MR. MILLER: Yes. He's been working hard.

PAUL BUSH, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Make yourself comfortable. Please adjust the chair and the microphone so you can speak directly into the microphones. I'm going to ask you to scoot that chair up a little bit. And when you're settled in and ready, would you state your full name, please, and spell your last name.

THE WITNESS: My name is Paul J. Bush, spelled B-u-s-h.

THE COURT: Thank you.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

501

BY MR. MILLER:

Q. Good afternoon, Mr. Bush. Your occupation, sir?

A. My occupation is a criminalist for the Iowa Division of Criminal Investigation in the state crime laboratory.

Q. And what, sir, is a criminalist?

A. My job as a criminalist involves the collection and preservation of physical evidence in criminal cases, the analysis of that evidence, the writing of reports as to those results, and finally the testifying in court as to those results.

Q. Your education, sir?

A. My formal education consists of a bachelor of science degree with double majors in chemistry and biology from Morningside College. With that I also possess a teaching certificate and coaching endorsements. I also possess a master of arts degree in biology from Drake University. That master's degree was a thesis program in the area of forensic DNA analysis.

Q. Please summarize your professional experience and employment for the jury if you would, Mr. Bush.

A. My professional experience includes 22 years of work at the DCI crime laboratory specifically in the serology and DNA sections of the laboratory. I have also attended numerous courses throughout the country in the area of blood stain analysis, forensic serology, DNA analysis all from the FBI

502

academy in Quantico, Virginia, also from the FBI academy course work in hairs and fiber analysis, course work in forensic microscopy from the McCrone Institute in Chicago, course work in blood spatter interpretation from the Minnesota Bureau of Criminal Apprehension, and numerous courses in the area of DNA analysis from Applied Biosystems, Cellmark Corporation, Promega Corporation, and numerous other places throughout the United States.

Q. Now, your area of expertise is in DNA and serology and

hairs and fibers.

A. Yes, that's correct.

Q. Are there other areas of expertise within the state crime laboratory?

A. Yes, there is.

Q. If you could just give us a minute or so of description of that facility, what kind of work goes on there, sir.

A. The state crime laboratory is a full-service laboratory that provides physical evidence processing for the whole state of Iowa. Sections in the laboratory would include DNA, latent print examination, documents and handwriting examination, alcohol examination, firearms and tool mark examination, arson examination, trace evidence examination, drug analysis, and toxicology analysis. And then as a side part there also is crime scene processing that is done by the whole laboratory.

Q. That was my next question. That is an additional duty of

♀

503

yours in addition to the DNA and other laboratory work that you do?

A. Yes, that's correct.

Q. Tell us a little bit about how that's organized and what sort of -- what sort of work goes on in the field of crime scene processing in your laboratory.

A. Crime scene processing is done at the request of local law enforcement agencies. Typically our crime laboratory will send out a two-person team from the laboratory. Our job is specifically to collect and document physical evidence at crime scenes. So typically we are going out to the local sheriffs' departments or police departments throughout the state to assist them in the collection of physical evidence at the crime scenes.

Again, we have two-person teams that will go out and document this through photography, note taking, sketching, and then also the evidence collection.
Q. And does the laboratory restrict its endeavors in this regard to any particular kinds of crime scenes?
A. Again, it typically has to be a criminal-type case, so any death investigation, sexual assault, those types of cases. Again, it is at the request of local law enforcement or any law enforcement agency in the state.
Q. And typically would it be fair to say it's serious crimes of violence?
A. Typically it is serious crimes such as death

investigations.
Q. Typically are your crime scenes doing so in response to a crime that is reported immediately after its occurrence?
A. Typically, yes, we are called out usually very shortly after a crime has occurred or has been reported.
Q. Okay. Do you have any limit on how much time you'd respond to, though?
A. Could you be more specific?
Q. Well, if you aren't called within 24 hours, does that mean you don't respond?
A. Excuse me?
Q. You'd respond if somebody was calling you a full day or a full week later?
A. Yes.
Q. Did you do any crime scene processing work in connection with the Lori Duncan, Kandi Duncan, and Amber Duncan disappearance investigation, Mr. Bush?

A. Yes.
Q. And when did you do this work?
A. That was done in March of the year 2000.
Q. And when was it that you were requested to do such work?
A. I was requested in the middle of March that there would be some processing involved in this case. I actually proceeded to the processing on March 28.
Q. Okay. So you'd been requested to and did do the work in March of 2000.

505

A. Yes, that's correct.
Q. This isn't a case of you being requested to do something in 1993 and not getting around to it until the year 2000.
A. No. I was not informed until March of 2000.
Q. And specifically a DCI agent, Agent Basler in this case, asked that you do some work in Mason City?
A. Yes, that's correct.
Q. And what did he ask you to do?
A. I was requested to process a house for the presence of blood specifically looking at two bedrooms and a living room area in a house.
Q. And where was this house, sir?
A. This house was at 619 North Van Buren in Mason City.
Q. Please describe for the jury what you did when you got to Mason City to do this work.
A. Once I arrived in Mason City, I went to the state patrol or DCI regional office in Mason City, met with Special Agent Basler, two other agents from the Division of Narcotics Enforcement, and was informed at that time where I was to proceed for the processing of this house.

Q. And were you informed at that time or actually some time earlier that this was an investigation of a 1993 disappearance?
A. I was informed prior to this time that this case was related to a 1993 case.

Q. Now, Mr. Bush, just educate us just a little bit. Is it possible for physical evidence of a crime to persist over a matter of years?
A. Yes. Again, physical evidence can remain at crime scenes, you know, indefinitely. It may go away in short times. It just depends upon what has happened to that physical evidence, whether it be environmental activity or someone actually moving or changing the crime scene as to how long that physical evidence will last.
Q. I take it delay is not ideal.
A. No. Again, the best situation would be as soon as possible to collect physical evidence in criminal cases.
Q. Nevertheless, even years later, if you don't look, you won't find.
A. That's correct.
Q. So you agreed to look.
A. Yes.
Q. After the briefing, please describe for the jury what it is you did that day in March of 2000.
A. Again, on March 28 of 2000, I then proceeded to the residence. This was approximately 11 a.m. that I arrived at 619 North Van Buren and proceeded into a residence which was a two-story yellow framed house.
Q. And did you conduct a crime scene investigation in that house?

A. Yes.
Q. Please describe what you did.
A. Upon entering, I began upstairs looking at the two bedrooms, and also there was a bathroom up there and specifically was looking for the presence of blood on the carpets or in the bathroom area.
Q. What, if any, findings did you make?
A. As far as findings, there were two bedrooms upstairs. The northern bedroom, I looked both on the top side of the carpet. I flipped that carpet upside down, looked, did not find any blood there. I looked in the bathroom around the fixtures, on the floor areas, did not find any blood there.
There was also a southern bedroom in there. I noted one small stain in the corner of the southern bedroom that did screen positive for the presence of blood. However, I was not able to confirm anything more besides that.
Q. Okay. When you mention screening positive, I take it you were using some tests more sophisticated than just looking with your eyes.
A. That's correct. Again, when I went to this crime scene or as you would go to any crime scene, when you are looking for stains, typically you're going to visually look for any stains that would appear to be blood. After that I have -- had with me two chemical reagents that I use that allow me to screen for the presence of blood. They're color tests that will change color

♀

508

and give me an indication as to whether or not blood is present if I find some, say, reddish brown stain. And in this case I

brought these reagents with me to screen possible stains for the presence of blood.

Q. In the upstairs of that residence you found one stain that screened positive for blood?

A. Yes, that's correct.

Q. And please describe any further testing and any results with regard to that stain.

A. As far as that stain was concerned, I cut some of the tufts of carpet fibers from that stain, took them back to the laboratory, and attempted DNA analysis on that. Typically once you do the visual stain, you would then do a screening test which I did, in fact, do at the scene, and then we attempt to do a confirmatory test to determine whether or not there is actually human blood present or human DNA present. If, in fact, human DNA is present, then we will attempt to do DNA analysis on that. In this case my testing in an attempt to determine if human DNA was present was negative.

Q. No human blood there.

A. That's correct. At least I was not able to confirm that.

Q. Does that complete the search and the findings of the upstairs?

A. Yes.

Q. How about the downstairs, sir?

♀

509

A. As far as the downstairs is concerned, there was kind of a two-part living room downstairs with kind of a brown textured carpet in it. We chose then to remove this carpet from the residence. It was basically rolled up, put in a truck, and then hauled to another area where I could lay this carpet out in a large open area and attempt to check it at that point in time

for blood.

Q. And what findings, if any, did you arrive at?

A. As far as the large piece of carpet was concerned, I took it. I did blood screening tests on both the back side and the top side of the carpet. I found no blood present on it.

Q. So results in a search for human blood throughout this house at 619 North Van Buren were negative.

A. That's correct.

Q. That took you about how many hours that day if you can tell us?

A. I arrived in Mason City at 10 a.m. that morning. I was completed by about 3 p.m. that afternoon.

Q. Okay. And again, that was March of 2000?

A. Yes. Again, that was March 28 of 2000.

MR. MILLER: Thank you, sir. No further questions.

THE COURT: Mr. Spies?

MR. SPIES: Thank you.

CROSS-EXAMINATION

BY MR. SPIES:

♀

510

Q. Hello, Mr. Bush.

A. Hello.

Q. Mr. Bush, you've explained for the ladies and gentlemen of the jury a little bit about what a criminalist does and specifically what you've done in your 22 years as a criminalist?

A. Yes.

Q. I'd like you to just walk through again with us briefly, when people encounter one another, that is, brush up against one another, have physical contact with another, trace evidence can be exchanged from one person to another; right?

A. Yes, that's correct.
Q. And I think you've explained to us that trace evidence could include hairs?
A. Yes.
Q. Some people lose hairs more readily than others?
A. Yes, that's correct.
Q. Could include fibers for clothing?
A. Yes.
Q. It could include material that might be on the person's hands?
A. Yes.
Q. In addition, if you go to a crime scene to look for physical evidence, you could also look for fingerprints that we're all familiar with?
A. Yes.

♀

511

Q. Shoe impressions or debris from shoes?
A. Yes.
Q. You could also look for contact, say, fractures or tool marks that might be left from the contact of a hard object against a softer object?
A. Yes.
Q. And you would typically find that in cases of burglary where you might find pry marks or tool marks on a doorway?
A. Yes. That again is one type of evidence you may find at a burglary.
Q. Okay. And there are other things such as lip impressions or lip marks that might be made on a glass?
A. Yes, that's a possibility.
Q. Those are all sorts of things that one might look for at a

crime scene.
A. Yes, again depending on the specific crime scene.
Q. Okay. Now, you've told us that in March of 2000 you went to the address of 619 North Van Buren in Mason City. Is that the first and only time that you were at that address looking for the types of evidence we've talked about this afternoon?
A. Again, that was the only time I was there at that residence. The only type of evidence that I was looking for at that scene was blood.
MR. SPIES: Thank you. No other questions.
THE COURT: Mr. Miller, anything further for Mr. Bush?

512

MR. MILLER: Yes, if I may briefly.

REDIRECT EXAMINATION

BY MR. MILLER:
Q. Mr. Bush, I just want to be sure we have an understanding of the full potential for your field. There's been much publicity about the area of crime scene investigation in recent years. Fair statement?
A. Yes.
Q. Even at a fairly fresh crime scene, one to which you would respond within hours, is it at all unusual to be unsuccessful in developing physical evidence of any value to the investigation?
A. It's not unusual. Again, it just depends upon the circumstances of the case and the time frame involved as to when the crime scene team gets there.
Q. And the circumstances of the crime.
A. Yes.
Q. And even in a fairly fresh crime scene, it's not unusual to look, though you may fail to find any physical evidence of any

evidentiary value.

A. Yes.

Q. Much less years later.

A. That's correct.

MR. MILLER: I have no further redirect, Your Honor.

THE COURT: Mr. Spies, any recross?

MR. SPIES: Nothing else, Your Honor. Thank you.

♀

513

THE COURT: You may step down, Mr. Bush.

Members of the jury, why don't you take a stretch break.

And is the government ready to call its next witness?

MR. MILLER: Yes, Your Honor. The government calls JoAnn DeGeus.

JOANN DEGEUS, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. Ma'am, can you adjust the chair and scoot up a little bit so you can speak directly into the microphones? And would you state your full name, please, and spell your last name.

THE WITNESS: JoAnn DeGeus, D-e-G-e-u-s.

THE COURT: Thank you.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Mrs. DeGeus, you're doing just fine so far, but I'm afraid we're going to lose you if you don't get just as close as you can. Good job. Good job. There we go.

It's pronounced DeGeus.

A. Right.

Q. Where do you live, ma'am?
A. Britt.
Q. We've already heard that Britt's a small town of a couple

thousand souls about 40 minutes west of Mason City?
A. Right.
Q. Hancock County?
A. Right.
Q. Do you live in town?
A. No, we live in the country.
Q. When you say we, who are you referring to?
A. My husband and I.
Q. Who's your husband?
A. Ed DeGeus.
Q. Tell us a little bit about Ed DeGeus. What's he do for a living?
A. He has a construction company, Cats, backhoes.
Q. Pardon me?
A. Cats and backhoes.
Q. Does a lot of excavation work?
A. Right.
Q. How many years has Ed been doing that kind of work?
A. Probably 20.
Q. How much equipment does he have?
A. Well, he has a couple of Cats, a big backhoe, blade, five trucks, three of them -- four of them dump trucks, one to carry the heavy equipment with.
Q. That's a fair amount of equipment. Who operates all that equipment?

A. My husband.
Q. Anybody work with him?
A. Oh, our son did.
Q. Terry?
A. Right.
Q. Currently it's just Dad.
A. Right.
Q. Any other children of this marriage besides Terry?
A. Four other ones, two girls and two boys.
Q. What are their names?
A. Ronda, then Jeff, then Terry and Brenda and Brian.
Q. I want to visit with you a little bit about your son Terry. What year was he born?
A. November 19, 1960.
Q. He grew up there on that place out in the country near Britt?
A. Well, I think we lived south of Britt at the time.
Q. Did you ever live in Britt?
A. No, we've always lived in the country. Well, years ago we lived in Mason City.
Q. How many years ago was that?
A. I don't know. The kids were all really little.
Q. So basically your children grew up in the Britt community.
A. Right.
Q. Went to school there?

♀

516

A. Right.
Q. Did Terry graduate high school there?

A. Right, 1980.
Q. What'd he do after high school?
A. I think he started working for his dad.
Q. They work --
A. But then sometimes he quit and went and worked somewhere else so . . .
Q. So it was off and on with your dad?
A. Right.
Q. Excuse me, with his dad.
A. Yeah.
Q. I apologize. But just the two of them.
A. Right.
Q. How'd they get along?
A. Fairly good. They both had disagreements.
Q. Terry a good worker?
A. Terry was a very good worker.
Q. He worked hard for his dad.
A. Yes, he did.
Q. And I take it your husband Ed would demand as much.
A. Probably.
Q. What was your son's marital history? Did he have any marriages?
A. He was married in 1982 to Wendy Jensen, and then he had a

♀

517

daughter Ashley by her that was born in '82, September of '82.
Q. Ashley was born in September of '82.
A. Right.
Q. And that was the only child born of that marriage.
A. Right.
Q. How long did your son remain married to Wendy?

A. I don't really know.

Q. They divorced at some point.

A. Yes.

Q. Did Wendy and Ashley remain in the Britt area?

A. No. They moved over by Corwith. At first they lived up by Woden. Then they moved up by Corwith.

Q. Okay. Now, you're going to have to tell us a little bit, where's Corwith?

A. South and west of Britt about 15 miles.

Q. So they're still in the same neighborhood.

A. Right.

Q. Still there in Hancock County?

A. Right.

Q. After his divorce from Ashley's mom, did your son Terry DeGeus continue to maintain a relationship with his daughter Ashley?

A. Yes, a very good one.

Q. Describe that.

A. He had her almost every weekend. Very few weekends was he

518

without her.

Q. He didn't just have her every other weekend.

A. No.

Q. Every single weekend.

A. Just almost every weekend. Well, there was a few once in a while but pretty much catered to his daughter.

Q. Okay. But the rule was weekends were with Dad.

A. Right.

Q. How close were they, your granddaughter Ashley and your son Terry?

A.    Real close.
Q.    What sort of things did they do together?
A.    Everything and anything, whatever -- mainly whatever Ash wanted to do.
Q.    Where did your son Terry live at this time?
A.    He lived right across the field from us a mile across over on the blacktop.
Q.    Out in the country near your home?
A.    Right.
Q.    Can you describe his residence?
A.    It was just an acreage.
Q.    Did he have a phone out there?
A.    No.
Q.    How did he call folks?
A.    I really don't know.  Come over to my house or probably

♀

519

went to town.
Q.    On occasion he'd use your phone?
A.    Yes, he did.
Q.    Mrs. DeGeus, I want to visit with you a little bit about the -- about the fall of 1993, summer and fall.  Do you remember that year?
A.    Yes.
Q.    Did you notice any change in your son Terry's demeanor?
A.    Well, it was like in July, the last of July, the first of August he was really upset because his friend Greg disappeared, and he was more upset about two little girls that disappeared and couldn't find them anywhere.
Q.    Did he continue to express concern about this?
A.    Yes, he did.

Q. What was his mood like through the fall of 1993?
A. Really upset.
Q. Was he concerned at all about his own welfare to your observation?
A. No.
Q. Did he ask you or express any concerns about a situation that he had legally?
A. Well, he come home there for a while and kept asking me if he got a subpoena or not, and I told him no, and I says, Besides, Terry, it won't come to my house; it will go to your house.

520

Q. He did, however, express concern about getting subpoenaed?
A. Right.
Q. When was this if you recall?
A. Probably back in July. It was right along in there after he couldn't find his friends anymore.
Q. I don't want you guessing about any dates or anything. Just to the extent you can, I want you to do the best you can to tell me what you recall. But leading up to the time of your son's disappearance, what was his mood, his demeanor?
A. He was just plain upset.
Q. He was worried?
A. Worried.
Q. Mrs. DeGeus, we've talked a little bit about the relationship your son had with Wendy Jensen. After their divorce, did they get along okay at least as far as sharing --
A. Yes.
Q. -- sharing that time with that child?
A. I believe they remained friends.

Q. There was another woman in his life. Well, there may have been I don't know how many, but one in particular let's talk about. Her name is Angela Johnson. Do you remember Angela Johnson?
A. Yes.
Q. Describe your son's relationship with Angela Johnson as you understood it.

♀

A. Well, it was kind of like he was really in love with her, and she told him that if he would get a divorce then she would marry him, but then he got his divorce, and she went and lived with Dustin Honken.
Q. He had an emotional attachment to Angela Johnson.
A. Yes.
Q. You could see it was a strong one.
A. Right.
Q. I assume the two of them spent time together when they weren't in your company.
A. Yes.
Q. But at least from what you saw of it, would it be fair to say that he was obsessed with that woman?
A. Yes.
Q. Mrs. DeGeus, I want to visit with you about the last day you saw your son. Do you remember that day?
A. Yes.
Q. Do you remember what the date was?
A. November 5, 1993.
Q. Do you recall what day of the week that was, ma'am?
A. Friday.
Q. And how do you recall it was a Friday?

A. I went and got Ash from school because it was the weekend.
Q. And Ash would be spending her weekend with her dad.
A. Right.

♀

522

Q. That day what was your son doing during the day if you know?
A. Pardon?
Q. Your son Terry, what was he doing that day if you know?
A. Working with his dad.
Q. Did you yourself have any contact with Angela Johnson that day?
A. Yes. She called -- she called that Friday and told me to have Terry call her, and I -- when Terry come home from work, I told him.
Q. About what hour was that? When would he get back?
A. I don't really remember what time it was. I just know him and Ash left, and then later he come back and brought Ash back to me because he said he was going to go meet Angela.
MR. ROGERS: Objection, Your Honor. Excuse me. Objection, Your Honor. Hearsay and confrontation.
THE COURT: Sustained.
BY MR. MILLER:
Q. Let me just go through it one step at a time with you if I can.
A. Okay.
Q. About what hour of the day was it that Angela Johnson called your home?
A. I don't recall the time.
Q. But it was while your son was still at work.

♀

523

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 460 of 3636

A. Right.
Q. Now, this was the first week of November, November 5, 1993.
A. Right.
Q. Did your husband and your son work past dark ordinarily?
A. No. It varied sometimes, but usually 5, 5:30 they come home.
Q. And had you already collected Ashley by then?
A. Yes.
Q. And she was with you at your residence?
A. Right.
Q. I just want to go through this one step at a time. You saw Terry at your residence. He stopped to pick up Ashley?
A. Right.
Q. You informed him of the call that you'd had from Ashley -- or excuse me, from Angela Johnson?
A. From Angela, right.
Q. And that was a request from Angela for him to do what?
A. To call him.
Q. To call her?
A. Yes. Sorry.
Q. Did he do that while you were there?
A. I didn't notice if he used my phone or not.
Q. Very good. You mentioned that he left.
A. Pardon?
Q. You mentioned that he left.

524

A. Yes, he took Ash and went home.
Q. About how much later was it that you next saw your son?
A. I don't really recall the time, but I think it must have

been like around eight o'clock.

Q. That Friday evening.

A. Right. He brought Ash back to me.

Q. And did he state to you what he intended to do that evening?

A. Yes.

Q. And what did he say to you?

A. He told me he was going to go over to Mason City and meet Angela at the country --

MR. ROGERS: Objection, Your Honor.

Q. Hold on. Hold on.

MR. ROGERS: Hearsay, confrontation.

THE COURT: I think you're relying on 804(6); correct?

MR. MILLER: I believe it's both 804(b)(6) and statement of intent, yes.

THE COURT: Yes, subject of my prior ruling. Objection's overruled.

BY MR. MILLER:

Q. Please go ahead and describe what your son told you.

A. He told me he was going to go over and meet Angela at her place of work in Mason City which was the country club. He told me I didn't have to put Ash to bed because he wouldn't be gone

525

very long.

Q. Did he then leave?

A. Yes.

Q. And Ashley remained there at your house with you?

A. Right.

Q. Please go ahead and describe that evening for us, please.

A. Well, when he didn't come back and I couldn't get Ash to go

to sleep because she knew her dad did what he always told her he was going to do, but finally I must have eventually got her to sleep. Then we got through the night, and I was worried because I wondered -- usually he does what he tells me he's going to do. And then the next morning we got up, and he wasn't home yet.

Q. He never came back to pick up Ashley all through the night?

A. No. And so then I called Angela.

Q. Hold on just a second. You go ahead. You made a phone call to Angela?

A. Yes.

Q. That Saturday?

A. Right.

Q. Please describe that.

MR. ROGERS: Objection, Your Honor. Objection, Your Honor. Hearsay and confrontation as to what Angela said.

THE COURT: Well, what exception are you relying on?

MR. MILLER: 802(d)(1)(C), Your Honor.

THE COURT: 801(d)(2)(E)?

♀

526

MR. MILLER: (d)(2)(E), I'm sorry. Co-conspirator.

THE COURT: Okay. Objection's overruled. You may answer.

BY MR. MILLER:

Q. What did Angela Johnson -- describe your conversation with Angela Johnson.

A. So then I called Angela and asked her if Terry was there, and she told me no, he wasn't there and she hadn't seen him.

Q. She claimed she had not seen him that previous night?

A. Right.

MR. MILLER: With the Court's permission, I'd like to

publish Exhibit 38 for the jury at this time.

THE COURT: You may.

BY MR. MILLER:

Q. Look at the monitor in front of you. That's Government Exhibit 38. Do you recognize that, Mrs. DeGeus?

A. Yes, that's my son.

Q. That's your son Terry DeGeus as he appeared in life?

A. Right.

Q. After he left Ashley with you saying that he was going to go visit Angela Johnson, did you ever again see him in life?

A. No, I did not.

MR. MILLER: Thank you. I have no further direct.

THE COURT: Mr. Rogers?

MR. ROGERS: Thank you, Your Honor.

527

CROSS-EXAMINATION

BY MR. ROGERS:

Q. Ma'am, how old was your granddaughter Angela -- or excuse me, Ashley when your son Terry divorced her mother Wendy?

A. I suppose she probably -- I'm not sure. I'd say around eight.

Q. So that would have been -- let me ask you this. What grade was she in when you picked her up from school that night in November of 1993?

A. I believe she was like in third grade.

Q. So her parents would have been divorced well over a year by then; right?

A. Right.

Q. Is that right?

A. Right.

Q. Okay. Maybe two?
A. I really don't remember what year they got their divorce.
Q. And they got their divorce because your son Terry had fallen in love with Angela Johnson?
A. Yes.
Q. And Angela Johnson according to what you were told had led him to believe that if he would divorce Wendy she would marry him.
A. Right.
Q. And to your knowledge did Terry ever ask Angela to marry him?

528

A. Yes.
Q. And when would that have been?
A. Pardon?
Q. When would that have been?
A. I don't remember that either. Let's see. His divorce I think went through like in '89, and right after that.
Q. So that would have been sometime in '89 or 1990?
A. Probably.
Q. Some three years before your son disappeared.
A. Right.
Q. And Angela never married him.
A. No, not that I know of.
Q. Okay. Now I want to go forward some three or four years to the summer of 1993. Where did Terry live then?
A. A mile across the section from us over on the blacktop.
Q. Okay. Same place that he lived --
A. When he passed away.
Q. The day that he left Ashley at your house.

A. Right.
Q. Was that also the same place he lived back in March of 1993?
A. Right.
Q. And you remember something happening there in March of 1993 at the house where he lived.

♀

A. I don't -- no.
Q. Remember the stand-off with the police?
A. Oh, yeah, that's -- I heard somebody testify to that.
Q. Okay. And you remember it happening when it happened. You knew it was going on, didn't you?
A. I didn't hear about it for quite a while.
Q. Your own son is involved with a stand-off with the police, and you didn't hear about it for --
A. Nobody said nothing.
Q. And when did you hear about it?
A. I don't really remember.
Q. It wasn't here in court this week, though. You heard about it long before that, didn't you?
A. Yes.
Q. Okay. Now, between the time that that incident with the police happened and the end of that summer when Ashley went back to school, would Angela Johnson call your house quite a bit looking for Terry?
A. Yes.
Q. Maybe every day or so?
A. Almost every day. It never ended. She called every day even though they'd tell me they was supposed to have been split up.

Q. To your knowledge was Terry still seeing Angela at least off and on?

A. I don't have no idea.
Q. But she'd call for him a lot.
A. Right.
Q. Okay. Did she ever come to your house?
A. Yes.
Q. How frequently would she do that?
A. I believe I only seen her once or twice.
Q. Was that with Terry?
A. Yes.
Q. Would he bring her --
A. Yes.
Q. -- home for dinner and things like that?
A. No. Just some days because I'd babysit for her daughter Alyssa and Ash, and they'd come together and dropped them off.
Q. And what general time frame was that? Was that during the summer of 1993? Was it before that? Was it after that?
A. I think it was before that because it seems like to me in '93 is when they really weren't -- I mean, I didn't think they were seeing each other anymore.
Q. But she was still calling every day.
A. Right.
Q. And so she didn't -- you didn't see them together at your house that summer as far as you can remember?
A. No.
Q. Now, you've mentioned Terry being upset because some

friends of his had disappeared; is that right?
A. Right.
Q. Did he ever tell you the names of those friends?
A. Yes.
Q. And what were those names?
A. Well, I'd heard him talk about Craig (sic) before.
Q. You'd heard him talk about Greg before?
A. Right.
Q. And had he put a last name with that?
A. I don't believe so.
Q. Just somebody named Greg.
A. (Witness nodded head.)
Q. Had you ever met this Greg?
A. No.
Q. Do you know how long Terry had known Greg?
A. Pardon?
Q. Do you know how long Terry had known Greg?
A. No, I don't. All I knew is learned about Craig is when Terry couldn't find him.
Q. And Terry was looking for Greg at some point?
A. Right.
Q. And that was some time during the summer of 1993?
A. Right.
Q. Did he tell you that that's who he was looking for?
A. Well, he just -- when he come home, he just says to me,

532

Mom, my friend, he's just disappeared. I don't know where he went. I can't find him anywhere.
Q. So he led you to believe that Greg was somebody that he saw

on a regular basis and that had just somehow disappeared? Is that what you believed?
A. That's the way I took it, yes.
MR. ROGERS: Those are all the questions I have, Your Honor.
THE COURT: Mr. Miller, any redirect?
MR. MILLER: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. MILLER:
Q. Just a couple matters, Mrs. DeGeus. Terry's concern about the disappearance of Greg Nicholson, I think you've indicated that was in the late summer and fall of 1993?
A. Right. No, it was like in July or something like that.
Q. Okay. What's your best recollection about when that was?
A. July.
Q. Okay. Now, it became common knowledge around your area that Nicholson and the Duncan family had disappeared at some point; right?
A. No. All I did was hear that from Terry.
Q. About the disappearance of all four of those people?
A. Right. He didn't say they disappeared. He just says he couldn't find them.

♀

Q. All four of them.
A. All four of them.
Q. Mrs. DeGeus, if your son was conducting drug transactions with Angela Johnson or anyone else for that matter, I assume he wouldn't share that information with his mother.
A. No, I had no idea he was doing that.
MR. MILLER: Thank you. I have no further cross --

redirect.

THE COURT: Mr. Rogers, any recross?

MR. ROGERS: No, Your Honor. Thank you.

THE COURT: You may step down. Thank you.

Mr. Miller, ready to call your next witness?

MR. MILLER: Yes, Your Honor. We call Ashley DeGeus.

ASHLEY DEGEUS, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. Make yourself comfortable. And can you pull up the chair so you can speak directly into the microphones? And when you're ready, would you please state your full name and spell your last name.

THE WITNESS: I'm Ashley DeGeus, last name D-e-G-e-u-s.

THE COURT: Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Your age, Miss DeGeus?

534

A. Twenty-one.

Q. Can you give us your date of birth?

A. 9-2 of '83.

Q. And just a couple things about your situation. Are you currently working?

A. Yes, I am.

Q. Full time?

A. Yes.

Q. What sort of work?

A. I work -- I'm one of the assistant managers at Claire's Boutique in Des Moines.

Q. Your parents are whom? Your parents?
A. Wendy Jensen and Terry DeGeus.
Q. They divorced when you were a youngster.
A. When I -- what was that?
Q. They divorced when you were about how old?
A. I was five, six.
Q. And we've already heard a little bit about it, but I'd like to hear in your own words a description of your relationship with your father, Terry DeGeus, after your parents divorced.
A. I was there every weekend. My dad and me were very, very close.
Q. What sort of things did you do?
A. Like my grandmother said, almost anything I wanted to do. I was always with him. He'd take me out to eat. He always paid

535

a lot of attention to me on the weekends.
Q. Did he ever do any work on weekends?
A. Sometimes, sometimes a little bit on Saturdays I think.
Q. Did he leave you alone when he went off to do work?
A. No. He would take me to my grandmother's.
Q. That continued until you were how old?
A. I just turned ten.
Q. And for those years following your parents' separation, you spent just about every weekend with your dad.
A. Yes.
Q. Over those years did you become acquainted with a woman by the name of Angela Johnson?
A. Yes, I did.
Q. And how did you know Angela Johnson?
A. She was dating my father.

Q. How often would you see Angela Johnson?
A. For a while when my parents first divorced it was quite a bit.
Q. And what would be the circumstances?
A. We would go stay at her house.
Q. Who else was there besides your dad and yourself and Angela Johnson?
A. Her daughter Alyssa.
Q. How old was Alyssa compared to you?
A. I believe she was almost a year older than me.

536

Q. Fairly close in age, enough to have some similar interests I assume.
A. Yes.
Q. How would you two get along?
A. We got along okay.
Q. Found yourself spending time together because your parents chose to spend some time together.
A. Yes.
Q. That went on for about how long?
A. I really don't remember. Probably a year, maybe more.
Q. Okay. And again, if you don't remember or know the answer, that's fine. I just want to know what you can tell us. It's okay to tell me if you don't remember. You were just a ten-year-old girl when your father disappeared. I understand that.

By the time that your father disappeared, was he still seeing Angela as far as going over and taking you over there on weekends?
A. I myself hadn't seen her. We hadn't gone and stayed with

her, but they did have contact.
Q. But as far as you going over and spending nights over with your dad over at Angela Johnson's, that had ceased.
A. True.
Q. Miss DeGeus, I want to visit with you just a little bit about that last day with your dad. Do you remember that day?

537

A. Yes, I do.
Q. What did you do that day?
A. My grandma picked me up from school.
Q. Take your time. There's a little water there, and I don't want you to hurry. We just need to -- and this won't take very long, but there's a couple questions I need to ask you about this; okay?
A. And we went back to Grandma's, and when Dad came home from work, he picked me up.
Q. Picked you up at your grandma's.
A. (Witness nodded head.)
Q. And then what happened?
A. And then we -- I'm not sure what we did. And he ended up taking me back to Grandma's and telling me that he had to go see Angie.
Q. Did you -- let me ask you this. How'd you react to that?
A. It was unusual to me because I always -- when I was with Dad for the weekend, I was with Dad for the weekend unless he had to work.
Q. But on this occasion he was wanting to leave you with his mom.
A. True.
Q. And he told you that he was planning on doing what that

evening?
A. Going to talk to Angie.

Q. Did he tell you what he expected you to do that evening?
A. He told me that I didn't have to go to bed, I could wait up for him, and he would pick me up, and he told me if I happened to fall asleep that he would still pick me up and take me to his house.
Q. And was that something a ten-year-old girl wanted to know?
A. Yeah.
Q. Did he tell you when he expected to be home that night?
A. He told me he'd be there by midnight, no later.
Q. What did you do that evening after he left?
A. Sat up, watched TV, and waited for him.
Q. How late?
A. Till midnight.
Q. Then what'd you do?
A. I got my grandma.
Q. Let me go through this evening with you just a little bit. When you say you went to get your grandma, where was she?
A. In her bedroom I think.
Q. Okay. How about your grandpa Ed?
A. He was sleeping.
Q. When did your grandpa ordinarily go to bed?
A. 8:00, 8:30.
Q. Early to bed and early to rise guy.
A. Yep.
Q. What was his routine in the evenings?

A. Eat ice cream at eight o'clock.
Q. And then hit the sack?
A. Yep.
Q. So he'd been in bed for several hours already.
A. Yes.
Q. And your grandma was in bed, but you were still up waiting for your dad?
A. Yes.
Q. Go ahead and tell us what happened.
A. Grandma told me not to worry and to get some sleep and he'd be there.
Q. Did you get to sleep?
A. I eventually did, but I believe I got up early.
Q. Why?
A. Probably rest -- I don't know. Grandpa was up.
Q. Were you concerned about your father?
A. Yes.
Q. Why?
A. Because it was unlike him to leave me there.
Q. Anything like that ever happen before?
A. No.
Q. What'd you do that next day?
A. Me and my grandma went to Clear Lake, Mason City to look for him.
Q. Any luck?

♀

540

A. No.
Q. Ever see your father again?
A. No.
Q. Did you ever make any effort to try to find out what he did

that evening?

A. Yeah, I called Angie Johnson's house.

Q. Did you -- well, go ahead and tell us about that.

A. Alyssa answered the phone, and Angie answered the phone at the same time. And Angie yelled at Alyssa and told her to get off the phone.

MR. ROGERS: Objection, Your Honor. Hearsay as to what Angie said, hearsay and confrontation.

THE COURT: Are you relying on 801 (d)(2)(E)?

MR. MILLER: Yes, we are, Your Honor.

THE COURT: Okay. The objection's overruled. You may answer.

A. Angie told Alyssa to get off the phone, not to talk to me.

Q. Is that unusual?

A. Yes.

Q. Go ahead. Please continue.

A. I asked Angie where Dad was and if she'd seen him, and she said that he never showed up there and that she hadn't seen him.

Q. That's what Angela Johnson told you when you called her.

A. Yes.

MR. MILLER: Thank you. I have no further direct.

541

THE COURT: Mr. Rogers?

MR. ROGERS: No questions, Your Honor.

Thank you, ma'am.

THE COURT: Thank you. You may step down.

Mr. Miller, do you have another short witness, or do you want to stop for the day?

MR. MILLER: I believe we could get through one more brief one.

THE COURT: That'd be fine. Thank you.

MR. MILLER: We'd call Wendy Jensen to the stand.

WENDY JENSEN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. Try and adjust that chair so you can speak directly into the microphones. Can you scoot it up a little bit more, please? It's hard, I know. Thank you. Would you state your full name, please, and spell your last name.

THE WITNESS: Wendy Sue Jensen, J-e-n-s-e-n.

THE COURT: Thank you.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Good afternoon.

A. Hi.

Q. Ms. Jensen, you grew up in the Hancock County area?

♀

A. Yes.

Q. Are you a Britt native, or are you a Corwithian?

A. No, I'm from Woden.

Q. What's the --

A. Woden.

Q. Woden? Okay. We heard about Corwith and Britt. Where's Woden?

A. Northwest of Britt.

Q. That still in Hancock County?

A. Yes.

Q. When did you first get acquainted with Terry DeGeus?

A. The May of my sophomore year of high school.

Q. You developed a romantic relationship with the man?
A. Yes.
Q. Got married and had a child together.
A. Yeah.
Q. And that's Ashley, and we've heard from her. This marriage lasted about how long, Mrs. Jensen?
A. Seven years.
Q. And the cause of the breakup was what?
A. He left me for Angie Johnson.
Q. We visited about this at some length already, so I don't want to get into too much detail, but after your divorce from Mr. DeGeus, were you nevertheless able to accommodate one another with regard to time spent with your daughter Ashley?

♀

543

A. Yes.
Q. And describe that briefly for us if you would.
A. I would say like after the first couple months, then he had her every weekend.
Q. That was something they both enjoyed.
A. Yes.
Q. And that continued throughout the years until his disappearance.
A. Right.
Q. Did Terry DeGeus -- well, let me ask you this. The weekend that your ex-husband disappeared, was that a regular weekend as far as him expected to have custody of Ashley that weekend?
A. He pretty much had her every weekend. There wasn't really anything set in paper.
Q. So that would be normal for him to have her that weekend.
A. Right.

Q. Did you actually ever have to deliver the child, or did her father or grandparents pick her up from school?
A. Once in a while we met halfway like if she was in -- I'd take her to Wesley, and he'd pick her up at Wesley.
Q. When did you next see your daughter Ashley?
A. After the 5th?
Q. After Friday evening, the 5th of November, 1993.
A. JoAnn brought her home on Sunday.
Q. What was Ashley's condition?

544

A. She was very, very upset. She was worried that her dad didn't have any shelter.
Q. Did she describe for you the circumstances under which she'd last seen her dad?
A. Yes.
Q. And did you do anything or take any steps, ma'am, to try to find your ex-husband, to find your child's father?
A. The following Friday I called Angie at her house.
Q. When?
A. The following Friday.
Q. And did you manage to contact her?
A. Yes.
Q. Describe that conversation.
A. I called her up --
MR. SPIES: I'm going to object on hearsay grounds and on Mr. Honken's right of confrontation.
MR. MILLER: Again, 801(d)(2)(E), Your Honor.
THE COURT: Thank you. Objection's overruled. You may answer.
A. I called her up and asked her what she had done to Terry.

Q. Go ahead. Please just describe the full conversation if you would, please.
A. And she said she hadn't seen him at all, and I told her that Ashley said that that's where he was going the previous Friday, and then she said he had stopped by her work for a

♀

little bit but then went on to Mason City to see other friends.
Q. So when she first told you that he did not show up, you didn't accept that answer.
A. No.
Q. You pressed her.
A. Right.
Q. And she changed her story.
A. Yes.
Q. And what did she finally say or claim to you?
A. That she stopped -- he stopped by her work for a little while but then went on to Mason City to other friends'.

MR. MILLER: Thank you, ma'am. I have no further direct.

THE COURT: Mr. Spies?

MR. SPIES: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SPIES:

Q. Ms. Jensen, my name's Leon Spies. I have just a couple of questions for you.

Ms. Jensen, you said -- and perhaps you were in the courtroom when your former mother-in-law, Mrs. DeGeus, testified as you've said that Terry DeGeus left you for Angela Johnson?
A. Right.
Q. And this would have been in about 1989?

A. July of 1989.

Q. All right. And you and Terry DeGeus were divorced in 1991?
A. No. October '90.
Q. All right. Would you agree with your former mother-in-law that Terry DeGeus wanted to marry Angela?
A. Yes, I know he did.
Q. And even after you and he separated and divorced, he continued to confide in you about his feelings for Angela?
A. In the beginning he did.
Q. Excuse me?
A. Yes, he did sometimes.
Q. Okay. And would you agree that he'd lamented or felt sad about losing Angie?
A. I think -- well, everybody feels sad when they lose somebody.
Q. Pardon me?
A. Everybody feels sad when they lose somebody.
Q. Sure. But would you agree that he was obsessed with her?
A. I don't know that he was obsessed.
Q. He continued to call her frequently, or did he tell you about calling her frequently?
A. No. Terry didn't have a phone.
Q. Okay. Tell us about Mr. DeGeus's -- about Terry DeGeus's cars or vehicles there in November of 1993. What kind of vehicles did he have?
A. I think he was driving his Grandfather DeGeus's car, but I

don't remember for sure.

Q. Did he also have a pickup truck?

A. I don't remember.

Q. Or do you remember a pickup truck with a topper that he drove?

A. I remember that his father had one, but I don't remember that he had one.

Q. All right. Was Mr. DeGeus a physically powerful man?

A. Yes, he was strong.

MR. SPIES: Thank you. Those are all the questions I have.

THE COURT: Mr. Miller, anything further?

MR. MILLER: No, Your Honor.

THE COURT: Thank you. You may step down.

Members of the jury, that will conclude the evidence for today. Please remember my prior cautionary instruction. Keep an open mind until you've heard all of the evidence in the case; had a chance to receive my final instructions; hear the closing arguments of the lawyers; most importantly, go back into the jury room, see all the evidence that's been admitted, and start your deliberations. We'll start tomorrow morning at 8:30. So we'll see you all at 8:30. Thank you.

(The jury exited the courtroom.)

THE COURT: Counsel, any matters we need to take up? Mr. Williams?

548

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: No, Your Honor. Thanks.

THE COURT: Okay. We'll see you tomorrow morning, our usual start time, meet with the lawyers at 8:15. If there's

anything that arises between now and 8:15, come get me earlier; okay?

MR. WILLIAMS: Very good.

MR. PARRISH: Sounds good. Thanks.

THE COURT: Thank you. We'll be in recess.

(The foregoing trial was adjourned at 4:23 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR 11-9-04
Date

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| JEFFREY HONKEN | | |
| | MR. WILLIAMS | 276 |
| | MR. PARRISH | 310 |
| | MR. WILLIAMS | 351 |
| | MR. PARRISH | 353 |
| MELISSA FRIESENBORG | | |
| | MR. WILLIAMS | 355 |
| | MR. SPIES | 373 |
| | MR. WILLIAMS | 379 |

VOLUME 2 9-13-04 witness testimony

KEVIN PALS
MR. MILLER 380

CHRISTI GAUBATZ
MR. MILLER 387
MR. PARRISH 413
MR. MILLER 446
MR. PARRISH 451

LISA ASBE
MR. MILLER 455

CINDY HICOK
MR. MILLER 470

MARGE MILBRATH
MR. MILLER 477

PAUL BUSH
MR. MILLER 501
MR. SPIES 509
MR. MILLER 512

JOANN DEGEUS
MR. MILLER 513
MR. ROGERS 527
MR. MILLER 532

ASHLEY DEGEUS
MR. MILLER 533

WENDY JENSEN
MR. MILLER 541
MR. SPIES 545

♀

EXHIBITS:

42 383
43 385
1 392
44A and 44B 410

*****

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, Plaintiff, vs. DUSTIN LEE HONKEN, Defendant. /

No. CR01-3047
Sioux City, Iowa
September 14, 2004
8:19 a.m.

VOLUME 3

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
UNITED STATES DISTRICT JUDGE, and a jury.

♀

APPEARANCES:

For the Plaintiff:

C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant:

ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

(Proceedings reconvened outside the presence of the jury.)

THE COURT: I would like to go on the record. All the lawyers and the defendant are present. I did have an ex parte contact yesterday with a juror because I got a note, and I haven't put this one on the record yet. It came yesterday about mid day. Could you please shut the shades on the wall to your left up top, thank you, and didn't sign it any particular juror number. And you'll recall I went ahead and did that.

So anything else we need to take up this morning, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: No, Your Honor. Thank you.

MR. WILLIAMS: Your Honor, one matter did just come up, and I want to make sure we have a clear record on this. Part of your order of July 16 of this year concerned the admissibility of two books, if you will, that were seized from the defendant's house, Poor Man's James Bond which is Exhibit 80 and the Anarchist Cookbook which is Exhibit 70.

In our submissions, the government indicated we were only going to seek admission of what we believe to be the relevant portions of those books in this case. There's a whole series of cases actually dealing with these two publications in which they've held it reversible error for the court to admit

the entire books when only a portion of it's relevant because there's a number of things in these books. And you ordered in your order of July 16 that they're admissible as submitted.

The defense has had an opportunity to review these. They voiced an objection on the rule of completeness.

THE COURT: I saw that.

MR. WILLIAMS: They are now telling me they want the entire books in, and I want to make a clear record both of the defense counsel and the defendant that they've reviewed it, they've weighed the pros and cons, and it's their choice to have the entire books go in.

THE COURT: Let me ask you this: What have the courts said about why it was reversible error to put the whole book in?

MR. WILLIAMS: In a word, these are anarchist, anti-government, anti-law enforcement publications that the courts have deemed highly prejudicial because there's other portions of these books that talk about taking down the government, talk about creating explosives, talks about booby traps and all kinds of things that in particular cases have not been relevant. Some cases if it involved an explosive, only the portion dealing with explosives was admitted. Other portions were not. And because of the potential prejudice because of the anti-government slant to these publications and because of the other materials that are contained in them, they find them prejudicial.

555

THE COURT: Did you indicate what pages of the book you wanted to put in?

MR. WILLIAMS: We did, Your Honor. We actually -- our

copies of the exhibits that we gave both to the Court and to the defense only has those portions that we deemed appropriate. And in our written submissions we indicated what pages those are, and we actually attached those to our submission.

THE COURT: Okay. I just wanted to make sure the record is clear on that because the exhibit list is not.

MR. WILLIAMS: Right.

THE COURT: But the exhibit list isn't really part of the record either.

MR. WILLIAMS: That's correct, but we did make those -- we attached those as exhibits to our motion back in July.

THE COURT: You're talking about Exhibit 70, the Anarchist Cookbook, and Exhibit 80, the Poor Man's James Bond.

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: Okay. What's the defense position?

MR. SPIES: Mr. Williams is correct, Your Honor. We'd like the entire Exhibit 80 and the entire Exhibit 70 submitted in the interest of completeness. We believe it gives a more accurate portrayal of what the nature of those publications is, and we've discussed this with Mr. Honken, and he concurs.

THE COURT: Okay. Any other record?

556

MR. WILLIAMS: If we could just have Mr. Honken agree that that's been the disclosure.

THE COURT: Why don't you do that, Mr. Spies.

MR. SPIES: Mr. Honken, you just heard Mr. Williams indicating that we've -- and we represented to the Court that we'd like the entire Exhibits 80 and 70 submitted should they be offered by the government. Is that your wish as well?

THE DEFENDANT: Yes, it is.

THE COURT: Okay. Thank you.

Anything else we need to take up before we bring the jury in?

MR. WILLIAMS: No, Your Honor. Thank you.

MR. SPIES: No, Your Honor. Thank you.

THE COURT: Thank you.

(Recess at 8:24 a.m.)

THE COURT: Ready for the jury, Mr. Williams?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay.

Mr. Parrish, can we bring the jury in?

MR. PARRISH: Yes, Your Honor.

THE COURT: Okay. Thank you.

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated. Quite the thunderstorms last night, so glad to see everybody made it.

Mr. Williams, you may call your next witness, or

♀

557

Mr. Miller.

MR. MILLER: Thank you, Your Honor. The United States calls Brian DeGeus.

THE COURT: Thank you.

BRIAN DEGEUS, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. Make yourself comfortable, and please adjust that chair. Can you scoot it up a little bit more, please? Thank you. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: Brian Carl DeGeus. Last name

D-e-G-e-u-s.

THE COURT: Thank you.

Mr. Miller.

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Good morning, Mr. DeGeus.

A. Morning.

Q. Your age, sir?

A. Thirty-seven.

Q. You are the -- one of the children of Ed and JoAnn DeGeus of Britt, Iowa; is that correct?

A. That is correct.

Q. Your siblings' names, your brothers and sisters, who are

♀

they?

A. I have a sister Ronda Frances, a sister Brenda Stone, and brother Jeff DeGeus.

Q. Where do you live, Mr. DeGeus?

A. I live in Orlando, Florida.

Q. Your occupation, sir?

A. I do window screens.

Q. How long have you lived in Florida?

A. This will be 14 years.

Q. How often do you get back to Iowa, sir?

A. I try to get home for Christmas, but lately it's only been like every two years.

Q. Did you get home for Christmas in December of 1993?

A. Yes, sir, I did.

Q. And was there any other reason for being back here in Iowa

in addition to visiting family?
A. I believe that year I had a hernia operation that I did in Iowa City.
Q. After returning to Iowa, Mr. DeGeus, did you have any concerns in December of 1993 about the whereabouts of your brother Terry DeGeus?
A. Yes, I did.
Q. And did you do anything to try to investigate that matter?
A. I contacted Dustin Honken.
Q. How did you contact Mr. Honken?

559

A. By phone.
Q. And whom did you telephone?
A. To Dustin Honken.
Q. Okay. I'll ask you to scoot that chair up just a little closer to those microphones. Those mikes only pick up about five or six inches away at best.
A. All right.
Q. I know you're not shy, so be sure to speak up good and loud; okay?
A. All right.
Q. Where was it that you were able to contact Mr. Honken?
A. I think he was living in Clear Lake at the time.
Q. Okay. With whom?
A. Angie Johnson.
Q. When you reached him, what did you do, by phone?
A. I contacted him, and we agreed to meet at a Pizza Hut in Clear Lake.
Q. And did you, in fact, have that meeting at Pizza Hut in Clear Lake?

A. Yes, we did.
Q. This was when?
A. December of '93.
Q. What happened during that meeting, Mr. DeGeus?
A. We just talked about my brother Terry and his disappearance.

♀

Q. You wanted to know if Mr. Honken knew anything about that?
A. Yeah.
Q. Did you accuse him of knowing anything about that?
A. I asked him questions about it, yes.
Q. What did he tell you?
A. He just made a statement of that he had him doing some stuff down south for him in that manner.
Q. Dustin Honken claimed that he had your brother Terry DeGeus doing stuff for him down south?
A. I think that was the terminology, yeah.
Q. Any other explanation other than that?
A. No, sir.
Q. Anything else to that conversation that you can recall, sir, or is that the gist of what he told you?
A. That was the gist of what he said. He said he'd probably show up in a couple weeks.
Q. Do you recall what Mr. Honken's demeanor was, how he was acting?
A. I don't recall taking inventory of that time.
Q. How long have you known Dustin Honken?
A. I've known him since I was a kid.
Q. Grew up together?
A. Yeah, we grew up together.

Q. Did you -- well, let me ask you this. How long were you in Iowa that visit in '93?

A. That particular visit, I believe it was like -- I couldn't move for like two weeks because of the pain. I think I ended up staying here like five weeks.

Q. After your meeting with Mr. Honken at the Pizza Hut in Clear Lake, did you have any further contact with him while you were there?

A. I never had no further contact that I recall. I recall trying to get ahold of him, but I never got through.

Q. What effort did you make to get ahold of him after that first meeting?

A. I used the phone trying to call him and never got no answer from him.

Q. Who did you talk to?

A. I talked to Angie Johnson I think once for sure, possibly twice.

Q. Did she say that she would --

A. She said she would relay a message that I was wanting to talk to him again.

Q. But did he, in fact, ever return your calls?

A. No, sir.

Q. When did you get back here from Florida, Mr. DeGeus?

A. I got back last night.

Q. Okay. How are things down there in Florida?

A. Windy and rainy.

Q. Been that way for a few weeks now, hasn't it?

A. It's been bad down there, yes, sir.

Q. Now, Mr. DeGeus, just a little bit about your personal background. Just put it in plain terms, neither you nor your brother Terry was any angel. Fair statement?

A. Fair statement.

Q. Okay. Just tell us a little bit about your own background. Have you been in jail?

A. Yes, sir, I have.

Q. For what?

A. Stealing stuff when I was younger.

Q. As a juvenile?

A. As a juvenile, yes, sir.

Q. And then as an adult?

A. I got a D -- two DUIs.

Q. Mr. DeGeus, about your parents Ed and JoAnn, they spend all year in Iowa?

A. No, sir.

Q. What portion of the year do they spend elsewhere?

A. Usually every winter months, somewhere around -- every year varies a little bit, but usually around end of November -- once it gets cold where Dad can't work anymore, then he goes south to Arizona.

Q. And stay down in Arizona until about when?

A. Usually they always call when they leave down there about the 1st of April, somewhere in there, give or take a week

563

depending on the weather back here.

Q. So if something happened in their neighborhood in March, they wouldn't necessarily know about it right away?

A. No, they would have been in Arizona, so they wouldn't have been able to figure -- know that, no.

Q. Mr. DeGeus, the individual you met with in December 1993 who told you that your brother Terry was doing some things for him down south, is that person present here in the courtroom?

A. Yes, sir, he is.

Q. Would you point him out for us and describe him?

A. Dustin Honken. He's sitting right here.

MR. MILLER: Thank you. I have no further direct.

THE COURT: Mr. Parrish?

MR. PARRISH: Thank you, Your Honor. May it please the Court and counsel.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Good morning, Mr. DeGeus.

A. Good morning.

Q. My name is Alfredo Parrish, and I'm representing Mr. Honken.

Mr. Miller asked that you were no angel, and you told him that you had a couple of violations of DUI and a couple other matters. You had some other matters also, did you not?

A. Yes, sir.

564

Q. What were they?

A. Possession of drug paraphernalia.

Q. I'm sorry? I didn't hear that.

A. Possession of drug paraphernalia.

Q. What else?

A. Theft and burglaries.

Q. Okay. What else?

A. To my knowledge that's all.
Q. Nothing about cocaine?
A. No, sir.
Q. And never involved with resisting officers?
A. Excuse me?
Q. Never involved with resisting any officers?
A. I was charged with resisting arrest, but it was downgraded to just resisting a -- I think -- I can't remember what it got -- it didn't stick.
Q. Was that in Iowa or Florida?
A. That was in Florida.
Q. And when you said you were no angel, you're aware that one time you were listed as armed and dangerous?
A. No, sir, I was never aware of that.
Q. So you're denying that that ever happened?
A. I'm saying I don't have knowledge of that.
Q. You indicated you came up to the Mason City area, specifically Clear Lake, and you called Mr. Honken. How did you

565

get his telephone number?
A. I don't recall. I think my mother had it from Angie, from Terry calling Angie I would assume.
Q. And you indicated, did you not, that you were a little leery about meeting with Mr. Honken because -- and you wanted to meet him in a public place; is that accurate?
A. That is accurate, yes.
Q. Now, these charges that you had that Mr. Miller asked you about whether or not you were an angel on it, had these charges occurred before 1993 or after 1993 when you had this meeting with Mr. Honken?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 496 of 3636

A. Which charge are you referring to?
Q. About resisting officers.
A. I don't recall. I think it was -- I don't recall my criminal history day for day.
Q. Okay.
A. It was around that time I assume.
Q. So around the same time that you were charged with resisting officers would be about the same time you told the law enforcement that you wanted to meet with Mr. Honken in public because you were a little bit afraid of Mr. Honken; is that right?
A. Yes, sir.
Q. And were you?
A. Yes, I was.

566

Q. Okay. And when you met with him, it was at the Pizza Hut, and Mr. Honken came in, and you indicated to Mr. Miller that you didn't recall how he was acting. Do you recall in an earlier interview back in 1997 you said he was acting normal?
A. I never -- I just said I didn't take note of how he was acting. I didn't act -- he was talking to me just like you're talking to me.
Q. He was talking to you just like the two of us are talking; is that right?
A. In a similar manner, yeah. He was using his hands and stuff.
Q. Okay. And he sat down -- I'm sorry. Go ahead.
A. He was more aggressive I should say.
Q. And he sat down with you; is that right?
A. I believe when I got there he was already there, and I came

to his table and sat down if I recall right.
Q. Matter of fact, you talked for 20 to 30 minutes; is that right?
A. 15, 20, 25, somewhere in that area, yes.
Q. You asked him any questions you wanted to ask him; is that right?
A. That is correct.
Q. He answered all of your questions; is that right?
A. In a roundabout way, yeah.
Q. Matter of fact, he also asked you do you think he's the

♀

567

type person who would harm his (sic) brother; isn't that correct?
A. I don't recall that being said, no.
Q. Do you remember telling the law enforcement officials earlier that he asked you did you think he was the type person who would harm your brother? Remember telling them that back in 1997?
A. I made the statement that he's the type person that I was leery of going there because I thought he was capable of hurting my brother, yes.
Q. Well, no. I asked you did Mr. Honken ask you that question.
A. No, he did not. I don't recall that, no.
Q. So you're denying that he asked you that question? Is that your testimony?
A. You're asking me if Mr. Honken --
Q. Right.
A. No, I don't recall him asking me that question, if he could harm my brother. No, I don't recall that.

Q. Well, the whole context of this conversation was whether or not your brother had been harmed in any way; is that right? That was part of what you were investigating by calling Mr. Honken to come down to the Pizza Hut to meet with you. That's what you wanted to find out; is that right?
A. Correct.

♀

Q. And I'm saying during the course of that conversation, are you saying that the exchange, that particular exchange, between you and Mr. Honken never occurred?
A. I don't recall.
Q. Okay. If it occurred, you may have forgotten about it.
A. (Witness nodded head.)
Q. That's okay if you have.
A. That's fine.
Q. Okay. And after the conversation, did you both get up and walk out of the Pizza Hut?
A. I think, yeah, there's two doors, one on each side. I went out one side, and he went out the other.
Q. And that was the end of the conversation; is that correct?
A. Yes, sir.
Q. And you went back to Florida after that?
A. I went back home to my mom and dad's in Britt.
Q. All right. And did you ever -- and you stayed here for approximately how much longer? When I say here, I mean in Clear Lake or Mason City area.
A. After that -- there I was down to Iowa City and I had a hernia operation. That took a couple days.
Q. And did you ever come back any time after that?
A. Yes, sir.

Q. And you knew where Mr. Honken lived; is that right?
A. I can't recall if I've ever known exactly his house. I

just know he lived in Clear Lake, yes.
Q. All right. And you knew where he lived in Clear Lake; is that right?
A. Exactly?
Q. Well, you had a pretty good idea.
A. Pretty good idea, yeah.
Q. And would you agree that it would have been pretty easy if you couldn't get him on the phone considering you had this one meeting with him and he was still in the area, hadn't gone anywhere, you could have driven over to whatever house he was living at and sat and chatted with him just like you had chatted with him at Pizza Hut if you had wanted to?
A. I wouldn't know which house to go to.
Q. You think that would have been too difficult for you to find out had you wanted just to speak with him again and had not been able to get him on the telephone?
A. I ain't going to go knock on somebody's door I don't know and have somebody come to the door.
Q. Okay. But you do agree that the one time you got in touch with him, he met with you right away, and he sat there in a public restaurant and talked to you about your brother in detail.
A. That's correct.
MR. PARRISH: Okay. Thank you. Nothing further.
THE COURT: Mr. Miller, anything further?

MR. MILLER: No, Your Honor.

THE COURT: Thank you. You're excused.

Ready to call your next witness?

MR. WILLIAMS: Yes, Your Honor. United States calls Dan Cobeen.

DANIEL COBEEN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. And, Mr. Cobeen, would you please adjust the chair so you can scoot it up as much as you can so you can get as close to those microphones as possible? And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: My name is Daniel Ross Cobeen. Spell my last name you said?

THE COURT: Yeah.

THE WITNESS: C-o-b-e-e-n.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Cobeen, actually I want you to pull those microphones back a little bit closer. Unless they're about four or five inches away from you, they don't pick up anything.

A. It's coming back in my ears is all. I'm having a hard enough time right now.

571

Q. Let's just learn a little bit about your personal background, first of all. Mr. Cobeen, how old of a man are you, sir?

A. I think I'm 42.

Q.   And where are you from?

A.   I'm born and raised in Mason City, Iowa, and work in Clear Lake, Iowa.

Q.   How far did you go through school, sir?

A.   Well, I just went to boat mechanic school, got number one in class, so I'd have to say about 14 and a half years.

Q.   And graduated from high school.

A.   Finally, yeah.

Q.   Did you do some time in the military?

A.   Yes, I did.

Q.   In what branch?

A.   U.S. Army.

Q.   And how long were you in the Army?

A.   Three years.

Q.   And what rank did you achieve?

A.   E4.

Q.   Are you currently employed, sir?

A.   Yes.

Q.   And where do you work?

A.   My father owns Darrell's Marina Repair.  I'm a boat mechanic.

572

Q.   A boat mechanic.  Can you explain a little bit to the jury what do you do as a boat mechanic?

A.   My dad's marina, we try to do an all-around service for the people on Clear Lake.  We'll pick up their boat.  We'll deliver their boat.  We store their boat, and we service anything wrong with their boat.

Q.   How long you been doing that?

A.   I've been watching -- my dad had five boys.  I'm the only

mechanically gifted one I guess because I've been tearing things apart since I was a kid. Well, he always told me watch and learn, watch and learn, and I'll send you to school. He sent me to school, and I got better scores than anybody, including him.

Q. Are you married, sir?

A. Yes, I am.

Q. And do you have children?

A. Yes, I do.

Q. How many?

A. A son 5 years old, a daughter 12 1/2, and a daughter 15. Three.

Q. I want to talk to you a little bit about your background. First of all, you do have a criminal history.

A. Yes, I do.

Q. What have you been convicted of, sir?

A. Theft of 32 sheets of plywood and burglary on the same charge.

♀

573

Q. And explain that to the jury. They charge you with burglary for breaking into someplace to steal the plywood?

A. I guess. Sheriffs come by my house, and they had a warrant to look for the -- the warrant said electrical items and et cetera. Well, come to find out, they charged me with stealing 32 sheets of plywood with my Ford Escort hatchback. Sheriff come out and measured it. It was 47 inches. I couldn't fit them in it. If I had to put them on top of it, I would've broke the axle. So I couldn't afford a lawyer, so I didn't plead guilty. They took me to court. I lost, and I ended up in Beje Clark halfway facility.

Q. Very good. Is that the only criminal conviction you have,

sir?

A. Since I've been of age and adult. When I was a kid, no. When I was a kid I did everything. I was always in trouble.

Q. As a juvenile?

A. Exactly.

Q. All right. As an adult, that's the only conviction you have.

A. Yes.

Q. Was that a felony offense, sir?

A. They say they both were.

Q. Okay. And what did you get sentenced to?

A. Restitution of $500, 120 days in a halfway house for drug rehabilitation which I don't know what has to do with stealing

574

lumber, and then I also had to pay child support because I was away from my kids at the time.

Q. All right. And you indicated Beje Clark. Is that the halfway house?

A. Yes, that is.

Q. Located where?

A. In Mason City, Iowa.

Q. And about when was this that you were in the halfway house at Beje Clark?

A. From I think like December or somewhere at the end of '94 and going into the beginning of '95 I think.

Q. Now, part of the halfway house situation, did they have you on work release?

A. After being there two weeks, if you're not in there for alcoholism -- if you're in there for alcoholism, you got a different course. But if you're not in there for alcoholism,

after two weeks of being there and if you're clean, you can go out and find a job because you gotta pay rent while you're in there also. So I went to Manpower. It's like an express service facility. They find you jobs. And they got me a job.

Q. Where did they get you a job at, sir?

A. Kraft Foods.

Q. And that's located where?

A. In Mason City, Iowa.

Q. What'd you do at Kraft Foods?

♀

575

A. Pudding is packaged, pudding in these little cups. It's ran through the machine, and then they're put in six-packs, and then they're wrapped, and then they came to me, and that line of it was called case packing. I wrapped all them six-packs into one big case, and the machine I was on was a case packer.

Q. While you were there, did you meet somebody by the name of Dustin Honken?

A. He sat right beside me every day. He was in charge of me on the same machine.

Q. And this would have been in early 1995?

A. Yes, sir.

Q. When you met Mr. Honken, at some point I assume as with another coworker you would engage in conversation with him from time to time?

A. Every day we sat beside each other all the time.

Q. Get to know him a little bit?

A. Yeah.

Q. He got to know you a little bit?

A. Yes.

Q. Did you let him know at some point that you were in a

halfway house at the time?

A. Right away.

Q. Okay. And why don't you describe if you would for the jury over the course -- let me back up. How long did you work then at Kraft? You started in early 1995. How long was that?

♀

A. Kraft Food through an express company, you're only allowed to work a thousand hours. After my thousand hours, they terminate you, and you gotta find another job unless you get hired through the company.

Q. So in terms of months, how many months were you there roughly?

A. It lasted about exactly the three months that I was in the halfway house.

Q. So during that three-month time period, can you describe for the jury how yours and -- your acquaintance with Dustin Honken developed? Had you guys become close friends, acquaintances? Why don't you explain that, please.

A. I'm working on case packer probably for about two weeks, been talking to Dustin Honken, looking at the magazines. He was always reading gun and ammo magazines, so, of course, I'd pick them up and look at them on occasion because I was bored. And about three weeks after I was there, maybe a month and a week -- I don't know -- between three to five weeks after I was there, he said he had asked people around there about me. Well, I just sort of got a little leery because I don't like people talking about me because I'm already in a situation I shouldn't have been in, so I was sort of leery about that.

And then he brought up probably about six, seven weeks after I was there about wanting to manufacture methamphetamine

with him. I told him, No, I'm in a halfway house. I don't need

no more problems. Well, then I went and seen how I ended up in all this because I couldn't afford a lawyer. I went back and told my public defender that represented me the first time that put me in Beje Clark so I guess she didn't do a good job anyway, but what happened was I told her the guy's name, Dustin Honken, what was going on, and I just wanted it on paper ahead of time in case somebody was trying to set me up.

Q. Okay. Let me stop you there, and we're going to back up a little bit and get to that point again. So at some point Dustin Honken approaches you and starts talking to you about manufacturing methamphetamine. But let's back up before that time period. Had you guys talked about drugs before that?

A. Yeah, a little bit. I can't remember everything about it, but yeah.

Q. Okay. And were you using methamphetamine or other drugs back at this point in your life?

A. I couldn't because they pee tested you, urine analysis once a week at Beje Clark.

Q. Prior to going into the halfway house, did you use methamphetamine and other drugs?

A. I really didn't use methamphetamine, but I was a pot smoker, and I had gotten meth and pot for people.

Q. While you were working at Kraft with the defendant, with Dustin Honken, did you ever provide him with any drugs while you were working there.

A. I got him like an eighth of a bag of pot and like three-quarters to a gram of methamphetamine.

Q. And where did you get that from if you recall?

A. Somebody in Mason City. I can't really recall. I think it might have been from a guy over in Clear Lake.

Q. Did Dustin Honken pay you for those drugs?

A. Yes.

Q. And so it's in this context that you talked about drugs and you'd actually provided him with drugs at Kraft that he starts talking to you about being involved in manufacturing methamphetamine?

A. Well, let me correct you on this. We got ahead of ourselves there.

Q. All right.

A. I didn't get him any drugs until after I was out of Beje Clark because they would not let me do none of this after I met with John Graham to contact him whenever Dustin wanted me to help him manufacture. I had to be out of Beje Clark because they would not let me do nothing. So after I was out of Beje Clark is when I got him the drugs.

Q. It was before that while you were in Beje Clark that he talks to you about manufacturing then?

A. Yes.

Q. All right. And what did he tell you about manufacturing?

A. He had told me that he -- he had made it before and what --

579

the quality of his stuff was like 96 to 98 percent pure, and he brought up a name, Greg Nicholson. Well, I grew up with -- I know everybody around Mason City and Clear Lake because I got a big family. And anyway, I knew of him. He's the same age as me

if I'm right or a year apart, whatever, and I knew him because I used to go to the Dugout Lounge in Clear Lake which was a bar underneath the Upper Floor, and a bunch of friends I know in a band used to go there and play.

And anyway, to get some drugs from some people there, you had to know the band and had to be, like, invited. Well, that -- I was invited to go down there and get drugs, and that's where I got them three -- well, I got some drugs from Greg Nicholson. He was one sitting down there and sold them to me.

Q. And this would have been when in relation to when you were --

A. This was like in '92 or -- this was back when Nicholson was selling it. Dustin told me what Nicholson had is what he had made the first time.

Q. All right. So why don't we explain this to the jury a little bit. You and the defendant or Dustin Honken are talking about manufacturing drugs. He talks about how pure he can make it, and that came up in the context that he indicated he was the one who had sold the drugs to Greg Nicholson?

A. I -- he -- he was trying to prove to me about the quality of his stuff and if I'd ever came across his stuff. And it came

♀

about that I knew Nicholson and I had gotten his stuff beforehand, so yes, I told him it was good stuff.

Q. Did he tell you back then when he was talking about previous when he was manufacturing before who else was involved with him at that point?

A. He told me it was Nicholson, Tim Cutkomp, and him.

Q. Did he make any statements to you about any prior drug charges that he had or criminal charges he had in relation to

his prior involvement with drugs?
A. When all this -- we were just talking about about Nicholson came about, then he had said -- brought up something about how -- I said -- I don't know how it came about but about Nicholson and them guys being gone now, they're not around anymore. And he had said that Nicholson had owed him money and had got busted and tried to set him up, and it came out that he had them disappear.
Q. He had them disappear?
A. Those were his exact words, he had them disappear.
Q. Did you ever inquire more about what that meant?
A. I sort of did, and he said, Well, if you -- if you get on my bad side, I have somebody that can knock on your door and, boom, blow you away.
Q. How did you take that?
A. I don't really get -- I'm not one to get threatened by anybody, but it was a threat.

♀

581

Q. Did he make any statements to you about wanting to harm any law enforcement officers that you recall?
A. He had brought up about -- I think his name is Dave Mizell, officer or FBI Agent Dave Mizell, officer or FBI Agent John Graham, and an Officer Stearns in Mason City. He wanted them killed was his exact words.
Q. At some point you're having this conversation with him about this manufacturing that he wants you to get involved with, what do you tell him at first? Do you say yes right away?
A. As soon as he brought it up, I think I'd been working there three weeks to five weeks. I'm pretty sure it's like three weeks because I couldn't believe how -- where everything was

going in my life at the time. And he had brought up if I wanted to manufacture meth, and he had asked a bunch of people at Kraft about me, and so I guess he knew that I'd been into this, that, and a little bit of everything. And I told him I wanted nothing to do with it. I got a newborn baby, my wife, and another child. I don't want nothing to do with it. I go, I just got my hands slapped for something I didn't do. Here I am with him and ending up in all this. I didn't want nothing to do with it, so I turned around and walked away.

THE WITNESS: Sorry for going so quick, ma'am.

Q. Just let me remind you to slow down a little bit.

At some point you indicated earlier in your testimony that you had gone to your public defender that you had for your

582

theft charges. Is this about the time that you went to your public defender?

A. Right after I told him no, about a week later he did it again.

Q. He did what again?

A. Asked me if I wanted to manufacture meth. When I say no, I try to -- I usually mean no. And if he can't understand my decision, so I looked at him again, and I'm thinking he's a cop, an FBI agent, and they're -- you know, that three strikes, you're out policy where they just got me for burglary and theft, well, now they get me for manufacturing and doing something for him. I'm thinking three strikes, now I don't have a family; I'm in prison.

So I went and I talked to my -- I couldn't afford a lawyer. So I went -- I'm in this position because of my public defender. So that's the only lawyer I knew. So I went back to

the public defender's office in the Brick and Tile Building in Mason City, and I had told her what was going on and I wanted it written down so in case somebody tried to frame me or set me up.

Well, I told her the guy's name was Dustin Honken and he wanted me to manufacture meth with him. And she goes, I'll get ahold of you tomorrow. Within 30 minutes I get a phone call from her saying, Can you meet me in the district attorney's office in Mason City courthouse the following morning? I said, Yeah, you know, because I was sort of worried about, okay, that

583

wasn't no -- tomorrow morning, 30 minutes is 30 minutes.

So I agreed. I met with her there the next morning. I walked into the basement, walked into this room. Camcorder about where the young lady, the recorder's sitting, and about 12 sheriffs, FBI -- I pulled my pants up and said, Holy shit, what did I just walk into? Pardon my language.

Q. Yeah. Let's be careful with your language if we can. So you basically walked into the DA's office in Mason City.

A. Yes.

Q. And there was a number of officers there.

A. A whole lot of officers.

Q. Now, you mentioned a camcorder. You later found out that camcorder wasn't recording anything.

A. So they say.

Q. Okay. So you meet with these officers. Bottom line is do they ask you to cooperate in the investigation of Dustin Honken?

A. If I remember correctly, Officer -- FBI Agent, Special Agent, John Graham said, Come in and have a seat, Mr. Cobeen. And then I'm trying to get my stomach out of my chest, so I walk in, and I have a seat. I'm observing all the faces in the room

still thinking, what did I just get myself into? Then John Graham goes, Well, here's the deal.

MR. PARRISH: Objection. Hearsay.

Q. Let's just -- the problem is we can't have you repeating what a bunch of other people said.

♀

A. Okay.

Q. Bottom line, were you asked to cooperate?

A. He asked me what I wanted --

MR. PARRISH: Objection. Hearsay.

THE COURT: It's not being offered for the truth of the matter asserted.

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: It's not hearsay. Objection's overruled.

A. Finish what I was saying?

Q. Please.

A. Refresh my memory again.

Q. I'm just trying to figure out what they asked you to do at this meeting.

A. John Graham had me have a seat and asked me what was my intentions, and I told him that -- and then I told him that I would work undercover for them or I would contact him once Dustin wanted me to manufacture meth was the exact statement.

Q. And ultimately you did cooperate with law enforcement in the investigation.

A. As soon -- I went back and told my counselor at Beje Clark what was going on also, and she told me I could not do nothing with them until I was out of their facility. So I graduated. I got out of Beje Clark after my 120 days. About a week or two later Honken approached -- Dustin Honken approached me and

wanted me to start talking to him about manufacturing meth.

Right away I contacted -- the agreement was to contact him when Dustin contacted me. So I contacted John Graham and told him what Dustin had told me.

Q. Now, we're going to talk about the cooperation you provided, but at some point you provided cooperation to law enforcement, and as a result of that, did they end up paying you some money for relocation and other expenses?

A. They -- yes, they did.

Q. And how much money did they pay you total if you remember?

A. They came up to my apartment building, and they said, You have to relocate, and I told my wife and kids, We gotta move.

Q. And the government paid for your expenses in relocating.

A. They gave me some -- about $7,000, and I had to go pay off all my fines at the courthouse first before, so I used that money right away to pay them off, some of it. And then I think I had like $6,800 left. My dad's a mechanic like me. Well, he had a good van, one-owner van, with everything new on it, so I bought that from him, and we loaded up, and he's got a winter house in Florida. So I -- you know, I wouldn't have to pay rent, just turn on the utilities, so I went there.

Q. And you relocated with your family for a period of time after your cooperation ended.

A. Yes.

Q. As a result of your cooperation with the government, did the government do anything to reduce your charges that you had

in state court?

A. Well, the money they gave me paid off my fines, so you could say they did.

Q. Were you facing any additional charges that you didn't get charged with as a result of cooperating with the government?

A. No, not that I know of.

Q. Did you get any other benefit other than the relocation expenses that were paid?

A. None that I know of.

Q. Are you getting anything for testifying here today?

A. No, just for my gas mileage for driving here.

Q. Do you think you're going to get anything for testifying here today?

A. I'm not asking for anything for testifying here.

Q. Are you facing any charges now?

A. No, I'm not. Am I?

Q. Part of your cooperation involved recording a couple conversations; is that correct?

A. Define like wearing a -- recording what me and Dustin talked about? Yes, yes.

Q. Now, just explain to the jury a little bit -- and we're going to move into next the cooperation provided. But were you always able to get ahold of Special Agent Graham in advance of times that you would have contact from Dustin Honken?

A. No.

♀

587

Q. So were there times that you had contact with Dustin Honken where there wasn't adequate advance notice to be able to wire you up?

A. There was a couple times he just showed up knocking on my door.

Q. So you had recorded and unrecorded conversations with the defendant.

A. Could you repeat that one more time?

Q. So you had both recorded and unrecorded situations.

A. Every time -- the agreement was every time I met with Dustin Honken, whatever happened I would contact the number on this card that Officer Graham gave me, and then I would relay everything that happened to him.

Q. And did you do that?

A. Every single time.

Q. So let's talk about what happened then. Once you agreed with Dustin Honken that you would go forward and help him manufacture methamphetamine, did you have a conversation with him about what you would get out of it?

A. Yes.

Q. And what was that conversation?

A. Originally he had planned on making like a hundred, two hundred thousand dollars worth of this stuff, and my cut would be like $20,000. But I also had a part in it because I knew so many people that I could -- I knew three or four big drug

♀

588

dealers like -- could I use names?

Q. Sure.

A. Like Steve Gomez who's locked up for it already and a few other people. And he wanted me to introduce him to them so he could get rid of his stuff in big quantities.

Q. So that was supposed to be at least initially your role in this organization.

A. Introducing him to a few people and then a little bit of money on top of it.

Q. Did he tell you who else would be involved with you two in manufacturing the methamphetamine?
A. He had me meet him at his house one night. I don't know the date. And there was going to be -- he said everybody that was going to be involved in it would be there. There was about six people there.
Q. And who do you recall being there?
A. There was Brian Sturgis. There was a Karla Johns -- I can't remember Karla's last name. I think Dustin and two -- a guy and a girl that was all dressed in leather, biker people. I don't know their names.
Q. Did you ever find out what their roles were supposed to be in this thing?
A. He basically told each and every one of us while we were all there looking at each other what our roles was going to be.
Q. What did he say?

589

A. Two people would distribute. I would hook him up with the people I told him, just Steve and them guys, and I can't remember who he assigned what job, but we all had designated jobs in it.
Q. Was Tim Cutkomp supposed to be involved in this at all?
A. Tim wasn't there at the time.
Q. Did you later learn whether he was supposed to have some role in this manufacturing?
A. Not really. He sort of always kept me and Tim apart from one another.
Q. Okay. How about did you ever hear the name Angie Johnson?
A. Yes. After that meeting, about three weeks later he came up to me and told me he wanted to introduce me to Angie Johnson

because she had the final word in me going through all this with him.
Q. And so what happened?
A. I went with him to Clear Lake to her house. We sat down. She wasn't there at the moment when we got there, but her ex-husband I think was there and her older daughter. We sat down, talked a little bit, and she showed up. Her and her ex-husband had a little conversation. He left. Then we all sat down. The daughter, oldest daughter, I think went with a friend, and they just asked me a few questions, Mrs. Johnson did and Dustin. And then basically about an hour later he took me home. The next day he said, It went good; she's okayed you to

590

be in on it.
Q. So after that did you actually start participating in the early attempts to put the thing -- to put the lab together?
A. He came by my house one day in a Ford pickup, said it's time to start it, the lab.
Q. Let me stop you then before we get to that point. We'll pick up with that in just a minute. At some point did he tell you how this whole thing was going to be financed, who was putting up the money for it?
A. He said that a few people had money invested in it.
Q. Did he tell you who those people were?
A. Angie Johnson had like 1,500 to $5,000 invested, somewhere in there. It kept going up from the sounds of it. Originally I think it was only $1,500 at the beginning when we started.
Q. And so I interrupted you. You were just about to say that at one point Dustin Honken came by your house and picked you up. Do you remember approximately when this was?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 518 of 3636

A. Be honest with you, I've gone through that paperwork four times in the last couple days, and I can't remember it right now.
Q. Let's do it this way. About when did you get out of the Beje Clark facility?
A. I think about -- beginning of 1995.
Q. Okay. And when you were --
A. I'd say about May of '95, somewhere in there probably.

♀

Q. Is when? When he picked you up?
A. I think so.
Q. Sometime in the spring of '95 is your best recollection?
A. Yes.
Q. Tell the jury what happened when he picked you up.
A. He came, knocked on my door. This was one of them where he just showed up so I couldn't contact nobody. Usually Dustin would call me and say, Come on over and we're going to do another step in the process of manufacturing. Well, a few times he would just show up at my door.
Well, this is -- he come knocking on my door, and he goes, You ready to go? And I'm like, Yeah, wherever. What are we doing? And I had to go to the bathroom and came back out, and I guess -- I don't -- I heard about this later. I'll fill you in on that. But my wife and child, he threatened to my wife's face.
Q. Let me stop you if I can. Unless you hear something directly, it's called hearsay, and we can't have you testifying about it.
A. Okay.
Q. All right? So you -- he comes over to your house, and you

end up leaving with him?

A. We go downstairs, jump in a Ford four-by-four pickup. Yes, I left with him, and we went to -- it used to be Barclay, like, Welding Supplies and stuff like that. I can't really remember

♀

the name of it now. But I bought a hyd -- first -- on the way there we stopped at Shopko, and he went in and got like out of an ATM machine or something like that, he got money out. Somewhere he got money on the way. I can't remember where exactly right now and -- like $300. He gave me when we got to the -- well, actually, here -- okay. Let me redirect myself here.

We stopped, got money at a bank. We went from the bank to Shopko. He did not want to be seen at that building, at Barclay's, so I dropped him off at Shopko. I drove the truck down there and bought a hydrogen tank.

Q. Where did you get the money for the hydrogen tank?

A. He gave me the money there at Shopko parking lot when he got out of the truck.

Q. How'd you decide to buy a hydrogen tank?

A. How did I decide to do it?

Q. Was that your decision that you wanted to go buy a hydrogen tank?

A. He came by and picked me up. I didn't know what I was doing till he filled me in on it.

Q. So he told you what to buy?

A. He told me exactly what to buy.

Q. And you went into the store, and you bought a hydrogen tank?

A. I bought a tank about two feet tall, and it was a hydrogen

tank is what the paperwork said because I got a receipt for it.
Q. And did it have hydrogen in it?
A. I didn't turn it on and smell it, but I presume so.
MR. WILLIAMS: May I approach, Your Honor?
THE COURT: You may.
BY MR. WILLIAMS:
Q. I'm showing you Exhibit 78. Do you recognize that, sir?
A. That's the receipt that I got from that company, and when I took the tank back to Dustin and got in the truck, he didn't ask me for it, so I put it in my pocket to give to Officer Graham.
Q. And did you later give it to Officer Graham?
A. Right after Dustin dropped me off at home, the agreement was to call John Graham or Officer John Graham on the phone. So I did. He told me to meet him at a designated spot, and then I gave him this receipt and told him what we had just done.
MR. WILLIAMS: United States would move to admit Exhibit 78 into evidence, Your Honor.

* * * *

(Government Exhibit 78 was offered.)

* * * *

THE COURT: Any objection?
MR. PARRISH: Other than relevance.
THE COURT: The only objection is to relevance?
MR. PARRISH: That's correct.
THE COURT: Objection's overruled. Seventy-eight is

♀
594

received.

* * * *

(Government Exhibit 78 was admitted.)

* * * *

MR. WILLIAMS: Permission to publish it to the jury.

THE COURT: You may.

BY MR. WILLIAMS:

Q. Do you see on your screen, sir, is that the same exhibit we've been talking about?

A. Yes, it is.

Q. And that is a receipt for the hydrogen tank?

A. Yes, that's what it is.

Q. What did you understand from your conversations with the defendant the hydrogen was going to be used for?

A. Dustin told me there was nine to ten steps in manufacturing -- his manufacturing of meth the way he did it. This was one of the steps is the way I took it.

Q. At some point did you make a trip to Minnesota as part of your, if you will, undercover cooperation with law enforcement?

A. Yes, I did.

Q. Tell the jury, first of all, was there a discussion about a trip to Minnesota that you had with the defendant?

A. With Dustin?

Q. Yes, I'm sorry, with Dustin Honken.

A. Dustin Honken, and he had come up to me and said we had to

595

go get something up there at a chemical place in Minneapolis, and me and him were going to go there this coming up weekend, back then anyway.

Q. And so what happened?

A. The day we were supposed to go, I went to his house. Tim

Cutkomp was there that day, and Dustin said he couldn't go, he had to watch his kids or his girlfriend or ex-wife was coming by. He gave me an excuse. And he said Tim was going to drive me there.

Q. And so what happened at that point?

A. Just before we left his -- just before we left his house, he wrote down on a piece of paper what he wanted and gave it to Tim Cutkomp, and then me and Tim left his house and got in the car and proceeded to Minneapolis.

Q. What did he want on that piece of paper?

A. I didn't know until I got up to Minneapolis, and Tim gave me the piece of paper and told me to get this and then gave me I think a $20 bill.

Q. And do you remember what it was you were supposed to get up there?

A. As I was walking in, I read it three or four times so I could know what I was going to say because I'm not good with, you know -- chemical words are, you know, different. It was magnesium chloride.

Q. And when you had this conversation with Dustin Honken about

the need to make this trip, what was the purpose? What was the chemical to be used for?

A. He said -- he tried to define and explain every step to me, but I wasn't really paying too much attention really because I didn't want to know nothing about manufacturing meth except for the purpose of what John Graham wanted, Officer Graham wanted me to do. He said it was a catalyst or something like that.

Q. You understood it was something to do with the manufacture of methamphetamine.

A.    He -- if I remember right, he said he had to do this and that to take one chemical out to put another chemical in, something like that.  It was a -- I can't -- I don't know.  I'm not really scientifically inclined.
Q.    Bottom line, something to do with manufacturing meth, though.
A.    Yes, it was one of the steps of manufacturing meth.
Q.    I'll show you Exhibit 75 and ask you if you recognize that document.
A.    Yes, I do.
Q.    And what is that?
A.    It's a receipt for the magnesium chloride.
Q.    Is that from that trip you made to Minnesota with Tim Cutkomp?
A.    Yes.
MR. WILLIAMS:  Your Honor, permission to publish

Exhibit 75.  There's no objection to that exhibit.
THE COURT:  You may.  Seventy-five is in evidence.
BY MR. WILLIAMS:
Q.    This is a particularly difficult one to read, but that is the BME receipt from the location in Minnesota you went and picked up this magnesium chloride?
A.    Yes, that is.
Q.    And the purchase price was -- total purchase price was $22.50?
A.    Yeah, I had to use $2.50 of my own money.
Q.    Very good.  Let me ask you about, was there a time you made a trip to Des Moines?
A.    I don't know exactly -- it was pretty close to about after

that magnesium chloride. He said that we had to go to Des Moines because he needed a mailbox -- mailbox -- a drop box is what -- the way I think he put it.
Q. Did he say why he needed a drop box?
A. He sort of did, but I can't remember exactly why right now.
Q. Why not just go to someplace in Mason City for a drop box?
A. I don't know.
Q. Did he ever explain to you why not just go down the street in Mason City and set up the drop box?
A. I -- well, he never did anything himself. He always had me or somebody else doing it.
Q. So what did you do?

598

A. I went into this building where we parked in front of. Him and Tim sat there. He gave me the exact -- everything I was supposed to say on a piece of paper and open this drop box up in my name.
Q. And do you remember, was it set up in your name or Dustin Honken's name or something else?
A. He wrote the name Cytomex. That was the name of the company -- drop box I was supposed to open, Cytomex.
Q. Did it cost money to set up a drop box like that?
A. I can't remember.
Q. Now, ultimately and just to make sure, as these things are happening that you're involved in, you're immediately going back and reporting this information to Special Agent Graham.
A. Like with that, that particular time and the magnesium, I knew we were going to do it ahead of time, so I -- after I'd seen Dustin, every time I'd contact the number right away. Usually we met two blocks after his house after I left there, so

I didn't even have to use a phone. He was usually -- I already knew where I was going to meet him.

Q. Special Agent Graham.

A. Special Agent Graham. I'm sorry.

Q. And at some point did you actually see a meth lab set up someplace?

A. Actually I seen every single tube, container, butter dish, heating -- every element involved in every step, he explained

♀

it, how it worked and what it was doing. So yes, I watched him put it all up in his garage.

Q. Whose garage?

A. The lab was set up in the garage originally.

Q. Whose garage?

A. It's on 16th Street in Mason City at Dustin Honken's house where he lived.

Q. And did you even draw out a diagram of that meth lab to provide to Special Agent Graham at some point?

A. Special Agent Graham asked me to see if I can remember the diagram -- remember what it looked like so I could tell him. Well, he would leave sometimes and have me watch one or two of his kids, so I went out there and wrote down step by step on a piece of paper as best as I could do it as quick as I could do it, yes.

Q. And you later provided that to Special Agent Graham?

A. Right after I left, I went and gave him that, to Agent Graham.

Q. Is there some point that this meth lab is being set up that you're asked to smell something outside of the garage?

A. I think we were like on step 4 or 5. He told me -- there

was snow on the ground at the time, and I could see like a hole burnt in the snow out the back door of his garage, and there was a water hose running out there, a little chunk of one, maybe six feet long. And that was his, like, exhaust from the chemicals

and everything. And he told me to go out there and take a little whiff of that, and it about knocked me over.

Q. What smell was that? Do you remember?

A. It was strong is all I know.

Q. Now, at some point after you are cooperating with law enforcement, is the defendant's house or Dustin Honken's house ultimately searched by law enforcement officers?

A. Yes.

Q. And you're done cooperating against Dustin Honken at this point?

A. Here I am, so no, I'm still not done.

Q. At least undercover.

A. In what I had agreed to do with them, with Officer Graham, yes, I was -- yeah.

Q. Now, was it immediately apparent or in other words did -- to your knowledge did Dustin Honken know right away that you had been cooperating?

A. No.

Q. At some point were you and other people subpoenaed to appear before the grand jury to provide handwriting exemplars?

A. Yes.

Q. Who all did you see -- did you go down to that grand jury with anybody else?

A. No.

Q. Did you have any contact with Dustin Honken about your

subpoena to the grand jury?
A. When I got down there, he had Angie Johnson come up to me and wanted me -- Don't worry, he -- don't worry, everything will be okay is what she said.
MR. PARRISH: Objection. Move to strike, denial of right of confrontation and hearsay on the Angela Johnson, ask that it be stricken from the record.
THE COURT: Overruled.
BY MR. WILLIAMS:
Q. And this is down in Cedar Rapids, Iowa?
A. In the grand jury building, she walked over to me and asked me to come with her. We went down one flight of steps. That's when she said Dust --
MR. PARRISH: Same objection.
A. Dustin said not to worry about it.
THE COURT: Same ruling.
Q. Any other instructions you were given at that point?
A. I can't really remember right now.
Q. All right. Now, you indicated earlier that at some point you relocated. But before you relocated, after you're done with your undercover cooperation on behalf of Special Agent Graham --
A. Yes.
Q. -- and before you moved down to Florida when you relocated, where were you living in that interim period?
A. Uptown in Mason City there's a bar called Sportsman's

602

Lounge. I lived right above it one door down.
Q. Were you working at that point someplace?

A. No.
Q. Do you know somebody by the name of Brian Beach?
A. Yeah. Now you refreshed my memory, I was working part time.
Q. And where were you working part time at?
A. I was -- you know a dock that you tie your boat up on to or walk out on on the lake. I was putting docks in and taking them out. At that time I was putting them in.
Q. This would have been in the spring of 1996?
A. I think so.
Q. And you were helping Brian Beach do that.
A. Yes.
Q. Is that over in Clear Lake?
A. Yes.
Q. Did you have a vehicle at that time you were driving?
A. I think I did. I can't remember.
Q. Do you remember what it was?
A. I just hope it wasn't that same Escort. I don't remember.
Q. All right. Now, your parents, they still -- in 1996 were they still alive and living around the Mason City, Iowa, area?
A. My parents?
Q. Yes, sir.
A. Yes, they live there.

603

MR. WILLIAMS: May I approach, Your Honor?
THE COURT: You may.
BY MR. WILLIAMS:
Q. I'm showing you Exhibit 218. Do you recognize that address on 218?
A. Without looking at it, 2715 12th Avenue South, Clear Lake,

that's my parents' address in Clear Lake, Iowa.

Q. Thank you. Mr. Cobeen, the Dustin Honken we've been talking about up to this point during your testimony, do you see him in the courtroom here today?

A. Is it all right if I look around?

Q. Yes, sir.

A. Yes, I see him right here.

Q. And can you describe what he's wearing?

A. Glasses, yellow shirt and got an ink pen in his hand.

MR. WILLIAMS: Nothing further, Your Honor.

THE COURT: Mr. Parrish, you may cross-examine, but why don't we give the jury a stretch break first. You've been sitting for a while.

Please be seated.

MR. PARRISH: May it please the Court and counsel.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Good morning, Mr. Cobeen. How are you?

A. I'm fine.

604

Q. I have a few questions I need to ask you. I represent Mr. Honken.

A. Mr. Parrish, ain't it?

Q. That's correct.

A. I remember.

Q. Okay. I just have a few questions to ask you. I just want to make sure we understand the context. When you went to work for Kraft, it's my understanding you had not worked for a few years prior to that, is that correct, except for a couple of part-time jobs?

A. Yeah, exactly.

Q. Okay. And you also up to that point had been in drug treatment approximately what? Three times? Is that right?

A. With an eight-year span three different treatments, yeah, for three different drugs, yeah.

Q. And also at that point in time from 1993 up until 1996 you didn't have any visible means of supporting your family; is that correct?

A. My wife worked. I raised the kids.

Q. You indicated earlier in testimony your wife at that point was on ADC; is that right? She did not work?

A. Part time worked. She worked at a head start program.

Q. You also agree that the government paid you about $7,000 for your work at that time when you were working undercover, is that correct, or as a confidential informant; is that correct?

♀

605

A. No. They gave me $7,000 to relocate.

Q. Okay. So that was not payment for what you were doing.

A. No, because to relocate I had to buy a vehicle and move my family, so I used it for that.

Q. You would also agree that you took detailed notes during this time; is that right?

A. During the time where I was working with Officer Graham?

Q. Working as a confidential informant; is that correct?

A. Yes.

Q. And part of the reason you did that is because you wanted to make sure you got all of the information accurate. Would you agree with that?

A. I -- everything that me and Dustin had done I relayed to John -- Officer Graham.

Q. You also agree that part of what you did, you paid off your fines. You also ended up -- the second thing you did was work out some arrangements where you could report to these officers.
A. Say that one more time.
Q. Well, one thing you did was pay off your fines. The second thing you did was work out some system where you could report to the officers the information you were gathering.
A. For the first one I had to pay off my fines or else they would have a warrant out for me.
Q. Exactly.
A. Yeah.

606

Q. And the next thing you wanted to do was get off probation because you were serving time for this burglary charge that you said you didn't really commit; is that right?
A. Exactly.
Q. You went into court, and you also indicated to the judge just like in this courtroom that you did this but now you're telling this jury you didn't do this; is that right?
A. Didn't do what?
Q. This burglary that you pled guilty to.
A. They never found no lumber. It wouldn't fit in my car, so no, I did not do it.
Q. But the point is you told one judge you did it because you entered a plea of guilty because you said you didn't have a lawyer, and the next you're saying --
A. My lawyer said our best arrangement would be to plead guilty, not me; my public defender did.
Q. That's what I'm trying to say. You went in front of a court.

A. Yes.

Q. You said you did something that you didn't do; is that right?

A. That's exactly true.

Q. Okay. And you're telling us now even though you said in another court that you had done something, what you're telling us today in 2004 is that you didn't do it.

♀

A. You look on any document. I did not do it, and those were my final words.

Q. Okay. But you would agree that you did tell another judge that you did do it.

A. My public defender said to plead guilty for lesser charge for whatever.

Q. Okay. And as a result of that, you were doing time for the --

A. I was in Beje Clark, in a halfway facility.

Q. And while you were on probation, is it accurate that you never, in fact, handled any drugs -- is that your testimony here today -- while you were on probation?

A. While I was on probation?

Q. Yes, you never handled any drugs at all.

A. I wasn't really on probation. I had to report to a probation officer until I got out of Beje Clark.

Q. Exactly. That's what I'm saying.

A. When they gave me the money, I was already out of Beje Clark.

Q. So you were not on probation any longer after that.

A. No, not then.

Q. So was something else that happened was your probation was

cut short? You had a two-year probation; is that right?
A. I don't remember exactly how long it was.
Q. Well, when you went in front of a judge, you entered a plea

to this charge, you would agree that part of what you had to do was go to Beje Clark. Once you finish Beje Clark, you were on probation for a period of time. That's how the system worked; isn't that correct?
A. I really don't remember. This was long time ago.
Q. So you've forgotten then how that operated.
A. I remember the restitution, the Beje Clark, and $1,000 fine and child support.
Q. Okay. So I guess the question I'm asking you is were you on probation after you finished the plea to the felony charge, or was that probation cut off, or you just don't remember one way or the other? Either answer I'm satisfied with.
A. I remember reporting to a probation officer until I got out of Beje Clark. Then I did not have to do it.
Q. So would you agree then after you got out of Beje Clark which is the halfway house you never had to make any additional reports or do any additional work with regard to your probation? Would that be accurate?
A. I didn't have to report to a probation officer after that I don't think.
Q. You don't know how that happened, though. You don't know what arrangements were made so you didn't have to do that.
MR. WILLIAMS: Objection, Your Honor.
A. I don't know.
MR. WILLIAMS: There's no evidence saying arrangements

were made. Misstates the evidence.

THE COURT: Well, assumes a fact not in evidence, but it's sustained.

BY MR. PARRISH:

Q. Were any arrangements made then is my question.

A. For me to get off probation?

Q. Yes, sir.

A. No. I went and reported to him, and he said I'm done with my probation.

Q. Okay. And did you get a document or anything like that indicating you had been discharged from probation to your best recollection?

A. To my best recollection I don't remember.

Q. And would it be accurate since that time -- and that would have been what? About 1995, '96?

A. Late '94, early '95.

Q. -- you've not had to report to any further probation officer or anything like that?

A. I don't report to nobody but my dad, my boss.

Q. But that has been the case since about 1995 or 1996?

A. No, 1994 because I could not do anything with Dustin until I was out of Beje Clark and I had no probation.

Q. Right. That's what I mean. And I'm sorry if I'm not making myself clear, but I'm saying since that time you've not had to do any further probation or report to any officer or

610

anything like that.

A. No.

Q. So then the only thing you had to do -- and correct me if I'm wrong -- is to make some reporting requirement with regard to the law enforcement officials you were working with. Do you understand my question?
A. No.
Q. All right. Well, you were working with law enforcement officials as a confidential informant. So what you would have to do is get items ready such as receipts, such as what you did during that day, such as what information Mr. Honken had related to you and report to law enforcement officials. That's basically all you had to do; is that right?
A. Whatever me and Dustin Honken talked about.
Q. Right.
A. The receipts like these --
Q. Yes, sir.
A. I just put them in my pocket without telling Dustin I had them.
Q. Okay. And you have that work that you did. Did you also have other work you were doing at the same time? Were you working at Kraft at that time?
A. I was working at Kraft -- well, I think my hours might have ran out at Kraft. I can't remember.
Q. Okay. So if your hours ran out -- so the only thing you had to do -- and just to make sure we're tracking here, the only thing you had to do was track Mr. Honken's conduct. Would that be fair?

611

A. I didn't track him. When he called me to go meet him for this or that, I'd do it.
Q. And you had to report on his activities.

A. To Officer John Graham as soon as I left Dustin's house.
Q. All right. Other than that, did you have any other work to do, or were you working any other place, or were you doing anything else that you had income coming from during this period of time?
A. I might have been putting dock in or taking them out because I did that part time.
Q. Well, do you remember if you were doing that or not?
A. I -- be honest with you, I don't really remember.
Q. But the only thing you remember is that you were getting information if Mr. Honken were to call you or the law enforcement officials called you and wanted to know what Dustin was doing or if Dustin called you to help him out with his drug manufacturing, that was your primary responsibility back then. Would that be a fair statement?
A. Not really put like that but somewhat.
Q. Okay. And in that -- at this point in time you had a high school education. Would that be accurate?
A. Yes.

♀

612

Q. And you had three years in the service. Would that also be accurate?
A. Yes.
Q. And what did you do in the service? Tell us just briefly.
A. I was in Berlin, Germany, and I drove an M13A1 armored personnel carrier.
Q. And you indicated in your testing for one of the jobs you have now that you tested pretty well.
A. I was an expert in everything. I got my E-2 stripe faster than about anybody.

Q. Exactly. So you would think your reports that you gave to law enforcement on Mr. Honken would be pretty accurate information. Would you agree with that?
A. It was -- everything that we had done or said I gave to Officer Graham.
Q. And you would agree that you met with Dustin about a hundred times. Would you agree with that?
A. I couldn't -- I didn't keep track of every number, but I'd say quite a few times, whole lot of times.
Q. Well, let me refer you briefly. You recall previously testifying that you saw Dustin about 100 times.
A. If that's what the paperwork says.
Q. You won't dispute that, will you?
A. No, if that's what the paperwork says.
Q. And over those 100 times, would you agree that you had

♀

613

numerous conversations with him about any number of things?
A. Yes.
Q. All right. And one of the things you had conversations with him about, his drug manufacturing; would you agree?
A. Yes.
Q. He talked about that quite a bit.
A. He did. I listened.
Q. He gave you details about it.
A. Only when we were at his house setting up the details did I get details.
Q. Didn't matter where it was, but he gave you details about it. You would agree. I'm not asking are you aware.
A. Not about the manufacturing.
Q. Well, you told us on direct examination that he took you

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 538 of 3636

through step by step by step.
A. That's at his -- while we were doing step by step; not sitting there working we wasn't.
Q. Well, it doesn't mean where it occurred. I'm not asking that question. I'm just asking did you, in fact, get the step-by-step process and the detail process of it.
A. I was told it from Mr. Honken, but I did not really take it in until I wrote down everything and gave it to Officer Graham.
Q. Exactly. And that's all we're -- I'm not trying to get you in trouble. I just want you to follow me here for a moment. You're not doing anything wrong.

♀

A. No, I don't know nothing about chemicals, so I don't remember step by step.
Q. I'm not asking if you remember it. I just want to know if you detailed it.
A. Yes, I did.
Q. Because that was your job, to detail it, is that correct, and take it back to the officers and tell them what he told you?
A. It wasn't a job.
Q. Okay. It was something you were doing then.
A. Yes.
Q. All right. Would you also agree that during this time of these 100 meetings Mr. Honken had lots of magazines when he was at work at Kraft?
A. Him and the other employees.
Q. He was a big reader; is that right?
A. Well, I don't know if he read them, but he looked at the pictures a lot.
Q. Well, you told us on direct examination that he had a few

magazines which you saw and you would read them on occasion. Is that accurate?
A. I would look at the pictures too.
Q. Okay. Look at the pictures. So you would look at the pictures, and he would look at the pictures and pass the pictures around, but they would be magazines is my question.
A. Gun and ammo magazines.

♀

Q. Gun and ammo magazines; is that okay?
A. Yeah.
Q. But he had access to lots of them according to your testimony; is that right?
A. Yes.
Q. Did you ever see him with a gun?
A. No.
Q. Over a hundred times you never saw him with one gun; isn't that right?
A. No.
Q. Matter of fact, if through this work you were doing for the law enforcement officials these 100 meetings you would have had with him, through all the magazines you saw him read, through all the drug manufacturing, you would have made a note of the fact of any of these places you'd seen him you'd seen him with one gun; would you agree?
A. If he showed me a gun when I was meeting with him, it would have been written down on paper or relayed to John Graham.
Q. Absolutely. So you never saw a gun in his car. You would agree?
A. I would agree.
Q. You never saw a gun throughout the entire drug

manufacturing process. You would agree with that.
A. I would agree with you.
Q. You never saw a gun at Kraft Foods at work; is that

correct?
A. Besides paper gun.
Q. Okay. Paper gun. And you never saw a gun when you went to Minneapolis; is that correct?
A. You're right.
Q. You never saw a gun when you went down to Des Moines; is that correct?
A. No, I didn't.
Q. You never talked about a gun he had buried somewhere; is that correct?
A. No, we didn't.
Q. Now let me ask you this. Did you ever decide to make an inquiry of him of these 100 meetings, Well, did you ever put a gun somewhere, Mr. Honken?
A. The way I see it is --
Q. No. Just answer my question, not the way you see it right now.
A. I'm working undercover. I'm not going to ask him no stupid question like that or I'd be buried.
Q. But he took you in your confidence; is that right?
A. I don't know.
Q. Do you remember telling the agents, He's taken me into his confidence? Do you remember saying that?
A. Yes.
Q. Okay. So you're telling us now he didn't take you into his

confidence or he did?
A. I'll say no now.
Q. You'll say no now.
A. Yeah.
Q. But you agree you said it under oath earlier yes. Did you agree earlier you said under oath yes?
A. Yes, I will.
Q. So which statement is true? The one you told under oath before or the one you're telling now?
MR. WILLIAMS: Objection, Your Honor. Misstates the evidence. There's no evidence he ever stated under oath.
MR. PARRISH: He stated it on his own.
MR. WILLIAMS: He stated it in a report to a law enforcement officer.
THE COURT: Why don't you rephrase --
MR. PARRISH: Objection, explaining his answer.
THE COURT: Pardon me?
MR. PARRISH: He's explaining to him what he said.
THE COURT: Well, why don't you rephrase your question.
BY MR. PARRISH:
Q. Did you state under oath in the past that Mr. Honken had taken you into his confidence?
A. Yes, I did.
Q. All right. Are you stating under oath now to this jury

♀

that he did not take you in his confidence?
A. That confidence was for using me. That ain't confidence.
Q. Are you saying yes or no? Are you changing your testimony?

Yes or no.
A. I'll stick with he took me into his confidence.
Q. So what you said a couple seconds ago about he did not was not true.
A. He's a user. That ain't confidence.
Q. I'm not asking what you thought he was. I'm just asking what your testimony is.
A. My testimony is what I think and feel.
Q. Okay. Tell us what you think and feel, but I'm interested in the answer to the question. What you said just a minute ago with regard to Mr. Honken taking you into his confidence where you said no was not accurate then, was it?
A. Remember the meeting where I met Angie Johnson and she had the last word?
Q. Sir, I'm just asking you a question. I'd like to get a yes-or-no answer because that's how I framed my question.
THE COURT: Just a second. Mr. Cobeen, you need to try and answer the question that the lawyers are asking; okay?
THE WITNESS: Okay, Your Honor.
BY MR. PARRISH:
Q. Just answer yes or no --
A. He took me under his confidence, yes.

♀

619

Q. Okay. So you didn't mean to answer that no just a second ago.
A. I won't define that to you, Mr. Parrish.
Q. Now, about yourself, you would agree that you've tried every drug that's possible to try in your lifetime?
A. I can't say every drug, no.
Q. Do you recall testifying under oath that you have, in fact,

tried every drug that anybody could try in their lifetime? Did you say that under oath?
A. I said I've tried about every drug there is out there.
Q. In your lifetime.
A. I'm still alive, so I would say yeah.
Q. So when you said you didn't just a minute ago, which statement is accurate?
A. I haven't tried LSD, so you can -- you know, there's a few.
Q. We've talked about what Mr. Honken said about guns and what he may have confided in you about guns which you said were none, but I'm going to ask you, did you ever see any evidence and did Mr. Honken ever tell you that he had harmed anyone in those 100 meetings that you had with him?
A. I'd have to -- disappear --
Q. Yes or no, sir.
A. Disappearing to me could go either way.
Q. Do you recall your previous testimony --
A. No. Him personally do it? No.

♀

620

Q. All right. So out of those 100 meetings with Mr. Honken, you would agree that he never said a single word to you indicating that he had harmed anyone; is that accurate? Yes or no.
A. He said he wanted to kill some people.
Q. That's not what I asked you, sir.
A. No, he did not say he harmed anybody that I remember.
Q. All right. Matter of fact, you previously testified to that exact same question that he had never told you that he had ever harmed a single individual on the face of this planet; isn't that correct?

A. He just --
Q. No. Answer my question. Is that correct?
A. Say that again. Say it again. Say the question.
Q. Isn't it true that you had also previously testified that Mr. Honken had never told you that he had harmed a single individual? Isn't that correct?
A. If the paperwork in front of you says that.
Q. Well, did you say that earlier, sir?
A. It's ten years ago, Mr. Parrish. I don't remember.
Q. Well, let me ask you now. Are you telling me now that he said something that he harmed somebody else?
A. He said he wanted to kill a few police officers.
Q. I said harmed in the past tense, sir, harmed during those 100 meetings.

621

A. No, not that I remember.
Q. All right. And that is your testimony today; isn't that correct?
A. If that's what I -- can I rely on my previous statements? What do they say?

THE COURT: Mr. Cobeen, here's how it works. The lawyers get to ask you the questions. You don't get to ask them the questions.

THE WITNESS: Okay.

THE COURT: Okay? That's just how we run it.

THE WITNESS: But ten years ago it's hard to remember things, Your Honor.

THE COURT: I understand that. But I'm going to ask you to refrain from asking Mr. Parrish questions; okay?

THE WITNESS: Yeah, yes, Your Honor.

THE COURT: Thank you.

BY MR. PARRISH:

Q. If I showed you a copy of your transcript, would that help you refresh your recollection?

A. Yes, it would.

MR. PARRISH: Referring to page 59 of the transcript beginning with line 6.

Q. Just read that to yourself.

A. Where it's yellow?

Q. Yes, sir.

♀

A. I can't even read these small words.

Q. Would you like me to read it to you?

A. As long as you read them what they say.

Q. Well, no, I'm just going to trick you here. No, I'm going to read exactly what they say.

A. Yes, you may.

Q. Just had he made any threats, physical, and seeing him harm anybody? No. Okay. Just he made threats, physical, and seeing him harm anybody. No.

A. You're right. I did not see him harm anybody.

Q. Or never saw any afterresults such as physical evidence that he had harmed anyone. You did not do that. You did not see that. Answer, I didn't see no evidence of him harming anybody. Would that be accurate as to what you testified?

A. Yes, it would.

Q. And what your testimony would be today, sir?

A. Yes.

Q. And had you seen any evidence in those 100 meetings or had he made any statements with your experience as being an expert

in these areas that you've already talked about, being three years in the service and your ability to test well and not having any other work that you can recall other than this work at that time, you would agree you would have documented that information and you would have it available here in court.

A. I didn't document but the lab setup.

♀

Q. I understand. But had that information been provided to you, that was part of what you had reported on?

A. If he had told me he had harmed someone, I would have reported it.

Q. Exactly, and that would have been what you agreed to do; right?

A. I just agreed to relay information that me and Dustin, whatever we did, to Mr. Graham.

Q. And do you think that would have been important information to have related had he said something like that?

A. Yes, I would think so.

Q. And you would agree that with regard to the drug work you did provide them information on that just as you indicated you would do as part of your agreement with them.

A. Say that one more time.

Q. Okay. Let me slow down a little bit and see can I make my questions a little bit clearer. With regard to the drug information, you would agree you did provide everything you thought the officers would want.

A. I didn't do no thought about it. I just relayed everything that happened between me and Dustin to Officer Graham.

Q. Right. Did you ever see anyone around Dustin? You talked about these meetings that you went to. Did you see anyone

around Dustin who ever carried any weapons?
A.   Not to my recollection.

Q.   Did you ever see him try to order any weapons from all the magazines you said he had?
A.   I don't remember, but I don't think he did.
Q.   And had he tried to order them or fill out a blank form or send something off, you would agree that that's something that you would have written down and recorded.
A.   I didn't look at his mail.
Q.   I understand, but had you -- had you seen something like that --
A.   If I seen an order form that said he's trying to buy a gun, yes, I would have noticed it and told somebody.
Q.   Exactly.  And had he talked to somebody about it, you would have thought it would be something that would be somewhat important.
A.   Yes, I probably would relay that.
Q.   You even told them with regard to the statement that you just volunteered a second ago about making people disappear, you told the officers and also previously testified that you never thought Mr. Honken did anything with regard to making people disappear, didn't you?
A.   At that time, yes.  That was my true statement at that time.
Q.   Finally, sir, with regard to the drug manufacturing, to your knowledge, were any drugs manufactured in this process where you were working with the officers and Mr. Honken was

trying to manufacture methamphetamine, to your knowledge?
A. Define drug.
Q. Well, methamphetamine I assume is what you --
A. No, there was no finished product that I had seen.
MR. PARRISH: All right. Thank you. Thanks so much, sir. I have no further questions.
THE WITNESS: Sorry, Mr. Parrish.
THE COURT: Mr. Williams?
MR. WILLIAMS: Nothing, Your Honor.
THE COURT: Okay. You may step down.
Members of the jury, it's ten o'clock. We'll be in recess for 25 minutes until 10:25. Please remember my prior cautionary instruction about keeping an open mind until you've heard all of the evidence in the case. Thank you.
(The jury exited the courtroom.)
THE COURT: Any matters we need to take up, Mr. Williams?
MR. WILLIAMS: No, Your Honor.
THE COURT: Mr. Parrish?
MR. PARRISH: No, Your Honor.
THE COURT: Thank you. We'll be in recess.
(Recess at 10:02 a.m.)
THE COURT: Ready to have the jury brought in?
MR. WILLIAMS: Yes, Your Honor.
MR. PARRISH: Yes, Your Honor.

626

THE COURT: Do you have your next witness ready to go?
MR. WILLIAMS: Yes, Your Honor.
THE COURT: Okay.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Ready to call your next witness, Mr. Williams?

MR. WILLIAMS: Yes, Your Honor. The United States calls Special Agent John Graham.

JOHN GRAHAM, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. Make yourself comfortable. Please adjust the chair and the microphone. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: John, J-o-h-n, Phillip with two l's, Graham, G-r-a-h-a-m.

THE COURT: Thank you.

Mr. Williams.

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Graham, can you explain to the jury what do you do for a living, sir.

A. I'm employed by the state of Iowa with the Department of Public Safety and assigned to the Division of Narcotics Enforcement.

627

Q. Can you relate to the jury kind of your employment history as a law enforcement officer.

A. I was first hired by the state in 1980, attended the academy. And after graduating from there, I was assigned to the capitol security division of public safety. After a year there, I transferred to the Iowa State Patrol, and then in November of 1982, I transferred to the Division of Criminal Investigation

where I was a narcotics officer with them. In 1987, Department of Public Safety broke narcotics away from DCI and formed the new division, Division of Narcotics Enforcement.

Q. And you've been with the Division of Narcotics Enforcement ever since.

A. Yes, I have.

Q. What is your title there, sir?

A. I'm an agent with the Division of Narcotics Enforcement.

Q. Were you assigned -- when you joined the DCI and started working narcotics and ever since you've been with DNE, the Division of Narcotics Enforcement, have you been assigned to a particular office?

A. Yes, I have.

Q. And where has that been?

A. In Mason City, Iowa.

Q. What geographical area do you cover out of that office, sir?

A. Typically the north central Iowa area and in most recent

years more specifically the nine counties or the eight counties surrounding Cerro Gordo County.

Q. Do you also reside in the Mason City, Iowa, area?

A. Yes, I do.

Q. Do you list your address and telephone number in the phone book?

A. No, I do not.

Q. Is there such a thing as a city directory for the city of Mason City?

A. Yes.

Q. What's a city directory versus a telephone book?

A. Well, it's a list of people's addresses and telephone numbers. It's a list of businesses. It's a quick reference guide in addition to a telephone book.
Q. Is that issued by local government?
A. I believe it's a private company that you can purchase one through.
Q. And do you take steps as a law enforcement officer to make sure that your name does not appear in the city directory as well?
A. I do, yes.
Q. And why do you not have your phone number listed and address in the phone book and also in the city directory?
A. During the early stages of my career, I did a lot of undercover, and I just quite simply didn't want people that I

629

was working on know where I lived at.
Q. Can you relate to the jury, please, what's your formal education?
A. I graduated from Iowa State in the spring of 1980 with a degree in sociology.
Q. You indicated that you went to the initial training through the Department of Public Safety through the academy. Since that time, have you received additional training in the area of narcotics enforcement?
A. Yes, I have.
Q. Has that included specialized training in the methamphetamine laboratories and the methamphetamine manufacturing process?
A. Yes.
Q. And through that process have you become educated in how

methamphetamine is manufactured and the way different lab materials are used in the manufacturing process to some degree?
A. Yes.
Q. I want to direct your attention to the investigation of Dustin Honken in narcotics activity. At some point in 1995 did you become involved in investigating Dustin Honken for narcotics activity?
A. Yes.
Q. Can you relate to the jury how you first got involved in 1995?

A. An individual by the name of Dan Cobeen had reached out through his attorney to law enforcement saying that he had information concerning Mr. Honken.
Q. Now, at this point were you familiar enough with Dustin Honken to know that he had previously been charged with narcotics offenses back in 1993?
A. Yes.
Q. And were you aware what had happened to those charges by 1995?
A. Yes.
Q. And what had happened to those charges?
A. In March of 1995 they had been dismissed.
Q. When in relation to the dismissal of those charges did Dan Cobeen approach his attorney and did you get involved?
A. It was later on in the year, in the fall of 1995.
Q. Can you describe for the jury -- then once Mr. Cobeen came forward and began cooperating with law enforcement, can you describe how you conducted the investigation using Mr. Cobeen?
A. Mr. Cobeen agreed to accompany Mr. Honken in trips to

obtain glassware, chemicals, and other items necessary. Mr. Cobeen agreed to monitor the progress of the establishment of the lab and then report those findings back to me.

Q. What was Mr. Cobeen getting out of this?

A. Nothing.

Q. Were there occasions when you had sufficient advance notice

♀

631

that you actually put a recording device on Mr. Cobeen to record conversations he had with Dustin Honken?

A. Yes.

Q. Were you able to do that all the times on all the meetings he had with Dustin Honken?

A. No.

Q. On the recordings that you did make, can you explain to the jury when a recording is made using a recording device on a confidential informant, are you somehow involved, if you will, in the chain of evidence that results from that recording?

A. Yes.

Q. And explain how, please.

A. In this particular instance, I placed a tape recorder on Mr. Cobeen's person and turned it on. I followed -- would have followed Mr. Cobeen to Mr. Honken's residence, watched him enter the house. On one occasion I waited till he returned outside and met with him and obtained the tape recorder from him at that time. On a second occasion it was a late night meeting, and I did not wait outside, and I met with Mr. Cobeen early the next morning to retrieve the tape recorder.

Q. Now, ultimately -- and we're going to jump ahead a little bit. But ultimately based on the undercover recordings and a search that you conducted at Dustin Honken's house, it's off of

that evidence that Dustin Honken later pled guilty to drug charges?

A. That's correct.
Q. As the law enforcement officer on this case at that point, when Mr. Cobeen would have these contacts that you knew about in advance with Dustin Honken, did you conduct any type of surveillance?
A. Yes, I did. I would follow Mr. Cobeen to Mr. Honken's house.
Q. And so you were able to actually see that he, in fact, met with Dustin Honken on some of the occasions?
A. Yes.
Q. At some point did you -- let me ask you, first of all, were you the so-called case agent of the drug investigation at that point in 1995?
A. It was kind of a shared thing between myself and Agent Dave Mizell with the Drug Enforcement Administration. I was kind of the one responsible for the handling or the contact person for Mr. Cobeen since I was local for Mr. Cobeen to contact.
Q. At some point did you and Special Agent Mizell make the decision to execute a search warrant based on the information you had obtained up to that point from Mr. Cobeen?
A. Yes.
Q. What residence were you going to search?
A. Mr. Honken's residence located at 1104 16th Street Northeast, Mason City, Iowa.
Q. Did you conduct that search on February 7 of 1996?

A. Yes.

Q. Why did you decide to execute the search at that point in the investigation?

A. It was at a point where the lab was kind of in a shutdown mode and that the next step according to Mr. Cobeen was going to be -- as far as law enforcement's opinion could potentially be dangerous to the surrounding neighborhood.

Q. And so before that occurred, it was your decision to execute the search at that time?

A. That's correct.

Q. To search the residence, did you obtain a search warrant?

A. Yes.

Q. And on the day of the search on February 7 of 1996, did you make contact with Dustin Honken?

A. Yes.

Q. Where did that take place at?

A. At Angela Johnson's residence in Clear Lake, Iowa.

Q. And what was the purpose of having contact with him at that time?

A. To notify him that we were in the process of executing a search warrant at his residence.

Q. And the search actually did go forward then at his residence in Mason City?

A. Yes.

Q. And again, just to remind the jury who may not be familiar

with the geography, the distance between Clear Lake and Mason City, Iowa, sir?

A. It's approximately ten miles.

Q. Explain if you will to the jury when we have a search

that's taking place at a house suspected of containing a methamphetamine laboratory, can you walk the jury if you will through the steps of a search and whether, in fact, there's teams and people have different duties during the search?

A. Any type of laboratory search requires law enforcement officers who have received specialized training in the dismantling of laboratory equipment and then the subsampling of any substances that are found in that lab.

So in this particular case we had a team of law enforcement officers who had received that training, and they went in and did the initial search to determine where the lab was located at.

Items were then placed into basically three categories, one being contaminated materials, another into materials that needed to be subsampled, and then the final one was items that could be later used in a court proceeding.

Q. So walk the jury through if you will -- in a typical search of a meth lab then you say there are three categories of evidence: Contaminated, samples of materials, and then items later to be used in court. When you mean contaminated, what do you mean by that?

♀

A. According to procedures, anything such as a glassware or some tubing or utensils that are used to stir up or mix or contain any types of liquids or solids, once those things are introduced into those items, they are considered contaminated and have to be disposed of by a hazardous waste material company.

Q. And you said the sample. When you say sample, what are the teams taking samples of?

A. If there's a container that has a liquid or a solid, there will be a subsample taken out of that container, and then that will be submitted to the laboratory for analysis. The remaining -- or the container that has that sample will then be disposed of along with the contaminated materials.

Q. Is it common during these searches for somebody to go through and take photographs, to photograph the evidence, particularly of these contaminated items, before they're ultimately destroyed?

A. Yes, it is.

Q. Now let's talk about the search that took place of the defendant's house on February 7, 1996. Can you generally describe before we get into some of the photographs the evidence that was found in the search.

A. Generally -- let me back up. The house was a ranch-style house that had a single-stall attached garage, and in the garage was generally where we found the laboratory equipment, the

636

chemicals, and the other tools that are related to that. In the house itself is where we found various books, notes, some scales, some other writings that pertained to -- some of which pertained to the manufacturing process.

Q. Was anybody in the house at the time you executed the search on February 7, 1996?

A. No.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Special Agent Graham, I'm showing you what's been marked as Exhibits 51 through 64 with the exception -- I think 59 is

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 558 of 3636

missing out of here. Can you identify what those exhibits are?

A. Exhibit Number 51 is a photograph taken on February 7, 1996.

All the Exhibits Numbers 51 through 64 minus Exhibit Number 59 were photographs taken on February 7, 1996, from the Dustin Honken residence.

MR. WILLIAMS: Your Honor, these are exhibits that are not objected to, and I'd ask permission to publish these to the jury.

THE COURT: You may.

BY MR. WILLIAMS:

Q. Special Agent Graham, could you take a look at Exhibit 51 and generally describe, first of all, what location in the

♀

637

Dustin Honken residence is this photograph taken?

A. That's a picture of the garage area, and it kind of shows the northeast corner of the garage.

Q. Based on your experience and education in the area of methamphetamine manufacturing, when you look at a photo of this and these items and, first of all, is that a methamphetamine lab based on your training?

A. Just looking at it you can't tell, but once we got into it based on some of the subsampling, we could determine that it was. Some of the items that would suggest that are the tubings, the compressed gas cylinder that's there, and then there's some other plastic containers on the floor that have tubing and have liquid in them.

Q. Let's talk for a minute -- you talked about the compressed gas cylinder. Is that what you're talking about right there?

A. Yes.

Q. And some of the tubing and material, the tubing, you're talking about this thing here?
A. Yes.
Q. And then what's right there?
A. It's a piece of glassware that's commonly found in some methamphetamine labs.
Q. I want to talk to you a minute. You mentioned that there is sampling done of items before they're destroyed. Can you walk the jury through when a sample is taken basically the chain

♀

of custody of the sample until it's tested by the lab?
A. Once a container is located, either the agent or else the chemist who discovers that will then measure the volume of whatever liquid or solid that's in there, take a small portion of that substance that's in there, put it into another small container, seal that up for transportation to the lab. Typically what happened in this case, all those samples -- subsamples, excuse me, were given to Agent Mizell, and then Agent Mizell submitted them to the lab for analysis.
Q. And once it's submitted to the lab for analysis, is there a number of other people that may be involved in the ultimate getting of the sample, the testing of the sample, and the return of the sample to law enforcement if that is done?
A. Yes.
Q. Now, I've been using kind of a term of art. I've been using chain of custody. Can you explain what that is to the jury, please?
A. It's simply just kind of a road map of what happens to a piece of evidence. If it was found by myself and given to Agent Mizell, then it goes to the laboratory, those types of things

are documented, and that then builds the chain of custody.

Q. Why is it necessary to document this chain of custody?

A. So we can then present it at a later time in a court proceeding.

Q. What if one piece of that chain of custody was to be

♀

missing in a case? What, if anything, would that -- what impact would that have to your investigation, your ability to prove the case?

A. In some instances that is evidence that would not be able to be presented in court.

Q. Exhibit 52, can you describe for the jury what they're seeing there?

A. Yeah, it's just a close-up picture of the work bench that was -- we saw in Exhibit Number 51. And again, you can see the beaker and other items.

Q. Fifty-three?

A. It's generally the same photograph except moved to the right a little bit, and you're looking into the kitchen area on the right-hand side of that photograph that goes into the residence.

Q. Fifty-four, sir.

A. Again, that's under the work bench, and you can see on the lower right-hand side the two plastic containers that contained a liquid as well as the various hoses and other tubing.

Q. Fifty-five?

A. That's on the right side of the work bench, and again, we see the compressed gas cylinder and the two plastic containers on the floor with the liquid.

Q. Special Agent Graham, based on your training and

experience, are there different levels of sophistication of

methamphetamine labs?
A. Yes, there are.
Q. And based on your review of the evidence of this case including these photographs, is this a sophisticated or unsophisticated methamphetamine laboratory?
A. For the state of Iowa it falls on the side of sophisticated.
Q. Showing you Exhibit 56. Is that just another photograph of that same bench but it's a close-up?
A. Yes.
Q. Fifty-seven, sir?
A. That is what we refer to as a three-neck flask, and it's seated on a -- or in a pan that was on a heating mantle.
Q. Where at in the house roughly do you know this to be?
A. That was on the steps leading to the doorway that would go into the kitchen. The plastic-suited legs there that you see was somebody that's standing inside the residence.
Q. Is it one of the search team individuals?
A. Yes.
Q. Exhibit 58, sir?
A. Again, it's a picture of the top portion of the steps or the landing before you would enter the residence.
Q. Exhibit 60?
A. Again, just a different view of the same area.
Q. I want to talk to you for a minute about one of the items

in this photograph. Can you explain to the jury what that item is there?
A. That's what I referred to earlier as the three-neck flask.
Q. What is the significance of a three-neck flask? Is that something unique to a methamphetamine laboratory? Let me put it this way. Is it used in the methamphetamine laboratory?
A. Yes.
Q. And this is an item that -- would that fall in the category of the contaminated items that would have been found at that search site?
A. Yes.
Q. And so what ultimately happened then with that three-neck flask?
A. If there was liquid in there, that would have been subsampled and then set aside for the disposal company to properly take care of it.
Q. So ultimately that would have been destroyed along with some of the other evidence.
A. Yes.
Q. Exhibit 61, first of all, where in the house is that photograph taken, sir?
A. It's in the kitchen area just inside the doorway from the garage.
Q. And 62 is what, sir?
A. It's just more of a close-up picture of Exhibit Number 61.

642

Q. I want to show you on there, Exhibit 62 on the left-hand side, do you see that?
A. Yes.
Q. What is that, sir?

A. It's a brown bottle.

Q. And do you recall as part of your investigation in this case there was a search at Greg Nicholson's house in March of 1993 in which methamphetamine was seized during that search?

A. Yes.

Q. And showing you the photograph that's marked and been admitted into evidence as 26S, is that a similar brown bottle that was seized from Greg Nicholson's house?

A. Yes.

Q. And just so we're clear, Exhibit 62 is an item seized from Dustin Honken's house in 1996.

A. I don't recall if it was actually seized or not. It was certainly photographed.

Q. Found. It may have been one of those items that ended up having to be destroyed.

A. Yes.

Q. And it does look -- it does appear that there's some liquid in there, in the bottle, just from looking at it?

A. There's some substance in there.

Q. And earlier one of these photographs I showed you you indicated there was a man with those legs in the photograph

643

there, and I didn't ask you, those were white legs with boots or whatever. Why are they in that kind of gear?

A. Again, according to procedures that have been established for law enforcement in the response to methamphetamine labs, law enforcement needs to protect itself from any chemicals or odors that may be in the area where the lab's at, and that was some of the protective equipment that was worn by one of the officers.

Q. So going back to Exhibit 62 for a moment, the item in the

right of this photograph, can you explain to the jury what that is, sir?

A. It's a scale.

Q. Based on your training and experience, are scales used in narcotics trafficking?

A. Yes.

Q. Can you explain how, sir?

A. They can be used either to weigh out a product for resale or else in a lab situation they could be used to weigh out powdered substances if you're going to add that in to the manufacturing process.

Q. Special Agent Graham, I'm going to show you what's been marked as Government's Exhibit 65 -- I'm sorry, 68 I believe and ask you if you can identify that, please. Sixty-five I believe it is.

A. Yes. Contained in this sack is Exhibit -- Government's Exhibit Number 65 which is the scale that is shown in the

♀

photograph in Government's Exhibit Number 62.

Q. Is there a term used to describe a scale of this nature, I mean, a different-beam scale?

A. There are different types of scales. There's triple-beam scale which this would kind of fall into the category of that. However, it's also a balance scale.

Q. And is that -- when you see a scale based on your training and experience, a scale of this nature, is that one used to weigh out quantities that would be more consistent with distribution or quantities that might be consistent with personal use quantities?

A. It's one that could be used both, although this has

enough -- could measure enough weight that it could be used in the distribution.

Q. Showing you Exhibit 63, can you describe what the jury's looking at there, sir?

A. That would be an example of the items that had been set aside for the disposal company to come and pick them up for disposal.

Q. And 64 is just another shot of that same thing, sir?

A. Yes.

Q. Now, were there some uncontaminated glassware seized from the residence that you were able to maintain?

A. Yes.

MR. WILLIAMS: By the way, Your Honor, Exhibit 65, the

645

triple-beam scale, is one that the defense has no objection to, and it is admitted into evidence already.

THE COURT: Yes, that's right. Thank you.

BY MR. WILLIAMS:

Q. Agent Graham, if you could take a look at Exhibit 66 and identify that for the jury, please.

A. Exhibit Number 66 is a distillation flask that was seized from the garage area of Mr. Honken's residence.

Q. Is that a fairly specialized piece of glassware based on your training and experience in narcotics trafficking?

A. Again, based on the types of laboratories that we typically see in Iowa, it is.

MR. WILLIAMS: And again, Your Honor, Exhibit 66 is one of those admitted into evidence with no objection from the defense.

THE COURT: Thank you.

BY MR. WILLIAMS:

Q. Special Agent Graham, once the crew came through and handled all the hazardous materials and so forth and disposed of what we see in the picture, Exhibit 64, did other law enforcement officers then seize other items from the house and they fall into that third category you talked about, items that you were able to keep?

A. Yes. Actually some of the team members that were used, once it was determined that the lab was essentially in the

♀

646

garage area, team members that have the specialized training then searched the majority of the house, and then later on it was followed up by Agent Mizell and myself to search.

Q. And during the search of the house itself, did you find various papers that you indicated earlier that you tied to narcotics and manufacturing activity?

A. Yes.

Q. Handing you Exhibit 67, can you identify that for the jury, please?

A. Government's Exhibit Number 67 is an envelope that has instructions on it that was seized from the Honken house on February 7, 1996.

MR. WILLIAMS: Your Honor, permission to publish. This is another exhibit that there's no objection to.

THE COURT: You may.

BY MR. WILLIAMS:

Q. And can you relate for the jury -- and it's kind of a little hard to read the handwriting. Can you read that for them, please?

A. Tim, please set up for simple distillation. Set the hot

plate on setting number 9. Dustin. And then on the -- written on the side it says -- I guess I can't read the second word. Something about -- oh, please run the chlorine outside or dump it so it don't fumigate the place.
Q. The actual exhibit you have in front of you is 67. Can you

♀

show the jury, first of all, has that got anything in it as well?
A. Yes, it does. It contains some coupons.
Q. And any significance to the coupons that you can determine?
A. No.
Q. But that's the form in which it was found at the time you seized it from the house.
A. Yes, it is.
Q. And on -- is there -- this note that we're looking at on Exhibit 67, is that written on the front or the back of that envelope?
A. It's what I would refer to as the back side.
Q. With the flap?
A. With the flap.
Q. Is there anything on the front side of the envelope?
A. Yes, there is.
Q. And what is that?
A. It's kind of like a shopping list that's listed on it, things to pick up, and then also there's a return address for a business in Arizona.
Q. The business in Arizona, what's the name of that business?
A. Printed Circuit Technologies.
Q. And based on your knowledge of this investigation, was that the company owned and operated by Jeff Honken down in Arizona?

A. Yes.

♀

Q. Handing you Exhibit 68, can you identify this for the jury, please.

A. Government's Exhibit Number 68 is a piece of paper containing chemical notes on it that was seized from Mr. Honken's residence on February 7, 1996.

MR. WILLIAMS: Again, Your Honor, this is one not objected to. Permission to publish it to the jury?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Can you explain what this is to the jury, please, sir?

A. It's kind of a step-by-step process of starting out with chemicals and then through a manufacturing process another chemical is produced and then another chemical is produced until eventually the substance methylamine is produced -- or excuse me, methamphetamine.

Q. And that's that last line down there on the lower right-hand side?

A. Yes.

Q. Again, based on your experience as a narcotics officer, is this a sophisticated, if you will, recipe for methamphetamine manufacturing?

A. Yes, it is.

Q. In your career have you seen anything quite this sophisticated before?

A. Not in Iowa, no.

♀

Q. Handing you Exhibit 69, can you identify that for the jury,

please.

A. Exhibit Number 69 is a letter that was seized from the Dustin Honken residence on February 7, 1996.

Q. And who is it addressed to?

A. It's addressed to Dustin, and on the envelope it says Dustin Honken.

Q. And is there a signature to it?

A. It appears to be written -- written over so you can't read it. However, on the return address portion of the envelope, it's from Angela Johnson.

MR. WILLIAMS: United States would move to admit Exhibit 69 into evidence, Your Honor.

* * * *

(Government Exhibit 69 was offered.)

* * * *

THE COURT: Any objection to 69?

MR. SPIES: We object on relevance grounds, Rule 403. It constitutes hearsay, and it also violates Mr. Honken's right to confront.

THE COURT: Overruled. Sixty-nine is received.

* * * *

(Government Exhibit 69 was admitted.)

* * * *

BY MR. WILLIAMS:

650

Q. The easiest way to do this, Special Agent Graham, I think is going to be put it on here. First of all, 69, is that the letter you just referenced, sir?

A. Yes, it is.

Q. And it's a multi-page letter from Angela Johnson to Dustin

Honken?

A. Yes.

Q. There's a date on that?

A. Yes, there is.

Q. And what date is that?

A. October 21, 1995.

Q. Twenty-one, sir?

A. From what I -- excuse me. It's October 26.

Q. You need to get your reading glass prescription checked on, sir.

Let me move to a latter page of this document. In particular, was there a reference to a business relationship between Dustin Honken and Angela Johnson in this letter?

A. Yes, there was.

Q. And it's been marked with those arrows. Do you know who marked those with the arrows?

A. No. It was not marked -- no, I don't know.

Q. It was not marked by law enforcement.

A. No, it wasn't.

Q. This is the condition in which it was seized?

♀

A. Yes.

Q. And generally what's the general tenor of the letter, first of all?

A. It's -- generally it's about their personal life.

Q. And then at some point toward the end of the letter there's a reference here. Could you read out the reference to their business relationship?

A. I expect you to keep your word about our business relationship and support your daughter the best you can and

treat me nothing less than what -- than with respect from here on out. I will not expect anything less than that from you or anyone.

Q. And then there's -- anyone else ever again?

A. Correct.

Q. Very good. You indicated earlier in your testimony among other things you found there you also found some books of some sorts?

A. Yes.

Q. Handing you Exhibit 70, can you identify that for me, please.

A. It's one of the books that were seized on February 7, 1996, from the Honken residence, and it was the Anarchist Cookbook.

MR. WILLIAMS: United States would move to admit Exhibit 70, Your Honor.

* * * *

♀

652

(Government Exhibit 70 was offered.)

* * * *

THE COURT: Any objection?

MR. SPIES: Relevance and Rule 403, Your Honor.

THE COURT: Overruled. Seventy is received.

* * * *

(Government Exhibit 70 was admitted.)

* * * *

BY MR. WILLIAMS:

Q. Where was this found at in the residence, sir?

A. It was found in a bedroom in the living portion of the house.

Q. And the person living in that house was who?

A. Dustin Honken.

Q. Were there other items, other books and catalogs and things like that, found in the same location in that same closet?

A. Yes.

Q. The Anarchist Cookbook, have you had an opportunity to look through that cookbook?

A. Yes, I have.

Q. Is there a portion of that what's called the Anarchist Cookbook that deals with homemade silencers for firearms?

A. Yes.

Q. First of all, showing you Exhibit 70 on the screen, is that the cover of the Anarchist Cookbook, sir?

653

A. Yes, it is.

Q. Directing your attention then to what is page 98 of that cookbook, do you see a reference in the lower right-hand corner to silencers?

A. Yes.

Q. And this is just the first part of it. Does it go on for several pages to discuss how to make a homemade silencer?

A. That's correct.

Q. Showing you Exhibit 71, can you identify that, please?

A. Exhibit Number 71 is a copy of the Secret Agent Headquarters catalog.

Q. What is that a catalog for? Well, let me back up. Where did you seize that from, sir?

A. We seized that from the same bedroom in the Honken residence on February 7, 1996.

MR. WILLIAMS: United States would move to admit Exhibit 71, Your Honor.

* * * *

(Government Exhibit 71 was offered.)

* * * *

MR. SPIES: Objection on relevance and Rule 403 grounds, Your Honor.

THE COURT: Objection's overruled. Seventy-one is received.

* * * *

♀

(Government Exhibit 71 was admitted.)

* * * *

BY MR. WILLIAMS:

Q. Special Agent Graham, could you open up Exhibit 71 and describe for the jury the type of items that are in this catalog? What is it a catalog for?

A. It's a catalog that you can order items such as a body wire or transmitters. There's different types of surveillance equipment that you can order out of here, weapons detection devices. There's some countermeasure devices such as to be able to pick up radio frequency. Again, there's some countermeasure devices or countersurveillance devices to determine whether or not your telephone's been -- had a wire tap placed on it. There are some other night vision optics that you can purchase through here and other surveillance equipment as well as some video cameras.

Q. Now, in your experience as a narcotics officer, what significance does that type of equipment have for you? Is that used in the drug trade?

A. Sometimes they are.

Q. And what would they be used for in the drug trade?

A. Most often they are used as countersurveillance measures to alert a drug trafficker, number one, if law enforcement is approaching their residence or just so they can be notified if someone is approaching their residence.

♀

Q. And just so we're clear, in this case did you find any of those type of devices present in Dustin Honken's home during the search on February 7, 1996?

A. No.

Q. You found a catalog for those items but not the items themselves.

A. Correct.

Q. Showing you Exhibit 74 and 73, can you identify those for the jury, please.

A. Again, both those books were seized from the Dustin Honken residence in February of 1996.

Q. And where were they located at when you seized them?

A. Again, they were in the same bedroom.

Q. And those are for types of lab equipment to be ordered?

A. Yes. Exhibit Number 73 pertains primarily with glassware that's associated with chemistry.

Q. Let me stop you there.

MR. WILLIAMS: Your Honor, may I publish that? It's one of them with no objection from the defense.

THE COURT: You may.

BY MR. WILLIAMS:

Q. And so that's the cover of Exhibit 73, sir?

A. Yes.

Q. And 74 is what?

A. Is a chemical and safety products book that was also seized

on that day.

MR. WILLIAMS: Permission to publish again, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. And that's the cover of that catalog as well.

A. Yes.

Q. Showing you Exhibit 79, can you identify that, please?

A. Government's Exhibit Number 79 is the Loomponics Unlimited catalog that was seized from the bedroom in Mr. Honken's residence in February of 1996.

MR. WILLIAMS: And, Your Honor, this is one where there's no objection, so I believe it's admitted into evidence.

THE COURT: It is.

BY MR. WILLIAMS:

Q. Special Agent Graham, could you just describe for the jury what is that a cat -- or what is the Loomponics catalog if you will?

A. It is a catalog where you can order different and various types of books from.

Q. And books including some of the type of books that you seized from the residence on February 7, 1996.

A. Yes.

Q. Showing you Exhibit 80, can you identify that for the jury, please.

A. Exhibit Number 80 is a copy of the Poor Man's James Bond

book, volume number 1, and it was seized from Mr. Honken's residence in February 1996 again from the closet area of the bedroom.

MR. WILLIAMS: United States would move to admit Exhibit 80 into evidence, Your Honor.

* * * *

(Government Exhibit 80 was offered.)

* * * *

THE COURT: Any objection?

MR. SPIES: Relevance and Rule 403, Your Honor.

THE COURT: Overruled. Eighty is received.

* * * *

(Government Exhibit 80 was admitted.)

* * * *

BY MR. WILLIAMS:

Q. Special Agent Graham, are there portions of that book that's called Poor Man's James Bond that deal with the manufacturing of homemade silencers?

A. Yes.

Q. First of all, this is the cover of Exhibit 80; is that correct, sir?

A. Yes.

Q. Looking at Exhibit 80, page 2, is there a copyright publication date on that page of the Poor Man's James Bond?

658

A. Yes, there is, 1991.

Q. We talked about the fact that this had entries regarding silencers. Is this page a page out of the book that deals with homemade silencers?

A. Yes, it is. It's page 35.

Q. And it continues to have information about manufacturing homemade silencers for the next several pages; is that correct?
A. Yes.
Q. Is there also a section of Exhibit 80, this book called Poor Man's James Bond, that has to do with securing and tying prisoners?
A. Yes.
Q. Turning to page 414 of the Poor Man's James Bond, is this one page where the securing of prisoners is first discussed?
A. Yes, it is.
Q. And that goes on for several pages, sir?
A. Yes.
Q. Does it also include a section about gagging prisoners?
A. Yes.
Q. Is that the page on 416 of the Poor Man's James Bond that has to do with the gagging of prisoners?
A. Yes, it is.
Q. Is there a talk -- a discussion in this in particular about using cloth to be put in the mouth before the person's gagged?
A. Yes.

659

Q. I've highlighted there a section there. Can you read that to the jury, please?
A. A gag prevents a prisoner from crying out. Force a handkerchief or a strip of cloth into the prisoner's --
Q. And can you go ahead and read that as well from the book?
A. -- mouth. A lump of turf will suffice if nothing else is available. Tie a handkerchief around the prisoner's mouth.
Q. Is there also a discussion about using adhesive tape as a form of a gag?

A. Yes, there is.
Q. Could you read that for the jury, please.
A. Place several strips of tape across the prisoner's mouth. The tape should be at least one inch wide and five inches long. Stuffing a handkerchief or a strip of cloth into his mouth will make the gag much more effective.
Q. Now, was Dustin Honken arrested for the methamphetamine lab at the time of the search on February 7, 1996?
A. No.
Q. Was he ultimately indicted by a federal grand jury on April 9 of 1996?
A. Yes.
Q. And was he then arrested on April 29, 1996?
A. Yes.
Q. Can you explain to the jury why a delay? Why not just arrest him at the time?

♀

660

A. We continued with some of our investigation, and we waited for the laboratory to conduct some of the preliminary analysis so we could properly charge Mr. Honken.
Q. After his arrest on April 29, 1996, was there a hearing to determine whether he should or could be released pending trial?
A. Yes.
Q. As a result of that hearing -- first of all, did you attend that hearing?
A. Yes, I did.
Q. Did you testify at that hearing?
A. Yes.
Q. Were there ultimately -- first of all, was the defendant ordered to be detained pending trial at that time?

A. No.
Q. Did the court impose restrictions on the defendant while he was released pending trial?
A. Yes.
Q. What were the nature of those restrictions?
A. He was under what was referred to as home confinement or house arrest and was required to wear an electronic ankle bracelet that would set off an alarm if he ventured too far away from his home. He was allowed to continue work at -- in Mason City, and so during those off hours away from the home then he was not in violation. He was also allowed trips to visit with his attorney as well as any other court-ordered requirements.

661

Q. Were there restrictions on the people he could have contact with at all?
A. Yes.
Q. And who do you recall that he was prohibited from having contact with?
A. Mr. Tim Cutkomp and Mr. Dan Cobeen.
Q. I want to talk to you for a moment about that electronic ankle bracelet. Who's in charge of monitoring and -- that activity and placing it on him and so forth? Whose responsibility is that?
A. U.S. probation officer.
Q. And at that time in 1996, were there a couple U.S. probation officers named Jay Jackson and Jerry Skadburg who were involved in this case supervising either Dustin Honken or somebody else?
A. Yes.
Q. Now, at some point after the -- Dustin Honken's arrest in

April of 1996, was anybody else arrested with him, first of all?
A. Yes, Mr. Cutkomp.
Q. And did Mr. Cutkomp at some point decide to cooperate with law enforcement?
A. Yes.
Q. At some point after he initially indicated he wanted to cooperate, were wired communications -- in other words, did he wear a wire and record conversations with Dustin Honken?

♀

A. Yes.
Q. During those -- at some point during his cooperation, were you, if you will, walled off from that portion of the active investigation?
A. Yes, I was.
Q. And why was that?
A. Since Mr. Honken had been arrested and that he was represented by counsel, to protect his constitutional rights, there was another investigative team, if you will, or a taint team that was established to run that portion of the investigation, and Agent Mizell and myself were walled off and did not have knowledge of what was taking place.
Q. Until after it was accomplished.
A. That's correct.
Q. And is that because of the potential that during those recorded conversations something might infringe upon his representation by counsel?
A. Yes.
Q. Because at this point he had counsel.
A. Yes, he did.
Q. Ultimately after the recorded conversations take place, was

the -- based on those recorded conversations, was Dustin Honken arrested again?
A. Yes.
Q. And was he -- did this take place on June 11 of 1996?

A. Yes.
Q. And what happened with him? Where was he ultimately placed after his arrest on June 11, 1996?
A. Ultimately he was housed in Woodbury County Jail.
Q. On June 2 of 1997, did the defendant -- did Dustin Honken enter a guilty plea to the charges, to at least a couple of the charges pending against him arising from his arrest in April of 1996?
A. Yes.
Q. The person that we've been talking about, Dustin Honken, you've seen him on a couple occasions; is that correct, sir?
A. Yes.
Q. You saw him at the day of the search on February 7 of 1996?
A. Yes.
Q. And you saw him again at the detention hearing that took place where you testified?
A. Yes.
Q. Is he in the courtroom here today, sir?
A. Yes, he is.
Q. Can you identify where he's sitting and what he's wearing for the jury, please?
A. He's seated to my left. He's wearing kind of a tan yellowish type shirt, collared shirt, with glasses.

MR. WILLIAMS: Your Honor, government has no further questions of this witness at this time on these subjects. We

would request permission to recall him at a later time on another subject.

THE COURT: Permission granted.

Would you like to cross-examine him now, Mr. Spies?

MR. SPIES: Yes, Your Honor.

THE COURT: Okay. Why don't we give the jury a short stretch break, and then you can begin your cross-examination.

Thank you. Please be seated.

Mr. Spies, whenever you're ready.

MR. SPIES: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SPIES:

Q. Agent Graham, just to kind of start back at the beginning again, your investigation into Mr. Honken began in October of 1995 when, as you testified, you learned of information from Dan Cobeen that was conveyed to law enforcement or to the Cerro Gordo County attorney by Mr. Cobeen's lawyer; am I right?

A. Yes.

Q. And that's when you became actively involved in the investigation, and as we heard earlier this morning from Mr. Cobeen, he was recruited and helped by you to obtain information from Mr. Honken?

A. He offered his information because of his recruitment by Mr. Honken.

Q. Right. I understand. But then you took advantage of that

665

invitation to cooperate, had Mr. Cobeen furnish you with information he was getting from Mr. Honken.

A. Correct.

Q. And Mr. Cobeen was from time to time furnished with recording devices to record his conversations with Mr. Honken.

A. Yes.

Q. Was it your decision about when to furnish Mr. Cobeen with a recording device?

A. Yes, it was.

Q. So, for example, you would get some information from Mr. Cobeen about some upcoming meeting with Mr. Honken. You then made a decision about whether to record that encounter or not.

A. That's correct.

Q. And were all of the encounters between Mr. Cobeen and Mr. Honken that were recorded recorded at either Mr. Cobeen's residence or at Mr. Honken's residence?

A. Both at Mr. Honken's residence.

Q. All right. And were any recorded at the workplace where Mr. Cobeen and Mr. Honken were working?

A. No.

Q. So from October of 1995 when you began your involvement in the investigation until the search warrant that was executed at Mr. Honken's home in February of 1996, that would kind of span your involvement in the investigation leading up to the search.

♀

666

A. Correct.

Q. Roughly four months.

A. Correct.

Q. And included in your investigative work in this case in addition to working with Mr. Cobeen and recording those conversations, you also did surveillance as you've told us

today?

A. Yes.

Q. And the surveillance would consist of what? Your driving with Mr. Cobeen to his meetings with Mr. Honken?

A. Not with him. I would follow him and then watch him park in front of the house and then walk into the house.

Q. Okay. And as you would drive to these meetings, would you be driving your own personal car?

A. No.

Q. You had like a state vehicle that you were using?

A. Yes.

Q. Okay. And in addition to going to meetings with -- where Mr. Cobeen and Mr. Honken were going to be getting together, you would sometimes do surveillance independent of that.

A. Correct.

Q. So, for example, you would drive by Mr. Honken's house to see if there was any activity there?

A. Yes.

Q. And you wanted to determine where, in fact, Mr. Honken

667

lived.

A. Correct.

Q. You would want to see if there were other cars parked there that you might be able to identify with a suspect?

A. Yes.

Q. And would there be other reasons that you would be doing surveillance of Mr. Honken's house?

A. There was one occasion where I picked up his garbage for any investigative leads.

Q. Okay. And that -- just for the education of all of us here

in the courtroom, that's a standard investigative measure that's used. It's called a garbage drop or a garbage pick-up where you'd go through somebody's garbage to see if there's any drug paraphernalia in there, other evidence of crimes?
A. Correct.
Q. Okay. So how many times do you think you would have driven by where Mr. Honken was living in that four-month period between October of '95 and, say, February of '96?
A. From the end of October until the first part of December, there would not have been any because I was -- had been injured and I was off duty.
Q. Oh.
A. And then beginning in December of 1995, it would have been on -- at least on a weekly basis. Well, once he established a residence in Mason City. Initially he had not -- he was not

♀

living in Mason City. He was living with Angela Johnson, and then later on -- it was sometime in December -- he established his Mason City residence.
Q. So did you do any surveillance, that is, driving by, between October -- the end of October '95 and, say, the beginning of January '96?
A. Very little.
Q. And I'm not going to pry into the nature of your disability, but did you do any driving in Clear Lake, Iowa, near the Angela Johnson residence doing surveillance?
A. I don't recall that I did.
Q. Okay. Now let's turn to the methods that you used to monitor the contact between Mr. Honken and Mr. Cobeen. You used a -- just a tape recording device that he was equipped with,

that Mr. Cobeen was equipped with?

A. Yes.

Q. And did this contain a microphone separate from the -- like the built-in microphone on a small handheld tape recorder?

A. I did not use any external microphone. It was just the built-in microphone on a micro cassette tape recorder.

Q. Okay. Mr. Cobeen testified this morning about one time during his work with you that he I believe sold some drugs to Mr. Honken. Do you remember that incident?

A. Yeah, I remember him telling me that he had done that.

Q. And was that on your instructions?

669

A. No.

Q. He was acting outside of the instructions that you had given him?

A. I believe that that took place prior to him meeting with us in October of '95.

Q. But while he was on probation?

A. I don't know what his status was at that time.

Q. Did Mr. Cobeen tell you that he was using drugs with Mr. Honken?

A. He said that he had prior to our meeting, yes.

Q. Did he tell you that he'd used drugs with Mr. Cutkomp?

A. I don't remember.

Q. Or did he tell you that he was using drugs with Mr. Cutkomp while he was working for you?

A. No, he did not tell us that.

Q. You described for us in going through government's photographic exhibits -- I think they are roughly 50 through 67 or 68 -- the photographs that were taken during the search of

Mr. Honken's residence in February of 1996. And you described this as a comparatively sophisticated operation. Before you got involved in the investigation of Mr. Honken in October of 1995, most of the meth labs or the drug labs that you had seen involved a completely different process for making methamphetamine; is that fair?
A. Yes.

♀

Q. And the process that you were most acquainted with was using ingredients like anhydrous ammonia, lithium batteries, pseudoephedrine like from cold tablets, drain cleaner, stuff like that.
A. Actually that became more popular after this time period. That would have happened a few years later. The process that was oftentimes used was obtaining P2P and then converting it into methylamine which then can be converted into methamphetamine. This particular process started completely from the bare -- like making a scratch cake. You start at the bare minimum and then build up.
Q. That is Mr. Honken's technique?
A. Yes.
Q. So he was actually making some of the raw ingredients that went into the manufacturing or the cooking process.
A. Yes.
Q. And he was doing this in his garage as shown in the photographic exhibits that we've looked at here this morning.
A. Yes.
Q. But he was still using some fairly crude techniques like aluminum foil, a space heater out in the garage in the middle of the winter, so in that respect there were some crude techniques.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 588 of 3636

A. Certainly, yes.

Q. Okay. Let me ask you this. You were asked about some of the exhibits that were seized from Mr. Honken's residence.

MR. SPIES: If I may approach, Your Honor.

THE COURT: You may.

BY MR. SPIES:

Q. First of all, I'd like to ask you some questions, Agent Graham, about the catalogs and books that were seized from Mr. Honken. By the way, do you know based on your investigation of these exhibits when Mr. Honken would have received these?

A. No, we don't.

Q. You have no clue.

A. No.

Q. Okay. So he may have had these for years. He may have had them for weeks as far as you know.

A. That's correct.

Q. And the only real guidance we have is the copyright dates that are on these catalogs and books.

A. Yes.

Q. And by the way, all of the catalogs and books that we've looked at here, that you looked at, were published in the United States or somewhere and they bear copyrights.

A. Yeah, I believe they do.

Q. Okay. So they were published legally and distributed legally as far as you know.

A. Yes.

Q. Okay. Let's take a look first at Government's Exhibit Number 70. This is the Anarchist Cookbook where Mr. Williams I

think pointed out an excerpt that dealt with silencers? You remember that testimony?

A. Yes.

Q. Does Government's Exhibit 70, the Anarchist Cookbook also have information about illegal drugs, making illegal drugs, putting illegal drugs into brownies for amusement purposes?

A. Yes, it does.

Q. Next drawing your attention to Government's Exhibit Number 80, the James Bond cookbook -- excuse me, the James Bond book, Mr. Williams asked you again if this contains information about silencers and also has information about binding and gagging people. You've examined this whole book, haven't you, Mr. Graham?

A. I don't think that I've examined page by page, but I leafed through it to know that there are several topics in there.

Q. Would you agree that the Poor Man's James Bond book, Government's Exhibit Number 80, also contains an excerpt from the United States Marine Corps manual on hand-to-hand combat?

A. Yes, it does.

Q. And, in fact, it may be in the United States Marine Corps excerpt that the provisions read by Mr. Williams about binding and gagging people are contained. Would you agree with that?

A. I'd have to review it to make sure it goes back, but it could very well be.

Q. All right. And does the Poor Man's James Bond book also

673

have information about chemistry, electronics, fireworks, things like that?

A. Yes.
Q. Now, you've told us that even though one of the catalogs, one of the government's exhibits, has information about surveillance equipment and countersurveillance equipment you found no evidence of that at Mr. Honken's house in Mason City; right?
A. We did not.
Q. Okay. And some of the objects that are contained or for sale in the catalogs of countersurveillance or surveillance equipment can also be purchased at a Radio Shack. They can be purchased through a Cabela's catalog of sporting equipment; right?
A. Yes, they can.
MR. SPIES: Agent Graham, I appreciate your time with me this morning.
Those are all the questions I have, Your Honor.
THE COURT: Thank you, Mr. Spies.
Mr. Williams?
MR. WILLIAMS: Just a couple follow-up questions.
REDIRECT EXAMINATION
BY MR. WILLIAMS:
Q. Special Agent Graham, you were asked questions about recording conversations between Mr. Cobeen and the defendant in

this case. At the time that Mr. Cobeen was working at Kraft with the defendant, was he cooperating with law enforcement at that time?
A. Yes.
Q. And was any recording attempted at the workplace?
A. No.

Q. Can you explain to the jury some of the factors that go into your judgment as a law enforcement officer in determining when to attempt to record a conversation with a suspect and when not to?

A. Well, if we are aware of it, we'll certainly do whatever we can to make sure that that conversation is recorded. Also we have to look at the setting that the meeting will take place, whether or not there's too much background noise that will drown out any conversations that could take place and, again, whether or not it's feasible or logistic possibility to complete that.

Q. Are there safety concerns that factor in?

A. There are sometimes.

Q. Can you explain that, please?

A. Sometimes certain types of electronic equipment can pick up if somebody's wearing a body transmitter. Other times if one person is meeting another person, if they suspect them, they may subject them to a patdown search.

Q. And could that place a confidential informant in danger if he's found to be carrying a recording device?

675

A. It could.

Q. And is that one of the factors you took into account in determining when you were going to have Mr. Cobeen record any conversations with the defendant?

A. Yes.

Q. Exhibit 70 and Exhibit 80, the Anarchist Cookbook and the Poor Man's James Bond book, you were asked some questions about that. The fact that both of those contain chapters or sections about manufacturing drugs, is there anything about -- in either one of those about manufacturing the drug methamphetamine?

A. I don't believe so.

MR. WILLIAMS: Nothing further.

THE COURT: Mr. Spies, anything further?

MR. SPIES: Nothing else, Your Honor. Thank you.

THE COURT: Thank you. Thank you. You may step down.

MR. WILLIAMS: United States calls Tim Cutkomp.

TIMOTHY CUTKOMP, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. Mr. Cutkomp, could we get you to pull up that chair as close as you can and pull those microphones down so you can speak directly into the microphones. And would you state your full name, please, and spell your last name.

THE WITNESS: Timothy Ken Cutkomp. The last name is spelled C-u-t-k-o-m-p.

THE COURT: Thank you.

♀

676

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Cutkomp, I want to learn a little bit about your background, sir, and who you are. First of all, how old are you, sir?

A. I'm 37.

Q. And where do you come from?

A. Britt, Iowa.

Q. You grew up in Britt, Iowa?

A. Yes.

Q. Did you attend school there?

A. Yes, I did.

Q. How far did you go through school?
A. 12th grade.
Q. Once you graduated from high school in Britt, Iowa, did you pursue any further education?
A. Later on I attended NIACC.
Q. North Iowa Area Community College?
A. Yes.
Q. Approximately when was that if you recall?
A. From '90 -- in '91 and '92.
Q. And what kind of degree were you pursuing there?
A. Liberal arts.

♀

677

Q. What kind of classes did you take in pursuit of that degree, sir?
A. Some science classes and math.
Q. Did you take any chemistry classes there, sir?
A. I took one, yes.
Q. After NIACC in your life have you pursued any further education?
A. Yes, I have.
Q. And what other education have you received, sir?
A. I've taken an apprenticeship for sheet metal.
Q. Where did you take that at?
A. In the Des Moines area.
Q. And is that -- how long of an apprenticeship program is that, sir?
A. Four years.
Q. When did you take that?
A. I just got done with the fourth year.
Q. And have you graduated then?

A.    Yes.
Q.    What's the result of graduating from an apprenticeship program like that?  You get some type of --
A.    You're a journeyman sheet metal worker.
Q.    And a journeyman sheet metal worker means what then?
A.    You are licensed to install and do the work of a sheet metal worker I guess.

♀

Q.    Is that primarily like heating and cooling for homes and office buildings, that type of sheet metal?
A.    Yes.
Q.    Is that what you currently do?
A.    Yes, it is.
Q.    How long you been doing that, sir?
A.    Nearly four years.
Q.    Are you married now?
A.    No, I'm not.
Q.    Have you been in the past?
A.    Yes.
Q.    And when was your marriage before, sir?
A.    I was married in '88, and I was divorced in '93 -- or '92.
Q.    Did you have any children through that marriage?
A.    Yes, I have three children.
Q.    And how old are they?
A.    Sixteen, fourteen, and thirteen.
Q.    Do you have joint custody or visitation rights with them at this point?
A.    Yes, I do.
Q.    And do you still have contact with your ex-wife?
A.    Yes, I do.

Q. I want to talk to you a little bit about Dustin Honken. At some point in your life did you meet somebody by the name of Dustin Honken?

A. Yes, I did.
Q. Can you relate to the jury when you would have met him in your life.
A. Probably first grade. We went to school together from first grade till we graduated.
Q. There in Britt, Iowa.
A. Yes.
Q. And did you continue to have contact with him even after you graduated from high school?
A. Yes, I did.
Q. Can you describe for the jury the nature of your relationship with Dustin Honken through your high school years and beyond?
A. We were friends.
Q. I'm sorry?
A. We were best friends.
Q. Best friends.
A. (Witness nodded head.)
Q. And that maintained all the way through post-high school.
A. Yes.
Q. You went to the North Iowa Area Community College. Did Dustin Honken attend that school as well?
A. Yes, he did.
Q. At the same time you did?
A. Yes.

Q. What type of classes did Dustin Honken take at North Iowa Area Community College?
A. Chemistry and math.
Q. Did he take one or more than one chemistry class, sir?
A. He took more than one.
Q. How did he do in that?
A. Very well.
Q. Had you guys worked together before as well?
A. We worked at Wellborn together.
Q. When was that?
A. Probably '90.
Q. So in relation to college, that would have been before college.
A. Yes.
Q. Tell the jury a little bit about that. Wellborn does what, sir?
A. They make circuit boards.
Q. And did you start to work for Wellborn first? Did Dustin Honken begin there? Who started first there?
A. Dustin began there.
Q. And what was his position at Wellborn?
A. He was a manager of some kind.
Q. And what was your position?
A. I worked on the line making the circuit boards.
Q. Did Dustin Honken have anything to do with your hiring that you know of?

A. I just put him down as a reference probably.
Q. Did he have any direct supervisory responsibility over you

at Wellborn?
A. Not really.
Q. You were more on the line?
A. Yes.
Q. And do you know what his duties were at Wellborn?
A. Not exactly. He did -- he was in different positions. I know that he was in charge of the multi-layer circuit boards for a while and then moved to another area.
Q. More the manager area?
A. Yes.
Q. Do you know growing up somebody by the name of Terry DeGeus?
A. Yes.
Q. How did you know Terry DeGeus?
A. He went to school with my sister, and he's a brother of a guy that was in my class.
Q. And what was that guy's name if you recall?
A. Brian DeGeus.
Q. Also from Britt, Iowa, then?
A. Yes.
Q. While you were in -- I want to move in the time line, if you will, to the time that you and Dustin Honken were in college

682

attending North Iowa Area Community College. That would have been in 1991, maybe early 1992?
A. Yes.
Q. At that point did you have any conversations with Dustin Honken about manufacturing or selling controlled substances?
A. Yes, I did.
Q. Can you tell the jury how the topic first came up.

A. He had talked to me about selling marijuana, that he was selling at NIACC and just mentioned the -- selling methamphetamine.

Q. What kind of quantities of marijuana was he selling then at NIACC? Was this kind of small quantities of stuff?

A. Yeah, small.

Q. What did he say about manufacturing other drugs then?

A. He thought it would be possible to manufacture it and then sell it.

Q. Did he think he would be successful at it?

A. Yes.

Q. So what did he discuss with you? I mean, how far did the discussions go at that point while you're still in college about manufacturing meth?

A. He wanted to know if I'd be interested in participating in it.

Q. And did he really lay out what his plans were at that point about where he was going to do it or how he was going to do it?

683

A. No.

Q. When he approaches you at this point -- you're in college in Mason City -- and he starts talking about manufacturing methamphetamine, what's your response at that point?

A. I wasn't interested at that point.

Q. So what happens then?

A. I continued in school, and later Dustin moved to Arizona.

Q. Did you continue in school after that while Dustin Honken moved down to Arizona?

A. Yes, I did.

Q. Now, this is about the time I think you indicated earlier

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 599 of 3636

in your testimony you ended up getting a divorce from your wife.
A. It was a little after that.
Q. All right. Some time in 1992.
A. Yes.
Q. And were you separated from your wife for a period of time before that?
A. I was, yes.
Q. After Dustin Honken -- let me back up. When he moves to Arizona, does he tell you why he's moving to Arizona?
A. To continue -- to go to school down there, and he was going to help or start making the methamphetamine.
Q. After he moves to Arizona, do you continue to have contact with him?
A. He came back at least once, and we talked.

684

Q. And did you talk on the phone from time to time while he was in Arizona as well?
A. Yes, we did.
Q. Did the topic of you participating in the manufacturing of methamphetamine come up again?
A. Yes, it did.
Q. Can you describe for the jury how those conversations went?
A. He would ask if I was interested in going to Arizona and helping in the process of manufacture, and at that time I had said no.
Q. At some point did you ultimately agree to do so?
A. Yes, I did.
Q. Approximately when was that?
A. In the spring of '92.
Q. At this point in your life you're separated from your wife.

A. Yes.
Q. Had you completed that semester of school at NIACC?
A. Yes, I had.
Q. How was school going for you, by the way? You do okay?
A. I did okay.
Q. So ultimately you agreed to go down to Arizona and help Dustin Honken manufacture methamphetamine?
A. Yes, I did.
Q. What's he tell you the plans are at that point?
A. Before I moved down, we had discussed that I would get ten to twenty thousand dollars for assisting him in the manufacture.

Q. When you're talking about it at this point, is this intended to be a multi-year process, or were you coming down to do one thing of manufacturing?
A. At that time I was just going to help get it started, make one batch.
Q. And for that you were going to get ten to twenty thousand dollars.
A. Yes.
Q. Did you know how to make methamphetamine?
A. I did not.
Q. When you went down to Arizona -- you said that was in the spring, maybe May of 1992?
A. Yes.
Q. -- where did you go?
A. I moved in with Jeff Honken.
Q. And why there?
A. That's where the -- where they had had the lab set up was there, and that's where we were staying I guess.

Q. Where was Dustin staying at that time?
A. He was staying with Jeff also.
Q. How long did you guys stay at Jeff Honken's residence then?
A. Maybe a month.
Q. And then what happened?
A. We moved into the Tamarack Apartments.

♀

686

Q. Where were those located at?
A. On the west side of Tucson.
Q. And Jeff Honken lived in Tucson as well at that time?
A. Yes, he did.
Q. Whose apartment was this he moved into?
A. I rented it under my name.
Q. Why under your name?
A. I guess that was part of me getting my percent.
Q. Who made the decision that you're going to rent the apartment under your name?
A. Dustin and Jeff I suppose and myself. I mean, we discussed it.
Q. You discussed it, the three of you.
A. Yes.
Q. And who paid the rent during that time period?
A. Jeff did.
Q. Did you have any dealings with the money flow yourself on paying for the rent, or how was that done?
A. I would have got the money to give to the landlord.
Q. And where did you get the money from?
A. From Jeff.
Q. When you were in this apartment, did you attempt to start the manufacturing process in that apartment?

A. Yes, we did.
Q. How long were you in that apartment, sir?

A. A month or two.
Q. And then what happened?
A. The process made a smell, so we decided not to do it there and moved the lab to a house out in the country.
Q. Why didn't you want to do it with the smell?
A. So we wouldn't -- we didn't want to attract attention in the apartment.
Q. You knew at this point that what you were doing was illegal.
A. Yes, I did.
Q. And who all was involved at this point? You talked about Dustin Honken. Did Jeff Honken know what was going on?
A. He knew what was going on, yes.
Q. What was your understanding of what his role was in this manufacturing process?
A. To provide the money to get the lab going and for the rent.
Q. Did he participate in any of the actual attempts to manufacture or any of the work on the lab itself at all?
A. Not when I was there, no.
Q. Not that you were aware of then?
A. No.
Q. Okay. While you were in this apartment for a couple months, did you have any success in manufacturing any batches of methamphetamine at that time?
A. Yes, we did. We made one batch.

Q. And approximately how many ounces if you recall was that first batch?
A. Two to four ounces.
Q. And when you manufactured this methamphetamine, did you have it in particular containers when it was all done?
A. We put it in some glass jars at that time.
Q. Now, what was the plan for where it was going to go from there?
A. Dustin knew some people in Mason City that he was going to sell it to.
Q. Did he tell you who those people were?
A. Greg Nicholson, and I don't know if he was selling it to Terry at that time or not, that first batch.
Q. Did you know Greg Nicholson?
A. I'd met him, yes.
Q. And when did you meet him?
A. I think I went over during college at some point and talked to him.
Q. By yourself or with anybody else?
A. I would have been with Dustin.
Q. And this would have been while you guys were in college in 1991, 1992?
A. Yes.
Q. Was there any drug transaction that you witnessed on that meeting?

689

A. I don't recall.
Q. Okay. Was that the first time you had ever met Greg Nicholson?

A. Yes.
Q. And did Dustin Honken ever tell you how he knew or came to know Greg Nicholson?
A. Yes, he met him through a man we worked with at Wellborn, Scott Gahn.
Q. Let's talk about the methamphetamine lab in that apartment that you had for approximately two months. Who determined how to set up the meth lab in the first place there?
A. Dustin determined how to set it up. Since he'd been in college and took the chemistry, he knew how to do the processes.
Q. Did you have to order or buy specialized equipment and things to manufacture the methamphetamine?
A. Yes, we did.
Q. Who determined what needed to be purchased?
A. Dustin did.
Q. Where was it purchased from? Do you recall?
A. Adchemco. We got a lot of the stuff from Adchemco. I know there were other places too, but that's the one I remember.
Q. Explain to the jury a little bit. Do you just walk into Adchemco and, say I'd like to buy some magnesium chloride; can you fill this pitcher, or how is it done?
A. Well, the things that are not watched, you can go in and --

690

I think you have to have a company, but you can go in and purchase, yes.
Q. When you say watched, what do you mean by watched?
A. There are certain chemicals that are watched by the government, and they have to report when they're sold.
Q. So you said at least on the chemicals that aren't watched you can go in but you have to have a company?

A. I'm not sure if you have to or not. It seems like you do, but I'm not --
Q. Did you guys use a company name to make those purchases when you were operating the lab down in Arizona?
A. Yes.
Q. What name did you use?
A. I don't -- PCT or PCI.
Q. Printed Circuit Technology?
A. Yes.
Q. Whose company was that, by the way, if you know?
A. That was Jeff's.
Q. And so you guys used the name Printed Circuit Technology when you were making the purchases of these chemicals?
A. Yes.
Q. Chemicals were purchased for the purpose of manufacturing methamphetamine, though.
A. That's correct.
Q. They weren't used in this Printed Circuit Technology, a

♀

legitimate business at that time?
A. Not at that time, no.
Q. Who determined what kind of chemicals you needed to obtain to make this methamphetamine?
A. Dustin did.
Q. And who actually designed the meth lab itself and started setting it up?
A. Dustin.
Q. Was this a easy process?
A. I didn't think it was easy, no.
Q. Did you think it was complicated?

A. Yes.
Q. Did you receive instruction on how to manufacture methamphetamine?
A. Yes, I did.
Q. Who provided that instruction to you?
A. Dustin did.
Q. Once you're successful in actually making that first batch of methamphetamine in the apartment, what happens with that meth?
A. It was packaged, and Dustin delivered it to Greg.
Q. Now, how do you know Dustin delivered it to Greg?
A. He told me.
Q. He being Dustin?
A. Dustin told me, yes.

♀

692

Q. Okay. Greg is living where at this time?
A. In Mason City.
Q. So Dustin Honken had to make a trip back to Mason City to make that delivery.
A. Yes, he did.
Q. Do you know how he got up there?
A. He either drove or flew. I'm not -- I don't remember.
Q. Later on there's a number of other trips. Is that fair to say?
A. Yes.
Q. Also involving the delivery of methamphetamine?
A. Yes.
Q. Sometimes Dustin Honken drove; sometimes he flew, and you just can't recall on this particular occasion which one it was.
A. That's correct.

Q. What was the plan at this point? Once you sold the methamphetamine, who was going to get what cut of this manufacturing?
A. It was going to be cut into -- divided into thirds. The profits would be divided into thirds.
Q. And so Dustin Honken would get a third.
A. Yes.
Q. Who else would get a third?
A. Jeff Honken.
Q. And who else?

♀

693

A. Myself.
Q. Now, is this -- at this point in your life, is this beyond what you initially thought you were going to come down to Arizona for?
A. Yes, it is.
Q. Did you determine you'd just stay, though, and keep doing this for a while?
A. Yes, I did.
Q. After that initial delivery up to Greg Nicholson of this four to six ounces of methamphetamine, did Dustin Honken come back from that trip?
A. Yes, he came back.
Q. Did he come back with any money at that point?
A. I don't recall if he had money at that point.
Q. At a later time was money obtained for that delivery?
A. Yes.
Q. And what happened with that money if you recall?
A. Most of it was given to Jeff to pay for the rent and other expenses that he'd had.

Q. Do you remember how much money would have been made off of four to six ounces of methamphetamine at that point?
A. I don't recall how much he brought back, yeah. It was sold for about 1,800 an ounce.
Q. And again, there's been a number of trips, and you didn't keep records I trust of each of the transactions on how much

694

money was brought back and so forth.
A. No, I didn't.
Q. Who was kind of in charge on making the decisions on who was going to get how much money and who was going to make the deliveries and that kind of stuff?
A. Dustin.
Q. So after this first batch of methamphetamine is manufactured, is anything added to it to stretch it from more than four to six ounces into a larger quantity?
A. Yes. It was cut with vitamin B.
Q. What's vitamin B?
A. A cut that they use for the methamphetamine.
Q. Something you can pick up like at a vitamin store or something like that?
A. I believe we picked it up at a smoke shop.
Q. And the purpose for adding, if you will, cut to the methamphetamine is what, sir?
A. To make it seem larger than it is, I guess, get more money for it.
Q. Okay. And if you start off with four to six ounces and you add another four to six ounces with a white powdery substance and you mix it with the white powdery methamphetamine, you end up with nearly a pound of white powdery substance that has

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 609 of 3636

methamphetamine in it.
A. Yes.

Q. The decision to cut this methamphetamine and add vitamin B to it, whose decision was that?
A. Dustin's.
Q. After this initial batch of methamphetamine at the apartment, you indicated earlier that it gets moved to another location; is that correct?
A. Yes.
Q. And the purpose for that is you didn't want to get caught because the smell would alert other people in the apartment building?
A. Yes.
Q. So where did it go to?
A. We moved to a house down by Green Valley, Arizona.
Q. Where is that in relation to Tucson if you will, sir?
A. South.
Q. How far south from Tucson?
A. Thirty to forty miles.
Q. Now, at this point who moves into this house?
A. Dustin and I did at that point.
Q. All right. Is the house purchased or rented?
A. Rented.
Q. Who's paying the rent on this house?
A. The company. Jeff gave us the money for it.
Q. And whose name was the house placed in to rent it?
A. Mine.

Q. Again, why your name?
A. Part of my -- what I was getting for my third.
Q. So part of your third was the condition that you put the places in your name.
A. Yes.
Q. And who made that decision?
A. That probably was made between all of us.
Q. Group decision as you're sitting down and talking about what to do?
A. Yes.
Q. At this point does Dustin Honken have anybody else that comes down to Arizona to live in Arizona for him?
A. Yes. Missy Friesenborg.
Q. Did you know Missy Friesenborg?
A. Yes, I did.
Q. How'd you know her?
A. I was friends with her. I took a year of college at DMACC. I knew her there.
Q. Des Moines Area Community College?
A. Yes.
Q. When did you take that college course there?
A. Right after high school.
Q. So that would have been before Wellborn, before NIACC.
A. Yes.
Q. All right. And had you any responsibility for introducing

♀

Missy Friesenborg to Dustin Honken?
A. Yes, I did.
Q. What was the nature of your relationship with Missy?
A. We were friends. She lived with a friend of mine from high

school.

Q. Did it ever become a romantic relationship between you and Miss Friesenborg?

A. No.

Q. When she came down, do you remember approximately when that was in relation to when you guys moved out to this house in southern Arizona?

A. It would have been a little while after we moved out to the house.

Q. Did the living arrangements change at all as far as where Dustin Honken lived then after she moved down to Arizona?

A. Yes, he moved in with her in Tucson.

Q. And when you say moved in with her, did he spend all the time up there, or did he go back and forth between the two locations?

A. He would go back and forth. The majority of the time was spent in Tucson, but he would come back to the house to make sure I was -- that everything was going okay.

Q. Once you moved to this house in southern Arizona, is the meth lab set up again?

A. Yes.

698

Q. Who decides how it's going to be set up?

A. Dustin.

Q. And do you start to again manufacture methamphetamine there?

A. Yes.

Q. Are you successful in manufacturing methamphetamine at that location?

A. Yes, we were.

Q. Did you manufacture one batch or more than one batch of methamphetamine?
A. We manufactured more than one batch.
Q. And how long did this manufacturing process last then?
A. From the beginning of the process to the --
Q. Let me ask a better question. That was a poor question. I've been trying to get some time frames on this. You came down to Arizona in roughly May of 1992.
A. Yes.
Q. Okay. You lived with Jeff Honken for maybe a month roughly.
A. Yes.
Q. Okay. So that takes us to June. You live in an apartment for a couple months in Tucson, so that's July, maybe August of 1992?
A. Yes.
Q. So some time maybe in August or September you move out to

♀

699

this house in southern Arizona.
A. Yes.
Q. So from roughly September of 1992, how long did the manufacturing process then continue after that?
A. Till February of '93.
Q. Let's talk about that. During that time period then, approximately how many different batches do you recall to the best of your knowledge that was manufactured at that location?
A. Five to six.

MR. WILLIAMS: Your Honor, I just paid attention to my watch for the first time. This is as good a place as any to stop.

THE COURT: That would be fine. Thank you. Let's see. It's almost -- well, it's between five and ten after. Why don't we start up again at 12:55, so we'll be in recess until 12:55. Please remember my cautionary instruction about keeping an open mind till you've heard all of the evidence. Thank you.

(The jury exited the courtroom.)

THE COURT: Counsel, are there any matters we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: No, Your Honor.

THE COURT: Okay. Thank you. We'll be in recess.

(Lunch recess at 12:07 p.m.)

THE COURT: Ready to have the jury brought in?

700

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. Is Mr. Cutkomp in the room? There he is.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Williams, you may continue your direct examination of Mr. Cutkomp.

MR. WILLIAMS: Thank you, Your Honor.

BY MR. WILLIAMS:

Q. Mr. Cutkomp, before we broke for lunch we were at that point where I was asking you -- and I took you to the time frame of once you moved into that house in southern Arizona which would have been roughly September of 1992 up until -- you said the methamphetamine manufacturing operation continued until February of 1993. You indicated that you guys manufactured roughly five to six batches of methamphetamine. Did I summarize

your testimony correctly, sir?
A. Yes.
Q. All right. The batches of methamphetamine, were they always the same quantity each time you made it?
A. Each time we made it, we were able to get a little more out of what we were doing, got a little better at it.
Q. So let's try to put some quantities on this if you will. Throughout those five to six batches that you made, what's the smallest amount of methamphetamine that you made in a given

701

batch do you think?
A. Two to four ounces, first batch.
Q. And what's the largest amount of methamphetamine you were able to make?
A. A pound, pound and a half.
Q. Throughout this process when you would make manufacture -- when you would make the methamphetamine, after that would you always add what we talked about before, cut to it, or would you sometimes add cut and other times not?
A. Sometimes we would, and sometimes we wouldn't.
Q. What made that decision? I mean, why would you do it sometimes and not other times?
A. Sometimes we left it pure and left some cut at Greg's house and he cut it.
Q. All right. And who made the decision on whether you were going to cut it down in Arizona and -- versus sending it up with some cut for Greg -- and we're talking about Greg Nicholson?
A. Correct.
Q. -- for Greg Nicholson to cut?
A. Dustin.

Q. When you would make these batches of methamphetamine, who all was it being distributed to other than Greg Nicholson?
A. Terry DeGeus.
Q. Anybody else?
A. On one occasion a guy from NIACC got some. I don't

remember his first name. Searcy I believe was his last name.
Q. And when would that have been?
A. I'm not sure.
Q. During this time period we've been talking about?
A. Yes.
Q. All right. And how do you know about that particular distribution to Searcy?
A. Dustin told me.
Q. All right. Let's talk about the payments then. Well, let's back up. You manufacture these five to six batches down in Arizona obviously to distribute them. Did all of it get distributed to people back in Iowa then?
A. I believe so.
Q. All right. Do you know of anywhere else it would have been distributed to other than Iowa?
A. No.
Q. How was it transported back to Iowa?
A. Dustin took most of the batches. I took the last batch.
Q. All right. When was the last batch you took, sir?
A. In -- after he had dismantled the lab at the end of February or March.
Q. Of 1993.
A. Correct.
Q. Okay. When Dustin Honken would transport the

methamphetamine back to Iowa, we talked previously he would

either drive it up or sometimes fly it?

A. I believe he flew.

Q. And why do you believe he flew on some occasions?

A. I know he flew, but I'm not sure he flew to take it up. He might have just gone back to get the money when he flew.

Q. Let's talk about that. There were some trips where drugs were transported up to the people in Iowa. Were there additional trips to go up just to collect money from the sale of the methamphetamine?

A. Yes.

Q. And how many trips do you think -- let's put it this way. How often do you think trips based on your recollection were made during this time period of September of 1992 through February of 1993?

A. One or two a month to begin with.

Q. And did it get more frequent or less frequent as time went on?

A. As time went on, early '93, Dustin was going about every two weeks.

Q. You indicated you took one trip up, the last trip to take the last batch of methamphetamine up in February or maybe early March of 1993?

A. Correct.

Q. Why was it decided on that trip you were going to take it up?

A. I was going to move back to Iowa, and the batch was done, and I was going up to Iowa, so I took it.
Q. How'd you get back up to Iowa?
A. I took a Greyhound bus.
Q. And you took it on the bus with you?
A. Correct.
Q. What'd you do with it once you got back to Iowa?
A. I took it over to Greg's house.
Q. Why did you take it there?
A. Someplace to store it, keep it.
Q. Who made the decision to store it over at Greg Nicholson's house?
A. Dustin and Greg and myself probably some.
Q. Okay. And when you got over to Greg Nicholson's house, did you give it to him?
A. Yes, I did.
Q. What was it contained in?
A. Some plastic jars.
Q. When --
A. Pardon me. They were glass jars.
Q. Glass jars.
A. Yes.
Q. Did you deliver any other methamphetamine to anybody else?
A. I don't recall if I did at that time.
Q. Okay. Do you recall making any other trips carrying any

705

methamphetamine from Arizona?
A. I don't recall that I did. I did ride back with Dustin in a car on occasion.
Q. And do you know whether on those occasions he would have

been transporting any of the methamphetamine?
A. I'm not sure if it was to transport it or just to go to get some money.
Q. Whose car were you taking, by the way?
A. Jeff's.
Q. On that last delivery you made, how much methamphetamine was there in that delivery to the best of your recollection?
A. Uncut would have been about a pound and a half.
Q. Uncut.
A. Yes.
Q. Pound and a half of pure methamphetamine.
A. Correct.
Q. Let's talk about the proceeds then. Once the -- the purpose of taking this methamphetamine up to Terry DeGeus and to Greg Nicholson was for what purpose?
A. Could you repeat that?
Q. What purp -- why did you take it to Greg Nicholson and Terry DeGeus?
A. For them to sell.
Q. And from selling it, they -- did they succeed in selling some of the methamphetamine?

706

A. Yes, they did.
Q. And did that create cash?
A. Yes, it did.
Q. What happened with the cash?
A. It was used to pay for rent and for the expenses of manufacture, and some of the money was used to buy furniture and other items.
Q. You indicated earlier that the cash would -- there would be

trips made up specifically just to get cash from the sales of the methamphetamine?

A. Correct.

Q. Did you make any trips purely for the purpose of going up and collecting cash from the sale of methamphetamine?

A. I did.

Q. How many trips did you make, sir?

A. I know I made one. I'm not sure if I made any others on my own.

Q. You just can't recall today on whether you made more than one?

A. No, I don't remember.

Q. Do you remember how much cash you collected on that one occasion?

A. Probably several thousand.

Q. And who did you collect the cash from?

A. I collected some from Greg Nicholson and Terry DeGeus.

♀

707

Q. How did you know who to go to to collect the cash?

A. Dustin had told me who was getting it.

Q. Did anybody keep track of the proceeds?

A. Dustin did, yes.

Q. And how would he keep track of those proceeds?

A. On a piece of paper.

Q. And how would it -- I mean, what was the appearance of the piece of paper? What was on it?

A. Two columns of amounts of money.

Q. Why two columns?

A. One for T Man and one for G Man.

Q. Showing you what's been already admitted into evidence as

Exhibit 33. Maybe not. There we go. Exhibit 33, you recognize -- first of all, do you recognize that handwriting?
A. I'm not sure if I recognize the handwriting or not.
Q. Okay. Can you read the references there?
A. Yes.
Q. And what are the references to?
A. The G Man and then there's a T Man, then amounts of money.
Q. And when you're talking about G Man, you're talking about right there?
A. Yes.
Q. And T Man is right below it?
A. Correct.
Q. Okay. And who did G Man refer to?

708

A. Greg Nicholson.
Q. And who did T Man refer to?
A. Terry DeGeus.
Q. Had you -- do you know, for example, if you ever saw this particular note before?
A. I don't recall seeing this note.
Q. Did you see notes similar to this before?
A. Yes, I have.
Q. And where did you see those notes at?
A. It was in Arizona.
Q. Who made up those notes?
A. Dustin did.
Q. Did anybody else keep track of the proceeds other than Dustin Honken?
A. Jeff did for repaying his money for paying for the house and food and stuff.

Q. All right. And did you actually see him keeping track, or is this just he's getting paid back for these items, so presumably he's keeping track of the money?
A. I knew he was keeping track somehow. I don't know how.
Q. All right. Once money would come back from Iowa, how was that money then split up among the three of you, Jeff Honken, Dustin Honken, and yourself?
A. It was given to Jeff, but Dustin would keep some of it.
Q. And would you get any of it?

709

A. I would get a little.
Q. Among the three of you, how was the money split up? Originally I think you indicated you were going to get ten to twenty thousand dollars for your help. Did you ever get the ten to twenty thousand dollars?
A. No.
Q. How was the money split up?
A. Well, it was -- Dustin had asked if he could use the money for bringing Missy down and setting -- getting furniture and stuff, and I said yeah, that would be okay. So some of the money was used there, and then Jeff got money, and then I got a little bit for food, and they gave me some for some entertainment also.
Q. How much money do you think you got out of this whole process from the time you went down to Arizona until you got back to Iowa in February of 1993?
A. Besides living expenses or --
Q. Yeah, besides living expenses.
A. Three, four thousand.
Q. And in all fairness, you did get living expenses too;

right?
A. Yes, I did.
Q. Your rent was paid for.
A. Yes.
Q. Meals paid for?

♀

A. Correct.
Q. Did you have transportation down there?
A. At times I did. At times I didn't. We rented vehicles every once in a while.
Q. Why would you rent vehicles?
A. For me to have transportation.
Q. Okay. Why not just buy a car?
A. I don't know.
Q. Who made the decision to rent a vehicle versus purchase a car?
A. Dustin and Jeff.
Q. What's the most amount of money that you ever saw in the possession of Dustin Honken from the sale of methamphetamine?
A. About $20,000.
Q. And where did you see that at?
A. He had it on his -- on himself.
Q. Was this in Iowa or down in Arizona?
A. In Arizona.
Q. And what was the context that you saw this money in?
A. He'd just come back from Iowa picking up some money.
Q. And how do you know it was about $20,000?
A. He told me it was 20,000.
Q. Angela Johnson, did you ever meet somebody by the name of Angela Johnson?

A. Yes, I did.

♀

Q. Approximately when do you remember first meeting her?
A. Early '93.
Q. Did you have any conversations with Dustin Honken about Angela Johnson?
A. Yes, I did.
Q. What did you understand from conversations with Dustin Honken was her involvement, if any, in the sale of methamphetamine?
A. She had contacted him. She was Terry's girlfriend, and she was selling some of the methamphetamine that he was getting.
Q. So she was Terry DeGeus's girlfriend, and she was selling some of the methamphetamine that Terry DeGeus was getting from Dustin Honken?
A. Correct.
Q. And so why did she contact Dustin Honken?
A. She wanted to sell it herself without going through Terry.
Q. She wanted to move up the chain.
A. Correct.
Q. And so what did Dustin tell you what happened after that then?
A. I'm not sure.
Q. Did he ever tell you whether, in fact, he started supplying her with methamphetamine?
A. I don't remember if he did at that point, no.
Q. Did he tell you whether any romantic relationship started

♀

between him and Angela Johnson?

A. Yes, there was, yes.
Q. And when did -- you met her in early '93. When did this conversation take place that you understood that she had this contact with Dustin Honken and wanted to move up the chain?
A. About that same time.
Q. Early 1993?
A. Correct.
Q. Now, at some point you said the lab was dismantled and you moved back to Iowa, so I want to turn to that for a little bit and talk about that.
A. All right.
Q. When did that occur, first of all?
A. End of February, early March of '93.
Q. And why was the lab dismantled?
A. Well, I wanted to move out of the house and move back to Iowa.
Q. Why?
A. I was going to not be involved in the process anymore.
Q. Why not?
A. I was afraid I'd get caught I guess, just tired of it.
Q. What were you going to do when you moved back to Iowa?
A. I don't know what I was going -- get a job.
Q. You didn't have any firm plans at that point.
A. No, I didn't.

713

Q. Let me ask you, while you and Dustin Honken are manufacturing this methamphetamine down in Arizona, are you using some of it?
A. Yes, we were.
Q. Using large quantities, small quantities of it?

A. At times large, at times not so -- not so much.
Q. Did it vary?
A. Yes.
Q. Okay. You're both using methamphetamine?
A. Yes, we were.
Q. In what manner were you using it? Were you snorting it, shooting it?
A. Snorting it usually.
Q. Okay. You said usually. Was there another way you used the methamphetamine other than snorting it?
A. Sometimes we put it in some pills and sometimes smoked it.
Q. The methamphetamine use, were you attempting to get out of that as well in this move back to Iowa?
A. I'm not sure if I was or not.
Q. All right. I was just trying to explore if that was one of the motivations.
So you decided some time in February of 1993 that you wanted to move back to Iowa and get out of this.
A. Correct.
Q. So what do you do?

♀

A. I -- we packed things up and moved the chemicals and glassware into a storage shed, and I moved back to Iowa.
Q. Did you have any discussions with Dustin Honken about what his plans were going to be?
A. I probably did, but I'm not sure what they were at that point.
Q. Did you have any conversations with him about whether he was going to continue in the manufacturing of methamphetamine?
A. Yes. He would have continued. We had -- we were still in

the process of doing stuff with the chemicals, so the chemicals were in -- and glassware was stored so that they could be used later, yes.

Q. When you decided to close up the lab, you didn't take all the chemicals and the glassware and throw them in a dump someplace.

A. No.

Q. You box them up?

A. Correct.

Q. You box them up carefully?

A. Yes.

Q. And you took them where?

A. To a storage shed in Tucson.

Q. Whose storage shed was that?

A. It was Jeff's.

Q. When you moved back to Iowa, that would have been

♀

approximately when, sir?

A. March.

Q. Of 1993.

A. Correct.

Q. When you moved back to Iowa, where did you go?

A. I moved in with my parents.

Q. And where do they live at?

A. In Britt.

Q. In town there or out in the country?

A. Out in the country.

Q. What is your plans at this point? You're now back in Britt, Iowa, living with your folks. It's March of 1993. Do you have plans at that point to have any further involvement in

the distribution of methamphetamine?
A. No.
Q. Do you have any contact with Dustin Honken after you move back?
A. Yes, I did.
Q. And can you describe for the jury that contact you had with him.
A. Well, we talked, and he came back at least the one time. We got together. He and Russ and I went out.
Q. I want to direct your attention to March 21 of 1993. Was that the time you're referencing that he came back and you got together with him?

716

A. If that's when we got together with Russ. I don't remember the date, no.
Q. Do you remember the day when Dustin Honken was arrested in March of 1993?
A. Yes.
Q. It was that day we're talking about.
A. Okay.
Q. Is that the time you're talking about?
A. Correct, yes.
Q. Okay. Do you remember any other trips he made other than that one where he came back on the day he was arrested?
A. I'm not sure if he did or not. That was -- how much time there was between those two periods.
Q. Let's talk then about that time that -- this trip back where he ends up getting arrested. What -- how'd that work? You were already in Iowa at that point; right?
A. Yes, I was.

Q. You indicated you got together with Russell Miller?
A. Yes, we all got together and went out the night before.
Q. Who's Russell Miller?
A. He was a friend that Dustin and I had met in college.
Q. Was he involved at all in this methamphetamine operation?
A. I believe he knew some things about it. I don't know how much he would have been involved with it. Not from my perspective he wasn't.

♀

717

Q. And why do you believe he might have been involved in it somehow?
A. I knew that he had talked to Dustin about it some in college, about how to make stuff, and other than that, I'm not -- I guess I thought he probably knew what we were doing.
Q. But you don't have any firsthand knowledge of that; is that fair?
A. Yes.
Q. Okay. And so Dustin Honken comes back. Where is he -- does he drive back? Does he fly back?
A. I believe he flew, but I'm not positive.
Q. And where do you meet up with him at?
A. Russ and he came and picked me up.
Q. At your house -- at your folks' house?
A. It was either at my folks' house or at my sister's house.
Q. And once he picked you up, what'd you guys do that day?
A. That day we went out, partied, went out to the bars, and then we went back to the hotel room and stayed up, talked, then went to bed.
Q. Everybody stay at the hotel?
A. Dustin, Russ, and I, yes.

Q. And did you have one room or multiple rooms there?
A. There were two rooms.
Q. Who was in which room?
A. Russ and I were in one, and Dustin was in the other.

Q. I'm sorry?
A. With Angie.
Q. With Angie. I was going to ask you, did he join up with Angie Johnson that night?
A. Yes.
Q. And where did you join up with her at?
A. Probably at the hotel. I don't remember seeing her that night, but I knew she was at the hotel.
Q. And how do you know she was at the hotel?
A. We discussed it since.
Q. So let's talk about the next morning. The day he comes up, you guys meet up, you go out, you party, you end up back at the hotel. What happens the next morning?
A. Dustin woke me up the next morning and said it was time to go to Greg's house, Greg Nicholson.
Q. Why were you going to Greg Nicholson's house?
A. To collect some money.
Q. You knew that was the purpose.
A. Yes, I did.
Q. This is drug money.
A. Yes.
Q. Why are you going along?
A. Hanging out. I suppose I was going to get some of it.
Q. From your prior participation.
A. Correct, yeah.

Q. Sure. So what happens when you -- do you go over to Nicholson's house?
A. Yes, we did.
Q. What vehicle do you take?
A. I believe we took Russ's car.
Q. Does he go with you?
A. No, he didn't.
Q. So what happens when you go over to Nicholson's house?
A. I sat out in the car. Dustin went in for a period of time. And then he came out, and we started driving away, and we were arrested.
Q. Both of you guys were arrested?
A. Correct.
Q. When you were arrested, you're ultimately taken to a local jail?
A. Yes.
Q. In one squad car?
A. Yes, we were.
Q. Did you have any conversations with him along the way to the jail about what to do?
A. First we went to be interrogated at the police station I believe.
Q. All right.
A. And then after that -- I don't remember much on the way to the police station that we talked about.

720

Q. All right. And then you're at the police station being

interrogated for a while, and then after that what happens?
A. We were transported to the jail.
Q. All right. And on the way to the jail, is there a conversation about what to do?
A. Yes, there was.
Q. And can you relate for the jury that conversation, please.
A. Basically not to say anything and to get ahold of Melissa Friesenborg and to tell her to get rid of a box that was in her apartment, and there was two vials in the refrigerator that had some methamphetamine in them that we wanted her to get rid of.
Q. These are instructions that you're getting from Dustin?
A. Yes.
Q. And so once you get to the jail, did you have an opportunity to actually call up Melissa Friesenborg?
A. Yes, I did.
Q. And what did you tell her?
A. That there was a box in her apartment with my stuff that had some things in it that could be used for -- I'm not sure what was in it, but they were things that we didn't want to be found and then to get rid of the vials that were in the refrigerator.
Q. What were you fearful of?
A. Evidence.
Q. And so you wanted her to destroy this evidence?

721

A. Yes, we did.
Q. What was in that box?
A. I don't remember what was in the box. Something that could have been used to store it, or maybe there was some piece of glassware. I'm not sure.

Q. Something to do with the manufacturing of methamphetamine?
A. Correct.
Q. And did you know what was in the box back then? You just can't recall today or --
A. I don't recall today.
Q. And did you have any other conversations with her about passing on any instructions to Jeff Honken at all?
A. Just that I had my -- my suitcase was there, and I believe I told her to give it to him and to let him know what was going on. I don't remember any -- that I gave her any instructions for Jeff.
Q. Beyond that?
A. Beyond that, no.
Q. Okay. Do you remember anything about doing anything with the glassware, all the stuff you had told us about before that was stored in that storage unit? Do you remember passing on any instructions on that?
A. I did not that I know of. I know that Jeff had taken it and destroyed it all. I'm not sure who talked to him about it.
Q. After your arrest, are both of you ultimately released from

722

the local jail there?
A. I was released from the local jail, yes.
Q. And then after a while Dustin Honken was as well?
A. He was taken to Linn County I believe before he was released.
Q. Okay. And he was ultimately released from Linn County?
A. Yes.
Q. Did you have any conversations with him about any concerns he had about the evidence against you in the case, against both

you in the case?
A.    Well, it wasn't long after that that charges were dropped on me because there really wasn't a lot of evidence on me.
Q.    What about -- did Dustin Honken talk to you about any concerns he had about the evidence against him?
A.    He thought that the evidence was minimal, that there wasn't a whole lot of evidence against him.
Q.    Did he have a conversation with you about who he believed to be the witnesses against him?
A.    He believed that Greg was the witness.
Q.    Greg Nicholson.
A.    Greg Nicholson, yes.
Q.    Did you have any contact from Angie Johnson about this time about what you should or shouldn't do in relation to any investigation?
A.    She did call and said something about --

723

MR. PARRISH:  Objection, hearsay and confrontation.
MR. WILLIAMS:  801(d)(2)(E), Your Honor.
THE COURT:  Objection's overruled.  You may answer.
A.    Could you repeat the question again?
Q.    Yeah.  Did Angie Johnson contact you and have any instructions for you about what you should do in the event of the investigation?
A.    She did.
MR. PARRISH:  It would be the same objection.
THE COURT:  Same ruling.
BY MR. WILLIAMS:
Q.    What'd she say?
A.    Just not to say anything.

Q. And this is to the authorities if they interviewed you?
A. Correct.
Q. You indicated that ultimately Dustin Honken was taken down to Linn County. Did you understand that to be in connection with federal charges that were brought against him?
A. Yes.
Q. The charges against you had been dropped.
A. Correct.
Q. Did you know were there any restrictions on who Dustin Honken could have contact with based on your knowledge at the time?
A. He was not supposed to have contact with me and I believe

724

Russ.
Q. Did you have contact with him after that anyway?
A. Yes.
Q. Who initiated that contact?
A. He would either have Angie or Kathy call me, and then after they had got me on the phone, then he would talk to me.
Q. Kind of a three-way call?
A. Yeah.
Q. Who's Kathy?
A. An ex-girlfriend of Dustin's.
Q. What's her last name?
A. Rick.
Q. Where was she living at back in March of 1993?
A. In Mason City.
Q. And Angie Johnson, where was she living at at that time?
A. In Clear Lake.
Q. And so he would talk to you by going through either Angie

or Kathy and setting up a three-way call.
A. They would call, and then he would get on the phone.
Q. I see. So he was wherever they were at the time is how you took it?
A. Correct.
Q. Did you have any in-person conversations with him as well?
A. Yes. He would come down or I would go up there, and we'd drive around and talk.

Q. When you say come down, come down to your folks' place in Britt?
A. No. I was living in Maxwell then.
Q. Okay. Maxwell, Iowa?
A. Correct.
Q. What were you doing in Maxwell, by the way?
A. Living with my sister looking for a job.
Q. During this time period the charges are pending against Dustin Honken; is that correct?
A. Correct.
Q. Do you have any conversations with him at that point about manufacturing methamphetamine again?
A. Yes.
Q. Can you describe for the jury those conversations?
A. He wanted to continue or start up manufacturing again so that he would have some money and possibly not have to stick around for facing the federal charges.
Q. Did he indicate what he needed the money for?
A. To -- so that he'd have enough to maybe flee the country or pay off people. I don't know. Stuff like that.
Q. Did he talk to you at all about using any of the money with

regard to Greg Nicholson?
A. Possibly giving some to Greg to change his story.
Q. Did he ask you to do anything to help him start up the meth lab again?

A. Yes, he did.
Q. What did he ask you to do?
A. Asked me to go down to Tucson and pick up glassware and chemicals.
Q. Now, is this the stuff that had been stored, or is this new equipment and --
A. It would have been new chemicals.
Q. Okay. And did you agree to do that?
A. Yes, I did.
Q. And so did you go to Tucson to pick up glassware and chemicals?
A. I went part way and decided not to go the rest of the way and came back.
Q. Why did you decide not to go the rest of the way?
A. I guess I just didn't really want to be involved in the process anymore.
Q. Were you going to get something for making this trip?
A. I would have gotten money for it, yes.
Q. When you came back to Iowa -- how far did you get, by the way, on your way to Tucson, Arizona?
A. Into New Mexico someplace.
Q. Before you decided to turn around and come back?
A. Yes.
Q. When you got back, did you have a conversation with the defendant about -- with Dustin Honken about the trip?

A. Yes, I did.
Q. And what did you tell him about what happened?
A. I told him that I had gotten down to New Mexico and spent the night and that someone had stolen the money so I wasn't able to go.
Q. He sent you down with some money?
A. Yes.
Q. How much money did he send you down with?
A. I believe it was a couple thousand dollars.
Q. Now, that wasn't the truth; correct?
A. Correct.
Q. Nobody stole the money.
A. Nobody stole the money.
Q. What'd you do with the money?
A. I used it to -- I bought a car, and I used it to live on.
Q. Did he ask you to make another trip down the road?
A. At some point he did, yes.
Q. Do you remember approximately when that was?
A. Some -- it would have been some time I believe summer or fall of '93.
Q. Okay. That first trip he asked you to make and you kind of got most of the way there, approximately when was that in relation to the March charges?
A. A month or two later.
Q. Okay. And this next trip is maybe a couple more months

728

after the first one?
A. Yeah, yes.

Q. Did you make that trip?
A. Yes, I did.
Q. Did you go with anybody?
A. Yes, I did.
Q. Who?
A. Christi Cole.
Q. Who's Christi Cole?
A. She was a friend of Angie's, a girl I dated a few times.
Q. And was there another purpose for the trip? Was she doing anything on that trip other than going down with you to get chemicals or glassware or something?
A. Yes, she was going to -- her ex-husband was going to meet her in Flagstaff, and we took her daughter down there, and he picked her up to take out to California.
Q. After he picked up the daughter in Flagstaff, Arizona --
A. Correct.
Q. -- what'd you guys do?
A. We continued on to Tucson and picked up the chemicals.
Q. What chemicals did you pick up if you recall?
A. I don't recall which ones we picked up, no.
Q. How did you know what chemicals to pick up?
A. I had a list of things that we needed.
Q. Where did that list come from?

729

A. Dustin.
Q. Did it have the type of chemicals and the quantities needed?
A. Did --
Q. Let me repeat that. Did it have not only the name of the chemicals you needed but also the quantities you needed?

A. I don't know for sure.

Q. Okay. And were you successful in actually buying some of those chemicals?

A. We bought some, yes.

Q. Did you get all the chemicals that were requested by Dustin Honken?

A. No, I didn't.

Q. Why not?

A. Money, and some of it I just didn't want to take back.

Q. Why not?

A. They're kind of iffy chemicals that finding them in the car weren't -- was probably not a -- might have attracted some attention.

Q. You might have gotten arrested.

A. Yes.

Q. Okay. And so you used some money to purchase these chemicals down there?

A. Correct.

Q. Did you use -- did you go in with your own name, or did you

use some company name to do that?

A. A company name.

Q. Do you remember what company name you used?

A. I do not.

Q. When you got the money, where did you get the money from to make that -- those purchases?

A. From Dustin.

Q. When you got the chemicals you did get, do you remember today what chemicals you purchased down there on that trip?

A. No, I don't.

Q. What'd you do with the chemicals once you purchased them?
A. We transported them back to Clear Lake.
Q. And what'd you do with them once you got them back to Iowa?
A. At that time I'm not sure what we did with them. Either left them at Angie's or took some over to Christi's.
Q. Okay. Did any ever end up at Dustin Honken's father's house?
A. Yes, at some point there was some stored there.
Q. And where did his father live at?
A. Steamboat Rock.
Q. Now, we're still in the spring and summer of 1993. Dustin Honken's charges are pending against him. You've gotten some chemicals at his request. Is any attempt at that point made to manufacture the methamphetamine?
A. I don't believe that we attempted at that point to make any

♀

methamphetamine.
Q. At this point in time in the summer of 1993, were you aware, did Dustin Honken make any statements to you about looking for anybody?
A. At that point he -- I don't believe he had said anything about looking for anybody at that point.
Q. Did he talk any more about the witnesses pending against him?
A. Yes, he talked about options on where the money could be used and who the witnesses were and just different options.
Q. Who was he concerned about?
A. Mostly Greg.
Q. At some point did you become aware that Greg Nicholson had disappeared?

A. Yes.

Q. Did you have any conversations with Dustin Honken about Greg Nicholson's disappearance?

A. Yes, I did.

Q. And can you tell those conversations to the jury, please.

A. First he contacted me and let me know that Greg didn't show up for a court appearance. And later on there were other conversations.

Q. That first conversation when he called you up to tell you that Greg Nicholson didn't show up for a court appearance, do you happen to recall today what day that was that he would have

♀

called you up?

A. I don't remember what day.

Q. Okay. In relation to -- well, let me ask you this. Did you know whether Dustin Honken was scheduled to plead guilty to his drug charges at some point?

A. I believe he was going to plead guilty at some point, yes.

Q. And do you recall -- his conversation you had with him, did you know whether that was a call that he made before or after he was scheduled to plead guilty?

A. I don't remember if it was before or after.

Q. You said later on there was additional conversations with him, and I want to stick at this point just to the summer and fall of 1993. Were there additional conversations with him at that time about Greg Nicholson's disappearance that you recall?

A. In ninety --

Q. Yeah, in the summer of 1993 to the fall of 1993.

A. There was some after he had told me that Greg had not shown up for court.

Q. What did he tell you?
A. Just things that -- at some point -- I'm not sure if that's when -- but he gave me a scenario of someone going over dressed as a pizza delivery person and then taking -- having somebody coming in after that person and taking the people that were in the house and making a tape, a videotape, exonerating him, just like a hypothetical kind of thing.

♀

Q. Explain what you mean to the jury. Is he telling you he actually did this?
A. He was saying it hypothetically, that this is something that could happen to somebody, but I guess I took it that that probably could be a way of what happened.
Q. So he's saying hypothetically this could have happened. And did he indicate what impact that would have on his ability to get out from underneath his charges at that point?
A. He wouldn't have to worry about the charges because the tape would exonerate him.
Q. So when he's talking about this hypothetical, how did you take that?
A. I took it that that's what had happened.
Q. Any conversations with Dustin Honken about this time about whether there were children involved?
A. I don't recall any conversations with him, no.
Q. Did he ever indicate to you about whether he -- well, you indicated that he mentioned a videotape in this hypothetical, so let's talk about that for a minute. Did he elaborate at all on the videotape as part of this hypothetical?
A. At some point he told me that Greg made a tape and had -- he had it and that it exonerated him as being part of the drug

trafficking.

Q. Is this after this hypothetical conversation some time later he tells you he actually has a tape of Greg Nicholson?

A. Yes, yes.

Q. Did he tell you where he got it?

A. He told me that he found it I guess. I don't -- either -- I assumed that he got it from what he had said happened. I guess I didn't go into their conversation that deep.

Q. He didn't really just come right out and tell you exactly where he got it. You were just relying on that hypothetical that he gave you to understand where he got it from?

A. Correct.

Q. Did you ever see that videotape?

A. I saw a tape, yes.

Q. And when you say you saw a tape, you saw it in the box kind of tape? Is that what you mean?

A. Correct.

Q. Did you ever see it actually played on a TV?

A. No, I never saw it.

Q. Where did you see this tape at?

A. In the car.

Q. And what was the context that you saw a tape in a car?

A. Dustin had showed me the tape that he had.

Q. Who all's in the car at this time?

A. Just he and I, I believe.

Q. And is this in the same conversation in which he told you he had a tape of Greg Nicholson?

A. Probably, yes.

Q. And he shows you a tape.
A. Yes.
Q. Now, you never saw the tape, so you don't know whether that was, in fact, what was on the tape.
A. No, I don't know for sure.
Q. But that's what he told you.
A. Yes.
Q. Did he ever tell you what he did with that tape?
A. He gave it to his lawyer so he could have it for evidence.
Q. Down the road did you ever see that tape again?
A. I'm not sure if -- I'm not sure if it was before or after he got back from his lawyer that I saw the tape.
Q. All right. And you never did see any tape of Greg Nicholson.
A. I never saw it played, no.
Q. All right. Let's talk about Terry DeGeus. In November of 1993, did you learn that Terry DeGeus disappeared?
A. Yes, I did.
Q. How did you learn that Terry DeGeus disappeared?
A. I believe that Dustin told me. It was on the news too so . . .
Q. Could have been from either one of those sources.
A. Correct.
Q. Did you have a conversation with Dustin Honken about Greg Nic -- I'm sorry, about Terry DeGeus's disappearance?

♀

736

A. Yes.
Q. And what did he tell you?

A. He was relieved that Terry was gone.

Q. Did he say why he was relieved that Terry was gone?

A. At some point he -- before that he -- in our conversations he had said that he thought that Terry might have been responsible for Greg disappearing also.

Q. Okay.

A. And he thought that maybe Terry had taken off to avoid charges.

Q. Did he have any conversations with you about whether he was concerned at all about Terry DeGeus testifying against him at all?

A. Yes, he was. He thought that Terry had been subpoenaed for grand jury to testify.

Q. And this is in the fall of 1993?

A. Yes.

Q. Did he make any statements to you about how far down somebody would have -- something or somebody would have to be buried so the frost wouldn't heave it up?

A. Yes, he did.

Q. Now, let's get a little bit of your background. Do you have some farming background in your history?

A. I grew up on a farm.

Q. Explain to the jury then the nature of this conversation

♀

737

about something coming up with the frost.

A. Well, we would drive around and talk about stuff, and we were driving around, and he asked how low you would have to bury something so the frost wouldn't pull it up. And at some point during the conversation he said something about -- or I don't know if he said something or insinuated something about bodies

being buried.
Q. That's how you took it.
A. Yes.
Q. Any conversation about how far down plowing goes in a field?
A. At some point, yes.
Q. And what do you remember about that conversation?
A. We were driving around, and it was out in the country someplace, and it seems to me that at that point we drove by a place that kinda must have had some interest. He had said something about how far down farming equipment might go when it's tilling the land.
Q. Did he point out some area when you were driving by someplace?
A. It was just at that point that -- of the conversation that that area stuck in my mind.
Q. Did he make any statements to you about a backhoe?
A. Yes, he did.
Q. What was the nature of that conversation?

738

A. He wanted to know about -- if there was any way to get one from somebody or to rent one, and I took it to be able to dig up the bodies and to bury them deeper.
Q. At this point he's asking you about a backhoe, is this in connection then with the same kind of conversations he's having with you about how far down something needs to be buried so the frost doesn't heave it up?
A. In the same context, yes.
Q. Did he ever express to you any degree of certainty about how sure he was that Greg Nicholson or Terry DeGeus would ever

show up again?

A. He -- it sounded to me like he was pretty positive that Greg would never show back up again.

Q. And how about Terry DeGeus?

A. He wasn't quite as sure about Terry.

Q. And from the context of the conversations you were having with Dustin Honken, did you get any sense or what was your sense of why he wasn't so sure that Terry DeGeus wouldn't show up again?

A. Well, there were several -- there were several things that he -- that I was taking it as either that he knew that Terry had taken off and wasn't going to come back or had done something and -- he had taken off or he wasn't -- wasn't taken care of as well as the others.

Q. Now, Mr. Cutkomp, Dustin Honken was your best friend from

♀

grade school.

A. Correct.

Q. In these conversations, is he coming right out and telling you that he killed anybody?

A. No.

Q. Over the course of the years of you guys doing things together, did you develop a way of talking to each other where you didn't say things explicitly?

A. We, like anybody in a relationship I guess, sometimes just by looking a certain way, I guess, I could tell what he was thinking and things like that, yes.

Q. In the winter of 1993, 1994, were you asked to help in melting down some type of firearm?

A. Yes, I was.

Q. Can you explain to the jury how did that topic come up?
A. Dustin either called or asked me in person if he could come out to my parents' house. And when he got there, I'm not sure if I knew that he had a gun before or after he got there, but he brought the gun, and we cut it up and melted the pieces.
Q. Why at your farm or your dad's farm?
A. We have cutting tools and a torch there.
Q. It's a farm.
A. Correct.
Q. Okay. And your father owns tractors and things like that, I assume?

740

A. Yes.
Q. And as part of that he had torches and other equipment to use for repairing tractors?
A. Correct.
Q. And so when he comes out, you don't remember at this point whether he told you he had a gun before he came out or he had one after he came out. In any event, did he tell you anything about the gun, where it came from?
A. He said that Angie had gotten it for protection and that after Terry had disappeared that she didn't -- they didn't feel like they needed it anymore.
Q. And so this would have been definitely some time after Terry DeGeus had disappeared that this occurred.
A. Correct.
Q. Can you describe the gun?
A. It was black; ten, eight, ten inches long. I'm not sure exactly how long.
Q. Do you have much history with guns, sir?

A. No, I don't.

Q. At some point -- and we're going to get to this soon -- you began cooperating with law enforcement. As part of that cooperation, did you attempt to draw the firearm that you melted down that day?

A. Yes, I did.

MR. WILLIAMS: May I approach, Your Honor?

♀

741

THE COURT: You may.

BY MR. WILLIAMS:

Q. I'm showing you Exhibit 40. Can you identify that for the jury, please?

A. That's a picture of the gun that we melted.

Q. And that's the drawing that you made to the best of your recollection after you began cooperating with law enforcement?

A. Yes, it is.

MR. WILLIAMS: United States would move to admit Exhibit 40 into evidence, Your Honor.

* * * *

(Government Exhibit 40 was offered.)

* * * *

THE COURT: Any objection?

MR. PARRISH: Yes, relevancy and 403, Your Honor.

THE COURT: Overruled. Government's Exhibit 40 is admitted.

* * * *

(Government Exhibit 40 was admitted.)

* * * *

MR. WILLIAMS: Permission to publish, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Exhibit 40 is now on the screen. Is that the drawing that you made, sir?

A. Yes, it is.

MR. WILLIAMS: May I continue to approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Taking a look at Exhibit 9A and 9B, first of all, can you just tell me what you see in the photographs generically?

A. I see --

Q. Just firearms?

A. Firearms, guns, yes.

Q. And on Exhibit 9B in particular, is there a firearm that looks similar to the one you melted down in 1993, 1994?

A. Yes, there is.

MR. WILLIAMS: Government moves to admit Exhibits 9A and 9B into evidence, Your Honor.

* * * *

(Government Exhibits 9A and 9B were offered.)

* * * *

MR. PARRISH: Be the same objection as to the previous Exhibit 40, Your Honor.

THE COURT: Overruled. 9A and B are admitted.

* * * *

(Government Exhibits 9A and 9B were admitted.)

* * * *

MR. WILLIAMS: Permission to publish, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:
Q. Showing you Exhibit 9B in particular, sir. The firearm that you melted down on that day in the winter of 1993, 1994, which of the two firearms did it appear to you to be like?
A. The black one, the top one.
Q. Is there any way at all that you could be mistaken; in fact, you melted down a weapon more like the one on the bottom there?
A. No, there's no way.
Q. No way at all.
A. No way at all.
Q. You indicated that you cut it down. What did you cut it down with?
A. We cut part of it down with a band saw, and then we cut it the rest of the way with a torch and melted it.
Q. Did you just melt it on the ground, or what did you melt it on?
A. A piece of metal that was nearby in the shed.
Q. Some type of scrap piece of metal?
A. Yes.
Q. And when you melted it down, by the time you got done melting it down, could you just describe for the jury what'd you end up with?
A. We had several pieces that were -- they were broken -- it was melted down in several different pieces.

744

Q. And could you recognize what you had at that point, or were they kind of like blobs of metal?
A. They were unrecognizable from a gun, just pieces of metal.

Q. Now, did you question Dustin Honken about why you're melting down a gun? If you just didn't need it, why not just sell it or do something else with it?
A. He said it just -- he told me that it just looked bad to have it, so he didn't want to have it around anymore.
Q. Did you question him at all about why he just didn't sell it or give it away or something?
A. No, I didn't.
Q. The piece of metal that you used against which you melted down this gun, what did you do with that?
A. We threw it away, threw it in a ditch.
Q. Before you threw it in a ditch, did you attempt to do anything to that?
A. To cut it a little bit.
Q. And why?
A. So it wouldn't be recognizable either.
Q. And did you have any conversations about whether there was a concern about what if that piece of metal was found as well?
A. Yes. There might be some kind of evidence that could be taken from it too.
Q. So the purpose was to destroy this evidence.
A. Correct.

745

Q. You -- what did you do then with the various pieces of this gun and the galvanize -- or the piece of steel you had?
A. We threw it out into a ditch.
Q. And all in the same ditch or in multiple ditches?
A. It was along the same road.
Q. And at some point down the road, did you direct law enforcement officers to the approximate location where this

would have been done at?

A. Yes, I did.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Showing you, sir, what's been marked as Exhibit 48, do you recognize this, sir?

A. Yes, I do.

Q. And what do you recognize it to be?

A. The piece of metal that we cut the gun on.

Q. How can you tell?

A. I just recognize it, and it's got the part that we cut.

Q. Where you attempted to cut it into smaller pieces?

A. Where we attempted to cut into, yes.

Q. Is that over here on the side?

A. Correct.

MR. WILLIAMS: United States would move to admit Exhibit 48 into evidence, Your Honor.

♀

746

* * * *

(Government Exhibit 48 was offered.)

* * * *

THE COURT: Any objection?

MR. PARRISH: Yes, Your Honor, the same objections.

THE COURT: Overruled. Forty-eight is received.

* * * *

(Government Exhibit 48 was admitted.)

* * * *

MR. PARRISH: And also foundation.

THE COURT: Well, you didn't reserve that objection in

the pretrial order.

MR. PARRISH: That's fine.

BY MR. WILLIAMS:

Q. After the disappearances of both Greg Nicholson and Terry DeGeus -- we're now in the winter of 1994 -- is there any further discussions with Dustin Honken about continuing the methamphetamine manufacturing operation?

A. Yes, there was.

Q. Can you relate to the jury the nature of those conversations?

A. He still wanted to continue making the methamphetamine so that he would be able to take care of things or again to flee the country if needed, he needed to.

Q. So were any further steps taken toward that end?

♀

747

A. Yes, there was.

Q. And can you describe those for the jury, please.

A. At some point he and Angie Johnson went down to Arizona, and they picked up some furniture and some chemicals while they were down there.

Q. How do you know that?

A. I saw the chemicals and the furniture.

Q. And did Dustin tell you at any point what he was doing?

A. Yes.

Q. What kind of chemicals, if anything, do you remember?

A. They were just -- I don't remember which ones that he purchased, but they were to be used for the methamphetamine.

Q. Can you describe then in 1994 and moving into 1995 how did matters progress toward starting up the methamphetamine operation that had been discontinued from Arizona?

A. At some point Dustin and I had gone down to Arizona again and picked up some more stuff. And then we set up a lab in Angie's house for a little while.
Q. Angie Johnson's house?
A. Angie Johnson's house.
Q. In Clear Lake?
A. In Clear Lake. And then at some point we set one up at my house in Mason City.
Q. Where were you living at?
A. On Eighth Street in Mason City.

♀

748

Q. All right. And then how'd it progress from there?
A. I believe that we took the stuff to the house that Dustin moved into on the north side of Mason City.
Q. And this would have been in late 1995 into early 1996?
A. Yes.
Q. All right. Now, as things are moving forward, are you out acquiring the materials again to start up the methamphetamine laboratory?
A. Yes, we were.
Q. Who all's involved at this time in the renewed effort to manufacture methamphetamine?
A. Mostly Dustin and I. Angie had given us some money, and at some point Dan Cobeen was helping out with some things.
Q. How about Jeff Honken? Was he involved again to your knowledge?
A. He -- we -- when we were down in Arizona, we stopped by and talked to him, and he gave Dustin some money. I'm not sure if he was going to be involved in anything or not.
Q. Okay. So you don't know personally whether that money was

knowingly provided to Dustin Honken because Jeff Honken knew it was going to be used to manufacture meth or just loaned to him for some other purpose.

A. I'm not sure what the purpose.

Q. Right. So to the best of your knowledge, it was you, Dustin Honken, Angie Johnson, and then you mentioned Dan Cobeen.

♀

749

A. Correct.

Q. Who's Dan Cobeen?

A. He's someone that we met at Kraft Foods.

Q. Now, you say, We met at Kraft Foods. You're going to have to fill in the jury a little bit. At some point did you and Dustin Honken begin working at Kraft Foods?

A. Yes, Dustin and I worked at Kraft Foods, and Dan Cobeen was working with a temporary service, and he was working there.

Q. Approximately when did you guys, you and Dustin Honken, begin working at Kraft Foods?

A. Dustin started there before I did probably in '93, and then I got a job there in the spring of '94.

Q. Did -- what did you do at Kraft Foods?

A. I worked in the processing area where they cook the pudding.

Q. And what did Dustin Honken do at Kraft Foods?

A. He worked on the line packaging the product after it was packaged -- put in cups.

THE COURT: Mr. Williams, I'd like to give the jury a stretch break.

MR. WILLIAMS: You bet.

THE COURT: Okay. Thank you.

Please be seated. Thank you.

Mr. Williams, thank you.

MR. WILLIAMS: Thank you, Your Honor.

BY MR. WILLIAMS:

Q. We were just talking about working at Kraft. Did Dustin Honken have anything to do with you getting your job at Kraft Foods?

A. He -- somewhat. He helped me -- told me some things on how to get through the interview process.

Q. And so you ultimately started working there as well then.

A. Correct.

Q. Who is the one who involved Dan Cobeen in this operation?

A. Dustin was.

Q. Was that with your agreement that Dan Cobeen was brought in?

A. No, it was not.

Q. Explain that to the jury, please.

A. I did not think that Dan should be involved in the process. Basically I did not trust him to be involved with it.

Q. Why not?

A. I didn't know him, anything about him.

Q. So Dan Cobeen does get involved at some point.

A. Yes.

Q. You guys acquire equipment and chemicals.

A. Yes.

Q. Any steps taken to prevent you guys getting caught by law enforcement during this time frame?

A. At some point someone had left the garage door open, and we

moved everything out of Dustin's house.

Q. Did you store parts of the methamphetamine lab at different locations?

A. Yes, we did.

Q. And where would you store some of this methamphetamine material?

A. Some was stored at Dustin's dad's house. Some was stored at Angie's and some at Kathy's.

Q. Do you know Jay Lien by chance?

A. I don't recognize the name, no.

Q. Did you ever store any other materials at anybody else's house to the best of your recollection?

A. I stored some at my house at some point but not at that time.

Q. Okay. Let's talk about the operation at Dustin's house. In 1995 the lab is set up where at in this house?

A. In the garage.

Q. And who all's participating in the manufacturing process of it?

A. Dustin and I.

Q. Now, at this point who's deciding what chemicals you're getting, how you're going to do it, what process you're using and so forth?

A. Dustin for the most part.

Q. And when you say for the most part, what do you mean by that?

752

A. I knew some things about what was going on by this time that we'd talked about some things.

Q. All right. And so you're not saying he made all the decisions, but you helped out in some of the decision-making process about how to manufacture it this time around.
A. Correct.
Q. And were you ultimately successful in manufacturing the methamphetamine at his house at this point?
A. We were not, no.
Q. Was there any discussion you had with Dustin Honken about why he wanted to make methamphetamine at this point, because at some point the charges are dropped against him, aren't they?
A. Yes.
Q. Any conversation about what he needs the money for now or why he wants to manufacture meth now?
A. There are several reasons. One was that he was still concerned about witnesses showing up, and he had gotten in debt some from getting the chemicals and just to have some I suppose, and money.
Q. What did he say about witnesses showing up again?
A. Just over time different conversations kinda added up to mean to me that he was worried about them either coming back as witnesses or showing up dead.
Q. Did you have any conversations with him that you understood

753

to be concerns about whether something needed to be done with bodies to make sure they didn't reappear?
A. At some point he'd discussed making a -- an incinerator that would burn bodies.
Q. And this would have been when approximately you would have had this conversation with him?
A. I'm not sure at what point.

Q. Was it during the time period you guys are back man -- or starting up the manufacturing process, or is it --
A. I believe it would have been around that time.
Q. Around some time in that time period?
A. Yes.
Q. When he's having this conversation with you about making an incinerator to burn bodies, do you express any concern to him?
A. I don't know what I -- what we -- my reaction was. I don't remember.
Q. Between you and Dustin Honken, was there ever discussion over time in your long-term relationship about whether one of you had more guts to do things than the other one?
A. There was. At times we had discussed that Dustin had more -- he'd follow through with things that he planned on doing.
Q. Where you might not follow through?
A. Correct.
Q. Now, in February of 1996 there's a search of Dustin

754

Honken's house. Are you aware of that?
A. Yes, I am.
Q. Does -- how do you become aware of the search at Dustin Honken's house?
A. I believe Dustin called me on the phone and told me that someone was searching his house.
Q. Did he ask you to do anything?
A. To go to Kathy's and there were some things there that we were storing and to get rid of it.
Q. Kathy Rick's house?
A. Correct.

Q. And again, just to remind the jury, Kathy Rick is somebody that was a girlfriend of Dustin Honken's?

A. Correct.

Q. Did he have a child with her?

A. Yes, he did.

Q. And by this time did he have a child with Angela Johnson?

A. Yes, he did.

Q. Did Kathy Rick to your knowledge know of the stuff that was stored at her place?

A. To my knowledge she didn't know it was there when I arrived at her house.

Q. And so what did you do when you got to the house?

A. I -- well, she was leaving, and I came -- took the stuff in the house and got rid of the chemicals down the drain and

♀

755

destroyed bottles and anything else that would have been there and dumped it later or dumped it somewhere.

Q. So you destroyed any evidence that might have been at Kathy Rick's house.

A. Correct.

Q. And that was on instructions of Dustin Honken?

A. Correct.

Q. Were you ultimately arrested on drug charges in April of 1996 as well?

A. Yes, I was.

Q. And between the time of the search in 1996 and the arrest in nineteen ninety -- I'm sorry, in April of 1996, did you have conversations with Dustin Honken about what appeared to be the impending investigation of your drug operation at the time?

A. Yes, I did.

Q. Can you describe for the jury the nature of those conversations you had with him?
A. Just a lot of different things, what they might have for evidence, who might be the witnesses, where they might be storing the evidence, different ways of getting rid of witnesses and the evidence.
Q. Let's talk about that for a little bit. What do you mean different ways of getting rid of witnesses?
A. Well, who might be the main person as a witness to -- that might be the most important to the case, and mostly when that

♀

756

kind of conversation came up, I didn't want to hear about it so . . .
Q. There were conversations, though, about eliminating witnesses?
A. Yes.
Q. At this point in the conversations you're having with Dustin Honken, has he identified somebody he believes to be the key witness against him?
A. Yes.
Q. And who is that?
A. Dan Cobeen.
Q. Does he discuss any other witnesses that may need to be eliminated?
A. Officers that were there during the raid and some chemists.
Q. Do you take any -- you also indicated not only taking care of witnesses but also evidence and where it was stored. Can you explain what you mean by that?
A. He had -- he had found a place in Bondurant that he thought the evidence was being stored, and we had gone down and looked

at the place in preparation to go in and destroy the evidence that was in there.
Q. What do you mean you went down to look at the place?
A. Look at the building that the chemicals -- where Dustin thought the chemicals were stored.
Q. What efforts did you make when you went down there to look

at this? How did you do it?
A. We went down and got out of the car and looked at it during the night so that no one would see us.
Q. Did you take any other precautions to make sure you wouldn't be seen?
A. Yes, we had Angie drop us off nearby, and then she would drive away, and we would scope out the place. Then she'd come back later.
Q. Did you wear any special clothing?
A. Just dark clothes and stocking over our heads so that no one could see us.
Q. So you went and you actually kind of looked at this facility that Dustin believed held the evidence against him?
A. Correct.
Q. And what was the plan if you actually found the evidence there?
A. To break in and to take the evidence and mix it up with other things or to destroy it or drive a vehicle into the building or something to disrupt the evidence so it wouldn't be able to be used.
Q. So were you successful?
A. No, we were not.
Q. Why not?

A. I guess we just never got into the building and found out later that the chemicals were not in the building anyway.

♀

Q. During this same time period after the search but before you guys are arrested, any conversations with Dustin Honken about what, if anything, you should tell the police if you're confronted or questioned by the police?
A. Just tell them nothing, don't talk.
Q. Now, ultimately you guys are indicted on federal charges and arrested in April of 1996; is that correct?
A. Correct.
Q. Are you released pending trial?
A. I'm released, yes.
Q. Any restrictions on you?
A. At this time or --
Q. In April of 1996, any restrictions on who you can have contact with or where you can go?
A. No. I don't recall if I had any on me, no.
Q. Did you go back to work at Kraft Foods?
A. Yes, I did.
Q. What about Dustin Honken? Did he have any restrictions on him?
A. Yes, he did.
Q. What restrictions did he have?
A. He wasn't supposed to have contact with myself, and I don't believe he was supposed to with his dad either.
Q. Now, ultimately after you guys are arrested there's a no-contact order. He's not supposed to have contact with you.

♀

Do you have contact anyway?
A. Yes, we do.
Q. And how is that done?
A. Well, we worked at Kraft, so I guess they allowed some contact during that time. And we talked while we were at Kraft. And I guess I don't remember having any other contact outside of Kraft until later after I'd been arrested.
Q. When you had contact with him at Kraft Foods, did you take any precautions while you were there so people couldn't hear what you were talking about?
A. It's loud there anyway, so unless you're nearby, you wouldn't hear anybody.
Q. While you were in Kraft -- I'm sorry. While at this point you're arrested, you're released, is there continuing discussions you have with Dustin Honken about eliminating witnesses?
A. Yes, there was.
Q. And at some point do you make a decision to cooperate with law enforcement?
A. Yes, I did.
Q. Why?
A. There are a lot of reasons. Mostly it came down to that I didn't want any -- looking back on what had happened before, I didn't want it to continue.
Q. What do you mean by that?

760

A. I could see that other people had disappeared, and I assumed that they had been killed, and I did not want that happening anymore.
Q. Now, you also recognized that by cooperating you stood to

reduce the sentence you were going to receive.
A. Yes, I did.
Q. And ultimately did you plead guilty to federal narcotics charges as part of your cooperation?
A. Yes, I did.
Q. Were you ultimately sentenced to federal prison?
A. Yes.
Q. Did you receive a reduction in your sentence prior to being sentenced on -- because of your cooperation?
A. During the sentencing I received a downward departure, yes.
Q. And when you say a downward departure, can you explain what that means to the jury?
A. They -- because of my cooperation, they took time off of the mandatory sentence. It's a guideline that they go through, go by.
Q. What were you looking at if you recall as a sentence before you got it reduced for cooperation?
A. Somewhere between 10 and 14 years I believe.
Q. And what did you end up actually serving as far as a sentence?
A. I got a sentence of four and a half years.

761

Q. And then you received some time for -- time off for good behavior while you were in federal prison?
A. Correct.
Q. That plea agreement -- did you plead guilty pursuant to a plea agreement, a written document?
A. There was a written document, yes.
Q. And it was an agreement between you and the United States?
A. Correct.

Q. And in that agreement was a requirement for you to continue to cooperate.
A. Yes, there was.
Q. As part of your cooperation, did you agree to record conversations with Dustin Honken?
A. Yes, I did.
Q. And did you actually record some conversations with him?
A. Yes, I did.
Q. Mr. Cutkomp, I'm going to show you what's been marked as Exhibit 200 -- get these in order -- and then 201 is a transcript; is that correct?
A. Correct.
Q. And then 202 is also a disc?
A. Correct.
Q. And then there's a 203 which is a transcript?
A. Correct.
Q. 204 is on a disc?

♀

A. Correct.
Q. And then there's a transcript which is 205?
A. Correct.
Q. And then there's a 206 which is a disc with a sound recording on it?
A. Yes.
Q. And then there's a 207 which is a recording -- I'm sorry, a transcript?
A. Yes.
Q. And then there's a 208 which is a disc with a recording on it?
A. Yes.

Q. And then there's 209 which is a transcript as well; is that correct?
A. That is correct.
Q. Have you had an opportunity to listen to these tapes to determine if -- what's on those tapes?
A. Yes, I have.
Q. Generally what are on those recordings?
A. They're conversations between Dustin and I.
Q. Did you have an opportunity to listen to those and compare those to the typed-out transcripts that are in front of you?
A. Yes, I have.
Q. And do they fairly and accurately reflect what's on those tapes?

A. Yes, they do.
Q. And do those tapes fairly and accurately reflect conversations you had while wired undercover with Dustin Honken in the spring of 1996?
A. Yes.

MR. WILLIAMS: United States would move to admit Exhibits -- excuse me, Your Honor. I should have had this memorized -- 200, 202, 204, 206, and 208.

* * * *

(Government Exhibits 200, 202, 204, 206, and 208 were offered.)

* * * *

MR. PARRISH: No objection except the instructions on the best evidence.

THE COURT: Okay. Exhibits 200, 202, 204, 206, and 208 are admitted.

* * * *

(Government Exhibits 200, 202, 204, 206, and 208 were admitted.)

* * * *

THE COURT: And I'm going to give the jury a little bit of an instruction, a little more detailed instruction on the use of the transcripts.

As part of the evidence in this case, you are going to hear audio tape recording of intercepted conversations. Those

♀

conversations on the recording were legally recorded and may be considered by you like any other evidence. The audio tape recordings are accompanied by typed transcripts. The transcripts are not evidence. To the extent that the transcripts undertake to identify the speakers engaged in the conversations, the identity of the speakers as set out in the transcript is not evidence. Rather, it is merely the opinion of the person who transcribed the tape.

You are permitted to view a transcript for the purpose of helping you follow the conversations as you listen to a recording and to help you keep track of the speakers. You are specifically instructed that whether the transcripts correctly or incorrectly reflect the conversation or the identity of the speakers is entirely for you to decide. If you decide that a transcript is in any respect incorrect or unreliable, you should disregard it to that extent. You should, therefore, rely on what you hear rather than what you read when there is a difference. Thank you.

MR. WILLIAMS: May I have just a moment, Your Honor? In fact, if I could, Your Honor, these tapes with the agreement

with defense counsel we're going to play from beginning to end. They are lengthy tapes, and the first one's going to take approximately one hour to play. I'm wondering if we might not be best served by taking our afternoon break at this point, or we can play the tape, whatever your wishes are.

♀

THE COURT: Now would be a good time to take the recess.

Okay. Members of the jury, we'll take a 25-minute recess. It's approximately 2:15. We'll see you in 25 minutes. Please remember my prior cautionary instruction.

(The jury exited the courtroom.)

THE COURT: Please be seated. Anything else we need to take up, Mr. Williams?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

THE COURT: Mr. Spies?

MR. SPIES: No, Your Honor.

THE COURT: Okay. We'll see you in 25 minutes. Thank you.

(Recess at 2:17 p.m.)

THE COURT: Please be seated for one minute. I have a matter I'd like to take up. Both the press who are present and I understand some of the family members who are present have asked for copies of transcripts of the tapes. I don't know if there are enough copies made to make them available now, and I want to know if any party had an objection to it.

MR. WILLIAMS: First answer is we don't have extra copies made right now. We're going to be into tomorrow morning on some of these tapes, and certainly by tomorrow morning we can

have additional copies of the transcripts made.

Second answer is the government has no objection to releasing the transcripts to the family or the press if the Court has no objection to it.

MR. PARRISH: We really never thought about the transcript. I think with the Court's instruction, I don't think it's going to be any great concern that the best evidence is really the tapes themselves. The tapes, correct.

THE COURT: Okay. Well, you know, I'm not in the copy business, and so it's the government's exhibits. I'm not going to have my staff make copies. If the government wants to make copies, I think it would be nice -- you know, I believe in being open to the press, and that's the fundamental concept of the courts, and so I'm not going to order you to do it, but if you would be willing to have your staff make copies and make it available to the press and certainly to the family members, that would be greatly appreciated.

MR. WILLIAMS: We'd be glad to do that, Your Honor. We just won't be able to do it on -- I think we're going to get into two tapes this afternoon, but by tomorrow morning we'll have copies for the press and families of the tapes we play today and the tapes we'll be playing tomorrow morning.

THE COURT: Okay. Thank you.

MR. WILLIAMS: One other matter we wanted to bring up to the Court's attention just to get on the record an agreement between the parties, there is at the beginning of each of

these -- I think almost each of the tapes there is about a 15-minute gap where Mr. Cutkomp is traveling where there's no conversation taking place. And then there's a time after each of the tapes after he leaves the house where there's no conversation. The defense has no objection to us not playing dead time and just starting and stopping where the conversation starts and stops with the understanding once the conversation starts, it's not going to be stopped even if there's a pause in the conversation until the very end of the tape when there's no more conversation taking place, and that's the understanding we've reached with the defense on this matter.

THE COURT: Is that the understanding, Mr. Parrish?

MR. PARRISH: It is, Your Honor, and we've spoken to Mr. Honken about it. He's in agreement with that process. I have listened to each of the tapes and believe that's consistent with what the tapes will show.

THE COURT: These are basically some of the tapes that were played in the ninety -- 1998 sentencing of Mr. Honken; is that right?

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: I don't remember the -- I've listened to a lot of tapes since then. I don't remember the quality. It varies usually from poor to horrible. How bad are these?

MR. WILLIAMS: These have been enhanced. Given that, there are still some difficulties as there are with any tape,

768

and in particular I think on the last one there's a lot of whispering going on, and so they've been enhanced with the earphones. We tested it. We think it's audible. They're better than the normal tapes, but there are still obviously

difficulties any time you're trying to record something under those settings.

THE COURT: How many extra audios do we have if any members of the family want to wear them?

THE CLERK: We actually don't have any. You have yours, and that's about it.

THE COURT: Okay. I'd be willing to give mine up. Is there anybody that wants it? Raise your hand. Go for it. Going once, twice. No hands are up. Okay. I'll keep mine. Thank you.

Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. PARRISH: Oh, Judge, we're not waiving my prior -- by this agreement with the government, I think it's clear we're not waiving any prior objections we made on this matter pretrial.

THE COURT: Okay. Correct.

MR. PARRISH: Okay.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Williams?

♀

MR. WILLIAMS: Thank you, Your Honor. With the Court's permission, government would propose playing the first of a number of tapes we're going to be playing. This one took place on May 24 of 1996. It's my understanding your staff has handed out copies of the transcripts of those tapes and earphones to each of the jurors. And with your permission, we'd play the first tape at this time, Your Honor.

THE COURT: You may. Thank you. 200 is the tape; 201

is the transcript.

MR. WILLIAMS: The tape is 200, Your Honor.

(Government's Exhibit 200 was played in open court.)

BY MR. WILLIAMS:

Q. Mr. Cutkomp, first of all, I want to correct the record. I was looking at the wrong transcript. This was one that was done on May 16 of 1996; is that correct?

A. Yes.

Q. All right. Tell the jury, first of all, where did this conversation take place at?

A. At Dustin's mother and stepfather's house.

Q. And where was that located at?

A. In Britt, Iowa.

Q. Where in the house did you have this conversation that was taking place with Dustin Honken?

A. Most of it was in the living room.

Q. And was there a TV on in the background?

770

A. Yes, there was.

Q. Tell me about the conversation you had with Dustin Honken. Was it maintained at a normal speaking voice that you would normally use with Dustin Honken?

A. Pretty much.

Q. Okay. And I want to talk to you about a couple things in here. At one point there's a woman named Carmen. Who's Carmen?

A. Dustin's stepsister.

Q. There's a conversation in the beginning about Jay Jackson and contact by Jay Jackson. Who's Jay Jackson?

A. The probation officer that was in charge of us.

Q. On page 2 of the transcript there's discussion about stuff

being down in Oklahoma. What items are down in Oklahoma or believed to be down in Oklahoma?
A. The evidence and chemicals.
Q. So this is after you guys have eliminated the place in Bondurant as a possible location for where the evidence is?
A. Correct.
Q. And so why is there a conversation about Oklahoma?
A. Because that's -- that's where Dustin believes that the chemicals and evidence has been taken.
Q. Why does he care?
A. He's looking to see where it's at so we can get rid of it.
Q. On page 10 there's a discussion about the monitor, the electronic monitor he has on him, and you talk about getting

771

electronic books about the middle of page 10. Do you see that?
A. Yes.
Q. Can you tell the jury what are you guys talking about at this point?
A. We had discussed a way for Dustin to be able to fool the monitor so that when he left the house that the monitor in the house would think that he was still there.
Q. And so it was a way of finding some way around this electronic device that was keeping him in the house?
A. Correct.
Q. On page 11 at the bottom of the page there's a discussion about Dustin Honken says, I found one. Basically there's two others to find. What is he referencing there, the bottom of the page, the last paragraph?
A. He was talking about the people that were in the house and the witness that -- which ones were the most important.

Q. Going over to page 14, at the top of page 14 is a discussion in the top paragraph. Says, I didn't see any. I looked through everything. And then it goes on to say, So basically without Cobeen and Graham, you're out of it. Pretty much. I mean, if I wanted to bad enough, I'd go get my guardian and slit certain things but.
Do you know what he's referencing when it's the reference to guardian?
A. I don't recall what that was.

♀

Q. What did you understand he was talking about slitting at that point?
A. I don't remember what that meant, no.
Q. On page 15 at the bottom of the page -- and earlier in the conversation he was talking about flipping. What did he mean by flipping there?
A. Well, in '95 I had -- I checked myself into a mental health center.
Q. Okay. And why was that?
A. I was having some other legal problems and some emotional problems at that time.
Q. Okay. And you received treatment at that -- for that at that time?
A. Yes, I did.
Q. Is the flipping -- so your reference there is unless you have another problem mentally with something going on?
A. Yep, yes.
Q. All right. And at page 18 at the -- there's a paragraph there toward the bottom. It says, So I don't know how I'm going to do that. I mean, I can have Kathy go maybe but yeah, if I

can find him, if I can find them, I ain't worried about it. Makes click, click, click noise.

What's going on at this point in the conversation?

A. Just talking about finding different people.

Q. And is there any hand gestures being made at this point

that you recall?

A. I don't recall.

Q. When he says it would only take five minutes of his time, what's he talking about there?

A. I'm not sure.

MR. WILLIAMS: At this point, Your Honor, we would ask to play the next tape which is Exhibit 202. This one is the one that takes place on May 24 of 1996 as well.

Q. And, Mr. Cutkomp, to set the stage for this, does this conversation -- where does this conversation take place at?

A. It would be at his stepparents' house -- or stepdad's and mother's house again.

Q. And that's in Britt, Iowa.

A. Yes.

MR. WILLIAMS: With the Court's permission, if I could have your staff pass out new transcripts for this conversation on May 24.

THE COURT: And I understand there's no objection to 202, and my cautionary instruction regarding the transcript applies to the transcript which is Exhibit 203.

MR. PARRISH: That is correct, Your Honor.

THE COURT: Why don't we take a short stretch break before we start this tape.

Okay. Please be seated. Thank you.

MR. WILLIAMS: Your Honor, if I can clarify as we get

into this, the length of this tape is such that it actually bled over to a second file, so there's going to be a short period where my technician's going to have to stop it and start it into the next file.

THE COURT: That's fine. Thank you.

MR. WILLIAMS: Thank you. With your permission, we'll go ahead and start playing this.

THE COURT: That would be terrific. Thanks.

(Government Exhibit 202 was played in open court.)

THE COURT: Mr. Williams, we're coming up on 4:30. Would now be a good time to stop?

MR. WILLIAMS: Certainly, Your Honor. We'll track where we stop.

THE COURT: And start it up in the morning.

Okay. Members of the jury, that will conclude the evidence for today. Please remember my cautionary instruction about keeping an open mind until you've heard all of the evidence in the case, had a chance to receive my final instructions, hear the closing arguments of the lawyers, and, most importantly, go back into the jury room and begin your deliberations. We'll see you tomorrow morning at 8:30. Thank you.

(The jury exited the courtroom.)

THE COURT: Are there any matters we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: Nothing, Your Honor. Thanks.

THE COURT: Okay. See you tomorrow morning at 8:15.

MR. WILLIAMS: Thank you.

(The foregoing trial was adjourned at 4:31 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR — 12-1-04 Date

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| BRIAN DEGEUS | | |
| | MR. MILLER | 557 |
| | MR. PARRISH | 563 |
| DANIEL COBEEN | | |

VOLUME 3 9-14-04 witness testimony
MR. WILLIAMS                                        570
MR. PARRISH                                         603

JOHN GRAHAM
MR. WILLIAMS                                        626
MR. SPIES                                           664
MR. WILLIAMS                                        673

TIMOTHY CUTKOMP
MR. WILLIAMS                                        676

*****

EXHIBITS:

78                                                 594
69                                                 649
70                                                 652
71                                                 654
80                                                 657
40                                                 741
9A and 9B                                          742
48                                                 746
200, 202, 204, 206, and 208                        763

*****

Case 3:09-cv-03064-MWB-LTS    Document 284-72    Filed 06/23/11    Page 681 of 3636

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, Plaintiff, vs. DUSTIN LEE HONKEN, Defendant. /

No. CR01-3047

Sioux City, Iowa
September 15, 2004
8:30 a.m.

VOLUME 4

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
UNITED STATES DISTRICT JUDGE, and a jury.

♀

APPEARANCES:

For the Plaintiff:

C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant:

ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 682 of 3636

Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Good morning. Please be seated.

I just have a couple of matters to take up before we bring the jury in. First of all, is there anything we need to talk about from the lawyers' perspective, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: No, Your Honor. Thank you.

THE COURT: Okay. With regard to the transcripts that the parties and I have agreed to make available to various members in the back of the courtroom including the press, I have decided that we're going to collect those at the end of each playing of the tapes just like we do with the jury so that we're treating everybody in the courtroom the same.

So you'll have those copies to use while the tapes are being played, but as soon as the tapes are done and we move on to either other tapes or other evidence, we'll go ahead and collect those transcripts. So they won't be leaving the courtroom.

Anything else before we have the jury brought in, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: No, Your Honor. Thank you.

THE COURT: Okay. Let's have the jury brought in. Thank you.

(The jury entered the courtroom.)

THE COURT: Please be seated. Before we get started, Mr. Williams, I just wanted to address the jury. In listening to the weather reports early this morning, there's an indication that there could be pretty severe fog tomorrow morning, so I thought I'd kind of monitor it at the end of the day today before we send you home. But if it looks like there's going to be severe fog -- I know many of you have huge distances that you're traveling -- we might start at 9 rather than 8:30. You'll probably still have to leave at the same time, but it will give you a little bit of extra time in case the fog is as bad as they're predicting. So I'll try and monitor that with the weather, and then we'll make a decision before we send you home at the end of the day.

But I just wanted you to think about it, and I may even ask you if you want to start even a little later than 9 or if you want to start at 8:30. It's fine with me, but I know some of you have great distances, and I don't want to put anybody in harm 's way. So we can take that up at the end of the day. Maybe the weather folks will have a more accurate prediction about what it's going to be like.

Mr. Williams, you can proceed.

TIMOTHY CUTKOMP, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

♀

781

MR. WILLIAMS: Thank you, Your Honor. We left off at the end of the day in the playing of a tape that occurred on May 24, 1996, and remind the jury this took place between

Mr. Cutkomp who is on the stand and Dustin Honken at the home of Mr. Honken's parents. With the Court's permission, we stopped at approximately page 24 of the transcript. I think we've got it queued back up to start at the very bottom of page 23 to overlap a little bit, and then we're going to move on to page 24. And with the Court's permission, we would begin playing of that tape again.

THE COURT: Thank you. You may.

(Continuation of Government Exhibit 203.)

MR. WILLIAMS: Your Honor, this is just the place where we're shifting over to the new tape.

THE COURT: I understand that. Thank you.

(Continuation of Government Exhibit 203.)

CONTINUED DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Cutkomp, just to place some context on this a little bit more, where in the house did this conversation take place?

A. I believe in the living room.

Q. At page 20 of the transcript down toward the bottom of that page, there's a discussion about all they have on you is Dan Cobeen and a piece of paper. Do you see that reference down there, the third paragraph from the bottom? It starts off, Got

nothin'. The only thing they have -- they have on you is Dan?

A. Yes.

Q. Okay. And piece of paper. Do you recall that part of the evidence that was seized from Dustin Honken's house was a piece of paper that somehow implicated you?

A. Yes.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Showing you what's been admitted as Exhibit 67. Do you recognize that envelope there?

A. Yes, I do.

Q. Did you have a chance when you were charged back in 1996 to look at the government's discovery file and review the evidence against you at that time?

A. Yes, I did.

Q. Do you remember that this note that is to you from Dustin Honken was part of the government's file at that time?

A. Yes.

Q. Is that what's being referenced on page 20?

A. Yes.

Q. Going to page 26, if you'll look at the bottom of that page of the transcript, the second paragraph up from the bottom, you make a reference, you say, I'm worried that you took a little thing and threw it in there or something. What are you talking

about there, Mr. Cutkomp?

A. That when the bodies were buried that Dustin threw something in to implicate me.

Q. You're talking about the murders in 1993 and that when he buried the bodies that maybe he threw some piece of evidence in or something that if it was ever found it would implicate you?

A. Correct.

Q. And you're expressing your concern about that to him.

A. Yes.

Q. And then the last thing is on page 29, the fourth paragraph up from the bottom, it starts off, Maybe, probably, but it's so

hard to get that person to do anything. They're all so bitchy about it, and it goes on from there. Who is that person that is being discussed there and then on to the top of the next page there?

A. Angela Johnson.

Q. Very good. Now, this conversation took place on May 24 of 1996. There was another recorded conversation that took place a few days later on May 29 of 1996; is that correct?

A. Yes.

Q. And that would be -- Exhibit 204 is the actual tape, and the transcript is 205.

MR. WILLIAMS: With the Court's permission, I would request assistance from your staff to pass out the transcript of 205.

♀

THE COURT: Yes, and why don't we collect 203.

MR. WILLIAMS: Very good.

THE COURT: Thanks. Why don't you pass the transcript all the way down to this end. That's fine. Rick can collect them, our CSO.

Mr. Williams, do you have extra transcripts for the people in the back of the courtroom?

MR. WILLIAMS: We've already passed those out.

THE COURT: Oh, you've already done that. Okay. Thank you.

Suzanne, why don't you take the transcripts from Gary. Thank you.

BY MR. WILLIAMS:

Q. And, Mr. Cutkomp, just to set the stage for this tape that took place on May 29, 1996, where does this recording take place

at again?
A. At Dustin's parents' house.
Q. In Britt, Iowa?
A. In Britt, yes.

MR. WILLIAMS: Very good. With the Court's permission, we would ask to play Exhibit 204 at this time.

THE COURT: You may. Thank you.

(Government Exhibit 204 was played in open court.)

THE COURT: Mr. Williams, could we take a break sometime soon?

785

MR. WILLIAMS: Yes, Your Honor. We can do it right now.

THE COURT: Thank you. Members of the jury, it is about 5 after 10. We'll be in recess until 10:30. Please remember my prior cautionary instruction about keeping an open mind until you've heard all of the evidence. Thank you.

(The jury exited the courtroom.)

THE COURT: Anything we need to take up, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: No, Your Honor. Thanks.

THE COURT: Okay. Thank you.

(Recess at 10:05 a.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Williams, are you ready to proceed with the tape?

MR. WILLIAMS: We are, Your Honor, with your

permission.

THE COURT: You may. Thank you.

(Continuation of Government Exhibit 204.)

MR. WILLIAMS: This is a point, again, Your Honor, where we have to switch over to another drive on the CD, so I don't know if it may be a good time for a stretch break or not.

786

THE COURT: Okay. Great. Members of the jury, why don't you take a stretch break.

Okay. Please be seated. Why don't we give the jurors a second to get their headphones back on and get situated. And whenever you're ready, you can start the tape.

(Continuation of Government Exhibit 204.)

BY MR. WILLIAMS:

Q. Mr. Cutkomp, while we're shifting over to the next tape, I just had a couple follow-up questions for you. On page 43 of this transcript, there's a discussion about Graham, and do you know which -- who Graham was that they're talking about if you look kind of in the middle of that page?

A. One of the officers.

Q. Okay. And there's a discussion about looking in the city directory and so forth. At this point what is Dustin Honken talking about doing to Graham?

A. Finding out where he lives.

Q. And then on the next page there's talk about a station wagon and directions to go down 17th Street. What is that in relation to?

A. Dustin thought that that's where Graham lived.

Q. And so he's looking for Graham at this point?

A. Correct.

Q. Now, there's another tape that takes place that's Exhibit 206, and this is a recording that takes place on June 4 of 1996,

and the transcript is marked as 207.

MR. WILLIAMS: With the Court's permission, we'd pass that out at this time and collect the --

THE COURT: Could I see the lawyers just for one second?

(At sidebar off the record.)

MR. WILLIAMS: So if we could have the old transcripts picked up and the new ones passed out, Your Honor, we'll move on with the new one.

THE COURT: That would be fine. Thank you. If you can just pass the old transcripts back down, and we'll pass out the new transcripts.

Members of the jury, I was meeting with the lawyers just a minute ago at sidebar there to make sure that they knew that these headsets only last -- we get varying opinions about how long the headsets are good for. They're kind of like a cell phone. They then have to be recharged. So we're going to recharge them over the noon hour, but it takes 12 hours to recharge them. I'm not sure 45 minutes is going to add a whole lot to their life. Apparently we have some back-up batteries that we'll use.

So the point is we'll try and get through as much of the tapes as we can. If your headsets go out and stop functioning, just try and raise your hand, and we'll stop and then get you another probably battery for the headset. So we

may not have a problem. But if we do, we have a contingency plan, so that's what we were talking about.

Thank you. You may proceed.

MR. WILLIAMS: Thank you, Your Honor. When the jury's ready, we'll go ahead and start playing the new tape.

THE COURT: Thank you.

(Government Exhibit 206 was played in open court.)

MR. WILLIAMS: Your Honor, I went ahead and instructed the tape to be stopped for lunch.

THE COURT: That's fine. Thank you.

Members of the jury, we'll take our noon recess. We'll be in recess till 12:45. Please remember my cautionary instruction about keeping an open mind until you've heard all of the evidence. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated.

Mr. Williams, have you estimated the amount of time left on the tapes?

MR. WILLIAMS: We've got a half an hour left on this one and about an hour on the last one.

THE COURT: Okay. Think we should try and recharge them?

THE CLERK: Yeah, I'll switch out the old batteries with the new ones.

THE COURT: Okay. We have new batteries for what?

♀

789

Ten of the seventeen?

THE CLERK: Uh-huh.

THE COURT: Do we have any more back there charging?

We don't have any more headsets, do we?

MR. WILLIAMS: I think we have about 15 batteries, Your Honor.

THE COURT: And those batteries are fully charged?

MR. WILLIAMS: They should be.

THE COURT: Would you mind doing that, Suzanne?

THE CLERK: Sure.

THE COURT: We'll be in recess.

(Lunch recess at 12:02 p.m.)

THE COURT: Ready for the jury?

MR. WILLIAMS: Yes, Your Honor.

MR. PARRISH: Your Honor, could we bring up one matter? At the end of the government's presentation with regard to the tapes, could we either take a break for a second and bring up a matter with the Court or be able to approach the bench on a matter if it's not at a recess time before I start my cross-examination?

THE COURT: Do you want to do it right now?

MR. PARRISH: No. We'd like to do it at the end.

THE COURT: Well, why can't you do it now? We have the jury out now. We could do it now.

MR. PARRISH: It would not be something that I think

would be an issue at this time.

THE COURT: Well, if it's not an issue at this time, how do you know it's going to be an issue at some other time?

MR. PARRISH: That's fine. We don't have to have a recess. We can just go ahead and do it.

THE COURT: Okay. Let's have the jury brought in.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Williams?

MR. WILLIAMS: With the Court's permission, once the jurors have got their headsets back on, we'd continue with the playing of the tape.

THE COURT: Yes. Thank you very much.

(Continuation of Government Exhibit 206.)

BY MR. WILLIAMS:

Q. Mr. Cutkomp, this --

MR. WILLIAMS: I'm sorry, Your Honor?

THE COURT: No.

MR. WILLIAMS: Okay.

BY MR. WILLIAMS:

Q. Mr. Cutkomp, this conversation took place on June 4, 1996. I just want to ask you a couple questions. First of all, where did this take place at?

A. At Dustin's parents' house.

Q. And Marvea Smidt is listed as one of the early people that

appears on that. Who is Marvea Smidt?

A. Dustin's mother.

Q. Where in the house did this conversation take place?

A. Part in the living room and part in the garage.

Q. And the latter part where you're talking about the attic and everything, is that in the garage?

A. Correct.

Q. Now, there was another recorded conversation. The last one was on June 6 of 1996 in the sequence here?

A. (Witness nodded head.)

Q. And that is Exhibit 208. The transcript is 209.

MR. WILLIAMS: With the Court's permission, we'd collect the transcript 207 and pass out 209.

THE COURT: Yes.

MR. WILLIAMS: Take a moment to queue it up past the dead time on this tape. With the Court's permission, we'll go ahead and play the exhibit.

THE COURT: You may. Thank you.

(Government Exhibit 208 was played in open court.)

BY MR. WILLIAMS:

Q. Mr. Cutkomp, I've got a couple questions for you about this conversation. Where, first of all, on this June 6 conversation with Dustin Honken did this take place?

A. At his parents' house.

Q. And where at at his parents' house?

♀

792

A. I'm not sure on this one.

Q. Turning to page 16 of the transcript, the first large paragraph where it starts, Anyway, I told you that if things are followed, do you see that paragraph there?

A. Yes.

Q. At the end of that it says, I know that she has not been there for a while. You answer, At day care. Dustin Honken says, At CB, yeah. Who's the "she" that you guys are referencing at that point?

A. Dan Cobeen's wife.

Q. And is this an effort to try to still figure out where Dan Cobeen is at?

A. Yes.

Q. Moving to page 20, three-quarters of the way down on that paragraph -- I'm sorry, on that page, there's a line there where

you say, What about your house idea? Dustin Honken says, Huh? And you say, Your house that you were going to build. What's that reference to, sir?

A. He jokingly talked about building a house filled with explosives and inviting all the officers over.

Q. And then finally back on page 22 about three-quarters of the way down, you say, I know exactly which one you're talking about too. The one. And there's a reference, There's only one possibility in my mind. Just what it is. So anyway. Do you see that reference there?

♀

793

A. Yes.

Q. You say, I know exactly which one you're talking about too. What's that a reference to, sir?

A. I thought it meant Terry DeGeus.

Q. So there was a reference that there was one body that there might be some concern might reappear?

A. Correct.

Q. Now, was this the last in the time of the recorded tapes that you made undercover with Dustin Honken, sir?

A. Yes.

Q. And after that, his -- was he arrested and taken off pretrial release?

A. Yes, he was.

Q. Now, during the course of your cooperation with the government, was there one other tape that was recorded with Dustin Honken on May 22, 1996?

A. Yes.

Q. Was there problems with that tape recording?

A. Yes, there was a -- it cut out quite a bit, and there was

several people coming in and out of the house quite a bit.

Q. Did you have much of an opportunity to talk with him during that particular recording?

A. Not about the case or anything.

Q. And that one would be if we went through this on the transcripts, there's -- at the front page of the transcripts

there's a reference to -- for example, on the one, 209, there's a reference to Exhibit N-6. Do you see that reference there? On the front page --

A. Yes.

Q. And so this -- the tape that was not played for the jury would have been between N-1 and N-2 -- I'm sorry, N-3, so it would have been -- if we had done it in sequential order would have been the second tape we would have played.

A. Yes.

Q. Is that correct?

A. Yes.

Q. After this happened, after you had cooperated with the government and provided these recorded recordings, where were you living at then for the duration from 1996 and for roughly the next year or so?

A. I lived with my parents, and I lived in an apartment in Mason City.

Q. And where did your parents live at, sir?

A. In Britt.

Q. Out in the country?

A. Out in the country.

Q. And for a period of time you were living with them.

A. Yes.

Q. And where were you working at, sir?
A. Kraft Foods.

Q. And you continued to work at Kraft Foods?
A. Yes.
Q. And you continued to work the same shift you had before?
A. Yes, I did.
Q. The Dustin Honken with whom you had recorded these conversations, do you see him in the courtroom here today, sir?
A. Yes, I do.
Q. Could you describe for the jury where he's sitting and what he's wearing?
A. He's sitting over here wearing a tan shirt.

MR. WILLIAMS: Thank you. Your Honor, I have no further questions.

THE COURT: Would now be a good time to take our mid-afternoon break before we begin the cross-examination?

MR. PARRISH: It would, Your Honor.

THE COURT: Okay. Members of the jury, it is about 2:30. Why don't we take a break for 25 minutes and come back at -- well, why don't we just take a break till 3:00. We'll take a recess and come back at three. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated. Now, was there a matter you wanted to take up, Mr. Parrish?

MR. PARRISH: Yes, Your Honor. We would ask the Court I believe in accordance with the rulings on the motion in limine -- if, in fact, a matter does come up, we have to alert

the Court initially if we want to address it. I believe that based upon the examination of Mr. Cutkomp the government has opened the door to us being allowed to ask him about his prior convictions, his prior arrest.

THE COURT: How? I thought they followed my motion in limine ruling.

MR. PARRISH: They asked the question about was he flipping, and that was part of the tape. He then indicated that the flipping referred to his mental illness, and also he described the mental illness. But we believe we have some additional points we want to address with the Court in the form of argument on that point.

THE COURT: I don't understand what you mean. What do you mean you have additional points you want to raise in the form of argument? What does that mean?

MR. PARRISH: We want to argue several different points that we believe address the issue of the pretrial ruling on the motion in limine.

THE COURT: Okay. Let's hear your argument.

MR. PARRISH: First of all, he acknowledges that he was sent to a mental institution. He was arrested for it.

THE COURT: Just a second, though. What about this is new?

MR. PARRISH: I'm sorry?

THE COURT: What has happened that would be new for me

to change my ruling? You're just asking me to reconsider my ruling.

MR. PARRISH: Exactly.

THE COURT: Well, I'm not going to reconsider my

ruling.

MR. PARRISH: Okay.

THE COURT: You could have filed a written motion three months ago to ask me to reconsider the ruling.

MR. PARRISH: No, not on testimony that's come out in court today. We could not have filed --

THE COURT: Well, you knew it was in the tapes.

MR. PARRISH: These were questions that were asked by Mr. Williams after he finished talking about the tapes. This was not on the tapes. This was his interpretation of the tapes that Mr. Williams asked him about yesterday. So it would have been impossible for us to have addressed those three months ago.

THE COURT: Why do you have such an attitude?

MR. PARRISH: Because you have one, Your Honor. And I don't appreciate being talked to like that in a courtroom when I work hard to prepare my case and walk into the courtroom and am ready to try my case. I don't appreciate it by any judge or anyone else. I like to be respected just like everyone else is in the courtroom.

THE COURT: Well, you could lose the attitude, Mr. Parrish.

MR. PARRISH: Well, I would ask the Court to treat me in the same manner as they treat other people in this courtroom.

THE COURT: Go ahead and make your argument about how you claim the government opened the door to my motion in limine ruling.

MR. PARRISH: Specifically when he was asked the question about how did he interpret flipping, he said he interpreted flipping to mean that he had had some mental

problems earlier and had received treatment for it. He then proceeded to say what the treatment was for, and he was hospitalized I believe for a period of time, and that's what he said Mr. Honken meant by him flipping. That was his explanation which we believe opens the door to the relationship that was established between these two people over a period of time.

THE COURT: Well, that wasn't the subject of the motion in limine ruling, the relationship between Honken and Cutkomp?

MR. PARRISH: I agree, Your Honor, it was not.

THE COURT: How is that precluded by the motion in limine ruling?

MR. PARRISH: Well, the fact of what he was treated for is the issue that the Court told us we could not get into. We believe it sets the stage for the nature of their relationship because he acknowledges later on and as part of a way to prove that issue that he did not tell Mr. Honken all of

♀

799

the reasons as to his being treated, why he was being treated, the number of times he'd had these problems, the fact that he was arrested -- not arrested but stopped out in Arizona at a college and questioned about it, the fact that he was keeping that as a secret from Mr. Honken but yet the government establishes that they had this relationship where they talked in code.

And the question is did Mr. Honken really understand what he was talking about as referred to in the tape where he talks about him cracking up, and it's referred to over and over again that he was aware of part of why he was cracking up but not aware of all of those times he was cracking up.

Also he refers to the fact he was mentally unstable at the time these tapes were being made and Mr. Honken could have had some knowledge of it.

So we believe in light of that we should be allowed to go into the detail this person had committed these acts over 30 times and at the time he was having the conversations with Mr. Honken and taping the conversations with Mr. Honken --

THE COURT: Well, I don't understand the relevance of it.

MR. PARRISH: That's simply the relevancy of it. That's our argument. That's the only argument we want to make on it, that it should be admissible. We should be allowed to ask and this would be the nature of the type of questions that I

♀

propose to ask -- and we may not even get to it till tomorrow morning on these aspects of it, but this is what we propose to ask, Your Honor: One, isn't it true that for a period of time you were treated for these particular acts? Isn't it a fact over 30 times you had committed these acts? Isn't it a fact you secreted that from Mr. Honken? Isn't it a fact he recognized four or five times during the taped conversations he asked you were you cracking up? Isn't it a fact you kept a secret from him, and when you were talking in this code section, isn't it a fact you were mentally unstable and which he acknowledges and Mr. Honken clearly did not understand and could have been acting that way to keep him from cracking up? And that's what he said through the tapes, and that's what he said in prior sworn testimony.

And we believe the government has opened the door and we should be allowed to get into those specific acts and let the

jury understand the full picture. Otherwise Mr. Honken cannot fully cross-examine him if the Court excludes us from that.

And I do apologize to the Court for speaking in that tone, but sometimes, Your Honor, the Court just yells sometimes at me and may -- other people in here for no reason, and I think it bothers me sometimes. I haven't done 33 years --

THE COURT: You know, I'm not going to listen to your 33 years --

MR. PARRISH: I understand that.

801

THE COURT: We're not going do that, remember?

MR. PARRISH: I remember. And I won't get into the other aspects of it. But I think sometimes everybody is working hard.

THE COURT: I appreciate the fact you're working hard.

MR. PARRISH: And that's all we're trying to do is alert the Court this was a problem, and let's take a break at an appropriate time.

THE COURT: Mr. Williams.

MR. WILLIAMS: Your Honor, government has not opened the door to anything. We were very careful about this issue. The Court's order of July 16 of 2004 indicated that the Court concludes that the government's motion to exclude evidence of Cutkomp's incidences of indecent exposure will be granted to the extent parties, counsel, and the witnesses may not make any reference to, ask questions concerning, or introduce evidence of Witness Tim Cutkomp's past behavior of indecent exposure, but they may refer to these instances as a misdemeanor conviction, quote, unquote, and, quote, acts constituting misdemeanor violations of the law, end quote, that caused Cutkomp to see a

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 702 of 3636

psychiatrist.

When we asked about flipping out, Mr. Cutkomp said merely that he had committed some minor crimes and that he had had a psychological problem that had caused him to be hospitalized. We were in full compliance with the motion in

limine, and we've not opened the door beyond what this Court has already analyzed as being an inappropriate area for the defense to get into.

And so with all due respect to the defense, the government doesn't think the government -- that we've opened up any door and that the Court's ruling should remain in effect.

THE COURT: You know, there were a lot of motion in limine rulings, but it seems to me that the motion in limine just kept out the misdemeanor convictions, the nature of the convictions. They can fully explore his mental health.

MR. WILLIAMS: Certainly, yeah. The only thing that was the subject of the motion in limine was what the crime was. The fact that he had committed misdemeanor crimes, that he had committed 30 misdemeanor crimes, that he had psychological reaction to it or that was the upshot of his psychological difficulties at that time, emotional difficulties, none of that's prohibited by the motion in limine, and the government doesn't have a problem with them getting into it.

THE COURT: In fact, the defense didn't even file a timely resistance to the government's motion in limine on that point.

MR. WILLIAMS: That's correct.

THE COURT: Well, I don't see how the government's either violated or even come close to circumventing the motion

in limine ruling. So to the extent that you're asking me to

reconsider it, it's denied. You have wide latitude to cross-examine him on all the mental health issues.

MR. PARRISH: I just want to be clear, Your Honor.

THE COURT: Yeah.

MR. PARRISH: Does that include the issues about what he had indicated -- and I don't want to violate the Court's motion in limine on it -- that he had exposed himself over 30 times? He said initially that part of it was because of the drug issues. Then he acknowledged that he did not tell the agents the truth but also had exposed himself in Arizona and other places because of other problems he was having. This was not the conviction, though.

THE COURT: Well, I'm going to have to review my ruling. I mean, you know, there were more than a hundred pages of rulings. I didn't know this was going to come up.

MR. PARRISH: It was addressed in some detail, Your Honor. This Court did it at the pretrial part, and that's why I wanted to make sure that we didn't cross the line.

THE COURT: Well, I assume you'll still be cross-examining him tomorrow.

MR. PARRISH: Oh, I have several --

THE COURT: Is that a good guess?

MR. PARRISH: It's a good guess, Your Honor, and I don't even need to get into that today with where I need to go with my examination.

THE COURT: Okay. Why don't we do this. Give me a chance to review my ruling, and we can take it up either tonight or first thing tomorrow morning.

MR. PARRISH: That's fine, Your Honor.

THE COURT: Okay. Anything else?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Thank you. We'll be in recess.

(Recess at 2:41 p.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Parrish, you may cross-examine.

MR. PARRISH: Thank you, Your Honor. May it please the Court and counsel.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Good afternoon, Mr. Cutkomp. How are you?

A. Not too bad.

Q. I'll reintroduce myself to you. My name is Alfredo Parrish, and I'm representing Dustin Honken.

What I'd like to do, first of all, is talk just a little bit about the length of your relationship with Mr. Honken. As I understand it, it goes all the way back to

805

Britt, Iowa, when you all were what? Five, six years old, something like that?

A. First grade.

Q. First grade?

A. (Witness nodded head.)
Q. Did you know him before you were in the first grade?
A. No, probably not.
Q. When you say probably not, did your families know each other at that time?
A. I don't recall if they did or not.
Q. But you would probably think that the first time you ever had any really good recollection of knowing Mr. Honken is when you were in the first grade, not any time before that such as in kindergarten or anything like that?
A. Correct.
Q. And did you establish this friendship in the first grade?
A. No.
Q. When was the friendship first established then that you referred to on direct examination of a friendship that caused you to talk in a way where you didn't even have to say words sometimes?
A. Around junior high.
Q. So you would agree then from when you were in the first grade up until elementary school, you didn't establish that close-knit relationship that you described on direct

806

examination. Would that be accurate?
A. That's accurate.
Q. All right. And you didn't -- did it start in the seventh grade?
A. I don't recall where it started.
Q. Okay. You thought -- is that what you consider junior high?
A. Seventh and eighth.

Q. Seventh and eighth grade? And where did you go to seventh and eighth grade school with Mr. Honken?
A. In Britt.
Q. What was the name of that school?
A. Britt Elementary and Britt High School.
Q. And how did you kind of establish that close-knit relationship at that point in time?
A. I don't know. Just hanging out I guess, doing stuff.
Q. Like what?
A. Well, when I got my license, we -- we'd go to Mason City and watch movies and go out to eat.
Q. Now, did you get your license before Mr. Honken got his license?
A. Yes, I did.
Q. Why was that?
A. Because I was older than he was.
Q. All right. And did you have your own car?
♀
807

A. I did later, not right when I turned 16, but I had one.
Q. All right. So you turned 16 before Mr. Honken, and you would drive him in to Mason City in your car; is that right?
A. Correct.
Q. Did Mr. Honken have a car back then?
A. When he got his license, yes.
Q. Okay. And -- but for a year, I take it, he did not have a car and depended on you to drive him places when he was six -- when he was 15 and you were 16; is that right?
A. Correct.
Q. How tall are you?
A. I'm six-three.

Q. How tall is Mr. Honken?
A. About six-three.
Q. So you were exactly the same size in terms of heighth; is that right?
A. Yes.
Q. Now, just looking at you and looking at him, just by what I observed, you appear to be the more athletic type. Would that be accurate?
A. I would say that's probably accurate, yes.
Q. And were you the more athletic type in school?
A. Yes.
Q. Were you one of the biggest kids in your high school?
A. Yes.

♀

808

Q. Was that not only including heighth in terms of just how tall you were but also your broad shoulders, your big arms, et cetera; is that right?
A. I would say heighthwise I was one of the taller kids.
Q. Okay. What about broad shoulders and big arms, et cetera?
A. I was in shape. I don't know if I was really -- there were other people bigger, but I was good size.
Q. Well, let me ask you then back then did you take any like vitamin supplements, anything like that to stay bulked up?
A. Not when I was in high school, no.
Q. Well, did you -- well, right out of high school did you start taking stuff like that?
A. No.
Q. So you didn't take anything to bulk up at all, no vitamins, no workout of any great extent?
A. I have since -- when I worked at Kraft, I started taking

some creatine.
Q. Did you wear glasses or anything like that when you were in high school?
A. No.
Q. What about Mr. Honken over there? Did he wear glasses or -- when he was in high school?
A. I believe he did.
Q. Okay. Was he kind of like the bookish type, the guy who studied all the time?

♀

A. Not really.
Q. Not really?
A. No.
Q. But he wore glasses, though.
A. Yes.
Q. That wasn't probably very cool in high school when a kid wore glasses; is that right? They were kind of considered the nerdy type?
A. I suppose some people probably thought that.
Q. Was he the skinny one compared to you, the big, kind of built one?
A. Sure, yes.
Q. So when you guys walked around, I assume you were kind of the big fella and Mr. Honken over there was the little skinny guy with you. Is that how it was most of the time?
A. He was thinner than I was, yes.
Q. And did you have in that circle of high school friends anyone else who hung out with the two of you all that much?
A. My nephew.
Q. What was your nephew's name?

A. Todd Olson.
Q. Excuse me?
A. Todd Olson.
Q. Okay. And did you have a brother or anyone who hung out with you at all, a half brother or something like that?

♀

A. No.
Q. You did not?
A. No.
Q. But you did have a half brother?
A. No, I don't have a half brother.
Q. Did you have a brother at all?
A. I had two stepbrothers.
Q. I said half brothers. I'm sorry. I misspoke. You had two stepbrothers.
A. Yes.
Q. What were their names?
A. Rodney Olson and Larry Olson.
Q. Now, Rodney Olson, was Rodney older than you or younger than you?
A. He's older than me.
Q. And how much older was Rodney than you?
A. Thirteen years probably.
Q. Okay. Did he live in Britt, Iowa, also?
A. Yes.
Q. And let's go back for a second to your relationship with Mr. Honken in high school. Did he ever come over to your house?
A. Yes, he did.
Q. And did you ever go over to his house?
A. Yes.

Q. And I assume that's how the relationship became more

cemented, by you all visiting each other; is that correct?
A. Yes.
Q. Okay. Now, would Rodney be over there?
A. He would have been at our house.
Q. And he was living at your house at that time?
A. No.
Q. He'd just come over to visit sometimes.
A. He farmed with my dad, had a house nearby.
Q. And was that part of the same farmhouse that Mr. Honken would come over to visit, or would it be a different situation?
A. It was a different house.
Q. But it was all part of one huge farm I take it.
A. The houses were close, yeah.
Q. Okay. And did Mr. Honken get to know your brother Rodney?
A. I don't know if he really got to know him or not.
Q. I mean, but he would be over at the house sometimes, and he became acquainted with him from what you observed I take it.
A. I'm sure he talked to him before, yes.
Q. Now, was Rodney by any chance a friend of Terry DeGeus?
A. I don't know if they were friends or not.
Q. They were in the same class?
A. No.
Q. They were not?
A. They were not.
Q. What about Greg Nicholson?

A. Greg was not in the same class either.

Q. Did they know each other, Rodney and Greg?
A. I believe they probably did.
Q. And when you say they probably did, what are you basing that on?
A. Things that Dustin has told me.
Q. Things that Dustin told you?
A. Correct.
Q. About Rodney and about Greg Nicholson?
A. That's correct.
Q. Tell us, when was the first time Mr. Honken told you something about Greg Nicholson and Rodney?
A. I don't remember a time.
Q. You don't know whether you were in high school --
A. Through our conversations --
Q. I'm sorry. Go ahead.
A. Through our conversations --
Q. After -- go ahead.
A. After we had got involved with drugs.
Q. When Mr. Honken became involved with drugs?
A. Correct.
Q. And what? He found out some information that he related to you about Rodney; is that correct?
A. Correct.
Q. Now, let me just ask you, in the times that you've had

813

discussions with law enforcement officials over the years -- and you probably met with them what? Thirty, forty times?
A. I don't know how many times.
Q. That would be about right.
A. I don't know how many times.

Q. Okay. Could be more?
A. Possibly.
Q. Have you ever mentioned to them what Mr. Honken's told you about your stepbrother Rodney and his relationship with Mr. Nicholson?
A. I don't recall.
Q. Okay. You can't recall ever mentioning that to them; is that correct?
A. That is correct.
Q. Would you agree that you never mentioned any of that in your grand jury testimony?
A. I don't know if I did or not.
Q. And you don't know whether or not you ever mentioned any of that in any prior debriefing statements from the government. Would you agree with that?
A. I don't know if I did or not.
Q. What did -- did Mr. Honken tell you at one point that he thought Mr. Nicholson was responsible for the disappearance of your stepbrother Rodney?
A. He's never told me that, no.

♀

814

Q. But he did disappear?
A. Yes, he did.
Q. And what year did he disappear?
A. 1986.
Q. And that was the context of the relationship, is it not, that Mr. Honken related to you that it was in the context of your stepbrother disappearing?
A. I don't know if it was that context or not. Since Dustin knew people in Mason City that were involved with drugs, I asked

him to keep an ear out if he'd ever heard anything.

Q. So you had then at some point requested that Dustin do part of finding out what might have happened to Rodney; is that correct?

A. Sure, yes.

Q. Because you had always been curious about how did your stepbrother just disappear somewhere; is that right?

A. Correct.

Q. And would you agree that the idea of disappearing and the conversation related to disappearing dates all the way back to when you and Dustin found out that your brother had disappeared? That's where the nature of that conversation where you can speak without words came about; would you agree?

A. I would say it probably -- I don't know when it started, I mean.

Q. So in the context of the tapes that we heard and you talk

♀

815

about the language issues that you explained on direct examination, that disappearing language dates a long way back in your relationship; would you agree?

A. I would agree.

Q. But would you agree also that you never once told law enforcement over 40 times you've been interviewed that it may relate somehow to the disappearance of your brother Rodney; would you agree with that?

A. I don't know if I agree with that. I may have.

Q. Well, can you name one instance where you told law enforcement either pre-tape, after the tape -- tapes were made, at any debriefing session, at any grand jury session where you have referred to the disappearance of your brother Rodney and

the fact and circumstances that it may in some way be connected with Mr. Nicholson?

A. I don't recall if I have or not.

Q. Not one instance can you recall that, can you?

A. I don't believe I've ever thought that Greg had anything to do with my brother disappearing.

Q. Well, did you think your brother was dead, your stepbrother was dead?

A. Yes, I do think so.

Q. And that's because you thought he had disappeared.

A. Correct.

Q. And you didn't hear from him again.

♀

A. Correct.

Q. But there's never been any confirmation of that fact; would you agree?

A. That is correct.

Q. And that's been since which date?

A. 1986.

Q. And you indicate when Dustin told you that information -- and you think when Dustin told you that information that Dustin was not telling you something that was accurate.

A. I believe he told me that Greg knew my brother.

Q. He also told you that Terry DeGeus knew your brother; isn't that correct?

A. I know that Terry knew my brother.

Q. You knew that for a fact.

A. I know that we all lived in the same area. My brother owned the house that the DeGeuses used to live in.

Q. So you knew for a fact that your brother who had

disappeared knew Terry DeGeus also.

A. Correct.

Q. Let me ask you this question. Did you ever tell law enforcement throughout all of these years of investigation that Terry DeGeus and your brother knew each other one time?

A. I don't believe I have.

Q. So this is the first time in the course -- since 1993 that you have ever mentioned that to anyone; isn't that correct?

♀

817

A. I don't know for sure.

Q. Well, you can't think of any other instance; isn't that correct?

A. I don't know any, no.

Q. You also indicated on direct examination when asked by Mr. Williams in exploring the relationship between you and Mr. Honken that you had the ability somehow to communicate -- and we've talked briefly about your ability to communicate -- on what is meant by disappearing. But you also told him that you normally were open with all of your conversations in terms of disclosing what each of you were doing; isn't that right?

A. I don't know what your -- the question that you're asking.

Q. Well, do you think you're always truthful with each other to determine what the other one meant when the other one made a statement?

A. I believe we were truthful, yes.

Q. Well, did you ever think that you deceived each other on occasion?

A. On occasion I would say we left things out sometimes maybe. I don't know.

Q. On things that were important, would you say that you would

normally disclose it?
A. Correct.
Q. Would you have disclosed to him that you had on 30 occasions committed acts constituting misdemeanor violations of

♀

the law?
A. Could you repeat the question? I'm not sure how you -- what you're asking me.
Q. Would you tell me whether or not would you keep from him the fact that you had committed 30 acts constituting misdemeanor violations of the law that caused you to see a psychiatrist?
A. I did leave out some of those instances, yes.
Q. Matter of fact, you not only left it out prior to the time that you met with Mr. Honken with these tapes, but you also left it out each time you were interviewed by law enforcement; would you agree with that?
A. I would agree.
Q. Matter of fact, you have made the statement that it was a mistake that you left these out; isn't that true?
A. I would agree. That -- could I say something?
Q. You could just answer my questions right now. We'll give you plenty of time.
A. Okay.
Q. Now, with that in mind, let's go back to where you've testified previously where you've lived. And what I'd like to really start with is in 1991. And before I get into that, let me ask you this question. Prior to the time that you went to Arizona the first time, would you agree that Mr. Honken had not produced one iota of methamphetamine? Would you agree with that?

A. I would agree with that.
Q. Would you also agree that Mr. Honken went out to Arizona prior to the time that you went out and proceeded to research and live pretty much like a monk to come up with a process to produce methamphetamine? Would you agree with that?
A. I'm not sure how he lived when he moved out there, but I would agree he moved out there to research.
Q. Well, would you agree that when you said you did know how he lived that you have previously testified that when you went out Dustin was living in his brother's home in a bedroom using the kitchen as a laboratory? Do you recall testifying to that?
A. Yes, I do.
Q. Do you also recall testifying that you moved into that same house?
A. Correct.
Q. So then let me ask you this question. How could you just tell the jury a second ago that you didn't know how Mr. Honken lived when you first -- when he first moved out to Arizona?
MR. WILLIAMS: Objection. Argumentative, Your Honor.
THE COURT: Overruled. You may answer.
A. Could you repeat the question?
Q. Tell us how you explain that you didn't know how Mr. Honken was living when you moved out and lived in the same place he was living and watched a lab in the kitchen being built.
A. I'm not sure that I remember the lab being in the kitchen.

820

Q. Well, do you recall -- are you telling us you have no

recollection of a lab being --

A. I have no -- while I was there, I don't remember that we had the lab in the kitchen.

Q. You do?

A. I do not remember that. It may have been, but I don't --

Q. In Jeff's house where was it?

A. In the garage I believe when I got there.

Q. You don't recall telling law enforcement officials and also testifying previously that the house began to stink and, therefore, Jeff's wife wanted the lab out of her house and what you all were doing was telling her that you were doing some kind of processing of getting gold?

A. That was before I arrived.

MR. PARRISH: Your Honor, may I approach, please?

THE COURT: You may.

BY MR. PARRISH:

Q. I'd like to refresh your recollection and show your sworn testimony of where you moved into -- take a look at that page beginning with line (sic) 198 and go forward. You can see the yellow. The highlights might help you get there faster. And go on to line 10 where Jeff's wife complains about the house beginning to stink.

A. Okay.

Q. Have you had a chance to read it?

821

A. Correct.

Q. Does it refresh your recollection?

A. It refreshes my recollection that --

Q. So is your testimony at that time true, or is your testimony that you just testified to a minute ago saying it was

before you moved out there true? Which one is true?

MR. WILLIAMS: Objection, Your Honor. Argumentative. It's not been established there's any inconsistency between the sentencing transcript and the testimony here.

THE COURT: Overruled.

A. I believe that -- could you repeat the question?

Q. Which statement is true, that you moved in after that or you moved in before that or what you say here, I moved in with Dustin at Jeff's house?

A. They're both the same answer.

Q. And that statement that we could no longer do it at Jeff's house because Jeff's wife Patty didn't want them working on it anymore because it was making the house stink, we -- does that we include you, or does that we mean Jeff and Dustin?

A. That means that when I got there we could not do it in the house anymore.

Q. Well, what do you mean we could no longer do it? Why would it be a we when, in fact, it would be Jeff and Dustin who would be doing it? This is your sworn testimony; is that correct?

A. That is correct.

♀

822

Q. Okay. So explain that to me, please.

A. What I meant by we is it was just a way of talking. I didn't mean that I had been doing it there.

Q. Oh. So you -- and let me make sure I understand this. When you're saying we in that context of a sworn statement by you, we doesn't really mean we. Is that what you're telling me?

A. It does, but I'm not sure how you're wanting it -- wanting -- what you're saying. We could not make it there.

Q. Anymore they said as if you had made it there previously.

A. They had before. I had not.
Q. But you would agree you didn't say they had made it there before. You said we, did you not?
A. I'm not sure if I did or not.
Q. Well, you want to take a look at it again?
A. I remember what I just read.
Q. Well, you just said you didn't remember it. I was -- do you need to see it again?
A. What you just showed me?
Q. Yes, sir.
A. I remember what I just read.
Q. Okay. What did you say then?
A. I said that -- on that paper I said that we could not do it there anymore.
Q. Was that statement true at the time you made it?
A. It was true to the -- what I meant it to say, yes.

823

Q. Do you want to change it now?
A. No.
Q. So what was the year that you moved out there and when Jeff told you that you could not make the meth or try to work -- make the meth there anymore in 1992? What month was that?
A. It was in the spring of '92. I'm not sure what month.
Q. Now, had you been to Arizona before that time?
A. I had been there, yes.
Q. All right. You didn't mention that in direct examination. Tell the jury about the first time you went out to Arizona.
A. I went out to Arizona in the -- it would have been in '86 or '87 -- I'm not sure -- for about a week to visit Dustin.
Q. And that's when he was out there the first time; is that

right?

A.    Correct.

Q.    And he was living in his brother's home at that time?

A.    I believe he was.

Q.    And you stayed with him?

A.    I believe I did.

Q.    All right.  Then you went back out in '92, and that was only your second visit to Arizona; is that right?

A.    I don't remember any other times.

Q.    All right.  And you went out there for one specific purpose; is that right?

A.    Correct.

♀

824

Q.    To manufacture methamphetamine.

A.    That is correct.

Q.    A partnership was going to be set up; is that correct?

A.    Correct.

Q.    You agreed to that partnership; is that correct?

A.    Yes, I did.

Q.    The partnership that was supposed to be set up was going to be Jeff who would do the financing; is that right?

A.    Correct.

Q.    Then you were going to be the person who did the labor work, the big guy who carried the weight of the manufacturing; is that right?

A.    For the most part, yes.

Q.    Well, you had some manufacturing experience, did you not?

A.    How do you mean manufacturing experience?

Q.    Well, not in illegal drugs I mean, but you knew how to carry the weight of a line.

A. I had worked in a factory, yes.

Q. Right. But going to be the same type of system. You were going to be the person who was the worker; is that correct?

A. Correct.

Q. And as part of being the worker, you were going to do -- produce the product; is that right?

A. Correct.

Q. Dustin was going to be the person who did the research.

♀

And as he did the research, he was going to help you out if you had a problem getting the product out.

A. Correct.

Q. So it was a three-way partnership; is that right?

A. Yes.

Q. And as a matter of fact, the profits were supposed to be split three ways; is that correct?

A. When I first went down, that's not what the agreement was, but not soon after that, that's what the agreement was.

Q. Well, when you first went out and they made you the offer, you were going to come out for ten to twenty thousand dollars that you were going to make a quick hit, produce it one time, and then you were going to leave.

A. Correct.

Q. That's what your plan was.

A. Correct.

Q. But you got there. Jeff's wife wanted you guys out of the house; is that right?

A. Correct.

Q. Because it was stinking up the house.

A. Correct.

Q. So then you went out. You got the apartment at Tarmac -- is it Mammarack?
A. Tamarack I think.
Q. You got the apartment at Tamarack, and you set that up; is

that right?
A. That's correct.
Q. Matter of fact, Jeff didn't go get the apartment, did he?
A. No, he did not.
Q. Dustin didn't go get the apartment, did he?
A. No.
Q. You did it.
A. That's correct.
Q. You went over. You got the lease signed; is that correct?
A. That is correct.
Q. You went over to get the lease signed solely for the purposes of manufacturing methamphetamine at that apartment because you could no longer do it at Jeff's house because his wife didn't want you there.
A. Correct.
Q. Jeff paid you the money to give it to the other person, is that correct, to pay the lease?
A. Correct.
Q. You got the lease, and you started with Dustin's teaching you how to produce the material; is that right?
A. That is correct.
Q. During that time, Jeff provided all of the money for the process; is that correct?
A. That is correct.
Q. Dustin had no money; is that right?

A. I -- he had no money for that, no.
Q. Dustin had no car; is that right?
A. I don't recall if he did or not.
Q. Well, think about it a second. Did Dustin have an automobile?
A. I don't think he did.
Q. Okay. Did you have one?
A. I did not.
Q. Okay. Had you just left a job in Iowa to go out to Arizona to manufacture this stuff?
A. Yes, I did.

MR. WILLIAMS: Your Honor, if I could just interrupt for a minute, the light is shining right in the witness's eyes.

THE COURT: Oh, I'm sorry. Where is it coming from? Can you tell? Sometimes it's hard to tell. Back there.

MR. WILLIAMS: With permission to approach, I can find out.

THE COURT: Yeah.

MR. WILLIAMS: It's this one right here, Your Honor.

THE COURT: Well, that's going to be tough. Well, now they're not -- we'll just leave them like that.

BY MR. PARRISH:
Q. Okay. So you were at this apartment. You got the apartment at Tamarack. Then you stayed there for approximately how long? You said you had gotten there, it was the spring.

You stayed at Jeff's house. Then you moved to Tamarack. How long did you stay at the apartments there?

A. Anywhere from two to three months.

Q. And you paid the rent every month.

A. Correct.

Q. And Dustin supplied the wherewithal in terms of research to keep trying to get this product out.

A. Correct.

Q. And all of a sudden you started having a stink problem there; is that right?

A. We had -- we used chlorine, and it made a gas, and to go any faster in the process, we would have had to produce more gas.

Q. Did you ever come back to Iowa during that time in 1992 for those three or four months?

A. I'm not sure what the time frame was that I came back, but I did come back to Iowa.

Q. Well, we're talking about before you had your first batch of meth made. You did, didn't you?

A. I don't know if I did or not.

Q. Did you have a family back here?

A. Yes.

Q. What did you have back here?

A. For family?

Q. Yeah.

829

A. I have a mom and dad, a sister. I have an ex-wife and three children.

Q. This is in 1992.

A. Yes.

Q. Okay. You had an ex-wife in '92?

A. No, not yet.

Q. Well, that's what we're talking about. We want to just -- we want to focus on --
A. All right.
Q. That's all right. We just to want focus on '92; okay? Who did you have in '92 back here as a family when you were out in Arizona trying to produce this stuff?
A. All but change in the ex-wife.
Q. So she was a wife at that point.
A. Yes.
Q. And you were married. No divorce had taken place at that point.
A. Not yet, no.
Q. Any kids?
A. Three kids.
Q. Okay. Now, during the time you were out in Arizona for those -- well, you had been out there now almost four months paying the rent for the apartment, were you taking care of the kids back in Iowa then?
A. I was not, no.

♀

830

Q. Do you know how they were living?
A. They were living with their mother in an apartment that their grandmother owned.
Q. And who was paying that rent back there?
A. My ex -- my wife and her mother basically.
Q. Did you ever send them any money at all during that time?
A. I don't recall if I did or not. I don't believe I did.
Q. You don't think you did?
A. I don't believe I did.
Q. So now it's getting -- and you're at the Tamarack

apartments still working to make meth. And then in 1992 toward the fall and you have that chlorine problem, do you go out and find another place?

A. Correct.

Q. You did it yourself.

A. I did it with -- I went to a place myself, yes.

Q. Okay. Where did you go if you were not familiar with Arizona to find a place?

A. Looked in the phone book.

Q. And what type place were you looking for?

A. Somewhere out in the country where it would be away from other houses.

Q. And why were you looking for a place like that?

A. So that there wouldn't -- the smell wouldn't be noticed.

Q. And what did you base your experience in looking for a

place out in Arizona out in the open? What knowledge were you basing that on that that's what you had to have?

A. The fact that we made an odor in the apartment.

Q. And so you surmised that you had to have a place in the open, wide open where other people could not come around; is that right?

A. Correct.

Q. And you got a place how far from a town?

A. I'm not sure how far. Five, ten miles.

Q. And you filled out an application for the lease or rent?

A. Correct.

Q. And what'd you tell them in your application?

A. I don't recall what I said.

Q. You have no recollection of what you told them in your

application as to where you were working?
A. No, I don't remember.
Q. What do you think you told them?
A. Most likely that I was working for Jeff at his company.
Q. But you weren't.
A. No, I wasn't.
Q. And just like you told the Tamarack people that you were working for Jeff too; is that right?
A. Probably. I'm not sure what I told them.
Q. That wasn't true, was it?
A. If that's what I told them, then it wasn't true, no.

Q. And you knew at the time when you were telling them that that it was not true.
A. That would be correct.
Q. Okay. So then you moved to the place out in the country. And did you have to get power turned on, or was it turned on already as part of the deal?
A. I probably had to get it turned on.
Q. And I imagine you had some pretty enormous electric bills, et cetera, trying to run that power plant to produce meth out there?
A. I don't recall how -- they were higher-than-normal bills.
Q. And they were in your name also?
A. Correct.
Q. Did you have an automobile at that time?
A. I did not.
Q. Did Dustin have an automobile?
A. He did not.
Q. Now, at a point in time we're in the fall or are we into

almost winter of 1992?
A. At what point are we?
Q. Well, when you're out in the farmhouse in Arizona that you found and signed up for.
A. At first it was the fall.
Q. And then you moved into the winter; is that correct?
A. Correct.

♀

Q. Then you worked, would you say, two to three months to produce your first batch of methamphetamine?
A. At the house or --
Q. At the house.
A. I don't recall how long we worked at the house. Probably a month to get the first batch at the house.
Q. Would you say it would have been about October?
A. Yeah, about there.
Q. And you produced approximately eight ounces; is that right?
A. Yes.
Q. Now, you intimated on direct examination when you were asked by Mr. Williams as to the setup you were using methamphetamine; is that right?
A. Correct.
Q. Matter of fact, did some question come up that you were maybe using up your nose most of your share?
A. I was using -- when I used it it was up my nose, yes.
Q. So when you were then indicating on direct examination that maybe you didn't get your full cut, wasn't there some discussion that possibly you were taking more meth than what you should have been taking and, therefore, cutting into the profits?
A. I don't agree with that, no.

Q. You don't agree with that.
A. No.
Q. But you agree with the fact that you were using a share

while you were out there producing it.
A. Correct.
Q. Did you tell Mr. Honken how much you were, in fact, using?
A. He knew approximately how much I was using, yes.
Q. Well, if you were out there being the person who was, in fact, manufacturing and in charge of manufacturing -- we'll get to the next step in this progression in just a moment -- you would agree that he could not exactly monitor what was coming out as a product and what was left over when he got down to the eight ounces ready to go back to Iowa.
A. He was there when the final process was done.
Q. Well, didn't you -- he was always there when the final process was going?
A. Correct.
Q. Melissa came in in November; right?
A. Correct.
Q. Melissa, when she came in in November, Mr. Honken moved, which you've already acknowledged, to live with her leaving you in the house full time by yourself; is that accurate?
A. Correct.
Q. You had no phone in the house; is that right?
A. I did not have a phone.
Q. So you couldn't communicate with him when the product was ready to bubble or boil or whatever it does to get the white powder, could you?

A. I had no way of communicating with him at the house.
Q. So -- but you would live out there full time, and all you would do is try to produce the product.
A. Correct.
Q. He would only come out, according to your earlier statement, when there was a problem with the product.
A. He came out when he felt that he should come out. I had no way of calling him to let him know there was a problem, but he came out to make sure there was no problem.
Q. So you said he was always there when the final product was produced. Would it be accurate to say that a couple of times when a product was produced he was not there?
A. I don't recall any time that he was not there when the final product was produced.
Q. You can't recall any, but I'm asking you could there have been a time when the final product was produced and he was not there?
A. I don't believe that he was not there.
Q. Okay. In October, eight ounces was, in fact, produced, but actually more than eight ounces was produced; isn't that correct?
A. In October?
Q. Yes, sir.
A. I don't recall how much exactly was produced.
Q. Well, if you were using it -- and what was the rate of your

836

usage?
A. Probably 50 -- I don't know what the weight would be. A

line every other day.
Q. A line every other day?
A. Correct.
Q. So you were using methamphetamine back in 1992 about four times a week?
A. That would be fair, yes.
Q. And if you produce your first batch, you would agree that you would have produced more than eight ounces.
A. I don't know how much exactly. We could have produced more than eight ounces, yes.
Q. But Mr. Honken only had eight ounces to take back to Iowa; is that right?
A. I don't know exactly how much, but it was around eight ounces, yes.
Q. And when he took the eight ounces back, could you tell us what you did at that point?
A. When he took them back, took it back?
Q. In October.
A. I may have gone with him at that time.
Q. How did you travel?
A. In a car.
Q. Whose car?
A. Jeff's.

837

Q. And where did you take the drugs, the first eight ounces that you produced?
A. I know it was probably taken to Greg's. I don't remember going with him on that occasion.
Q. You probably just rode back with him and got out of your car and went to visit somebody?

A. He probably dropped me off in Des Moines at my wife's house, but I don't remember.
Q. So this would have been about the first time you came back when you came back in October, the first time you would come back to see your wife since you left in the spring.
A. That could be correct, yes.
Q. Did you bring any money back to her at that time?
A. I don't remember if I did or not.
Q. Did you have any money to bring back?
A. If I did, it wasn't very much.
Q. So in October was the first trip back where you and Mr. Honken drove. He drops you off in Des Moines. Then where does he go with the eight ounces of meth that is your first batch?
A. I believe he went to Greg's house.
Q. It's true, is it not, that from that proceeds all of that money was sent back to Jeff?
A. Most likely, yes.
Q. You told -- you believe that meth at that time was selling

838

for $1,800 per ounce; is that correct?
A. When it started, I believe that's what it started at. I'm not sure what it was at that point.
Q. As a matter of fact, you were the first person to go out and collect for this eight ounces of methamphetamine; isn't that correct?
A. I don't recall if I was or not.
Q. Would your previous sworn statement assist you in that?
A. Yes.
Q. Refer to page 206, and you might to want read the whole

thing to set the context, but why don't -- if you want to look at the yellow mark, it will help you find it quicker, get the answer to my question.

Does that refresh your recollection, Mr. Cutkomp?

A. Yes, it does.

Q. And am I accurate when I indicate that you were the first person to come back on that eight ounces to collect; is that correct?

A. I believe that is correct.

Q. So now we have you going out with no prior meth being made, you producing the meth, and you make the first trip back to Iowa to collect on the meth --

A. That would not be --

Q. -- from Mr. Nicholson; isn't that correct?

A. That batch, yes.

♀

Q. Well, it's the first batch.

A. That would be the second batch.

Q. And it was selling at that time according to you for about $1,800 per ounce.

A. I don't know, but that's what it started at.

Q. How much did you collect?

A. I'm not sure how much. Couple thousand probably.

Q. How many ounces were there?

A. On which -- on the way back?

Q. In October when you came back to collect.

A. I believe around eight ounces.

Q. How much should you have collected?

A. For the whole eight ounces?

Q. Yes, sir. At $1,800 an ounce -- you said eight to ten

ounces I believe was your exact testimony on this point, but for eight to ten ounces, give an estimation of what you were to collect.
A. If the whole thing was sold and they gave me all the money for it, I'm not sure what it would be.
Q. Well, at 1,800, it'd be $18,000, wouldn't it?
A. 18,000.
Q. Is your testimony you only collected $2,000?
A. It was several thousand. I don't know how much exactly.
Q. Well, do you remember telling officers at one point it was only 2,000 you collected?

A. I don't recall how much I told them. I know it was around several thousand.
Q. What did you tell Mr. Honken you collected?
A. Whatever I sent. I'm not sure exactly.
Q. What did you tell him?
A. Several thousand.
Q. And what do you call several thousand?
A. As near to my recollection, it would have been around 2,000.
Q. Do you remember telling the agents in your grand jury testimony April 25, 1997, that it was 5,000?
A. I don't recall how much, no.
Q. Would seeing your testimony help you refresh your recollection?
A. Sure, yes.
Q. You can look at the whole page for context, but if you want to, you can go directly to the yellow-marked pages for what you told --

A. Yes, that's what I said.
Q. $5,000?
A. Correct.
Q. So on your first visit we know it's supposed to be -- 18,000 is the value of the product. You tell us already on direct examination -- I mean on cross-examination that you thought it was 2,000, but you told the grand jury back in 1997

♀

that it was about 5,000 you collected; is that right?
A. That is correct.
Q. Did you ever use another figure of the amount you collected on that first trip back?
A. I don't remember exactly how much was collected.
Q. When you went in to collect the money which was approximately $18,000, do you know of your own knowledge what happened to the difference of that money between the 18,000 in product that was out there and the 2,000 that you said at one time or the 5,000 you said at the other time that was collected?
MR. WILLIAMS: Objection, Your Honor. Assumes facts -- objection, Your Honor. Assumes facts not in evidence. There's been no evidence to establish 18,000 was owed at that time.
THE COURT: Overruled.
A. I'm not sure what the -- what question you're asking.
Q. Do you know what would have happened to the difference in that money when you went there and you collected 2,000 you said at one time, 5,000 you said at another time, when you said that the value of the product at 8 to 10 ounces would have been at $1,800 per ounce at that time in October of 1992? What would have happened to the difference in that money?

A. The difference would be that they had only given me part of the amount. They didn't give me the whole thing.
Q. That's what you told Mr. Honken; is that right?

A. That would be the truth.
Q. You also told Mr. Honken when he'd given you money before, approximately $2,000, that you were robbed.
A. I don't recall how much that was exactly, but yes, that is true.
Q. Well, you told us that he gave you some money, you went down to New Mexico when you were supposed to be going back to Arizona, you told him you were robbed, and, therefore, you didn't bring any money back; is that right?
A. Correct.
Q. That was a lie; right?
A. That was a lie, yes.
Q. You just stole the money.
A. Correct.
Q. What'd you do with that money?
A. I used it to buy a car and to live off of.
Q. Did you send it back to your family?
A. I was living in Iowa at that point. Which point are you talking about?
Q. Well, the money you stole, did you give that to your family?
A. The money that I got from the time I went to New Mexico I used to buy a car and I used to live off of.
Q. My question simply is --
A. I don't know if my family got any.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 738 of 3636

Q. You kept it all for yourself.
A. I don't recall.
Q. Now, would it be true that you returned to Tucson in 1992 in November after you'd come out and collected this money?
A. Correct.
Q. When you went down to Tucson to live, Mr. Honken was no longer living there at the house.
A. I don't recall when he moved out.
Q. Again, I want to show you a transcript, your previous sworn testimony, on page 207. Take a look at it. You can start with the yellow for context and read straight down on the page, and you'll see whether or not you testified previously whether or not Mr. Honken was there in November of 1992. Read it first and see if it refreshes your recollection.
A. It does re -- oh, here, after that, the yellow. Yes, it does.
Q. Does it refresh your recollection?
A. Yes.
Q. Now, my question again, Mr. Honken had moved out of the house in the desert that was in your name; isn't that correct?
A. Correct.
Q. You were living in the house producing methamphetamine all by yourself; isn't that correct?
A. Most of the time, yes, that is correct.
Q. Mr. Honken was living with Missy.

844

A. Correct.
Q. Young lady who testified here earlier; is that right?
A. Correct.

Q. You continued to produce methamphetamine in the house that you were living in in the desert; isn't that correct?
A. That's correct.
Q. Mr. Honken nearly stopped making regular visits down there, didn't he?
A. He came down to help out when he felt I needed help I guess.
Q. Well, do you recall saying he only came out when you had problems and you needed technical help?
A. Correct.
Q. So he didn't just come down any time. He came down when you had problems with the production, and he would come down to help you out so you could produce methamphetamine. Isn't that correct and what you previously stated?
A. I'm not sure. I'm not sure.
Q. You're not sure that's -- well, just tell us, when did he come down?
A. He had a schedule. He would come down when he felt like it.
Q. No one else was living with you; is that correct?
A. That is correct.
Q. Now, did you produce another batch of methamphetamine?

♀

845

A. That is correct.
Q. And this would have been in 1992.
A. Yes.
Q. How much did you produce?
A. I'm not sure how much we produced on the next batch.
Q. Would it have been about eight to ten ounces again?
A. That sounds correct, yes.

Q. And what did you do with that?
A. That was taken back to Mason City also.
Q. Matter of fact, did you take that back?
A. I don't believe I did, but I -- it's possible that I did.
Q. Now, you had -- from the original partnership that existed where you were just going to be a producer, you had now stepped into the position of being the courier because you'd taken the first batch back where you were dropped off in Des Moines with Mr. Honken driving. You'd also become a collector because you now had driven by and picked up money, either two or five thousand or some other amount. And now it's in December of November -- I'm sorry, December of 1992, and you may have brought another item back, not only produced it but brought it back to Iowa; is that right?
A. I don't know if I agree with that whole statement.
Q. Which part don't you agree with?
A. The first batch is not the first -- the one I took back.
Q. Okay. You took another one back too?

846

A. The batch -- the eight to ten in October I took back I believe with Dustin.
Q. Right. Okay. Well, it was the second batch you'd taken back. I probably misspoke. It was the second batch you'd taken back. I'm sorry.
A. Okay.
Q. Okay. So now you're taking the batch back in December because you want to go visit your family. It's Christmastime. You want to see your kids.
A. I don't recall if I took the batch back then, but yes, I went back around that time.

Q. Now, when you went back in October, you thought about staying in Iowa; is that right?

A. Correct.

Q. You changed your mind and says, well, you're going to go back out and work some more to do some meth.

A. Correct.

Q. But then you came back in December, and you decided again you wanted to go back out there but just to visit that time, visit back to Iowa and you wanted to go back to Tucson and finish your work.

A. When I left, yes.

Q. But you stayed here for quite a while, didn't you, in December?

A. Yes, yes.

847

Q. Tell us how long you stayed here.

A. Several weeks. I don't know.

Q. Well, where did you stay?

A. I stayed with my ex-wife a little bit of the time I believe.

Q. You were divorced by then.

A. Yes.

Q. And your divorce came through when you were out in Arizona.

A. Yes.

Q. Is that correct?

A. Correct.

Q. You did not appear back in court in Iowa for any function having to do with your divorce.

A. No.

Q. And this was only your what? Third trip back since you

left in December of '92?

A. I believe it was the second, but it might have been the third.

Q. So you stayed a little bit with your ex-wife. Where else did you stay?

A. I got an apartment.

Q. Where?

A. In Des Moines.

Q. Did you get a job here too?

A. At that time I don't remember if I got a job or not.

♀

Q. And how did you pay for the apartment?

A. Dustin had given me some money for Christmas and --

Q. How much?

A. I don't recall.

Q. You didn't mention that on direct examination, did you?

A. I don't recall if I did or not.

Q. Would that have been money that came from the drug proceeds that you all were selling?

A. Correct.

Q. And you can't remember the amount.

A. No, I don't.

Q. So when you talk about your income only being about $2,000 as you said on direct examination from the products you had been producing, that may not have been quite accurate.

A. I don't know what the exact amount was, no.

Q. Matter of fact, as you think back now, you can't remember in 1992 the total amount of funding that you received from the sale of these drugs, can you?

A. I don't recall the exact amount, no.

Q. And would you also agree that you've given several different figures for the amount that you received over the years of providing statements on this matter.
A. That is correct.
Q. Would part of the reason you're having a difficult time remembering is because of your use of drugs during that time?

♀

A. I don't believe so.
Q. Okay. You don't think that interferes at all with your ability to think back as to what you were doing.
A. I don't believe that I paid that close of attention when I got the money.
Q. And you agree you were doing about four lines a week.
A. Correct.
Q. All during 1992 from the time you start producing it in October, say, through December of '92.
A. No, not every day and every week.
Q. You said every other day.
A. I mean not every week. I didn't -- I didn't have it all the time.
Q. So in December you're back in Iowa. You stay with your ex-wife for a while. You go out and lease an apartment. And where do you get an apartment?
A. In Des Moines.
Q. What place?
A. It was over by Merle Hay Mall.
Q. What's it cost you?
A. About $230 probably.
Q. A week?
A. A month.

Q. Is it an apartment by yourself?
A. Correct.

Q. And how long is the lease for?
A. I'm not sure how long it was for.
Q. And you have signed up as being employed somewhere?
A. I don't recall if I did or not.
Q. And you stayed in Iowa at this apartment and with your ex-wife. Did you ever visit your family?
A. I did, yes.
Q. And did you stay with them?
A. You mean my parents?
Q. Yes, sir.
A. I don't recall if I stayed with them during that time or not.
Q. So then in 1992 when the -- when the year is about to close, you go back to Tucson; is that right?
A. Correct.
Q. And then you began making meth again; is that right?
A. Correct.
Q. Let me ask you, is Mr. Honken back in Arizona at that point in time, or is he in Iowa?
A. He was in both places, lived in both -- he lived in Tucson. He visited Iowa.
Q. And he was in Iowa quite a bit during that time.
A. Correct.
Q. Matter of fact, he had fewer visits out to you in Tucson than ever; is that correct?

A. That would be correct probably.
Q. And you proceeded to put together the biggest and best batch of meth that had ever been produced by your group.
A. That would be correct.
Q. Matter of fact, you put together about how many -- just tell us, what was the amount that you put together.
A. Of the last batch or --
Q. Last batch that you worked on basically by yourself.
A. About a pound and a half.
Q. Do you think it was larger than that?
A. I think that's pretty close to being accurate.
Q. It took you about three to four weeks to do it?
A. Probably, yes.
Q. Okay. As a matter of fact, you divided it up into three batches, didn't you?
A. We had three batches from that point.
Q. And you divided it up in three batches. Dustin took two; is that right?
A. There was three different batches there three different times.
Q. You're talking about the batch in March of '93.
A. Correct.
Q. There were three batches, and Dustin took two in March of '93.
A. That was only one batch.

852

Q. If I showed you the transcript again, would that help you a little bit refresh your recollection?
A. Sure.

Q. I want you to look at the circled part here and start with the yellow for context and then go to the circled part.

THE COURT: While you're doing that, I'm going to give the jury a stretch break.

MR. PARRISH: Thank you, Your Honor.

THE COURT: Okay. Please be seated. Thank you.

BY MR. PARRISH:

Q. Mr. Cutkomp, did you have an opportunity to take a look at page 210 and refresh your recollection?

A. I did.

Q. All right. And I referred you to the March 1993 date, is that correct, with the three batches?

A. There were three batches since the beginning of the year to March.

Q. That's what I thought I'd indicated, and I said what happened to those batches? Did Dustin take two and you take one?

A. That would be correct.

Q. All right. Now, what happened to the idea that you were just going to be the producer and -- as we said earlier and Mr. Honken was just going to be the salesperson and Mr. Jeff Honken was going to be the financier?

♀

853

A. I don't know.

Q. So when you told the jury on direct examination that that was the context of your relationship, you didn't tell them that you were actually delivering, did you, on direct examination?

A. I don't recall if I did or not.

Q. So you were a deliverer of the methamphetamine also.

A. I did deliver, yes.

Q. So correct me if I'm wrong. You manufactured. You delivered. You collected. Is that right?
A. Correct.
Q. So basically you did the exact same thing that Mr. Honken was doing.
A. Correct.
Q. What did you do -- well, first of all, what was the size of your batch in March of 1993?
A. The last batch was three and a -- or a pound and a half.
Q. Your batch was a pound and a half?
A. I don't -- I don't know what you mean by my batch, but the last batch was a pound and a half.
Q. Well, you said you gave two to Dustin, you took one, and that's what you just read and said was accurate.
A. Correct.
Q. My question -- and I'm sorry again if I didn't make myself clear. What did you do with your batch?
A. The batch that I took?

854

Q. Yes.
A. I took it to Greg.
Q. So you were a direct distributor to Greg Nicholson?
A. I took that batch to Greg, yes.
Q. Did you tell law enforcement that you were a direct distributor to Greg Nicholson?
A. I told them that I took that batch to Greg, yes.
Q. You told them that was the only batch you took?
A. I don't recall if I told them that was the only batch I took or not.
Q. Well, when you got there to deliver your batch, where was

Mr. Nicholson in March of '93?
A. At his house.
Q. And did you leave it there?
A. Yes, I did.
Q. Did you move back to Iowa at that point?
A. Yes, I did.
Q. Prior to your moving back to Iowa, did you clean up the house that you were living at?
A. Yes, we did.
Q. Yes, we did?
A. That's correct.
Q. Now, are you using we in the context that we started this examination in saying we? Are you saying that you and someone else cleaned up the house?

♀

A. I believe Dustin helped me clean the house.
Q. Want to take a look at your testimony on page 213, see if it refreshes your recollection?
A. (Witness nodded head.)
Q. Yellow mark should help you get to it very quickly.
A. Which one is it? 213 you said?
Q. 213, yes, sir. Should help you get to it real quickly. But you can read the white lines -- the black lines for context.
A. Okay.
Q. You said we, Dustin and I. Do you recall saying Dustin and you cleaned the house before?
A. All I said before was -- I was asked if -- what we did with the house or --
Q. We?
A. What did I do at the house, and I said, Cleaned it up and

gave the keys back to the real estate agent.
Q. So you never said Dustin cleaned the house, did you?
A. I did not say that he helped, no.
Q. So are you adding that for the first time in 11 years?
A. I guess. I don't know if I --
Q. Why?
A. I'm clarifying it I guess.
Q. Eleven years later you're clarifying. Is that your testimony?
A. I'm saying that I was not clear on that point.

♀

856

Q. Well, you had property there also, didn't you?
A. At where? At the house?
Q. At the house you were living in in the desert that Dustin had not lived in for several months.
A. Correct.
Q. Four months to be exact. Is that right?
A. I had property there, yes.
Q. What did you do with your property there?
A. I took most of it back to Iowa with me and left a few things with Missy.
Q. Specifically what you did, you took a suitcase full of your clothes and property back with you to Iowa, and you left a suitcase and a box of personal things at Missy's house or apartment. Isn't that what you said and that's what you did?
A. Yes.
Q. Dustin was not at all involved in that situation; isn't that correct?
A. I would say yes, that would be correct.
Q. Okay. These personal things that you took over to Missy's

house, what were they?
A. Probably some clothes and pictures. I'm not sure.
Q. That's it.
A. And a box with -- that had some chemicals, the things that I testified to that she -- I called for her to throw out.
Q. That you testified to on direct examination, you took those

♀

857

things over to Missy's house, isn't that right, and dropped them off?
A. The suitcase and my box of personal things. The other box, Dustin would have known what was in it.
Q. I didn't ask you whether he knew what was in it. I asked you did you take it over to Missy's house?
A. I believe I did.
Q. All right. And you clean that house. Did you go back and get your deposit?
A. I did not.
Q. You left the house very clean.
A. That is correct.
Q. That means you threw away all the laboratory stuff.
A. No, that would not be correct.
Q. You left it out there.
A. We packaged it up and took it into a storage shed.
Q. We packaged it up?
A. That would be correct.
Q. Did you say we packaged it up?
A. I'm not sure if I said we on -- anywhere else.
Q. Until today.
A. I know that I've said that we took it to a storage shed.
Q. Then in March of 2000 -- I'm sorry, not March of 2000,

March of 1993, do you move back to Iowa?
A.    Yes.

Q.    And where do you move to?
A.    I believe I moved in with my parents.
Q.    In Maxwell?
A.    No, that would have been in Britt.
Q.    In Britt?  And how long do you live there after March when you come back?
A.    I'm not sure how long it was exactly.
Q.    How did you get back?
A.    I took a Greyhound bus.
Q.    With your suitcase.
A.    Correct.
Q.    And with your methamphetamine.
A.    That is correct.
Q.    And you get back in Iowa.  You move in with your parents in Britt, and how long do you live with them?
A.    I'm not sure how long exactly.
Q.    Well, it's now March of 1993.  Do you start working somewhere else?
A.    I started working -- I moved to Maxwell and then started working, but I'm not sure what --
Q.    How far is Maxwell?
A.    Maxwell is near Des Moines.  A hundred miles or so.  I don't know exactly.
Q.    A hundred miles from Britt?
A.    Around there, yes.

Q. And you're away from Mr. Honken; is that right?
A. That's correct.
Q. And from the time you moved to Maxwell, do you start a job?
A. When I moved to Maxwell I did, yes.
Q. What job do you start?
A. I started as a telemarketer.
Q. Working out of your house or out of a place, business?
A. In Des Moines.
Q. What place?
A. I don't recall the name of the business. It was on Office Park Road.
Q. You live in Maxwell. You go down to Office Park Road. And then you work there five days a week?
A. I believe that's how long I worked there.
Q. All right. You work there five days a week. Then do you move any other place throughout the summer of 1993?
A. No, I did not.
Q. Let's go to the fall of 1993. Where are you living at that point?
A. In Maxwell.
Q. Do you go to Mason City?
A. I did to see Dustin, yes.
Q. Once a month?
A. Possibly. I'm not sure.
Q. Where do you see him?

860

A. Usually at Angie's house.
Q. Did you go over on your own and find out where he lived, or did he call you?
A. He called me earlier in the summer, and through contact

with him I knew where he lived and where to go.

Q. Did you stay with him at all?

A. I don't recall staying the night, but I may have, yes.

Q. And did you get to know Angie at all?

A. Yes, I did.

Q. Did you meet her on your own, or had you known her before?

A. I met her. Dustin introduced me.

Q. That was the first time you'd ever met her.

A. I met her earlier in '93.

Q. I'm sorry? In March of '93, the part you discussed on direct examination?

A. I believe it was February, but I'm not sure exactly the date.

Q. Okay. But then when you saw her again in the summer of '93, you would only be coming up to the Mason City area about once a month or every other weekend or something like that; is that right?

A. Around there. I'm not sure exactly what the time period was that I came up.

Q. Well, did you have your kids over some period of time, over some weekends?

♀

861

A. I did have my kids on some weekends.

Q. And those weekends you didn't come up and hang out with Dustin I take it.

A. No, I wouldn't have, I don't believe.

Q. I mean Mr. Honken. But you would come up and spend time with your parents and the kids' grandparents; is that right?

A. That I would bring the kids up to my --

Q. Right.

A. I did sometimes, yes.

Q. And the other times you'd be working. So you basically lost contact with Mr. Honken; would you agree?

A. Correct.

Q. And during that time, did you continue your job at this telemarketing, or did you switch to a place in Van Meter, Iowa, to start your work?

A. That's correct, I did.

Q. And when did you take up the job in Van Meter?

A. Probably a month or so after I got the job at the telemarketing.

Q. And what were you making at the telemarketing company?

A. I don't recall what the amount was.

Q. Not very much.

A. Prob -- I don't know what the amount was.

Q. Then you start working for Van Meter. What were you doing there in Van Meter? Dahl's?

♀

A. Sheet metal.

Q. And how long did you do that work?

A. About a year.

Q. So you were working how many days a week starting in the fall of 1993?

A. Five.

Q. And you would agree then that you had very little time to come up to Mason City area?

A. Correct.

Q. And would you also agree that you pretty much lost contact with Mr. Honken during that period of time?

A. That would be correct, yes.

Q. When you came up in the summer to see him or the early fall to see him before you started working at Dahl's in sheet metal, do you know where he was living at that time of your own personal knowledge?
A. What was the time period?
Q. September, late August of 1993.
A. He was either living with Angie or Kathy or his parents. I'm not sure.
Q. You're not sure where he was living; is that right?
A. I'm not positive, no.
Q. Would you be sure where he was living in September, where he was living in August, or where he was living in July of 1993 of your own personal knowledge as you sit here today?

A. I remember visiting him at Kathy's and at Angie's.
Q. You remember visiting him at Angie's; is that right?
A. Correct.
Q. You also remember visiting him at Kathy's house; right?
A. Correct.
Q. Did you ever visit him at his mom's house during that time too?
A. I don't recall for sure if I did or not.
Q. But you would agree your visits to that area because of your work load and everything else was not that great, and you had previously stated as you've stated and will state now I would imagine that you basically lost contact with the Mason City area.
A. I did not go up there a whole lot, no.
Q. Matter of fact, didn't you give the description or is it your description you were there about once a month maybe or

maybe every other weekend at most during that time?

A. It was around that. I don't know what the average would be.

Q. When you were out in Arizona, was there any type of weapons out there?

A. There was, yes.

Q. Okay. Two; is that right?

A. Yes.

Q. They were both owned by Jeff; is that right?

♀

A. That is correct.

Q. Did you ever see Mr. Honken with either one of those weapons?

A. Yes, I did.

Q. And where did you see him with them?

A. He had them at Jeff's and at the house.

Q. They were at Jeff's house; is that right?

A. Correct.

Q. And they were there also when you went out to the house.

A. That's correct.

Q. In the country in the desert.

A. That's correct.

Q. And you said when he moved from the house did he take those weapons with him?

A. I don't know if that was when he took the weapons or not. I know that they were at the house.

Q. He may have left them out there for you.

A. I know that they were out there.

Q. And you were concerned about critters, et cetera?

A. Correct.

Q. And that's why you had them out there from Jeff's house; is that right?
A. That's correct.
Q. Did you ever see him fire them at all when they were out there?

♀

A. That's correct.
Q. When?
A. Shooting at some targets.
Q. And when was that?
A. I'm not sure at what . . .
Q. And did you fire them out there?
A. I probably did once or twice.
Q. And they were small handguns, is that right, like a 22 and a 45?
A. I believe that would be correct.
Q. And do you know whether they were ever left at Jeff's house when you moved back to Arizona, and was that part of the personal effects that you took over to Missy's house, or do you know?
A. I believe that he probably got them before that, but I don't know for sure.
Q. You have no recollection of it.
A. I don't remember when they got back to him, no.
Q. Other than that time where you saw Mr. Honken doing some target practicing when you all were out in the country, other than the time when he was 13 years old or 15 years old, did you ever see him with any other type of weapon?
A. I don't recall if I did or not.
Q. So it's now -- you work for Dahl's as I understand it in

Van Meter for about a year. You worked about five days a week.

You limited your access to the Mason City area, and as best you can recall sitting here now, when was your next contact after you started working for Dahl's five days a week did you see Mr. Honken?

A. I don't remember when the next point was that I saw him.

Q. Do you remember the context of when the next time you saw him?

A. I do not.

Q. Do you remember the season after you started your work at Dahl's doing sheet metal work when the next time you saw him?

A. Spring or summer. I'm not -- I'm not sure what the exact time was or anything.

Q. And do you remember what you visited him about? Just to sit down and chat, or was it for business purposes?

A. I don't recall what the first time I saw him we talked about.

Q. Do you remember who he was with after you started work in the fall of '93 for Dahl's doing sheet metal work, who he might have been with when you saw him?

A. It would have been in the spring that I started at Dahl's I believe.

Q. The spring of '93 did you start at Dahl's?

A. I believe so, yes.

Q. Well, let's go into the summer of '93. Do you recall seeing him in the summer of '93?

A. I know I saw him in the summer, yes.
Q. And would it have been on a weekend if you were working five days a week?
A. Most likely.
Q. And do you recall the nature of that visit by any chance?
A. I saw him more than one time during the summer.
Q. But not very often.
A. Not a whole lot. He came down to -- and we drove around some also.
Q. Came down to Des Moines?
A. Yes.
Q. And you would go up there to visit him on occasion?
A. Correct.
Q. Were you distributing methamphetamine during that time?
A. No.
Q. Was Mr. Honken distributing methamphetamine during that time?
A. I don't believe he was.
Q. So then in the summer of 1993 it's your best recollection that neither of you were distributing methamphetamine when you were working at Dahl's doing sheet metal work and Mr. Honken was back in Mason City area; is that correct?
A. I believe that is correct.

MR. PARRISH: Your Honor, this might be an appropriate time to stop before I switch to a different topic if it's okay.

868

THE COURT: Sure. You want to break for the evening?

MR. PARRISH: That would be great, Your Honor.

THE COURT: Yeah, that'd be fine.

Members of the jury, that's going to conclude the

evidence for today. I did check on the weather, and there is no mention of fog, so why don't we just plan on starting at 8:30. And if there's bad fog in the morning, then we might just wind up starting a little late if you're having trouble getting in, and we'll be understanding of that. But the latest forecast on several different places didn't indicate any potential fog, so let's hope that's the case.

We'll see you tomorrow morning at 8:30. Remember my cautionary instruction about keeping an open mind until you've heard all of the evidence in the case and had a chance to receive my final instructions, hear the closing arguments of the lawyers, and go back and begin your deliberations. Thank you. We'll see you tomorrow at 8:30.

(The jury exited the courtroom.)

THE COURT: Okay. Please be seated. Why don't we take up this motion in limine situation. I've had a chance to re-read my ruling. And I'm not really tracking you, Mr. Parrish, on how you think the government exceeded the scope of my ruling because my ruling precluded mentioning the nature of the specific misdemeanor conviction, and that's really all it precluded. And so the government didn't bring that out.

♀

869

So I understand why you want to argue that the government opened the door by violating my motion in limine ruling, but I'm not sure I see that they did. So what am I missing?

MR. PARRISH: Well, Your Honor, I'm not sure they violated your order, but I think they opened the door by setting the context creating a situation of the relationship between the two of them and the mental health treatment, and the jury is not

really getting the full story as to why this gentleman was having all of these serious problems and the fact that he was establishing this relationship with his friend and on the verge of seeking mental and psychiatric assistance and even checking himself in. At the same time his best friend who he has now demonstrated to this jury was his best friend was being kept from all these secret type of acts. He said he didn't keep them because he was embarrassed by them.

In order for the jury to have the full picture, they need to know what Mr. Honken was viewing about his friend at that time to get the full picture, and just by saying, well, he was flipping out, he says, well, I know you were aware of that or words to that effect, I'm not doing that, I got treatment, and I was in a mental health institute and the jury now says, "Well, we don't know why" we think is a big deal.

THE COURT: But what's the relevance of why he sought mental health treatment?

MR. PARRISH: I think because of the nature of the act and the consistency in which it was committed and the length of time for which it has been committed goes all the way back as he says in his prior testimony prior to 1992 which kept this huge secret from his friend, and now we're giving the jury the impression that they confide in each other with such degree of language that they don't even need language to communicate. So if he doesn't need language to communicate, does Mr. Honken now believe that his friend had these serious problems all his life and didn't recognize it?

THE COURT: But you can get into the fact that he didn't confide those in Mr. Honken and how many occasions there

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 762 of 3636

were. We're just not telling the jury what the underlying misdemeanor conviction was.

MR. PARRISH: I understand.

THE COURT: So I think I'm letting you go all the way around it.

MR. PARRISH: Okay.

THE COURT: But I understand your position. Yeah, you're not saying the government violated the order. You're just saying that they got so close that you ought to be allowed to fully explore it.

MR. PARRISH: Right, to tell the full story, I think to say he had 30 acts -- and we'll get into them a little bit more, and that's why I thought we'll take the break today to set

♀

up the stage for the tapes. As we set up the stage for the tapes, I think the jury ought to know what these acts were because it changes the image of this portrait that the government wants to make. He is not who he appears to be, and I think the government -- the jury ought to know that. He wasn't just some clean-cut young man who was running around committing 30 acts of these violations. They were pretty serious violations that could put you in a different light, and I think his full light should be exposed to the jury. I mean -- I shouldn't put it that way. I withdraw that.

THE COURT: I caught your drift, though.

MR. PARRISH: I didn't mean to say it in that context.

THE COURT: Mr. Williams?

MR. WILLIAMS: Your Honor, we've been over this before. There is absolutely no reason, no justification for getting into the nature of the crime other than to tarnish the

image of this witness.

THE COURT: Well, that's what defense lawyers are supposed to do on cross-examination.

MR. WILLIAMS: Only if it goes to their credibility.

THE COURT: Right.

MR. WILLIAMS: And the nature of the crime doesn't go to his credibility. The fact he committed the crimes, the fact that he may or may not have not fully disclosed he was committing the crimes to his best friend, that's all fair game.

♀

It's just -- there's just no legitimate basis for getting into the nature of the crime, and that's the only thing we've objected to.

THE COURT: And it's not a crime that Rule 609 allows impeachment for anyway.

MR. WILLIAMS: That's exactly right.

THE COURT: Right.

MR. WILLIAMS: I mean, frankly there's a great argument we made and not followed that they shouldn't be able to get into it at all, but to the extent it goes to the credibility -- and I understand the Court's ruling -- the government doesn't have an objection to that given the Court's ruling. Just the nature of the crime just doesn't -- it's not relevant, and it's highly prejudicial.

THE COURT: I'm not sure it's highly prejudicial, but I'm not sure it's very probative because I'm letting them get into everything else other than the underlying act. And so in my view what limited probative value there is is substantially outweighed by prejudice, but I don't think there would be any great prejudice either. But I'm going to stick with my ruling

because I don't think anything's really changed. So I know you don't like the ruling.

MR. PARRISH: Oh, no, Your Honor. I can live with the ruling.

THE COURT: And I don't blame you for trying. That's

♀

what you're supposed to do, and nobody does it better.

MR. PARRISH: I think the question, though, is he's a central witness as this Court well knows from his history of working on this case for all these years. And in the -- when the stakes are so high in going back and reviewing many of the Court's comments with Mr. Colloton and Mr. Reinert and I going through some of the same issues, the stakes are so high, I think some levity ought to be -- ought to be given to us in examining this witness.

THE COURT: Well, I think you'll find that my normal practice is to give the lawyers on both sides tremendous latitude in cross-examination, and I intend to do that here. But I'm going to stick by my ruling.

MR. PARRISH: That's fine. That's fine.

THE COURT: You want to have some good issues to appeal in the unlikely event you wouldn't be successful.

MR. PARRISH: Well, that's true.

THE COURT: Okay. Anything else we need to take up?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

MR. PARRISH: Nothing, Your Honor. Thank you.

THE COURT: Okay. We'll just get together tomorrow morning at 8:15. And are you anticipating getting to any other witnesses tomorrow?

MR. WILLIAMS: I certainly hope so.

THE COURT: I guess I should ask Mr. Parrish that.

MR. PARRISH: I think I'll be through hopefully a little before noon. That's what I anticipate unless there's one issue with one tape, and we'll kind of work that out, the tape that was not played. But we'll talk to Mr. Williams about it and my client about it.

THE COURT: And are you telling the defense -- you're pretty much sticking to the order of your witness list?

MR. WILLIAMS: That's correct. What we've been doing, Your Honor, is giving them daily lists of the next two days in advance to the extent that we change anything, but it's basically the same list we have that we provided to the Court.

THE COURT: Okay. Good. Thanks. We'll be in recess.

(The foregoing trial was adjourned at 4:35 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

12-1-04
Shelly Semmler, RMR, CRR Date

INDEX

VOLUME 4 9-15-04 witness testimony

| WITNESS: | | PAGE: |
|---|---|---|
| TIMOTHY CUTKOMP | | |
| | MR. WILLIAMS | 781 |
| | MR. PARRISH | 804 |

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 767 of 3636

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, Plaintiff, vs. DUSTIN LEE HONKEN, Defendant. /

No. CR01-3047

Sioux City, Iowa
September 16, 2004
8:20 a.m.

VOLUME 5

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

877

APPEARANCES:

For the Plaintiff:

C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant:

ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn
Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Are there any matters we need to take up this morning before we bring the jury in at 8:30?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

MR. PARRISH: None, Your Honor. Thank you.

THE COURT: Thank you.

(Recess at 8:21 a.m.)

THE COURT: Ready to have the jury brought in, Mr. Williams?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Please be seated. Good morning, members of the jury. We left off with Mr. Parrish in cross-examination of Mr. Cutkomp.

MR. PARRISH: May it please the Court and counsel.

TIMOTHY CUTKOMP, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

CONTINUED CROSS-EXAMINATION

BY MR. PARRISH:

Q. Good morning, Mr. Cutkomp. How are you?

A. Good.

Q. Good. Let's start back off where we left off yesterday. I

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 769 of 3636

believe we had gotten up to 1993 where you had started your job at Dahl's in sheet metal. You'd stopped the -- any manufacturing of methamphetamine at that point. What I'd like to focus on now if I could are the relationships that existed in 1993 so the jury can have a understanding of how -- what your personal relationships were like at that point, what you and Mr. Honken's relationship was like at that point. And what I'd like to do is really go to the summer of 1993 where we left off. At that point you were divorced; is that correct?

A. Correct.

Q. Had you started seeing a Christi Gaubatz at that point?

A. No.

Q. So you knew who she was, though; is that right?

A. I never saw Christi. Cole I did.

Q. Well, that's her name, Christi Cole Gaubatz; right?

A. Okay.

Q. Let's call her Cole then for you. So the jury won't be confused, we're talking about the same person.

A. All right.

Q. All right. So had you started dating Christi Cole during the summer, early fall of 1993?

A. In the summer sometime, yeah.

Q. All right. In the summer sometime. Where was she living?

A. In Mason City.

Q. She was also Angie Johnson's best friend; is that right?

880

A. Correct.

Q. Matter of fact, she had a key to Angie Johnson's house; is that right?

A. I'm not sure if she did or not.
Q. Well, you did on occasion go over and get a key to -- from Christi Cole and go over to Angie Johnson's house at some point in the relationship with Miss Cole; is that right?
A. I don't remember if I did or not. I may have.
Q. Okay. You may have done something like that.
A. Yes.
Q. You just can't focus on a date that it may have occurred?
A. I don't remember doing it, but it could have happened, yes.
Q. So during that time Dustin Honken is dating Angie Johnson; is that right?
A. Correct.
Q. Dustin Honken is also seeing an individual named Kathy Rick.
A. Correct.
Q. All right. When you would come from Van Meter -- and were you living in Van Meter, or were you actually living in Des Moines?
A. I was living in Maxwell.
Q. Okay. You were living in Maxwell. And Maxwell, again, was how far from Mason City?
A. Probably between 90 and a hundred miles.

♀

881

Q. And at that point it's your testimony, is it not, that you had some distance from Dustin according to what you said yesterday.
A. Correct.
Q. So actually when you would come into this area in 1993, summer, fall, you would come in to see Christi Cole.
A. I did in the summer. We'd stopped seeing each other in the

summer sometime.
Q. You did?
A. Correct.
Q. Before you took a trip to Arizona?
A. Correct.
Q. So you broke up at some point.
A. Yes.
Q. When you would come over to Christi Cole's place to spend what? Overnight with her or just a weekend with her --
A. Sometimes overnight.
Q. -- would Angie Johnson come over?
A. I don't recall if she did.
Q. You don't recall seeing her at any point when you were spending the night with Christi Cole; is that right?
A. Not at Christi's, no.
Q. Were you aware at that time that Angie Johnson was seeing Christi Cole's husband also?
A. I wasn't aware that she was at that time, no.

882

Q. You've never been aware of that?
A. I've never been aware of that.
Q. So that would be news to you if Christi Cole's ex-husband was seeing Angie Johnson.
A. At that time, yes. I know she did at one point, but I don't --
Q. Oh, you did know that at one point that Christi Cole's husband was seeing Angie Johnson, the person who was dating Dustin, Mr. Honken.
A. I thought it was before that point I guess.
Q. But you knew at some point in time that relationship

existed too.
A. Correct.
Q. When the relationship ended with Christi Cole -- and we're in 1993 now. Would it have been the fall of '93 when that relationship ended?
A. I believe it was still summer, but it could have been. I'm not sure.
Q. It could have been the fall. You were still living in Maxwell working in Van Meter.
A. Correct.
Q. Now, at one point you indicated you were working in Clarion. You didn't indicate that in testimony so far, but you were working out of Clarion?
A. I worked at a -- it was a heating and cooling company.

♀

883

Q. In Clarion.
A. So I worked at various locations.
Q. Exactly. So what they would do is send you to different jobs.
A. Correct.
Q. At one point you were sent to Clarion; is that right?
A. That's correct.
Q. Clarion is how far from Mason City?
A. Probably 60 miles, 50.
Q. And how far from Maxwell?
A. Probably 50.
Q. And how long did you work the job in Clarion?
A. A month probably. I'm not sure.
Q. Okay. After you left the Clarion job in '93 -- and obviously you're still working for Dahl's -- where did you go

from there? Where did they assign you?
A. I'm not sure exactly where I went after that.
Q. During the time you were in Clarion and that you were working for Dahl's, did you see Mr. Honken at all?
A. I'm not sure. I may have.
Q. And if you did see him, you would agree that it was very rare.
A. Correct.
Q. Okay. It was not like the contact you had had in Arizona where you would see him every day and you would talk to him

♀

884

every day and spend 24 hours a day with him. You would agree?
A. That -- I agree, yes.
Q. At most, as you previously described, you would see him almost maybe once a month, at most maybe every other week. That would be a more accurate description of what your relationship was like with him at that point. Would you agree?
A. I would agree.
Q. You would agree that also at that point in time as you previously discussed on I believe direct examination about a week after Mr. Nicholson did not show up for court you had a conversation with Mr. Honken about Mr. Nicholson; isn't that correct?
A. I believe so, yes.
Q. Matter of fact, you described it as a confrontation with Mr. Honken; would you agree?
A. I'm not sure I used that word. I may have. I don't recall.
Q. You may have used the word confrontation?
A. I don't believe I did.

Q. But you may have.
A. Yes.
Q. Okay. How ever you gave the description, Mr. Honken related to you, did he not, that he thought Mr. DeGeus was responsible for the disappearance of Mr. Nicholson; isn't that correct?

♀

A. That's correct.
Q. Matter of fact, at the time he had that conversation with you, it was a week after Mr. Nicholson did not show up for court; isn't that correct?
A. That would be the time -- around the time frame, yes.
Q. As a matter of fact, you specifically had that conversation where you disclosed that to law enforcement officials as early as 1996; would you agree?
A. I believe so, yes.
Q. At that time when you were working for Dahl's in Van Meter, Iowa, and Mr. Honken made that statement to you about a week after Mr. Nicholson did not show up in court, do you know from your own knowledge where Mr. Honken was living?
A. I'm not positive.
Q. Do you know if he was, in fact, living with Angie Johnson?
A. He may have been.
Q. Do you know if you were at that time in any way seeing Christi Gaubatz or Christi Cole Gaubatz?
A. I don't believe I was at that point.
Q. After that conversation with Mr. Honken a week after Mr. Nicholson did not show up in court, do you recall the next time that you had a conversation with Mr. Honken at all or you saw him at all?

A. No, I don't remember the next time.
Q. Now, let's follow then that week after and see can we put

it in some context with where you were working, and take your time if you have to so we can put it in its context of your relationship at that time with Mr. Honken.

You indicated yesterday on the early part of the cross-examination that you thought you continued to work at Dahl's for approximately a year. Would that be accurate?
A. Approximately. It was a little less.
Q. And you'd started you thought in the spring of '93.
A. Correct.
Q. So now we're into the winter months of '93. You did describe an incident where Mr. Honken, according to you, brought a weapon over to a farm where your folks lived; is that right?
A. That's correct.
Q. You would agree that you initially described that weapon to law enforcement in your first interview as a 22-caliber weapon. Would you agree with that?
A. I would agree, yes.
Q. Okay. It was not until some years later that you changed your description from a 22-caliber to something that resembled a Tec-9. Would you agree with that?
A. I don't know what a Tec-9 is but . . .
Q. Well, the photograph they showed you in court, you agree -- one that you had drawn out, that was after you had given an earlier description of the weapon as a 22-caliber weapon.
A. I'm not -- I'm not very good with guns so . . .

Q. Right. And you told them you weren't very good with guns.
A. Correct.
Q. You told them that you thought it was a 22, though, didn't you, in your first interview?
A. I thought it was around that. I didn't know what . . .
Q. Right. A 22 being a small weapon.
A. Correct.
Q. Now, let's go back for a second. In part of the cross-examination we talked about yesterday, you indicated that when you were out in Arizona that there was, in fact, two weapons that Jeff Honken owned. One of them was a 45 you thought, and one was a 22; is that right?
A. Correct.
Q. And correct me if I'm wrong. Would the first time you had ever seen Dustin with any other weapon other than the 45 and 22 that you all kept out in Arizona for target practice would have been the weapon that you described that he brought out to the house, to the farmhouse, in I believe it was the winter of 1994? That would be the next time you'd seen him with any type of weapon.
A. Correct.
Q. So as a frame of reference, would it be fair to say that you were comparing in your mind the weapon that you had seen in Arizona, one being a 45 and one being a 22, you were using your best recollection to see what weapon he brought out in the

888

winter of 1994 resembled, and to you it resembled more the 22 than any other weapon you could make as a reference; would you agree?

A. I'd agree with the size, yes.

Q. A 22, you would agree, is a much smaller weapon than a 45.

A. I know they shoot a smaller --

Q. Right, okay. Now, let's talk about the timing that you indicated he brought the weapon out that you originally described to law enforcement as a 22. You recall the date being the winter because a significant event -- well, I don't know whether it was significant or not, so I don't want to put an adjective to it, but an event had occurred in your house with regard to recollection and that being your folks had gone to Africa; is that right?

A. I believe so, yes.

Q. All right. As a matter of fact, you use that as a point of reference to describe when he brought the 22 out to work with you to melt it down because that was the time your folks were gone.

A. Correct.

Q. Did they go to Africa for a long period of time or something?

A. About two weeks.

Q. And was that a big trip for them?

A. Yes.

♀

889

Q. All right. And I assume that's why you used that as a point of reference because nobody was in the house. Were you basically coming up and taking care of the farm from down in Van Meter -- I mean down in Maxwell?

A. I'm not sure.

Q. But did anybody else other than yourself have any responsibility of looking after the farm?

A. I have an ex-sister-in-law that keeps track of things.
Q. All right. But you knew you were there during that period of time, and you used that as a point of reference when you first talked to law enforcement; is that right?
A. Correct.
Q. So you took this weapon which you described at that time in your initial interview as a 22, and you and Mr. Honken proceeded to melt it down; is that right?
A. Correct.
Q. Had you ever done anything like that with metal before?
A. I've never -- with -- I've torched metal in school and stuff.
Q. Oh, you did take classes in that?
A. In high school I took it.
Q. Right. You gave a description earlier on direct examination and I also believe on cross-examination as the type of classes you were taking as opposed to the type of classes that Mr. Honken was taking in school; is that right?

890

A. Correct.
Q. You also gave a description at NIACC, the courses that you were taking as opposed to the courses that Mr. Honken was taking; is that right?
A. I don't remember if I said what classes they were.
Q. He took mostly chemistry, et cetera?
A. Science classes and math.
Q. Science classes? And you took work-type classes, mechanical-type classes?
A. Well, liberal arts. Wasn't really mechanical classes.
Q. But working around the farm, you had developed some

technique and I'm sure working with sheet metal you'd developed some technique with weapons -- I mean not with weapons but with metal?

A. Correct.

Q. So you were knowledgeable of how to melt down, how to destroy or to alter metal; is that right?

A. Sheet metal, yes, correct.

Q. Would you think you would have been more knowledgeable of that than Mr. Honken?

A. I don't think so, no.

Q. You think your experience in working around this sheet metal gave you less experience than what Mr. Honken had; is that your testimony?

A. I don't know what our experience comparison would be.

891

Q. Had you ever seen him work around metal ever since you've known him?

A. Yes, I have.

Q. When was that?

A. In high school.

Q. Okay. Other than in high school.

A. No.

Q. Okay. So this is in 1994, the winter. So from high school to 1994, you'd never seen him work around metal even though on some occasions you had been around him sometimes 24 hours a day; is that right?

A. I don't remember any other time, no.

Q. Right. Did you work around metal since high school?

A. Yes, I did.

Q. Matter of fact, you had a full-time job dealing with metal.

A.    Correct.
Q.    So would you agree based upon that you may have gained more experience in that area than he had?
A.    In sheet metal I would agree, yes.
Q.    So after you melted this weapon down -- this is the winter of 1994 -- when is the next time you see Mr. Honken?
A.    I'm not sure when the next time would have been.
Q.    Okay.  Let's go by your job and see can we use that as a base.  Do you work up until the summer at the plant from Van Meter, Dahl's?

♀

A.    It's a -- it wasn't a plant.  It was a mechanical company.
Q.    Mechanical company?
A.    (Witness nodded head.)
Q.    Okay.
A.    Into the spring sometime.
Q.    Into the spring.
A.    I believe so.
Q.    And you leave that job; is that right?
A.    Correct.
Q.    So we're now in the spring of 1994; would that be accurate?
A.    Correct.
Q.    In the spring of 1994 when you leave that job, where do you go?
A.    I went to Mason City to Kraft Foods.
Q.    Do you reestablish a relationship with Christi Cole Gaubatz?
A.    No.
Q.    Do you see her at all?
A.    I see her every once in a while, yes.

Q. Do you reestablish a relationship with Mr. Honken?
A. Correct.
Q. He's working at Kraft Foods; is that right?
A. That's correct.
Q. Do you live with him?
A. I don't remember living with him, but I may have stayed

there on occasion, yes.
Q. All right. Is he living by himself?
A. Not at that point I don't believe.
Q. Who's he living with?
A. I believe he was living with Angela Johnson.
Q. And you would stay overnight with them on occasion?
A. On occasion, yeah, yes.
Q. How large was their place?
A. They had three bedrooms I believe.
Q. You stayed in one bedroom?
A. I stayed in the living room usually.
Q. And they had a daughter -- a child living there?
A. Correct.
Q. A baby?
A. I believe so at that point.
Q. And they also -- Angie had an older child?
A. Correct.
Q. And describe as best you can what the apartment looked like or the house looked like. Was it an apartment or a house?
A. It was a house.
Q. Describe what the house looked like when you lived there.
A. I don't recall ever living there, but I --
Q. When you stayed there overnight. I'm sorry.

A. Correct.
Q. Okay.

♀

A. Well, it was -- had a living room and a kitchen, two bedrooms in the back, and the basement was finished, living room in the basement and like a bedroom down there.
Q. Okay. And where did the kids live?
A. I believe that the baby lived -- was in -- next door, right next to Dustin and Angie.
Q. Okay.
A. And I think that their -- Angie's older daughter lived downstairs. I'm not sure where she was at.
Q. Okay. And when you started working at Kraft Foods, would you think that your relationship with Mr. Honken then started back where it left off where you guys would chat a lot, talk about different things, et cetera?
A. Correct.
Q. During the entire time you were staying there when he was staying with -- as you testified to, with Angie Johnson, did you see a weapon in the house at all?
A. No, I did not.
Q. Whenever you visited there, did you see a weapon in the house at all?
A. No, I did not.
Q. What type car was Mr. Honken driving during that time? And we're talking about 1994 going to the summer and into the fall.
A. I'm not sure what it was.
Q. Do you recall him having a 19 -- was it a Toyota Corolla?

♀

A. I'm not sure. I know Angie had a car that --

Q. She had a Toyota -- the little hatchback, and I'll think of it in a second. But would you remember Dustin having maybe an '85 Toyota Corolla?

A. He could have. I'm not sure.

Q. And Angie had some type of little Toyota?

A. Correct.

Q. Have you ever ridden in the vehicles, either one of them?

A. Correct.

Q. Describe to the jury as best you can the size of those vehicles from the inside.

A. They were -- I believe they both were just two doors, small cars.

Q. Pretty tiny automobiles?

A. Yes.

Q. Do you remember the color of those vehicles?

A. I remember Angie's was blue.

Q. All right. And would you tell the jury what type of vehicle Christi Gaubatz Cole had at the time you were dating her and immediately after.

A. I don't recall what car she had.

Q. Okay. You don't remember if it was a Toyota or not.

A. I don't recall, no.

Q. Okay. When you -- in '94 continued working at Kraft, had then reestablished your relationship with Mr. --

♀

896

MR. PARRISH: Your Honor, I don't know whether you can do anything. Maybe I can move this up a little bit. That light is coming in from that --

THE COURT: From back here?

MR. PARRISH: Right. I don't know whether you can move it at all.

THE COURT: Is that better?

MR. PARRISH: That's a little bit better, Your Honor. Thank you.

BY MR. PARRISH:

Q. Now we can see each other. So in '94 we're into the early fall. Do you reestablish your relationship with Christi Cole Gaubatz at that point?

A. No, I did not.

Q. All right. Let's go in -- does anything significant happen in '94 with regard to you and Dustin manufacturing methamphetamine? And I want to go all the way to December of '94.

A. At some point we made a trip down to Arizona, and he made a trip down to Arizona with Angie.

Q. You think at some point he and Angie went down to Arizona; is that correct?

A. Correct.

Q. Now, you said '94. Would it be accurate to say that that did not occur until 1995?

897

A. It may have been that long. I'm not sure.

Q. Okay. Well, I just want to make sure we're on the same time frame here. You indicated, did you not, that she made a cash advance from a credit card of about -- you think the amount may have been $5,000?

A. I believe so.

Q. Okay. Now, when you indicate that it was 1994 when it happened, would you agree that you may have previously stated it

was 1995?

A. It could have been '95.

Q. All right. And in 1995 you then -- you and Dustin began to work on a lab not to produce methamphetamine; is that right?

A. I believe so, yes.

Q. All right. Tell the jury at what -- you started then to produce another drug in Angie's house in 1995 with that $5,000 cash advance. Tell the jury what you tried to produce at that point.

A. Methcathinone.

Q. Do you know how to spell that?

A. I have no idea.

Q. Okay. Would you tell them what that is and what was the purpose of that particular drug that you tried to produce in 1995 at Angie's house?

A. It's a drug similar to methamphetamine. I'm not sure what exactly --

♀

898

Q. What does it do?

A. It's a stimulant I believe. I don't know that much about it.

Q. What type stimulant is it? Do you know what the stimulant is for?

A. No, I do not.

Q. And how long did you work in Angie's house to try to produce that?

A. Several weeks.

Q. And where was it located?

A. In the basement.

Q. Did you stay there overnight during that time when you were

working on trying to produce that new drug?

A. I may have at some point.

Q. Was Mr. Honken working at Kraft Foods during 1995 when you tried to produce a drug that was not methamphetamine?

A. Correct.

Q. And Miss Johnson had invested $5,000 in that operation, and she became concerned about getting her money back; would that be right?

A. Yes, she did.

Q. And you were working at Kraft Food, and Dustin -- Mr. Honken was working at Kraft Food; is that right?

A. That is correct.

Q. And while you and Mr. Honken were working on the lab to set

899

up, who was in charge of production? Was it you as you had been out in Arizona?

A. No.

Q. Okay. Who was it?

A. We never really produced. We just --

Q. I know you didn't produce any. Right. And I'm sorry. I didn't mean to cut you off. You didn't really produce any, but actually you were working on trying to produce some; right?

A. Correct.

Q. So my question was who was actually in charge of the production?

A. Dustin was in charge of the experimenting.

Q. And what part did you play in it then?

A. I basically was just there to watch I guess.

Q. Then you also proceeded to set up a lab in Dustin's dad's home; is that correct?

A. At some point we did.
Q. And what was his name?
A. Jim, Jim Honken.
Q. And what type laboratory did you set up in his home?
A. That one, we tried to make some MDA.
Q. Tell the jury what MDA is.
A. It's a -- kind of a stimulant hallucinogen. I'm not sure exactly what it's supposed to do.
Q. And how long did you and Mr. Honken work on that project

♀

together?
A. Probably a couple weeks to a month.
Q. Would you have worked on that for one to two months? Is that what you previously have stated?
A. That is possible, yes.
Q. Okay. Matter of fact, you both worked on that project; is that right?
A. Correct.
Q. That was not a methamphetamine project but a project to produce a different type of stimulant; is that correct?
A. That is correct.
Q. Something similar to LSD; would that be right?
A. I'm not sure.
Q. It's a hallucinogen; right?
A. It's a hallucinogen, yes.
Q. And what part of his dad's house did you work on that project in?
A. Upstairs in like a room up in the attic.
Q. And I assume during all of that time you and Mr. Honken, while you were working on these projects similar to the time

you'd spent in Arizona working on projects and in Angie's basement working on projects, talked quite a bit.

A. I'm sure we did, yes.

Q. Talked about many different things.

A. Correct.

♀

Q. And that would also be true of the trips that you took back together from Arizona that you described on both direct and cross-examination yesterday. During those 8-, 10-, 12-hour trips, two boyhood friends talked a lot about many different things; is that right?

A. Correct.

Q. Probably talked about sports.

A. Probably, yes.

Q. Talked about politics.

A. I'm sure we did.

Q. Talked about women.

A. Yes.

Q. Talked about children.

A. Yes.

Q. Talked about your dreams.

A. Correct.

Q. And I take it through those times -- and we're talking about up to the spring of '95 and considering the fact you'd been associates until seventh grade and good friends after that that -- you got to know each other pretty well.

A. Correct.

Q. You knew exactly how to pull each other's buttons.

A. I'm sure we --

Q. Like if you wanted to get a particular response from

Mr. Honken, you knew what words to say to get that type of

response from him.
A. I don't know what kind of response but yes.
Q. Right. And if he wanted to make you react a particular way, he would know how to do that with you.
A. Correct.
Q. It would be like anyone's best friends. You can't say anyone's but most people's best friends. They know how to pull each other's buttons and how to get next to each other if they wanted to in terms of conversation.
A. Correct.
Q. Like if you wanted to get him upset, you could mention a topic that would just make him start babbling about anything.
A. Probably, yes.
Q. Right. And he could basically do the same thing with you.
A. Probably, yes.
Q. Up until the spring of 1995, would you agree that you and Dustin -- and we're talking about the point where you're back at his dad's trying to make this hallucinogen -- you and Mr. Honken, not his dad but Mr. Dustin Honken, are reestablishing your relationship after this so-called breach where you didn't do any drugs for a while?
A. Correct.
Q. You're reestablishing; is that right?
A. Correct.
Q. So then after the -- did you have any success with making

this hallucinogen MDA at his dad's house?
A. No, we did not.
Q. So that was a failed project. So at this point you have the failed project at Angie's house, the failed project at Dustin's dad's house, and you're now getting to the spring of 1995. And what do you do with regard to a place to live at that point?
A. I believe I was living in an apartment at that point.
Q. And do you then begin to move from the apartment to a house on Eighth Street?
A. Correct.
Q. And as you move into a house on Eighth Street, do you proceed to set up a lab in your house?
A. Yes, we did.
Q. And that's in Mason City; is that right?
A. That's correct.
Q. And when you set up that house in Mason City in the spring of 1995, you set up a new arrangement with Mr. Honken, did you not?
A. I'm not sure.
Q. Well, up until that point I understand the arrangement had not changed. Back when you and Jeff and he were working on it, it was a third, a third, a third. Do you then in the spring of '95 when matters are set up in your house, you set up an arrangement where the split is to be 50/50?

904

A. At some point since '93 we made that arrangement. I'm not sure if that was when or not.
Q. So that meant that each of you would contribute 50 percent of the effort and you would each withdraw 50 percent of the

profits; is that correct? It was an equal partnership.
A. Correct.
Q. At that point when the lab was set up at your house, Angie became pretty agitated about her money; is that right?
A. Correct.
Q. Did she start making demands on you?
A. She asked me how long it would take. She didn't really say a whole lot to me about it.
Q. What'd you tell her?
A. That I didn't know.
Q. How long did you work at your house trying to get a lab going and produce -- what were you trying to produce there?
A. Methamphetamine.
Q. How long did you work at your house on Eighth Street trying to get it produced?
A. I'm not sure how long exactly. Month, two. I'm not sure.
Q. Were you successful?
A. No, we were not.
Q. After you tried your project at your house or you both tried your project at your house on the 50/50 arrangement, then did it -- did you set up another lab?

905

A. Yes, we did.
Q. So at this point you've had three failed laboratories set up; is that right?
A. Correct.
Q. Where's the next lab that you set up?
A. I believe it was at Dustin's house in Mason City.
Q. And after you set up the lab in Mason City in Dustin's house, between the time you had set the lab up in Angie's home

and the time you set up the lab in '95 in Mr. Honken's home, had you gone to Arizona?
A. I don't know if I did at that point or if it was earlier on.
Q. Well, but you know at some point in that time you went to Arizona.
A. Yes, Dustin and I did.
Q. You then -- well, you also went with Miss Christi Gaubatz Cole.
A. Earlier in the -- I believe it was in the summer of '93, but I'm not positive.
Q. So you think it was all the way back in the -- I asked you about that earlier, and I probably -- I hope I made myself clear, but if I didn't, I asked you about that earlier had you gone out to Arizona with Miss Gaubatz Cole.
A. I don't remember that.
Q. Okay. But you did.

906

A. I did at some point, yes.
Q. Matter of fact, you went out with her, and you bought some chemical products.
A. Correct.
Q. You also established an answering machine in a false name; is that correct?
A. I believe so.
Q. You and she spent the night together; is that right?
A. We all -- her ex-husband and his girlfriend and Christi and I and their daughter spent the night in a hotel room, yes.
Q. Did you make just one trip out there with her, or did you make more than one?

A. Just one.

Q. When you -- in '95 then when you and Mr. Honken set up the laboratory in his house, that would have been on 16th Street in Mason City?

A. I believe so, yes.

Q. Did you ever spend the night over there?

A. Yes.

Q. And was Mr. Honken living over there also?

A. Yes, he was.

Q. And did he live over there at the same time you were living there?

A. I just spent the night. I was not living there.

Q. Was anyone else living there from the nights you would

907

spend there? Could you tell?

A. I don't believe so.

Q. So from what you could tell, had he then split off with his relationship with Miss Johnson?

A. At least to some extent, yes.

Q. And from what you could tell, was he in conflict between Miss Johnson and Miss Rick, and were both of them tugging on him for -- to establish a personal relationship or make some type of commitment?

A. I believe so, yes.

Q. During that time -- and we're talking about 1995 and into 1996 -- did Mr. Honken to your knowledge have any other type of relationship?

A. Not to my knowledge, no.

Q. With just those two people.

A. I believe so.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 794 of 3636

Q. Then we know that Mr. Honken's house was, in fact, raided; is that correct?
A. That is correct.
Q. Search warrant was issued; is that right?
A. I believe so, yes.
Q. After you knew the search warrant was issued or there was an investigation, tell the jury what you did to destroy, if anything, any of the evidence that was around.
A. I went to Kathy's and --

♀

Q. Kathy who?
A. Kathy Rick.
Q. And where did she live in relation to the laboratory?
A. The laboratory was on the north side of town, and Kathy lived on the south side.
Q. Okay. Tell us what you did.
A. I -- well, she left, and I took the chemicals out of the garage with some glassware, and I took it into the house, dumped the chemicals, and destroyed the glassware and got rid of it.
Q. What else did you do?
A. I'm not sure.
Q. Okay. But you did do whatever you could to destroy evidence, documents, chemicals, glassware so the investigators could not find this material.
A. Correct.
Q. Did you blow up anything?
A. I did not.
Q. Did you shoot anybody?
A. I did not.
Q. Did you threaten anybody?

A. I did not.

Q. You knew this investigation was going on; is that correct?

A. Correct.

Q. Mr. Honken knew this investigation was going on; isn't that correct?

♀

A. Correct.

Q. Matter of fact, to your knowledge, Mr. Honken simply waited knowing that he was going to be arrested from this investigation; isn't that correct?

A. He destroyed some things too but . . .

Q. Well, yeah, he destroyed some things; is that right?

A. That is.

Q. Well, tell the jury what he destroyed during that time.

A. He destroyed some chemicals and glassware at Angie's house.

Q. And he knew the investigation was going on; isn't that right?

A. Correct.

Q. Matter of fact, it was not until some days after all this material had been destroyed that you both were arrested; isn't that right?

A. Could you repeat that? I'm not --

Q. It was not until some days after this material had been destroyed that you all were arrested; isn't that right?

A. Correct.

Q. Mr. Honken made no attempt to run away, did he?

A. No, he did not.

Q. He made no threats toward anyone while this investigation was being conducted, did he?

A. Not to my knowledge.

Q. Well, not to you, did he?

A. No, not to me.
Q. Not one single threat, not one single thing did he do to say he was going to harm anybody prior to the time of his arrest; isn't that correct?
A. He discussed things with me.
Q. He discussed things with you?
A. Yes.
Q. Did he do anything?
A. He did not.
Q. Matter of fact, as you go back and think and reflect on your relationship with Mr. Honken, he was a pretty big talker, wasn't he?
A. He liked to talk, yes.
Q. That's kind of putting it mildly, isn't it?
A. Yes.
Q. I mean, we've heard the tapes. That's kind of putting it mildly that he liked to talk.
A. Correct.
Q. He would just babble on ad infinitum on occasions, wouldn't he?
A. I don't know if he babbled, but he talked a lot.
Q. You don't want to say he babbled, but he is the kind of person that once he starts talking he just doesn't shut up.
A. Sometimes, yes.
Q. And sometimes it's irritating to hear him babble so much

about all the things that are running through his head; would

you agree?

A. I don't know if I was irritated.

Q. You were never irritated with him? You could stand there and listen to it?

A. Well, I liked to debate with him about stuff so . . .

Q. Why did you like to debate with him?

A. We had different views on things.

Q. Matter of fact, at one point during the tape he's telling you, Well, why aren't you talking back to me about this, because he was so used to you guys having this kind of exchange? It may not have been great ideas but exchange of ideas that went on since childhood, didn't you?

A. I'm not sure that's the reason, but that could be, yes.

Q. Didn't he ask you at one point, Why aren't you talking back; why aren't you addressing things? Didn't he ask you that at one point on the tape?

A. Something like that, yes.

Q. But you knew if you pushed the right buttons you could make him babble on and on, didn't you?

A. I'm not sure about that.

Q. You're not sure about it. You think it's possible.

A. I'm sure that in political debates and things like that that that would be possible, yes.

Q. But not in other kind of debates like women or something

912

like that.

A. Something like that, possibly, yes.

Q. Something like, well, who you make out with and how could you possibly do that and why didn't you tell me about it, that type of discussion?

A. Yes.

Q. Now, would you agree that as things got closer and this investigation started up you both were reflecting on what happened in 1993? Would you agree with that?

A. Correct.

Q. Now, in 1993 you've already acknowledged to us during the direct and cross-examination and more so during cross that you were just as involved as Mr. Honken with the operation out in Arizona.

A. Correct.

Q. But what happened, you got out of it; is that right?

A. I tried.

Q. Do you think you got out of it simply because the law enforcement did a lousy investigation? They didn't call out to Arizona to find out you were the person actually --

A. I misunderstood what you meant by getting out.

Q. You think because they just didn't do a good job of investigating.

A. That was part of it I believe.

Q. Okay. Had they gone out to Arizona and talked to law

913

enforcement out there and gone out to this house and found these leases and all of this, they would have found out you were just as, if not more, involved as Mr. Honken.

A. Just as.

Q. And you would have found out that -- they would have found out that in terms of the penalty you were facing it would have been life in prison.

A. I don't agree with that.

Q. You don't think it would have been life.

A. I don't agree, no.

Q. For the amount that was being produced out there, those 3 or 4 pounds, 96 percent pure, are you telling us you don't think you would have been facing life in prison?

A. I don't believe there would have been that much found, but that's possible, yes.

Q. Well, it wouldn't necessarily be by how much was found, but it also meant how much the lab was capable of producing. Don't you know that was a fact?

A. At the time I thought that was possible, yes.

Q. Matter of fact, you and Mr. Honken discussed that in the first part of the tape where you were trying to talk him into making comments. He talked to you about what the ramifications were with regard to the amounts. Would you agree? You had discussions about it.

MR. WILLIAMS: Objection, Your Honor. Argumentative

914

about trying to talk him into making comments.

THE COURT: Overruled.

BY MR. PARRISH:

Q. You had discussed about the amounts and the amounts leading to a life sentence.

A. Probably, yes.

Q. Matter of fact, you had many discussions about life imprisonment and whether or not Mr. Honken would want to do life, and to him he said it was just like a death sentence, didn't he?

A. Yes, he did.

Q. It wasn't just the first discussion you had on the tape. You had had many discussions about matters like this; isn't that

correct?

A. That's correct.

Q. Matter of fact, you told him part of the reasons that you'd go out and commit those crimes that you were committing is because of the pressure of having to go to prison. Didn't you tell him that at one point?

A. Which crimes?

Q. The crimes that you were going out committing, the 30 of them you committed and didn't tell law enforcement about or tell Mr. Honken about.

A. I did tell law enforcement, just not the federal law. At the time I was on probation, and I would have discussed it with

♀

915

them.

Q. Yeah, but my -- that's not my point. You didn't tell him -- strike that. I'm sorry.

You told him you were going out committing these crimes because you felt the pressure of possibly going to prison.

A. That could be one reason, yes.

Q. Matter of fact, you said you committed so many of them you had to go and commit yourself to a mental institution.

A. Yes, I did.

Q. But you kept that a secret from your best friend, Mr. Honken.

A. Which part?

Q. Part of it.

A. Part of it, yes.

Q. You also kept it a secret from law enforcement when you told them you would cooperate against Mr. Honken.

A. I don't agree with that I kept it a secret.
Q. You didn't tell them everything.
A. Correct.
Q. All right. So, therefore, you were keeping some things from law enforcement, and you were keeping some things from Mr. Honken, and you were actually creating your own little environment to operate in, weren't you?
A. I don't know what that means but . . .

♀

Q. Well, let's put it this way. Mr. Cutkomp, you would agree as all human beings when you're caught in this situation you're going to look out for number one, and that's Mr. Tim Cutkomp; would you agree?
A. I would agree that I would look out for myself.
Q. So in one way you were going to play both ends here against the middle, and you were the person you thought was in the middle.
A. When I got in trouble, I wanted to straighten my life out, and that was part of the way to get to straightening my life out was telling the truth about things.
Q. But you admit up to this point you'd lied to Mr. Honken.
A. Yes, I did.
Q. You'd lied to law enforcement.
A. I don't agree that I lied to law enforcement.
Q. You just kept information from them.
A. I didn't discuss the whole amount, no.
Q. So that's a little different in your mind than lying.
A. I did discuss it with the government, just not the federal government.
Q. And you would agree that there's another factor you didn't

tell them about either in your relationship with Mr. Honken that led to your wanting to cooperate, did you?
A. I'm not sure.
Q. Well, was there something else going on between you and

♀

Mr. Honken prior to the time that you made these tapes up, went to get these tapes?
A. I'm not sure what you're talking about.
Q. Didn't you confront your ex-wife who you wanted -- you just told him you wanted to straighten your life out. Didn't you confront your ex-wife and ask her had she and Mr. Honken had a relationship?
A. I did not. Dustin told me one day that they had.
Q. You don't remember, sir, saying that you talked to her and she told you they had. You talked to Mr. Honken, and he told you they hadn't? Are you telling us now -- I'm sorry.
A. I believe it was the other way around, but I'm not -- it could have been that way.
Q. That's fine. Well, first you only said you talked to Mr. Honken about it. So why don't you tell us if you talked -- before you did the tapes, did you talk to both your wife about it, your ex-wife, about whether or not she had a relationship with Mr. Honken? Tell us yes or no.
A. Yes, I did.
Q. All right. Did you talk -- before you made the tapes, did you talk to Mr. Honken about whether or not he had a relationship with your ex-wife, the relationship you wanted him to say before you made the tapes?
A. At that point my relationship with her was over, but yes, I did.

Q. I didn't ask you that. Did you ask him about it before you made the tapes is my question.

A. I discussed it with him before I made the tapes, correct.

Q. Did you go to law enforcement and tell them that you believed Mr. Honken had had an intimate relationship with your ex-wife?

A. I don't recall if I did or not.

Q. You don't recall if you did or not?

A. I don't recall discussing that with them.

Q. Oh, okay. So prior to the time that the tapes were made, it was crossing your mind that your best friend had been involved in an intimate relationship with your ex-wife.

A. I had known about it, yes.

Q. Well, if you had known about it, who told you about it?

A. One of the two.

Q. But you can't remember which of the two told you about it.

A. I don't remember which one said that something happened and which one said nothing happened.

Q. So here we have law enforcement then having you tape your best friend, and you don't tell them the full story of all the 30 or so crimes you're going out committing. You don't tell them about -- you don't tell your best friend about that. And also you would agree you don't disclose to law enforcement that you believed Mr. Honken had had a relationship with your wife.

A. I did not, but my ex-wife would have discussed it with them

I believe.

Q. With law enforcement?
A. I believe that she did.
Q. Did you know at the time that she had discussed it with them before you started making the tapes?
A. I knew that she had gone and talked to them, yes.
Q. Is that your testimony, is that your ex-wife talked to them about the relationship she had with Mr. Honken before the tapes were made? Is that your testimony?
A. I'm not sure what happened.
Q. Oh, okay. You're not sure now; is that right?
A. I wasn't sure before.
Q. Well, would you think that's something -- when you're going in to tape your best friend, a person who you know inside out and which buttons to push and not push to get certain responses from them, do you think law enforcement would want to know that you believe they've had an intimate relationship?
A. That makes sense, yes.
Q. Okay. You can't think of any reason why you didn't tell them, can you?
A. At that point I guess I didn't -- my relationship with my ex-wife was over, and we were basically friends, and if they wanted to have a relationship, I guess I thought that was between them.
Q. But you talk about -- you talk about the relationship being

920

over. You still had a relationship with the children; is that right?
A. Yes, I did.
Q. You told not only Mr. Honken but everyone else that your wife was the love of your life, didn't you?

A. Yes.
Q. You make no dispute about that, do you?
A. I make no dispute about that.
Q. So the context and backdrop of these tapes has now been set; would you agree? And what I mean by the context and backdrop of these tapes where you get your best friend to respond to inquiries from you, you would agree that the trips that you made, the lifelong friendship you've established, the information you failed to disclose to him, failed to disclose to law enforcement, and the relationship that you now knew at that time that he had with your ex-wife, the love of your life, within that context, these tapes were made; would you agree?
A. Correct.
Q. Now --
THE COURT: Mr. Parrish, would now be a good time to give the jury a stretch break?
MR. PARRISH: It would, Your Honor. Yes, Your Honor.
THE COURT: Okay. Thank you.
Okay. Please be seated.
Mr. Parrish?

921

MR. PARRISH: Thank you, Your Honor.
BY MR. PARRISH:
Q. You stated in response to one of the questions I asked you that that relationship was over, but you did concede she was the love of your life. But you would agree that in 1997 and '98 when you went into a mental hospital and when you were under psychiatric care you told the psychiatrist that it still upset you, didn't you?
A. I'm not sure if that was when I was in care, but I have

told the psychiatrist that, yes.
Q. You told the psychiatrist you were still upset about that relationship between Mr. Honken and your wife.
A. I'm not sure if I said that or not. Things that she's done has upset me, yes.
Q. And that was one of them.
A. I'm not sure. Probably, yes.
Q. Was that the biggest division other than what is happening here today in terms of your conflict with Mr. Honken, the fact that he had a relationship with your wife, the love of your life?
A. I don't believe so.
Q. In the context then of that situation the tapes were made. Let's talk about the tapes themselves. Would you agree that you and Mr. Honken were working together at Kraft Foods during this time the tapes were made?

922

A. Correct.
Q. You also would agree that you had several conversations prior to the time that you actually went out to do the taping. And what I mean by that, during the day you and Mr. Honken would, in fact, talk.
A. Correct.
Q. And during those conversations, do you think you would talk about matters related to your case?
A. Correct.
Q. And during that time, you both conceded that even with this no-contact order -- and you did not have a no-contact order toward him, did you?
A. I did not.

Q. All right -- that there was an acceptable level of contact that the two of you all could have because the people who were in charge of both you guys being released knew that you worked together and you would chat.
A. Correct.
Q. Let me just ask you, were those conversations at work taped?
A. Part of them, yes.
Q. Do you know what happened to those tapes?
A. I do not.
Q. Tell the jury how many times you were taped at work.
A. I had a cassette tape that I would use sometimes at work.

♀

Q. And how many times did you use that tape?
A. If Dustin would come and want to talk like where it was quiet, then I would use it.
Q. I understand you are telling us the context of when you used it. And I'm sorry if my question wasn't clear, Mr. Cutkomp, but how many times did you use that tape at work?
A. I do not recall.
Q. Was it more than 20?
A. Possibly.
Q. Was it more than 30?
A. I'm not sure.
Q. Do you know what happened to those 20 or 30 tapes that you taped Mr. Honken at work at Kraft Foods? What'd you do with the tapes?
A. I gave them to one of the agents.
Q. To who?
A. One of the agents.

Q. Do you know which one you gave it to?
A. Lori. I don't know --
Q. Miss Lewis?
A. Correct.
Q. Okay. Have you ever seen those tapes anymore?
A. I have not.
Q. Have you ever had any opportunity to come back and clarify any of those tapes?

♀

A. I have not.
Q. Matter of fact, would you agree that the same conversations that are on these four or five tapes that the government has introduced into evidence, the same subject matters, the exact same subject matters, was, in fact, covered on the tapes out at Kraft Foods?
A. Correct.
Q. And what was your shift, because you worked the B shift; is that right?
A. That's correct.
Q. Tell the jury what the B shift is.
A. Well, there's four shifts, and they rotate two at a time. A and B are together. One goes during the day for 12 hours, and then next one goes for 12 hours at night, and they rotate the next week.
Q. And you and Mr. Honken worked the same shift.
A. Correct.
Q. Tell the jury how you set up this cassette tape and how it would work. Give them some idea.
A. Well, I'd just push the button for play, and that's it I guess.

Q. You would be pushing for record I would hope.
A. Record, yes. Sorry.
Q. Yeah. You'd push it for record, and you'd sit there during the breaks at work and talk to Mr. Honken.

A. At some point I suppose.
Q. At several points; is that right?
A. Correct.
Q. For a period of how long did you do that? Not for, you know, how long you ran the tapes, but how many weeks or months did you do that?
A. I'm not sure.
Q. Over three months?
A. I don't believe so.
Q. Two months?
A. Poss -- I don't think it was that long, but that's possible.
Q. One to two months. Does that sound about right?
A. One sounds about right.
Q. And during that time, you would agree you worked what? You guys worked seven-hour shifts, eight-hour shifts?
A. Twelve.
Q. Twelve-hour shifts?
A. Correct.
Q. And how many breaks did you have in those shifts?
A. Three probably.
Q. Three breaks?
A. Correct.
Q. Is that right?
A. Correct.

Q. And during those three breaks, I assume you would walk up -- and where did you keep the cassette tape?

A. In my pocket or -- I probably had a coat on. I worked in the cold areas.

Q. I'm sorry?

A. I worked in the colder areas, so I probably had a coat on.

Q. All right. And did Mr. Honken have a coat on?

A. I'm not sure.

Q. But what you would do, you would go up during the breaks -- and how long would the breaks be on a 12-hour shift?

A. Probably 15 minutes for morning break and then half hour and 15, I believe.

Q. For the lunch?

A. Lunch, half hour, yes.

Q. Is that right? And what you would do is walk up with this cassette tape. You would then push the button record, and then you would start talking to Mr. Honken these 20 or 30 times; is that right?

A. How ever many times, yes.

Q. And then you would take that tape at the end of your shift, and you would take it back to law enforcement.

A. Correct.

Q. Did you ever see any tape -- transcripts of those tapes?

A. I did not.

Q. As a matter of fact, is that why if we look at the tapes

927

that were, in fact, transcribed, that's why it appears that there's a huge gap in conversation that it seems like there's a

huge point missing and then there's a focal point of the tape? Do you follow what I'm saying?

A. I do not.

Q. Okay. When I look at the transcripts -- and -- I'll see a conversation ending at one point, and then I'll look at the tape again or I listen to it again, and I'll see like it's starting up and I say, jeez, something is missing here in the conversation like some conversation occurred somewhere else leading up to this.

A. I'm not positive what you're saying.

Q. All right. Okay. Maybe I'm just not phrasing my question very clear, and I apologize.

Let me put it this way. It seems like there are missing segments of conversation. Do you follow what I'm saying? Well, for instance, if you look at the tapes that were introduced into evidence and I go to look at the times that the tapes were made, a couple of them look like they were made right after -- not long after you got off work.

A. Yes.

Q. All right. So what I mean by that, I have a copy here of your work records, and you would work up until what time?

A. 6:30.

Q. In the morning?

928

A. Both morning and night.

Q. For the 12-hour shift; right?

A. It would depend on which week it was. We rotated.

Q. Right. And a couple of times it looks like you went over to Mr. Honken's house or where he was staying at that moment within an hour or so after you got off work.

A. I don't recall how long it was, but that is possible.
Q. Sometimes you did go over after work; is that right?
A. Possibly.
Q. Now, this is what I want to ask you. Before you would go over for the transcript tapes that the jury got and after you would get off work, did you go meet with law enforcement?
A. Yes.
Q. Because you have to get a body wire; right?
A. Correct.
Q. Sometimes you had done a taped cassette before you went over to get the body wire; you agree?
A. I actually don't think it happened -- it would have been on one of our days off that I went over, but yes.
Q. Okay. And were you debriefed or talked to about, well, what did Mr. Honken say to you at work that day and they would ask you questions about what he said, what did you talk about during the breaks? Did that occur?
A. Yes, it did.
Q. And then you would go over to his house or where he was

929

staying. And would you agree it would be a continuation of the conversation that had been started during the 12-hour shift?
A. Yes.
Q. So how do we find the missing parts of that 12-hour shift leading up to the taped conversation?
A. I'm not sure.
Q. You would agree that once you got the taped conversations and you listened to the tape, some of the words were not clear.
A. That is correct.
Q. As a matter of fact, on some of the words that were not

clear, you listened to the tapes, and you added your interpretation of what the words were, didn't you?

A. I did not add on what was on the tape or on the manuscript.

Q. Is your testimony that you never added any words to the tape?

A. What is the question?

Q. My question is did you add any words to the taped conversation in terms of the written transcript?

A. No.

Q. Did you see at one point or were you shown a written transcript?

A. I have seen written transcripts, yes.

Q. And did you listen to the tape at the time the written transcript was in front of you?

A. Correct.

Q. And did you get to certain words that you could not understand?

A. That's correct.

Q. Tell me then who added the words when it was inaudible and it could not be understood. You said you didn't do it. Did you tell someone and they put a word down there?

A. If it was inaudible, I did not say what it said.

Q. Is your testimony there was never a time -- and make sure I understand this -- there was never a time where you listened to the tape and there was a word that was not in there or was not clear and you, in fact, added to the word?

A. There was a time that I listened to the tape and whoever transcribed it did not know what the word was, and I could hear the word, and I said that I heard the word, yes.

Q. Okay. So the person listening to the tape could not hear the word. You came. You would listen to the word. You would tell them, This is the word that I said, and they would put that word into the transcribed tape.
A. If it was able to be heard, yes.
Q. By you.
A. I believe it would -- you could hear it.
Q. Well, if you believe you could hear it, why would they need you?
A. After you've listened to it, you can hear it and if you know what the word is ahead of time.

♀

Q. Well, you believe that; right?
A. I can hear it.
Q. Right. But they were saying they could not hear it or could not understand it.
A. They did not say anything to me about . . .
Q. But yet you would tell them the word, and they would put the word down there; isn't that right?
A. Correct.
Q. Well, let's go to a particular word. Matter of fact, one of those words that was in question was the word buried.
A. I don't recall, but that's . . .
Q. Sound right? Unburied?
A. I don't know.
Q. Unburied was a word?
A. I don't recall.
Q. But if you talk about the context of that sentence and the word unburied, you indicated, did you not, that, first of all, Mr. Honken was implying buried; is that right?

A. At some point, yes.

Q. Then they could not hear the word. You then said the word was unburied meaning on that context if Mr. Nicholson would ever come back again. Now, with that in mind, let me ask you this question. There was a question asked of you as to whether or not Mr. DeGeus -- well, I think you might have posed the question to Mr. Honken if Mr. DeGeus would come back. He

♀

932

said -- and correct me if I'm wrong -- he was 99 percent sure he would not come back and he wasn't so sure about the other person. Could you straighten me out on that?

A. I'm not sure. I think it was the other way around.

Q. Okay. Straighten me out. What did he say?

A. I believe he was talking about Greg being 99 percent and wasn't so sure about the other one which I took to mean Terry.

Q. And then -- go ahead. I'm sorry. Go ahead.

A. I took to mean Terry.

Q. And you also took it to mean even though Mr. Honken didn't say it that it was buried.

A. Correct.

Q. But he never said that.

A. No, he did not come out and say that, no.

Q. Matter of fact, when they asked you to come in, you then added your words to what you thought it'd mean about buried or unburied, but he put it in the context which you explained to them of walking through the door; isn't that right?

A. At some point he said that, yes.

Q. Mr. Honken always referred to it as walking through the door, and you implied buried or unburied which you added to the tape. You would agree?

A. I do not totally agree with that, no.
Q. Okay. Tell me what you don't agree about.
A. That he always said that. I'm not sure what he always

♀

said.
Q. On the taped conversation.
A. I'm not sure what he always said.
Q. All right. You mean always said ever. Okay.
A. Correct.
Q. You indicated that you had developed a method for speaking to each other, and one of the contexts in there was the fact of being a preacher; is that right?
A. Correct.
Q. Well, tell the jury in the context of the tape, preacher, you put in the context of the movie Pulp Fiction. You knew at the time you asked him that question that the context of the preacher had nothing to do with Pulp Fiction, didn't you?
A. I'm not sure if I put it in the context of Pulp Fiction.
Q. Well, in the tape he's talking about the movie Pulp Fiction and the preacher in the last scene when he's talking about it, and you say to him about being -- you talk to him about being a preacher, don't you?
A. At some point I said that, yes.
Q. Well, matter of fact, isn't it true, Mr. Cutkomp, that you and Mr. Honken developed the word preacher when you were in high school?
A. Correct.
Q. Then why did you lead law enforcement to believe that preacher was only in the context of Pulp Fiction where the guy

♀

goes out and is talking about all the people he's killed?
A. I don't believe that I did.
Q. Okay. Well, let's say you didn't. Tell the jury where preacher comes from from high school that you and Dustin developed the code word for.
A. We talked about -- he and some other friends of ours discussed getting to the military and some of them being bounty hunters or hit men, and preacher meant hit man.
Q. It had to do with the military and when you all were in high school; isn't that right?
A. Correct.
Q. So then you then put it in the context at the closing end of the last tape about Dustin wanting to be a preacher; isn't that right?
A. I believe so, yes.
Q. Because you knew exactly where the conversation was going to go. It was going to go back 15 years on code words that you and Mr. Honken had developed with your high school friends. Didn't you know that?
A. Probably, yes.
Q. Did you ever explain to law enforcement officials toward the end of that tape that's what he had referenced to and having nothing to do with Terry DeGeus or with Gary -- with Greg Nicholson? Did you ever tell them that?
A. I'm not -- could you repeat the question? I'm not sure

935

what --
Q. Did you ever explain to them the context of being a

preacher to law enforcement so they could understand the tapes a little bit better?
A. I believe I have. I'm not sure.
Q. Well, is it explained anywhere in what's been presented so far?
A. I believe it has.
Q. Oh, okay. You would agree that you have stated that you believe through all of your conversations on the tapes with Mr. Honken that he's only implied things; is that correct?
A. Correct.
Q. He's only implied killing people; is that right?
A. Correct.
Q. He's only implied incinerating people; is that right?
A. Correct.
Q. He's only implied burying them; is that right?
A. That is correct.
Q. He only implied getting a backhoe; is that right?
A. Correct.
Q. Now, let's talk a second about the code you said you set up with Mr. Honken for talking as you referred to in your direct examination. You talk about the code that was set up. And tell us when you say that code was set up where you would have the conversation with him.

936

A. It's just something that was developed over time I suppose. Talking all of the time, we knew part of what each other was thinking.
Q. Well, didn't you say --
A. Code might not be the right word.
Q. Okay. How do you want to call it? What do you want to

call it?
A. Understanding.
Q. Understating?
A. Understanding each other.
Q. Okay. Well, in this understanding, you relate that it was developed for a specific reason; is that right?
A. I may have.
Q. All right. You indicated that it was developed only in the event other people were with you.
A. Correct.
Q. So if it was only developed in the event other people were with you during these four tapings or five tapings, who else was with you?
A. Over time I believe --
Q. No. Listen to my question, please, please.
A. All right.
Q. My question is if it was developed for the purposes of using only when other people were with you, my question is who was with you when you were making those five tapes?

937

A. We assumed someone was always listening.
Q. Well, did you ever tell law enforcement that you and Mr. Honken assumed all the time someone was listening?
A. I'm not sure if I said that.
Q. Is this the first time you've never made that statement?
A. It may have -- it may be.
Q. So in other words, are you telling us here today that you and Mr. Honken never had direct conversations?
A. About . . .
Q. Anything.

A. No, that would not be correct.
Q. All right. So you would agree then that on numerous occasions, particularly when you're manufacturing methamphetamine together, doing all of the things that you all did together that you did have direct conversations about matters.
A. Correct.
Q. And you only talked in code, as you say it, when other people were, in fact, listening.
A. Correct.
Q. So, therefore, you could get someone to acknowledge things that may not be true by creating the impression that they were, in fact, true.
A. I don't agree.
Q. Well, if you have two people -- I'm sorry. Go ahead. What

♀

938

was your answer?
A. Just that I don't agree with that.
Q. You don't agree that that could happen.
A. I don't agree that I would do that.
Q. You don't agree you would do it.
A. No.
Q. Oh, okay. But you agree that it could happen.
A. That is possible.
Q. By giving the impression of someone doing something they didn't do simply by having the other person talk in some code that they were familiar with over the years.
A. I'm not sure, but I'll agree with that.
Q. Okay. But you're saying, if I understand you, no, no, no, I did not do that. It could happen, but you're telling us, I

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 821 of 3636

didn't do it; is that right?
A. I'm not sure what the question is.
Q. You're telling us you didn't talk in code, is that right, to Mr. Honken on these tapes?
A. I'm not sure that I meant code.
Q. Well, you didn't talk in this method that you all had developed for talking if other people were around.
A. I did to some extent, yes.
Q. Okay. So if you did that, you would agree that what you see on the tapes would not be the essence of a pure conversation on the same subject matter between you and Mr. Honken.

♀

939

A. It was not plain, no.
Q. That's right. You would agree -- you said it was not plain. You would agree that on many of the subjects that law enforcement had sent you in to get statements on would not be plain. You would agree with that.
A. I would agree.
Q. Have you ever had that discussion with law enforcement officials that conversations on those key subject matters was not plain?
A. I'm not sure.
Q. Did they ever discuss with you you need to go back, get some more conversation because these things are just not clear?
A. I don't remember anybody saying that, no.
Q. Let's look now for a moment --
MR. PARRISH: Your Honor, do you want to take a break at -- what do you normally do? At ten?
THE COURT: Normally right around ten. Would now be a good time?

MR. PARRISH: Now would be a good time.

THE COURT: Okay. We'll do it now then. Members of the jury, we'll take our mid-morning recess. We'll be in recess until 25 minutes after 10. Thank you. Please remember my cautionary instruction about keeping an open mind till you've heard all of the evidence in the case. Thank you.

(The jury exited the courtroom.)

♀

THE COURT: Anything we need to take up, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: No, Your Honor. Thank you.

THE COURT: Thank you. We'll be in recess.

(Recess at 9:57 a.m.)

THE COURT: Ready to have the jury brought back in, Mr. Parrish?

MR. PARRISH: Yes, Your Honor.

THE COURT: Mr. Williams?

MR. WILLIAMS: Yes.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Parrish, you may continue your cross-examination.

MR. PARRISH: Thank you, Your Honor. May it please the Court and counsel.

BY MR. PARRISH:

Q. Mr. Cutkomp, we were just getting ready to go into a new area right at the break. And before I do that, I want to just add one other area to the context. You would agree that you understood in addition to all the other factors that took place right before the five tapes that we listened to that you had

told law enforcement about your involvement in all the other attempts to manufacture; is that correct?
A. I believe so.

Q. And these taped conversations were in 1996; is that right?
A. Correct.
Q. I believe we've understood the context to be that other taping took place at work. There was some debriefing, and then on the first one of May 16 that we have the transcript of, you go to visit Mr. Honken.
A. Correct.
Q. And where is he?
A. At his --
Q. Do you have that transcript in front of you?
A. I do not.
Q. Do you know what happened to it? You had earlier, did you not, the -- you had all of them in front of you?
MR. PARRISH: Your Honor, I'm going to give him some so he can have them as a reference if I turn to a point and he might want to refresh his recollection.
THE COURT: And then do you have a copy for yourself?
MR. PARRISH: I do, Your Honor. Thank you.
THE COURT: Okay.
BY MR. PARRISH:
Q. I note at one point you ask about pop in the refrigerator; that right?
A. I believe I did, yes.
Q. You go down and get it, and you walk back up, and I'm just listening to the sound on the tape. I hear pop open with no one

telling you where to go, where to come back to. A few seconds later, a few minutes I hear, psss, and a pop opens. Are you that familiar in the house and that comfortable in the environment that you just go down, pick it up, come back, psss, flip it open, and no one gives you directions to anything?

A. I'm not sure I was that familiar with the house, but I knew where the basement was, and I had been at -- I had gone over to his parents' house growing up, so I was comfortable with being there.

Q. So that noise we hear is the pop being opened without anyone telling you anything. It's just like having another family member in the house; would you agree?

A. Yes.

Q. And that sound we hear, psss, is you opening the pop without anyone giving you directions.

A. Probably. I'm not sure.

Q. Now, when this conversation starts, would you agree that the context of that May 16 tape is that Mr. Honken is saying that he's not worried about Mr. Cobeen?

A. Possibly. I'm not sure where we're talking about here.

Q. Well, go to page 8. Let me switch. You might be able to find these quicker. You won't have so many pages. These are the ones you were working off yesterday. We're not going to go through them in that much detail. These might be a little bit easier to work off of them since these are the ones you had

943

yesterday. Go to the May 16 tape which would be Exhibit 201.

A. I see it.

Q. Okay. And he's saying in this initial one that's actually

taped that no one needs to harm Mr. Cobeen; right?
A. In this instance he's talking we don't have to worry about him leaving.
Q. And part of the reason, you would agree, is that you have analyzed this with him, and he's told you that as to him and his case they had the lab in his house and they pretty much have him. He's told you this before; isn't that correct?
A. Correct, probably.
Q. He's told you before even the taping conversation has started that pretty much his goose is cooked on this drug case.
A. Correct.
Q. But what he's also told you beforehand is he feels somewhat responsible for getting you into this mess, doesn't he?
A. He said that, yes.
Q. But also you were having problems mentally that you'd not disclosed to him.
A. Correct.
Q. And so when he is talking to you in this context and this friendship, relationship, he's looking at you seeing that you are on the edge which you are?
A. I don't totally agree with that, but yes.
Q. Well, doesn't he refer on page 11 of 201, Exhibit 201, he's

♀

944

concerned about your stability and your sanity?
A. Where was it at?
Q. Go to the second Dustin, second D. Are you on page 11?
A. Yes. From the bottom or --
Q. Second D down it should be.
A. It's talking about a lead fishnet there.
Q. He says, You're flipped. You're not going to flip on me.

I already flipped; remember?

A. That's not on this page, but I do remember that part.

Q. It's not on May 16, page 11? Let me see where you're at. Page 12?

A. Yes.

Q. Okay. Page 12. And that's where you indicate to the jury on direct examination -- I believe it was direct examination -- that you were basically outlining to him that you had had some mental stability issues.

A. Correct. I had told him, yes.

Q. And he was concerned at that point that you were going to crack up.

A. I believe he was doing it in a joking manner, but he may have been.

Q. Well, interesting enough, when there are jokes on it, laughter would show up. Is there laughter there?

A. I don't see any there, no.

Q. You had a chance to listen to the tapes where you said you

945

added the portions to clarify what was happening at the time; is that right?

A. I clarified a word here and there, yes.

Q. Right. Do you see any laughter there at that portion where he's concerned about your sanity?

A. I don't see any written down, no.

Q. And he knows at this point that his best friend from your interpretation of the relationship at that time may be cracking up.

A. That could be, yes.

Q. You would agree that when that situation is set in motion

with regard to the relationship between the two of you all, it puts this whole conversation in a different context.
A. Somewhat, I agree.
Q. Explain to the jury about the context that your best friend feels -- who has now known you have gone to a mental institution for help, tell us what Dustin does when he knows you're feeling stressed out. What does he do over the course of your entire relationship?
A. I guess I haven't really been real stressed out before. I don't know how -- what you're . . .
Q. Well, you were stressed out out in Arizona; is that right?
A. At what -- yes.
Q. Okay. And you did go out and do things that were criminal.
A. I did one thing, yes.

946

Q. Yes. And you did that when you were stressed out; is that right?
A. I did.
Q. That ultimately led to the psychiatric help.
A. Correct.
Q. So in that relationship that you and Dustin had, would he try to make sure that you did not crack up?
A. I don't recall him ever really making an effort to make sure that I didn't crack up, no.
Q. But wouldn't he talk to you to make sure that everything was okay? Don't flip out on me; don't go crazy on me?
A. This is probably one of the only times he's said that, yes.
Q. Well, go to 202, 203, the second D from the bottom. Again, he asks about your stability and your sanity, the second D from the bottom.

A. On which page?

Q. Page 41.

A. Yes, he does say something about that.

Q. So he says it again that you have just flaked out.

A. Correct.

Q. That means he thinks right now in the context of the conversations he's having with you that you're pretty much crazy.

A. I believe that Kathy was saying that Tim has flaked out.

Q. But he says it to you because he says you've never talked

947

like this, doesn't he?

A. That's -- yes.

Q. So here's Dustin again, and again use the background in your relationship where you said he's only said it once. Here's another instance that he says it again; is that right?

A. One of the only times I said. He hasn't said it that many times is what I meant.

Q. Okay. Go to Exhibit 20 -- you said he hasn't said it one or two times?

A. That many. That's what I meant by one of the only times. I meant it not very many.

Q. So he said it more than one time.

A. Yes.

Q. He said it a few times.

A. Correct.

Q. But other than these conversations, do you know of any other times where Dustin thought you were crazy other than the time in May and June of 1996?

A. I don't believe he ever thought I was crazy, but he talks

about flaking out, yes.

Q. Well, he talks about, first of all, that you're flipping out on him. He talks the next time that you've flaked out on him or flaked out completely. And go to Exhibit 206, 207 where he's concerned with your stability and sanity. Go to page 6, third from -- the third D down.

♀

A. Okay.

Q. Where he says, You're not going to crack up on me, are you? You say, I went through that already. He says, Huh? Went through that already, remember? I remember you -- remember you saying. And then you say, No, I don't feel like that. Huh? No, I haven't.

A. Okay.

Q. I do not feel that way. I'm just worried about you, you know, I mean. I just don't want.

So throughout these taped conversations, you agree that that becomes one of his underlining questions to you: Are you mentally okay?

A. He did ask that, yes, correct.

Q. And it's the first time ever are you telling us that he has posed those questions to you in that context?

A. I don't believe he did very often in our relationship, no.

Q. And then you would agree that when he kept asking you these questions he did not know the full story about what was going on in your life, but this is what he just sensed, that there was something about you that made him think you were cracking up or had cracked up mentally.

A. He did not know the whole story, that is correct.

Q. And did you before these conversations keep doing these

criminal acts before the conversations you had with him, you taped with him?

♀

A. Anywhere?
Q. Anywhere.
A. No.
Q. You'd done them before.
A. Yes.
Q. Did you do them afterwards?
A. After the tapes?
Q. Yes.
A. I don't -- no.
Q. Never again.
A. No.
Q. And you had been doing them for how many years?
A. Several.
Q. How many?
A. Five.
Q. Longer than that? Before '92?
A. Probably about five.
Q. Didn't have anything to do with drugs; right?
A. It did, yes.
Q. That's what you said -- but it was not drug-related crimes you were committing.
A. No.
Q. And you weren't stealing from Mr. Honken or anyone else, were you?
A. I'm not sure what the question --

♀

Q. That's what --
A. These crimes were not, no.
Q. And one of the other things Mr. Honken kept talking about as you kept talking about Cobeen is that he wanted to talk about let's follow the legal process. Would you agree?
A. He did say that sometimes, yes.
Q. Matter of fact, the first two portions of the tape when he was concerned about your mental state, he said let's focus on going down to Drake, doing some research. Let's see can we get some time, let's study the chain-of-custody issues. That's what he was talking about doing; is that right?
A. Correct.
Q. But your sole goal if I understand what you said in direct examination was to go in and see could you get some admissions with regard to Mr. DeGeus and Mr. Nicholson; is that correct?
A. Going in --
Q. Was not to go in and find anything out about drugs or anything; right?
A. Into Dustin's house.
Q. Right.
A. Correct.
Q. You had one sole purpose; is that right?
A. I went in to -- yes.
Q. But he kept talking about the drug case and said, Hey, look, I know, you know, Cobeen is the connection. In your case

951

let's not do anything. Basically he wanted to look at the chain of custody, see what the lawyers had to say about it and see if, in fact, it could be worked out. Is that -- would you agree

with that?
A. Correct.
Q. And this was after you had tried to have several conversations with him at work, and that was the end result of that conversation would be the taped conversation that occurred May 16. You agree with that?
A. I'm not sure what --
Q. Well, we'll go on to the other tapes. But that's the end result of the May 16 conversation.
A. Possibly, yes.
Q. Okay. Now, during that time Mr. Honken encourages you to visit with your children, doesn't he?
A. Correct.
Q. Matter of fact, he asks you over and over again how's the relationship with your children; is that right?
A. Yes, he did.
Q. Was he always concerned about you visiting your children, or was he so concerned that somehow you'd lost touch so badly that getting back and seeing your kids would be something that may help you get back on even keel? How did you interpret that?
A. I don't know how I interpreted it. That he -- to be honest, I interpreted he wanted to know where my ex-wife lived.

952

Q. Because of his romantic interest in her?
A. No.
Q. Why was that?
A. I felt that he was threatening my ex-wife.
Q. Well, did you tell anyone that?
A. I believe I have.
Q. Who -- did you tell anyone that in any of the debriefing

you went through that he was trying to find out where your ex-wife was so he could threaten her?

A. Well, as a threat towards me, yes, I thought so.

Q. Oh. So you think in these tapes that we just listened to there was somewhere in there that he was trying to threaten your ex-wife. Is that your testimony this morning?

A. That's how I took it.

Q. Oh. Did you ever tell them that in any of the debriefing with law enforcement that he was just trying to find out where your ex-wife was?

A. I believe I did.

Q. Oh, okay. Did you testify to that on direct examination?

A. Not today I did not.

Q. Oh. You just happened to add that in this morning?

A. I added that when you asked me what I was thinking.

Q. So you were thinking -- let me make sure I'm tracking you here. You were thinking when he was encouraging you to go visit with your children that all Mr. Honken was trying to do at that

953

time was find out where your ex-wife was living so he could go harm her.

A. I don't believe that he really was going to harm her. I believe that he was doing it as a threat, but I don't know that. It's just something I thought.

Q. Is this what you were thinking much like the other statements you were making as to what he was thinking, the same statement you just made?

A. No, not exactly, no. I didn't know the exact reason.

Q. Well, what is the difference between your saying what you just said this instant about when he was encouraging you to go

visit your kids as that being a threat against your wife and your kids? Tell us the distinction between that and the other things that you've said he implied. Tell us the difference.
A. He was more specific about the other things. This is just something I felt. I don't know if that's what he meant or did not.
Q. Well, didn't you just tell us on cross-examination yesterday and this morning that you thought he was implying that he wanted to harm these people or had harmed these people? Do you remember --
A. He had been more specific about that than just asking about my children.
Q. So if we listen to the taped conversation -- and this is what you're telling us. I want to make sure I understand it.

954

If we listen to the taped conversation where he encourages you to go visit your kids, how are your kids doing, when's the last time you've seen them, Tim, are you going to go see them this afternoon when we finish this conversation here, have you talked to them lately, are you telling us today those were all threats to you as you now interpret them?
A. I don't know if they all were, no.
Q. Well, are you saying some of them were threats?
A. At some point he was trying to find out where my ex-wife was living and --
Q. Just -- I'm sorry.
A. And I did not want him to know, and he kept asking, and that's where I got the impression that he was -- there was a possibility that he would try to use that against me.
Q. So you're saying in these tapes that we just listened to

the last day or so that in those tapes there are threats against your wife -- your ex-wife and kids; is that your testimony?
A. No, I'm not testifying to that.
Q. Oh. You don't even -- you're not even implying that, are you?
A. I'm saying that the question you asked me about what I thought he was meaning, I told you what I thought he was meaning. I'm not implying that he said that or did not say that. That's what I thought. I -- you asked me a question. That's all. I'm just answering your question.

♀

955

Q. I understand. But I want to make sure I understand your answer too. Where he's referring to your children and asking you have you visited with them, go see them, are you telling me that those were somehow threats? That's all I'm asking.
A. I felt it could have been, yes.
Q. And you're also saying that you told law enforcement that those statements about his -- about Mr. Honken encouraging you to visit your children at the same time he's asking about your sanity, you told law enforcement that those were threats.
A. I don't know if I did that specific instance, no.
Q. I thought you just told me -- and I may have missed it, but I thought you just told me a minute ago that after you heard these conversations about Tim, go visit your kids, you then related that to law enforcement at some time --
A. I had related at some point that Dustin was looking for my ex-wife, and I discussed that with them. I don't know if this was the instance or not.
Q. But you discussed he may have been looking for your ex-wife, and yet you never disclosed to them that they had a

relationship.
A. I did, I believe. I believe they knew.
Q. But you're not sure.
A. I believe they knew.
Q. So that's different from what you said earlier.
A. I don't know what I said earlier exactly.

♀

Q. So when he's saying let's do research, let's find out, you know, how the law works and the chain of custody works, what would you say would be what you wanted to focus on?
A. When we would do research?
Q. Yeah. You were not satisfied with the fact that Mr. Honken wanted to concentrate on reading books and trying to do this the right way, were you?
A. Yes, I wanted to do it the right way.
Q. Well, then why did you not just leave the conversation on that level? Why did you keep trying to increase the level of the conversation to being worried, going to prison? Why did you keep escalating the conversation during the time you were talking when he was focusing on research, chain of custody, making sure the law enforcement officials did it correctly? Could you explain that?
A. Because in our other conversations, he had discussed getting rid of people, and that's why I was wearing the wire was so that I could get him to talk about those things.
Q. Okay. But he'd also in the other conversations talked about doing research and doing it the right way.
A. Correct.
Q. And you would agree that the nature of your conversations as with any people who are engaged in criminal activity such as

you and Mr. Honken were engaged in, the conversation would be all over the board all the time; isn't that correct?

♀

957

A. At times, yes.
Q. Matter of fact, it was all over the board down in Arizona; is that right?
A. Correct.
Q. It would be all over the board on trips going back and forth to Arizona; is that correct?
A. Correct.
Q. It would be all over the board when you'd be working in the laboratory both in Arizona in the laboratory in Angie's house and the laboratory in Mr. Honken's dad's house and the laboratory in your house. The conversations would be all over the board.
A. Correct.
Q. And you would agree that in those conversations you would know how to direct the conversations to any particular subject matter the same as Mr. Honken would know how to direct the conversations.
A. Correct.
Q. You would agree also that Mr. Honken indicated to you that you intimated to Mr. Honken --
A. I'm not sure what --
Q. Intimated, you hinted in your conversation.
A. Hint, okay.
Q. -- that he should get rid of people.
A. I never hinted that he should get rid of people.

♀

958

Q. Well, in your briefing, in your briefing with law enforcement, would you agree they told you you can't do that?
A. Yes.
Q. What did they tell you?
A. That I could not bring up the subject.
Q. What subject did they tell you you could not bring up?
A. People, the subject of getting rid of them.
Q. And let me ask you, you've listened to those tapes, haven't you?
A. Correct.
Q. Are you going to tell us on four pages -- four segments or five segments of those tapes you never brought it up at all?
A. I'm not sure if I was the one to bring it up or if he was.
Q. Even though they had instructed you not to bring it up, you would agree that on several occasions you brought it up, particularly with regard to Mr. Cobeen.
A. I'm not sure if I agree with that or not.
Q. You don't agree with it?
A. I'm not sure if I agree with that.
Q. Why don't you turn to 202, 203 where Mr. Honken has said he doesn't need to kill Cobeen, Cobeen's sole reason that Cutkomp is tied to the meth lab on page 6 and what your statement is.
A. Where are you at?
Q. On page 8, go to the fifth and seventh --
A. What was page 6?

959

Q. I'm sorry. What was your question?
A. You said page 6?
Q. I'm sorry, page 8.
A. And how far down?

Q. The fifth and eighth sentence down.
A. I wouldn't even worry about that, and it takes time. There ain't no hurry?
Q. Do you say, I'm in a hurry?
A. No, I do not, I don't believe. Here it is. Okay.
Q. I'm in a hurry?
A. Yeah.
Q. And Mr. Honken tells you, I'm not in a hurry?
A. Correct.
Q. You're trying to egg him on or edge him on or show him there's some urgency to this matter? Is that what you're trying to do to your best friend?
A. I'm trying to get him to talk, yes.
Q. But he's talking to you in the context of a best friend who he thinks is cracking up. You would agree?
A. I don't agree, no.
Q. So you think these statements that he made several times he just said them to say them about your mental disability.
A. I don't really think he was worried about me cracking up, no.
Q. Even when he said he was worrying about you, you don't

960

think he was worrying about you.
A. I don't think so, no.
Q. You think he was just lying to you?
A. I don't think he was lying. I think he was checking to see how I felt about what we talked about in the tapes.
Q. Well, he didn't even know according to you he was being taped; is that right?
A. He did not.

Q. So you think he was kind of setting you up not even knowing that he's being taped?
A. I'm not sure where that -- what you mean by setting me up.
Q. Well, you were trying to get him to say certain things, is that right, that you'd heard him say before according to you?
A. Correct.
Q. How do you know he wasn't trying to get you to say certain things?
A. I don't.
Q. So these two best friends are sitting in these conversations, and neither one know why the other one is saying anything to them. Is that what you're telling me?
A. I don't totally agree with that, no.
Q. What part don't you agree with?
A. I'm not sure what the whole context of that would mean but . . .
Q. Okay. Go to 204, 205, page 25, the fourth T down.

♀

A. Fourth?
Q. Yes.
A. Okay.
Q. What do you mean there?
A. I had -- one night when I was out with a roommate, I met a guard someplace that had a gun that was similar to the one that I thought he was talking about.
Q. So all of that conversation is in a context about other matters that had taken place, and you narrowed it down to one sentence, is that right, or one series of references without talking about the full incident that you had observed before? Would that be a fair statement?

A. I'm not sure.

Q. Well, what I'm saying is that we're looking at the pure context of the conversation. But are you telling me that you and Dustin had another view of what happened that led to what this conversation is?

A. That statement I think I just took out of the air when he was talking just for something to say.

Q. Something to say.

A. Correct.

Q. Okay. You would agree that throughout these tapes you reaffirm the fact that Mr. Cobeen is the only tie between you and the meth lab. You don't disagree with that, do you?

A. I agreed with Dustin, yes.

♀

Q. And you also affirm that yourself.

A. I agreed with what he said, yes.

Q. Now, you mentioned earlier in one of the responses to the question that you had some concerns about probation or something?

A. I'm not sure where that's at.

Q. Okay. You had mentioned that, that you had some concerns about it.

A. I may have. I'm not sure.

Q. What concerns did you have about it?

A. I'm not sure what the -- where it's at or what the reference would be.

Q. So as you sit here today, you have no recollection of what you meant about your concerns about probation; is that right?

A. I don't recall what they would have been, no.

Q. Let's go again to the next conversation, the May 24 tape.

Again, the conversation starts out about the legal theories and what can happen with regard to the legal theories; is that correct?

A. Where are we at?

Q. Well, just in general.

A. Okay.

Q. Would you agree?

A. I was looking for it. I'm not sure.

Q. No, no. It's just the first part of the introduction to

♀

the tape.

A. Okay.

Q. In that you would agree that Mr. Honken discusses in some detail the fact that they could not complete, meaning you all -- and you've had three previous attempts to do this which you've explained to us today -- could not complete the manufacture of the methamphetamine. He talks about what he calls the empty can theory?

A. Correct.

Q. Now, Dustin's been the kind of guy who always read a lot as has been established already and talked a lot which you've pretty much confirmed; is that right?

A. Correct.

Q. Did he talk a lot about all the stuff he read?

A. Some of it, yes.

Q. Did he read all kind of books?

A. He read -- yes, he did.

Q. What kind of books did he read?

A. I don't know. Just different books. I don't remember any of the names.

Q. Read a lot of books about chemicals?
A. Yes.
Q. Read a lot of books about guns?
A. He had some books on guns, yes.
Q. But more books about chemistry than guns?

♀

A. Yes.
Q. One of the things that he wanted to bring back or did he bring back from Arizona were all of his books?
A. I think he did. I don't know.
Q. Did you see them in his house when you were going in doing the taping, all of the books that he had?
A. I may have. I don't recall.
Q. Of all the people who you knew and dealt with during that time, would you agree that he was perhaps the most studious and the one who read more than anyone else?
A. He read a lot, yes.
Q. And when he wasn't out or in the process of manufacturing drugs or was not with his kids or something like that, he'd be reading.
A. He may have been. I knew he read.
Q. Did you read a lot?
A. I read some.
Q. As much as he did?
A. No.
Q. Now, he does talk in the May 24 tape about getting the evidence suppressed; isn't that correct?
A. Where are we at?
Q. Go to page 10.
A. Okay.

Q. And he said that's a technique that you can use to win your

case if the evidence is suppressed.
A. Correct. I don't see that there, but, I mean, I . . .
Q. And in that context you would agree that he's still keeping all the conversation in a legal context saying, We have to work on our case.
A. I'm not sure if this -- I'd have to read the whole context there. I'm not sure. He may have been.
Q. All right. And you would agree that he does have a discussion about the destruction of the evidence that the government's going to destroy at some point.
A. Correct.
Q. Which is -- I'm sure had been explained to you also that at some point after evidence is seized, it can be photographed, videotaped, and then it can be destroyed; is that correct?
A. Correct.
Q. And he was concerned and expressed concerns that if it's destroyed he won't have a chance to examine the evidence and send it off to an expert where they can determine if, in fact, he can have -- could have manufactured methamphetamine.
A. Correct.
Q. Now, these buildings that you were working in as a sheet metal worker, did you go around to different buildings all around the --
A. I did, yes.
Q. -- central Iowa?

A. Yes.
Q. And you were what you call a vent specialist or someone who could --
A. Sheet metal.
Q. But did you work on getting in buildings and working up in the vents?
A. I guess.
Q. And you were living in Maxwell, Iowa?
A. Correct.
Q. And Maxwell, Iowa, how far is that from Bondurant?
A. Ten, fifteen miles. I'm not sure.
Q. How far is Mason City from Bondurant?
A. Ninety, hundred miles.
Q. And you were not living in Maxwell at that time; is that right? And when I mean that time, at the time the tapes were being made.
A. No, I was not.
Q. But you had lived within 15 miles of Bondurant; is that right?
A. Yes, I am.
Q. You're familiar with where Bondurant is.
A. I am, yes.
Q. Did you work on any buildings in that area?
A. I don't recall working on any in Bondurant, no.
Q. Do you think you could have? Not in Bondurant. I said in

967

that area.
A. I don't recall working on any in that specific area, but I may have.
Q. Well, Dahl's is what type of company? What do they do?

A. Heating and cooling.
Q. And explain to the jury in heating and cooling what kind of access does that allow you to have to buildings when you're going in and sent out on a job?
A. I'm not -- you can get into buildings.
Q. And what do you do in those buildings? Explain to us.
A. Heating and cooling, duct work.
Q. And then you go up in the vent areas. Like in the courthouses, you go and work in the vent areas in these places; is that right?
A. Correct.
Q. And so any building that you would be assigned to like you had told us you were assigned to a building for a month in Clarion, were you doing heating and cooling there?
A. Yes, I was.
Q. So this building down in Bondurant -- wait a minute. Let me ask this question. Does Mr. Honken have any experience in that area?
A. I don't believe he does, no.
Q. Through all the time you've known him, you've never known him to have any experience in that area; is that right?

968

A. I don't believe he has.
Q. So between the two of you all, who would have the most experience with accessing a building and going through a building and finding out where material is? You or Mr. Honken?
A. I guess me.
Q. All right. But who did you say came up with the idea of going through the building in Bondurant?
A. I said that Dustin wanted to go into the building.

Q. And in this building in Bondurant, tell the jury the different plans that you discussed prior to the time of the taped conversation about the building of how you can get into the building. Why don't you tell the jury what you told him before you had the taped conversation.
A. We had discussed going in through a door, or there was a access through some duct work and also driving a -- like a bob -- not a bobcat but a -- a big vehicle through it.
Q. One of the ways you said was going through the vent area; is that right?
A. Correct.
Q. And you knew the vent area; is that right?
A. I knew how vent areas work, yes.
Q. Let me ask you this. Why on this tape is there no discussion about going through the vent areas or go in with a truck?
A. I'm not sure.

Q. But you agree prior to this conversation on the tape you had had prior conversations with Mr. Honken about how you would access this Bondurant building to destroy this evidence; would you agree?
A. I would agree we had conversation on how we could do that, yes.
Q. And so when you had this conversation that was, in fact, taped, you then would use the prior conversation as a set-up conversation and wait to hear Dustin's response to your prior theory. Would you agree?
A. I'm not sure if I agree with that whole statement.
Q. Well, which part would you disagree with?

A. I'm not sure what you meant by theory.
Q. Well, we know that Mr. Honken replies to the different ways that the building could be accessed. You've already conceded that you've had previous conversations about this that's not on tape, and yet the taped conversation you come in and Mr. Honken is talking about his theory. That's only half of the conversation; would you agree?
MR. WILLIAMS: Objection, Your Honor. I'm not sure anywhere on these tapes where it talks about the building in Bondurant. If I could be directed where that is . . .
MR. PARRISH: This is cross-examination. I'm asking him questions.
MR. WILLIAMS: It's implying that there's a

♀

970

conversation on the tapes about Bondurant building.
THE COURT: Why don't you either direct him where that is on the tapes or rephrase your question.
BY MR. PARRISH:
Q. Well, did you have a discussion about it? I thought you conceded you had a conversation about that; is that correct?
A. We have had conversations about it, yes.
Q. And you've had conversations about destroying evidence; isn't that correct?
A. That's correct.
Q. And that's taped conversation destroying the evidence; isn't that correct?
A. Yes.
Q. And where was the evidence that was supposed to be destroyed if it was not in Bondurant?
A. I believe Dustin thought it was either in Chicago or

Oklahoma.

Q. Matter of fact, you had set up the other conversation before you got to these conversations; isn't that true?

A. I'm not sure if I had or not.

Q. Well, who else did if it was not you?

A. We -- Dustin and I had both just talked. I don't know if I had set anything up or not at that point in the conversation because I don't know where we're at right now.

Q. Are you telling us if you knew exactly where you were in

♀

terms of this conversation you would know if that portion of the conversation was set up earlier?

A. I don't know, no.

Q. Okay. Doesn't he have a conversation with you in the May 24 tape that he can't figure out why law enforcement would do such a shoddy job twice?

A. I remember someplace in here saying something like that.

Q. Does he mean -- do you know what he's referring to in terms of a shoddy job, in terms of the investigation regarding witnesses or what?

A. I believe it was not having enough witnesses, but I'm not totally exactly sure what he meant.

Q. And you do agree that he posed the empty can theory to you at that point.

A. At some point he did. That sounds consistent. I'm not sure, though.

Q. Then you would agree that on the May 29 tape and the June 4 tape -- let me ask you, does he at any point -- has he expressed to you his fear of Angie Johnson?

A. I'm not sure. He was afraid the way that she acted off

the -- off the cuff at times, yes.

Q. And you were too?

A. Yes.

Q. Why?

A. She was hot headed.

♀

Q. You had observed it?

A. I'm not sure if I observed it or just knew from what Dustin had said.

Q. What about Dustin? Did you ever see him get angry?

A. He's gotten angry before, yes.

Q. Well, they asked you about Dustin, did they not, and asked you whether or not he was the type person who got in fights?

A. I would say no, he doesn't.

Q. Matter of fact, you described him as calm and the type person who would try to avoid fights.

A. I would agree with that, yes.

Q. And you described him as a very thoughtful person, did you not?

A. Correct.

Q. And Angie you described as very hot headed.

A. Correct.

Q. I lost my page here.

THE COURT: Would you like me to give the jury a stretch break?

MR. PARRISH: Oh, that'd be great, Your Honor.

THE COURT: Members of the jury, why don't you take a stretch break.

Thanks. Please be seated.

BY MR. PARRISH:

Q. Mr. Cutkomp, we're going to close out to just review very

briefly these last couple of tapes, the June 4 and the June 6 tapes. Before I do that, though, there is another tape. You've talked about the 20 or 30 tapes you took into law enforcement that you never had an opportunity to review as you sit here today that came from the cassette that took place at work. But I believe Mr. Williams asked you at the end of one of the taped conversations about another tape, a sixth tape I think, that you actually had an opportunity to listen to; is that right?
A. I've reviewed it, yes.
Q. But there was not much on that tape that made a lot of sense; is that right?
A. That's correct.
Q. Okay. And you've not only listened to the tape, but you tried to work through that transcript and words that you thought you had heard. You tried to add those in or fill them in as you went through.
A. I reviewed the tape, and it cut out. I didn't tape well.
Q. It kept cutting out here and there; is that right?
A. Correct.
Q. Was that part of the reason why you asked Mr. Honken what his cell phone number was and you couldn't get his cell phone because the law enforcement officials thought the cell phone might be interfering --
A. I don't know. I don't remember.
Q. -- with the transmission of your body tape?

A. I don't recall.

Q. Well, you recall telling Mr. Honken at some point could he move his cell phone out of the way because you think the cell phone might be -- that Dustin might be taping you?
A. Possibly. I'm not sure.
Q. When you -- you're saying that conversation never occurred that you told Dustin to move his cell phone because you thought it may have had a microphone in it?
A. I don't recall the conversation, but it could have.
Q. Sounds like something you may have discussed with him?
A. Possibly, yes.
Q. And if you had that conversation with him, did you want to give him the impression that possibly he was cooperating against you with law enforcement officials?
A. I'm not sure.
Q. Okay. But as you go to January (sic) 4 and 6 and you go to your debriefing after you get off work or take your day off work, is there a concern that Mr. Honken only wants to focus on doing legal research and waiting and let the courts do its work? Was there any concern expressed to you that Mr. Honken only wanted to work within the parameters of the law?
A. Concern from?
Q. Law enforcement.
A. I don't believe so.
Q. That was never expressed to you up to this point when you

975

went back for these last two tapes, the tape of June 4 and the tape of June 6.
A. I don't believe so.
Q. And when you went back, tell us whether or not you ratchet up the conversation a little bit by -- earlier you told us on

cross-examination that you did not lead Mr. Honken to believe that you were having any mental problems. Do you tell him at one point in the tapes you're falling apart?

A. I don't recall. I may have.

Q. Turn to the June 6 tape, page 20, and that's Exhibit 209. And what I mean by ratcheting up the conversation, you're telling your best friend that you are, in fact, going nuts.

A. Where are we at on the --

Q. Okay. You'll find it -- go down to a T where it says, I'm falling apart.

A. I believe I'm talking about I'm getting old, my body is falling apart.

Q. So you took that to mean that he was -- that you were telling him it only applies to your body.

A. That I was getting old. I don't know what I meant exactly.

Q. So you don't think that confirmed to him at all that you were at a point where you just couldn't handle anything anymore; is that right? That didn't signal that message to him.

A. I don't believe that's what I meant.

Q. Do you think he could have misinterpreted you like you have to him on several occasions?

A. That's possible, yes.

Q. So it was not in any way -- you weren't trying to ratchet up anything; is that correct?

A. I don't know if I was at that point or not.

Q. And you weren't telling him or leading him to where Cobeen was and Dustin is telling you, No, I don't want to hear it, I don't want to talk about it. Did that occur?

A. Yes, it did.

Q. So you were pushing Dustin toward Cobeen, and Mr. Honken is pushing you away saying, Nope, I don't want to go there; is that right?

A. He had told me earlier not to mention names. That's what he was talking about I believe.

Q. Doesn't he say, I wouldn't do anything, nope, nope, nope? What does your lawyer think you should do? Does he say that?

A. I'm not reading it, but I think that's right.

Q. Go to the June 6 tape -- you think that's right? Go to the June 6 tape.

A. Okay.

Q. Page 11. I wouldn't do anything. Nope, nope, nope, nope. What does your lawyer think you should do? Then you said, He might be staying with friends. Find it?

A. No, I haven't found it.

Q. Page 11.

♀

A. Okay. Okay. What's the question?

Q. My question was you then tell him, He might be staying with friends. He's saying, Nope, nope, nope, and he also says, There is no rush.

A. I guess I didn't get that far. I don't see the "there's no rush" part.

Q. Okay. But you see everything else?

A. I see the "nope, nope, nope" part.

Q. And then you direct him, He might be staying with friends? Were you just trying to get a statement from him as to what his action might be?

MR. WILLIAMS: Objection, Your Honor. Misstates the evidence. There's no reference to "he might be staying with

friends" anywhere on this page.

Q. Let me ask you this question. Are you trying to -- after Mr. Honken talks about one subject matter, are you trying to get him to focus on Mr. Cobeen and what action he should take to help your case out?

A. I'm not sure what I was doing exactly.

Q. Okay. You could have been sending some mixed signals.

A. I know I was trying to listen to what he had to say, and if he should talk about Cobeen, then that's what I wanted to listen to I guess.

Q. But you said the main reason you went in there was to get some conversation about Mr. Cobeen; would that be true?

♀

978

A. Correct.

Q. After this taped conversation which is the June 6 one, do you know whether or not you engaged in any additional taped conversations?

A. I don't know.

Q. Was that the end of your conversation you did after that in terms of tapes?

A. I'm not sure what the last one was, if that was it or not.

Q. But that was not your last interview; is that correct?

A. I'm not sure. I was interviewed when he was arrested.

Q. But you were also interviewed in May of 2004. Do you recall being interviewed in May? That's this year.

A. Oh, okay.

Q. Do you remember you were interviewed in May of 2004?

A. Prob -- yes. I don't know. I've talked to agents. I don't know what date it was.

Q. Who do you think you talked to in 2004 that you were

interviewed by? Would it have been Mr. Graham?

A. Correct.

Q. Do you remember where the conversation took place?

A. At a hotel room.

Q. Would it have been May 6?

A. I don't recall the date.

Q. Do you know what the purpose of that interview was?

A. To listen to the tapes, to just review them again.

♀

Q. What if I told you it was to determine your whereabouts during the summer and fall of 1993 and this interview was conducted on May 5, 2004, at 7:00 p.m. in Clive, Iowa? Would that surprise you?

A. Yes, that would surprise me.

Q. I'm going to show you a copy of this.

MR. PARRISH: And, Your Honor, I should probably -- I just want to mark it for identification and show it to him. So would it be okay if I just marked this as an A for identification? Would that be a problem?

THE COURT: That'd be fine.

MR. PARRISH: Thank you.

BY MR. PARRISH:

Q. I just want to mark this and see if it helps you refresh your recollection on that May 5, 2004, meeting in Clive, Iowa, that you had with John Graham which is just a few months ago.

A. I remember being there.

Q. Does it surprise you anymore?

A. I mean, I am surprised that that's what it was for, but I -- I -- I guess I thought I was there to listen to tapes.

Q. Are you saying that's all you did in that May 6 meeting in

Clive, Iowa, when you were living in West Des Moines was listen to tapes? Is that your testimony to this jury?

A. No, that's not. I did talk to Graham.

Q. Matter of fact, he wanted to know where you were in the

♀

summer and fall of 1993, didn't he?

A. Correct.

Q. This was after all the tapes you had made, after all the tapes you'd made at work. This was 11 years later he was asking you about where you were during that time, didn't he?

A. Correct.

Q. You told him you were living with your sister in Maxwell, Iowa, didn't you?

A. Correct.

Q. Told him you started working for Dahl's; is that right?

A. That's correct.

Q. And you worked at a place in Clarion, Iowa, in '93 and '94, didn't you?

A. I believe so.

Q. You also told him, did you not, in May of 2004 that you didn't recall any other conversation with Mr. Honken about Mr. Nicholson other than the fact that he told you that Mr. Nicholson had missed his court date; isn't that right?

A. I'm not sure what I said exactly, but if that's written, then I agree with that.

Q. That's what you told him, isn't it?

A. (Witness nodded head.)

Q. In Clive, Iowa, this year; is that right?

A. I don't remember exactly what happened in '93, dates and specific instances. So I am not specific about it.

Q. But you told him at that time in response to questions that you did nothing to cause the disappearance or death of Mr. Nicholson, Mr. DeGeus, Ms. Duncan, Kandi Duncan, or Amber Duncan, did you not?
A. That's correct.
Q. And that was in May of 2004.
A. Correct.
MR. PARRISH: Thank you. I have no further questions.
THE COURT: Mr. Williams, redirect?
MR. WILLIAMS: Very briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. WILLIAMS:
Q. I'd like you, Mr. Cutkomp, to turn to Exhibit 203 which is one of the transcripts of the recorded conversations. This one took place on May 24 of 1996. And if you would turn with me to page 10 of that transcript, do you recall getting some questions from counsel for the defendant in this case about whether Dustin Honken was interested in taking care of these legal problems in a legal manner by suggesting such things as suppressing the evidence? Do you recall that line of questioning, sir?
A. Correct.
Q. And you were referenced specifically to this page of the transcript, page 10, about the discussion about suppression. Do you recall that?
A. Yes.

Q. I'm going to read this. I want to have you tell me if I'm

reading accurately. At some point -- is it fair to say before we get to that point you're talking about who was testing what and who was present at the scene of the search?
A. Could you ask that again?
Q. Yeah, if you can just take a look -- I want to set the stage for this. If you look above in the transcript where we start talking about the suppression which is kind of the sixth paragraph from the bottom where they talk about suppression, the context is there's a discussion between you and Mr. Honken about who was at the scene of the search and who was testing the chemicals and so forth. Is that the context of the conversation?
A. Correct.
Q. Okay. And then if you'll start with me about three quarters of the way down the page, about halfway down the page with the D it says, Uh-huh, I already know there's two that tested it. Both those guys better be. Do you see where I'm at?
A. Correct.
Q. And that's Dustin Honken speaking there?
A. That's correct.
Q. Next line is, That one guy and then one that was. That's your words?
A. Correct.
Q. And the next line is, Supervisor. And at this point Dustin

983

Honken's speaking; correct?
A. That's correct.
Q. And it goes on to say this: Uh-huh. So when they destroy it, if one of those -- if those guys don't want to testify or something or can't make it or whatever, then, laugh, no way can

they get it. We could get it suppressed based on the fact we can't even fuckin' cross-examine their techniques on how they analyze stuff, you know. Did I read that correctly?

A. Correct, yes.

MR. WILLIAMS: I have no further questions.

THE COURT: Any recross?

MR. PARRISH: No, Your Honor. Thank you.

THE COURT: Okay. Mr. Cutkomp, you can step down.

And do you want to get started with another witness for 20 minutes or so? Do you have another witness ready to go?

MR. MILLER: Yes. United States calls Lori Lewis.

THE COURT: Okay. Thank you.

LORI LEWIS, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. Make yourself comfortable. Please adjust the chair by scooting it up, and adjust the microphones so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: My name is Lori Lewis. My last name is L-e-w-i-s.

♀

984

THE COURT: Thank you.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Your occupation, ma'am?

A. I'm a special agent with the Iowa Division of Narcotics Enforcement.

Q. That would make you a colleague of Special Agent John

Graham?
A. That's correct.
Q. How long have you been so employed, ma'am?
A. Since 1985.
Q. Did you in connection with your job responsibilities do any work relating to the Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, Terry DeGeus disappearance investigation?
A. Yes, I did.
Q. And that work that you did would have been approximately when, ma'am?
A. It would have started in the month of May of 1996 and continued through 1998.
Q. And can you just very briefly describe -- well, let me withdraw that.
Did your work include attempts at undercover tape recording with the assistance of one Tim Cutkomp?

985

A. Yes.
Q. Anyone else work with you in connection with that task?
A. Special Agent Mark Hein from the Drug Enforcement Administration and other task force officers.
Q. And let me just explore that with you just a little bit. Drug Enforcement Administration, that's something different from the agency you work for?
A. That's correct. That's the federal drug enforcement, the federal agency that does primarily drug enforcement work.
Q. The federal law enforcement agency that's similar to the state law enforcement agency that you work for.
A. Correct.
Q. I take it that it's not unusual that these agencies

cooperate in investigations?
A. No. It's very common.
Q. The rule rather than the exception I take it.
A. On larger cases, yes, that would be true.
Q. Cases worthy of federal interest.
A. Yes.
Q. Okay. Give us just a little bit of background about how one goes about recording conversations covertly. Are there -- what techniques and equipment are ordinarily used in general? I don't want you to give away any trade secrets. Just let us know how this process evolved.
A. There's different equipment that's available to us. We can

♀

either use what's referred to as a micro cassette recorder which is actually placed on the cooperating individual's person. That just allows for a tape recording to be made of the conversation that takes place. There's no ability for law enforcement or anybody else to then monitor the conversation at the time that it's actually taking place.

It's also -- another tool that's available to us is a -- what we refer to as a body bug. It's actually a transmitter that is received by radio that we can then monitor sometimes the conversation that is taking place.
Q. Ms. -- or Agent Lewis, we've listened to some tapes over the last couple days, and I don't think anybody here's going to disagree with me if I suggest that they are of varying and frequently somewhat poor quality, at least as far as being able to hear clearly what's being said. That surprise you?
A. No.
Q. Why is this not surprising in your area?

A. Well, there's a lot of things that can affect the quality of a tape recording or a transmission. Sometimes the placement of the equipment on the individual has an impact. What they're actually wearing may interfere with the transmission of the signal. Also the tone of the voices that are used, any kind of background noise that's in the location where the recording's being made can also impact the clarity.

Q. And, frankly, the nature of the work itself, the fact that

♀

987

you're seeking a covert or secret recording means you can't be putting a microphone right under someone's chin.

A. Correct.

Q. So the difficulty with the quality of recordings is inherent in the nature of that work.

A. Yes.

Q. Did you nevertheless attempt such recordings with Tim Cutkomp on a number of occasions?

A. Yes.

Q. And would you summarize for the jury how many occasions and under what circumstances that was done in the spring of 1996?

A. There were two occasions where I attempted to record the conversations that Mr. Cutkomp was having with Mr. Honken while he was at work. There were I believe four other occasions where we had it set up where Mr. Cutkomp actually went to where Mr. Honken was staying and had conversations with him at that location.

Q. As for the latter category, how ever many such occasions there were, were all of them successful in giving at least some audible conversation?

A. Yes, to a varying degree of clarity.

Q. And was there one that was significantly worse than the others?

A. Yes.

Q. Could you describe that for us?

A. It was -- large portions of it was inaudible because of the things I'd already described. There were numerous people that were present in the room. I believe there was a TV that was playing or a radio. All of those things affect how much of the actual conversations that we can actually record.

Q. Were there any mechanical difficulties on that particular case as well?

A. On that one there was. I believe Mr. Cutkomp had been equipped with both devices. There was a tape recorder as well as a micro -- or I'm sorry, a body bug transmitter that had been placed on him. And we discovered after he came out of the house that the wires, the antennas of the two pieces of equipment, had actually crossed, and it had caused a malfunction of the equipment.

Q. Were you able to obtain a recording that was of any value, of any significant value whatsoever?

A. No.

Q. Let me go back to the other category then which would be the occasions in which there was an effort to obtain a covert recording of a conversation between Mr. Cutkomp and Mr. Honken at Kraft. There were, again, how many such occasions?

A. Two.

Q. And do you DNE and DEA folks document your work?

A. Yes.

Q. I assume that's for purposes of being able to be accurate

months or years later.

A. Correct.

Q. There were two such attempts.

A. Yes.

Q. Describe them, and describe any results obtained from them if you would, please.

A. The first attempt was on May 18. I had provided Mr. Cutkomp a small micro cassette recorder and instructed him how to use it. Because of the nature of the conversations that we anticipated where he was actually going to be doing this at work, I instructed him how to operate the equipment. That would not have normally been done.

When I received the tape back and listened to it, it was virtually inaudible. I don't recall there being anything transcribable on the tape.

Q. Nothing whatsoever.

A. No.

Q. Go ahead. Was that the only occasion?

A. No. The next day we attempted to do the same thing again. And when I received the tape back, there was some conversation that was audible, but there was a lot of background noise with the equipment from the factory, and as I recall, Mr. Honken speaks very softly as opposed to Mr. Cutkomp that has somewhat of a louder voice or a more resonating voice.

Q. Now, you've listened to all of the taped conversations

990

including those that were done at Mr. Honken's parents' residence?

A.    Yes.
Q.    Was -- what was the quality of this second Kraft tape compared to those?
A.    Far less than the quality of the tapes from the residence.
Q.    Were you able to get any recording of any evidentiary value in your opinion?
A.    No.
Q.    Nevertheless were both recordings transcribed or at least an effort made to document and make a record of it to what little extent could be done?
A.    Yes.
Q.    Was that included in your report?
A.    Yes, it was.
Q.    And your report included in the discovery materials in this case.
A.    Yes, it was.
Q.    Moving to an entirely different matter, did you during the course of your work on this case in the spring of '96 interview Mr. Cutkomp regarding a gun that he had assisted in destroying?
A.    Yes.
Q.    And with the Court's permission, if we could have Exhibit 40 published.  Were you with Mr. Cutkomp when he drew that?
A.    Yes.

991

Q.    And when was that drawing made?
A.    May 25, 1996.
Q.    And I'm not picking on you --
A.    I'm sorry, May 22.
Q.    Of '96.
A.    Of '96.

Q. I don't mean to pick on you, because in my years I've seen this happen a great many times. But when one three-hole punches a document, sometimes a hole goes right through part of what's printed on there.

A. Correct.

Q. What we're missing is the numeral 5 I take it?

A. Yes.

Q. But your records show that that was May 22 of 1996 that that was done?

A. Yes.

Q. Following his description of him cutting up and disposing of this gun, did you do anything in an effort to try to locate any remnants of the firearm?

A. Yes, we --

Q. Go ahead and describe that.

A. I had a team of several officers meet. We conducted a search of the area that Mr. Cutkomp had indicated that they had thrown the parts out of the window, and we conducted a search of that area.

♀

992

Q. Describe that area.

A. It's a -- the area we searched was about a mile-long stretch of County Road B4 in Hancock County which is a blacktop that runs south of Britt. The area that we searched was from Kent Avenue to Jewel Avenue, and it was on the south side of the roadway.

Q. And describe the procedure and personnel involved in this effort.

A. I was present, Special Agent Hein from DEA was there as well as -- not every day were all of the people the same. There

were task force officers from the DEA task force in Des Moines that assisted in the search. There were deputies from Hancock County that assisted in the search. Special Agent Kemming from the Division of Criminal Investigation assisted. I believe he was there every day that we searched, and Agent Basler assisted on at least one day.

Q. A lot of agents walking ditches.

A. Yes.

Q. With any equipment?

A. We had metal detectors that we had obtained from the National Guard counterdrug unit.

Q. And did you find something?

A. Yes. I located a piece of sheet metal or steel that matched the description, I felt, that Mr. Cutkomp had provided me earlier to describe how they had cut up the gun and the metal

993

that they had melted the gun on.

MR. MILLER: And with the Court's permission, if I may approach the witness with Exhibit 48?

THE COURT: You may.

BY MR. MILLER:

Q. Agent, I'm handing you what is marked Government Exhibit 48 and ask if you recognize that.

A. Yes, it's the piece of metal that I recovered from the ditch in Hancock County.

Q. Could you please take it out of the wrapping so that the jury can see it a little bit better?

A. (Witness complied.)

MR. MILLER: And with the Court's permission, Your Honor, I'd like to ask the witness to display it -- publish to

the jury by simply stepping before the jury and getting close enough that they might be able to see it.

THE COURT: That's fine. You may.

BY MR. MILLER:

Q. And what did you do with that item now marked Exhibit 48 after you found it in the ditch?

A. I submitted it to the DCI criminalistics laboratory in Des Moines.

MR. MILLER: With the Court's permission, I'd like to publish Exhibit 49 at this time.

THE COURT: You may.

♀

994

BY MR. MILLER:

Q. Handing you the exhibit marked Exhibit 49 which is on the camera, can you tell us what that is?

A. Yes. This is a copy of the laboratory report prepared by Dennis Chapman.

Q. And looking at the bottom portion of it, does that document who submitted it and when?

A. Yes.

Q. Submitted by yourself on June 25 of '96?

A. Correct.

Q. And referring to the top, does it contain the laboratory findings?

A. Yes, it does.

Q. For the record, we've magnified that, and that is now visible to the jury.

A. It states that Exhibit A was found to contain a piece of galvanized steel with a small melted -- excuse me, with small melted beads of metal. Examination of the beads found them to

be made of iron. Origin of the metal -- melted metal could not be determined.

MR. MILLER: Thank you, ma'am. I have no further direct, Your Honor.

THE COURT: Mr. Spies?

MR. SPIES: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SPIES:

Q. Ms. Lewis, while we're on the subject --

MR. SPIES: If I may approach, Your Honor.

Q. -- Exhibit Number 28 --

THE COURT: Would you move that microphone, Mr. Spies? There. Thank you.

Q. In what I would call the northwest quadrant of Exhibit Number 28 there's a cut mark. Do you see that cut mark on Exhibit Number 28?

A. I would actually correct you. It's Exhibit 48.

Q. I'm sorry, 48.

A. I do see the cut.

Q. Okay. Does that appear to be made by a torch?

A. No, it appears to me to be made by some kind of a sharp device.

Q. And you've testified concerning Exhibit Number 49. This was Dennis Chapman's report of his analysis of metal droplets that were found on Government's Exhibit Number 48?

A. Yes.

Q. And it was Mr. Chapman's opinion that there could be no determination made about the origin of those droplets; is that right?

A. It indicates that he was not able to make the determination, that's correct.

Q. Did you have any follow-up involvement, Agent Lewis, in

other testing that was done on those metal droplets by the FBI crime laboratory or by the Ames laboratory?

A. No, I did not.

Q. That would have been either Agent -- Criminalist Chapman or someone else from the DCI crime laboratory?

A. Or -- I believe that was part of the investigation after Agent Basler became involved.

Q. All right. And are you aware of the results of those other investigations by the FBI crime laboratory or by the Ames laboratory about their testing of those droplets?

A. No, not specifically I'm not.

Q. Let me turn to another aspect of your investigation, Agent Lewis. You told us that you began your investigation in I think May of 1996?

A. That's correct.

Q. And including in that was the efforts to get tape recordings of Dustin Honken and Timothy Cutkomp during their interactions at work and at Mr. Honken's house.

A. Correct.

Q. Now, you told us that you took steps to equip Mr. Cutkomp with recording devices or transmitters that would assist in getting accurate reproductions of the recordings of the conversations between him and Dustin; right?

A. Yes.

Q. And you talked about using just an audio cassette recorder

and also a body bug which actually transmits the conversations to someone else who listens in?
A. Yes. I believe the DEA also used what they refer to as a Nagra. It's another tape recording type device.
Q. Did you personally assist Mr. Cutkomp in fitting himself with these recording devices?
A. No, not personally.
Q. Did you give him any instruction on how to use them?
A. I instructed him how to use the micro cassette recorder that I provided him at work.
Q. So you provided him with a cassette recorder at work but not the one that was used at Mr. Honken's home?
A. That's correct.
Q. Okay. And did you give Mr. Cutkomp some instructions on what kind of clothing to wear or where to hide this recorder in his clothing?
A. As far as the clothing at work was concerned, that as I recall is dictated by their work rules. I don't know where he secreted it on his person.
Q. Did Mr. Cutkomp tell you there were places at Kraft Foods where he and Mr. Honken would go where it was quiet?
A. Yes.
Q. And did you give him instructions on trying to record conversations in quiet places at Kraft Foods?
A. I did, yes.

998

Q. Did Mr. Cutkomp tell you that he had tried to record conversations 20 to 30 times?

A. I don't recall that. The only two days that I'm -- the only two days that we attempted to record conversations at work were the two days, the 18th and 19th of May.
Q. Did Mr. Cutkomp give you the cassette tapes each time after he tried to record a conversation with Mr. Honken at work?
A. He returned the entire unit back to me, the tape recorder and the tape.
Q. And did you have a role in actually trying to enhance the recordings to make them more audible?
A. No.
Q. Or do you know what steps were taken by the DNE or the Division of Criminal Investigation to try to enhance or make those tapes more audible?
A. No.
Q. Do you know whether they were digitized or filtered in any way to make them more audible?
A. I don't believe they were, no.
Q. Let me ask you about one other brief aspect of your investigation. You were involved in the search of Mr. Honken's locker at Kraft Foods, were you not?
A. Yes.
Q. And during the search in -- I think it was in June of 1996 you were able to retrieve several items from Mr. Honken's

♀

999

locker.
A. That's correct.
Q. And including magazines and books and other material that he had in his locker there at work.
A. Yes.
Q. You also retrieved an invoice for the purchase of some

books. Do you remember that?
A. Yes.
Q. And you also retrieved an order form for the purchase of some books.
A. That's correct.
MR. SPIES: Thank you. Those are all the questions I have, Your Honor.
THE COURT: Mr. Miller, any further questions on redirect?
MR. MILLER: No, Your Honor. However, we do request permission to recall the witness on another subject at a later time of trial.
THE COURT: You may.
You may step down.
Members of the jury, we're going to take our lunch break. I did want a little bit of guidance from you on this issue about whether to leave the window blinds open or closed. I like a lot of light in the courtroom, but I don't have to sit where you are looking directly at the windows. I understand

1000

that. And in other trials I've had, I've tried to get a sense of the jury. And some want them closed; some want them open. And so how many of you prefer to have them closed? Okay. We don't really run a democracy where majority rules very often, but I'll be closing them from now on. You want them closed all day long.
JUROR 636: They're okay in the morning.
THE COURT: Okay in the morning but close them in the afternoon?
JUROR 968: Forewarn us before you close them.

THE COURT: Give you a heads-up before I close them? Okay. Good.

It's almost 5 after. We'll be in recess until 12:50, 10 minutes to 1. We'll see you back at 10 minutes to 1. Please remember my cautionary instruction about keeping an open mind. Thank you.

(The jury exited the courtroom.)

THE COURT: Any matters we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: Not for us. Thank you.

THE COURT: Okay. Thank you.

(Lunch recess at 12:04 p.m.)

THE COURT: Ready to have the jurors brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. PARRISH: Yes, Your Honor.

♀

1001

THE COURT: Okay.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Williams, are you ready to proceed?

MR. WILLIAMS: I am, Your Honor. United States calls Marcy Hyde.

MARCY HYDE, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. Can you adjust the chair so you scoot it up so you can speak directly into the microphones? And you can pull those microphones back to get them as close as possible to you. And then would you state your full name, please, and spell your last name.

THE WITNESS: Marcy Hyde, H-y-d-e.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Miss Hyde, let's learn just a little bit about you. Where are you from, ma'am?

A. Garner.

Q. And how long have you lived in the Garner area?

A. Fourteen years.

Q. For those unfamiliar with north central Iowa, could you

explain where Garner is located in relation to Mason City?

A. It's west of Mason City.

Q. About how far roughly? Do you know? How long does it take you to drive there?

A. I take B20, so it takes me about a half an hour.

Q. Do me a favor if you would, Miss Hyde. These microphones only pick up if you're about three inches away from them, so scoot up just a little bit.

A. Okay.

Q. Excellent. Could you share with the jury the extent of your formal education. How far did you go through school?

A. I have a B.A. in finance and banking.

Q. And where did you get your -- that's a bachelor of arts degree?

A. Yeah.

Q. What school is that from?

A. Buena Vista.

Q. And are you currently employed?

A. Yes.
Q. And where at?
A. Kraft.
Q. Where is the Kraft facility at that you're working at?
A. Mason City.
Q. How long have you worked at Kraft?
A. It will be 14 years in -- thir -- 11 years in January.

1003

Q. And what do you do at Kraft?
A. I'm a quality support.
Q. Just give some idea to the jury, what do you do as quality support?
A. I take care of all the quality needs for the whole plant for B shift.
Q. And B shift, what is B shift?
A. We have four shifts, A, B, C, and D, and I'm on B shift.
Q. And when does B shift work?
A. Four on, four off, four days, four nights, 6 to 6:30 both times, vice versa.
Q. So walk us through that if you will. On a typical week, what do you mean by four days on, four days off?
A. We work 4 days, 6 to 6:30. Then we have 4 days off. And then we work 4 nights 6 to 6:30. Then we have 4 days off.
Q. And then it just keeps repeating that schedule.
A. Yes.
Q. All right. You began working then at Kraft Foods back in January of 1994?
A. Yes.
Q. And just give the idea to this jury who may not be familiar with this Kraft plant, what does the Kraft Foods plant in Mason

City, Iowa, produce?
A. Jell-O, pudding, cheesecake, pudding sticks.
Q. How large of a plant is it?

♀

A. It's pretty large. I don't know how many square foot but . . .
Q. Does it have one main building or multiple buildings?
A. Multiple buildings now. We put on a new building since . . .
Q. Roughly how many employees work up there?
A. Two hundred on the floor, and then there's probably thirty or forty staff I suppose.
Q. Do you know and did you meet at some point somebody by the name of Dustin Honken?
A. Yes.
Q. And when did you first meet him?
A. He started January 17, 1994, with me.
Q. Same day you started.
A. Yes.
Q. And could you explain to the jury when you first start at the Kraft plant, do you go through some type of orientation?
A. Yes.
Q. And you went through that orientation with Dustin Honken.
A. Yes, we did.
Q. During the course of that orientation, is that a one-hour, one-day, multiple-day orientation?
A. It was two weeks, but the first week we just sat in the conference room and meet with a lot of people and go over all sorts of OSHA stuff and team building things and meet everybody,

♀

more or less meet the staff, and then the next week we float on all four of the shifts to meet everybody and kind of get the layout of the plant.

Q. And because you started with Dustin Honken at the same time at this plant, did you get an opportunity to get to know him a little bit during that orientation period?

A. Yes.

Q. Did you talk about what brought him to work at the Kraft plant in 1994?

A. Yes.

Q. And what did he talk to you about?

A. He said that he was brought back to the state of Iowa because of a trial or something like that and that he couldn't leave the state of Iowa because of this missing person.

Q. He told you there was somehow a missing person?

A. Yeah.

Q. Did he tell you if he knew or had any connection to this missing person?

A. He said it was his best friend from Britt.

Q. That was missing.

A. That was missing.

Q. And what did he tell you about this missing best friend from Britt?

A. He just wanted to know if I had seen anything in the papers about this missing person and that I was to keep my ears open

1006

more or less and let him know if anybody was talking about the -- you know, the missing person.

Q. Did he indicate to you that he had been charged with

anything in relation to this missing person?

A. Yeah. He more or less said that he was charged -- I didn't know with what; I never really got that far into it -- but that his lawyer would get him off.

Q. Did he ever talk to you anything about the body of this missing friend of his?

A. During different -- I mean, this wasn't during orientation, but during the course we talked about it.

Q. Let me go there then. You were with him for a little bit during orientation. Do you continue to have a friendship with him, work relationship with him over the next -- from 1994 up through 1996?

A. Yes. I went to A shift, and he was on B shift, but then when I was going through my divorce, I transferred to B shift, so then I was working with him.

Q. And when was it that you would have shifted to B shift then?

A. It would have been in the summer of '95.

Q. All right. So at least from the summer of '95 until the spring of '96 you guys were working the same shift together.

A. Yes.

Q. And during the course of that, did your acquaintanceship

1007

and business relationship with Dustin Honken become more familiar?

A. Yes.

Q. Did you guys talk a lot together?

A. Yes, we did.

Q. During the course of those conversations, did he talk about money much?

A. Yes.

Q. And why don't you describe for the jury his conversations about money.

A. He just wanted a lot of money quickly, fast money.

Q. And that was a topic that he brought up?

A. He didn't want to work at Kraft very long. He wanted to get out of there and make quick money so that he could quit Kraft and go back to Arizona.

Q. So at some point he had told you he had come from Arizona.

A. Yes.

Q. Now, it's during the course of these ongoing conversations with him in 1995 and into 1996 do you continue to talk about this missing friend of his?

A. Yes.

Q. And it's in that course did he talk about the body of this missing friend?

A. Yes. At first he said that he -- for all he knows that the -- his friend was overseas having the time of his life. You

1008

know, he told me that in the beginning.

Q. And how did that change over time then?

A. Well, after, I mean, he wasn't found for a long time, you know, I -- I think I said, you know, he's gotta be dead by now, you know, and Dustin agreed.

Q. Was there ever a conversation of more than one body?

A. After it came out in the paper with the other bodies, I came back to sleever and asked him about the rest of them, and I remember asking him, Is there any more that, you know, are going to come out in the papers?

Q. And what did he say?

A. He said no, that there was no more.
Q. What was his attitude when he was talking to you about his missing friend?
A. Not really -- just nonchalant. Just -- there really wasn't any emotion or anything. He wasn't upset about it.
Q. Did he ever talk to you about what happened with the charges ultimately?
A. Yeah. When it came out in the paper that the charges got dropped, I think I was still on A shift when that happened. I'm not sure. But I remember covering off with him because -- he must have been on A shift, covering off and saying, I see it got dropped, and, you know, he was really happy that the charges got dropped.
Q. And this would have been approximately when?

A. I don't remember. I just remember talking to him like in a cover-off type thing, a five-minute thing.
Q. You were still on A shift, though.
A. I think. I'm not sure. Or maybe I was doing a trade or something. I don't know.
Q. All right. Let me take you then to 1996. Did you learn at some point that Dustin Honken had been charged with new drug charges in 1996?
A. Yes.
Q. And how did you learn about that?
A. The paper.
Q. Did you have a conversation with Dustin Honken about those new charges?
A. Yes, I did.
Q. And what did he tell you about them?

A. He said he'd get off again.
Q. Did he talk to you about what the evidence was against him?
A. Yeah. Well, I kind of -- before -- I knew it was drug charges, you know, during the course of our conversation so . . .
Q. Did he ever tell you about whether he had any witnesses against him on this new drug charges?
A. I read in the paper and I talked to him about Cobeen. I remember telling him that he better not come up dead or it's not going to look good for you.

♀

1010

Q. Did you know Cobeen?
A. No, I didn't. I just read it, that he was a Kraft temp in the paper and that he was an informant for the case.
Q. And when you told Dustin Honken he better not come up dead, what was his response to you?
A. He told me he wouldn't.
Q. Did you talk to Dustin Honken about how it was that he got caught on these 1996 charges at all?
A. With the drug lab in his house, the last one?
Q. Correct.
A. Yeah. I talked to him about the drug lab in his house.
Q. And what did he tell you about the drug lab in his house?
A. He said they didn't find much, they didn't' find enough.
Q. In the spring of 1996, were you aware of whether there were restrictions imposed by the court on Dustin Honken's movements?
A. Yes. In the paper it said he was to --
Q. Let me stop you, Miss Hyde. We can't have you repeat what you read in the paper.
A. Okay.

Q. From your personal knowledge talking with Dustin Honken, did you guys talk about any restrictions he might have had on his movements?
A. Yes. I asked him if I could see the monitoring device that he was supposed to wear, and he said that he didn't have to wear it at work, that he didn't have it on.

♀

1011

Q. And what monitoring device were you talking about?
A. The electronic monitoring device that the police put on him after he was arrested.
Q. Now, focusing on this time after he's on this release and he's charged, does he talk to you about John Graham?
A. Yes.
Q. Do you know John Graham?
A. Yes, I do.
Q. How do you know John Graham?
A. Through my husband now. It wasn't my husband then, but we were dating.
Q. Okay. And the person you were then dating, was there a friendship between him and John Graham?
A. Yes.
Q. And can you relate to the jury, what conversation did you have with Dustin Honken about John Graham?
A. He asked me where John Graham lived, and I told him that I didn't know where he lived.
Q. Did he ask you this one time, or did he talk to you about it more than once?
A. A couple of times. He had said that John Graham was at the prerelease trial and didn't want him to get out on bail. He was really angry that Dustin got out on bail.

Q. And so it's in that context that he asked you where John Graham lived?

A. I'm not sure if that was the one -- I mean, we had several conversations about John Graham, so I'm not sure which one, but he did ask me where he lived, and I told him that I didn't know.

MR. WILLIAMS: No further questions. Thank you.

THE COURT: Mr. Spies?

MR. SPIES: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SPIES:

Q. Good afternoon, Ms. Hyde.

A. Hello.

Q. My name is Leon Spies. I'm one of Mr. Honken's lawyers. I have just a few questions for you.

Ms. Hyde, you've described for us here the working situation at Kraft Foods where you and Mr. Honken worked together and you both started working at Kraft in January of 1994. Am I right?

A. Yes.

Q. And you worked together at Kraft for how long? How long did Mr. Honken continue to work there?

A. He was arrested in June of '96. I don't . . .

Q. And that would have been the last time he worked there after his arrest -- or prior to his arrest?

A. That's the last time he worked there.

Q. Yes.

A. Yeah, I -- yes.

Q. Okay. Now, would you -- would it be fair to say that the employees that work together at Kraft develop a close-knit relationship?
A. Yes.
Q. In other words, you get to know one another personally if you work together a lot. You get to know about one another's families, family situations, things like that?
A. Yes.
Q. And are the working conditions at Kraft such that families can actually come and visit the employees during breaks and during lunchtime?
A. Yes.
Q. And it was in that sort of a framework that you got to meet some of Mr. Honken's children; right?
A. Yes.
Q. And you would see significant others in his life come to work, have lunch or have dinner with Mr. Honken?
A. Yes.
Q. And you'd see Mr. Honken interact with his children?
A. Yes, I did.
Q. And he was proud of his children, and he talked to you about his children a lot?
A. Yes, he did.
Q. Okay. Another side light of working conditions being like that is that there are a lot of rumors that fly through the

♀

1014

workplace; would you agree?
A. Yes.
Q. And there were a lot of rumors about Mr. Honken.

A. Yes.
Q. And he was concerned about what people were saying about him behind his back.
A. Yes, he was.
Q. And, in fact, he told you, didn't he, Ms. Hyde, that he was concerned about what people were saying about him behind his back?
A. Yes.
Q. And he asked you to kind of let him know what people were saying.
A. Yes.
Q. That you would be his ear out on the floor.
A. Yes.
Q. But you weren't spreading any rumors about Mr. Honken, were you?
A. No. I never, ever talked to anybody else about Dustin, about the case and all that, you know.
Q. Let me ask you just a few questions about what you just told us here this afternoon about Mr. Honken and his case. Now, he told you that he had come up here because there was an investigation being conducted into what? His drug activity? Is that right?

1015

A. Yes.
Q. And you'd read about that in the paper, hadn't you?
A. Yes.
Q. And he also told you that the case involved some missing witnesses or a missing witness?
A. A missing person, yes.
Q. And had you read about that in the paper too?

A. I hadn't before he told me, but then later I had.
Q. Okay. And did you discuss with Mr. Honken what you read in the paper about him?
A. Yes.
Q. You did?
A. Yes, on several occasions.
Q. All right. And this was at about the same time that he was concerned about what other people might be reading in the newspaper about him.
A. Yes, because every time another article came out about him, he would get nervous about it and talk to me about it.
Q. Yeah. And what people were saying and the rumors that were going around the Kraft plant.
A. Yes.
Q. Okay. Now, you mentioned to us this afternoon that the subject of bodies came up, and had you read in the newspaper about bodies being found?
A. Not being found but missing persons.

1016

Q. So it wasn't about bodies. It was about missing persons.
A. Well, missing persons, yes.
Q. That's an important distinction. You would agree with me?
A. Okay. Yes.
Q. So the conversations that you had about -- with Mr. Honken was not about bodies but about people missing?
A. We also talked about where these bodies might be, and I asked him if he thought they had cement feet in Clear Lake.
Q. And you also mentioned that Mr. Honken said something about one of these persons being overseas having a good time?
A. Yes.

Q. Let's talk about the conversations about Mr. Graham. Did you personally know Mr. Graham at the time that Dustin talked to you about Agent Graham?
A. Yes.
Q. And there was somebody in your life named Brenda?
A. Yeah. Randy's sister is Brenda.
Q. And Agent Graham was friends with Brenda?
A. Yes.
Q. So you knew that Agent Graham had a connection to a significant other in your life.
A. Yes.
Q. And Mr. Honken told you that Agent Graham had testified at a hearing that he had in court to determine whether or not he could be released on pretrial release?

1017

A. Yes.
Q. And you knew, of course, that Dustin was out on pretrial release and that he was subject to electronic monitoring.
A. Yes.
Q. Did he ever show you the electronic monitoring device?
A. No, he didn't. I asked him if he would, and he said he never had it on.
Q. He never put down his sock and showed you where this device was at?
A. No.
Q. So he asked you if you knew where Agent Graham lived?
A. Yes.
Q. And you said no?
A. I did not know.
Q. But you thought that Agent Graham lived near where Brenda

lived?
A.    Yes, because his dog was at Brenda's house, and my husband and I were over there, so Randy called John to come and pick up his dog, and he was there within a minute.
Q.    Okay.  So you knew roughly where Agent Graham lived.
A.    Yeah, the vicinity.
Q.    And Mr. Honken told you that Agent Graham had testified in court; right?
A.    Yes.
Q.    And then he also told you, did he not, that he was curious

♀

1018

about where Agent Graham lived because he kept bumping into him.
A.    Yes.
Q.    And he was bumping into Agent Graham when he, Dustin, was going to and from work.
A.    Yes.
Q.    And he thought that that was curious.
A.    He thought that Agent Graham was following him.
Q.    Yeah, but he thought he must have lived nearby because he kept running into him.
A.    Yes.
Q.    Okay.  Now, you never heard Dustin threaten Agent Graham, did you?
A.    No.
Q.    In fact, you never heard him talk about harming anybody.
A.    No.
Q.    While you were working there at Kraft, you told us that the name Cobeen came up?
A.    I read it in the paper.
Q.    Excuse me?

A. I read it in the paper.
Q. Oh, okay. But you never heard Dustin say Cobeen.
A. No.
Q. That was something you read in the paper. And was that something that was kind of in the rumor mill at Kraft?
A. Yes.

♀

1019

Q. All right. In the people in Dustin's life that you got to meet, did you ever get to meet Angie?
A. I seen her at a company picnic, but I never talked to her.
Q. Angie would sometimes bring their daughter to the plant for Dustin to interact with?
A. I never seen Angie bring the little girl. Only at the company picnic I seen Angie.
Q. Okay. In the conversations that you and Mr. Honken would have, though, about his family, he talked to you about Angie, didn't he?
A. Yes.
Q. And he told you --
MR. WILLIAMS: Objection, Your Honor. Hearsay.
THE COURT: Well, you can go ahead and ask -- why don't you go ahead and ask the question. And then we'll see about your objection.
BY MR. SPIES:
Q. Well, in the conversations that he had about his family and about his children and his significant others, he would talk about Angie.
A. Yes.
Q. And just as he talked about the people that were -- that he was concerned about, about the people -- what people were saying

about him, he would talk about Angie in those respects too; right?

A. Yes.
Q. Did Dustin sometimes go to places in the plant to make phone calls?
A. Yes.
Q. And did he tell you that he was going to go call Angie to find out how their daughter was doing?
A. Yes.
Q. Now, did Dustin tell you that he was worried about Angie?
A. Yes.
Q. And that he was concerned because she was violent?
A. Yes.
Q. Did Dustin also tell you that he was afraid that Angie might kill him?
A. Yes.
Q. Did you share -- have a locker there at Kraft?
A. Yes.
Q. And was your locker nearby where Dustin's locker was?
A. For uniforms or what?
Q. Well, I think you had lockers where you could keep things like, you know, your personal belongings, lunches, reading materials, tools.
A. There's a girls' locker room and a boys' locker room so . . .
Q. I gotcha. So you wouldn't have been near Dustin's locker.
A. No.

MR. SPIES: Thank you. Those are all the questions I have, Your Honor.

THE COURT: Mr. Williams?

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Miss Hyde, this Brenda, where was she living at back in 1996?

A. I don't know the address.

Q. Do you remember what the street was?

A. No.

Q. Do you remember whether it was near 17th Street?

A. No.

Q. And do you know what type of vehicle John Graham was driving back then?

A. No.

MR. WILLIAMS: Nothing further.

THE COURT: Mr. Spies, anything further?

MR. SPIES: No. Thank you, Your Honor.

THE COURT: You may step down.

MR. WILLIAMS: United States calls Belen Kappelmann.

BELEN KAPPELMANN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Make yourself comfortable. And can you please try and adjust the chair so you can speak directly into those microphones. Get you to scoot it up a little bit. And would you state your full

1022

name, please, and spell your last name.

THE WITNESS: It's Belen Ann May Kappelmann, K-a-p-p-e-l-m-a-n-n.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. And for the court reporter, Belen is spelled B-e-l-e-n?

A. (Witness nodded head.)

THE COURT: You'll have to answer out loud.

A. Yes, correct.

THE COURT: Thank you.

Q. Thank you. Miss, I just want to learn a little bit about you and have you share some information with the jury about your background. Where are you from originally, ma'am?

A. I was born in Seoul, Korea.

Q. And -- go ahead.

A. And then I was adopted when I was three and lived in Minnesota.

Q. Could you do me a favor, Miss? These microphones only pick it up if you're within about three inches, so if you could either move those or move your chair a little bit closer.

So you lived in Minnesota -- I'm sorry -- from the age of three until approximately when?

1023

A. Eighteen.

Q. And at some point you came to Mason City, Iowa.

A. Yes.

Q. And when was that?

A. Probably about, oh, '87, 1987.

Q. And have you lived in the Mason City, Iowa, area since then?

A. No. I've moved from Mason City area in '99, 1999.

Q. And then what?
A. Moved to Monroe, Iowa.
Q. All right. And you've lived in Monroe since 1999?
A. Correct.
Q. Very good. And I want focus on 1996. You were living in Mason City at that time?
A. Correct.
Q. Were you working someplace?
A. Yes, Kraft Foods.
Q. Kraft Foods?
A. Yeah.
Q. And what were you doing at Kraft Foods?
A. At that time I was in the process area.
Q. And did you have a different last name back in 1996?
A. Yes, it was Butterfield.
Q. And at some point in your employment at Kraft Foods, did you meet somebody by the name of Dustin Honken?

1024

A. Yes.
Q. Can you share with the jury how did you end up meeting him?
A. He just came in as a new hire and, you know, started working there. He wasn't in my area, so I didn't know him, you know, personally.
Q. When you first -- when he first started working there, you were already employed by Kraft?
A. Correct.
Q. Okay. And he started in 1994. Does that fit with your recollection?
A. That sounds about right.
Q. From 1994 through the beginning of 1996, did you and he

become acquainted over the course of that time period?
A. Yeah, just over time.
Q. And can you describe for the jury a little bit, by 1996, by the spring of 1996, how would you describe the relationship you had with Dustin Honken?
A. Just -- I don't know -- casual friends.
Q. Did you learn a little bit about his background?
A. I didn't know a lot about his background, no.
Q. Did you know whether he had girlfriends?
A. Oh, yeah, yeah.
Q. And who did you understand he had -- was his girlfriends?
A. At that time Kathy Rick was in the picture somewhere and Angie Johnson.

♀

1025

Q. Did you learn whether he had any children?
A. What was that?
Q. Did you learn whether he had any children?
A. Yes, I did.
Q. And what did you find out?
A. That he had one by each one of the girls.
Q. Did you ever end up babysitting for him?
A. Yes, I did.
Q. How many times?
A. Just once.
Q. And who was that -- was it for one of the two children?
A. Yeah, it was for Marvea.
Q. And who's Marvea's? The child of which? Kathy Rick or Angie Johnson?
A. Angie.
Q. Directing your attention to February of 1996, did you learn

that law enforcement officers had conducted a search at Dustin Honken's house?

A. I can't recall if it was February.

Q. I'm sorry?

A. I can't recall if it was February to be sure.

Q. Okay. Do you recall at some point in 1996 learning --

A. Yeah.

Q. -- that officers had searched his house?

A. Yes.

♀

Q. All right. And did you have any conversations with Dustin Honken about that search at his house?

A. No.

Q. Did -- at some point in the spring of 1996 did Dustin Honken ask you to do him a favor?

A. Yes.

Q. And what was that favor?

A. He just wanted to know if he could have some -- a book or books sent to my address in Mason City.

Q. Did you ask him why?

A. No, I didn't.

Q. Did he explain to you why he didn't just have those books delivered to his address?

A. I never questioned it. I just -- I just figured he didn't want one of his girlfriends -- to have it delivered when one of his girlfriends was there at whatever address, so I didn't question it. It didn't bother me.

Q. So when he asked you if you would agree to have some books delivered to your address, did you agree to do that?

A. Yep, I did.

Q. And were books ultimately delivered to your address?
A. Yes.
Q. Do you recall how they were delivered? Was it U.S. Mail? Was it a commercial --
A. Well, I wasn't there when they were actually delivered

because I believe at the time I was -- I was picking up my daughter from preschool, and so then when we came back to the house, my house, they were at the back door just sitting there at the back door.
Q. What did you do with those -- with the package?
A. I just put it in my car in the backseat.
Q. And then what?
A. And then I went in the house and called up Dustin. I remember telling Kayla not to take off her coat because I didn't want to have to pack her back up and just called Dustin and just told him that his package arrived and took it over there.
Q. Took it over where?
A. To his residence in Mason City.
Q. And do you remember where he was living at that time?
A. I think it was the northeast part of town.
Q. And do you know, was anybody living with him at that point?
A. I thought it was Kathy Rick's place and his place.
Q. So you understood that to be where Kathy Rick lived as well.
A. Correct.
Q. When you got there, was anybody there?
A. Yeah. Brandon, Kathy's boy, and Ryan, Dustin's boy with Kathy.
Q. All right. And was Dustin Honken there?

A. Yes.

Q. And when you got there, did you hand him the package?
A. Yes, I did.
Q. And what did he say?
A. He just said, Thanks.
Q. Did he ever explain to you what was in the package at all?
A. No, he didn't.
Q. Did you get anything for doing this favor for him?
A. No.
Q. Did you ever ask him why he just didn't have the package delivered to Kathy Rick's house?
A. No, I didn't.
Q. How large was the package?
A. I'd say it was probably a little bit larger than notebook size.
Q. Okay. And from the weight of it, could you tell -- to you did it seem like it had one book, multiple books in it, any idea?
A. I wouldn't be able to tell for sure because one book can feel like two books.
Q. Certainly. Did it feel heavy enough to be a book?
A. Yes, it did.
Q. Did you ever have another conversation with him at all about these books that were delivered that you provided to him?
A. No.
Q. Now, he asked you to do this favor one time?

A. Yes.
Q. Did he ever ask you to do it again?
A. No.
Q. Did you ever receive any other packages from him or for him?
A. No, I didn't.
Q. In the two years you'd worked there before, had he ever asked you to receive packages for him?
A. No, he didn't.
Q. This is the first time in two years?
A. Yep.
Q. And this is after law enforcement officers had searched his house.
A. I don't know for sure.
Q. Okay.

MR. WILLIAMS: Your Honor, may I approach?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Ma'am, I'm going to show you what's been marked as Government's Exhibit 235. Have you ever seen this before today?
A. No, I haven't.
Q. I want you to take a look at the upper left-hand corner. Is that your name on there?
A. Yes, it is.
Q. The address on there, do you recognize that address?

1030

A. Yes.
Q. What address was that?
A. It was my address in Mason City.
Q. Back in 1996?

A. Correct.
Q. All right. And if you could take a look at Exhibit 236, have you ever seen that before?
A. No, I haven't.
Q. Again, I'd like you to take a look at the upper left-hand corner. Is your name there?
A. Correct.
Q. And that address, do you recognize that address?
A. Yep, it's the same address as on the other one.
Q. All right.
MR. WILLIAMS: I have nothing else, Your Honor.
THE COURT: Mr. Spies.
MR. SPIES: Thank you, Your Honor.
THE COURT: You may cross-examine.
CROSS-EXAMINATION
BY MR. SPIES:
Q. Good afternoon, Miss Kappelmann. My name's Leon Spies. I'm one of Mr. Honken's lawyers. I have just a couple of very short questions for you.
A. Okay.
Q. You told us you had babysat for Dustin, and this would have

1031

been babysitting for little Marvea, Dustin's daughter with Angie?
A. Correct.
Q. And when you were babysitting for Dustin, did Dustin come and then you went home, or who relieved you from your babysitting responsibilities?
A. Angie showed up.
Q. Was she surprised to see you babysitting for Marvea?

A. She seemed like it, yeah.
Q. How did she seem like she was upset -- I mean surprised?
A. Well, she came in the door, and I had my daughter with me, and she was already asleep on the couch, and I was just sitting watching TV, and she came in and she goes, What the hell you doing here? So I was kind of startled by that.
Q. Okay. Now, let me ask you just a little bit about working with Dustin. Did you work side by side with Dustin at Kraft?
A. No, I did not.
Q. Did you even work in the same areas, or how did you work together?
A. The only time I really dealt with him at work was when he would need supplies at whatever machine he was working on because sometimes I would work in materials and be on line supply, so if he called up, you needed glue or cases or something, then I might have done that.
Q. Okay. And as I understand it from testimony that we just

♀

1032

heard from Marcy Hyde -- by the way, do you know Marcy Hyde?
A. Yes.
Q. -- that you would work 12-hour shifts at Kraft?
A. Correct.
Q. And during those shifts, you would get to have breaks to either take a rest, have lunch, or whatever?
A. Yes.
Q. And could you have your family visit you at Kraft?
A. Oh, yeah.
Q. And did you ever see Dustin's families come to visit him?
A. I don't -- I can't recall.
Q. Did you and Dustin talk about his children?

A. Oh, yeah.

Q. And you mentioned I think a Brandon and Ryan were at Kathy Rick's place, and those were two children that Dustin was fond of and obviously loved.

A. Correct.

Q. Okay. Now, let's talk about the order forms that Mr. Williams just asked you about. You said that there was one time when Dustin asked you to accept some books that he had ordered; is that right?

A. Correct.

Q. And did you have anybody living with you at your home at that time?

A. Yeah, my father was still there.

♀

Q. And was your father at your home throughout the day?

A. For the -- well, when he wasn't in the hospital, yeah, he was there.

Q. So he had some health difficulties, and you were caring for him in your home?

A. Correct.

Q. Okay. And as I understand it, you didn't think there was anything strange or peculiar about Dustin asking you to have these things sent to your house?

A. No, I guess because I would have done it for anybody. It didn't bother me so . . .

Q. Nothing unusual about it.

A. No, it didn't, you know, alarm me I guess.

MR. SPIES: Okay. Thank you. I have no other questions for you, Miss Kappelmann.

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: No, Your Honor.

THE COURT: Thank you. You may step down.

MR. WILLIAMS: United States calls Robert Riepma.

ROBERT RIEPMA, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Make yourself comfortable. And could you scoot that chair up and speak directly into the microphones? And state your full name, please, and spell your last name.

THE WITNESS: Robert Allen Riepma, R-i-e-p-m-a.

♀

1034

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Good afternoon, Mr. Riepma.

A. Good afternoon.

Q. Could you tell the jury where are you from, sir?

A. Clear Lake, Iowa.

Q. And how long have you lived in the Clear Lake, Iowa, area?

A. Approximately 21 years now.

Q. Twenty-one years in that same area? How far did you go through school, sir?

A. Not quite a two-year degree in college.

Q. Where did you attend college at?

A. Iowa Lakes Community College.

Q. Now, have you been employed steadily at the same job for a while, sir?

A. Just about 11 years.

Q. And where is that at?

A. Kraft Foods in Mason City, Iowa.
Q. What do you do for Kraft Foods?
A. I run a production machine.
Q. I want to direct your attention to 1994 and thereafter.
Did you come to know somebody by the name of Dustin Honken?
♀

A. Yes, sir.
Q. How did you come to know him?
A. I started there in the last part of '93, and then I was training new people when they came to work there. And for approximately the first six months that Dustin was there, I worked with him and trained him on a machine.
Q. Did you know him before he started at Kraft Foods?
A. No.
Q. During the time period, the first six months you trained him, thereafter, did you have contact with him through the spring of 1996?
A. Just at work, when he was at work. That's it.
Q. Right. And I guess that's what I was focusing on. Did you guys work near each other between 1994 and 1996?
A. We were on the same shift, but I was on a different machine area.
Q. And during breaks would there be time where people from different areas would be able to get together and have contact with each other and so forth?
A. Yes.
Q. And you had contact with Dustin Honken in that manner?
A. Yes, correct.
Q. During the course of the two years from 1994 through the spring of 1996, did you -- well, why don't you describe for the

jury if you would what was the nature of the relationship you

had with Dustin Honken? How would you describe it?
A. Well, we got along, you know, as coworkers and stuff. And like I said, I trained him for the first six months. Then it was just I guess when you periodically have breaks together and work the same shift, it's just, you know, conversation along those work frame.
Q. And during -- in that context, did you get to know him a little bit?
A. A little bit, yes.
Q. Did you ever talk to him about criminal charges from 1993?
A. When he first started there, he showed me some handwritten papers that were about some court charges or charges that were held against him.
Q. What did he tell you about those?
A. He just told me that there were witnesses about this paper that they didn't show up to testify against him and everything was dropped.
Q. And did he tell you anything about those witnesses then?
A. No, he did not.
Q. Did he tell you about whether the witnesses ever showed up?
A. He just said that the paper said that the witnesses didn't show up so he was free.
Q. Now, a little bit about your side interests here. Do you have a side interest in different types of weapons, sir?
A. Yes, I do quite a bit of hunting, and I collect some guns.

Q. And just describe for the jury the nature of your

collection activity. First of all, it's been over the course of a number of years that you collect weapons and hunting rifles and so forth?

A. Probably over the course of 20 years I've been pretty much collecting some, keeping some and buying some for resale to sell again.

Q. So you kind of buy and trade some weapons.

A. That's correct.

Q. Any particular type of weapons that you've kind of concentrated on at all?

A. I have a lot of black powder guns right now, a number of shotguns because of my hunting, and I had some -- a number of assault rifles.

Q. Back in 1996 did you collect a number of or did you have at that time some assault rifles as well?

A. Yes, sir.

Q. I want to talk to you about a weapon called an SKS assault rifle. Are you familiar with those weapons, sir?

A. Yes, I am.

Q. Can you tell the jury a little bit about what those are?

A. It's a Chinese army rifle. The ammunition is a 7.62 by 39 shell. They're semi-automatic. Most of them have a wooden stock unless they've been converted over to a synthetic stock. And they're a small -- a small-caliber, high-powered rifle.

1038

Q. And it was used -- manufactured by the Chinese.

A. Yes, sir.

Q. Is it a military weapon?

A. Yes, sir.

Q. You said it's semi-automatic. Can you just describe for

our jury -- perhaps they don't know what that means. What is a semi-automatic weapon?
A. A semi-automatic weapon is where you can put a number of shells in a magazine, and once the magazine is loaded, every time you pull the trigger, it fires a shot and automatically loads the chamber for the next round, for the next shot.
Q. And how is that compared to a fully automatic weapon?
A. A fully automatic weapon, when you pull the trigger, it continues to fire until the magazine is empty.
Q. With one trigger pull.
A. Yes, sir.
Q. Now, in the course of your collection over the years of weapons and your trading of weapons, are you familiar with publications that would teach you how to convert a semi-automatic assault rifle to an automatic assault rifle?
A. I have not read publications, but they are out there, yes.
Q. You've seen them advertised.
A. Yes, I have.
Q. And is it to your knowledge legal or illegal to possess a fully automatic firearm?

1039

A. To my knowledge unless you have a certain firearms permit it's illegal.
Q. Did you ever sell any weapons to Dustin Honken?
A. Yes, sir.
Q. What did you sell to him?
A. I sold him an SKS Chinese Paratrooper army rifle.
Q. When did you sell that to him in the best of your recollection?
A. I'm thinking it was the late summer or fall of '95.

Q. Now, is that a weapon that would be typically used for the purpose of hunting?
A. It could be, yes.
Q. And did you have any discussions with Dustin Honken about why he wanted a Chinese military assault rifle?
A. No, sir.
Q. Did he give you any explanation about why he wanted one?
A. No, sir.
Q. Could you describe the weapon for the jury that you sold to him? You say it was an SKS assault rifle. What features did it have on it, sir?
A. This one had a wooden stock, approximately 40 to 44 inches long. It had a banana clip which the normal clip on the gun holds ten rounds. The banana clip holds 30. And the gun also had a bayonet on the front of the gun.
Q. Do you ever go hunting with a bayonet?

♀

1040

A. No, sir.
Q. The weapon had a 30-round clip. Did you sell him any ammunition to go with this firearm, sir?
A. I sold him four boxes of ammunition.
Q. At some point you were interviewed by law enforcement officers about the weapon that you sold to Dustin Honken. Is that accurate, sir?
A. Yes, sir.
MR. WILLIAMS: May I approach, Your Honor?
THE COURT: You may.
BY MR. WILLIAMS:
Q. Showing you Exhibit 227, do you recognize that, sir?
A. Yes, sir.

Q. And what is that?
A. That is my drawing of an SKS rifle that I sold Dustin.
Q. And is that -- I'm sorry. That's 227. And is that a drawing that you provided law enforcement officers at their request?
A. Yes, sir.

MR. WILLIAMS: United States would move to admit Exhibit 227 into evidence, Your Honor.

* * * *

(Government Exhibit 227 was offered.)

* * * *

THE COURT: Any objection?

1041

MR. ROGERS: No objection, Your Honor.

THE COURT: 227 is received.

* * * *

(Government Exhibit 227 was admitted.)

* * * *

MR. WILLIAMS: Permission to publish, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:
Q. Is that your drawing that's appearing on the screen there?
A. Yes, sir.
Q. You indicated earlier that you had sold four boxes of this ammunition. How many rounds of ammunition are in a given box, sir?
A. There are 20 rounds in a box.
Q. And I'm going to show you -- I'm showing you what's already been admitted as Government's Exhibit 9A. Do you recognize that weapon in the photograph to the right there?

A. Yes, sir.
Q. And what is that?
A. That is an SKS army rifle.
Q. Now, can you tell from looking at 9A whether there's any differences between the SKS assault rifle in 9A compared to the one that you sold Dustin Honken?
A. The one that I made the sketch of has the banana clip in it which holds 30 rounds, and the picture of the other one does

♀

not. It has the clip that holds ten.
Q. Any other differences, material differences, that you see, sir?
A. Just that the picture of the one has brackets where you'd mount a strap on. I don't think I have those on my drawing.
Q. Do you remember whether the one you sold Dustin Honken had the ability to put a strap on it?
A. I think it had the ability, but I'm not sure if the strap was with it.
Q. And just to be clear, an SKS, the one you sold to Dustin Honken, had a wooden stock on it and a wooden frame just like the one we see on 9A?
A. Yes, sir.
Q. Now, was any paperwork created when you as a private individual sold a weapon to another private individual? Did you generate any paperwork as a result of that?
A. No, sir.
Q. You weren't a licensed firearms dealer selling for a profit.
A. No, sir.
Q. How much did Dustin Honken pay you for that assault rifle?

A. $250.

Q. And what form did he pay you for that?

A. If I remember correctly, he gave me 200 cash, and then later on he gave me $50 more.

♀

Q. And cash again?

A. Yes.

Q. Did you ever have any other conversations with Dustin Honken about wanting to buy additional firearms from you?

A. No, sir.

Q. At some point -- let me ask you this. Do you know somebody by the name of Rick Held?

A. Yes, I do.

Q. Who is he?

A. He's on the same shift and works at Kraft with me in a different area of the plant but the same shift and time period as I work.

Q. And was he working there back in 1996?

A. Yes, sir.

Q. Have you ever sold any firearms to Rick Held?

A. Yes, sir.

Q. And what firearms have you sold to him?

A. I sold him a semi-automatic 380 pistol.

Q. Can you describe that pistol, please?

A. It's approximately five inches long. It has a clip that holds five shells. And I think it was made by Davis and it was chrome with black handles.

Q. Do you remember approximately when you would have sold that -- and this is a handgun?

A. That's correct.

Q. -- when you sold that handgun to him?
A. It was either early or summer of '96 I think. I'm not real sure on the time.
Q. And why was -- did Mr. -- what was your understanding of why Mr. Held wanted to purchase a handgun from you?
A. I don't know, sir.
Q. Did he ever give you an explanation for what he was going to use the weapon for?
A. No, sir.
Q. How much do you recall him paying you for that weapon?
A. $180.
Q. Now, the person Dustin Honken to whom you sold a Chinese military assault rifle, do you see him in the courtroom here today, sir?
A. Yes, I do.
Q. Can you describe for the jury where he's sitting and what he's wearing?
A. He's sitting to my left in sort of a light brown shirt, brown, beige shirt.

MR. WILLIAMS: Thank you. No further questions, Your Honor.

THE COURT: Mr. Rogers?

MR. ROGERS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. ROGERS:

Q. Good afternoon, sir. How are you?

A. Good afternoon.

Q. My name's Charles Rogers. I'm one of Mr. Honken's lawyers, and I just have a few questions for you.

Let's talk a little bit about this SKS rifle. Calling your attention, first of all, to Exhibit 9A, can you see that there? And this shows the bayonet; is that correct?

A. That's correct.

Q. And I assume that's detachable?

A. Yes.

THE COURT: Mr. Rogers, could you slide that microphone a little closer to you? Thank you.

Q. I'm sorry. I assume that's detachable?

A. Yes, detachable if you remove a screw.

Q. And I guess if you wanted to fix bayonets in a combat situation, you'd rotate down and point forward?

A. That's correct. If you pull the bayonet in the position that the picture is right now, if you would grab the bayonet and pull it towards you, it's sort of locked in a pivot point, and it would either lock straight down or it will lock straight ahead.

Q. Okay. And this is the wooden stock; is that correct?

A. That's correct.

Q. Now, you said something about stocks being converted to synthetic stocks?

♀

1046

A. Yes, sir, for hunting.

Q. And that's not an uncommon thing with the SKS, is it?

A. No, sir.

Q. In fact, you have bought and sold SKS rifles with synthetic stocks, haven't you?

A.    Yes, sir.
Q.    And it's fairly easy to convert, isn't it?
A.    Yes, sir.
Q.    There are just a few screws that you remove that hold the mechanism of the rifle to the stock, and then you can attach other types of stocks; correct?
A.    That's correct.
Q.    The one that you sold Mr. Honken you said was a Paratrooper model?
A.    Yes, sir.
Q.    And that is shorter than the --
A.    It's approximately -- I'm not sure -- but four to six inches shorter than the one that the foot soldier carried.
Q.    Right, the infantry model I guess we'd call that.
A.    Yes, sir.
Q.    So -- but either of them could be converted -- and that's shorter in barrel length; right?
A.    Yes, sir.
Q.    Okay.  Either can be converted to have different types of stocks.

A.    Yes, sir.
Q.    The advantage of a synthetic stock is that it is lighter to carry.
A.    It is lighter, and in hunting it's a dull black so like for camouflaging or not reflecting as well.  In this case the wood would be different.
Q.    Right.  So you're not going to get sheen off it like you would in this photograph here.
A.    And the synthetic stock might have a Monte Carlo stock like

for the cheek for better shooting.
Q. And there are also synthetic stocks that are folding stocks?
A. That's correct.
Q. And there are synthetic stocks that are shaped basically like the wooden stocks.
A. Yes, sir.
Q. And there are synthetic stocks that have like pistol grips even on them.
A. Yes, sir.
Q. And all of these are readily and legally available to modify an SKS --
A. Yes, sir.
Q. -- Chinese military rifle.
A. Pretty much every sporting store you can get them.
Q. And there's nothing illegal about any of that stuff.

A. No, sir.
Q. It's not like converting a semi-automatic rifle to a fully automatic rifle which would be illegal.
A. Yes, sir.
Q. Now, you said this fired a 7.62-millimeter round?
A. I'm pretty sure it's 7.62 by 39.
Q. Is that the same round that's fired, for example, in the American M14 rifle?
A. I don't think so. I'm not sure.
Q. Okay. That's what they gave me in the Army, but I don't know how long it was. It was 7.62 in diameter.
A. I'm not sure if that's -- the 7.62 is the millimeters, the width, the shell or the length. I'm not sure.

Q. I think 7.62 is the diameter of the shell, of the bullet.
Anyway, having said that, you thought that Mr. Honken was buying this rifle for hunting purposes; is that correct?
A. I would not doubt that.
Q. In fact, you talked, oh, about a year and a half ago with an investigator by the name of Delbert King who came to your home?
A. Yes.
Q. And you told him that you thought it was -- that Mr. Honken had an interest in hunting and wanted the gun for that purpose?
A. Well, I talked a lot about him in our work time about hunting and stuff.

1049

Q. And that was not an uncommon topic of conversation not only with you but with almost everybody who worked there at Kraft.
A. That's correct.
Q. I mean, you're there for 12 hours at a stretch; right?
A. Yes, sir.
Q. Sometimes all night long.
A. Yes, sir.
Q. From 6:30 at night till 6:30 in the morning or vice versa?
A. Yes, sir.
Q. And you're working side by side, and you talk.
A. Yes, sir.
Q. And one thing people do in northern Iowa and southern Iowa and western Iowa, every place else, is hunt; right?
A. Yes, sir.
Q. And that's a very common topic of conversation.
A. Yes, sir.
Q. And, in fact, this is a rifle which people frequently would

use for deer hunting, for example.
A. Not deer hunting.
Q. What would you hunt with this rifle?
A. Be for more like fox or coyote. You can't hunt with a rifle in Iowa.
Q. Oh, you can't hunt deer with a rifle?
A. No, sir. Black powder rifle, not a high-powered.
Q. See, I'm from Missouri, so I don't know. In Missouri you

♀

1050

can hunt deer with rifles.
A. Yes, sir.
Q. Okay. How about Minnesota?
A. I don't think you can in Minnesota, but you can in Wisconsin. I'm not sure about Minnesota.
Q. Okay. So if you wanted to go hunting with this rifle, you'd have to go to another state at least.
A. If you're hunting for deer.
Q. If you're hunting for deer.
A. Yes, sir.
Q. See, I've learned something today.
So during the conversations you had with Mr. Honken over the years you both worked at Kraft, he had expressed and discussed hunting quite a bit like everybody else up there?
A. I had talked a lot to him about my hunting experiences and my hunting, yes.
Q. And he was interested.
A. Yes, sir.
Q. Okay. Let me ask you this. The clip that you drew on the picture was what's called a banana clip; right?
A. Yes, sir.

Q. Kind of a curved looking one?
A. The shape of a banana, yes, sir.
Q. And that holds 30 rounds?
A. Yes, sir.

Q. And those are also readily available at sporting goods stores and those places?
A. Yes, sir.
Q. And that probably wasn't standard issue with the Chinese paratroops; right?
A. I don't know if it was or not, sir.
Q. Okay. How many rounds per minute could this rifle fire if it were fully automatic?
A. I'd just be estimating or guessing. If it were fully automatic?
Q. Right.
A. If it were fully automatic, it would probably discharge 30 rounds in a matter of a couple seconds, maybe 3 or 4 seconds at the most.
Q. All right.
A. If it were fully automatic.
Q. And so if you'd do 30 rounds in 4 seconds, then you'd do 15 times 30 in a minute. Is that fair?
A. That's the math.
Q. Of course, you'd have to change magazines pretty quick.
A. Yes, sir.
Q. In the semi-automatic stage, just every time you pull the trigger?
A. Every time you pull the trigger.
Q. What happens is the gases which propel the bullet forward

out of the barrel also slide the mechanism on the top of the rifle back so that it chambers another round? Is that how the semi-automatic --
A. I'm not sure if it's based upon the gases or if it's just a mechanical discharge of the shell that kicks it back.
Q. Some -- it --
A. It automatically loads.
Q. It automatically discharges the expended round and chambers the new one?
A. Yes, sir.
Q. So that takes how ever long that takes.
A. Yes, sir.
Q. And then you pull the trigger and start over again.
A. Yes, sir.
Q. And you've never fired a fully automatic SKS, have you?
A. No, sir.
Q. Ever seen one?
A. No, sir.
Q. Moving to the 380 pistol, that was a semi-automatic handgun; is that correct?
A. Yes, sir.
Q. And you described it as being about five inches long?
A. Roughly five to six inches long, yes.
Q. That kind of what's sometimes called a ladies' gun?
A. It's a small gun.

1053

Q. Would fit in a smaller person's hand?
A. Yes, sir.

Q. And you sold that to Rick Held.
A. Yes, sir.
Q. And he didn't tell you why he wanted it, and you didn't ask him.
A. Correct.

MR. ROGERS: Those are all the questions I have. Thank you.

THE COURT: Mr. Williams?

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Riepma, in all these conversations you had with Dustin Honken, did he ever tell you he ever went hunting?
A. No, sir.
Q. Did he ever tell you he ever shot any animals at all?
A. No, sir.

MR. WILLIAMS: Nothing further.

THE COURT: Mr. Rogers?

MR. ROGERS: No further questions.

THE COURT: Okay. You may step down.

MR. WILLIAMS: United States calls Rick Held.

RICK HELD, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. And can you pull the chair up and adjust the microphones so you can

speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: It's Rick Donald Held. Last name is spelled H-e-l-d.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Held, where are you from, sir?

A. I'm from Geneva, Iowa.

Q. And where is that in relation to Mason City, Iowa?

A. It's south of Mason City 40 miles.

Q. How long have you lived in that area?

A. All my life.

Q. How far did you go through school, sir?

A. Through high school.

Q. And are you currently employed?

A. Yes, I am.

Q. Where at?

A. I work at Kraft Foods in Mason City, and I also farm.

Q. Now, how long have you worked at Kraft Foods?

A. Thirteen and a half years.

Q. And how long have you also farmed?

A. Twenty-six or seven years, all my life since I was out of

1055

school.

Q. Can you share with the jury a little bit about your farming operation? During that last 20 years, what type of farming have you done?

A. Well, I raise corn and soybeans. It's a small 260-acre farm. Then I have two hog buildings which hold 1,200 head of pigs apiece, and I finish -- I custom feed out for another person.

Q. What do you mean you custom feed out? That's a term I'm not familiar with.

A. I own the buildings and the ground, and they own the hogs, and I take care of them for them, and then we sell -- they sell their pigs. I just -- they hire me to do -- take care of their pigs for them in my buildings.

Q. I see. And so when you feed them and they get large enough, then they're sold for market.

A. Yes.

Q. Over the course of the last two decades, the farm economy has had its ups and downs. Have you and your farm operation had good years and bad years?

A. Yes, it has.

Q. During 1996, can you share with the jury, were you having a bad year or a good year around that time period?

A. Well, it was a bad year for the hog prices, and I had a little disease which took away some of the pigs, and I, you

1056

know, was losing money on some hogs.

Q. Had you run up a fairly sizable farm debt in approximately 1996?

A. Yes, I did.

Q. How much approximately was that?

A. Oh, between eleven and twelve thousand dollars.

Q. Now, at the same time you were working at Kraft Foods -- at least the last 13 years I think you said?

A. Yes.

Q. -- what kind of shift are you working at Kraft Foods?

A. It's a four-by-four swing shift, four days on, four days off.

Q. And what shift were you working?

A. I'm on B shift.

Q. While working on B shift in 1994 to 1996, did you come to know Dustin Honken there?
A. Yes, I did.
Q. Can you describe for the jury if you would over the course of that approximately two-year period how did your relationship develop with Dustin Honken?
A. Well, I guess I worked a Hamba at one time, and he worked downstream from me off and on which meant that we had close contact to talking to each other throughout the day or not. That's how I got to know who he was.
Q. A Hamba? Is that what you said?

1057

A. Yes, a Hamba. It's a filler packaging machine for making -- putting Jell-O Pudding in a cup.
Q. Our court reporter I think will ask me some time down the road how do you spell Hamba?
A. H-a-m-b-a.
Q. Thank you. And so over the course of about a year, year and a half time period, did you get to know Mr. Honken fairly well at work?
A. Yes, I did.
Q. Did you socialize outside of work with him at all?
A. No. One time -- I guess there was only one time that I had went to a bachelor party to where he was at.
Q. Other than that, no other socializing outside of work.
A. None.
Q. In 1996, did you share with him at all just in your casual conversations at work your kind of financial difficulties you were having with the farm?
A. Yes, I did.

Q. So he was kind of aware you were having a bad year at that point.
A. Yes, he was.
Q. Did you learn at some point in 1996 that Dustin Honken had been charged with federal drug offenses?
A. Yes, I did.
Q. And that was some time in the spring of 1996; does that

♀

sound familiar?
A. Yes, it does.
Q. Did you talk to him at all about those drug charges?
A. I would say I probably did, but I don't remember a whole lot about it.
Q. Did he tell you anything about what type of case the government had against him in this drug -- these drug charges?
A. No, he didn't.
Q. At some point did he talk to you about glassware?
A. Yes, he did.
Q. Tell the jury about that if you would.
A. He told me that he was going to be writing a book and he was going to be using glassware and plastic jugs and that when he was through with them if I would store them for him.
Q. And what was he going to be writing a book about? Did he tell you?
A. Methamphetamine.
Q. He asked you to store the glassware?
A. Yes.
Q. And when was this that you would have had these discussions with him in relation to -- let's go to these charges. Do you recall whether this is before or after the charges against him?

A. I would think probably after.

Q. And did you end up storing anything for him at that point?

A. No, I didn't.

♀

Q. Did you have conversations with him about drugs generally?

A. I suppose. Working the shift that we work, you talk about anything at any time because it's long, and just to stay awake, you talk about everything.

Q. In 1996, sir, did you ever use methamphetamine?

A. Yes, I did.

Q. How often did you use methamphetamine?

A. Twice.

Q. And when was this approximately?

A. I suppose during work. I mean it was during work, yes.

Q. Okay. And I'm sorry. I should have made it more clear. What year approximately do you recall this was?

A. '96.

Q. Okay. And where did you get the methamphetamine from that you used?

A. From Dustin.

Q. Dustin Honken?

A. Yes.

Q. On both occasions.

A. Yes.

Q. How much methamphetamine did you buy from him?

A. I didn't buy any of it. He give it to me.

Q. Okay. I'm sorry. I should rephrase that. How much did you get from him?

A. What they consider a line.

♀

Q. All right. Which is -- any idea in gram amounts how much that is?
A. No.
Q. Now, did this happen at work?
A. Yes, it did.
Q. And did you use it at work?
A. Yes, I did.
Q. Was anybody else present when this happened?
A. No, they weren't.
Q. How did it come to pass that Dustin Honken supplied you with methamphetamine, sir?
A. How did it happen? Is that your question?
Q. Yeah. How did it go from you being a coworker with him to suddenly he's providing you with methamphetamine? Can you just kind of share to the jury how it got to that point?
A. Well, I suppose it got to that point if you ever work a 12-hour shift and you work 4 days of it and you're 2 1/2 -- or a round trip is an hour each way, so you're gone from home 14 1/2 hours. Besides you have hog work to do when you get home. Then you have to sleep, and you gotta turn around and come back again. You try to find ways to stay awake.
Q. And methamphetamine has that effect on a person.
A. Yes, it did.
Q. So it's a stimulant.
A. Yes.

1061

Q. And at some point you must have discussed methamphetamine with Dustin Honken to the point where you knew he might have

some to share with you?
A. Yes, I think I probably did.
Q. Did you ever see him using methamphetamine?
A. No, I didn't.
Q. And when he provided you with methamphetamine, where did he get it from? Did he just have it in his pocket, or did you see?
A. I don't know.
Q. Did you -- I'm sorry.
A. When I got it from Dustin Honken, he just told me where it was, and that's where I found it.
Q. Okay. Why don't you explain that a little bit to the jury.
A. He told me that it was -- he put a line out for me on a table, and that's where I found it at work.
Q. Some room in the building?
A. Correct.
Q. And you never had to pay him anything for this.
A. No, I didn't.
Q. Did -- in the conversations that you had with Dustin Honken about your farm situation in 1996, is it fair to say, sir, that 1996 was kind of a stressful year for you?
A. Yes, it was for me.
Q. You have a horrible debt on your farm at this point?
A. Do I have one now?

1062

Q. No, I'm sorry, back in 1996.
A. Back then, yes.
Q. You had a bad debt. You're working, as you just described, incredible hours to the point where you actually use methamphetamine to try to keep up with your work?
A. Correct.

Q. Does Dustin Honken make any -- have any conversations with you about trying to help you at all with that debt?
A. He told me one time he would be able to give me some money for -- to help pay on the feed bill.
MR. WILLIAMS: May I approach, Your Honor?
THE COURT: You may.
BY MR. WILLIAMS:
Q. I'm going to show you Exhibit 219A and B. I'm going to take it out of this envelope. Have you ever seen this letter before, sir?
A. No, I hadn't.
Q. And is your name or at least the name Rick on the top of this?
A. Yes, it is.
Q. Okay. And it's signed -- can you make out the signature there?
A. Yes.
Q. Who's the signature of?
A. It says Dustin Honken.

1063

Q. And 9B (sic) is an envelope here or a piece of paper I guess. Is that your name on there?
A. Yes, it is.
Q. Among other items that you talked about with Dustin Honken while working at Kraft Foods, did you ever talk about firearms with Dustin Honken?
A. Yes, I did.
Q. Yeah, if you could pull that microphone back down, that'd be great.
Share with the jury if you would, is this a one-time

conversation about firearms, or was that a frequent topic you guys talked about or just occasional?

A. I suppose it was just occasionally because he knew I hunted and I had bird dogs, and Dustin was always inquisitive about hunting and firearms, and I suppose we talked about it more than what I can remember.

Q. Did Dustin Honken ever indicate to you that he ever went hunting?

A. No.

Q. At some point did he ever ask you about purchasing a firearm?

A. Yes, he did.

Q. And can you remember when in relation to the charges in 1996? Was this before or after he was charged in 1996?

A. I think it was after he was charged, and he had asked me if

♀

I would buy him -- or buy a pistol for his girlfriend that had to move to Des Moines and that she was going to feel -- she wasn't going to feel safe down there.

Q. Did he tell you the girlfriend's name?

A. No.

Q. Did he indicate -- had you ever told him before you had guns for sale, by the way?

A. No.

Q. Okay. And did he indicate why he was asking you about buying a gun?

A. I'm sorry?

Q. Why is he coming to you about wanting to buy a gun? Did he ever tell you?

A. No.

Q. Do you know Bob Riepma?
A. Yes, I do.
Q. Is -- Bob Riepma, is he kind of a firearms collector and buys and trades guns?
A. Yes, he does.
Q. Did Dustin Honken ever tell you about whether he had gone to Mr. Riepma about buying a gun from him?
A. No. He just -- he had told me Bob would have a pistol that he thought was the right thing for his girlfriend, and he asked me if I would buy it from Bob for him.
Q. Did he give you a specific description of the firearm?

1065

A. He told me a 380.
Q. A 380. Did he give you a further description other than the caliber of the weapon?
A. No.
Q. What did you understand this to be? A handgun or a rifle?
A. I understand it to be a handgun.
Q. Did you ask Mr. Honken, Why don't you just go to Mr. Riepma yourself and buy it?
A. No, I didn't.
Q. Did you find it at all odd that Dustin Honken's asking you to go to another coworker at the same plant with you to have you buy a gun for him?
A. Yes, I do now.
Q. Did you at the time?
A. No.
Q. So what happened?
A. I did what he asked me to do and had bought the pistol from Bob for him.

Q. How did you pay for the gun?
A. Dustin had given me cash.
Q. And were you going to get anything out of making this transaction?
A. At first, no, I guess. And when I did, I don't know if he didn't have the correct change or what, but there was ten bucks left over, and he just told me to keep it.

♀

Q. Who told you to keep it?
A. Dustin.
Q. All right. So let's try to break down this transaction a little bit. After he's charged with federal crimes and he's asked you to go to Bob Riepma, he has a specific description of the weapon he wants you to buy.
A. Correct.
Q. And he provides you with cash to go buy it.
A. Uh-huh.
Q. That's a yes?
A. That's a yes.
Q. Okay. Thank you. How much cash do you recall him providing you if you recall today?
A. I remember somewhere around $180.
Q. And there was $10 left over.
A. Correct.
Q. So do I take it at some point you had a conversation with him after you went to Bob Riepma to say, Hey, I've got it and it only costs me $10 less than what you gave me? Does that make sense? Or maybe that was a bad question to you.
After you went to Bob Riepma and got the gun -- first of all, did you tell Bob Riepma why you were buying the gun?

A. No, I didn't.
Q. Did you tell him who you were buying it for?
A. No, I didn't.
♀

Q. Any particular reason why you didn't tell him?
A. Never asked.
Q. All right. And so you get the gun from Bob Riepma. Do you have any further conversations with Dustin Honken about the gun?
A. The only conversation I guess we had -- and I don't know if this was before or after -- is that he just told me just to leave it in my pickup. When he wanted it, he would get it.
Q. And when was the conversation that -- if you recall that he told you go ahead and keep the extra $10?
A. I don't recall. I don't remember if it was before or after.
Q. All right. And so where did you actually get the handgun from from Mr. Riepma? Did that take place at work, or did you go over to his house, or how'd that work?
A. I never went to his house. I suppose we exchanged it at work I -- I don't remember, but I'm thinking that we probably exchanged at work.
Q. All right. Did any ammunition come with the handgun?
A. A box -- a partial box of shells or a full box. I don't recall.
Q. Of ammunition to go with it?
A. Correct.
Q. All right. And you indicated that Dustin Honken told you leave it in your truck and he would get it at some point?
A. Yes, he did.
♀

Q. And so did you do that?
A. Yes, I did.
Q. And did you tell him at some point that you had it in your truck?
A. No, I never -- never had the chance to because he was taken in at that time.
Q. And that was on -- does it sound right June 11, 1996, he was arrested?
A. Right.
Q. Is that about right?
A. Yeah.
Q. And the point of the matter is did he ever come back to Kraft after that point?
A. Did he?
Q. Yes.
A. I don't think so.
Q. Okay. So you weren't able to ever get the gun to him because he ended up going into custody.
A. Correct.
Q. All right. Did you have any conversation with Dustin Honken again about that firearm?
A. I had a phone call one day. It was from a girl -- this person said that she was his girlfriend.
Q. Let me stop you just a minute. We just need to -- let me just stop you for a minute, Mr. Held. We just have to lay kind

1069

of an idea of where this is happening. First of all, let me ask you this. Did you ever have a conversation with Dustin Honken himself about the handgun again?

A. No.

Q. All right. You indicated at some point you received a phone call; is that correct?

A. Yes.

Q. Okay. And approximately how long after you had purchased -- well, let me do it this way. How long after Dustin Honken had been taken in again on June 11 of 1996 did you receive this phone call?

A. I don't recall, but it was -- if I had to guess, two weeks, three weeks.

Q. And when you received this phone call, did the person identify themselves?

A. No. They only identified themselves as Dustin Honken's girlfriend.

MR. ROGERS: Objection. Hearsay, Your Honor, as to how the person identified themselves.

THE COURT: What do you think, Mr. Williams?

MR. WILLIAMS: I think there's a couple ways at this. One is not for the truth of the matter asserted. The other is 802 -- 801(d)(2)(E).

THE COURT: Okay. Objection's overruled.

MR. ROGERS: Your Honor, I don't believe there's a

1070

sufficient foundation unless the truth of the matter asserted is coming in to show that this is within the scope of 801(d)(2)(E).

THE COURT: You know what? Why don't we send the jury out. It's time anyway, and let me think about it for a moment.

Members of the jury, it is about 17 after. We'll be in recess, oh, for about -- what would that be? About twenty-seven or eight minutes until quarter to three, and then

we'll have you come back. Please remember my cautionary instruction about keeping an open mind. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated. Isn't the problem with whether or not it's 801(d)(2)(E) is which girlfriend?

MR. WILLIAMS: Exactly, and I'm going to retract that as a basis because thinking this out, that's absolutely right. I don't think we can establish an 801(d)(2)(E) exception without establishing the identity of the girlfriend.

I would submit that this is admissible as not hearsay. It's not introduced for the truth of the matter asserted. Whether it was or was not the girlfriend doesn't matter. What she's supposed to say to him whether it's the truth or not doesn't matter. So you have a foundation.

THE COURT: Give me a proffer of what it is that was allegedly said.

MR. WILLIAMS: She would say, Dustin doesn't want the pup anymore, quote, unquote, and that's the full extent of the

♀

conversation. Mr. Held will -- I believe will testify he understood that was a reference to the gun because he had nothing else to do with Dustin at that point. So the government would submit whether Dustin wanted a pup or wanted the pup or whether he wanted the gun, whether it's true or not isn't -- it's not being introduced for the truth of that matter.

THE COURT: Okay. Then what's it being introduced for?

MR. WILLIAMS: To connect Dustin to control and ownership of the handgun that was purchased. Instead of it going to his girlfriend, it was actually intended for Dustin

because he's controlling the exercise of where the firearm goes to.

THE COURT: Mr. Rogers?

MR. ROGERS: That, Your Honor, is exactly the matter asserted in the statement over the telephone. Dustin does not want it anymore. That is the hearsay prohibited purpose that denies Mr. Honken his right to confront the declarant.

THE COURT: I don't think so. I don't think so. I think the truth of the matter asserted is whether or not he wants it.

MR. ROGERS: The truth of the matter asserted is who's making the decision.

THE COURT: I don't think so. Anyway, I understand. Go ahead and make whatever record you want to make, but the

♀

objection's overruled.

MR. ROGERS: I think I've made it.

THE COURT: I think you have. But if you want to make any other record, go ahead.

MR. ROGERS: Violates the Sixth Amendment right to confrontation. Did I do that one already?

THE COURT: No. But we can add that to it. Anything else?

You can think about it on the break. How's that?

MR. ROGERS: Thank you, Your Honor.

THE COURT: We'll be in recess. Thank you.

(Recess at 2:21 p.m.)

THE COURT: Please be seated. We have a note. It was handed to me by -- I don't even -- I was on the phone. I'm assuming it's from a CSO, and it says, Judge, several jurors

have found Juror 646 constantly digging in her very large bag very distracting. We miss some of what is being said when she is digging and moving. Can something be done about it?

MR. WILLIAMS: Your Honor, I think that's why they pay you the big bucks.

THE COURT: That must be the reason. I was looking -- the last ten years I've been searching for the reason. I just found it.

MR. PARRISH: We want to see how you handle this.

THE COURT: Well, I don't want to create juror

♀

1073

dissension, so I'm going to blame it on the CSOs. They have broad shoulders.

MR. PARRISH: Maybe you could say, Judge, there's some noise that's distracting other jurors, so could everyone be a little bit more careful maybe in moving their personal items around and not directing it to 6 --

THE COURT: Actually I was going to blame it on you, Mr. Parrish.

MR. PARRISH: Well, I can take the heat.

THE COURT: That you were worried that they might have missed some of your cross-examination.

MR. PARRISH: Well, that might be an approach.

THE COURT: I think I'll deal with it at the end of the day. Thanks. Let's have the jury brought in.

MR. ROGERS: Judge, I need to make more record on our objection like you said.

THE COURT: Oh, okay.

MR. ROGERS: I'm sorry. I just want to clarify that, first of all, if the statement made over the telephone by the

unknown female are not being offered for the truth of the matters asserted within the statements, then it's irrelevant. If they are being offered for the truth of the matters in the statement, then it is not only hearsay but denies Mr. Honken his right to confront and cross-examine the witnesses against him.

THE COURT: Anything else?

♀

MR. ROGERS: That's all.

THE COURT: Okay. Mr. Williams, anything else you want to add?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Let's have the jury brought in.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

BY MR. WILLIAMS:

Q. Mr. Held, just to take the jury back, we're at a point after which Dustin Honken has been arrested on his drug charges on June 11, 1996, and you were indicating you received a phone call from a woman who identified herself as a girlfriend of Dustin Honken. Do you recall where we were at on conversation with you?

A. Yes.

Q. Okay. Once you had -- when that person called up and identified herself as his girlfriend, she didn't otherwise identify who she was.

A. No.

Q. All right. What did she say to you?

MR. ROGERS: Your Honor, is this subject to my

continuing objection?

THE COURT: Yes, it is.

♀

MR. ROGERS: Thank you. Objection's overruled.

BY MR. WILLIAMS:

Q. What did she say to you, sir?

A. When I answered the phone, she just told me that this was -- I'm Dustin Honken's girlfriend, and Dustin does not want the pup anymore.

Q. Did she say anything else other than Dustin does not want the pup anymore?

A. That was it. That's all I recall.

Q. And did you just hang up at that point?

A. I said -- what I can recall, I said, Okay, good-bye.

Q. All right. What did you understand was meant by pup?

A. Well, I did sell dogs, but I knew Dustin probably didn't want a dog from me, and the only thing I had that was his or that he would want from me would be the pistol that I had gotten for his girlfriend.

Q. Did you have any pending sale of a puppy dog to Dustin Honken?

A. No.

Q. What did you do then with that gun that you'd purchased from Mr. Riepma?

A. I took it off my farm, took it down to a railroad tracks to a culvert. I wrapped it up tightly into a plastic bag, and just hid it I guess.

Q. What did you wrap it up in, sir?

♀

A. A plastic bag and some duct tape and I think probably an oily rag in case moisture would get in it and the shells.
Q. And the shells with it?
A. Yes.
Q. Why did you do that, sir?
A. Well, because I've always -- I have a passion for guns. I like to hunt, and just to throw something away like that, it gets hard for me to do, not throw it away but just give it a flip into the culvert. But why did I -- what's your -- I'm sorry. Maybe I don't understand your question.
Q. That's fine. Why didn't you just keep it?
A. Because I suppose maybe at that time I knew that there was probably things that weren't going the way that I thought they were supposed to go or there was something wrong here.
Q. So in the back of your mind someplace you had some bad feelings about this.
A. Yes, I did.
Q. On December 17, 1996, do you recall that law enforcement officers came to your home with a search warrant to search for firearms?
A. Yes, I do.
Q. Did you tell them about the handgun that Dustin Honken had you buy that you had ultimately hidden in a culvert? Did you tell them at that time, at the time of the search?
A. No, I didn't.

1077

Q. Okay. Later, though, did you volunteer that information to the police?
A. Yes, I did.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 942 of 3636

Q. And did you actually then take them down to the culvert?
A. Yes, I did and showed them where it was at.
Q. And they found -- did they find the handgun there while you were showing it to them?
A. Yes.
MR. WILLIAMS: May I approach, Your Honor?
THE COURT: You may.
BY MR. WILLIAMS:
Q. Sir, I'm showing you Exhibits 226A through M. Do you recognize these photographs, sir?
A. Yes, I do.
Q. And what are those a photograph of?
A. They're photographs of the pistol and the shells and the bag that I put those in.
Q. And this is the pistol that you had purchased at the request of Dustin Honken?
A. Correct.
MR. WILLIAMS: United States moves to admit Exhibits 226A through M into evidence, Your Honor.

* * * *

(Government Exhibits 226A through 226M were offered.)

* * * *

1078

MR. ROGERS: Objection, Your Honor. Relevance, 403.
THE COURT: Overruled. Exhibits 226A through M are admitted.

* * * *

(Government Exhibits 226A through 226M were admitted.)

* * * *

MR. WILLIAMS: Permission to publish, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Mr. Held, first of all, looking at Exhibit 226A, do you see that -- do you see that photograph there, sir?

A. Yes, I do.

Q. Can you explain to the jury what are they looking at there?

A. That's just the gun all wrapped up in duct tape and a plastic bag.

Q. And is that in the manner in which you had wrapped it up, sir?

A. Yes, it is.

Q. Again, 226B is just another photograph of that same weapon? Sir, I'm sorry. If you look to the screen to your right, I'm displaying that same photograph on that screen. It might be easier for you. Is that the same weapon, just another photograph of it?

A. Yes.

Q. And Exhibit 226C, what is that, sir?

1079

A. Another picture.

Q. Okay. And is that on the other side of the item?

A. Yes.

Q. Just another photograph from a little bit farther away, sir?

A. Yes.

Q. And what is the jury looking at there, sir?

A. The jury's looking at duct tape, the pistol, some ammo, the plastic bag that I put it in.

Q. Okay. So this -- if I'm -- the item I'm circling right here, what is that?

A. Box of shells or partial box.
Q. And the item right there?
A. That is the pistol.
Q. And this is 226M. I shifted ahead there. Again, this is the -- what is it right there?
A. That is the box of shells.
Q. Did you ever take this firearm out and fire it at all?
A. Yes, I did, couple times.
Q. I'm sorry?
A. I mean couple rounds.
Q. Okay. And so when you originally got the box of ammunition from Mr. Riepma, how many additional shells do you think would have been in it than what's shown right here?
A. Maybe three or four more.

1080

Q. Not a lot more.
A. No.
Q. And then this is the handgun that you'd purchased from him?
A. Yes, it is.
Q. And is this the clip that goes inside the gun?
A. That's the clip.
Q. Mr. Held, the handgun that Mr. -- or that Dustin Honken had you purchase for him from Bob Riepma after he was arrested in June -- I'm sorry, after he was arrested in 1996, do you see that Dustin Honken in the courtroom here today, sir?
A. Yes, I do.
Q. Can you describe for the jury where he's sitting and what he's wearing?
A. Dustin's sitting right over here with a light brown shirt on.

MR. WILLIAMS: Nothing further, Your Honor. Thank you.

THE COURT: Mr. Rogers?

MR. ROGERS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. ROGERS:

Q. Afternoon, sir. How are you?

A. Pretty good.

Q. My name's Charlie Rogers. I'm a lawyer representing Dustin Honken.

1081

When Mr. Honken told you or asked you if you would buy this pistol from Mr. Riepma, he told you it was for his girlfriend; is that correct?

A. That is correct.

Q. And she was going to be moving to Des Moines and didn't feel safe there, and she wanted a pistol to defend herself or protect herself?

A. For protection.

Q. And he told you that he wanted a 380 because that was a small gun that would be the right size for a woman's hand?

A. Yes.

Q. And he told you that you could probably get one from Bob Riepma; correct?

A. Correct.

Q. And you then talked to Mr. Riepma and said, Hey, Bob, you got a 380 pistol that would be the right size for a woman or words to that effect?

A. Yeah, I suppose I did, yes.

Q. And then he says yes and told you how much it would be, and

you told Dustin, and he gave you how ever much it was plus $10 more?

A. Correct.

Q. Okay. And then you got the pistol from Mr. Riepma, and you put it in your truck. Then you told Dustin it was in your truck and he could pick it up when he left work; right?

A. No, I was never able to talk to Dustin, but that's how -- that's what the arrangements were. He says, Just leave it in your truck, and I will pick it up when I want it.

Q. And actually a couple of things. First of all, you testified earlier regarding this matter back in 1997, didn't you?

A. Yes.

Q. And at that time this thing was a lot fresher in your mind than it is now seven years later, right, seven and a half actually?

A. Correct.

MR. ROGERS: May I approach, Your Honor?

THE COURT: You may.

BY MR. ROGERS:

Q. I'm going to show you a portion of the transcript of your earlier testimony and see if that refreshes your memory.

MR. ROGERS: And I'll just indicate the part I've got highlighted there. Mr. Williams, this is on page 12, line 4, beginning line 4.

Q. Okay. Does that refresh your recollection about what you told Mr. Honken?

A. Yes, it does.

Q. Okay. And you told him that the gun was in your pickup and

when he wanted it he was just supposed to get it; right?

A. Yes.

Q. Now, this was the time after Mr. Honken had been arrested on federal drug charges; right?

A. Correct.

Q. And he told you just leave it in your pickup; right?

A. Correct.

Q. Did he tell you that he was going to have his girlfriend come get it?

A. No.

Q. Did Dustin himself ever lay hands on this gun?

A. No, he never touched it.

Q. And he never actually even saw it, did he?

A. No, he didn't.

Q. And were you aware that it would not have been legal for him to possess a firearm while on pretrial release on federal drug charges?

A. No, I wasn't.

Q. But it would make sense that he would want somebody else to pick it up rather than him if that was the situation.

A. Correct.

Q. And if he was buying it for his girlfriend, that would make sense for her to pick it up.

A. Correct.

Q. After you -- you and Dustin worked the same shift.

A. Yes, we did.

Q. And he was at work the day that you actually received this

gun from Mr. Riepma; right?
A. I don't recall that if he was there that day or not.
Q. Okay. But at some time you had a conversation with him telling him you had it in your pickup.
A. Correct, yes.
Q. That conversation was at work.
A. Right.
Q. And he didn't stop by your truck after work to pick it up then, did he?
A. No.
Q. Okay. Even though he had that opportunity. He had not yet been arrested.
A. Correct, yeah.
Q. Okay.
MR. ROGERS: Those are all the questions I have, Your Honor.
THE COURT: Mr. Williams?

REDIRECT EXAMINATION

BY MR. WILLIAMS:
Q. Mr. Held, did Dustin Honken's girlfriend ever come and pick up that gun from you?
A. No.
Q. Did she ever call you to come pick up the gun?
A. Could you repeat that question?
Q. Did she ever call you to say, Hey, I want to come pick up

1085

that gun from you?
A. No.
Q. Did she ever request that you provide the gun to her?
A. No.

MR. WILLIAMS: Nothing further.

THE COURT: Mr. Rogers, anything further?

RECROSS-EXAMINATION

BY MR. ROGERS:

Q. And you don't know who it was who called you on the phone a couple weeks later claiming to be Dustin's girlfriend, do you?

A. No.

MR. ROGERS: Thank you.

THE COURT: Mr. Williams, anything further for Mr. Held?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. You're excused.

Ready to call your next witness?

MR. WILLIAMS: United States calls Dean Donaldson. Your Honor, Mr. Donaldson's in custody. It may take a few minutes.

THE COURT: Oh, that's fine. Okay. Members of the jury, you can take a stretch break.

I know it's hard to raise your hand, but just raise your right hand as best you can.

DEAN DONALDSON, PLAINTIFF'S WITNESS, SWORN

1086

THE COURT: Okay. Please be seated in the witness box there. Would you state your full name, please, and spell your last name.

THE WITNESS: Dean Lester Donaldson, D-o-n-a-l-d-s-o-n.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Donaldson, how old of a man are you, sir?

A. Fifty-one.

Q. Where are you from originally?

A. I grew up in Meriden -- I grew up in Cleghorn.

Q. Cleghorn, Iowa?

A. Cleghorn, Iowa, yes.

Q. Where is that in relation --

A. It's 60 miles from Sioux City west.

Q. West from Sioux City or east from Sioux City?

A. East. I'm sorry. East.

Q. Can't go too much farther west. How far did you go through school, sir?

A. I went 12 years at Meriden-Cleghorn, and then I went to Worthington, Minnesota, one year of college.

Q. Let me ask the marshal if I could have you give a hand just

♀

1087

to scoot up just a little bit farther because it's hard to get those microphones to pick you up. Thank you.

Currently you're in custody, and we're going to talk about that in a minute. But when you're not in custody, do you have a trade or profession you're in?

A. Yes, I roof with Steve White.

Q. And how long have you been in the roofing profession, sir?

A. The last, on and off, ten years.

Q. Now, you're currently incarcerated for what crime, sir?

A. Attempted burglary and attempted theft.

Q. And what is it that you were attempting to steal?

A. That day I was charged with attempting to steal a van and

attempting to break into a grocery store.

Q. How long of a term are you serving, sir?

A. Fifteen habitual offender.

Q. And what's that mean, 15 habitual offender? What do you mean by that?

A. They enhance a 5-year sentence to a 15 and get an 18-month mandatory on it.

Q. So you're doing -- is this a state charge?

A. Yes.

Q. And so you've got an 18-month mandatory.

A. Mandatory, yes.

Q. And then you may be up for parole after that.

A. Yes.

♀

Q. How long of the 15-year sentence have you been serving, sir?

A. I went to Oakdale November 24 -- 25, I'm sorry.

Q. Of which year?

A. Last year.

Q. This isn't your only first felony conviction, is it?

A. No, it's not.

Q. Could you share with the jury a little bit about some of your other criminal history, please?

A. In the past I've had hog thefts.

Q. Hog thefts?

A. Yes.

Q. How many times you've been convicted of --

A. Four times. Three. This is the fourth I believe, felony.

Q. And they're all felony offenses?

A. Yes.

Q. Have you served time in prison before for those?
A. Yes, I have.
Q. Any crimes of violence in your history, sir?
A. No, sir.
Q. Just the thefts?
A. Yes.
Q. Let me direct your attention if I can to January 23, 1996. Were you in the Woodbury County Jail on that day, sir?
A. Yes, I was.

Q. And what charge were you in jail for at that time?
A. Hog theft.
Q. One of the ones you talked about so far?
A. Yes.
Q. How long had you been in jail for -- or how long did you serve in jail on that charge then from January 23, 1996, until at some point --
A. I served two and a half years on that charge.
Q. Okay. Did you get bailed out of the Woodbury County Jail at some point, sir?
A. Yes, I did.
Q. And was that on August 14, 1996?
A. Yes.
Q. Let's talk about the time period you were in jail then to begin with, and we'll talk about getting bonded out in a moment. You were in jail then from January 23, 1996, until August 14, 1996, when you were bonded out.
A. Yes.
Q. During that time period, did you come to know another inmate there by the name of Dustin Honken?

A. Yes, I did.

Q. How did you first meet him, sir?

A. I was in D block in Woodbury County Jail, and we just -- he was there several days, and one day we just started talking.

Q. We need to educate the jury a little bit about this. The

♀

Woodbury County Jail, is it divided into different sections?

A. Yes.

Q. And do they call those blocks?

A. Yes.

Q. The block you happened to be on when you got assigned to Woodbury County Jail was D block?

A. Yes.

Q. As in David?

A. Yes.

Q. In a given block or let's just talk about D block for now, can you describe for the jury how that's set up? Is there --

A. There's two tiers. There's like 15 cells, and they're doubled up, so there's like 30 people in a cell now.

Q. And two tiers of cells?

A. Yes.

Q. Are those against one wall of the D block, or do they go around?

A. It goes around.

Q. Is there any common area for the inmates to use when they're not in their cells?

A. Yeah, they have a day area to watch TV and stuff and eat breakfast.

Q. All right. And from D block, is there any other place in the Woodbury County Jail that inmates are allowed to go at

different times exercise and things like that?

♀

A. Yes, there's an exercise room that's -- the units -- the tiers -- I mean the cell blocks go around, and in the center there's a walkway, and then there's a workout place where people can exercise once a week.

Q. And so from time to time inmates from different blocks will go and work out in that area?

A. Yes.

Q. What is the arrangement? When is it that -- and I want to focus on 1996 when you were -- back in 1996 versus if they've changed it now. Back in 1996, were you restricted to your cells within D block at any given time of the day or night?

A. Only after ten o'clock till four in the morning you were in your cells. Other than that, you were -- could run the area.

Q. And could inmates visit with each other in their cells freely?

A. They did. They weren't necessarily supposed to, but they did.

Q. All right. And then you could visit with each other in the common area.

A. Yes.

Q. During the time period you were in D block from January of '96 until August of '96, do you recall was Dustin Honken in that D block with you that entire time period?

A. Yes.

Q. Did you come to know him a little bit?

♀

A. Yes.

Q. Can you describe for the jury how your relationship with Dustin Honken developed over the course of that approximately six months you were together?

A. Well, we just started talking one day, and then he said he was in there for manufacturing meth, federal case, and it just escalated from there. We started talking about my bond was 5,000, that was cheap, and he then -- it progresses I'd say, and he decided he was going to bond me out because he had a hydrogen tank that the federal people didn't seize and he wanted me to go get it which at that time I thought would be a good deal.

Q. And we'll talk about that in a little bit. Let me ask you this way. Did you have a number of conversations with Dustin Honken over the course of that six months?

A. Yes.

Q. And the conversations over time, did you become closer to each other where you shared more information with each other?

A. Yes.

Q. Did you share information about your background with him?

A. Yes.

Q. And did he do likewise with you?

A. Yes.

Q. Did you develop any level of trust with each other while you were together for that six-month period?

A. Yes.

♀

Q. During that time period, did he talk to you about his past criminal charges?

A. Yes, he did.

Q. Did he talk to you about his past criminal conduct?

A. Yes.

Q. And did he talk to you about his current charges, the charges he was in on in 1996 as well?

A. Yes, he did.

Q. And then ultimately he talked to you about bonding you out at some point; is that correct?

A. Yes.

Q. What I want to do is I want to go back through and talk about the various topics that you guys discussed kind of in the chronological order if you will recognizing that -- is it fair to say he didn't talk to you about these items in chronological order? It was kind of all jumbled over the course of six months?

A. Right.

Q. All right. I'm breaking this out just so it's a little bit easier for us to understand. Let's talk about the nineteen ninety -- or I'm sorry, his prior charges. Did he tell you at some point that he had been charged before this time he's in jail with drug charges?

A. Yes.

Q. What did he tell you about those charges before?

♀

1094

A. Oh, he started out by saying they had come up missing -- that's where it all started -- that his charges were dropped because the informants come up missing when it came to sentencings, that he's supposed to take a plea bargain or sentencing and they didn't -- they were missing, so he decided to pull his plea bargain out or his ver -- or what I'm trying to say, his plea. He wanted to pull it out.

Q. Did he talk to you about what type of charges there were

that were pending against him before?
A. They were for meth, methamphetamine manufacturing.
Q. He said that some witnesses came up missing; is that right?
A. Yes.
Q. Did he describe those witnesses for you, sir?
A. Eventually he did. He said there was one man that was a big man that used to go with his old girlfriend and the other guy was just an informant that snitched on him. They both were.
Q. Let's talk about -- you said the big guy that used to go with his girlfriend. Did he tell you anything about that, the big guy?
A. He just said that he used to go with his old girlfriend Angie Johnson and he owed him $30,000.
Q. What did he owe him $30,000 for?
A. For meth.
Q. Did he tell you anything more about Angie Johnson at that point, about whether she was involved at all in the meth from

♀

1095

before?
A. Yes. Angie participated in pretty much everything he did, the impression I got from him.
Q. And you indicated something about another witness who was somebody who had told on him?
A. Uh-huh.
Q. What did he tell you about that person? First of all, was it a male or a female?
A. Are you talking about the '93 or the '96?
Q. Back in '93. I'm talking about the charges he had before he was in jail this time.
A. Right.

Q. He's telling you about these past charges and the witnesses that come up missing.
A. Oh, okay.
Q. So you talked about this big guy who had dated Angie Johnson.
A. Right.
Q. And you'd indicated there was another guy who had told on him, or I think maybe you used the word snitched on him?
A. Right.
Q. What did he tell you, if anything, about this other guy who had snitched on him?
A. The only other things that he actually said about that particular person is that when they went and killed these

♀

1096

people. He explained that.
Q. From what he told you, was this person that snitched on him a man or a woman?
A. It was a man.
Q. Did he talk to you anything about any children being involved at all?
A. He mentioned a child, but he particularly -- he said it was a couple, and a child was mentioned, but it didn't go any farther than that, and I didn't elaborate -- I didn't ask him to answer any more questions. I never asked him nothing.
Q. So at this point just to be clear, you aren't somehow working for the federal government while you're in the Woodbury County Jail, are you?
A. No, I'm not.
Q. And you weren't back in 1996 at that point when you were sitting in there.

A. No, I wasn't.
Q. Have you ever been charged by the federal government with anything?
A. No.
Q. And you weren't working as an informant for the government at that point.
A. No.
Q. You just happened to be another inmate in the Woodbury County Jail in a conversation with Dustin Honken.

♀

A. Yes.
Q. When he's talking to you about these witnesses missing, did he ever explain to you how it was they came up missing?
A. It was, like I said, talk -- you know, progressing. In the end he was talking about that he had killed them, him and Angie, his girlfriend.
Q. And so just so we're clear, this isn't something he told you right off the bat. This is something that kind of progressed over time.
A. Yes.
Q. Let's talk about the -- if we can each of the people so we can kind of keep this straight. The big guy, did he tell you how that guy came up missing?
A. Yes. He was to meet I believe Angie. She was supposed to meet him in the country. I thought they were going to make him believe it was a drug deal, and that's where they killed him, at an abandoned farm.
Q. Did he tell you how they killed him?
A. They shot him.
Q. Did he tell you with what?

A. They shot him with a gun, and he said they shot him twice, and he kept coming, and he begged for his life, and he shot him again.
Q. Did he tell you what type of gun was used?
A. I can't remember to be honest.

♀

Q. Did he tell you where the gun came from?
A. Angie had bought it.
Q. Did he tell you where she bought it from?
A. I don't remember.
Q. The big guy you said was at an abandoned farm and the guy kept coming; is that right? Did he make any other comments about the shooting to you?
A. He just said, They don't die like on TV.
Q. Did he describe what he meant by that?
A. That they don't just drop. When he shot him, he kept coming begging for his life.
Q. What happened -- did he tell you what happened with that person's body after he was shot?
A. When we were talking, he just -- he said they were buried with a backhoe, but they were buried shallow he said.
Q. And is this -- when you say they, are we talking about the big guy now, or are we talking about somebody else?
A. Well, when we talked about it, he really -- he didn't break them down. He just -- he talked in general both of them were buried shallow, so I didn't -- I didn't ask any more about that.
Q. Did he tell you anything about the burial process, what it was like or what he did?
A. He just said that dead people are real heavy. That's the main thing he stressed on.

Q. I want to shift a little bit now to this couple or the

family that you had mentioned before. This isn't the big guy. This is somebody else.
A. Uh-huh.
Q. What did he tell you about what happened with that couple?
A. They just -- they pulled up to the house, him and Angie, and they went in, and they took drop cords and yanked their -- just yanked them and choked them, choked them down.
Q. And who did they choke down?
A. At the time in jail he said that the couple. Like I said, he mentioned a kid, but he didn't really tell me about kids. He just said a couple.
Q. Did he indicate whose house it was they had gone up to?
A. No, honestly he didn't. He just said a house, their house.
Q. And did he say what happened with them after he strangled them? Let me back up. Did he indicate who strangled them?
A. I -- no, I just believe that he did.
Q. He didn't really say one way or the other?
A. No.
Q. All right. Did he say what happened to the bodies after the people were strangled?
A. He just mentioned that the reason he strangled them was because there was no blood, they left no trace of nothing when they moved them, and that's -- I know no more than that.
Q. Did you get the sense when he was talking about a child that a child had been killed in this process as well?

A. Yeah, I got that feeling, but again, I never asked. He

just mentioned it, and I just left it go at that.
Q. Did you ever ask him anything about whether it bothered him about kids?
A. He had mentioned that he didn't care because they were trying to take him away from his kids. He didn't care. That's why he didn't care. They're trying to put him in prison away from his kids.
Q. When he's talking to you -- and I understand this happened not just in one conversation but over the course of many conversations over a six-month period -- at any point during those conversations did he talk to you about any concern about the bodies, about the remains?
A. Yeah, he was concerned that they were too shallow, that they would either surface or Angie would possibly turn on him if she got in trouble for drugs or something.
Q. Did he indicate that she was somehow involved in the burial and knew where they were?
A. Yes.
Q. That Dustin Honken that you met in the Woodbury County Jail that told you about murdering these people, do you see him in the courtroom here today, sir?
A. Yes.
Q. Can you describe for the jury where he's sitting and what he's wearing?

1101

A. He's to the left-hand side of me. He's got a green shirt on.
Q. One of the other topics that you indicated Mr. Honken had talked to you about in the Woodbury County Jail were the charges he was in there for at that time, and this is in 1996.

A. Yeah.

Q. What'd he tell you about those charges, sir?

A. Well, he just ex -- he was going through the guidelines, and he said that two more people, his best friend, had snitched on him plus a guy that he had tooken in -- Cobeen I think his name was -- he had taken into his project of making meth. Tim was his old friend, but Tim wanted out because he'd gone Christian and he wanted out of the -- making meth and the things that had been happening, so he took in -- I think it was Cobeen his name was, and he turned on him also.

Q. And this is things that the defendant's telling you.

A. Yes.

Q. Did he indicate where he took in this other guy at, how he came to know him?

A. I'm not real sure. I'm not going to say. I don't know.

Q. All right. Let's go back to -- when you met him, obviously he 's in custody at the Woodbury County Jail. Did he ever indicate whether there was a period of time after he was initially charged that he was out and not incarcerated?

A. Yes.

♀

1102

Q. What did he tell you about that?

A. Well, he was out, and he had found a way to beat his band, his bracelet on his ankle that monitored him telling them where he was at all times. He knew how to beat that. And if they wanted to arrest him if he did, if it had gone another few days, he was going to murder the prosecuting attorney in Cedar Rapids, I think it was the chemist who diagnosed it as meth in Chicago, the Cobeen family, and then he was going to go back and kill his girlfriend Angie because she was a witness to everything. She

was going to help him with these murders, but then in the end he was going to kill her because she was the last witness.

Q. Did he tell you at all the name of the prosecutor?

A. I think it was Reinert.

Q. What -- you said he had found a way to defeat this monitor he had. Did he tell you, explain any further to you what process he had come up with or how he --

A. No, he didn't.

Q. But in the end he told you at that point he wasn't able to go through with it because he was arrested?

A. Right, yes.

Q. During the time period you're talking with him, you'd indicated earlier that he was going to bond you out to go get a hydrogen tank, and I think your initial statement was you thought at that point it was a pretty good idea.

A. Yes.

♀

1103

Q. I want to take you to that conversation. While you're in jail, do you have a conversation with the defendant about the manufacturing of methamphetamine?

A. Yes.

Q. Did he indicate to you whether he had any future plans for manufacturing meth?

A. Well, he said if he bonded me out and I went and got that tank and got him some other things and some books that he needed that he could make up to ten million and he'd split it with me if I did that.

Q. If you helped him get these things?

A. Yes.

Q. And to do that he was going to bond you out somehow?

A. Yes.

Q. What'd he tell you about this hydrogen tank? Explain how that comes into this.

A. Well, it's something that not just an ordinary person can get. You gotta have some skills in chemistry and all those things in order to get it evidently. I think he got it from Arizona, and that's why it was important that he got it.

Q. Did he tell you where that hydrogen tank was?

A. It was at his friend that he worked with. Jay was his name. He said it was at his house.

Q. And so do you guys have a discussion then about a plan to get you out so you can help him on this?

♀

1104

A. Yes.

Q. And did you agree to do it?

A. Yes.

Q. How were you to get the hydrogen tank?

A. I have a note for Jay to explain who I was from Dustin.

Q. And what were you supposed to do with that note?

A. I was supposed to give it to him.

Q. To this Jay guy?

A. Jay.

Q. And once you gave him the note, what was supposed to happen at that point?

A. He would give me the hydrogen tank.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Sir, I'm showing you Exhibit 212, sir. Do you recognize that, sir?

A. Yes.

MR. WILLIAMS: Your Honor, can I aid the witness, put on his glasses?

THE COURT: Yes.

BY MR. WILLIAMS:

Q. Do you recognize that?

A. Yes.

Q. What is that?

♀

A. That's a note to Jay.

Q. And who's it signed by?

A. Dustin Honken.

Q. And do you recognize this as the note that was provided to you to give to Jay?

A. Yes, I do.

MR. WILLIAMS: United States -- I'm sorry. 212 has not been objected to, Your Honor, and I would --

THE COURT: 212 is in evidence. Thank you.

MR. WILLIAMS: May I publish it to the jury, please?

THE COURT: You may.

MR. WILLIAMS: Your Honor, I don't know if you have the screen -- there we go. Thank you.

BY MR. WILLIAMS:

Q. Looking at the screen to your right there, Mr. Donaldson, that's the note that was provided to you?

A. Yes.

Q. And it says -- it's kind of hard to see. Looking at the original it says, What's up? Things could be better, but I'll have to settle. Sure is a bummer that -- I'm sorry, what Tim did, huh? Don't worry about the letter -- I'm sorry, don't

worry about the money. I'll make up for it. I'm having this letter hand delivered so my friend here can get something from you. Don't worry. He's cool. Stay cool, and watch out for Tim. He's on the bad guys' side now. Don't worry. Things

♀

aren't as bad as they seem. I hope to see you soon to get on with things.

Did I read that correctly?

A. Yes.

Q. Where did you get that note, sir?

A. I got it from Dustin Honken.

Q. And did you see him write that out?

A. Yes.

Q. And why did he provide it to you again?

A. He wrote it out so I would give it to Jay so we could get the hydrogen tank.

Q. Now, you indicated part of this plan as well was once you got out you were going to be in a position to help him. He wanted some books and some things as well?

A. Yes, he wanted some books that probably by the time he possibly would get out they would be not available in stores, and plus he had some books at his family that he wanted me to get.

Q. And so did he give you any kind of list or anything like that to use if you got out?

A. Yes, he did.

MR. WILLIAMS: May I continue to approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Sir, showing you Exhibit 213, do you recognize that, sir?

A. Yes.
Q. And what is that?
A. Those are things that I was supposed to get.
Q. And on the front side of 213, are those different types of chemicals?
A. Yes.
Q. And on the back side of 213, what is written there, sir?
A. Those are books that I should get.
Q. Now, is this -- in whose handwriting is 213?
A. That is mine.
Q. Mr. Donaldson, how did you know what to write down on those different chemicals and the books and so forth?
A. Because I had copied that off a list that he had made.
Q. Why didn't you just take the list he had made?
A. Because he didn't want his handwriting on anything that would bring it back to him.
Q. How do you know that?
A. He told me that.
Q. And so he wrote down a list, and then you had to copy it off of that list?
A. Yes.
Q. Did he provide you -- I'm sorry. Did you have that list then as a result of him providing you that information then?
A. Yes.
MR. WILLIAMS: United States would move to admit

Exhibit 213, Your Honor.

* * * *

(Government Exhibit 213 was offered.)

* * * *

THE COURT: Any objection?

MR. PARRISH: I don't think we listed an objection to that.

THE COURT: Well, you did. You listed relevancy and hearsay.

MR. PARRISH: Okay. I would make those objections.

THE COURT: Okay. Overruled. 213's admitted.

* * * *

(Government Exhibit 213 was admitted.)

* * * *

MR. WILLIAMS: I'm sorry, Your Honor. Permission to publish?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Do you see 213 there on the screen, sir?

A. Yes.

Q. Okay. That's very hard to see. Did you make that writing in what? Pencil or ink?

A. It was in pencil I believe.

Q. All right. Kinda hard to see. And is that the front or the back of Exhibit 213?

1109

A. I think it's the front.

Q. Very good. Now, did he give you any additional list of chemicals that you were supposed to acquire?

A. The only list is on here I was supposed to get. Anything I should have gotten was on this paper.

Q. Let me show you Exhibit 211. Do you recognize that, sir?

A. Okay. Yeah.

Q. And what is that?

A. It's also things that I needed to get for the project making meth.

MR. PARRISH: I'm sorry. You need to speak up just a little bit, please.

A. These are all things that I needed to get for -- that he had asked me to get to make -- when he got out to make meth.

Q. And who asked you to get those things?

A. Dustin.

Q. And then over on the right-hand side are some prices that go along with that?

A. Yes.

MR. WILLIAMS: United States would move to admit Exhibit 211 into evidence, Your Honor.

* * * *

(Government Exhibit 211 was offered.)

* * * *

THE COURT: 211 is already in evidence.

1110

MR. WILLIAMS: I'm sorry.

THE COURT: That's okay.

MR. WILLIAMS: Permission to publish, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Is that -- 211, is that in your handwriting?

A. Yes, it's in my writing.

Q. Where did you get the information from to put down there?

A. From Dustin.

Q. And how did he give that information to you?
A. He wrote it down on a piece of paper, and I just copied it.
Q. And then why not just take the piece of paper he wrote it down on?
A. Because he didn't want his handwriting on anything.
Q. Showing you Exhibit 217, do you recognize that, sir?
A. Yes.
Q. And what is that?
A. That's also things to make meth with.
Q. And where did you get those things to make meth with?
A. I copied it off Dustin's handwriting off another sheet of paper.
Q. And this is something he provided to you that you were supposed to use once you got out?
A. Yes.
MR. WILLIAMS: United States moves to admit Exhibit

217, Your Honor.

* * * *

(Government Exhibit 217 was offered.)

* * * *

MR. PARRISH: Objection. Hearsay, relevance, and 403, Your Honor.

THE COURT: Overruled. 217 is admitted.

* * * *

(Government Exhibit 217 was admitted.)

* * * *

MR. WILLIAMS: Permission to publish, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. And again, just so we're clear, this is your handwriting, sir.

A. Yes.

Q. But the information you had for that is something that was provided to you by whom?

A. Yes.

Q. I'm sorry. Provided to you by whom, sir?

A. Oh, by Dustin Honken.

Q. If Mr. Honken is still in jail and he's going to bond you out, was there some plan for how he was going to participate in this, or what were you supposed to do once you got out to get this thing up and running?

♀

A. Well, I was supposed to get ahold of Angie because anything I needed she would take care of if I couldn't -- if I needed something, I was supposed to get ahold of her, and that would -- he had contact with her, so it wouldn't be a problem.

Q. Now, earlier in your conversation or your testimony you indicated that he had wanted you to get some publications because he had calculated that he might not have those available to him when he got out. Did he have some idea of when he thought he might get out of jail?

A. Well, he was saying seven or eight years at this time.

Q. And did he have some way that he had tried to figure out whether he could decrease the amount of time he was going to be spending in jail?

A. Again, this is over a long period of talking. And then he came to the guidelines of the federal system thinking, well, if this guy was gone or this guy, I could possibly be out in two or three years.

Q. So he talked if certain guys were gone?
A. Right.
Q. It would decrease his sentence?
A. Yes.
Q. Who was he talking about if they were gone it would decrease his sentence?
A. His best friend Tim and the other -- the guy that he was involved with in his '96.

♀

Q. Now, when the conversation initiated about bonding you out, was it solely for you to participate in this methamphetamine thing with him?
A. Yes.
Q. Did it develop into something else over the course of time?
A. Yes.
Q. What did it develop into, sir?
A. Oh, he again was getting into the guidelines of the federal system, and he wanted his best friend to be killed.
Q. This Tim guy?
A. Yes.
Q. Did he want you to participate in it somehow?
A. Eventually, yes.
Q. What did he ask you to do?
A. He wanted me to take care of Tim.
Q. To kill him.
A. Yes.
Q. And did you agree to do it?
A. Yes, I did.
Q. Did you know Tim Cutkomp?
A. No, I didn't.

Q. Did you know where he lived?
A. Only from the directions that he had drew for me. He lived with his family, his mom and dad.
Q. So did he provide you some information then about how you

might be able to go about killing Tim Cutkomp?
A. Yes.
Q. And how did he give you that information?
A. He drew a map of where he lived, and he had showed me -- he told me where he worked and when he would be going to work at different times of different days.
Q. What do you recall about him telling you about where he worked at?
A. He worked at a place I believe in Mason City, and so Tim usually left his mom and dad's about 5:30 on certain days. He had it on a calendar marked for me which day he'd go early or which day he went late, and he wanted me to be there at 5:30 at a stop sign.
Q. And where was he working at? Do you recall?
A. A Jell-O factory in Mason City, I believe.
Q. Now, are you from Mason City at all?
A. No.
Q. Do you have connections to Mason City at all?
A. No.
Q. So did he provide you directions then I think you said to where Mr. Cutkomp lived?
A. Yes, he did.
Q. Sir, I'm showing you Exhibit 216, ask you if you recognize that, sir.
A. Yes, I do.

Q. And what is that?
A. The one is an X by the bridge. One's an X by his family's --
Q. Let me stop you. What is the entire sheet?
A. It's a map of where he lives, where he -- the road he takes to work.
Q. And who's the "he" that you're talking about?
A. Tim, his best friend.
Q. And where did you get this map?
A. From Dustin.
Q. And is this your handwriting, or is this somebody else's handwriting?
A. This is mine.
Q. And how do you know how to draw this map?
A. I copied it.
Q. Off of what?
A. Another sheet that he had drawn up.

MR. WILLIAMS: Your Honor, United States would move to admit Exhibit 216 into evidence.

* * * *

(Government Exhibit 216 was offered.)

* * * *

MR. PARRISH: Objection. Hearsay, relevancy, and 403, Your Honor.

THE COURT: Thank you. Objection's overruled.

1116

Government's Exhibit 216 is admitted.

* * * *

(Government Exhibit 216 was admitted.)

* * * *

BY MR. WILLIAMS:

Q. And again, just so we're clear, why not just take the map that he drew for you?

A. Again, this all points to me, not him basically. That's why he didn't want his hand -- his marks on anything.

MR. WILLIAMS: Permission to publish 216, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. On the screen, is that the map that you drew based on the information provided to you by the defendant in this case?

A. Yes, it is.

Q. Did he explain to you how or where you were supposed to kill Mr. Cutkomp?

A. At one time he wanted it done by the bridge because there was some barriers there, and he wanted it done behind these corn bins because no one would see it. But instead we came up with going the other direction to a stop sign at 5:30 in the morning, putting barricades there so he'd have to get out and move them.

Q. And how were you supposed to kill him at that point?

A. When he got out of the car, I would kill him with a gun.

Q. Did you have any talk about ever killing him at the house

1117

itself?

A. Yes, he did.

Q. Tell the jury about that, please.

A. He said to go kill him at the house. And I said, What happens if his mom and dad are there? He goes, Kill them too. They had him.

Q. They had him as in --
A. As their son. It's their fault that he exists.
Q. What did you say about that?
A. I said no. I just -- I said, No, that's crazy.
Q. And so is that where it kind of developed then to do it on his way to work?
A. Yeah.
Q. What kind of a weapon were you supposed to use to shoot him with?
A. It was going to be a high-powered rifle.
Q. Did he indicate where you were going to get this high-powered rifle?
A. Well, it was going to be 5:30 in the morning, so he was going to get me a -- I wasn't sure where I was going to get the rifle, but he'd give me information where I could get a night scope, or it could have night vision where I could see plainly at night.
Q. Did he ever provide you or tell you that he had somebody who had a gun that you could get?

♀

1118

A. Yes, he did.
Q. Who did he say had that gun?
A. He said -- I believe his name was Rick Held.
Q. Who is he?
A. He's a farmer that worked at the Jell-O plant with him.
Q. How were you supposed to get that gun?
A. I believe he wrote me a note for that gun also, but I really didn't want the gun. I told him I didn't want that gun.
Q. You indicated earlier that you had some -- you had been provided some information about Mr. Cutkomp's work schedule. Do

you recall that testimony?

A. Yes.

Q. Did he provide you with information about that work schedule?

A. Yes, he did.

Q. Showing you, Mr. Donaldson, Government's Exhibit 221, do you recognize that, sir?

A. Yes.

Q. On one side is the calendar for 1997; is that correct?

A. Yes.

Q. And on the other side is a calendar for 1996?

A. Yes.

Q. On the side with the calendar for 1996, are there notations and marks on it?

A. Excuse me?

♀

1119

Q. Are there notations and marks on this side?

A. Oh, yes, yes.

Q. Where did you get this calendar?

A. From Dustin.

Q. And what was the purpose of getting this calendar from Dustin?

A. So I could get his work schedule which Dustin had.

Q. Just so we're clear, whose work schedule is this, sir?

A. This is Tim's work schedule at the Jell-O factory.

MR. WILLIAMS: 221 has no objection, Your Honor. Permission to publish?

THE COURT: You may.

BY MR. WILLIAMS:

Q. I'm showing you the side on the screen there of 1996. What

is the notation there at the top if you will? Can you read that?
A. It said zero means days and minus means nights.
Q. And what did you understand that to mean?
A. The zero meant he works days. The minus means he works nights.
Q. The other person you talked about that I believe you said the defendant had some concern about was a Mr. Cobeen.
A. Uh-huh.
Q. Is that right?
A. Yes.

Q. What did he tell you about Mr. Cobeen?
A. Well, he lived in an apartment I think in Mason City, an upstairs apartment, and decided that that would be a problem trying to do something with him as he was going to Tim.
Q. And so?
A. So, therefore, we came -- he -- I can't say we or he. We came up with a deal we're going to write a threatening note to his parents.
Q. And so is this something else you're supposed to do if you're bonded out by the defendant?
A. Yes.
Q. And what do you mean by a threatening note to the parents?
A. Just write them a note stating that they better not let their son testify or something bad will happen to him.
Q. And were you provided anything to help achieve this if, in fact, you were bonded out?
A. Yes, I was.
Q. And what were you provided with, sir?

A. He provided me with a note that I was supposed to send to them.
Q. Did he provide you with any address as well?
A. Yes.
Q. Let me start first, sir, with what's been marked as Government Exhibit 218. Do you recognize that, sir?
A. Yes.

♀

Q. What is that?
A. That's his address.
Q. Whose address?
A. That is Darrell Cobeen. I'm not sure if that's him or his father's address. I took it as his father's.
Q. Is this your handwriting or somebody else's?
A. It's mine.
Q. And how did you get the address for a Darrell Cobeen?
A. I copied it off another sheet from Dustin.
Q. And again, why didn't you just take the sheet he had with the address on it?
A. So there was no connection between him and that person.
Q. And showing you Exhibit 220, do you recognize that, sir?
A. Yes.
Q. And what is that?
A. That's a note that I was supposed to type and send to them.
Q. And whose handwriting is this?
A. This is my handwriting. I copied it again off of a sheet of paper that Dustin had wrote out.
MR. WILLIAMS: United States would move to admit Exhibits 218 and 220, Your Honor.
* * * *

(Government Exhibits 218 and 220 were offered.)

* * * *

MR. PARRISH: With regard to 218, our objection would

be hearsay, relevance, and 403 and confrontation, and as to 220 -- did you say -- what was your next one?

MR. WILLIAMS: 220.

MR. PARRISH: Oh. 220 would be relevancy and 403.

THE COURT: Thank you. Objections are overruled. Government's Exhibits 218 and 220 are admitted.

* * * *

(Government Exhibits 218 and 220 were admitted.)

* * * *

MR. WILLIAMS: Permission to publish, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Showing you first what's been marked as Exhibit 218, sir. Is that the address that you wrote down for Darrell Cobeen's residence?

A. Yes.

Q. And again, that's in your handwriting.

A. Yes.

Q. And looking at 220 -- I'm going to increase the size on that for you -- is that your handwriting there, sir?

A. Yes, it is.

Q. Can you read that for the jury, please?

A. It would be unwise for you to testify at the upcoming drug trial for you or your relation's sake.

Q. And how did you determine what you were going to write on

that note there?
A. I copied it off another piece of paper.
Q. I think you indicated earlier this was -- you weren't intending to actually give this handwritten note to Dan Cobeen's parents.
A. No.
Q. You were supposed to use a typewriter?
A. Yes, I was supposed to buy a used typewriter and send it from either -- first he wanted it sent from up in Minnesota, St. Paul or somewhere like that. And then we decided it'd be Des Moines instead.
Q. So you were supposed to buy a used typewriter. Why type it?
A. Because I guess the new typewriters you can trace it back to where it came from. That's what he had told me.
Q. Okay.
A. I believed him.
Q. So these are things the defendant's telling you to do.
A. Yes.
Q. And you're supposed to go out and buy an old typewriter and type it out?
A. Yes.
Q. What were you supposed to do with the typewriter after you typed it out?
A. Destroy it.

1124

Q. And then you were supposed to send it I think you said from St. Paul, and then you guys decided on Des Moines?

A. Yes, he didn't want them to get any connection between that and his girlfriend.
Q. Now, initially when you were talking about -- the initial plan was for you to get bailed out to start to be involved in this methamphetamine operation and you were supposed to get a half of whatever was manufactured or the profit I guess from it; is that right?
A. Yes.
Q. And then over the course of several conversations, it shifted to you having some additional jobs to do. Were you supposed to get anything else in addition for your efforts here?
A. Well, he was saying if I would come forth and do all that he would just ask -- he'd give me the whole ten million or whatever there was from that profit.
Q. Was there any discussion about coming up with additional money if you didn't go through with it?
A. Yeah. Then we had talked that I wasn't sure that I could do something like this, so I said maybe I knew some people that would do it.
Q. Why don't you explain that to the jury. What do you tell the defendant?
A. I told him I wasn't sure I could do it. I said maybe I could get an El Forestero or this guy Ladean Hummel that was

♀

1125

dying from cancer. Maybe they could do it because they're kind of a rough crowd. I just didn't know if I could do it.
Q. Do you think they would do it for free if you asked them?
A. No, that's where we talked about money because it would probably cost at least five thousand we figured, five to ten. We didn't know.

Q. So where was the money supposed to come from?
A. So that's when he come up with his friend Rick Held because he has a horse trailer, and I was in jail for stealing hogs, so we came up with the idea that he would let me use his trailer and I'd steal some hogs and help Rick Held out with his feed bill which he was behind on his feed bill and help Dustin for what he needed to get something done, someone taken care of.
Q. So this is kind of a contingency plan if you didn't go through with the killing yourself that this is maybe another way of getting it accomplished?
A. Yes.
Q. Did he give you anything to use to make contact with Mr. Held?
A. Yes. He gave me a note I believe.
Q. I want to show you what's been marked as Government's Exhibit 219A and 219B. Do you recognize that, sir?
A. Yes.
Q. What is that?
A. One's a note to Rick Held.

♀

Q. Where did you get that note?
A. From Dustin.
Q. When did you get it from him?
A. I got it while I was in jail with him.
Q. And what was the purpose of that note?
A. The purpose was to give to Rick and to let him know who I was and that he was just going to help me -- I was going to help him with his feed bill and help Dustin with his money.
Q. Exhibit 219A, is that the letter itself or the note?
A. Yes.

Q. And is that in your handwriting?
A. No, it's not.
Q. Whose handwriting is that in?
A. Dustin Honken's.
Q. How do you know that?
A. He wrote it. I was there, and he handed it to me.
Q. And 219B, what is that?
A. 19B --
Q. That's the small piece of paper.
A. That's Rick Held and his address in Mason City. I wrote that.
Q. And whose handwriting is that?
A. That is mine.
Q. And where did you get Rick Held's address from?
A. From Dustin.

♀

1127

Q. Did you know Rick Held at all?
A. No.

MR. WILLIAMS: United States would move to admit Exhibit 219A and B into evidence, Your Honor.

* * * *

(Government Exhibits 219A and 219B were offered.)

* * * *

THE COURT: Any objection?

MR. PARRISH: First 219A, relevance. 219B would be hearsay and relevance.

THE COURT: You only objected to relevance in the --

MR. PARRISH: 219 --

THE COURT: But it's overruled.

MR. PARRISH: Okay.

MR. WILLIAMS: Permission to publish, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Showing you 219A on the screen, can you read that to the jury, sir, please?

A. Says, Rick, hey, how's it going? Things are okay. I sure miss work. Never thought I would. I probably just miss the few good friends like you. It sure is a bummer what Tim did. Whether you do -- whatever you do, don't trust him. He is deep under the fed's thumb. Hey, I'm also writing this to tell you this guy can help solve your feed bill situation. He is also

1128

helping me. Listen to him carefully. I've known him a long time. He's cool. Well -- I can't read that one.

Q. Okay.

A. Well, take care. Hope to see you soon.

Q. Okay. And you've known him for a long time. Let me talk to you about that again. I think I've been talking about it being six months that you knew him. You were in the Woodbury County Jail starting January of 1996; is that correct?

A. Yes.

Q. Was Dustin Honken in the Woodbury County Jail starting in January of 1996, or did he come some time later?

A. Some time later.

Q. And do you remember approximately when that was?

A. I'm not going to say. I'm not positive.

Q. Okay.

A. A few months.

Q. All right. So ultimately did you, in fact, get bonded out?

A. Yes, I did.

Q. Did you have discussions with the defendant about how that was going to happen if he was in -- if he was in jail as well?
A. He was going to have one of his girlfriends bond me out.
Q. Did he tell you which girlfriend was going to bond you out?
A. I believe her name was Kathy Ricks (sic).
Q. And did he tell you how that was going to happen? Where was she going to get the money to bond you out?

♀

A. I believe between her and his dad I think he said he was going to get the money and she was going to put her house up.
Q. Did you ultimately get bonded out, sir?
A. Yes.
Q. And approximately when was that? Was that the August date?
A. Yes.
Q. August 14, 1996?
A. Yes.
Q. Did it come as a surprise to you that you got bonded out?
A. Yes, it did.
Q. Why is that?
A. I -- because it'd been going on for so long, and I just -- I kept feeding into it because I really didn't think it was going to happen. I just figured I wanted to go to jail at one point -- or go to prison on my five-year sentence, and he talked me out of it, but it still lingered on, and I thought it was a no-go situation, I was just going to go to prison which I wanted to do.
Q. Next thing you know you've been bonded out.
A. Yes.
Q. So what'd you do?
A. First thing I did is went to Phil Parmalee's place. That's

where I went to when I bonded out.
Q. Who's Phil Parmalee?
A. He was a friend of a friend of mine to be honest. I really

didn't even actually know the guy. He was a friend of my friend's.
Q. And why did you go there then once you got out?
A. Because somewhere -- I was supposed -- somewhere along the line someone told me to go to Phil Parmalee. I got a letter or I can't remember how, but I was supposed to go to Phil Parmalee's. I'd never been there before.
Q. Some friend of yours told you that was a place to go?
A. A friend of mine, yes.
Q. Did that have anything to do with this plan or your scheme of what you were supposed to do when you were out?
A. No.
Q. That was just some other friend that told you if you need a place to go to, go to Phil Parmalee?
A. Yes.
Q. Did you take these items we talked about this afternoon, these notes and list of chemicals and things like that with you?
A. Yes, I did.
Q. And what'd you do with those items?
A. They were in a bag, and that's where they ended up, in a bag.
Q. And where was the bag at?
A. Phil Parmalee's.
Q. And did you leave it there?
A. Yes.

Q. So did you carry out the plan as requested by the defendant?
A. No, I didn't.
Q. Why not?
A. I was dishonest to him. I guess I didn't mean to be, but I was.
Q. You just couldn't go through with it.
A. No.
Q. So what did you do?
A. What did I do?
Q. Yeah. While you were out, what'd you do?
A. I was working with Steve White, but as far as anything to this, nothing.
Q. All right. Did you commit any additional crimes when you were out?
A. No.
Q. How long were you out, sir?
A. I -- like till November I believe.
Q. And then what happened?
A. Well, I was supposed to come in, and I -- I chickened out, and I missed court. It cost me five years.
Q. So let's talk about this a little bit. Being bonded out doesn't mean you're out of the charges.
A. No, no.
Q. Charges are still pending. And did you have a court date

1132

you were supposed to show up for?
A. Yes.
Q. And what was that court date? Was that a plea or a trial?

A. It was -- no, it wasn't -- it was sentencing date.
Q. All right. So had you pled guilty or been found guilty already?
A. I already pled guilty. They just told me to come back in a month or whatever it was. And when it came -- I wasn't -- I wasn't ready to face that five years.
Q. So as you said, you just chickened out and --
A. But what I did I wasn't ready to face because I hadn't did anything like I said I would, and I knew -- the last thing I said to Dustin, I said, What happens if I don't do it? He goes, Don't make me mad.
Q. When did you say that to him?
A. The first -- the last -- because I was shocked I was getting out, and before I left, I said, What happens if I don't get it done? He goes, Don't make me mad.
Q. So what happened when you failed to make your court date?
A. When I failed my court date, I got additional five years for failure to appear.
Q. Did you get arrested at that point?
A. Yes.
Q. And where did they take you?
A. Took me to Woodbury County to holding, and then I went to C

1133

block. I was in D block previous to that. Now I'm in C block.
Q. In the Woodbury County Jail.
A. Yes.
Q. And what happens to you once you get to the Woodbury County Jail?
A. Oh, like I said, I go to holding. Then I go to C block. And like I said, I had some contact with Dustin. I seen he had

that evil look when he talked about his best friend. He had that same look on his face when I seen him because I --

Q. How did you see him?

A. Because there's glass. If you look at a right angle, you can see between C and D. There's glass you can see.

Q. Is there a window or a door? What is it?

A. There's not -- there's just glass windows all the way along both sections. It's all glass.

Q. So you can see from one block into the other.

A. Yes.

Q. All right. So tell the jury, what did you see?

A. I saw Dustin Honken, and then there's a door, a metal door, in the back between C and D, and I talked and tried to explain to him, and I told him I'd write him a note later telling him exactly what happened, where I stood.

Q. And --

A. And that never happened.

Q. So what did you -- did you have any further conversation with Dustin Honken in jail?

A. No conversation, no.

Q. Did he communicate to you in some other way?

A. Yes.

Q. How?

A. Well, I was in D block previous to C block before I was bonded out. And there was a guy over there making a noose sign around my neck like I was a dead man and all this referring to Dustin Honken which is -- and then the next thing that happened, Dustin went to the weight -- or the exercise room which he never did in the past, and he's making -- and I'm sitting up on my

upper tier where my room was at which I very seldom did watching TV. And Dustin Honken's making these motions like a gun like he's going to kill me.

Q. I know it's hard for you to lift your hand, but can you do it as best you can?

A. He's going tew, tew like I'm a dead man.

Q. He's making a shape of gun with his hand?

A. Yeah.

Q. You couldn't hear what he was saying?

A. It's all glass. I didn't hear it, but I could read his lips.

Q. Was he looking at you?

A. Yes.

Q. And how did you take that?

♀

A. For real. I took it seriously.

Q. Did you end up contacting the police?

A. Yes, I did.

Q. And why was that?

A. Because something I didn't mention, he was also trying to get some guys to come up there and do something to me. That's where that all -- that's the only reason because he was trying to get people in my unit to do something physical to me.

Q. So you had a concern for your safety.

A. Yeah.

Q. So you went to the police.

A. Yeah.

Q. And did you tell them about everything that had happened up to this point?

A. Yes, I did.

Q. Now, were you provided with some type of limited use immunity letter at that time?
A. Yes.
Q. And what did you understand that limited use immunity letter did for you?
A. The only immunity I would get is anything that I had told. If I hadn't told something I had been participating in, then I could be charged for that.
Q. But as long as you told about it, you understood you wouldn't be charged for the activity.

1136

A. Right.
Q. So based on that did you provide that information then to the government?
A. Yes, I did.
Q. And did you ultimately testify before grand jury about what you knew?
A. Yes, I did.
Q. As a result of providing that information to the government and to the grand jury, did you receive any reduction in your theft charges that you were facing at that time?
A. Absolutely none.
Q. No reduction at all?
A. None.
Q. Did you get any benefit for coming forward with this information?
A. No, I didn't.
Q. Now, the charges you're in jail for now, are those those same charges you had back in 1996?
A. They're basically the same, but they're not the same. Same

kind of charges.

Q. Same kind of charges, new crime.

A. Right.

Q. So you were out. You served your sentence on the 1996 charges, and then you got out at some point but committed another crime?

♀

1137

A. Yes.

Q. All right. On that new crime you committed, did you get any reduction in your charges there?

A. No, I didn't.

Q. Did you get any reduction in your sentence for providing this information to the government?

A. No, I haven't.

Q. Has anybody made any promises to you that you're going to get the sentence you're serving right now reduced in exchange for providing any information?

A. No, I haven't, and I haven't asked for any.

Q. Do you have any hope that somehow by testifying in this trial you're going to somehow get your sentence reduced?

A. No, I don't.

MR. WILLIAMS: Thank you. I have no further questions.

THE COURT: Mr. Parrish?

MR. PARRISH: Thank you, Your Honor.

THE COURT: Members of the jury, why don't you take a stretch break.

Please be seated.

MR. PARRISH: May it please -- oh, go ahead.

THE COURT: Mr. Parrish, any time you're ready.

MR. PARRISH: May it please the Court and counsel.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Mr. Donaldson, is that correct?

A. Yes.

Q. You don't go by any other names, do you?

A. No, I don't.

Q. You've never used any other name?

A. I -- that's my name.

Q. No. But my question is have you ever used any other names?

A. Referring to what?

Q. To anything.

A. Maybe over a traffic ticket years ago possibly.

Q. What name was that?

A. I can't recall that.

Q. You've used a name and you can't recall it?

A. We're talking years ago. No, I can't remember it.

Q. What other name have you used other than the one you've forgotten about?

A. I haven't.

Q. That's it?

A. Yeah, I used the name a long time ago for a traffic ticket because my license was expired.

Q. Oh. So your license was expired, and you gave the police officer a different name.

A. Yes, I did.

Q. Well, let me just ask you what the end question was with

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 996 of 3636

this. And the prosecutor just asked you, well, did you get any benefit out of the information that you provided that's still up on the screen now for some reason I guess.

MR. WILLIAMS: Oh, I'm sorry.

MR. PARRISH: Thank you. Thanks.

BY MR. PARRISH:

Q. That's not exactly accurate, is it?

A. Yes, it is.

Q. You didn't get a letter to the parole board?

A. That doesn't mean anything.

Q. That's not what I asked you.

A. You asked me if I got any benefits, and I said no. It wasn't a benefit. That didn't do me nothing, so I didn't get no benefits from it. I could write the governor, but that doesn't do me any benefits.

Q. Okay. We'll just take this one step at a time.

A. Go ahead.

Q. Just slow down. I want you to kind of answer my question like you were doing the prosecutor's. Just slow down and relax a little bit.

A. I'm fine.

Q. Okay. My first question to you is did you get any benefits. You said no. Then I asked you did you get a letter to the parole board. Yes or no.

A. I didn't see it if I did.

♀

1140

Q. Well, first of all you said it wasn't a benefit.

A. I'm saying if I did I'm not aware of it.

Q. Just wait a second.

A. I'm not aware of it; okay?

Q. Let me just ask the question; okay?

A. Go ahead.

Q. Just relax. Did you get a letter to the parole board? Yes or no.

A. I'll say no.

Q. You'll say no. Is that the truth?

A. Because I have no --

Q. Wait a minute. Wait a minute. Wait a minute. Is no the truth?

A. Yes. I have no awareness of it if it happened. No one told me, no one.

Q. So is your testimony that if a letter was written by the U.S. Attorney's Office to the Iowa State Parole Board, your testimony here today is that no one up to this day as you sit here has ever told you anything --

A. No, I --

Q. Wait, wait, wait. No one has ever told you anything about it.

A. No one has showed me anything, no.

Q. Well, have they told you?

A. No one has showed me anything.

Q. Have they told you that they were going to send you a letter?

A. Yes.

Q. All right. When did they tell you they were going to send you a letter?

A. I can't recall the date.

Q. Why were they going to send you a letter?

A. Just to show them that I did help out on a case.

Q. So in other words, in 1996, they told you they were going to write a letter to the Iowa State Parole Board to -- wait just a second.

A. I'm fine.

Q. Okay. Just take it easy -- to say that you had helped out; is that right? Is that right? Yes or no.

A. They probably just said I did my duty as a citizen and I helped out.

Q. You just said the letter was to say that you had helped out. Yes or no.

A. As a citizen, yes.

Q. So they did send a letter for you.

A. Yes.

Q. Let me ask you this question. Why did you just answer the question from the prosecutor when he asked you did you get any benefit, you said no?

A. I did just as much time as I would have with or without a

1142

letter, so I didn't get any benefit, sir.

Q. Okay. Let me ask you something else. You said you had how many felonies?

A. I've had quite a few. I've been in prison for three or four different incidents.

Q. No. You said you have how many felony convictions?

A. You have it in front of you. You could probably tell me.

Q. I don't have it in front of me.

A. I don't know your -- I don't know.

Q. Don't anticipate what I have. Just answer my question if you don't mind.

A. Okay.
Q. How many felony convictions do you have?
A. I don't know.
Q. How many do you think you have?
A. Well, I've been in prison four times, so I could have eight.
Q. So you think you might have eight felony convictions?
A. Yes.
Q. How far do they date back?
A. 1985.
Q. So since 1985 you believe you've had eight felony convictions all in the state of Iowa?
A. Yes.
Q. What have they been for?

1143

A. Hog theft and --
Q. How many -- wait a minute. How many for hog thefts?
A. All but two.
Q. So you have six felonies for stealing hogs.
A. Yes. If I've got eight, that's what I have. All but two I know aren't for that. One's for attempted theft of a van and attempted burglary of a grocery store.
Q. So you're on a felony conviction right now.
A. Yes.
Q. Do you have any pending right now?
A. No, I don't.
Q. So where are you living right now?
A. I'm in Oakdale, the penitentiary.
Q. Which one?
A. Oakdale.

Q. You've been there since when?
A. November 25.
Q. The one you're serving now or the two you're serving now, does that make a total of what? Is that more than eight, or is that --
A. I said I don't know. I just guessed eight.
Q. You just kind of lost track. Could it be more?
A. It could be either way.
Q. More or less?
A. Yeah.

Q. Now, most of your crimes are for theft; is that correct?
A. Yes.
Q. That means taking the property of other people when that property does not belong to you; is that right?
A. Yes.
Q. Is that correct?
A. Yes.
Q. I take it you have a habit of doing that?
A. I don't like to look at it like that.
Q. It's not a habit. I thought you were serving what's called a habitual?
A. That's what -- yes.
Q. Is that like a habit of committing felonies?
A. That's not my opinion of that, no.
Q. Okay. Now, if that means taking other people's property, you indicate -- and correct me if I'm wrong -- that you were in Mr. Honken's cell D; is that right?
A. Uh-huh, yes.
Q. You weren't his cellmate by any chance, were you?

A. No.
Q. Did you have access to his cell?
A. Only when he was in it.
Q. I just asked you did you have access to his cell. Yes or no.
A. Yes.

Q. How many times did you go into his cell?
A. Most of the time we met in his cell. He had been in my cell.
Q. And as you went into his cell, would you agree that you had access to his legal papers?
A. I had no idea where he kept them exactly, no.
Q. You stole them, didn't you?
A. Excuse me?
Q. You stole his legal papers, didn't you?
A. What would I do that for?
Q. I asked you a question.
A. No, I didn't.
Q. Are you telling us now that you never took a single item belonging to Mr. Honken from his cell and when you were arrested along with the papers that are now there you had note papers relating to Mr. Honken?
A. Yes.
Q. Legal papers?
A. Yes, I testified that no, I did not take any papers from Dustin Honken out of his room.
Q. Were there papers in his room?
A. That's what you just told me. You just accused me --
Q. I'm asking were there.

A. I don't know.
Q. You never saw any --
♀

A. He had the guidelines -- the only papers he got is the papers I copied off to write this.
Q. Guideline papers? Is that one of the things --
A. He had a guidelines book.
Q. Okay. What else?
A. I don't know what else. Whatever he -- he would write down that he'd want me to copy.
Q. Did he have newspaper articles?
A. I can't recall that.
Q. You can't recall that. Do you ever recall reading any of his newspaper articles from his mother?
A. I can't recall nothing in jail that would -- nothing that pertained to Dustin Honken.
Q. Do you recall testifying that you had seen his newspaper articles or articles relating to him?
A. I don't recall that, no.
Q. You don't recall doing that, testifying to that.
A. No, I don't.
Q. Let me just ask you, have you, in fact, and had you, in fact, read newspaper articles from him?
A. I don't recall it.
Q. Let me start a different area with you, and let's work back to that. You indicate, did you not, that when you got out of jail you went to live with a Mr. Parmalee; is that correct?
A. Yes.
♀

Q. Did you work for Mr. Parmalee?
A. I did work for him somewhat, but I went back to the guy I roof with most of the time, Steve White. But I did help Phil Parmalee move some things. He owned a business in South Sioux City, helped him at his farm out in South Dakota I believe it was.
Q. Mr. Williams asked you whether or not you committed any other crimes when you were out.
A. Uh-huh.
Q. And your response was that you did not commit a single crime once you were released from the Woodbury County Jail; is that right?
A. I didn't commit no crime. I missed court, but I wasn't committing a crime other than I didn't look at that as -- when you said it, I think you were talking about theft. No, I did not steal nothing while I was out on bond.
Q. You did, however -- and correct me if I'm wrong -- get five additional years added to your sentence --
A. Yes.
Q. -- because you did not show up in court. Was that just a failure to appear?
A. Yes, it was.
Q. Excuse me. Or was that an escape charge?
A. It was a failure to appear.
Q. And five additional years was added to your sentence; is

1148

that right?
A. Yes.
Q. And you served those additional years, or did you get some type of deal?

A. I didn't get no deal.

Q. What did you get? Five additional years on top of the theft charge you were facing?

A. Yes, yes.

Q. So you went into prison in when?

A. I don't have the dates in front of me, but I -- I did two and a half years same as I did on a three-year sentence. Two and a half to three is what a fifteen-year sentence is, so I didn't get any kind of break as you were suggesting earlier.

Q. I'm not suggesting. I'm just asking a question. So you did, in fact, go into prison, and the five years was escape charge that you served; is that right?

A. It was not escape. It was failure to appear.

Q. Failure to appear. Is that normally served on top? And what I mean by on top, with your years, you understand me. If you do a failure to appear, you cannot discharge your failure to appear with your theft charge at the same time, can you?

A. Yes, you can.

Q. Well, who worked that out for you?

A. I didn't get that, but you can. You asked me if I could get it. I said yes. I didn't get that. No, I didn't. You

♀

1149

asked me if you could do that.

Q. Your testimony is that you first served your theft charge. Once you discharged that, is your testimony that then you began to serve your failure-to-appear charge?

A. Yes.

Q. And then you discharged that. One was five years, and how much was your theft?

A. Five.

Q. So you discharged a ten-year sentence, one on top of each other, in two and a half years?
A. I didn't say that. You did.
Q. Well, I'm asking you.
A. I served a five-year sentence. I discharged a five. Whenever you discharge a five, you run on -- they parole you on to your second number.
Q. So you were paroled on to your second one.
A. To a work release.
Q. And you're saying that the letter written by the government did nothing to help you get that.
A. No, it didn't.
Q. You did that pretty much on your own also.
A. Yes.
Q. Let's go back to your other testimony about the letter. You indicated -- and correct me if I'm wrong again -- that Mr. Honken did not want anything in his handwriting; is that

right?
A. Yes.
Q. Yet you testified that he gave you a letter in his own handwriting.
A. (Witness nodded head.)
Q. Do you think those things contradict each other at all?
A. He gave -- only he wrote things that were going to his personal friends.
Q. So there was a distinction then. Things going to his personal friends he wrote in his own handwriting.
A. If he needed something from them, the only person he did that was Jay and his other friend Held.

Q. So he wrote those in his own handwriting.
A. Yes.
Q. So he did put some things in his own handwriting that he gave you.
A. Only if it wasn't criminizing (phonetic) in any way.
Q. No. My question is there are some things he gave you in his own handwriting; is that right?
A. Yes.
Q. Some things you copied; is that right?
A. Yeah.
Q. Are you telling us you did not go into his cell and you copied the material out of his cell? Did you do that?
A. I'm telling you no, I didn't.

♀

Q. Well, where did you copy it from?
A. From him when he handed it to me.
Q. Were you in his cell?
A. Not always. Sometimes we were in mine.
Q. And you would copy it off things he had written down.
A. He handed it to me, and I'd take it back and copy it over.
Q. So he would hand you the material. You would then go into your cell, and you would copy it down.
A. Yes.
Q. Then you would bring it back to him.
A. Yes, and he destroyed it.
Q. He would destroy his original copy.
A. Yes.
Q. And tell us, did this happen over the course of one day or over the course of a period of time?
A. A long course of period of time. The heavy stuff was at

the very end. At first it was nothing.
Q. You also said, did you not -- and you corrected this toward the end of your testimony. First of all, you answered the question that Mr. Honken was with you from January of 1996 for 6 months before you got out. And I believe you indicated you were released in August; is that correct?
A. Yes.
Q. But that's not correct, is it?
A. I'm not sure of his day when he got there. Six months,

1152

probably no, that probably isn't correct.
Q. So when you answered the prosecutor that it was six months and he was there in January of 1996, was that a mistake on your part?
A. Yes, it was.
Q. Do you know when he got there?
A. I honestly don't. I don't recall.
Q. When you were released from prison, I assume from the Woodbury County Jail, you indicated that a deal had been cut to pay you how much?
A. Which deal are you talking to, referring to?
Q. The deal to have you released. How much money did you get?
A. To get released, I didn't get any money to get released.
Q. Did you have any money when you stepped out of the jail?
A. Phil Parmalee gave me some money. I didn't have any.
Q. How much?
A. Gave me a hundred bucks.
Q. But the hundred bucks was not in any way related to Mr. Honken.
A. No.

Q. So what type car did you have?
A. I didn't have a car.
Q. What type house did you have to live in?
A. I was living at Phil Parmalee's.
Q. So you had no money; is that right?

A. Yes, and I worked for him when I first got out.
Q. Nobody was out waiting to give you any money; is that right?
A. I didn't ask for any. I'm a big boy.
Q. No. My question is nobody was waiting to give you any money; is that right?
A. No.
Q. You had no automobile of any sort; is that right?
A. No.
Q. You had no bank account; is that right?
A. Yes, that's right.
Q. You had no house to live in; is that right?
A. That's right.
Q. You had no telephone; is that correct?
A. Where I stayed at I had a telephone.
Q. Of your own.
A. I had access to it, so it was like my own.
Q. Did you have a telephone in your name?
A. No, I didn't.
Q. Now, you indicated that you believed Mr. Honken was a top graduate or student at Arizona State; is that correct?
A. Yes.
Q. And what did you base that on?
A. What he told me.

Q. You also said that you believed everything he said to you;

is that correct?
A. Yes, I did.
Q. And you also said that you, in fact, did not read a single item from any newspaper related to his case before he got there; is that correct?
A. That's correct. I don't recall it.
Q. After he -- excuse me. You're saying you don't recall.
A. I don't recall.
Q. After he got there, did you read any article that appeared in newspapers related to his case?
A. Again, I don't recall it. We don't get newspapers in our -- very seldom in our units, so I don't really recall seeing any.
Q. Did you discuss Mr. Honken with any other inmates who were at the Woodbury County Jail at the time he was there?
A. Would you rephrase that, please?
Q. Did you discuss with any other inmates Mr. Honken once he got to the jail?
A. Did we discuss what?
Q. Mr. Honken at all or his case.
A. Oh, yes.
Q. All right. He was big news I take it; is that right?
A. Only because he made it big news.
Q. He made it big news.
A. Yes.

Q. And tell us what Mr. Honken said to make it big news once he arrived there.
A. He was the meth dealer, and he kept -- I'm not the only one that was exposed to what he had did.
Q. When he got to the Woodbury County Jail, you're saying other people around the jail knew about him being in the jail.
A. No, I'm not saying that. I'm saying Dustin exposed himself.
Q. To other people.
A. Yes.
Q. Not just you.
A. Yes.
Q. And you know who those other people are?
A. One was Boudine. There were several. I can't remember. That's one I do know. Boudine was one of them.
Q. Go ahead. Did you have discussions with those other people about Mr. Honken?
A. He was there when Dustin had talked about his meth projects and all this and that.
Q. Okay. And were other people around when Mr. Honken talked about his project in front of you?
A. Not about the seriousness of some of those things, no. When he talked about killing people, no.
Q. Only you were around then.
A. Yes.

1156

Q. Nobody else.
A. No.
Q. Did you see in his cell papers?
A. Again, I saw his guidelines book, and that's all I seen.

Q. Let me finish my discussion just a second. Did you finish -- did you see in his cell other legal papers that were in envelopes?

A. No, I didn't. I didn't snoop in nobody's room.

Q. I didn't ask you whether you snooped.

A. I don't recall any envelopes, no.

MR. PARRISH: Do you want to stop here, Your Honor?

THE COURT: That'd be fine. Thank you.

Members of the jury, that concludes the testimony for today. And let me get my days straight. Today's Thursday. So we'll be seeing you a week from today. We won't be holding court next Monday, Tuesday, or Wednesday. We'll start next -- we'll go next Thursday and Friday and then get back into our schedule.

Keep an open mind until you've heard all of the evidence in the case, had a chance to receive my final instructions, hear the closing arguments of the lawyers, and, most importantly, go back and begin your deliberations.

I just want to raise one matter. It's come to my attention that some jurors are distracted by the movements of other jurors, and I know it's hard when you're all in close

1157

proximity. I can do pretty much anything up here. Nobody's sitting next to me, and you can tell I'm fairly active.

So I'd just ask you to try and -- I know you're all trying real hard to be respectful of each other so that everybody can hear and not distract each other. So we'll see you next Thursday, and we'll start court exactly at 8:30. So thank you very much, and we'll see you next week. Thank you.

(The jury exited the courtroom.)

THE COURT: Mr. Tuck, you can remove Mr. Donaldson. Thank you.

Everybody can be seated. I've just got a couple matters to take up with the lawyers.

With regard to the phone call objection in the Held testimony, the phone call allegedly made by one of the girlfriends, I just want to go back and say even though the government withdrew the 801(d)(2)(E), I'm going to rely on that because all I have to do is find by a preponderance of the evidence that it would be an alleged co-conspirator Angie Johnson, and I'm willing to make that finding. So I'm going to rely on 801(d)(2)(E). In looking at the other 801(d)(2) exceptions, I'm also going to rely on (A), (B), (C), and (D).

So let me ask the defense a question. Do you all have a witness and exhibit list and a book of exhibits, or are you in the process of coming up with that?

MR. PARRISH: We're still working on material. As you

know, a lot of our material is coming out of institutions. We're slowly getting it. We got some more in I believe a couple of days ago. Mr. Williams has been pretty helpful with us in getting these materials. But we're not at the point yet where we can put together -- we did prepare an original list of exhibits, but I think that's going to be altered somewhat that we gave the government early on.

THE COURT: When do you think you'll be in a position to give me what would be close to a near final witness and exhibit list?

MR. PARRISH: Well, we're going to work on it I'm sure this week, so we'll try to have something -- I think we start

back Wednesday. We go through that next Thursday? Do we go through that following next Thursday or Friday?

THE COURT: I'm sorry. We have court next Thursday and Friday.

MR. PARRISH: Yeah, but then that next week.

THE COURT: Oh, the next week, I think Monday through Thursday.

MR. PARRISH: I think we can have something by that Monday which would be the --

THE COURT: A week from this coming Monday.

MR. PARRISH: Right.

THE COURT: Okay.

MR. PARRISH: And we'll try to get that ready.

♀

1159

THE COURT: Now, I just want to make sure, because I think Judge Zoss is handling this, that we're not going to have problems with getting writs or subpoenas or whatever's necessary to compel the production of witnesses that you're going to be calling.

MR. PARRISH: I think we have that all worked out. There are a couple of problems, Your Honor, but they're unrelated to the writs themselves. They relate directly to the specific witness and the individual problems that the witnesses are having.

THE COURT: Is that the one we might do by videotape?

MR. PARRISH: Well, we don't know about that one.

THE COURT: Video conferencing, excuse me.

MR. PARRISH: We do have three that we've agreed to. And we copied Judge Zoss on the letter. We didn't copy you, but we could get that letter to you.

THE COURT: No, that's fine. I don't need to be necessarily in the loop. All I need to be in the loop on is if there's a problem and I can have enough time to try and solve that.

MR. PARRISH: Right. We'll get copies of that to you also on Thursday, the witnesses coming in by video conferencing and the other one.

THE COURT: Okay. Now, Mr. Williams, do you have any approximate judgment, guesstimate as to when you think you may

be finished? I know it's very hard. I'm just asking for a rough approximation.

MR. WILLIAMS: Sure. I'll give you two possibilities. Part of it depends on stipulations we're still working out with the defense as to some of the evidence. If the stipulations are reached, I think an optimistic close of our case would be the end of the first week of October and worst-case scenario, sometime during the second week of October. If the stipulations aren't reached, I think the end -- I think the second week of October is optimistic, and it's probably the third week of October before we'd be able to finish our case in chief but probably the beginning of that third week.

That's my best guess right now. I think a lot of our timing is going to really depend once we get some of these federal inmates in how long they take. We're roughly estimating a half day for each of them, and they could be a day; they could be a couple hours. It's going to be hard to tell. That's my best guess at this point, Your Honor.

THE COURT: Okay. Thanks.

MR. PARRISH: And what we would add, Your Honor, just

on the inmate question -- and we're still debating a witness list with our client, but I believe we designated about the 18th to start. At least that's with the marshal's office. And we were not anticipating the stipulations at that point. But that was the best date we thought we could work with. We could

♀

probably talk to them about speeding them up, but we kind of chatted, and we thought we would be looking at about the 18th. But if we had other witnesses, we might be able to fit them in earlier and just work around the inmates.

THE COURT: Well, I think you're going to have to know fairly certain because this whole inmate thing has gotten much more complicated by Hurricane Ivan because -- matter of fact, I had a trial that was supposed to start yesterday that Judge Wolle was coming in to try for me, and he wound up continuing it because the government couldn't get their witnesses here who were not located in Florida, but I believe nearly all of the U.S. marshal planes that are used to transport witnesses have been used because they evacuated every single inmate is my understanding in all the federal prisons in Florida, and they have a lot down there. And there was no way to get the inmates here, so we had to continue the case.

So I imagine that's going to be an ongoing problem for a while as they start getting the inmates back to the federal prisons. So we've got that looming.

So anything you can do to try to figure out when the defense is going to start and who your witnesses are going to be would help the marshals in the scheduling of it; okay? Anything else we need to talk about?

MR. ROGERS: Your Honor, in light of your most recent

ruling concerning the telephone hearsay through the testimony of

Mr. Held --

THE COURT: Yes.

MR. ROGERS: -- I want to for the record -- it may well be clear on the record. I don't know. But I want to make it clear that we are objecting to the entire thing as hearsay including the representation by the female caller that she was, in fact, a girlfriend of Mr. Honken which is I think what you're relying on to establish by a preponderance of the evidence that it was Angela Johnson.

THE COURT: Right. I understand that.

MR. ROGERS: So I want to make sure our objection goes all the way to that part.

THE COURT: I assumed that it did, and now there's no question about it.

MR. ROGERS: Thank you.

THE COURT: Thank you. Anything else?

MR. PARRISH: No, Your Honor.

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Thank you. We'll be in recess.

(The foregoing trail was adjourned at 4:35 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

12-3-04
Shelly Semmler, RMR, CRR Date

INDEX

VOLUME 5 9-16-04 witness testimony

| WITNESS: | | PAGE: |
|---|---|---|
| TIMOTHY CUTKOMP | | |
| | MR. PARRISH | 878 |
| | MR. WILLIAMS | 981 |
| LORI LEWIS | | |
| | MR. MILLER | 984 |
| | MR. SPIES | 995 |
| MARCY HYDE | | |
| | MR. WILLIAMS | 1001 |
| | MR. SPIES | 1012 |
| | MR. WILLIAMS | 1021 |
| BELEN KAPPELMANN | | |
| | MR. WILLIAMS | 1022 |
| | MR. SPIES | 1030 |
| ROBERT RIEPMA | | |
| | MR. WILLIAMS | 1034 |
| | MR. ROGERS | 1044 |
| | MR. WILLIAMS | 1053 |
| RICK HELD | | |
| | MR. WILLIAMS | 1054 |
| | MR. ROGERS | 1080 |
| | MR. WILLIAMS | 1084 |
| | MR. ROGERS | 1085 |
| DEAN DONALDSON | | |
| | MR. WILLIAMS | 1086 |
| | MR. PARRISH | 1138 |

*****

EXHIBITS:

| | |
|---|---|
| 227 | 1041 |
| 226A through 226M | 1078 |
| 213 | 1108 |
| 217 | 1111 |
| 216 | 1116 |
| 218 and 220 | 1122 |

*****

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, Plaintiff, vs. DUSTIN LEE HONKEN, Defendant. /

No. CR01-3047

Sioux City, Iowa
September 23, 2004
8:18 a.m.

VOLUME 6

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff:

C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant:

ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn
Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

(Proceedings reconvened outside the presence of the jury.)

THE COURT: I'd like to go on the record now. First, are there any matters that we need to talk about other than the matter I need to raise with regard to a juror note that we just received? Is there anything else we need to talk about, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: No, Your Honor. Thank you.

THE COURT: Okay. Maybe at the end of the -- well, let me ask you this. Have you all had a chance to look at the proposed merits final jury instructions?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Would we be able to talk about them maybe at the end of the day today?

MR. WILLIAMS: Yes.

THE COURT: Okay. Mr. Rogers, are you taking the lead on those?

MR. ROGERS: I hope not, Judge. I have looked through them.

THE COURT: Well, who has?

MR. ROGERS: I say I have looked through them, but I didn't realize I was taking the lead, but I can be ready by the end of the day to do so.

THE COURT: Okay.

MR. ROGERS: If I have to.

THE COURT: Well, if you're not -- I don't care who takes the lead, but I said in my letter we were going to talk about them this week. But you've taken the lead on all other instruction matters. If you want to pass the mantle to one of the other two, I don't care, but somebody's gotta speak.

MR. ROGERS: We'll be ready.

THE COURT: Let's take up this matter. I was just handed this note that Juror Number 14 brought in from her doctor. It had her name on it, so we excised her name and put in the juror number. I'm not inclined to really question her unless the parties want to question her. I'm going to take the note at face value, but -- so what's the government's position?

MR. WILLIAMS: We have no objection to that, Your Honor.

MR. PARRISH: Judge, I would agree with the Court that based upon the note that I don't think there's a great deal of value in questioning her.

THE COURT: Yeah, I just don't see what I could add to it, and I'd be -- you know, if the doctor is saying that she needs to be excused due to high risk of miscarriage, I really don't know what kind of question I could ask that could -- that would result in an answer that would change my mind from discharging her. So, you know, I just thought I'd -- she's

1168

nervous enough and apparently told one of our clerks that she feels very bad about this, and I just don't want to add to her stress. So if you don't mind, I thought we'd just bring her up,

and I'll excuse her, just have her come in and sit down for a second, and then I'll thank her and excuse her.

MR. PARRISH: That's fine with us, Your Honor.

THE COURT: Okay. Thank you.

(Juror Number 14 entered the courtroom.)

THE COURT: Hi.

JUROR NUMBER 14: Hi.

THE COURT: We did receive your note, and we just wanted to let you know that we're going to go ahead and excuse you.

JUROR NUMBER 14: Okay.

THE COURT: And thank you very much for serving, and the only condition upon being excused is that you have to write me a note when your baby's born and tell me what the name is and that everything came out okay. I'm sure it will. Good luck to you, but I know that this would be stressful to you, and we want to honor the doctor's judgment, and thank you very much for serving, and good luck with your pregnancy.

JUROR NUMBER 14: Thank you.

THE COURT: Okay. Thank you. You're excused.

JUROR NUMBER 14: Thank you.

(Juror Number 14 exited the courtroom.)

♀

1169

THE COURT: Anything else?

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: No, Judge.

THE COURT: Okay. We'll see everybody at 8:30. Thank you.

(Recess at 8:23 a.m.)

THE COURT: Gentlemen, we need to go back on the

record. We have a new problem. I'm just reporting what Duane Walhof, our marshal, has told me. Mr. Donaldson -- has he been tendered for cross?

MR. WILLIAMS: He has, Your Honor.

THE COURT: Okay. He's apparently refusing to testify now until he talks to one of the government lawyers. That's what I've been told.

MR. WILLIAMS: We got the message he wanted to talk to us, and we passed the message back to the marshals that we were unable to talk to him because of the rules once he's been tendered to the defense. So that's the only communication we've had through the marshals is simply we couldn't talk to him.

THE COURT: Okay. What I'm going to do is waive that rule as long as you don't woodshed him. I think you know what I mean by that.

MR. WILLIAMS: Certainly.

THE COURT: And I have every confidence you're not going to do that. But for some reason he wants to talk to the

1170

government lawyers, and so I'm going to go ahead and allow it. The defense can make any objection they want.

MR. PARRISH: Your Honor, we would object -- I understand the Court's allowing it -- on the basis of the rule that once the witness begins his cross-examination --

THE COURT: Well, it's my rule that I impose, and I can waive it any time I want to.

MR. PARRISH: Absolutely.

THE COURT: You didn't even ask for the rule. It's my rule. So what's the basis for your objection?

MR. PARRISH: The one I was just getting ready to

make.

THE COURT: What's the basis for it?

MR. PARRISH: Well, the rule is that once the process starts, any conversation between the prosecutor and the witness should not be allowed.

THE COURT: Yeah, but the purpose of the rule is to prevent woodshedding, and I've instructed him not to do that.

MR. PARRISH: And we certainly appreciate that.

THE COURT: Okay. Why don't you go meet with him and let us know what's up.

MR. WILLIAMS: Very good.

THE COURT: Thanks.

(Recess at 8:28 a.m.)

THE COURT: Please be seated. Mr. Williams, do we

♀

1171

have a problem?

MR. WILLIAMS: No, we don't, Your Honor. I agreed with the defense counsel to put this on the record so we have a record of what happened.

Mr. Donaldson was housed with Mr. Kluver apparently last night in a local jail. Mr. Kluver learned who he was and said that he was asked by the defendant to kill Donaldson and that the people were out to get Dean Donaldson and that the defendant's connected to the outside and could do harm to him and so forth. So Mr. Donaldson was worried about his safety.

I told him that as far as we know there's no evidence of a plot to kill him that we're aware of. We're not aware of the defendant having anybody on the outside who's attempting to kill Dean Donaldson and that in the event that he has concerns about his safety down the road, that's something we would

certainly talk to him about and would take steps, if necessary, to protect him. Given those reassurances at that point, he's fine and said he's willing to testify.

I related that information to Mr. Parrish when we got back in the courtroom before the Court took the bench.

THE COURT: Okay. Why don't we bring Mr. Donaldson in. Why don't we bring the jury in too.

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated. Members of the jury, we did lose a juror this morning due to health

reasons, so I just wanted to alert you to that. And we were in the cross-examination of Mr. Donaldson, so, Mr. Parrish, any time you're ready.

MR. PARRISH: Thank you, Your Honor.

DEAN DONALDSON, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

CONTINUED CROSS-EXAMINATION

BY MR. PARRISH:

Q. Good morning, Mr. Donaldson.

A. Good morning.

Q. I'll reintroduce myself to you. My name is Alfredo Parrish, and I'm representing Mr. Honken along with Mr. Spies and Mr. Rogers.

We left off I believe it was last Thursday, I was asking you a few questions about your background, and I believe I asked you what names other than Dean Donaldson had you gone by. I believe your response was that except for one traffic ticket some time ago you may not have used any different names. Is that your response?

A. It's been probably 15 years ago, 10 or 15.

Q. Did you use the name Randy Roger Mews, M-e-w-s.
A. Mews, yes, I did.
Q. Did you use the name Randy Roger Muus, M-u-u-s?
A. I'm not positive, but I could have. I used it twice.
Q. Did you use the name Randy Mews, M-e-w-s?
A. Yes.

♀

Q. Did you use the name Randy News, N-e-w-s?
A. Not to my knowledge I didn't.
Q. So then in response to my question I asked you last Thursday, you would agree that you've used and been known by at least, by your own admissions, three additional names other than Dean Donaldson?
A. No, it was one name, Randy Roger Mews, and I don't know if I used it three times. But when I'm up here, I'm here on a trial; I didn't know I was on trial. I didn't know you were going back all those years on all those things you're asking me.
Q. Now, also you told the jury last Thursday that when you got out of jail it was a total surprise to you and you had no knowledge that you were going to, in fact, be getting out; is that correct?
A. He'd been telling me for two months he was going to do it. It didn't happen. So yes, I was surprised.
Q. And you said you were so totally surprised you just walked out; is that right?
A. No, I didn't.
Q. Matter of fact, did you, in fact, write a letter indicating that you were going to be getting out?
A. Not to my knowledge after . . .
Q. You said you never wrote a letter to --

A. I said not to my knowledge I didn't.
Q. Do you think you could have?

A. I don't remember doing it.
Q. Do you know a person by the name of Jannetta?
A. Yes.
Q. Did you write a letter to Jannetta indicating to her that you missed her very much and you were going to be getting out of this dump?
A. I really don't recall it, to be honest.
Q. And did you ever tell Jannetta when you were getting out of this dump you'd like to meet with her and talk with her?
A. Again, I don't remember the letter.
Q. And did you make any plans indicating that you would meet her there on a Friday?
A. Again, I don't -- I believe not.
Q. So any letter like that in your handwriting would not have been a true document? Is that what you're saying?
A. I don't recall it at all.
Q. Well, you did, did you not, recall with some degree of specificity --
A. I don't recall.
Q. Excuse me?
A. I don't recall any of it.
Q. All right.

MR. PARRISH: I'd like to mark a note for identification, and I'll just label it just for identification Defendant's Exhibit B as in boy.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1027 of 3636

THE COURT: Well, do I have a copy?

MR. PARRISH: I don't think you do, Your Honor.

THE COURT: Well, am I going to get one?

MR. PARRISH: We can make sure -- I just want to mark this for identification to see if he can recall.

THE COURT: Okay. That's fine.

BY MR. PARRISH:

Q. Would you take a look at what I've marked as Defendant's Exhibit B for identification purposes only and tell me whether or not you recognize that as your handwriting and signed by Dean Donaldson.

A. Yes, it looks -- that's my writing. Have you got a date on it, though?

Q. Well, we'll worry about the date later, but this is your handwriting; is that accurate?

A. Yes.

Q. Okay. And that letter was written to a Jannetta; is that correct?

MR. WILLIAMS: Objection, Your Honor. Without establishing a date, it is irrelevant at this point.

THE COURT: Well, I don't have a -- I need to see the document.

And your objection is it's irrelevant because there's no date?

MR. WILLIAMS: Yeah, the whole line of questioning's

1176

irrelevant unless the defense can establish the date of this letter and this communication to Jannetta occurred at a time prior to him being bonded out by the defendant in this case.

He's been in jail, as direct testimony showed, a number of times. This could have been written at any point. I just don't know when it was written.

THE COURT: Objection's overruled. You may proceed.

BY MR. PARRISH:

Q. Do you recall writing a letter to a Jannetta?

A. No, I don't.

Q. Do you recall telling Jannetta at any point in time that you've been in the joint since January?

A. I don't recall the letters.

Q. Do you recall on direct examination when Mr. Williams asked you when did you go to the Woodbury County Jail you indicated you had gone in January; is that correct? Was that your response to Mr. Williams when he asked you the same question?

A. I don't remember telling him I got in there in January, but I see in that letter didn't it say I was in there since January?

Q. Was there another jail you might have been in since Mr. Williams indicated you'd been in lots of jails a lot of times in January of that same time where you might have written a letter to a Jannetta?

A. Would you rephrase that question?

Q. Yes. I'm sorry. The question was not clear. Was there

any other jail facilities you might have been in since January and during that period of time you wrote a letter to a person by the name of Jannetta?

A. I don't recall it, but that's my handwriting. I just don't know when that letter was written.

Q. So does this letter in any way refresh your recollection, Mr. Donaldson, that you may have known beforehand contrary to

what you represented on direct examination that you were going to get out of jail --
A. I could have wrote that -- I could have wrote that before I even met Dustin.
Q. My question -- and I didn't get a chance to finish it, and I apologize, but go ahead and feel free to --
A. Oh, I apologize. Go ahead. I could have wrote that when I first got there because I thought somebody was going to lend me money. But I don't think that was written at the end of my sentence in jail.
Q. You kind of lost track of my question now, but I never got a chance to finish it.
A. I apologize.
Q. But can you think of anyone else you would have written a letter to, and does this letter refresh your recollection as to whether or not you knew in advance that you were going to get out of jail as opposed to what you represented on direct examination?

1178

A. As I stated in the past, this was going on for two months he was getting me out, and it didn't never happen.
Q. You told us also, did you not, on direct examination and also on cross-examination that you had a total number of convictions somewhere in the neighborhood of eight, and in those convictions you said, six of them were for hog theft, and other than hog theft, you had no other types of convictions. Was that your testimony on -- excuse me, on direct and cross-examination last Thursday?
A. Yes, that's what I said, and again, I didn't know I was on trial and had to go back and think about a lot of things I said,

and there was one other one in there for a felony with an assault because I left -- a guy tackled me, and I pushed him off me, and I got it for assault.
Q. Well, first of all, let's deal with what your answers were just a moment ago. You indicate, did you not, that when you took the oath you understand that you have to tell the truth?
A. Yes, I did. I . . .
Q. So when you indicated on direct examination that in point of fact and on cross-examination you'd only had convictions for hog theft, six of them, was that true, or was that a false statement?
A. Just to my best knowledge at the time.
Q. And that was on the time last Thursday; is that right?
A. Yes.

Q. And you also, did you not, added voluntarily that you had no convictions of any violent crimes? Did you, in fact, say that on Thursday under oath?
A. That wasn't a violent crime.
Q. Did you say that under oath on --
A. Yes, I did.
Q. All right. Now are you telling us that you've thought about it over the weekend -- and you're going to have to let me finish.
A. Go ahead. I'm sorry. I apologize.
Q. You thought about it over the weekend and now you have a conviction dealing with a felony assault?
A. I never assaulted no one. I just got up, and I pushed him to get up, and I stood there, and I got it for assault.
Q. My question is --

A. Yes, yes.
Q. So the testimony you gave us on Thursday then was untrue.
A. Yes. I'm not sure if this is allowable in a federal court, but if you think I'm lying about the situation I'm here on, I'll be more than glad to take a polygraph test.
THE COURT: Mr. Donaldson, let me go through a couple ground rules.
THE WITNESS: Uh-huh.
THE COURT: The lawyers get to ask the questions. I want you to try and listen carefully to the questions that

Mr. Parrish asks and then if you get asked more questions by Mr. Williams. And do your best to respond to the question that they ask and not volunteer something else.
THE WITNESS: I apologize. I will listen.
THE COURT: Okay. Thank you.
BY MR. PARRISH:
Q. So, Mr. Donaldson, are you telling me that you made a statement that was untrue to this jury last Thursday because you had forgotten about it?
A. Yes.
Q. Okay. Let me ask you this. You were convicted in 1985 of theft in the third degree; is that correct?
A. I believe so.
Q. You were sent to Oakdale.
A. That was a misdemeanor, yes.
Q. That's called an aggravated misdemeanor, isn't that correct, two years in prison? That's why you were sent to Oakdale?
A. Yes.

Q. It was not a misdemeanor where you just go and do jail; is that right?
A. I'm -- it was a misdemeanor. I'm not sure what degree.
Q. And your parole was revoked on that on May 24 of 1985; is that correct?
A. Yes, it was for working out of county.

♀

Q. Now, was the theft third stealing hogs?
A. Yes, it was.
Q. Then in 1987 in Woodbury County after you'd gotten out and your parole was revoked, you had theft second in 1987. That was again in Woodbury County; is that correct?
A. I believe so.
Q. And was that for stealing hogs?
A. Yes, it was.
Q. In 1989 you had theft second, a conviction; is that correct?
A. I believe so. I . . .
Q. And was that for stealing hogs?
A. I believe so.
Q. Do you remember what you told the jury when -- on -- when you said Mr. Honken bailed you out or someone who knew him bailed you out for $500 and you had a failure to appear, did you mean to leave us with the impression that that's the first time you had a felony charge and a conviction of failure to appear?
A. No.
Q. Matter of fact, in 1989 when you came back from that hog theft charge, you failed to appear; isn't that correct?
A. I don't recall that.
Q. Didn't you get in a high-speed chase with the police

officers during that time that you pled guilty to also?
A. Yes.

Q. Okay. And you were charged with eluding and conviction when the police had to track you down and chase you through the streets, isn't that correct, and you pled guilty to that?
A. I didn't plead guilty to eluding, no.
Q. Then your parole was revoked on that charge in 1992 after you went in for failure to appear and for theft second; isn't that correct?
A. I believe so.
Q. You went back to Oakdale, but in that instance you went out of Cherokee County; isn't that right?
A. I'm not sure, but I believe so.
Q. Now, that was a theft charge also; isn't that correct?
A. Yes.
Q. So in 1992 you had approximately four theft charges, one failure-to-appear conviction. All of these are felonies; is that correct?
A. I -- what year did I have a failure to appear? The only failure-to-appear conviction I have is from failure to appear on this charge when I was in jail with Dustin Honken.
Q. So you deny you had one in 1989 that you were paroled on on December 3 of 1990. You deny that you had that failure to appear. Is that your testimony?
A. I don't remember. I don't recall.
Q. You just don't remember.
A. I don't recall no failure to appear.

Q. And you don't remember being revoked on that on February 26, 1992, either, do you?
A. I might have been revoked but not a failure-to-appear charge.
Q. Okay. Then on 12-14, 1989, out of both Cherokee County and April 25, 1990, out of Plymouth County, you had two second-degree theft convictions; isn't that correct?
A. I believe so.
Q. And both of those, you would agree, involved what? Theft of other people's property?
A. Insurance on hogs.
Q. Insurance on hogs.
A. But it's still theft. There's no justifiable reason.
Q. So what you would do is go talk to a farmer and work out a deal where the hogs would be stolen and then the farmer would receive a check.
A. No.
Q. So it was not that type of insurance fraud that you said was a theft second. Actually you would go on other people's property, and you would actually steal the property from them; is that correct?
A. Yes, yes.
Q. You would agree then that in April -- I'm sorry, on August 2, 1992, you were convicted of committing an assault during the course of committing a felony that you pled guilty to; is that

1184

correct?
A. Yes, I pled guilty to it.
Q. You were paroled on that August 15, 1994. Then you went back into Woodbury County with two counts of vehicle and

livestock theft. That would have been January 23 of 1996; isn't that correct?
A. Yes.
Q. And so that January letter that we just talked about that you wrote to Jannetta which you said is your handwriting and was written to Jannetta, can you think of any other document that would correspond to a January date other than the one that you wrote to Jannetta when you went back to Woodbury County Jail on January 23 of 1996? Can you think of any other document?
A. Not right offhand, no.
Q. Now, you were at the Woodbury County Jail. Now, to ask you at this point, I'd like to know your relationship and contact with other people who might have been in the jail. One of them has the name of a Dean, not Dean Donaldson but Mr. Dean. Do you know Mr. Dean?
A. Yes.
Q. Now, how long had you known Mr. Dean?
A. Quite a while. I can't give you a year. For a while, few years.
Q. Well, wouldn't it be accurate that you had known Mr. Dean since 1984 or 1985?

1185

A. In the '80s sometime. I can't tell you when.
Q. Now, you'd known Mr. Dean outside of the jail institution and also outside of the prison institution; would you agree with that?
A. Yes.
Q. But you'd also known Mr. Dean inside of the prison institution; is that correct?
A. Yes.

Q. Briefly let me just ask you, what's your educational background?
A. Went to school after high school one year.
Q. So you've had what? One year of college?
A. (Witness nodded head.)
Q. Is that a yes?
A. Yes.
Q. And where did you have this college?
A. Worthington, Minnesota.
Q. And what field were you majoring in?
A. I played football up there. I really didn't want to go to school because I wanted to farm, so I really didn't major in nothing.
Q. But you took college classes for about one year?
A. Yes.
Q. And then, of course, you got out and started getting yourself in a whole bunch of trouble and got a whole bunch of

felony convictions; is that right?
A. No, that's not right.
Q. Well, let's say at one point then you ended up coming in contact with a guy by the name of William Dean. Now, did you and Mr. Dean do crimes together before 1996?
A. Yes, we did.
Q. Okay. And tell the jury what type of crimes you and Mr. Dean did together before 1996.
A. We stole some hogs.
Q. So the only crime that you're telling us that Mr. Dean was involved with you with before 1996 was the theft of hogs? You'd never been involved in any other type of violations of the law

such as drug violations or anything like that?
A. What do you mean by drug violation?
Q. Well, smoking crack, making meth, smoking meth, shooting meth in your arm, anything like that.
A. I don't shoot drugs. I don't do meth, but we did cocaine, yes.
Q. So you and Mr. Dean prior to 1996 or January 1996 did cocaine together. I assume that was not within the prison walls.
A. No, it wasn't.
Q. Okay. It was outside the prison walls.
A. Yes, it was.
Q. Okay. Other than smoking cocaine together and stealing
♀
1187

hogs together, you didn't engage in any other type of criminal acts with Mr. Dean?
A. No, I didn't.
Q. And you would say that you had committed crimes with him and smoked cocaine with him for approximately ten years; is that right?
A. I've known him maybe ten years. I know he don't smoke -- you're not making it the way it is. I see him now and then, and I have smoked with him before, but it's not an ongoing thing or nothing.
Q. Now, let me ask you, did you and Mr. Dean ever live together before January of 1996?
A. No.
Q. Did you ever own any property together or split money prior to 1996?
A. No.

Q. Well, when you would steal these hogs and you would sell them, isn't it true that you and Mr. Dean would split the money and you had a basic partnership for stealing other people's property?
A. No. I stole them. He went with me, and I paid him.
Q. Well, that's what I mean. You had a partnership with Mr. Dean for stealing other people's property.
A. That's not true.
Q. Well, tell us what is true.

A. He was not my partner. He just was somebody that went with me. He's not my partner.
Q. Was he an employee of yours in this theft operation?
A. I did it one time.
Q. Well, by 1996 you'd done it at least seven times that you were caught for.
A. I wasn't with Mr. Dean, was I?
Q. So you were only with Mr. Dean on one occasion. Is that your testimony?
A. Yes.
Q. Okay. So you and Mr. Dean engaged in one criminal operation of stealing hogs, and you smoked cocaine with him outside of the prison walls. Other than that, is your testimony you had no other type of relationship with him prior to January of 1996? Is that your testimony?
A. Yes.
Q. Okay. But you agree that you had seen him in the state institutions or the prison.
A. Yes.
Q. Now, let's talk about when you saw Mr. Dean in prison, in

jail. Had you seen him in jail prior to January of 1996?

A. Yes.

Q. On how many occasions would you say?

A. I was in prison right beside him. His bed was right beside mine.

♀

Q. For how long?

A. Six months or maybe eight.

Q. And this was after you had engaged in these crimes together; is that right?

A. Yes.

Q. Now let's go to January of 1996 up until December of 1996. We know during that period of time according to your testimony you were in and out of the jail and on one occasion you went down to Oakdale. First of all, with the time you were in jail from January through November -- well, let's take it through August of 1996, did you see Mr. Dean at all while he was at the Woodbury County Jail?

A. Yes.

Q. Did you have occasions to chat with him?

A. Yes.

Q. And did you chat with him about many different subjects?

A. I don't recall, but I'm sure we did.

Q. And this is the same Mr. Dean that you had this relationship with for probably the last 10 to 12 years; you would agree?

A. We knew of each other for ten years I guess.

Q. Now, after 1996 or sometime in 1996 when you came back for your failure to appear, you would agree at that point that you were shipped off to Oakdale.

A. Repeat the question, please.

Q. Okay. After you pled guilty and came back on your failure to appear and you returned on your bond, you were then shipped off to Oakdale after you pled guilty; is that right?
A. Yes.
Q. Was Mr. Dean also shipped to Oakdale?
A. I believe he was already in Oakdale I believe.
Q. He was in Oakdale when you got down there; is that right?
A. I never saw him, no.
Q. So you never saw Mr. Dean after January and through December of 1996?
A. Not at Oakdale.
Q. Well, where did you see him?
A. He was at John Bennett.
Q. And explain to the jury what John Bennett is.
A. It's a prison at Fort Madison.
Q. It's like a farm outside of the Fort Madison institution where if you're about to be released or you have some type of status you can be sent to; is that right?
A. It's a gradual release place, yes.
Q. And when did you see Mr. Dean down there?
A. When I got there.
Q. Were you shipped directly from Oakdale down to John Bennett farm?
A. Yes.
Q. And you and Mr. Dean had opportunity to talk down there;

would you agree?

A. Yes.

Q. And you saw him down there and spent time with him down there.

A. Yes.

Q. And this would have been in 1996.

A. '96 or '97. I'm not sure.

Q. Okay. And you were down there -- I believe you indicated on direct examination that you were down there for at least approximately what? Two and a half years?

A. I had a discharge my first five-year sentence, and they paroled me to my second one, and I got released.

Q. Was Mr. Dean released prior to the time you were released?

A. He was in -- I don't know -- quite a while after I was. He was doing -- I don't know what he was doing.

Q. So all the time you were down at John Bennett, you would agree that Mr. Dean was down at John Bennett also.

A. Yes, but Mr. Dean had gotten in trouble and went into maximum security.

Q. So you lost track of him at one point; is that right?

A. Right.

Q. Then when you got out of Fort Madison or John Bennett, you then had some additional crimes that you committed; is that right? This is after you got out, after you'd served and discharged your time.

♀

1192

A. Oh.

Q. To refresh your recollection, January 30, 2001, you had another theft conviction?

A. Yes.

Q. And you pled guilty to stealing some people's property?
A. I didn't plead guilty, no.
Q. And then you -- 12-10 of 2001, you were -- pled guilty in Woodbury County as you've already testified to I believe on direct examination where you not only got the habitual offender which is a 15-year sentence, but you also received a couple of underlining offenses; is that correct?
A. Yes.
Q. And what were they?
A. You'll have to read them. I don't know exactly how they're called.
Q. Well, let's just short circuit a little bit. They were both involving stealing other people's property; is that correct?
A. Yes, they were. Yes, they were.
Q. So now we're up to about 14 felonies. Would you agree?
A. Is that what it is? I don't know.
Q. But then after you were released from there back in January 13 last year, you were picked up in Ida County; is that right?
A. Yes.
Q. And in Ida County you were picked up, and you pled guilty

♀

in that also?
A. Yes, I did.
Q. And you got your second habitual charge; is that right?
A. Yes.
Q. Now, this is not tacked on top of the 15 because you've already gone to prison and you've discharged that 15; is that correct?
A. No, that's not.

Q. Okay. Tell us how that works.
A. They run together.
Q. So you got another 15 later on after you'd already gotten the first 15 back in 2001.
A. It was on appeal.
Q. But you still got it.
A. Yes.
Q. So then you went down and you got -- from Ida County you got attempted burglary, possession of burglary tools, and criminal mischief; is that right?
A. I believe so.
Q. And this attempted burglary is breaking into someone's house?
A. No, I've never did that. Again, I said I deal with insurance companies.
Q. So that's what you were doing all that time, bilking insurance companies?

1194

A. Basically. There's no justification in it, but that's what I was doing.
Q. Now, you also knew another individual, did you not, who was at the Woodbury County Jail?
A. Another indi -- you have to give me the name.
Q. Mr. Putzier.
A. Yes.
Q. And how long had you known Mr. Putzier since 1996?
A. Again, I can't give you a date. Quite a while. I knew his brother.
Q. Again, would you believe that you had known Mr. Putzier since 1984, 1985? Would that be accurate, or would it have been

a little bit longer?
A. A little shorter than that I believe.
Q. Not much shorter.
A. I -- yeah, a little bit. Probably in the '80s, late '80s, probably.
Q. Okay. I said '85, '86. But you think it could be --
A. Later than that, '87, '88 probably.
Q. So '87, so you'd known him about 7 years when you saw him over at the Woodbury County Jail; is that right?
A. Yes.
Q. Let me ask you this. Did you do any crimes, first of all, with Mr. Putzier, Mr. Dean, and yourself combined as an operation?

1195

A. No.
Q. Did you do any illegal acts with any of them such as cocaine? Now, you've told us about Mr. Dean, but with the three of you all together is what I want to know before you went to the Woodbury County Jail.
A. Never, the three of us never did anything together, no.
Q. Now, did you do some criminal acts with Mr. Putzier, just you and Mr. Putzier, separate from Mr. Dean?
A. Yes.
Q. All right. Tell the jury what criminal acts prior to 1996 you and Mr. Putzier did together.
A. He was with me when he was involved in the breaking in of a store in Ida County.
Q. Okay. You did the Ida County burglary together; is that correct?
A. Yes.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1045 of 3636

Q. Other than the Ida County burglary, did you do any other burglaries with him that you've been convicted, first of all? We want to talk about the ones you've been convicted of.
A. I've never did any convictions of burglary except the one in Ida County. That's the only time we ever did it ever.
Q. And that was the only time with Mr. Putzier? Is that your testimony?
A. Yes.
Q. You've never done a single other crime with Mr. Putzier in

♀

the eight years that you've known him?
A. I said burglary.
Q. Oh, okay. Then tell us then what other crimes did you do with Mr. Putzier --
A. Stole --
Q. Excuse me, prior to 1996.
A. I stole pigs with Mr. Putzier.
Q. On how many occasions?
A. I can't recall but a few, quite a few.
Q. Quite a few. In those few, would you agree that you all established a relationship?
A. Yes.
Q. And it was a monetary relationship; is that correct?
A. Again, I didn't hang with these people, but we had a relationship as far as we stole those pigs, yes.
Q. And you shared money together; is that accurate?
A. Well, it was like a business. We didn't . . .
Q. Right. It was like a business?
A. Yes.
Q. And tell us how the business operated.

A. Well, that's probably not the right term, but when we took pigs, we split the money, and we went our own ways. We didn't run together.
Q. Who had control of the business? Did you have control of it, or did Mr. Putzier have control of it?

1197

A. It was just a mutual thing where we talked things out.
Q. Okay. And then whatever you would work out as part of an agreement, that's how you would exchange the money after you had committed these particular acts; would that be accurate?
A. Yes.
Q. Okay. Then Mr. Putzier then beginning in 1996 happened to be one of the individuals who was at the Woodbury County Jail; would that be accurate?
A. Yes.
Q. He was at the Woodbury County Jail if you can recall for approximately how long, Mr. Donaldson?
A. For how long was Putzier in jail?
Q. Yes, sir. How long was he in jail at the same time you were in jail?
A. Again, he was there, and then he bonded out, and he came back so . . .
Q. Okay.
A. He was there quite a while.
Q. And during the time he bonded out, were you ever out during any of that time?
A. No.
Q. Now, let's go to the end of 1996, and you've described how you and Mr. Putzier had some type of business relationship. What I want to know is in 1996 outside of the Woodbury County

Jail, did you have the opportunity to visit with Mr. Putzier at

all outside of the jail in 1996? And to make that question clearer, during the time you were bonded out and the time Mr. Putzier was bonded out, did you and he get together outside of the jail?
A. No.
Q. Okay. So then the only time in '96 you would have gotten together with Mr. Putzier would have been inside of the Woodbury County Jail; is that right?
A. We were in there on a charge of theft. That's what we were in there for, but we were never out after that, no, together, no.
Q. I gotcha, because when you got out, I take it Mr. Putzier never really got out.
A. No.
Q. Okay. So then when you came back and you were sentenced in -- I believe it was like November sometime, November 20 something of 1996, you would agree that you went to Oakdale and you don't know when Mr. Putzier went; is that right?
A. That's right.
Q. You never saw him anymore.
A. No.
Q. And you never saw Mr. Putzier anymore after 1996 until when? And I want to use the operative date of somewhere about the last week of November in 1996. When was the next time you saw Mr. Putzier? I know you went to John Bennett, Oakdale and

John Bennett.

A. The next time I saw him was when I was in -- I was in Woodbury County Jail on that charge of theft and he come back from the federal -- federal for something.

Q. Okay. And do you remember what year that might have been?

A. 2001 possibly.

Q. Okay. So if I looked at 2001, then when you -- when he came back for that charge in 2001 -- that would have been somewhere around December 2001 -- you then ran into Mr. Putzier who was then back from some federal case in 2001, and you both were at the Woodbury County Jail; is that right?

A. Yes.

Q. And you would have been there on your habitual, getting ready to go down on your habitual at that point.

A. Yes.

Q. And that was the first time you'd become reacquainted with him according to your testimony since about 11-21 of 1996; would that be right?

A. Yes.

Q. So you'd not seen him or talked to him according to your testimony in five years?

A. I believe not. That's true.

Q. Okay. So after five years you got together, and he and you got together and involved in this crime in Ida County in 2003 after you met back at the Woodbury County Jail in 2001; would

1200

that be right?

A. That's -- yes.

Q. Okay. And is that the charge you're now sitting here on right now, you and Mr. Putzier's charges, or is that a different charge?

A. Putzier didn't get any charges.

Q. Okay. But you did.

A. Yeah.

Q. Okay. And he was with you.

A. Yes. Excuse me. I better back up. He got charged with -- I think through his cooperation, and they were dismissed or . . .

Q. Well, you don't know for a fact as to what happened.

A. No, I don't know.

Q. Okay. That's fine. We can leave it at that, that you were charged, and that's presently what you're now in jail for and why you're being held.

A. Yes.

Q. That's the only thing I wanted to bring out.

Other than you and Mr. Putzier with your relationship going back to the late '80s, is there anyone else who was involved who's presently sitting on this charge who was at the Woodbury County Jail in 1996?

A. No.

Q. Okay. So it would have been just the three of you, is that

1201

correct, according to what you're telling us?

A. At different times, never together, yes.

Q. Okay. Right. I believe I've asked you already about the material of Mr. Honken's that you had. Did you, in fact, have on you an envelope when you were arrested that Miss Smidt had sent to Dustin at the time you were arrested or at least the time you talked to law enforcement officials?

A. A letter sent by who?

Q. An envelope, a large envelope, with Marvea Smidt's name on

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1050 of 3636

it that was sent to Dustin Honken that was part of the material that was on you at the time you talked to law enforcement officials when you told them where this material could be found.
A. I believe that's not true.
Q. You don't recall telling them at any point in time that was just an envelope that Mr. Honken's mother sent him newspaper articles and things in.
A. Again, no, I don't recall saying that.
Q. You don't recall saying that you had on occasion read newspaper articles sent to Mr. Honken and had, in fact, discussed newspaper articles.
A. Again, that was eight years ago. I don't recall it.
Q. You don't recall that.
A. I don't recall.
Q. You told us Mr. Honken gave you a letter in his own handwriting with you to deliver it to Jay Lien; is that right?

1202

A. I only remember the first name Jay, yes.
Q. Well, Jay. You also said that Mr. Held was an individual who owned hogs; is that right?
A. Yes.
Q. And Mr. Held was a farmer who had some financial problems with his hogs; is that right?
A. According to what Dustin told me, that's right.
Q. You also indicated that prior to the time of your involvement with Mr. Honken what you would do is mainly steal hogs.
A. Yes.
Q. You also told us that Mr. Held was a hog farmer.
A. That's what he told me.

Q. However, you never went up to determine if Mr. Held was a hog farmer or not, and to your knowledge as you sit here today, you don't know of your own personal knowledge whether or not he was a hog farmer.
A. No, I don't.
Q. You indicate that you were supposed to get ten million dollars for your work on this matter.
A. Originally half a -- five million, and then as he progressed and everything changed, that was for a hydrogen tank and some other things, and it escalated up to other things and ten million.
Q. How were you to be paid this five million dollars? First

1203

of all, how were you supposed to be paid the ten million dollars?
A. He was going to make meth.
Q. He was going to make meth, and you've testified that he was going to do seven or eight years in prison; is that right?
A. Well, at first, yes, yes.
Q. So he was going to do -- you were going to go kill somebody or threaten somebody for him. He was going to serve seven or eight years in prison, and then he was going to get out and pay you ten million dollars. Is that the arrangement? Is that the plan?
A. When we were talking, he said when that all happened he'd be out in three years.
Q. Okay. So if you go and kill two or three people for him, in three years you were going to be delivered what? A check or cash or what? Ten million dollars?
A. No. He had to make it, but I'm sure I would have had to

participate if something like that happened.

Q. So the plan then is he goes to prison for two to three years. You go out. You kill these people for him, and then he gets out. He sets up a meth lab operation, and as part of your deal for your killing people, then you would get five to ten million dollars; is that right?

A. Yes.

Q. And that's the plan that you agreed with him; is that

♀

right?

A. That's what we talked about.

Q. Oh, you talked about it. Are you telling us there was no agreement to do that?

A. Well, that's what we had talked about. That's what we had said. So I guess that would have been an agreement.

Q. So you agreed to do that before you left prison; is that right?

A. Prior to leaving I agreed to that.

Q. Now, this $500 that was posted for you, when you got out, had you explained to Mr. Honken that you didn't even have an automobile?

A. I had had one, but it had gotten towed when I went to jail. Then I didn't have one.

Q. Did you tell him you didn't have a car?

A. I believe I did.

Q. Did you tell him that you didn't have a house to live in?

A. Do you mind if I explain something from last week?

Q. Well, I just want to know did you tell him that? That's my question, Mr. Donaldson.

A. Okay. I think he knew that.

Q. Okay. Did you tell him you didn't have any money?
A. He knew all -- everything.
Q. Now, it's true that you repaid of the $500, $200 of it back on the bond; is that correct?

♀

A. The guy I was working for, I can't remember if it was -- maybe he didn't pay twice.
Q. Right. You were bonded out. Your bond was $5,000. You posted 10 percent of it, and you took the $500, and you paid $200 or somebody on your direction paid $200 of the $500 back to the person who had bonded you out.
A. I believe that's correct.
Q. This letter that was supposed to be delivered to Jay was written in Mr. Honken's own handwriting.
A. Yes.
Q. The other letter to Mr. Held was written in Mr. Honken's own handwriting.
A. Yes, it was.
Q. Mr. Honken told you that a child was missing.
A. He had mentioned something about a child. He didn't say -- that was missing, but I didn't talk -- I didn't question nothing about that.
Q. But you told the grand jury when you were interviewed on this that he said a child was missing. You told them that March 14 of 1997; is that accurate? And you said that under oath, didn't you?
A. Yes. As I just said, there was a child, but I didn't go into -- besides the two people, that I didn't want to hear about what happened to it.
Q. You never heard from him that there was more than one child

missing, did you, or you never told anyone that prior to today's date, did you?

A. I believe probably no.

Q. You told them that Mr. Honken told you that he strangled them; isn't that correct?

A. Yes.

Q. He told you that he put a rope around their neck; isn't that correct?

A. Yes. No, excuse me, no.

Q. Would you like -- if you saw your testimony, would it refresh your recollection if you could read it?

A. (Witness nodded head.)

Q. I'm going to show you page 23. Beginning with line 19 is the question, and go through 20 through 25.

A. Sorry about that.

Q. No, that's all right.

A. What do you want me --

Q. You might want to look and see if this helps you refresh your recollection. We're on page 23, and as I told Mr. Williams, beginning with 19 and go down to line 25.

A. This is all through.

Q. I'm going to ask you some other questions, but that's the only question that's pending right now, Mr. Donaldson.

A. Yeah, he did tell me that. But you said a rope. It was a drop cord.

1207

Q. Well, we're going to get to that.

Now, does that refresh your recollection?
A. Yes.
Q. And is your recollection that they were -- that he told you they were strangled?
A. Yes.
Q. And he used a drop cord around their neck and cut off their circulation around their neck?
A. Yes.
Q. And then he demonstrated to you how it happened?
A. (Witness nodded head.)
Q. Is that right?
A. Yes.
Q. And how many people did he tell you it happened to?
A. He didn't. I believe he said couple is the way . . .
Q. He said a couple of people?
A. I -- in my imagination -- what he said I thought he meant a man and a woman, but at one time he mentioned a child, and I'm just -- in my -- I didn't say nothing. I'm thinking that it was all three with strangled.
Q. So he never said it, but what you're telling us -- and correct me if I'm wrong -- that you thought when he said a couple he meant a man and a woman; is that right?
A. (Witness nodded head.)
Q. Is that yes or no?

A. Yes.
Q. But he never told you that; is that accurate?
A. I can't remember him saying it right as I sit here.
Q. But yet you never told anyone else that as far back as you can remember; is that right?

A. I believe not.
Q. Okay. But what you did -- and correct me if I'm wrong on this, Mr. Donaldson. What you did, you said, Well, I think this is what happened, and you tried to explain what you said Mr. Honken was telling you to other people; is that right?
A. No.
Q. Okay. Go ahead.
A. He was at this -- he drove up to their house. They went in, and then they just -- he went in their house, and he started -- he strangled them.
Q. Okay.
A. He was talking about the informant's house.
Q. Okay. He said he went up to the informant's house, he walked into the informant's house and just strangled them.
A. Yeah. Again, as I sit here, I can't recall exact words he said.
Q. Okay. But you did make up in your mind what you thought he was saying, didn't you?
A. It was pretty plain. He showed me the cord around the neck, and it was pretty plain what he did.

Q. Uh-huh. And how many people did he do that to?
A. I don't recall exactly what he said at that time.
Q. Okay. And you've always told law enforcement when you've been interviewed that you're not exactly clear what he said to you, but you also would think about what he was trying to tell you; is that right? You were struggling with trying to remember it.
A. Well, again, it's eight years ago.
Q. Well, we're going back to what you'd said back then.

A. Yeah. Maybe I didn't want to hear it about the kids. I just . . .

Q. Well, when you say you didn't want to hear about the kids --

A. I never questioned nothing about the kids. I thought he said child. I didn't question nothing. I didn't want to go into that.

Q. Now, I -- and correct me if I'm wrong. You said that he never said anything about any children. He said a child was missing, and that's what you've said consistently up to today's date; is that correct? Do you want to change that now?

A. No. I -- it was always a child. He didn't say children.

Q. Okay. Matter of fact, you even told law enforcement that he had never indicated to you he had killed a child, is that right, at least prior to today's date?

A. I can't honestly answer that at this point. I don't -- I . . .

1210

Q. He told you there was no blood and there was no mess; is that correct?

A. Yes.

Q. He told you he buried all the bodies with a backhoe; is that right?

A. That's what he told me.

Q. Did he ever tell you how he learned to operate a backhoe?

A. I think he did tell me his father or someone owned a junk yard or something.

Q. And that's where he learned to operate a backhoe.

A. I guess.

Q. And it was near a construction site that these bodies were

buried; is that correct?
A. That I don't know.
Q. Well, it was not buried anywhere close to a construction site to have a backhoe?
A. I don't know where they buried the bodies. I don't know.
Q. And it happened during the day, or it happened at night that these people were strangled?
A. I can't tell you that either.
Q. Did you know whose house it happened in?
A. The big guy --
Q. Did he tell you -- go ahead.
A. The big guy was in the country, and he just said when they

1211

got the couple that they pulled right up to the house and went right in.
Q. When he says they, did he tell you who they was, who they were?
A. The couple. Well, one was the informant so . . .
Q. So what?
A. I assumed it was his girlfriend. I didn't . . .
Q. Why couldn't it be his wife?
A. Well, it could have been.
Q. So did Mr. Honken tell you who it was?
A. We talked so much. At one point in time I believe he did tell me.
Q. Uh-huh. And what year did this happen?
A. I believe '93 is when it happened.
Q. When in '93?
A. I can't tell you.
Q. Anything else as you sit here today about what Mr. Honken

told you about killing anyone you can recall?
A. Only thing I can tell you he said, he says they don't die like on TV and their bodies are heavy.
Q. Anything else?
A. I don't recall anything else.
Q. Now, you told us on direct and when I started my cross-examination that you'd had discussions with other people about this other than law enforcement; isn't that correct?

♀

A. No, I didn't. The only discussions we might have had was about his meth making.
Q. No. I asked you -- you said other than law enforcement you had discussed this with other people.
A. The killings?
Q. Yes.
A. No.
Q. What Mr. Honken told you.
A. No.
Q. You said this conversation took place when just the two of you were alone; is that right?
A. Yes.
Q. Is your testimony that you never discussed this with Mr. Putzier?
A. I discussed -- no, I never, no.
Q. The whole time you've known Mr. Putzier and since 1996, your testimony is you and Mr. Putzier have never discussed Mr. Honken.
A. About these killings, no, just that they don't like each other.
Q. Oh, you've discussed the fact that Mr. Honken and

Mr. Putzier don't like each other?
A. In 2001.
Q. Anything else have you and Mr. Putzier discussed about Mr. Honken other than the fact that they don't like each other?

A. No.
Q. What about with Mr. Dean? Did you have any discussion with Mr. Dean about Mr. Honken?
A. Just -- I guess you'd call it small talk, just that he killed kids.
Q. Oh, now it's kids.
A. I didn't say -- people read the paper.
Q. Oh, who read the paper?
A. He must have.
Q. How do you know?
A. Otherwise he wouldn't have known.
Q. So --
A. I didn't tell him nothing.
Q. You didn't tell him anything, but why would he bring up the fact -- if you've never discussed it with him, why would he just automatically just initiate the discussion with you?
A. We're talking in 2000. This is way past jail that we talked about it, not in jail, no.
Q. Oh, but I didn't ask you -- I didn't limit it to jail.
A. Oh, well --
Q. I asked you had you ever had any discussions with anyone about Mr. Honken and the fact that he killed anyone other than law enforcement. That was my question.
A. Oh, I'm sorry. Yeah, people --
Q. Okay. Tell us --

A. People in Oakdale see it.
Q. Okay. People in Oakdale.
A. And they see I had a subpoena. They know that.
Q. Okay. People in Oakdale saw it; is that right?
A. (Witness nodded head.)
Q. Is that yes?
A. Yes.
Q. Oakdale is the facility where you were in, Mr. Dean was in, and Mr. Putzier were in at one time; is that right?
A. Not together, no.
Q. But you were at Oakdale; is that right?
A. Everybody goes through Oakdale. Some stay; some don't.
Q. And rumors fly through Oakdale, don't they?
A. Well, anywhere they do.
Q. Well, people talk about a lot of things at Oakdale, people who are charged with crimes, and they go through there as a clearing facility. People and inmates talk a lot, don't they?
A. Depends on the severity of the crime.
Q. Well, they talk about their crimes, don't they, on occasion?
A. I don't care. I don't ask.
Q. They talk about their lawyers, don't they, how good or how bad a job they did?
A. Sometimes, yes.
Q. They talk about the judges down there, don't they, whether

1215

you got a fair judge or a judge who wasn't fair?
A. Yes. But, you know, they gotta -- they have to look in the

mirror. There's a problem. It's not the judge.

Q. They talk about the juries down there, whether or not the jury did a fair job, whether or not the jury listened to what was going on in the courtroom, don't they?

A. I've never heard them say that, but they possibly do.

Q. They talk about the guards. They talk about whether or not the guards treat them fair.

A. Yes.

Q. Whether or not the guards pick on them; is that right?

A. That's true.

Q. Matter of fact, it's a place where, again, all legal mail, in fact, that the lawyers are sending their client comes through just like they send the mail to them in the county jail where they are; would you agree?

A. Yeah.

Q. And clients or inmates, other inmates, have on their packet documents. These documents are called legal mail. As many times you've been in and out of the institution, you're well aware of that process; is that correct?

A. Yes.

Q. And legal mail is when a lawyer or the court would send a document to a person who's incarcerated, and it means, does it not, that the guards can't read the mail? They can only look at

1216

it for contraband. Supervisors can't read it. They can only, in fact, inspect it to see if anything's in there. After they get it in there, that mail belongs only to that individual; isn't that right?

A. Yes.

Q. You've got mail like that; isn't that right?

A.    Yes, but it came open, and legally it shouldn't have been, but yes.
Q.    Well, we can disagree about that.  But actually they can open the envelope, take a look at it, and then not read it but pass it on to the inmate; is that right?
A.    That's right.
Q.    Now, Mr. Honken received mail like that in 1996 when you were at the Woodbury County Jail; isn't that correct?
A.    Again, I'm sure he did, but I don't recall any certain time, no.
Q.    Well, did you go into his cell and see what appeared to be mountains of envelopes or mountains of mail that he received?
A.    Again, I can honestly tell you I don't remember.
Q.    Are you telling us --
A.    I don't remember.
Q.    -- you don't remember seeing a single document in his jail cell?
A.    The main thing he went over -- no, I did -- the document he did show me, a part in his federal deal what he had did.

1217

Q.    Okay.  He did show you allegations made about him; is that right?
A.    He showed me the charges.  That's what it was, the charges.
Q.    Okay.  And when did he show you these charges?  While he was in jail in 1996?
A.    At some point, yes.
Q.    Now, Mr. Donaldson, by any stretch of the imagination, you're not a stupid man, are you?
A.    Ain't no rocket scientist.
Q.    Right, but you have one year of college.  You went through

high school, and you're sitting here having a fairly intelligent question-and-answer session with me, and I assume back in 1996 you had the same type of acumen to be able to exchange questions and answers; is that correct?
A. That's correct.
Q. Now, when he showed you those documents, you knew in point of fact those were the allegations that the government had made against him; would you agree?
A. Yes.
Q. And when you saw those documents, you can process that information and have an understanding as to what the allegations are; would you agree with that?
A. Yes.
Q. And would you agree also that the allegations accused him not only of the situation that he was currently facing but

♀

talked about how he found himself in that situation by the allegations that occurred in 1993; would you agree with that?
A. Yes.
Q. Now, can you sit here today and tell us that you can specifically distinguish what you remember about reading the allegations and what Mr. Honken told you about what he said about those allegations?
A. Like again, this is a long process; you asked me a little question.
Q. It's difficult.
A. As it proceeded, he basically told me that he did it.
Q. Okay. And you're saying that sitting at that jail, he looked -- while you were looking at those allegations, he shared them with you, and he says, Yes, I did this; is that right?

A. Towards the end, yes.

Q. Okay. But you also agree that when you were at the jail on direct examination when Mr. Williams asked you he was there in January of 1996 through August I guess when you left. That wasn't accurate. He'd only been there about two months; is that right? Is that what you best remember?

A. I believe he was longer than two months because I remember he'd been telling me for two months I was going to get out and I didn't. I just -- I wanted to go do my five-year sentence.

Q. Okay. But you wouldn't disagree with what the charts say about when he was brought to the Woodbury County Jail and that

you had been there since January. If the records showed that he'd been there a much shorter time than what you are talking about, you wouldn't disagree with the records of the jail.

A. No.

Q. Okay. Now, let's talk about that jail cell for a second and where you were placed. You talked about being in cell block D; is that right?

A. Yes.

Q. Now, cell block D is one of the several cell blocks they had over at the Woodbury County Jail -- and I don't know what's over there now but what was over there in 1996; would you agree?

A. Yes.

Q. In that cell block when you take a shower, do you lock your cell door?

A. No.

Q. Matter of fact, when individuals walk out of the cell to go take a shower, the cell door is open; is that accurate?

A. Yes.

Q. And you did the same thing, and Mr. Honken from your observations would do exactly the same thing. He'd leave, and would you take your legal paperwork into the shower?
A. I surely didn't.
Q. Very few people would do that; is that right?
A. That's right.
Q. So did people -- now, when people would go take a shower,

♀

did one person go take a shower at a time, or did several people go out and take a shower?
A. One at a time.
Q. And the other people would be locked in in the cell block.
A. They're in the cell block, yes.
Q. And that means that if Mr. Honken went to take a shower, his cell door is actually open.
A. Yes.
Q. And the other inmates who would be in there in that cell block could get out of the cell block and go over to view his cell if they wanted to.
A. They could, but you're overlooking -- there's a bubble of someone watching.
Q. I understand. It's not a question of who's watching, but the question is they could go into his cell.
A. Yes.
Q. What about the bathroom? Is the bathroom right in the cell itself?
A. Yes.
Q. So when people would come over -- and the cell is what? A relatively small area; would you agree?
A. Yes.

Q. And how many people are in that block?
A. Well, it's made for what? Fifteen, but there's probably thirty in there. They're doubled up, most of them.

Q. It's made for 15, but -- well, we're talking about back in 1996, though.
A. Yeah.
Q. About 30 people in there?
A. I believe there was, best guess.
Q. And so out of the 30 people where it was made for 15, they would have to take each person out each time to go take a shower?
A. No, you took -- you could go take a shower any time you wanted to.
Q. Just walk out of there and do that?
A. (Witness nodded head.)
Q. So your cell door was open when you went to take a shower.
A. Yes.
Q. And how far was the shower from where D block, Mr. Honken's cell, was?
A. I honestly don't remember.
Q. Okay. But he would be out of view of his cell; would you agree with that?
A. Oh, yes.
Q. Same thing would apply to you when you walked out. Did you have a lot of legal mail in your cell?
A. No.
Q. Who was Jimmy back in 1996?
A. Excuse me?

Q. Who was Jimmy back in 1996? Do you know who Jimmy was?
A. Yeah. He's a little Mexican guy.
Q. Now, you talk about what Mr. Honken told you during those conversations. You were supposed to use Mr. Held -- Mr. Held would be the hog farmer -- you were supposed to use his equipment; is that right?
A. Yes.
Q. And his equipment consisted of a trailer and a truck; is that right?
A. That's what you'd need, yes.
Q. Did you ever use a night scope for finding hogs?
A. No.
Q. Are you sure?
A. I'm positive.
Q. Mr. Honken never told you about a book that he used to kill people; is that correct?
A. Repeat that, please.
Q. Mr. Honken never told you about a book used to kill people; is that correct?
A. I don't remember nothing like that, no.
Q. Would it be accurate to say that you added the fact that you thought somebody else was with Mr. Honken because you thought Mr. Honken could not have done all of this by himself?
A. That's incorrect.
Q. Where was his mother from, Mr. Honken's mother?

1223

A. I believe it was Britt, wasn't it?
Q. Uh-huh. And how'd you know she was from Britt?

A. He had told me so. Also I was supposed to get some drug books that were at her house.

THE COURT: Mr. Parrish, I'd like to give the jury a stretch break. Would this be a good time?

MR. PARRISH: Oh, sure.

THE COURT: Members of the jury, why don't you take a stretch break.

Thank you. Please be seated.

BY MR. PARRISH:

Q. Mr. Donaldson, I'd like to close out with just a couple of areas that I've tried to focus on with regard to your examination. I've asked you a couple of times about newspaper articles. I've asked you also about an envelope that you took that belonged to Mr. Honken that his mother had sent him. You've testified twice that you denied that you did this.

A. I don't recall it, no.

Q. Well, you said no, you didn't initially. I want to ask you again, did you take -- first of all, were you aware that his mother was sending him newspapers about this incident that he was charged with from Britt, Iowa?

A. I don't recall.

Q. Do you recall whether or not you took his property with you, one specifically an envelope from his mother, when you left

the Woodbury County Jail?

A. I don't recall.

Q. I'm going to show you your testimony when you were asked at the grand jury, page 61, beginning with line 20 when you were asked why did you have this. I want you to read it to yourself first, and I'll ask you whether or not that refreshes your

recollection about the questions I've asked you during the examination.

A. Okay. I didn't recall it.

Q. Well, I'm asking, first of all, does it refresh your recollection.

A. I don't recall it. It says I said it. I said it. I don't recall it, though.

Q. So you would agree that it says that you had an envelope; he must have given it to me to put in my personal belongings. His mother would send him newspapers from her from Britt is why this evolved. Would you agree that that was your testimony under oath in 1997?

A. Yes.

Q. And you were asked, Why did you have the envelope? Was it so you could have the address of his mother? Do you remember what you said to them under oath then?

A. No.

Q. You said, No, there was no reason except to put my personal letters in it that we get. It was like a big envelope.

♀

So let me ask you again, do you recall as you sit here today whether or not based upon your looking at this document and having that testimony read back to you you knew that Mr. Honken's mother sent him newspaper articles that was in his cell that you had access to?

A. Again, I don't recall it.

Q. And do you recall when you first talked to law enforcement you delivered to them those notes, that they only had the notes from Mr. Honken but did not have the newspaper articles in it? Do you recall that envelope, first of all?

A. No, I don't.
Q. So was your testimony before the grand jury in 1997 on that issue, was it truthful, or was it untruthful?
A. It was truthful.
Q. So you would have had it.
A. If it says I had it, I was truthful.
MR. PARRISH: Thank you, Mr. Donaldson.
THE COURT: Mr. Williams, any redirect?

REDIRECT EXAMINATION

BY MR. WILLIAMS:
Q. Mr. Donaldson, what you were being asked in the grand jury about at this point is a number of items law enforcement had found when they conducted a search of Mr. Parmalee's place. Is that the context of these questions?
A. Yes.

♀

Q. Okay. And they went through item by item, page by page of the things they found where you told them they would be.
A. Yes.
Q. And your recollection is you don't recall the envelope one way or the other today.
A. No.
Q. When you were asked about it back in 1997, it was closer in time. At that point you remembered the envelope?
A. Yes.
Q. Last two questions I have of you. Any doubt in your mind at all, Mr. Donaldson, any doubt at all, that the defendant in this case told you about killing witnesses in 1993?
A. No doubt at all.
Q. Any doubt in your mind at all that the defendant in this

case solicited you to go out and kill Tim Cutkomp?
A. There's no doubt in my mind.
MR. WILLIAMS: I have nothing further.
THE COURT: Any recross, Mr. Parrish?
MR. PARRISH: No, Your Honor. Thanks.
THE COURT: You may step down.
Jury can take a stretch break.
Is the government ready to call its next witness?
MR. WILLIAMS: Yes, we would call Dan Lederman, Your Honor.
DANIEL LEDERMAN, PLAINTIFF'S WITNESS, SWORN

1227

THE COURT: Please be seated in the witness box. Would you please adjust the chair and the microphone so you can speak directly into the microphones. You'll have to scoot that chair up a little bit. And would you state your full name and spell your last name.
THE WITNESS: Daniel Isaac Lederman, L-e-d-e-r-m-a-n.
THE COURT: Thank you.
Mr. Williams.
MR. WILLIAMS: Thank you, Your Honor.
DIRECT EXAMINATION
BY MR. WILLIAMS:
Q. Mr. Lederman, can you give us a little background about you, sir? Where are you from?
A. I'm from Waterloo, Iowa, and I went to school at University of Iowa, and I've lived here in the area for about ten years.
Q. Tell us a little bit about your schooling. You graduated from University of Iowa?
A. No, I did not graduate. My father passed away when I was

at school, and I dropped out to help with the family business. I have three older brothers, and we run the company together.
Q. And when your father passed away, you had to put your education on hold to take over the family business?
A. Yeah, he pretty much -- he pretty much paid for our schooling, and the company was his main form of income, so when he passed away, my brothers and I had to pick up the slack.

Q. What was the family business, sir?
A. Well, we have a clothing store in Evansdale, Iowa, that's a small department store and the bail bond business that my dad had started in Waterloo and Cedar Rapids.
Q. What was the name of the bail bonds business?
A. Lederman Bail Bonds.
Q. And are you currently working for that company then?
A. Yes, sir.
Q. Explain a little bit. You have a number of brothers. You have kind of a partnership that you run that through?
A. I have three older brothers. We're all in business in different areas in Iowa. One's in Davenport. One's in Waterloo/Des Moines, and I'm here in Sioux City, and we manage different offices and agents around the state of Iowa. We also are in South Dakota and some other states too.
Q. And so this bail bonds business you have, you have a number of sites in and out of Iowa.
A. Yes, sir.
Q. What portion of the business are you in charge of then, sir?
A. Basically I'm an agent, slash, manager, but I have been in charge of spearheading expansion into other states, South Dakota

and Wyoming specifically. I've also worked in Minnesota, and my job description pretty much is managing the agents that I've hired and trained.

♀

Q. And is there a particular office you're in charge of, sir, in that regard?

A. I work mostly out of Sioux City.

Q. I want to have you explain a little bit about the business itself. Can you explain when you're a bail bondsman, what do you do?

A. Pretty much we get people out of jail. If someone's in jail and they have a bond, let's say the bond is a thousand dollars and they don't have the thousand dollars to post the bond to get out of jail. We post the thousand dollars, and we charge a 10 percent fee of a hundred dollars. In return, we also have a -- to get to accomplish the bond, we also usually require a cosigner on the bond, mom, dad, brother, sister, some type of family or friend, that guarantees the defendant's appearance in court.

If the defendant fails to appear for court, the person who signed for the defendant would be liable for the thousand dollars.

If they go to all their appearances, then the bond is exonerated. They don't get their hundred dollars back, but the bond is exonerated, and the obligation, the cosigner's obligation, is over and doesn't require the person to appear for court anymore because he was either sentenced or the case was dismissed.

Q. So if somebody's in jail and they have, let's say, a $5,000

♀

bond to get out, they don't have to go through a bondsman; is that correct?
A. No, sir.
Q. If they have the $5,000 themselves, they can get out?
A. Yes, sir.
Q. It's in the event where somebody doesn't have that kind of cash that they would come to you.
A. Yes, sir.
Q. And your company puts up the $5,000 as far as the court's concerned then.
A. Yes.
Q. So the court doesn't have to worry about going collecting from some third party. You're saying to the court, I'm good for the $5,000, and the way you make money off that is you charge a fee for that service.
A. Yes.
Q. And is it always 10 percent that you charge then to the individual for posting the bond?
A. We may charge slightly higher fees for cash-only bonds, but primarily 10 percent is usually the amount. If there's travel involved, we might charge extra to travel to counties that are farther away or certain fees maybe like a mortgage filing fee or what not.
Q. Why don't you explain that a little bit. If you have somebody who's going to put up a bond, that's going to cosign

for a bond, you have somebody in jail who has a $5,000 bond and somebody's going to cosign, what's the type of property that you might have them put up as collateral in the event that the

person skips town, doesn't show up, you could go collect on?

A. Some of the types of property would be real estate, titles to vehicles. A lot of times you do it on a personal signature. If we feel that the person is -- especially a -- a special risk, we will require a mortgage on a home.

Q. In the event that you require a mortgage on a home, what type of documentation is generated for you so you know you have something that you can go back on in case the person doesn't appear?

A. Two things primarily. One is what's called an indemnification and hold harmless agreement. That is a contract that we have that the defendant's mother, brother, friend sign, the cosigner, and also with that, a mortgage or a lien on their property. The lien is filed with the county, and the contract we hold in our files.

Q. And you would have documentation in your files to reflect that in a case that you accepted a house as collateral for basically putting up the bond for somebody.

A. Yes.

Q. What happens -- you talked a little bit about if the person shows up for court, then everything's fine. The bond is excused by the court, and everybody goes their way. You get your fee,

♀

1232

but otherwise everything else is the same. What happens if he doesn't show up for court?

A. If he fails to appear for court, we get a notice in the mail usually a few days after the failure to appear, and that notice is for us to appear at a forfeiture hearing usually 10 to 20 days outside of the defendant's failure to appear. And at that point we try to find the defendant. And if we cannot find

the defendant and the forfeiture hearing comes, then the court will enter judgment against us for the amount of the bond, and we are ordered to pay that.

Q. And so to make sure that doesn't happen, you will in the interim try to find the person that apparently has failed to appear yourself.

A. Yes.

Q. Now, when you are posting bond for somebody, do you do any independent investigation of the people who's posting the bond for them to find out if they're involved in criminal activity or whether something is afoot?

A. There's a computer system for Iowa. It's called Iowa Courts Online, and we do use that quite a bit to basically do background checks on people. ICIS as it's called shows liens, judgments, prior criminal history of people that live in Iowa, and we use that. If it's a mortgage that we're doing, before we take a mortgage on any property, we always verify with the recorder's office, you know, what the estimated value of the

property is and who the owner is so we know that who's signing is the correct owner of the property.

Q. You guys are not law enforcement officers, though; is that fair?

A. Right.

Q. And you don't do an independent investigation to determine if somebody's being bonded out for some wrongful purpose. That's not part of your job.

A. I didn't understand that question.

Q. Yeah. You guys don't investigate whether somebody's being bonded out for some illegal purpose. That's not part of your

job to investigate why the person's being bonded out to find out if there's something criminal going on.

A. It's not our -- it's not our job to investigate the matter that they're being arrested for, but I think that we do try to understand the crime that's involved and understand the situation so that when we post the bond we know what we're doing instead of just posting the bond for anybody who, you know, might be involved in a certain matter especially if it was a domestic situation and there was a victim involved. We try to make sure that that person isn't a cosigner. A lot of time domestic situations the victim will actually want to get the person out. But no, it's not our job to investigate the matters of the facts of the case, no.

Q. Let me direct your attention to 1996 and ask you if in

August of that year your firm bonded out a guy by the name of Dean Donaldson.

A. In '96 we posted a bond for Dean Donaldson. And excuse me while I open this up. It was posted on the 14th of August in 1996.

Q. Can you describe how that came to be that you started to post bond for him?

A. Originally we had gotten a phone call from -- I think it was the defendant, but I'm not sure. I have a call sheet actually that we took when the defendant first called us.

Q. And so we're clear, when you talk about the defendant, you're talking about Dean Donaldson?

A. Dean Donaldson. If you give me a second, I'll get to that here. It looks like we have a call sheet here. Whenever we get a call, we try to write down all the information on the

defendant and the information about who's calling. And it looks like when the call came in, there is no date. I'm guessing that it came in around the 14th or 13th. The call sheet was received I think by Kathy Ann Rick because her information is all spelled out here on the call sheet. So the person who called must have been able to give us that information rather quickly whereas the defendant's information is scant.

So I would guess that the person who called on the call sheet would have been a Kathy Rick, and the bond information was verified. And a check on the person, the

1235

caller's property, was checked and noted on the card, the assessed value of the property and the ownership of the property.

Q. Where was Dean Donaldson in jail at?

A. Woodbury County.

Q. And what was the amount of his bond?

A. 5,000.

Q. In order to post that bond, your fee to somebody would have been how much, sir?

A. 500.

Q. And who was -- who ultimately -- did somebody ultimately pay that fee to you?

A. The money was paid to an agent in Mason City or in Waterloo by a Kathy Ann Rick, and it was -- $516 was paid. I'm guessing the $16 was the mortgage filing fee.

Q. And that was -- when you say an agent, it would have been one of your agents.

A. Yes.

Q. Okay. Was there some type of collateral put down for that

bond?

A. There was a mortgage filed on Kathy's property at 1606 South Delaware in Mason City.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

♀

Q. Sir, I'm going to show you what's been marked as 210, and we have letters on this, so there's 210A, 210B, C, D, and all the way through E here. Could you take a look at this and tell me whether this is a copy of what you have in your file concerning the transaction of bonding out Dean Donaldson in August of 1996?

A. Yes, it is.

MR. WILLIAMS: United States would move to admit Exhibit 210 into evidence, Your Honor.

* * * *

(Government Exhibits 210A through 210E were offered.)

* * * *

THE COURT: A through E?

MR. WILLIAMS: A through E.

THE COURT: Any objection to 210?

MR. ROGERS: Relevance, Your Honor.

THE COURT: Overruled. Government's Exhibits 10A through E are admitted.

MR. WILLIAMS: I'm sorry? 210A through E.

THE COURT: 210A through E. Thank you.

* * * *

(Government Exhibits 210A through 210E were admitted.)

* * * *

MR. WILLIAMS: Thank you, Your Honor.

BY MR. WILLIAMS:

♀

Q. You indicated Kathy Rick was the one putting up the bond. What was your understanding of who Kathy Rick was in relation to Dean Donaldson?

A. Kathy Rick, I -- at that time I don't exactly recall, but I do know that I questioned it, and for my information I was given a Post-It Note on one of these when it was faxed to me that Kathy Rick -- Kathy Rick's boyfriend is best friend to Dean. That was a Post-It Note on here. Usually when someone signs for somebody, I try to find out what their relationship is. And at the time Dean was calling, he didn't have anybody locally to sign for him, and this person out of Mason City which is rather far away wanted to, and I think at that time she -- our office manager wrote a Post-It Note to kind of tell me what was going on.

Q. When you were going to post bond for this Dean Donaldson, did you look into his background a little bit to see where he was from and what kind of criminal history he had and so forth?

A. In 1996 ICIS wasn't fully functional. I don't think that they had it online at that time. And I was not in the practice of using ICIS for that. So there wasn't very much -- it wasn't very easy to check people's criminal history, and I don't think that at that time I checked his criminal history, no.

Q. Based on your knowledge of Mr. Donaldson at that time, did you know him to have any ties to Mason City at all?

A. No.

♀

Q. And it was that connection suddenly from Mason City that made you want to question why somebody from Mason City was posting bond?
A. Yes.
Q. You said that she put up a house for the bond in this case; is that correct?
A. Yes.
MR. WILLIAMS: Permission to publish, Your Honor?
THE COURT: You may.
MR. WILLIAMS: Your Honor, if I could have the screen? Thank you.
BY MR. WILLIAMS:
Q. First of all, Mr. Lederman, what is the jury looking at that is Exhibit 210B?
A. That's an indemnification and hold harmless contract.
Q. And what is the -- what is the purpose of that document, sir?
A. The purpose of that -- of this contract is to guarantee the defendant's appearance in court. And if the defendant fails to appear for court, the person who signs the contract is liable for the full amount of the bond being $5,000.
Q. And on that large portion there, in this case that was signed by Kathy Rick?
A. Yes.
Q. And how did she pay for the $514 or whatever the sum was

that was the fee to your company, sir?
A. I'm not sure if it was cash or check. It probably was not credit card because it would usually say credit card, but it

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1083 of 3636

doesn't designate what -- how it was paid, just that 500 was paid on this and then 516 on the other document. So I don't know exactly how she paid.

Q. Okay. What happened with Mr. Donaldson? Did he appear in court as required?

A. No, he did not.

Q. What happened?

A. Mr. Donaldson failed to appear for court on -- I think it was November 7. On November 7 of '96, Dean Donaldson failed to appear for court.

Q. So what happened after that?

A. We got a notice in the mail notifying us that the defendant failed to appear and setting a court date for the forfeiture hearing for us to produce the defendant, and at that time I made phone -- several phone calls in trying to find where Mr. Donaldson was and was unsuccessful in getting ahold of him, and eventually on January 7 we arrested -- or I'm sorry, January 9 of 1997, we arrested the defendant or at least my company did, an agent of mine.

Q. And then he was returned to the jail at that time?

A. Yes, sir.

Q. Okay. And what would have happened then to the bond and

Miss Rick and her house and everything?

A. Well, we appeared before the judge and asked that the bond be exonerated and the forfeiture set aside. That was granted by the judge, and the obligation for the cosigner was done because the case came to a disposition or at least -- I'm sorry, our bond came to an end because it was exonerated and the forfeiture was set aside.

Q. So the bottom line for Miss Rick was she was out the fee of $514, but her house was returned to her, and she didn't have a lien on it anymore?
A. I think at that time we did not return -- we did not release the lien. It was at a later date. The mortgage was actually released I think later in 1998. We usually return the mortgage to the recorder right away if we know that the case is done. And sometimes we don't. It just depends. A lot of times we wait until the cosigners actually call us to notify us that the lien is still on there. And we try to get them off. But this one was not released at that time. It was released later on.
Q. And sometime in 1998.
A. Yes. Actually I have it right here. The mortgage release was completed -- it was in 1998. The 15th day of August of '96 is when it was filed, and I can't read the month, but it was in '98.
MR. WILLIAMS: Very good. No further questions, Your Honor.

THE COURT: Mr. Rogers, are you going to cross-examine this witness?
MR. ROGERS: No questions, Your Honor.
THE COURT: Okay. You may step down.
Members of the jury, we're going to take our mid-morning recess. It is ten after ten. We'll be in recess for 25 minutes. Thank you.
(The jury exited the courtroom.)
THE COURT: Are there any matters we need to take up, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: No, Your Honor. Thanks.

THE COURT: Thank you.

(Recess at 10:12 a.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Is the government ready to call its next witness?

MR. WILLIAMS: Yes, Your Honor. United States calls William Dean.

WILLIAM DEAN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness

stand. Would you state your full name, please, and spell your last name.

THE WITNESS: My name is William Walter Dean, D-e-a-n.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Good morning, Mr. Dean. I'd like to have you tell the jury a little bit about yourself. How old are you, sir?

A. Forty-four.

Q. And where are you from, sir?

A. Here in Sioux City.

Q. Grew up in this area?

A. Yeah.

Q. How far did you go through school?
A. Eleventh grade.
Q. Currently you're in custody, and we'll talk about that in a minute. But do you have a trade or profession, employment you have on the outside?
A. I did a little carpentry work and got a certificate, bakery and stuff like that.
Q. Before you got arrested this last time, were you working?
A. I was -- I was doing a little bit lawnmower service on my own.

♀

Q. And if you could, Shelly has a hard job to take down everything, so if you can make sure you talk into the microphone, and we need to talk slow enough so she can take everything down.

Let me ask you a little bit about your current situation. You're in what jail right now, sir?
A. Woodbury County.
Q. And what's the charge pending against you right now?
A. Burglary third.
Q. You have not been tried or pled guilty or anything on that charge right now; is that correct?
A. That's correct.
Q. And when were you arrested on that charge?
A. About four weeks -- about three and a half weeks ago or something like that.
Q. All right. The -- this time in the Woodbury County Jail is not your first time in the Woodbury County Jail?
A. No.
Q. You have some other prior convictions in your past, sir?

A. Yes.

Q. What prior convictions do you recall having today, sir?

A. OWI, and I had a robbery case. I think I had another burglary case back a while ago.

Q. Have you actually spent time in some Iowa prisons as well as a result of some of those convictions?

♀

A. Yeah.

Q. All right. At some point in April of 1997, do you recall law enforcement officers coming and wanting to talk to you about Dustin Honken?

A. Yeah, I remember they come and talk to me, yeah.

Q. And you were called before a grand jury. Do you recall that?

A. Yeah.

Q. At first were you willing to talk to the grand jury?

A. No.

Q. Did you a couple days later agree to do so?

A. Yeah, yeah.

Q. All right. So let's just talk about that for a minute. Did you reach out to law enforcement officers and say, Hey, I've got information about Dustin Honken; I want to make a deal?

A. No. They -- another guy told them that I was there in the same cell they was, and then they came, wanted to talk to me, and I told them about what -- what I hear -- what I heard or what Dean told me, what this guy told me about.

Q. All right. And the guy we're talking about is who?

A. Dean Donaldson.

Q. All right. So you didn't go to law enforcement. They came to you and wanted to talk to you about it.

A. Yeah.
Q. And at first you didn't want to talk about it.
♀

A. No, no, I didn't. I didn't want to talk about it.
Q. Okay. Now, ultimately you agreed to do so.
A. Yeah.
Q. Why was that? Why did you agree to talk to grand jury ultimately?
A. Wanted to know the truth. They had me locked up. I mean, I couldn't -- they had me locked up, so in order for me to move -- get moved or get whatever, I would have had to talk to them.
Q. Okay. Well, you weren't locked up on any federal charges at the time; is that right?
A. No, no, no, no, no, no.
Q. And did anybody make promises to you that your charges would somehow go away or your sentence would be reduced if you talked?
A. No.
Q. Okay. So I'm not sure if I understand. Did you think somehow by talking that something was going to happen with your charges?
A. No. They just said they was going to write a letter to the parole board or something like that, but as far as charges going away or something like that, no.
Q. Did anybody write a letter to the parole board for you?
A. Yeah, they did.
Q. Did that have any impact on what happened with you down the
♀

road?

A. No.

Q. Did you have any charges ever dropped or dismissed because you talked to the grand jury or provided information to law enforcement officers?

A. No.

Q. Have you in your mind received any benefit whatsoever for providing this information to the law enforcement or the grand jury?

A. No.

Q. What do you think you're getting for testifying here today?

A. Nothing.

Q. Has anybody made any promises you're going to get anything for testifying here today?

A. No.

Q. Has anybody offered you anything for testifying here today?

A. No.

Q. I want to talk to you a little bit about why it is that law enforcement officers came and talked to you back in 1997. You indicated that you were in the Woodbury County Jail at some point and Dean Donaldson apparently told somebody you were in the same cell. Is that how this whole thing got started?

A. Excuse me?

Q. That Dean Donaldson told somebody that he was in the same cell with you back in 1997?

1247

A. Yes.

Q. Okay. So let's talk about that to begin with. You know Dean Donaldson, sir?

A. Yeah.

Q. Did you know him back before you were in the Woodbury County Jail in 1997?
A. Yeah.
Q. And how did you know Mr. Donaldson before?
A. I met him when we was -- wasn't locked up. I met him through another person. He was at a bar, and I think we had a couple drinks, and I got to, you know, associating with him, talk to him.
Q. Okay. How long do you think you knew Mr. Donaldson before you were both in the jail in 1996, 1997?
A. I've known Donaldson for about 15 years, about 15, 20 years.
Q. And how would you describe to the jury your relationship with Mr. Donaldson?
A. Associate, somebody I know, associate.
Q. In the past have you guys used drugs together?
A. In the past did we use drugs together?
Q. Yeah.
A. Yeah, yeah, yeah.
Q. Okay. And what type of drugs did you use?
A. We used -- do I have to answer this question or what, man?

1248

I mean, what I -- I don't know what this --
Q. We're talking about something that -- let's concentrate on the past here; okay?
A. Okay.
Q. So stuff that would have happened back before 1996.
A. Yeah, we used coke, coke, cocaine together back then.
Q. Okay. And did you ever participate, help him out in committing some crime back in 1996, before, sometime in there?

A. Yeah.

Q. What did you help him do?

A. He came to me, and he told me that he knew how to steal some hogs and sell them and he wanted me to help him.

Q. And you did.

A. Yeah.

Q. Okay. So by the time you guys are in the Woodbury County Jail in 1996, 1997, you know Mr. Donaldson pretty well then.

A. Yeah.

Q. When you were in the Woodbury County Jail, did you guys share a cell together at that time?

A. Yes, a big pod, and we all, yeah, was in the same -- same pod there.

Q. Okay. And are you -- was that in D block over here in the Woodbury County Jail?

A. Yeah, that I can remember, yeah.

Q. All right. And I want to focus on the time period of, you know, the period of, say, June to August of 1996. During that time period did you come to meet somebody by the name of Dustin Honken?

A. Yes, yes, I did.

Q. And how did you meet him?

A. I met him -- I think him and Dean Donaldson was in the cell -- or in the room talking, and I came in, and I seen Dean. I recognized Dean, and Dean introduced me to Honkens (sic).

Q. So they had some relationship before you got to the jail?

A. Yeah.

Q. All right. Did you develop any acquaintanceship or personal relationship with Dustin Honken?

A. I just talked to him, I mean, not -- I just talked to him.

Q. During the time period that you were in the jail with Dean Donaldson and Dustin Honken, did Dustin Honken ever ask you questions about Dean Donaldson?

A. Yeah, he just asked me can -- can Dean be trusted.

Q. Who asked you that? Dustin Honken did?

A. Yeah, can Dean be trusted.

Q. And did he tell you why he wanted to know that?

A. No.

Q. What'd you say?

A. I said as far as I know he can. I mean, I said I never had no problems with not -- with, you know, not trusting him.

Q. At some point -- and I want to make this clear. I don't

1250

want to hear -- I don't want to have you testify about what Dean Donaldson told you at all, if anything. What I want to do is concentrate on any conversation or any statements you heard from Dustin Honken; okay? So with that as background, were there times where you were together where Dean Donaldson was speaking with Dustin Honken?

A. I mean, I went in the room several times, but I -- I mean, eight years ago, I can't really say what they was talking about. I just know they was in the room a lot together and they was talking, and I'd go in there, and they talk about meth or meth and stuff like that and crank and making it and all that kind of stuff like that.

Q. Okay. So you overheard conversations between Dean Donaldson and Dustin Honken about manufacturing methamphetamine?

A. Yeah, crank.

Q. And you just happened to be in the room when they were

talking about this kind of activity.

A. Yeah.

Q. Did you hear them talk about anything else?

MR. PARRISH: Objection. Hearsay as to Mr. Donaldson.

MR. WILLIAMS: I can rephrase, Your Honor.

THE COURT: Okay. Thank you, Mr. Williams.

BY MR. WILLIAMS:

Q. Did you hear Dustin Honken make any other statements about any other crimes to Dean Donaldson while you were overhearing

conversation?

A. No, no, I -- no.

Q. Let me ask you this. Did you ever find out either directly from Dustin Honken or through hearing conversations with Dean Donaldson about what he was in jail for in the Woodbury County Jail in 1996?

A. What Honkens was in jail for?

Q. Right.

A. Yeah, for man -- for crank, for crank or selling crank.

Q. Did you ever have a conversation directly with Dustin Honken about that?

A. Yeah, I talked to him about it, but, I mean, he didn't go into -- he didn't say -- I guess there was a lot of money involved or something like that, but he didn't -- he didn't, you know, go too involved in what he was doing.

Q. Did he ever tell you about how he got caught?

A. I'm pretty sure I heard him and Dean just talking about somebody snitched on him, somebody told on him.

Q. Who did you recall Dustin Honken said snitched on him?

A. I guess it was a friend. I don't -- I can't really -- I

just overheard it was a friend or partner or somebody, partner was selling drugs with him.

Q. Do you remember today any conversations that you overheard where Dustin Honken talked about killing people?

A. I can't really -- I can't really remember him saying

♀

nothing about killing people. I just remember Dean telling me --

MR. PARRISH: Objection, hearsay.

Q. Well, yeah. What we don't want to have is have you repeat what Dean told you. What we need to know is whether you overheard Dustin Honken saying anything about killing people. Do you remember anything about that today?

A. Not right off, no.

Q. Would it refresh your recollection if you saw your sentencing -- or the transcript from your earlier testimony?

A. Yeah, I guess.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

A. About the bodies . . .

Q. What I want you to do is just take a minute and read through this. And when you're done reading through that, let me know, and I'll take that back from you.

Did you have a chance to read through that portion of the transcript, sir?

A. Yes.

Q. Did that refresh your recollection about whether you ever heard Dustin Honken talk to you about killing people?

A. I think it was said something about the bodies being heavier than -- heavier. That's about it. I mean, heavier

than -- something about a body being heavier as far as I can

remember.

Q. Dead bodies being heavier?

A. Yeah, yeah, dead bodies being heavier.

Q. Do you remember him saying something about wrapping something around the throats of people?

A. Man, it's been -- I -- if I said it back then, I probably could remember it, but right now at this time, I can't really remember him saying too much about it.

Q. So today you just don't have that recollection; is that what you're telling me?

A. I mean, that's -- it's like I just don't have it. I mean, if I did, I'd say I did. I remember about the heavier bodies. I remember -- I remember exactly that, about the bodies being more heavier than lift -- he said it is true -- he said something about it is true what they say. The body's more heavier when they're dead or whatever, yeah.

Q. All right. And you remember that part.

A. Yeah, I remember that part.

Q. All right. Now, at some point were you aware that Dean Donaldson gets -- got bonded out of the Woodbury County Jail?

A. Yeah.

Q. All right. Were you still in the Woodbury County Jail when he got bonded out?

A. No. I got out.

Q. All right. Now, did you end up back in the Woodbury County

Jail then in 1997?

A. Yeah.

Q. Later on that fall?

A. Yeah.

Q. Did you run back into Dean Donaldson while you were back in there?

A. Well, I ran into Dean Donaldson when he was out, and Dean Donaldson told me --

Q. Let me stop you, sir. Again, Dean Donaldson can testify about what he knows.

A. Okay.

Q. We can't have you testifying about what Dean Donaldson told you. Let me ask you this, though. At some point when you end up back in the Woodbury County Jail in November of 1997, was Dean Donaldson in there as well?

A. Yes, yeah.

Q. And while you were in there, did you observe -- let me ask you this, first of all. What cell block were you and Dean Donaldson in in 1997 when you were both back in there in November?

A. I can't re -- it was either D or F. I can't really remember which block.

Q. Okay. Did you see Dustin Honken while you were back in the Woodbury County Jail in November of 1997?

A. Yes.

♀

1255

Q. Was he in the same cell block as you, whatever cell block that might have been?

A. No, I don't think he was at that time.

Q. Can you see inmates in other cell blocks?

A. Well, you can -- if they go to rec. or whatever, you can see them. There's a big screen -- I mean there's a big window, and they'll walk right past you. Yeah, you can see them.
Q. Okay. So you can see other inmates if they're in the recreational area?
A. Yeah.
Q. All right. At some point did you see what you determined to be some form of communication being made by Dustin Honken to Dean Donaldson while you guys were in the jail together in November of 1997?
A. Some, yeah.
Q. What did you see?
A. He was -- as he was walking by, I could see him. He said he's a snitch, and he did something like -- in the motion of -- it appeared to be like a gun, but it -- I don't -- you know, it just appeared to be.
Q. All right. So where was Dustin Honken at when you saw this?
A. He was walking past the window.
Q. And he was inside the exercise area?
A. Well, he was going to the exercise area I guess, yeah.

1256

Q. All right. And where was Mr. Donaldson at this point?
A. He was sitting at a table, and I was up by the window, and I could see he just said he's a snitch and did that motion or whatever.
Q. And he was directing -- Dustin Honken was directing this toward who?
A. Dean Donaldson.
Q. And did you actually hear him say the word snitch?

A.    Well, you can't hear, but you could -- you know, you know, you're about this -- about a feet away -- you know, you can -- about a feet away.  It was between little thin glass, you know, so, you know, you know . . .
Q.    So you saw him form words that you understood to be the word snitch.
A.    Yeah.
Q.    And then he made a gesture with his hand that looked like what?
A.    It appeared like a pistol.
Q.    And how did Dean Donaldson take that?
A.    He just looked at me and shook his head, and then he started to tell me --
Q.    Let me again stop you.  We can't have you repeating what Dean Donaldson told you.
A.    Yeah.
Q.    That Dustin Honken that you saw in the Woodbury County Jail, do you see him in the courtroom here today?

1257

A.    Yeah.
Q.    Can you tell the jury where he's sitting and what he's wearing, please, sir?
A.    He's sitting over to my left in a yellow shirt or appears to be -- yellow -- to my left, sitting over there.
MR. WILLIAMS:  Very good.  I have no further questions.
THE COURT:  Mr. Parrish?
MR. PARRISH:  Thank you, Your Honor.  May it please the Court and counsel.
CROSS-EXAMINATION

BY MR. PARRISH:
Q. Morning, Mr. Dean.
A. Good morning.
Q. I have a few questions I need to ask you. I represent Mr. Honken along with Mr. Spies and Mr. Rogers. And as I understand it -- and correct me if I'm wrong -- the minute Mr. Donaldson got out of jail in 1996, he came straight over and met with you and had a conversation with you, not -- we don't want to know what the conversation was about, but he met with you, did he not?
A. No, I mean, I was --
Q. In 1996.
A. No, he didn't meet with me. I was walking down -- up the street, and he was coming down the street, and I seen him.

Q. And you had a conversation with him.
A. Yeah.
Q. Okay. And this was right after he had gotten out of jail, is that right, had been bonded out?
A. Yeah.
Q. And that was the first conversation you'd had with him. That's the first conversation you'd had with him since he had been bonded out; is that right?
A. Since he was out?
Q. Yes, sir.
A. Yeah.
Q. Okay. And you told the grand jury back in 1997 that you had a conversation with him right after he'd gotten out of jail; isn't that true?
A. Yeah.

Q. All right. And this conversation went on for quite some time; isn't that true?
A. I suppose, yeah.
Q. And you had questions for him about the conversation, or did you just listen to that conversation right after he'd gotten out of jail?
A. I can't remember. I probably listened and had questions, listening, had questions.
Q. And what did you have questions about during the course of

1259

that conversation? Did you have questions about --
A. I probably had questions about how much money did it take to bond him out of jail and how much money was he going to receive and stuff like that.
Q. Those kind of questions you asked him, did you not?
A. Yeah, I probably did.
Q. Now, would it be accurate to say that Mr. Donaldson never had a conversation with you about Mr. Honken after he -- immediately after he'd gotten out of jail? Would that be a true statement?
A. Huh-uh.
Q. That would be a false statement.
A. Yeah.
Q. You told this jury a little bit about your background, did you not? I want to know about your relationship with Mr. Donaldson prior to 1996 along the same line that Mr. Williams asked you those questions. What I'd like to know is that prior to 1996 you had known him since what? The mid '80s? Would that be accurate or --
A. Somewhere around there, yeah.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1101 of 3636

Q. Okay. And you met -- did you meet him in jail?
A. No, I didn't meet him in jail.
Q. Where did you meet him?
A. Met him on the streets. He was with somebody else that I knew, and the conversation -- we started talking.

Q. And you only committed one crime with him in terms of theft?
A. That's it.
Q. Okay. And who proposed the crime? Did he propose it, or did you propose it?
A. No, I -- he did. I didn't know nothing about pigs and hogs. He the one that told me about hogs and stuff like that.
Q. So did he represent himself as kind of an expert in dealing with the theft of hogs and then turning around and making money out of it?
A. Yeah.
Q. So you entered into this relationship with him as kind of a venture where you would go into where? I assume just a pig farmer or a hog farmer are the ones who would have the hogs; is that right?
A. Yes.
Q. So he proposed this to you as some kind of venture where you would go in, you would steal the hogs, and as a result of this theft of the hogs, you would end up with some money in your pocket; is that right?
A. (Witness nodded head.)
Q. Is that right?
A. Yeah.
Q. And how would you get the money in your pocket from the

theft of the hogs? Explain that just briefly if you can.

♀

A. He would take them to the hog market, and they would write him out -- they would write a check and cash the check.
Q. Okay. Make sure we're tracking here. You would go out along with Mr. Donaldson. You would steal the hogs from the farmer, and I assume you would use some form of transportation such as a truck or a trailer; is that right?
A. Yeah.
Q. You would take the trailer. Then you would take the trailer with the hogs on it out to the market; is that right?
A. Yeah.
Q. Mr. Donaldson then would go in, negotiate the deal on these stolen hogs.
A. Yeah.
Q. He would then take the check that he would be paid for these hogs. Then he would split the money with you; is that correct?
A. Yeah.
Q. And would you agree that all the years that you knew Mr. Donaldson that was basically his major trade, stealing hogs and then taking them in, taking the money, split it with whoever would be working with him; is that correct?
A. Yeah.
Q. Matter of fact, he was sort of proud of that as some type of profession; would you agree?
A. Yeah.

♀

Q. But you agree that there was only one time where he allowed

you in on that proposition where you could work it out; would that be accurate?

A. Yeah.

Q. But that was not the extent, as you've explained to the jury, of your relationship with him. It was not that one business venture of stealing hogs. You were engaged with him in other conduct that perhaps was illegal, is that right, that you talked about prior to 1996?

A. Yeah.

Q. All right. Explain to the jury what type of conduct that was prior to 1996 when you were at the Woodbury County Jail.

A. While we was at the jail?

Q. Prior to the time -- that means -- I'm sorry, sir. Before you were at the jail, explain to this jury what type of other conduct you and Mr. Donaldson engaged in that was not quite above board.

A. Drinking and smoking cocaine.

Q. All right. And where did you smoke this cocaine?

A. All over at different houses.

Q. All over just Sioux City area or just all over the midwest or the northwest part of Iowa?

A. Sioux City.

Q. Just in Sioux City?

A. (Witness nodded head.)

1263

Q. All right. Is that correct? Is that yes?

A. Well, yeah, mostly, mostly.

Q. All right. Now, this cocaine, this was more than one time, is that right, that you did it all over Sioux City?

A. Yeah.

Q. Matter of fact, that cocaine was not like powder cocaine that you sniff up your nose. You would agree this was crack cocaine; is that correct?
A. Yes.
Q. And this crack cocaine from your experience and sharing it with your friend would be cocaine that would, in fact, affect your memory.
A. Sure it would.
Q. Right. And it would affect your memory because sometimes if somebody would have a conversation with you, you may not be able to have recall because if you smoke too much of this crack cocaine it affects your ability to recall exactly what someone said; isn't that right?
A. Sure it would.
Q. And if you smoke it over a period of time, your memory becomes so defective that sometimes it's difficult to separate what's true from what is, in fact, fiction. Do you understand what I mean by that?
A. Yeah, I understand what you're saying, but . . .
Q. But that happens to people who smoke a lot of crack

♀

1264

cocaine. You agree?
A. Sure, yeah, it could.
Q. You agree that you smoked a lot of crack cocaine, is that right, prior to 1996?
A. Sure, yeah.
Q. All right. And you also agree that Mr. Donaldson on several occasions smoked a lot of crack cocaine with you; is that correct also?
A. Yeah.

Q. And it was one of the habits that you and Mr. Donaldson would have on occasion when you would get together. It would just be something you would do.
A. Yes.
Q. Okay. Now, did you do anything else other than smoke crack cocaine together prior to 1996, I mean, and the hog business venture that you did one time? Did you do anything else between the two of you?
A. Not that I can remember.
Q. Would you agree that this relationship went on for at least seven years prior to the time that you both found yourselves at the Woodbury County Jail?
A. (Witness nodded head.)
Q. Is that a yes?
A. Yeah.
Q. Okay. Thank you. Then you would agree that Mr. Donaldson

1265

went to the Woodbury County Jail prior to the time that you went there. And what I mean by prior, he was actually in jail when you went there; would you agree?
A. Yeah.
Q. So this is 1996. You're in jail. You both get out at one point. And you'd agree that with regard to Mr. Honken you perhaps were only in the cell block which is cell block D with Mr. Honken for only approximately a week at best. Would that be accurate?
A. Probably.
Q. Let's say a week more or less. Could we say that?
A. Two, yeah, a week or two.
Q. A week to two at most; is that right?

A. Yeah.

Q. And you would agree you've been in and out of that Woodbury County Jail just looking at -- and we won't go into detail with regard to the number of times you've been there, but you would agree that you've been there a number of times.

A. Yeah.

Q. And you're familiar with cell block D, are you not?

A. Yeah.

Q. And you know with cell block D once you walk out and you go to the shower, anyone can have access to your papers. You would agree with that? People can go into your cell because your cell's not locked.

♀

A. Oh, yeah, yeah.

Q. Matter of fact, do people do that on occasion?

A. They do steal people's commissary.

Q. Why?

A. Because the cell's open and it's there. I mean, they --

Q. So it's just common habit of inmates when one inmate walks out of a cell, another inmate might just go in, take a look at whatever they would have from the commissary or whatever papers might be laying out there.

A. That is a possibility, that's true.

Q. And a number of times you've been in Woodbury County Jail over a period of time -- you've been there at least 14 separate times; would you agree?

A. Yeah.

Q. And in those 14 separate times, you would agree that what you've observed about inmates once an inmate would walk out of the cell and that door would be open in that cell block, other

inmates just had a habit of going in there and going through their personal effects; is that true from what you observed?

A. It could, yeah.

Q. And that you made observations of during the 14 times that you've been in there over a period of time; is that correct?

A. I've seen it happen.

Q. Now, would you also tell us whether or not once you got out of that cell -- and we're talking about in 1996 again -- when

you, in fact -- well, let me put the question this way. In 1996 when you got out, did you eventually go back into jail in 1996?

A. Yes.

Q. Okay. And you went back into jail in 1996 in December. Would have been like December 1; would that be accurate? Does that sound about right?

A. Yes, yeah.

Q. Mr. Donaldson was gone at that point; is that right?

A. I'm pretty sure.

Q. Because he left November 21 of 1996; would that be right?

A. I . . .

Q. So it's possible -- I just hope that's not my bag. I don't think it is.

So it's possible Mr. Donaldson was gone when you went back into the Woodbury County Jail if you didn't go back until 12-1 of '96?

A. Yeah, I'm pretty sure he was gone.

Q. All right. So if he was gone, do you know whether you saw him when you went back on your burglary charge and the interference charge and your failure-to-appear charge in December of '96? Do you understand that question?

A. Well, he had to come back. He was -- I mean, he had to come back in. He was sitting there. I mean, I don't know exactly what date he came, but he came back in. I don't know if it was exactly that date, but he came -- he did come back in.

♀

Q. Okay. And that's fine. And you could be confused about the date, but you know at some point he was there and you weren't there. At some point you were there and he wasn't there. Would you agree?

A. Yeah, I can't remember the days back eight years ago.

Q. Exactly. And when Mr. Williams asked you that question about when you might have seen any gesture that Mr. Honken might have made, as you sit here today just as you couldn't back in 1997 tell the jury -- grand jury any idea as to when you thought that gesture might have been made.

A. When I thought it might have been made?

Q. Right.

A. It was --

Q. The date I mean.

A. Oh, the date, I mean, no, I can't say what exactly date it was.

Q. Right. But what you did was put it in some perspective and say, Well, I think it might have been after Mr. Donaldson may have come back in the jail. That's what you told him; right?

A. No, Donaldson -- I'm pretty sure Donaldson was in jail and he -- whatever, whatever.

Q. Okay. Somewhere around whenever he was in jail.

A. I can't say what the date is.

Q. Okay. That's fine. Now, after you came back December 1, you were then shipped out somewhere, weren't you?

A. Yeah, I guess.
Q. Okay. You were shipped down to Oakdale.
A. Yeah.
Q. All right. Now, you stay in Oakdale for at least 60 days, don't you?
A. Yeah.
Q. All right. And when you got down in Oakdale, Mr. Donaldson was down in Oakdale; is that right? Your friend of about eight or nine years was down in Oakdale with you?
A. I think he came down there. I don't know if he went down there before me or after me, but yeah, I'm pretty sure he was down there.
Q. But you both were down at Oakdale, this facility for holding people to ship them out to the different institutions. You were down there together in 1996 and beginning the early part of 1997; would you agree with that?
A. If it was on record, then it had to have been.
Q. And you would agree that you had numerous conversations down there.
A. Sure.
Q. Now, I just want to ask you, was another person down there by the name of Mr. Putzier?
A. Yeah.
Q. All right. He was at Oakdale too.
A. Yeah, Putzier.

Q. So did you, Mr. Donaldson, and Mr. Putzier all being from

the Sioux City area ever get together and have any discussions?
A. Sure we probably did.
Q. And some of those discussions concerned Mr. Honken, didn't they?
A. I'm pretty sure that something was said about Mr. Honkens but . . .
Q. Now, you also got together with Mr. Putzier, Mr. Donaldson, and yourself down in the marshals' holding cell in 1997, did you not?
A. Where at?
Q. In a holding cell for the marshals.
A. (Witness nodded head.)
Q. Remember when you were all waiting to testify at one point?
A. Yeah.
Q. And you had the conversations at that point about Mr. Honken, didn't you?
A. I'm pretty sure something was said. I don't -- yeah, about the case.
Q. Now, would it be a true statement or a false statement that you didn't see Mr. Putzier and Mr. Donaldson together for five years after 1996? Would that be a true statement, or would that be a false statement?
A. See them together?
Q. Yes, where you saw them together where they could have a

1271

conversation with each other between 1996 and what? Five years from that would be 2001. Did you ever see them together during that time?
A. I can't remember if it was that long, but I did see them together again.

Q. At Oakdale was one place you saw them.
A. And then back on the streets I saw them together.
Q. You saw them together back on the streets; is that right?
A. Right.
Q. So it would be a false statement for them -- for you to say you never saw them together from 1996 up to and including 2001. That would be a false statement.
A. I said I don't know how long it was, but, I mean, the next time I did see them was probably -- you know, was back in Sioux City.
Q. Okay. But you do remember seeing them at Oakdale. You do remember seeing them at the marshals' holding cell. And you do remember seeing them on the streets in the Sioux City area; is that right?
A. Yeah.
Q. Now, when you saw them together, I'm not asking you what they were saying to each other, but did they appear to know each other and be engaged in conversation with each other?
A. Yeah.
Q. And did you engage in conversation with them during that

1272

period of time?
A. Yeah.
Q. Matter of fact, when you went down in December of '96, you were out prior to 1999, weren't you? Would you agree with that? You were out of prison after you went down in that burglary charge and interference charge and the failure-to-appear charge. You were released before September of '99, weren't you?
A. I'm pretty sure, yeah.
Q. And you were out on the streets in the Sioux City area

during that time; is that correct?
A. Yeah.
Q. Now, during that time did you get back together with Mr. Donaldson, first of all, to engage in any criminal acts? And what I mean by that, after 1996, did you meet with him again and do cocaine with him anymore?
A. I'm pretty sure I did.
Q. Okay. What about with Mr. Putzier?
A. Yeah.
Q. And did you do that with all three of them together at any point in time where the three of you all got together to do crack cocaine?
A. No. I think it was --
Q. Separate both times?
A. Yeah.
Q. You would get together with Mr. Putzier, do cocaine with

♀

him. Then you would get together with Mr. Donaldson and do cocaine with him after you got out of prison; is that how it would work?
A. Yeah.
Q. Okay. Did you ever do any more hog thefts with Mr. Donaldson after you got out of prison from your 1996 charge?
A. No.
Q. So the only thing you did with him after that would have been crack cocaine; is that right?
A. Yeah.
Q. And you continued to do crack cocaine with him up until what year? What year did you stop?
A. I don't -- I can't remember.

Q. You can't remember.

A. No.

Q. And let me just ask you a question. When they were interviewing you all these times about any conversations that you had with Mr. Donaldson and Mr. Putzier who we may hear from here at some point, did you ever tell them all the times that you were doing crack cocaine with them and how it affected your memory? Did anyone ever ask you that question?

A. No.

Q. Did you ever tell them that?

A. No.

MR. PARRISH: Thank you, Mr. Dean. I have no further

questions.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Dean, while you were in the Woodbury County Jail with Dustin Honken, were you smoking crack cocaine in the jail there?

A. No.

Q. Okay. Do you have any doubt in your mind whatsoever, sir, that you heard the defendant in this case say that he knows that dead bodies are heavier than when they're alive?

A. No.

Q. Any doubt in your mind at all?

A. No.

Q. Any way crack cocaine could have affected your memory of that fact, sir?

A. No, sir.

Q. Any doubt in your mind that you saw the defendant in this case make a hand gesture of a gun toward Dean Donaldson?
A. No, sir.
MR. WILLIAMS: I have nothing further.
THE COURT: Any recross, Mr. Parrish?
MR. PARRISH: No, Your Honor. Thank you.
THE COURT: Okay. You're excused, Mr. Dean.
Mr. Williams, ready to call your next witness?

♀

1275

MR. WILLIAMS: Yes, Your Honor. United States calls Mr. Putzier.
THE COURT: Okay. The jury can take a stretch break.
DENNIS PUTZIER, PLAINTIFF'S WITNESS, SWORN
THE COURT: Okay. Please be seated in the witness box. Can you adjust the chair and the microphone so you can speak directly into the microphones? And when you're ready, would you state your full name, please, and spell your last name.
THE WITNESS: Dennis Leroy Putzier, P-u-t-z-i-e-r.
THE COURT: Mr. Williams?
MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:
Q. Mr. Putzier, I want you to tell the jury a little bit about yourself, sir. How old are you?
A. I'm 39 years old.
Q. How far did you go through school, sir?
A. To the 12th grade, but I got a GED.
Q. Now, what area are you from originally?
A. Correctionville, Iowa, is where I grew up, Sioux City, this

area.

Q. Correctionville is a little town that's a little bit east of Sioux City?

A. Yes, sir.

Q. Do you have a trade or profession you practice, sir?

A. Right now I'm assistant manager for a hog confinement. It's Husky Hogs out of Kansas.

Q. And how long you been doing that, sir?

A. Four months.

Q. Now, you have a bit of a criminal history in your past; is that correct, sir?

A. Yes, sir.

Q. Okay. Are you currently on any charges?

A. Yeah, I got a couple charges.

Q. Okay.

A. One is an old charge from I believe 2002, and I'm just waiting to go to court on that, and that is in Omaha. And then I got one charge in Beaver City. Me and my son had got into an altercation. It's just like an assault, third-degree assault, but I already talked to the county attorney, and he found out what happened, and they're dismissing that. I will have to pay court costs. And then I got a driving under the influence in Nebraska also.

Q. And those are charges that are pending right now.

A. Yes, sir.

Q. Has anybody on behalf of the government indicated that they're going to do anything about those charges on behalf of you because you're testifying here today?

A. No, sir.

Q. Let's talk about some of your past criminal history. You've had a number of felony offenses in your past, sir?
A. Yes, sir.
Q. In 1986 I think you had an attempted burglary conviction?
A. Yes, sir.
Q. You had a burglary conviction in 1990?
A. Yes, sir.
Q. Do you remember getting convicted of delivering some type of controlled substance in about 1991?
A. Yes, sir, that was marijuana.
Q. You had a theft charge in 1991 as well?
A. Yes, sir.
Q. Okay. 1996, you had a charge that we're going to be talking a little bit more about, but that involved some type of theft of hogs?
A. Yes, sir.
Q. Okay. And in 1997, you were convicted of aiding and abetting a felon to escape prison; is that correct?
A. Yes, sir.
Q. That was a federal charge, wasn't it?
A. Yes, sir.
Q. And we're going to talk a little bit about that as well. Let me ask you this. First of all, did you ever -- with regard to any of those past state charges, the burglary, the theft, that kind of stuff, did anybody on behalf of the federal

1278

government do anything to erase those charges or reduce your sentences on any of those charges in exchange for cooperation?

A. No, sir.

Q. In 1997, this aiding and abetting a felon to escape, was that a federal prisoner you helped aid and abet an escape?

A. Yes, sir.

Q. And who was that prisoner you helped escape?

A. Dustin Honken.

Q. Now, the escape never actually occurred; is that correct?

A. That's correct, sir.

Q. It was an attempt.

A. Yes, sir.

Q. All right. And as a result of your involvement in attempting to escape and helping Dustin Honken escape, you ended up pleading guilty to a federal charge on that.

A. Yes, sir.

Q. As a result of that federal charge, did you go to prison?

A. Yes, sir.

Q. For how long?

A. Approximately two and a half years.

Q. Now, were you facing more time than that when you were charged with that crime?

A. I believe I was facing up to five years. I'm not positive, but that's what I believe I was facing up to.

Q. And was that ultimate sentence reduced somehow?

1279

A. Yes, sir.

Q. And how was that reduced?

A. I can't -- it's 5K1. I don't know exactly what it -- just for telling the truth about what happened.

Q. Okay. So in exchange for providing assistance to the government, a motion was made, and your sentence was reduced?

A. Yes, sir.

Q. And where was that reduced at? I mean, who ultimately reduces your sentence in this case or in that charge?

A. I'm not positive. I don't know if it was the government or the judge. I'm not honestly positive.

Q. Okay. Let me work at it this way. Were you sentenced in federal court?

A. Yes, sir.

Q. And was it here in this room?

A. Yes, sir.

Q. And was Judge Bennett presiding at that time?

A. Yes, sir.

Q. Okay. And what's your understanding about who ultimately makes the decision about whether you get a reduction for cooperation?

A. Like the district attorney puts in a motion or something.

Q. All right. And then the judge ultimately sentenced you.

A. Yes.

Q. Okay. Let's talk about how all that came about then at

1280

this point. But let me -- before I go there, other than the sentence reduction at the time that you pled guilty to aiding and abetting Dustin Honken escaping jail, have you received any other benefit for providing the information to the government?

A. No, sir.

Q. Do you think you're going to get any benefit for testifying here today?

A. No, sir.

Q. Let's talk about then what happened back in 1996. At some point you're in the Woodbury County Jail in 1996 as we talked

about before for this theft charge for something to do with the hogs.

A. Yes, sir.

Q. Were you involved in that with somebody else?

A. Yes, sir.

Q. And who was that?

A. That was Dean Donaldson.

Q. Did you know Dean Donaldson before you guys committed this crime in nine -- that led to you being in jail in 1996?

A. Yes, sir, I've known him for 10, 15 years at least.

Q. As of today or as of back in 1996, did you know him for 10 or 15 years?

A. That would have been back in 1996.

Q. Can you describe for the jury if you will what was the nature of your relationship back in 1996?

♀

1281

A. The nature of our relationship was honestly just criminal like stealing pigs and getting high together, and that was it.

Q. Okay. Friends?

A. Yeah. We were so-called friends if you could call us friends, you know.

Q. Okay. Primarily it was a relationship based on getting high on drugs and . . .

A. Yes, sir.

Q. Now, the stealing of the pigs, is that something you did on one occasion or more than one occasion with Dean Donaldson?

A. More than one occasion.

Q. And ultimately you were caught in 1996 on that.

A. Yes.

Q. How did you get caught?

A. Dean Donaldson got caught at John Morrell, him and Dee Dee Medina, and when the cops went to arrest them, they said that they borrowed a truck and the hogs from me, and then they had a warrant put out for me, and I got arrested in Anthon, Iowa, and brought to Sioux City.

Q. It was ultimately because Dean Donaldson had apparently told on you?

A. Yes, sir.

Q. So directing your attention then to the summer of 1996, say June to August of 1996, you're in the Woodbury County Jail at this time?

A. Yes, sir.

Q. And what cell block -- why don't you walk the jury through if you would, are there a number of cell blocks, first of all, in the Woodbury County Jail?

A. Yes, sir.

Q. And do you recall back on this charge in 1996 what cell block you were in to begin with and what cell blocks you ended up going to?

A. I believe I started out in cell block E, and then I got moved to cell block C, and then from C I went to G, and then from G I went to A, and I believe that's the only ones I was in.

Q. All right.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. I'm going to show you Exhibits 214A, and then there's a number of subletters all the way down to X. Do you see those photographs, sir?

A. Yes, sir.

Q. And do you recognize what's in those photographs?

A. Yes, sir.

Q. And what is that?

A. On the top photograph here it is --

Q. Let me ask you this way. Is -- the whole grouping of photographs, can you describe what those are photographs of?

♀

A. They're photographs of different cells and cell blocks of the Woodbury County Jail.

MR. WILLIAMS: United States would move to admit Exhibits 214A through X, Your Honor.

* * * *

(Government Exhibits 214A through 214X were offered.)

* * * *

THE COURT: Any objection?

MR. PARRISH: Relevance, Your Honor, and 403.

THE COURT: Overruled. Government's Exhibits 214A through X are received.

* * * *

(Government Exhibits 214A through 214X were admitted.)

* * * *

MR. WILLIAMS: Permission to publish, Your Honor?

THE COURT: You may. I'm going to close the blinds for the jury too.

MR. WILLIAMS: If I could, Your Honor, I think I need to have the controls.

THE COURT: Oh.

MR. WILLIAMS: Thank you.

BY MR. WILLIAMS:

Q. Looking on your screen in front of you, sir, 214N, what is that a photograph of, sir?
A. That's a photograph of the Woodbury County Jail, the

outside of it.
Q. And that's here in Sioux City, Iowa?
A. Yes, sir.
Q. Exhibit 214Q, do you recognize that, sir?
A. Yes, sir, that's C, block C. I've been in that cell before.
Q. And that's a photograph of cell block C, and there's a couple -- if you will, is this a second level tier right there?
A. Yes, sir, and that's the railing on the walkway up above.
Q. And below we have a cell C7?
A. Yes, sir.
Q. Okay. And what's the cell number up here then?
A. That would be 8.
Q. C8 up above.
A. Yes.
Q. All right. I want you to just help the jury understand a little bit about the operation of the Woodbury County Jail. First of all, is there a way to communicate with inmates between different cell blocks?
A. Yes, sir.
Q. And how's that done, sir?
A. In most of the cells in the Woodbury County Jail, there's a fire door not between every one, but like from C to D, from D to E, and from E to F there's a fire door, so you can talk through it. You can slide papers through the sides of the doors. You

can also slide like -- in the front of the -- through the hallway where people walk, there's cell doors where you can -- we've slid several things underneath there. There's a bigger gap there if you gotta pass bigger things. There's -- you just pass kites which are notes.

Q. Kites, is that just a slang term used in the jail for notes?

A. Yes, sir.

Q. Okay. Between inmates.

A. Yes, sir.

Q. And is this a fairly common practice that not just you but other inmates use to communicate between the cell blocks with other inmates?

A. Yes, sir, they do it more or less all day long.

Q. And is there like a common exercise area at the Woodbury County Jail as well?

A. Yes, there is. I believe now they've changed it to where they bring an exercise machine into some of the cells, cell blocks. But there's -- right across from C and D there's a little room with glass that they go in to exercise.

Q. Back in 1996 was there a common area for exercise?

A. Yes, sir.

Q. Now, at some point while you were in the Woodbury County Jail, did you come to have contact with somebody by the name of Dustin Honken?

♀

1286

A. Yes, sir.

Q. Can you explain to the jury how you first had contact with

Dustin Honken?

A. I was sitting in my cell in E block, and somebody brought me a note that had been slid through the door, and the best of my knowledge, I can remember that the note said, Hey, I'm Dustin Honken --

MR. PARRISH: Objection, hearsay.

Q. Hang on just a second.

MR. WILLIAMS: Not being introduced for the truth of the matter asserted, just to establish the nature of the contact.

THE COURT: Overruled.

BY MR. WILLIAMS:

Q. Go ahead.

A. I was slid a note, and it says, I know you don't know me, but my name's Dustin Honken. The reason I'm writing you is because I had bonded Dean Donaldson out, and I'm sending you some paperwork to show where I have been, why I'm here, and why I was here before and just more or less that was it a good thing for me to bond Donaldson out. He said he was going to take care of something for me I needed done. He said your brother and Ladean would help. And I don't remember everything, but that's some of the stuff I do remember in the first note that I got, and then I just wrote him back and told him, you know, what I

1287

thought of Dean because of the reason I was in there, and I told him, you know -- and then after that he was in lockdown --

Q. Let me stop you at that point just to go back to -- you responded to that note; is that right?

A. Yes, sir.

Q. Okay. And what did you tell him about Dean Donaldson then?

A. I told him he was stupid to even get him bonded out because he was going to do nothing but go out and smoke crack and he wouldn't do nothing for him. From what I took he wanted Dean to go kill somebody for him, and I knew better than that.
Q. At some point did you get moved to C block then?
A. Yes, sir.
Q. And once you got moved to C block, did you continue to have communication with Dustin Honken?
A. Yes, sir.
Q. How did that occur then?
A. I got moved over to C block, and there was another couple people over there I'd met and I'd known for a while. Kenny Raider was one. Terry Davenport was another. And they was talking about escaping, this and that. And I never thought it was possible, but I tried. I did try to escape, and I found -- we tried one room, and it was solid. So in C8, there was a room beside where I lived. I went in there, and all the way up to the top -- it would be left-hand corner of the cell -- I broke a door handle off, and I broke a brick out. I broke all the way

through to the back, and then there's some insulation in between there. It's got like tinfoil on the outside, and I looked through, and I could see the red brick facing. So then we couldn't get no more out. There happened to be a bar.

So I covered it up with some book covers and soap. And then I was still talking to Dustin at this time, and I told him what was going on. He said, Hey, you know, you can do this, you know, and if you get out, I need you to take care of something, and if you do that, I got drugs and money for you, and you'll be taken care of forever and then --

Q. So let me stop you at this point. I want to back up a little bit and kind of take this bit by bit if we could. The communication you had with Dustin Honken, how were you guys talking to each other?
A. Through the fire door between D and C.
Q. Showing you Exhibit 214R, do you recognize that setting there, sir?
A. Yes, sir.
Q. Is there a fire door in that picture?
A. Yes, sir. It's the door to the left of D1 underneath the stairs.
Q. Is that the fire door through which you and Dustin Honken communicated then?
A. Yes, sir.
Q. And how do you -- that looks like a solid door. Isn't it,

1289

sir?
A. Yes, sir, it is.
Q. So how do you guys communicate through a solid door?
A. Right there by the handle, if you talk right into the -- you know how you can shut some doors and they are not sealed completely? You can slide papers, newspapers, kites, letters, all different kinds of things through there, and you can talk and hear very clearly through there.
Q. So how long in days, weeks, months was it that you had kind of continued communication with Dustin Honken then through that door?
A. At least a month, maybe more.
Q. And this would have been in the fall of -- or early fall, late summer of 1996?

A. Yes, sir.

Q. So while you guys are communicating through this wall or through this door, how many times do you think during that span of time do you guys -- did you guys talk?

A. At least 10, 15 times a day every day.

Q. All right. And over the course of talking with him, I mean, at first did you guys tell everything you knew about each other to each other?

A. Yes, sir.

Q. And over the course of time did you get into more detail about things, about different matters with him?

1290

A. Yes, sir.

Q. When you talked to him, did he tell you about a number of events in his life, past crimes and things about his current charges that he was in for at that time?

A. Yes, sir.

Q. Did he tell you about it in kind of a straight chronological order, or did it kind of come in over time mixed up?

A. From the first letter he told me why he was in there and that he had been there before. And then it started off him telling me what happened in '93 and then how he had gotten out and then how everything turned out to then and how he came back to jail and if one thing happened he could get out again.

Q. Okay. So let's talk about that a little bit. Rather than try to recap exactly the conversations you had, what I want to do is just talk to you about the different topics you guys discussed during these talks through that door.

A. Yes, sir.

Q. Did he tell you -- you said about being in trouble before. What did he tell you about his prior case before?
A. He told me he was arrested by the feds for manufacturing methamphetamines in 1993.
Q. And did he tell you about how he got caught back then?
A. That some people had told on him.
Q. And so what did he tell you about what happened -- well,

♀

first of all, did he tell you any details about who was involved with him back then in '93?
A. Yeah, but honestly I do not remember names. He told me there was a couple people that had told on him and that were going to testify against him and they had disappeared, that he'd killed them.
Q. He told you he killed them?
A. Yes, sir.
Q. Some inmate you've -- have you ever even seen his face at this point?
A. Through the windows you can see, and then in the door there, the fire door, there's a hole to open the door with a key, and it's a big key, so it's a pretty good-sized hole, and you can look through there and see different people walking around.
Q. Did you know Dustin Honken before you went to the Woodbury County Jail in '96?
A. No, sir. The first time I've ever knew anything about him is when he sent that first kite to me.
Q. So explain to the jury. I mean, some guy you didn't know before you get into jail and at some point he tells you that he killed somebody, how is it that you got to the point in a

conversation that he's telling you about killing someone?

A. Just by talking every day and how -- he said, you know, all's I need to do is get rid of this other person and I can

take care of you forever. But I've been in prison. I've been locked up before, and I've heard a lot of people say this and that, and you never know. And you don't have a lot of things to do in jail but to talk to somebody. And it's kinda interesting to hear things, and you just kind of wonder if this really is. And then just by -- over the lengthy conversations that we'd had, I started believing him. And to be honest, he offered me quite a bit of money and drugs, and I was just going to take his money and drugs if I could ever get out of there until towards the end he wanted to come with me.

Q. We'll get to that. At some point he wanted to participate in this escape.

A. Yes, sir.

Q. So over the course of a number of conversations, you guys talk a lot, and at some point he tells you that he killed witnesses back in 1993?

A. Yes.

Q. Did he give you any details about how that happened?

A. He just said that he had killed several witnesses, that his girlfriend, Angela Johnson, had helped him, and they took them out; in execution style he killed some of them, and they buried them. And if I'm right, because it's been a while, I believe that he told me that his girlfriend is down, she's bad, and that ain't how he put it completely, but she had went to the house and got the mother and some kids, but on the kids he told me

that they were in Mexico still alive, that he did not kill them.
Q. Okay. Did he tell them how -- tell you how he killed them?
A. Yeah, that they shot them and killed them.
Q. When you say they shot them, did he say who actually pulled the trigger?
A. I believe he did, but I cannot tell you honestly because I can't remember.
Q. Very good. Did he tell you where they were shot at versus -- and by that I mean they went to a house. Did they shoot them at the house? Did they shoot them someplace else?
A. They shot them someplace else.
Q. And did he tell you where they were buried at?
A. Just in a field out -- and I believe it was either by Britt or Mason City area. Just drove them out in the country and shot them.
Q. And did he tell you about any other murders?
A. He -- I didn't sit and listen to everything in detail on the murders. I was -- I did question him about the kids, and he said, No, we didn't kill the kids, that they were in Mexico. They took them and just took them away.
Q. When you say you questioned him about the kids, what do you mean by that?
A. Because he told me there was kids involved, two kids, and I don't know. I just don't believe any kids should ever be involved in nothing like that and anybody should ever hurt a kid

1294

ever, and I believe he could hear that in our conversations, so he wouldn't tell me that they were killed.
Q. So when the topic of the kids came up, you expressed some

concern about that in your conversation with him?

A. Yes, sir.

Q. All right. Now, is this all in one conversation he's telling you all these details about it, or does this occur over the course of a number of conversations with him?

A. This occurs over the course of a number of conversations, and that's why I cannot be sure of when and where because, like I said, we'd talk anywheres from 10 to 15 times a day at least, I mean, from the time the doors opened up until they closed.

Q. Okay. Now, you said you've been in prison before and people talk about murdering people all the time. Is that fair to say?

A. Yes, sir.

Q. Okay. Why do they do that?

A. Just to try to make themselves look big or try to keep other people from -- you know, making them think that they're somebody.

Q. Was there anything about the conversation you had with Dustin Honken that led you to believe it wasn't the same thing, that he was just making something up?

A. It made me -- when I know that he'd got completely out and they had to drop all charges and they have never found the kids

1295

or any of them people since, that's what made me believe that he honestly did kill them.

Q. Now, did you know something about the case? Had you read something in the newspapers or anything like that where you knew something about it?

A. No, just from what he'd told me and showed me from his paperwork.

Q. What kind of paperwork did he show you? Do you remember?
A. It would have been stuff from his attorney, things he had sent in from his old case and from his case he was looking at then, facing.
Q. All right. Are you sure that Dustin Honken told you he killed these people? Are you sure you're not just remembering that you read this off of some paperwork that he sent to you?
A. No, I'm positive he told me because he asked me -- he told me, If you go kill this person in Des Moines, Iowa -- he's staying with his mother and father; Angela will drive you out there -- if you go out and kill him and his mom and dad, just kill them all, they'll have to let me go again.
Q. All right. So let's talk about this. At some point he's talking to you about murdering people in 1993, and those charges, what did he tell you happened to the charges in 1993 then?
A. They had to dismiss everything. They had no evidence.
Q. All right. And so what did he tell you about how he got in

the Woodbury County Jail then in 1996 when you were talking to him?
A. One of his best friends had told on him for manufacturing methamphetamine and it was in a garage somewhere. I don't remember where.
Q. And so did he tell you at that point if you even recall today who else was involved other than this friend of his?
A. One of his best friends that he'd known for years was involved in it with him, and if we could get him killed that they would have to dismiss everything and let him go.
Q. So did he ask you to do something toward that end?

A. Yes, he asked me -- when he first thought I was going to get out, he told me Angela would come because of the bar, that to go ahead and wait till after lockdown, push the bricks out, and throw these sheets down and Angela would tie a hacksaw, a chisel, a hammer, and I could cut it and go out, and she would take me to where I had to go to this person's mother and father's and then that would be the end; he would be out, and he would take care of me forever. I could just leave and go to Mexico, and I wouldn't have to worry about nothing.

Q. How was he going to take care of you forever?

A. Making drugs. He was going to keep making methamphetamines, and then it was easier to make it in Mexico because all the pills and stuff that he needed he could just get there. The hard part would be to bring it back across to the

1297

United States to sell it, but there's a lot of people down there he said that would do it because towards the end this Mexican and him were both going to escape with us.

Q. What was the Mexican's name?

A. I cannot remember.

Q. Well, let me ask you about this. You're working on making a hole in a cell over in the C block; is that right?

A. Yes, sir.

Q. Did it take you a while to break that hole through?

A. A couple of days, but I worked on it I would say from four to eight times within a two-week period.

Q. And was that in your cell or somebody else's cell?

A. It was in somebody else's cell.

Q. How does that work then? How do you get in somebody else's cell to be busting a hole through?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1134 of 3636

A.    When they open the doors in the morning which would be around 3:30 I believe, the doors are open from 3:30 until 10:00 lockdown, and so I would just go out of my cell and into another cell and start working.
Q.    Was somebody in that cell?
A.    Excuse me?
Q.    Was somebody living in that cell?
A.    Yes, sir.
Q.    Were they involved in helping you bust that hole then?
A.    No, not the person that lived there.  I just told him what

I was doing and not to say nothing.  He said okay.
Q.    Okay.  So obviously you can get in a fair amount of trouble trying to break out of a jail, I assume.
A.    Yes, sir.
Q.    There's this guy in the next cell block next to you in D block that you didn't know before you got into jail named Dustin Honken.
A.    Yes, sir.
Q.    Why on earth are you telling him, somebody you don't know, that you're attempting to break out of the Woodbury County Jail?
A.    Because I -- I believed him by everything he had told me and showed me, and he told me he'd give me a lot of money and drugs and he wanted me to kill somebody for him, and I was just going to go out there and take his money and drugs.
Q.    And so for better or worse, the two of you develop some type of trust between you that you told him about you were currently at that time trying to break out of the Woodbury County Jail, and you trusted him enough to tell him that?
A.    Yes, sir.

Q. And he apparently trusted you enough to tell you about his past crimes.

A. Yes, sir.

Q. How were you supposed to kill this friend of his? Did he tell you that?

A. Yes, he told me to -- Angie was going to take me out to

♀

this friend of his parents' house. It's on a farm, and I was just going to go up to the door and shoot them all and then just leave. He wanted to make sure I shot them all, checked them before I left to make sure they was dead, then go, and not worry about nothing because they would know where I was at, and as soon as he got out, they would come and take care of me because as long as he got rid of that witness they had nothing on him.

Q. Did you ever learn that witness's name?

A. I've been told it. He has told it to me, Dustin, and I've seen it in the paper afterwards, but I don't recall it honestly.

Q. All right. You just remember that it was a best friend of his.

A. Exact -- yes.

Q. All right. Did you agree to do this?

A. Yes, I told him I would do that.

Q. And you were to be paid ultimately through drug money down the road.

A. Yes, sir. He said he had some money that -- Angela had some money there for me plus -- I don't remember. I honestly believe it was ten pounds of pure methamphetamine that he'd made that he was going to give me.

Q. Now, did -- in the conversations you're having with Dustin Honken there, did he ever tell you about whether he had asked

anybody else to do the same thing he was asking you to do?
A. He told me that that was the reason that he had bonded Dean

Donaldson out, that he was going to have him take care of somebody for him. And he asked me -- he said that Dean had talked to him about my brother Dale and Ladean Hummel, that they would do that, and he asked me if they were capable of it.
Q. And what was your response?
A. I said yes, they probably were.
Q. Did he express any concerns when you told him that Dean Donaldson would just go out and smoke drugs? Did he express any concern?
A. Yes, sir, he got very -- kind of sick with himself, and he started saying, Oh, no, that's my wife's house, and, you know, that's where my children gotta live.
Q. I'm not following his wife's house. What's that got to do with Dean Donaldson?
A. He said that he'd put her house up for bond to get Dean out and that if Dean didn't do what he was supposed to do that he wouldn't be able to get out and he'd probably end up losing his house, and he just went on and on and on about what I could do to help him get Dean back in if he didn't do it and who he hung out with and what he did.
Q. Did you help him out at all trying to -- because you knew Dean Donaldson; right?
A. Yes, sir.
Q. Did you help Dustin Honken out by telling him anything you knew about where Dean Donaldson hung out, who his friends were,

that kind of stuff?
A. Yes, sir, I gave him a lot of addresses where I knew he would be. I told him who he was staying with at the time which was Phil Parmalee. I told him which houses he would be going to to get drugs from and several different things. He promised, you know, that he'd give me a computer for getting Donaldson back, he would buy me a TV in prison, he would do several different things for me.
Q. What type of computer was he going to get you?
A. That was some kind of laptop. I don't know what kind for sure.
Q. And so those promises were made in exchange for you trying to help him locate Dean Donaldson.
A. Yes, sir.
Q. Did he ever indicate that he gave anything to Dean Donaldson to help Dean Donaldson kill these people or carry out these jobs for him if he got out?
A. I can't answer that honestly. I don't remember.
Q. You don't remember. That's fine. Well, let me move on then. Let's talk then a little bit about this escape. Initially who all was going to escape from the Woodbury County Jail?
A. When it first started, it was me and two other people, Terry Davenport and Kenny Raider.
Q. And toward that end you ended up making a hole in a jail

1302

cell.
A. Yes, sir.
Q. On the screen there do you see the picture there of a cell

marked C8?
A. Yes, sir.
Q. Was that the cell in which you had made the hole?
A. Yes, sir.
Q. Okay. Now, we saw earlier in the picture -- is that the last cell before you get to the D block, or are there other cells in between?
A. There's other cells in between.
Q. All right. And you indicated earlier you'd made this hole toward the top of the room.
A. Yes, sir.
Q. Okay. Showing the jury what's been marked Exhibit 214B. Can you identify that for me, please?
A. Yes, sir. That is the brick that I broke out with the door handle.
Q. And this is the area where you had busted a hole through that brick?
A. Yes, sir.
Q. That's a little bit more of a closeup view of that same hole; is that right?
A. Yes, sir.
Q. Tell me about -- you said earlier in your testimony you'd

♀

busted it out with a door handle. What do you mean by that?
A. On the front of the cells on the outside they have brass door handles that are probably an inch and a half, 2 inches around and, oh, 12 to 18 inches long with a 4-inch L on each end, and that's what I broke off the door and used --
Q. How did you break it off a door?
A. I just braced my feet on the side of the wall and just

pulled until it snapped.
Q. And then you used that as a tool to break through?
A. Yes, we used it as a hammer and a pry bar.
Q. And how far did you get through that wall then?
A. I made it clear to the -- through the front facing, and I had all the other side of it loose clear to that other crack, and you can see in the back where I had broke through the back of it, and back there, that's where that tinfoil -- that was insulation.
Q. Right there?
A. Yeah, there would have been tinfoil in front of that, and I dug that out, and that's insulation. And then right through that you can see a little red. That's the face -- the red brick facing on the building.
Q. On the outside of the building.
A. Yes, sir.
Q. Did you run into any problems with just keeping going then?
A. Yes. Right off to the right there would be a bar that

1304

goes -- it would be a rebar, so you could not fit in between.
Q. Some type of steel bar?
A. Yes, sir.
Q. Did you have any conversations with Dustin Honken about running into that bar and the problems you were having?
MR. PARRISH: Relevance and 403, Your Honor.
THE COURT: Overruled. You may answer.
A. Yes, sir. He -- because he'd ask me -- every few minutes be knocking, Dustin wants you, so I'd go down to the door. How's it coming? What'd you do? I ran into a bar. Oh, man, what can we do? We gotta figure something out, you know, and it

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1140 of 3636

was just that kind of a conversation constantly all day long for a week or so.
Q. Did Dustin Honken do anything to help you get through that bar?
A. Yes. He sent a bolt from the other side. He sent a piece of the step which is like sandpaper kind of. He thought it would work as a hacksaw to cut through there that they had broke off somehow. I'm not sure how. Then he had Angela come and visit him and talk to her and told her that -- what was going on and when to meet and that I was going to throw a sheet out and she was going to tie on the tools for me to go through the bar, bust the rest of it out and then just -- he had several different conversations with Angela about it.
Q. All right. And first of all, you weren't present for those

conversations with Angela Johnson, I take it.
A. No, but he would tell me what was going on, what she said and when she'd be there. And then finally she was just -- at the end that's when we were all just going to go together.
Q. Okay. And so what he tells you -- or what you know about Angela Johnson's involvement is things that Dustin Honken told you.
A. Yes, sir.
Q. Okay. Now, let's go back to this piece of the step. What do you mean a piece of the step was sent over?
A. On the stairs that are going from the main floor up to the second tier, they have -- it's like a rock, but it's like sandpaper or -- I don't know what you call -- like hooking things on to drills that grind -- like for a grinder, that type of thing.

Q. Okay. And how do you know that Dustin Honken had anything to do with getting you a piece of that step?

A. Because he told me through the door that he was getting a piece of that broke off and would be getting it sent to me.

Q. And how did he -- if you're in a different cell block -- what cell block was Dustin Honken in at this point?

A. He was still in D.

Q. Okay. And so how does he get you a piece of a step if you're in C block and he's in D block?

A. I tied a comb or something of that nature on to a piece of

♀

string that we had taken off of one of the sheets, and I slid it out under the door. They call it fishing. And I could slide it under their door. And if it wouldn't go under, they'd also make one and go over my string and pull it under their door and tie it on to my string so I could pull it on to my cell block.

Q. Kind of a pretty clever way of passing things underneath the door then?

A. Yes, sir.

Q. So did you actually get a piece of step then?

A. Yes, sir.

Q. Did you try it on the rebar?

A. Yes, sir.

Q. Did it work?

A. No, sir.

Q. And so is that how it evolved then at some point Angela Johnson was going to bring in stuff that would actually get through this wall?

A. Yes, sir.

THE COURT: Mr. Williams, would now be a good time to

take our break?

MR. WILLIAMS: Yes, Your Honor. I'm sorry I wasn't paying attention.

THE COURT: That's okay. Thank you.

Members of the jury, it's almost 12:05. We'll be in recess until 12:50. Please remember my prior cautionary

instruction about keeping an open mind until you've heard all of the evidence in the case. Thank you.

(The jury exited the courtroom.)

THE COURT: Is there any matter we need to take up, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: No, Your Honor.

THE COURT: Thank you. We'll be in recess.

(Lunch recess at 12:04 p.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. PARRISH: Yes, Judge.

THE COURT: Thank you.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Williams, you may proceed with your direct examination.

MR. WILLIAMS: Thank you, Your Honor.

BY MR. WILLIAMS:

Q. Mr. Putzier, before we broke for lunch, we were talking about this escape plan. I'm going to come back to that in a minute. Right now I just want to back up a little bit. Do you

remember you testified before a federal grand jury back in 1997, April of 1997?

A. Yes, sir.
Q. Okay. And you were asked about all these matters back in that grand jury session. Is that fair to say?
A. Yes, sir.
Q. Did you tell the truth to the jury -- grand jury back in that session?
A. To the grand jury?
Q. Yes, sir.
A. No, sir.
Q. Why didn't you tell the truth?
A. Because I was asked by Dustin to not let it be known that Dean was bonded out because it would hurt him bad and he'd do a lot of time in prison, just please don't do that. And another reason I did it for Dustin was because Dean had told on me, and I really didn't like Dean.
Q. So you admit you lied to the grand jury back in April 1997.
A. Yes, sir.
Q. Now, by November of 1997, do you provide information to law enforcement officers at that point and tell them the truth about what happened?
A. Yes, sir.
Q. Okay. Why the change? Why suddenly in November are you telling what happened?
A. Because I talked to the -- they came and talked to me and told me to think about what I'm doing.

MR. PARRISH: Objection what they told him. It's hearsay.

MR. WILLIAMS: It's not introduced for the truth of the matter asserted, Your Honor.

THE COURT: Overruled.

BY MR. WILLIAMS:

Q. Go ahead.

A. I believe it was Steve Colloton, Mark Heins, and I don't know who the other one -- came to the prison and talked to me because a friend of mine, Terry Davenport, had called and asked to talk to them about what he knew about --

MR. PARRISH: Objection, hearsay.

MR. WILLIAMS: Again, Your Honor, not being introduced for the truth of the matter asserted.

THE COURT: Overruled.

A. -- what he knew about the murders and everything because there was a piece in the Des Moines --

Q. Let me stop you at this point and maybe cut to the chase here.

A. Okay.

Q. At some point law enforcement officers came back to talk to you, and they told you -- whether it's true or not, they told you that other people had been talking, so they talked to you and wanted you to give up the information at that point; is that --

1310

A. Yes, sir.

MR. PARRISH: Objection. Hearsay.

THE COURT: Overruled.

MR. PARRISH: Form of the question too.

THE COURT: Can you use your microphone too, Mr. Parrish?

MR. PARRISH: I do, Your Honor. Thank you.

THE COURT: Thanks.

BY MR. WILLIAMS:

Q. So in November of 1997, you went ahead and talked to the police at that point about what happened and what you knew.

A. Yes, sir.

Q. Now, do you remember today what you said back in 1997 to people?

A. I remember all -- or not all of it but most of it, yes.

Q. Okay.

A. I would have to, you know, be reminded of some of it. I'd like to -- you know, I don't want to answer something that is not true.

Q. Sure.

A. I want to be able to look at what it was.

Q. Let me ask you this way. Do you remember specifically today what you told law enforcement officers back in 1997 about what Dustin Honken had told you about these murders in 1993?

A. I don't know probably all the specific things, but I

remember a lot of things that he told me, and everything I've said up to now is what I have remembered clearly.

Q. Okay. Would it refresh your recollection about what you told the police, though, back in 1997 if you looked at your report from back then?

A. Yes, sir.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

MR. PARRISH: Your Honor, he hasn't said -- I would object to his memory being refreshed at this time. He's not stated he can't recall that information.

THE COURT: Yeah. Why don't we go through the hoops.

MR. WILLIAMS: Okay. I thought I had this clear but maybe not.

THE COURT: Well, I think he has. I think it's somewhat ambiguous. So why don't you just lay a little better foundation.

MR. WILLIAMS: Sure. Be glad to.

BY MR. WILLIAMS:

Q. Do you remember today exactly what it is you told the police back in 1997 about what Dustin Honken had told you about the murders?

A. No, sir.

Q. You remember something of it, but you don't remember exactly what you said back then.

♀

A. Yes, sir.

Q. Would it refresh your recollection if you looked at your report from back then on what you told them at that time?

A. Yes, sir.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. And what I want you to do is just take some time and read at the bottom of this page, page 4 of your interview --

MR. PARRISH: And may I ask which interview is that, Mr. Williams, please?

MR. WILLIAMS: It was prepared December 8. The

interview took place on November 19, 1997, and I'm having him look at the bottom of page 4 and on to the top of page 5.

BY MR. WILLIAMS:

Q. And just to yourself for a few minutes, go ahead and read that to yourself for a few minutes. When you're done, let me know, and I'll get that back from you.

Have you had an opportunity to read through that?

A. Yes, sir.

Q. Okay. Here's my concern, Mr. Putzier. I went back over lunch, too, to look back at what you had said before. Back in 1997, what did you tell the law enforcement officers about what the defendant had told you -- what Dustin Honken had told you about being involved in murders in 1993?

A. That he had people killed or that he was involved with killing the people so that he would get his charges dismissed, they had nothing against him, and that if he could get this Tim -- and like I said before, I really couldn't remember the guy's name, but it was his best friend. If he could get him taken care of, get him killed, that they would have to do the same with these charges, dismiss everything.

Q. Now, back in 1997 you said -- at least the report says that you couldn't say Dustin directly said he killed those witnesses in '93, but he made it clear to you that he did by the way he said things. Do you remember telling that to law enforcement officers back then?

A. I remember talking about several different things and that he had said that he had killed them or that -- you know, I can't say that he did, but just from the way he talked to me and what he told me, he -- you know, he said in several different

conversations that he killed them. Then he also said he's had them killed and nobody will ever find them.

Q. Here's my concern. When we talked to you this morning right before lunch, you were relating some pretty good detail about killing these people and so forth about that. And do you recall ever telling that kind of detail to law enforcement before you testified this morning about that?

A. I thought I did, but I may not have.

Q. Okay. And here's my concern. Are you testifying on those

details based on your own recollection of what Dustin Honken actually told you, or are you picking that up from someplace else, those kind of details?

A. No, I'm -- it's from what Dustin told me. There's other people that talked about Dustin but nothing about what he killed -- just that he wanted to try to get ahold of me, and a lot of people brought me information from Dustin, Hey, he wants to talk to you when they'd come in from the jail after I was in prison.

Q. Okay. And I just want to ask you just point blank here, is the information you're relating about the detail you gave this morning, did that come from Dean Donaldson or from -- yeah, from Dean Donaldson or William Dean, or did you pick it up in newspapers or anything else like that?

A. No, sir. I have not read nothing on Dustin in the newspapers. I have -- you know, the last I've heard from Dustin or about Dustin was when I was in prison and he was trying to get me killed.

Q. All right. So why didn't you tell law enforcement officers back in 1997 about that kind of detail about the murders?

A. I couldn't tell you that to be honest with you right now.

Q. Okay. And I want you to be sure on this. You're telling this jury that those details about who he killed and everything, that comes from your memory of what Dustin Honken told you and nothing else.

♀

A. Yes, sir.

Q. Okay. Let's move then back to what we were talking about right before lunch, and that is these escape plans. You had indicated in your prior testimony at some point Dustin Honken indicated he wanted to join in this escape.

A. Yes, sir, towards the end.

Q. And when you say towards the end, approximately when are we talking about that he indicated he wanted to join in?

A. Before I got moved out of C block over to G. That was the end when I wasn't in there no more.

Q. Okay. And let's talk about that for a minute so we put an end to it. What happened with this escape attempt?

A. I was shaving my head with a razor, and the jailer told me I could not -- it was made for my face, not my head, and we kind of got in a little argument, and I wanted to finish shaving the rest of my head because I had half of it shaved, and they said I wasn't going to do it, and I told them I was, so I just kept shaving my head, and they said, Pack your stuff; you're moving. So they moved me, and that was the end of the escape attempt because I was gone.

Q. So they moved you to a different cell block.

A. Yes, sir.

Q. And was that discipline for not obeying the orders of the guards over there?

A.   Yes, sir.

♀

Q.   And once you got moved to the other cell block, could you get back and get access to C block where you had the hole started?

A.   No, sir.

Q.   And so your escape attempt came to an end at that point.

A.   Yes.

Q.   All right.  So how much before that happened best of your recollection if you can tell us today was it that Dustin Honken started indicating that he wanted to go with you?

A.   I would say approximately --

MR. PARRISH:  Objection, relevancy and 403, Your Honor.

THE COURT:  Overruled.

A.   I would say approximately a week because it was going to be that weekend that I got moved.  I got moved during the week, but the next weekend is when it was going to go down, everything was going to happen, when Angie was going to come get us, when he was going to come through the wall and go out of the hole with me.

Q.   So let's talk about that for a minute.  The hole that you had started was in a cell in C block.

A.   Yes, sir.

Q.   Dustin Honken remained in D block throughout this time period?

A.   Yes, sir.

♀

Q. How was he going to get from D block to C block to go out the hole with you?

A. They were going to go through the wall in one of the cells upstairs that joins the cell in C, from C to D. They were going to try to go through the wall, but it was solid, so that's when they slid me a bolt that they had filed down underneath the door to have me try to jimmy the lock on the fire door to try to get that open so he could just come through there.

Q. So let's talk about this for a minute. You say they tried to put a hole in the wall between the two cell blocks. How do you know that to begin with?

A. Because Dustin told me that's what they were going to do, and I heard -- it's very plain to hear that door handle hit that wall trying to make a hole to come through.

Q. And so Dustin's telling you this in one of your conversations at that fire door?

A. Yes, sir.

Q. All right. And then when you say you heard, what did you hear?

A. I heard a loud bang like something hitting cement very hard, and it was -- the door handle, the same sound that I got from hitting the cement with the door handle, breaking the brick out.

Q. All right. So did you have a conversation with Dustin Honken then after that about whether that was successful or not?

1318

A. He said it was solid mortar in between and that we're going to have to try to get that fire door open. Also now that I think back, I do remember pieces of glasses, like the arms off of a glasses, sent to me, several different things sent to me to

try to get the door open.
Q. And so did you attempt to open that fire door then?
A. Yes, several times.
Q. And did Dustin Honken attempt to open that fire door?
A. Several times. He would be always there when I was there. He'd be on one side; I'd be on the other, and he'd be telling me where to try to push the -- there's little notches sticking out, and we was trying to get them pushed back and turned at the same time. That way we could get that fire door open so he could get over there and into my cell block with me.
Q. So explain this to the jury if you would. Are you working inside the key hole on the lock to the door?
A. Yes, sir. The fire door between C and D, they have a key hole there to open that, and if you look down in there, it's -- they're pretty big brass keys that they use to open the door. And if you look in the key hole, you can see little notches come down that need to be pushed up or down or over, and we were just trying to jimmy that to get the lock to open so we could get him through the fire door into our cell block.
MR. WILLIAMS: Your Honor, could I have you . . .
THE COURT: I'm not sure you have your --

1319

MR. WILLIAMS: Oh, I thought I had it set. My fault.
THE COURT: That's okay. Thanks.
MR. WILLIAMS: I only pushed one button I guess.
BY MR. WILLIAMS:
Q. So we have that -- picture 214S, do you recognize that, sir?
A. Yes, sir, but I don't know -- I know it's a fire door, but I don't know which one.

Q. Fair enough. Is that the same type of fire door that you were working on the lock on?
A. Yes, sir.
Q. Okay. And so when you were working on the lock, you would be on one side of the door and Dustin Honken would be on the other side?
A. Yes, sir.
Q. All right. And did you ever succeed in getting that lock undone to where you could actually open that door?
A. No, sir.
Q. So by the time that you were -- you indicated there was going to be something happening that weekend, but you got moved before it ever took place.
A. Yes, sir.
Q. And that was the end of any escape attempt by you.
A. Yes, sir.
Q. Now, ultimately did you -- were you ever charged yourself

1320

with escape attempt?
A. They came to me and asked me about it and was going to try to charge me with attempted escape through the state, and they could not. They didn't have enough evidence to prove anything.
Q. All right. And so -- but you ended up pleading guilty to aiding and abetting somebody else attempting to escape.
A. With the feds, yes.
Q. All right.
A. I admitted to it, told the truth.
Q. All right. And so that's the admission the state didn't have at the time that they approached you or talked about possibly charging you.

A. Yes, sir.

Q. All right. After you get moved to another block in the Woodbury County Jail, do you ultimately go to prison someplace?

A. No. I was in that cell block for a while, and then they moved me from that cell block approximately within the week to A, cell block A, which is right there where I can be watched constantly.

Q. And then what happens with you?

A. That's when they found the hole over there in cell block C, and they just moved me over there, and I stayed there in A block until I got sentenced and brought to prison.

Q. And where were you doing time at then?

A. First I went to Oakdale and from Oakdale to Clarinda.

Q. Okay. And while you were in Oakdale, do you have conversations with Dean Donaldson or William Dean about anything about the escape or anything about Dustin Honken?

A. No, sir.

Q. Do you remember running into either one of those guys while you were at Oakdale for a period of time?

A. I cannot recall being with either one of them in Oakdale. I know I was with Terry Davenport, and I believe that's it.

Q. Okay. So you end up going to Clarinda; is that right?

A. Yes, sir.

Q. Do you continue to have any communication with Dustin Honken after this happened?

A. I continued to have communication with Dustin Honken when they moved me to G and A. We would write letters back and forth to each other --

Q. All right.

A. -- in the county, Woodbury County Jail. And also after I got to prison, some guy -- I cannot think of his name -- brought me some information about Dustin, what he wanted me to do.

MR. PARRISH: Objection, hearsay.

Q. Yeah. And --

THE COURT: Sustained.

Q. Mr. Putzier, we can't have you relate anything that anybody else has told you.

A. Okay.

Q. Okay? My question is did you receive -- and I'll make it more specific and make it easier for you. When you're in Clarinda, did you have any communication from Dustin Honken?

A. Yes, sir.

Q. And how did that communication come to you?

A. It came in a letter mailed to me. I'm not for sure from who.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Showing you Exhibit 215, do you recognize that, sir?

A. Yes, sir.

Q. And what is that?

A. That's a letter sent to me from -- I can't read the name at the top.

Q. Okay. And that's -- the first page is the envelope?

A. Yes, sir.

Q. Okay. And that's -- do you see the date stamp on that?

A. 29th of August, 1997.

Q. Okay. And by then you're in Clarinda.

A. Yes, sir.

Q. All right. And then this is addressed to you, and then ultimately is it signed by somebody?

A. Yes, sir, Dustin Honken.

Q. All right.

♀

MR. WILLIAMS: United States would move to admit Exhibit 215, Your Honor.

* * * *

(Government Exhibit 215 was offered.)

* * * *

MR. PARRISH: Objection. Relevance.

THE COURT: Overruled. 215's admitted.

* * * *

(Government Exhibit 215 was admitted.)

* * * *

MR. WILLIAMS: Permission to publish, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. On the screen there, Mr. Putzier, if you can look at that, is that the envelope?

A. Yes, sir.

Q. Okay. And you were in Clarinda at that time.

A. Yes, sir.

Q. The second page of that letter, is that -- how is that addressed to you at the beginning there?

A. It says, Hey, buddy.

Q. All right. And is that a term that Dustin Honken used to refer to you while you were in the Woodbury County Jail?

A. Yes, sir.

Q. Okay. Now, at some point does he in this letter talk to

you about Dean Donaldson?
A. Yes, sir.
Q. And I highlighted a portion of that. Do you see that section at the bottom?
A. I see a couple different places here so far.
Q. Okay. He's asking you about at the first part of that letter that Dean Donaldson apparently is telling on him?
A. Yes, sir.
Q. And then do you see on the screen there the portion that I've highlighted for the jury?
A. Yes.
Q. Could you read that to the jury, please?
A. As far as -- as far as Dean goes, I need you to talk to -- to tell everything you know about him that shows he's uncredible.
Q. Or unreliable?
A. Unreliable. If you can think of other people that will support that Dean is unreliable and a compulsive liar that he is --
Q. Is that please?
A. Please tell them to tell Mr. Dolan. Also tell.
Q. Okay. Mr. Dolan was an investigator that was hired by Dustin Honken at that time?
A. Yes, sir.
Q. Okay. How did you take this? When you get this letter,

what did you understand you were supposed to be doing at this

point?

A. Just -- well, there's several different things, but he just wanted me to help him out again in any way I could. He trusted me. He believed in me, and he just wanted to make Dean look bad so that the things Dean was saying about him might not hurt or might not be used against him.

Q. And he's recruiting you to help him do that.

A. Yes, sir.

Q. In going to the third page of this letter -- and again I'm going to highlight a portion of that on the screen. Do you see that? It starts off at the top about the escape stuff?

A. Yes, sir.

Q. Okay. And in that he's saying to you that what David Leavitt's telling and what Derek Boggs is telling other people about your involvement in this escape, and then down in the next paragraph it says, I know it's crazy 'cause you weren't even in there when that hole was there, and they're just trying to blame you for the hole in the wall because you got kited out of the block and it was easy to blame it on you. Do you see that section?

A. Yes, sir.

Q. Now, you testified earlier you actually made that hole.

A. Yes, sir.

Q. Did Dustin Honken know you made that hole?

1326

A. Yes, sir.

Q. How are you taking this letter to you then when he's saying he knows it's crazy because you weren't even in there?

A. He's just trying to -- I believe that he knows a lot of people are telling on him and I for making the hole, and he's

trying to cover it up so no one knows he was trying to get out of there with me as well as me trying to get out of there and make it look like somebody else had done it. Even though they know the truth about who did it, he's still going to lie and try to say it wasn't him or I.

Q. And at this point when you guys are trying to make this hole, his concern is this Tim guy, this best friend of his who if he eliminates will get him off the charge.

A. Yes, sir.

Q. Now, ultimately did you get called to testify in a sentencing hearing back in 1998, 1997, 1998, sentencing hearing of Dustin Honken on his prior federal charge?

A. Yes, sir.

Q. And when you were brought back, were you in custody at that time?

A. Yes, sir.

Q. Were you held in a local jail someplace?

A. Yes, sir.

Q. While you were in that jail, did you get some form of communication from Dustin Honken?

1327

A. Yes, sir.

Q. And what was the form of communication you got at that point?

A. It was a kite passed to me.

Q. And again, a kite is what? Just a --

A. It's like a note or a letter, short letter.

Q. And where was that at? Where were you at when you got this?

A. I was in E block when it came to me.

Q. In the Woodbury County Jail?
A. Yes, sir.
MR. WILLIAMS: May I approach, Your Honor?
THE COURT: Pardon me?
MR. WILLIAMS: May I approach, Your Honor?
THE COURT: You may.
BY MR. WILLIAMS:
Q. I'm showing you what's been marked as Government's Exhibit 84. Do you recognize that, sir?
A. Yes, sir.
Q. What is Exhibit 84, sir?
A. It's a letter that Dustin had sent -- excuse me? It's a letter that Dustin had sent to me.
Q. And that's the letter you were just talking about receiving while you were in the Woodbury County Jail prior to testifying in his sentencing hearing?

♀

A. Yes, sir.
MR. WILLIAMS: United States would move to admit Exhibit 84, Your Honor.
* * * *
(Government Exhibit 84 was offered.)
* * * *
MR. PARRISH: Objection, relevance.
THE COURT: Overruled. 84 is received.
* * * *
(Government Exhibit 84 was admitted.)
* * * *
MR. WILLIAMS: Permission to publish, Your Honor?
THE COURT: You may.

BY MR. WILLIAMS:

Q. Showing the jury Exhibit 84 -- and I've blown it up here a little bit so it's easier to see -- can you go ahead -- you've got the original in front of you. Can you go ahead and read that to the jury, please?

A. Yes, sir. Dennis, Hey, bud, you looked pretty worried when I seen you Saturday. I need to know what's up, what you're thinking. The feds called you here against me for my sentencing. Dan Frye made some statements against me. Did you also? I have not -- I hope not, buddy. I can't imagine you would. Call my girlfriend's house and tell/ask him what is going on and we can talk through him. The number is

♀

515-567-3013. Just chill out. They can't charge you with anything, nor have they. I haven't done anything else to charge me with. Dustin Honken.

Q. And you received this before you testified at his sentencing hearing in 1998?

A. Yes, sir.

Q. How did you take this note, sir?

A. He's trying to keep me on his side. He's trying to let me know, hey, there's nothing they can do; don't worry about it; just keep trying to help me and just that he wanted me to call and talk to his girlfriend. He said when I walked by his cell block, Hey, do you need anything? I'll have it sent to you. You know, just get ahold of my girlfriend Angie. She's coming down to see me, you know, several different times. And then after that, it was a whole different story.

Q. Now, this was a reference that's made in there to the Saturday, when he saw you on a Saturday. You had apparently

passed at some point in the jail?

A. Yes, sir, and I'm not positive because he was in A block, but I believe it went out on a visit with somebody else and then they brought it back to me. Somebody from the visit brought it, and I do not recall who brought it.

Q. Okay. And I guess what I'm saying, the statement he made to you, Hey, buddy, do you need anything, that was made when you had that passing on that Saturday?

♀

A. Yes.

Q. Now, Mr. Putzier, the Dustin Honken we've been talking about during your testimony here, the one that told you about killing witnesses back in 1993, do you see him in the courtroom here today, sir?

A. Yes, sir.

Q. Can you describe for the jury where he's sitting and what he's wearing?

A. He's got a long sleeve shirt on. He's right here on the end with glasses on looking me in the eye. He's got blond hair.

MR. WILLIAMS: I have no further questions, Your Honor.

MR. PARRISH: May it please the Court and counsel.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Good afternoon, Mr. Putzier. How are you?

A. Fine. And you?

Q. You know what a career criminal is?

A. I believe I do.

Q. What's a career criminal?

A. A repeat offender.

Q. What do they look like? What does a career criminal look like?
A. I don't know what they look like. They vary in looks.
Q. Could it look like you?

♀

A. Yes, sir.
Q. Tell me why.
A. I just said they could.
Q. Are you one?
A. I've had plenty of run-ins with the law, yes.
Q. Well, you've been determined to be a career criminal, have you not?
A. If that's how you see it in your eyes, yes.
Q. How I see it in my eyes? Are you telling me no one's told you that you are a career criminal? Is that your testimony?
A. I ain't never said nothing like -- I said that's how you see it in your eyes. There has been people that have told me that, yes, sir.
Q. What do you have to do to be a career criminal, be classified as a career criminal?
A. Be a repeat offender in crimes I guess.
Q. And a repeat offender. How many times do you have to repeat?
A. I don't know that for sure, sir.
Q. Do you have any idea?
A. No, sir.
Q. Is it more than one time?
A. I'm sure it's more than once.
Q. Is it more than two times?
A. I could not tell you that for sure.

Q. Is it more than three times?
A. I don't know.
Q. But you have to kind of stack it up a little bit to be classified as a career criminal; you would agree?
A. I'm sure you're probably right.
Q. Well, was it just maybe a year or so ago when you were in this courtroom that a question as to whether or not you were a career criminal came up?
A. That could be. I'm not positive of the date.
Q. It was also at that time when you indicated to this Court that you were going to stay out of trouble?
A. Yes, sir.
Q. Right here, is that correct, right where you're sitting right now?
A. In this courtroom, sir, yes.
Q. And did you go right out to Nebraska and get the theft by deception right after that?
A. No, sir.
Q. Well, the question that Mr. Williams was asking you about, after you'd been determined to be a career criminal, you then go out and you get this charge in Nebraska that you just discussed on direct examination; isn't that correct?
A. No, you're wrong, sir.
Q. Oh, you got that before.
A. Yes, sir.

1333

Q. Is that your testimony?

A. Yes, sir.
Q. So when did you get it?
A. I was -- already had that charge when I was here sentenced to finish my supervised release, sir.
Q. You mean April 6, 2004?
A. April 6, 2004, theft by deception?
Q. Yes.
A. I think you need to check your records, sir.
Q. When was it?
A. It wasn't 2004. I don't know for sure, but I know it was maybe 2002.
Q. Oh, so it was May of 2002, so the charge that Mr. Williams asked you about on direct examination that you said you were going to get taken care of over in Nebraska, is your testimony -- that you said is currently pending when he asked you the question, are you telling me that's not theft by deception?
A. That's one that happened in 2002.
Q. So in 2002 then, the theft by deception when you came in this courtroom in 2003 less than a year ago, is that the one that was discussed at that hearing?
A. It's been more than a year ago.
Q. So it's been pending how long now?
A. Since it happened, 2002. I can't tell you the honest truth

on where it's -- which day it happened because I don't know.
Q. What truth did you say?
A. The honest truth.
Q. Oh, okay.
A. Because I don't know which date it was. But I know it was

in 2002 of some.

Q. You have had some problem with what you call the honest truth; would you agree?

A. Yes, sir.

Q. Matter of fact, you have sort of a habit of lying under oath; would you agree?

A. I have lied under oath, yes, sir.

Q. Well, you have a habit of it, don't you?

A. No, sir.

Q. Well, let's talk for a second about -- is your testimony just a moment ago to this jury you don't have a habit of lying under oath or you do have a habit of lying under oath? I didn't quite understand you.

A. I believe you understood me.

Q. Which one? Do you have a habit of lying under oath, or you don't have a habit of lying under oath?

A. I have lied under oath. That's what I said.

Q. But you're saying it's not a habit.

A. I said I've lied under oath.

Q. A number of times. A number of times. Is that correct?

That's a question. A number of times you've lied under oath.

A. I went to -- I was subpoenaed to grand jury one time.

Q. But --

A. So I don't see that being a number of times.

Q. -- when you raised your right hand and you swore to tell the truth, you lied several times under oath; is that correct?

A. Yes, sir.

Q. Matter of fact, you said you even lied about lying, didn't you?

A. I lied about lying. You'll have to --

Q. You lied about lying.

A. I don't remember that. Can I see what you're talking about?

Q. Let's go over this just a second.

A. Let's go over it.

Q. Just a few minutes ago you told Mr. Williams that Mr. Honken told you in 1996 that he killed someone, didn't you?

A. Yes, sir, and he did tell me that.

Q. Well, you heard Mr. Williams' questions to you. He came up and asked you. He says, Well, now, you were before the grand jury. Did you tell the grand jury that back in 1997? What did you tell them? You told them no, didn't you?

A. I am not exactly sure. I believe I told them I'm not sure.

Q. Oh. Well --

A. As far as I know he didn't.

1336

Q. Well, was I'm not sure whether I told the grand jury back in 1997, was that the truth that you just told Mr. Williams on his direct examination?

A. No, sir, it was a lie just like I told you I lied to them.

Q. So you did not tell the grand jury in 1997 that Mr. Honken said he'd killed anyone; is that right?

A. Yes, sir.

Q. So if you had ever represented to anyone, including this jury or anyone else, that he had said that and you had told the grand jury that, that would have been a lie, wouldn't it?

A. Yes, sir.

Q. He also asked you on direct examination, Did you say that? He pulled out this interview. He brought this interview up to

you. And he asked you, Would this help you refresh your recollection that after you met with the grand jury when you told everybody that you were about to tell the truth at that time he showed you a statement that you made -- I believe it was December 18 or 19 of 1997 -- that you were going to tell the truth, did you in that interview tell any of the law enforcement officials that Mr. Honken had killed anyone?

A. I told them the truth to the best of my ability at that time what I remember.

Q. That's not what I asked you, sir. I asked you when Mr. Williams asked you on direct examination about the interview when you told everyone you were going to tell the truth, did you

tell them that Mr. Honken said that he had killed someone? Yes or no. He showed you the interview, and you said after you'd read it your memory had now been refreshed.

A. No, sir.

Q. All right. Did you tell anyone in the reinterview May 21, 2004, not too long ago, that Mr. Honken had said he had killed someone back in 1996? Did you tell anyone at that interview?

A. I don't recall, sir. I'd have to see it.

Q. So you don't recall telling them just a few months ago that Mr. Honken said he had killed someone; is that accurate?

A. I'd have to see what I said, sir. That's all I'm asking.

Q. Did you tell anyone during the sentencing hearing that Mr. Williams asked you about on direct examination that Mr. Honken said he had killed someone when he was over at the Woodbury County Jail?

A. I believe so.

Q. You believe you did in your sentencing hearing? He asked

you about that on direct examination and which led him to ask you on your other questions did you tell anyone else prior to that time other than what you said in court, and you said you don't recall. Are you telling us now that you do recall?

A. I said I believe so. I said I don't know for sure. I'd like to look at what you're asking me. You got anything there?

Q. Excuse me just a -- my question is when Mr. Williams asked you the questions, do you remember what your answer was?

A. Yes, sir.

Q. What was your answer to Mr. Williams?

A. I told him that Dustin did kill somebody because Dustin did tell me he killed somebody. Then when he brought me that piece of paper up here, I said that's -- I don't remember completely everything what I said back then.

Q. No. When Mr. Williams asked you on direct examination whether or not other than your testimony in court here today had you ever told anyone else that Mr. Honken told you in 1996 that he had killed someone, what did you just tell him just a minute ago, to this jury on direct?

A. That I did not say that.

Q. Right. So you're telling me now your answer is different, that you did tell someone in your grand jury, in your sentencing transcript?

A. No, sir.

Q. So then do you want to clarify that and tell this jury whether or not prior to today's date since 1996 have you ever told anyone on the face of this earth in any interviews that they've had with you that Mr. Honken said to you in 1996 that he killed someone?

A. I believe I have, sir. Just like when I was in the federal prison and they come and talked to me about him, when he was threatening my life, and I said yes, he has killed people.
Q. I asked you, sir, in any reports, any interviews you had

under oath where you've told anybody that Mr. Honken said he killed someone, the same question Mr. Williams asked you on direct examination and you answered no, are you telling me that answer was not correct that you gave him?
A. I don't know if I have or not. I'd like to look through all of them for sure because I know he has told me that he has killed someone.
Q. So in answer to Mr. Williams' question on direct examination, you want to retract that answer and tell Mr. Williams that you did not tell him the truth when he asked you that question on direct examination?
A. No, sir.
Q. Do you want to stick with that question?
A. Yes, sir.
Q. So your answer then would be no, prior to today's date you've not told a single law enforcement official or any grand jury or anyone else that Mr. Honken in 1996 told you he killed an individual; isn't that correct?
A. I cannot say that's correct because I believe I have told, and you're saying any law enforcement agents. I believe I have talked to other law enforcement agents and said yes, he has.
Q. Oh. So you believe that what -- the answer you gave Mr. Williams then was incorrect just a few minutes ago.
A. No, sir. The question you keep asking me about other law enforcement agents or something, you know, I can't -- I'm not

going to sit here and say I didn't say it or that I did because I know Dustin told me that he had killed somebody, but I am not sure when, you know, or how I put it.
Q. But my question, you just told Mr. Williams a few minutes ago that he didn't tell you -- that you didn't tell anybody prior to today's date. Are you telling me something different now?
A. No, sir.
Q. So which one is accurate?
A. What he asked me, sir.
Q. All right. So you're sticking with that then.
A. Yes, sir.
Q. Now, with that out of the way, let's move to another area. You have admitted that you're a perjurer, aren't you?
A. Yes, sir.
Q. You've admitted under oath that you lied under oath; isn't that correct?
A. Yes, sir.
Q. Could Mr. Honken see the hole in the cell wall that you were digging? Yes or no.
A. No, sir.
Q. Did he ever see, to your knowledge, while you were there a hole in the cell wall of the Woodbury County Jail from what you could observe with your own eyeballs?
A. No, sir.

Q. Did you ever, while you were at the Woodbury County Jail, see Mr. Honken hand you anything to assist you with trying to

get out of the Woodbury County Jail, yes or no, that you saw him do with your own eyeballs?
A. Yes, sir.
Q. What was that?
A. It was a piece off his glasses that he had brought in, his eyeglasses.
Q. You saw him take a piece off his eyeglasses is your testimony?
A. Yes, sir, I saw him when I slid the string over to him, he put it on and slid it back to me.
Q. Oh. So then you could see into his cell from your cell.
A. Yes, sir.
Q. You were in the same -- you were not in the same cell block.
A. No, sir.
Q. And a string could reach from your cell to his cell.
A. Yes, sir.
Q. Unassisted.
A. Yes, sir.
Q. How far is it?
A. Fourteen, twenty feet. I could show you how to do it, sir.
Q. Phil Parmalee, friend of yours?
A. Yes, sir.

1342

Q. Friend of Mr. Putzier?
A. I'm Mr. Putzier.
Q. I mean friend of Mr. Donaldson?
A. Could be, sir.
Q. Friend of Mr. Dean.
A. It could be, sir. I'm not positive.

Q. You and Mr. Dean were charged together; is that correct?
A. Yes, sir.
Q. But that was not the end of you and Mr. Dean's criminal career, though, was it?
A. Excuse me?
Q. The fact that you were charged together in 1996 did not end your criminal career together.
A. No, sir.
Q. You started additional criminal career with him in 2003, right, or was it before 2003?
A. I believe it was 2002 that I went with him.
Q. And then you worked up into 2003 breaking into safes, doing B and Es, those type of things?
A. I never broke into safes, sir.
Q. Oh, he was the only one breaking into safes, huh?
A. Yes, sir.
Q. You were just helping him?
A. No, sir.
Q. Were you just helping him with the ATM machine?

A. I never broke into no ATM machine, sir.
Q. Didn't quite get that done; right?
A. I never done it. I never been charged with it.
Q. You were trying, though; right?
A. No, sir.
Q. Well, let's talk about it. You say you were never charged with it. Mr. Williams asked you the question has the government -- and he didn't specify federal or state government, did they give you any kind of breaks. Do you remember what you told the jury when he asked you that?

A. They never gave me no breaks for anything I've said.
Q. Well, sir, the charges that Mr. Donaldson came in here and testified that he was convicted of and currently charged with in 2003, you had the exact same charges, and your charges were dismissed, weren't they?
A. Yes, sir.
Q. So what do you mean telling Mr. Williams that you had not gotten any benefit from the government by cooperating?
A. Sir, he asked me if I have had anything promised or given to me for being here to testify against Dustin Honken. That's what he asked me. And no, I have not.
Q. So you didn't interpret the question to mean has the government given you anything in exchange for your cooperation.
A. No, sir. The government hasn't.
Q. So you didn't get any benefit for cooperating at the time

you and Mr. Donaldson were busted.
A. In Ida County, that's a whole different thing. This has nothing to do with Dustin Honken. He asked me if I had anything given to me for this testimony I'm about to give on Dustin, and I said no, sir, and that's the truth.
Q. You told the grand jury in April of 1997 that Dean Donaldson was a snitch, didn't you?
A. Yes, sir.
Q. You told people in the jail that Dean Donaldson was a snitch, didn't you?
A. Yes, sir.
Q. You told them he was a snitch because at the time you were conducting the hog theft you, in fact, made your getaway, Mr. Donaldson did not, and you were tracked down and hauled off

to jail, and that's why you were sitting there was because of Mr. Donaldson as you interpret it; isn't that correct?

A. You're partially right, sir, but I was not with him that night. I didn't have nothing to do with it. He got stopped at John Morrell as I said, okay, him and this girl that had stole them. They said I gave it to them and the reason being is because I was the one that stole that truck earlier that week, and that's the reason.

Q. So you went to jail in 1996 in what month?

A. I think February, sir. I'm not positive.

Q. And when you went to jail in February of 1996 telling

everyone in the jail Mr. Donaldson was a snitch, would you agree that was at least five months before Mr. Honken even came to the jail?

A. Yes, sir.

Q. So you had spread the rumor around the jail that Mr. Donaldson was a snitch, and you were so ticked off with him that you told other inmates that.

A. Yes, sir. I told Dustin Honken he was a snitch, sir.

Q. Well, you couldn't tell Dustin Honken that he was a snitch before Dustin got to the Woodbury County Jail, could you?

A. No, sir. As soon as Dustin sent me that first note, sir, and asked me about the problems with him bonding Dean out, I told him, you know, he was stupid because Donaldson was a snitch.

Q. Matter of fact, not only did you spread it around the jail right after you got arrested for the hog theft that you said you had no part in, that Donaldson just sucked you into the process by talking, you spread paperwork around the jail, the Woodbury

County Jail, indicating that Mr. Donaldson was a snitch prior to the time that Mr. Honken even arrived at the jail, didn't you?
A. Yes, I said Donaldson was a snitch before that, yes, sir.
Q. Not only did I say you said he was a snitch, sir, my second question -- I'm sorry I didn't make it clear -- is that you also spread paperwork around the Woodbury County Jail so everybody would know that Donaldson was a snitch; isn't that true?

1346

A. I showed the paperwork that I got from my attorney, sir, yes, sir.
Q. And tell us, what was your purpose before Mr. Honken even arrived at the Woodbury County Jail to spread the news around the Woodbury County Jail that Dean Donaldson was a snitch? Tell us what your purpose was in doing that.
A. Just to let everybody know that he had told on me.
Q. And what would be the purpose of that?
A. Because I wanted to let them know that.
Q. So you wanted the general population of Woodbury County Jail to know that in February 1996 prior to the time that Mr. Honken even arrived at the Woodbury County Jail that your partner in crime was a snitch.
A. Yes, sir.
Q. You also, did you not, spread paperwork around the jail that he was not only a snitch but he was a liar; would you agree?
A. I don't recall that, but that could be.
Q. You don't recall it, but it could be? What part of it could be?
A. That he's a snitch could be, but the liar part I'm not sure.

Q. But you're saying it could be that he was a liar. You mean you never spread the rumors around the Woodbury County Jail that --

A. No, sir. I believe I told them right to their face and I told him that he was a snitch and that he was a liar because I was not with him.
Q. But you also said that --
A. Because he was still in the county jail when I was there and I told him, Dean, you told on me, and, you know, you're lying, so there you go.
Q. Just one point here. Are you telling me the closest you ever got to Mr. Honken was 14 to 20 feet away?
A. No, sir.
Q. Did you ever get face to face with him over at the Woodbury County Jail?
A. I don't believe we've ever been in the same room, no, but the closest we've ever been was at that fire door, approximately three inches from each other's face.
Q. But I saw a photograph of the fire door, and maybe I missed something, but it's a solid -- and I believe that was a question asked by the prosecutor -- that it's a solid door.
A. Yes, sir, it is.
Q. So you call that face to face?
A. It's as face to face as you can get in that county jail. You can look in that key hole and look in each other's eyes when you're talking, sir.
Q. So that's the closest you ever got to Dustin Honken ever; is that correct?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1178 of 3636

A. That's correct.
Q. And the other times you would have been what? Fourteen to twenty feet away from him; is that right?
A. 99 percent of the time we were at that fire door talking to each other unless he was sliding me something underneath the doors.
Q. Wait a minute. I think you might have misspoken. Let me correct -- now, there are 24 hours in a day. Except for like a couple of minutes you guys were right next to the fire door, is that what you're telling me? 99 percent of the time 24 hours a day?
A. No, that's your recollection, sir. 99 percent of the time when we were talking we would be at the fire door. Otherwise we'd be at the windows where we could see each other to talk. That's what I meant, sir.
Q. Matter of fact, you were facing 15 years. Is that for being an habitual --
A. No, sir.
Q. Back in 1996?
A. I've never had nothing habitual.
Q. So when you made the statement, I had nothing to do with none of this, I don't care none about this, I don't care about that dude, I don't care about neither one of them, I want to do my 5 years, I gotta do 5 years, I got 15 years, I want to do my 5 -- my little 5 years and go try to make it, so you were not

1349

telling the truth then when you said you had 15 years?
A. No, you asked me if that was habitual, sir. It was not an

habitual sir. I had 15 years, three 5-year sentences back to back.

Q. For what?

A. Not the habitual.

Q. For what?

A. For a theft of the pickup, for a forgery, and for -- I don't know what you call the other charge, for not showing up for court.

Q. Failure to appear?

A. Yes, sir. And when I said the five years, I already had a year -- a little over a year in, and in the state of Iowa, you do half of your sentence. They cut it in half as soon as you got there.

Q. Now, you just told this jury a few minutes ago that with regard to Mr. Donaldson and what you were presently facing you had nothing to do with it. Isn't that what you just said a few minutes ago after I started my cross-examination?

A. Nothing to do with what, sir?

Q. Nothing with stealing those hogs.

A. I didn't. That's why I got charged with stealing the pickup, sir.

Q. Now, I want to read you this and ask you does this sound familiar to you. Page 19 of the grand jury transcript again

1350

beginning with line 4. So you can punish me because I never done anything wrong because I want to be myself; right? I can see getting punished for stealing hogs like I did. I done that.

A. That was a different -- a charge before them, and me and Dean Donaldson, I've stated in here, have stole hogs several times, but the time he got caught that night, sir, I was not

with him.

Q. So that question and response from the grand jury, was that the truth, or was that a lie?

A. No, that was the truth.

Q. You were asked about Mr. Donaldson being out of jail. You says, No, I have no idea, none, zero. Remember saying that?

A. Exactly, and that was a lie because Dustin Honken asked me to lie, so I did.

Q. Did you also tell them right after that, I told him the dude's no good; that's the truth; I'm not going to sit here and lie to you. Just a second before you go. Where are you sitting?

A. Excuse me?

Q. Explain to us where you're sitting.

A. No. Explain to me what kind of question that was.

Q. This is in the grand jury.

A. Okay.

Q. Where were you sitting?

A. What's that got to do with where I'm sitting now?

♀

1351

Q. I'm asking you a question.

A. Okay. Tell me the question again, please.

Q. Where are you sitting?

A. I didn't understand the question.

Q. I'm sorry. Where were you sitting when you said that?

A. I don't recall the question. Can I have the whole question again?

Q. I told him the dude's no good. That's the truth. I'm not going to sit and lie to you. Where are you sitting when you said that?

A. I was sitting in the grand jury when I said that, and I was talking about Dean Donaldson.
Q. And had you taken an oath and raised your right hand and said you were going to tell the truth?
A. That was the truth, sir. What are you trying to ask?
Q. So when you said, I'm not going to sit here and lie to you, was that the truth, or was that a lie?
A. When I was talking about the question that I just stated? That was the truth.
Q. No. What you just said, is that the truth?
A. Here. Can you say that question again? I'm trying to tell you that what I said -- I said that I told you -- I'm not going to sit here and lie to you about Dean Donaldson's no good. Yes, that was the truth.
Q. But you told us earlier that that was a lie when you --

what you said about Mr. Donaldson in the grand jury.
A. Where did I tell you? Can I get that? Can you tell me, show me where that's at, please?
Q. I'm asking you the question.
A. Which question was that, sir?
Q. Did you say that what you said about Dean Donaldson was a lie?
A. I don't understand you. I understand that you asked if Dean Donaldson was no good. I said he's no good, and that's no lie, and that's what I meant.
Q. So that was the truth, that Dean Donaldson --
A. I believe you understand what I said.
Q. -- that Dean Donaldson is no good is the truth.
A. Yes, sir.

Q. So when you told the grand jury that in April of 1997 when you swore to tell the truth, you were actually telling the grand jury the truth at that time.
A. That Dean Donaldson was no good?
Q. Yes.
A. In my opinion, yes, sir.
Q. And when you told them, I'm not going to sit and lie to you, you were telling them the truth at that time.
A. About Dean, yes, sir.
Q. Then you also said there is so much hearsay here and there and there you can't believe nothing in that jail. You can't

trust nobody in that jail, and I heard that he got bonded out through somebody. Was that the truth, or was that a lie?
A. Well, it depends on what parts of it, sir. There is a lot of lying in that jail. There's a lot of, you know, people in that jail that lie.
Q. What about you making the statement that there's so much hearsay and you can't believe nothing in that jail; you can't trust nobody in that jail? Is that the truth?
A. I don't believe I'd want to go to a jail and believe or trust in nobody, no, sir.
Q. So what you were telling the grand jury at that point was the truth.
A. Yes, sir. I wouldn't believe and count on nobody in the jail.
Q. Matter of fact, we're talking about the letter that Mr. Williams brought up to you and asked you about Mr. Donaldson that allegedly Mr. Honken wrote and said you know about this guy; you know he's unreliable. Did you say about Mr. Donaldson,

I don't trust him?
A. Yes, sir.
Q. Did you also say when we're talking about Mr. Honken -- no. When you said, I don't trust him, was that true or false?
A. On Mr. Honken?
Q. No, on Mr. Donaldson.
A. Oh, yes, sir.

♀

Q. Was it true or false?
A. Repeat that again. I didn't understand. Was that Dustin Honken or --
Q. I don't trust him.
A. No, I don't trust Dustin either.
Q. Well, we're not asking about Dustin yet.
A. Okay.
Q. We'll get there.
A. I didn't understand the question.
Q. Okay. That's fine. We'll take our time.
A. All right. Thank you.
Q. We'll slow down a little bit.
A. Okay. You too.
Q. Now, did you -- I don't trust him, speaking of Mr. Donaldson, was that true?
A. Yes, sir.
Q. Or was that false? Which one?
A. It was true, sir.
Q. Okay. I mean, in jail people say a lot of stuff that don't mean nothing. It just don't mean nothing. Was that true?
A. In a lot of conversations, yes, sir.
Q. Did you ever say, I don't know the dude, this Dustin? On

April 22 of 1997, did you say that under oath?
A. I would have to see the part where they asked the question, what question it was.

Q. So you're saying you have no recollection of ever saying that?
A. I could have said I don't know him, but I've -- you know, I've seen him and stuff, but I don't know him. I still don't know him. I know he told me he killed a lot of people, and that's all I really know about him.
Q. Referring to page 23, line 9 through 13, take a look at it and see -- read it to yourself and see if it refreshes your recollection.
A. Yeah, I see what you're saying.
Q. Excuse me, Mr. Putzier.
A. Yes, sir.
Q. Does that refresh your recollection?
A. Yes, sir, and that's why I wanted to look at it because you're trying to make it look like I don't know him, and that's in the middle of a --
Q. Let's --
A. Can I finish talking, sir?
Q. No, sir, you can't. You answer my question; okay?
A. I was trying to, sir.
Q. My question, sir, is did you say to the grand jury under oath that you didn't know Dustin? Yes or no.
A. Yes, sir. Can I read that statement to the --
Q. No.
A. Okay, sir. That's all I need to hear.

Q. Let me finish my question.

THE COURT: Mr. Putzier, you're going to have to listen to Mr. Parrish's questions and ask -- and answer the questions he asks you; okay?

THE WITNESS: Yes, sir. Yes, sir. I'm sorry.

BY MR. PARRISH:

Q. Was that true, or was that false?

A. That was true, sir.

Q. You were asked, were you not, in front of the grand jury as to whether or not Dustin had put up any money for bond; is that correct?

A. Yes, sir.

Q. Do you remember whether or not you said Dustin put up any money for bond or not?

A. I don't recall, sir, but I probably lied and said no, because like before I said Dustin told me not to say anything about him bonding Donaldson out, and I'm not even sure about the money, but I know about his wife's house.

Q. Let me ask you something a second. Did you meet with law enforcement officials any time in the last week?

A. I stopped here yesterday afternoon when I got into town, sir.

Q. And you met with them?

A. Yes, sir.

Q. How long?

A. Excuse me?

Q. How long did you meet with them?

A. A half hour, 45 minutes.

Q. And you met with them before then for how long? When's the last time you met with them before that?
A. I couldn't tell you, sir. It's been a long time.
Q. Back in -- would it be that May meeting that I asked you about already in May -- I believe it was May 21 or something along that line.
A. I don't believe I met anybody in May.
Q. Well, when you were interviewed, what they call a reinterview.
A. Sir, to be honest, I don't know if I was interviewed. I got a subpoena in the mail, and I talked to somebody on the phone for a few minutes, and that was it.
Q. Okay. What I'm driving at, the point is, you said when asked about putting up the money you lied to the grand jury; is that right?
A. Yes, sir.
Q. You knew you were lying at the time.
A. Yes, sir.
Q. Matter of fact, you said, No, Dustin couldn't. How could he? He's in jail. He couldn't get the money; is that right?
A. Exactly, sir.
Q. That was a lie.

1358

A. Yes, sir.
Q. What you're telling us is that you knew Dustin could get the money.
A. Yes, sir.
Q. And did you see any evidence that he could get any money from anybody?
A. From a lot of people in there that he'd helped out.

Q. Like who?
A. Well, I can't recall the names, but I'd also talked to his wife on the phone and his girlfriend.
Q. His wife?
A. Yes.
Q. He had a wife?
A. From Mason City, yes.
Q. What was his wife's name?
A. I can't recall her name, sir. I did not -- the one that put the house up for him. I know Angela Johnson. I know that name.
Q. What does that name mean to you?
A. That was the girl that Dustin had me call all the time and who said she would send me money, who said she'd do this, who said she'd do that.
Q. How much did you get?
A. They never sent me nothing, sir.
Q. What about those notes that you said you got from Dustin?

A. Yeah, there's one right here, sir.
Q. Other than that. I thought there was some other notes.
A. Yeah, there was plenty of them.
Q. Where are they?
A. I did not keep them at the time, sir. I believe there's plenty of letters that I said we wrote back and forth from him and I.
Q. You were pretty angry at Mr. Donaldson; would you agree?
A. Yes, sir.
Q. Now, you and Mr. Donaldson's relationship had gone back for quite some time; is that right?

A. Yes, sir.
Q. And matter of fact, your relationship went back to the extent that you would basically smoke dope with him?
A. Yes, sir.
Q. Crack cocaine?
A. Yes, sir.
Q. And you would do other crimes with him; is that correct?
A. Yes, sir.
Q. But when he told on you, you got angry with him; is that correct?
A. Yes, sir.
Q. And Dean Donaldson was the kind of person you described as an individual who would wear the same clothes for a whole week.
A. Yes, sir.

♀

1360

Q. Back then you did the same thing, didn't you?
A. No, sir.
Q. I mean you didn't look all clean cut and everything like you look now in this courtroom, do you?
A. I look pretty clean cut always, sir.
Q. You think you do?
A. Yes, sir.
Q. You didn't trust him, did you?
A. No, sir. I told you that.
Q. You said he'd lie.
A. Yes, sir.
Q. And that was the truth.
A. Yes, sir.
Q. You said all he'd do is smoke up dope.
A. Yes.

Q. Smoke dope all the way up; is that right?
A. Yes, sir, I said that.
Q. Then he says, Let's go do another theft so we can have some more money; is that right?
A. I believe so, sir.
Q. Matter of fact, at that point you said this friend of yours for how many years? What? Eight years or so you said you didn't care whether he choked on a piece of chicken and died.
A. Yes, sir.
Q. And you described him as a piece of -- and we won't use

1361

that word in the courtroom but something that's not too nice; is that correct?
A. Yes, sir.
Q. Did you tell the grand jury in 1997 that you were nothing but a dope smoker and all you wanted to do was go and smoke dope and steal hogs?
A. Yes, sir.
Q. And that's basically what you were, a dope crack head who stole hogs; is that right?
A. Yeah, yeah.
Q. But you're reformed now; right?
A. I feel better, sir.
Q. So -- so in 1992 as you described it, not 1993, it was not you who was out attempting to burglarize, resisting arrest, possessed burglary tools, theft second, and malicious mischief? Was that you?
A. I was in Ida Grove, sir.
Q. And that was not you --
A. What year was that? Excuse me.

Q. It shows 2003, but you said it was 2002 with Mr. Putzier?
A. Okay.
Q. You guys were out running --
A. I'm Mr. Putzier.
Q. I keep calling you -- anyway, I won't say that.
A. Thank you, sir.

♀

Q. Anyway, I'm -- I apologize.
A. Thank you, sir.
Q. But you guys were running together, and I just assumed that you guys were friends; is that right?
A. I don't know if you'd call people friends that are smoking dope every day, sir. Maybe associates.
Q. But this friendship was so great that you got back together in 2002.
A. I just said I wouldn't call us friends. It was associates. It was drugs.
Q. Business associates.
A. Nothing to do with business. That's dope.
Q. Well, you got out of federal prison for this aiding and abetting escape; is that right?
A. Yes, sir.
Q. And you got revoked.
A. Yes, sir.
Q. For not showing up for your drug test on time. That was one of the things.
A. Yeah, yes, sir.
Q. Failing to report an arrest was something else.
A. Yes.
Q. For getting picked up on two or three additional charges;

is that right?
A. Which charges would them be, sir?

Q. Well, you should know which charges they were. You were the one who had to come into the courtroom and explain them. Are you telling me you don't know which charges they were?
A. No, I'm asking you, sir, would you tell me which ones.
Q. I'm asking questions here. You have no idea.
A. No, sir.
Q. We'll get to that in a minute.
A. Thank you, sir.
Q. You told the detectives that you knew absolutely nothing about an escape charge; isn't that correct?
A. Yes, sir. I asked you which charges you was talking about. I thought you was going to tell me.
Q. You told them you knew nothing about it; is that correct?
A. Yes, sir.
Q. That was a lie.
A. Yes, sir.
Q. And that was a lie in front of the grand jury.
A. Yes, sir.
Q. Back in 1996, you indicated you had known Mr. Donaldson for 15 years; is that correct?
A. That would be real close, sir. I'm not positive. Give or take a few years.
Q. Well, at least 15 years you had known him.
A. Probably, sir. It would be real close. I can't tell you exactly how many years.

Q. The grand jury asked you, Did you think Mr. Honken would harm you in any way? Do you remember that question being asked of you?
A. I believe so.
Q. Would you like to see it?
A. Yeah, I'd like to see it because . . .
Q. Referring to page 40, line 16. And your response?
A. Yes, sir, I remember that.
Q. Does that refresh your recollection?
A. Yes, sir.
Q. Remember you told them that you did not think he would harm you in any way?
A. Yes, sir.
Q. Matter of fact, with regard to Mr. Donaldson, you indicated that bonding Donaldson out was not that big a deal because all he was going to do is run around and smoke crack and sit on a corner and not have nothing. That's all he's going to do is steal some pigs; is that right?
A. Yes, sir.
Q. Was that the truth?
A. Yes, sir.
Q. I think you probably thought that would have been pretty difficult for anybody to recognize about Mr. Donaldson?
A. What was that question, sir?
Q. Was he kind of a rocket scientist to figure out that's the kind of person he was?

1365

A. Can you tell me that question? I don't understand what you said.

Q. Yeah. I'm sorry it's not clear. Now, Mr. Donaldson in 1996 is a crack head, and so are you. You're two crack heads sitting over at the Woodbury County Jail.
A. Yes, sir.
Q. That go out and steal pigs.
A. Yes, sir.
Q. Now, my question to you is do you think it would take a rocket scientist to figure out that you're talking to two crack heads who steal pigs for a living?
A. I don't know, sir. You'd have to tell me that.
Q. Well --
A. We'd have to sit down and talk and you tell me what kind of rocket scientist I was.
Q. Well, let's put it this way. Do you think it would take a very intelligent person to figure out that they are having a conversation if one existed at all with a couple of crack heads over at the Woodbury County Jail who steal pigs for a living?
A. I don't know where you're getting that, sir, but I'd like to sit down and have a conversation with you some time and see what kind of person you thought I was.
Q. Now, we talked a little bit about your activity while you were incarcerated. Now, you were incarcerated in Nebraska.

1366

Would have been Harlan County, Nebraska, in 2003?
A. Yes, sir. No, no, no, no, no. Not in 2003, no, sir.
Q. When was it?
A. Harlan County.
Q. What about September 2002 after you had been arrested on a burglary charge over in Nebraska?
A. That could be, sir. It was close to that time.

Q. 2002?

A. Yes, sir, around 2002.

Q. And you were at the Harlan County Jail?

A. Yes, sir.

Q. You told us that another inmate had confessed to you; right?

A. Yes, sir.

Q. Of first-degree murder.

A. Yes, sir.

Q. At that time when you were over at the Harlan County Jail in Nebraska, would you agree that there was absolutely nothing in any of these records that indicated that Dustin Honken had confessed to you according to your testimony on direct examination and on cross-examination?

A. Can you come back on that question again? I'm lost.

Q. I will. I will. Prior to your incarceration and being held over in Nebraska and telling the sheriff there that a murderer had confessed to you, alleged murderer had confessed to

♀

you, you would agree consistent with the testimony that you have given us today in this courtroom you had never made a statement that Dustin Honken told you that he had killed someone.

A. When you asked me that earlier, sir, I said no, but I know in my heart that Dustin has asked me that.

Q. Now --

A. And told me that he has killed them.

Q. After you took this statement in September of 2002 over at the Harlan County, Nebraska, Sheriff's Office and you had been arrested on burglary, what happened to those burglary charges?

A. It had nothing -- that case just got over with. I got

nothing out of that. I did not testify against nobody in that case, so I don't know what you're getting at.

Q. Well, you did --

A. I got charged. Them burglary charges were not in Harlan County. They were in Furnas County, sir.

Q. You were just housed in the Harlan County Jail.

A. Yes, sir.

Q. And in that Furnas County case, did those charges ever come up and you ever have to go to court on them?

A. Yes, sir.

Q. And what happened?

A. They were trespassing. That's what it was.

Q. It was dropped to trespassing?

A. That's what it was was trespassing.

♀

1368

Q. And that was after you had made the statement saying that another alleged murderer had actually confessed to you in 2002. Is that --

A. That had nothing to do with Furnas County, sir.

Q. I didn't ask you that. I just said it was after you told law enforcement that another alleged murderer while you were housed in Harlan County had confessed to you; isn't that correct?

A. What are you trying to say, sir? That's what I'm trying to ask you.

Q. Just answer my question.

A. I didn't understand you. What are you trying to say? That my charges got dropped? That's what I would like to know because that's not the truth.

Q. Okay. Let me try to make my question clear again.

A.   Okay.
Q.   And when you were at Harlan County, it was at that point that you said a person who was charged with murder confessed to you that they had committed murder.
A.   When I was in Harlan County, a person did confess to killing his wife, beating her to death, leaving her lay naked on the floor, yes, sir.
Q.   Prior to that time, as you have said, you never told anyone that Mr. Honken had confessed to you prior to 2002; isn't that correct?

A.   I don't -- I'm not positive, but I don't know what this has got to do with that.
Q.   But after you then indicated that you were going to be a witness if the case went to trial, it was only after that charge over in -- while you were housed in Harlan County and arrested in Furnas County did you later or subsequent tell anyone that Mr. Honken had confessed to you.  It was only after that time.
A.   I still don't understand that.
Q.   Okay.
A.   And I don't know where you're going with that.  This case on that murder case is still pending, so I shouldn't even talk about it, but I never got nothing out of it.  I'll guarantee you that.  But I just don't understand where you're going with Dustin thing from another guy killing his -- beating his wife to death, leaving her lay dead on the floor.
Q.   Now, in 19 -- I'm sorry, in the year 2002 after you'd gotten out from the federal penitentiary for this attempt to escape, you had to go back.
A.   I had to go back and finish my time, yes, sir.

Q. Why?
A. Because I violated my parole, sir.
Q. What'd you do?
A. I got high. I ain't got nothing to hide. I do have a drug problem.
Q. High on what?

A. I smoked marijuana. I do crack cocaine, regular cocaine. Cocaine is my problem. When I was a young kid, 12 years old, my Cub Scout master shot me up with cocaine. Is that what you want to hear? That's what happened. And everything ain't been the same since. I'm doing real good right now, and I'm going to do my best to continue. Thank you, sir.
Q. My question is what did you do to violate your probation or your parole --
A. Dirty UA, sir.
Q. Excuse me -- in 2003?
A. Dirty UA. I had some driving -- I got stopped. I didn't have my license or my son in a seat belt. I had them tickets. And then I had a charge in Omaha that is still pending.
Q. You had an attempted burglary. You had a possession of burglary tools. You had resisting arrest. You had theft second. You failed to notify your probation officer of the arrest. You didn't show up for your drug test. And you continued to associate with criminals and in criminal activity. Would that be accurate?
A. Most of that is true.
Q. All right. Then so the point is after that -- this is in 2003 -- you went back; is that right?
A. That was the reason I went back, that stuff.

Q. How many times did you go back? Once or twice?
A. Two times, sir.

Q. What'd you go back the second time for?
A. What you just read off.
Q. What'd you go back the first time for?
A. For trespass charges and being out of the state, nothing to do with drugs. I wasn't doing drugs.
Q. Out of what state?
A. The state of Iowa. I was in the wrong jurisdiction.
Q. Oh, when you were over in Nebraska and got the burglary charge.
A. That was trespassing, sir.
Q. This farm that you talked about on direct examination as to where you would have to go to assist Mr. Honken in his request --
A. Uh-huh.
Q. -- as I understand it, it was near Des Moines?
A. From what I recall. I know -- I didn't have to worry about where it was because Angela Johnson was going to drive me there, sir.
Q. But you understood it was near Des Moines where Mr. Cutkomp lived with his family; is that right?
A. I just knew Angela was going to drive me there, so I really didn't have to know where it was.
Q. If you saw your testimony under oath on that, would that refresh your recollection as to whether or not you said it was near Des Moines?

A. I did say it was near Des Moines as far as I remember, but I said I didn't have to really know where it was because Angela Johnson was going to bring me there anyways.
Q. Well, did he tell you that it was a farmhouse down near Des Moines?
A. I believe that's what he said. I don't know if I'm a hundred percent sure.
Q. Why don't you take a look at what you said under oath on page 572 of the sentencing transcript.
A. And I already said I said that, sir, yes.
Q. Well, you said you weren't sure.
A. Okay.
Q. Take a look at the yellow, and for context you can look at the sentence that precedes that.
A. That's when I was trying to get out of the jail, sir. About the hole, is that --
Q. No, it's whether or not he told you that the farmhouse was near Des Moines.
A. And I told you I believe he did, but I know I know Angela lived in Des Moines, and I knew she was going to take me there.
Q. Did that refresh your recollection that you did testify --
A. Yes, yes, sir.
Q. -- previously under oath that it was near Des Moines?
A. Yes, sir.
Q. And you're not telling us at this point that that testimony

1373

was false.
A. No. I said that's what I believed. Thank you, sir.
Q. Now, you indicate that when we went over part of your statements that you made under oath that some of them were lies

and some of them were the truth; is that right?
A. Which ones was you saying? I said I went into that grand jury and I lied for Dustin, yes, but some of the things I said about Dean and a few other things were honest, yes. So you're right, correct.
Q. And why did you lie to the grand jury? Why did you take an oath, go in front of the grand jury, same oath you took here, and start lying to the people in front of -- a number of people in front of the grand jury? Why did you do it?
A. Because I was sticking up for Dustin, and I was wrong for doing it, and I understand that.
Q. You did --
A. I wished I wouldn't have, and I did it. You're right.
Q. You did it because you were taking up for Dustin?
A. Yes, sir, because he kept asking me and begging me saying that he's -- you know, you do this and I'm going to do this for you, and I'm going to give you a lot of money, and I make the best dope, 90 percent dope, wah, wah, wah.
Q. So you did it for the money. Is that what you're saying?
A. And the drugs, sir, because I was a drug addict like I told you.

Q. You did it for the money and the drugs.
A. Yes, sir.
Q. Do you want to see what you told a judge when you were under oath as to why you did it?
A. Sure. That's fine.
Q. You think what you just told us a minute ago is the truth; is that right?
A. I think it is, yeah, but I'm not positive.

Q. You're not positive?
A. Go ahead and show me.
Q. Wait a minute. You just said something and I asked you was that the truth, and you said yes, but you're not positive if it's the truth or not?
A. I would like to make sure on what I said, sir. It's been a long time.
Q. Is it the truth what you just said?
A. I don't know. I'd like to see what you got.
Q. You don't know if it's the truth or not?
A. I'd just like to see what you have, sir.
Q. No. Did you just say that you don't know what you just told this jury was the truth or not? Did you just say that?
A. I said that because I'm not going to sit here and lie to these people. I didn't come in here to lie to these people.
Q. Well, what do you mean that you don't know what you just said to this jury under oath is the truth? Explain that.

♀

1375

A. What did you ask me again? And then I'll explain it.
Q. The reasons why you went to the grand jury and lied. That's what I asked you. And you just said you --
A. I said I was a drug addict and I was thinking about the drugs and the money.
Q. So is that the truth?
A. That could be part of it, yes, sir.
Q. Oh, it could be part of the truth.
A. Yes, sir.
Q. Do you know whether it's part of the truth or the whole truth that you were sworn to tell when you took the oath when you walked in here?

A. That's up to you to believe on that, sir.

Q. Well, is it the whole truth or part of the truth?

A. Everything I've said in here is the truth, sir. Thank you.

Q. Even the lies that you admit that you told was the truth.

A. Yeah, yeah, that's the truth that I lied.

MR. PARRISH: Your Honor, while I look at this, would the jury want to take a couple of breaks or --

THE COURT: Well, yeah. We can take our recess.

MR. PARRISH: It's taking me a little longer. I thought I had it marked.

THE COURT: It's about, let's see, 2:25. We'll take a 25-minute recess. Please remember my cautionary instruction about keeping an open mind until you've heard all of the

♀

1376

evidence in the case. Thank you.

(The jury exited the courtroom.)

THE COURT: Any matters we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: No, Your Honor. Thank you.

THE COURT: Okay.

(Recess at 2:25 p.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. PARRISH: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Parrish, you may continue your cross-examination.

MR. PARRISH: Thank you, Your Honor. I'm just about finished.

BY MR. PARRISH:

Q. Before I get to my final couple of questions for you, I just want to ask you, you indicated that you'd read Mr. Honken's paperwork. He'd showed it to you. You were not a good reader, but you just read through it; is that right?
A. Yes, sir.
Q. You also said you -- Mr. Williams asked you -- you'd read some newspaper articles about the case?
A. I never -- I said I never read no newspaper articles about the case, no, sir.

Q. Oh, okay. I thought you said on direct examination you had. Are you saying now you never read any --
A. I said I read the articles that he had sent me. That's what I had read.
Q. Oh, about his case.
A. Yes, sir.
Q. Oh, okay.
A. It's probably the same thing.
Q. Okay. Newspaper articles. You had read newspaper articles about the case; is that correct?
A. I've looked at the paper, but I ain't read no articles.
Q. Oh, so --
A. When I first met him, he sent me some paperwork is what I said.
Q. Oh, okay. But I thought later you had said you read some newspaper articles in regards to what Mr. Williams asked you --
A. There was one in Des Moines. That was in the '90s I know that Terry Davenport read over, and that's where -- when he had his sister call him in and he --
Q. I'm confused. All I asked was you told Mr. Williams on

direct examination -- I'm just trying to clear up a couple things. You said you had read a couple newspaper articles. You're saying now you hadn't read any newspaper articles about the case?

A. I don't believe I had read any newspaper articles. If I

did, I was wrong.

Q. Oh, so that earlier statement you had read newspaper articles is incorrect?

MR. WILLIAMS: Objection, Your Honor. I think that misstates the record. I think his earlier statement was he hadn't read any articles.

THE COURT: Overruled. You may answer if you can.

A. I had never read no newspaper articles.

Q. You never saw any either.

A. No, I never.

Q. So when the reference was made to Tim and you said, Well, maybe I read that in a newspaper or something like that, you were referring back to the earlier papers you had read that Mr. Honken had showed you in the jail cell? Is that what --

A. The papers that he had sent me, yeah.

Q. Oh, okay, that he had sent you in the jail cell.

A. Yes.

Q. Okay.

A. If I understand which time you're talking about, yeah.

Q. Okay. They were never newspaper articles. They were actually papers.

A. These were papers that were sent from like his attorney or stuff that he had slid through the doors to me.

Q. Oh, okay. So you read some of his legal paperwork.

A. Yes.

Q. Oh, okay. And you'd read that while you were at the jail.
A. Yeah, that was in '96.
Q. And you'd read that before you had talked to the grand jury or anything.
A. Yes.
Q. Okay. Now, one -- a couple other questions real quick. One is that I asked you on cross-examination -- when I asked you about when you told the grand jury that Mr. Donaldson was a liar, you told me on cross-examination that that was the truth.
A. Yes, sir.
Q. Okay. I want to show you what you said at your sentencing hearing. Do you remember what you said at the sentencing hearing about that?
A. No, sir, I don't remember.
Q. Okay. Why don't you take a look at it. I'm referring to page 589, line 9 through 14.
A. Right here, the whole thing?
Q. Yes, sir. Just see if that refreshes your recollection as to what you told the grand jury -- what you said at your sentencing hearing. Did that refresh your recollection now?
A. Yes, it did, yes, sir.
Q. All right. You told us here a minute ago that what -- when I asked you that question, that that was the truth. At the sentencing hearing when I asked you you were lying to the grand jury about Donaldson being a liar, you said yes. Did you say

yes? Did you just refresh --
A. Yes, I did, yes.
Q. Now, I want to know, which one is the truth? The one to the grand jury, the one I asked you on cross-examination, or the one you said under oath at the sentencing hearing?
A. What Dean Donaldson was saying about me was a lie. That's what I was trying to say.
Q. No. It's what you said to the grand jury. One time you said it was a lie. The other times you said it was the truth. And then you told us at the sentencing hearing it was a lie. So which one is accurate?
A. I believe Dean Donaldson has lied about a lot of things. I can say that.
Q. That's the truth.
A. Yeah.
Q. So you would agree that you have said it's the truth and it's a lie at least four different times.
A. Yes, sir.
Q. Now let me ask my final questions of you dealing with what you said just a few minutes ago when we took the recess and I was trying to find in my notes what you'd said. You said that the reason you lied to the grand jury was for money, and you also said the other reason you lied to the grand jury was for drugs, and I asked you was that the truth, and you said part of it. My question to you is that's completely different than what

you told under oath before; isn't that true?
A. I don't know because I don't know what I said then on that. But what I can tell you, sir --
Q. Why don't you take a look -- why don't you take a look at

what you said --

MR. PARRISH: Page 596.

Q. -- as to why you testified for Mr. Honken beginning with line 14. Read that and refresh your recollection as to why you told under oath before as a reason you testified for Mr. Honken falsely in front of the grand jury.

Have you had an opportunity, Mr. Putzier, to refresh your recollection as to what your testimony was under oath before the grand jury?

A. Yes, sir, now that I looked at it, yes, I know.

Q. You told the grand jury, did you not, that you testified falsely and you perjured yourself and you lied because you felt sorry for Mr. Honken; isn't that correct? Is that correct what you told the grand jury?

A. I would have felt sorry for his family losing their house, yes, sir.

Q. Do you want to take a look at it again?

A. I know what I said. You're right, sir. Yes.

Q. Did you say the reason you testified falsely and committed perjury, because you felt sorry for him; isn't that correct?

A. Yes, sir.

1382

Q. You didn't say because of money, you didn't say because of drugs, did you?

A. No, sir.

Q. And you mean you felt sorry for somebody when they just told you they killed four people; is that right?

A. Yes, sir.

MR. PARRISH: Thank you.

THE COURT: Mr. Williams?

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Just to clarify, these were statements that he just showed you that you made during the sentencing hearing, not during the grand jury; is that right?

A. Yes, sir.

Q. And the context of these questions were about why it is that you ultimately told the truth. Did I get the context down correctly?

A. I believe so, sir. I was confused on some of the things, yes.

Q. Okay. And in this answer you're basically saying initially you felt sorry for him, but you're not going to go to jail for him, and you were afraid you were going to get charged federally with escape and all those charges.

A. Exact -- yes, sir.

Q. And that's why you ended up coming forward and telling the

♀

1383

officers what you did.

A. That's -- yes.

MR. WILLIAMS: Okay. I have nothing further, Your Honor.

THE COURT: Mr. Parrish, anything further?

MR. PARRISH: No, Your Honor. Thank you.

THE COURT: You may step down.

Ready to call your next witness?

MR. WILLIAMS: Yes, Your Honor. United States would call Terry Bregar.

TERRY BREGAR, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness

box. Would you state your full name, please, and spell your last name. Sir, would you state your full name and spell your last name.

THE WITNESS: Terry William Bregar, B-r-e-g-a-r.

THE COURT: Thank you.

Mr. Williams.

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Bregar, let's talk just for a minute about your condition, sir. Are you blind at this time, sir?

A. Yeah.

Q. And is that a consequence of a complication from diabetes?

1384

A. Yes, it is.

Q. All right. You are currently in custody, sir?

A. Yes, I am.

Q. How old of a man are you, sir?

A. I am 59.

Q. And how long have you been in custody on these current charges?

A. Eight years.

Q. How far did you go through school, sir?

A. Tenth grade.

Q. And where are you from originally?

A. Iowa.

Q. Where at in Iowa?

A. Center -- do you know where Des Moines's at? North of Des Moines about 25, 26 miles.

Q. Okay. Somewhere south of Ames, Iowa?

A. Yeah.

Q. Very good. What are you currently in jail for?

A. Conspiracy on methamphetamine.

Q. To distribute or manufacture methamphetamine?

A. Yeah, distribute.

Q. And you've been in jail in federal custody for how long then? Eight years?

A. Right at eight -- October 1 will be eight years.

Q. How much more time do you have to go, sir?

♀

1385

A. I got 13 months and 2 weeks left.

Q. Now, was that a case where you pled guilty, or did you go to trial?

A. I pled guilty.

Q. And was that in federal court here in Sioux City, Iowa?

A. Yes, it was.

Q. What was your original sentence, sir?

A. 15 years, 180 months.

Q. At some point did you provide information and testify at a sentencing hearing concerning Dustin Honken?

A. I did.

Q. As a result of that, did you get a reduction in your sentence?

A. Yes, I did. I got four and a half years taken off.

Q. And how did that happen? Explain to the jury how your charge was reduced -- or I'm sorry, your sentence was reduced.

A. The prosecutor and my lawyer and the judge all got together and talked, and I was in on a telephone call.

Q. And you were on this telephone call with everybody.

A. Yes, sir.

Q. And the government made some motion to reduce your sentence for your cooperation?
A. Yes, they did.
Q. And then ultimately the judge ruled on that.
A. Yes.

Q. And would that have been Judge Bennett?
A. Yes, it would.
Q. All right. Now, when did that -- when did your sentence get reduced then, sir, if you recall approximately?
A. In early '98.
Q. How much more time do you have left on your sentence, sir?
A. Now?
Q. Yes, sir.
A. I got 13 months, 2 weeks.
Q. And when you -- at some point you're going to be going to a halfway house. Is that part of the breakdown on how you serve out --
A. Yeah, it will be more like a rest home-type situation, you know, where they'll be able to help me.
Q. Because of your disability.
A. Diabetes, yeah, blindness.
Q. Very good. Now, how was it that you ended up providing information to the government? Did you come to them saying, Hey, I've got information; I want something from you?
A. No.
Q. How did it happen?
A. They was -- they come to -- what's that county over there? LeMars, LeMars, Iowa, and Dean Donaldson was there, and they went -- they come to see him, talk to him, and I guess he told

them they should talk to me, but I had never even considered it,

didn't know nothing about it.

Q. When the law enforcement officers initially talked to you, did you talk to them?

A. Yeah.

Q. And did you provide them information you knew about Dustin Honken?

A. Yeah.

Q. As a result of that, as we talked about, ultimately you got a reduction in your sentence for providing cooperation.

A. Yeah.

Q. Very good. Now, what, if anything, do you think you're getting for testifying here today?

A. Nothing.

Q. Do you think there's -- I mean, have you asked for a reduction in your sentence for testifying here today?

A. No, I haven't.

Q. Let's talk about how this whole thing came about. At some point the charges you're talking about that you're currently in prison for, is that the first time you've been in trouble with the law, sir?

A. No, it hasn't.

Q. Let's tell the jury a little bit about that. What other convictions have you had in the past, sir?

A. My first conviction was false -- un -- accessory to steal a truck and trailer for X amount of thousands of dollars and a

conspiracy on methamphetamine that didn't amount to a hill of

beans. I never heard of them for 15 years.
Q. And those are the --
A. And the last one was possession of stolen property.
Q. The possession of stolen property, was that before --
A. State of Iowa.
Q. State charges. Was that before or after these federal charges?
A. I had one federal charge, state charge, now federal.
Q. Okay. In October of 1996, were you in Woodbury County Jail for a couple weeks?
A. No. Yeah, yeah, in November. That's real close.
Q. I'm sorry, November, yeah, November 6 to November 20. Does that sound about right?
A. Somewheres in there, yes.
Q. And what were you doing in Woodbury County at that time? What kind of charges were you on?
A. Awaiting sentencing on the -- for the methamphetamine charge.
Q. Okay. The federal charges you're currently doing time on.
A. Yeah.
Q. And you were just being housed temporarily in the Woodbury County Jail until you were sentenced.
A. Yeah.
Q. While you were in that Woodbury County Jail, what was the

1389

status of your ability to see at that point, sir? Could you see?
A. Oh, I had no problem. Never even had glasses.
Q. So this blindness occurred, this complication from diabetes occurred, after this time period November of 1996?

A. Yes.
Q. At that time you could see just fine.
A. Oh, yeah.
Q. All right. What were you -- what unit were you in?
A. I think D unit.
Q. And did you meet somebody by the name of Dustin Honken there?
A. Yes, I did.
Q. Could you describe for the jury -- you were only there for a couple weeks. How was it you came to meet Dustin Honken?
A. He's kind of the meeting guy that comes in, you know. He'd talk to everybody that come in, and being I was one of the white guys, we talked.
Q. Did you talk a lot with Dustin Honken?
A. Not a lot but, you know, quite a bit. We talked about cars, dope, money, women, you know, standard procedure.
Q. You were in for drug charges. Did you learn what he was in for?
A. Yeah, he said he was in on drug charges too.
Q. Did you guys talk about your various experiences with

1390

methamphetamine?
A. Oh, yeah.
Q. What did Dustin Honken tell you about his experience with meth?
A. His?
Q. Yes, sir.
A. Oh, he was very knowledgeable about it.
Q. Did he describe what kind of methamphetamine operation he had?

A. Yeah, but it was far above my, you know, thinking. I just can't relate to something like that.

Q. What do you mean by that?

A. Well, he's more or less a chemist or something, you know, used them big hundred dollar words and stuff. I'm just an old backwoods guy.

Q. Were you involved with actually manufacturing methamphetamine, sir?

A. No.

Q. Did you know much about manufacturing methamphetamine?

A. I bought a book and read on it, the secrets of methamphetamine, but I couldn't make heads or tails of it.

Q. Did -- when he was describing his methamphetamine manufacturing to you, did Dustin Honken ever talk to you about the purity levels he was getting out of his methamphetamine?

A. Yes, we did.

Q. What did he tell you?

A. He wanted to know if I wanted to get out of there, and I looked at him kind of strange, yeah, but how. He says, I can't get in on it. I got all the problems I need now.

Q. Okay. And we're going to talk about that in a minute. I guess my question to you was when you were talking about methamphetamine manufacturing, did he talk to you about how pure he was able to make his meth?

A. Oh, yeah, like 98, 99 percent pure.

Q. And based on your own experience in the involvement in methamphetamine, was that -- is that significantly good methamphetamine?

A. Oh, yeah, real good.

Q. At some point when he was talking to you about his involvement, did he ever tell you about having any prior charges against him?
A. Yeah, he said he had a prior charge of meth but the witnesses never showed up.
Q. Did he tell you about -- you know, when he got involved approximately when that was before when the witnesses didn't show up?
A. I thought he said it was '93, but I don't -- I'm sure he said '93.
Q. Did he tell you why he got involved with meth in the first place, what motivated him to get involved in the manufacturing

♀

of methamphetamine?
A. What's that now?
Q. Did he tell you why he got involved in manufacturing methamphetamine in the first place?
A. I don't remember so. He might have.
Q. You just don't recall today?
A. Yeah.
Q. Okay. Back in this 1993 case, did he tell you how it was that he got caught?
A. Some friend of his I think.
Q. And --
A. You know, I just -- that's a long -- that's eight years ago.
Q. Sure. Tell me again, what did he say about the witnesses?
A. They wasn't able to come, go to the courtroom to testify against him. They was gone.
Q. And when he's telling you this, that the witnesses weren't

able to testify, did he tell you what happened to those witnesses?
A. No, not really. He made it like, you know, like (demonstrating).
Q. And just so we have a good record, what are you doing with your hands when you just said that?
A. Shooting a pistol.
Q. So when he tells you that these witnesses didn't show up,

♀

1393

he's making the sign of shooting a pistol with a hand?
A. Smiling and, you know, they didn't show up, which I didn't even think nothing about.
Q. Did he tell you anything about where the witnesses are at all back then?
A. No.
Q. Do you remember him telling you anything about where they might be located at?
A. No. He never said nothing about actually killing anybody or like that. I mean, that was never brought up.
Q. Okay. What he tells you is they disappeared, and he makes the sign of a gun.
A. Yeah.
Q. Did he tell you whether anybody else was involved with him back in this 1993 case?
A. He had a girlfriend.
Q. Do you remember what her name was?
A. Andi, Angela, somewheres in that category.
Q. What did he tell you about her?
A. That she had had his baby.
Q. Did he tell you anything about whether he had any concerns

about her and whether she might be talking to any --
A. Oh, yeah, she could cause him a great deal of harm was all he said, was not good.
Q. So let's back up a little bit. What did Dustin Honken tell

you then about Angie? She could do him a lot of harm. What was the context of that conversation you had if you recall?
A. I can't. It's too far.
Q. Okay. When he told you that she could do him a lot of harm, was he talking about with regard to drugs or something else?
A. I -- I figured drugs or, you know, they'd done some crime together.
Q. And was he concerned about whether she was going to talk to law enforcement or something?
A. A little, not a lot, just a little. He was concerned it could happen this way.
Q. Now, he told you that he's in jail in 1996 because of drugs.
A. Yeah.
Q. Okay. Did he tell you how he got caught in 1996?
A. Somebody told on him, his friend or something like that.
Q. And do you remember what he told you, if anything, about his friend?
A. If his friend could go missing, you know, it'd be that much better.
Q. Do you remember him ever telling you anything about tapes?
A. Yeah.
Q. What'd he tell you about tapes?
A. He said this friend and his wife had a tape of him saying

something pretty bad, talking to them, and that he was trying to figure a way to get this -- have this tape disregarded from evidence.

Q. Okay. So he told you that there was a tape of him saying stuff to his friend?

A. And his wife.

Q. And his wife. Whose wife was this?

A. I don't know. Whoever who his friend is. I can't remember that.

Q. Okay. And what did he tell you about his concerns about this tape?

A. That this guy might be the one that turned him in.

Q. You said he was worried about the playing of the tape?

A. Yeah.

Q. What did he tell you about that?

A. He didn't elaborate other than it wouldn't be good.

Q. Did Mr. Honken make any statements to you about what, if anything, he was trying to do to resolve his current case, his current 1996 case?

A. Well, he thought about trying to break out of jail. He said if he could get out he could take care of the situation.

Q. What did he say? He said if he could get out he could take care of the situation. What did he -- what was he talking about?

A. Somebody showing up missing again, you know, being gone.

Q. In saying that, did he make any reference back to that 1993

case?
A. No, not that I remember.
Q. Okay. So he indicated to you that if he could get out for a week people would go missing and he'd get out of his current charges?
A. Yeah.
Q. And at some point did he talk to you about who it was that he wanted to go missing?
A. Tim Reinert.
Q. Reinert?
A. Rine -- the agent or he's a prosecutor.
Q. Prosecutor?
A. Yeah.
Q. Okay. Did he tell you about anybody else he wanted to go missing?
A. Well, his friend and that woman there would have to be missing too.
Q. The friend who did the tape on him?
A. Yeah.
Q. The -- what did he tell you, for example, on this prosecutor? Did he tell you anything about where he knew where he was or how he was going to get to him or anything?
A. No.
Q. Did he indicate to you whether he knew where this

1397

prosecutor lived at all that you recall?
A. In Cedar Rapids, yeah. That would be it, Cedar Rapids.
Q. Now, you indicated earlier in your testimony you've done time before in jail. Is it common for other inmates to talk about wanting to kill the person who got them in trouble,

wanting to kill the prosecutor, wanting to kill other people?
A. Yeah, a lot of them.
Q. A lot of them say that.
A. Yeah, about all of them ain't too happy.
Q. All right. And so was there anything about Dustin Honken when he's telling you that if he had a week and he could get back out again that -- anything about his expression or the appearance on his face that made you believe he was serious?
MR. SPIES: I'm going to object to that question as calling for an opinion that's not properly the subject of opinion testimony.
THE COURT: Can you lay a foundation for the status of his blindness?
MR. WILLIAMS: I'll rephrase. How about I do that?
BY MR. WILLIAMS:
Q. When Dustin Honken's making statements to you about wanting to make people disappear in his current case, what was his expression?
A. Very stern. He wasn't laughing, nothing like that. He acted serious to me.

1398

Q. And how did you take it?
MR. SPIES: Again, I'm going to object to that question, Your Honor. This is calling for an opinion that's not properly the subject of opinion testimony.
THE COURT: Overruled. You may answer.
A. I really didn't think nothing about it, you know. I mean, a lot of people says I'm going to kill this guy and that guy. You know, you hear it all the time. But he was -- he was -- he had a hard look in his eye.

Q. Did -- when he's talking about wanting to take care of his current case, did he tell you whether he had taken any steps toward that end?
A. Yeah, but vaguely about he bailed a guy out of jail that was supposed to get out and take care of a couple things for him.
Q. Did he tell you who that was?
A. No, but later I found out it was Donaldson.
Q. Now, did you learn that from Dustin Honken?
A. Well, they brought Dean back in and put him in the cell, in the next pod over from us, and Dustin was, you know, looking, There he is; there's that son of a bitch. Woops. Excuse my language.
Q. Did you know Dean Donaldson before all this happened?
A. No.
Q. What was -- did Dustin Honken say anything to you about

♀

1399

whether Dean Donaldson had done what he was supposed to do?
A. He didn't do it. Whatever he was supposed to done, he didn't take care of it.
Q. And what was Dustin Honken's reaction to that?
A. He blowed a gasket.
Q. Blown a gasket. What do you mean by that?
A. Oh, he was mad.
Q. Did he say anything -- I'm sorry.
A. He said he could have somebody on that right away, whatever that means.
Q. He was going to have somebody on that right away.
A. Yeah.
Q. When he was saying that, did he make any gestures to you at

that point?
A. Yeah, the old (demonstrating).
Q. Again, the gesture you're making is what, sir?
A. Yes.
Q. What's the gesture you were making with your hand there?
A. Like he had a pistol shooting somebody.
Q. Now, he had said to you if he could be out for a week he could take care of things and get out from underneath his charges.
A. Yes.
Q. Okay. And did he talk to you about whether he was actually trying to get out of the jail?

A. He was going to escape.
Q. What did he tell you about that?
A. That he had something planned, he was going to escape from jail, wanted to know if I wanted to go along. No.
Q. What did he tell you about that plan?
A. They'd got a hole knocked in the wall in the adjoining pod and they -- to the outside I understand. Whether it ever happened I don't know. But anyway, he had that, and somebody was supposed to bring a rope down and they tore a mattress up -- I mean a sheet up to tie on the big rope and pull it up, and sounded like insanity to me.
Q. How do you know all this?
A. From talking to him. He'd give me -- you know, he talked to me.
Q. This is Dustin Honken told you all this.
A. Yeah.
Q. And did you actually see him take any steps toward that end

at all?

A. He was trying to pick the lock from the fire door adjoining cells where you could get into the next one over.

Q. Did he tell you who was involved on the other side into the next pod?

A. Yeah. I'm thinking.

Q. Do you remember the name at all?

A. Dennis.

♀

Q. A Dennis?

A. Dennis.

Q. Did you know this Dennis at all?

A. Did I?

Q. Did you?

A. No.

Q. Did you ever see this Dennis he was talking about?

A. Uh-huh.

Q. And how do you know you saw the Dennis he was referring to?

A. Because he was in the window. They was looking at each other.

Q. What window is that?

A. From the -- if you get up by the door in D unit, come back by this door in C unit, you can actually see from one unit to the next pretty close.

Q. Now, is that through the fire door, or is that through another door?

A. That's another door.

Q. Another door, okay. And can you describe the guy that you saw him talking to?

A. Maybe five-eight, bald head, pretty stout build.

Q. Bald head like his hair fell out?
A. Shaved head.
Q. Shaved head. Did he tell you about any other steps he had taken or was going to take to try to get out of the jail?
♀

A. Well, he had packed up his, you know, personal items and already sent them out, so that's a pretty good indication something's going to happen.
Q. And how do you know he packed up his personal items and sent them out?
A. He told me about it, you know, packed them up and had them, and he's giving them to the cop.
Q. Did he tell you who's -- you indicated earlier that he told you that somehow a rope was going to be lowered down outside the jail. And what was going to happen when they lowered the rope out?
A. They was going to tie the sheet to it and pull up a good rope and tie off the rope.
Q. Was somebody on the outside supposed to be helping them?
A. Oh, yeah, yeah.
Q. And did Dustin Honken tell you who that somebody was that was supposed to help him?
A. I think he said his girlfriend.
Q. Do you remember any name that he gave at that point?
A. If it was Angie, I don't remember the name of the other girl or Andi or I'm not sure.
Q. Do you know a guy by the name of Frye, another inmate there by the name of Frye?
A. Yeah.
Q. Was he involved in any way in this attempt to break out?
♀

A. I don't think so.
Q. Okay.
A. Other than I think they broke the knob off of his door.
Q. Off of whose door?
A. Frye's, big brass thing. If you snap it off, you could use it as a hammer.
Q. And how do you know they did that?
A. I was right there.
Q. You saw it happen?
A. Yeah, he just slammed the door and yanked it back.
Q. Who did that?
A. I don't know the name of the guy. I think he was a Spanish -- Spanish descent.
Q. Was Dustin Honken around when that happened?
A. Yeah.
Q. Where was he when this was happening?
A. Back behind me more back that way.
Q. So was he involved in breaking off this handle of the door at all?
A. No.
Q. And do you know what happened to that handle?
A. Yeah, they used it to try to beat a hole into the next block.
Q. Now, did you see that happening?
A. I seen him chisel on it, yeah.

1404

Q. You saw who chiseling on it?
A. Dustin.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1227 of 3636

Q. You saw Dustin Honken use that handle to chisel on the wall?
A. Yeah.
Q. How many times did you see that happen, sir?
A. He tried and tried.
Q. How long did that go on?
A. Not a whole long. You could see the walls were cored and ain't no way to bust through them. They had rebar in them and poured cement.
Q. Now, you were only in there for a couple weeks.
A. Yeah, I don't even think it was that much.
Q. I'm sorry?
A. I don't even think it was that much, but yeah.
Q. Okay. You were in there for two weeks or less; is that right?
A. Uh-huh.
Q. That's a yes, sir?
A. Pardon me?
Q. Is that a yes?
A. Yes, yes.
Q. And the reason I did that, our court reporter has to take down yes or no's, and it's hard for her to tell uh-huh from huh-uh.

When you got -- why was it you ended up leaving the Woodbury County Jail then when you did?
A. They needed more room there, and they sent me to LeMars.
Q. All right. So it had nothing to do with an escape attempt or anything else for why you were transferred out.
A. No. I think that would have been abandoned.

Q. All right. And so no escape had actually occurred by the time you were transferred to Plymouth County then.
A. No.
MR. WILLIAMS: I have nothing further. Thank you, sir.
THE COURT: Mr. Spies?
MR. SPIES: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SPIES:
Q. Mr. Bregar, Bregar.
A. Yes, sir.
Q. Mr. Bregar, my name's Leon Spies. I'm one of Mr. Honken's lawyers.
A. Okay.
Q. I'm going to ask you just a very few questions this afternoon, and if you can't understand or hear me, just let me know; okay?
A. Okay.
Q. Mr. Bregar, you've told us this afternoon that you were at

♀

the Woodbury County Jail. And as Mr. Williams asked you, you were there for just about two weeks or less; am I right?
A. Yes.
Q. And during those two weeks, were you there first before Mr. Honken arrived?
A. No, Dustin had been there quite a while.
Q. Okay. And you got there. And as I recall from some of the testimony that you gave before the grand jury investigating this case that you were there from about the 6th of November until the 20th of November. Does that sound right?

A. That sounds right in that area.
Q. And back in 1996, would you have been about 41 years old?
A. No. 50, 51.
Q. I'm glad you caught that. So you would have been about 51 years old then.
A. Yeah.
Q. And were you able to tell us about how old Mr. Honken was when you met him?
A. Twenty-seven maybe.
Q. Considerably younger than you.
A. Oh, yes, by far.
Q. And you'd already had lots of experience in jails and prisons when you got there to the Woodbury County Jail.
A. Yeah.
Q. And Mr. Honken was there, and do you remember what

1407

Mr. Honken looked like when you met him?
A. Been too long. He was -- okay. He was tall and thin.
Q. Wore glasses?
A. I think so, maybe blond hair, pretty short.
Q. Yeah. And you thought as you got to know Mr. Honken over this roughly two-week period of time that he was a pretty intelligent guy.
A. Oh, very.
Q. And he used, as you said, big words when he talked?
A. Yeah. He'd definitely been to school on, you know, some kind of chemist-type school to break down stuff to get this out of that or that out of it.
Q. All righty. And he was somebody that was interesting for you to talk to?

A. Pardon?

Q. He was someone that was interesting for you to talk to.

A. Oh, yeah, yeah.

Q. And as you sat there and talked as you told the jury here today, you talked about women, you talked about drugs, you talked about cars.

A. Oh, yeah.

Q. A variety of issues.

A. Yes.

Q. It wasn't all just serious conversation, though.

A. No, it was just jail talk, you know.

♀

Q. Okay. And we'll get into this jail talk a little bit more, but let me ask you this question. As you talked with Mr. Honken, one of the things that you talked about was making drugs.

A. Yeah.

Q. And you had, in fact, made methamphetamine before, hadn't you?

A. No, I had witnessed -- I had witnessed being made, but I never have made any.

Q. All right. So you knew enough about how methamphetamine was made that you were able to talk to Mr. Honken about that.

A. Yeah.

Q. And did you kind of compare recipes?

A. Oh, yeah.

Q. Just as people making brownies might compare recipes.

A. Yeah.

Q. Mr. Bregar, as you talked to Mr. Honken about the recipe that he used for making methamphetamine, did he tell you the

ingredients that he used?

A. He probably did, but I don't re -- lithium because he said that was awful hard to get. Ephedrine or something like that.

Q. Ephedrine?

A. Yeah.

Q. And did he tell you that he was able to get ephedrine down in Arizona in five-gallon quantities?

A. Oh, yeah.

Q. But he told you he had trouble getting lithium?

A. Yeah.

Q. And you told him to just go to K-Mart and buy batteries?

A. Yes, I did, K-Mart, Wal-Mart.

Q. Okay. And he told you that he used ephedrine and lithium to make his methamphetamine.

A. Yeah.

Q. Now, you've told us and the ladies and gentlemen of the jury about conversations that occur in jails and prisons, and talking about drugs among people who use drugs or sell drugs is a common conversation, isn't it?

A. Yeah.

Q. And as you talked to Mr. Honken, did he also talk about this dream he had of selling methamphetamine over the Internet?

A. Oh, yeah.

Q. And he had this idea in mind that he could sell drugs without ever seeing anybody.

A. Yes.

Q. And you thought that was pretty way out, didn't you?

A. Oh, yeah, that's fantastic, you know.

Q. Let's talk a little bit now, Mr. Bregar, about these

missing witnesses about his 1993 case; okay?
A. Uh-huh.
Q. Now, you told the men and women of the jury this afternoon

that when Mr. Honken talked about his 1993 case he said that some witnesses had disappeared; right?
A. Yes.
Q. And as you told us here this afternoon, he never said that he had killed anybody, did he?
A. He never told me he killed anybody.
Q. I beg your pardon?
A. He never said anything to me about killing anybody.
Q. All right. In fact, what he told you was that they had just disappeared.
A. (Witness nodded head.)
Q. By that I mean the witnesses.
A. Yes.
Q. And he told you that they had just left town.
A. Yeah.
Q. Mr. Williams asked you about some gesture that you saw Mr. Honken make, and you tried to demonstrate that for us here this afternoon.
A. Well, if this shirt was open a little bit and I put my right hand in it, Dustin stood that way a lot of times, like he had a pistol in a shoulder holster right there.
Q. Okay. So did Mr. Honken put his hand inside of his jail garb?
A. Yeah. Yeah. I think we had the button shirts.
Q. Right. So back at Woodbury County back in 1996, the

inmates there at the county jail wore a jumpsuit that was either buttoned up or snapped up the front.
A. Yeah.
Q. And Mr. Honken would put his hand inside of the gap between the buttons or the snaps?
A. Yeah, just resting it there.
Q. Okay. And that's the gesture that you're talking about today?
A. Yeah. Well, then if he'd be upset about something, he'd go like he's shooting, bang, bang.
Q. And you presumed like he was talking about a gun.
A. Yeah, yeah.
Q. Mr. Bregar, let me ask you, you were asked some questions about another aspect of his current case or his new case, and you said that there was a witness out there that he was concerned about or some tape recordings that he was concerned about.
A. Yeah.
Q. Remember talking about that?
A. Yes, I do.
Q. Mr. Honken told you that he was just going to plead guilty and be done with it, didn't he?
A. Yeah. He would plead guilty, if they could get this tape cancelled, he would just plead guilty and that would be it.
Q. Just be done with it.

1412

A. Yeah.
Q. Okay. Now let's talk a little bit about these escape

discussions that you talked about; okay?
A. Uh-huh.
Q. There were -- in the D block that you were in, there were a lot of other people there, weren't there?
A. Oh, yeah.
Q. Would you say there would have been about 30 people in D block when you were there for those two weeks with Mr. Honken?
A. I would think so.
Q. Do you think you could remember any of the names of the people that were in there with you?
A. No. I remember Frye.
Q. Right.
A. And Brownlee.
Q. Right. Was there a Dayton Sabasta there?
A. Yeah.
Q. And a Luis Lopez?
A. I don't know about the Lopez.
Q. William Garrison?
A. Don't ring a bell.
Q. But would it be fair to say that there would have been, say, 20 or 30 people in D block?
A. Oh, yes.
Q. All right. And I take it from your testimony that there

were some people in C block that were supposedly involved in this escape adventure.
A. Dennis.
Q. Did you know a David Leavitt?
A. Yeah.
Q. And David Leavitt knitted together a rope, am I right?

A. Yeah.
Q. And this was the rope that was supposed to go out the jail to pull up the rope that was supposed to let people escape through this hole 40 feet down to the street.
A. Yes.
Q. Now, as you heard about the discussions about this escape adventure, you thought it was pretty crazy, didn't you?
A. Oh, more than that crazy.
Q. Excuse me? What did you say?
A. Pardon?
Q. What did you say?
A. That would be worse than crazy, you know. I wouldn't even consider such a thing.
Q. It was nuts, wasn't it?
A. Yeah.
Q. And in the time that you had been in jail and in prisons, you've heard some pretty wild stories about escape attempts, haven't you?
A. Oh, yes.

♀

1414

Q. People hiring helicopters to come and fly people out, and you thought this was just another crazy scheme.
A. That he was wishing would work, but you ain't going to get out of that jail.
Q. Okay. In fact, there were some people who you heard were going to try to get out and go to Mexico.
A. Yeah.
Q. But you knew it wouldn't work.
A. I was 99.9 percent sure it wouldn't.
Q. Now, isn't it a fact, Mr. Bregar, that the only thing that

you saw Mr. Honken do in connection with this escape scheme was to fiddle with the fire door?
A. Yes.
Q. You didn't see him beating on any walls or chiseling away at any bricks, did you?
A. Up in his room he was trying to go through the wall. He had chipped and come in -- went through the cinder block wall and got to the coring of the cement and rock on the inside.
Q. Just a corner of a block?
A. Not really (demonstrating).
Q. But you've testified before that the only thing you saw him do was to fiddle with the fire door.
A. Yeah, yeah.
Q. Let me ask you about your comment about Mr. Honken packing up some belongings.

A. Yeah.
Q. You told us that he packed up some stuff and had it sent out?
A. Uh-huh.
Q. Is that right?
A. Yeah.
Q. Is that something you do when you're going to be moved or transferred or you're going to be leaving the facility?
A. That's standard procedure, yes.
Q. Okay. So if Mr. Honken was getting ready to be transferred to Cedar Rapids for a court appearance, he would send his stuff out.
A. Yeah.
Q. All right. I want to ask you a couple of questions about

Dean Donaldson; all right?
A. Yeah.
Q. Now, Mr. Donaldson you told us was the source of Mr. Honken being upset.
A. Yeah.
Q. And Mr. Honken told you that sometime during your two weeks that you were there with him that Mr. Donaldson had been bonded out?
A. Yeah.
Q. And Mr. Donaldson was supposed to take care of something for Mr. Honken?

1416

A. Yeah.
Q. It's true, isn't it, Mr. Bregar, that Mr. Honken never told you what it was that Mr. Donaldson was supposed to take care of?
A. Oh. It was steal some hogs and get some money to his lawyer.
Q. And get some money to his lawyer?
A. Yes.
Q. I got it. Okay. But that's the extent of what he told you about why Donaldson was bonded out.
A. No.
Q. That's it.
A. No.
Q. Did he tell you anything else about why Mr. Donaldson was bonded out other than to steal some hogs and get some money for his lawyer?
A. Take care of one other thing, but Dustin didn't really relate what it was.
Q. Okay. Did he tell you that his family had put up some

money to bond out Mr. Donaldson?
A. Yeah.
Q. And that he was worried about whether the collateral that had been put up for the bond might get forfeited?
A. Yes, he was.
Q. Now, you left the Woodbury County Jail about November 20, 1996.

♀

A. Yes.
Q. And from the Woodbury County Jail you went to the Plymouth County Jail in LeMars; right?
A. Yes, I did.
Q. And it was at the Plymouth County Jail in LeMars that you ran into Dean Donaldson.
A. Yeah.
Q. And while you were at the Plymouth County Jail with Dean Donaldson, you talked to Mr. Donaldson a little bit about Dustin Honken, didn't you?
A. Yeah.
Q. Mr. Bregar, you've told the jury in response to questions from Mr. Williams that sometime in 1997 law enforcement officers came to you and wanted to talk to you about Dustin Honken; right?
A. Yes.
Q. And you agreed to cooperate; am I correct?
A. I agreed to hear them out, you know, see what they had to say.
Q. I'm sorry?
A. I wanted to hear them out and hear what they had to say.
Q. Sure. And you wanted to hear them out because you wanted

to know if there was something in it for you?
A. I was already sentenced. I didn't think nothing could happen for me.

♀

1418

Q. But the law enforcement officers and the attorneys that came to see you said that they could get that sentence reduced.
A. Said they might be able to help.
Q. If you would help.
A. It might help, yes.
Q. And you entered into an agreement to testify before the grand jury, and this was based on your understanding that if you gave them information that would be helpful you might get your sentence reduced?
A. There was no guarantee.
Q. No guarantee, but it was an adventure in trust, wasn't it?
A. Yeah.
Q. And you knew from your experience in the federal system that the only way that you could get your sentence reduced from 180 months was if the prosecutors made that recommendation to the Court.
A. Yeah.
Q. And the only way that they would make that recommendation to the Court was if you gave them substantial assistance.
A. Yes.
Q. And they apparently thought you gave them substantial assistance, so they made the motion and got your sentence reduced.
A. Yeah. A conference call.
Q. I beg your pardon?

♀

1419

A. A conference call.
Q. Yeah. The prosecutor, your lawyer, the judge.
A. Yeah, yes.
Q. So your sentence was reduced from 180 months down to 126 months?
A. Yes. Which I could hardly believe it happened.
Q. Pardon me?
A. I could hardly believe it happened, getting that much time off.
Q. Okay. Mr. Bregar, let me ask you about a little bit more about your experience in jail, and you've intimated a little bit in response to questions from Mr. Williams about the way people talk in jail. When people talk in jail, especially newcomers, they try to present themselves as important, don't they?
A. Oh, yeah.
Q. And there's a lot of big talk, bragging, complaining, whining in jail.
A. Oh, yes.
Q. And people claim, as you've indicated to Mr. Williams, to have escape plans to get out.
A. Oh, yeah, every jail you go to.
Q. Okay. And people in jail talk about being upset with witnesses, being upset with prosecutors, being upset with judges.
A. Yes.

1420

Q. Even being upset sometimes with their own lawyers.
A. Yeah.
Q. And oftentimes there's talk of revenge and getting even

with people, killing witnesses. Talk like that is common, isn't it?

A. Yeah.

Q. Everybody's got a plan.

A. Yes, sir.

Q. There's lots of lying in jail, isn't there?

A. Oh, yes.

Q. And talk is cheap.

A. Yes.

MR. SPIES: Mr. Bregar, appreciate your time with me this afternoon. I have no other questions.

THE WITNESS: Thank you.

THE COURT: Mr. Williams?

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Bregar, everybody has a plan in jail. Sometimes people carry them out, don't they?

A. Oh, yeah.

Q. You said that you could hardly believe that you got the reduction you got. Do you remember testifying about that?

A. Run that by me again, would you?

Q. Yeah. When the lawyer here for Mr. Honken was talking to

1421

you, he talked to you about the fact you got a reduction in your sentence.

A. Yes.

Q. You were skeptical you were going to get that reduction, weren't you?

A. I don't know what you mean about that.

Q. Were you skeptical? Did you believe the government was

actually going to --
A. Oh, no, absolutely not.
Q. When you came to testify at the sentencing hearing for Dustin Honken in '98, did you want to testify there?
A. They brought me there, yeah. To start with, no, I didn't want nothing to do with it.
Q. And at first you refused to testify.
A. Yeah.
Q. So when you testified at that hearing, did you really believe the government would end up making a motion and get your sentence reduced?
A. No.
Q. And you testified anyway?
A. Pardon?
Q. And you testified anyway.
A. Yeah. The more I thought about it, I didn't figure I could hurt him or help him either way.
Q. Did you make up anything simply because you thought you

♀

1422

were going to get some reduction in your sentence, sir?
A. No.
Q. When you talked to Dean Donaldson back at the Plymouth County Jail, what you've told the jury here today, is that what you heard yourself and saw yourself while you were in the Woodbury County Jail, or are you just repeating something that Dean Donaldson told you?
A. No, it ain't nothing Dean told me. It was just -- Dean didn't talk a whole lot, but he was scared.
Q. What you've testified to today is what you saw and what you heard with your own eyes and your own ears.

A. Yes.
Q. And when Dustin Honken told you that the witnesses from 1993 disappeared, you testified that he made a shape of a gun with his hand.
A. Uh-huh.
Q. And he smiled.
A. They left.
Q. He laughed.
A. They left town.
Q. They left town. And then he smiled.
A. Yeah.
MR. WILLIAMS: I have nothing further.
THE COURT: Mr. Spies, anything further?

RECROSS-EXAMINATION

♀

BY MR. SPIES:
Q. Mr. Bregar, when the agents first approached you in 1997 and asked for your cooperation, you thought that over, didn't you?
A. I thought about it.
Q. And you knew that the cooperation at least as they presented it to you was the only way that you were going to get your sentence reduced.
A. I never figured I'd get my sentence reduced.
Q. Pardon me?
A. I didn't figure I would get my sentence reduced.
Q. You didn't figure, but apparently you thought it was worth the effort.
A. Yeah. The second time they talked to me, I told them that I wouldn't do it, forget it.

Q. But then you thought about it, and they said this is a way you can get your sentence reduced, and you said, well, then yeah.

A. It was explained to me that some mothers and dads wanted to know where their children was, and I told them I don't know nothing about any bodies, I've never heard nothing about any bodies.

Q. There you go. Now, Mr. Williams just asked you if in your experience some of these plans had come true that people talk about in jail. You didn't see any of Mr. Honken's plans come

1424

true, did you?

A. No.

Q. You said the escape plan was abandoned.

A. Oh, he'd have to be a lunatic to crawl out of the building 40 foot in the air.

Q. Okay. And then you were gone. You went to Plymouth County then.

A. Yes.

MR. SPIES: Thank you. No other questions.

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: No, Your Honor.

THE COURT: You're excused.

Members of the jury, why don't you take a stretch break.

And, Mr. Williams, are you ready to call your next witness?

MR. WILLIAMS: I am, Your Honor. The United States calls Daniel Frye.

DANIEL FRYE, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Would you please adjust the chair and the microphone so you can speak directly in the microphones? Yeah, can you pull that other microphone a little closer? And can you scoot that chair up just a little bit closer, please? Thank you. Would you state your full name, please, and spell your last name.

♀

THE WITNESS: Daniel Lester Frye, F-r-y-e.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Frye, I want you to tell the jury a little bit about yourself. How old are you, sir?

A. I'm 31.

Q. And where are you from originally?

A. Sioux City.

Q. How long have you lived in the Sioux City area?

A. All 31 years.

Q. All your life.

A. All my life.

Q. What do you do for a living, sir?

A. I build houses.

Q. And how long have you been in that profession?

A. About five years.

Q. How far did you go through school?

A. Eleventh grade and got my GED.

Q. When did you get your GED?

A. In 1996, '97.

Q. Now, in your past you've had some problems with the law; is

that fair to say?
A. Yes, it is.

Q. In 1996 you had a felony conviction that had to do with methamphetamine?
A. Yes, I did.
Q. What was that about?
A. I got pulled over with an amount of methamphetamine and was charged with intent to deliver methamphetamine.
Q. And you were ultimately convicted of that charge?
A. Yes, I was.
Q. Did you end up doing some time in prison for that?
A. Twenty-six months.
Q. And was that in state court or federal court?
A. State court.
Q. And when did you end up going to -- you actually went to a prison for a period of time?
A. Twenty-six months, yes, I did.
Q. Twenty-six months. And what jail was that, or what prison was that?
A. Clarinda Correctional Facility.
Q. Okay. And before -- I'm sorry, after that did you have another felony conviction in 1999?
A. Yes, I did.
Q. Was that a possession of drug charges?
A. Yes, it was.
Q. Okay. Did you end up going to prison for that one?
A. I got my parole revocated (phonetic) and went back over a

parole revocation, and the conviction went along with it.

Q. Okay. And so you were -- you had been paroled from your '96 conviction, and when you got caught again in '99, they revoked you and sent you back to prison on your prior charge.

A. Correct.

Q. Since you got out -- when did you get out on that last charge from '99?

A. July of 2000.

Q. And since that time have you been convicted of any felony offenses?

A. No, sir.

Q. Any crimes dealing with your truthfulness or anything like that?

A. No, sir.

Q. Been gainfully employed since then?

A. Yes, sir.

Q. Now, at some point you provided information to the government concerning what you knew about an escape attempt from Woodbury County Jail.

A. Yes.

Q. Why -- did you come to the government with that information looking for something?

A. No, I did not. They approached me.

Q. And where did they approach you at?

A. I was first approached at Clarinda Correctional Facility I believe.

Q. This is while you were doing time down there?

A. Yes.

Q. Okay. And did you initially agree to cooperate?
A. Yes, I did.
Q. And did you provide information to the government then at that point?
A. Yes, I did.
Q. I want to talk a little bit about that information then. When you were arrested back in -- it was 1996 on this possession with intent to deliver methamphetamine charge; is that correct?
A. Yes.
Q. What county was that out of?
A. Woodbury County.
Q. And when you were arrested on that charge, were you in jail for a period of time on that charge?
A. Yes, I was.
Q. Did you have a bond or something on you?
A. Yes, I'd gotten out once and had my bond revoked.
Q. And so you were back in.
A. Yes.
Q. Directing your attention then from October to December of 1996, were you in the Woodbury County Jail during that time period?
A. Yes, I was.

1429

Q. What cell block were you assigned to during that time period, sir?
A. I believe it was D block.
Q. And D block has a number of cells in it?
A. Yes, it does.
Q. What cell were you in during that time period?
A. Number 7 I believe.

Q. Did you meet somebody by the name of Dustin Honken while you were in D block?
A. Yes, I did.
Q. Can you explain to the jury just the circumstances? How did you come to know him?
A. They put me in D block after a day or two. You know, there's not much going on in there, so people start looking for friends or someone to talk to, and him and I met and just kind of said what we were in there for vaguely and talked a little bit off and on since then.
Q. All right. And was Dustin Honken already there by the time you arrived to the cell block?
A. Yes, he was there, yes.
Q. He was there already. How would you describe the nature of the relationship you ended up developing with Dustin Honken then over that time period? Did you guys become close, or was he just somebody in the cell block with you there?
A. More of an acquaintance.

♀

Q. You weren't friends with Dustin Honken then.
A. No, I wasn't -- I wouldn't say friends, no.
Q. Did Dustin Honken kind of hang out with other people more than you?
A. Yes.
Q. And who were some of the people that he hung out with there if you recall?
A. Dayton Sabasta, Luis Lopez, I believe. That's all I can think of right offhand.
Q. Now, at some point -- let me ask you, the cell block in -- I'm sorry, D block in the Woodbury County Jail, does that have

one or two tiers of cells to it?
A. It has two tiers.
Q. And your cell was number 7 I think you had testified to?
A. Yes, on the lower tier.
Q. And do you know where Dustin Honken's cell was at that time?
A. His was above in the corner on the top tier.
Q. Okay. And when you say in the corner, was his the last cell block on the row -- I'm sorry, the last cell on the row?
A. It's either the first or the last, yes.
Q. Okay. And what was -- if you went from the wall that was on his cell to the other side, what was on the other side of that wall?
A. C block.

Q. Okay. While you were in the jail in 1996, did you have a time when your door handle came up missing?
A. Yes, I did.
Q. Explain to the jury what you recall about that.
A. I remember being in the common room playing cards or something and needing to use the restroom, so I got up and went back to my cell and went to shut the door to use the facilities and noticed that the handle was gone.
Q. Now, did you have a cellmate with you at that time?
A. Yes, I did.
Q. Okay. And I just want to caution you, we can't have you testify about what somebody else said, but did you -- without repeating what he said, did you ask him about that door handle?
A. Yes, I did.
Q. And did you see what he was doing at the time?

A. Yeah. He just kind of smiled and was eating a candy bar that he had gotten.

Q. At about that time, did you hear anything then -- right then or sometime thereafter?

A. Short time later I heard some pounding.

Q. And did you investigate to see what that was about?

A. Yes, I did. I went upstairs to the upper tier, and in the corner cell, Dustin's cell, he was hitting the wall with the door handle. So I opened the door and asked what they were doing, and he turned around and asked me if it was loud. And I

verified that yes, it was very loud, and I shut the door and left.

Q. Was somebody else in there with him?

A. Yes, there was.

Q. Who was that?

A. Dayton Sabasta.

Q. Now, you actually saw Dustin Honken pounding on the wall.

A. Yes, I did.

Q. Did you tell law enforcement about that before?

A. No, I did not.

Q. Why not?

A. At the time I had not been to prison yet, and I was awaiting my own sentencing or parole revocation -- probation revocation hearing, so I was on my way to prison, and I didn't really want to cooperate or get in any trouble or get labelled a snitch or a rat when I'm going to do time.

Q. Why were you concerned about that, sir?

A. For my safety.

Q. So you held back on what you knew at the time when you

talked to law enforcement?
A. Yes, the first time I talked to them I did.
Q. And what did you tell them about what you saw then about this door handle?
A. I believe I told them that I just seen that it was missing off my door, heard some pounding later, and that was the end of

it because I didn't want to get involved I think is what I told them.
Q. So you knew you lied to law enforcement at that time then.
A. Yes, I did.
Q. What is the truth, sir? Did you actually see Dustin Honken pound on the wall, or didn't you?
A. The truth is I did.
Q. You're sure of that.
A. I did see him. Yes, I did.
Q. Let me -- if you look at that screen to your right, sir, do you see that Exhibit 214M which has already been admitted into evidence?
A. Yes, I do.
Q. Do you recognize what's in that photograph, sir?
A. Yeah, it's a hole in the concrete block.
Q. And what hole is that?
A. The hole they were beating in the wall with the door handle.
Q. The one that Dustin Honken was beating in?
A. Yes.
Q. The Dustin Honken that you saw trying to beat a hole in that wall, do you see him in the courtroom here today, sir?
A. Yes, I do.

Q. Can you describe for the jury where he's sitting and what he's wearing?

A. He's right there in the white shirt.
Q. He's to your left or to your right?
A. To my left.
MR. WILLIAMS: Thank you. I have no further questions, Your Honor.
THE COURT: Mr. Rogers?
CROSS-EXAMINATION
BY MR. ROGERS:
Q. How are you, sir?
A. Good.
Q. My name's Charlie Rogers. I'm one of Mr. Honken's lawyers.
Let me get this clear. You were in the Woodbury County Jail right over there for possession of methamphetamine with intent to distribute; is that correct?
A. Yes, it is.
Q. And you were arrested for that in 1996.
A. Yes.
Q. And after you were arrested, you posted bond.
A. Correct.
Q. And you were released.
A. Correct.
Q. And then your bond was revoked.
A. Yes.
Q. And why was your bond revoked?
A. I believe I was pulled over for possession again.

Q. Possession again of methamphetamine?
A. Yes.
Q. Okay. So you're arrested, charged with possession of methamphetamine, get out on bond, and you're possessing methamphetamine again.
A. Correct.
Q. Were you charged again with that possession as well?
A. Yes, I was, I believe.
Q. And were you also charged with possessing anything else during -- in that same case?
A. I don't recall.
Q. Were you charged with possessing marijuana, for example?
A. I don't recall.
Q. You have been convicted of possessing marijuana, haven't you?
A. Yes, I have.
Q. And you were -- you ended up pleading guilty to the methamphetamine charges.
A. Correct.
Q. And you admitted to the judge in state court under oath that you did, in fact, possess the methamphetamine.
A. Correct.
Q. And that you had the intent to distribute it.
A. Correct.
Q. And you admitted, therefore, being a meth dealer; right?

1436

A. Correct.
Q. And, in fact, that was true when you told the judge that, wasn't it?
A. Correct, yes.

Q. You were a meth dealer.
A. Yes.
Q. You were also a meth user.
A. Yes.
Q. A very heavy meth user.
A. Yes.
Q. And you used meth at least once a day for a long period of time.
A. Correct.
Q. And you would agree with me, would you not, that the use of methamphetamine affects your mental processes, the way your mind works, the way your memory works?
A. Yes, it does.
Q. And when you were brought back to jail after your bond was revoked in 1996, you had been using meth while out on bond; right?
A. Yes, I had.
Q. And it takes a period of time for you to be without meth for your system to detoxify, doesn't it?
A. Correct.
Q. And you've been through that more than once, haven't you?

1437

A. Yes, I have.
Q. And during the time that you were in the county jail in the same housing unit as Mr. Honken, you were going through that detoxification for part of that period, weren't you?
A. Yes, I was.
Q. Now, you were released in the 1996 case when?
A. In 1998, July 1 I believe.
Q. Weren't you released -- okay. Let me go back here. First

you were arrested in 1995; is that right?
A. '95, correct.
Q. And then you are released on probation in '95; right?
A. I'm released on probation, ten years suspended sentence, three years probation, correct.
Q. Was that in '95 or in --
A. Yes, in '95.
Q. And then you violate that probation.
A. Correct.
Q. And that's how you end up in jail in '96.
A. Correct.
Q. And at that time as a result of that violation, they put you in a treatment program; right?
A. Yes, they did.
Q. And you went through the treatment program.
A. Yes, I did.
Q. And successfully completed it like they said.

♀

1438

A. No, I did not.
Q. You did not. You violated the program?
A. I violated the program.
Q. And how'd you violate the program?
A. It was against the rules to smoke while I was in the program, and I chose to smoke.
Q. Smoke tobacco?
A. Cigarettes, yes, cigarette tobacco.
Q. And so you chose to smoke a cigarette and got kicked out of the program and made to do your ten-year sentence?
A. Correct.
Q. And it was after that that you ended up in the same cell

block as Dustin Honken, or was that before?
A. That's correct, after that.
Q. Okay. In fact, you also were charged again -- I take that back. Is that the same conviction that was another possession of methamphetamine with intent to deliver? One or two of those? How many?
A. One.
Q. Only one, okay. So that was a revocation of the probation on that same conviction.
A. Yes, sir.
Q. That happened in December of 1996.
A. Yes, sir.
Q. And where did they send you?

1439

A. Oakdale and then Clarinda Correctional Facility.
Q. All right. And Oakdale is what they call a reception center?
A. Correct.
Q. Where everybody goes when they're sentenced to the Iowa Department of Corrections?
A. Yes. It's a classification center.
Q. Right. And you're there for a short time, and you're sent to wherever you're sent.
A. Generally, yes.
Q. Some people stay there for a while?
A. Yes, they do.
Q. But you were only there for how long?
A. I was there for over a year I believe.
Q. Okay. And then they sent you to Clarinda?
A. Clarinda for the drug treatment program.

Q. And you went through that drug treatment program there at Clarinda.
A. Correct.
Q. That's the second drug treatment program that you've been placed in.
A. Correct.
Q. Were there some before the cigarette one?
A. By choice, yes.
Q. Okay. So how many?

A. Three.
Q. Three? And so you'd been through three programs. Then you had the cigarette thing, and now you're in your fifth substance abuse treatment program?
A. Yes.
Q. At Clarinda.
A. (Witness nodded head.)
Q. And you were released from Clarinda when?
A. July 1 of '98, I believe.
Q. Okay. And by May of 1999 you're back in prison, aren't you?
A. Correct.
Q. And you're back in prison for another drug offense.
A. Correct.
Q. And that once again was possession of a controlled substance; is that right?
A. Yes, it was.
Q. And was that with intent to distribute or just simple possession?
A. Just simple possession.

Q. But it also violated your parole on the original ten-year sentence.

A. Correct.

Q. And how long did you stay in prison that time?

A. I think 16 months.

♀

Q. And did you go through another drug treatment program?

A. Yes, I did.

Q. All right. And as I understand it, you have not been arrested since then; is that correct?

A. No, I have not.

Q. Now, you testified when Mr. Williams was asking you questions that you didn't say anything about Mr. Honken using this door handle to bang on the wall because you were afraid of what might happen to you in prison because you'd never been there before; right?

A. Correct.

Q. That's what you told him.

A. Correct.

Q. You went to prison, however, in the end of 1996.

A. Yes.

Q. And then you came back to this court, to this very room, in 1997, didn't you?

A. For?

Q. For Mr. Honken's sentencing hearing.

A. Yes, I did.

Q. Sat in that same chair you're sitting in now or at least a chair in the same place.

A. Correct.

Q. And you testified under oath at that proceeding too, didn't

you?

A. Yes, I did.
Q. And you were not afraid of what would happen in prison because you'd already been there for a while. I mean, you're still afraid.
A. Still afraid but . . .
Q. Yeah.
A. At that point I didn't have a choice whether I wanted to or not. I'm incarcerated. Marshals came and got me, brought me back to testify.
Q. And you came, and you testified.
A. Correct.
Q. You didn't say then that you saw Mr. Honken pounding on the wall, did you?
A. No, I did not.
Q. Okay. Now, after you testified in that sentencing hearing, they took you back to the Woodbury County Jail to wait to take you back to Oakdale; right?
A. Correct, to wait to take me back to Clarinda.
Q. You were in Clarinda by then?
A. Yes.
Q. And while you were in the Woodbury County Jail, you had a visit because your family's here in town.
A. Yes.
Q. Okay. When they took you to the visiting room, there right next to you in the visiting booth next to the one they put you

in was Dustin Honken; right?
A. I don't recall.
Q. You don't remember seeing Dustin sitting right there next to you in the visiting room?
A. No, I don't recall.
Q. You're not saying that didn't happen.
A. I'm not saying it didn't happen. I'm saying I don't remember.
Q. So you were not afraid of Dustin, or otherwise you would have noticed whether or not he was there; right?
A. That would seem appropriate.
Q. Okay. Now let's talk a little bit about this door handle. Are all the cells alike there?
A. Basically.
Q. Do they all have the same kind of door handle?
A. Yes, they do.
Q. So if Mr. Honken wanted a door handle, was there anything special about yours?
A. No.
Q. Who was your roommate, by the way?
A. It was Jim Brownlee.
Q. And he's the guy who you saw smiling eating a candy bar.
A. Correct.
Q. Did you guys -- well, first of all, do they conduct shakedowns, inspections of the cells?

1444

A. Yes.
Q. And when you're put in a cell, you have to sign a form saying everything's there; right?
A. Yes, I believe.

Q. And if the door didn't have a handle, somebody would notice that, don't you think?
A. Yes.
Q. Okay. And so did you get written up for having a missing cell door handle?
A. No.
Q. Okay. Because by the time they discovered the cell door handle was missing, you had already started telling the jail people, the guards, what you knew about the situation; right?
A. No.
Q. No?
A. Shakedowns -- cell searches are conducted in the morning. The handle was broken off late morning, early afternoon I believe, and it was turned in at lockdown that evening.
Q. Turned in by who?
A. Jim Brownlee.
Q. So your cellmate, the candy bar eater, says, Hey, guess what; my cell door broke; here's the handle?
A. Correctly.
Q. So whatever had been happening with the pounding had taken place only in that one afternoon?

1445

A. Correct.
Q. Let me shift gears a little bit. Do you know a man named Dennis Putzier?
A. Yes, I do.
Q. How long have you known him?
A. '94, since 1994.
Q. You knew him from being here in the Sioux City area?
A. Yes, I do.

Q. And knew him from being a drug user and he was a drug user?
A. Correct.
Q. You never done drugs together?
A. Yes.
Q. What kind of drugs have you done with him?
A. Cocaine or meth.
Q. When you say cocaine, you don't mean powder cocaine. You mean crack cocaine; right?
A. No. I mean powder cocaine intravenously.
Q. You and Putzier did IV powder cocaine?
A. Yes.
Q. Okay. Is that how you used your meth too?
A. Yes.
Q. You ever done meth with Putzier?
A. Yeah.
Q. And did you do that intravenously as well?
A. Yes.

1446

Q. Would you share needles, or would you each have your own?
A. We'd have our own.
Q. And you never smoked crack cocaine with him?
A. Not that I recall, no.
Q. You might have?
A. I might have. Not that I remember.
Q. You're not saying you never smoked crack cocaine.
A. No, I'm not saying that. I'm saying I don't remember smoking any with Dennis Putzier.
Q. With Dennis. Now, when you were in the Woodbury County Jail in October and November of 1996, was Dennis also in the Woodbury County Jail?

A. Yes, he was.
Q. And was he in the same housing unit you were in, same cell block?
A. I believe so, yes.
Q. He was in C with you guys?
A. I don't recall. I've been in county jail a couple of times, and Dennis was in there a couple of times while I was in there. Once he was in with me. Once he was in the next block over. I do not recall if he was in my cell block or not.
Q. And have you been at other institution with Dennis as well?
A. Yes, I have, Clarinda.
Q. At Clarinda? Were you also together at Oakdale?
A. We may have been there at the same time, but I don't recall

♀

1447

seeing him.
Q. But you were at Clarinda together both before and after you testified at Mr. Honken's sentencing hearing.
A. Correct.
Q. And you and he -- how big a place is Clarinda, by the way?
A. I think they house right around 900 inmates.
Q. So you -- and it's a -- what? A low-medium security kind of place?
A. It's medium-high.
Q. Medium-high? But inmates sort of have the run of the yard during the day?
A. No. Every -- there's three wings. In each wing there's three or four pods. Each have their own yard and certain times that they have access to that yard.
Q. So were you and Dennis Putzier in the same wing?
A. We were for about a month, and then I got moved over to

treatment side. That's where I was at when I came back here to testify last time.
Q. So before that time you had spent a month in the same wing with him.
A. Correct.
Q. Now, let's talk a little bit about the Woodbury County Jail. Woodbury County Jail is broken up into cell blocks; right?
A. Correct.

Q. Sometimes they call them pods?
A. Correct.
Q. And these consist of two tiers of cells?
A. Correct.
Q. With stairs at what? One end or both ends?
A. Both ends.
Q. And then there's also an open area kind of common space that's out in front of the cells; right?
A. Correct.
Q. They have tables there?
A. Correct.
Q. With tables and chairs that are sort of formed out of one piece of metal?
A. Yes.
Q. And they're bolted to the floor?
A. Correct.
Q. And there's a TV there?
A. Correct.
Q. And that's where people sort of hang out when they're not supposed to be in their cells.

A. Yes.

Q. And that's where you would see Dustin Honken during those couple of months that you were there when he was there.

A. Yes.

Q. He would be hanging out there in the day area.

♀

A. Yes.

Q. With everybody else.

A. Yes.

Q. He was talking with other people?

A. Correct.

Q. His cellmate was Dayton Sabasta?

A. I don't recall if he was cellmates or just happened to be in that cell block.

Q. Okay.

A. I think he was just in the cell block. I don't think --

Q. Who lived in the cell where somebody tried to bash a hole in the wall?

A. In our block? Dustin Honken did.

Q. Who lived with him?

A. I don't know. I don't recall.

Q. You don't recall who that was?

A. No.

Q. Could have been Sabasta?

A. Could have been.

Q. Anyway, Dustin talked with a lot of people there in the pod; right?

A. Correct.

Q. You never heard him tell anybody that he killed anyone, did you?

A.    Not that I recall, no.

♀

Q.    You would recall something like that, wouldn't you?
A.    Yeah.  No, I did not.
Q.    Okay.  Fair enough.  Dustin Honken would do the same kinds of things during the day that other inmates did, watch television, talk, work on his legal work, whatever; right?
A.    Correct.
Q.    And there was nothing unusual about his day as opposed to anybody else's day.
A.    No.
Q.    He didn't spend all his time standing over at the fire door talking through the key hole with anybody, did he?
A.    Not all day, no.
Q.    Okay.  And do you remember a time when you were in the Woodbury County Jail where you were in D block and your friend Dennis was in C block?
A.    Yes.
Q.    Do you recall talking to Dennis sometimes through the fire doors?
A.    Yes.
Q.    And you didn't have to elbow Dustin aside to get a chance to talk to your friend Dennis, did you?
A.    No, I didn't.
MR. ROGERS:  I have no further questions.
THE COURT:  Mr. Williams?
MR. WILLIAMS:  Thank you, Your Honor.

♀

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Frye, you remember being asked the question about when you came back for the sentencing of Dustin Honken and you were asked about a pounding on the wall, you were asked what you said at that time. Do you recall that line of questionings from the defense attorney?

A. Yes.

Q. Do you recall exactly what you said back then, sir?

A. No, exactly I don't.

Q. Would it refresh your recollection if you looked at your testimony from that sentencing hearing, sir?

A. Yes.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may, Mr. Williams.

BY MR. WILLIAMS:

Q. If you need to go back a page to get the context, go ahead, but if you would read just down to the end of this page, and let me know when you're done. Just read it to yourself.

A. Okay.

Q. Okay, sir. Do you recognize that to be your testimony from the sentencing hearing of Dustin Honken in 1997?

A. Yes, I do.

Q. And were you asked the question back then about what you saw and whether you saw Dustin Honken pounding on the wall?

A. Yes, I do.

Q. And what did you say back then during the sentencing hearing, sir?

A. I said that I observed him banging on the wall with the handle from my cell.

Q. Okay. So when you were called back to testify and you were placed under oath, you told the truth.
A. Yes, I did.
Q. Now, when you went to state prison and did your time and so forth, did you ever get any reduction in any of your sentences or any charges dropped in exchange for coming in and testifying at Dustin Honken's sentencing?
A. No, sir, I did not.
Q. Are you getting anything for testifying here today?
A. No, sir.
MR. WILLIAMS: I have nothing further, Your Honor.
THE COURT: Mr. Rogers, any recross?

RECROSS-EXAMINATION

BY MR. ROGERS:
Q. Did they write a letter to the parole board on your behalf?
A. No, they did not.
Q. Did you ask them to?
A. No, I did not.
MR. ROGERS: That's all the questions.
THE COURT: Mr. Williams, anything further?

1453

MR. WILLIAMS: No, Your Honor.
THE COURT: You may step down.
Any objection if we send the jury home at this time?
MR. WILLIAMS: No, Your Honor.
THE COURT: Okay. Members of the jury, that will conclude the evidence for today. Please remember my prior cautionary instruction about keeping an open mind until you've heard all of the evidence. We'll see you tomorrow at 8:30. Thank you.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1270 of 3636

(The jury exited the courtroom.)

THE COURT: Please be seated for a moment. We're going to take about a half-an-hour recess, but then I want to meet and talk about the status of the proposed final instructions on the merits phase, find out the status of defense witness and exhibit list and defense mitigation instruction. So we'll take a 30-minute break. You can either have Mr. Honken back here. He has a right to attend. It's just going to be an informal discussion. We're not going to resolve anything, just kind of a status update, see where we are. So obviously --

MR. PARRISH: Are we going to be in the courtroom for that?

THE COURT: Yeah, we'll be in the courtroom for it. I think I'm going to send Shelly home, because I don't anticipate we'll be making any record. It will just be an informal status discussion of where we are; okay?

1454

MR. PARRISH: Thanks.

THE COURT: Okay. Thanks. We'll be in recess.

(The foregoing trial was adjourned at 4:25 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR 1-5-05 Date

♀

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| DEAN DONALDSON | | |
| | MR. PARRISH | 1172 |
| | MR. WILLIAMS | 1225 |
| DANIEL LEDERMAN | | |
| | MR. WILLIAMS | 1227 |
| WILLIAM DEAN | | |
| | MR. WILLIAMS | 1242 |
| | MR. PARRISH | 1257 |
| | MR. WILLIAMS | 1274 |
| DENNIS PUTZIER | | |
| | MR. WILLIAMS | 1275 |
| | MR. PARRISH | 1330 |
| | MR. WILLIAMS | 1382 |
| TERRY BREGAR | | |
| | MR. WILLIAMS | 1383 |
| | MR. SPIES | 1405 |
| | MR. WILLIAMS | 1420 |
| | MR. SPIES | 1423 |
| DANIEL FRYE | | |
| | MR. WILLIAMS | 1425 |
| | MR. ROGERS | 1434 |
| | MR. WILLIAMS | 1451 |
| | MR. ROGERS | 1452 |

VOLUME 6 9-23-04 witness testimony

*****

EXHIBITS:

| | |
|---|---|
| 210A through 210E | 1236 |
| 214A through 214X | 1283 |
| 215 | 1323 |
| 84 | 1328 |

*****

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, Plaintiff, vs. DUSTIN LEE HONKEN, Defendant. /

No. CR01-3047
Sioux City, Iowa
September 24, 2004
8:34 a.m.

VOLUME 7

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

APPEARANCES:

For the Plaintiff:

C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant:

ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor. You just wanted to make a record I think this morning that with regard to Exhibits 250 through 250 -- through 294 that those are photographs and a floor plan of Florence. The defense has no objection to those being admitted into evidence.

MR. PARRISH: That's correct, Your Honor.

THE COURT: Okay. Then those exhibits are admitted into evidence.

* * * *

(Government Exhibits 250 through 294 were admitted.)

* * * *

THE COURT: Are we now ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. PARRISH: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated.

And, Mr. Williams, you're calling Mr. Tokars as your next witness?

MR. WILLIAMS: We are, Your Honor.

THE COURT: Sir, to the extent that you can, can you raise your right hand.

FREDRIC TOKARS, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Thank you. Would you please state your full name and spell your last name.

THE WITNESS: Fredric William Tokars. It's T-o-k-a-r-s.

THE COURT: Thank you. Maybe could we get the assistance of the marshal there to get those microphones a little bit closer because the acoustics aren't very good? Thank you.

Mr. Williams, any time you're ready.

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Tokars, I would ask you to just keep your voice up because these microphones only work if you're a few inches away from them.

I'd like to have you tell the jury a little bit about your personal background, sir. Where'd you grow up as a young boy?

A. I grew up in Amherst, New York, and when I was 18, I moved down south, lived in Miami, went to school at the University of Miami, and then settled in Atlanta, Georgia.

Q. And tell the jury a little bit about your educational background, please, sir.

A. I have an undergraduate degree in accounting, went to

1460

graduate school and then to law school, and I was a lawyer, practicing attorney in Atlanta, Georgia.

Q. What was the nature of your practice in Atlanta, Georgia?

A. I started out working as an assistant district attorney for Fulton County and later became a judge and then went into private practice.

Q. What type of judge were you at that time, sir?

A. Just a state court judge, not a federal court judge.

Q. And what's the difference if you can explain that to the jury, please?

A. Well, we handled state court cases, mostly misdemeanors, not really serious felony charges, those kind of things, traffic offenses, probable cause hearings and things of that nature, more like a magistrate judge rather than a full-time judge.

Q. So you became a prosecutor for a short period of time; then you became a judge; and then you went into private practice?

A. That's correct.

Q. What was the nature of your private practice?

A. I did criminal defense work. I did some corporate work, some tax work because I had also been a CPA prior to that and a little bit of everything, sort of a general practice.

Q. Now, you're currently in custody; is that correct, sir?

A. That's correct.

Q. What are you in prison for at this time?

A. Racketeering. That's the overall offense, and that

1461

included the crimes of money laundering for drug dealers and then the murder of my wife Sara.

Q. Explain to the jury a little bit about this. First of all, you were assisting people involved in narcotics trafficking and laundering drug money? Is that how -- the charges were money laundering in aid of racketeering?

A. That's correct. My wife Sara promoted night clubs, and it

was alleged that I as the attorney was assisting the night clubs, laundering their drug money through the night clubs, and so I was charged with just about everything that the overall conspiracy was involved in.

Q. And a part of that conspiracy was that your wife was murdered.

A. Yeah. I was charged with setting up that murder or asking that it be done because she was going to be a federal witness against all the members of the conspiracy.

Q. Let's talk for a moment about the nature of your charges. You were charged both by the federal government and the state government; is that accurate?

A. That's correct.

Q. And you have federal charges that were the racketeering, money laundering?

A. That's correct.

Q. What were you charged then with in state court?

A. Conspiracy for murder.

♀

1462

Q. And you were convicted in both of those courts.

A. That's correct.

Q. Did you plead guilty, or did you go to trial on those cases?

A. I went to trial.

Q. Have you ever entered a plea agreement with the federal government at all?

A. No.

Q. In those two cases, did you ever cooperate against other members of the people that you were involved with in your case?

A. No.

Q. You have been -- when were those convictions, sir?
A. 1993 and 1996.
Q. And explain to the jury, two convictions, two different dates. Was the first 1993 the federal charges?
A. Yeah, I went to trial -- I was arrested in 1993, was convicted in -- actually 1994 I was convicted of the federal charges, and then I was transferred to the state, and it took a rather long time for them to get ready for the trial, and so then I was convicted then in nineteen ninety -- I think at the end of 1996.
Q. What sentence did you receive in the federal case?
A. Life without parole.
Q. And what sentence did you receive in the state case?
A. Life, life in prison.

♀

1463

Q. Now, at some point you came to provide information to the federal government concerning Dustin Honken. Is that fair to say?
A. That's correct.
Q. Okay. Was that pursuant to any type of plea agreement with the federal government?
A. No, it wasn't.
Q. Did you come to the federal government looking for some type of deal or some type of break on your sentence?
A. No, I didn't.
Q. Has anybody promised you or indicated to you that you're going to get any reduction in your life sentence in exchange for your cooperation?
A. No.
Q. You recognize, sir, that you're going to die in prison.

A. That's correct.

Q. So why are you testifying?

A. Well, I didn't want to get involved in this situation. It was sort of pushed on me, and there came a point in time where I was just sort of playing along doing what I needed to do to survive in what I considered to be a very dangerous prison, something that I'd never been used to before in my life. And there came a point in time where I realized that I couldn't keep playing along. I contacted my attorney just to make sure that I wasn't going to get into any trouble with Dustin with what was

going on, and he told me, Well, continue to play along. If it gets worse, then I'll call the other side. I'll call the government.

And he eventually did call the government just to make sure that I wasn't going to get myself into any more trouble. I'm really sorry for the things that I've been involved with, but I still have family members and friends that support me, and I didn't want them to continue to be more ashamed of me. I mean, right now I've reconciled myself with my family. They're still supporting me and helping me and loving me, and I didn't want to do anything else, and so my lawyer Alan called up the federal government and talked to whoever, the FBI or the DEA -- I don't know who he talked to -- and told them about what was happening, and then they arranged a meeting to meet with me.

Q. Sir, you're in a wheelchair right now. Could you share with us just a little bit, what is your physical ailments at this point?

A. Well, I've got epilepsy. I've got some neurological problems, but I've had spinal surgery, and I've had just really

bad difficulties with my back, lower spine, and my neck, and so I'm confined to a wheelchair right now.

Q. Are you on any medication at this point?

A. Well, yeah. I've always taken a good bit of medication throughout my life for epilepsy and for other things, but yeah, I do take a good bit of medication.

♀

Q. I guess the point is anything about that medication do you think affects your ability to understand what's going on here today or to remember things in the past?

A. No. I mean, there are times where it makes you sleepy or something before you go to bed, but no.

Q. I want to talk to you about how this all came about. First of all, when you were convicted on your federal charges, were you sent to a federal prison?

A. Yes, I was sent to United States Penitentiary in Florence, Colorado.

Q. And when was that, sir?

A. It was in the springtime of 1997.

Q. And how long did you continue to be at the -- what we call USP, a United States Penitentiary, Florence?

A. I was there until December of 1998, and then I was transferred to a different prison.

Q. Can you describe Florence to the jury a little bit, first of all, what the physical layout is. Is USP, Florence a large prison or a small one?

A. It's about average size. I guess if you could describe -- if you could imagine like a football field with -- where all the spectators are around the outside, there are a number of buildings. About seven of them are individual units that in

each unit houses about a hundred different inmates. Then there's an education department, a food department, I mean, you

know, like a dining hall, a commissary department and some other administrative buildings, and they're all around the circumference of the prison. In the center of the prison is like a big athletic field like a soccer field if you will.

Q. What type of freedom of movement do inmates then have within the overall facility when they're there?

A. We're locked in our -- in the units like from ten oh -- 9:00 at night until 6:00 in the morning, and then we're locked in our cells usually from 12:00 at night until about the same time, 5 or 5:30, 6, depending on where you are. But normally in the daytime you can walk anywhere around -- they call it a compound. It's a prison compound I guess you could call it, and you can go anywhere. You know, you walk to the lunch hall. You walk to the dining hall. You walk to education. You would walk to any of the other buildings, the laundry department, things like that.

Q. Is there like a library you can go to and access as an inmate there?

A. Yeah, there's a legal library and a leisure library all together in the compound too.

Q. And you are still in federal prison someplace at this time?

A. That's correct.

Q. Just not in Florence.

A. That's correct.

Q. Okay. Let's talk a little bit about at some point while

you were in Florence did you reside in the BB or bravo B unit?
A. Yes, I did.
Q. Was that a special designation, that unit?
A. It was a nonsmoking unit.
Q. And when were you in the -- when did you start to reside in the BB unit then?
A. Roughly the first part of 1998.
Q. And at some point while you were in the bravo B unit, did you meet somebody by the name of Dustin Honken?
A. Yes.
Q. Could you explain to the jury, was he there when you arrived in the unit, or did he come some time after that?
A. No. He -- Dustin arrived in the late spring or maybe early summer of 1998, and I had already been in that unit. Prior to me having been in that unit, I was in the unit next to that, and that was called the BA unit. It went from BA to BB, and the BB was the nonsmoking unit. And because we didn't smoke, we went into that unit.
MR. WILLIAMS: Your Honor, permission to publish to the jury Exhibit 250A and B which has been admitted into evidence already.
THE COURT: You may.
BY MR. WILLIAMS:
Q. On the screen there in front of you, sir, do you see that diagram marked as Exhibit 250A?

1468

A. Yes, sir.
Q. And do you recognize that?
A. Yes, sir.

Q. And what is that?
A. That is the diagram of the interior of the B -- BB unit.
Q. Okay. And if you could, that is the interior of the bravo B unit? Is that what you said?
A. Yes, sir.
Q. Very good. Could you explain, first of all, when the jury's looking at these, what are those different markings on the side there?
A. Well, those are rooms. As you go along the red line, each one of those little triangles in there is an individual room that would house two different inmates.
Q. So each one of these is a separate cell then?
A. That's correct.
Q. Okay. And what's this semi circle there?
A. They call it an officer's station. It looks sort of like a horseshoe, and that's where the officer stays to monitor the whole unit, the interior of the unit.
Q. And bravo B unit, are there just one tier of cell, or are there two tiers of cells?
A. Two tiers of cells that are identical, you know, one on the first floor, and then you go up some steps, and then you would be on the second floor.

♀

1469

Q. And looking at Exhibit 250B, is that the second floor of the bravo B unit then?
A. That's correct.
MR. WILLIAMS: Permission to publish some of the photographs, Exhibits 251 through 294, Your Honor?
THE COURT: You may.
BY MR. WILLIAMS:

Q. Sir, if you'll look at what's been marked as Exhibit 254, do you see that photograph in front of you, sir?
A. Yes, sir.
Q. And what is the jury looking at there?
A. That's the interior of BB unit from the perspective of the officer's station, that station where the officer resides to watch over the unit.
Q. And you were talking about that semi circle that was on the diagram. That's what this is?
A. Yes, that's the officer's station.
Q. During the day when inmates aren't locked in their cell, do you have free access to that interior space there where the tables are located?
A. Yes, and people play cards and read books, and there are also TVs along on the top of the wall so that you can sit out there and watch TV. And then there are also two individual TV rooms, one for -- just for sports and then one for Hispanics, like Spanish TV.

1470

Q. During the time period when Dustin Honken arrived in the bravo B unit, where was your cell in the bravo B unit?
A. Well, let me -- it's a little hard to describe from this perspective, but if you were to walk into the unit and walk down the aisle to the right about five cells, that is where my cell would be. Yeah, roughly right there. Roughly -- I don't know. Are you looking at the same -- yeah, okay. See where the person's arm is there? Just maybe two or three cells down from that.
Q. So either this cell or that cell?
A. Yes, that's correct.

Q. And where was Dustin Honken's cell at at that time?
A. It's not in the picture, but if you were to continue to go down that block of cells, then you would make a sharp left, and it would be like the first or second cell after you made the turn.
Q. How soon after Dustin Honken arrived in the bravo B unit did you make contact with him?
A. Probably right away. You know, it's sort of -- whenever anyone new comes into the unit, sooner or later someone will introduce you to them or say hello, and he came up to me and introduced himself to me.
Q. Now, were you -- while you were in Florence, were you concerned about people knowing about your background?
A. Yeah. It's a -- this is probably one of the most violent

prisons in the whole country, the Florence, Colorado, unit, and I was really worried having been a prosecutor and a judge that if people found out about my background, you know, that I'd get killed. And we had plenty of murders there, plenty of stabbings, plenty of beatdowns, I mean, things that just would really nerve you to the bone, and so I was always very worried about that.
Q. So while you were in the bravo B unit, did you make it well known talking to other people what your background was?
A. No, not at all. I tried to hide the fact about my background. And, in fact, when my case was reported in the law books, I went to the law library and ripped it out just so that people wouldn't be able to read about the book -- the case itself because it had references to those things in the case.
Q. Was there publicity about your case when it was going on?

A. Yes, it was a high-publicity case.

Q. And there was some publicity even after the case was over; is that true?

A. Yes, sir.

Q. And that was a concern of yours.

A. Yeah, it was because, you know, again, the more people would see about the case on TV or whatever, the more they'd know about, you know, my case and my background.

Q. Describe for the jury if you will, sir, when you first started having contact with Dustin Honken, what was that about?

A. Well, at first he just came and introduced himself to me, and in the prison context there, he appeared to be brighter, more articulate, more, you know, clean cut than most of the people there. And he just acted like a real nice guy and came up and said hello and, you know -- and I told him hello, you know, and we talked a little, and that was it.

Q. And over time did you start to talk to him a little bit more as time went on?

A. Yeah. Then one occasion he came up to me and told me he had heard that I was an attorney and wanted to know if I'd help him on his case, and I told him that I was real busy on my case and would answer questions which I did, and then later on, you know, he came back for more information, and the intensity of those conversations increased.

Q. Did he continue to want you to work on his case?

A. Yeah. Eventually after three or four encounters, he came in the room and said, you know, I really need someone to help me on this case, and I insisted that, you know, I'm just busy on my case which I really was at the time, and I told him that I

didn't really want to get involved, that I'd answer questions. And that is when, you know, he looked at me and said, Well, you know, I heard you used to be a prosecutor and a judge. And I didn't answer him. And he said, You know, if people find out about this out here in the prison, you know, you're a dead man. You know that, don't you?

♀

And I just -- you know, it really, really scared the living daylights out of me. And, you know, he said that, Well, if you help me on the case, you know, you don't have anything to worry about. And so that's when I started helping him more thoroughly on his case.

Q. And so in the end you did start working on his case with him.

A. Yes, sir.

Q. And in the context of working on that case with him, did you learn about what his legal problems were?

A. Yes. Dustin had two cases, essentially an earlier case from 1993 which is dismissed and then a later case from 1996 which he was currently working on at the time.

Q. And how long did these conversations with Dustin Honken then last while you guys were in the bravo B unit?

A. For about four or five months from, you know, I guess June, July time frame until December when I was transferred out of there.

Q. Your transfer out of there had nothing to do with Dustin Honken, or did it?

A. No, it didn't.

Q. Okay. And so during that four- or five-month period that you guys were having conversations, do you have a rough idea of

how many conversations you had about his case?
A. Perhaps a hundred, maybe more.

Q. Did the information that he provide to you become more detailed as time went on?
A. Yes, it did.
Q. Did you solicit information from him? Did you ask him about his case?
A. No. I didn't really want to get involved in his case. There were -- I had a lot of things on -- you know, I had just been convicted in my case, and I was having a very difficult time with my family and my children, trying to keep everybody, you know, at least, you know, happy or sane. It was a very traumatic event for my family, and I was working on my case, and so I really didn't want to have to get involved to help him with his case.
Q. Did he, nevertheless, tell you about his case?
A. Yeah. We started working on it, and he would come over to my room and bring portions of transcripts, and he would talk about it. In the beginning it was mostly about the case that he was currently working on. He was at the level of appeal. He had pled guilty to the manufacture of methamphetamine, and he was appealing the sentence that he received. He thought that he had received too high of a sentence, and he wanted me to work -- to give him advice on the appeal and handle what would be the last step in that process which would be -- we call it a 2255 motion. It's essentially a habeas corpus motion.
Q. And that is asking a court to review what had happened in

the trial to determine if there is some error?

A. That's correct, and also on appeal if anything happened during the trial or during the plea bargain process or from what the appellate lawyer did, then it's sort of like your last chance to go before the judge and say these lawyers were ineffective. That's usually the claim in a habeas corpus, ineffective assistance of counsel, and you make the claim that the lawyer didn't do his job and as a result you were denied your constitutional rights.

Q. Now, in the process of these multiple conversations you're having with him, did he ever compare himself to you at all?

A. Yeah, he did. I think that was -- that was part of what Dustin saw in me, that, you know, he saw me as being a lawyer, and he is rather bright, and I think he prided himself at being able to talk to me and impress me. And also my case, it was fairly well known about the murder of Sara and, you know, claiming that she was a federal witness and that I had had her murdered, and that impressed him. And eventually, you know, it came to in his case, hey, listen, you know, I know what you did. You know, you had witnesses murdered in your case. You got caught. Well, I've done this in my case, and I didn't get caught. And I would have done it in my second case, but I got arrested for it before I had a chance to do it.

Q. I understand from what you've described so far you had a long series of conversations with Dustin Honken. And I take it

it didn't come at you in chronological order. In fact, you said he first started talking to you about the '96 case, and then he got into other matters as well; is that fair to say?

A. That's correct.

Q. What I want to do for aiding the jury in understanding this, though, is I want to concentrate on different portions of the history here and have you relate whenever it was told to you what you were told by Dustin Honken about the various acts he was involved in. Do you understand where I want to go with this?
A. Yes, sir.
Q. So let's talk, first of all, he told you about a case before that the charges were dropped I think you said.
A. Yes, sir.
Q. Do you recall what he told you about the timing, what year that was that he had charges?
A. 1993.
Q. And it's also going to be very important here that -- you had access to his legal papers; right?
A. Well, he kept them in his room, and he would bring over papers whenever we needed to look at them. But the papers that he would bring over had to do mostly with his 1996 case because that's the case that I was working on. And so I don't know what paperwork he had for his 1993 case, but -- and he may have had some, but I just -- we didn't really look at it because it

1477

wasn't important for the new case.
Q. All right. I guess what I want to make sure you do is that you testify based on what Mr. Honken told you versus anything you've read in any of his legal papers. Can you do that?
A. Yes, sir.
Q. What did Dustin Honken tell you about, first of all, what kind of charges was he facing back in 1993?
A. He was charged with drugs again, manufacture of

methamphetamine, distribution.

Q. Did he tell you who was involved with him back then?

A. His girlfriend Angela Johnson, Angie; Greg Nicholson; and Terry DeGeus. Terry DeGeus and Greg Nicholson were basically distributors. They just sold for him.

Q. Did he tell you how he got caught in 1993?

A. I don't remember exactly, but I believe Greg Nicholson -- this is the scenario. Greg Nicholson who was sort of his friend but more business partner was arrested, and then he turned Dustin in. Then Dustin was arrested. And then later on Terry who was also working with them was also arrested, and they all became witnesses against him.

Q. And this is things that Dustin Honken was telling you.

A. Yes. And Tim, Timmy, his friend, best friend, was also arrested, but he was never charged with the same overall offense. He was charged in the state court.

Q. And this is in the 1993 time frame.

♀

A. Yes, sir.

Q. So what did Dustin Honken tell you, if anything, about how that case progressed against him?

A. Well, he said with Timmy, Timmy Cutkomp, that is, he was able to work out a plea in the state court or they dismissed the case. It just went away. It wasn't that serious of a charge. In the federal case, 1993 case for Dustin, he had worked out a plea bargain and was prepared to go in and plead guilty, but then he decided that he just couldn't do it, so he decided to go out and eliminate the witnesses.

Q. Now, before that happened, did he tell you whether he had any conversations with his attorney at the time?

A. Yeah. He had gone to see his attorney and basically said, What would -- you know, what would happen if I could get a videotape of the witness, Greg Nicholson, that is? What would happen if I could get him on a videotape saying that I really wasn't involved in the manufacture of methamphetamine and that he had just lied? And his lawyer told him, Well, that might be good, but you would need someone to authenticate the videotape, and even if you had the videotape, if that witness -- if Greg came into court and said, Well, I was just coerced or forced to make the videotape, then the value of the videotape would really just go down the drain.

Q. And when you said -- you used a term authenticate the tape, what do you mean by that?

1479

A. Well, some third party to describe where the tape came from and who made the tape and, you know, why it was a credible tape as opposed to someone just manufacturing it.

Q. So this is a conversation that Dustin Honken told you he had with his attorney prior to being involved in any murders.

A. Yes, sir.

Q. What did he tell you happened?

A. Well, he realized that if he could get the videotape, that would be helpful, but then if Greg Nicholson was still a witness, then the videotape would be worthless. So he planned on killing Greg.

Q. And what happened?

A. He and Angie basically went to a house that -- well, first Greg had moved, and I don't know why he moved. I think he was getting a divorce, separating from his wife, and he left the residence, and so Dustin was looking for him, and he couldn't

find him. And finally he found a third-party friend that knew where he was living.

Q. And once he learned where he was living, did Dustin Honken tell you where he was living at at the time if he wasn't living with his wife?

A. He was living with Lori Duncan, his current girlfriend, and her two kids.

Q. So what did Dustin tell you happened after he found out where he was living at?

♀

A. Well, he and Angie drove over there and parked a car a couple blocks away from the house so that they wouldn't be noticed. He had the videotape equipment in a duffle bag, and he had a gun and rope, and they knocked on the front door of the house and just were allowed into the house.

Q. What happened once they got into the house?

A. He told them that there wouldn't be any problems. He said that he wanted the videotape. Greg agreed to make the videotape. He said no one's going to get hurt. And Angela, his girlfriend, took the woman, Miss Duncan, and the two children, into another room just to keep them quiet while Duncan stayed in the room with Greg and made the videotape.

Q. While Duncan stayed in the room with Greg?

A. No, no, excuse me. Lori Duncan went into the room with the two girls, and Angela Johnson was watching them and sort of securing them.

Q. And then who was in with Greg then?

A. Dustin.

Q. And what happened in that room then with Dustin and Greg Nicholson?

A. Dustin videotaped him, and apparently on the videotape he said that he had nothing to do with the drugs.

Q. What did Dustin Honken tell you then as he's relating this information to you happened after the videotape was made?

A. He hit him over the head with a gun, and this he had

planned out. His goal was to strangle him, but he was afraid that that would cause too much of a fight and too much of a mess, so he hit him over the head with a pistol and then strangled him, and he couldn't resist, and that's how he killed him.

Q. Once he killed Greg Nicholson -- this -- he tells you this takes place where in the house at this point then?

A. In the separate room.

Q. What happens at that point?

A. Well, after he killed Greg, he went in to where Angela Johnson was with Lori Duncan and the two girls.

Q. And when he got in that room, what happened?

A. Well, that's when the commotion started. Apparently up until that point in time, things were quiet, and what he did is he went in and hit the girl, Lori Duncan, over the head with a pistol and knocked her out, and that's when the two girls just started to really scream and cry. And that's when Angie had to start subduing them. And then Dustin proceeded to strangle Duncan after he knocked her out with the pistol. And then afterwards he proceeded to help Johnson in doing whatever she was doing to kill the girls.

Q. Did he tell you what Johnson was doing to, as you say, subdue the girls?

A. It didn't come out in the detail but just that she started

to do something and then when he was done with Lori Duncan that

he went over and helped her complete whatever she had started.

Q. Did he describe to you how the girls were killed?

A. Not in detail, but from the series of events, it sort of seemed like the same way, but I can't say for sure.

Q. Did he tell you -- you indicated he had come to the house with a rope or something and strangled these people. Did he tell you what he strangled them with?

A. At one time he described it as a rope. And then one time he described it as a cord.

Q. Now, was there -- did you see inconsistencies sometimes in what he was telling you how these events occurred?

A. Yeah, these things -- these conversations came in bits and pieces over a period of time, and sometimes I could see inconsistencies. One time he would tell me, Well, we drove over in a car and -- but I'm not going to tell you what kind of car it was. And then one time the next time he would say, Well, we drove over in Angie's car. It was, you know, like for some reason he was testing me or trying to impress me about the detail that he was giving me. And, you know, eventually that is what came out, what I'm telling you right now.

Q. Did he tell you when they went over to that house, did he know that Lori Duncan and the girls were going to be there?

A. At first he said no, but before that he said that he knew that Greg was living with Lori and that they went over there after hours and, you know, during the evening hours when it was

starting to get dark, and so he said he figured that somebody was going to be there. He never mentioned that he knew the two girls were going to be there, but at first he said, No, I didn't know anyone was going to be there, and then later he said, well, he figured that Lori would be there with him.

Q. Did he tell you why he killed Greg Nicholson?

A. Yeah, because he was going -- he was ruining his life. He said that Greg Nicholson was ruining his life, he was taking him away from his kids, and that anyone who would do that to him was going to die and that if Lori was there she was going to die and if anyone else was there, they were going to die because he was -- his life was being ruined and he was being forced away from his children and that that was a bigger crime than anything that he could possibly do.

Q. Did he give you any justification for killing the girls?

A. Just that they were there and that they could be witnesses against him. And he said that he would kill, you know, anyone that was there. That's the only way he could have done it.

Q. Once he relates to you that he killed these people, did he tell you what happened with the bodies?

A. He put them in the trunk of the car, and they took them to a construction site where he had access to a backhoe that had keys in it that he was able to dig a hole with. This was someplace that was close by, and that's where he and Angela buried the bodies.

Q. Other than Angela Johnson, did he indicate that anybody else was involved in this killing?

A. No.

Q. Now, these are things that Dustin Honken's telling you; is

that right?
A. That's correct.
Q. Okay. Did he tell you in this -- when these people were buried using this backhoe how many graves were dug?
A. He described one hole, never mentioned more than that.
Q. Give you any more detail about how they were buried at all?
A. Not really, just that he dug a hole. He thought that they weren't buried deeply enough and at some point in time he wanted to go back and move the bodies elsewhere and then have them reburied, but that's all.
Q. Now, he's telling you this information in the fall of 1998.
A. Late summer, fall of 1998.
Q. Through December. You left in December; right?
A. That's correct.
Q. You mentioned that he went to the house, he told you he went to the house with a gun. Did he tell you anything about the weapon that he had when he went to the house?
A. Just that it was a pistol.
Q. Tell you any more details about that pistol?
A. No.
Q. Did he tell you where it came from at all?

1485

A. No.
Q. Now, you indicated this thing started as you got into this conversation that he had talked to his lawyer ahead of time --
A. That's correct.
Q. -- about this tape; then he made a tape. Did he tell you what happened to that tape?
A. Well, he made the tape, and afterwards he went back to his lawyer and said, Look, I've got this videotape. I want you to

call the government and tell them that I'm not going to plead guilty and that I want a trial. And then his lawyer said to him, Well, you still have the same problem that Greg is going to come into court, and he's going to be there, and he's going to say that, you know, I made the tape only because I was coerced into it; I was forced into it. And Dustin told his lawyer that don't worry; he's not going to show up in court.

Q. What ultimately happened to that tape? Did Dustin tell you?

A. Dustin apparently -- after the attorney looked at the tape, they decided that Dustin should hold on to it, and Dustin destroyed it to make sure -- at that point in time I think his lawyer was worried. That's the way Dustin described it to me. His lawyer was worried that, well, where is the witness if he's not going to show up into court, so Dustin realized the magnitude of that and destroyed the videotape so no one would see it.

Q. Now, at some point down the road when you're talking to him in Florence, Colorado, in 1998, is Dustin Honken concerned now about that videotape and his lawyer?

A. Yes. What happened was his lawyer was subpoenaed to testify before the grand jury. Somehow the prosecutor found out about the existence of the videotape and wanted to talk to his lawyer about it. His lawyer claimed that this was attorney-client privilege, that I shouldn't have to divulge anything. And they had subpoenaed him to go before the grand jury, and he refused -- his lawyer refused to testify before the grand jury.

Q. Was Dustin Honken asking you to do any legal work or legal

research with regard to that issue?

A. He was asking me what my opinion was and to look up the law, you know, what the Supreme Court cases said about that. And I told him about what they call the crime-fraud exception. That's a doctrine that is an exception to the attorney-client privilege. In other words, if you participate in a crime -- if your lawyer finds out that you are participating in a crime after you've already started to represent him, then the lawyer can be forced to testify about those facts. And that's what Dustin was worried about.

Q. Did he express a concern about whether that might have some impact on his credibility at some point?

A. Yes. He was worried because when he pled guilty to the

1487

charge in 1996, somehow somewhere along the line they asked him about the videotape, and he had said there never was a videotape, I never made a videotape, and that's not true. And so he was worried now that his lawyer -- he had the grand jury subpoena, his lawyer, and then was ordered by a different judge to testify before the grand jury, he was worried that his lawyer was going to admit there was a tape, and then that would be inconsistent with what Dustin had said when he pled guilty. It would make -- it would show that he had lied.

Q. So this all came up in the context of asking you to do legal research on whether, in fact, the government could compel the lawyer to divulge what happened.

A. That's correct, and that's why the 1993 case became relevant. You know, in other words, that's when he started to tell me about the facts from the 1993 case.

Q. Now, when he was telling you about the 1993 case, you

indicated already he had two people he was selling drugs to, Greg Nicholson and Terry DeGeus.
A. That's correct.
Q. You've told us what he related to you about Greg Nicholson. Did he tell you anything about Terry DeGeus?
A. Terry was originally Angie's -- you know, Angela Johnson? Terry was Angie's boyfriend, and somehow he got connected with Dustin and started to sell the methamphetamine for Dustin.
Q. And as a result of that, did Dustin Honken tell you when

you were having these conversations with him whether he was concerned about Terry DeGeus being a witness against him?
A. That was -- the same thing with Greg, that, you know, Terry somehow was arrested. I'm not sure if it was through Greg Nicholson's testimony, but they arrested Terry, and Terry had testified before the grand jury, and Dustin found out about it, and so he and Angela Johnson formulated a plan to murder him.
Q. And did Dustin Honken tell you about that plan?
A. Yes, he did.
Q. What did he tell you the plan was?
A. He and Angela went to a pawn shop and purchased a pistol, and Angela called him on the telephone and basically said that she had had a falling out with Dustin, because Terry and Angie used to be boyfriend and girlfriend. And so when Dustin was involved, I guess that put -- that separated them in terms of their relationship. Well, Angie called Terry on the telephone and said, Look, I had a falling out with Dustin; you want to get back together, and, you know, let's meet. And so she planned a meeting with him.
Q. Did Dustin Honken tell you where this meeting took place?

A. Someplace out in the country, just away from town. It didn't -- no details.
Q. And during these conversations you were having with Dustin Honken -- I take it these occurred over a number of conversations when he was telling you the details of this?
♀

A. That's correct.
Q. During the conversations you were having with him, did he tell you what happened then once they met up in the country?
A. Dustin and Angela got to where -- this location where they were going to meet first, and then when Terry arrived, Terry DeGeus, that is, he got out of his car, and he could see that Dustin was there, and he was, you know, shocked. And he started to say, you know, Dustin, you know, I'm going to pay you this money. Terry owed him twenty to thirty thousand dollars. And Dustin pulled the gun out and shot him, and he was still walking. Terry was described as a big guy, sort of a biker-type guy, and he just kept walking saying, Listen, don't worry about the money; I'm going to pay you the money, and Dustin shot him again and again until he fell down.
Q. Did Dustin Honken tell you where on Terry DeGeus's body he was shooting him?
A. He didn't describe it, but Terry kept walking towards him, and he kept thinking that -- begging, you know, for his life thinking that it was the money that was involved, not the fact that he had been spotted as a witness, not the fact that, you know, he was testifying against him.
Q. Ultimately after multiple shots Terry DeGeus goes down?
A. That's correct.
Q. Did Dustin Honken tell you what happened at that point?

A. Only that he and Angie took him in the car and buried him

someplace. He described it as just being out in the country someplace where a farmer might eventually -- you know, in a shallow grave I guess where a farmer might eventually be plowing and might find it. And his goal was to rebury Terry's body at some point in time in the future.

Q. And again, he's telling you this information in 1998.

A. That's correct.

Q. Did he tell you any details about how Terry was buried or where he was buried or anything like that?

A. Not really, no, just that it was a shallow grave and it was out in the country and someplace where a farmer might find it if he was, you know, plowing the ground.

Q. I want to talk to you a little bit about this firearm. You indicated that Dustin Honken had told you that he and Angie had gone to a pawn shop someplace and purchased a weapon. What did he tell you about that weapon?

A. Just that it was a pistol and he was concerned that the gun could be traced, you know, if they found Terry's body that the bullet could be traced back to this pistol and so that he wanted to destroy it.

Q. Did he tell you whether, in fact, he did destroy it?

A. Yeah. Timmy had a farm, Timmy Cutkomp, that is, had a farm, and they went to his farm, and apparently they had welding equipment, blow torch-type equipment, and they melted the pistol down, you know, cut it up first and melted into one glob, piece

of glob, and then he ditched it in a drainage ditch, you know,

drainage ditch, dropped it into it.

Q. As Dustin Honken's telling you about the destroying of the gun, how is he describing the nature of the work he's doing there?

A. The nature of the work he's doing?

Q. Yeah. I mean, was -- did he describe whether it was well done or his efforts to destroy this gun, or did he characterize it in any way?

A. He said it wouldn't ever be traced back to Angela, you know, through the pawn shop. That's what he was worried about, that, you know, somehow they could find the pistol and trace it to the pawn shop and found out that Angela had bought the gun there.

Q. So he destroyed the handgun that was used, the pistol that was used in the killing of Terry DeGeus.

A. That's correct.

Q. Did he ever tell you whether that gun was the same gun used when they gained entry into the Duncan house?

A. He never mentioned that. It was -- it may have been, but I just -- he never mentioned it that way.

Q. When they removed the bodies out of the Duncan house of Greg Nicholson, Lori Duncan, and the two little girls, did he tell you whether they took any effort to remove any traces of evidence like they did with the gun back at the house?

1492

A. You know, when he was -- the plan was to strangle them so there wouldn't be any blood or anything. And, you know, Dustin said it was important to be extremely meticulous and only that they had cleaned the house and that if people went to look at the house they wouldn't find anything.

Q. Did Dustin Honken tell you what ultimately happened then with those charges that were pending against him in 1993?
A. He asked his lawyer to call the government and ask the government for a trial, that he didn't want to plead guilty, and eventually they dismissed the charges because they couldn't contact the witnesses, Greg or Terry.
Q. Now, you indicated when we started off your testimony here today that Dustin Honken was in the federal prison because he had pled guilty to a drug charge.
A. That's correct.
Q. What did he tell you about that drug charge he had pled guilty to?
A. It was a 1996 case, a methamphetamine case. He had a laboratory in his garage, and he was -- had some sophisticated method of making methamphetamines, that one of his partners had been arrested, and so, you know, he just elected to plead guilty because of the evidence that was against him.
Q. Did he tell you who was involved with that methamphetamine operation?
A. His friend again, Timmy Cutkomp; Angela Johnson, his

1493

girlfriend; and a guy by the name of Cobeen, Dan Cobeen.
Q. And did he tell you how he got caught in that case?
A. I don't remember but that Cobeen was a witness against him, and he was really angry, that, you know, he wanted to take care of Cobeen; he wanted to kill him. He thought if he could get him out of the way and a couple of the agents, then he would be home free, and that was his goal.
Q. Did he tell you what agents he wanted eliminated?
A. There were two of them in particular, and there were

actually more. He even mentioned the prosecutor in that case, but the two that I remember was -- one was Graham. He was an agent with the state. And the other one was by the name of Mize (phonetic), and Dustin was out on a bond. He was wearing an ankle bracelet. And he was working at the Kraft corporation. And while he was there, he met a girl who just somehow knew the Agent Graham or somehow knew somebody who dated him. And so he found out his address, and he found out Cobeen's address, and he scoped out -- he and Timmy Cutkomp, that is, drove out to these addresses and sort of scoped them out to plan out how they were going to kill them.

Q. So did Dustin Honken tell you whether he was able to ultimately carry out those plans?

A. No, he wasn't able to. The way he described it was his friend Timmy had been tape recording him, and as a result, that is when they revoked his bond.

♀

1494

Q. And so he was placed in custody.

A. That's correct.

Q. Did he tell you about any concerns he had about Tim Cutkomp or any desire to do anything to Tim Cutkomp as a result of that?

A. Yeah. He was just shocked that his, you know, best friend would do this to him, and he wanted to kill him. He just said it didn't make any difference what kind of friend he was. It didn't make any difference; he had to go. He was just going to kill him. He was just determined to do it.

Q. At some point while you are in the federal prison with Dustin Honken in the summer -- from summer of '98 to December of '98, does Dustin Honken tell you that -- anything about whether he's being investigated for the murders of these people back in

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1306 of 3636

1993?

A. He did. When the videotape issue arose up, I was working on this 1996 case, and I was working on the issues. It didn't have anything really to do with the murders. Then when this videotape issue came up and I said, Well, what's the videotape from, and he said, Well, that's from a different case from 1993, and I said, Well, why is that so important? And he said, Well, because the witnesses disappeared. And I said, Well, how did the wit -- you know, in other words, that's how it led into the 1993 case. And so it wasn't as if I started to help him on the 1993 case. That just sort of came along because of the videotape.

♀

1495

Q. Now, at some point when he's talking about these murders, you had indicated he was concerned about the bodies, wanted to go back at some point and rebury them --

A. That's correct.

Q. -- did he express any concerns to you about Angie Johnson?

A. He was worried that she was really weak, that, you know, although she had helped him with all this -- all these murders that she was weak and that if she was ever charged that she would eventually roll on him, you know, agree to help the government and then, you know, show the government where the bodies were, and so he wanted to rebury them.

Q. Now, at some point did he talk to you about future plans to harm any of these witnesses that had testified against him?

A. Yes. He was relentless. He was determined. He said, No matter how long it takes, I'm going to get out of prison. Even if I have to do my 20-, 25-year, you know, bit, I'm going to get out and kill them. And he came to me and wanted to know -- from

what he read about my case, whatever research he did, he came to believe that I had millions of dollars of money someplace stashed in offshore bank accounts, and these were some of the allegations that were made in my case. But he came to believe that I had all this money and all these contacts. And he said, Well, you know, you know people. You hired a hit man to murder your wife. Can you find somebody now to help me take care of some of these witnesses, because if I can kill Cobeen, if I can

intimidate, you know, Timmy Cutkomp who was in prison at the time, but if I can get to his parents and intimidate them, you know, you can get me back to have a new trial, and we can get one of these -- some of these witnesses taken care of, I'll get out of prison, and then I'll go kill your witnesses. I mean, it was -- you know, he was always talking about getting out of prison and killing witnesses.

Q. Did he talk at all about escaping from prison in order to carry out those plans?

A. He did. He talked about it. And, you know, it was always somehow I'm not going to do my prison time and I'm going to go out and take care of these witnesses, and that's when he asked me if I knew anyone in the outside world who could do something for him. And that's when I called my attorney because I started to get worried. You know, there was just so much talk that I was willing to put up with. Sometimes in the prison system people talk like this. They brag about things to make themselves look tough. In Dustin's case, he was doing this to impress me, that he was so sophisticated that, you know, I had killed these four witnesses before or whatever and that if I -- I was ready to do it again, but, you know, I got caught only

because my friend turned me in.

I called my lawyer, and I said, Alan, you know, I just don't want to get into any more nonsense here. I've already got enough problems with my family. I'm not going to get out of

prison, but I certainly don't want to be accused of doing anything else. And Alan told me -- he said, Listen, just play along with the guy, and if it gets worse, then call me again, and so that's what I did. And Dustin kept pressuring me, and I told him that when I was in Georgia in Atlanta that I represented a group of people that were generically referred to as the Dixie Mafia and that if I -- if he really wanted it I could find him somebody, a hit man, to take care of somebody out there. It was all just imaginary. There wasn't going to be any murder or anything. But, you know, he hit on it right away. And that's when he started to formulate these plans.

Q. And was it that concern of yours where he wanted you to suddenly participate in additional murders that caused you to call your attorney?

A. I called Alan, and when I told him about what he was doing because Alan had told me to play along with him, and Alan said, Well, this is too serious, and he thought maybe Dustin was trying to set me up and so I -- he said, I'm going to call the government. And that's when he called the government. And that's when the government, you know, decided to come and interview me.

THE COURT: Mr. Williams, could I give the jury a stretch break now?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. Thank you.

Okay. Please be seated. Thank you.

Thank you, Mr. Williams. You may continue.

MR. WILLIAMS: Thank you, Your Honor.

BY MR. WILLIAMS:

Q. Mr. Tokars, the Dustin Honken who told you while you were in prison with him that in 1993 he killed Greg Nicholson, Lori Duncan, and Lori Duncan's two little girls and Terry DeGeus, do you see him in the courtroom here today?

A. Yes.

Q. Could you describe for the jury where he's sitting and what he's wearing?

A. He's sitting right there with the tan shirt on in between the two lawyers.

Q. To your left.

A. That's correct.

MR. WILLIAMS: Thank you. I have no further questions.

THE COURT: Mr. Parrish?

MR. PARRISH: Thank you, Your Honor. May it please the Court and counsel.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Morning, Mr. Tokars.

A. Morning.

Q. How are you?

A. Okay.

Q. Now, you indicate to this jury that you were a judge; right?
A. Yes, sir.
Q. And you described this judge as a district court judge?
A. No.
Q. Down in Atlanta, Georgia?
A. State court, like a magistrate functions.
Q. Well, actually it was a part-time job working probably ten hours a week that you asked for and then after you got it you started advertising in the Atlanta phone book that you were a judge so you could get more business. That's, in fact, the judge that you had that -- was it Andrew Young, the mayor at the time, who appointed you to that position?
MR. WILLIAMS: Objection, Your Honor. Compound question.
THE COURT: Sustained. Why don't you rephrase the question.
BY MR. PARRISH:
Q. It was not a state district court judge appointment, was it?
A. It was a state court judge, and I was basically handling magistrate-type functions, yes.
Q. It was a city court judge, and you were appointed by Mayor Andrew Young; isn't that correct?

♀

1500

A. I was appointed by Andrew Young, but it was a state court judge.
Q. Well, Mayor Andrew Young was the mayor of Atlanta which is a city; isn't that correct?
A. That's correct.

Q. And it was a position that you worked at most approximately ten hours a week; isn't that correct?
A. Sometimes more, sometimes --
Q. But basically it was a ten-hour-a-week job; isn't that right?
A. That's correct.
Q. Right after you got the position, you started advertising in the Atlanta phone book that you were a judge, and you took an ad out, is that correct, in the Atlanta phone book right after that indicating you were a judge?
A. I don't remember that.
Q. You forgot that.
A. It's been a long time, sir.
Q. Okay. Now, when you had this position, you were also in a law firm; isn't that correct?
A. Either that or I was practicing by myself.
Q. Well, you had a female as your partner, is that correct, who you went to law school with; is that right?
A. I had one part of the time, yes, sir.
Q. And you took out an insurance policy on her for

♀

1501

approximately 1.7 million dollars, didn't you?
A. No --
Q. Or you tried to.
A. No, sir.
Q. You're telling us you did not try to take out an insurance policy on your law partner for about 1.7 million dollars?
A. Are you talking about a policy for the firm, or are you talking about an individual policy?
Q. Well, did you take out a policy about 1.7 million dollars?

A. Absolutely not.

Q. Did you take out a firm policy for that amount?

A. We never took out any policy.

Q. Did you try to?

A. We talked about getting firm insurance. That's all.

Q. Did your law partner later after you were charged with killing your wife indicate that she was happy that you never were able to get that policy out on her?

A. I don't know.

Q. Did she tell you that?

A. No.

Q. But you did have a policy on your wife, did you not?

A. Yes, sir.

Q. Matter of fact, it was for almost two million dollars; is that right?

A. Well, it was -- the beneficiary was a trust.

♀

1502

Q. Well, we'll get into that in a minute. But you did have a policy on your wife at the time she was killed for approximately two million dollars; isn't that right?

A. I think that was the 1.7 million that you were talking about.

Q. All right. I missed it by 300,000?

A. No, no, you were talking about a different person. You were talking about the lawyer. Now you're talking about my wife.

Q. She was a non-wage earner; is that correct?

A. Who?

Q. Your wife was a non-wage earner.

A. No, she made very good money.

Q. Oh, she did?
A. Well, off and on.
Q. Right before she was killed, she was not -- she was working somewhere? Is that your testimony?
A. No. When that happened, no, she was not working at that time.
Q. When she was killed in front of the children, she was not working.
A. That's correct.
Q. Matter of fact, the impression when Mr. Williams asked the question about your wife's death, you indicated that it was part of some conspiracy that, in fact, you were involved in that led

to her death; is that right?
A. That was the allegation. And then there was the allegation that I had hired somebody to murder her as I said.
Q. I'm sorry. I thought that was your testimony on direct examination. Did I miss something?
A. About -- excuse me?
Q. You said your wife was killed as part of a conspiracy to keep her from being a federal witness and that is what made your case similar to Mr. Honken's case. Is that what you said on direct examination?
A. I never said anything that made my case similar to his, no.
Q. I thought you indicated on direct examination that's why he approached you in the first place. Was that correct, or did I miss that?
A. I said that I was charged in a conspiracy and also that one of the allegations was that I had my wife murdered as part of that conspiracy, yes, and that she was going to be a witness,

yes.

Q. For killing witnesses in a federal investigation; isn't that what you said on direct examination?

A. Yes, sir.

Q. But this person who said he killed her, Eddie Lawrence, was actually a person you began to represent in your law practice; is that correct?

A. I did represent him in my law practice, yes.

♀

Q. And you started representing him in a case that, in fact, involved a counterfeit charge; is that right?

A. That's correct.

MR. WILLIAMS: Objection, Your Honor. This is beyond the scope of what's permissible under 609.

THE COURT: Well, we're getting pretty far afield now.

BY MR. PARRISH:

Q. And, in fact, the same person who did, in fact -- the same person who was charged with you in your case, that being Eddie Lawrence, is a person who you and Mr. Honken had a discussion about; isn't that correct?

A. That's not correct.

Q. You're telling us that you and Mr. Honken never had a discussion about taking care of Eddie Lawrence, the person who testified against you? Is that your testimony here this morning?

A. He did bring that up.

Q. No --

A. Wait, wait. Can I answer the question, please?

Q. No. My question is -- it calls for a yes-or-no answer, Mr. Tokars. Did you or did you not have a discussion about

Eddie Lawrence? It's yes or no, Mr. Tokars.
A. The answer is no, but let me -- can I explain it?
Q. No.
THE WITNESS: Judge, do I have a right to explain the

answer?
THE COURT: Well, you'll have the right on redirect.
THE WITNESS: Okay. Okay.
BY MR. PARRISH:
Q. So you're denying that you and Mr. Honken ever had a discussion about Eddie Lawrence.
A. He brought it up.
Q. Are you denying that you ever --
A. It was not a two-way conversation.
Q. All right. Then did Mr. Honken ever have a discussion with you about Eddie Lawrence?
A. Yes, he brought it up.
Q. Tell the jury who Eddie Lawrence is.
A. Eddie Lawrence is the person who claimed that I hired him to murder my wife Sara.
Q. Are you minimizing that and saying you didn't do that?
A. No, I'm just describing what you said. You asked me to tell the jury what -- and I thought I --
Q. Are you saying you didn't do that?
A. Didn't do what?
Q. You've not been convicted of hiring Eddie Lawrence to kill your wife?
A. I've been -- no, I have been convicted. I said that. I was convicted.
Q. And Eddie Lawrence was the individual who you had a

business arrangement with and who you started representing in Atlanta for a counterfeit charge; isn't that correct?

MR. WILLIAMS: Objection, Your Honor, relevance and beyond the scope of 609.

THE COURT: Overruled. You may answer.

A. What was the question again?

Q. Eddie Lawrence was the individual who you started representing in your law practice in Atlanta on a counterfeit charge; isn't that correct?

A. I represented him in my -- in his case, yes, that is correct.

Q. And he was also the person who you were in business with and you described in your response to Mr. Williams' questions --

A. I'm sorry. Repeat that now.

Q. I didn't quite finish the question. You described in Mr. Williams' questions that -- let me strike that question and start over.

A. On the business are you talking --

Q. Just hold on a second, please, Mr. Tokars. I'll be with you in a second.

A. Okay.

Q. Mr. Williams asked you the questions about the night clubs that you were involved in.

MR. WILLIAMS: Objection, Your Honor. That misstates the record. I never asked him anything about the night clubs.

1507

THE COURT: Well, he testified about his wife's involvement in the night clubs.

MR. WILLIAMS: Correct. I never asked anything about the night clubs.

THE COURT: That's true. You can rephrase your question. The objection's sustained. You can rephrase your question.

BY MR. PARRISH:

Q. You presented testimony then about night club involvement; is that okay? Did you not testify to that on direct examination?

A. About Sara? About -- who are you talking about?

Q. Did you, in fact, testify about your wife being involved in night club promotions?

A. Yes, sir.

Q. You indicated on direct examination she had, in fact, gathered information while she was doing that concerning your money laundering; isn't that correct?

A. While she was doing what?

Q. Promoting night clubs.

A. No. She was promoting night clubs, but that didn't have anything to do with gathering information.

Q. So that was a separate matter.

A. Gathering infor -- she was gathering information, but it didn't have anything to do necessarily with the night clubs. It

1508

had to do with money laundering.

Q. Are you telling me -- are you telling me you didn't incorporate numerous night clubs in the Atlanta area along with Eddie Lawrence?

A. I incorporated night clubs but not -- he didn't help me do it, no. I mean, I did this as part of the law firm, not with

Eddie Lawrence.

Q. So these night clubs that were set up had nothing to do with the ones that your wife was, in fact, promoting.

A. No, they did. Some of them did, not all of them. There were different night clubs.

Q. Well, how many were there?

A. Over a period of ten years, maybe seven or eight.

Q. And how many were you involved in?

A. What do you mean by -- you mean handling as the legal work?

Q. Any type involvement you want to talk about.

A. I handled legal work for --

Q. How many?

A. For how many clubs? About seven or eight.

Q. And how many did you personally invest in?

A. None.

THE COURT: Mr. Parrish, I think we're going to take our mid-morning recess at this time.

MR. PARRISH: Okay. That's fine.

THE COURT: Members of the jury, we're going to take a

little bit longer recess. It will be about 30, 35 minutes or so. So we'll bring you back right around 20 after 10. Thank you.

(The jury exited the courted room.)

THE COURT: Please be seated. Now, what is your theory for the breadth of your 609 examination that you're conducting with regard to the offenses Mr. Tokars was convicted for?

MR. PARRISH: First of all, Your Honor, it would be the conversations, first of all, with Mr. Honken was a lot more

extensive than what the government has gone into which I would be allowed to explore in the terms of completeness. That gets me into Eddie Lawrence, and it gets me into the arrangements that he had, gets me into issue of him attempting to kill witnesses in his case, gets me into a discussion about whether or not transfers of money were made, gets me back -- he said he was only transferred to Colorado, Florence, Colorado. I believe he was in prison before in the Atlanta area where an exchange of money took place between he and another inmate.

THE COURT: What's that exchange of money have to do with this case?

MR. PARRISH: Well, it gets into the issue of his credibility, and it gets into the issue of whether or not he is being accurate with what his testimony is about his recollection of Mr. Honken's case and whether or not he is fabricating and

♀

drawing similarities from his own case into Mr. Honken's case. I believe that's a reasonable exploration.

The other justification we believe we could argue, Your Honor, is that he asked him what type work he did. He was a CPA which I think goes to his background information. I can explore that in more detail. We believe he set up material -- and I don't want to detail him and get him prepared --

THE COURT: Right.

MR. PARRISH: -- to answer my questions, but I believe many of the areas he was involved in I have researched and am prepared to ask him questions about it. He talked about the racketeering. I believe he's minimizing his conduct not only on direct but also -- on direct examination so far with regard to involvement in his wife's death. I think he's giving the jury

the impression that he has rekindled his relationship with his children who were killed in front of their mother (sic) where a six-year-old turned off the car key and walked through a field after getting up off the blood -- out from under the blood of their mother where she was killed and kidnapped.

THE COURT: Yeah, but what theory allows you to get into all of these details? That really goes beyond what Rule 609 allows.

MR. PARRISH: Well, I think, Your Honor, under --

THE COURT: He said he pled guilty to them, to the charges.

♀

MR. PARRISH: I agree he did. And I don't dispute that.

THE COURT: Or was found guilty, excuse me.

MR. PARRISH: Yes. He pled guilty, but there were two separate proceedings. And the proceedings, one was state court obviously where he again minimized what happened. In state court it was a death penalty case. It was not just a trial where he said he served life. He neglected to mention it was a death penalty case.

THE COURT: What's the relevance of that?

MR. PARRISH: The relevance of that is that they've talked --

THE COURT: 609 doesn't allow you to get into the penalty. It just allows you to get into the fact of the prior conviction.

MR. PARRISH: True, but I believe, Your Honor, we can make a reasonable argument that when he talked about the case he mentioned it as being just an ordinary run-of-the-mill state

murder trial. It was a death penalty case, and that shows the exact nature of the case, and I believe if the state brought it -- I'm sorry, the government brought it out as a state court proceeding we can talk about what was the actual state court proceeding. It was a death penalty case after he was already serving a life sentence in federal court.

THE COURT: But what under Rule 609 allows you to

bring out the penalty?

MR. PARRISH: Just the nature of the trial. I don't think he received that as a penalty.

THE COURT: What in Rule 609 allows you to bring out anything about the nature of the trial? Rule 609 is limited to the fact of the prior conviction.

MR. PARRISH: Well, they brought up the trial, and I believe in terms of cross-examination we can ask him what was the nature of the trial and how the trial began.

THE COURT: Let me hear from the government. Mr. Williams?

MR. PARRISH: And I think 608 is another factor the Court ought to consider in analyzing how far we could get into that, Your Honor, because he's saying he's a CPA -- and I'll wait until the government finishes with their analysis. But I think the Court has to look at 608 also to make sure that they're not trying to create a character that does not exist.

THE COURT: Well, I don't think 608 applies here, but anyway, let's stick right now with Rule 609.

MR. WILLIAMS: I think this is so far beyond 609 at this point, Your Honor, that it doesn't even fall close to it. 609 allows the defense to get into the fact he has a prior

conviction, that it's a felony offense, when it occurred, and the fact of conviction. And beyond that, he's not entitled to explore the nature of the underlying crime. And the whole

purpose for 609 is to prevent exactly what's happening here, and that's a mini trial of Mr. Tokars on his case versus getting to the merits of this case, and I think it's a waste of time, and I think it's beyond the 609 -- what 609 allows.

THE COURT: I don't disagree with you, but you've been in trial with me before, and you know -- I mean, I'm fairly comfortable that I can severely limit the scope of cross-examination on the 609 issue and be well within the rule, and I haven't heard anything from Mr. Parrish that persuades me otherwise.

On the other hand, it's really your case. Are you sure you want to run the risk of me trying to place some limitations on the scope of cross-examination of Mr. Tokars?

MR. WILLIAMS: I do, Your Honor, because I just think this is so far beyond -- I mean, clearly what happened with Mr. Tokars' case is a horrible murder, and Mr. Parrish could get into all kinds of details about that solely for the purpose of trying to paint this man as a bad man versus whether he's credible or incredible. And I think it's well beyond the scope of 609. I think it is a waste of time. I think it's going to be confusing to the jury, and I would ask the Court to limit the defense under Rule 609.

MR. PARRISH: Your Honor, may I respond briefly?

THE COURT: You may.

MR. PARRISH: Thank you. Let me just try to suggest

to the Court a couple of things here. And I would say, Your Honor, in a typical drug case that the Court ought to apply those limitations where the snitches who come in or the cooperators who come in are somewhat limited in their access to people.

Here, though, we're talking about -- and I ask the Court to bear with me a second. We're talking about a murder case where there's similarities that overrun, that they are talking in a prison setting where he is a prison lawyer, that he has described a situation where people who are in prison puff up to each other in order to protect, in order not to appear vulnerable, et cetera. Both of these people could have been doing the same thing with each other to get that story out.

And then there's a unique similarity here that is different than other cases that come up because both of these cases in and of themselves are so unique. And I think to fail -- to not give us the opportunity to explore his background a little bit would limit us in exposing his credibility to the jury.

And I would agree we should not go too far into that, but I think within a prison setting that has been outlined by the government, they have really basically opened the door. And to close it for us would not give us -- the jury the full opportunity of what it looks like with this person and who this person is. And so we think the Court should allow some

1515

additional exploration.

Clearly the government doesn't want it, and you can

see why, because his facts of his case go to his credibility. Clearly he was found guilty, and no one's disputing that. But if he attempts to minimize his conduct within that position of being found guilty, to explore further allows us to get into his credibility.

I don't think it should be as limited, Your Honor, as it is in other cases, first of all, because of the enormity of the penalty in this case; second of all, because of the nature of the contact of these two individuals within the prison and the fact they are dealing within a legal context. And, you know, they do make exceptions on occasion even in penalty and evaluations of penalty. Does a lawyer get a greater penalty than someone else who is in a position of trust? Here's a person who represented himself to be a judge, and yet his conduct was so reprehensible as a judge that his own colleagues condemned his actions and conduct.

THE COURT: I understand that, Mr. Parrish, but, you know, if I give you a little bit of an opening, you're going to --

MR. PARRISH: Rip his heart out?

THE COURT: Well, I know you're waiting to do that. And I want to draw some kind of balance here. I'm willing to give you some leeway beyond what I think the text and case law

1516

under Rule 609 largely because to the extent that your client and Mr. Tokars discussed some of these items which the government alluded to to a certain extent in their direct, I think you ought to be able to explore it. But I'm not going to allow you to go back and retry Mr. Tokars and all of the facts of his case.

MR. PARRISH: I agree with you.

THE COURT: So I'm having a hard time drawing a line that would give you notice about how far you can go and how far you can't go.

MR. PARRISH: Right.

THE COURT: But I'm willing to interpret Rule 609 very broadly to give you the full cross-examination probably -- well, I'm pretty confident beyond what Rule 609 allows and beyond what your right of confrontation under the Sixth Amendment would allow. But I'm not willing to let you retry his entire case and get into all of the facts and details of his conviction because, as Mr. Williams pointed out, that's exactly why we have Rule 609.

MR. PARRISH: I agree with that, Your Honor, but I think just a little bit more liberal in this area. I don't intend to get into the full details. However, some of his exchange with Mr. Honken talks about his experiences as a lawyer, and I think also if the Court -- which can observe and how it plays out his conduct with the jury in terms of

Mr. Tokars explaining his position, I should be able to ask him, you know, what did you do for a living, you know, and matters of this nature because it does outline his background so the jury could have a full understanding of what his background is.

THE COURT: Well, you know, knowing you, I'm sure you probably have the transcript from his trial, and I don't want -- I'm not going to let you -- I'm not going to let you retry his case today.

MR. PARRISH: And I should not, and I agree with the Court on that.

THE COURT: So -- and I don't want you to disclose your cross-examination because that would be unfair, but I'm afraid maybe I'll just let you go and then when I think you've gone too far, we'll have to send the jury out and try and rein you back in. But I'm going to allow you some leeway, but I'm not going to allow you to retry all of the facts because he's admitted he pled guilty to it. To the extent you can tie it into conversations that Mr. Tokars had with Mr. Honken or that you in good faith allege that he had with Mr. Honken, I'll allow you to explore that, for example, this -- is it Eddie Richardson? That matter? I think that's permissible. But I'm not going to give you -- I'm not opening the door to go ahead and retry his entire trial.

MR. PARRISH: I agree with that because he had two trials, one in state and one in federal court. But beyond a

1518

reasonable doubt to his background, his personal background, he objected -- and I realize it was a compound question, and I straightened that out, but who he is and what he represents himself to be in terms of a judge and a lawyer, I would assume that's fair game.

MR. WILLIAMS: I think we're beyond that anyway. We've already covered that issue, and I think any additional questions about that's irrelevant.

THE COURT: Well, you're the one that brought out that he was a judge and a lawyer.

MR. WILLIAMS: I know.

MR. PARRISH: And a prosecutor. And I have not even asked those questions because we stopped at that point, and getting to a close to a recess he asked if he was a prosecutor.

I haven't even covered that area.

THE COURT: You've already covered the judge issue, and knowing you, I expect you want to go back to it.

MR. PARRISH: Not really. He admitted he was appointed by the mayor and not some state --

THE COURT: I'm going to allow you some leeway on his background because it was brought out by the government, as well it should have been. I'm not being critical. He brought it out.

MR. WILLIAMS: My only point is I think he's covered the judge stuff already, and to go back into it I think is

redundant and irrelevant at this point. That was my only point. And I didn't object him getting into the judgeship. I objected to the nature of the question is all.

MR. PARRISH: He acted like he was some high-powered state court judge, and that wasn't even the case, and that was the impression he tried to give to this jury. He thinks we're from Iowa and we don't know diddly squat, and that's insulting to me.

THE COURT: I think you made your points. I want to give you some break, so we'll probably -- why don't we just take a recess until 10:30 to give everybody a full break. And, you know, I don't have a bright line for you because it's impossible to draw the line in the sand, but I'm putting you on fair notice that at some point when the government objects I'm going to rein you in.

MR. PARRISH: I understand.

THE COURT: And I don't know how far you're going to go, so it's hard for me to know when to rein you in, but you'll

know when it happens. How's that?

MR. PARRISH: That's fair enough.

THE COURT: Okay. Thank you. We'll be in recess.

(Recess at 10:02 a.m.)

THE COURT: You ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Mr. Parrish?

♀

MR. PARRISH: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Parrish, you may continue your cross-examination.

MR. PARRISH: Thank you, Your Honor.

BY MR. PARRISH:

Q. Are you telling us, Mr. Tokars, that you were convicted of something you didn't do?

A. I was convicted -- in which one now? State or federal are you talking about?

Q. Both.

A. I'm sorry. I misunderstood the question.

Q. Are you telling us, sir, you were convicted of something you did not do?

A. I was convicted in both federal and state court.

Q. Of a crime you did not commit?

A. I was convicted.

Q. Are you telling us a crime you did not commit?

A. I didn't say that.

Q. Did you commit them?

A. The allegations that were made against me were gruesome allegations.

Q. Did you commit the crimes? Yes or no.

MR. WILLIAMS: Objection, Your Honor. I'm not sure if Mr. Tokars might have some rights. He may be appealing or

seeking judicial review of his conviction. For him to be questioned today about whether he admits the crime may jeopardize his rights. I just don't know what the situation is.

A. I'm just simply going to refuse to answer the question the way it was phrased.

Q. On what grounds?

A. Well, there were allegations against me that were gruesome allegations --

Q. On what grounds --

THE COURT: Just a second. Just a second. I hate to do this, members of the jury, but oftentimes in a trial there's a day where you get a lot of exercise, and today may be the one, so I'm going to send you out, and we'll bring you back as soon as we can. Thank you.

(The jury exited the courtroom.)

THE COURT: Okay. Please be seated.

Mr. Williams, I was waiting for an objection from you, but what about just a general relevancy objection?

MR. WILLIAMS: Well, I think it goes a number of different directions, frankly. I think he has a constitutional right perhaps not to testify, and I can't remember, but I think he may be actually litigating his prior convictions, so he has a constitutional right there. There's relevance, and it's beyond 609.

THE COURT: What's your theory, Mr. Parrish, for the

admissibility?

MR. PARRISH: The initial question asked by Mr. Williams about the general nature of his case and his explanation about the case opens the door.

THE COURT: Well, he's admitted that -- under Rule 609 you're entitled to show the prior conviction to which he's admitted. I've actually never -- it's an interesting question that you asked.

MR. PARRISH: It was -- we thought about it for some time.

THE COURT: I'm sure you did. And then it's a relatively complicated question about when the Fifth Amendment right ends. It directly implicates his Fifth Amendment privilege. The question is whether at this status of his appeals either being exhausted or post-conviction or whatever -- I don't know, and I certainly don't know the procedures under Georgia law, and we haven't made any inquiry of Mr. Tokars -- whether or not there's any remaining claim that at least arguably could support the invocation of the Fifth Amendment.

THE WITNESS: I'm on direct appeal.

THE COURT: On both your state case or your --

THE WITNESS: My federal case, but the facts are the same. I mean my state case, but the facts are the same as the federal case.

THE COURT: Well, which case is on direct appeal?

1523

THE WITNESS: My state case, motion for new trial, but we haven't had our direct appeal yet.

THE COURT: Oh, okay. And what's the status of your

federal case?

THE WITNESS: Right now there's nothing, nothing going on.

THE COURT: Was there a 2255 filed?

THE WITNESS: Yes, sir.

THE COURT: Yeah. I thought I remembered reading that, but yeah.

MR. WILLIAMS: And the other obvious problem that this raises, Your Honor -- and I think it goes to 609 and relevance -- is, you know, if you want to get into whether he committed this crime or not, we got a whole new trial going on because we're going to have to go back into why it is Mr. Tokars says he -- if he does -- I don't know what his answer's going to be, but if he says, No, I didn't commit the crime, then what evidence is there he didn't commit the crime and how strong was the evidence he did commit the crime, and all of a sudden we've got a whole new mini trial which is the whole thing that 609's designed to prevent.

THE COURT: Mr. Parrish, anything else you'd like to add?

MR. PARRISH: Yes, Your Honor. It goes to his candor as a witness.

1524

THE COURT: Well, that's what was troubling me I think, does it go to -- is it a basic kind of credibility question that you could always ask of a witness? And that's your argument.

MR. PARRISH: That is, Your Honor. Very basic.

THE COURT: And I'm going to give you the privilege of arguing that in the Court of Appeals, so I'm going to sustain

the government's objection and hold that it's not relevant, it goes beyond the scope of Rule 609, and it implicates the defendant's Fifth Amendment privilege against self incrimination, and on that grounds I'm going to sustain the government's objection and not allow you to ask the question.

MR. PARRISH: In the context, Your Honor, of the discussions with my client, am I allowed to explore it in that context, not as a direct question but did he, in fact, share information with Mr. Honken about that? And if his case is a live case, so to speak, if that's what the government is saying -- and I assume that's what he said now, his case is a live case -- that puts he and Mr. Honken -- his case is less alive than Mr. Honken because Mr. Honken has not had his trial. His is on direct appeal, so his is a live case so we have then basically two people in the institution discussing two hot cases. And then we get into the context of who's really playing who, so to speak, in the context of the prison population. Do you follow me on that?

♀

THE COURT: Well, but what's the relevance of what Mr. Tokars would say about his case to Mr. Honken?

MR. PARRISH: To entice Mr. Honken to respond to him in terms of information that he can call his lawyer who he says is Mr. Bell and replay what they're talking about and then continue the so-called setup of Mr. Honken because he thinks he's being set up, and then Mr. Honken -- he says, Well, actually I'm setting up Mr. Honken at this time. I mean, this is the game that's going on within the prison walls that I think the jury needs to understand.

THE COURT: Well, I'll allow you to explore it in that

context, but I'll not allow you to ask the direct question that implicates Mr. Tokars' Fifth Amendment rights.

MR. PARRISH: I gotcha.

THE COURT: Mr. Williams?

MR. WILLIAMS: Just so I have a clarification, I don't have a problem with the defense asking, Did you guys talk about your case, did you share your information about your case, did he share information about his case? The details, again, of Mr. Tokars' case in whatever context it comes out is irrelevant to this litigation. And so the topic, Did you talk about your case, did you talk about the merits of your case, did Mr. Honken talk about the merits of his case, fine, I don't have an objection. I think they're allowed to get into that to explore that area. But if it's going to come out, Did you tell

♀

1526

Mr. Honken that your children were spattered with their mother's blood, I mean, come on, that's irrelevant, it's prejudicial, and it's way outside of what should be --

THE COURT: Well, I'll allow Mr. Parrish to get at the motivation of why Mr. Tokars would have shared some details of his case because that's what I understand you to say you believe is relevant. But I'm not going to allow you to get into the details of his case because I don't think that's relevant. And I realize you're just --

MR. PARRISH: I really -- I haven't really started with him yet. I think there was one other issue maybe so we won't have to --

THE COURT: Yeah. If you know of something else that might be controversial, we can try and resolve it now.

MR. PARRISH: Oh, right. What I was going to resolve

is the issue of the uniqueness of his occupation puts him in a situation where obviously he might have some knowledge with dealing with informants. You know, he said he was a prosecutor -- they covered that on direct examination -- prior to the time he was a defense lawyer.

THE COURT: I think his knowledge of informants and Rule 35(b) motions and 5K motions and equivalent state court procedures is relevant.

MR. PARRISH: Okay. Thanks.

THE COURT: Okay? Ready to have the jury brought back

in?

MR. WILLIAMS: Yes, Your Honor.

MR. PARRISH: Yes, Your Honor.

THE COURT: Thank you.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Parrish, you may continue with your cross-examination of Mr. Tokars.

MR. PARRISH: Thank you, Your Honor.

BY MR. PARRISH:

Q. As I understand it, you were convicted in state court in what year?

A. 1996. 1996 I believe.

Q. You were convicted in federal court in what year?

A. 1994 I believe. Early 1994.

Q. And you had been in prison on the charges of your federal trial because your federal state -- your federal trial was first; is that correct?

A. Correct.

Q. And you had been held for how long prior to the time that your federal trial started?
A. Maybe six months, something like that.
Q. Okay. So you were actually held at a holding institution beginning when?
A. Ever since I was arrested in August -- or -- yes, August.

♀

Q. Of what year?
A. '93.
Q. Okay. So since 1993 were you ever out of an institution? What I mean by that, a jail institution or a secured facility.
A. No, I wasn't.
Q. So then you were held where first in 1993?
A. In -- I was arrested in Palm Beach, Florida.
Q. And then you were then transferred back to Georgia.
A. Correct.
Q. Then you were held in Georgia where and for how long?
A. At the Atlanta peniten -- pretrial detention center, at the Atlanta penitentiary.
Q. Right. They have a section where they keep you if you're waiting trial, and then if you've been convicted right in that same area, they have a place where if -- once you've been convicted you go to that area; is that right?
A. I was in the hospital for about four months.
Q. With your back problem?
A. Yes.
Q. Okay. And as I understand it, you were then convicted on the federal charge. Was that down in Birmingham?
A. Yes, sir.
Q. Then you -- that's Birmingham, Alabama; right?

A. Yes, sir.

Q. And then from Birmingham after your conviction you were

moved back to Atlanta.

A. And then to Cobb County.

Q. Right. Well, you moved to Atlanta just to Cobb County or to the federal institution first?

A. I was there for a couple weeks and then to Cobb County.

Q. Okay. To await the trial on your murder charge.

A. Correct.

Q. In state court, is that correct, for the killing of your wife; is that right?

A. Yes, sir.

Q. Okay. And then you were held in Cobb County for approximately how long?

A. Several years. Well, you know, until they prepared for trial.

Q. Now, as I understand it, while you were at these institutions, your case was emblazoned all over the newspapers across the south, would that be accurate, I mean, the fall of this judge, the fall of this lawyer?

A. There was publicity, yes, sir.

Q. Right. And people in Cobb County, matter of fact, where you used to visit and on occasion on traffic tickets, et cetera, send people --

A. Wait, wait. Excuse me? I'm sorry. I didn't hear that.

Q. When you were in Cobb County, the same place you had visited when you were a lawyer, you were actually sitting there

as an inmate.
A. I was in the jail, in the jail.
Q. That's what I mean. You used to visit the jail to see clients, didn't you?
A. Oh, yes. I see. But I didn't go in the jail, no.
Q. You never went to the jail to see clients when you were a lawyer?
A. Yeah, but not in the area where I was housed. You know, I was incarcerated.
Q. And what about the federal penitentiary in Atlanta when you were a criminal defense lawyer? Did you ever go out there and visit --
A. Yes, sir.
Q. -- clients?
A. Yes, sir.
Q. What about the facility down in Alabama? Did you ever go down there and visit clients?
A. Yes, sir.
Q. And that's when you were a lawyer; is that right?
A. Yes, sir.
Q. Matter of fact, the same night your wife was killed, in fact, you were visiting an inmate -- at least that's what you told folks -- you were visiting an inmate in Montgomery, Alabama; is that right?
MR. WILLIAMS: Objection, Your Honor. Relevance.

1531

THE COURT: Sustained.
BY MR. PARRISH:
Q. Well, were you practicing as a lawyer the night your wife

was killed?

MR. WILLIAMS: Objection, relevance, Your Honor.

THE COURT: Overruled. You may answer.

A. Was I practicing as a --

Q. As a lawyer --

A. Yes, sir.

Q. -- the night your wife was killed.

A. I was an attorney.

Q. Right.

A. Yes, sir.

Q. And as part of your visits to the different institutions, you've indicated you'd been to Birmingham, an institution where, in fact, you visited clients; is that right? The same institution you were housed in; is that accurate?

A. No. That's not true. I was in a different -- different one.

Q. Different one. The institution in Atlanta where you were housed, as a lawyer you had visited that.

A. Yes, sir.

Q. The institution in Montgomery where you were driving to in that three-hour drive, you had, in fact, visited that institution as a lawyer to see inmates; would you agree?

A. I'm sorry. What'd you say about a three-hour drive?

Q. Did you take a three-hour drive from Atlanta to Montgomery to visit a client back in December of 1992?

MR. WILLIAMS: Objection, relevance, Your Honor.

THE COURT: What's the relevance of it, Mr. Parrish?

MR. PARRISH: To show his relationship with the prison and whether or not as a lawyer he worked with different types of

inmates when he was an attorney.

THE COURT: Overruled. You may answer.

A. Okay. What was your question again?

Q. Did you visit an institution in Montgomery, Alabama, federal or state, to visit with a client?

A. Oh, yes.

Q. Now, Cobb County, had you also visited the institution of Cobb County both as a lawyer and again as an inmate?

A. I never visited as an inmate. I went there to represent clients, yes.

Q. Okay.

A. And then I was incarcerated there afterwards.

Q. These clients who you represented, you would agree that you represented, first of all, we'll talk about in your private practice. You represented a gamut of clients. Would that be accurate?

A. What type of clients?

Q. A gamut, several clients.

A. Yes, sir.

Q. Several types of clients; would you agree with that?

A. Yes, sir.

Q. You said on direct examination when you were confronted as you described by Mr. Honken, you said this was something that was very dangerous and you never had been used to this. Do you recall stating that on direct examination?

A. Being incarcerated in a penitentiary, yes, sir, that was very dangerous.

Q. And you said you never had been used to it.

A. Never in my entire life had I been inside a penitentiary.

You're right.

Q. I thought you were at the penitentiary in Atlanta.

A. In the visiting room. They have a much separate visiting room. You go in there, and you meet clients in separate little rooms that are locked and secured with marshals or BOP personnel standing outside, but it's much different to live inside of a penitentiary, sir.

Q. I thought you were at the federal institution in Atlanta before you got to Colorado?

A. Visiting.

Q. Not as a visitor but when you were incarcerated there after your conviction down in Birmingham?

A. Yeah, I was there for a few weeks, but mostly my real sentence started in Florence, Colorado.

Q. We're not talking about a real sentence. We're just talking about the times you've been in institutions and what you represented on direct examination about your feeling when you first got out to Colorado. It's true, is it not, that when you were in Colorado it was not the first time you had been in a federal institution; isn't that correct?

A. Well, I was in a pretrial detention center which is separate from the regular prison, so when I was transferred to Florence, Colorado, that was the first time that I was in a penitentiary where I was actually living with the whole group of convicted felons.

Q. So after your conviction in Birmingham, Alabama, on the racketeering charge where you received a life sentence without parole, are you telling us then when they transferred you back from the holding facility in Birmingham, Alabama, after a jury

down there convicted you and you were moved to the Atlanta penitentiary, they put you in the pretrial holding facility? Is that your testimony?
A. Oh, I did spend a few weeks in the penitentiary. That's correct.
Q. Well, that's what I asked a few times.
A. That's correct.
Q. So when you represented earlier to this jury that the first time you had been inside of a federal institution that was a normal prison was the one that was in Colorado, was that

1535

statement true, or was that statement false?
A. I consider it true.
Q. Okay. Why do you consider it true when you just admitted that you were, in fact, in the federal penitentiary in Atlanta?
A. It was like my first long period of stay in the penitentiary, sir.
Q. Oh, so you're drawing a distinction, and your distinction is that when you were in Atlanta in a federal penitentiary that was not a long stay, and that's why you represented on direct examination when you were in Colorado that was a long stay, so that's the distinction you're making for the jury?
A. They were for pretrial purposes, sir.
Q. Well, you had been convicted, Mr. Tokars, in Alabama, with life without parole. You were sent to Atlanta to serve life imprisonment. You went to the regular prison section, and that's where you were held. Are you telling us now that you were again in the pretrial section and not in the sentencing section?
A. Almost as soon as I got there I was transferred to Cobb

County, and there, yes, I was placed again in the pretrial area where I --

Q. How long were you at the Atlanta penitentiary, Mr. Tokars?

A. I don't remember. It was a few weeks.

Q. What's a few weeks, Mr. Tokars?

A. Month.

Q. Could it have been longer? Could it have been like three months, Mr. Tokars?

A. I don't remember to be candid with you, sir.

Q. You've forgotten that.

A. I'm sure if I needed to map it out I could figure it out somehow, but I don't have -- I haven't thought about it in a long time, sir.

Q. So, Mr. Tokars, you're at the Atlanta federal prison. You've been in the pretrial section. You've been shipped down to Birmingham. You had a trial that was flashed across what? The Atlanta Constitution, several of the other newspapers across the south. Here's this judge, this lawyer who was on the rise. Your case is in all the newspapers. You're now sitting in Atlanta at the federal institution in prison, and you're telling me as you sat in that prison nobody knew you were a judge and nobody knew you were a lawyer? Is that your testimony?

A. I never said that I was a fast-and-rising judge or whatever -- you included a lot of facts, and I just disagree with the facts that you -- that you, you know, portray. If you want to break it down and ask them individually, I'll be glad to respond to them but --

Q. So it was not big news in Atlanta when you were serving time that you had been convicted of racketeering charges and now

you're being transferred over to Cobb County to state court to face a trial of killing your wife? Are you telling us in

Atlanta, Georgia, that was not headline news all over the south?
A. Well, I know it was --
Q. Yes or no.
A. I know it was in the news. I don't know about all over the south. In Atlanta, Georgia, yes, it was.
Q. And in Atlanta, Georgia, where the Atlanta Journal is published as you know, the penitentiary is in that same area. Matter of fact, you drive by it on the way from the airport; isn't that correct?
A. The penitentiary, yes, it's in south Atlanta.
Q. Near the airport.
A. Yeah, I guess it is. I don't -- yeah, I suppose. I don't . . .
Q. So when you were in that institution that you had visited at least one section of it as a lawyer and now you were back in as an inmate, could you tell us whether or not you were treated to any extent where you had to take any steps to protect yourself?
A. When I was in -- yeah. Well, my room got fire bombed, and I was extorted by groups of people, and they fire bombed my cell, and I was locked up because of that. They threw a fire bomb or a Molotov cocktail in my cell.
Q. Do you remember on direct examination when Mr. Williams asked you that question, your response was -- and you just said it again on cross-examination -- that this was a dangerous

place, you had never been used to this? You went on to explain that in Florence, Colorado, it was the first time you had confronted this situation. Now you're telling us on cross-examination that while you were in Atlanta in the penitentiary your cell was fire bombed. You agree that's what you're telling us.

A. That's why I was only there for a few weeks.

Q. Well, you told us earlier you were transferred, sir, because you had to go to Cobb County to face a trial in state court for murdering your wife.

A. That's correct. I was transferred there.

Q. So which one were you transferred for? Because your cell was Molotov cocktailed, or were you transferred because of the trial you had to face for murdering your wife?

A. I was transferred because of the Cobb County trial. I was placed in what they call the protective housing unit after the Molotov cocktail.

Q. So you mean you were in a protected situation in Atlanta, Georgia, even before you got out to Colorado; isn't that correct?

A. That's correct.

Q. Well, why didn't you tell Mr. Williams that on direct examination?

A. He didn't ask me.

Q. Oh. So had he asked you that, you would have told him

1539

that.

A. Certainly.

Q. Why didn't you tell -- in those ten interviews that you've had with law enforcement, why didn't you once mention that you

were Molotov cocktailed in Atlanta penitentiary while you were waiting to be transferred to Cobb County? Because no one asked you?

A. That's correct.

Q. So had they asked you in those ten interviews that you had been moved to protective custody when you were all the way back in Atlanta before you were even convicted of murdering your wife, you would have, in fact, told them that.

A. Well, I had been convicted.

Q. Well, you were convicted of racketeering initially.

A. Well, yeah, okay. I had been convicted, though. I'm not sure . . .

Q. Right. And you're telling us had they asked you those questions in all of those interviews that you had -- in all of those interviews that you had -- and let me just make sure --

A. Excuse me, sir?

Q. I'm going to make sure how many interviews -- ten interviews and one grand jury testimony, you never bothered to mention that; would you agree?

MR. WILLIAMS: Objection, Your Honor, relevance of this whole line of questioning.

1540

THE COURT: We need to move on to another area. You can finish this up but . . .

MR. PARRISH: Thank you, Your Honor.

BY MR. PARRISH:

Q. You would agree you never bothered to mention that because it wasn't asked.

A. I answered questions, and they didn't ask me about that.

Q. Do you also agree that once you were moved to protective

custody there was paperwork that had to be prepared with regard to that, for putting you into protective custody?

A. I'm not sure. I'm not sure -- I didn't prepare any paperwork.

Q. Well, when you get into protective custody, there's a certain process you have to go through; isn't that correct?

A. I just was transferred into the hole. They put you in the hole. It's a very restrictive area, and it's not -- it's got terrible conditions. I don't have anything to do with their paperwork or what they do.

Q. Well, you had clients, did you not, in the past who had, in fact, been informants.

A. Yes, sir.

Q. Matter of fact, Eddie Lawrence was a person who you represented which we asked you about earlier on cross-examination. You were representing the informant in his case when you first met Eddie Lawrence, the person who you were

♀

1541

charged with killing your wife with.

A. Say -- I'm sorry. I -- who was I --

Q. You were representing the informant in Mr. Lawrence's case on the counterfeiting case, and that's how -- that goes back to what? 1989?

A. Who was the person I was representing? I don't -- I'm not following you.

Q. The informant in Mr. Lawrence's case.

A. If you could give me the name, I'd know who you were talking about.

Q. Well, so you're saying you can't recall if you did or not?

A. I'm just not sure who you're talking about.

Q. Well, let's talk about how far back you go in representing informants, people who inform against other people either as a prosecutor or as a criminal defense lawyer.
A. Well, you don't represent them as a prosecutor.
Q. Well, you work with them, don't you?
A. You work with them, but you don't represent --
Q. Kind of like Mr. Williams is working with you.
A. Correct.
Q. You sit down, and you have interviews with them; is that correct?
A. Sure, yes, sir.
Q. And you talk to them about what they're going to testify to; is that correct?

1542

A. Yes, sir.
Q. You have law enforcement come in and interview them; is that correct?
A. You can.
Q. And as a prosecutor, you did that; isn't that correct?
A. That's correct.
Q. Now, you also know during that process that you get an opportunity to make deals with them or work out matters that might benefit them if they have a pending case or if their family needs some assistance or something like that; isn't that correct?
A. Usually they ask for shorter sentence.
Q. Right. But they also may ask for money sometimes. They may ask for telephone privileges. They may ask to be placed in protective custody. These are things they ask for if they are informants; isn't that correct?

A. They could ask for them all, yes.

Q. And as a prosecutor, you knew that; isn't that right?

A. Yes, yes, sir.

Q. And you worked with people as a prosecutor in that area; would you agree?

A. Yeah, when I was working with the government, yes, sir.

Q. Now, not only did you work as a prosecutor in that area, but you also agree that your experience dates all the way back to a point in time where you taught seminars to law enforcement

♀

officials.

A. What was your question?

Q. You taught seminars to law enforcement officials.

A. Yes, sir.

Q. And how long did you do that?

A. Over a period of years.

Q. How many years?

A. I don't know. Six, seven, eight. I've never . . .

Q. You also taught tax classes; is that correct?

A. That's correct.

Q. You also tried cases in front of juries; is that correct?

A. Did I do what now?

Q. Tried cases in front of juries; is that correct?

A. Yes, sir, yes, sir.

Q. So the courtroom is not a place that's unfamiliar with you; is that right?

A. That's correct.

Q. Talking and looking at jurors in the eye and trying to explain your position is nothing new to you; would you agree?

A. Correct.

Q. Matter of fact, you did that in Atlanta, Georgia, prior to the time that you became a defense lawyer for how many years?
A. You mean when I was -- worked for the government?
Q. Prosecutor.
A. Oh, I did that -- I don't know -- about three or four

years, four years.
Q. And you also, once you went into private practice -- and we've talked briefly about your private practice. You also set up what's called businesses.
A. Corporations, yes, sir.
Q. And you also became an expert in offshore money accounts.
A. I handled some of those, yes, sir.
Q. Well, you didn't just handle them. You wrote a book that you hoped would become the Bible in setting up offshore money accounts for people who would do drug dealings in the southeastern part of the United States; isn't that correct?
A. I put together a manual on how to set up offshore corporations and trusts, but it wasn't -- it wasn't supposed to be a Bible, and it wasn't designed just for any purpose whatsoever. I actually used that manual in order to train people as well.
Q. But people accuse it of being just a money laundering scheme; is that right?
A. Well, people -- you can use corporations offshore to avoid taxes and those kinds of things, and that was the allegation in my case, that I was laundering money for drug dealers and that this manual was part of how I did it.
Q. And you set up these accounts for individuals in what? Caribbean countries or some other countries?

A. Yeah, any country, you know, outside of the United States

you could use.

Q. And people who would do that type of work, if you represented to, say, some kid from Iowa or someplace else that you had this type of business operation, do you think some of them would look to you as being a very sophisticated and very smooth type of person?

A. If I did what now?

Q. Represented that you had been able to do all of this work for several years in the Atlanta area, do you think some kid from Iowa or someone else could look at you as some type of smooth or sophisticated operator?

MR. WILLIAMS: Objection, Your Honor, asking the witness to speculate.

THE COURT: Overruled. You may answer.

A. I never represented that to Dustin Honken. I never told him anything about my case. He had done his research on his own. There was probably some media, and that's how he found out about it. He tried to talk about it. He tried to get me to talk about my case, and I didn't want to talk about it.

Q. In answer to your question, you talked about media in your case. Matter of fact, your case was so prominent, if you want to call it that, that there were several national news shows on your case; is that right?

A. There were some shows nationally, yes, sir.

Q. Which ones?

A. I don't remember. I didn't watch any of them.
Q. Did A&E do a series on you?
A. I believe so.
MR. WILLIAMS: A -- go ahead.
Q. Did NBC do a series on you?
A. I don't know about that. A&E is the one that I heard about.
Q. So you would agree, Mr. Tokars, that you were fairly well known not only in the Atlanta area, but you would agree that when you got to Florence, Colorado, in 1998 you were pretty well known; is that correct?
A. Those TV shows came after -- pretty much after that.
Q. You were concerned, were you not, after the TV shows came on that the general population would find out about you, and you were concerned about your safety not only with regard to where you were in Atlanta, but you were concerned about your safety once you got out to Florence, Colorado.
A. Yes, sir.
Q. And your concern about your safety was not limited to what some of your cohorts you had gotten together with back in Atlanta to do these crimes, but you were also concerned about what a general population might do if they found out if you were a prosecutor and a lawyer and a judge; would that be accurate?
A. I'm sorry. What did you say about cohorts in Atlanta?
Q. You were not just necessarily concerned about your cohorts

1547

in Atlanta who you had committed crimes with.
A. Oh, you mean my codefendants?
Q. Right, or cohorts, how ever you want to call it.
A. Was I concerned about them?

Q. Yes.

A. Yes, I was.

Q. So you had several concerns. You were concerned about the people you had done business with, is that right, in these offshore accounts and hiding all this drug money?

A. Well, you mean the codefendants.

Q. Right.

A. Well, they weren't necessarily people that -- they were mostly night club promoters, people involved in night clubs.

Q. Drug dealers.

A. Some of them were, yes, sir.

Q. Murderers.

A. Some of them were, yes, sir.

Q. Matter of fact, some of your business partners got bumped off, didn't they?

A. Say that again.

Q. Some of your business partners who owned night clubs with you got bumped off, didn't they?

A. Business partners? No, I never --

Q. What about Mr. Klein? Did he get killed?

MR. WILLIAMS: Objection, Your Honor. Relevance to

this whole line of questioning.

THE COURT: Sustained.

BY MR. PARRISH:

Q. So you indicate you had some concerns about some of your codefendants.

A. Yes, sir.

Q. Again, you had some concern about the publicity. And if we could put this in context, after you'd left Cobb County with the

conviction of murdering your wife in state court, you then were being sent out to Florence, Colorado, with two separate convictions; would that be accurate?

MR. WILLIAMS: Objection, Your Honor. Compound question.

THE COURT: Sustained.

BY MR. PARRISH:

Q. You were being sent out -- let me set the context again. After, in fact, you were convicted in state court of murdering your wife and after you'd had the federal conviction, you were then being sent out to Colorado, to Florence; isn't that correct?

A. That's true.

Q. That's my question.

A. Yes, sir.

Q. Now, that's the context of your going out there. Do you disagree or agree with that?

A. No. It was after my convictions, yes, sir.

Q. Okay. You never went back to Atlanta after your Cobb County conviction.

A. You mean after I went to Florence?

Q. Yes, sir.

A. No, I went to Florence and didn't go back to Atlanta.

Q. Okay. And did you remain in the Atlanta area after your murder conviction which was after your federal court conviction? Did you remain there at all? Do you understand that question?

A. Well, I went to -- when I went to Florence, I never went back.

Q. No, that's why I thought maybe you didn't understand my

question. You were convicted in Cobb County, and I believe you said it was in 1996.

A. Yes, sir.

Q. After that conviction in state court, you're now in state court custody, is that right, because you'd been transferred from federal custody to state court to go face a state court charge of killing your wife.

A. I was in the Cobb County Jail.

Q. Right.

A. Okay.

Q. And then after that were you transferred back to the Atlanta penitentiary before you went out to Florence, Colorado?

A. I don't remember. I know that it was right after that I

1550

went out to Florence. I don't remember how long it was. I can't remember -- I was -- it seemed like I was in Cobb County, I was convicted, and it seemed very shortly thereafter I was in Florence, but I don't remember the exact details.

Q. Well, that's what I -- on direct examination that's what I was confused about, and I just wanted to clarify it. You indicated to Mr. Williams -- and correct me if I'm wrong -- you were convicted in 1996. You then went out to Florence, Colorado, and you got out there before Mr. Honken came out. You indicated on direct examination that you didn't get out there until 1998. So I'm just curious --

A. No, no, no. Excuse me, sir. I'm sorry. It was '97.

Q. Okay.

A. No. Mr. Honken got there in '98.

Q. Exactly. You got out there in '97; right?

A. Yes, sir.

Q. So you'd been out there how long before Mr. Honken even came out there?
A. About a year.
Q. All right. So then before Mr. -- before you were moved to Florence and if you were convicted in '96, where did you stay from '96 to '97 before you were moved out to Florence?
A. I think my conviction was either in December or January -- it was either in December of '96 or January of '97. Shortly thereafter I stayed in -- I don't remember how long I was in the

Cobb County Jail. I don't remember the details. But soon thereafter I was transferred to Florence, Colorado.
Q. Okay. And as I understand it as you've just said, you were out there a year before Mr. Honken came out there, and you indicated -- and correct me if I'm wrong -- that you were in -- you were not in bravo B the first time or B bravo, how ever you call it?
A. BB?
Q. Yes.
A. What about it?
Q. Were you there when you first got out there in 1997?
A. No. I was in the BA next door, BA.
Q. And when you were out there, prior to the time that Mr. Honken came out in '98, did you have any discussions whatsoever about your case, or did anyone ever come up and discuss with you your case?
A. I never told anybody anything in my case.
Q. Well, I asked you for that year before you met Mr. Honken did you discuss your case with anyone, did anyone discuss your case with you?

MR. WILLIAMS: Compound question, Your Honor.

THE COURT: Sustained.

BY MR. PARRISH:

Q. Did anyone discuss your case with you, or did you discuss your case with anyone?

MR. WILLIAMS: Compound question, Your Honor. The witness has testified that he did not discuss his case with anybody. That's a separate question from whether anybody tried to discuss with his case with him.

THE COURT: It is two questions.

BY MR. PARRISH:

Q. Did anyone discuss your case with you?

A. I never discussed my case with anyone. I didn't want to talk about it. And people would try to ask me about my case sometimes.

Q. Well, no, you're getting into the answer. Let me ask that first. Now -- let me ask the question so we can get moving here. Okay. Did anyone come up and discuss the case with you, which you've again answered already? But go ahead. Why don't you go ahead and answer it now. I've asked it.

A. When is this you're talking now? With Dustin you mean.

Q. Anybody prior to Dustin.

A. Prior to Dustin?

Q. Yeah.

A. Some people might have asked me about it, but I just didn't talk about it.

Q. Well, my question is why did they ask about it if they didn't know anything about it?

A. I don't -- I will say this: I don't really know why people

would ask me, but that's a general conversation in a prison.

People ask people about com -- you know, about their cases and things, but I wouldn't talk about my case.
Q. Okay. And on an average of, say, a week, how many people would ask you about your case, Mr. Tokars?
A. I don't know. Maybe in the whole year, a couple, two or three, you know, would ask me about it. That's all.
Q. And do you have any idea how they would have known something about your case in 1997?
A. I don't know.
Q. Did you express any concerns to prison authorities about people knowing anything about your case in 1997?
A. I don't think so. I don't remember exactly, but I don't think I did.
Q. Had you expressed any concern to your lawyer who you've talked about on direct examination about your case and your concerns to your lawyer about people knowing about your case?
A. In 1997 you're talking?
Q. Yes, sir.
A. And who did my lawyer talk to?
Q. No. Did you talk to your lawyer about any concerns you had about --
A. I may have. I don't remember.
Q. Now, you described, did you not, your lawyer as Mr. Bell.
A. That's correct.
Q. He's your best friend, isn't he?

A. He is my best friend.

Q. And you described conversations you had with him, and he's the lawyer who's still doing your appeal on your state court case?
A. No. He's -- he's sick, and he can't handle the legal work himself. But I have other lawyers who are doing that.
Q. Well, when you say he can't handle your work, you at one point --
A. The legal part of it, the legal part.
Q. Well, I understand. At one point -- when did he get sick?
A. About nineteen eighty -- '87 or '88.
Q. How -- '86 or '87?
A. Something like that.
Q. And does he have -- did he have a practice going in 2000?
A. No.
Q. Well, you were on the phone with his secretary in the year 2000 asking him about you'd just gotten back from Iowa and you wanted to know when that issue is going to kick in for you to get helped, and you got disciplined for that, didn't you?
A. I'm sorry. Oh, it was his wife maybe.
Q. Oh, so you know him -- he's your lawyer who you told the people on direct examination you were calling to tell him about Mr. Honken, and this was the same lawyer who's been sick since 19 -- in the 1980s?
A. No, no, he's sick, and he doesn't practice anymore.

1555

Q. Oh. But he was the lawyer that you told us on direct examination who you were calling to tell them about Mr. Honken so he could call law enforcement. Am I right?
A. That is correct.
Q. This is the same lawyer who doesn't practice?

A. Well, he doesn't have like a law practice. He's somewhat retired. He's on disability. And he's got, you know, money that he's earned before. He's in his, you know, 50s.
Q. Are you representing to us he has a license to practice law?
A. In Florida, yes, sir.
Q. Oh, in Florida.
A. Yes, sir. He was my -- we went to school together at the University of Miami.
Q. And I'm trying to make this clear. Did he -- was he practicing at the time when you called him and told us on direct examination that you called him to have him intervene on your behalf with the federal government? Was he practicing at that time?
A. I didn't really ask him to intervene on my behalf. I asked him for what we should do. He is a smart person. He's a lawyer. And he's a person that I would consult with. He knows a little bit about all the areas of the law, but he doesn't, like, have a firm where he takes clients or anything. And like I say, he is my best friend.

1556

Q. Okay. But you didn't tell us on direct examination that the person you called to have him intervene on behalf of yourself when you had information on Mr. Honken was your best friend, did you?
A. Did I --
Q. Did you tell Mr. Williams that on direct examination that the person who you called to have intervene on behalf of you with the federal government was your best friend?
A. I've told him that in the past, but, you know, he knows it,

yes, sir.
Q. And you called him -- you said, My lawyer; is that right? Is that how you referred to it when you were asked that question on direct examination?
A. Alan Bell is who you're talking about.
Q. Yes, sir.
A. Yes, he's my lawyer, yes, sir, or he's actually one of them, but he is the one that we were talking about, yes, sir.
Q. And when you, in fact, called him, are you able to recall the time? And I know you may not know the exact date, but are you able to put a time in perspective?
A. Which time is this now?
Q. The first time you called him.
A. No, I don't remember --
Q. About Mr. Honken.
A. I don't remember.

♀

1557

Q. Do you recall the year by any chance?
A. 1999, 1998 into 1999 I believe, first part of '99.
Q. So you think it might have been the first part of '99?
A. Either that or the very end of 1998, but I can't really remember.
Q. Okay. It's tough to remember that? You didn't make any notes or anything, did you, about this information?
A. About what now?
Q. About this information that you had that Mr. Honken was providing to you, you didn't make any notes about that.
A. About the telephone call?
Q. Yes, and the information that you had that you wanted him to intervene with the government with.

A. No, I don't remember anything like that.
Q. Okay.
A. I didn't -- but I didn't ask him to intervene like that. I asked him for, you know, what his opinion is, what we should do.
Q. You never asked him to call the federal government and let them know if you could be of some value to them?
A. No. He suggested that I call them just to make sure that I don't get into any trouble, and that is how the thing started.
Q. So did you call, or did he call on your behalf?
A. No. He called. I've never called anybody.
Q. When was the first time you were contacted?
A. I guess it was like maybe March, April, March of 1999, '99.

1558

Q. And by that time you would have known Mr. Honken for how long?
A. Well, I was already in a different prison, so I knew him while we were at Florence.
Q. How long had you known him?
A. About nine, ten months, something like that.
Q. And in those nine to ten months, I believe you testified you spoke with him about a hundred times.
A. Something like that, yeah.
Q. In the prisons there are people who are known as prison lawyers or people who could do work for people within the prison institution; is that correct?
A. There are people who do legal work, yes, sir.
Q. Were you considered to be one of those people?
A. I did legal work for some people, yes, sir.
Q. Approximately how many people did you do legal work for in -- when you were in Atlanta, if any? And we're just talking

about while you were incarcerated.

A. None.

Q. All right. Once you got to Colorado beginning in '97, late '97, beginning in '98 prior to the time Mr. Honken arrived, how many different people did you do legal work for?

A. Maybe a couple.

Q. Would you agree that all the people you did legal work for were people who had, in fact, been convicted much like yourself

♀

with regard to the particular crimes?

A. Yes, sir.

Q. Other than Mr. Honken, did you know of any other individual within Florence who had any trials or an investigation regarding a trial pending other than Mr. Honken?

A. I usually just gave people advice. I don't -- I'm not sure what your question was, but I never -- repeat your question one more time again now.

Q. Okay. Other than Mr. Honken, did you know of any other individuals who were incarcerated with you who had an active case pending, not an appeal but an active case pending?

A. There probably were, but I just don't remember.

Q. Do you know of any or anyone you could name other than Mr. Honken?

A. I can't -- if you have somebody's name and you could refresh my memory, I could -- but I just can't -- I don't know.

Q. But you would agree other than Mr. Honken's case you can't think of any others.

A. No. Well, if you would give me the name, I might -- I don't, you know . . .

Q. I understand. But just offhand as you sit here today you

can't.

A. No, sir. No, sir. No, sir.

Q. All right. So now let's set this context again, and I'll try not to ask a compound question in setting the context. So

we're sitting here now with Mr. Honken's case. He's the only case that you know of that may be actively pending in terms of an investigation. Would you agree with your experience as a prosecutor and as a defense lawyer that to some people within the prison setting his case may have extra value to them? Do you understand my question?

A. Extra value to who?

Q. To the other inmates.

A. I'm sorry. I --

Q. You don't understand that question?

A. No. I'm sorry.

Q. All right. Let's break it down then.

A. With my background you said?

Q. I'm not at the moment worried about your back problem. But let me see if I can break it down a little bit where we can be on the same page here. Within a prison institution, most people who come in have convictions, and they may be fighting an appeal; is that right?

A. Correct, sir.

Q. You have explained to this jury what a 2255 means.

A. Correct, sir.

Q. And how that works. That means a person's been tried or they've been convicted or they pled guilty and then they're on appeal and they're trying to get a new trial for some reason; is that right?

A. That's correct, sir.

Q. Now, Mr. Honken's case was a little bit different. He had a case where the government was investigating whether or not he may have committed an act back in 1993; would you agree?

A. Yeah, but that's not what I was working on.

Q. I understand that, and we're not concerned yet what we're working on. We're just trying to set the context right now. Do you follow me?

A. Yes, sir.

Q. So just follow along with me a minute.

A. Okay.

Q. So Mr. Honken is now this kid from Iowa who's out in this institution that you described as one of the most dangerous institutions in the country. He has a methamphetamine conviction that he's pled guilty to in this courtroom. So now Mr. Honken is out there. He's being investigated on a murder charge that they think back here in Iowa he's committed some murders. Does his case as it stands as an active investigative case have any value to other inmates? Yes or no.

A. In what way are you meaning?

Q. We'll talk about that. Does it have any value, first of all?

A. I don't know -- if you could tell me what you mean by what value.

Q. All right. What if an inmate wants to testify against him

and they'll get a 3553 motion filed for them on behalf -- by the

government?
A.    To get their sentence reduced?
Q.    Absolutely.
A.    Okay.  Then that's what you mean.
Q.    Yes, that's just one thing.  We're going to go through some more.
A.    Could that be a value to the inmate?
Q.    Yes.
A.    Yes, sir.
Q.    Tell the jury how Mr. Honken's case under those circumstances would be of value to an inmate.
A.    Well, if they cooperated against him, then they could get a reduction in their sentence.  You know, their sentence could be reduced from ten years to five years or something to that effect.  But all of that would have to be agreed to with the government, and it would have to be in writing, and that's what would happen.  Then the prosecutor would have to go to the judge and make a motion to that effect.
Q.    Okay.  What if they have 2255 motions or motions for new trial pending or a deal -- and I'm talking about other inmates -- or a deal where if they have valuable information related to any case, just give the prosecutor a call and they'll be able to talk to them and see if their information has value? Can other inmates do that?

1563

A.    They could, yes.
Q.    Do they do that?
A.    Yes, sir.
Q.    What -- and you described a condition also of when you walk into a prison that people kind of lay lines down within this

dangerous institution. Why do people do that when they get in there?
A. They do what now?
Q. Lay lines down so people won't bother them like you went to the step of going to the library and ripping your case out of the library book. Why did you do something like that?
A. Because I didn't want to get killed.
Q. So you did that to protect yourself, didn't you?
A. Yes, sir.
Q. And you believed you would have gotten killed because -- not because of the crime you had committed but because people thought you were a prosecutor.
A. Yes, sir.
Q. Is that right?
A. Yes, sir.
Q. And you tried and you wanted to keep that a secret.
A. Yes, sir.
Q. Did you keep it a secret from Mr. Honken?
A. He knew about it. He came and approached me.
Q. He knew you were a prosecutor.

1564

A. Yes, sir.
Q. He knew you had been a state court judge.
A. Yeah, he knew my background.
Q. And he had -- he'd known about your cases from what he read.
A. He knew something about them, yes, sir.
Q. And how did he know this?
A. I'm not sure.
Q. Well, you testified on direct examination that he

researched you; is that right?

A. That's what he told me.

Q. And how does he research you in a prison setting?

A. I don't know what he did, sir.

Q. Do you know the ways people research people in a prison setting which is, I assume, described to some extent by why you went to the library and ripped your case out? Can you in that context show us how individuals in a prison setting would, in fact --

A. That could be one way, sir, to go read somebody's case.

Q. Now, did you at all subscribe to what's called the Federal Supplements at the time you were in prison at any point in time?

A. Yes, sir.

Q. Tell the jury what the Federal Supplements are.

A. They're books that come out every week that have cases in them from all over the country, district court cases, Court of

Appeals cases, Supreme Court cases, you know, all federal criminal cases.

Q. It might have been just limited to district court; right? Would that be more accurate?

A. Well, yeah, then they had the federal other ones, the Federal Thirds or whatever.

Q. So a case related to Mr. Honken if the court wrote an opinion in that might be in there; is that correct?

A. That's correct.

Q. Did you read about it in the Federal Supplement that you had?

A. No, it wasn't in there. I mean, at least I didn't see it. No one brought it to my attention.

Q. You're not saying it was not in there.

A. Well, if it was, I don't know.

Q. Well, you just said it was not in there.

A. I've never seen it. And when I was in there at the prison system, it was after he had been convicted, you know, and so I don't -- he pled guilty. They don't report all those cases in there, and in his case I don't see why they would have reported a guilty plea. Usually the cases that are in these binders that come out are like really -- like my case was in it because it was such a terrible case. But he pled guilty to simple manufacture of methamphetamine, and I guess, you know, it just wasn't that big of a case. I don't know.

♀

Q. Well, you knew from reading his paperwork as you've already described on direct examination that he had other issues that were, in fact, pending, and you knew that from sharing his legal work and his request according to you that you help him out.

A. I was working on his 1996 case which basically involved issues of possession and manufacture of methamphetamine. And that was what we talked about. The only time the other issue came up on the earlier case was when the videotape came out. And to my knowledge, none of that was ever put in those law books. You know, I don't -- I've never seen any of it, and no one's shown it to me.

Q. Would you agree that during some of the interviews that were asked of you the investigators became so concerned with what you were saying that they had you at one point separate what Mr. Honken had told you from what you recall from reading his legal papers and you -- isn't that correct?

A. No.

Q. Are you telling us at no point in time did you go through an interview with law enforcement and they had you underline what you remember --
A. No, that is correct.
Q. All right.
A. What they did is I had given them a statement, and they said they wanted me to go through and underline everything that he had said to me because many times I said things like in my

♀

opinion or at least I believe, and those would have been things that he didn't tell me. But it never -- they were never concerned about me reading material or anything. They asked me what I read, and I told them, but that was never the concern that you just, you know, implied it was.
Q. So is your testimony that the investigators were not concerned that maybe you were confusing his legal papers -- what you'd read on his legal papers with what he had told you and they wanted you to underline so they could be able to distinguish one from the other?
A. They wanted me to underline what he told me, and that's what I did.
Q. And then you told them, did you not, in the interview that was conducted on 10-18, 1999, that what Mr. Honken told you was very inconsistent?
A. Say that again.
Q. Do you remember telling them that in the interview on 10-18 of '99 that what Mr. Honken was telling you was inconsistent?
A. That he told me or --
Q. Yes, what he was telling you was inconsistent.
A. He made very many inconsistent statements over a period of

time, yes, sir.
Q. About the facts of the 1993 incident.
A. Well, about all of the facts.
Q. Right.

A. I mean, some of them were, you know, the 1996.
Q. Right. And part of them about 1996 that were inconsistent.
A. (Witness nodded head.)
Q. And the investigators to some extent had some concern about whether or not the legal work that you were doing may have been getting confused with what he was telling you and that might have led to the inconsistencies.
A. No.
MR. WILLIAMS: Objection, Your Honor. Asked and answered already.
THE COURT: Overruled.
A. They never -- they never expressed that concern to me, no.
Q. Then if they were not concerned about the inconsistencies based upon your legal work getting confused with what he told you, do you have your own idea as to what they were concerned about with regard to the inconsistencies in his statements?
A. They never expressed any concern about inconsistencies in his statements.
Q. Did you recall an interview that took place on October 18 of 1999 that took place -- I believe it was in Sheridan, Oregon?
A. I was interviewed there. I don't know what date it was, but that sounds about right, yes, sir.
Q. At that point you talked about you had written a letter to Mr. Honken, but Mr. Honken did not respond to your letter you had written him?

A. Yes. That was at the request of the federal government, the agent.
Q. Matter of fact, the letter was supposed to be sent through your lawyer, Mr. Bell, and then from Mr. Bell it was supposed to be sent to make sure that Dustin would think the letter would be okay to receive and respond to?
A. Well, when I left the penitentiary at Florence, Dustin and I figured if we needed to communicate concerning his case we would send letters either to and from each other through his girlfriend Angela or through my attorney Alan.
Q. And when you sent this letter, you would agree that Mr. Honken never responded to the letter.
A. That's correct.
Q. And what was the nature of the letter that you wrote to him?
A. If --
Q. And this would have been in 1999.
A. If you have it there, I think it had to do with his 2255.
Q. And what information were you trying to get about his 2255?
A. I was trying to let him know that I'd still be willing to work on his case because when I left, that's where I left it with him, that I'd finish it for him. And I can't remember the details. It's been a while since I've seen it. But if you have a copy of it, refresh my memory, but that's -- essentially it had to do with his 2255.

1570

Q. You also had the opportunity to read Mr. Honken's presentence investigation report; is that correct?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1372 of 3636

A. I looked at part of it.

Q. You also had an opportunity to read the drug quantities that was in the brief prepared by his counsel; is that correct?

A. His lawyer had prepared a brief, and that was one of the arguments about the estimation of the drugs. They had found all these precursor chemicals in his laboratory, and they were trying to estimate how much drugs that could make. And that's -- that was one of the issues on his '96 case, yes, sir.

Q. And you would agree that in the presentence report and other paperwork you told them in the interview in October of 1999 that the material that Mr. Honken provided to you included details on how people were killed; isn't that correct?

A. No, that's definitely not cor -- and I don't believe there -- there definitely -- in the things that I read, there was nothing in there about people being murdered or anything like that. If you have something --

Q. And that would include the sentencing -- well, I didn't ask that question. You also read portions of the sentencing transcript; is that correct?

A. I don't remember seeing his sentencing transcript, no.

Q. You never read any portion of his sentencing transcript; is that your testimony?

A. I won't say I never read any portion of it, but I never --

1571

don't remember reading it.

Q. So you're telling me then in the presentence report which you read, in the sentencing transcript, in the briefs that were prepared on his original case, and in the issue dealing with the drug quantities, that there was nothing about any people being killed in that information?

A. I'd have to look at what you're talking about, but I -- the part of the PSI that I looked at, I don't remember anything in there that had anything to do with that.
Q. Well, do you remember an individual by the name of Dean Donaldson?
A. Yes, sir.
Q. All right. Do you know what Mr. Donaldson indicated that Mr. Honken had told him?
A. No, only that Dustin wanted to murder -- murder him.
Q. So you don't remember Mr. Donaldson indicating in any way that Mr. Honken had confessed to him that some people were strangled?
A. No. You see, that didn't have anything to do with the videotape.
Q. No, sir. That's not my question. I haven't gotten to the videotape yet. I just asked you whether or not Mr. Donaldson in his question -- in his testimony that you acknowledged that you reviewed --
A. No, no, I --

♀

Q. Let me finish my question.
A. I didn't review that.
Q. Well, you said you knew who Mr. Donaldson was.
A. No. I remember the name. Yes, sir.
Q. Well, then you proceeded to tell me what Mr. Donaldson said, only that he wanted --
A. No, no, I told you what Dustin said. I didn't --
Q. Oh.
A. I don't know Dean Donaldson, and I've never met him, and I don't know anything about him other than what Dustin told me.

Q. So you're saying you never read anything having to do with Mr. Donaldson.
A. I might have seen his name someplace, but that's correct.
Q. Well, do you think you could have seen it in the presentence report?
A. It could have been in there, but I don't remember if I saw it, and I'm certain that it was never anything that was . . .
Q. Well, they've done a presentence report on you, have they not, from the federal court?
A. Yes, sir.
Q. Tell the jury what a presentence report is and what it contains.
A. It's a recommendation of what kind of sentence you should get, the nature of your charges essentially.
Q. No. But it also gives background. It gives the

government's version of the incident, does it not?
A. Yeah, it can, yes, yeah.
Q. Okay. And the government has an opportunity to lay out what they believe are the facts that support the conviction or the enhancement of the conviction; is that correct? No. Is that correct, first of all?
A. That's correct. Yes, sir. Yes, sir.
Q. Now, it also contains what -- maybe Mr. Honken's version of the incident; isn't that correct?
A. It could, yes.
Q. Yeah. Well, you had one done, did you not, as part of your federal conviction for racketeering?
A. Yes, sir.
Q. All right. So you know, in fact, that's what those reports

contain. They're very detailed, some of them 40 to 50 pages with lots of background information on the individual; isn't that correct?

A. They can be.

Q. So you had access to Mr. Honken's, at least you say, a minimum of part of his presentence report that came out of the court; isn't that correct?

A. He would bring it into my room. We would ask questions about things, and he would pull it out and say here's the information.

Q. All I'm asking, sir, is you had access to it.

A. I never sat down and sit there and read it the way you're implying, sir.

Q. Is your testimony that you never read a part of Mr. Honken's presentence report?

A. No. I told you I had read part of it, but I never sat down and read the whole thing like you're implying.

Q. I'm not implying anything, sir. I'm just asking you a question. And so in this report that you read according to your own admissions part of it, did you see anything about Mr. Donaldson in there?

A. I don't remember that. I don't remember seeing anything in there about him.

Q. Do you remember anything about Mr. Putzier in there?

A. The name sounds familiar, but I don't really -- again, that was not anything that I was dealing with at the time.

Q. Are you telling me, sir, that when you -- in your first interview -- and this would have been in March of 1999? Would that be correct?

A. Yes, sir, yes, sir.

Q. Okay. You said you'd not read Mr. Donaldson's -- you don't recall at least.

A. Donaldson's, no.

Q. Didn't know who Mr. Dean was.

A. No, no. Start all over. Sorry. You got me confused.

Q. You may know who Mr. Donaldson is now.

1575

A. No, I've never met him in my entire life.

Q. You never read anything that he said.

A. His name may have been in some of the documents, but that was not an issue that I was really concerned with at the time.

Q. Well, on your first interview, how did you tell -- what did you tell the agents of how these people were killed? Your first interview, what did you tell them?

A. You mean with -- you mean about Dean Donaldson?

Q. That Dustin. How did Dustin tell you according to you when you first talked to law enforcement in March of '99 as to how these people were killed?

A. He described to me that he and Angie drove over to the house where Greg and Miss Duncan were with the children. They drove over there with a videotape in a canvas bag, that he had a pistol and he had rope or a cord and that when they got there knocked on the door --

Q. And they were strangled.

A. No, they were allowed in the house.

Q. No, but they were strangled. That was the method of death. They were strangled.

A. Yes, yes, sir.

Q. And you're telling me prior to that interview in March of

1999 you had not read Dean Donaldson's statement that Mr. Honken told him that they were strangled; is that your testimony?

♀

A. Yes, sir.
Q. You also said, did you not, that they were strangled -- that Mr. Nicholson was strangled with a rope; is that correct?
A. Yes, sir, that he hit him over the head --
Q. Also you said they were buried with a backhoe; is that right?
A. In a -- yes, sir.
Q. You also said that they were, in fact, put into the back of a trunk; is that right?
A. In the trunk of a car.
Q. Angie's car; is that right?
A. One time he said that -- he didn't describe whose car it was, and then another time he said it was her car.
Q. Okay. Did you know it was a Toyota Tercel?
A. I don't have any idea, sir.
Q. So from your impression four bodies were put in the back of a Toyota Tercel? Is that what you're saying Dustin told you?
A. No, I never said that. I don't know what kind of car he was referring to, sir.
Q. He never told you it was Miss Gaubatz's car?
A. Whose car?
Q. Gaubatz.
A. I'm sorry. I don't know --
Q. Never heard that name before.
A. Gaubatz's?

♀

Q. Yes.
A. No, I have not. I'm sorry.
Q. Did he tell you it was Angie's car?
A. One time he did, and one time he said that it was -- he wouldn't -- he didn't say whose car it was.
Q. Did he tell you what type of car Angie drove?
A. No, he didn't describe --
Q. He didn't tell you it was a Toyota Tercel?
A. He didn't describe anything about what type of car it was.
Q. But you're pretty familiar with cars, are you not?
A. I used to be.
Q. Used to buy some pretty fancy ones, didn't you?
A. No.
Q. But you do, in fact, know what a Toyota Tercel is, don't you?
A. I had a Toyota Camry. Is it about like that?
Q. A Tercel is much smaller than that, isn't it?
A. I don't know. I've never -- I've been in prison for 12 years, sir.
Q. Now, you first told them that all of the people -- Mr. Honken told you all the people had been killed together, is that correct, all five people; is that right?
A. All --
Q. At the same time.
A. All -- wait.

1578

Q. Were five people killed at the same time? Is that what you told them in your first interview?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1379 of 3636

A. No, wait. There were two separate incidences that were involved, one with Greg and Lori, and then the other one was separate with Terry.
Q. And the first one that occurred, no one bought a weapon for that, right, according to what Dustin told you?
A. He never mentioned where they got the pistol from.
Q. Matter of fact, what you told law enforcement is that he told you that Angie did not buy a gun until she was going to go kill Mr. DeGeus, is that right, and that's when they went to the pawn shop?
A. I never phrased it like that. I just mentioned that that is when the gun came up, before Terry DeGeus's murder, that it was purchased in a pawn shop.
Q. And it was after -- the way you had explained to the law enforcement officials first, after the Nicholsons had been killed.
A. That's chronologically the way it was described.
Q. Right. So after the Nicholsons had been killed, Angie goes to a pawn shop to buy a weapon which later is used to kill Mr. DeGeus; is that right?
A. That's correct.
Q. That's what Dustin told you.
A. That's correct.

1579

Q. You then told the law enforcement officials that.
A. That's correct.
Q. So that would mean -- if Mr. Nicholson and Miss Duncan and her two kids were killed in July, that would mean that Angie would have gone to the pawn shop some time between July and when Mr. DeGeus was killed; would you agree with that?

A. I don't know.
Q. Well, that would be the logical step according to what you said Mr. Honken told you.
A. I don't know the answer to that question.
Q. But you would concede that he told you that she bought the gun after the Nicholsons were killed.
A. No. He told me the story about Terry afterwards. He could have bought the gun before all that. I don't know.
Q. So you were giving them the chronology of how he told you, not the chronology of what happened.
A. Say that again. I'm sorry.
Q. You were giving them the chronology of the order in which he told you, not the order of what you believed happened.
A. That was the time sequence of when the murders occurred, sir.
Q. But it also would include the time sequence of when you indicate Miss Johnson bought a weapon.
A. I don't really know when she bought the gun, but that's when the conversation about buying the gun came up, when he was

♀

1580

talking about planning the murder of Terry DeGeus.
Q. And you also indicate -- and correct me if I'm wrong. With regard to Mr. DeGeus, you indicate that Mr. DeGeus was shot twice; is that right?
A. I don't know how many times he was shot, but he was shot more than once. Dustin described it as he shot him once, and he kept coming forward saying, Don't worry; I'll pay you back the money; I'll pay you back the money. And then he shot him again and maybe again.
Q. Also in your interview of March you told them that

Mr. Thinnes -- at least you even indicated that you thought Mr. Thinnes was involved in this process, didn't you?
A. I told them what Dustin told me about Mr. Thinnes.
Q. Well, let's go back to your relationship with your clients. You had good friendship and business relationship with your clients who were drug dealers, didn't you?
A. No. I had clients who were drug dealers.
Q. But you invested money with them, and you also had money that you invested with them out in offshore accounts, didn't you?
A. No, I didn't invest money with drug dealers. I formed corporations for them and things like that, sir.
Q. You're saying you and Eddie Lawrence did not have a business relationship of any sort? Is that your testimony?
A. No, I didn't say that.

Q. Okay.
A. But I didn't invest money with him in a business.
Q. You loaned him money.
A. I formed a corporation, and I lent him some money, yes, sir.
Q. Now, you then surmised, did you not, when they questioned you about Mr. Honken, you indicated that Mr. Honken and Mr. Thinnes were good personal friends? Did you not indicate that to the investigators?
A. Dustin described it as if they were friendly and that he would meet him for lunch and they would have sandwiches and talk about his case.
Q. And Mr. Thinnes would lie for him; is that what you indicated to law enforcement officials?

A. No, I said Dustin indicated that when Mr. Thinnes was questioned about the videotape he was going to say he looked at the videotape but he didn't remember what was on it and then gave it back to Dustin.
Q. Well, didn't you indicate that you thought Mr. Thinnes would be involved in a conspiracy to commit murder because he was the one who made the suggestion to Dustin to go out and get the video? Isn't that what you told the investigators when they were being interviewed?
A. I told them that Dustin was concerned that Mr. Thinnes was going to lie or have to lie about the existence of the videotape

and he was going to have to tell the truth and that that would be inconsistent with Dustin lying when he pled guilty. They asked him about the videotape, and he said there never was one.
Q. So you are indicating in your answer to the specific question I asked you that you never intimated to these investigators that Mr. Thinnes was somehow involved in these killings or the covering up or the suggestion that Greg Nicholson be killed? Is that your testimony, that you never implied that in your response to questions by law enforcement officials?
A. That the lawyer was going to -- involved in the murder?
Q. Yes, by suggesting that he go out and get a video.
A. No, I never suggested that.
Q. Didn't you say at one point that the lawyer's probably concerned that it might have been his suggestion that led to this?
A. I only know what Dustin told me, sir.
Q. After you, in fact, met with the investigators after your

first interview, you met with them and had a second interview; is that correct?
A. Yes, sir.
Q. And do you recall when your second interview took place? Would it have been about the next morning?
A. Yes, sir.
Q. And that would have taken place in the exact same place;

♀

would that be accurate?
A. I believe so, yes, sir.
Q. You indicated at that time that Dustin told you the bodies were buried at a construction site.
A. That's the way he described it, sir.
Q. You told them he'd used Johnson's car to transport the bodies; isn't that correct?
A. That's what he told me, sir, yes, sir.
Q. You also told them that Honken told you that DeGeus's murder was messy and DeGeus was put in the back of Ms. Johnson's car? Didn't you say that?
A. He told me that he transported the body in her car, yes, sir.
Q. In the back of the car and it was messy; is that right?
A. I don't remember saying messy, but he shot him several times with a gun.
THE COURT: Mr. Parrish, would now be a good time to take our noon recess?
MR. PARRISH: It would, Your Honor. Thank you.
THE COURT: Members of the jury, we'll be in recess for 45 minutes until 12:45. Please remember my instruction about keeping an open mind until you've heard all of the

evidence. Thank you.

(The jury exited the courtroom.)

THE COURT: Are there any matters we need to take up?

MR. PARRISH: No, Your Honor. Thanks.

MR. WILLIAMS: No, Your Honor.

THE COURT: All right. Thank you. We'll be in recess.

(Lunch recess at 11:58 a.m.)

THE COURT: Mr. Parrish, ready for the jury?

MR. PARRISH: I am, Your Honor.

THE COURT: Okay. Thank you.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Parrish, you may continue your cross-examination of Mr. Tokars.

MR. PARRISH: Thank you, Your Honor.

BY MR. PARRISH:

Q. We left off, I was asking you a question about the mess that you indicated Mr. Honken indicated was in the car from Mr. DeGeus's killing, but you indicated -- I believe you stated you didn't recall making that statement?

A. That he shot him twice and maybe more.

Q. Put him in the back of Miss Johnson's car?

A. Yes, sir.

Q. And you said that he didn't indicate to you that it was messy at all; is that right?

A. I may have said that, but I don't recall. If I did, I did.

Q. Okay. Fine. I want to go back for a second and clear up a

couple of things with regard to your testimony. I believe you indicated that you said you left Florence in December of '98. Would that be accurate?
A. Yes, sir.
Q. All right. And that was your testimony on direct examination. You also indicated that you had called Mr. Bell who was your lawyer at some point when you were having the conversation with Mr. Honken, is that right, to figure out what you should do or how you should get this thing moving along?
A. At one point I called Alan just to ask him for advice.
Q. Right. And I asked you what was the date for that call when he just told you to just play along.
A. Hmm. I don't remember exactly. It would have been like November time frame maybe.
Q. November of 1998; would that be right?
A. That's correct.
Q. All right. So as I understand it -- and make sure we're on the same page here -- Mr. Honken comes in according to what you recall in March of 1998. It was not until November that you called Mr. Bell, and Mr. Bell says play along; is that right?
A. Roughly October, that fall period.
Q. Well, you said earlier the latter part of the year when these questions were asked of you before lunch. Are you telling me now it was --
A. Which questions are you talking about?

1586

Q. Yes. When you talked to Mr. Bell, your lawyer and your best friend.
A. Okay. I talked with him like roughly in the fall, in the

autumn, of 1998.

Q. In the autumn of '98 you call him, and you give him this information. And does he at that point immediately intervene for you and call law enforcement to your knowledge?

A. No. He thought it may have been just innocuous, that just play it along, that it might just go away.

Q. Well, didn't you tell him at that point that you thought Mr. Honken was trying to set you up?

A. No. Actually he suggested that.

Q. So as a matter of fact, in the first telephone conversation which you had with your best friend, Mr. Bell, there was a question about who was trying to set who up. Was Mr. Honken trying to set you up, or were you going to try to set Mr. Honken up by getting information from him?

A. I believe I said that was like more in the -- in the latter telephone call. The first time he told me just play along. He didn't think it was going to be anything, big deal. And then the second conversation that issue came up that he might be trying to set me up or that I could get into trouble, and that's why he recommended to --

Q. Well, when was the second conversation, Mr. Tokars?

A. I don't really remember the dates, but it was in, you know,

1587

the fall period.

Q. So is your testimony that you made a call in October, then you played along for a while, and then you made another call after that to Mr. Bell, your best friend, to have a conversation with him about what you should do now?

A. Yes, sometime in the autumn. What I -- sometime in the autumn of 1998.

Q. And how far apart were these conversations?
A. I don't really remember.
Q. Well, at what point in the conversations in 1998 did Mr. Bell tell you that he had contacted law enforcement?
A. I don't remember that either, sir.
Q. Do you remember any conversation in 1998 where Mr. Bell told you that he had, in fact, contacted law enforcement and law enforcement wanted to talk with you?
A. I just don't remember the exact date, sir.
Q. Why were you moved in December of 1998?
A. That had nothing to do with this case.
Q. Why were you moved in December of 1998?
A. Because my -- I had been at Florence, Colorado, for a period of time. Most of the people there wanted to be transferred to an FCI where you have a little more freedom, a little less violence, and I asked my counselor and asked my counselor. He said, If you have good conduct, you know, after a year, year and a half, that you'd be eligible to transfer. My

lawyer did contact the warden at one point in time.
Q. When?
A. I don't remember. It may have been as soon as I got there. It may have been after that.
Q. And that's Mr. Bell?
A. Well, he contacted the warden, but it had nothing to do with this case. There was no mention of this case.
Q. So in December when you were moved, is it your testimony that you were moved for reasons other than anything having to do with Mr. Honken?
A. That's correct.

Q. You wanted to move, if I understand it correctly, to a better facility where you had a little bit more freedom and it was a little less dangerous for you; is that correct?
A. That's correct.
Q. Had another event happened at that time where your case had gotten additional national publicity?
A. Refresh my memory.
Q. Well, I'm asking you.
A. I don't know what you're referring to.
Q. Well, had your case gotten any additional publicity where you were concerned about whether or not it was okay for you to stay at Florence?
A. Well, the person that you mentioned earlier, Eddie Lawrence, he recanted -- he was really the only person that

♀

1589

linked me to violence in my case. The other witnesses -- most of the other witnesses really were money laundering witnesses. And this person said that I hired him to have my wife murdered. Well, he admitted that he lied, and he filed motions with the court basically saying that he lied about many of the things he said about me, and that got some publicity, and my lawyer -- my lawyers thought that that was something very significant in developing my case, and that's something that Mr. Honken came to me and brought to my attention. I knew about it already, but he maybe saw it on the news or somehow found out about it.
Q. So from that press you had some concerns and your lawyer had some concern back in December, maybe even November of 1998, which caused you to be transferred to the facility in Oregon?
A. No. He'd been trying to get me transferred from the penitentiary -- an FCI is called a federal correctional

institute, and on the scheme of things, it's like a mid-level security da -- I call it a dangerous scale. It's from a low, medium, to a high, and the high is what we were in at the penitentiary in Florence. And in the middle would be an FCI. It's a mid-level security. And as soon as I got to the penitentiary, I wanted to get out of there. And my lawyer had been, you know, lobbying I guess if you will to try to get me transferred to a lower-level institution.

Q. So if I understand you correctly, you were using your knowledge, your lawyer was using his knowledge to work the

Bureau of Prisons to get you in a better facility.

A. He wrote them a letter. He wrote the warden a letter and said that my client is a non, you know, violent client. He won't be involved in any trouble there, and the warden I think told him if he's there for a year or so, year and a half, he doesn't get in any trouble, that we'll transfer him.

Q. So you mentioned Mr. Lawrence again, the person who you said recanted his testimony --

A. Not all of it, sir. He --

Q. Well, wait a minute. You just -- you didn't tell the jury it was not all of it. You said he recanted his testimony which linked you to any violence in the murder of your wife.

A. No. I said that he was the main witness who linked me to violence in the case.

Q. Oh, oh.

A. And he said that on the day before this murder occurred, you know, with my wife, he said that I met with him at my office and that he planned this whole thing out, and he said that -- basically he admitted that that meeting never occurred and that

a lot of the things that he testified to about money laundering and my relationship with him didn't occur.
Q. Oh, did he say that you didn't tell him to kill your wife?
A. No, he never --
Q. He never recanted that; right? You're not trying to minimize that, are you?

♀

A. No, no, I -- sir, let me just make my point.
Q. That's fine. You've explained that enough. What I'd like to go to is this other area here where Mr. Honken did, did he not, come in and meet with you? When he first started talking about his case and you indicated and agreed that you would assist him, he said before he told you anything he wanted you to sign an agreement. Did he say that? Yes or no.
A. Not at first.
Q. Well, did he say that? I didn't say whether it was first, second, third, or fourth, sir. Did he say that to you? Yes or no.
A. Somewhere throughout the summertime --
Q. Just answer my question. Did he say that to you? Yes or no.
A. Yes, sir.
Q. Did you ever sign that agreement with him? Yes or no.
A. There was never an agreement. He never had one.
Q. So the answer is no, you did not ever sign the agreement; is that correct?
A. There wasn't an agreement to sign.
Q. Okay. So the answer is no.
A. That's correct.
Q. All right. As a matter of fact, he told you he would not

tell you anything about his case even though he would share his paperwork with you unless there was agreement between you and he

that anything he said to you you could not repeat. Yes or no.
A. No.
Q. If I understand you correctly, when Mr. Honken came there, he was initially put in a facility separate from bravo, the unit you were in; would that be accurate? This was in 1998.
A. When he first --
Q. Yes, when he first got to Florence, Colorado. It was not the same unit you were in.
A. I don't remember exactly, but he was there shortly thereafter.
Q. Okay. After a while then he was transferred, and as you pointed out to Mr. Williams on direct examination, you were put in these cells within a block that made you a little bit closer together; would you agree in 1998?
A. You mean in the BB unit?
Q. Yes, sir.
A. Yeah, we were both in there, yes.
Q. Okay. Then you developed a relationship where he had, according to you, asked about your signing an agreement, but you would agree without any signed agreement the two of you all at some point worked on his case; would you agree with that? This is in 1998. I want to stay focused on that.
A. He suggested the agreement --
Q. Yes or no. Listen to my question.
A. I'd say no then.

Q. No. Thank you. And please listen to my question.
A. Yes, sir.
Q. If I ask you the question if you can answer it yes or no, I would certainly appreciate it. Thank you.
Now, so without this signed agreement, would you agree that the two of you all continued to go to the library and do research on his case? Yes or no.
A. Most of the time we talked about it.
Q. No. I said go to the library was my question. Did you proceed without any written agreement to go to the library to work on his case? Yes or no.
A. We worked there sometimes, but most of the time --
Q. So it was yes? Is the answer yes, you did on occasion go to the library without a signed agreement?
A. Yes, sir.
Q. Is that yes?
A. Yes.
Q. All right. And then when you would be in the library working on his case, you would also on occasion work on your case that was pending in 1998. Yes or no.
A. No.
Q. So you would agree you never worked on your case at any point in time when you were in the library with Mr. Honken.
A. That's correct.
Q. All right. Now, in 1998 you would agree that at some point

1594

you made two calls to your lawyer which we've already discussed about Mr. Honken.
A. And it may have been more.

Q. But at least two.
A. Yes, sir.
Q. All right. And after you'd made these two calls concerning him, one he says play along. You think it might have been the fall. But then into October you make another call where you ask him to intervene with the government on your behalf.
A. No.
Q. All right. That did not occur. It was not then until 1999 when you met with the agents and you had your interview October 3 of that year when you were in Sheridan, Oregon, was the first time you would have met with law enforcement; would that be correct?
A. No. I think you got the year wrong.
Q. That's what we need to clear up.
A. 1998 -- he suggested in the second call we contact --
Q. No, we had the years wrong. Let's leave it at that, okay, because we're going to go to your grand jury testimony now. You told Mr. Williams on direct examination that you were in Florence until December of 1998. Do you remember your testimony here in court this morning?
A. Wait, wait. What's your question?
Q. That you were in Florence until December of 1998, and my

1595

question is do you recall your testimony this morning in court?
A. Yes, sir.
Q. All right. Do you recall what you testified to to the grand jury on that exact same issue when they asked you in the exploration of your relationship with Mr. Honken as to how long you were at the institution in Florence?
A. No. I'd like to see it, though, if you . . .

Q. What do you think you told them?
A. I'm not -- about how long I was there?
Q. Yes, sir.
A. I would have told them just under 2 years; 20 months, 18 months.
Q. From what time until what time?
A. Well, I don't know what -- I'm not sure what you're referring to. I will tell you that --
Q. Well, no. If you don't know what I'm referring to, then you don't have to answer the question.
A. Okay. Then I don't.
Q. Then what I'd like to ask you is you would agree that if you would lead people to believe that you knew someone longer than what you've actually known them they would tend to believe that you would have a better relationship with them; would you agree?
MR. WILLIAMS: Objection. Asking the witness to speculate.

1596

THE COURT: Overruled. You may answer.
A. I'm not sure what you're asking.
Q. Well, if you told a group of people that you've known someone a long time, they may have a different idea of your relationship with that person than what it really is.
A. Yes.
Q. Yes. You've told us that you were with Mr. Honken and you left December of '98. I'm going to show you your testimony on Wednesday, May 17 of 2000, as to what you told the grand jury as to how long you were at Florence. I want to refer you -- you might want to look at page 6. I'll move this here for you. If

you look at page 6 and read down beginning with line 7.

THE COURT: Mr. Parrish, could you pull up that microphone there?

MR. PARRISH: Yes, sir. For him?

THE COURT: For you.

MR. PARRISH: Okay.

BY MR. PARRISH:

Q. Look at page 7.

A. Yeah, that was a mistake, December of '99. I think it's corrected, though, later on.

Q. Wait, wait, wait. Let's just deal with one thing at a time. Okay. Can you reach that?

A. Yeah, I'm fine.

Q. You arrived in '97 is what you told the grand jury; is that correct?

1597

A. Yes, sir.

Q. You told them you left in '99; is that correct?

A. Yeah, I think that was --

Q. You just read that, did you not?

A. Yes. I think that was corrected, though, later on in the grand jury if you go forward a little bit.

Q. Now, when you left in 1998 in December, do you know whether or not there had been any ruling on whether or not Mr. Thinnes had to, in fact, testify before the grand jury?

A. Yeah, I believe he was ordered to.

Q. In 1999 he had to go testify there -- in 1998 before you left; is that your testimony?

A. I believe so, yes.

Q. Could you be mistaken about that?

A. No.
Q. If I told you the Eighth Circuit did not rule until mid-1999 on that point --
A. No, the judge ordered him to testify.
Q. Was that a definitive ruling as you understood it without an appeal?
A. No, no. I'm not saying he couldn't appeal it, but yeah, he was ordered by the judge to testify.
Q. That's what you're doing on your case, appealing it; right?
A. I'm sorry. What's your question?

1598

Q. Well, you know appeal means that it's not a final ruling.
A. He had an order from the judge ordering his lawyer to testify, and he brought it to me.
Q. Well, it was on appeal, though; right?
A. It wasn't then. It was just an order from the district court judge.
Q. So if you left then in '98, Mr. Honken didn't get there until the spring or summer of '98, you didn't make your call to your lawyer until like October or so of 1998 and you had no signed agreement that you and Mr. Honken had entered into, Mr. Honken then would have had to start talking to you where you could play along sometime in October of 1998? Would that have been accurate?
A. You got the dates -- I'm not -- there weren't concrete times that this thing started. He came early summer, maybe late spring, and that's when we started to talk. That's -- if that answers your question.
Q. So you're saying you talked to him then for three to four months before you even bothered to call your lawyer.

A. Roughly.
Q. Well, what did you mean then on your answer to the direct examination question when Mr. Honken first got there, he approached you and this was a dangerous situation; he pushed himself on you right away? What did you mean by that in your answer to Mr. Williams on direct examination?

♀

1599

A. He approached me and wanted me to work on his case, and I felt threatened that he wanted to use my background as leverage and if I wouldn't help him that he would make sure that other inmates, dangerous inmates, knew about that, my background.
Q. So is your testimony still the same, that this happened immediately after he got there, or was it some time after he got there and then you didn't make the call until at least, by your own testimony, October to your lawyer, Mr. Bell?
A. Shortly after I got there, we started to talk. Maybe within a week or two after that, that's when he brought the issue up, and we started to work on his case off and on. It got a little bit more heavy as time went on. And then when the problem came up with me trying to locate a hit man to kill his witnesses, that's when I called my lawyer.
Q. So then if I understand you correctly, you talked in March, you talked in April, you talked in May, you talked in June, you talked in July, you talked in August, you talked in September. You called your lawyer -- according to your best estimate, even though you said it was the last part of the year in your earlier testimony, you called your lawyer in October.
MR. WILLIAMS: Objection, Your Honor.
Q. Would that be accurate?
MR. WILLIAMS: Objection, Your Honor. Compound

question.

THE COURT: Overruled. You may answer.

A. I think he got there more like May or June, sometime like that, in 1998, shortly --

Q. So now he didn't get there until June of 1998.

A. Late spring, early summer I said.

Q. Okay. Well, you talked to him in June, July, August, September; 4 months you talked to him, 120 days, and then you call your lawyer. Is that your testimony now?

A. Yeah, but I called my lawyer in response to that specific question about him trying to -- him asking me to find a hit man, and that didn't come up until the latter part of the summer.

Q. So that means that he tells you he kills somebody, he tells you how it's done, he tells you he kills them back in 1993, he tells you he strangles them, he tells you all of this over the period of four months but yet you don't call your lawyer until he says, Hey, could you get the -- is it Dixiecrats or Dixie Mafia?

A. Until he was trying --

Q. Is it Dixiecrats or Dixie Mafia he wants you to call?

A. Dixie Mafia.

Q. Yeah, okay, Dixie Mafia. He wants you to call them, and that was not until what? October?

A. August, September time frame.

Q. Oh, now it's August.

A. That came up in August, September, and I ended up calling my lawyer shortly thereafter.

Q. So now it's not till the last of the year that he told you. It's now almost summer that he's told you.
A. No, the phone call that I made to Alan roughly like we were talking about in October, that fall period, that one is the one that I told him what was going on, and he said just play along with it, it's probably not going to be anything that develops into anything.
Q. So now when was this phone call? You've given us three different dates. When was the phone call to Alan?
MR. WILLIAMS: Objection, Your Honor. Argumentative.
MR. PARRISH: I'll withdraw it.
BY MR. PARRISH:
Q. Give us the date that you first made the call, sir.
A. Roughly October, you know, in the fall period in that time frame give or take a little time. I don't have a calendar of the times that I made the calls.
Q. Did you ever write him a letter?
A. About this?
Q. Yes.
A. No.
Q. Okay. Did you ever document the phone call prior to this time until the interview you had in -- I believe it was March of 1999 about this?
A. I'm sorry.
Q. Did you document this in any way other than the interview

you had with the Iowa law enforcement people in March of 1999?
A. No.
Q. So all of this is purely by your memory; is that right?
A. That's correct.

Q. When you first talked to Mr. Honken, you indicated he dodged the issue of who committed the murders; is that right?
A. That's correct. He skimmed over it.
Q. And you didn't press him on that issue; is that right?
A. That's correct.
Q. And the reason you didn't press him on the issue, because no one had ever asked you to press him on it; is that right?
A. No one had asked me to? No, no one did.
Q. And you do acknowledge that you did read part of his file. You agree with that.
A. Yeah, parts of it, yes.
Q. You told -- you believe that Mr. Honken was telling you things to test you to see if he trusted you; is that correct?
A. And to impress me.
Q. And many inmates do that to impress people; is that correct?
A. Sometimes they brag.
Q. I asked you this morning with regard to inconsistencies, and you admit that there were inconsistencies in his testimony; is that correct?
A. Yes, sometime --

1603

Q. Or not his testimony. In his statements to you; is that correct?
A. Sometimes he would say some things, and then he would say other things that appeared to contradict it, yes, sir.
Q. And I asked you whether or not you were ever asked at any point in time do you know whether this is from your own recollection or do you know whether or not this is from the -- from reading his legal work.

MR. WILLIAMS: Objection, Your Honor. It was asked and answered. We're covering old ground here.

THE COURT: Overruled.

MR. PARRISH: I have a portion I want to show him.

THE COURT: Overruled. You may proceed.

BY MR. PARRISH:

Q. You were asked that before the grand jury, were you not?

A. I don't remember.

Q. Well, you said earlier this morning that you didn't recall anyone asking you whether or not you could separate the two matters. Then I asked you, well, at some point did the law enforcement officials go through, have you do a statement, then underline the portions that were attributed to Mr. Honken and the portions that were attributed to his legal work? Do you remember those questions?

A. You misrepresented the facts just what you said. They asked me to underline specifically what he told me.

♀

1604

Q. Right.

A. Yeah.

Q. Yeah, that's what I just said. I'm sorry I didn't make that clear, but I thought that was the question I asked. Now the question I asked, were you asked again as to whether or not you were confusing the two matters?

A. I was never asked whether I was confusing anything.

Q. I'm going to show you your grand jury testimony again of May 17 of 2000.

MR. PARRISH: I'm going to refer him to page 23.

MR. WILLIAMS: Okay.

BY MR. PARRISH:

Q. And that's your answer, and you can follow that down on page 23. And read that straight down. The underlining sections will give you the answers. The other sections will give you the context.
A. I said I will swear --
Q. No, no. Just read it to yourself, sir, and I'll ask you the questions.
A. Okay. Yes, sir.
Q. Have you read it? Does it refresh your recollection?
A. Yes, sir.
Q. Were you asked a question as to whether or not you may have been overlapping some of what you'd read in his legal work with what he told you in the grand jury?

♀

A. The question --
Q. No. Were you asked that, sir?
A. No, that's not the way the question was asked.
Q. You didn't say, I will swear what I'm telling you --
A. I did say --
Q. Let me finish.
A. Yes, sir.

THE COURT: Mr. Parrish, that was argumentative.

MR. PARRISH: I'm sorry, but he keeps interrupting me, Your Honor.

THE COURT: He does.

THE WITNESS: I apologize.

THE COURT: Okay. Let Mr. Parrish complete his full question, and then hopefully he'll let you complete your full answer, and then it will run more smoothly.

BY MR. PARRISH:

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1403 of 3636

Q. I will swear that what I'm telling you I didn't read in there, and I don't think it is in there. I mean, I haven't -- I haven't read enough of his material to know for sure, but I believe -- I don't believe if they had these details that he told me about what happened in there. I think he would have been tried and convicted already of these charges.

Was there some question about whether or not you were confusing what he was telling you with your review of his legal documents? Yes or no.

A. Yes.
Q. And that was not the first time that that question was posed to you; is that correct? Yes or no.
A. No.
Q. As a matter of fact, it was a running theme in some of the interviews that you had with law enforcement and with other people who interviewed you during the ten separate interviews that you had; isn't that true? Yes or no.
A. No.
Q. So it's your testimony that it only came up two times.
A. I didn't say that.
Q. Did it come up more than two times? Yes or no.
A. I don't know.
Q. Now, with regard to the facts that we started on earlier this morning about what you said Mr. Honken told you, he told you, did he not, according to your testimony that Angie had started beating the kids?
A. Started killing them, doing something to them.
Q. Well, it makes a difference, doing something to them or killing them. You said it two different ways. Do you know what

he said to you?

A. That she started doing something and then he came over and helped -- helped finish them off.

Q. This was in the house; is that correct?

A. Yes, sir.

♀

Q. Do you want to see what you said to the grand jury under oath? Would that refresh your recollection?

MR. WILLIAMS: Objection, Your Honor. His recollection's not been called into question.

THE COURT: Why don't you lay a better foundation.

BY MR. PARRISH:

Q. Do you know what you said to the grand jury about it?

A. I assume I said what I just told you.

Q. Do you know what you said to the grand jury?

A. No.

Q. If you saw the grand jury testimony that you said under oath, would that refresh your recollection?

A. Yes, sir.

Q. Would you like to take a look at it?

A. Sure.

Q. Look at page 29. Again, the yellow for -- 29's right here, the yellow for the actual answer and the other writing that's unmarked for context.

A. Yes, sir.

Q. Now, Mr. Tokars, have you had an opportunity now to have had your memory refreshed?

A. No, it's the same as what I said before.

Q. So is your testimony that you said before that I don't want to say -- I don't know if he used the word beat? Is that what

you just told this jury a minute ago?

A. Yeah, and that she started the process.
Q. That's fine.
A. She started some type of process, and then he came over and finished it off.
Q. Did you tell them that Mr. Honken told you at one point it was a cord and another point it was a rope?
A. He referred to them that way, yes, sir.
Q. No. At two different times; is that correct? At one point he told you it was a cord. Another point he told you it was a rope; is that correct?
A. Correct.
Q. You told us this morning, did you not, or maybe this afternoon when I was asking the question with regard to Mr. Thinnes that you weren't clear as to whether or not he'd had the conversation with Mr. Thinnes prior to the video?
A. Prior to making the video?
Q. Yes.
A. No, he had the conversation beforehand.
Q. Right. So that, as I asked you earlier, put it in the context that Mr. Thinnes had somehow suggested to Mr. Honken to go get the video according to what Mr. Honken told you.
A. No, no, that is not true. He -- that -- he told him that the videotape wouldn't be of any help if Mr. -- if Greg came into the courtroom and said that it was forced upon him, that it was coerced. I don't think he suggested that you should go out

and kill the guy. I mean, I'm not -- I never said that.
Q. But you do tell the grand jury, do you not, and you have made the statement that Mr. Honken told you that he had this conversation with Mr. Thinnes -- or you call him Thinnes -- prior to the killings.
A. Yes, sir, about the videotape.
Q. You also indicated that Mr. Honken told you that Angie was his common law wife.
A. He referred to her that way I think several times, yes, sir.
Q. And that's what you told the grand jury.
A. He had a child with her.
Q. I didn't ask you about the child. I asked you simply about the reference to the common law wife.
A. He described her that way.
Q. You said earlier that you did not know who Mr. Donaldson was, is that correct, or wasn't clear as to what he said or where you got information about Mr. Donaldson; is that correct?
A. Dustin told me that he wanted to kill him.
Q. You told the grand jury what you knew about Mr. Donaldson, did you not?
A. Yes, sir.
Q. And it was during that exchange that you also indicated to the grand jury that Mr. Honken told you that he would take care of Eddie Lawrence.

♀

A. He mentioned that, and that came up in the context when he recanted his testimony. When Eddie Lawrence said that he had lied at my trial, then Dustin suggested that if I help him get out of prison by working on his 2255 that he would go out and

murder Eddie Lawrence and then Eddie Lawrence wouldn't be able to testify against me.
Q. So this conversation about Eddie Lawrence, what was the date that it took place?
A. I don't remember.
Q. And you never expressed to the grand jury or anyone else as to the date any of these conversations took place with regard to Mr. Lawrence; would you agree?
A. I don't remember.
Q. And as you sit here today, you have no idea as to when the conversation with Mr. Lawrence took place; would you agree?
A. That's correct.
Q. When I asked you about Mr. Thinnes, you indicated that you didn't think in any way that Dustin told you his testimony would implicate him; is that right?
A. Whose testimony?
Q. Mr. Thinnes's testimony.
A. Would implicate him?
Q. Yes.
A. He indicated that he was going to say that he didn't remember what was on the videotape, that Mr. Thinnes would not

1611

be able to remember.
Q. And what did he feel about Mr. Thinnes according to what you -- what he said to you? What did he feel Mr. Thinnes was going to do?
A. That he was going to say that he didn't remember what was on the videotape.
Q. What was he going to do to the Court? What was Mr. Thinnes going to come in and do to the Court according to what Dustin

told you?

A. That he would lie.

Q. And what was he going to lie about?

A. His ability to remember what was on the videotape.

Q. Well, did you say they'd eaten together, they'd become friends and he felt safe that Mr. Thinnes was going to lie well enough that the videotape wouldn't become an issue? That's what you said he told you.

A. It may not have been exactly like that, but that was the context, that he was going to say he couldn't remember and that that would be good enough to help Dustin.

Q. And, therefore, he thought this video would not be an issue is what he told you; is that correct?

A. That's correct.

Q. When Mr. Honken first came in -- and your testimony on direct examination that you thought he was a real nice guy and he was clean cut -- is that your testimony?

1612

A. Yes, sir.

Q. And he was the kind of person who you thought you could talk with, is that correct, and who you spent time with; is that correct?

A. Well, he definitely was friendly, very nice, very friendly, very smart and good -- you know, good rapport with people.

Q. And his shape was much like yours. You were walking around at that point; right?

A. Yes, sir.

Q. You can't walk anymore right now?

A. Not very much.

Q. But you can walk?

A. Little bit.

Q. Okay. And Mr. Honken basically has the same kind of a build, kind of a thin build like yours?

A. I guess so.

Q. And around the prison walls, you guys didn't buff up that much I take it.

A. I think you can look at me and tell I didn't.

Q. Okay. Well, look at Mr. Honken. Did he buff up very much?

A. He looks like he's in pretty good shape. Dustin's -- he used to exercise.

Q. So basically if you walk around with these guys, you have what? Your brains to protect you within the prison setting?

A. That comes in -- you know, that can make a difference.

1613

Q. Comes in handy, doesn't it?

A. Sometimes.

Q. And knowing how the system works also comes in handy too; would you agree?

A. Well, what system are you --

Q. Well, the Bureau of Prisons and how, as you said, when a person comes in and they have a case and you want to work up a 3553 or something like that, if you know how the system works, you can play it fairly well if you have good brains.

A. A 3553 to get a sentence reduced?

Q. Right.

A. I think you have a year after your -- after you're convicted, you have a year to apply to get your sentence reduced. And after that I don't think it applies anymore.

Q. Well, under certain exceptional circumstances it can apply; would you agree?

A. I don't think so. Under the law I believe you have the sentencing guidelines and then you have the statute, rule thirty-five hundred, and that's for a year afterwards. I'm not aware of any more than that.
Q. And if you're serving life imprisonment without the possibility of parole, I take it really there are absolutely no benefits you can get from any cooperation with the government; would you agree with that?
A. No. There are some benefits you could get.

♀

Q. Oh, there are? Like what?
A. Well, I suppose you could get money.
Q. Okay. You can get money. What else can you get?
A. You could probably get transferred to a facility that you would want to get transferred to.
Q. Like what, for instance?
A. Any other prison that you would want to go to closer to home, safer institution?
Q. Like if you have kids and you want the kids to visit you, if you cooperate, you could get with the Bureau of Prisons, and if you're going life without parole, boom, hey, I can get transferred if I give a little information? Is that one of the things you can get?
A. Well, yeah, that's possible to get transferred.
Q. What about phone call privileges?
A. You get phone calls as a regular inmate.
Q. Well, what about special ones or additional ones to call your lawyer or have them call your family for you? Is that important?
A. I've never seen that happen in the prison system, but I'm

not saying it couldn't happen.

Q. What about medical facilities or moving to a facility that could enhance your ability to be away from other people?

A. Such as?

Q. Is that a possibility? We don't need to name such as.

♀

A. No, but when you say away from other people, where --

Q. Well, away from other inmates. You indicated Florence was a dangerous place.

A. Correct.

Q. You could move to, as you described, a medium facility.

A. Right, an FCI.

Q. That's what you might want to do. I'm not saying you specifically but people in general.

A. Yes, sir.

Q. Is that correct? And also there is a program that if you, in fact, cooperate, you can be put -- say, for instance like you were in Atlanta, put into protective custody, is that correct, of some sorts?

A. When I was in Atlanta I was put in the hole. That's pretty much the answer. If someone threatens your life, they place you in a very restrictive environment. You're in a room by yourself, very limited commissary. You have to wear an orange jumpsuit, no -- none of the things you could normally get in a regular prison. I did not want to go to the hole when that happened.

Q. No. My question is you could be placed in protective environment; isn't that correct?

A. You're protected because you're in a room by yourself.

Q. So that's another advantage. Is another advantage you

could go to a prison where the food might be better?

A. I wouldn't know. Some prison -- I've been in some prisons where the food is okay.
Q. Well, you've heard, have you not, of a program called wit. sec. program; is that right?
A. Yes, sir.
Q. And the wit. sec. program is a program if people are, in fact, cooperating they can get into, and there are certain institutions in the country that provide a place for these individuals to go; is that right?
A. They do have those places.
Q. Okay. Now, prior to your going to assist Mr. Honken, you would agree you had not in any way qualified for that program.
A. That's correct.
Q. But you had tried to transfer to other institutions which you well documented in your testimony.
A. Yeah, and I went to Oxford, FCI, Oxford.
Q. Well, you went to Oxford. You also went to a place in Oregon. You also went to -- were you ever at Rochester?
A. They were FCIs that I went to.
Q. At Rochester?
A. No, I wasn't at FCI.
Q. You didn't go to the medical facility at all?
A. I really don't want to talk about my locations.
Q. Well, not your location now, but did you ever go for any medical treatment that you had requested? I don't care what

institution you went to.

A. Oh, yeah, I've had medical treatment.

Q. So you kind of developed a way that you could kind of not work the system but make your request -- and not saying you're not entitled to them. You knew how to make your requests as a lawyer to get into the different places that you needed to get into; would you agree?

A. No. If you have medical needs, you go to the doctor. And if you think your needs are serious enough, then they would transfer you there to a medical facility.

Q. But you also knew, did you not, that if you would cooperate and develop a process so you could cooperate you could get into a different program?

A. You'd go into a protected prison.

Q. Right, because you knew at one point that if a person testified that you could get into a program like that.

A. Yeah, you could, yes.

Q. But you also knew at one point Dustin told you he had to go and testify by telephone conferencing; is that correct?

A. He did, yes, sir.

Q. And he told you that he went to -- he was gone for a period of time. You wondered where he had gone, and he came back, and he confided in you that he had testified with regard to a jail incident involving another inmate; is that right?

A. Something like that, yeah.

1618

Q. And he was concerned that if people knew that he would be considered a rat.

A. That's correct.

Q. And if he was considered a rat, he could be considered that he was endangered.

A. Correct.
Q. And you knew that if you were to be considered a rat you could be considered endangered.
A. Correct.
Q. This information Dustin shared with you about his testimony did you share with anyone else?
A. No.
Q. This information that you told Dustin about yourself being a prosecutor and a judge --
A. I never told him that.
Q. Well, you said he found out.
A. Yeah, but I never told him that.
Q. Well, okay. Let's say he knew this information. The information he knew about with regard to you, did he share it with anyone?
A. I don't know.
Q. Not to your knowledge, is that right, at this point?
A. That was the promise he made to me.
Q. And did you make a promise to him?
A. Just that I would help him.

Q. That's all.
A. Correct.
Q. When he told you with regard to the deaths of these individuals, you reached the conclusion based upon what he told you that they all occurred at the same time; is that right?
A. You mean Miss Duncan and Greg, Greg and the children?
Q. Yes.
A. Those four, yes, sir.
Q. And also DeGeus?

A. Shortly thereafter, a couple months thereafter.
Q. So you don't remember what you told them as to when you thought they occurred, about the same time?
A. I remember making that statement, and then later when they showed me what they had taken down, they asked me to correct any of the things in it, and that was one of the things that I --
Q. So my question --
A. That was one of the things I corrected, and I corrected it by writing -- crossing it out with a pen and putting in the correct information.
Q. So you did say that. Yes or no?
A. I didn't, no.
Q. If I showed you a statement where it's indicated that you did say it, do you want to tell me whether or not that refreshes your recollection? Look down at the -- and read down to the bottom line.

A. I didn't write that. Someone else wrote that, and I told them --
Q. Sir, I know you didn't write that. I didn't say you wrote it. I said take a look at it and see if it refreshes your recollection.
A. And that's what I told them was wrong, and they changed it.
Q. Well, my question, sir, is did you ask -- did you tell them that at some point in time?
A. No, I told them that that was wrong, and they corrected it.
Q. Did your colleagues down at Atlanta when you were a lawyer refer to you as a master of evidence?
A. Not that I know of. A master, no.
Q. So my question is did you tell them that? Yes or no.

A. No, sir.

Q. So this statement that they wrote down, Tokars stated he has a perception this death occurred approximately the same time as Nicholson's death, you're saying they made a mistake.

A. When you say approximately --

Q. No. Are you telling me -- if you say you didn't say it, are you telling me this statement is a mistake? Yes or no.

A. That's correct. It's a mistake.

Q. Sir, when you, in fact, came out to the grand jury -- and I believe we stated the date was May of 19 -- May of 2000, May 17 of 2000 -- did you get back and did you become somewhat anxious when you didn't hear about whether or not you were going to be

moved into a program?

A. Yes, sir.

Q. As a matter of fact, you became so anxious that you violated some rules to try to find out what was holding them up; is that correct?

A. That's correct.

Q. Matter of fact, you came back -- May 17 is when you testified before the grand jury. And as early as June 2 you were calling because you said, I thought they were going to move real quick.

A. You mean Alan would have called.

Q. Yeah, I just thought they were going to move real quick, and you wanted to find out why in the world they didn't move fast enough.

A. That sounds correct.

Q. And that would have been about what? Two weeks after you got back from Iowa?

A. Yes, sir, or something -- yeah, yes, sir.

Q. And where were you at that point in time?

A. I don't want --

Q. Okay. Were you -- let's put it this way. Were you outside of Florence at that point in time?

A. Yes, sir.

Q. Did you, in fact, get any additional privileges or privileges whatsoever as a result of what your testimony has

♀

been with regard to Mr. Honken?

A. No.

Q. Did you lose any?

A. No.

Q. I want to clarify a couple of other points with regard to your testimony. You indicated that when you first started working with Mr. Honken -- this is on direct examination -- that you took working with him as a threat; is that correct?

A. No. He threatened me, and, therefore, I worked for him.

Q. So if I understand you correctly, for the first several months that we've outlined, you only worked with Mr. Honken on his case because you were threatened.

A. Yeah, after a couple -- he asked me some questions initially. I answered those voluntarily and told him I wouldn't have a problem with answering questions but that I didn't really want to work on his case. That's when he sort of threatened me, extorted me, and that's when I agreed I'd work on his case.

Q. So these hundred conversations that you had with Mr. Honken about his case were all done under extortion or threats is what you're saying.

A. You could say that.

Q. And during all of this time, you never reported that to your best friend Mr. Bell or to any prison authorities; is that correct?
A. Correct.

Q. And you never told anyone that you had changed your impression about Mr. Honken; is that correct?
A. That I changed my impression?
Q. Your impressions about him. You never related that to other inmates, any prison authorities, or anyone like that.
A. I never talked about Mr. Honken.
Q. To anyone other than your lawyer prior to the time you talked with law enforcement.
A. You mean to other inmates or --
Q. Yes, sir.
A. I don't recall talking to any about Dustin.
Q. Or to any authorities in prison about Mr. Honken.
A. No.
Q. You never asked to be transferred because of the work you were doing with Mr. Honken; is that correct?
A. When I was at Florence, no.
Q. Okay. You never raised it as a question to your lawyer, Mr. Bell, who was your best friend at any telephone conversation you had with him; is that correct?
A. That's my recollection.
Q. I want to look at my notes just a second, and I think I may not have any further questions.
The last interview you had with law enforcement would have been in the year 2000?
A. I can't remember the exact dates. There was -- you had a

list of them there? What? Ten of them?

Q. Right. Would you say you had one in the last three years or so?

A. No. I was interviewed about two months, three months ago. I mean, it was more or less just not like a real interview. They came out to talk with me to tell me I was going to go to the trial.

Q. Okay. And that would have been about -- that was about -- did they take notes on anything during that interview to your knowledge?

A. I don't think so.

Q. Okay. And so then the last interview before that would have been about four years ago?

A. Yes, sir.

MR. PARRISH: Okay. Thank you. I have no further questions.

THE COURT: Members of the jury, why don't you take a stretch break, and then we'll hear the redirect.

Okay. Please be seated.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor. May I approach?

THE COURT: You may.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Tokars, do you recall in your cross-examination you

were questioned about a report that was made that discussed the

timing of Mr. DeGeus's death in relation to Mr. Nicholson's death and Lori Duncan's death and the girls? Do you recall that line of questioning?
A. Yes, sir.
Q. And you indicated to Mr. Parrish that that had been corrected; is that correct?
A. That's correct.
Q. And showing you what's in front of you at this point, do you recognize that?
A. Yes, sir.
Q. And what is that?
A. That is the statement that he had, and there's a line drawn through it that shows my correction, and the correction says that I said that the deaths occurred about two to three months after Nicholson's death and after Honken decided he wanted a trial.
MR. PARRISH: May I for the record get the page you're referring to in the report?
THE COURT: Yes, you may.
BY MR. WILLIAMS:
Q. So the way this worked was you were interviewed. Officers went back. They typed up the report which was their best attempt of reflecting what you said. They came back at some point, and you got a chance to read it then?

1626

A. That's correct.
Q. And you corrected that when you saw that it was a mistake.
A. That's correct.
Q. You were asked during your direct examination if you recall -- I'm sorry, during cross-examination -- hold on just a

moment for me. While I'm looking this up, let me talk to you about the wit. sec. program. I don't want to get into the details of how the wit. sec. program works. The witness security program, is that a program for protecting people who are witnesses and yet they're incarcerated in the federal system?

A. Yes, sir.

Q. And in order to protect you, there are certain rules that you're expected to live by which includes you don't talk to people on the outside about being in the witness protection program.

A. That's correct.

Q. And that was what you were talking about earlier in your testimony that you had called Mr. Bell and in that conversation you talked about that and that was a violation of that.

A. Yes, sir.

Q. The witness protection -- or the witness security, wit. sec. program, are there some downsides to it?

A. Definitely.

Q. And again, without getting into how the program works, can

1627

you relate to the jury what are some of the downsides you experience as a member of the wit. sec. program?

A. Well, you can't have people visit you. You can't have people know where you're at and where you're located, and that's a distinct disadvantage if you want to have people send you things or come and visit you. And, you know, it's -- it makes life much more difficult in the prison system because they have to watch over everything you do. All the correspondence you receive is looked at and those kinds of things. So it's much

more close supervision.

Q. If you are not in the wit. sec. program, are there better employment opportunities for you within the federal prison system than you have in the wit. sec. program?

A. Yeah. There -- well, there's a lot of things that you can do if you're not in the wit. sec. program, the witness protection program, a lot of things you'd be eligible for. A lot of things you could do that you can't do if you're in the witness protection program.

Q. The benefit of the witness protection program is it keeps you alive.

A. That's correct.

Q. Is it much of a benefit in your view other than keeping you alive?

A. No.

Q. And I found the place I want to talk to you about. Do you

1628

recall during your cross-examination you were questioned about your grand jury testimony on May 17 of 2000 about when it was that you left the Florence facility and it was pointed out that at some point you had said it was in 1999 and you had indicated it was corrected later on in that transcript? Do you recall that line of questioning?

A. Yes, sir.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Again, Mr. Tokars, showing you your grand jury testimony from May 17 of 2000, page 13, do you see at the top there?

A. Yeah. It says, Oh, yes, well, no, let me see. He arrived

I believe in the summer, spring, summer of 1998, and I left in the fall of 1998 -- I'm sorry. I have my dates all mixed up.

MR. WILLIAMS: I have no further questions, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: Just a couple of questions.

RECROSS-EXAMINATION

BY MR. PARRISH:

Q. There's a reason, is there not, Mr. Tokars, as to why you're having such a terrible time with your memory about everything?

A. I don't believe I'm having a terrible time with my memory, sir.

Q. Well, sir, didn't you tell the grand jury on that same page 13 that you're having problems with your memory because of your medical condition? Did you tell them that, sir?

A. At that time I might have.

Q. Well, do you need to look at it in order to refresh your recollection as to whether you told them the problem that you had with your memory and why you were getting things so confused was because you had medical difficulties and sometimes my memory on dates is pretty messed up?

A. That sounds correct if I said that.

MR. PARRISH: Thank you. I have nothing further.

MR. WILLIAMS: Nothing, Your Honor.

THE COURT: Okay.

Ready to call your next witness?

MR. MILLER: Yes, Your Honor. United States calls Ron McIntosh.

THE COURT: Okay. Why doesn't the jury -- you can take another stretch break if you like while we change witnesses.

MR. WILLIAMS: Your Honor, Mr. McIntosh is also incarcerated, so it may be a few minutes to transfer.

THE COURT: Okay. Why don't we do this. Why don't we send the jury down to the jury room and take our 25-minute recess now. And we probably won't go all the way to 4:30 today

depending on when we break with witnesses. It's Friday, and the jurors have a long way to go. The lawyers have long drives, and so I think they'd probably appreciate getting out a little bit early. So why don't we take our recess now. We'll be in recess until 2:25 and then come back and go till probably 4 or 4:15 depending on where we are with witnesses. Thank you.

(The jury exited the courtroom.)

THE COURT: Anything we need to take up with the lawyers?

MR. PARRISH: No, Your Honor.

MR. WILLIAMS: No, Your Honor. Just this next witness is also in the same program, and that's why we're having delays, I understand. Same personnel have to handle them.

THE COURT: I understand. Is there any chance we're going to be able to finish this witness this afternoon?

MR. WILLIAMS: We certainly hope so. We're thinking we can.

THE COURT: Well, I know you can. It depends on Mr. Parrish.

MR. PARRISH: I'm not doing it.

MR. ROGERS: I'm going to filibuster, Judge. I'm here

for the weekend.

THE COURT: Fresh troops.

MR. PARRISH: My voice is going.

THE COURT: Mr. Berrigan, could I talk to you for just

one second?

MR. BERRIGAN: Absolutely, Your Honor.

(Recess at 2:01 p.m.)

THE COURT: Mr. Williams, ready for the jury?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Williams, are you ready to call your next witness? Mr. Miller.

MR. MILLER: Yes, Your Honor. The United States calls Ron McIntosh.

THE COURT: Okay. I know it's hard to raise your right hand, sir, but do the best you can. Would you raise your right hand, please.

RONALD MCINTOSH, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in our witness box. The marshal will assist you because we want to try and get that chair as close to the microphones as possible.

THE WITNESS: Okay.

THE COURT: And could we ask our marshal to pull those microphones forward a little bit? Thank you. Thank you very much.

Sir, would you state your full name and spell your

last name.

THE WITNESS: Ronald J. McIntosh, capital M-c capital I-n-t-o-s-h.

THE COURT: Thank you.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Good afternoon, Mr. McIntosh.

A. Good afternoon.

Q. Your age, sir?

A. My age?

Q. Your age.

A. Sixty next month.

Q. Mr. McIntosh, I want the jury to get just a little acquainted with you first. You are incarcerated.

A. Yes, sir.

Q. Have been for approximately how many years, sir?

A. I believe on October 26 it will be 19 years.

Q. I want to first go through those years up to around age 40 then. Where were you raised, sir?

A. I was born and raised in southern California. I -- my father passed away my senior year. I moved to Seattle, graduated from high school in Seattle, attended the University of Washington for four years.

♀

Q. When did you graduate high school?

A. 1962.

Q. And immediately after high school you attended college?
A. No, sir. I went into beauty -- beautician school, became a hair dresser for women.
Q. I want to do this chronologically. First thing out of high school you went to beautician school?
A. Yes, sir.
Q. Okay. Tell us how long you pursued that year.
A. It was 2,000 hours of training, so I spent a year in beauty school, and then I worked as a beautician till January of 1966 when I was drafted.
Q. That was my question.
A. Sorry.
Q. 1966 there was a little change in your life. What service -- what branch of the service were you --
A. United States Army.
Q. And you remained in the Army for approximately how long?
A. I was released in April of 1970.
Q. Approximately four years.
A. Yeah, little over.
Q. And would you just briefly summarize for the jury your career in the service?
A. Well, I was a draftee and decided that being infantry was not my deal, so I reenlisted while in basic training, became an

aircraft mechanic. And then I discovered that 30 percent of those guys were dying, and so I had a pilot's license in civilian life, so I volunteered and was accepted and went to helicopter warrant officer's school. And then I went on to maintenance officer school and then test flight school and a whole bunch of schools. Then finally I arrived in Vietnam in

February 1968.

Q. And what were your responsibilities when you arrived in Vietnam?

A. Well, I was a maintenance officer and test pilot which means basically you do not go out on missions until they become shorthanded. I was with the first air calvary which meant I ended up going on a lot of missions even though my job didn't call for it.

Q. Flying a helicopter?

A. Flying a helicopter, yes, sir.

Q. For combat missions?

A. Yes, sir.

Q. For how long, sir?

A. Just about ten days short of a year.

Q. Were you involved in any particular engagements there?

A. I got there in time of Tet, Que Son, Ashaw Valley, and then what we refer to as the Fish Hook which was towards the end of '68, portions of the early part.

Q. You spent a full year of active combat helicopter flying in Vietnam.

A. Yes, sir, I did.

Q. You got out of the service in 1970.

A. Yes, sir.

Q. What did you do then, sir?

A. Well, the first thing I did was I went to work for -- well, actually first thing I did was flew helicopters in Alaska for a charter, non-sched. charter service. Then I stopped doing that and went to work for Beneficial Finance, became office manager in less than 18 months.

Q. Where was that?
A. That was in Seattle.
Q. And approximately when was this?
A. This would have been -- well, '70, six months for the flying, so we're talking '71, '72.
Q. Please go ahead and proceed and tell us about that career.
A. At the finance business?
Q. Yeah.
A. Well, okay. The -- you come in as starting in collections. Then they work you over to loan officer, and then eventually you become -- when an office becomes available, you become an office manager. I took over an office that was 18th -- the least profitable in the state and 6 months in it second most profitable in the state.
Q. You had some success there.

♀

A. Yes.
Q. Did you also again pursue education further?
A. While I was there, I started attending night school originally and managed to go to University -- first at community college, North Shore Community College, and then transferred to the University of Washington and finished four years of college majoring in international finance and minor in computer science.
Q. And that was at what school?
A. University of Washington, Seattle.
Q. And then just briefly if you would summarize for us your career from that point on.
A. I went to work for a stock brokerage firm called Foster and Marshall, a regional firm that covered seven states. I stayed there for about a year and transferred over to Smith Barney in

Seattle. I stayed with Smith Barney till '78, and then I transferred to PaineWebber in Seattle, and I remained there until roughly June of '81.

Q. You were still with PaineWebber in June of '81?

A. I believe that's -- yeah, that'd be correct.

Q. Mr. McIntosh, as we've already noted, you're incarcerated. You have a criminal history, sir?

A. Yes, I do.

Q. And would you tell us when that began?

A. In '81. That's why I stopped with PaineWebber. I was convicted of mail fraud in 1981.

♀

Q. Was that in connection with securities?

A. Yes, that was -- involved business at PaineWebber.

Q. Was that a federal offense?

A. Yes, it was.

Q. And what was the result to you, sir?

A. 18 months' incarceration plus 5 years' probation, $130,000 restitution.

Q. After incarceration, what did you do?

A. I opened or went in partnership with a number of businesses, one of them being a gold and silver bullion company called First International Trading Corporation.

Q. Was the '81 federal fraud conviction the end of your criminal history, sir?

A. Unfortunately, no. In -- I was arrested in October '85, convicted I believe was February '86 of violation of California's law of selling unregistered securities.

Q. And please describe the effect that had on you both with regard to the state of California and any effect it may have had

with regard to the federal system as well.

A. It violated my federal probation and caused me to be incarcerated in the federal system to a sentence of three years.

Q. Is that all of your criminal record, sir?

A. No, sir.

Q. What were the next convictions, sir, and when did they occur?

♀

A. Approximately the following October I escaped. I commandeered a helicopter.

Q. Just tell me what were you convicted of. When were you next convicted?

A. My next conviction.

Q. Yeah.

A. I see. Okay. I'm sorry. My next conviction was escape, air piracy, use of a firearm during commission of a felony, and aiding and abetting an escape.

Q. Actually four different felonies.

A. At one time, yes, sir.

Q. Those were federal charges, sir?

A. Yes, they were all federal.

Q. And they were in connection with a single incident.

A. Yes, sir.

Q. How does air piracy fit with escape and aiding and abetting escape in your case, sir?

A. I obtained a furlough transfer which means I was allowed to leave one prison on my own, and I used that opportunity to commandeer a helicopter and I flew it into a federal prison and picked up my girlfriend at that time.

Q. Used a helicopter to free a girlfriend from a federal

prison facility?
A.    Yes, sir.
Q.    How many times has that been done, Mr. McIntosh?

A.    I'm -- to the best of my knowledge only one successful helicopter escape from the federal system, and that's mine.
Q.    That was in when, sir?
A.    I picked her up I believe on the 5th of November, 1986.
Q.    And obviously at some point the law enforcement authorities caught up with you.
A.    Eleven days later.
Q.    And does that end your criminal history, Mr. McIntosh?
A.    Once again, unfortunately not.  I'm convicted of conspiracy to murder and first degree murder in the state of California in -- conviction was actually in '90 -- December of '90, and my sentence was set down in '91.
Q.    And that's with a death that occurred when, sir?
A.    The death occurred May 1984.
Q.    And the victim in that case, was it family, friend, business --
A.    He was a business partner in a business I was involved with called Alaska Oil and Gas.
Q.    Mr. McIntosh, the sentence that you received for the air piracy, escape, aiding and abetting an escape, those four that occurred at the same time, what sentence did you receive as a result of that, sir?
A.    Twenty-six years, four months I believe it was.  Aggregated sentences is the way it was phrased then.  That was they combined them all.

Q. That was in 1987 -- excuse me.
A. '87 was the conviction actually, yes. The event was in '86.
Q. And that was a federal sentence.
A. Yes, sir.
Q. The murder conviction and the conspiracy to commit murder conviction in California, what did that result in as far as a sentence for you, sir?
A. Life without the possibility of parole.
Q. And you are currently serving time for what sentence or sentences, sir?
A. I have completed all my federal sentences and am currently serving the life sentence in the state of California.
Q. Were your federal sentences reduced as a result of any --
A. No, sir.
Q. -- anything?
A. I did -- because of what's referred to as an old law sentence which means I received statutory good time for good behavior, so I went to full term for mandatory release on the federal sentence.
Q. You served your full federal sentence.
A. Less good time, yes.
Q. Didn't receive any sentence reduction from any prosecutor or judge.
A. No, sir.

♀

1641

Q. Different states have different laws about life sentences, Mr. McIntosh. What is the practical effect of a life sentence

without the possibility of parole in the state of California? Does it mean what it says?
A. You will die in prison.
Q. You can't get paroled from that.
A. No, sir.
Q. You can't get a sentence reduction.
A. No, sir.
Q. Ron McIntosh is going to die in prison.
A. Yes, sir.
Q. Are you appearing here in connection with any promises from the government as to any --
A. None whatsoever.
Q. And again, none possible in your case.
A. As far as I know. I can hope, but not that I know of.
Q. During the years that you have spent in prison, Mr. McIntosh, did you spend any at a facility in Florence, Colorado, United States Penitentiary, Florence?
A. Yes, I did.
Q. When did you arrive there, sir?
A. I was somewhere between the 40th and the 80th inmate to arrive. I helped open the institution. It was March 1994.
Q. You helped open the institution?
A. Well, the first 300 inmates had to be 5 years incarcerated

1642

with no incident reports to go there because most of the guards had never worked with inmates. They had been rifted out of the service, and so we made the joke that we were there to train the guards.
Q. That was a joke.
A. Well, it was probably more truth than joke, but anyway,

yes, sir.

Q. That was in March of '94?

A. Yes, sir.

Q. And that's when USP, Florence actually opened?

A. I believe it actually opened in February officially, but there was only 40 people there, 40 inmates in February.

Q. So you were one of the very first inmates in Florence.

A. I was on the second bus, so that's why I know there was between 41 and 80.

Q. And you stayed there from March of '94 until when, sir?

A. The end of March 2000.

Q. Mr. McIntosh, we've already heard a little bit about Florence, USP, Florence, but very briefly if you could describe for us the security level and the nature of the institution as far as the population.

A. The institution is classified as a United States Penitentiary high security which infers that it is more secure than all the other penitentiaries in the system. It is considered to be the last stop before going to what is Marion or

♀

known as administrative detention which is called the ADX or the Rockies, Alcatraz of the Rockies. What type of people are there?

Q. I would assume history of violence or escape risk, that sort of thing.

A. Escape risks, history of violence. The average sentence when I was there seemed to be life, and the average age was in the late 20s.

Q. Are there a number of housing units at Florence, sir?

A. There is B through E, and each one has two -- an A and a B

side.
Q. That'd be a total of eight?
A. Yes, sir. Population ran about 1,250 when I was there.
Q. So that'd be about 300 for each letter and 150 or so for each --
A. Each side, yes.
Q. -- each side? Were you in the same unit the whole time you were incarcerated?
A. No, I was in E unit when I arrived, but shortly thereafter I transferred to BA, and then I transferred -- they created a nonsmoking unit, and I moved over there which was BB.
Q. When was that created?
A. Oh.
Q. If you recall.
A. No, I really don't. Maybe '96.

♀

Q. Mr. McIntosh, during your years at USP, Florence, did you ever make the acquaintance of a man by the name of Dustin Honken?
A. Yes, I did.
Q. Approximately when was that if you recall?
A. I believe it was in the spring of 1998.
Q. Do you recall your first contact with the man?
A. Yes, I do.
Q. Please describe that.
A. I was sitting in the dining room at a table by myself, and this young man walked up and said could he sit down, and I said yes. And he kept on talking, and I finally said, Is this your first time in prison? And he said yes, it was. And I said -- asked him, Are you gay? And he said no. And I said, Well, then

you better grow some facial hair because you're kinda pretty. And shortly thereafter he excused himself and left, so I feel he felt he was offended, but I was trying to be honest.

Q. Give him some advice.

A. Yes.

Q. Was that the last you saw of --

A. Oh, no, no. I saw Mr. Honken numerous times.

Q. Do you recall your second encounter with the man?

A. He approached me a few weeks later and said that he was -- explained that he thought I was queer and was hitting on him and that -- but he decided that I was being honest with him and he

♀

was having some problem with somebody who had lent him some items and he asked me what he should do, and I said you buy item for item and you return those to that individual in front of his friends and tell him thank you for the loan and then be ready to fight. It doesn't matter whether you win or lose the fight. It's just that you stand your ground. And I understand he did do that and it was successful. It did not end in a fight, and it ended his problem.

Q. Is it important to know how to carry yourself in a maximum security institution like USP, Florence?

A. There are a number of incidents or stickings or how ever you wish to phrase that.

Q. I take it when you first met him and asked if this was his first time in, it was apparent to you that he was naive or --

A. It was apparent to me that he was what we call a fish which means he just -- he's a fish out of water; he just got in here.

Q. The second contact that you had with him was to give him that advice with regard to how to handle the --

A. Yes, I believe -- yes.

Q. And what -- why was that advice important? What would be the possible consequences of handling that wrongly?

A. Well, if he -- and, of course, this is just my opinion, but from the years of experience there, if you didn't pay back the loan, the items that the gentleman had loaned him, then the gentleman would have a reason to constantly come by. If you

didn't do it publicly, then the gentleman could lie to his friends and claim something else. And if you're not willing to fight, then you must be a punk. Excuse my expression, but that's prison.

Q. So it's important to handle it in the way that you recommended in order to protect his own reputation and to avoid any further problems with the individual in question.

A. Yes, sir. I'm sure there are other ways, but that way I know works.

Q. During the course of your years there at Florence following the spring of '98, did you have further contact with Mr. Honken?

A. Yes, I did. I had earned a reputation as a jailhouse lawyer, and out of the blue he came up to me one day and asked a very unusual question. He said if somebody was dead and you transport their body across a state line, is it a federal crime, and I explained to him, I says, My God, why would anybody do that? And he said that, well, we drove about 20 miles and we buried the body and we didn't know we had crossed a state line till some days later. And I explained to him that I knew it was a crime where the murder had occurred. I knew it was a crime -- jurisdictional-wise, a crime where the body would be found if found, and I assumed it was a federal crime because any time a

crime crosses a state line it usually becomes federal.

Q. And you so advised him?

A. Well, yeah. If that's advice, that's what I told him.

Q. You didn't do any research on the subject?

A. No, I did not on that subject.

Q. Now, you indicated that you had a reputation as a jailhouse lawyer. Just tell us very briefly what the term jailhouse lawyer refers to and what sort of activities are done under that name.

A. Well, most of the time it's for filing a habeas corpus which is challenging for some constitutional right that's been denied during the trial that hasn't been raised previously on direct appeal, or in the old days you could file many habeas corpuses that hadn't previously been presented to the court. Also we used to run into a lot of parole revocation hearings when we had parole, and then the next big thing is errors that had been made during sentencing where either the scoring's been done wrong or they double counted something, that type of thing.

Q. How much of such work did you do when you were at Florence?

A. I have presented over a hundred cases.

Q. So a fair amount of work.

A. Yes.

Q. Even though you're not a lawyer yourself.

A. I've never signed one because I'm not a lawyer, so they have to sign them as pro per or pro se.

Q. But you do some legal work for them and help draft documents and the like?

A. I do, sir, or have in the past.

Q. You've mentioned contact with regard to a question with regarding movement of bodies. Is that the only matter or issue that Mr. Honken brought to your attention as a jailhouse lawyer during your mutual time there?
A. No, it is not. He -- actually there are several, but, I mean, the next one --
Q. Let me just first ask you to enumerate if you would what matters he brought to your attention, and then we can go through them one at a time.
A. He inquired to when was the effective date of the federal death penalty. He asked me to look at his trial transcripts. He asked me to look into child support. He asked me to -- questions regarding grand juries and attorney-client privileges, and I drafted a number of letters for him.
Q. Do you recall the conversations that you had with Mr. Honken with regard to the question of the effective date of the federal death penalty?
A. He was very concerned whether it took effect in '93 or '94. He didn't say why at the time. And I did go up and research it for him.
Q. Do you recall offhand what conclusions you even arrived at?
A. I believe it was '93 or before.
Q. And passed along that advice to Mr. Honken?
A. Yes, sir.
Q. You mentioned that he asked you to look at his transcript.

1649

What's that refer to, sir?
A. He felt he had a violation where the police had asked him questions without his attorney being present and that this may

have been sufficient for a reversal, and I looked over the transcripts. I advised him that I didn't feel that I knew enough to be of any assistance to him on that case.

Q. And that was a violation that he felt had occurred when, sir?

A. Pretrial, like '93, '94, '95. Whenever -- I don't recall when he went to trial. '96.

Q. But prior to the sentence that he was serving.

A. Right.

Q. It was in connection with the sentence that he was serving.

A. Yes.

Q. You arrived at the conclusion that you could not be of assistance?

A. I didn't see anything that I felt would be a reversal. And what I -- I've had quite a bit of success, but I pick and choose my cases because I don't get paid for it. I don't -- you know, my standard fee if they win and get released is I'd like them to send me a postcard. But I didn't see an issue that I felt was a reversible issue.

Q. And did you so advise Mr. Honken?

A. Yes, I did.

Q. Was that the end of the matter, or did he take his work

1650

elsewhere to your knowledge?

A. He took it to Mr. Tokars who lived on the range below me.

Q. Who was Mr. Tokars?

A. Tokars had been an -- my understanding is he had been an attorney in the state of Georgia, had been a judge, magistrate and was serving time now.

Q. How many jailhouse lawyers were there in your area?

A.    Well, it varied between 6 and 12, and most all of us lived in BB, so we would -- had discussions and conferences trying to figure out issues.

Q.    How much contact did you have with Mr. Tokars?

A.    Tokars wasn't there very long, maybe a year.  I had quite a bit of contact with Mr. Tokars, one, because he was an attorney and I was working on legal items and because we lived in the same unit.  Plus when he first arrived he had a problem that some people put a contract out on him which meant to kill him, excuse me, and I went and talked -- he came running -- I don't know who sent him to me, and I went and talked to some people and was able to negotiate that to disappear.

Q.    You had contact with other people in the unit who did that sort of work as well?

A.    The legal work?

Q.    Yes.

A.    Oh, yes.  My cellie had been to the New York -- I can't remember the correct wording but the law school -- New York law

1651

college, or anyway, he was an attorney, past attorney, and another gentleman that lived down the hall was also a past attorney so . . .

Q.    After you informed Mr. Honken that you didn't feel you could be of assistance to him with regard to his case, he went to Tokars you say.

A.    Yes, he did.

Q.    Was that the end of your involvement on his case?

A.    On his case?

Q.    His '96 case, trying --

A.    Yes, that's the -- I reviewed his stuff.  I referred him,

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1443 of 3636

and I did not work on his -- the old case before. He did ask me other questions later on, and other issues did come up but not regarding that case.

Q. You mentioned that he at one point raised a matter of child support?

A. Yes, he wanted to know if there was any way he could not be held liable for child support, and I informed him that I wasn't sure and I'd have to research it.

Q. What information, if any, did he provide you in connection with that question?

A. He explained to me that he had not been married, that he had a son by a woman named Kate, that she was a bookkeeper or some type of professional work, that he had a daughter by a woman named Angie and at the time she had been a stripper and

was at that time working in a -- as a waitress.

Q. I believe you already indicated you weren't able to provide much assistance to Mr. Honken as far as the question of child support obligation.

A. Well, I did go up and research it, and I came -- found out that basically I didn't feel he could get out of it, that he may not have to pay it while he was in, but it would be a debt owed to the state.

Q. During the course of your representation on these various matters, Mr. McIntosh, did you ever confront Mr. Honken with regard to the question of killings?

A. Well, yes, I did. I -- we gotta back up for a second. When I was researching the issue of child support, somebody -- a gentleman asked me what I was doing just out of curiosity, and I explained that I was looking up child support issue for Dustin,

and he said to me --

MR. ROGERS: Objection, hearsay, what this somebody said.

Q. Let me just try to rephrase the question. Did you during that time frame ever confront Mr. Honken regarding the question of violence?

A. Yes, I did.

Q. Would you describe that.

A. I came back to the unit. Dustin walked in and wanted to know what I'd learned on the child support. And I said, I hear

you killed some children. Did you strangle them? He said, No. I strangled the rat and his girlfriend, and Kate suffocated the kids because they wouldn't shut up.

Q. Where was that conversation, Mr. McIntosh?

A. In my cell in BB.

Q. Who was present?

A. Mr. Honken and myself.

Q. Can you tell us approximately when that conversation occurred?

A. Approximately the 1st of April, '99.

Q. Why, sir, would you take it upon yourself to confront another inmate on a subject like that?

A. In prison you can't mess with children. If I were to help somebody with his legal problems who had messed with children, then I become as guilty in the eyes of the other prisoners as that person.

Q. There's some hierarchy or grading of seriousness of offense within the prison population?

A. Children are basically taboo. You can't mess with

children.

Q. That's looked down upon by other inmates.

A. (Witness nodded head.)

Q. Did he describe that incident in any further detail to you, Mr. McIntosh?

A. Well, at that time I was shocked, and I said you mean --

♀

when he said Kate suffocated the children, I said to him, You mean the one that has your son? And he says, No, the one that has my daughter, which I was confused on that issue, who he was really talking about. And then I said, Why in the world did you get them involved anyway? And he explained to me, We didn't think they were in the house; we went in there; we had to kill them because they were now witnesses. And that was the end of that conversation. It was not brought up again as my cellie came in the room.

Q. A third party entered the room.

A. Uh-huh, yes.

Q. Mr. McIntosh, you mentioned that there was also an inquiry to you from Mr. Honken at one point regarding testimony of an attorney or videotape?

A. Yes, there was.

Q. Describe that, sir.

A. Dustin came to me and wanted to know if an attorney could be forced to testify at a grand jury regarding a videotape that Dustin had placed in the care of the attorney.

Q. Can you describe the conversation you had with him at that time, sir?

A. I inquired as to the nature of the videotape. He explained that the videotape was of an individual who had been involved in

drug business and that the individual on the tape cleared Dustin of any involvement in the tape -- or in the drug business I

mean. And then Dustin said that he killed the man and disposed the body, and I immediately responded, My God, that's not on the tape, is it? And he says, No, it's not on the tape. Later on I asked him if the attorney had viewed the tape. He said no, he was unaware whether the attorney had viewed it. I says, Does the attorney still have the videotape? And he said no, he did not. And after some research later on, I told him that I felt that the attorney probably would divulge whatever he knew at the grand jury.

Q. He would be subject to subpoena.

A. I believed he would be. That's what I told him.

Q. That's the advice you gave Mr. Honken.

A. Yes.

Q. Did you do any further work in connection with that issue of any sort?

A. Dustin had me type a letter that was addressed to a Mr. Hoffines of Legal Search in -- I believe it was Denton, Texas. He wrote basically the same question to him.

Proceed on? He later on brought back the response from Mr. Hoffines. Mr. Hoffines said he wanted $3,000. Dustin indicated that he could pay the fee, and I told him, I says, Well, I think it's a waste of 3,000. I think the answer is they will subpoena the attorney, but you do whatever.

Q. During the period of time that you visited with Mr. Honken about these various legal questions and in particular after your

conversation with him about the killing of these children, did you have any other conversations in which he described to you in any more detail the full circumstances of what happened to any degree?

A. No, I don't believe so.

Q. While you were incarcerated with Mr. Honken, you've already mentioned that he arrived there in spring of '98 and was what you called a fish.

A. Yes, sir.

Q. Naive, first-time prisoner.

A. Correct.

Q. Did his status remain such in the population there at Florence?

A. He became affiliated with a group of gentlemen who were very aggressive and at which time his demeanor changed.

Q. Who were his friends in the population?

A. The ones I know of were Joe Dougherty, Dave Loparo, Frank Plunk, Bill LeBaron, guy named Swan, Fergie or Ferguson. I did say Carl Boles, didn't I? If I didn't -- that's the ones I recall.

Q. Is an inmate's status important to his well being in an institution like USP, Florence?

A. Yes.

Q. And his status I take it changed from being a vulnerable prisoner to . . .

1657

A. They would -- to an aggressor.

Q. What is the status of an inmate who in any way earns a reputation as an informant in a prison like USP, Florence?

A. The status? Usually dead. Excuse me if that was not the answer you -- but that's -- it was very much looked down upon. They were -- if given opportunity, they would be -- they would -- if they're smart, they'd check themselves in -- lock themselves into jail essentially so no one could get to them. I've known a number of people who've been killed for that.
Q. Are there any methods employed or while you were there in any event were any methods employed to ascertain whether prisoners were informants or not?
A. The standard procedure back then but Bureau of Prisons has changed what's allowable now, but back then inmates would often have in their possession their presentence report, and in the case of the group I was talking about, they would approach people and demand to see their presentence report because in the presentence report will be a statement by the probation officer whether this person has lended any assistance to government officials.
Q. Did Mr. Honken to your observation participate in such activity?
MR. ROGERS: Objection, Your Honor. This is irrelevant, 403, 404.
THE COURT: Sustained.

BY MR. MILLER:
Q. Did he ever in your presence express an attitude toward informants?
A. Mr. Honken said that everyone should kill their rats. I killed my rats. I strangled my rats. You should kill your rats.
Q. And did he ever describe to you in any more detail how he

killed his rats?
A. He said he strangled them.
Q. Did he indicate on how many occasions?
A. There was two occasions. One occasion one man was killed, and the other occasion Honken said he killed a man and a woman.
Q. And that's the occasion where two children were killed also?
A. Two children, but he did not kill those children.
Q. But he attributed that to his girlfriend?
A. To a woman, yes.
Q. Who had his daughter.
A. Yes, who had his daughter.
Q. Mr. McIntosh, at any time during your mutual residence at USP, Florence, did Dustin Honken express to you any concern about whether he was being informed against by anyone else in particular?
A. Yes. Tokars who I explained was working on his case was transferred to Oxford FCI, and Tokars -- Dustin asked me if

1659

Tokars -- if I thought Tokars was an informant or now working with the government, and I told him I didn't believe he was.
Q. Mr. Honken was concerned about that, however.
A. He was concerned that Tokars was working with the government.
Q. Tokars had received a transfer?
A. He'd received a transfer, yes.
Q. And why would that raise any suspicion?
A. Well, normally if somebody comes to the penitentiary other than a lateral transfer to another penitentiary, he's going to spend approximately -- on a life sentence he's going to spend

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1450 of 3636

five years before he can ever hope to see going to an FCI. Mr. Tokars had spent about a year at the penitentiary and went to an FCI. So this raised a lot of questions by a lot of people.

Q. How would an inmate in Florence know where another inmate was transferred to?

A. Well, you can call it -- I call it a telegraph. You can call it the grapevine. It seems like something goes on in one penitentiary. Within three days wherever you are in another penitentiary you know what the rumor is. There's -- as I said, there was about 1,200 people at Florence. There's about three or four hundred that are permanent residents. The other are kind of transferring through the system. It's not unusual to see somebody at the penitentiary. He leaves. Two years later

1660

he's back. He's been to three other institutions, so word gets around.

Q. Mr. McIntosh, the Dustin Honken who bragged about killing his rats and who consulted with you regarding this videotape and the killings of five people, is that person present here in this courtroom?

A. Yes, he is, right here. He has a polo shirt, tan color, glasses.

MR. MILLER: Thank you, sir. I have no further direct.

THE COURT: Mr. Rogers? Why don't we give the jury a short stretch break before you begin your cross-examination.

Okay. Please be seated. Thank you.

CROSS-EXAMINATION

BY MR. ROGERS:

Q. Good afternoon, Mr. McIntosh. My name is Charlie Rogers, and I'm a lawyer representing Dustin Honken.

Let's talk a little bit about the United States Penitentiaries at Florence and elsewhere. First of all, you're currently serving a California state sentence; is that correct?

A. That's correct, sir.

Q. And that is life without parole.

A. Yes, sir.

Q. And it's always been life without parole since that sentence was imposed in 1991.

A. Yes, sir.

Q. And so you've always known that there was never a chance of you being paroled on that sentence.

A. Yes, sir.

Q. However, you're not serving that sentence in an institution in the state of California run by the California Department of Corrections.

A. No, I am not.

Q. You're serving that institution -- that sentence at a federal institution, aren't you?

A. Yes, sir, I am.

Q. And that is as a result of your cooperation with the government in this case.

A. I believe so.

Q. And other cases too perhaps.

A. I believe so.

Q. And so the reason you're not at Pelican Bay or San Quentin is because of your cooperation with the government.

A. That's correct.

Q. And that's a benefit that's been given to you, isn't it? You'd rather be where you are now -- and I'm not asking you where that is -- than you would be at Pelican Bay or San Quentin.
A. Yes, sir.
Q. You didn't just happen to be subpoenaed and show up here,

did you?
A. No, sir.
Q. You initiated a chain of events that led to your being here, didn't you?
A. Yes, sir, I did.
Q. And now let's talk a little bit about prison and life in prison. You've been there quite a while.
A. Yes, sir.
Q. With a little brief time on the streets when you went out and did more crimes and got caught.
A. Sixteen days, sir.
Q. I'm not talking about your escape time.
A. Oh.
Q. I'm talking about your parole time.
A. Yes, sir.
Q. You start off as a stockbroker.
A. Yes, sir.
Q. In Seattle.
A. Uh-huh.
Q. And you steal $130,000 from the company you're working for and the clients whose accounts you worked on.
A. Yes, sir.
Q. And you get caught.

A. Yes, sir.
Q. And you got -- you had two counts to which you pleaded

guilty.
A. I'm sorry?
Q. Two counts?
A. Perhaps. I don't really remember. But the fly-by is what I remember.
Q. And on one count you were sentenced to 18 months. --
A. I'm sorry, five years probation.
Q. Three-year sentence, five years' probation?
A. Eighteen months on Count -- on the first count.
Q. Right.
A. Five years' probation on the second.
Q. On the second count, and when you violated the probation, you had a three-year sentence to do.
A. Correct.
Q. And then you were sent to serve that sentence. Where did you serve your 18 months?
A. I started at Terminal Island in southern California.
Q. Terminal Island is an administrative place where they hold pretrial people mainly or people waiting to get transferred?
A. Back then people did time. I believe now it might be pretrial, but back then they served time.
Q. And that's in Long Beach?
A. Near San Pedro if that helps, Los Angeles, southern California.
Q. Right.

A. And I was only there for maybe three months and then I was transferred to Lompoc camp.
Q. Okay. And Lompoc camp is also in southern California.
A. Yes, sir.
Q. On the coast west of Santa Barbara?
A. Just north of Santa Barbara, yes.
Q. And there are -- there's a -- what's called a federal prison camp there?
A. Yes, sir, there is.
Q. That's a minimum security institution?
A. Yes, sir.
Q. Where you could wander off if you wanted to?
A. Absolutely.
Q. But next door to it is what's called a United States Penitentiary at Lompoc; right?
A. It is today. Back then it was an FCI.
Q. It was an FCI in those days.
A. Uh-huh.
Q. And you were sent to the camp.
A. Yes, sir.
Q. So that's -- if you're going to do time in the federal system, there's probably no better place than the FPC, Lompoc, is there?
A. Camp is the place.
Q. And Lompoc's a beautiful place.

1665

A. Yes, it is.
Q. Pretty country, gorgeous climate.
A. (Witness nodded head.)
Q. And so how long were you there?

A. Oh, nine months approximately.
Q. And then you were paroled from your 18-month sentence?
A. I mandatory released it, paroled.
Q. That's right. But you were mandatorily released to serve the probation term that had been imposed at the same time for the other count in your original case.
A. Yes, sir.
Q. And you stayed in the southern California area and got involved with all these securities-type frauds?
A. Well, no. I went to Hawaii.
Q. Okay. Went to Hawaii to get --
A. I stayed there six months, and then I returned to California, northern California.
Q. And that's when you got involved with the other securities frauds offenses?
A. Yes, sir.
Q. And that's also when your business partner, Mr. Ewing, turned up dead.
A. Yes, sir.
Q. And you were charged with the securities offenses in the state of California did you say?

1666

A. Yes, sir.
Q. And your federal -- were you convicted of those?
A. In the state?
Q. Yes.
A. I pled guilty.
Q. You pled guilty?
A. Actually I pled nolo contendere to be technically . . .
Q. What kind of sentence did you get for those?

A. Four years concurrent with my federal time.
Q. And your federal time was as a result of your probation being revoked.
A. Yes, sir.
Q. And that was a three-year sentence.
A. Yes, sir.
Q. And where were you sent to serve that?
A. I was at Pleasanton -- FCI, Pleasanton, California, which is just east of Oakland.
Q. And that is an FCI, a federal correctional institution.
A. Yes, sir.
Q. And unlike the camp at Lompoc which was a minimum security place, the FCI is a medium security kind of place.
A. It has two fences and no towers.
Q. So still maybe escapable, but it's not like a USP.
A. Not a walk-away.
Q. Okay.

♀

A. Yes.
Q. And so -- I have to stay away from this microphone because I get feedback from this microphone.
How long were you at FCI, Pleasanton?
A. I believe real close to 11 months.
Q. And were you moved then to a camp there in Pleasanton?
A. No. I was given a furlough transfer to go to -- back to Lompoc camp in which I --
Q. Lompoc camp.
A. -- which I wandered off on.
Q. Wandered off. And in the course of wandering off you came across a helicopter?

A. It wasn't quite that easy, but I did acquire a helicopter, yes, sir.
Q. You acquired a helicopter at gun point.
A. Yes, sir.
Q. And you took that helicopter and went to some other federal institution where your girlfriend was?
A. No, I went back to the same institution, FCI Pleasanton, and picked up my girlfriend.
Q. So Pleasanton was coed?
A. Back in those days it was a coed prison.
Q. So you got this helicopter at gun point, committed the crime of air piracy.
A. Yes, sir.

Q. Went and helicoptered your girlfriend out of Pleasanton.
A. Yes, sir.
Q. And the two of you played Bonnie and Clyde for a couple of weeks?
A. I believe it was 11 days.
Q. Okay. And then they didn't send you to camp, did they?
A. No more camp, sir.
Q. Where did they send you after that?
A. United States Penitentiary, Leavenworth.
Q. All right. And that is what's called a main line penitentiary.
A. Back then it was the top-of-the-line penitentiary.
Q. Because Alcatraz had closed?
A. Alcatraz was closed, yes, sir.
Q. Marion had opened but Marion was --
A. That's administrative lockdown.

Q. In those days at least.
A. Still is.
Q. Well, it's a little different, but yeah.
A. Well, there's one hour out of the cell a day at Marion.
Q. At Leavenworth you were there with all kinds of people?
A. Yes, sir.
Q. At the prison camps where you were, it was mainly white collar types like yourself; right?
A. The average education was a master's degree at the prison

camp when I was there.
Q. But not so at Leavenworth.
A. No. Might be high school maybe.
Q. And how long were you at Leavenworth?
A. Continuous or --
Q. That time, first time.
A. I was there two years.
Q. And where did you go from there?
A. County jail, Redwood City, California, for the murder case.
Q. Okay. So you went there, and you had your murder trial, and you were found guilty there.
A. At the murder trial.
Q. Did you plead guilty?
A. No, I was found guilty.
Q. You were found guilty? And is -- that case, the appellate process is over with on that case?
A. The appeal is done, yes, sir.
Q. And you don't have any pending --
A. No, I have no currently pending legal action.
Q. And so your sentence, at least in your opinion as a

jailhouse lawyer, is pretty much final?
A. Right now it's in concrete or granite or how ever you wish to phrase that.
Q. All right. And when you received that sentence, were you brought back to the feds?

A. Yes. I returned to Leavenworth.
Q. Okay. And how long did you stay there this time?
A. Be three years.
Q. And Leavenworth is a very old institution, isn't it?
A. It was completed in 1898.
Q. And they've built some new stuff since, but it's still --
A. Only the UNICOR. Well, they remodeled the inside, yes.
Q. Right. And they built the special housing unit that's new.
A. Correct. While I was there, they built the new special housing unit.
Q. But in general it's an old place.
A. Uh-huh, yes, sir.
Q. And how long were you there?
A. Well, as I just said, I was there for -- from August of '87 till August of '89. I came back -- I believe it was end of February -- no, it must have been 1st of March '91, and I left in March '94.
Q. And that's when you left to go to Florence.
A. Florence.
Q. And they were opening the federal correctional complex in Florence, Colorado, at that time.
A. Yes, sir.
Q. And to set the stage for that, that is not just the penitentiary where you were. There are also a federal prison

camp at Florence; right?

A. Yes, sir.
Q. Which is a minimum security kind of place where you can just walk away if you feel like it but you may end up elsewhere; right?
A. Yes, sir.
Q. And there's also an FCI, a federal correctional institution, that is kind of a medium security place.
A. Yes, sir.
Q. And then there's the penitentiary where you were.
A. Yes, sir.
Q. We're going to talk about it in a minute. And then next door to the penitentiary is what they call the administrative maximum or ADX.
A. Yes, sir.
Q. And the ADX is the most secure facility in the federal system.
A. That's my understanding, yes, sir.
Q. Now, at the penitentiary at Florence, fair to say that that's a pretty violent place?
A. Reasonably violent, yes, sir.
Q. I mean, people get killed there.
A. Yes, sir.
Q. People get beaten there by other prisoners.
A. Yes, sir.
Q. People get beaten there by the guards.

A. Yes, they do.
Q. People get extorted.
A. Daily, especially commissary day, sir.
Q. And people get assaulted sexually.
A. Yes, they do.
Q. You said if you don't fight you're a punk.
A. Yes, sir.
Q. That's what you meant.
A. That's what I meant, yes, sir.
Q. When you got there, you had already served over ten years in federal custody off and on, right, or --
A. Off and on that'd be close.
Q. And so you kind of knew your way around penitentiaries.
A. Yes, sir.
Q. You also got there as part of the first group who were there to train the guards I believe you said?
A. Yes, sir, yes, sir.
Q. And that was a hand-selected group of inmates who were not management problems.
A. Correct.
Q. And when they opened that penitentiary and built the population up to its level that they wanted to keep it at, they started by putting inmates there who were not management problems.
A. Initially that's correct, yes, sir.

1673

Q. That's how it started.
A. Yes.
Q. After a while they got the same kinds of inmates as any other USP and maybe somebody worse than some other USPs.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1462 of 3636

A. It was referred to, if I may, as a knucklehead joint. That meant the people who couldn't make it at the rest were being shipped there.
Q. But in terms of your security level designation, it wasn't any different from Leavenworth or USP, Atlanta or any other United States Penitentiary.
A. Exactly the same, sir.
Q. Okay. But after the initial training of the guards had taken place, then a warden at some other penitentiary who was asked to transfer inmates to build population at Florence would naturally pick the ones he didn't want to have around.
A. That's correct, sir.
Q. Now, at USP, Florence it's a pretty new facility, isn't it?
A. It'd be 11 years old now, sir.
Q. So as prisons go, that's pretty new.
A. Yes, sir.
Q. Certainly compared to Leavenworth which is 111 years old or something.
A. Yes, sir.
Q. It has security features, doesn't it?
A. United States Penitentiary, Florence?

1674

Q. Yes.
A. Yes, sir.
Q. It has security cameras.
A. Yes, sir.
Q. And there are cameras that show every corridor.
A. I don't believe so, not when I was there.
Q. There's a corridor that's not covered by security cameras?
A. I don't believe --

Q. In the inmate population area, not out in the administration area.
A. No, in the inmate population.
Q. You think there are corridors that are not covered by cameras?
A. That was my belief, yes.
Q. Is it your belief that the common areas in the housing units are covered by cameras?
A. When I arrived there and most of my stay they were not cameraed. When I left they were -- virtually all of it was cameraed in the housing units.
Q. Okay. And so somebody could sit in the control center, monitor the screens. If something's going on in a housing unit in the common areas, they'll be able to see that on the screen and take whatever action is appropriate?
A. I believe so.
Q. And there is a group of employees of the Bureau of Prisons,

1675

of officers, who are called the SIS; is that correct?
A. Special investigation services, yes, sir.
Q. And their job, they're kind of like the police inside the joint, right, or the detectives maybe?
A. We refer to them more as detectives or -- yes.
Q. And they also monitor those security cameras and the video screens to see who's talking to who, don't they?
A. I believe so.
Q. There are also speakers in the walls.
A. No, there's a speaker overhead to make announcements, but I don't know of any other speakers.
Q. So you have speakers overhead so you can hear

announcements. You don't know whether they have microphones so they can hear you or not.

A. I'm pretty sure they did not because they used to use remote radio devices they would plant in cells to monitor certain cells, so I don't think --

Q. So you know them to do that?

A. I know them to do that.

Q. And they, of course, don't tell people who are living in the cells, Guess what, you've got a bug in your cell, do they?

A. No, sir.

Q. But all the inmates know that kind of thing's going on.

A. I believe so.

Q. And there are files that are kept in the SIS office about

♀

1676

various individuals, various groups of individuals, things like that.

A. I believe so.

Q. And the unit that you lived in was BB or bravo B?

A. Yes, sir.

Q. And so that would be the B side of bravo house? Is that --

A. That would be the way to I guess explain it, yes, sir.

Q. And that was -- at some time at least became a nonsmoking unit?

A. Nonsmoking, yes, sir.

Q. Is that where you were when Mr. Honken -- when you first met Mr. Honken?

A. No. I believe I was -- no, I was there, but Mr. Honken was not there.

Q. And so you did not meet him then there in BB. You met him someplace else.

A. No, sir.
Q. Where did you meet him?
A. I met him in the dining room.
Q. So there's a dining room that everybody goes to?
A. It seats approximately 240 people, and they rotate you through there.
Q. By shifts kind of?
A. It's not -- you're released by shift, but when you go is your choice. You can go with another unit if you wish. You

don't have to eat with your unit.
Q. And during the day, you're not confined to your unit.
A. No. Everyone was required to have a job. Some jobs don't mean much, but you have to be on your job assignment till 3:15.
Q. So you could I assume have a lunch hour while you're on your job?
A. Yes. Lunch was -- normally ran from 11 to 12.
Q. And so if you were working -- your job was what? An orderly there in the unit?
A. In psychology.
Q. What did you do there?
A. I was an orderly there which means you're a janitor.
Q. Okay. And you're an orderly in the psychology unit?
A. Department, yes.
Q. Department? So you worked actually in the administrative part of the prison?
A. Well, it was called the educational wing because education was next to me, and the other side of the chapel was next to me.
Q. So that's an area to which the inmates did have usually access.

A.    Yes.
Q.    So the psychology department's not over with the warden's office.
A.    No, no, no.
Q.    And so you could go to dinner when your boss let you

basically?
A.    Yes.
Q.    And that's where you met Mr. Honken?
A.    Yes, sir.
Q.    And it was clear to you that he was what you call a fish.
A.    By his conversation I assumed he had never been in prison before.  I asked him.  He said no, he had not.
Q.    And you could tell by looking at him.
A.    Yes, very clean-cut gentleman.
Q.    Young, clean-cut, scared?
A.    Possibly.  I didn't see that he was scared, but by the chatter, I would -- could deduce that.
Q.    And you told him -- you asked him, Are you gay?
A.    Uh-huh.
Q.    Which you believe he interpreted as you making a move on him, hitting on him; right?
A.    Yes, sir.
Q.    But instead you're just basically trying to find out if he's somebody who needs to be warned to watch out for himself.
A.    Yes, sir, that was my feeling at the time.
Q.    In fact, that's what you did.  You warned him to watch out for himself.
A.    Yes.
Q.    And you told him, You better grow some facial hair or

something.

A. Yes, sir.
Q. And you would agree, would you not, that it is -- for your safety in prison how you appear is just as important or more important than how you really are? In other words, it's how people perceive you that puts you in danger.
A. I would say it's probably the most important thing.
Q. Right. And so it was clear to you that it was not in Mr. Honken's interest to appear as this sheep from Iowa among the wolves of the United States Penitentiary at Florence.
A. It was not in his best interest.
Q. And so it would be better for him to appear as a tougher, meaner kind of guy.
A. Yes, sir.
Q. Now, at some time several months after your conversation in the mess hall Mr. Honken moved into your unit, the nonsmoking unit.
A. Yes, sir.
Q. And it was after that that he asked you to do legal work for him; is that correct?
A. No. The first question was about transportation of bodies across a state line. He had not moved in the unit.
Q. That was while he was still --
A. I believe -- I'm not sure where he lived. I believe he was still down in E unit.
Q. He was not in your unit.

A. He was not in my unit, no, sir.

Q. So he was just coming by your unit to consult with you in your profession as a jailhouse lawyer.
A. I believe he actually approached me near the horseshoe pit.
Q. Near the?
A. Horseshoe pit, not my unit. On the yard, if you will, recreation yard.
Q. So they have horseshoes you can throw there?
A. And bocce ball and baseball and soccer. Back then we had weights. They took them away, weightlifting.
Q. I thought they took the weights away before that.
A. Well, we still had a few.
Q. Now, how did one go about getting transferred into the nonsmoking unit?
A. You submit what's officially called a request to staff. We call it a copout, and you say, I want to move for health reasons, and they put you on a waiting list, and then you're moved when a space becomes available.
Q. And in these units, do you live in a room of your own?
A. No. You have a cellie.
Q. A cellie. And you mentioned the word cellie a couple of other times; right?
A. A roommate if you prefer or how ever you want to describe it. Somebody in your room.
Q. Roommate, cellmate, cellie, same deal; right?

1681

A. Yes, sir.
Q. And do you get to pick your cellie?
A. You can put in a request. It may be granted, or it may not.
Q. Okay.

A. So when you first arrive, you're more likely to be designated, just assigned an open bed. And then you try to negotiate that so and so will move over here if I can move over there.
Q. And once you know the ropes, you can cell pretty much with anybody you want to who wants to cell with you.
A. Right.
Q. Unless there's some security reason not to in the eyes of the administration.
A. Correct.
Q. Who was your cellie when you first met Mr. Honken?
A. When I first met Mr. Honken?
Q. Yes.
A. Bob Levine.
Q. Bob?
A. Levine.
Q. Levine, okay. And who was your cellie when Mr. Honken moved into your unit?
A. It was either Henry Ubotz (phonetic) and without -- a nickname for Ubotz; I don't know his last name -- or Pat Gibson

1682

because it was right about that same time I changed cells.
Q. And did you also at some time have a cellmate named Steven Vest?
A. Yes, I did.
Q. And was Vest ever a cellmate -- let me take that back. Was Mr. Gibson ever a cellmate of a guy named Steven Ferguson?
A. I do not recall, sir.
Q. Now, you mentioned that there were several jailhouse lawyers who were all in the same unit that you were in?

A. Yes, sir.
Q. And that included Mr. Tokars?
A. Tokars, yes, sir.
Q. And it included your cellie which was --
A. Bob Levine.
Q. Bob Levine? And he was an actual former attorney?
A. I don't -- he attended law school. I don't know whether he actually passed the bar or not.
Q. Okay.
A. Because he went into real estate, so I'm not sure whether he did or not.
Q. And at some point took up a life of crime.
A. Well, I think he was first a real estate developer.
Q. All right. And who else were the jailhouse lawyers there?
A. There was Bill Moore from the state of Washington.
Q. Was he a real lawyer?

1683

A. He claimed to be. I do not know.
Q. A lot of people claim things that aren't true in prison.
A. Right. I sometimes believe he might have been a little bit of a blow-hard, but he did know the law.
Q. Okay.
A. And there's a couple other gentlemen. I can't think of the name at the moment.
Q. So Mr. McIntosh (sic) asked you something about would it be a federal crime for -- to transport dead bodies from one state where they were killed to another state where they were buried? Is that --
A. Would you repeat the question, please, sir?
Q. Did you tell us that Mr. McIntosh -- excuse me, Mr. Honken

asked you if it would be a federal crime to kill somebody in one state and transport their body and bury it in another?

A. Yes, sir.

Q. And your opinion was probably?

A. Probably.

Q. And did you tell us that when you asked him why he wanted to know Mr. Honken told you, We took the bodies some 20 miles and buried them, and then we found out several days later it was across the state line?

A. That's correct, sir.

Q. Did he ever say what states we're talking about?

A. No, sir.

♀

Q. And -- but that's what you say he told you.

A. Yes, sir.

Q. All right. The next legal matter that he asked your advice on was this child support matter?

A. No, sir. The next -- the next legal matter was when was the effective date of the death -- federal death penalty.

Q. And you told him --

A. I believe it was '93 or before.

Q. But as a matter of fact, the federal death penalty act was passed in 1994, wasn't it?

A. I haven't looked at it since he asked me, sir.

Q. But you did look at it at the time.

A. At the time.

Q. And you were looking at Title 18 of the United States Code?

A. Yes, sir.

Q. Section 3591?

A. You can quote the last four. I don't remember. But Title

18, yes, sir.

Q. And then he asked you about the child support later.

A. No. The next thing he asked me to do which is after he moved into the unit was to look at his transcripts.

Q. Okay. Now, let me ask you something else. You were talking about some people who were trying to find out if various inmates were informants by looking at their presentence investigation reports; right?

♀

A. Yes, sir.

Q. And that was not a practice unique to those particular inmates, was it?

A. To look at the presentence report?

Q. Right.

A. No, sir, it's not.

Q. Almost everybody goes and wants to look at the other -- the presentence report of other people around them so they'll know who they're dealing with; right?

A. It's a common practice, or was.

Q. Okay. It's not now because --

A. They won't let you have your presentence report.

Q. They won't let you have your presentence.

A. Correct.

Q. But in those days they would, and if you didn't have one, you'd have some explaining to do.

A. Correct.

Q. And Mr. Honken had his presentence investigation report.

A. I would assume so. I don't --

Q. And you looked at it, didn't you, when you looked at his other legal papers?

A. I must have, but I don't recall looking at it.

Q. Well, you were helping him on some sentencing issues; right?

A. No, he wanted to see if he could get his conviction

overturned. That's different than sentencing to me.

Q. That's different than sentencing. And so what was the transcript you were looking at? Was that a trial transcript?

A. Trial transcript, yes, sir.

Q. Couldn't have been a sentencing hearing transcript.

A. I don't believe it was.

Q. So your belief, having reviewed those documents that he showed you, in talking about him trying to use your services to get relief from his conviction, was that he was there having been convicted after a trial.

A. Yes.

Q. And you're sure of that.

A. No. To be honest, I'm really not sure. It was transcripts, and I looked at it and said, I don't think I can be any help to you.

Q. And that's when you referred him to Mr. Tokars.

A. No, I did not refer him. I just said I couldn't be of any help. He later went to Mr. Tokars.

Q. Didn't you tell Mr. Miller a few minutes ago that you referred Mr. Honken to Mr. Tokars?

A. I don't believe so. He went to Mr. Tokars.

Q. Are these the issues that you sent -- that he went to Mr. Tokars about as far as you understand?

A. Yes, sir.

Q. Okay. And you didn't use the word refer?

A. I don't believe so. You can replay it. I don't have it.

Q. And it was after that that he asked you about the child support matters?

A. Yes, sir.

Q. And you did consult with him about that?

A. Yes, sir.

Q. And obviously he's there as an inmate in the prison; right?

A. Yes, sir.

Q. You're there as an inmate in the prison.

A. Yes, sir.

Q. Neither of you are making a whole lot of money to pay child support with.

A. No, sir.

Q. And so they don't take child support out of your $20 a month or whatever you make for being an orderly; right?

A. Not that I'm aware of, sir.

Q. But his concern was when he got out would he have a debt for the child support?

A. That was what I believe would have been the case.

Q. And it was after that that you say you were talking to another inmate?

A. Yes, sir.

Q. And that would be Mr. LeBaron; is that correct?

A. Yes, it was.

Q. And Mr. LeBaron was a -- do you know what he was serving

his time for?

A. I believe it was -- no, I can't really recall. I mean, I can speculate basically kind of what I remembered if you want that.
Q. No, I don't want speculation. Anyway, based upon what Mr. -- and by the way, was this conversation with LeBaron while Mr. Tokars was working on Mr. Honken's case?
A. I don't think so. I think Mr. Tokars had already left the institution.
Q. It was after Mr. Tokars had already left.
A. The institution, yes.
Q. And your testimony is that he left Florence and you shortly thereafter found out through the telegraph that he was at the FCI in Oxford, Wisconsin?
A. Yes.
Q. You didn't hear about him going to Sheridan, Oregon?
A. No, sir.
Q. Okay. And were you -- you were at Florence when Mr. Tokars came there too; correct?
A. Yes, sir.
Q. And before Mr. Honken got there, you and Mr. Tokars were in the same housing unit?
A. Before Mr. Honken --
Q. Got into the unit.
A. Right. Yes, sir.

1689

Q. And before Mr. Honken got to the penitentiary.
A. Yes, I believe that would be correct.
Q. And you knew Tokars was a lawyer.
A. Yes, sir.
Q. Had been a magistrate judge.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1476 of 3636

A. Yes, sir.
Q. And everybody else there knew that.
A. Yes, sir.
Q. And Mr. Tokars had been the target of a -- I believe contract was your word?
A. Yes, sir.
Q. That was before Mr. Honken even got there, wasn't it?
A. Yes, I believe it was.
Q. And that was based upon his status as a former judge and as a former prosecutor and as someone who had caused his wife to be killed in front of the children.
A. That is correct. It was the latter.
Q. Combination of things; right?
A. Well, just the killing -- the way his wife was killed in front of the children was the frosting on the cake as far as the population was concerned.
Q. And it was generally known among the population that that was Mr. Tokars' situation.
A. Yes, it was.
Q. And so there was not a secret that he was keeping from

♀

everybody, was there?
A. No. He was trying, but it was out.
Q. And that was before Mr. Honken even appeared on the scene.
A. Yeah, I believe so.
Q. So then at some point after Mr. Honken is living in the same unit as you -- and that was only for how long?
A. Between six and seven months he lived in the same unit.
Q. And you and he and Tokars all three lived in the same unit for how long?

A. All three of us at the same time? Between three and four months.
Q. Okay. Mr. Honken came in September. Mr. Tokars left in December?
A. Well, I don't recall exactly when Dustin arrived in the unit, but I believe he came sometime mid fall and that Tokars left maybe end of February, 1st of March.
Q. You wouldn't dispute it if Mr. Tokars told us he left in December, would you, of '98?
A. Well, it could be. I've measured my time because my attorney had passed away, and my new attorney was trying to locate my files. My attorney actually passed away in September, and the attorney was still trying to locate the files in January. So I've used that as a time gauge of when --
Q. And you think Tokars was still there?
A. Tokars was there because that was the time that I was

1691

looking at Dustin's transcripts.
Q. And so you were looking at Dustin's transcripts while Tokars was still there.
A. Yes.
Q. And you read the transcripts of testimony given at whatever procedure -- proceeding he had transcripts of.
A. Yes, sir.
Q. And you read the transcripts of various witnesses who testified.
A. I must have.
Q. And one of those was a guy named Dean Donaldson, wasn't it?
A. I do not recall an individual name.
Q. Going back to Mr. Honken, he came into the unit at roughly

the same time or after your attorney died; is that correct?
A. Roughly the same time, in that time frame.
Q. I'm curious, by the way. You told us something about Mr. Honken early on coming to you for advice about somebody having lent him something?
A. Yes, sir.
Q. If somebody lends you something, do they have some sort of control over you?
A. Well, it's common practice in the prison for predator-type individuals to lend stuff to new guys that come in, and then when they get far enough in debt, then they go ask them for whatever favor they seek. They don't normally want the

merchandise back. It might be a sexual favor. It might be a sticking. It might be all kinds of things.
Q. So it's a matter of --
A. Extortion.
Q. -- sort of laying the foundation for extortion.
A. Yes, sir.
Q. And was this person who had lent Mr. Honken whatever he had lent Mr. Honken a sexual predator?
A. Apparently. I do not know who the person was. I did not see the person or the returning of the merchandise.
Q. But you were just telling Mr. Honken, first of all, you shouldn't have taken the stuff in the first place to get yourself in this position, but here's how you can get yourself out of it without --
A. Without caving into the extortion because it only leads to further extortion.
Q. Right. And you have to do it in front of people or

otherwise --
A. And be ready to fight.
Q. Okay. Now, you say that Mr. Honken told you that he strangled his rat; is that correct?
A. Yes, sir.
Q. Did he say rat or rats?
A. Well, depends on which occasion you're talking about.
Q. Okay.

♀

A. Many occasions he said, I strangled my rats. On the one occasion he said, I strangled the rat and his girlfriend, the rat's girlfriend.
Q. All right.
A. So sometimes it was plural. Sometimes it was single.
Q. He never told you he never shot anybody, did he?
A. No, sir.
Q. And did he tell you how he strangled these people?
A. I assumed with his hands because on occasions he gestured with his hands.
Q. (Indicating.)
A. Like that, yes, sir.
Q. So he didn't use like a karate kind of --
A. No, no indication of karate blow or just strangle.
Q. Didn't claim he rendered them unconscious before strangling them.
A. No.
Q. Didn't claim that he did anything with the children.
A. No.
Q. Said that Kate --
A. Said that Kate did.

Q. -- did the children. And there's no doubt in your mind that Kate is the person he was talking about other than the other girlfriend.
A. No, I'm -- as I said, at the time I was confused because it

struck me that an accountant wasn't the type that would strangle or suffocate children, and so I questioned him. I said, You mean the one that has your son, and he said, No, the one that has my daughter, and so since that day, I don't know who he was talking about.
Q. But --
A. Kate or Angie, I don't know.
Q. But Kate is the word he used.
A. Kate was the word he used, yes, sir.
Q. And he said Kate and not Kathy.
A. No, he always called her Kate.
Q. Always called her Kate. And Kate is the one that did the strangling.
A. Yes, sir.
Q. And you just are confused about who had the son and who had the daughter; is that a fair statement?
A. I'm not confused who has which child. I'm confused which one he was referring to.
Q. All right. Do you recall testifying before the grand jury?
A. Yes, sir.
Q. And do you recall telling the grand jury that you got confused on whether Kate had the son or the daughter? Is she the professional, or is she the model? That's where you were confused?
A. Well, he confused me very much on which was who because it

didn't make sense to me, and to this day I'm still confused who he was referring to on that particular event.

Q. But there's no question that it was Kate.

A. He said Kate.

Q. And that's what he said then, and that's what you wrote down in your notes.

A. That's what I -- that was the name used.

Q. And that's what you typed up in your little typewritten notes?

A. Yes, sir.

Q. And there's no question that that's what you say he told you.

A. Yes, sir.

Q. Now -- and what did he say Kate did?

A. Suffocated.

Q. Suffocated?

A. The children.

Q. The children?

A. I can't recall whether it was because they wouldn't be quiet or they wouldn't shut up, which word he used.

Q. But one or the other.

A. Yes, sir.

Q. Either wouldn't be quiet or wouldn't shut up.

A. Yes, sir.

Q. You also say he told you about some videotape?

♀

1696

A. Yes, sir.

Q. And did he tell you he talked with his attorney about the

videotape?

A. No. He said he'd given the videotape to his attorney which would imply that he talked to him, but I -- he did not say he talked to him.

Q. Did he tell you that he asked the attorney about the videotape before he ever obtained the videotape?

A. I don't believe so.

Q. You reviewed his transcripts.

A. Yes, sir.

Q. You reviewed his testimony in that transcript.

A. I would have, yes.

Q. And there was a mention of a videotape in there, wasn't there?

A. I don't recall it, sir.

Q. All right. And you made notes of your contacts with Mr. Honken and typed them up, didn't you?

A. Yes, sir.

Q. And you kept them in the office of the psychologist you worked for?

A. Yes, sir.

Q. So they wouldn't be found in your cell.

A. Yes, sir.

Q. Because you were planning or hoping to find a way to use

1697

them to your benefit.

A. Once I started making the notes, yes.

Q. And that was when?

A. After Mr. Honkens (sic) had threatened to kill my friend John Morrow.

Q. Okay. I'm looking more for a time than an event that had

not previously been mentioned, but go ahead.
A. That would have been in the spring of '99, sir.
Q. In the spring of '99 is when you started making these notes?
A. Yes, sir.
Q. How long was that after the conversations that the notes purport to reflect?
A. Well, the meeting was approximately a year. The reference to moving the bodies would have been approximately six months. Reviewing his trial transcripts would have been approximately two to three months. And the issue on child support and things following had not occurred.
Q. And so you made these notes, and you typed them up, and you tried to use them to your advantage; correct?
A. My personal advantage? No.
Q. Yeah.
A. No, sir.
Q. Well, you prepared a letter, didn't you?
A. Yes, sir.

♀

1698

Q. To the United States attorney for the Northern District of Iowa.
A. Yes, I did.
Q. And you and another person did.
A. Yes, sir.
Q. And you referred to yourself in the letter as CI 1; is that right?
A. If you say so. I don't have a copy.
Q. Well, there's a CI 1 and a CI 2, and I don't know who's who.

A. I don't know, sir.

Q. Let me show you the letter, and maybe we'll figure it out.

MR. ROGERS: May I approach, Your Honor?

THE COURT: You may. Mr. Rogers, let me ask you this. Can you tell me approximately how long you think your cross-examination is going to take?

MR. ROGERS: Probably at least another half hour is my guess.

THE COURT: Okay.

MR. ROGERS: And I don't want to -- I don't want to stay here till 4:30, but on the other hand . . .

THE COURT: And you don't want to limit yourself to just a half an hour either, do you?

MR. ROGERS: Right.

THE COURT: Right. Okay. Let me ask you this. I

hate to interrupt the cross-examination, but if you don't have an objection, I could send the jury home now because we're not going to finish with this witness today.

MR. ROGERS: That's fine.

THE COURT: But it's your call. If you want to keep going . . .

MR. ROGERS: No, I have no objection to that.

THE COURT: Would now be a good time?

MR. ROGERS: Yes, sir.

THE COURT: Okay. Members of the jury, that will conclude the testimony for the day. Please remember my cautionary instruction about keeping an open mind until you've heard all of the evidence in the case, received my final instructions, had an opportunity to hear the closing arguments

of the lawyers, and, most importantly, go back in the jury room, review the exhibits that have been admitted into evidence and begin your deliberations. We'll see you Monday at 8:30, and we'll be starting exactly at 8:30. So have a good weekend, and we'll see you next week. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated. Are there any matters we need to take up with the lawyers?

MR. WILLIAMS: Just one matter of clarification, Your Honor.

THE COURT: Yes.

♀

1700

MR. WILLIAMS: I just want to make sure -- we're trying to eliminate some witnesses if we can. We -- also with a couple of my witnesses, I didn't use exhibits that we had on our exhibit list, some of which the defense had no objection to, but I think my practice with you in the past has been they're not admitted into evidence unless we actually use them with a witness and admit them into evidence and simply because the defense has not objected to them doesn't mean they're automatically admitted. It makes a difference because I'm trying to figure out whether I need to call witnesses. If the exhibits are going to be back with the jury, I better call the witnesses so they can explain what they are. If the exhibits aren't going back, I don't need to call the witnesses.

THE COURT: Well, here's my view. The exhibits not objected to are automatically admitted. Generally how I view it is they're then withdrawn unless there's an objection. If there's an objection, then they stay in evidence.

MR. WILLIAMS: Okay. So I'll go through my list and

figure out which ones we'll not actually end up using, and I'll notify the defense. We'll cover that with them and find out if they have any objection.

THE COURT: And then you have two choices. If there's an agreement, they're withdrawn. If there's no agreement, they're still in evidence. So you don't really have to call a witness to lay a foundation. But if you're worried about --

MR. WILLIAMS: They won't make sense.

THE COURT: -- they won't make sense, then you'll probably have to call the witnesses.

MR. WILLIAMS: Okay. That helps.

MR. PARRISH: We should have our exhibit notebook and we should close out on our witnesses and schedule by Monday. We'll bring that into you on Monday.

THE COURT: Okay. So we'll get an exhibit notebook, a witness list. We're talking now just on the merits.

MR. PARRISH: Exactly.

THE COURT: And then, Mr. Rogers, I don't mean to pick on you, but you seem to be the instruction man by default.

MR. ROGERS: I am since you started picking on me.

THE COURT: Well, you make it easy. So when do you think you'll have the -- I think what we needed were the draft of the CCE instruction that -- you didn't like mine, and you want to change it, so we need a proposal on any of my proposed final merits instructions. We'll need something in writing from you soon. It may not be Monday, but I hope it will be some time next week.

MR. ROGERS: I said Wednesday yesterday I think. I'm sticking to my story.

THE COURT: So Wednesday. And then when are we going to get your proposed penalty phase instructions if there is a penalty phase because we're working ahead?

MR. ROGERS: Also Wednesday.

THE COURT: Also on Wednesday. And the one I'm most interested in would be the proposed mitigation instruction and then the proposed weighing or balancing instruction because there's not much out there on that; okay?

MR. ROGERS: You don't think we did that good a job on the subcommittee, Judge?

THE COURT: No comment.

MR. MILLER: Your Honor, just to forewarn the Court and counsel of a potential evidentiary issue with the current witness, there was a 403 objection sustained on my direct examination going as to Mr. Honken's activities of -- I guess we could describe it a predatory nature. During redirect I anticipate in view of questioning as to the fact that Mr. McIntosh initiated contact with authorities, I would anticipate questioning him as to the reason he initiated such contact, and there's been just within the last few minutes some questioning along those lines as well, but I didn't want to just do it in view of the previously sustained objection without forewarning both Court and counsel in case that's an evidentiary issue that either -- are you tracking with me?

THE COURT: No, I'm tracking, but I'm not clairvoyant.

MR. MILLER: Okay. I feel the door is wide open as to asking the question --

THE COURT: Here's what I mean. I think you know the

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1488 of 3636

answer to the question. I don't because I haven't prepped the witness; right?

MR. MILLER: Right.

THE COURT: So what's the answer to the question? What's your good-faith belief the answer to the question will be?

MR. MILLER: I believe he will indicate that Mr. Honken was participating in the preparation of what are called rat packets or circulating of information that identifies and targets informants or alleged informants within the prison system and that this was endangering lives including that of Mr. Morrow which was the response about two questions ago.

THE COURT: Well, wait a minute. Is that this witness's motivation? I'm not interested in Mr. Morrow.

MR. MILLER: Yes, this witness's motivation for contacting authorities.

THE COURT: Okay.

MR. MILLER: It was brought out --

THE COURT: And your question is if you try and elicit that will you be in violation of my sustaining the defense objection?

MR. MILLER: And there's no order in limine on this. I simply wanted to give advance notice to both the Court and counsel of that being a potential evidentiary issue that I saw.

THE COURT: And I appreciate the heads-up.

MR. MILLER: That was the only reason I raise it.

THE COURT: And I think the answer is if you can tie

it to this witness's motivation, then it's not barred by -- it may be barred by something else, but I wouldn't consider it within my sustaining the objection to the question; okay?

MR. MILLER: Very good. Thank you.

THE COURT: Thanks for the heads-up.

MR. PARRISH: Judge, who should we contact regarding the three witnesses if we decide to call them? Do we work with Rick on that?

THE COURT: The three you think you're going to call by videotape?

MR. PARRISH: If we're going to call them --

THE COURT: Here's what we need to do. Because there's no provision that I'm aware of in the Federal Rules of Criminal Procedure for calling a witness by videotape, although I don't think your client's confrontation rights are implicated because you're calling the witness, we're going to have to make a very good record that this is done by agreement of the parties and that whatever right you may have to have the witnesses subpoenaed and testify live, that your client and as lawyers you're waiving that right.

So on a procedural matter, we have to make a very good record about all the potential waivers of any rights that you may or may not have concerning calling the witnesses live.

♀

1705

On the technical matter of how are we going to do it --

MR. PARRISH: Right.

THE COURT: -- by video conferencing, you can work with Rick Hunt on that. And what we'll do is he'll contact the various institutions. We'll do a dry run with the video

conferencing to make sure it works, that there's no compatibility issues. We've never had a problem before, but we always do a dry run, and then we'll have to schedule it. And perhaps the U.S. Attorney's Office can help us schedule it with the prisons to make sure they're going to have the witness available in the video conferencing room and the security and the like so that we can do it live.

MR. PARRISH: We'll know by Monday on the final list of that.

THE COURT: And that's at least a couple weeks out, isn't it?

MR. PARRISH: That's correct. That's what we believe.

THE COURT: Okay. Good. Anything else?

MR. PARRISH: I think that's it, Your Honor.

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. See you Monday morning. We'll meet at 8:15, 15 minutes before we bring the jury in, just to see if there's anything new.

MR. PARRISH: Sounds good.

1706

THE COURT: Thank you. We'll be in recess.

(The foregoing trial was adjourned at 4:12 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR 1-5-05
Date

♀

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| FREDRIC TOKARS | | |
| | MR. WILLIAMS | 1459 |
| | MR. PARRISH | 1498 |
| | MR. WILLIAMS | 1624 |
| | MR. PARRISH | 1628 |
| RONALD MCINTOSH | | |
| | MR. MILLER | 1632 |
| | MR. ROGERS | 1660 |

*****

EXHIBITS:

| | |
|---|---|
| 250 through 294 | 1458 |

*****

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, Plaintiff, vs. DUSTIN LEE HONKEN, Defendant. /

No. CR01-3047

Sioux City, Iowa
September 27, 2004
8:16 a.m.

VOLUME 8

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

APPEARANCES:

For the Plaintiff:

C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant:

ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn
Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1493 of 3636

Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Good morning. Any matters we need to take up before we have the jury brought in at 8:30?

MR. WILLIAMS: Yes, Your Honor. We have a couple. Go ahead.

MR. MILLER: Your Honor, with regard to Steve Ferguson who will be the second witness after the current witness, McIntosh, a Rule 609 issue: Mr. Ferguson has -- among a multitude of theft, burglary, and bank robbery convictions has a 19 -- January 1987 felony public sexual indecency conviction with 3 years' confinement. We received no pretrial notification of an intent to use that for impeachment.

However, I did speak with defense counsel this morning and was advised that they do intend to impeach on that, and we feel that it is barred under 609 as being a crime not affecting dishonesty more than ten years of age.

THE COURT: What's your theory?

MR. PARRISH: Your Honor, we agree with the government on that position. However, we believe it should be assessable on the basis that he did not lead a crime-free life. You see a conviction on 2-22-90 which -- and then another conviction, possession of firearm, 10-21-96, another conviction of 7-7-98, and he had a violation of supervised release 7-22-97. And based upon that we think that it opens up his -- I believe it's 1986

conviction.

THE COURT: Well, have you ever complied with Rule 609(b), given written notice?

MR. PARRISH: We've not given written notice. We just received, I believe, his -- well, we've got an order of the witnesses, but also I believe we've gotten the criminal histories that were delivered to us last week.

THE COURT: When were the criminal histories delivered?

MR. WILLIAMS: Well, we actually have a dispute on that. My legal assistant indicated that she sent criminal histories for all of our witnesses over to the defense quite a long time ago. They indicated they didn't have any, and so the -- I think second week of trial we handed them a box with another set of copies of all the criminal histories. So they've had this individual's criminal history for at least two weeks.

THE COURT: Do you dispute that?

MR. PARRISH: We dispute the fact that we did not get all the criminal histories when --

THE COURT: Well, I'm not talking about all the criminal histories. I'm talking about the criminal histories for the witness at issue.

MR. PARRISH: Right. We would agree that we did receive them in the last week or two.

THE COURT: Well, why didn't you file a written notice

1712

under 609(b)?

MR. PARRISH: Well, you know, we looked at his records. We have a lot of material to go over, and we looked at

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1495 of 3636

his record, and when we started focusing on the particular witnesses and the order they were going to be called in, we see Mr. Ferguson is going to be called. We had an opportunity to review his record. It came up as an issue I believe this morning. We noticed it a couple of days ago, maybe last Thursday.

THE COURT: Why didn't you file the written notice then?

MR. PARRISH: Well, I can. We can file one before he comes in.

THE COURT: Well, that's not timely.

MR. PARRISH: If we need to file one.

THE COURT: Setting aside the fact that you didn't comply with Rule 609(b), what's your theory for why you can impeach the witness?

MR. PARRISH: Well, we believe he's not led a law-abiding life since 1986 and has, in fact, been in numerous incidents of difficulty which we believe opens up the area of his 1986 conviction.

THE COURT: How many convictions do you have to impeach him with?

MR. PARRISH: He has two -- I believe it's three, Your

Honor, 2-22-90 which is a bank robbery. He has a 10-21-96 possession of firearm. He has a 7-7-98 bank robbery, and he has a violation of supervised release from 7-27-97.

THE COURT: Mr. Williams, why do you really care? Mr. Miller?

MR. MILLER: Well, Your Honor, the potential prejudice of sexual indecency certainly far outweighs any probative value.

There's no question this guy's a thief, a burglar, a bank robber. All of those things do go to his honesty. However, I think there's a high likelihood that a jury would disregard his testimony for inappropriate reasons were they to know he had a sexual indecency conviction.

THE COURT: What does a sex indecency conviction have to do with whether they believe -- I assume this is the one of "Mr. Honken confessed to me" witnesses?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: What does that have to do with it? Why would anybody either believe it -- I don't see much probative value in any of that, but I don't see much prejudice either.

MR. WILLIAMS: I see potential serious prejudice in the case of any juror who would be so offended by sex crimes that would be inclined to totally disregard the testimony of anyone who has such a record.

THE COURT: There certainly isn't much probative value to it in terms of the underlying rationale behind Rule 609.

♀

There's not much probative value to that conviction.

MR. WILLIAMS: There's not, and it's past the ten years as well.

THE COURT: Right. Well, I'm going to deny the defense's right to use it for impeachment. They didn't comply with Rule 609(b), and alternatively, it has little probative value with regard to impeachment, and its prejudice substantially outweighs any probative value that it would serve the defense for impeachment.

What else do you have on your list?

MR. WILLIAMS: Actually, Your Honor, that's the only

thing the government has. I misspoke.

THE COURT: Mr. Rogers?

MR. ROGERS: Just a housekeeping matter, Your Honor. I intend to utilize some documents in my continued cross-examination of Mr. McIntosh, and I have had them marked for identification. They're not in our exhibit notebook because I don't intend to offer them in evidence.

THE COURT: Okay. Just something to refresh -- what's the purpose of it?

MR. ROGERS: To refresh his recollection and to --

THE COURT: Sure. Well, you can use anything to refresh his recollection.

MR. ROGERS: I just wanted to let you know I made copies for the Court so you'll know what we're talking about.

1715

THE COURT: Great. Thank you. But you don't intend to offer those.

MR. ROGERS: I don't intend to offer them unless he goes south on me which so far he hasn't.

THE COURT: Okay. Anything else?

MR. MILLER: Your Honor, just with regard to that, Mr. Rogers did provide me with a copy, and, of course, I am familiar with those materials. Simply forewarning Court and counsel depending on the cross-examination the United States may seek to offer those documents following the cross-examination.

THE COURT: And what's your theory as to how these documents would be admissible?

MR. MILLER: Your Honor, only under the rule of completeness if the cross-examination were to focus on a portion.

THE COURT: But the rule of completeness doesn't get you over the foundation requirements. That's a separate rule after an exhibit meets the foundation requirements, so how would you lay the foundation to admit any of these exhibits? Rule of completeness has nothing to do with foundation. Just has to do with an exhibit that could be admitted assuming there's a foundation for it that's otherwise admissible. Then you can put in the rest of the exhibit.

MR. ROGERS: I don't think the foundation's going to be in dispute, Your Honor, and I don't think the rule of

completeness would come into play unless we offer as actual evidence a portion of the document.

THE COURT: Right. Because you're just intending to use it to refresh the witness's recollection, and we never reach the rule of completeness; right?

MR. ROGERS: Right.

THE COURT: But if we do, you won't have a foundation objection. Is that what you're telling me?

MR. ROGERS: That's correct. We got them from them, and they'll get them from us.

THE COURT: Okay. Anything else?

MR. ROGERS: That's all from . . .

MR. WILLIAMS: No, Your Honor. Okay. We'll bring the jury in at 8:30. Thank you.

(Recess at 8:25 a.m.)

THE COURT: Mr. Rogers, ready to have the jury brought in?

MR. ROGERS: Yes, Your Honor.

THE COURT: Mr. Williams?

MR. WILLIAMS: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated. You will recall that Mr. Rogers was in his cross-examination of Mr. McIntosh.

Mr. Rogers?

♀

MR. ROGERS: Thank you, Your Honor.

RONALD MCINTOSH, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

CONTINUED CROSS-EXAMINATION

BY MR. ROGERS:

Q. Mr. McIntosh, let me see if I can get a time frame on some of the events you've testified about. At some point you decided that you wanted to make notes of the conversations you say you had with Mr. Honken and keep those notes somewhere; is that correct?

A. Yes, sir.

Q. When did that -- when did you start making the notes?

A. It would have been sometime near the first part of April of '99.

Q. Sometime around April of 1999. So that was some months after Mr. Tokars had already left USP, Florence.

A. Yes, sir.

Q. And those notes -- well, let me ask you this. In your cell at USP, Florence, do you have a locker where you can keep things?

A. Yes, sir.

Q. Do you have a lock for that locker?

A. Yes, sir.

Q. Did you keep those notes in your locked locker in your

cell?
A. No, sir.

Q. Why not?
A. Cell's subject to being searched.
Q. By the staff?
A. By the staff, yes, sir.
Q. Okay. But there was nothing in these notes which the staff would have believed to have been contraband, was there?
A. No, sir.
Q. But you're afraid that a staff member would have found the notes and somehow some other inmate would have learned about them? Is that the --
A. Yes, sir.
Q. You also had a cellmate.
A. Yes, sir.
Q. And there's also the risk that your cellmate might have access to the notes if you inadvertently left it unlocked or something like that.
A. That's correct.
Q. And also other people could come into your cell when you weren't there, and if the notes were not locked up, they could have access to them.
A. Yes, sir.
Q. There's also a lot of fairly skilled criminals there at USP, Florence.
A. Yes, sir.
Q. And they could probably figure out how to open your lock on

your locker; is that correct?

A. Yes, sir.

Q. So it's not safe to keep things in your cell, is it?

A. You don't keep anything you want to keep.

Q. All right. Nothing you want to keep and nothing you don't want everybody in the world to know about.

A. That's correct.

Q. Okay. Now, so you, however, worked as an orderly in the psychology department; is that correct?

A. Yes, sir.

Q. And you had a friend that you worked for there.

A. I beg your pardon, sir?

Q. You had a staff member who you worked for who was your friend.

A. Yes, sir. He's still a staff member, but he's my friend, yes.

Q. And you qualify that because it's unusual for a staff member and an inmate to be friends.

A. Well, your friendship has certain limits.

Q. Right, both from your point of view and from his point of view.

A. Yes.

Q. And that's Mr. Smith; is that correct?

A. At one time it was Dr. Smith, yes.

Q. Dr. Al Smith?

1720

A. Yes, sir.

Q. And at another time Dr. Hutchinson?

A. Dr. Hutchinson, yes, sir.

Q. And so you prepared these notes of your conversations with Mr. Honken, and you kept them in the psychology department.
A. Yes, sir.
Q. Where did you keep them there?
A. I think I actually kept them in the room I worked in which was the janitor's closet.
Q. Okay. And was that subject to search?
A. Yes, it's subject to search.
Q. So how would that be safer than your cell?
A. Well, it's safer because when they're in there, they're looking specifically for shanks or wine or larger items. They're not really going through the papers.
Q. There were other papers kept there too?
A. Yes, sir. It was also a storage room.
Q. All right. So when you say shanks, you mean --
A. Knives, sir.
Q. Homemade weapons, knives?
A. Yes, sir.
Q. And those are not infrequently found at USP, Florence and other federal institutions; is that correct?
A. Not infrequently?
Q. Infrequently. They are frequently found.

1721

A. They are frequently found. I see what you're saying.
Q. I had the double negative going on. So they are found frequently.
A. Yes, sir.
Q. There are lots of shanks around.
A. Unfortunately, yes, sir.
Q. And at USP, Florence they're frequently used as well.

A. Yes, sir.
Q. And wine is homemade alcoholic beverage?
A. Yes, usually out of citrus is preferred, oranges.
Q. Orange juice from your breakfast tray.
A. Yes, sir.
Q. And they're mixed with water and sugar and a starter which contains yeast from some other batch of wine?
A. Yes, sir.
Q. And they're allowed to ferment, and people drink it and become intoxicated.
A. Yes, sir.
Q. And that's also very, very, very common.
A. Yes, sir.
Q. All right. Now, also after you had decided to keep these notes regarding what you say Mr. Honken told you, you at some point initiated contact with the government, didn't you?
A. Yes, sir.
Q. And you did that through your friend Dr. Smith.

♀

1722

A. Yes, sir.
Q. And in July of 1999, you asked Dr. Smith to contact law enforcement people in Iowa; is that correct?
A. I don't remember whether it was June or July, but yes, I did ask him to contact.
Q. And Dr. Hutchinson also contacted law enforcement on your behalf, didn't he?
A. I don't believe Dr. Hutchinson did.
Q. Let me call your attention to July the 29th of 1999. Were you present in the room in the psychology department when Dr. Hutchinson talked on the telephone and then put you on the

telephone to talk to Special Agent -- woops, where'd he go? -- Basler?
A. That's quite possible. Usually it -- maybe I'm not supposed to volunteer, but usually Mr. Jones would place such a call for me. He was in the psychology department.
Q. But you're not denying that Dr. Hutchinson called Mr. Basler, talked to Mr. Basler, put you on the line, and you had a conversation with Mr. Basler.
A. I don't recall it, but it certainly could have happened.
Q. And then you also prepared a letter to the United States attorney for the Northern District of Iowa, didn't you?
A. Yes, sir.
Q. And that letter was on behalf of yourself and another inmate.

A. Yes, sir.
Q. And that letter was intended to let the United States attorney for the Northern District of Iowa know that you and this other inmate were interested in giving information against Mr. Honken.
A. Yes, sir.
Q. And it was also intended to let them know that you wanted you and the other inmate -- you, plural, wanted concessions on your own case in return for that information; is that true?
A. I don't recall putting that in, but it would be a nice thing.
Q. Well, let me ask you, do you recall putting in the letter -- well, first of all, the letter referred to two individuals as CI 1 and CI 2; is that correct?
A. Be honest with you, sir, I don't remember the contents of

the letter.

Q. Well, perhaps looking at it would refresh your recollection as to what's in it; is that correct?

A. I believe so.

MR. ROGERS: Your Honor, I'm going to show the witness what has been marked for identification as Defendant's Exhibit C.

THE COURT: You may.

BY MR. ROGERS:

Q. Take a look at that if you will. And go ahead and read the

whole thing.

A. Yes, please. Thank you.

Okay.

Q. Now, first of all, does that refresh your recollection that you, in fact, referred to yourselves as CI 1 and CI 2?

A. Yes, sir.

Q. And having read that letter, do you now recall that you were CI 1?

A. No, I was CI 2, sir.

Q. You were CI 2.

A. Yes, sir.

Q. Are you sure about that?

A. Well, it said that CI 2 was the jailhouse lawyer so . . .

Q. Well, I'll ask you about that in a minute. You're not real sure of your memory now even having read the letter whether you were 1 or 2?

A. Well, CI 1 had the bank robberies on the bottom of the first page I believe, and that was another individual.

Q. All right. And, in fact, I'm not asking you where he is or

what happened to him, but that, in fact, was Pat Gibson; is that correct?

A. That's correct.

Q. And in that letter you told the U.S. attorney for the Northern District of Iowa, We, CI 1 and CI 2, are in hopes of making some type of deal that will set us free of prison.

Whatever deal is made must be worked out with each individual as our needs are different. We both wish to start a new crime-free life. Both of us have minimal family ties. Both are older persons; correct?

A. That's what it says, yes, sir.

Q. And you prepared this, didn't you?

A. Yes, but I laughed when I just now read it because I recall that Mr. Gibson insisted that line be there.

Q. Well, you're the one who actually typed it up.

A. Yes, sir.

Q. You typed it up on the computer in the psychology department?

A. No, it was a typewriter, but I did it.

Q. Typewriter with justification on the right margin?

A. Yes, sir.

Q. And so you put that in there.

A. Yes, sir.

Q. And, quite frankly, you wanted to make a deal to get out of prison, didn't you?

A. It would have been nice.

Q. It would have been nice.

THE COURT: Do you have another question?

MR. ROGERS: Yes, I do, Your Honor. I'm looking here.

BY MR. ROGERS:
Q. When did you prepare this letter if you remember? We've

got you taking the notes starting in April of '99. We've got the phone calls to law enforcement in June or July of '99.
A. I assume the letter's dated. Without turning it over, I think it's probably in June.
Q. So it was before you ever talked on the phone to any law enforcement agent involved in this case.
A. Yes, sir.
Q. After you talked on the phone with the law enforcement agents, you met with Special Agent Basler and Special Agent Mizell; is that correct?
A. That's correct, sir.
Q. And they came to USP, Florence to talk with you.
A. Yes, sir.
Q. And you sat down and talked with them on two successive days.
A. Yes, sir.
Q. And the -- this meeting was sort of promised you when you talked with them on the phone. They said, We'll come talk to you.
A. Yeah. I didn't say it was a promise. It was an indication they would come talk to me but they . . .
Q. And the first meeting was November the 8th of '99 and the second --
A. It was early November, yes, sir.
Q. And two successive days.

A. Back-to-back days.

Q. During your first meeting, you told them that your California sentence -- that you had a detainer for the California sentence.

A. Yes, sir.

Q. And you told them that you were unsure of the status of that detainer thinking that it might be commuted to prison time served; is that correct?

A. That's correct, sir.

Q. And you certainly wanted their help if it would have been available and necessary in getting your California sentence commuted to prison time served, didn't you?

A. Any help I asked for them was to find out whether it had been because as I explained earlier, I was -- I didn't explain this part. I was told it had been commuted. I had the detainer removed from me at Florence. Then my attorney passed away. And the clemency never showed up. And so I was in -- very concerned in that period of time.

Q. And you told us before that your attorney passed away in September of 1998; is that correct?

A. That'd be about right, yeah. Might have been late August or 1st of September.

Q. And so at that time you'd never seen any paperwork saying your sentence has been commuted, had you?

A. That's correct.

1728

Q. And so you couldn't get ahold of your attorney to find out whether or not it had.

A. He was deceased. His files were in disarray, and I was trying to get them to a second attorney which they never did

show up. I attempted -- if I may volunteer, I attempted to call California several times, and I couldn't get a response from the governor's office.

Q. And, in fact, when you wrote this letter to the U.S. attorneys in Iowa, you were still looking for help getting that commutation done so you could get out of prison.

A. Or the paperwork.

Q. And you certainly wanted that help if you could have gotten it from the agents investigating this case; is that correct?

A. That's correct. But if I may respond to what they said at the time was that they could be of no assistance. That was on the first day.

Q. And you came back on the second day.

A. Yes, sir.

Q. And you told them at that time that you had been tried and convicted of murder in California and that there was some type of clemency proceeding possibly in the works and it might have already been signed by the governor; right?

A. Yes, sir.

Q. You told them that you'd been trying to contact the governor's office and gave them the telephone number of the

person you'd been trying to talk to there.

A. Yes, sir.

Q. And they agreed that they would try and help you locate that.

A. No, sir. They told me they could be no help with the state case.

Q. None whatsoever.

A. That's what they told me.

Q. Okay. So you're telling us that after those two meetings you had no hope whatsoever that your cooperation against Mr. Honken might somehow resolve the fact that you're serving a life-without-parole sentence for the state of California.
A. You said hope. Hope springs eternal, sir. I always have hope.
Q. All right. And so you have hope that your cooperation against Mr. Honken might somehow affect your sentence of life without parole that you're serving for the state of California.
A. Quite honestly I cannot see how it will. I mean, I'm not entitled to any hearing, parole hearing or anything, so I have to -- in fact, if I may, I have a private investigator that I've hired with the limited funds I have trying to somehow reopen the case on my own.
Q. You are familiar, I assume, with the concept of executive clemency.
A. Yes.

Q. And you understand that that is a discretionary power of the governor.
A. Yes, sir.
Q. And the governor can grant clemency to whoever he wants to grant clemency to.
A. Not in California, sir.
Q. He cannot?
A. Since Governor Brown was there, now seven people have to sign off on it.
Q. Okay. But the governor initiates it, and the seven people approve it; right?
A. I would assume so.

Q. And you hope that your cooperation in this case would result in some sort of contribution from the United States government to the governor and this commission in California that might give you a chance at clemency; isn't that true?
A. I don't think cooperating with the government's going to hurt me in any way. And if the occasion comes, I hope that they would testify on my behalf and tell the truth as I am doing here today.
Q. And you hope they will do something which will help that occasion to come, don't you?
A. I do not anticipate any such thing, sir.
Q. Well, let's talk about what you anticipate because at some point you left USP, Florence and went to the witness security

1731

program wherever you are, and I don't want to know where; right?
A. Correct.
Q. And at that time -- and the time you actually signed into the witness security program was February the 15th of 2001; is that correct?
A. Yes, sir.
Q. But you'd already been moved to a different institution by then.
A. I was moved to a county jail.
Q. And since then you have been in the Bureau of Prisons; is that correct?
A. Yes, sir.
Q. Even though you're doing federal -- state time, you're in the federal Bureau of Prisons.
A. I am now. When I was moved, I was still doing federal time.

Q. Okay. And when you were doing federal time -- well, throughout your course as a federal inmate, you have received every six months what's called a program review report; is that correct?

A. Yes, sir.

Q. And one of the things that happens in that program review report is there is a form to be filled out that says -- a part of the form that is entitled Release Preparation Participation; is that correct?

♀

A. I believe so, yes.

Q. And back in 2001 while you were still doing your federal time, that was always marked N, slash, A, not applicable, wasn't it?

A. I do not recall, sir.

Q. Well, let me show you what's been marked Defendant's Exhibit R to refresh your recollection.

MR. ROGERS: May I, Your Honor?

THE COURT: You may.

BY MR. ROGERS:

Q. I'm going to call your attention to the top of the second page.

A. Yes, sir, it's marked N/A, life term.

Q. And if you flip that back to the first page, it talks about pending charges towards the top; is that correct?

A. Yes, sir.

Q. And it says state life term to follow.

A. Yes, sir.

Q. Meaning they don't have to worry about your release preparation because as soon as you're done with the feds you're

doing a state life term.

A. Yes, sir.

Q. Now, that was dated in May of 2001 up in the upper right-hand corner, wasn't it?

A. May 9, yes, sir.

Q. And your next review date would have been then November of 2001; correct?

A. Yes, sir, yes, sir.

Q. And once again on that November review of 2001, you had already finished your federal time, hadn't you?

A. I believe so, yes.

Q. But they still were not doing any release preparation for you, were they?

A. No, they've never done any, sir.

Q. They weren't even talking about it because you still --

A. They still don't.

Q. You had your life sentence; correct?

A. Yes, sir.

Q. And your next review date would have been in the spring of 2002; is that correct?

A. Yes, sir.

Q. And at that time a change occurred in the status of your release preparation, didn't it?

A. I'm unaware of it, sir.

Q. Well, do you recall being encouraged to maintain clear conduct and participate in all areas of the prerelease program 12 months from your release?

A. No, I do not recall, sir.

Q. Let me --

A. No -- well, you can. You can show me the paper, but I've

been doing these for 19 years twice a year, sometimes 4 times a year, and I usually just sign them. I have no idea what they really say.

Q. Well, let me --

A. And that's being honest. Sorry.

Q. -- show you then Exhibit T, and at the top of the second page it does indicate under the heading Release Preparation Participation, He was encouraged to maintain clear conduct and participate in all areas of the prerelease program 12 months from his release; right?

A. That's what it says.

Q. And that similar notation was on your next review in September of 2002; correct?

A. I don't know, sir. If you say so, I'm sure.

Q. And in February of 2003, the notation is, We will enroll in prerelease program 12 months prior to release from the Bureau of Prisons; is that correct?

A. I don't know, sir. I mean, I'm not trying to be hard nosed or anything.

Q. Let me show it to you because I'm not trying to be -- and this is dated February 26, 2003; right?

A. Yes, sir.

Q. And it says --

A. That's what it says, sir.

Q. -- We will enroll in prerelease program 12 months prior to

his release from the Bureau of Prisons; correct?
A.    That's what it says, sir.
Q.    Do you recall inquiring of the people who run the witness security program about the possibility of main -- being continued in that program even after your release from federal custody?
A.    Yes, sir.
Q.    And, in fact, they told you that you would have to go through the marshal's service to do that.
A.    Maybe I didn't understand the first question.  I asked if I would be retained in the federal system upon completion of my federal sentence.
Q.    Okay.  On release from custody if you ever get out, have you inquired about being in witness protection even after you get out?
A.    I've made many inquiries not necessarily for myself, but I've made many inquiries what do they offer and so on.
Q.    For yourself.
A.    For myself and for other people who've asked me.
Q.    You've told them that if you were able to get out of prison you want to stay in the witness protection program, and they've told you that's up to the marshal's service; right?
A.    No, sir, I've never specifically asked anyone that.  I've stated if I got out I would like to stay in the program.  Maybe we're mixing words.  I don't know.

♀

1736

Q.    Maybe -- you told them, If I get out, I want to stay in the program.
A.    Yes, sir.
Q.    And they've told you --

A. If I got out, it was up to the marshals, yes, sir.

Q. Okay. I think that's what I was asking. Most recently you had a progress report by the bureau of provisions -- Bureau of Prisons, excuse me, completed January 20 of 2004; is that correct?

A. Okay.

Q. And that also contains a release plan portion, doesn't it? You've seen those documents like this, haven't you?

A. I've seen the documents, yes, sir.

Q. Okay. And yours under the release planning says Mr. McIntosh's release plans remain guarded due to his current sentence length. Any release plans will be finalized with his unit team members at a later date; is that correct?

A. Okay.

Q. You don't --

A. I don't remember, sir.

Q. And so that certainly does not indicate that you have abandoned all hope, does it?

A. Be honest with you, today's the first I'm being made aware of it. I mean, yes, I signed the papers. I can't argue that.

Q. You see them; you sign them; and you're a jailhouse lawyer,

and you sign stuff without reading it?

A. He hands it to me at the mail call, and I just sign it and give it back.

Q. And you're not disputing that you have had conversations with your unit team in the federal Bureau of Prisons concerning your hope for release; is that correct?

A. No, I'm not disputing that.

Q. All right. And you also are not disputing that your hope

for release in your mind and in the mind of your unit team might have something to do with your testimony in this case.
A. I don't -- I don't think I could argue that one wouldn't hope so.
Q. And certainly your hope for release in your own mind is better testifying for the government against Mr. Honken than it would be if you had not.
A. That's true.
Q. Let me go back to something we touched on Friday -- was it just Friday? -- and you had indicated that you knew some people from USP, Florence; is that correct?
A. I beg your pardon, sir?
Q. You had indicated -- I'd asked you about various people who were at Florence and did you know those people. Remember that?
A. Not specific names, no, sir, but I remember, yes, we did discuss some people.
Q. Okay. I'm going to --

♀

MR. ROGERS: If I may approach, Your Honor.
Q. -- show you what has been marked Defendant's Exhibit Q which is kind of a blank chart.
THE COURT: You may.
Q. I'm going to try and fill it in. Can you write?
A. No, sir. It is blank. You'll have to write.
Q. I'll have to do the writing. You haven't seen my writing, Mr. McIntosh. You wouldn't ask me to do that. You're probably better with handcuffs than I am without. But let me -- I'll print. How's that?
A. Okay.
Q. First of all, do you know a man named Steven Vest?

A. Yes.
Q. Okay. And was he there at Florence?
A. He was my last cellie.
Q. Okay. And he was also celled with some other people who were involved in this case, wasn't he?
A. That's news to me, sir.
Q. Okay. Well, let's go through it. Let's put him up here at the top. Vest; right?
A. Okay.
Q. And you celled with him, and he was your last cellie at Florence?
A. Yes, sir.
Q. McIntosh there; right?

♀

A. Okay.
Q. Shows that you're one of his cellmates.
A. Okay.
Q. On this flow chart. You know about this flow chart; right?
A. I know about flow charts, yes, sir.
Q. Because you actually have a bachelor's degree or almost a bachelor's degree in business administration?
A. I never went to work, so I never received it.
Q. But you've got all the studies in.
A. Yes, sir.
Q. Now, we've talked about a guy named Pat Gibson.
A. Yes, sir.
Q. Was he a cellmate of yours at some point?
A. Yes, sir.
Q. And in your letter he is CI 1 and you're CI 2.
A. Yes, sir.

Q. Do you know a man named Steven Ferguson?

A. I know who he is. I wasn't close to Mr. -- to Fergie as they call him. He was in charge of the suicide prevention for a while which was run through the psychology department.

Q. Were you ever celled with him?

A. No.

Q. To your knowledge was Pat Gibson celled with him?

A. You told me that the other day. I wasn't aware of it.

Q. You don't know that?

♀

1740

A. Not on my own, no, sir.

Q. We'll leave him blank then.

MR. ROGERS: Your Honor, at this time I'd move to admit Defendant's Exhibit Q. We will be filling it in with other witnesses as we go along.

* * * *

(Defendant Exhibit Q was offered.)

* * * *

THE COURT: Well, I couldn't find a Q in the packet that you gave me. Do I have a Q?

MR. ROGERS: No. It should be in the notebook.

THE COURT: I've never received the defense exhibits.

MR. ROGERS: Oh, I'm sorry.

THE COURT: Anyway, does the government have any objection to Defendant's Exhibit Q?

MR. MILLER: 403, Your Honor.

THE COURT: Why don't you hold off until I get a copy of it. Do you have an exhibit list for me? Are you going to have other exhibits now that I haven't seen?

MR. ROGERS: I am not, Your Honor, and I thought you'd

gotten those. Let me show it to you.

THE COURT: Well, we're going to take this up outside the presence of the jury, so we'll do it at our next break.

BY MR. ROGERS:

Q. Mr. McIntosh, when is it that you claim Mr. Honken told you

that he suffocated two adults while Kate suffocated two children?

A. It's near the end of April or the first of March. There was a lockdown in there. Either before or after lockdown --

Q. Of 1999?

A. Yes, sir.

Q. And the whole unit was locked down for some reason?

A. Whole institution.

Q. Okay. The whole institution, all of --

A. It was not during the lockdown, though, but it was -- I mean, it couldn't have happened during the lockdown because I went to the law library.

Q. This conversation took place in the law library? Is that what you're telling us?

A. No, I went to the law library to research child support. It was upon returning from that.

Q. And so that would have been in --

A. The first part of April's the way I've described it.

Q. Of --

A. 1999.

Q. -- 1999. And contemporaneously with that conversation is when you made your notes that you hid in the janitor's closet in the psychology department.

A. Yes, sir.

Q. And there's no doubt in your mind that it was Kate who

Mr. Honken told you had smothered the children.
A. That was the name he used, yes, sir.
Q. Kate.
A. Yes, sir.
Q. And when was it that you say Mr. Honken told you they had killed the people in one state and buried them across the state line in another state?
A. That was in roughly September of '98.
Q. That was a long time before.
A. Yes, sir.
Q. That was when Mr. Honken first moved into the unit.
A. Yes, sir, it was about that same time.
Q. And that was before you had refused to help him do his 2255 motion.
A. Yes, sir, that was correct.
Q. And before he had asked Mr. Tokars to help him with his 2255 motion.
A. I believe so.
Q. And by the way, did Mr. Tokars help other inmates do legal things as well?
A. I would assume so, but I'm not aware of it.
Q. Well, you guys -- you told us earlier I think that the jailhouse lawyers all happened to be in basically the same housing unit.
A. Yes, but Mr. Tokars didn't come and chat or discuss or

strategize with the rest of us. For whatever reasons he kept to

himself.
Q. So he did not participate in the round table meetings of the jailhouse lawyers.
A. The round -- we would often discuss how we were approaching things on other cases, two or three of us get together so we could argue the best ways to present it. He did not.
Q. And Mr. Tokars did not participate in that.
A. No, sir.
Q. So did you -- did he ever tell you that he was working with Mr. Honken on his --
A. Yes, sir.
Q. -- motion? And when was that?
A. I don't recall when. It was before he left obviously, but -- I remember going downstairs and discussing something with him, but I don't remember what -- that he indicated he was working on Dustin's case, and I believe I explained to him at the time I had not.
Q. That you had declined the offer of employment; is that correct?
A. Yes, sir.
Q. Now, at the time that you prepared the letter to the United States attorney in the Northern District of Iowa, you and Mr. Gibson did that together; correct?
A. Yes, sir.

Q. And were you cellmates at that time?
A. Yes, sir.
Q. And you had talked about Mr. Honken's case at some length with Mr. Gibson; isn't that correct?
A. Yes, sir.

Q. And after Mr. Gibson left, then Mr. Vest became your cellmate; is that correct?

A. Yes, sir.

Q. And you and he also talked about Mr. Honken's case, didn't you?

A. I don't recall that, sir.

Q. You don't know whether or not you did?

A. I will stand neutral on it. No, I do not recall it.

Q. Okay.

A. In fact, I find that very odd if I did, but I don't recall.

Q. When you agreed to help Mr. Honken work on his child support matter, did he ask you to sign any type of confidentiality agreement or anything like that?

A. No, sir.

Q. Do you recall him asking Mr. Tokars to sign a confidentiality agreement?

A. Unknown to me, sir.

Q. Do you recall typing for Mr. Honken a proposed agreement that he wanted Mr. Tokars to sign?

A. I don't recall doing it. I might have. I typed a number

1745

of things for Dustin.

Q. Now, it is dangerous if you are an inmate in the general population who has the reputation of being a rat or an informant; isn't that true?

A. Very dangerous, sir.

Q. And it's been that way during your entire 18 years in the federal penal system.

A. Yes, sir.

Q. And it was that way long before you ever laid eyes on

Dustin Honken in the dining room at USP, Florence.

A. Yes, sir.

Q. And inmates are always trying to find out who might be a rat.

A. Yes, sir.

Q. And they've developed ways to do this over the years, haven't they?

A. Yes, they have I'm sure.

Q. There are several different ways.

A. Different ways?

Q. Yes.

A. Yes, sir.

Q. And sometimes it doesn't matter whether the person actually is a rat or not. If they look like a rat or act like a rat or are suspected of being a rat, that's dangerous.

A. They're a rat.

♀

1746

Q. And so appearance in that sense is probably more important than reality.

A. I don't know that it's more important. It's very important.

Q. Right. And so somebody who is not a rat who appears to be a rat is in just as much danger as somebody who really is a rat.

A. Correct.

Q. And more danger than somebody who is a rat who doesn't appear to be a rat.

A. Yes, that's correct.

Q. Okay. Sometimes the administration tries to make people look like rats to get them in danger so that they will seek protection and become rats.

A. Correct.

Q. That's --

A. Yes, sir.

Q. -- a standard ploy, isn't it?

A. Yes, sir.

Q. Were you at Leavenworth when there was an SIS captain named Pierce?

A. I remember the name. I don't remember the man.

Q. So you don't know whether that's his favorite ploy or not.

A. I don't remember the man. I guess I remember the name.

Q. But that's not an uncommon thing at any institution, is it? That's kind of a tactic that is frequently encountered.

A. Yes, sir. They're always looking for sources of information.

Q. Right. And people who are known to give information to the SIS are at risk.

A. Yes, sir.

Q. And when we say at risk, they're at risk of physical violence if they remain in the general population.

A. I don't think there's any violence. I think there's just death which is violent, but, I mean --

Q. Sounds violent to me.

A. But there's no just a beating. It's not just we'll teach him a lesson.

Q. And that's the convict code for as long as you've been there.

A. Yes, sir.

Q. And if somebody is identified as a rat and marked to be killed, they're not given advance notice, are they?

A. No, but sometimes word leaks out.

Q. But in prison --

A. They have no notice.

Q. -- if you intend to kill somebody, you kill them; you don't talk about it.

A. No, sir.

Q. In the context of appearance being more important than reality, it's important to an inmate that he look able to take

♀

care of himself, isn't it?

A. Yes, sir.

Q. It's important to an inmate that he appear tough whether he really is or not.

A. Yes, sir.

Q. It's important to an inmate that he appear willing to fight even if he's scared out of his wits inside.

A. Yes, sir.

Q. And it's important to an inmate that he appear aggressive even if he's meek as a lamb.

A. No, he doesn't have to appear aggressive. He just has to appear to stand the line.

Q. Well, but appearing aggressive is certainly one way of looking tougher than you are.

A. But that's asking for trouble.

Q. Depending on who you're with and who you're being aggressive to.

A. Well, everyone has a friend, so if you're aggressive to anyone, you are eventually taking on their friends.

Q. So it depends on who your friends are. If you're going to want to appear tough, you want friends who appear tough as well.

A. No. What I'm trying to say is if you want to be aggressive to this person because you perceive him as weak, then what's going to happen is that person will have a friend, and now you have to confront that friend. So it's better just try to be

neutral, appear tough, but don't cause any waves. If you run with a tough crowd, you're going to get in trouble. So what you want to do is appear tough and mind your own business.

Q. But if you are, in fact, running with a tough crowd, you have to appear as tough as they are.

A. Yes, that's true.

Q. Whether you really are or not.

A. You have to be as they are if that's who you choose to run with.

Q. Okay. Or who chooses to run with you.

A. Okay. Yes, sir.

MR. ROGERS: Those are all the questions I have.

THE COURT: Any redirect?

MR. MILLER: Yes, Your Honor.

THE COURT: Mr. Miller?

REDIRECT EXAMINATION

BY MR. MILLER:

Q. Mr. McIntosh, you mentioned that when he came into the system when you first met him Dustin Honken was a fish.

A. Yes, that's a term applied to anybody who's not been to prison.

Q. Did he remain such status?

A. Well, no one remains that status. They eventually change. No, he did not remain that status.

Q. And did he begin to run with a group?

A. Yes, he chose to run with a group of gentlemen, yes.
Q. Group of gentlemen with a reputation for being mean and aggressive?
A. Hard liners I guess is the way to say it.
Q. You spoke a little bit about Inmate Tokars.
A. Yes, sir.
Q. What was he like?
A. Well, Tokars was a fish also when he first got there, and Tokars, as I say, always remained to himself. Basically I don't recall him ever taking up with everybody.
Q. He shied away from the other prisoners?
A. As much as possible.
Q. I think you indicated to Mr. Rogers on Friday that he was trying to keep his status as a former prosecutor and judge secret but --
A. It got out.
Q. Without him even knowing it.
A. Oh, he knew it.
Q. He eventually figured that out?
A. Within a day or two.
Q. Was Mr. Tokars a little bit naive about his ability to keep his background secret?
A. He didn't -- what had actually -- if I may elaborate. May I or --
Q. Sure.

A. What had actually happened there is he was from somewhere

in Georgia. I don't know exactly where, but there were other people from the same county, and they knew him and knew the case, and that's how the word got out.

Q. So if I could rephrase it, it would have been naive for him to think that he could have kept it secret indefinitely.

A. Yes, sir.

Q. Now, Mr. Rogers on Friday and again this morning questioned you about this identification of Kate as the defendant's fellow participant in these murders. Was that confusing to you in any way, and if so, why?

A. Well, the name Kate was not confusing to me, but it struck me odd that this accountant type had suffocated children. And so I just finished, as I said, working on the child support, so I asked him if it was the one who had his son, and he said, No, the one that has my daughter. And that confused me more because it was my understanding that Kate had the boy and Angie had the daughter, and so as I left that conversation at that time, I wasn't sure just who he was talking about or which child went with which person. I didn't understand how I was confused, but I never discussed it again with him.

Q. The statements he gave you were inconsistent in that regard.

A. To me they were, yes.

Q. And is there any reason why an inmate might intentionally

1752

make inconsistent statements to a fellow inmate talking about such matters like that?

A. Absolutely, keep them confused.

MR. ROGERS: Objection, Your Honor. Calls for speculation.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1530 of 3636

THE COURT: Overruled. You may answer.
BY MR. MILLER:
Q. Why would one inmate intentionally make inconsistent statements to a fellow inmate?
A. So when anybody wanted to talk about anything the individual said, it would not ring true.
Q. Mr. McIntosh, I don't want to know where you're currently incarcerated, but you are currently incarcerated.
A. Yes, sir. Incidentally, my living conditions are no different than they were before.
Q. Is this a walk-away place?
A. No. They have two fences and a lot of guns and a lot of electronics.
Q. And razor wire on top of those fences?
A. Razor wire on top of the building, on top of the fences, in between the fences.
Q. Do you as a witness security prisoner have more liberty or less liberty than an ordinary general population prisoner?
A. Virtually the same. Lockdown's the same. Counts are the same. Fog counts are the same. Counting -- you know, they have

1753

to count us to make sure we didn't get away.
Q. So why is it that you would prefer to be in wit. sec., Mr. McIntosh?
A. The actual benefit that I see is I don't worry about being stuck or killed or knifed, how ever you want to phrase that.
Q. It's a matter of staying alive.
A. Yes.
Q. Do you still have that letter?
A. No, sir, he took it.

Q. But you did read through it.
A. Yes, sir.
Q. And you remember that letter?
A. Yes, sir.
Q. What motivated you to write that letter, Mr. McIntosh?
A. Well, I was working -- this is lengthy. Is that all right? Anyway, I was --
Q. As succinctly as you can describe for us.
A. I'd been helping John Murrow on his case, and John came to me and explained to me --
MR. ROGERS: Objection, hearsay what John came and explained.
THE COURT: It's not being offered for the truth of the matter asserted I don't believe but . . .
A. -- that --
THE COURT: You know, I don't know exactly what he's

1754

going to say. Can you rephrase the question?
Q. Let me rephrase and see if I can refocus.
Without -- were inmates' lives in danger, Mr. McIntosh?
A. Yes, sir.
Q. From whom?
A. From Honkens and his associates.
Q. Mr. Honken's status as an inmate had changed or transformed considerably since you first met him when he was a fish there.
A. Yes, sir.
MR. ROGERS: Objection. Asked and answered.
THE COURT: Overruled.
MR. MILLER: If I may approach, Your Honor.

THE COURT: You may.

BY MR. MILLER:

Q. Handing you what is marked Government's Exhibit 350, is this another copy of the letter that Mr. Rogers showed you and from which he quoted a couple sentences?

A. Yes, it appears to be the same.

MR. MILLER: Government offers Exhibit 350.

* * * *

(Government Exhibit 350 was offered.)

* * * *

MR. ROGERS: Objection, Your Honor. It's irrelevant, 403, 404.

♀

1755

THE COURT: Now, 350 wasn't on your witness list -- exhibit list, was it?

MR. MILLER: No, Your Honor.

THE COURT: Well, it's hearsay. What exception to the hearsay rule does it meet? Are you trying to say it's an 803(6) business record?

MR. MILLER: No, Your Honor. Under the rule of completeness, the portion of it was quoted to the witness and read into the record, and it has been identified.

THE COURT: Yeah. You know, we went over this. Rule of completeness does not authenticate an exhibit. It is not an exception to the hearsay rule. It allows you to put into evidence other parts of an exhibit that are otherwise admissible. What exception to the hearsay rule would Government's Exhibit 350 meet?

MR. MILLER: I'll withdraw it, Your Honor.

THE COURT: Thank you.

BY MR. MILLER:

Q. Mr. McIntosh, what did you --

THE COURT: Mr. Miller, just a second.

MR. MILLER: Yes.

THE COURT: Now, if you want to have him -- if you want to ask him questions about the letter under the rule of completeness, I'll allow you to do that. But it's not admissible as substantive evidence because it doesn't meet an

exception to the hearsay rule.

MR. MILLER: Very good.

THE COURT: Okay?

MR. MILLER: Thank you, Your Honor.

BY MR. MILLER:

Q. Mr. McIntosh, what did you tell the government in that letter that Dustin Honken had told you with regard to what had happened to those children?

A. I don't know that I said what happened to the children in that letter at all. I said that Dustin Honkens had killed his rats and a woman I believe.

MR. MILLER: And if I may refresh his recollection?

THE COURT: You may.

BY MR. MILLER:

Q. Directing you specifically on the third page to the numbered paragraph 3.

A. May I read it or --

Q. Yes.

A. Too bad about the girl and the kids, but they were witnesses to the murder.

Q. And that's what Mr. Honken told you.

A. Yes, sir.

MR. MILLER: No further redirect, Your Honor.

THE COURT: Mr. Rogers, any recross?

MR. ROGERS: Thank you, Your Honor.

RECROSS-EXAMINATION

BY MR. ROGERS:

Q. Sir, that was in the context of Dustin telling you that Kate suffocated the women -- or the children I mean; is that correct?

A. Yes, sir, yes, sir.

Q. And you never heard Dustin Honken threaten your friend John Morrow, did you?

A. No, sir.

Q. And you never saw Dustin Honken do anything to John Morrow, did you?

A. No, sir.

Q. And as a matter of fact, you had reported the activities of those people you now call Mr. Honken's associates to the SIS long before you wrote this letter, didn't you?

A. I think they were near -- close to simultaneous.

Q. And, in fact, what happened is a guy named Joe Dougherty, Joe Dock as they call him, asked you to copy some materials for him, didn't he?

A. Quite possibly. I've known Joe for a number of years.

Q. Right. And he is one of the people that you say Mr. Honken associated with.

A. Yes, sir.

Q. And some of these things that he was having you copy were, in fact, the PSIs of other inmates showing that they had

testified and stuff like that; right?
A. No, I don't believe so, sir.
Q. That's not what you went to the SIS with?
A. That's what I went to the SIS with, but I did not make the copies.
Q. But Dougherty asked you to.
A. No.
Q. Did not.
A. No. I never made any of the copies.
Q. But you went to the SIS with the fact that these materials were being accumulated and, therefore, people's lives were going to be in danger because they were rats?
A. And distributed. In fact, I recall they were simultaneous.
Q. So we have two different things here. We have your cooperation with the SIS, the detectives inside the prison, with regard to the danger of the rats, and then we also have separately your decision to cooperate with the United States against Mr. Honken in this case which was, as your letter states, motivated by the desire to make a deal; isn't that true?
A. No, sir.
MR. ROGERS: That's all I have.
THE COURT: Mr. Miller, any re-redirect?
MR. MILLER: Yes, Your Honor.

FURTHER REDIRECT EXAMINATION

BY MR. MILLER:

Q. Those papers that Mr. Rogers was referring to, is that what's known as a snitch packet or rat packet?

A. Yes, sir.
Q. And what is a rat packet?
A. It contains a photograph, a description of the individual, a summation of his case, what he informed on, and any other vital statistics that might identify him or locate him.
Q. And what's the purpose of a rat packet?
A. To have him --
MR. ROGERS: Objection. Calls for speculation.
THE COURT: Overruled.
MR. ROGERS: Also getting far afield, Your Honor.
THE COURT: Overruled. You may answer.
A. To have him killed.
Q. And who was circulating rat packets?
A. The group that he was -- Dustin was associated with.
Q. That letter you sent to the government, did that, in fact, set you free, Mr. McIntosh?
A. Not in the least.
Q. You're serving life without parole.
A. Yes, sir.
MR. MILLER: Thank you. No further redirect.
THE COURT: Mr. Rogers, anything further.
MR. ROGERS: No recross, Your Honor. Thank you.
THE COURT: Okay. Mr. McIntosh is excused.

1760

Members of the jury, you can take a stretch break.
MR. WILLIAMS: Actually, Your Honor, this may be one of those where it's going to take some time. I know it's a little early, but it may be the best time to take a break to minimize the inconvenience of the jury, the morning break, or we can move them as fast as we can. The next witness is

incarcerated as well.

THE COURT: No. I understand that.

MR. WILLIAMS: We're glad to do it how ever you want to, Judge.

THE COURT: I don't like to go two hours with our court reporter, and that would put us -- well, she volunteered. Okay. We'll take you up on it. Members of the jury, it is 20 minutes to 10 or thereabouts. We'll take a -- we'll probably take a 30-minute recess because I have a little matter I want to take up with the lawyers. Please remember my prior cautionary instruction about keeping an open mind until you've heard all of the evidence. And we'll see you back here in 30 minutes. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated. Now, why don't we take up that exhibit that -- Mr. Rogers, that you have that you offered, the chart that I had never seen before. That appears to be solely a demonstrative exhibit. What would the -- and you weren't offering it for demonstrative purposes. You were trying

♀

1761

to admit it as substantive evidence. And I would remind you that the same chart -- a conceptually similar chart that the government used in opening statement which would be Government's Exhibit 2, you lodged a substantive exhibit -- substantive objection to. And then the government said they were going to use it as demonstrative, and that's how we resolved that. What would be the basis for admitting your proposed exhibit?

MR. ROGERS: Judge, this is I think an exhibit that we intend to continue to create with other witnesses just to show the relationships of the government witnesses to each other and

the development of -- or their opportunities to develop false stories.

THE COURT: Well, but it's demonstrative. It's not substantive. You can use it as a demonstrative exhibit. You can certainly put it up on the screen in closing argument, for example. But it's demonstrative. It's not substantive.

MR. ROGERS: That's fine. I'm now on that page. Wait a minute. Let me consult.

THE COURT: Okay. Well, here's the point. You're going to continue to develop this exhibit because it's chart in progress really.

MR. ROGERS: Right.

THE COURT: And so you'll have ample opportunity to come up with a theory of admissibility as substantive evidence if you want to. I'll be interested to hear what that is, and

1762

maybe you can find something. But we don't have to make that decision now, do we?

MR. ROGERS: No, we don't, Your Honor. I'm happy to leave that to wiser heads than mine.

THE COURT: Okay. But it's going to -- you're going to be adding to this chart, so you can continue to lay the foundation for it, and it will either -- you know, at a minimum it will be allowed to be used as demonstrative in your closing, and if you can come up with a theory that would admit it as substantive evidence, then it will actually go into evidence. I'm not foreclosing the possibility. It's just nothing is quite so obvious that strikes my evidence cord here that would allow it to be admitted. But we can take that up at another time.

MR. ROGERS: Thank you.

THE COURT: Okay? Anything else we need to take up?

MR. PARRISH: No. I was just going to say, Your Honor, that's correct. It will be used with other witnesses and develop a theory that it may be argued that it's substantive evidence at the end of the chain, so to speak.

THE COURT: Okay. Anything else we need to take up from the government?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay.

MR. PARRISH: We do have those notebooks prepared and ready.

♀

THE COURT: Oh, okay.

MR. PARRISH: What we'd like to do -- we might -- if we can give this to you, we may have to change a couple of minor matters.

THE COURT: As we go.

MR. PARRISH: Right. But we could give you a copy. I'll also give the government a copy understanding that since they have not completed their case we will probably make some changes.

THE COURT: Sure, just like they've made changes to their exhibit list. Right. That's fine. We can do that on the break. Thanks. We'll be in recess.

(Recess at 9:43 a.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. PARRISH: Yes, Your Honor.

THE COURT: Do you have your next witness ready to go?

MR. WILLIAMS: Yep, ready to go, Your Honor.

THE COURT: Who's going to be doing it? Mr. Williams?

MR. WILLIAMS: I am.

MR. PARRISH: And I'm going to be doing the cross-examination.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Williams, is the government ready to call its next

1764

witness?

MR. WILLIAMS: Yes, Your Honor. The United States calls Steve Vest.

THE COURT: To the extent that you can, would you raise your right hand, please.

STEVE VEST, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. The marshal will assist you. And could we try and get that chair as close as we can to the microphones, and you can adjust those microphones. Thank you very much. And would you tell us who you are by stating your name and spelling your last name, please.

THE WITNESS: Steve Vest, V-e-s-t.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Vest, we want to learn a little bit about you, sir. Where are you from originally?

A. Kansas City.

Q. And how long have you lived in the Kansas City area?

A. My entire life before.

Q. How far did you go through school, sir?
A. Eleventh grade.
Q. And before -- and we're going to talk about your

incarceration in a little bit. But before you were incarcerated, did you have some type of trade or profession?
A. I owned a couple businesses.
Q. What type of businesses did you have, sir?
A. A car wash and a forklift company.
Q. And those were down in the Kansas City area?
A. They were.
Q. Are you married, sir?
A. I am.
Q. And how long have you been married?
A. Twenty years.
Q. And children?
A. Two kids.
Q. Let's talk a little bit about your incarceration, sir. You're doing federal time right now?
A. I am.
Q. What was the nature of your conviction? What were the charges?
A. Conspiracy for a homicide and conspiracy for drugs and money laundering.
Q. The homicides, were those alleged in the charging documents to have been related to the drug activities?
A. They were.
Q. Okay. And when were you convicted of those crimes, sir?
A. In '96.

Q. What type of sentence did you receive?
A. A life sentence.
Q. And was it one life sentence or two life sentences?
A. I think it was four.
Q. Four life sentences. In that federal charge -- that arose out of the Kansas City office down there?
A. Yes.
Q. And the U.S. Attorney's Office for the Western District of Missouri is the one who filed the charges against you?
A. Yes.
Q. Did you go to trial or plead guilty to those charges?
A. I pled guilty.
Q. Was that pursuant to any type of an agreement where you agreed to cooperate against other witnesses in your case?
A. No, it wasn't.
Q. At some point you have provided information and cooperated with the federal government and provided information about Dustin Honken; is that fair to say?
A. Yes.
Q. And we're going to talk about how that came about at some point. What I'm interested in exploring with you right now is do you have any agreement with the federal government to get any reduction in your sentence in exchange for your cooperation regarding Dustin Honken?
A. No, I don't.

1767

Q. You understand being a member or being somebody who's been incarcerated pursuant to the federal system that there are some

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1543 of 3636

ways in which reductions can be effected of a sentence?
A. Yes.
Q. And who do you understand would have to make that decision?
A. I'm not really sure, tell you the truth.
Q. What do you understand -- what, if anything, can this U.S. Attorney's Office in the Northern District of Iowa do, if anything, for you?
A. Nothing that I understand.
Q. Are you hoping that regardless of that that somehow you might get your sentence reduced?
A. Someday I hope so, parole or something.
Q. I'm sorry?
A. Maybe parole or something. I don't know.
Q. And right now you're serving four life sentences?
A. I am.
Q. Nevertheless, you're hoping that somehow you might be able to still get a reduction in your sentence.
A. Yeah. I never give up hope.
Q. And do you think that your cooperation regarding Dustin Honken is certainly not going to hurt those chances?
A. Right.
Q. Anybody given you any guarantees or promises that somehow it's going to help your chances?

A. No.
Q. Despite that, do you still wish to testify here today?
A. I do.
Q. Let's talk a little bit about your incarceration. At some point after you were incarcerated in 1996, you were then put into the federal Bureau of Prisons system; is that correct?

A. Yes.
Q. What institution did you go to initially, sir?
A. Florence, Colorado.
Q. And is that a United States penitentiary?
A. It is.
Q. How long were you at the Florence -- USP, Florence?
A. Four and a half years.
Q. We've had some description about USP, Florence. We understand that there's a number of different units there. During your four and a half years at USP, Florence, were you in the same unit the whole time?
A. No, I was not.
Q. At some point did you go to what's called the bravo B unit?
A. I did.
Q. And was that a nonsmoking unit?
A. It was.
Q. While you were in the bravo B unit and even before that time, had you developed a relationship with one of the SIS investigators there?

1769

A. I did.
Q. Explain to the jury what is SIS.
A. It's something like the FBI on the outside. You know, it's the FBI kind of on the inside, investigators.
Q. What caused you initially to develop a relationship with somebody with the SIS?
A. I had some information that this -- they was going to stab this guy, and so I went and told my counselor. My counselor told me to go see the SIS guy, and that's how I got to . . .
Q. And that had nothing to do with Dustin Honken.

A. No.
Q. All right. But it's through that that you came to know somebody who was connected with SIS.
A. Yes.
Q. At some point did you meet Dustin Honken?
A. Yes.
Q. And where did you meet him at?
A. The first time was in Spanish class. We had a Spanish class together.
Q. Were you living in the same unit at that time?
A. No.
Q. When you met him in the Spanish class, how long did you get to have contact with him in that Spanish class? Was it a matter of weeks, months?
A. It was months I think, couple months.

1770

Q. And how did your relationship develop, if at all, during your contact there?
A. Yeah, not much really. I mean, we just said hi and stuff like that.
Q. After that at some point did you end up in the same housing unit?
A. I did.
Q. And was that the bravo B unit?
A. It was.
Q. Do you recall, were you there first, or was Dustin Honken in that unit before you arrived?
A. I think he was there before I got there, but I'm not real sure.
Q. In any event, while you were in the bravo B unit, did you

have multiple cellmates or cellies?
A. I did.
Q. And that just happens over time that one will move out and another one move in or something?
A. Right.
Q. Who were some of the cellmates you had while you were in the bravo B unit?
A. Ron McIntosh, Wayne Byerly, and some other guy. I can't remember what his name was.
Q. Okay. And at some point did you for at least some short period of time cell with Dustin Honken?

♀

A. I did, couple of days.
Q. You indicated that during the Spanish class you didn't really get to know Dustin Honken very much. Did that change once you guys got into the same unit?
A. It did.
Q. And could you explain to the jury the nature of your relationship and how it developed over time with Dustin Honken?
A. Just being in the same unit, you know, you see everybody every day, and, you know, you get to talking more, and I got a cellie. Wayne Byerly came, and he was my cellie, and he was hanging around him a lot, and so he would come in my room and stuff like that. That's how I got to know him.
Q. And Wayne Byerly was close with Dustin Honken?
A. He was.
Q. And over time because of that initial connection between Wayne Byerly and Dustin Honken, did you and Dustin Honken develop a close relationship?
A. We did.

Q. Now, let's talk a little bit. You indicated at some point that you had a cellmate by the name of Ron McIntosh.
A. I did.
Q. At some point did he leave the institution?
A. He did, yes.
Q. Do you recall just roughly when that would have been?
A. I'm not sure.

♀

1772

Q. Okay. After he left the institution, did you have any conversations with Dustin Honken about Ron McIntosh?
A. I did. He -- I think it was about a couple months after he left. He came up to me and said he just found out through his lawyer that Ron made a statement against him.
Q. And did he indicate where Ron would have made the statement against him at?
A. I don't remember.
Q. Okay. And so why was he telling you this? What? Did he want something from you?
A. He was just letting me know, you know, that he did that I guess. He said that Ron was doing some legal work for him, and so he made some -- he made a statement against him so . . .
Q. So Dustin Honken's telling you that Ron McIntosh made a statement against him, Dustin Honken.
A. Yes.
Q. Did Dustin Honken express any concerns about that?
A. Yes.
Q. And did he ask you to do anything for him?
A. Yes. I told him if I ever run into Ron down the road that I would let the shot callers know that he made a statement against Dustin.

Q. Now, what do you mean shot callers?
A. Well, it's on the yard -- in a prison yard you have different -- like you got the whites and the blacks and the

Mexicans, and everybody kind of has a shot caller, and they kind of run the yard.
Q. Shot caller is some inmate?
A. Yes.
Q. And presumably the shot caller would do what if you advised the shot caller at some other institution that Ron McIntosh had informed on Dustin Honken?
A. They would either go to Ron and say, Get off the yard right now, go check in, or they would make arrangements to have somebody go stab him.
Q. And when you say go check in, what do you mean by that?
A. He would have to go to lieutenant's office and say, I'm checking in, and they would lock you up.
Q. And do they call that something?
A. PC. They call it protective custody.
Q. And what is protective custody?
A. It's basically what's called being in the hole. You're just in a cell by yourself, you know, no -- nothing to do, no TVs, phones, nothing like that.
Q. So the idea would be that you told Dustin Honken that if you were in another institution where McIntosh was at, you would tell the shot caller, some guy, about his prior informing, and that shot caller would do one of two things: Either have him stabbed or tell him to go get off the yard and get into protective custody?

A. Yes.
Q. As a result of this discussion about Ron McIntosh, did you and Dustin Honken develop a little bit more trust and a little bit closer relationship after that?
A. We did.
Q. And at some point did he approach you about any type of plans for escaping from custody at some point?
A. He did.

MR. PARRISH: Objection, relevance, 403.

THE COURT: Could I see the lawyers at sidebar? And then we'll decide whether we have to send you out or not. Thank you.

(At sidebar on the record.)

THE COURT: What's this relevant to?

MR. WILLIAMS: Two things: Context for where he disclosed the murders because it's in the context they're talking about escaping when he comes back here for trial and then getting out to kill the prosecutors and witnesses that the conversation came up about his prior murders, and so number one, it's context.

Number two is his intent to go out and kill Cutkomp and witnesses and so forth, his consciousness of his guilt of having previously committed murders and knowing that these people were after him.

MR. PARRISH: My objection on 403, Judge, is that it's

so prejudicial in and of itself, it's not related to the escape plan that you've already allowed into evidence under your theory of the Woodbury County Jail. It goes into a separate escape

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1550 of 3636

plan.

THE COURT: I wish you would have given me a heads-up on it. I'm going to send the jury out, and we'll take it up; okay?

MR. WILLIAMS: Okay. Thank you.

(The sidebar was concluded.)

THE COURT: Members of the jury, regrettably, I am going to have to send you out while I take up this matter with the lawyers. Thank you. Please remember my cautionary instruction about keeping an open mind until you've heard all of the evidence. We'll bring you back as soon as we can. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated. Of course, this all comes as news to me, gentlemen, because in our extensive pretrial motion practice, extensive motion in limines filed by both sides, this one was never raised. Was it, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. So let's go -- why don't you give me a quick proffer of what the evidence would be from Mr. Vest.

MR. WILLIAMS: Certainly, Your Honor. He would testify that it was in this context of talking to Dustin Honken

1776

about escaping -- Honken knew that he was under investigation, anticipated he would be called back here for a murder trial. And knowing that he was going to come back here, he plotted with other inmates to come up with a scheme for escaping from custody while they were back here and escaping up to Canada, ultimately coming back down into Iowa and killing the witnesses who had testified against him and the prosecutors and agents and so

forth.

It's in this context of talking about the escape and the fact that he feels he can trust him at this point because Mr. Vest says, Yeah, I'm interested that he also then makes further disclosures about the murders that occurred back in 1993 and activities that occurred in 1996.

So number one, the government believes it's necessary to get into this because of the context in which the disclosures were made. It shows the trustworthiness. It shows why Dustin Honken would confide in a person he didn't know about these prior murders.

And number two, by talking about escaping, going to Canada, coming back down and killing people, it shows consciousness of guilt of his prior offense.

THE COURT: And these comments were before Mr. Honken was indicted on these charges; is that correct?

MR. WILLIAMS: That's correct, Your Honor. And this was part of our charged conduct as well, Your Honor. Let me

look for it.

THE COURT: Which count or counts of the indictment?

MR. WILLIAMS: Count 7 is what I'm looking at, Your Honor, which has a charging date of between July 1 of 1993 and continuing thereafter until about 2000. These conversations would have taken place between 1998 and 2000 because Mr. Vest would have left the prison at that point.

THE COURT: Is Count 7 Cobeen and Cutkomp?

MR. WILLIAMS: No, that's Count 6. Count 7 is the conspiracy to commit crimes of violence and to kill witnesses. And so it's part of that --

THE COURT: But was this alleged -- was any of this testimony alleged as overt acts in support of that count in the indictment?

MR. WILLIAMS: Yeah, I was thinking it was, Your Honor, and that's what I'm looking for.

THE COURT: Well, the best way to find that would be in the jury instructions.

MR. WILLIAMS: It's exact -- it's paragraph 30 of the indictment -- I'm sorry, paragraph 30 of Count 7 of the indictment reads, While incarcerated in USP, Florence from 1998 to the present, Dustin Lee Honken has expressed plans to various inmates to escape from custody and kill witnesses and others involved in the prosecution, investigation of this case. While soliciting individuals to join in these plans to escape and

commit violent offenses, Dustin Lee Honken made admissions about his prior murder of Gregory Nicholson, Terry DeGeus, and the Duncan family.

THE COURT: Okay. But do you have the preliminary draft of the final instructions handy? Page 20 would be starting the listing of the 19 overt acts. I think it would be paragraph 19 of the overt acts.

MR. WILLIAMS: Is this the preliminary instructions, Your Honor?

THE COURT: Nope. Well, I've actually got the finals, but I think we listed the same overt acts in the preliminaries.

MR. WILLIAMS: And what page are you on, sir?

THE COURT: Twenty-two.

MR. WILLIAMS: I don't have the final preliminary. I have the final instructions. What instruction number is it?

THE COURT: It would be -- well, it's page 22 of the final -- of the proposed final instructions.

MR. WILLIAMS: Mine start at page 45. That's why I'm looking -- I think I can find it.

THE COURT: I'm sorry. I'm looking at the preliminaries. You're absolutely right.

MR. WILLIAMS: Looking at the finals, it is listed as the subparagraph 19 on page 61 of instruction number 7.

THE COURT: So my point is that not only is it an alleged overt act in Count 7 of the conspiracy, but it's also --

I also gave it in the preliminary instructions to which there was no objection by the defense.

MR. WILLIAMS: It's specifically charged conduct.

THE COURT: It's specifically charged conduct. Defense had a couple years to file a motion in limine ruling. None was ever filed. So it's not like this evidence comes as any surprise.

MR. WILLIAMS: I apologize, Your Honor, but that's why I didn't raise it.

THE COURT: Well, because they didn't move in limine on it.

MR. WILLIAMS: And it was specifically charged. I thought this was --

THE COURT: Is there some reason you didn't file a motion in limine on this?

MR. PARRISH: I don't think it's required under the evidence that's coming in. This is 403 --

THE COURT: That wasn't my question. My question was was there some reason you didn't file a motion in limine ruling.

MR. PARRISH: Well, it's so far outside of the realm of what could have been allowed. I don't think it should have been filed. I think it would be objectionable under 403. And also -- do you want my complete response now --

THE COURT: Well, you didn't move to strike the indictment in this case or challenge this as an overt act. I

already instructed the jury on this.

MR. PARRISH: Well, you only instructed the jury as to Count 7 I believe, and I believe even at a bare minimum even if you did your analysis you would end up with a limiting instruction to the jury at this point that it only applies to Count 7, so -- but you would still have to do a 403 analysis of it before it even is allowed in, and I'm not sure that a motion in limine would be required to it because it does not go to the entire -- all of the counts.

THE COURT: Excuse me?

MR. PARRISH: It would only go to Count 7.

THE COURT: Why didn't you file a motion in limine on Count 7?

MR. PARRISH: Well --

THE COURT: I mean, you had advance notice. You know, you may be right that there's no requirement that you file the motion in limine. But if you thought there was a 403 problem, I mean, that was the basis of most of your motion in limine.

MR. PARRISH: True.

THE COURT: So why wasn't there one filed on this if you thought it was a problem?

MR. PARRISH: Well, because I think the 403 analysis because if you follow his testimony, he says in the summer of

2000 is when he met Mr. Honken, and then that's what his testimony starts from, doesn't go back to '98, doesn't go back

to '99.

THE COURT: Well, on the limiting -- let's -- okay. Now on the limiting instruction, I asked you all two different times on the record if you were going to have a limiting instruction to draft one. If there was evidence admissible on some counts and not on others, you were supposed to give me a limiting instruction. I've never received a limiting instruction.

MR. PARRISH: I agree with that on this particular issue. You did get some on --

THE COURT: Is there some reason why I didn't receive a limiting instruction?

MR. PARRISH: Well, Judge, I have explained it to you. I can't offer --

THE COURT: I guess I must be slow, Mr. Parrish. I'm not understanding why I didn't get a limiting instruction when I asked you twice to give me one if you thought there would be one.

MR. PARRISH: Okay. It goes to an escape charge discussed in the summer of 2000 related to a matter unrelated to anything dealing with his conspiracy. The government's own argument is to give you context. It does not take the context of an escape discussion unrelated to any charge in this case and subject to a 403 analysis to give the Court a context -- to give the jury some context of how the discussion occurred.

THE COURT: Yeah, I don't buy his context argument because I think there are other ways to get the evidence in other than for context. So if their argument was simply they needed it for the context, I would sustain your objection. I wouldn't let them put it in for context. Nice try, Mr. Williams, but, you know -- but here's my problem. The problem is it's charged conduct.

MR. PARRISH: And you're saying that motion in limine should have been filed to that, but --

THE COURT: Actually --

MR. PARRISH: Okay. Go ahead.

THE COURT: I'm sorry.

MR. PARRISH: Go ahead. No.

THE COURT: I don't even think a motion in limine would help you on charged conduct.

MR. PARRISH: Exactly.

THE COURT: How could I preclude them from putting evidence in on conduct that they've charged?

MR. PARRISH: I agree. That's why it's more subject to a 403 analysis at the time they try to introduce it if they do to show whether or not it's admissible under the 403 analysis, and then you have to look at the factual context, not the context that the government is arguing that they want to bring it in under.

THE COURT: But, see, here it's so highly probative

1783

because it's charged conduct.

MR. PARRISH: Only, only it's probative to his activity if the Court determines when the conversation took

place. The Court, first of all, has to make an initial analysis factually as to when the conversation took place. By their record thus far, it's the summer of 2000. That's when the Court has to then evaluate it. Then it has to go through the --

THE COURT: Well, but just a second. It says here in the 19th overt act in support of the conspiracy in Count 7, While incarcerated at the USP in Florence, Colorado, from 1988 (sic) until his transfer to another penitentiary. So they're within the time frame of the charged conduct.

MR. PARRISH: But then -- well, yeah, but you don't base it solely on, Your Honor -- the 403 analysis solely on the basis of the indictment. You have to go back to the facts of what his testimony was, and I think then what the Court has to do is look at what did he just testify to. He said 2000. We're not that concerned I guess from '88 (sic). Mr. Honken was not there. So I think what we look at is the period of time they put it in from '98 to 2000. They've chosen at least at this juncture to leave it at I believe the summer of 2000 after -- when he met him. But we do agree, Your Honor, that it is listed as charged conduct when it's outlined from '88 up until 2000, but it really doesn't kick in -- it really doesn't kick in until his testimony says this is when they had the discussion.

THE COURT: Well, I don't disagree with that, but that's still within the time frame alleged in the 19th overt act in support of the conspiracy in Count 7, so it's within the time frame which I thought was your argument that there was some kind of time frame problem.

MR. PARRISH: Right. It is. And if you look at the summer of 2000, then you have to evaluate whether or not the

escape discussion within that period of time falls under the guidelines that should take it out of 403. And it's our argument that it does not at this point.

THE COURT: But here's my problem with your argument. I've already instructed the jury in preliminary instructions about this 19th overt act which is exactly the subject matter of this witness's testimony, and there was no objection from the defense as this being an overt act in support of the conspiracy.

MR. PARRISH: Oh, I understand the Court's thought on that, and I'm not sure you have to make an objection as to that to be under the protection of 403, and I don't think I disagree with the Court's thought that it's been read, and many times the courts will read indictments that are not subject to 403 until such time that the evidence comes in.

THE COURT: But I think you're right. You didn't have to -- you didn't have to object to the 19th overt act. But your -- the fact that you did not object to it seems odd to me, and now you're saying it's more prej -- I guess you're saying

1785

it's just more prejudicial than probative. And I would have some sympathy towards that argument if it was with regard to uncharged conduct. Matter of fact, I probably wouldn't let the government do it.

But here it's with regard to charged conduct. So the probative value of the evidence is exceptionally high. Is it prejudicial? Well, all good government evidence is prejudicial on highly probative matters. So if your argument is 403, I don't think so with regard to charged conduct. If it was uncharged conduct, I'd be very sympathetic.

MR. PARRISH: Right. But I think what you have to do

in analyzing under 403 is go if we're entitled to it -- even if you don't accept our argument, you still at most must instruct the jury how it applies and how -- when it comes in it must limit it to that. I'm not saying we're agreeing right now --

THE COURT: Well, only if -- only if -- so you're saying I should give a limiting instruction.

MR. PARRISH: On that aspect if you decide that it meets the 403 threshold.

THE COURT: Yes.

MR. PARRISH: I think that's what you have to do first.

THE COURT: And how do you respond to what I previously asked you about if there was a need for a limiting instruction you all were supposed to give me one?

MR. PARRISH: Well, Judge, I don't dispute the fact that if we analyze it different from the Court we should have submitted it to the Court. I'm not sure our analysis was the same as the Court's with regard to the --

THE COURT: Can I paraphrase this?

MR. PARRISH: Sure.

THE COURT: You were so confident that I was going to rule in your favor on your 403 argument that there wasn't any necessity to have a limiting instruction. How's that?

MR. PARRISH: Do you want me to base it on the previous rulings we've gotten? If you want me to base it on that, I would say, oh, I don't know, Your Honor. But if you look at the Count 7 conspiracy that the government argued the overt act 19, if you look at it, Your Honor, it starts between -- looking at the indictment, July 1, 1993, and

continuing thereafter until about 2000. And I think that's the operative time. And his testimony up to this point has been 2000. If you look at the discovery material we got, it's consistent with that. So I'm not sure they're able to get into --

THE COURT: Well, except that the 19th overt act says from 1998 until his transfer to another penitentiary. And obviously this took place at Florence because that's where Mr. Vest and Mr. Honken were.

MR. PARRISH: Yes, but what point in time?

THE COURT: Is your argument now that the overt act in 19 exceeds the scope of the conspiracy alleged in the underlying indictment?

MR. PARRISH: Exactly, and Your Honor, also that's been our argument all along and why I think under 403 -- I had a list of them, and I guess I -- to respond to them. That was one of the points that we were talking about is after -- my first argument is after the date of the charges alleged in the indictment. That was my first response, but I was just responding to your question.

And then my second argument was the escape is after the conspiracy charged in the indictment. My third argument was the 403 unfair prejudice. And then my fourth argument was after the events. Then I was going to have the Court go take a look at the actual testimony that he said it was the summer of 2000. And then my sixth argument was that the Court then would have to look at a minimum of limiting instruction on it and then advise the jury prior to that time if we lost on the five preceding issues. That's what I had written up in response to their

argument.

THE COURT: Okay. Mr. Williams, anything you want to add?

MR. WILLIAMS: No, Your Honor. I think I've made my point. This is charged conduct. It's clearly within the time frame charged in the indictment, and I think it's admissible.

1788

THE COURT: Your first five arguments, Mr. Parrish, are overruled. I'm going to sustain your sixth argument and give a limiting instruction notwithstanding the fact that you didn't provide me with one. Any input into when you want me to give the limiting instruction and what it should say?

MR. PARRISH: Your Honor, it should address the issue -- and I would just say by accepting and participating in the limiting instruction we would ask that in no way waives our previous objection.

THE COURT: Doesn't waive anything.

MR. PARRISH: We would think it should be very simple, Your Honor, that it only goes to Count 7, the issue of the escape. Obviously we're going to cross-examine him on that point.

THE COURT: Vigorously no doubt.

MR. PARRISH: Yes. But we'd also ask that the jury just be advised that this evidence regarding any discussion about an escape only goes to Count 7.

THE COURT: Okay.

MR. PARRISH: And that it should be considered for that purpose and none other, and I think an oral instruction would be satisfactory with the record on that. That's my thought, Your Honor. Let me just review it with my co-counsel.

Okay. That's what we would ask, Your Honor.

THE COURT: So I can tell the jury that the -- now,

before I get to what I'm going to tell them, I want to know the timing of it. You want me to give it before the testimony or after the testimony?

MR. PARRISH: It should be given before the testimony we would ask, Your Honor, and I assume in his questioning since he's in that area now I would imagine he's going to direct --

THE COURT: Would you have any objection if I track the language of Count (sic) 19 and tell the jury that I believe this witness will be testifying concerning Honken expressing plans to escape from custody and to kill witnesses and others involved in the prosecution and investigation of the case; that evidence is only relevant on Count 7 and may only be considered on Count 7 and can't be considered for any other purpose?

MR. PARRISH: That's correct, Your Honor. And, Your Honor, I would just add -- and I realize the Court has ruled.

THE COURT: Go ahead and supplement your objection.

MR. PARRISH: No, I was just going to ask -- we're asking that all the elements of 403 be in the Court's analysis of that ruling, and what I mean by that, confusion of the issues is one thing, but I think this limiting instruction really helps us on that point.

THE COURT: But your primary argument is that the probative value is substantially outweighed by the danger of unfair prejudice.

MR. PARRISH: Absolutely.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1563 of 3636

THE COURT: And on that I've clearly overruled that argument.

MR. PARRISH: Okay. Thanks.

THE COURT: Because it's charged conduct.

MR. PARRISH: Right. Gotcha.

THE COURT: Okay. Are you now going to get into this?

MR. WILLIAMS: Yes, Your Honor. That's exactly where I was going.

THE COURT: Now, do you have any objection if in the limiting instruction I track the language of the 19th overt act of Count 7?

MR. WILLIAMS: Not at all, Your Honor.

THE COURT: I'm not going to tell them that.

MR. WILLIAMS: Sure. No objection at all.

THE COURT: Or I actually could tell them that. They have it.

MR. WILLIAMS: Actually it might be better because it does specifically tie it into that.

THE COURT: Might be better. Right.

Mr. Parrish, do you have any objection if I actually tell them this evidence refers to the allegations in the 19th overt act in Count 7?

MR. PARRISH: I think that would be helpful. I agree with the government on that.

THE COURT: Good. Are we ready to have the jury

1791

brought in?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Any other record you want to make, Mr. Parrish?

MR. PARRISH: No, Your Honor.

MR. WILLIAMS: Again, I apologize, Your Honor. I really didn't see this one coming.

THE COURT: I understand. Neither did I. That's what makes trials interesting.

(The jury entered the courtroom.)

THE COURT: Please be seated. Members of the jury, you may recall -- I believe it was in preliminary instruction number 16 on definition of the evidence -- where I told you that sometimes evidence is admitted for a particular purpose and not for other purposes and if that were to happen in the trial I would tell you when it's going to happen and tell you the purpose for which it can be considered and the purposes for which that evidence may not be considered. We are now in that situation.

And you are about to hear evidence -- and this relates to -- if you actually have your preliminary instructions there with you which I know each of you have, on page 22, it would be the paragraph marked 19, and that is an overt act which the government alleges to be in furtherance of a conspiracy to tamper with witnesses and to solicit the murder of witnesses in

1792

Count 7. We're now talking about preliminary instruction number 9 that started on page 18. But the particular overt act in the conspiracy is 19.

And you're about to hear evidence concerning this overt act that the government has alleged where they allege that Mr. Honken expressed plans to various inmates to escape from custody and kill witnesses and others involved in the prosecution and investigation of this case. And you're about to

hear testimony from this witness concerning that. It's admitted only on Count 7 and may be considered only on Count 7 and not for any other purpose. Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

BY MR. WILLIAMS:

Q. Mr. Vest, we were just talking about the fact that at some point Dustin Honken talked to you about some escape plans; is that correct?

A. Yes.

Q. Approximately when do you recall this would have occurred, sir?

A. It was after McIntosh left.

Q. And before you left the institution.

A. Yes.

Q. And you would have left the institution approximately when, sir?

1793

A. I think it was 2001.

Q. So it would have occurred before that.

A. Yes.

Q. And when in 2001 do you recall that you left the institution, sir?

A. I believe it was February.

Q. Can you give the jury some context in which this escape discussion took place?

A. Honken approached me one day and said that they were, you know, thinking about escaping, that they had had some plans for escaping and wondered if I'd be interested.

Q. And what was your reaction at that point?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1566 of 3636

A. I said, No thanks, you know; I appreciate the offer, but I'm not interested.

Q. And so from then until some time later, did you have any further discussions with him about the escape plan?

A. I did. I talked to the SIS guy, and I told him about them, and he said --

MR. PARRISH: Objection as to what SIS said, hearsay.

MR. WILLIAMS: Not being introduced for the truth of the matter asserted, Your Honor.

THE COURT: Sustained. I'm sorry. The objection's overruled. Your argument's sustained. You may answer the question.

A. So I talked to him, and he said I should get some more

information on it. So I went back to the housing unit, and I talked to Dustin. I told him I was interested. Excuse me.

Q. So you told him you were interested in participating in this plan. After that did you have one or multiple conversations with Dustin Honken concerning this escape plan?

A. Multiple.

Q. And during the course of these conversations -- first of all, was this the discussion about a escape from USP, Florence or escape from some other setting?

A. It was an escape from -- when he was going to go to this trial, he was going to get some guys together in Sioux City and in one of the county jails and we were going to bust out of there.

Q. Now, what trial was he anticipating he was going to be going to trial on?

A. This trial here.

Q. And so what did he tell you was the plan?
A. He said that we was going to get four to six of us, and we was going to go to this county jail, and we would be in the hole probably because, you know, we're coming from the USP and all, and he said that him and Artie or one of the two or both of them preferably, they'd arrange it that they would go to the shower and on the way back that they would kill the guard and then take his keys and let us out.
Q. Artie is Artie who?

A. Artie Dufur.
Q. And how did he have a connection to Dustin Honken?
A. He was like his best friend.
Q. I need to have you explain a little bit something. How is it that all of you are going to come back to Sioux City for a trial?
A. He was going to use us for -- to testify for him.
Q. In what capacity? What were you supposed to say?
A. Make statements about the guys who were making statements against him and just on his behalf.
Q. And so what do you mean make statements against those guys?
A. Saying that they were lying or this or that, you know.
Q. And so that's what he wanted you to do?
A. Yes.
Q. And he could call you as a witness for that purpose then and get you back here.
A. Yes, he wanted me to write a letter to an attorney or he was going to arrange that.
Q. So the plan is to get a number of other USP, Florence inmates back including this Artie Dufur and at some point

overpower a guard, kill him, and take the keys.

A. Yes, sir.

Q. Then what was the plan?

A. Pardon me?

Q. Then what happened or what was the plan to be after that?

♀

A. After that we was going to go down to this control center and there was going to be a couple guards in there, going to kill them, and then we had a couple choices. He said we could -- there's a back way we could go around and take this other guy out and we would have had the whole jail or we could just leave right then. He said we could go downstairs. They have some guns stashed and we might be able to get some of those guns or, you know, if not, but we could get the keys off one of the guards and take his car and leave.

Q. Now, what jail was it being discussed that this escape would occur from?

A. Sioux City.

Q. And did Dustin Honken tell you he had any familiarity with that jail?

A. Yes, he told me how it was laid out. He said you go down to the showers and when you come back the guards was on the right-hand side. He said he'd been there before.

Q. Dustin Honken said he had been there before.

A. Yes.

Q. In telling you what the plan was for this escape, once he got to the point where you had gotten downstairs and to the point of getting out of the jail itself, what was to be the plan at that point?

A. After we would have got out, we would drive the car to a

grocery store and, you know, wait in the parking lot and wait

for some woman to come out to get in her car and we was going to overpower her, throw her in the trunk and take her car and then drive down to Oklahoma, rob a bank, ditch the car that we drove down there in, take the money and buy another car and then head up north.

Q. Why go south to what'd you say? Oklahoma?

A. Yes.

Q. Why go south and then go north?

A. This way it would throw the police off. They think that, you know, we were heading south when we were actually going to be heading north.

Q. Now, when Dustin Honken's telling you these plans, does he indicate to you that these are his plans?

A. Yes.

Q. What was supposed to happen then once you headed north after this diversion trip south?

A. We were going to drive up to Canada and cross the border.

Q. And what was to be done up in Canada?

A. We were going to stay up there for about a year, and he wanted to stay up there, and Artie was going to train us, and we was going to get guns and stuff like that and train us in military things, and we were going to live up there. And then after that Dustin was going to come back after about a year, and he was going to kill everybody he could.

Q. Artie was going to train you in military?

A.    Style, yes.
Q.    Did Dustin tell you whether Artie had some background in military training?
A.    Yes, he said he did.
Q.    What did he tell you about Artie Dufur?
A.    He told me a little bit about his case, how he got arrested and stuff like that, and he just said that he was -- he was all that.  He said he knew, you know, just about everything.
Q.    Did he indicate whether he had prior military background?
A.    He did.
Q.    Did you see, while you were in USP, Florence with Dustin Honken, Dustin Honken and Artie Dufur perform any training toward this end?
A.    Yes.
Q.    And what training did you see them perform?
A.    They would work out and do different things, you know, and they would work on hand signals and different, you know, things like I know one time he told me he was going to teach us like the diamond thing that he was going to use.  He said with that you could just about handle anything.
Q.    I didn't understand what you just said.  Teach you about a diamond?
A.    Yeah, a diamond technique he called it.
Q.    And what was the diamond technique?
A.    You had like four guys, you know, one in front, one in the back and two on the side.

Q.    And this was to be used how?
A.    Just for whatever we wanted to do.  I mean, that was just one of them that he said.

Q. So this is some type of formation that if you guys are going to be acting together you were in a diamond formation of some sort?
A. Right.
Q. You indicated that the plan was to have four to six people participate in this escape attempt. You've identified Artie Dufur, yourself, and then Dustin Honken. Did he tell -- did Dustin Honken tell you who else was to be part of this plan?
A. Yes. John Hunter, Dave Loparo, and Joe Dougherty.
Q. Now, once you got up to Canada, you indicated you'd be training for a while. Artie Dufur would provide you with his military training, and then after about a year, what was Dustin Honken -- what did he tell you he was going to do at that point?
A. He was going to come back into the United States, and he was going to kill -- you know, he said he figured he had one day, and he started early in the morning and kill as many people that was involved in his case, you know, prosecutors, agents, families, anybody that testified against him.
Q. Do you recall him identifying anybody specifically by name?
A. Yes. He would -- John Graham, Pat Reinert, Steve Colloton, something like that, and Bill Basler, the agents, and Tim,

1800

Tim -- I can't think of how to pronounce his last name, but him -- his whole family. He said he grew up with him and he knew where just about all his family lived so that wouldn't be a problem.
Q. And the intent was to kill Tim and the family?
A. Yes.
Q. Did Dustin Honken tell you anything about specific plans he had for killing John Graham?

A. Yes. He said he was going to go in his house and if he had enough time what he would like to do is tie him up and then kill his family, but he wanted to tie him up and kill his wife and torture his wife in front of him, and then after he killed her, then he'd kill him.
Q. Did he indicate how he planned on getting access to Special Agent Graham's house?
A. Yeah, he said he was going to go dressed as a priest.
Q. Did he indicate to you why it is he wanted to go back and kill all these people?
A. He just said that, you know, it was just personal because I had made a comment. I said, Well, don't you think that just being out, that that would be, you know, the -- these people are going to already be, you know, suffering because, you know, they know you're free. And he said, No, that's not enough.
Q. When he's talking to you about these escape plans and the plans to murder these people, what's his demeanor like?

A. Happy, excited.
Q. Happy in what way?
A. Just, you know, thinking about how it was going to go down.
Q. Mr. Vest, you've been in the federal system for a while. Is it common for inmates to talk about killing the people that put them where they're at?
A. No.
Q. I'm sorry?
A. I mean, you know, not like somebody might say, Yeah, I'd like to kill him or a glancing thing but not to go into no kind of discussion about it.
Q. So this kind of detailed explanation and planning you've

not run into before.
A. No.
Q. In the context of telling you about this plan to go forward and escape when he was called back for trial and to kill people, did he tell you anything about any prior killings he was involved in?
A. Yes, he did.
Q. And what did he tell you?
A. He was telling me -- he told me about the time he killed four people first and then later another guy.
Q. Did he tell you what the context was in which those people were murdered? In other words, was it related to some other criminal activity he was involved in?

♀

A. Yes. He got arrested for drugs, and so the people -- this guy was going to testify against him. And so he went over and killed -- he told me how he killed him and his family.
Q. What did he tell you about the drug activity he was involved in? First of all, let's try to put a date. Do you recall when he told you approximately these prior murders took place?
A. What do you mean by that?
Q. I'm sorry. Let me rephrase. Do you remember -- he's telling you about previously killing some people.
A. Yeah.
Q. Did he tell you what date that occurred or what year approximately when this activity took place?
A. I think it was '96 I think he said. I'm not sure.
Q. Okay. Sometime in the '90s.
A. Okay.

Q. And when he's telling you about this, what did he tell you, if anything, about the drug activity he was involved in that got him caught in the first place?

A. He said that him and Tim was in Arizona, and they were -- had a drug meth lab down there, and he was -- Dustin was some kind of a chemist, and he made some real good stuff apparently, and he used to bring it up to Iowa and sell it to Terry and Greg, and that's what happened.

And he came -- he went into Terry's house -- I mean

♀

Greg's house, and he said that -- talking about -- some people got arrested in Minnesota. He asked his wife about did you hear about that, and his wife said, Yeah, we've heard; it's been on the news. And he said, Well, where is Greg at? And she says, Downstairs.

So he goes downstairs, and Greg's wearing a wire, but he doesn't know it at the time, and he asks Greg -- said something about it to Greg, and Greg said, No, I didn't hear about it. And he said right then that should have told him that something was up, but he just let it go. And he talked to Greg about getting some more drugs. And when he left Greg's house, he got pulled over, got arrested.

Q. So he told you that when he came into Greg's house he talked to Greg's wife.

A. Yes.

Q. And Greg's wife apparently knew about these arrests up north but Greg himself didn't.

A. Right.

Q. And that's how he ultimately got caught at least in that case. That's your recollection of what Dustin Honken told you?

A. Yes.
Q. Now, let's talk for a minute -- you mentioned a couple people, Greg and Terry. Do you recall today if Dustin Honken ever told you last names for these people?
A. Yeah. Terry Nicholson and Greg DeGeus (sic).

♀

Q. Okay. And let's talk about the Terry person. Did the Terry person have any connection with another female that Dustin Honken got hooked up with at some point?
A. Yes. Her name was Angie.
Q. And what did Dustin Honken tell you about the connection between Terry and Angie?
A. He said that they were going out together when he first met him.
Q. Did Dustin tell you whether Angie had any involvement in the drug activity?
A. Yes. He said that he owed him $30,000 at one point.
Q. Who owed who money?
A. Greg -- I mean Terry owed Dustin $30,000. So he went up there and dropped off some drugs, and then Angie called him, said, I want to meet you at a hotel. And so they go to a hotel, and Angie comes over, and Dustin was a little nervous because he thought it was some kind of set-up or something, so he frisked her to see if there was a wire, and there wasn't. And she handed him 10,000 and said, I don't know why you mess with Terry because I'm the one who sells all the drugs. I'm the one who's got all the connections.
Q. And so what did Dustin Honken tell you happened after that?
A. He said that they had sex after that and he started dating her.

Q. What drug was it that they were involved with? Did he tell

you that?
A. Meth.
Q. While -- you got up to the point where Dustin Honken goes into Greg's house, comes back out, and he gets pulled over. Did Dustin Honken tell you what happened to him at that point?
A. He said he went to jail and Angie came to see him, and she wanted to break him out of jail, and he said, No, just hang on; let me go to my bond hearing and see if I get out.

So he went to the hearing. He got out, and then he had conversations with Angie, and he told her that he was looking at ten years if he gets convicted of this crime and the only way he could get -- do -- you know, out of it is to kill them, and she agreed to help him. She said, Okay, I'll help you.
Q. So what did Dustin Honken tell you at that point then that they did?
A. He sent Angie over to the house, and she got -- she went inside the house, got inside the house, and pulled out a gun, and she got them all four to -- on a couch and just held them on gun point, and they were asking her like, Well, what's this about? And she said, You'll see.

And then at that point in time Dustin walked in the door. And the guy looked over at Dustin and said something like, Oh, shit, and Dustin said, That's right; oh, shit's right, or something like that.

And he came in there and told him, Look, I'm going to

stash you at a house until this trial's over, till my trial date's ended, and then this way you can't testify against me, and once that's over, I'll let you go. And he said okay.

And then he had him make a -- Greg make a video saying -- denouncing all this stuff that he previously said about Dustin and then had the wife write a note that they would be gone for a while.

Q. Okay. Let's talk about this for a little bit then. Do you recall today whether Dustin Honken told you how it is that Angie got into the house where these four people were at?

A. No, he never said.

Q. And who all did Dustin Honken say were in the house? There was Greg and who else?

A. His wife and two kids.

Q. And if you recall, did he tell you where the wife and the two kids were at while the video is being made?

A. No, he never said.

Q. What, if anything, do you recall that he told you, if anything, about the gun itself that was used?

A. At that time?

Q. At that time.

A. Nothing.

Q. All right. Did Dustin Honken tell you what time of day or night or anything else that this occurred?

1807

A. No.

Q. What did he tell you -- did he tell you whether, in fact, Greg Nic -- or Greg made this tape?

A. No. He just said he had him make a tape. So I'm assuming he did. That's the way he said it to me.

MR. PARRISH: Objection to the assumption.

THE COURT: Overruled.

BY MR. WILLIAMS:

Q. So after whatever happens at the house happens, what did Dustin Honken tell you happened next?

A. They drive to some field, and he said he takes the -- Greg and his wife out and leave Angie and the two girls in the car, and he walks them into the woods, and he kills them. And he said that the two girls jumped when he shot the other two and hugged each other, and Angie said, Don't worry; it's just fire crackers. And then Dustin came back to the car and said, Come on, I'm going to take you with your mom, and he walked them over there, and he shot them too.

Q. When Dustin Honken's telling you about shooting these people, first of all, he takes Greg and the woman out of the car, does he tell you where he shoots them at on their bodies?

A. No.

Q. The girls are in the car with Angie. They're hugging each other, and then he comes back and gets them.

A. Yes.

1808

Q. Did he tell you when he took them out to the woods -- first of all, where's Angie Johnson at at this point?

A. I'm not sure. He didn't say.

Q. All right. And did he tell you where on their bodies he shot them?

A. He said in the back of the head.

Q. And Dustin Honken's telling you this approximately when if you recall? When is he telling you this information?

A. What year?

Q. Yes, sir.
A. 2000. I think it's around 2000. It was in there.
Q. What happened with the bodies?
A. He didn't say. He buried -- he said he buried them. That's all he said he did. That was it.
Q. Did he tell you whether it was one grave, multiple graves, any details?
A. Nope.
Q. Did he tell you what Angie Johnson's involvement was, if any, in the burial?
A. No.
Q. What was Dustin Honken's demeanor like when he's telling you about these killings?
A. He was smiling. He was, you know, I'd say happy.
Q. Did he give you any explanation about why he killed Greg?
A. He said because he testified -- he was going to testify

1809

against him.
Q. Did he give you any explanation for why he killed the woman and the children?
A. Yeah. After he told me that, after he told me the story, I said, Well, why did you have to -- you know, why did you have to kill the whole family? Why didn't you just take Greg out and catch him alone or call him or something and then just take him? You know, why did you need to kill the wife and the kids? And he said, Well, the way I look at it is if you're going to testify then you put your whole family at risk.
Q. You indicated earlier in your testimony that he told you about a couple murders, one involving four and then one involving another person.

A. Yes.

Q. Who did he tell you was the other person that was murdered?

A. Terry DeGeus.

Q. And when in relation to the murders of the four, Greg and his wife and the two kids, did he tell you that he murdered this Terry DeGeus?

A. He said after he killed them that he thought that the feds were going to lean on Terry, so he had to get rid of him too.

Q. And what do you mean he's afraid the feds are going to lean on Terry? What does that mean?

A. He thought they were going to lean on him to testify against Dustin in the same drug case.

1810

Q. And did that concern Dustin Honken?

A. It did.

Q. And so what did he tell you happened with Terry DeGeus?

A. He said he had Angie call Terry and have him meet her somewhere, at some field. And so when he got there, Dustin was leaning up against the car, front of the car, with the gun sticking out of his waist band, and so Terry gets out of the car, and he says, What's the gun for? And Dustin said, Protection.

And then at that point Terry started saying, Well, look, man, I know I owe you the 30,000; don't worry; I'm going to get it to you, you know; I'm working on it. And they were arguing back and forth, and Dustin said, Well, I'm not really worried about the money. I'm worried about you testifying. He said, Man, I ain't saying nothing to the cops about you or anything like that.

He said at that point Angie was standing out there

listening and as -- she went and got in the car, and that was like a message to Dustin like hurry up, mother fucker, and so --

Q. Let me stop you. Do you remember -- did she say anything to him when she's getting in the car?

A. I don't think so. I don't recall.

Q. Okay. And so then what happens?

A. Then he shoots him once in the stomach, and he said that was -- his last words were, I said I wasn't going to say

♀

anything, and at that point Dustin shoots him a couple more times, and while he's laying on the ground moaning Dustin goes back to the car and gets -- tells Angie to hand him an aluminum baseball bat.

Q. Had there been -- did Dustin Honken relate to you that he had had any conversations with Angie Johnson about how they were going to kill Terry DeGeus?

A. He didn't say. He just said that this guy was tough -- you know, acting like he was a tough guy, and, you know, that's why he beat him with a bat, to teach him a lesson.

Q. So he goes back to the car and says what to Angie?

A. He says, Hand me the bat, so Angie hands him over the bat, and he walks over and starts beating Terry with the bat. He said he hit him, you know, he don't know how long, but he hit him till he couldn't swing the bat no more, till he wore himself out.

Q. Did he tell you where on his body that he was hitting Terry DeGeus with a bat?

A. He said all over.

Q. He did it so long that he wore himself out.

A. Yes.

Q. Then what happened?

A. Then he walks back to the car, and he said when he got to the car Angie kind of screamed, and he said, What's wrong? And she said, Oh, you look like that guy from the shining. You got

blood all over you. And he said, Come on, help me drag him because I'm too tired; I can't do it by myself.

So they go and grab him, and they start -- by the feet, and they start dragging him. And after they was going a little ways, some air or something came out of him, and Angie let go of his body and jumped and said, Oh, do you think that was his soul? And Dustin said, No, that was just air. And so they drug him to the place where they buried him.

Q. Where is this taking place at, this whole murder of Terry DeGeus? Did he explain where it's taking place?

A. No. Some kind of field. I don't know.

Q. In a field someplace.

A. Yes.

Q. And as they're dragging Terry DeGeus's body, you said some kind of air let out of him and Angie Johnson asked if that was his soul.

A. Yes.

Q. After they drag him to some location, did he give you any indication where they dragged him to or how far they dragged him?

A. No.

Q. Did he tell you what happened after they dragged him a little ways?

A. He said that they started digging and Dustin was singing, you know, Swing high, swing low, and he started making jokes

about him and stuff.
Q. So as they're digging did he tell you what he's digging with?
A. No. Oh, a shovel. He said that when he went to get -- when he first got the shovel out of the car when he walked back over to Terry that he was still barely alive but he finished him off with a shovel.
Q. And so he's digging with a shovel and singing as he's doing it.
A. Yes.
Q. Did he indicate whether he did anything with Terry DeGeus's body? Did he do anything to the body?
A. No.
Q. Do you recall whether he indicated -- you said he was making jokes. Did he make any joke in relation to doing anything with the body if you recall?
A. Yes. He said he grabbed his foot and started shifting it like a four-speed.
Q. Anything about the body at that point? Did he indicate what condition the body was in?
A. No, he didn't say.
Q. Any idea -- not any idea. Did he tell you at all when this is occurring, what time of day, what time of night, anything like that?
A. No.

1814

Q. Did he express to you any concerns about the burial of

Terry DeGeus and that body in particular, about any concerns about whether somebody might find out at some point?

A. I don't recall.

Q. Okay. What -- you indicated in your testimony here that he was using -- he used a gun and shot Terry DeGeus I think you said three times from the description that Dustin Honken gave you.

A. Yes.

Q. What did he tell you about the gun, if anything?

A. He said after that he took the gun and melted it down.

Q. Did he tell you how he melted it down?

A. I can't remember. I think it was with a torch, but I'm not sure.

Q. Did he tell you whether anybody helped with him at all?

A. He said Tim.

Q. What happened with what was left of the gun if he told you?

A. I can't remember.

Q. Okay. What happened -- did Dustin Honken tell you what happened with those initial drug charges that were filed against him that Greg Nicholson was a witness and he was worried Terry was going to be a witness?

A. He said they were dropped.

Q. And now you're talking to Dustin Honken in a federal prison. Did he relate to you how he ends up in a federal prison

if those charges were dropped as a result of these murders?

A. Yeah, he got on some other charge.

Q. And do you recall what, if anything, he told you about those other charges?

A. I can't remember.

Q. Do you recall what type of charges they were?
A. I don't remember. I just remember I think he had 24 years that he had.
Q. In talking to you about this whole matter, does he indicate to you at some point that he has a child by some other woman other than -- let me back up and rephrase.

At some point when he's telling you about Angie Johnson, does he relate to you on whether Angie Johnson is ever pregnant with his child?
A. Yes.
Q. And in relation to the murder of Terry DeGeus, what does he tell you the timing is with regard to her pregnancy?
A. He said she was about four months pregnant.
Q. Did he ever tell you that he had a child by any other woman?
A. Yes, Kathy.
Q. And what, if anything, did he tell you about Kathy and her involvement in any of this activity?
A. He had -- he was kind of seeing both of them, and at one point in time he got to the point where he didn't really like

♀

1816

Angie too much, and so Kathy apparently knew about the murders because he said that Kathy said, Well, why don't you just come live with me, and Dustin said, Well, I can't do that now because I can't piss Angie off. And she said, Well, I don't know why you had her help you do that anyway. Why didn't you ask me? And he said, Well, I just can't leave her now. It's too late. And he said, Not unless I get rid of her, and she goes, Well, I'll help you.
Q. And did he indicate whether he had any plans to kill Angie

Johnson then?

A. Yes. He said he had a -- he was getting some guns together to kill her.

Q. And did anything happen that kept him from doing that?

A. Yeah, he got arrested.

Q. And on the charges he ultimately went to federal prison on?

A. Yes.

Q. Now, at some point you indicated in your testimony that Dustin Honken is planning -- knows he's going to be coming back here for a while at some point. Did he tell you what charges he thought he was going to be charged with at that point?

A. Yes, the murder of the bodies.

Q. Had he been charged at the time you were talking to him with any murders?

A. No.

Q. But he apparently told you that he figured he was going to

♀

1817

be charged at some point.

A. Yes.

Q. Did he have any concerns he expressed to you about the evidence that was going to be brought in against him at all?

A. Yeah. He said that Angie gave some guy a map and that they found the bodies, but he was pretty sure that they wasn't going to be able to use that against him in court.

Q. At any point in all the discussions you had with Dustin Honken about these murders that took place of Greg Nicholson and Terry DeGeus and so forth, did Dustin Honken ever tell you that Tim Cutkomp was involved in murdering any of these people?

A. No. He said, in fact, that was -- that was his -- why he was mad at Angie because he kept telling her he had an ace in

the hole, and he said that when it come down to going to trial he was going to blame it all on Tim because apparently Tim liked some local woman that was on TV, someone on the news, and she disappeared, and he was going to kind of, you know, say, Look, you know, she disappeared, you know, put it on him.
Q. Did Dustin Honken tell you that -- at any point that Terry DeGeus was involved in the murders of the first four victims in this case?
A. No.
Q. Never claimed that to you.
A. No.
Q. Mr. Vest, the Dustin Honken we've been talking about this

morning, the one who told you that he murdered five people in relation to his drug case, do you see him in the courtroom here today, sir?
A. I do.
Q. Can you describe for the jury where he's sitting and what he's wearing?
A. Right there, second from the end.
Q. And to your right or to your left, sir?
A. Second to my right.
MR. WILLIAMS: I have no further questions, Your Honor.
THE COURT: Members of the jury, why don't we take a stretch break before we begin the cross-examination.
Okay. Please be seated.
Mr. Parrish, whenever you're ready, you may cross-examine.
MR. PARRISH: Thank you, Your Honor. May it please

the Court and counsel.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Good morning, Mr. Vest.

A. Morning.

Q. Let me, first of all, try to understand what you have been convicted of. I believe you indicated one was a money laundering charge; is that correct?

A. Yes.

Q. And how many years did you get for the money laundering charge?

A. I'm not sure.

Q. You were also convicted of what else?

A. I had I believe it was ten counts all together.

Q. You were convicted of ten separate counts?

A. Yes.

Q. And that would have been ten separate counts from which state or what federal agency? Could you give us some idea?

A. From Missouri.

Q. Out of the state of Missouri or was it --

A. Yes.

Q. -- out of the federal system in Missouri?

A. The federal system.

Q. And what year were your convictions?

A. It was in '96.

Q. And what year were you charged?

A. '94.

Q. And where did you stay from 1994 until 1996?

A. CCA in Leavenworth.

Q. Explain to the jury what CCA in Leavenworth is, please.
A. It's similar to a county jail, but it's privately owned, and it's -- basically that's what it is.
Q. Well, it's a federal place where only federal prisoners are

being held pending federal charges; is that correct?
A. Right, yes.
Q. They have people from all over the midwest who come into that institution, and they're being held pending a federal trial; is that right?
A. Yes.
Q. You were at that institution from the date you were arrested until you started your trial; is that right?
A. Yes.
Q. And in that -- Mr. Williams asked you did you eventually plead guilty. That was to avoid the death penalty; is that correct?
A. Yes.
Q. And you entered your plea not -- you worked out a deal because you and your brothers were involved in the conspiracy to kill two people; is that right?
A. Yes.
Q. Where the graves had been dug the night before; is that right?
A. Yes.
Q. And you participated in that process of digging the graves prior to the time that two people walked in and you and your brothers killed them; is that right?
MR. WILLIAMS: Objection, Your Honor. Beyond the scope of 609 and irrelevant.

THE COURT:  It is.  I'll allow a little bit of leeway. We're not going to --

MR. PARRISH:  That's as far as I want to go, Your Honor.

THE COURT:  Thank you.

MR. PARRISH:  Thank you.

BY MR. PARRISH:

Q.   That's correct, isn't it?

A.   Yes.

Q.   And as a result of killing these two people and having previously dug the graves the night before to bury them, you, in fact, entered a plea along with the charges of killing these people, conspiring to kill these people and bury them, several other charges in relation to not only that killing or those two killings but also in relation to other crimes you had committed; is that correct?

A.   Yes.

Q.   Now, the killing of those two people you would agree is not the sole reason you got the life -- the four life sentences. You got two life sentences for killing those two people along with your two brothers; is that right?

A.   Right.

Q.   But part of the reason that you negotiated regarding the death penalty relief is that you also had additional charges related to killing those two people; you agree?

A.   Yes.

Q.   And those charges related to money laundering; is that

correct?
A. Yes.
Q. What else?
A. Like I said, it was like ten charges. I don't know. Conspiracy for drug trafficking and things of that nature.
Q. Okay. Conspiracy for drug trafficking and what else?
A. Arson.
Q. Arson?
A. Uh-huh.
Q. What else?
A. I don't know. I can't remember.
Q. Is your testimony in front of this jury that you cannot remember why you're serving four life sentences in the federal penitentiary?
A. Yeah, I can remember.
Q. But you would agree that you've made many efforts to try to get out from serving four life sentences.
A. I filed my appeals if that's what you're asking.
Q. Well, not only did you file an appeal, you later said that you only did this to avoid the death penalty.
A. That's why I pled guilty, yes.
Q. Right. But you told them later that you were forced into it. In your appeal, you told them later, I really didn't do

this; I forced -- I was forced into it to save my brothers' lives.
A. Yes, that's true.
Q. That was true.
A. Uh-huh.
Q. So this guilty plea was a lie that you told to the judge.

A. No.

Q. Down in Missouri.

A. No. My brother's attorney told my brother that he was going to get the death penalty, and he said the only way that he would not get the death penalty, if he could get me to agree to plead guilty with him.

Q. So you're telling us you went in front of a judge down in Missouri in federal court, you raised your right hand, and you said, This is the truth. I was involved in these crimes. This is what I did. You outlined it to them under oath. Later on you said and you're saying under oath now that when you testified in front of that judge about your guilty plea where you got four life sentences all of that was nothing but a lie. Is that what you're telling us?

MR. WILLIAMS: Objection, Your Honor. Compound question.

THE COURT: Overruled.

A. No, that's not a lie. I said I pled guilty.

Q. So it's true.

♀

A. Yes.

Q. So when you filed your appeal, that was a lie.

A. I filed my appeal to try to go to court.

Q. You filed your appeal saying you were forced into it. Was that the truth, or was that a lie?

A. That was the truth.

Q. Okay. So both of them are true.

A. Exactly.

Q. The fact that you told the judge the truth down in Missouri that you got four life sentences on was true. The fact that a

few years later you filed a motion saying, I want to withdraw it because I was forced into it, both of those things are true; is that the testimony in front of this jury?

A. Yes.

Q. Okay. Now, you told us just a minute ago that Mr. Honken told you he melted the gun down; is that right?

A. Yes.

Q. Do you remember what you told the grand jury?

A. No.

Q. I'm going to show you your testimony referring to page 44 when you said one of the firearms was melted down. I'm not sure which one -- I'm reading from line 19. I'm not sure which one was, but I believe it was on the first family, but I'm not sure, but I know he told me his friend melted the firearm down.

Do you recall telling the grand jury that March 8 of

2001?

A. I'm sure that's --

Q. No. Do you remember, sir, telling the grand jury that March 8, 2001? Yes or no.

A. No.

Q. If I showed it to you, would it refresh your recollection whether or not you told them that?

A. Yes.

Q. You would agree if you did tell them that that's directly contradictory to what you told this jury a few minutes ago?

MR. WILLIAMS: Objection, argumentative.

THE COURT: Overruled.

A. It's been four years --

Q. No, sir. Listen to my question. If you told them that,

would you agree that directly contradicts what you just told this jury a few minutes ago?

A. Yes.

Q. I'm going to show you page 44, line 19. Read it to yourself and see if that refreshes your recollection.

A. Yes.

Q. Which one is true, sir? What you told the grand jury in 2001 or what you told this jury just a few minutes ago?

A. They're both true. I said that -- I believe I said --

Q. Well, wait a minute. If they're both true, let me ask you this question. He told me his friend melted the firearm down.

1826

You told us a few minutes ago he melted it down.

A. Yes, I believe I said him and his friend melted it down.

Q. Do you want to take a look at it again?

A. No, not on there. I'm talking about a minute ago when . . .

Q. Oh, okay. Sir, you would agree that when you, in fact, met with the grand jury even though you were serving four life sentences you told them that you'd like to get paroled.

A. Yes.

Q. And basically that's what you're working toward, trying to get paroled.

A. Yes.

Q. And you accepted and undertook what could be considered work within the prison walls to try to get parole.

A. I'm not sure of your question.

Q. What don't you understand about it? Let me know, and I'll try to explain it.

A. Just say it again.

Q. Did you undertake some work within the prison to try to get parole?
A. No.
Q. All right. You would agree that you did not talk to Mr. Honken about any of these incidents until two weeks before you were interviewed December 7 of 2000? That was a telephone interview between you and Mr. Basler; would you agree with that?

1827

That was the first time you talked to any law enforcement officials from Iowa; would you agree? Yes or no.
A. Say that again.
Q. It was December 7, 2000. That was your first interview; isn't that correct?
A. Yes.
Q. In that interview you said, I talked to Mr. Honken about two weeks earlier; is that correct?
A. Yes.
Q. That would have made it about Thanksgiving of 2000. You agree with that?
A. Yes.
Q. Now, prior to that time, you would agree that you also had done other work for the group identified by Mr. Williams as SIS.
A. Yes.
Q. And we've described not only from you but also from other witnesses who SIS is, so I don't want to go back into that. But you would agree that the work you did for SIS was common knowledge within the prison grounds.
A. Not actually -- not everybody in there would know.
Q. Well, quite a few people knew you were an informant working for SIS. Mr. Honken knew it, didn't he?

A. No.
Q. How do you know Mr. Honken didn't know it?
A. If anybody would have known it, I wouldn't have been on the

yard.
Q. Well, you said some people knew it.
A. Knew -- I misunderstood the question. I'm talking -- knew what? The information or knew --
Q. That you were working for SIS.
A. No one knew.
Q. Well, one of your cases, did you not, were cases involving personnel at the prison?
A. I don't understand.
Q. Someone who was bringing in drugs.
A. Oh, yes.
Q. And it was not directly against any inmate. It was against a dental person working in the personnel office.
A. Right. That's how it started because --
Q. That's how it started. How many years ago? Tell the jury how many years ago was that work done?
A. You lost me. I don't even -- I'm not sure what you're asking. What happened was --
Q. No, I don't need to know the details, just the year that you did that work -- let me just ask it this way. It may be quicker. Was that prior to the time Mr. Honken came there?
A. Yeah.
Q. Okay. And nobody bothered you in the prison. You walked around the prison; isn't that correct?
A. Yes.

Q. You hung out with other inmates in all of the areas that other inmates hung out with; is that correct?
A. Yes.
Q. Did you know an individual there by the name of Mr. Tokars?
A. No.
Q. You never met Mr. Tokars in the prison.
A. He might be familiar face or his first name, but I don't remember his last name.
Q. Okay. You just remember his first name and nothing else about him?
A. I don't know what's -- his first name.
Q. Fred Tokars, the lawyer from Georgia who killed his wife.
A. I don't know.
Q. Didn't know him.
A. I said I -- I don't remember.
Q. Doesn't ring a bell you said? I didn't quite hear you. I'm sorry.
A. No, I don't.
Q. You would agree also that on December 29 -- I'm sorry, January 29, 2001, you had a second interview with law enforcement officials from Iowa.
A. Yes.
Q. You would agree also March 8 you testified -- and we've already referred to at least two of your statements -- in front of the grand jury in Cedar Rapids, Iowa.

1830

A. Yes.
Q. You would agree also that from that date on where did you

stay after the March 8 grand jury testimony? Where did you stay?

MR. WILLIAMS: Objection, Your Honor. May we approach?

MR. PARRISH: Let me ask it a different way.

THE COURT: I think he's going to rephrase it because I think he understands.

BY MR. PARRISH:

Q. Let me ask it -- well, January 18 of 2001 which is -- my point is that you were interviewed by Mr. Basler. You were at the Benton County Jail; is that correct?

A. Yes.

Q. October 26, 2001, you were at the Benton County Jail; is that correct?

A. Yes.

Q. And then November 28, 2001, which was a month -- well, a month and two days later, you were transferred somewhere else; is that correct?

A. Yes.

Q. Okay. So you'd agree that you conducted your interview on December 7 at the USP in Florence; the January 29 interview at the USP, Florence; your March 8, 2001, interview in Cedar Rapids. The 7-18-01 interview by Mr. Basler was at the --

1831

Benton County and then October 26, 2001, at Benton County. And would that have been the last interview you had?

A. No. Since I got -- you mean since today?

Q. Yes, sir. Did you have one after October 26, 2001?

A. Yes.

Q. Where was this one?

MR. WILLIAMS: Objection, Your Honor, to location.
Q. Okay. Who was at the interview?
A. The prosecutor.
Q. And how long did the interview take place?
A. How long was the interview?
Q. Yes, sir.
A. I'd say less than an hour.
Q. Did they take notes during the interview?
A. I'm not sure. I don't think so, but I'm not sure.
Q. You're not sure? And you said just the prosecutor was at the interview?
A. The prosecutor and a couple of agents.
Q. Who were the agents at the interview?
A. Bill and --
Q. Bill?
A. Yeah.
Q. You mean Mr. Basler.
A. Yeah.
Q. Oh, okay. And who else?

A. I don't remember.
Q. And did you see them taking notes in that interview?
A. I don't recall.
Q. And what was the date of the interview?
A. I don't remember.
Q. Was it this year?
A. Yes.
Q. Was it this month?
A. No.
Q. How many months ago?

A. Couple months ago.
Q. About two months ago?
A. I guess.
Q. In that interview, did you cover the facts of the case or of your testimony or anything like that?
A. They just pretty much asked me the same questions they did before.
Q. Did they clear up any discrepancies in your testimony such as who melted the gun down?
A. No.
Q. That was never cleared up prior to that time.
A. No.
Q. And you're sure that was the only other interview asked of you; would that be accurate?
A. Until I came here.

Q. Until you did just the brief one before you came up to testify?
A. (Witness nodded head.)
Q. Okay. Now, you would agree that prior to your knowing Mr. Honken and after you had gotten your four life sentences you had made some efforts to transfer from Colorado.
A. Yeah. When you go to team, they put you in.
Q. No. The answer is yes, you did make some efforts to transfer?
A. Yes.
Q. And you would agree that those efforts started as early as 1996 when you asked not to be transferred to Colorado but rather to stay in Leavenworth.
A. Yes.

Q. And Leavenworth would have been somewhat closer and more convenient for you; is that right?
A. A lot closer.
Q. As a matter of fact, you had a request -- in 1996 you had your wife Vicki also request a transfer for you to Leavenworth; is that correct?
A. Yes.
Q. That was denied November 6, 1996; is that right?
A. Yes.
Q. Long before you met Mr. Honken; would you agree with that?
A. Yes.

Q. You also made another request for transfer in 1998; is that correct?
A. Yes.
Q. And you wrote Senator Ashcroft asking for a transfer to Oklahoma; is that right?
A. Yes.
Q. And you wrote another Representative Skelton back on 10-21 of '98 asking for a transfer; is that correct?
A. Wrote who?
Q. Well, you wrote another representative -- would have been Skelton -- to ask for a transfer?
A. I don't recall.
Q. Okay. But let's just say both of those requests were denied; is that right?
A. Yes.
Q. In 1999 you made another request for a transfer; is that correct?
A. I don't know.

Q. Is this a letter written to Senator Bond? Do you recall making some request in '99 -- this again is before you met Mr. Honken -- to try to get transferred to a different institution?
A. I don't recall.
Q. Could that have been made by you and you've forgotten about it?

♀

A. I could.
Q. If your records reflect that you made some efforts like this again in 1999 and it was determined that El Reno was a medium institution and you were not eligible for that, does that help you refresh your recollection?
A. I don't remember because when I went to team, they would always put me in. They would look at my jacket, and they said, Well, we're going to put you in for a transfer.
Q. Let's go to year 2000. In the year 2000 leading up to your opportunity to meet Mr. Honken, you had your son write a request for a transfer; is that right? You referred to your family and the fact that you had a family with a couple of kids; is that right?
MR. WILLIAMS: Objection to a compound question, Your Honor.
MR. PARRISH: Well, let me -- I was trying to give him some clarification to refresh his recollection.
THE COURT: I wasn't going to sustain it.
MR. PARRISH: That's all right, but I don't mind clearing it up very quickly.
BY MR. PARRISH:
Q. You testified on direct examination you had a wife and a

couple of kids; is that right?
A. Yeah.
Q. So you did at your behest have your son write a request --

and this is before you met Mr. Honken -- in May asking that you be transferred?
A. I don't recall.
Q. You have a son Austin; is that right?
A. Yes.
Q. You have a son Steven; is that right?
A. Yes.
Q. They wrote a letter asking the warden to help you do a transfer; is that right?
A. I don't recall.
Q. You had your dad Pat; is that right?
A. No.
Q. Is that wrong? Your father wrote a request to the warden asking that you be transferred? That didn't happen?
A. No, my dad passed --
Q. On May 22 of 2000?
A. No, my dad passed away in '93.
Q. In '93? Do you know who could have written for you and indicated they were your dad?
A. I don't believe. What was the name?
Q. Could your father-in-law have done it?
A. I don't -- maybe.
Q. What about your wife Vicki on May 10, 2000? Did she write a letter making a request for a transfer?
A. I don't know.

Q. Well, let's put it this way. Since 1996 you would agree that several efforts were made for you to be transferred including a request before you even went out to Colorado that you not be there or if you were there to get out of there before you even met Mr. Honken. Do you agree with that?
A. Yes.
Q. And you would agree that was one of your priorities.
A. To get closer to home, yes.
Q. Right. But also you would agree one of your priorities was also to get a parole as you told the grand jury March 8 of 2001.
A. Well, yeah, but it's, you know . . .
Q. I'm sorry. Yeah, but you know what?
A. I said yeah, it's a priority but not as -- you know, I was trying to get -- not as much as getting closer to home.
Q. The transfer would have been better for you.
A. I'm not going to get -- unless parole comes back in.
Q. And you would agree if you're serving a life sentence and like yourself four life sentences, is that without parole or with parole?
A. That's without.
Q. So you would agree that serving four life sentences without parole things that may not be important to people like ourselves who are outside of the prison, certain items available within the prison system become pretty significant.
A. Yes.

1838

Q. Okay. One of those things, you would agree, that would be a high priority for a person who is serving four life sentences with a family would be to be as close to that family as possible

without the family having to travel so many miles from Missouri to Colorado to see you.

A. Yes.

Q. That's almost like a pot of gold, isn't it?

A. Yes.

Q. And there are various ways that you can work to get that pot of gold; would you agree?

A. I suppose.

Q. One of those would be to be close with the people within the prison structure who have the power to make that pot of gold be delivered.

A. They don't make any of those decisions.

Q. Right, they don't, but they contribute to it based upon what you do for them within the structure.

A. I'm not sure. I don't know. I don't know how it works. I don't know the inner workings of it.

Q. Let's talk about how it works then within the structure of where you wanted to go in terms of your work within the prison walls. You had a job in May of 2000 when your last request was, in fact, denied; is that right? You were working somewhere within the prisons.

A. Oh, yes.

♀

1839

Q. Where were you working?

A. On a trash crew.

Q. I'm sorry. You're going to have to --

A. Trash crew.

Q. Transcript?

A. Trash crew.

Q. Oh, trash crew. And how long had you held that position?

A. Couple years.
Q. So let's go from May to August. Did you know Mr. McIntosh during that time?
A. Yes.
Q. And Mr. McIntosh was what you called your cellie or cellmate; is that right?
A. Yes.
Q. You knew he was a lawyer within the jail system or jailhouse lawyer or something like that?
A. Yes.
Q. He was your roommate for approximately how long?
A. A few months.
Q. When you say a few months, would that few months go into the year 2000?
A. I'm not sure when he left.
Q. All right. No, I'm talking about when he was your cell person.
A. I don't know.

Q. When he was your cell person, you knew he was working on Mr. Honken's case according to what he told you at least; is that right?
A. No, he never discussed it with me.
Q. He never mentioned it to you.
A. No.
Q. So here's your cellmate -- and you've known Mr. McIntosh for how long?
A. Few months.
Q. And in those few months that you knew him and you stayed in the same jail cell with him, he never once told you that he was

assisting Mr. Honken.

A. No.

Q. Now, tell us in that cell, just describe briefly to the jury how that cell is laid out and how it was laid out in 2000. How many bunk beds -- do you think you could even -- I'm going to ask you how many people stayed within a cell within the place -- was it bravo B unit? Is that where you were?

A. Yes. Two.

Q. How many -- I'm sorry?

A. Two.

Q. And tell the jury what's in there.

A. Bunk beds, a little desk, two lockers, a toilet, and a sink.

Q. Okay. I was going to have you diagram one, but I think

these photographs would perhaps be better and probably quicker also. I'm going to show you --

MR. PARRISH: And, Your Honor, you may want to refer to your government's exhibit notebook, and in the order it would be Government Exhibit 292, 293, and 294.

Q. Could you take a look at those documents that are already admitted and tell me whether or not that's a fair and accurate representation of what the cell would look like, say a typical cell.

A. Yes.

Q. Okay. And two people would live within those walls; is that correct?

A. Yes.

Q. And within those walls you and Mr. McIntosh I believe in the year 2000 lived together; is that right?

A. Yes.

Q. And in those two years that you, in fact, lived together, I believe it's your testimony he never once discussed Mr. Honken to you in any way.

A. Right.

Q. Now, Mr. McIntosh left in 2000; is that correct?

A. Yes.

Q. You had no idea as to why Mr. McIntosh left; is that right?

A. He said --

Q. No. If you know, tell us. Don't -- we don't want to hear

the conversation yet. Just tell us do you know why he left? Yes or no.

A. Exactly no.

Q. But you know in point of fact that to your knowledge it had nothing to do with Mr. Honken at that point when he left in May of 2000.

A. Right.

Q. Did he, from your observation, appear to be scared when he left?

A. No.

Q. Did he appear to be frightened when he left?

A. No.

Q. Did he act in any way like anybody was after him from what you observed about his conduct when he left?

A. Not that I recall.

MR. PARRISH: Your Honor, I know we went early.

THE COURT: Would now be a good time to take our --

MR. PARRISH: Yes, that'd be fine with me.

THE COURT: Okay. Members of the jury, we'll be in

recess until 12:45. Please remember my prior cautionary instruction about keeping an open mind until you've heard all of the evidence in the case. Thank you.

(The jury exited the courtroom.)

THE COURT: Mr. Parrish, Mr. Williams, Mr. Miller, anything we need to take up?

♀

1843

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: No, Your Honor.

THE COURT: Okay. We'll be in recess until 12:45. I know there's at least one high school class here I believe and maybe some law students. We need to clear the third floor for a little bit while Mr. Honken's transported back to the marshal's office. Once we do that, if you want to come back in, I'll be glad to meet with you and try and answer any questions in about 10 to 15 minutes. Thank you. We'll be in recess.

(Lunch recess at 11:53 a.m.)

THE COURT: Please be seated. We have another issue?

MR. WILLIAMS: Yes, Your Honor. I'm just trying to anticipate things in light of this morning's objection, and we went back to look at Mr. Ferguson's testimony that's going to be coming up next and just wanted to raise a couple issues with the Court.

We anticipate that Mr. Ferguson's going to talk about admissions that the defendant made about the murders, but in addition, he's going to talk about the escape plans as Mr. Vest did. The conversation that he had with the defendant about the escape plans is hard to tell -- and I don't think he has a good, firm recollection of when that occurred, although he does make the statement that he became more intense about wanting to talk

about escape after he was indicted which would have been August of 2001. It's a follow-up -- it's the same plans; it's the same

plot, but the conversation may not have taken place until August of 2001.

The other thing that he's going to testify about is that he was solicited by the defendant to try to kill McIntosh, Tokars, and Vest, and that solicitation occurred in June of 2001.

Now, a couple arguments for why I think that's admissible. The subparagraph 19 of Count 7 --

THE COURT: You can't save it for the penalty phase if there is one? I don't recall. Have you alleged future dangerousness or --

MR. WILLIAMS: Yes, Your Honor.

THE COURT: -- as a nonstatutory aggravating --

MR. WILLIAMS: Correct, Your Honor.

THE COURT: -- aggravator? Yeah. Certainly would be relevant on that, wouldn't it?

MR. WILLIAMS: Certainly, certainly, and we could. I think it's also admissible -- the language of Count 7, subparagraph 19 says that these solic -- or these -- conspiracy to escape and kill witnesses occurred from approximately 1998 to the present in the language of the indictment.

THE COURT: I'm sorry. Did you say Count 8?

MR. WILLIAMS: I'm sorry, Count 7, Your Honor, and paragraph -- in the indictment it's paragraph 30.

THE COURT: You know, I don't have the original

indictment with me, but why then did we limit it to --

MR. WILLIAMS: Because the language in the indictment's less than artfully drawn, Your Honor.

THE COURT: Well, that would hardly be a surprise.

MR. WILLIAMS: Indeed.

THE COURT: That's just a general comment on your office, not on you personally.

MR. WILLIAMS: Thank you, Your Honor. Count 7 indicates at the beginning -- it said, Between about July 1, 1993, and continuing thereafter until about 2000, so forth and so on. Then when we get to the subparagraph 30, it says -- pertaining to the specific plot to escape and kill witnesses, it says, From 1998 to the present, Dustin Honken plotted to escape and kill witnesses. And so the present presumably is the date of the indictment.

THE COURT: Okay. Now let me ask you that. And that would cover the language that's actually in the jury instruction in preliminary -- the preliminary instruction with regard to overt act 19 because in there we phrase it from 1998 until his transfer to another penitentiary. So we're within the charged language in the preliminary instruction.

MR. WILLIAMS: Correct.

THE COURT: Okay.

MR. WILLIAMS: And so I think it's covered under the charged conduct. In the event that it isn't, the alternative

1846

backup argument would be 404(b). To the extent that he's plotting to kill witnesses again and the people who testified against him or he believes testified against him, it's all part

of the same -- I mean, frankly, you can say it's all part of the same conduct regardless of whether the date's specifically charged but certainly 404(b). So I just wanted to raise the Court with that ahead of time and then we didn't have to be interrupted.

THE COURT: Okay. Mr. Parrish, do you have anything you want to add to your litany of objections from this morning, ,or is it the same?

MR. PARRISH: Your Honor, it would be exactly the same being made at this time with the full force and effect of our prior objection.

THE COURT: Okay. Same ruling.

MR. WILLIAMS: That's it, Your Honor.

MR. PARRISH: I imagine we want to bring this up now. I know you indicated about the 609, the prior notice. I have had an opportunity to do a little bit more checking on that now, and we did check, and I believe our law clerk indicated that when we got our last batch of material Mr. Ferguson's criminal history was in the last batch of material we received which we think was about a week prior to last week I think, last Thursday.

THE COURT: And it wasn't provided in earlier -- is

there a discovery file in this case? Did you ever replicate it to a disk or something?

MR. WILLIAMS: There is a discovery file, and the defense has had access to the discovery file which included a criminal history in there. We didn't give them a physical copy. Well, Sali Van Weelden would say that we got them a physical copy of the criminal history. The defense says they didn't

receive it, they don't recall receiving it, so there's some conflict there. So we gave them another copy.

THE COURT: But it's been in the discovery file for --

MR. WILLIAMS: It's been in the discovery file.

THE COURT: -- how many years?

MR. WILLIAMS: As long as we've had Mr. Ferguson as a witness in this case. It would have dated back to 2001. So certainly from the date of indictment because we would have had information on him in the file from that time.

THE COURT: And when was the defense first notified that these folks might be witnesses?

MR. WILLIAMS: I can't remember the deadline the Court imposed.

THE COURT: But at least they were on the witness list that you gave me before the trial started.

MR. WILLIAMS: Yeah. I think we gave them -- I can't remember the scheduling order, but I think we had to give them our witness list like a month before trial.

1848

THE COURT: Right. Okay. So I don't -- is that going to pop up with this other witness?

MR. PARRISH: That's Mr. Ferguson, Your Honor. Earlier you remember he indicated that the 609 question came up with regard to the 19 I believe --

THE COURT: Oh, I see. This all comes up with regard to Ferguson.

MR. PARRISH: Exactly.

THE COURT: Hey, let me ask you now something, Mr. Parrish. You're arguing an exception -- set aside for moment that I'm in error for saying you weren't timely -- just

let's forget about that for a moment. Just on the merits of it, are you telling me that there's an exception to the ten-year requirements in Rule 609? And I want to make sure I understand that exception.

MR. PARRISH: Your Honor, it's kind of a contra argument. You know, if the defendant takes the stand and clearly there's a notice requirement there, but if you can show that the defendant was not crime free for a number of years, you get to kick back beyond the ten-year period of time if there is a parole revocation or history of some violations or other criminal acts.

So I'm making the contra argument in the event that a witness testifies that if they can't show a period of crime-free era sufficiently, we should be able to argue that the connection

goes back to '86.

THE COURT: And did you cite a case for that proposition?

MR. PARRISH: I did not, Your Honor. I did not.

THE COURT: But you're fairly confident that's the law? I don't know, to be honest with you.

MR. PARRISH: I know in -- let me just put it this way. There's a State versus Martin hearing obviously in state court that's required under that theory if you want to go back prior to ten years.

THE COURT: Okay.

MR. PARRISH: I cannot cite the comparable federal --

THE COURT: Let me ask Mr. Williams.

MR. WILLIAMS: I'm sorry, Your Honor. I'm just not familiar with an exception to 609, 10-year rule if there's a

pattern of conduct. I'm not saying there may not be one out there. I'm simply not familiar with any such exception.

THE COURT: And I plead the same thing. Could be out there. I'm just not aware of it. Can't recall I've ever had it come up in ten years, but when are we going to get to Mr. Ferguson?

MR. WILLIAMS: He will be our next witness, Your Honor.

THE COURT: Oh. Hey, let me ask you another question.

MR. WILLIAMS: Sure.

♀

THE COURT: To the extent that we're skipping over witnesses --

MR. WILLIAMS: Yes, Your Honor.

THE COURT: -- does that mean that they're probably not going to be called, or are you just going to call them in a different order?

MR. WILLIAMS: Some we're going to call in a different order because we're trying to accommodate the marshals, but certainly at the break I'll let you know which ones we're definitely not calling.

THE COURT: Yeah, maybe at the end of the day or something.

MR. WILLIAMS: Certainly. We've been trying to keep the defense advised two days in advance of who we're calling.

MR. PARRISH: And one last thing, Your Honor. I believe Mr. Williams and I had a discussion about this beforehand. With regard to Mr. Vest -- and you may recall there was an extensive discussion about the central files which we did receive a substantial number of them, and the government gave

them to us voluntarily. In exchange we did not issue the subpoenas.

However, in going through the central files of Mr. Vest, it appears that he's already testified about maybe working with SIS. It's referred to in the central files, but no actual reports exist with regard to that. I told Mr. Williams

1851

one of the alternatives that we might do, we'll get a subpoena back out.

The second thing we will do is go on with our cross-examination and he would check to see if that information is available because he says he does not recall seeing it either. But all of us checked our files. We didn't find anything on it.

But we would like at a minimum to reserve, if necessary, additional cross if it's determined that the evidence that -- if it's found, records if they're found, that contradict anything that he might testify about. I thought that was the most efficient way to deal with it as opposed to requesting this information prior to starting cross.

THE COURT: Mr. Williams?

MR. WILLIAMS: Number one -- and I've told Mr. Parrish -- I don't think they're necessarily entitled to this information in the first place. But as I understand what he's looking for is Mr. Vest testified he assisted SIS with regard to an investigation. I think he's looking for the reports on that investigation --

THE COURT: In my view it's so collateral that even if such a report does exist, I would not be inclined to reopen cross-examination. But you can, you know, make your record on

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1617 of 3636

it, and then we can -- if there is such a report, you see it, then I'll make my final decision. But my inclination is that

we're now into a collateral matter. You're probably not entitled to the reports in the -- but I guess they're entitled to subpoena them.

MR. WILLIAMS: I don't even -- I'm sorry.

MR. PARRISH: Go ahead. I was going to say the only catch to that -- and you may be right that the other may be a collateral matter. But his initial interview regarding Mr. Honken is with a Mr. Felz who's an SIS person who he originally worked with who led to the phone call to Mr. Basler of December 7 of 2000. That report does not exist. At least up to this point we have not seen it.

THE COURT: That would be material in my view, right, noncollateral.

MR. PARRISH: Right.

THE COURT: Okay. But let's just figure out if there is a report and deal with it at that time.

MR. PARRISH: That's what we thought.

MR. WILLIAMS: Very good.

THE COURT: Can we have the jury brought in now?

MR. WILLIAMS: Yes, Your Honor.

MR. PARRISH: Yes, Your Honor.

THE COURT: Who do we blame for bringing them in late? I'll blame myself for it. How's that?

MR. WILLIAMS: Both of us.

MR. PARRISH: We'll both take the blame.

(The jury entered the courtroom.)

THE COURT: Please be seated. Members of the jury, I apologize for taking a little bit longer on the lunch break. I just wanted to assure you we were not goofing off, that I was meeting with the lawyers, and we had some matters that we had to take up. And as I told you in preliminary instruction number 18 that we do have occasion to have these bench conferences. We try and keep it to a minimum. We meet both early in the morning and then at the end of each trial day and try and anticipate all potential problems, but no matter how many times you meet, there are always things that arise. And so we were working on that. And again, it was my decision to keep you waiting, and I apologize for keeping you waiting.

Mr. Parrish, you may continue your cross-examination.

MR. PARRISH: Thank you, Your Honor.

BY MR. PARRISH:

Q. I'm going to show you -- it's right on your screen, Mr. Vest. I hope I do this right. Oops. I did it wrong. I did it. Okay. You'll see Government's Exhibit 294 I previously showed to you, and I did not put it up on the screen. Is that a typical cell that you see in Florence, Colorado?

A. It is.

Q. All right. And the area right up at top would be the top bunk, is that correct, that does not have bedding on it?

A. Right.

1854

Q. Okay. And the sink is to -- well, it's to my left. It's perhaps -- is it to your left in your photograph also?

A. It is.

Q. Okay. And the two lockers right across from the sink,

would that be the lockers where inmates keep sometimes their personal material; is that correct?

A. It is.

Q. And would it also be an area where if there was an overflow of material that an inmate would have, where would that material be left?

A. They have -- if you got legal material, they got a box you keep it in some room, locked room.

Q. And those lockers, as I understand from other inmates who've testified and perhaps from your own experience, are fairly easy to get into if they're locked.

A. I don't know. With the lock on there?

Q. Yes, sir.

A. No, I don't . . .

Q. You're not knowledgeable as to whether or not they're easy to get into or not?

A. If you don't know the combination you're saying? I mean, no.

Q. If you knew the combination, you could easily get in there?

A. Yes.

Q. Okay. And that's how they're controlled, just by a

♀

combination lock on the outside?

A. Yes, and a key. They got a key for the back.

Q. I'm sorry?

A. On the back of them they have a key that the COs can open up through a key.

Q. You know what I'm going to do? I'm going to move that microphone up a little bit. Your voice tends to just drop off a tiny bit at the end. Let me see if I can move that just a

little bit closer. It might be difficult for you.

A. Okay. Thank you.

Q. And I'm going to show you what is marked as 293. And that would be a different view of basically the same cell with the locker being on top and some material I assume on top of that locker; is that correct?

A. Yes.

Q. It's true you, in fact, were Mr. Honken's roommate in 2000.

A. Yes, for a couple days.

Q. You did not tell the grand jury when you were interviewed May 8, 2001, that you were Mr. Honken's roommate.

A. Was I asked? I don't know.

Q. You did not tell them that; is that correct?

A. I don't remember.

Q. Matter of fact, they asked you the question, Did you tell them, first of all, at the trial that you were cellies with a Mr. Honken? And did you tell them something different when the

grand jury asked you that question on March 8 of 2001?

A. If the grand jury asked me if I was his cellie, I would have said yes.

Q. If you didn't tell them when they asked you that question that you were his cellie, would you agree that would not have been the truth?

MR. WILLIAMS: Objection, Your Honor. Could I have a citation to where he was asked that question?

MR. PARRISH: I'd just asked him the question first.

MR. WILLIAMS: Well, it's stating evidence not in the record unless he can establish, in fact, he was asked that question. He's implying that he was asked that question.

THE COURT: Yeah. You actually can't -- can I see the lawyers at sidebar for a second?

MR. PARRISH: Oh, sure.

(At sidebar on the record.)

THE COURT: I'm sorry. I'm confused, but you actually have a tendency -- and so does Rogers -- to ask questions about what they said in the grand jury which is actually hearsay without -- you can use it to impeach him, but you can't ask him did you say so and so in the grand jury, but you're not doing that here.

MR. PARRISH: Right.

THE COURT: He's saying that there's nothing in the grand jury that -- testimony that would support the question

that you just asked.

MR. PARRISH: Exactly.

MR. WILLIAMS: I --

THE COURT: But isn't it like a negative inference?

MR. PARRISH: Well, it is.

THE COURT: You didn't ask him that.

MR. PARRISH: No, that's what his response was, that he didn't answer them that. But you have to realize where I'm going with the question. First of all, if he didn't tell them, the grand jury, that he was, in fact, his roommate, the grand jury may have a different impression of his relationship with Mr. Honken.

THE COURT: Yeah, but the grand jury's impression isn't relevant to anything.

MR. PARRISH: Well, it's relevant whether or not you're going to indict somebody.

THE COURT: We're not going to get into the issue of probable cause in the trial.

MR. PARRISH: But the question is whether or not he may have deliberately not told the grand jury where he lived in relation to Mr. Honken and that he had access to his cell and to his legal papers. I think that's a pretty important issue.

THE COURT: Well, it's an important issue, but it's not important if he wasn't asked that by the grand jury to ask whether he told the grand jury that. So -- because what he told

the grand jury isn't relevant. It's actually hearsay. It can only be used to impeach him.

MR. WILLIAMS: Right.

MR. PARRISH: But he did -- this is what he told the grand jury here. Where were you celled at this time? And he says two doors down. Then he moved into that unit.

THE COURT: Yeah, but if nobody asked him -- anyway, you can't get into it -- you can ask him, and then you can impeach him with it if his answer is inconsistent; okay?

MR. PARRISH: Okay.

(The sidebar was concluded.)

BY MR. PARRISH:

Q. Do you recall prior to your trial testimony today telling anyone that you were Mr. Honken's roommate?

A. Yes.

Q. Who did you tell?

A. I don't know. Whoever --

Q. Excuse me?

A. I don't know. Whoever interviewed me.

Q. You have no idea who you told that to?

A. I believe it was Mr. Basler.
Q. And when did you tell Mr. Basler that?
A. I don't know.
Q. Did you tell him how you got to be Mr. Honken's roommate?
A. I don't recall.

♀

Q. Do you recall now how you got to be Mr. Honken's roommate?
A. No. He went to the hole. He went to the hole when we had a food strike and they put him in the hole.
Q. And Mr. Honken had a food strike. He wouldn't eat certain food that the authorities --
A. No, the institution had a food strike.
Q. The institution did.
A. Right.
Q. Okay.
A. So they locked up some guys, and he was one of them. And so he went to the hole, and Swanson, John Swanson, was his cellie. He was getting ready to leave.
Q. Mr. Swanson was his cellie at the time; is that right?
A. Exactly.
Q. All right.
A. So he -- so I went into his room in case he left so when he came out he would still get -- he would have his room.
Q. I'm going to show you what is marked as Defendant's Exhibit Q for just a second. And I know you won't be able to write, but I have -- on Defendant's Exhibit Q, if I put John Swanson here, you would say that you moved into the cell with Mr. Swanson after Mr. Honken was placed in the hole because of an institution food strike; is that correct?
A. Yes.

Q. Were you also -- I'm going to refer you again to

Defendant's Exhibit Q. Did you know Wayne Byerly?
A. Yes, I did.
Q. And were you ever a roommate with Wayne Byerly?
A. Yes, I was.
Q. And you were also a roommate, as you've indicated during the trial, with Dustin Honken; is that correct?
A. Yes.
Q. Now, if I'm correct on this -- and referring again to Defendant's Exhibit Q -- you were roommates with John Swanson, Wayne Byerly, Dustin Honken, Mr. McIntosh. And were you ever roommates with Mr. Gibson?
A. No.
Q. But Mr. Gibson and Mr. McIntosh were roommates.
A. I don't know.
Q. Mr. Honken and Mr. Swanson were roommates; is that right?
A. Yes.
Q. So when Mr. Honken went on his strike, you moved into the cell in the year -- this is the year 2000; is that right?
A. Yes.
Q. -- with Mr. Swanson knowing that Mr. Swanson was leaving; is that right?
A. Yes.
Q. So I put Mr. Honken here. You would agree that Mr. Swanson -- I'm referring you again and writing on Defendant's Exhibit Q. Mr. Swanson and Mr. Honken were

roommates before you moved in; would that be accurate?
A. Yes.
Q. And when you moved into Mr. Honken's room for a few days with Mr. Swanson, you knew in advance that Mr. Swanson was going to be leaving and Mr. Honken would be coming back.
A. Right.
Q. At this time -- and this would have been the year 2000 -- Mr. Honken had never talked to you at all about his case.
A. He has.
Q. I'm talking about before Mr. Swanson moved out.
A. Yes, he talked to me before he moved out.
Q. Well, when did Mr. Swanson move out?
A. I don't remember the exact date.
Q. Do you remember on direct examination I asked you the question relative to your first interview of December 7, 2000, and you said Mr. Honken talked to you approximately two weeks prior to that time, and I asked you was it about Thanksgiving, and you said yes?
A. I guess.
Q. Okay. So he wanted to talk to you, as you said earlier on cross-examination, about Mr. McIntosh, and that is what you said in your December 2000 interview; is that accurate?
A. Repeat the question.
Q. Okay. You said he wanted to talk to you about Mr. McIntosh because Mr. McIntosh was going to testify against him, and

♀

1862

that's when the conversation started which was two weeks, as you've indicated, prior to the December 7 interview by telephone.
A. Yes.

Q. Okay. So my question to you then is if that was the case, would it be accurate that Mr. Swanson and Mr. Honken ceased being roommates, they stopped being roommates, somewhere around that same time?
A. I'm not sure when it was.
Q. But would you dispute that?
A. No.
Q. Okay. And in that time that Mr. Honken and you were roommates, were his legal papers in his cell that we just -- I realize that was not the cell, but it was just a typical photograph of what the cell would look like.
A. I'm not sure.
Q. Well, are you telling us it's your testimony you have no idea if Mr. Honken kept his legal papers there?
A. Exactly. I've never seen any paperwork on it, on him.
Q. Well, do you recall a conversation where you indicated that you met with a Mr. Byerly?
A. Yes.
Q. And do you recall that you indicated to law enforcement officers that Mr. Byerly shared newspaper articles with you concerning Mr. Honken?

1863

A. No, that's not the case. He was reading a article. Mr. Byerly was reading an article about Dustin, but I never seen the article.
Q. Now, Mr. Byerly was your roommate at one point.
A. Yes.
Q. When was he your roommate?
A. Right before I moved in with John.
MR. PARRISH: Your Honor, may I be able to publish

Defendant's Exhibit Q to give the jury some idea of the chart we're working from?

THE COURT: Any objection at this point? It's not yet in evidence but . . .

MR. WILLIAMS: I would object I guess from the standpoint that it is just a demonstrative exhibit, and I'm not sure --

THE COURT: Well, but demonstrative exhibits can be shown to the jury. I'm not ruling on its admissibility as substantive evidence.

MR. WILLIAMS: Then I don't have any objection, Your Honor.

THE COURT: And let me just kind of translate because I don't like to talk in code. Remember -- well, remember in opening statement when Mr. Williams had some things up on the board, up on the screen, and he was showing you? Those are what we call demonstrative, and that means it's just to illustrate a

♀

1864

point, but it's not actually in evidence. And when we talk about substantive evidence, that's something that I actually admit.

This Defendant's Exhibit Q is at minimum demonstrative to help you understand the case and show you the relationship between where various individuals were housed in various cell blocks. But I haven't ruled yet on whether it's admissible as substantive evidence. But you'll at least be able to see it because it's demonstrative.

You may.

MR. PARRISH: Thank you, Judge.

BY MR. PARRISH:

Q. I'm going to show you -- and it should show up on your screen, Mr. Vest. Here we go. Hold on a sec. It's showing up on your screen but not the big screen there.
MR. PARRISH: I think maybe I'm punching it too much.
THE COURT: Why don't you move on and come back to it. I may have inadvertently shut the projector off.
MR. PARRISH: It was just on a second ago. Okay.
BY MR. PARRISH:
Q. So as I understand it, Mr. Swanson was with Mr. Honken. Mr. Byerly was also your roommate; is that right?
A. Yes.
Q. He was your roommate for how long?
A. Few months.

1865

Q. And was that -- would that have been in the year 2000 also?
A. Yes.
Q. And is that when he was reading the newspaper articles to you which you indicated to --
A. I only seen him with one article, and he never read it to me.
Q. Well, I want to show you a second interview you recall I asked you about earlier, and that would have been July 18, 2001, that occurred in the Benton County Jail. Remember we talked about that right before lunch?
A. Yes.
Q. All right. And that was an interview with you, and I believe the person conducting the interview was Mr. Basler. Do you recall telling Mr. Basler that Mr. Byerly brought newspaper clippings about Dustin Honken into the cell in your interview that you had with him on July 18, 2001?

A. Yes.
Q. Okay. So you did not limit it to just one --
A. Clipping. That's all I seen was some -- I don't know what he had, some kind of pa -- I didn't look at it, so I don't know exactly what it was.
Q. Oh, I understand that. But I'm just going to show you the report from Mr. Basler and see whether or not this refreshes your recollection since you put it as one clipping; okay? Take a look at the second page, and I'll show the government where

I'm referring to.
MR. WILLIAMS: I know where you're at.
A. Uh-huh.
Q. Okay. Did you have a chance to refresh your recollection on that?
A. It was just --
Q. Now, I understand this is not your statement, but you think if Mr. Basler wrote down clippings when he said -- when Mr. Byerly brought in clippings about Honken into the cell, it would have been only one clipping; is that right?
A. He had a paper in his hand, and that's all I remember.
Q. Okay. And let me just ask you this, and if you don't know the answer, that's fine. But did he have that clipping or clippings prior to the time of your interview in December of 2000?
A. I don't remember.
Q. All right.
THE COURT: Mr. Parrish, could I interrupt for one second? I want to consult with my technical consultant here.
MR. PARRISH: Absolutely.

THE COURT: Thank you. Sorry for the interruption. Thank you, Rick. You're the wizard, technical wizard.

MR. PARRISH: Is it up and running?

THE COURT: It will be in a minute or so.

MR. PARRISH: Okay.

♀

BY MR. PARRISH:

Q. Oh, here we are. Let's turn to this real quickly. You have it down on your screen, Mr. Vest. And I just want to go over this so we can all be on the same page regarding the information. If we go here, we have Mr. Vest there. You were a roommate of Mr. Swanson at one point; is that accurate?

A. Yes.

Q. You were also a roommate of Wayne Byerly who at least brought you one clipping as you've identified; is that correct also?

A. He never brought me a clipping.

Q. Well, he was reading the paper then, is that right, about Mr. Honken's case; is that right?

A. Yes.

Q. And what you don't know is you don't recall the date, whether or not it was before you gave your interview of 12-7 by telephone or not; is that right?

A. Yes.

Q. You also were a roommate for Mr. Honken at one point where you're unsure if his legal work was, in fact, in his cell or not; is that correct?

A. I have no way of knowing. I don't know.

Q. You were also Mr. McIntosh's roommate at one point; is that right?

A. Yes.

Q. When Mr. McIntosh left, according to you, your testimony, at least you were not aware as to whether or not -- why Mr. McIntosh was leaving?
A. Yes.
Q. And then Mr. Gibson -- is that Pat Gibson? Were you roommates with Mr. Gibson yourself?
A. No.
Q. Was Mr. McIntosh roommates with Mr. Gibson?
A. I don't know.
Q. Okay. Thank you.
MR. PARRISH: Do you want me to do that, Your Honor, or do you want --
THE COURT: I'll do it. Thanks.
MR. PARRISH: Thank you.
BY MR. PARRISH:
Q. Now, if we could, I'd go back to -- and I got a little thrown off there, but let me go back. After Mr. Honken came into your cell, would you agree that it was only after that date that you made a statement to the officer by telephone?
A. What do you mean when he came into my cell?
Q. Right. When you all were roommates. Actually you came into his cell; is that right?
A. No, that's -- yeah, but I was only in his cell for like two days, maybe three at the most and they pulled me out, so I had -- no, that wouldn't be accurate.

Q. Oh, that's fine. And I just want to ask you about that.

Is that anything unusual to go in someone's cell for two or three days?
A. I left the institution.
Q. Right, okay. So if I understand you correctly -- and correct me if I'm wrong -- you'd never been Mr. Honken's cellmate. You had moved in with Mr. Swanson. You knew Mr. Swanson was leaving. You then moved in with Mr. Honken when he was in the hole. He came back. And you were in the cell with him for a few days, and then you left.
A. Exactly.
Q. Do you remember the date you left the institution?
A. No.
Q. Do you remember the year?
A. It was 2001.
Q. Was it in January before you gave your second interview to the law enforcement officials?
A. I believe it was in February.
Q. So it was after you'd given your second interview, is that right, because I asked you specifically if you can recall where your interviews took place, and you indicated that the one by phone --
A. Right.
Q. -- was at the institution.
A. Florence, right.

1870

Q. The second one was January 29 of 2001.
A. Right, in the institution.
Q. At the institution; right?
A. Yeah.
Q. Let me just ask you, on that date when you gave your second

interview, were you occupying Mr. Honken's cell?
A. I don't know.
Q. You could have been.
A. Oh, no, there's no way I would have because I was only his cellie for like two days, and I left right after that. So if I left in February, I was only there in his cell for two days.
Q. All right. And would you have left like February 1?
A. I'm not sure.
Q. Okay. And your interview at that time for the second interview would have been in front of the grand jury. That would have taken place March 8 of 2001; is that right?
A. Yes.
Q. And that's when you came out in front of the grand jury, and you presented testimony to them after two prior interviews; is that correct?
A. Yes.
Q. And after the fact you had stayed in Mr. Honken's cell; is that right?
A. Yes.
Q. Now, in Mr. Honken's cell, you were still working the trash

♀

crew at that point, or had you switched jobs before you left?
A. Still.
Q. And Mr. Honken was working where?
A. I don't remember where he was working.
Q. And when he would leave the cell, would you have access to the cell?
A. Yes.
Q. And you know you didn't live with Mr. Byerly before -- two days before you left, did you?

A. No.

Q. So would that be -- strike that question.

So would you assume from that based upon where you were living at the different times that you could have only talked to Mr. Byerly prior to the time that you gave your interview of December 7 of 2000?

A. I don't understand the question.

Q. Okay. That's probably -- I apologize if it was not a clear question. We know you gave your interview on 12-07. The question is did you live with Mr. Byerly at any point in time after December 7 of 2000?

A. Yes.

Q. When?

A. Up until I moved in Dustin's room.

Q. Well, yeah. Okay. So you lived with Mr. Byerly at that point.

♀

1872

A. Yes.

Q. Okay. Anyone else that you lived with other than Mr. Byerly?

A. Between him and John?

Q. Yes, sir.

A. No.

Q. Okay. I want to make sure we have this right now. You correct me if I'm wrong. You were living with Mr. McIntosh.

A. Yeah.

Q. You moved from Mr. McIntosh to Mr. Byerly.

A. Actually he moved in with me.

Q. Mr. Byerly moved in with you.

A. Yes.

Q. You lived with Mr. Byerly until you lived with Mr. Swanson.
A. Yes.
Q. Who was Mr. Honken's roommate.
A. Yes.
Q. And then when Mr. Swanson moved out, Mr. Honken came back into the cell.
A. Exactly.
Q. Two days later you left the institution.
A. Yes. And also about Mr. Honken's property since he just got out of the hole, I doubt he even had his property because it usually takes a week or two to get it once you get out of the hole.

♀

Q. Well, you said he didn't have his property. Are you telling us your testimony is under oath he did not have his property?
A. No. I'm just saying I don't know.
Q. Oh, okay. Where was Mr. Honken working when you were living with him?
A. I don't know.
Q. Was he out of the cell at any point in time and you were in the cell?
A. Oh, yes.
Q. What I'd like to do now is just discuss your work for SIS and what you were doing for them. Mr. Felz was your contact person for SIS; is that right?
A. Yes.
Q. And Mr. Felz was the individual you had worked with before when you talked about the incident that occurred prior to the time that Mr. Honken got there where you gave some information

regarding drugs being delivered.
A. It was over a stabbing.
Q. I understand your testimony was over a stabbing. Is your testimony it had nothing to do with drugs being delivered?
A. That's what the stabbing was over.
Q. And I take it while you were at the institution you did not do heroin yourself?
A. No.

♀

Q. You never did.
A. Never.
Q. Never had access to it.
A. Yeah, I had access -- anybody in there has access.
Q. Did you know a Mr. Ferguson?
A. Yes.
Q. And how did Mr. Ferguson tie in to the relationship? Were you ever his roommate?
A. No.
Q. Did you know him on the block?
A. Yes.
Q. And how did you know Mr. Ferguson?
A. He lived in the same unit.
Q. How long had he lived in the same unit?
A. I'm not sure.
Q. Did you ever see him and Mr. Honken hang out together?
A. Yeah.
Q. Were they real tight from what you observed?
A. Yeah. I believe that they were.
Q. You believe they were from your --
A. I think they went to the different programs that they had

in the institution together.
Q. They did -- well, you and Mr. Honken also went to the different programs like the Spanish classes, et cetera, too; right?

♀

A. Exactly.
Q. Now, was Mr. Ferguson ever a roommate of Mr. Gibson?
A. I don't know.
Q. And what about Mr. Plunk? Did you know him?
A. Yes.
Q. And was he ever a roommate of Mr. Honken?
A. Not that I'm aware of.
Q. When you were Mr. McIntosh's roommate and he would be working on matters for the other inmates, did he bring the paperwork back into his cell?
A. I have no idea.
Q. Okay. So you had no idea where he was keeping his paperwork or what he was doing with his paperwork. Is that your testimony?
A. He -- as far as I know, they had some kind of -- like four or five of them hung out in the law library and did their stuff there. I never seen him do any in the cell, so I don't know.
Q. When you told us this morning that Mr. Honken's escape plans were to go to Oklahoma, is there any reason why you mentioned Oklahoma?
A. No.
Q. Excuse me?
A. I don't -- what do you mean?
Q. Well, why did you mention Oklahoma today at trial?
A. That was the plan.

Q. That's what he told you.

A. Uh-huh.

Q. Do you remember telling the grand jury something different?

A. No.

Q. Would you like to see your testimony from the grand jury to see if it refreshes your recollection?

A. (Witness nodded head.)

Q. I'm going to show you page 25, line 5 through 7.

A. Uh-huh.

Q. Have you had a chance to read that, Mr. Vest?

A. I did.

Q. Do you recall what you told the grand jury?

A. I said Omaha.

Q. And so where did the idea of Oklahoma come from?

A. That's the way I remembered it was Oklahoma.

Q. Do you remember the names of the victims you gave to the jury this morning being Terry Nicholson and Greg DeGeus?

A. Greg Nicholson, Terry DeGeus.

Q. So when you gave that testimony at trial, it was just a mistake you had made on the recall of the people?

A. Yeah. I believe I started to change it but they asked me another question.

Q. Okay. That's fine. You indicated that he told you these incidents occurred in 1996 in your testimony?

A. I don't remember the year.

Q. You don't remember the year? Do you remember what you said

during your trial testimony to the jury?

A. Yes.

Q. What'd you tell them?

A. I said it was around -- I believe he said it was in '96, but I wasn't, you know, a hundred percent positive.

Q. And do you remember what you told the grand jury?

A. No.

Q. If you told the grand jury a different date, which one would be correct?

A. The grand jury.

Q. Not the one that you said here today.

A. Yes.

Q. The one you said here today would be incorrect.

A. If it was different from the grand jury. Grand jury was four years ago, so I had a fresher memory back then.

Q. You would have a fresher memory on what took place; is that right?

A. Yeah.

Q. Do you remember what you told the jury about who the victims were in this case?

A. I don't understand the question.

Q. Yes. Do you remember telling the grand jury who Mr. Honken told you the victims were when you testified at trial?

A. Yes.

Q. What did you tell them?

A. I told them their names.

Q. And who did you say they were? Mr. Nicholson and who else?

A. DeGeus.

Q. And who else?

A. I don't know.
Q. You don't remember who else you told them? It was Mr. Nicholson's wife?
A. Yes, his wife.
Q. Is that who it was?
A. His wife and two kids.
Q. So he told you it was Mr. Nicholson, Mr. Nicholson's wife, and Mr. Nicholson's two children; is that correct?
A. Yeah.
Q. As a matter of fact, you said he used that as a rationale for killing them. Because the victims or whoever was a rat, their whole family should die which meant that Mr. Nicholson's kids had to die; is that correct?
A. Yeah.
Q. And you said he looked at you and told you with an eye of seriousness that you thought he was telling you what was accurate; is that right?
A. Yes.
Q. Is there any dispute in your mind that that's what he told you?

1879

A. No.
Q. And there's no dispute in your mind that that was the rationale he gave you.
A. Yeah.
Q. Do you know where Mr. Honken went to school?
A. Nope.
Q. Do you know his mother's name?
A. Nope.
Q. Do you know his father's name?

A. Nope.
Q. Know the name of his children?
A. Nope.
Q. Do you know what car was indicated was used?
A. Nope.
Q. Do you know what town he's from?
A. No.
Q. Do you know what his mother does for a living?
A. No.
Q. You also said that Mr. -- when you had a next interview that occurred -- and that was prior to the time that you went in front of the grand jury. That would have been January 29, 2001, two days before you were getting ready to leave the institution; is that correct?
A. I guess. I don't know.
Q. Right. You said it was right after -- no, let me make sure

1880

this is correct because I don't want to lead you into saying yes if it's not correct, so don't just agree with me just to agree with me. My question is you had an interview January 29 of 2001; okay?
A. Uh-huh.
Q. This is the interview that you indicated or that's indicated from the report at least occurred at the institution in Florence.
A. Right.
Q. My question to you is how long after that interview if you can recall did you leave? I know you've already established that two days after you were Mr. Honken's roommate you left the institution.

A. Right.

Q. But we just want to put that in context of the interview if you know.

A. I'm not sure. I think it's about two, three weeks. I don't remember. I'm not positive.

Q. It could be as long as two or three weeks. It could be a shorter period of time or a little bit longer period of time.

A. Somewhere around there, yeah.

Q. Okay. Now, you indicated, did you not, in that interview that Mr. Honken never mentioned anything to you about any individuals being tied up; is that right?

A. Right.

♀

Q. He never mentioned to you anything about transporting any victims in the back of a car when they were bloody; is that right?

A. Right.

Q. He never mentioned to you anything about where Mr. Nicholson was living, finding out where he was living; is that correct?

A. Right.

Q. He never mentioned to you anything about people being put in a barrel or anything like that; is that correct?

A. Right.

Q. He never mentioned to you anything about anybody being strangled to death; is that right?

A. Right.

Q. As a matter of fact -- and correct me if I'm wrong -- in terms of what you've established as your relationship with Mr. Honken, it's true, is it not, that except for those two days

when you were in his cell and he was out of the cell part of that time, that was perhaps the longest time you'd spent with Mr. Honken at any length of time since he had been incarcerated and you had been incarcerated other than in the Spanish class?
A. No, I've spent all kinds of time with him.
Q. Okay. And like when? Like the two weeks before Thanksgiving?
A. We hung out together and worked out together and things

♀

1882

like that.
Q. Okay. You worked out together and things like that; is that right?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. You went to Spanish classes together; is that right?
A. Once.
Q. Oh, just one time?
A. Uh-huh.
Q. So it was not a daily process that you went to this class?
A. No. They have a program and you go there and you go -- it lasts for how ever many months that it is, and it's over.
Q. Okay. Oh, no. You meant you went more than one time to the Spanish class.
A. Oh, okay.
Q. And you worked out together you said.
A. Yes.
Q. You also would spend time in the commissary just hanging out or down in the lounge area just hanging out talking?
A. Yes.

Q. And you never knew he was talking with your roommate Mr. McIntosh all of this time? Is that what you're saying?
A. No, I didn't say I know he was talking to him. I didn't know he was doing any legal work.

Q. Oh. So you thought he and Mr. McIntosh were just friends maybe when they would spend time together.
A. Everybody in there talks to everybody.
Q. Okay. There's a lot of talking going around.
A. Right.
Q. And you didn't ever see him talk to Mr. Tokars at any point in that time.
A. I don't know.
Q. Fred Tokars?
A. I can't place him.
Q. All right. So if I understand you correctly and make sure that we're on the right track here, in the year 2000 before you made your statement, you never saw him spend time with Mr. McIntosh anywhere -- and we're going to go through certain months -- in April of 2000, May, June, July, August, September, October; would that be about accurate?
A. That I never saw them?
Q. Yes, you never saw them together; is that right?
A. It's not easy to remember. I don't know.
Q. Okay. I understand that. And in November when you first started -- Mr. Honken you said first started talking to you around Thanksgiving sometime and before your first call to law enforcement in Iowa that they called you, did you and Mr. Honken spend a lot of time together during that two-week period of time?

A. I'm not sure.
Q. Okay. Well, let's go after that 12-7 interview of 2000. From 12-7 to the end of the year -- and if there's a better reference point, we can go into the next interview of January 29, 2001 -- did you and Mr. Honken spend a great deal of time together as best you can recall? You weren't roommates during that time.
A. No, we weren't roommates. I started spending more time with him when Wayne moved in with me because Wayne was good friends with him, and that's when we started all hanging out together, but I'm not sure when that was.
Q. Well, this is what I wanted to ask you because we're talking about the time you were spending with Mr. Honken, and you said you just moved into his cell when Mr. Swanson left.
A. Uh-huh.
Q. And you said Mr. Honken just came up from the hole that he had been placed in for some time.
A. Uh-huh.
Q. How long had he been in the hole?
A. I don't know. Probably a week or two.
Q. So he at least had been in the hole for a week or two before you had your interview of January 29 of 2001; would that be accurate?
A. I'm not sure. I don't know.
Q. Would it surprise you if you found out Mr. Honken was in

1885

the hole the whole month of December?
A. No, it wouldn't surprise me.

Q. So if he was in the hole the whole month of December, did you have access to him?
A. No.
Q. Would you have had access if he was in the hole in January to him?
A. No.
Q. Well, when you gave your interview on December 7 of 2000, would you agree that from that date forward at least to the end of the year you had absolutely no access to Mr. Honken?
A. If he was in the hole the whole month, you're right.
Q. So you couldn't have talked to him at all to get additional information during the month of December we know for a fact to go and give it to law enforcement; would you agree?
A. What add --
Q. Additional information from Mr. Honken.
A. I had the information before they got there, so I don't know when exactly I got it.
Q. Well, that's what we're going to tie down here a second. You had information on 12-7-01 that took place in a telephone conversation with Mr. Basler. You don't dispute that, do you?
A. Right.
Q. And in this interview you told him -- and which you've already acknowledged -- that basically Mr. Honken wanted you to

1886

write a letter.
A. Uh-huh.
Q. About McIntosh and send it to some lawyers. At least that's what you told him; is that right?
A. Yes.
Q. And you also told him that he told you some information

about murdering some people in Iowa, and you said he told you that a couple of weeks ago.

A. Uh-huh.

Q. Is that a yes? Okay. I'm sorry. You have to answer yes so the court reporter can get that down.

A. Yes.

Q. Then you would agree you had no further access to him if he was in the hole for the month of December; right?

A. Yes.

Q. You told us that you moved in with his roommate, Mr. Swanson, at the same time Mr. Honken was in the hole. That's what you told us; is that right?

A. As far as I remember, that's the way it went down.

Q. Well, that's what you told us on direct.

A. Uh-huh.

Q. And that's what you also told me when I followed up on cross-examination when we were preparing this chart.

A. Yeah, he was in the hole. He was in the hole.

Q. Okay. Then you said -- and correct me if I'm wrong -- that

♀

when -- or while Mr. Honken was in the hole, you moved in with Mr. Swanson knowing that Mr. Swanson was going to leave. Are you following me so far?

A. Right.

Q. Mr. Swanson left.

A. Uh-huh.

Q. Mr. Honken then came out of the hole and back to his cell.

A. Right.

Q. Two days later you left.

A. Yeah.

Q. So is it your testimony now that all the information you had about Mr. Honken you had it prior to the December 7, 2000, interview?

A. If I'm --

Q. Yes or no.

A. I'm trying to follow what you're saying. He got out in January. He would have been in -- I would have had contact with him from January to the end of January before he went back into the hole.

Q. Well, when did you move in with Mr. Swanson now then?

A. The last time he was in the hole.

Q. You just don't know.

A. I don't remember exact date, no.

Q. You also -- oh, let me just ask you a couple of questions to set up the context for these -- this area of questions. As I

1888

understand it, when people are in the institution, people make a lot of statements to protect themselves to make sure that they don't come to physical harm or get stuck as you call it; is that right?

A. I suppose.

Q. Okay. And would you agree that one of the worst crimes anyone could admit to doing in prison is harming a child?

A. Yes.

Q. And that's because children are considered sacred even to inmates who have been convicted of murder and everything else; would that be accurate?

A. Yes.

Q. And a person who would subject themselves to spreading knowledge that they had killed kids, that person would be in

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1649 of 3636

danger; is that right?
A. Yes.
Q. And one reason Mr. Tokars was in so much danger is the fact that he had been convicted of killing his wife in front of the children; would that have been accurate?
A. I'm not sure. I can't place him.
Q. Okay. You can't place him? Okay. But to your knowledge, even these two days that you spent with Mr. Honken, were you aware that he was subjected to any threats by other inmates before you left the institution?
A. No.

♀

Q. Were you aware as to whether or not he had been put in the hole for any point in time for protective custody because other inmates harmed him?
A. No.
Q. And you knew him -- I believe you've outlined -- from -- if we go back from the January 29 or the two days after that or thereabouts, you'd known him since what? Was it 1998?
A. Somewhere around there.
Q. Okay. And in your presence, which you said you spent a lot of time with him, did you ever see or hear anyone threaten him in any shape, fashion, or form due to what they say were the allegations against him?
A. You're talking about Dustin?
Q. Yes.
A. No, I never . . .
Q. Part of what people do -- and correct me if I'm wrong -- is to share their presentence report or at least up until a certain date when it was no longer allowed. They would ask to review

that to make sure people were not testifying against other people; is that right?

A. That's only if somebody has a question about you.

Q. Right. If a question comes up in the yard about an individual and in order to protect yourself, you would show them your presentence report.

A. Yes.

♀

Q. And I would imagine if you had other matters pending, you might show them how that other pending matter might impact you while you're in prison. And let me tell you exact -- specifically what I'm talking about so you can understand the question. Most people in the prison environment, particularly in Colorado where individuals who have already been convicted such as, say, yourself of two murders and other matters; is that right?

A. Yes.

Q. Mr. McIntosh, another similar person convicted of murder; is that right?

A. I don't know.

Q. Okay. Within that context, his case either was on appeal or his case was basically over at that point. There's nothing else you can do on your case; would you agree?

A. Yes.

Q. So the only relief as we briefly discussed this morning would be in someone giving you some type advantage, say as moving or giving you some relief in terms of, you know, whatever kind of benefit or putting you in protective custody? That would be one of the benefits you would get; is that right?

A. Yes.

Q. Now, with Mr. Honken's case, you would agree he would be an individual as you've kind of outlined whose case we could consider a live case? Would that be right? And what I mean by

live case, it's an ongoing case.
A. Yes.
Q. It would be current; is that right?
A. On his new charges?
Q. Yes, sir.
A. Yes.
Q. And that means that he's an individual who will need witnesses for his trial if he presents witnesses; is that right?
A. Yes.
Q. He would need to review physical evidence in his case if there's physical evidence that links him to this situation; is that correct?
A. Yes.
Q. Other than Mr. Honken's case, of the 125 people in the pod with you, do you know anyone else who had what could be called a live case?
A. I don't know. You know, everybody doesn't discuss their cases.
Q. Anybody else that you know of? If you don't know, you can just say you don't know.
A. No, I don't know.
Q. Did you discuss with anyone else that they were going back to court to face trial for killing anybody other than the appeal part related to the case?
A. No.

Q. He would be the only one of the years that you had been there.
A. Yes.
Q. And you'd been there since when?
A. '96.
Q. Now, if we go back to '96 when you were at the place -- it was not Leavenworth but what was the place close to --
A. CCA?
Q. Yeah, CCA. In that place that's a pretrial where people are in the institution and a number of them are waiting trial; is that right?
A. Yes.
Q. So that means they're getting witnesses, they're meeting with their lawyers, they have their legal papers that they protect pretty secretly, you would agree.
A. Yes.
Q. And I would assume you were the same way. When you were in pretrial status, you didn't want anybody reading letters from your lawyers, did you?
A. No.
Q. Okay. Why is that? It might tell your strategy or your preparation?
A. Just something you don't do.
Q. Exactly. If you're on appeal and your case is published around for everybody to read, you would agree that's a whole

1893

different situation.
A. I suppose.

Q. Right. As a matter of fact, in appeal cases, you can go to the library and pull someone's file and -- not their file, but you can pull information about their case, the briefs that are written, the appellate record written by the judges, this type of thing?
A. I don't know.
Q. You've never done that?
A. No.
Q. So you're not aware people can do that in your case.
A. I'm not aware.
Q. But you knew that jailhouse lawyers had abilities to do that.
A. No, I have no idea of any of that stuff.
Q. You never consulted with a jailhouse lawyer?
A. No.
Q. You never asked Mr. McIntosh a legal question the whole time you were there?
A. Oh, yeah, yes.
Q. And you knew he could go to the library and find out information on cases.
A. Yeah, on cases, yeah.
Q. And how far was the library away?
A. Across the yard.

1894

Q. And did people have access on a daily basis to the library?
A. Yes.
Q. And were there any restrictions in going to the library and reading cases or reading other material that you'd want to read?
A. I've never been in there, but I'm sure there's not.
Q. To your knowledge there would be no restrictions on that.

A. Yes.
Q. And was Mr. McIntosh a fairly well-respected jailhouse lawyer within the institution?
A. I'd say he was.
Q. There were several in your particular wing; is that right?
A. He was the only one that I remember.
Q. And he's the only one you may have talked to about any legal matters. Would that be accurate also?
A. Yes.
Q. And with that context in mind, with regard to Mr. Honken, do you recall him other than with yourself discussing the facts of what I called his live case?
A. Repeat the question.
Q. Okay. In that context that we've just set the backdrop on, do you recall Mr. Honken having any discussion with anyone else in your presence about his live case? Not talking about the appeal case that had the drug case. We're talking about the live case that we've just discussed and set context for.
A. No, not in my presence.

1895

Q. Not in your presence. No one else.
A. Well, except for when he was talking to Swanson about writing some note, do that, but other than that, not that I recall.
Q. But never any details; is that right?
A. Right.
THE COURT: Mr. Parrish, why don't I give the jury a stretch break, and that will give you an opportunity to review your notes.
MR. PARRISH: Thank you, Judge.

THE COURT: And check with your co-counsel.

MR. PARRISH: Thank you.

THE COURT: Please be seated.

Mr. Parrish, do you have any additional cross-examination?

MR. PARRISH: Yes, Your Honor. I have just a few questions left.

BY MR. PARRISH:

Q. And I want to just clear up a few matters or have them clarified for me. One thing you indicated, that Mr. DeGeus was taken out to a field according to what Mr. Honken told you? He was lured out into a field is what you said?

A. He said they met on a field.

Q. And that was in your January 29 interview?

A. I guess.

Q. I'm sorry. I -- did you say yes or no?

A. I said I guess.

Q. Oh, okay. You just don't remember the date of the interview. But you think he was lured out into a field?

A. DeGeus?

Q. DeGeus, yes, sir.

A. Yeah, they -- I don't know about lured out into a field, but they met at some type of field he said when he was telling me.

Q. And you indicated he was lured out into the field but the car had blood all over it; is that right?

A. Yes. He told me he had to take it to a car wash afterwards to wash the blood off.

Q. Did he ever tell you what kind of car it was?

A. No.

Q. Did he ever tell you or did you ever state that Mr. Honken told you that he finished the kids off by choking them?

A. No, he never said that.

Q. Did Mr. Honken ever tell you that Mr. DeGeus had made a statement against him already?

A. No.

Q. He said he was concerned that he may some day in the future make a statement against him.

A. Yes.

Q. He mentioned nothing that he'd gone to the grand jury or anything like that.

A. No.

Q. Did he ever tell you that Mr. DeGeus was put in the trunk of a car?

A. No.

Q. Did he ever make any statement to you about any dent in an aluminum bat?

A. Yes.

Q. And he told you there were dents in an aluminum bat; is that right?

A. Yes.

Q. And that's from hitting somebody with it?

A. Yes.

Q. That he'd hit him so hard with a bat that it actually dented the bat.

A. That's what he said.

Q. And that applied to which person?

A. To Greg Nicholson -- I mean Terry DeGeus.

MR. PARRISH: Those are all the questions I have, Your Honor. Thank you.

THE COURT: Mr. Williams?

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Vest, you just mentioned that the defendant told you that he had to have Mr. DeGeus's car washed off. Do you

remember did he tell you what they did with the car after they washed it off?

A. He said they dropped it off somewhere to be found.

Q. To be found.

A. Right.

Q. And you'd indicated in your prior testimony that the initial confrontation with Terry DeGeus took place while Dustin Honken's leaning on a car.

A. Exactly.

Q. Okay. And at some point after that he's dragged someplace to be buried?

A. Yes.

Q. You indicated or you were asked questions on cross-examination about isn't it kind of an unwritten rule that somebody who does harm to a child is not looked upon well by other inmates in the prison, and then you were asked a series of questions about whether Mr. Honken was ever in protective custody and so forth. Do you remember that line of questions?

A. Yes.

Q. Did Mr. Honken disclose to you any of the information he provided to you before he thought you were in on the plot to escape?

A. No, he did not.
Q. So he thought you were one of his small cadre of four to six people who were going to escape with him before he made that

disclosure to you?
A. Yes.
Q. And the other people that were involved with him, were they tough people?
A. Yes.
Q. Artie Dufur?
A. Yes.
Q. Joe Dougherty?
A. Yes.
Q. Mr. Loparo?
A. Yes.
Q. All a pretty tough crowd.
A. Yes, they were.
Q. You were asked a number of questions about timing and so forth. Do you recall today exactly when you were at different locations and what cell you were in and on which date and so forth?
A. Not really.
Q. Okay. Would it refresh your recollection if I showed you the interview report that you gave on January 29 of 2001 to at least some of the dates involved?
A. Sure.
MR. WILLIAMS: May I approach, Your Honor?
THE COURT: You may.
BY MR. WILLIAMS:

Q. Mr. Vest, I'd just ask you to read this front page for some specific dates, and when you're done, just let me know, and then I'll talk to you about it.
A. Okay. Just read right here?
Q. Just read it to yourself.
A. Okay.
Q. Now, Mr. Vest, this is the interview report that was done of you at Florence, Colorado, on January 29 of 2001; is that accurate?
A. Yes.
Q. And in there do you relate when you were moved to the BB unit?
A. In '99, November of '99.
Q. Okay. And then in there do you relate also when it was in relation to this interview that Dustin Honken first came to you and started talking to you about a plan to escape?
A. Yeah, three months earlier.
Q. All right. So that tries to put at least some time frame on this.
A. Yes.
Q. And it's in this January 29 interview that you relate all of the details about the murders that you provided to the jury here today.
A. Yes.
Q. And there was a previous short telephone interview in

1901

December in which you advised Mr. Basler you know some of this information, but it's not until this interview you actually give the detailed information.

A. Right.

Q. And this occurred months before you ever celled for a couple days with Dustin Honken.

A. Yes.

Q. You were asked some questions about your cooperation with SIS and whether it was known to other people about that cooperation. Do you recall that line of questioning?

A. Yes.

Q. When you provided information to SIS about the stabbing that was going to occur in relation to some drugs being smuggled into the prison, did SIS keep your identity and keep that information confidential for your protection?

A. Yes, they did.

Q. Was that information generally known to the rest of the population, the prison population, that you provided that information?

A. No.

Q. Would you have been in danger had that information been out in the general population?

A. Yes, I would.

Q. And why is that?

A. Because I would have been telling on people, and they would have stabbed me.

Q. You indicate that -- you were cross-examined about your hopes that at some point you may not be doing four life sentences. Do you remember that line of cross-examination, sir?

A. Yes.

Q. And you had indicated that that hope was premised on hoping they would change the law so that there was such a thing as

parole.
A. Yes.
Q. Do you recall that?
A. Uh-huh.
Q. Based on your understanding, at least in the federal system as it exists today, is there any parole if you have a life sentence?
A. No.
Q. Now, are you hoping that at some point they'll change that law so a life sentence won't mean a life sentence anymore?
A. Yes.
Q. And that's what you were talking about that you're hoping that might happen?
A. Yes, it is.
Q. Are you aware of any pending legislation or anything like that where you think that might occur at all?
A. Not that I'm aware of.
Q. And then finally, do you recall that line of questions of

♀

1903

you, sir, that the benefits that you could receive since you can't get out from underneath a life sentence that it's like gold to you to be closer to your family? Do you remember that line of questions, sir?
A. Yes, I do.
Q. Your family is -- without giving any addresses, what city are they from, sir?
A. Kansas City.
Q. Leavenworth is a city just outside of the greater Kansas City metropolitan area; is that right?
A. Yes.

Q. So when you were in Leavenworth you were very close to your family.
A. I was.
Q. Florence, Colorado, is about what? One state away from Kansas City?
A. Yes.
Q. Across the state of Kansas.
A. Yeah. I think it's like 14 hours driving.
Q. Since you've provided this information to the government and cooperated against Dustin Honken -- I don't want you to disclose locations -- are you closer or much farther away from your family after you've cooperated?
A. I'm further, further away.
MR. WILLIAMS: No further questions, Your Honor.

THE COURT: Mr. Parrish, any recross?
MR. PARRISH: I do, Your Honor.

RECROSS-EXAMINATION

BY MR. PARRISH:
Q. Who is George Conte?
A. He's a guy that was in BB unit.
Q. Who is he?
MR. WILLIAMS: Objection, Your Honor. Outside the scope of direct examination or --
MR. PARRISH: I can tie it in pretty quickly.
THE COURT: Well, it is, but I'm going to allow it.
BY MR. PARRISH:
Q. Was he one of the reasons you wanted to transfer?
A. No.
Q. He was not?

A. No.

Q. So who is Mr. Conte did you say?

MR. WILLIAMS: Objection, Your Honor. Relevance at this point.

THE COURT: Sustained.

MR. PARRISH: May we reopen for the purposes of pursuing that line of questioning, Your Honor? It would be very brief.

THE COURT: Well, it's not a question of you reopening because it's beyond the scope of his cross-examination -- I mean

his redirect, so how can you reopen a cross?

MR. PARRISH: Right. We think it -- well, I won't argue the point. I understand the Court's ruled.

THE COURT: Go ahead. You can argue it.

MR. PARRISH: Not in front of the jury. I don't want them to see me arguing.

THE COURT: Why don't I see the lawyers at sidebar. Thank you.

(At sidebar on the record.)

THE COURT: You'll have to speak up.

MR. PARRISH: Oh, I'm sorry.

THE COURT: I'm a little bit confused what's going on here. Just fill me in.

MR. PARRISH: Conte is a person who he had worked with with SIS that was part of one of his reasons they want to transfer. They want to act like the only reason he wanted to transfer was Honken, and that was not the only reason.

THE COURT: But he said no to that.

MR. PARRISH: Right. But he had him on his redirect

to believe that's the reason he wanted him to transfer.

MR. WILLIAMS: I never asked why he transferred.

MR. PARRISH: He's talking about transferring. You asked him about Leavenworth, and you asked him about is that closer.

THE COURT: You opened up the issue -- I think it's

within the fair game, but you asked him if that was a reason, and he said no. Now, you can impeach him if you have something to impeach him with, but he already said no.

MR. PARRISH: It will take me a couple minutes to find it. I'm sure I have it in my notes, because he was --

THE COURT: Well, why don't I --

MR. PARRISH: Because he was an SIS -- see, when you become an SIS --

THE COURT: Wait, wait, wait. I don't want to take any more time. You can impeach him, so I'll give you a couple minutes to find it if you think you have something to impeach him with.

MR. PARRISH: Okay. I'll try to do it quickly. If he doesn't, then I can probably try and bring it back through another witness.

THE COURT: Okay.

(The sidebar was concluded.)

THE COURT: You may proceed, Mr. Parrish.

MR. PARRISH: Thank you, Your Honor.

BY MR. PARRISH:

Q. You agree, do you not, that you were an SIS informant? You worked for them and with Mr. Felz?

A. Yes.

Q. And part of the reason that you were transferring was also because of other work you had done; is that right?

A. I'm not sure what you mean.
Q. Well, it was not solely for Mr. Honken.
A. Why I was transferring?
Q. Yes.
A. Yeah, that's why I was transferring.
Q. That was the only reason.
A. That was the only reason.
Q. And not related to any other SIS work you had done that had gotten around the grounds.
A. No, not that I'm aware of. I never heard of any.
Q. You indicated that Mr. Honken told you he wanted you to go back to Iowa with him; is that right?
A. Yes.
Q. And he was first -- when he was preparing his case or talking about his case, he talked about signing affidavits; is that correct?
A. Yes.
Q. And that was the basis of the escape plan; is that right?
A. Yes.
Q. But when he approached you with an affidavit, you never signed an affidavit; is that right?
A. I don't recall signing one.
Q. Do you recall as you sit here now whether or not you signed one?
A. I don't recall.

Q. As a matter of fact, you said that -- contrary to what you told Mr. Williams, you said two to three months went by prior to the time -- after the time he'd asked you to sign an affidavit, and that's when you talked to Felz; is that right? He was giving you a context of when these conversations took place.
A. Yes.
Q. Now, if you go to what you told us before, that the most recent in time to the incident would best -- would be your best memory; would you agree?
A. Back then.
Q. So you told him that January 29, 2001, it was two to three months ago; is that right?
A. Yes.
Q. You just told him on direct examination.
A. Right.
Q. But if you go to your first interview which was 12-7, 2000, you told him, as you said already on direct and cross-examination, that Mr. Honken spoke to you a couple of weeks prior to that about murdering people in Iowa. Is your memory better now, or was it better then in January -- I'm sorry, in December, two weeks after he'd talked with you?
A. I'm not sure what you're asking.
Q. Well, you told Mr. Williams on redirect that it was two to three months prior to that time of the January interview.
A. Uh-huh.

1909

Q. Yet you said in December when you did the telephone interview that it was just a couple of weeks before that Mr. Honken had talked with you.

A. Yes.

Q. Which one is accurate?

A. Well, a couple weeks would have been in November, so it would have been around the same time.

MR. PARRISH: Okay. No further questions, Your Honor.

THE COURT: Mr. Williams?

MR. WILLIAMS: Nothing, Your Honor. Thank you.

THE COURT: This witness is excused.

MR. WILLIAMS: We're going to have a short delay in between on the next witness, Your Honor.

THE COURT: How short is short?

MR. WILLIAMS: As soon as the marshals can facilitate.

THE COURT: It's a little early for our break, so I think we'll just patiently wait while the U.S. marshals do their work. Everybody can take a stretch break if you want to.

MR. MILLER: May it please the Court. Your Honor, the United States is calling Steven Arthur Ferguson.

THE COURT: Thank you.

Members of the jury, I just wanted to explain what the delay is. We're actually very busy this week, and it's really taxed our United States marshals. Judge O'Brien, our senior judge who's 81, is trying one of my other criminal cases as we

1910

speak. And we have another judge who probably is here now or will be here in just an hour or so, a federal judge from Des Moines, a friend of mine, Judge Gritzner who's come up to try another one of my criminal cases starting tomorrow. Our magistrate judge is trying one of my civil cases this week that just started jury selection. We're out of courtrooms, so he's over in state court. And so we've really overtaxed our court

security officers and marshals, and that's led to some of the delay. But the good news is when this case is finished I won't be behind in my other cases. But I apologize for the delay. Normally we wouldn't have such delay.

We're ready for the next witness. Thank you.

I know it's hard to raise your right hand, but do the best you can, and I'll swear you in.

STEVEN FERGUSON, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. The U.S. marshal will assist you because we want to try and get the chair as close to the microphones as possible. Would you please state your full name and spell your last name.

THE WITNESS: Steven Arthur Ferguson, F-e-r-g-u-s-o-n.

THE COURT: Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Mr. Ferguson, you're a native of what area of this country?

A. I'm from Arizona.

Q. Grew up there?

A. Yes.

Q. What age a man are you, sir?

A. Pardon me?

Q. What age are you?

A. Oh. I'm 46.

Q. You're currently a prisoner?

A. Yes.

Q. How many years of your life have you spent in prison?

A. Real close to 20 years all together.

Q. And I assume that didn't begin until you were an adult?
A. At about 20 or 21 I think, yes.
Q. So certainly the vast majority of your adult life has been spent in prison.
A. Yes.
Q. You have a number of convictions, theft conviction or convictions?
A. I have several felonies. Would you like me to --
Q. No. I'll just ask you, sir, theft, does that include theft and burglary?
A. Yes.
Q. Does it include criminal trespass?
A. Yes.
Q. Does it include one or more bank robbery convictions?

♀

1912

A. Yes, it does.
Q. How many bank robbery convictions?
A. Well, in two separate incidents I was convicted of a total of I think nine bank robberies. I'm not sure, though.
Q. And for what are you currently incarcerated, sir?
A. Bank robbery.
Q. Does your criminal history show a use of aliases?
A. Yes.
Q. How many?
A. I've used one, but I believe there's another one listed that I don't recall ever having used.
Q. What one do you recall using?
A. I used McCloud, Andrew McCloud, and I think the one that they have listed that I don't recall using was Matthews.
Q. You're not denying that you may have used such an alias in

the past?

A. I may have, but I don't believe I did.

Q. Well, you just tell us your best recollection of whatever either I or defense counsel asks you; okay?

A. Okay. My best recollection is that I did not use that alias.

Q. But you are listed as having two aliases, McCloud and Matthews.

A. Yes.

Q. In addition to criminal history and one or more aliases,

♀

you also have a history of drug abuse; is that correct, sir?

A. Yes.

Q. What particular drug, sir?

A. Mostly marijuana, but I've used other drugs like cocaine and speed, LSD, barbiturates, things like that.

Q. Heroin?

A. I've tried that a couple times, yes.

Q. Mr. Ferguson, you mentioned that you're currently serving a term for bank robbery. That was a sentence imposed upon you when?

A. That sentence was imposed in 1997. I think it was July.

Q. And what sentence did you receive, sir?

A. I received 96 months for the bank robberies and then an additional 30 months for violation of supervised release.

Q. 96 months, that's 8 years?

A. Eight years.

Q. Did you get credit for any time served awaiting sentencing?

A. No, no, I didn't, didn't get any credit for that.

Q. Where are you in relation to expiration of that 96-month

term?
A. That particular term ends I believe in June or July of next year.
Q. Just a few months away from now?
A. Yes.
Q. But you also have a 30-month consecutive incarceration.
♀

And what's that for, sir?
A. That's for the violation of the supervised release on a previous sentence, and that starts when the 96 months ends, and that sentence should expire in about September of 2007.
Q. So presently you're scheduled to be discharging your time in prison in -- when is it, sir?
A. It's about September of 2007, just less than three years.
Q. Just under three years from now?
A. Yes.
Q. Having been continuously in custody since about when?
A. Since August of 1996.
Q. Mr. Ferguson, are you here pursuant to any promises made to you by anyone on behalf of the United States government?
A. No, I'm not.
Q. You have just under three years remaining on your incarceration.
A. Right.
Q. What is your understanding of the best hopes you might have of receiving any benefit for any behavior as a citizen in connection with this matter?
A. Well, my understanding is that the U.S. Attorney's Office in Iowa may contact the U.S. Attorney's Office in Arizona and let them know that I've been cooperative. And then the U.S.

Attorney's Office in Arizona may or may not decide to file a motion for a sentence modification. And if they do, it will be

up to the judge in Arizona as to whether or not I get any modification or how much it will be.

Q. That's the procedure in the federal system for a sentence reduction.

A. Yes, I believe so.

Q. And it involves a motion and a hearing and a decision by the court.

A. Right.

Q. And that needs to be a motion by the prosecutor who prosecuted you for the sentence that you're currently serving.

A. Yes.

Q. Somebody in Arizona apparently.

A. Yes.

Q. Any such motion been filed?

A. Not that I'm aware of.

Q. And you're presently less than three years away from discharging your sentence.

A. That's correct.

Q. During your years behind bars, Mr. Ferguson, did you ever serve any time in the United States Penitentiary, Florence, Colorado?

A. Yes, that's where I began this -- serving this particular sentence in June of --

Q. Tell us approximately what period of time that included.

A. I got to Florence in about late June of 1998 and left there

I believe in October of 19 -- of 2001.

Q. During that time you spent in Florence, did you meet the defendant in this case, Dustin Honken?

A. Yes, I did.

Q. Describe how you met Mr. Honken.

A. Well, Dustin was working as a clerk for the chaplain. I would go up there to do my yoga and meditation, stuff like that, and that's where we met, started to get acquainted with each other.

Q. Approximately how often would you see him under those circumstances if you recall?

A. Oh, at least once or twice a week if not more often. I was going up there pretty regularly.

Q. And that connection was through a mutual interest?

A. Well, Dustin was kind of interested in learning some yoga, so we talked a little bit about that, and him and I and some other guys did a few sessions together.

Q. Did your acquaintance with Mr. Honken grow at any point?

A. Well, yes. We became more well acquainted I guess you would say, you know, as we talked and had classes together, and then eventually I moved into the same housing unit that he was in at Florence probably about three months after I got there.

Q. How'd you happen to get into that housing unit?

A. Well, he mentioned that it was a nonsmoking unit and, you know, it was quieter than most of the other units and stuff like

that, so that was an enticement for me because I wanted that kind of environment, so I put a request in to move over there, and within a few weeks I had been approved to move.

Q. That's bravo B?

A. Bravo B, yes.
Q. The nonsmoking unit.
A. Right.
Q. After moving to bravo B -- and let me just ask, approximately when, if you recall, was it that you moved to the BB unit?
A. I think that would have been September or October of 1998.
Q. I assume you'd have had more contact or at least the possibility of more contact with Mr. Honken beginning at that point?
A. Well, yes, because we lived in the same housing unit. We had more opportunity to see each other and to talk.
Q. Did you become better acquainted with him during that period of time?
A. Yes, I did. We spent more time together.
Q. Mr. Ferguson, did you join any organized groups of which Mr. Honken was a member?
A. Well, a few months after I had moved into that unit -- actually almost immediately after I moved into the unit, Dustin asked me to come up to the chapel to go to some services with him, and I declined for several months, and then I decided to

♀

1918

start going, and so we went to some of the meetings, and I became active with the group up there.
Q. Can you tell us the names of any other members of that group?
A. Well, there was me and Dustin, John Hunter, Joe Dougherty, Mike Llorente, Neel Huffman, Artie Dufur. Right offhand, I don't recall any other names, although there were several -- if I thought about it for a minute, I could probably come up with

some more.

Q. Dufur, Huffman, Llorente, Dougherty, Hunter, Honken, and yourself.

A. Yes.

Q. Among others.

A. Among others.

Q. And while participating in those group meetings, did you continue to become better acquainted with the defendant, Mr. Honken?

A. Well, yes. Over the probably year or so that I was going to those meetings, we talked more, had more opportunity to see each other.

Q. And these would be conversations that included conversations I assume with Hunter, Dougherty, Llorente, Huffman, and Dufur?

A. Well, yeah. We all had sort of a -- most of us lived in the same unit. I don't think Llorente and Huffman did, but the

♀

1919

rest of us did, and so we got together more frequently.

Q. And let me ask you this. Just as a general matter, I think in society as a whole people often associate in cliques or groups or associations. Is that true in prison as well?

A. Yes, yeah. You have certain people you hang around with that you know like your closer friends, and then you have your associates, acquaintances that are farther away that you don't know as well and other people you kind of know to, you know, say hi to but other than that you really don't know very well at all, so it's probably pretty much the same as being out in the -- out of prison.

Q. The same and different too; wouldn't you say, Mr. Ferguson?

A. Oh, yeah, it's definitely different.
Q. That's a dangerous environment.
A. Well, yeah. Even though you can be friends with someone, you still never know who's going to be your enemy from one minute to the next. You could be friends with a guy one day and end up stabbing him the next, so -- it's not funny, but that's kind of the way it is.
Q. Nevertheless, associations within prison can be a source of protection.
A. Oh, yes, yeah.
Q. And you were affiliated with Mr. Honken and a number of others whom you've mentioned.
A. Yes.

Q. Mr. Ferguson, I want to direct your attention to a point in time where you learned that some bodies had been discovered in Iowa. Do you remember that, sir?
A. Yes, I think that would have been -- it seems to my recollection that it was early in 2001, but it could have been late in 2000, but I was watching news on CNN, and they have a little ticker that goes across the bottom of the screen, and I was reading that, and it said there had been -- I believe it was four bodies had been uncovered that were -- had been missing in connection with a drug case in Iowa from the 1990s.
Q. Now, before I ask you the next question, you mentioned -- you were estimating some dates for us. When you're doing years and years in prison, is it a little more difficult sometimes to keep track of the days, the months, the years?
A. Well, yes, it is. Every day is much like the one before, so you almost live the same day over and over and over again.

And sometimes they all just blend into one. So it's hard to keep track of a lot of things, especially if you're not really trying to keep track of it, you know. It's just things happen and people come and go, and sometimes it just -- sometimes my birthday's gone by and I haven't even realized it.

Q. Mr. Ferguson, I want to direct your attention to the time in which you saw that ticker going across the screen on CNN. Did the fact that bodies had been discovered in Iowa pique your interest, sir?

A. Well, it did because I knew that Dustin had been concerned about that very issue. There was the possibility -- the probability that some people that had been missing in connection with his drug case were about to be discovered where they were at.

Q. Up until that time, had he made any comments, either direct or indirect, about persons missing in Iowa?

A. Well, at one time he did say that he had been under investigation for witness tampering and that the witnesses had been permanently tampered with and wouldn't be testifying.

Q. When you saw that ticker running across the bottom of the screen on CNN, what did you do, Mr. Ferguson?

A. I went and told Dustin what I seen, let him know that it was on the news, and he went down -- asked me what channel it was and everything, and I told him what I had seen as close as I could remember what it was word for word, and so then he went down to the TV room and --

Q. Did he do that immediately?

A. Within a very few minutes.

Q. Please proceed.

A. And then I didn't go with him, so I can only assume that he stayed there and waited for it to come up again.

Q. I just want to know what you know and what you observed.

A. That's -- he went down there, but beyond that, I don't know what -- if he stayed long enough to see it again or not.

Q. He showed an interest in the matter when you brought it to his attention.

A. Yes.

Q. And he went to the TV room.

A. Right. He perked right up, asked me what I'd seen, specifically what they'd said, and I told him, and then he -- we parted company right after that.

Q. Did that event cause any change in Mr. Honken's mood or behavior to your observation, sir?

A. Well, he became more concerned about what was going on in Iowa with his case and everything. His girlfriend had apparently provided the map that led the authorities to the bodies, and at this point now he's been -- just a matter of time before indictment comes down is what he's looking at.

Q. He had more concerns at that point.

A. Yes, yeah.

Q. Did you ever discuss those concerns with him, Mr. Ferguson?

A. Well, at one time I did ask him -- this was after I think we'd discovered that another inmate was providing information against him, and I asked him how he got himself into this situation. I just said, you know, You're a smart guy. I don't understand how this -- how this all came about.

Then he explained to me that him and his girlfriend Angela had concocted a ruse to get the guy involved -- I don't

know what his name was -- to come with her to a meeting with

Dustin in order to try to get him to maybe back off his testimony or to recant or to somehow mitigate what he was doing to Dustin. But the plan was that when she brought him to wherever Dustin was that Dustin was going to kill him and then instead of doing that she brought him and the whole family and at that point Dustin felt like -- they felt that there was -- that they had no choice because she'd already kidnapped all these people and their kids.

Q. Indicate he had no choice but to do what?

A. But to kill them.

Q. Everybody.

A. Yeah.

Q. What were the circumstances of that conversation, sir, to the best of your ability to where you were, who was present, and what you were doing?

A. Well, that particular conversation I think was right after he'd gotten his indictment I believe, and we were just standing out on the tier. The cell block has two floors, and on the second floor is just a walkway, a little mezzanine with a rail around it, and so we were standing out there talking, and that's when I asked him about the -- how he'd gotten himself into that situation, and it was just me and him talking at that time.

Q. Those comments were in response to you asking how he as a smart guy could end up in a situation like this.

A. Right.

Q. Did you make any notes of that conversation?
A. No, I didn't. I wasn't keeping track of any of the --
Q. Did you have any indication or expectation or intention whatsoever of ever doing anything with that information?
A. Not at that time, no.
Q. You were simply asking.
A. I was -- just out of curiosity and wondering how all this came about.
Q. How your friend could have got in that situation.
A. Right.
Q. And you're telling us today what you recall of that conversation those years ago.
A. Yes.
Q. Mr. Ferguson, during the period of time that you were associating with Mr. Honken and his friends Dufur and Dougherty and Hunter, were there ever in your presence any discussion of escape plots?
A. Well, not with --

MR. PARRISH: Objection. Relevancy and 403, Your Honor. I believe I might have made that prior to this, but I just wanted to make sure. But I believe I had made it preliminarily.

THE COURT: Overruled.

MR. PARRISH: And we'd ask for a date as to the time for purposes of perfecting the objection that the discussion

took place.

BY MR. MILLER:

Q. Mr. Ferguson, let me ask you this question. And again, I don't want you guessing about anything, sir, but to the best of

your ability if you can tie this information to any particular time frame or time period, approximately when did this occur?
A. This would have been in the late spring and summer of 2001. I don't remember exact date or month. I couldn't tell you.
MR. PARRISH: Then my objection, Your Honor, would be relevancy, 403, and ask the Court to consider the date and time given in the question, response.
THE COURT: The objection's overruled. You may answer.
BY MR. MILLER:
Q. Mr. Ferguson, please go ahead and describe such conversations as you recall them.
A. Well, as I recall, it really wasn't one specific conversation, but there were a couple of -- two or three over that period of time where Dustin had mentioned the possibilities of which jails he might be held in in Iowa while he was going to trial and --
MR. PARRISH: Your Honor, I hate to interrupt, but may we get the limiting instruction to the jury on that specific point, please? Thank you.
THE COURT: You know, why don't I just go ahead --

1926

it's time for our afternoon recess anyway. Members of the jury, we'll be in recess until about 3:05. Thank you.
(The jury exited the courtroom.)
THE COURT: Please be seated. Mr. Parrish, just with regard to the time frame, the witness says the conversation took place in 2001, but the 19th overt act in furtherance of the conspiracy says up until he was transferred from Florence, so that's why the time frame doesn't have any impact on my ruling.

I just wanted you to understand.

MR. PARRISH: I understand that, Your Honor, and I think you had brought that up when we approached, but I thought with Mr. Vest, I think he said sometime in 2000. I wanted to make sure that my objection was perfected under 2001 discussion which I think could arguably be a second escape plan separate from the one that Mr. Vest had alleged had been discussed since they were now -- Mr. Vest was now gone.

THE COURT: You know, it could be a variety of things. It could be totally wrong on the dates. It could be a separate plan, but anyway, it's covered by a broad interpretation of the 19th overt act in Count 7 which talks about from 1998 until the defendant was transferred from Florence. So that's just my rationale.

MR. PARRISH: Okay.

THE COURT: I don't expect you to agree with it, but I just wanted to explain it.

♀

MR. PARRISH: I just wanted to make sure I was protected on the dates on that.

THE COURT: You bet.

MR. MILLER: And, Your Honor, we have no objection to the limiting instruction.

THE COURT: Okay. Just remind me. I'll make a note here to give the limiting instruction regarding Count 7 when we bring the jury back in 25 minutes or so; okay? Thank you. We'll be in recess.

(Recess at 2:42 p.m.)

THE COURT: Ready to have the jury brought in?

MR. MILLER: Yes, sir.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

BY MR. MILLER:

Q. Mr. Ferguson, before the break you described generally a conversation that you had on the range with Mr. Honken after you asked him how he got himself into that situation and mentioned among other things that he felt he had to kill everyone present on the one occasion. Did he, during that conversation, in any way attempt to justify his behavior in killing children?

A. Well, he -- the justification was that the guy who had been providing information against him, I think he said something

like, This is all your fault; this is what you get for trying to take me away from my family, and now I'm going to take you and your whole family away.

Q. Now, this was a conversation that occurred several years ago.

A. Yes.

Q. You weren't making any notes of it.

A. No.

Q. And did not at that time have any intention whatsoever of ever repeating it to law enforcement.

A. That's correct.

Q. Nevertheless, to the extent that you can, were there any other details that you recall?

A. Well, there were several conversations over the period. And another one I specifically asked him, he was talking about having gotten his indictment and the government seeking the

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1684 of 3636

death penalty, and at that time I asked him about the ages of the kids. I said, How old were the children? And he said they were five and eight. And I said, Well, if anything gets --

Q. I don't need to know what you told him.

A. All right. Yeah, that's what he said.

Q. Any other specifics as far as any description of the children other than the ages to your recollection?

A. Just that it was a boy and a girl.

Q. Any other description to your recollection of what was done

with the bodies?

A. There were -- there was some reference made to having stuffed them in barrels and buried them. Beyond that, I don't know what they did with them.

Q. But that's your best recollection.

A. Yes.

Q. Now, right before the break I was directing you to the subject and the area of discussion of some escape plot or escape plots; is that correct? And as far as time frame, that was in approximately what time, sir?

A. Well, the -- primarily in the spring and summer of 2001.

Q. Okay. Thank you.

MR. MILLER: Your Honor?

THE COURT: Members of the jury, before we get to any testimony about alleged escape plots or plans to kill witnesses, I'm going to give you essentially the same limiting instruction that I gave you with Mr. Vest.

The testimony that you're about to hear that may discuss various escape plots and escape from custody and plots to kill witnesses and others involved in the prosecution of this

case, that testimony is only relevant on Count 7 of the indictment. It's not relevant on any other matters in the indictment.

BY MR. MILLER:

Q. Mr. Ferguson, was this a single conversation or a number of

conversations?

A. Are you referring to the escape?

Q. Yes.

A. There were several, several conversations in which --

Q. In what settings?

A. Mostly in the housing unit. Some were probably out on the tier up against the rail, and there might have been one or two inside one of the cells.

Q. And who were the parties to these conversations?

A. Generally it was just myself and Dustin. I don't recall ever having had any conversations specifically about his case in the presence of anyone else.

Q. Describe for us if you would, please, what Mr. Honken told you with regard to an escape plot.

A. Well, he'd talked about the -- some of the jails up around Cedar Rapids and the neighboring counties and what type of set-up they had and how they could -- possibly might effect an escape by maybe taking control of the guard control room and making their way out from there with help. He talked about how he had been trying to learn techniques of avoiding search parties and stuff like that so that he could, you know, better -- have a better chance of escaping, getting away.

Q. Mr. Ferguson, if I can interrupt you briefly, you mentioned that he felt he could escape with help. Did he indicate from

whom he might be able to obtain help?

A. Well, he did say at one time that he had been working on something with Artie Dufur and John Hunter about the possibility of getting those guys brought to Iowa under subpoena to help him with his defense and then taking advantage of any opportunity that might have come up.
Q. Mr. Ferguson, did Dustin Honken relate to you any plans should his escape attempt succeed?
A. Well, specifically what he said was that he wanted to get out and kill some more people and shoot their kids in their fuckin' face is the --
Q. Shoot who?
A. Shoot their children in their fucking faces is what he said. He didn't care how long he was out or whether he'd gotten caught or not as long as he could do that.
Q. What sort of demeanor or mood was he displaying when he made these sorts of comments?
A. Well, it was serious, the kind of anger you would display at the thought of someone, you know, working against you or trying to, you know, ruin your life, that type of thing.
Q. Anger.
A. Yes, anger.
Q. Mr. Ferguson, did Dustin Honken at any point seek to enlist your participation in any plan or plot to assist him in thwarting the prosecution?
A. Well, at one time he did. We were having a little

conversation on the -- leaning up against the rail there on the

tier and just talking about nothing in particular, and he asked me at one point if I was interested in making some money, and I told him, Well, yeah, I'm always interested in making a few dollars and asked him what he had in mind. And at that point he said that we should go inside one of the cells. So we went in my room.

Q. I'm going to interrupt you now just a second. In order to get you context for this, where was the initial part of the conversation, sir?

A. This would have been out on the mezzanine, what we call out on the tier leaning up against the rail.

Q. Are there opportunities to make money as a prisoner at USP, Florence?

A. Well, yeah, you can do a lot of different things. Guys have a lot of different hustles. We had been involved in some -- making alcoholic beverages and distilling the alcohol out of the wine and selling that, different things like that. Other guys have different hustles they do.

Q. Okay. Hustles. I assume there are rules against these hustles.

A. Well, yeah, it's things that aren't allowed by the institution but we do anyway to --

Q. Not terribly unusual nevertheless.

A. No, it's fairly common. I mean, everybody -- not everybody

but a lot of guys have just different things they do, whatever it might be.

Q. I inferred from your comment that you've participated in a hustle or two over the years as a prisoner in the system.

A. One or two, maybe three.

Q. Maybe four.

A. Possibly.

Q. He invited you to move the conversation to another location?

A. Yes. At that point, he said, Well, let's go inside, meaning into one of the rooms. So as we were standing out in front of my room, we just went in there and sat down, so I asked him what was on his mind. He said, Well, I want you to -- would you be willing to try to go up to Wash -- I mean to Iowa and kill one of those rat bastards for me, and we talked about that for a minute. I said, How would I -- what's on your mind about how I would get up there? And he said that the way he was thinking was that I would be able to somehow contact the prosecutor's office and get myself brought to Iowa under the guise of providing information against him and then having done that to seek out one of these guys, namely Tokars, McIntosh, or Vest, and kill one of them, and so we talked about how that might be accomplished.

And one of the ideas was to take some heroin with me and give -- since Steve had done some heroin, give him some of

it and then possibly give him an overdose or to instigate a fight with him or one of the other guys and then claim self defense.

And another possibility was that we might find someone else there or I might find someone else there in the jail that I could start trying to manipulate them into attacking this guy, one of the witnesses.

Q. Is that something that can be done inside the correctional system?

A. Well, yeah. Sometimes -- you get a lot of guys, you know, if you can whisper in their ear and say so and so's a rat and he's no good and we gotta take care of him and stuff like that, some guys are a little on edge emotionally or they're -- they're just plain nuts and maybe you can manipulate them into doing stuff like that for you. It happens.

Q. And this business about heroin, I would assume heroin is a contraband even more so than fermented orange juice.

A. Yes. It's illegal, but it's there.

Q. It can be found inside our federal prison system?

A. Yeah, yeah. It's a lot more expensive than what it is out on the streets, but it's available if you've got the money for it.

Q. The effort to keep contraband out of our prisons is one of the major challenges.

A. (Witness nodded head.)

♀

Q. What did he -- you mentioned that this was a money-making opportunity for you. Can you describe that for us, sir?

A. Well, yes. He said he would pay me $10,000, and so I asked him how he planned to do that, and he said that the mother of his son had a house that he could get her to mortgage to cover the expense.

Q. How -- he wanted you to kill one of those rat bastards?

A. Yes, primarily Steve Vest was the one that we were primarily talking about. I think he felt a greater sense of betrayal over him than the other two.

Q. He'd been closer to Mr. Honken?

A. Yes.

Q. Did -- or how did Mr. Honken expect to benefit from the

killing of only one of those three rat bastards?

A. Well, just to send the message that they could be gotten to, that the other ones might reconsider what they were doing.

Q. How did you respond to Mr. Honken's request or suggestion?

A. Well, after we talked about it a little bit, I -- I knew as soon as he asked me that I wasn't going to do it, but we talked about it anyway, and I told him that the only -- the only scenario I could see that might have a chance of success would be the one where I instigated the fight myself and that the best thing I could hope for out of the deal would be a manslaughter charge and because at that time I only had six years left, I really wasn't into doing it.

♀

1936

Q. This was three years ago.

A. Yeah, this was three years ago.

Q. Back when you had six years left as opposed to the less than three you have now.

A. Right.

Q. And so you declined.

A. Yes.

Q. And he found that understandable given the fact that you were a short termer.

A. Right, yeah. We talked a minute more about it, and he had mentioned that he'd talked to a couple other people about it, but beyond that, we didn't have any further conversation about me actually doing it.

Q. Mr. Ferguson, at some point you decided to contact federal authorities; is that correct?

A. Yes.

Q. When?

A. I had been thinking about it. During that summer it had been on my mind because of some of the things he was talking about doing with the escape and all. But I didn't actually do it until late August of 2001.

Q. Why did you wait?

A. I didn't feel like I would be safe in doing it because I didn't feel like there was any way to contact you guys without someone finding out because the mail wasn't secure and the phone

calls are monitored. It's just -- my own safety would have been in jeopardy had I done anything like that.

Q. What happened that changed that situation?

A. I had to go to court in Denver to testify in another matter on behalf of an inmate who was being sentenced on an escape attempt. And I took that opportunity to write the letter and have it forwarded through his attorney to your office.

Q. This is something you did while you were away from the -- from Florence.

A. Yes.

Q. And so through that attorney you got a letter to the U.S. attorney for the Northern District of Iowa?

A. Yes.

Q. And, Mr. Ferguson, what was your reason for making that contact?

A. Well, primarily it was because of the fact that Dustin was talking about killing these other kids. I was bothered by the fact that he had killed the other -- the original two children, and he kept talking about with his escape plans and stuff about getting out and killing other kids, and that kind of -- it didn't really set well with me, you know, as far as the

possibility of him actually succeeding. I thought there might be a chance of him doing it. And I also kind of felt like that if he did do it, then I would bear some responsibility myself because of the knowledge that I had and not doing anything about

it.

Q. The blood of those children would be on your hands.

A. To some extent, yes. And I couldn't see myself sitting by and just letting that happen.

MR. MILLER: No further direct, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: Thank you, Your Honor. May it please the Court and counsel.

MR. MILLER: Counsel.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. You really get heroin inside of the prison down in Florence?

A. Oh, yeah, absolutely.

Q. And you get needles?

A. Homemade needles. They -- if a guy wants heroin badly enough, he'll find a way to get it in his system.

THE COURT: Mr. Ferguson, could we get you to either lean a little bit forward into the microphones?

THE WITNESS: I'm sorry.

THE COURT: Thank you. You're doing a good job of scooting that chair up.

THE WITNESS: Thanks. How's that?

THE COURT: Much better. Thank you.

BY MR. PARRISH:

Q. And you and Mr. Vest -- is that Steve Vest, the gentleman who just left here -- would do heroin out in the prison in Colorado?
A. He was known to. A lot of guys were known to. I never did any with him myself if that's what you're asking.
Q. And heroin; right?
A. Heroin.
Q. In the institution?
A. In the institution.
Q. You did too?
A. Yeah, I've done heroin in prison before.
Q. Out in Colorado.
A. Yes, and bought it in prison. Well, no, I didn't do it in Colorado, no. In Arizona in federal prison.
Q. Mr. Honken too?
A. I'm not aware that Honken did any heroin.
Q. I'm going to show you what is marked as Defendant's Exhibit
Q. I want to ask you, were you and Mr. Gibson ever roommates?
A. Pat Gibson?
Q. Yes.
A. Yes.
Q. Okay. I'm going to show you this first. It should be popped up on your screen right in front of you to your right.
A. Okay. I see it.
Q. All right. You see where -- oh, thank you. Where you see

Mr. McIntosh and Mr. Vest were roommates at one time; is that

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1694 of 3636

right?
A. I really couldn't say. I don't know.
Q. All right.
A. I don't remember if they were or not.
Q. But all you know is you and Mr. Gibson were roommates; is that correct?
A. Yes.
Q. So if I showed this to you right here -- I want to make sure you take a look at this document, Defendant's Exhibit Q -- if I wrote your name in here, Ferguson, F-e-r-g-u-s-o-n?
A. Yes.
Q. And I'm going to go back and put it on the board, and would you tell me whether that's accurate on Defendant's Exhibit Q, that you and Mr. Gibson were roommates for some period of time?
A. It's accurate that Mr. Gib --
Q. Do you know how long and what year you might have been roommates with him? And I know you indicate dates are a little bit difficult. But could you tell me whether or not it was in the year 2000?
A. No.
Q. Okay. What year was it?
A. We were roommates from approximately September or October of 1999 until March or April of 2000. Yes, I guess it would be 2000 then.

Q. March or April of 2000?
A. I'm sorry. I misspoke. 1998 to 1999.
Q. What month in 1999? Do you know?
A. March or April.
Q. Okay. And that would have been in bravo B; is that right?

A. Yes.
Q. And did you know Ron McIntosh at all?
A. I knew him -- yes, I knew him.
Q. And did you know Steve Vest?
A. I knew Steve, yes.
Q. Did you know Wayne Byerly?
A. Yes, I did.
Q. Did you know John Swanson?
A. Yes.
Q. Did you know Gerald Plunk?
A. Yes.
Q. And you also indicated, did you not, that you knew Dustin Honken?
A. Yes.
Q. Were you roommates with LeBaron?
A. No.
Q. What about Stier?
A. Artie Stier, yes.
Q. Stier?
A. Yes.

1942

Q. I didn't see this, but you said you had nine bank robbery convictions?
A. Well, I've had -- on the indictments I believe there were nine counts.
Q. Oh, okay. Nine counts of all separate bank robberies?
A. Something like that, yeah, nine, but there were two separate indictments.
Q. Oh. But you never killed anybody; right?
A. No.

Q. Okay. It was just Mr. McIntosh who had killed somebody and Mr. Vest and who was the other person? Mr. Tokars? Did you know Fred Tokars?
A. I have no idea about them killing anyone.
Q. Oh, okay. You never knew that before today?
A. Not until just now.
Q. And you knew them for how many years?
A. Well, McIntosh left I'd say within a year after I got there. Steve Vest I probably knew for a couple years. LeBaron, the whole time I was there, three and a half years.
Q. Okay. We're just talking right now about Mr. Vest, Mr. McIntosh.
A. Okay. I knew McIntosh for a year or less I would say.
Q. What year?
A. That would have been from September or October of 1999 until he left.

1943

Q. In March --
A. Excuse me, of 1998 until he left I believe in March or April of 1999.
Q. Are you sure he left in '99? Could you have been confused about those dates? And if you are, that's fine. If you believe you're pretty accurate, that's fine too.
A. I believe that's correct, 1999.
Q. So you think Mr. McIntosh left Colorado in 1999.
A. I believe so, yes.
Q. All right. What about Mr. Vest? When do you think he left?
A. He left in 2001. That would have been about April.
Q. So you don't think he left until April of 2001; is that

right?
A. That's correct.
Q. Okay. Now, do you think possibly you might be mistaken about both of those dates?
A. If I am mistaken, it's not by much.
Q. You think you've been off by a whole year?
A. No.
Q. Now, what about the CNN report? When did that come on?
A. To the best of my recollection, that would have been -- and I'm just going to give you a vague time period of late 2000 or early 2001.
Q. All right. Do you think it might have been 2000, somewhere

1944

about November? Would that surprise you at all or even October of 2000?
A. That could be correct, yes.
Q. All right. Prior to October of 2000, had you ever discussed with Mr. Honken his pending case or potential pending case?
A. Prior to October of 2000?
Q. Yes, sir?
A. Yes.
Q. You had?
A. We had talked at one time about -- he asked me to write a letter for him to his girlfriend because she was sitting in jail, and this was prior to the bodies having been discovered.
Q. And this would have been prior to October of 2000; is that right?
A. It could have been October or maybe slightly before that, yes.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1698 of 3636

Q. All right. And did you know at that time if Mr. McIntosh and Mr. Honken were together?
A. Well, I think McIntosh left before then.
Q. Okay. What about with Mr. Tokars? Did you know a Fred Tokars?
A. I knew -- yes, I did.
Q. Did you see Mr. Honken and Mr. Tokars together during that time?

A. They talked occasionally, but they -- to the -- I didn't notice that they had any real close relationship.
Q. So from what you observed, you never saw Mr. Tokars and Mr. Honken in any close relationship? Is that your testimony?
A. That's what I would say, not in a close relationship. I think there might have been some legal -- that Tokars had been helping him at one point with some legal stuff, but on a personal relationship, no.
Q. Do you know when?
A. Well, Fred left in -- he left early. He left before McIntosh did, so it would have been -- it would have been late '98.
Q. So if he left before McIntosh left, McIntosh you said left in 1999.
A. I believe so, yes.
Q. So Fred Tokars left before McIntosh left.
A. To my recollection, yes.
Q. You think as early as 1998.
A. That's possible, late '98.
Q. Okay. So then when the news came out on CNN according to you when you advised Mr. Honken at some point about some news

coming in from Iowa, that would have been October of 2000. According to your best recollection, Mr. Tokars was not there, nor was Mr. McIntosh there; is that accurate?

A. Yes, it is.

Q. And you would say you never saw Mr. Tokars engage in any conversation with Mr. Honken in the year 2000; would that be accurate?

A. Yes, that would be accurate.

Q. And after this newsletter came out -- not the newsletter but the CNN news report came out, from that point forward -- that would be October of 2000 forward -- you never once saw Mr. Honken with Mr. Tokars, nor did you ever see him with Mr. McIntosh; would that be accurate?

A. Yes, it is.

Q. Now, let's talk about observation that you made between the gentleman who you said was using heroin there, a gentleman by the name of Mr. Vest.

A. Yes.

Q. Did you know Mr. Vest was in prison for conspiracy to distribute drugs?

A. No, I didn't.

Q. Did you know any reason why he was incarcerated?

A. I seem to recollect that there was a homicide involved in his case, but other than that, I don't know anything about it.

Q. Did you know he was serving at that time four life sentences without the possibility of parole?

A. That sounds right, yes.

Q. Did you see Mr. Vest -- and this is the time period we're talking about. We're talking about the time period where you

say Mr. Tokars was gone, Mr. McIntosh was gone. Did you see Mr. Mac -- I'm sorry, did you see Mr. Vest from the time the CNN report came out which would have been about October according to your best recollection up until December with Mr. Honken? That's Mr. Vest with Mr. Honken.

A. Yes.

Q. You did. What if I -- okay. Tell me when you saw them together.

A. Well, they were roommates for a while if I recall correctly.

Q. Well, do you think they weren't roommates until 2001?

A. That's possible, yes.

Q. Well, I want your best recollection. Don't just agree with me because I asked the question.

A. Okay. My best recollection is that it could have been late 2000 or early 2001 when they became roommates.

Q. So you think they may have been roommates in December; is that right?

A. That's possible, yes.

Q. Now, you notice on that chart I gave you there was a fella named John Swanson on that chart.

A. Yes.

Q. Now, Mr. Vest moved in with Mr. Swanson, is that right, at some point?

A. No, Mr. Swanson was living with Mr. Honken, and then he

went to the hole.

Q. Ah.

A. And got transferred.
Q. Exactly. So when did Mr. Honken go to the hole?
A. Mr. Swanson went to the hole.
Q. Mr. Swanson went to the hole.
A. That's who we're talking about, isn't it?
Q. We're talking about Mr. Swanson and Mr. Honken. Mr. Swanson went to the hole?
A. Yes.
Q. Okay. When did Mr. Swanson go to the hole?
A. It would have been just immediately prior to him -- to Steve Vest moving in with Mr. Honken.
Q. Oh, okay.
A. That would have also been late 2000 or early 2001 because that's when they moved in together.
Q. Now, Mr. Swanson went to the hole for what?
A. I think he got into a fight.
Q. Hmm.
A. And went to the hole for that.
Q. And how long was he in the hole?
A. Well, I'm not sure because we never saw him again on that yard.
Q. Oh, okay. Mr. Swanson then goes to the hole. Mr. Vest moves in with Mr. Honken.

1949

A. Yes.
Q. And you never see Mr. Swanson again. Is that your testimony?
A. Not that I never see him again, but I never saw him there again.
Q. In bravo B.

A. In Florence, at USP, Florence.

Q. That's what I meant. You never saw him in Florence again; is that right?

A. That's correct, yes.

Q. Okay. So now there Vest is roommates with Mr. Honken, and this would have been in December of 2000; is that right?

A. To the best of my recollection, yes.

Q. And how long do you remember them being roommates?

A. I'm thinking three or four months.

Q. Okay. And in those three or four months that they were roommates, would you agree that the cells are pretty much a one-on-one cell where the -- when I say one on one, two people living within the cell with bunk beds, one on top of the other. Would that be accurate?

A. Yes.

Q. And the legal files are also in those cells; is that correct? People keep their legal files?

A. Some people do. There's another place they're kept also.

Q. And would you agree that after the CNN report came out, it

became common knowledge that Mr. Honken had what you call a live case or a current case going?

A. I think it was probably common amongst those who knew him.

Q. You mean it wasn't common throughout bravo B that he had a live case and he needed witnesses and was preparing for --

A. I can't really testify as to what anyone else might have known or not, just the people I knew and he knew. I know they knew, but I don't know what anybody else knew.

Q. Well, let me just ask you, did you ever discuss this case with Mr. Vest?

A. No, I didn't.

Q. But yet you knew Mr. Honken and Mr. Vest, according to you at least, were roommates in December.

A. Yes.

Q. Did you ever discuss his case in December -- I'm sorry, in January with Mr. Honken of 2001?

A. That's probable. I can't say absolutely certainly that we did, but most likely something may have come up in that month about his case.

Q. Okay. Okay. And did you discuss it at all with Mr. Vest?

A. No.

Q. Were you ever in the room at any point in time in December when both Mr. Vest and Mr. Honken were in their room?

A. I'm sure I was.

Q. Okay. And what would be the purpose of your visit into their room in December?

A. Oh, we stop by each other's rooms all the time to ask about various things that are going on or to pass a few minutes' time or for any number of reasons.

Q. And Mr. Honken at that time had told you according to you -- and correct me if I'm wrong -- that he had killed children; is that right?

A. Not during any visit with -- where there was anybody else in the room, no.

Q. Well, when did he first tell you that he had killed some children?

A. This I think would have been after Steve left because --

Q. Oh. So he told you that he killed children after Mr. Vest left. Would that have been sometime in February of 2001?

A. That would have been the spring or summer of 2001.

Q. Not until the spring or summer of 2001.

A. To the best of my recollection, yes.

Q. Okay. And so for the first time Mr. Honken told you -- this would be almost a year after this CNN report had come out; would that be accurate? Getting into the spring and summer of 2001?

A. That would be --

Q. Say nine months later.

A. Several months later, yes.

Q. So it was at that point for the first time that Mr. Honken

told you he had killed someone; is that right?

A. Yes.

Q. Okay. And I take it that he told you he killed somebody and he killed five people at one time; is that right?

A. That's what I remember.

Q. Okay. And he told you these five people were all interrelated, is that right, in terms of family?

A. Well, he didn't give me any specific details on how the relationship was. It was the guy, his old lady, and the two kids. Beyond whether they were married, whether it was his kids and not her kids or both their kids, I have no idea.

Q. Well, he gave you the sex of the two children that he killed; right?

A. At another conversation, yes.

Q. Yeah, he told you one was a boy.

A. And a little girl.

Q. He killed a little boy; right?

A. Yes.

Q. How old was this little boy he killed?
A. I don't know.
Q. And he told you he also killed a little girl after he killed the little boy; is that right?
A. He didn't tell me anything in any particular order, who was --
Q. But he did say he killed one little boy and he killed one

little girl?
A. What he said was, We killed them.
Q. The little boy -- he didn't say --
A. The whole bunch of them.
Q. I'm sorry?
A. He never said that I specifically shot or killed anyone. He said, We killed them. That's --
Q. But he did make a specific reference to the sex of the people he killed.
A. Yes.
Q. Okay. One being a little boy and the other being a little girl?
A. (Witness nodded head.)
Q. Is that yes?
A. Yes.
Q. And what about the other three people?
A. The parents and it seemed like there was someone else involved, but I'm -- to be honest with you, I'm hazy on that.
Q. Okay. He killed the parents of the little boy and the little girl?
A. The people who I assumed were their parents, yes.
Q. Okay. And then he killed what -- who was the other person?

A. I'm not sure. I thought it was someone else involved with the case or that happened to be there at the time, but I don't know.

Q. So this other person just happened to be there at the time, and he killed that person or they killed that person too?
A. Well, he was -- to my understanding the other person was there when Angela went and kidnapped them and was there at the time and so was brought along with them.
Q. Okay. So Angela went and kidnapped all five of them.
A. That was my understanding, yes.
Q. And what did she do with all five of them after she kidnapped them? Where did she put them?
A. I don't know. She just -- all Dustin said was she brought them to where I was at.
Q. Okay. So Dustin told you in 2001 sometime about the summer after Mr. Vest was gone -- correct me if I'm wrong on this -- that he went out. He got Angela. Angela goes out, kidnaps five people, and brings the five people to where he is; is that right?
A. Essentially, yes.
Q. Okay. Does he say where he is when he does that?
A. No, he didn't.
Q. Okay. And then he says how he kills them?
A. Pardon me?
Q. Does he say how he kills them?
A. No.
Q. Oh, okay. And doesn't say how she brought them there to him; right?

A. No.
Q. Okay. And then he says that he kills them and he puts them in a barrel?
A. That was -- I think in a -- he did say that, that they had stuffed them in barrels and buried them, but that was in a different conversation.
Q. Okay. But nevertheless, sometime in 2001 -- and does he stuff all of them in the same barrel?
A. I don't know. He didn't say.
Q. But he takes the barrel, and does he say how he takes the barrel and buries them?
A. No.
Q. Now, you weren't on heroin at the time you heard this conversation, were you?
A. No, I wasn't.
Q. And this jail break that was supposed to take place, that was in Cedar Rapids, Iowa; is that right?
A. There or one of the surrounding counties.
Q. The surrounding counties of Cedar Rapids, Iowa?
A. Of Cedar Rapids, yes.
Q. Did you ever write a letter after you were there at one of the counties saying you're here at Benton County Jail for the marshals to do their magic?
A. Not that I recall.
Q. If you saw a copy of a letter like that -- what do you mean

1956

by the marshals do their magic? What kind of magic?
A. I have no idea.

Q. I'm going to show you what is marked for identification purposes only and see if it refreshes your recollection as to a letter you may have written. It's Defendant's Exhibit AF. And take a look at it. It's a Dear Bill letter. I'm sorry. Dear Bill letter. And do you see in the purple section I've marked on it? Does that, first of all, appear to be your handwriting?
A. Well, it does, yes.
Q. I'm sorry. You're going to have to bend down and talk to the microphone.
A. Yes, it does look like my handwriting.
Q. Pay reference -- reference the part I've put in purple. Does that letter refresh your recollection, sir? Are you still reading it?
A. I'm still reading it.
Q. Okay. Go ahead.
A. Okay. Yes, I --
Q. Just let me ask you, first of all, sir, now that you've read it, Defendant's Exhibit AF that's marked for identification purposes, does it refresh your recollection?
A. Yes.
Q. And did you say you were waiting for the marshals to do their magic?
A. Yes, I did.

1957

Q. And did you also say that it's been a nice break from your routine being in Benton County?
A. I did.
MR. PARRISH: Excuse me just a minute, Your Honor.
I'm sorry. Thank you, Your Honor.
Q. Do you recall by any chance when you wrote this letter?

A. Well, let's see. I was in that jail from just after Thanksgiving in 2001 until mid March, and so I probably wrote it I'm guessing February. I think that's when I wrote it, but I'm not certain.
Q. And you would agree that after you saw the CNN report you did have the opportunity to read some additional newspaper articles, did you not?
A. I saw one --
Q. Yes or no.
A. Yes.
Q. And where were these newspaper articles? Were they in general circulation around the prison? Strike that question. I'm sorry. Let me go back.
These newspaper articles that you read, were they related to Mr. Honken's case?
A. Yes.
Q. Would that have been in the year 2000?
A. No.
Q. 2001.

♀

1958

A. 2001 would be correct.
Q. And was that the first article that you had read with regard to Mr. Honken's case?
A. It would be the only article, but yes.
Q. Were you aware back in 2000 of other newspaper articles circulating around bravo B after the CNN news report came out? Yes or no.
A. No.
Q. Were you aware that Mr. Honken complained that he had some documents missing from his files?

A. Yes.
Q. Was it around the time that Mr. Vest was still there, or had Mr. Vest left?
A. I think he might have already left, but I'm not certain.
Q. Did Mr. Honken name for you the people who he thought had gotten access to his legal files and -- or persons and were, in fact, circulating them around the prison?
A. I had never heard that anything like that happened.
Q. Well, you indicated he talked about some missing papers being taken, and my question -- my follow-up question, did Mr. Honken ever complain to you that these papers were being circulated around bravo B or circulated around Florence?
A. May I say something to clarify?
Q. Just answer that question if you don't mind.
A. The answer is no.

1959

Q. To your knowledge did Mr. Honken ever find his legal papers that were missing or that he complained about were missing from his files?
A. No.
Q. Did you ever find them?
A. No, I didn't.
Q. Do you know of anyone who did, in fact, find them?
A. No.
MR. PARRISH: Thank you, sir. I have no further questions.
THE COURT: Mr. Miller?
MR. MILLER: Yes. Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. MILLER:

Q. Directing your attention to what's been referred to as Defendant's Exhibit Q, there's a line connecting you to Pat Gibson; is that correct?
A. Yes.
Q. And as I understand your testimony, that's based on the fact that at one point you were cellmates?
A. That's correct.
Q. If you were to draw a box and a line connecting you to a box with the name of every other roommate you had while you were in Florence, how many other boxes would you have?
A. None.

♀

1960

Q. None of them on the folks in that --
A. Oh, just all the other roommates I had?
Q. Sure.
A. Probably a half dozen.
Q. Who were those folks?
A. Well, I was roommates with Artie Stier and John Hunter and Charles Barbee and Richard Chandler. I was roommates with another guy for about a week, and I can't think of his name right offhand. There was actually two guys, two separate roommates that I was with for about a week, and I don't remember either one of their names.
Q. So if the flow chart were to list everybody with whom you were roommates while you were in Florence, it would also have a box for Artie Stier, a box for John Hunter, a box for Charles Barbee, a box for somebody named Chandler, and two other boxes of people whose names you can't recall.
A. Yes, that's correct.
Q. Another six boxes?

A. Right.
Q. And that'd be Stier?
A. S-t-i-e-r.
Q. And who else?
A. Charles Barbee.
Q. B for Barbee?
A. Right.

♀

Q. Hunter?
A. Hunter.
Q. Who else?
A. Chandler.
Q. And a couple unknowns.
A. And a couple of unknowns.
Q. And would that help complete the diagram if we were to show everybody with whom you were roommates at one point?
A. Yes.
Q. You mentioned to Mr. Parrish that at one point at Dustin Honken's request you wrote a letter to Angela Johnson. What's that about, sir?
A. Well, she had been arrested in connection with the witness tampering charges, and our thought was that the government was trying to put pressure on her by arresting her in order to get her to cooperate and that he'd asked several people -- I don't know who else, but he asked me to write a letter to kind of encourage her a little bit, to hang in there.
Q. Did you know the woman?
A. No.
Q. But on behalf of Mr. Honken you wrote a letter encouraging her to what?

A. Oh, just to hang in there and be strong.
Q. Not say anything to authorities.
A. Right. That's correct.

Q. That was pursuant to Mr. Honken's request.
A. Yes.
Q. And I assume you would have considered it impolite to refuse that request.
A. Oh, yeah. Being a friend and all, you do somebody a favor when they ask if it's not too outrageous.
Q. Did you write or sign anything else at Mr. Honken's request in connection with this case?
A. I seem to vaguely recall signing something to the effect of maybe Tokars and McIntosh being snitches or something like that.
Q. A document or affidavit prepared for your signature by Mr. Honken?
A. If you'll forgive me, I'm feeling a little bit ill right now. Do you think we could take a short break?

THE COURT: Sure.

Members of the jury, I think what we'll do is just wait a few minutes and see whether or not we can continue and finish up with this witness today or whether or not we'll send you home and finish up with the witness first thing tomorrow morning. So why don't you just -- you can take a stretch break if you'd like.

Members of the jury, I'm going to go ahead and send you home for the day. So we will see you tomorrow morning at 8:30. Please remember my cautionary instruction about keeping an open mind until you've heard all of the evidence in the case,

had a chance to receive my final instructions, hear the closing arguments of the lawyers, and, most importantly, go back and review the exhibits and deliberate with your fellow jurors. We'll see you tomorrow morning at 8:30. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated. I did have a brief conversation with one of the U.S. marshals, and it was reported to me that he was throwing up violently in the little witness room there, so that's why I decided to send the jury home.

MR. PARRISH: See, if that had happened during my cross-examination, I would never live that down.

THE COURT: That's right. But, see, it's just -- timing's everything, and now it's that -- it's all Mr. Miller's fault for his redirect. I've never seen a redirect have such an effect on a witness before, but there's a first time for everything.

MR. ROGERS: I think what Mr. Miller did with our diagram is what did it.

THE COURT: Could be. Could be. Theories abound.

So let's just talk about a few things. I would like the government to go through the defense exhibit list and do the same thing that they did with yours. That should come as no surprise; right?

MR. WILLIAMS: Yeah. Your Honor, actually while Mr. Miller had one of his witnesses up, I was doing that today.

1964

I will run it by Mr. Miller tonight, but we should be able to get a response to the defense and to the Court by tomorrow.

THE COURT: Okay. Great. What about your witness

list?

MR. PARRISH: Oh. Did you see it in the inside pocket?

THE COURT: Oh, I'm sorry.

MR. PARRISH: Just check your --

THE COURT: There's a witness list in the exhibit book?

MR. PARRISH: Yeah, look at the inside book. It ought to be there.

THE COURT: There it is. Thank you.

MR. PARRISH: As you know -- and I was talking with the marshal's office -- we're still working on it. We had a meeting early this morning, and so we'll try to keep working on that as time goes on.

THE COURT: That's great. Thank you.

MR. PARRISH: And the exhibits right next to it will show which exhibit they may refer to.

THE COURT: Right. I see that, that it's coordinated by witness to exhibit, and I appreciate that.

We have proposed penalty phase instructions, and those were going to be I think Wednesday. How are we coming? Mr. Rogers, is Wednesday realistic?

1965

MR. ROGERS: Wednesday is realistic.

THE COURT: Okay. Good.

MR. ROGERS: I don't have a whole lot of witnesses between now and then, so I should be able to get it done.

THE COURT: Okay.

MR. ROGERS: If it turns --

THE COURT: And I know, Mr. Parrish, you wanted to

meet with me on a CJA budget matter.

MR. PARRISH: Right, Mr. Spies and I, yes, Your Honor, if we could.

THE COURT: Okay. And could we do that tomorrow morning?

MR. PARRISH: Sure. Absolutely.

THE COURT: Okay. So why don't we do that tomorrow morning at like a quarter to eight or so. Would that be okay?

MR. PARRISH: That's fine.

THE COURT: Anything else?

MR. WILLIAMS: Yes, Your Honor. A few things, just housekeeping, to let you know where we are on some things. You had asked earlier about the witnesses and whether we're not calling some of those people and so forth. The remaining witnesses we have tomorrow -- and I've got a -- we've actually provided this list to defense already. Lori Lewis will testify.

THE COURT: Can you give me the numbers here? Where are we?

MR. WILLIAMS: 23.

THE COURT: Oh, okay.

MR. WILLIAMS: We called her before, but we also indicated we might be calling her again on a different subject matter, and so Lori Lewis will actually testify right before Anthony Altimus which is 37.

THE COURT: Okay.

MR. WILLIAMS: And then we're going to do Altimus, Johnson, and Birkey, 37, 38, 39. 40 is Graham. And that should take us through tomorrow.

THE COURT: Okay.

MR. WILLIAMS: We are not calling Byerly or Swanson or Plunk. And then the parties have entered into a stipulation that we're going to be reading into evidence concerning Mr. McNeese and the maps --

THE COURT: Mr. McNeese is not going to be testifying?

MR. WILLIAMS: I know you're disappointed, Your Honor. You'll see him I think down the road.

THE COURT: No doubt.

MR. WILLIAMS: So we're not going to call Mr. McNeese or Mr. Fischer. Mike Merino who is number 52 we're going to put on, but his testimony is going to be substantially short. We're just going to put him on to lay a foundation for how this whole thing came about.

And then if you go to the next page, because of the

lack of objections to foundation and so forth, we're going to eliminate 62 through 67, 69, 74, and 76 through 78.

THE COURT: I'm sorry. 76 through 78?

MR. WILLIAMS: Yes, Your Honor. We're on pace at this point, Your Honor, to rest our case next week, possibly as early as Wednesday. Most likely, frankly, it'd be Thursday before we'd rest our case. It would be -- October the 7th I believe --

THE COURT: Okay.

MR. WILLIAMS: -- is that Thursday.

THE COURT: Let's talk about that date because that raises another question. I had originally indicated a need to only go till one o'clock that day. Now I can go to 4:30, but I understand there's a problem on the defense side?

MR. SPIES: I thought so. I think it was attributed to me, and I double-checked my paper calendar, and I told your

clerk that I would double-check my computer calendar tonight and let her know immediately tomorrow morning.

THE COURT: Okay.

MR. SPIES: But I think that I no longer had that conflict, but I'll triple-check tonight.

THE COURT: Okay. That'd be good. Anything else?

MR. WILLIAMS: Yeah. Just a couple matters. We did get from the defense -- and we appreciate it -- an exhibit and witness list today. What we don't have are a couple other things. One is we don't have any Jencks material from the

♀

defense. The Court's order before indicated that we were supposed to get their witness and Jencks material back on July 12 of 2004. We have yet to get any Jencks material from the defense. I keep being told by the defense that they're working on it, they're working on it. We haven't received any. And I don't know. There may not be any. But I just want to bring that issue up again that we still haven't received any Jencks material.

And in a similar vein, we've been waiting for and asking for repeatedly their reports from their experts on mitigation, Miss Rickert and Mr. Cunningham. We have not received any reports concerning what they're going to testify about, you know, what they're basing their testimony on or anything else. I have some concerns that Mr. Cunningham is unqualified to testify on certain issues, particularly about how the Bureau of Prisons is operated and so forth.

THE COURT: Although he's testified in other cases as I recall.

MR. WILLIAMS: There's also been motions sustained to

keep him from testifying and to limit the scope of his testimony depending on where he's going. My problem is I can't alert the Court that there's an issue here until I get those reports so I can deal with that issue. And again, I've been told by the defense -- and I believe them -- that they're working on this, but the problem is obviously we're getting very close to this

issue, and I want to reemphasize our need to get those reports from the defense.

MR. PARRISH: Let me respond to the first one which I'm in charge of. Mr. Williams asked me last week. He wanted -- specifically focused on I believe Mr. Stewart's reports and our private investigator, Mr. King's report. I told him he had been out and interviewed numerous inmates and people who were not inmates. We have no report that's been adopted by this witness that falls under Jencks or Rule 16.

Now, if he wants me to state that on the record, I assume this is adequate to put on the record with regard to that matter. But to say we have not discussed this with him, I have specifically discussed it with him, and I've told them what we had available, and I told him what I would make available to him. If we do have a statement that is adopted, I will give that to him. But at this point we do not. And specifically as we gathered our information, I didn't do it for those purposes.

MR. WILLIAMS: And I agree. We have discussed this issue, and what I understand is their reports -- they have some investigators that went out and interviewed a number of witnesses. They've represented to me that those reports were never shown to the witnesses and never adopted by the witness, and I've told them I understand that does not fall within

Jencks, and that's fine, and we're not asking for those reports.

What I'm concerned about -- and maybe they're making

the representation to me now there is nothing like that -- is any reports on any of their witnesses that they have seen or any written statements by these. For example, I believe that Joe Dock and some of these other people, Loparo, have signed off on these affidavits that Mr. Ferguson talked about here today and that there may be affidavits that exist that have been signed by these people on the subject matter they're going to be testifying about, and if there are statements like that, that's what I'm asking for.

And I understand that, you know, as to all of our witnesses, for example, if they interviewed them by their investigator and didn't have them adopted, that doesn't fall within Jencks, and we're fine with that. I don't know if that clarifies or confuses the issue.

THE COURT: Just out of curiosity, didn't you turn over non-adopted agent reports?

MR. WILLIAMS: I have made a practice of just doing that. I had tried a case with you I think about four years ago, and I relied upon the firm definition of Jencks material and realized how that doesn't always help me. So ever since then I've adopted the policy of just turning that stuff over regardless.

THE COURT: But you're not actually requiring reciprocity.

MR. WILLIAMS: No. And I don't think that the rule

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1721 of 3636

requires it, and I'm not demanding it.

THE COURT: Okay. I just wanted to clarify it.

MR. WILLIAMS: Yes, Your Honor.

MR. PARRISH: And that's my interpretation of it, Your Honor. I would agree that the rule does not require it.

THE COURT: But they've given you a lot of material that they weren't required to give you.

MR. PARRISH: Right, yeah.

THE COURT: I mean, most of the witness statements -- you refer to like ten interviews of this witness. I assume each one wasn't adopted by the witness.

MR. PARRISH: I agree, but the question is did it have material in there that was required under case law or under the rule. That might be the question. But they did provide that for us. But I don't think the rule similar to the one in state court means that the defendant has to return the same thing. At least at this point that's not how the rule is interpreted under Rule 16.

THE COURT: No, I'm not saying it is the rule. I just pointed out that it appears that the government bent over backwards to give an exceedingly broad view of Jencks Act material, and you're now taking an exceedingly narrow view. I'm not saying whether that's good or bad. I'm just trying to see if that's what happened.

MR. PARRISH: Right, yes, and I would agree that the

1972

rule applies differently to the government than to a defendant the government chooses to charge. That's what I'm saying. I think the rule is not --

THE COURT: I'm not sure about that, but anyway, there's nothing at issue about that.

MR. PARRISH: I agree.

THE COURT: Now, what about the -- so are you saying you have no Jencks Act material for any of the witnesses on your witness list?

MR. PARRISH: At this point we have none, Your Honor, as falls under that category.

THE COURT: Okay. What about these affidavits?

MR. PARRISH: I believe the affidavits, if, in fact, we have them or if we have access to them, if the witness is called, those affidavits as adopted by the witnesses ought to be produced. I think the government has some because they were in some of the discovery file material. Now -- I think that's correct.

THE COURT: Well, they're shaking their head no but . . .

MR. WILLIAMS: I can tell you that we have heard from Ferguson and many others that there are these affidavits and that there was this effort made by the defendant to get these affidavits. We've never seen one, and we've never been able to come across one.

1973

THE COURT: Okay. To the extent that you have in your custody or control affidavits signed by witnesses that you will be calling in the defense, would you agree that those would be covered by Jencks Act and you have an obligation to turn those over?

MR. PARRISH: Absolutely. It's not even a close call. I agree.

THE COURT: Yeah. And you're saying those affidavits don't exist or they may exist but not with regard to witnesses that you're going to call in the defense.

MR. PARRISH: At this point I would say that but also -- I mean -- you know, without them closing out their case, I'm a little nervous about saying too much.

THE COURT: Well, but you had an obligation to turn those over back on July 12.

MR. PARRISH: Absolutely, but I think we have to be awful careful of disclosing information regarding the client or information regarding the client that might be confidential. I would agree that within the rule we do have to turn over any signed statement adopted by the witness or a signed statement that the witness gave in preparation for the trial.

Now, I don't know whether they're saying there is information out here that may have been collected prior to trial that witnesses might have had. I know there were some documents circulated prior to Mr. Honken ever being indicted or charged or

♀

1974

anything.

THE COURT: Well, let's find out. Is that what you're talking about?

MR. WILLIAMS: No. What I'm referencing is specifically what Mr. Ferguson talked about, that the defendant anticipated he was going to be called back for a trial, that he was going to be charged with murder, that he was concerned that Tokars, McIntosh, and Vest were going to inform on him and he made a concerted effort to get a number of inmates in the jail to sign off on affidavits.

THE COURT: But those affidavits were signed prior to

the indictment.

MR. WILLIAMS: Prior to the indictment but in anticipation of litigation in this case, in anticipation that he was going to have these people testifying against him. And some of them may have been signed afterwards. I just don't know. I've never seen them. So I'm not sure of the timing on it.

THE COURT: Does that make any difference?

MR. WILLIAMS: I don't think it does.

THE COURT: But you need to identify whether the defense has in its control any affidavits of any witnesses that you intend to call. And if you do, you need to disclose that. Then we can take -- you don't necessarily need to disclose the affidavits if you're claiming that they're not covered by the Jencks Act. But I'm saying anything that is arguably covered,

you need to disclose that so that the government can properly advocate why it's covered under the Jencks Act or why it's not.

MR. PARRISH: I agree with that a hundred percent.

THE COURT: Okay. Good.

MR. PARRISH: Yeah, I don't think we have a dispute about that.

THE COURT: Doesn't sound like it.

Now, let's go to the expert reports.

MR. SPIES: I can address that, Your Honor. Mr. Williams and I discussed it last week. I immediately called Dr. Cunningham's office. He was in trial testifying. I understand that our mitigation specialist, Lisa Rickert, is trying to make contact with Dr. Cunningham down in Texas today. I'll be speaking with her tonight. But as of now I have no reports from Dr. Cunningham. As I told Mr. Williams, I believe

he's prepared some exhibits or is in the process of preparing some exhibits for demonstrative purposes.

THE COURT: Have you talked personally to Dr. Cunningham?

MR. SPIES: Yes, but not since -- really since the beginning of trial, and to the extent that he's got reports that relate to his testimony, I told Mr. Williams I would furnish those. I don't have them yet. I also told Mr. Williams last week when we discussed it that if there are any demonstrative aids that Dr. Cunningham intends to use I'll furnish those as

well. And Mr. Williams is aware of that, and I hope to have contact with either him or Ms. Rickert this evening. There are no other reports that I have that are within the scope of what Mr. Williams --

THE COURT: And what more, if anything, are you asking me to do?

MR. WILLIAMS: I guess what I'm asking is I've been having these conversations with Mr. Spies since before this trial began trying to get these reports on their experts. I want to be on the record. I believe Mr. Spies is working diligently and in good faith trying to get stuff from his experts, but I keep hearing the same explanation from Mr. Spies that he's getting the same explanation from his experts that they're promising, promising, promising.

I think it might be helpful if the Court would order the defense -- and Mr. Spies can pass that on to his experts -- that by some drop-dead date we gotta have them or you may limit their ability to testify because I can't prepare. I've got -- you know, I've got a right to rebuttal on this, but I can't

prepare any rebuttal until and unless I see these. I can't prepare if it's improper --

THE COURT: Do you have a rebuttal expert lined up?

MR. WILLIAMS: I do, and I keep getting demands from my rebuttal expert for what's he rebutting, and I can't tell him anything at this point.

♀

THE COURT: Well, do you know whether or not your expert, this Dr. Cunningham, has prepared a report or not? You don't know that?

MR. SPIES: You know --

THE COURT: How could you not know whether an expert prepared a report?

MR. SPIES: I don't know if he's prepared a report. That's the honest truth. I know he's going to -- you know, this is still a work-in-progress because he's still getting information as I understand it from our mitigation expert. He's also been getting some files that the government has obtained relating to Mr. Honken. Those have been furnished to Dr. Cunningham, and he's been working on other cases unrelated to Mr. Honken's case. So I don't know that he's got a report.

THE COURT: Did you ask him to prepare a report?

MR. SPIES: He is preparing exhibits. I've not asked to prepare a report. He's outlined generally what he's going to be talking about. I told Mr. Williams about that, but I've not seen a report.

THE COURT: Well, if he has prepared a report or if he intends to prepare a report, you're going to have to have that report to the defense (sic) by Monday. And if he's prepared a report and you don't have it to the defense by Monday, then I'll

entertain a motion to strike his testimony if it's not produced by Monday.

MR. PARRISH: Your Honor, with regard to that, we wish you would delay any ruling on that till we meet in the morning at the quarter-to-eight meeting to discuss what issues may relate to that if you would care to.

THE COURT: Sure, sure. That's fine.

MR. PARRISH: And we might be able to explain to you which I don't think would be -- the government should have privy to some of the issues we might be having.

THE COURT: Right. Because he's a CJA court-appointed expert; is that correct?

MR. PARRISH: And so are other folks who are gathering information assisting us on this matter.

THE COURT: Okay.

MR. PARRISH: And that was one of the issues why we thought there was some urgency to us meeting with you on those matters.

THE COURT: Okay. I'll do that. That's reasonable.

Anything else?

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: No, Your Honor. We have nothing further.

THE COURT: Okay. Now, Mr. Rogers, I just want to make -- I'm interested. What do you intend to give me on Wednesday? Am I on my own to prepare the penalty phase instructions? I mean, you're not requesting any specific

instructions or whatever you're going to request -- you know, you're really in violation of my order on instructions by over a year because you were supposed to submit a complete set, and I just have this sinking feeling I'm not going to get a complete set of penalty instructions from the defense. Is that accurate?

MR. ROGERS: I don't think so. Well, it depends on what the meaning of "is" is. I intend to submit the instructions that we are requesting that you give. I do not intend to submit an instruction submitting the aggravators that the government intends to submit.

THE COURT: What about the weighing process?

MR. ROGERS: I do intend to submit an instruction as to the weighing process and --

THE COURT: Everything but the government's proposed statutory and nonstatutory aggravators?

MR. ROGERS: Yes, sir.

THE COURT: Okay. That would be what I call a complete set.

MR. ROGERS: Okay. Fair enough.

THE COURT: A modified complete set.

MR. ROGERS: Modified complete set.

THE COURT: But all that I could expect you to do. I wouldn't expect you to do their work for them.

MR. ROGERS: Thank you. And I also hope to have and expect to have some language that I would suggest are included

in the merits phase instructions to meet those two objections I raised last week.

THE COURT: Right. Anything else we need to chat about on the defense?

MR. PARRISH: Just it's a very minor point. Wednesday, Your Honor, I have to do a hearing at noon with Judge Ovrom, and it's going to be a telephone hearing on a first-degree case down in Polk County. I told her we normally broke about noon. And if --

THE COURT: Do you want to take a little longer lunch break?

MR. PARRISH: Oh, it's going to take probably five or ten minutes, and Miss Westhoff is here also who's working with me on the matter, but it is going to impact us soon because I think the trial is set to start November 1. I told her we'd have a feel on this case I felt by the middle of the week which we seem to be getting, but I assume you're not taking a break or anything like we had discussed earlier assuming -- depends on how the case ends obviously would be the big thing. It may be a long break for everybody.

THE COURT: And am I taking a break between the merits phase and the penalty phase if there is one?

MR. PARRISH: Right. You had discussed that at some point.

THE COURT: Yeah. I don't think so. Maybe a day or

something, but it kind of all depends on how long the deliberations are. The lawyers will have a break in the sense that, you know, the jury will be deliberating on the merits. I'm not planning on taking -- I think somebody talked about a week or two-week break. No way am I going to do that.

MR. PARRISH: That's fine. So I just wanted to give her some idea then of whether or not we'd be available because otherwise they want to move that to a different date. It's only

going to take about five minutes I would think or ten minutes at most.

THE COURT: Now, have the parties given any thought as to whether or not I should use preliminary penalty phase instructions and final penalty phase instructions or just one set?

MR. WILLIAMS: I haven't thought about it a lot except I did think about it the other day. I don't know that you need to do two sets, but I'm wondering if there would be any harm in you outlining the marshalling instructions, in other words, the ones that talk about basically what their job is going to be. And you don't have to list out I think all the aggravating and all the mitigating but say, you know, basically you're going to have to weigh and kind of give them a road map along those lines before we do penalty phase and then read the entire instructions at the end.

But I've not seen -- I'd have to go back and take a

1982

look at our proposed penalty phase, but my recollection is I think there's one that's kind of a marshalling one you could read to give them some idea of what their job is going to be. That's the only thoughts I've had on it. I could look into it further.

THE COURT: You don't have to. I'm inclined to probably do a preliminary and final set. How long is the penalty phase -- if there is one, how long will the government take?

MR. WILLIAMS: I think we'll take probably a day. I'd be surprised if we took more than a day, maybe a day and a half at the outside.

THE COURT: And would that be primarily victim impact testimony?

MR. WILLIAMS: Yes, Your Honor. We might have a little bit beyond that but not much.

THE COURT: Well, let me ask you about that now. I was reading some victim impact cases this weekend, and don't some cases talk about the proportionality of victim impact testimony in the penalty phase?

MR. WILLIAMS: They do, but they talk about it, as I understand, in relation to all the evidence the government is alleging are aggravating factors.

THE COURT: I see.

MR. WILLIAMS: And we are going to be adopting

1983

obviously what happened during the guilt phase, and that's going to be the emphasis on why we think they're aggravating.

THE COURT: So you don't just focus on the length of the penalty phase but the -- kind of the ratio or relationship of the evidence of the victim impact testimony versus the overall evidence that the jury can consider on statutory and nonstatutory aggravating factors.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay.

MR. WILLIAMS: And I'll tell you --

THE COURT: And then other cases talk about kind of -- they get into this numbers game, five per victim may be too many but two to three seems to be okay.

MR. WILLIAMS: Right.

THE COURT: I read some cases about that as well. And so can you just give me a heads-up on kind of the number of

victim impact? And while I'm at it, some cases talk about victim impact statements that are simply read to the jury, and others talk about it in terms of the traditional question-and-answer. And which way are you proposing to do it? I assume the traditional question-and-answer.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. Which I would actually prefer.

MR. WILLIAMS: Yeah, I'm intending to do it that way. I'm intending to do certainly no more than two per victim, and

in many cases I think we're going to maybe have just one per victim -- I'm sorry, no more than three and in most cases one and maybe two per victim witnesses testifying, and it's going to be short. I'm going to get on and get off with them, let them testify about the impact and about the victim.

THE COURT: Okay.

MR. WILLIAMS: And every one of them's going to be short, and that's why I don't think -- I'll be surprised if we burn a day.

THE COURT: Now, do we actually have a deadline -- I don't think we do -- for disclosure of penalty phase witnesses? I'm sorry -- yeah, penalty phase witnesses, yeah.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Was that in one of the scheduling orders?

MR. WILLIAMS: It was, Your Honor, and we have disclosed that to the defense at this point already.

THE COURT: Okay. And did the defense have a deadline?

MR. WILLIAMS: They did, and I think --

THE COURT: Let me guess. It passed.

MR. WILLIAMS: Well, I think what they did is they basically gave us a list of all their witnesses, period, without breaking it out on who might be in the penalty phase, so I have not received a list that says these people are --

THE COURT: Well, let me ask you this. The witness

♀

1985

list that they gave you, I would be willing to suspect -- I don't think I've ever seen it -- far exceeds their current merits witness list. Would that be a fair statement?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: And I really doubt that all of the remaining witnesses on that witness list that they gave you are now penalty phase witnesses. Would you agree with that?

MR. WILLIAMS: I would agree. Especially given at least one of those people are dead, it would be hard to call that person.

THE COURT: Right. So, you know, it's not fair to the government to expect them to cull out who you're listing as a merits witness and decided not to call and who you're calling as a penalty witness, so when will you be in a position to give the government a firm penalty phase witness list?

MR. SPIES: Assuming that we can get through to Ms. Rickert tonight, I can give that to Mr. Williams in the morning.

THE COURT: Okay. I'd kind of like to see it too.

MR. SPIES: Sure.

THE COURT: Okay. So at least sometime this week you'll have a firm penalty phase witness list.

MR. SPIES: Right, based --

THE COURT: What about a penalty phase exhibit list?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1734 of 3636

MR. SPIES: We don't have any yet. Again, we'll be

talking with you about that tomorrow morning, Your Honor.

THE COURT: Okay. Anything else?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Rogers?

MR. ROGERS: Just one. By the way, to go back to something you raised with Mr. Williams, I had anticipated there being preliminary penalty phase instructions in the event of a penalty phase, and I intend to prepare at least a modicum of such instructions and have them for you Wednesday.

THE COURT: Okay. You've got a lot to do I suspect.

MR. ROGERS: I do have a lot to do.

THE COURT: Now, is that Wednesday morning or Wednesday evening, Mr. Rogers?

MR. ROGERS: It will probably be morning because I probably won't have anything -- any time to do it during the trial.

THE COURT: No multi-tasking on Wednesday for you.

MR. ROGERS: I may actually be sitting here doing them while everything else is going on, in which case I might have to get them printed out sometime during --

THE COURT: Do you have an estimate of how long your merits phase defense will last in terms of days?

MR. ROGERS: I'm going to yield to the wiser heads on that, Judge. That's not my . . .

MR. PARRISH: Well, depends on where -- how much --

how many more witnesses the government would have. I think that --

THE COURT: Well, they kind of told you who they're calling; right?

MR. PARRISH: They did tell us, but we don't know what they're going to say. We have a good idea from the discovery, but I would imagine it would not be more than three, four, or five days.

THE COURT: Okay.

MR. PARRISH: That's probably another matter that we need to --

THE COURT: Should we be meeting at 4:30 tomorrow morning?

MR. PARRISH: I think it will take about 15 minutes. I think it will be resolved fairly quickly. But you have to realize, you know, we are operating under -- well, we won't get into that. But let's just leave it at the point that we will -- we don't anticipate a very long time, but we're still having conferences with our client.

THE COURT: Okay.

MR. PARRISH: About --

THE COURT: I'm simply trying to figure out what my deadline is to have the penalty phase instructions done.

MR. PARRISH: We want to save you that --

THE COURT: I know you do.

♀

1988

MR. PARRISH: -- in closing arguments which is my question. Do you anticipate at the end of the merits phase evidence or rebuttal or whatever, whenever the government will end if they have rebuttal, do you anticipate going right into

arguments then?

THE COURT: No.

MR. PARRISH: Are you going -- okay.

THE COURT: Let's say we finish at 10:30 in the morning. I'm going to send -- I assume you want some time.

MR. PARRISH: Right.

THE COURT: I just don't think it's fair in any -- basically in any case but -- or, you know, I made a couple exceptions in one- to two-day trials. I make the lawyers give their closing after we finish the evidence. But a trial of any length you should have the evening and whatever other time there is that day. So I was just anticipating that I would do that. You know, if we finish at 4:30, we just happen to finish all the evidence and the renewed Rule 29 motion and everything, we'd start the next morning. But if we finish at whatever time earlier than that, then we'd just send the jury home.

MR. PARRISH: Okay. And I think -- are you talking about in the closing -- and I don't know whether you've said that yet. Is it limited to two hours?

THE COURT: I'm not going to limit closing arguments.

MR. PARRISH: No limits.

1989

THE COURT: Let me ask you this.

MR. PARRISH: I know. You heard about my four-hour argument right after an eight-week trial.

THE COURT: What is the longest you could conceive of arguing?

MR. PARRISH: I've argued four hours before. In this case I don't anticipate it. That was in a case with four different types of DNA. I did argue for four hours, but it was

like in -- I think it was an eight-, maybe a nine-week trial or something like that. But in this case I don't anticipate that type of issue. I think it's fairly focused here pretty much what my opening statement said. I don't think it's much different.

THE COURT: I don't think I'm going to put any -- I'm going to waive -- in other words, we have a local rule that says an hour. I'm going to waive that. And if you take four hours, you take four hours.

MR. PARRISH: What about the rebuttal, though, of the prosecution? Is that limited in any way?

THE COURT: Well, I have on occasion, particularly with the assistant U.S. attorneys who carry the reputation with me as being sandbaggers who I won't name -- Mr. Williams is not in that group -- given them a 50 percent rule. You can take -- you know, you can take as long as you want on your initial opening, but your rebuttal is limited to 50 percent of that

1990

because what I've seen them do is give a 7-minute opening and load up in rebuttal and give a 50-minute rebuttal, and I'm not going to allow that. So would you have any problem with a 50 percent rule, or is Mr. Miller going to give --

MR. WILLIAMS: Mr. Miller is going to be doing it, Your Honor.

MR. MILLER: Your Honor, Mr. Parrish and I have had a number of cases against each other over the years. I would hope he would confirm that I haven't sandbagged him by saving ammunition for rebuttal. I do have a practice, Your Honor, of making notes during my opponent's final argument, and I feel I have a duty to respond to arguments made. And if 15 points are

argued on behalf of the defense, I feel I'm not doing my job if I only respond to 14 of them. So I do tend to give a rebuttal that is --

THE COURT: What about this? How would this be? Do you think you can give a rebuttal in half the time that he gives his closing?

MR. MILLER: I think that'd be a fair estimate. It might not fit within half that time. The case that Mr. Parrish and I tried three times, my first rebuttal was a five-minute rebuttal.

THE COURT: Did it grow then?

MR. MILLER: My second rebuttal after that particular hung jury was somewhat more successful, and I think it probably

matched his argument minute for minute roughly. I still ultimately lost the third retrial, however.

THE COURT: Well . . .

MR. MILLER: But even in that I wasn't -- I don't think counsel would claim that I sandbagged him. I spent the time addressing what I felt were arguments that needed to be addressed, and I would hope I could respond to a five-minute point in less than five minutes.

THE COURT: Sandbagging only comes when they lose. Hung jury doesn't count. Well, are you asking me to do anything in terms of limiting the government's rebuttal?

MR. PARRISH: I would ask, Your Honor, that -- and I don't anticipate a four-hour -- even a two-hour argument in this case. I just don't see the facts warrant it. But I would think that, you know, isn't there a third rule or something like that, it only can be so long as the third one? The only concern I

have is that, you know, they don't have the next day to come back and argue. That's one big -- their rebuttal. That's the big problem I have sometimes. And the other one -- and I'll make sure I close in plenty of time so they would finish.

THE COURT: Yeah. If we start at 8:30, then you have some control over that; right? If you go till 3:30, they may very well have some rebuttal.

MR. PARRISH: I would agree with Mr. Miller; in his arguments we've never had that problem I think. I wouldn't want

1992

them to be able to stand up if I argue for an hour and a half to argue for four hours or three hours my argument.

THE COURT: I don't think that's going to happen. I'm not going to impose any limit right now, but as we get closer, maybe we can chat about it. Do you have any idea, Mr. Miller, what you would, based on your very considerable experience, think the length of your opening -- are you going to do both the opening and the rebuttal?

MR. MILLER: Yes, Your Honor. And I'm anticipating --

THE COURT: Are you going to have to handcuff Mr. Williams?

MR. MILLER: Yeah --

THE COURT: You're going to have to physically restrain him?

MR. MILLER: We've had a few arguments, Your Honor, about control of this case already, and they'll continue I'm sure. However, I'm guesstimating two hours. I am pleased that I'm not limited to that because I could be exceeding that, but I hope -- I also have tried enough cases to know that brevity is important to persuasiveness.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1740 of 3636

THE COURT: But there is a lot of evidence in this case.

MR. MILLER: Yes, it is.

THE COURT: That's why I think our local rule is not appropriate in this case. I think we'll just leave it kind of

open ended.

MR. PARRISH: That's fine.

THE COURT: And I may be inclined to not put any restriction, but, you know, if you want to object in his rebuttal that he's sandbagging or something, we can take that up.

MR. PARRISH: I try not to object during argument. I don't like to do that.

MR. MILLER: But he has done it.

THE COURT: But what I want to know is how many times has he moved for a mistrial during your closing arguments?

MR. PARRISH: Never.

THE COURT: Okay. Thank you. We'll be in recess.

(The foregoing trial was adjourned at 4:37 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

VOLUME 8 9-27-04 witness testimony
Shelly Semmler, RMR, CRR 1-6-04 Date
♀
1994

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| RONALD MCINTOSH | | |
| | MR. ROGERS | 1717 |
| | MR. MILLER | 1749 |
| | MR. ROGERS | 1757 |
| | MR. MILLER | 1758 |
| STEVE VEST | | |
| | MR. WILLIAMS | 1764 |
| | MR. PARRISH | 1818 |
| | MR. WILLIAMS | 1897 |
| | MR. PARRISH | 1904 |
| STEVEN FERGUSON | | |
| | MR. MILLER | 1910 |
| | MR. PARRISH | 1938 |
| | MR. MILLER | 1959 |

*****

Page 250

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1742 of 3636

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, Plaintiff, vs. DUSTIN LEE HONKEN, Defendant. /

No. CR01-3047
Sioux City, Iowa
September 28, 2004
8:24 a.m.

VOLUME 9

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

APPEARANCES:

For the Plaintiff:

C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant:

ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn
Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1743 of 3636

Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Please be seated. Why don't we take up the matter of the attorney fee records that the government intends to introduce later on today. Mr. Williams?

MR. WILLIAMS: Your Honor, the United States would introduce through Special Agent John Graham records from the Parrish law firm from the period of 1996.

During the sentencing back in 1998, Dustin Honken testified that the reason that he bonded Dean Donaldson out of jail was not to go kill anybody like the government alleges but because Donaldson was going to go commit some crime and get money to him because Mr. Parrish had demanded another $5,000 from him as a retainer and he was out of retainer at this point and needed some more money and that's why he bonded Donaldson out of jail.

We subpoenaed the Parrish law firm records. Those were provided to us after the Court ruled on the privilege issue in a redacted form where all they have is the dates and amounts, and then we also requested any correspondence to Dustin Honken requesting additional funds, and there was one letter in there that was the initial retainer letter and no other letters.

My intent would be when we have John Graham on the stand, we're going to be going through the sentencing transcript, statements that Mr. Honken made. I'm going to ask

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1744 of 3636

him about the statements he made about why he bonded Donaldson out, and at that point my intent would be to admit into evidence those billing records in the redacted form.

The defense has advised me they don't have an objection to the foundation, and so the way we'd handle it is simply have Special Agent Graham say pursuant to the investigation, we issued a subpoena on the Parrish law firm. They complied, and they provided us these documents as compliance with the subpoena requesting all this information, and these are the documents and put it in in that manner.

We don't think it's privileged because the submissions we've previously made to the Court is the defendant brought this up and made this an issue during the sentencing, the fees issue, as an explanation for his conduct, so he's brought that into issue himself.

THE COURT: Well, I don't think that would waive the privilege if it was otherwise privileged.

MR. WILLIAMS: I think it can, Your Honor. There's case law on that issue, that if the defense -- if the defendant himself brings his fee issues into question, any privilege that might have existed on that or any communication with his attorney, if he brings it up in issue, then he's waived it because you can't invoke it yourself and talk about the communication you have with your attorney and then bar the other side from getting into that matter. So I think he waived it by

1999

bringing it up.

Fee -- you know, bottom line is the fee information, that's all we've got, and communication about fee information is

not privileged.  And then, frankly, background or back-up argument is crime-fraud exception, but I don't think we even need to get there.  I think it's enough to simply say it was fee information and that's all we needed and he brought it up into issue.

THE COURT:  What's the defense position?

MR. PARRISH:  We would argue that it's privileged information, they should not have access to it.  We filed a brief before Judge Zoss, and I believe this Court had an opportunity to review each and every objection that we raised to it.  We would ask that the Court consider the brief that we did file with the full force and effect as if it's filed at this time.

We would add that it also is an infringement on the right to counsel under the Sixth Amendment of the United States Constitution which we believe we also raised in our brief.  It has a chilling effect if it is introduced during the course of this trial as any part of any substantive evidence because of the fact that it relates to an exchange between counsel --

THE COURT:  How does it have a chilling effect in this trial?

MR. PARRISH:  The first part as to how it would have a

2000

chilling effect is it would be the attorney who was representing him having documents related to the case that may affect his client's own credibility, and that counsel, as the government has raised in this case, is the exact same counsel who's present this time, and it does not go to whether or not it's an issue of fee because I think we're all clear that the issue of the reason for the billing has been redacted.  Yet the fee is unique

because the argument by the government is that it could be part of a continuing conspiracy by the defendant in the methamphetamine manufacturing case. And consequently, we think that the document should not be introduced, nor should it be referred to in any way, shape, fashion, or form during the course of this trial.

THE COURT: Any response, Mr. Williams?

MR. WILLIAMS: No, Your Honor. I don't think there's really a Sixth Amendment issue here at all. All we're getting into is the attorney's fees. I think we have a right to do that. To the extent that the defendant's prejudiced by this issue coming up, he chose that path by making his attorney's fees an issue in a defense during the prior sentencing.

THE COURT: Okay. Well, I don't think the fees are privileged, and I just don't see a Sixth Amendment argument. Do you have any case law that supports the Sixth Amendment argument?

MR. PARRISH: We filed it in the brief. I have

nothing else to add.

THE COURT: Okay. Thank you. So I'll allow the admission of the attorney fee records.

Anything else we need to take up this morning?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: Not that I can think of at the moment.

THE COURT: Okay. Thank you. Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. MILLER: Yes, Your Honor.

THE COURT: Let's see. Mr. Miller, you were on redirect?

MR. MILLER: Yes.

THE COURT: Okay.

(The jury entered the courtroom.)

THE COURT: Please be seated. Good morning. As you will recall, we're on redirect of Mr. Ferguson.

STEVEN FERGUSON, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

CONTINUED REDIRECT EXAMINATION

BY MR. MILLER:

Q. Good morning, Mr. Ferguson.

A. Good morning.

Q. How are you feeling this morning?

A. Quite a bit better. Thank you.

Q. When did the feeling of illness set on? Is it something that's been going on --

A. Well, it started earlier in the day. It just sort of built up as the day went on.

Q. Okay. It wasn't anything we did, I --

A. No. I'm all right.

Q. Just a couple matters more, sir. You mentioned during Mr. Parrish's cross-examination that you had seen or been shown a clipping or clippings. Can you describe that for us, please?

A. Yes. Dustin received a photocopy of a newspaper article talking about the guy who had -- I think his name was McNeese -- who had persuaded Angela to draw the map.

Q. And can you describe how you observed this or what happened to bring that to your attention?

A. Well, it was during mail call. Usually about 4 p.m. the

unit officer hands out mail, and all the inmates gather around, and Dustin had received it in a letter, and he showed it to me, and he said, This is that rat bastard that got the map from Angela, and it showed the picture of McNeese and then the text of the article. And so I read it. So he goes, So you'll know what he looks like if you ever see him again.

Q. Did you have access to any other papers or news clippings?

A. No, I didn't.

Q. Or any legal papers?

A. None.

♀

2003

Q. Also you mentioned that while sitting in an Iowa jail you wrote a letter to Agent Basler indicating that you were waiting for the marshals to do their magic.

A. Yes.

Q. That referred to waiting for them to finish their procedures to get you processed into witness security program?

A. Yes, that's what that was about.

MR. MILLER: Thank you. I have no further redirect, Your Honor.

THE COURT: Any recross?

MR. PARRISH: None.

THE COURT: This witness is excused.

MR. MILLER: The United States calls Lori Lewis.

THE COURT: This is a witness that you sought permission to recall?

MR. MILLER: Yes, Your Honor.

THE COURT: Okay.

LORI LEWIS, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. Please adjust the chair

and the microphone. And when you're ready, state your full name and spell your last name, please.

THE WITNESS: My name is Lori Lewis, L-e-w-i-s.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Good morning, Agent Lewis.

♀

A. Good morning.

Q. You testified previously about the search of a ditch and recovery of a piece of metal. There are a couple other matters I wanted to visit with you about. During the Nicholson, Duncan, DeGeus missing persons investigation in spring and later in 1996, did you at any time participate in the execution of a search warrant at the Angela Johnson residence in Clear Lake?

A. Yes, I did.

Q. And when did you do that, ma'am?

A. It was June 11, 1996.

MR. MILLER: If I may approach the witness, Your Honor?

THE COURT: You may.

BY MR. MILLER:

Q. I've handed you a packet of photographs marked Exhibit 76A through M. Just by general subject matter, what are those photographs?

A. These are photographs of the items that were seized from the Johnson residence on that date.

MR. MILLER: United States offers Exhibit 76A through M inclusive.

* * * *

(Government Exhibits 76A through 76M were offered.)

* * * *

THE COURT: I think it's already in evidence.

MR. MILLER: With the Court's permission, I'll ask to publish just two of those at this time, A and then G.

THE COURT: You may.

BY MR. MILLER:

Q. Directing -- there we go. For the record we had it oriented the wrong direction. It's now right side up. Do you recognize what the jury is viewing in Exhibit 76A, Agent Lewis?

A. Yes.

Q. What is that?

A. It's a bottle of concentrated acetic acid.

Q. Is that among the items seized from the Angela Johnson residence on June 7 of '96?

A. Yes.

Q. And is that among items that are usable in the manufacture of methamphetamine?

A. Yes.

Q. And with regard to 76G, please, what does 76G show?

A. It is a brown suitcase that contains plastic tubing. There was also some wrapping -- or Saran wrap, extension cords. There's also I believe some sassafras that was located in the paper sack that was in the suitcase.

Q. And are those likewise items usable in the manufacture of methamphetamine?

A. I believe my understanding is sassafras is actually used in the manufacture of MDMA.

Q. How about tubing?
A. Yes, the tubing would be.
Q. And the other photographs in Exhibit 76 show similar items?
A. Yes.
Q. Moving on, did you also during the course of that investigation in the summer of 1996 participate in the search of a locker at Kraft in Mason City?
A. Yes, I did.
Q. And would you describe first when this occurred?
A. It was on June 14, 1996.
Q. And where did you search, ma'am?
A. It was the employee locker located in the men's locker room at Kraft Foods.
Q. Was anything seized?
A. Yes.
Q. What did you seize?
A. There were several magazines. There was an order form for several books from Paladin Press. There was also an invoice from books that had been ordered from Loompanics Unlimited, just general toiletry items, personal items.

MR. MILLER: With the Court's permission, I'd at this time like to publish for the jury Exhibit 230.

THE COURT: Any other objection other than what's in the exhibit list?

MR. SPIES: No, Your Honor, other than the relevance

2007

and 403.

THE COURT: Okay. Those objections are overruled. 230 is admitted.

* * * *

(Government Exhibit 230 was admitted.)

* * * *

BY MR. MILLER:

Q. What is Exhibit 230 which is now being displayed to the jury, Agent Lewis?

A. It is a copy of the Mason City -- the -- a copy of a page of the Mason City city directory.

Q. That document was seized where?

A. From Dustin Honken's employee locker at Kraft.

Q. Were there a multitude of such pages, or was that the only one?

A. It was only the one page.

Q. Only the one page. And can you tell us the beginning and ending names on that page?

A. The top left of the page starts with government offices, and the bottom right ends with -- it appears to be John Green.

Q. And if we could focus in on any listed residents of that community whose last name is Graham, are there any?

A. If I could actually see the document -- the screen here is fuzzy. Thank you.

Q. My apologies.

A. There are several entries for people with the last name of Graham.

Q. And just focusing in on that, you work in the same office as Agent John Graham?

A. Yes, I do.

Q. Is his phone listed or unlisted?

A. His phone is unlisted.

Q. Thank you, ma'am. Moving on, Exhibit 235 --

MR. MILLER: State offers Exhibit 235 in evidence.

* * * *

(Government Exhibit 235 was offered.)

* * * *

THE COURT: Any objection to 235?

MR. SPIES: Relevance and 403, Your Honor.

THE COURT: Overruled. 235 is received.

* * * *

(Government Exhibit 235 was admitted.)

* * * *

BY MR. MILLER:

Q. I'm handing you what are marked Government's Exhibits 235 and 236. Can you identify those, ma'am?

A. Yes. 235 is the order form that was completed for books from Paladin Press, and 236 is an invoice from Loompanics Unlimited of books that were shipped by that company to Belen Butterfield.

Q. And how did Exhibits 235 and 236 come into your possession, ma'am?

A. They were both in Mr. Honken's employee locker at Kraft.

MR. MILLER: United States offers Exhibits 235 and 236.

* * * *

(Government Exhibits 235 and 236 were offered.)

* * * *

THE COURT: Well, I thought I just admitted 235. 236?

MR. SPIES: Relevance and 403.

THE COURT: Overruled. 236 is received.

*   *   *   *

(Government Exhibit 236 was admitted.)

*   *   *   *

MR. MILLER: And with the Court's permission, we'd like to publish 235 at this time.

THE COURT: You may.

BY MR. MILLER:

Q. Again, what is the jury looking at there?

A. That is the order form from Paladin Press of -- it was made out in the name of Belen Butterfield.

Q. And focusing in on the titles?

A. One title was Full Auto Conversion of the SKS Rifle. Another is the Ruger 1022 Exotic Weapons System. A third is How to Make a Silencer for a 22. And the fourth is How to Make

2010

Disposable Silencers, Vol. 2.

Q. And these were seized from Mr. Honken's locker at Kraft on what date or that was on what date?

A. The order form was seized on June 11, 1996 -- I'm sorry, June 14.

Q. Of '96?

A. Of '96.

Q. And then Exhibit 236, another document seized from Mr. Honken's locker in June of '96?

A. That's correct.

Q. And focusing in on the titles?

A. Again, there are four titles. The first is Home Workshop Explosives. The second is Poor Man's James Bond. Third is Ragnar's Guide to Home and Recreational Use, and the fourth is Ragnar's Homemade Detonators.

Q. Thank you. Agent Lewis, later in the year did you participate in the -- this investigation so far as the interview of one Dean Donaldson?
A. Yes, I did.
Q. And following that interview, did you participate in the execution of any search warrants in the Sioux City area?
A. Yes, on December 12.
Q. Describe that.
A. It was a search of the property belonging to Phil Parmalee. The purpose of the search was to retrieve items that Dean

2011

Donaldson had described to us during the course of his interview.
Q. And at the Parmalee property, did you, in fact, recover documents?
A. Yes.
Q. Documents that appeared to fit the description provided by Dean Donaldson when you'd interviewed him?
A. Yes.

MR. MILLER: And, Your Honor, I believe 211 through 221 have already been received in evidence. 222 I believe has not, or at least it's not yet been published to the jury. We would offer it at this time.

* * * *

(Government Exhibit 222 was offered.)

* * * *

THE COURT: 222 is the only one not objected to. Is that the one you're offering?

MR. MILLER: Yes.

THE COURT: Okay. Any objection to 222?

MR. SPIES: 222, relevance and 403.

THE COURT: Okay. Overruled. 222 is admitted.

* * * *

(Government Exhibit 222 was admitted.)

* * * *

BY MR. MILLER:

2012

Q. What is Exhibit 222, Ms. Lewis?
A. It is two scraps of paper that are in an evidence envelope.
Q. That's among the documents that were recovered at the Parmalee property?
A. That's correct.
Q. Can you describe in general -- let me ask you this. We've already seen a number of documents that were shown to us by Mr. Donaldson. Was there, among those, a hand-drawn map?
A. Yes.

MR. MILLER: And with the Court's permission, I'd simply just like to display again Exhibit 216.

THE COURT: You may.

BY MR. MILLER:

Q. What is Exhibit 216?
A. It is a hand-drawn map of the Britt, Iowa, area.
Q. And is that along with handwritten notes to Jay Lein and a Held individual and other hand-drawn and handwritten documents describing by Mr. Donaldson the items that you recovered at the Parmalee residence in December?
A. Yes.
Q. In December of '96?
A. Correct.

MR. MILLER: Thank you, ma'am. I have no further

direct.

THE COURT: Mr. Spies?

CROSS-EXAMINATION

BY MR. SPIES:

Q. Good morning, Agent Lewis.

A. Good morning.

Q. I have just a couple of short questions for you. You described for the ladies and gentlemen of the jury and for the Court this morning the search that was done of Mr. Honken's locker at Kraft Foods back in June of 1996, and you described for us some of the items that were located in his locker. In addition to the items that you described for the ladies and gentlemen of the jury this morning, did you also find in Mr. Honken's locker an assortment of magazines?

A. Yes.

Q. Including Dog World magazine?

A. Yes.

Q. Dog Fair magazine?

A. Yes. I know there were several dog-related magazines.

Q. Okay. Did you also find a magazine called Mother Earth News?

A. Yes.

Q. And Smart Money Magazine?

A. Yes.

Q. In addition to an assortment of magazines about guns and ammunition and related hunting stuff; right?

A. Yes, that's correct.

Q. You also found a United Way pin?
A. Yes, I believe there was.
Q. And a cassette tape called Loving Your Child is Not Enough?
A. Yes.
Q. Okay. Agent Lewis, in describing for us the search of Angela Johnson's residence in Clear Lake, Iowa, also in June of 1996, you described two photographs that portrayed a bottle of acetic acid and some tubing, Saran wrap, and some other materials. Did you also find at Angela Johnson's residence an assortment of writings and notes?
A. Yes.
MR. SPIES: If I may approach, Your Honor?
THE COURT: You may.
BY MR. SPIES:
Q. Agent Lewis, I'd like to show you first what has been marked as Defendant's Exhibit AG and ask you if Defendant's Exhibit AG is a note that was found at the Angela Johnson residence when you searched in June of 1996.
A. Yes, it is a copy of the note.
Q. All right. And similarly, Defendant's Exhibit AH, is that also a writing found at the residence of Angela Johnson in June of 1996?
A. Yes.
Q. All right. And are both of those exhibits photocopies of the originals?

2015

A. That's correct.
Q. And are the photocopies substantially authentic copies of the original save for the water mark that's in the background of those photocopies?

A. Yes.

Q. Now, in describing the items that were seized again from Mr. Honken's locker in June of 1996, you referred here to the jury to Exhibit Number 235, and 235, is it your understanding, Agent Lewis, that that represents an order form that was filled out but not sent in?

A. That's my understanding, yes.

Q. All right. And the last matter I'd like to clarify for you and for the Court and jury is Exhibit Number 222A which was shown to you on the screen --

MR. SPIES: If I may approach, Your Honor.

THE COURT: You may.

BY MR. SPIES:

Q. 222A was shown to the men and women of the jury. It's actually a two-part of 222?

A. Correct.

Q. And what you have there before you, is that a photocopy or reproduction of that exhibit?

A. Yes, it is.

Q. All right. And could you tell us how to spell the name Dustin?

2016

A. D-u-s-t-i-n.

Q. All right. And how is it spelled in Exhibit Number 222?

A. D-u-s-t-e-n.

MR. SPIES: Thank you. I have no other questions of this witness, Your Honor. We're not offering AG and AH.

THE COURT: Any redirect?

MR. MILLER: No, Your Honor.

THE COURT: You may step down.

MR. WILLIAMS: United States calls Anthony Altimus.

ANTHONY ALTIMUS, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Try and adjust the chair and the microphone so you can speak direct -- can you scoot that chair up a little bit, please? Would you state your full name, please, and spell your last name.

THE WITNESS: Anthony Altimus, A-l-t-i-m-u-s.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Altimus, I'd like to have you tell the jury a little bit about yourself, sir. First of all, how old of a man are you, sir?

A. I'm 35.

Q. And how far did you go through school?

A. I got my GED.

Q. Do you remember when approximately you got your GED?

A. Around 1985.

Q. Okay. Mr. Altimus, let me ask you just to speak up just a little bit. These microphones don't pick up your voice unless you're just a couple inches away. Thanks.

Where are you from originally, sir?

A. I'm from Sioux City, Iowa.

Q. Your whole life?

A. Yeah.

Q. Are you currently employed, sir?

A. Yes.

Q. And what do you do for a living?
A. I work at a outside vendor, sells Greek food. It's called Gyro.
Q. You sell gyros in Iowa City; is that right?
A. Yes.
Q. How long have you been doing that work, sir?
A. Five years.
Q. Have you had other names you've gone by in the past, sir?
A. Yes.
Q. And what are those names?
A. I went by the name of Anthony Bugh, Anthony McKetrick, and Anthony White Feather.
Q. And why did you go by those various names in the past?

♀

2018

A. Two stepfathers. That was their last name.
Q. You had a couple stepfathers?
A. Yes.
Q. And Bugh is B-u-g-h?
A. Yes.
Q. And so over the years you've been -- you've gone by various names because of your -- whatever relationship you had with your stepfathers at the time?
A. Yes.
Q. Okay. Sir, you've had some trouble with the law in your past; is that fair to say?
A. Yes.
Q. You had a conviction back in 1998, a felony conviction you did ten years for?
A. Yes.
Q. And that was a kidnapping and going armed with intent; is

that right?

A. Yes.

Q. The kidnapping, what did that involve, sir?

THE COURT: Excuse me. We've got a note from the jury. They're having a hard time hearing you. So can you try and use a louder voice if you could, please?

THE WITNESS: Yeah.

THE COURT: You're soft spoken, so we'd appreciate it if you'd speak up. Excuse me.

♀

2019

BY MR. WILLIAMS:

Q. You may have to just get right down in front of that microphone. Let's go back over this. I indicated you have some criminal history including a kidnapping and going armed with intent. What did the kidnapping involve, sir?

A. When I was younger, a teenager, I went out to a juvenile detention center here in Woodbury County here and had a friend of mine go in there with a weapon and break her out of a juvenile detention center, and then we fled to South Dakota where I was arrested and brought back here to Woodbury and proceeded to prison after that.

Q. And who did you break out of this juvenile detention center?

A. My girlfriend.

Q. Okay. So you went to -- you broke out your own girlfriend from a detention center, and you got charged with kidnapping and going armed with intent for that?

A. Yes.

Q. Okay. And then in 1996 you were convicted of theft in the first degree and sentenced to prison for that as well.

A. Yes, I did.
Q. Since then have you incurred any other felony convictions, sir?
A. No.
Q. The theft conviction you had in 1996, for a period of

time -- well, first of all, what county was that out of?
A. Woodbury County.
Q. And for a period of time were you incarcerated at the Woodbury County Jail?
A. Yes, I was.
Q. We're going to get into that in a little bit. At some point did you provide information to the government concerning Dustin Honken?
A. Yes, I did.
Q. How did that come about that you started providing information to the government on that matter?
A. I was sitting in a cell in Anamosa State Penitentiary. News came on, showed his picture, if you had any information to contact this number. Well, some days went by. I went to a sweat lodge -- it's part of a Native American tradition -- and went back to my cell and having bad dreams and everything about it, and then I went up to administration, asked them what I should do, I think I have some information I seen on the news a few days ago. And then they came back later and had me talk to some people, and that's how I got to the -- information to the government.
Q. Were you looking for some type of reduction in your prison sentence?
A. No.

Q. You went because you indicated you went to a sweat lodge,

part of your Native American tradition, and had some thoughts about it. You decided you wanted to come forward at that point?
A. Yeah, I was trying to change my life around and do better, and by having all this information, I felt if I brought it forward it might leave a lot of bad spirits and everything behind.
Q. Now, Mr. Altimus, did you -- did the government ever do anything to reduce your sentence that you were serving in the Anamosa State Penitentiary?
A. No.
Q. How long were you serving there, sir?
A. I didn't hear you.
Q. How long of a sentence did you have?
A. Fifteen years.
Q. And how long did you actually serve?
A. I discharged my number.
Q. I'm sorry?
A. I discharged it. I completed it all, not 15 years, but they cut it in half when you go in, so like 7.
Q. Okay. And is that an automatic when you go in the state system they cut your sentence in half?
A. Most of them, yeah.
Q. All right. Did the government do anything on your behalf at all with regard to your state sentence?
A. They wrote a letter to the parole board I think. I'm not

for sure.
Q. Okay. And that letter to the parole board, did that have anything -- any impact in your belief, your understanding, on how long you served in the state penitentiary?
A. No.
Q. Let's go back then to that 1996 theft charge that had you in the Woodbury County Jail for a period of time. You were there from September 28 of 1996 to February 3 of 1997?
A. Yes.
Q. When you first went into the Woodbury County Jail -- the jury's already heard a description; there's a number of blocks in that jail -- what cell block were you initially assigned to, sir?
A. C block.
Q. And how long were you in the C block? Do you recall?
A. Just -- I can't remember. I was there for a while.
Q. At some point did you get transferred to another block?
A. Yes, I did.
Q. And what block was that?
A. G block.
Q. G?
A. G.
Q. And then where did you go after G block?
A. After G block I went to prison after that.
Q. Okay. So that would have been the last block you were in

2023

before you got sent to the Anamosa facility?
A. Yes.
Q. While you were in the Woodbury County Jail, did you come to know somebody by the name of Dustin Honken?

A. Yes, I did.
Q. Did you have contact with him, one-on-one contact with him, in C block, or was it in G block that you had one-on-one contact with him?
A. It was G block.
Q. Did you know of him while you were in C block?
A. I seen him. He was in the next block, and he talked to several people through the door.
Q. What block was he in? If you were in C at the time, what block was Dustin Honken in?
A. He would be in D.
Q. And you said he talked to several people through the door?
A. Yes.
Q. Who was he talking to in your block, C block?
A. He was talking to a Spanish guy and a white guy. They called him Pelon.
Q. Pelon?
A. Pelon.
Q. Do you know Pelon's real name?
A. Right offhand I can't remember. We called him Pelon because he shaved his head, the Spanish people in jail.

2024

Q. And you testified at the grand jury at some point. Do you remember doing that?
A. Yes.
Q. Would it refresh your recollection what his real name was if you had a chance to take a look at your grand jury testimony?
A. Yes, it would.
MR. WILLIAMS: May I approach, Your Honor?
THE COURT: You may.

BY MR. WILLIAMS:

Q. Mr. Altimus, I just want you to read this to yourself. I'm directing you to page 5, and at the bottom of that page there's a question asked of you. If you'd just read those lines to yourself, and when you're done, let me know.

Have you had a chance to read that, sir?

A. Yes, I did.

Q. And does that refresh your recollection about Mr. Pelon's real name?

A. Yes, I do.

Q. And what was that?

A. Dennis Putzier.

Q. Now, you saw Mr. Honken in the other cell block talking to the Spanish guy and Dennis Putzier, but you didn't have any one-on-one contact with him while you were in C block. Am I getting you?

A. I didn't have no contact with him.

Q. When you moved to G block, did you start to have contact with Dustin Honken then?

A. Yes, I did.

Q. Okay. And once you were in G block, can you just describe for the jury, do you have one conversation with Dustin Honken? Do you have multiple conversations with him? How does that work?

A. I talked to Dustin every day of the week for several hours that we was out. We mostly did it in his cell or another cell that was in the little block we was in.

Q. And during the course of those conversations -- how long -- to the best of your recollection, how long do you think you were

in the same cell block, G block, with Dustin Honken when these conversations would have taken place?
A. We was in there from the time they opened the door in the morning all the way till they locked the door at night. We'd come out to eat lunch, go back in there, shower, and maybe to the rec., maybe an hour. But we'd be talking the whole period of the day.
Q. And then do you remember how many months you would have been in G block with Dustin Honken?
A. Several months.
Q. And during the course of these several months and the multiple conversations you had with Dustin Honken, did you guys tell each other information about yourselves?

2026

A. Yes, we did.
Q. And did the details and the depth of the information become greater as time went on?
A. Yes.
Q. During the course of those conversations, did he talk to you about past criminal conduct he had committed?
A. Yes, he did.
Q. Did he talk to you about the charges he was currently under?
A. Yes, he did.
Q. Did he talk to you about plans to have you do something for him if you could get out of -- if you could get bonded out of the jail?
A. Yes, I did.
Q. What I want to do is recognizing that this occurred over the course of time, I want to take each of those subjects and

talk to you about them one at a time. So do you understand where I'm going to go with this?
A. Yes, I do.
Q. Let's talk, first of all, did he talk -- what did he tell you about his current case? What was he in prison for, in the jail for, at that moment?
A. He was in there for meth.
Q. And did he tell you anything about who was involved with him in the meth operation that ended up with him being in the

jail?
A. Can you say that question for me one more time?
Q. Sure. Did he tell you who was involved with him with the meth?
A. I don't think there was anybody that was in jail with him, but there was other people that was outside.
Q. And do you remember who those people are that he told you about?
A. He said his best friend.
Q. His best friend?
A. (Witness nodded head.)
Q. Did he tell you how he got caught and ended up in the jail there?
A. He said that somebody told on him and he got set up, ended up there.
Q. I'm going to ask you to just get a little bit closer to that microphone as you're testifying if you would, sir.
Did he describe the nature of the evidence that was pending against him? In other words, did he talk to you about what evidence the government had against him?

A. Yes.
Q. And how did he describe that?
A. He said, you know, they had several evidence up against him and . . .
Q. Don't remember a whole lot more than that?
♀

A. (Witness shook head.)
Q. Okay. Now, at some point did he talk to you about a prior case, prior charges he had against him?
A. He said that he was in jail before and he got released from --
Q. Did he tell you how he got released?
A. He got released because he told me, you know, the government, they don't have no bond. They release you or they don't. And they let him out on a monitor at the time.
Q. Did he ever tell you anything about having any involvement with witnesses disappearing?
A. Yes, he did.
Q. What did he tell you?
A. He told me that his witness disappeared so the government had to let him out of jail.
Q. Did you believe him initially?
A. Not right offhand, no.
Q. Did he do anything to show you he was telling you the truth on that?
A. He had his mom send him newspaper articles to him in jail so I could see that he was telling the truth to me.
Q. And the newspaper articles had something to do with disappearances of witnesses?
A. Yes, it did.

Q. So at this point are you asking him a lot of questions

about this past involvement in the disappearance of witnesses?
A. I told him I couldn't read, so he read the article to me and stuff. Then he was going to go and explain more, and I told him I didn't need to know the information because, you know, I was a convict and we got code to laws, and we don't need to know a lot of information because in prison and jail you go by a code and you don't need to know a lot of information, you know. You mind your own business, be quiet.
Q. So he tried to tell you more information about it, but you shut him off.
A. Yes, I did.
Q. So in the course of any of the conversations with you, did he ever give you any details about how the witnesses disappeared?
A. I just remember he said he killed them and disposed of the bodies somewhere, but he would try to go into more how he did it, and I told him to stop, I didn't need to know information more.
Q. Now, why are you telling him to stop talking to you?
A. Because it's code in prison, you know. We don't -- I don't need to know this information, you know. I don't know this guy that well, you know, why he's telling me deep into information I don't even need to know, you know.
Q. And so did you ever get much more details from him other than the fact that he told you he killed them and he disposed of

the bodies someplace?

A.    That's it.

Q.    Now, at some point did he tell you about whether he had attempted to bond anybody out of the jail?

A.    He said he bonded one person out of jail.

Q.    Did he tell you who that was?

A.    He just said it was -- referred to him as a crack head and it was a black male.

Q.    Did you know who he was talking about, who he bonded out?

A.    I didn't know the guy personally, no.

Q.    Did he tell you -- did Dustin Honken tell you why he bonded this guy out?

A.    He bonded him out to kill somebody for him.

Q.    What did he tell you about what happened?

A.    He said he bonded this guy out and he used his ex-wife's house as a collateral for bond, and he got out and just started smoking drugs and didn't do nothing for him.  And then he ended up back in jail in so many days.

Q.    What was Dustin Honken's attitude when he was telling you about this guy that he bonded out?

A.    He was very upset.

Q.    Did he tell you anything that -- any plans he had regarding that individual?

A.    He was trying to get people to jump on him in jail and things like that.

                                              2031

Q.    Now, share if you will with the jury, Mr. Altimus, at this stage in your life, you're in the Woodbury County Jail.  You've been caught for theft in the first degree.  Mentally what's your attitude about life at this point when you're in the jail?

A.    I didn't have a life.  I was at the bottom of my ropes of

life. I didn't have a care or anything about the world. I didn't have much contact with my family. I didn't have no friends out there, so basically when I went to jail this time, I just gave up hope of living and life, everything.

Q. And did you convey that attitude in your discussions with Dustin Honken?

A. Yes, I did.

Q. At some point did Dustin Honken approach you about doing something for him?

A. Yes.

Q. What did he ask you to do?

A. To kill his best friend.

Q. Did he tell you the name of that best friend?

A. I don't recall him ever telling me his name, no.

Q. Okay. And you're in jail at this point. How are you supposed to be able to kill somebody if you're sitting in the Woodbury County Jail with Dustin Honken?

A. Well, over days and period of time talking with him for many hours, we came up with a plan of how to try to get me out of jail to go kill his best friend.

♀

Q. And what was that plan?

A. Well, when I first met him, I told him I was a federal inmate in jail because federal is stronger than state. So when I started hearing about his case and everything, I told him I was a federal inmate to try to impress him a little bit more, and then we came up with a plan, you know, since I was federal I couldn't be bonded out. I told him I had a state charge too. If he could bond my state charge, the federal government would release me out on a bond.

Q. Now, when you told him you were a federal inmate, that wasn't the truth?
A. No.
Q. Why did you lie to him?
A. I lied to him to try to impress him more.
Q. Okay. Now, previously you had talked about -- you had told him that you couldn't read and you had him read that newspaper article to you. Now, could you read at the time, sir?
A. Yes, I could.
Q. So why did you tell him you couldn't read?
A. Just a thing you pick up in prison, you know. It's a -- you try to con people, manipulate them, things like that. It's a thing you pick up when you go to prison. You know, you learn how to bend rules and manipulate people and do things like that.
Q. And that was just part of it?
A. Yes.

2033

Q. So ultimately when you told him that you also had state charges and could be bonded out, let's, first of all, talk about what the plan was that if, in fact, you got out, what were you supposed to do other than -- I know you said kill the best friend. Did he give you any details about how you were supposed to go about doing that?
A. Well, he had a girlfriend that was supposed to bond me out of jail, and we was supposed to go to Des Moines and stay at a motel, and she would show me where he worked and the environment around there, and then I'd go back and kill him once I found out his routine.
Q. What was that girlfriend's name?
A. Angie Johnson.

Q. And did you ever, while you were in the Woodbury County Jail, see Angie Johnson?
A. Yes, I did.
Q. How did you see her when you were in jail?
A. Looking out the window.
Q. And how do you know that was her when you -- first of all, what window were you looking out of?
A. In the jail, in G block, you can look out, and there's like an alley, and I think there was a bank there too. And she'd be standing outside talking to Dustin holding up signs, you know, "I love you" and other signs, and she had long, black hair, and Dustin pointed and said, That's my girlfriend. That's how I

♀

know.
Q. And so it's that girlfriend that was supposed to help you get bonded out and also help you locate this best friend.
A. Yes.
Q. Did he tell you any more details about how he wanted you to actually carry out the killing?
A. Once we got down to Des Moines and stuff, he tried to explain to me that his woman would explain how -- that once I killed them how I could get rid of the bodies and stuff.
Q. So this girlfriend was supposed to explain to you how to get rid of the bodies and how to do everything once you got out?
A. Yes.
Q. What were you supposed to get out of this?
A. Dustin, if he bonded me out, I would take $10,000.
Q. And he said that his girlfriend was going to bond you out at some point. Did he explain to you how it is that his girlfriend was going to bond you out?

A. Yes.

Q. And how was that supposed to be done?

A. While we was in jail, there was a guy Johnson that came in there for meth too, a big ring. He sold a meth -- how to make meth to this guy for a thousand dollars, and the two women met at a Dairy Queen in Fort Dodge, and Johnson's girlfriend gave Angie Johnson a thousand dollars, and then she came up and tried to bond me out of jail but failed.

♀

Q. Now, how do you know all this when you're sitting in the jail?

A. Because we was talking and sit in the cell blocks and everything, and Dustin and him would go in there, and before I got bonded out, Johnson told me that --

Q. Let me stop you, because what Johnson tells you we can't talk about. But did Dustin Honken ever explain to you how this whole thing worked?

A. Yeah, Dustin Honken told me that he conned Johnson out of a thousand dollars and sold him a meth recipe.

Q. And it was that thousand dollars that was supposed to go to Angie Johnson that was supposed to get you out of jail.

A. Yes.

Q. Now, you said that you were supposed to be told about how to dispose of the body, and this is just the body of Mr. Cutkomp -- I'm sorry, of this best friend?

A. Yes.

Q. Did he ever talk to you about, once you found the routine -- I think you indicated you were supposed to figure out what his routine was; Angie Johnson was going to help you -- where you were supposed to do the killing at?

A. I was going to kill him wherever I found him at. It depends on where the location -- found a best spot. He said he had a mom and dad that lived on a farm so he could be there. That'd be a good location, and we was just going to follow him

around to find out the best spot, you know, because he said he had a real simple life, work, home, and to his mom and dad.
Q. Did Dustin Honken ever talk to you about what to do if you ended up going into the house, his mom and dad's house, to kill him and the folks were there, his parents were there?
A. Yes, he did.
Q. And what did he tell you to do then?
A. We figure, you know, we would have to eliminate them all and if somehow he got away, we figure if we killed one of them or did some harm to them, his best friend would be so scared to come testify that he wouldn't.
Q. Now, you were supposed to get paid for this, and once you committed the murders, what was supposed to happen with you?
A. At the time we came up with a plan. Dustin came up with that we was going to first prior to going to Des Moines that Johnson -- he came in with a big ring of drug dealers, so the head guy's name was Dick. I ain't ever seen the guy. I just know him by name. Had a bunch of people there that owed him a bunch of money for meth. We was going to try to go to Fort Dodge and collect the money and eliminate some people there, drug people and people that owed him, take the money, and proceed to Des Moines and kill his best friend. And then once we killed his best friend and got rid of them, I was going to be taken to Canada.
Q. And so the way to get you out of all this is to get you up

into Canada at some point.

A.    Yes.

Q.    Now, Mr. Altimus, at this stage in your life -- I think you described it as you were at the bottom -- did you agree to go through with this plan?

A.    Yes.

Q.    Were you ultimately bonded out?

A.    No, I was not.

Q.    What happened?

A.    Angie Johnson came down there and tried to bond me out, and the bondsman and -- she was short a few hundred dollars because the bondsman told me it was 1,200, and I talked to the bondsman. He said he would accept a thousand dollars.  She came down with a thousand dollars, and then he wanted some collateral.  The bondsman told me once I called him back that she had a good job down there in like Des Moines or right outside Des Moines. Might have been Ankeny I think at like a country club or something like that, but it wasn't good enough to bond me out with her signature.

Q.    When you're having these conversations, you were actually talking to the bondsman about all this as it's happening?

A.    Yes, I called him on the phone.

Q.    And while he was on the phone, did you end up talking to anybody representing themselves to be Angie Johnson down there?

A.    Yes, I talked to Angie on the phone.  The bondsman put her

on the phone.  I told the bondsman that was my sister because

last time Dustin tried to bond somebody out the bondsman really didn't want to do it because it wasn't a family member. Most bondsmen want somebody in the family to bond you out, not somebody that don't know you.

Q. So when you talked with Angie Johnson, what was the conversation?

A. She told me that she was short a couple bucks, and that was kind of like a code that she needed a couple more hundred dollars, asked me if, you know, I had any more ideas or if Dustin knew any more ideas. She used codes for names and things like that.

So I asked Dustin if he knew any more ideas how to get me out. He didn't have none. And so she proceeded and left the bondsman, and he was trying to work in jail to figure out how to get somebody -- have some collateral for me. So he was talking to Johnson. Johnson had some mobile homes that we was trying to get the titles to from his ex-wife or his girlfriend to come down and put for collateral, but it all failed, and I never got out of jail.

Q. So ultimately instead of getting out of jail and carrying through with this plan, you end up getting sent off to the Anamosa Men's Reformatory.

A. Yes, I did.

Q. The Dustin Honken that we've been talking about today that

2039

solicited you to kill his best friend, do you see him in the courtroom here today, sir?

A. Yes, I do.

Q. Could you describe where he's sitting and what he's wearing?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1780 of 3636

A. He's sitting to my left, and he's wearing a yellow shirt.

MR. WILLIAMS: Thank you. I have no further questions, Your Honor.

THE COURT: Mr. Parrish?

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Good morning, Mr. Altimus. How are you?

A. All right.

Q. I'm going to ask you when I ask you questions to speak up so the last juror all the way over on the right can hear you. Your voice tends to drop at the end of your sentences. So we want to make sure the jurors can hear everything that you say; okay?

A. All right.

Q. All right. I first want to talk a little bit about your background much as Mr. Williams talked about it. As I understand it, you had a conviction of kidnapping; is that correct?

A. Yes.

Q. And you described it as going over and -- was it kidnapping

a girlfriend of yours?

A. Yes.

Q. And at the same time you were armed with a weapon?

A. I didn't ever commit going --

Q. No, my question was you were armed with a weapon?

A. I was not armed with a weapon, no.

Q. But Mr. Williams asked you about the charge, and you indicated it was just kidnapping. As I understand it, it was also going armed with intent?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1781 of 3636

A. Yes. There was a gun that was used that was --
Q. What type of gun?
A. It was a sawed-off shotgun.
Q. All right. And you took a sawed-off shotgun. You went into a place where a bunch of kids were; is that right? Is that a yes or no?
A. Can you say that question for me --
Q. Where a bunch of kids were -- you took a sawed-off shotgun, and you went into a place where a bunch of kids were.
A. I did not do that personally.
Q. The person with you did that.
A. My accomplice.
Q. But you pled guilty to it.
A. Yes, I did.
Q. So you and an accomplice, your accomplice, went into a place where kids were with a sawed-off shotgun and took your

girlfriend which I assume was a kid also; is that right?
A. Yes.
Q. Okay. And you took your girlfriend, and you took off to a different state?
A. Yes.
Q. And that state was South Dakota; is that right?
A. Yes.
Q. Now, Mr. Williams asked you about that incident on direct examination. You did not tell him about you or the friend going in with a sawed-off shotgun, did you?
A. No.
Q. Matter of fact, during any of your interviews, did you tell any of the other law enforcement officials about going in with a

sawed-off shotgun?
A. Can you say that question one --
Q. Did you tell any of the other law enforcement officials who interviewed you that you went into a place with kids with a sawed-off shotgun, you and your friend? Did you tell them? Yes or no.
A. No.
Q. And as a result of going in with that sawed-off shotgun and kidnapping your girlfriend and taking her to a different state, you were not charged federally, were you?
A. No.
Q. Actually you were charged in Iowa; is that correct?

2042

A. Yes.
Q. And as you were charged in Iowa, you, in fact, entered a plea, but what the judge did in your case, the judge sentenced you not just to one term of sentence, but the judge stacked your sentences, didn't he or she, whoever the judge was?
A. Yes.
Q. All right. That meant that you had to serve one sentence, and on top of the next sentence you had to serve another sentence; isn't that correct?
A. Yes.
Q. So that meant that based upon this crime that Mr. Williams asked you about, you then had to serve two separate sentences stacked on top of each other down at one of the institutions; isn't that correct?
A. Yes.
Q. Which institution did you go to?
A. Anamosa State Penitentiary.

Q. How old were you when you went in there?
A. Eighteen years old.
Q. How old were you when you got out?
A. Around 25, 26.
Q. That's a long time, isn't it?
A. Yes.
Q. And that's because they were stacked; is that right? That's because the sentences were stacked on top of each other;

is that right?
A. No, that was not.
Q. Oh. Why was it then?
A. Because of my nature of behavior in prison. I could have been released earlier if I would have had a good maintained attitude in prison.
Q. That means you acted up when you were there.
A. Yes, I did.
Q. And that means as a result of that you just kept adding time to your sentence; is that right?
A. Yes.
Q. And it also meant that you didn't get out until what year?
A. Around I would say 1995.
Q. Right before you went back to Woodbury County Jail; is that right?
A. Yeah.
Q. Now, when you were asked by law enforcement officials earlier about the incidents that you had that kept you in prison that long, did any of them bother to ask you one time why somebody 18 would stay in prison so long? Did any of them ask you one time that question?

A. When you refer to law officials, can you --
Q. Yes, sir. When you were interviewed about this case and these law enforcement officials were sitting down and chatting with you, did they once ask you how did you happen to stay in

prison -- when you were only 18 years old when you went in, how did you happen to stay there so long?
MR. WILLIAMS: Objection, Your Honor, to even relevance on this issue.
THE COURT: Overruled.
A. I don't recall, no.
Q. All right. You don't remember answering a single question like that prior to today, do you, to anyone?
A. No.
Q. Well, let me ask you, you said you had an attitude there because you had some difficulty getting along; is that correct?
A. Yeah.
Q. Your attitude was negative; is that right?
A. Yes.
Q. Then you got out. You believe it was in '95. Would you be surprised if your discharge date was September of 1996? Would that surprise you?
A. No, it wouldn't.
Q. All right. So really about the same time that you were eventually released from prison because you'd actually run out of time, you then meet up with Mr. Honken; is that correct?
A. Yes, I did.
Q. But you meet up with him not because you've been discharged. It's because the moment you get discharged you go out and commit another crime.

A. Yes, I did.
Q. And that's the crime Mr. Williams asked you about on the direct examination which is theft first; is that right?
A. Yeah, it was theft first degree. I --
Q. Which meant you got another ten years; is that right?
A. Yes, it was.
Q. And as a result of this next ten years, you go back to Woodbury, and then you go down to Oakdale which is the receiving center that this jury has heard so much about; isn't that correct?
A. Yes.
Q. At Oakdale, you run into your buddies, Mr. Putzier; is that right?
A. When I was at Oakdale?
Q. Yes, sir.
A. I don't remember if I ran into Putzier there.
Q. Oh, you cannot remember if you ran into Mr. Putzier; is that correct?
A. I don't recall, no.
Q. Okay. Is it a fact you may have run into him but now as you sit here today you can't recall if he was in Oakdale at the same time? Is that your testimony?
A. I remember I met him at another facility when I was at. I don't remember I was at Oakdale with him.
Q. But you do remember that after you left Woodbury County

Jail where Mr. Putzier was, you saw him later at another institution; is that correct?

A. Yes.

Q. You're just telling this jury now you cannot recall which institution you later ran into Mr. Putzier at; is that correct?

A. I met him at Clarinda Correctional Facility. That's where I met --

Q. It was Clarinda. Okay.

A. I said I don't remember if I ever ran into Putzier at Oakdale.

Q. Okay.

A. But I know for a fact that I ran into him at Clarinda Correctional Facility.

Q. Fine. Now, Mr. Putzier, if I'm correct, was also at the Woodbury County Jail at the same time Mr. Honken was there.

A. Yes, he was.

Q. So if I understand you correctly, you then met at Woodbury County Jail, but just before I asked you that, did you know him before you went to the Woodbury County Jail?

A. You're referring to Dustin?

Q. Mr. Putzier, yes.

A. Did I know him before then?

Q. Yes, sir.

A. No, I did not.

Q. So you had never in the past done drugs with Mr. Putzier or anything like that.

A. No.

Q. And you didn't once you got out because you really weren't out for a long period of time, were you?

A. I was out of prison like 28 days.

Q. And right back in.

A. Right back in.

Q. So here you are what? 25, 26 years old, and since 18 you've been locked up.

A. Yes.

Q. The only thing you have known since you have been an adult is how to operate within a prison environment; isn't that correct?

A. Yes.

Q. And what you've described to this jury is a mentality that you developed; isn't that correct?

A. Yeah.

Q. It teaches you how to survive within this setting; isn't that correct?

A. Yeah.

Q. And so you learned how to con people within that setting, didn't you?

A. Yes.

Q. You learned how to scam people within that setting; isn't that correct?

♀

A. Yeah.

Q. So a person like Mr. Honken who had never been inside of a jail institution in his life, would you agree that you had an advantage over him?

A. I don't feel I had -- I feel I had a little bit of advantage over him, yes.

Q. Well, let me give you an example. You knew how to go up to someone like Mr. Honken who had never been in a jail facility and tell him, I can't read.

A. Yeah.

Q. That meant you could read his papers if you wanted to and he wouldn't even know you could read; would you agree?
A. Yes.
Q. Matter of fact, people read other people's papers in jail all the time, didn't they?
A. They did, yes.
Q. Why?
A. If they did, they would get killed.
Q. Well, if they got caught they would probably get killed.
A. Yeah.
Q. But let me ask you, why did they read them in the first place?
A. I would not know.
Q. Well, wouldn't they read them to find out why the person is there?

♀

2049

A. That's the reason -- maybe to find out if they're lying or something, yeah.
Q. Absolutely. To trade information; isn't that correct? That's another reason they did it. If you knew a person was in jail for something, you could get access to their personal files, wouldn't you think that it might help you later on to deal with law enforcement?
A. If -- I don't understand your question.
Q. Well, if you had confidential information about an inmate who has just come into the jail and you could access that information, couldn't you trade it for a deal?
A. I don't think so. I ain't ever seen anything like that done, no.
Q. Oh. So you're saying you cannot trade confidential

information for a deal if you're in prison or in jail.

A. Can you --

Q. Do you understand my question?

A. I don't under -- can you rephrase it so I understand it?

Q. I will. Let me pull back a little bit, and I apologize for not making myself clear. If you had access to information about an inmate from reading their files, first of all, you could talk to other inmates about it; isn't that correct?

A. Yeah.

Q. That's one thing. You could also talk to the jailhouse guards about it if you wanted to trade information about that

person, could you not?

A. Yeah, but you're saying trading information. I don't understand.

Q. Well, for advantages at the jail.

A. I mean, I couldn't tell the guard information and he'd give me a pack of cigarettes, no. That's not the information you traded. When you say traded, what do you mean by trading them? Giving something for something?

Q. Yes.

A. I don't believe you could ever do that, no.

Q. So you couldn't give any information out for a benefit to you in terms of your sentence or in terms of a reduction or in terms of getting released or something?

A. Maybe if I was in prison or maybe in jail if I seen a fight and I told the jail I seen it and gave information or if I knew somebody had drugs in there or doing -- maybe smoking cigarettes in jail when you can't, if I told them that in his cell, maybe -- benefit may be moving to another block. Maybe they

might give me, you know, an extra blanket in there or something like that, but nothing I don't believe . . .

Q. But an extra blanket inside of a cold prison is an advantage, isn't it?

A. The word advantage, can you break that down for me?

Q. Okay. It's a benefit. I mean, let's take it step by step. Complaints are made about the Woodbury County Jail as being a

little cold in the wintertime, isn't it?

A. Yeah, they give you a little blanket.

Q. They give you a little blanket.

A. Yeah.

Q. And it's a little chilly in there, isn't it?

A. Yes.

Q. If you had an extra blanket, you're a little bit warmer, aren't you?

A. At the time you would be, yeah.

Q. And everybody wants to be a little bit warmer at night when they cuddle up in their bunk.

A. Yes.

Q. So that is a benefit, isn't it?

A. Depends on where -- you're saying that if I get a blanket from a guard or something, I mean, I just walk into another cell and take a blanket.

Q. Oh, okay.

A. I mean, there's blankets all over. That's the way our mentality was. If I wanted a blanket, I could walk in and just strong arm somebody and just take a blanket.

Q. I'm sorry. You --

A. Strong arm somebody. That's the men --

Q. How do you do that?
A. Just walk in and take their blanket and walk out. What are you going to do about it?

Q. Oh, okay. So that's what you would do.
A. Yeah.
Q. And that was basically your attitude.
A. Yeah.
Q. And so when Mr. Williams talked about you being so down on your luck and not able to kind of think and move, you still had the attitude that you could take care of yourself, didn't you?
A. Yeah.
Q. And so in order to take care of yourself, you've already acknowledged that you would con people.
A. By taking care of myself in prison life, it's life or death.
Q. Matter of fact, it's the way you survive, isn't it?
A. Yeah.
Q. And tell the jury what would happen if you didn't protect yourself by trying to impress people. Tell them what would have happened to you.
A. Prison lifestyle is very different than the outside world. If you don't understand it, you can be killed for a cigarette, for talking to somebody, looking in the wrong cell, seeing something you didn't see. So the lifestyle is live or die. So you go in. You're doing a life sentence till you walk out. That's the way I felt.
Q. That's right. And that's the way most of the other inmates feel, right, that they're doing a life sentence when they walk

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1792 of 3636

in; right?
A. Not all of them. There's different people referred to as convicts and inmates.
Q. Right. But what I mean by a life sentence, every day your life is on the line.
A. Yeah.
Q. As a matter of fact, what you want to do is walk in right away and impress people how tough you are and don't mess with me.
A. You don't want to do that, no.
Q. What do you want to do?
A. When you walk -- when I walked in, you know, sometimes when you do that, you can have somebody that will challenge you, think they're tougher so they're going to test you. There's always somebody tougher, somebody bigger, somebody that can strong arm you, bigger than you. So if you walk in and just try to strong arm somebody, it'd be difficult to do in a prison.
Q. You had a chance to watch Mr. Honken over there, didn't you, when you were over at Woodbury County, and you've described that to Mr. Williams?
A. To watch him?
Q. Yeah, you had a chance to watch him and chat with him, did you not?
A. Yeah.
Q. Okay. Who walked over and challenged him when you were

2054

over at Woodbury County Jail? Who in that prison challenged him once?

A. Challenged him? What do you mean?
Q. Challenged Mr. Honken one time.
A. In a fight or something --
Q. In any way.
A. Nobody.
Q. Nobody. Nobody over at Woodbury County Jail, did they?
A. No.
Q. Did you see people hanging around his cell, though?
A. Yeah.
Q. Who?
A. Several people.
Q. Tell the jury who did you see hanging around Mr. Honken's cell.
A. People that was in the cell block.
Q. Donaldson?
A. Donaldson.
Q. Who else?
A. Who's Donaldson?
Q. Well, I asked you did you see Donaldson there?
A. And I tried to ask -- I didn't see it. I don't know a Donaldson.
Q. Okay. Did you see anybody? Name the people who you saw hanging around his cell.

2055

A. It was just in G block when I was with Dustin.
Q. I understand that was in D block.
A. That was like Johnson.
Q. Johnson was there; right?
A. Yeah.
Q. Who else?

A. There was several other people in the block -- I don't know by name -- that was in there.
Q. And you saw Johnson there quite a bit, didn't you?
A. Yeah.
Q. Matter of fact, could you see Mr. Honken and observe things that he was looking at from your perspective? Do you understand that question?
A. No.
Q. Could you take a look at him -- and you're both in the same area -- and whatever Mr. Honken could see you could see?
A. Everybody see things different in their eyes.
Q. I'm sorry. The reason I asked that question, you gave a description to Mr. Williams of seeing a person you said had black hair outside with a car.
A. So if we're looking outside a window, me and Dustin, we would see the same person?
Q. Yes. Did that happen?
A. Yeah.
Q. Okay. And were you in the same cell together, or how did

it happen?
A. We was in the same cell, and then we'd rotate over to another cell because up on the top floor you could -- there's two cells, and you can look out.
Q. But you weren't really in the same cell together.
A. Yes, we was in the same cell when we looked out.
Q. All right. And then you can look out of the window?
A. Yeah.
Q. And you looked out of the window and saw a car?
A. Yeah.

Q. And you said that car he indicated was his girlfriend's car?
A. She came up and got out of that car.
Q. Right. You saw her get out of the car; right?
A. Yeah.
Q. Now, what kind of car was it? Was it a tiny car?
A. The car I couldn't recall.
Q. Was it a Toyota Tercel?
A. I couldn't recall.
Q. Uh-huh. Did it look any way unusual to you or anything like that when you saw the car?
A. I just know it had four wheels, steering wheel.
Q. Did you notice the color? I'm sorry. Did you notice the color of it or anything?
A. The color I couldn't tell you off the hand.

♀

2057

Q. And that car was driven right up outside of the Woodbury County Jail; is that right?
A. In the back, yeah.
Q. There was no attempt to conceal the car or anything like that.
A. I don't think she was a Houdini.
Q. Houdini?
A. Make it disappear or anything.
Q. And I assume law enforcement officials are around this jail; is that right? I mean, they were guarding you, and you were at the Woodbury County Jail; is that right?
A. This ain't -- it wasn't no National Guard with this big military. I mean, people could walk up to the jail, talk to you, do anything out there. It's an alley, and maybe I think

there was a bank out back.

Q. And did you see him waving out to her or anything like that?

A. Yeah.

Q. You saw her waving up to him.

A. Yeah, she had signs.

Q. She had signs? What? I love you, Dustin?

A. Yeah.

Q. Oh, okay. And so I would imagine anybody else around there could have seen the same thing.

A. Yeah.

♀

Q. Now, one thing you didn't talk any detail about, was there supposed to be some big jail break there with a rocket coming through the wall of the jail there?

A. When you say a jail break, what --

Q. Was there supposed to be a jail break that was discussed and a rocket was supposed to sail through the Woodbury County Jail at one point?

A. Yeah, me and Dustin talked about that one time, yeah.

Q. Now, you brought up the idea of the rocket because you knew something about the rocket; right?

A. It all started when I came into the G block.

Q. Well, I just asked the question did you bring up the idea of this rocket that you knew about?

A. I told Dustin Honken that I could obtain launch rockets and other several types of weapons.

Q. Big military weapons.

A. Yes.

Q. You told him you could do that.

A. Yes.
Q. But that's not true, is it?
A. No.
Q. You wanted to impress him.
A. Yes.
Q. Why did you want to impress Mr. Honken?
A. Wanted to impress him because he was a federal inmate and I

was a state.
Q. So if he was a federal inmate, he was big time; is that right?
A. Yes.
Q. Why was he such big time if he was a federal inmate and you were just a state inmate?
A. Because anybody that usually goes to federal has a big crime.
Q. And he had big newspaper articles written about him; right?
A. I ain't seen the article, no, but, I mean, he read it to me.
Q. I thought you did see them and you told him you couldn't read.
A. He got the articles in there and showed them to me, and I handed them back to him and read them. I never sat down and read the articles and looked at them, no.
Q. Matter of fact, other people in the jail also had access to these articles, didn't they?
A. When you say access, what do you mean?
Q. Okay. I'm sorry. Other people in the jail read these articles, didn't they?
A. I do not know. I can't -- I don't know.

Q. Did you say that the articles were circulated around the jail?
A. No. I said Dustin Honken had his mom mail them in, and he

tried to show them to me, and I didn't look at them and gave them back to him, let him read them to me.
Q. Okay.
A. When you say they was around the jail, I have never seen them around the jail.
Q. Did other people talk about Mr. Honken being a federal prisoner over at Woodbury County Jail?
A. They did.
Q. Was that kind of common knowledge?
A. When you say common --
Q. Let me see can I break that down a little bit. Was that what other people understood was that Mr. Honken was a federal prisoner and that was talked about around the jail with other inmates? Do you understand that question?
A. Say that one more time for me, please.
Q. All right. Let's try it again. When Mr. Honken was in the jail cell, you indicated you understood he was there and he was a federal inmate and you'd read his articles; right?
A. I didn't read them personally.
Q. He read them to you; is that right?
A. He read them to me, yes.
Q. Now, you said other inmates knew that he was a federal inmate from your observations then; is that correct?
A. They said that, yeah. How they knew he was a federal inmate I do not know.

Q. No. I understand you don't know why, but it was a general conversation piece around the jail that he was a federal inmate, and we're not asking how they knew, but it was general conversation.
A. Yes.
Q. Okay. Then at some point during your stay and Mr. Honken's stay, you brought up the fact that you knew something about military weapons.
A. Yes.
Q. Including a rocket launcher.
A. Yes.
Q. And part of what you and Mr. Honken did was spread a rumor around the jail that at some point someone was going to shoot a rocket launcher into the jail and you were going to escape through the hole.
A. We didn't spread it around the jail, no, I mean.
Q. Other inmates knew about it, didn't they?
A. In our cell block.
Q. Yeah.
A. But I mean you say --
Q. But it was a lie.
A. It was, but when you said spread it around the jail, we didn't go around block to block telling people.
Q. Let's just talk about within your cell block then. We don't know what other people knew in the other cell blocks, do

2062

we?
A. Well, the way you was explaining it to me, I thought you was saying you spread it around the jail. When you say spread

it around the jail, that means a thousand people in the jail or whatever.
Q. I'm sorry. They have a thousand people --
A. In one block we had a handful of people. It wasn't --
Q. Well, you had 30 people, didn't you?
A. No.
Q. So, first of all, the fact that you had a military rocket was a lie.
A. Yes.
Q. The fact that there was going to be some scheme for a rocket to be shot through the cell was a lie.
A. Yeah.
Q. And the whole thing regarding any escape of blowing a hole in the jail was a scam set for a certain purpose, wasn't it?
A. It was a scam, yeah.
Q. And tell the jury the purpose of this scam. Who was to benefit from it?
A. Me, Dustin, and Johnson.
Q. And tell the jury from this scam about an escape of blowing a hole in the jail cell how, in fact, were you going to benefit. Just briefly explain that as succinctly as possible to this jury.

2063

A. Well, if the hole was blown in the wall, me and Johnson was going to escape, and other people. Dustin told me he was going to stay because if I escaped from the jail through a hole I could run to a building around the corner or something where it'd be safer to run and hide, and they wouldn't even think I would be in a building like that, and I would proceed to go, if I made it that far, to kill his best friend. He said he didn't

want to go escape through the thing because if I killed his best friend he would get out.

Q. So the scam built upon this military rocket launcher that didn't exist was going to consist of you -- a hole being blown into the wall and then escaping through the wall, but Mr. Honken was going to stay there, and you were going to get out. Then you were going to go kill his best friend, and then he would then get off of his charge.

A. Yeah.

Q. And the whole thing was nothing but a scam.

A. When you say scam --

Q. Well, did you have other people believing that was going to happen?

A. Yes, I did.

Q. As a matter of fact, to prepare for it, a couple of people put earplugs in, didn't they?

A. It wasn't earplug. It was Milk Duds.

Q. So a couple of inmates started going around the jail

2064

putting Milk -- was it Milk Duds or M&Ms?

A. It was a Milk Dud.

Q. So they put Milk Duds in their ears waiting for this explosion to come through the Woodbury County Jail; right?

A. Yeah.

Q. Matter of fact, the Milk Duds ended up melting in one of the guy's ears, didn't they, because he kept them in for two nights?

A. Yeah.

Q. Now, how many other scams were going on in the jail at the same time? There was another scam too; right? What about the

scam for the sale of the methamphetamine for a thousand bucks? Was that a scam going on too?
A. Yeah.
Q. Tell the jury how that scam was supposed to work.
A. All I know is Dustin and Johnson talked about Dustin was going to sell him a meth recipe and Johnson was going to buy it for a thousand bucks.
Q. Let me ask you, from your experience, running scams and talking about escaping, is that anything new for someone who's like yourself -- and not criticizing you for it -- who's spent so many years in prison? Is that just typical day-to-day conversation?
A. You mean while I was --
Q. Conning people.

2065

A. In prison it's not an everyday thing to try to escape, no.
Q. It's not. To talk about it?
A. Not every day, no.
Q. But talk is not unusual.
A. Talk in prison about escaping is -- I don't think I never done it before, no.
Q. Not that you've done it but discussed it.
A. Discussed it, no, not in prison.
Q. You have not.
A. No. My mentality in prison was just try to survive.
Q. Try to survive.
A. Yeah.
Q. And would you agree that surviving you were conning other inmates constantly about matters?
A. In prison you manipulate things, yeah. You bend -- you try

to con your way out of anything, everything you can, yeah.
Q. And your friends; is that right too?
A. Not your friends.
Q. Oh, it's not true in prison that the person who claims to be your friend one day might be the same person putting a shank in your back?
A. It could be, yeah, but usually --
Q. That's not unusual either, is it?
A. No, usually you get killed by your best friends because they're the closest.

Q. Normally -- so there's some truth to that saying --
A. Usually in prison somebody else can't come close to you. It's usually your friend or somebody in your organization.
Q. So that old quote is true: You keep your friends close but your enemies closer?
A. Yeah.
Q. That's kind of something of a creed you live by in prison, isn't it?
A. Yeah.
Q. You knew that his mom sent him articles, did you not? When I say him, Mr. Honken. You knew his mother sent him articles.
A. That's what he told me. He showed me like an envelope with stuff that got mailed.
Q. Right. And you saw the type of envelope she would send him the articles in?
A. I seen them, yeah.
Q. Okay. And you told that to the grand jury; is that correct?
A. I seen, you know, the guy that brings the mail give him a

thing, and he'd show me the envelope and the papers in it. He didn't show them direct to me. He handed them to me. I handed them back.

Q. As a matter of fact, you had heard about Dustin's case before you even started a conversation with him; isn't that correct? And that's what you told the grand jury.

♀

A. I seen him talking to another people in another block.

Q. Well, you heard about his case, and that's a fact, and that's what you told the grand jury on page 14, Because I heard about his case and everything, he was high, high up there and everything, and I wanted to go in there and impress him at first and everything. So you'd heard about his case even before you'd met him. Isn't that what you told the grand jury under oath?

A. If I could see that to refresh my memory.

Q. Absolutely. Have you had a chance to read that grand jury document and refresh your recollection?

A. Yeah.

Q. And would you agree that even before you met him you'd heard about his case?

A. Before I met him?

Q. Yes.

A. Face to face?

Q. Yes.

A. I didn't know everything about his case.

Q. Not everything about his case. You'd heard about his case and everything is what you said; isn't that correct?

A. I heard about his case.

Q. And you wanted to go in there and try to impress him first; is that right?

A. No. I didn't -- I mean, you're saying when I want to walk in there and impress him. You're saying I want to walk into the

block --

Q. Do you want to take a look at it again and read it to yourself? Would you read again page 14.

A. Yeah.

Q. Did you tell the grand jury back in 1997 that you wanted to go in there and try to impress him and you had heard about his case and everything? Is that what you testified to under oath then?

A. Yeah.

Q. You're not telling us that was not true.

A. I wanted to go in and impress him when I talked to him, yeah.

Q. Matter of fact, when you talked about Mr. Honken making any statements to you about who had killed someone, he never indicated to you it was related to anyone in 1993; is that correct?

A. Can you say that one more time for me, please?

Q. Excuse me?

A. Can you say that one more time for me, please?

Q. When you said Dustin Honken told something to you about killing someone, he never related to you it was anything about any 1993 witnesses; isn't that correct?

A. I mean, can you -- I mean, little by little for me because you --

Q. Let me try to break it down. I'm sorry.

A. Because you --
Q. When you talked to Mr. Honken in the conversations with Mr. Williams on direct examination, you indicated Mr. Honken indicated that he'd killed someone. At least that's what you said.
A. Yeah.
Q. My question is did he ever tell you it related to any 1993 witnesses?
A. Yes.
Q. Did he tell you in the conversation that when you were asked by the grand jury -- when they asked you in relation to if she had killed anyone, did he say anything about whether or not it was related to any 1993 witnesses? Do you remember what you told the grand jury?
A. Not offhand, no.
Q. The underlined orange. Did you have a chance to read that?
A. Yeah.
Q. The answer to the grand jury was no; is that correct?
A. Can we go back to the direct question that you asked me?
Q. Okay. And he told you that she had killed somebody before, and the answer is yeah. Did he say anything about who she had killed or whether it related to the 1993 witnesses? Your answer is no.
A. She didn't know nothing, no.
Q. Are you denying you said that?

2070

A. No, I said it because it's right there in front of me black and white.
Q. When he referred to Mr. Putzier while you were in jail, he

referred to Mr. Putzier as a crack head, did he not?
A. Putzier we called Pelon.
Q. Well, I understand what you called him, and I think Mr. Williams on direct examination clarified that for us, and I didn't want to go back through that. But he referred to Mr. Putzier as a crack head, did he not, Mr. Honken did?
A. No. You're saying he called Dennis Putzier a crack head. Is that what you're saying?
Q. Yes, sir.
A. No, he called the black male that he bonded out a crack head.
Q. The guy he bonded out a crack head?
A. Yeah, that he --
Q. Who'd he bond out?
A. He bonded out someone while he was incarcerated in jail.
Q. Okay. Well, let's put it this way. Let's make it easy. The person he bonded out according to you he called a crack head; is that right?
A. Yeah, but his name wasn't Dennis Putzier.
Q. Okay. Matter of fact, in blowing up that hole when you and Johnson and Mr. Honken was, in fact, having this discussion, who is the person who actually put the Milk Duds in their ear?

2071

A. Johnson.
Q. Somebody involved in the discussion; is that right?
A. Yeah.
Q. Now, you said you were sitting in the cell when you got this news cast about Mr. Honken's picture coming on TV and saying something about a triple murder or something like that. Where were you sitting?

A. In my cell block at Anamosa State Penitentiary.
Q. What year was it?
A. I couldn't tell you that right offhand.
Q. Well, we're going to need to track it, and I'll help you track it. You went to Woodbury County Jail. You were there in what? '96?
A. Yeah.
Q. From Woodbury County Jail you went to Oakdale?
A. Yeah.
Q. Was that still in '96?
A. Yeah.
Q. In '97 you went where? Where did they transfer you out of Oakdale?
A. Oakdale in 1996, I went to Anamosa State Penitentiary.
Q. In --
A. In '97.
Q. In '97. Did you see it on television in 1997?
A. I don't remember what year I seen it. I just remember I

was in Anamosa State Penitentiary. It came on the news. I know I was there for a period of time because I was -- it takes a period to go from receiving in Anamosa State Penitentiary to different pods and blocks over there, and I was in another block from receiving, so I was there a period of time. I don't know how long a period of time I was there, but I remember seeing a news flash watching the news one day.
Q. So do you know which institution you were in?
A. Yeah.
Q. Which one?
A. Anamosa State Penitentiary.

Q. All right. And when did you leave Anamosa?
A. I couldn't tell you that.
Q. You don't know whether you left it in '98, '99?
A. I remember I left and went to another institution, yeah.
Q. Which institution did you go to?
A. Clarinda Correctional Facility.
Q. Clarinda?
A. Yes.
Q. All right. And when you left Anamosa and went to Clarinda, is that when you ran into Mr. Putzier?
A. Yes.
Q. Had you heard about Mr. Honken on the news when you saw his face flash across the TV screen before you ran into Mr. Putzier?
A. Can you slow this down a second? I don't understand.

Q. I'm sorry.
A. Thank you.
Q. Did you hear about Mr. Honken and his face flashing across the news before you got to Clarinda and met Mr. Putzier?
A. Yes.
Q. So it was somewhere in between those times that you heard this flash on the news; is that right? It was before you got to Clarinda Correctional Facility, and it was after you were in Anamosa State Penitentiary; would that be a fair statement?
A. Yes.
Q. Okay.
A. Can you tell me what year I went to Clarinda?
Q. Not right now I can't. I have that in my information, but it's not part of any question I'm going to ask you.
Let me just ask you this. You would agree, as you've

said, that you had to lie a lot when you were dealing with Mr. Honken.
A. I had to lie a lot?
Q. Yes. Did you not tell the grand jury you just lied a lot to him?
A. Yeah, but you just said I had to.
Q. Well, I'm just using your words. Do you want to take a look at them and see if you said that?
A. When you're stating it to me, you're saying you had to. It's like, well, I had to.

2074

Q. Well, why don't you take a look at your own statement and see whether or not you said you had to lie a lot.
A. I know. But when you're speaking to me, it sounds like you're trying to ask me you had to. I mean, you're trying to -- I don't understand how you're directing your question to me. It's like I had to. I mean, everybody has choices in life. They don't have to do nothing.
Q. I'm going to refer you to page 66 beginning with a grand juror asking you a question and your response to that question. Read it to yourself, please. Are those your words, sir, under oath, or were those my words when I said you had to lie a lot?
A. I had to lie a lot.
Q. Are those your words, sir?
A. Yes, they are.
Q. Just one last question. When you were moved to Clarinda, did you go down there for treatment or something, or did you just move because your time had ended in Anamosa?
A. I moved from Clarinda for -- had to be treatment and the rest and everything.

Q. For treatment did you say?
A. Yeah.
Q. What kind?
A. I was going down there for drugs and alcohol treatment.

MR. PARRISH: Thank you, sir.

THE COURT: Mr. Williams, how much redirect do you

have?

MR. WILLIAMS: Probably about ten minutes.

THE COURT: Okay. Why don't we do it after the break.

Members of the jury, it's about 10 after. We'll be in recess for 25 minutes. Please remember my cautionary instruction about keeping an open mind until the end of the case. Thank you.

(The jury exited the courtroom.)

THE COURT: Anything we need to take up, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: Nothing.

(Recess at 10:10 a.m.)

THE COURT: Please be seated. You each have a copy of a note we received just a minute ago from Juror 968?

MR. WILLIAMS: Yes, Your Honor.

MR. PARRISH: We do, Your Honor.

THE COURT: What does the government want me to do?

MR. WILLIAMS: We consulted with defense counsel about this. We're wondering if we could talk with the juror and see if she could -- he or she could hang on till noon, if they're feeling well enough to go for another hour and a half and then maybe recess for the day at noon because we're concerned about

losing another juror.

THE COURT: I am too.

MR. WILLIAMS: And I think it'd be preferable if the juror can't hang on even for another hour and a half that we adjourn for the day as opposed to lose a juror. And if they can hang on for another hour and a half, we could at least try to complete a little bit more of the case and then give that juror a break, and that was kind of our consensus. At least we could make a compromise and have them hang on a little bit longer, or we could quit now, but I don't think we want to lose a juror.

THE COURT: Mr. Parrish?

MR. PARRISH: As I indicated earlier, it's been my experience about every three weeks you lose a juror on a case like this.

THE COURT: You've been pretty accurate.

MR. PARRISH: Yes, pretty accurate on that point. I thought as Mr. Williams said, if she can or he can stay on until noon, that would be good, but I just think it's too risky at this point considering we might have a potential of going another three, maybe even four weeks of trial to lose another juror particularly when we're going to get into the winter, snowstorms, et cetera, coming up. I think we're hitting it pretty close right now.

THE COURT: Okay.

MR. PARRISH: That's my thought, Judge, and we'd be willing to go with a recess. I think Mr. Spies and I -- we listened to Mr. Williams. I think we would go with a recess at

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1813 of 3636

noon.

THE COURT: Any problem if we bring the juror in and question the juror?

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: No problem.

THE COURT: Okay. I'll do questioning, and then if the lawyers -- I'll always give the lawyers a right to supplement the questions; okay?

MR. WILLIAMS: Very good.

THE COURT: Could we have Juror 968 brought up, please, and when the juror comes up, can you give the juror the microphone?

(Juror 968 entered the courtroom.)

THE COURT: Why don't you just grab a chair so you can sit down. I have a note, and I shared with the lawyers, and we understand you're not feeling well. We're sorry to hear that.

JUROR 968: Yes.

THE COURT: How sick are you?

JUROR 968: I've been feeling sick since yesterday, and it's to the point where I don't know -- I would rather be going home than I would be getting up and running out of court.

THE COURT: Let me ask you this. Do you feel sick to your stomach?

JUROR 968: Yes.

THE COURT: Okay. Do you think you could hang on till

about, oh, just another hour and a half till noon or so?

JUROR 968: Yes.

THE COURT: We're reluctant to excuse you as a juror because we've already lost two, and we still have a ways to go.

On the other hand, we don't want to torture you with sitting here when you're feeling ill. And so we kind of came up with a compromise that if we could go till noon or so. But do you think you'd be well enough to continue tomorrow? I know it's always hard to tell.

JUROR 968: I would hope so.

THE COURT: Because we really don't want to lose another juror.

JUROR 968: Yes. I don't plan on being gone for long but . . .

THE COURT: You're seated of kind of in the middle, aren't you?

JUROR 968: Yes.

THE COURT: Would you like to change seats so if you have to make a quick exit you could get out quickly?

JUROR 968: That would be nice.

THE COURT: So you would change seats with -- I believe it'd be Juror 204. And why don't the CSOs arrange that change so you could sit in the end seat. And then if you feel sick and that you're going to throw up, then you just make a mad dash, and one of the CSOs will go with you, and we'll just stop

the trial. I actually had that happen one other time, and I was the only one that noticed that the juror had left. The lawyers just kept going. But I'll try and keep an eye out and stop you -- or stop the trial so that -- we obviously can't go on without you. And we appreciate the fact that you're willing to go till noon.

Mr. Williams, would you like to ask the juror any questions?

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: No, Judge.

THE COURT: Thank you. You can go back now, and we'll bring everybody up in a few minutes.

JUROR 968: Okay. Thank you.

(Juror 968 exited the courtroom.)

MR. WILLIAMS: Your Honor?

THE COURT: Yes.

MR. WILLIAMS: We just talked with counsel, and I think we've got Anthony Johnson and Colleen Birkey. They both traveled from out of town to get here today, and I think once we get through with those, whether it's noon or earlier, let's just quit whatever time we're done with them. The other one's John Graham, and he can be here any time we need him.

THE COURT: That'd be fine. Thank you.

(Recess at 10:35 a.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Please be seated. Members of the jury, first, we have a juror who's sick, and we rearranged the seating chart in case she needs to make a mad dash from the courtroom, make it easier. We're also only going to go till about noon today, and then we're going to send you home. We just couldn't take -- we just couldn't lose another juror, and so we decided that we'd just go till about noon and then send you all home. So I just wanted to keep you advised of the developments.

The witness can be seated. And, Mr. Williams, it's --

you're back on redirect.

MR. WILLIAMS: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Altimus, if you would pull that chair up again and let's make sure you talk right into the microphone, please.

You were asked a question on cross-examination about whether you've ever testified that the defendant told you that his killings were related to a 1993 case. Do you remember that question posed to you?

A. Yes.

Q. And then you were shown some grand jury testimony. Do you recall that?

2081

A. Yes.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. The portion of the grand jury that you were pointed out to has to do not with any statements made about the defendant but statements that the defendant made to you about his girlfriend and her participation in murders; is that accurate?

A. Yes.

Q. Okay. And it says, Now, before we get into that, let me ask you this. Are you saying that he told you that Angie Johnson had been a back-up before in killing people? And what was your answer?

A. Yes.

Q. And what did you say down here?

A. She had told me that she had done it before.

Q. And the question was she had done what before? And what was your answer?
A. Killed.
Q. And what else did you say?
A. So she was talking about backing me up and said that all I can do is assume that she'll kill.
Q. And what else did you say?
A. I ain't never seen it or anything. All I can --
Q. And the question was asked, But you told -- but he told

♀

you -- and that's Dustin Honken?
A. Yes.
Q. Okay. But he told you that she had killed somebody before. And your answer was?
A. Yeah.
Q. And the question was, Did he say anything more about who she had killed or whether it was related to the 1993 case? And your answer was?
A. No.
Q. Okay. You were asked some questions about prison life and scams and conning people and so forth. Do you remember that line of questioning, sir?
A. Yes.
Q. Let's talk a little bit about Dustin Honken. Is Dustin Honken a smart guy?
A. Yes.
Q. How smart?
A. I feel that he's a very smart person.
Q. I think you described him at one point in one of your testimonies as brilliant.

A. Yes.

Q. Talked a little bit about scams on cross-examination. The scam about having a rocket used to blow a hole in the wall of the jail, now, did you and Dustin Honken have serious conversations about whether that was a possibility?

♀

A. We had conversation, yeah.

Q. And were you serious about at least exploring that as one way of doing it?

A. We was trying to explore it, but no way we could have done it because we would have probably all died if we tried something like that.

Q. So you and Dustin Honken seriously talked about it and rejected that as an idea.

A. Yeah.

Q. And is this after the attempt to bond you out went nowhere?

A. Yeah.

Q. And so during the conversations you had with Dustin Honken, you guys realized that's kind of a foolish idea and it's just not going to work?

A. Yes.

Q. But you don't tell the other people in the prison or in the jail in your pod there that you've rejected the idea. In fact, you kind of scam them into believing that you're really going to do it.

A. We was scamming a guy named Johnson. You know, we was making him believe that because we was trying to get the thousand dollars to get me out of jail.

Q. And the "we" part of that is Dustin Honken was in on that scam.

A. Yes.

Q. He was scamming Johnson like you were scamming Johnson.
A. Yes.
Q. And the meth recipe, that was described as -- the sale of the meth recipe was described as a scam. Who was scamming who on getting that meth recipe for a thousand dollars?
A. Dustin was scamming Johnson out of a thousand.
Q. And you were part of that.
A. Yes, I was an accomplice.
Q. This whole talk about scamming people also went into the -- at some point you talked on direct examination about a plan that once you got out you might go and rip off some people that are drug dealers. Do you remember that line of questioning?
A. Yeah.
Q. And that was kind of a scam to be pulled on those drug dealers.
A. Yes.
Q. Whose idea was that scam?
A. It was Dustin Honken's idea.
Q. And he came up with that plan.
A. Yeah, and the way to pay me the $10,000, that would be -- if I did that, that would be part of the money I would get for doing what he wanted me to do.
Q. And in the process of talking about that, though, were you serious about actually having to go out and kill some drug dealers?

A. At the time, my state of mind, I'd say yes.
Q. And as part of that did you have a conversation with Dustin Honken about whether -- about who you might have to kill in that process?
A. Yeah.
Q. And was there any question or any discussion about whether you'd have to kill children?
A. Yeah.
Q. And tell the jury about that, please.
A. He asked me if there was a child or somebody smaller that was in the house if I ran in there what would I do? I said I would kill everything that's moving, I would kill a dog, a cat, a human, a snake. Anything that was alive, I'd make sure it was dead, eliminated.
Q. And at your stage of your life at that point, you were serious about it.
A. Yes.
MR. WILLIAMS: I have nothing else, Your Honor.
THE COURT: Mr. Parrish?
RECROSS-EXAMINATION
BY MR. PARRISH:
Q. I just have a couple of quick questions for you, Mr. Altimus. First of all, have you ever killed anyone?
A. No.
Q. Have you ever carried a gun?

A. No.
Q. You're just a big liar, aren't you?
A. Yes.
MR. PARRISH: Nothing further.

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: No, Your Honor.

THE COURT: You may step down.

Ready to call your next witness?

MR. WILLIAMS: Yes, Your Honor. The United States calls Anthony Johnson.

ANTHONY JOHNSON, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Ask that you adjust your chair and the microphones so you can speak directly into the microphones. You need to scoot that chair up. And would you state your full name, please, and spell your last name.

THE WITNESS: Anthony Craig Johnson, J-o-h-n-s-o-n.

THE COURT: Yeah. Can we get you to scoot that chair up a little closer? And you can also adjust those microphones and pull them down.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Johnson, these microphones only work if you're about

2087

three inches away from them, so you might have to speak into them a little bit as we go through this.

I'd like to have you tell the jury just a little bit about yourself, sir. How old of a man are you, sir?

A. Forty-six.

Q. And how far did you go through school?

A. Ninth grade.

Q. Where are you from originally?

A. Manson, Iowa.
Q. And have you lived in other cities in Iowa your whole life?
A. I've lived all over the United States.
Q. Do you have a trade or profession that you practice, sir?
A. Yeah, pipe fitting and welding.
Q. Pipe fitting and welding. How long have you been in that business, sir?
A. Ten years.
Q. And you're currently employed?
A. Yes, I am.
Q. How long you been in the same job, sir?
A. Two years.
Q. You have had a run-in in the past with the law; is that fair to say?
A. That's correct.
Q. You had a conviction, felony conviction, back in 1997 for possession of methamphetamine with intent to deliver?

2088

A. That's correct.
Q. Is that the only felony conviction you've had, sir?
A. Yes, sir.
Q. You were arrested initially on state charges on that case, sir?
A. Yes.
Q. And then, as they say, that case went federal. In other words, the state charges were dropped, and federal charges replaced those state charges?
A. That's right.
Q. When you were arrested on the state charges, were you held in a county jail pending trial?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1823 of 3636

A. Yes.
Q. And what county jail were you initially held in?
A. Sac City.
Q. Were you transferred to another jail after the federal charges were brought?
A. Well, I was released from there. I posted bond on that, and then later on I was arrested on federal charges.
Q. Oh, okay. And then where were you brought at that point?
A. Sioux City here.
Q. And were you held in the Woodbury County Jail here?
A. That's correct.
Q. Pending trial.
A. Right.

2089

Q. What ultimately happened with those charges, sir? Did you plead guilty or go to trial?
A. I pled guilty.
Q. And when you pled guilty, was that pursuant to any plea agreement with the government where you agreed to testify against other people in exchange for some bargain or something?
A. No, I didn't.
Q. You just pled to the charge.
A. I just pled guilty to the charge.
Q. And what kind of sentence did you get, sir?
A. Five years, two months.
Q. And did you serve that time?
A. I did the time, yeah, with good acceptance, you know, whatever. Yeah, I did my time.
Q. Okay. And in the federal system you get 15 percent off your sentence for good behavior in prison; is that fair to say?

A. That's correct.
Q. Okay. And so you got sentenced to five and a half years, and then you served that full term minus whatever time you got off for good time?
A. Right.
Q. In other words, anybody reduce your sentence in any way for any information you provided to the government on any case?
A. Can you repeat that?
Q. Yeah. Let me repeat that. Did the government reduce your

♀

sentence in exchange for any information you provided?
A. No, they didn't.
Q. Did you get any benefit from the government for giving information about Dustin Honken?
A. None whatsoever.
Q. Has anybody ever promised you that you were going to get something?
A. No.
Q. Are you getting anything for testifying here today?
A. No, I'm not.
Q. At some point you did provide information concerning Dustin Honken; is that right?
A. Repeat that again.
Q. At some point you did provide information to the government about Dustin Honken.
A. Yes, I did.
Q. How did that come about? Did they come to you, or did you go to the government?
A. The government brought me to them. I mean they brought me from prison to Sioux City here to question me.

Q. And did you answer the questions?
A. Yes, I did.
Q. During the questioning, the focus was on what part of your contact, in other words -- let me rephrase that. That was a bad question.

♀

Were you questioned about your time in the Woodbury County Jail with Dustin Honken?
A. Yes, I was.
Q. All right. Let's talk about that for a little bit. Do you recall that you entered the jail there in January of 1997? Does that sound about right?
A. Yes.
Q. And do you recall when you would have been released from the Woodbury County Jail to the Bureau of Prisons?
A. June I believe of the same year.
Q. June of '97?
A. June or July. I think it was June.
Q. Woodbury County Jail has a number of different blocks there. Did you -- were you housed in different blocks during your stay which was what? January to June of 1997?
A. Yes, I was.
Q. And what different blocks do you recall that you were housed in?
A. I don't recall the letters anymore. G I remember. First one was G block.
Q. Okay. At some point you were in G block.
A. Uh-huh.
Q. And while you were in G block, did you meet Dustin Honken?
A. Yes, I did.

Q. Could you describe for the jury the circumstances that you

would have met him under?
A. We was just in the same cell.
Q. Just like any other inmate.
A. Right.
Q. Were you cellmates with him in the same -- in that G block?
A. There was only four bunks in that place, and, you know, you got the day room. That's where we met.
Q. So G block's pretty small then. There's only four people in it?
A. That's right. Well, that's what's supposed to be in it, but there's usually more.
Q. At the time you were back there, how many other inmates were in that block with you and Dustin Honken?
A. It varied. There was always four, but it varied. There could be somebody sleeping on the floor in one of them too.
Q. What's the most you remember being in that cell block with Dustin Honken?
A. I couldn't tell you for sure. I just know there was four all the time.
Q. Okay. Did you end up having conversations with Dustin Honken over time?
A. Pardon me?
Q. Did you end up having conversations with Dustin Honken?
A. Yes, I did.
Q. Did you tell him about yourself and about your charges?

A. Yes, I'm sure I did.

Q. And did he tell you about himself and his charges?
A. I don't remember it all, but I just remember we discussed some of it, yes.
Q. Did he tell you a lot about his case?
A. I couldn't tell you that for sure. I just remember having conversations about it, and I couldn't say a lot or a little, you know. I don't -- whatever you consider a lot.
Q. Fair enough. Why don't you just describe for the jury, I mean, how would you describe the relationship you had with Dustin Honken while you guys were in that G block together. Close friends? Acquaintances? Buddies?
A. Well, it might have been friends at times, you know. Started out just being another cellmate, and then we started discussing other scenarios in the jail, and we became friends.
Q. Okay. And in the process over time I assume you became closer than you were at the beginning.
A. Yes.
Q. And the conversations you had, did he provide you more detail as time went on than he would have right at first?
A. I wouldn't say detailed a lot more later on than what he did at the very beginning.
Q. Now, is this the first time you had spent any real length of time in jail?
A. Yes.

Q. You were kind of new to this territory then.
A. That's correct.
Q. At some point did Dustin Honken tell you anything about prior charges he had had before this time in jail?
A. He told me some stuff. I just remember he was in jail once

before and was released -- and got out or was released. Let's put it that way.

Q. He was released.

A. (Witness nodded head.)

Q. And did he tell you why that happened, how he got released before?

A. I don't recall.

Q. Did he ever tell you anything about witnesses appearing or disappearing that he had before?

A. Yes, he did.

Q. What did he tell you about that?

A. He just said that some witnesses that were supposed to testify for him -- against him are missing, and he just said that he never had nothing to do -- he ain't going to say whether he had anything to do with them or not but just that they would not show up to testify against him.

Q. He said, I'm not going to say whether I had anything to do with it or not, but they're not going to show up to testify against him?

A. That's correct.

2095

Q. What was his attitude when he was telling you about these witnesses not showing up at some point?

A. Just I suppose serious, you know, or, you know, just con -- just conversation, you know.

Q. Okay.

A. I can't tell you what kind of -- put it into a category I should say.

Q. All right. At some point did you disclose to him that you were in jail for a methamphetamine-related offense?

A. Yes, I did.
Q. And at some point did you guys have a conversation about manufacturing methamphetamine?
A. Yes, we did.
Q. Tell the jury about that. Had you manufactured meth before?
A. No, I haven't.
Q. Did Dustin Honken tell you whether he had manufactured methamphetamine before?
A. Yes, he had.
Q. And was that something that you were interested in?
A. Yes, I was.
Q. At that time in your life.
A. At that time, yes.
Q. Okay. And at some point was there any discussion about whether you might buy a recipe from Dustin Honken for

manufacturing methamphetamine?
A. Yes, there was.
Q. Tell the jury about that, please.
A. Well, he just wanted to know if I wanted to buy a recipe. He could use a thousand dollars, so I -- that's what the discussion was. You know, he'd give me the recipe for a thousand dollars.
Q. And the recipe was supposed to be for making meth.
A. That's correct.
Q. And you were supposed to pay him a thousand dollars.
A. That's correct.
Q. Now, sir, at this point you're in jail. Do you have a thousand dollars with you there in jail?

A. No, I don't.

Q. So did you have some way that you were going to come up with a thousand dollars in order to pay Dustin Honken for this meth recipe?

A. Yes, I did.

Q. And what was that plan?

A. The ex-wife on the outside, talk to her to gather up some money.

Q. What's the name of your ex-wife?

A. Colleen Birkey.

Q. Now, she's an ex-wife. Are you guys still friends?

A. That's correct.

♀

2097

Q. Okay. So despite the fact you ended up divorcing at some point, you remained friends with your ex-wife.

A. That's correct.

Q. Was she visiting you at the jail?

A. She visited a couple times, yes.

Q. Okay. And so how was it that you were going to carry out this plan to have your ex-wife, Colleen Birkey, come up with a thousand dollars?

A. Well, I talked to her on the phone and told her -- said if she'd gather it up and then I get with -- somebody would get with her on what to do with the thousand dollars.

Q. And so did you tell your ex-wife what you needed the thousand dollars for?

A. No, I didn't.

Q. Was she willing to go ahead and do that anyway?

A. Yes, she was.

Q. And so what was the plan? Where was the thousand dollars

supposed to come from, first of all?
A. Where was the what?
Q. Where was the thousand dollars supposed to come from?
A. Well, she was -- source that I had back on the street yet or whatever. I just told her to get me a thousand dollars.
Q. Okay. So you didn't really have a plan for it. You just said, I need a thousand dollars.
A. Yes.

♀

Q. Okay. And how was the thousand dollars ultimately supposed to get to Dustin Honken?
A. Well, his girlfriend Angie was supposed to get with -- the two were supposed to meet, and that was how -- the thousand dollars was supposed to go to her.
Q. And did you know what was supposed to be done with that thousand dollars?
A. No.
Q. Did Dustin Honken tell you what he intended to do with the thousand dollars?
A. No.
Q. And so did you set out this plan to your ex-wife, Colleen Birkey?
A. I just told her gather the thousand dollars and somebody would be in contact with her.
Q. And did you have anything to do with how she was supposed to get in contact with this Angie Johnson?
A. Well, I believe I gave Dustin the number and he gave it to his girlfriend.
Q. Okay. So your best recollection is you gave your ex-wife's telephone number to Dustin Honken to pass on to his girlfriend.

A. Right.
Q. The Dustin Honken who asked you for a thousand dollars in exchange for a methamphetamine recipe, do you see him in the courtroom here today?

A. Pardon me?
Q. Do you see him in the courtroom?
A. Yes, I do.
Q. Can you describe for the jury where he's sitting and what he's wearing?
A. Right there, yellow shirt.
Q. To your left?
A. Yep.

MR. WILLIAMS: I have no further questions, Your Honor.

THE COURT: Mr. Spies?

CROSS-EXAMINATION

BY MR. SPIES:

Q. Good afternoon, Mr. -- good morning, Mr. Johnson.
A. Good morning.
Q. My name's Leon Spies. I'm one of the lawyers representing Mr. Honken here this morning, and I have just a few questions for you.

You told Mr. Williams that you didn't get anything in exchange for providing information to the government about what you knew about Mr. Honken and the time that you spent with him in the Woodbury County Jail. But in order for you to provide this information, you reached an agreement with the government that anything that you told them about your activities in the jail wouldn't be used against you; right?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1833 of 3636

A. That's correct.
Q. And you had your lawyer negotiate that with the investigators and the United States Attorney's Office.
A. That's correct.
Q. As you came in the courtroom this morning, Mr. Johnson, did you run across or did you pass somebody that you knew?
A. Yes, I did.
Q. That was Anthony Altimus, wasn't it?
A. Yeah.
Q. And you knew Anthony Altimus from the Woodbury County Jail.
A. That's correct.
Q. And would you agree that he's a con man?
A. Yes, I would.
Q. And he conned you, didn't he?
A. Yes, he did.
Q. And you were pretty upset about it.
A. Yes, I was.
Q. And you're still upset about it.
A. Yes, I am.
Q. All right. I want to ask you just a few questions about when you first met Dustin Honken in the Woodbury County Jail; okay?
A. Okay.
Q. And you look like a burly, strong guy. And were you pretty well put together back in 1997 when you came into the Woodbury

County Jail?

A. Probably about the same I am now.
Q. All right. And when you saw Mr. Honken for the first time, he was kind of a skinny guy with glasses, wasn't he?
A. Yes, he was.
Q. And he looked kind of feminine.
A. Yes.
Q. In fact, you thought he was gay when you first saw him; right?
A. That's right.
Q. Now, in the G block that you were in there at the Woodbury County Jail, Mr. Johnson, would you describe that Mr. Altimus was kind of the leader of that block?
A. I wouldn't know about a leader. I mean, four people, you know . . .
Q. Okay. He did a lot of talking there in G block?
A. I don't recall.
Q. Did he tell you that he was there on federal charges?
A. I think he said he was on state charges.
Q. But did he also tell you that he was there on federal charges? Do you remember that?
A. I don't recall, no.
Q. Okay. But did it appear to you that he was trying to act like a big shot in the G block?
A. I wouldn't say really try to act like a big shot in G block, no.

Q. Okay. But he came up with some pretty wild ideas, didn't he?
A. I think we all had some pretty wild ideas.
Q. I'm sorry?

A.    I said I think we all had some wild ideas.
Q.    Okay.  Including you?
A.    Oh, yeah.
Q.    Including Mr. Honken?
A.    Uh-huh.
Q.    Okay.  And among these wild ideas were you buying this recipe from Mr. Honken for a thousand dollars?
A.    Yes.
Q.    And did he actually give you this recipe?
A.    Yes, he did.
Q.    And you wrote it down?
A.    He had it written down.
Q.    Okay.  And you just threw it away, didn't you?
A.    I ended up throwing it away a couple days later, yes.
Q.    Let me ask you this.  We've already heard your opinion about Mr. Altimus.  I want to ask you specifically about what you just told the jury here that you heard Mr. Honken tell you. Now, you told us that he was pretty brief in describing what had happened in the past with him?
A.    That's correct.

2103

Q.    That's right?  And he told you, didn't he, Mr. Johnson, that he had nothing to do with the disappearance of these witnesses?
A.    Yes, he did.
Q.    All right.  And you were interviewed, as you told us here this morning, by some agents who had you brought down from where you were serving your federal sentence; right?
A.    Right.
Q.    That was up in Yankton, South Dakota?

A. That's correct.
Q. They brought you down here to Sioux City, and they interviewed you?
A. That's correct.
Q. And one of the agents that interviewed you was a Lori Lewis, female agent?
A. That's correct.
Q. Okay. And she asked you that question about whether Mr. Honken had told you anything about the disappearance of these witnesses; right?
A. I suppose. I don't recall.
Q. Well, you didn't tell Agent Lewis that Mr. Honken wouldn't say whether he did or didn't have anything to do with these -- the disappearance of these witnesses; is that correct?
A. I don't know.
Q. You don't remember?

A. I don't remember whether I told her that or not.
Q. If I showed her -- showed you a copy of the report that she wrote about what you said, would that help you remember?
A. I seen that copy.
Q. Okay. And you didn't tell Agent Lewis that Mr. Honken used the words, "wouldn't say that he did or didn't have anything to do with it"; am I correct?
A. Repeat that question.
Q. All right. Well, the point is that you told Agent Lewis and Agent Hein that Mr. Honken said that he had nothing to do with the disappearance of these witnesses.
A. That is correct. What I said back there is what I recollect back then in those days, and this is what I recollect

nowadays.

Q. Would you agree with us, though, Mr. Johnson, that your memory of what Mr. Honken told you when you were in jail with him in early 1997 would have been better in January of 1998 when you were interviewed by Agent Lewis?

A. Yeah, probably would have been better for him, yes.

Q. And Mr. Honken never talked to you about any guns, did he, never said he had any guns?

A. Not that I recall.

MR. SPIES: Those are all the questions I have, Your Honor. Thank you.

THE COURT: Mr. Miller? I'm sorry, Mr. Williams,

anything further?

MR. WILLIAMS: Just one question.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. You were asked about Mr. Altimus and what he was like in there. Mr. Honken, was he a smart guy?

A. Yes, he was. Appeared to me anyway, yes.

Q. Smarter than Anthony Altimus?

A. Yeah, and Anthony Altimus was Anthony Bugh to me. I didn't know him by Altimus, whatever it is.

Q. He used the last name Bugh at that point in his life?

A. Pardon me?

Q. He used the name Bugh?

A. That's what I recall anyway, you know, but . . .

MR. WILLIAMS: I have nothing else, Your Honor.

THE COURT: Anything further, Mr. Spies?

MR. SPIES: No further questions, sir. Thank you.

THE COURT: You may step down.

Ready to call your next witness?

MR. WILLIAMS: Yes, Your Honor. The United States calls Colleen Birkey.

COLLEEN BIRKEY, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. Try and make yourself comfortable and pull up that chair so you can speak directly into the microphones. And would you state your full name,

please, and spell your last name.

THE WITNESS: Colleen K. Birkey, B-i-r-k-e-y.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Miss Birkey, I'd like to have you tell the jury just a little bit about yourself, ma'am. Where are you from originally?

A. Manson, Iowa.

Q. And how long have you lived or did you live in the Manson, Iowa, area?

A. I was born and raised.

Q. And where are you living now?

A. In Manson.

Q. What do you do for a living?

A. I'm a certified nurse's assistant at a nursing home.

Q. How long you been doing that?

A. Two years yesterday.

Q. How far did you go through school then?

A. 12th grade.

Q. And to be a nursing assistant, do you have to get additional training as well?
A. Yeah, it's a 72-hour course through a college.
Q. And did you successfully complete that course then?

A. Yes, I did.
Q. At some point in your past were you married to a Anthony Johnson?
A. Yes, I was.
Q. When was that marriage, ma'am?
A. 1981.
Q. And how long did it last?
A. Seven years.
Q. At some point did you guys become divorced?
A. Yes, we did.
Q. After the divorce did you nevertheless remain friends with your ex-husband, Anthony Johnson?
A. Yes, I did.
Q. And that friendship, does that last till today?
A. Yes.
Q. At some point did you learn that in 1996 your ex-husband had been arrested and charged with some drug offense?
A. Yes, I did.
Q. And at some point did you learn that he was held on federal charges up here in Woodbury County?
A. Yes.
Q. Did you maintain contact with him during this time period?
A. Yes, I did. I brought our two kids up to see him a couple times.
Q. And at some point while he's in the Woodbury County Jail,

does he ask you to do a favor for him?
A. Yes, he does.
Q. Did he ask you to get ahold of some money for him?
A. Yes, he did.
Q. What did he ask you to do, ma'am?
A. He asked me to get a thousand dollars and meet a girl named Angie and give her the money.
Q. Did you question him why it was he needed a thousand dollars to go to a girl named Angie?
A. No, I didn't.
Q. Were you willing to do the favor for him?
A. Yes, I was.
Q. How'd you come up with a thousand dollars?
A. I borrowed it.
Q. And who'd you borrow it from?
A. From my mom.
Q. Did you tell her what was going on at all?
A. I told her it was for bills.
Q. And so you get a thousand dollars from your mom. Did he tell you who this Angie person was?
A. Just a girlfriend of somebody he was in jail with.
Q. And he didn't tell you why he needed the thousand?
A. No, he didn't.
Q. How were you supposed to get the money to this Angie?
A. I was to call her and meet her somewhere.

2109

Q. And how did you know how to call her?
A. He gave me a phone number.

Q. Who gave you the phone number?
A. Tony.
Q. Tony is Anthony Johnson?
A. Right.
Q. Sure. And so did you call this woman?
A. Yes, I did.
Q. Do you remember the area code of the phone number that you called?
A. 515.
Q. And what area is that in?
A. Des Moines.
Q. And so when you called her as a result of that conversation, did you guys meet up someplace?
A. Yes, we did. We met at the Tom Thumb restaurant in Fort Dodge.
Q. And how was that place in particular chosen?
A. I don't know. I just -- it was easy to come from Des Moines. It's on 169.
Q. And so you met at the Tom Thumb?
A. Right.
Q. Do you recall day, night, what time of day or night this was?
A. It was night.

2110

Q. And tell the jury a little bit when you met up with this person there, what happened?
A. I pulled into the Tom Thumb restaurant, and she came out of the restaurant and got in my car, and I handed her an envelope and, you know, said my name was Colleen, and she got out of the car, and that was it.

Q. Any conversation about what was going to happen with the thousand dollars?
A. Nope, none whatsoever.
Q. Any thank you?
A. Nope.
Q. Did she tell you what her name was?
A. I knew her name was Angie.
Q. And how did you know her name was Angie?
A. From Tony, Anthony.
Q. And so can you describe what this woman looked like?
A. I do not remember.
Q. Pretty brief meeting with her.
A. Right.
Q. But you -- nevertheless you did deliver a thousand dollars to a gal named Angie.
A. Yes, I did.
Q. And this would have been approximately when if you recall?
A. What time --
Q. Just when?

♀

2111

A. I don't remember. I know it was nighttime. I don't remember what day it was or what month it was.
Q. Regardless, it was at some point when Tony was in the Woodbury County Jail --
A. Right.
Q. -- that this all happened.
A. Right.
Q. Had you ever met or heard anybody by the name of Dustin Honken?
A. No.

Q. You didn't know Angie Johnson from anybody.
A. No, I did not.
Q. And you never did really know what this thousand dollars was for.
A. Not at all.
MR. WILLIAMS: I have nothing else, Your Honor.
THE COURT: Mr. Rogers?
MR. ROGERS: Very briefly, Your Honor.
CROSS-EXAMINATION
BY MR. ROGERS:
Q. How are you, ma'am?
A. Fine.
Q. Are you still friends with Mr. Johnson today?
A. Yes, I am. We have two children together so . . .
Q. And does he live in the same general area as you do now?

2112

A. In Fort Dodge.
Q. Okay. And that's not that far from Manson.
A. No, about 20 miles.
Q. So that's closer -- Fort Dodge is closer to Manson than it is to Des Moines?
A. Yes, it is.
Q. Okay. And Mr. Johnson asked you to get a thousand dollars, didn't tell you how you were supposed to come up with it; right?
A. Right.
Q. And your idea was to borrow it from your mother.
A. Right.
Q. And to do that you told your mother you were going to use it to pay bills because she didn't want you doing anything for Mr. Johnson; is that a fair statement?

A. Well, not that she wouldn't want me to do anything for Tony because she was her son-in-law too (sic). I didn't know what it was for. I just told her it was for bills.
Q. And did he ever tell you how he was going to pay it back?
A. No, he didn't.
Q. Did he tell you that he would pay it back?
A. No, he didn't.
Q. I assume you told your mother you'd pay it back.
A. Right.
Q. And I assume you did pay it back.
A. And I did.

MR. ROGERS: That's all the questions I have.

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: No, Your Honor.

THE COURT: You may step down.

THE WITNESS: Thank you.

THE COURT: You're excused.

MR. WILLIAMS: Your Honor, this may be as good a time to break as any given the juror's condition. The next witness we would have would take several hours.

THE COURT: Okay. Members of the jury, we're going to go ahead and send you home. And we'll see you tomorrow at 8:30, and I hope our ill juror is feeling better by tomorrow morning. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated.

Mr. Rogers, do you have those instructions done by any chance? I realize it's not Wednesday morning, but I'd have an opportunity to work on it this afternoon if you've got them

done.

MR. ROGERS: I do not, Your Honor, but I will also have an opportunity to work on them this afternoon, and I have been working on them.

THE COURT: I'm sure you have.

MR. ROGERS: I'm probably about halfway done.

THE COURT: Okay. Thank you. Now, I'm a little bit

confused about the defense witness and exhibit list. You referred to an exhibit today I believe, Mr. Spies. I don't understand your lettering system. AQ or something? And is that an exhibit that I supposedly have?

MR. SPIES: No. We're not sure we'll be offering it. It was just to establish foundation with Ms. Lewis, Your Honor. So my understanding is that the defendant's exhibits go A through Z and then AA through AZ and so forth. So that's why I used the designation conveyed to me by one of our loyal staff as AF I think or AG and AH. But we used the exhibit this morning with Ms. Lewis just to establish a foundation. Should we use the exhibit --

THE COURT: But your exhibit list only goes through R. That's what perplexes me. Then you start with A1, B1, C1, but then it goes D.

MR. SPIES: Then I'm in error, but in any event, we'll stick with that designation.

MR. ROGERS: Judge, what happened is the items I had marked during my examination yesterday during my cross-examination of Mr. McIntosh were the rest of the alphabet, R, S, T, L, N, like that. R, S, T, U, V, W, X, and Y I think were --

THE COURT: How do we get -- was it AG -- how do we jump from R or whatever to AQ?

MR. SPIES: Well, I don't know the answer to that

question, Your Honor, but I'll venture a guess.

THE COURT: Okay.

MR. SPIES: And I think that we didn't have an AQ but we did have a Q at one point, and I forget which witness that was with.

MR. ROGERS: Q, Your Honor, is the --

THE COURT: You have a Q, but I thought you referred to an exhibit this morning as AQ.

MR. SPIES: No, I referred to an AG and an AH I believe.

THE COURT: Where's AB or AC? I'm not tracking your system here.

MR. SPIES: Well, perhaps there is no system, Your Honor, but the exhibits I referred to this morning with Agent Lewis were AG and AH.

THE COURT: Okay.

MR. SPIES: But I can assure the Court that we'll get this straightened out.

THE COURT: Okay. I just wanted to make sure I wasn't missing a whole bunch of exhibits or something.

Has the government had a chance to go over the defense exhibits?

MR. WILLIAMS: We have, Your Honor, and I actually asked one of our staff to type up our list of what objections, if any, we had on theirs, and I think that's being worked on. I

can get a copy of that I'm sure today both to the Court and to the defense counsel. I don't think there's a lot of problems with their exhibits for the most part.

THE COURT: Just out of curiosity, what would be the relevance of things like Defense Exhibit H, J? Setting aside foundation and hearsay and all of those objections that I assume would apply, what would be the relevance of it? And do you have a copy of those for me to look at too? I mean, I don't need to look at it if there's not going to be an objection to it, but if there is going to be an objection to it . . .

MR. WILLIAMS: There is going to be an objection to those two for numerous reasons. I think the H is a transcript of Tokars' -- of a 60 Minutes or something TV program on Tokars, and J I think is the videotape of an A&E show on Tokars. Have I got that right?

THE COURT: You do.

MR. WILLIAMS: And we're going to object to those on numerous grounds.

THE COURT: Are you going to have a copy of those exhibits for me so I can look at them --

MR. PARRISH: If we plan to introduce them, we will.

THE COURT: Okay. Well, when are you going to make that decision?

MR. PARRISH: I assume when we talk to our client this afternoon or this morning.

2117

THE COURT: Okay. I just want to make sure if you're going to use the exhibits that I have them sufficiently in

advance that I can look at them so that I can figure out what they are. I mean, I have some sense of it because the description's quite accurate, but I need to actually look at them if you're going to pursue those.

Now, on your witness list, I thought I understood Mr. Williams to say that the defense witness list had both penalty phase and merits phase witnesses.

MR. PARRISH: That's inaccurate.

MR. WILLIAMS: As I understood it, Your Honor -- and we could be miscommunicating on this, but I think what I was told if I recall correctly -- and I could be off on this -- is the original list that we were provided with, you know, some 40 or 60 names on it, I think I was told that that included penalty phase witnesses. I'm assuming that the list they gave us the other day is just guilt phase witnesses. That's how I took it to be. But I could be wrong on that as well.

MR. PARRISH: That's accurate.

THE COURT: So when will you have a penalty phase witness list?

MR. SPIES: Your Honor, we've got a preliminary penalty phase list. I went through it with our mitigation specialist last night. I'm going through it with her again this afternoon, and I'll have the -- what I hope to be the final list

2118

to Mr. Williams probably later today.

THE COURT: And will you also have then a penalty phase exhibit list?

MR. SPIES: Yes.

THE COURT: Okay. And does the government have a penalty phase witness and exhibit list?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1849 of 3636

MR. WILLIAMS: Yeah, we provided the defense with the witness list some time ago. I'm actually revising it, cutting out some witnesses, and so we're going to give them a revised one today that's going to be pared down a little bit. And then the exhibit list, we provided them with the exhibits. We'll get them a list today as well that actually lists them out, but it's going to be pretty slim. I think there's only five or six, maybe seven exhibits, and they're mostly photographs.

THE COURT: Okay. Anything else?

MR. WILLIAMS: No, Your Honor.

THE COURT: Anything else? I'd like to see the defense lawyers about a continuation of our CJA discussion this morning too, so if you could do that now, that'd be great. If you want to do it later on today, that's fine too.

MR. SPIES: Now is fine.

THE COURT: Okay. Anything else? Okay. Thank you. We'll be in recess.

(The foregoing trial was adjourned at 11:25 a.m.)

2119

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR    1-5-05 Date

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1850 of 3636

♀

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| STEVEN FERGUSON | | |
| | MR. MILLER | 2001 |
| LORI LEWIS | | |
| | MR. MILLER | 2003 |
| | MR. SPIES | 2013 |
| ANTHONY ALTIMUS | | |
| | MR. WILLIAMS | 2016 |
| | MR. PARRISH | 2039 |
| | MR. WILLIAMS | 2080 |
| | MR. PARRISH | 2085 |
| ANTHONY JOHNSON | | |
| | MR. WILLIAMS | 2086 |
| | MR. SPIES | 2099 |
| | MR. WILLIAMS | 2105 |
| COLLEEN BIRKEY | | |
| | MR. WILLIAMS | 2106 |
| | MR. ROGERS | 2111 |

*****

EXHIBITS:

| | |
|---|---|
| 230 | 2007 |
| 235 | 2008 |
| 236 | 2009 |
| 222 | 2011 |

*****

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1852 of 3636

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, Plaintiff, vs. DUSTIN LEE HONKEN, Defendant. /

No. CR01-3047
Sioux City, Iowa
September 29, 2004
8:21 a.m.

VOLUME 10

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

APPEARANCES:

For the Plaintiff:

C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant:

ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn
Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Good morning. I wanted to go on the record and see if there are any matters to take up before we bring the jury in at 8:30.

MR. WILLIAMS: Your Honor, two quick matters on behalf of the United States. One is that Exhibit 300 is the transcript of the sentencing hearing, basically that portion of it dealing with Dustin Honken's testimony during the sentencing hearing. In reviewing it, I found that on page 978 there is a reference by the defendant in his testimony about Mr. Cutkomp exposing himself. And we would ask that those words just be excised out of the version that goes back to the jury and not be published during the testimony today with Special Agent Graham to the jury based on the Court's previous ruling on that issue.

THE COURT: Mr. Spies?

MR. SPIES: Well, Your Honor, I appreciate Mr. Williams bringing that to the Court's attention because we were going to bring it up as well. This is obviously a touchy subject. It's been the subject of a limiting order by the Court. It again came up during the testimony of Mr. Cutkomp, and the defendant's position is that we understand the reasoning behind the Court's ruling before trial, but now the government is using the defendant's own words against him, and it's going to be difficult for the jury to understand the dimensions of

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1854 of 3636

Mr. Honken's testimony at his sentencing hearing without also understanding the explanation that Mr. Honken gave to the Court about why he said certain things to Mr. Cutkomp.

So we've now pitted -- the government has pitted Mr. Cutkomp against Mr. Honken, and we believe now that the door has been opened certainly by the government introducing the defendant's own words against him. But now they want to say -- they want to use selected words, and so on the theory that the door has now been opened and to give true dimensions and context to the defendant's testimony at his sentencing hearing --

THE COURT: Well, how does it do that, though? How does it give context to . . .

MR. SPIES: Well, we've been dancing around what it was that precipitated these nervous breakdowns and bizarre behavior by Mr. Cutkomp, and I forget what the term of art we selected was, misdemeanor convictions of an unspecified nature, but the defendant testified in his sentencing transcript about his misgivings about Mr. Cutkomp's mental stability. That came out during the cross-examination of Mr. Cutkomp. And unless the jury is armed with the information about Mr. -- what Mr. Honken knew, it's not going to be able to understand the full dimensions of those misgivings and reservations that Mr. Honken had about Cutkomp.

It's one thing to go out and engage in shoplifting. It's another thing to engage in acts of public indecency, and I

2125

think certainly the jury would not be alarmed or inflamed by understanding what it was that Mr. Cutkomp did and what it was that Mr. Honken knew to understand the depth of his reservations

about Cutkomp's mental stability.

So in the interest of completeness, in the interest of allowing the jury to fully consider what Mr. Honken said at his sentencing hearing, I believe that the -- that that portion should not be excised.

THE COURT: It's on page 978, Mr. Williams?

MR. WILLIAMS: Yes, Your Honor. It's at line 9.

THE COURT: Well, I don't really understand your argument, Mr. Spies, because it says, And he didn't tell me before that he went and snapped. The reason why he snapped is not particularly relevant in my view, and the only thing that would be excised would be the two words "exposed himself"; correct?

MR. WILLIAMS: Correct, Your Honor.

THE COURT: And the only purpose of that, it seems to me, is exactly the prejudice for the reason why I granted the motion in limine ruling that the probative value was substantially outweighed by unfair prejudice. So if they're asking to excise the part about he went and snapped, I would understand your argument, but the underlying reason, I don't see the probative value of it.

So in order to be consistent with my motion in limine

ruling, I'm going to sustain the government's motion to delete the two words "exposed himself." Any other record you want to make on it?

MR. SPIES: No, Your Honor.

THE COURT: Okay. Thank you.

MR. WILLIAMS: One other item on behalf of the United States, Your Honor. Mr. LeBaron's going to be testifying this

morning. Mr. LeBaron has a number of convictions for murder. One of the murder victims in his -- one of his cases was a child. We think it'd be a violation of Rule 609 for the defense to attempt to elicit the age or nature of the victims of his murder convictions, and it would be prejudicial under 403 and, frankly, irrelevant under 402 for the defense to bring that out during cross-examination of Mr. LeBaron.

THE COURT: Who wants to respond?

MR. PARRISH: Your Honor, we think that it is relevant. I believe he said he's -- part of the background information we found on him, he's killed so many people he doesn't even remember the number of people that he may have killed, and I believe that is relevant to go into to ask him --

THE COURT: Well, let me ask you this. Do you have any case that says under Rule 609 you're entitled to get into the underlying facts?

MR. PARRISH: No, not under 609. I think what Mr. Williams has been doing with these people, as the Court may

recall, I believe it was not Mr. Ferguson, one of the other people asking them about their background, asking them a little bit about their case. It was not Mr. Ferguson. It was Mr. Altimus, a little bit about the facts of his case where he broke a person out of a juvenile home but yet not -- which I think opens the door because I think what the government is doing to some extent is giving some credibility to his crime, so to speak, if anything like that could happen which I believe allows us then to go in and fully explain what the operative facts were as we understand them.

THE COURT: Well, there's no rule of evidence that I

know that allows you to get into areas of what you phrase are the operative facts of the underlying conviction. However, I've given you more leeway than Rule 609 entitles you to. Would you agree with that?

MR. PARRISH: I would agree with that, Your Honor.

THE COURT: And in order to be consistent, I'm going to allow you to get into the ages of the victims.

MR. PARRISH: Thank you, Your Honor.

THE COURT: Anything else?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay.

MR. PARRISH: We do have one, and I know you want to start right on time, but I think we can take care of this at another recess. We're updating --

THE COURT: Do you want to give me a heads-up on what it would be?

MR. PARRISH: We're updating our witness list. Our computers went down at the hotel last night. We are updating our exhibit list. I sent Julie back to the hotel --

THE COURT: Are you adding to it or deleting from it or some of each?

MR. PARRISH: We're deleting some of the exhibits. We had a long meeting with Mr. Honken yesterday afternoon. And oh, one other thing on Mr. Loparo who has been subpoenaed who's on our list, we did determine there are some -- an affidavit. As we understand, the affidavits were never sent to us. It was prior to the time that we were appointed -- I was I guess appointed first to represent Mr. Honken. He did send them somewhere else. I'm having my office go back through some of

the earlier material he had sent us to see if we can find it. But I understand there may be an affidavit that was never forwarded to us.

THE COURT: Okay.

MR. PARRISH: This would have been back in 2000. I think our appointment was about 2001. So we're trying to see if we can track that. The government may have some of them in their discovery file. I think they're -- well, we saw one that we found last night that we got from your discovery file. So we're trying to see if they're -- how similar they are. Until

♀

we get our hands on it, we won't know, but we'll try to have something by Monday.

THE COURT: Okay. That sounds good. And we can take up your revised witness and exhibit lists at the end of the day today. Anything else?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Thanks.

(Recess at 8:31 a.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Williams, are you ready to call your next witness?

MR. WILLIAMS: I am, Your Honor. The United States calls Special Agent John Graham.

JOHN GRAHAM, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. Make yourself comfortable. Adjust the chair and the microphones so you can speak directly into the microphones. And when you're ready,

would you please state your full name and spell your last name.

THE WITNESS: John Phillip with two l's Graham, G-r-a-h-a-m.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor. Your Honor, we had requested the Court permission previously to recall Special

Agent Graham. I just wanted to remind the Court that was the setting.

THE COURT: That's right. Thank you.

MR. WILLIAMS: Thank you.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Could you remind the jury, please, Mr. Graham, what your position is?

A. I'm an agent with the Division of Narcotics Enforcement with the state of Iowa.

Q. And were you involved and are you involved in the investigation of the disappearances and drug-trafficking-related activities of Dustin Honken?

A. Yes.

Q. When we left off with your testimony at the last hearing -- I'm sorry, at the last time you testified, we had you testifying about a search that occurred at the defendant's house on February 7 of 1996. Do you recall that testimony generally, sir?

A. Yes.

Q. And during that search I think you indicated that you found some papers with handwriting on them; is that correct?

A. Yes.

Q. Did you do anything to try to determine the authorship of those pieces of paper found in the defendant's house?

A. Yes, we did.
Q. And what did you do?
A. We took handwriting exemplars from individuals to determine the author of those documents. Once the handwriting exemplars were obtained, they were submitted to the DCI laboratory and compared to the documents that were seized at the search warrant.
Q. And how did you go about getting those handwriting exemplars?
A. Grand jury subpoenas.
Q. And who was subpoenaed to provide handwriting exemplars to the grand jury?
A. Mr. Dustin Honken, Mr. Tim Cutkomp, Ms. Angela Johnson, and Mr. Dan Cobeen.
Q. And do you recall approximately when they would have been subpoenaed to provide those handwriting exemplars?
A. March of 1996.
Q. Now, was this prior to the time period that the defendant was incarcerated in the Woodbury County Jail?
A. Yes.
Q. You indicated among the people that you subpoenaed to provide handwriting exemplars -- and why don't we just explain that to the jury. What is a handwriting exemplar in the first place?
A. Individuals are asked to provide samples of their

handwriting. It's prepared sheets, and they have to go through and just write out what is asked of them that's on those preprinted sheets.

Q. And you indicated among the people you had subpoenaed to the grand jury to provide handwriting exemplars was Dan Cobeen; is that correct?

A. Yes.

Q. Wasn't Dan Cobeen working with the government at this point and providing information to the government?

A. Yes, he was.

Q. So why would you ask him to provide handwriting exemplars?

A. The two reasons at that time, no one was aware who the cooperator was in the investigation, and in order to provide further protection on Mr. Cobeen's identity, we thought it was necessary to go ahead and subpoena him to the grand jury and also request his handwriting. A second reason was is one of the documents that was seized and that we wanted to compare handwriting to was a document that was signed by Dan Cobeen.

Q. I want to remind the jury a little bit about some of the dates involved in this case. Do you recall the date when the defendant in this case was indicted on federal drug charges that resulted in his ultimate conviction in 1996?

A. He was indicted on April 9, 1996.

Q. And when was he arrested?

A. April 29, 1996.

♀

2133

Q. And after he was arrested, was he released on pretrial release?

A. Yes, he was.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1862 of 3636

Q. And with some restrictions; is that correct?
A. Yes.
Q. And you testified about those last time I believe.
A. Yes.
Q. He was arrested again on June 11 of 1996?
A. Yes.
Q. And that was after the tapes, undercover tapes, that were conducted with the assistance of Tim Cutkomp.
A. Yes.
Q. Was the defendant released from jail at any point after his rearrest on June 11 of 1996?
A. No.
Q. Can you explain to the jury a little bit, in the federal system when a decision is made to hold a defendant pretrial, do they have the possibility of getting bonded out?
A. The federal system, a person -- the government can seek or ask to seek for detention. A person -- and there will be a hearing. That person will either be released kind of on their own recognizance, or else they'll be detained until such time they either plead guilty, are found guilty, or are acquitted. And certainly if they are found guilty or pled guilty, they'll be sentenced.

♀

2134

Q. So in the federal system unlike the state system, once the Court determines that a person should be held for trial in custody, there's not an opportunity to get bonded out.
A. That's correct.
Q. Now, in this case did the defendant, Dustin Honken, ultimately plead guilty?
A. Yes, he did.

Q. And on what date?
A. June 2 of 1997.
Q. And when there's a guilty plea in federal court, is that proceeding transcribed by a court reporter?
A. Yes.
MR. WILLIAMS: May I approach, Your Honor?
THE COURT: You may.
BY MR. WILLIAMS:
Q. Special Agent Graham, I'm handing you what's been marked as Government's Exhibit 302, and I'm going to ask you if you can identify that, please.
A. It appears to be the original copy of the sentencing transcript taken at the change of plea hearing of Dustin Honken on June 2, 1997.
MR. WILLIAMS: Your Honor, Exhibit 302 has already been admitted into evidence. Permission to publish?
THE COURT: You may.
BY MR. WILLIAMS:

2135

Q. On the screen in front of you there, Special Agent Graham, is that the cover page of that transcript, sir?
A. Yes, it is.
Q. I'm going to have you read a portion of that transcript. Let me ask you, first of all, during this plea that took place of the defendant on June 2, 1997, was there a question-and-answer exchange between the prosecutor and the defendant to establish exactly what crime he had committed, basically a factual basis for the guilty plea?
A. Yes.
Q. Using that Exhibit 302 in front of you there, sir, I'd ask

you to turn to -- there's what we call bates numbers in the upper right-hand corner. They're numbers that are applied to identify the pages. There's a B002463. Can you find that page, please?

A. Yes.

Q. And looking at line 15, is that where the exchange between the prosecutor and the defendant begins?

A. Yes, it is.

Q. What I'd like you to do, Special Agent Graham, is take the role of the defendant. I'm going to take the role of the prosecutor. And I'd like to read through those exchanges concerning the facts over to page 2464 at line 13; all right? And I'm going to start -- Mr. Reinert was the prosecutor at the time; is that correct?

2136

A. Yes.

Q. Starting at line 15, Mr. Honken, between 1992 and February 7 of 1996, did you have an agreement with another person to manufacture methamphetamine?

A. Yes.

Q. And who was that?

A. Mr. Cutkomp.

Q. And when you entered into that agreement with Mr. Cutkomp, did you know at the time that you were going to be manufacturing methamphetamine?

A. Yes, sir.

Q. And did you enter into this agreement at the beginning in early 1992 or sometime later than that, between 1992 and 1996?

A. Yes, I did.

Q. And your house was searched on February 7 of 1996; is that

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1865 of 3636

correct?

A. Yes, it was.

Q. And on that date you were in the process of attempting to manufacture methamphetamine; is that correct?

A. Yes, I was.

Q. And you knew that you were attempting to manufacture methamphetamine at your house.

A. Yes, sir.

Q. Now, in the federal system after a defendant pleads guilty, what process then occurs naturally in the next session or the

next proceeding?

A. The judge orders a presentence investigation that's conducted by the department of probation, and once that's completed, it's provided to the judge, and then there will be a sentencing hearing that's set up.

Q. And this presentence investigation, is there a written document that's ultimately perform -- or created?

A. Yes.

Q. Is that sometimes known as a presentence investigation report or a PSI or a PSIR?

A. Yes.

Q. And explain to the jury if you could, in the federal system when a defendant is being sentenced and focusing back on the time period of 1996, 1997, are there certain factors that dictate at least the range of a sentence that a defendant will get as a result of the underlying crime?

A. Yes, there are.

Q. And could you explain that to the jury, please.

A. In the federal system there's what's referred to as the

sentencing guidelines, and it's based on levels. And in -- for example, in a drug case, drug quantity will drive the base offense level, and those levels are used by a judge to help them determine the starting point on where a sentence -- what sentence should be applied to a particular defendant.

Q. And so the amount of drugs a defendant has been involved

with in a crime can dictate at least a range of what that sentence will ultimately end up with.

A. Yes.

Q. And what are some of the other factors in 1996 -- well, let me ask you this.

In 1996 in the defendant's case, was the drug quantity a disputed factor?

A. Yes, it was.

Q. What are some of the other disputed factors that were at issue during the sentencing hearing back in 1996 of the defendant?

A. The defendant's role in the offense, whether or not there was any obstructive behavior conducted by the defendant. It was also contested on whether or not the defendant possessed any firearms during that time period.

Q. And when the judge is presented with disputes between the parties on how the sentencing guidelines should be applied and what the defendant's sentence should be, what happens at that point?

A. There's evidence or testimony that's presented to the judge to assist the judge in determining what appropriate sentence should be applied.

Q. And did that happen in the defendant's case back in 1997

and 1998?
A.   Yes.
♀

Q.   And can you explain to the jury, was this a one-day sentencing or multiple-day?
A.   Multiple days.
Q.   And over what time period?
A.   It began in December of 1997 and concluded in February of 1998.
Q.   And it didn't go every day during that time period.
A.   No, it did not.  I believe there were four -- parts of four days that made up the sentencing hearing.
Q.   And it fit in around the judge's other schedule.
A.   Certainly.
Q.   And as a result of that sentencing hearing, was a transcript generated of the testimony provided by parties during that sentencing hearing?
A.   Yes.
Q.   Did the defendant, Dustin Honken, testify at that sentencing hearing?
A.   Yes, he did.
Q.   And was his testimony transcribed as well?
A.   Yes.
MR. WILLIAMS:  May I approach, Your Honor?
THE COURT:  You may.
BY MR. WILLIAMS:
Q.   Special Agent Graham, I'm handing you Exhibit 300.  Do you recognize that, sir?
♀

A. Yes, I do.
Q. And what is that?
A. It is a copy of the portion -- Mr. Honken's testimony during the sentencing hearing.
MR. WILLIAMS: Your Honor, Exhibit 300 has already been admitted into evidence, and permission to publish?
THE COURT: You may.
BY MR. WILLIAMS:
Q. Special Agent Graham, looking at the screen in front of you, is that the first page in the transcript where the defendant in this case begins to testify?
A. Yes, it is.
Q. And there are a number of pages in front of you; is that correct?
A. Yes.
Q. During the time period of his testimony during the sentencing hearing, did it cover a number of topics that were at issue in the sentencing that you previously identified?
A. Yes.
Q. Did that involve discussions about drug activity and drug quantities?
A. Yes, it did.
Q. Did it involve discussions about obstructive behavior?
A. Yes.
Q. And did it involve discussions about firearms as well?

2141

A. Yes.
Q. What I'd like to do is go through this transcript and discuss certain portions of it as we go with you.
First of all, talking about drug-related testimony to

begin with, generally during the testimony by the defendant -- and let me ask you this. Were you present at the sentencing hearing, sir?
A. Yes, I was.
Q. And did you watch the defendant testify?
A. Yes.
Q. Generally during his testimony what was his position with regard to the quantity of drugs that were produced by him, Tim Cutkomp, and others?
MR. SPIES: Your Honor, I'm going to object to this question. It appears to be calling for opinion testimony that's not properly the subject of opinion testimony. I also would object on relevance grounds not knowing more particularly what Mr. Williams is driving at.
THE COURT: Overruled. You may answer.
A. Generally based -- generally he -- Mr. Honken minimized the amount of drugs produced in the sense that he said that the drugs were cut when they arrived in Iowa or arrived in Iowa cut.
Q. And so he disputed the quantity and the purity of the drugs?
A. Yes.

2142

Q. What generally was his position with regard to his role in the offense, particularly vis-a-vis Tim Cutkomp?
MR. SPIES: Your Honor, the same objection. This is calling for opinion testimony that's not relevant.
THE COURT: Overruled. You may answer.
A. Generally he min -- Mr. Honken minimized his role in regards to the manufacturing of methamphetamine.
Q. Now, let's talk in specific about some of the things he

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1870 of 3636

said. At some point during his testimony, was he asked about how the drugs were, in fact, transported to Iowa, in what containers?

A. Yes.

Q. I'm directing you to page 909 of that transcript. In particular I want to bring out just one portion of that for you.

THE COURT: Mr. Williams, before we do that, I'd like to see the lawyers at sidebar just for a second.

Excuse us just for a moment.

(At sidebar on the record.)

THE COURT: As Mr. Spies pointed out, what is the relevance of this?

MR. WILLIAMS: The relevance is a number of admissions that the defendant made that -- for example, the videotape. He testified in his sentencing hearing there was no videotape. There was a videotape. He admits that --

THE COURT: Okay. But we're not talking about the

2143

videotape now, are we? I mean, we're talking about role and quantity.

MR. WILLIAMS: Well, not so much on role and quantity at this point as much as -- I guess I was mostly just setting the stage on why we're even talking about these issues.

THE COURT: Well, that's what I was wondering, why are we talking about these issues?

MR. WILLIAMS: Well, because in relation to talking about those in the sentencing, then we talk about other things that are at issue in this trial. And so all I was trying to do is point out to the jury why were these things coming up during the sentencing. It's because in the sentencing these issues

were in dispute, and now we're going to talk about things that deal with the activities here.

So, for example, the defendant maintained during his sentencing that it was really Tim Cutkomp who ran this operation, that Tim Cutkomp was the one who had the motive to kill the witnesses in this case. And yet the next question I'm going to ask is, you know, we transported in brown bottles, and we previously showed we seized brown bottles from Honken's house and brown bottles from Nicholson's house to show that, in fact, he was more involved.

And so I'm not going to get back into sentencing issues, and perhaps I did a bad job of it, but I was just trying to set the stage for the jury to understand why we were even

2144

talking about this stuff.

THE COURT: Okay. Thanks.

(The sidebar was concluded.)

BY MR. WILLIAMS:

Q. Special Agent Graham, directing your attention to line 18 to line 21, was Mr. Honken asked about how the drugs were packaged that were delivered to Mr. Nicholson?

A. Yes.

Q. And what was his answer?

A. Usually in brown bottles, those little brown bottles.

Q. Did the defendant testify about who his only two customers were for the methamphetamine back in 1993?

A. Yes.

Q. And showing you page 944 of that transcript and again lines 1 through 3, what did he indicate regarding whether he distributed to anybody else other than Greg Nicholson and Terry

DeGeus?

A. Nobody.

Q. Do you recall that in your testimony you indicated that some notes were seized that had markings on them G Man and T Man -- I'm sorry, not in your testimony. Are you aware as your involvement in this case that there were notes seized in 1993 that had G Man and T Man on them?

A. Yes.

Q. And was that issue discussed during Mr. Honken's testimony?

A. Yes.

Q. Directing your attention to begin with to page 944 of that transcript and focusing again on just a few lines of this, going down to lines 23 through 25, the question was asked, Is it true that you kept records of your drug transactions with Mr. DeGeus and Mr. Nicholson? And what was his response?

A. I kept -- kept some rough -- yeah, I did, some.

Q. And on the next page, 945, did that discussion continue?

A. Yes, it did.

Q. And the question was asked, And did you in those rough notes or whatever you want to call them refer to Mr. DeGeus as T Man? And what was his answer?

A. Yes, I did.

Q. And Mr. Nicholson, did you refer --

A. Actually T Man -- Mr. DeGeus is T Man. Yes, that's correct.

Q. And did you refer to Mr. Nicholson as G Man, and what was his response?

A. Yes, sir.

Q. Now, at some point during his testimony was there a

discussion about trips made by the defendant and Angela Johnson after his arrest in 1993 but before 1995?

A. Yes.

Q. Directing your attention to page 1015 of that transcript and again to a portion of that transcript in particular, the

♀

defendant was asked, After your travel -- were your travel restrictions lifted in 1994 for your pretrial release?

And if you could, Special Agent Graham, explain to the jury, first of all, what were the travel restrictions on the defendant?

A. If I recall correctly, he was not able to travel outside of the state of Iowa or outside of the district of the Northern District of Iowa.

Q. And at some point after the passage of time sometime in 1994 those restrictions were lifted?

A. Yes.

Q. So when asked this question, what was the defendant's response?

A. I don't recall exactly when they were. They were lifted at some point, that's correct.

Q. And then he was asked, And after they were lifted, is it true that you and Angie Johnson traveled to Arizona? And what was his response?

A. Yes, we did.

Q. Now, when you seized the evidence out of the defendant's house during your search in 1996, did you, in fact, testify before that you recovered some notes, in fact, a note written on the back of an envelope to Tim Cutkomp or it actually said to Tim? Do you recall that testimony?

A. Yes.

Q. And was the defendant asked about that specific note during his sentencing in 1997, 1998?
A. Yes.
Q. Showing you Exhibit 300, page 1023 and again focusing on a portion of that -- focusing on a portion of that transcript at line 21, did the defendant admit that he left that note for Tim Cutkomp?
A. Yes.
Q. Among the items you seized, there was also a diagram that had molecule structures on it that went from various stages that ultimately had the words methamphetamine at the bottom. Do you recall that exhibit?
A. Yes.
Q. That was Exhibit 68?
A. Yes.
Q. Is that the one we're looking at there?
A. Yes, it is.
Q. And was he asked about that exhibit during his sentencing hearing?
A. Yes.
Q. Showing you page 1027 from the sentencing transcript and going to line 12, he was asked -- the defendant was asked, And then Mr. Parrish reminded me that Exhibit 23 had the note to Tim, and it also had a handwritten diagram of what appears to be methamphetamine production. Do you remember that in Exhibit 23?

Let me ask you to clarify, first of all, during a sentencing hearing, the parties mark exhibits much as we have in this case as well.
A. That's correct.
Q. And in the sentencing hearing back in 1997, 1998, were the numbers attached to the exhibits some of the same ones we used -- did -- let me rephrase that.
Were the exhibits used in that sentencing hearing some of the same ones we've used in this trial?
A. Yes.
Q. And were different numbers attached to those exhibits at that time?
A. Yes.
Q. And in particular, Exhibit 23, was that kind of a booklet with a number of different pages in it?
A. Yes.
Q. And page 5 of Exhibit 23, was that what we had previously looked at as Exhibit 68?
A. Yes.
Q. And so when he's asked about this, what was the defendant's response about whether he wrote that exhibit, Exhibit 68?
A. I've written hundreds of them. I'm sure it's one I wrote.
MR. WILLIAMS: A moment, Your Honor. I'm realizing that I'm going back and forth between microphones, and it's going to be a lot easier for everybody to hear me if I simply

2149

use this.
Shelly, is that working okay?
THE REPORTER: Thank you. It is.
BY MR. WILLIAMS:

Q. Now, Special Agent Graham, you're familiar enough with this case to know there was a question about whether a videotape was produced of Mr. Nicholson at some point in time allegedly saying that the defendant had nothing to do with drug activity.
A. That's correct.
Q. And that was an issue at the sentencing hearing.
A. Yes.
Q. Was the defendant asked questions about that videotape and the video recording during the sentencing hearing?
A. Yes.
Q. Showing you page 961 of that transcript and going to, to begin with, at line 18 -- I want to focus on that part of the transcript -- the question was asked of the defendant, While you were on pretrial release, did you have any knowledge of a videotape of Mr. Nicholson that was created during that time? And what was the defendant's sworn testimony in response to that question?
A. There was never no videotape created. It was a bluff for the prosecution not to go to trial.
Q. And he was asked, So you actually talked about a videotape. And what was his response?

A. Oh, yes, I did.
Q. And going to the next page of the transcript, page 962, and focusing at the top of this, he was asked a clarifying question. For some reason I can't get this, but you can read that. It says, And it was just a bluff. You're saying you made it up. And what was his response?
A. That is correct.
Q. Now, during a sentencing like this when a witness

testifies, are they placed under oath?
A. Yes, they are.
Q. And was the defendant placed under oath when he gave his testimony during his sentencing hearing?
A. Yes.
Q. And the testimony we've been talking about so far was after the defendant was placed under oath to tell the truth.
A. That's correct.
Q. The timing of the sentencing I want to talk about for a minute. Are you aware from your involvement in this investigation at some point a grand jury subpoena was issued to compel the testimony of an attorney by the name of David Thinnes to appear before the grand jury to testify about this videotape?
A. That's correct.
Q. And are you aware whether, in fact, he did at some point testify before the grand jury about a videotape?
A. Yes, he did.

Q. Was -- that testimony in which he revealed what he knew about that videotape, did that take place before or after the sentencing hearing in which the defendant denied the existence of any videotape?
A. It was taken after.
Q. So Mr. Thinnes testified after this hearing in which the defendant denied the existence of a videotape.
A. That's correct.
Q. Now, as part of your involvement in this case, you're aware that at some point there was a plea hearing set on July 30 of 1993 at which the defendant had indicated the intent to plead guilty to those charges back in 1993.

A. That's correct.
Q. And are you aware whether that plea went through or did not go through?
A. It did not go through.
Q. And was the defendant asked during his sentencing hearing in 1997 and 1998 about what happened at that plea hearing?
A. Yes, he was.
Q. Directing your attention to page 963 of the transcript and focusing on, to begin with, at the bottom of that page, line 20 -- boy, I'm not getting this to work pulling up. So let me just ask you, the question was asked starting at line 20, And on the date of the plea hearing, you notified the court that you changed your mind and you wanted to stand trial; right? And

what was the defendant's response?
A. That's correct.
Q. And the question then, And then on that day you met with Mr. Reinert and your attorney all together in the U.S. Attorney's Office; right?
A. Yes, that's correct.
Q. Let me pull up the second page here. And that answer was on page 964 at line 1?
A. Yes, it is.
Q. And then the question was asked at line 2, And isn't it true that you or your attorney at that point told Mr. Reinert that his case wasn't as strong as he thought it was? And what was the response by the defendant?
A. Yes, sir.
Q. Now, was there a discussion at the sentencing hearing about the disappearances of the witnesses in 1993 that stood to

testify or could have testified against the defendant concerning his drug activity?
A. Yes.
Q. Directing your attention to page 955 of the transcript and in particular at line 14 through 20, was the defendant asked about whether he had contact with Scott Gahn about Mr. Nicholson while he was on pretrial release?
A. Yes.
Q. And what was his response?

A. I believe I ran into him one time outside of someplace he was trying to convert to a bar. We had a discussion about Mr. Nicholson because he was an acquaintance, and he knew what had went on from I don't know who. But that was as far as the discussion went.
Q. So the defendant admitted that while he was on pretrial release he had a conversation with Scott Gahn about Mr. Nicholson.
A. Yes.
Q. During this case, as you're aware -- you were involved I think you testified about having Mr. Cutkomp wear a wire and record conversations with the defendant; is that correct?
A. Yes.
Q. And during the sentencing trans -- during the sentencing of the defendant back in 1998, was he asked a number of questions concerning the recordings that were made with Mr. Cutkomp?
A. Yes.
Q. Now, first of all, a transcript was made of each of those recordings, and those were available during the sentencing back in 1998?

A. Yes.
Q. And at any point did the defendant dispute the accuracy of the transcripts that were generated from those tapes in 1998?
A. Not to my recollection.
Q. And were those the same transcripts that were used in this
♀

trial?
A. Yes.
Q. Now, at some point during the questioning of the defendant, there was a portion of those tapes in which he talked about having climbed bigger hills than this, and this was during a conversation with Mr. Cutkomp. Do you, first of all, recall that portion of the tape in which that discussion took place?
A. Yes.
Q. And was he asked about that phrase that he used, I've climbed bigger hills than this, during his sentencing hearing in 1998?
A. Yes.
Q. Directing your attention to page -- page 968 of the sentencing transcript and in particular having you look at line 13, starting at line 13, he's asked, What did you mean on page 8 -- and page 8 is a reference to the transcript, sir?
A. Yes, sir.
Q. -- what did you mean on page 8 when you said a couple lines down, I've climbed far bigger hills than that little hill? What was his response?
A. I would have been bolstering the thing that it wasn't going to be a problem. All throughout these conversations I'm reassuring him that no matter what for him not to worry, for him not to worry, for him not to worry.

Q. And question, Okay. Well, let's be specific. What did you

mean by that little hill? And what was his response?
A. I'm sure I meant Dan Cobeen there.
Q. And the question, And what did you mean by far bigger hills?
A. Meaning -- I just made the statement I guess. I was just trying to simplify that I (sic) wasn't going to be any problem -- do you want me to continue?
Q. Hang on just a second. Let me pull up the transcript, sir. And this continues on page 969?
A. Yes.
Q. And so please continue.
A. -- problem for Mr. Cobeen because he was so concerned that this Cobeen was going to be such a problem, that he was going to take care of it. So I was just appeasing him and saying it wasn't going to be a problem so that way I wouldn't have to worry about him doing it if he had assurance that I was going to take care of it.
Q. And the question at this point was, Well, didn't you mean that Mr. Nicholson and Mr. DeGeus were far bigger hills than Mr. Cobeen? And what was his response?
A. I might have implied that in order to make it look like I wasn't going -- make it look like this wasn't going to be a problem.
Q. Now, at this point and at other locations in the transcript, is the -- what is the defendant explaining why he's

talking to Tim Cutkomp about these things and he's worried about

Tim Cutkomp? Could you explain what he was testifying about?
A. Throughout Mr. Honken's testimony, he referred to these conversations about Mr. Cobeen, that he was worried that Mr. Cutkomp was going to carry out some action that was going to cause Mr. Cobeen some harm or potentially death. Mr. Honken testified that he was essentially playing along with this to make sure that Mr. Cutkomp did not carry out any plan, and by telling him that he was going to take care of it, it was his testimony that that would have prevented Mr. Cutkomp from doing any harm.
Q. So the defendant claimed that even though he made all these admissions and statements about harming people and about not being worried about Mr. Cobeen, he claimed that was all in an effort to mollify Mr. Cutkomp so he wouldn't kill somebody.
MR. SPIES: Your Honor, I'm going to object to the form of the question couching it in terms of all these admissions and statements, and I object to the form of that question. It's argumentative and irrelevant.
MR. WILLIAMS: Let me rephrase, Your Honor. That --
THE COURT: Sustained.
MR. WILLIAMS: Thank you.
BY MR. WILLIAMS:
Q. Going back and trying at this again, during the testimony, did the defendant make statements claiming that he believed

Mr. Cutkomp was going to kill somebody?
A. Yes.
Q. And did he explain that his statements about him being willing to take care of Mr. Cobeen was an effort to mollify Mr. Cutkomp?

A. Yes.

Q. On that same vein, I'd like to direct your attention to page 976 of the transcript and in particular looking at line 18, the defendant was asked this question: And there -- again, there referring to the transcript of one of the tapes, sir?

A. Yes.

Q. And there you're saying it's easier to get out of this case than it was to get out of the '93 case. And what was the defendant's response?

A. Yeah. Yes, I'm implying that, yes.

Q. And the question, And then as you go on to the top of the next page, feel free to read the lines. And his response was?

A. Okay.

Q. And then he was asked, But then we're back to where we were before. I mean, you gotta remember both those -- I'm sorry. Both those guys were skeptical. At this point the prosecutor is reading from the transcript; is that correct?

A. Yes.

Q. Okay. So the prosecutor's saying, But then we're back to where we were before. I mean, you gotta remember both those

♀

2158

guys were skeptical. Do you -- and I'll shift to the next page -- see that on the top of 39? And what was the defendant's response?

A. Yes, I see that.

Q. And the question was, And that you said you're referring to Nicholson and DeGeus; right? And the response was?

A. Yes, uh-huh.

Q. So the defendant was asked whether when he's talking about those guys were skeptical, during the sentencing he admits when

he's talking about those guys are skeptical he's talking about Mr. DeGeus and Mr. Nicholson.

A. Yes.

Q. At some point was he asked about his statement during the undercover tapes of Mr. Cutkomp about saying that those guys won't come walking in?

A. Yes.

Q. Directing your attention to page 982 of the transcript and in particular at line 16, and again the prosecutor's reading from that transcript of that recording, and he says, And then Mr. Cutkomp said, What is the possibility of one showing up? He said the same thing essentially twice. Do you see that? And the defendant's response was?

A. Yes.

Q. And then the question is, And then you said, It ain't going to happen. They ain't going to come walking in, and that I know

2159

of. What did you mean by that? And the response?

A. Well, I'm --

Q. And then he was interrupted. Does that refer to the SKS rifle? And what was his response?

A. No. That is referring to the witnesses coming from '93.

Q. At some point during the undercover recordings of the -- between the defendant and Mr. Cutkomp, there was a discussion about I've seen worse things than that. Do you remember that line or that part of the recording?

A. Yes.

Q. And was that in the context again of the discussion between Mr. Cutkomp and Mr. Honken about whether Mr. Honken is capable and willing of taking care of the problem so that Mr. Cutkomp

doesn't have to worry about it?
A. Yes.
Q. And was he asked about that line about I've seen worse things during his sentencing?
A. Yes.
Q. Directing your attention to page 988 of the transcript, in particular starting at line 23, was the defendant asked this question? This is after you've just said you've seen worse things you never care to speak of; right? And what was the defendant's response?
A. Yes, I see that.
Q. And going to the next page which is 989, and the question

2160

was asked, And you say, Nope, never think about it, never, never bothers me. And the question was asked, What were you talking about there? And what was the defendant's response?
A. I was talking about a couple different instances. When I was around 14, 15 years old, I rode with my brother. He worked for Snell's Ambulance. And on a routine call for a motorcycle accident, a guy was blown apart, pieces all over the place, decapitated, and they were shuffling through the weeds to try and find his head and stuff like that.
And another time when I worked down at Burger King in 1986, I was supposed to be taking out the trash. We're not supposed to leave the door -- excuse me. We're not supposed to leave the back door open. Actually the back door to the business is left open. We had an outside area that was fenced in, and we weren't supposed to leave the fence open, and I left it open. And the door came sliding open, and I thought somebody was coming in to rob us because people had robbed people that

way. That's why we're supposed to shut the outer gate. And what it was was a woman that was left -- was beaten and raped and stabbed the night before and crawled up through the back area of the garbage thing. They had left her for dead. And that was one of the most horrible sights I'd ever seen.

That's exactly what I'm talking about when I say I've seen terrible things, and I don't think about it. I don't like to think about it. I don't talk about it.

♀

Q. And so the defendant's claiming that when he said, I've seen horrible things and I don't like to talk about it, he's not talking about murdering anybody. He's claiming that it had to do with when he worked with his brother with the ambulance service?

MR. SPIES: Your Honor, I'm going to object again to the form of the question, the use by Mr. Williams of the word "the defendant is claiming." I think the proper way to state it is "the defendant is stating." And I object to the form of the question as argumentative.

THE COURT: Between stating and claiming?

MR. SPIES: Yes.

THE COURT: Why don't you rephrase it with stating.

MR. WILLIAMS: I will do that, Your Honor.

THE COURT: Thank you. Objection's sustained.

BY MR. WILLIAMS:

Q. During the testimony by the defendant, he's stating that he -- that his prior statement in the recording that he's seen such bad things he doesn't want to talk about it is not in reference to any murders he's committed but is in reference to when he worked with his brother on the ambulance service. Is

that what he stated during his testimony?

A. Yes.

Q. And did he also state during his testimony that the other thing that made him say those words was that it had to do with

something he saw while he was working at Burger King when he was down in Arizona with his brother?

A. Yes.

Q. Now, as part of your involvement in this investigation, are you aware that there was an issue with regard to the destruction of a firearm in which Tim Cutkomp was involved?

A. Yes.

Q. And was the defendant questioned about that issue during his sentencing in 1998?

A. Yes.

Q. Directing your attention to page 965 of the transcript starting at line 13, was the question asked of the defendant, Well, isn't it true that at some point you talked to Mr. Cutkomp about disposing of a gun? And what was his response?

A. The actual gun that I had he -- him dispose of was the SKS that Robert Riepma had sold to me. He's stating it's a Tec-9, but that's not true. That's not the one.

Q. And the question was asked, And this was shortly after Mr. DeGeus disappeared; right? And what was his response?

A. No. This would be '95.

Q. And the question, So you're saying that you did not contact Mr. Cutkomp in late 1993, early 1994 about destroying a firearm. And what was his response?

A. That's correct.

Q. And the question, But you're saying you did melt down a gun

with him, but it was the one you got from Bob Riepma. And going to the next page at 966, what was the defendant's response?

A. I didn't even melt down a gun with him. I gave it to him to get rid of because my children were so interested in it because I made the mistake of opening up the trunk, and it was sitting in the gun case. And I opened up the trunk, and my kids seen it, and ever since then they wanted to see the gun, they wanted to see the gun, so I gave it to Tim just to do whatever he wanted to it.

Q. And so the defendant during his sentencing stated that he never melted down a Tec-9; is that correct?

A. That's correct.

Q. He stated that he melted down an SKS assault rifle, is that correct, or an SKS rifle?

A. That's the rifle that he gave --

MR. SPIES: Excuse me, Your Honor. I'm going to object to the form of the question in the sense that the question implies that Mr. Honken melted down a gun. I think that the testimony read by the witness was that Mr. Cutkomp melted down the gun.

THE COURT: Sustained.

MR. WILLIAMS: Let me rephrase that.

BY MR. WILLIAMS:

Q. The defendant stated that the gun that was melted down, whoever melted it down, was an SKS rifle.

2164

A. Mr. Honken testified that the gun that he gave Mr. Cutkomp

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1889 of 3636

was the SKS.
Q. All right. And the reason that he stated in his testimony that he wanted to have that gun destroyed was because he didn't want his kids to get it -- is that what he stated during his testimony -- or have access to it?
MR. SPIES: Again, Your Honor, I object to the form of the question. I think the transcript speaks for itself. I think that the witness just read that Mr. Honken said, I gave it to Tim just to do whatever he wanted to it.
THE COURT: Sustained.
MR. WILLIAMS: I'll just move on, Your Honor.
BY MR. WILLIAMS:
Q. Was the defendant questioned during his sentencing hearing about conduct that occurred after his arrest again in 1996 on the new drug charges?
A. Yes.
Q. And was he asked in particular about questions about his purchase or attempted purchase of firearms during that time period?
A. Yes.
Q. Directing your attention to page 1032 of the transcript and in particular at line 10, do you recall the question was asked or you see the question was asked, During the time you were on pretrial release, is it true that you tried to purchase a gun?

2165

Do you see that, where I'm talking about there?
A. Yes.
Q. And while I have my assistant trying to get this magnifying thing to work again, I'm going to go over to my hard copy. And the answer that he provided was what?

A. I tried to purchase one for my girlfriend living in Des Moines for her, that is correct.
Q. And the question was, You went to Kurt Zirbel at Kraft to try to buy the gun, and the answer was?
A. Yes.
THE COURT: Mr. Williams, why don't we give the jury an opportunity to take a stretch break, and maybe you can fix your magnifier.
MR. WILLIAMS: Great. Thank you.
THE COURT: Do you need more time on your computer?
MS. CLINE: It's just coming up.
THE COURT: Just rebooting it?
MR. WILLIAMS: Your Honor, if you like we can certainly move on while they're working on that. Special Agent Graham has a copy of the transcript. I have a copy of the transcript.
THE COURT: We could put the transcript on the digital document camera if you want to.
MR. WILLIAMS: I can do that as well. That will work.
THE COURT: Why don't we go ahead and proceed.

BY MR. WILLIAMS:
Q. So, Special Agent Graham, we're back on page 1032 of the transcript. We just talked about the testimony about attempting to purchase a gun from Kurt Zirbel. If you'll turn to line 20 of that transcript and looking at line 20, is the defendant asked the question, And then you went to Rick Held about a gun; is that correct? And what's his response?
A. Yes, that's correct.
Q. And the question, And you suggested to him that Bob Riepma

could maybe provide one. And the response was?
A. That's correct.
Q. And then continuing to the next page at 1033, at the top the question was asked, And you're saying you had already purchased a gun previously from Riepma in 1995. And what was the defendant's response?
A. Correct.
Q. And the question, Which is this SKS military rifle, and the response was?
A. Correct.
Q. And the question, So you had asked Mr. Held to buy a 380 pistol for you from Riepma. And the answer?
A. Yes.
Q. And the question, That would be in 1996 while you're on pretrial release, and what was the answer?
A. Correct.

2167

Q. Now, during the recording -- going back to the recording between Mr. Cutkomp and the defendant in 1996 while the defendant was on pretrial release, do you recall there was a discussion on that tape about having some type of gun that could fire so many rounds per minute? Do you recall that discussion being part of one of those undercover tapes?
A. Yes.
Q. I'd like you to turn to page 1034 and ask you was the defendant asked whether -- or asked about that conversation during his sentencing hearing as well?
A. Yes.
Q. And in particular looking at line 13 to the bottom of that page, starting at line 13, the question's asked, You told

Mr. Cutkomp in these recorded conversations that you had another gun; right? And what was the response?
A. Are you talking about the machine gun one?
Q. Question, You made reference in the tapes to a machine gun; right? And the answer?
A. Yeah, I did.
Q. Question, You said it could fire -- I think you said it could fire over a thousand a minute, and the answer?
A. I think I said some wild number.
Q. And the question, I think there was one place where you said a thousand and one place where you said 1,400 and some. And the answer?

♀

A. Right, okay.
Q. And the question, Do you remember that, and the answer?
A. Yeah, I remember saying that.
Q. And what was his explanation for talking about a machine gun on the undercover tape with Mr. Cutkomp?
A. I believe it was still in connection with --
MR. SPIES: Your Honor, excuse me. I'm going to interrupt the witness. I don't know if the question's calling for an opinion from the witness, a summary of the testimony that Mr. Cutkomp's already given, or the transcript that's already been received into evidence, so I object to the form of the question and would ask that it be rephrased so I can lodge an appropriate objection.
THE COURT: Sustained.
BY MR. WILLIAMS:
Q. Going to the next page, at 1035 of the transcript, was the defendant asked the question there at line 3, question, You just

made that up to tell Mr. Cutkomp you had a gun. And the answer was?

A. Correct. He was concerned of how I was going to deal with Mr. Cobeen, how I was going to get him, how I was going to get these agents and all those people, so I said I had a machine gun. And then he wanted to see it, and I said, well, I couldn't show it to him. I didn't even actually have it.

Q. So it was in relation again to Mr. Cutkomp's -- defendant's

testifying that it's in relation to Mr. Cutkomp's concern about taking care of witnesses.

A. Yes.

Q. Now, during the sentencing hearing again was he asked about recordings, that recording again about statements trying to locate different people including Mr. Cobeen, Special Agent Mizell, and yourself and others during those recordings?

A. Yes.

Q. Directing your attention to page 999 of the transcript and in particular to line 24 of that page, do you see the question at line 24, You mean you actually talked to him about going to do surveillance, for example, on Dan Cobeen; right? Do you see that question there?

A. Yes.

Q. Okay. And turning to the next page and focusing on the first three lines, what was his response to that?

A. That is correct.

Q. And the next question is, You talked about him going to Brian Beach's house and seeing where Mr. Cobeen might be living. And what was his response right below that?

A. We talked about scenarios.

Q. Directing your attention to page 998, in particular I want you to look at lines 20 to 22. And was the defendant asked the question, But you don't dispute that many of these conversations are about killing Dan Cobeen. And the defendant's response?

A. No, definitely not.
Q. Turning to page 985 and in particular looking at the first four lines of the transcript there, was a question asked of the defendant, When Mr. Cutkomp said what I just read and then you said, Don't even remotely worry about that; I have enough anger in me that there is no problem, the question was asked, What did you mean? And what was the defendant's response?
A. I'm talking about Cobeen.
Q. Turning to page 986, the next page, do you remember during the undercover tapes that the defendant made some comment about comparing something to football?
A. Yes.
Q. Football game?
A. Yes.
Q. Turning to page 986 and in particular to lines 5 through 15, the question was asked, And then you said, You know what you feel like before a big football game? What were you talking about there? And what was the defendant's response?
A. I guess -- I don't know. I guess --
Q. And the question, Weren't you talking about the kind of -- and what was the answer?
A. Probably being psyched up or something like that I suppose.
Q. And the question, You're talking about the kind of mind-set you have to be in to go kill somebody. And the response?
A. Yeah, uh-huh.

Q. And the question, Is that right? And what was the response?
A. Yes, I would be saying that, yes.
Q. Now, was the defendant questioned during the sentencing about efforts to actually locate Special Agent Mizell, Graham, and others for the purpose of killing them?
A. Yes.
Q. Directing your attention to page 1041 of that transcript, in particular lines 20 to 24, the question was asked, So you agree that there was a discussion in the tapes about killing Agent Mizell. And the answer?
A. As well as many other people. Yes, I do.
Q. And the question, Other people like the chemists, for example? And the response?
A. Chemists, Graham, Cobeen, you know.
Q. During the sentencing of the defendant in 1998, was he questioned about what would happen or what he was intending to do if he got out -- when he got out of prison regarding Mr. Cobeen?
A. Yes.
Q. Directing your attention to page 1070 of the transcript, in particular at lines 15 to 24, the question was asked, And as the Court has to decide what your sentence should be, I want to ask you this one last question about the one thing you said to Mr. Cutkomp. Do you remember saying to him, It doesn't matter

even if I'm in prison for f'ing 15 years, whatever. When I get out, he's still dead no matter what. No matter what, I swear on

my life that f'er's going to go before me? And the question was asked, Do you remember saying that, and the defendant's response?

A. Yes, I do.

Q. And the question, And you were talking about Mr. Cobeen; right? And the defendant's response?

A. Yes, I was.

Q. Now, Special Agent Graham, was there further questions posed to the defendant about actually looking for you in particular?

A. Yes.

Q. And was there a question posed to him about a page that had -- from the city directory that had Gs on it that were seized from his locker?

A. Yes.

Q. Directing your attention to page 1005, in particular line 16 through 22, the question was asked, So you agree that that page was in your locker because it related to efforts to find Mr. Graham, and what was the response?

A. I'm stating that yeah, he gave it to me to try and find him. Yeah, he did.

Q. And who's the "he" that he's talking about?

A. Mr. Cutkomp.

2173

Q. And the question is, But you're claiming it was Cutkomp who produced it to you. And the response?

A. Right. He gave it to me.

Q. Again, directing your attention to page 1004 and in particular lines 12 to 15 --

MR. WILLIAMS: We're going to look for some new

software, Your Honor.

Q. Let me go to 1004 and point out to you page -- I'm sorry, line 12 through 15. First of all, was he asked about at that point, Well, do you disagree with her testimony -- and who's testimony are we talking about at this point?

A. Marcy Hyde.

Q. Do you disagree with her testimony that you asked her where Graham lived, and what was the defendant's response?

A. Yes. I did not ask her directly where John Graham lived.

Q. Did you know a Brenda back in 1996?

A. Yes.

Q. And what's your relationship with this Brenda back in 1996?

A. She was a family friend.

Q. Miss Hyde's boyfriend, was he somehow connected to this Brenda?

A. Yes.

Q. And how?

A. They're brother and sister.

Q. And were you a friend back in 1996 of Miss Hyde's boyfriend at that time?

A. Yes.

Q. Had you, in fact, ever gone over to Brenda's house on occasion?

A. Yes.

Q. In fact, did you at some point have to go pick up your dog from Brenda's house?

A. Yes.

Q. Now, in 1996 were you married, and did you have children, sir?

A. Yes.

Q. And you do today.

A. Yes.

Q. In 1996 remember what vehicles you and your family had at that time?

A. Yes.

Q. Did you have any station wagon?

A. Yes.

Q. And can you describe that, please?

A. It was a brown Plymouth station wagon.

Q. Did you have a child's seat in that station wagon at that time?

A. From time to time.

Q. And why would you have it in your vehicle from time to time?

♀

2175

A. My wife runs a home day care center.

Q. Now, at some point during the sentencing hearing in 1998, was the defendant questioned about activities that occurred in the Woodbury County Jail?

A. Yes.

Q. In particular was he asked about contacts he had with Dean Donaldson?

A. Yes.

Q. Directing your attention to 1046 of the transcript from the defendant's sentencing hearing in 1998, in particular at lines 16 to 18, was the question asked of the defendant, You say you also agree that you gave Mr. Donaldson a diagram of how to find Mr. Cutkomp's house, and what was the response?

A. Yes, I do.

Q. And earlier in the testimony had the defendant testified about why it was he was providing a map to Dean Donaldson to Tim Cutkomp's house?
A. Yes.
Q. Turning to page 925 of the transcript and in particular pointing out the lines from 8 to 19, could you please read that to the jury?
A. There was never anything about eliminating any witnesses whatsoever. The map I had given him -- actually I didn't give it to him. It was on the back of my legal papers, so he copied it. I wasn't like some big -- excuse me. It wasn't like some

big hiding thing or anything. I gave him that because at the time and still Kathy Rick has a lot of possessions of Mr. Cutkomp in her garage, furniture and stuff. And at that time he -- his parents also had a television set of mine. And through the whole course of the events with these hogs he was supposed to drop off and that, having a trailer over there and everything, that he agreed to take that stuff back to Mr. Cutkomp's place. It had nothing to do with killing anybody.
Q. So the defendant's testimony in 1998 was that the reason he gave a map to Mr. Donaldson to the location of Mr. Cutkomp's parents' house is because there was property he wanted to return to Mr. Cutkomp.
A. Yes.
Q. And he wanted Mr. Donaldson to do that.
A. Yes.
Q. This is the Tim Cutkomp who had just worn a wire on him and caused him to be revoked on pretrial release.
A. Yes.

Q. Turning to page 1058 of the transcript, was the defendant asked about whether, in fact, he provided a work schedule to Kraft Foods to Dean Donaldson?
A. Yes.
Q. And directing your attention in particular to lines 11 down to 19, the question was asked, Well, you also gave Mr. Donaldson a copy of Mr. Cutkomp's work schedule, didn't you? And what was

the response?
A. I gave it for the reason for Rick Held and Jay Lein, not specifically for Mr. Cutkomp because he was supposed to go to Rick Held's and Jay's, and they both work the exact same shift as Mr. Cutkomp does.
Q. And the question, So you acknowledge that you gave a work schedule to Mr. Donaldson, and the answer?
A. Yes.
Q. There was some documents seized in this case, if you're aware of as one of the agents involved, of a note to Mr. Held and a letter to Mr. Lein that was seized from the defendant's -- I'm sorry, from a location where Mr. Donaldson had put them after he was released from jail over here. Are you aware of those notes and letters I'm talking about?
A. Yes.
Q. Okay. And directing your attention to page 1059 of the transcript and on to the next page, was the defendant at his sentencing asked about his authorship of those notes?
A. Yes.
Q. Okay. So looking at, first of all, page 1059 at the bottom of that page, was the question asked of the defendant, Well -- at line 22, Well, you admit that you gave him a letter of

introduction to Rick Held; right? And what was the response?
A. Yes, that's correct.
Q. And the question, Because that's in your handwriting;

right? And going on to the next page at 1060, what was his response?
A. Uh-huh.
Q. And the question, And so was the letter to Jay Lein in your handwriting?
A. Yes.
Q. And the question, So you admit that you gave him that; right? And the response?
A. Yes.
Q. Was the defendant questioned during the sentencing hearing in 1998 about whether, in fact, he had his girlfriend Kathy Rick arrange to bond out Mr. Donaldson?
A. Yes.
Q. Turning to page 1044 of the transcript, in particular at lines 12 through 14 of that transcript, at line 12 the question was asked of the defendant, And you agree, of course, that Kathy Rick put up her house as part of the bond. And what was the answer?
A. That's correct.
Q. Now, was he then asked -- at some point during the sentencing transcript was he asked about why it is that he had his girlfriend put up her house to bond out Dean Donaldson?
A. Yes.
Q. I'd like to direct your attention to page 923 of the transcript and in particular in the middle of that page, the

question at line 8, the question was posed to him, Let's go to Mr. Donaldson. Did you assist Mr. Donaldson in getting out on bond? And the answer?

A. Yes, I did.

Q. And the question, And why did you do that? And the answer?

A. It was about money. At that time I had given you the initial retainer, and my sentencing was going to be longer, and I think I'd entered into a plea agreement with the government at that time or gave them a signed plea agreement or whatever. But you had asked for 5,000 more. I was concerned about money.

Q. Let me stop you at that point. It goes on and talks about some other issues, but I want to focus at this point on that exchange. First of all, at this point who is asking these questions of the defendant?

A. Mr. Parrish.

Q. And so when the defendant at line 12 says, At that time I had given you the initial retainer, he's addressing Mr. Parrish at that point?

A. That's correct.

Q. And he says down at line 16, But you had asked for 5,000 more. I was concerned about the money. 5,000 more is in reference to what?

A. $5,000 more towards the representation of Mr. Honken.

Q. Now, he indicates in this paragraph that -- at line 14 he says, And I think I'd entered into a plea agreement with the

2180

government at that time or gave them a signed plea agreement or whatever. The actual date of the defendant's plea you

previously testified about, was that on June 2 of 1997?

A. Yes.

Q. And the timing of when Mr. Donaldson was in the Woodbury County Jail with the defendant, was that a year before any plea by the defendant?

A. Yes.

Q. Pursuant to this investigation, at some point did you -- did the United States serve a subpoena on the law firm of Mr. Parrish for billing records and correspondence relating to fees back during the time period being spoken about by the defendant in his sentencing in 1998?

A. Yes.

Q. And again, to focus us in, the reference is made that he's explaining why he bonded out Dean Donaldson was because he needed more money to pay to Mr. Parrish.

A. Yes.

Q. And the bonding out of Mr. Donaldson took place in the summer of 1996.

A. That's correct.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Handing you Exhibit 305. Can you identify that, please?

A. Government's Exhibit Number 305 is the information provided by Mr. Parrish's law firm pursuant to the subpoena served on the firm.

MR. WILLIAMS: United States would move to admit Exhibit 305 into evidence, Your Honor.

* * * *

(Government Exhibit 305 was offered.)

* * * *

MR. SPIES: We object on the grounds previously urged to the Court, Your Honor, and ask that those be adopted right here.

THE COURT: Thank you. Those are adopted here, and the objections are overruled. Government's Exhibit 305 is received.

* * * *

(Government Exhibit 305 was admitted.)

* * * *

BY MR. WILLIAMS:

Q. Pulling up the front page of Exhibit 305, is that a cover letter enclosing the documents to the government pursuant to that subpoena?

A. Yes, it is.

Q. And did the Parrish law firm fully comply with the subpoena served upon it?

A. Yes, they did.

♀

Q. Looking at the last page of that subpoena, what is that page referencing there, sir?

A. That acknowledges that Mr. Parrish and Mr. Honken had a meeting and that if Mr. Honken wanted Mr. Parrish to represent him, he would have to come up with a $10,000 retainer.

Q. And the date of this letter is what?

A. May 6, 1996.

Q. And the -- it references a meeting that took place on May 4 of 1996 between the defendant and Mr. Parrish.

A. Yes.

Q. Do you know from your investigation when, in fact, Mr. Honken was ultimately incarcerated in the Woodbury County Jail after his release was revoked due to the tapes recorded by Mr. Cutkomp?
A. Yes.
Q. And when was that?
A. June 18, 1996.
Q. As part of their compliance with this subpoena by the law firm, was there billing records in there that indicate the dates and the amount of the $10,000 retainer that was being used as time went on?
A. Yes.
Q. And just to show you one of those pages, is that an example of one of the pages of the billing records that were provided to the government?

♀

2183

A. Yes, it is.
Q. And that's the second page of Exhibit 305?
A. Yes.
Q. The column on the left, is that -- are those the dates?
A. Yes.
Q. And then there's two columns on the right. The column to the left on those two columns is captioned at the top by hours?
A. Yes.
Q. And then there's a dollar figure to the right of that?
A. Yes.
Q. Did you determine that on the -- how much money was remaining in the retainer on the date that Mr. Honken was put into the Woodbury County Jail on June 18 of 1996?
A. Yes.

Q. And what is that amount of money that was left in the retainer at that time?

MR. SPIES: Your Honor, I'm going to object to the question. It calls for an opinion from this witness that I think requires him to have some understanding of the billing practices and the accounting practices of the Parrish law firm, and he's plainly not qualified to do that.

THE COURT: Why don't we take that matter up outside the presence of the jury. It's time to take our recess now.

And so, members of the jury, it's ten o'clock. We'll take a 30-minute recess and be back at 10:30. Please remember

my prior cautionary instruction about keeping an open mind until you've heard all of the evidence in the case. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated. What's your position, Mr. Williams?

MR. WILLIAMS: My position, Your Honor, is it's fairly self-explanatory. It's a running total of the amount of money from the time that he retained Mr. Parrish. The last page of the exhibit is the date of the first meeting with Mr. Honken on May 4. The first entry on that billing record is on May 4, and it's self-explanatory that as time goes on dollar figures are accumulated coming off that retainer. And all I'm asking is for two calculations to be made. Starting with $10,000 and subtracting off as time goes on how much money is used, we can determine how much money remained in the retainer on the date of his incarceration and on the date of Mr. Donaldson's bonding out.

If the defense is going to require me to bring in

somebody to explain the billing statement, then I will do that. But I will be subpoenaing somebody from Mr. Parrish's firm to come in and testify about that if that's going to be an issue in this case.

THE COURT: Mr. Spies?

MR. SPIES: Well, I don't quarrel with the witness's ability to make a simple calculation, but to draw an inference

♀

that because of that calculation there was no need for Mr. Honken to post an additional retainer with the Parrish law firm I think is where Mr. Williams is going with this question. And there are all sorts of --

THE COURT: But that goes to the weight, not the admissibility.

MR. WILLIAMS: And perhaps I can clarify too, and Mr. Spies doesn't know where I'm going, so in fairness that should let him know what I'm doing. I'm not going to ask the agent whether there was a need for more money in the retainer. I'm simply asking him on this date based on these calculations how much was left in the retainer on this date and how much was left in the retainer on August 14 of 1996.

THE COURT: Right, because they may have a policy that the retainer can never fall below X amount or whatever. There's all kinds of explanations.

MR. WILLIAMS: Absolutely.

THE COURT: Okay. So as long as you don't go there, then I'm going to overrule your objection, but I think that helps clarify it, not that you're still not objecting. I'm not trying to talk you out of your objection. But -- because I agree with you. This witness is not in a position to know all

of the factors that would go into whether or not additional money was required by the Parrish law firm. But I think the statements are so simple that he could testify to --

MR. SPIES: I may have been a little quick triggered there, Your Honor. I was thinking Mr. Graham was going to venture farther than Mr. Williams said he was going to.

THE COURT: It wasn't a quick trigger. You were absolutely correct in making the objection and making sure he wasn't going to go there.

MR. WILLIAMS: And I apologize. We could have probably avoided this if I would have just talked to Mr. Spies ahead of time and told him where I was going with this witness.

THE COURT: Okay. Anything else we need to take up?

MR. SPIES: No, Your Honor.

THE COURT: Okay. We'll be in recess.

(Recess at 10:04 a.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. PARRISH: Your Honor, regarding that hearing I had in Des Moines at noon today, I've called my office, and another lawyer is going to go down, Tammy Westhoff, who was here, and explain to Judge Ovrom where we are, and I think it's going to be taken care of, so we don't have to stop at noon.

THE COURT: Okay. But we can break a few minutes before noon if you'd like.

MR. PARRISH: No. It's all taken care of.

THE COURT: Okay. Thanks.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Williams, you may continue your direct examination of Agent Graham.

MR. WILLIAMS: Thank you, Your Honor.

BY MR. WILLIAMS:

Q. Special Agent Graham, right before the break we were talking about the billing records, and I think I posed the question to you whether you had taken an effort with these billing records to determine the amount of retainer that remained on a couple dates, and in particular just to show one of the pages, looking at this page again which is page 2 of Exhibit 305, the amount of the money -- amount of the retainer I guess earned as time went on is reflected in that far right-hand column I think was your testimony earlier. Is that accurate?

A. Yes.

Q. And so did you add up the amount of money earned and then subtract that from the initial $10,000 retainer to determine what the amount of the retainer was remaining on two different dates?

A. Yes.

Q. And the first date was the date on which Mr. Honken first was admitted -- incarcerated in the Woodbury County Jail?

A. Yes.

Q. And that was on June 18 of 1996?

A. Yes.

2188

Q. And how much of the retainer remained on June 18 of 1996?

A. $5,787.

Q. And then directing your attention -- are you aware from

your involvement in this investigation that Mr. Donaldson was bonded out of the Woodbury County Jail on August 14 of 1996?

A. Yes.

Q. And did you do that same calculation to determine how much of the retainer remained from the $10,000 on August 14 of 1996?

A. Yes.

Q. And how much was that?

A. $2,998.

Q. Part of the subpoena to the Parrish law firm requested any correspondence relating to billing or fee requests submitted to Mr. Honken?

A. Yes.

Q. And you indicated earlier that the Parrish law firm fully complied with that subpoena.

A. Yes, they did.

Q. And as part of their response to that subpoena, was there any correspondence to Mr. Honken requesting additional sums of money from him?

A. Not for the time period subpoenaed.

Q. The only document would have been that initial request for the retainer.

A. That's correct.

2189

Q. Now, after the sentencing of Mr. Honken, when somebody is sentenced in federal court, is there a document that's issued by the Court at the completion of a sentencing announcing the judgment by the Court?

A. Yes.

Q. And what is the name of that document if you recall?

A. Judgment of conviction.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Handing you Exhibits 303 and 304, can you identify those for me, please?

A. Government's Exhibit Number 303 is a copy of the judgment and conviction of Mr. Honken dated February 24, 1998.

MR. WILLIAMS: Your Honor, these judgments, Exhibit 303 and 304, have been not objected to by the defense.

THE COURT: They're already in evidence.

MR. WILLIAMS: May I publish them to the jury, please?

THE COURT: You may.

BY MR. WILLIAMS:

Q. I'm showing you the front page of 303. Is that the judgment of Mr. Honken dated February 25 of 1998?

A. Yes.

Q. And 304 is what, sir?

A. Is the judgment of conviction dated from January 25, 2000.

♀

Q. And was there a -- I'm sorry, January 25 of 2000, looking at the front of page -- of Exhibit 304?

A. I'm looking at the line where it says date of imposition of sentence is January 25, and then it's signed by Judge Bennett on February 1, 2000.

Q. Okay. Thank you. Can you explain, was there some type of legal issue that was in dispute after the initial judgment in February of 1998?

A. Yes.

Q. And was that ultimately resolved on appeal?

A. Yes, it was.

Q. And as a result of that, is that why there are two different judgments for the defendant in this case?
A. Yes.
Q. The first judgment was replaced by the second judgment which is Exhibit 304?
A. That's correct.
Q. And the second judgment of the defendant dated February 1, 2000, reflects the ultimate sentence imposed on the defendant at that time.
A. Yes, it does.
Q. After the defendant was sentenced in 1998, what happened with him at that point?
A. He would have gone through the Bureau of Prisons' intake process and ultimately was sent to serve his term at the U.S.

Penitentiary in Florence, Colorado.
Q. And at some point was he transferred to another penitentiary?
A. Yes.
Q. And what penitentiary was that?
A. The U.S. Penitentiary in Marion, Illinois.
Q. And when approximately was he transferred to that penitentiary?
A. I believe it was May of 2003.
Q. Last series of questions I have of you, Special Agent Graham, as part of preparation for trial in this matter, did you meet a number of times with Mr. Cutkomp for various purposes?
A. Yes.
Q. And did that include a meeting with him in May of 2004?
A. Yes.

Q. And what was the purpose of that meeting with him in May of 2004?

A. To review the undercover tapes -- to partially review the undercover tapes as well as I interviewed him one more time.

Q. And what did you interview him about?

A. As far as his whereabouts in the summer and fall of 1993.

Q. And why did you interview him about those issues?

MR. SPIES: I'm going to object to this question, Your Honor. I don't know if it's going to be calling for hearsay, an opinion of the witness, or some other inadmissible testimony,

and I would respectfully ask the question be rephrased so I can lodge an appropriate objection.

THE COURT: Well, I don't understand what rephrasing you asked for. The question is, And why did you interview him about those issues? How could you rephrase that?

MR. SPIES: Well, what I'm getting at is whether Mr. Cutkomp said something to Agent Graham that Mr. Williams is going to inquire into that would constitute hearsay, and that's what my concern is.

MR. WILLIAMS: Your Honor, I will not be asking Mr. Graham anything about what Mr. Cutkomp said.

THE COURT: What Mr. Cutkomp said, okay. You may proceed.

MR. WILLIAMS: Thank you, Your Honor.

BY MR. WILLIAMS:

Q. Why is it that you were interviewing Mr. Cutkomp about his whereabouts in 1993?

A. During the sentencing of Mr. Honken, it became apparent that perhaps a defense was going to be maybe shift some of the

blame based on Mr. Honken's testimony during the sentencing transcript to Mr. Cutkomp, so we needed to determine where he was at during those months or during that time period.

Q. Was Mr. Cutkomp ever a suspect in the murders of the people, Nicholson, Duncan family, and DeGeus?

MR. SPIES: I'm going to object to this calling for an

opinion that's not properly the subject of opinion testimony.

THE COURT: Overruled. You may answer.

A. No.

MR. WILLIAMS: No further questions, Your Honor.

THE COURT: Mr. Spies?

MR. SPIES: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SPIES:

Q. Good morning, Agent Graham.

A. Morning.

Q. I think in an effort to expedite my cross-examination of you I'm just going to ask you if you recall from the transcripts that you've reviewed I know many, many times whether certain testimony was made by Mr. Honken back at the time of his sentencing; okay?

A. Okay.

Q. And for the jury's information, there were about 190-plus pages of transcript covering Mr. Honken's testimony during this 4-day sentencing hearing; right?

A. Yes.

Q. All right. And so to properly put into context all the testimony that you've given this morning and that I'll be asking you about this morning, the better evidence would be the whole

transcript; would you agree?
A. Yes.

Q. Now, at the sentencing trans -- sentencing hearing that Mr. Honken had, he was not required to testify at that hearing, was he?
A. That's correct.
Q. Okay. So let me move through some subject areas for you this morning, Agent Graham, and if at any time you don't recall the testimony, I'll refer you to a page and line; okay?
A. Okay. That's fine.
Q. During Mr. Honken's sentencing transcript, did he testify about his friendship with Tim Cutkomp?
A. Yes.
Q. And he told the Court that he considered Tim Cutkomp his best friend.
A. That's correct.
Q. And this was, in fact, his only friend.
A. Yes.
Q. Someone like a brother to him.
A. Yes.
Q. And Mr. Honken described that any time Mr. Cutkomp had problems he'd go to Mr. Honken, and similarly, any time Mr. Honken had problems, he would talk to his friend Tim about them.
A. That's correct.
Q. And he said that there was no friend in his life that was closer to him than Tim.

A. That's correct.
Q. But that some problems arose in their friendship when Tim Cutkomp suspected that Mr. Honken had had a sexual encounter with his ex-wife; right?
A. That's correct.
Q. Now, Mr. Honken also described that both he and Tim Cutkomp were methamphetamine users.
A. That's correct.
Q. And that they both liked it too much.
A. Yes.
Q. During the sentencing transcript, there was a lot of testimony, as you've described this morning, about Mr. Cutkomp and Mr. Honken manufacturing or making methamphetamine; right?
A. Yes.
Q. And that had to do with one of the issues you described for us earlier, the drug quantity amounts.
A. Yes.
Q. Now, did Mr. Honken testify that after his arrest in March of 1993 he did not produce any methamphetamine after that?
A. Yes, he did.
Q. And although he tried in what? Late '95 and early '96?
A. Correct.
Q. So there was no actual methamphetamine produced according to Mr. Honken's testimony after 1993.
A. Correct.

2196

Q. He also described that Mr. Cutkomp was doing much of the work of the actual manufacturing?
A. Yes, he did.

Q. And this would have been down in Arizona?
A. Yes.
Q. Did Mr. Honken describe Dan Cobeen as someone who'd been selling methamphetamine and who had expressed an interest in making methamphetamine?
A. Yes, he did.
Q. And that Mr. Cobeen and Mr. Cutkomp had gotten together and had talked about Mr. Cobeen helping in the manufacturing process.
A. Yes.
Q. Now, I'm going to ask you some questions now about your recollection of what Mr. Honken said about Mr. Nicholson and Mr. DeGeus; okay?
A. Yes.
Q. Now, Mr. Honken described that he had met Mr. Nicholson through Scott Gahn; right?
A. That's correct.
Q. And Scott Gahn had met -- or Mr. Honken had met Scott Gahn through his employment at Wellborn Industries.
A. Yeah, I -- yes.
Q. And Mr. Honken said that he knew Terry DeGeus through Terry DeGeus's brother Brian DeGeus.

2197

A. Yeah, I believe he testified to that.
Q. And Mr. Honken, in fact, said that he had gone to school with Brian DeGeus.
A. Yes.
Q. Is it also your recollection -- you were asked some questions this morning about the G Man, T Man testimony that Mr. Honken gave at his sentencing hearing?

A. That's correct.
Q. And did Mr. Honken describe there that the debt that's reflected in that note from Mr. DeGeus dealt not only with methamphetamine that Mr. DeGeus was going to be selling for Mr. Honken or had sold for Mr. Honken but also a prior drug debt involving marijuana?
A. Yes.
Q. But that the Nicholson drug debt that was reflected in that note dealt only with methamphetamine.
A. Yes.
Q. Mr. Honken also said in his sentencing hearing that he had learned from Brian DeGeus that Brian's brother Terry DeGeus was using a lot of the methamphetamine that Terry had gotten from Dustin.
A. Yes.
Q. You've testified this morning, Agent Graham, about testimony given by Mr. Honken which he described a trip down to Arizona by -- that was taken by Mr. Honken and Angela Johnson.

2198

Do you remember that testimony?
A. Yes, I do.
Q. Did Mr. Honken at his sentencing hearing also describe for the Court a trip that was taken by Tim Cutkomp with Christi Cole to go down to Arizona?
A. Yes, he did.
Q. Next I'd like to turn to the testimony that Mr. Honken gave about his conversation with Scott Gahn about where Terry Nicholson was -- I'm sorry, where Greg Nicholson was; okay?
A. Okay.
Q. You described earlier for us that he said at his sentencing

hearing that he had, in fact, talked to Scott Gahn about where Greg Nicholson was; correct?
A. Yes.
Q. And Mr. Honken said that Scott Gahn did not know where Mr. Nicholson was.
A. That's correct.
Q. Turning to the time in the transcript or in the sentencing hearing where Mr. Honken was talking about Greg Nicholson and his whereabouts, he was asked about that in the sentencing hearing, was he not?
A. Yes.
Q. And Mr. Honken said that he had no idea that Greg Nicholson was gone until the day that Mr. Honken was scheduled to plead guilty in federal court.

A. Yes.
Q. And it's also right that he said that he had heard that Greg was gone from talk around town.
A. Yes.
Q. And that, in fact, it was his lawyer, Mr. Thinnes, who had made a call to the clerk of court where Mr. Nicholson was supposed to appear in court.
A. Yes.
Q. And it was Mr. Thinnes who learned from the clerk of court that Mr. Nicholson had failed to appear in court.
A. That's correct.
Q. And it was after that that Mr. Honken and Mr. Thinnes announced to the prosecution that they were not going -- that Mr. Honken was not going to plead guilty.
A. That's correct.

Q. There was also testimony in the sentencing hearing about, as you said, obstruction issues?
A. Yes.
Q. And was there also testimony, Mr. -- or Agent Graham, about talk in the transcript between Mr. Cutkomp and Mr. Honken about going to Bondurant?
A. Yes.
Q. So there was an issue about whether Mr. Honken had conversed with Mr. Cutkomp about going to Bondurant to destroy evidence.

♀

A. That's correct.
Q. And we've heard from Mr. Cutkomp about that earlier in this trial, but did Mr. Honken explain that, in fact, Mr. Cutkomp and he had driven by some building in Bondurant?
A. Yes.
Q. And that Mr. Cutkomp said that he could get into the building and destroy evidence?
A. Yes.
Q. And that Mr. Cutkomp said that he was proficient in crawling through duct work to get into a building?
A. Yes.
Q. Let's now turn, Agent Graham, to the subject of guns, and you've talked about Mr. Honken's testimony about destroying or getting rid of guns. Mr. Honken at his sentencing transcript said that he had not ever possessed a Tec-9 pistol; right?
A. That's correct.
Q. And concerning the gun that was given to Mr. Cutkomp, you've already told us that he said it was the SKS rifle that he'd gotten from Bob Riepma.

A. That's correct.
Q. And the SKS, Mr. Honken explained at his sentencing hearing, was something he had for only a short period of time, that he'd bought it from Mr. Riepma having been told by Mr. Riepma that it might be a good investment.
A. Yes.

♀

Q. Agent Graham, I'd like to talk next about your own role in the sentencing issues that came up. You've testified for us that there was testimony that you were in danger. Do you remember that?
A. Yes.
Q. And Mr. Honken at his sentencing hearing did, in fact, testify that he and Tim Cutkomp had talked about you.
A. That's correct.
Q. And they talked about you being a witness in their cases.
A. Yes.
Q. And Mr. Honken said that he never looked for you.
A. That's correct.
Q. And he did say that he had talked to Marcy Hyde who he worked with at Kraft Foods about you.
A. Yes.
Q. And Marcy Hyde was told by Dustin that he thought that you were following him.
A. Yes.
Q. And Marcy told him that you lived near Brenda Payne.
A. Yes.
Q. And did Brenda Payne know where you lived?
A. Yes.
Q. And you knew where Brenda Payne lived.

A. Yes.
Q. And this city directory page, this page that's been entered

into evidence here in this case, Mr. Honken explained that Tim Cutkomp had gotten that copy for him; right?
A. Yes.
Q. And had put it in his locker or had given it to him at work.
A. Yes.
Q. Let me ask you next, Agent Graham, about the incident at the Woodbury County Jail and Mr. Honken being jailed there, again, a subject of his sentencing testimony; right?
A. Yes.
Q. Mr. Honken said that concerning Dean Donaldson, that he had asked -- I'm sorry, that Dean Donaldson had asked Dustin Honken to show Dustin his paperwork. Do you remember that testimony?
A. Yes.
Q. And the reason that Dean Donaldson had asked Dustin to show him his paperwork, because Dean Donaldson thought that Dustin was a cop.
A. I be -- yes.
Q. And so he showed his paperwork to Dean Donaldson to prove he wasn't a cop.
A. Correct.
Q. And Dustin also described that when he went into jail he was scared.
A. Yes.
Q. And that his father who had been in prison had told him

when you go into jail, you better act tough.
A. Yes.
Q. And Dustin said at the sentencing transcript, at the sentencing hearing, that he had tried at the Woodbury County Jail to come across like he didn't want to be messed with.
A. Correct.
Q. And he tried to give the impression that the government's accusations against him were true.
A. Correct.
Q. And he did that, and after that he was widely accepted by the inmates at the Woodbury County Jail.
A. Yes.
Q. And that everybody there wanted to know how to make meth.
A. Yes.
Q. And, in fact, he gave Dean Donaldson some information and some books about how to make meth.
A. That's correct.
Q. Next I'd like to turn to the issue of Dustin's testimony about bonding Dean Donaldson out of jail or trying to bond him out; okay?
A. Okay.
Q. You've described for us here that Dustin testified that he did, in fact, help Dean Donaldson get bonded out of jail.
A. Yes.
Q. And he had asked his girlfriend Kathy Rick to help bail

♀

2204

Mr. Donaldson out.
A. Yes.
Q. And that it was a money-making effort to try to, in fact, help Kathy raise some money.

A. Yes.
Q. Now, you've described in court here this morning Government's Exhibit 305 which I think are the billing records of Mr. Parrish's law firm?
A. That's correct.
Q. All right. Now, I know that you're not here to give any opinion testimony about the billing practices of Mr. Parrish or Mr. Parrish's law firm. But you were aware, weren't you, Agent Graham, that in the summer of 1996 there was an effort to negotiate a plea in Mr. Honken's case?
A. I know there was one. I don't recall the timing of that, but it would have been sometime during that time period perhaps.
Q. And, in fact, that there were several plea agreements or proposed plea agreements exchanged between Mr. Parrish and the prosecutors prosecuting Mr. Honken's drug case.
A. Yes.
Q. And that those fell through.
A. That's correct.
Q. So during the summer of 1996, there was a lot of legal activity going on between the defense and the prosecution in trying to resolve Dustin's drug case.

A. Again, I don't recall the timing of it, but I know that there was some.
Q. All right. And the arrest of a client creates a host of new problems for a defense lawyer, doesn't it?
A. I would think so.
Q. Access to the client?
A. Yes.
Q. The ability of the client to assist the investigation of

the case?
A. Yes.
Q. The ability of the client to work?
A. Yes.
Q. The ability of the client to have contact with his family?
A. Yes.
Q. That leads to more calls from the client's family to the defense lawyer?
A. I don't know. I would assume so.
Q. You'd be willing to agree with me that the arrest of a client can create a whole host of new problems for the defense.
A. Yes.
Q. All right. Now, you've testified about a portion of the sentencing transcript where Mr. Honken was asked about why he needed this money, and you've already told us and you told the jury that Mr. Honken said that he needed money to pay Mr. Parrish's firm an additional retainer. You remember that?

2206

A. Yes.
Q. And you were referring to page 923 of the sentencing transcript, and those were questions that Mr. Parrish was asking Mr. Honken; right?
A. That's correct.
Q. And Mr. Parrish asked Mr. Honken, Did you assist Mr. Donaldson in getting out on bond? Mr. Honken said, Yes. Mr. Parrish asked, And why did you do that? And at that point Mr. Honken replied, Because you -- I'd given you an initial retainer, and you asked for $5,000 more; right?
A. Yes.
Q. And you've said that there was no correspondence furnished

to you by Mr. Parrish's firm about that, but you don't know and you're not privy to any conversations between Mr. Parrish and Mr. Honken about the subject of fees.

A. That's correct.

Q. Now, Mr. Honken also said in his sentencing hearing that he did not ask Mr. Donaldson to kill anybody.

A. That's correct.

Q. And he said that he did not give Mr. Donaldson Mr. Cobeen's address.

A. That's correct.

Q. Let's next talk while we're on the subject of the Woodbury County Jail, Agent Graham -- well, I think we've had enough of the Woodbury County Jail. Let's move to the conversations

between Mr. Cutkomp and Mr. Honken that were recorded and that we've heard in this courtroom; okay?

A. Okay.

Q. Mr. Honken said at his sentencing hearing that the conversations that he had with Tim Cutkomp involved Tim Cutkomp's concern that Mr. Cobeen would tie him into the drug case.

A. Yes.

Q. And in addition to that, Tim Cutkomp, as described by Mr. Honken, was flipping out.

A. Yes.

Q. And Dustin believed that Tim wanted to deal with Mr. Cobeen because Cobeen was the only person that could tie Cutkomp to the drug case.

A. Correct.

Q. And so these conversations about little hills and bigger

hills Mr. Honken explained at his sentencing hearing was, as Mr. Williams asked you, an effort to appease or to mollify Tim Cutkomp because of Dustin's concern that Tim was going to try to kill Cobeen.

A. Correct.

Q. And he was trying to reassure Mr. Cutkomp not to worry about the case.

A. That's correct.

Q. In fact, in the early transcripts between Mr. Cutkomp and

Mr. Honken, they talked about reviewing the evidence with their lawyers, talking about legal issues that might come up, how those might be addressed by their lawyers; right?

A. Correct.

Q. And at a point Mr. Honken said that he was pretending that he, Mr. Honken, would do what was necessary to keep Tim's nightmares from coming true.

A. Correct.

Q. And he also said that it was not long before that Mr. Honken was aware that Tim had had a nervous breakdown.

A. Correct.

Q. And that as a result of this nervous breakdown, Tim Cutkomp had done some things that Dustin Honken had no clue he would ever do.

A. Correct.

Q. And so Mr. Honken was really concerned about Mr. Cutkomp's mental stability.

A. Yes.

Q. And so Mr. Honken said at his sentencing hearing he was taking Mr. Cutkomp's statements about getting rid of Dan Cobeen

very, very seriously.

A. Yes.

Q. And said repeatedly throughout the sentencing hearing that he was doing this as an appeasement to Tim Cutkomp until they had the chance to look at the evidence. He was buying time.

♀

A. Yes.

Q. Now, importantly, Mr. Honken said that he had absolutely nothing to do with getting rid of Terry DeGeus or Greg Nicholson.

MR. WILLIAMS: Objection, Your Honor. Argumentative with the "importantly" comment at the beginning of that question.

THE COURT: Sustained. You can just rephrase your question.

MR. SPIES: Sure.

BY MR. SPIES:

Q. At page 977 of the sentencing transcript starting at line 10 --

A. Okay.

Q. -- Mr. Honken was asked, And you're saying, though, you had nothing to do with getting rid of Nicholson and DeGeus, and what was Mr. Honken's response?

A. Absolutely I had nothing to do with it.

Q. And he, in fact, reiterated that several times throughout the sentencing hearing.

A. Yes.

Q. Now, he also said that in his conversations with Mr. Cutkomp he was concerned about Mr. Nicholson coming back after 1993 to testify about his drug activities.

A. Yes.

Q. Mr. Honken also described for the sentencing court during his sentencing hearing that he and Mr. Cutkomp had many other conversations other than the ones that were recorded at Mr. Honken's home; right?
A. Yes, he did.
Q. That they talked at work about their cases, and he summarized or talked about some of those conversations at work.
A. Yes.
Q. In fact, he said that at work he had told Tim that he had no idea what had happened to Greg Nicholson and Terry DeGeus.
A. Yes.
Q. Nor did he have any knowledge about their whereabouts or the whereabouts of the missing children?
A. That's correct.
Q. Now, the last thing I want to ask you about, Agent Graham, is you described for the jury today Mr. Honken's plea of guilty, and that was on June 2, 1997, when Mr. Honken appeared before the Court and, as Mr. Williams asked you, admitted that he had been involved in a conspiracy to manufacture methamphetamine and an attempt to manufacture methamphetamine. Do you remember that?
A. Yes.
Q. And did Mr. Honken at page B2464 of the plea transcript --
A. I don't have that document in front of me. Can you give me the page number again?

Q. Yes, it's bate stamp 2464.

THE COURT: Is that Government's Exhibit 302?

MR. SPIES: Yes.

A. Okay.

Q. Beginning at line 18, did Mr. Honken say at his guilty plea hearing, I would like to state one thing. Since I've been sitting in jail for the last year, before I first came to jail, I had full intents to fight this because I felt I had good grounds to fight this on. But during this year I've had a lot of time to think about things, and I've seen a lot of the damage firsthand what it does to people coming in, and I realize I've done wrong and my actions are wrong in what I've done, and I'd just like -- came to a decision to get this over with and plead guilty and serve my time, to get out so I can do something good once again and be with my children who I've seen -- which is very damaging to me to see them grow up through the glass during this last year because they're very small. And I just want to apologize to the Court and anybody that would have been hurt in any of my wrongdoings in the past. Is that what Mr. Honken said?

A. Yes.

MR. SPIES: I have no other questions.

THE COURT: Mr. Williams?

REDIRECT EXAMINATION

BY MR. WILLIAMS:

2212

Q. Special Agent Graham, you were asked some questions on cross-examination about these tape recordings and whether, in fact, it was during these tape recordings, undercover tapes with the defendant that by their nature were not known to the

defendant, that he made statements -- I'm sorry. Let me rephrase.

During the sentencing hearing, he was asked about these undercover tapes, and you were asked isn't it true that during the sentencing hearing he claimed that while all the statements he made during those -- in the transcripts were true and that he was talking about killing Cobeen and he was talking about hunting down witnesses and so forth that he was also attempting to mollify Tim Cutkomp who he was afraid was flipping out and was going to kill somebody. Do you remember that line of questions you got from the defense counsel?

A. Yes.

Q. Those were questions and statements the defendant made about tape recordings with Tim Cutkomp, and were those the same tape recordings in which the defendant stated during those recordings that he understood that Tim Cutkomp couldn't go through with something like this?

A. Yes.

Q. Now, you were asked a lot of questions by the defense counsel about statements that the defendant made during his sentencing hearing. Do you recall those questions?

♀

2213

A. Yes.

Q. And you were asked isn't it true he said this and isn't it true he said that and isn't it true he said the next thing? Do you recall that line of questions?

A. Yes.

Q. You're not testifying today whether you know any of the things he said to be true or not true; is that fair?

MR. SPIES: Your Honor, I object to this on relevance

grounds. It's not the proper subject of opinion testimony, it's inflammatory, and Rule 403.

THE COURT: Well, he's not giving his opinion about whether they're true or not, that your objection would be to that, so anyway, the objection's overruled.

BY MR. WILLIAMS:

Q. And let me rephrase just so we're clear. You're not saying they're true or not true. You're not opining at all about whether what he said during that sentencing hearing is true or not true; is that accurate?

A. That's correct.

Q. And this was the statements that the defendant made during that sentencing hearing, that would be the same sentencing hearing in which the defendant said that there was never, ever a videotape of Greg Nicholson.

A. That's correct.

MR. WILLIAMS: Nothing further.

2214

THE COURT: Mr. Spies, anything further?

MR. SPIES: No further questions. Thank you.

THE COURT: You may step down.

Government ready to call its next witness?

MR. MILLER: Yes, Your Honor. United States calls Joseph McGee. He is an in-custody witness, Your Honor. It may be a minute or two.

THE COURT: Okay. Members of the jury, why don't you take a stretch break while we wait for the next witness.

I know it's hard to raise your right hand, but do the best you can.

JOSEPH MCGEE, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Can we try and get that chair a little bit closer? Thank you. Would you state your full name, please, and spell your last name.

THE WITNESS: Joseph Brian McGee, M-c-G-e-e.

THE COURT: Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Good morning, Mr. McGee.

A. Good morning.

Q. Your age, sir?

A. Thirty-seven.

♀

Q. It's apparent that you're a prisoner, sir.

A. Yes.

Q. How many years have you served in prison?

A. Approximately 22.

Q. And you're now 37?

A. Yes.

Q. Would you please list for the jury if you will and can the felonies of which you have been convicted?

A. I've been convicted of five armed bank robberies and one forgery and one burglary.

Q. That's your adult criminal history?

A. Yeah, and I was enhanced on the armed bank robberies for using a firearm.

Q. Enhanced, that means your sentence would be increased because you used a firearm.

A. Yeah, it's an additional felony conviction.

Q. Did your criminal career begin as an adult, or did you have criminal problems as a juvenile as well?
A. As a juvenile.
Q. And you were first a ward of the state at what age, Mr. McGee?
A. Eleven.
Q. Where are you from, sir?
A. Pennsylvania.
Q. Any particular area in Pennsylvania?

A. Outside Philadelphia.
Q. During your years of incarceration, Mr. McGee, did you ever serve any time at an institution in Florence, Colorado, United States Penitentiary, Florence?
A. Yes, I did two terms in Florence, Colorado.
Q. Tell us when those terms were, sir, please.
A. Between 1995 and '98 and again near the end of '99 to 2002.
Q. You left at some time in 2002.
A. Yes.
Q. Your leaving, did that have anything whatsoever to do with this case, sir?
A. No.
Q. You were transferred to a different institution.
A. Yes.
Q. By the Bureau of Prisons.
A. Correct.
Q. You've mentioned that you first entered USP, Florence in 1995. What unit did you go to if you recall?
A. EB.
Q. DB?

A. EB.
Q. EB? And how many different units did you reside in at USP, Florence if you recall?
A. Four.
Q. What were the other units?

♀

A. DA, DB, and CA, and the special housing unit.
Q. What is special housing unit?
A. The hole, the SHU.
Q. Referred to by inmates as the hole?
A. Correct.
Q. Why do they call it the hole?
A. Solitary confinement, segregation.
Q. You mentioned that there was a period where you were -- between '95 and 2002 where you were somewhere other than Florence, Colorado?
A. Yes, sir.
Q. Where were you during that period of time?
A. Leavenworth; USP, Leavenworth in Kansas.
Q. And what were you doing during those months?
A. I was sent to Leavenworth, and then I was going to a trial.
Q. As a witness?
A. Yes.
Q. On behalf of the defendant in that case?
A. Correct.
Q. Were there any incidents involved with that term in Leavenworth, Mr. McGee?
A. Incidences, sir?
Q. Yes, sir.
A. In what -- what nature?

Q. You indicated you were -- is that called going out on a

writ?
A. Yeah, but I wasn't writted out. I was actually sent to Leavenworth as a disciplinary transfer from Florence, Colorado.
Q. Being disciplined for what?
A. For dirty urinalysis test.
Q. And from Leavenworth returned to USP, Florence some time in '99.
A. Correct.
Q. Except for that period of time in Leavenworth, you were at USP, Florence from '95 through '02.
A. Correct.
Q. During those -- during that period of incarceration in Colorado, sir, did you ever make the acquaintance of an individual by the name of Dustin Honken?
A. Yes.
Q. Do you recall your first encounter with the man?
A. Yes. They were going to put him in my cell.
Q. Please describe that.
A. When a new guy comes in, he comes in with his bed roll or whatever, and the officer will assign him to a cell and tell him to take his stuff up to his cell, and Dustin was assigned to my cell, and he came up there with his bed roll, and at the time I wasn't taking cellies, so I -- and there was another inmate who had a cell open who I knew, and I had worked it out where Dustin could move in with him.

Q. Okay. I just want to be sure we understand this. When you

say, At the time I wasn't taking cellies, what do you mean by that, Mr. McGee?

A. It's kind of -- a guy can kind of buck a little bit, you know. I'm not sure of the correct terminology but to be stubborn kinda and say -- if you can work something else out, another cell or arrangement, then you can kind of dictate to the officer, kind of tell the CO, No, look at, this isn't going to work out, but this will work out. We already have it arranged. So it's kind of bullying the correctional officer in doing what you want them to do.

Q. The institution said that Mr. Honken was going to cell with you, and you said no, he's not.

A. Yes.

Q. And he didn't.

A. Correct.

Q. Do you recall your next encounter with the man, with Mr. Honken?

A. Out on the yard, on the compound. The next -- he had some property stolen from him out of his cell. I think it was either the first night or the second night that he was here. He had left the unit. I think he just went to the store or something and he had a bag of groceries and some stuff in his cell. My next contact with him was over his stolen property trying to find out who had gone into his cell and stolen his stuff.

2220

Q. Describe that contact.

A. I think it was just his cellie Gin, the guy who I had hooked him up with to go in his cell with, he had come to me and said they stole his radio or something, stole some stuff off of him, and I think it was some black guys that stole it. I was

really preoccupied, and I didn't really have much going on concerned with him or what was happening with him at the time or who stole his stuff. I didn't really care. And I precursor -- I looked into it a little bit.

Q. Let me just ask you this. Did you have any sort of a conflict or confrontation with Mr. Honken over that matter?

A. At that time, no, not really. Dustin didn't -- later on, yeah, Dustin had told people that he felt that I had stolen the stuff out of his cell, but at the time I didn't know that Dustin felt that way.

Q. Well, did you do anything about that?

A. Later on when I had found out about it, I confronted him about it, and I told him, you know, that's a cowardice -- cowardice way to be to go behind my back and tell people you felt I had stolen something from you rather than just bring it to me if you felt that way. And he was like, No, no, I didn't feel that way about it, so it was just a slight altercation.

Q. And it was and I take it perhaps even still is in your nature to confront someone if you have a disagreement.

A. Yes.

2221

Q. What housing unit was this, Mr. McGee, where you were living at that time?

A. EB.

Q. Mr. Honken took up residency with the other inmate, this Gin fellow you mentioned?

A. Yeah, he moved out immediately after he got his stuff stolen and moved to another unit.

Q. What unit was that?

A. BB.

Q. Were you ever housed in BB?
A. No.
Q. Did you nevertheless continue to from time to time maintain contact with the defendant, Dustin Honken?
A. Dustin became friends with a group of people who lived in BB who I socialized with, interacted with. One of them was a close friend of mine.
Q. These are mutual friend of yours and Mr. Honken's.
A. Yes.
Q. And who are these individuals?
A. Dave Loparo, Joe Dougherty, Artie Dufur.
Q. What sort of activities did you do with these fellows?
A. Mostly it was just like talking, yard talk on the yard. All of us had an interest in martial arts and working out. Carl Boles was another one who lived in another unit, and there was really just an interest in martial arts and different techniques

and styles.
Q. So through your mutual friends you'd have additional contact with Mr. Honken as well?
A. We would walk the track occasionally and, you know, hang out. And I think sometimes Dustin might have had some -- he seemed -- like little problems or little things that was going on and stuff. He was just doing time, jailhouse -- just doing time.
Q. You were doing armed bank robbery time. What sort of time was Mr. Honken doing to your knowledge?
A. I believe he was doing time for drug dealing.
Q. Different fellows were doing time for different things, but you and Mr. Honken were both associating with a group that

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1940 of 3636

included Loparo and Dufur and Dougherty and others.

A. And others, yeah.

Q. Mr. McGee, while you were in Florence, Colorado, did you ever become acquainted with an inmate by the name of Tokars?

A. Yes.

Q. Who was Tokars?

A. Here he was an inmate who had notoriety because it was rumored that he had been a magistrate judge in Atlanta, Georgia. That gave him a status of a lawyer, so he was -- I think everybody kind of like knew of him because it's not very often you get someone who understands the law and the workings of the law that's right there among your midst that you can get with

2223

and have him look at your case.

Q. And being acquainted with someone who had some knowledge of the law is a matter of interest and concern to inmates in any institution like Florence?

A. Uh-huh.

Q. And I assume the reason's fairly obvious, but can you just tell us briefly what sort of interest you would have in Mr. Tokars and his legal abilities?

A. I wanted him to look at my case, of course, to see if he could get some time off my sentence. I got like about 40 years. And the sentence that I got was an odd sentence, and the laws had changed over the years, and I went to -- my problem was getting back into court. And I had asked him about it and talked to him. He was kind of a high -- a little bit out of my price range after being in jail for so long.

Q. Tokars was.

A. Yeah, and he was -- he was working on a lot of people's

cases. I mean, he was taking -- he had a lot of cases, and my case I don't think really interested him.

Q. He turned down your case.

A. Yeah.

Q. And he was busy doing other legal work.

A. He was more involved in conspiracy-type cases and big cases.

Q. And he had a big case of his own, didn't he?

2224

A. Yeah.

Q. Other inmates were interested in seeking his assistance, I assume?

A. Yes.

Q. To your knowledge did the defendant seek the assistance of Mr. Tokars?

A. I'm not sure if he actually seeked his assistance. I think they were cellies at the time or something. I think that he was working on Dustin's case.

Q. And I just want to know what you are sure of, sir.

A. Yeah, I'm --

Q. If you don't know, that's fine.

A. I know he had read Dustin's legal work. I don't know if he was hired to work on it or what or if they were cellies or how it came about, but I know he had read Dustin's legal work, his papers.

Q. You were aware there was an association there.

A. Yes.

Q. And how did you become aware of that?

A. It kind of -- like I lived in a separate unit, so I wasn't really privy to what was going on in BB, but Dustin brought it

to my attention when Rick automatic -- he just like disappeared one night, packed up, left, gone, and Dustin was very upset and very concerned about his departure because he had been working on his case or reading parts of his case, or possibly parts of

his case was missing, information from his case was missing.

Q. Mr. Tokars' departure worried Mr. Honken?

A. Well, it was automatically assumed that that guy was telling on Dustin, that that guy had gained information from him for his case and enough to -- enough to go to the -- to the DA with it or whatever he went to it with.

Q. An unexpected transfer would give rise to such suspicions, Mr. McGee?

A. Yeah.

Q. And did Mr. Honken have such suspicions and concerns?

A. Yes, he did.

Q. And he shared them with you.

A. Sure, he did.

Q. A person who is doing prison time yet shares information about other inmates with authorities, is there a term for that type of a person in prison?

A. Yeah. He was -- he's pretty low person. I guess he's a rat. He's held in contempt.

Q. What was Mr. Honken's attitude toward rats?

A. You know, I really don't know.

Q. Let me ask you this, Mr. McGee. Did he express an attitude toward rats? Did he make statements about --

A. Yeah, I think he played along with the persona of the convict code that, you know, rats are -- that, you know, they're worse than like child molesters. They're worse than people who

kill children. They're -- you know, rats are -- they're like an evil.

Q. And that's the attitude of inmates about that subject.

A. Yes, it is.

Q. Widespread. It wasn't unique to Dustin Honken by any means.

A. I would say that's part of the criminal code. That's a way of life for criminals.

Q. Did Mr. Honken ever brag about his own handling of rats?

A. Dustin made it known that the people who -- that he had gotten rid of rats. Dustin made it known that he would kill rats and he had, people that had testified against him.

Q. He had personally killed rats.

A. Yes.

Q. How did he express that? How did he carry himself when he made such expressions?

A. I think all of us would come across with that kind of bravado, and I know it's probably hard for people to understand that have never been in prison, but it's part of that tough guy persona. It's part of that thing that keeps the predators at bay. You know, it's part of everything. It's part of becoming that hard guy, that tough guy where you would -- everybody I think in prison who carries that convict code has bragged at one time or whatever about, you know, killing snitches or killing rats.

2227

In Dustin's particular case, it was the concern over

Rick who had read some of his legal work who became aware of an open investigation or a case with Dustin that involved some murders of some confidential informants or people who were going to the grand jury.

Q. And that's this Rick. You're referring to Tokars?

A. Yes. And there was some concern that -- in that case there were some informants who had -- or government witnesses -- and I think that's the term that you would use that holds more esteem than a rat. A rat is kind of like someone who will run to an officer and say, Hey, he's got a knife or, Hey, he's got wine under his bed. But to murder a government witness is a more -- has more esteem attached to it.

Q. More esteem.

A. It's the only way I can think to say it.

Q. Well, attitude about rats was fairly common -- negative attitude about informants or rats would be fairly common inside USP, Florence and I'm sure still is; fair statement?

A. Yes.

Q. But actually claiming to have successfully succeeded in killing rats is something else again; is that a fair statement?

A. Yes, it is, uh-huh.

Q. Not everybody made that claim, did they?

A. No.

Q. But Dustin Honken did.

A. Yes.

Q. Repeatedly?

A. Yes.

Q. You've mentioned braggadocio or demeanor in which that was -- was that in character for Mr. Honken, or was it unusual

demeanor when he would make these comments?
A. No, this was definitely outside of Dustin's character to -- Dustin didn't come across as a convict to -- I mean, you gotta understand, here's a guy who first comes into prison, and the first thing that happens to him the first night he's there is someone steals his stuff. That happens to somebody who's not very prison oriented because if you're stupid enough to lay your stuff laying out like that where someone's going to come in there and steal it or if you don't know nobody and you're in that kind of environment and you don't -- you know, you gotta take precautions, you know, so you can understand that he's not schooled in prison ways, and he spoke like an intelligent person, educated person, you know. He's not like a drug addict or trailer park trash, and he's certainly not like someone like me who spent their whole entire life incarcerated.
Q. Mr. Honken was just a little bit more polished.
A. Yeah.
Q. Educated.
A. Yeah, he could fit in with regular people a lot easier, you know.

Q. But on those occasions when he bragged about the fact that he'd killed his rats, was he coming across in the same demeanor, or did that show a change in demeanor?
A. Well, to believe it or not, when he would talk in that form, I find it hard to believe that he would -- at that point in time that he was capable of -- he just didn't come across to me as a killer, you know, and here -- he didn't come across like that, a little spooky I guess you could say.
Q. He was a clean-cut young man.

A. Yeah, I don't see him as being that kind of a violent-type dude, you know.
Q. After Tokars suddenly disappeared, got transferred unexpected to a different institution, was anything done about that matter by Mr. Honken and you and his friends?
A. Yes.
Q. What?
A. We formed affidavits. Well, I guess as time went on at first there was concern about whether -- that Dustin's wife was on the street or his girlfriend and that there was discussion about how these people were killed who were government witnesses, informants, and Dustin felt pretty comfortable at first that his wife or girl would hold strong being that she would be the only one who could implement (sic) him where he would get indicted. He hadn't been indicted at the time.
Q. And his wife or girlfriend was the only one who could

2230

implicate him?
A. Right, and she wasn't indicted at the time either. So when Rick left, there was a lot of assumptions as to why did he leave and was he telling and sweating the indictment or what was -- you know, what's really going on.

And then his wife got arrested, and then he knew that the indictments were coming down. And Rick really was, you know -- I didn't care for him, you know, at the time. I didn't like the guy at all. I thought he was kind of creepy. So I agreed -- we agreed to sign affidavits that would discredit him, character assassinations, you know.
Q. Who agreed to sign these affidavits beside yourself?
A. Joe Dock and Artie Dufur and Loparo and myself, and I

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1947 of 3636

imagine there were some other people too. But in that group we had an ulterior motive for signing those affidavits.

Q. I want to get to that in just a second. But first with regard to the affidavits themselves, sir, those were on behalf of Mr. Honken.

A. Yes.

MR. PARRISH: Your Honor, I'm going to make an objection as to hearsay as to the other individuals and ask that the questions be restricted to Mr. McGee's response and why he signed the affidavit.

THE COURT: Sustained.

BY MR. MILLER:

Q. Did anyone besides yourself sign such an affidavit in your presence, sir?

A. Yes.

Q. Who?

A. Dave Loparo and Joe Dougherty.

Q. Were those affidavits all the same or similar?

A. They corresponded with each other.

Q. And what did they purport to do?

A. To discredit Joe -- or Rick Tokash or how ever you say his name.

Q. In what way?

A. There were -- well, specifically that he was engaged in homosexual activity with black inmates on the yard. I believe my affidavit dealt with that we were like giving him protection, that he had ran into debt with black inmates for using drugs, that he was a drug addict, that he owed a lot of money, that he was paying protection and just that he was a despicable human

being.

Q. And that was for purposes of discrediting Mr. Tokars?

A. Yes.

Q. Was it a truthful affidavit that you signed?

A. No.

Q. You mentioned that there was a second reason or agenda for signing those affidavits. What was that, Mr. --

MR. PARRISH: Again, Your Honor, his affidavit is what

2232

we believe it should be restricted to. The rest would be hearsay. I have no problem with him stating what his affidavit said but not those.

THE COURT: Sustained.

BY MR. MILLER:

Q. Let me back up. Who asked you to sign that affidavit?

A. Dustin.

Q. And you indicated you had a second reason, and what was your second reason for signing that affidavit, Mr. McGee?

A. I signed it -- Dustin typed it up, and it was just like a -- just -- it was just a means of getting to be transported to court to where I could have access for a possible escape attempt.

Q. Was this a plan that was discussed by you and others?

A. Yes.

Q. And only as to those occasions when it was discussed in your presence, sir, who discussed these plans?

A. Joe Dock.

MR. PARRISH: Objection. Hearsay.

A. Dave --

MR. PARRISH: He said Joe Dock.

A. Joe Dougherty.

THE COURT: Just a second. Well, he can state who was present. I believe that's what the question called for.

MR. PARRISH: I have no objection to that question.

THE COURT: It was ambiguous, so we'll ask Mr. Miller to rephrase the question to eliminate the hearsay objection.

MR. MILLER: I'll see if I can ask a clearer question.

BY MR. MILLER:

Q. You discussed escape plans?

A. I discussed escape plans with Dustin. I discussed it with Artie Dufur. I discussed escape plans with Dave Loparo and with Joe Dougherty pertaining to this court proceedings right here.

Q. And during those discussions, sir, was a plan formulated? Yes or no.

A. No.

Q. No plan was formulated?

A. It was on the cuff. It was kind of, you know, not -- hype -- we hypothesized of what kind of conditions we would incur. We practiced.

Q. Let me just ask you this. You've indicated that in addition to discrediting Mr. Tokars it was your expectation that you would be writted out or taken to a court proceeding somewhere?

A. Yes.

Q. And where did you get that idea?

A. Dustin said -- Dustin had told us, told me and Mr. Loparo and Joe Dock, and at different times we talked about it that he knew the lay of the land pretty well and that where this case was taking -- case was taking place at was a relatively

unsophisticated legal setup as far as county jail goes, as far as facility that is designed to hold high-security inmates such as we are, that it wasn't really prepared to deal with the type of security that we require.

Q. Who was inmate Loparo?

A. He was probably one of my best friends.

Q. Cellmate of yours?

A. Yes, he was.

Q. Did he have any expertise in the area of escape?

A. Yes.

Q. How about any of the rest of those fellows?

A. Joe Dougherty had some pretty serious escapes, home invasions, and I think the plans kind of just went like that. Like Joe Dougherty had escaped and did a home invasion, took hostages and was successful at it and stayed free for quite a while before the authorities caught up to him. Mr. Loparo had escaped from prison in Arizona and same thing, stayed away for a period of time. I myself have escaped from like county jails and stuff like that. So yeah.

Q. You guys weren't just play acting, were you?

A. No.

Q. What did you do, if anything, in connection with these discussions?

A. Practiced retrieving an officer's weapon, how to check if it's -- if there's a round in the chamber, if the safety's on,

♀

2235

if the clip is seated and how to do it as fast as possible to go through like the steps to seat the clip, rack it, hit the

safety, learn how to remove our handcuffs with our black boxes on and our chains on with a very minimum of tools and stuff, things that we could just maintain through any type of transfer situation and practice martial arts too, different types of holds and stuff like that that might . . .

Q. And who is it that participated in practicing these maneuvers?

A. All of us, and Carl Boles, even though I don't really think Carl knew what was going on, but Carl, Carl was like a -- I would say a master marshal artist, you know, probably above a master. He's been doing it for all of his life. So he's a really good person to take different techniques to, so all of us and some other inmates who were good in martial arts who maybe not knew what the intentions were.

Q. And did you practice together?

A. Yes.

Q. And who did you practice together with?

A. Carl Boles. We would partner up, Dave Loparo. I think Dustin mostly practiced with Artie, partnered up with Artie, and Carl Boles too. He would practice with him.

Q. In preparation for an escape back here in Iowa.

A. Once it became -- I mean, we always practiced martial arts. It wasn't something that we just started to do. It was

2236

something we did every day. But once we became, you know, ready for the escape, I think, yeah, the martial arts centered around scenarios that you would encounter with an armed person like an escort.

Q. You've mentioned getting out of a black box. What's a black box?

A. That's what I'm wearing right now that's covering my handcuffs.

Q. How would you be able to practice that?

A. There are a lot of ways. You could go to the SHU and you're in the SHU and you're cuffed all the time. We went on a court trip to Denver, and we practiced, and there's also -- there was a lot of crooked cops believe it or not, you know. There's a whole crew. We had a pair of handcuffs, me and Loparo, and a black box, and we used to like try to do different things with it when we had it. You know, we kept it stashed. We had a lot of different type of things, you know.

Q. Did you develop techniques where you were actually successful in defeating the black box?

A. Sure.

Q. Now, Mr. McGee, you'd heard -- as you've indicated, you'd heard Mr. Honken brag about he killed his rats.

MR. PARRISH: Objection. Repetitive.

THE COURT: Overruled.

BY MR. MILLER:

2237

Q. At that point were you aware of any other killings at all?

A. No.

Q. At any point during these practicing sessions and what was going on there at USP, Florence, did you ever take it upon yourself to confront Mr. Honken about that subject?

A. Later as time went by -- and I couldn't really be specific of exactly how much time. Time is a really different thing to me than it is to you. But, you know, it came out -- me and Dustin I don't think ever really got along. I don't think he ever cared for me, and I certainly never really cared for him or

seen him as a strong source of -- he just -- maybe I was in my predator stage, and I just didn't see how he had anything to offer really.

But it came to be known, I mean, that the government witnesses were killed was an accepted thing, that he whacked some government people who testified against him or went to the grand jury or whatever it had been, and he had been indicted for it. And then it came out that I guess the bodies were discovered. And it became known that there were two little girls that were also murdered with those government witnesses.

Q. Did that cause you to do something, Mr. McGee?

A. Yeah, it turned to a confrontation. Me and Loparo -- everybody wanted -- I had a big problem with it, yeah, because in the past that kind of thing has been -- you know, killing children or sexual offenders who, you know, hurt children, you

know, it's something that we kind of have taken care of ourselves, you know. I guess society feels that it's okay because we're already deemed as ruined people, so, you know, for us to traumatize those that traumatize young kids or women, it's kind of an accepted thing. The guards will kind of look the other way, and people will kind of give you a wink and the okay as if you're doing the right thing, you know. So -- and that's the way I've been raised, you know. I've been raised that if a man hurts a child and he lives next door to me that I should hurt him, I should try to kill him.

Q. What did you do after you learned that the accusations against Mr. Honken included the killing of children?

A. I confronted him after beating my head against the wall. Mr. Loparo, you know, it was an accepted fact that these

government witnesses were murdered by Dustin and buried somewhere for years and years, and then when they recovered the bodies and dig them up, wow, here's two little girls that definitely aren't government witnesses.

So it was pretty -- you know, and it was just a simple acceptance of logic that he had also killed those girls and buried them with -- you know, it was just like an accepted thing, and I would go round and round with Dave about it and Joe Dock like, Come on, what the hell are we doing, you know, but the escape was just a fever. I mean, I've been in prison right now straight for 16 years or so. I still have 19 more years to

serve. And, I mean, there are times that I spend weeks or months thinking about hanging myself or taking my own life rather than to endure 20 more years of incarceration, you know. So you can delude yourself with escape. I mean, you sit back in your cell and you dream of living on a sailboat somewhere in the Caribbean, you know, with a bag full of money and you're free, you know, and you're just going to live out your days out there, boom, and put it -- you know, it's like a fantasy, you know.

Q. You're telling us you had a disagreement with Loparo and Dougherty about the situation.

A. About going to court and trying to help this guy out when he killed these little girls. I didn't feel that it was right.

Q. Mr. McGee, did you take it upon yourself to confront Dustin McGee -- or excuse me, I apologize, to confront Dustin Honken about that matter?

A. Yeah, I did.

Q. Where was this and who was present?

A. Dave Loparo was present, Artie Dufur was present, and Joe

Dougherty was present in front of BA which is a -- BB, BA are two units that are attached together, their unit, and there's some tables out front, and I guess I was having a bad day and I had a bad attitude. And Dustin had picked up on it, and he'd -- I think it was kind of building, and he asked me what my problem was, you know, and, you know, kind of like, I don't know, in a friendly way or how ever, you know, but, you know, like, What's

♀

your problem, you know. And I was like, My problem. What's my problem? You know what I mean?

Q. Go ahead and describe your conversation. Tell us --

A. I said, You killed two little girls, you fuck. Who are you to ask me what my problem is? And Dave Loparo grabbed my arm and kind of pulled me back, and Artie kind of slid over next to Dustin. And Joe Dock, he's just a big old bear kind of like guy, you know, and Dustin had responded, you know, like they were rats, you know; they were being raised by rats; they would have grew up to be rats; they were rats; they would have been on the stand testifying against me; they were rats; they had to go.

Q. That was Dustin Honken's statement to you.

A. Yeah.

Q. They would have grown up to be rats themselves.

A. Yeah, that they were rats. They were being raised by rats. They were growing up -- you know, and it's kind of like a heated moment, fast words, and I was like, you know, I was kind -- it was a no-win situation for me at the time. I was kind of sick of the whole thing and walked off.

Q. Did you leave the -- leave the group as far as the escape plans at that point?

A. Well, I did. I told Dustin take my affidavit, rip it up

and shove it up his ass; don't call me for court; don't call me down there; I don't want nothing to do with that shit.

Then Loparo who was supposed to be my friend, he's

like, Come on, you know, we can get out, and Joe Dock too. You know what I mean? And they're like -- I mean, this is how insane these people are, how insane the whole thing was. They were like, Let's go on the court trip and escape, and then we'll whack Dustin after we escape. If you still feel that strongly about him killing these little girls, we'll deal with it when we get out, but let's get out. Just go along. You know what I mean? Don't lose it. Just go along.

Q. Did you then?

A. No, not really. I think Dustin lost all confidence in me at that point in time. He's a little smarter than he appears. You know what I mean? I underestimated him a little bit. But I don't think he underestimated me. I think he saw me for what I was. In his mind he's probably sitting there thinking I'm a rat, but I got my own opinion of that.

Q. Mr. McGee, are you here today because anybody in the government has made any promises to you?

A. No.

Q. Have you received anything at all, any inducement, any sentence reduction, anything like that at all?

A. No.

Q. You're 37 years of age?

A. Yes.

Q. Got how many years left?

A. 19, 2023.

Q. So why are you here?
A. You know, I swore I wasn't going to do this because I don't know if I can make it sound right, but there's only one reason why I'm here, because -- and I would like to try to explain it.

I've been in solitary confinement for about three years now, so this is the most talking that I've done in quite a few years and in front of so many people. But -- okay. Why am I here? The police came and talked to me, and there's a fine line. Had it been just adults involved in this crime, adults that agreed to engage in a criminal activity and that kind of lifestyle, all right. I think just like if you agree to live a basically responsible lifestyle, well, there it is. You're responsible for the life that you choose and by the rules you decide to play by. And if Dustin was involved with other dudes that were selling drugs or whatever and things went bad and just like the price that I'll pay for being here. We all make our choices in life; all right?

Those two little girls didn't make their choice, you know. The adults, eh, you want to sell drugs, you want to deal with drug dealers, drug dealers are usually killers when money's involved and illegal money. It's a big stigma to be a rat or to be an informant.

But the most important thing to me -- and this is selfish, but this is why I'm here today -- is because I got this complex about being a bad guy, about people looking at me, women

2243

looking at me, other men looking at me, men who take care of their families who are basically responsible who work for a

living and pay their taxes, look at me like I'm some other form of life. And I -- for so long I have been another form of life, you know, victimizing them people. And lately I've come to hold those people in esteem.

Q. Mr. McGee, I think if we can take a roundabout explanation -- I think you've already told us already -- it's because of those little girls that you're here?

A. Yeah, and because they're here right now. You know what I mean? No matter how you look at it, the way life goes, them little girls got dug up. They got brutally murdered, and there's no way you can get around it. They're here with us right now, and everybody's gotta do their part. You gotta do yours. His defense attorney has to do his, you know. And -- but those little girls, someone gotta do their part for them. And if nobody in this courtroom -- he's hating on me looking at me. They're looking at me like I'm a criminal. But them little girls in the courtroom, they're saying that's a good guy.

Q. Mr. McGee, the person who in his conversation with you justified killing two little girls because they would have grown up to be rats, is that man present here in this room?

A. Yeah, it's Dustin. He's sitting right there.

MR. MILLER: Thank you. I have no further direct.

THE COURT: I think now would be a good time to take

2244

our noon recess.

MR. PARRISH: It would, Your Honor.

THE COURT: We'll be in recess for 45 minutes. Please remember my prior cautionary instruction about keeping an open mind until you've heard all of the evidence in the case. Thank you.

(The jury exited the courtroom.)

THE COURT: Anything we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: Your Honor, I wanted time to think about a couple matters over the noon hour. Two times -- and maybe I'll bring it up to the Court. Two times the witness referred to Mr. Honken as sitting over there and what he was thinking. Twice he made the comment -- I realize it's not the prosecutor making the comment, but it could imply or infer somehow on Mr. Honken's requirement to testify. I'd like to take a look at that over the noon hour, but I want to give the Court an idea of what my thought might be on that. He made two statements: One, he's sitting over there hating me or words to that effect, and he's sitting there thinking that he is a rat -- thinking that I'm a rat.

And I realize it's not the prosecutor making the statement, and I'm not sure the prosecutor actually invited that response as to so many other responses, but it might implicate Mr. Honken's requirement not to testify. And I want to think

about that over the noon hour, but I wanted to give the Court some thought that I was thinking along that line.

THE COURT: Okay. Thank you. We'll be in recess.

(Lunch recess at 11:59 a.m.)

THE COURT: Please be seated.

Mr. Parrish?

MR. PARRISH: Thank you, Your Honor. I was speaking with my client a minute. I didn't get a chance to turn to the page. And let me just briefly tell the Court what concerns me.

And first of all, I want to tell the Court why I

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1960 of 3636

didn't make the objection. Sometimes if you make the objections at points like that, it draws more attention to it, and it creates additional problems. The language that I was concerned about and I was looking for, when he made the statement Mr. Honken is probably sitting over there thinking that I'm a rat, again, I want to preface it by saying I don't think Mr. Miller invited that comment, so I don't think it can be attributed -- attributable to prosecutorial mistake or something like that, and I was looking for the exact --

THE COURT: Do you know what page that's on? I remember it.

MR. MILLER: 123.

MR. PARRISH: 123? Okay.

MR. MILLER: Page 123, lines 4 and 5, and there's a similar reference, 125, lines 6 and 7.

♀

MR. PARRISH: Right. The one I was most concerned about, 123, 3 and 4. And I don't think he -- I think he saw me for what I was. In his mind he's probably sitting there thinking I'm a rat, but I got my own opinion of that.

I guess it's troubling because he's sitting there thinking. If he had been -- Mr. Honken is there or he's thinking without him sitting there, that's the thing that concerns me. Does it somehow infer that Mr. Honken must explain or doesn't have a right to sit there in that fashion? And I'm sure the Court's probably thinking what's the remedy available for the Court if there is a remedy that's required if I can establish that it impacts his right not to testify without drawing more attention to it. Maybe a -- remind the jury there is no requirement of Mr. Honken to testify. I don't know what

the government's position is on that. If the prosecutor had said it, it would have been a real problem I think, a more serious problem; let me put it that way.

THE COURT: But the substance of it really isn't prejudicial to the defendant.

MR. PARRISH: It is not. It is not. It's the idea of having him sitting there thinking as if maybe he could respond or maybe he should respond to what he's thinking or articulate what he's thinking for this jury. It's just troubling to me that he phrased his -- I don't think he's an articulate-enough individual to be able to create -- and we were discussing over

2247

lunch hour -- to create that impression that maybe Dustin ought to testify. I don't buy that.

THE COURT: I mean, I just think it would -- I think it would be odd to remind the jury -- what do you want me to remind him of? The defendant's Fifth Amendment right not to testify?

MR. PARRISH: I'm sorry, Your Honor?

THE COURT: The defendant's Fifth Amendment right not to testify?

MR. PARRISH: Well, again, that might bring more attention to it as we think about it and reflect on it a little bit. It may not be worthwhile to do anything.

THE COURT: I don't want to keep you from making your record. I don't want to keep you from asking me to do something. For whatever it's worth -- and it's really your view that counts -- I don't think it was prejudicial, and I think it probably went right by the jury in terms of any Fifth Amendment issue. But that's my instinct, but, you know, we have different

roles in the trial as we both well know.

MR. PARRISH: Right. And let me ask if the government has any problem with reminding this witness -- and I know from doing my background and preparation on him that he is perhaps a difficult witness that -- remind him that he is not to discuss Mr. Honken sitting there might resolve it for my cross-examination purposes, that he does not restate that he's

♀

sitting there impacting his right not to testify.

MR. MILLER: I have no problem with doing that.

THE COURT: Why don't I do it.

MR. PARRISH: Okay. Good.

THE COURT: I just want to be clear. You don't want me to say anything to the jury yet.

MR. PARRISH: No.

THE COURT: But that we want to remind the witness not to comment on what Mr. Honken may be thinking or doing while he's sitting there.

MR. PARRISH: And particularly sitting there.

THE COURT: Right. I'll be happy to do that. I think the problem was somewhat enabled by the fact that the witness was on the narrative for quite a while on some of those answers.

MR. PARRISH: And I realize I did not object, and it was more purposeful.

THE COURT: I assume that.

MR. PARRISH: Okay.

THE COURT: Right, right. Okay. Why don't we bring the witness in before we bring the jury in.

(The witness entered the courtroom.)

THE COURT: Mr. McGee?

THE WITNESS: Yes.

THE COURT: I just wanted to comment on one thing that you said in your testimony. And you kind of were looking over

at Mr. Honken, and you were talking about in his mind he's probably sitting there thinking I'm a rat. And there's no reason why you would know this, but it's not appropriate for you to comment at all on what Mr. Honken might be thinking or not thinking during the course of the trial. So I'd ask you not to do that again.

THE WITNESS: All right.

THE COURT: Okay?

THE WITNESS: Okay.

THE COURT: It's just not appropriate for a witness to comment on what the defendant is either thinking or not thinking in the course of a trial. So I'd just ask you not to do it; okay?

THE WITNESS: Sure.

THE COURT: Thanks.

We ready to have the jury brought in?

MR. MILLER: Yes, Your Honor.

MR. PARRISH: We are, Your Honor.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Parrish, you may cross-examine.

MR. PARRISH: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. PARRISH:

Q. Good afternoon, Mr. McGee.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1964 of 3636

A. Good afternoon.
Q. Sir, I've had the opportunity to read your autobiography. It's published on the Internet, isn't it?
A. Yeah, I believe there is part of a program that I was writing that was in --
Q. About 86 pages?
A. Yes, sir.
Q. Tell a lot about yourself, don't you?
A. It's pretty open.
Q. Matter of fact, some of the stuff you told this jury after you got toward the end of your testimony about -- probably about ten minutes of twelve was almost some of the exact wording right out of what's published on the Internet that anyone can go and pull up, is that right, about your philosophy about life in prison?
A. I didn't really think I got into philosophy.
Q. A little bit, though. I mean, almost your exact wording was taken right out of the publication on the Internet.
A. I wrote it with my heart.
Q. You wrote it with your heart.
A. Yes.
Q. And you would agree did you tell these officers when they interviewed you from law enforcement that you'd published your life story on the Internet?
A. No, I don't believe I mentioned it to them.

2251

Q. Matter of fact, they never even asked you that, did they?
A. No, they didn't ask me.
Q. As a matter of fact, you can go right to the Internet and

punch in and track down prisoners and track down biographies, and sitting right there on a website is a picture of you and probably about what? A hundred and some pages of what you put together in your own hand?

A. I'm not sure exactly what got posted on the Internet.

Q. Yeah.

A. But I wrote about 400 pages.

Q. Oh, but you're not sure all the rest of it got published; right?

A. I never seen what got put on the Internet because I don't have computer access or nothing like that.

Q. There's no way you have access to it that you could tell us whether or not everything you actually put together is actually on there. You don't know that from watching it yourself.

A. I never seen what got posted.

Q. Okay. I tell you what. I was absolutely fascinated by it.

A. Thank you.

Q. And for the last what? How many years have you been in the hole?

A. Three.

Q. But total all time since you've been in prison for 22 years, how many?

2252

A. A little over ten years.

Q. About ten years in the hole; right?

A. Yeah.

Q. And in that hole you don't have access to a lot of the other privileges that other inmates who are out of the hole have access to, do you?

A. Correct.

Q. Your phone calls are restricted; is that right?
A. Yeah.
Q. Your ability to communicate and get out on the yard is restricted; is that right?
A. It's solitary confinement.
Q. You know, one thing that was not in your autobiography, were you injured not too long ago?
A. Yes.
Q. Okay. You got stabbed.
A. Yeah, I got stabbed.
Q. Okay. And by another inmate.
A. Yes, I did.
Q. And was that while you were in the hole?
A. That's while I was on the compound.
Q. It was while you were in the compound.
A. Yeah.
Q. And where were you?
A. I was coaching a softball team.

♀

2253

Q. No, but where were you? What institution?
A. In Florida, Coleman, Florida.
Q. Coleman, Florida?
A. USP, yes.
Q. And since you got stabbed, you've been in protective custody; is that right?
A. Yes.
Q. All right. And you were in -- you were stabbed down in Florida at a prison institution, and let me ask you this. Was that three years ago about?
A. Yeah, I think it was.

Q. Okay. And had you called any law enforcement with regard to Mr. Honken before you got stabbed?
A. No.
Q. Okay. But you knew Mr. Honken at that point?
A. Had I known him?
Q. Yes.
A. Previous to getting stabbed?
Q. Yes.
A. Sure, yes.
Q. You really don't have a good concept of time, do you?
A. Time is relevant.
Q. Right. You indicate with regard to time that other people pay their bills, do certain things at a particular time if we're outside of the system.

A. Right.
Q. But inside of the system you would agree that people lose all track of time, and specifically you have basically lost all concept of time as we think of it.
A. After 22 years in prison, yeah.
Q. As a matter of fact, you told Mr. Miller that you have no idea -- if you were to go back and think through when you had a conversation with Mr. Honken, you have no idea when that might have been taken place.
A. I have a general idea. I couldn't give you the date and time, no.
Q. Right. You can't even give us a month, can you?
A. Yeah, I would -- yeah. Different -- all different conversations at different periods of time throughout every day of the month, different conversations working out, associating,

hanging out, walking the track or bumping into each other in the law library, sure, during the whole time that I was there.
Q. Well, can you give us a year when you first met Mr. Honken?
A. I guess it was in '96, '97, the end of '96, the beginning of '97, like December or January, somewhere around there.
Q. What if I told you Mr. Honken was here in '96, he was in Iowa in '96? What would you think then?
A. I would think that I was wrong about when he actually got there, but the fact would remain that he did get there.
Q. Right.

A. And he came to my unit on that day that he got there.
Q. Exactly. But the problem that you have that you've told us about in your autobiography, you told them about when you've testified before, that you really just have an awful difficult time with dates.
A. Yeah, I don't keep a calendar.
Q. Right.
A. I don't pay attention -- I don't know what today's date is. I don't pay much attention to the time.
Q. Okay. You do know what month it is, though, don't you?
A. September.
Q. Right. And you know what year it is.
A. '04.
Q. Right. But if you had to go back and try to remember a particular incident like you said you met Mr. Honken in 1996, if Mr. Honken was here in 1996, you know there is no way you would have met him in Iowa in 1996.
A. Right, and I would say that it was '97. Like I said, '96 or '97 is what I said, either the end part of '96 or sometime in

'97. But you're correct. I don't know the month or the year.
Q. As a matter of fact, you have purposely set your mind-set to where you want to wipe out dates and years and months as how you basically deal with the time you're serving. Would you say that that's how you have adapted in prison?
A. I wouldn't say it's an intentional thing. I think it's

just something that gradually happens over a period of time, especially in solitary confinement.
Q. Absolutely. And you're saying in solitary confinement, that's the place you've reached and you've been in solitary confinement of the 22 years you said about 8 of them; right?
A. About ten.
Q. About ten. I'm sorry. Ten of them; right?
A. Ten years.
Q. So almost half of the time that you've actually been in the institution you've been in what you would call solitary confinement where you've lost concept of time, date, and place -- or not place. Time and date and year; would you agree?
A. I think I just -- for the sake of arguing --
Q. Oh, we don't have to argue. Just tell me yes or no.
A. I would agree, not to that extent that you're saying. I know times. You know what I mean? I know birthdays, and I know the seasons, and I know, like you said, what month it is right now, just, you know, yeah.
Q. You would also agree that you wrote a letter indicating that you might have information on Mr. Honken; is that correct?
A. No, that's not correct.
Q. Did officers contact you about whether or not you had information on Mr. Honken?

A. Yes, they did.

Q. You had not initiated any contact.

A. No, I didn't.

Q. And when was that?

A. We're back to that time thing. I think it was about a year -- I don't know, nine months ago. I'm not -- I was in Florida. I've been in -- let's see, two months, three months -- I'd say six months ago, seven months ago is a good guess.

Q. It gets confusing to you, doesn't it?

A. Football is much easier to pick.

Q. So it could be six months ago. It could be eight months ago; is that right?

A. I think it's roughly five or six months.

Q. Okay. I think now that we've established that you don't have a good concept of time and not being critical of you for not having one, what I'd like to do is really deal with something else, another subject that you talked about on your direct examination, and that is Mr. Honken coming into an institution where you met him. And regardless of the year that it took place, you indicated he seemed as a person who maybe had no business being there in a sense?

A. I think what I meant was he seemed like the kind of person who hasn't been there before.

Q. And did not seem to be a violent person from your observations of him?

A. More the sneaky type. You got different kinds of ways that people survive kind of like in prison. And some people are

overtly violent or they cover themselves and adorn themselves with tattoos and they shave their head and they try to -- they grow a big bushy mustache and are overtly violent.

Q. Let me just go back to my question again, and I'm sorry, and I know you want to talk about these things, but my question was -- and just take a couple of seconds and listen to my question.

A. All right.

Q. You indicated when he came in he seems like a person maybe who couldn't take care of himself? Yes or no.

A. Yeah, correct.

Q. And you made that conclusion based upon your many years of experience in prison; is that right?

A. My gut feeling, yes.

Q. And what you try to do when you get in a situation where there are a lot of tough guys around you is to make sure that you survive; is that right?

A. I think that's human nature.

Q. Right. And coming into Florence whatever year Mr. Honken came in, you thought maybe he did not have the tools to survive. You reached that conclusion about him, didn't you?

A. I concluded that somebody was going to have to teach him, and I didn't really want that responsibility.

Q. Matter of fact, when he first came into your cell, you knew well enough how to bully as you described the authorities so you

2259

could control at least the action within your own cell. Would you agree with that?

A. Every man tries to -- you know, that's your castle; right?

Yeah, that's my cell.
Q. Right.
A. For life.
Q. I understand that. And one of the first issues you had with Mr. Honken is that he indicated that some things were missing from his cell right after he got there. Would you agree with that? We don't have to know what time.
A. When he moved in with Gin, yeah. Someone stole his stuff, yeah.
Q. Now, when you said stole his stuff, you limited it just to items he purchased from the commissary. Would you agree that he was concerned about some of his legal documents missing too?
A. Like I said, I don't really know what all got stolen; right?
Q. But also would you agree -- and we'll forget about the time period here, but would you agree that he also had some concerns that information or some of his items, whatever it might have been, were circulating around the prison grounds?
A. A radio.
Q. One thing that bothered you is that he accused you of taking it behind your back.
A. Right.

2260

Q. That's not something you do in prison.
A. I don't think that's something you do in life, you know.
Q. And if he did, in fact, do that which you said he did, you confronted him on it.
A. Yeah.
Q. Were you angry with him?
A. No.

Q. Was he angry with you?
A. No, I didn't feel that way.
Q. Matter of fact, throughout the whole time that you saw Mr. Honken when he was at Florence, you never saw him get angry, did you?
A. Maybe when Rick -- when his wife got indicted, he got angry, and when Rick left he got angry.
Q. Okay. We'll talk about that in just a second. But other than that incident, you never saw Mr. Honken get angry; would you agree?
A. No, I didn't.
Q. Very soft spoken.
A. Yeah.
Q. Okay. Now, let's talk about the incident with Rick Tokars. Did you know Rick Tokars yourself?
A. Just from being in the same prison with him.
Q. I mean, did you actually meet him? You said he always struck you as kind of a sneaky -- did you say sneaky, slimy guy

2261

or just sneaky guy?
A. Yeah, he -- I don't know how to say -- like --
Q. Well, just yes or no.
A. Like a weasel or like a rodent.
Q. Oh, he's --
A. Yeah, that's my impression of him.
Q. You described Fred Tokars as a weasel then; right?
A. Yeah.
Q. You didn't associate with him, did you?
A. I let him read my legal work, you know.
Q. All right. I assume you were one of the people who could

afford him then.

A. No, I couldn't. He wasn't interested in my case.

Q. Okay. It was a pretty old case; is that right?

A. Yeah.

Q. You had gotten 40 years according to you; is that right?

A. I got 447 months which is 37 years.

Q. But you described it oftentimes in your biography and in your other court proceedings as 40 years; right?

A. Yeah, because of the three years I did with the state of Pennsylvania.

Q. But then you saw Dustin one time when you said he had gotten angry. Now, let's see if we can find out from your memory what was that date? Can you think of that date?

A. I would have no idea.

2262

Q. But would you agree that on that date whenever it might have been when Mr. Tokars left -- and just bear with me a second -- prior to that date you had never heard that Dustin had killed anyone?

A. Oh, no, I heard -- prior to that?

Q. You had heard that.

A. Sure.

Q. All right. So then it was common knowledge at least to some people that prior to Rick Tokars leaving that Dustin had killed someone.

A. Yes.

Q. Had you seen any proof of it?

A. No.

Q. Had Dustin at that point ever said anything to you about it? Now, this is when Mr. -- prior to Mr. -- this is before

Mr. Tokars left.
A. No.
Q. Now, we have that date firmly in mind because we've had some evidence on when that occurred, not that you can tell us, but we do have evidence on that.
A. Right.
Q. Now, this is where I want to go with that. Now we have Mr. Tokars who has, in fact, left. You say this is the first time that you think you see Dustin angry at all. Do you know how many times you'd known Dustin prior to this point, how long

you'd known him? A year or two let's say?
A. I --
Q. It's hard to say.
A. I mean, I don't know.
Q. Okay. That's all right. That's perfectly fine. Now, when he sees him and he's gone and he sees you, you have stated that Mr. Honken's main concern initially when you responded to Mr. Miller is that he had read his legal papers and may have taken some of Mr. Honken's legal papers with him; isn't that correct?
A. Yeah.
Q. All right. Do you know why Mr. Honken would be concerned as to why Mr. Tokars, this person you described as a weasel, has taken his legal papers and they are missing from his files? Why would he be concerned about it at this point, whenever that date may have occurred?
A. Because it was always -- my understanding was always that there was an old case that involved murders that they had been trying to pin on Dustin, an old drug case that never stuck

because all the witnesses in the case disappeared, they died.
Q. Now, I want to ask you this. At this point in time when Mr. Tokars has left, had you at that point in time read a single news article about Dustin Honken being accused of any murders back here in Iowa?
A. No.

♀

Q. Let's go forward from Mr. Tokars leaving. Did you know another individual, name by Mr. McIntosh?
A. Yeah.
Q. Did Mr. McIntosh eventually leave?
A. I think he left with -- the same time Rick did. I think they left together.
Q. And again, with the caveat or the position that you have some confusion with time, you don't know when that was, do you?
A. I think it was in the winter or fall time like it was getting cold outside, winter, fall.
Q. It was winter or fall of some year?
A. In Colorado, yeah, it was getting to be like fall or winter.
Q. Now, before Mr. McIntosh left, had you been in the presence of Mr. McIntosh and Mr. Honken at any point in time where you heard Mr. Honken make any admissions to Mr. McIntosh about his case?
A. No. They were in the law library at different times working.
Q. I understand that, but about this case did you ever hear Dustin in your presence make any admissions?
A. To me?
Q. To Mr. McIntosh or in your presence make any at the time

Mr. McIn -- before Mr. McIntosh left.
A. (Witness shook head.)

Q. Is that a yes or no?
A. No.
Q. Okay. But again, when Mr. McIntosh left the same as -- I think you said they left about the same time, but assuming it was not the same time that they left, you would agree that it was common knowledge that Mr. Honken was being investigated back in Iowa with regard to some old murders. You understand and you agree with that.
A. Yes.
Q. Okay. Did you know an individual by the name of Mr. Vest?
A. Yes.
Q. You indicated --
A. Bill Vest?
Q. Steven.
A. Steve? Yeah, I know.
Q. You indicated to the jury and I think you've also acknowledged in your autobiography that on occasion you would imbibe in heroin use.
A. Correct.
Q. You did that in prison.
A. Yes, sir.
Q. Matter of fact, you not only -- and correct me if I'm wrong -- were caught with contraband but also ended up getting a dirty UA a few times and was actually put in the hole for that dirty UA.

A. I did ten years in the SHU for something.
Q. All right. You had some access to that heroin out in Colorado.
A. Yeah.
Q. Okay. Is that a yes?
A. Yes.
Q. Let me just ask you this. When law enforcement interviewed you, did you tell them that you were a heroin user in prison?
A. I don't recall. I've been clean for quite a few years, so I don't recall.
Q. Did you tell them that is my question.
A. I don't recall.
Q. Okay. Did they ever bother to even ask you that question to your knowledge?
A. If I used drugs? I don't think they asked me.
Q. Okay. Did you ever use any drugs with Mr. Vest?
A. No.
Q. Did you ever know of him to be a heroin user out in Colorado?
A. No.
Q. Do you know when Mr. Vest left? And let me ask you this in a different way to see can I get in touch with how you remember things; okay? And I'm just using your autobiography to kind of help me understand you a little bit.
A. Okay.

2267

Q. Did Mr. -- do you recall Mr. Vest leaving Florence at any point in time, or did you leave before Mr. Vest left if you understand that question?
A. I think -- see, I know Steve's brothers too. His brothers

are in the system too.
Q. Exactly. And some testimony has been presented on that.
A. And, you know, I would say that Steve left before me because I remember rumors circulating about him -- you know, there's so much gossip in prison.
Q. I understand that, and we're going to talk about that in a minute, but as long as you recall in your mind that Mr. Vest may have left before you -- and let me ask you this question. Had you confronted Dustin with what you described toward the last ten minutes of your testimony in court which was about ten minutes to twelve, had you confronted Dustin at that point about killing -- him having killed any children?
A. At which point is that?
Q. Before Mr. Vest left. And that's why I want to help you try to relate to your time.
A. I can't correlate it by Vest because I didn't really associate with him. He was in a different group, and I didn't really . . .
Q. Well, you know you hadn't done it before Mr. Tokars left.
A. Tokars was gone.
Q. Right. And I believe that Mr. McIntosh was also gone.

2268

A. Yeah, he was gone.
Q. Right. Now the next person we're going to is Mr. Vest and see had the confrontation with you and Dustin as you described it taken place before Mr. Vest left. And let me see if I can help you out here a second.
A. Okay.
Q. What if I told you Mr. Vest may have left sometime in February or March of 2001? Can you relate back to that date by

any chance? If you can't, maybe we can use something else to help you. That's going back about -- this is 2004 now. That's going back about three and a half years.
A. Let's see.
Q. And that would have been before you would have been in the hole where you've described now you've been for three years.
A. Right. I could have been in the hole at that time.
Q. That's all right.
A. Either that or I was running my program. I can't correlate it by Steven Vest's departure or arrival because I didn't pay much attention to that inmate.
Q. Let's do it this way then. You remember you described to Mr. Miller what you called as affidavits and at one point you told Dustin you wanted him to tear up his affidavit and throw it away?
A. Yeah.
Q. Do you remember what year that might have been by any

♀

2269

chance? If you don't know the year, that's all right.
A. I just know that it happened. You probably got the affidavit. There's probably a date on it. You could save a whole lot of time. What date did I sign on it because I don't know?
Q. I'm sorry. I can't help you.
A. I might have lied about everything else on the affidavit, but I don't think I lied about the date.
Q. That's good. That's good. Okay. But you can't remember. And that's okay if you can't. That's all right. All right. Now, let's see can we do it a different way. If you can't relate it to the year which was 2001, let me see can we relate

it to when you left Florence; okay? Want to try it that way? Do you think that might be a good way to try it? When do you think you left Florence? Now, if you've been in the hole for three years, all you gotta do now is go back three years to Florence -- I mean go back to three years to when you were placed in the hole. Let's try to do it by --

A. Oh, I got placed in the hole the day after Valentine's Day 2002, February 15, 2002.

Q. Right. So when you said you've been in the hole for three years, you're really counting about two years and so many months; would that be right? So you really haven't been in the hole for three years, have you?

A. I'm on my third year. I'd be going on my third year right

♀

now.

Q. Gotcha. Gotcha. So if we go back to Valentine's of 2002 --

A. Is it 2002? Yeah.

Q. All right. That'd be about February 14, 2002.

A. Yeah, I think it's 2002.

Q. All right. So do you remember how long -- and let me do it this way. Before you were placed in the hole in February of 2002, can you think back to when your confrontation with Mr. Honken would have been? Was it a long time before you were put in the hole?

A. Yeah, it would have been a while. I think it was right after -- it was after he came -- after his wife had told an informant -- after they dug the bodies up and it became news. I didn't read the article, but other people --

Q. Ah --

A. -- saying that the kids were killed and it became like news.

Q. Right. All around the prison.

A. Yeah, I mean everybody -- it became scuttlebutt.

Q. Everybody was talking about it.

A. Yeah.

Q. Inmates all over this pod were talking about it; would you agree?

A. I just know that the group of people that I kind of like

ran in and that Dustin ran in -- Dustin had a big mouth too, you gotta understand. He went around telling everybody everything. You know what I mean? Like they just arrested my wife; they just arrested my wife, and he's like, She'll be strong; she'll hold strong. You know what I mean? And she's the only one that can get me in trouble. So -- and there might be two or three other people standing around, and then they go run off, and they say it to two or three people, and then it's all over the compound.

Q. You know, that's a great reference point, and that's exactly where we wanted to go to. So you believe just right after the news when word was circulating all around the prison and Dustin was going around saying that to everybody, that's about the time of your confrontation with Dustin; is that right?

A. Correct.

Q. All right. Do you think by any chance that would have been in the year 2000?

A. It very well could have been.

Q. Would you agree now with me that prior to that time you had never heard nor had there been any discussion that you had heard

that Dustin had been charged with killing a single child? Would you agree with me on that?
A. I had never heard anything about women -- or children being killed or women for that matter.
Q. And you're probably pretty tuned into the system; is that

right? I mean not the system itself of the BOP because I know your comments on the BOP, but I meant into the prison system itself, to the inmates, the other inmates.
A. Yeah, I used to be plugged in real tight where I knew what was going on.
Q. Exactly.
A. But about that time, 2000, I kind of -- when I started working on that autobiography --
Q. You got pretty serious about some other stuff.
A. Yeah.
Q. All right. Now, when this news started spreading around in the year 2000 that Dustin had killed kids and you described it as pretty bad -- low conduct; is that right? Is that how you would describe it?
A. I would describe it as evil.
Q. Evil.
A. Yeah.
Q. Okay. Now, you also described in a sense that, well, if people thought he had done this in prison then inmates have a so-called convict code where they take care of things like that themselves; is that right? Is that what you said?
A. Convicts are so reliable. That's why they're all doing time in prison; right?
Q. Let me --

A. But yes, there is an unspoken code that we're supposed to

be honorable people, but quiet as we're kept, most of us aren't.

Q. Excuse me. Convicts are supposed to be honorable people?

A. That's what you're talking about that we honor a certain code or lifestyle that we live by. That's the hype. I don't know how accurate it is.

Q. Anyway, Mr. Honken, you would agree, after this news comes out in Florence that people are talking about including people in this group and after you have this confrontation, you're in this prison up until February 14 of 2002, almost a year and six months later; is that right?

A. Pretty sure, yeah.

Q. Okay. And you got all of these other people who are around you who indicate that Mr. Honken has now acknowledged that he's committed the worst of the worst crimes and he's walking around the prison grounds all this time when you're there; would you agree?

A. That's accurate.

Q. And you never saw him -- at that point with Mr. Tokars, about the confrontation, you never saw him angry again with anyone; would you agree?

A. I mean, he's a very contained individual. He doesn't show his emotions at all.

Q. Let's talk a couple of minutes about something else you mentioned on direct examination. You indicated that -- you were naming the people who had escaped prior to that time. And you

also said you had escaped.
A. Uh-huh.
Q. And maybe I missed something here, but I did a lot of thorough background work on your record, and you wrote a lot about yourself in your autobiography, but could you describe for us when you indicated you escaped?
A. From Como Heights Maximum Security Unit, from Weaversville Intensive Treatment Unit in Allentown, Pennsylvania.
Q. And what year was that?
A. It's on my federal jacket. That's why I have escapes on my federal -- I'm max custody because I have escapes, escape risk.
Q. And what year was that?
A. 1984 and '85.
Q. And you were in there for treatment or something then?
A. I was locked there certified as an adult as a juvenile getting ready to go to the state, and from there I went to Como Heights in Graterford State Penitentiary.
Q. And that's what? Twenty -- about 20 years ago; right? You were a juvenile you said at that point?
A. Yeah.
Q. You're 37 now?
A. Yeah.
Q. So you were 17 years old.
A. Yeah, time is 20 years ago. Who would have ever imagined?
Q. It goes by fast, doesn't it?

2275

A. Twenty years ago, long time.
Q. But you would agree you were a juvenile at that point?
A. Certified adult.
Q. I understand you were certified adult, but you were

actually a juvenile, and they were moving --

A. Juvenile in an adult system.

Q. Right.

A. Right. I was a juvenile in adult.

Q. And you had been for a couple of years at that point; is that right?

A. Certified an adult? Yes.

Q. So that was the escape that you were talking about when you told the jury on direct examination back when you were 17 years old and they were transferring you in. Is that -- or did you mean something else?

A. No, those are the escapes that I have, two escapes.

Q. Okay. Now, these other escape plans that you said all these other people had, you weren't with them when they escaped, were you?

A. None of us were together.

Q. Well, so you were just basing it on what they told you.

A. Well --

Q. No. Just answer my question yes or no.

A. No.

Q. Are you basing it on just what they told you?

2276

A. No.

Q. Were you there? Yes or no.

A. No. There is books --

Q. No, no. Just hold right there, okay, if you don't mind.

If I ask you how long after you had this confrontation with Mr. Honken which looks like it's about somewhere about 2000, what were the years that you discussed the escape? If I had to give you some framework to work with that, could you tell

us?
A. It was prior to that, and it was after that.
Q. Oh.
A. Prior to that confrontation and after the confrontation.
Q. That's fine. If it was before that, you would agree that you met with Mr. Honken before you even knew anything about any other charges coming down about kids. You don't dispute that, do you? Was that a confusing question?
A. Yeah.
Q. You met with Mr. Honken before this news came out about these bodies being found.
A. I signed the affidavit before the news came out that the children were murdered.
Q. Oh. So you signed the affidavit before October of 2000?
A. Yeah, I signed the affidavit way before that. I signed the affidavit --
Q. When did you sign it? I thought you didn't know.

2277

A. Before -- at least months before that. Do you have a copy of the affidavit, sir, because the date's on there?
Q. Let me ask you the next question. After you had the confrontation with Mr. Honken, is your testimony to this jury that you still met with him and continued to discuss escape plans with him? Is that your testimony?
A. That's not my testimony at all.
Q. So after the confrontation with him, you never met with him anymore.
A. No, I stayed away from him. I didn't really have anything else to do with him.
Q. So after this news came out that day and you had your

confrontation, it's your testimony you stayed away from him from 2001 all the way until you were in solitary in Valentine's Day of 2002.
A. He left before then. He left the institution before I went to the hole. I started my groups. He left the institution.
Q. When did he leave?
A. Your guess is better than mine.
Q. You mean Mr. Honken was not out there when I came to see him in 2002?
A. I mean he wasn't on the compound during February, Thanksgiving or --
Q. Of 2002 when I was out there in the summer, you say that wasn't Mr. Honken I met with?

A. I went to the hole February 15 of 2002, and Dustin was not on the compound at that time, and he hadn't been on the compound for at least a couple months, for at least three or four months and possibly longer than that which is the time span that you're talking about, between the years of 2001 and 2002. Dustin was -- I guess he was in the SHU.
Q. That's fine. You've answered my question, Mr. McGee. Thank you.
Now, you indicated that Dustin basically did not hang out with this group which did martial arts, is that correct, that he would generally work out with one other person? That's what you said on direct examination.
A. He worked out with two people, Carl Boles and -- predominantly Carl Boles and Artie Dufur, but there was other people who would spar too.
Q. Yeah, but what I want to talk about is you said you had a

group who you worked out with separate from Mr. Honken's group who he worked out with. Would you tell us the name of the people who you worked out with?

A. The same people he worked out with.

Q. But at different times. Is that how it was --

A. Practicing martial arts is illegal, so you have to be circumspect in how you do it. You can't have a large amount of people doing a martial arts demonstration. You have to sneak it.

♀

Q. So you worked out with a group of people?

A. Nobody could do martial arts with a group of people. You have to do it like one on one and off in a corner somewhere where people can't see.

Q. And were you working at the time back in 2000?

A. Yeah.

Q. Where were you working?

A. I was -- I had started -- right around that time I started running my groups. I was going to group -- I was running groups, about six groups a week.

Q. What kind of group?

A. Called the Inside Out Group.

Q. Okay.

A. It was . . .

Q. So that was your job in prison?

A. Pretty much so. It was for working with juvenile delinquents.

Q. Okay. And did you get paid for that?

A. No.

Q. Okay. Did you have another job separate from that that was

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 1990 of 3636

related to your prison --
A. I had given up an orderly job to do the group full time.
Q. Okay. So you had stopped doing your orderly job, but I bet you -- I won't bet you, but do you know when you started that?
A. Started what?

Q. When did you give up your orderly job?
A. 2001.
Q. Ah. So you gave up your orderly job. Do you remember what season it might have been when you gave up your orderly job?
A. Excuse me. I'm sorry. I'm not trying -- it's not sarcasm. Okay. I would have to say Christmastime.
Q. Of what year?
A. Thanksgiving, November, around November of 2001 I started getting serious about the program that I had done that's on the Internet with that autobiography, so you know what I'm talking about when I say the program because it's right there with that.
Q. It is.
A. Right, for helping juvenile delinquents.
Q. But then from January -- December, January, and February you were thrown in the hole; right?
A. February.
Q. Why did they throw you in the hole?
A. Because I used to be a bad guy, and when I was a bad guy I did bad things, and when I did bad things, I'd do bad things for bad people. Those bad people happened to be in a position of the administration and the institution who had been indicted. And when I quit doing bad things for them, I kind of became a target for them. When I started pushing my group and doing that, other gangs -- it was an anti-gang which you read all

about. Some of them took an opposite view, didn't really

appreciate what I was doing.

Q. So the administration who you think you had been working with before came down on you.

A. Yeah.

Q. And so the administration targeted you, and they put you in the hole after you had started doing good things by working with juvenile delinquents; is that right? That's what it ended up being, quite frankly.

A. Their justification for it was there were threats, anonymous threats from different gangs, people in the yard who didn't agree with what I was doing with the juv -- they thought I was selling out, so they locked me up for like my protection I guess.

Q. Okay. And so all the way back in February of -- Valentine's Day of 2002, even before you called anyone on Mr. Honken, there were people around the prison grounds who thought you had sold out; is that right?

MR. MILLER: Objection. Misstatement. He's not testified he called anyone about Mr. Honken.

MR. PARRISH: That is correct. Let me restate that.

BY MR. PARRISH:

Q. Prior to Valentine's Day of 2002 and before you had contact with anyone or anyone had contacted you on your information on Mr. Honken, you would agree that at that point in time rumors were circulating about you. This is before Valentine's Day of

2002 before you had given any information on Mr. Honken; is that

right?

A. Rumors weren't never circulating about me.

Q. What do you call it then?

A. I'm pretty straightforward. You know, just like when that guy came and stabbed me --

Q. No, no, just stick with me --

A. Not rumors, just my behavior on the yard ruffled me. They didn't like the way I was conducting myself.

Q. Now, the question is who didn't like it? Other inmates didn't like it, or the administration didn't like it? Which one?

A. Both, both.

Q. So both the administration was against you and other inmates were against you in February of 2002; is that your testimony?

A. Yes.

Q. And so the administration then made the decision to put you in the hole.

A. Correct.

Q. And did you oppose that?

A. There is no opposing going to the hole. What do you mean did I oppose it? Did I want to go? No.

Q. And you haven't gotten out since that time; is that right?

A. Right.

2283

Q. Let me ask you a couple other questions before I stop. Did you indicate that it was your job as a convict to kill Mr. Honken on direct examination?

A. No.

Q. You didn't mean to say that, did you?

A. That's not what I said.
Q. What did you say?
A. I said the convict code instills in people, brings them up with a philosophy that says that that is a proper thing to do, that it's a socially acceptable thing to do.
Q. It's a socially acceptable thing for other convicts to kill Mr. Honken; is that right?
A. Yes.
Q. Let me ask you this question. What would you use as evidence to kill him in prison?
A. Hmm. I've never killed anyone, so I wouldn't -- I don't know what it takes to kill someone.
Q. No. But if it's a convict's code based upon the fact that you think he killed two kids to kill him in prison, what would you use as evidence to kill him?
A. I wouldn't know. I mean, for me personally? I've never killed anyone. I don't know what it would take to push me to that point or to convince me to go out and do it.
Q. Would it be the fact that other inmates said that he did it? Is that enough to kill a man?

♀

A. No.
Q. Well, would you want to see some physical evidence that he did it before you would kill a man?
A. Me personally, I mean, I don't know what it would take for me to kill somebody.
Q. Well, you said it would be the convict code if you'd heard that he had killed two kids to kill him.
A. The convict code shows that there's certain things that you just don't do and if you do like sitting here testifying right

now.

Q. I understand. We want to stick straight with the question I'm asking that you responded to on direct examination.

A. I think I --

Q. Wait a second. Excuse me. I'm sorry.

A. I think I understand your question if you want me to answer it.

Q. Fine. Make sure you understand it. Otherwise I'll ask it again so you can understand it.

A. Okay. What body of evidence would it take under the convict code to justify killing someone?

Q. Killing Mr. Honken, yes.

A. I think just the TV program like 60 Minutes or 20/20 that did a series on somebody that portrayed them as being a serial killer, a child molester, or horrendous person.

Q. That's all it would take.

♀

A. That's just about all it would take.

Q. You've probably not had a chance to hear about Dan Rather's mistake, have you?

A. The document?

Q. Yes, they made a serious mistake when they printed it on the news and they were wrong.

A. Or maybe it was on purpose.

Q. Okay. Well, whichever reason. Is that a reason to go kill somebody?

A. Prison is a very boring place. It's like -- it's the worst soap opera you never seen.

Q. Okay. Let's -- we want to talk about that. It's the worst soap opera you've ever seen. That's because people spread

rumors in prison, don't they, Mr. McGee?
A. Yes, they do.
Q. People say things that are false in prison, don't they, Mr. McGee?
A. Yeah, they do.
Q. People make up stuff about people in prison, don't they, Mr. McGee?
A. All the time.
Q. People go into other people's locker and steal their legal work, don't they, Mr. McGee?
A. Yes, they do.
Q. They steal their legal work, and they spread it around all

across the prison to see if someone else can come to harm, don't they, Mr. McGee?
A. Yes.
Q. And they've been doing that ever since you've been in prison, haven't they, Mr. McGee?
A. Yeah, they have.
Q. And you've been in there for 22 years; isn't that a fact, Mr. McGee?
A. Yeah.
MR. PARRISH: Nothing further.
THE COURT: Mr. Miller?

REDIRECT EXAMINATION

BY MR. MILLER:
Q. As far as what would convince you, would an inmate telling you that he felt he was justified in having killed two children because they would have just grown up to be rats, is that the sort of thing that convinced you, sir?

A. Convinced me that he did it.
Q. It came from his own mouth.
A. Yeah.

MR. MILLER: No further redirect.

THE COURT: Mr. Parrish, anything further?

MR. PARRISH: No, Your Honor. Thank you.

THE COURT: You're excused.

Why doesn't the jury take a stretch break.

♀

Is the government ready to call its next witness?

MR. MILLER: Yes, Your Honor. United States calls Michael John Kluver. And this is another incarcerated witness, Your Honor.

Your Honor, may we approach?

THE COURT: You may.

(At sidebar off the record.)

THE COURT: Mr. Kluver, to the extent that you can, can you raise your right hand.

MICHAEL KLUVER, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. The marshal will assist you because we need to try and get that chair as close to the microphones as we can. And could you state your full name, please, and spell your last name.

THE WITNESS: My name is Michael John Kluver, K-l-u-v-e-r.

THE COURT: Thank you.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Your age, Mr. Kluver?
A. Thirty-one.
Q. Where did you grow up, sir?
A. I grew up in South Carolina.

♀

Q. You are currently in custody; is that correct?
A. Yes, sir.
Q. I would like you simply to list for us the names of the felonies of which you have been convicted in the course of your criminal history.
A. I was convicted for robbery in 1994. I was convicted for bank robberies in 1998. And I was also convicted for theft in nine -- in 2000.
Q. You have been in a number of prisons as a result of those convictions; is that correct?
A. That's correct.
Q. Now, you were raised in South Carolina, but it's true, isn't it, that you also have some ties to Iowa?
A. Yes, sir.
Q. Relatives here?
A. I do have a few family members here.
Q. And have spent at least a portion of your life as an Iowa resident?
A. Yeah, that's correct.
Q. During the years of your incarceration, Mr. Kluver, was there a period of time when you were placed at the United States Penitentiary, Marion, Illinois?
A. Yes, sir.
Q. And can you tell us what status of an institution USP, Marion is?

A. It's a maximum facility.

Q. During what period of time if you can give us months and years were you at USP, Marion?

A. From February the 2d of 2004 until June the 30th of 2004.

Q. During those approximately four months at Marion, did you make the acquaintance of the defendant in this case, Dustin Honken?

A. Yes, I did.

Q. Mr. Kluver, in your years in prison, have you earned a reputation as what's known as a jailhouse lawyer?

A. That's correct.

Q. And did you -- did that reputation follow you to USP, Marion? In other words, did you have that reputation there as well, sir?

A. Yes, sir.

Q. While you were in USP, Marion, did you have conversations with -- and this is a yes-or-no answer -- any conversations with the defendant, Mr. Honken, regarding his case?

A. I did.

Q. And without asking you to describe those conversations, please just tell me approximately how many occasions, when, and under what circumstances as far as where in the institution you would be able to have such conversation or contact.

A. At times it would be at recreation, and then other times would be when he was an orderly on the range.

Q. In addition to speaking with one another, did you also

communicate in writing?
A. Yes, sir, we did.
Q. And again, just so the jury understands, how is it possible for two inmates in a maximum security federal prison to communicate with one another in writing?
A. It's possible because the orderlies usually pass the kites when they come out to clean.
Q. You use the term kite. Is that a term that's used in prison? What does it mean?
A. Kites are the same thing as letters.
Q. When we talk about kites, we're talking about letters including letters between inmates?
A. Yes, sir.
Q. And orderlies would act as couriers from one inmate to another?
A. That's correct.
Q. And did you receive -- in connection with your conversations with Mr. Honken, did you receive any inmate kites from Mr. Honken?
A. Yes, sir, I did.
Q. You've mentioned that you were released in June of this year?
A. No, I wasn't released. I was just transferred to a halfway house.

2291

Q. Okay. I apologize. And feel free to correct me if I do state something inaccurate. Where was that halfway house, sir?
A. It's in Council Bluffs, Iowa.
Q. While at that halfway house, sir, did you have contact with any law enforcement authorities with respect to the defendant in

this case, Dustin Honken?
A. Yes, I did, on two occasions.
Q. And on one of those -- well, let me ask you this backing up. You left USP, Marion in June of this year and went to Council Bluffs halfway house.
A. Yes, sir.
Q. Did you take with you any of those kites received from Mr. Honken?
A. Yes, I did. They were in my property.
Q. And how many of them are there?
A. I believe there was four.
Q. When you met with law enforcement authorities, did you turn over those kites, sir?
A. Yes, I did.
MR. MILLER: And if I may approach the witness, Your Honor?
THE COURT: You may.
BY MR. MILLER:
Q. Mr. Kluver, I'm handing you or to be more accurate I'm showing you four exhibits marked Government Exhibit 306,

2292

Government Exhibit 307, Government Exhibit 308, and Government Exhibit 309. Do you recognize those documents, sir?
A. Yes, I do.
Q. And what are they?
A. These are the kites that I received from Dustin.
Q. And to be perfectly accurate, these are photographs of those kites?
A. Yes, sir.
Q. They have government exhibit stickers, some laboratory

notations. With the exception of the laboratory notations and the government stickers, are they accurate photocopies of the kites that you received from Dustin Honken?

A. Yes, they are.

MR. MILLER: United States offers Exhibits 306, 307, 308, and 309.

* * * *

(Government Exhibits 306 through 309 were offered.)

* * * *

THE COURT: Any objection?

MR. PARRISH: Your Honor, as to the 306, 307, 308, 309, we just -- we object as 403 and relevancy. And I don't think we have any question about foundation.

THE COURT: Okay. Thank you. 306 through 309 are admitted into evidence over the defendant's objection. Thank you.

♀

* * * *

(Government Exhibits 306 through 309 were admitted.)

* * * *

BY MR. MILLER:

Q. Mr. Kluver, just for clarification, you indicated that you were released to a halfway house in June of '04 and yet you are in custody. Have you been rearrested on some other charge, sir? Yes or no.

A. Yes, I have.

Q. Are you here today pursuant to any plea agreement, offers, or inducements from the government in connection with your case at all?

A. No, no plea agreement.

Q. No promises of any such.
A. Neither one.
MR. MILLER: Thank you, sir. I have no further direct.
THE COURT: Mr. Parrish?

CROSS-EXAMINATION

BY MR. PARRISH:
Q. I just have two questions for you, sir. The first question is -- and this calls for a yes-or-no answer -- were there additional letters or kites that Mr. Honken sent you that are not in your possession now? You can tell me yes or you can tell me no.

A. Yes, there was.
Q. Okay. The last question I have for you, did you on the documents that are present -- and that would be Exhibits 306, 307, 308, 309. Did you change or alter any of the writing on any of the documents, specifically 306, 307, 308, 309? That calls for a yes-or-no answer.
A. No.
MR. PARRISH: Thank you. No further questions.
THE COURT: Thank you. Any redirect?
MR. MILLER: Yes, if I may.

REDIRECT EXAMINATION

BY MR. MILLER:
Q. Mr. Kluver, did you submit to a request for a handwriting exemplar?
A. Yes, I did.
Q. You provided -- in other words, you provided an example of your own handwriting to authorities; is that correct?

A. That is correct.

Q. And did you turn over to authorities all of the kites that you received from Mr. Honken that you took with you from the institution?

A. The ones that I didn't receive, they ended up -- I ended up throwing away.

Q. You had thrown away the others?

A. Yes, sir.

♀

MR. MILLER: Thank you. I have no further redirect, Your Honor.

THE COURT: Mr. Parrish, anything further for this witness?

MR. PARRISH: No, Your Honor, no further questions. Thank you.

THE COURT: You may step down.

MR. MILLER: Your Honor, the next witness may take a little while if this would be an appropriate, albeit early, time for the break. I don't think we're going to fill the afternoon as it is.

THE COURT: Oh, okay. Then it probably would be a good time.

Members of the jury, we'll be in recess for 25 minutes or until about 2:25, and please remember my cautionary instruction about keeping an open mind until you've heard all of the evidence in the case. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated. Just one thing. The next time the government tries to offer an exhibit that you haven't -- it's one thing not to have it in your exhibit list.

I understand things come up. But I need copies of exhibits. I have some familiarity with those exhibits because I was involved in kind of an independent miscellaneous case matter with those exhibits, so I could recall them if I'm putting two and two

together. But it would have been nice that I had copies of them because I thought you were just laying a foundation for them, you weren't going to offer them. Normally before you offer an exhibit it's helpful if I have a copy and I've read it ahead of time. I mean, I do recall the essence of those exhibits, but I was kind of in an awkward position given the 402, 403 objection.

MR. MILLER: I recognize the --

THE COURT: Without having copies of it ahead of time.

MR. MILLER: I recognize the oversight, Your Honor, and I apologize.

THE COURT: Okay. That's okay. If it happens again, I'm just not going to admit them until I've had a chance to review them. And the only reason I admitted them this time is I did review them albeit a couple months ago, maybe not even that long ago.

MR. WILLIAMS: This is only by way of explanation, not excuse. We've been doing last minute with these documents to get them submitted for fingerprinting and all that kind of stuff and it was a last-minute decision whether we were going to be able to use them at all. That was an oversight on our part --

THE COURT: Was that a statutory or nonstatutory mitigator?

MR. WILLIAMS: I think that was a statutory mitigating circumstance.

MR. ROGERS: I think he lost his acceptance of

responsibility, Judge.

THE COURT: Thank you. We'll be in recess.

(Recess at 2 p.m.)

THE COURT: Ready for the jury?

MR. WILLIAMS: Yeah. Very quickly, Your Honor, we have another -- very quickly, Your Honor, we have a copy of our exhibit list that's updated. And to jump to my legal assistant's defense here, we checked, and it ends up she actually put our exhibits in your notebook.

THE COURT: Oh, they weren't on my list.

MR. WILLIAMS: Our fault is we failed to tell you about it in advance.

THE COURT: Clairvoyant I'm not.

MR. WILLIAMS: Thank you.

THE COURT: Let's have the jury brought in.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Miller, you ready to call your next witness?

MR. MILLER: Yes, Your Honor. The United States calls Gary Licht. Mr. Licht, if you'll please step forward and be sworn.

GARY LICHT, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. And if you'd be so kind as to adjust the chair and the microphone so you can speak directly into the microphones. Scoot the chair up

a little bit, please. And when you're ready, would you state your full name and spell your last name.

THE WITNESS: My name is Gary Licht, L-i-c-h-t.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Your occupation, sir?

A. I'm employed by the Iowa Division of Criminal Investigation laboratory in Des Moines, Iowa. I am a questioned document examiner.

Q. This jury heard some time ago from a Paul Bush. Is he a member of the same laboratory?

A. Yes, he is.

Q. Different section, same lab.

A. Yes.

Q. What sort of work goes on in the questioned document section of the crime lab?

A. Any documents, whether they be handwritten or machine produced, about which questions have been raised in a criminal matter can be submitted to the questioned documents section. And they involve a wide variety of case types, substrates, and a wide variety of situations.

Q. Would you briefly summarize for the jury your education, training, and experience that qualifies you to do such work.

A. My educational background is that I have a bachelor of science degree in zoology from Iowa State University and a

2299

master of science degree in biology from Florida State University. And when I was employed by the Iowa DCI lab, I began a training program. That training program was 32 months full-time on-the-job training in the analytical methods and instrumental techniques that I would need to characterize, compare, and identify questioned and known documents, whether

they are handwritten or machine produced.

As part of that training, I read the pertinent books and scientific articles that were necessary for whatever area I was studying at the time. I did practical exercises. I took practical tests, written tests, and oral tests. I also completed a comprehensive examination when I was done with the training.

I also participated in something called supervised case work where I would pull a case that we had to be worked. I would work through it and then put my notes and my report in a separate file and then hand that over to the training examiner. He would then work through the case separately and write his report. When he was done, he would then open up what I had done, and then we would talk about what I had done in that particular case. And that part of the training began after I'd been there only about nine or ten months. So supervised case work was an integral part of the training program.

I attended specialized workshops ranging anywhere from four hours to two weeks that dealt with various areas pertaining

2300

to handwriting, a couple of workshops on difficult extended handwriting problems, another couple of workshops on difficult signature comparison problems. And I also spent two weeks with another examiner in Illinois to get an idea of how case work was done in the Illinois State Patrol laboratory system.

Q. How many years' experience do you have in document examination, sir?

A. Ten years.

Q. And is that your full-time duty?

A. Yes, it is.

Q. It's not a second career or a secondary responsibility. It's your focus, your professional focus.
A. Yes, it is.
Q. Mr. Licht, in connection with those duties and responsibilities, did you do some work in connection with the Nicholson, Duncan, DeGeus disappearance and death investigations?
A. Yes.
Q. And among the work that you did in connection with that case, did you recently examine what are referred to as inmate kites?
A. Yes.
Q. How many of them?
A. I believe there were four of those that were written comprised of about ten sides of pieces of paper total.

2301

MR. MILLER: And if I may approach the witness, Your Honor?
THE COURT: You may, Mr. Miller.
BY MR. MILLER:
Q. Just so it's clear that we're talking about the same item, is Government Exhibit 307 one of those four documents that you examined?
A. Yes, it is. These are four pages from that.
Q. What examinations did you do in connection with those four kites, sir?
A. I did a handwriting comparison to known writings that were submitted. I also examined those pieces of paper to see if I could determine any other facts about them using instrumental techniques to see if any other handwriting or handwriting

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2009 of 3636

impressions that were not immediately visible would become visible.

Q. And when you indicated that you compared the documents with known writing, can you describe for us specifically whose known writing you compared it to and how you go about doing such work?

A. I had known writing submitted from two individuals. They were submitted and identified to me as that of Dustin Honken and Michael Kluver. The comparison process involves looking very carefully at the questioned writing to see if indeed it's all by one writer. And if it isn't, I have to separate it into groups based upon the handwriting characteristics.

Then I look at each set of known writing, then look to see if within that set it's all by one writer. And if not, I have to subdivide it, and I do that with each set of known writings that I get. I can then look at the writing to see what significant characteristics are there, in other words, those characteristics which are different from what's called copy book style. Copy book is what we looked at when we learned to write in our early years somewhere in 3rd or 4th grade when we first looked at cursive or printing. I look for those characteristics that I can use that have some significance to them in the comparison process, and then I do a side-by-side comparison between questioned and known.

Q. Did you note anything noteworthy regarding the known samples?

A. Yes. In both sets of known writings, I had characteristics to work with in the comparison process.

Q. And did you arrive at any conclusion regarding authorship or in whose handwriting these four kites was?

A. Yes.

Q. And please tell us what conclusion you arrived at, sir.

A. I was able to conclude that the questioned material that was submitted as -- it was submitted to me as Exhibit BW; I don't know what the state's exhibit is with that -- were written by the same writer as exhibits that were submitted as the known writing of Dustin Honken and that those same questioned items

were not written by the writer of the known writing submitted as that of Michael Kluver.

Q. Mr. Licht, I believe we're following you clearly enough, but since you use different laboratory designations that may not be identical to our exhibit identifications, I want to hand four documents to you and ask you to let us know whether or not we're talking about the same thing here. Handing you Government Exhibits 306, 307, 308, and 309, are those the four documents that you referred to as having examined?

A. Yes. Those -- 306, 307, 308, and 309 were submitted as the questioned documents.

Q. And those four exhibits, 306, 307, 308, and 309, are the ones that you've expressed the conclusion were written by the author --

A. Yes.

Q. -- by Dustin Honken?

A. Yes. Those were submitted as the questioned documents.

Q. And the ones that you arrived at the conclusion were authored by the same person who provided what was submitted to you as the known handwriting of Dustin Honken.

A. Correct.

Q. Were there any scratch-outs or write-overs on the

documents?

A. There were a few words that were scratched out, and there were a few corrections or other words written in.

Q. Is that uncommon in your experience in examining extended writings?

A. It's not uncommon. In extended writings I see scratch-outs.

Q. Particularly in ink writing as opposed to pencil?

A. Yes.

Q. Were these in ink or pencil?

A. These were in ink.

Q. Just displaying for the record page 3 of Exhibit 307 --

MR. MILLER: With the Court's permission.

THE COURT: You may.

BY MR. MILLER:

Q. Page 3 of Exhibit 307 is on the display. You recognize that, sir, as one of the pages from one of the documents that you examined?

A. Yes.

Q. And that has, for example, a scratch-out on it.

A. Yes, it does.

Q. What, if anything, did you do in connection with any scratch-outs that were observed on the various documents?

A. I used instrumental techniques that are useful for discriminating between similar inks but those that I potentially can discriminate using careful illumination and examination with various filters and cameras. I use ultraviolet, visible, and infrared light to do those examinations.

And those examinations are useful when, for example, there are two black inks, one of which obscures another or for some reason there's something else obscuring some writing, and I use those instrumental techniques to try to read what is obliterated. In this particular situation I wasn't able to read what was scratched out.

Q. The ultraviolet and infrared lighting techniques did not allow you to read any of the underlying scratched-out writing?

A. Correct.

Q. Are you able to arrive at any conclusions because of that, sir?

A. If I can't discriminate the overwriting from what was underneath it, I have to conclude that either it's scratched out with the same pen or with another pen which has the same ink characteristics.

MR. MILLER: Thank you, sir. I have no further direct.

CROSS-EXAMINATION

BY MR. SPIES:

Q. Good afternoon, Mr. Licht.

A. Good afternoon.

Q. Mr. Licht, I have just a couple of short questions for you. The first is could you describe for the jury what proficiency testing you routinely go through?

A. In addition to the testing I did in training and also

♀

2306

research, I take two proficiency tests each year, and I am proficient.

Q. All right. And in examining Government's Exhibits 306 through 309, you described for the ladies and gentlemen of the jury the testing procedures or the examination procedures that you go through. And would I be fair in saying that probably the first thing you do is you just look at the document?
A. Yes, I take a good hard look at all of the documents.
Q. All right. And then in addition to that you might do some microscopic or magnified examination of the documents?
A. Correct.
Q. And you look at it not only to see how a -- an author or a writer might form their letters but other distinctive characteristics about the person's writing?
A. Yes.
Q. And that would be just a way that any member of the jury or any of us could go about comparing the way a person writes to a questioned document like the ones you were asked to look at.
A. I don't know if a layperson would spend as much time and as much detail looking at that as a document examiner does.
Q. No, I understand that. But it'd be a place that we could start.
A. Yes.
Q. And that would be something you would do to start in your examination of a questioned document, make observations about

2307

how letters are formed, how letters are grouped together, distinctive characteristics about crossing t's or dotting i's.
A. Correct.
Q. And in examining the questioned documents that you were asked to look at here, you did that as well as the other testing that you've described for us this afternoon.

A.    Correct.
Q.    Did you do any chemical testing of the inks that were used in the formation of the letters and numerals in Government's Exhibits 306 through 309?
A.    No, I did not do any chemical testing.
Q.    So, for example, you've been trained as a document examiner that among the gross examination of a questioned document, the magnification that you can use to look at a questioned document, the use of different types of lights and instruments, you can also do chemical testing of the inks that were used in the formation of the letters.
A.    Yes.  If there's a particular question about that, I can do that.
Q.    And the reason you didn't do it with Government's Exhibit 306 through 309 is you knew that the pens that were used were standard-issue pens at the correctional institution where these letters came from.
A.    No, I didn't know that they were any sort of a standard issue.  I didn't have any questions to answer regarding the inks

2308

other than I looked at the overwriting or the scribbled-out areas to see if I could differentiate that, and that was about the only questions that I had related to the ink itself.
Q.    Okay.  And so, for example, in Government's Exhibit 307, specifically page 2 of Exhibit Number 307 that you see there on your monitor, when you were asked to examine the cross-outs on Government's Exhibit 307, you used, as I recall from your testimony, different types of light sources to see if you could detect any peculiarities about the cross-outs?
A.    Yes, I looked to see if I could read what had been crossed

out.
Q. All right. And tell us a little bit more about how you tried to figure out what was underneath the cross-outs.
A. I first look under the microscope to see if it's obvious under magnification if I can read it to the point where I'm sure what it says. If I'm not sure what it says, then I don't want to offer any conclusion about that. I then go to instrumental techniques to see if I can find the right combination of illumination and camera filters to make one ink appear different from the other. And in this particular situation I still could not read what was scratched out.
Q. It may be silly of me to ask you this, but did you look at the back of the paper to see if you could find out what was maybe obliterated?
A. I looked at the backs, and I didn't see anything where it

2309

was plain and obvious what the words were.
Q. All right. Now, granted, what we're looking at here on the monitor and what you have before you and I think what has been received in evidence are photographs of the actual original documents; am I right?
A. They're representations of the documents. I'm not sure at this point if we're looking at photocopies or what, but they are representations of the documents.
Q. All right. But what you looked at were the originals.
A. Yes.
Q. Okay. And are there also, Mr. Licht, computer programs that allow you to in essence photograph a writing and systematically remove cross-outs?
A. There are programs that assist in discriminating between

the inks. There are not programs that, say, follow the scribble lines.

Q. You're not aware of digitizing documents and being able to lift out overwrites?

A. There have been attempts at that. I haven't seen any that actually worked without someone trying to follow either straight lines or circles. Under the situations that I've seen where it did work, it was -- the person was able to follow the scribbling lines over the top, and that was done manually more efficiently than the software.

Q. All right. And, in fact, you've read in the Journal of

Forensic Sciences articles about digitizing writing and removing overwrites, haven't you?

A. Yes, and, in fact, I do use some of those techniques.

Q. Okay. Now, finally, in trying to discern what's under the overwrites, do you also look at the pattern that a person uses in forming their letters and characters to see if you can deduce what some of the letters were underneath the overwrites?

A. I did some of that, and in this situation without being able to be clear about what was written, I did not try to offer any particular discernment of what the words were exactly.

Q. And finally, did you notice in your examination of the known writing of Dustin Honken that he tends to round off his r's? And by r's, I mean the small r's.

A. I would have to look at them, but rounded r's is reasonably common, and I would have to go back and look and see. I mean, on this particular exhibit, I do see some rounded r's in front of us.

MR. SPIES: Thank you. Appreciate your time.

THE COURT: Mr. Miller, anything further?

MR. MILLER: No, Your Honor.

THE COURT: You may step down.

Government ready to call its next witness?

MR. WILLIAMS: Yes, Your Honor. The United States calls Michael Merino.

MICHAEL MERINO, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Please adjust the chair and the microphone so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: Michael Joseph Merino, M-e-r-i-n-o.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Merino, could you tell the jury what you do for a living, sir.

A. I'm a jailer at the Benton County Sheriff's Office.

Q. Do me a favor, Mr. Merino. These microphones actually only work if you're within a few inches of those, so if you could just repeat what you do for a living, sir.

A. I'm a jailer at the Benton County Sheriff's Office.

Q. And the Benton County Sheriff's Office, where is that located at, sir?

A. Vinton, Iowa.

Q. How long have you been employed as a jailer there?

A. Seven years.

Q. Can you just describe generally for the jury what are your

duties as a jailer at the Benton County Sheriff's Office?

A. To look out for the health and welfare of the inmates, feed them, their meds, that sort of thing.

Q. How large of a jail is the Benton County Jail?

A. Thirty-one beds.

Q. And do you have both male and female inmates that are housed in your jail from time to time?

A. Yes.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Mr. Merino, I'm showing you what's been marked as Government's Exhibit 318. Do you recognize that diagram there, sir?

A. Yes.

Q. And what is that?

A. That's a diagram of the Benton County Jail.

Q. Is that a reasonably accurate diagram of the layout of the interior of the Benton County Jail?

A. Yes.

MR. WILLIAMS: Your Honor, 318 has already been admitted into evidence. And permission to publish?

THE COURT: You may.

BY MR. WILLIAMS:

Q. On the screen in front of you, Mr. Merino, is the -- is that diagram; is that correct?

A. Correct.

Q. Okay. I'd like you to walk the jury through if you would

some of the locations there. First of all, there's a notation for front entrance here?
A. Yes.
Q. Okay. And then there's a lobby area that kind of comes from this area down through here?
A. Yes.
Q. Then there's a couple rows of cells; is that correct? There's cells 8 through 5 on that side, and then on the other side there's also some cells as well; is that correct?
A. Correct.
Q. There's an indication here of an outdoor recreation area. Do you see that indication there?
A. Yes.
Q. From the cells that are marked cells 5 through 8, are there windows on to that outdoor recreation area?
A. Yes, there are.
Q. And then is there a wall on the outside of the recreation area?
A. Yes.
Q. Right there?
A. (Witness nodded head.)
Q. Okay. Tell the jury if you would, sir, the windows out into that recreation area, can inmates see through them?
A. No, they're frosted.
Q. And can they be opened at all in any way?

2314

A. No.
Q. This is a relatively small jail. Is that fair to say?
A. That's fair to say.

Q. And when you have both -- let me ask it this way. Do you often or on occasion have both male and female inmates in your jail at the same time?
A. Yes.
Q. Is there a particular row of cells that are designated female cells and a particular row designated male, or how do you determine what cells the males would go into and what cells the females?
A. There is no certain cell that we put females or males in. It's whatever's available at the time.
Q. We see on TV sometimes pictures of jails that have the open bars down that people can see right through. Is that how the Benton County Jail is set up inside?
A. No.
Q. Are there doors that would block views into the cells so that you wouldn't have to worry about males seeing females undressing or anything like that?
A. Yes.
Q. And so because of that, you can put a female and a male in any cell as long as they're not in the same cell?
A. Correct.
Q. And is it just the staff there that makes the determination

2315

on any given day if you've got both males and females in the jail what cell they would happen to go into?
A. Yes.
Q. Now, are there rules within the Benton County Jail concerning communication between inmates, whether they're male and male or male and female?
A. We don't allow it.

Q. Don't allow communication between inmates, period?
A. Correct.
Q. Now, some of those cells, do they hold more than one inmate within a cell?
A. Yes.
Q. And are the inmates allowed to talk with each other within the cell?
A. Yes.
Q. Are inmates allowed to talk with each other from cell to cell?
A. No.
Q. Explain a little bit on this outdoor recreation area. Are inmates from different cells allowed to use that outdoor recreation area at the same time?
A. No.
Q. And so, for example, if you had 2 inmates in cell 5, they might be let out to use the recreation area, but you're not going to have inmates from cell 5 and inmates from cell 6 using

it at the same time.
A. No.
Q. There's a booking area up at the top here. And are inmates allowed periodically to have access up into that area?
A. Yes.
Q. And what's the purpose for that?
A. Shaving purposes, changing books, that sort of thing.
Q. You have a little bit of a library up there on shelves beneath the booking area?
A. Correct.
Q. And inmates can go up there and retrieve books on occasion?

A. Yes.
Q. Is there any common area where all the inmates at the jail at one time can congregate and communicate with each other?
A. No.
Q. Now, Mr. Merino, you have these rules against communication within the Benton County Jail. Nevertheless, do inmates find ways to communicate with each other?
A. Unfortunately, they do.
Q. Do you make efforts to stop that communication?
A. We try our best.
Q. What are some of the ways that inmates have found around the rules against communicating with each other?
A. Talking through the walls, putting notes in books and exchanging them, just a lot of different ways, talking to

outdoor rec. through the windows, just a lot of different ways like that.
Q. Let's talk about some of those ways you just talked about. You said putting notes in books. Do they hide notes inside books and then they take it back up to the library?
A. Then they exchange the books.
Q. And then talking in the outdoor recreation area through the windows I think you said is one way of doing it as well.
A. Yes.
Q. And you said the windows don't open. Can they -- if somebody's out in this yard, can they communicate with somebody, for example, in cell 6 somehow?
A. Yes.
Q. And how would they do that?
A. They just knock on the window and talk to them through the

window.
Q. Now, at some point in the year 2000, was an inmate by the name of Bobby McNeese an inmate at the Benton County Jail?
A. Yes.
Q. And was he a federal inmate?
A. Yes.
Q. Can you explain to the jury a little bit, Benton County Jail's a county jail; is that right?
A. Correct.
Q. Do you nevertheless hold federal inmates from time to time?

2318

A. We hold quite a few federal inmates.
Q. And how does that work? How is it that you have federal inmates in your county jail?
A. Well, I assume that they think our jail's pretty secure, so that's where they put our -- put their inmates.
Q. Okay. So there's some arrangements between the U.S. marshals and your jail administrator to allow federal inmates to be housed there.
A. Yes.
Q. All right. And Bobby McNeese was one such federal inmate; is that correct?
A. Yes.
Q. And he was held in your jail at least from the time period of March of 2000 through October of 2000?
A. I would say that's accurate.
Q. Angela Johnson, did you become aware of her becoming an inmate at the Benton County Jail at some point in time?
A. Yes.
Q. And how did you become aware, first of all, that she became

an inmate there? Did you actually see her arriving at the Benton County Jail?

A. I believe Detective Pete Wright told me about a week before she came.

Q. And then at some point did you actually see her in the jail?

♀

A. Yes.

Q. Was she the only female in the jail at the time?

A. No.

Q. And was she housed with another female inmate?

A. Yes.

Q. Do you recall that she arrived at the jail on July 30 of the year 2000?

A. I would say that's around the time.

Q. Would it refresh your recollection -- you've testified about this matter before; is that correct, sir?

A. Yes.

Q. And would it refresh your recollection if you had an opportunity to look at your prior testimony?

A. Yes.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. If you would just read down here to yourself, and when you're done reading, just let me know.

A. Okay. Okay.

Q. Sir, does that refresh your recollection that she arrived on July 30 of 2000?

A. Yes.

Q. While you were the jailer at the Benton County Jail in the summer of 2000 after Angela Johnson arrived there, did you

become aware that there was communication occurring between Robert McNeese and Angela Johnson at the Benton County Jail?

A. Yes.

Q. And, in fact, was at least one note intercepted by the jail staff being passed by Miss Johnson to Mr. McNeese?

A. Correct.

Q. And that communication occurred more than once during that time period; is that fair to say?

A. Yes.

MR. WILLIAMS: At this point, Your Honor, the government would request permission to read into the record a stipulation entered into between the parties, between the United States and the defendant, Dustin Lee Honken.

THE COURT: Okay. You may.

MR. WILLIAMS: Thank you. The stipulation reads, The United States of America, Plaintiff, versus Dustin Lee Honken, Defendant. Subject to the record previously made, the United States of America and the defendant, Dustin Lee Honken, stipulate and agree as follows: During August and September of 2000, Angela Johnson was in the Benton County Jail awaiting trial on federal criminal charges relating to the deaths of Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus.

While in the Benton County Jail, Johnson became acquainted with a fellow jail inmate named Robert McNeese.

McNeese was and currently still is serving a federal sentence of life in prison on matters unrelated to the case. Johnson and McNeese discussed Johnson's case. As a ruse, McNeese told Johnson that she could escape responsibility for these deaths if McNeese could arrange to have some other inmate who was already serving a life sentence falsely claim responsibility for murdering the five victims.

McNeese told Johnson that in order to make the confession believable, the other inmate would need to be able to furnish proof of his involvement by leading authorities to the victims' bodies.

Johnson prepared and provided to McNeese certain maps and notes describing the location where the bodies of the five victims were buried. McNeese then turned over these maps and notes, Government's Exhibits 310, 311, and 312, to the Iowa law enforcement authorities.

Exhibits 310, 311, and 312 have been analyzed at the Iowa DCI criminalistics laboratory. Both fingerprint and handwriting analysts conclude that Angela Johnson authored or could not be eliminated as authoring Exhibits 310, 311, and 312. The stipulation was dated the 24th day of September, 2004. It's signed by myself and Thomas Miller on behalf of the United States and by the defendant and his three attorneys.

I have no further questions of this witness, Your Honor.

♀

MR. SPIES: Your Honor, no questions of this witness. Thank you.

THE COURT: You may step down.

MR. WILLIAMS: Your Honor, I apologize. This is the first day this has happened. But we are out of witnesses for the day, and so we do not have any witnesses available to testify the rest of the day. I apologize.

THE COURT: Okay. Members of the jury, that will conclude the evidence for today. I did want to give you a handout. There's been a slight modification in our schedule, and next Thursday we were originally going to be off at 1, but we can now go till 4:30. I hope that doesn't disappoint anybody. I have a new schedule, but I don't really need to pass it out because that's the only change. And if you'd just hang on one second -- could I see the lawyers just at sidebar very briefly?

(At sidebar off the record.)

THE COURT: Just to kind of give you a heads-up on where we think we are in the case, Mr. Williams has informed me and the defense lawyers that he thinks the government will be resting sometime next week, so just to give you a heads-up. I still don't know how long the trial's going to last, but we do have the indication that the government thinks they'll be resting next week. I hope that's not like the lawyer who asked -- who said to me one time, I have one more question, and

2323

I always keep track when they say that, and he asked 167 additional questions. So you never know. But I'm fairly confident the government's going to rest next week.

Please keep an open mind until you've heard all of the evidence in the case, had a chance to receive my final instructions, hear the closing arguments of the lawyers, and go back to the jury room and review the evidence and begin your

deliberations. We'll see you tomorrow morning at 8:30. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated. Anything we need to take up on the record?

MR. WILLIAMS: Just a minor housekeeping issue -- and I don't think anybody has any problem with this -- Government's Exhibit 250 through 294 have to do with the floor plan of the Marion -- I'm sorry, of the Florence facility and photographs there. We produced those to the defense and produced them in court with the understanding from the defense, number one, that they will not provide copies to the defendant and they will not reproduce those copies other than for use among themselves. And we would ask the Court -- we will be asking the Court to seal those exhibits at the conclusion of this case so they don't become available to the public for security reasons.

THE COURT: Any objection on that?

MR. PARRISH: That was the understanding we had, and

♀

2324

we will accept that. We have no problem with that.

THE COURT: Okay. I'll order that they be sealed, Exhibits 250 through 294, at the conclusion of the case.

MR. WILLIAMS: And then to the extent -- and I don't know if the defense will be doing this or not. But to the extent -- we also provided them a floor plan to Marion and photographs of Marion as well. And to the extent that those are produced, we would ask that those also be sealed for the same reasons.

THE COURT: Any objection?

MR. PARRISH: Same thoughts.

THE COURT: Okay. I'll order those -- well, those aren't in evidence, though, are they?

MR. WILLIAMS: No, they aren't. If they're offered, I will be asking for it.

THE COURT: Okay. If they're offered, I'll go ahead and seal them.

MR. PARRISH: And with the status of the record, Your Honor, I'm not sure we're going to even get into Marion at this point, is that right, because you're not calling any more witnesses from Marion?

MR. WILLIAMS: That's correct.

MR. PARRISH: So I don't think that's going to be an issue at all, and they're not in our notebooks at the present time.

♀

THE COURT: Okay. Now, you've indicated that you think you're going to rest on Tuesday?

MR. WILLIAMS: As early as Tuesday, yes, Your Honor. A lot of this is going to be hard to tell just how long it's going to be to get through the rest of our case, but our best estimate is it could be as early as Tuesday. I don't think it will be any later than Wednesday that we'll be resting.

THE COURT: Okay. Now, Mr. Parrish, you indicated that you have a revised defendant's exhibit and witness list; is that correct?

MR. PARRISH: We do, Your Honor. I think we provided this afternoon the last list -- this morning at least the revised list. I told Carey we're going to work on it a little bit more this evening. I was thinking it was going to be next Thursday when the government was going to rest. We'll try to

get as busy as we can on it now. I told her by Monday we would get her a final -- get to you at least a final list. I'm thinking now we'll make every effort to try to get it tomorrow.

The only problem we do have, Your Honor, is one of the witnesses. I told the marshal's office Monday I thought we'd be starting. The problem is I need to meet with this witness before he testifies. He would be in the U.S. marshal's custody. I have not talked to the marshal's office since this afternoon they told me now it might be Tuesday or maybe even Wednesday when they're called. So I don't know what the Court's thought

might be on it, but I will meet with Duane right afterwards and see is there any way we could move up the schedule. I'm not sure we can at this point. But I can get back to the Court first thing in the morning and let you know.

THE COURT: Okay. That's fair. Now, are we going to be taking any defense witnesses by video conferencing?

MR. PARRISH: That's out now.

THE COURT: Okay. That's out.

MR. PARRISH: All of that's out. The other additional witnesses who are coming in from the prisons, I believe that's out at this point. We might want to make some brief record on it at some point with regard to Mr. Honken. But other than that, all of those witnesses would be out now except for Mr. Loparo.

THE COURT: And he's the one that you need to talk to Duane about.

MR. PARRISH: I do. We told him Monday. We were looking at Thursday as a close date.

THE COURT: You told him a week from next Monday.

MR. PARRISH: Right.

THE COURT: Right.

MR. PARRISH: Because we had agreed I think on two a day, and after we met Mr. Honken last night or yesterday afternoon, we're down to just one who we think we'll need.

THE COURT: Okay. Anything else?

MR. PARRISH: I can't think of anything.

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay.

MR. PARRISH: We'll try to get you a list in the morning now, our final list.

THE COURT: Okay. Thank you.

MR. WILLIAMS: I guess one other thing, Judge, and I'll just give this information both to you and to the defense by tomorrow. I think in light of the testimony from Mr. Altimus, I never did get him with it on the Cobeen issue, and that's my fault. All I listed was testimony about efforts to kill Cutkomp. And so we're going to have to revise the instructions and the verdict form on Count 6 to reflect that. But I will get a notation -- I'll get a letter to the Court by tomorrow regarding where I think those changes need to be made in the jury instructions.

THE COURT: Okay.

MR. WILLIAMS: Nothing else, Your Honor.

THE COURT: Would you be able to meet, Mr. Rogers or whoever else from the defense, and talk about the final draft of the instructions, the merits instructions, yet today?

MR. ROGERS: Sure.

THE COURT: Would somebody from the government be

available?

MR. WILLIAMS: Certainly.

THE COURT: Okay. I'd just like to go over those again. Why don't we meet at -- in half an hour at a quarter to four, and it's just informal. If you want to just come back in chambers, we can discuss it, just on the conspiracy issue and the issue Mr. Rogers has raised in his proposed jury instructions; okay?

MR. WILLIAMS: Very good.

THE COURT: Thank you. We'll be in recess.

(The foregoing trial was adjourned at 3:13 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR 1-5-05 Date

VOLUME 10 9-29-04 witness testimony

INDEX

| WITNESS: | | PAGE: |
| --- | --- | --- |
| JOHN GRAHAM | | |
| | MR. WILLIAMS | 2130 |
| | MR. SPIES | 2193 |
| | MR. WILLIAMS | 2211 |
| JOSEPH MCGEE | | |
| | MR. MILLER | 2214 |
| | MR. PARRISH | 2249 |
| | MR. MILLER | 2286 |
| MICHAEL KLUVER | | |
| | MR. MILLER | 2287 |
| | MR. PARRISH | 2293 |
| | MR. MILLER | 2294 |
| GARY LICHT | | |
| | MR. MILLER | 2298 |
| | MR. SPIES | 2305 |
| MICHAEL MERINO | | |
| | MR. WILLIAMS | 2311 |

*****

EXHIBITS:

| | |
| --- | --- |
| 305 | 2181 |
| 306 through 309 | 2293 |

*****

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, Plaintiff, vs. DUSTIN LEE HONKEN, Defendant. /

No. CR01-3047
Sioux City, Iowa
September 30, 2004
8:31 a.m.

VOLUME 11

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

APPEARANCES:

For the Plaintiff:

C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant:

ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn
Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. PARRISH: Yes, Your Honor.

THE COURT: Thank you.

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated. Just so the lawyers and parties know, we do have a juror with a sick child, and the juror requested that she be allowed to have her cell phone in the courtroom on vibrate, so if we see a juror answering the phone, we'll just stop and take care of those personal matters.

Mr. Williams, are you ready to call your next witness?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Mr. Miller.

MR. MILLER: Your Honor, the United States calls J. D. Smith. Agent Smith, if you'll step forward and be sworn.

J.D. SMITH, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Make yourself comfortable, and please adjust that chair so you can -- scoot that up so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE DEFENDANT: J.D. Smith, S-m-i-t-h.

THE COURT: Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. I addressed you as Agent Smith, but the fact of the matter is you're just plain Mr. Smith at this point; is that correct?

A. That's correct.

Q. You're a retired agent with the DCI?

A. That's correct.

Q. When did you retire, sir?

A. February of '03.

Q. After how many years' service?

A. Thirty-two years.

Q. Is that the entire amount of time you spent in law enforcement?

A. I had a six-year leave of absence as a public safety commissioner for the city of Cedar Rapids from 1990 through '95.

Q. That's an elected position?

A. That's correct.

Q. And that -- duties of the Cedar Rapids commissioner of public safety included what, sir?

A. That's a commission form of government, so the public safety commissioner is over the police department, the fire department, employee safety and housing inspections at that time.

Q. That was for the city of Cedar Rapids six years?

A. Yes.

Q. So you have a total of 38 years in law enforcement, sir?

A. That would be correct.

Q. You're retired. Do you still live in the Cedar Rapids area, sir?

A. Yes, I do.

Q. Agent Smith, in the year 2000, where were you employed?

A. I was employed with the DCI in Cedar Rapids office.

Q. What were your duties at that time, sir?

A. At that time I was assigned to the intelligence unit.

Q. In connection with your duties as a DCI agent, did you ever do any work in connection with the Nicholson, Duncan, DeGeus missing persons investigation?

A. Yes.

Q. What was your first contact with that case, sir?

A. I believe it was in October of 2000. I was requested to come to U.S. Attorney's Office, met with Detective Pete Wright who was assigned to the DEA and some U.S. attorneys. I was asked to take a couple of maps that had been obtained from an individual, and these maps were supposed to depict where some bodies may have been buried up around Mason City. And I was assigned to take the maps and see if we could find these locations in the Mason City area.

Q. These were maps that had been obtained from an inmate in

the Benton County Jail?

A. That's my understanding, yes.

Q. And, in fact, what did you do with those maps, sir?

A. We then took the maps and on -- I believe it was October 3 drove up to the Mason City area and drove around trying to find these locations. This was kind of in the evening. It was getting dark. But we think we found the two locations, and then

we drove around a little larger area than that to see if there was anything else that kind of matched the maps. And then on October 4, we went down to the county offices and obtained aerial maps, recorder's office and some of the other offices, and then went back out and checked the areas again.

Q. Can you just describe for us generally what sort of information was contained on these -- on these maps?

A. Well, there were two of them. They both indicated what looked like an area to the south of Mason City.

Q. These were hand-drawn maps?

A. Hand-drawn maps with some writing on them.

Q. Agent, with the Court's permission, I'm going to ask you to step down. The enlargements of those exhibits are present here in the courtroom; is that correct?

A. That's correct.

Q. And if you would put them up on the easel, would that assist you in describing to the jury what was on those maps and how you went about seeking to identify the locations that

matched those maps?

A. Yes.

MR. MILLER: With the Court's permission.

THE COURT: Yes, and any of the defense counsel can move over to the small table there or anywhere else you want so you'll have a better view of the overheads. But the witness can step down.

Do you have a mike for him?

MR. MILLER: Yes, he is miked already, Your Honor.

THE COURT: Okay. Thank you.

BY MR. MILLER:

Q. What exhibit number is that, sir, that you're showing us?
A. This is Government Exhibit 311A.
MR. MILLER: And if you would put it on the overhead as well, Mr. Williams, I think that might assist us.
Q. What is Exhibit 311A, sir?
A. Exhibit 311A is a map that we referred to as site number 1. It's drawn on lined paper. It depicts -- has written on it Old Highway -- it just says Old 18, a house abandoned, a lumber yard. And then it shows a road going what I would assume to be south, although the map doesn't really give the directions, to a blacktop. And then actually if that is south, you would go back west to a gravel road, and it is marked on the map as gravel road Kildeer Road, K-i-l-d-e-e-r Road. And it has drawn on it an abandoned map -- or excuse me, abandoned house and then what

we thought was silos and then a field out behind with an X on it. I don't think it shows up very well on the overhead.
Q. Does it actually show up better on the chart that you're looking at?
A. Yes.
Q. Okay. And just with regard to some of those landmarks, it indicated Old Highway 18?
A. It just said Old 18.
Q. Old 18. And is that a landmark you were able to identify, sir?
MR. MILLER: Would the Court inquire as to whether or not it's --
THE COURT: Yeah. Can you see it now? What was the problem? There was a reflection?
JUROR 646: The light was shining on it.

THE COURT: Okay. Well, there's not much we can do about that so . . .

A. On the map it shows an abandoned house on this part. It says lumber yard. There's a road going -- looks to be north and south. It says Old 18. And then down with an arrow that says to blacktop which would be south of there and then over to a gravel road which says Kildeer Road, abandoned house. I believe that says silos and field, and then there's an X there.

Taking this map and driving out there, we were able to go south of Old 18 down to a blacktop and over to a road that is

♀

marked Kildeer Road. That is its name. Actually the abandoned house is not on the corner. It's about a quarter mile south of that corner. There are resident silos. There are two grain bins sitting back from the road just outside of the curtilage area, and then a field is out behind that. And we referred to that as site number 1.

Q. Agent Smith, there's an exhibit marked Exhibit 1 to your right, a map. If you would put that up on the other easel, would that assist you in describing to the jury where you found that location?

A. Yes.

Q. Please do so. And just so we're clear on the record, as you are describing for the jury, should you happen to move back and forth between exhibits, I want the record to be clear by you letting us know specifically which exhibit you are describing as you do so.

A. Okay. On Exhibit 1, it shows the site as on Kildeer Avenue. And actually we came down Lark Avenue from Mason City across the Old 18, and then we went down to the blacktop road

which went east and west which is marked on the map that said blacktop road over to Kildeer and then down. The map actually shows it being on the corner, but it's actually about a quarter mile south of the corner on Kildeer, and the rest of the map's description as far as silos, the grain bins match that. Abandoned house matches that.

♀

The one thing we did find there is it's not a law an abandoned house. It was burned down, and that happened in 1996. We went back and checked the records to see how long ago that had happened. And that was investigated by the state fire marshal's office and I believe Cerro Gordo County.

Q. There had been an abandoned house there prior to '96, but it was burned down by the time you were there in 2000?

A. That's correct.

Q. And just -- I want to be clear. You indicated that the structure was not on the corner but a quarter mile south of that corner. Were there any structures between the house and the corner?

A. No.

Q. So that was the first such structure from the corner that was indicated on the hand-drawn map.

A. That was the first structure, and it had the E-911 marker of 11524 on it.

Q. And when you and Deputy Wright were out there in early October -- the 3rd I believe you said it was?

A. Yes.

Q. Okay -- you were -- you traveled that area and were satisfied that that appeared to match the location identified on the hand-drawn map?

A. Yes. As I said earlier, we drove a couple miles each way from there, too, to see if there were any other areas that

looked like that, and there were not.

Q. That was the only one that appeared to match the site on the hand-drawn map.

A. Yes.

Q. Please proceed by going to the next map, sir, and describe for the jury what it shows. What exhibit number is that, sir?

A. This is Government Exhibit 310A. This is, again, a hand-drawn map. It shows Highway 18 and says Mason beside it. There's a road that looks to be going north and south and crosses a set of railroad tracks, and then it has Old Highway -- or Old 18 which we assumed was Old Highway 18. It mentions an abandoned green house on -- would be west side and a lumber yard on the right side. There's a number 5, and it says, Under the tree with the two tires are the four. And there's an X mark close to the field area by the railroad tracks.

Again on Government's Exhibit Number 1, this would be the area right here in the 1500 block. It was Lark Avenue which was actually the same avenue that you go down to get to the blacktop to get over to Kildeer.

Q. And again, you and Deputy Smith drove the area until you were satisfied you found what appeared to be the location identified by the hand-written map, 310A?

A. Deputy Wright and I did.

Q. Yeah.

A. And in this area it should be noted that on this map where

it says lumber yard, it is not a lumber yard. It's a bulk plant. In some conversation with just some citizens we ran into, they said that had been a lumber yard prior to about 1977 I think. There is a lumber yard a mile over on that corner, but the rest of the area doesn't match up. The abandoned green house -- or there is a green house there -- we assumed it was abandoned -- is there, and there are a set of railroad tracks just between these two highways on Lark Avenue.

Q. As to both 310A and 311A, there were at least some slight discrepancies between what the hand-drawn map showed and what you found.

A. That's correct.

Q. But in both cases you were -- what you located and what's shown on Exhibit 1 was what best matched what appeared on those maps.

A. Yes.

Q. In fact, the only thing that appeared to match?

A. Yes.

Q. Thank you. Before we go any further, would you show 310B and 311B so the jury knows what those are?

A. 310B is an envelope that has a return address of the Benton County Correctional Center and has the names of Gregory Nicholson, Lori Duncan, Kandi Duncan, and Amber Duncan.

Q. And that was the envelope that the map was inside when recovered at the Benton County Jail?

♀

2342

A. Yes.

Q. And then as to . . .

A. Again, this is a --

Q. What number?

A. 311B, an envelope with the return address of Benton County Correctional Center, has the name of Terry DeGeus on it, November 5, 1993.

Q. Okay. You can take those down now, sir.

In addition to two envelopes and two maps enclosed in those envelopes, were there also some notes that were recovered with the maps and turned over from the Benton County Jail?

A. Yes.

Q. And would you take those and one at a time display those for the jury first describing by exhibit number exactly what --

MR. SPIES: Your Honor, may we approach, please?

THE COURT: Well, let's back up a minute because I'm a little bit confused, Mr. Miller. My notes indicate you haven't actually offered 310, 310A and B, 311A and B. Now, based on the stipulation yesterday, are these --

MR. MILLER: Oh, I apologize, Your Honor.

THE COURT: -- are these admitted?

MR. MILLER: Your Honor, the state does offer -- I apologize. The state offers Exhibits 310A and B and 311A and B.

* * * *

(Government Exhibits 310A, 310B, 311A, and 311B were

2343

offered.)

* * * *

MR. SPIES: We object on relevance, 403, Sixth Amendment grounds, hearsay.

THE COURT: Those objections are overruled. Now, you're talking about 310A and B and 311A and B?

MR. MILLER: Yes, Your Honor.

THE COURT: 310A and B and 311A and B are admitted.

* * * *

(Government Exhibits 310A, 310B, 311A, and 311B were admitted.)

* * * *

BY MR. MILLER:

Q. Now, before you show anything else, let me ask you this. Were there, in addition to those two maps, notes accompanying those maps as well, sir?

A. Yes.

Q. And are those --

MR. SPIES: Excuse me, Mr. Miller.

Your Honor, may we approach, please, on this?

THE COURT: Yes.

(At sidebar on the record.)

THE COURT: So much for there being no objections to the exhibits today, but yeah.

MR. SPIES: Well, I thought that these notes were

already the subject of the Court's pretrial ruling on the admissibility of the maps. The Court ruled that the maps were admissible, but my recollection of the ruling was that these notes were not admissible. These notes were written by Angela Johnson, and they clearly are hearsay. They are in our opinion testimonial in nature, and my recollection of your ruling was that you did not rule that they were admissible.

THE COURT: I ruled that the maps were admissible.

MR. SPIES: The maps were, but not the notes.

THE COURT: What do the notes say?

MR. MILLER: They do not mention any other

participants. They simply describe the grave sites, and it was my understanding the maps and notes were --

MR. SPIES: The notes also describe how the wounds were inflicted.

THE COURT: Describe what?

MR. SPIES: How the wounds were inflicted.

THE COURT: We've got a huge issue now.

MR. MILLER: And those were admissions against interest which was the basis of the ruling, admissions against penal interest which was the basis of the issue on the basis of the pretrial ruling.

MR. SPIES: We looked at your ruling last night, and our reading of your ruling was you ruled the maps were admissible and that was all.

♀

THE COURT: Well, let's send the jury out and take it up.

(The sidebar was concluded.)

THE COURT: Members of the jury, we're going to have to send you down to the jury room. I don't know how long it will take, but I have a matter I need to take up with the lawyers. It wasn't anticipated. I apologize for that. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated.

Mr. Williams, I thought you indicated that there were no objections to any of the exhibits this morning.

MR. WILLIAMS: I did, Your Honor, and I had forgotten that on the maps they had reserved their objections on those issues. You had already ruled on that issue on the maps, and it

was our impression -- and we have -- I've not reread your ruling recently, but it was my impression that you had ruled on the notes as well. I know we briefed that, and that was part of our submission for our motion under 104 was both the maps and the notes.

And the argument that we would have to the admission would be the same we made during the pretrial submissions. There's nothing in the notes that incriminate or even mention the defendant in this case. They are simply statements about where the bodies were buried, how they were buried, and how the

2346

people were killed, no mention of Dustin Honken, no allegations that anybody else was involved in the killing that I can recall off of them.

I know we filed -- when we filed the motion, we asked for the Court to rule on both the maps and the notes, and then you ruled that you granted our motion, so I guess we assumed that that had to do with both maps and the notes. Apparently the defense has an interpretation -- they may be right -- that you'd only ruled on the maps. And so I apologize. I knew -- I had forgotten that there were these objections, but I knew that you had ruled on this issue, so I didn't think it was going to be an issue.

THE COURT: But you addressed the Bruton issue. What about the Crawford issue?

MR. WILLIAMS: No, that was part of the Crawford submission as well. It's the same thing. The reason the maps -- the reason you ruled the maps were admissible was they were a statement against her interest. They were made to somebody who was not a -- law enforcement known to her at that

time to be a law enforcement officer which was the subject of the Crawford opinion.

Her notes to the same person comes under the same analysis. They are statements against her interest. They don't implicate somebody else which would be the Bruton issue.

THE COURT: Right.

MR. WILLIAMS: And they're provided to somebody not known to her at that time to be a law enforcement officer, so they come under Crawford. It's the same analysis.

THE COURT: Mr. Spies?

MR. ROGERS: Your Honor, may I address this issue?

THE COURT: Sure, although it's Mr. Spies that raised it.

MR. ROGERS: It's Mr. Spies who raised it. It's his witness.

THE COURT: But in this instance I'll allow the exception. We'll go to the World Federation of Wrestling rules, and you can tag team me. How's that?

MR. ROGERS: Well, you started with Mr. Williams even though it's Mr. Miller's witness.

THE COURT: Then there's some reciprocity, isn't there?

MR. ROGERS: Thank you, Your Honor.

THE COURT: Thank you, Mr. Rogers.

MR. ROGERS: And the reason I asked to do that is I did go over your ruling in detail more than once last night in anticipation of this. You talk only about the maps, although I interpret it to include the written notations on the maps about which the witness has testified. The stipulation that we

entered into regarding the maps does not include these notes, and we explicitly reserved in the stipulation our objections

made at the time of the pretrial ruling.

THE COURT: Well, see, I wasn't prepared for this because they told me this morning that there were no objections to any of the exhibits. So which exhibits do you have objections to?

MR. ROGERS: We object to --

THE COURT: 312?

MR. ROGERS: -- 312 -- let me look at the list here what's what. 312, 312A and B.

THE COURT: Well, 312A and B is just an enlargement of 312.

MR. ROGERS: Right.

THE COURT: Right.

MR. ROGERS: 317. We've actually lodged objections to all of these exhibits except for the floor plan of the Benton County Jail which is already in. And so we do object to them. But what we're talking about here I think is 312A and B and 312.

THE COURT: Do you have a written copy of your stipulation, because I never received that yesterday? And does the stipulation have any bearing on any of the objections to these exhibits?

MR. ROGERS: It reserves our objections to the maps which we're not talking about now, but it does not deal with the notes with Exhibit 312, but we did preserve our objections in the stipulations. It said subject to the record already made or

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2050 of 3636

words to that effect.

MR. MILLER: Your Honor, my recollection is that the stipulation specifically refers to Exhibits 310, 311, and 312.

THE COURT: That's nice, but nobody gave me a copy of the stipulation.

MR. WILLIAMS: I apologize, Your Honor. We did file that, but I should have given you a copy of it yesterday when we were dealing with it. We'll get one right now.

THE COURT: You don't have it now?

MR. WILLIAMS: I sent somebody down to go get it.

MR. ROGERS: Addressing while they're waiting for that the Crawford analysis, our contention is that the written note or statement of Angela Johnson in Exhibit 312 is obviously testimonial within the meaning of Crawford, different than the maps which are not being offered for a hearsay purpose. And so I think it's totally different than the maps. And you make in your ruling -- and it's a detailed and thorough analysis under several different aspects. The findings that you make to justify the admission of the maps would not justify the admission of the notes.

The other point that needs to be raised is you also make a secondary analysis with regard to the maps and their reliability under Roberts versus Ohio to the extent that they're not covered under Crawford. And that analysis would not support the admission of the notes because there's no validation of the

information contained in the notes which gives it the independent indicia of reliability assuming that it comes -- it's not under Crawford and assuming that -- which we disagree with and assuming that it's somehow within an 801(d)(2)(E)

exception. There's just no -- the main indicia of reliability with the maps is they did, in fact, lead to the bodies. That doesn't work with the notes.

Further, the notes can be read as implying that Miss Johnson does not actually know herself who was shot how many times which would imply that Miss Johnson is attempting to shift responsibility from herself to an unnamed other person, and inferentially in the context of this case that would be shifting responsibility to Mr. Johnson (sic). I think that also makes it inadmissible under Bruton as well as Crawford and 801(d)(2)(E).

THE COURT: Okay. Mr. Rogers, I'm looking at this stipulation. Did you say you reserved your objections in the stipulation?

MR. ROGERS: It says subject to the record already made, the very first line I believe.

THE COURT: So you stipulate that 310, 311, and 312 were turned over by McNeese, that they were analyzed by the DCI, and that fingerprint and handwriting analysis conclude that Angela Johnson authored or could not be eliminated as authoring Exhibits 310, 311, and 312. So what does "subject to previously made" refer to?

2351

MR. ROGERS: That refers to our resistance to their motion for pretrial admission of these exhibits and also to the objections listed on the government's witness list back at the beginning of the trial.

THE COURT: Mr. Williams?

MR. WILLIAMS: Yes, Your Honor. First of all, if you look at the bottom of the stipulation, the first page, it indicates Johnson prepared and provided to McNeese certain maps

and notes describing the locations where the bodies of the five victims were buried. McNeese then turned over these maps and notes and then lists what they were turned over. So first of all, it's clear that everybody understood we were talking about the notes.

Number two, what they're raising now is a Bruton objection to the admissibility of the notes. The Crawford and hearsay analysis, as I said before, that would apply to the maps equally applies to the notes, and then there's a Bruton issue. So let me address both of those.

First of all, saying hearsay and Crawford, these notes, unlike the maps, weren't later verified as to the accuracy, to the contrary. The notes describe the location of the bodies just like the maps do. In fact, the notes also say, for example, Terry DeGeus was buried on his knees. The body recovery and the forensic will demonstrate that, in fact, he was buried on his knees. And so the facts are verified and the

♀

2352

reliability of the notes are as reliable as the maps were which is part of your analysis for why they're admissible.

So there is no difference in the admissibility under the Crawford and hearsay exceptions for the admissibility of the notes than there are with the maps, and that was part of our submission under Rule 104. The defense took no objection to your ruling, and it's my fault for not I guess getting a clarification --

THE COURT: What do you mean they took no objection to the ruling?

MR. WILLIAMS: Well, they never asked for any clarification -- and neither did I -- that the maps meant maps

only and not notes. I mean, we clearly moved for the admission, and we referenced them by exhibit number for all of these maps and notes, and you granted our motion and --

THE COURT: Let me stop you for a second.

Mr. Rogers, how do you distinguish in terms of the Crawford analysis between the maps and the notes?

MR. ROGERS: The notes are more obviously testimonial. They are a written account of what Miss Johnson claimed happened that was given to an agent of the government. That's I think classically testimonial within the meaning of Crawford. And they're also prepared by Miss Johnson in some twisted way of her own mind for the use in court proceedings. They were prepared to brief an unknown conspirator of hers that didn't ever really

exist to attempt to give perjury. That's about as close to testimonial as you can get.

MR. WILLIAMS: Here's where that analysis fails, Your Honor, and that is while they may be testimonial, they were not made to a person unknown to the defendant, to Miss Johnson as a government agent, and that's the necessary ingredient for it to be a Crawford violation.

THE COURT: Okay. Why don't we move to the Bruton issue.

MR. WILLIAMS: The Bruton issue, number one, they've never objected on Bruton. Number -- so this is new. They never raised that objection before. They've never claimed any Bruton violation. There was no Bruton violation raised in the pretrial litigation on this issue. This is the first time we've heard any Bruton allegation with regard to --

THE COURT: Well, wait a minute. In their objections

in the pretrial exhibit list, they say Sixth Amendment right of confrontation. Isn't that what a Bruton issue is?

MR. WILLIAMS: I took that as the Crawford issue which is also a Sixth Amendment --

THE COURT: Well, that may be how you took it, but doesn't -- isn't Bruton a Sixth Amendment issue?

MR. WILLIAMS: Bruton falls under Sixth Amendment, yes, Your Honor.

THE COURT: And there's no more reason to assume that

they tried to limit it to Crawford than it would be to assume that they included Bruton by saying Sixth Amendment right of confrontation. It would include both.

MR. WILLIAMS: Well, I think I have a reasonable interpretation given that we've litigated this issue pretrial and the only objection they raised pretrial under the Sixth Amendment was Crawford. They never raised pretrial any Bruton allegation beforehand.

THE COURT: They didn't have an obligation to. What was their obligation to raise the Bruton issue before now? Would have been nice.

MR. WILLIAMS: Would have been nice.

THE COURT: Because we all know I don't like surprises. Now we have them. But failing that, there was no -- they had no obligation to raise it earlier.

MR. WILLIAMS: Granted. So let me address it on the merits.

THE COURT: Okay.

MR. WILLIAMS: There's no Bruton problem here because under Bruton, what Bruton bars is any direct allegation by

another person naming, identifying the defendant as participating in a criminal act. Courts have been able to obviate any concerned Sixth Amendment injury to a defendant by excising the names, by redacting direct references. Implied references are always allowed under a Bruton analysis, and all

we've heard from the defense today is you could imply because she's not sure how many times they were shot, therefore, somebody was with her, and that fits into they're theory of defense anyway, that Terry DeGeus helped her kill the four. So there's nothing that in any way directly or frankly even indirectly points the finger at the defendant in this case under the Bruton analysis in those notes.

THE COURT: Mr. Rogers, on the Bruton issue.

MR. ROGERS: On the Bruton issue, Your Honor, first of all, my memory is that we did raise this in our initial resistance, which was belated as the Court noted, to the government's motion and that after that resistance had been filed Crawford was announced, and we filed a supplemental resistance based on Crawford, so I think it was raised and Crawford was additional piling on if you will.

THE COURT: But whether you did or you didn't, you clearly raised it in your objection in the exhibit list.

MR. ROGERS: But my view is, Judge, that references which in the context of the evidence can be taken as references to the defendant are prohibited under not Bruton itself but under the cases that follow Bruton -- and I'm drawing a blank on the name of the Supreme Court case decided I think three years ago from Maryland. I just can't remember the name of the case, but you know what I'm talking about.

THE COURT: I know what you're talking about, yeah.

MR. ROGERS: So I don't think the fact that it's an indirect reference and names had been redacted saves it.

The other point I wanted to make -- and it's not on the Bruton issue -- but with regard to the stipulation, that stipulation was only as to the foundation to obviate the necessity of calling Mr. McNeese as a witness, and that's all it does. It stipulates only to the foundational elements; McNeese got them from Johnson, so they don't have to call McNeese, and we don't have to cross-examine another --

THE COURT: Yeah, I don't think you've waived your Bruton and Crawford objections by the stipulation.

MR. ROGERS: Okay.

THE COURT: I don't think I could infer that from the stipulation. I don't think the government's trying to argue that.

MR. WILLIAMS: No, Your Honor.

THE COURT: Would have been nice had the stipulation addressed all of that, but that's water over the dam; is that right?

MR. WILLIAMS: That's right.

THE COURT: Okay. Here's what we're going to do. I'm not going to decide this right now. And I haven't had a chance to go back -- how long was I -- I engaged in some very extensive Crawford analysis. I think you're probably right, Mr. Williams, but I want to take another look at it. And so you're going to

have to rearrange your witnesses or do what you can with this witness and give me a chance maybe over the lunch hour to review Crawford, and there's been a lot of lower court decisions -- matter of fact, I think I counted about 20 Fed. Supp. and circuit court opinions -- since I filed my opinion on the Crawford analysis. I want to go back and review some of those because I was one of the early ones on Crawford, and there's been a lot written since then.

And so this is an important matter, and I can see why you thought there wasn't a problem. There is a problem. I'm not going to rule on it from the seat of my pants, and so you'll just have to adjust your presentation of the evidence. I don't think that's going to be a big burden.

MR. WILLIAMS: It will be no problem at all, Your Honor. We will move on past these notes, and we'll go on with the rest of our evidence, and we will not raise these notes again.

THE COURT: Okay. But now, let's get back to -- does the defense have an objection to 310 and 310A and B, 311 and 311A and B? Or is your objection just to 312 and 317?

MR. SPIES: To the extent that the government is now offering the envelopes, I think they go along with the notes, and so our objection is the same to the envelopes, 311A and B -- I'm sorry, 310B and 311B which I think are the envelopes.

THE COURT: Well, let's take them one at a time. 310

2358

says the map.

MR. SPIES: Right. I'm trying to discern from the government's list here which -- we're objecting to the envelopes as well as the notes.

THE COURT: Are the envelopes separate exhibits?

MR. MILLER: Yeah, and we can leave them out.

THE COURT: What exhibits are the envelopes?

MR. WILLIAMS: 311B and 311 -- 310B.

MR. SPIES: I don't see them described on the exhibit list but . . .

THE COURT: Well, on the exhibit list it says enlargements of map for 310 and 310A and B.

MR. WILLIAMS: The Bs should have been the envelopes. The envelopes, frankly, Your Honor, are just -- we --

THE COURT: Let's back up. 310, 310 was covered by my Crawford ruling. And you're just reasserting, am I correct -- are you handling this, Mr. Rogers, or Mr. Spies or both? You're just reasserting the objections that I overruled in the Crawford analysis.

MR. ROGERS: That's correct, with regard to 310, the map, and the enlarged map, whatever that is.

THE COURT: Whatever that may be. But anyway, 310 I'm going to admit because that's consistent with my pretrial ruling. So 310 is in evidence. I think you'll need to offer it in front of the jury, but I just -- 310A and B in your

description purport to be simply an enlargement of 310.

MR. WILLIAMS: And 310A is.

THE COURT: 310B would be the envelopes.

MR. WILLIAMS: Yes, Your Honor.

MR. ROGERS: To which we additionally object under Bruton and Crawford because the listing of names is testimonial in our view and because . . .

THE COURT: Okay. So I'm going to go ahead and admit

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2059 of 3636

310A for the same reason I admitted 310. I've already ruled on it. 310B I'm going to ask you not to offer at this time because that's going to be subject to some further analysis and discussion.

Now, what's 311?

MR. WILLIAMS: 311 is the map of the other site.

THE COURT: Okay. So I'm going to admit 311 pursuant to my earlier Crawford analysis ruling. And you're preserving your objections on that obviously.

MR. ROGERS: Right.

MR. WILLIAMS: 311A is the enlargement of that same exhibit.

THE COURT: Okay. So I'm going to admit 311A on the same theory.

MR. WILLIAMS: And 311B is the envelope in which it was provided to the --

THE COURT: Okay. So we really have the problems with

♀

2360

regard to 310B and 311B with regard to your position that that wasn't covered by my earlier ruling and additionally the Bruton issue. Is that a fair summary?

MR. ROGERS: That's correct, Your Honor.

THE COURT: Okay. Now, what's 317?

MR. WILLIAMS: 317 we're not -- it's not at issue. We're not putting it in today. And I don't think we're putting it in, period.

THE COURT: Okay. And then 312, what's the status of 312?

MR. WILLIAMS: 312 is the one you were going to look at, Your Honor, under the Crawford analysis. 312 are the notes

that explain the location and so forth.

THE COURT: Okay. Okay. So right now it's 310B, 311B, and 312 are subject to further review.

MR. WILLIAMS: And we can easily move on without addressing those.

THE COURT: Okay. And you still have to offer 310A and 311A.

Mr. Spies, did you have something to add?

MR. SPIES: No. I was just standing up to get adjusted.

MR. ROGERS: Your Honor, I'm assuming that when they offer these in front of the jury our objections have already been stated and continue and we don't need to object anymore.

♀

THE COURT: You don't need to make any further objection. You've already made your record. To the ex -- yeah, you've already made your record on it for hearsay, Sixth Amendment right of confrontation, and all of the issues you raised in the pretrial ruling.

MR. ROGERS: Thank you, Your Honor.

THE COURT: Okay? Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. Thank you.

(The jury entered the courtroom.)

THE COURT: Members of the jury, please be seated. Sorry for the delay. I told you at the beginning of the trial that we work very hard to anticipate any issue, and we do work hard to do that. We didn't anticipate this issue. It's ultimately my responsibility, so I apologize for the delay.

Mr. Miller, you may continue.

MR. MILLER: Thank you, Your Honor.

BY MR. MILLER:

Q. Mr. Smith, if you would again approach the two easels.

MR. MILLER: First before we do anything at all with them, for the record, Your Honor, United States offers Exhibits 310, 310A, 311, and 311A.

* * * *

(Government Exhibits 310, 310A, 311, and 311A were offered.)

♀

2362

* * * *

THE COURT: Any further objection, Mr. Spies?

MR. SPIES: None other than what we've done before, Your Honor.

THE COURT: Okay. Thank you. Those exhibits are admitted over the objection of the defendant.

* * * *

(Government Exhibits 310, 310A, 311, and 311A were admitted.)

* * * *

BY MR. MILLER:

Q. And before we move on, Mr. Smith, I just want to be sure the jury understands clearly which of the two hand -- which of the handwritten maps, hand-drawn maps, correlates to which of the locations on Exhibit 1?

A. 310A correlates to the Lark Avenue location which is on Exhibit 1 shown, and 311A on Exhibit 1 would be the 11524 Kildeer Avenue location.

Q. You and Deputy Wright located those two places on October 3 and 4 of the year 2000?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2062 of 3636

A. Yes.
Q. What did you do after locating those two sites, sir?
A. After we located them, we then went back to Cedar Rapids to the U.S. Attorney's Office and met with them to set up a process to obtain search warrants for these properties and then to

search them, see if there was any grave sites there.
Q. What preparation was done for a search at that -- at those locations?
A. It was decided to use Mike Hochrein with the FBI out of St. Louis to actually do the excavating on these sites. We did bring in some cadaver -- on that first time a cadaver dog, and they flew in from I believe the DC area two gentlemen running a ground penetrating radar system.
Q. So some time and effort was spent to assemble the appropriate personnel and equipment for this task?
A. That's correct.
Q. You mentioned Mike Hochrein. Who is Mike Hochrein, and why was his expertise sought?
A. He has some experience in archeological digging and this kind of work, so he was brought in to do the grave sites, and I might also add we did take some metal detectors out there on both locations.
Q. When did you next return to either of these sites in an effort to locate graves?
A. I believe it would have been October 11, 12, and 13 of 2000.
Q. And what happened on October 11?
A. We had a briefing at the Mason City Police -- or excuse me, airport with the individuals involved from the FBI, the DCI,

Cerro Gordo County, Mason City PD who were involved in this,

securing the area. The DEA had obtained the search warrants.

We first went to what we referred to as site 1 on Kildeer Avenue and began searching on that site.

Q. Okay. And I'm going to interrupt you at this moment. I think at least for the time being we're done using the exhibits that are on those two easels. If you would set down the exhibits and move the easels out of the way so they don't obstruct the jury's view of you, you can return to the witness chair to continue testifying.

Sir, you mentioned that on October 12 an effort was made to search the Kildeer Avenue site, the more southerly of the two sites, for an unmarked grave?

A. Yes.

Q. Describe what efforts were done then on that date.

A. The site was secured after the search warrant was served. We engaged the county engineer to bring somebody down with a mower.

Q. I apologize for interrupting, sir. You mentioned after the search warrant was served. Upon whom was the warrant served?

A. On the owners of the property.

Q. And that's a farmer in the area?

A. Yes.

Q. Thank you. Please continue.

A. Because of some of the weeds and stuff between the curtilage area and the field, the county engineer was asked to

bring a mower down so we could mow off the top brush, and then a

search was begun of that area with the cadaver dog, and the ground-penetrating radar and the metal -- metal detectors were used some, and then Mike Hochrein was using a probe.

Q. What sort of personnel was out there?

A. There were officers from several different agencies, probably 10 or 15 people.

Q. Were either or any of those methods successful in locating a grave on that date?

A. Actually it would have been graves of some animals that had been buried out in the field.

Q. They found a grave, but there weren't any humans in it.

A. No.

Q. What was that?

A. I believe -- and Mike Hochrein could cover it in more detail. I believe it was some cattle or maybe some hogs out there that had been buried.

Q. Something that would be not foreign to an agricultural site.

A. That's correct.

Q. In any event, on October 12 a search of that Kildeer Avenue site was unsuccessful at least in finding any human remains.

A. Yes.

Q. Was there an effort to search the Lark Avenue site for a grave?

2366

A. Yes.

Q. And when was that conducted?

A. I believe that was started on the 12th, and again, there were kind of two areas done up there because the map was a little bit off. Rather than the driveway being south of the

railroad tracks, it was north of the railroad tracks. But everything else was pretty much in line.

Q. In line with what was on the hand-drawn map?

A. With what was on the map, yes.

Q. Personnel and equipment used on the Lark Avenue site included what?

A. Some of the same personnel were used, and the DEA agent Cavanaugh found two tires over a depression, and at that time it was -- cadaver dogs were brought over with -- they did not hit on that area, and then they used the ground-penetrating radar on that area. And later Mike Hochrein was brought up, and they began excavating that particular area or site.

Q. If we could bring up Exhibit 310, and that's -- is that the Lark Avenue site?

A. I can't see it very well on this screen, but I believe, yes, it is.

Q. Is there language on there referring to a pair of tires?

A. I can't read it off of what I have here.

Q. Well, tell us -- you mentioned a pair of tires. What did that refer to, Agent Smith?

2367

A. I believe there was some notations that they were under a couple of tires.

Q. That the bodies at the Lark Avenue site were under a pair of tires?

A. Yes.

Q. Okay. And that was a notation on the map?

A. It's my recollection that it was, yes.

Q. Was, in fact, a pair of tires found at the Lark Avenue site?

A. Yes.

Q. And were those tires then removed and the scene examined further?

A. Yes.

MR. MILLER: With the Court's permission, I'd like to publish at this time Exhibits 404 and 405 for which I believe there's no objection.

THE COURT: Mr. Spies, any objection to those exhibits?

MR. SPIES: No, Your Honor. I think the 400 series are admitted by stipulation.

THE COURT: Thank you.

MR. MILLER: Exhibit 404 then.

BY MR. MILLER:

Q. What does Exhibit 404 show, sir?

A. That would be the area where the two tires would have been

located. I believe from this map it should have been somewhere right in there.

Q. Thank you, sir. And Exhibit 405, what does 405 show, sir?

A. I think that's the same location, just back a little bit further.

Q. At a slightly different angle possibly?

A. Yes.

Q. And the location of the grave was -- and where the two tires were found before this photograph was taken was where?

A. Should have been right in this area in here.

Q. Would you just describe that terrain for the jury, please, a little bit? What's that area like?

A. It's a wooded area with a lot of brush cover on it. An old

driveway does go back in there. It looks like an area where people went out and maybe partied. There's a lot of trash and junk in that area, cans, bottles.

Q. After the tires were removed, was there anything that would indicate the possibility of a grave there, sir?

A. Other than there was a slight depression.

Q. What was done at that time, sir?

A. The scene was secured, then turned over to Mike Hochrein, and he took it from there.

Q. Did Agent Hochrein conduct some work at that scene?

A. Yes.

Q. For what length of time?

♀

A. Starting on the 12th, and he worked completely through the night till the evening of Friday, the 13th.

Q. So approximately day and a half or so?

A. About that time.

Q. Doing what?

A. Digging out the grave site.

Q. That was conducted entirely under Agent Hochrein's supervision?

A. Yes.

Q. After the grave site was completely exhumed and the evidence recovered there, I assume the crew packed up and left.

A. Yes.

Q. Did you subsequently return to that site, sir?

A. I returned the next week with three or four other DCI agents with metal detectors. And from a stake that had been placed in one corner of the grave site, we took a 30-foot radius of that stake and went over it with metal detectors.

Q. What were you seeking?
A. We were trying to see if there were any metal casings or lead bullets or anything.
Q. Exhibit 449, please. Showing the jury Exhibit 449 as it currently appears, is there any landmarks there that you can point to?
A. I believe down here would be the stake that would be on one of the corner of the graves we used as our center point.

♀

2370

Q. And if you can clear that, sir, at this time, Exhibit 449 is a 360-degree photograph showing the area in question. I'll ask that we begin showing that. And as we circle the area, would you please describe for the jury what they're seeing?

(Government Exhibit 449 was played in open court.)

A. This would be going actually towards the north. That's part of what's left of the -- looked like the old driveway or trail that was kind of used back in this little wooded area. As we go around more to the right here, we'll get into a farm field that's out there adjacent to this wooded area.
Q. When you were doing your metal detector search, I assumed you used some weed whackers to try to get down some of the brush?
A. Yes, we did.
Q. Did you, in fact, find any firearms components as you did your mental detector search, sir?
A. Not that had anything to do with this case, no. Found a lot of bottle caps, beer cans, pieces of barbwire, nails, shingles, particularly nails.
Q. Did it appear to be a bit of a dumping ground?
A. Yes.

Q. If we can halt it right there . . .
A. That would be the access back here coming back into this area.
Q. And the first red mark that you made, does that show a

roadway?
A. Actually that's the railroad tracks that are just to the south of there. That's actually the rail, but there's a road that comes in between the railroad tracks and this first line here that kind of comes around. That's actually a field access there.
Q. This portion of Exhibit 449 looks to the south?
A. Yes.
Q. Thank you. Please continue.
Halting it at this point, there's a vehicle in the background. Can you tell us where that is?
A. That would be on the hard surface road, Lark.
Q. Lark Avenue?
A. Yes.
Q. Thank you. Please continue.
Halting briefly, there appears to be a structure there. Is that a culvert?
A. I believe it is. There's a creek that runs through back there.
Q. And there's a culvert for it to pass under Lark Avenue?
A. Yes.
Q. Thank you. Please continue.
And the stake again appears. We've done the full 360.
A. Yes.
Q. How many people were out there working with those metal

detectors, sir?
A. That second week, there were about five of us out there.
Q. Again, unable to locate any firearm components that appeared to have any connection with this case?
A. Yes.
Q. Sir, on the 12th and 13th of October, did Agent Hochrein, in fact, exhume human bodies, human remains, from that location?
A. I believe he exhumed four bodies from that location.
Q. Did you make any efforts subsequent to that to further search the Kildeer Avenue site?
A. Yes.
Q. Describe that, please.
A. We'd had a couple meetings about redoing some more on the Kildeer site, and at first we were going to try to get Mike Hochrein and the folks with the ground-penetrating radar back. But due to some scheduling problems, that wasn't going to be possible, at least not until December or January, and that Mason City area up there, it's not a good time to be outside digging in December and January. So it was decided that we would go up before that.
So on November -- actually early November we made some plans to go back up there and look at the Kildeer site again.
Q. With what personnel and/or equipment?
A. At that time we decided to, again, try some dogs, and we also hired a backhoe operator and used metal detectors.

Q. Was the dog successful in locating any human remains?

A. No.
Q. Was the backhoe operator?
A. Yes.
Q. Describe that process if you would, please.
A. Well, we were up there on two separate days. I believe it was the 7th and 8th of November. On the 7th we used the dogs, and they were more or less out in the area where we had first been on the Kildeer site. Showed some interest in a couple areas but never really, what they said, hit on them.

So when we went out there on the 8th, it was decided to use the backhoe. That was our plan. And the backhoe operator went over at that time and started digging in those areas, and we found, again, some buried animals out there. The advantage of using a backhoe operator is we could clear a bigger area, take an inch or two of the soil off. And then he was able to see where the soil had been disturbed such as a couple of tiling projects that had come through that area.

About that same time one of the operators with the metal detector had found a trinket, a Scorpio medal, over one area on the Kildeer site, so we took the backhoe and scraped off a rather large area and then started working closer to where that metal had been found. And after two or three times of taking two or three inches off at a time, he came on a boot that was sticking up.

2374

Q. And after that boot was located, was the location treated as a crime scene and processed further?
A. Yes. At that time we took the backhoe away, and Agent Wade Kisner and a couple people from the laboratory who were there put a tent over the area. In fact, we put two tents over the

area and began excavating it with small hand tools.

Q. And on that occasion on November 8 of the year 2000, was a human body exhumed from that site?

A. Yes.

Q. And I believe you mentioned that was worked on by Special Agent Wade Kisner and others?

A. Yes.

MR. MILLER: Thank you, sir. I have no further direct.

THE COURT: Mr. Spies, you may cross-examine.

MR. SPIES: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SPIES:

Q. Morning, Mr. Smith.

A. Morning.

Q. Good to see you again. Mr. Smith, you've described for the ladies and gentlemen of the jury the location of the two sites that you, for lack of a better term, with Detective Wright conducted surveillance at, the Lark Avenue location and the Kildeer Avenue location.

2375

MR. SPIES: If I may approach with an exhibit, Your Honor?

THE COURT: You may.

BY MR. SPIES:

Q. Showing you --

THE COURT: Mr. Spies, can you either pull that microphone closer to you or wear one of the mikes? Which would you prefer? Mr. Spies, Mr. Rogers has his mike, so maybe you could wear that one.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2073 of 3636

MR. SPIES: Thank you.

BY MR. SPIES:

Q. Detective -- excuse me. Mr. Smith, you've described for the ladies and gentlemen of the jury the location of the two sites, the Kildeer Avenue site which -- would you describe the Kildeer Avenue site as being southwest of Mason City?

A. Yes.

Q. And similarly, the Lark Avenue site would be west and slightly south of central Mason City, Iowa?

A. That would be fair to say.

Q. Could you tell the ladies and gentlemen of the jury about how far those two sites are from the Minnesota border north of Mason City?

A. I'm sorry. I'm not familiar with that area. So I couldn't tell you.

Q. No clue.

2376

A. No clue.

Q. All right. Now, you've described for us, Mr. Smith, the manner in which the search of these two sites was undertaken. And as I recall, the Lark Avenue site where the four human remains were found was searched during the period of October 12 to October 13, 2000; correct?

A. Yes.

Q. And you returned to that site about five days later with metal detectors and searched that vicinity in about a 30-foot radius; am I right?

A. Yes.

Q. Okay. And next you went to the Kildeer Avenue site approximately November 8 and assisted in the examination of that

area.

A. Yes.

Q. Okay. Agent Smith, I have just a couple of questions for you. As you participated in the search of the Lark Avenue site where the four sets of human remains were found, did you actually assist in the search and assist in the excavation of that area?

A. No.

Q. You were there, as I understand it, in a supervisory capacity?

A. More as a liaison. We had located the place, and they came in with their technicians and their experts. We turned it over

2377

to them, let them . . .

Q. Now, during the excavation and the recovery of the remains at the Lark Avenue site where the four sets of skeletons were found, did you also observe the uncovering of two animal skeletons?

A. Yes.

Q. And from your observation of that site, was it your conclusion that those two small animals had been placed over the four human remains?

A. I think that was an assumption that was made at that time.

Q. And it was a conclusion that you reflected in your report --

A. Yes.

Q. -- about your inspection of this area; right?

A. Yes.

Q. During the search of the Lark Avenue site, did you uncover or did you see uncovered any barrels?

A. I don't believe so.

Q. And you told Mr. Miller in response to questions that were asked of you that you -- both during the time that you participated in the excavation of that site and then a few days later when you went out there with metal detectors you found no firearm components?

A. That's correct.

Q. And by firearm components, you mean spent bullets or shell

♀

casings?

A. There may have been a shell ca -- excuse me. I was thinking of shotgun casing. I don't think we found any at that time, but no, we didn't find any metal casings or any bullets.

Q. And bullets, of course, are the part of the firearm component that's expelled from the end of the barrel.

A. That's correct.

Q. And a shell casing would be the metal part of the cartridge that remains in the gun or is ejected from the gun when the gun is fired.

A. That's correct.

Q. And you found none of those in that 30-foot radius that you examined by metal detector.

A. That's correct.

Q. Next I wanted to ask you a couple of questions about the Kildeer Avenue site, and this was the site where you just described for the ladies and gentlemen of the jury where a boot was uncovered?

A. Yes.

Q. And that led to further inspection and excavation there; right?

A. Yes.
Q. Did you make any measurements of that site during the recovery of the human remains found there?
A. I personally did not. There were measurements made.

Q. Okay. And I think that you told us that as the backhoe operator went over that area that the backhoe operator uncovered some -- I forget the expression you used -- either some irregularities or some disruption of the soil?
A. That's correct.
Q. And that's what led to that being identified as a site that might require closer inspection?
A. That and the finding of this little medallion or medal.
Q. Correct. And did you reflect in your report summarizing the inspection of that site, that is, the Kildeer Avenue site, that the grave was about 4 feet, 11 inches long?
A. I believe I put that in my report. The exact measurements would have been made by Agent Kisner as far as grave site and depth and width.
Q. And again, did you find any firearm components in your inspection with metal detectors at that site?
A. With respect to metal detectors?
Q. Yes.
A. No.
Q. I know that there were some firearm components that were found in the grave itself; am I right?
A. Yes.
MR. SPIES: Thank you, Mr. Smith. I have no other questions.
THE COURT: Mr. Miller?

MR. MILLER: Your Honor, I have no redirect. However, with the Court's permission, pending ruling on another exhibit, I'd like the opportunity to recall the witness.

THE COURT: You may.

You may step down.

Ready to call your next witness?

MR. MILLER: Yes, Your Honor. The United States calls Michael Hochrein.

MICHAEL HOCHREIN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Please adjust the chair and scoot it up so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: My full name is Michael J. Hochrein. Hochrein is spelled H-o-c-h-r-e-i-n.

THE COURT: Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Good morning, Agent Hochrein.

A. Good morning, sir.

Q. Your occupation, sir?

A. I'm a special agent with the Federal Bureau of Investigation.

Q. How long have you been a special agent, sir?

2381

A. For approximately 16 years.

Q. What age a man are you?

A. I am 43 years old.

Q. Do you have general criminal investigation responsibilities as an FBI agent?

A. Yes, sir. As an agent, I'm responsible for investigating a variety of crimes or violations of federal statute.

Q. Where are you posted, sir?

A. Currently I'm in Pittsburgh division in Pittsburgh, Pennsylvania, a small satellite office about 80 miles east of Pittsburgh.

Q. In addition to general criminal investigation duties, do you have any special responsibilities with the Federal Bureau of Investigation, Agent Hochrein?

A. Yes, sir. I'm a member of the evidence response team for Pittsburgh division, and subsequent to that I was on the evidence response team for the FBI in St. Louis, Missouri.

Q. You mean prior to that.

A. Yes, sir.

Q. How long were you at the St. Louis office, sir?

A. Until 2003. I moved to the Pittsburgh office in November of 2003.

Q. When did these special duties begin, sir, for you in your career?

A. They began with the development of the ERT concept or

2382

evidence response team concept with the bureau back in the early to mid-1990s. So I began just as those were being developed in each division.

Q. Agent Hochrein, do you have any special background or education that particularly qualified you for membership on the ERT team?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2079 of 3636

A. Yes, sir. My formal education is in anthropology with a specialty in archaeology. And prior to being a special agent with the FBI, I was employed as an archaeologist.

Q. I want to go through that, but first tell us a little bit about what these subjects are. What is anthropology?

A. Anthropology in general is the study of man, and it is divided into several subdisciplines. Some of those subdisciplines or areas include physical anthropology or the study of the remains of man, the bones, the condition of the bones, description of those bones or other human remains.

Then you have other disciplines such as linguistic, the study of language; cultural anthropology, the study of man's culture or background; and then archaeology which is the study of man's stuff or things. We're interested in -- as archaeologists in recovering items that are associated with man including his remains and how they got to where we found them. And we're interested in three things. We're interested in the condition of those items, those artifacts or evidence. We're interested in space and time that they're found.

♀

2383

By condition, what I mean is, first of all, what is the item. We'll rely on a number of outside experts because we're dealing with everything that people might touch throughout their life. I may rely on the physical anthropologist if it's a bone to tell me whether it's human and possibly give me a description. If it's not human, we may rely on a mammalogist or a zoologist to help us tell us what species of animal it is. If it's a coin, we might go to a coin expert. So we use a variety of experts to determine what the condition and what the thing is.

The second thing that archaeology is interested in looking at is the concept of space. That object when we find it is in one space and one position and orientation when we find it. And that position in the ground or on the surface tells something about how it got there and what happened to it over time.

So as an archaeologist -- I'll give you an example. If I find -- let's say I'm doing an excavation and I find a coin and the coin is in the ground and it's oriented so that it's sitting on edge inside the ground. Well, I know that naturally when objects fall they'll fall and lay on a plane or a level or a surface, so there's some reason why we found that coin standing on edge, and that position is important to record so that we can determine how it got there and what happened to it over time.

♀

The same thing with human remains or other objects. Their position is critical. So archaeology is -- the key part of that is recovering the evidence exactly as it was found or as precisely as possible.

And the third thing we're interested in is time. What about that object tells us how old it is and how much time it may have spent in the position that we found it?

Q. And would you please describe for us what formal education you've had in the fields of anthropology and archaeology.

A. In 1982 I received my bachelor of arts degree in anthropology with a specialty in archaeology from the University of Pittsburgh. Immediately after that I entered the graduate program for anthropology at the same university, University of Pittsburgh. And later on I also entered a second master degree

program in criminal justice. Before I could complete the graduate degrees, I was hired by the FBI and relocated to St. Louis, Missouri, so those degrees are still pending.

Q. How many years did you pursue graduate studies in the field of anthropology and archaeology?

A. From 1982 to 1988 is when I left the program to enter the FBI.

Q. And either prior to or in addition to work that's done in this area on behalf of the Federal Bureau of Investigation, do you have any other employment history in this field?

A. As a graduate student, we were asked on one occasion to

assist the Pennsylvania State Police in a 22-year-old homicide in locating the human remains and excavating those remains. And then throughout the graduate -- the student process, the reason it takes so long is you're exposed to different field work. So we would travel across Pennsylvania and in other areas of the eastern United States to work on prehistoric and historic excavations.

Q. In addition to field work, did you have any actual formal employment in addition to that of the FBI?

A. Yes, sir. I was employed by the Cultural Resource Management Program within the University of Pittsburgh to work on excavations that were impacted by the construction of pipelines or highways. I was also employed by the Carnegie Museum of Natural History as an archaeologist to examine artifacts and laboratory and also to work on historic excavations.

Q. And did you have any teaching duties with respect to either of those positions?

A. Yes, sir. I was a teaching -- graduate teaching assistant, and we would also -- I would also lecture outside the university for different organizations.

Q. You've already described for the jury the fact that prior to joining the FBI you were involved in one field work experience consulting with a homicide investigation in Pennsylvania?

♀

A. Yes, sir.

Q. Okay. Is that what got you interested in law enforcement, or did you have a previous interest there?

A. That was the episode or what took place where I realized I could apply the discipline of archaeology to law enforcement and have a practical application for archaeology.

Q. And what is that practical application, sir?

A. That is the use of archaeology to help reconstruct a crime scene and specifically a buried crime scene.

Q. The recovery of human remains?

A. Yes, sir, as part of it.

Q. Describe for us, please, any training that you have in the particular area of recovery of human remains.

A. Annually or biann -- every other year I attend the master's death conference in St. Louis. We also have done our own research in the area of recovery techniques for human remains, for buried human remains specifically. And as a result of that, we have also put on training courses both in the St. Louis FBI and for the FBI academy in the recovery of human remains, not just buried human remains but also those that are found on the surface, those that are found on mass disasters.

And I've had the opportunity to teach at Mercyhurst

Archeological Institute in Pennsylvania, the FBI academy, the University of Tennessee, Knoxville anthropology facility which in popular -- in the press is more well known as the body farm.

And I've also traveled internationally to teach as part of terrorism crime scene courses the recovery of human remains in the context of explosions or mass disasters.

Q. Do you also teach these areas within this country for regional, state, and local law enforcement?

A. Yes, sir, for a variety throughout the midwest and also in Pennsylvania.

Q. Have you done any formal research and publication in the field, Mr. Hochrein?

A. Yes, I have, sir.

Q. Would you summarize that for the jury, please?

A. That research again is devoted mainly to recovery techniques, in what we call geotaphonomy. It's a fancy word for what conditions or characteristics of a grave itself helps us tell how that grave was constructed and what happened to it over time before and while the body and after the body has been put into the grave.

Q. In summary, you are both a criminal detective and an archaeologist.

A. Yes, sir, in a sense. Archaeology is very much very similar to crime scene processing. The goal of archaeology is to recover evidence in context and let the evidence speak for itself, and you have one shot at it because once you recover that evidence, you can never return it to the way it was originally found, and that's the premise in archaeology is that

once you open up an area and start to excavate, you can never go back. You recover the evidence as it is found.

Now in a forensic situation or a situation that deals with a crime scene, there are certain things we look at that a traditional archaeologist may not look at, things such as tool marks. In graves that are more recent, you may have the impression of the type of tool that was used to construct the grave, and it may not be a shovel. Some people have used crowbars. Some people have used hubcaps, et cetera, to excavate the grave, and that's important because that goes to helping us understand how much intent went into making the grave.

The other thing we may look at is did the grave in a forensic context, did that grave sit open for a period of time before the body was put into it. For example, did someone dig a grave anticipating that they were going to kill someone and put it in the grave and the grave sat open for a period of days, a rainstorm occurs and washes sediment into the grave before the body is put into there?

An archaeologist who's trained in geotaphonomy or looking for those features may be able to tell you that something happened to cause sediment to form beneath the body before the body was placed into it. And we'll locate other things like shoe prints or fabric impressions. If an individual kneels down alongside a grave and law enforcement discovers the grave soon after the body is placed in that grave, sometimes

2389

you'll have impressions from the knees or the fabric still present on the ground, and we'll record those and cast that

information.

Q. There's a lot of detail that an archaeologist, a trained archaeologist, looks for that an ordinary crime scene processor might not?

A. Yes, sir, because in traditional archaeology you're dealing with sites that are much older, and typically that sort of evidence, perishable evidence, disappears after a period of time.

Q. You've described some of the objectives, what things you're looking for in a grave excavation itself. Can you describe for us some of the procedures and considerations that go into actually locating a grave?

A. Yes. Before we can actually begin that recovery, we have to find the grave. So the first part of archaeology is the search or location of the site. And we start with what we call less intrusive and work to more intrusive.

What that means is that we'll start with a technique that will have -- do less damage, the least damage possible, to locating the grave. So, for example, we may combine nonintrusive techniques like using a cadaver dog or a dog that's trained to detect the scent of human decomposition. And we may combine that with more sophisticated techniques like ground-penetrating radar or infrared thermography.

2390

Now, ground-penetrating radar is a technique where -- it's much like sonar in the ocean where a signal is sent down and is reflected off a surface or an object back to the machine and then an image is created. And if you're qualified to interpret that image, you can tell where the surfaces are or if there's a disturbance or some object which is causing that

image.

In ground-penetrating radar we're doing the same thing. We're sending a signal down through the layers of soil, and it's reflecting off the different surfaces. So if I have a pit or a grave, the radar will go down, and it will pick up that difference between the soils in the disturbed grave versus everything around it that hasn't been disturbed.

Infrared thermography works in a way in which we're looking for the difference in heat between the grave and the undisturbed areas around it. So, for example, even in an old grave -- and we've used this on prehistoric sites -- when you dig a grave, you can never put the soil back in the same way or when you dig a pit. What happens is over a day or weeks the sun will send heat down into the soil, and it will be absorbed differently in the grave from the areas that aren't disturbed around it. And then when it's reflected back up, that signature can be detected by different types of equipment.

So these are the sorts of techniques which are called nonintrusive and we're trying to narrow -- these don't tell us

♀

that there's a grave or a pit there. It only tells us that there's a disturbance that's causing something that might be a grave or pit.

We'll also combine that with just simply walking through looking for pieces of bone, material, or other evidence that we believe is associated with the body.

The next phase is to become a little bit more intrusive, and we'll use simple tools such as a soil core sampler which is nothing more than a big tube which takes out a plug of soil, and we can visually examine it for differences in

that disturbed fill in the grave and the undisturbed fill, and we can also look for things like pieces of bone. We can look for pieces of fabric, and that gives us another clue that we have possibly a grave in that area.

After that, the next phase is just systematically opening up a small area to determine if we do, in fact, have remains there. And after that we would do a full excavation if we determined there were, in a case of a buried body, human remains.

Q. And if you do, in fact, find what you determine to be a human grave site, can you just very briefly summarize the procedures if there are any standard such as to how you go about that task.

A. Yes, sir. The normal protocol is to first set up a system whereby we can diagram and photograph the evidence we find. And

we typically do that by establishing a grid system using pins and string across the area we're going to excavate. That does a couple things for us. That allows us to measure, take measurements, of the evidence we find while we're doing our excavation and to take those measurements in three dimensions, not just in a plan view or a bird's eye view but also so that we can look at it in side view or profile.

It also gives us a scale so that when I look at a photograph or show you a photograph, you will be able to get a general idea of the size of the piece of evidence that we're looking at based on the size of the grid system.

We match this up -- once the grid system's in place and while we're doing that, we also take photographs. We take notes, and we do a sketch of the scene. And there's a certain

redundancy or repetitiveness in the -- those procedures. And that's intentional because if I, for example, forget maybe to tell the scribe or whoever's taking the note of a certain feature, it may be depicted on the diagram, and if for some reason it's not on the diagram, it may be on the photograph. So we're just ensuring that we have covered the possibility of recording all the evidence at the scene in some format before we leave.

Q. What sort of personnel and equipment is used in the actual excavation of human remains at a crime scene grave site?

A. If we have enough people, we'll generally assign an

2393

individual to be a scribe or a note taker. We will have no more than -- in the teams that we've formed in St. Louis, no more than two excavators at a time because a lot of the excavation is based on how the soils feel and look, and if we switch people in and out, they're not as familiar with the person who started the excavation.

We'll have a photographer or a number of photographers. We'll have an evidence collection person so that once I collect the piece of evidence it's handed over to the evidence collector who packages it, and then we have site scene security people and whoever else we deem necessary.

Q. Agent Hochrein, is it fair to use the term forensic archaeologist in connection with your work?

A. Yes, sir.

Q. With respect to your duties as a forensic archaeologist with the FBI, did you become involved in a missing persons investigation in the Mason City area in the year 2000?

A. Yes, sir.

Q. What was your first contact with that investigation, sir?
A. It was on or around October 6 of 2000 that I was in St. Louis, and the team got a call from the Omaha division of FBI asking for assistance and that they had developed some information on the possible location where there may be some buried remains.
Q. What happened next as far as your involvement, sir?

A. On October 11 myself and one or two others of the St. Louis evidence response team travelled to Mason City, Iowa, where we met with local, state, and federal investigators, and we were briefed on the background of the case before we went then out to look at the various sites.
Q. How many sites did you visit that day?
A. That day we visited one of two sites that we were made aware of, and that site was located at Kildeer Avenue. I believe that's southwest of Mason City.
Q. I'd like you to describe for the jury what you did that day, but first tell us what you had in the way of resources, both personnel and equipment, to try to locate a grave at the Kildeer site.
A. Yes, sir. As I spoke before, we try to incorporate as many techniques as possible that we have available. And on that day the FBI laboratory made available to us a ground-penetrating radar team of two technicians and ground-penetrating radar equipment. We also had available -- and I'm not certain who arranged it, but a cadaver dog was made available to look over the site.
Q. What's the theory behind the use of a cadaver dog?
A. Again, the cadaver dog is a dog that is trained in

discovering human remains based on the scent of decomposition.
Q. With the use of both the ground-penetrating radar and the cadaver dog, what, if any, results did you obtain on that date

at the Kildeer site?
A. Well, the problem was we found too much. On Kildeer Avenue site, we found locations where we had not only skeletal material revealed but buried skeletal material, and the ground-penetrating radar found so many anomalies or possibilities of pits that we decided to pick what appeared to be the most promising. And that was a site that -- where we put a soil core down through and came up with some bone. When we did our next phase or our test excavation, it revealed the remains of a cow or a calf.
Q. An animal burial pit.
A. Right, a nonhuman burial. It was toward the end of the day, and we decided that where we would leave that site is to map it in, record where we had done our work and where certain skeletal material had been found, and then we decided to move to the second site.
Q. That was still on October 11?
A. Actually that began on the 12th. We finished up the mapping at the Kildeer Avenue site on the morning of the 12th.
Q. And as of the morning of the 12th, efforts at the Kildeer Avenue site were at least thus far unsuccessful in locating a grave.
A. Yes, sir. No human remains were found at the location; only buried nonhuman remains.
Q. And the next efforts were continuing on the 12th of October

of the year 2000. You searched the Lark Avenue site for a grave.

A.    Yes, sir.

MR. MILLER: Your Honor, we're going to move into another subject matter, and this might be an appropriate time to break for the morning.

THE COURT: Thank you. It would be.

Members of the jury, it is about 11 after 10. We'll be in recess for 25 minutes. Please remember my standard cautionary instruction about keeping an open mind until you've heard all of the evidence in the case. And we'll be in recess. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated just for a second. I want to revisit the notes/Crawford issue. I did have a chance to look back on my original ruling. And one of the things I'm going to want you to address at the end of the day is I reserved ruling on whether or not the 801(d)(2)(E) co-conspirator hearsay exception would apply to the maps and to the notes as well because I wanted to hear the evidence at trial with regard to the conspiracy. I've now I think heard all of the government's evidence in that regard.

I think the problem still lies that I identified in my ruling, and that is there's more than sufficient evidence to find that Dustin Honken and Angela Johnson were co-conspirators.

2397

The problem is that Mr. Honken had gone to jail in '98, gone to federal prison in '98, and so in 2000 when the maps and the notes were created, I think it's going to be a stretch for the

government to convince me that it was done in the scope of and in furtherance of the actual conspiracy. It certainly is concealment which is an exception to the 80 -- which is part of a co-conspirator -- it could be co-conspirator hearsay. But that concealment has to be in furtherance of the actual conspiracy. Once this conspiracy ends and a co-conspirator engages in concealment, it's no longer 801(d)(2)(E).

Are you willing to concede that point right now, or do you want to just argue it later on tonight?

MR. WILLIAMS: I'm willing to concede that point right now. We will withdraw any submission under 801(d)(2)(E).

THE COURT: Okay. It'd be a great exception for you, but I don't think you have the evidence to support it.

MR. WILLIAMS: We agree.

THE COURT: Because the conspiracy clearly came to an end prior to that.

MR. WILLIAMS: Certainly on the evidence we've presented in this trial, yes, Your Honor.

THE COURT: Okay. And that's all I have is the evidence in this record.

MR. WILLIAMS: That's right.

THE COURT: Okay. So we won't be addressing that

2398

issue. We'll just have to look at the Crawford issue and the Bruton issue.

Okay. We'll be in recess. Thanks.

(Recess at 10:14 a.m.)

THE COURT: Ready for the jury?

MR. MILLER: Yes.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Miller, you may continue your direct examination.

MR. MILLER: Thank you, Your Honor.

BY MR. MILLER:

Q. Agent Hochrein, you told us that you proceeded from the unsuccessful Kildeer Avenue search to the Lark Avenue search on the 12th of October in the year 2000.

A. Yes, sir.

Q. If we may pull up Exhibit 401 -- I believe that's been previously admitted -- what is Exhibit 401, Agent?

A. This is an overall aerial photograph of the vicinity of where Lark Avenue is. If we can orient this -- okay. It's correctly oriented. If we can zoom in on this area here, that's the -- that's -- what we try to do on any crime scene is get a view from the most distant and work our way in to give you a close-up view of the evidence.

So just to get you oriented, we're here zooming in on that last aerial photograph to this section at the intersection

of Lark Avenue which runs north and south in this direction and the railroad right-of-way. This is the area where we would -- we were directed to by the background of the investigation or what the investigators had told us where a possibility of human remains might be.

Q. And if we can just zoom back out to the overall view of all of 401 for a moment, I would like you, please, to step down and using Exhibit 1, the map of the area, just make sure that the jury is oriented as to the aerial photograph and the map.

THE COURT: Mr. Spies, if you want to move over, any other of the defense lawyers, feel free to.

A. Let me stand over on this side. Okay. In this aerial photograph, again, we were zooming in at this intersection, Lark Avenue, and the railroad right-of-way. That matches up to this area of the line-drawn map which is referred to by arrow as 1500 block Lark Avenue. This is the railroad right-of-way, and this is Lark Avenue oriented north-south.

Q. Thank you, sir. Now if we can pull up Exhibit 408 -- excuse me, 406B.

A. Okay. If we can orient this, turn it 90 degrees clockwise.

Q. Thank you. And Exhibit -- go ahead and describe for the jury what location on the map they're looking at.

A. Okay. On the map again, this is another close-up as we zoomed in before, a little better detail of that intersection between Lark Avenue and the railroad right-of-way that the

investigators led the crime scene team to. There's Lark Avenue, and there's the railroad right-of-way.

Q. And 408 is a diagram that's leaning against the jury box. I believe it's been previously received in evidence. If you could put that up and orient the jury as to how 408 and 406B on the screen relate to one another.

A. Okay. Again, just as we used the photographs to bring you in closer to the crime scene, this is a line drawing that we prepared based on measurements we took with a transit and surveying instruments. We took measurements, and this is the line drawing that was prepared. North-south Lark Avenue is running here. This is the Chicago, Milwaukee, St. Paul, and Pacific Railroad right-of-way. And this depicts an access route, this access route into the scene that preexisted us going there. This road was already there, but it was used by

investigators to get into the scene.

This is that wooded area that you see up in the area. And if you look, you'll see a faint, in the photograph, blue area. That's the tent or shelter that was erected over the excavation at the point that this photograph was taken. And I believe that photograph was taken on the date of excavation on November 13, the following day, as the excavation was going on.

That covers this area, and this is our grid system. It's a system of one-by-one-meter squares, and a meter is a little over three feet. So these squares are set in that

2401

position after we determined where we wanted to conduct our excavation.

Q. I believe you can take those down off the easel now and move the easel over and return to the witness chair.

MR. MILLER: And then if we can pull up both of those on to the screen, Mr. Williams, that might be easier.

Q. Please describe that terrain for the jury.

A. This is described generally as a flood plane. You have Crane Creek which is running under Lark Avenue to the northwest of the excavation site. Here's our excavation area. And this terrain is generally flat, although it drops in elevation from Lark Avenue. And then it flattens out along the creek, and in general I would describe it not as a cultivated field but as a partially wooded area that over time was used to discard of trash. If you were to walk across this area, you'd find things such as cans, bottles, glass, broken glass, miscellaneous debris that over time people have just dropped in that area.

Q. Even shotgun shell casings and the like?

A. Yes. Things typical of hunting in the area. For example,

you might find shotgun shells, just a variety of evidence that someone typically might drop on the ground or intentionally dispose of their trash in that area.

Q. You've already indicated that it was in that location that you've already circled where the grave was discovered.

A. Yes, sir.

♀

Q. And you use the term in your field clandestine grave?

A. Yes, sir.

Q. What's that term refer to?

A. Clandestine simply refers to a secreted grave, an intentional -- an intent on hiding the grave from someone. It's not a legitimate grave as you would find in a grave yard but something that's hidden or secreted.

Q. And describe for the jury how that grave was located.

A. That grave was first located based on information developed by the investigators who, as I understood it, knew that there were possibly tires associated with this site.

While we were at the Kildeer Avenue site and I believe it was shortly after we broke for lunch, we were advised that two tires were found in this general area where eventually the excavation would be. Based on that then we brought in the same techniques we used at Kildeer, a cadaver dog and the ground-penetrating radar. The cadaver dog showed no interest in the site, and that's not unusual. Sometimes cadaver dogs will find bodies. I've also seen dogs that have successfully found a body under 20 feet of water miss a body that they walk by on the surface. I don't know how to explain it.

But in this situation the cadaver dog did not find the site, but it was located not only by the tires but by the

ground-penetrating radar found an anomaly or a -- something different in the soil beneath surface that indicated there was a

pit or some sort of feature there that was causing a disturbance.

Q. If I can interrupt you, in addition to the ground-penetrating radar, were there any surface indications that it may be the presence of a grave in addition to the two tires?

A. There was also -- if I looked at it we would see -- or if we were there we would see a subtle depression at that time indicating that there was some sort of feature causing the soil around that area to settle in differently from the undisturbed area around it.

Q. And if we can bring up Exhibits 404 and 405, looking at Exhibit 404, what does that show, sir?

A. This is a view looking roughly toward the west. And when we arrived at the site, the tires had been moved, but my understanding from the investigators is that they were located somewhere in this area and that they were just to the west and a little bit south of some hog pen wire, a bale of hog pen wire that you can very faintly see in that area.

Q. And what did you do at that location then when you arrived, sir?

A. At this point we moved into the next phase as I talked about, the more intrusive part of the search, where we inserted a soil core sampler or a tube that extracted a solid core of soil. And we compared it with soil cores that we took outside

the grave. And we could see right away that there was a difference, that the soil in the soil core did not have layering that you normally see in undisturbed soil. Also there was a little bit of bone in the soil core itself. So that gave us an indication that something was buried at that spot. So we then moved to the next phase which is opening up a small area so that we can actually see what's causing that disturbance and causing skeletal material or bone to be in the soil core.

Q. You previously described that as a test excavation?

A. Yes, sir.

Q. If we could pull up Exhibit 409 which I believe has been already received in evidence, what does Exhibit 409 show, sir?

A. This is a picture depicting the test excavation or a small systematically excavated pit down to determine if we do have in this case human remains or type or evidence of burial. It's approximately 15 inches by 15 inches, again, minimally intrusive. We're doing as minimal amount of damage as possible because we wanted to recover that evidence, as much of it, as precisely as possible. So we're only opening up enough area where I can move a hand tool, a trowel, to excavate the soil away from whatever is buried underneath.

Q. How deep did you go with that test excavation if you recall?

A. I would have to refer to my notes, but I believe it was about seven to nine inches.

2405

Q. And what, if any, findings did you make at that time?

A. When we excavated that area, we did find skeletal or bone material.

Q. Did you make any other findings at that point?

A. We determined that the bone material, originally it was that of a small animal, and originally we thought that this might be a dog or a cat. It was determined that that, in fact, was a possum. And now I learned something being a city slicker that I never understood, but possums, they don't hibernate during the winter. What they do is they will find a burrow or a log or something, and they would hold out the cold weather by going in, lining the burrow with leaves, and then that's how they keep warm during the winter.

Well, originally we thought when we saw that that was a small animal remains and we thought it might be a dog or a puppy or something, we thought, well, dogs don't burrow, and maybe because we had dug a test pit we had eliminated the outline of a small pit in doing that test excavation. So we thought, well, maybe someone had dug out and placed this small animal, this dog if it was a dog, there.

Well, when the results came back that it was a possum, it made more sense. We weren't seeing an outline of a pit dug into the grave later on because there was none. What we were seeing is a burrow that came in this direction, and the chamber for the burrow was where the possum remains were found. And

♀

2406

also in this area we had leaves, dried leaves, and that was explained by the habit that the possum has of lining the abandoned burrow with leaves.

The other part -- the other nonhuman bone material that was in this test pit was determined to be a shrew. Now, the relationship between the shrew and the possum may be his food. A possum is a scavenger, eats carrion or dead animals.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2100 of 3636

The shrew may represent a last meal. We don't know that for sure. But there was a combination of possum bones, shrew bones. And then as we uncovered the leaf material, then we found evidence of human bones.

Q. Because of that finding, I assume you undertook a formal full excavation at that point.

A. Yes, sir. At this point and when we had uncovered the upper torso or the collarbones, the clavicles of a human and then the part of the mandible or the lower jaw, that's when we knew for certain that we had human remains, and that's when we decided to do a full excavation where we systematically open up a large area going level by level and trying to determine -- not only to uncover the remains but also to determine how they were put there or the shape of the grave and other associated evidence.

Q. Exhibit 410, please. What is Exhibit 410, sir?

A. In this view you're looking directly down into that test pet, that 15-by-15-inch approximately square test pit. This

♀

item here is a nonhuman bone, other nonhuman bones. There's part of one that you can see here. Here's another one.

Okay. And then this material here is the stitching, the synthetic stitching, of some sort of garment, some sort of piece of clothing. And then all of these bones in this area are human representing the thoracic area or the upper chest area of a human being.

And then this debris here, this item, these pieces here, those are all pieces of dried leaves or vegetation that we determined later were caused by the possum lining that burrow when they went in.

Q. Where was that possum burrow in relation to the human remains?
A. The burrow or the -- leading up to the chamber, the chamber sat directly over this area from what we can determine, and the burrow entered in at this direction.
Q. And that was burrowing or animal activity?
A. Yes.
Q. Exhibit 411, please. What is the jury viewing now in Government Exhibit 411, sir?
A. Okay. This is further on in the excavation where we've decided -- we've established our grid system, and we've uncovered -- we're working down into the grave. This is plastic which lines -- were preventing dirt from falling into those remains that we've already exposed, so this would be plastic

that's covering those human remains you saw in the last shot. This is what I mean by an indication of what we're looking for in terms of the shape of the grave and its orientation. The difference between this undisturbed or relatively undisturbed soil and the soil inside the grave gives us an indication that the grave is running in this sort of direction. Based on that, we can then enlarge the grid system so we can do a further excavation and systematically take it down to expose the remains.
Q. You began this formal excavation process at approximately what hour and date if you recall?
A. I believe it was early to late afternoon. I'm not certain of the exact time, but it was the afternoon of the 12th.
Q. And you continued that process for a period of about how long, sir?

A. The total excavation lasted 36 hours. And our practice is is that once we begin an excavation and open up an area we don't stop and then come back the next day. We work and continuously work on it so that we can avoid any subtle changes, weathering, or et cetera of the bones.
Q. And before we move on and discuss the actual exhumation of human remains, does this photograph 411 show anything, at least anything you can describe to the jury, as to the location of the animal activity that was above the body?
A. Yes, sir. As we spoke before, the chamber to the burrow

would have been in that location. When I talk about the burrow itself, you might hear me refer to what's called a crotovina. Now, that's another fancy word that geologists have come up with to explain a burrow that's abandoned and has filled in, either collapsed in on itself or sediments have washed into it. You can faintly see -- if you notice the pale discoloration between these two red lines that I've drawn, that's what is typical of a crotovina or an infilled burrow. And these are typical in archeological sites of all ages. We run into them all the time because animals will typically burrow across sites over time. So that's called a crotovina, and it's leading into the chamber where those nonhuman remains were found.
Q. Any indications whatsoever that that is anything other than natural animal activity?
A. No, that's all natural.
Q. Agent Hochrein, you mentioned the considerable length of time that you spent out there. What did you have in the way of personnel and equipment to do this job?
A. We had numerous people, both federal, state, and local.

You can see in this photograph we've got a light source so that we could excavate once it got dark. The tent was erected to keep weather out and media out, the view of the grave while we were working. We had generators. We had people who were occupied by screening. Once this fill is removed, we then take it, and it is screened by other individuals to ensure that we

don't miss small pieces of evidence. Things like finger bones or phalanges are very small, and a lot of times they'll look like little pieces and bits of rock, so you want to make sure that you don't accidentally excavate those. And by screening, you recover them, and you can at least say that they came from this approximately three-foot-by-three-foot area and to a certain depth.

Q. Documentation of the process consisted of what, sir?

A. The process as I was excavating, we had an individual who was a scribe, and they would take notes. So if I encountered a certain feature or something that I felt was significant, then I would relay that to them, and they would write it down. Photographer throughout the process would take photographs of the excavation.

Q. And this work was all done under your supervision, sir?

A. Yes, sir.

Q. How did you go about doing the excavation, sir?

A. The excavation was -- no heavy equipment was involved. What we used is we used the smallest, least-destructive tools that we have to uncover the remains. And that would consist of in this case a combination of hand trowels, masonry trowels, the smallest type, that are sharpened so that they can cleanly cut through the soil and then smaller items that we can clean away

the soil from the remains.

In addition to that, then we have a vacuum. And we

vacuum -- once we loosen the soil, we vacuum it away from the remains and from the edges of the grave if we can see that. And that helps us because we're -- if, for example, we found a tool mark, for example, we are not affecting that tool mark. We're simply loosening the soil from it and then vacuuming it away so we can then cast the tool mark if we can find them.

Q. If I can interrupt you briefly, if we could put up Exhibit 412, does Exhibit 412 illustrate some of the process that was conducted by yourself there, sir?

A. Yes, sir. This is a picture looking down into the excavation, and what I'm doing here is gently cleaning the soil and roots away from the uppermost individual or individual number 1. The excavation of individual number 1 took 24 of those 36 hours because of the amount of root activity that was running through the body and literally sewing it to other individuals beneath it.

Q. 413, what does Exhibit 413 show?

A. This is an image of -- you see some of the tools we used, root clippers, scissors. Here's a trowel over here. And then this is the vacuum. This is treated like an evidence vacuum where it's cleaned after every excavation, and the fill goes through here, and then it's collected in a large container. It doesn't go through any fan blades or anything like that that could damage it. It simply goes in, and then that material is taken to a screen of quarter-inch and in some cases 16th-inch

mesh where we look through it further for small items in the event that we accidentally vacuumed a loosened piece of evidence.

Q. And Exhibit 414 shows what, sir?

A. Here again is further excavation of individual number 1. This is a small plastic implement that I'm using to loosen the dirt so I don't damage the remains. And the goal in archaeology in general and forensic archaeology is to locate as much evidence and not find it on the screens but actually find it in the excavation so that we can map it in three dimensions.

So here you see -- this is the hipbones of individual number 1. These are actually pockets, and we're trying to work around those pockets so that we keep them in the position that they're found. These are the pocket linings of the pants he was wearing or the individual was wearing. You'll see in here -- I would have to check the notes, but that might be a button or a coin. Again, when we find it, we make every attempt to keep it in the position it was.

Q. It's apparent you uncovered human remains, sir. Just one set of human remains?

A. No, sir. There were a total of four individuals in this grave.

Q. You've prepared some diagrams that would assist in describing the relative position and location of the remains?

A. Yes, sir, I have.

2413

Q. Before we look at those diagrams, can you just tell us in your own words what the positioning of the bodies was, sir?

A. There were four individuals, as I said. The first individual or the individual number 1, the uppermost individual,

was oriented with his head toward the -- I believe the east, his feet toward the west. He was laying on his back or that individual was laying on his back and directly above individual number 2 who was positioned same orientation, with the head towards the east, feet towards the west but laying on belly or face down.

Fourth individual was smaller than the other two individuals.

Q. Excuse me. Perhaps the third?

A. I'm sorry, the third individual, excuse me, was below, directly below individual number 2, same orientation, head to the east, feet to the west. And then fourth individual was the smallest of all the remains, and that individual was at the bottom of the grave beneath individual number 3.

Q. Agent Hochrein, what I'd like you to do for the jury is to utilize both the diagrams that you prepared and the photographs that were taken in describing individual by individual what your findings were at the scene as you conducted this forensic exhumation. I believe the easiest way for us to do that would be to ask you again to step down and to put up on the two easels the two diagrams that you prepared, Exhibits 415 and 451. And

2414

first if you would simply identifying for the record what the exhibit number is describe for the jury what these two exhibits show.

A. To our right we have -- to the jury's right we have Exhibit 415. That's a plan view or a bird's eye view of the remains as we -- based on measurements we made as we did the excavation.

To your left is Exhibit 451 which is a profile based on those same measurements. Remember we're dealing in three

dimensions. So this allows us to reconstruct what the remains would look like if we cut that grave in half and were looking in towards the side of the grave in profile.

Q. Both of those exhibits were prepared by yourself based upon the documentation done at the exhumation?

A. Yes, sir. And the way we do that is -- I'll get you oriented. The top of these diagrams unless I turn them will always be north as represented by the north arrow. These lines, these solid lines, are our grid system that you've seen in some photographs. Each of these little symbols is a convention we use in archaeology to represent the stake or the pin that we tie the strings that represent these lines to.

Now, when I spoke of a crotovina, this is the position of that crotovina coming into this dashed line area which represents our test excavation. This dashed line is our actual excavation, and then this dotted line represents the approximate orientation of the grave itself. Because these soils were very

♀

difficult to excavate -- they were very loose, gravelly -- they weren't -- typically if a body is buried in a clay soil, it will hold the tool marks, and you'll be able to define a shape much better. This was a little more difficult. So although at the outset we could determine a grave edge, as we excavated in, we had to become more arbitrary in our excavation, and you'll see it's a little more square than the real grave actually probably was.

Now, these numbers help us, again, to orient myself and yourself. What they represent is -- I'll explain this. We do our measurements in time at one point before we leave a site, and we refer to that as our datum or point of origin. So all

these measurements we would take throughout the excavation relate to this point that is referred to on the diagram as 00. What these numbers mean is a distance from that point. So 0W1 designates that we're not moving north or south off of our point of origin. We're moving west. So W1 means that we have moved one meter west but no meters north or south of our point of origin. As we move across, 0W2 would mean we haven't moved north or south but we've moved two meters west. And as we move up into the exhumation, 1W1 would mean that we've moved one north and one west.

Now, in archaeology, the convention is that if I collect evidence and don't -- let's say we miss it, but it's picked up on the screens. We can at least say that it came from

this one meter or about three-foot-square area and all the evidence we referred to as coming from whatever the southwest designation of the grid system is.

So if I found evidence in this three-foot-by-three-foot area, I would label on or have the evidence collector label that it came from unit 0W2 because 0W2 is the label in the southwest corner of that grid square. So that's to explain what the grid system is and how we do our mapping.

To get the third dimension, we'll stretch a string out from this -- the top of the stake which represents this point. We'll level that string, and then we'll measure the distance down to whatever piece of evidence we're measuring, and now we can reconstruct a diagram such as this where we can look at it in side view or profile.

Q. When you say this, you're referring to 451.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2109 of 3636

A. Yes, sir.

Q. And again, just for the sake of keeping a clear record that's being made by our court reporter, when you do refer to a specific exhibit, if you would also try to mention the exhibit number, it will keep our record clearer.

A. Yes, sir.

Q. Before we look at any photographs, I think you've already indicated that the posture of this individual number 1 was on his back?

A. Yes, sir.

Q. Did you happen to identify any clothing or personal effects associated with individual number 1?

A. Yes, sir. We could determine that the individual was clothed. And that's based -- if you look at figure 415 or Exhibit 415, he was wearing one sock -- or two socks. He had one shoe on, his right shoe. And then as I explained before, these are the actual pocket linings, but along this, there were a number of fibers, and what those represented was the stitching in his blue jeans because the natural fibers, the cotton fibers, had decomposed and rotted away. But the synthetic fiber like the stitching in his jeans stayed there. So in these photographs that we might see in a bit, you'll see things that look like roots. They're not all roots. Some of those are the stitching from the pants.

In the same vein, he had a shirt on because we found that sort of stitching in the area of his torso which indicated that he had a natural fiber shirt on with some sort of synthetic stitching.

Q. Any other clothing associated with that particular

individual?

A. In the -- in the mouth partially outside the mouth was a green fabric which I recognized as a sock, and then the other fabric if you would call it that, if you can see in figure -- or Exhibit 451, was a silver metallic tape which I recognized as

♀

duct tape wrapping around his eyes and partially wrapping the green sock that was in the mouth.

Q. Any footwear?

A. Footwear included that one shoe on individual number 1's right foot.

Q. And any personal effects associated with it that were not clothing?

A. We also found a wallet, and that wallet on both of these exhibits is represented by the number 59. That's evidence item number 59. Other items that were associated with this individual included a ligature or a piece of rope that tied his left and right wrists together.

Now, this individual was on his back, but his left arm was extended down behind the back, and then his right arm came up at an angle, and they were connected by a rope which appeared to me to be clothesline-type rope from this wrist to the wrist behind his back.

Q. If we can look at Exhibit 416 now, please if you would for the jury, is this -- first of all, was individual number 1 an apparent adult or child to your observation?

A. In my experience even though I'm not a physical anthropologist, I recognized that as an adult skeleton.

Q. What does Exhibit 416 show, sir? And feel free to refer not only to the photograph but to the diagrams as well, but if

you do so, please make the record clear as to what exhibit you

are explaining.

A. Okay, sir. If we can orient Exhibit 416, turn it 180 degrees, okay, even though you're looking at it upside down, I wanted to turn it that way so it would match Exhibit 415, the diagram.

Okay. Here again is the pocket linings in this position. Here's that ligature that ran from his wrist, his left arm or individual 1's left arm which is along his side, behind his back. And his hand, his left hand, is in this position, and then his right arm is at an angle. It's actually projecting up towards us.

If you look at Exhibit 451, the profile, you get a better idea of the orientation of those arms. Here is the left arm down along the side and behind the back, and here's the right arm that goes down deeper into the grave and then up, so it's actually positioned up, and then the hand bones would have been found above where the wrist would be on that individual.

The wallet or evidence item 59 which appears on the two exhibits before you was found behind the right hip of the individual. And then across the lower upper legs or the femurs, there was a root that extended immediately across those bones across the entire grave. That is referred to as item 34 on both of these exhibits before you.

Q. What, if any, significance was that to you as an archaeologist, sir?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2112 of 3636

A.   Well, as I talked about before, we rely on outside experts to help us reconstruct these graves.  And in this case through my experience, I understood that a botanist could help determine the age of that plant.  It took a certain amount of time for that root to grow across the remains, and that might help us determine how long the remains were there.

That root that was recovered, item number 34, was determined to have grown to the size we found it through 4 growing seasons, so at least 4 years had gone by for that root to get to that size.

So now we know that this individual number 1 and the individuals beneath that individual had to have been there for at least four years.

Q.   Possibly more.

A.   And likely more because the root, remember, it has to -- that root would eventually -- if we refer to Exhibit 415 again, this symbol refers to the bush that you saw in some of the subsequent or previous photographs.  This -- that root which is item 34 extended across here and then eventually was part of this bush.  So it took more than four years for the root to grow out from the bush and across the remains.  So all we can say from the root itself is that over the position of the body it took four years to grow to that size, but it took even longer to grow out from the bush.

Q.   So those bodies were interred at least four years prior to your excavation.

A.   Yes, sir.

Q.   Anything inconsistent with a figure of seven years?

A.   No, sir.

Q. That would be perfectly consistent with what your finding was?
A. Yes, sir.
Q. Anything else on Exhibit 416 before we move on that is of significance?
A. Just to orient you further, if we looked at the profile which is Exhibit 451, this again is the depth to which our test pit went, approximately seven to nine inches. And here again, it is over here. The crotovina would have come in this direction or from the east.
Q. Crotovina again being natural animal activity?
A. Exactly.
Q. Exhibit 418, what does 418 show, sir?
A. Exhibit 418 is a close-up view of the wallet I spoke of or evidence item number 59. Now, earlier I had talked about one of the things we look at is space and position. This is a good example of that because this wallet was found sitting on edge almost. Well, we know that if it had fallen on a horizontal surface it wouldn't have been in that position. So this was an indication to us as well as its position behind the right hipbone of the individual and the fact that we had found rivets

♀

2422

from the jeans in that area that it was probably in the rear pocket and that the hip of individual number 1 was rested against that -- that was the grave edge. That would have been the edge of the pit that he was laying against.
Q. Exhibit 419, what does 419 show, sir?
A. Okay. 419 is a close-up view of individual 1 or the uppermost individual's feet. And what you're looking at is we're standing -- if I can refer to Exhibit 415 again, we are

standing at the west edge of the grave looking down towards the feet.

Now, also in these photographs you might see -- the second individual begins to appear and also the third individual. These bones are related to individual number 3. These are the lower legs and feet of individual number 2.

One of the things that you'll notice in these photographs is there's no soil in between the individuals. That's indication to us as archaeologists that their deposit was about the same time. There wasn't a deposit of individual, they were covered up by soil and then someone came later and put in a second individual or a third individual. They were all put in there about the same time is what that is consistent with.

Q. Exhibit 420 shows what, sir?

A. Okay. Here is a close-up view. If we can orient Exhibit 420 90 degrees clockwise. Okay. Here we're standing -- if I can refer to diagram or Exhibit 415 again, we're standing at the south edge of the grave looking across the excavated feet of individual number 1. And in this photograph you can see the bones of individual number 3, and also I'd like to point out that in some of these walls you'll see small individual episodes or what we call lenses of soil. That's consistent with the fill when it's put back into the grave being deposited in small amounts. If, for example, someone had used heavy equipment to fill in this grave, we would expect to see the fill all a consistent color or a modeled color. But these lenses or these individual episodes of filling back in is indication that a smaller instrument was used, perhaps a shovel, perhaps hands to fill in the grave.

Q. And looking closely at the shoe and sock, is there any indication of a ligature on the right ankle of individual number 1?
A. Yes, sir. In this area we have a ligature that appears to be with the sock.
Now, this is a good example of where we -- when we did note taking that we have to combine not just the notes but also the photographs and the diagrams because in my notes, because the socks partially covered or mostly covered this ligature, it was not immediately apparent to me. But it was picked up in the photograph, and later on it was noticed.
Q. Exhibit 421, what does 421 show, sir?
A. Okay. If we can turn this photograph 90 degrees clockwise.

Okay. In this photograph you're standing about this area or the lower pelvis -- I'm referring to Exhibit 415 again -- and you're looking down into the excavated portion of individual number 1, and we're looking at his left -- his right wrist which is elevated away from the body, and we've removed the rib cage and other bones in his chest area, and you can see that the ligature is attached from the right wrist to the left wrist. These are the hand bones of the left hand, and the ligature goes around the left wrist of individual number 1.
Q. I believe you indicated that the cord connecting the two wrists passed behind the back of the individual?
A. Yes. Again, you're looking at the excavation after we removed the rib cage and some of the spinal cord -- or I'm sorry, the spine itself. So with all that taken off, you're seeing the ligature as it laid behind the back of individual number 1. These bones, this skull and this silver material,

will be individual number 2, and this is the shoulder blade of individual number 2, and this is a bra strap associated with individual number 2.

MR. MILLER: Your Honor, with the Court's permission, I'd ask the Court inquire if everybody on the jury can actually see the screen okay past the tripods.

THE COURT: Are you able to see it over the tripods? Okay.

MR. MILLER: Apparently there's one of the jurors

who's having difficulty with that. I want to make sure we see them all.

THE COURT: Who's having the difficulty? Raise your hand. I bet that solves it.

Thank you, Mr. Miller.

MR. MILLER: I just want to be sure that the jurors at both ends can see okay if the Court would inquire on --

THE COURT: Can everybody see okay? Okay. Okay. Thank you.

MR. MILLER: And I apologize for not correcting that sooner.

BY MR. MILLER:

Q. Exhibit 422 shows what, sir?

A. Exhibit 422 is a close-up photograph of individual number 1's skull as removed from the grave before it was packaged. What we wanted to represent here is the green material which I recognized as a small sock, and the silver material is duct tape or what I recognize as duct tape.

Q. What was done with the human remains recovered at this site, sir?

A. Our protocol is that once I removed the remains, we transfer them up next to the grave. We have a sterile or a sheet that's fresh out of packaging, and we lay the remains out on the sheet as they were oriented in the grave. So, for example, this individual was laying face up. We would take the

♀

bones up and place them face up in the orientation and position they were in the grave. And then any other evidence that's found, for example, if they find additional bones while screening, those are packaged, and then they are individually packaged, put with these remains, and then the remains are wrapped in this sterile white cloth.

The next thing we do is then we wrap that in plastic, and then we initial, date, and then it's packaged and ready to go to the medical examiner's office.

Q. To the best of your ability, each of the bodies is individually collected and packaged?

A. Yes, sir.

Q. Exhibit 423, please, shows what, sir?

A. This would be what I spoke of, of individual number 1 laid out on this white sheet. And we make no attempt to clean the bones at that point or to examine the remains to any real extent at the site. We want to simply as quickly as possible transfer them from the grave up to this sheet so that they can be wrapped with other associated evidence, and then the further examination will be done by the medical examiner in his or her office.

Q. 424 shows what, sir?

A. This is that second wrapping where now we've taken that sterile cloth. We've carefully wrapped the bones in their original orientation, and then we've put all our identifying

information, the feature it came from, the level it came from,

the date and time it was collected and who was involved in that process.

Q. Agent Hochrein, I'll hand you what is marked Government's Exhibit 400 which I believe there's no objection and has been received in evidence and ask you if you would, please, display it to the jury and describe for them what this is.

A. Okay. Based on the notations on the package and what I recognized while doing the excavation, this is the billfold or wallet that in Exhibits 451 and 415 is represented by the item number 59. And it consists of the wallet and then the contents of that wallet, and those contents include a driver's license for Gregory James Nicholson, an Osage Farmers National Bank card, and another card labeled emergency identification card, Nationwide Legal Services, Bikers Against Manslaughter.

Q. The exhibit there is not in exactly the same condition it was when you retrieved it from the site.

A. No, sir. When I retrieved this, it was -- everything was inside the wallet. The only thing that was removed because it might help us in identifying the individual was the driver's license, and that was done by another individual, not myself. There's also a comb that was associated with this wallet.

Q. In its current condition, Exhibit 400 shows the wallet and the contents removed from that wallet.

A. Yes, sir.

Q. Thank you, sir. I'll now hand you what is marked

Government's Exhibit 501 and ask if you would -- first I believe

this is also without objection been received in evidence and ask that you please display it to the jury and describe for them what this is.

A. Okay. Again, based on the packaging and in that it looks similar to what I remember excavating, this is the ligature or the clothesline-type material that we found during the excavation that was tied around the left and right wrists of individual number 1.

Q. You can set that on the table, and if we can see Exhibit 425 at this time on the screen, what does 425 show, sir?

A. This is a general view again of the excavation in process. Again, here we have the grid system that you'll see in the diagrams and various photographs. That helps me to explain to you the size of this excavation. Here we're facing north or we're standing -- if I can refer to Exhibit 415 again, we're standing on the south side of this excavation looking across the grave towards the north. You also see some of the additional equipment, the tent structures, the lighting that was used and tarps that were used to protect the excavation from weather.

Q. Agent Hochrein, after you completed recovery of individual number 1, collecting it, and packaging it, you continued with further excavation process.

A. Yes, sir.

Q. I believe diagram Exhibit 426 is on the floor in front of

2429

the jury box. What does 426 show, sir?

A. Exhibit 426 is a diagram that was prepared by myself based on measurements that we took at the excavation, and this represents the position and orientation of individual number 2 or the individual that was immediately under individual number

1.

Q. Please describe that position and orientation.

A. Individual number 2 who appeared to me based on my experience is an adult may -- an adult human was faced face down or belly and torso down with the head facing towards the east, feet facing towards the west. If I can refer to Exhibit 451, in profile, this is the position of the second individual laying beneath individual number 1. Again, there's no fill in between the two individuals which is consistent in my experience with artifacts or evidence being deposited about the same time.

Q. Did you observe and document any clothing, personal effects in connection with individual number 2?

A. Yes, sir, and referring again to the various exhibits, this individual had a synthetic material, sweatpants on. This individual was also associated with one shoe, two socks that were worn on both feet. The shoe was off the foot and laying in between the two feet.

Individual, because we had fibers, synthetic fibers, in the area of the torso, was clothed with some sort of shirt or some sort of natural fiber garment, and then this individual had

2430

a bra on which is represented by these straps, and then this individual also had a silver tape or what I recognized as duct tape wrapped around the head.

Q. Before referring to any bindings or ligatures and just with regard to the clothing, I think you've made a distinction already a couple times between synthetic and natural fiber garments. What is that distinction in your work?

A. A synthetic material is something like polyester or rayon or some other man-made material that is of a composition that

won't break down as quickly as a natural fiber material like cotton or wool. So when I refer to the fact that we see synthetic fibers but no shirt, that's an indication to us that that shirt was made out of cotton, wool, flack, some sort of material that's natural and will decompose quickly when buried in these conditions.

Q. You've also indicated that as with individual number 1 individual number 2 had a single shoe.

A. Yes, sir.

Q. And that was associated with which foot?

A. I'm not sure that I can say because -- I would have to look at my notes whether we matched that up, whether it was right or left.

Q. That's fine. We'll catch up with that later.

In addition to the clothing, did you observe any bindings or ligatures in connection with individual number 2?

2431

A. Yes, sir. This individual exhibited bindings represented on Exhibit Number 15 -- 415 and 451 as item number 67 which were in the areas of her left -- of that individual's left and right wrists. Individual also had ligatures around the left and right ankles.

Q. Were those ligatures connected to each other?

A. Yes, they were, sir, and they again were similar to the ligatures on individual number 1 in that I recognized them as clothesline-type material.

Q. And I don't want to quarrel with you, but does your documentation really specify whether or not they're actually connected?

A. I believe -- I'd have to refer to my notes again one more

time.

Q. The ligature on the wrists, can you describe any more detail the orientation of that or not?

A. This individual, again, was laying on her belly or on the -- chest down, and this individual's left arm was extended across her abandon or chest, and her right -- the right arm was extended down along her side. The ligatures were found in the area of the right wrist.

Q. And extended --

A. Toward the left wrist.

Q. But not actually -- at least when you exhumed it actually attached to the left wrist?

♀

A. I don't recall that they were attached.

Q. Did you make any determination as to the position of the ligature as far as whether it passed in front or in back?

A. They were in front of this individual's body. Again, her left arm was in this position, right arm along the side, and the ligatures were running between these two.

Q. Were there any additional bindings in addition to the ankle and wrist ligatures?

A. Not that I recall.

Q. With respect to the individual's head area, did you find anything foreign to the body that's not in the nature of clothing?

A. Wrapped around the skull was a material that I recognized as duct tape.

Q. If we can show Exhibit 427, what is Exhibit 427, sir?

A. Okay. This is a photograph again with -- looking down into the excavation with individual number 1 removed off the top of

individual number 2. That photograph correspond -- that photograph in Exhibit 427 corresponds with the diagram in Exhibit 426. So in the photograph we had the feet oriented toward the west, head toward the east. And you're standing above looking slightly north in the photograph, and in the diagram or Exhibit Number 426 you would be standing down here looking down into the grave.

Q. Now, with respect to the head area, you've indicated that

there was some duct tape on this individual as well?

A. Yes, sir.

Q. Can you point that out?

A. This silver material is what I recognized as duct tape wrapped around the skull.

Q. Now, you found with regard to individual number 1 what you identified as a green sock underneath the duct tape. Were you able to actually make a determination with respect to this individual as to whether or not there was anything underneath the duct tape yourself while you did that?

A. Yes, sir. This individual also had a green sock in the mouth area.

Q. Covered by the duct tape.

A. Yes, sir.

Q. Exhibit 428, what does Exhibit 428 show, sir?

A. This Exhibit 428 shows a view of -- close-up view of individual number 2's feet where you can see the ligature attached to the left ankle and another end of the ligature tied around the right ankle of this individual with a shoe in between the two feet.

Q. Or in any event a ligature around each ankle.

A. Yes, sir.

Q. And does this photograph assist you in identifying whether that's a right or left shoe?

A. That would be the right shoe.

♀

Q. And again, just to be sure that the jury is oriented, can you show with regard to the diagrams where -- what's shown by Exhibit 428?

A. On Exhibit 426, the diagram of individual number 2, you would be standing or looking down into the grave from this location in this direction. So we would have -- she's on her face, on her belly, so this would be her left foot and leg and her right foot and leg, and the shoe would be in the middle of the feet.

Q. Exhibit 428 is currently rotated 90 degrees to the left. Does that show it in the same orientation as appears in your diagram?

A. Yes, sir. If that helps, that's -- the photograph is now oriented the same as the diagram.

Q. And what did you do with respect to the second individual?

A. This individual, like the first, was -- carefully the soil and any roots and other material that was covering her was -- this individual was removed. And once cleaned and photographed, then those remains, like the first, were taken from the grave, positioned on a sterile cotton sheet, and wrapped and packaged as we saw before with individual number 1.

Q. If we can look at Exhibit 430, what does 430 show, sir?

A. Exhibit 430 is a photograph of individual number 2 as removed from the grave and laid out on that cotton sheet. This exhibit shows -- again, this individual was facing face down.

Skull is here, arms. This is the ligatures here, and this is all associated evidence that was either found in the grave or found on the screen in association with that body.

Q. Now, as you collected these remains, sir, if I remember my high school biology, there's 200 plus bones in the human body. Am I remembering correctly?

A. Yes.

Q. After several years' decomposition, those bones I assume are not necessarily physically connected to each other anymore.

A. No, sir. And the physical anthropologist can speak to this. But the bones, the ligaments, and the other softer tissue will decompose over time, so these bones are individual from each other. They're not necessarily connected.

Q. So I take it then you were not able to physically remove that body, that skeleton, in one piece to place it on that sheet. Can you describe the process for us, how you managed to arrive at this -- what we see in Exhibit 430?

A. Yes, sir. The remains were picked up and moved in sections. If we could carry the entire torso section and remove it carefully and then put it on the sheet, we would do that. Items such as the arm bones or in some of the other individuals the leg bones which were not connected, they would be lifted out separately to avoid breaking them or damaging them and then laid out in the approximate orientation that they were found in the grave.

2436

THE COURT: Mr. --

A. I'm sorry.

THE COURT: I'm sorry. Why don't you finish your answer.

A. Some of the bones as the hand bones, we made a decision not to individually map each finger bone. Instead we collected as much of the hand bone as we could in association with that body in one mass and then packaged those and put them with the remains.

THE COURT: Mr. Miller, I'm going to give the jury a stretch break. We've only got about 15 minutes to go till lunch. They've been sitting for quite a while.

Okay. Thank you. Please be seated.

Mr. Miller, thank you.

MR. MILLER: Thank you, Your Honor.

BY MR. MILLER:

Q. I have just a couple more photographs and one exhibit to identify with this particular individual at which point it might be, although a few minutes early, an appropriate lunch break.

Sir -- and if we can call up Exhibit 429, and what does Exhibit 429 show?

A. Exhibit 429 is a close-up view looking at that individual number 2 on the sheet. This is a close-up view of the ligature on I believe the left wrist. These would be the left hand bones. This would be the left wrist. And this was the ligature

2437

found in association with that.

Q. And that's the ligature that I believe that's on the diagram 426 that was found on the left wrist extending down toward the right wrist?

A. Right. Again, individual number 2, her left wrist or arm

is across the body. Right arm is extended down along her side, and this ligature would have been attached in the area of the wrist or appeared to be attached in the area of the wrist and then headed towards the right arm and hand.

Q. And I'm going to hand you now what is marked Government Exhibit 601 which I believe is already received in evidence and ask if you would please identify this for the jury and show it to them.

A. Okay. This I recognize from the packaging, and it appears to be the same item that I excavated which is attached at the left wrist and extending down towards the right arm or wrist, the clothesline or the ligature-type material.

Q. And the fact that it's still intact and not totally disintegrated indicates what as to the material it's made from?

A. That would indicate that it has a greater composition of synthetic material than if it was entirely made of a natural fiber.

Q. Exhibit 431 shows what, sir?

A. This is individual number 2 as she -- as prepared for the medical examiner. This is after the cotton sheet has been

2438

wrapped and she is subsequently wrapped in plastic and labelled.

Q. And you referred to it as "she." In any event, was it identified as being an adult as opposed to a child?

A. Yes, sir. These remains were later identified as an adult female.

Q. And the procedure with regard to all four of the remains was the same I assume as far as the collection and the packaging procedures involved.

A. Yes, sir.

Q. And what was done with these collected remains after they were packaged, sir?
A. The remains were immediately handed over to Division of Criminal Investigation, Iowa Division of Criminal Investigation, agents that were on scene and as I understand were then transferred to the medical examiner's office.
Q. Agent Hochrein, I want to move on next to the area of the recovery of the third individual.

MR. MILLER: And if this would be an appropriate lunch break, Your Honor?

THE COURT: It would be. Thank you. Members of the jury, we'll take a -- I think we'll take 55 minutes and be in recess until 12:45. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated. I'm turning for a second to the jury instructions we've been working on.

2439

Mr. Williams, have you had a chance to come up with a list on the impeachment instruction?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Other than that, is there anything else we need to take up? Mr. Spies?

MR. SPIES: Nothing from the defense, Your Honor. Thank you.

THE COURT: Anything else from the government?

MR. MILLER: Just informational, Your Honor. Mr. Spies advised me this morning that he at least as of early this morning did not anticipate lengthy cross-examination on this or probably the other witnesses I'll be calling today. I have two witnesses here this afternoon, and we have a couple

physicians coming first thing Monday morning. We are on schedule and do anticipate closing on Tuesday, but in any event, I would anticipate an early day today.

THE COURT: Okay. Thank you. Okay. We'll be in recess. Thanks.

(Recess at 11:52 a.m.)

THE COURT: Ready to have the jury brought in?

MR. MILLER: Yes.

MR. SPIES: Yes.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Miller, you may continue with your direct

2440

examination.

MR. MILLER: Thank you, Your Honor.

BY MR. MILLER:

Q. Mr. Hochrein, before we move on to the recovery of the third individual's remains, I just want to cover a couple matters to make sure I'm clear on these. The grave itself after your 36 hours or so of exhuming all 4 bodies was of approximately what dimensions?

A. From what we can tell in reconstructing the shape of this grave, it was about six and a half feet long, two and a half feet wide and about -- it was no deeper than two and a half feet deep at the time we excavated it.

Q. And the tool or tools used in the creation of the grave, did you form an opinion to the nature of such implements?

A. Yes, sir. In my opinion and in my experience, the dimensions of the grave in that it was only two and a half feet deep combined with those small lenses or those individual

deposits of small amounts of soil back into the grave indicated to me that large equipment or heavy equipment was probably not used with the reasoning that if you did have such a shallow grave but heavy equipment why would you dig it so shallow, and those individual deposits back in indicate to me that hands, shovels, some small type of implement was used to deposit the soil back into the grave.

Q. Hand tools such as a shovel.

A. Yes, sir.

Q. And secondly, you visited with the jury regarding these animal remains, but I want to be sure I'm very clear on that. When you first discovered the animal remains, did you know what kind of an animal you had?

A. No, sir.

Q. And did you have a preliminary hypothesis as to what you might have at that point?

A. We hypothesized that they were small, that they could be possibly a dog, a cat, a small animal that size.

Q. Possibly something even deposited by a human?

A. Yes, sir. You have to understand originally when we opened that small area you're looking at a 15-inch-square area, and our thinking was that if this was a small animal such as a pet, as a dog, puppy, cat, those aren't burrowing animals, and if they were placed in the grave, someone may have dug a small pit on top of the human remains and placed this dog, cat, or whatever it might be in the grave.

When the results came back that these were, in fact, possum and shrew bones, then it made sense. The reason we weren't seeing an outline of a small pit, we did not obliterate

it. It wasn't there. What happened is the possum, as I explained before, in its wintering habits to stay out of the cold, it will find an abandoned burrow, a log, something, a hole of some sort, go into that burrow or that chamber, line it with

dried leaves, and then it will winter out or stay there until the weather gets warmer. It doesn't hibernate there. It just stays there until it gets warmer.

Q. And in this case apparently it died a natural death during the winter.

A. As far as -- there was no -- the results, there was no indication of trauma to the animal bones, so there was no indication it died a violent death I guess.

Q. But it was bones of a possum and the skull of a shrew

A. Yes, sir.

Q. And not the bones of a dog or cat or other pet.

A. No, sir.

Q. And again, natural animal activity, not human activity.

A. In my opinion, yes.

Q. Moving on then, after collecting and packaging the remains of the second individual, the adult female, you continued to find additional human remains below her body --

A. Yes, sir.

Q. -- I think you've already indicated. If you would, please put diagram 434 on the easel. And if you have your microphone on, please feel free to go ahead and step down to do that.

What is Exhibit 434, sir?

A. Exhibit 434 is a diagram that was -- that I drew based on measurements that we took as we excavated, continued further down in the grave the excavation. This is a diagram of --

referring to Exhibit 434 of individual number 3. This individual was smaller than individual numbers 2 and 1 which were directly above this individual.

In referring to Exhibit Number 451, the third overlay or transparency depicts this victim in profile or looking at a side view based again on the measurements we took as we excavated the site.

This individual was laying face down on his or her belly. The head of individual number 3 was directed towards the east, feet towards the west, and this individual was directly beneath individual number 2. There was no soil or significant amount of soil between the two individuals which is consistent with this individual being deposited in the grave about the same time as the other individuals.

Q. What clothing or garments did you observe?

A. In the exhibits before you, both Exhibits 434 and 451, this individual appeared to have what appeared to be a dress, a small -- I have daughters, and I recognized it as a sun dress, a type of sun dress, and there were also panties or underwear associated with this individual beneath that you could see beneath the sun dress around her pelvis or hips.

This material was also synthetic or mostly synthetic in that it survived decomposition, and it was completely over the body, so this individual was clothed in this dress at the time of the burial.

♀

Q. Now, the prior two individuals you noted ligatures and bindings. Did you find any such with respect to individual

number 3?

A. No, sir. We found no ligatures or bindings with this individual.

Q. Did you find any obvious sign of trauma, however?

A. Yes, sir.

Q. What?

A. In the back of the skull of this individual there was a single circular hole or defect which in my experience I recognized as a possible bullet hole.

Q. Exhibit 433, please, what does Exhibit 433 show the jury?

A. 433 is a photograph standing on the west end of the grave, so if I'm referring to Exhibit 434, the diagram, you would be standing on the west side of the grave looking across the excavation.

Just to orient you again, these grid lines match up in the diagram to these grid lines, representations of the grid lines. This is our excavation, and we're looking down into the excavation at individual number 3. Now, individual number 3 in profile, this is the way she looked or this individual looked, and this individual was directly beneath individual number 2.

Now, one of the things that happened in that we were collecting hand bones in group in order to save some time is that individual number 2 or the -- what we recognized as the

adult, the hand from individual number 2, the left hand, was in the position or on the hand of individual number 3, the number 3 individual. So consequently, some of those bones became commingled or were collected together. Individual number 3's hand bones were collected with individual number 2.

Q. And you didn't make an effort to try to separate them by

individual, leaving that up to the pathologist or forensic anthropologist?

A. Exactly. Inasmuch as I'm not a physical anthropologist, that would be up to the medical examiner. We collect as best we could in association with that the rest of that body, but that happens often in archaeology where you may get some commingling.

Q. And do you have some experience in mass grave work, mass disaster?

A. I studied it. I've read mass grave work. I haven't actually been involved in the excavation of a mass grave, for example, the ones in Europe or in Asia or Africa.

Now, in terms of mass remains, my experience has been -- I was assigned to work in the Oklahoma City bombing, the World Trade Center after 9-11 and the crash of Governor Carnahan's airplane where we had three individuals in that crash site. That's an example -- not a burial, but that's an example where you have remains commingled. It's typical to get remains from one individual mixed with another.

Q. And that particular task at least in part you leave to the

2446

forensic anthropologist or pathologist?

A. Yes, sir.

Q. Exhibit 435 shows what, sir?

A. Here we have a bird's eye view or a planned -- plan view photograph looking directly down on to individual number 3. If we can take that photograph and turn it 180 degrees, it will match up to the diagram where we have the legs and feet at the west end, the head is at the east end, and this material is that dress or garment that was being worn by individual number 3.

Q. You recovered individual number 3 from that grave, sir.

A. Yes, sir.

Q. In the same manner that you've previously described as to the other two victims.

A. Yes, sir. She was lifted as completely as possible, placed on another clean cotton sheet that was taken right out of the package, wrapped. Any remains that were -- or evidence that was found in association with that skeleton was then packaged and placed with those remains, wrapped again, and labelled and set to the side for the medical examiner.

Q. Now, you've described a sun dress and some undergarment. Was there any other clothing at all observed on this, or was that it?

A. I believe that was it.

Q. No shoes or socks?

A. No shoes or socks. Now, one of the phenomenon that happens

♀

2447

in a mass grave or where you have multiple victims in a grave is as you get further down or you get more remains together, preservation will be a little bit better of soft tissue and other items like hair, for example. So on this individual there was also a significant amount of hair that was excavated around the skull area because you're moving -- you're moving into an area where there's less oxygen getting to the remains, less what we call anaerobic activity which increases the rate of decomposition. So this individual was -- had more intact or better preservation than the individuals above her.

Q. The deeper the body, the slower the decomposition.

A. Generally, yes.

Q. Exhibit 439, please, shows what, sir?

A. This is a photograph of individual number 3 laid out on the

sheet as you saw with the other individuals, any associated evidence placed with that individual before the individual's wrapped up and packaged.

Q. And based on your experience, did that appear to be an adult or a child?

A. In my experience that appeared to be what we would refer to as a subadult or a juvenile.

Q. And Exhibit 440 shows what, sir?

A. This is a photograph of individual number 3 packaged and ready to be shipped to the medical examiner's office.

Q. You mentioned that there were four victims. After

excavating the third, did you proceed immediately to excavate the fourth?

A. Yes, sir. As soon as we lifted off -- and you may have noticed in previous photographs -- the fourth individual was discovered immediately underneath individual number 3.

Q. And go ahead if you would, put up diagram Exhibit Number 442 for the jury. And what does Exhibit 442 show, sir.

A. Okay. Exhibit 442 and the last diagram that's part of Exhibit 451 show individual -- or the fourth individual, the bottom-most individual, in the grave, and it's a diagram based on measurements I took during the excavation. This individual, again, the head is oriented towards the east. The feet are oriented -- if we look at profile in 451, are actually in a -- what I refer to as like a frog-like or squatting position. That's caused -- when we talk about position again, that's caused by those feet being up against the edge of the grave. This is an indication of where the grave stopped because if she had -- if this individual had been further out, it's more likely

that that individual would be extended. But the legs were drawn up in almost a frog-like or squatting or a fetal position.

This individual had clothing associated with her which included a bathing suit. It also included a -- what I recognized as a T-shirt or sleeved T-shirt which was pulled up over the head with the arms, the right and left arms, trapped into the sleeves of the garment or the shirt. This individual

2449

was also laying on its back with the face oriented towards the south.

Q. But lying face up.

A. Face up, yes, sir.

Q. Were there any ligatures or binding on this individual?

A. No, sir.

Q. If we can see Exhibit 441, please, Agent Hochrein, what does Government Exhibit 441 show?

A. Photograph which is Exhibit 441, you're standing -- if I can refer to Exhibit 442, the diagram which corresponds to the photograph, you are standing at the west side of the grave looking across the excavation. Here again are the grid lines which are suspended across the excavation. We've removed individual number 3, and you're looking at the remains of individual number 4 towards the west end of the grave.

Just to get you oriented again, this individual is directly beneath individual number 3 with individual number 4's head in the abdomen or belly of individual number 3. Individual number 3 is immediately below individual number 2 with her head or this individual number 3's head beneath individual number 2's abdomen or belly. And then individual number 1 is laying directly over individual number 2.

Q. Exhibit 443, please, Agent Hochrein, what does Exhibit 443 show?

A. This is a more bird's eye view of individual number 4 where

you're looking more directly down over top of her. If you refer to Exhibit 442 again, those strings, these lines that represent the grid system, you're looking at this intersection, and here are the remains looking down into the pit. And thank you. Now we've oriented the photograph so it's the same orientation as the diagram. So here's our intersection of lines, and this is the remains. And this is another -- this is an example why we try to match up the diagrams with the photographs because in these excavations, typically over time the color of clothing, bones, et cetera, will start to match the soil around it. So the photograph may be difficult to see, and that's why we add the diagram.

Q. Bones and garments tend to take on the color of the soil around it over time?

A. They'll become what we call stained through exposure to the soils and the chemicals in the soils.

Q. No shoes or socks with this victim either.

A. No. This individual had no shoes, socks, and the only clothing found associated at the time of excavation would have been the swimming suit and the shirt pulled up over the head.

Q. Exhibit 445, please. And what does Exhibit 445 show us, sir?

A. This is a photograph of individual number 4 laid out in the same basic orientation as the individual was pulled out of the grave and associated material that was found with the

individual.
Q. And again, is this an apparent child as opposed to an adult?
A. In my experience this is a small skeleton, and the clothing also would indicate that it was a child.
Q. Exhibit 446, please. What does Exhibit 446 show?
A. This is the fourth individual after the remains are wrapped and prepared for transport to the medical examiner's office.
Q. Agent Hochrein, I'm handing you what I believe has already been received in evidence as Government Exhibit 800 and ask if you can identify it for us and then please show it and describe to the jury what it is.
A. Okay. This is -- I recognize this as the bathing suit that was on individual number 4. This is not packaging that we would have packaged at the scene, but I do recognize that pattern as the pattern and the size and general type of garment that was worn by individual number 4.
Q. And except for the fact that it's been mounted and packaged, it appears --
A. Yes, sir.
Q. -- and, of course, the fact it's no longer on a child's body --
A. When I saw this, it would have been on the body.
Q. Thank you, sir. You can set that down now, and again if you want to resume the witness chair.

♀

2452

Work at the scene was completed approximately when, sir?

A. It was completed late on the 13th of October after approximately 36 hours of excavation.

Q. All four bodies after being packaged were transported to the medical examiner's office for further forensic analysis?

A. Yes, sir. My understanding, there were DCI agents there that it was handed to. At one point there were also representatives from the medical examiner's office who came out to look at the excavation.

Q. And packaging and transportation was done at least to some degree under their direction I take it.

A. Yes, sir.

MR. MILLER: Thank you. I have no further direct, Your Honor.

THE COURT: Mr. Spies? Thank you.

CROSS-EXAMINATION

BY MR. SPIES:

Q. Good afternoon, Mr. Hochrein.

A. Good afternoon, sir.

Q. I have just a few short questions for you, and I think we'll be done with your examination. You've described for us the locale, the vicinity in which you did your investigation in Cerro Gordo County, Iowa. Do you know the approximate location of that vicinity in relation to the Minnesota border?

♀

2453

A. I'm not certain of the exact mileage. I'm sorry, sir. I don't know the exact distance.

Q. All right. Now, you've described for us the dimensions of the grave in which the four individuals were found as being approximately six and a half feet long by two and a half feet wide and two and a half feet deep. I know that you described

for the jury this morning some of the techniques that were used in the investigation of clandestine graves including ground-penetrating radar, and I think you also described some thermal imaging techniques that can be used?
A. Yes, sir.
Q. In the use of the ground-penetrating radar or in any other manner during your excavation of this site, were you able to determine a configuration or a shape of this grave?
A. No, sir, I did not have those results available to me at the time. That is -- that's a technique where the images are taken back to, in our case, the laboratory and examined. The -- and it's not like a photograph. It's not an exact depiction of the dimensions. It's just -- you get an approximation of the size of whatever feature.
Q. Now, I understand in examining the report that you prepared in connection with your investigation that the nature of the soil was such that you couldn't see clear lines of separation between the fill that was used in the grave and the undisturbed soil outside the grave?

A. Yes, sir, not throughout the entire excavation. At the uppermost levels, it was clear. As you worked down into the grave, the nature of the soils, the color, the texture became so mixed and since there was such time involved, it was hard to distinguish between the grave edge and the undisturbed edge.
Q. But nonetheless, you were able to conclude from what you were able to see and examine during the course of your excavation that it was probably not created by large powered equipment like a backhoe or a bulldozer.
A. That would be my opinion based on the -- its dimensions and

the -- what we call stratigraphy or the layering within the grave.
Q. Now, you did describe for the jury this morning and this afternoon that there were different layers of material, and even though there was no soil or fill between the individual victims found in the grave, you did find a level of fill or material on top of the individuals; right?
A. Yes, sir.
Q. And included in this material on top of the individuals was a leafy material that you've associated with this animal?
A. Yes, sir.
Q. Now, I understand from examining your report that because of the nature of the excavation you weren't able to determine -- I'll try to rephrase this.
Did this leafy layer extend the entire breadth of the grave site?

A. No. It was concentrated in the area of the animal, the nonhuman remains.
Q. Okay. And your first assessment of this layer of leaves in proximity or in relationship to this animal skeleton was that you thought it had been purposely put there by a human being.
A. Yes, sir. Before my understanding of the habits of a possum, it appeared to me that perhaps this might have been leaf fall that fell into the pit.
Q. All right. But your first hypothesis or assumption was that this leafy material constituted an example of some separate material that had been placed on top of the grave after the initial burial of the victims.
A. Yes, sir.

Q. Okay. And I think Mr. Smith, formerly Agent J.D. Smith, talked about that this morning that that was kind of a working assumption during the investigation of the grave site. Would you agree with that?

A. Up until we got the results of the species of animal that was involved.

Q. Now, but you also concluded, didn't you, because of the size of this burrow in relation to the size of the skeleton of the animal that you didn't think the animal could have gone through that little burrow?

A. Initially my thinking was that if this is a puppy or a dog,

number one, it's not a burrowing animal; and, two, my experience is with puppies or dogs that they might be of a size that could not fit in through a burrow.

Q. Now, you estimated this burrow to be between three and four inches in diameter, didn't you?

A. Yes.

Q. Mr. Hochrein, in addition to the testimony that you've given us about the individuals that were found in this clandestine grave, you also did some examination about the climate during different periods of 1993?

A. Yes, sir. Part of, again, outside experts that we ask for information about is -- one of the routine things we do is we'll ask for climatological or weather information for the time period that we're interested in.

Q. All right. And do you recall without looking at your report that your determination of the climate in July 24, July 25, 1993, was that the temperature -- the average temperature about that time was in the mid 70s?

A. I'd have to refer to the report to be certain.
Q. By the way, you're a native of where?
A. I'm originally from Pennsylvania.
Q. I'm going to show you page 76 of your findings -- I'm sorry, page 23 and 24 of your findings. By the way, did you do any examination of the Kildeer Avenue site?
A. We did test excavations.

♀

Q. And that was in early October; right?
A. That was the day before the Lark Avenue excavation.
Q. Handing you page 23 of your report, did you determine the average temperatures and precipitation for 1993 in the Mason City area?
A. Yes, sir. Based on the -- reviewing the United States Soil Conservation Service soil report, that document indicated that the average temperature -- I'm sorry, for what period?
Q. July.
A. For July was 71.4 degrees, the average daily temperature, and that's Fahrenheit.
Q. And could you tell us, please, the average precipitation?
A. The average precipitation according to the soil conservation report would be 4.4 inches in July.
Q. I wanted to ask you just a few follow-up questions, Mr. Hochrein, about individual number 4 about which you have just testified. You described for the ladies and gentlemen of the jury that there was a garment up over the head of individual number 4 and the arms were protruding through the garment over the head; is that right?
A. Yes, sir.
Q. Based on your training and your experience, were you able

to determine whether or not that garment was drawn up over the head of individual number 4 before or after death?

A. No, sir.

Q. And finally, Mr. Hochrein, you described for us that there was no evidence that this grave was dug by means of a backhoe. During your excavation of this grave site, did you determine whether there were any barrels or other similar containers in proximity to any of the victims?

A. Not in the immediate proximity.

Q. And did you discover in the course of your excavation any shell casings or other firearm components?

A. Not in the immediate -- within the grave.

MR. SPIES: Thank you.

THE COURT: Mr. Miller?

MR. MILLER: No redirect, Your Honor.

THE COURT: You may step down.

THE WITNESS: Thank you.

MR. MILLER: United States calls Mary Buckley. Mrs. Buckley, if you'll please step forward and be sworn.

MARY BUCKLEY, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Please adjust the chair and the microphone so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: Mary Lynn Buckley, B-u-c-k-l-e-y.

THE COURT: Okay. You're very soft spoken, so we'll have you scoot up a little bit. And actually I think it might be easier -- those microphones are adjustable, so you can pull

them back towards you. Can we get you to pull the other one back closer? Thank you.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Good afternoon, Mrs. Buckley.

A. Hi.

Q. Where do you live, ma'am?

A. Mason City.

Q. That's coming through loud and clear. Stay close to those microphones, and that will help us a lot.

How long -- let me ask you this. Have you lived your whole life in Mason City?

A. Yes.

Q. And who are your other family members that live in Mason City?

A. My son and daughter.

Q. Yes. What are their names and ages?

A. Brad, 18, and Jada, 9.

Q. Brad's a high school senior I believe.

A. Yes.

Q. How are the Mohawks doing?

A. Bad.

Q. He plays football for them?

♀

2460

A. Yes.

Q. They're doing their best, though, I hope.

A. I hope, yeah. It looks like it.

Q. Okay. And he has a younger sister nine years old?
A. Correct.
Q. Does he have any cousins?
A. Yes, Brock, my brother's son.
Q. How old's Brock?
A. Fourteen.
Q. Do you have parents, Mrs. Buckley?
A. Yes.
Q. And their names?
A. Dave and Marge Milbrath.
Q. And they live there in Mason City as well?
A. Yes.
Q. And where in Mason City -- well, let me ask you this. You and your family live in Mason City. You work where, ma'am?
A. Metalcraft.
Q. Metalcraft?
A. Uh-huh.
Q. How long have you worked there?
A. Seven years.
Q. Did you work outside the home before you worked at Metalcraft?
A. Yes.

2461

Q. And where did you work then, ma'am?
A. Fieldstone Cabinetry, Northwood, Iowa.
Q. You've told us about your children's cousin that lives there in town. Did they have some cousins that are now deceased?
A. Yes.
Q. And who is that?

A. Kandi Duncan and Amber Duncan.
Q. Daughters of your sister Lori.
A. Yes.
Q. I'm going to be real quick, ma'am. Kandi and Amber were how old when they disappeared?
A. Ten and six.
Q. Did you see a lot of your relatives along with the rest of the family?
A. Yes.
Q. And that was true up until the time of their disappearance. I assume you'd see them frequently.
A. Yes.
MR. MILLER: If I may approach the witness, Your Honor?
THE COURT: You may.
BY MR. MILLER:
Q. Mrs. Buckley, I'm going to show you a garment that's marked as Exhibit 700 and ask you if you can tell us whether or not it

♀

looks familiar to you.
A. Yeah.
Q. And how, if at all, do you recognize it, ma'am?
A. Kandi wore a lot of jumpsuits or swimsuits like that.
MR. MILLER: I believe there's no objection, Your Honor, and we offer 700 and request permission to publish it at this time.

* * * *

(Government Exhibit 700 was offered.)

* * * *

THE COURT: I think it's in evidence, isn't it?

BY MR. MILLER:

Q. Showing you Exhibit 816, do you recognize that garment?

A. Yes, it's a Fieldstone T-shirt.

Q. Fieldstone?

A. Uh-huh.

Q. And can you tell us what you know about this garment?

A. Fieldstone -- Northwood always had a parade on July 4, and Fieldstone, of course, entered that parade and handed out T-shirts for the kids and the workers that worked there that walked in the parade.

Q. That's something they did every year?

A. As long as she worked there, yes.

Q. And did Lori have such a garment for her daughters?

A. Yes.

♀

2463

Q. Does that look like a garment that you knew Amber to wear?

A. Yes.

Q. And Exhibit 800, do you recognize that?

A. Yes.

Q. And what is that?

A. Amber's swimsuit.

Q. Amber's?

A. (Witness nodded head.)

Q. Mrs. Buckley, did your sister Lori keep photographs of her children?

A. Yes.

Q. I'm showing you what I believe has already been received in evidence as Exhibit 721, and if we can display that, please.

A. It's Kandi and Amber.

Q. That's a picture of Kandi and Amber? Easter garments?

A. Yes.

Q. Easter '93?

A. Yes.

MR. MILLER: Thank you, ma'am. I have no further questions.

Q. Let me just ask you one follow-up. You mentioned that that Fieldstone T-shirt was something that the employer provided for their employees.

A. Yes.

Q. We may have already learned this, but where did your sister

work before she disappeared?

A. Fieldstone Cabinetry.

Q. How'd she get that job?

A. Me.

Q. Okay. You already worked there before she moved to town after her separation?

A. Uh-huh.

Q. Divorce?

MR. MILLER: Thank you. I have no further direct.

THE COURT: Mr. Rogers?

MR. ROGERS: No cross-examination, Your Honor.

THE COURT: You may step down.

Ready to call your next witness?

MR. MILLER: Your Honor. The United States calls Dr. John Frasco.

JOHN FRASCO, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. Make yourself comfortable. And try and pull that chair up as close as you can so you can speak directly into the microphones. And you can

move those microphones. And when you're ready, would you please state your full name and spell your last name for us.

THE WITNESS: My name is Dr. John F. Frasco, F-r-a-s-c-o.

THE COURT: Mr. Miller?

MR. MILLER: Thank you, Your Honor.

♀

DIRECT EXAMINATION

BY MR. MILLER:

Q. Dr. Frasco, you are a doctor of what, sir?

A. I am a doctor of dental surgery.

Q. How long have you worked in that field, sir?

A. I graduated from dental school in 1973, so this is my 31st year.

Q. Where did you get your undergraduate and dental training, sir?

A. I received a bachelor of arts degree from St. Mary's College, now St. Mary's University, in Winona, Minnesota, 1969, and I graduated from Loyola University School of Dentistry in Maywood, Illinois, in 1973.

Q. Where is Maywood, Illinois?

A. Maywood, Illinois, is approximately six miles west of the city of Chicago.

Q. Okay. So I think there's a number of Loyolas, but when we think of the Loyola in the Chicago area, that's where you went to dental school.

A. Yes.

Q. Got your degree there when, sir?

A. 1973.

Q. And would you just briefly summarize for us your career in

dentistry.

A. I practiced in the suburbs of Chicago for 20 years, in the

village of Oak Park on the near west side of Chicago. Because of family issues, we chose to relocate to northern Iowa, and we selected a location in Mason City in 1993. I opened a practice in Mason City and maintained that practice for about eight years. I retired several years ago from private practice, but, you know, you just can't get away from it, so I picked up a situation where I'm working with another dentist in his office in Northwood, Iowa. Should I elaborate on the rest of it?

Q. Well, let me just backtrack a little bit first, and then I'll ask you to elaborate. During your 20 years practicing dentistry in the Chicago area, what was the nature of your practice, sir?

A. I was a general practitioner. I treated families.

Q. Did you have any interests, professional interests, professional dental interests, outside of general practice?

A. Oh, yes. In 1974, the year after I graduated, I attended a class, and it stimulated my interest in forensic dentistry. I participated in a training program at the Armed Forces Institute of Pathology in 1976, and my career in forensic has gone from there.

Q. Did you -- well, let me just ask you this. While you were in the Chicago area, did you have an opportunity to exercise the skills and education that you learned in the area of forensic dentistry?

A. Oh, yes. For a number of years I was a deputy coroner in

DuPage County, Illinois. I also found that my area of expertise was in lecturing. I was fortunate enough to have some very good mentors, and I was able to pass on what I knew about this to professional groups and some civic groups. And furthermore, we got involved with the Cook County Medical Examiner's Office. After the Sioux City plane crash in 1989, it was seen that there was a need for major metropolitan areas to have key people who were trained and willing and capable of going in and helping when you have mass disaster situations like that. So several of us got together, and we formed the Cook County Dental Identification Team which is under the auspices of the Cook County Medical Examiner's Office.

I also did a lot of consulting work with local law enforcement and provided testimony on several occasions.

Q. Did you also do some teaching in the area of forensic dentistry as well?

A. Yes. In 1979 I accepted a position as a part-time faculty at -- where I went to school, at my alma mater, at Loyola University, and in 1981 they asked me to come on as a full-time faculty member. I additionally maintained my private practice, and because of the nature of how universities work, I was able to spend some time there, and I had multiple other doctors working in the office with me.

While I was at the university, we found that there was a critical need for getting the young dentists more interested

2468

in the area of forensic dentistry, so two of us got together and we set up a program. We had to pass through the university curriculum committee, and we developed the second undergraduate

training program in forensic dentistry for dental students in the U.S.

Q. And, Doctor, you've already described at least a little bit something of the nature of forensic dentistry, but would you go ahead and more completely define that field for us, please.

A. Oh, as an educator, I'd be happy to.

The area of forensic dentistry is the application of the science of dentistry to the field of law. There's four primary areas that we get involved with. Probably the foremost one and the one the public sees the most is the identification of the unknown victim. Secondary is bite mark analysis and evaluation. The third area is trauma on the oral tissues. And the fourth area is dental negligence and malpractice.

Q. Do you have experience in all of those areas?

A. Yes.

Q. Doctor, since leaving the Chicago area, have you maintained an interest and, more importantly, activity in the field of forensic dentistry?

A. It's interesting. When I moved from Chicago to north Iowa, I thought I might be at a loss for doing forensic work, and yet I find now that after these 12 years they've been keeping me busier in Iowa than I had thought it would be.

I built an association or a relationship with our local medical examiners in Cerro Gordo County because Mercy Hospital and the pathology associates were fortunate in that area that we have five pathologists with our hospital, and they are keenly interested in obviously the area of forensic work. And so when I moved to Mason City, I did develop a relationship with them, and I've done numerous cases in identification of

individual and a few multiple situations that have occurred in north central Iowa. They also service the eight counties -- eight surrounding counties for their pathology work.

Q. Do you in addition have any statewide affiliations professionally?

A. Yes. Several years ago I was asked to become a consultant to the state medical examiner's office in Des Moines. This is under Dr. Julia Goodin, Dennis Klein, the chief deputy state medical examiner. And I've provided forensic identification services for them on a number of occasions.

Q. And finally, have you an association with any nationwide forensic science organizations?

A. Yes, several. I've been a member of the American Academy of Forensic Sciences in the odontology section since 1978. Several years ago I became affiliated with the National Disaster Medical System, the Disaster Mortuary Operational Response Team which is a federal response team originally designed to be activated and deployed to provide mortuary services in the event

2470

of natural disasters. And subsequently they were put under a memorandum of understanding with the National Transportation Safety Board, so we've been involved with several air and train fatality -- multi-death fatality situations.

Most recently we've been moved from the Department of Health and Human Services over to the Department of Homeland Security, and our now direct superiors are the Federal Emergency Management Agency. We've had opportunities to work with that group in the island of Guam for a plane crash in 1979; at Bourbonnais, Illinois, for a train crash in 1999; World Trade Center, obviously 2001. I spent three months there and most

recently the hurricanes in Georgia, and that was about two weeks ago.

Q. Charlie, Frances, Ivan, Jeanne?

A. All of the above.

Q. One of the areas that you mentioned was identification. That falls -- why and how is it that dentistry is of aid in identifying human remains?

A. Each and every one of us has a dental makeup. I'm sure that there are no two individuals in this room that have the exact same combination of teeth, missing teeth, present teeth, fillings, replacements, and so on. The uniqueness of the human dentition is already very provable.

Because of that and the fact that in many circumstances fingerprints are not readily available, visual

♀

identification can be fraught with all sorts of problems, DNA can be timely and costly where dental information and evaluation can be a very cost-effective and expedient method of being able to determine identification of an individual.

Q. Dr. Frasco, did you do any such work in connection with autopsies performed by the state medical examiner's office in October of the year 2000?

A. Yes, I did.

Q. And would you describe that work briefly for us?

A. I was requested by the chief deputy medical examiner, Dr. Dennis Klein, to assist in helping with the identifications of some skeletal remains that were found in my home county, in Cerro Gordo County, Iowa. I proceeded to go down to the morgue at Broadlawns in Des Moines. And with Dr. Klein and several other individuals, we reviewed the remains of three adult

victims and two children.

Q. Okay. Were you able to make any identification on any of these remains, Dr. Frasco?

A. Yes, I was. On the first visit down, we evaluated the three adult remains. The way we do an identification is to do a visual examination, take X-rays, photograph, just as if you were to go into your own dentist's office. We gather all of that information from that victim. We rely on law enforcement to give us some sort of information on who these individuals might be, and it's our job to determine whether or not they are those

individuals.

On that first visit we did collect the information of the three adults. I deferred collecting the information on the children for the time being waiting for our forensic anthropologist to come in from New York, and I wanted her to be able to work with the children prior to me doing the work that I had to do.

We were provided with names of individuals and records from their family dentists. On the three adults we were able to determine positive identification on those three individuals.

Q. And who did you identify?

A. The first individual was presented to me as medical examiner's case 00SME115, and on review and evaluation, it was determined that that was Gregory Nicholson.

Q. That was based upon comparison with known dental records of Gregory Nicholson?

A. Correct. We had antemortem, records that were available when he was alive that had been done by his -- the treating dentist, and those were compared with the information that we

had gathered from that decedent.

Q. State medical examiner identification number 00115 you determined to be the remains of Gregory Nicholson.

A. Yes, I did.

Q. Did you make a professional finding as to the identity of the remains in a similar fashion as to state medical examiner

♀

2473

number 00116?

A. That particular individual was determined beyond reasonable degree of dental certainty to be Lori Duncan.

Q. Again, based upon comparison with known dental records?

A. Correct.

Q. And finally with regard to state medical examiner number 00135, did you make an identification?

A. Yes, I did. That particular individual was evaluated some time later when -- after it had been discovered, and that was determined to be Terry DeGeus by reason of comparison of his dental records with the findings with the body.

Q. You mentioned that you deferred any attempted identification on the two children. Those are -- correct me if I'm wrong -- state number 00117 and 00118?

A. Correct.

Q. And the reason for deferring was again what, sir?

A. Children's structures are so very fragile, and when I was at the morgue the first time, they were still in the condition that they had been removed from the ground, and I wanted to give the anthropologist a chance to work with that situation before I started doing the things that I need to do to evaluate, examine, and document the findings in the skull.

Q. Who was the forensic anthropologist that worked on this

case?
A. Dr. Dawnie Steadman.
♀

Q. And she was from New York?
A. She was originally teaching at Iowa State University in Ames, and she's also a consultant with the Iowa State Medical Examiner's Office, and she subsequently has accepted a position at University of Binghamton or Binghamton University in New York state.
Q. At some point did she complete enough of her work that she was able to allow you to do your work in attempting an identification?
A. Yes. Several days later she was able to come in from New York. We actually met and worked side by side. She prepared and did what she needed to do to assess the skeletal remains, and at some point during that visit down to Des Moines, she said it was okay for me to go ahead and do what was necessary.
Q. Before I get into the question of identification, are you called upon as a forensic anthropologist ever to make a professional assessment as to age of victims?
A. As a forensic dentist.
Q. I'm sorry, as a forensic dentist.
A. Yes.
Q. And did you make any such effort in connection with this case?
A. Yes. With regards to the two children, on searching for records from a family dentist, we were unable to locate any, and I went to exhaustive measures to try to go beyond the typical of
♀

the law enforcement or the medical examiner's office asking the family who the family dentist might be. We contacted former employers of Lori Duncan. We contacted child services through the Title 19 program and through the WIC program and the schools to see if there were any mention of any dental contact for these children. And much to my chagrin, we were unable to find any.

At that time it was decided that -- we can make an assessment of the dental age of an individual by looking at their teeth. And it's so much more accurate and more critical when it's a youngster. After age 21, the jaws -- we can basically say someone is over about the age of 21 because of the formation of the roots of the teeth and the loss of all of the baby teeth and the growth and development of those adult teeth. But in the younger individuals, we can get pretty accurate with regards to assessing their dental age which is pretty well correlated to their chronologic age, their actual age in life.

Q. Did you do such work with respect to the remains identified at the state medical examiner's office as 00117?

A. Yes, I did.

Q. And what were your findings, sir?

A. May I refer to my notes?

Q. Please, if that will help you be accurate.

A. Yes.

THE COURT: Members of the jury, why don't you take a stretch break while the doctor's looking at his notes.

Q. Feel free to stretch yourself if you need to.

A. Thank you.

THE COURT: Okay. Please be seated. Thank you.

Q. Before our stretch break, I asked you if you were able to

arrive at a finding with regard to estimating the age of the individual identified by the state medical examiner as 00117.

A. Yes. To answer your question, 00SME117 was determined to be an individual of 10 years, 8 months plus or minus 30 months.

Q. And that's an estimate.

A. That's an estimate.

Q. Ten-year-old child approximately.

A. Approximately.

Q. Based upon the teeth.

Were you able to do any such work with regard to the victim identified as medical examiner number 00118?

A. 00SME118, we evaluated that particular individual. We had very scant amount of dental material to go from, so it was only based on the measurements and eruption of two teeth, but we were able to come up with an individual that was six years, zero months plus or minus ten months.

Q. Six years of age.

A. Six years of age.

Q. Approximately.

A. Approximately.

Q. And you determined that from looking at only two teeth?

2477

A. There are a number of other factors we take into consideration, but we're looking at the growth and development of those teeth. And as I indicated earlier, the older we are, the less likely we can give a good age assessment from the dentition. The younger they are, the narrower the range in which we can come to with regards to an age assessment. In her particular circumstance, we had two teeth that gave us very, very good information, one on the lower jaw and one on the

fragment of upper jaw that we had.

Q. What about the rest of the teeth?

A. The remaining sections of her mid face were gone. They were missing. We had three teeth in one segment of her upper left jaw.

Q. Large part of her face was gone.

A. I'm sorry?

Q. A large part of her face was gone.

A. Yes.

Q. Doctor, you indicated that you were unable to locate dental records from which you could make a positive identification with regard to these children.

A. Correct.

Q. Nevertheless, did you attempt to at least attempt an evaluation based upon in-life photograph or photographs?

A. Yes, I did. It was requested that I look at a very good-quality family photograph or photograph that was taken --

2478

looks like it was in some particular season of the year, a holiday photo of sorts, together with and comparing that to photographs that I had of the victim's remaining skull.

MR. MILLER: If I may approach the witness, Your Honor.

THE COURT: You may.

BY MR. MILLER:

Q. Doctor, I've handed you what I believe has been received in evidence as Exhibit 710.

MR. MILLER: And we'll ask that that be displayed with the Court's permission.

THE COURT: I just want to double-check. Yes, 710 is

in evidence. Thank you.

BY MR. MILLER:

Q. What is Exhibit 710, sir?

A. 710 is a photograph of the victim identified as 00SME117, the older of the two children, that I took at my time in the morgue.

Q. This is the one you estimated at approximately ten years of age?

A. Correct.

Q. Okay. And you compared that with what in-life photograph, sir?

A. There was a photograph that was presented to me of the children dressed in festive gear. I think someone mentioned it

was an Easter photograph.

Q. Okay. You have in front of you an item marked Exhibit 721 in the folder.

MR. MILLER: With the Court's --

THE CLERK: I moved it. I'm sorry.

MR. MILLER: That's my fault.

BY MR. MILLER:

Q. Exhibit 721, is that the photograph that you used for comparison purposes?

A. Yes, it is.

Q. Okay. And if we can have that on the screen as well. Tell us what, if any, conclusions you were able to arrive at based upon that comparison, Doctor.

A. Again, we cannot make a positive identification in this particular situation, but we can evaluate the circumstances and include or exclude someone from possibility. When I looked at

the dental architecture, the shape of her front teeth, the spacing, the position, you can see that her right front tooth is slightly elongated both on the skeletal remains. And on looking very, very closely with some digital magnification at my office, I was able to discern that from the antemortem or the living -- the picture while they were alive, on the older child that her -- in fact, her right central incisor was slightly longer than the other one. Together with the spacing between the two front teeth and just by the mere fact that we have those

particular individual teeth present and not being there as baby teeth or missing in that transition stage when they're going from baby teeth to adult teeth, I felt that it is highly suggestive that, in fact, 00SME117, that skull, in fact, belonged to the older child.

Q. The older child shown in the picture 721.

A. Correct, and that would be Kandace.

Q. The child in back.

A. Correct.

Q. And again, just so we're perfectly clear, you're not able to make a positive identification simply upon a comparison of photographs I take it.

A. No, I am not.

Q. But in your professional opinion, the teeth shown in 117, the postmortem photograph, is consistent with the teeth you see in that picture of Kandi?

A. It is completely consistent with, and there are no exceptions.

MR. MILLER: Thank you. I have no further direct, Your Honor.

THE COURT: Mr. Spies?

MR. SPIES: We have no questions, Your Honor. Thank you.

THE COURT: You may step down, Doctor.

MR. MILLER: May it please the Court. Your Honor, we

have two physicians promised to be here first thing Monday morning along with our crime scene examiner for the Kildeer site, and we should be able to move along on schedule at that time.

THE COURT: Okay. That's a way of saying you're out of witnesses.

MR. MILLER: That's a way of saying we're out of witnesses.

THE COURT: That's what I thought, but well done. Could I see the lawyers just for a second at sidebar before we send the jury home?

(At sidebar off the record.)

THE COURT: Members of the jury, I was just discussing with the lawyers, you know, kind of where we are and where we're going because I always like to give you a heads-up to the extent that I can and I don't look too bad with my predictions about the case.

Our best judgment is that we will have the final instructions and the closing arguments on the merits part of the case, not guilty/guilty part of the case, a week from Monday. Of course, that could change, but that's our best judgment right now, and I just thought I'd give you a heads-up about that.

So that concludes the testimony for today. I'm going to repeat my cautionary instruction: Keep an open mind until

you've heard all of the evidence in the case, had a chance to

receive my final instructions, hear the closing arguments of the lawyers, and be able to go back in the jury room and review the exhibits that have been admitted and deliberate with your fellow jurors. We'll see you back here Monday morning at 8:30. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated.

Are there any matters that we need to take up at this time, Mr. Williams?

MR. WILLIAMS: No, Your Honor. I do have that list on instruction number 14. I have a draft typed up. I made some revisions to it. We're going to retype it in the next 15, 20 minutes, and we'll give it to you. I've given a draft copy of that to the defense counsel.

THE COURT: Has the defense signed off on that?

MR. WILLIAMS: Not yet. I want to give you as much advance notice of where I think we're going, and I talked briefly with Mr. Rogers about it, and we'll let you know if we have a dispute on it.

THE COURT: Okay. Do you think you'll be able to let me know on Monday?

MR. ROGERS: Yes, Your Honor.

THE COURT: About whether or not we've got the right names in the right sequence in the right instructions on impeachment?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2167 of 3636

MR. ROGERS: Yes. We're going to -- I will -- I've made a copy of the draft Mr. Williams gave me which I will take. I'll leave the copy he gave me with Mr. Parrish, and we'll both go over our notes and see if there are additions or substitutions or things that we think ought to be there and bring that to your attention Monday.

THE COURT: Okay. Anything else from the government?

MR. WILLIAMS: No, Your Honor.

THE COURT: Anything from the defense we need to take up?

MR. PARRISH: I don't think so. Thank you.

THE COURT: Okay. Thank you. I may have to e-mail you the proposed preliminary and final penalty phase instructions if there is a penalty phase. We're just, you know, planning ahead on the contingency, and we made some more revisions in light of our informal discussions. Those aren't completed yet with the verdict form, but I'll e-mail them to all counsel either later on this afternoon or some time tomorrow. And then we can start talking about those on Monday too. But we need to get the merits phase instructions out of the way first, but I wanted to get you what I think is pretty much a near final draft subject to, you know, input from both sides.

MR. PARRISH: Your Honor, I know this is hard to think about at the moment, but I was just curious. Have you thought mechanically about after -- assuming there is a phase after the

merits phase -- and, of course, it's so unpredictable in terms of what a jury will do, et cetera, in terms of time -- have you thought about -- if it's early morning or afternoon or Wednesday, Thursday should their verdict return, have you

thought any in terms about starting that next morning or waiting a day, or have you thought --

THE COURT: I haven't really thought about it, so I'd be glad to solicit the views of the lawyers on what you think would be appropriate. Have you given it --

MR. PARRISH: I have not thought about it either. I don't know whether Mr. Williams has or anything.

MR. WILLIAMS: I guess my reaction is that when they come back with a verdict, even if it's in the morning at some point, frankly I think we ought to give them the rest of the day off and let them come back fresh the next day to start back up with the penalty phase; if it's at the end of the day, let them go home that night, come back and start the next morning. I don't see a reason to skip 24 hours just for the sake of skipping it, but I don't think the day they come back on the merits phase if they come back and we go to penalty phase they ought to be asked to immediately start focusing on a penalty phase. We ought to give them at least overnight to relax and come back fresh.

MR. PARRISH: And let me tell you the reason I say that for a couple reasons. I'm not doing that. Mr. Spies and

2485

Mr. Rogers will be working on that aspect of it. But I think two things we have to bear in mind.

THE COURT: Scheduling witnesses is one thing.

MR. PARRISH: Right. That's the big -- you took the words right out of my mouth, and the number of witnesses and, you know, we have a preliminary list. But getting these people in, getting them rooms, et cetera, and coordinating that might be a little bit of a problem particularly if they're going to go

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2169 of 3636

in one day.

THE COURT: I'm not sure Mr. Williams anticipated that situation.

MR. WILLIAMS: Well --

THE COURT: Did you?

MR. WILLIAMS: I did. And the family members and the witnesses we're going to have I think we can get here, you know, overnight if we need to and be prepared to do the next day. So if we had a verdict at four o'clock in the afternoon, I think I could safely say we'd be in a position -- particularly if we're providing preliminary instructions and opening statements on the penalty phase, I could have my witnesses here to start that following day. But I'm open to suggestions if --

MR. PARRISH: I know we had talked at one point if there were one we would have a short break. My only thought is that in terms of cost, expense, et cetera, we can get the subpoenas and the people contacted, but getting them here and

2486

having them waiting for two nights I'm not sure is the best economic -- best use of finances. That's just one thing I'm thinking of.

THE COURT: And you have a more difficult task logistically than the government does for a whole lot of reasons in terms of scheduling witnesses. So I'd probably be inclined to maybe give the jury a day break, a full day, part of a day if they reach a verdict and then give them the next day off and then start the penalty phase, and that would give you more time to get your witnesses here because it's going to be tougher for the defense to get the witnesses here logistically than it is for the government.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2170 of 3636

MR. PARRISH: Exactly, particularly for a couple experts that are tied into it. The costs, et cetera, involved in that would help us if they knew --

THE COURT: Exactly. And my point is I'd rather give the time off between the two phases if there is a second phase than between the government putting on penalty phase witnesses and then taking a break for the defense. So I'd rather break it up in between, and I think the jurors might appreciate the time off actually. They've been at this for a long time.

MR. WILLIAMS: I have no objection, Your Honor. That's fine.

MR. PARRISH: That sounds like something --

THE COURT: So I'm fairly inclined to go ahead and,

you know, grant that extra day largely to allow the defense to schedule their penalty phase witnesses if we need a penalty phase.

On the issue of opening statements in the penalty phase, Mr. Rogers, you're the resident expert inasmuch as you're the only one in the group who's been in a death penalty trial other than this one. So what's your view?

MR. ROGERS: Your Honor, I think we discussed yesterday, I've seen it done both ways. In cases I have personally tried, there have been opening statements allowed in the penalty phase, and I don't think it's been a problem. I have seen other cases where there have not been, and it seems to me that this is sort of really uncharted testimony -- or territory for the jurors more than anybody else even though it is uncharted for many of us. And I don't see that an opening statement is going to hurt anything, prejudice either side. I

think it does help the -- just as the Court's preliminary instructions help the jury focus on what is going to be happening in the penalty phase if there is one, I think opening statements would also help them do that.

THE COURT: Can I infer from that that the defense has a preference for opening statements?

MR. ROGERS: Yes, Your Honor.

THE COURT: Okay.

MR. ROGERS: I thought that was fairly obvious, but

2488

yes.

THE COURT: It was somewhat obtuse, but I thought that's where you were going.

What about the government?

MR. WILLIAMS: We would prefer opening statements, Your Honor.

THE COURT: Okay. Well, if both sides want opening statements, we're going to have opening statements.

Now, let me ask you this one too, Mr. Rogers, because, again, you're the only one in the room with experience. In the closing argument penalty phase -- well, see, I guess your last case you didn't get that far, that's right, because you had a hung jury as I recall.

MR. ROGERS: That's right.

THE COURT: Does the government get rebuttal, and is that an open question, or is it just foregone that the government gets rebuttal?

MR. ROGERS: I'm going to have to look in my book, Judge, because I don't think it's foregone. And in Missouri state court it is foregone. It's in the statute.

THE COURT: That they do get a rebuttal?

MR. ROGERS: That they do get a rebuttal.

THE COURT: Is there anything in the death penalty statute that gives you rebuttal closing in the penalty phase?

MR. WILLIAMS: Not that I recall, Your Honor. I

believe the statute speaks only that the parties should be allowed to argue during the penalty phase without dictating the manner in which the argument's to be taking place. I'd want to look at that again, but that's my recollection of the language of the statute.

THE COURT: I assume you want rebuttal argument, and I assume the defense doesn't think you should get it. Is that a fair assumption?

MR. ROGERS: Those are both fair assumptions I think.

MR. WILLIAMS: Yes, Your Honor.

MR. ROGERS: I can't speak for Mr. Williams.

THE COURT: Why don't we give you an opportunity maybe some time next week if you have any case law -- I'll obviously look, but if you have any case law, because that's an issue I'll probably have to resolve.

MR. SPIES: Yes.

MR. ROGERS: What he said.

THE COURT: Anything else, Mr. Rogers?

MR. ROGERS: No, Your Honor.

THE COURT: Just kind of looking ahead and anticipating issues that might arise. What we're doing is we've turned this into an on-the-record brainstorming session, but I'd entertain anything else you want to add.

MR. ROGERS: Nothing at this time, Your Honor. Thank

you.

THE COURT: Okay. Mr. Williams, anything?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Okay. Thank you. We'll be in recess.

(The foregoing trial was adjourned at 2:06 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

1-5-05
Shelly Semmler, RMR, CRR Date

INDEX

VOLUME 11 9-30-04 witness testimony

| WITNESS: | | PAGE: |
|---|---|---|
| J.D. SMITH | | |
| | MR. MILLER | 2333 |
| | MR. SPIES | 2374 |
| MICHAEL HOCHREIN | | |
| | MR. MILLER | 2380 |
| | MR. SPIES | 2452 |
| MARY BUCKLEY | | |
| | MR. MILLER | 2459 |
| JOHN FRASCO | | |
| | MR. MILLER | 2465 |

*****

EXHIBITS:

| | |
|---|---|
| 310A, 310B, 311A, and 311B | 2343 |
| 310, 310A, 311, and 311A | 2362 |

*****

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, Plaintiff, vs. DUSTIN LEE HONKEN, Defendant. /

No. CR01-3047

Sioux City, Iowa
October 4, 2004
8:33 a.m.

VOLUME 12

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

2493

APPEARANCES:

For the Plaintiff:

C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant:

ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn
Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Good morning. Ready to have the jury brought in?

MR. MILLER: Yes, sir.

MR. PARRISH: Yes, Your Honor.

MR. SPIES: Yes, Your Honor.

THE COURT: Mr. Miller, are you taking the first witness?

MR. MILLER: Yes, Your Honor.

THE COURT: Okay.

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated.

Is the government ready to call its next witness?

MR. MILLER: Yes, Your Honor. United States calls Wade Kisner.

Agent Kisner, if you'll please step forward and be sworn.

WADE KISNER, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. Make yourself comfortable. And can you adjust the chair so you can speak directly into the microphones. And would you please state your full name and spell your last name.

THE WITNESS: Wade A. Kisner, K-i-s-n-e-r.

THE COURT: Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Your occupation, Mr. Kisner?

A. Special agent with the Iowa Division of Criminal Investigation.

Q. How long have you been so employed?

A. Twenty-seven and a half years.

Q. And can you briefly describe the duties of a general crim. agent with the DCI?

A. Yes, a general crim. agent with DCI is responsible for conducting investigations, assisting local law enforcement agencies. Those investigations would include the interviewing of witnesses and suspects, collection of evidence, organizing and directing investigations.

Q. Do you work out of the same office that the now-retired Agent J.D. Smith worked out of?

A. Yes, I do.

Q. And that's in Cedar Rapids?

A. Yes, it is.

Q. In connection with that job, Agent Kisner, did you participate in the Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus missing persons investigation?

A. Yes.

Q. Do you recall what your first contact with that case was?

2496

A. Yes, I do.

Q. And what was that?

A. On October 17, 2000, I was requested by Special Agent Smith

to assist him and other agents in examining crime scene site number 2 on Lark Avenue.

Q. And is this the metal detector search that was done under Agent Smith's supervision?

A. That's correct.

Q. And we've already heard a bit from Agent Smith on that, but if you would just briefly remind us what work was done on that occasion.

A. We went to the location. Utilizing gas-operated string trimmers, we removed the vegetation, conducted a visual examination of the area around the grave site for approximately 25 to 30 feet in all directions. Subsequent to that examination, utilizing metal detectors, we covered the entire area in attempt to recover any additional evidence that might have been left at the scene.

Q. Did you -- those metal detectors find anything?

A. Yes. We recovered large amounts of pop tabs, bottle caps, pieces of wire.

Q. Sort of things one might have at a site where kids might party from time to time?

A. Yes.

Q. Did you succeed in locating any firearms components?

2497

A. We did not locate any that day.

Q. No bullets or shell casings.

A. No.

Q. And you looked carefully with a metal detector.

A. I'm sorry?

Q. And you looked carefully with metal detectors.

A. Yes.

Q. That was on the 17th of October, 19 -- or excuse me, 2000?
A. That's correct.
Q. What was your next active involvement in the case, sir?
A. I was requested to participate in a search for remains which were believed to be buried in a location which I believe has been described as site number 1 on Kildeer Avenue.
Q. When was this search done?
A. The search encompassed several days. We actually began the examination of the area on November 7, 2000.
Q. Now, we've heard that detectives and officers were out there the previous month on about the 11th and 12th of November -- of October, rather, without succeeding in finding anything. Why, if you're aware of the fact -- I understand these decisions were made by your superiors, but why did you go back rather than waiting for the same people to be available if you know?
A. My understanding was there was a concern about the weather becoming an issue. We were afraid that if we waited much longer

the snows would come and that the ground would be frozen and a search and examination that we were looking at doing would be difficult.
Q. Winter often arrives in northern Iowa during the month of November.
A. Yes.
Q. So it was decided to go out there then rather than wait for the availability of the ERT team from St. Louis?
A. That's correct.
Q. When did you go out there? November 7 I believe you indicated?

A. My recollection is that was the first day that I participated actually out at the site.

Q. Describe what went on out there.

A. There was a contingent of several law enforcement officers that were involved doing various tasks. Originally some cadaver dogs were brought in and were allowed to cover the site prior to us doing any other kind of excavation of the area.

Q. Did they -- were they successful in locating any human remains?

A. Well, the dogs did alert at several locations, and we did examine those areas that the dogs seemed to alert on. And by excavating those areas, we did recover bones. However, they were identified as animal remains as opposed to human remains.

Q. The sort of remains you might find on a farm.

♀

A. That's correct.

Q. If we could put up Exhibit 904, I believe that's been received in evidence. What does Exhibit 904 show us, Agent Kisner?

A. This exhibit is an aerial photograph of the Kildeer location which has been referred to as site number 1. This photograph obviously was taken earlier in the fall when the crops were still in the field.

Q. As of November 7, the crops had been removed?

A. That's correct.

Q. Other than that, does it show the layout as it appeared in the fall of 2000?

A. Yes, it does.

Q. Okay. And this is maybe just a quirk of mine, but if we could rotate that 90 degrees counterclockwise, we'll have north

at the top; is that correct? Now do we have north at the top? Is that correct?

A. That's correct.

Q. Okay. Thank you, sir. Can you using the Telestrator just generally show the area where you fellas were searching?

A. Actually we were searching this whole entire area beginning near the entry into the site. I believe the -- I believe the dogs covered this whole entire area. We actually even went into this tree line. But I believe the dogs pretty much covered this whole area around these grain bins and down along this fence

line which you see kind of jutting out here on the corner.

Q. There's also the remains of a burnt-down old farmhouse there; is that correct?

A. Yes.

Q. Can you just indicate with an X where that is?

A. (Witness complied.)

Q. Thank you, sir. You can take off the markings now.

Did you attempt any procedures other than the use of cadaver dogs?

A. Yes, we did. We utilized the dogs, of course, and explored the locations where the dogs seemed to be making an alert. We also gridded the area between the fence line and out into the cornfield and searched it with metal detectors utilizing two-man teams, one officer running the metal detector and the other officer excavating any contacts that we had in the soil.

Q. And I take it that would be easier to do in November after the crops were out than it would have been in October with the crops still standing.

A. Yes.

Q. Go ahead and describe that process. First let me just back up and ask you a little bit, what -- who was out there? What'd you have in the way of personnel?

A. We had DCI agents including myself and J.D. Smith. The FBI had at least one agent there and I believe at times two. We were assisted by the Cerro Gordo County Sheriff's Department,

♀

the Mason City Police Department, the fire marshal's office, and I believe there may have been another agency with regard to the search and rescue with the dogs. I believe there were two -- two independent organizations that were represented with regard to the dogs.

Q. This work began on November 7 of 2000?

A. Yes, that's my recollection.

Q. And entire process finished approximately when?

A. I believe it was concluded officially on the 9th of November.

Q. So you were out there a couple days.

A. Yes.

Q. Plus. How many metal detectors were utilized?

A. My recollection is that we would have been using at least three or four at various times.

Q. Using the Telestrator again show us where that was done and describe any progress that was made in the search with respect to the use of the metal detectors.

A. This was generally the area that we gridded and searched with the metal detectors. There were some other usage of the metal detectors at other locations around the site depending on some of the hits that we got in the area with the dogs. We were looking for anything that might be metal, any -- a buckle, a

zipper, anything that we would get some type of hit on with a metal detector in various locations outside of that grid. But

in that general location, we concentrated and did that really foot by foot.

Q. What, if anything, did you find with the use of metal detectors in that location?

A. Well, for the most part, we found artifacts which you would expect to find at an old farm site like that which would consist of bits of wire, nails, fence staples. There was one item that was recovered during the search which did not seem to fit with everything else that we were recovering.

Q. What was that?

A. That was a medallion, describe it as kind of a silver-colored metal medallion with the Scorpio -- word Scorpio on it. Appears to be some type of item someone might wear around their neck or possibly on a key chain.

Q. And where was that found if you can point?

A. Generally my recollection is that that was found -- it's a little touchy. Generally it was found more between the fence line and the first -- what would be the first row of crops, in two or three feet probably from the corner of this fence.

Q. That Telestrator is a little sensitive. You can hit the "clear all" and try it again if that will help you put an X at approximately where the -- that looks like a glob of red lines to me, Agent.

A. I'm working on this.

Q. Okay.

A. It's kind of like leading a pheasant, isn't it? Generally at the point of that mark would be the area.
Q. At the upper point of that mark?
A. Yes, sir.
Q. Right along the edge of that crop?
A. That's correct.
MR. MILLER: If I may approach the witness, Your Honor?
THE COURT: You may.
BY MR. MILLER:
Q. Handing you Exhibit 914, does that look like that Scorpio medal, sir?
A. Yes, it does.
Q. After that medal was discovered, what was done, sir?
A. Because it seemed to be a unique find at that location, one of the agents did mark that location with a flag for later reference.
Q. And was any further work done in that area?
A. Yes. We came back the following day which would have been the 8th of November and continued the search. There was some concerns about bad weather setting in later that day and possibly the following day. And J.D. Smith along with several of the officers that were there made a decision to attempt to take the soil down in an effort to locate the location of the remains.

Q. What were the conditions like on the 8th of November, 2000?
A. Very cold, below freezing at times, steady winds.
Q. And you mentioned taking the soil down. Can you describe

that process, what was done, and what equipment or personnel was used in that regard?

A. The excavator who had been brought to the site to use the heavy equipment if it was necessary was asked to use his bucket on his backhoe and to begin taking an area of topsoil off this area that we've been discussing three or four inches at a time in hopes that we would see some type of change in the soil which would alert us to where the grave could be located.

Q. Okay. So at this point the use of the backhoe was in a search rather than an excavation purpose at that point.

A. Yes.

THE COURT: Mr. Miller, could I interrupt you for a second? Apparently there's a problem with what we call the calibration on the Telestrator. We have our technical Houdini in the courtroom. Would you like to take -- it will take just about a minute to recalibrate it.

MR. MILLER: Sure. Very good.

THE COURT: We'll just take a short recess. The members of the jury can take a stretch break if you like, and Rick's going to recalibrate it. It was done this morning, and it worked fine, so we're not sure why we're having the problem with it, but we are.

2505

Thank you, Rick.

Please be seated.

MR. MILLER: Now we'll find out whether it was really the equipment or Agent Kisner.

BY MR. MILLER:

Q. Can you put an X approximately where that medal was found.

A. (Witness complied.)

Q. Where the X is where the --

A. Yes, that's correct.

MR. MILLER: I'm not sure it wasn't the agent as opposed to the equipment, Your Honor.

Q. But in any event, we've identified it with that X; is that correct?

A. Yes.

Q. Who operated this backhoe, Agent?

A. The owner of the backhoe and the equipment was Leroy Navratil.

Q. Is he a law enforcement officer?

A. No. He was a private excavation contractor I believe from the Mason City area.

Q. And he went about the process of just scraping off that topsoil a few inches at a time?

A. That's correct.

Q. Covering approximately what area?

A. I would say the -- an area probably 50 feet by 50 feet approximately.

Q. That began approximately when?

A. That would have started during the afternoon of November 8.

Q. If we can have Exhibits 917 beginning with A and then going through H, I believe they've already been received in evidence. Showing you and the jury Exhibit 917A, can you describe for the jury what they see there, sir?

A. Yes. This is the site at Kildeer. This is the backhoe being operated by Leroy Navratil pushing the topsoil back.

Q. And again, this is an effort to see a change in the coloration of the topsoil?

A.    Yes, that's correct.
Q.    And what would that possibly indicate?
A.    That the soil had been disturbed.  Whenever you dig a hole through black topsoil and then replace soil, typically the clay or subsoils get intermixed with the topsoil and they're apparent from visual inspection.
Q.    Is this visual inspection that a backhoe operator would have some experience at trying to spot himself?
A.    Yes.  He was very experienced in doing sewer work and that type of thing, so he was specifically looking for any types of soil disturbances.
Q.    And that's important for their own safety in the excavation business I take it.
A.    Yes, it is.

2507

Q.    There are live lines beneath the soil sometimes.
A.    That's correct.
Q.    Okay.  Please continue with 917B and describe for the jury what they see in that photograph.
A.    917B is another photograph of the site.  There were times when we would do additional surveys with the metal detector.  I believe this was a site for -- that we got a hit on that we were going to excavate further.  Sometimes we were finding metal objects five to eight inches below the surface.  This typically gives you an idea of the operation and what we were trying to accomplish at the site.
Q.    Looking at 917C, what does that show, sir?
A.    As you can see in 917C, there is a definite discoloration in the middle of the photograph.  This is what Mr. Navratil and the investigators were hoping to find as we removed the topsoil

off the edge of the field. Certainly you can see that this is an area of clay which shouldn't be there and shouldn't be appearing at this particular location, and so that alerted us to -- this could possibly be the site we were looking for.
Q. And where was that in relation to that Scorpio medal?
A. Well, I believe you can see the red flag in the photograph which I believe was the flag that was placed at the location where the medal had been recovered.
Q. So it was very close to where that medal had been found.
A. Approximately two to three feet.

♀

2508

Q. Thank you. Showing 917D, can you describe for us the process as it continued and what this photograph shows?
A. Yes. Once we observed the change in the soil composition, the clay which seemed to be close to the surface, we ceased the operation with the backhoe, and Mr. Navratil then repositioned the backhoe over this area and utilizing the bucket began taking small areas of dirt off with the bucket.

I believe it was on his second pass, as he was bringing the bucket down -- I was positioned in front of the bucket, and as he pulled it slowly forward towards the backhoe, I was looking for anything that might indicate to us that we had found the grave site. My recollection is that on about his second pass with the bucket of the backhoe as he slowly was pulling the bucket across this area, I witnessed a leather boot basically come to the surface. I immediately stopped Mr. Navratil. He pulled up the bucket of the backhoe and moved the machine out of the way, and this photograph would be taken depicting what I observed as the bucket had passed over this site. You can see in this photograph the leather boot that has

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2189 of 3636

now become visible.
Q. And to assist us, would you please use the Telestrator to circle that boot.
A. (Witness complied.)
Q. I apologize, Agent Kisner, but if you could hit the undo and just move that circle to where it completely circles the

2509

boot.
A. (Witness complied.)
Q. There we go. That's better. That circles the boot that popped up with that second or third pass?
A. Yes, it does.
Q. Thank you. Go ahead and move on to 917E. What does 917E show?
A. This is an additional photograph of the leather boot, a close-up photograph showing the position of the boot as it was -- as it became visible at the time of the examination of the site.
Q. That was collected, I assume or . . .
A. Yes, it was.
Q. 917F. Describe what you did after locating that boot, Agent.
A. Our first concern was that we knew we had several hours or possibly days of work ahead. The weather was a concern, and so at this point the other officers put together a structure over the grave site which was going to be excavated to protect us from the weather should the weather continue to get worse. I believe the Mason City officers or someone from the area had obtained a tent-like structure which is utilized by a local funeral service for graveside services, and that structure was

put together above the site that was going to be excavated.

Q. Now, the photograph that the jury's looking at, Exhibit

917F, shows you in the process of excavating that grave, sir?

A. Yes, it does. It shows the grave being excavated. This would be inside the tent. We had auxiliary lighting set up running on generators which allowed us to continue working into the evening.

Q. What was done with the soil that was removed from that grave?

A. Myself and Linda Knittig who is a criminalist with the Iowa Division of Criminal Investigation laboratory were actually working the area where the remains were found with hand trowels and brushes, and the dirt which was being removed and collected by trowel was being placed in five-gallon buckets. Those buckets were subsequently given to other officers who were assigned to sifting tables, one big table which was in the rear area of the tent which was a dry sift. Some of the soil which was closer to the surface was able to be sifted without any additional use of water. And then a second sifting operation was being operated adjacent to the location using water to soak through the clay which we were removing from the site. One of the fire departments had brought in one of their mobile trucks, and we were using that as a source of water to examine the soil which was coming out of this location.

Q. Continuing with 917G, what does 917G show?

A. This would be a photograph of the tent, if you will, that was placed -- structure that was placed above the grave site to

protect the excavation. This would be a photograph looking from the west in the field back towards the edge of the farmstead. In other words, you can see the fence line on the far side of the tent. The grave would have actually been more located in the front section of this tent where the brown awning or brown canvas is depicted.

Q. As opposed to the blue.

A. That's correct.

Q. In other words, the far side of the tent from this perspective.

A. Yes, and in the back section of the tent would have been the dry sifting operation.

Q. 917H, please. Looking at Government Exhibit 917H, please describe for the jury what they see in this photograph.

A. This photograph depicts the wet sift area. I believe the two individuals in the photograph would be Victor Murillo who is a criminalist with the DCI laboratory and Special Agent Seward who is with the Fort Dodge field office. They were both assigned to sift various buckets of earth that was coming from the grave site.

Q. And did they succeed in recovering anything of evidentiary value there at the scene?

A. Yes, they did.

Q. What?

A. They recovered I believe at least two bullets that I'm

aware of.

Q. That was done by Agent Murillo -- excuse me, Criminalist Murillo?

A. Yes.

Q. And whatever the number of bullets were, he was the one who participated in that process?
A. Yes, that's correct.
Q. And all of those bullets were recovered from the grave itself.
A. That's right.
Q. Not from area around the grave but right in the grave there.
A. That's correct.
Q. Exhibit 912, please. Showing you Government Exhibit 912, what is that, sir?
A. Photograph 912 depicts the remains in the position that they were at the time the grave site was discovered and was excavated. Utilizing trowels and brushes, we've been able to expose the skeletal remains, and you can see a definite top and bottom or head versus the feet of the remains in this photograph.
Q. Okay. And would you go ahead and use the Telestrator if you can to show us the various body parts that are visible in Government Exhibit 912.
A. Yes, I can. This would be the leg or lower extremities of

2513

the skeletal remains. At the top you can see what is left of the scalp area and some hair.
Q. Can you describe the position of those legs for us?
A. The body was face down, and the legs were in a position bent back across or behind the back up on to the -- what would probably be the rear hip area.
Q. So they were bent at the knee.
A. Yes, they were.

Q. What happened next in this crime scene?
A. Once we were able to get the remains exposed, we were at a point where the remains could be removed. We were hoping to try to remain -- remove everything intact if we could. I was advised that the state medical examiner was coming to the scene and wished us to leave the scene as it was as it's depicted in this photograph for her to examine.
Q. And she arrived at the scene sometime thereafter?
A. There was a period of time that elapsed before she could get to the scene, but I believe she got there at approximately nine o'clock that evening.
Q. And by she, we're referring to Dr. Julia Goodin, the state medical examiner?
A. Yes, that's correct.
Q. And I take it the site was turned over to her at that point?
A. That's correct.

♀

MR. MILLER: Thank you, sir. I have no further direct.

THE COURT: Mr. Spies?

MR. SPIES: Thank you.

CROSS-EXAMINATION

BY MR. SPIES:

Q. Good morning, Agent Kisner.
A. Good morning.
Q. I have just a few questions for you about your work in this investigation. As you told the ladies and gentlemen of the jury, your first involvement in the investigation was to go to the so-called Lark Avenue site with metal detectors to look for

metallic objects?
A. Yes.
Q. All right. And you went there with I think several other agents, and you inspected about a 30-foot or 25-foot radius around the grave site that was located at that scene?
A. Yes.
Q. And whatever metallic objects you recovered, you would have transferred those to the Iowa state Division of Criminal Investigation crime laboratory?
A. I know that Special Agent Smith took custody of the items that were recovered, and I doubt that any of those items got submitted, but I know he maintained custody of those items.
Q. All right. And I think Agent Smith testified last week

that some of them were transferred to the FBI laboratory for examination. Is that your recollection?
A. I would have no knowledge of that.
Q. All right. Well, among the items that you found at the Lark Avenue site, did you find a bullet, a bullet fragment there?
A. No, not to my recollection.
Q. All right. But you did examine and you found some bullet fragments at the Kildeer Avenue site that we've just heard described this morning; correct?
A. Yes.
Q. And in your work as a crime scene investigator, one of the absolute positive things that you do is to document what you find, maintain a so-called chain of custody to make sure that whatever is retrieved is accounted for later on.
A. Yes, that's correct.

Q. And the items that you would have found either at the Lark Avenue site or at the Kildeer Avenue site would have been documented, recorded, and then transferred on to somebody else in a chain of custody.

A. That's correct. I believe the laboratory took custody right then at the site since Linda Knittig was in the site or in the hole with me.

Q. All right. And you've described for us when you were at the Kildeer Avenue site or site number 2 that Victor Murillo, a

criminalist from the DCI laboratory, was there.

A. I believe the Kildeer site is number 1, and I believe the Lark Avenue is number 2, but Mr. Murillo was at the Kildeer site on November 7, yes.

Q. All right. And you showed us a photograph this morning of Mr. Murillo participating in the sifting of some of the soil contents that were removed from the grave site.

A. Yes, that's correct.

Q. All right. Let's talk about the Kildeer Avenue site now that you've just described for us this morning. You described the body that was located there as being face down with the knees bent backward over the upper legs; right?

A. Yes.

Q. And was this actually found -- was the body actually found, Agent Kisner, in the farm field itself?

A. Yes, just in the edge of where the crops would have been.

Q. All right. We saw the remnants of cult -- or of harvested corn, and I was wondering if it was actually located in the portion of the field where corn had been planted and harvested.

A. I would describe it as being right on the edge.

Q. All right. So there's an area there that would have been driven over by farm tractors, cultivators, plantars, combines?
A. Very possibly.
Q. In addition to that, you described for us that a backhoe was used to scrape soil off of that area, and I think you said

♀

that there were two passes or so with the bucket of the backhoe?
A. Yes.
Q. Before this soil irregularity was found.
A. Actually the passes with the -- that I was referring to were the bucket, the actual bucket where the boot came into site, but I want to say that he made two or three passes with his bucket taking off the topsoil before the clay was exposed.
Q. Do you have an estimate, Agent Kisner, of how deep the body would have been below the surface of the soil?
A. I would describe it as a shallow -- shallow grave and no more than two feet in depth.
Q. Okay. And again, harkening back to the photographs that you showed us this morning, would the site where the body was located be within sight of the roadway?
A. Are you describing the roadway Kildeer itself?
Q. Yes.
A. Probably not. There is a general slope to the land there. You have to go quite a ways into the farm location to get to this site, so I don't believe it would be visible from the road at all.
Q. And to get access to the spot where this excavation was done back in November of 2000, was there a roadway that went along the fence line that, for example, farm implements would use to get into the farm fields?

A. I would describe it as more of a grassy open area where I'm

sure you could have obtained access to the field, but I don't recall there being a specific roadway as such.

MR. SPIES: All right. Thank you. I have no other questions.

THE COURT: Mr. Miller, any redirect?

MR. MILLER: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. MILLER:

Q. I take it you didn't do a precise measurement of the depth of that shallow grave.

A. I personally did not.

Q. Nevertheless, the -- that boot popped up after just a couple scrapes of that backhoe?

A. That's correct. And obviously Mr. Navratil's very skilled at what he does, and he was taking, you know, inches at a time when he made those passes.

Q. The rest of the body was a little bit lower but still in a shallow grave.

A. That's correct.

Q. The search for bullets done with metal detectors at the Lark Avenue site found none; is that correct?

A. Yes.

Q. And the bullets recovered at the Kildeer Avenue site were recovered from the dirt in the grave.

A. That's correct.

Q. Finally, sir, that grave site itself as far as what would be obstructing view of the grave from Kildeer Avenue, if anything?

A. Well, certainly you have the grain bins. You have the fence line, and depending on the year what crops would have been in the field, and I believe there's another shed or what they would probably refer to as a corn crib which is located up near the roadway itself, so all those would be obstructions.

Q. Structures obstructing view of the grave site from Kildeer Avenue.

A. Very possibly, yes.

MR. MILLER: Thank you. I have no further redirect.

THE COURT: Anything further, Mr. Spies?

MR. SPIES: Nothing else, Your Honor. Thank you.

THE COURT: You may step down.

Ready to call your next witness?

MR. MILLER: Yes, Your Honor. The United States calls Julia Goodin.

JULIA GOODIN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. Make yourself comfortable. And when you get settled in, could you scoot that chair up so you can get as close to the microphones -- there you go. And when you're ready, would you -- can you pull those microphones in a little bit closer? Would you state your full name, please, and spell your last

2520

name.

THE WITNESS: Julia Goodin, G-o-o-d-i-n.

THE COURT: Thank you.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Good morning, Dr. Goodin.

A. Good morning.

Q. Please do speak directly into those microphones. They're sensitive but don't pick up unless you're within a few inches. So that will help you to be heard. And also I believe Judge Bennett's law clerk put some fresh water on the table in front of you, so feel free to use that if you need to do so.

Your occupation, ma'am?

A. I'm a forensic pathologist employed by the state of Iowa as the chief state medical examiner.

Q. What is forensic pathology?

A. Forensic pathology is a branch of medicine that connects it with the legal system. Pathology is the study of disease basically. Many of you may know a pathologist who works in a local hospital or has their own office. They generally are in charge of performing the autopsies for that hospital and also responsible for the laboratory work like the blood bank, urinalysis, the chemistry that's done there. In addition, they

2521

read out the biopsies that are taken during surgery to determine what type of disease a person has, if a biopsy's actually cancer or not, and they perform the autopsies in the hospital.

Forensic pathology is a subspecialty of that in which we do those things, plus we have additional training in forensic pathology where we do autopsies to determine cause and manner of death predominantly in people who die outside the hospital or those who die of unknown causes, especially those who die from

homicides, suicides, accidents and, as I said, outside the hospital natural deaths.

Q. What is your education, Doctor?

A. After going to college for four years, I went to medical school for four years at the University of Kentucky in Lexington, Kentucky, where I received an M.D. degree.

Following that I did a residency in anatomic and clinical pathology at Vanderbilt University Medical Center in Nashville, Tennessee.

Following that I did a one-year fellowship in forensic pathology in Baltimore, Maryland, at the medical examiner's office there.

I'm licensed to practice medicine in several states including Iowa, and I'm board certified in forensic pathology, anatomic pathology, and clinical pathology.

Q. Do you have membership in any professional associations that pertain to your work?

♀

2522

A. I am a member of the National Board of -- National Association of Medical Examiners, and I'm on their board of directors. I'm also a member or fellow of the American Academy of Forensic Sciences, and I'm on their board of directors as well.

Q. You've briefly described for us what forensic pathology is. Can you more specifically describe your responsibilities as the official state medical examiner for the state of Iowa?

A. They seem to be endless. Predominantly I'm responsible for the guidelines and rules for the 99 physician county medical examiners throughout the state of Iowa. In addition to that, I run the central office. I have two other forensic pathologists

in that office and the staff. I'm responsible for them as well. I'm responsible for the budget of that office and the administrative duties.
Q. Who are the other professional employees in your office?
A. I have a deputy chief, Dr. Dennis Klein, and one other associate forensic pathologist or medical examiner, Dr. Jerry McLemore. I also have a P.A. who is our -- works as our director of forensic operations and mainly our investigator, John Kraemer, and then several people who work in the office as office staff and assistants.
Q. As administrator of that office, Doctor, I suppose you don't do any actual hands-on forensic pathology yourself, do you?

2523

A. No, that's not true at all. In addition to all of those things, I also do autopsies and teach and testify in court and am responsible for the reports and so forth.
Q. Did you do any such work in connection with the Terry DeGeus death investigation?
A. Yes, I did.
Q. And what was your first contact with that investigation, Doctor?
A. John Kraemer and I went to the scene in that case to help recover the remains.
Q. Can you tell us the date and time?
A. I went to that scene in the evening on the 8th of November in 2000 and -- year 2000.
Q. Your purpose in going there was what?
A. We knew at the time -- we had been told that the remains had been there for some time, and it is helpful to be at the

scene to help recover the remains and the bones to see the position, to look at what's surrounding the body, and to try to make sure that all of the remains are actually recovered.
Q. What'd you find upon arriving there?
A. When we got there, the grave had been mostly unearthed, and the bones were exposed. The body was face down. The feet or legs were bent at the knees up over the body. There was still clothing on and with the body.
Q. Can you do anything to document the position and location

♀

of the body?
A. John Kraemer who was with me then documented the scene in a scene report and did a small sketch of the body as well.
Q. If we could have Exhibit 909, I believe that's already been received in evidence.
I take it this is not to scale.
A. That's correct.
Q. But this is just for purposes of helping understand the nature of the general scene. Exhibit 909 is the crime scene sketch that was done by your assistant, Mr. Kraemer?
A. Yes, that's correct.
Q. Can you just go ahead and describe for the jury what that shows.
A. You can see the -- does this show --
Q. Whatever appears on the screen in front of you will be appearing on the big screen.
A. I see. I'm just trying to see if when I point -- do I have a pointer --
Q. You have to actually touch the screen.
A. Ah. Sorry. This is the grave here as you can see. And he

sketched the body in the grave site, and you can see how the legs are bent up. You can see that the head is facing south and the feet are north, but the feet are sort of bent. I should say the legs are bent at the knees.

Q. If we can go ahead and put up Exhibits 912 and 913, and,

Dr. Goodin, while we're waiting for that, if you would just touch the screen where it says "clear all" at the lower right-hand corner, the screen itself with your finger -- there you go -- we now have displayed to the jury Government's Exhibit 912 and 913. Can you describe those two exhibits and what they show for us?

A. Yes. The top one is a photograph that we actually took at the scene. And this is our number plate. It has our autopsy number on it and so forth. It also helps to orient -- this is sort of the demarcation of the grave. This is hair and part of the shirt that's kind of pulled up over the head. These are the bones here, bones here. This is a boot so that you can see his legs are bent up like this and his body would be along here with the hair here. And the sketch at the bottom is a sketch that I did to sort of orient you to that.

This again is the long bones of the legs here with the boot, and then you can see the pelvis here and the vertebra. The ribs would be kind of along in here, although they're broken, and there's -- one of the upper extremities here and again the hair here, and the grave is along here.

Q. And if you can go ahead and clear your Telestrator markings on that exhibit. I think the diagram helps the jury understand what the photograph shows. Would that be a fair statement?

A. Yes.

Q. What was done after you arrived there, ma'am?

A. After I arrived, we carefully tried to unearth the rest of the bones and then collect those bones, and they were put into a body bag and transported to the office or transported to the morgue.
Q. Thank you. We can clear the screen now.
Was the body given a designation for purposes of your records?
A. Yes. Our case number is 135, 00SME135.
Q. 00 I assume stands for the year 2000?
A. Yes, and 135 was that number of case that we were on at that time.
Q. What was done with the body?
A. The body was, as I said, transported to the morgue at Broadlawns in Des Moines. It's transported in a body bag that's sealed at the scene by one of the DCI agents, Linda Knittig. And then once it arrives in the morgue, I check the seal and open the body bag there.
Q. You did that in this case?
A. Yes.
Q. And when did you do that?
A. The autopsy actually took place the following morning on November 9, 2000.
Q. And would you just generally describe the procedure that was used in conducting this autopsy.
A. Our usual procedure with any body is that we open the body

bag in the morgue as it appeared and we take photographs, make

note of anything that arrives with the body, and then do a complete external examination with documentation and diagrams.

It's a little bit different when your body's -- all you have is skeletal remains because there's not much of an internal examination. It's mostly a process of sorting through all the things that were brought in with the body, cleaning the bones, and photographing them.

So we photograph them in different -- in the process first before they're cleaned up, and then once we have them cleaned up, we rearrange them so that they're in anatomical order, look at each bone specifically to try to identify any type of injury or fracture and then photograph them and document that.

Q. You mentioned among the first items done was an examination of whatever clothing and personal effects arrived with the body?

A. Yes.

Q. If I can have Exhibit 1050, I believe that's already been received. What does 1050 show?

A. Once we opened the body bag, the different parts were wrapped up in different -- some were in bags marked as evidence, and most of the body itself was wrapped in this sheet here, and then as you can see, there's also bags of personal items and so forth and some dirt that was brought from the scene as well.

Q. Exhibit 1049 shows what?

2528

A. This one more specifically, you can actually identify the boot that was with the body here. Again you can see the evidence bags and the body itself.

Q. Exhibit 1048 shows what?

A. We removed those items from the body bag and tried to clean

them up a little bit and then put them on a special board to photograph them. And this is most of the items that were found in the grave with the body and sort of still around it on the bones. This photograph actually shows socks. There were two baggies here. There was a pair of underwear. This is the underwear, and this is part of the waistband of the underwear which actually had the name of the deceased in the band of the underwear. Again, the boots that were with the body or on the feet. There was actually bones in the boots. And then there were parts of a pair of blue jeans and a lot of threads and zippers that was part of that, and then some of the victim's hair you can see here.

Q. You mentioned that there was a name on the waistband of those briefs?

A. Yes.

Q. What was that name?

A. DeGeus.

Q. You've indicated that you cleaned up the bones and placed them in anatomical order?

A. Yes.

♀

2529

Q. Exhibit 1011, please, and would it -- there we go. Would that be the best orientation for us to discuss that, Doctor?

A. Yes.

Q. Thank you. What does Exhibit 1011 show?

A. This is the bones once we had placed them in anatomical order or sort of. They're not completely in anatomic order. Over -- as you look at the body -- this would actually be the left side, and this is the right side of the body -- we have the long bones of the lower extremities on both sides, some of the

bones of the feet as you can see here and the foot.

This is the pelvis here. These are all the ribs. This is the vertebral column. And this is like the jaw, the lower jaw bone, and then bones of the head although the head -- the skull was fractured and in multiple pieces. We have both of the scapulas present and then the long bones of the extremities along here.

Q. Before we get into asking about any indication of injury that you may have observed, was there an effort to identify these remains?

A. Yes.

Q. Aside from just looking at the waistband of the briefs.

A. Yes.

Q. And describe how identification was made.

A. There were -- as you can see, the jaw bone is present, the lower jaw bone, and several of the teeth were present. And some

♀

of them had fallen out of the jaw, so we collected the teeth and sent them to our dentist, Dr. John Frasco, who compared the teeth and X-rays he made and photographs he made and examination of those with the dental records, X-rays, from DeGeus and positively identified those as his remains.

Q. Who participated in the autopsy process other than what you've described already?

A. I had -- John Kraemer was present helping me with the process, and Kathy Beauchamp was the autopsy technician.

Q. Did you find any evidence of trauma on this body, Doctor?

A. Yes, I did.

Q. And would you please describe that for us.

A. There are multiple areas of trauma. There's been a gunshot

wound to the head. The head is in multiple pieces, so I can't really determine exactly the entrance and exit points of the gunshot wound, but it's fragmented the skull into multiple pieces. There's also a gunshot wound to the thorax or the chest, and that's because there is -- in the third thoracic vertebral body on the front side of that is a injury which is consistent with a gunshot wound, a fracture.

Q. Can you just -- using the Telestrator just show us just generally where that is?

A. As I mentioned, this is the pieces of the head, and it's in multiple pieces from the gunshot wound. In addition, here's your vertebral bodies all along here. The third thoracic

vertebral body would be the one that the third rib is connected to, and that vertebral body which is probably right in here has an injury which is consistent with a gunshot wound.

In addition, on the left pelvis there's a gunshot wound that goes right through the top of that pelvic bone, and then on the left humerus which is the long bone in your upper arm is fractured into three pieces because of a gunshot wound to that arm.

Q. Doctor, did you do any additional work or tests in an effort to try to locate any bullet fragments?

A. I'm not sure I understand your question.

Q. Did you do any X-ray?

A. Oh, yes, yes, we did X-ray. We X-rayed several pieces of bone trying to identify metal which sometimes sheers off from the bullet and gets stuck to the bone so that you can see where the gunshot wound actually was, and we did that in this case.

Q. If we can show what I think has already been received as

1009A and B, did those X-rays lead to the discoveries of fragments, Dr. Goodin?

A. Actually, yes. We found a bullet fragment, a metal fragment, within the clothing or head or hair with the body.

Q. Okay. And what does 1009A show?

A. It actually shows that fragment. That's it right here.

Q. And 1009B?

A. That's just the other side.

2532

MR. MILLER: If I may approach the witness, Your Honor?

THE COURT: You may.

BY MR. MILLER:

Q. Showing you what is marked Government Exhibit 1005, I'll ask if you recognize that.

A. This is actually the piece of what we thought was jacket or bullet that was recovered from the body.

Q. And were those items submitted to the DCI crime laboratory for further analysis?

A. Yes.

Let me make this -- this is the jacket in this Exhibit 1005 that was recovered from the skull. It was with the skull pieces. The photograph is actually of the -- of a metal fragment that was recovered in the hair.

Q. So those are two separate fragments.

A. Yes. I just didn't want to indicate that they were the same item.

Q. 1009 was one fragment, and what you're holding there --

A. Is actually -- it looks more like jackets that we recovered from the head.

Q. Very good. Both what are possible portions of firearm components.
A. Yes, yes.
Q. Recovered by yourself at autopsy.

♀

A. Yes.
Q. From the head and head area of Terry DeGeus.
A. Yes.
Q. Thank you, ma'am.
Finally showing you what is marked Exhibit 1000, do you recognize that?
A. Yes, I do.
Q. What is Exhibit 1000?
A. It's the sweatshirt, zip-up hooded garment, that he was wearing, and it was pulled up over his head and sort of upper extremities at the grave site, and then we recovered that at autopsy when we were going through the remains, washed it, cleaned it up, and identified holes in it.
Q. Thank you. Doctor, I just want to be clear. I think you've already indicated that apparent gunshot wounds were observed in several locations on the body of Terry DeGeus?
A. Yes.
Q. And those locations were where generally?
A. One to the head, one to the left upper extremity or the upper arm I should say, one to the chest or thorax which went through the third vertebral body, and one to the pelvis which went through his left ilium, pelvic bone.
Q. Dr. Goodin, did you arrive at an opinion as to the cause and manner of death?
A. Yes, I did.

Q.   And what was that?

A.   He died of multiple gunshot wounds.

Q.   Dr. Goodin, the office of state medical examiner you've already mentioned -- and I think we've already heard from another witness -- utilizes some outside expertise, Dr. Frasco, for example.

A.   Yes.

Q.   In the case of examination of trauma to skeletonized remains, does the office seek additional expertise on a routine basis?

A.   Yes, we do.

Q.   And is that something that's standard within the field of forensic pathology?

A.   Yes, it is.

Q.   Can you describe what is routinely done in such cases?

A.   When we have a skeleton which has injuries which are both perimortem and possibly postmortem and sometimes they're complicated injuries or we have difficulty describe -- or identifying the body, we will call in a consultant who is generally a forensic anthropologist which we did in this case who was Dawnie Steadman.

Q.   And what sort of expertise does a forensic anthropologist bring to the subject?

A.   They are -- they have specific knowledge and abilities and expertise in identifying skeletal remains.

Q.   Also assist in distinguishing perimortem from antemortem or

postmortem wounds?
A. That's correct. They can identify the disease process on the bones, any injuries, whether they're perimortem or postmortem, and help us sometimes with trajectory and also especially in this case putting the bones back together with the skull in this case to try to help determine a trajectory.
Q. Because the skull was in so many pieces.
A. Yes.
Q. And using the terms perimortem and antemortem and postmortem, can you just make sure that we all understand those terms clearly?
A. Premortem is something that's happened prior to the person's death. Perimortem is something that's within that process of their death. That's part of the injuries that probably caused their death. That would be perimortem. And then postmortem would -- especially in skeletal remains, if they're out in the open or somebody's moved them or something has happened after the death, that's postmortem.
Q. And these remains were then given to Dr. Steadman for further examination in the area of forensic anthropology?
A. Yes.
MR. MILLER: Thank you. I have no further direct.
THE COURT: Mr. Spies?
MR. SPIES: Thank you.

♀

CROSS-EXAMINATION

BY MR. SPIES:
Q. Good morning, Doctor.
A. Good morning.
Q. Doctor, you just described for us this morning that you

asked for the assistance of a forensic anthropologist in evaluating the skeletal remains you've described for us here today; is that right?

A.    Correct.

Q.    Do you feel qualified to describe for the jury some of the changes that occur in the soil to skeletal remains after they've been buried?

A.    Only that -- what we -- I can tell you what we see in general, that once a body is buried, it begins to decompose. You lose the soft tissue.  The bones have a color change depending on the type of soil they're in.  In this case we actually have adipose here that's attached to the bones.  It's a type of sort of soapy, foamy material that accumulates on the bones if they're sort of in a wet environment at some point. Those types of changes is what happens after they're buried. Does that answer your question?

Q.    Yeah, that's kind of in the direction I was heading.  And in addition, when a body is buried underneath the soil or in the soil over a long period of time, the skeleton or the bones can actually undergo changes too; is that true?

2537

A.    They -- as I said, they change colors.  I'm not sure what else you're referring to.

Q.    Okay.  Well, for example, a body that's buried in a shallow grave and gets run over by tractors can undergo soil compaction; right?

A.    Yes.

Q.    And the compaction or the weight of soil can actually change the bones, the way they're arranged in the grave, can change fragile bones and actually fracture them.

A. You can get postmortem fractures, yes.
Q. All right. And in addition, the presence of water, freezing and thawing, can change the structure of bones as well, can't it?
A. It can sometimes cause fractures, yes.
Q. And just as water that gets into rocks and freezes and thaws can split a rock, water getting into bones, teeth, other hard elements of the body can actually fracture and break those pieces apart.
A. Sometimes, yes.
Q. And you've observed in some of your own work that the -- that teeth can become dislodged from the jaw during long periods of burial.
A. Yes.
Q. Okay. I wanted to ask you specifically about some of the injuries that you observed in Mr. DeGeus's remains as you

♀

2538

discovered and evaluated them at the morgue at Broadlawns. You've described for us that there were four gunshot wounds that you observed, a wound to the head, a gunshot wound to the chest or thorax, a wound to the pelvis, and a wound to the left upper arm?
A. Yes.
Q. All right. You examined all of the skeletal remains carefully for injuries, and as I recall from examining your report, you saw no injuries to the hands; is that right?
A. That's right.
Q. And there were no injuries to the right arm.
A. Not that I identified.
Q. And there were no leg injuries that you were able to

detect.
A. I didn't.
Q. In addition to describing the layout or the arrangement of the skeletal remains of Mr. DeGeus in the grave, would you agree that metallic objects can gravitate downward in a grave such as the grave that you helped excavate?
A. I suppose they could.
Q. Well, the reason I bring that up is one of the findings you made in your autopsy of these remains was that there was copper-colored staining on some of the bones; correct?
A. On the bone from the skull, yes.
Q. Right. And you attributed that copper-colored staining to

the staining from a bullet fragment?
A. There was a piece of jacket with that bone.
Q. And when you talk about jacket, you're talking about a bullet jacket.
A. Yes.
Q. And the jacket would be the hard metallic coating on a lead bullet.
A. It's the jacket that surrounds the bullet usually made of copper.
Q. Right. The jacket's made of copper, but the interior might be made of lead.
A. Yes.
Q. All right. And so when that copper starts to tarnish or decompose --
A. Oxidize.
Q. Oxidize, thank you -- it turns green.
A. Yes.

Q. And the green bullet fragment can actually gravitate downward in the soil and rest against a bone; is that true?
A. It could.
Q. And you've seen that many times in the autopsies you've performed of skeletal remains.
A. No, I haven't really seen it just gravitate there. That would be something unusual.
Q. All right. In addition, you could find copper-colored

♀

2540

staining on other parts of the body, say, from copper rivets in blue jeans.
A. You can see copper staining from other copper items.
Q. All right. Doctor, in addition to the four gunshot wounds that you described for us this morning, did you see any evidence of any blunt trauma?
A. The head is in so many pieces, I can't rule out the possibility of blunt trauma to the head as well, but other than that, I did not identify specific blunt trauma.
Q. Okay. And by blunt trauma, we mean the use of force in a way other than by, say, a gunshot.
A. Or a knife, sharp injury.
Q. Right. So the trauma that you saw to the skull you couldn't either rule in nor rule out blunt trauma?
A. Correct.
Q. It could be -- well, let me ask you this. When a skull is struck by a bullet, the skull actually fractures, doesn't it?
A. Correct.
Q. And sends out tiny fracture lines or cracks throughout the skull depending on where the skull is struck.
A. Yes.

Q. And if the skull is struck in a place where the bone is thick, that could affect the way the skull fractures?
A. Yes.
Q. Or if the skull is struck in an area that's thin, the bone

is thin, that could affect the way the skull fractures?
A. Yes.
Q. In addition, if the bullet strikes -- actually our skull is not just one big bone, is it?
A. Correct, it's made up of several bones.
Q. All right. And in between each of those bones is a little fissure or --
A. Sutures.
Q. Suture. And if the bullet strikes a suture, it may fracture along the suture line.
A. Correct.
Q. And so depending on where the bullet strikes the skull can affect how much the skull's fragmented.
A. Yes.

MR. SPIES: Thank you. Those are all the questions I have for you.

THE COURT: Mr. Miller, anything further?

MR. MILLER: No, Your Honor.

THE COURT: You're excused.

It's about ten minutes to ten. We'll take our morning recess. We'll be in recess for 25 minutes. Thank you.

(The jury exited the courtroom.)

THE COURT: Counsel, any matters we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. SPIES: No, Your Honor. Thank you.

THE COURT: Okay. Thank you. We'll be in recess.

(Recess at 9:52 a.m.)

THE COURT: Ready to have the jury brought in?

MR. PARRISH: Yes, Your Honor.

MR. MILLER: Yes, Your Honor.

THE COURT: Do you have your next witness ready to go?

MR. MILLER: Yes.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Ready to call your next witness, Mr. Miller?

MR. MILLER: Yes, Your Honor. The United States calls Dennis Klein.

Doctor, if you'll please step forward and be sworn.

DENNIS KLEIN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Try and adjust the chair and the microphone so you can speak directly into the microphones. And when you're ready, would you please state your full name and spell your last name.

THE WITNESS: My full name is Dennis Klein, last name K-l-e-i-n.

THE COURT: Thank you.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

♀

2543

Q. Your occupation, Dr. Klein?

A. I'm a forensic pathologist.

Q. And with whom are you employed?
A. With the state of Iowa as deputy chief state medical examiner.
Q. We've just heard from Dr. Goodin. She is your superior?
A. That is correct.
Q. How long have you worked in that office, Dr. Klein?
A. A little over four years. I began in August of 2000.
Q. Would you briefly summarize your credentials for us beginning with your formal education through college and what experience you have in this field?
A. After graduating from high school, I attended a four-year college at Bowdoin College in Maine, received a bachelor of arts degree in chemistry.

Then I went to the University of Vermont medical school where I received an M.D. degree.

I then did a one-year internship in internal medicine at the Beth Israel Hospital in Boston, Massachusetts, then continued on in anatomical and clinical pathology residency training also at the Beth Israel Hospital.

I then did a one-year fellowship training in forensic pathology at the University of New Mexico.

After these I completed board certification exams in anatomical and clinical pathology as well as in forensic

2544

pathology.
Q. And have been with the Iowa State Medical Examiner's Office again since when?
A. Since August of 2000.
Q. Would you describe your responsibilities there as chief deputy medical examiner?

A. Under Iowa state law, the deputy state medical examiner has the responsibility of assisting the chief medical examiner in their duties which include the investigation of any deaths that fall under medical examiner jurisdiction. So any deaths which are unnatural, suspicious, or unexpected would fall under medical examiner jurisdiction. That may include an investigation through doing an autopsy, preparing reports, and determining opinions as far as cause and manner of death.
Q. Did you happen to carry out any such responsibilities in connection with the Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan death investigations?
A. Yes.
Q. And what was your first contact with that case, sir?
A. My first contact was a call from the Division of Criminal Investigation that an excavation was in progress on October 13, 2000. My first contact was to drive to the Mason City area to view the excavation site and discuss the preliminary findings with investigators.
Q. I don't want to know what anybody else told you in the form

2545

of any fact assertions, but if you could just briefly familiarize us with what you did at the scene and what your observations were.
A. My first observations were the surroundings. It was on the edge of a agricultural field. At that time there was a tent established and an excavation was in progress, and at my arrival there had been one -- the body of -- the remains of one body had already been excavated and the process of a second. I was able to examine and view the excavation site and then prepare back at the laboratory for the receiving of these bodies for further

examination.

Q. Okay. You were planning on performing the autopsies on whoever was recovered from this mass grave?

A. Yes.

Q. After visiting the scene there on the 13th of October, 2000, what did you do, sir?

A. I returned back to the laboratory, and then it was the following day on October 14 that we actually received the remains of four individuals, the individuals that you've just previously mentioned. At that time we began the initial process of examination of the remains and also importantly making arrangements to have consultation with a forensic anthropologist.

Q. And explain why you felt that was important.

A. Forensic anthropology is a specialty in science that are

individuals who are trained to examine skeletal remains, look at bones. They're able to determine age, sex, stature, ancestry, and also have specialty training in interpreting any types of abnormalities including injuries or diseases that could have affected the bones. I felt at this point because of the degree of decomposition, nearly decomposed to the point of skeleton, that an expert in that area was the most prudent course to take and would certainly rely on their opinions and expertise in determining my conclusions on cause and manner of death.

Q. Did you, in fact, contact a forensic anthropologist?

A. Yes, I did.

Q. And whom did you contact?

A. Dr. Dawnie Steadman.

Q. Where is Dr. Steadman?

A. She's at Binghamton, New York, a university professor.
Q. Did she at that time have any formal relationship with the Iowa State Medical Examiner's Office?
A. We had a state contract with Dr. Steadman. In the event that we needed forensic anthropology consultation services, we could call upon her to help us with the case.
Q. That had already been in place prior to October of 2000, I take it.
A. That's correct.
Q. And without expecting you to have perfect recall on records in your office, can you tell us at least in general

approximately how long that relationship had been in effect?
A. I had been in the office since August 2000, and the contract had been in place at that time, so I don't know when before then.
Q. Well, you mentioned that Dr. Steadman at least in 2000 was on a college faculty in New York. Had she previously been located more locally?
A. Yes.
Q. Where was that?
A. She was at the state University of Iowa in Ames.
Q. And you're a native of Vermont or Maine or New Mexico?
A. I grew up in Maine. Maine doesn't have a state medical school, so that's why I attended University of Vermont.
Q. Well, I apologize for correcting you, sir, but the University of Iowa, just because there are so many Hawkeyes and Cyclones that don't always mix well, is in Iowa City. Iowa State is in Ames. She was at which institution?
A. In Ames.

Q. Very good. And you've been an Iowan enough now to know that. You are a native indeed of New England; is that correct?
A. That's correct.
Q. But you've been living here in Iowa for how long, sir?
A. Four years.
Q. Raising your family here, sir?
A. Yes.

♀

Q. And you live in the Des Moines area.
A. That's correct.
Q. Now, the body as I recall you're telling us arrived back in Des Moines on the 14th of October?
A. That's correct.
Q. Was anything done immediately in the way of beginning the performance of an autopsy?
A. The initial stages of documentation of how the remains were received which include the outsides of the pictures and written documentations, sketches of the packages that the remains were in, and then also the condition of the remains including pictures and documentation.
Q. Further processing of the skeletal remains awaited the arrival of Dr. Steadman?
A. That's correct. We did perform X-rays and some initial pictures, but the actual portion of the examination which included extensive cleaning of the skeletal remains and the actual examination of the bones themselves waited for the arrival of Dr. Steadman.
Q. And that occurred when?
A. That began October 24.
Q. And again, she came from New York?

A. That's correct.

Q. Full autopsy procedures began at that time?

A. That's right.

Q. And can you tell us the approximate duration of this or these autopsies?

A. For all four individuals took four days for the majority of the cleaning and analysis to take place.

Q. Beginning on the 24th of October, 2000.

A. Until the 28th of October, 2000.

Q. And including the 24th and the 28th would be 5 full days. Was it actually each of those full days, or was it just portions of days?

A. It was a Monday through Thursday and then just the morning of the Friday.

Q. So about four and a half days?

A. That's correct.

Q. Describe for us aside from yourself and Dr. Steadman any other personnel participating in this procedure, sir.

A. Yes, there were.

Q. And who was that?

A. Special Agent William Basler from the Division of Criminal Investigation was present I believe for every day during the examination while Dr. Steadman was present.

Q. Dr. Klein, I'm going to keep you talking here for a little bit. Judge Bennett's law clerk has placed a glass of fresh water on the desk in front of you, so feel free to use that, and please do continue to speak into the microphones. That helps. Thank you very much.

What -- well, you tell us the process. How did you begin to go about the examination of the skeletal remains recovered from this mass grave?

A. Well, when the bodies are received in this condition, the first thing you have to understand is that it's not necessarily going to look necessarily like an intact human because they've been in the ground for considerable periods of time and the decomposition process is quite extensive.

So the normal thing that we would do is look at the external portions of the body. Well, that's not present at this time. So what we do is we examine what we have, and then the first thing that we do is we take X-rays of the entire remains from head to toe. The reason for doing this is that we're very interested in looking for any type of projectiles, bullets or other types of instruments or objects that could be in the body. And it's important to do this at the very beginning before any type of manipulation or cleaning takes place so that we're alerted to that and begin that process of collecting those projectiles.

Once that process is done, then in a layer-wise fashion, the dirt is removed, and the clothing is then examined. Obviously clothing also degrades, so that needs to be removed, photographed, looking for any types of labels that would give indications of sizes or even names that may be inscripted in those.

♀

2551

After those are documented and preserved for evidence, then the next step is the actual cleaning of the bones which is

the task that's actually quite tedious. Involves with a brush and sometimes water cleaning the bones so that one can see the surface.

And then the bones are allowed to dry, and then with the help of a forensic anthropologist, these bones are placed back into their anatomical position, and they're laid out on a table, and then an inventory is made of all the bones that are present and document which bones are missing.

After that is complete, then from a series from head to toe, each bone is examined carefully for disease, injuries or any type of abnormalities. Those are documented, photographed, and then examined very carefully, and interpretations are made at that time.

Any evidence that's collected, any other types of personal effects are also cleaned, photo documented, and then kept as evidence.

If there are any bullets or projectiles, those are collected during the cleaning process, and those also are photographed, documented, and preserved.

Q. These were a number of skeletons recovered from a single mass grave.

A. Yes.

Q. And how many skeletons, sir?

A. Four.

Q. You've mentioned a process that involves cleaning up the bones?

A. Yes.

Q. And I assume that is involved in the process of assembling them in separate identified skeletons?

A. Yes.
Q. And is that work all completed before analysis begins on any of the skeletons?
A. Yes, it's the first step in beginning the analysis process.
Q. If we may publish Exhibit 814, I believe that's already been received. Showing the jury Government Exhibit 814, Dr. Klein, would you describe for the jury what they see in this photograph.
A. This photograph -- I described in my previous discussions one of the initial things that's done is that the bones are cleaned, and then they're laid out in their anatomical positions, and this, in fact, is all four individuals and their skeletons are laid out on a table which has a white sheet.
Q. Then yourself and Dr. Steadman did individual examinations of the bodies of each of these four individuals?
A. Yes.
Q. You've already indicated that before washing and cleaning and assembling all of the skeletons an examination was done of the uncleaned bodies and the clothing and effects that came with

them?
A. Yes.
Q. State medical examiner number 00115, is that one of the four that was examined in this case, sir?
A. Yes, it was.
Q. And ultimately was an identification made on whose remains that was?
A. Yes, it was.
Q. Describe that, please.
A. The individual was Gregory Nicholson.

Q. And that's based upon dental examination, dental records?
A. Yes, that's correct.
Q. Exhibit 505, please. I want to take these individual by individual now if we would. What does Exhibit 505 show us, Dr. Klein?
A. The remains of Gregory Nicholson are within this clear plastic wrapping, and this is the way the body was presented to me at the morgue. And at the excavation site the remains were placed in these plastic bags, and then the writings that you see on here are the writings of individuals who performed the excavation at the site.
Q. And at the site with no positive identification having yet been made, he was referred simply to as individual number 1?
A. That's correct.
Q. If we can look at Exhibit 506 now, please, 506 shows what

♀

2554

now, sir?
A. When the wrappings are removed, there is a sheet that also encased the remains. Once those are splayed open before any other type of manipulation, this is the way the remains appeared to us at the time of beginning the autopsy.
Q. And I believe you mentioned you examined initially clothing and personal effects as well?
A. That's correct.
Q. Exhibit 511, please. What does Exhibit 511 show, sir?
A. This -- it's a high-top tennis shoe. There's a sock, and then there's a rope, a clothesline-type of rope that is around the sock. I described it in my report as a ligature around the right ankle. This is the right shoe and a sock, and the bones of the right ankle are inside there.

Q. From Greg Nicholson.

A. That's correct.

MR. MILLER: If I may approach the witness, Your Honor?

THE COURT: You may.

BY MR. MILLER:

Q. Handing you what's marked Government Exhibit 502, could you recognize that, sir?

A. Yes, I do.

Q. What is Exhibit 502?

A. This is the right shoe recovered from the remains of

Gregory Nicholson.

Q. And Government Exhibit 503, what is that, sir?

A. This is the right sock and ligature recovery -- recovered from the remains of Gregory Nicholson.

MR. MILLER: Your Honor, with the Court's permission, I would ask that the witness step down and simply display that without making any comment but simply display it to the jury so they can see it a little more closely.

THE COURT: Any objection, Mr. Spies?

MR. SPIES: No, Your Honor.

THE COURT: Okay. You may.

A. (Witness complied.)

Q. There were how many shoes, sir?

A. One shoe.

Q. And how many ankle ligatures?

A. One on the right.

Q. In addition to the ligatures or ligature on the right ankle that you just showed the jury, were there any other bindings

observed upon the body of Greg Nicholson?
A. Not at the time of my observation during autopsy.
Q. Any other artifacts, fabrics, or the like anywhere on his body?
A. Yes, there were.
Q. Describe that, please.
A. There were the remnants of pants or shorts, and then there

were coins which includes corroded three pennies and two quarters.
Q. Was there anything attached to the skull of the victim, sir?
A. Yes, there was.
Q. Describe that, please.
A. Over the lower facial area was a green fabric, and around -- partially around the skull was a gray duct tape.
Q. Exhibit 515, please. Exhibit 515 is being shown to the jury, Dr. Klein. Can you describe that for us, please?
A. Yes, this is the skull of Gregory Nicholson. The skull's positioned such that it is facing directly towards the viewer. There is a green rag here which is over the mouth area. You can see some remnant teeth here, and then this is the gray duct tape which is over -- now over the nose and eye area.
Q. Did you recover that, sir?
A. Yes, I did.
Q. I'm handing you Government Exhibit 500. Could you look at that and tell us if you recognize it, sir?
A. Yes, I recognize this as the duct tape and green cloth that I just described which was collected from the remains of Gregory Nicholson.

Q.   Now, is that currently in the same condition as it was when you took it off Greg Nicholson's skull?
A.   No.

Q.   What, if any, changes are there in its appearance?
A.   There is Magic Marker writing on it, and there's also a purple material now adhering to the duct tape.
Q.   Okay.  Can you explain for us the change in appearance?
A.   This is most likely from processing done at the crime lab after I submitted it as evidence.
Q.   After removing that from the body of Greg Nicholson, it was submitted to the DCI crime laboratory for further analysis?
A.   Yes.
Q.   Thank you.  You can set that aside.
     With Dr. Steadman -- and let me just back up.  You mentioned that Agent Basler was present as well?
A.   Yes.
Q.   Was he doing the examination, or was he acting in the capacity as an assistant there?
A.   He was assisting with cleaning and photo documentation.
Q.   Over four and a half days there was a certain amount of manual labor involved?
A.   Yes, quite a bit.
Q.   And what sort of tools were used in the cleaning?
A.   Faucet water and then brushes and toothbrushes.
Q.   Any such work done by Agent Basler was done under your supervision and that of Dr. Steadman?
A.   That's correct.
Q.   You've already mentioned to us that after cleaning these

bones they were assembled on four gurneys, four skeletons?
A. Yes.
Q. Was an examination done of Mr. Nicholson's body at that point for the presence of any evidence of injury?
A. Yes.
Q. And please describe for us in general terms where upon his body, if any, evidence of trauma was observed.
A. There were three major areas of trauma. Probably the most important is evidence of a gunshot wound in the head, and there was a gunshot defect in the skull. There was a fracture of the fourth cervical vertebra which is one of the neck bones, and then there was a fracture of the right rib, and this fracture was consistent with a gunshot trauma.
Q. Did you ultimately arrive at a conclusion as to the cause of death, Dr. Klein?
A. Yes.
Q. And what is that?
A. Gunshot wound of head.
Q. You mentioned that there was a injury I believe you indicated consistent with being inflicted by a bullet on one of the ribs?
A. That's correct.
Q. And can you just show us -- we'll get into more detail with Dr. Steadman, but can you show us approximately where that is on your own person?

♀

A. The fifth rib would be right around the nipple level, maybe a little bit lower on a person, and this was on the right fifth in the back, so on myself it would be right around here

(indicating).

Q. The fracture on C4, did that -- well, let me ask you this. That's where on a person's body, C4?

A. That would be in the mid to lower neck and on myself would be right about here (indicating).

Q. Now, in the medical field and anthropology too, you use things like C4 and L5 and those sorts of things. C4 refers to what bone?

A. C stands for cervical, and cervical is the medical term for neck. And then there are a series of bones that form the neck and goes all the way down to where we sit. And they are numbered 1 through 7 on the neck and then 1 through 12 in the back and then 1 through 5 in the lower back. So it's about midway in the neck would be 4, 1 being the furthest to the top and 7 being the lowest.

Q. So C1 would be the very top vertebra?

A. That's correct.

Q. And C4 would be the third one down from that?

A. That's correct.

Q. To a layman like me, C4 refers to a neck bone.

A. That's correct.

Q. You indicated some trauma there. Any conclusions yourself

2560

as to the nature of that, or should that await Dr. Steadman's examination?

A. Well, we did observe a number of what we call hairline fractures. There was more than one. And analysis and interpretation of how these occurred will probably best be described by Dr. Steadman.

Q. Finally you mentioned trauma observed in the area of

Mr. Nicholson's head. Can you describe that more specifically for us, sir?

A. Yes. In the back lower aspect of the skull was a defect that had all the characteristics of an entrance point for a bullet. In line with that heading towards the face in the back of the nose area in the skull, what we identified on X-ray and then later recovered was a metal fragment. It was very corroded obviously having been in the ground for some time, but it was consistent with a bullet.

Q. If we can see what has already been received as Government Exhibit 533, please, what is Exhibit 533, sir?

A. This is the skull of Gregory Nicholson, and this is a view of -- facing the skull head on.

Q. Exhibit 531 and 532.

A. Exhibit 531, this is an X-ray of the skull, and it's a side-view of the skull. And a majority of the brain material and the skin have been decomposed and is replaced by a lot of soil, and that's a lot of the other material. But what we're

very interested in here is this -- you can see it's very white. We call that an opacity, and things turn white if they are -- if they block X-rays. So things like lead and metal block X-rays, so they show up very white on X-ray. So this would be the bullet that we recovered. And just to give you an idea, this is the back of the skull, and this would be the front.

Q. Exhibit 532.

A. This also is an X-ray. Instead the view now is going front to back. And so just to orient you, these are the fillings in the teeth, and then this is the bullet here up again in that nose area. So now you've had two viewpoints, a side and a front

view, to see that it's basically right in the center -- center line of the skull towards the nose, back of the nose area.

Q. You told us earlier that the X-ray is one of the first things actually done even before the cleaning of the bodies.

A. Yes, that's correct.

Q. And was it at that stage that you recovered the projectile?

A. Soon after that. It was during the cleaning process. We recovered the bullet -- that's one of the first things that we do in the cleaning process because it's so important to recover it at that time.

Q. I'm handing you Government Exhibit 504 and ask if you can identify that for us, sir.

A. Yes, this is the bullet that we recovered from the skull of Gregory Nicholson.

Q. What was done with that, sir, after you recovered it from his skull?

A. It was very lightly brushed to remove most of the soil, photographed, and then it was essentially placed in this white container that we have right here, and then that was sent to the DCI crime laboratory.

Q. Dr. Klein, further examinations and conclusions regarding the nature of these wounds and possible trajectories of actual bullet wounds was conducted by Dr. Steadman; is that correct?

A. Yes. The trajectory of the head wound was clearly -- there was a clear entrance wound in the back of the head, and there was a bullet in the front of the head. So the trajectory of back to front is quite clear. The trajectory of the trauma to the right -- posterior right fifth rib, Dr. Steadman concluded that it was consistent with a back-to-front trajectory, but she

would need to explain that further in coming up with those conclusions.

Q. The basis for her findings is something she could explain.

A. Yes.

Q. I want to move on to the next adult victim. That's medical examiner number 00114; is that correct?

A. 116.

Q. I'm sorry, 116. Thank you for correcting me. And before we do that, I'm going to move those exhibits away from you so we can begin the next matter.

♀

Again, as with individual 115, was there an identification made on individual 116?

A. Yes, there was.

Q. Again by Dr. Frasco's dental comparison work?

A. Yes.

Q. And who was it determined was the person known to your medical examiner's office initially as SME00116?

A. It was Lori Duncan.

Q. If we can have Exhibit 605, please. What does Exhibit 605 show us, sir?

A. Again, these are the remains of Lori Duncan as they were received from the excavation site at the morgue in Des Moines. They're -- obviously writing and indication as individual number 2 which corresponds with our number 00SME116 which was later identified as Lori Duncan.

Q. And this photograph shows the remains as received at the morgue.

A. Yes.

Q. Packaged and sealed.

A. Correct.

Q. Exhibit 6 -- excuse me. I'll ask you first, you unsealed that to examine the contents.

A. Yes.

Q. And if we can look at Exhibit 608 now, please, what does Government Exhibit 608 show, sir?

♀

A. Again, as we described previously for individual number 1 or Gregory Nicholson, this is Lori Duncan, and the wrapping has been removed, and the remains as we see them here are as they were received from the excavation site.

What we can see here is the skull is right here. The chest area is right here, and then there's a lot of dirt here and then covering other parts of the remains, and then the shoes and ligatures are here. And then you also see these other tan envelopes which are -- contain small bones that were collected at the time of excavation and were believed to be part of this individual.

Q. Did you do -- let me ask you this. Did your X-ray show any bullets or bullet fragments still remaining with the body?

A. No.

Q. As with Greg Nicholson's remains, did you at least during an initial phase of your examination collect and examine clothing, personal effects, bindings, and the like?

A. Yes, we did all of that.

Q. And what did you find?

A. As far as clothing, we did find a bra, women's underwear covered by sweatpants. There were two white socks and a right shoe. As far as effects go, there were ligatures around both ankles, and then around the skull just as we had described for

Gregory Nicholson, there was a green cloth that was actually inside the oral -- the mouth, and then there was a duct tape

that went all the way around the chin and the back of the head. That was a gray duct tape.

Q. We heard a bit about this from Mr. Hochrein last week, but the presence of only a portion of what a person would ordinarily be wearing after seven years' decomposition is explained by what, sir?

A. Well, there's two expla -- one could be a material that is degraded in the ground or the articles were not with the individual at the time that they were inhumed.

Q. Absence of upper garment doesn't necessarily mean after seven years that one wasn't worn, however.

A. That's correct.

Q. Okay. And why is that?

A. I'm sorry. Could you repeat --

Q. How come some garments decompose and some don't I guess is my short question?

A. Right. Basically different materials depending on what they are, if they're a natural fiber versus a synthetic fiber, they're going to degrade at different rates, and also depends on in that particular environment if there was air or bacteria that could degrade.

Q. Which would ordinarily degrade faster? Natural fibers or man-made?

A. Usually natural fibers will degrade quicker.

Q. If we can see Government Exhibits -- I'm going to be

displaying 609 through 614 beginning with 609. What does Government Exhibit 609, that photograph, show us, sir?

A. What this shows is -- what I was trying to illustrate is the ligature around the right ankle there.

Q. 610.

A. And again, this is a close-up showing -- the ligature goes around this way, and these are loose ends of the ligature.

Q. How many loose ends were there on there if you recall?

A. On the right -- excuse me, on the left ankle there were three, and on the right ankle there were two loose ends.

Q. 611.

A. And again, this shows the left ankle, and there's three loose ends.

Q. And feel free to quarrel with me, Dr. Klein, but is there possibly a fourth?

A. Oh, yes, I'm sorry. These -- this is one rope here, and then this continues on, and then there are three ends to this. So there's a little connection between here.

Q. This is from which ankle of Lori Duncan?

A. This would be the left.

Q. Exhibit 612 shows what, sir?

A. This is the right ankle and right shoe.

Q. Of Lori Duncan.

A. That's correct.

Q. And Exhibit 613?

2567

A. And again, this is a close-up of the ligature.

Q. The ligatures on the right ankle and the left ankle of Lori Duncan --

A. Right, so both ankles had ligatures around them.

Q. But they were not connected to each other.

A. That's correct.

Q. At least at the time of the autopsy.

A. Yes.

Q. And actually Exhibit 614, sir.

A. And here is the right ankle with two loose ends.

THE COURT: Members of the jury, why don't you take a stretch break.

Thank you.

BY MR. MILLER:

Q. Doctor, Exhibit 602 is what, sir?

A. Exhibit 602 is the right shoe of Lori Duncan.

MR. MILLER: And again, Your Honor, the witness is not wearing a lavaliere, so I'll ask that he not actually address the jury, but if he with the Court's permission could simply briefly show it up close so they can see that.

THE COURT: Mr. Spies, any objection?

MR. SPIES: Without objection, Your Honor.

THE COURT: Thank you. You may proceed.

BY MR. MILLER:

Q. Go ahead and show it to the jury a little closer so they

can see what you're referring to.

A. (Witness complied.)

Q. Exhibit 603 is on the desk in front of you. Would you identify that, sir?

A. Exhibit 603 is the sock and a ligature, and it's in particular the right sock of Lori Duncan.

Q. And that also shows that ligature around that right ankle?

A. That's correct.

MR. MILLER: And again with the Court's permission if the witness can step down and do the same procedure.

THE COURT: Any objection, Mr. Spies?

MR. SPIES: No, Your Honor.

THE COURT: You may.

A. (Witness complied.)

Q. And finally on this subject, Exhibit 604 is on the desk in front of you. Do you recognize that, Dr. Klein?

A. Yes, I do.

Q. What is 604?

A. 604 is a sock and a ligature, in particular the left sock of Lori Duncan.

Q. That you removed from the left ankle of Lori Duncan at autopsy?

A. Yes.

MR. MILLER: Again, Your Honor, with the Court's permission.

♀

2569

THE COURT: You may. Any objection?

MR. SPIES: No.

A. (Witness complied.)

Q. Dr. Klein, you mentioned some bindings or artifacts that were recovered from the area of Lori Duncan's skull. You described that again as what, sir?

A. There was a green cloth that was in the mouth, and then there was a duct tape, a gray duct tape, that went all the way around the chin, and they connected in the back of the head.

Q. Dr. Klein, we've been showing a number of photographs today. I assume -- well, you tell me. What is the procedure or

protocol for documenting your findings at an autopsy?

A. Really they're twofold, and they're usually complementary. One is actual sketching and notation, and then the other is photographs.

Q. We've seen a handful of photographs here. I assume this is a small fraction of those that were taken?

A. Yes.

Q. And did you select these for purposes of illustrating your findings to the jury in this case?

A. Yes, I did.

Q. If we could call up Exhibit 619, please, what does Exhibit 619 show us, Dr. Klein?

A. 619 is a photograph of Lori Duncan's skull, and this is the right side of the skull. The face would be on this end, so the

♀

front would be here, and this would be the back. And then there's the gray duct tape around the skull, and the chin would be right around in this area.

Q. The fibers and lines that appear to surround a lot of the face, what is that? This is prior to cleaning?

A. Yes, that's correct. So a lot of the fibers that you see are actual vegetation, so root-type material, dirt, and that type of material.

Q. So that was actually attached to the skull as it was received by you?

A. Yes.

Q. Exhibit 620. Shows what, sir?

A. Again, skull's in the same condition. This is looking at the back of the skull. And again, here is the gray duct tape material as it appeared on the back before any other processing

or cleaning had been done to the remains.

Q. Exhibit 621 shows us what, sir?

A. And again, this is a photograph now looking at the face of the skull of Lori Duncan, and again, this would be the top here, and this would be the chin area right in there, and the duct tape is covering the chin area.

Q. Exhibit 622 shows us what, sir?

A. This again is the skull of Lori Duncan, and this is a view looking from the bottom of the skull upward, and so this would be the front of the skull. This would be the back of the skull.

And the mouth would be right in here, and you can see a little bit of green -- that green fragment -- fabric that I've been discussing as it protrudes slightly from the mouth. And this gives you a view of the duct tape which goes all the way around the base of the head incorporating the chin and the front.

Q. Did you compare at least visually the green fabric and duct tape observed on these two adults, Nicholson and Lori Duncan?

A. Yes, I did.

Q. And describe any observations along that line.

A. The duct tape had the consistency of what one would normally find as normal duct tape you would find at a hardware store. The green fabric was of a thin type of material that may be from a rag made from clothing or even a rag for cleaning.

Q. Exhibit 623, and what does that show us, sir?

A. This is the actual duct tape and green fabric that was able to be removed in its entirety from the skull of Lori Duncan, and so this would have represented the back of the skull, and this would have been the front of the skull.

Q. And finally Exhibit 624. Shows what, sir?

A. This is a close-up of the front of the duct tape, so if we -- and this here is the green fabric that was in the mouth, and this would have been the front of the skull here.
Q. Dr. Klein, what did you do with that item, that tape and fabric?
A. After drawing sketches, photo documenting, then I turned it

over to the crime laboratory for further analysis.
Q. In the condition that it appears in the photograph Exhibit 624?
A. Yes.
Q. So you didn't personally try to unravel it or take it apart.
A. No.
Q. Turned it directly over to the crime laboratory?
A. That's correct.
Q. So as far as any shape of that green fabric, that wouldn't be something that you documented but rather would be up to the laboratory personnel?
A. That's correct.
Q. Thank you, sir. If we can have Exhibit 625, I believe that's been received in evidence, photograph. And orienting that with the skull at the top, what does Exhibit 625 show us, Dr. Klein?
A. This is the full skeleton of -- I believe this is of Lori Duncan. Can we make that a little bit higher magnification?
Q. Pardon me?
A. Just verify the number on there. Yes, this is the full skeleton of Lori Duncan.
Q. Okay. Thank you. Can you tell us after washing the bones

and assembling the skeleton of Lori Duncan, did you, with Dr. Steadman, succeed in locating any areas of trauma?

A. Yes.
Q. And just in general where were they located, sir?
A. In general the injuries involved the head, the left forearm, and ribs and the left hand and the right hip.
Q. Taking those in order and again understanding that more detailed findings were arrived at by Dr. Steadman, can you tell us in general what was observed in the right hip area, the first you indicated was possible trauma.
A. Yes. The right hip had a fracture line that could have been from trauma, blunt force-type trauma.
Q. Any observations regarding trauma to -- I believe you indicated the left extremity?
A. Yes. There -- on the hand was also a hairline fracture, also could have been due to blunt trauma. And then there was a fracture of the ulna which is the bone along the pinky and elbow, and towards the elbow side there was a fracture that was consistent with a gunshot wound.
Q. You described injuries in the area of the ribs?
A. Yes.
Q. And what observation did you make?
A. There were fractures in four of the ribs. In the right fourth rib in the back was a fracture -- I'm sorry. In the right front fourth rib was a fracture. In the back of the left ninth rib and in the front eighth rib were all fractures that were consistent with gunshot wound. And then in the right front

seventh rib was also a fracture that may have been due to a gunshot wound as well.
Q. Not as clearly a gunshot wound, however, as the --
A. That's correct.
Q. And finally with regard to -- well, let me ask you this. Would assessment as to trajectory and mechanics involved in these wounds be something that Dr. Steadman's expertise would be better directed toward addressing?
A. Yes.
Q. And finally you indicated observing some trauma in the area of the head. Can you describe that for us, please, generally.
A. Yes. The easiest injury to identify is an exit wound in the left side of the skull in the frontal bone which is towards the forehead on the left side. It has a characteristic finding of bevelling that indicates a bullet leaving the skull. There were absent bones and multiple fractures on the right side of the face that is the most likely position or location of an entrance wound, but certainly Dr. Steadman who performed a reconstruction would better be able to describe the entrance point of a bullet on the head.
Q. Again, X-rays of the entire body were negative for the presence of any lead still present in the body.
A. Yes, it was all negative.
Q. Did you arrive at a professional opinion regarding cause of death of Lori Duncan, Dr. Klein?

A. Yes, I did.
Q. And what is that?
A. Multiple gunshot wounds.
Q. There was a pair of smaller skeletons received at autopsy;

is that correct, sir?
A. That's correct.
Q. Subadult victims.
A. Yes.
Q. Was identification possible by standard dental record examination?
A. No.
Q. Did you, however, arrive at an identification of the remains of these two small skeletons, Dr. Klein?
A. Yes.
Q. And describe that for us and how you base your identification.
A. There is a scientific technique called mitochondrial DNA, and I'm sure you've probably heard through the news and just reading normal lay literature that one can make an identification on DNA. We use the slightly different technique called mitochondrial DNA, and unlike DNA which is unique to each individual, mitochondrial DNA is a much shorter and robust DNA that's found in all of our cells, and there are many, many copies in one cell as opposed to just one copy in the normal cell of nuclear DNA.

♀

2576

What's an interesting and unique aspect of mitochondrial DNA is that mitochondrial DNA is passed on from mother to their child. So, for instance, I have the same mitochondrial DNA as my mother, and I have the same mitochondrial DNA as my grandmother.
Q. On your mother's side.
A. On my mother's side, my maternal grandmother. We were able to take advantage of this technique combined with anthropology

to come up with an identification of these two individuals. We were able to use the mitochondrial in the maternal line of both these children, and they did, in fact, all share the same mitochondrial DNA, and then using anthropology to determine age estimation and stature, we were able to separate the two siblings Amber and Kandace.

Q. On the basis of age as indicated by the skeletal remains.

A. That's correct.

Q. And while discussing the mitochondrial DNA just so we get a very clear idea about this -- I just want to be sure -- we hear a lot about DNA in the area of forensic science these days. Mitochondrial DNA is a little different from something we commonly think of as being the almost fingerprint positive DNA, and I think you've explained to some degree you actually have the same mitochondrial DNA as your mother.

A. That's correct.

Q. All of us do.

♀

A. That's right.

Q. And if you have a child, that child, does that child have your mitochondrial DNA, Dr. Klein?

A. No. It would have my wife's mitochondrial DNA.

Q. So one can identify the same mitochondrial DNA going up the matrilineal line, mother, grandmother, great grandmother.

A. That's correct.

Q. And comparing the mitochondrial DNA of these two children with DNA sample from Marge Milbrath arrived at what, if any, findings?

A. They shared the same mitochondrial DNA which shows that they had a very high probability of being from the same maternal

line, and then combining that with the stature which is the heighth and the age estimation based on the findings in the bones, also combined with the circumstances were all consistent with making an ID and is a very good scientifically means of making an ID in this situation.

Q. Circumstances in this case including the simultaneous disappearance of Lori Duncan and her two daughters.

A. That's correct.

Q. And in talking about probabilities, I mean, the two children had mitochondrial DNA consistent with being grandchildren of Marge Milbrath.

A. That's correct.

Q. Through their mother.

♀

A. That's correct.

Q. You're not telling us what any specific probabilities are here.

A. No. That's outside my area of expertise.

Q. And, frankly, just so we're clear about this, you did not personally do the mitochondrial DNA examination.

A. That's correct.

Q. Where was that done, sir?

A. That was done by the FBI laboratory.

Q. And just so we're perfectly clear because I don't want to be overstating anything, the mitochondrial DNA scientifically speaking shows us at least that these two small skeletons were consistent with being children of Lori Duncan who was herself a child of Marge Milbrath.

A. That's correct.

Q. And based on that and the estimated ages of the children

and the circumstances, you arrived at what identification of the remains of these two skeletons?
A. The individual identified as individual number 3 was Kandace Duncan and then the last individual who's the smaller of the two, Amber Duncan.
Q. Let's talk about Kandi Duncan first. Did you follow the same procedure as with the two adults beginning with an external examination?
A. Yes.

♀

Q. And if I can have Exhibit 701, please. What does Exhibit 701 show us, sir?
A. What we're trying to illustrate here is individual number 3 which is later identified as Kandi Duncan or Kandace Duncan. And within this clear plastic wrapping are the remains of Kandace Duncan.
Q. The wrapping in the foreground here.
A. That's correct.
Q. The wrapping in the background, can you even tell us which individual that is?
A. This is individual or item number 52 which is Gregory Nicholson.
Q. Thank you. Exhibit 702. What does Exhibit 702 show us, sir?
A. In the same procedures we showed for the previous two individuals, the wrapping is removed, and the remains as they're received from the excavation site are photographed here, and these are the remains that are later identified as Kandace Duncan.
Q. Did you document any clothing, effects, or other artifacts

aside from the body itself?

A. Yes, there was a dress as well as some remnant underwear.

Q. Were there any bindings on this individual?

A. None that were presented during autopsy.

Q. What you found was a dress of some sort.

♀

A. That's correct.

Q. I show you what has been received as Government Exhibit 700 and ask if you can identify that for us, Doctor.

A. Yes, this is the dress that covered the remains of Kandace Duncan.

Q. Was the skeleton cleaned as -- in the same fashion that you described earlier?

A. Yes, we followed the same protocol that we've described.

Q. In examining the skeleton remains of Kandi Duncan, did you find any evidence of trauma on her body, Doctor?

A. Yes, I did.

Q. What was that?

A. There was a entrance gunshot defect in the back of the head, and then there was a blowout defect in the face which would be consistent with an exit gunshot defect.

Q. If we can have Exhibit 704, please, what does 704 show, sir?

A. 704 is the uncleaned skull of Kandace Duncan. This is the left side of the skull. This would be the front, and this would be the back, and here we can see remnant teeth.

Q. Exhibit 705 shows what, sir?

A. This is also the uncleaned skull of Kandace Duncan. What's illustrated in the center of the picture is the entrance gunshot defect, and this would be in the back of the skull about here on

my own head.

Q. Near the center of the back?
A. That's correct, slightly to the right but more or less in the back.
Q. Exhibit 706, please, what does Exhibit 706 show, sir?
A. During the cleaning process, the skull was very fragmented. So again, this is the skull about midway through the cleaning process. In the previous picture we showed the entrance defect here. The bone that was here came off as well as many other fragments, and these fragments were all likely due to the gunshot blast, and it was later on in the process that these pieces are placed back and we're able to analyze those again as far as entrance and exit defects in the skull.
Q. Did your X-rays locate any bullets or bullet fragments with regard to Kandi Duncan's remains?
A. No.
Q. And again, assuming a single bullet entered and exited, would that at least still be consistent with gunshot injury?
A. That's correct.
Q. Did you arrive at a conclusion, sir, as to the cause of death of Kandi Duncan?
A. Yes, I did.
Q. And what is that, sir?
A. Gunshot wound of head.
Q. Finally, Doctor, the fourth skeleton, individual number 4, you examined that as well as the other 3 I take it.

A. Yes.

Q. And the same procedure?

A. Yes.

Q. Beginning with the external examination, what were your findings, sir?

A. Again, they revealed the individual's clothed in a bathing suit and a short-sleeved shirt, and after cleaning we found that there was an entrance gunshot defect in the back of the skull and again there was defects in the facial area consistent with an exit site, so again, consistent with a bullet going from the back of the head and exiting out the front of the skull.

Q. If we can have Exhibit 801, please. I believe you've already indicated you followed the same procedure as with the other three victims?

A. That's correct.

Q. 801 shows us what, sir?

A. This is the wrappings or coverings that Amber Duncan's remains were maintained from the scene excavation to the morgue.

Q. Exhibit 802 shows us what, sir?

A. This is as the remains were received after the wrappings are removed. This shows the clothing and the skeletal remains prior to any processing or cleaning.

Q. What was the posture of the victim as far as her body position? Was there anything unusual about it, sir?

A. Yes. Well, the bathing suit was on the torso as would be

2583

expected. The shirt was inverted with the head -- with the arms up over the head so almost in a posture as if someone were removing a T-shirt, one would go in this type of posture, and that's the way the remains and the shirt were as we received

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2254 of 3636

them.
Q. And just so we're very careful, you're not suggesting to the jury that any such physical movement was done by any particular person.
A. No. I just used that for example purposes of describing the position of the person, not how they got there.
Q. And were the garments and any personal effects, if any, recovered from the body before continuing the autopsy?
A. Just the clothing were the only effects that were collected and preserved for evidence.
Q. And in this case the clothing consisted of a bathing suit and a T-shirt that was pulled up over the head?
A. That's correct.
Q. Exhibit 816, do you recognize that item, sir?
A. Yes, I do. This is the shirt from Amber Duncan that was recovered during autopsy.
Q. That's the T-shirt that you've described as having been pulled up over her head?
A. Yes.
MR. MILLER: And with the Court's permission again without asking the witness to comment at all if he could be

permitted to display it to the jury by showing front and back in front of the jury box.
MR. SPIES: No objection, Your Honor.
THE COURT: You may.
A. (Witness complied.)
Q. And finally, sir, can you identify Exhibit 800 that's already been received in evidence?
A. This is the bathing suit that was recovered from the

remains of Amber Duncan.

MR. MILLER: And again with the Court's permission, I'd like him to publish to the jury in the same fashion.

THE COURT: You may. No objection, I assume.

MR. SPIES: No.

A. (Witness complied.)

Q. Dr. Klein, after removing the garments and cleaning the bones, you again laid them out in anatomical position with Dr. Steadman?

A. Yes.

Q. And did you observe any indication of trauma on the bones of Amber Duncan?

A. Yes.

Q. And describe that for us.

A. Very similar to the previous case, there was an entrance gunshot defect in the back of the head, and there were blowout defects in the facial area consistent with an exit site.

Q. Showing Exhibit 805, what does Exhibit 805 show, sir?

A. This is the back of the skull of Amber Duncan prior to any cleaning, and what we see here is an entrance bullet defect.

Q. And Exhibit 808 shows us what, sir?

A. These are fragments of the skull and facial area of Amber Duncan, and you can see here's some remnant teeth, so it puts it in the upper jaw area. And these are all fragments that Dr. Steadman was able to utilize in attempting to partially reconstruct the skull.

Q. Reassembling that skull was Dr. Steadman's task?

A. That's correct.

Q. Dr. Klein, based upon your examination at autopsy, did you

arrive at a professional conclusion regarding cause of death of Amber Duncan?

A. Yes, I did.

Q. And what is that, sir?

A. Gunshot wound of head.

MR. MILLER: Thank you. I have no further direct.

THE COURT: Mr. Spies?

CROSS-EXAMINATION

BY MR. SPIES:

Q. Good morning, Doctor.

A. Good morning.

Q. Doctor, you mentioned for us this morning that you did a short I think residency or internship at the University of New

♀

Mexico.

A. Yes.

Q. And what year was that, please?

A. That would have been from 1999 to 2000.

Q. And while you were at the University of New Mexico, did you meet Dr. Stanley Rhine?

A. He was not there at the time that I was there.

Q. All right. Dr. Rhine is a faculty member, was a faculty member at the University of New Mexico in their anthropology department; am I right?

A. That's correct.

Q. And a distinguished renowned forensic anthropologist?

A. Yes.

Q. Doctor, if I may, please, I want to turn your attention to the specific findings that you made in your examination of the four skeletal remains that you testified about this morning.

First in reference to the skeletal remains of Greg Nicholson -- this was your case number 115.
A. Yes.
Q. -- you observed for the jury that you detected a gunshot wound to the head and that the bullet that was used did not exit Mr. Nicholson's head; am I right?
A. That's the conclusion, yes.
Q. In your experience and your training in forensic pathology, is the fact that the bullet did not exit the skull indicative

2587

that it was a low-velocity as opposed to a higher-velocity bullet?
A. In general the more velocity that a bullet has the higher likelihood that it will be a perforating gunshot or through and through. But it depends on the case and what happens. Sometimes they go through, and sometimes they don't.
Q. Sure. There are all sorts of variables that come into play, where, what type of bone the bullet struck.
A. That's correct.
Q. Whether there were any intervening articles like clothing, glass, et cetera, that might interfere with the path of the bullet?
A. Those could all be factors, yes.
Q. Whether the bullet was deformed as it passed through the skull and so forth.
A. Yes, those are all possible.
Q. You did observe that this was a back to front trajectory?
A. Yes.
Q. All right. And I think that you described it both in your testimony this morning and in the report that you did in

summarizing your findings that the bullet fragment or the missile fragment that you found in Mr. Nicholson's skull was severely deformed and corroded?
A. Yes.
Q. Doctor, in your report concerning your findings, you

described the entrance wound I believe as a keyhole wound?
A. Yes.
Q. And could you tell the ladies and gentlemen of the jury what you mean by a keyhole wound?
A. If I could just back up and describe how we determine gunshot wounds in the skull to begin with, if anyone has ever seen, for instance, a BB that goes through plate glass, usually what happens is you get a bevelling effect such that the small portion of the cone is where the bullet enters, and then where the bullet exits that plate glass, there's the wider area, so it's a cone going out this way as the bullet's travelling in this direction.

The skull can be considered very similar in its behavior to ballistics as plate glass. The skull is flatter in some areas and more curved in other areas. In the area of Gregory Nicholson where he was shot, it was in a curved portion of the skull at the base, and so what happens is depending on where that curve is and how that bullet hits it, part of the bevelling can be inward and then part can be outward because of that curvature and the relationship of the bullet and the skull. And it forms what's called a keyhole. Just as a keyhole like a skeleton key has a certain almost like a spade-type shape, that's what we've described as a keyhole. And in this particular instance why it's a keyhole is because the bullet is

hitting on a very curved portion and may be at some angle as

well.
Q. In other words, the bullet would have struck the skull at something of an angle compared to the -- let's see if I can mix up my geometry here, compared to the tangent of the curvature of the skull.
A. That's correct.
Q. So something of an angular entrance at that site.
A. Right, the relative angle of the curve and the trajectory of the bullet, that's correct.
Q. You also observed in your findings that there was no soot associated with this wound. Could you tell us, please, what you mean by that?
A. If a weapon is held within a certain distance, usually fairly close, within a couple of inches, the gun powder which is used to propel the bullet out of the gun can also produce soot deposition on an object or a person if they're shot at close range.
Q. So, for example, when a firearm is discharged, not only does a bullet come out of the end of the barrel but also smoke, soot, and in some cases unburned particles of gun powder residue that are actually propelled out the end of the barrel.
A. Yes.
Q. And depending on how close in proximity to the target of that gunshot, those gunshot or gun powder residues can actually be embedded in the skin or in some instances embedded in the

bone surface itself.

A. Yes, that's all possible.

Q. All right. And so your finding in reference to Mr. Nicholson that there was no soot at the site of where the bullet entered gave you a clue that this was not a close contact or a contact gunshot wound.

A. At least the evidence for saying that it was a close range or contact was not there.

Q. Doctor, let me ask you just a short question about your observations of the fourth cervical vertebra in Mr. Nicholson's body. You said that there was a hairline fracture or fractures at that site?

A. Yes, there were more than one fracture.

Q. And are you in a position to tell us the -- how those fractures occurred?

A. Again, I think Dr. Steadman would be the person who has the most expertise in having opinions and drawing conclusions on how that may have occurred.

Q. In your experience as a forensic pathologist, however, have you observed similar fractures being consistent with a fall?

A. Yes.

Q. Next I'd like to ask you a few questions about your findings in the examination of Lori Duncan's remains. This was your case number 116. Again, you described that there was a gunshot wound to the head, but in this instance you found no

2591

bullet fragments or missile fragments indicating that the bullet penetrated and exited her skull?

A. That's correct.

Q. Were you able to determine any distinct entrance wound?

A. No distinct entrance, but there was a distinct exit wound.

Q. Right. And did you reach a conclusion about the trajectory of the bullet passing through Miss Duncan's skull?
A. Right. The most likely trajectory is a right to left and possibly some upward, but because of the degree of fragmentation and exact location, I was not able to determine, and maybe Dr. Steadman could be more specific on exact entrance site.
Q. We have to be careful, though, about drawing conclusions about trajectory, don't we?
A. Yes.
Q. In other words, there are -- again, just as there are all sorts of variables that can affect the size of an entrance wound or the path of a bullet through bone, drawing conclusions about whether a bullet was fired up, down, left, or right can depend on a lot of variables as well.
A. Yes.
Q. Not only the height of the shooter, the manner in which the firearm was held, the way the body was -- person shot was adjusted in relation to the shooter, there are a whole lot of factors; right?
A. Right. I mean, a forensic scientist who analyzes gunshot

wounds, the trajectory that's given is always in relation to a presumed anatomic position. We're not able to determine exact position of the shooter nor of the victim.
Q. So, for example, if a person were looking down or up, that could affect the perceived trajectory of the bullet.
A. Yes.
Q. Okay. Again, did you find in examining the skeletal remains of Lori Duncan that there was no soot at the site of the gunshot wound?

A. We did not find -- that's correct. We did not find any soot on any of the fragments that were in the areas presumed to be the entrance site.

Q. You also described for the jury this morning injuries to the ribs of Lori Duncan. And again, would Dr. Steadman be in a better position to describe whether those rib fractures occurred as a result of gunshot wounds, falls, or other trauma?

A. Yes.

Q. Finally I want to ask just a few questions about the skeletal remains that you examined of Kandi Duncan and Amber Duncan. Again, with children, the bones of children are thinner than the bones of adults; is that right?

A. Yes.

Q. And this is also true with the skull bones.

A. Yes.

Q. And we heard from Dr. Goodin this morning that our skull is

2593

really not just one continuous bone. It's a series of bones sutured together, so to speak.

A. Yes.

Q. And the -- are the skull bones of uniform thickness, Dr. Klein?

A. No.

Q. Where are the thicker parts of our skull?

A. The thicker portions are in the base of the brain and along the -- what we call the petrous ridges which is where the brain sits on, and then there's also thick portions in and around the maxilla.

Q. Did you measure the entrance wound to the skull of Kandi Duncan?

A. Yes.
Q. And did you find it to be 5/16 of an inch?
A. Yes, I did which measures about .312 inches. The measuring utensil that I use is measured closest to the 16th of an inch, so I usually measure to the closest of a 16th of an inch. So there's some variability in -- you know, I'm not able to measure down to the hundredths and even tenths of an inch.
Q. So was that a mathematical computation then to get to .312 inches?
A. Right. That would just be dividing 5 by 16.
Q. And again, you observed no soot to the entrance wound to Kandi Duncan's head?

2594

A. That's correct.
Q. Likewise, you measured the diameter of the entrance wound to Amber Duncan's head and I think in your report observed that to be 3/8 of an inch?
A. That's correct.
Q. And again, no soot?
A. That's correct.
Q. Doctor, would in your experience and training the gunshot wounds to Amber Duncan and Kandi Duncan be immediately incapacitating?
A. I think that would be the most likely situation.
Q. Result in immediate loss of consciousness?
A. Yes, that would be the most likely.
Q. And finally concerning the garment that you've described being over the head of Amber Duncan, you're not able to determine whether that garment was put in that position before or after her death.

A. That's correct.

MR. SPIES: Thank you.

THE COURT: Mr. Miller, any redirect?

MR. MILLER: Yes, Your Honor. Thank you.

REDIRECT EXAMINATION

BY MR. MILLER:

Q. Please explain the mechanism involved in depositing soot on a victim during a gunshot experience and what, if anything, that

tells us.

A. Well, the mechanism is a weapon is held -- the end of the muzzle of a weapon is held in front of an object or person, and the weapon is discharged. The first thing to come out of the barrel is the bullet. Following that is going to be smoke, soot, partially burned gun powder particles that are going to land on the surface if they're close enough.

So if there's any intervening material overlying a person, say, such as clothing or hair, the soot in that material will often be collected on that surface that's intermediate between the end of the rifle and the person. And it's the expulsion of these materials out of the end of the weapon that lands on the surface of material or person that causes soot deposition.

So, for instance, in a case of a gunshot wound to the head in a person that I would observe who isn't decomposed and it was a close range of fire, we would see soot deposition on the skin, and we may or may not see soot deposition on the skull, especially if it were an inch or two away. If it was a contact wound, there's more likelihood of actually having soot on the skin but also may also see it on the skull.

Q. So soot may actually go as deep as the bone itself.
A. It can, yeah, but it doesn't always.
Q. And in any event, the first surface struck would be the skin or hair?

♀

A. That's correct.
Q. And would the presence of hair affect possibly how deep smoke, soot, or particles may travel?
A. These are all barriers that would absorb and be the first contact for soot, and so these would all be factors that may decrease the chance of actually seeing soot on the skull bone.
Q. And in this case the bodies of all four victims were decomposed such that the skin was all gone.
A. That's correct.
Q. Had there ever been soot, smoke, or particles on the skin, decomposition took care of that.
A. Yes.
Q. And with regard to any that might have gone as far as the bone, would exposure to the soil and the ground have any possible effect on the preservation of such evidence?
A. It could. I don't know. I don't know of any studies or anything that have looked at that particular question.
Q. I just want to be -- and I'm not sure it makes any difference, but I just want to be as sure as we can about this. Can you really tell us anything one way or the other as to the likely muzzle target distance between the end of that gun and the back of, say, Amber Duncan's head?
A. No. I think the best description of a range would be indeterminate.
Q. And let me ask you this. Is the loss of soft tissue -- and

by that I mean not only skin but organs and muscle -- cause the loss of evidence that you would otherwise want to and find of value in doing a death investigation?

A. Yes. I think there's information that's been lost by not having soft tissue available to analyze.

Q. Not only with respect to possible muzzle target distance determination but injuries that may affect soft tissue and not fracture bone.

A. That's correct.

Q. Are there any such injuries?

A. Yes, there are many injuries, bruises, lacerations, injuries to internal organs that could be gunshot or any type of penetrating injuries that don't involve bone. These are all pieces of information that could be determined in the intact body versus the decomposed skeletonized body.

Q. Likewise, blunt trauma, does that sometimes leave evidence on soft tissue without fracturing bone?

A. Yes.

Q. And finally I think you indicated as one of the factors affecting the deposit of soot, smoke, and other particles from the muzzle of a gun would be any intervening materials whatsoever?

A. Yes.

Q. Would a silencer on a firearm be one such possibility?

A. Yes.

2598

MR. MILLER: Thank you. I have no further redirect.

THE COURT: Mr. Spies, anything further for this witness?

MR. SPIES: Nothing further, Your Honor. Thank you.

THE COURT: You may step down.

THE WITNESS: Thank you.

THE COURT: Members of the jury, we'll take our recess until 12:45. Please remember my instruction about keeping an open mind until you've heard all of the evidence in the case. Thank you.

(The jury exited the courtroom.)

THE COURT: Anything we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: No, Your Honor.

THE COURT: Could I just see one lawyer from each side for a second?

(At sidebar off the record.)

(Lunch recess at 11:54 a.m.)

THE COURT: We ready to have the jury brought in?

MR. MILLER: Yes, sir.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Is the government ready to call its next witness?

MR. MILLER: Yes, Your Honor. The United States calls Dawnie Steadman.

♀

2599

Dr. Steadman, if you'll step forward and be sworn.

DAWNIE STEADMAN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. Make yourself comfortable. And could you please adjust the microphone and the chair so you can speak directly into the microphones. And you

can move those microphones. And when you're ready, would you tell us your full name, please, and spell your last name.

THE WITNESS: My name is Dawnie Lee Wolfe Steadman, S-t-e-a-d-m-a-n.

THE COURT: Thank you.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Good afternoon, Dr. Steadman.

A. Good afternoon.

Q. Your occupation, Doctor?

A. I'm a professor -- assistant professor at the state University of New York at Binghamton.

Q. In what field?

A. In anthropology, biological anthropology.

Q. How long have you been employed there?

A. Since 2000, four years.

Q. And what are your duties there at the university?

A. I teach both undergraduate and graduate courses in

biological anthropology including skeletal anatomy and physiology, introduction to biological anthropology, forensic anthropology, paleopathology. I also do research in those fields, in forensic pathology and bioarchaeology.

Q. Please summarize for us if you would your formal education that allows you to work in this field.

A. I received a bachelor's in anthropology from the University of Arizona in 1989, and I received my master's and Ph.D. from the University of Chicago, the Ph.D. in 1997.

Q. You've indicated that you've done continued research in these fields?
A. Yes, I have.
Q. And have you been published?
A. Yes. I have a book that I've edited that came out in 2003 in forensic anthropology, and I've also published papers in forensic anthropology and bioarchaeology in peer review journals.
Q. Describe these fields for us. Bioarchaeology and forensic anthropology, what do they involve, ma'am?
A. Both of these fields involve the study of the skeleton, the principles of skeletal anatomy, physiology, growth and development, and how bone changes over time with age and also with trauma.

Bioarchaeology looks at past populations, how individuals lived, what they ate, what types of diseases they had during their life.

And forensic anthropology takes these same principles but applies them to problems related to legal matters. So forensic anthropology then is the application of skeletal biology towards identifying unknown individuals and determining the circumstances of their death.
Q. Now, your undergraduate years concluded in '89?
A. That's correct.
Q. Okay. So including your graduate studies, you've been working in this field for only about 15 years or so.
A. That's correct.
Q. Do you have any actual experience in the area of forensic anthropology, Dr. Steadman?

A. Yes, I do. I work both in the United States and I also do international consultation and work. I do a lot of human rights work internationally. I've worked in Argentina with the Argentine forensic team helping to identify some of the 15,000 people who were -- disappeared during the Dirty War in the late '70s and early '80s. I have also worked in Cyprus helping to identify the missing there from the 1976 war. And most recently this summer I was in Spain as a forensic consultant starting a team to help identify -- exhume, identify, and determine circumstances of death of individuals who died in the Spanish Civil War and the subsequent Franco era atrocities as well.
Q. You've named three areas in the world where you've

2602

participated in human rights investigations in identifying and examining the victims in mass graves, Argentina, Cyprus, and Spain. This sort of work goes on where possible in various sites around the world where major conflicts and genocides have occurred throughout history?
A. That's correct.
Q. Okay. And your own work has been to date focused in on-site exhumations of mass graves in Argentina, Cyprus, and Spain?
A. That's correct. They were all mass graves that I was working with, yes.
Q. And what sort of work do you do in these exhumations of mass graves relating to the international human rights efforts?
A. It varies. In some cases we need to actually find and locate the graves before we can do the exhumations, but minimally we do the exhumations. We remove the bodies from the graves; analyze them; determine, if possible, who they are. And

then we also look at the circumstances of their death, what sorts of traumatic injuries are present on the bones, if there's any evidence of torture and so on. And then we submit these findings to the appropriate agency.
Q. Okay. So you do this with an aid or an aim, rather, toward both identifying victims and ascertaining the circumstances of their death?
A. Yes, both are goals in these situations, yes.

Q. And can you give us any idea of the approximate number of victims with relation to whose exhumation you've been involved professionally?
A. In Argentina, there was a mass grave of 343 individuals I believe. Not all of those were exhumed while I was there. But I looked at a fair number of them.
In Cyprus we had between a hundred and two hundred.
And this summer I looked at 17 individuals from a single mass grave.
Q. And that was in Spain.
A. This was in Spain, yes.
Q. So your work -- your experience with regard to forensic anthropology includes hundreds of victims.
A. Internationally, certainly, yes.
Q. Have you had any experience with regard to forensic anthropology within the United States?
A. Yes, I do forensic anthropology for the state of New York. The state police consult me for cases. I also do cases for the Iowa state medical examiner, and I'm also a member of the federal mass disaster team called DMORT. That stands for the Disaster Mortuary Operational Response Team. And this team is

ordered by the President to come into areas to assist with mass disaster recovery and identification of victims.

The two areas that I've been involved in was I worked with the office of the state medical -- office of the city

medical examiner in New York City and DMORT after September 11. I helped identify the remains of the individuals killed in the World Trade Center. And I was also involved in identifying the remains at the Georgia crematorium in 2002.

Q. How did you happen to have connection with the Iowa State Medical Examiner's Office?

A. I was an assistant professor at Iowa State University between 1997 and 2000, and I did -- I was consulted on cases by Polk County medical examiner and then the state medical examiner as well, and I now have a contract with the state medical examiner's office.

Q. Since moving to the state University of New York at Binghamton, you've also added various law enforcement agencies in that neighborhood. I think you mentioned the New York State Police. How about your actual -- you mentioned 9-11. What entity is it with whom you worked there on the identification of the victims of September 11?

A. I worked under the auspices of both DMORT and the office of the New York City medical examiner for the 2001, and that work actually extended into 2002 to identify the victims.

Q. Dr. Steadman, in connection with your expertise as a forensic anthropologist, have you done any work or did you do any work in connection with the Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus death investigations?

A. Yes, I did.
Q. And specifically addressing your attention to October of the year 2000, what, if anything, did you do, and how were you contacted to do it?
A. I was contacted by the medical examiner's office asking me to come from New York to Des Moines to help with the analysis of the remains of four individuals that were exhumed from a mass grave, and I did that, and I worked with the remains in Des Moines between October 24 and I believe October 28 of 2000.
Q. We've already heard a little bit about the procedure. Who is it that actually prescribed the procedure to be used in performing the autopsy on these skeletal remains?
A. Well, it was a combination of Dr. Dennis Klein and myself working together to process the remains and analyze the remains.
Q. We've been advised that the first order of business after collecting and documenting the condition of the victims and collecting any effects and clothing was a cleaning and assembly. If we can have Exhibit 814 again displayed, can you explain for us, Dr. Steadman, the reason that you would assemble all four skeletons before beginning the actual analysis?
A. Yes. Because these individuals were in a single grave and they were mostly to completely skeletonized, that means that there is a significant amount of commingling between the bones of the individuals. And what that means is that the bones of some individuals have sunk down and have become mixed with those

of the others.

And so it's very important to make sure that we put

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2274 of 3636

all of the bones of each individual -- we reassociate the bones correctly to the proper individual. And that was done in this case. So each individual, all of the bones were thoroughly washed, and then I separated any commingled remains and associated them with the correct individual.

Q. We've seen that these remains arrived in four separate packages. Weren't they already completely separated?

A. Most of them were, but there was some commingling between the children especially and also between the children and the adult female who was later identified as Lori Duncan who was right above the children.

Q. And can you explain why that was a difficulty?

A. Well, with children because they're still growing, they actually have more bones than adults. And the bones are very small, and so they can get mixed up easily in a small mass grave. And it was -- because of the differences in size, though, and development between the children, it was easily -- it was easy to successfully reassociate the remains with the proper individual in the laboratory.

Q. Describe how you did that.

A. Based on the size of the bones and also based on the developmental stage of the bones, I was able to distinguish which bones went with which child and also with which adult.

2607

Q. Having ultimately separated the bones and reassembled these bodies into the skeletons of the four individuals, what role did you then assume in connection with this autopsy?

A. My role was actually twofold in this. One was to create a biological profile for each individual that would assist in the identification of all four individuals. And a biological

profile in anthropology, forensic anthropology, is to assess the individual's age, their sex, their ancestry, their stature, and any sort of pathologies or anomalies that existed in the skeleton prior to the individual's death such as previous fractures that they suffered during life or diseases that might affect the bone. This is what we call the biological profile, and that helps us establish an identity for each individual.

My second role was to look at evidence of trauma and try to interpret the circumstances of death for each individual.

Q. Are there various classifications of trauma in your field?

A. Yes. When we talk about the skeleton, we have to carefully distinguish three different types of trauma: Antemortem, perimortem, and postmortem. Antemortem are injuries that occurred to the skeleton during life and such that we have -- we can see some healing in the bones. So an example of an antemortem trauma would be a fracture that we see in an individual's arm that has a well-healed callus so that we know it occurred some time during the individual's life and isn't related to their death or anything that happened to the remains

after death.

Perimortem trauma, peri means around, so that means around the time of death. And we consider anthropologically injuries that occurred at or around the time of death not to have any healing to them which means that they were still alive and had time to heal the bone and it didn't occur significantly after death such as the time that the bones were recovered.

And the things that we look at to establish perimortem trauma is that the margins of the wounds are of similar color to the surrounding bone. And I'll explain that a little bit more

in a second.

Postmortem injuries are those that occur after the time of death, post, of course, meaning after. And these we can distinguish because they're going to have margins that are lighter than the surrounding bone. So if a wound occurred perimortem, that means that the margins of that wound are decomposing with the rest of the tissue and with the rest of the bone are going to become dark or the same color as that bone. If an injury occurs after death and decomposition, it's going to be newer and, therefore, create a whiter color to the margins of that injury. And so that's one of the ways then that we can distinguish perimortem and postmortem.

Q. The educated, experienced eye of a forensic anthropologist can separate premortem, perimortem, and postmortem bone injuries.

♀

2609

A. Yes.

Q. On the basis that you just described. In categorizing wounds observed on skeletal remains, could you also do so with respect to the possible mechanism of injury?

A. Yes. Certain types of trauma can leave markers on bone that are distinctive and tell us what happened to that individual. Gunshot trauma leaves distinct marks on the bones; sharp trauma we can interpret; blunt trauma we can interpret and also sometimes burning and things like that that can affect bone. So those are some of the categories that we -- that we can see in the bone.

Q. The different mechanisms of fracture show distinguishing characteristics that often allow you to determine whether it's blunt trauma as opposed to gunshot, for example?

A. Often, yes.

Q. And in fairness, are there occasions where there are ambiguities?

A. Absolutely.

Q. You've mentioned that you first participated in the autopsies of the four individuals recovered in October of 2000. Did you at a later date also examine the remains of Terry DeGeus?

A. I did.

Q. So you did work in connection with all five victims in this case.

♀

A. Yes, I did.

Q. I'd like to go through these and get from you your findings one individual at a time, and I'll begin with Mr. Nicholson. And, Dr. Steadman, are you equipped with a lavaliere microphone at this time?

A. Yes, I am.

Q. And in describing your findings including those as to trajectory where that was a possible determination for you to make, would it assist you in -- and aid you in explaining to the jury to use the demonstrative exhibit, Government Exhibit 6, the skeleton model?

A. It would.

Q. Okay.

MR. MILLER: And with the Court's permission, I would ask again making sure that the record is clear by speaking good and loud so that everyone can hear you through that lavaliere microphone if the witness be permitted freedom to step down from the podium and use the model as well as the exhibits.

THE COURT: Any objection, Mr. Spies?

MR. SPIES: No, Your Honor.

THE COURT: Okay. You may.

THE WITNESS: Thank you.

BY MR. MILLER:

Q. And at such time as you feel that's appropriate, I'll leave that to you. I only ask that you make the record clear with the

use of the lavaliere microphone, and as you refer to any exhibits, please, if possible, identify them by exhibit number, and I'll try to assist you in that respect; okay?

A. Thank you.

Q. Okay. What can you tell us about Greg Nicholson as far as your findings of his biological profile? He was known to you at first as SME00115; is that correct?

A. That's correct, also as individual number 1 from the field, yes.

Q. Okay. And was this your first contact with it prior to dental identification having been made?

A. Yes.

Q. What did you do in order to assess individual number 1 or SME115 as to his or her biological profile, Dr. Steadman?

A. After assessing the -- after washing the remains and making sure that all of the bones were properly associated with this individual, I conducted the analysis of the biological profile and estimated that this was an adult male approximately 30 to 40 years of European or white ancestry.

Q. And how were you able to -- if you can just very briefly indicate how you were able to come to such conclusions.

A. I determined that the individual was an adult because all

of the growth and development of the teeth and the bones had been completed. And then to estimate the age of 30 to 40 years, I looked at several indicators of adult age on the skeleton.

♀

May I approach the exhibit, please?

Q. Please do. And if it will help you, feel free to move the exhibit toward the jury if that will help them see what you're referring to. If you need any help with that, just let me know. I'll help you move it. Otherwise we'll let you do so.

A. Okay. I'm now at the exhibit. I'm sorry, the number of the exhibit?

Q. This is Exhibit Number 6 for the record, the skeletal model.

A. And I'm also on the lavaliere microphone. Is the sound okay? Okay.

The elements of the -- or the parts of the skeleton that we look at to estimate age of adults is this area here which is called the pubic symphysis. It's where the two hipbones meet in the front.

When an individual is very young, each face of this joint has a lot of bellows, a very rugged topography. And as an individual ages, that topography gets smoothed out over time, and a rim begins to form around that face. And then as the individual ages even more, that rim begins to break down, and everything simply appears more porous and older.

And so I used that to help estimate age. And I also used another joint area back here where the pelvis meets the sacrum in the back. This is called the articular surface. You may also know it as the sacroiliac surface or the SI joint it's

♀

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2280 of 3636

commonly referred to. And here we see kind of a similar sort of process although not quite as distinct as the pubic symphysis where we see striations that are very prominent during youth and then they level out over time. And we see changes in the rim and also in the texture of the bone in this joint. And that helps us establish age.

Q. The sacroiliac is where?

A. The sacroiliac joint is between the sacrum and the side of the pelvis here, and it's difficult to see in a mounted skeleton, but it's where they attach here in the back.

Q. Okay. Go ahead.

A. And then the third area that I used is the skull and specifically looking at the degree of union of the sutures of the skull. When an individual is born, the sutures are very far apart to help with the molding process of getting through the birth canal. And as the child ages, the bones of the skull come closer and closer together. But it's not until the age of 35, 40, or even later that the sutures actually close and fuse over time.

So we can use this as more of a general marker of young adult age, middle adult age, or older adult age. So when I look at the evidence of all three of these areas together, that allowed me to estimate an age of 30 to 40 years in the case of individual number 1.

Q. Your assessment of sex?

♀

2614

A. By looking at the characteristics of the pelvis as well as the characteristics of the skull, I was able to estimate that

this individual was male. Male individuals have a much narrower pelvis than females because they don't have the function of childbirth, so a female pelvis is going to be much wider in every direction. And in the case of individual number 1 who later was identified as Mr. Nicholson, it was clearly a very narrow pelvis and had muscle markings on the skull that were robust, typical of that that we would expect to see in a male individual.

Q. Muscle markings?

A. Muscle markings, where the muscles from the neck come up and attach to the skull such as here on the side of the skull and also these areas in the back of the skull where your neck muscles come up and attach in the back.

Q. What's the difference in a female?

A. They have the same muscle attachments, but females tend to have less muscle mass than males in this area so that these markings aren't as distinct in a female as they are in a male.

Q. The biological profile in this case I take it matched what was later found to be through positive dental identification Greg Nicholson?

A. Yes. There were no inconsistencies.

Q. Okay. If we can have Exhibit 520, please, showing you 520, the skeleton of Greg Nicholson after it was cleaned and laid

♀

out, you did an examination not only as to the biological profile, but I think you indicated that you did a trauma assessment as well, or that's one of your roles?

A. Yes, I did.

Q. Did you note any significant premortem trauma indications?

A. Yes. This individual had some spinal arthritis which is

not uncommon in individuals over 30, 30 years. He also had evidence of a broken bone in the foot, and I -- these were not of anything very significant, but they also were not inconsistent with anything that was later known about DeGeus's -- or excuse me, Mr. Nicholson's history.

Q. Those were healed injuries.

A. Yes.

Q. Did you find what you would classify as perimortem injuries on this individual?

A. I did. I found evidence of perimortem injuries in the thorax or chest area as well as the neck and in the head.

Q. If we can see Exhibit 523, please, with regard to the rib injuries on this individual, Exhibit 523 shows what, Doctor?

A. This is the right fifth rib from Mr. Nicholson. And what you can see here -- I hope I'm not standing in anybody's way, but you can see that there's a traumatic separation of the bone here, and I believe that there's another exhibit.

Q. 525.

A. And this is when I placed the two fragments that you just

♀

saw together. And what you can see here is a defect, semicircular defect here, and a lot of bone loss on this side of the rib. And this is consistent with a gunshot wound. And where you're looking in the body here is on the back of the thorax, and you're looking at rib 5, so we count down, rib 1, 2, 3, 4, 5, and it's very near the spine. It would be in this area here.

And when a bullet enters bone, it creates a cone-shaped defect where you have -- where the bone -- where the bullet enters bone, you have usually a circular or somewhat

circular plug of bone removed, and then on the other side as it exits the bone it creates this cone. And we call this side of the cone bevelling. And it's usually larger than the entrance side. And the direction of that cone opening or that bevelling tells us the direction of travel of the bullet through the bone.

And so what we see here in this case is that on the fifth -- on the back of the fifth right rib the bullet entered the rib from the back and exited out through the front, so we can see that the trajectory of this bullet wound is back to front.

Q. Dr. Steadman, you also indicated evidence of trauma in the area of the neck?

A. Yes.

Q. If we can have Exhibit 529 and 530, the jury is now looking at two exhibits, Government's Exhibit 529 and 530 side by side.

♀

2617

Would you describe for the jury what those show?

A. This is -- both pictures are different views of the same bone. This is the fourth cervical vertebra. The cervical vertebra are those of your neck. There's seven of them total. And we determine the fourth by counting down from the first one just underneath the skull. So one, two, three, four. It would be this vertebra here kind of in the middle of the neck.

And what I observed on this vertebra in Mr. Nicholson is that there are several hairline fractures in this vertebra. You can see one here which is on the spine of the fourth vertebra, and the spine is what you feel when you feel the back of your neck. It's what sticks out that you can touch. And then there are also hairline fractures on the side, each side of the vertebra as well which would be here and here. And the

etiology of these fractures is unclear. They could be due to a twisting motion or -- and/or, you know, extension of the neck, but I was not able to determine a clear etiology other than to rule out that there's no clear gunshot trauma to this area. There's no defect, just these fractures.

Q. First of all, you do assess this as perimortem trauma.

A. Yes, I do assess this as perimortem trauma again because the margins of the wounds, all of the wounds, are dark and not indicative that this occurred at the time of exhumation or anything postmortem.

Q. You've indicated that -- and you used the term etiology.

What is that?

A. Etiology means the cause, cause of the trauma or cause of the wound.

Q. And etiology as you've indicated you rule out gunshot.

A. There's no clear -- there's no gunshot defect here, so there's no bullet that traversed this vertebra, that's correct.

Q. You did indicate rotation or severe movement of the neck. Would you rule out any other source such as blunt trauma or even a fall?

A. No, I would not be able to rule out those causes.

Q. All we know is that there's severe trauma to the neck but something other than gunshot at that point.

A. That's correct.

Q. Finally with regard to Mr. Nicholson, you indicated that you observed perimortem trauma in the area of his head; is that correct?

A. That's correct.

Q. And show you Exhibit 537. Go ahead if you would, please

describe for us what the jury is looking at in Exhibit 537 and what, if any, indications of trauma you see there, sir -- or excuse me, ma'am.
A. What you're looking at here is the base of this skull, so if I took this skull off and turned it upside down, that's what you're looking at here. And there is some significant area of bone loss and fragmentation in this area here that I observed.

And I was able -- some of the bone fragments were recovered, and I was able to reconstruct the -- this area of the skull to some degree.
Q. And that again is something that you do a fair amount of as a forensic anthropologist is try to reconstruct fragmented bones?
A. Yes. That's a lot of what we do, yes.
Q. Particularly with regard to skulls?
A. Yes.
Q. Exhibit 539, please, and what does Exhibit 539 show, Dr. Steadman?
A. This is some of the fragments that were recovered that I was able to reconstruct accurately with the skull. This is a normal opening here. This is a foramen magnum where the spinal cord exits the brain and comes down the spinal canal. But this area over here, this is traumatic bone loss, and what I can see here is a gunshot entry wound to the back and base left side of the skull. And so where it entered is back here on the skull, and I'm pointing to the left side of the skull behind the ear and near the base of the skull, and I believe there's another exhibit.
Q. Exhibit 540, what does 540 show?

A. Here you're looking at the skull in the same orientation as this skeleton. And the defect that I've been discussing that is a gunshot entrance wound is here, and in life the ear would be

in this area here. So it was just behind the ear entering in this manner here.
Q. Behind Greg Nicholson's left ear.
A. Correct.
Q. And how did you conclude that that was an entrance wound?
A. I was able to observe the bevelling of the wound, and as I discussed earlier, this had bevelling that was on the inside of the skull, and so that told me that the bullet was going in the direction towards the inside of the skull and so that this was interpreted then as an entrance wound.
Q. Did you attempt to determine as near as possible the trajectory of that missile?
A. Yes.
Q. Exhibit 541, please, what does 541, show?
A. This is a probe inserted into the entrance wound of the skull of Mr. Nicholson, and in this case there was no exit wound. On radiographs that we took that day, we observed a bullet or a bullet fragment lodged just behind the nasal area inside the skull, and so it appeared that the bullet stopped inside the skull just behind the nasal area so that there was no exit wound of the skull.
Q. Dr. Steadman, you examined that entrance wound and I assume measured it as well.
A. I did.
Q. Are you able to tell us what the caliber of a bullet was

that caused that entrance wound?

A. No. From bone, it's not possible to reliably determine the caliber of the bullet based on the size of the wound. There are simply too many factors based on both the bone as well as the bullet to allow us to do that with any degree of reliability. It depends on the plasticity of the bone, the elasticity of the bone especially in younger individuals, whether the bullet was hitting a suture or a fracture line, and also some of the characteristics of the bullet itself such as the degree of deformation, the angle of impact, and so on. So there's too many variables to allow us to reliably determine caliber because the wound could be much larger than the caliber and it can even be smaller than the caliber in some cases.

Q. So a bullet can actually leave a hole in bone that's of greater diameter than the bullet itself.

A. That's correct.

Q. And likewise can even leave a hole in the bone that's actually of smaller diameter than the bullet itself.

A. That's also correct.

Q. And that's because of what?

A. The variables that I explained, the plasticity of the bone, some of the variables related to the bullet including the angle of entry, any existing sutures that the bullet went through or fracture lines that the bullet passed through. All of these can affect the diameter of the wound.

♀

Q. Understanding, Dr. Steadman, that you're not expressing an opinion as to the caliber of the bullet that caused this, is this wound at least consistent with a nine-millimeter caliber

bullet?
A. It's possible, yes.
Q. As well as that of other calibers.
A. Yes.
Q. Did you make a determination as to the number of bullets that struck Greg Nicholson at the time of his death?
A. In forensic anthropology, we can only estimate the minimum number of bullets that struck bone in the body because there are many areas of the body where a bullet could pass and not affect bone, so we can't estimate a maximum number. We can only conservatively estimate a minimum number of impacts. And I did in this case. And the minimum number of bullets in this case I estimated were two, one to the back left back of the skull as I previously demonstrated and one also to the back of the thorax.
Q. Dr. Steadman, you moved on to also do an examination of what was initially identified as state medical examiner number 00116?
A. That's correct, I did.
Q. And did you do your biological assessment before actually learning of the dental identification results?
A. I did, yes.
Q. And just very briefly if you would, please, explain to us

2623

what your biological profile was on the second individual.
A. Using the same aging areas that I showed you before, the methods with the pubic symphysis, with the articular surface or the sacroiliac joint and also with the cranium, I estimated this individual was also between 30 and 40 years of age. And again, by looking at the pelvis characteristics as well as those of the skull, I estimated that it was a female, an adult female. And

then I also estimated the stature and the ancestry, and this was a female, adult female, 30 to 40 years of European or white ancestry.

Q. And was that consistent with the information relating to an identification you later learned to be Lori Duncan?

A. Yes, the biological profile was consistent with that of Lori Duncan.

Q. If we can see what's previously been admitted as Exhibit 625, please, what does Exhibit 625 show, Dr. Steadman?

A. These are the skeletal remains that later were identified as those of Lori Duncan -- that of Lori Duncan that I laid out in anatomical position following washing and reassociation of appropriate bones. And you can see like the previous individual it's laid out in anatomical position, and there's a number of small fragments up here, and just to explain, those are fragments of the skull and of the face of this individual.

Q. That cluster of small bones in the upper left-hand corner of the photograph with the head oriented at the top is fragments

from her skull?

A. That's correct.

Q. Looking at the skeleton overall -- and I realize we'll have a chance to look at some of these bones more closely, can you identify the areas in which you observed evidence of perimortem trauma.

A. In this individual there was evidence of perimortem trauma in the pelvis, in the thorax, in one extremity, and also in the head.

Q. First with regard to the pelvis, if we can see Exhibit 638, please, 638 shows what, Dr. Steadman?

A. Okay. What you're looking at here is the back of the right hipbone here. And the evidence of perimortem injury that I observed is a hairline fracture here that would be approximately here, and I'm pointing to -- on the exhibit, the standing skeletal model, I'm pointing to an area on the back of the pelvis on the right side about halfway between the top of the pelvis and where the leg attaches. And you can see the dark margins of this fracture, and this suggests, of course, that it's perimortem in nature.

Q. Did you arrive at an opinion as to etiology?

A. The etiology is unclear. It's -- there is no defect related to a gunshot wound, so I believe that this is a blunt trauma either direct or indirect or from a fall. But the exact cause is uncertain.

Q. You described I believe some evidence of perimortem trauma to the thorax. What does the term thorax refer to, by the way?

A. Thorax refers to the chest area but not just the chest that we think of as the front but also includes the entire kind of rib cage including the back. We consider that the thorax.

Q. And that was in a number of places on this thorax of Lori Duncan?

A. Yes, there were a few cases of perimortem injury in the thorax region, yes.

Q. Directing your attention first to the fourth right rib and displaying Exhibit 629, what of significance do we see in Exhibit 629, Doctor?

A. What you're looking at here is the external surface kind of near the mid-shaft of the right fourth rib. And so it would be on the right side of the body, the fourth rib down, in this area

here kind of on the side and at the front. And what I observed is an area where bone has been traumatically removed. The margins are dark and jagged. And on the other side, on the internal surface, there's a little bit of bone fracturing, and that's pushing the bone deeper into the rib. And this is indicative of gunshot trauma.

Q. Is it possible or was it possible for you to arrive at any conclusions regarding trajectory of that missile?

A. The amount of fragmentation on the inside of the rib suggests that the bullet came from the back and exited out the

front, and I'm pointing in that direction on the skeleton model.

Q. If we can show Exhibit 635, Doctor, did you find any trauma on the ninth left rib?

A. Yes. This rib is over on the left side most of the way down. It would be this rib here. And this area that you're looking at is again the area of the rib close to the spine. And you can see significant fragmentation of the rib in this area, and this is also consistent with a gunshot wound coming from back to front in this area.

Q. Dr. Steadman, is that necessarily a different bullet than the one you described with regard to the fourth right rib?

A. No. If this bullet did enter the ninth rib back to front, it is possible that it then pierced the right fourth rib on the opposite side in the same trajectory such that this -- both injuries may have been caused by a single bullet. And again, a conservative estimate is that one bullet caused both injuries.

Q. And in connection with your work, particularly in expressing opinions in court, do you make an effort to be conservative in your assessments?

A. Yes, extremely so. We don't want to artificially inflate the number of injuries or the number of bullets.

Q. And wherever it's possible to -- possible to explain two injuries by a single projectile, you've been careful to make that notation.

A. We certainly -- I certainly state that it is possible that

♀

a single bullet caused both injuries, that's correct.

Q. Did you also find perimortem trauma with respect to the seventh right rib?

A. Yes.

Q. Pulling up Exhibit 630, what does Exhibit 630 show us?

A. Here what you're looking at is near what we call the sternal end or the front of the rib on the seventh rib down. And what I observed is a series of fractures that did not remove any fragments of bone in this area here. And the etiology of this particular wound is unclear.

May I --

Q. Please feel free to drink some water. It's more important that we get your information clearly than quickly. So take your time.

A. The pattern of this particular trauma was unclear as to its cause, and it is -- I did interpret it as perimortem trauma because, again, the margins are dark, and the type of fracture is consistent with perimortem. But the underlying cause of this particular wound is unclear.

Q. Do you rule out any particular kinds?

A. I don't rule out any particular kind. It is possible that this is a gunshot wound whereby the bullet did not completely perforate the bone and may have just stopped. It could also be

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2293 of 3636

due to blunt trauma. I couldn't rule that out either. There's simply not enough information of this wound to allow me to make

a scientific diagnosis of the etiology.

Q. Okay. And again, even if we were to assume it is gunshot, does that necessarily dictate an additional missile in addition to the ones that you've already documented on the thorax?

A. Not necessarily, especially because it didn't seem to perforate the bone. It could have bounced off and gone elsewhere.

Q. When flying bullets strike the human body, they don't always continue to follow a straight path. Is that a fair statement?

A. That's correct. It can -- excuse me.

Q. I just wanted you to explain that.

A. Yes. It can -- even through soft tissue, it can change directions. Bullets fragment, and instead of just one projectile, you can get several projectiles as it hits bone or hits even soft tissue, and it also depends on the bullet type. Some are more prone to fragmentation and deformation than others. So all of these things have to be taken into account when we assess the number of bullets and the type of damage done.

Q. You observed perimortem trauma to one or more extremities on this victim?

A. Yes, I did.

Q. Describe that. Where was that?

A. The left ulna which is one of the bones of the forearm --

it's on your pinky side of the forearm here -- exhibited gunshot trauma.

Q. If we can see Exhibit 636. Showing the jury Government Exhibit 636, what does that show us, Doctor?

A. What you're seeing here is most of the lower shaft of the ulna -- and I'm pointing to that on the exhibit now -- on the left ulna, and what is missing is the upper part of the ulna where it actually forms the elbow with the other bone, the radius and the upper bone, the humerus here. So this segment of the ulna, the upper inch or two, is missing. And the type of fragmentation that we see in the free end of the ulna suggests that this is due to gunshot trauma.

Q. Any additional perimortem trauma on that limb?

A. Yes. The other thing that I observed was on the right fourth metacarpal which is your ring finger on the left side, the bone of the palm, was a spiral fracture on the back side of that bone. And that could be due to a twisting injury or a blunt trauma. That's an injury that was clearly perimortem because the margins were dark, but the etiology of exactly how this fracture occurred is unclear.

Q. But it is a fracture.

A. It is a fracture, yes. It's a hairline fracture.

Q. And that's on the left hand?

A. The left hand of the fourth metacarpal. May I check my notes and make sure that's the left hand?

2630

Q. Sure, if that will help you be accurate, that's the most important thing is that we be accurate.

A. Yes, that's correct. It was the left hand. I wanted to be

very clear.  It's the left fourth metacarpal.
Q.    You've also indicated that the etiology or cause of that fracture is unclear.  Can you narrow it down at all?
A.    We don't see a perforating injury related to a gunshot. But it could be due to a blunt trauma with the hand striking something or something striking the hand in a fall or some such scenario.
Q.    How about any violent motion or twisting of the hand itself?
A.    Yes.  The spiral nature of that also suggests that it could be due to twisting of the hand, but again, it's not diagnostic of that.
Q.    In any event, it was trauma sufficient to fracture that bone.
A.    Correct.
Q.    And what sort of force is that, force necessary to fracture bone?
A.    It depends on the bone and the type of direction.
Q.    You also mentioned that perimortem trauma was observed on the head of Lori Duncan.
A.    That's correct.
Q.    If we can see Exhibit 644, what does 644 show us?

2631

A.    Here this photograph is of the skull on the left side.  And so referring to the skeletal model, it would be in this plane. And you can see the top of the nasal area here, so the face was largely detached traumatically, but the face would be here, and the back of the skull would be here.  And what I observed is a defect in the left frontal bone up here above the left eye that is consistent with a gunshot exit wound.  And I interpreted this

as an exit wound because we have this external bevelling that I mentioned before. And you can also see fractures radiating from this defect, this exit wound, as well.

Q. And that's clearly an exit wound.

A. That's correct, I believe, yes.

Q. Now -- go ahead.

We've heard the term keyhole-shaped bullet wound. Is this one such?

A. Yes. This is a keyhole exit wound. And the name gets its -- it gets its name from the shape of the defect where you have the circular part here and then this area here that resembles the old keyholes. And this tells you also the direction in which the bullet was traveling as it exited the bone. The circular area is where it started to leave the bone, and then the rest of the keyhole points to the direction in which the bullet was leaving the bone such that the bullet was exiting right to the left.

Q. Exhibit 648, please. And what does 648 show us?

A. Here this is a picture of the anterior part of the skull of Lori Duncan. And there was no clear entrance wound in this case. What I did interpret or what I did observe, however, is that when I looked at the radiating fracture patterns on the right side of the skull and just behind the eye area, they all pointed to one particular area which is no longer present behind the eye. And this suggests that this is where the bullet entered the skull such that it travelled from the right behind the eye and slightly upwards to exit the left side of the top of the vault.

Q. Dr. Steadman, did you arrive at an opinion as to number of

gunshots suffered by this victim?

A. Yes. The minimum number of gunshots that I interpreted in this victim were two, one to the skull as I just mentioned and one to the thorax as I explained earlier, whereby one bullet entered the back and exited the front causing -- potentially causing both of those traumatic rib injuries.

Q. And the trajectory on the head was behind the right ear and upwards through the skull?

A. No, it was behind the right eye.

Q. I'm sorry, behind the right eye.

A. Behind the right eye and then right to left through the top of the skull, and that of the second bullet to the thorax was back to front.

Q. Can you explain the lack of facial bones in this area as it

relates to the trauma?

A. They appear to be traumatically detached from the skull. The face was very, very fragmentary as I showed in a previous slide, and they were too fragmentary and too incomplete to reconstruct. So I was only able to reconstruct the vault.

Q. Now, Doctor, you've indicated that there's what you've diagnosed as a clear bullet wound to the back, one to the left ulna.

A. Yes.

Q. And one to the head.

A. Yes.

Q. Why do you say that there's a minimum of only two as opposed to a minimum of three bullets traveling through this victim?

A. Again, because I want to be very conservative about the

number of bullets, the ulna could have actually been involved in either of those other two bullet trajectories. For instance, if the arm was over the head -- and I can't do it. I'll have to do it on myself. If the arm was over the head at some area, the bullet may have impacted the ulna as well as the head. Similarly, if the arm was in the trajectory of the bullet entering or exiting the thorax, it could have been impacted in that way as well. So that's why I keep the minimum number of bullets at two despite three distinct injuries.

Q. Simply because --

♀

2634

A. Minimum of three.

Q. -- of all the possible placements of an arm.

A. Correct, correct.

Q. And again, as with Mr. Nicholson, the possibility always exists that bullets may have passed through the body and struck only soft tissue as opposed to bone.

A. Yes, and you can see in this area of the abdomen here, there's a large area in which there is no bone and it's all filled with soft tissue, and so there could definitely be bullets that entered the body that did not mark bone.

Q. But as far as what you can tell us, there are at least two bullets, one to the back, one to the face, and one passing through the arm.

A. Yes.

Q. Dr. Steadman, you examined the remains of Kandi Duncan.

A. Correct.

Q. Did you attempt to assist in identification of this victim?

A. Yes. As with the others, I conducted a biological profile of this individual. Because the individual was a child, it's

unreliable to estimate sex of children because the sex characteristics that I talked about in the skeleton, the widening of the pelvis in the female and the greater muscle attachments and all in a male, those don't happen until after puberty. So for younger children, an assessment of sex is unreliable skeletally, so that wasn't attempted in this case.

But I did estimate the age of the individual by looking at the stage of development of the bones as well as the teeth. And I estimated that this individual was between 8 and 11 years old.

Q. Did you also do an assessment of perimortem trauma?

A. Yes, I did.

Q. And how many locations on the body of Kandi Duncan did you find indications of perimortem trauma?

A. I found evidence of perimortem trauma in the skull.

Q. If we can see Exhibit 711, what does Exhibit 711 show us?

A. This photograph is showing the back of the skull of Kandace Duncan, and so you're seeing this area of the skull. And what I observed is a defect here that is round and internally bevelled that is a gunshot entrance wound. And this is on the back of the skull just to the right of the midline on the occipital bone.

Q. Where is that in comparison to the entry wound you found on Kandi Duncan?

A. This is the entrance wound for Kandace Duncan.

Q. Okay. I apologize. I'm getting ahead of myself. Exhibit 710 shows what?

A. This is the anterior or front of the skull of Kandace Duncan. And what this is showing is an area here of traumatic

injury that is consistent with the exit wound of that bullet. And what I'm pointing to is the area where the orbit meets the

nasal area on the left side of the face, so just left of the midline area.

Q. Is it --

A. And so we would be talking about this area here referring to the same area mentioned on the exhibit skull.

Q. And Exhibit 716 shows us what?

A. This has the probe going through the entrance wound and out the exit wound such that we can see then the trajectory of this bullet was back to front.

Q. Dr. Steadman, we've already talked about this with respect to the previous two victims, but are you able to make any gunshot caliber determination based upon the size of these wounds?

A. No, I'm not, and it's for the same reasons as I mentioned earlier.

Q. Moving on then to the fourth and final skeleton, that of Amber Duncan, would you please look at Exhibit 806? What is Exhibit 806, Dr. Steadman?

A. I'm attempting to see that number. Okay. This is the skeleton of the fourth individual, the youngest child, which was later identified as Amber Duncan, and you can see the bones, and also up here once again are the fragmentary parts of the face that were traumatically separated from the skull.

Q. What, if any, challenges were involved in identifying and separating the bones of the two children and the woman?

A. As I mentioned previously, with the commingling that was in the grave of the individuals because they were on top of each other and with the children having more bones and smaller bones than the adults, there was -- this individual Amber was on the bottom of the grave, and so some of the bones of her sister above her dropped down and were mixed, and so I had to carefully separate the bones of each of the children, and that was done successfully in the lab.

Q. Am I correct in observing that there are less than complete collection of the small bones of the hands and toes, hands and feet?

A. Yes, that's correct.

Q. You assembled what was submitted and recovered.

A. That's correct.

Q. Did you conduct a biological profile on individual number 4?

A. I did, and again, I did not estimate sex for the same reasons as for Kandace. This is a younger individual. And based on the development of the teeth and development of the -- developmental stage of the skeleton, I estimated the age of this individual to be between 5 and 7 years.

Q. And again for the record, this was individual identified to you at time of autopsy as number SME00118?

A. 118, correct.

Q. And the previous one was SME00117?

♀

2638

A. That's correct.

Q. And the estimated age again was what?

A. Five to seven years was my estimate of age.

Q. With regard to number 118 identified by the medical

examiner's office as the body of Amber Duncan, did you arrive at any assessments with regard to perimortem injury?

A.    I did.   There was evidence of perimortem injury in the skull.

Q.    And if we can see Exhibit 809, please.   What does Exhibit 809 show us, Doctor?

A.    Again, this is a photograph of the back of the skull that was identified as Amber Duncan.   And I observed a defect here that had internal bevelling as well as radiating fractures right just -- just right of midline on the back of the skull that is a gunshot entrance wound.

Q.    And as I was trying to get to earlier and got ahead of myself, do you note any association or can you compare the wound that you see there in the back of the head of Amber Duncan to that which you observed in the back of the head of Kandi Duncan?

A.    The location of the two is very similar, yes, and if I made a mistake a moment ago in talking about Kandace, I may have said that the wound was to the left of center for Kandace, and I want to be clear that it was also to the right of center.   I can't remember if I made a mistake or not.

Q.    But both entrance wounds on these little girls was just

2639

right of center?

A.    Just to the right of center, yes.

Q.    Exhibit 808, please.   And what does Exhibit 808 show us?

A.    This shows on this side, on the right side and middle, some of the fragments of the facial skeleton that were traumatically detached.

Q.    And did you attempt to reassemble those?

A.    No.   The fragments were so thin and there were so many

fragments that it was not possible to accurately reconstruct them to the skull. But I could identify each of the fragments and know where each of the fragments were, belonged in the face, yes.

Q. Exhibit 807 shows us what?

A. This is the anterior skull or front of the skull of Amber Duncan. And the exit wound appeared to be in the nasal area of this individual as well here that then resulted in fragmentation of the majority of the face. So we're talking here. I'm pointing to the exhibit skeleton, the nasal area of the skeleton.

Q. And finally Exhibit 813, what does 813 show us?

A. This is the same skull of Amber Duncan with a probe through the entrance wound and the area of exit showing the trajectory going from back to front.

Q. And bearing in mind that this is merely what was left of the skull of Amber Duncan, does that show a trajectory or at least explain to us how this trajectory relates to that which you observed on Kandi Duncan?

A. The trajectory was similar, back to front or the same, back to front.

Q. You in addition to photographically made measurements and documentation as to location and dimensions of the various injuries?

A. I did.

Q. Were you able to -- and I think you've already indicated the limitations if not impossibilities of this, but were you able to arrive at any conclusion regarding the caliber of the weapon?

A. I did not.
Q. And again, why not?
A. Because of the plasticity of the skull, the location of the injury, of the entrance wound with a suture and unknown variables related to the bullet would not allow a reliable determination of caliber.
Q. And again, the caliber -- or the size of the hole could be either larger or smaller than the caliber of the actual bullet itself?
A. That's correct. It can be.
Q. How could it possibly be smaller than the caliber of the bullet itself?
A. How could it?

♀

Q. Yes.
A. The elasticity of the skull would allow the entrance wound to kind of snap back into place, and also the location on a suture would allow more initial deformation but then the bone to kind of snap back into place creating perhaps a smaller dimension. Again, we don't know all the variables that allow for these types of things, but those are some possibilities.
MR. MILLER: May it please the Court. We have one more individual to discuss. It might be an appropriate time for at least a stretch break.
THE COURT: Okay. Why don't we go ahead and take a stretch break.
BY MR. MILLER:
Q. Dr. Steadman, you indicated that the work that you did back in October on these 4 victims lasted from the 24th through the 28th of October?

A. That's correct.

Q. At the morgue in Des Moines?

A. That's correct.

Q. Did you do any further work in connection with this case?

A. I did.

Q. When was that?

A. On November 30 the remains identified as Terry DeGeus were sent to me in my laboratory at Binghamton University in New York.

♀

Q. And what did you do upon receipt of those remains?

A. Very similar process as I've described before. The remains had already been washed at the medical examiner's office, and so I laid them out in anatomical position, took an inventory of the remains, and then conducted a biological profile analysis and also an analysis of trauma.

Q. Okay. Now, Dr. Steadman, by the time November 30 rolled around, I trust that they were submitted to you with an identification already noted?

A. Yes.

Q. By -- based on dental records?

A. That's correct.

Q. Why do you as a scientist bother to do a biological assessment or a biological profile anyway?

A. It's part of the normal protocol, see if there are any inconsistencies, and also it allows us simply a more thorough analysis of the skeleton because we look at every single bone and we make sure that we don't miss any trauma that would be important to a case.

Q. And as a scientist, do you like your own opinions to be

independent --

A. Absolutely.

Q. -- of outside influences?

A. Absolutely, yes.

Q. Thank you. Go ahead and just summarize if you would,

♀

please, what, if any, findings you made with regard to the biological profile of the person identified to you as Terry DeGeus.

A. I estimated that this individual was an adult male between 30 and 40 years of European or white ancestry who had some evidence of spinal arthritis and arthritis in one shoulder as well as a broken bone that had healed in one shoulder as well.

Q. If we can see Exhibit 1011 -- I believe that's already been received -- what does Exhibit 1011 show us, Dr. Steadman?

A. These are the remains that were identified as Terry DeGeus, and these are laid out in anatomical position in my laboratory at Binghamton University.

You can see the -- all of the bones laid out in anatomical order and the skull is fragmentary, and I had not yet reconstructed it at the time of this photograph. This is the condition in which I received the remains.

Q. How much work went into trying to reconstruct that skull?

A. The skull was very, very fragmentary, and it took a great deal of time to reconstruct the skull accurately.

Q. I want to get to that, but before we do so, in looking at the entire skeleton, did you observe perimortem injuries in more than one location?

A. I did. There is evidence of perimortem injuries in the pelvis, in the thorax, in the skull, and in one extremity of the

skeleton.

Q. I want to take those one at a time. First with regard to the pelvis, and if we can look at Exhibits 1019 and 1020 --

THE WITNESS: Mr. Williams, is it possible to turn 1019 vertically? Thank you.

Q. Looking at simultaneously and side by side Government Exhibits 1019 and 1020, tell us, please, what those two photographs show.

A. Here you're looking at the left side of the pelvis, and you're looking at the whole -- what we call the os coxa or one-half of the pelvis on the left side. And what I observed is a defect in the top of the pelvis here, in this area here and here. Here you're looking at the back side of the pelvis, and here you're looking at the front side which is how I have the skeleton facing you now. And the defect shows bone pushed into the pelvis on the back side and then a greater amount of bone loss, that cone-shaped defect, on the front side. And this is a gunshot wound with a trajectory of back to front through this bone of the pelvis.

Q. Perimortem.

A. This is perimortem, yes.

Q. Okay. You mentioned injury to the thorax. Did you find such on the third thoracic vertebrae?

A. Yes, I did.

Q. On the L3 rib? If we can look at Exhibit 1013 first, please. Showing you Exhibit 1013, can you tell us what that

shows?
A. This is the third thoracic vertebra. The thoracic vertebra are those of the thorax, the chest area. There's 12 of them normally total, and they're immediately below the neck. They start below the neck, and they go 1 through 12 counting towards the bottom. So the third thoracic vertebra is fairly high in the chest area. And what this photograph demonstrates is the front part or anterior part of the vertebra, the part that's closest to the internal organs. And you can see an area of bone loss here as well as some green staining. And when I took X-rays of this bone, there were fragments of metal embedded in this area here, and the amount of bone loss together indicated this is a gunshot wound.
Q. Were you able to arrive at an opinion regarding trajectory?
A. I was not in this case. There was not enough pattern to the injury to indicate a trajectory.
Q. Also with regard to the L3 rib, showing you Exhibit 1038, what does that show?
A. This is a photograph of the sternal or front end of the left third rib. In life there's cartilage represented on this skeletal model as these kind of orange pieces of material here. So the bone of the stern -- of the ribs don't actually touch the sternum. They're connected by cartilage in life. So what you're looking at is the very tip of the anterior sternal end of this left third rib where it joins the cartilage. And I

observed a defect here on the top of that area, and I did an X-ray of this and found that there are small pieces of metal embedded in this area that is indicative that a bullet passed through this area.

Q. Any determination of trajectory on that wound?
A. No, there was not enough to allow me to reliably estimate trajectory.
Q. And in assessing number of bullets, is there any way to distinguish the two thoracic injuries?
A. There's not because, again, I was not able to determine trajectory in either one. So I could not estimate a minimum greater than one.
Q. And frankly, bullets do ricochet some off bone?
A. That's correct, they can.
Q. You've indicated traumatic injury to one of Mr. DeGeus's extremities?
A. That's correct, there was.
Q. Showing you Government's Exhibit 115 --
MR. WILLIAMS: 115?
Q. 1015, I apologize -- what does that show, ma'am?
A. This is the humerus or upper arm bone on the left side of Mr. DeGeus. And what I observed is that there is traumatic fragmentation of this bone. This fragment is free, and also I observed, both grossly and with X-ray, fragments of a bullet still lodged inside the bone here so that I interpreted this

injury as a gunshot wound.
Q. Any determination as to trajectory, Dr. Steadman?
A. No, I was not able to assess trajectory because of the amount of bone loss. And just to be clear, we're looking at near the top of the arm bone, the humerus here on the left side, and I'm pointing to that area on the exhibit skeleton.
MR. MILLER: If I may approach the witness with an exhibit, Your Honor?

THE COURT: You may.

BY MR. MILLER:

Q. Showing you Government's Exhibit 1000, I'll ask you to look at this and let us know whether or not you find any correlation between the perimortem trauma and the apparent holes on the garment.

A. What I observe now is I see a defect in the garment in the left chest area, assuming that the garment was put on with the zipper in the front and the hood in the back, and five holes in the left arm area of the garment, again, assuming it was put on with the zipper in the front.

Q. Now, to be perfectly fair about it, one doesn't know exactly how a garment is twisted upon a person's body at a time of death.

A. That's correct, yes.

Q. And I want to be sure we don't draw any undue conclusions from this, but are the holes observed on Exhibit 1000 at least

consistent with where you found gunshot trauma on the body of Mr. DeGeus?

A. They're not inconsistent, no.

Q. And again, just to be sure that we're not overstating any expertise here, you don't claim to have made any scientific finding as to whether or not the holes on Exhibit 1000 are or are not bullet holes.

A. No, that is beyond my area of expertise.

Q. Thank you. Finally you indicated that perimortem trauma was observed in the area of Mr. DeGeus's head.

A. That's correct.

Q. If we can see Exhibit 1046 and 1040 -- for the record,

we're showing side by side Government Exhibits 1046 and 1040 -- can you tell the jury what the subject of these two photographs is?
A. Yes. This is the area of severe fragmentation that I reconstructed.
Q. And you're referring to 1046?
A. Yes, on 10 -- is that 46?
Q. Yes.
A. Okay. 1046 on the right side of the skull.
Q. That's after --
A. In the -- excuse me.
Q. Is that after you've done reconstruction?
A. Yes. This is after significant reconstruction. You can

♀

2649

see all of the small fragments that I was able to glue back to this area. All of this area has been glued back together for the purposes of reconstructing any sort of trauma that might have taken place. So you're looking then at the right side of the skull. I'm referring now to the exhibit skeleton just above the ear area and behind the right eye area. This is the area that has been reconstructed and where you can still see that some fragments are detached and/or missing.

And then referring to Exhibit 1040, this is a very thin piece of bone behind the right eye called the sphenoid bone, and what I observed is a semicircular defect here -- the rest of the bone is missing up here -- that I thought was consistent with a gunshot wound, and this would be an area on the exhibit skeleton about here just immediately behind the right eye in this very thin area of bone, and this is naturally thin, thin area of bone here.

Q. Exhibit 1034, please, shows what?
A. This is looking kind of downwards on the top and the front of the skull of Mr. DeGeus. And all of -- you can see that I've reconstructed this area, the face as well as the skull up here. But these bones are simply not present, this large defect here. And so this is likely an area of gunshot trauma, but there is no distinct exit wound here. There is some -- a little bit of bevelling up here, external bevelling, that suggests that that might be the location of the exit wound. But it certainly is

not very, very clear.
Q. How many bullets do you conclude passed through the skull of Mr. DeGeus?
A. The evidence suggests at least one.
Q. And are you able to arrive at or find any evidence suggesting the trajectory?
A. The trajectory appears -- based on the wound that I mentioned previously on the right side of the skull, the trajectory appears to be similar to that that I demonstrated in Lori Duncan of right to left, and assuming that this is the area of exit, right to left and slightly upwards.
Q. And again, you cannot be definitive that it was entrance in the face and exit in the head.
A. That's correct.
Q. But that's the indication as opposed to the opposite.
A. That's -- yes.
Q. And again, that's a similar angle as to what you observed with the probe on Lori Duncan.
A. Yes.
Q. Now, there was a great deal of fragmentation of the skull

of Terry DeGeus.
A. There was, yes.
Q. Can you give us some idea about how many hours and how much effort was involved in reconstructing those pieces?
A. Oh, I didn't count the hours or anything like that. It

was -- it took some time and was painstaking to make sure that all of the recovered pieces were put back in its proper place. And in some cases some of the bones I was not able to reconstruct, but this is as complete as it could be reconstructed reliably.
Q. As to that head, you diagnosed at least one bullet passing through the head.
A. I estimated, yes, it was one bullet, yes.
Q. Can you definitively rule out additional blunt trauma in addition to the gunshot wound?
A. No, I cannot rule that out. There was so much fragmentation that it is possible that there was either previous or subsequent blunt trauma. That can't be ruled out, no.
Q. But you don't diagnose that either.
A. I cannot offer any definitive evidence of that, no.
Q. What you do have definitive evidence of is at least one bullet passing through his head.
A. Yes.
Q. And again, impossible to opine regarding gunshot caliber.
A. Correct, for the reasons I mentioned previously.
Q. But as with the four other victims, at least consistent with nine-millimeter ammunition.
A. Yes.
Q. It could be other caliber as well.

A.    Yes.

Q.    But you would never rule out nine-millimeter.
A.    No, I couldn't do that, no.
Q.    Based on your findings.

MR. MILLER:  Thank you, Dr. Steadman.

THE COURT:  You can go back to the witness box.

THE WITNESS:  Okay.  Would you like me to put this --

THE COURT:  That'd be great.  Put it off to the side. Thank you.

And Mr. Spies, would you like to cross-examine now or after the break?

MR. SPIES:  Let's take a break for a minute, Your Honor.

THE COURT:  Pardon me?

MR. SPIES:  May we take a break now, Your Honor?

THE COURT:  Sure.  Members of the jury, it's 2:25 now. We'll take a 25-minute recess.  Please remember my cautionary instruction about keeping an open mind until you've heard all of the evidence in the case.  Thank you.

(The jury exited the courtroom.)

THE COURT:  Anything we need to talk about, Mr. Williams?

MR. WILLIAMS:  No, Your Honor.

MR. SPIES:  No, Your Honor.  Thank you.

THE COURT:  Thank you.  We'll be in recess.  Could I see the lawyers just for one second just on witness scheduling?

(Recess at 2:26 p.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated. You can be seated. Thank you.

Mr. Spies, whenever you're ready, you may cross-examine.

MR. SPIES: Thank you.

CROSS-EXAMINATION

BY MR. SPIES:

Q. Hi, Dr. Steadman.

A. Good afternoon.

Q. Doctor, I'm not going to have you recap all that you've spoken about this afternoon about your findings in reviewing the skeletal remains of Mr. Nicholson, the Duncans, and Mr. DeGeus, but I do want to ask you some specific questions and some general questions as well.

First of all, could you explain to the ladies and gentlemen of the jury the period of time that you encompass when you talk about perimortem, that is, about the time of death?

A. The perimortem period is a bit ambiguous. When we talk about at or around the time of death, it's not a defined period in terms of minutes or hours or even days or weeks. Typically what we assign as perimortem is something that is clearly not

antemortem. It doesn't have healing, but it also is clearly not postmortem. As long as its margins are dark, as long as the fractures are consistent with fractures that are typical of fresh bone, then we assess that it's perimortem. If we're unclear, then we state that as well and say that it could be

perimortem or postmortem if we're certainly -- if we're not certain.

Q. So, for example, if you were to observe an injury on a bone where there's no significant evidence of healing and the origin of that injury is consistent with some traumatic event occurring at about the time of death, would you classify that as perimortem?

A. That is correct, yes.

Q. Even if the injury might have happened a day or two beforehand and there was no significant evidence of healing, you would still have to classify it as perimortem.

A. If it's -- yes.

Q. Okay. Now let me also ask you about postmortem. I think in describing maybe some of the changes that you observed in the skeletal remains of one or more of the victims you described some postmortem changes. And again, could you tell us what you mean by postmortem?

A. Postmortem are those that occur after the time of death that we cannot assess as being perimortem. Typically we look at the morphology or the form of the margins, the color of the

2655

margins and whether the bone might have been dry rather than fresh when the fracture or the trauma occurred.

Q. And I think in the fact of observing some of the changes or the fractures that you saw in the skeletal remains of Mr. DeGeus that you saw quite a wide variety of postmortem changes, didn't you?

A. Yes.

Q. And just for purposes of explanation, postmortem changes could result when a body is buried in soil and the soil compacts

or compresses down over the skeletal remains.

A. Yes, that can happen.

Q. Or if the body is in such a place in the soil that there's freezing and thawing that takes place over a long period of time.

A. That -- it's possible that that could happen, yes.

Q. Just, for example, as water gets into stone and can freeze and thaw and break a stone apart, water can get into remnants of bone, teeth and result in skeletal changes that way.

A. There haven't been very many studies about the impact of freezing and thawing on buried remains. We don't know that much about what could happen in those scenarios.

Q. But you know from your studies in forensic anthropology that other forensic anthropologists have observed that freezing and thawing can change the composition of bones that have been buried in soil.

2656

A. I've seen that mentioned, yes.

Q. And in addition to that, the weight of farm equipment, the weight of machinery over the top of skeleton remains can also result in breakage, changes in skeletal structure.

A. Yes, if the remains aren't very deep, yes, that's true.

Q. And another thing that can influence the changes in skeletons is the size, the health, the thickness of the bones.

A. In terms of later fracture?

Q. Yeah, changes that can occur in the soil.

A. I'm sorry. Could you --

Q. Well, let me be more precise. For example, the bones of children are thinner and more fragile and can undergo changes in the soil over a long period of decomposition.

A. Yes, there are changes that could happen with decomposition, changes in color and so on, yes.

Q. Now, let me ask you some specific questions, Doctor, about your findings in examining the skeletal remains of the people about whom you've testified this afternoon.

First of all, you described in the case of Mr. Nicholson that there was an entrance wound to the left side of Mr. Nicholson's head?

A. That's correct.

Q. And you also observed in your report of this examination that there were ten fractures that radiated from the entrance wound; am I right?

♀

A. I believe there were ten, yes.

Q. And could you explain for the ladies and gentlemen of the jury what you mean by radiating fractures?

A. Radiating fractures are those that radiate away from the site of an impact in terms -- when the impact is a gunshot trauma. They are the linear fractures that I pointed out to you that were running away from either an entrance wound and sometimes also an exit wound. Those are radiating fractures.

Q. And I think we've had another witness today talk about the skull not being a single solid piece of bone but consisting of several bones connected by suture lines. Would you agree with that?

A. Yes, that's correct.

Q. And when the skull is struck by a high impact such as by a bullet, that depending on where the skull is struck and what thickness of bone is struck and a lot of other variables that the skull can fracture like a piece of plate glass.

A. Yes. It depends on the velocity of the bullet, the direction of impact of the bullet, and the nature of the bone, yes.
Q. And once the firm structure of the skull is affected that way, that is, by fracturing it, it itself becomes fragile and can break or breaks with the impact of the bullet.
A. Yes. Well, the whole purpose or what the radiating fractures do is try to relieve stress, and so yes, that's part

of the process.
Q. And in addition, when there's decomposition that is from the soft tissue, the connective tissue, overlying skin and hair, when that decomposes away, those organs of the body help to hold bone together as well, don't they?
A. Yes.
Q. And once they decompose away, there are fewer structures to hold the bone together.
A. The fragments of the bones you mean, the fragments?
Q. Yes.
A. Yes.
Q. You observed in Mr. Nicholson in addition to the head wound the fracture, the hairline fracture, of the fourth cervical vertebra, and I think you've already described that you could not conclude what the source of that injury was; am I right?
A. That's correct.
Q. All right. Now, turning, Doctor, next to Lori Duncan's remains, you've described for us the gunshot wound to her skull, and I believe it's your observation that you could not detect a clear entrance wound on her skull; am I right?
A. That's correct. There was an area of missing bone, yes.

Q. And when you don't have a clear entrance wound or a clear exit wound, your calculation or effort to describe the trajectory of the bullet is an estimate at best; is that right?
A. It's an estimate, yes.
♀

Q. Okay. You did conclude in the case of Lori Duncan that there were at least two bullets that were fired into her body; am I right?
A. That's what I said, yes.
Q. And there could have been more than two?
A. Yes.
Q. Now, we also know from your testimony this afternoon that there is really no reliable way to estimate caliber size especially when you're talking about when all you have left is a bone or a bone fragment that resulted from a bullet wound; right?
A. That's correct. There's -- the reliability of estimating caliber is very, very low.
Q. And at best it's often a guess.
A. Most forensic anthropologists would not attempt that guess, no.
Q. In fact, it would be folly to try to distinguish between, say, a 9-millimeter bullet and a 38-caliber bullet as being the cause of any of these wounds, wouldn't it?
A. There are some studies that do suggest that there are differences in those calibers, yes, large caliber versus small caliber that can be detected.
Q. Well, how would you compare a 38 to a 9-millimeter bullet?
A. I wouldn't. I don't have the expertise to compare those bullets. I'm not a firearms expert.

Q. All right. So it wouldn't do me any good to ask you the comparison between, say, a 22-caliber bullet and a 357 Magnum bullet.
A. I'm not a firearms expert, no.
Q. But you would agree and other forensic anthropologists would agree with you that you really can't base caliber size on entrance wounds in bone.
A. I would say that, yes, that I would not do that.
Q. Next let me ask you just a couple of brief questions about the remains of Kandi Duncan and Amber Duncan. Again, on Kandi Duncan and on Amber Duncan, you weren't able to detect a distinct exit wound to the head of either of those two young girls, were you?
A. There was not the exit bevelling that we can see in most exit types of wounds, but we could see an area of damage near the midline of the face of both individuals that indicated that that's where the bullet exited, yes.
Q. So we know that the bullet exited the front or the facial area of each child, but especially in Amber Duncan's case, you observed that the bones were too thin to observe any bevelling at all.
A. We did not see bevelling, right. I'll speak for myself. I saw the damage, yes, of that area.
Q. So in each of those situations, again, the trajectory of the bullet would be a guess.

A. Well, the bullet clearly entered the back of the skull.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2322 of 3636

There's a clear entrance wound in the back of the skull.
Q. But whether it was up or down or right or left in relation to the midline of the head --
A. There was -- in the case of Kandace Duncan, there was no other injury except in that area of the left nasal orbit area that would indicate another exit wound or another potential exit wound.
Q. But as the angle up or down, slightly right or slightly left, we don't know that, do we?
A. In her case, the angle of trajectory was almost straight. I don't -- I can't recall without looking at the exhibit if there was a little bit of up or down to it. If I remember correctly, it was fairly straight through.
Q. Yeah. I think in relation to Kandi you said there was no distinct exit wound, and in relation to Amber Duncan, you likewise observed that the bones were too thin to observe bevelling to find a clearly demarcated exit wound.
A. Right, and the estimation was based on the damage, yes.
Q. Now, in relation to Kandi Duncan and Amber Duncan, you saw no other evidence of trauma to either one of those girls, did you?
A. I did not see any other evidence of perimortem trauma to the bone, no.
Q. Okay. And in relation to Kandi Duncan, Amber Duncan, Greg

2662

Nicholson, and Lori Duncan, you saw no evidence of strangulation.
A. There was no -- I would have to recall whether the hyoid bones were found in all cases, but the skeletal evidence of strangulation is not always present. There could be

strangulation without any sort of skeletal evidence of it.
Q. Well, my question was you saw no evidence of strangulation. Certainly your report mentions no evidence of strangulation.
A. I did not see anything that would suggest strangulation in the skeletal remains that I had in front of me, no.
Q. Finally regarding Mr. DeGeus, you described for us this afternoon that there were a lot of missing bones in Mr. DeGeus's skull area; right?
A. There were some fragments that were missing, yes, in the -- yes.
Q. And my recollection was -- well, did you attend the removal of Mr. DeGeus's body from the site where it was found?
A. I did not, no.
Q. But you've heard it described as being face down in a grave about two to two and a half feet deep?
A. I was not sure of the depth, but I did hear that it was face down, yes.
Q. But in any event the fracture pattern you saw in Mr. DeGeus's skull was complex, wasn't it?
A. It was complex, yes. It was very fragmentary.

Q. And did you describe in your report that you observed two impact sites to Mr. DeGeus's skull?
A. Yes, and those are the two that I described earlier.
Q. And are these purported two gunshot wound sites?
A. That was my interpretation, yes.
Q. So as to Mr. DeGeus we have, I think you said, a minimum of three gunshot wounds?
A. Yes, I believe that's correct.
Q. And as many as how many?

A. I don't make a maximum estimate.
Q. But based on the number of bone deformities that you observed, are you able to determine the maximum number of bone deformities that would be attributable to gunshot wounds?
A. No, I'm not. I can only estimate a minimum number.
Q. Now, Mr. Miller had you examine the sweatshirt that was removed from his skeletal remains, from Mr. DeGeus's skeletal remains, and I think you honestly told this jury you're not in a position to say whether any, all, or none of those are gunshot marks on the sweatshirt.
A. That's not my area of expertise, no.
MR. SPIES: Doctor, thank you for your time with me this afternoon. Those are all the questions I have.
THE COURT: Mr. Miller, any redirect?
MR. MILLER: Yes. Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. MILLER:
Q. Doctor, I just want to be perfectly clear about one thing. You look at bones, not soft tissue.
A. That's correct. My area of knowledge is with the human skeleton.
Q. Okay. And what you examine is decomposed remains professionally.
A. Yes.
Q. Are there forms of violent and even potentially fatal trauma that affects soft tissue only and not bones?
A. Yes, of course.
Q. Including strangulation among other things?
A. Strangulation. As I mentioned before, some gunshots don't

affect bone. Some stab wounds might not impact bone. Bone doesn't have to be involved in a traumatic event.

Q. There's such a thing as fatal trauma that affects soft tissue only.

A. That's correct, yes.

Q. Affects vital organs, ability to breathe.

A. That's correct.

Q. All you can say is what the bones, in fact, do show you, and in this case you've documented fractures of various natures including multiple gunshot injuries.

A. Yes, I was able to do that in this case.

MR. MILLER: Thank you. I have no further redirect.

THE COURT: Mr. Spies, anything further?

MR. SPIES: Nothing further, Your Honor. Thank you.

THE COURT: Okay. My understanding is that that's all the evidence for today; right?

MR. WILLIAMS: Yes, Your Honor. We're running ahead of schedule.

THE COURT: Okay. That's fine. Let me give the jury a heads-up. Here's what I think is going to happen. We're going to send you home now or in just a minute or so. We're going to bring you back tomorrow. The government's going to rest probably right around noon, right around the lunch hour. You'll have lunch if you want to. Well, I guess the way we're working it, you'll all be together. So you'll have lunch, and I think we'll be done for the day tomorrow. So you'll have -- you can plan tomorrow afternoon we won't have you in court; right?

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: Okay. And then let's see. Then we'll

bring you back Wednesday, and we'll see if the defense has any evidence, and then we'll go till we're done with their evidence, and then we'll get into final instructions and closing arguments.

But the plan is most likely, just so you can plan ahead, it's going to take a full day to go through the final instructions and then the closing arguments of the lawyers. And what I don't want to do is get part way through that, for

♀

example, on Thursday and then bring you back on Monday for the rest of the closing arguments. It's just awkward when you break it up.

So we may have another day on Thursday like we're having today where we won't be here all day Thursday because I wanted to give -- in a long case I always give the lawyers some time after the close of evidence to work on their closing arguments. That's only fair because they've been working very hard throughout the trial.

And so our plan is Monday will be a very full day. We'll start off at 8:30 with the final instructions. And then we'll have the closing arguments. So my best guess is that you may have a little bit of time to start your deliberations on Monday but may not. You may want to just wait and start on Tuesday. So I'm just trying to give you a heads-up as to what I think is going to happen.

Please remember my cautionary instruction. Keep an open mind until you've heard all of the evidence in the case, had a chance to receive my final instructions, hear the closing arguments of the lawyers, and, most importantly, go back to the jury room, review the evidence, and begin your deliberations.

Thank you very much. We'll see you tomorrow morning at 8:30.

(The jury exited the courtroom.)

THE COURT: Please be seed for just one minute. Carey, did you pass out the instructions or --

THE CLERK: No, Roger's bringing them in.

THE COURT: Okay. Okay. I've got the latest revised set of final merits instructions. Primarily there are changes to the organization of the elements of the CCE instruction, a total redo of the verdict form into the tabular type of verdict form that we e-mailed you this weekend I think on the penalty phase instructions. And it just shortens it dramatically. It's much, much shorter. Those are the primary changes. I've got a cover letter for you that sets out what the basic changes are.

So you'll have tonight to review it, but I really would like to meet tomorrow when we finish with the evidence and then start going over the instructions and really get them in final form and maybe even have our instruction conference -- well, I guess we can wait and do that Thursday, do the final instruction conference. But, you know, if we can get it done tomorrow, that's fine. So is that a plan? It's a plan. Is it a workable plan, Mr. Rogers?

MR. ROGERS: Yes, it is.

THE COURT: Okay. Mr. Williams?

MR. WILLIAMS: Yes, Your Honor. I think, frankly, we could probably do the final jury instruction conference tomorrow. I don't think a lot's going to change between now and the end but . . .

THE COURT: The law may not. My mind might.

MR. WILLIAMS: Certainly.

THE COURT: And I think I told you I also reordered the CCE instruction. Instead of all of the elements in chronological order, I put them -- I matched them up with how we parse them out with definitions, so I think it just reads a whole lot better. But you can all take a look at it. I mean, there's nothing earthshaking in there other than -- and then in the penalty phase instructions -- well, I guess you've seen them basically.

MR. WILLIAMS: Yes.

THE COURT: Yeah. The only question we have I think -- isn't your main objection to the step 5 weighing of the gateway element aggravating factors?

MR. ROGERS: Yeah. It may even be step -- they're called step 1 factors.

THE COURT: Yeah, the step 1 factors, the gateway factors, eligibility factors.

MR. ROGERS: Exactly. That's my main objection. There's some other things I'm not sure and we won't know till later whether there's an evidentiary basis for them, and we can talk about that too.

THE COURT: Just give me an example of that.

MR. ROGERS: You had to ask. I had to volunteer.

THE COURT: Are you talking about like some of the overt acts in the conspiracy or some of the --

MR. ROGERS: I'm talking about the heinous, cruel, or

2669

depraved manner with regard to the girls, Kandi and Amber.

THE COURT: Well, let me ask you, do you have some

authority that shooting somebody in the back of the head is not -- it's gotta be more than that?

MR. ROGERS: Yeah.

THE COURT: Well, why don't you get me some authority.

MR. ROGERS: Godfrey versus Georgia. I mean, basically that was shooting somebody in the front of the head with a shotgun but same deal. It has to be more than that. It has to be either intended to cause pain apart from the actual infliction of death itself, torture kind of thing, or it has to be corpse mutilation, something like that.

THE COURT: Mr. Williams, I'm not expecting you to argue it now, but I guess we'll be prepared to argue that.

MR. WILLIAMS: Yeah, and I would disagree and just give a heads-up to the Court. Where I'm coming from, the definition the Court has on that includes, among other things, the threat of another person imminently subject to death. One of those two little girls had to watch the other one die and know that that one's going to be killed. They also had the possibility of knowing their mother was going to be killed, and the mother likewise knew that about her girls, and Greg Nicholson knew that about all three of those people with him.

So to the extent that torture is mental torture, includes the possible knowledge of the threat that other people

2670

are going to be killed, I think it falls within that definition for all the victims in this case.

THE COURT: Okay. Well, we'll be in recess, and we'll take -- Mr. Parrish?

MR. PARRISH: I just have one quick thing. I assume we can use the room that we've been using for witnesses as they

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2330 of 3636

come up. I realize with Mr. Loparo it's not necessary, and we made separate arrangements for his interview, but when witnesses come up, we can use the same room that the lawyers have been using for a conference room?

THE COURT: Sure.

MR. PARRISH: Is that the appropriate room?

THE COURT: Yeah. Duane, do you have any other ideas? I see you in the courtroom.

DEPUTY WALHOF: No, Your Honor, I don't.

MR. PARRISH: We have no problem with that. But I just did not want to bring other people who are not authorized by the Court to be there unless we had permission.

THE COURT: No. That's fine.

MR. PARRISH: Okay. Thank you.

MR. WILLIAMS: And just to clarify, Your Honor, previously we had talked off the record of a possibility of a jury instruction conference tonight. Given we're going to end early tomorrow, do you want to --

THE COURT: That's what I decided, give you more time

♀

2671

to look at the instructions.

MR. WILLIAMS: Great. Thank you.

THE COURT: Thanks. We'll be in recess.

(The foregoing trial was adjourned at 3:21 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR 1-7-05 Date

♀

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| WADE KISNER | | |
| | MR. MILLER | 2495 |
| | MR. SPIES | 2514 |
| | MR. MILLER | 2518 |
| JULIA GOODIN | | |
| | MR. MILLER | 2520 |
| | MR. SPIES | 2536 |
| DENNIS KLEIN | | |
| | MR. MILLER | 2542 |
| | MR. SPIES | 2585 |
| | MR. MILLER | 2594 |
| DAWNIE STEADMAN | | |
| | MR. MILLER | 2599 |
| | MR. SPIES | 2653 |
| | MR. MILLER | 2664 |

*****

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, Plaintiff, vs. DUSTIN LEE HONKEN, Defendant. /

No. CR01-3047

Sioux City, Iowa
October 5, 2004
8:28 a.m.

VOLUME 13

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

2674

APPEARANCES:

For the Plaintiff:

C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant:

ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn
Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Good morning. Please be seated. I believe there's one small matter we need to take up before we have the jury brought in, Mr. Williams?

MR. WILLIAMS: Yes, Your Honor. In your ruling on pretrial motions this summer -- I think it was July 14 if I recall correctly -- the government had moved for permission to use as a demonstrative exhibit an Intratec Tec-9 handgun. The Court reserved ruling at that time wanting to wait to see how the evidence came in and to ensure that the government could link up the defendant to possessing an Intratec Tec-9 at some point before you were going to allow us to use a demonstrative exhibit for that purpose.

The government believes we've done that at this point primarily through the testimony of Tim Cutkomp but also through the testimony of forensics from the crime scene and also through statements by Christi Gaubatz, and so for those reasons, we would like to use with our last witness, Victor Murillo, an Intratec Tec-9 as a demonstrative exhibit.

THE COURT: And that would be Government's Exhibit 10?

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: And it's only demonstrative. It's not going to go back to the jury.

MR. WILLIAMS: Correct, Your Honor. We've cleared it

with the marshals. We've secured the weapon.

THE COURT: Okay. Anybody from the defense want to respond? Mr. Spies?

MR. SPIES: Well, Your Honor, our position remains the same, that we believe it would be confusing and inflammatory. We think that the connection that the government is urging the Court to make in permitting this demonstrative exhibit is equivocal at best.

THE COURT: Well, it may be equivocal, but I think there's sufficient evidence that a jury could find that a Tec-9 was in the picture, so to speak, so I'm going to go ahead and allow the use of it as a demonstrative -- for demonstrative purposes only.

Anything else we need to take up before we have the jury brought in?

MR. PARRISH: Just briefly, Your Honor.

THE COURT: Yes.

MR. PARRISH: We updated this morning our exhibit and witness list book. We're narrowing it down. We're trying to get these people scheduled to go first in the morning. One thing -- and I was just speaking to Mr. Williams about it and his assistant -- we're finding there were some documents -- and it's not their fault -- that we issued as subpoenas early on that we had the hearing with Judge Zoss. We now have gotten some of these documents. It appears that we're maybe seeing

♀

2677

some of these documents for the first time that date back to '93. We are going to supplement it, and I've given the government a copy of the exhibits we've gotten from the jail.

And Miss Redden, Lieutenant Redden -- I talked to her late last night; she's coming in at seven this morning -- is going to start recopying the file because she acknowledges that some of the material may not have been given to the government and was not given to us. And so we're probably going to try to supplement our file sometime this afternoon about three or four and bring it over, but we have documents in there we think are pertinent to our defense.

THE COURT: Okay.

MR. PARRISH: Thank you.

THE COURT: Thank you for the heads-up on that.

Ready now to have the jury brought in? And who's your next witness?

MR. MILLER: Frank Tarasi.

THE COURT: Thank you. Let's have the jury brought in. Thank you.

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated.

Is the government ready to call your next witness?

MR. MILLER: Yes, Your Honor. The United States calls Frank Tarasi.

Mr. Tarasi, if you'll please step forward and be

2678

sworn.

FRANK TARASI, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Can you adjust the chair and the microphones so you can get as close as possible?

THE WITNESS: With the Court's permission, I would prefer if you don't mind if there's -- I naturally project very

well.

THE COURT: Okay.

THE WITNESS: I don't know that I will need the microphones.

THE COURT: Well, I guarantee you'll need the microphones.

THE WITNESS: Okay.

THE COURT: I think I've been in the courtroom a little more often than you have.

THE WITNESS: Okay. I apologize, Your Honor.

THE COURT: That's fine. But you're going to need the microphones. You may not need them as close if you project well. It's a huge courtroom, and without the sound system, I guarantee the jury couldn't hear you even with your projection.

So why don't you state your full name and spell your last name for us.

THE WITNESS: My full name is Frank L. Tarasi the Third, last name spelling, T-a-r-a-s-i.

2679

THE COURT: Thank you.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. And my apologies, Mr. Tarasi. It was -- you and I have some experience over the years, and I'm familiar with your booming voice and warned you not to get too close to those; is that correct?

A. Yes, sir.

Q. Just make sure that everybody can hear you and hear you

clearly, and we'll let you know if it's either too soft or too loud. Very good?
A. Yes, sir.
Q. Your occupation, sir?
A. I am employed as a criminalist by the Iowa Division of Criminal Investigation in the criminalistics laboratory.
Q. We have already heard that there are various sections in the laboratory. To which are you assigned?
A. I am assigned to the latent print section of the laboratory where I am responsible for fingerprint comparisons as well as footwear and tire track comparisons, fracture match comparisons as well as all laboratory personnel are available for crime scene duty.
Q. How long have you been with the DCI, sir?

A. Over 22 years now.
Q. How much of that time spent in the area of latent fingerprint processing among other areas?
A. When I began my employment with the DCI, for about a year and a half I worked as a drug chemist. After that year and a half in the drug section, so for about 20 1/2 years, I have been in the latent print section.
Q. Summarize your education for us, Mr. Tarasi.
A. I have a bachelor of science degree in chemistry which was received in May of 1980 from Clarion State College in Clarion, Pennsylvania. In August of 1981 I received a master of science degree in the field of forensic chemistry which is the field of criminalistics. That was received from the University of Pittsburgh in Pittsburgh, Pennsylvania. I have completed over 4,000 hours of training sponsored by the DCI crime laboratory

and the Federal Bureau of Investigation in various aspects of fingerprint and footwear comparison.

Q. Have you any idea of approximately how many latent fingerprint examination cases you've performed over the years, the 22 or so years?

A. In excess of 5,000 cases I've worked on.

Q. Did you do some such work in connection with the Lori Duncan, Angela -- excuse me, Lori Duncan, Amber Duncan, Kandi Duncan, Greg Nicholson, and Terry DeGeus missing persons investigation?

♀

A. Yes, I did.

Q. Before we get into exactly what work you did, could you just educate us a little bit -- I don't think there's anyone here who hasn't heard about fingerprint comparison as being an area of forensic science, but for just a minute or two if you could describe for us some of the basics of that science and what concerns you customarily address.

A. Yes. Present on the fingers, palms, and toes and soles of your feet is a skin unlike any other portion of your body. It is friction ridge skin, makes it easier for you to pick items up, but the -- there are ridges on the skin as I've drawn here on the Telestrator. The orange lines would represent the friction ridges as are present on a fingerprint. This would be what is called a loop-type pattern in that the ridges enter from one side, recurve, and go out the other.

Where these friction ridges stop or divide into two that I've circled are examples of individual characteristics. These individual characteristics are unique to each area of friction skin as far as that particular area of friction ridge

skin as well as unique to an individual. They are permanent. These ridges are formed in the third to fourth month of fetal development and will stay the same barring any injury until decomposition after death. These ridges will be reproduced or can be reproduced when you touch an item.

I will then process the piece of evidence or the piece

of material, develop the latent prints that have been reproduced as they have been deposited, and then can compare them to a set of known prints to say whether a particular individual has, in fact, touched an item.

Q. What factors, if any, affect whether or not a fingerprint is actually transferred from a finger to an object?

A. There are a number of factors that can influence whether we develop a latent print on a surface: One, is there material present on the fingers to transfer the friction ridge detail. An individual who has very dry skin would be less likely to deposit a latent print because the dry skin, there's not the transfer media.

If an individual were to touch an item, even though they may leave a latent print, it could be destroyed as I just wiped off the latent prints that I deposited on this counter.

Something else, environmental influences. A latent print is deposited on a surface and left out in the elements for an extended period of time; it can be washed away or destroyed so it cannot be developed. Those are some of the reasons why we would not develop latent prints on an item.

Q. They may never have been left in the first place?

A. That is also a possibility, that an individual did not touch an item.

Q. Okay. Or if you touched, had such dry skin that there was no transfer of a print.

A. That is a possibility.
Q. And also if a print is left, it does not necessarily persist forever.
A. That's correct.
Q. And what are some of the factors that affect the duration of time that a latent fingerprint might persist?
A. Some of the factors would be what happens to the print after it's deposited. For example, I place my latent prints on the counter here. If I were to do nothing with them, they would be able to be developed until the cleaning staff comes in tonight and wipes the counter down. If I were to wipe the counter off, once again, I could remove the latent prints. If I were to put my fingerprints on this pen, then put the pen inside my pocket and have the pen rub around inside my pocket, the latent prints could be removed from the pen by coming in contact with the clothing inside my suit coat.
Q. What method or methods do you use as a forensic scientist to try to recover latent fingerprints?
A. There are a number of methods available to us. The first choice that we will make is -- depends on what type of a surface we're examining. If I am examining something porous such as a piece of paper, I will use one series of tests. If I am examining something that would be considered a nonporous surface such as this plastic pen, I would use another series of tests. The paper, all of them are going to be primarily chemical

analyses, but depending on whether the latent print material gets absorbed into the surface as in paper or is left on the surface with a nonporous surface is going to dictate what we utilize.

Q. I assume with a nonporous surface, all else being equal, the fingerprint is not going to persist as long.

A. Nonporous surfaces are generally more difficult to develop latent prints off because they are easily -- the print is on the surface and can be very easily wiped off. A print on an absorbant material is actually in the material, so it would be difficult to remove. You could put more prints on top of it that would make it more difficult to evaluate and compare, but the prints would still be there.

Q. Okay. And you mention another subject, the difficulty of evaluating and comparing. Just because you find ridge detail, does that mean that you're able to actually do a fingerprint comparison?

A. No, it's not.

Q. Why not?

A. The reproduction of friction ridges has to contain sufficient individual characteristics so that I can make an identification. The drawing that I had earlier, I had circled ending ridges and bifurcations. An ending ridge is where a ridge ends. A bifurcation is where a ridge divides into two. Those are two of the three basic type of individual

2685

characteristics. The third is what is called a ridge dot where it's a ridge that's no longer than it is wide. Those are the three basic types of characteristics. It is their unique

relationship to each other that allows us to identify the prints. If I do not have sufficient information to be able to identify it, the print is not suitable for identification.
Q. You mentioned earlier that crime scene processing in addition to latent print examination is one of your responsibilities at the crime lab.
A. Yes, it is.
Q. And is the recovery of latent fingerprints at crime scenes among the things that you routinely attempt when you do crime scene processing work?
A. Yes, it is.
Q. Is it at all unusual, even in a fresh brand new crime scene, to be unsuccessful in recovering latent fingerprints suitable for identification?
A. That is not uncommon.
Q. What -- how often is it common?
A. It's going to depend on the circumstances of the case as far as the interaction between the participants, if you will, of the crime scene, individual -- I walked into this room today. I touched various doorknobs. I touched various counters. There are various areas that I could have deposited latent prints. However, because of what I've done, I probably have not left any

latent prints that would be able to be developed just because of the way I handled things in this example. So to say 10 percent of the time or 20 percent of the time, I can't give you a number. I can say it does not surprise me that I do not develop latent prints at a crime scene.
Q. Is it a minority of the time that you do, latent prints suitable for identification?

A. Of the cases that I examine in the laboratory, approximately 25 to 30 percent of the time I develop latent prints suitable for identification.
Q. And these are generally fresh crime scenes.
A. These would be pieces of evidence that have been submitted to the laboratory for comparison, relatively fresh, yes.
Q. As opposed to, for example, a seven-year-old crime scene.
A. Correct.
Q. Nevertheless, you look.
A. When asked, I look.
Q. Among the items that you examined for possible latent prints, was there a one-page note addressed to Phyllis?
A. Yes, there was.
Q. If we could display what has already been received in evidence as Exhibit 47. Do you recognize 47, Mr. Tarasi?
A. Yes, I do.
Q. And what is Exhibit 47?
A. Exhibit 47 is a copy of laboratory Exhibit B as in boy D as

in David that was submitted to the DCI crime laboratory reference this case that I examined for latent prints.
Q. Approximately when did you examine it if you recall?
A. Sometime probably September of 2001.
Q. What, if any, findings did you make on that examination?
A. There were no developed latent prints suitable for identification on this exhibit.
Q. Did you do fingerprint examination work with respect to a series of four notes or inmate kites?
A. Yes, I did.
Q. If we can have Exhibit 306, please, do you recognize that

as one of these four kites?
A. This is one of those four letters that I examined.
Q. And did you examine those four letters for the presence of any latent fingerprints?
A. Yes, I did.
Q. What, if any, findings did you arrive at, sir?
A. On two of the letters there were latent prints that were developed that were suitable for identification. On what was given laboratory Exhibit BW-1 which would have been the first letter, there were six developed latent prints suitable for identification. On the letter that was designated BW-3, there were five developed latent prints suitable for identification. All six developed latent prints suitable for identification on BW-1 were identified to an individual whose ink fingerprints

2688

appeared on a card bearing the name Dustin Lee Honken. On BW-3, four of the five developed latent prints were also identified to the individual whose ink fingerprints appear on the card bearing the name Dustin Lee Honken.
Q. And again, the presence or absence of latent fingerprints on paper like on other objects is a matter of chance.
A. Latent prints are a chance or accidental reproduction of friction ridge skin, so yes.
Q. Sometimes you find them, and sometimes you don't.
A. That's correct.
Q. In this case, you found as many as 11 that matched Dustin Honken?
A. There were ten latent prints that were identified to Mr. Honken. There was one developed latent print that was not identified to him.

Q. Identified to anybody at least among the examinations that you did?
A. It was not identified at this time.
Q. Did you in connection with this investigation also process for latent fingerprints any physical evidence recovered from the search of the Lark Avenue crime scene?
A. I believe -- I'm not familiar with what the Lark Avenue crime scene was, but there was a number of exhibits that I have examined.
Q. Submitted in October of the year 2000 in connection with a

mass grave discovered in Cerro Gordo County?
A. Yes, I did.
Q. And can you just give us an overview of the items that you examined and what you did and what your findings were, sir.
A. There were a number of items that were submitted to the laboratory, pieces of beverage can, pieces of gray tape. I believe a couple of tires were also submitted, some other miscellaneous items that I would say. All of those items were examined for latent prints.
Q. These were all items recovered from out of doors?
A. As far as I know, yes.
Q. Well, let me ask you this, and I don't want you guessing about anything, but assuming that they were various items recovered from a dump site or an area of woods where people were known to frequent for parties and the like, would exposure to the elements be one of those things that might affect preservation of latent fingerprints?
A. The exposure to the elements could very likely affect my ability to develop latent prints on these items.

Q. Finally, sir, did you -- were you asked to do such work in connection with some items recovered at the autopsies of Greg Nicholson and Lori Duncan?
A. If you're referring to some gray cloth tape, yes, I was.
MR. MILLER: If I may approach the witness, Your Honor.

♀

THE COURT: You may.
BY MR. MILLER:
Q. Mr. Tarasi, I have just handed you two exhibits marked Government Exhibits 500 and 600, and making the record perfectly clear as to which of those exhibits you are describing, would you please go ahead and tell this jury what you did and what, if any, findings you made with respect to those exhibits.
A. Laboratory exhibit -- excuse me, Government Exhibit 500 is laboratory Exhibit BB, and this was a brown paper bag that contained a mass of four pieces of gray cloth tape, commonly called duct tape. I was asked to fracture match the ends of these pieces of tape as well as examine them for latent prints as well as I was also requested to try to identify the green piece of material that was stuck to the pieces of tape.
Q. And what findings, if any, did you make, sir, in that examination?
A. The four pieces of gray cloth tape was able to fracture match two of the pieces back to show that they had one time been originally connected. I was also able to connect the other two pieces by fracture match that they had been originally connected. I was not able to combine all four pieces to show that they had at one time been from one piece, but all four pieces of tape are consistent in the size, in the shape, and the

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2347 of 3636

thread count, the class characteristics, that we look for when we're examining cloth tape.

The piece of green material on this was stuck to the glue side of the tape, and it appears to be a sock.

Q. That green material appears to be a sock?

A. Yes, this green material appears to be a sock.

Q. What size of a sock?

A. I did not do any measurements on it.

Q. Can you hold it up and just show us the approximate size of the sock?

A. Approximately four inches -- approximately four inches long.

Q. Did you attempt latent fingerprint examination on Exhibit 500?

A. On the tape portion of Exhibit 500 on both the sticky side of the tape as well as the shiny side of the tape, I did attempt latent print processing.

Q. And what findings, if any, did you arrive at, sir?

A. There were no developed latent prints suitable for identification on the tape.

Q. The tape appears to be somewhat purplish in color as it appeared here today. How do you account for that?

A. The purple color is a result of my chemical processing, looking for latent prints. It's a developing technique that we use on sticky items such as tape where we are trying to stain latent print residue in the glue. It also stains other areas.

Q. Now, those objects were in the ground. Assuming they were

in the ground for seven years, Mr. Tarasi, does it surprise you at all that you were unable to find latent prints suitable for identification?

A. No, it does not.

Q. But that doesn't stop you from trying.

A. It does not stop us from trying.

Q. Referring you now, please, to Government Exhibit 600, would you examine that, tell us what it is and describe any examinations you did on that object.

A. State's exhibit -- Government's Exhibit 600 is laboratory Exhibit BC. It is a mass of two pieces of duct -- of gray cloth tape, duct tape. These two pieces of tape were able to be fracture matched back together showing that they did have a common source. I examined them, also comparing the ends of BC, Government's Exhibit 600, to the ends of the tape BB, Government's Exhibit 500. I was not able to determine a fracture match saying that they could definitely have come from the same source.

However, the class characteristics between the two tapes, size, the shape, and the thread count, were all consistent.

I also recovered a piece of green material from the sticky side of the tape, and I also examined that tape in Government's Exhibit 600 for developed -- for latent prints.

Q. And made what, if any, findings, sir?

A. There were no developed latent prints suitable for identification on the tape, Government's Exhibit 600.

Q. Now, you've described the green cloth on Exhibit 500 as having the appearance of a small sock. Describe the material

that you found on Exhibit 600 and compare it to that if you would, please.

A. The material in Government Exhibit 600 is similar in color, in class characteristics to the item in Government Exhibit 500. It may have one time been a part of a sock, but I cannot definitely say that.

Q. But at least to the appearances, the fabric and color is the same.

A. Yes.

MR. MILLER: Thank you, sir. I have no further direct.

THE COURT: Mr. Spies?

MR. SPIES: Thank you.

CROSS-EXAMINATION

BY MR. SPIES:

Q. Good morning, Mr. Tarasi.

A. Good morning.

Q. Mr. Tarasi, I have just a few short questions for you. In addition to your training as a fingerprint examiner, you've also been trained in -- when you examine a piece of evidence or an exhibit that's been submitted to you in the laboratory to take

2694

care to make sure that you don't destroy other evidence or alter other potential evidence that might be on an exhibit; am I right?

A. We are aware of that potential, yes.

Q. And you've had a great deal of training and your experience at the crime laboratory about how to do that and what steps to take. For example, if Government's Exhibit 306, the letter that you testified about today, might have a use in being examined by

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2350 of 3636

a document examiner, you and the document examiner might want to get together to figure out who does what first; am I right?
A. That is our protocol, yes.
Q. So, for example, if you were going to use any chemical methods to try to lift latent fingerprints from document Exhibit Number 306, you'd want to make sure that you didn't alter chemically the ink that was on that letter.
A. No, that is not our protocol. The document section of our laboratory will do their examination and preserve the evidence photographically before it comes to the latent print section. The chemical solvents that we use for developing latent prints in many instances will dissolve the inks that are present in common pens.
Q. Okay. So, for example, you'd want to coordinate your activities to make sure that you didn't foul up some other examination that was going to be done by the laboratory.
A. That's correct.

♀

2695

Q. And just as you've described for us this morning, your examination of Exhibits Number 500 and 600, the masses of duct tape, did you submit those exhibits to any other section of the laboratory?
A. I don't recall that there were any other examinations, any other sections involved in examining those items.
Q. Were those exhibits submitted to the trace evidence section so far as you know?
A. I don't recall that they were.
Q. And did you examine Exhibits 500 and 600 for any trace evidence?
A. Yes, I did.

Q. You testified about two particular items of trace evidence, the green fabric material that you've told us about already this morning; right?
A. Yes.
Q. And as you went through Exhibits 500 and 600, what other types of evidence did you look for?
A. I would have been looking for possibility of biological fluid stains on these or hairs or fibers.
Q. As a matter of fact, duct tape that is sandwiched together can be a virtual photo album or time capsule of what took place when those two layers were put together.
A. It's possible, yes.
Q. So, for example, you've just described that you could find

2696

hairs embedded in the adhesive between two layers of duct tape. You could find biologic material, skin, hair, hair follicles, sandwiched between pieces of duct tape?
A. It's possible.
Q. You could find glove impressions in the adhesive between the sandwiches of duct tape.
A. That's possible, yes.
Q. And as you went through the sections of duct tape, Exhibits 500 and 600, you took great care to see if there was any of that trace evidence in between those layers of tape.
A. Yes, I did.
Q. And you're telling the jury this morning that the only things that you found in there were the green fabric.
A. That's correct.
Q. No dog hairs.
A. No.

Q. No human hairs?
A. No.
Q. No particles of skin?
A. I did not really look for particles of skin per se, but I did not see anything that appeared to be any biological evidence on those pieces of tape.
Q. And when you say you didn't look for particles of skin per se, what do you mean by that?
A. A particle of skin could be a microscopic example, couple

of epithelial cells that have been sloughed off the skin of an individual. I could develop that, those microscopic particles, by the Gentian Violet technique that I use because it is actually a protein stain for skin or for proteins. But to actually swab the material for DNA samples, no, I did not.
Q. How many inches of fabric tape do you think you analyzed in Exhibits 500 and 600?
A. All of it. As far as how much?
Q. Yeah. I'm sorry.
A. The mass of duct tape, laboratory Exhibit BB, when I originally examined it was approximately 18 inches long. I believe -- and that would have been the mass of it. Divide that up, double the length, possibly three feet. BC is a mass that's approximately eight inches by five inches, so once again, multiple pieces, two to three feet maybe.
Q. Okay. Now, Mr. Tarasi, you've described for us this morning that you -- also when you were examining Exhibits 500 and 600 you did fracture matching. And fracture matching is where you try to see if the ends of two items of evidence, whether it be tape, paper, cardboard, fabric, correspond.

A. Yes, like a jigsaw puzzle.

Q. Gotcha. And when you examined 500, you were able to determine that the pieces of tape in Exhibit Number 500, there were two pieces that matched of the four pieces that are in Exhibit Number 500?

♀

A. Exhibit 500 contains four pieces of gray cloth tape. Two of those pieces fracture match back to each other. The other two pieces fracture match back to each other, but there is no commonality that can be determined between those, what you will, ultimately two pieces of two pieces.

In Exhibit 600, there is two pieces of tape. They can also be fracture matched back so that they would be one piece. Once again, I cannot compare or I cannot say that 600 and 500 show a source of commonality.

Q. So the explanations would be either that they came from different rolls of tape containing the same thread count --

A. Same class characteristics in addition to thread count; it would be size and shape.

Q. Or they came from one roll of tape but that there were pieces of tape in between Exhibits 500 and 600 that were disposed of and you didn't have.

A. That's one possibility, or the ends of those pieces have been damaged so that I could not make a comparison.

Q. Now, in your analysis of cloth tape such as duct tape, have you determined that manufacturers of duct tape can have one continuous run of tape that might be severed into several different rolls but all of those rolls would contain the same class characteristics as you've described this morning?

A. Yes and no. In some instances there is -- cloth tape is

manufactured in a three-step -- essentially a three-step

process. You have the plastic backing, the shiny, silver side, silver material. You have the thread or the cloth material that's in. And then you have the adhesive. The orientation of the threads as they appear on the plastic can change as it goes along the roll.

Q. Even within one run.

A. Even within one roll.

Q. Okay.

A. As far as their position relative to the edge of the roll and other class characteristics.

Q. All right. I think you told me exactly what I was looking for. Now let me ask you one question about Exhibit Number 306, the letter -- do you have that with you?

A. Depending upon what you want to ask me about.

MR. SPIES: May I approach, Your Honor?

THE COURT: You may.

BY MR. SPIES:

Q. I believe that Exhibit 306, if I'm correct, was one that you were asked to examine for the presence of fingerprints; am I right?

A. Yes, that's correct.

Q. And looking at page 2 of Exhibit Number 306, Mr. Tarasi, could you tell the ladies and gentlemen of the jury how that letter is signed?

A. Appears to have the name Dustin.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2355 of 3636

Q. Thank you.
MR. SPIES: I have no other questions, Your Honor.
THE COURT: Mr. Miller?
MR. MILLER: Thank you, Your Honor.
REDIRECT EXAMINATION
BY MR. MILLER:
Q. Just a couple matters, Mr. Tarasi. At the laboratory, Exhibit 306 through 309, the inmate kites from Marion penitentiary, Mr. Licht examined those before you did?
A. Yes, that is our standard protocol. Items that are going to be for documents and latent prints are examined by document section first.
Q. So he had an opportunity to look at that ink before you did anything to the paper.
A. That's correct.
Q. As to Exhibits 500 and 600, those pieces of duct tape, you mentioned that you applied Gentian Violet. That's a stain that helps develop body fluids such as amino acids?
A. It develop -- it will stain or can stain if they are present epithelial cells and other human proteins that are present on the -- that can be present on the sticky side of tape.
Q. And you found none.
A. And there were no developed latent prints suitable for identification on either of those items.

2701

MR. MILLER: Thank you. No further redirect, Your Honor.
THE COURT: Mr. Spies, anything further?
MR. SPIES: Nothing else, Your Honor. Thank you.

THE COURT: Thank you. You may step down.

THE WITNESS: Am I excused, Your Honor?

THE COURT: You are. Thank you.

THE WITNESS: Thank you.

THE COURT: And you're right. You do have a booming voice.

THE WITNESS: Thank you.

THE COURT: Ready to call your next witness?

MR. WILLIAMS: Yes, Your Honor. The United States calls Bill Basler.

WILLIAM BASLER, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated. State your full name, please, and spell your last name.

THE WITNESS: My full name is William Wayne Basler. Last name is spelled B-a-s-l-e-r.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Basler, can you remind the jury what you do for a living, sir

A. I'm employed by the state of Iowa with the Division of Criminal Investigation.

♀

2702

Q. What is the nature of your educational background, sir?

A. I have a bachelor's degree from the University of Northern Iowa.

Q. And after you graduated from college, did you go straight into law enforcement at that time, sir?

A. Fairly directly. I made a small detour into Winnebago Industries, but a few months after graduating from college, I was hired by the DCI.

Q. And your service in the Navy, was that before or after college?
A. It was before.
Q. Okay. Once you went into law enforcement, can you give the jury a background of your involvement with DCI?
A. Sure. I started in 1975. My first five years I worked a narcotics assignment. Approximately 1980 I switched over to what's generally called the general crim., general criminal, investigation section of the DCI and remained with that unit from 1980 until last year.
Q. And what happened last year?
A. I received a promotion.
Q. To what position, sir?
A. My current title is special agent in charge. What that means is that I'm a first-line supervisor of the agents that do what I did for those years. I supervise agents in Mason City, Fort Dodge, Waterloo, and Dubuque.

Q. Could you describe the Division of Criminal Investigation generally to begin with, and then we'll break it down into your area.
A. Division?
Q. Yeah, the entire Division of Criminal Investigation. What's it consist of, sir?
A. There's a lot of different parts of the DCI. You've heard about the laboratory already. That is a part of the DCI. We're also charged with the responsibilities for the gaming establishments in the state, both the tracks and the riverboats. Identification section, all of the criminal records are maintained by us as well.

Q. As a special agent in the criminal -- general criminal section, what were your duties when you had that position, sir?
A. Generally our job was to investigate violent crimes, whether that be murder, kidnapping, sexual assault, robbery, that type of thing. Also worked an occasional white collar-type embezzlement case.
Q. In the time that you have been with the DCI as a special agent and even today as a special agent in charge, have you worked out of a particular office over those years?
A. Yeah, pretty much my whole career I've been in Mason City. I started, as I mentioned, with the state in 1975. I moved to Mason City in 1976 and still live there.
Q. In addition to your duties as a special agent with the DCI,

2704

now special agent in charge, do you have outside teaching responsibilities?
A. Yes.
Q. And could you explain those to the jury, please.
A. More an opportunity than a responsibility. I've been at North Iowa Area Community College in Mason City, NIACC, teaching classes in their criminal justice program for approximately the last nine years.
Q. At some point in your career, did you become involved in the investigation of the disappearances of Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus?
A. Yes.
Q. And at this point as we told the jury during jury selection, you are the case agent in charge of this investigation?
A. Yes, I am.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2359 of 3636

Q. What I'd like you to do is kind of walk the jury through, if you would, since the disappearances in 1993 how this investigation developed. First of all, let's go back to 1993. After the initial disappearances, what was the nature of the criminal investigation into those disappearances at that time?
A. My involvement or any involvement by law enforcement?
Q. Any involvement at that time.
A. It's my understanding that when Greg Nicholson, Lori Duncan, and her daughters disappeared, that particular event was

handled as a missing persons case by the Mason City Police Department.
Q. And then what happened in November then, on November 5 when Terry DeGeus disappeared? How did the investigation change, if it did at all at that point?
A. It didn't change because that was my first involvement. During November of 1993, late November, we being the DCI and me in particular received a call from the Hancock County Sheriff's Office and requested that we assist them into the disappearance of Terry DeGeus. The only way that the DCI can get involved in an investigation is if we're requested to do so. We are an assist organization. We can't just go around the state saying we're going to investigate this or we're going to investigate that. We have to be requested and asked into that investigation by either a local agency, a sheriff's office, a police department, or a local county attorney, the attorney general's office, something like that. Somebody has to invite us.
Q. And this might be a good time -- we're talking about a couple different counties involved at this point. To help the jury fully understand this, we have a map that's marked as

Government's Exhibit 7 for demonstrative purposes only.

MR. WILLIAMS: I would request permission for the witness to step down and demonstrate that to the jury.

THE COURT: You may. And if the defense counsel want to rearrange themselves, that's fine too.

BY MR. WILLIAMS:

Q. Mr. Basler, if you could on there, you said your first involvement in this case began when you were invited in by the Hancock County Sheriff's Department to participate in this investigation. Where was Terry DeGeus living at the time that he disappeared, sir?

A. At the time he disappeared, Terry was living in a farm home that was located north of Britt in the country just across the section from where his parents lived.

Q. And what county was that in?

A. In Hancock County.

Q. And could you point out on Government's Exhibit 7 approximately where that location is?

A. Approximately here north of Britt.

Q. And how far away is Britt from Mason City, Iowa?

A. I think it's 28 or 30 miles.

Q. And could you point out on Exhibit 7 where Mason City, Iowa, is located.

A. Here (indicating).

Q. And is Mason City in a different county than Britt?

A. Yes, it is.

Q. And what county is that?

A. Mason City is located in Cerro Gordo County.

Q. And we've also heard some testimony about Clear Lake, Iowa.

Could you demonstrate on the map, Exhibit 7, where Clear Lake,

Iowa, is located in relation to Mason City, Iowa?
A. Yes, Mason City is here, and Clear Lake is just to the west on the map located where the blue area is.
Q. And finally, we've heard some testimony during the trial that there was a meeting that took place between Angela Johnson and Colleen Birkey in Fort Dodge, Iowa. Could you point out Fort Dodge, Iowa, on Exhibit 7, please.
A. Fort Dodge is here.
Q. Thank you. If you could go ahead and return that back and return to the witness stand.
MR. WILLIAMS: Thank you, Your Honor, for your staff's assistance in that.
BY MR. WILLIAMS:
Q. Now, Mr. Basler, you were invited in in November of 1993 by Hancock County to look into the disappearance of Terry DeGeus. What steps were taken in that investigation into his disappearance, sir?
A. By me?
Q. By you, yes, sir.
A. One of the first things I did was make application for a search warrant for Terry DeGeus's farm residence that we talked about earlier.
Q. And were you able to get that search warrant, sir?
A. Yes.
Q. And did you execute a search at his house?

A. Yes, I did.

Q. And what did you find during that search?
A. Not a lot. I was looking for things that might give me some signal if Terry DeGeus had left voluntarily, left involuntarily, that type of thing. In that regard I tried to determine if there was clothes that appeared to have been taken and packed and taken with him. I also looked around for letters, notes, maps, that type of thing.
Q. And what did you find in the house?
A. There were some items taken out of the house such as what I mentioned, notes, maps, letters, but one thing that I did find that struck me was that we found a receipt for a grocery store in Britt, Gunther Foods, and this receipt was dated the same day that Terry DeGeus disappeared, November 5. We knew that Terry had his daughter Ashley on most weekends, and on this grocery store receipt, it indicated that he had bought things like Fruity Pebbles and cookies and stuff that would indicate that someone was planning to have a child around.

In addition to that, on that same receipt, there was the notation that he had bought a carton of Marlboro cigarettes, and we -- I found a carton of cigarettes on top of the refrigerator with one pack removed.
Q. How did -- did the receipt indicate how he paid for those items?
A. Yes, the receipt gave the date and the listing of the items, and it also showed the amount tendered and the change that had been received.

2709

Q. And how much change was received?
A. The change-change, as opposed to the paper money, was 37 cents.

Q. At the point that you investigated Terry DeGeus's disappearance in November of 1993 and searched his house, did you find any sign that indicated to you that he had been harmed as a result of your search?
A. No.
Q. Did you have any indication at that point that he had been murdered?
A. No, I didn't.
Q. How did you treat his disappearance then as an investigator?
A. It was still treated as a missing person, but I from that point forward thought that perhaps his leaving wasn't something that he'd planned. I'm a smoker, and I know that if I'm going to leave for an extended period of time and I've just bought a carton of cigarettes, those cigarettes are going with me, and I thought that that was significant.
Q. Let's take the jury forward then. What other steps occurred in the investigation of the disappearances of either Terry DeGeus or Nicholson and the Duncan family after November of 1993?

2710

A. My investigation continued in varying degrees after that. Interviews were done trying to find out Terry's whereabouts or people that he had had contact with prior to his disappearance, that type of thing. The investigation in Mason City also continued to be handled by the Mason City Police Department into the disappearance of Greg Nicholson, Lori Duncan, and her daughters.
Q. The DCI was still not asked to come into that investigation at this point?

A. That's correct.

Q. Now, over the course of the investigation, were cars ever searched or looked for that belonged to the victims in either of the disappearances?

A. Yes.

Q. And could you explain that to the jury, please.

A. After I got involved in the investigation, I at some point in time tried to track down Terry DeGeus's car that he was driving at the time and found that it had been sold and later turned into a race car and consequently wrecked and later still taken to a salvage yard where it was crushed.

Q. Was any success made in searching or finding cars that may have been driven by Lori Duncan or Greg Nicholson?

A. No. They were -- my understanding is that those vehicles were located at Lori Duncan's house the day that they all disappeared.

♀

2711

Q. Now, moving forward into 1996, did the investigation change and the involvement of some of the agencies change in that year?

A. Yes, it did.

Q. Can you explain that to the jury, please.

A. My understanding of what happened in 1996 was that another drug investigation that involved Mr. Honken had taken place and that subsequent to that 1996 investigation and charges being filed Tim Cutkomp had agreed to cooperate with the police and had told law enforcement about --

MR. SPIES: Excuse me, Your Honor. I believe that he's trying to give a rendition of the course of the investigation, but I fear we're venturing into hearsay, and I'd ask for another question to give me an opportunity to --

THE COURT: I'll sustain the objection on the narrative. And try to keep it in Q-and-A format. Thanks.

MR. WILLIAMS: Very good, Your Honor.

BY MR. WILLIAMS:

Q. So you learned at some point there was a narcotics investigation and Tim Cutkomp was cooperating; is that correct?

A. Yes.

Q. What was your involvement, if any, in his cooperation?

A. Very little. We, the DCI, then opened a second investigation that focused on the disappearance and likely murders of the five individuals who up to that point in time had just been considered missing.

♀

2712

Q. So it was after Tim Cutkomp's cooperation and wearing a wire that a murder investigation was opened.

A. That's correct.

Q. And was the DCI invited in to be involved in that murder investigation at that time?

A. Yes.

Q. Were you the agent who was acting as the case agent on that murder investigation in 1996?

A. No, I wasn't.

Q. Who was?

A. Richard Kemming who was one of our agents from Cedar Falls.

Q. These events that we're talking about occurred up near Mason City where you indicated to the jury you officed. Why weren't you in charge of this investigation back then?

A. Also during the spring of 1996 there had been a homicide in another town located nearby Mason City, and I was in charge of that particular investigation and wasn't available to

participate on a full-time basis with this new Honken investigation that occurred -- or excuse me, that was opened in 1996.

Q. So this was an unrelated murder investigation that was demanding all of your time?

A. Yes.

Q. And the way the DCI works, agents will often help out in other territories if one agent's overburdened?

♀

A. That's true.

Q. Okay. And so Mr. Kemming, Special Agent Kemming, worked that investigation for a period of time; is that correct?

A. Yes.

Q. Moving forward then in time to 1999, how did this investigation change and the agency's involvement in this investigation change, if at all, in that year?

A. Prior to 1999, my schedule became such that I had the time to devote to this case, and it made sense logistically. Agent Kemming was 90 miles away, and I was there. I, as I mentioned, had the time to take over that investigation, and the case was transferred to me. Didn't -- and the difficulties necessarily at that point in time -- even though we had our own investigation going, there were other agencies that were doing their own legitimate investigations regarding Mr. Honken and Angela Johnson. And in that pre-1999 time, there were any number of agencies doing any number of different investigations regarding the same matter.

Q. So there were federal, state, and local agencies all investigating the same events, as you say, all legitimately, but there were a number of agencies doing that. Did something

change in 1999 in that regard?
A. Yes.
Q. And what's that?
A. There was a decision to consolidate all of the

investigations into one, keep the same agencies involved but have just one investigation.
Q. Is it at that point that you took over as the case agent in charge of all those investigations?
A. Yes.
Q. During the course of the investigation into the disappearances, did you take steps to determine whether the Duncans, for example, had left voluntarily or even involuntarily and were, in fact, not murdered?
A. Yes.
Q. And what steps did you take to determine if they were, in fact, alive living someplace else?
A. At that point in time, early 2000, late 1999, all we knew was that there was people missing. We suspected what had happened to them but only, again, at that time knew that they were missing. There's a variety of means that you can employ to try and find out if someone has just taken off and set up residency somewhere else.

We did a number of what we call 50-state driver's license checks. That's a computer system that allows you to query the driver's license records of all 50 states to see if an individual has been issued a license in that particular state.

As I said, we did that a number of times and again checking for the adults that were missing in that regard, Lori Duncan, Greg Nicholson, and Terry DeGeus. Negative results on

that.

I also checked Social Security records. Even the young girls that were missing had Social Security Numbers, so I, with the assistance of the Social Security Administration, checked their records to see if there had been any work activity by any of these five individuals that might have generated activity with that agency. Also negative there.

We checked criminal records nationwide thinking that perhaps they'd gone somewhere else and had gotten in trouble and arrested. Negative there as well. I'm rambling here.

Q. Did you also check any public school records?

A. Yes.

Q. And what was -- describe that search, please.

A. Both Amber and Kandi had been enrolled in the Mason City school system. Another thought that we had as investigators was that if they'd voluntarily taken off and were just hiding somewhere that perhaps the school where the children had been reenrolled would contact Mason City for the previous records and establish a contact that way. The school system said that that had not happened. And, as a matter of fact, both of the little girls had minor learning difficulties that involved them in special programs. And given the nature of their learning difficulties, they felt certain that these children enrolling in another school would have caused that new school to reach out to the Mason City school system.

Q. And no results there.

A. No.

Q. And did you finally check any financial records to determine if there had been any financial transactions?

A. Yes.

Q. Could you explain that.

A. Most notably, Lori Duncan had in excess of $600 in her checking account at the time that she disappeared, and that money remained in her account for years without being accessed.

Q. You indicated that in 1999 you took over and coordinated the murder investigation in this case or the investigation into missing persons at that point. And then was it shortly thereafter in July of 2000 that the first indictment was returned against Angela Johnson?

A. That's right.

Q. During this trial there's been some dates that have been relevant. And, in fact, at some point was a calendar created reflecting the dates and the days of the weeks from 1999 to aid the investigation and prosecution in this case?

A. Yes.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Handing you Exhibit 8, can you identify that, please?

A. Yes, I can.

2717

Q. And what is that?

A. Appears to be a calendar that reflects the year 1993.

MR. WILLIAMS: And, Your Honor, this has been already admitted into evidence.

THE COURT: As a demonstrative exhibit, or is it in

evidence?

MR. WILLIAMS: I think it's in evidence.

THE COURT: Well, we'll take that up. You have it under the section called demonstrative Exhibits 1 through 19.

MR. WILLIAMS: Very well.

BY MR. WILLIAMS:

Q. Could you tell the jury based on that calendar, first of all, the last date that Greg Nicholson and the Duncan family were seen was what day?

A. July 25, 1993.

Q. And what day of the week was that?

A. It was a Sunday.

Q. And what day was Terry DeGeus last seen?

A. Terry was last seen on November 5 of 1993.

Q. And what day of the week was that?

A. That was a Friday.

Q. We've talked about the ages of various people at various times during this prosecution so far. Based on public records, did you determine the ages of the victims in this case at the date of their disappearances?

2718

A. Yes, I did.

Q. How old was Greg Nicholson when he disappeared in July, on July 25, 1993?

A. Greg Nicholson was 32.

Q. Lori Duncan?

A. Thirty-one.

Q. Kandi Duncan?

A. Ten.

Q. And Amber Duncan.

A. Six.

Q. How old was Terry DeGeus when he disappeared on November 5 of 1993?

A. To back up, I think I might have misspoken earlier. To answer your question, Terry DeGeus was 32. And at the time of his disappearance, I believe that Mr. Nicholson was 34.

Q. And Terry DeGeus you said was 32?

A. Yes, sir.

Q. You're familiar that there are signs of the Zodiac?

A. Yes, I am.

Q. And did you -- you're aware that there are certain symbols associated with different calendar dates in which a person's born during the year.

A. Yes.

Q. And given Terry DeGeus's date of birth, what was his sign of the Zodiac?

2719

A. Terry DeGeus was born on November 19, 1960. It's my understanding that that particular birth date has the sign of Scorpio.

Q. Do you recognize Exhibit 914, sir?

A. Yes.

Q. And what is that?

A. This is a medallion, for lack of a better term, that has the word Scorpio printed on one side.

Q. And that was the medallion that was found by law enforcement officers when they searched the Kildeer site?

A. That's true.

Q. There also have been some locations discussed throughout this trial regarding where different events occurred in the

Mason City, Iowa, area.

MR. WILLIAMS: With the Court's permission, I'd ask the witness step down and use Exhibit 1 to demonstrate the locations of some of those sites.

THE COURT: Any objection, Mr. Spies?

MR. SPIES: No.

THE COURT: You may.

BY MR. WILLIAMS:

Q. Agent Basler, using Exhibit 1, first of all, is that a map of the general area of both Clear Lake and Mason City?

A. Yes, it is.

Q. There's been some testimony already, but could you remind

the jury where the Lark Avenue site is located on that map where the bodies of Greg Nicholson, Lori Duncan, Kandi Duncan, and Amber Duncan were discovered?

A. Those four bodies were located here.

Q. And the Killdeer site where the body of Terry DeGeus was located?

A. Killdeer site was in this location.

Q. Where was Lori Duncan living with her children in July of 1993, sir?

A. The address was 619 North Van Buren Avenue in Mason City.

Q. And can you point out to the jury where on Exhibit 1 that was located?

A. Yes. If you don't mind, I'm going to sneak around this. That address is located approximately here in Mason City.

Q. And we've heard testimony that Angela Johnson worked at the country club in November of 1993. Can you point out where on Exhibit 1 that's located?

A. Yeah, the Mason City Country Club is located approximately here.
Q. And we also heard testimony that Angela Johnson lived in Clear Lake in the summer and fall of 1993. Can you point out where on Exhibit 1 her house is located?
A. Yes. Angela Johnson was living on South 19th Street in Clear Lake.
Q. Now, as part of your investigation, did you drive the route

♀

2721

from the Duncan house to the Lark Avenue site where the bodies were discovered?
A. Yes.
Q. And what route from the Duncan house to the Lark Avenue site did you take?
A. Want me to describe the route?
Q. Describe the route if you would, please, using Exhibit 1.
A. We tried to in our minds determine how -- what directions someone that may have just kidnapped those four individuals at Lori Duncan's home might have arrived at this site on Lark Avenue. We would assume that the person that kidnapped those folks would want to probably take the most direct route but also a route that isn't going to take you through areas where there's a lot of people.

As a consequence of that line of thinking, Agent Graham and myself drove literally from the driveway at 619 North Van Buren where Lori Duncan was living with her children. We drove north to 12th Street Northwest which is this road and then drove west to where it intersects with Eisenhower Avenue and continued on over to Lark Avenue and then drove straight south to the grave site.

Q. What was that distance, sir?

A. The distance was approximately 5.3 miles.

Q. And how long -- what speed did you drive that route?

A. Another thing that we were trying very hard to do was to

drive exactly the speed limit, again thinking that the kidnappers don't want to draw attention to themselves so they're not going to break any traffic rules. So we drove that entire route driving the posted speed limit, and it took just over 11 minutes.

Q. Okay. If you could take down Exhibit 1 and return to the witness box, please.

A. (Witness complied.)

Q. Agent Basler, do you recall the testimony of Steve Vest who repeated statements that he said the defendant made to him while incarcerated in USP, Florence?

A. Yes.

Q. And do you recall that one of those was that a female was -- or the female that was kidnapped was forced to write a note to a neighbor?

A. Yes.

Q. Showing you Exhibit 47 on the screen, was that note recovered from the neighbor of Lori Duncan or from that Duncan house?

A. I believe the note was located -- excuse me, was recovered by the Mason City Police from the neighbor's house.

Q. And the neighbor's name?

A. The neighbor's name was Phyllis Proscovec.

Q. And Miss Proscovec, is she alive or not today?

A. No. Today she has died.

Q. And anything to do with any type of violent end to her life?
A. No. She was in failing health when I interviewed her back in the late '90s and went from there to a nursing home and has since died.
Q. And she was the one who took care of the little girls from time to time while Lori was working?
A. Yes. She's the one that I think we heard talk about caring for the girls, making sure that they got up in order to get to school on time because Lori had to leave early for her job in Northwood.
Q. During the trial we've also heard testimony about -- from Tim Cutkomp about assisting in melting a firearm down. Did you have any participation in the investigation in attempting to recover the melted pieces of a gun or any other item that was used in that process?
A. Yes.
Q. And, in fact, a piece of galvanized steel that was recovered that the jury's already seen; is that correct?
A. That's correct.
Q. Could you describe for the jury what steps were taken by law enforcement to test anything on that piece of galvanized steel?
A. The initial test that was done on this piece of galvanized metal and, more specifically, the melted drops of metal that

were found on that piece of metal, the initial testing was done by the DCI laboratory, and their analysis was that those

droppings were iron.

Q. Any further testing performed on that -- on the droppings on that piece of metal?

A. Yes.

Q. And could you describe that for the jury, please.

A. We were hopeful to learn more than the droppings being just iron and decided to send that same piece of metal and those same droppings to the FBI laboratory in Washington.

Q. And did they provide any further results as a result of their examination?

A. No, no different analyses than we had gotten from our state lab.

Q. Was any further testing attempted on this -- on the droppings on that piece of metal?

A. Yes, one more.

Q. And why is that if you've already taken it to DCI lab and then the FBI as well?

A. Well, since the FBI had looked at those metal droppings, I had been in contact with the company in Miami that makes the Intratec nine-millimeter that I believed was involved with these homicides and in turn put those people in touch with scientists at the Iowa State University laboratory that was just getting into some type of forensic work. They agreed to help me out in

♀

this third analysis of these drops.

And it was my understanding that although a large portion of an Intratec nine-millimeter is made out of iron, there are also components of the Intratec nine-millimeter that are metal but differed somehow from the regular iron. It's probably a bad description, but that's about the extent of my

understanding with it.

At any rate, I put the people at Iowa State in touch with the people at the company that manufactured the gun. And as a consequence, a third analysis was done, but Iowa State wasn't able to tell us anything further than what we'd already been told.

Q. We've heard some testimony here by Special Agent Graham who was reading statements made by the defendant during the sentencing regarding the destruction of a weapon. Do you recall that the statements made by the defendant during that sentencing was that it was an SKS assault rifle that he had provided to Tim Cutkomp to be destroyed?

A. Yes, I remember that.

Q. And do you recall what the reason was given by the defendant during the sentencing hearing in 1998 for why he felt he had to have that gun destroyed by Tim Cutkomp?

A. Yes, I believe he --

MR. SPIES: Your Honor, I'm going to object to the form of the question. I think Mr. Cutkomp testified -- or Agent

2726

Graham testified that Mr. Honken said that he had given the gun or a gun to Mr. Cutkomp to get rid of, not necessarily to destroy, so I object to the form of the question.

MR. WILLIAMS: I can rephrase, Your Honor.

THE COURT: Okay.

BY MR. WILLIAMS:

Q. I didn't mean to misspeak. What was the reason that the defendant testified in 1998 for why he said he gave the SKS assault rifle to Tim Cutkomp to get rid of?

A. The reason was that apparently Mr. Honken's children were

showing an excessive interest in that particular weapon.
Q. Based on your analysis of public records, how many children has Dustin Honken fathered, sir?
A. It's my understanding that he has two children.
Q. And who are they?
A. Ryan and Marvea.
Q. How would -- let me back up. In 1998 when Dustin Honken testified that he had given this SKS to Tim Cutkomp to get rid of, what year did he say that occurred in in his sentencing?
A. 1995 I believe.
Q. In 1995 how old was Ryan, his son?
A. The information I received was that Ryan was born late in 1993, so I would assume during 1995 Ryan would have been somewhere between one and two.
Q. And his other daughter -- his daughter Marvea?

2727

A. Marvea was born in February of 1994, and as a consequence, in 1995 she'd have been approximately a year old.
Q. As part of your investigation, did you conduct any site search of the Lark Avenue site yourself?
A. Yes.
Q. Now, we've heard testimony from a number of people about the searches that occurred in October of 2000 that resulted in recovery of the remains of the victims at the Lark Avenue site. You were still the case agent in charge of this investigation at that time, sir?
A. Yes.
Q. Were you involved at all in the recovery of those bodies from the Lark Avenue site?
A. No.

Q. And why not?
A. The maps that led to the recovery of the bodies had been drawn by Angela Johnson who was in jail charged and had a lawyer representing her. In order to protect her constitutional rights, there was an informational wall, if you will, set up in the investigation so that the investigators that had been involved with the investigation were on one side and a new team of investigators brought in to handle this new information, i.e., the map and the ultimate recovery of the bodies.
Q. And that wall remained -- that informational wall as you described it remained until it was resolved whether there was

♀

2728

any problem with constitutional rights?
A. That's my understanding.
Q. And so at some point you became aware of what had occurred and the search that occurred at the Lark Avenue site?
A. Certainly.
Q. And as a result of that, you took your own -- undertook your own investigation and search of that site at some later date.
A. Yes.
Q. And what were you looking for when you went back at a later date to search that site?
A. We went back to the site during the summer of 2001, some nine months after the bodies had been recovered, and we were looking for shell casings and bullets.
Q. Based on your awareness at this point once the informational wall came down, wasn't that type of search already conducted?
A. Yes, it was.

Q. Why are you going out there a second time?

A. It's my understanding that search had already been conducted twice, but our plans that day were to expand it beyond areas that had been previously searched.

Q. What was your understanding of the range of feet from the grave site that had been previously searched by the other investigators in this case?

♀

A. My understanding, that the first metal detector search was done by the excavation team and centered around the grave itself. The second metal detector search was done by Special Agent J.D. Smith and his crew, and they expanded that metal detector search out to a radius of 25 to 30 feet from the grave.

Q. Showing you an aerial photograph of the Lark Avenue site, 406B, could you, using that light pen, describe for the jury the approximate scope of the metal detector search that was conducted by J.D. Smith and his team.

A. I'm going to for reference purposes indicate the grave being there. I think that's the blue tent that you see around the grave. And the search by Agent Smith and his crew would have approximately been in that area.

Q. And could you describe the extent of the search you conducted then in the summer of 2001.

A. We bit off a pretty big task there, but we wanted -- we were trying to picture in our minds where these shootings might have occurred. That's difficult because we're talking eight years after the fact, but at any rate, it's hard to see in this photo because of the trees, but we did an area that was bounded on the west side by the creek that runs through there and basically included portions of that area that's within that big

green rectangle.

Q. Did you have any idea at the time you were conducting this search if the victims were shot at the scene of their burial or

not?

A. We had received information that the victims had --

MR. SPIES: Your Honor, I'm going to object to this. It's plainly calling for hearsay, and I object on those grounds.

MR. WILLIAMS: Let me rephrase. I'm not intending to go there.

THE COURT: Okay.

BY MR. WILLIAMS:

Q. Agent Basler, did you know -- yes or no -- for certain whether, in fact, the victims had been shot at that location?

A. No.

Q. And did you know for sure if they had been shot where among the location at the Lark Avenue scene that shooting could have occurred?

A. No.

Q. And so when you're conducting your search, it's based on your best investigative thoughts at that time, but you don't have any sure idea where the shooting -- if it occurred at all at Lark Avenue, where it occurred.

A. No.

Q. Could you describe for the jury what that location is like and what it was like in 2001 when you were conducting your search.

A. It's fairly heavily wooded. There's a lot of brush, and where there isn't trees and brush, there's grass, and in the

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2382 of 3636

open areas when we got there in 2001 during the summer, the open areas that were grassy, the grass had grown up to almost knee heighth.

Q. And looking at the screen now, do you see that Exhibit 449 is that 360-degree photograph of the Lark Avenue site?

A. Yes, I do.

Q. Now, in this photo there isn't knee-high grass. When you were out there in the summer of 2001, was any attempt made to mow down some of that grass?

A. Yes, that knee-high grass I was talking about -- may I mark on this?

Q. Please.

A. You can see it in the background here, this area, this area. This entire area that kind of looks like a park now was heavily grown up with grass. Before we did our search, we had the county come out with a mower on a tractor and mow that down for us so that it was more accessible.

Q. And at this scene at Lark Avenue if we go back toward the stream -- I'm sorry. Just orient the jury a little bit. What are they looking at at this point?

A. This appears to be looking south. I think that you can see the railroad tracks in the back here, and there is a way to drive into the area here. We had also been told that at one point in time there was a way to drive in this area from this direction.

2732

Q. And were there also trees and other obstructions present at the site that limited your ability to conduct a metal detector

search of the entire area?
A. Yes.
Q. Now, we see in this photograph that there are both mature and immature trees that have been there. Did you have any idea or could you tell how many of those trees were present at the time of the murders in July of 1993 and what were later grown up?
A. Can you make that stop? Yeah, we thought about it a lot. Obviously trees like this were certainly there in 1993. But what's hard to visualize was trees like this and the brush. It was just virtually impossible to imagine what that particular site looked like eight years before.
Q. Nevertheless, on the area that you did end up conducting another metal detector search, did you find anything during that search of the area you did?
A. Yes.
Q. And could you describe for the jury some of the things that you found there.
A. We found all kinds of beer cans and remnants of beer cans, pop cans, wire, nails, staples, coins, and we did find a few ammunition components.
Q. And what type of ammunition components did you find?
A. We found several old shotgun shells that apparently had

been fired out there. We found one 30-06 casing which is a casing for a high-powered rifle. We found I believe five or six 38 shell casings, and we found one 38 bullet.
Q. First of all, this area that we see in Exhibit 406B, is that inside or outside of the city limits of Mason City?
A. It's outside.

Q. Is it permissible for people to discharge firearms outside of the city limits in the county of Cerro Gordo County?
A. Sure.
Q. And is that an area that's also used by hunters to do hunting through that creek area?
A. Yes, it is.
Q. As a result of your search, you indicated you found 38 shells, 38 components?
A. 38-caliber shells.
Q. Okay. And where did you find the 38-caliber -- did you find actually a 38-caliber slug or a bullet?
A. If I might, just terminology, when I say casing, I'm talking about the remaining part after a bullet is fired. And when I say a bullet, I'm talking about the actual part that goes out the end of the barrel.
Q. And you found a 38-caliber bullet.
A. Yes.
Q. And where was that found in relation to the grave site itself?

2734

A. That was found about six or eight feet directly east of the grave.
Q. And how about the 38-caliber shell casings?
A. They were found to the south of the grave and were approximately 10 or 15 feet away.
Q. Wasn't that within the area that would have been searched by J.D. Smith and his crew previously?
A. Yes.
Q. Did they just miss them?
A. I don't think so.

Q. Why not?
A. They utilized the same techniques that we did using the metal detectors, and again, my search was done eight month -- excuse me, nine months after their search. I think that the components that I found weren't there when they did their search.
Q. During the -- this investigation, did you make any efforts to search any coins and have the dates on those coins determined from any coins found in the burial sites of any of the victims?
A. Yes.
Q. And what was the purpose of that?
A. There had been coins found in an area that we associated with the remains of Greg Nicholson and also coins found in the grave of Terry DeGeus. We decided that those coins should be submitted to the laboratory to try and make a determination of

when the coins were minted. When they were recovered, they were fairly heavily corroded and weren't able to be read, so the coins were sent to the laboratory and cleaned up, and the dates were examined.
Q. Did any of the dates on the coins post date 1993?
A. No. All of the coins were 1993 and before.
Q. Any other significance regarding the coins that came from the Terry DeGeus burial site?
A. Interesting possibly more than significant, but as I mentioned earlier, the day that Terry disappeared, he'd been to the grocery store, and in his change from the grocery store, he had received 37 cents. I was curious enough to check the coins that were found in his grave, and although there was more than 37 cents in his pocket, there were the appropriate coins in

there to total up to that amount.

MR. WILLIAMS: Your Honor, I see that we're at ten o'clock. This might be a good time for a break.

THE COURT: It would be. Members of the jury, we'll take our mid-morning recess. We'll be in recess for 25 minutes. Please remember my cautionary instruction about keeping an open mind till you've heard all of the evidence in the case. Thank you.

(The jury exited the courtroom.)

THE COURT: Anything we need to take up, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

♀

MR. SPIES: No, Your Honor.

THE COURT: Okay. Thank you.

(Recess at 10:02 a.m.)

THE COURT: Ready to have the jury brought in?

MR. SPIES: One matter to bring to your attention, Your Honor.

THE COURT: Okay. Please be seated.

MR. SPIES: During the government's examination of Agent Basler, counsel asked Agent Basler whether -- as nearly as I can recount it, whether Steven Vest testified at trial that Mr. Honken told him, Mr. Vest, that the woman had been forced to write a note to the neighbor. Our collective recollection was that Steven Vest did not testify about that, and with the Court's indulgence, we're going to ask the court reporter if possible to see if that can be located in the testimony.

THE COURT: I'm probably -- why wasn't that done when we took the break so we're not doing it now keeping the jury waiting?

MR. SPIES: Because we wanted to take a chance to look at our notes to see if we could find it in our notes.

THE COURT: So when do you want us to do that?

MR. SPIES: Well, I don't know. As I said, we're asking the Court's indulgence, and I think we can zero in on the area from our notes as to where that would have come up.

THE COURT: Okay. Why don't we stop now and see if

♀

Shelly will search. You can just put in Steven Vest, and that should be a pretty quick search because I think he only mentioned the name once or something. Is that what you're asking, to do it right now?

MR. SPIES: Sure. But what I'm saying is I don't know that Steven Vest testified to that.

THE COURT: I understand that, but I thought you wanted the realtime transcript. No. What do you want?

MR. SPIES: Well, we want --

THE COURT: You want Vest's testimony to see whether he testified to it.

MR. SPIES: Yes, whether he testified about Dustin saying that the woman was forced to write a note.

THE COURT: And then you're going -- I mean, there was no simultaneous -- let's just review the history. There was no simultaneous objection at the time.

MR. SPIES: Correct.

THE COURT: Okay. But then if -- I just want to understand this. You want Vest's testimony to see if Vest actually testified to that about the note.

MR. SPIES: Yes.

THE COURT: I don't recall it either, but I've learned

not to trust my memory, so I think it would be good to check the realtime transcript.

MR. SPIES: Right.

THE COURT: And then you're going to want me to admonish the jury to disregard that testimony.

MR. SPIES: To disregard the question and answer, yes.

THE COURT: Right. Of this witness, right. But when do you suspect we're going to do that? Do you want to do it now, or can we keep moving and do it over the noon hour?

MR. SPIES: Yeah, I think we can keep moving, Your Honor, and like I said, I don't want to make this an imposition on our reporter. I don't know, given the technology that she has, how difficult it would take to search for note in Steven Vest's testimony. I think it might be -- do a word search, but I don't know the technology.

THE COURT: Well, his testimony wasn't all that long, was it? Be easiest to just print the whole thing out.

MR. WILLIAMS: It would have come out during the direct examination, so the direct wasn't that long, maybe an hour.

THE COURT: Do you want to do it now, or what do you want to do?

MR. SPIES: I would ask Shelly how long it would take, but I'm content to keep moving along and we can do it later.

THE COURT: Whatever. Why don't we do it now. I think it would only take 10 or 15 minutes. I wish you would have alerted me to the problem 20 minutes ago.

MR. SPIES: Well, Your Honor, as I attempted to

explain to you, we were searching our collective notes.

THE COURT: Well, while you were doing this, we could have done this.

MR. SPIES: We didn't know it was a problem until we --

THE COURT: You knew it was a problem because you knew he hadn't -- anyway, we're just keeping the jury longer. So why don't you tell the jury it will be another 15 or 20 minutes, and we'll have Shelly print out the Vest direct examination.

MR. SPIES: Thank you.

MR. PARRISH: Your Honor, I have something to bring up off the record, just an update. I met with Duane, and this does not have to be on the record.

THE COURT: Okay.

(A discussion was held off the record.)

THE COURT: Let's just go back on the record for a minute. While we were off the record, our court reporter Shelly did a search and found the transcript section in Mr. Vest's testimony that referred to the note, and I gave the lawyers an opportunity to actually review it on her laptop, and having reviewed it, I guess I'm going to ask Mr. Spies is there anything you want me to do at this point?

MR. SPIES: No, Your Honor. I think that what Shelly found in the transcript is sufficiently close to the question asked by Mr. Williams that we have no objection, and we

2740

apologize for our bad recollection.

THE COURT: No. I mean, I didn't remember it either, and it's an important point, and so it was certainly worth

taking the time to search the record and find out because you were certainly entitled to relief if that question hadn't been asked, so I appreciate you doing it.

We ready to have the jury brought in now?

MR. WILLIAMS:  Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT:  Thank you.  Please be seated.  Sorry for the delay, but like I told you in the preliminary instructions, sometimes there are matters I need to take up with the lawyers, and we had one of those, and we were able to get it resolved, and thank you for being patient with us.

Mr. Williams?

MR. WILLIAMS:  Thank you, Your Honor.

BY MR. WILLIAMS:

Q.  Agent Basler, as part of the investigation in this case and as the case agent in charge of this investigation, did you consider the possibility that Terry DeGeus was somehow involved in the murders of Greg Nicholson, Lori Duncan, and her two little girls?

A.  Yes.

Q.  And as a result of that, did you do anything to determine whether, in fact, he was involved in the murders?

2741

A.  Yes.

Q.  Could you describe for the jury what steps you took in the investigation toward that end?

A.  In 1997 we, as investigators, had received information that these individuals had been killed and possibly buried, and we were trying to think of, if they were buried, where that burial might have taken place.  Mr. DeGeus's -- Terry DeGeus's father

owned and still owns a construction business that is largely involved with the demolition of buildings and the removal of that building material so that areas can be cleared for crop use. On that premise with that possibility in existence, I went to Mr. DeGeus's wife, JoAnn, who did the records for the business and asked her about --

MR. SPIES: Excuse me, Your Honor. I'd object to testimony told to this witness by another as hearsay.

MR. WILLIAMS: Let me rephrase or let me phrase the question to get us there.

BY MR. WILLIAMS:

Q. Agent Basler, did you have a discussion with JoAnn DeGeus -- without relating what that discussion was, did you have a discussion with her?

A. Yes, I did.

Q. As a result of that, did you determine whether there was a work site that Terry DeGeus was working on in July of 1993?

A. It was determined that there was a work site that both Ed

2742

and Terry DeGeus were involved with around the July 25, 1993, date.

Q. With that information, what steps, if any, did you take to determine if there was possible bodies buried at that work site?

A. This particular site was what I described earlier, an abandoned farmhouse and the associated farm buildings that Mr. DeGeus had been contracted to knock down and clear away so that that ground might be farmed. I talked to the farm owner and told him that I wanted to dig up his alfalfa field, and he wasn't crazy about the idea, but after I explained essentially what I've told you here today, why, he agreed to let us do that

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2392 of 3636

if we would restore the ground and the crop to its current condition as best we could.
Q. And so did you, in fact, dig up his alfalfa field?
A. Yes, we did.
Q. And you were able to pinpoint the location of where the house was that had been destroyed and taken away?
A. Yes.
Q. How many times did you search this location, sir?
A. We dug it up once in 1997 and did it again in 1999.
Q. Why did you do it twice?
A. The first time in 1997 was for the reasons I just mentioned. Subsequent to that there were cadaver dogs taken to that area, and the dog handlers seemed to think that the dogs were alerting to locations in the vicinity of that same area

2743

that we'd already dug up.
Q. And so you dug it up a second time.
A. Yes, we did.
Q. How long did each of those digs take, sir?
A. Both of them took approximately two days.
Q. And did you find any evidence of bodies or anything else connecting those sites with any murders?
A. No.
Q. As part of this investigation, did you also obtain toll records for the telephones of the DeGeus family and Angela Johnson?
A. Yes.
Q. Now, you heard testimony in this trial that in 1993, November of 1993, at the house where Terry DeGeus lived he did not have a telephone.

A. That's correct.

Q. Okay. And do you recall the testimony that he would use the telephone at his parents' house of Ed and JoAnn DeGeus?

A. Yes.

Q. And so you obtained toll records for a number of months surrounding July of 1993 to determine if there was phone contact between Angela Johnson's residence in Clear Lake and Terry DeGeus's parents' residence in Britt?

A. Yes.

Q. And was there a number of phone calls between the two of

♀

those locations?

A. Yes.

Q. Okay. And just so we're clear, this wasn't a wire tap. In other words, you had no idea what the conversations were.

A. No. This was getting copies of the actual phone bill that you get in the mail that indicates the date the calls were made and the number called.

Q. In looking at months -- a couple months before July 1993 and a couple months after July of 1993, were there a number of phone calls placed between those two residences?

A. Yes.

Q. And did you notice whether there was any increase in the frequency of phone calls around the July 25th date over the overall pattern of phone calls that were made between the DeGeus residence and Angela Johnson's residence?

A. I didn't notice any increase in call frequency.

Q. Did the fact that there were phone calls between the DeGeus residence and Johnson residence indicate to you that it had any evidentiary value in determining whether Terry DeGeus was

involved in the murders?

A. No.

Q. Why not?

MR. SPIES: Well, I'll object to that question, Your Honor, as calling for an opinion that's not properly the subject of opinion testimony.

♀

THE COURT: Sustained.

BY MR. WILLIAMS:

Q. Agent Basler, we'll move on. Did you at any point consider Tim Cutkomp as a suspect?

A. He was considered briefly, yes.

Q. And what factored in to determine whether in your view he was responsible at all in the murders in this case?

MR. SPIES: Your Honor, again I'm going to object to that question as calling for an opinion that's not properly the subject of opinion testimony.

THE COURT: Overruled. You may answer.

A. As I mentioned, we at least briefly considered that Tim Cutkomp may have had some involvement in these five murders, but what stuck in my mind was the fact that Tim Cutkomp was the one that first notified law enforcement that these people had been killed and gave us what information he could about their present location. Probably more importantly in my mind again was the fact that he agreed to voluntarily wear a body microphone to talk with Mr. Honken, and in my mind someone that had committed the murders would not be willing to do that just because of the exchange of information that might occur when he's visiting with Mr. Honken.

Q. You've used undercover tapes frequently in your line of

work over the many years you've been involved in law enforcement?

A. Yes.
Q. And when somebody is wired and they go into a house or someplace else to talk to a suspect, has it been your experience that they have any ability to control what the other person says?
A. You can control what you say, but you sure can't control what the other person says.
Q. So -- let me move on. Obviously you testified earlier in this case that Angela Johnson was considered a suspect to the point where she was actually indicted on charges related to the murders in this case.
A. That's right.
Q. Now, when was she indicted?
A. She was indicted in July of 2000.
Q. And when was she actually arrested then?
A. I arrested Angela Johnson on July 30 of 2000.
Q. And once you arrested her, what did you do with her?
A. I transported her to the Benton County Jail in Vinton, Iowa, where she was going to be held pending her court appearances.
Q. What are the status of her charges right now?
A. Her status is that her charges are pending. She's set for trial next March for similar charges as we're dealing with here.
Q. When was the defendant, Dustin Honken, indicted in this case, sir?

A. Mr. Honken was indicted during the summer of 2001.
Q. Why was Angela Johnson indicted before Dustin Honken?
MR. SPIES: Your Honor, I object to the form of this question as calling for an opinion. It's argumentative and not properly the subject of opinion testimony.
THE COURT: Overruled. You may answer.
A. Angela Johnson was indicted first because investigatively we had sufficient information as to her involvement in these five murders before we had the sufficient information in Mr. Honken's case, specifically --
MR. SPIES: Your Honor, I apologize for interrupting the witness. I object on hearsay grounds in addition and ask that my hearsay objection precede this witness's voluntary answer and ask that the objection be sustained and the response stricken.
THE COURT: Your motion to have it precede the answer is granted, and your objection's overruled.
BY MR. WILLIAMS:
Q. Proceed. Specifically you were saying what is it that -- what evidence was it that you had regarding Angela Johnson that led to her indictment first?
A. We had information about her purchase of the weapon at the pawn shop in Waterloo. We also had information that she had shared with a close friend of hers by the name of Christi Gaubatz.

2748

Q. Ultimately Dustin Honken was indicted.
A. Yes.
Q. And after he was indicted, where was he incarcerated at?

Let me ask you this way. At some point was he transferred to USP, Florence?
A. Yes.
Q. And this was after his sentencing in 1998 on drug charges.
A. Yes.
Q. Okay. During the time period he was at USP, Florence, can you relate to the jury, do you know whether his telephone calls and mail were monitored at that institution?
A. Yes, I do.
Q. Can you describe how that works to the jury, please?
A. Yes. When a prisoner arrives at the penitentiary in Florence, Colorado, they are told on paper that their mail will be read and their telephone calls will be listened to, and they sign a form acknowledging that they understand that fact.
Q. When you indicate their mail will be read, are we talking about mail that goes in and out of the institution, mail that may be exchanged clandestinely between inmates we've heard about before called kites, or both? What mail is monitored by the staff there?
A. The mail that's monitored by the staff is that mail that comes in from the U.S. Post Office and also those letters that are destined to be sent out of the prison also through the

2749

United States Post Office.
Q. And with the exclusion that letters to attorneys and from attorneys are not read.
A. Right. Letters to and from attorneys were not read nor were calls to attorneys listened to.
Q. During the investigation, did you have occasion to review copies of mail sent to and from Dustin Honken while at USP,

Florence?
A. Yes.
Q. And did you also have an opportunity to listen to recorded telephone calls made by Dustin Honken -- or which Dustin Honken was on the phone during the time period he was at USP, Florence?
A. Yes.
Q. Based on your review of that -- of those things, did you see any indication that the defendant was aware that he was having his phone calls monitored and mail monitored?
A. Absolutely no question in my mind.
Q. Could you explain, please.
A. There would be times both in the letters but more so in the telephone calls where Mr. Honken would say to the person that he was talking to that the calls are monitored and numerous occasions when the conversation would be going towards facts about his case he would steer the conversation elsewhere.
Q. In this case you became aware at some point that the defendant was transferred to another United States penitentiary?

A. Yes.
Q. And that was located where?
A. During the spring of 2003, Mr. Honken was transferred to the penitentiary at Marion, Illinois.
Q. And while he was in Marion, Illinois, we've had testimony that he sent four kites, possibly more but four were recovered, that he sent to another inmate there by the name of Michael Kluver. Do you recall that evidence in this case?
A. Yes, I do.
Q. Showing you Exhibit 307, is that one of those kites that was sent to John Michael Kluver by the defendant?

A. Yes.

Q. And is that page 3 of that same exhibit, sir?

A. I can see the 3 at the top that's circled, but the words I can't read on this screen.

Q. I'm going to highlight a portion of that. Can you make that out at this point?

A. Not very well.

Q. Let me bring you the original.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. I'm handing you -- it's actually not the original. It's a photo of Exhibit 307. And could you turn to the third page, and do you see the paragraph I've enlarged on the screen?

2751

A. Yes.

Q. Could you read that paragraph to the jury, please.

A. I would very much like to hear of your, quote, for ears only, unquote, tactic on beating this case. Believe me, I have tried a lot of slick shit in the past. Some has worked -- I bet -- excuse me, I beat a case before -- and some hasn't. I'm willing to try anything if it has a possibility of working. It would be great if I can -- I'm not sure what that next word is -- with you, but I don't know how we can arrange it. Oh, I believe he says if I can rec., r-e-c, period, with you, but I don't know how we can arrange it. Let me know if you have any ideas on that. I will probably be going back out to general population next week, so we will have to figure out something soon.

MR. WILLIAMS: Thank you, Mr. Basler. I have no

further questions.

THE COURT: Mr. Spies?

MR. SPIES: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SPIES:

Q. Agent Basler, we've heard throughout the course of this trial a lot of testimony including from Paul Bush from the Division of Criminal Investigation laboratory, this morning from Frank Tarasi from the crime laboratory, from FBI Agent Hochrein, and others about the importance of physical evidence in the

development of a criminal investigation. Do you remember sitting through that testimony?

A. Yes, sir.

Q. All right. We've heard about fingerprints. We've heard about hair. We've heard about fabric portions, threads, fibers, glove impressions, DNA, all sorts of material that can be gathered from crime scenes. Do you remember that testimony?

A. Yes.

Q. And we've also heard how encounters between people can result in the transfer of evidence from one person to another, be it hairs and fibers, DNA, other types of evidence. You've heard that testimony as well.

A. Yes, I have.

Q. And in your long experience with the Division of Criminal Investigation, you've worked with a whole host of crime scene technicians, crime scene experts, and experts in all phases of physical aspects of criminal investigation.

A. Yes.

Q. Now, though you began your involvement in this

investigation -- by that, the investigation into the disappearance of Lori Duncan, Greg Nicholson, Lori Duncan's two children, and Terry DeGeus -- in November of 1993, by virtue of your being a case agent in this case, you've had an opportunity to look at all of the investigative files of all the different law enforcement agencies that have worked on this case.

♀

A. I believe that I have, yes.
Q. Including the Mason City Police Department, the Clear Lake Police Department, the sheriff's offices of Hancock County, Cerro Gordo County, the FBI, and others.
A. Yes.
Q. All right. In your review of the investigation that was done into the disappearance of Lori Duncan and her children and Greg Nicholson, can you -- you can tell us, can't you, that Lori Duncan's house was not treated as a crime scene after her disappearance?
A. I think that would be accurate.
Q. In other words, learning that Lori Duncan had disappeared and that her children had not reported to the neighbor for school, that area was not cordoned off or turned into a crime scene investigation.
A. I wasn't there, but I don't believe that it was.
Q. Well, from your review of the records of the Mason City Police Department, you know that it was not treated as a crime scene.
A. I think that's true.
Q. And, in fact, I think Ms. Duncan's family and maybe some neighbors came in and cleaned it up.
A. I believe you're right.

Q. In fact, the Division of Criminal Investigation didn't do any investigating at Lori Duncan's house until I think it was

the spring of 2000 when Paul Bush testified that some carpet remnants were removed from the house.
A. Yes. As I mentioned earlier, we can't get involved in a case unless we're asked to get involved in a case, and that request was not made in '93 during Lori Duncan's disappearance and the others.
Q. So the answer is yes?
A. Yes.
Q. Thank you. In other words, the Mason City Police Department didn't ask for your assistance in investigating Lori Duncan's house as a crime scene until 2000.
A. Yes.
Q. Now, the same would be true for Lori Duncan's car; am I right?
A. That's correct.
Q. So Lori Duncan's car was not treated as an instrumentality or a location of a possible crime.
A. I don't believe that it was, no.
Q. And so from your review of the investigation done by the Mason City Police Department, Lori Duncan's car was not examined for the presence of any physical evidence, hairs, fibers, or evidence of a crime.
A. I don't believe so.
Q. The same would be true of Greg Nicholson's vehicle.
A. Yes.

Q. Now, you've talked about a search that was done -- a search warrant was obtained and used to search Terry DeGeus's home; am I right?
A. Yes, sir.
Q. And, in fact, I think we heard during the testimony of Aaron Ryerson very early on in this case that he was at Terry DeGeus's home when a search was conducted I think in the spring of 1993. Do you remember that testimony?
A. Yes, I do.
Q. And then you told us about a second search warrant at Terry DeGeus's house what? Late in the fall of 1993 or early winter?
A. Yes. It would have been very late November or early December.
Q. Now, you described for us your participation in the search of Terry DeGeus's house in late 1993 or early 1994. You plainly were not involved in the search that was done of Terry DeGeus's house in March or early spring of 1993.
A. No, I wasn't there in March.
Q. But when you did the search later in that year, did you search not only the house but the property outlying Mr. DeGeus's house?
A. I don't recall that we searched the outbuildings. My memory is that our main focus, my main focus, was in the house trying to make a determination if Terry DeGeus had left voluntarily or not.

2756

Q. Right. And I think the record would show from your own notes that you only spent about an hour in the house that day.
A. That would be accurate, yes.
Q. And Mr. DeGeus's family helped you or were present during

the course of the search?
A. They were present. They didn't help.
Q. We heard from Frank Stearns who I think was the very first witness in this trial from the Mason City Police Department that he obtained a search warrant and went to Terry DeGeus's house in March of 1993 and I think testified that Mr. DeGeus was driving a 1978 Oldsmobile. Do you remember that testimony?
A. No.
Q. All right. Do you know, as a matter of fact, from your own review of the investigation that Mr. DeGeus had a 1978 Oldsmobile that was a subject of the search when Mr. DeGeus was approached by law enforcement in March 1993?
A. No, I don't recall that.
Q. Looking at the warrant that Officer Stearns obtained, would that help you remember?
A. I'm not disputing that it may have been. I just don't recall that particular vehicle.
Q. Okay. Well, what I'm getting at is at any time did you search or obtain a search warrant to look at Mr. DeGeus's 1978 Oldsmobile?
A. No.

♀

Q. Aaron Ryerson also testified that Terry DeGeus drove a truck. Did you get a search warrant or did you search Terry DeGeus's truck?
A. No.
Q. We've heard testimony earlier in the trial that Mr. DeGeus's car was found at an apartment complex in Mason City, Iowa. You remember that?
A. Yes.

Q. And that car was I think a 1973 Buick?
A. That's correct.
Q. Did you search the Buick?
A. No.
Q. You've testified for us here this morning that you considered whether or not Terry DeGeus would be a subject or a suspect in the disappearance of the Nic -- Mr. Nicholson and the Duncans. You had information, did you not, that Mr. DeGeus and Angela Johnson had an intimate personal relationship?
A. Yes.
Q. And that that relationship broke down.
A. Yes.
Q. And that Mr. DeGeus was unhappy about the breakdown of that relationship.
A. Yes.
Q. And had been physically abusive of Angela Johnson.
A. Yes, I learned that.

♀

Q. And had stalked her.
A. Yes.
Q. We also heard testimony from Aaron Ryerson that Terry DeGeus had a handgun. Do you remember that testimony?
A. Yes, I do.
Q. And you had information that Terry DeGeus carried a handgun under the seat of his pickup truck.
A. I believe we had that information, yes.
Q. And did you locate that handgun?
A. No.
Q. Or make any effort to determine how Mr. DeGeus would have obtained that handgun.

A. No.

Q. You've described for us this morning, Agent Basler, the phone records that you examined and evaluated showing phone calls between Terry DeGeus and Angela Johnson. And you looked at the phone records of Mr. and Mrs. DeGeus, Terry's father and mother?

A. Yes.

Q. And you compared those to phone records for Angela Johnson's residence?

A. Yes.

Q. And based on your review of those phone records, you knew that on July 24, 1993, Mr. DeGeus made a telephone call to Angela Johnson that lasted 15 minutes.

2759

A. Do you have those records?

Q. I've got a summary of them if that would help you remember.

A. I'd rather look at the actual records.

Q. We'll try to get those for you before we're done here.

A. I remember the call. I remember the time. What I'm not sure of is where the call was placed from. That's my question. Does that make sense?

Q. Yeah, I think so. So you don't know if it occurred on July 24?

A. No, no, I understand the date and the length of the call. I'm not sure where the call was made from, whether it was from Angie's house to the DeGeus residence or vice versa.

Q. All right. I think I understand. But in any event, there was a significant -- call of significant length on July 24 either to Angela Johnson or from Angela Johnson to Mr. DeGeus.

A. In the morning, yes.

Q. Let me ask you a couple of questions, Agent Basler, about the return that you made with other investigators to the Lark Avenue scene in 2001.
A. Yes, sir.
Q. And you went to the Lark Avenue vicinity as you've demonstrated on the photographs that were shown here earlier and by your testimony to do another scan or another search of that area for metallic objects.
A. Yes.

2760

Q. All right. And you had the assistance during that trip of the National Guard.
A. Yes, we did.
Q. And did you use National Guard technology in trying to find metal objects?
A. No. We used the National Guard, A, because they're warm bodies and, B, because they had their own metal detectors.
Q. Okay. So the answer is yes, you used their technology or their equipment in this search.
A. Yes, we used their equipment as well as other equipment. We were trying to equip the number of people that we had available to do this particular search.
Q. And you described for us the items that you found there. Did you take notes and document the location of where those items were found?
A. Yes.
Q. And you had those in your personal files or in your departmental files?
A. I believe so.
Q. And did you photograph and document the location of the

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2408 of 3636

items that you found, you've described for us here today?
A. We didn't photograph all of the items. I think you're talking about the ammunition components.
Q. Yes.
A. Yes, I believe that was photographed.

♀

Q. You told us that you retrieved a 38-caliber bullet; am I right?
A. Yes, I recovered a bullet that was later determined to be a 38-caliber.
Q. And you recovered nine 38-caliber shell casings?
A. A number of them. I'm unclear as to the number, but there was certainly several.
Q. All right. Would looking at your report help you remember about how many you recovered?
A. And I will trust if you're reading from my report that there were nine.
Q. Okay. It does say nine.
A. I'll believe that.
Q. And you submitted the 38-caliber bullet or the bullet you recovered to the DCI or the Division of Criminal Investigation laboratory.
A. Yes, sir.
Q. And did you submit the shell casings to the laboratory?
A. No.
Q. Is a 38-caliber pistol used as a hunting weapon?
A. Can be.
Q. What do you hunt with a 38-caliber pistol?
A. Small game. By can be, I'm not indicating that it normally is. Usually it's used for other purposes like target practice.

Q. You've testified for us this morning, Agent Basler, about

the correspondence that Mr. Honken had with members of his family, his friends, the phone calls he made to his family and friends that were monitored. Aren't inmates told routinely when they go to prison or go to a correctional facility that their nonlegal mail is going to be examined?
A. Yes, I believe I testified to that.
Q. All right. And in addition, when lawyers mail mail to inmates at correctional facilities, they have to put on there that it's special mail, that it's attorney-client privilege mail.
A. Yes, the envelopes are usually marked on the outside.
Q. So inmates would know that their mail is being monitored and presumably that their calls could be monitored.
A. I don't think there's any doubt.
Q. In fact, you transported Mr. Honken yourself, didn't you, from one correctional facility to another?
A. No.
Q. Pardon me?
A. No.
Q. Have you ever examined his files in jail?
A. His central file?
Q. No, no, his personal files that he keeps in his cell.
A. No.
Q. You've never looked at them?
A. No.

Q. Seen them described?
A. I've seen portions of information that he had with him when he was transported.
Q. Where did you do that?
A. Where did I see the information?
Q. Yes.
A. In my office.
Q. And this would include the contents of some of his files in his cells?
A. No. If I can explain, we might be able to shorten this up a little, what I'm talking about at least.
Q. Go ahead.
A. During 2001, Mr. Honken was transported from Florence, Colorado, by the marshals back to Iowa I believe for a court appearance on his new charges. As he passed through Oklahoma City which is kind of a central receiving spot for prisoners that are being transported around the country, I received a telephone call from a person at that facility, a federal employee -- I assume a correctional officer -- and that correctional officer told me that while Mr. Honken was there that they had gone through the possessions that were on him and they had found some newspaper articles and clippings and offered to fax to me what they had found.
Q. Okay. So what we're getting at here is he had newspaper clippings in his files in Oklahoma City, and you were informed

2764

about that.
A. I don't know whether the clippings were. I was told that they were on his person as opposed to in his file.
Q. Okay.

A. I didn't look. I was notified of it and read those copies that they sent to me.

Q. Let me ask you next about the letters that you've been asked about and a portion of which you read to the jury here this morning, specifically the letters that were described as kites from Mr. Honken to John Kluver. Do you remember those exhibits?

A. Sure.

Q. And I think you read a portion of Exhibit Number 307. That was one of several exhibits that you've heard testified about here by Mr. Kluver.

A. Yes, there were four.

Q. Yeah. And Mr. Kluver said that these were not all the letters or correspondence that he received from Mr. Honken but just portions of them. Do you remember that testimony?

A. Yes, I do. The ones that he gave us were not just portions. They were the entire kites. What he said was that there were other kites that he didn't have any longer.

Q. Right, and that's what I was driving at.

A. Sure.

Q. But you've examined these exhibits yourself, haven't you?

2765

A. I've read them.

Q. Yes. And in Mr. Honken's letters to Mr. Kluver who -- Mr. Kluver said he was a jailhouse lawyer; right?

A. I believe so.

Q. In these letters, Mr. Honken talks about going through his discovery; is that right?

A. He may have, and I assume you're reading from it, and I'll trust your reading.

THE COURT: You may.
Q. Handing you Government's Exhibit Number 306, does Mr. Honken describe in his letters to Mr. Kluver going through his discovery?
A. Ask your question again, please.
Q. Does Mr. Honken describe in his letter to Mr. Kluver going through his discovery?
A. Mr. Honken describes going through his own discovery, yes.
Q. Yes. And discovery is the collection of investigative files and witness statements and reports that a person gets to prepare for trial.
A. Yes, that's true.
Q. Does Mr. Honken also describe in Exhibit Number 306 indexing witness statements?
A. Yes, he does.
Q. And does he also in Exhibit Number 306 talk about using the Freedom of Information Act to prepare for trial?
♀

A. Yes, he has the initials for that, but I understand that's what that means.
Q. FOIA.
A. Yes, sir.
Q. In Exhibit Number 308, does Mr. Honken describe reading through his discovery materials and again preparing for trial?
A. Yes.
Q. And does he also say that he learned in his discovery materials that other inmates had been going through his files and gathering information about him?
A. Yes.
Q. And that one inmate had been getting information out of the

newspaper or out of the paper.
A. Yes, sir. It doesn't say newspaper. It says out of the paper.
Q. In fact, in Exhibit Number 309, does Mr. Honken say to Mr. Kluver that he's learned that there were people passing around newspaper articles?
A. He doesn't say he learned it. He says that he knows that that was happening.
Q. All right. And again in Exhibit Number 307, does Mr. Honken again refer to his -- going through 900 pages of discovery?
A. Yes, he does.
Q. And does he also describe in Exhibit Number 307 it will be

up to the jury to decide between the two?
A. Those words are written there, yes.
Q. And does he also describe depositions and other means of learning about the evidence so he can prepare for trial?
A. Yes.
Q. And finally, in Exhibit Number 307, does he also describe being attentive to the jury instructions and commenting about the trial judge?
A. Yes.
Q. Agent Basler, you've described for us this morning that in the course of your investigation you had or recommended that there be submitted to the FBI laboratory and to the laboratory facilities of Iowa State University the pieces of metal that were found on the galvanized sheet of metal that's been placed into evidence in this case. Do you recall that testimony?
A. Yes, I do.

Q. And you said that as a result of the submissions to the FBI laboratory and to the Iowa State University that both those facilities concluded that they could not trace the metal droplets on that galvanized steel to any particular firearm.
A. That's correct.
Q. And, in fact, they specifically addressed the issue whether those droplets came from a Tec-9 or from an SKS rifle.
A. I don't believe that any laboratory could tie those droppings to any particular weapon.

Q. Maybe my question was unclear. But you had asked them to make that determination, didn't you, whether they could attribute those metal droppings either to a Tec-9 or to an SKS?
A. Yes. Specifically the Iowa State Laboratory I was hoping that if the melted metal had come from one of the identifiable component parts of the gun they might be able to make that determination.
Q. And they were not able to do that.
A. No, they weren't.
Q. Next I wanted to ask you some questions about testimony you obtained in response to Mr. Williams' questions about the age of Mr. Honken's children. In the course of your investigation, you learned that Mr. Honken had an intimate personal relationship with Kathy Rick.
A. Yes.
Q. And that Ms. Rick had a child by -- from a previous relationship named Brandon.
A. Yes.
Q. And that Brandon called Dustin Dad.
A. On occasion, yes.

Q. And Brandon would have been about 5 years old in 1995?

A. I don't know what his age is.

MR. SPIES: Agent Basler, thank you. I think those are all the questions I have for you.

THE WITNESS: You're welcome.

♀

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Agent Basler, as part of your investigation file when you work up an investigation, do you keep track of newspaper articles that may come out relating to your investigation?

A. No.

Q. You don't keep copies of them or put them in your discovery -- or in your investigation file or anything?

A. No, I don't.

Q. Nevertheless, over the course of the years, have you on occasion read those articles that appeared in various newspapers concerning this investigation?

A. I've certainly read some of them, yes.

Q. Are you aware of any newspaper article where the note left with the neighbor was ever mentioned in any newspaper article?

A. No.

Q. Have you ever seen in the paper at any point any newspaper article that described the two little girls being shot in the back of the head?

A. No, sir.

Q. You were asked on cross-examination about the phone call that occurred between Angela Johnson and the DeGeus house on

July 24, you said in the morning on July 24. Do you remember

being asked that question on cross-examination?
A. Yes, I do.
Q. And again, just so we're clear, there were calls for months before and after July 24 between those two homes.
A. Yes, there are a large number of calls.
Q. And there was nothing in the pattern of the phone calls that stood out regarding this call on July 24 that was different in any way than any of the other phone calls.
A. No.
Q. And finally, sir, on TV, on shows like CSI, they always find physical evidence and are able to crack the case, if you will, with this physical evidence that they miraculously come up with. Based on your years of experience as a real investigator, does it work like that?
A. No. They not only do it; they do it in an hour. Unfortunately, that's not the way it works.
Q. In your experience is it difficult to actually come up with that type of scientific evidence that cracks a case?
A. It's difficult. Sometimes you find it. Sometimes you don't find it. You always try as best you can.
MR. WILLIAMS: I have nothing further.
THE COURT: Mr. Spies?

REDIRECT EXAMINATION

BY MR. SPIES:
Q. Well, Agent Basler, you would agree with us that the

newspaper articles would speak for themselves as to what they

did or didn't reveal about the details of the investigation into Mr. Honken's complicity or lack of complicity in this crime.

A. Absolutely.

Q. And finally, concerning physical evidence, if you don't look, you can't find it.

A. True.

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Okay. You may step down.

MR. MILLER: Your Honor, the United States calls Victor Murillo.

THE COURT: Okay. Members of the jury, why don't you take a stretch break.

VICTOR MURILLO, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. And could we get you to scoot the chair up a little bit so you can speak directly into the microphones. And when you're ready, would you state your full name for us, please, and spell your last name.

THE WITNESS: My name is Victor Michael Murillo. Last name is spelled M-u-r-i-l-l-o.

THE COURT: Thank you.

Mr. Miller?

MR. MILLER: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Good morning, Mr. Murillo.

A. Morning.

Q. Your occupation, sir?

A. I'm employed as a criminalist with the Iowa Division of Criminal Investigation's state crime laboratory in Des Moines, Iowa.

Q. Which of the various sections of the state crime lab are you assigned to, sir?

A. Currently I'm working in the firearms and tool mark section of our lab.

Q. How many years have you been full time in that firearms section?

A. Been full time in the firearms section since 1989, approximately 15 years.

Q. And at least part time any period of time preceding that as well?

A. Yes. For about four years prior to that, I also did some gunshot residue analysis examining gunshot residue kits, kits that were used to collect residue from the hands of an individual who was suspected of discharging the firearm.

Q. So you have approximately 20 years in the field of firearms identification work?

A. Yes, sir.

Q. We've heard from a number of your colleagues that it's common also in addition to have forensic science specialties within the laboratory but also to have crime scene examination responsibilities as well. Is that true in your case, sir?

A. Yes. I've been a member of the crime scene team since 1985 and just recently kind of semi-retired from that position. I'm not currently on call, but I could be in the future.

Q. How many years did you do crime scene work?

A. Again, since 1985 until about a year ago, so approximately

18 years.

Q. In connection with those duties, sir, are you the same Vic Murillo who participated on November 8 of the year 2000 in the processing of a grave on Kildeer Avenue in rural Mason City, Iowa?

A. Yes, I am.

Q. We heard from Agent Kisner yesterday and from Special Agent J.D. Smith last week regarding that matter, so I don't want to go through it with you in detail again. But it's our understanding that you participated in the screening of soil that was taken out of that grave?

A. That's correct. I participated in the excavation of the body, removal of the remains of DeGeus, the victim or one of the victims in this case. I was also involved in the sifting of the soil and debris that was in that grave site looking for any items of evidentiary value.

2774

Q. Describe that process and what, if anything, that you recovered that you felt of potential evidentiary value from the grave of Terry DeGeus.

A. The result of that excavation process and the sifting of that debris, there were three bullets, fired bullets, that were recovered from that scene, from that grave site. I took possession of all three of those fired bullets at that time, took them back to the laboratory so that they could be examined further.

MR. MILLER: If I may approach the witness, Your Honor?

THE COURT: You may.

BY MR. MILLER:

Q. Mr. Murillo, I've handed you what is marked and been received in evidence as Government Exhibit 902. Do you recognize that, sir?
A. Yes, I do.
Q. What is 902?
A. Exhibit 902 are the three bullets that were recovered from the grave site that I just recently talked about that were later examined in the laboratory by myself as well.
Q. I want to get into that examination here in a little bit, but before we do so, does the field of firearms examination and tool mark examination involve anything other than trying to identify and connect bullets to firearms and vice versa?

♀

A. There are several different subsections of the firearms section. One is gunshot residue analysis which I think we may talk about a little later today, the examination of firearms and fired evidence which is bullets and cartridge casings that are usually recovered from the scene of a crime or that are in some way related to the scene.
Q. You mentioned muzzle target determination or garment examinations. Can you describe that process for us briefly?
A. Yes. Often we are asked to examine the clothing from the victim of a shooting. We look for any holes that may be in that clothing to try and determine whether those holes were made by a bullet. We go further in looking at the area inside of the hole and around the hole looking for any gunshot residues, any residues that could have been deposited by the firearm if it was fairly close to the victim when it was discharged. Very often there are powder particles or sooty residue material, some lead that is deposited on the clothing if the shot is fairly close.

And my job is to try and figure out what type of residues are present, whether they are present or not, and, once I find a pattern of residues that may be around a specific entry hole, try and duplicate it with a specific firearm if that's possible. If I don't have a firearm, I can sometimes give an idea as to how far the muzzle or the front end of the barrel was to that garment when the original shot was discharged.

Q. And do you on occasion try to make determination as to

whether a hole in a garment is, in fact, a bullet hole?

A. Yes.

Q. And you do it in that fashion?

A. Yes.

Q. What sort of factors affect the persistence of powder, soot, or other gunfire particles?

A. Well, there's actually three different things that could happen. It's possible that we'll find residues as I just mentioned. Sometimes we don't find residues, and three different things can take effect. One, there are residues that could possibly be deposited on the victim's garment, but those residues could somehow be removed either by weathering, by rain, or they could be physically removed from the garment.

It's possible that the muzzle-to-target distance is too great, that the shot was fired from too far away, and, therefore, those residues could not be deposited on the garment. It will only travel usually about maybe three to six feet depending on the type of firearm, the type of ammunition that's used. So it's possible there's no residue present at all.

The other option obviously would be that what we're looking at is not a bullet hole. It could be something else and

obviously a bullet did not penetrate that particular item.

Q. The shape and size of a hole in a garment by itself doesn't allow you as a scientist to make a determination one way or the other I take it then.

♀

A. No. It's all a big factor on the type of ammunition, the type of fabric material that you're looking at. Sometimes large bullets make small holes. Sometimes small bullets make large holes. So just by looking at the hole only you can't make a determination as to whether it's a bullet hole or not or even what caliber could have possibly been used, what size of bullet was used to make that hole.

Q. Okay. And as with the examination for gun powder residue and the like, I believe you've already indicated that exposure to the elements can affect persistence of such evidence.

A. Sure. If the victim is, for instance, shot outside and is laying at a scene somewhere and it's raining and it's windy, those weathering factors could play a big part as to whether the residues are still present or whether they were even deposited at all.

Q. The passage of time as well.

A. Yes.

Q. Despite those limitations, do you often at least attempt to make an examination?

A. Sometimes we can't always see the residues that may be present. There's always a physical examination that is performed. I physically will look at the garment, look at it underneath a microscope looking for powder particles and any residue that may be present, and then there are sometimes some chemical tests that can be performed. We can spray some

chemicals on the garment and look for powder, look for lead residues which may show us some type of a pattern, something to indicate that there were residues present as well.

Q. Did you examine a small T-shirt in connection with the Amber Duncan death investigation?

A. Yes.

Q. Mr. Murillo, I've handed you what is marked Government Exhibit 816. Do you recognize that item?

A. Yes, I do.

Q. What is it?

A. Government's Exhibit Number 816 is a small T-shirt that I was asked to examine for gunshot residues. Similar type of examination that I've just explained was performed on this garment, and results of the examination was interpreted in a report.

Q. What, if any, conclusions were you able to arrive at, sir?

A. I did find some very small holes in the front left lower chest area of the T-shirt. I didn't find any residue. I didn't find any powder. In doing at least one of the chemical tests that I thought might be beneficial, I didn't find any residues present, at least any lead residues that were present on this garment. There were holes that were present. Whether they were made by a bullet or not, I can't say.

Q. The absence of any residue could be because there was never any residue on it.

2779

A. No, not at all, just for the simple reason of the variables

that we just talked about a little while ago.
Q. It could be because of weathering that it was and then became absent, or it could be because there never was any such to begin with.
A. Yes, that's correct.
Q. And I just want to be clear on this. Do you draw any conclusions one way or the other with regard to whether or not that garment was ever struck by a bullet?
A. Again, it's possible that the holes that I found could have been made by a bullet and I just don't see the residues for some reason. It's possible that the holes that I'm seeing could be just from the wear and tear of the garment, possibly just moles or insects or something that are eating at the fabric as well. I can't make any determination as to whether a bullet did or did not pass through this fabric material.
Q. And normal wear and tear can cause holes in garments as well; fair statement?
A. Yes.
Q. As well as weathering and time.
A. Yes.
Q. And I'm not suggesting anything one way or the other. I just want to be absolutely sure so the jury knows. Again, we've heard several times if you don't look you can't find. At least in this case you looked.

2780

A. Yes, I did.
Q. And are able to arrive at no conclusions one way or the other.
A. That is correct.
Q. You have before you three bullets that you've indicated

that you recovered from the grave of Terry DeGeus?

A. Yes.

Q. Can you educate this jury just a little bit about how you go about doing a firearms examination in trying to determine the source or the weapon that may have fired a particular bullet?

A. Yes. An examination of these three items, there is quite a bit of information that's taken from each of these. Number one, I try and determine what the composition of the bullet is, whether it's lead, whether it's copper. Could be aluminum. Could be steel. And that's all noted in the paperwork that I fill out.

Q. Mr. Murillo, I'm going to interrupt you, and I apologize. We have a couple other firearm components I want you to discuss, so before you actually specifically discuss any examinations or findings with regard to the three bullets before you, I just want in general terms how you go about making such examinations.

A. In general terms basically we look at what we call class characteristics, caliber, rifling examination, compare them to one another and try and determine whether one firearm was used, several firearms were used and try and match the bullets to one

another and eventually, if we find a firearm, try to match it to the weapon.

Q. How are you able to do that? Can you tell us a little bit about the physics involved of the way a firearm shoots a bullet and how that results in evidence that sometimes allows an examiner like yourself to make an identification?

A. There's information on the outside of a fired bullet that comes from that bullet having passed through a specific barrel or a specific firearm. The way that a firearm is manufactured

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2426 of 3636

or at least the barrel is manufactured, it's a large solid tube started with. A hole is drilled from one end of the tube to the other. The diameter of that hole in that blank is now what we call the caliber of that particular firearm. The hole could be 22/100 of an inch in diameter, and that eventually will become a 22-caliber barrel. It will be used on a 22-caliber firearm. If a 45/100 of an inch hole is drilled through that barrel, then obviously we're looking at a 45-caliber type of barrel.

Once the hole has been drilled through the barrel, there is rifling that is constructed on the inside of that barrel. There are spiral grooves that are placed on the inside of that barrel from one end to the other. There are portions of the barrel that are cut away that are called grooves. There are portions of the barrel that are not cut away that are called lands. If you look at a cross-section of a barrel, it kind of looks like little teeth that are protruding to the inside of

that barrel, part that's cut away, part that's not cut away.

When the bullet engages in that rifling or it passes through that barrel, the outside of the bullet is going to have a mirror image of the inside of the barrel. On the outside of the bullet, we can look at rifling information including the number of teeth or the number of lands and grooves as we call them on the inside of the barrel that will be present on the outside of each of the bullets that's fired from that particular barrel.

We look at -- number one, when we look at the bullet, we look at the caliber. Is it the same as the barrel that it came from? Does it have the same rifling information? There are certain number of grooves that are cut in that barrel; and,

therefore, we should have the same number of impressions on the outside of the bullet.

So I can look at a bullet and count the rifling lands and grooves or the impressions from the lands and grooves from the barrel. I can count those all the way around the outside of each of the bullets that I'm examining.

Once I come up with a number, I can also look at the direction. Some barrels cut rifling so that the bullets will spin to the right as they leave the barrel. Others will spin to the left, either clockwise or counterclockwise.

So the rifling information that you see on the bullet will show rifling that leans to the right or rifling that leans

♀

to the left. So I come up with a number.

And in this case each of the bullets that I looked at had six land-and-groove impressions. They also had rifling information that led me to believe they came from a barrel that had a right-hand twist.

I also looked at the width of each of the impressions that were left on the outside of the bullets, and from all that information, I can determine whether they all have the same type of rifling configuration. And from all of that information, I can give the investigators information about the type of firearm that that bullet could have come from, make and model of firearm that that -- a firearm that was used to produce these fired components.

Q. Okay. And just speaking again just in general terms, rifling is a spin that the barrel puts on the bullet?

A. That's correct. When the bullet passes through the barrel, it engages in that rifling, and it causes the bullet to spin as

it moves down the barrel. When the bullet leaves the barrel, it continues to spin as it's in flight. Ultimately what we would like to do is spin that bullet perfectly when it's in flight so it stabilizes the bullet as it's moving through its trajectory. If we spin it correctly, put the correct amount of spin on that bullet, it should become stable as it's in flight instead of unstable where it's wobbling back and forth. If we can create that stability on the bullet by spinning it correctly, we can

make the bullet fly true and straight and ultimately hit the target which is what we want to do with any firearm. We want to hit the target that we're aiming at with the bullet.

Q. Okay. A bullet that's not spinning is not going to fly in a straight line or a true line?

A. That's correct. A barrel that doesn't have rifling at all and a bullet passes through that particular type of barrel will -- once it hits the air or leaves the barrel will begin to either tumble or begin to wobble and ultimately won't hit the target that you're aiming at.

Another analogy that I use sometimes is passing a football back and forth. If you have two people that are passing a football, we're putting a spin on that ball. If you throw a nice perfect spiral with that football, it will fly true and straight and it won't wobble at all. If you don't spin it correctly, then it will wobble. It will be unstable as it's in flight. Very similar thing happens with a bullet when it leaves the barrel of a firearm.

Q. The rifling that puts a spin on a bullet is necessary for the weapon to be accurate.

A. That's correct.

Q. And I think you've indicated depending upon the manufacturer they have different characteristics as to the rifling.
A. Yes. These particular bullets had six land-and-groove

impressions with a right-hand twist. There are other manufacturers that use different numbers, different directions of twist. The numbers can be anywhere from usually 4 to about 20 and, of course, any combination of left or right.
Q. So the number of lands and grooves and the direction of twist are class characteristics that you look at that help you identify possible manufacturers or models of guns.
A. That's correct.
Q. In addition to class characteristics that would identify a possible weapon type, is there such a thing as individual characteristics that would allow you to identify a specific weapon itself?
A. Yes.
Q. Describe that, please.
A. Individual characteristics on a bullet are referred to as very tiny striated or scratch-type markings that are going to be left on the outside bearing surface of that bullet. Each barrel will leave a signature or a unique set of markings on the outside of every bullet that passes through that barrel. It's like a fingerprint that's left on every bullet that comes from one specific barrel. We should be able to look at all of the bullets theoretically and identify those unique characteristics on each of the bullets. If they have the same pattern of uniqueness, then we know that each of those bullets came from the same firearm.

Q. In doing your work as a forensic scientist, are you always able to identify individual characteristics on bullets recovered from crime scenes?
A. Not always, no.
Q. And why not?
A. Number one, sometimes the barrel of the firearm just doesn't mark the bullet very well, and sometimes I've taken several test-fired bullets, ones that I know came from a specific firearm, and I've not been able to match them to one another. The barrel may be very poorly made and for some reason it just doesn't produce those individual characteristics on each of the bullets that's fired.
Q. On actual crime scene work, you're dealing with people and objects that have been struck by bullets. Does that affect your ability sometimes to determine individual characteristics?
A. Yes, it does. Obviously bullets are moving through the air. They're eventually going to hit a target, whether it's a body or a tree or a house or a car. The bullet is going to become very damaged. It could mushroom, flatten out. It's also possible that you could add some other markings on the outside of the bullet from having impacted or scratched another surface, and that could certainly hinder the identification process of those bullets as well.
Q. And how about exposure to the elements?
A. Yes, exposure to the elements, if you leave a bullet, for

2787

instance, out in the water, it could corrode. It could become pitted or damaged on its outside surface, and that would affect

whether I'm able to see those individual characteristics or not.

Q. Leaving a bullet in soil might have the same effect?

A. Yes.

Q. I'm handing you what is marked as Government Exhibit 504 and ask if you can tell us what that is, sir.

A. Government Exhibit Number 504 is a bullet that was removed from another victim in this particular case. I also looked at this particular item and compared it to the three bullets that we previously talked about.

Q. And is that the bullet recovered from the head of Greg Nicholson?

A. Yes, it is.

Q. And handing you Exhibit 1005, do you recognize that, sir?

A. Yes, Government Exhibit 1005 is a fragment of jacket material that was recovered from the victim DeGeus during the autopsy or the examination of the body. That was also submitted to the laboratory, and I examined that item as well.

Q. I want to go through these one at a time. First with regard to Exhibit 504, that's a lead fragment recovered at the autopsy of Greg Nicholson?

A. Yes.

Q. Would you describe that lead fragment for us, please.

A. Yes. This particular item, Exhibit 504, is a large lead

2788

fragment, does not have a copper jacket on it at all. It is simply made of lead only. When I examined it, it didn't have any rifling information on it, and there was really no further exam that could be performed on this other than the usual information that's taken from it, the fact that it is lead. I weighed it and determined that it came from a -- what would be

called a medium-class cartridge or a firearm that fires a medium-class bullet.

Q. And what does that mean, sir?

A. By medium class I'm referring to this bullet as having been fired from either a 38 Special revolver, a 357 Magnum revolver. It's possible this could be the core from a jacketed bullet and could have been fired from a semi-automatic pistol which would be either a 380 auto pistol or a 9-millimeter pistol.

Q. So that's possibly, among other things, the lead core from a jacketed 9-millimeter bullet.

A. Yes.

Q. Again, it lacks rifling information, and why is that?

A. If it's the lead core from a jacketed bullet, the outside of the jacket is what's going to have all the information that's important to identify it back to a particular barrel.

The way a bullet is constructed or manufactured is they start with a cup of copper, and then they fill it with lead, so the inside of the cup is filled with solid lead. The portion of the bullet that makes contact with the barrel is

going to be the outside of that copper jacket. The lead core on the inside of the bullet is not going to make contact with the barrel. Oftentimes when a jacketed bullet strikes a target, the core and the jacket will separate. They'll come apart. And we may find the jacket which is going to be the important part. That's going to have all the rifling information on it. The lead core will not have any rifling information on it, and we can still weigh it and get an idea as to the possible caliber, but we're not going to be able to identify the core as having come from a specific firearm.

Q. Okay. Talking about caliber first, is it possible that 504 came from a bullet with a caliber as small as a 22 or a 25?
A. No. This particular fragment weighed about 70 grains which means it has to be approximately 380 or larger. 22 bullet, for instance, is only going to weigh about 30 or 40 grains. This one weighs twice as much, so we know it's not a 22 or a 25 or even a 32. It has to be something a little bit larger.
This fragment -- in looking at the width of -- or the diameter of this particular lead fragment, I can get an idea as to the caliber, but I know it wasn't fired from a 40 or a 45 or something quite larger than that.
Q. Nothing as large as a 40 or 45.
A. That's correct.
Q. Nothing as small as a 22 or a 25.
A. Yes.

Q. Something in the middle which would include a 9-millimeter.
A. Yes, it would.
THE COURT: Mr. Miller, would now be a good time to take our break?
MR. MILLER: Sure.
THE COURT: Okay. Members of the jury, it is about five minutes to noon. We'll be in recess till 12:45. Please remember my instruction about keeping an open mind until you've heard all of the evidence in the case. Thank you.
(The jury exited the courtroom.)
THE COURT: Any matters we need to take up?
MR. MILLER: No, Your Honor.
MR. PARRISH: No, Your Honor.
THE COURT: Okay. Thank you. We'll be in recess.

(Lunch recess at 11:56 a.m.)

THE COURT: Ready for the jury?

MR. MILLER: Yes.

MR. SPIES: Yes.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Miller, you may continue your direct examination.

MR. MILLER: Thank you, Your Honor.

BY MR. MILLER:

Q. Mr. Murillo, we were visiting about Government Exhibit 504, the bullet fragment from Greg Nicholson's skull. What was the

condition of that bullet, sir?

A. Exhibit 504, again, was a lead bullet that was damaged from impact. Obviously the nose of the bullet had been smashed and flattened a little bit. Again, there was no rifling on the outside of the bullet, and there was some contamination on the outside of the bullet as well.

Q. What sort of contamination?

A. This bullet had corrosion, some white residue obviously from being corroded, being wet and oxidized, and you could obviously see that on the outside of the bullet as well as I think you can see it on the bullet as we have it in the packaging today.

Q. And corrosion is what?

A. Corrosion is basically just the oxidation of the metal. It gets wet. It oxidizes, and the lead turns into usually sometimes a different color or kind of corrodes or pits the metal and obviously damages the outside surface.

Q. Is that a weathering process that occurs over time with

metal?

A. Yes, yes.

Q. Given the damage as far as distortion of the bullet as well as the corrosion that it showed, you've already indicated you were unable to get any individual characteristics off of it; is that correct?

A. With this particular bullet which is the one that came from

♀

Nicholson, didn't have any rifling information on it at all, so there's no class characteristics other than the caliber, and as well there were no individual characteristics present either.

Q. So you would never be able to tie it to a specific firearm.

A. I think we mentioned earlier about some of the calibers that we could possibly tie it to, but we couldn't identify -- we could never identify this particular fragment to a specific firearm.

Q. The impact damage and the corrosion prevented you from saying how many lands and grooves and direction of twists it might have had at one point.

A. That's correct, yes.

Q. All you can tell us is the possible caliber, and that again is what, sir?

A. Yes.

Q. And that caliber is what?

A. Again, medium class which includes a 38, 357 or 380 or 9-millimeter Ruger cartridges.

Q. The firearm known as Tec-9 manufactured by Intratec Arms, what caliber of bullet is that firearm?

A. The Intratec Tec-9 is a nine-millimeter Luger semi-automatic pistol that fires a 9-millimeter Luger cartridge.

Again, it's a semi-automatic pistol which means every time you pull the trigger it fires one shot from that particular pistol.

Q. It fires a bullet of a caliber such as that noted in the

lead fragment recovered from Mr. Nicholson.

A. Yes.

Q. Let's move on then to the three bullets that you recovered from the DeGeus grave. Those are in evidence as Government Exhibit 902. First you've indicated that you're the man that actually found those -- or participated in the recovery of those at the crime scene.

A. Yes.

Q. Took them to the lab and examined them, I trust?

A. Yes.

Q. What condition were those three bullets in, sir?

A. As far as the impact damage, one of the bullets possessed almost no impact damage at all which indicates if it did hit a body it probably hit soft tissue and maybe didn't mushroom or open up like the other two did. The other two bullets that came from that particular grave site did have some impact damage that were mushroomed a little bit at the nose or the front of the bullet. They also did have some corrosion on them as well.

Q. Were they in sufficiently good condition for you to ascertain any rifling impressions?

A. Yes. In looking at the outside of all three of the bullets that came from the DeGeus grave site, I think I mentioned earlier that each of the bullets possessed six land-and-groove impressions with a right-hand twist. I could also measure the width of the land-and-groove impressions that were on the

bullet. They were the same between all three of them. And again, from all that information that I generated from those bullets, I came up with several makes and models of firearms that could have fired those bullets.

Q. Okay. And what makes and models does that include, sir?

A. There are actually about 20 different manufacturers that I came up with. We can enter all of that information into a database that the FBI provides to us, and it will spit out all of the different manufacturers of firearms who produce barrels with those same specifications.

Q. If I can interrupt you, sir, I take it that six lands and grooves with a right-hand twist plus the noted widths of the lands and grooves found on these particular three bullets is not terribly unusual.

A. It's actually one of the more common rifling specifications for nine-millimeters. But by narrowing the list down, by including all that information, not just the 6 right which is the most common, but by looking at the width of those impressions, we can narrow the list down to, in this particular case, about 20 different manufacturers.

Q. Out of how many firearms manufacturers worldwide are there if you have any idea?

A. There may be quite a few that I'm not even aware of, but I would guess could be at least twice if not three times that many.

2795

Q. Is the Tec-9 semi-automatic handgun manufactured by Intratec Arms one of those 20 which has those characteristics?

A. Yes. The Intratec Tec-9 is one of the firearms that I came up with or one of the firearms that was generated by the search through that database.

Q. And finally, sir, with regard to Government Exhibit 1005, the copper fragment or the bullet fragment recovered from the head of Terry DeGeus, you examined that as well?

A. Yes.

Q. What condition was that particular fragment?

A. Exhibit 1005 consists of several small fragments of copper. There was one fairly large fragment that I examined more closely that did have some rifling information present. The entire jacket, of course, was not present, but a small portion of it was. There was some rifling information that was there, and it was consistent with the other three bullets that came from the grave site.

Q. What condition was it in as far as any contamination noted?

A. As with the other bullets that came from the grave site, there was quite a bit of corrosion. Even in looking at the bullets today, there's a green color there, copper. This particular copper jacket, when it corrodes, it will turn a little bit of a greenish yellow color, and that's what we had on these fragments as well.

Q. Now, as to all five of those bullets or bullet fragments,

the bullet fragment from the skull of Greg Nicholson, the bullet fragment from the skull of Terry DeGeus, and the three bullets from the DeGeus grave, based upon what you were able to determine in the way of information from those five bullets, is it possible that those five were fired from the same firearm, sir?

A. Yes, it is.
Q. And again, just so we're perfectly clear, that one very corroded and damaged bullet from the skull of Greg Nicholson, you can't tell us class characteristics as well as you can with the other four bullets.
A. That's correct.
Q. It could even be from a 38 as opposed to a 9-millimeter.
A. Yes.
Q. And you don't know the direction of twist or the number of lands and grooves.
A. That's correct.
Q. All you know is that it is of a caliber consistent with nine-millimeter.
A. Yes.
Q. As are the other four.
A. That's correct.
Q. The other 4 of which show rifling impressions consistent with a Tec-9.
A. Yes.

2797

Q. All five -- I think you've already indicated -- also show corrosion.
A. Yes, they do.
Q. Now, approximately a year later or some time in September of 2001, you also examined a bullet submitted by Agent Basler; is that correct?
A. Yes, I did.
Q. And can you just briefly describe what your findings were with regard to that bullet?
A. Yes. There was another bullet that was submitted to the

laboratory at a later time. I was asked to look at it, compare it to all of the bullets that we -- had been recovered previously. That particular bullet was also medium caliber, and I determined that it was probably fired from either a 38 or a 357 Magnum cartridge. That bullet possessed not only class characteristics where I could get the caliber but also some rifling information on it. The rifling information generated from that bullet was six lands and grooves just like the others. However, the twist was in an opposite direction. It had six land-and-groove impressions with a left-hand twist. The bullets that we examined previously from the grave site had six land-and-groove impressions with a right twist, so obviously the twist was different between both of them, and that led me to believe that obviously it was fired from a different firearm.
Q. It was certainly fired from a different firearm than the

four bullets recovered from the DeGeus grave.
A. That's correct.
Q. As to the one bullet recovered from the skull of Greg Nicholson, scientifically you wouldn't be able to say one way or the other I take it.
A. That's correct. I think we've already mentioned that that large lead fragment could have come from a 38 or a 357. There's no rifling information on it. It certainly could have come from that same firearm that that bullet came from at the later date.
Q. Let me ask you with regard to any contamination on the bullet that was submitted to you in September of '01 by Agent Basler, what, if anything, did you note?
A. There was some damage to the bullet. Reference to the corrosion, there was none that was present on that particular

bullet.
Q. No corrosion on that bullet.
A. That's correct.
Q. And just so we know specifically what we're talking about here, we're talking about the bullet that came not from either of the graves but from several feet away from the grave submitted by Agent Basler the following year.
A. I believe so, yes.
Q. And again, no corrosion on that bullet.
A. That's correct.
Q. Now, sir, can you describe for us the general appearance of

♀

2799

a Tec-9? What kind of a weapon is it?
A. Again, an Intratec Tec-9 is a fairly large semi-auto pistol. It has a very large grip and frame which is actually made of plastic, a very long barrel and receiver combination, and it usually uses a fairly large magazine as well which can hold somewhere in the neighborhood of 25 to 30 rounds of ammunition. So it's much larger than most semi-automatic pistols.
Q. You indicated among composition was some plastic?
A. That's correct. The frame or the part that you would hang on to is made of a polymer or a plastic material. The receiver, the barrel, magazine, the bolt part that moves inside of the firearm is made of steel, a very hard material.
Q. And is it made of iron as well?
A. Iron is a main component of steel, yes.
Q. And just so we're perfectly clear, the Tec-9 isn't the only firearm that's made largely of iron, is it, that has a lot of iron in it?

A. Just about every firearm is going to be made of steel somewhere on that firearm. Just about every barrel that I've seen that's been manufactured has been made of steel, and it has to be that strong to hold up to all the pressures from the cartridge that's fired and to be able to hold up under the friction of the bullet that passes through the barrel as well.
Q. And frankly, again, just so that we're being perfectly

♀

accurate, if one were to find some melted iron, not only could it be from a Tec-9; it could be from virtually any firearm. And, in fact, it could be from any number of appliances and items we find throughout society that aren't firearm related at all, nails, farm implements, and the like; fair statement?
A. Yes, that's correct.
MR. MILLER: With the Court's permission, I'd like to publish what's already been received in evidence as Exhibit 40.
Q. Do you see the drawing in front of you marked Government Exhibit 40, Mr. Murillo?
A. Yes, I do.
Q. What does that show to you as a firearms expert?
A. This obviously appears to be a hand drawing of a firearm, and this particular drawing looks very, very similar to an Intratec nine-millimeter pistol.
Q. A Tec-9.
A. Yes, it does.
Q. And if we can show on split screen Exhibit 44B, what does 44B show, sir?
A. 44B is a photograph of the actual firearm, an Intratec Tec-9 nine-millimeter semi-automatic pistol.
Q. Mr. Murillo, looking at Exhibit 40, the hand-drawn picture

of a handgun, you've been in this business for 20 years or so?
A. Yes.
Q. Is that correct? And does the DCI laboratory keep what it

refers to as a library of firearms?
A. Yes, we do.
Q. How extensive a library is that?
A. Actually holds about 3,000 different firearm -- different makes and models of firearms. Approximately 1,900 of those are handguns; about 1,200 are long guns, rifles, or shotguns.
Q. Is there any make and model of handgun that looks more similar to the drawing in Exhibit 40 than a Tec-9, sir?
A. The Intratec Tec-9 is fairly unique in the way that it looks, and there are a couple of other manufacturers that have kind of taken on the manufacturing process of the Tec-9, but -- and they will look a lot -- very similar to the picture that we have here which includes AA Arms and Interdynamics. It's actually kind of the same company that was making these firearms. But there's no other manufacturer that produces a firearm similar to this.
Q. That's a fairly unique profile?
A. Yes, it's a fairly unique firearm in itself, has some really unique features which include the magazine which you can see on the bottom front portion of the frame and then the perforated heat shield, if you will, that sits outside of the barrel. It has the holes in it and is fairly unique to that particular firearm.
Q. And again, is there any make and model that looks any more similar to the drawing in Exhibit 40 than what you see there in

44B, the Tec-9?
A. No, there is not.
Q. Are you familiar with a firearm term the SKS?
A. Yes, I am.
Q. What's an SKS?
A. SKS is a semi-automatic rifle. It's actually produced by several Third World countries, China, Russia, Yugoslavia, some of the European countries are actually making this firearm or have manufactured it for quite some time. Again, it's a semi-automatic long gun. It's a rifle, so it's going to be quite a bit longer than any other handgun.
Q. And if we can substitute Exhibit 44B, please, with Exhibit 9B, and what does Exhibit 9B show, sir?
A. Exhibit 9B is a photograph showing a comparison between the Intratec Tec-9 which we've just shown in an earlier photograph which is on top in that photograph, and at the bottom of the photograph is an SKS, again, a semi-automatic rifle. It does have a magazine on the bottom of the fore end or the stock, but you can obviously see it's a firearm that's much longer in length than any handgun.
Q. The Tec-9 and the SKS have a dissimilar profile; fair statement?
A. Yes, it's pretty obvious that one is much longer, much larger in size than the other.
Q. Now, obviously the one that's pictured there has a wood

2803

stock. Are there occasionally those with plastic stock as well?
A. Yeah. Most of the firearms that I have seen, the SKSs, do have a wood stock. It's either light or dark in color. Those

can be replaced. You can buy aftermarket stocks that are made of synthetic material, plastic stock, if you will, several parts on the SKS that can be replaced with plastic or polymer.

Q. And does the use of a plastic or the replacement of a plastic stock change the profile or silhouette of the weapon significantly?

A. Not necessarily. The plastic or polymer stock that's used to replace this is going to be pretty much the same overall size as the wooden stock.

Q. Still a firearm that is not similar in appearance to the Tec-9.

A. That's correct.

Q. We can take down -- well, yeah, take those down. Can you just -- I believe you already described for us the appearance and to some degree the composition of a Tec-9. Can you describe what a Tec-9 is used for, sir? Is it a sporting weapon?

A. I don't think it was designed specifically for a sporting purpose. I mean, it's not really a hunting type of firearm. The only use that I can think of would be maybe some recreational shooting or possibly for security purposes, home security.

Q. Legitimate use.

2804

A. I'm sorry?

Q. Only legitimate use.

A. Yes.

Q. Mr. Murillo, in describing the manner in which a Tec-9 is loaded and operated, would it assist you to have a demonstrative Tec-9 safe -- in safe condition and unloaded, of course, but would that assist you in describing and showing to the jury how

a Tec-9 is loaded and operated?
A. Yes, it would.
Q. And how it functions?
A. Yes.
MR. MILLER: Your Honor, with the Court's permission, at this time I'd like to, for demonstrative purposes only, ask the witness to examine Exhibit 10.
THE COURT: You may subject to the objection previously made by counsel.
MR. MILLER: For the record, I've handed the witness Exhibit 10, a demonstrative exhibit.
BY MR. MILLER:
Q. And before you do anything else, Mr. Murillo, as an experienced firearm examiner, I know you already understand this, but for the record I want to make sure that the jury and everyone here knows that you are examining it first and foremost to make sure that it is in a safe and unloaded condition.
A. Yes, it is.

2805

Q. Thank you. Now, having done that, would you please explain to the jury -- using Exhibit 10 as a demonstrative exhibit, explain to the jury the manner in which that gun is loaded and operated.
A. Yes. Again, this is the Tec-9 pistol that we've been referring to just recently.
Q. I'm going to interrupt you just briefly, and I apologize, sir, but there is a yellow sticker and also a white plastic strip on the weapon. What are those?
A. Yellow sticker just designates the Government Exhibit Number 10. The plastic tie has been run through the barrel

which does not allow the weapon to be loaded, so it can't be discharged, can't be fired. It's just there for safety purposes.

Q. That plastic tie guarantees that it cannot be operated and fired in this courtroom in its present condition.

A. That's correct.

Q. With the exception of that plastic tie and the yellow exhibit sticker, is that Tec-9 as one would appear for use?

A. Yes.

Q. Thank you, sir. Please continue.

A. Again, as we mentioned earlier, several different parts of this particular firearm. The frame we mentioned earlier is made of polymer or plastic material. There's a receiver which is at the top of the frame, and it's made of steel. If you look

inside of the receiver, there is a bolt. Usually a semi-automatic pistol is going to have either a bolt or a slide that reciprocates or moves back and forth, and that's what cycles the ammunition in and out of the firearm. In this particular case it's a bolt. It's a cylindrical piece of steel that moves back and forth inside of the receiver.

Just to the left and connected to the bolt is a bolt handle, and that allows the user to manually move the bolt to the rear or allow it to go forward. There is a large spring on the back side of the bolt that always pushes the bolt to the forward position.

You can manually pull the bolt rearward which pushes against the spring, and that allows for examination through the ejection port which is this little window that you see on the right-hand side, and we can see down inside the magazine where

I'll see some of the internal working parts as well as if we look forward we can see into the chamber and see that there's obviously not a cartridge that's been chambered at this particular time.

The barrel, as we mentioned earlier, is on the front of the receiver. It's only about maybe five, six inches in length, and those are the general parts of that particular firearm.

Usually with the firearm is going to be a magazine. I think I mentioned earlier you can put several rounds of

♀

ammunition into this particular magazine. The cartridges are loaded against what is called a follower. There's a plastic piece at the top of the magazine, and there's a large spring along the length of the magazine. Every time I put a cartridge into the top of this magazine, it pushes the follower down and pushes against the spring inside of the magazine. We can continue to push cartridges one on top of the other until we stack them along the length of the magazine, until we've fully loaded the magazine.

Once we've done that, what we need to do is get a cartridge from the magazine into the firearm. There is a magazine well, a large opening at the front of the pistol just in front of the trigger guard and trigger, which allows for the insertion of the magazine. We just simply slide it into place, and it will lock in place.

In order to fire this particular firearm, now what we need to do is get one of those cartridges from the magazine into the chamber into a firing position. The chamber is located at the back end of the barrel, and we can do that by reciprocating

or cycling the bolt just as we did earlier manually. If I were to pull the bolt to the rear as far as I possibly can and allow it to go forward, the forward movement of that bolt will strip the top cartridge off of the top of the magazine and push it up and into the chamber at the back end of the barrel. So now that one cartridge is ready to be fired.

♀

When I move the bolt to the rear, I also cock the internal mechanism, firing mechanism, in the pistol as well. So now the gun's ready to be fired. All we have to do is simply pull the trigger which releases the firing pin or the hammer internally. I don't know if you heard that or not, but it clicked. You could hear it go forward.

Once we've done that, that fires the cartridge which is in the chamber. By firing the cartridge, a lot of pressure is built up inside of that cartridge. It burns all the powder that we talked about and the gunshot residue we talked about earlier. It creates a lot of pressure. That pressure pushes the bullet down the barrel and towards the target. All that pressure that gets built up in that cartridge case also pushes rearward. It pushes the bolt to the rear automatically, and in doing so, the bolt, when it moves to the rearward position, pulls the empty cartridge casing out of the chamber, and there's another metal piece inside of the gun which kicks the empty casing out of this ejection port.

So now we've cleared the mechanism of that empty casing by moving the bolt to its full rearward position under the pressure of the cartridge. We don't do it manually. But it's done automatically when that cartridge is fired.

Once the bolt moves all the way to the rear and that

casing has been extracted and ejected from the gun, the spring pressure behind the bolt will cause the bolt to go forward again

under pressure, and it loads the next cartridge off of the top of the magazine and into the chamber. We have to take our finger off of the trigger and pull it again to fire the next round. That's what a semi-automatic weapon does. You can only fire one round or one cartridge for each pull of the trigger. And we can continue to do this, just simply pull the trigger, let go, pull the trigger again for every cartridge that's fired in this particular firearm. And we can continue to do that until we've used up all of the ammunition in the magazine.

Once we've done that, the magazine can be removed. There's a magazine release lever just behind the magazine. We push up on it. The magazine comes out. Now we can insert another magazine or reload this magazine with more ammunition, insert it into the gun, and then start the process over again, manually load the first cartridge in.

Once we've done that, all we have to do is pull the trigger. The bolt under pressure will cycle all of the ammunition and fire the cartridges one at a time.

Q. And in order for that Tec-9 to be used and operated as a weapon, magazine has to be loaded and inserted into the weapon and, for each bullet fired, that trigger squeezed separately.

A. This particular weapon does not have to have the magazine in the gun to fire. It is possible to pull the bolt to the rear, manually drop one cartridge into the chamber. We can drop the bolt and fire one round. The bolt will cycle. The empty

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2451 of 3636

casing will be kicked out, but it won't load another round obviously if we don't have a magazine.

Q. In order to fire multiple rounds, one would need to have rounds loaded into the magazine and the magazine inserted into the weapon.

A. That's correct.

Q. And separately squeeze the trigger for each round fired.

A. That's correct.

MR. MILLER: Thank you, sir. I have no further direct.

THE COURT: Mr. Spies?

MR. SPIES: Thank you.

CROSS-EXAMINATION

BY MR. SPIES:

Q. Hi, Mr. Murillo.

A. Morning. Afternoon.

Q. Mr. Murillo, you've described for the ladies and gentlemen of the jury and for all of us this afternoon the operation of the Tec-9 and your conclusions about the bullet fragments that are in issue in this case, and as I understand from your testimony, you cannot say that any of the bullet fragments, Exhibits 504, 902, or 1005 came from a Tec-9.

A. I think we mentioned earlier it's only a possibility that it could have come from a pistol like this one.

Q. All right. It's equally possible that it could have come

from one -- as many as 20 other firearms that you've described in your report?

A. That's correct.

Q. I'm going to ask you a few questions about not only the operation of a pistol but of a revolver as well. The Tec-9 would be classified as a pistol; am I right?
A. It's a semi-automatic pistol.
Q. Right. And could you explain for us, please, the difference between a pistol and a revolver.
A. Yeah, a revolver is going to look fairly similar in size to a semi-automatic pistol. However, a revolver is going to have a cylinder, a round cylinder, that will rotate every time you either pull the hammer back or pull the trigger. It will rotate to a separate chamber. Usually the cylinder will have five or six chambers and will hold five or six cartridges at a time. Every time we pull the trigger, the cylinder rotates to a new cartridge, and it can be fired. The cartridge casing is not extracted and ejected at that time. Simply pull the trigger, the cylinder rotates to the next cartridge, the next available live cartridge, and it can be fired.
Q. So using a -- I'm sorry.
A. And we can continue to do that until we've fired all five or six cartridges in that cylinder. Once we've done that, we can swing the cylinder outward, empty all of the casings, and then reload the cylinder with fresh ammunition.

2812

Q. So using something that we might all be familiar with, the Lone Ranger's six shooter was a revolver.
A. Right.
Q. And you could spin the cylinder and put in the bullets and fire away.
A. Not always that easy, but yeah, very similar.
Q. All right. But you just identified one difference for us.

A revolver, the shell casing or the casing actually holds the bullet and the propellant that fires the bullet through the barrel of the gun; and in a revolver, the shell casing stays inside the cylinder of the gun?
A. That's correct.
Q. Until it's manually emptied out.
A. That's correct.
Q. Whereas with a pistol and particularly a Tec-9, with each firing of the gun, as you've described for us this afternoon, that shell casing is ejected out by an ejector mechanism.
A. That's correct.
Q. And just as you've been able to talk to us this afternoon about how you can identify bullets by the lands and grooves that are imparted on that bullet as it twists through the barrel of the gun, the ejector mechanism on a pistol also makes a mark on the cartridge, doesn't it?
A. That's correct.
Q. And so, for example, one thing that you've testified about

in other court cases and in other sorts of investigations you've been involved in, sometimes you can identify a cartridge case as coming from a particular firearm, that is, a particular pistol, by the marks that are made on the cartridge case by the ejector mechanism.
A. Not necessarily the ejector. There are some -- several different markings that are made on a cartridge case, the firing pin, breech face. Those are all markings that can be identified as having been specifically fired in a firearm. The extractor and ejector markings can indicate that a cartridge or a casing was cycled through the gun, not necessarily fired. It's

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2454 of 3636

possible to load a live cartridge into this gun, for instance, chamber it, and then pull the bolt backward. That would cause an extractor mark which pulls the casing out or the cartridge out, and we could put an ejector mark there as it shows the live cartridge out of the ejection port. Those markings would indicate that it was cycled in the gun but not necessarily fired. But you're right. There are several markings on a casing that can be identified or used to identify that particular casing to a specific firearm.
Q. Okay. And you just mentioned another thing for us just now about another marking that can show up on a cartridge case, and that's the firing pin impression made by the firing pin or the hammer in a firearm; right?
A. Right.

2814

Q. And the firing pin is the mechanism of the gun that hits the back of the cartridge to start the ignition process to make the explosion to propel the bullet out of the gun.
A. That's correct.
Q. And some guns have distinctive firing pins, don't they?
A. Well, every firearm should theoretically have a distinct firing pin. It should leave distinct markings, a unique set of markings on the cartridge case.
Q. Okay. And you've learned in your training and in the memberships in some of the organizations that you belong to that a Tec-9, some models of the Tec-9, semi-automatic pistol have distinctive firing pin impressions that they leave on cartridge cases.
A. That's correct.
Q. All right. Now, we've concluded that a revolver does not

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2455 of 3636

eject a cartridge case. A pistol or a semi-automatic pistol will eject a cartridge case each time it's fired.

A. That's correct.

Q. The exhibits that you were asked to identify and to examine at the laboratory were bullet fragments and not cartridge cases; am I right?

A. That's correct.

Q. I wanted to ask you just a couple of other questions about the bullet fragments that you've testified about this afternoon. You've described for us some of the general characteristics that

2815

these bullet fragments have. Did you also, Mr. Murillo, send some or all of these bullet fragments to the FBI laboratory in Washington, DC?

A. Yes, I did.

Q. And the purpose of your sending those bullet fragments to the FBI laboratory was to have them analyze the chemical composition of those bullet fragments to see if they had any distinctive chemical fingerprints, so to speak.

A. Yes.

Q. And you did that.

A. Yes, I did.

Q. And you got the results back from the FBI laboratory.

A. Yes.

Q. And as a firearms examiner and expert, the report you got back from the FBI is the type of report that you would rely on in reaching conclusions about the origin of these bullet fragments.

A. It could, yes.

Q. Okay. And am I right that the FBI reported to you that

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2456 of 3636

the -- that two of the three bullet fragments that were recovered from the Terry DeGeus burial site were indistinguishable -- chemically indistinguishable from one another?
A. That's correct.
Q. And that one of the bullets from the Terry DeGeus site was

different from the other two bullets in chemical composition?
A. That's correct.
Q. And that the bullet fragment from the Terry Nicholson (sic) skeleton was different from all the other three.
A. That's correct.
Q. You've testified for us that the bullet fragments could have come -- I think the bullet fragment Number 504 which was I think from the skull of Greg Nicholson could have come from a 38 Special revolver?
A. 38 Special cartridge.
Q. Yes. I'm sorry. And I think you said that a 38 Special cartridge could be fired in a 38 revolver?
A. That's correct.
Q. I think I said Terry Nicholson. It should have been Greg Nicholson.
A. I'm sorry?
Q. I think I said Terry Nicholson. It should be Greg Nicholson. Sorry.
A. Oh. I didn't catch it.
Q. Were you given any shell casings at all to examine in your analysis of the evidence in this case?
A. No, I was not.
MR. SPIES: Mr. Murillo, thank you for your time with

me this afternoon. I have no other questions.

THE COURT: Mr. Miller?

MR. MILLER: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. MILLER:

Q. Mr. Murillo, first with regard to the work that was done at the FBI laboratory, the lead analysis --

A. Yes.

Q. -- two of the three bullets recovered from the DeGeus grave were similar, and the third was different?

A. Yes.

Q. Okay. As well as the fragment from the Nicholson grave was different.

A. Yes.

Q. Does that tell you anything of any evidentiary significance as far as any conclusions you can draw that help us determine the origin of the bullets?

A. The two bullets that matched one another -- they had the same lead composition -- obviously indicates that those two bullets or at least the lead, the lead on the inside of those two bullets, probably came from the same source of lead, the same mass of ingots of lead.

The other two, however, probably came from a different source of lead. A different source of lead was used to make the lead core in those others, those other bullets that we examined. They're obviously chemically compositionally different than the first two. It's possible that those lead cores or the lead

fragments that we're looking that were different came from a different box of ammunition. It's possible it came from the same box of ammunition. I've looked at one box of ammo and seen -- or studies have been done where we've looked at one box of ammunition and had several different sources of lead in the lead bullets in that one box. So just because it's different doesn't mean it came from a totally different source or a totally different box of ammunition.

Q. And even in this case, the three bullets recovered from the DeGeus grave came from, if we can use the term, two different ingots of lead apparently?

A. Two different ingots of lead even though they're from the same manufacturer. They're all three Winchester bullets, same weight of bullet, same caliber of bullet. However, the lead source was different that was used to make the cores from those -- at least two of the bullets was different than the one or the third bullet from the grave site.

Q. And this is not unusual even among bullets taken from the same retail box.

A. That's correct.

Q. As to the cartridge casings, you've -- the five bullets and bullet fragments in front of you, the three from DeGeus's grave, the one from DeGeus's head, and the one from Nicholson's head, were all recovered from those two hidden graves; is that correct?

2819

A. Yes.

Q. Were there any shell casings recovered from either grave, sir?

A. No, not that I'm aware of.

MR. MILLER: Thank you. No further redirect.

THE COURT: Mr. Spies, any other recross?

MR. SPIES: No other questions necessary. Thank you.

THE COURT: Okay. You're excused.

MR. MILLER: May it please the Court. Your Honor, the United States rests.

THE COURT: Okay. Could I just see the lawyers at sidebar just so I can tell the jury about scheduling?

(At sidebar off the record.)

THE COURT: Members of the jury, I just wanted to confirm with the lawyers the game plan. Here's what's going to happen. We're going to bring you back tomorrow morning at 8:30. We'll have some -- in all likelihood have some evidence from the defense. We may finish tomorrow, but more than likely it will go into Thursday. And because the jury instructions are relatively long -- about 50 pages' worth -- and the closing arguments will take up the better part of a day, rather than trying to rush into the jury instructions and closing arguments on Thursday and then have you have several days before you come back to start your deliberations, the lawyers and I unanimously made the decision that we're going to have the jury instructions

2820

Monday morning and then final arguments Monday. I anticipate they'll go most of the day, so it's even unlikely that you'll begin your deliberations on Monday, although it's possible that you could begin your deliberations on Monday.

So that's the plan as it stands right now. I'll be the first one to let you know if there are any changes. That concludes the evidence from the government. So that concludes the evidence for today. And we'll see you tomorrow morning at

8:30.

Remember my cautionary instruction: Keep an open mind till you've heard all of the evidence in the case, had a chance to receive my final instructions, hear the closing arguments of the lawyers to summarize and interpret the evidence for you, and then go back into the jury room to begin your deliberations. So we'll see you tomorrow at 8:30. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated.

Mr. Rogers, are you going to be making the Rule 29 motion?

MR. ROGERS: Yes, Your Honor.

THE COURT: And are you going to be doing that orally, in writing, or both?

MR. ROGERS: Both.

THE COURT: Okay. Have you -- I checked before we came in here, and I don't think a motion had yet been filed or

♀

2821

at least it didn't show up on our --

MR. ROGERS: I think it has been filed since we came in here, Judge.

THE COURT: Okay.

MR. ROGERS: I also have a hard copy for your convenience.

THE COURT: Okay. Thank you. Mr. Rogers, would you have any objection if I suggest that we take a recess so I can read the written motion first before we have oral argument on it?

MR. ROGERS: That's fine.

THE COURT: Okay. And what else is on the agenda?

Mr. Williams, you're going to remind me to make my Rule 804(6) rulings along the lines of United States versus Bell and I think it was United States versus Irving or Irvine.

MR. WILLIAMS: And there also I think are a couple occasions of 80 --

THE COURT: Emory, excuse me, United States versus Emory.

MR. WILLIAMS: -- 801(d)(2)(E) as well rulings you're going to have to make.

THE COURT: Okay. So I'll have to make some Bell rulings as well.

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: Why don't we take that up after the Rule

29 motion.

MR. WILLIAMS: Very good.

THE COURT: And then I have some kind of odds and ends that I want to talk to the lawyers about related to mostly the penalty phase if there is one, and then also I want to start talking about the jury instructions, but I really don't want to do that till four o'clock this afternoon if that's okay. Is that going to be a problem to come back at four?

MR. WILLIAMS: No, Your Honor, not at all.

THE COURT: Or we can talk about them informally between now and four when we finish the other matters too.

MR. PARRISH: Do you need everyone back for that, Your Honor? I have witnesses coming in.

THE COURT: No, I don't.

MR. PARRISH: But I'll be happy to and just reschedule.

THE COURT: No, I think we can just actually have an informal conference on the jury instructions and make the formal record on the jury instructions -- probably wait till Thursday or so or maybe tomorrow if we have time when the defendant's present and everybody's here. But I did want to get the input from the lawyers after you reviewed the latest revisions. And we can kind of do that informally. Is that okay?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay.

♀

MR. WILLIAMS: Allow me if I could to raise now -- and that would allow Mr. Parrish perhaps to leave and work on other things -- there's going to be a couple evidentiary issues that I anticipate coming up with the defense case that I want to bring to the Court's attention at this time.

The defense apparently is going to be calling Mr. Billick, Mike Billick, as one of their witnesses.

THE COURT: How do you spell that?

MR. WILLIAMS: B-i-l-l-i-c-k I believe. Mr. Billick was interviewed in 1993, and in that report he relates a conversation that he had with Terry DeGeus -- it's hard to say when but sometime about a year before which would have been approximately December of 1992. In part of that conversation he claims that Mr. Billick -- I'm sorry, Mr. Billick claims that Mr. DeGeus told him that Mr. DeGeus was getting drugs from a source in Arizona, that Greg Nicholson was also involved, that Greg Nicholson was making some mistakes and he was going to be making a move to replace Mr. Nicholson at some point.

United States is going to object to any attempt by the defense to elicit that testimony from Mr. Billick as hearsay and

not properly admissible under 804(b)(6).

MR. PARRISH: I'll shorten the Court's time. I agree that's hearsay unless the Court was going to let me get it in.

THE COURT: Well, Mr. Parrish, I hate to --

MR. PARRISH: I won't jump to conclusions. Let me

2824

back up. Okay. I'll just be quiet.

THE COURT: Well, it's all news to me, so I wanted to think about it. Just query here, why isn't it an 801(d)(2)(E) statement? It's made -- because it's not made in furtherance of? It's made in the scope. The conspiracy was still going on back then according to the government allegations in the indictment.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: And according to the government's theory, DeGeus is a co-conspirator of several other folks including the defendant here, so why doesn't it come in as an 801(d)(2)(E) statement?

MR. WILLIAMS: I don't believe it is in furtherance of the conspiracy. What he intends to do is allegedly replace somebody else in the conspiracy. I don't know if that really fits as in furtherance of the conspiracy.

THE COURT: Would you agree that it's in the scope of?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. So the question becomes whether it's in furtherance of. And, for example, if he's talking to Billick about it to see if Billick knows anybody, then it's in furtherance of, so it depends upon the context in which it's stated to Billick. But it certainly is not beyond the realm of possibility that it's made in furtherance of the conspiracy.

MR. WILLIAMS: It's not beyond the realm of

possibility, but in order for it to be made to Billick in furtherance of it, there would have to be some motive for why he's telling Billick about his intent to, in theory, replace Mr. Nicholson. And that is the link that's missing.

THE COURT: Well, but -- okay. Let's talk about that. While I don't know what Billick is going to say so it's hard to know, but that's not -- it doesn't seem to me that's the kind of idle conversation that one would just drop in the course of talking about the weather and sports, that depending upon the context it could have been made as a kind of recruiting statement to Billick. Otherwise what's the purpose of telling Billick?

MR. WILLIAMS: Bragging.

THE COURT: Pardon me?

MR. WILLIAMS: Bragging, Your Honor.

THE COURT: Well, there's a lot of bragging that have been in 801(d)(2)(E) statements that I've admitted in the government's cases over the last ten years. You'd agree with that, wouldn't you?

MR. WILLIAMS: Well, certainly when the bragging is in order to recruit or encourage or something along those lines some other member of the conspiracy, yes. But there is no showing -- and I don't know. Again, Your Honor, I'm raising this as an issue. It certainly depends on the context in which it comes in. I wanted to alert the Court this may be an issue.

I didn't want you to be caught by surprise.

THE COURT: Yes.

MR. WILLIAMS: If the testimony is Billick was somehow being recruited or was a member of this conspiracy and the statement was made to him to participate in the conspiracy with Mr. DeGeus, then I would say it was in furtherance of the conspiracy.

THE COURT: Well, it doesn't even have to go that far. If it was made to simply kind of float the idea, do you know anybody who I might be able to recruit, then it's made in furtherance of the conspiracy. And unless I misheard you, Billick doesn't have to be part of the conspiracy.

MR. WILLIAMS: No, I'm not saying he -- and maybe I misspoke. I just used that as an example of one way in which the context could make it in furtherance of the conspiracy.

THE COURT: But would you agree with me it's kind of an odd statement to have made in just casual conversation?

MR. WILLIAMS: Unless they are friends and he's bragging, yes. I mean, it's certainly something that could be in furtherance, but we just need the context in order for that to be established, and I just wanted to alert the Court that this is an issue. We have to wait to see how the context comes out, but I didn't want you to be surprised when I jumped up and objected --

THE COURT: Right.

2827

MR. WILLIAMS: -- and why I didn't raise this issue earlier. This way you can be alerted to what the context is as it comes up.

THE COURT: Okay. And depending upon the context,

then you won't be surprised how I might rule.

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: But it all depends upon the context.

MR. WILLIAMS: Absolutely.

THE COURT: Right.

MR. WILLIAMS: Yeah, absolutely. It's under 802 -- 801(d)(2)(E). I don't think under any circumstances it comes under 804(b)(6) because 804(b)(6) is only admissible when offered against the party. In this case it's being offered by the party. 804(b)(6) reads --

THE COURT: Yeah, forfeiture by wrongdoing.

MR. WILLIAMS: Right.

THE COURT: Yeah, it would be hard to believe that the rule was intended for this purpose.

MR. WILLIAMS: Right.

THE COURT: Right. I didn't hear the defense suggest otherwise.

MR. WILLIAMS: No, I don't think so. The only other area I wanted to touch on with you is -- and I'm not sure where the defense is going on this. But just to alert the Court that we may have an issue here, they have requested a file from the

♀

2828

Woodbury County Jail concerning the defendant's stay there from 1996 roughly to 1998.

In that file -- I just started to review a copy of it that was provided to me as well -- there are a number of letters and statements -- I'll give you an example. There's a letter from Mr. Parrish claiming that he had a conversation with his client who claims that inmates are looking through his mail, and the letter now requests the Woodbury County Jail to do something

about that.

The government's position is there's going to be a number of things in this file that are hearsay and hearsay upon hearsay that we're going to be objecting to or believe are inadmissible. And again, I just wanted to alert the Court -- I don't even know if the defense is going there, but I wanted to alert the Court that may be an issue, and I didn't want you to be caught by surprise again.

THE COURT: I appreciate the heads-up. Are you going to try and offer the entire file?

MR. PARRISH: I am not. Matter of fact, Your Honor, what's interesting about Mr. Williams' preemptive objection here is that we asked him on several of these witnesses as we had that hearing in front of Judge Zoss that that's part of the problem of what we're having. They said they had this material in their discovery file. We're finding out as we subpoena the documents they didn't get the material any more than we got the

2829

material, and we've been working with the sheriff's office trying to get the material and review it. And I provided them copies of the material that was just passed to me last night by Lieutenant Redden.

THE COURT: So you actually got some new material that wasn't contained in the government's discovery file.

MR. PARRISH: Exactly.

THE COURT: Did the government represent that they were giving you -- that what was placed in the discovery file was the entire file?

MR. PARRISH: They thought they had it. Mr. Williams said today that he was a little disappointed because maybe they

didn't give us all the material that they thought they had given to him.

THE COURT: Do I understand that they gave you everything they had, but it turns out they didn't have everything?

MR. PARRISH: That's exactly right.

THE COURT: Right.

MR. WILLIAMS: We had previously requested from the Woodbury County authorities what they had on Dustin Honken, and they interpreted that to mean apparently only a portion of the file they had on Dustin Honken, not the entire file, and so they provided us with a portion of it, apparently not the entire thing.

♀

THE COURT: Are you going to be able to get through that file because --

MR. PARRISH: We're going -- she's had it ready at 12 noon. Julie's going to go over right away and pick the rest of it up because she only provided us part of the file. Then I started looking at the material I had from '96, and I said, Well, here's some stuff here that had '96 that's not shown in your file. She then acknowledged she made a mistake in it. She said she'd have the whole thing ready. She came in early this morning and started making a copy. I'm going to narrow down just some of the pertinent parts we want to introduce that they've opened the door with regard to the escape that I'm not sure the government even knew existed until this morning.

THE COURT: Okay. And, you know, if you need additional time to look at it, you can come back and ask for some time because you're entitled to -- this is not how it

should have happened. I'm not trying to blame anybody.

MR. PARRISH: Right.

THE COURT: But you should have had all this before the trial, and you got a lot going on right now, so if you need additional time, you just come back and ask.

MR. PARRISH: I think we can get ready, Your Honor. She did apologize for the mistake. The government thought they had it. Turned out they didn't have it either. So I'm not blaming them for it. But we're going to just try to get ready

for this stuff tonight, and I think we can.

THE COURT: Okay. What else?

MR. WILLIAMS: That's it, Your Honor.

THE COURT: Okay. Why don't we take a 30-minute recess and come back at 2:15 and take up the defendant's Rule 29 motion. Now, are all of the lawyers and Mr. Honken going to be here, or, Mr. Parrish, are you going off to pursue other matters?

MR. PARRISH: I think I can be here. What time are we talking about? Half an hour?

THE COURT: Thirty minutes.

MR. PARRISH: Oh, absolutely. I can be back.

THE COURT: Okay. Well, if you're not back, you want us to not start without you?

MR. PARRISH: You can go ahead and start without me.

THE COURT: You sure?

MR. PARRISH: I'm positive.

THE COURT: And is that okay with Mr. Honken?

THE DEFENDANT: (Nodded head.)

THE COURT: Okay. He indicated yes. Thank you.

We'll be in recess.

(Recess at 1:46 p.m.)

THE COURT: Please be seated. I'm sorry I'm late, Mr. Rogers, but I was on the phone with Judge Patti Saris from Boston who chairs our Defender Services Committee, and we're

working on a response to Chief Judge Loken's guidelines in CJA cases, so that's why I'm late. And I wanted to say I've now been a United States District Court judge for a little over ten years. I have never had a written Rule 29 motion presented to me, and it's particularly impressive in this case because you're not at your office, and it's harder to do it away from the office. But I appreciate the fact that you took the time to put it in writing.

MR. ROGERS: Thank you, Your Honor. And hopefully it will shorten up the oral part.

I want to talk about the conspiracy murder counts and the CCE murder counts because I think that that is the real shortfall in the government's proof in this case starting with the -- I mean, Mr. Honken is charged with killing each of five people three different times, three different ways or in violation of three different statutes. And I think it would be disingenuous to say that there's not evidence which, if believed, would not -- would warrant a finding with regard to witness tampering murder.

But with regard to the conspiracy murder, the evidence is pretty clear --

THE COURT: Now are we talking Counts 8 through 12 just to be clear?

MR. ROGERS: Yes, Your Honor.

THE COURT: Yeah, okay.

MR. ROGERS: And if believed, the government's evidence has shown that Mr. Honken was involved with Jeff Honken and Tim Cutkomp making meth in Arizona, that the meth would be brought to Iowa, would be distributed by Terry Nicholson -- or excuse me, Terry DeGeus, Greg Nicholson.

But the evidence is also clear from Mr. Cutkomp and from Jeff Honken that that conspiracy came to an end early in 1993, that Mr. Cutkomp testified that he decided to get out of the meth business, that he was going to move back to Iowa and get a real job, and that he told that to Mr. Honken and to Jeff Honken, that the meth that was found in Nicholson's basement at the time of his arrest was, in fact, their last batch. They took down the lab. They dismantled it. They broke a lot of glassware. They took some items and put them in storage.

Cutkomp himself, not -- unbeknownst to Mr. Honken apparently took some of his personal effects and took them to Miss Friesenborg's apartment, and with that he also had some items which had been used in the manufacture of methamphetamine, but he just left them there because he didn't want to take them back to Iowa with him, and he was, according to his own testimony, done with that.

Mr. Honken comes to Iowa and is arrested shortly after Greg Nicholson is arrested in March of 1993.

After that arrest nothing happens with regard to the manufacture or distribution of methamphetamine until at least

1995 and probably 1996. Those are the objectives of the charged

conspiracy in the conspiracy murder counts. Counts 8 through 12 are the manufacture and distribution of methamphetamine. And the Arizona part of it by the government's own evidence is over at that time and certainly has not been resumed at the time that Greg Nicholson and the Duncans disappear or at the time that Terry DeGeus disappears.

Let's look at the government's other evidence as to the motives for those murders, what they claim Mr. Honken has told various people. There has not been a single witness who has come in here and said, Dustin Honken told me he killed these people so he could keep on making meth, keep on selling meth, nobody. What has the evidence been from witness after witness after witness? Killed them because they were rats. Killed them because they were witnesses. I killed my rats. Everybody should kill their rats.

The only evidence of motive produced by the government in their case for those murders has been evidence of witness tampering murder, not evidence of murder in furtherance of or while engaging in a drug conspiracy.

That same argument applies to the CCE count because if there ever was a CCE, it was also over when people left Arizona or certainly when people were arrested with the product of the last batch of methamphetamine.

But there's other problems with their CCE murder

counts.

THE COURT: Well, let's stick with the conspiracy murder.

MR. ROGERS: Okay.

THE COURT: Isn't the question -- I think you

acknowledge this in your motion. Isn't the question of whether there's one conspiracy or multiple conspiracies a fact question for the jury?

MR. ROGERS: Yes, it is, and I cited the Maull case, and there are zillions of cases that say that. But for it to be a fact question for the jury, there has to be evidence from which the jury can find -- which a reasonable jury can find beyond a reasonable doubt in favor of the government. I mean, yes, it's a fact question, but there has -- just like the guilt or innocence of the defendant is a fact question. There still has to be evidence from which a jury can find him guilty before you can submit them.

So even though it's a fact question for the jury does not mean that it's not subject to analysis under Rule 29 on whether there's sufficient evidence to support the government's theory of the facts.

THE COURT: But let me ask you this. Don't you think the jury could find -- and maybe it's not the government's theory -- but that the jury could find that Mr. Honken and Angela Johnson were engaged in the concealment portion of the

2836

'93 conspiracy and that that was in furtherance of that conspiracy even though others may have dropped out earlier? What's wrong with that theory? Now, I don't mean to speak for Mr. Williams but . . .

MR. ROGERS: Other than the fact that the evidence doesn't support it?

THE COURT: There's no evidence to support that in your view?

MR. ROGERS: Right, as distinguished from killing

people because they're witnesses or potential witnesses. How does that --

THE COURT: Well, they're potential witnesses in the '93 conspiracy.

MR. ROGERS: But in 1993 killing a potential witness is prescribed by a particular statute that has its own range of punishment, not the same as the Title 21 murder-while-engaged-in-a-conspiracy statute. And while engaged in the conspiracy, I don't know that for the purposes of the murder statute that applies after the active conspiracy is over and the objectives of the conspiracy are either achieved or abandoned as opposed to the concealment of a past conspiracy. It has to be contemporaneous in time with the actual conspiracy to be murder while engaged in. That's what the word "while" means.

THE COURT: What else do you want to argue?

♀

MR. ROGERS: I want to talk about CCE.

THE COURT: I thought you did. Thank you.

MR. ROGERS: Can I talk about CCE now? For CCE the basic thing is you have to have one supervisor and five or more supervisees, organizer, manager --

THE COURT: For a total of six; right?

MR. ROGERS: For a total of six.

THE COURT: Or more.

MR. ROGERS: When we were having our informal conference about instructions, the government indicated that the people they were talking about were Mr. Honken obviously, Jeff Honken, Tim Cutkomp, Terry DeGeus, Greg Nicholson, Angela Johnson. Either they are contending that Mr. Honken is the

organizer, supervisor, manager of the other five people or that one of the other five people is the organizer, supervisor, and manager of the other four and Mr. Honken, and I -- those are apparently alternative theories. And I think either one fails.

First of all, Angela Johnson is a real problem there because the evidence is not -- is that not until after the activities in Arizona are disbanded and Cutkomp and Mr. Honken come to Iowa for the last time is Angela Johnson involved.

The evidence from Mr. Ryerson I believe it was is that Angela -- that Terry DeGeus told him that he sent a woman to do a man's work. He sent Angela to conduct business with Mr. Honken on his behalf. Angela somehow negotiated with

2838

Mr. Honken a substitution of herself for DeGeus. That's after the Arizona aspect of things is over with.

It also never really came to any fruition because there was never any product for Angela to distribute because it was stored at Greg Nicholson's house and he got arrested.

The other key component that is missing to the theory that Dustin is the one engaging in the CCE is there is absolutely no evidence that he organized, supervised, or managed Jeff Honken. In fact, the evidence is completely to the contrary, that Jeff was calling the shots and telling Dustin what to do and later, when Tim came up, telling Tim and Dustin what to do. He's the one that tells them, Get out of this house. He's the one that tells them, You gotta get out in the country. He's the one that rents the properties. He's the one that gives them money to buy things. He's the one that tells them where to do it.

He even has to take them there because neither of them

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2476 of 3636

have transportation. They're stuck out in the boondocks someplace in Arizona in the middle of the desert, and Jeff drives down every week or so with a load of groceries to see how things are going.

If there is anybody who is an organizer, manager, or supervisor of others at that end of things it is Jeff Honken organizing, managing, and supervising Dustin and Tim Cutkomp.

Then the problem is there's no connection whatsoever

shown between Jeff Honken and anybody in Iowa. He's not organizing, managing, or supervising Greg Nicholson. He's never heard of Greg Nicholson. He's not organizing, managing, and supervising Terry DeGeus. He knows Terry from growing up in the same town, but he has no idea that Terry is involved in distributing the methamphetamine the state's -- the government's evidence shows was manufactured in Arizona.

Most significantly, no evidence whatsoever that in any way Jeff Honken organized, supervised, or managed Angela Johnson ever for anything.

So I think the CCE, even though it obviously was over before the Duncans and Mr. Nicholson and obviously Mr. DeGeus disappeared, I don't know that there ever was a CCE as the statute defines it and as it's required, and certainly the government has not proven beyond a reasonable doubt that there was, in fact, a CCE where there was one chief and five underlings.

So since they cannot show the existence of a CCE, they certainly can't show that Mr. Honken was engaging in the CCE and that these murders were somehow connected with that, and they cannot show that Mr. Honken was working in furtherance of the

CCE and that these murders were connected with that.

What we have here, Judge, is a case which, if the government had available in 1993 the evidence that it has shown in this courtroom, would support only charges of witness

tampering murder, and those are the only charges -- with regard to the homicides, with regard to the homicides which I think they've made a submissible case to submit to this jury, and that focuses the issue not on what happened but on did they prove that he did it. And I think that's what the actual question of fact for the jury in this case is. Thank you. Any other questions by the Court?

THE COURT: I don't at this time. Thank you. And I'll make an exception to my World Federation of Wrestling tag team rules if either Mr. Parrish or Mr. Spies would like to -- I know I didn't give you advance notice that I'm waiving my rule, but if you want to jump in now or even after Mr. Williams and Mr. Rogers reply, you feel free. Neither one are shy, so feel free to jump in if there's anything you want to add. Anything you'd like to add at this time?

MR. PARRISH: Not at this time, Your Honor.

MR. SPIES: No thank you.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor. I will take them in the order they were discussed by Mr. Rogers.

First of all, the conspiracy counts, Counts 8 through 12 of the superseding indictment, there is one conspiracy and certainly sufficient evidence for the jury to make that determination on whether there's one conspiracy or multiple conspiracies and for a number of reasons, and I'll go through

those not the least of which, number one, is that the defendant pled guilty in 1997 to engaging in a conspiracy to distribute methamphetamine covering the dates 1992 to 1996.

Second, we look at the tape, undercover tape, that was recorded between Mr. Nicholson and the defendant when he makes the delivery of methamphetamine -- I'm sorry, when he picks up the cash for a prior delivery of methamphetamine from Mr. Nicholson in March of 1993. And during that recorded conversation, the defendant makes explicit statements about his full intent to continue the operation after that date. He talks about future payments. He talks about future shipments. He talks about once we get past this hump I'm only going to come up about once a month.

Number 3, after his arrest, the lab equipment, the meth lab equipment, is not destroyed but stored until they believe they might get apprehended, and then they choose to destroy it or have it destroyed to keep it from falling into the hands of law enforcement.

But when Mr. Cutkomp comes back to Iowa thinking he's going to get out of this conspiracy, they store the lab equipment. They don't destroy it. They don't shut down the operation. And that's consistent with the defendant's recorded statements with Mr. Nicholson, that he has absolutely no intent in March of 1993 of stopping his methamphetamine distribution no matter what the temporary intent was of Mr. Cutkomp.

Four, after his arrest in March of 1993, Mr. Cutkomp

testified that the defendant spoke with him about manufacturing methamphetamine again so he could raise money so he could properly defend himself and hire a lawyer against these charges.

Number 5, toward that end, the defendant talks Mr. Cutkomp into making trips down to Arizona for the purpose of purchasing chemicals for the purpose of manufacturing methamphetamine. The first of those trips takes place in the summer of 1993 before the murders take place, and Mr. Cutkomp doesn't go through with that trip and ultimately makes another trip in which he does in the fall of 1993 or in the winter of 1994 purchases chemicals for the purpose of manufacturing methamphetamine, brings them back to Iowa and stores them at the defendant's father's house.

Number 6, the defendant and Angela Johnson in 1994 make their own separate trip down to Arizona for the purpose of purchasing chemicals to be used in the manufacture of methamphetamine.

Number 7, the defendant kills five people in order to conceal the conspiracy that he had already engaged in and was continuing to engage in.

Number 8, he melts down a weapon again to conceal the crime that he has committed in furtherance of this conspiracy.

Number 10 (sic), the defendant and Mr. Cutkomp then set up a mail drop box with Mr. Cobeen in 1995, in the fall of

1995, down in Des Moines for the purpose of receiving additional chemicals and equipment for manufacturing methamphetamine.

And number 11, in 1995 and continuing into February of 1996, the defendant engages in experimentation and begins the manufacturing operation which ultimately ends up in his house.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2480 of 3636

In February of 1996 he's arrested. And so the conspiracy -- there's certainly enough evidence for this jury, for a reasonable jury, to find that the conspiracy never ended; that while Tim Cutkomp for a brief period of time thought he was going to get out of this conspiracy, he found himself back into it; that the defendant never intended to stop the conspiracy to manufacture methamphetamine; and that he took steps throughout the time period from 1992 up until 1996 to manufacture and distribute methamphetamine without stop.

Jeff Honken may or may not have gotten out of the conspiracy in 1993 after the defendant's arrest. I think that's unclear. There was additional loans made to the defendant, and the jury could reasonably find that Jeff Honken was minimizing his own involvement and intended to further --

THE COURT: What if he did get out? What's the effect, if any, of that?

MR. WILLIAMS: None. It would have no effect on the conspiracy. Members can join or leave a conspiracy at any time. The conspiracy doesn't cease to exist as long as there's some original members continuing. In this case we have Mr. Cutkomp,

the defendant, and Angela Johnson throughout this time period.

In his written motion, Mr. Rogers suggests that Angela Johnson had no real involvement in this other than being a customer, and I think the evidence is to the contrary in several respects.

Number one, her involvement in these murders helped to conceal the conspiracy, was part of the conspiracy, and certainly that was an aid of the conspiracy more than simply being a customer.

Number two, she made trips with the defendant to purchase chemicals for manufacturing methamphetamine.

Three, she financed the meth conspiracy, manufacturing attempts in 1995, and also allowed her house to be used for that purpose. So that's my response to the conspiracy counts.

With regard to the CCE counts, Counts 13 through 17 of the superseding indictment, the government's allegation is this, that the defendant was the organizer of five or more people in furtherance of a drug conspiracy, continuing criminal enterprise.

We don't allege that Jeff Honken was an organizer, manager, or supervisor, nor do we allege that the defendant was a manager or supervisor of five or more people. We do allege -- and I think the evidence shows -- that he was an organizer of five or more people involved in this continuing criminal enterprise. Those people are Jeff Honken, Tim Cutkomp, Angela

2845

Johnson, Greg Nicholson, and Terry DeGeus.

The evidence demonstrated a number of things that shows that the defendant organized this operation. The testimony from Tim Cutkomp and Jeff Honken was that it was the defendant who recruited them to participate in this operation. It was the defendant who went to his brother Jeff to ask for money to finance the operation. It was the defendant who recruited Tim Cutkomp to come down to Arizona to participate in manufacturing of methamphetamine.

It was the defendant who decided what drug was going to be manufactured. It was the defendant who decided the method in which the drug was going to be manufactured. It was the defendant who determined what chemicals and equipment were

needed in the manufacturing process. It was the defendant who determined who he was going to use as sources -- I'm sorry, as distribution channels for the drug back in Iowa, that being namely Terry DeGeus and Greg Nicholson.

It was the defendant who determined the amount of drugs that were going to be shipped back to Iowa. It was the defendant who determined the quantity of cut that was going to be sent back with those drugs to be cut.

It was the defendant who decided and arranged with Mr. Nicholson to use his house as a store location for further distribution. It was the defendant who kept track of the amount of money that was owed by the distributors in Iowa for the

♀

methamphetamine that was distributed up in Iowa. It was the defendant who determined that he was going to allow Angela Johnson to bypass one of his distributors, Terry DeGeus, who was behind in bills.

It was the defendant who organized the manner in which the witnesses in this case were going to be murdered in order to conceal the conspiracy and the drug organization. It was the defendant who determined to use and recruit Mr. Cutkomp to help him destroy the weapon used in those murders. It was the defendant who organized or made the decision to use his lawyer in an attempt to evade apprehension by getting this tape made of Mr. Nicholson and to try to use Tim Cutkomp as the source for that tape, as the foundation for it.

It was the defendant who recruited and organized the trips to Arizona between 1993, the summer of 1993, and 1994 both by Mr. Cutkomp and by himself and Angela Johnson. It was the defendant who determined how to and where to store those drugs

and chemicals -- I'm sorry, the chemicals when they were brought back from Arizona in 1994 -- I'm sorry, 1993, 1994.

It was the defendant who again decided what they were going to attempt to manufacture back in Iowa in 1995, and it was the defendant who recruited Mr. Cobeen to participate in this effort, and it was the defendant who actually gave explicit instructions to Mr. Cutkomp at least once that we have a written envelope in which he gave instructions.

♀

But it's the defendant's role in organizing this operation, not in the direct supervision, not in the management, although management could also come into play. But certainly in the way this thing was organized, how it was set up, who was going to occupy what role, the evidence is sufficient for a reasonable jury to come back and conclude the defendant was an organizer of five or more people in furtherance of the conspiracy.

In his written motion, Mr. Rogers indicates that DeGeus was nothing but a customer. I think the evidence is contrary to that. The quantities, first of all, that were provided to Mr. DeGeus were distribution quantities as testified to by Special Agent Mizell. The quantities -- I'm sorry. The drugs were fronted to Mr. DeGeus which encompasses, as explained by the agents, the expectation those drugs are going to be further sold, not just consumed in order to create additional sales of the drugs so that he could be repaid. And the amount of money reflected in the drug notes owed by Mr. DeGeus to the defendant are consistent with the fact he was distributing for the defendant, not simply a customer of him, and that the financial arrangement was such that there was an understanding

he was going to sell those drugs and then return payment back to the defendant.

During the argument by Mr. Rogers, he indicated that Angela Johnson's a real problem. He said that Angela Johnson

did not become involved in this thing until the case was dis -- until the conspiracy was disbanded and after the defendant's arrest in March of 1993.

Again, I think the evidence is to the contrary on that, certainly sufficient for a jury to reach the conclusion that she was involved earlier than that. The testimony was that Angela Johnson became involved some time in the winter of 1992, 1993. By March of 1993, she's sleeping with the defendant and staying in the hotel room with him on the day of the arrest. It was before that that she made a cash delivery of drug proceeds on behalf of Terry DeGeus at which point she made the move to step into his place in the organization.

Again, it is a conspiracy. It's the agreement to engage in illegal conduct that is illegal, not any overt acts. So even assuming for the sake of argument that no other further act took place before the arrest, she still at that point has agreed to participate in a drug organization with him based on the evidence.

But she does more. Not only does she do that, she also then helps to purchase a firearm for the defendant. The government's evidence is sufficient for a reasonable jury to conclude that she did that at the defendant's behest. It was the defendant who knows about firearms, the defendant who's a firearm nut, the defendant who has firearms magazines in his locker.

It's reasonable for a jury to conclude it was the defendant who walked into that pawn shop with Angela Johnson and chose the weapon of choice that he thought would be useful for him in committing these murders. Angela Johnson is assisting him and continues to assist him through the murders and also continues to assist him in obtaining chemicals, financing the meth operation, and storing drugs -- I'm sorry, chemicals for use in manufacturing methamphetamine at her house.

So the government submits that there's more than sufficient evidence for a reasonable jury to find that the defendant is the organizer of a continuing criminal enterprise of five or more people, and the government would ask the Court deny the defendant's Rule 29 motion. Thank you.

THE COURT: Mr. Miller, the tag team rule has reciprocity to it, so is there anything else you'd like to add?

MR. MILLER: I appreciate that very much. No thank you, Your Honor.

THE COURT: Okay. Mr. Rogers?

MR. ROGERS: I'll yield to Mr. Parrish on the tag team.

MR. PARRISH: I'll be real quick, and you probably won't believe that, but I will be.

This motion has gravitas. It's not made in jest. It's not made as a motion to file just to file, and I'll tell you why.

♀

Frankly let us concede for the purpose of this argument but for nothing else that everything the government has

said with regard to two dates which are operative in this case to get to the counts they want to get to, clearly the death penalty counts, the two dates are July 5 -- I'm sorry, July 25, 1993; the other operative date is November 5, 1993. What existed of the conspiracy on that date?

Mr. Williams says, Well, it doesn't make any difference if Jeff was involved at that point or not. Well, it does when you go to the CCE and you have to have the five people involved. And it does go -- you have to take in consideration all of their evidence at this point. Nothing existed with regard to the conspiracy by every witness's testimony. That includes Tim Cutkomp, their main witness. He was in Des Moines working where? At this plant, heating plant, at that time. No evidence of any methamphetamine being produced by anybody. The last known production goes all the way back to Arizona in February where Mr. Cutkomp was out there by himself. No exchange of money was taking place at this point on these dates.

Now, let's go to one critical point that the government must rely on to get to this point: The tapes. Assuming that the tapes were not fuzzy in any way and assuming that you can give the best interpretation to the government which the Court must do at this point, what do the tapes say? If he did this according to the government's theory, he did it

because of his family which does not move it under the CCE or move it under the other conspiracy.

He did it -- even if you take the fact that he was not trying to get Tim Cutkomp to calm down and not go nuts on him, he did it not to continue manufacturing. If you look at every single word of the tape from the transcripts which I've listened

to a thousand times, not one time does he say, I did this to remanufacture or to continue to manufacture methamphetamine or to cover up this methamphetamine.

As Mr. Rogers has said much better than I could ever say it, if it's anything, it's pure, old-fashioned, before-1994 witness killing if you give them their best interpretation. There's no other way they can get around it.

They say, Well, Jeff is not important. They have to have Jeff included in it to make the five, and they say, Well, the operative word is supervising, not organizing. Then where is the organization testimony? Does it come in when Angie delivers for DeGeus $10,000 when they meet in the hotel in Mason City? Does she become an organizer at that instance when they have sex? Or what other evidence do they have in the record to support he organized her in any shape, fashion, or form? Nothing.

So at this juncture of Rule 29, the Court has to give them every benefit, and obviously I'm going to make an opposite argument on those issues and how they affect the evidence

2852

including all of the other factors that come into play, but right now this is all they're entitled to. And if you give them that -- what they're entitled to, there's no way they get past the CCE or the conspiracy.

Now, I know what the Court perhaps is thinking. Well, we got that '93 plea that I fought so hard with Mr. Colloton not to get that goes back to '92, and that's the argument that they made --

THE COURT: It's the 96 plea.

MR. PARRISH: '96, right, the '96 plea that makes the

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2488 of 3636

conspiracy go -- and I understand the Court's thought on this. The Court is saying you're not even giving that to the jury as a question. They can't use that base plea because then you get into your double jeopardy issue. So they're going to have to jump around that, dance around that to get to that point because they can't use his plea.

THE COURT: Well, isn't the plea in evidence?

MR. WILLIAMS: It is, Your Honor.

THE COURT: And you can use the plea.

MR. WILLIAMS: Certainly.

THE COURT: And it's not double jeopardy at least based on how I ruled in my pretrial ruling. It may ultimately turn out to be but . . .

MR. PARRISH: If they do use it, it then is double jeopardy if it's part of the basis of their -- but I understand

♀

the government's argument on it. They're saying, Well, there's something else out there. But even Tim Cutkomp again -- and this is kind of an operative fact here -- talks about a new agreement to start manufacturing in 1995, clearly two years later where -- a new agreement where he splits it 50/50. That's their evidence. That's what they've presented.

So, Your Honor, I think --

THE COURT: It was either a new agreement or it's a substantial modification of the division of the proceeds of one continuous conspiracy.

MR. PARRISH: Right. And as Mr. Rogers pointed out in his motion, they tried to do a growth hormone thing totally separate from methamphetamine. Then they tried to manufacture this hallucinogen totally separate. And I don't think, Your

Honor, those are jury arguments. Those are pure legal arguments that they can't jump through the hoop on. It's a pure Rule 29 that cuts out ten of these charges. And I think, Your Honor, it has gravitas. That's all I wanted to add to that.

THE COURT: Mr. Spies?

MR. SPIES: It does not require many words to speak the truth, and I think my counsel have done it.

THE COURT: You can't vouch for the credibility of witnesses, but you can always vouch for the credibility of co-counsel; right?

MR. SPIES: With gusto.

THE COURT: Mr. Rogers?

MR. ROGERS: I'll accept the voucher of Mr. Spies, Your Honor, and have nothing else to say.

THE COURT: Mr. Williams?

MR. WILLIAMS: Yes, Your Honor. If I could just respond very briefly to that, number one --

THE COURT: Can I ask you a question first?

MR. WILLIAMS: Oh, certainly.

THE COURT: Do you have to have five or more in the CCE at the time of the murder?

MR. WILLIAMS: No. All we have to prove is that a CCE existed.

THE COURT: Existed with five or more.

MR. WILLIAMS: That's correct, and the five or more don't even have to be -- he does not have to organize all five or more even at the same time. We could have a drug conspiracy where people come and go, but as long as during the course of the conspiracy he organizes, supervises, or manages five or more

people, that's sufficient.

THE COURT: And what case stands for the proposition that you don't have to have five or more at the time of the CCE murders?

MR. WILLIAMS: By definition of the statute and also -- of a case, I can't give you a citation right off the top of my head. Even the Court's instructions to which the defense

has no objection --

THE COURT: Well, they may now.

MR. WILLIAMS: Yeah, they may now, but the Court's instructions are based on the Eighth Circuit precedent and the Eighth Circuit model, and it doesn't require that the government establish that at the time of the murders that he was at that time, at that point in time --

THE COURT: That he was organizing five or more at that time.

MR. WILLIAMS: No. And it would lead to an absurd result. That's not what government -- what Congress intended by enacting the statute. They enacted the statute to go after those people who were more criminally culpable than other people who then at some point in the organization somebody's killed. And so to suggest that it's some type of a game that we have to play to make sure that at the very moment that the murders occurred he's in charge of five or more people just doesn't make sense logically.

THE COURT: What's the effect of the '96 plea with regard to the term of the conspiracy?

MR. WILLIAMS: I think it's dispositive. It's an admission by the defendant that he engaged in a conspiracy from

1992 to 1996, no ifs, ands, or buts about it. It's his own admission. So how that can be read or interpreted -- maybe perhaps today he would like to back out of that plea, but it's a

little too late.

THE COURT: Maybe?

MR. WILLIAMS: Well, I'm sure definitely he would like to at this point, but it's too late.

MR. PARRISH: Jeopardy attaches at that point then.

MR. WILLIAMS: Whether jeopardy attaches is a whole different issue. It's a legal issue. This Court has ruled on it. If the defense is correct and the government's wrong, we'll hear about it at the Eighth Circuit. That's separate from the factual issue. As a factual issue, the government has established by the plea alone the defendant was engaged in this conspiracy during that time frame.

THE COURT: Are they somehow estopped from arguing otherwise?

MR. WILLIAMS: I don't know if they're estopped from arguing it. I certainly wouldn't suggest that --

THE COURT: You wouldn't want to go that far.

MR. WILLIAMS: No, I don't -- you know, counsel is acting completely appropriate I think in making the arguments they are here today, and I don't think they're estopped from making that argument. What they're saying makes sense. I can see where they're coming from. As substantive evidence, the guilty plea, though, forecloses any real serious Rule 29 consideration that, in fact, there was a conspiracy from '92 to '96.

THE COURT: Mr. Rogers, how do you get around that?

MR. ROGERS: First of all, Your Honor, I don't think that Mr. Honken pleaded guilty to engaging in that conspiracy from 1992 to 1996. I believe the language of the indictment to which he pleaded guilty -- and I don't have it in front of me -- was between 1992 and 1996. Big difference because from 1995 to 1996 is between 1992 and 1996, but it certainly does not encompass 1992. So -- and I think that what they had the agent --

THE COURT: But it's one conspiracy. He just pled guilty to one conspiracy.

MR. ROGERS: He pled guilty to what he was charged with, and the government chooses to frame the charges the way they want to, and your choices are plead guilty or not guilty; right? So, I mean, I'm assuming that there was -- there were negotiations between Mr. Parrish and Mr. Colloton about the dates in the indictment and whether they would amend or file an information in lieu of an indictment in return for the plea to change the dates. Those negotiations were unsuccessful. He pleaded to the charge. But I don't think the charge alleged a continuous unitary conspiracy beginning no later than 1992 and ending no earlier than 1996.

THE COURT: Well, it didn't allege multiple conspiracies.

MR. ROGERS: It didn't allege -- and he only pled to

2858

one, but when he made his factual basis upon which this Court accepted his plea to the charges in the indictment, he didn't

say, I started in 1992, and I kept doing it. All he talked about in his factual basis was the Cutkomp/Cobeen conspiracy. So I think to say that that is conclusive, it's clearly not. His judicial admissions are perhaps conclusive to some extent, although I don't know if that rule applies in criminal cases. But, you know, there's certainly very -- very strong evidence.

But the fact that the charge to which he pleaded guilty was broader than and included the time frame of the acts that he admitted doing I don't think has anything to do with our argument here as to whether the conspiracy shown by the government in this trial to have existed in Arizona was over with before the conduct which Mr. Honken admitted when he pleaded guilty to the 1996 conspiracy charge began. I think it's clear from all of the evidence they're separate agreements involving different people for different purposes.

THE COURT: Mr. Williams?

MR. WILLIAMS: Just one other point. I wanted to respond to Mr. Parrish's comments about the motive and the lack of evidence of motive of killing these people in order to further the drug conspiracy. Fundamentally motive is not an element of the offense. If you look to the CCE elements in this case, the elements are, one, that there was a -- the defendant was engaging in or working in furtherance of a continuing

2859

criminal enterprise. The Court then defines what that is.

Number two, the defendant intentionally aided and abetted the killing of the victims in this case. And number three, the killing was connected to the continuing criminal enterprise. That's all that's needed to be shown, and the connection is the concealment of their involvement in an effort

to avoid conviction on that.

So the government doesn't have to prove a motive in relation to the killings connected to the drug conspiracy and the drug CCE murder counts.

That said, even assuming that motive was a requirement of the government, a reasonable jury could clearly understand that while he wants to avoid prison so he can be with his kids, killing his witnesses and avoiding jail also allows him to remain free to continue his criminal conduct which, in fact, he does after he kills these people.

And so the facts of the matter are when he kills them he doesn't go back to his family and live a lawful life. When he kills them, he goes out and starts manufacturing and distributing drugs still. So for those reasons, I think that that argument fails.

THE COURT: What's your response to Mr. Rogers' argument about the way he parses the language of the plea agreement and the indictment that Mr. Honken pled guilty to in '96?

♀

2860

MR. WILLIAMS: Hindsight's 20/20, and lawyers can think of a lot of things to do. The fact of the matter is he was charged with a conspiracy from '92, '96, and he pled to that conspiracy. If the defendant was not guilty of that, he had the choice of going to trial to prove that he wasn't guilty of that conspiracy, that it was a different conspiracy, that it didn't last during that time period. He had that option. He had the option of negotiating if he could with the government.

Mr. Rogers has suggested today there were that kind of negotiations going on. The problem is there is no evidence of

that and certainly no evidence presented to the jury of that.

So the fact is he didn't go to trial. He didn't renegotiate. He didn't do anything except come in and plead guilty to the crime as charged.

And so for those reasons, while it's nice to look at it in hindsight and try to parse the language, that's not what he was charged with; that's not what he pled guilty to.

THE COURT: Mr. Rogers?

MR. ROGERS: I hate to keep doing this, Judge, and I -- but I just cannot understand Mr. Williams' last comment because surely if Mr. Honken chose to go to trial in 1996, the government would not assume the burden of proving a continuous conspiracy which started at the earliest date mentioned in the indictment and continued through unbroken till the latest date. They wouldn't assume that burden. If they failed to prove

2861

something that happened in 1992, you wouldn't direct them out because the indictment says between 1992 and 1996, not from 1992 to 1996.

And that's a big difference in terms of what Mr. Honken pleaded guilty to because if the charged conduct occurs within the larger charge date but it's charged as between, that's sufficient. If the conduct occurs before the earliest date, then it doesn't have anything to do with the conspiracy. If the conduct occurs after the latest date, it doesn't. But any dates in between count, and that's all, and there's no question that 1995 is between '92 and '96.

So I don't think that the guilty plea, if you go back and you look at the transcript and the factual basis made by Mr. Honken, the admissions that he made, supports their argument

that there is a continuing conspiracy or that he has admitted that there's a continuing conspiracy. It just doesn't.

THE COURT: Let me ask you this. At the Rule 29 stage the lens through which I must view the evidence in the record is the light most favorable to the government.

MR. ROGERS: Right. That's true. That's what Mr. Parrish said.

THE COURT: Right.

MR. ROGERS: That's correct, but I don't think you can change the words in the 1996 indictment to make it more favorable to them.

♀

2862

THE COURT: Right. I wasn't planning on doing that.

MR. WILLIAMS: And just to be clear, Your Honor -- and I just asked my legal assistant to go get a copy of the indictment, but I'll -- my recollection is the indictment charges, as we charge in every single case we charge, that from about 1992 and continuing until 1996 the defendant engaged in a conspiracy, yada, yada, yada. And so while at the plea colloquy the question was put to him, Between these dates did you engage in a conspiracy, I believe that was maybe the language used during the plea colloquy. The charging document clearly charged from 1992 and continuing until 1996.

THE COURT: Was there a Rule 11 letter in the '96 case?

MR. WILLIAMS: You know, I don't think in '96 we were doing Rule 11 letters at that time, Your Honor. Perhaps we were. I don't recall. I know that that --

THE COURT: You were because I started September 6, 1994, and I've been using Rule 11 letters which I adopted from

now Chief Judge Longstaff in the Southern District where I was a magistrate judge from day one.

MR. WILLIAMS: Then I'm guessing we did, Your Honor.

THE COURT: But that's not in evidence.

MR. WILLIAMS: No.

THE COURT: The Rule 11 letter.

MR. WILLIAMS: That's correct.

♀

No, I stand corrected. It does say, Between about 1993 and February 7, 1996, so apparently we used different language back then than we do today. I don't think that changes ultimately any decision by the Court, but I just wanted to make that correction.

THE COURT: Well, it makes your argument that the '96 plea is an admission and forecloses their argument less weighty.

MR. WILLIAMS: It does make it less weighty.

THE COURT: Right.

MR. WILLIAMS: Right. I mean, certainly it doesn't make it -- if you read the "between" language the way that the defense wants you to read it, it doesn't make it dispositive.

THE COURT: Right.

MR. WILLIAMS: It's certainly obviously compelling evidence that when he pleads guilty to conspiring between '92 -- I'm sorry, '93 and '96 in this case that he was in one conspiracy between those dates. But it doesn't make it dispositive necessarily if you interpret it the way the defense asks you.

THE COURT: Anything else any of the five lawyers would like to add?

MR. WILLIAMS: Not on behalf of the United States,

Your Honor.

MR. ROGERS: No, Your Honor.

THE COURT: Well, I agree with Mr. Parrish. You've

raised a very serious motion, but I think in the light most favorable to the government that I have to view the facts I think a reasonable jury could find a single conspiracy and could find the elements of conspiracy murder and CCE murder, not suggesting that they're going to do that, but I'm just saying that I think they could do that. And, therefore, I'm going to go ahead and deny the Rule 29 motion.

Anything else on the Rule 29 motion?

MR. WILLIAMS: No, Your Honor.

MR. ROGERS: No, Your Honor.

THE COURT: Okay. On the 804(6) issue and the 801(d)(2)(E) issues under United States versus Bell and the 804(6) under United States versus Emory, I want to -- I haven't had a chance to re-read Emory, and I haven't read it since I filed my opinion on this issue back on the 16th day of July, so I think I'm going to defer making my Bell and Emory rulings till first thing tomorrow morning.

Mr. Rogers, I noticed a look on your face when I said I'd like to defer till four o'clock a discussion of the jury instructions. Do you have a problem with that?

MR. ROGERS: I really don't, Judge.

THE COURT: Okay.

MR. ROGERS: But if we're just going to do it informally, I see no reason to go back for 40 minutes and come back. Whatever you want to do.

THE COURT: Okay. Well, I have some administrative matters I need to attend to, and it's more a situation of that. There are a couple kind of unrelated issues to the discussion we've been having that I want to raise and, you know, just in terms of our theme of trying to think ahead and alert each other to potential issues.

I think the only remaining government motion that I think I never ruled on -- or maybe I did rule on it -- is about the allocution of the defendant should that come into play should we have a penalty phase.

MR. WILLIAMS: I'm not aware of you ruling on that.

THE COURT: I don't think I had ruled on that one.

MR. WILLIAMS: And then we did file this recent motion in limine regarding the testimony from Tom Mullin, but as I understand Mr. Parrish's response, they don't intend to get into that, so I think that motion's moot.

THE COURT: Mr. Parrish on the Mullin motion?

MR. PARRISH: I spoke -- on that in limine motion? I spoke to Mr. Mullin. I think my testimony with him -- they probably know what all my evidence is going to be by now, all the questions we've exchanged back and forth, but I did speak with Mr. Mullin. He's going to be called. He's going to be asked if he did review a file passed on to him by Lieutenant Redden and did he file charges. I'm not going to ask him why or why not. I mean, if they want to go into that and open the

2866

door, I perhaps will follow up on that. But no, I don't intend to ask him any questions of prosecutorial discretion.

THE COURT: Does that render your motion moot?

MR. WILLIAMS: It does, Your Honor.

THE COURT: Okay.

MR. PARRISH: But, Your Honor, I have just finished, while we were sitting here, going through the file for Mr. Honken which I'm getting now for the first time, and I think we're going to have some pretty interesting issues regarding the door that they've opened about the escape and the exchanges that Mr. Honken was having with the jail administrators during that time including letters that our office wrote to the jail about Mr. Honken's privileges, et cetera. We'll try to copy this as quickly as possible and get the pertinent ones back to the Court so the Court can look at it.

But I believe a lot of these letters that were happening at the same time the -- Putzier and all these other guys were testifying and Mr. Honken was making complaints about how he was being treated, why he was having people going through his paperwork, he was complaining about that over and over again to the jail administrators.

They've opened the door to it now saying, Well, all he was trying to do is bust out. I believe this goes to explain what his conduct was there, and we're going to ask that all of these documents related to that issue go in that were happening

at the same time.

Now, I understand Mr. Williams is perhaps going to object to it, but remember back at the pretrial hearings the Court asked, Why are you going into that? We told them clearly if they go into it we intended to introduce evidence about his conduct during that time. I believe this file that we're now getting for the first time is pretty relevant.

THE COURT: Well, doesn't it also go to the issue of how these various what I call "Dustin confessed to me" witnesses, how they got the information?

MR. PARRISH: Absolutely. Goes from his first letter where he complained to Lieutenant Redden that they were going through his legal work and he didn't want any inmates in his cell with him. And we wrote letters I believe that Mr. Williams now has reviewed indicating that there was some question about how he was being treated there.

THE COURT: Okay. Now, let me ask you this. Without getting into the merits of the argument because you haven't even seen what he's got -- you haven't seen it yet, have you?

MR. WILLIAMS: I've seen portions of it. I was also provided a copy.

THE COURT: I just want to know the process you all suggest how we're going to resolve this, not jump into the merits of it right now because obviously I haven't seen the letters and the like.

2868

MR. WILLIAMS: Certainly, and I can alert you where I'm coming from so you don't waste time looking at other issues that it's relevant, we don't object to. That foundation we're not going to object to. My objection goes to hearsay and double hearsay and in some cases triple hearsay in the form of these letters and so forth.

And so statements by the defendant, statements by jail staff, statements reflecting a letter by Mr. Parrish about what Mr. Honken has told him or has told jail personnel, my objection goes to the hearsay end of it. So that's where I'm coming from so the Court's alerted where my objection's going to be.

How do we handle it? My suggestion would be that Mr. Parrish identify those documents he thinks are admissible and provide them to the Court and identify them for me, and then we can all be prepared to discuss that matter maybe first thing in the morning.

THE COURT: Let me ask you this on your hearsay objection. Do you think that a lawyer writing to the county jail on behalf of a client, that that's an 803(6) business record?

MR. WILLIAMS: No, Your Honor, I don't think it's a business --

THE COURT: Okay. Well, assume for the sake of argument that it is. You still have hearsay within hearsay, what I would call second-level hearsay within the 803(6)

document.

MR. WILLIAMS: That's correct.

THE COURT: Yeah.

MR. WILLIAMS: And that's what I'm obviously more concerned about because he was attempting -- he was acting in full good faith at the time. I don't want my arguments to be taken wrong. But in that letter what they want to introduce in this trial is statements Dustin Honken made to him back in 1996. They want to introduce them for the truth of the matter asserted, and that is people are looking at his legal stuff. And so from that standpoint it's the statement that is repeated in Mr. Parrish's letter that is the hearsay that has the greatest problem for us. Even assuming that Mr. Parrish's letter is a business record, that doesn't take care of the underlying hearsay statement.

MR. PARRISH: Let me tell you something kind of interesting. Wouldn't it explain my billing practices? I mean, they introduced it, so I'll say, Okay, fine, this is what I was working on; this is why the $5,000 was necessary. They've opened the door to it. Doesn't it explain that even on a tiny, tiny point? I can offer the work that was being done. I say that kind of facetiously, but it is of serious consequence that now they've introduced part of my records. In the sense of completeness, I'll introduce the work that I was sending back and forth about.

2870

But I also would refer the Court to 803(8)(C) which goes to criminal cases. Part of an investigation by the jail -- because every time he would write these grievances, Lieutenant Redden is going to say, Well, they investigated it. A couple of times he told about people not letting him do his legal work. He asked for legal papers, et cetera. And they --

THE COURT: Wouldn't the 803(8)(C), wouldn't that allow you to get in the jail records?

MR. PARRISH: Right.

THE COURT: But how about your letters?

MR. PARRISH: That's a good question. If they kept them as part of the investigation and took action as part of the response to my letters or to my associates' letters, is that admissible? Maybe -- I would argue that the letters ought to be admissible too, but clearly their response to the letter if they conducted even a cursory investigation and then Lieutenant Redden says, Well, I had Deputy Such and Such go talk to this inmate, and this is what I found out, either your complaint had substance or not.

But also I'm sure they're going to object to some of Mr. Honken's letters where he complained about it and they conducted investigation and wrote a response to his grievance about his paperwork and where he was being placed.

But it really doesn't give us an opportunity if it's kept out to explain all of their conduct about what Mr. Honken

♀

was doing when their so-called witnesses said that Mr. Honken was only trying to escape during this period of time. There are letters explaining Mr. Honken's conduct that's contrary to his escape. He's saying, I want legal work; these are the cases I want; bring me these documents. He's all over them about paperwork he needs to help work on his case.

MR. WILLIAMS: I have no objection to that type of documentation coming in.

THE COURT: Okay. Well, why don't you sit down, look over the documents, see what the defense wants to put in, and then we'll revisit it. Now, when exactly are we going to revisit this?

MR. PARRISH: I'm going to try to have this copied this afternoon, back to the Court and a copy that we're going to use back to Mr. Williams. My only catch is I have the witnesses coming in tonight. And I'd like to work it as smooth as possible, but I can be here at eight in the morning to go over this.

THE COURT: Okay. Why don't we try and get started on this issue. Matter of fact, why don't we try and get started at -- it shouldn't -- I don't think it will take me long to make my Emory and Bell rulings, but why don't we get started at 7:45 tomorrow. Would that be okay?

MR. PARRISH: Eight o'clock you say?

THE COURT: I said 7:45. You're an early riser. Oh,

you have to meet with witnesses, don't you?

MR. PARRISH: Mr. Loparo's going to be down at the jail, but I think somebody else could probably argue that in the morning. I think Mr. Spies or Mr. Rogers could --

THE COURT: No, let's just -- will you be available at eight?

MR. PARRISH: I'll be here. I'll be at the courthouse at seven. I'll be available at eight.

THE COURT: Okay. We'll just meet at eight o'clock so that you can attend.

Okay. Now, on my list of things, are you -- are you asking -- are you even asking that the defendant give an allocution before the jury in the penalty phase if there is one?

MR. SPIES: We haven't fully discussed that yet, Your Honor. Now that the government has rested, we know the complexion of the case. I'll be meeting with Mr. Honken about that this evening and tomorrow morning.

THE COURT: Okay. My understanding is -- here's my understanding, and I'll get the cites to you in the morning; I have them. Two circuits have ruled that there is no right of allocution before the jury in a death penalty phase. One district court judge I believe from the District of Hawaii has ruled that there is subject to some kind of limiting instruction, but I'll get the cites to all of you. There may be other cases. That's just what I've come up with when I was

thinking about this issue, and so I'll try and get that information to you.

I want to talk a little bit about -- even though we're ahead of things now about alternate jurors, and we had kind of an off-the-record discussion, and Mr. Parrish raised something that, quite frankly, I hadn't even thought of. I have never used the provision under Rule -- I think it's Rule 24, 24(c) -- 24(e) -- no, 24(c)(3) called retaining alternate jurors. I've never done that, but I'm thinking about doing it in this case. And here's what I was thinking about doing.

After closing arguments -- I usually do it after closing arguments. I read the final two instructions on deliberations, and the next thing I do is send the jury out to deliberate. At that time is the first time I indicate to the alternates who the alternate jurors are. And in the normal routine case or how I've always done it in the past, I just send the alternates home at that point, and there's no thought that they're ever going to come back and deliberate.

I'm thinking in this case that I would sequester, if you would, the alternate jurors in another room in the courthouse and have them stay here while the jury deliberates on the merits because you don't know how long that's going to take, and then I believe the rule allows you to lose one, so you can go down to 11 which is quite a bit of a safety net, but you can't go below 11. The rule does authorize then bringing an

2874

alternate juror in as a trial juror but instructing the jury that they must begin their deliberations anew with the alternate juror. Now, I'm also -- so that's what I intend to do.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2507 of 3636

Then I'm also thinking about if the jury comes back with a guilty verdict on any of the ten counts that carry the death penalty and we start the penalty phase then having the alternates sit in and listen to all the evidence on the penalty phase and then repeat the same process in the penalty phase that I would have done in the merits phase.

Mr. Parrish raised the issue, well, you then have potentially an alternate juror sitting in on the penalty phase that never voted on the merits phase. And here's kind of my response to that. I don't know that it's a very good response, but here's what it is.

If we drop below 11 in the penalty phase, the only option at that point is declare a mistrial. I believe that's the only option. So it seems to me that rather than declaring a mistrial the better course -- and this is all pretty hypothetical because we'd have to lose, you know, folks in order for this to happen. But the better course would be to substitute an alternate juror even though the alternate juror didn't vote on the merits over the defendant's objection because I assume they'd object at that point and then let that go up to the circuit. And then the worst-case scenario is they said I did it wrong and you have to retry the penalty phase which we

2875

would have had to do in any event. But you at least have some chance that it's a permissible procedure.

I haven't been able to find a federal case where that's ever happened, and it's not surprising. There are so few death penalty cases, and of the death penalty cases that go to trial, so few have a penalty phase. So it's not surprising that there's no reported decision on the issue. There might be in

the states, and I really haven't looked.

But I'm -- kind of as I'm processing this out loud, there's no real downside to do it if it ever comes to that. Hopefully it's not going to come to that.

So that's just tentatively what I'm thinking about, but I wanted to get that out on the table so you all know at least what I'm thinking about. And I'm obviously going to give you opportunity to persuade me that that's some kind of egregious error and a wrong path to go down. But right now I'm not seeing the downside to it.

MR. WILLIAMS: Your Honor, it sounds like it makes all the practical sense in the world to me is my gut reaction to it. I'm afraid I think the plain language of the statute under which we're operating may specifically bar that.

THE COURT: Preclude that?

MR. WILLIAMS: Title 21, section 848(i)(1) defines before whom the penalty stage of the sentencing can occur, and (A) is before the jury which determined the defendant's guilt,

2876

and then (B), and it goes beyond that, talks about specially empanelled juries in the penalty phase after a mistrial or after an appeal or what not goes on.

THE COURT: Do you think the plain language bars that?

MR. WILLIAMS: I think it does.

THE COURT: The first part you quoted me doesn't trouble me too much because it is the jury that determined the guilt phase with one addition who's an alternate juror, and I'm not sure that's inconsistent with the plain language of the text.

MR. WILLIAMS: And perhaps it isn't. I guess I was

reading "before the jury who determined the defendant's guilt" would mean that jury deliberated and returned the guilty verdict.

THE COURT: But it doesn't say, Before all 12 jurors who determined the defendant's guilt. It says, Before the jury. And an alternate is a substitution to the jury, so I see what you're saying, but at first blush I'm not sure it's inconsistent.

MR. WILLIAMS: And perhaps it isn't.

THE COURT: But I haven't focused on 848(i)(1), and I need to. I was just looking at Rule 24(c)(3), so I'll certainly take a look at that.

MR. WILLIAMS: But otherwise, as I said, I think that proposal makes abundant practical sense. Just whether we can

2877

actually do it or not.

THE COURT: Now, the only other thing on my list is something I could foresee happening in the merits deliberations, and that would be a jury note that says, We would like to listen to the Cutkomp tapes or saying, Gee, we didn't get -- the transcripts aren't sent back to us; we want to read those transcripts which would be a whole lot less painless than listening to the tapes because the tapes are not easy to listen to.

So we have some time to think about that. But that's something that I think we should have a -- at least the parties express their views to me clearly because while I have received a lot of juror notes I didn't anticipate, I would anticipate receiving a juror note on this issue. I think there's at least a 50 percent likelihood that at some point during the

deliberations we're going to get a note.

MR. PARRISH: I'm predicting that will be the first note.

THE COURT: Right. The first note? Yeah. I think that'd be a pretty good prediction, so we should have discussed it, thought it through, and at least have a tentative game plan because I like to respond as quickly as possible to jury notes even though that's hard to do sometimes.

So that's all I have on my list. Anything else?

MR. WILLIAMS: This may be entirely premature, but

♀

just to raise this as something to think about -- and we'll be raising it at a later time -- if we go to a penalty phase, the case law, as I understand it, bars the government and likewise bars the defense from presenting evidence during the penalty phase in the context of opinions of the witnesses concerning whether they think the defendant ought to be sentenced to death or not.

On the government's side, we will not be asking and we will be instructing our witnesses not to volunteer any opinion about what they think of the defendant or what they think the appropriate punishment should be, and we're going to be asking that that same limitation be placed, as I think it is appropriate, on the defense witnesses as well.

THE COURT: Well, it seems to me that for -- maybe the opinion but the effect which is pretty similar, the defense witnesses are entitled to testify as to the mitigating factors, and the mitigating -- some of the mitigating factors -- matter of fact, the first several and others that the defense has listed would clearly call into question the effect of the

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2511 of 3636

punishment on, for example, Mr. Honken's children, his parents. Those are legitimate mitigating factors. And so while they wouldn't necessarily be able to come out and give an opinion, their testimony would necessarily involve why it would be inappropriate to give Mr. Honken the death penalty. Am I missing something?

♀

MR. WILLIAMS: No. I think you're right. And perhaps it's parsing words to some degree. What I'm seeking is an order from the Court keeping the defense witnesses from expressing their opinion about the death penalty, expressing their opinion about whether the jury ought to impose the death penalty, or making any plea for his life. Factually can they talk about what effect, if the death penalty was imposed, it would have on their lives or the lives of other people? I think that is permissible. But to make an out-and-out plea to spare his life or to make statements against the death penalty and the like I think are not -- do not go to any characteristic of the defendant or any other legitimate mitigating factor.

THE COURT: Mr. Spies, I understand you're going to be handling this if there is a penalty phase. What's your view?

MR. SPIES: Well, I guess I'm inclined to agree with the Court because it's going to be hard for some witnesses to say, I don't want my dad to die, without having the effect of indirectly expressing their opinion about what they want the jury to do. And I think that it's going to be difficult to compartmentalize that to Mr. Williams' satisfaction. I don't know how we would be able to do that.

THE COURT: Well, I think we could do it by tying it as directly as we can to the mitigating factors which I think by

necessity evidence on the mitigating factors would indirectly give the person's view on the penalty -- on what the appropriate

penalty would be. I don't know how I could allow you to fairly put on your mitigation evidence and not have your witnesses at least indirectly suggest that it's a life sentence that's appropriate and not the death penalty. I mean, without doing that, they wouldn't fairly be able to present evidence in support of their mitigation. You'd agree with that.

MR. WILLIAMS: Yes, but it's precisely that quote and quotes like that that I think are barred and not permissible. And if necessary, I can file a motion with the law on this area. But testimony "I don't want my dad to die," that does not go in any way to any of the legitimate mitigating factors. It's permissible for a witness to testify perhaps about what effect it would have on his life if his father was executed and I would be depressed or whatever the statement may be. But to make a statement "I don't want my dad to die," that does not go to any mitigating factor. That's a statement of opinion. It's a statement of that witness's views, but it's not a mitigating factor, and so that's where I have concern. And perhaps it would aid the Court -- there has been law on this area, and perhaps it'd be helpful to the Court if I briefed this issue.

THE COURT: It certainly would be, yeah, because I think you all know this is my first death penalty case.

MR. WILLIAMS: Mine too.

THE COURT: So I've looked at some cases that talk about the scope of both aggravating and mitigating evidence in a

penalty phase, but I certainly haven't read but a smattering of them. So that would be a good thing for you to do, file your brief.

Anything else you can think of?

MR. SPIES: I believe not, Your Honor. Thank you.

THE COURT: Okay. Why don't we take a recess, and we're almost to 4, but it was your 20 minutes you were concerned about, Mr. Rogers, but we'll come back. Matter of fact, I think it's really just going to be an informal discussion at this point. I think it's a little premature to make our formal record on the jury instructions. So -- and we can do it in open court if the lawyers -- and if you want your client present when we talk about the jury instructions informally. I'll certainly be glad to do it in open court, and we can do it either on the record or off the record. My general policy has been informal discussions about jury instructions are off the record, but I certainly have no objection to doing it on the record if you want to.

MR. ROGERS: I think off the record is fine, Your Honor, and Mr. Honken advises me he does not want to be present in the informal discussions.

THE COURT: But he will be present at the formal discussions.

MR. ROGERS: Exactly.

THE COURT: Government have any problem with that?

♀

2882

MR. WILLIAMS: No, Your Honor.

THE COURT: Why don't you just come back at four o'clock, and we'll talk about it in my conference room. We'll be in recess.

(The foregoing trial was adjourned at 3:42 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR 1-11-05 Date

2883

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| FRANK TARASI | | |
| | MR. MILLER | 2679 |
| | MR. SPIES | 2693 |
| | MR. MILLER | 2700 |
| WILLIAM BASLER | | |
| | MR. WILLIAMS | 2701 |
| | MR. SPIES | 2751 |
| | MR. WILLIAMS | 2769 |
| | MR. SPIES | 2770 |

VOLUME 13 10-5-04 witness testimony

VICTOR MURILLO

| | |
|---|---|
| MR. MILLER | 2772 |
| MR. SPIES | 2810 |
| MR. MILLER | 2817 |

*****

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, Plaintiff, vs. DUSTIN LEE HONKEN, Defendant. /

No. CR01-3047
Sioux City, Iowa
October 6, 2004
8:21 a.m.

VOLUME 14

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff:

C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant:

ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Are we ready to go on the record?

MR. PARRISH: Yes, we are.

THE COURT: I need to make my 801(d)(2)(E) co-conspirator hearsay United States versus Bell, United States versus Bourjaily ruling and then do the same thing on the 804(6). All the evidence offered by the government as 801(d)(2)(E) meets the requirements of United States versus Bell and United States versus Bourjaily, so although it was conditionally admitted, I now find that it was properly admitted because the evidence was made by a co-conspirator in the course of and in furtherance of the conspiracy and meets any of the other requirements imposed by United States versus Bell, decision by the United States Court of Appeals for the Eighth Circuit in 1978, and then the United States Supreme Court decision in United States versus Bourjaily.

With regard to the 804(6) evidence that was admitted, the Eighth Circuit has suggested in the case United States versus Emory, 186 Fed. 3d 921, 1999 decision, that the same procedure utilized in 801(d)(2)(E) should be utilized for 804(6) evidence. And I find the requirements of United States versus Emory have been met in this case because the government has established that Mr. Honken procured the unavailability of the declarant with regard to all of the 804(6) evidence. And I find

that both by a preponderance of the evidence, and Emory also discusses that at least one court appears to have held that it's by clear and convincing evidence.

So even though that's not the circuit law, I'm going to go ahead and find that the government has established the 804(6) evidence by clear and convincing evidence standard as well as an alternative holding even though my understanding of the Eighth Circuit law is it just has to be by a preponderance of the evidence.

Mr. Williams, does that satisfy the government with regard to the co-conspirator and 804(6) rulings?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. Anything else we need to take up before we bring the jury in?

MR. PARRISH: No, Your Honor.

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay.

MR. WILLIAMS: Your Honor, we're going to start at 8:30? Is that what time we're going to bring the jury in? In other words, do I have time to go to the . . .

THE COURT: Yes, you do. We won't start without you. How's that?

MR. WILLIAMS: Thank you.

(Recess at 8:24 a.m.)

THE COURT: Good morning. Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Mr. Parrish, you ready?

MR. PARRISH: Yes, we are, Your Honor.

THE COURT: Okay. Thank you.

(The jury entered the courtroom.)

THE COURT: Please be seated. Good morning.

Mr. Parrish, are you ready to call your first witness?

MR. PARRISH: We are, Your Honor. We'd like to call Mike Billick.

Please come forward, raise your right hand, and be sworn.

MICHAEL BILLICK, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. Make yourself comfortable, and please adjust the chair. Scoot it up so you can speak directly into the microphone. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: It's Michael Eugene Billick, B-i-l-l-i-c-k.

THE COURT: Thank you.

Mr. Parrish?

DIRECT EXAMINATION

BY MR. PARRISH:

Q. Mr. Billick, could you give us your home address, please?

2889

A. It's 21348 320th Street, Plymouth, Iowa.

Q. And how old are you, sir?

A. Forty-seven.

Q. And in Plymouth, Iowa, what county is that in?

A. Cerro Gordo.

Q. And about how far is that from Sioux City, Iowa? You should know almost exactly because you drove in late last night,

didn't you?
A. About 425 miles.
Q. And you're here as a result of subpoena; is that correct?
A. Yes, sir.
Q. All right. I was just checking the mileage fees. You mean round trip; right?
A. Yeah, I was going to say I think it's 225.
Q. I was looking at your mileage fee that I have to write a check out for. I was just double-checking, but you're okay on that; okay?
I just -- do you know Mr. Honken?
A. No, I don't.
Q. Okay. Have you ever met him before?
A. No, sir.
Q. All right. And right now you're on parole; is that correct?
A. Yes, sir.
Q. Tell us a little bit about your criminal history. You do

2890

have one; is that right?
A. Right. I have a delivery of controlled substance, methamphetamine.
Q. Okay.
A. And another one for trading drugs for stolen merchandise.
Q. And you've been to prison; is that right?
A. Yes, sir.
Q. And tell the Court -- tell the jury where you've been to prison before.
A. I've been to Newton Correctional Facility and then Anamosa.
Q. And you're employed right now since you've been out; is

that right?
A. Yes, sir.
Q. Tell the jury where you are employed.
A. I work for Darrell's Marine and Storage in Clear Lake, Iowa.
Q. And tell us what you do there.
A. I'm a boat mechanic.
Q. And as a boat mechanic, tell us what type of work you do as a boat mechanic.
A. I repair stern drives and engines, basically all-around boat maintenance.
Q. And how long have you done that?
A. About three years.
Q. What I want to do is go back to 1993. You and I have

discussed, have we not, both in person and on the phone about statements you made to law enforcement back in 1993; is that correct?
A. Yes, sir, we did.
Q. Do you know a fella by the name of Mr. Nicholson, Greg Nicholson? Did you know him personally back in 1993?
A. I knew him personally.
Q. Just in kind of passing?
A. Right.
Q. All right. You were in the drug culture or so-called drug exchange back in 1993; is that correct?
A. Yes, sir.
Q. You told law enforcement that you were also in 1993; is that correct?
A. Yes, sir.

Q. And they interviewed you in 1993 concerning your experience and who you knew in the Mason City area who dealt drugs; is that right also?
A. Yes, sir.
MR. WILLIAMS: Objection, Your Honor. Leading the witness.
MR. PARRISH: Just for foundation.
THE COURT: Overruled.
BY MR. PARRISH:
Q. Now, let's go back to this 1993 interview. In 1993, do you

recall who you spoke with who were drug officials at all from the state?
A. I spoke with Bill Basler.
Q. Anyone else?
A. Not that I can recall.
Q. Okay. There were certain events that you recall back in 1993 as to what happened to you; is that right?
A. Yes, sir.
Q. In February. Well, tell the jury in February of 1993 what happened to you. Well, you don't have to go into details, but did you go to jail?
A. Right.
Q. Okay. And that was in February of '93?
A. I believe so.
Q. And you got out in when?
A. September of '93.
Q. All right. And before that time did you know a fella by the name of Terry DeGeus?
A. Yes, sir, I did.

Q. Give the jury a description if you can of Terry DeGeus.
A. A person -- what he looked like?
Q. What he looked like.
A. He was probably 5-10, probably 190 pounds, 195. He had shorter brown hair and ponytail in the back.
Q. All right. Was he built pretty well from your observations

♀

of him?
A. I would say he's stocky.
Q. And would you tell the jury approximately how many times did you meet with Mr. DeGeus prior to the time that you went to jail in 1993.
A. I would say 15, 20 times.
Q. Tell the jury the setting that you had these meetings with him.
A. The first time I met him was at a bar, and I believe that we went to my trailer in Mason City after that and did some drugs.
Q. All right. And when you say did some drugs, did you mean that the kind of drugs you did you did -- explain. Was it an exchange? Was it a sale? What was it?
A. I would say the first time was we did some of his or we did some of mine.
Q. Is that a certain thing that takes place within the drug culture, particularly people who, in fact, deal drugs? Why do they have that kind of exchange about drugs, why they would exchange some of yours for some of his? Tell the jury why you'd do that.
A. I would say to kind of get to know each other at first, and then, you know, it would be like sampling.

Q. Okay. Sampling. Is that to try to find the quality of the drug?

♀

A. Yes.
Q. All right. And in those exchanges with him, did Mr. DeGeus tell you of a concern or some business plan that he had with regard to his drug operation? Just answer that yes or no.
A. Yes.
Q. All right. Did that drug or plan that he had that he discussed with you at the time during this exchange or the other 15 exchanges that you had have to do with Mr. Nicholson?
A. Yes, sir.
Q. Did you tell that to law enforcement back in 1993?
A. I believe I did.
Q. And what did you tell them that Mr. DeGeus said to you with regard to the drug operation of Mr. Nicholson?
A. I believe that Mr. DeGeus wanted to assume the role that Mr. Nicholson had.
Q. With regard to what?
A. With regard to who held on to the drugs or who had them to . . .
Q. And what type drug was this?
A. Methamphetamine.
Q. Did you have any idea at that time -- and what I mean by at that time, in the winter prior to the time you went to jail in 1993 -- of where Mr. DeGeus was getting his drugs from?
A. I can't recall.
Q. All right. What about did you have any idea where

♀

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2525 of 3636

Mr. Nicholson was getting his drugs from?
A. I assume they were coming from the same place. I'm not sure.
Q. All right. Now, when he had those discussions with you, those 15 or so discussions with you, did he ever come to your house with a weapon?
A. Yes, he did.
Q. Tell the jury, describe to the jury what type weapon this was that he came with.
A. I believe that it was a small pistol. He came to my house and had it in his pocket.
Q. And describe to the jury how did you describe the nose of that weapon. Was it a revolver, or was it a pistol, or was it a semi-automatic? How did you describe that weapon as you sit back and think about it?
A. I believe that it was a revolver.
Q. Okay. From your observations of it; is that right?
A. Right.
Q. Tell the jury why you were concerned about that weapon and why you took particular note of that weapon when you saw it with him.
A. Well, he brought it in my house in his coat pocket, and I for one don't like guns around drugs for several different reasons, you know, penalties basically.
Q. They go up; right?

2896

A. Right.
Q. Okay. And what did you tell him to do with regard to the revolver when he had it when he approached you about it?

A. I believe that I asked him to either put it in his vehicle or for sure put it away.
Q. And did he do that?
A. Yes.
Q. And during the course of this time, you would have met him 15 times or even more or less; is that correct?
A. Correct.
Q. And that was in 1993 in Cerro Gordo County; is that correct?
A. The fall of '92, the spring -- the early winter of '93, yes.
Q. All right. And other than that statement about Mr. Nicholson's drug operation and what he wanted to do with regard to it, did he make any additional statements to you after that time that you recall?
A. Not that I can recall.
MR. PARRISH: No further questions, Your Honor.
THE COURT: Mr. Williams?
MR. WILLIAMS: Thank you, Your Honor.
CROSS-EXAMINATION
BY MR. WILLIAMS:
Q. Mr. Billick, did you have the opportunity to review the

2897

interview report that you provided to Special Agent Basler back on December 15, 1993, before you testified here today?
A. No, sir, I haven't.
Q. You would agree that you knew that Special Agent Basler was a law enforcement officer at the time you spoke to him, wouldn't you?
A. Yes, sir.

Q. And you knew that it was a crime to make a false statement to a law enforcement officer. You knew that; right?
A. Yes.
Q. And so you did your best at that time to tell him the truth and the complete truth, didn't you?
A. Right.
Q. You would agree with me that when you were interviewed on December 15 of 1993 your recollection of the events back then would be a whole lot clearer than they would be almost 11 years later; correct?
A. Correct.
Q. Okay. Isn't it true that when you were interviewed by Mr. Basler back on December 15, 1993, you never even mentioned not once Terry DeGeus ever having a firearm?
A. I'm not sure if --
Q. Would it refresh your recollection if you had a chance to actually read through your report?
A. I could say that my report would be a lot more truer to my

♀

memory than what it would be today.
Q. Okay. Would it help if you read through this report to remember what you actually said back then?
A. Sure.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:
Q. Mr. Billick, just take a few minutes and go ahead and read through this report, and when you're done, let me know. I'll get it back from you. Have you had an opportunity to read through it?

A. Uh-huh.
Q. Mr. Billick, there's no mention anywhere in that report about a handgun being owned by Terry DeGeus, is there?
A. No, sir.
Q. Okay. Now, also in this report when you're talking to Agent Basler on December 15 of 1993, you told him at that point that you had not seen Terry DeGeus since the prior December; isn't that right?
A. That could be correct.
Q. Isn't that what you told --
A. That's what the sheet says, right, and that would be -- like I say, my memory back then what I told him was a lot fresher than it is today.
Q. Sure. And so it'd be fair to say that that statement was

more accurate that you hadn't seen Terry DeGeus since December of 1992.
A. Right.
Q. Okay. So any of these conversations you would have had with him would have had to have occurred some time prior to December of 1992; is that fair to say?
A. Right.
Q. Okay. And what you told Special Agent Basler is that you had not -- you did not get back to Mason City until November 10 of 1993; isn't that correct?
A. That sounds about the time, right.
Q. Okay. And you also told him that the source for the drugs to Mr. DeGeus was somebody in Arizona, didn't you?
A. That's what it says, yeah.
Q. And today you testified that you had told Special Agent

Basler about your own involvement in drug activity with Mr. DeGeus, but you'll agree having had a chance --

MR. PARRISH: Objection. That's a misstatement of the record.

THE COURT: Well, the jury can use their own recollection. Objection's overruled.

MR. WILLIAMS: Thank you, Your Honor.

BY MR. WILLIAMS:

Q. You'll agree with me, Mr. Billick, nowhere in this report of interview does it reflect that you told Special Agent Basler

about your own drug activity with Mr. Billick, does it?

MR. PARRISH: Mr. Billick --

Q. I'm sorry, with Mr. DeGeus. I'm sorry.

A. It doesn't say right there. I talked to him for about an hour and a half, you know. It doesn't say -- it doesn't say that I was using, right.

Q. Right. And then finally, it says that what you told Special Agent Basler back then was that Mr. DeGeus told you that Greg had apparently been making mistakes in the drug operation and that DeGeus had plans to take over Greg's territory.

A. That'd be a lot more clearer than as him just wanting to take over, you know. Like I said, the memory is quite -- is -- it wasn't that significant at the time to remember but . . .

Q. Sure. And it's common in the drug trade that if you want to move up in the drug trade, you want to take over other people's territory, take over their customers and sell to their customers and kind of move in on their territory.

A. Right.

Q. That's common in the drug world, isn't it?

A. Right. You'd rather be the "to go to" guy than . . .
Q. Sure. And Mr. DeGeus never told you that he ever intended to do any harm to Greg Nicholson, did he?
A. No.
MR. WILLIAMS: I have nothing else, Your Honor.
THE COURT: Mr. Parrish, anything further for this

witness?
MR. PARRISH: No questions. Thank you so much, Mr. Billick, and my legal assistant's not here, but she'll be back in a minute if you want to wait. Thank you so much.
THE COURT: Okay. You can step down.
MR. PARRISH: I want to check and see if Lieutenant Redden's here, Your Honor.
THE COURT: Could I see the lawyers at sidebar for a second?
(At sidebar on the record.)
THE COURT: I hate to crimp your enthusiastic style. I don't think it's appropriate to thank the witness, though.
MR. PARRISH: Oh.
THE COURT: I know you're just trying to be cordial.
MR. PARRISH: Well, he drove in late last night.
THE COURT: And I don't want to make a big deal out of it.
MR. PARRISH: I'll just tell him -- no.
THE COURT: Thanks.
(The sidebar was concluded.)
THE COURT: Mr. Parrish, are you ready to call your next witness?
MR. PARRISH: Yes, Your Honor, Lieutenant Redden,

please.

LYNETTE REDDEN, DEFENDANT'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Make yourself comfortable. Try and adjust the chair and scoot it up so you can speak directly into the microphones. And feel free to adjust those microphones. And when you're ready, would you state your full name, please, and spell your last name for us.

THE WITNESS: It's Lynette Redden, R-e-d-d-e-n.

THE COURT: Thank you.

DIRECT EXAMINATION

BY MR. PARRISH:

Q. Would you tell us what your employment is, please?

A. I work for the Woodbury County Sheriff's Office. I'm the jail administrator.

Q. And how long have you held that position?

A. Approximately 24 years, 25 years.

Q. And tell us what your duties are.

A. I'm in charge of the jail facility, operation of the facility, the care and control of all inmates, and the day-to-day operation of the jail.

Q. And what jail facility is that?

A. It's the Woodbury County Jail in Sioux City, Iowa.

Q. And tell the jury where that jail is in relation to this courthouse.

A. It's about a block away. It's at 407 Seventh Street across from the courthouse.

Q. And how large a structure is it, Lieutenant?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2532 of 3636

A. Our facility holds 198 inmates.

Q. And is that on any given day? Is it sometimes higher, sometimes lower?

A. For the most part, higher.

Q. And when you say higher, describe how much higher.

A. I'd say we average between 200 and 215 at the main jail.

Q. And in this facility, would you tell us how many people guard it? I assume you're in charge of all the individuals there; is that correct?

A. Yes.

Q. Okay. And that would be all the people in charge of the -- in charge of the deputies who run it; is that correct?

A. Yes.

Q. And you've held that position for approximately how long?

A. Twenty-four years.

Q. Okay. You've actually been in charge of it. It was not a promotion or anything like that. You started out in that position, I take it.

A. In this facility, yes.

Q. Prior to that tell us what you did.

A. I started in law enforcement in 1975. I worked as a police ID technician and also police matron. When the facility, the jail facility, was joined with the county in 1978, I took a position as a correctional officer in the jail, and from there I worked for many years as a correctional officer and then worked

2904

through the ranks from sergeant to lieutenant which is what my rank is now.

Q. And in that position you supervise deputies; is that correct?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2533 of 3636

A. They're correctional officers.

Q. Correctional officers?

A. Yes, sir.

Q. Tell the jury how many correctional officers you supervise currently at the Woodbury County Jail.

A. There's 65 officers, and then we have 3 nursing staff.

Q. And do you have other personnel in addition to the correctional officers who work there who you supervise?

A. No, sir.

Q. All right. In this capacity do you come in contact or direct contact with inmates?

A. Yes.

Q. You've told us what the capacity of the jail is. You've also shared with us the people you supervise. Would you tell us a little bit about the structure itself, how it is set up and the number of floors and tiers and how they break down?

A. The law enforcement center is two floors. The first floor is clerk's office, courts, and sheriff's office. Second floor is the jail facility. In the jail facility, it is for the most part a double-tier facility. So in the pods themselves, when you go into the day room, it is double tiered. There's stairs,

♀

2905

so you go to the second floor of cells, and then there's a first floor of cells.

Q. Okay. And the first floor of cells, is that considered the ground floor of the building, or is it the second or third floor of the building?

A. It's the second floor of the building.

Q. All right. And the third floor is really -- the second line of jail cells, so to speak, would actually be the third

floor of the building.

A. Yes. It's all on the second floor, but basically that's true.

Q. Okay. You had this position in 1993, is that correct, when Mr. Honken was an inmate there; would that be correct?

A. In '93, yeah, I held that position, yes.

Q. You also in -- well, he wasn't there in '93, but you held that position in 1996. Would that be accurate also?

A. Yes.

Q. And Mr. Honken was an inmate there in 1996; is that right?

A. Yes.

Q. In 1996 would you tell the jury the line of authority in terms of your position, who you report to and who reports above you if you could do that.

A. Chain of command, it would be myself, and then I answer directly to Chief Deputy Simmons and Sheriff Dave Amick.

Q. And Sheriff Amick I assume is in charge of the county.

2906

Everyone seemed to know him when we were doing our jury -- witness list for them, and he's been sheriff here for how long?

A. I believe 12 years.

Q. Okay. However, within the jail structure -- and what I mean by that, in line of supervision -- does the deputy actually work in the jail with you, or does the deputy, the chief deputy, work in a different building?

A. He works in the same building, but he's in the sheriff's office, and that's on first floor.

Q. With regard to your office, where is that in relation to the jail tiers?

A. It's on the second floor adjacent to the jail.

Q. And I know you've given us a brief description of your duties. Other than keeping the inmates locked up until such time that they go to trial or after they've been sentenced to the jail for punishment, do you have other duties with regard to inmates?

A. Yes.

Q. Would you describe to the jury what those other duties are and what they were in 1996 with regard to inmates who were incarcerated there for whatever purpose, pretrial or after trial?

A. Review files on incident reports pertaining to inmates and officers, review and answer grievances from inmates, work -- I work closely with the nursing staff and our jail doctor on

medical issues.

Q. What about mail responsibilities if -- I mean mail, m-a-i-l. If in the event the inmates received mail and had issues regarding receipt of mail, et cetera, that's part of something that would filter up to your desk at certain points; is that correct?

A. Yes. Basically any kind of complaint that the inmate may have, if the staff is unable to answer their questions, it would ultimately come to me, Mr. Parrish.

Q. All right. And during the course of time that you had the position in 1996, if there were certain incidents that occurred within the jail and these incidents would be assault or threats, whatever matters may come up, did you report those matters to your chief deputy, or were they matters that were reported to the county attorney or to the sheriff for investigation? Tell us how that worked in 1996.

A. It would depend what the situation is. I mean, if there was a investigation where an inmate was assaulted and criminal charges were being pursued, we would have our investigation division which is in the sheriff's office come up and interview inmates. And from there they would send a report to the county attorney's office for review of charges.
Q. All right. And in 1996, that was the system that was in place; is that correct?
A. Yes.

Q. And let me make sure I understand this. In 1996 if an inmate was assaulted and that report came to your desk, what you would do is refer it to your investigator to go out and take a look to see if it had merit, at least for the purposes of referral.
A. That's -- it's close.
Q. Help me out.
A. When you say refer it to my investigator, it would be the sheriff's office investigator. They are not assigned to me or responsible. The rest of it is accurate.
Q. And how would you get that information to the sheriff's office to investigate?
A. I would give it to the sergeant that's in charge of investigations at the sheriff's office.
Q. Who was that in 1996?
A. I'm not sure.
Q. All right. But assuming that was the procedure, did you do this in writing, or did you do this by a phone call or e-mail, or how did it work?
A. What I would have done, Mr. Parrish, is taking -- taken the

incident reports that we have from the jail, and I would give it to the investigating sergeant in the sheriff's office for their review.

Q. Did you make any exceptions in 1996 with regard to that policy and procedure, or did you follow the policy and procedure

♀

that you just described to this jury?

A. I did.

Q. Were there exceptions in '96?

A. Not that I'm aware of.

Q. And that's how you were trained to do that; is that correct?

A. Correct.

Q. And that's how you did it in 1996 during the time Mr. Honken was a resident at the jail.

A. Correct.

Q. Now, once that matter would move over to an investigator on the sheriff's department, would that investigator have access to the county jail, the Woodbury County Jail, to investigate that incident?

A. Yes.

Q. And tell us about the access that that investigator would have to the jail if there was some incident involving -- I assume we can call this a crime or criminal investigation. Explain to the jury how they would go about doing that criminal investigation if they got a complaint about it.

A. If we had a incident where it needed to be investigated, the officer that is assigned to investigate the situation would have access to whatever they need in the jail.

Q. And that would be the inmates?

A. Correct.

Q. That would be the injury; is that correct?

A. Yes.

Q. That would also be the jail cells to show where the incident might have occurred in.

A. Yes.

Q. Would also include any -- if there was a result of an injury or photographs that needed to be taken, that would be taken; is that correct?

A. Correct.

Q. Now, let me ask you this. That incident report itself with regard to that inmate who was the receiving end of it or the person who, in fact, did the act, would you include within their file the incident report?

A. Yes.

Q. All right. So, therefore, then the person who, say, was assaulted or the person who inflicted the assault, that information would go into that resident's file -- go ahead.

A. The jail incident part.

Q. The jail incident part, right.

A. The part where the deputies would come up to investigate, that information probably would not be in the inmate's file.

Q. Absolutely. So you have a criminal investigation now going on with regard to this incident. We're just talking about the procedure right now in 1996. So the investigator would come over. They would then accumulate an investigative file; is that

right?

A. Yes.

Q. As you understand the process, once you completed the investigative file as you told me, that would then be turned over to the sheriff or directly to the county attorney's office?

A. I would -- my understanding is the investigator would directly send it to the county attorney's office.

Q. And who was the county attorney back in 1996? Would that have been Mr. Mullin?

A. I believe so.

Q. All right. Tom Mullin; is that correct?

A. Yes.

Q. Okay. And then Mr. Mullin then with I assume discussions with the sheriff would decide whether or not charges were going to be filed.

A. Or one of his county attorney -- assistant county attorneys.

Q. Or an assistant county attorney; is that correct?

A. Yes.

Q. And in 1996, would you agree with me that that was the process in 1996; that was the situation in 1997; that was also the situation in 1998?

A. Yes.

Q. Now, let's go back again to 1998. And you indicated when you gave me this file -- and hold on just a second because we

2912

gotta figure out how we're going to share this file.

A. Okay.

MR. PARRISH: Your Honor, I think we're one copy short here. The copy that we had back there this morning, if I can

get that copy out of the --

THE COURT: Defendant's Exhibit W?

MR. PARRISH: That's right, Your Honor, but I can work off this one if that's okay with the Court, the one that's in there, this one.

THE COURT: The one I threw away? Okay.

MR. PARRISH: Sorry about that, but I can work off this one.

THE COURT: I had a second copy.

MR. PARRISH: I was trying to figure a way to do that without making a problem, but I couldn't think of a way to do it.

BY MR. PARRISH:

Q. All right. Now we have enough copies to work with. You did, as a result of a subpoena issued on you in the last few days, go back through and gather together Mr. Honken's file, did you not?

A. Correct.

Q. And you were kind enough to allow us access to it because there was some misunderstanding for whatever reason -- doesn't matter -- that we only had a portion of the file, but right now

we have the complete file; is that correct?

A. That's correct.

Q. I'm going to share with you -- this will probably be easier -- did you have a chance to read it the last few days?

A. Yes.

Q. Okay. So you're somewhat familiar with it.

A. Yes.

Q. I have some documentation that I'm going to go with. We've

labelled this Defendant's Exhibit W. And what we're going to do is go through certain portions of Mr. Honken's file while he was down at the Woodbury County Jail. Is that okay?
A. (Witness nodded head.)
Q. If you have problems, what we'll do is I'll share my copy with you because I have mine marked.
A. Okay.
MR. PARRISH: I'm going to give her Exhibit W.
Q. And you can take a look -- well, obviously you know it's not the complete file because there are only certain documents I want to refer to during the course of my examination; right?
A. Yes.
Q. You indicated -- and what I'd really like to do is go to the -- one of the main areas of questions I want to ask you. There was an incident, was it not, that -- Mr. Honken administratively was charged with attempting to escape; is that right?

2914

A. Yes.
Q. All right. All right. Now, let's talk about that for an instant. That was an instance that was handled administratively; is that correct?
A. That's correct.
Q. Now, explain to the jury -- you talked about how a case would get up to the court and be handled if the county attorney got access to it. But explain to them about a secondary process that you had within the jail that was administratively -- administrative. Tell them how that would work in 1996.
A. The inmates after they've been booked and are there for their first 24 hours, after that they are set up with blankets

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2542 of 3636

and towels and toilet articles. They're showered and put into our inmate jumpsuit. At that time we give them an inmate rule book that states the rules and regulations of the jail facility. They're stressed to read that inmate rule book and follow rules and regulations while they're incarcerated in the Woodbury County Jail.

In an incident with Mr. Honken, we completed an investigation within the jail on an incident report and wrote Mr. Honken up for violation of the rules and regulations.

Q. And do you have a date when that was done? Do you know offhand when that was done?

A. I believe it was November 25, 1996.

Q. And did Mr. Honken agree with that, or did he disagree with that?

A. I'd have to look.

Q. All right.

A. Mr. Parrish, he disagreed.

Q. All right. Now, let's talk about that for a second. First, as I understand it, it was related to a hole in his jail cell wall; is that correct?

A. Yes.

Q. And you had a chance to actually go out and take a look at this hole, did you not?

A. Yes, I did.

Q. And this hole that was in his wall was related to -- let's -- and I think I've asked you this a long time ago, but where did that hole -- assuming that hole was successfully grilled or drilled or whatever you do to it to get through it, where would it lead to?

A. I believe the hole in D2 was by the plumbing, adjacent to the plumbing tunnel.
Q. And the hole was approximately -- it was not a big hole, was it?
A. No.
Q. About two and a half by three inches or something like that?
A. Around three inches.
Q. It was filled in with soap.

♀

2916

A. Correct.
Q. Mr. Honken said that the soap was there and he had told the jail staff this prior to the time he was -- when he was first put into the cell, did he not?
A. I don't remember that.
Q. You don't recall him saying that?
A. No.
Q. Do you recall him writing you a letter indicating that he was unhappy with the decision that they were saying that he, in fact, put the hole there when he had complained to them earlier that the hole was already there when he got there?
A. Mr. Parrish, do you have a better copy of --
Q. I do. Mine is not very good, but I'm going to show you our W, his letter to you where he was just given 26 days' lockdown.
A. From what I can review from this, Mr. Parrish, it looks like he is saying that Joe Sandoval was the guy in David 11 that had done this and that it was a poor patch job.
Q. Matter of fact, he had complained about that even before they said he had done it; would you agree?
MR. WILLIAMS: Objection, Your Honor. Leading the

witness.

MR. PARRISH: Let me withdraw that.

BY MR. PARRISH:

Q. Let me ask you, had you heard from him prior to this time that he wrote you this letter indicating that -- whether or not

he had done this?

A. No.

Q. So this letter was the first response that you had gotten one way or the other from Mr. Honken.

A. This was an appeal to the disciplinary, so it was the first response I had.

Q. Now, let me ask you that. Prior to the time that Mr. Honken wrote this letter about what the incident report said, had anyone gone and talked to Mr. Honken and asked him what had happened and how that hole ended up getting there?

A. I'd need to look at the incident report if I can.

Q. Sure. Help yourself. Anything you need to refer to, feel free to pull it out and look at it.

A. I don't show from the jail incident that Mr. Honken was confronted on this.

Q. Right. So that would mean that this letter that he wrote would be the first time anybody in the jail or any part of the investigators would have heard what Mr. Honken had to say about that hole that was in his cell wall from what you can review in the file.

A. I don't have what the investigators -- I just have the incident report from the jail.

Q. And what the incident report from the jail shows is that Mr. Honken was not confronted at all, and that means he was not

asked questions to give his version of what happened.

MR. WILLIAMS: Objection. Leading, Your Honor.
THE COURT: Overruled.
BY MR. PARRISH:
Q. Was he asked -- okay. I'm sorry. Go ahead.
A. Not from the jail report.
Q. Are there provisions within your administrative rules that allow Mr. Honken to respond to this hole that they saw in the wall prior to the time that he wrote his letter to indicate that he didn't do it? Are there rules within the administrative process?
A. Through the disciplinary board.
Q. Does he get a right to appear there?
A. Yes.
Q. And did he appear there?
A. Yes.
Q. And did he talk to them to your knowledge?
A. I'm not -- you know, I wasn't at the disciplinary board.
Q. Okay. But do you know that after he wrote you the letter you stuck with the decision or you said the decision of the disciplinary board would stand; is that correct?
A. I reviewed the incident report, Mr. Honken's appeal, and what the disciplinary board had given him for deadlock time and made my decision from that.
Q. Now, let me ask you this. Did you or anyone else go back and check the last time his cell had been inspected before these

other people had been moved in there?

A. We inspect all cells every day at least three times a day.
Q. Absolutely. But my question, did you go back and check to see whether anyone found any incident of a patch in the wall at all?
A. I don't know if they did or not.
Q. And this patch in the wall, would you agree, was a patch that was made to look like it fit right into the wall? From your own eyeball inspection of it, it was a hole dug out and a patch placed in there that made it look like it was part of the wall?
A. You're referring to the soap?
Q. Yes, ma'am.
A. That's what it looked like, yes.
Q. And Mr. Honken's complaint was that when he got there it was there.
A. I -- from reviewing the file, I do not see where he said that, no.
Q. Okay. From your review of the incident report, did you have anyone who said they saw him knocking into the wall?
A. I believe there was a letter from another individual --
Q. The anonymous letter.
A. The anonymous letter in the incident report was from Inmate Garrison, and it was in Inmate Garrison's cell. When Officer Peterson went in to do his head count, he saw the letter

2920

addressed to Sergeant Harlow. Officer Peterson asked if this was for him, if he should take it, and Officer Peterson took the letter and then read it. And, of course, at the bottom of it, it had anonymous, but it was in Inmate Garrison's file -- or cell.

Q. Now, from this incident and this disciplinary report, Mr. Honken was given 26 days' lockdown after he lost his appeal; is that right?
A. Correct.
Q. And lockdown, he went to the hole?
A. Excuse me?
Q. Explain lockdown. What is lockdown so the jury can understand it?
A. Lockdown is in -- locked in a individual cell away from all other inmates.
Q. All right. And tell us when he's in lockdown locked from all other inmates, explain his privileges at that point, where he is in the jail, and who he has access to with regard to other inmates.
A. I believe in this case he was in temporary holding.
Q. And explain to the jury how that works.
A. He would have been moved from David block to temporary holding, and the cells are set up there that they're individuals. There is no day room area there. There is no TV. All bodily movement of the inmate is done with an officer other

2921

than in their individual cell.
Q. And the records will show he was there for 26 days.
A. Correct.
Q. What about his access to mail? During that time does he get his mail? I mean just as a general process.
A. Normally, yes.
Q. Does he get telephone calls?
A. He would -- his telephone calls were restricted except for legal.

Q. And what about his visitations?
A. No visitation.
Q. So that would mean from the time of the lockdown which was sometime in November up until his 26 days would end, he would not have access to visitation, his mail would not be restricted, but he would have no television, and the officers would watch all of his movements; is that accurate?
A. Correct.
Q. Now, after that period of time, did you send that file out for an investigation to the sheriff's office of Woodbury County?
A. After his disciplinary?
Q. Yes, ma'am.
A. No.
Q. To your knowledge was that matter ever referred to the county attorney, Mr. Mullin?
A. I believe it was, yes.

2922

Q. And do you know when that was done?
A. No.
Q. To your knowledge, did anyone from the sheriff's office come in and conduct an additional investigation, not part of the administrative process, an additional investigation into that hole in the wall?
A. Could you repeat that, Mr. Parrish?
Q. Right. As with regard to the hole in the wall that he was given the 26-day lockdown for, to your knowledge did anyone from the sheriff's office ever come in and conduct an investigation into that hole in the wall?
A. Yes.
Q. Do you know who did that?

A. I believe from reviewing incident report -- I think Deputy Fox and Deputy Haafke were involved.
Q. Have you ever seen a copy of those reports?
A. I believe some time ago.
Q. Would you agree that those reports were not put into Mr. Honken's file?
A. Not his jail file, no.
Q. Which file was it put into to your knowledge?
A. That would be in the investigator file.
Q. Over in the sheriff's office.
A. Correct.
Q. Do you know whether that report as we sit here today has

ever been turned over to the government?
A. I'm not sure.
Q. Do you know whether they've requested it or not?
A. Not from me.
Q. And when that investigative file was completed, not the administrative part, would that file then have been turned over to part of the sheriff's investigative file and eventually to Mr. Mullin had the proper process been followed?
A. Correct.
Q. Would it have been turned over to him whether or not charges were filed?
A. Yes.
Q. The sheriff on their own, would you agree, could file charges?
A. Yes.
Q. To your knowledge was that done?
A. No.

Q. I'm just curious. Was that hole in the wall ever fixed?
A. Yes.
Q. Okay. Now, you indicated it went into the plumbing area. Does it really go from D2 into C block cell if you go back and think about it?
A. Correct. It was behind the door.
Q. So actually before you said into the plumbing area. It actually would go into another cell block area.

♀

A. Correct.
Q. Now that you think about it; right?
A. It's behind the door.
Q. And I believe that's consistent with what you've testified to before.
A. Yes.
Q. What I'd like to do -- we've taken care of the matter of where the escape went. We have additional follow-up questions with other witnesses on that. What we'd like to do right now is go back to Mr. Honken, and what we're going to do is go to some time before the incident involving his disciplinary action on the lockdown, and we're going to move forward with you with regard to some other matters that he was involved with when he was at the Woodbury County Jail.

Mr. Honken, when he first came in, had a complaint about his placement, didn't he?
A. During his time. I'm not sure if it was at the beginning, but yes.
Q. Right. He complained -- and correct me if I'm wrong. He complained about numerous things; would you agree?
A. Yes.

Q. What were the complaints -- and explain to the jury the complaint he had about having other people in his cell when he first got there.
A. He complained because of the seriousness of his charges

that he did not want to be in any cell with anybody else.
Q. Why did he say that?
A. I believe in one of his complaints he said that he was -- wait a minute. He says that he feels that his case is being compromised by being assigned to a roommate.
Q. Because people were reading his legal files; is that right?
MR. WILLIAMS: Objection, Your Honor. Leading the witness.
MR. PARRISH: I'll withdraw it.
BY MR. PARRISH:
Q. Why did he say that then? How were they being compromised? What were his complaints about the compromises of his file, of his case?
A. On the letter I'm looking at right now, he just says that being compromised by having a roommate.
Q. Okay. Was he so upset, do you know, that not only did he complain to you about it -- and to set as background, when he writes letter other than legal mail, that mail is read, is that correct, by the jail? They look at it if it's not legal mail to see if he's up to something; would you agree?
A. We scan mail, yes.
Q. All right. And you scan the letter he had written to Judge O'Brien, did you not, with that same complaint -- Judge O'Brien being a federal judge over here -- about why they're putting me in a cell someplace where they're going through my files?

A. I have a letter that he addressed to -- it says, Sarg., that he called Judge O'Brien's office.
Q. And did he have access to the telephone where he could call if he wanted to?
A. Yes.
Q. All right. And his complaint then again was about people going through his mail. Was that --
MR. WILLIAMS: Objection, Your Honor. Leading the witness.
Q. What was the nature of the complaint?
A. It states that I've called Judge O'Brien's office and told them that I feel my case is being compromised by being assigned a roommate.
Q. Now, he didn't just write that complaint initially. Did he consistently and persistently to your knowledge from review of his file follow up on the nature of that complaint from the day he got in there and forward? Just, first of all, answer yes or no to that.
A. Yes.
Q. All right. You've talked about him talking to you about it or writing to you about it, him putting a note in his file that he called to Judge O'Brien about it when he wrote a note to the sarg. Did he also get to the point to your knowledge as to whether or not he had his counsel intervene directing a letter to you that his legal papers were being gone through by other

inmates?

A. I believe I have a letter from you, Mr. Parrish.
Q. Okay. If it's not from me, would it have been from one of my associates at the time that you have in the file? Would you go to that letter, please? It's from my office; is that right?
A. Yes, it is.
Q. And do you have that letter present?
A. Yes. It's from April 14, 1997.
MR. PARRISH: I want to move, first of all, to introduce Exhibit W.
* * * *
(Defendant Exhibit W was offered.)
* * * *
MR. WILLIAMS: No objection, Your Honor.
THE COURT: Defendant's Exhibit W is received.
* * * *
(Defendant Exhibit W was admitted.)
* * * *
BY MR. PARRISH:
Q. This is going to pop up on your screen, but what I'd like you to do is take a look at that letter, and I have some parts I believe in yellow. Can you look at the letter right now right in front of you? I think I can make this a little bit smaller. Hold on a second. In this letter to you, do you see the part underlined in yellow? Would you start reading that part as to

2928

what the complaint was?
A. Mr. Parrish, it doesn't -- on my screen it doesn't really show it in yellow.
Q. Start where it says, Normally.
A. Normally I would not write a letter of this nature, but in

this case I have been informed that on more than one occasion Mr. Honken has observed his cellmates looking through his legal documents and material.

Q. So that complaint is consistent with the complaint that you said Mr. Honken raised when he first was put into the Woodbury County Jail. Is that consistent with that?

MR. WILLIAMS: Objection, Your Honor. Misstates the evidence.

THE COURT: Overruled. You may answer.

A. No.

Q. Would you also go to the last paragraph in yellow where it says, Given the nature of these charges? Do you see that paragraph?

A. Yes.

Q. Did you receive this letter also? This paragraph in the letter, you remember reviewing that?

A. Yes.

Q. Okay. And what does that say?

A. Given the nature of these charges and the fact that other inmates seem overly interested in Mr. Honken's case, I am

2929

requesting that Mr. Honken be placed in a cell by himself.

Q. Did you do that?

A. The letter that I sent back to Mr. Hartley on April 29, 1997, I advised him that at this date he was by himself but that I could not guarantee that he would be in a cell by himself all the time.

Q. Now, that's not all that Mr. Honken did with regard to actually protesting the concern that he had about people reviewing his files, not just myself writing a letter or someone

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2555 of 3636

from my office writing a letter, him writing a memo, him saying that he called Judge O'Brien, but wasn't there an incident involving Mr. Honken where he -- or do you recall an incident where he would not go into the cell with another inmate?

A. I'd have to review. I don't remember.

Q. Sure. Go ahead. And if I can find it quicker, I'll bring it up to you. You don't remember off the top of your head whether or not he was disciplined at one point for refusing to go into a cell because he was protesting the fact that people were going through his mail.

A. I remember an incident where he was having trouble, but I don't remember what it was in reference to.

Q. Okay. Go ahead and take a look at it.

THE COURT: Mr. Parrish, I'm going to give the jury a stretch break while the witness is looking through the document.

MR. PARRISH: Thank you.

♀

THE COURT: Thank you.

Please be seated. Thank you.

BY MR. PARRISH:

Q. Have you had any opportunity to find that at this point? You said you do remember an incident, but you can't recall specifically if it was because he refused or was stating that he was refusing to want to go in a cell with someone because they were reading his papers?

A. I have one incident that I'm looking at from June 30 of '97 where he was concerned that someone in his cell had tuberculosis, but that's the only one I've found so far.

Q. He had numerous concerns about health and cleanliness that he wrote about, did he not, about the showers not being cleaned

down enough, about some personal effects not getting to him timely?
A. I remember one incident on cleaning.
Q. He complained about that?
A. Yes.
Q. Okay. By the way, as you go through these things, when he ended his letters to personnel at the jail, was he always courteous and ended with a "thank you" on all of his notes?
A. I'd have to look at all his notes.
Q. Okay. Feel free to do that as you flip through them.
A. I'm looking at one from -- he doesn't have a date on it. From 1-23 of '97 is what the officer -- and he's asking for the

1996 edition of the federal sentencing, and he just signs it Dustin Honken. I don't see "thank you" on it.
Q. Excuse me just a second. I just showed you a series of six letters. You said you just looked at one. I just showed you six letters in the file. All of them concluded by Mr. Honken saying "thank you." Would you agree?
A. Yes. I found the incident. I just need to read it.
Q. Sure. Go ahead.
A. Mr. Parrish, the incident I'm looking at is an incident that occurred in G block, and for the most part it looks like there was a bunch of horseplay and they were throwing their coffee cups from the top tier to the bottom and breaking them up. There were several inmates in that, and from what I'm reading here that there wasn't any cooperation on who did what when. Nobody wants to tell on the other person.
Q. And does it say that Mr. Honken was involved in that or anything about him refusing to go to his cell in that incident?

A. Unless I'm missing it, I don't see.

Q. So you're saying you just recall maybe there was an incident where he would not go in his cell when someone was there, but you're saying you don't see it at this point in his file.

A. That's correct. I haven't found it.

Q. That's fine. Now what I want to show you is a series of letters all in Exhibit W, and it might be quicker if I showed

♀

them to you so you don't have to look at that file since it's an exhibit.

A. Great. Thank you.

Q. And does that look like material that came from his file that Mr. Honken might have written requesting legal material and some assistance with getting access to legal documents? And that might speed up things a little bit because you can go right to those documents that I've pulled for you, and I know it's kind of cumbersome to go through a file when it's like that without being indexed.

A. Yes.

Q. And how does he conclude each of his requests throughout the time he was there when he requested legal material? How many different pages do you have there?

A. I have 11.

Q. And how many times does he say "thank you" when he makes a request?

A. Ten.

Q. And do those documents that he requested get delivered to him on his case when he's requesting this material? You do the best you can in responding to him; is that correct?

A. There should be a written response from me along with those.
Q. As a matter of fact, you deal with all the inmates like that, and it's a lot of work over there, isn't it?

A. Yes.
Q. And matter of fact, he thanks you at one point for your prompt response to his request for legal material to help him work on his case.
A. Yes.
Q. I'm going to show you a letter -- did he complain also about the TV and the noise and the fact that access to the phone stopped him from working on his case? Just tell me -- and I have the material I'm going to show you and your response because I can get to it a lot quicker than you since I'm familiar with the file. Do you recall that incident?
A. Offhand, no.
Q. Okay. I'm going to let you take a look at it where you responded to Mr. Honken with regard to that matter.
A. Yes.
Q. And he had indicated in his comment to you that he was more concerned about working on his case than watching television or access to the phone to work on his case.
A. And -- is it in here?
Q. Well, do you recall it? I can get to it later.
A. No, I don't.
Q. But you did respond to that letter.
A. I did respond to it.
Q. And that's the important thing. And I'm going to show you one other letter. And the copy I have is very difficult to work

with, but that's an incident where an individual was injured over at the Woodbury County Jail. Mr. Honken had some concern about that individual and thought someone should take a look at it.
A. Yes.
Q. Of the incidents at the jail during the time Mr. Honken was there, other than the escape where he got the 26 deadlock time, was he involved in any assaults of any inmates that you investigated?
A. Not that I remember.
Q. Did any inmates to your knowledge assault him which you investigated?
A. Not that I remember.
Q. Would you agree that everything related to Mr. Honken about his file and his conduct at the jail you would have included in his file except for any investigation of any other matters that were outside of the grievance procedure?
A. Yes.
Q. And he was at the Woodbury County Jail, and tell the jury how long was he at the jail. From what date? It would have been -- you go back to '96 and go forward. That might help you get to it quicker.
A. I believe he arrived in our facility in June of '96, and he was there through December. I'm not sure how long he was there.
Q. Okay. But maybe in '98, '97, '98?

A. Off and on, yes.
Q. Okay. The mail that comes in, you indicated it's opened

and scanned by deputies, and I assume that's for security reasons, is that correct, or jailers or correctional officers for security reasons; is that correct?

A. Correct.

Q. Now, once it's scanned, can residents have access to actual newspapers, or do they have to have copies of newspapers? Do you understand my question?

A. Newspapers have to be ordered through the Journal.

Q. And what about clippings?

A. If there is a clipping in their mail, we'll check it, but they can have it.

Q. And they can have that; is that correct?

A. Sure.

Q. With regard to their jail cells, once they're in a pod, are those jail cells open, or are they locked? And what I mean by that, the individual cells where you put someone into with a roommate or without a roommate, are they locked?

A. Sometimes.

Q. And do you have a schedule as to when they're open?

A. Yes.

Q. And what was that schedule in '96 with regard to the cells? And I realize you may not be able to say if there was a lockdown or something like that. I'm not interested in that. But what

was the general rule with regard to the cell doors being open within the pod?

A. In the morning they would be open between 4 and 4:30 a.m., and deadlock time would occur at 10:30 p.m.

Q. And those cell doors would be open all the rest of the time unless there were some additional security measures being taken;

is that correct?
A. Yes.
Q. And the inmates on the pods, would they or would they not have access to the other inmates' jail cells?
A. They're not supposed to, no.
Q. I understand they're not supposed to, but would they physically have access to it?
A. Yes.
MR. PARRISH: No further questions. Thank you.
THE COURT: Mr. Williams, you may cross-examine.
MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:
Q. Good morning, Lieutenant.
A. Good morning.
Q. You were just asked a minute ago about an incident where the defendant was complaining about access to a telephone and TV. Do you recall being asked that question, ma'am?
A. Yes.

2937

MR. WILLIAMS: May I approach, Your Honor?
THE COURT: You may.
BY MR. WILLIAMS:
Q. Lieutenant, I went ahead and marked my pages on this Exhibit W, and I'm -- for the record I'm pointing to page 53 of that, and do you recognize that as the letter that Dustin Honken wrote to you complaining about that access to the TV and telephone?
A. Yes.
Q. And in that does he, in fact, at the end of that threaten

that if you don't do what he wants in giving that access that he and the other inmates will take matters in their own hands?

A. Yes.

Q. And you responded on page 54 of Exhibit W telling him not to threaten another inmate; is that correct?

A. That's correct.

Q. You were asked some questions, Lieutenant, concerning complaints that the defendant made about being in his own cell. It's true, ma'am, when he first came to the Woodbury County Jail that he thought he was entitled to some special privileges because he was a federal inmate versus a state inmate; is that correct?

A. From his letter, yes.

Q. All right. And at some point but this is on -- April 14 of 1997 was the date of that letter that was sent to you by the

Parrish law firm complaining about people getting into his cell; is that correct?

A. Yes.

Q. This is quite a bit of time after he was first in the Woodbury County Jail if that started in June of 1996; would you agree?

A. Correct.

Q. And you responded to that letter by the Parrish law firm, did you not, Lieutenant?

A. Yes, I did.

Q. And can you find that response? If not --

A. Yes, I've got it right in front of me.

Q. Okay. In that response you indicate that you actually looked into this matter to determine if that was a problem,

didn't you?
A.    Correct.
Q.    And in the second paragraph you indicate you do not have any letter written from Inmate Honken stating that his roommate was or is looking at his legal material.  His most recent roommate was David Mount and by my observation seemed to get along quite well.  Approximately October of 1996 Inmate Honken stated in a letter that he thought it could be a probability that an inmate could read his legal material but had no names identifying anyone.  Did I read that correctly, ma'am?
A.    Yes, you did.

♀

Q.    And, in fact, there was never any report in any of your file where any inmate was caught having access to a defendant's cell in an unauthorized manner; is that accurate?
A.    As far as I know.
Q.    And when you wrote this letter in April of 1997 in order to respond to that, you went back through the file to determine if there was any other prior complaints by the defendant about people having access to his file, and the only thing you could find was this one letter in October of 1996 in which he claimed that there might be a possibility or probability an inmate could have access.  Is that fair?
A.    That's correct.
Q.    Turning to the escape issue for a moment, the notice that you as jail authorities got concerning this escape incident, as you indicated in your direct testimony, came from an anonymous note or a note that was signed anonymous, but it actually came from an Inmate Garrison alerting the staff to this escape attempt.  Is that accurate?

A. Yes.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. I just want to make sure you can get to this. I'm pointing to page 23 of Exhibit W. Is that the note we were looking at there before?

♀

A. Yes.

Q. Could you read that to the jury, please?

A. It says, Sergeant Harlow, the reason why I'm telling you this is that I don't want the entire block to be locked down just for the two individuals who are planning to escape, and they are as follows, Dustin, D2, and Sabasta, D3. Sabasta was the one who yanked the door handle off of D5 last night to use for a hammer in D2's room. I feel that they are only two to get locked down, not the entire block. They're supposed to break through to C block who already supposed to have a hole leading outside. The ring leader over in C block is Dennis Putzier. And then it's signed anonymous.

Q. And, in fact, Lieutenant, showing you what's already been admitted as Exhibit 214L, you did, in fact, find a hole started -- I'm sorry.

THE COURT: You're trying to show it from your computer?

MR. WILLIAMS: I am, Your Honor, and I'm not quite sure why it's . . .

THE COURT: Let's see if I can help you out here.

MR. WILLIAMS: There we go. Thank you.

BY MR. WILLIAMS:

Q. I hit the wrong button I think. 214L, do you recognize that as the hole that was in D2 that had been patched with some soap?

A. Yes.

Q. And that was found immediately after correctional officers got this anonymous note from one of the inmates there; is that correct?

A. No.

Q. When was that found?

A. It was not found until the 25th of November of 1996.

Q. Okay. And why was there a delay between the time of the note and the discovery, or do you know?

A. From the review of the incident, they shook down David block after this letter was given and found nothing. On the 25th I had -- while doing head count, I had Sergeant Harlow check the cells once again, and that is when they found the soap in the wall.

Q. So they missed it the first time through.

A. Correct.

Q. And as you testified on direct examination, that wall, if successfully broken through, would lead into C block; is that correct?

A. Yes.

Q. And in C block you, in fact, found, showing you Exhibit 214B, a hole that had been started in the outside wall just as indicated by the anonymous note; is that correct?

A. Yes.

Q. Based on your investigation within the jail administration,

you testified on direct examination a conclusion had been made that the defendant, Dustin Honken, was, in fact, involved in an attempt to escape from the jail.

A. Correct.

Q. And as a result of that, he was written up and disciplined as an administrative matter by your staff; is that correct?

A. Yes.

Q. The defendant disagreed with that. He appealed. That appeal was heard by the staff there. And just explain, when an appeal is made, is there a number of people that an appeal is made to that review the facts to determine if there's merit to the appeal?

A. The appeal is delivered to me, and I review the files, the record, and the appeal from the inmate and make a decision from there.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. To help explain a little bit, I'm showing you page 30 from Exhibit W, and this is a document entitled Disciplinary Hearing Board. What is a disciplinary hearing board?

A. It is compiled of three people that do not work in the jail facility, and they meet as a board and have the people that have been accused as in this case Dustin Honken come and explain his side of the story. From there the board makes a decision on the

2943

case reviewing the incident report and talking to the individual.

Q. And page 30 reflects that on December 6, 1996, there was such a hearing at which the defendant was given an opportunity to give his side of the story; is that correct?
A. Correct.
Q. And there's a finding made by the board, is there not?
A. Yes.
Q. Could you read that, please?
A. The board does not believe Inmate Honken's story that he -- that the correctional officers knew about the patch hole. We feel that the inmate Honken was part of the hole being created. He will be deadlocked for 26 days.
Q. And then after the appeal, you wrote a response -- let's see. Yes. The hearing was on December 6 of 1996, and then you wrote a response to the defendant's appeal of that decision that's dated on December 12 of 1996?
A. Yes.
Q. And you rejected his appeal.
A. Correct.
Q. And then, Lieutenant, at some point this matter was referred to the county attorney as you indicated because you all believed that there was merit to the fact -- or to the charge of attempted escape by the defendant.
A. Correct.

2944

MR. PARRISH: Object as a misstatement of the record that "you all" being -- who "you all" is.
MR. WILLIAMS: I'll rephrase it.
THE COURT: Rephrase the question.
BY MR. WILLIAMS:
Q. The sheriff's office -- and you are part of the sheriff's

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2568 of 3636

office; is that correct?
A. Yes.
Q. The sheriff's office referred the matter to the county attorney believing that the defendant ought to be prosecuted criminally for attempted escape.
A. Yes.
Q. By the way, ma'am, were you able to review the file in this case enough to also look at some of the visitation records, who was visiting Dustin Honken during this time period he was in the Woodbury County Jail?
A. I haven't recently, no.
MR. WILLIAMS: Okay. Thank you. I have no further questions.
THE COURT: Mr. Parrish, anything further?
MR. PARRISH: Just one last question, Your Honor.

REDIRECT EXAMINATION

BY MR. PARRISH:
Q. You would agree that the majority of this file was just produced for the government and for myself this past week? Part

of it had been produced, but the rest of the file was put together this week; is that right?
A. Per subpoena, yes.
MR. PARRISH: Thank you. Nothing further.
THE COURT: Mr. Williams, anything further?
MR. WILLIAMS: No, Your Honor.
THE COURT: Thank you. You're excused.
Mr. Parrish, would now be a good time to take our mid-morning recess?
MR. PARRISH: It'd be a great time, Your Honor.

THE COURT: Okay. Members of the jury, it's 10:00. We'll be in recess for about 25 minutes till -- make that 30 till 10:30, and we'll see you back here at 10:30. Please remember my cautionary instruction which you all have memorized now. Keep an open mind till you've heard all of the evidence in the case. Thank you.

(The jury exited the courtroom.)

THE COURT: Are there any matters we need to take up?

MR. PARRISH: Your Honor, no. I think our next witness is perhaps going to be Mr. Loparo, so we'll need to bring him in.

THE COURT: Okay.

MR. PARRISH: I'll alert the marshal's office now.

THE COURT: Okay. Thank you.

Mr. Williams, anything further?

2946

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: I just have one observation. After Mr. Parrish's slick move, I think he'll now be known as Al "Trash Can" Parrish which is actually if you think about it an improvement from one of the juror questionnaires that I believe called you -- all the lawyers pond scum. So you're moving in the right direction. Thank you.

(Recess at 10 a.m.)

THE COURT: Ready to have the jury brought in?

MR. PARRISH: We are, Your Honor.

THE COURT: Okay.

(The jury entered the courtroom.)

THE COURT: Members of the jury, please be seated.

Mr. Loparo, I need to swear you in. I know it's

tough, but can you raise your right hand?

DAVID LOPARO, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Thank you.

Would you state your full name, please, and spell your last name for us.

THE WITNESS: My full name is David Allen Loparo, L-o-p-a-r-o.

THE COURT: Thank you.

Mr. Parrish?

MR. PARRISH: Thank you, Your Honor.

DIRECT EXAMINATION

♀

2947

BY MR. PARRISH:

Q. Good morning, Mr. Loparo.

A. Good morning.

Q. We met today for the first time this morning downstairs; is that correct?

A. Yes, sir.

Q. And however, you had met with an investigator from my office, Mr. Delbert King, down in Atlanta?

A. Yes, sir.

Q. Is that correct? And you met with him I believe it was back in July. Is that about right?

A. Yes, sir.

Q. All right. Tell us right now where you presently are incarcerated.

A. Atlanta, Georgia.

Q. And how long have you been in Atlanta?

A. Approximately two years.

Q. And where are you from, sir, originally?

A. Originally from Cleveland, Ohio.
Q. And presently you have some convictions; is that right?
A. Yes, sir.
Q. Would you tell the jury what convictions you have, please, felony convictions.
A. That I'm serving time for right now. I've been convicted of two bank robberies, and I also have a conviction for

♀

fraudulent schemes and theft.
Q. Now, you have what you call a discharge date. Much like the Army or whatever, you have a date when your time for service ends; is that right?
A. Yes, sir.
Q. Would you tell the jury when you're scheduled to get out of prison.
A. I finish my federal sentence in 2006, October 18, 2006.
Q. So that's about two and a half more years that you have facing your federal charges; is that right?
A. It's actually just a little over two years.
Q. All right. Would you tell us on the charges that are presently pending, other than staying in Atlanta, where else have you been incarcerated?
A. I've been to Florence, Colorado.
Q. Okay.
A. Marion, Illinois, and Leavenworth, Kansas.
Q. Now, let's talk about Leavenworth. How long were you in Leavenworth, Mr. Loparo?
A. Approximately maybe three months, and then I got pulled on a writ to go back to state court.
Q. And then after Leavenworth and the state court, did you

then get transferred to Colorado, or did you go to someplace else?
A. No, I went to Marion after that, Marion, Illinois, and then

I got transferred to Colorado.
Q. And do you recall the date you were placed in Colorado? Could you give the jury those dates?
A. I believe it was approximately August of 1997.
Q. And from 1997 until what date did you remain in Colorado, Florence?
A. I was approximately there for five years so . . .
Q. And then from Colorado, Florence, you went to Atlanta; is that correct?
A. Yes, sir.
Q. Now, I want to talk for a second how you got from Atlanta here to this courtroom today. I want the jury to understand a little bit about that process. Were you presently working when you were in Atlanta?
A. Yes, I was.
Q. Okay. Tell the jury where you were working.
A. I was a plumber, worked on the plumbing crew.
Q. And as a plumbing crew person, what do you do when you're in prison down in Atlanta?
A. You fix toilets.
Q. And is that all over the prison, or is that outside of the prison?
A. That's all over the prison, sir.
Q. Okay. And do you have a crew boss or someone who supervises you?

A. Yes, sir.
Q. And who is that?
A. That'd be Randy Wright --
Q. If you don't remember --
A. No, it's --
Q. Is it an inmate or is it --
A. No, that's a correctional off -- it's . . .
Q. Okay. While you were in Atlanta -- and then we'll talk about your trip here, but when you were there, did you have a cell on your own, or did you have a cell that you shared with someone else?
A. You share a cell.
Q. Now, when you got here, how did you know that you were coming? Did you get some type of order that says, boom, you have to be here in court? How'd that process work?
A. Monday morning after breakfast I was coming back from breakfast getting ready to go to work, and the unit officer told me that I was going on the air lift.
Q. All right. So you're going on the air lift, and do you get on the air lift at that point?
A. Well, he takes you back to your cell and asks you to pack your stuff if you got anything to pack and then escorted me to R and D which is receiving and discharge, and that's where they search you and cuff you up and get you ready for the bus that will take you to the airport.

2951

Q. All right. And before you came here were you thoroughly searched?
A. Yes, sir, many times.

Q. Many times.
A. Many times.
Q. And were you just like patted down or something like this?
A. No. They first walk you through a metal detector. This is when you're leaving Atlanta; okay? I'll take you through this real quick.
Q. Yeah, just quick because we want to focus on there and get to the area of the other search.
A. Well, you walk through a metal detector. Then they strip search you. They have you bend over, cough, and some other things that I'd rather not say.
Q. Okay.
A. They strip search you, a basic strip search, and run a metal detector over your body.
Q. Did they at any point X-ray you?
A. No, sir.
Q. Did you lose your position down in Atlanta with regard to your work by this transfer?
A. No, sir.
Q. You'll be able to go back --
A. Well, I'm not sure.
Q. You don't know.

♀

A. I don't know.
Q. Okay. It's a wide open question at this point.
A. It is at this point, yes.
Q. So when you got here, you came in, and you go down to a holding cell. Actually you go to another cell; is that right?
A. Yes.
Q. And when you were at this cell, it's what's called a dry

cell; is that right?
A. Yes.
Q. And explain briefly to the jury what a dry cell is once you got there.
A. Well, a dry cell just means there's no running water. If you have to use the facility -- someone's sitting there watching you in case you have to use the facilities. They put you in a dry cell usually because they think that you're hiding something.
Q. And so you were in this dry cell for how long?
A. They put me in the dry cell when I got to Oklahoma City for about 14 hours.
Q. And then you were then transported here by marshals, and then you went into a dry cell in Woodbury County? Is that where you went into another dry cell?
A. No, sir. They had running water there.
Q. Okay. You did have one running -- but your dry cell was before that.

♀

2953

A. Yeah, it was in Oklahoma City.
Q. Up to this date, have you had a chance to shave? I know you have a beard, but did you have a chance to shave, take a bath, anything like that?
A. No, sir.
Q. And you were a little concerned that you had not had that opportunity before you appeared in front of the jury; is that correct?
A. Yes, sir.
Q. And you expressed that concern to us when we went down and met with you this morning; is that correct?

A. Yes, sir.

Q. So you would agree that for whatever reasons -- and not blaming anybody for it -- you did not have a chance to shave your beard and make -- and comb your hair so you'd have the kind of appearance that you'd want to have for this jury; is that correct?

A. Yes, sir. I don't feel comfortable appearing like this in front of the jury. I would like to be a little bit more presented, but I wasn't given that opportunity.

Q. All right. What I'd like to do at this point now is go back to your relationship with Mr. Honken. You know Mr. Honken; is that right?

A. Yes, I do, Your Honor.

Q. Would you tell the jury as best you can recall when you

first met Mr. Honken.

A. I would say it would be in late or early nineteen ninety -- late '97, early '98.

Q. And where did you meet him?

A. I met him in echo B unit in Florence, Colorado.

Q. You also know a gentleman named Joe McGee, do you not?

A. Yes, I do, Your Honor.

Q. Okay. I'm not Your Honor but . . .

THE WITNESS: I'm sorry. I didn't mean to do that, Your Honor. My apologies.

THE COURT: He just thinks he is. No, just kidding.

MR. PARRISH: I play one on TV. But I'm not -- but I appreciate that, but I'm not. You can just say yes or no to me.

THE COURT: Not yet anyway.

BY MR. PARRISH:

Q. So let me just ask you this. You were aware -- you're in Atlanta, and you've described how you came up here. You were in Atlanta, and you do know already that Joe McGee testified in this courtroom; is that correct?

A. I believe it was last Monday, yes.

Q. Right. Now, before I get into details about it -- and I don't want to know what someone said to you, but I just want to know did you get this information while you were in Atlanta, and did this information come from anyone in this courtroom that Joe McGee was in this courtroom and he testified?

A. It didn't come from anybody in this courtroom, no.

Q. Okay. But down in Atlanta in your cell you had information that Joe McGee was in a courtroom in Sioux City, Iowa, testifying in this court, did you not?

A. Yes, sir.

Q. All right. And that's what you related to me this morning when we first met; is that correct?

A. Yes, sir, yes, sir.

Q. I'm curious, and I'd like you to explain to this jury, is there a process by which inmates can get information about what's going on in a courtroom into a prison cell from out in what we call civilian life or real life, so to speak? Just answer that yes or no. Is there a process?

A. Sure, yes.

Q. Tell the jury the different processes that inmates who are locked -- let me just ask you this before we go there. Were you in the hole at that point?

A. No.

Q. You were out of the hole.

A. Yes.

Q. Tell the jury the access to information that you as an inmate in Atlanta, Georgia, have with regard to matters that are going on outside of your jail cell. Where are the different places you get this information from? Without saying what it is, where do you get it from?

♀

A. There's a lot of ways you could get it.

Q. Tell us.

A. There's more than one way. You got a prison grapevine. I mean, you got a lot of information, people transferring here and there. You get word something's happening. Like someone will arrive in Atlanta that -- but that's not how I got that in -- I got that information off the Internet.

Q. Okay. You have access to the Internet.

A. No. I mean someone -- someone does, and if there's something that you're interested in, they look it up.

Q. Have you ever heard of a newspaper called the Des Moines Register?

A. Yes, sir.

Q. You're not even from Des Moines, are you?

A. No, sir.

Q. Have you ever lived in Iowa?

A. No.

Q. How do you know a Des Moines Register exists? Explain that briefly to the jury.

A. Because I've gotten copies of this case actually through the mail from -- off the Internet because the Des Moines Register is on the Internet.

Q. How long have you had access to people who have access to

the Internet?

A. Since the Internet was -- probably 1995.

Q. Now, let's talk for a second about your meeting with Mr. Honken. Your recollection is that you met him in about 1997, 1998. And I just want to show you a couple of exhibits. Were you living in '98 in what section in Florence, Colorado?

A. I was living in a unit called echo B, EB.

Q. Now, I have photographs of a couple of areas here, and I just want to show you just for the purposes of orientation, and I'll tell you these are exhibits that are already admitted into evidence by the government. And they may not be your specific unit, but we just want to talk in general as to whether or not you recognize these as being somewhat familiar to the setup at the institution in Florence, Colorado.

That's Exhibit 252. Take a look at that. I'm going to show you now Exhibit -- can you see that? I might focus it a little bit better. Okay. That focuses a little bit better for you. I'm going to show you Government Exhibit 259. Do those areas look familiar to you as being similar to the type of units you lived in when you were out in Colorado?

A. Yes, sir.

Q. Now, you said you met him in echo section. Describe prior to the time you met Mr. Honken how long had you been out there.

A. Not very long, maybe four, five months.

Q. Did you have an orientation period before you got to the institution? And what I mean by that, before you got to Florence, did they orient you at all about what to expect?

A. Not really.
Q. All right. Once you got there, were you oriented?
A. Yeah, they do a little orientation, but it's just like a three-, two-day thing, maybe a few hours.
Q. Was Mr. Honken one of the first inmates you met out there, or did you meet other people prior to the time that you met him when you were in echo?
A. No, I had been there for a minute, so I knew some other people.
Q. So you would say you were there prior to the time that Mr. Honken arrived there; is that right?
A. Yes, sir.
Q. So you were in echo, and from echo did you move to another place?
A. About three or four.
Q. All right. During the whole -- during the five years you were out there; is that right?
A. Yes, sir.
Q. Okay. So when Mr. Honken came out, could you give us some idea how you first became acquainted with him? How did you meet? How did you bump into him?
A. My recollection of first meeting Mr. Honken was someone had broke into his locker and stole all his gear after he just went to the store, and it upset me to see a new arrival just have that happen to him right off the bat. And we had a little

2959

discussion about it.
Q. Tell me -- when you first met Mr. Honken and that incident had happened, tell the jury as best you can recall your

impressions of him from your observations, not getting into any conversation but your impression of him based upon what had happened to him and your reaction.
A. He was green. He was a fish. He was a new guy to prison. He's a victim. Someone made him a victim.
Q. And how did he act? Not saying what he said, but how did he act?
A. He acted like a square, a geek, just like someone that ain't been to prison would act.
Q. Okay. And that was your initial impression of that meeting with him after he had lost his material; is that correct?
A. Yes.
Q. Did you give him at that point in time, 1997 or 1998, whatever date it might have been from your recollection, a way in which he could get this issue resolved? Did you give him advice at that point?
A. I may have gave him some advice.
Q. And what would that advice have been with regard to how he should conduct himself in trying to find out what he had lost?
A. I don't remember the exact advice I gave him.
Q. Okay. But you do recall talking to him about it; is that correct?

2960

A. Yes.
Q. After that encounter with him, did you subsequently and later on develop a relationship with him of sorts?
A. Yes.
Q. Tell the jury what type of relationship you developed with Mr. Honken and bearing in mind you're not there for life, are you?

A. No, sir.
Q. You're not charged with killing anybody or anything.
A. No, sir.
Q. You're there on a bank robbery charge where you say in 2006 you're scheduled to release your federal time.
A. Yes, sir.
Q. So tell me -- under that scenario tell us how your relationship with Mr. Honken developed. And did you eventually end up being roommates with him or anything along that line after 1998 when you met him?
A. Well, it took a minute, but we developed a relationship.
Q. Okay. Would you say you developed a friendship?
A. Yeah, over the years, yes.
Q. Did you have conversations with him?
A. Yes, sir.
Q. In those conversations with him, did he ever at any point in time admit to you that he had killed anyone?
A. No, sir.

Q. In these conversations with him if you had to recount the number of them, okay, how many would you say on a weekly basis? Let's start there and work forward from 1998.
A. I mean, it's a number that you can't put a number on. I can't guess that number.
Q. All right.
A. A lot.
Q. Would it be in the hundreds of thousands?
A. I mean, I'd be guessing -- I would just say a lot. You talk to your friend every day. You talk to your friend. You don't count the conversations; correct?

Q. And let me talk about where these conversations would take place. Would they take place at all within his cell on occasion?
A. Yes.
Q. Would they take place on the prison grounds, in the mess room, et cetera?
A. Yeah, in the mess hall or on the yard, walking the track, in the band room, you know, wherever.
Q. You also are aware that Mr. Honken had what's called a live case or a case that at some point may come back for a jury trial. Did you become aware of that at some point?
A. Yes, sir.
Q. Tell us the ways in which you became aware of the fact that he had a pending case and what I call a live case, not an

♀

2962

appealed case, not one that you're doing a post-conviction or a writ on, a habeas on, a live case. The other inmates in the institution other than Mr. Honken at Marion -- not Marion but at -- or at Florence, did you know of any other inmate with what could be called a live case or one that would be coming up for a jury trial?
A. Not really.
Q. He was the only one; is that correct?
A. Yes, sir.
Q. Could you explain to the jury if someone has a live case out there would there be any interest in his case over and above someone who just had a case on appeal or trying to get a writ?
A. Interest by who?
Q. By other inmates.
A. There'd be some interest in a live case, yes.

Q. Tell us why, and explain that to us if you would, please.
A. I think the jury's probably seen that already.
Q. Explain what you mean they've probably seen it.
A. Inmates, certain inmates, will look for an opportunity to get out of prison. I mean, prison's not a good place to be. It's not a nice place to be. And some people look for opportunity wherever opportunity arises. And a live case will give you an opportunity because if you can get close to whoever the live case is on and find out a little bit about the case, you might be able to help the prosecutor's hand. And the

prosecutor's the one that can help you get out of prison.
Q. Were there to your knowledge articles circulating within the prison walls related to Mr. Honken's case?
A. Yes.
Q. Did you see them yourself?
A. Yes.
Q. Did you ever see other inmates within the prison walls with his articles and reviewing articles related to his case?
A. I didn't see them personally, but I've heard other people had copies of it.
Q. But you've never seen them yourself; is that right?
A. No.
Q. I mean you've never seen them read --
A. I've never seen them while they were reviewing them.
Q. Do you know an individual by the name of Mr. Tokars?
A. Yes.
Q. Tell the jury how you met Mr. Tokars and the relationship that you had with Mr. Tokars, please.
A. Mr. Tokars and I lived in the same unit for a minute, and I

used to make -- I used to make what they call hooch, jailhouse wine, and he used to like to drink, so he was like a customer of mine. And through this interaction with him, we got to discussing -- he was in -- he was like a money launderer, and I had some interest in money laundering, so we developed this relationship where we would share information.

♀

Q. And in that development of that relationship, did you learn that Mr. Tokars was an attorney?
A. Yes, he told me he was an attorney.
Q. Did you know where he was from?
A. I knew he was from the Georgia, Atlanta area.
Q. And did you know the sentence that was placed on him?
A. I knew he had a life sentence.
Q. Did he ever make a request of you with regard to Mr. Honken's files?
A. Excuse me?
Q. With regard to Mr. Honken's files, did Mr. Tokars --
A. Oh, yes.
Q. -- ever make a request of you? Explain to the jury what request did Mr. Tokars make of you once you developed a close relationship with him.
MR. WILLIAMS: Objection, Your Honor. Hearsay.
THE COURT: What exception to the hearsay rule does it meet?
MR. PARRISH: It's not offered for the truth of the matter asserted. Goes to the denial by Mr. Tokars of any request to obtain Mr. Honken's files other than what Mr. Honken told him.
THE COURT: Well, how'd you -- you didn't comply with

Rule 613(b).

MR. PARRISH: Notice?

THE COURT: Well, I'm going to send the jury out, and we'll take this up.

MR. PARRISH: Maybe we could just approach a second --

THE COURT: Do you want to rephrase your question? If you want to come back to it --

MR. PARRISH: We don't have to take a break right now. Thank you, Your Honor.

BY MR. PARRISH:

Q. Well, let me ask you this. As a result of Mr. Tokars' request, did you go and relate information to Mr. Honken?

A. Yes, I did.

Q. And what did you tell Mr. Honken? Not what Mr. Tokars told you, but what did you tell Mr. Honken about what you had considered at one point? And don't tell me what Mr. Tokars said; okay? Do you understand that question without getting into the hearsay?

A. Not really.

Q. Okay. Let me see if I can try it a different way. As a result of the conversation with Mr. Tokars, did you go and relate to Mr. Honken something that Mr. Tokars had asked you to do?

A. Yes.

Q. All right. As a result of that, did Mr. Honken express any reaction?

A. Yes.

MR. WILLIAMS: Objection.

Q. And I'm not asking what that reaction was. Describe then, not tell us what he said -- describe Mr. Honken's reaction to what you told him about Mr. Tokars.

A. Disbelief.

Q. Could you tell from his facial expression how Mr. Honken was acting?

A. Yes.

Q. Now, you've had a chance, as you've described, in numerous conversations that you had with Mr. Honken to determine whether he's the type person who would get angry, upset at all; is that correct?

A. Yes.

Q. Now, of the numbers of times that you've seen Mr. Honken over the years, did you ever see him get upset or angry with anybody?

A. No.

Q. Describe his demeanor most of the time you would see him.

A. Like a jolly good fellow. I mean, just a -- just a average person that's trying to make their way through a bad circumstance.

Q. Did you ever see him in any fights or anything like that?

A. No.

Q. Did you ever see anybody fight him at all?

A. No.

2967

Q. Now, there is an incident that's been described by Mr. McGee where it was indicated you were present where Mr. McGee, after articles had come out, confronted Mr. Honken, and Mr. Honken made an admission with regard to him killing kids

and saying that they were rats and they were going to grow up and be rats. Do you recall any such confrontation like that between -- in your presence where you were present and Mr. Honken was present and Mr. McGee was present?
A. There was never any incident like that.
Q. If there was an incident like that, would you recall it?
A. Of course I would recall it, yes.
Q. Do you know Mr. McGee? And I asked you already about the fact that you knew about his testimony from what information you had gotten on the Internet. Did you -- were you friends with Mr. McGee?
A. Yes, I was.
Q. And was it a friendship as close as it was with Mr. Honken?
A. Yes.
Q. And did you see any type of confrontation that comes close to a description like I've described?
A. That's a fantasy. What you described there was a fantasy. That never happened.
Q. If you had heard a confrontation like that and Mr. Honken had made such an admission in front of you as to killing two kids, explain to the jury what your reaction would have been.

A. I'd have been disgusted.
Q. And what else?
A. And he would have had a problem.
Q. Why?
A. Because nobody likes people that kill children. In prison that's -- that's one of the worst things you can be, a child molester or a child killer.
Q. And if he had made that statement, would you be sitting

here in this witness box in Sioux City, Iowa, today?
A. Absolutely not.
Q. What would you have done if I issued a writ and told you to be here? What would you have done?
A. I would have told you to go to hell.
Q. Now, were you interviewed by law enforcement officials at any point in time?
A. They tried to interview me in Georgia.
Q. And when was this?
A. About two weeks ago.
Q. And do you know who came down to interview you?
A. It was an FBI agent.
Q. And were you in the hole at that time, or were you outside of the hole?
A. I had just gotten out of the hole.
Q. And you were back in your cell; is that right?
A. I was actually at work.

2969

Q. You were at work.
A. Yes, sir.
Q. And you got a message with regard to someone wanting to interview you; is that correct?
A. No. I got a message that SIS wanted to see me, and I thought it was to return some of the property that they have confiscated from me. A few months ago they'd came and taken all my property and hadn't given it back to me yet.
Q. But you determined later it was an interview.
A. As soon as they show me the FBI agent, yes.
Q. And did you sit down and talk with them at that point?
A. No, sir.

Q. Did you know at that point that you were subpoenaed, were at least trying to be writted out by Mr. Honken to be here?
A. Yes, sir.
Q. Did you know Mr. McGee to be an individual in your presence who's used heroin? In your presence and from what you have observed, do you know that, not from what you've heard or anything?
A. Yes.
Q. Do you know an individual by the name of Steve Vest?
A. Yes, sir.
Q. And tell us how you know Mr. Vest.
A. Well, Steve Vest used to -- he was in the unit that I had lived in for a while, and he --

2970

Q. Bravo B?
A. Yes, sir.
Q. And how long was he there?
A. A few years.
Q. And did you ever develop a friendship with Mr. Vest?
A. Not a real good friendship.
Q. Do you know a fella by the name of Neel Huffman?
A. Yes, sir.
Q. Have you seen Mr. Huffman here at all today?
A. I was looking for him, but I don't see him.
Q. You haven't seen him; is that right?
A. No.
Q. Do you know what charges he was facing and where he was from?
A. Not --
Q. Mr. Huffman.

A. Not really.

Q. But you knew you knew him from Florence, Colorado; is that correct?

A. Yes.

Q. When you were in Florence, Colorado, could you tell me whether or not you developed what could be considered a friendship with Mr. Vest?

A. I don't want to say friendship. When I'm somebody's friend, I'm a friend. We had an acquaintance. He had a guitar,

and I'd spar his guitar every now and then. We had an acquaintance.

Q. Not what you would call a friendship.

A. Not what I would call a friendship, no, sir.

Q. What I'd like to do now is move into the area of the cell, and I had a photograph of the actual cell, but we don't need to go through that. The jury has seen it. You're familiar with what the cells look like. I want to talk to you about the makeup of the cell. They've seen lots of photographs of it during the course of this trial. In a cell you had a person who was a cellie sometimes who would be your roommate so to speak; is that correct?

A. Yes, sir.

Q. Tell us what you would keep within that cell. I mean just describe what it would be.

A. What you would keep within that cell.

Q. Yeah.

A. You would keep all your clothes. You would keep some commissary items that they let you purchase, some can -- like toothpaste, soap, deodorant, some food items, your shoes, and

your legal stuff.

Q. Right. Now, that's the point -- and your legal point -- and the jury has seen also photographs of the lockers. What if you had an excess amount of legal papers, say a live case with lots of paperwork? Where would you keep that material?

♀

A. Well, in Florence they had a -- they had a little special room like in the front of the unit that they used to keep legal -- excess legal materials.

Q. Were you ever roommates with Mr. Honken?

A. Not that I recall.

Q. Okay.

A. Maybe for a minute in the SHU, but that was about it.

Q. And did you ever go into his room at all when --

A. Yes, yes.

Q. And let me just ask you, did you ever see his legal paperwork and how he handled it on occasion when you would go into his room?

A. Sure.

Q. Describe to the jury -- with regard to Mr. Honken's legal paperwork on his live case, from your observations, describe how he would handle it, what he would be doing with it, and how often you would see him, if at all, working on it just from your viewpoint.

A. From my viewpoint, he was very private with it.

Q. Did you see him working on it a lot?

A. Sure.

Q. And where would you see him work on it?

A. It would be in his cell.

Q. Okay. Did you ever see him outside of his cell with any of

his legal paperwork?

A. Maybe I think one time I seen him moving it to the legal room.
Q. Okay. And the legal room in relation to bravo B, is that on the same unit, or is that somewhere else?
A. No, it's in the same unit.
Q. Who has access -- and we don't need names of people, but who has access to this legal room?
A. Policewise?
Q. Yes, sir.
A. The counselor. Counselor has a key.
Q. Anyone else? Now, you say the counselor. Is that the same thing as a unit manager?
A. No, no. You have a unit manager, counselor, and a case manager.
Q. Did you ever want to get access to that legal room on bravo B at all?
A. Did I?
Q. Did you? Yes.
A. I had access to it.
Q. And why would you have access to it?
A. That's -- I used to hide my wine in there.
Q. And how did you get inside of the room to get to your wine?
A. I picked the lock.
Q. And how do you pick the lock?
A. I can't tell you that. No.

Q. You'd have to -- no, I won't say that. It wouldn't be appropriate.

But -- so it was just common knowledge that you picked the lock to get into the legal room?
A. Yeah. I mean, there's other people that had access to it too. If you worked on a trash crew, you had access to it because that's where they kept some of the cleaning supplies.
Q. Okay.
A. So before we learned to pick the lock, you'd wait until the trash crew went in there, and then you can go in there and hide your stuff.
Q. And that was the overflow legal stuff or if you wanted to go down and work on your so-called case that was pending; is that right?
A. Yes, sir.
Q. Now I want to go back to the room where the inmates are working, where they're sleeping. In this room the jury has seen the locker that you put your material in. I want you to describe to the jury whether or not other inmates who were not living in that cell had access to that locker. And if they did, how did they get it? Do you understand my question?
A. Yes, I do.
Q. Okay.
A. These lockers, when they say it's a locker, I don't know if you seen a picture of it, but it's a real flimsy thing. Anybody

2975

that wanted to get into a locker could get into a locker.
Q. How do they get into it?
A. They'd peel the lock off of it, or they'd pick that lock. I mean, that's a Master lock.

Q. Was that a common occurrence within the -- in Florence of picking locks?
A. Sure.
Q. Why?
A. Because you're in prison.
Q. What do people want to get access to?
A. Well, they might -- it depends. I mean, they might have commissary in there. They might have legal work in there. They might have drugs in there. Who knows?
Q. When you had access to the locker, were the cells locked down at a certain period of time where you could not get into the room to get into the locker, so to speak? Do you understand that question?
A. I think I do.
Q. Okay.
A. There are certain times that the cell is locked.
Q. When is that?
A. Usually -- well, at night after you lock in the cell is locked. But without an inmate in the cell? Is that what you're asking me?
Q. Yes, sir, when you would leave to go work.

A. Oh, okay.
Q. Would that cell be open, or would that cell be locked?
A. No, it's open.
Q. What about an inmate that had a different shift who didn't work the same hours and you didn't have a roommate or your roommate was in the hole? Would that cell be open for other inmates to have access to?
A. You could request it to be locked I guess, but no one -- I

mean, that's rare.

Q. Most of them were open most of the time; is that right?

A. Yes, yes, sir.

Q. Did you know of any inmates who would, in fact, keep overflow legal work in their cell and not just take it down to the legal room?

A. They try to keep you from doing that, but I'm sure it's possible.

Q. But the procedure was that you would take it down to the cell area -- I mean to the legal --

A. The overflow. It's real strict as far as tidiness. They want a cell to look a certain way. And if you have anything that's in abundance, you gotta put it in the overflow room.

Q. I asked you the question earlier about Mr. Vest. And do you recall whether or not he was in the same unit, bravo B, for three years, or to your knowledge did he live in more than one unit?

♀

2977

A. I think he lived in more than one unit.

Q. Would that be also true for you too, that you -- you mentioned that you lived in echo unit. At one point you were living in bravo unit. Would you have lived in more than one unit also?

A. Yes, sir.

Q. And to your knowledge that would have been the same of Mr. Honken.

A. Yes.

Q. To your knowledge. Did you know an individual by the name of Ron McIntosh?

A. Yes.

MR. PARRISH: Thank you. Those are all the questions I have right now.

THE COURT: Mr. Williams, you may cross-examine.

MR. PARRISH: Sorry about that.

MR. WILLIAMS: Did you have something else?

MR. PARRISH: No, no. I just said something I shouldn't have said. Just a habit.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Loparo, I want to talk to you about these interviews that you had. You indicated that you were interviewed by an investigator for the defendant in this case in July of this year?

♀

2978

A. Yes, sir.

Q. And then you met again this morning with some attorneys.

A. Yes.

Q. Okay. And when you met with them, they went over what you'd said before to the investigator.

A. Very briefly.

Q. Okay. And they covered what you had told that investigator before just to make sure that they understood what you had said before; is that right?

A. Yeah, I guess.

Q. That's kind of natural to prepare a witness. And then you confirmed that what you had told the investigator before was accurate; is that right?

A. Right.

Q. Okay.

MR. WILLIAMS: Your Honor, I'd request a copy of the

interview report done by the defense investigator. He's adopted the statement that was done by that investigator, and we've not received a copy of it.

THE COURT: Mr. Williams, I think he has to adopt it at the time.

MR. WILLIAMS: Very well. That's your ruling. We'll move on.

THE COURT: Well, I can send the jury out and you can --

♀

MR. WILLIAMS: That's all right. We'll move on.

THE COURT: Okay.

BY MR. WILLIAMS:

Q. The fact of the matter is when federal law enforcement officers came down to talk to you, you refused to talk to them, didn't you, sir?

A. Yes, I did.

Q. In fact, you stated that you knew that the Federal Bureau of Investigation -- what they wanted to talk to you about, and you refused to answer any questions.

A. I said I refuse to answer any questions without an attorney being present.

Q. Now, what you said was you knew the Federal Bureau of Investigation wanted to talk to you about -- what it was they wanted to talk to you about, and you stated that Dustin's attorney was not present and you refused to talk.

A. See, that's -- that's why I don't talk to the FBI because they're liars.

Q. Now, Mr. Loparo, you indicated earlier that you developed a friendship with the defendant in this case; is that right?

A.   Yes.
Q.   And you said earlier, you know, when you make friends they stay your friends; right?
A.   That's correct.
Q.   And you guys actually became pretty close friends along
♀

with some other people there, right, in Florence?
A.   Sure, sure.
Q.   You guys belonged to a small group of close-knit friends there in the prison.
A.   Close-knit friends.  Define that.
Q.   You guys were very close friends.  You did martial arts together.  You went to exercise together.  I'm talking about Artie Dufur, Joe McGee.
A.   Martial arts, they don't allow you to practice martial arts in the federal Bureau of Prisons.
Q.   Oh.  So you've never practiced martial arts with anybody in the federal prison?
A.   No, sir.
Q.   Just never have done it.
A.   No.
Q.   You would agree, though, that you were close-knit friends with the defendant and Artie Dufur and Joe Dougherty, that group of people, weren't you?
A.   Well, you mentioned Artie Dufur.  I barely know Artie Dufur.  Joe Dougherty I know a little bit.  When you say close-knit friends, I don't really have a real close-knit friendship with too many pe -- you know, you put me into like sort of a group, and I'm not into a group.
Q.   Not into a group.

A. No, sir.

Q. Didn't you participate in a group who plotted to escape when you got called back here to testify for the defendant's trial?
A. Absolutely not.
Q. You didn't practice getting out of handcuffs and black boxes.
A. No. This is Joey McGee's story?
Q. Did you practice getting out of handcuffs and black boxes, sir?
A. No.
Q. In fact, you know how to get out of handcuffs and black box, don't you?
A. No, sir.
Q. You could do it right now if you wanted to.
A. Out of a black box?
Q. Yes, sir.
A. I highly doubt that. That's why they put them on you.
Q. Really. Would it really surprise you very much if after -- when he was brought back here Joe McGee demonstrated --
MR. PARRISH: Objection, Your Honor, and -- objection, not part of any evidence in the case.
THE COURT: Sustained.
BY MR. WILLIAMS:
Q. Mr. Loparo, you can take a black box. You can snap it against the wall. You can pop the pins. You can take a piece

of paperclip out of your mouth that's hidden in there, and you

can pick the locks and get out of that within a minute to a minute and a half, can't you, sir?
A. No, I'm not aware of that.
Q. That's just a surprise to you.
A. Yes, it is.
Q. And so you're denying that you at any point worked together or plotted together with the defendant and other people to come back here and testify for the purpose of being able to escape.
A. I categorically deny that.
Q. And the fact that you were together with these people when the defendant stated that he killed his rats and that those kids were going to grow up to be rats and they deserved to die, you deny that that conversation ever took place.
A. That never happened.
Q. Just never occurred.
A. That conversation never happened.
Q. Now, you have an attitude about rats, don't you, sir?
A. Attitude meaning . . .
Q. You don't like rats. You don't like people who inform for the government, do you?
A. No one likes somebody that lies. I mean, a liar and a rat could be two different things.
Q. That's not my question to you. You share an attitude along with almost every other federal inmate that people who inform

2983

for the government are rats.
A. (Witness shook head.)
Q. No?
A. I mean, you're putting me in this category again like every other federal inmate. I don't understand that.

Q. Isn't it true that you think that people who inform for the government are rats?
A. People that inform for the government are government informers.
Q. Oh. They're not rats.
A. What's a rat?
Q. You've not heard that term used in prison before.
A. Maybe on occasion, but, I mean, a rat, what's a rat?
Q. That's just something new to you, huh?
A. No, it's not something new. I mean, I've heard the term. A rat, that's . . .
Q. So let me ask you, Mr. Loparo, you're saying that this whole idea that you and a number of other inmates plotted together with the defendant to escape from custody when called back to a local jail, it's just a fantasy.
A. That's somebody's fantasy. That's somebody's way of maybe getting a time cut. That's what that is.
Q. Now, when you were asked about your criminal history, you kind of left off one of your felony convictions, didn't you, sir?

2984

A. Escape?
Q. Yeah, escape. Felony escape from a local jail in Maricopa County, Arizona.
A. 1994.
Q. That's correct. And you were charged with a number of other people in that escape attempt, weren't you --
A. Yes, I was.
Q. -- in that escape? You actually succeeded in escaping from that jail, didn't you, sir?

A. Yes, I did.
Q. But you didn't mention that when asked about your prior felony convictions, did you, sir?
A. We didn't get to that.
Q. You talked about a pipeline of information in the federal prison that gives you information about people. Do you remember testifying about that, sir?
A. Yes.
Q. And that pipeline of information would allow you to find out where another inmate might be housed; right?
A. Depends on the inmate.
Q. Yeah. If you wanted to locate where another inmate had been transferred to, you could find that out pretty darn easy, couldn't you?
A. You mean just like a friend of yours? Friend of yours gets transferred, you want to find out where he went?

♀

2985

Q. If you want to find out where another inmate went to, you could find that out pretty easy, couldn't you?
A. Sometimes.
Q. And you could get word to somebody else in another prison where that inmate got transferred to if you wanted to get word to some other friend or some other associate you knew in that prison, couldn't you?
A. I couldn't, but I'm sure -- I'm sure it could happen.
Q. Could happen.

MR. WILLIAMS: I have nothing further, Your Honor.

THE COURT: Mr. Parrish?

REDIRECT EXAMINATION

BY MR. PARRISH:

Q. You have no idea what Mr. Vest looked like when he walked into the courtroom, do you? You don't know whether he was clean shaved, had on a white shirt, was dressed.
A. No.
Q. You didn't know that, did you? Had his hair combed very neatly?
A. No.
Q. And you don't know anything about how he was transported here for the government's case, do you?
A. No, sir.
Q. But you know you didn't get transferred here in a white -- you didn't have a white shirt when you walked in, do you?

2986

A. No.
Q. And you didn't have anything to comb your hair or comb your beard like you wanted to; is that correct?
A. That's correct.
Q. Now, let me ask you this. When you talk -- when the government asked you about what you could do with regard to escaping, is there any, to your knowledge, escape attempt on your jacket or in your file that you've seen?
A. No.
Q. Do you know anything about the Woodbury County Jail and how it's set up and the number of people who control it?
A. No.
Q. Have you seen any plans of the jail, the Woodbury County Jail?
A. No.
Q. Have you seen copies of anything relating to the Woodbury County Jail?

A. No.

Q. You don't even know if you're going to have the job that you had when you go back to it; is that correct?

A. That's correct.

Q. Did you get any kind of benefit at all when you got writted out by Mr. Honken and his counsel to come up here and testify? Did you get any kind of break whatsoever?

A. No, sir.

♀

Q. Matter of fact, if anything, you're going to lose things, aren't you?

A. Maybe.

Q. Maybe.

MR. PARRISH: Thank you.

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: Yes, Your Honor.

RECROSS-EXAMINATION

BY MR. WILLIAMS:

Q. You were asked some questions about what information you knew about things back here, and you had testified that the way you learn things was at least in part through the Internet; right?

A. Yes.

Q. Okay. Who is your source that feeds you information from the Internet?

A. It's my stepmom.

Q. And you were asked about coming back here to the jail. Isn't it the fact, sir, that the defendant in this case told you all about the Woodbury County Jail, how it was set up, how it was operated, and how the guards could be overpowered?

A. I don't -- I never heard the Woodbury County Jail until just the other day.

MR. WILLIAMS: Nothing further.

THE COURT: Anything further, Mr. Parrish?

♀

MR. PARRISH: No, Your Honor.

THE COURT: Could I see the lawyers at sidebar for a second? Members of the jury, you can take a stretch break.

(At sidebar on the record.)

THE COURT: I'm a little bit at a loss on the discovery issue because I never get involved in discovery. I was kind of looking at Rule 16(b), and that doesn't allow it. There's actually an exception that says they don't have to turn it over, but I imagine you have a reciprocal discovery agreement.

MR. WILLIAMS: We do.

THE COURT: Here's why I don't think it was adopted by the witness. I think it has to be at some point actually shown to him and adopted. All you said was he testified basically consistent with what's in the report. I don't think that's an adoption.

MR. WILLIAMS: We can move on.

MR. PARRISH: I can make it a little bit too. He did not see it this morning because we were rushed. We walked in --

MR. WILLIAMS: That's fine.

THE COURT: Because I think maybe I wasn't accurate when I said he has to adopt it at the time, but I don't think he has ever adopted it.

MR. PARRISH: When you rule against us, call us up here and explain why you rule against us. I'm just kidding.

MR. WILLIAMS: We're fine.

(The sidebar was concluded.)

THE COURT: Please be seated.

Mr. Loparo, you're excused.

MR. PARRISH: Will you come forward, please, raise your right hand, and be sworn.

SCOTT TRACY GAHN, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. And could you please adjust the chair so you can speak directly into the microphones. Could we get you to scoot that chair up a little closer?

THE WITNESS: Sure.

THE COURT: Thank you. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: Scott Tracy Gahn, G-a-h-n.

THE COURT: Mr. Parrish?

MR. PARRISH: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. PARRISH:

Q. Mr. Gahn, you did, in fact, testify earlier in this trial, did you not?

A. Yes.

Q. And you testified, did you not, that Mr. Honken was there at your place of business, and you also indicated that Mr. Greg Nicholson within an hour or so had just left your business. Do

you recall your testimony to that effect before this jury

earlier?
A. Yes.
Q. It's true, is it not, that you told the agents at that time that Mr. Honken related to you that he had a tape of Nicholson?
A. Run that by me again.
Q. You told law enforcement at that time that Mr. Honken told you that he had a tape of Mr. Nicholson saying that Mr. Honken had nothing to do with the drug incident.
A. Are you referring to the time that they showed up at my club at the same day?
Q. Which was the last time you had ever seen Dustin; isn't that correct?
A. First let's address the question --
Q. No, answer my question, sir.
A. You'll have to run it by me again.
Q. Did you tell the law enforcement that when you saw him at that time Mr. Honken told you he had a tape of Mr. Nicholson saying that Dustin had nothing to do with the drug incident? Yes or no. Did you tell them that?
A. And referring to the day that the two showed up at my club?
Q. Yes, which was the last time you saw them. Did you tell them that? Yes or no.
A. To the best of my recollection, I honestly don't remember.
Q. Let me see if I can refresh your recollection. Take a look

at this statement made to law enforcement officials on the date you said was the last time you said you saw Dustin and Mr. Nicholson.
A. Okay.
Q. Look at it.

A. I'm looking at it.
Q. Refresh your recollection. You don't have to talk yet, please.
A. Okay.
Q. Just refresh your recollection.
A. Give me a minute, please.
Okay.
Q. Does that refresh your recollection?
A. Sure, it does.
Q. Did you tell them that? Yes or no.
A. No, not on that day at the club.
Q. No, not that you told them that on the day of the club. Did you tell them when he had the tape that was the last time you saw Mr. Honken? The report says it does, isn't it?
A. Well, first --
Q. Wait a minute. Does the report say that?
A. Says that Gahn stated --
Q. No, does it say that you told them on the date that there was a tape there, that he had the tape, that that's what you said?

2992

A. Well, this is true what I said right here.
Q. Okay. That's true what you said.
A. Yeah.
Q. That you told them that the last time you saw Mr. Honken, he said that he had a tape of Mr. Nicholson.
A. I don't recall that being in the conversation at the club that day.
Q. But that's what you told them. You said this is true.
A. That says at some point in time Dustin told me that.

Q. But you also told us that the last time you saw him was the date Mr. Nicholson had just left an hour or two before. Isn't that true what you testified to this jury?
A. I think that'd be fairly true.
MR. PARRISH: Thank you. No further questions.
THE COURT: Mr. Williams? Mr. Miller?
MR. WILLIAMS: Mr. Miller.
MR. MILLER: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MILLER:
Q. Did you ever testify before the grand jury, sir?
A. Yes.
Q. Did you see Mr. Honken after that?
A. Yes.
Q. And when was that?
A. He came into my place of employment at Tractor Supply and

♀

asked me if I was a undisclosed witness at the grand jury.
Q. And was this before the occasion when he came around looking for Mr. Nicholson?
A. Correct.
Q. Tell us about that occasion, what you recall of that occasion when Mr. Honken came around looking for Mr. Nicholson.
A. The day in the club?
Q. Yes, sir.
A. As I stated when I was down here a few weeks ago, Dustin was just inquiring about where Greg was at, was wanting to find him, and he was real emphatic, almost desperate to find him, and I remember he kind of jokingly said, If you can help me find Greg, I'll buy you the baddest Harley you ever saw.

Q. He wanted to find Greg Nicholson that bad.
A. $25,000 worth, yeah.
Q. Did he say anything to you about having a tape of Greg Nicholson on that occasion, Mr. Gahn, to your recollection?
A. I do not recall the day at the club that the thing about the tape even came up. I was aware of that before the day at the club. And how I even became aware of that, I think Dustin told me.
Q. Do you think maybe Dustin told you about a tape before, or is it possible he told you about a tape after, Mr. Gahn?
A. I don't think there's much possibility he told me about a tape afterwards. I think it was before that sometime.

Q. This is 11 years ago, Mr. Gahn.
A. Long time ago.
Q. Been a lot of water under the bridge, hasn't there, sir?
A. Yes.
Q. You're sure he came to your place that day looking for Greg Nicholson, desperate to find him.
A. In July '93.
Q. Yes, sir.
A. Absolutely sure.
Q. Anybody ever show you any videotape?
A. No.
Q. And was he there for any purpose other than to try to find Greg Nicholson?
A. No.
Q. That was the only reason he was there.
A. Yes.
Q. As far as whether or not you had any other conversations

with him before or afterwards, do you really have any clear recollection, Mr. Gahn?
A.    I have a clear recollection of the day he came in to Tractor Supply.  Afterwards, no.
Q.    But you may have.
A.    Very possible, but to the best of my recollection, that was -- July '93 was really probably the last time I saw either one of them.

Q.    And again, that's 11 years ago.  He's ordinarily pretty calm and collected in your experience?
A.    Sure, very polite, well mannered, and a lot of other actually good qualities if you wanted to look -- think about it.
Q.    But on the day when the one thing he had on his mind was finding Greg Nicholson, he wasn't the same mood as usual?
A.    No, he was nervous, and Dustin's not the nervous type.
Q.    He was desperate to find him.
A.    In my opinion, yes.
MR. MILLER:  Thank you.  No further questions.
THE COURT:  Mr. Parrish?
REDIRECT EXAMINATION
BY MR. PARRISH:
Q.    And you told them on that date that he walked in with the tape and you told them when you were interviewed February 22 of 2000 that you never saw Dustin again after that particular day, didn't you?
A.    To the best of my recollection I didn't see Dustin after July '93.
MR. PARRISH:  No further questions.
THE COURT:  Mr. Miller, anything further?

MR. MILLER: No, Your Honor.

THE COURT: Mr. Gahn, you may step down.

MR. PARRISH: I'd call Mr. Neel Huffman, please.

NEEL HUFFMAN, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. And you can adjust the chair and the microphone so you can speak directly into the microphones. We'll get you to scoot that chair up, and you can pull those microphones down. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: Neel Scott Huffman, H-u-f-f-m-a-n.

THE COURT: How do you spell your first name?

THE WITNESS: N-e-e-l.

THE COURT: Okay. Thank you.

Mr. Parrish?

MR. PARRISH: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. PARRISH:

Q. Mr. Huffman, would you give us your address, please?

A. 6869 South Hollywood Road, Baileyville, Illinois.

Q. And how far is Baileyville from Sioux City?

A. Oh, it took me about seven, seven and a half hours.

Q. Okay. And everything kind of sped up for you because it was down the road, and you ended up having to get here today, so things went a little bit faster for you in terms of getting into Sioux City; is that correct?

A. Yes.

Q. You're here on pretty short notice.

A. Yes, I am.

Q. Okay. Would you tell us where you're employed out in Baileyville?
A. Well, I have two jobs. One is at North Grove Woodworking, and then another one is at Gladkin Enterprises.
Q. And how old are you?
A. Thirty-five.
Q. Are you married, sir?
A. No.
Q. And in Baileyville, do you live by yourself, or do you live with your folks?
A. I live with my folks.
Q. And what do your folks do?
A. Farmers.
Q. And tell the jury -- I know you briefly told us, but what kind of -- describe the work that you do right now.
A. I'm a custom cabinet builder, and I also do maintenance work for Gladkin Enterprises who owns a bunch of bars.
Q. And how many hours do you normally put in during a day?
A. About 12, 13 hours a day.
Q. Have you ever been to Sioux City before?
A. Nope.
Q. Now, as I understand it, you have some convictions; is that correct?
A. Yes.
Q. And we've talked about it; is that right?

2998

A. Uh-huh.
Q. You're going to have to -- I didn't probably tell you this.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2615 of 3636

You need to answer yes or no so the court reporter can get it down.
A. Oh.
Q. That's all right. Just relax a little bit. Now, you had an opportunity to meet one of the individuals from my office, my investigator, retired detective, Mr. King?
A. Yes, I did.
Q. Over in Illinois; is that right?
A. Yes.
Q. And we had a chance to meet yesterday in my hotel room along with a couple of other people who were working with me; is that correct?
A. Yes, we did.
Q. And prior to that time, had we ever met at all?
A. No.
Q. But you did have a sit-down meeting and a couple of phone conferences with me over the weekend.
A. Yes.
Q. Would you agree like late Saturday night you and I were chatting on the phone; is that right?
A. Yes, we did.
Q. Other than that, have we had any other meetings or have we met at all or have I done any legal work for you or you know

2999

anything about me?
A. No.
Q. All right. With that out of the way, I want you to tell me or tell this jury at least where you had other convictions from related to any prison time that you might have done.
A. In the state of Illinois I did state time for about six

months on a theft of property.

Q. All right. And then you had a federal charge; is that right?

A. Yes.

Q. And tell the jury what the federal charge was.

A. Armed bank robbery.

Q. And where did that occur?

A. In Illinois.

Q. And did you get away with any money?

A. No.

Q. Okay. You got caught, right, at the bank?

A. Yeah, a little bit later.

Q. Pretty close; is that right?

A. (Witness nodded head.)

Q. And you were how old when that happened?

A. Twenty-three.

Q. And you did how much time in prison?

A. About a little over nine and a half years.

Q. And how that happened, did you accept responsibility? Did you go in and plead guilty?

A. Yes, I did.

Q. All right. And you pled guilty. You accepted responsibility; is that right?

A. Yes.

Q. But you did what? So many years because they had a gun charge on top of what we call a 924 --

A. (c).

Q. -- (c) on top of your bank robbery charge which meant that you served about pretty close to nine to ten years; is that

right?

A. Yes.

Q. So where were you designated from once you got the federal charge and had entered your plea of guilty? Tell the jury where you went from there and what year that might have been.

A. Well, when I first got sentenced which was in '93, I went to Oxford, Wisconsin, first, was only there for just a couple months. Then I went to Pekin, Illinois, and was there for about four years. And then I got an assault charge while I was there, and they sent me to Florence, Colorado.

Q. Now, the assault charge was a charge within the prison; is that correct?

A. Yes.

Q. And as a result of that assault charge, did they punish you within the prison system for something that didn't occur outside

♀

3001

where you got, say, any type of civilian conviction so to speak; is that right?

A. Yeah, this was something that just happened in the institution.

Q. Tell the jury where you went when you got the assault charge within the prison. Where did you go?

A. To Florence, Colorado.

Q. And do you recall what year you might have gotten to Florence?

A. I think it was January of '99 I believe.

Q. And when you were in Pekin, Illinois, that was a facility that handled roughly how many people if you know?

A. About 1,200 people.

Q. All right. And is it a pretrial stage, or do they have

people there who are awaiting trials, or do they mostly have people there who have been convicted and their case is either on appeal or they're trying to get some type of relief through habeas proceeding?

A. Yeah, most of it is everybody's already been sentenced and they might be waiting on appeal.

Q. In your case you went in. You entered a guilty plea. Did you appeal your case, or was that basically the end of it? You were going in, and you were just going to do time?

A. No, I was just doing my time.

Q. And you acknowledge it -- and how do you describe the

situation as your going in and trying to rob a bank as a 23-year-old person?

A. Stupid.

Q. And so you wanted to do your time and get it over with; is that right?

A. Yeah.

Q. You knew it was time. You know you were going to have to be there the next nine and a half years, and you wanted to take your punishment; that right?

A. Just wanted to get it over with.

Q. All right. And you did get out, didn't you?

A. Yeah.

Q. Tell the jury when you got out.

A. March 2 of this year.

Q. Now, during this time when you committed this robbery -- during the time you were at the institution in Pekin and during the time you were in Colorado, describe to them whether you had any kind of drug problem or any problems related to drugs, use

of drugs, getting high with drugs, or anything like that.

A. I never have.

Q. Never been an issue with you; is that right?

A. Never.

Q. So here -- and describe for them briefly what Baileyville is like. I believe I had that -- yeah, Baileyville, Illinois. Tell them what size town it is and where you had come from and

when you got in an institution -- first of all, just describe what Baileyville is like.

A. Well, Baileyville's one of them ones if you blink you're going to miss it because it's about a hundred people, just two gravel roads that meet.

Q. Okay. So it's a little town, and now you find yourself in the midst of a federal penitentiary; is that right?

A. Yeah.

Q. So you get there. You're now out in Florence, Colorado, and you've been in -- you've been in Pekin, and, of course, obviously you've been in the hole there from your description. Did you learn anything from Pekin to help you get along better out in Florence, Colorado?

A. Well, I learned to kind of just bite my tongue.

Q. Why did you bite your tongue?

A. Because I got in trouble when I didn't.

Q. All right. And what else did you learn about getting along in prison being from a small town and finding yourself in the midst of a pretty tough institution?

A. Well, you learn there's not a lot of people you can actually trust. There's only, you know, one or two people that you actually can get along with and know that you can trust them

because all the rest of them are just there trying to take advantage of everybody.

Q. Take advantage like what?

A. Well, they're either going to steal from you. They're going to lie to you. You know, they're going to use you for whatever they can so that they can get better, you know, so that they can make out ahead.

Q. Now, let's jump ahead for a second; then we'll come back in. But at some point in Florence, Colorado, you were transferred out because of an investigation; is that correct?

A. Yes.

Q. All right. And this investigation -- just briefly describe for us, because we want to just set the stage for going through the rest of your testimony, this investigation was about your relationship with a female correctional officer; is that right?

A. Yes, it was.

Q. And did you admit your involvement with this female correctional officer, or did you deny it?

A. Well, there was nothing that happened while she was actually employed there, so yeah, I denied it.

Q. But it's your position that it was not a relationship that had developed; is that right?

A. You're right.

Q. But you do acknowledge that after you were transferred some years later she did come and visit you.

A. Yes, she did.

Q. You don't deny that.

A. No.

Q. So you did develop a relationship with a female correctional officer, but it was not what the prison authorities thought that it was, and they transferred you because of that relationship; is that right?
A. Yes.
Q. Okay. Now, did you have any other incidents in Florence, Colorado, related to any disciplinary action against you?
A. Yeah.
Q. Okay. Briefly tell the jury what that was and what the result of that might have been.
A. Well, I got another assault charge while I was there on another inmate, so I went to the hole for that. And I went to the hole a few times for just petty stuff like possession of anything not authorized or -- whether it was food stolen out of the kitchen or . . .
Q. Did you ever go down for any possession of any paraphernalia or any of your cellies or roommates have any paraphernalia that you went down for at all?
A. Yes.
Q. Was that something you had done? I mean any possession of any drug paraphernalia or anything.
A. Well, I did go to the hole for one -- for an incident on that, and it was because the cellmate I had at the time was in the hole and he had a homemade syringe in the cell, and when they shook it down, they found it.

3006

Q. So you were punished for that also.
A. Yes.

Q. But is it your position that you had it or it was yours?
A. Well, since I was the only one living in the cell, I said it was mine.
Q. And you took the hit for it.
A. Yeah, I did.
Q. Have we covered all the incidents? Have we covered the fact of your prior criminal history and all of that up to present time?
A. I believe so.
Q. And right now you're employed. You're working 13 hours a day.
A. Yep.
Q. Now if I could, I'd like to go back to Florence and when you first got there and as best you can recall how you met Mr. Honken. Could you describe that for the jury as best you can, please?
A. Well, when I got to Florence, they let you off the bus there, and you go through all their processing stuff, and then they take you down to your unit. Well, I believe it was that same evening Mr. Honken and a couple other inmates that he was with came up to me and asked me if I needed anything because when you first go to an institution like that, you usually have to wait ten days, a week, two weeks to get your property. So

3007

you don't have no shampoo, no soap, no toothpaste, no nothing like that. So Mr. Honken come up to me and asked me if I needed anything, so he . . .
Q. And what was your first impression of him when you met him and he came up and made that -- I mean, you guys are seeing each other. You're out on the prison yard or out in the prison

facility, and you meet this other young man, and you immediately form some impression. What was your impression when you first met him on the prison --
A. I thought he was a very nice individual, and, you know, that was very nice of him to come up because he don't know me from nobody -- you know, there's 1,400 people on the yard there -- you know, don't know me out of anybody to come up and offer to give me stuff of his own because that's stuff you have to pay for yourself.
Q. So does he do that? Does he provide you some personal effects?
A. Yes, he did.
Q. And so that got you until your personal effects arrive sometime later; is that correct?
A. That's correct.
Q. Now, do you have an orientation period there where you have a chance to -- they tell you about the prison, what to expect, what your jobs might be, and this type of thing?
A. Yeah, they do, but by the time they give it to you, it's

♀

3008

usually after you've already been there three weeks, a month, so you pretty much already know everything anyways.
Q. So you're kind of feeling yourself around before they actually start the orientation period; is that correct?
A. Yes.
Q. So you get your personal effects. And are you living in the same unit with Mr. Honken at that point in time when he offers to provide some personal effects for you?
A. No.
Q. Where are you living if you can recall?

A. Charlie bravo unit.
Q. How far is that from Mr. Honken's unit that he's living in if you know? And this is when you first go in.
A. It's two buildings down.
Q. Do you have recreation in the same place, or do you have mess hall in the same place?
A. Yes.
Q. And how far is the mess hall from your unit at that point when you first go in?
A. I don't know. 150 yards, 200 yards.
Q. And was it closer to Mr. Honken's building or closer to yours?
A. It was closer to Honken's.
Q. Okay. After you had that initial encounter with him, do you immediately develop a friendship with him, or does it take a period of time that this friendship develops?

A. Oh, it was over time. It wasn't immediate.
Q. Does it get to the point where you and he become cellies?
A. Yes.
Q. Tell the jury how that happened and in which area did you become cellies with Mr. Honken.
A. Well, I had -- I was living in Charlie B unit. He was living in bravo B unit. The cellie that I had went to the hole, so me and Mr. Honken talked about it and came to the conclusion he was going to move over in my unit with me.
Q. Now, when he moved over to this unit with you, there's been some discussion already in the record and on this trial about having a smoking unit and a nonsmoking unit. And I want to know, first of all, what unit you were living in when he first

moved in with you, and also I want to know whether it was a smoking or a nonsmoking unit. Describe that for the jury, please.

A. Well, Charlie B unit was a smoking unit, and that's the one he moved in with me.

Q. Was Mr. Honken a smoker?

A. No.

Q. So he moved in with you to the smoking unit. You're now cellies; is that right?

A. Yes.

Q. And have you established a friendship at this point?

A. Yeah. That's pretty much where -- I mean, we already had a friendship because -- that went on for a little while before he moved in with me, but that's probably where it got stronger.

Q. And so you're living in Charlie, and tell the jury how long did you live in Charlie.

A. How long did me and --

Q. Yes, just in Charlie unit first. We'll start there.

A. Well, I lived in there probably for a good six, seven months.

Q. And then when Mr. Honken moved in as your roommate, how much longer did he live in there before you moved or changed roommates?

A. Well, it was -- I don't know. It was just a few months.

Q. Do you recall now -- and I know I've taken you through back and forth a little bit. Can you recall the year now that he might have moved in with you into the Charlie unit first?

A. It would have had to have been in '99.

Q. All right. This is where we're going to go from '99. When

he moved into the Charlie unit in 1999, tell us whether or not he brought with him legal papers or documents related to any cases he might have had.

A. Yes, he did.

Q. All right. The jury has had a good orientation as to what these cells look like, the lockers that they set up and this type of thing, so I'm not going to bore them with that. But I

♀

want you to describe for me when people would bring their legal papers in where they would put them if they kept them in the cell.

A. Well, if they kept them in their cell, there was only two places. One was either in their locker or underneath the bed.

Q. Why is that?

A. Because the cells were so small that's all you had.

Q. Okay. And let's talk, first of all, about the lockers. Well, let's talk about the cell first, and then we'll talk about the lockers next. We've had some description about the cells and when they're open and when they're closed. I want to first go to Charlie. With regard to Charlie, when are the cells open in the mornings, and when are they closed at night where other inmates cannot get access to them; okay? Do you understand that question?

A. Yeah.

Q. Okay. Answer that for me, please.

A. Well, the doors are open first thing in the morning right before breakfast.

Q. What time is that normally?

A. I think it was either around 5:30 or 6. I don't remember for sure.

Q. Okay. Fine. And after they open, do other inmates have access to other people's cells at that point?
A. Oh, yeah.

Q. And what time do they close down at night where the actual cell is locked?
A. I think we got locked down at ten o'clock at night.
Q. And after that point no one has access to the cell; would that be accurate?
A. Not after you're locked down at night.
Q. But during the day everyone has access to it.
A. Yeah. If you're not in your cell, anybody else can go in there.
Q. Now, let's talk about the locker that is within the cell that the jury has seen photographs of. And these lockers have been described. Could you tell us whether or not if your locker is locked, do other people have access to that locker?
A. Well, it's just a little combination lock, so anybody can open them things, whether it's with a boot or, you know, whatever. I mean, they're very easy to open.
Q. Was it common practice for people to have items missing from their cells?
A. Oh, yeah, I had stuff stolen from me.
Q. Okay. That's not unusual?
A. No.
Q. Would the lock actually be broken off, or would at some point the combination just be jimmied open where --
A. Well, there was a bunch of different ways to do it. If there was a lock hanging there open, it was real easy. Just --

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2628 of 3636

because there was different ways that you could get the combination off the lock so -- and once you had the combination, you could open it any time and shut it any time you wanted, and nobody would ever know. Or people made these little aluminum things out of soda cans, and they'd open them with them, and it was just like using a key.

Q. Now, I want to talk about the box now that would be put under the bed, and you specifically referred to Mr. Honken's legal work. Were they a particular type of box that came from the institution, or was it a box that he brought in with him, or do you know?

A. No. They were just plastic boxes that the institution provided.

Q. And in these boxes you would see that he would put the rest of his legal documents and, I assume from what you said, place them under the bed.

A. Yeah.

Q. How long did you and Mr. Honken live in the place where he had his legal paperwork under the bed and in the locker from time to time in Charlie, first of all?

A. Okay. In Charlie it was just -- I don't even remember for sure. It was probably anywhere from four to six months.

Q. In that time I want to ask you these questions related to that particular time in Charlie. Did you know a Mr. Tokars, Mr. Fred Tokars?

3014

A. I heard of the name before, but I did not know him.

Q. Did you know an individual by the name of Mr. McIntosh?

A. Again, I knew the -- I did meet him but just briefly. I

really didn't know him.
Q. Okay. Did you know an individual -- and I know I'm maybe jumping ahead in time here, but did you know an individual by the name of Steve Vest?
A. Yes, I did.
Q. Now, we're going to talk about Mr. Vest a little bit later and where he worked, et cetera, but I want to, first of all, go forward from the move from Charlie after you stayed there how many months? Five to six months in there?
A. It was something like that.
Q. And then you both moved; is that correct?
A. Well, no.
Q. Okay. Tell me what happened.
A. We were cellies.
Q. In Charlie.
A. In Charlie bravo unit.
Q. This is 1999.
A. Yes.
Q. Okay.
A. And then there was another inmate in the unit, and I believe they wanted to put -- there was an individual in another cell, and he was a nonsmoker, and I think they wanted to put a

smoker in with him, and it wasn't going to work out between those two, so me, Mr. Honken, and Inmate Lynn, we sat down and talked about it and decided that Mr. Honken was going to move in with Inmate Lynn since both of them were nonsmokers, and the smoker was going to move in with me or something like that. We come up to some agreement so that everybody was happy.
Q. And that's still within the Charlie unit; is that right?

A. Yes.

Q. And this is before the move over to the nonsmoking unit which is bravo B which we can get to.

A. Right.

MR. PARRISH: Your Honor, this might be an appropriate time for a recess.

THE COURT: Okay. It would be.

Members of the jury, it's a little bit before 12. We'll be in recess until 12:45, and please remember my cautionary instruction. Keep an open mind until you've heard all of the evidence in the case. Thank you.

(The jury exited the courtroom.)

THE COURT: Any matters we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: No, Your Honor.

THE COURT: Okay. Thank you. Could I just see the lawyers on scheduling for a minute?

(Lunch recess at 11:57 a.m.)

♀

3016

THE COURT: Are we ready to have the jury brought in?

MR. PARRISH: We're all set, Your Honor.

THE COURT: And who's your next witness going to be?

MR. PARRISH: Let me get this. Bruce Golden, Your Honor.

THE COURT: Okay.

MR. PARRISH: And we'll be -- yes, you need to wait just a second till the jury comes in, and then the judge will call you up. And then we have the sheriff and the county attorney. They'll be pretty brief.

THE COURT: Mr. Williams, ready to have the jury

brought in?

MR. WILLIAMS: Yes, Your Honor. I am.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Parrish, ready to call your next witness?

MR. PARRISH: Yes, Your Honor. The defense calls Bruce Golden. Would you come forward, please, raise your right hand, and be sworn.

BRUCE GOLDEN, DEFENDANT'S WITNESS, SWORN

THE COURT: Thank you. Please be seated over there in the witness box.

DIRECT EXAMINATION

BY MR. PARRISH:

Q. Would you state your name, spell both your first and last

3017

name for the record, please.

A. Okay. My name is Bruce Golden, B-r-u-c-e G-o-l-d-e-n.

Q. And where are you employed, sir?

A. At Art Silva Lincoln-Mercury Toyota.

THE COURT: Mr. Parrish, could I just interrupt you for a second? I just wanted to explain to the jury we're taking a witness out of order. I forgot to do that. We were on another witness, and just to accommodate witnesses' schedules, we're just taking it out of order. I'm not sure we've done that in this trial. But it happens in virtually every trial I've ever had, even the short ones, so there's nothing unusual about the fact that we sandwich a witness in between a witness and that witness comes back.

So I just wanted to let you know in case some of you were wondering why we're on a new witness already.

I'm sorry, Mr. Parrish. Why don't you start over again.

MR. PARRISH: I will, Your Honor. Thank you.

BY MR. PARRISH:

Q. Would you tell us, sir, where you are employed?

A. I am employed at Art Silva Lincoln-Mercury Toyota.

Q. I'm going to have you speak up a little bit. I know you perhaps have not been familiar with this process, but I'm going to have you pull the microphones a little bit closer and move your chair a little bit closer too. You're going to have to

♀

project your voice over where all these jurors can hear that.

Sir, tell us what -- are you married, sir?

A. Yes, I am.

Q. You have children?

A. Yes.

Q. How many children?

A. Two.

Q. Okay. And tell us, sir, you've been working there about 16 years you said?

A. Yes.

Q. Tell us what you do.

A. I am a mechanic. I've been working there -- I work on cars.

Q. We can almost look at your hands and tell.

A. Oh, yeah.

Q. Didn't we just pull you right out of the shop and right into the jury room? Matter of fact, you are on your lunch hour, and we promised we'd get you in and out of here pretty fast; right?

A. Yes.

Q. You have a bunch of customers waiting on you to get their cars taken care of I take it.

A. Oh, yeah.

Q. I want to show you -- you met with Julie yesterday, and you had an opportunity to take a look at some exhibits.

♀

MR. PARRISH: We would move to introduce, Your Honor, Exhibits O1, O2, O3, O5, and O6 and O7.

* * * *

(Defendant Exhibits O1, O2, O3, O5, O6, and O7 were offered.)

* * * *

THE COURT: Okay. Any objection, Mr. Williams?

MR. WILLIAMS: Not to those. I'm just wondering if he's skipping O4.

MR. PARRISH: O4, I'm sorry. Got stuck together.

THE COURT: How about O1 through O7?

MR. PARRISH: That'd be good.

MR. WILLIAMS: No objection.

THE COURT: Defendant's Exhibit O1 through O7 are received.

* * * *

(Defendant Exhibits O1 through O7 were admitted.)

* * * *

MR. PARRISH: Thank you.

BY MR. PARRISH:

Q. Would you tell me, sir, were you trained as a mechanic, or did you train on the job, or did you go to mechanic school?

A. I went to Western Iowa Tech for two years, and then I have

had on-the-job training and then trained through Ford Motor Company and also Toyota.

Q. And did you take all of that training -- you're from Sioux City; is that right?
A. Well, Sergeant Bluff, yes.
Q. Sergeant Bluff? Did you take all of that training in the Sioux City area, or did you take it at the Toyota dealership, somewhere else?
A. Well, I had to travel like to Kansas City or Watertown, South Dakota, for my training.
Q. Okay. And how long have you worked on Toyota automobiles specifically?
A. Since about '92, '93.
Q. Are you familiar with all types of Toyotas would you say?
A. Yes.
Q. Did you have an opportunity to take a look at what we have marked here as O1? Did you have a chance to look at that automobile?
A. Yes.
Q. And does that look to you -- oh, there's my screen. Does that look like a 1984 Tercel?
A. Yes, it does.
Q. All right. Do you know -- have you ever worked on those automobiles before?
A. Yes, I have. It's been a while.
Q. It's been a while, but you have in the past; is that correct?

A. I've worked on them, yes.
Q. All right. Tell us a little bit about the automobile itself. I mean not in details but just a little bit about the engine, the size of it, how many seats and et cetera.
A. Well, let's see. In '84 they did come out with three body styles and two engines in that, you know, line. One's a 4A, and the one's a 4AC. They're both four cylinders, and also let's say manual transmission and automatic.
Q. Okay. And you can take a look at this. Inside of which is O7 and probably from your experience you could take a look right at that shift mode and tell us whether or not that's an automatic or a stick; right?
A. It appears to be automatic transmission.
Q. Looks like an automatic; is that right? Is that the standard seat? Did they have a seat that would go all the way across from your experience with working on Toyota Tercels?
A. No, they, you know, usually had front bucket seats in them.
Q. Right. And the front bucket seat was -- what you mean by that, that's separated out, and there was no complete seat in any of those Tercels; is that correct?
A. Yes.
Q. Going to show you another feature of that automobile, and you tell me if that's accurate from your experience, and I'm going to show you Defendant's Exhibit O6. And describe to the jury what you're taking a look at that with regard to a Toyota

Tercel, 1984.
A. The rear hatch is open. The package tray is up too. Just looks like the trunk area.

Q. All right. And when you say the trunk area, do you see those two seats that are kind of -- look right there, that split right there?
A. Yeah.
Q. Now, is that the front seat when that hatchback is up, or is that the backseat?
A. That's the rear seat.
Q. All right. And tell us, does that rear seat, in fact, go down?
A. Yes. Both of them seats do fold down.
Q. All right. And so when that seat folds down, it makes a full trunk area; is that right?
A. Yes.
Q. Okay. This is probably a little bit better here. I'm going to show you O5 that's been admitted. Take a look at that and tell me in O5 can you see both the front seat and the backseat of that 1984 Tercel?
A. I can definitely see the front seat, so the rear seat is a little hard because of the lighting, but I think I can see it.
Q. Sir, in your best recollection in your experience in 1984 from Toyota Tercel, is there a -- was there a smaller automobile made by the Toyota Motor Company other than the Toyota Tercel?

♀

A. I don't believe so, no.
Q. Okay. And in that Toyota Tercel, tell us how many people could the Toyota Tercel hold.
A. To fit comfortably?
Q. Yes.
A. Possibly four.
Q. Possibly four. And tell us why you describe it as possibly

four.

A. There's not enough leg room for a very tall person.

Q. Okay. What about a person six-foot-three?

A. It'd be awful cramped in the backseat.

Q. It would be difficult for a six-foot-three person to sit in the backseat?

A. Yes.

Q. From your experience in having worked on these cars for a number of years, what -- could four people fit in the backseat?

A. Four children, yes. Not four adults. It'd be real hard.

Q. What about two adults and two children?

A. It's possible, but I don't believe so, no.

Q. Would it not only be pretty cramped but it would make some kind of unusual looking --

A. Definitely.

Q. And why is that? Describe to the jury why that would be in a Toyota Tercel, why it would look unusual from your experience as a mechanic and having worked on these cars for a number of

3024

years.

A. Awful small car and a lot of people in it. It's very hard to comprehend.

Q. Okay. And, sir, would you tell us whether or not what you see here with regard -- on D3 (sic) is a fair and accurate representation of -- what I've shown you on the other exhibits would be a fair and accurate representation of what a Toyota Tercel 1984 looked like?

A. Yes.

Q. No doubt in your mind about that.

A. No doubt in my mind. It looks like a Tercel.

MR. PARRISH: No further questions.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Good afternoon, sir.

A. Afternoon.

Q. It is possible for two adults to be in front, two adults to be in the backseat and two kids to be sitting on the laps of the two adults in the backseat; right?

A. It could, but it'd be real cramped.

Q. Sure. If you were worried about comfort, you wouldn't want to do that, would you?

A. No.

Q. If somebody really wasn't worried about the comfort of the people in the backseat, that could be very easily done, couldn't it?

A. It could, yes.

Q. And, in fact, if necessary, you could put a couple small kids back underneath that trunk area, couldn't you, sir?

A. I suppose, yes, you could.

Q. I suppose so.

MR. WILLIAMS: Thank you. No further questions.

THE COURT: Mr. Parrish, anything further?

MR. PARRISH: I do have just a couple of questions.

REDIRECT EXAMINATION

BY MR. PARRISH:

Q. Let me ask you something. Let's go to that backseat area just a second that the prosecutor asked you about. Now, from

your experience, tell us and tell the jury what type of fabric are you familiar with that shows up on a Toyota Tercel.
A. They had two types of fabric. It could either be vinyl or carpeting.
Q. And that carpeting was carpeting that you say law enforcement could go in, take a look at and see if there was dirt, mud, or anything on it. It would show up just like in any other piece of carpet or vinyl, would it not?
A. Yes, it would.
Q. All right. And let me just ask you with regard to the

3026

front seat, describe to the jury what type of material would exist on the floor of a 1984 Tercel.
A. That looked like carpeting.
Q. Carpeting or vinyl. Those are two items that you've seen in there; is that correct?
A. That's correct.
Q. And they didn't have any special-type duty that would remove debris or fabric or lint or blood or mud or anything like that that would automatic scoop itself up out of the car, did they?
A. No.
Q. You didn't see that in 1984, did you?
A. No.
MR. PARRISH: All right. Nothing further.
THE COURT: Anything further, Mr. Williams?
MR. WILLIAMS: Not a thing, Your Honor.
MR. PARRISH: I'm finished, Your Honor. Thank you.
THE COURT: Okay. You're excused.
THE WITNESS: Thank you.

THE COURT: Thank you.

Mr. Parrish, are you ready to call your next witness?

MR. PARRISH: We are, Your Honor. We'd call Sheriff Amick, please.

THE COURT: Sheriff, if you'd come forward, I'll swear you in. Good afternoon.

DAVID AMICK, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box over there. You can adjust the chair and the microphone so you can speak directly into the microphones. And when you're settled in, would you please state your full name and spell your last name for us.

THE WITNESS: David Harley Amick, A-m-i-c-k.

THE COURT: Thank you.

Mr. Parrish?

DIRECT EXAMINATION

BY MR. PARRISH:

Q. Sheriff, good afternoon again.

A. Good afternoon.

Q. I want to tell you when we were going through jury selection, I don't think there was anyone who came in this courtroom who didn't know you. Everybody would go to your name first because it was first, and everybody knew you. I just want to tell you for what it's worth.

A. Maybe it has something to do with my age. I'm not sure.

Q. Okay. Well, let me ask you a few questions. And, first of all, tell the folks what you do, and as part of what your position is, tell us briefly what your duties are.

A. I am the Woodbury County sheriff and generally oversee all

operations of our department which would include patrol, investigations, jail, crime prevention, DARE, and a variety of

other divisions within the department.

Q. And how long have you been sheriff of Woodbury County, sir?

A. Twelve years.

Q. And as part of that responsibility, do you supervise the jail? Is that one of the responsibilities under the Code of Iowa you have responsibility for?

A. Yes, I do.

Q. All right. And we've had Lieutenant Redden testify already this morning, and we don't really need to go back through the outline of the jail, et cetera, but what I would really like to focus on is whether or not you are ultimately her supervisor.

A. Yes, I am.

Q. And as part of that supervision, you occupied that same position in 1996, '97, and '98. Would that be accurate?

A. Yes, it would.

Q. Okay. She has also described for us the administrative appeal process within the jail. She's also described for us what could be considered an outside process for administration of the jail as to whether or not charges or investigations are conducted within the jail; okay?

A. Okay.

Q. Now, with that in mind, you've had an opportunity to briefly meet with me about her investigation related to Mr. Honken, have you not?

A. Yes.

Q. And you've had an opportunity to go back this afternoon -- since I met with you during one of the brief recesses to go back and get a report that you thought was in Mr. Honken's file; is that correct?
A. That's correct.
Q. Okay. You determined, did you not, from your discussions with me that that report related to Mr. Honken regarding an investigation by one of your deputies was not placed in Mr. Honken's file; is that right?
A. That's my understanding.
Q. All right. Now, let's make sure we understand what this investigation is. There is an internal investigation that follows up from an incident report. That's put into the inmate's file as you understand the process; would that be accurate?
A. That's correct, yes.
Q. There's a corollary report if additional charges are going to be filed or investigated. That's a separate file that would move on a different track; would you agree?
A. Generally, yes. Oftentimes they will be combined someplace in the process.
Q. Right. Now, I want you to take a look at a report that I asked you to go back and obtain. First of all, do you know if that report has ever been given to the government at this point? And that's the outside investigation report.

3030

A. I could not say for sure if it has or not.
Q. And you don't even know because obviously with the many responsibilities you have, you may not handle each individual request that you get for information, do you?

A. No.

Q. Do you have a staff that would handle that for you?

A. That's true.

Q. Matter of fact, give us an idea how large your staff is.

A. About 115.

Q. Okay. But you did go back and you did track down a report that you had reviewed as a result of the subpoena you received from us; is that right?

A. Yes.

Q. And you obtained that report related to an investigation that was conducted by one of your deputies into what was called an escape attempt from the Woodbury County Jail; would that be accurate?

A. Yes.

Q. What year was that report?

A. 1996.

Q. And in that 1996 report, would you tell us who, in fact, conducted the investigation?

A. Deputy Ray Haafke would have been the investigator assigned along with Deputy Scott Lanagan.

Q. And did they get a report, sir, and did they bring it to you?

A. They did a report. It was not personally brought to me, no.

Q. Is there a particular reason it was not brought to you? And you related to me and you can relate it to the jury as to where you might have been or why that report was never brought to your attention in '96.

A. At the time of this incident I was out of town, but our

standard procedure would have been that through our investigation supervisor these type of reports are typically, once completed, referred on to the county attorney for their review.

Q. All right. And as it was typically done, was that report referred on to the county attorney for the county attorney's review?

A. Yes.

Q. All right. Did you do that personally, or did one of your deputies do that?

A. That would have been handled by one of the staff.

Q. And would you agree that that's the normal business practice and those reports that you obtained or your office through their standard operating procedure would pass those reports on to the county attorney for his or her review?

A. That's correct.

Q. Or it might go to an assistant, but they would then take a

♀

look at the file; is that right?

A. Yes.

Q. Now, you did have an opportunity to come back and review the file, did you not?

A. Yes, I did.

Q. And you have in front of you now a report -- and we don't necessarily need the report unless the government wants it, but you have that report in front of you, and does that report report on the jail incident with regard to the escape that was supposedly done by Mr. Honken?

A. Yes, it is.

Q. All right. Would you take a look at it and tell whether or

not there's a reference in that report done by your investigators to Mr. Honken.

A. Yes, there is.

Q. And is that in reference to an anonymous letter?

A. Yes.

Q. Other than that anonymous letter -- and we've already heard testimony about that -- is there another single reference to Mr. Honken about any escape attempt at the Woodbury County Jail in 1996?

A. Not that I see scanning through that.

Q. Would you tell the jury how many pages that report is, please.

A. Thirteen.

♀

Q. And that's the report that was passed on to the county attorney; is that correct?

A. Yes.

MR. PARRISH: No further questions.

THE COURT: Mr. Williams?

MR. WILLIAMS: No questions, Your Honor.

THE COURT: Thank you. You're excused.

THE WITNESS: Thank you.

MR. PARRISH: Thank you.

THE COURT: Ready to call your next witness?

MR. PARRISH: Yes.

THE COURT: Who would that be?

MR. PARRISH: Mr. Mullin if he's there. He said he'd be there at 12:45. He'd be equally short in terms of time.

THOMAS MULLIN, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated in our witness

box. Make yourself comfortable, and you can adjust the chair so you can speak directly into the microphone. And when you're settled in and ready, would you state your full name for us and spell your last name, please.

THE WITNESS: My name is Thomas Steven Mullin, M-u-l-l-i-n.

THE COURT: Thank you.

Mr. Parrish?

MR. PARRISH: Thank you, Your Honor.

3034

DIRECT EXAMINATION

BY MR. PARRISH:

Q. Mr. Mullin, would you tell us what your employment is, sir, and also tell us how long you've occupied that position.

A. I'm the Woodbury County attorney, and I've been the Woodbury County attorney since 1988.

Q. Okay. And we know each other from prior work of mine up in Sioux City, and we've chatted on the phone --

A. Yes.

Q. -- a few times, have we not?

A. Yes, we have.

Q. I just want to ask you a few questions. And we did talk -- I believe it was last week.

A. Yes.

Q. -- just briefing you on what your testimony would be so you could have an opportunity to review your files; is that correct?

A. It is.

Q. Did you receive a report from the sheriff's office with regard to an escape charge in 1996 involving Mr. Honken?

A. We received several documents from the Woodbury County

Sheriff's Department late in 1996 containing references to evidence of an attempted escape and the possibility of a criminal act or acts of criminal mischief.

Q. Okay. And with regard to those reports, did you conduct any additional investigation other than what the sheriff had

sent to you, Sheriff Amick or his deputy -- I believe he indicated it was Deputy Haafke and one gentleman who may have been retired now who did the investigation. Did you conduct any additional investigation other than what they did with regard to those charges?

A. I believe that other than reading the reports that they sent to us the two prosecutors in my office who received those reports and worked with them probably would have had a telephone discussion or two or maybe in-person discussion or two with one or more officers in the sheriff's department or jailers. Other than reading the reports and perhaps -- but I think they probably did -- talk to some sheriff's people, I think that was what the folks in my office did with respect to the reports that we received.

Q. And you would agree that no charges were filed as a result of the report sent to you by the sheriff's office; is that correct?

A. If I could back up just one bit, on the last answer that I gave, who did we talk to --

Q. Go ahead.

A. -- I'm pretty sure that at the time somebody from my office probably spoke with maybe somebody from the United States Attorney's Office or someone else in federal law enforcement, but I'm not sure.

Q. Okay.

A. I'm sorry.

Q. No, that's fine. But you would agree that all you had as a report at that time -- and we've tracked it from Lieutenant Redden up to the sheriffs and their investigators and then into your office as part of the investigation. That's all you had as a report; is that right?

A. As a report in writing, yes.

Q. Okay. And then you would agree that you conducted no additional investigation into the matter. Would that be accurate?

A. Nothing other than, again, probably discussions with a couple of people in the sheriff's department who may have been the authors of those reports.

Q. Okay. But do you in your own office have an investigator too?

A. At the time we did have a person who did some investigating for us. I don't know. I doubt that he had anything to do with this case.

Q. Okay. So you don't remember assigning your investigator out to go take a look or do some follow-up reports or anything like that.

A. I don't recall.

Q. All right. And would you agree then -- and I know you backed up a second when I'd asked that question -- that no charges were filed by your office against Mr. Honken regarding

escape or injury to a building or anything like that?

A. That's right.

MR. PARRISH: Nothing further.

A. No --

Q. Go ahead.

A. I was just going to say that's right, no charges.

MR. PARRISH: Nothing further.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Good afternoon, Mr. Mullin.

A. Hi, Mr. Williams.

Q. Do you have any reason to disagree that the report you would have received from the sheriff's office would have been about 13 pages long? Does that sound about right?

A. I've got a copy here. I've got four copies of that that I brought with me in case anybody wanted a copy, but Mr. Parrish subpoenaed the records that we had, so I brought copies. Roughly, so I suppose that's about it, but I'd be happy to count the pages if you'd like.

Q. No, that's fine. If we had testimony from Mr. Amick that it was 13 pages of report, would you have any reason to disagree with that approximately?

A. No. And then we had some other documents that after I

received the subpoena -- documents that were in our computer as part of our case tracking records, but those weren't, you know, investigative reports or anything. They just contained our own I guess bureaucratic administrative kinds of computer screens,

but I printed those up as well in case anybody wanted to see them.

Q. Certainly. And so for one of your assistants to review this file to determine whether it was worthy of filing attempted escape charges, they would have had about 13 pages of reports from the sheriff's department at that time.

A. About that, yes.

Q. And give the jury an idea if you could back in 1996 what was the typical caseload of one of your assistant county attorneys.

A. First of all, the two assistant county attorneys who handled these reports and to whom they were directed, one was in our felony division, one in our misdemeanor division. And the misdemeanor division attorneys at the time would have had a case load of something like 1,500 cases a year each probably, and felony attorneys at that time, 200 felony cases a year roughly that they dealt with, case inputs.

Q. Sure. Is it accurate to say that you personally did not make any charging or noncharging decision in relation to any attempted escape in 1996 from the Woodbury County Jail?

A. That is correct.

♀

3039

Q. And so that decision would have been made by one of your assistants at that time.

A. Yes.

Q. Now, at the time your assistants would have been reviewing this file, I think we've already established they would have had about 13 pages worth of documents to go off of to make that charging decision.

A. They may or may not have also seen photographs. I recall

that there's a reference in a couple of the reports to some photographs that were taken, but that . . .
Q. And then they talked a little bit with some of the personnel over there.
A. I'm guessing so, yes.
Q. Sure. Tell the jury, Mr. Mullin, in the county attorney's system, county attorneys don't routinely use a grand jury for purposes of investigating a case; is that fair to say?
A. Yes, it is.
Q. And that's different from the federal system, isn't it?
A. Very different.
Q. Now, we've talked about you had about 13 pages of interview reports you based your -- or your assistants based their decision on; right?
A. That plus any photographs they might have seen plus any discussions they might have had with any investigative sheriff's folks.

Q. Did your county attorneys have the benefit of an interview conducted by federal law enforcement officers on March 4 of 1997 of a Terry Bregar?
A. No, they did not.
Q. Did they have the benefit of a March 25, 1997, interview of William Garrison?
A. No.
Q. Did they have the benefit of an April 15 and 16, 1997, interview of Derek Boggs?
A. No.
Q. Did they have the benefit of an August 7, 1997, interview of Anthony Altimus?

A. No.
Q. Did they have the benefit of a November 19, 1997, interview of Daniel Frey?
A. No.
Q. Did they have the benefit of a December 18, 1997, interview of Dennis Putzier?
A. What was the date on that, please?
Q. December 8(sic), 1997.
A. No.
Q. Would they have had the benefit of a December 17, 1997, interview of a Ronald Walstrom?
A. No.
Q. And would they have had the benefit of a January 26, 1998,

♀

interview of Tony Johnson?
A. No.
Q. Would they have had the benefit of a May 14, 1997, grand jury testimony of Derek Boggs?
A. No.
Q. Or the March 14, 1997, grand jury testimony of Terry Bregar?
A. No.
Q. Or the April 17, 1997, testimony of William Garrison?
A. No.
Q. Or the September 8, 1997, grand jury testimony of Anthony Altimus?
A. December '97 did you say?
Q. September 8 of 1997.
A. The answer is no.
Q. There was a sentencing that occurred in December of 1997

and again on February of 1998 of the defendant in this case, Dustin Honken. Would any of your assistant United States attorneys -- I'm sorry, assistant county attorneys in making their charging decision have had the benefit of transcripts of testimony by Derek Boggs, Terry Bregar, James Brownlee, Daniel Frey, Dennis Putzier, or William Garrison that would have taken place during that sentencing hearing in 1997 and 1998?
A. No.
Q. Were you aware that Dennis Putzier pled guilty in federal

court to aiding Dustin Honken in an attempt to escape from the Woodbury County Jail?
A. No.
MR. WILLIAMS: I don't think I have any other --
Q. One more question. As county attorney in 1996, you would have been familiar with the laws pertaining to Iowa laws, criminal laws at that time; is that fair to say?
A. That's what county attorneys do. We prosecute violations of Iowa criminal laws.
Q. So you know -- you knew in 1996 what the laws were.
A. Some of them.
Q. Certainly. In 1996 was there such a criminal violation under Iowa law for attempted escape?
A. No, there was not.
Q. In fact, that was not added to the Iowa Code until 1999.
MR. PARRISH: Objection. Fine. I'll withdraw it.
Q. Is that correct?
A. The Iowa legislature added the criminal offense of attempted escape in 1999, that's correct.
Q. So no matter how much evidence your staff would have had of

an attempted escape in 1996, they could not have charged the defendant or anybody else with attempted escape in 1996; is that correct?
A. That is correct.
MR. WILLIAMS: Nothing else, Your Honor.

THE COURT: Mr. Parrish?
MR. PARRISH: I just have one question.

REDIRECT EXAMINATION

BY MR. PARRISH:
Q. But would you agree in reviewing the photographs that someone did tell the deputies that even though the jail was checked three times a day they walked in Mr. Honken's cell and didn't find the hole for three whole days three times a day, nine examinations and they never once found the hole?
A. Sir, I would need to go back and re-read the reports to be able to answer that question.
Q. But you never heard that up to this point; right?
A. Say again, please.
Q. That they went in and checked the jail cell, that they told them there was a hole. The deputies went back three times a day for three full days and never found the hole in the wall that they claim Mr. Honken was trying to get through.
A. They read the reports that were submitted to our office. I don't recall exactly what the timing was on any of those things, and I never keyed in on how many days or how many times somebody would have walked by. I know that at some point some of those things were discovered by correctional officers, but I don't have it fixed in my mind what the dates were or any of those things.

Q. But that would affect your decision, not all of this stuff

Mr. Williams was reading to you. As a practical county attorney, it would affect your decision if you knew that the deputies within the jail who inspected it three times a day had walked by this hole and didn't even see it.

A. All facts that we could ascertain would have been relevant, all facts.

MR. PARRISH: Thank you. Nothing further.

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: Nothing, Your Honor. Thank you.

THE COURT: Thank you. You're excused.

THE WITNESS: Thank you, Your Honor.

THE COURT: Members of the jury, why don't you take a stretch break.

And, Mr. Parrish, are you ready to call your next witness?

MR. PARRISH: We are, Your Honor.

THE COURT: Are you going to be calling Mr. Huffman back now?

MR. PARRISH: We are, Your Honor. Yes.

NEEL HUFFMAN, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

THE COURT: Okay. Mr. Huffman, why don't you come forward. You're still under oath, and so you can resume your position back in the witness box. Thank you.

MR. PARRISH: I can't find my notebook. I'm not using it anyway, but I have no idea where I put it. Okay. Well, I'm

not using it anyway. I just like to have it as a crutch.

CONTINUED DIRECT EXAMINATION

BY MR. PARRISH:

Q. Let me go back. We stopped off at Charlie.

A. Yes.

Q. Do you remember where we were? And from Charlie where we're going to move to is where you and Mr. Honken moved to, if anywhere, after that; okay?

A. (Witness nodded head.)

Q. Now, you're at Charlie. Charlie is a smoking unit.

A. Right.

Q. You explained to the jury right before your break as to how you guys decided to divide up roommates. And we got the year down. I think you indicated it was about 1999. Would that be accurate?

A. I believe so, towards the end of '99.

Q. Now, at this point had you met a fella by the name of Steve Vest?

A. Yes, I've met him.

Q. All right. Now, let's talk about before this move in '99 over to bravo. I want you to explain to the jury as best you can as to whether or not there was common knowledge from your experience on Charlie unit as to whether or not Dustin had what we refer to as a live case going.

A. Yeah, I think pretty much everybody knew that.

3046

Q. And how was that knowledge made known, not what people said, but was it through the Internet, through newspapers, through just general prison rumor, or how was it getting around?

A. Yeah, mostly it was -- I think probably the majority of everybody knew it was from just gossip and there are rumors.

Q. Okay. And were newspaper articles to your knowledge circulating around Charlie company -- and we just want to stay with Charlie company right now -- about Mr. Honken's case?
A. Yes. I mean, I think there was quite a few of them.
Q. So it was pretty much common knowledge; is that right?
A. Yes.
Q. Now, what we want to do is move from Charlie company, and I want you to take the jury over to bravo B. Was that a direct move, or did it take some time to get to bravo B?
A. Well, no, it didn't take very long. It was a few months.
Q. All right. Then tell us what you did. Now you and Mr. Honken are no longer roommates. You're in Charlie company right before we took the recess and took these other three witnesses. Can you now take us over to bravo B and tell us how we get there.
A. Well, Mr. Honken moved out. Okay. I stayed in that unit. It was for a few months. I don't know for sure exactly how long it was. It might have even been about a year. And Mr. Honken went through a couple of different cellies over there, people that was his cellie that left, went out on court writs or got

3047

transferred or whatever. Well, then some of his stuff started ended up missing, so we got talking about it, and he went --
Q. When you say stuff missing, explain to us what was missing.
A. Personal papers, legal work.
Q. To your knowledge do you know who took them?
A. I know only of one individual for certain that did.
Q. Did you confront that individual?
A. Yes, I did.
Q. And tell us which individual you confronted about taking

Mr. Honken's legal work, and tell us not what he said but how the confrontation took place and where it took place.

A. Well, the individual is Wayne Byerly, and he was in the special housing unit. Well, I got put in the special housing unit. I seen him there, so I --

Q. Explain to the jury what the special housing unit is because I don't think that's -- I know you guys call it SHU; right?

A. Yeah, or the hole.

Q. Or the hole. Okay. Explain to the jury where the special housing unit is in relation to Charlie and how did you end up running into Mr. Wayne Byerly down at that SHU unit.

A. Well, it's a completely different unit on the other side of the yard. And Mr. By -- I can't think --

Q. Byerly, but you cannot say what he said.

A. No, no, he was already in that unit. I got put in there

3048

because I got locked up for an investigation. So while I was in that unit, I noticed that he was in there and he was out being an orderly. So while he was sweeping the floor, I called him over to the door of the cell that I was in, and I asked him why he stole Mr. Honken's legal work.

Q. All right. And do you know from your own personal knowledge what happened to Mr. Honken's legal work when it got stolen?

A. Do I know for sure what happened to it?

Q. Yes, do you know where it was disseminated, where it was taken or who ended up with it?

A. No, I don't know for sure.

Q. But you did confront Mr. Byerly about it.

A. Yes.
Q. At that point had you moved into the bravo unit?
A. This was after that.
Q. This is after you'd moved into bravo unit; is that right?
A. Yes.
Q. Now, I want to also go to your knowledge of Mr. Vest. You know who Mr. Vest is, don't you?
A. Yes.
Q. Do you know why Mr. Vest was in prison?
A. I believe it was for murder. I don't know for sure.
Q. Do you know how many murders?
MR. WILLIAMS: Objection, Your Honor. Relevance, also

calling for hearsay.
THE COURT: Overruled. You may answer.
BY MR. PARRISH:
Q. Do you know how many murders?
A. I believe it was two.
Q. Okay. Do you know where Mr. Vest was working in 1999 and the year 2000?
A. He was working as an orderly in BB unit I believe.
Q. Explain to the jury what an orderly does, and explain to the jury what an orderly has access to.
A. Okay. An orderly is -- a unit orderly is an individual that cleans the units, whether it's sweeping, mopping, dusting, painting. They take care of the units. And at that time I believe Mr. Vest's sole job was the little room that they kept all the individual legal work in.
Q. Now, I want to ask you another question. To your knowledge was Mr. Vest and Mr. Byerly cellies?

A. I don't know because I didn't live in the unit at that time.

Q. You did not live in the unit.

A. No.

Q. Did they ever become cellies to your knowledge? And if you know, tell us. If you don't know, you don't have to tell us.

A. I'm not a hundred percent positive.

Q. All right. But you do know that Mr. Vest was an orderly

3050

and Mr. Vest had access to certain rooms; is that right?

A. Yes, he did.

Q. Explain to the jury how Mr. Vest got access to certain rooms.

A. Well, like I said, his main job was -- there was this little bitty closet, and that's where individuals kept their legal work. All it was was just a box, had a little piece of paper with their name written on it in Magic Marker. Well, that room was locked all the time except for when the orderly wanted to go in there and clean.

Q. And who did the orderly have to go to to get the key to get into the room?

A. Either the case manager or the unit manager.

Q. Tell the jury whose legal work was kept in that little room that you described.

A. Mr. Honken's.

Q. Did you notice at a certain point in the year 2000 any change in Mr. Vest's relationships toward anyone?

A. Oh, yeah, dramatic.

Q. Now, you said it was dramatic. I want you to describe to the jury as an inmate there who knew other inmates what you

noticed about Mr. Vest's relationship with other people in the unit. Just describe in your own words what you observed.

A. Well, Mr. Vest was real quiet, pretty much kept to himself and everything all the time until just in a matter of like two,

three days he just all of a sudden wanted to be just best buddies with Mr. Honken, myself, and a few others that just hung around together.

Q. And what did you see in terms of this person who Mr. Vest who now had kept his distance from Mr. Honken and Mr. Honken had never established a relationship with? Did you notice that change when he became an orderly getting access to the legal room, or was it before that? Tell us.

A. No, it was after.

Q. It was after he had access to the legal room.

A. (Witness nodded head.)

Q. Is that a yes?

A. Yes.

Q. And first of all, how did you respond to what you observed about Mr. Vest's change in attitude or attempt to change the relationship? Just tell us how you felt from what you observed about it.

A. Skeptical.

Q. Why?

A. Because here was this individual that's been there for a while, and all of us had been there for a little while, but up until that point, he never even wanted to even communicate with nobody, even try to be friends with them, and all of a sudden he just wanted to just be friends with all of us and just kept asking question after question about Mr. Honken.

Q. And did you say anything to Mr. Honken about what you had observed about Steve Vest's attitude or sudden change in attitude on the prison yard?
A. I don't really know if I did or not.
Q. Did you know whether or not or were you still there at the time Mr. Vest became Mr. Honken's roommate?
A. Yes, I was.
Q. Tell us how that came about if you know from your own words.
A. Well, I believe the roommate that Mr. Honken had went to the hole or something like that.
Q. Would that have been Mr. Swanson?
A. Yeah, John Swanson.
Q. All right. And then what happened?
A. Steve wanted to move in with Dustin real bad.
Q. And when you say real bad, describe what you observed about -- without saying what he said, describe what you observed about Mr. Vest in terms of wanting all of a sudden to get next to Mr. Honken.
A. Well, when the whole move process was about ready to happen when he was trying to move in there, he wanted everybody he know to go talk to the counselor and unit manager to get him in there.
Q. To get him in Mr. Honken's room.
A. Yeah.

Q. But you were skeptical, and you described the reasons why

you were skeptical about Mr. Vest. Did you -- strike that question.

And you said you never expressed that directly how you can recall or you recall doing that. Did you express that skepticism to anyone else when you noticed this change?

A. I think I did just to the cellie that I had at the time.

Q. And who was that?

A. Mr. Mike Llorente.

Q. And you expressed to him your concern about why Mr. Vest was all of a sudden taking such a huge interest in Mr. Honken and his case.

A. Yeah, we talked about it quite a bit.

Q. Is there any reason why you didn't alert Mr. Honken or engage in discussion with him about what Mr. Vest was doing?

A. Well, it really wasn't none of my business, and usually, you know, everybody just -- well, everybody tries and just mind their own business.

Q. You've described what you have talked about as your attitude and what was happening to you. Did you observe Mr. Honken and his interaction with other people on the yard, in his cell, at the mess hall, matters like this? Did you make observations about this?

A. Oh, yeah.

Q. Describe what you observed as how Mr. Honken conducted

3054

himself when he was in the prison during the time you observed him.

A. Oh, Mr. Honken was always, you know, a very polite individual, always willing to help anybody that needed help or anybody that came to him and asked for help no matter, you know.

If somebody needed something, he had no problem going out and getting it for them or finding somebody that had it so they could borrow it or use it, you know. He was just a very friendly person.

Q. And that was how he conducted himself during the whole time you saw him; is that correct?

A. Yes.

Q. Now I want you to describe for the jury with regard to his legal papers, his legal documents and what you observed about his case, describe as best you can in your own words how he conducted himself toward his paperwork, his legal papers, and his pending case.

A. Well, he was always studying his legal work. Whether he'd get something in the mail or whatever, you know, it was -- the first thing he did was open it, read it, you know, but sometimes he'd leave it lay on top of his locker. Well, then other people would come over and try and look at it or want to ask him all kinds of questions as soon as he got something.

Q. Would that also be concerning newspaper articles that were sent to him with some regularity?

♀

3055

A. Yes, it was.

Q. Do you remember at one point in the year 2000 when Mr. Honken went to the hole? Were you there?

A. Yeah.

Q. With regard to food strike deal?

A. Yeah.

Q. When he came back out of the hole, who ended up in his cell if you can recall?

A. Well, I was still down in Charlie bravo unit then.

Q. Right.
A. And I think it was either Wayne Byerly or Vest, one of them too.
Q. When he came out of the hole, you think it was either Wayne Byerly or Vest who ended up in his cell.
A. Yes.
Q. Let me ask you this. Did you know that Mr. Vest at that time had done work for SIS?
A. No.
Q. Do you know now?
A. I do now.
Q. Tell the jury from what you knew who is SIS.
A. They're the investigators that work just inside the institutions, so if somebody wants to tell on somebody else or they have any kind of information, that's who they go to. Or if anything happens inside the institution, they're the ones that

investigate it.
Q. And with regard to Mr. Vest, you didn't find out till later that he had perhaps cooperated with regard to other staff or other inmates with SIS; is that correct?
A. Yeah, I didn't know it till later.
Q. All right. But you knew that he was -- either one of two people, either Mr. Byerly who you had confronted about stealing Mr. Honken's paperwork or else it was Mr. Vest when Mr. Honken came out of the hole, that's who ended up as his cellie.
A. Yes.
Q. What I'd like to do now is go to an area involving a confrontation. Do you know anything about a confrontation between Joe McGee, Mr. Honken where Mr. Loparo was present and

Mr. Honken made an admission that he killed any people?
A. No, I don't know nothing about that.
Q. Have you ever heard of anything like that?
A. No.
Q. Did anyone ever discuss that with you where you were in eyesight of seeing any confrontation like that occur?
A. No.
Q. Did you ever see -- do you know Joe McGee?
A. Yes.
Q. Did you ever see him in any way confront Mr. Honken in the yard, in his cell, in the mess hall, or anywhere the entire time that you were at Florence, Colorado?

♀

3057

A. No.
Q. You talked about your confrontations. Did you ever see Mr. Honken in any confrontation or a fight or almost fight with anybody in Florence, Colorado?
A. No.
Q. I want to go to another area with you, and this area involves the mail. You talked about the rumors that circulated around the prison. I want to -- before I get in that area, though, I want to discuss briefly with you whether or not you know what I'm talking about when I say a live case or a case that's going to come back in front of a jury and a case that's on appeal or on a writ. We've talked about that briefly this morning. Do you recall that?
A. Yes.
Q. Now, other than Mr. Honken -- and I've asked this question of other inmates -- do you know of anyone else who had what could be called a live case where they were going to go back

ultimately and face a jury trial?

A. Only one.

Q. And who was that?

A. Dickie Lynn.

Q. And who was the other one?

A. That's the only one.

Q. It would be Mr. Honken too; is that right?

A. Yes.

♀

Q. Does a case like that with regard to inmates, first of all, who are facing life imprisonment, does that case at all from your knowledge of being out in the penitentiary, do people have a great interest in that kind of case?

A. Oh, yeah.

Q. Tell the jury why people who would be serving life imprisonment would have an interest in a case like Mr. Honken's.

A. Because anybody that's doing time, you know, was always looking for a way to make their time less, and something like that is the easiest way to do it.

Q. So he'd be one of the hottest commodities at Florence, Colorado.

A. Oh, yeah.

Q. Well, how would they get to the point where they could get some benefit then?

A. Well, if they got -- if they could come up with anything that they could use against him or that they think the government would want, well, they're going to pry it out of them, steal it from them, whatever they can and take it to the government and try and work out a deal.

Q. Well, you've been his roommate for approximately how long?

You talked about the six months with the Charlie company, but you were also his roommate again.

A. Yeah.

Q. Okay. And when was that? At bravo unit; is that right?

A. Yeah, it was in bravo after I moved over there.

Q. And how long were you his roommate then?

A. I think it was, again, probably about six months, maybe a little longer.

Q. Is there a particular reason why you eventually became his roommate again? Was there some concern being circulated as his case got closer to trial?

A. Some of his paperwork, his personal stuff, was disappearing, so Mr. Honken went to the unit manager and says, Hey --

MR. WILLIAMS: Objection, Your Honor. Calls for hearsay.

THE COURT: Sustained.

BY MR. PARRISH

Q. We'll stay away from the hearsay. But did you do anything as a result of his papers missing; okay? Not what he said to you or anything or what he said to a unit manager, but did you do anything to try to stop this missing papers from his legal file?

A. Yeah, I moved in with him.

Q. All right. Did you and he trust each other?

A. Yes.

Q. Now, compared to someone who's doing life, when you were in Colorado, how much time did you have left?

A. Four years maybe.

Q. Four years which you've now -- as you've told the jury earlier this morning you've discharged; is that right?
A. Right.
Q. So would you be considered a short timer or someone like that?
A. Yeah, I was a short timer.
Q. Compared to a lot of what these other people had to serve in terms of double lives and four lives and stuff like that; is that right?
A. Yes.
Q. So Mr. Honken trusted you.
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. Okay. Were you also from a small town much like he was from a small town?
A. I think I'm from a smaller one.
Q. And in terms of criminal history, was your -- I realize you did not do drugs and it was not a drug plea or anything like that. But in terms of prior criminal history, it was fairly similar.
A. Yeah.
Q. And so he trusted you and you trusted him; is that right?
A. Yes.
Q. And so you stayed in the cell with him as his roommate

3061

until he transferred.
A. Until I transferred.

Q. Until you transferred.
A. Until I transferred, yes.
Q. Let me ask you, do you remember what year you transferred and moved to -- I believe it was Terre Haute you moved to?
A. Yeah.
Q. When did you move there?
A. It was like July or August of 2002.
Q. Okay. And were you his roommate at the time you transferred?
A. Yes.
Q. Did anything to your knowledge come up missing from his cell after you moved in with him?
A. There was a few things. There's only one that really stood out, and that was a handwritten letter that Mr. Honken received in the mail.
Q. And that letter turned up missing.
A. Yes.
Q. And there were a few other documents that were missing.
A. Newspaper articles. What else, I really don't remember for sure.
Q. And when you mentioned newspaper articles, do you remember whether or not there was an article from the Des Moines Register?

3062

A. No, not for sure.
Q. All right. So you don't recall whether there was an article in the Des Moines Register that talked about a note.
A. I remember something about a note, but whether or not it was from that paper . . .
Q. Okay. And you don't know whether it was October 15 of

2000.

A. No, not for sure.

Q. And were you aware as to whether or not his mom was sending him these newspaper articles that referred to the investigation?

A. Oh, yeah, I'm aware of that.

Q. You knew she was doing that. As a matter of fact, did you see what he would do on occasion when he'd be a little careless with regard to the newspaper articles, where he would leave them?

A. On top of his locker.

Q. Well, what about when he'd go in the mess hall? Did you ever make any observations about when you'd do mail call and you'd go to lunch?

A. Mail call was kind of a funny thing the way they ran it.

Q. Tell the jury how they would run mail call and how people got access to your mail then.

A. Well, they'd call your name to hand out your mail. Well, if you weren't there, about anybody in the unit could just pick it up for you. So it was nothing for anybody to get your mail,

♀

3063

you know, and sometimes you might not even get your mail because somebody else got it and read it or did whatever they wanted with it.

Q. Now, you indicated you were his cellie twice, once in 2002, again back in 2000. And not saying what it would say, but how often would you see Mr. Honken -- during that six months when you were in Charlie company and again when you're in bravo B company, how often did his mom write him?

A. Sometimes twice a week. At least every week, sometimes twice.

Q. And in those times that she would write him, would she always -- if there were articles related to his case, did you see him open his paper -- not saying what the articles said, but would you see the articles come out of his letters?
A. Oh, I think every time there was an article she sent it to him.
Q. And where would you see the articles related to the mess hall or the mail? Where did you see them left by Mr. Honken on occasion?
A. Well, on top of his locker because when they'd call mail call, usually as soon as mail call was done, well, then they'd call chow time, so we'd go to eat. Well, a lot of times you didn't have time to put your stuff away or anything, so you'd just throw it in your cell, and off you'd go to eat.
Q. I want to ask you with regard to your appearance here

today, when my investigator met with you, he gave you a subpoena to appear; is that correct?
A. Yes.
Q. And you drove over here from your job, got permission from your -- is it probation or parole officer?
A. Probation.
Q. To drive over here to testify; is that correct?
A. Yes.
Q. Matter of fact, you drove over here on your own dime, so to speak, at this point; is that right?
A. Yes, I did.
Q. And just tell the jury where you got your car to drive over here when I asked you could you make it over here to testify for Mr. Honken. Tell them about the cars that you have right now.

A. Well, I told them that -- when they asked me to come out, I says, Well, I really don't -- I've got two vehicles. One's a '65 Mustang I'm restoring, and I know that ain't going to make it this far, and my other one's a '92 Ford Explorer, and I really didn't think it'd make it.
Q. So what'd you do?
A. I went down to Enterprise and rented a car.
Q. And your mom gave you a credit card?
A. Yeah, because I went to a few different rental companies, and nobody would do it since I didn't have a credit card.
Q. And you drove here how many -- seven hours?

♀

3065

A. Yeah.
Q. To testify for Mr. Honken.
A. Yes.
Q. And you never once, the whole time you've known him, ever admitted to killing anybody, have you?
A. No.
MR. PARRISH: Nothing further.
THE COURT: Mr. Williams?
MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:
Q. Mr. Huffman, you drove all that distance because Honken's a friend of yours; right?
A. I consider him a friend.
Q. Sure. You guys belonged to the same small group in the prison; right?
A. Yes.
Q. And this was a pretty tight-knit group, wasn't it?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2674 of 3636

A. You could say that.

Q. Sure. Loyalty was very important among this group, wasn't it?

A. Well, it was, but as you can see, most of them weren't, though.

Q. Loyalty was important, wasn't it, in this group?

A. Yes.

♀

Q. The relationship you developed with the defendant in this case started with him doing favors for you, didn't it?

A. Yeah.

Q. And it became so close you guys actually did some business together, didn't you?

A. Yes.

Q. You had a -- your own hooch operation, didn't you?

A. Yes.

Q. And as a result of that hooch operation, you guys brewed your own illegal intoxicating liquor inside the prison.

A. Yes.

Q. And then you would sell it to other inmates.

A. Yes.

Q. Now, you couldn't take the cash you got from selling it to other inmates and put it on your books in the prison, could you?

A. No.

Q. No. And so to do that, you had to get it outside of the prison and then have somebody else get it back into the prison to put it on your books and on the defendant's books; right?

A. Sometimes.

Q. Right. And you know you did that in this case by sending it to the defendant's mother, didn't you?

A. I did.

Q. Right. And she would put it into a bank account at the bank where she worked, and then when she would cut money back

and put it on your books and put it on the defendant's books.

A. She never once put money on my books.

Q. It would go back and would go on the defendant's books then.

A. I don't know about that because I never sent her money.

Q. Well, sir, didn't you interview with law enforcement officers back in February of this year?

A. Yes.

Q. And you knew at the time you were interviewed -- in fact, you were interviewed by Special Agent Basler here; right?

A. Yes.

Q. You knew him to be a law enforcement officer.

A. Yes.

Q. You knew it was a crime to make a false statement to a law enforcement officer.

A. Yes.

Q. And you did your best to tell him the truth, didn't you?

A. Yes.

Q. And you tried to tell him the complete truth; right?

A. Yes.

Q. And didn't you tell him when he interviewed you that, in fact, that the proceeds would have been from the moonshine operation at the prison which Honken's mother would then send back to Honken and credit to Huffman's commissary account?

A. No. Just like you said, she sent it back to Honken, but it

got credited on his account.
Q. All right. But you knew that it got sent back to credit Honken's account then.
A. Yes.
Q. Illegal proceeds from your activity in prison.
A. Yes.
Q. And the defense attorney talked to you a little bit about your illegal activity in prison. In fact, he talked to you about your past assault write-ups. You've been written up twice in prison for assault.
A. Yes.
Q. Once in another prison and once in Florence.
A. Yes.
Q. And the Florence assault that you were written up for actually resulted in injury, didn't it?
A. Yes, it did.
Q. And it involved a weapon, didn't it?
A. Yes, it did.
Q. In fact, weapons are quite common in federal prison, aren't they?
A. Yes.
Q. A lot of inmates have weapons there. They make their own homemade shanks; correct?
A. Yeah.
Q. And, in fact, the defendant had his own weapon in Florence,

3069

didn't he?
A. Not that I ever seen.

Q. Don't you recall again talking to Special Agent Basler about this very issue, sir?
A. Yes, I do.
Q. Okay. And you were asked specifically about that, weren't you, sir?
A. And I told him that I never seen him have one.
Q. You stated that everybody at the prison in Florence had a weapon including Honken, didn't you?
A. No, I didn't say that.
Q. And that you refused, however, to say what kind of weapon Honken may have had and where that weapon was located, didn't you?
A. I think I said that I didn't know where any weapon was located.
Q. And you're denying that you ever told Special Agent Basler that the defendant had a weapon in prison.
A. Yes, because I never seen him have one. I said that.
Q. You never said that to Special Agent Basler.
A. I don't believe so.
MR. PARRISH: Asked and answered, Your Honor. Argumentative.
THE COURT: Overruled.
BY MR. WILLIAMS:

3070

Q. Now, you talked a little bit about Mr. Vest. The reason he would get into this legal closet was because there was cleaning materials in there; right?
A. No, there was no cleaning materials in there, just legal work.
Q. Oh. So he would go in there to clean a closet.

A. Clean -- sweep, mop the floor.
Q. A little tiny closet.
A. Yeah, paint -- no, it wasn't little tiny. It was a good-sized closet because everybody had their legal work in there.
Q. All right. I thought I heard you describe it earlier as a tiny closet. My mistake.
So he would go in there, and to get access to that, he would have to have somebody unlock it.
A. Yes.
Q. And then he would clean it.
A. Yeah.
Q. And then it would be locked back up.
A. Yes.
Q. Now, in your conversations with Mr. Honken, you had many such conversations with him; right?
A. Yes.
Q. By the way, going back to this interview you had with Special Agent Basler, he spent a fair amount of time with you

talking to you, didn't he?
A. A little bit, yeah.
Q. Okay. Over an hour.
A. Probably.
Q. Right? He asked you all about Mr. Honken and all the activities in the Florence penitentiary involving Mr. Honken, didn't he?
A. Yes.
Q. Quite exhaustive interview, wasn't it?
A. I don't know. I mean, it was an interview.

Q. Okay. You never once told him, not once in that interview, anything about people taking Mr. Honken's legal papers, did you?
A. He never asked.
Q. You never told him anything about Mr. Vest allegedly getting access to his papers, did you?
A. He never asked me nothing about Vest.
Q. Never told him anything about Mr. Byerly allegedly getting access to Mr. Honken's papers, did you?
A. He never asked no questions like that.
Q. Now, in the conversations you had with the defendant, Mr. Honken, he talked to you about rats, didn't he?
A. We all talk about rats.
Q. Sure. Rats are something that inmates in Florence and elsewhere -- a rat's a derogatory term or a bad term about somebody who informs and cooperates with the government, isn't

♀

it?
A. Yes.
Q. It's a common term in prison, isn't it?
A. Very common.
Q. Common for inmates to have a very hostile attitude toward people who are rats, isn't it?
A. Yes.
Q. And that's something that all inmates or almost all inmates talk about on a regular basis.
A. Yes, almost daily.
Q. And in Florence as well.
A. Yes.
Q. And so if an inmate took the stand under oath and said, I have hardly ever heard the term rat used, that doesn't fit with

your experience, does it, sir?
A. No.
Q. Now, Mr. Honken told you that he believed that rats should be gotten rid of, didn't he?
A. He told me that?
Q. Yes, sir.
A. He might have.
Q. Didn't you again in your interview with Special Agent Basler get asked specifically about statements the defendant made about rats?
A. I don't recollect.

♀

Q. And didn't you, in fact, say that Honken considered that rats should be gotten rid of?
A. I might have said that. I feel the same way. I mean, everybody that's done time feels the same way.
Q. That rats should be gotten rid of.
A. Well, yeah, I mean, they should -- when I say something like that, I mean that the institutions ought to quit promoting it and quit giving them special favors just because they do it.
Q. Now, you did talk, in fact, with the defendant in this case about the murders, didn't you?
A. Did I ever talk about the murders?
Q. Yes, sir.
A. Just the rumors that were going on.
Q. And you told Special Agent Basler that Honken told you that the murders were committed by his stepbrother or half-brother.
A. No, he asked me that, and I said that I heard something like that.
Q. Well, the statement that is in the report here says that

instead of the murders being committed by Honken's -- I'm sorry, that you said that Honken stated that the murders had been committed by Honken's stepbrother or half-brother.
A. If that's what's written down, that's what I said, but I don't recollect it.
MR. WILLIAMS: I have nothing further, Your Honor. Thank you.

♀

THE COURT: Mr. Parrish?

REDIRECT EXAMINATION

BY MR. PARRISH:
Q. I just have a couple of questions. First of all, with the interview with Mr. Basler, do you know where that interview took place?
A. Yes, down at the federal penitentiary in Terre Haute.
Q. And you told me he had come down to interview you; is that correct?
A. Yes.
Q. Were there any questions that Mr. Basler asked you that you did not answer? I mean, did he ask you any question and you said, No, Mr. Basler, I'm not going to answer --
A. Oh, no, I never refused to answer nothing.
Q. Did he like the answers you were giving him?
A. No, not always.
Q. Made him a little unhappy I take it; right?
A. Probably.
Q. Let me just ask you, when did the interview take place with Mr. Basler?
A. The date?
Q. Yes. What year?

A. Oh, it was this year.
Q. Just this year? Did you ever wonder why he was coming down and interviewing you this year, 2004?

A. Because I was about ready to get out.
Q. Did they ever tell you whether or not they went to the house where the incident -- where these people were allegedly taken in 1993?
A. No.
Q. Did they ever tell you whether or not they went and did fingerprints or blood analysis of the house?
A. No.
Q. Did they ever tell you whether or not they went out to the car and checked the car back in 1993? Did Mr. Basler tell you that?
A. No.
MR. WILLIAMS: Objection, Your Honor. Relevance to this whole line of questioning.
THE COURT: Sustained.
BY MR. PARRISH:
Q. Did Mr. Basler tell you he had any physical evidence that connected Mr. Honken to this 1993 incident when he was interviewing you in 2004 --
MR. WILLIAMS: Objection. Same ground, Your Honor.
Q. -- when he was asking you the questions?
THE COURT: Well, it's beyond the scope of redirect. The objection's sustained.
Q. Well, did he give you a --
THE COURT: What he asked him is actually hearsay too,

so, I mean, it's not a proper question. So if you can rephrase the question . . .

Q. Let me try to do that. He read you the interview of what Mr. Basler asked you; is that correct? He read you a list of questions Mr. Basler asked you; is that correct?

A. Yes.

Q. On that interview did he ask you anything about any physical evidence from 1993 that connected Mr. Honken to this incident?

MR. WILLIAMS: Objection again, Your Honor, for the same grounds. It's outside the scope of direct examination. It's irrelevant, and it's hearsay.

THE COURT: Sustained.

BY MR. PARRISH:

Q. Well, let me ask you this. Did he show you any physical evidence when he was at the interview in Terre Haute in 2004 indicating that Mr. Honken was in any way connected with this incident of 1993?

A. No.

Q. Well, he asked you on cross-examination about appearing with these questions. Did you, in fact, refuse to answer a single question about Mr. Honken's activity while you saw him in Colorado?

A. No.

Q. Let me ask you this question. Did he ever bring you back

3077

the questions that he asked you and show them to you and said, Are these your answers; are these correct?

A. No.

Q. So these questions that Mr. Williams was reading to you, you've never adopted these as your answers. This is what Mr. Basler interpreted your answers to be.
A. Correct.
Q. All right. So you can't say that Mr. Basler wrote down exactly what you were saying.
A. No.
Q. When you answered the question relating to rats, did he ask you what you meant by rats in the context that he was asking you the question?
A. No.
Q. So did you explain to him when he was asking the question as you explained on cross-examination to Mr. Williams you meant in the institution where people are, in fact, constantly setting up people? Is that what you had reference to?
A. That's what I had reference to.
Q. Why does the prison condone that type of activity or why do they allow that type of activity, is that what you were saying?
A. Yeah, that --
Q. I want to hear what you were saying about it. You can explain that.
A. Well, nobody understands why the institutions allow us to

have the rats in there like they do or why they pretty much put people out there to do that because all that's doing, sometimes it hurts the institution too. But they do it all the time anyways. They'll give them special favors. They'll give them -- let them work deals with the government. They'll let them stay out later and watch TV, whatever.
Q. Well, isn't that just a way, though, to run the institution

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2685 of 3636

a better way? I mean, don't they think this is the way the institution ought to run by having people tell on everybody else that keeps everybody under control?

MR. WILLIAMS: Objection, Your Honor. Totally irrelevant and speculation. He has no idea.

THE COURT: Sustained.

MR. PARRISH: I don't think I have any further questions.

RECROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Huffman, you were asked the question did you refuse to answer any question posed to you by Special Agent Basler. Do you remember being asked that on redirect examination?

A. Yeah. I never refused any question.

Q. You refused to tell him what kind of weapon Dustin Honken had and where it was hidden, didn't you, sir?

A. I might have that one.

MR. WILLIAMS: Nothing else, Your Honor.

♀

THE COURT: Mr. Parrish?

FURTHER REDIRECT EXAMINATION

BY MR. PARRISH:

Q. Did you ever see Mr. Honken with a weapon?

A. No.

Q. Did you ever tell him he had a weapon?

A. No.

MR. PARRISH: Nothing further.

THE COURT: Mr. Williams?

MR. WILLIAMS: Nothing, Your Honor.

THE COURT: You may step down. You're excused.

Members of the jury, why don't you take a stretch break.

Could I see the lawyers just for one second?

(At sidebar off the record.)

MR. PARRISH: We call Bill Basler, please.

WILLIAM BASLER, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated. I think we all know who you are, but just to be consistent, would you state your full name, please, and spell your last name.

THE WITNESS: My full name is William Wayne Basler, B-a-s-l-e-r.

DIRECT EXAMINATION

BY MR. PARRISH:

Q. Good afternoon, Mr. Basler.

3080

A. Afternoon.

Q. I just have a couple of quick questions for you. Do you remember your testimony -- I believe it was yesterday; could have been the day before; I don't recall -- about whether or not there was a newspaper article referencing a note that was found?

A. I remember conversations about newspaper articles, yes, sir.

Q. Did you testify there was no newspaper article that had reference to a note?

A. I think I testified that the only newspaper articles that I read were periodically in the local newspaper.

Q. I'm going to show you what is marked as Defendant's Exhibit V. Take a look at Defendant's Exhibit V, please, and see if that's an article from the Des Moines Register of October 15, 2000.

A. Yes, it is.
Q. Does that reference a note that was found?
A. Does the article reference a note?
Q. Yes.
A. I haven't read it. Would you like me to?
Q. No, I thought I showed you the point. Did you want to use my glasses? I don't know whether it will work.
A. Do you have a larger print?
Q. Want to try them? No? Normally I carry one of those things that you can pull up, and I always keep it in my bag, but

I don't have one. Let me read --
A. No, I think I can read it. Do you want me to read it to you?
Q. No, just to yourself. Does it reference the word "note" is the only question I have to ask you.
A. Yes.
MR. PARRISH: Okay. Nothing further.
MR. WILLIAMS: Can I see it?
I have no questions, Your Honor.
MR. PARRISH: Nothing further.
THE COURT: You may step down.
MR. PARRISH: Call Miss Nelson, please.
ALYSSA NELSON, DEFENDANT'S WITNESS, SWORN
THE COURT: Please be seated. Make yourself comfortable. And could you please adjust the chair so you can speak directly into the microphones. And when you're ready, would you please state your full name, please.
THE WITNESS: My name is Alyssa M. Nelson.
THE COURT: And can you spell your full name for us.

THE WITNESS: Alyssa is A-l-y-s-s-a, middle initial M. Last name is N-e-l-s-o-n.

THE COURT: Thank you.

Mr. Parrish?

MR. PARRISH: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. PARRISH:

Q. You're the sister of Mr. Honken; is that correct?

A. Yes, I am.

Q. Normally my next question would be, and you've been a sister all your life, right, but I won't ask that. That will show up in some book somewhere.

A. For 32 years I have been.

Q. And you're 32 years old; is that right?

A. Yes, I am.

Q. And you have a brother by the name of Jeff also; is that correct?

A. Yes, I do.

Q. Now, tell us where you're presently living and where you're presently working.

A. I reside in South Sioux City, Nebraska. I am employed by the state of Nebraska. I am a probation officer employed by the state of Nebraska.

Q. And as a probation officer, tell us what your duties are.

A. I supervise people who are either convicted of misdemeanors or of felonies, and I write presentence investigation reports for our district and for our county judges.

Q. And how long have you held that position?

A. That would be six and a half years.

Q. Tell us briefly your educational background after high school. I assume you grew up in Britt; is that right?

A. Yes, I did.
Q. And after high school, where did you go to college, and what degree did you get?
A. After I graduated from Britt High School in 1989, I attended Waldorf College in Forest City, Iowa, where I graduated in 1991 with an associate's degree, and I then went to Morningside College in Sioux City, Iowa, here where I graduated in 1993 with a bachelor's degree in criminal justice.
Q. And are you married or single?
A. I'm married.
Q. And is your husband employed?
A. My husband is employed by the city of South Sioux City as a police officer.
Q. And how long has he been a police officer?
A. It will be ten years.
Q. Do you have children?
A. Yes, I have three.
Q. And how old are your children?
A. I have a son who is seven, and I have twin girls who are six and a half.
Q. What I want to do is, first of all, ask you some questions, and I don't want to hear any hearsay about anything, but when Dustin in 1996 was at the Woodbury County Jail, you visited him; is that correct?
A. Yes, it is.

Q. And how often did you visit him there?
A. I visited him approximately either once or twice a week as much as my schedule would allow.
Q. And in terms of living near Sioux City in 1996, where were you living in relation to the Woodbury County Jail? Approximately how far away?
A. I lived right over the bridge here in South Sioux City, Nebraska.
Q. What I want to do is really go back to a couple of points in your life. Were you living and attending school in Britt, Iowa? And what I mean by that, high school. Is that where you went to high school, in Britt, Iowa?
A. Yes, I did.
Q. What year did you graduate?
A. I graduated in 1989.
Q. And do you recall what year Dustin grad -- I mean Mr. Honken graduated?
A. 1986.
Q. Did you know a young man by the name of Tim Cutkomp?
A. Yes, I did.
Q. And when you were growing up, did Tim Cutkomp visit your home?
A. Yes, he did.
Q. He was older than you; is that right?
A. Yes, he also graduated in 1986.

3085

Q. I also want to know if you know when Jeff graduated from high school and if he graduated in Britt.
A. He did graduate from Britt, and I believe it was in 1980 he

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2691 of 3636

graduated from high school.
Q. And when did he leave home? You I assume -- and correct me if I'm wrong, but you all shared the same house together, is that correct, when you were growing up?
A. Yes, we all lived in the same house, and Jeff is quite a few years older than I am. I may be wrong at this guess.
Q. Go ahead.
A. I believe I was in seventh grade when he left home.
Q. Now, when you say when he left home, did he graduate from high school before he left home, or did he leave home before he graduated from high school?
A. I believe there was a short period of time where he moved in with my biological father, Jim Honken.
Q. Okay. And that's what I want to ask you. When you were growing up -- Dustin is how many years older than you?
A. Dustin is three years older than me.
Q. And Jeff then is six years older than Dustin; is that right?
A. That's correct.
Q. When you were growing up, did you have the opportunity to see the interplay and interaction between your brothers?
A. Yes, I did.

3086

Q. And based upon that experience and that interaction while you were growing up in the household with them except for the time when Jeff moved in with his dad, did you have an opportunity to observe who was the dominant brother or the brother who, in fact, would control the other brother?
A. Yes, I did.
Q. Would you tell the jury in your opinion from the interplay

that you observed about your brothers and the age difference in your brothers who was considered the dominant brother?

A.    My brother Jeff.

Q.    Was there any doubt in your mind about that?

A.    No doubt at all.

Q.    Now, I want to ask you, did Jeff at a certain point move out to Arizona?

A.    Yes, he did.

Q.    Did you have any opportunity to visit with Jeff out in Arizona?

A.    Yes, I did.

Q.    Could you tell us whether or not at any point in time between 1990 and 1993 did you visit his home in Arizona if you can recall?  Well, if you can't, I have a couple other questions, and then I'll be through.

A.    I can't recall.

Q.    All right.  Fine.  Do you know when he got married for the first time?

♀

3087

A.    I believe I was still in high school.

Q.    Okay.  And do you recall when Dustin moved out there for the first time where he stayed for a period of time?

A.    He did live with Jeff, Jeff and his first wife Patty, for a period of time when he first moved out there.

Q.    Did you ever go and live out there with them during that period of time?

A.    No, I never lived there.

MR. PARRISH:  I believe those are all the questions I have.

MR. MILLER:  No questions, Your Honor.

THE COURT: You may step down.

MARVEA SMIDT, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated. Would you state your full name, please, and spell your last name.

THE WITNESS: My name is Marvea Mary Smidt, S-m-i-d-t.

THE COURT: Can you spell Marvea for us.

THE WITNESS: M-a-r-v as in Victor e-a.

THE COURT: Thank you.

Mr. Parrish?

MR. PARRISH: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. PARRISH:

Q. I'm going to have you pull those microphones up like you've seen the other witnesses when you've been sitting here the last

month or so, and I want you to speak where the jury can hear you all the way back; all right?

A. Okay.

Q. All right. You're Mr. Honken's mother, are you not?

A. Yes, I am.

Q. Would you give us your address, please.

A. My address is 970 Highway 18 in Britt, Iowa.

Q. How long have you lived at that address?

A. Let's see. We have lived there for about seven years.

Q. And where did you live prior to that?

A. We lived in town at 626 Third Avenue Southwest.

Q. And how long did you live there?

A. Oh, let's see.

Q. Just roughly. Doesn't have to be exact.

A. Probably for almost seven, eight years there.

Q. Okay. And how old are you, ma'am?
A. How old am I?
Q. Yes, ma'am.
A. I was 63 yesterday.
Q. Happy late birthday, but I think I wished you happy birthday yesterday.
A. Yes, you did.
Q. And you're married to whom?
A. I'm married to Ron Smidt.
Q. And how long have you and Ron been married?

♀

A. We've been married for 27 years.
Q. And would you tell us the names of your children, please.
A. Okay. My children are Jeff Honken.
Q. Tell us how old Jeff is.
A. Okay. Jeff is 42.
Q. Okay.
A. And Dustin is 35, and Alyssa's 32. And then I have two stepchildren.
Q. And how old are they?
A. Carmen is 40, and Bruce is 44.
Q. And do you also have grandchildren?
A. Yes, I do.
Q. Okay. Tell us how many grandchildren you have, and tell us their ages too.
A. I have 12.
Q. Let's narrow it down a little bit then.
A. Okay.
Q. Do you have any grandchildren with Dustin, by Dustin -- Mr. Honken, Mr. Dustin Honken?

A. Yes, I have Marvea, and I have Ryan, and Brandon I consider mine because I've known him since he was born.
Q. All right. And Brandon is whose child?
A. Is Kathy Rick's.
Q. And what does Brandon call you?
A. Grandma.

Q. And what does Brandon call Mr. Honken, Mr. Dustin Honken?
A. Dad.
Q. And since you've known them, they've always referred to him as that?
A. Yes, they have.
Q. And do you treat Brandon any differently than you treat any of your other grandkids?
A. Oh, no, no.
Q. What I'd like to do, first of all, is talk about Britt, Iowa. How large is Britt, Iowa? We've heard a little bit of testimony about it, but describe to the jury how large it is. And we also want to know where you work there too.
A. Okay. Britt's, oh, I would say just a little bit smaller than 2,000 people. I am retired right now. I retired a couple years ago. I worked for 22 years at First State Bank in Britt, Iowa.
Q. What did you do at the bank?
A. Well, being at a small bank, I did quite a few different things. Mainly I was in charge of individual retire accounts and certificates of deposits, and, of course, I worked as teller also.
Q. Okay. And how many employees did they have at the bank?
A. Oh, let's see. I'd say about 12.

Q. And how many years did you work there?
A. Twenty-two.

Q. And where did you work before that?
A. I worked at Casey's. I managed Casey's for a year.
Q. And was that the Casey's in Britt or somewhere else?
A. No, it was in Britt.
Q. And how long did you do that?
A. I just did that a little over a year.
Q. And the house that you live in right now, is that the house Mr. Dust -- Mr. Honken -- and just assume when I'm referring to Mr. Honken because I am going to be talking about your other son Jeff Honken, but when I'm referring to Mr. Honken that I'm referring to your son.
A. Okay.
Q. Okay? So I won't have to say Mr. Dustin Honken all the time.
A. All right.
Q. All right. The home you live in now, is that the home that Mr. Honken grew up in?
A. No, it is not.
Q. Okay. What about the home you lived in before? Is that the home Mr. Honken grew up in?
A. No, it wasn't.
Q. Which one did he grow up in then?
A. That was on 83 Third Street. I can't remember. It's been such a long time ago, but it was in Britt.
Q. It was in Britt, Iowa; is that correct?

A. Uh-huh.
Q. And he went to the local high school there too?
A. Yes, he did.
Q. Now, Mr. -- he grew up with a fella also by the name of Tim Cutkomp; is that correct?
A. Yes, he did.
Q. Now, just briefly describe for us when he was growing up in high school the interaction that Mr. Cutkomp had with your home, in your home.
A. Well, Tim was just like another son. I mean, if I wasn't there, he'd come in and help himself to food and whatever. I mean, he was just -- like I said, he was just like a son to me just like the other kids were.
Q. And that was all the way through high school; is that right?
A. That's right.
Q. And describe he and Dustin's relationship from what you observed in high school?
A. Oh, they were very close. They were like brothers.
Q. And what I'd also like to do is have you describe as best you can Dustin's relationship with Jeff in high school.
A. Well, Jeff, as you've heard earlier, is quite a bit older than the other two so --
Q. When you say the other two, you're referring to Alyssa --
A. To Alyssa and Dustin.

3093

Q. All right.
A. So, you know, the relationship was just -- I mean, they weren't really that close because they didn't do a lot of things together.

Q. But in terms of who was whose boss as you say or we say sometimes as I refer to it in my household who's the alpha dog, so to speak, in the house, I know it's not me, but the question is if you had to look at an alpha dog between the brothers here, who would be the alpha dog, so to speak?

A. Oh, Jeff would be.

Q. Is there any question in your mind that he would be the alpha dog?

A. Oh, no, no question.

Q. And tell the jury how you reach that conclusion. Obviously you'll say as a mom, but just in observing these kids interact and grow up, describe what you have seen in them that clearly would show that Jeff was the alpha dog in the relationship.

A. Well, he was just lots older, and even when they were young I mean, you know, he was the baby-sitter. I mean, you know, he took care of the kids, so they had to do what he said, and he just was the one around there because he was -- you know, he was just older, and he could tell them what to do. When Mom was gone, he was the boss.

Q. And that relationship would you think in your opinion continued as they got older?

♀

3094

A. Yes, it did.

Q. Is there any dispute or has there ever been any dispute in your mind between these two kids, Jeff and Dustin Honken -- and I use that name just for the purposes of making this record -- that Jeff was the alpha dog?

A. Oh, no.

Q. Okay. What I'd like to do now is talk about when Dustin graduated from high school.

A. Okay.
Q. What did he do at that point after he graduated from high school?
A. Okay. He graduated from high school, and like in summers and that, of course, he worked for Ron.
Q. When you say Ron, you have to tell the jury who we're talking about.
A. Okay. That would be his stepfather. That's my husband.
Q. And what kind of work did he do for him?
A. At that time he had a salvage yard in Britt, Iowa, and he worked out there as well as the other two boys did. All three of them always did.
Q. And after he worked for him for a while after high school, did he do anything else at that point? This is right after high school.
A. Right after high school. Okay.
Q. Did he start college or anything?

3095

A. Okay. Well, he went to NIACC.
Q. Okay. And where is NIACC in relation to Britt?
A. NIACC is between 35 and 40 miles. It would be east of Britt.
Q. And was he working at all when he was going to NIACC?
A. Well, on weekends like when he'd be home or something, he'd work for Ron.
Q. Okay. He didn't actually stay at home at that time? He stayed at the dormitory at NIACC; is that right?
A. Yes, he did.
Q. And from what you observed, did he do well in school?
A. Yes, he did very well.

Q. Was there a certain point -- and again, I don't want to get into hearsay and what someone else might have said or he might have said, but was there a certain point where Mr. Dustin Honken indicated that he was going to move out to Arizona?
A. Yes, he did.
Q. Would you share with us what you said to him when he approached you about moving to Arizona?
A. I begged him to stay home.
Q. And you wanted him to stay in Britt?
A. (Witness nodded head.)
Q. And what did you want him to do?
A. I wanted him to finish college.
Q. And why did you want him to finish college?

♀

A. Well, he was doing so well. I knew he had the potential that he could, you know, do well.
Q. And -- but he left to go out to Arizona; is that correct?
A. Yes, he did.
Q. And I don't want to ask you what was said or anything like that, but do you know whether or not he had a conversation with his older brother before he left?
A. Yes, he did.
Q. Did he have a job when he left for Arizona?
A. No.
Q. Did he have any money when he left for Arizona?
A. No.
Q. I want you to describe to the jury what you knew about your son Jeff in terms of his financial situation when Dustin left Britt, Iowa, when he was doing well in NIACC and moved to Arizona. What was Jeff's financial situation like if you knew

in terms of did he own his home?
A. Yes, he did.
Q. Was he married?
A. Yes, he was.
Q. Did he have a company at that time?
A. Yes, he did.
Q. Had you been out to visit him?
A. Yes.
Q. Describe to the jury at the moment when Dustin left NIACC

and moved to Arizona what Jeff's situation was like from your observations and your visits out to Arizona. Just describe to them his house, his job, what you saw, and his wife.
A. Jeff and Patty owned a condominium at that time in Tucson, Arizona. I think there was -- it was a double garage and a large kitchen and living room. I think there was two larger bedrooms and one small bedroom.
Q. Okay. During that time when you visited out there, do you have any idea where Dustin was going to live when he got there?
A. He was to live with Patty and Jeff.
Q. Okay. Did you ever see the room that Dustin stayed in? That's been testified to in court about conditions he was living in out there. Do you know anything about it from your own observation, not what they told you?
A. No.
Q. All right. Then when Dustin went out there, did he move back here in 1993 after he was arrested?
A. Yes, he did.
Q. I want to go from there. Where did he live when he moved back here in 1993?

A. With my husband and myself.

Q. I want you to describe to the jury that house that he lived in with you and Ron in 1993. That would have been like the spring of '93?

A. Yes, it would be.

♀

Q. Describe where Dustin lived at that point.

A. At that time we had a -- it was a ranch-style house, and it had three bedrooms, a single garage at that time, kitchen, little dining room, living room, one bath upstairs, one full bath upstairs, and then there was a full basement.

MR. PARRISH: Your Honor, I'm sorry. I completely forgot about the time, and I looked up. I know this is the time for afternoon recess. I apologize for that.

THE COURT: That's fine. Would now be a good time?

MR. PARRISH: It would be. I apologize.

THE COURT: No, that's fine. Thank you.

Members of the jury, it's 2:30. We'll be in recess till three o'clock. Thank you.

(The jury exited the courtroom.)

MR. PARRISH: I was not paying attention.

THE COURT: No, that's fine. Counsel, anything we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: No, Your Honor. Thank you.

THE COURT: Okay. Thank you.

(Recess at 2:34 p.m.)

THE COURT: Ready to have the jury brought in?

MR. PARRISH: Yes, Your Honor.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Please be seated.

Mr. Parrish, you may continue your direct examination.

MR. PARRISH: Thank you, Your Honor.

BY MR. PARRISH:

Q. Miss Smidt, I'd like to go back for just a second. During the break we met just briefly, and I had Mr. Miller come over with regard to a couple of questions I had asked you about Mr. Honken particularly in 1986 after he graduated from high school.

A. Yes.

Q. Did he -- and I noticed there was a long pause in your response and you were thinking, so I just want you to relax just a minute. It's not going to take very long for me to go through these questions with you, but I want to know in '86 did Mr. Honken move out to Arizona for a period of time?

A. Yes, he did.

Q. Okay. And how long did he stay out there that time after high school?

A. I really don't remember.

Q. Okay. And did he come back? But you were talking when you said later when he was in NIACC, that's when you had your discussions with him you didn't want him to go out and he went out; is that correct?

A. That's correct.

Q. And we'd gotten to the point in 19 -- so that would have been the second time he'd gone out to stay with his brother

Jeff.
A. That's right.
Q. All right. Now let's go then to 1993 now when he's back. He's been arrested, and he's now living in your home with you and Ron, and you'd given a description of that home. Do you know in 1993 where Dustin is working?
A. Well, he's working for Ron.
Q. Okay. Tell me what he's doing for Ron at that point if you can recall.
A. Out at the salvage yard. They strip cars for parts. So he would be doing that.
Q. Do you have any idea what hours he worked?
A. Well, usually what it would be is between seven, eight in the morning until five, six at night.
Q. Okay. And then he would be home at six at night. Did he have dinner with you and Ron at that time?
A. Yes, he did.
Q. All right. We talked a little bit about the way the house is set up. How many telephones did you have in the house in 1993?
A. One.
Q. Did Mr. Honken have a mobile telephone?
A. No, he did not.
Q. And where was this telephone located?
A. It was in the kitchen.

3101

Q. And in the kitchen did you have a table where the family would sit down for breakfast or dinner or whatever, or was it in a different location?
A. No, that's -- we sat there.

Q. All right. And in 1993 when Mr. Honken was living in the home with you and Mr. Smidt, describe his room as best you can recall.
A. Bedrooms were very small because it was a small ranch-style home. There was two bedrooms on one end, and then there was a bedroom up farther towards the kitchen there, and his bedroom was first, and then it was Ron's and my bedroom, and then there was a spare bedroom.
Q. And so Dustin would sleep in the spare bedroom; is that correct?
A. Well, no, I called it his room there.
Q. His room; right?
A. Yes.
Q. And he would keep his personal effects and his clothes in there?
A. Yes, he did.
Q. Did he have an automobile at that time as best you can recall?
A. Yes, he did.
Q. Would you describe the automobile and where he got it from and if you know the value of that automobile.

3102

A. I'm not very good at years or anything. It was a old brown car. It was very small.
Q. Was it a Toyota?
A. It was very small. Yes, Ron helped him purchase it.
Q. And do you know how much they purchased it for?
A. 500 or less. It was a beater.
Q. And it was a beater that he drove around in; is that right?
A. That's correct.

Q. Okay. In 1993 and early 1994 when he was living with you, did he have any other type of automobile other than that automobile?
A. No, he did not.
Q. And where did he park his automobile?
A. Right out in front of the house on the road.
Q. Did you have a garage on the house?
A. Just a single garage.
Q. And so his car when he'd come home would be parked behind your car or just in the driveway or what?
A. Usually right out on the road.
Q. Okay. And I believe you indicated other than working for Mr. Smidt to your best recollection in 1993 and into 1994 he didn't work anywhere else; is that correct?
A. No, he did not.
Q. If I could, I'd like now to move to 1996; all right?
A. Okay.

♀

Q. Can we do that?
A. All right.
Q. Okay. You focus with me now in 1996.
A. All right.
Q. Mr. Honken in 1996 has been arrested for manufacturing methamphetamine; okay?
A. All right.
Q. He's at the Woodbury County Jail.
A. Yes.
Q. And can you focus on that time?
A. Yes.
Q. All right. I want to know once he was at the Woodbury

County Jail did you write to him?
A. Yes.
Q. Tell the jury how often you wrote to him, first of all.
A. I wrote to him -- ever since he's been incarcerated, I've always wrote to him every -- once a week if not more. And if I didn't get it written the first week, I would do two, two letters the next week. I've always done that.
Q. All right. Ever since he's been incarcerated; is that correct?
A. That's right.
Q. Now, I want you to name the places that he's been incarcerated that you've written to him, and, first of all, we're just talking about the writing. You've written to him

♀

once a week. Start with the Woodbury County Jail.
A. Woodbury County Jail and Florence and Marion.
Q. And when you would write to him, did you on occasion send him newspaper articles?
A. Yes, I did.
Q. I want you to describe to the jury where you got the newspaper articles from, and we're talking about the newspaper articles related to his case; is that correct?
A. Yes.
Q. First of all, when you would send them to the Woodbury County Jail, where would you get the newspaper articles from?
A. At that time I was working at the bank, but I did get the Globe Gazette at home, and if I didn't bring it from home, I would take the bank's copy because I always -- I made copies of it is what I did.
Q. Tell us why you made copies of the articles.

A. Because it was brought to my attention that you couldn't send like the whole paper or anything, so I always just made copies of his -- the portion of his.
Q. Did you try to send the whole paper initially?
A. I sent -- I cut it out. I did initially, and then I was told, you know, that I could not do that, that it had to be copies.
Q. And when you sent the first articles with the actual newspaper, were those newspapers ever sent back to you, or did

you just change the plan of how you would send them out in the future?
A. I just started making copies.
Q. So let's go to '96. Mr. Honken is at the Woodbury County Jail. And as the articles would come out with regard to his case or matters related to the investigation where his name was mentioned, every week that he was in the Woodbury County Jail from 1996 up until '97 or '98, did you send him letters and also articles?
A. Yes, I did.
Q. Tell the jury where you got the articles from. You told us about the Globe Gazette. What about the Britt articles?
A. No, there would also be the Britt Tribune -- that's every Tuesday -- and then the Des Moines Register.
Q. And where would you get the Britt Tribune from?
A. Just the Britt newspaper office.
Q. And how would you get the newspaper?
A. Well, since I wanted it on Tuesday, after I got off work, I'd just walk down to the newspaper office and purchase it then. Otherwise if they would send it out, it was always a day late,

so I always wanted it that day.
Q. And where would you make your copies from?
A. At the bank.
Q. Did you go through the trouble of purchasing certain type of envelopes at all that you would package it in? Or would you

package it in whatever would be available?
A. No, I purchased -- at that time Randy from Iowa Office Supply, that's where the bank purchased all their paper products and everything, and so I purchased a box of white -- well, they just fold over. They're like, you know, letter size so things didn't have to be folded up, and I purchased a box of those from him so I could mail things to him.
Q. Okay. Testimony has come out that one individual may have had an envelope at some point with your name as return address on it. Were these a particular type of envelopes that you purchased from this Randy person? You probably don't know about that, but describe the envelope again that you purchased from the Randy person.
A. What would they be? Maybe --
Q. What color were they?
A. They're white. They're all white.
Q. And what would you put on the outside of it?
A. I'd put Dustin's address and everything, and then I would write my return address up in the corner.
Q. Why did you write your return address?
A. Because you had to write return addresses to send to there. You couldn't put like one of the little stickers or anything.
Q. And what name would you put on there as a return address for you when he was at the Woodbury County Jail?

A. Marvea M. Smidt.

Q. And what address did you put on there?
A. Well, if I was living wherever I was -- you know, living there, I mean, I would put my home address.
Q. Your address and ZIP code; is that right?
A. Yes, that's correct.
Q. And then where would you mail the envelopes out from?
A. The local post office.
Q. Did you take them down and drop them off, or did you just put it in your drop box in your mailbox?
A. No, I went down there and I -- because a lot of times I had them weighed.
Q. They would weigh it for you.
A. Uh-huh, yes.
Q. Is that a yes?
A. Yes, yes.
Q. And you would put these envelopes in the mail, and in it on occasion would be articles; is that correct?
A. That's correct.
Q. Did an article come out every week that you would send to him with the letters?
A. If things came out that were different than the article I'd sent before, I always sent it to him. I mean, if it was just the same thing over and over I didn't, but if it was something different because I read everything that came out in the papers about him, and I would send them.

Q. You would send them out to him.

A. (Witness nodded head.)

Q. Okay. And at the Woodbury County Jail, can you think of a single week where you failed to send Mr. Honken a letter or a newspaper article related to his case?

A. No, I can't. I did every week.

Q. Now, let's go out of the Woodbury County Jail and go to Florence, Colorado. Strike -- let's go back for a second.

We've talked about the Britt, the Globe Gazette. Let's talk about the Des Moines Register.

A. Okay.

Q. Where would you get the Des Moines Register from?

A. At the bank. You know, at one time we had both papers, but I can't remember when we discontinued the Register, so then I would get it at the bank.

Q. So when your subscription expired -- and you're saying you don't recall the date -- but what you would do is get the bank's copy, cut that out, make a copy and send that out to Mr. Honken; is that right?

A. I'd either cut it or fold it up, but I'd make sure to send the whole copy.

Q. And where would you make your copies?

A. At the bank.

Q. Now I want to go to Florence, Colorado.

A. Okay.

3109

Q. And Florence, Colorado -- was the habit that you started at the Woodbury County Jail with regard to the articles, would you do the same thing with regard to the articles?

A. Yes, I did.

Q. Would you religiously write him every week?

A. Yes, I did.
Q. Did you send an article every week?
A. If there was one.
Q. If there was no article, it would be just a normal letter writing to him, outlining to him what was going on, bringing him up to date with the family; right?
A. That and pictures of the kids and that.
Q. Now, did you change your habit in '98 when he arrived at Florence, Colorado, with regard to the articles you would send? And what I mean by that, did you ever at any point stop sending the Britt article? Did you ever stop sending the Globe Gazette article, or did you ever stop sending the articles that were in the Des Moines Register?
A. Well, like if they were the same thing, I wouldn't send it, I mean, you know. Like a lot of times the Britt paper and the Globe Gazette are the same, especially right now they are because they're affiliated. But even back then if they would be the same, you know, I wouldn't send each one. I would just get the one that would say.
Q. And would you carefully read the article to make sure that

3110

the article you were sending Mr. Honken was not a repeat of the article you had sent him in the past?
A. Yes, I did.
Q. All right. And you continued to send him the articles the whole time he was in Florence, Colorado; is that right?
A. That's right.
Q. Let's go to Marion, Illinois.
A. Okay.
Q. Once he was in Marion, did you continue to send him

articles?

A. I'd send him articles.

Q. Did you continue to write him every single week?

A. Every single week.

Q. During the times you wrote him and during the times you sent articles to him, have you ever, since 1996, ever received back in the mail any of the articles that you, in fact, had sent out to him, or did you receive back in the mail any of the letters you had written to your son?

A. No, I have not.

MR. PARRISH: Your Honor, I'm just looking at my notes. I believe those are all the questions I have.

THE COURT: Could I see the lawyers just for a real quick sidebar just on a small matter?

(At sidebar on the record.)

THE COURT: Did you want to offer Defendant's Exhibit

B?

MR. PARRISH: Which one was B?

MR. WILLIAMS: V.

THE COURT: Oh, I'm sorry. I didn't hear it correctly. V.

MR. PARRISH: Not at this point I don't.

THE COURT: Well, is there going to be another point?

MR. PARRISH: That's an interesting -- I think I probably made the point I wanted to make.

THE COURT: You have, but you referred to it as Defendant's Exhibit V.

MR. PARRISH: I was just saying for identification.

THE COURT: That's okay. I just didn't know if you

intended to offer it or not. I do that for both sides. If I think you neglected to offer an exhibit, I just point it out.

MR. WILLIAMS: I appreciate it.

THE COURT: Yeah, you did make your point.

MR. PARRISH: Thank you.

(The sidebar was concluded.)

MR. PARRISH: Excuse me one second. That's fine, Your Honor. I have no further questions.

THE COURT: Okay. Thank you.

Mr. Miller?

MR. MILLER: No questions, Your Honor.

THE COURT: Okay. You may step down.

♀

3112

THE WITNESS: Thank you.

MR. PARRISH: Your Honor, subject to what we previously discussed with the Court, we'd keep matters open at this point subject to close in the -- first thing in the morning on the Court's schedule.

THE COURT: Okay. Let me see the lawyers one more time. I'm sorry. I'm sorry, members of the jury, but I think it's going to save us some time. I apologize.

(At sidebar on the record.)

THE COURT: The plan is still to bring them in at ten. That will give you a chance to figure out if you want to call Kathy Rick, and if you have rebuttal, you can put it on.

MR. WILLIAMS: If I have any, it's going to be very quick.

MR. PARRISH: My thought is that he not call her, but we're still -- that's what we were over there talking about over the break.

THE COURT: Sure. And then we will do instructions tomorrow I think.

MR. WILLIAMS: Okay.

(The sidebar was concluded.)

THE COURT: Members of the jury, in an effort to keep you updated as to what the game plan is, here's what it is. We're going to bring you in tomorrow but probably not till ten. We're going to start court at ten o'clock. I have some matters

I need to take up with the lawyers. And there may be some more evidence, and there may not be. We won't know until tomorrow.

But if there is no more evidence, rather than just bringing you in to tell you there's no more evidence and sending you back on your way -- I'm sure you'd want to slug me if I did that -- we're going to go ahead and do the instructions tomorrow morning.

So for sure the plan is we'll do the instructions, and we may have some additional evidence, but we won't know that. And then after the instructions which will take probably close to two hours I would think, somewhere between an hour and two because, you know, with 17 charges, the instructions are complicated, we'll then send you home, and then we'll bring you back Monday morning, and then we'll have closing arguments on Monday. And they'll take the bulk of the day.

One thing you may want to think about: My practice has always been during deliberations not to dictate the time of deliberations. So what I mean by that is once you get the case and start your deliberations, if you -- I'm not suggesting that you should, but if you want to deliberate into the evenings, you can, and we can have a meal brought in. If you want to go home

at 4:30 or 4:00, you can. If you want to stay till five, you can. It's kind of whatever the jury decides to do, and then we'll accommodate that including deliberating in the evenings if you want to. And I'm not suggesting that you should do that.

♀

I'm just suggesting that we will do everything we can to accommodate how you want to conduct your deliberations.

So that's going to conclude the evidence for today. And we'll see you tomorrow morning at ten. So I'll ask the CSOs to coordinate that so that we have you all here just shortly before ten o'clock tomorrow morning. Thank you very much.

(The jury exited the courtroom.)

THE COURT: Please be seated. Are there any matters we need to take up, Mr. Parrish?

MR. PARRISH: No, Your Honor. I know you want us back -- did you want us back at a certain time -- have you decided how you're --

THE COURT: Well, we're still making some changes in the instructions, so why don't you just hang on, and we'll get those to you as soon as we can, and then I think maybe -- Mr. Rogers, based on what we've discussed, how much time do you think you're going to need to review the instructions? You're aware of all the changes that are being made.

MR. ROGERS: I'm aware of all the changes, and I'm not sure how you resolved my issue with the word "must" recurring over and over again.

THE COURT: Yeah, I resolved it against you.

MR. ROGERS: Okay.

THE COURT: Okay? So you're going to want to make a record on that, anything else you want to.

MR. ROGERS: And other than that, I don't think it will take a long time, and I'm thinking maybe if we're not having the jury until ten, I don't know what you have planned for between nine and ten tomorrow, but that ought to be enough time to make the record.

THE COURT: Well, I don't want to do it that way, and here's why. There are so many sets that have to be made. You know, we have 16 jurors, sets for the lawyers, Mr. Honken. It just takes a long time to make the sets because they're so long. So I want to have the instruction conference this evening so that everybody's signed off on it. Sometimes, you know, I make a change based on something I hear in the final instruction conference, and so that's why I don't want to do it tomorrow morning because we'd be stuck with the jury here and not having the instructions done. I want to make sure they're done tonight before I go home, one less thing for me to worry about. So -- and I want to make sure you have sufficient time to look them over, but we're now on our what? Eighth or ninth draft I think. There aren't any surprises. So would you be available at, say, 6:30 or 7:00 this evening? We could shoot for 6:30.

MR. ROGERS: Sure.

THE COURT: And then we'll make -- you know, you'll have all the time you need to make your record. I'm not trying to rush you. I want you to make a full, complete record. I don't think you have many objections.

MR. ROGERS: And some of them I've already made

unsuccessfully, and all I have to do is put them on the record and see if they're still unsuccessful and we can move on.

THE COURT: Right. So would 6:30 work?

MR. ROGERS: 6:30's fine.

THE COURT: Okay. And, Mr. Williams, would you just let the marshals know, or, John, would you let the marshals know we need Mr. Honken here to make the record on the instructions?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: And does -- I assume that gives the government enough time. You're aware of all of the changes.

MR. WILLIAMS: Certainly.

MR. PARRISH: If you'd give us, Your Honor, about ten minutes, we need to conference on the issue about the testifying.

THE COURT: Sure.

MR. PARRISH: We'll chat for a couple minutes. I know you asked me earlier what we were going to do. We just have not had a chance to meet on that. But we'll meet briefly on that and make a decision as to whether or not we want that in the instruction.

THE COURT: Oh, okay, right, on that issue. You bet.

MR. PARRISH: Right.

THE COURT: Anything else?

MR. WILLIAMS: No, Your Honor.

3117

THE COURT: Okay. We'll be in recess, and we'll get those instructions out to you ASAP. Thank you.

(Recess at 3:23 p.m.)

(Mr. Miller was not present for the following proceedings:)

THE COURT: Good evening.

MR. WILLIAMS: Good evening, Your Honor.

MR. ROGERS: Good evening, Your Honor.

THE COURT: Pursuant to Federal Rule of Criminal Procedure 30, now is the time that I've designated for formal objections on the record to my proposed final instructions on the merits phase.

The record should reflect that we began the jury instruction process actually before the trial started. We've had numerous informal meetings. I've made numerous revisions based on the informal meetings. Each of those sets of revisions resulted in a detailed letter describing the revisions and the reasons for the revisions, the case law supporting the revisions when there were, and we're going to make all that part of the record in the case so that the appellate court would know how seriously I take the matter of jury instructions, and I think it will reflect how much work that we've all done collectively on the jury instructions. So I just wanted to preface that with saying that.

Having said that, now is the time to make the formal

♀

record. Should anything change between now and when we instruct the jury in terms of evidence or anything else that could arise that would require a new or different instruction, you haven't waived any right because I actually do my instruction conference a little earlier than I think most judges do. The reason I do it is so that we can not have a delay between the conclusion of the evidence and the instructions to the jury, but I always want to be careful that while I consider this a final instruction conference, the lawyers always have the right, if something

should change, to ask to make an additional record on the jury instructions.

So having said that, does the government have any objections to the final -- proposed final instructions to the jury which number page 45 through 96, because the final set that will go to the jury will include the original preliminary instructions and then the verdict form which is 8 pages long? Does the government have any objections to either the proposed final instructions or to the verdict form?

MR. WILLIAMS: Your Honor, with respect to the instruction number 11 which defines the CCE, before we went on the record tonight, we had a conversation with the Court, and both the government and defense is in agreement that on page 78 in the provision defining a CCE we should insert a sentence stating that the government alleges that the defendant was the organizer, manager, or supervisor of, and then list the five

3119

people who we allege which is Jeff Honken, Tim Cutkomp, Angela Johnson, Greg Nicholson, and Terry DeGeus.

THE COURT: And, Mr. Rogers, do you agree with that?

MR. ROGERS: Yes, Your Honor.

THE COURT: Would you accept as a friendly amendment instead of the phrase "the defendant" if we use Mr. Honken's name?

MR. ROGERS: Yes. In fact, I believe I submitted that language -- I'm not sure what language was submitted. Anyway, I think Mr. Honken's name should be used.

THE COURT: Rather than say "the defendant," we just say Mr. Honken.

MR. ROGERS: Or maybe even Dustin Honken to

distinguish --

THE COURT: Well, in other places --

MR. ROGERS: Yeah, but this is --

THE COURT: I see, because we're listing the five and there's a Jeff Honken, we should use Dustin Honken.

MR. ROGERS: I think so.

THE COURT: Right. I think so. That's an excellent suggestion. Government disagree with that?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay.

MR. WILLIAMS: Other than that change, the government has no objections to the final set of jury instructions or the

♀

3120

verdict form as proposed by the Court.

THE COURT: Okay. Thank you, Mr. Williams.

Mr. Rogers.

MR. ROGERS: Your Honor, we have several objections. These have all been brought up to the Court at one or more informal meetings, and now I'm making these objections for the record pursuant to Rule 30.

With regard to final instruction -- excuse me. Let me get my cheat sheet -- final instruction number 4 on page 50, the last sentence reads, However, if the prosecution proves both of these elements beyond a reasonable doubt as to a particular count, then you must find the defendant guilty of that count. We believe that the word "must" is inappropriate in this context because if the jury chooses to acquit a defendant of anything, that decision is not reviewable by this Court or any other court. It is the final say.

And so I think it's wrong to say that they must find

the defendant guilty under any circumstances no matter what they find with regard to the degree of proof. I think that proof beyond a reasonable doubt is necessary to permit the jury to return a verdict of guilty, but I don't think it compels the jury to return a verdict of guilty. And so that's our objection to that language which recurs in several other instructions.

It recurs in instruction number 6 on page 54 and instruction number 7 on page 62 and instruction number 9 on page

71 and in instruction number 11 on page 79. And so we object to the use of the word "must" in that similar construction throughout the instructions for those grounds.

THE COURT: That objection's overruled.

MR. ROGERS: Your Honor, with regard to instruction number 7 on page 61, overt act 13, it's our contention that there has not been sufficient evidence adduced from which a reasonable jury could find beyond a reasonable doubt that, in fact, Angela Johnson called Mr. Held. As the Court will recall over our objection, Mr. Held testified that he received a telephone call from someone who identified themselves as the defendant's girlfriend who made the statement that Dustin doesn't need that pup anymore. I don't think that that is enough evidence to show that it's Angela Johnson.

There's also evidence that Mr. Honken had other girlfriends, Melissa Friesenborg, Kathy Rick, that he had an affair with the estranged wife or ex-wife of Tim Cutkomp. So it's a one-in-four shot at it being Angela according to the evidence this jury has heard, and I don't think that's proof beyond a reasonable doubt. And that's another objection that was raised I think at last night's informal discussion.

THE COURT: Yes, it was. Are you finished with that objection?

MR. ROGERS: Yes.

THE COURT: That objection's overruled as well.

MR. ROGERS: With regard to instruction 11 on page 75, this is the instruction that sets forth the elements of murder while engaging in a CCE, continuing criminal enterprise. And our position, Your Honor, is that just as the government must prove that a single unitary conspiracy spanned the time period during which the alleged conspiracy murders occurred, so must the government show that a single continuing criminal enterprise spanned the time period during which murders while engaging in a CCE are alleged to have occurred.

And I understand that this instruction does define a CCE and with the appropriate statutory language as a part of a series of three or more related felony drug violations. And it says the violations are related if they are driven by a single impulse and operated by continuous force.

However, our position, Your Honor, is that it would be more clear to the jury if the jury was told more explicitly it has to be a single continuing enterprise and not an enterprise that was over sometime in the spring of 1996 and with other drug violations that were committed later sometime in 1995 or 1996. Spring of 1993 is where I think the jury could certainly conclude that any CCE that may have existed was over.

So having said that, we are requesting the inclusion of the language -- after the word "series of violations" which conclude the first partial paragraph on page 75, we're requesting another paragraph be included with language tracking

the language of the multiple conspiracies instruction, instruction 6, to say, As with the conspiracies discussed in final instruction number 6, the prosecution must convince you beyond a reasonable doubt that the defendant was engaging in the single CCE charged at the time of the murders, comma, rather than merely proving that the defendant was at one time engaging in a CCE and at another time became involved in some other drug-related criminal activity.

If the prosecution fails to prove this requirement, then you must find the defendant not guilty of the CCE murder charge in question. And that's the language we're requesting there.

THE COURT: That objection is overruled as well.

MR. ROGERS: Thank you. With regard to final instruction 13, Your Honor, it's my understanding that the transcripts are not in evidence and that they will under no circumstances be given to the jury, and with that in mind, Mr. Williams and I have both sort of agreed that we need to look at what action is appropriate should the jury request to hear the tape recordings, either those with Mr. Cutkomp or those with Mr. Nicholson, replayed. And with that understanding, we have no objections to the language of instruction 13.

THE COURT: Okay. Well, let's talk about that a little bit; okay?

MR. ROGERS: Okay.

THE COURT: Because I could foresee a situation where the jury requested an opportunity to listen to the tapes again

and we would bring the jury -- I'm not saying I made up my mind about it. I'm just saying I could foresee the situation where we'd then bring the jury back into the courtroom, have the tapes played again, and have the transcripts passed out again, but in no event would the transcripts ever go down to the jury.

MR. ROGERS: In that event, Judge, we have -- and it may be a little late to raise it, but better late than never -- a problem with the transcripts insofar as they contain descriptors of nonverbal sounds, in other words, shooting noise. I don't think that's appropriate for a transcript that is merely supposed to aid the jury in understanding the words they're listening to. I think that's an editorialization. I think it's argumentative. I don't think that that should be in a transcript which is shown to the jury.

Now, yes, it was in the transcript that they already saw, but if it's going to be -- we are -- and if it's going to be -- if the jury is going to see a transcript again -- and we're opposed -- I think I made this clear, but we are opposed to the jury seeing the transcripts at all. They're not in evidence after the case is closed.

THE COURT: But just to make sure I understand what you mean by that, you're opposed to having the jury see the transcripts again. You didn't object to the jury seeing the

3125

transcripts in the first instance. When the tapes were played, there was no objection to the use of the transcripts.

MR. ROGERS: That's -- I'm not sure whether there was or not, but there was not this objection. Let me put it that way. But that was with the understanding that the transcripts are not evidence.

THE COURT: The transcripts are not evidence.

MR. ROGERS: And our current objection would be that if the transcripts are not evidence the jury should not see them during its deliberations under any circumstances.

THE COURT: Well, let's get back to final -- we need to take that matter up.

MR. ROGERS: Right.

THE COURT: But let's take -- do you have any current objection to final instruction number 13?

MR. ROGERS: No current objection.

THE COURT: Okay.

MR. ROGERS: This is the instruction you've already read to them at the time that the transcripts were first used.

THE COURT: Correct.

MR. ROGERS: Yeah, so we have no current objection to it.

THE COURT: Okay.

MR. ROGERS: Okay. Moving finally, Your Honor, to instruction number 15 on page 90, we have discussed with

♀

Mr. Honken the bracketed language in the final paragraph regarding the defendant not testifying. We have discussed with Mr. Honken his right to testify and his right not to testify and have advised him that that is his choice to make. Mr. Honken has advised us that he does not wish to testify, and we would request that the bracketed language be included in the instruction.

THE COURT: You would like that language included.

MR. ROGERS: Yes, sir.

THE COURT: And my understanding of the Eighth Circuit

law is it's error for me to give it if you don't want it, but I assume it would be error for me not to give it if you want it, and there's no reason why I wouldn't give it if you want it.

MR. ROGERS: Right, and we want it.

THE COURT: And you want it. I just want to be sure we're clear. You want that language.

MR. ROGERS: Yes, sir.

THE COURT: That bracketed language will be in the final instructions obviously without the brackets.

MR. ROGERS: Thank you. That is --

THE COURT: And do you want to make -- do you have any other objections to the instructions?

MR. ROGERS: Let me consult just a moment. We have no other objections to the instructions, Your Honor.

THE COURT: Mr. Rogers, I don't want to be too

3127

interventionist, but I actually think you do, so let me repeat what I think your objections are.

I think you have an objection to me even submitting the CCE murder instruction based on the record that you made in your Rule 29 motion, and I think you have the same objection to me even submitting the drug conspiracy based on the record that you made in your Rule 29 motion, and I don't think you need to go through -- although it's whatever record you want to make, but I think you want to incorporate all of the record you made on the Rule 29 motion with regard to me even submitting these instructions. And if I somehow misinterpreted your argument --

MR. ROGERS: I do. No, you did not.

THE COURT: And I'm not sure you need to.

MR. ROGERS: I'm not sure we need to anyway, but I do

appreciate the Court's reminder.

THE COURT: But I wouldn't want you to have somehow waived any of your Rule 29 argument by not making the objections to the jury instructions, and I understand that you do object to me submitting it based on your Rule 29 motion.

MR. ROGERS: We do object to you submitting actually the instructions concerning all the charged offenses, but certainly -- by all the charged offenses, I mean Counts 1 through 7 as well as Counts 8 through 17. But we certainly additionally object to Counts 8 through 17 and the instructions submitting those counts based upon the pleadings in our Rule 29

3128

motion and on the arguments made and the record made during the arguments on the Rule 29 motion, and I'll also advise the Court that we intend to orally renew the Rule 29 motion at the close of all the evidence, and we'll want to incorporate by anticipation those objections too, and I appreciate you bringing that to my attention.

THE COURT: Any other record you'd like to make on the jury instructions?

MR. ROGERS: No, Your Honor.

THE COURT: Okay. Any additional record the government would like to make?

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Now, we're still on the record. I would like to talk about the issue of -- in an anticipatory fashion if we do get a note from the jury -- and I think Mr. Parrish predicted I think in one of our informal discussions it may be the first note we get -- if we do get a note from the jury that they want to rehear the tapes, the defense position is you

object to that.

MR. PARRISH: I think the tapes might be in. The transcripts are not in. They're not entitled to the transcripts. The transcripts are not exhibits.

THE COURT: Well, they're not entitled to take them down to the jury room. But why aren't they entitled -- just hear me out.

♀

3129

MR. PARRISH: Oh, I am.

THE COURT: Yeah. Why aren't they entitled -- for the same reason they were entitled to have it the first time, if they request to hear it, why aren't they entitled to have the tapes as an aid to understanding the tapes?

MR. PARRISH: I can list a lot of reasons, but it would be overemphasizing the particular evidence. Why aren't they entitled to hear any aspect of the evidence over again in any setting?

THE COURT: Well, they are. All the exhibits that go into evidence, they're entitled to look at them 32 times if they want to.

MR. PARRISH: In terms of testimony.

THE COURT: A lot of judges do readbacks.

MR. PARRISH: Absolutely. Some do read back with the instruction this is a readback, this is something that's unusual with the prefaced instruction as to what the purpose of it is and then with the instruction they must consider it obviously with all the other instructions that I've given you and all the other evidence and let them know it's a highly unusual situation when it is, in fact, done.

However, with tapes that are not sworn testimony, you

move into a different category and matters that have already been introduced into evidence that matters were changed, Cutkomp added to the tapes after he listened to them, he added to words

with editorial comments in about shooting, kniving sounds, et cetera. Those matters were not added by Mr. Cutkomp but were subject to editorial interpretation by the typist actually doing it. So it does change, and it's not the nature of the typed testimony that courts normally read back. And again, it is an extremely rare occurrence when it does, in fact, happen.

THE COURT: Well, let me ask you this. The earliest we're going to face this I think would be either late Monday or some time on Tuesday I think would be the earliest.

MR. PARRISH: Right.

THE COURT: And I want to give you an opportunity to submit any authority to me ahead of time that would support your position.

MR. PARRISH: Okay.

THE COURT: So --

MR. PARRISH: I would just say, Your Honor, I'm not sure there's any that supports the fact that transcripts that are not evidence go in to the jury room that were not received as part of evidence.

THE COURT: Well, I've never talked about sending the transcripts into the jury room.

MR. PARRISH: Okay.

THE COURT: I'm sorry. I may have misspoke. No. Here's what I was talking about. If the jury requested to hear the tapes again, I doubt if I would just send the tapes down

with a tape recorder. I would probably bring the jury back into the court -- if I even granted it, I would bring them back into the courtroom, play the tapes and I assume also give them the transcript for the same reason they were allowed to have the transcripts in the first instance. But the transcripts would never go back into the jury room.

And if you think that's inappropriate -- we're just now all in an anticipatory phase; we may not get the request -- I want you to cite any authority to me you can -- I want you to cite any authority to me you can by Monday morning if you can.

MR. PARRISH: Yeah. I think Mr. Spies has had it come up in a murder case before. I've had it come up I believe several times in the past. He might want to address this specifically.

THE COURT: Mr. Spies?

MR. SPIES: Yeah. My case was a little different. It was a murder case, and there was undercover recordings made. The jury got to -- just like in our case, got to hear the tapes. They got to read transcripts. We actually had two sets of transcripts. We had the prosecution's set and the defense set where they can follow along and see the differences. Then during jury deliberations, unbeknownst to anybody, one of the jurors brought in a tape recorder to the jury room during the second or third day of deliberations and started playing the tapes. They didn't ask for the transcripts, but I thought this

3132

is just obviously reversible error.

So I was able to do some research. Under Iowa state

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2732 of 3636

law in that case -- and I'll use that as kind of a springboard and discuss it -- it was not reversible error for the jurors to rehear the tapes that had been admitted into evidence without the aid of transcripts, but I did some preliminary research, and I'll try to dig some up between now and the blessed event.

THE COURT: Okay. I've always understood that it was discretionary with the trial court judge, but I could be wrong about that.

Mr. Williams, anything you want to add?

MR. WILLIAMS: Well, I don't know that I'm going to really enlighten anybody here, but I think the law as I understand it is that a tape recording is different from testimony. It's not like playing back other testimony. A tape recording by its very nature is evidence. It's not testimony. And so it's not similar to choosing one person's sworn statement, sworn testimony, over somebody else's and letting the jury rehear or read back that portion. The tape recording is evidence, and the jury can be entitled with the Court's discretion to hear that. Many courts will actually send a tape recording in with the jury when they get the tapes and they can play them all they want to. And so I don't think there's any error if the Court chooses to do that.

I also am fairly certain that I've seen the case law

3133

where the court -- the appellate courts have said it's not error for the court to deny that request as well. I think it is within the Court's discretion to do that.

I have not seen any case law -- but I will do some research myself over the weekend -- concerning the question the defense raises, and that is, if we do bring them back in, can

the jury look at transcripts again. I mean, it seems logical to me, but I don't know of any case law on that, but I will take a look for that.

THE COURT: Mr. Rogers, would you like to weigh in on this?

MR. ROGERS: I'm asking the Court to waive the tag team rule once again.

THE COURT: I am. I'll be glad to.

MR. ROGERS: Because it seems logical to me that when a jury commences deliberation they're deliberating and that if they want to review evidence as part of their deliberations that's certainly their right and maybe even obligation. But I don't think the dispositive issue is where the portion of their deliberations which has to do with the review of certain evidence takes place, whether it's in the courtroom --

THE COURT: Or the jury room. I don't think that makes any difference either.

MR. ROGERS: Okay. So there's no question the transcripts are not evidence. There's also no question that the

3134

transcripts are prepared by a party and that even though we may have not made this objection at the time, they're argumentative to some extent when they characterize sounds that are nonverbal rather than saying here are words. In that sense it's like letting a party argue to the jury as they review evidence during deliberations, and that doesn't seem logical to me at all if the other party is objecting, which we are, so that's all I have.

THE COURT: Let me ask you this. A couple of questions: What would your objection be if I required the government to redact those editorial comments?

MR. ROGERS: We would still object that the transcripts themselves are not evidence, but our prejudice might be less. To me the -- if the Court in its discretion decides that the jury should be permitted to review the tape recordings upon request and if they want to, the best way to do it is give the tape recordings and a tape recorder.

THE COURT: Do you have any objection to that?

MR. ROGERS: I don't think there is one.

MR. WILLIAMS: I will just weigh in as a practical matter. These are onto CDs because they had to be enhanced, and the only practical way to play them would be to do it on the computer like we did in court. It has to be played on a computer, and it's not reel-to-reel tape. And to reduce it to a tape, you would lose integrity on the sound to do that. So we would be more than glad to do the setup and even supply an IT

♀

3135

person to run it if the Court chose to allow them to listen to it.

THE COURT: I have real problems with sending somebody to run equipment into the jury room which is --

MR. WILLIAMS: I'm not suggesting that, Your Honor.

THE COURT: Bring them up in the courtroom?

MR. WILLIAMS: Bring them up in here in your presence. We don't have to be present, but I can supply an IT person just to run it.

THE COURT: No. I think the lawyers should be present.

MR. PARRISH: Am I really missing this this much? I mean, maybe I am. I don't know.

THE COURT: It's fairly routine to have jurors come

back into the courtroom and listen to tapes.

MR. PARRISH: Oh, I'm not saying that, but am I missing something about the transcripts going to the jury that's not evidence?

THE COURT: The transcripts are not -- no, I've said this three times now.

MR. PARRISH: Okay.

THE COURT: The transcripts are not going back into the jury room.

MR. PARRISH: Right.

THE COURT: Which is the reason why I disagree with

♀

Mr. Rogers. He said there's no difference and the issue isn't where you play the tape. I think the issue is precisely where you play the tape because if you bring them back into the courtroom, I know you wanted me to use the transcripts, but if you use the transcripts, it's an aid for them to understand the tape. The transcript does not go back for them to debate and review and thumb through and comment on.

And I have a hard time understanding why if you have no objection to the transcript as an aid to the tapes when they were played originally you could have any objection to having them being used to assist the jury to listen to the tapes.

MR. PARRISH: Well, Your Honor, the big thing is the cross-examination issue that comes into play with Mr. Cutkomp on the issues of the tape that's not available anymore. So if you're going to do that, at a very minimum if it's going to be done with the transcript -- I mean, first of all --

THE COURT: Well -- I'm sorry. Go ahead.

MR. PARRISH: Go ahead.

THE COURT: No. You've already cross-examined him about that.

MR. PARRISH: Well, then you're going to bring back and play pure tapes and have pure transcripts? I don't get it. I guess -- I know you don't like me to use my experience, Judge, in this issue.

THE COURT: No. Go ahead. Go ahead. Have you ever

had that happen?

MR. PARRISH: Never, never. I've never had it even come up because it's not evidence, and when it did come up a couple of times -- well, I can name three or four of the judges -- no, it's not evidence, and it was resolved on that issue, and I guess I'm a little perplexed by it.

THE COURT: Okay. Let me ask you this. I'm sure you have tried a number of drug cases where there were tapes played to the jury in the course of the prosecution's case.

MR. PARRISH: Absolutely, and murder cases.

THE COURT: Okay. And I don't think I've ever had a case yet -- I think I've maybe had one where there weren't transcripts because the tapes are always either horrible, or at best-case scenario they're bad. They're never great. I think I've had one with a digital recorder where it was like -- it was actually a confession, and it was like we were in the room with the defendant. It was just crystal clear. He was found not guilty despite the excellent quality. But my point is you've been in trials where you've had tapes and you've had transcripts lots of times; right?

MR. PARRISH: Absolutely.

THE COURT: And you've never been in a situation where

the jury sent out a note saying, We want to hear the tapes again?

MR. PARRISH: And the answer is no.

THE COURT: And the judges have said no.

MR. PARRISH: Absolutely. It's not even been a close call. And I guess I had a fellow once who was Vietnamese. They had to take the tape, had a translator with the tape, and the jury had all kind of problems. It was a murder case. And, you know, I had a judge that was not very defense oriented. Unfortunately I lost the case but the --

THE COURT: I hope all judges are neutral, they're not either defense oriented or government oriented.

MR. PARRISH: But the transcript never went in.

THE COURT: Well, I'm not talking about the transcript going into evidence. I'm talking about if there's a request to listen to the tape, if I grant it, then the question becomes should the jury be allowed to use the tape to assist the transcript -- to assist them in listening to the tape just like they did the first time in the trial with no objection by the defense.

MR. ROGERS: And the point with that, Judge, is that after they hear it the first time, when they hear it the first time, you instruct them that the transcript's not evidence after they hear it with the transcript. Then the parties have an opportunity to argue the case and to point out any discrepancies they believe were found between the sounds and the printed word. And after deliberations begin, that opportunity is no longer available. And so I think it's just like anything else that's

not evidence. They shouldn't be seeing it or hearing it during their deliberations. It seems intuitively obvious to me.

THE COURT: Well, I think you're going to find case law's not -- doesn't support your position.

MR. PARRISH: Why wouldn't they introduce it as part of the evidence when the case is going in? It would not have been admissible at that point. What makes it admissible now for the purposes of an aid?

THE COURT: It's not admissible. It's as an aid to assist the jury in understanding what's on the tape. It's not admissible. I've never said that the transcripts were admissible. It's an aid just like it was an aid the last time.

Now, your point is intriguing to me, the last point that you made actually, because -- but I think the response is you had an opportunity to bring out discrepancies in the tape, and you did that, so that's in evidence.

MR. ROGERS: So why do they while considering the -- excuse me, while considering the validity of that argument get to do so while in the light of the nonevidence? I mean, it's like --

THE COURT: Well, maybe the fair thing to do would be a readback of the cross-examination of Cutkomp about the tapes. But we don't have to decide anything, nor will we, tonight.

MR. ROGERS: Right.

THE COURT: Right? But I raise it because these are

3140

issues that I think need a fuller exploration probably by all of us. I know this. I have -- I know this I think to almost a certainty. I have discretion to play the tapes. I won't say

any more than that. I don't know whether I have discretion to -- because I don't recall a case that talks about when the jury wants to replay the tapes and you let them, whether they can use the transcripts. I don't recall a case about that. I don't know that there is one. I imagine that there probably is. You've made some good arguments, and I have a totally open mind on it, and I have on occasion just said no.

MR. PARRISH: Let me throw a mechanical issue in to you.

THE COURT: Okay.

MR. PARRISH: Let me just assume this; okay? This is just popping off my head, and you're probably going to tell me to sit down. What if a juror walks in with earplugs and just wants to read the transcript? How can you stop that? If it's not evidence, they're in deliberations, they come out, the juror says, okay, they can put in mental earplugs, they just want to read something along in the transcript, how are you going to stop it as a judge? You can't order them to listen. I mean, just think of that as a pure mechanical issue or human nature issue. I don't know. I think we're stepping into grounds that we haven't gone.

THE COURT: But they could have done that initially.

♀

MR. PARRISH: Absolutely, but they're playing the tape in open court where they're hearing it for the first time, but now they're in the deliberative process, so it changes the nature of all evidence, and then it becomes an item to sit and work with, and it's the written word and not the hearing word that comes into play, wouldn't you think? I mean, I'm just thinking out loud here.

THE COURT: That's an interesting point. That's what I did when the tapes were being played. I didn't listen to them. I read the transcript because I knew I didn't have to make findings on the tape or I probably would have listened to them. I understand what you're saying. You couldn't make me listen to them. But I've heard them before too.

MR. PARRISH: Right, so have I, several times.

THE COURT: I'm sure you have, many more than I have. Well, I'm glad we had this discussion because it's likely to be an issue. And, you know, I get stressed when I keep the jury waiting, and so, you know, I want to have a thoughtful response, and so this gives us time to look at it.

And I'll just say this. I have a totally open mind as to what I'm going to do. I know I have not been entirely consistent in the past. I think I have allowed tapes to be replayed, and sometimes I've said no. And I think I have discretion.

And so you're going to have to think of arguments --

assuming I have discretion -- set aside the transcripts for a minute. Let's just say I decide to send or bring the jury back up here to play the tapes. Because I have discretion, you're going to have to muster the best arguments you can as to why I should say no if the defense doesn't want them to hear the tapes and the government why I should say yes. And I'll probably want a heads-up on that too, so maybe we can have some more argument when the jury goes -- when the jury deliberates, you know, Monday afternoon or Tuesday morning because I think there's a strong likelihood we're going to get this request. I hope I'm wrong and I can avoid the issue. But we better have thought it

out very carefully and make the best decision we can. And so I'm going to need your input and argument to make that decision.

Anything else on this tape issue?

MR. WILLIAMS: No, Your Honor.

THE COURT: Any other issues you want to talk about while we're together this evening?

MR. SPIES: Your Honor, I think Mr. Parrish suggested maybe off the record this afternoon that we make a record with Mr. Honken about his understanding of his right to testify and the decision, and I'd be happy to make that record in any manner you wish.

THE COURT: Okay. I think the best way to do it is for me not to be involved in it I think and for you just to go ahead and make whatever record you want to make on the issue and

that Mr. Honken wants to make on the issue.

MR. SPIES: Your Honor, on behalf of the defendant, I'd like to make clear that Mr. Rogers, Mr. Parrish, and I have had an opportunity on multiple occasions to discuss with Mr. Honken the state of the evidence, the anticipated arguments to be made during the course of trial with respect to that evidence.

Mr. Honken, as the Court is aware and all counsel are aware, has participated in the legal process for a number of years, and I'd like Mr. Honken to affirm for the Court that he's had an opportunity to fully and freely discuss the evidence, the issues that have arisen during the course of his trial, and, most importantly, that he understands his constitutional right to both testify and to testify about his knowledge of the facts and the issues that have arisen; that he also understands he has

the right to remain silent during the course of trial and not testify; he's been informed both by participating in voir dire and during the course of reviewing the Court's proposed instructions, the Court's final instructions exactly how the jury will be instructed on his decision to decline to testify; and that bearing all these factors in mind it's Mr. Honken's decision not to testify on his own behalf at his trial.

Mr. Honken, is that your understanding of your opportunity to freely confer with your lawyers, to review the evidence, to review the testimony of all the witnesses, and are

you fully aware of your right under the Constitution of the United States to testify on your own behalf, and is it your voluntary decision with all those factors in mind not to testify?

THE DEFENDANT: Yes, it is.

THE COURT: Any other record you'd like to make, Mr. Spies?

MR. SPIES: No, Your Honor.

THE COURT: Okay. Anything else that we should be talking about?

MR. PARRISH: I know I always like to talk about the mechanics, but assuming we start Monday morning when you finish your instructions in the afternoon, have you thought timewise -- and I have not talked with Tom at all about it -- on the record I should call him by his proper name -- but about the time set for argument, assuming now we'll start at 8:30 I assume; would that be correct?

THE COURT: Yes, I think so.

MR. PARRISH: Have you thought about an early lunch --

this is my only thought about this, and, you know, you can shoot me down on this if you like. But my thought is if we argue straight through the morning, we come back in the afternoon and they get an afternoon rebuttal. I thought if we start at 8:30, maybe a little snack break or something like that, we finish the argument up, I'm thinking two hours.

THE COURT: So are you suggesting that we take a break after the government's initial opening argument?

MR. PARRISH: Right.

THE COURT: And then we would come back -- well, let's add up the time. And here's kind of the problem. I think there's no way to do it without a lunch break.

MR. PARRISH: I agree. I agree with that.

THE COURT: Okay. Do you agree with that?

MR. PARRISH: Absolutely.

THE COURT: Given Mr. Miller's probably going to go between an hour and two hours.

MR. PARRISH: That's what he indicated.

THE COURT: You're going to go two hours, thereabouts, a little more, a little less.

MR. PARRISH: Right.

THE COURT: I'm not putting any time restrictions on.

MR. PARRISH: Okay.

THE COURT: And then the government's going to give a rebuttal. So we have to take a lunch break at some point. Am I wrong about that?

MR. PARRISH: No. Right. And I'm just wondering of your thoughts -- I know you've been restricting it pretty much to 45 minutes, and I was just thinking timewise --

THE COURT: What do you suggest?

MR. PARRISH: That's a good question. I don't know,

because I was working off -- and this is what I was working off initially -- the instructions taking about an hour and a half to two hours. Mr. Miller would go to lunch. We would then take lunch. Then I would start my argument, which is always a tough place to start arguing, right after lunch. Then he would finish his rebuttal and we'd be done. It would have been a perfect day, so to speak.

THE COURT: We could, for example, start at ten, have the government argue, take a lunch break, have you argue, and still have time for rebuttal because we're not going to be doing -- that's like where we would have been, maybe even starting a little earlier than where we would have been, had we started at 8:30 and done instructions.

MR. PARRISH: Exactly.

THE COURT: So that's a possibility.

MR. PARRISH: And I know Mr. Williams is not making the argument.

MR. WILLIAMS: No. I'm just thinking this is a golden opportunity with Mr. Miller gone to take over the argument.

THE COURT: That's right. He forfeited his right to give the closing.

MR. WILLIAMS: My thought.

MR. PARRISH: He might have some thoughts, but I think that might be workable.

MR. WILLIAMS: He might. The other idea, though, Your

Honor, is, you know, we often do the 8:30-to-2:30 schedule for trials with two 20-minute breaks, and that may be another option.

THE COURT: And then just serve lunch late.

MR. WILLIAMS: Right, and just let them know we're going to take two 20-minute breaks. We'll do Mr. Miller's argument, break for 20 minutes, come back, do Mr. Parrish's argument, break, come back, do Mr. Miller's rebuttal argument, and do it that schedule as well.

THE COURT: And then maybe we could have some snacks for them. That's a possibility too.

MR. PARRISH: That sounds really good because both of us -- I'm not crazy about it, but I am going to use PowerPoint, and I think Mr. Miller's going to use PowerPoint. And that would give us enough time to set up also. You know, if it's a couple of minutes less, couple more, it's no big deal. I just think that might be the fairest way to do it.

MR. WILLIAMS: As long as the jury knows in advance that's what's going to happen, they can plan their snacks accordingly.

THE COURT: The Court -- we've been providing them lunch and breakfast foods and the like. So is that what you prefer to do?

MR. PARRISH: I would. I don't know about Mr. Miller.

THE COURT: Well, he's not here.

3148

MR. WILLIAMS: I'll speak for him.

MR. PARRISH: I would like an idea like that or the idea that you suggested at about nine o'clock or so and then

maybe an early lunch. Either one of those would work, but I like the 20-minute idea.

THE COURT: So we'll start -- let's just figure this out. We'll start at 8:30. Let's say we go to 10:30.

MR. WILLIAMS: Break for a half hour.

THE COURT: I would like to give them a little stretch break but maybe let the lawyer decide when to give them a stretch break. You know what I mean? I don't want to be interrupting an argument for a stretch break. Two hours is a long time to sit down. So we could start at 8:30, figure Mr. Miller going 2 hours or less, thereabouts, with the idea that somewhere close to the middle he could stop for 20 -- even a 20-second stretch break makes all the difference in the world.

MR. WILLIAMS: Absolutely.

THE COURT: And that's -- you know, stretch breaks, that wasn't my idea. I learned that from Judge Vietor.

MR. PARRISH: I like them.

THE COURT: It's a great idea, and it's surprising the number of times I tell federal judges that and they say they never even thought of it, what a great idea it is.

And just to backtrack a little bit, I was at this federal judges' meeting in Seattle a couple weeks ago, and we

♀

3149

had a session that went two and a half hours, and judges on both sides of me were complaining like crazy about how long that was to sit. And I said, Well, do you give your jurors stretch breaks? They said, No, what are you talking about? I said, What do you think they're thinking for two and a half hours? And kind of the light bulb went off.

Anyway, 8:30, take a stretch break in the middle,

Miller finishes up about 10:30. We take a 20- or 25-minute recess at that point. Jurors can have some snacks, come back, you argue. Same thing, if you can slow down enough at some point somewhere in the middle, give the jury a 20-second stretch break.

MR. PARRISH: Oh, absolutely. I'll be taking a few.

THE COURT: Okay. And then when we're done with Mr. Parrish, we'll take another 20- or 25-minute recess and come back for government's rebuttal.

MR. PARRISH: That sounds good.

THE COURT: Mr. Spies, do you want to weigh in on this one?

MR. SPIES: No, I just wanted to take a stretch break.

THE COURT: Feel free. Okay. I think we have that solved. And you'll be the one, Mr. Williams, to explain to Mr. Miller that he forfeited his right to give his closing argument because he wasn't here to discuss the mechanics of it.

MR. WILLIAMS: I thought you were just about to

announce that you were going to announce that I had to give the closing argument. I was going to take that as an order from the Court.

THE COURT: I don't think so. I'll leave that between you and Mr. Miller.

Anything else?

MR. PARRISH: We met with the witness, Judge. I have not told the prosecution yet, but I believe we're in a position -- we met with her this evening back at the hotel, and our thought is that we're perhaps not going to call her. We did meet with Mr. Honken about it. I think he's pretty much

satisfied at this point, and I can tell you we perhaps will not be calling her.

THE COURT: Okay. But if you change your mind, you know, up until you rest, you've got a right to put on evidence.

MR. PARRISH: We do have a couple of exhibits they have not objected to that are going to go in, but other than that, I think we're at our stopping point.

THE COURT: Oh, yeah. Don't you have some weather exhibits?

MR. PARRISH: We have two weather reports, and we have the phone records.

THE COURT: Okay. Now, you don't have any objection to those records.

MR. WILLIAMS: I don't except --

♀

3151

THE COURT: Under the rule of completeness, Rule 103, you wanted to put in the entire phone records.

MR. WILLIAMS: Correct.

MR. PARRISH: He told me that. He alerted me to that.

THE COURT: And do you all have an objection to that?

MR. PARRISH: Not really.

THE COURT: You'd have one if you could think of one; right? I'm just teasing you.

MR. PARRISH: I don't want to handle them. That's all.

MR. WILLIAMS: Just a practical question, do you have those?

MR. PARRISH: Yeah, you sent them to us in discovery.

MR. WILLIAMS: So you're going to mark the whole thing as an exhibit then.

MR. PARRISH: No, I just want those two. You can mark them. We won't object to them.

MR. WILLIAMS: Then we'll do that. I just have to figure that out.

THE COURT: Okay. So that's probably what we're going to do first thing in the morning unless you decide to call Miss Rick; is that right?

MR. PARRISH: Right. That's exactly right. She drove in, and we had a long meeting with her, and I met with Mr. Honken beforehand. We came back and met with him

afterwards, and I believe he's pretty satisfied with our meeting and resolution of that matter.

THE COURT: Okay. Okay. We'll be in recess. Thank you.

(The foregoing trial was adjourned at 7:33 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

1-19-05
Shelly Semmler, RMR, CRR Date

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| MICHAEL BILLICK | | |
| | MR. PARRISH | 2888 |
| | MR. WILLIAMS | 2896 |
| LYNETTE REDDEN | | |
| | MR. PARRISH | 2902 |
| | MR. WILLIAMS | 2936 |
| | MR. PARRISH | 2944 |
| DAVID LOPARO | | |
| | MR. PARRISH | 2947 |
| | MR. WILLIAMS | 2977 |
| | MR. PARRISH | 2985 |
| | MR. WILLIAMS | 2987 |
| SCOTT TRACY GAHN | | |
| | MR. PARRISH | 2989 |
| | MR. MILLER | 2992 |
| | MR. PARRISH | 2995 |
| NEEL HUFFMAN | | |
| | MR. PARRISH | 2996 |
| BRUCE GOLDEN | | |
| | MR. PARRISH | 3016 |
| | MR. WILLIAMS | 3024 |
| | MR. PARRISH | 3025 |
| DAVID AMICK | | |
| | MR. PARRISH | 3027 |
| THOMAS MULLIN | | |
| | MR. PARRISH | 3034 |
| | MR. WILLIAMS | 3037 |
| | MR. PARRISH | 3043 |
| NEEL HUFFMAN | | |
| | MR. PARRISH | 3045 |
| | MR. WILLIAMS | 3065 |
| | MR. PARRISH | 3074 |
| | MR. WILLIAMS | 3078 |
| | MR. PARRISH | 3079 |

VOLUME 14 10-6-04 witness testimony

WILLIAM BASLER
MR. PARRISH 3079

♀

3154

ALYSSA NELSON
MR. PARRISH 3082

MARVEA SMIDT
MR. PARRISH 3087

*****

EXHIBITS:

W 2927
O1 through O7 3019

*****

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR01-3047 |
| Plaintiff, | Sioux City, Iowa<br>October 7, 2004 |
| vs. | 9:48 a.m. |
| DUSTIN LEE HONKEN, | |
| Defendant. / | VOLUME 15 |

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | C. J. WILLIAMS, ESQ.<br>Assistant United States Attorney<br>Suite 400 - Hach Building<br>401 First Street Southeast<br>Cedar Rapids, IA 52401 |
| | THOMAS HENRY MILLER, ESQ.<br>Iowa Attorney General's Office<br>Area Prosecutions Division<br>Hoover State Office Building<br>Des Moines, IA 50319 |
| For the Defendant: | ALFREDO PARRISH, ESQ.<br>Parrish, Kruidenier, Moss, Dunn<br>Boles, Gribble & Cook<br>2910 Grand Avenue<br>Des Moines, IA 50312 |
| | LEON F. SPIES, ESQ.<br>Mellon and Spies<br>Suite 411<br>Iowa State Bank Building<br>Iowa City, IA 52240 |
| | CHARLES M. ROGERS, ESQ.<br>Wyrsch, Hobbs & Mirakian<br>Suite 1300<br>1101 Walnut Street<br>Kansas City, MO 64106 |
| Also present: | William Basler |

Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

(Proceedings reconvened outside the presence of the jury.)

THE COURT: The first matter I want to take up is in the jury instructions, final instruction number 14, impeachment. On page 87 and then again on page 89, there's a reference to eyewitness testimony identifying the defendant. I thought it was ambiguous and it would be better to just eliminate the word "eyewitness" and just talk about testimony identifying the defendant. I changed the instructions along that lines after I consulted with the lawyers off the record earlier this morning. I've now provided the lawyers with a set of -- or with the changed instruction number 14 taking out the phrase "eyewitness," and I want to know if anybody has any objection to my modification of the instruction.

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

MR. ROGERS: And not on behalf of the defendant, Your Honor.

THE COURT: Okay. Thank you. Now let's turn to the other matter that just surfaced this morning. It's now about ten to ten. I think I was apprised of this somewhere around quarter to nine or something, whatever time it was. It was earlier this morning. Mr. Williams?

MR. WILLIAMS: Your Honor, the United States would propose calling in rebuttal Special Agent Bill Basler. The

purpose of his testimony would be to rebut the testimony elicited by the defense yesterday from Mr. Scott Gahn. Mr. Gahn testified yesterday that the last time he had seen the defendant was when the defendant asked him where Greg Nicholson was located. That's inconsistent with testimony both yesterday and prior that he had also had a confrontation with the defendant after Scott Gahn had testified before the grand jury.

When asked yesterday when he testified before the grand jury, was that before or after the meeting with the defendant looking for Greg Nicholson, he said before. In fact, we know that not to be the case. We know that he testified before the grand jury on October 27 of 1993, and so the United States would seek to put Special Agent Basler on the stand to impeach the testimony of Mr. Gahn.

THE COURT: Why are you doing it that way rather than calling Gahn?

MR. WILLIAMS: Well, I think it's more proper. At least from looking at the case law, it appears to me to be more proper to put the -- to impeach his testimony rather than put him back on.

THE COURT: Well, how is he going to impeach his testimony without violating the hearsay rule?

MR. WILLIAMS: It's not being introduced for the truth of the matter asserted. It's being introduced to impeach his testimony, impeach the credibility of the testimony he gave, so

3159

it's not hearsay, and it's not deemed evidence. It's being put on to impeach --

THE COURT: Well, is he going to testify to what Gahn

had told him previously, or is he going to testify to the date of the grand jury?

MR. WILLIAMS: He's going to testify to what Gahn told him previously, so it's going to impeach him. He's not going to give substantive evidence of the actual date.

THE COURT: Mr. Parrish?

MR. PARRISH: Seems it goes to the truth of the matter asserted.

THE COURT: Well, what exactly is he going to testify to?

MR. WILLIAMS: I would ask him whether he had previously spoken with Mr. Gahn on numerous occasions concerning the events surrounding his contact with Dustin Honken, whether Scott Gahn had told him that he had a confrontation or had a meeting with Dustin Honken in which Mr. Honken was looking for Greg Nicholson; that when did Mr. Gahn tell you that meeting took place; did Mr. Gahn tell you whether he ever testified before the grand jury; when did he say he testified before the grand jury; and what was the setting in which he told you that he had this later confrontation with the defendant in this case? About those five questions is all I plan on asking.

THE COURT: Well, how do you comply with Rule 613(b)

3160

doing it that way?

MR. WILLIAMS: He was confronted -- Mr. Gahn was confronted --

THE COURT: He wasn't confronted with the statements he allegedly made to Agent Basler. I mean, he was confronted about the dates and the timing of it, but he wasn't confronted with an alleged prior inconsistent statement made to Agent

Basler. And so I think you run afoul of Rule 613(b) doing it that way.

MR. WILLIAMS: Your Honor, I don't know that I -- and I'll be the first to admit that I may be wrong on this, but the way I'm reading 613(b) is I don't know that he has to be confronted with who he made the statement to. He was confronted with the essence of the statements he made. He had all the opportunity in the world to clarify --

THE COURT: Here's why I think you have to give him sufficient -- he could say, I never said that to Basler. He could have said that had you confronted him, and that's the purpose behind -- seems to me that's the purpose behind Rule 613(b) so that the witness can explain a prior inconsistent statement or deny it and so you don't have the situation that we're in now where then you have to recall the witness then to impeach the impeaching witness on the prior inconsistent statement.

So I think you do have to give them -- I don't think

3161

it's just about the general subject matter. I think you have to say, Did you say so and so to so and so so they're on notice about what the statement is. That's the purpose behind Rule 613(b).

Now, I realize that's just my interpretation of it. You know, I didn't realize we were going to have a 613(b) problem, so I'm just going on the plain language of the rule. But I think if you look at the purpose behind the rule, the witness has to have a fair opportunity to be able to say, Yeah, I never said that so that you don't sandbag the witness afterwards. That's the theory behind 613(b), isn't it?

MR. WILLIAMS: It is, and I think your analysis is correct, Your Honor, on that. I would propose at that point then that we call Special Agent Basler just to have him testify about when, in fact, Mr. Gahn testified before the grand jury.

THE COURT: And then the question becomes is that proper rebuttal.

MR. WILLIAMS: Right.

THE COURT: Okay. Mr. Parrish?

MR. PARRISH: It's not proper rebuttal because it's a question created by the prosecution in their own questioning, and that does not lay the foundation for rebuttal. It has to be a situation created by the defense in their presentation.

THE COURT: And are you saying you didn't get into this area at all in your direct examination of Gahn?

♀

MR. PARRISH: He adopted previous statements he'd made was where we left it off solely on the issue of the videotape and the tape that was made. That was the sole purpose he was called back for, and that was the date -- it was a July date that he did make a previous statement indicating that was the last time he saw Mr. Honken. Then the --

THE COURT: But doesn't this then rebut that? Assuming it's proper rebuttal, doesn't this rebut that?

MR. PARRISH: It does not. Once the government then began their cross-examination, they can't create rebuttal through cross. They can create it through --

THE COURT: But why doesn't this rebut his direct testimony as well?

MR. PARRISH: He was on. They had the opportunity --

THE COURT: Well, that's a different question.

MR. PARRISH: Right.

THE COURT: That's a different question.

MR. PARRISH: It may be.

THE COURT: Well, my question is -- I'm sorry.

MR. PARRISH: Go ahead.

THE COURT: Does this proposed rebuttal testimony rebut any answers that Mr. Gahn gave in your direct examination?

MR. PARRISH: It does not.

THE COURT: Mr. Williams?

MR. WILLIAMS: I respectfully disagree. It does. By

3163

itself clearly -- you know, you can't say simply the date, does that rebut, but obviously we have to take all the evidence in context, and given the other statements of timing and when things occurred, the date of the grand jury testimony explains that his last meeting with Honken was not in July of 1993, and so I think it's directly in rebuttal of testimony they elicited.

And all credit to the defense, they knew exactly what they were doing in this case, and they knew that Gahn had previously said in his testimony, Last time you saw Honken was at that July meeting, and they wanted to take advantage of that to show that therefore any conversation with the tape had to have occurred then. And so it was precisely the date and the timing of when matters occurred that was the purpose for why they called Mr. Gahn as a witness. And so it's in response to that timing issue that we think the date of the grand jury testimony is in direct -- directly rebuts their testimony or their evidence.

THE COURT: Now, what about the question of -- you went into that on cross-examination. You tried to -- you tried

to do yesterday what you want to try and do today, and you weren't successful in doing it. Would you disagree with that?

MR. WILLIAMS: No, Your Honor, I would not disagree with that. I think it's still permissible under the Shurn case, and I think the Shurn case, I read it as fairly square on point. In that case the government had a witness on the stand. As the

court said in Shurn, that the government was surprised with testimony prior -- different than her prior statements, and they called their case agent to rebut that testimony in the same manner we're doing here today.

Yes, we tried to, with Mr. Gahn, straighten him out yesterday. We were unsuccessful. But I don't think that precludes us from rebutting his testimony with the testimony of Special Agent Basler.

And the Court was kind enough to provide us with the case of United States versus Luschen if I'm pronouncing that correctly, L-u-s-c-h-e-n, in which the Eighth Circuit sets forth the 3-part test at page 1170 of that decision, and the 3-part test is whether the defendant is surprised -- whether the testimony is a surprise to the defendant, and certainly this is not. They've known all along when his testimony was before the grand jury; whether the defendant had opportunity to meet this proof, and they did and they do; and whether there's detriment to the defendant because the order in which the evidence was introduced. And I don't see any prejudice to the defendant by us putting on a witness for the single question of when did Scott Gahn testify before the grand jury.

THE COURT: Now, before we get to the rebuttal on that, would you please have the jury told that we're not going

to start for probably about ten minutes or so?

Okay. Mr. Parrish, I want you to apply the 3-part

test in United States versus Luschen, 614 Fed. 2d 1164 at 1170.

MR. PARRISH: Which case are you on?

THE COURT: United States versus Luschen and King, 614 Fed. 2d 1164 at 1170, and it's the case I passed out to counsel earlier this morning with the highlighted portion on the Eighth Circuit standard and the Eighth Circuit test for what is proper rebuttal. It's a three-part test.

MR. PARRISH: And you're on page 6 of that?

THE COURT: On page 6, at the bottom of page 6.

MR. PARRISH: Okay.

THE COURT: Surprise to the defendant; second, defendant's opportunity to meet the proof; and, three, detriment to the defendant because of the order in which the evidence was introduced.

MR. PARRISH: Surprise to the defendant only in the sense that they -- it was their witness on their case in chief. They had an opportunity through Mr. Miller, not Mr. Williams, to examine him yesterday and cross-examine him when he came back for rebuttal.

On the second issue, defendant's opportunity to meet the proof, we may need surrebuttal. Depends on what they say.

THE COURT: Surrebuttal from Gahn?

MR. PARRISH: Maybe.

THE COURT: Is Gahn here?

MR. WILLIAMS: He is not.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2761 of 3636

MR. PARRISH: He was just here. I just saw him in the courtroom.

MR. WILLIAMS: He was, but we let him go because we didn't -- our assessment was that this was not going to be admissible through Gahn. I may have made a mistake there, but I let him go on that reason.

MR. PARRISH: He was here 20 minutes ago.

MR. WILLIAMS: I know. The only question -- literally the only question I will ask Special Agent Basler is, When did Gahn testify before the grand jury? There's no way to rebut that with any surrebuttal testimony because the defense knows they have a copy of his sworn testimony before the grand jury on October 27, 1993. So the defense can't be prejudiced by the introduction of that testimony because there is no rebuttal to that.

MR. PARRISH: He's dead wrong. Page 11 of the transcript.

THE COURT: Which transcript? I don't have it.

MR. PARRISH: I'm sorry. Of the grand jury transcript. He's dead wrong on that point, and he knows it. Page 11 of the grand jury transcript, I'll read it, Your Honor. It's very short: Have you -- this is the question asked Mr. Gahn: Have you had any conversations with Mr. Honken in the last 12 months, for instance? Answer by Mr. Scott Gahn: He stopped after Greg got arrested -- this was -- oh, I suppose it

3167

was April or so -- and just said that Greg had set him up good and that Greg had set him up, has -- that has some writing across it, and he just chatted for a few minutes, and that was

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2762 of 3636

it. 12 months before, Judge, goes back to October of 1992.

THE COURT: But I thought the only question you were going to ask him is what was the date of his grand jury testimony.

MR. WILLIAMS: Exactly.

MR. PARRISH: But he talks about the conversation which now they're trying to rebut to say that it was a certain date. We would need to establish in surrebuttal that is inconsistent not only with what he said that they are now trying to rebut but also inconsistent with what they're trying to establish through Mr. Basler. And here's his grand jury testimony which said the last time he had a conversation with him was 12 months ago, so when he says that there's nothing to rebut, he's inaccurate -- to surrebut, he's in accurate.

THE COURT: Yeah, but that -- how does that rebut the date of the grand jury testimony?

MR. PARRISH: It rebuts the date when they are trying to establish now that he had this conversation with Mr. Honken after October because it goes back to his inconsistent statement indicating that it was a year prior to the time, sometime in April he says.

MR. WILLIAMS: That is in the record already. I mean,

♀

3168

the defense has established through Gahn very artfully yesterday that he doesn't know when things occurred. And so that's in. The question when did he testify before the grand jury is the only question at issue, and any surrebuttal would have to be to call into question the date in which he testified before the grand jury. And there just isn't any surrebuttal to that. He either did or he didn't on that date, and the defense knows he

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2763 of 3636

did.

THE COURT: You don't have any surrebuttal about the actual date of the grand jury testimony.

MR. PARRISH: No. I think you're accurate on that, Your Honor, and Mr. Williams is accurate on that. We don't. But obviously what they're trying to create here is the fact when was his last conversation with Mr. Honken and what was the nature of that conversation. Our testimony was solely to establish that that date was the date that Mr. Honken spoke to him about the video which the juror, remember, sent that question back. It was one of the first or second questions from the juror, Was it an hour or two hours? First he said it was an hour; then he said it was two hours. We wanted to try to establish solely that when he met with Mr. Gahn, had this conversation, Mr. Gahn knew he had the videotape.

Key, both he was alive and Mr. Honken was looking for him supposedly maybe for other purposes if he discussed the video. The conversation that took place after would mostly be

3169

collateral. But if they try to establish, well, in October after the grand jury he met with him, number one, he wasn't looking for Mr. Nicholson at that point. But then his grand jury testimony does establish that now he said it was April.

THE COURT: But you -- but isn't that already in the record?

MR. PARRISH: It was not. It is not.

THE COURT: Let's start at the beginning because now you've got me thoroughly confused. The only question you want to ask is the date of his grand jury which is October . . .

MR. WILLIAMS: 27, 1993. Yes, Your Honor.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2764 of 3636

THE COURT: And explain to me why that is important.

MR. WILLIAMS: Because the testimony by Mr. Gahn yesterday was that the last time he spoke to the defendant was when the defendant was asking him where Greg Nicholson lived. Then the defense elicited from him that at some point he had a conversation with Honken in which Honken told him about a videotape thereby leaving the jury with the impression that any conversation about the videotape had to have taken place before Greg Nicholson disappeared. We know because of Scott Gahn's prior testimony that he had a confrontation with the defendant --

THE COURT: At the grand jury.

MR. WILLIAMS: -- after the grand jury when the defendant asked him about his grand jury testimony and whether

he was the unindicted -- or the unnamed cooperator or something like that. And so the date of the grand jury establishes that he had a meeting with him afterwards.

Now, everything except the date of -- the actual date of the grand jury in my view is already in the record, and we're just trying to establish what that real date was.

THE COURT: Okay. So if I allow the government -- why don't you tell the jury it's just going to be longer, and I'm not going to give a time frame this time. We'll bring them back when we're ready.

If I allow the government to put in the date of the grand jury testimony of Gahn which would be October 27, what do you propose to do in surrebuttal?

MR. PARRISH: Okay. May I address, first of all, the problem I believe they have with this presentation of the facts

of the order of Mr. Gahn's testimony? It would be very brief.

THE COURT: Sure.

MR. PARRISH: He's inaccurate again. Number one, I asked the question solely about the tape. Mr. Miller then interjects in his cross-examination -- if you go to page 4 --

THE COURT: Well, I don't have it. You keep referring -- how would I have it?

MR. PARRISH: Okay. Right before we started you asked them to go out and print it up. I'm sorry.

THE COURT: Yeah, I did, but then when I found out you

already had it, I didn't have her reprint it. But maybe what we need to do is make a copy of that.

MR. PARRISH: I have two.

THE COURT: Okay. That would help me follow the argument much better.

MR. PARRISH: Why don't I give you my copy. This might be the marked copy. It's only -- both my copies are marked, but it doesn't matter.

THE COURT: Do you have a copy of it, Mr. Williams?

MR. WILLIAMS: I do, Your Honor.

MR. PARRISH: Both of my copies are marked because we did have some discussion starting yesterday about Mr. Gahn. We told them we were going to vigorously oppose it. When I saw Mr. Gahn today, I thought if they did it another way we'd use him for surrebuttal.

But if you go, Judge, to page -- so you see where my direct examination went. The government just said, Well, we asked him about dates; then they open up the question. But that's not how it happened. If you look at page 4, this is

Mr. Miller's question -- and you have it in front of you now, Judge -- Did you ever testify before the grand jury, sir? Yes. Did you see Mr. Honken after that? Yes. And when was that? Then he describes it. Mr. Miller now is cross-examining him. And was this before the occasion when he came around looking for Mr. Nicholson? Correct.

Then he goes on to describe the rest of the situation. But he's consistent that it was July of '93. That's what they don't like. That has been his answer. It has always been his answer. Now they want to rebut their own witness through their erroneous cross-examination. That's the problem. And it is a problem if they want to rebut their witness because of a failure of their cross-examination.

THE COURT: And how is it that -- do you agree with that, or are you saying it rebuts Mr. Parrish's direct examination?

MR. WILLIAMS: I say it rebuts his direct examination because --

THE COURT: Show me where.

MR. WILLIAMS: On page 4, line 9, the question was, The last time you saw him was the date Mr. Nicholson left just an hour before. Isn't that what you testified to this jury? And he said, I think that's fairly true.

MR. PARRISH: He could be lying. He may not be telling the truth.

MR. WILLIAMS: I understand that.

THE COURT: Yeah, but they're still entitled to rebut it.

MR. PARRISH: By what? By the grand jury? How does

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2767 of 3636

that rebut the truth of what he said? The truth of what he said is that maybe he's lying afterwards. We know what day the grand

jury is, but that doesn't make it true that he saw him after the grand jury when he's consistently stated the last time he saw him was July, and in the grand jury he says the last time he saw him was April to have a conversation with him. That does not make that statement true.

THE COURT: Well, the date of the grand jury effectively rebuts his answer -- I mean, whether it does or not is for the jury to decide, but it can be viewed as rebutting his answer on lines 9 through 10.

MR. PARRISH: Okay. On what page, Your Honor?

THE COURT: I'm sorry. On page 4.

MR. PARRISH: Okay. On page 4 --

THE COURT: Question, But you also told us the last time you saw him was the date Mr. Nicholson had just left an hour or two before; isn't that true? Isn't it true --

MR. PARRISH: That doesn't make sense, does it?

THE COURT: Isn't that true what you testified to this jury? Answer, I think that'd be fairly true. The date of the grand jury does rebut that answer.

MR. PARRISH: Well, he's testifying before this jury, the jury when he testified earlier in this trial, not the grand jury.

THE COURT: No, I understand that, but the date of the grand jury, because it's already in the record that he talked to Honken after the grand jury, after he testified in front of the

grand jury. The date of the grand jury, if the jury -- does rebut this testimony. I'm just looking for whether or not the date of the grand jury rebuts anything in the direct because I agree with you they can't create -- and then there's another problem I have with it, but that's a separate issue. But I agree with you; they can't create the inconsistency in their cross-examination and then call a rebuttal witness.

MR. PARRISH: Right.

THE COURT: And I'm also troubled by the fact that they could have shown him the grand jury transcript in the cross-examination, and they could have clarified it in cross-examination. They tried a bunch of different ways. They didn't get anywhere, and now they're wanting a second bite at what they couldn't get done yesterday. I'm troubled by that, but if you apply the three-part test, I think the government wins applying the three-part test.

MR. PARRISH: Actually it's a third bite at the apple for them, though.

THE COURT: Well, right.

MR. PARRISH: Right.

THE COURT: Right. So --

MR. WILLIAMS: And just to throw out a line of equity here too, Your Honor, bottom line is trials are about the truth, and the truth is that the date of the grand jury occurred not before July but after July, and so if the whole process is to

3175

get to the truth, I think while I can see the Court's bothered a little bit that we could have brought it out and maybe should have brought it out during cross-examination, we're all after the truth in this case, and I think this is a way to give the

jury as much facts as they can get so they can discern what the truth is.

THE COURT: Well --

MR. PARRISH: My only response --

THE COURT: There are all kind of things -- you know, when evidence gets suppressed, they don't learn about it -- and there are all kinds of situations where procedural rules prevent the jury from learning certain information, some of which would be undisputed and, therefore, true. So I'm not really overwhelmed by your argument. I agree with you a trial is a search for the truth. The narrow question here is is it proper rebuttal.

And I'm deeply troubled by the fact that what you're doing -- and I think you'll concede it -- is you took your best shot at cross-examination. You didn't get what you want, and now through rebuttal you want to try and do what you weren't able to do yesterday. Do you disagree with that?

MR. WILLIAMS: No, I don't, Your Honor.

THE COURT: And I have strong reservations about whether this is proper rebuttal given your concession which I appreciate, but it was simply conceding the obvious, but I

3176

appreciate that because a lot of lawyers are unable or unwilling to do that.

And so the -- but I think applying the three-part test it probably comes in. The question is is that three-part test really the appropriate test in this very unusual fact situation because in the limited time I had this morning, I put all three of my brilliant law clerks on it, and I looked too. I could not find a fact pattern where the government was unable to get what

they wanted on cross-examination of a witness and then now they want to try and cure it through rebuttal testimony.

And so I'm going to let it in because I think it comes in under the three-part test, but I'm also saying that if the brighter minds on the Eighth Circuit see it differently and think that the three-part test would not apply to this situation, that's a distinct possibility. And to be honest with you, I haven't had the time I need to really give it as much thought as I would like to, but I have to balance a whole lot of other factors. And so I'm going to allow just the date of the grand jury.

Then the question becomes are you telling me, Mr. Parrish, you want to recall Gahn on surrebuttal?

MR. PARRISH: I might, Your Honor. Let me add one last -- I just addressed one and two of the prongs.

THE COURT: Okay.

MR. PARRISH: Prong three, Judge, on page 6, it talks

about the detriment to the defendant because the order in which the evidence was introduced. I think you have to consider the failure of the prosecution in their case in chief now destroys the order of our very short and pointed defense, and now they want to call their agent in chief who sat through the whole trial to present this evidence. It enhances the importance of that evidence to the jury. It also requires the jury to consider it in a more enhanced setting because he is the person who sat through the whole case. And it does in that sense create prejudice.

And I realize that's not the actual prong that you have to look at, but it is a detriment to us in that sense of

the word, and it's surprise that the agent in charge would be the one having to present the case. So it does go back to each of the three elements.

Now, as to surrebuttal, if it's just that narrow -- and I obviously want to consult with co-counsel on this -- you know, we may be able to work it out. What bothers me I guess and I'll say very briefly, they knew yesterday they had problems with this. They approached us. We turned them down and said no. We then -- well, both counsel approached me on it.

Then this morning they had Mr. Gahn there. They had to foresee that it was a surrebuttal issue, and for the life of me if Mr. Gahn was walking around this courtroom 20 minutes ago, I can't imagine counsel in this case indicating that it's okay

♀

to drive back home without the issue being resolved.

THE COURT: I don't disagree with that, but let me ask you this. Let me ask you this. If on cross-examination yesterday Mr. Miller had shown Gahn the date of his grand jury testimony, just showed him his grand jury testimony, and said, Mr. Gahn, what was the date of your grand jury testimony, I assume that he would have been able to look at his grand jury testimony and say October 27.

MR. PARRISH: Absolutely.

THE COURT: Okay. Now, my question is that would have been on their cross. What would you have then done on redirect?

MR. PARRISH: Mr. Gahn, isn't it true that on October when you were there you told them that it was 12 months before that time that you had a last conversation with Mr. Honken? April, isn't that accurate, Mr. Gahn? He may have said -- well, whatever he would have said, I would have showed him the

transcript. He would have said yes. So how many different dates, Mr. Gahn, have you given them regarding when was your last conversation with Mr. Honken, and who have you talked to since? Did you meet with these guys last night? Did they send you home? Did they tell you to go home, not stay here? Why? And I would have had no further questions.

MR. WILLIAMS: But, Your Honor, I see that as a completely separate issue of what date did you testify before the grand jury. I mean, what Mr. Parrish --

3179

THE COURT: Well, it would have been proper -- but it would have been proper -- it would have been proper redirect.

MR. WILLIAMS: Absolutely, and I'm not suggesting otherwise. But that doesn't rebut in any way the date in which he testified before the grand jury. And so if we're just analyzing whether there's any real rebuttal to that one question on the question of whether they're prejudiced somehow by the presentation of rebuttal testimony, I don't hear the defense counsel saying they have anything to rebut the day he testified in the grand jury.

MR. PARRISH: That's inaccurate. I think -- and I don't want to say inaccurate, but I think the problem is this. The judge posed a question in the context of the cross-examination and redirect examination. That's the context in which I answered the question. However, because of the failure of the prosecution to ask the proper question at that time, I'm deprived, Mr. Honken is now deprived of his ability to cross-examine on that issue which would have been a pertinent issue. So it really creates an advantage for the prosecution on this particular point. It may be able to be resolved and --

well, I --

THE COURT: Well, we can resolve it by -- I could allow you to put the date in, and then I can allow them on Monday to recall Gahn and we won't do the jury instructions which I'm inclined to do because you sent him home. And I

♀

realize -- I don't -- I know you well enough after ten years to know you didn't do it to deprive them of surrebuttal because I know -- at least I believe you'd never do it. But your intent isn't the issue.

The question is it did deprive them of being able to call Mr. Gahn today, and I would allow them to recall him in surrebuttal even though I understand your argument because you're the ones that created the mess by not doing it yesterday in my view. And so had you done it yesterday, it would have been awfully simple to just show them the grand jury testimony. Then Mr. Parrish would have been able to cross-examine him.

See, the last thing they're going to hear on this issue is the date, not the fact that he gave them multiple dates and he's confused, and that's an important issue. And this is a very important issue in this case. And so unless you can work out some stipulation about what Mr. Gahn would testify to in surrebuttal or some other stipulation, I'm going to put the defense in the same position they would have been in yesterday, and, you know, it's easy to be an armchair quarterback and criticize Mr. Miller.

But he could have done that, and I'm not going to allow you to do it today without giving the defense -- in other words, I'm going to -- because you created the situation in my view, I'm going to put the defense in the same position they

would have been in yesterday or as -- you can never put them in

exactly the same position, but I'm going to do it as close as I can.

And, you know, I'm not very happy that we're going to send the jury home today after one question or a couple questions and not do the instructions because I told them we were going to do it. But I'm not going to put the defense in a worse situation because you created the situation, and I think it's the fairest thing to both sides to do it that way.

MR. WILLIAMS: Your Honor, if we could, can we just have a few minutes to consult both with defense counsel and with my co-counsel and we can make a decision whether this is where we want to go or whether we want to surrender this angle and simply proceed?

THE COURT: Right, you can.

MR. PARRISH: I would agree with that, Your Honor.

THE COURT: You can. I'll give you some time to think about it. But I just want to make it clear I'm going to allow you to do it because I think the three-part test weighs in your favor, but I'm going to allow the defense to recall Mr. Gahn in surrebuttal over your objection that it's improper surrebuttal.

MR. WILLIAMS: I understand.

THE COURT: And I don't really have a problem with doing it that way. And I'll take the heat for it with the jury. I always do because that's my job.

MR. PARRISH: Your Honor, I don't want you to consider

it piling on, but I'll just ask the Court one thing: When you look at the transcript, Your Honor, I'd just ask you when you have a chance to read through it real quickly -- it's only four or five pages -- look at the point of Mr. Miller's questions. They were really to reiterate what he had done in direct examination in his case in chief to talk about the attitude of Mr. Honken that day. He had many opportunities to clarify that, but I just wanted to point that out as the thrust of where he wanted to go. And he got everything out he wanted to get out, and that's my only thought in asking you to read those last three or four pages.

The other thing is --

THE COURT: Well, I think I could take judicial notice of the fact of the date of the grand jury testimony, but I'm not going to do it. We'll just --

MR. WILLIAMS: Can you give us five minutes, Your Honor?

THE COURT: Sure. Take more time than that because the jury's on call. It's not the worst thing in the world to send the jury home without giving instructions.

MR. WILLIAMS: No. I know. But this is an awkward situation, and we apologize for putting you in this position and the jury as well.

THE COURT: That's okay. That's what I -- that's my job to make these decisions; okay?

3183

MR. WILLIAMS: All right. Thank you.

THE COURT: Thanks.

(Recess at 10:29 a.m.)

THE COURT: Mr. Williams?

MR. WILLIAMS: Your Honor, given the circumstances, we've consulted about it, and we've decided not to call any rebuttal witnesses or put on any rebuttal evidence.

THE COURT: Okay. But I want to make sure -- I think you understand my position. It's not a problem to do what I outlined.

MR. WILLIAMS: I do. I fully understand your position, and we appreciate it, and we just made a tactical decision here that it's not, frankly, worth the effort of going through this to do it.

THE COURT: Okay. Let's just review where we are now. The defense has not yet rested. My understanding is you have no more witnesses to call but that you're going to put in some documentary evidence.

MR. PARRISH: That's correct, Your Honor. And I believe we have also agreed with the government that for the rule of completion with regard to Defendant's Exhibit V and Defendant's Exhibit U they can put in additional telephone records, but we'd just like them to go in as separate exhibits, and we have no objection to their exhibits, and I believe likewise they have no objections to our Exhibit V as in Victor

♀

3184

and U as in uptown.

THE COURT: So you're putting in Government's Exhibit's U -- I'm sorry, Defendant's Exhibits U and V.

MR. PARRISH: That's correct.

THE COURT: And the government's putting in?

MR. WILLIAMS: Exhibit 39.

THE COURT: Exhibit 39. And then at that point you're going to rest.

MR. PARRISH: I have two more.

THE COURT: Okay. I'm sorry. Yeah, you have the weather.

MR. PARRISH: We'd also refer the Court to Defendant's Exhibit T as in toy and S as in Sam. Both -- number one is the weather chart November 4, 5, 6, 7 and -- from the discovery file but also accurate that we found -- both sides find acceptable. Defendant's Exhibit S would be the weather chart July 24, 25, 26, 27 also from the discovery file but the weather chart which we find accurate. And I believe the government's waived foundation. Those will be our last two exhibits.

THE COURT: And you don't have any objection to those exhibits.

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: Okay. Now, Mr. Rogers, my normal practice in this situation is to have you reserve your Rule 29 motion -- I guess I'm asking you to reserve it -- maybe reserve is the

3185

wrong word -- and take it up after we send the jury out, but it would be deemed made at the appropriate time which would be at the close of all the evidence. Or we could just actually go ahead and do it now if you're ready to roll, whatever you prefer.

MR. ROGERS: I can do it now, Your Honor, since we're here. Basically the defendant would reassert the grounds asserted in our Rule 29 motion filed in writing at the close of the government's evidence and also the grounds asserted during the oral argument on that motion as grounds for urging the Court to enter judgments of acquittal on all counts and especially on Counts 8 through 17 at the close of all the evidence.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2778 of 3636

THE COURT: Okay. Mr. Williams?

MR. WILLIAMS: We would repeat all the same arguments we previously made on those issues, Your Honor.

THE COURT: Okay. Same ruling. The motion's denied. But this motion, just to protect your record, I'm the one that asked you to make the motion early. The motion would be deemed having been made at the close of all the evidence in the case or at the close of when the defense rests or both, whatever the rule requires. How's that?

MR. ROGERS: Thank you, Your Honor.

THE COURT: Okay. Now, once we bring the jury in, I think it will just take a couple of minutes to introduce the exhibits. And are we ready then at that point to go into the

reading of the instructions?

MR. WILLIAMS: Yes, Your Honor.

MR. PARRISH: Yes, Your Honor.

THE COURT: Okay. Now, that will put us -- well, maybe I can get them done by about 12:30, and then they can have lunch. Why don't we take a short -- is Mr. Honken going to need a bathroom break now, because we're going to be about an hour and a half or so with the instructions?

MR. PARRISH: That'd be fine.

THE COURT: He does?

MR. PARRISH: Yes, that'd be fine if we can take a break now and not take another one.

THE COURT: I thought maybe now we'll take a 20-minute break and come back at 11, finish the admission of the documentary exhibits, and then go into the instructions.

MR. PARRISH: I think that would be fine.

THE COURT: Any objection doing it that way?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Thank you. We'll be in recess.

(Recess at 10:39 a.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. PARRISH: We are, Your Honor.

THE COURT: Okay.

(The jury entered the courtroom.)

♀

3187

THE COURT: Good morning. Please be seated. Members of the jury, I wanted to apologize for the delay this morning. But we were not goofing off, I can assure you. I just asked Shelly what time we -- we all worked last night, and she said 7:33 was when we closed our record last night, and I know the lawyers were working well into the evening, and I didn't leave here till about 8:30, and we were all here early this morning.

And things, you know -- the interesting thing about trials is nobody can predict exactly what's going to happen, so things arise, and we've been blessed in this case by the fact that the lawyers have worked incredibly hard, just unbelievably hard, and so we've had a minimum number of times that we've had to have you sitting in the jury room. My goal in every trial is to have zero, but that's an aspiration, and we don't always reach that aspiration, and we haven't in this case. But we appreciate how conscientious you've been, and I again apologize for the delay.

Mr. Parrish, do you have additional evidence?

MR. PARRISH: Your Honor, we have no additional evidence except for the documents we introduced off the record.

Would you -- I mean they were actually on the record. Do you want me to redo those at this moment, or is it sufficient that they are in?

THE COURT: Well, why don't we let -- why don't you just describe what each exhibit is.

♀

MR. PARRISH: I'll do that, Your Honor. Your Honor, I believe what has already been admitted outside of the presence of the jury is Defendant's Exhibit S. Defendant's Exhibit S is a weather chart of July 24, 25, 26, 27. State has no objections to that I believe. And then Defendant's Exhibit T is the weather chart of November 4, 1993; November 5, '93; November 6, '93; November 7, '93.

Defendant's Exhibit U is the telephone record from Edward DeGeus's residence covering the specific dates in question, July -- June 30 through July 26. And Defendant's Exhibit V is Angie Johnson's telephone records from 7-13 through 8-6 of 1993.

Those are the exhibits, Your Honor. I believe they have been submitted to the Court outside of the presence of the jury without objection. We did indicate with regard to the telephone records we had no objections to the government's exhibit on telephone records in the rule of completeness. And we have no objections to those.

THE COURT: Okay. So Government's Exhibits S, T -- I'm sorry, Defendant's Exhibits S, T, U, and V are admitted.

* * * *

(Defendant Exhibits S, T, U, and V were admitted.)

* * * *

THE COURT: And, Mr. Williams, you have two exhibits

to move their admission?

MR. WILLIAMS: Actually just one exhibit, Your Honor, and that's 39 which is the telephone records under the rule of completeness covering additional dates.

* * * *

(Government Exhibit 39 was offered.)

* * * *

THE COURT: I wrote down 39, but I thought it was 3 and 9, so you have one exhibit, Government's Exhibit 39, which are also telephone records.

Mr. Parrish, does the defense have any additional evidence?

MR. PARRISH: No, Your Honor. Mr. Honken rests his defense.

THE COURT: Thank you.

Mr. Williams, does the government have any rebuttal evidence?

MR. WILLIAMS: No, Your Honor. The United States rests.

THE COURT: Okay. Members of the jury, we're now going to go to the instructions, so I'm going to ask you to take your set of preliminary instructions and pass it down this way towards our CSO Rick, and then Carey's going to pass out a new set of instructions which actually includes the original preliminary instructions numbers 1 through 21, and then I have 18 final instructions, but I'll wait to talk to you about that

till you have your set.

Okay. Does everybody have their set? It's awfully thick, isn't it? Okay. You'll notice we have a table of contents, and the first 21 instructions are the preliminary instructions that you received at the beginning. And now you'll notice the final instructions, and I renumber them final instruction 1, 2, 3, et cetera. They start on page 45. We have 18 final instructions and then a verdict form which is 8 pages long. The verdict form is actually how you record your verdict in the case. And we put it in a chart form. I can't remember how long it was when it wasn't in chart form, but I think it was like 35 pages long. It's now 8 pages by use of this chart.

I'm going to go through the first 16 instructions today. Then we're going to send you home. And then we're going to come back on Monday morning, and we'll have the closing arguments of the lawyers. The government will go first. Then the defense has an opportunity to give a closing argument. And then if the defense does give a closing argument, then the government has an opportunity to give a rebuttal closing argument.

Once the closing arguments are done, I'll go over jury instructions numbers 17 and 18 with you, and then I'll go over the verdict form.

So if you would please turn to page 45 and follow along with me.

3191

(The Court read final instructions numbers 1 through 16 in open court.)

THE COURT: Ladies and gentlemen of the jury, that concludes the preliminary (sic) instructions. The final two instructions, number 17, number 18, and the verdict form will be

what I will go over with you on Monday after we've heard all of the closing arguments by the lawyers. We're going to ask you now to come back on Monday at 8:30.

Just a heads-up, I'm sure some of you are curious about when you will find out if you are one of the alternates or not, and I just want to let you know how that works. At the conclusion of all of the closing arguments and the conclusion of my final two instructions and then going over the verdict form, I will be sending the jury down to deliberate. And as I indicated to you the other day, the time that you want to set for your deliberations is up to you. I don't dictate that it's 8:30 to 4:30 Monday through Thursday. You have to decide for yourselves when you want to deliberate. And as I indicated, you can deliberate in the evenings if you want to, and we'll have meals brought in.

And so right when I send you down to the jury room to begin your deliberations, that's when I'm going to tell you who the alternates are. But the alternates will not be sent home. In other words, I'm going to keep the alternates here in another jury deliberation room, so you won't be deliberating with the

3192

jury.

And the reason for that is if a juror were to become ill or have a family emergency or other reason and have to be excused, then I want one of the alternates to then replace one or more jurors.

What happens in that situation -- I've never actually had it happen. But what happens in that situation is then I have to instruct you to begin your deliberations all over again so that the new juror, the alternate who now becomes a juror, is

allowed to participate in the entire deliberations.

So I think the arguments will take most of the day on Monday, so I'm not even sure you'll have any time to deliberate. And if you do, it will be towards the end of the day because the arguments are going to be extensive.

And here's why I'm telling you that. While there may be some kind of idle time on Monday while the alternates are in the jury room, the big length will be the next day or how ever many days you deliberate. You'll know at that point you're alternates, so you'll be able to read anything you want to read while you're sitting in the other jury deliberation room waiting to see what happens.

So we will see you all -- what time did we agree to start? Do you want to start at 8:30?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: Yes, Your Honor, that would be good.

THE COURT: Then we'll see you all at 8:30 on Monday morning to hear the closing arguments of the lawyers. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated. Are there any matters we need to take up, Mr. Williams?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

MR. PARRISH: We were just discussing last night after a nice meal that -- what's your thought, Judge, on time to notify -- we'll need to let -- I'm sure all the families will want to know -- how much time they would have to get back once

the jury reaches a verdict? And I realize we have no idea when.

THE COURT: You know, I haven't given that any thought at all.

MR. PARRISH: Okay.

THE COURT: So I'd be happy to hear from the lawyers.

MR. PARRISH: We're not going to be that far away obviously. We're going to be over at the local hotel, or somebody will be down at the courtroom, so that's not a problem for us. And I don't know if Mr. Williams -- that's an issue for him, but I know the families probably wanted to be here.

MR. WILLIAMS: We recognize it's a practical difficulty because the family members live about three and a

half-hour drive away. It's not, I think, fair to have them staying here all the time. At the same time it's not fair to the jury to have them waiting for three and a half or four hours for the family members to appear. And so we've discussed that with them, and they recognize the difficulty.

To the extent we can give them notice, we will. But we also recognize the Court need not keep the jury waiting for three and a half or four hours for the family members to show up. So I don't know if that's helpful, but that's where we're coming from.

THE COURT: Well, what about this? Let's -- if the jury were to come back, say, at the end of the day, you know, close to the end of the day, I'm open to the possibility of then waiting till the next day to have the verdict announced in open court -- I just have to make sure there aren't any problems with that; I've never been through that; I've never done that -- to allow the families to come if they want to be in open court to

hear the verdict. I realize it's an inconvenience to the jury, but that's an inconvenience that I'm willing to have the jury endure in this case for obvious reasons.

So -- and maybe even if they came back, you know, in the morning or mid-day -- if they came back early in the morning, I think what I'd do is wait three or -- you know, just say they're back and wait four hours before we have the verdict read. So I guess what I'm saying is unless there's any

objection I'm willing to accommodate what I assume is the desire of the family members on both sides to be present for the verdict.

MR. WILLIAMS: We appreciate that, Your Honor.

THE COURT: Does the defense have any objection to that?

MR. PARRISH: Yes, Your Honor. I just spoke to Mr. Honken and his mom who's here. It's a three and a half-hour drive for her. If she stays with her daughter, it will be about 20 or 30 minutes. But, you know, as you just said, we have no idea what and how long the jury's going to take. So we would be accommodating either way the Court wants to go on it and would not have any objections. I think it's important for all families from both sides, but how ever the Court wants to do it will be fine.

THE COURT: I know there's law on like taking a sealed verdict and all, but I'm not even talking about taking the verdict.

MR. WILLIAMS: Right.

THE COURT: I'm talking about once the jury reaches a verdict defer the process of taking the verdict until everybody

has had an opportunity to travel here. And I understand that the parties don't have any objection to that.

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: Okay. Now, the next question becomes

♀

should I give the jury a heads-up ahead of time that that's what I intend to do?

MR. PARRISH: That's a good question.

MR. WILLIAMS: I think it's only fair to them to let them know that that's the case and why, just let them know --

THE COURT: Right. I don't think there's any problem with telling the jury what the procedure will be and why I've decided on that procedure.

MR. PARRISH: Right. And clearly they are understanding -- I know obviously if it's overnight they can't go home and discuss it. They would be under the same instructions that you've been giving them all along.

THE COURT: Right, and I would tell them that, that they can't -- they actually can't discuss it -- they can't discuss it with anybody, right, even after the verdict's taken in open court because depending upon what the verdict is I guess. If the verdict doesn't require a penalty phase, then they'll be discharged, and they can discuss it with anybody else. If the verdict requires a penalty phase, then they'll still be under the admonition that they can't discuss this case with anybody else until the whole case is resolved by the jury.

MR. PARRISH: Yeah. I'm not familiar -- this is an area I've never been in when it's been moved this far away and the families have to travel and they have this long of a case, so it's out of my degree of familiarity.

THE COURT: Even in all that experience you've had.

MR. PARRISH: You mean that one theft case that I keep talking about?

THE COURT: Anything else you can think of?

MR. WILLIAMS: Just one other practical consideration. In the event the jury came back and there would be a penalty phase, you've indicated there would be a one-day break in between.

THE COURT: I'd be hope -- that's what I thought originally. It's always good to revisit things, you know.

MR. WILLIAMS: Sure. And maybe we'll just wait to see how things come out, but I'm thinking what if the jury comes back late on a Wednesday, we give them one day off? Would we hold court on Friday, or do we wait till the following Monday to hold court?

THE COURT: Yeah, I think we'll just kind of play it by ear.

MR. WILLIAMS: Very good.

THE COURT: I do have a meeting on the 19th. It's the judicial council meeting of the Eighth Circuit that I'm on. I don't have to go. I'm sure Chief Judge Loken will understand why I'm not there. I would like to go because that's the time our judicial council is taking up some new proposed guidelines for compensating CJA lawyers, and that's something I have an interest in because I was a CJA panel lawyer in the Southern

District from June of 1975 until December 2, 1991, when I became

a magistrate judge. I serve on the Defender Services Committee of the Judicial Conference. And in my view the guidelines are very controversial. I have strong feelings about them, and I would like to weigh in with the other members of the judicial council.

On the other hand, I don't have to be there. So I think it may be -- but I'm just trying to give you a heads-up. I believe that's the 19th, and that may -- if there is a penalty phase, it may fall smack dab in the middle of that penalty phase. Anybody have any thoughts about it? If it creates too much of a scheduling problem, then obviously I'm not going to go because the trial's the number-one priority. So maybe we can kind of wait and see really. I don't have to decide it now. You don't have to let me know. We can wait and see where we are. I'll make my plane reservations. I'm just going to go up that day and come back. It's in St. Paul, and I can always not go. Is that okay?

MR. SPIES: Yeah, that's fine.

MR. WILLIAMS: Certainly.

THE COURT: Okay. Anything else?

MR. SPIES: No, other than we were going to go through the exhibits just to make sure everything's in order ready to go.

THE COURT: Okay. Good. Thank you. We'll be in

3199

recess.

(The foregoing trial was adjourned at 12:32 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR 1-19-05 Date

INDEX

| EXHIBITS: | PAGE: |
|---|---|
| S, T, U, and V | 3188 |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, No. CR01-3047

Plaintiff, Sioux City, Iowa
October 11, 2004
vs. 8:12 a.m.

DUSTIN LEE HONKEN,

Defendant. VOLUME 16
/

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

APPEARANCES:

For the Plaintiff: C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant: ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn
Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Can we go on the record and see if there are any matters we need to take up before closing arguments start? And then I want to go over kind of the schedule and make sure I'm tracking what we talked about on Thursday. Anything we need to take up from the government?

MR. MILLER: No, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: Yes, Your Honor. We want to make an objection to some demonstrative evidence.

THE COURT: Okay.

MR. PARRISH: I don't have the energy to argue this morning, but I do want to point out what is in front of the Court as demonstrative evidence and go on the record as to why we object to these photographs and how they are presently displayed for the jury during argument.

First of all, we believe it's not proper demonstrative evidence. It was not previously disclosed to defense counsel. As I understand it in conversation with the counsel for the government, photographs of the witnesses were taken after their testimony, and this was not disclosed to us. It was taken either during the course of the trial and not disclosed or taken immediately after the testimony, but which aspect of the testimony we don't know.

It does not represent the facial expressions or the witnesses themselves. It was taken during the course of the trial. And also it does not include the testimony of any defense witnesses who testified during the course of the trial. We believe it's a comment on the substantive evidence. We believe that the facial expression as shown by these witnesses don't represent the substance of their testimony. And, consequently, we feel as the display is put out it should not be presented in front of the jury in this manner because it's almost a comment on the evidence and does basically include substantive evidence or demonstrative evidence that was not previously disclosed in accordance with the Court's previous order or the meetings that we had here on Thursday to review all of the evidence.

THE COURT: Mr. Miller?

MR. MILLER: Your Honor, obviously we're not planning on sending any of these exhibits to the jury room. They are for an aid to the jury in recalling the testimony. There have been over 50 witnesses testified for the plaintiff in this case. During argument, it will be necessary for me to ask the jury to recall the testimony of particular witnesses.

For example, Anthony Altimus, it would certainly be appropriate and customary for me to ask the jury to recall the testimony of Anthony Altimus. You may recall him as the slender gentleman with the long pulled-back hair. A visual description

of his appearance would be certainly as admissible as what we have here, and this is simply an aid in view of the large number of witnesses, an aid for the jury in recalling which witnesses

we're referring to when we do discuss the substance of their testimony. The photographs of their faces is not substantive testimony.

THE COURT: I'm going to allow it, but here's what I'm going to do. I'm going to ask Sue to come in and take a digital photograph so that you'll have a record on appeal so that the Court of Appeals will be able to see unless there's an objection to doing so. I thought -- because it's hard -- it would be hard for an appellate judge to kind of visualize it, and you did an excellent job describing it, but, you know, this is a case where a picture's worth a thousand words.

And so if there's no objection from the defense, I'd ask -- we'll have Sue come in, take a digital picture of it. We'll just mark it as Court Exhibit A and make it part of the record. It's obviously not going back to the jury but just for purposes of your record on appeal if you don't have any objection to that.

MR. PARRISH: That'd be a great idea, Your Honor. If the Court is going to allow it, we'd ask for a limiting instruction that it not be displayed in the manner as laid out, that they, as they refer to the witness, be required to then pull that photograph out. I believe the manner in which it is

3205

displayed and the manner in which the government is talking about using it again would almost be as substantive evidence. They're in alphabetical order. If you look at some of the people there, some of the people are not dressed in some of the items they were during the trial. It doesn't show them in a light of how they were represented at trial. We ask for a limiting manner in how they demonstrate it by showing it one

photograph as they refer to the witness.

THE COURT: Well, what do you want the limiting instruction to say?

MR. PARRISH: Well, no, just have --

THE COURT: Oh, you don't want a limiting instruction to the jury?

MR. PARRISH: No, Your Honor.

THE COURT: I'm sorry.

MR. PARRISH: That it just be -- that it not be shown in this manner but shown in a manner -- if he says it's only used to demonstrate to the jury who that person is when he refers to that person during his argument, then he show that photograph but not some huge panel in an effort to show the overwhelming nature of their so-called testimony. I believe it creates prejudice to the defendant in the manner that it's being presented in this fashion.

THE COURT: Mr. Miller?

MR. MILLER: Your Honor, we could do it in any

fashion, and we worked this morning to try to figure out what would be most efficient. There is no place where we can show these without the jury being -- having their view obstructed, at least some of them of some of the witnesses unless we have them there. I could pull them off one at a time having kept them in the corner. That would be possible to do. It would necessitate lengthening my argument some considerable amount.

MR. PARRISH: It does block off my client from view. It blocks Mr. Rogers from view of the jury. I mean, what are we supposed to do, I mean, Mr. Miller? But it does block us off from being able to observe the jury during argument and be able

to properly respond.

THE COURT: Mr. Honken can't see the full jury panel from there.

MR. PARRISH: The panel from there, they won't see him. Mr. Rogers is blocked from their -- what? Three, four?

MR. ROGERS: At least three, maybe four.

THE COURT: Okay.

MR. MILLER: We could slide them over a ways.

THE COURT: And maybe we could use the easel or something and slide them over. I mean, I agree with the defense. It's not proper to block their view of the jury. So that entails moving them.

MR. MILLER: We could have one panel on an easel past the end of the witness table and then move the other two down.

3207

THE COURT: I tend to agree with the defense. I mean, I think it's fine to use the photograph of a particular witness to refresh the recollection of the jury because I think a lot of people are visual learners. There have been a lot of witnesses testifying. And it would assist the jury or could assist the jury in recalling the testimony of a witness to see the witness. I don't see the prejudice, but I think to have all three boards up there the entire time of closing argument overemphasizes the number of witnesses that the government's called in the case.

And I'm trying to think of an appropriate way that you can still use your demonstrative exhibit because I'm going to allow you to use it but not have all 50 or so up there during the entire closing argument, so I'm open to suggestions.

MR. MILLER: I can stack them over in front of Carey's desk. It will block Carey's view.

THE COURT: I take it they were in alphabetical order to assist you in using them.

MR. MILLER: Correct.

THE COURT: Right.

MR. MILLER: Or over by where we ordinarily do the sidebar possibly. We would have the backs of the boards to the jury that way.

THE COURT: What if you did this? What if you had part of the government's -- if you had somebody on the government's team, Mr. Williams, Sali, Agent Basler, had them in

3208

alphabetical order and just handed it to you when you needed one and then you could put it up -- if you don't want to hold it, you could put it up on one of the boards, but there would just be one up at a time so that you wouldn't have the effect of having all 50-some up there at any given time, because that way it accomplishes, it seems to me -- you know, caught me by surprise this morning, but it accomplishes your goal of being able to use a photograph to help refresh the jury's recollection which I think is perfectly appropriate, but it alleviates the potential prejudice, if there is any, of having the collective weight of all of them up there during your entire closing argument. I know it's not ideal for you.

MR. MILLER: I just -- I'd only suggest that if I had them stacked in a row facing to the south over near where we have our bench conference, that I could walk around and pick one off and show it, and the jury would never at any given time be looking at 50 photographs.

THE COURT: That's fine. That's the same way of doing what I suggested, just -- if that suits your style better,

that's fine.

MR. MILLER: Yeah, that'd be okay.

THE COURT: Okay.

MR. PARRISH: Your Honor, we would -- without waiving our previous objection, we have no problem with that.

THE COURT: Oh, okay.

♀

MR. PARRISH: Right. But I just -- if they had told me on Thursday when I was here working on all this and we talked about exhibits and everything, and I walked in this morning and was just caught so off guard by this. We haven't even had a chance to think through it. If they had related this to me on Thursday --

THE COURT: And I'm kind of surprised they didn't, but that's okay. There was no requirement you do so.

MR. MILLER: We didn't have them assembled as of Thursday. I didn't exactly -- frankly, as many months as we've had to prepare for this case, preparation continues right up until the last minute.

MR. PARRISH: I'd like to use that in my argument.

THE COURT: You're going to order the realtime transcript, aren't you?

MR. PARRISH: I would. I'd like that, Shelly.

THE COURT: Okay. So why don't you go ahead and rearrange pursuant to my ruling.

Mr. Parrish, would you agree that we don't need the digital of it? Or we can do that -- we can do it if you want.

MR. PARRISH: Your Honor, I believe under the record that's made it really solves our problem because it's the visual impact that was our main concern, and that was a great idea the

Court had, but I'm not sure at this point it would be necessary.

THE COURT: Okay.

MR. PARRISH: Right.

THE COURT: Well, if you change your mind by the end of the day, we'll just have it done and make it part of the record when we're all done with arguments.

MR. PARRISH: No, I think since the jury didn't see it we're satisfied. Thank you.

THE COURT: Okay. Anything else we need to take up?

MR. PARRISH: Not on behalf of the defense, Your Honor.

THE COURT: Can we go through the schedule? I just want to make sure I get this right. We're going to start at 8:30. The government intends to go for approximately two hours, but I've waived our local rule, one-hour requirement, and I'm not putting any time limits on the lawyers, so you estimate two hours, but there's not going to be a shock collar or anything, you know, at two hours. You'll be able to go as long as you want.

So let's say you go till 10:30. We can't go much more than about 2 hours and 15 minutes without giving Shelly a break. So let's assume you go 2 hours, 2 hours and 15, 2 hours and 20 minutes. Then I think we're going to take a 25-minute recess, then come back with Mr. Parrish's argument. And you think you'll go a couple of hours.

MR. PARRISH: I do, Your Honor. It may be a little bit longer. If it is, what I might do is I'll keep watching my

time. If we get into that, I might want to take a break before I do the final closeout. I'll let the Court know.

THE COURT: That'd be fine. And also because I don't like the jury to sit for two hours but I don't want to interrupt the flow of argument, I'd ask each of the lawyers to give at least one, perhaps two stretch breaks. So just when you're winding up on a point, just -- you can just look to me and say, Would this be an appropriate time to take a stretch break? I'll say sure. It will just be a 20- or 30-second matter, and then we can proceed with your argument. But I want you to pick your time to do it so I'm not interrupting the flow.

MR. PARRISH: That's fine, Your Honor.

THE COURT: Anything else we need to take up?

MR. MILLER: No, Your Honor.

MR. PARRISH: No, Your Honor.

THE COURT: Okay. Thank you.

(Recess at 8:27 a.m.)

THE COURT: Ready to have the jury brought in, Mr. Miller?

MR. MILLER: Yes, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: Yes, Your Honor.

THE COURT: Thank you.

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated.

♀

3212

Mr. Miller, you may give your closing argument on behalf of the United States.

MR. MILLER: Thank you, Your Honor. May it please the

Court, counsel.

MR. PARRISH: Mr. Miller.

MR. MILLER: Members of the jury, folks, what I'm going to try to do this morning with you is in three parts. First I'm going to give you an overview of the government's case, the circumstantial evidence case that we presented for you here this past five weeks, just in overview chronologically and by nature of evidence, the highlights, the basic elements of the case as it adds up against this defendant. That should be fairly brief I hope.

The second stage of my argument will be in more detail going through the evidence basically chronologically discussing with you the evidence from which we expect that you will find this defendant is indeed the person who, with his girlfriend Angela Johnson, killed these five people.

And then thirdly and finally, the last thing I'm going to do is discuss with you the Court's instructions as they set out the elements of the 17 offenses charged in the grand jury's indictment and the evidence as it proves beyond a reasonable doubt each one of the elements of those 17 charges.

So that's an overview of the structure of the comments that I'm going to be making to you folks over the next

3213

approximately two hours.

You folks have been most patient. You've been here continuously for the past five weeks and have given us of your time for the past two months. I will attempt not to tax that patience much longer, but we do need a couple hours to go through the great deal of evidence that you folks have heard over the past five weeks.

On July 25, 1993, Greg Nicholson suddenly disappeared without a trace, never to be seen again until fall of the year 2000 when his bullet-riddled skeleton was recovered from a shallow, hidden grave in the country near Mason City, Iowa.

On November 5, 1993, Terry DeGeus suddenly disappeared without a trace, never to be seen again until fall of the year 2000 when his bullet-riddled skeleton was recovered from yet another shallow, hidden grave in the country near Mason City, Iowa.

Members of the jury, except for the remarkable way in which these two men suddenly disappeared, the unique manner in which they died, and the extraordinary way in which their murders were concealed, the only thing that these two men had in common was a relationship that each of them had with an Arizona drug dealer by the name of Dustin Honken.

The only thing, members of the jury, that these two men had in common was a relationship with a man who had a motive to kill both of these men, a man with a talent for scheming and

planning not only the killing but the concealment of the killings and the destruction of evidence of these crimes.

This case is a circumstantial evidence case, ladies and gentlemen. By that I mean it presents to you a chain of circumstances, a chain of events from which you are asked to draw reasonable, logical conclusions. I want to go through that chain of circumstances with you now one at a time in summary.

On March 21, the defendant, Dustin Honken, was arrested. He didn't know it at the time, but his arrest was based upon the cooperation of one of those two distributors, in fact, Greg Nicholson, who had previously been arrested and in

exchange for charging concessions had agreed to cooperate with the government's investigation.

On March 21, 1993, Dustin Honken was arrested for drug dealing. Five days later he was released from custody on pretrial release.

Throughout the weeks that followed, represented by counsel, Mr. Honken learned about the case against him and learned, most importantly, that the key witness against him was, in fact, none other than Greg Nicholson.

During those weeks following his arrest and into the summer of 1993, Mr. Honken's attorney did his job culminating in early July in an agreement, a plea bargain, to resolve the charges against Mr. Honken in federal court.

That isn't the only thing, however, that was going on

because also during those weeks into the summer of 1993 Dustin Honken and his girlfriend Angela Johnson were literally hunting for Greg Nicholson.

On July 7, 1993, Dustin Honken's girlfriend who was also a business associate of his in his methamphetamine operation and who was also, during this period of time, becoming pregnant with his child acquired a Tec-9 semi-automatic handgun.

On July 25, 1993, Greg Nicholson was last seen in life.

On July 30, 1993, the date that Mr. Honken was scheduled to enter his guilty plea in federal court, he suddenly withdrew that agreement and on or about the same date provided to his attorney, Mr. Thinnes, a videotape, a videotape of Greg Nicholson apologizing to Mr. Honken, recanting his testimony, and falsely claiming that Dustin Honken was not involved in this

illegal drug activity.

It wasn't until the following week on August 2, 1993, that the United States government learned that Greg Nicholson was missing.

The investigation resumed, and on the 27th of October, 1993, the federal grand jury met to investigate this case further, questioned a number of witnesses including Dustin Honken's girlfriend Angela Johnson, questioned her specifically about the relationship that existed between her boyfriend, Dustin Honken, and a northern Iowa drug dealer by the name of

Terry DeGeus, questioned her specifically about that business relationship.

Just nine days later, ladies and gentlemen, Terry DeGeus disappeared, last seen in life on his way to a meeting with Angela Johnson, the girlfriend of Dustin Honken, the expectant mother of Dustin Honken's child, girlfriend and business associate of the defendant in this case.

That following winter, ladies and gentlemen, Dustin Honken destroyed a piece of evidence that went to his friend Tim Cutkomp whose father owned equipment suitable for cutting and welding pieces of metal and with Mr. Cutkomp's assistance cut and melted down to virtual nothingness a Tec-9 semi-automatic handgun.

Two years after his arrest, on March 21, 1995, charges were dismissed against Dustin Honken because the key witness against him, Greg Nicholson, remained missing.

In July of the year 2000, Dustin Honken's girlfriend, the mother of his daughter and the associate in his continuing drug enterprise, Angela Johnson, was indicted and arrested for

the murders of Greg Nicholson, Terry DeGeus, Lori Duncan, Kandi Duncan, and Amber Duncan and within weeks after that arrest, while sitting in the Benton County Jail, was duped by a fellow inmate into drawing two maps, maps that located two graves in the country near Mason City, Iowa, two hidden, shallow graves, one of which held the body of Terry DeGeus, the other, a

♀

3217

shallow, hidden grave holding the bodies of Greg Nicholson, Lori Duncan, Kandi Duncan, and Amber Duncan.

Ladies and gentlemen, that is an outline of the government's case, the circumstantial evidence, the series of occurrences, the chain of circumstances from which there is one logical, one reasonable conclusion: That Dustin Honken and Angela Johnson together murdered these five people.

Before I discuss the evidence in more detail, I want to discuss certain classifications of evidence. We're going to primarily discuss the evidence in chronological detail, but there are various kinds of evidence, although it is virtually all circumstantial. It helps to understand that evidence by putting it into categories.

There is motive evidence in this case, evidence showing the very strong reason that Dustin Hoffman -- excuse me, Dustin Honken had to wish Greg Nicholson and Terry DeGeus to be gone permanently: His desire to stay out of prison, a desire jeopardized by the continued existence of either one of these individuals, his two Iowa drug distributors.

In addition to motive evidence, strong motive evidence, there's evidence of opportunity. He was on pretrial release during this period of time and not only had the opportunity to commit these crimes but took advantage of that

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2806 of 3636

opportunity by stalking, seeking out, hunting for, with Angela Johnson, the two of them together, hunting for Greg Nicholson;

evidence of opportunity seized when, through his girlfriend Angela Johnson, he lured Terry DeGeus to a meeting in the country, lured him to his death.

Evidence of the means by which these murders were committed, the firearm acquired while Mr. Honken was on pretrial release acquired by his girlfriend Angela Johnson, the firearm, ladies and gentlemen, nine-millimeter handgun, that is consistent with all five of the bullets that were recovered from the two graves in the year 2000.

Evidence of motive, evidence of opportunity, evidence of means, evidence of guilty cons -- conduct. And by that I mean, ladies and gentlemen, behavior that displays consciousness of guilt, destroying evidence, concealing evidence, fabricating evidence, destruction of evidence, ladies and gentlemen, being an act motivated by a consciousness of guilt, the destruction of evidence benefiting the guilty.

And finally guilty knowledge, the sudden withdrawal of an agreement to plead guilty virtually simultaneously with the sudden disappearance of the key witness against him, a disappearance that was not even known to the government until the following week, knowledge not merely that that man was missing; more importantly, knowledge that he was never coming back; and guilty knowledge, ladies and gentlemen, as displayed by his partner in crime Angela Johnson when in the fall of the year 2000 she made the mistake of trusting a fellow inmate and

drawing two maps that led authorities finally seven years later to the graves of these seven people.

Ladies and gentlemen, that is the nature of the circumstantial evidence in this case, motive, opportunity, means, guilty conduct, and guilty knowledge. And from that we submit to you that the government's case is proven and proven beyond any reasonable doubt.

In addition, however, there is, in fact, an additional area of evidence, and that's incriminating comments made by Dustin Honken over the course of years to a number of people. And I'm going to mention to you now -- and I will repeat it a couple times throughout my discussion with you this morning -- that when I put quotes around something, whether it purports to be a portion of a recorded statement or the testimony of a witness, you're to understand that it's the recording itself or the testimony that came in that is the evidence, not some lawyer's recollection of that tape or that recording.

But there were a multitude of statements that you heard from a multitude of witness -- witnesses made by Dustin Honken to others that either implicitly or explicitly took credit for these killings.

That's an overview of the government's case, ladies and gentlemen, just to put it in context. The evidence that I'm going to now discuss for you in a bit more detail, I want to give you a little bit of another heads-up. It's week 6 I think

of your attendance as jurors and perhaps week 9 if we include the time that was spent selecting you folks. And I think we all understand that the brain absorbs no more than the seat can endure. I'm going to try to take two breaks during the course

of my presentation simply for a 30-second stretch or so and also for the fact that a court reporter can be asked to work hard only so long continuously.

Feel free to let me know by raising your hand if you feel you need a break sooner, but I believe I've picked two spots that are about one-third and two-thirds of the way through this presentation, so we'll do that.

This series of occurrences began in approximately 1992 when Dustin Honken went to Tucson, Arizona, where his brother lived and began attempting experiments to seek to apply his chemistry education to the production of the controlled substance called methamphetamine.

There were a number of people involved in this operation. Dustin Honken was the chemist. He was the one with the knowledge that is necessary to building a meth lab and not just some country bumpkin meth lab but a meth lab such as DEA Agent Mizell described, a super lab that produces methamphetamine of a high quality, better than 90 percent meth.

Mr. Honken's brother Jeff Honken had the money that was needed to put this operation into motion. He financed this knowingly, paid expenses that are necessary for the purchase of

3221

chemicals, equipment, glassware, and paid for the rent ultimately for a house in the country which was necessary because Mr. Honken, Mr. Jeff Honken, had a wife, and the production of methamphetamine produces odors that are not pleasant. They're not pleasant, and they're also incriminating if reported to authorities.

Jeff Honken provided the finances. Dustin Honken provided the expertise.

Tim Cutkomp was invited by Dustin Honken to join this operation and, at Dustin Honken's invitation, traveled to Tucson where he provided the labor, worked on the production line of making that methamphetamine, ultimately occupying that house in the desert south of Tucson where that meth was produced ultimately by the pound, lived in that desert house and did, according to the testimony of Jeff Honken, what Dustin told him to do which, of course, is only natural because Dustin Honken is the one who had the knowledge of how to do this.

Also involved in this meth enterprise, because making meth is wasted effort unless you can convert that methamphetamine into cold hard cash, and that requires a participant -- the participation of others, in this case Greg Nicholson, one of Mr. Honken's two Iowa meth distributors, sold that meth out of the basement of his house in Mason City, Iowa.

Terry DeGeus, Dustin Honken's other Iowa distributor, not quite the businessman that Greg Nicholson was. Too much of

that meth got used by Mr. DeGeus and by his friend Aaron Ryerson. Too much of it got shared with his girlfriend Angela Johnson who was a subdistributor but who also shared too much of it with her friend Christi Cole.

And finally Angela Johnson herself who in 1992 was merely a subdistributor, Terry DeGeus's girlfriend, and one who was an outlet for selling methamphetamine to others but who at about that time, late '92, early '93, traded DeGeus in for Dustin Honken, in the words of Aaron Ryerson, broke up with DeGeus when she hooked up with a bigger drug dealer; yet another distributor, and her position in this drug distribution network changed from that of a mere distributor to that of more of a

partner with Dustin Honken as time went by.

These are the six members of that drug operation as it first existed in '92 and into '93. It didn't last for very long, however, because law enforcement is always seeking to arrest people who sell illegal drugs including methamphetamine. And in March of 1993, members of the North Iowa Drug Task Force, including Detective Stearns, on March 17 executed a search warrant. They had previously arrested a fellow named Dave Patrick. He provided information that incriminated Greg Nicholson. He said, This is my supplier, Greg Nicholson.

They used that information to support an application for a search warrant which was issued and then executed at Greg Nicholson's residence in Mason City, Iowa, where they found,

among other things, cash and a brown vial containing what the laboratory later determined to be 97 percent pure methamphetamine.

Greg Nicholson had a dilemma at that point: Face the full brunt of the law or trade in some information for more lenient treatment.

If you'll remember the testimony of his ex-wife, she said it wasn't an easy decision for him, his ex-wife Leslie Olson. Dustin -- excuse me, Greg Nicholson worried about the possible consequences of cooperating with authorities. He was in a bind. He was facing severe consequences from the law and yet worried about where he would stand with Dustin Honken if he did cooperate. Ultimately he decided to cooperate.

He wore a wire and on March 21 engaging in a controlled contact, a contact that was observed and recorded with Dustin Honken, he met with Dustin Honken, recorded a

conversation that he had with Dustin Honken, delivered to Dustin Honken $3,000 in cash, proceeds of the sale of fronted methamphetamine.

Their conversation was recorded. You heard it played here in the courtroom several weeks ago. During that conversation, Dustin Honken made a number of incriminating statements about how he brings white stuff with him whenever he comes to Iowa, conversation in which he suggested to Mr. Nicholson that he should have a lot more cash for him next

time they visit, conversation in which you will recall Dustin Honken described his plans for continued growth of his methamphetamine business, getting into the kilogram market.

After that conversation was recorded, after that meeting between Nicholson and Honken -- excuse me, at that point officers moved in and arrested Dustin Honken.

He was searched. You'll recall the testimony of Detective Stearns with the Mason City Police Department, I believe the first witness to testify in this case. $3,000, the serial numbers of which matched the money that was given into Greg Nicholson's possession before he had that meeting with Dustin Honken, $3,000 cash, also on Dustin Honken a note entitled G Man, T Man -- G Man, Greg Nicholson; T Man, Terry DeGeus -- a little note with numbers on it, a ledger of the dollar amounts that were owed him for the methamphetamine that had been fronted; key to a local motel room and, in searching that local motel room, found, if you'll recall the testimony of Detective Stearns, in lipstick on the mirror in that room rented by Dustin Honken a note that concluded Happy Birthday, Love Angie.

That note, ladies and gentlemen, that G Man, T Man note, the drug ledger, the accounts, the money owed to drug Honk -- excuse me, Dustin Honken for the methamphetamine fronted in northern Iowa through his two distributors, G Man, Greg Nicholson, who as you can see paid as he went, and T Man, Terry

DeGeus, who ran up an unpaid debt, a drug ledger that kept track -- Dustin Honken's business records keeping track of the sales of his product in northern Iowa.

After he was arrested, he wasn't the only one arrested. I believe you'll recall Tim Cutkomp; he was on the stand for quite a while and testified to a number of events over a period of years. And he was with Dustin Honken and Russell Miller when they were arrested that day on the 21st of March of 1993 and told you folks before they separated Dustin said to him, Get word to Arizona; call Melissa, Melissa Friesenborg, the young woman who moved to Arizona at the invitation of Dustin Honken, had her own apartment down there. Dustin Honken had a key to that apartment and frequently stayed there and kept some things at her apartment.

At Dustin Honken's request, Tim Cutkomp made that phone call, and Melissa Friesenborg who you may recall testifying here some weeks ago, after receiving the call from Tim Cutkomp immediately after the arrest of Honken, Cutkomp, and that Russell Miller fellow who did as she was requested, look through her apartment and specifically check the freezer where, of course, she found chemicals and, as requested, got rid of the evidence, destruction of evidence in 1993 instigated by the defendant in this case, Dustin Honken.

She found the brown vials. She found some hoses in

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2813 of 3636

her apartment, and she discarded them all.

The other member of this drug operation who was down in Arizona at the time, of course, was Dustin Honken's brother Jeff Honken. He got a call according to his testimony. I'm sure you recall his testimony, the brother of Dustin Honken, one of three men who agreed to share the profits, three fellows who were in a loose partnership down there, Jeff Honken, Dustin Honken, and Tim Cutkomp. Got a call from his brother that he was arrested, got a call shortly thereafter from Melissa Friesenborg who had been asked by Tim Cutkomp who was acting on Dustin Honken's instructions. Jeff Honken got a call from Melissa Friesenborg suggesting that Jeff dispose of the stuff in the storage shed, and he did. And it was, among other things, glassware that smashed and crashed as he threw it into the dumpster, the first instance of many instances throughout the evidence in this case where guilty conduct in the form of destruction of evidence was undertaken time and time again by the defendant Dustin Honken.

Motive: In April of 1993 Dustin Honken was indicted based upon the evidence seized from him at the time of his arrest the previous month on March 21 and based also on the grand jury testimony of Greg Nicholson who had cooperated against Dustin Honken. At the time of his indictment, Dustin Honken could not know who exactly had testified against him. But at the time of his indictment, indeed at the time of his arrest, he had a motive to destroy evidence, to incapacitate

witness or witnesses to prevent himself from having to make a trip to prison.

Exhibit 30 is the indictment itself. It was previous to the indictment coming down that Mr. Honken had the opportunity to commit these crimes.

Five days after his arrest, he was released on pretrial release that stated conditions of release. That's in evidence as well, ladies and gentlemen. I've excerpted a portion of it here on the screen for you that states in part one of the conditions of release, Is to avoid all contact with the following named persons who are considered either alleged victims or potential witnesses: Dave Patrick, the fellow who had bought from Greg Nicholson; Greg Nicholson, Terry DeGeus, Dustin Honken's two Iowa distributors; Russell Miller, the fellow who was with Dustin Honken and Cutkomp at the time of his arrest; and Tim Cutkomp himself. Conditions of release, avoid all contact with those five named individuals.

You heard the testimony of both DEA Agent Dave Mizell and Attorney Dave Thinnes from Cedar Rapids who talked about the government proceedings against Dustin Honken back in the spring of 1993. And they had some disagreement as to what the likely consequences were. In either case, however, both had a range of probable sentencing of somewhere in the neighborhood of ten years facing Dustin Honken.

I believe Mr. Thinnes estimated it as somewhere

3228

between 90 and 120 months and Agent Mizell's 10 years to life. In either event, that 120 months or 10 years, the time period that falls within the range of the estimates of both of those witnesses and assuming Mr. Honken was accepting his attorney's

advice, he was fearing somewhere in the neighborhood of 10 years in prison.

Attorney Thinnes testified that as in all cases where it is an attorney's obligation to represent someone who is accused of a crime, he did his work and shared his conclusions with his client and advised his client that the key witness against him was a man who had worn a wire and recorded a conversation on March 21, a man by the name of Greg Nicholson.

As of that point, whatever that date in the spring of 1993, Dustin Honken knew that the case against him rested largely upon the testimony of one of his two Iowa drug distributors, a man by the name of Greg Nicholson.

And at that point, ladies and gentlemen, that motive, destroy evidence, focused on the key witness against him, a man who could testify that during the weeks and months preceding his arrest Dustin Honken had brought illegal drugs, methamphetamine, from Arizona to Iowa for Greg Nicholson to distribute.

Dustin Honken acquired the means to commit these murders, ladies and gentlemen. Even though the conditions of release set forth in the order, the court's order allowing him out of jail, prescribed in part subparagraph (g) that he was

3229

required to refrain from possessing a firearm, it certainly did not prevent his girlfriend from acquiring one.

In the spring of 1993, as you heard from Christi Gaubatz some weeks ago, Angela Johnson's closest friend, by the spring of 1993, Angela Johnson and Dustin Honken were already inseparable, very close to one another; that Angela Johnson was distraught when she learned that her boyfriend had been arrested.

Angela Johnson, who was receiving drugs and had begun a romantic relationship with Dustin Honken, applied for and obtained a permit to acquire a handgun in late June and early July in evidence as Exhibit 42, in evidence as Exhibit 43, the record of that transaction in which she purchased that Tec-9 semi-automatic from Duey's Pawn Shop in Waterloo, Iowa, not this but a weapon identical to this in make and model on July 7, 1993, barely weeks after her boyfriend's pretrial release and at about the time that her boyfriend learned the name and the identity of the person who was the key witness against him and charges for which he faced a ten-year stretch in federal prison.

And, ladies and gentlemen, Exhibit 10 as a demonstrative exhibit does not go to the jury room with you. It's merely to demonstrate for you and show you what we're talking about when we talk about a Tec-9 semi-automatic handgun, a gun which you can see well for yourselves, ladies and gentlemen, is not a small weapon that a lady for self-protection

is going to want to put into her purse but rather a far more offensive and deadly machine than that suitable for a different purpose all together.

They had the motive, the means, and the opportunity, the opportunity at the time of the pretrial release, an opportunity even before the pretrial release that Dustin Honken took advantage of by asking his friend Tim Cutkomp to contact Melissa Friesenborg. Melissa Friesenborg, this woman who -- this Iowa woman who moved down to Tucson or at least Arizona -- I don't recall offhand if it was Tucson or Phoenix -- she moved down there at Dustin Honken's invitation and suggestion, had an apartment. Dustin had a key to that apartment and spent part of

his time staying there, admitted to once or twice using drugs with Dustin Honken.

How much of Dustin Honken's activities she was aware of is for you to judge. She claimed that she thought that he was going to school and working in computers with his brother. In any event, she enjoyed the benefit of that relationship and described for you that her friend Dustin Honken would come around with cash, would buy stereo equipment and other luxuries with cash, testified that on that last occasion when Dustin Honken came up to Iowa and was arrested, he had actually told her that he was going to Texas. And it wasn't after he departed claiming he was going to Texas that she'd found out that he'd been arrested, that she'd spoke with him on the phone after he

3231

was arrested concerned about what was going to happen, asked him what he was going to do, said that she knew there were witnesses against him, What are you going to do; and he told her, I'm taking care of it; don't worry about it; it's being taken care of.

Opportunity seized, ladies and gentlemen, specifically by hunting for that key witness against him, Greg Nicholson, searching that town of Mason City until he found him, speaking with that fellow Scott Gahn, long-time acquaintance with both Honken and Nicholson, the man who introduced Dustin Honken to Greg Nicholson. Scott Gahn, fellow who now works nights at a nursing home in Mason City, Iowa, likes motorcycles and music, and back in the late '80s, early '90s was doing a fair amount of drugs back in his partying days, a fellow who may not, frankly, have been a rocket scientist to begin with and did a lot of drugs on top of that but who remembers very clearly one thing

that happened in 1993 because it was unusual for Dustin Honken to appear in that mood, when Dustin Honken came to him at a place that Scott Gahn was trying to turn into a nightclub, when Dustin Honken came to him wanting to know where's Greg Nicholson, desperate to find Greg Nicholson.

Opportunity to commit these crimes, ladies and gentlemen, seized by the defendant when he and his girlfriend Angela Johnson together hunted night after night for Greg Nicholson. And I'll ask you again to recall the testimony of

Christi Gaubatz who at that time was Christi Cole and Angela Johnson's closest friend who for her friend frequently babysat Angela Johnson's daughter Alyssa who was then just about ten years old, Christi Gaubatz who told you that Angela told her that she and Dustin needed her there because she and Dustin were looking for Greg Nicholson and on five or six occasions went out while Christi babysat, went out looking for Greg Nicholson.

Christi Gaubatz told you that Honken and Johnson together went out those nights looking for Greg Nicholson night after night. She told you that she was told that they were having trouble finding him, finding him alone, and on one fateful occasion asked to borrow her car, Christi Gaubatz's Toyota Tercel, so that they wouldn't be recognized by Greg Nicholson.

Mrs. Gaubatz told you about that night, ladies and gentlemen, that night which was unlike the other nights that she babysat for her friend Angela Johnson when she and Honken went out looking for Nicholson. It was unlike those other nights because on this final occasion they stayed out all night unlike the other occasions. They were out until near dawn. They were

out until about five o'clock in the morning on that final occasion and recalls that on their return the two of them, Honken and Johnson, went straight to the bathroom. And Christi Cole heard that shower go on.

An opportunity seized, ladies and gentlemen, seized by

♀

Dustin Honken and his girlfriend and partner Angela Johnson time and time again as time and time again through that summer they literally hunted for Greg Nicholson until the final occasion when they borrowed Christi's car and were out all night long returning only to head to the showers, occasions that ceased after that final night. That night when they were out all night long was the last time that Honken and Johnson went looking for Greg Nicholson.

Testimony of Christi Gaubatz, formerly known as Christi Cole, who was the best friend at the time of Angela Johnson, a woman who told you that she -- and I think it would be obvious to anyone -- knew that she had important information and she concealed that information when she was interviewed over the years by law enforcement until 2000, and you can well imagine -- and I don't condone the behavior of anyone in concealing information from authorities. But as I'm sure each of you knows, knowledge can be a heavy burden. Knowledge of a crime carried on your shoulders can be a heavy burden, and it was for her and ultimately in the year 2000 did disclose that information to authorities finally taking that burden off her shoulders, information about the many occasions that summer when Dustin Honken and Angela Johnson went looking for Greg Nicholson, information about that final day when they were out all night and never went looking for Greg Nicholson again.

Guilty knowledge, ladies and gentlemen, we've already

talked briefly, but I'll remind you that Dustin Honken was scheduled to enter a guilty plea to accept the benefits of a plea bargain on July 30, 1993. He did not do so. Less than five full days after Greg Nicholson was last seen alive, Dustin Honken suddenly and unexpectedly changed his mind about pleading guilty and with his attorney, Mr. Thinnes, informed the prosecutor, Your case isn't as good as you think it is.

On or about that same date, ladies and gentlemen, he provided to his attorney, David Thinnes, a videotape, a videotape of Dustin Honken -- excuse me, a videotape of Greg Nicholson -- I apologize; I'll misspeak again and again before I'm done -- a videotape of Greg Nicholson, his face on that screen, apologizing to Dustin Honken for getting him involved, that he wasn't involved in this meth conspiracy; a videotape, ladies and gentlemen, of what we know to be a false recanting of testimony provided by Dustin Honken to his attorney on July 30, 1993, on or about that day at about the same time that he suddenly withdraws his guilty plea, about the same time that Dustin Honken (sic), unbeknownst to the government, had disappeared; a videotape that at the time when facing merely drug charges could only be a benefit made without anticipating that those bodies would ever come to the surface.

And it wasn't until several days later, it wasn't until the following week, that the government obtained knowledge that Greg Nicholson had disappeared.

Guilty knowledge in the form of knowledge not only

that Greg Nicholson was missing but knowledge, ladies and gentlemen, on the part of the person who was giving up that plea bargain, knowledge not only that Greg Nicholson was missing but knowledge that he wasn't going to be returning.

Motive in relation to Terry DeGeus, on October 27, 1993, the federal grand jury met after Agent Mizell and his colleagues pursued further investigation attempting without Greg Nicholson to resurrect this investigation and these charges against Dustin Honken. The grand jury met and questioned witnesses regarding the subject, questioned witnesses, including Angela Johnson, and specifically again according to the testimony of Agent Mizell, specifically inquired of Angela Johnson about that relationship that Dustin Honken had with Terry DeGeus. That was the subject of the grand jury's questioning of Angela Johnson, ladies and gentlemen, on October 27, 1993, a grand jury session in Cedar Rapids where, according to the testimony of Aaron Ryerson, Terry DeGeus's good friend, another of the people who were subpoenaed to appear before that grand jury, that when he was down there and saw Angela Johnson, he also saw Dustin Honken with Angela Johnson.

And so Dustin Honken through his girlfriend, knowing that the grand jury was inquiring about his relationship with Terry DeGeus, just nine days later Terry DeGeus disappears. On his way to a meeting with Angela Johnson, you heard from Terry

DeGeus's mother that she had a phone call from Angela Johnson that day, November 5, asking her to tell Terry to give Angela a call. And you heard from several people, from Aaron Ryerson, from Terry DeGeus's own daughter Ashley DeGeus, that the last thing Terry DeGeus is known to have done that day was to drop

off his ten-year-old daughter Ashley at his parents' house and ask them to take care, watch his child for a few hours; he wasn't going to be gone long; he'd be home not long after midnight he promised his daughter. He was going to see Angela, and that's the last he was ever seen alive.

Terry DeGeus who for all his faults -- and we could number them at length: Was a drug dealer, was a tough guy, was mean to his girlfriend -- a guy who not every other weekend or just occasionally but every single weekend had his daughter Ashley. For all his faults, that was one thing about Terry DeGeus was that he had that attachment to that ten-year-old girl every single weekend. And when midnight passed and the night rolled on, Ashley DeGeus became more and more worried because it wasn't like her dad to stay gone, and he was never seen again because when he went to meet Angela Johnson, he ended up meeting Angela Johnson and Dustin Honken.

Strong motive to kill Terry DeGeus: Just nine days earlier his girlfriend Angela Johnson had been quizzed by the grand jury about Dustin Honken's relationship with Terry DeGeus and how much drug business they were doing; evidence in the form

of motive, evidence in the form of opportunity, evidence in the form of possession of the means to commit these crimes, evidence, ladies and gentlemen, in the form of guilty conduct, behavior that shows a consciousness of guilt.

I'm a little bit early, folks, but this is a change.

Would this be appropriate, Your Honor?

THE COURT: Sure.

MR. MILLER: Why don't we take 30 seconds.

THE COURT: Take 30 seconds and take a stretch break.

Everybody in the courtroom can. Thank you.

Thank you. Please be seated.

MR. MILLER: I mentioned that there are a number of instances in which the defendant in this case, Dustin Honken, displayed conduct which I have termed guilty conduct, conduct which shows a consciousness of guilt, falsifying evidence, concealing evidence, destroying evidence, making misleading statements.

In this case in connection with the disappearance and what we now know to be the murder of Terry DeGeus, these two partners in crime, Dustin Honken and Angela Johnson, made a number of false statements. Angela Johnson was contacted immediately by JoAnn DeGeus and by Terry DeGeus's daughter Ashley DeGeus wanting to know, What happened last night? Where's Terry? And what did she do? She lied. She told both of them, He never showed up; I never saw him last night.

♀

3238

You heard the testimony of Wendy Jensen who was Ashley DeGeus's mother, Terry DeGeus's ex-wife, whether or not she was concerned about Terry DeGeus's welfare, and she may well have been. She was also certainly concerned about the welfare of her daughter who had an attachment to her father. And she took it upon herself to call Angela Johnson and ask about that night, November 5. And to Wendy Jensen Angela Johnson also lied at first.

But Wendy Jensen wasn't shy about pushing. And she insisted otherwise. I know you met him. And Angela Johnson changed her story: Okay. I met him at the country club, but then he left to go to town. Again, ladies and gentlemen, the truth doesn't need altering. Angela Johnson changed her story

when she described what happened that evening, November 5, 1993, and Dustin Honken himself was questioned about what happened too.

The DeGeuses are a family. There's a couple black sheep in that family. Brian told you that he and Terry were both a couple of rounders. Terry was worse than that. He was a drug dealer. But when he came back to Iowa, Brian DeGeus wanted to know what happened to his brother. And because he wanted to know what happened to his brother, he contacted Dustin Honken and met Dustin Honken at a fast food or restaurant establishment there in Clear Lake. And Dustin Honken told Brian DeGeus that Terry was doing stuff for him down south.

♀

3239

Again, ladies and gentlemen, if Dustin Honken had nothing whatsoever to do with Terry DeGeus's disappearance and death, why did he take it upon himself to lie to Brian DeGeus about where his brother was? Again, ladies and gentlemen, conduct evidencing a consciousness of guilt in the form of false statements.

That winter evidence was destroyed, ladies and gentlemen. Among the other information that Christi Gaubatz didn't share until the year 2000 was the fact not only about that fateful night when Honken and Johnson went looking, hunting for Nicholson the last time but also on an occasion months later during the winter of '93 to '94 when Christi Gaubatz, then named Christi Cole, found a gun in her home in Clear Lake, a home that she shared with her child. And she was upset about that as any mother would be.

And knowing that her good friend Angela Johnson had a key to that apartment, Christi Cole knew where that gun came

from. And she called up Angela Johnson and said, You get over here. Johnson came and fetched that gun and said, Dustin will take care of it.

Among the many things that Tim Cutkomp testified to was the fact that that winter of 1993 to '94 Dustin Honken came to him at Cutkomp's father's shop in the country near Britt where Mr. Cutkomp Senior had cutting and welding equipment, and Dustin Honken had a gun, and he wanted that gun disposed of. He

wanted that gun destroyed.

Ladies and gentlemen, the destruction of evidence is powerful evidence of consciousness of guilt. Evidence that can tie a killer to a murder is damning evidence. It's evidence that has to be gotten rid of. And in the winter of 1993 to 1994, a gun was destroyed by Tim Cutkomp and Dustin Honken at Cutkomp's shop with the use of a band saw and a torch, melted down to liquid form.

Years later in 1995, Lori Lewis, Agent Lewis of the DNE, told you about sitting down with Tim Cutkomp and asking him about that gun, and Tim Cutkomp didn't know makes and models of guns. But he remembered what that gun looked like, and he drew a picture of that gun. And as you've heard from the testimony of DCI crime lab firearms expert Vic Murillo, the gun drawn by Tim Cutkomp resembles, more than any other gun in the world, a Tec-9 nine-millimeter semi-automatic handgun.

What reason, what conceivable reason, to melt down a gun, not just get rid of a gun but melt it down? Any number of reasons a person might want to get rid of a gun. Guns are ugly things. But they're also valuable things. One can sell them. One can give them away to friends. One can turn them into law

enforcement. One can dispose of a gun in any number of ways. But why, why would one cut up and melt down a gun but to destroy evidence?

And that's exactly what Dustin Honken did. And in

1995 when he was interviewed by Agent Lewis, Mr. Cutkomp described the process that they used to melt down that gun. They cut it up. They melted it down on a piece of galvanized steel, and they threw away into a ditch in rural Hancock County the remnants of that destruction process.

And Agent Lewis with a number of other law enforcement officers and volunteers and metal detectors went through that ditch, and indeed they found a sheet of steel that fit the description provided by Tim Cutkomp who told you that he remembered even trying to cut up that sheet of steel. State's Exhibit 48 is the piece of steel. State's Exhibit 49 is the report of the DCI crime laboratory that finds it to contain small melted beads of metal, melted beads of metal. Examination of the beads found them to be made of iron. Origin of the melted metal could not be determined, melted iron on this, ladies and gentlemen.

And I'll be the first to tell you the Tec-9 isn't the only gun that's made of iron. Virtually every gun has iron in it and not only guns but nails, barbed wire, farm implements. This courtroom itself probably is full of objects made of iron. So this isn't evidence in the nature of a fingerprint or DNA. But it is evidence that corroborates the testimony of Tim Cutkomp because this was found out in that ditch after much searching. It's not just iron, ladies and gentlemen, but it's melted iron. It's evidence that somebody, in fact, did go to

the trouble of actually melting down, not just discarding but actually melting down something. It was that important that it be that completely destroyed.

And I'll warn you, some of the evidence is a little bit dirty.

Motive: Dustin Honken's motive for committing these crimes came to fruition two years after his arrest when these charges were dismissed without prejudice which means that they could be refiled due to in -- Exhibit 32 is the order dismissing those charges reciting in part the absence of a witness who is crucial to the government's case, the absence, of course, of Greg Nicholson, the continued absence of a man who as far as the world knew for sure could just as easily be in Mexico but, in fact, was in a shallow grave.

Following dismissal of those charges, the meth operation began again, Dustin Honken as chemist, Tim Cutkomp as laborer to help carry out that production. Angela Johnson provided money for this operation.

And the defendant recruited the assistance of Dan Cobeen, a fellow who was working with him, a fellow who was on probation, and a guy who to look at and talk with and know that he had a criminal background would lead someone in Dustin Honken's position to think here's somebody who will join me in a criminal operation, not realizing that he was putting Dan Cobeen in a spot because Cobeen had already had enough trouble with the

law and didn't want more and, afraid that he was being set up,

took steps to protect himself by going directly to authorities, John Graham of the Division of Narcotics Enforcement headquartered in Mason City, Iowa, post, and Agent Graham began an investigation.

An investigation, with the assistance of continued information provided by Dan Cobeen about the acquisition of chemicals and methamphetamine equipment, culminated in a search of Dustin Honken's residence in February of 1996 and the collection of a multitude of equipment and chemicals used for the manufacturing of methamphetamine.

What happens? Again, the same thing over and over again. Just as in '93, charges went away when witnesses disappeared in 1996. Dustin Honken began the plotting, the murders of witnesses against him in the 1996 case. He plotted the murder of Cobeen. He plotted the murder of John Graham. He plotted the murder of DEA Agent Dave Mizell, and he plotted the killing of government chemists who could help to make the case against him, who could help send him to prison.

Ladies and gentlemen, the plotting and scheming that went in, the guilty conduct in the form of preparing to kill witnesses, conduct evidencing a consciousness of guilt was recorded by Tim Cutkomp when he felt that things were getting in too deep, and he went to authorities and was wired up.

And again, ladies and gentlemen, I'll remind you as I

play a few, just a few of the many, statements that were made by Dustin Honken during these conversations, four or five conversations with Tim Cutkomp, I'll remind you that the words you see in the form of a transcript and that you read in the transcript as you listened to those recordings is not evidence.

It is the recordings and the voice of Dustin Honken as you hear it on those recordings that is the evidence. You've already received instructions that inform you how to handle that. Again, the transcripts are an aid to understanding those recordings but not evidence themselves. It is the recordings that's the evidence, and any difference that you hear, it's what you hear, not the transcript that's the evidence.

But you heard a recording of a conversation on May 16, 1996, that included this comment from Dustin Honken.

(A portion of an audio recording was played in open court.)

MR. MILLER: And this.

(A portion of an audio recording was played in open court.)

MR. MILLER: Exhibit 300, ladies and gentlemen, is a transcript of Dustin Honken's testimony at the time of his sentencing. And among the many statements that he made under oath in this courtroom six years ago, question, But you don't dispute that many of these conversations are about killing Dan Cobeen. Dustin Honken's answer: No, definitely not. Again,

comments made a couple years before any bodies were found.

On the 24th of May.

(A portion of an audio recording was played in open court.)

MR. MILLER: Scheming to get rid of witnesses.

(A portion of an audio recording was played in open court.)

(A portion of an audio recording was played in open court.)

MR. MILLER: Again, during his testimony in 1998 -- the transcript is in evidence as Exhibit 300, and on page 1041 of that transcript, the question was asked of Dustin Honken, So you agree that there was discussion in the tapes about killing Agent Mizell? Dustin Honken's answer, As well as many other people, yes, I do.

Question, Other people like the chemists, for example? And Dustin Honken's response under oath, Chemists, Graham, Cobeen, you know. Again, testimony given more than two years before any bodies were actually discovered, testimony admitting guilty conduct in the form of scheming and plotting, obstruction of the case against him.

(A portion of an audio recording was played in open court.)

MR. MILLER: Whispered conversations, whispered, members of the jury, for a reason.

♀

3246

(A portion of an audio recording was played in open court.)

(A portion of an audio recording was played in open court.)

(A portion of an audio recording was played in open court.)

MR. MILLER: Scheming, members of the jury, to obstruct the case against him.

(A portion of an audio recording was played in open court.)

(A portion of an audio recording was played in open court.)

MR. MILLER: Scheming of a man full of anger and

determination, determination to obstruct the case against him and anger at those who testified against him.

(A portion of an audio recording was played in open court.)

(A portion of an audio recording was played in open court.)

(A portion of an audio recording was played in open court.)

MR. MILLER: Guilty conduct in the form of scheming, of obstruction of the case against him by killing witnesses against him, not idle conversation either, ladies and gentlemen, because during that same period of time he was taking steps to

acquire a handgun from Rick Held, one of his coworkers who he told him it was for his girlfriend; he told him to keep it in his pickup until he'd let him know the proper time to pick it up.

But it was the day after Dustin Honken's pretrial release was revoked and he was put back in jail that Rick Held heard from a woman claiming to be Dustin Honken's girlfriend that Dustin didn't need that pup anymore.

Dustin Honken was deadly serious about these plans and schemes to obstruct justice, during the same period of time ordering publications providing information about the use and adaptation of weapons. And then on May 29 . . .

(A portion of an audio recording was played in open court.)

MR. MILLER: It's my turn to get Dan Cobeen.

(A portion of an audio recording was played in open court.)

MR. MILLER: When it comes down to getting rid of the evidence against him, he's a whole different person.

(A portion of an audio recording was played in open court.)

MR. MILLER: We know that Dustin Honken attempted just that. Recovered from his locker at Kraft Foods by Lori Lewis after his rearrest in '96 was one page, a photocopy of one page, of the Mason City directory, the letter G where, if his phone

number and address was listed, Dustin Honken would have had the home address of John Graham, one of the four people whose deaths he discussed in these tapes.

And again, in Exhibit 300, he even admitted on page 1003, question, And so you were discussing the fact that if Agent Graham were also unavailable then that might eliminate the use of the tapes? Dustin Honken's answer, I did state that, I believe, somewhere, yes.

And then their contacts continued into June. On June 4 they met again at Dustin Honken's residence.

(A portion of an audio recording was played in open court.)

MR. MILLER: In the context of discussing obstructing the case against him.

(A portion of an audio recording was played in open court.)

(A portion of an audio recording was played in open court.)

(A portion of an audio recording was played in open court.)

MR. MILLER: Again, whispered conversation.

(A portion of an audio recording was played in open court.)

MR. MILLER: Ladies and gentlemen, guilty conduct in the form of plotting and scheming the deaths of witnesses led

Dustin Honken back into custody in June of 1996. He was incarcerated waiting trial on federal charges at the Woodbury County Jail here in Sioux City. There he met Dean Donaldson and discussed with Dean Donaldson a plan to bond him out of jail so that he could kill Tim Cutkomp and intimidate Dan Cobeen against testifying against him.

There are a number of documents, some of which are in the handwriting of Dustin Honken, others Dustin Honken insisted that Dean Donaldson copy so that they would be in Dean Donaldson's handwriting, but he kept those, and after his bail bond was posted by Kathy Rick, yet another of Dustin Honken's girlfriends and the mother of one of his other children, he took those documents and put them at a place where he stayed with a fellow named Parmalee, and they were later recovered pursuant to search warrant. One of those many documents is Exhibit 216 which is a map, a hand-drawn map, to the residence of Tim Cutkomp.

And again, at his sentencing in 1998, Dustin Honken was questioned about that. And on page 1046 at line 16, he admitted that he did as much. Question, You say you also agree that you gave Mr. Donaldson a diagram of how to find Mr. Cutkomp's house. Dustin Honken's answer, Yes, I do.

This is immediately after Dustin Honken has learned that Tim Cutkomp, his closest, lifelong friend, has betrayed him by wearing a wire and caused him to go back behind bars at the

Woodbury County Jail.

What purpose did Dustin Honken have in posting the bail bond for Dean Donaldson and sending him on his way with a map to Tim Cutkomp's house? That bond was actually posted by Kathy Rick actually putting up as collateral her own home, Kathy Rick, the mother of Dustin Honken's child, son Ryan.

Dean Donaldson, a crack head and a hog thief, ladies and gentlemen. Did Dustin Honken post his bond because he thought Dean Donaldson was a good financial investment? Or did he post his bond because he seriously believed that this was the type of guy who thought maybe he was getting into something bigger if he could hook up with a guy who knew how to manufacture methamphetamine and would be willing in his crack head stupidity to actually go out and do something as crazy and violent as following that map and killing Tim Cutkomp?

Anthony Altimus, when Dean Donaldson didn't work out -- Dean Donaldson, of course, was a crack head and a pig thief and nothing more and didn't have the gumption, the nerve, the know-how to go out and murder to Tim Cutkomp. He went out and smoked some more dope instead until he got caught and brought back to jail.

And so what did Dustin Honken do but talk with yet another inmate, an inmate by the name of Anthony Altimus, and pursued basically the same behavior? You'll remember the testimony of Anthony Altimus, also known as Anthony Bugh, a guy

who's had a career in crime. And he testified to basically the same scheme, a scheme to get his bail bond posted so that he

could get out, follow the map that Dustin Honken had helped him prepare to the home of Tim Cutkomp and kill Tim Cutkomp.

And once again, why would a fellow inmate go to the expense of posting a bail bond for a guy like Anthony Altimus, basically a career criminal? Suppose he looked like a good investment, or did he appear to Dustin Honken as someone who just might be crazy and violent and mean enough to go out and carry out that scheme believing that by getting in the good graces of a guy who knew how to manufacture methamphetamine he was getting into something bigger?

And that scheme almost worked because they actually took steps to bond him out. Anthony Johnson, stocky fella, came in here and testified that he was in jail with Altimus, also known as Bugh, and Dustin Honken and that in exchange for a methamphetamine manufacturing recipe he agreed to have his girlfriend Colleen Birkey pay a thousand dollars to Johnson's girl -- excuse me, Honken's girlfriend Angela Johnson.

And you heard from Colleen Birkey, the mother of Anthony Johnson's children, how she in her foolishness borrowed a thousand dollars from her own mother and gave it to An -- excuse me, Angela Johnson, money that Angela Johnson attempted to use to bond out Anthony Altimus unsuccessfully because the bonding company wanted more security.

3252

The testimony of Anthony Johnson, ladies and gentlemen, a fella -- you saw him here -- well built, strong man, manipulated, manipulated by Dustin Honken. Dustin Honken, new, new to the jail scene, was quick to adapt to it and within weeks was manipulating other inmates, in this case Anthony Johnson, into talking his own girlfriend into providing money to

bond out Anthony Altimus for a plan to go kill Cutkomp and intimidate Cobeen, again, more planning and scheming consistent with the planning and scheming that you've already heard in Dustin Honken's own voice.

Wild as it is, if you heard nothing but the testimony of Anthony Altimus, isn't so wild when you recognize that efforts were actually taken to bond him out, when you see that documents were filed that actually did bond out Dean Donaldson before him and a map to Cutkomp's residence and if you hadn't already heard in the defendant's own voice how he plans and schemes these crimes, these murders. The attempt was made unsuccessfully to bond out Altimus.

Guilty conduct continued, ladies and gentlemen, into 1998 when in this very courtroom Dustin Honken was questioned about that videotape long before Attorney Thinnes was ever compelled to testify before the grand jury, at a point when only Thinnes, Johnson, and Honken knew about the existence of that videotape.

In 1998 when DeGeus and Nicholson were still missing

3253

and Dustin Honken was being sentenced and the government was now as part of sentencing accusing him of being responsibility -- responsible for the disappearance of these witnesses, was questioned about a videotape that as time went by and the context of things looked more and more incriminating because these witnesses continued to be missing, Dustin Honken was asked this question on page 961: While you were on pretrial release, did you have any knowledge of a videotape of Mr. Nicholson that was created during that time? And Dustin Honken's answer under oath, There never was no videotape

created. It was a bluff for the prosecution not to go to trial.

Again, ladies and gentlemen, guilty conduct, behavior that evidences a consciousness of guilt, coming into a courtroom, taking an oath, and testifying falsely.

He was sentenced and sent to prison. And again, ladies and gentlemen, you've heard from a number of inmates who've also talked about plots and schemes to escape and kill witnesses which might seem bizarre if you weren't aware of the whole context and hadn't heard with your own ears the sort of scheming and planning that Dustin Honken is capable of, testimony of Inmates Tokars, McIntosh, Vest, and Ferguson, Tokars who testified that Dustin Honken was concerned that at least one body was buried too shallow, that Honken proposed a scheme for Tokars to help him dig up and rebury those bodies because he was worried that at least one of those bodies was

3254

likely to surface.

Testimony of Steven Vest that in the fall of 2000 Dustin Honken began recruiting inmates for a plot to come to Sioux City at the time of this trial and escape from this unsophisticated Iowa jail, unsophisticated at least according to the expectations of several career criminals with a history of successful violent escape from prison, people like Loparo, Dougherty, and McGee. Vest testified that that was a scheme to escape, an escape to be followed by the killing of witnesses and government officials and their families.

And again, ladies and gentlemen, bizarre as that may sound standing alone, in the context of the repeated planning and scheming and in the context of the actual behavior and the killing of adults and children, not so far fetched at all.

Testimony of Steve Ferguson described the fact that after Dustin Honken learned through that Bureau of Prisons grapevine that Tokars, McIntosh, and Vest, all three had gone to Iowa, the only reasonable conclusion of which was that they testified before an Iowa grand jury, became enraged and asked Ferguson, tried to enlist Ferguson, even though he only had six or so years left in prison, to volunteer to testify too and to come to Iowa and to try to kill any one of those three but especially Steve Vest if he could do so figuring that that would intimidate the two others into not testifying against him and offering Steve Ferguson in payment a promise that he could raise

cash by mortgaging the home where his son lived.

And again as far fetched as that might seem if it came out of the blue, it was in the context of a man who did that very thing a couple years earlier when he was here in Woodbury County Jail, actually did get his girlfriend Kathy Rick, the mother of his son, to mortgage her home to raise cash for Dean Donaldson's bond for that criminal purpose.

The testimony of Joseph McGee, and you'll remember Joseph McGee who testified that he became a part of that escape attempt, that plot to escape from prison, that plot to be carried out right here in Sioux City, Iowa, who was more than happy to join in on that plot until he learned more about the nature of the crimes that had been committed.

Guilty knowledge, ladies and gentlemen. In addition to guilty conduct, we have guilty knowledge. We've already talked about the maps to some degree. In July of 2000, not long after her old friend Christi Gaubatz relieved herself of the burden of the knowledge of the activities jointly undertaken by

Angela Johnson and Dustin Honken in the summer of 1993 and the gun that she'd found in her closet, after disclosing that information, Angela Johnson was indicted for five murders.

And weeks later, weeks later, while in the Benton County Jail thinking that it would somehow help her get out of prison because she trusted another inmate and a scheme to get a guy doing life to claim credit for these murders and persuade

♀

authorities that, in fact, he was the killer by being able to produce the bodies, Angela Johnson as part of that scheme drew two maps.

A stipulation was read into evidence that during August and September of 2000, Angela Johnson was in the Benton County Jail awaiting trial on federal criminal charges relating to the deaths of Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus. While in the Benton County Jail, Johnson became acquainted with a fellow inmate named Robert McNeese. McNeese was and currently still is serving a federal sentence of life in prison on matters unrelated to the case.

Johnson and McNeese discussed Johnson's case. As a ruse, McNeese told Johnson that she could escape responsibilities for these -- responsibility for these deaths if McNeese could arrange to have some other inmate who was already serving a life sentence falsely claim responsibility for murdering the five victims. McNeese told Johnson that in order to make the confession believable, the other inmate would need to be able to furnish proof of his involvement by leading authorities to the victims' bodies.

Johnson prepared and provided to McNeese certain maps

and notes describing the location where the bodies of the five victims were buried. These maps, ladies and gentlemen, Exhibits 310 and 311, drawn by Angela Johnson, the girlfriend and

♀

methamphetamine business partner of Dustin Honken, who in the spring and summer of 1993 was with Dustin Honken hunting down Greg Nicholson, who in the summer of 1993 with Dustin Honken went out repeatedly looking for Greg Nicholson while Christi Cole babysat her child, who gave birth to Dustin Honken's daughter the following winter, in February of '94, and who on November 5, while carrying Dustin Honken's child and still engaged both professionally and romantically with Dustin Honken, lured Terry DeGeus to his death, this woman, Angela Johnson, the girlfriend and criminal partner of Dustin Honken, drew two maps, Exhibits 310 and 311.

McNeese turned those maps over to authorities. Thereby using those maps, Exhibit 310, authorities found a shallow, hidden grave in rural Mason City, and by following that map, Exhibit 311, and then by using Agent J.D. Smith located both of those graves because those maps were accurately enough drawn, found not only the grave of Greg Nicholson and the Duncan family but a couple weeks later the grave of Terry DeGeus.

Ladies and gentlemen, again, motive, opportunity, means, guilty conduct, guilty knowledge, knowledge that only those who committed this crime could have.

As Joseph McGee told you Dustin Honken told him, only his old lady could incriminate him. But in addition to those areas of circumstantial evidence, there are also admissions, statements that incriminate himself made by Dustin Honken not

♀

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2841 of 3636

once but repeatedly and not to one person do we ask you to believe but ten:  Cobeen, Cutkomp, Donaldson, Altimus, Bregar, Tokars, McIntosh, Vest, Ferguson, and McGee.  All ten came into this courtroom and described incriminating statements made by Dustin Honken.

Tim Cutkomp, not long after the disappearance of these people, had conversations with Dustin Honken, and he described them for you, not explicit confessions but conversations in which Dustin Honken described a scenario in which an individual was forced to make a videotape, discussions in which he asked Tim Cutkomp about Tim Cutkomp's opinion about how deep a body would need to be buried in order to avoid a plow digging it up.

Testimony from Dan Cobeen that when Dustin Honken was recruiting him he said that Nicholson had told on him and that Honken said that he'd had Nicholson disappear, again, not an express admission that he killed him but a statement that he'd made him disappear and a statement that was made to Dan Cobeen for good reason, because he wanted Cobeen to stay in line.  He warned Cobeen against getting on his wrong side.

Statements made to Dean Donaldson in 1996 claiming that he'd killed a couple and a kid, that he didn't care about the kid because they were trying to take him away from his children, justifying, justifying, the killing of children.

Statement that Dean Donaldson related to you that Dustin Honken said that a big guy was supposed to meet Angie at

an abandoned farm and that he shot him twice, he kept coming, and he shot him again and that dead people are real heavy.

And also the statement that echos the statement that you heard from Tim Cutkomp, one that you heard from Dean Donaldson as well, dead people are real heavy -- or excuse me, that he was concerned that bodies were buried too shallow.

Testimony of Terry Bregar -- and you may remember Terry Bregar. He's a blind man now. He was not blind in 1996. He was an inmate of the Woodbury County Jail, and he could see then. The diabetes that he suffers from had not yet taken his sight. And he describes himself as a country bumpkin meth dealer. And with that in common, he and Dustin Honken talked about those things and their backgrounds. And Dustin Honken talked to Terry Bregar about an earlier case in which a witness didn't show up, and as he talked about that, Honken smiled and gestured, an admission of what he had done.

And Terry Bregar told you that Dustin Honken told him that if he could get out, if he could escape, he'd take care of that situation again.

You heard testimony from Anthony Altimus about incriminating statements, that Honken said he'd killed witnesses and disposed of the bodies. And again, this is in the context of Dustin Honken's efforts to recruit Anthony Altimus to do just that.

Testimony of Fred Tokars. Fred Tokars, a lawyer, a

man whose knowledge is important to inmates to the effect that we have something in common because, as you'll recall, Fred Tokars killed a witness. He had his wife killed because she was a witness.

Fred Tokars, a man doing life in prison without parole, as well he should, was a man with something in common

with Dustin Honken. And he described comments made to him by Mr. Honken that Honken and Johnson had looked for Nicholson and finally found him living with Lori Duncan, that they'd gone to the Duncan house -- that he'd gone to the Duncan house with Johnson and forced Nicholson to make a videotape. Tokars described Honken as saying that he'd struck Nicholson over the head with a gun and knocked him out.

And, ladies and gentlemen, just parenthetically recall the testimony of State Medical Examiner Julia Goodin and perhaps more appropriately that of Forensic Anthropologist Dawnie Steadman who found a hairline fracture on the cervical vertebrae, one of the cervical vertebrae, of Greg Nicholson.

Statement to Tokars that he'd killed all four and buried them; statements that he delivered the videotape to his attorney, that they had later killed DeGeus, Honken and Johnson together; statements to Tokars that only three people had seen the videotape, Honken, Johnson, and Thinnes; admission that he had lied about that videotape under oath; and most specifically speaking to this attorney Tokars worried that Thinnes could be

forced to testify about that videotape and wanting to know if the attorney-client privilege would protect him from that; further testimony from Tokars about the criminal scheming and plotting that occurred following his arrest in '96.

Statements by Ron McIntosh. Again, because McIntosh has some legal talent, is a jailhouse lawyer, Honken was worried about whether the government could force the testimony of his attorney about that videotape. A videotape, the existence of which now when he's accused of or at least suspected of murder, is incriminating.

Statements to Ron McIntosh that he had killed an informant, a woman and two children. Because they were witnesses, they all had to go.

Statements to Ron McIntosh that he'd killed another informant on another occasion. McIntosh who's doing life in prison without the possibility of parole, a California life following that federal prison sentence for air piracy, that helicopter escape artist, says -- told you that Dustin Honken made no secret of the fact and bragged about the fact that he killed his rats, everybody should. Woman and children? Again, because he's consulting Ron McIntosh for his legal talent shared the fact that he had done so and tried to justify it because they were witnesses.

Your Honor, I have a bit more to go, and perhaps if this would be an appropriate time for yet another stretch?

THE COURT: Okay. Why doesn't everybody take a stretch break. And let me just see the lawyers on scheduling at sidebar.

(At sidebar off the record.)

THE COURT: Members of the jury, I'm actually going to give you your 30-minute recess at this point. So I see some of you shaking your head yes, that that's a good idea. Perhaps the restroom calls. We'll be in recess for 30 minutes. You can't discuss this case yet. You can't discuss it until we've heard all of the arguments, you receive my final two instructions, go over the verdict form, and then you go back and deliberate. So keep an open mind until we've finished the case and you go back down and deliberate, and you can't discuss it with each other until that time. Thank you. We'll be in recess for 30 minutes.

(The jury exited the courtroom.)

THE COURT: Any matters we need to take up?

MR. MILLER: No, Your Honor.

MR. PARRISH: Your Honor, we'd like to approach maybe during the break and discuss what we're going to do about the jurors' lunch and stuff like that.

THE COURT: Okay.

MR. PARRISH: But I don't want to hold people up to do that.

THE COURT: Okay. Why don't we take our recess, and then you guys can just approach, and we can discuss. We'll be

in recess. Thank you.

(Recess at 10:44 a.m.)

THE COURT: Mr. Miller, Mr. Parrish, ready to have the jury brought in?

MR. MILLER: Yes, Your Honor.

MR. PARRISH: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Miller, you may continue with your closing argument.

MR. MILLER: Thank you, Your Honor.

You folks have been most patient. I'm going to try to tax that patience as little as possible by getting right back down to business.

We were discussing incriminating comments that had been made over the years to Cobeen, Cutkomp, Donaldson, Altimus, Bregar, Tokars, McIntosh, Vest, Ferguson, McGee.

Simply to help you recall who these people are, you'll

remember the fella in the wheelchair, Fred Tokars, doing life in prison, killed his wife, had his wife killed because she was a witness.

We've been talking about Ron McIntosh, the fella who turns 60 this year, the helicopter pilot who also is doing a California murder sentence of life in prison without parole.

You heard the testimony of Steven Vest, yet another

inmate from Florence, Colorado, and he described for you comments that were made to him by the defendant during their period of time together. He testified that Dustin Honken told him that after his arrest in '93 he conspired with Johnson to kill Nicholson, the witness who was against him, and he described in detail, ladies and gentlemen, what Dustin Honken told him.

Steven Vest was not a jailhouse lawyer like McIntosh and Tokars but rather one who ran with the same group of inmates as Mr. Honken. He described an evening in which Honken and Johnson went to the door of that residence of that Duncan family, during the course of their time there, forced Nicholson to make a videotape, and that they had a woman write -- they had the woman there who would be Lori Dunkle -- Duncan write a note to the neighbor lady.

And you remember the testimony of Marge Milbrath, one of the first witnesses, the grandmother of these two little girls, who testified that the next-door neighbor, Phyllis Proscovec, would watch those children during the day when their mother was working but that Phyllis is now deceased. But in evidence is Exhibit 47. You have that note corroborating details of the statements, the admissions made to Steven Vest by

Dustin Honken, a note we submit to you was made by Lori Duncan with a gun pointed at her to make authorities believe that these five people had left on their own.

Steven Vest described Dustin Honken's statement that all four of these victims were taken into the country, that Honken took the two adults, shot them, and then returned to the car where Angela Johnson, Dustin Honken's girlfriend and partner in crime, was holding those two little girls.

Steven Vest, this witness, again, doing four life sentences without parole from Kansas City, testified that Dustin Honken told him that after he came back to the car where Angela Johnson was holding those two little girls he took those girls, walked them away from the car, and shot those two little girls in the back of the head. That was the description Dustin Honken gave Steven Vest, ladies and gentlemen.

And if you'll recall the testimony and the evidence that was received here by Dr. Steadman, the forensic anthropologist, Exhibit 711, Kandi Duncan; Exhibit 809, Amber Duncan. Indeed, ladies and gentlemen, those two little girls were, as Dustin Honken described it to Steven Vest, lined up and executed by being shot in the back of the head.

Steven Vest described for you statements by Dustin Honken in which Honken expressed concern that the FBI would squeeze DeGeus to testify and that because of that his girlfriend Angela Johnson lured DeGeus to a field where he, Dustin Honken, repeatedly shot DeGeus and after shooting him finished him off with a baseball bat.

And here too, ladies and gentlemen, the physical

evidence corroborates the information that Steven Vest heard from Dustin Honken. Dr. Goodin and Dr. Steadman both testified that they diagnosed a gunshot to the head entering below the right eye very similar to the gunshot that they observed on the skull of Lori Duncan entering behind the right eye and exiting at the top of the head. But with regard to Terry DeGeus, what both of them also indicated is that while they do not diagnose blunt trauma, they also cannot rule it out. And Terry DeGeus's skull was found in many, many pieces.

Inmate Vest described Honken's description of how he treated the body of Terry DeGeus after he killed him, that after he dragged him and put him in that hole he grabbed DeGeus's foot and started shifting it around like a four-speed.

And, ladies and gentlemen, the evidence that came in here from Iowa State Medical Examiner Dr. Goodin shows the body of Terry DeGeus in that shallow grave in that field in rural Mason City, Iowa, lying face down with his legs bent at the knee, bent up toward the surface, in a position where Dustin Honken did just that with that leg like a four-speed.

And finally Steven Vest described for you the comment of his fellow inmate and friend Dustin Honken, then friend, that killing is like getting high.

You heard from Inmate Steve Ferguson, unlike Tokars, McIntosh, and Vest, not a lifer, not a man who's going to die in prison, a man who now only has actually less than three years

3267

remaining on his sentence, who turned down a request to kill Vest and/or McIntosh and Tokars because he was a short timer. But he also described admissions made by Dustin Honken that

Honken said to him that the witnesses in his '93 case had been permanently tampered with and that after the bodies were recovered he described a scheme with his girlfriend that resulted in the murders of the two informants, a woman and two children.

Admissions, evidence in the form of incriminating statements came in also through Joseph McGee. McGee said that Dustin Honken who was not shy about bragging about killing his rats did not disclose the fact that there were innocent children involved, did state that rats were killed and buried in a field where only his wife, Honken's wife, could implicate him. Joseph McGee understood that to be Honken's wife. I will submit that it was Angela Johnson.

And finally that after this escape plot was hatched, Angela Johnson was arrested, and it was expected that charges were imminent against Dustin Honken, the bodies were found, and that when those bodies were found, Joe McGee, this 37-year-old man who has spent the past 22 years in prison, grew up in prison, lived that convict code, confronted Dustin Honken because of the killing of children and the disgust with which that imbued in every level of our society and that Dustin Honken sought to justify his behavior by stating that those kids were

3268

being raised by rats, they'd just grow up to be rats themselves, again, ladies and gentlemen, a statement, an incriminating statement made by Dustin Honken.

Ladies and gentlemen, finally the government called Mike Kluver, and Kluver did not testify to any conversations at all, but Kluver, if you'll recall, is the inmate in Marion, and there's a couple reasons for bringing him to your attention.

Dustin Honken made comments incriminating himself way back in the mid '90s when he was talking to Tim Cutkomp about bodies being buried too shallow and a scenario about a videotape.

He made comments incriminating himself in 1995 when he met Dan Cobeen and recruited him to help make methamphetamine when he said that he'd had witnesses disappear, and this was long before he went to jail.

And when he did go to jail and he went to Woodbury County, he made comments incriminating himself when he spoke with Dean Donaldson. He made comments incriminating himself when he spoke with Anthony Altimus, and he made comments incriminating himself in murder when he spoke with that now-blind Terry Bregar.

And it wasn't just in Woodbury County, but it was also in Florence, Colorado, that he made those comments, those sorts of comments talking about killing his rats to Tokars, McIntosh, Vest, Ferguson, and McGee.

♀

3269

And, ladies and gentlemen, it isn't just in Mason City, Iowa, and the Woodbury County Jail, and the United States Penitentiary in Florence, Colorado, that Dustin Honken talked about his cases. He even talked with Michael Kluver. And in Kluver's case, he also wrote kites, one of which states in part -- and that's Exhibit 307 on the third page -- Believe me, I have tried a lot of slick shit in the past. Some has worked. I beat a case before. And some hasn't. I'm willing to try anything if it has a possibility of working.

Again, ladies and gentlemen, the behavior of Dustin Honken consistent with the behavior he has shown over a period

of ten years making comments to friends and fellow inmates incriminating himself discussing his cases and discussing sometimes explicitly, sometimes only by implication, his responsibility for obstructing justice and getting rid of witnesses.

Finally, ladies and gentlemen, consistent with all of those statements that were made in prison, made in the Woodbury County Jail, you have the recorded statements in Dustin Honken's own voice in which he makes comments that incriminate him in these crimes. And again, I remind you that the few excerpts I'm going to play for you now of the many that he made and that you heard are the evidence themselves. The transcripts are an aid to understanding that and are not evidence. It is the recordings themselves.

But you heard the recording of a May 24, 1996, conversation between Dustin Honken and Tim Cutkomp.

(A portion of an audio recording was played in open court.)

MR. MILLER: And again, ladies and gentlemen, in Exhibit 300 which is a transcript of Dustin Honken's testimony here at his sentencing in 1998, he was asked the question, Do you see at the fourth clause down you made the statement, I mean, you gotta remember both those guys were skeptical? Dustin Honken's answer, Yes, I do see that.

The following question, Who were you talking about there? And Dustin Honken's answer, I believe I'm referring to Mr. DeGeus and Mr. Nicholson. Testimony given, again, two years before those bodies were discovered.

(A portion of an audio recording was played in open

court.)

(A portion of an audio recording was played in open court.)

(A portion of an audio recording was played in open court.)

MR. MILLER: Kill him. That's a look you'll never forget. It's a look that Dustin Honken has seen.

(A portion of an audio recording was played in open court.)

(A portion of an audio recording was played in open

♀

court.)

MR. MILLER: And a week later in another meeting, on June 4 of 1996, wearing a wire Tim Cutkomp recorded another conversation with Dustin Honken.

(A portion of an audio recording was played in open court.)

(A portion of an audio recording was played in open court.)

(A portion of an audio recording was played in open court.)

(A portion of an audio recording was played in open court.)

MR. MILLER: Whispering, I've seen worse things that I care never to speak of. Good reason for whispering.

(A portion of an audio recording was played in open court.)

MR. MILLER: And finally on the 6th of June.

(A portion of an audio recording was played in open court.)

(A portion of an audio recording was played in open court.)

(A portion of an audio recording was played in open court.)

MR. MILLER: And again, ladies and gentlemen, not express confession of the killing of five people but statements,

statements made in the conversation of scheming and conspiring the killing of more witnesses. There are some things better left forgotten about. They had far more in '93, evidence in this case, ladies and gentlemen, consisting of evidence of the defendant's motive, his opportunity that he took full advantage of, the means that he had to carry out these crimes, the repeated behavior showing a consciousness of guilt, his and his girlfriend's knowledge that only the killers could have, and, of course, the admissions, the incriminating comments he made to not one but ten separate people.

Motive, to kill the two people who distributed drugs for him in the state of Iowa: G Man, Greg Nicholson; T Man, Terry DeGeus.

Opportunity, on pretrial release hunting for Greg Nicholson, by contacting Greg -- excuse me, Scott Gahn desperate to locate Nicholson and on multiple occasions going out with Angela Johnson to look for Nicholson until that final night when they stayed out all night long and never went looking for him again.

Means, in the form of access to a Tec-9 semi-automatic handgun which, according to the testimony of Criminalist Vic Murillo, is consistent with all five of the bullets that were recovered from these two graves. Vic Murillo was a scientist,

and he's careful about these things. He didn't tell you that they came from one particular gun but that they could have come

from one particular gun.

The person who committed these crimes and buried these bodies destroyed a lot of evidence. And those five bullets, every one of them, is badly corroded. It was for a purpose that those bodies were buried, to destroy evidence and to conceal a crime. All five of those bullets are badly corroded, but the one bullet that came out of the Nicholson/Duncan grave came from the skull of Greg Nicholson, and it was determined by Mr. Murillo to be of a caliber consistent with 9-millimeter. It was much larger than a 22 or a 25, and it was much smaller than a 44 or 45. Could be a 38; could be a 9-millimeter. But it was of that class.

9-millimeter is, of course, the caliber of the Tec-9, and it's a bullet that is consistent with, could have been fired from a Tec-9. He can say no more than that. He's a scientist, and he isn't going to say anything more than what he can scientifically say.

But the bullet that came out of the head of Terry DeGeus wasn't a 22 or a 25 or a 45. It was of the class consistent with 9-millimeter, too badly corroded to show any of the characteristics, the direction of spin and the lands and grooves, but consistent with having come from one of these and also consistent with the four bullets that came out of the DeGeus grave, one which was taken from his head that actually did show some lands and grooves that were consistent with the

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2855 of 3636

other three that were pulled out of the DeGeus grave. And these three did have rifling information on them. Corroded, yes, but not so badly corroded that Mr. Murillo couldn't get information off them.

And what he found was that each of these three bullets pulled out of the grave of Terry DeGeus had six lands and grooves with a right-hand twist. And that's a characteristic of a number of firearms. We can't say for sure that it's only one make and model of firearm, but coincidentally, ladies and gentlemen, six lands and grooves with a right-hand twist just happens to be exactly the class characteristics of the Tec-9.

Guilty conduct, false statements by both Johnson and Honken about what happened to DeGeus; destruction of that Tec-9, melting it down and cutting it; destruction of the videotape. Mr. Thinnes said he returned to Dustin Honken in '95 when the charges were dismissed and have never been seen; false testimony by Dustin Honken here in this courtroom at his sentencing falsely claiming, among other things, that there never was no videotape and continued criminal plans and schemes, many of which you've heard described coming into evidence through his own voice on those recorded conversations.

Guilty knowledge, ladies and gentlemen, the sudden withdrawal of the plea agreement knowing, knowing, not only that Greg Nicholson was missing but, more importantly, withdrawing the benefits of his plea agreement knowing that he wasn't going

3275

to be showing up ever again to testify against him.

Then finally those maps before you, the guilty knowledge drawn by his girlfriend, his partner in crime, Angela

Johnson, that only one involved in these murders could know.

Testimony from ten witnesses, incriminating comments in his own voice, comments . . .

(A portion of an audio recording was played in open court.)

MR. MILLER: . . . that are incriminating. Ladies and gentlemen, I would submit to you that the murderer of Greg Nicholson, Terry DeGeus, and the Duncan family was a man with a talent for criminal planning and scheming. He made sure not only that his crime could be successfully carried out but also that it would not be discovered.

I would submit to you that the murderer of Greg Nicholson, Terry DeGeus, Lori Duncan, Amber Duncan, and Kandi Duncan was a man with a talent for planning and scheming such as you've heard repeatedly in the Cutkomp tapes; the description of the Donaldson plot involving bonding out of jail; the Altimus plot and the diagrams to the Cutkomp house; the Woodbury County Jail escape plot; the Florence criminal escape plots.

The five premeditated murders and the concealments of those five premeditated murders, ladies and gentlemen, bear the distinguishing characteristics of an individual with a talent for planning and criminal scheming.

♀

3276

Destruction of evidence, the 1993 meth lab, the Tec-9, the videotape, the oath to testify truthfully destroyed when he testified falsely, five human lives, a Tec-9 automatic that was melted down, evidence destroyed.

Terry DeGeus, buried in the ground, evidence destroyed.

Four human beings buried in a grave. Witness Greg

Nicholson whose testimony would incriminate Dustin Honken, evidence destroyed.

Lori Duncan who witnessed the kidnapping, the forced videotape and the killing of Greg Nicholson whose testimony was extreme jeopardy to Dustin Honken, evidence destroyed.

Two little girls who witnessed those crimes on July 25, 1993, silenced forever so that they could not report to authorities, yet more destruction of evidence. Human lives but evidence all the same.

Ladies and gentlemen, the Court has given you instructions as to 17 charges. You'll be happy to know that I'm in the home stretch. What I need to do in one last phase is to discuss with you those 17 charges, each of those 17 charges, and discuss with you how it is the evidence establishes beyond a reasonable doubt, because it is the government's responsibility to prove beyond a reasonable doubt, each of the elements of each of the 17 charges.

The first five charges accuse Dustin Honken of murder

to prevent testimony. Count 6 accuses him of soliciting a crime of violence. Count 7 accuses the defendant of conspiracy; Counts 8 through 12, murder during the commission of a drug offense; and Counts 13 through 17, murder during continuing criminal enterprise.

Ladies and gentlemen, I'm not going to read these instructions to you again. They were read for an hour and a half, and I'm not going to do that again. But as I paraphrase any of them, please bear in mind that it's the Court's instructions, not my paraphrasing obviously, that is the law.

Counts 1 through 5 accuse the defendant of murder with

intent to obstruct justice, the elements of which -- and you'll find those beginning on page 49 of the Court's jury instructions, final instructions. The elements are murder, that he murdered those five people; second, that he did so with a particular intent either to prevent testimony or to prevent the report of a crime. And again, I have summarized and shorthanded these elements to some degree. It's the Court's instructions you must follow.

Murder is defined for you at page 8 of the instructions. It involves an unlawful killing. There are three elements: An unlawful killing, in this case the killing of Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus. As a second element, it includes malice aforethought. And as a third element, it includes premeditation.

3278

And again, you'll be happy to know that you're not left to your own devices. The Court has defined for you these terms, malice aforethought and premeditation. Malice aforethought means an intent at the time of the killing -- and again, this is at page 8 -- willfully to take the life of a human being or an intent willfully to act in a callous and wanton disregard of the consequences to human life.

Premeditation again which is defined on page 8 means the killing was intentional and the result of planning or deliberation. And on page 9 it is noted that the amount of time required for premeditation cannot be arbitrarily fixed. Doesn't require any particular amount of time.

Premeditation, planning, deliberation.

Was there malice aforethought? Was there premeditation in the killing of Greg Nicholson? Ladies and

gentlemen, you have the ropes, the bindings that bound him hand and foot. You have the gags and the little green socks that were used to stuff his mouth.

You have the fact that a firearm was used. And, ladies and gentlemen, one cannot operate, load and operate and then aim at the head and body of a living, breathing human being something like this without conscious thought, without malice and premeditation.

Malice aforethought, ladies and gentlemen . . .

(A portion of an audio recording was played in open

3279

court.)

MR. MILLER: . . . Evidence of it aplenty.

Lori Duncan, again, ropes, gag, a firearm that can only be used against another human being with malice aforethought and premeditation.

(A portion of an audio recording was played in open court.)

MR. MILLER: And I would submit what worse thing than the killing of a defenseless mother?

The murder of Kandi Duncan, the killing of Kandi Duncan was done with malice aforethought and premeditation. Again, ladies and gentlemen, the operation of a Tec-9 semi-automatic by loading it, placing it against the back of the head of a small child, and pulling the trigger can only be done with malice, malice aforethought, and premeditation.

(A portion of an audio recording was played in open court.)

MR. MILLER: And what worse things than the execution of a ten-year-old child?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2860 of 3636

The killing of Amber Duncan, was that done with malice aforethought? Was that done with premeditation? Again, ladies and gentlemen, as with Greg Nicholson, Lori Duncan, Kandi Duncan, so the case with Amber Duncan. The taking of a Tec-9, loaded, placing against the back of the head of an innocent, defenseless child is an act of malice, an act of malice

♀

aforethought, and an act worse than which no one could ever speak.

(A portion of an audio recording was played in open court.)

MR. MILLER: And finally, in the order in which they were killed, Terry DeGeus. Again, killed with a killing weapon, a Tec-9, the loading and operation of which and the placing against the face of a living, breathing human being is an act that can only be done with malice aforethought and premeditation. He was lured to his death hours before he was brutally killed.

(A portion of an audio recording was played in open court.)

MR. MILLER: Again, ladies and gentlemen, a look that Dustin Honken has seen over and over again.

On Count 1 you must establish and answer the question as to the specific intent with which Greg Nicholson was killed, and I would submit to you that while there are three listed the first one, which is to prevent Nicholson from testifying at a federal trial, is the most applicable. The evidence in this case supports all three. Certainly killing Greg Nicholson prevented him from reporting a federal offense, namely the obstruction of justice by kidnapping him and forcing him to make

a videotape. Certainly the killing of Greg Nicholson retaliated against Nicholson for providing information about that

meth-dealing operation. And we know the anger that Dustin Honken can bear toward one who rats him out.

But all three of those motives -- and I would submit that all three are applicable and proven by the evidence in this case -- certainly the most important is the first one because killing Greg Nicholson thwarted that prosecution by preventing him from testifying at a federal trial.

You must find with regard to the killings of Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus what the specific intent was, and I would submit to you that with regard to Lori, Kandi, and Amber, it was to prevent those three victims from reporting a federal offense. When he kidnapped Greg Nicholson, when at gunpoint he required him to make that videotape, he did so in the Duncan home, and he could not allow Lori Duncan and her two children to survive if he wanted to escape these charges.

Ladies and gentlemen, on Counts 1 through 5 of the trial information, there is a form of verdict. Should you find, as I urge you to find, the defendant guilty as charged on Counts 1 through 5, then you should check the marks as checked on this exhibit, the second line, guilty, on Count 1. And under Count 1, of the three choices as far as the intent that was proved, I would submit to you that the evidence supports checking all three of those boxes. But the one proven more than anything else was the first box.

As to Counts 2, 3, and 4, intent to prevent the victim from communicating to a law enforcement officer information relating to the commission or possible commission by Honken of a federal offense including witness tampering and violation of conditions of pretrial release, I would submit to you that those boxes are supported by the evidence in this case.

And finally with regard to Terry DeGeus, the box that indicates that the evidence proves an intent to prevent the victim from communicating to a law enforcement officer information relating to the commission or possible commission by Honken of federal drug-trafficking offenses, in other words, the T Man on that G Man and T Man note was Terry DeGeus. And after the October 27 grand jury hearing where Angela Johnson was questioned about DeGeus's relationship, that drug relationship, with Dustin Honken, that the killing of Terry DeGeus was with the intent to prevent that from going any further and proceeding into this courtroom as a drug charge.

Count 6, elements of soliciting a murder of a witness, the government is required to prove beyond a reasonable doubt that Honken intended Donaldson or Altimus to murder Tim Cutkomp and that the circumstances strongly corroborate that intent.

Count 6 has a third element, that the defendant solicited Donaldson or Altimus to murder Cutkomp, and those are set forth beginning at page 50 of your instructions. Do the circumstances in this case strongly corroborate the intent?

3283

Again, ladies and gentlemen, Exhibit 216, the map that was drawn to Tim Cutkomp's residence and the fact that he actually did, through his former girlfriend Kathy Rick, the mother of his son, actually post bond has been proven, that that intent has been

Case 3:09-cv-03064-MWB-LTS   Document 284-72   Filed 06/23/11   Page 2863 of 3636

corroborated.

And as with Anthony Altimus, likewise, the testimony of Colleen Birkey and Anthony Johnson who was duped into providing a thousand dollars for Anthony Altimus's bail bond, again, ladies and gentlemen, that that corroborates that Dustin Honken was, in fact, serious, deadly serious, about this scheme to kill Tim Cutkomp.

Count 6 you will answer not guilty or guilty. I would suggest that you check the guilty box and that you check both boxes. As to who was solicited to murder Timothy Cutkomp, both Donaldson and Altimus were solicited, both provided information on how to locate Tim Cutkomp, and both an effort made to post their bail bond, in Dean Donaldson's case successfully.

Count 7 is conspiracy to tamper with or solicit the murder of a witness. It has a number of elements. These are set forth beginning at page 57 of the Court's instructions. And again I have shorthanded or abbreviated them. It's the Court's instructions themselves that you must follow, but there are a number of elements: An agreement on a criminal objective or objectives; the fact that Dustin Honken joined the agreement; his knowledge of the purpose of the agreement; one or more overt

3284

acts committed in furtherance of the agreement.

Ladies and gentlemen, the criminal objective was the production and distribution of methamphetamine. Did Dustin Honken join that agreement? Ladies and gentlemen, the evidence shows that Dustin Honken originated, formulated, organized that agreement.

Did he know the purpose? He originated the purpose. It was his plan and his scheme.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2864 of 3636

And was there one or more overt act undertaken pursuant to the conspiracy? Those are enumerated. The judge listed them on Friday. They are 19 in number. And in consideration of your time and patience, I'm not going to go through them with you again. They begin on page 59. They include such things as Angela Johnson's purchase of a semi-automatic handgun; the killing by Johnson and Honken of Greg Nicholson and the members of the Duncan family; the killing by Johnson and Honken of Terry DeGeus; the contact with Rick Held about that pup; the schemes with Donaldson and Altimus.

Nineteen in number, ladies and gentlemen. You can look at them, and I'm not going to take the time to go over every one. You've been most patient already. But look at them, and I would submit that when you do you will feel the evidence establishes beyond any reasonable doubt that the defendant is guilty, that the killing was done for the purposes -- excuse me, that the conspiracy to tamper with witnesses and solicit the

♀

3285

murder of weapon -- witnesses, that he's guilty of that, and that the five purposes, each has been proven. Any one is sufficient, but you can mark all five if you feel all five have been proven.

And finally as to the 19 overt acts, you may unanimously agree on just one, but I would submit to you that as you read the 19 overt acts that are scheduled that the judge read to you last Friday, you will find the evidence establishes beyond a reasonable doubt each and every one of those, from Angela Johnson's purchase of that Tec-9 on July 7, 1993, on down the line.

And finally, ladies and gentlemen -- excuse me, not

finally. Second to last, Counts 8 through 12, the conspiracy murder counts, have a number of elements that are set forth in instructions beginning on page 68 of the judge's instructions: First, that the defendant was engaged in a conspiracy to commit a drug crime between 1992 and 1998; secondly, that the conspiracy involved at least 100 grams of pure meth; thirdly, that while engaging in the drug conspiracy the defendant killed the victims in question.

Ladies and gentlemen, as to conspiracy to commit a drug crime, you have in evidence Exhibit 303 which is the judgment and sentence of conviction of two drug crimes, conspiracy to distribute methamphetamine and attempted manufacture of methamphetamine, February 1998, conspiracy

♀

involving at least 100 grams of pure methamphetamine.

Ladies and gentlemen, Exhibit 25 is the laboratory report of Nila Bremer. One of the chemists, one of the drug government chemists, whose life, the taking of whose life, was discussed by Dustin Honken in the spring of 1996 gave a report dated April 28, 1993, indicating that among the property seized from Greg Nicholson which was drugs supplied to Greg Nicholson by Dustin Honken was a container with 148.34 grams of 97 percent pure methamphetamine. And the testimony of DEA Agent Mizell was that that translates -- 97 percent of 148.34 grams purity translates to 143 grams of pure methamphetamine.

And again on page 6 of the Court's instructions, actual pure methamphetamine is the methamphetamine itself, that is, either by itself or contained in a mixture or substance. This 97 percent pure 148 grams of 97 percent pure methamphetamine is the equivalent of 143 grams of 100 percent

pure methamphetamine, more than 100 grams of pure meth.

And finally the intentional killing. We've already discussed that at great length, and I'm not going to go over that again.

As to Counts 8 through 12, the form of verdict indicates with regard to each of the five victims not guilty or guilty. Should you find beyond a reasonable doubt defendant is proven guilty of each five -- each of these five, you check the guilty box.

♀

And on the second page of that verdict as to Counts 8 through 12, if you find as is proven by the laboratory report that there was 148-plus grams of 97 percent pure methamphetamine, then you should check the boxes indicated, that this drug killing included distribution of 100 grams or more of actual pure methamphetamine and that this drug murder included the manufacture of 100 grams or more of actual pure methamphetamine.

Ladies and gentlemen, Dustin Honken was engaged both in the manufacture and, through DeGeus and Nicholson, the distribution of methamphetamine.

And finally that Dustin Honken with Angela Johnson jointly committed these murders. He intentionally killed these victims, did not merely aid and abet their killings:

Finally, ladies and gentlemen, the last 5 counts of the grand jury's indictment are Counts 13 through 17 defined for you -- the elements of which are outlined for you beginning at page 74 of the judge's instructions. And they include several elements: One, that Honken engaged in a continuing criminal enterprise as defined; secondly, that Dustin Honken

intentionally killed his victims; thirdly, that the killing of the named victims was connected to the continuing criminal enterprise. We would submit to you that the evidence establishes each of those elements beyond a reasonable doubt.

Continuing criminal enterprise is defined in the

instruction for you beginning on page 74 and involves several elements: First, that an organizer, supervisor, or manager of the continuing criminal enterprise committed a felony violation of the federal controlled substances laws; second, that the violation was part of a continuing series of three or more related felony violations; thirdly, that the series were undertaken by the organizer in concert with five or more other persons; fourthly, that he actually organized, supervised, or managed those five or more other persons; and finally, final definition or element included in the definition of a CCE is that the organizer, supervisor, or manager obtained substantial income, money, or property from the series of violations.

And just to go through quickly, three or more related violations, again, we have, as I've already discussed, the two convictions in '98, the possession of more than 100 grams of pure methamphetamine as shown in the laboratory report. Exhibits 51 and following are a series of photographs that show the methamphetamine manufacturing laboratory at the home of Dustin Honken searched in February of 1996. Again, Exhibit 303 shows two actual convictions.

There are 13 listed violations, 3 of which are necessary to establish the CCE. One is that between '92 and 2000 the participants distributed methamphetamine on unspecified -- on specific unknown dates. Again, he's been

convicted of that.

Second, between 1992 and 2000, the participants possessed with intent to distribute methamphetamine on specific unknown dates. And as to that you know that in Tucson with Cutkomp and his brother he possessed such amounts of methamphetamine on multiple occasions.

Third, that on March 17, 1993, Greg Nicholson possessed with intent to distribute 143.89 grams or more of actual pure methamphetamine. Again, that's the amount that's shown by that lab report adjusted downward for 97 percent. 148 grams of 97 percent is the equivalent of 143 grams pure.

The fourth violation, between '92 and 2000 the participants conspired with each other to manufacture, distribute, and possess with intent to distribute 100 grams or more of actual pure methamphetamine. Again, he was convicted of that.

The fifth, between '92 and 2000 the participants used a communication facility, specifically the telephone and mail, to facilitate the commission of felony drug offenses. As to that possible violation of a federal drug law, we have the testimony of Tim Cutkomp and the testimony of Dan Cobeen. Cobeen said that they set up a mail drop in Des Moines. Tim Cutkomp testified that they called to Iowa before many of the deliveries of drugs in '92 and '93.

The sixth listed possible violation, any three of which are sufficient, is during September of '95 Honken had a

mailbox established in the name of Cytomex Company in Urbandale, Iowa. Again, the testimony of Dan Cobeen and Tim Cutkomp was to that effect.

The seventh violation, any three of which are sufficient for this element of the CCE, is that between '92 and '93 Honken and Cutkomp operated a methamphetamine-producing laboratory in Arizona using the name Printed Circuit Technology and manufactured 100 grams or more of pure meth. Again, I remind you of the testimony of Cutkomp and Jeff Honken.

Eight, on specified unknown dates between '92 and '93, the participants manufactured 100 grams or more of actual pure methamphetamine. Again, the testimony of Cutkomp was to that effect and I suspect is clear and establishes that beyond any reasonable doubt.

The ninth, between the fall of '95 and February of '96, the participants operated a laboratory at Honken's house in Mason City. Again, he was convicted of that, and those photographs beginning with Exhibit 51 document that.

Tenth, that during '95 and '96 at Number 5 19th Street South, Clear Lake, Iowa, Honken knowingly and intentionally possessed chemicals, equipment, and materials to be used in the manufacture of methamphetamine. And here you have the testimony of Lori Lewis who searched Angela Johnson's residence in '96 and found equipment and materials for the manufacture of methamphetamine and the testimony of Tim Cutkomp to the same

3291

effect, that this production began briefly at Angela Johnson's residence in Clear Lake.

The 11th of the 13 violations, any 3 of which are sufficient for this element of the CCE, is that on or about

October 17, '95, Honken had an individual purchase a cylinder of hydrogen gas for the development of methamphetamine and from Dan Cobeen you heard that testimony, the acquisition of that cylinder.

Twelve, the 12th violation of federal drug laws, on or about January 22, '96, Tim Cutkomp and Honken knowingly and intentionally possessed manganese chloride and other chemicals, equipment, and materials that may be used to manufacture meth. The testimony of Cobeen, Cutkomp, and that of Agent Graham who participated in the search establishes that.

And finally, the 13th drug crime, any 3 of which support this element of the CCE, on or about February 7, 1996, defendant's residence in Mason City, Iowa, one or more participants possessed a three-neck, round-bottom flask and other chemicals and equipment to be used to manufacture methamphetamine. And there too you have the testimony of DNE Agent Graham.

The government for elements 13 through 17 must also prove that Dustin Honken was an organizer. On that score please note -- I guess the actual language is organizer, supervisor, or manager, and I would submit to you that the evidence shows all

3292

three even though originally Jeff Honken, Dustin Honken, and Tim Cutkomp were in partnership.

The Court's instructions, you will find, show that there may be more than one organizer. On page 77, there may be more than one organizer, supervisor, or manager of the CCE. If Tim Cutkomp and Jeff Honken to any degree supervised and managed this, they did so in joint criminal conduct with Dustin Honken. And I would submit to you that among the three, clearly Dustin

Honken was the organizer of this criminal activity. It is he who was the chemist. It is he who had the know-how. It is he who actually put together the method of manufacturing methamphetamine. It is he who invited Tim Cutkomp to Arizona. It is he who distributed drugs through Terry DeGeus and through Greg Nicholson.

And again, ladies and gentlemen, reminding you one more time that the transcript of tapes is not evidence -- it's the tapes themselves that are evidence -- you did hear an undercover recorded tape of a conversation on March 21, 1993, between Greg Nicholson and Dustin Honken in which you heard Dustin Honken state, I bring white shit with me every time I come. You should probably have a lot more money for me next time I'm around, discussing his desire to get into the kilogram market here in Iowa. God, I'd love to get that market. As soon as we get past this little hump here in the next couple months, I ain't gonna come up here but every couple weeks, in the voice

of Dustin Honken discussing his plans for the continued development and growth of his methamphetamine manufacturing and distributing criminal enterprise.

Was he an organizer? It is he who ordered the destruction of the meth lab equipment in '93. It is Dustin Honken who took steps briefly to reassemble that lab when he asked Tim Cutkomp to come down and pick up some materials that was aborted when Tim Cutkomp lost his nerve and didn't do so. It is Dustin Honken who actually reassembled that meth lab in '95 and '96, first at his girlfriend Angela Johnson's house in Clear Lake and then at his residence in Mason City. It is he, Dustin Honken, who recruited Cobeen and Cutkomp's assistance and

money from his girlfriend Angela Johnson with whom he continued to maintain a business relationship even when their personal relationship went on the rocks, still parents of that daughter of theirs, still partners in crime.

Finally, we are required to prove beyond a reasonable doubt that this continual criminal enterprise involved five others, and I would submit that how ever many others were involved in this drug enterprise, in addition to Dustin Honken, there were at least five others:  Namely, Jeff Honken, Tim Honken (sic), Angela Johnson, Greg Nicholson, and Terry DeGeus.

The government is additionally required as one of the elements of CCE murder, in order to prove the CCE, to show that substantial money was involved.  And here too I remind you of

♀

3294

that drug ledger that shows the thousands of dollars that were owed by Greg Nicholson and Terry DeGeus, in Nicholson's case actually paid off from time to time; Nicholson's own comment during that undercover tape that he delivered many thousands of dollars; Melissa Friesenborg's testimony that Defendant Honken had cash and used it to buy stereo equipment; and finally Exhibit 26 taken at the seizure, the search of the Greg Nicholson residence itself showing cash laid out on the table.

Ladies and gentlemen, should you find the defendant guilty beyond any reasonable doubt of CCE murder, Counts 13 through 17 of the grand jury's indictment, you should mark guilty which is the second line on Counts 13, 14, 15, 16, and 17.  You must then indicate which of the alleged violations constitute the series of three or more violations of federal drug laws.  As part of the CCE, there are 13.  I would submit to you that you have evidence supporting beyond any reasonable

doubt putting a checkmark beside each one of those 13. You need find only 3 unanimously and then finally, again, that Dustin Honken killed these five individuals. He did so jointly with Angela Johnson. Together they killed five people, Counts 13, 14, 15, and 16 and 17, placing your numbers and, on a separate page to be sealed, your signatures.

Members of the jury, representing the plaintiff in this case, the United States, I ask that you return the only verdict reasonable and logical under the evidence in this case,

a verdict finding Dustin Honken guilty as charged on all 17 counts of the grand jury's indictment.

THE COURT: Members of the jury, we're going to take our noon recess. It will just be 35 minutes, so we'll be back at one o'clock to hear the closing argument on behalf of the defense.

MR. PARRISH: Judge, could we approach just one second?

THE COURT: Sure.

(At sidebar on the record.)

MR. PARRISH: Do you think 35 minutes is going to be rushing them on this?

THE COURT: Do you want more time?

MR. PARRISH: I think they ought to have about 45 minutes.

THE COURT: Okay. I thought you were anxious to get up.

MR. PARRISH: I am, but I think with this short of a break --

THE COURT: Fine. Fine.

(The sidebar was concluded.)

THE COURT: Forty-five minutes, so we'll see you back here in forty-five minutes. Please remember my cautionary instruction about keeping an open mind until you've heard all of the arguments, received my final two instructions, and go back

to the jury room to deliberate. We'll see you back here in 45 minutes. Thank you.

(The jury exited the courtroom.)

THE COURT: Anything we need to take up?

MR. PARRISH: No, Your Honor.

MR. MILLER: No, Your Honor.

THE COURT: Okay. Why don't you be seated. I have one matter that I want to discuss with you. Well, a couple.

Mr. Miller, thanks for telling the alternates that they were alternates because their numbers weren't up there.

MR. MILLER: I just put one, two, three, four -- I didn't put anybody's actual number.

THE COURT: Oh, I thought you put -- oh, those weren't actual juror numbers?

MR. MILLER: No.

THE COURT: I see.

MR. MILLER: I just put --

THE COURT: Because I looked for one of the alternate's numbers up there, and it wasn't there. I gotcha. They were hypothetical.

MR. MILLER: Hypothetical numbers.

THE COURT: Okay. I appreciate that. I don't think it would have been a problem in any event.

I want to talk to you about this discussion that we

had previously had about Rule 24(c), retaining the alternate

jurors, and there's actually a case, Mr. Williams, that says you can retain the alternate juror who doesn't sit in in the merits phase and then if there is a penalty phase use them in the penalty phase. There's actually a case that we found that says that.

But setting that aside for the moment because we don't need to discuss that right now, I am going to retain the jurors as alternate jurors. I've discussed that with you. But I've had a change in thinking on it. And here's my change in thinking.

I think rather than have them come back here and be in a room with just the alternates -- I'm just thinking about this; I want to make sure the parties agree if you can -- it would be better to send them home with a strong cautionary instruction that the alternates can't discuss the facts of the case with anybody; they can't read any news reports about the case; they can't listen to anything.

Here's my thinking. I think there's actually more of a likelihood that they might discuss it if we keep them at the courthouse every day in a room all by themselves when the other jurors are deliberating discussing the case. So that was my thinking in not keeping them at the courthouse. And then we would just have a telephone number that if we need them -- in the unlikely event we would need one, then we would just call them, bring them in, and then I'd have to instruct, as Rule

24(c) says, to start the deliberations anew if we're ever in

that situation, but I'm not sure I see the need to keep them at the courthouse. But if anybody's going to object to me sending them home, then I'm going to keep them at the courthouse.

MR. WILLIAMS: Your Honor, on behalf of the United States, there would be no objection to that plan.

MR. ROGERS: Can we think it over and tell you --

THE COURT: Yes, you can. Why don't you tell me back -- why don't you tell me right before we bring the jury in in 42 minutes.

MR. ROGERS: That's fine.

THE COURT: Okay? Thank you. We're in recess.

(Lunch recess at 12:28 p.m.)

THE COURT: Please be seated for a minute.

Mr. Parrish, you can continue to work.

MR. PARRISH: Thank you.

THE COURT: Mr. Rogers?

MR. ROGERS: Your Honor, we would have no objection to the plan expressed by the Court before lunch of giving the alternate jurors, after the other jurors have left to begin deliberating or go home, whatever they choose to do, with giving them a strong admonition and then allowing them to remain at home unless and until they're needed back.

THE COURT: They're called back, yeah, okay. Government have any response to that?

3299

MR. WILLIAMS: No objection, Your Honor.

THE COURT: Okay. But I like the suggestion that Mr. Parrish came up with that we'll send the 12 actual jurors down to deliberate and then I'll talk outside their presence to the alternate jurors and explain the course of action with

regard to them.

Okay. Thank you. Are you ready, or do you need a few minutes?

MR. PARRISH: I'm all set, Your Honor.

THE COURT: Okay. Let's have the jury brought in.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Parrish, whenever you're ready, you may give your closing argument on behalf of Dustin Honken.

MR. PARRISH: Thank you, Your Honor. May it please the Court and counsel.

MR. MILLER: Counsel.

MR. PARRISH: Good afternoon. Before I get started with my argument, I want to thank some people who have worked with me on this case.

Leon Spies, one of my best friends whose work I've admired from afar down in Iowa City, I want to thank him for the work and sacrifices that he's put together on this case in helping me present this case and also for Mr. Rogers, for your hard work and sacrifices. I want to let you know I found a new

friend, and I hope to share it for a lifetime. From the work I've seen you all do, you've instilled in me a greater respect for the law. And each of you have made me proud and lucky to be a part of such a noble profession.

To Mr. Williams and Mr. Miller who I've worked with and we've opposed each other greatly on the facts, I want you to know that I have great respect for both of you. And even though we're opposing counsel, I hope we've demonstrated that you can be opposing counsel without being personal enemies.

We all know of the hard work that all of us have had to put together to present this case here in Sioux City, so I would be derelict if I did not thank the staffs here in Sioux City, Cedar Rapids, Iowa City, Kansas City, and thanks, Julie, who's taken a year off -- a semester off law school to be here and work with us and Sali who's done so much work from the U.S. Attorney's Office in helping us coordinate all the documents that we've had to put together and also the marshal's office, the people who have, in fact, been kind enough to work with us with our visits -- they've gone over and beyond the call of duty in making things work smoothly -- and Shelly, the court reporter, and Carey, the judge's law clerk, they've been amazing.

I want to go back for just a minute. I want to go back to the voir dire. I want to go back a few months before that when at some point there were about 650 questionnaires we

had to look at. And we started working -- the lawyers and all of us started working through this case to make some sense of where we were going to end up.

And I saved the best for last, you, the jury, because I want to thank each of you last. You've taken the time, made the sacrifice to be here, to be away from your family and friends, the same as we've been away from our family and friends and staff for the last almost two and a half months for us.

But what I want to do is go back and talk to you about what we talked about when each of you came in here separately. Each of you came in and sat down in this chair, and you told us something about yourselves that distinguished you from the 650 people we had started with, and you told us a little bit about

yourselves that distinguished you from the other 75 or 150 or how many ever people we called in. What did you tell us that was so significant and so important?

Well, a couple of things you told us. We told you our concerns. We said, Look, there are two dead babies here. And if you can't get past the two dead babies and look at the evidence objectively, maybe this is not the case for you. We said, It's going to be difficult to look at the photographs. And heaven knows I've cried late at night with four kids and three grandkids when you look at photographs like this. You can't help but cry.

And we also said, There's another issue that you have

to address and tell us all that you could be fair in, and that is whether or not you could deal with the issue of methamphetamine, an absolute scourge on our society, and look beyond that and look to the facts of this case.

We didn't tell you about the closing and the photographs and how it would be presented electronically because we think people in our day and age are sophisticated enough to know we're not in a TV show. We're still back in the day-old age of where your hard work pays off and where the good old detective work is the kind of thing we're looking for. So we weren't so concerned about the shock and awe of photographs being presented through the electronic courtroom which is really part of the day and time, but it can't take away from real hard facts that you have to look at ultimately to reach a decision.

One other thing and one other person I want to thank, and that is Mr. Honken and his family for having the confidence in me for the last eight and a half years to represent him.

And to the families for their losses, the Duncans and the DeGeuses, our heart breaks for them too, but that's still not a reason to convict someone of a crime they did not commit.

And now we're going to talk a little bit about some of the evidence that is part of this case.

Remember in voir dire we talked about some of the things that may concern you as jurors? Remember we talked about the kids. We talked about the photographs. Remember most of

you indicated, well, you've seen photographs like that. And we reminded you, either Mr. Spies, Mr. Rogers, or myself or maybe sometimes the prosecution, that you can't convict someone based upon photographs. You can't convict someone based upon horrific pictures.

Each of you indicated that you would not. Each of you indicated that what you would do is review the hard evidence, that you would look at the evidence, that you would evaluate the evidence, that you would determine if from that evidence it is sufficient to convict someone of these crimes that Mr. Honken is accused of.

And what was amazing about the 16 of you who remained in the jury box is that each of you said that you would. Each of you said that when you go back into the jury room you would, in fact, review the evidence.

And I recall Judge Bennett at one point in his questioning talked about -- talking about courage, and in that comment about courage to you, he said, Do you -- and he picked out specific jurors each of the 15 or 18 days we were here and said, Do you, ma'am, or do you, sir, have the courage if everyone else disagrees with you to stick with your conviction?

Listen to the other side, but after you listen to the other side, would you have the conviction to stick with what you believe to be the right and proper and just verdict? And he reminded each of you could you do that?

♀

All of you indicated that you would, so you are the chosen few. And the chosen 12 who walked into the courtroom and walks back into the jury room and take this evidence with you will be the people who ultimately will decide this case. No one else on the planet, no one from any newspaper, no one from any outside influences like your spouse, your best friend is going to be there with you. And that's all we want.

We want you to take into that jury room your good old Iowa common sense, your good ol' Iowa upbringing that tells you we in Iowa do things differently. We look at the evidence. We evaluate the evidence. We're not swayed by emotions. We're good, solid people who look at the facts. That's all we want you to do.

And I want to tell you something. If you go in there and you look at the facts the way that we're going to present them to you in the next few minutes -- I should say next three and a half hours -- in the next few minutes -- it won't be that long -- in the next few minutes, there is no way, no way any of you could convict Mr. Honken on this evidence. And I'm going to lay out reasons why.

This case is flawed from the beginning. It's so obvious. It's so obvious that nobody can see it. It's kind of like a white elephant walking around in the courtroom and no one talking about it. And trust me, I had serious thought about using the term white elephant a few days before election, but I

want to tell you it's like having a white elephant walking around the courtroom. Let's talk about that for a few minutes.

Before I do, you know where else we have to start now that we've gone through voir dire. We now have to talk about some preliminary instructions that Judge Bennett gave you. You remember in those preliminary instructions Judge Bennett talked about the presumption of innocence? And remember at some point a couple of jurors says, Well, I can't do it. I can't give Mr. Honken the presumption of innocence because of something I read in the newspaper, something someone else had said to me, something -- I believe if kids were killed I can't do it.

But each of you said that you could. Each of you, if you had read some article in the paper, indicated, Well, if I read it, so what? I'm going to give him the presumption of innocence.

And you remember what else Judge Bennett said? On the presumption of innocence by itself is enough to end the trial with not guilty, just the presumption of innocence.

So what I'm going to do in the next few days -- oh, God, no, the next few -- you guys are saying, Oh, man, is he ever going to quit? What I'm going to do in the next few minutes is discuss with you the presumption of innocence and why that is so important, not in a detailed discussion but in the context of this case.

This means simply this: Dustin Honken sitting here

right now, presumed to be innocent. That's what each of you

indicated, presumed to be innocent. So if you accept the fact on nothing else, that's adequate. The case is over. No evaluation of the evidence. But we invite you to evaluate the evidence. We invite you to, and let me tell you why.

Let's start with where I told you you would be going in this case. I told you in my opening statement that you would be going on a journey for justice for Mr. Honken.

Mr. Honken walked into this courtroom in 1996, and he accepted responsibility and was sentenced in 1998. He told the Court something that a young man of his stature would have told them. What did he tell them? He says, I've seen the harms that drugs could do to people, and what I want to do is do my time and come out and help. And as a result of that, this young man was sentenced to 27 years in prison, 27 years. He didn't exercise a thousand other options that he could have taken. He walked in here, and he accepted his responsibility.

And you know what else, why I invite you to look at the evidence in this case? What else did he say? I manufactured drugs, but the government stands up in their argument and for an hour and 30 minutes, they talk about what we've conceded. Why is that? Because they don't want to talk about the evidence. But we're going to talk about the evidence. For an hour and a half all they talked about was something we conceded from the -- from voir dire examination.

When you get down to the evidence, it gets a little scary for the government, and we'll explain why.

One thing you should remember as you go through -- and Mr. Miller's going to be given an opportunity to come back up and rebut my argument after I finish. But what you should do is

that it's important, as the judge laid out to you in the preliminary instruction number 3, do not let sympathy or prejudice influence you -- do not allow sympathy or prejudice to influence you. The law demands of you a just verdict based solely on the evidence, your common sense -- the only thing I would add to that that I like so well is your good ol' Iowa common sense -- and the law as it's given to you. That is what we want you to do.

Let's talk about the government's opening statement. Mr. Williams gave that opening statement in this courtroom, and that opening statement is flawed, and I'll tell you why.

First of all, he says Terry DeGeus and Mr. Nicholson are the only other customers of Mr. Honken in 1993. Well, if that was the case in 1993 and we accept it, their argument is that he had other customers after 1993? Well, if he did, where are they? He delivered Mr. Held some methamphetamine when he worked at Kraft, but other than that -- it was a small amount that Mr. Held used to stay awake -- where are his customers after 1993?

So they concede he had two customers at best.

He said Mr. Honken had an appointed attorney. What does that mean? He explained it briefly, that he had no money. So here's Mr. Honken in 1993 broke, no money.

Then he says another point, that Mr. Thinnes who came in and testified -- would testify that the person on the tape identified himself as Greg Nicholson? Did that come out from Mr. Thinnes or any other witness at this point?

Then he said Mr. Nicholson's wife left him because she found out he was dealing drugs. Ladies and gentlemen, the

evidence in this case shows that Mr. Nicholson was dealing drugs out of the basement of his home for years. Scott Gahn verified that. So what does he mean in his opening statement as what the evidence is going to show? The evidence was the contrary of what he said it was going to show.

He also said there was a gentle stream where the bodies were buried.

I'm going to show you that spot in just a second, and while I'm showing you that spot, I want you to think back. You know, this year where is the eyes -- where are the eyes of the nation focused? On Florida; right? Four hurricanes, one year.

You might be thinking to yourself, why in the heck is he talking about Florida in 2004? The reason I'm talking about Florida in 2004, do you know what this is? It's a floodplain in 1993. Where were the eyes of the nation in 1993? Where were the -- they were focused on Iowa. You know why they were

focused on Iowa. Use your common sense, and I'll show you points in the record where they referred to it. We had more rainfall and more flooding than the history -- recorded history. You know what this is, 406A? It's a floodplain.

Now, let's flash forward for a second to a question asked the lead investigator into the case, Mr. Basler: Did you know what that area looked like in 1993? No, I have no idea.

So in 1993 are they telling us that the bodies were buried in a floodplain when every stream -- with a gentle stream running down it? This is a floodplain. And let me show you the evidence that supports it.

Put the chart up with the weather, 1993 chart. Point to the line at the bottom where it talks about in general -- oh,

oh, okay, The homogenous nature of sediments above the grave feature indicate the site may have experienced one or more flooding episodes since 1993.

Where was this gentle stream flowing in 1993, folks? There's a pink elephant walking around this crime scene, and no one knows it. The lead investigator, the lead investigator, who sees that it's a floodplain had no idea what it looked like in 1993. It's flawed. The case is flawed. So they buried them in a floodplain in 1993?

You remember a couple of references to it as a person who got meningitis taking sandbags up, and you saw the area with the floods, and you're going to see some other things related to

♀

the weather later on that talks about the scene and what would have been out there in 1993. This is not my evidence or their evidence. This is all our evidence just like any witness that comes into the courtroom. It's not their witness or my witness. They're each of our witnesses.

So here we have right now according to the government's own experts a floodplain in 1993. That's just to start the case. That's just the starting.

So a gentle stream is what the prosecutor said in his opening statement, and nobody bothered to check that it was a floodplain in 1993, and every major stream and river in Iowa, we don't even have to think about it because we all know what it looked like. But yet they would have you to believe that in that instance that's where the bodies were buried.

You can take those off.

We're going to go forward and talk a little bit more about the weather because it's going to tie in as being

significant to other matters related to the physical evidence in the case. But right now let's continue to talk about the opening statement of Mr. Williams.

Mr. Williams talked about Mr. Honken and Mr. Cutkomp in conversation only talking about what could be interpreted as bad things, not saying that for two tapes he talked about legal arguments, and then, as Mr. Cutkomp says, they started pressuring him a little bit to get more into detail.

3311

The government in his opening statement talked about these witnesses from the jail only. The jail only they talked about, and they did not talk about the federal people who were going to come in, the murderers, and try to connect somehow Mr. Honken to any of these statements or any of this evidence.

So the question is why would they ignore these folks? Now, realize that opening statement is not evidence, but what I would suggest to you, it does outline their case. Did they have doubts about these people, the reason they didn't mention them? You go back and use your own recollection of the opening statements. Don't use what I say as part of the opening statements in this case as being accurate.

Now, as I get more into my closing statement, this is what I want to tell you. Clearly it's not evidence, but if what I say to you is reasonable, if it's logical, if it's factually accurate -- and I hope I don't misspeak, but if I do, it's not deliberate -- all I would ask you to do is use that as a tool in your deliberation. Use it either to organize your thoughts or use it to challenge other evidence that would send the point that Mr. Honken did this act because the evidence presented shows he did not do it, that the government's theory is out

there but they can't get any facts to fit it.

Now, in my opening statement I agreed that the killings of these kids and this family was horrific and it shocked the conscience and rattled the soul, but you don't

convict someone of a crime they didn't do simply to find a solution.

I also told you that Mr. Honken was an individual who was a chemistry nerd. Was that accurate? Did everybody say that who talked to him from the time he started in until the last witness who testified, that he conducted himself in a manner that was proper? No incidents of violence, not one person except for this incident the government wants to say that he did, not one, not in the toughest penitentiary in the United States at Florence, Colorado, not in the jail. There was one threat when a guy wouldn't turn off his TV so he could do his legal work. Not one other incident, not Mr. Cutkomp's incident. Remember what Mr. Cutkomp said. He never once admitted it to me in all the conversations I had with him, in all the conversations.

But yet the government comes up in its closing and plays snippets. See, that's the beauty of modern electronics. You can make anybody say anything at any point in time. It happens to the highest government officials who end up getting embarrassed by people putting together things that it looks like someone else said with taking it out of context. You could do that with anything nowadays. Put it in context, and I'm going to talk about that a little bit later.

I also talked about his experience with a weapon. Remember that in my opening statement, that he had little

experience with weapons? No one's ever seen him carry a weapon. Tim saw him with a 22 and 45 out in Colorado, and that was about it. Nobody else came in here and said they saw Mr. Honken with a weapon.

And also I said one other thing: The drug trade attracts different sorts of individuals, people who are -- who have lifestyles surrounded by deceit, danger, secrecy, addiction, heartbreak, and violence. There's no doubt because of Dustin's abilities these type of people were attracted to him. Nicholson was attracted to him. DeGeus was attracted to him. Angie Johnson was attracted to him.

And what is the statement that the prosecutor said in his closing argument? They were inseparable? Where in the evidence that you see did you see these folks are inseparable?

In a few minutes we're going to talk about the phone calls. She was calling Terry DeGeus in August. She called him the night before the incident happened. She called him the day after. She didn't call him. So what is the government talking about? They want to make something fit into their theory.

What else did I tell you? I said there would be no physical evidence to connect, absolutely none, to connect Dustin Honken with this incident of July 25 or November 5. Was that accurate? You answer the question when you get back into the jury room and after I review this evidence with you.

And if you believe that based upon this evidence

there's something that connects him, then you do your duty. But if you believe there's no evidence as I said in our opening

statement that connects him, you also have to do your duty and return a verdict of not guilty.

I talked to you about the people who were coming in, but also I talked to you about one other thing. I said there will be letters that Dustin wrote. And, of course, I told you they were monitored. He wrote -- his mom wrote him every day -- and I kind of calculated in my mind. She wrote him every week from the time he was in Woodbury County Jail, well over a thousand letters. And you'll see from the evidence that he was a very prolific writer also.

In all the letters he wrote, all of the things he wrote, all of his monitored phone calls that they listened to, all the tapes around the prison, the monitors, the videos, was there one who came in and said, This is what Dustin said that incriminates in this case? Absolutely not, not one single thing. Isn't that amazing? Since 1996 and there's nothing.

Well, I said that in the opening statement, and you can see from the opening statement and compare them in terms of the accuracy and what we believe the evidence will show you. But pay particular attention to the gentle stream of 1993 in Iowa. It must have been the only gentle stream in Iowa that didn't rise, and it's in a creek bed. Use your common sense. It's in a creek bed they said.

♀

3315

I want to turn for a second to reasonable doubt. And let me just add, up to this point in the trial they said nothing about it. But when they come back in rebuttal, I don't know what they're going to say about it. They might say, Well, it's a red herring. Well, the evidence refutes that. They might say, Well, we didn't think about it, and it was irrelevant. The

evidence refutes that.

They says, Well, our investigator didn't look at it. Mr. Basler didn't take time to pull up the reports. Well, they can't say that because he's admitted that he didn't do that. So they're going to have to deal with this issue when they get back up in rebuttal. You pay close attention as you have to everything else as how they deal with this issue that they forgot about and that makes their case flawed.

Now, you can find not guilty solely based on the fact that this was a floodplain in 1993 and no bodies could have been buried there. That's not someone flying out to Pluto. That's the hard, cold facts of Iowa. That's the hard, cold facts of 1993 of somebody alleging that somebody buried five bodies or four bodies in a floodplain. That won't fly. That won't fly with good old common sense Iowa folks. I'll change the old adage, but it won't fly in that sense.

But what is reasonable doubt? This is what the Court says in instruction 16: A reasonable doubt may arise from the evidence produced by either the prosecution or the defendant

♀

3316

keeping in mind that the defendant never has a duty or -- burden or duty of calling any witnesses or producing any evidence. It may also arise from the prosecution's lack of evidence.

A reasonable doubt, folks, is a doubt based upon reason and common sense and not mere -- the mere possibility of innocence. Doesn't have to be a small doubt. Doesn't have to be a large doubt. It has no color, taste, or smell. It can be failure of the law enforcement to check the Duncans' house -- and we're going to go through the house in a few minutes not literally but in the sense of talking about it -- the failure to

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2892 of 3636

check Nicholson's car, the failure to check for prints, the failure to trace the so-called video camera, the failure to examine shells.

We're going to talk about each of those things, and that's why I invite you into this evidence package that they presented. Over a thousand pieces of evidence they've brought into this courtroom. You go through it. You go through it when you get back in the jury room. You know it can be a tiny doubt as long as the doubt is based upon reason.

Now, let's look at the weather charts again. Let's put back up Defendant's Exhibit S for just a second. I believe it's S. Yes. What do we know about Iowa weather in 1993 now that the evidence shows us? Interesting. Okay. July 24 what's happening? The average wind speed July 24 -- and we just went through July -- ten miles per hour. That's a little high. We

can tell that. Average temperature, 77 degrees Fahrenheit in July in Iowa? Precipitation, .08 inches. Sky coverage, what does it say on the 24th? Overcast for most of the 24-hour period. Doesn't that bring back memories to most of us who can remember that time?

Let's go into the 25th. What is the wind speed doing? It's picking up. You can tell by the document. It's picking up. 13.9, pretty windy for July around here; right? What's happening with the weather on the 25th? Almost if you round it off, two-tenths of an inch of rain. Sky coverage, overcast for half of the 24-hour period.

Well, what do we have here? We go to the 26th and 27th. What do you see in July? Four days of rain in a floodplain. And again, use your common sense. What's going on

down there?

Let's go from there to the house. And they had a photograph of the house. But we're going to talk about -- put the physical evidence initial chart up. Let's go to the one you just put up. Yeah, right. Thank you.

What did Mr. Basler say? If you don't look for it -- when Mr. Spies asked him that question, if you don't look for it, you can't find it. Well, clearly we know he didn't look for the weather in 1993. He's admitted that. So there's a creek bed, a flood -- in a floodplain, and you saw the aerial photographs, and use your common sense and figure out what it

was doing in 1993 which they didn't even bother to check, by the way. You have to first look for it, the physical evidence. Then you have to search for it as a good detective. Then you have to examine it. Then you have to collect it. Then you have to test it and determine if it matches and prepare a report. If you don't look for it, you can't find it.

Let's just go to the house for just a minute; okay? July 25 we want to go to Miss Duncan's house, and I don't think we have a PowerPoint on that, so we don't need anything up. But what I'm going to do is go to the Duncans' house for just a second. What do you remember about the house from the evidence as presented?

It's in a quiet neighborhood. There are houses close by, and they said these folks were there on the 25th and Amber left her little friend and -- Brittany and told her good-bye, and this is about three o'clock.

What else do we know? We also know that the mom or someone sees the daughter out on the back porch about 4 p.m. We

also see Greg Nicholson ride up on his motorcycle; right?

But what else about that house do we know? We know that the daughter's car, Lori's car, is parked in an unusual fashion. Remember the mom talked about that? And also you see Greg Nicholson's truck parked right by the door. So no one's going to be driving up in that driveway without leaving tracks on the side to get to the back door as the detectives or the

♀

government wants you to believe that happened. That's the first thing.

Second thing you have to look at is the motorcycle is there. The truck is there. Lori Duncan's car is there. Someone comes by at 6:50 and sees that, comes back at noon, the mother, and sees the same thing again. And two little girls are nowhere to be found and they find a note. No means of transportation and a note.

Well, what does this call for? Well, if you ask Mr. Basler about it, Mr. Basler says, Well, it wasn't my job. I wasn't doing it then. It was the Mason City Police Department's job. Well, what if that problem of not doing basic work reflects on you making a decision that you want men to convict the wrong man because now we have all these theories floating around, all these rumors about these people disappearing that takes seven years to accumulate? All these rumors are circulating now. Build the conspiracy; let it go as long as it can. The conspiracy will build. The longer it takes, the more conspirators you have.

But let's look back at that house and see what's missing. We know it's wet. The government's not going to get back up here and dispute that. They missed it, but they know

it's a fact because they're going to use their common sense and figure out that we're right, they're wrong.

Now, what's inside of that house when it's wet

outside? If people went in there, there are going to be tracks, right, in Iowa? What about Mr. Nicholson's truck that's parked out there? What about the lights in the house? What's the configuration? What about the fingerprints in the house? If there was no disturbance, did these people know the people they went away with.

And who's to say they died on that night? Where is the evidence to support that from that house? Did they take any clothes? Did they take the green sock and match it up back with the house? Wait a minute. Are we talking about convicting someone of murder here? On what? On this physical evidence that they didn't even bother to check until Paul Bush came in in the year 2000, 7 years later, to check for blood?

Folks, step back a second. Step back. They didn't put the swimsuit up and sit in front of you for three days by accident. They knows what motivates this case. It's not the physical facts because the physical facts don't fit. Why did they wait till the year 2000 to bring the top criminalist into the house to check on it? Think about it. And he said he found something that looked like blood maybe in the year 2000? They didn't check Greg Nicholson's car. They didn't check his truck for fingerprints. They didn't check Lori Duncan's car. They didn't find anything matching Mr. Honken in the house.

And remember Mr. Bush said that if people come in contact with other people they leave samples of their cells,

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2896 of 3636

samples of their hair. Their hair falls out -- remember Mr. Spies asking those questions -- all the time.

Well, you can look at it two ways. The government wants it both ways. The first way they want it is oops, we made a mistake; we blew it; we didn't check it for seven years. But they says, Oh, but that's okay if we made a mistake. We don't have any physical evidence that matches him up, but what we'll do, we want you to do our job for you (sic).

And remember what you told us during voir dire? It's not your job to fill in the gaps that the state fails to produce during the course of the trial. It's your job to evaluate the evidence. That may sound cold. It may sound hard. But that's your job as jurors to evaluate the evidence in the case, and that's all we ask you to do.

Now, I told you in my opening and I say it again, from that house and also from the grave sites which we'll talk about in a minute, there was no DNA, no blood, no fingerprints, no hair samples, no fibers, no footprints, no tire tracks, no eyewitnesses who put Mr. Honken at that house at that time and at that place in 1993 with regard to Lori Duncan or her kids or Mr. Nicholson.

Now, could you switch now to look at the car that they said was used for transporting -- and I know you have to switch the system. We're going to look at the car a second.

Remember the mechanic who came in, the local mechanic

3322

here who came in? At one point I was talking about -- we were preparing for this case, and I said, you know, you can put shiny

new stuff up, but then, you know, I'm sure like my dad always told me, other folks' dads always told them, you always kick the tires of a car to make sure it's good because sometimes they'll shine up pretty good, and yet when you kick the car -- and they always tell you to open the hood to see what's in there because sometimes when you open the hood it's not what people represent it to be.

So let's look at this car for a second. Here's this Tercel. Now, bear in mind both these Tercels were blue, Gaubatz -- and Gaubatz -- and we'll talk about her later on too, but Gaubatz is this person who lied seven times. Seven times she lied. But she also had a fight with Angie, and she hated Dustin.

But let's assume for a second that this is her car. Remember -- and remember the questions asked are not evidence, but the responses given are. Remember the government asking when we brought this mechanic in here about whether or not this Toyota Tercel was one of the smallest cars built by Toyota in 1984. Absolutely.

But the government says, Well, six people could sit in that car, couldn't they? Well, folks, we know Mr. Honken -- use your -- well, there was an item here that showed Mr. Nicholson was 5-11, so you can see that when you go in there. They have

his license in there. And you have these two little girls, a ten-year-old and a six-year-old. You have two other adults.

And, of course, it's the state's theory that they had a weapon this size. And they get in this little car, and they drive out into the mush because that's what it is in 1993. They drive it out into the mush, folks, this little Toyota Tercel

stick shift with two little girls, Mr. Nicholson, and their mom and two normal-sized adults. That's their theory that they want you to buy to convict him.

Now, they get in this little car. But let's look inside the car for a second. This is the back of it, one of the smallest cars built -- that was in this country at this time. And you want to show the ones with the two seats in it. And you'll have this back into the jury room, so go back and take a look at it. And I'll tell you what really tops it off is not so much the size of the car that you'll see in a minute; okay?

What did I ask the mechanic about this? And again, my questions are not evidence, but I asked him, well -- he says it either has carpet or vinyl on it. Well, do you remember I asked that funny question about whether or not it has an automatic vacuuming system that swoops everything out?

Now, remember what the weather is like. And remember what Miss Gaubatz said? Miss Gaubatz says, Well, they came home that night, but she doesn't know which night, mind you, and all we know, it may be the last night that she said that Angie told

♀

3324

her they went out to look for Greg Nicholson.

But what is it about this car? She says she gets in this car when they get home, sees nothing unusual, no blood, no dirt, no grime, nothing. This is the car, folks, according to the government that's just come back from the floodplain. This is the car that they are telling you Dustin rode in to kill these babies.

Well, what do we know next about what Miss Gaubatz said? She says, Well, not only did I look at the car that day, but I talked to Angie. I went back and looked at the car again

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2899 of 3636

real close, and I checked it out.

Well, the government could get back up and say, Well, they washed it; they cleaned it. Wait a minute. They walked into their own house. She pretended to be asleep. She looked at them. She smelled them. Remember that question? She smelled nothing unusual. She saw no mud, no dirt, no gunk, no tracks.

Yet the government says, Okay, that's not our job; you figure it out; you put dirt in there; you put gunk back in there. Even though the witnesses said it wasn't there, we want you to put it in there because that's the only way they could have killed them down in the floodplains in 1993. There's no other way they could have done it if you follow the government's theory of the case. But it's okay if they didn't know what it looked like in 1993. They says go ahead and convict him.

♀

Thanks.

What else did Mr. Basler tell you? He says, well, you know -- and, you know, he was a little reluctant. He didn't really want to answer Mr. Spies' question, and you can evaluate a witness. You remember how he answered Mr. Williams' question, how he answered Mr. Spies' question? Mr. Spies was just as polite as ever, but he didn't want to answer him. And he said, when he talked about the crime scene, No, we didn't make it a crime scene. He says, No, but that was somebody else's job at that point to make it a crime scene. It wasn't ours.

You know, but when they get to the house, if they've left so suddenly and if Greg Nicholson was living there, did they find any other drug notes in the house? They didn't even look. They didn't even use a magnifying glass to go through the

house. Did they search her telephone records? No. Nothing. Zilch.

Oh, they did find out several years later that her checking account had not been used. Even though her two little kids had never been heard of -- from, they did find that out.

Let's flash forward for a second. You know, they played all the stuff -- little snippets of stuff from that tape of Mr. Cutkomp and Mr. Honken, little snippets to make him look real bad, and I admit it makes him look real bad. We're not disputing that. But you have to go back in the jury room and look at the whole thing in the context that we set up.

You can basically do that to anybody because they do it on TV now for fun. You see it on David Letterman and Jay Leno all the time. They take people's comments and make them look like idiots. I mean, that's the new thing. That's the new funny thing. Can be used in a very evil fashion too if you want to.

But you are the people who must apply your common sense and see if that was done. And you are the people who must put it in the proper context because this is far beyond David Letterman and Jay Leno and some nice cute TV scheme. This is real life. This is real life here. There will be no commercial breaks.

So let's turn for a second then to the ammunition that was found -- well, you don't have to switch that yet. We'll just go with this.

There's a discussion with Mr. Murillo at one point -- and we're still back in 1993 now, but his conversation was taking place in the courtroom about two things. Mr. Miller

concedes that the nine-millimeter was not something they could confirm through their experts. He concedes that. But his theory is that it could have been.

Well, when could "could have been" be beyond a reasonable doubt? That's what the Court tells you you have to do. When can you convict someone on what could have been or what may have been? I don't see that in the instructions

3327

anywhere, but you read it yourself and see if there's anyplace for anything like that.

But let's go for a second to the ammunition. I know you might think -- and let me remind you if I say something to offend you or offend anyone else, it's not on purpose. Or if I said anything during the examination of the trial or any of my colleagues said anything, don't hold that against Mr. Honken. Hold that against me.

But Mr. Murillo talked about a couple of things that I want to remind you of that may almost appear to be shocking.

You remember those nine 38-caliber shells that he found out at the grave sites? Think about it a minute with me. I invite you to go through this evidence and see if it's there. Found out near the grave site. They didn't even send them to the lab. They didn't even test them knowing full well that 38-caliber shells can be fingerprinted just like anything else.

Do you wonder why? Because it didn't fit their theory. Two ways that it wouldn't fit their theory: Number one, a 38 won't eject from a 9-millimeter. What's the second problem they have with it? If it's in a revolver, it stays in there. That's their theory.

But the question that you have to answer once you go

back into the jury room is why would they take nine shells found near the grave site and not even test them? What do we know about the nine-millimeter? If you assume for a second that the

government is correct with regard to what this floodplain looked like in 1993 which they don't seem to know much about, it ejects these shells at the grave site in 1993 over the right shoulder.

But what else do they do? Interesting enough, they say, a nine-millimeter fired would not leave a bullet in the head. It would go through. They can only say it's consistent with a nine-millimeter, not that it's a nine-millimeter.

And what happens? Somebody -- and you figure that out. This bullet's still left in the head. And the normal process of a nine-millimeter is to go all the way through. And is there a match with the three lead items that they found? Look at the reports. They tried to match them up. Couldn't do it.

And do you know what? Twenty other different types of weapons could have -- twenty others, and do you see where Mr. Honken went to purchase this or did anyone come in the courtroom and says they saw Mr. Honken with this other than Tim Cutkomp who -- and we'll talk about his testimony about it later, but I want you to follow that up.

So I invite you again to look at the physical evidence that they produced or they didn't produce with regard to this situation.

The 38-caliber shells, there's absolutely no connection with Mr. Honken. There are no receipts for the purchase -- now, ladies and gentlemen, this is just

old-fashioned detective work. Where's Mr. Honken live? Two states. Arizona, Iowa; right? Hello. Could you give me some idea where I can find the receipts for anyone who purchased 9-millimeters or 38-caliber? Did anybody bother to do something as basic, as simple as that? Oh, no, we'll just jump way ahead because it looks like he may have done it. We believe he may have done it. But the proof, ladies and gentlemen, is proof beyond a reasonable doubt.

You can track a bullet. You can track a shell. You can track purchases. You can track friends who purchased it. Did they do that? No, but they say based upon what we've told you and we've got these two dead little girls, you go ahead and convict him. Just skip over, you know, the nitty-gritty stuff that you use in all the other cases.

So the shell casings that were recovered in 2001 were never even tested.

What can you say about the Tec-9 ejection method and their way of searching? Well, we know that not only did law enforcement search it several times, they brought out -- in my opening statement I talked about the modern technology and how significant it is in tracking stuff. They brought out the National Guard -- and remember Mr. Spies asked that question? With the most sophisticated equipment that they had and around that area they did not find one Tec-9 shell, and nobody disputes the fact, nobody disputes the fact that it was -- in fact, would

3330

eject shells in that fashion.

What do we do know about Mr. DeGeus? And again, we'll flash forward to the tape that the government didn't bother to

play. Mr. Honken tells Mr. Cutkomp that he believes Terry DeGeus is responsible for Nicholson's disappearance. He tells him that.

What do we have to support that that's in this record at this point? Well, if you believe or don't believe Miss Gaubatz, we know a couple of things. Well, I guess we start first with Mr. Billick if we want to put it in chronological order. What did Mr. Billick say? Remember the guy who went to prison, he came in here, he's a civilian witness? He says, Well, I know Mr. DeGeus walked into my house, and we were trying to feel each other out to exchange drugs or what have you. And he had a revolver. I told him to take it out of my trailer and put it somewhere else. He had a revolver.

What else do we know? We know that Mrs. DeGeus, JoAnn DeGeus, said that he was -- Terry was looking for his friend. That's what she called it. But do you remember the tape of Greg Nicholson when Mr. Honken was on tape? He was a little fearful of Terry. And we know Mr. Billick said Terry wanted to take over Nicholson's territory. We know that.

What else do we know about Terry? And forgive me for talking bad about the dead, but it's my job to get you to see the facts. I apologize for it, but you have to see the facts.

♀

3331

We also know that JoAnn DeGeus was asked a question, Well, wasn't it April or so? She stuck to her guns and says it was July that Terry was looking for Mr. Nicholson.

What else do we know about 1993? We also know in 1993 that he did have an operation going and he never came in front of the grand jury. If you use your recollection of it with regard to Terry DeGeus, go ahead.

But what else do we know about him? We know from Ryerson, the guy who lived in the house with him, that he was madly in love with Angie. We know from Mr. Basler that he was violent and he was a stalker. We also know about Mr. DeGeus that for 12 days at some point he didn't bathe and he was acting a little odd almost going into an epileptic fit at times.

What else do we know about Mr. DeGeus? We also know -- and this is in 1993 again -- that when Mr. Cutkomp mentioned to Mr. Honken that Terry had disappeared, Mr. Honken responded he was relieved because he thinks he had something to do with Nicholson's disappearance.

Now, let's go to July 25 of '93 or thereabouts because Scott Gahn comes into play at this point. Do we have a Gahn -- I don't know whether we have a Gahn one or not, but if you do -- oh, we do. Thank you.

It's interesting about Scott Gahn because you remember Scott Gahn said he saw Honken and saw Nicholson. He testified on the case in chief -- and again, it doesn't matter who called

3332

whose witnesses. Once they're in the courtroom, they belong to you, the jury, to ascertain the facts from them.

So Scott Gahn comes in. You remember we called him back too just to ask him one question about the videotape. And he does say he saw Honken, he saw Nicholson, and he discussed the videotape. Well, he said that's the last time he saw both of them. That's July of 1993. That's a fact in the record.

What does that tell you? And again, when we close our arguments, we have a chance to summarize what we think the facts mean. It tells you clearly that if July of '93 was the last time he saw Honken and the last time he saw Nicholson, he had

the videotape in his car when he saw -- when he saw Scott Gahn. That's the testimony in the record. You can reject it if you want to, and I'm sure the government would want you to reject it. But if you look at his testimony and discuss it amongst yourselves, that is what the record says.

The government didn't even mention it in his three-hour statement to you, and you know why they didn't mention it? They don't want this to be the case because if it is the case and the facts tell you this and nothing else, there is no way under the sun that you can convict this young man because that's a reasonable doubt by itself.

Now, we know he was interviewed several times, but what does he say even though he doesn't change his story about him having a videotape on that date? On the date Mr. Gahn comes

into trial, he does say 11 years later he was desperate to find him. He never told the grand jury. He never told anybody else in the interviews.

But remember what I said about let the time fly and people get away from the facts? They get away from the facts, but he can't get away from what he told them back in 1993, that he saw Honken within an hour or so of each other and Honken had the videotape at that time. So why did he have the videotape? And no one, no one on this planet, has ever told any of you sitting in that jury box anything else. So when you go back into the jury room and that point comes up, you will have to turn to that as your operative fact with regard to the videotape.

Now, if you jump ahead and say, Well, why did Mr. Honken say something different at his sentencing hearing on

that point, that's a whole different question, and we'll talk to you about it.

But what you have to think about when you get back into the jury room, you're going to have Government's Exhibit 300 which has the entire testimony, not just snippets of it. You read it. What would you think if later you had a videotape and discussed it with your lawyer and someone turned up dead later on? Think about it. Just apply good ol' Iowa common sense to the facts of this case, and there is no way, no way you could accept the distorted version of the government's case on

the facts that are presented through this evidence. But yet they would love to put a square peg into a round hole and make you accept it. I ask you to reject it.

Now, July of '93, let's look at the phone records but -- and as you put those up, I just want to share a couple of things that Mr. Basler said. Remember the question asked -- and I'm not picking on Mr. Basler. He was the lead detective, but there were other people who made a lot more mistakes prior to his time too.

But let's just follow up just a second on what Mr. Basler said. The question was asked of Mr. Basler, Did you, in fact, see a pattern in the phone calls prior to the time of the 25th between Angie and DeGeus's house? No. Well, Clear Lake number 515-357-6374, what's the day of that phone call? July 24. Another call, Clear Lake, Iowa, 515-357-6374.

Well, trace them back, folks, and you have the phone records. Matter of fact, the government put some phone records in too. You'll see two phone calls in June, maybe two in July, and you see eight -- I'm sorry, two in May, two in June, and you

count those up; eight to that number in July, the day before the 25th and the day after the 25th. So you decide.

As the Court will tell you, you know, you can't -- if an officer testifies in a case, simply because he's an officer -- and we talked about that during voir dire process. You can't automatically believe that officer is being accurate.

♀

They have lots of cases. They have lots of work, and they can make mistakes just like anyone else. So you see whether or not there's a discernible difference in the phone calls at that point and see what numbers they're going to.

And you know what? Do this: See if there's any document indicating that Angie Johnson called Dustin Honken during that period of time or Dustin Honken called her. And you heard Marvea testify about where Dustin was living during that period of time and where he was working, and she was working at the country club.

You can take that down. Thank you.

So when you get that back into the jury room and you start going through that particular evidence, you will have an opportunity to match it up and see who, in fact -- oh, yeah, thanks -- who was, in fact, contacting whom. And you use that to help you decide the facts of this case.

Matter of fact, if you choose or choose not to believe Miss Gaubatz, that's up to you. Gaubatz says no evidence Dustin was living there, and she had the key to her house. She was going in and out of Angie's house.

Now, what does the government want you to think? And, folks, you have to go with the facts. You can't speculate. 1993 we're still living in modern America. When is the first

time these folks meet? Well, they meet sometime in March, and there's a note written in lipstick on the door where Dustin and

Angie had some type of relationship and she comes to him at some point according to the evidence, brings him some money from Terry and says, I want you to be my man and also bring me dope. I mean, here's a guy who makes 97 percent pure meth, and he gets hooked up with a situation he can't handle.

And his girl -- and his girlfriend is pregnant and is due to have a baby. And what happens? This other woman gets pregnant. But you don't see him living with her. You don't see them, as the government argued, inseparable. You don't even see the phone calls going back and forth to support it. And if they had the phone calls, they would be there. They would be right there, and you would be reviewing them, and you'd be taking them back in the jury room and say, Shows that they were connected. You see a couple of letters that she wrote complaining about Kathy Rick and saying that they want to keep it purely business relationship, or that's what Angie is telling him.

Is this a good time for a stretch break?

THE COURT: Sure. Members of the jury, why don't we take a 30- or 45-second stretch break. Thank you.

Thank you. Please be seated.

MR. PARRISH: Let's look for a second just as a transition to pick something up and hold, Government's Exhibit 48. I think Mr. Miller concedes basically this has no evidentiary value in the way he talked about it, but if you really want me to talk about it a minute, I thought they said a

torch was in it and this has a -- you can see obviously what it is. But I don't even want to press that point because he pretty much concedes that in his argument.

Now, if he didn't concede it and he gets back up, all he would say -- I thought he said iron is in just about everything that's on a farm and this was found out somewhere. And did he say he positively identified it as the item they used? He said -- It's not like DNA I think is what he said. But let's move to the winter of '93 and '94.

Well, two things happen. We've pretty much conceded the drug matter. But let's talk about what else the state has conceded with regard to the drug matter and what all the other witnesses say about it.

First of all, in March of '93 a couple of things happen. But you're going to have to put March of '93 in context first because in March of '93 Mr. Honken gets arrested. Tim gets arrested for a short period of time, Mr. Cutkomp. Greg Nicholson turns informant.

But Dustin has come -- Mr. Honken has come back to Iowa. He remains in Iowa. What did Mr. Cutkomp say? He said they'd stopped producing drugs in March. That's what Mr. Cutkomp says. So in March of '93 in Arizona, that place is closed down. And you'll see the significance of that later on in the testimony.

And what you have to decide -- the judge has given you

3338

an instruction on it. Mr. Honken is on trial for these facts at this time in this case, not for any other case. And I don't remember the exact instruction that the Court gives that, but I

can assure you it's in the instruction. He's on trial for the facts of this case, not any other case that he's been involved in. And you indicated when you were in voir dire that that's the principle you would apply individually too in order to sit on this case.

So let's talk about the context of the tapes, not snippets which is, as I said a minute ago, the modern thing to do with things to make them cute. He was his best friend. Nobody denies that. But in this best-friend relationship there were problems. One of the problems is that for 30 different times Mr. Cutkomp engaged in criminal activity and never shared what it was with Mr. Honken, his best friend. Did it in Arizona, did it in Iowa, also cracked up and had to go into a mental institution for a period of time and didn't really disclose that, matter of fact, didn't disclose it to all of the law enforcement officials before he started taping their conversation.

What else did he say? They'd been friends -- and Marvea said it; Miss Smidt said it -- all the way back since high school. They were over at each other's house. Tim was over at his house a lot more. They were like brothers. Matter of fact, they talked in certain ways.

3339

All I would say before we go further is that wouldn't you think a person -- of course, with family members and with other people who we know we can look a certain way, talk a certain way, have them say things that you want them to say if you play them right. Mr. Cutkomp was facing life imprisonment too, folks. Don't forget that. His back was up against the wall too. And that's part of the context.

But there is something else. The love of his life, the love of his life. Now, he had an affair with Miss Gaubatz, Miss Cole. So we know that. And, you know, I really don't want to talk about all these relationships because you wouldn't believe -- you'd think what's going on in Mason City, but we kind of have to talk about it a little bit to put the context of what was happening here.

But we know that Mr. Cutkomp was having a relationship with Miss Gaubatz. We know that. They talked about it. But we also know that Mr. Honken had had a relationship with Mrs. -- Miss Cutkomp, and Tim calls her the love of his life. But he didn't disclose that to law enforcement.

Now, use your common sense. Your best friend has had a relationship with the love of your life. You are now having mental problems. You are facing life imprisonment. You are committing crimes at the rate over a couple of years over 30 and you make a deal, but you don't disclose to law enforcement all of these facts.

Do you really think that in that context you would not get some of the answers out of Mr. Honken that you got if you acted a certain way? Why wouldn't you? You don't have to be, as we referred to several times, a rocket scientist to do that. Wouldn't you know which buttons to pull, which buttons to push, which angles to reach for, particularly if you had all day to set somebody up at work and you come back and only tape four conversations?

And one of the -- the fifth they couldn't work for some reason. And Mr. Cutkomp said there were 20 conversations, but Lori Lewis says, Well, I only remember one. But Mr. Cutkomp

says, Well, I went there, and I taped him 20 times at work.

Now, you can decide which ones you want to believe. If you want to believe Miss Lewis, I'm not going to say Miss Lewis is making this up. But, you know, as Mr. Basler said, they were pretty busy back then. That's why they didn't check the house, didn't move for finger -- didn't do all of this stuff. But Mr. Cutkomp, it was his case, and he says in that case he had 20 taped conversations of Mr. Honken at work.

So he would set him up at work which he acknowledged and then would come home. And yet even in that context, even in that context, he said he never made a single admission about killing anyone. But they would take words that two jocks or two guys who exchanged a relationship with each other over years would talk about getting ready for a big game, talking about

when they were kids and this movie Pulp Fiction walking up and say pew or pow.

You know, you hear -- if your kids watch violence, you hear your four-year-old kids talking to your other kid about that kind of stuff, or you talk about a movie that you don't want your kids to hear, and you hear your four-year-old or seven-year-old talking to another kid; you says, My God, where did she hear that? And that's the kind of language they're exchanging.

So you're going to tell me that two adults exchanging a conversation who know each other as well as these two people don't know how to pull each other's button and push each other's buttons at any point in time?

But yet the government says forget about this context. Let's take this snippet out here, and let's play this over and

over again, and we'll put these two dead babies up there, and that will be enough because then folks will forget about the physical evidence, and they'll forget about the fact that we don't match it up. We'll forget about the fact that we didn't match the shells up. We'll forget about the fact that we didn't go out to Lori Duncan's house. We'll forget about the fact we didn't go through her car. We'll forget about the fact we didn't go through Mr. DeGeus's car, get his revolver out and trace that. We'll forget about the fact we didn't track those shells down.

♀

We'll just come in, and we'll use a few words that your best friend enticed you into making, and we'll blow them up on a board, and we'll put these horrific-looking pictures that will make anybody cry and break anybody's heart, and we'll use that to convict you.

What does he tell him during the conversations? He says, You're cracking up, man. You're breaking up. You're losing it. I'll take care of it. Don't worry.

What about Mr. Cobeen's count? Read the instructions. I think Mr. Cobeen's count is out now. Take a look at your instructions.

And who was the person that suggested access to the building? Mr. Cutkomp said it was him. And that's where the drugs were stored. Of course, Dustin said at his sentencing hearing, I said those things. Well, did he stand up and lie about them? He says, No, I said them. Everything they asked him, he said he said them.

And the videotape, use your common sense as to why he said what he said. And if you want to convict him because of

what he said about the videotape, then it's a lost cause, but you'd have to go back to Scott Gahn -- and you don't have to put it back up -- but to get to that point, and there's no way you can get by Scott Gahn because that's uncontradicted. That is uncontradicted in the record.

But if you want to convict him because he wasn't quite

straight about the videotape because this guy turned up dead later after he had a videotape, there's nothing else I can say to you.

But what didn't he talk about on the tapes? Didn't talk about Dustin having an affair with his wife. Didn't talk about what they had talked about earlier at work. And do you know what? All of the time that he had these conversations with Tim Cutkomp and all of the times that prior to the time he had the conversation with Tim Cutkomp, what did Mr. Cutkomp come and on direct and cross-examination say to each of you? Never once did Mr. Honken tell me he had killed any children. Never once did he tell me he killed Lori Duncan. Never once did he tell me he had killed Terry DeGeus, never once, his best friend, who knew how to pull every button that Mr. Honken had. But yet the government tells you that within a matter of days Mr. Honken is now confessing to anybody who will talk to him.

That's why they didn't mention that in their opening statements. That's why they didn't tell you who these people really were in their opening statements.

Remember what I told you about the drug culture? Mr. Honken is an individual who makes drugs. And, folks, he was good at it. That's nothing to be proud of, but he was good at it. He was basically a nerd from all the evidence, and he knew

how to make 97 percent pure methamphetamine, and he brought it into the state, and he's paying his price for it: 27 years.

But you never saw this man strike, hit anybody on the face of this planet nor any person who came in here who told you they have seen him do that. But yet now in this case this one incident which is horrific they now tell you that all of a sudden this man who never loses his temper, this man who never gets upset, this man who never gets angry all of a sudden goes and blows two young kids' brains out.

And he was the man who said, Tim, go visit with your kids. You hear his kids running around on the tapes. You hear him say, All I'm worried about is my kids. But yet this is the man who they tell you took those kids out into the dark of the night and into a floodplain in 1993 with nothing coming back clean and blew their brains out.

The drug culture is a culture of destruction, but you know what? You can't wait seven years and expect to pick up good evidence. You know where you turn to when you get to that point.

Remember the one thing -- and we're going to get just a second to the state people. Remember what the judge said when you all walked in here at one point, I think it was 15 at a time, and he would go through this thing that he indicated that he did at his daughter's birthday party, play a game called telephone, and you'd start at one end, and you go all the way around, and he used that as an example for hearsay and why it may not be the most reliable and in certain circumstances,

though, it can get in?

Well, let's go back to the basic form of that game because when you start telling people stuff and you start at one end, obviously when you get to the other end, it might be something of totally different meaning.

So we gotta talk for a few minutes about the people. And you can put that up, please. And before you get into them, you have to look at the instruction that the Court is going to give you on credibility of witnesses. And you have to look at the motives that these people may have for testifying. You have to look at whether these people said something different at an earlier time, whether they were using drugs or alcohol or whether or not they were addicted. That's what the Court's going to instruct you. And that's -- I mean he has instructed you, and that's what you'll take back into the jury room with you.

But also you'll have as to whether or not there is a innocent misrecollection, a sincere lapse of memory, or an intentional falsehood or pretended lapse of memory.

Now, let's look at these folks. From my background and experience, folks, I'd be the last person to criticize someone or want to condemn someone based upon who they are. But as part of my job in this courtroom at this point in time, we have to talk brutally frank about these people, and that's what I intend to do. I will be brutally frank with you about who

♀

these people are.

Dust -- Mr. Honken goes into the jail in 1996, first time in an institution for any period of time right across the street here in Woodbury County Jail, skinny, tall, a nerd.

Nobody disputes that. What does he run into? Here he is in cell block D. Could we go back and see what these folks looked like before they got into that cell block? We know what Dustin looked like. Look at these folks. Lying, stealing, violence, and drugs. That's what he went into that cell block.

Altimus, 28 free days since he was 18 years old.

Dean, crack head, buddies with Donaldson.

Donaldson.

And who's the guy behind them all? The career criminal himself, Mr. Smooth who remembers after 11 years, oh, and also after testifying -- getting ready to testify about a case in Nebraska that Mr. Honken confessed to him. And do you remember right after lunch that day when the prosecutor, Mr. Williams, got up and says, Well, did you ever tell anyone -- his questions are not evidence, but remember ever telling anyone else that before now? No. You mean for 11 years -- not 11 years. Since 1996 you never mentioned that to anybody? Well, no. But yet he lied to the grand jury. He lied to law enforcement. He made up stuff. And in the judge's instructions, instead -- from an intentional falsehood, Putzier told an intentional falsehood to you.

3347

You know, the problem is that these people were all connected before they went into the Woodbury County Jail. And when Mr. Honken walked in, he was in a buzz saw.

Well, let's go to where they went afterwards. That's okay. Let's go -- they're in the jail, and here they are now. These are the folks that the state in their opening statements didn't talk to you in detail about, but now that we have the evidence, it comes out who they are.

Where do these folks go? From Woodbury County Jail, Donaldson, Putzier, and Dean go to Oakdale. That's from the testimony. But Putzier makes a deal on this attempted escape deal -- and we'll talk about this later -- and he gets the South Dakota place, a federal pen, on attempt to escape, and he violates that twice, goes back and commits more crimes, and he's facing crimes as he sits here in the courtroom to testify. And he goes out with Donaldson in 2003 and commits more crime.

Donaldson and Bregar who comes in to testify go to the Plymouth County Jail. And you know there are conversations about what they talked about there. And at Clarinda, Putzier, Frey, and Altimus hook up.

So what do they have in their possession at the Woodbury County Jail? When Donaldson is found, he claims he has no newspapers, but he has an envelope, and Miss Smidt says she sends every article to Mr. Honken and she's done it for every week since he's been at the Woodbury County Jail and when he's

3348

been at Colorado and also when he's been at Marion. She sends him the newspaper articles. So we know that these folks not only have discussed this, but also we know that at these places they discuss it further.

Now, the government may get up afterwards in rebuttal and say, Well, what did they gain out of it? Well, I'm not going to go through what each of these folks gain out of it because you have to decide based upon the credibility-of-witness instruction if these people are believable.

We know he has a newspaper article circulating around in the jail. We know they're stealing -- his cell is open and they're taking his paperwork. He complains about that. And you

know what? You're going to get -- let me get that big packet, that packet of -- this is Mr. Honken's activity. I challenge you to ask them what their activity was.

Do you remember what -- Tom Mullin, the county attorney, came in, and Mr. Williams asked him a series of about eight questions about, well, did you know such and such a person; did you know such and such a person? This is on the attempt to escape from the Woodbury County Jail.

Well, why didn't we hear from those folks if they were so good? If they were so good, why didn't they bring them in? Because Tom Mullin told you he had his assistants go look, and he looked at all the facts.

What else did Lieutenant Redden tell you? She said

3349

she sent her deputies to investigate the hole in the wall. They looked for three days, and they were inspecting it every three hours. They didn't find it for three days until November 25 of 1996.

But what was Mr. Honken complaining about all of that time? Mr. Honken was saying, They're stealing my papers; they're getting in my files; they're going through my stuff; I want to be by myself. I want to write Federal Judge O'Brien complaining about this.

They're going through his stuff, folks, at the Woodbury County Jail. That's where it starts. He doesn't sit still about it. They're reading his paperwork. This man is special. He's walking in. He has made 97 percent pure meth.

Now, I know it might be difficult for you as honest, law-abiding citizens to imagine what that may have been like, but when you go back into the jury room, you know what you're

going to have to do when you're sitting around that table or whatever you all have down there because I haven't seen it, but when you're sitting around that table, do you know what you're going to have to think about? You're going to have to sit there for a minute, and you're going to have to say now, Mr. Honken was at the jail. I see all these letters he's written. I see he wrote his lawyer complaining. I see he wrote Lieutenant Redden. He keeps saying, These folks are going through my paperwork, stealing my papers. Why do you think they were doing

it?

It may be tough, but you know why they were doing it, folks, from the evidence in this case? To see could they run and tell somebody and get some favors. These folks are the lost souls of our society. You saw them. You looked at them. You evaluated them. They are the lost souls. You know they're the lost souls. They are the people who had no future, who have no future, and will never have a future. The only future those folks have is through this man right here. He was their moment of glory. He was their hero. He was the person who's going to take them and give them something to stand on.

So I was going to go through each of these people, but I'm just going to highlight it for you. Let's talk about these folks for just a minute.

You know, this is when the backhoe comes in, not like on TV, choked, mentioned a child was strangled, no blood, no mess, and he admitted reading his legal papers. Well, some of them didn't admit them, but at least we have that as a start, some people admitting it.

Let's go to the next one. William Dean, you heard him

testify, and you don't need to see his picture again, but you know where he was housed. We tracked those folks already.

Why don't we go to the next one. Admitted career criminal. And we know what his history was like, but we also know that he admitted he lied under oath, and from the evidence

that you reviewed, he lied to you as to what happened seven, eight years ago about what he recalled about Mr. Honken. He never told anyone else, but all of a sudden he walks in the courtroom, Well, jeez, he confessed; he confessed to me.

And look at all the times he was interviewed: '97 November, April, December, January, May of 2004. Remember in May of 2004 even in that interview when Mr. Williams asked him on direct -- on direct examination, Well, did you tell us then? He said, No; maybe I thought so, but I didn't. And he brought up the fact Mr. Honken told him the other people were shot execution style, sent the children to live in Mexico, and that's the beginning.

But let's stop for a second. We can take those off. Let's stop for a second. Let's not go any further. What if I went to sit down right now? State would get up and they'd say, you know, you convict him on what you just saw from those lost souls. It doesn't get any better because those people are going to get out, and they're going to wreak havoc on our society again because they are small-town, small-time people, small-time criminals.

I'm going to take you on another journey. We're going to go to the big time right now. We're going to go to Florence, Colorado, where this young man from Iowa was sent. Remember in my opening statement -- I want to skip a couple of those folks

there.

Franklin Roosevelt, our president some years ago, said repetition does not transform a lie into the truth.

I want to read you another quote from Psalms for a second just to set the stage for where we're going. My companion stretched out his hand against his friends. He violated his covenant. His speech was smoother than butter, yet war was in his heart. His words were softer than oil, yet they were drawn swords. That's what this young man had to go against.

They don't want anything, but yet three of them are in the wit. sec. program already, wit. sec. program already.

Let's talk about -- well, you just pop up the order, and we'll talk about them when they pop up.

Now, we know before we get there that Colorado is -- this place in Colorado is one of the most -- I can't say worst in the sense but one of the most difficult places to survive in the prison system. We know that from the testimony.

But Fred Tokars -- and I told you about him in opening statement. Now, you had a chance to look at Mr. Tokars, a person who called himself a judge and then on cross-examination said, well, it was a municipal appointment, a person who said he admits he read part of Honken's legal file. But you heard later on Neel Huffman talk about not what Mr. Tokars said to him about what he did as a result of a contact with Mr. Tokars.

Now, we know in '99 contrary to what the state said

about Mr. Vest -- they just had the years wrong when they put their PowerPoint up this morning -- they said Mr. Vest said in '99 and 2000 that Mr. Honken said these things to Mr. Vest. Well, we know in '99 that's not accurate because Mr. Vest never said that. Mr. Vest said two weeks before December 7. That was his testimony if you want to believe that date.

But here's a guy who's serving four life sentences. These folks have everything to gain and absolutely nothing to lose. What do they have to lose?

You know, the government gets up and says, Well, they're going to die in prison. Well, what did he do, Mr. Tokars? Ron McIntosh says, We found out he killed his wife in front of his children, and they didn't like it. What happened to him in Atlanta? His cell got fire bombed.

Well, if Mr. Honken was running around telling people he had done this stuff -- and this is while Mr. Tokars is waiting just to be sentenced or sent out to Colorado that it happened to him. Mr. Honken was without incident from the day he got there until he got moved to Marion in terms of any violence. So why if he was admitting this stuff didn't the inmates take care of their own problem if killing children was such a horrific act? Do you think the fact that there was no incident speaks clearly that he never admitted it to anyone and if they said he admitted it that they are not telling the truth?

But look at this. Here is a person who is a lawyer,

not that they're entitled to any special privileges, but you would assume that they would not have engaged in conduct that would result in four life sentences plus a term of years and set up an international money laundering operation and taught people

how to avoid money coming into the United States and then he reached the conclusion that Honken told him he strangled the people and that he cleaned the Duncans' house up thoroughly and the bodies were transported in the trunk of a car and buried at a construction site with a backhoe.

Where do you think that came from if he didn't read his PSI report, if he didn't read the sentencing transcript, if he didn't read what Donaldson said, if he didn't read the newspapers? It's pretty clear where they got it from at that point. All you gotta do is look at the facts and look at the testimony and not wiggle around it like the state -- the government wants you to do and not speculate. Look at the facts. Just go in and start going through these facts. And they do not fit the government's theory.

Can we go to the next person, please?

Let me tell you what was so striking about Mr. McIntosh. And when I told you we're going from the small-time criminal to a place that it's fair for anybody to have to go, this man walked into the courtroom and practically laughed about his crimes. He laughed. He thought to the folks in Iowa the fact that he had killed his business partner and

♀

3355

broke his girlfriend out by holding a weapon on a man to steal a helicopter was funny. Who do these people think we are? He laughed. He thinks it's funny.

But yet the government says, Oh, this is the best we can do. We can't bring anybody in other than people who've killed people and who thinks it's funny to say what Dustin's done. Oh, yeah, he's a big-time jailhouse lawyer; right? Well, what cases have you had? Well, I'm so busy I can't hardly take

them. Oh, yeah, he told me he killed some kids. I told him I didn't want to represent him anymore. He said it real cute and stuff, but what else does he say? Dustin never got into problems.

And let me tell you, if Dustin had a problem, if Mr. Honken had a problem, you would have seen it in the evidence. You would have seen some civilian person come in here and testify about it. If he had smacked somebody or hit somebody, you would have seen someone come in and talk about it. But you didn't, did you? It's not there. You won't find it. You won't find it anywhere on the planet.

But yet the government wanted to put that up about, well, what, he took them across state line and he admitted that he read Honken's trial transcripts and read his PSI. And Mr. Honken admitted to him that he strangled rats and suffocated children? Where is he getting this from? Well, go back in the jury room. Read through that evidence. And it's not hard to

find.

Let's go to the next one. Mr. Vest. I tell you, you know, I'd kind of like to take Mr. Vest and compare him to Mr. Loparo who came in. And it was interesting because you noticed in their closing argument they wanted to focus on Mr. Vest, but they had 1999 and 2000. Well, 1999 is wrong. That's not even a date that's in discussion with Mr. Vest.

But they put a PowerPoint slide up there to show that, and let me tell you why it was incorrect. First of all, Mr. Vest didn't even say that, but did you see Mr. Vest come in -- and let's set a little background about Mr. Vest for a second. Mr. Vest dug a grave night before. Then he killed two

people, and he buried them. And he and his brothers were facing execution.

And what he did, he entered into a plea to avoid the death penalty. And what he did after that, he went to prison, and he said he didn't do it. He said they forced him into doing it. That's what he said to you.

What else did Mr. Vest say? Mr. Vest didn't tell us where he was working, did he? Mr. Vest didn't tell you that he was working in the place that Mr. Honken's files were. He didn't tell you that he'd just gotten to be a friend of Mr. Honken.

But what do we know? We know that in October of 2000 the bodies were found and Mr. Vest who claimed to be

3357

Mr. Honken's friend had never said one word before newspapers were circulating around the prison about the bodies being found.

You know what Mr. Basler came in here and told you? He said there was no articles -- because he said he just read the Globe Gazette, there were no articles with anything in it about a note.

Well, wait a minute. We showed him the article from the Des Moines Register, and Miss Smidt said she'd always sent Dustin articles every week, and there was an article about the note. Remember the one when I was going to lend him my glasses to take a look at it? Well, the note was in there and about the bodies being found, and about them being shot was in there, and all the way back to Putzier they talk about execution.

But yet Mr. Vest -- and this is the thing about Mr. Vest that you really have to focus on for a second. He walked in here with a white shirt on. As I told you when I was

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2928 of 3636

thanking the marshal's office for all of their hard work in this case, that's not anything from them, but he walked in here with a white shirt. He was clean shaven, and they didn't do this, but somebody made the arrangements to make him look different, clean shaven, hair combed, white shirt, boots. Do you think that was an accident? When you go back in the jury room and all of you go back and use your collective memories, you decide if that was an accident.

And Mr. Loparo who walked in here unshaven, in a dry

cell for a couple of days, but he said, If I ever heard Dustin say anything like that and you had issued a writ for me to be here, I would have told you to go to hell, do you think he meant that?

What did Mr. Vest try to do for almost what? Seven, eight years? Just get moved to a different facility. Called senators, congressmen, Senator Ashcroft -- I guess he wasn't Senator Ashcroft, whatever he was at that time; he's attorney general now -- to get moved. His kids tried; his wife tried; his father-in-law tried. All tried and failed.

But what's happened now? He's been moved. And what else do we know about Mr. Vest who the government now wants you to rely on because that's what they focused on in their closing which they didn't tell you anything about in their opening but they wanted to probably just see how it's going? He denied having access to Mr. Honken's legal papers, but we know now through Mr. Huffman that he had a key that could get into the file.

We also know that when Mr. Swanson was moved out of Mr. Honken's cell that Mr. Vest moved into his cell and didn't

know that part of the time Mr. Honken was in the hole in December.

And where did Mr. Honken keep his legal papers? Under the floor when there was an overflow -- under the bed. And who could get access to the lockers? Anybody and everybody.

So, folks, they want to tell you that it was in 1999. But assuming that you accept it, assuming that you just accept what he said and not what the government said in their closing statement -- and they probably just made a mistake. It was not deliberate. I'm not blaming them for doing that deliberately, but, of course, they want to move it back as far back as they can.

But by his own admission he said it was two weeks before he gave the statement, December 7, 2000, Mr. Honken had said anything to him. So what does that mean if it was two weeks before? It was after this newspaper article from Des Moines had come out about the people being shot and a note being found. Do you think that someone who had run a business, a legitimate business, in the Kansas City area, who had a pretty successful business, then had turned to the drug trade and then had tried to take over a drug trade and then began money laundering and had committed so many crimes he couldn't even name them, do you think that person couldn't figure what to do with a little kid from Iowa? Do you think he couldn't?

And what else? His own other government witnesses who came in testified that he was using heroin in prison. How was he getting that?

So where is he now? He's moved. He's also serving four life sentences, not this gentleman but Mr. Vest. Oh, we

can go back to him. Thank you. We'll go back to Mr. Ferguson.

Mr. Ferguson, well, we know now the bodies were buried in a barrel. But he admitted to reading a newspaper article and saw the CNN report, and he also said that Vest does heroin in prison, and he also -- and we also know that Mr. Honken had the only live case. That's probably a term that's created just from this case because Mr. Honken out of 1,100 inmates had the only live case.

And who was attracted to live cases? People who were serving time. Who were the people who were most attracted to live cases? People who were lifers, people who were lifers.

And they said, Well, Mr. Ferguson was not. What about Mr. Ferguson? He read the newspaper. He saw it on CNN. He was aware that newspapers were circulating around. He knew that other inmates had common knowledge about Honken's live case. And we know from the cellmate chart that we'll see right at the close of the discussion about the inmates where these folks were all interconnected.

Could we go to the next one, please?

So what do we have here, folks? We have a trio of murderers coming to you, and this is what they're telling you. Based upon that evidence -- you know, our detectives made a lot of mistakes. They didn't do some stuff that was necessary. We know we're in trouble on the physical evidence connection. We know we have problems with some other parts of this case. We know we didn't track down what Mr. DeGeus was doing. We know we

don't have any eyewitnesses here, but would you do me a favor?

Just do me a favor. You know, I want you to take this trio of murderers here, and I want you to convict this young man. That's what I want you to do. That's all they have, and they know it. That's what they've told you.

You didn't see any silver bullets coming through here, did you? You didn't see any physical evidence. You didn't even hear them talk about physical evidence. They'll talk about the bodies, and they're terrible. I'll be the first to admit it. They'll talk about this weapon, and that's awful. They'll hold this weapon 10, 12, 15 times when they get back up as they've done 10 times already. But you can't convict people just on that type of evidence.

Let's talk about briefly Mr. Loparo -- you can take those off -- Mr. Loparo and Mr. Huffman. You heard how Mr. Loparo got here. He's getting out in two and a half years, has nothing to gain. He admitted he was charged with bank robbery, and he didn't say right away he was charged with an escape charge some years ago. But he told you categorically there was no confrontation between Mr. McGee as it was described and Mr. Honken, never saw anything like that. He told you what his opinion would be if he thought someone had killed kids. He talked about how newspapers got around, how people had access to the Internet and how inmates were always looking for opportunities when there was a live case coming in.

Mr. Huffman, of all the people, he was cellmates with Mr. Honken more times than anyone. And you know what? Use your common sense. He's from a small town in Illinois. He was serving short time. He was going to get out. He had a couple of problems there. He also came here on his own dime with his

mother's credit card working two jobs to testify, said he'd never heard Mr. Honken of all the times say anything like that.

And plus he said that other people heard about this case. He was aware of it. He also said that he knew Mr. Vest had access to Mr. Honken's file. What else did he say? Mr. Byerly -- and that's the person the government did not call -- he confronted Mr. Byerly about stealing Mr. Honken's legal papers.

You're going to get an argument about -- an instruction about burden of proof and who has that burden of proof. And remember the Court when we first came in talked a little bit about this. He said if you think someone did something, that's not enough. You can sit there right now, and you can say, Well, I think Mr. Honken might have done that. You can say that. That's fair game.

But you can't convict him because you think it. You can say, Well, I believe Mr. Honken might have done this. That's not good enough. It's not beyond a reasonable doubt. You can say, Well, you know, it looks like with all these statements the finger's kind of pointing at him. It's not

3363

enough. That's why we have jury trials, that we have courtrooms. That's why we have this process.

You can say you think the evidence points at him or the evidence seems to point at him. That's not enough. You can say, Well, I heard someone say that he did it and I think that's good enough. That's not good enough.

Evidence must be presented, and the Court has said it must be presented beyond a reasonable doubt.

Do you want to -- I don't know how long you've been

going, but you might want to take a break. I don't know --

THE COURT: Would a 30-minute break --

MR. PARRISH: That'd be good.

THE COURT: Okay. Members of the jury, we'll take our 30-minute break at this time. Please remember my cautionary instruction. Keep an open mind until you've heard all of the arguments, received my final instructions, and go down to the jury room. Thank you.

(The jury exited the courtroom.)

THE COURT: Could I see the lawyers for one second? We'll be in recess.

(At sidebar off the record.)

(Recess at 3:11 p.m.)

THE COURT: One matter, so be seated before we bring the jury in. We had some discussion last week. I believe we were on the record about it, but I just want to make sure, and

♀

3364

that is that the government asked and the defense did not object that once the jury reached a verdict we would delay it from three to four hours to allow family members to travel to the courtroom to be present when the verdict was taken, and I think we did make a record on that. Everybody agree we did make a record on that?

MR. WILLIAMS: I believe that was on the record, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: That's correct, Your Honor.

THE COURT: And no objection from the defense.

MR. PARRISH: That's correct.

THE COURT: Then the question becomes, which I do not

think we did make a record on, it seems to me if we're going to do that, as a courtesy to the jurors, they ought to know that ahead of time so that they can plan their deliberations accordingly and not be shocked when that happens. And what we would do is if the verdict came back early enough in the day, then we would delay it for four hours and take the verdict. If it's 4:30 at night when they reach a verdict and there isn't sufficient time, then the jury would go home, come back the next day probably at 8:30, and then we'd have the verdict brought in. I'm not taking a sealed verdict. I'm not going to, in other words, take the verdict. It would just stay in the jury room, and I'd ask them obviously if it was the same verdict it was

3365

they filled out the day before if there is any kind of a break. Any problem with that?

MR. WILLIAMS: No, Your Honor.

THE COURT: Any objection?

MR. PARRISH: No, Your Honor.

THE COURT: Okay. Ready to have the jury brought in?

MR. PARRISH: Yes, Your Honor.

THE COURT: Thank you.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Parrish, whenever you're ready.

MR. PARRISH: Thank you, Your Honor. I said that I was in the middle of the federal penitentiary out in Colorado, but I need to go back. I was looking at my notes, and I just want to add a couple of points that I wanted to point out to you in my argument. And let me go quickly to these points, and then I'll go back to the federal penitentiary, and we'll move forward

from there.

A couple of things I wanted to point out that I neglected to mention about Mr. DeGeus when I was talking about him at one point wanting to take over Mr. Nicholson's drug business. What I failed to mention to you is that he and Angie Johnson were lovers, and we don't know the extent of when that relationship ended because, as the testimony has come out during the course of the trial, when you get back in the jury room,

♀

you'll find out it was a very volatile relationship.

And Angie had a relationship with a number of men. Remember she had one with Christi Cole's husband at the same time Christi Cole was married to her (sic). Miss Gaubatz said she tried to have one with her spouse at the time, the new person, but they never got it off the ground in terms of that relationship.

And we also know during that time that Miss Johnson was -- had a relationship to some extent -- you'll see maybe a couple letters in the evidence about that, but she had also a relationship with Mr. Honken at one point and ultimately got pregnant by him.

And I was in the process of discussing in modern day America things like that happen. It doesn't mean that you have this tight relationship, not to belittle that fact of their relationship, but it doesn't mean that they had any tight-knit relationship unless you can show from the evidence in this record that it was something more substantial. And you have to look at the record. That's all we invite you to do is to look at the record.

And when I was asking you to trace the phone calls,

what I wanted to ask you to do is look at the phone calls that took place from Terry DeGeus to Angie Johnson's house. I might have misspoke and said from Angie Johnson to Terry DeGeus, but you should look from Terry DeGeus to the residence or where he

had access to the phone on the 24th and the 26th.

The other thing I wanted to mention about that which I did not mention and I believe Mr. Basler talked about it, that Mr. DeGeus had a Buick that was sold, was a large car. He also drove a truck with a topper on it during the same time in July of 2003 (sic).

And I ask you when you go back into the jury room you look at the Toyota Tercel driving through that mud and muck, et cetera, with the low -- and you have a look at photographs of that car going down through a floodplain in 1993 as opposed to a truck with a topper. When you get to the physical evidence and you start evaluating and try to connect up what the state has been -- the government has been telling you about this case, you'll see that as a jury which one is more logical and reasonable. The government is asking you to do that. We're asking you to do that also.

And I keep telling you over and over again we invite you to look at the evidence because if you look at the physical evidence, you'll know that it's absurd what the government is arguing in this case with regard to Mr. Honken's involvement.

The other thing I want to point out to you with regard to the weapon, that I believe Mr. Cutkomp acknowledged that Mr. Honken gave him a weapon, and there are some differences. You take it back and look at it. I'm not disagreeing that it does not look similar to this, but it's been some time, and

Mr. Cutkomp said he's not familiar with weapons.

What I would ask you to do with regard to that is what did he ask him to do? He said there was a young kid. And remember initially Mr. Basler did not acknowledge that there was a young kid -- Brandon I believe his name was -- that Kathy Rick had who was about five years old at the time who Mr. Honken -- who called Mr. Honken Dad. And remember Mr. Basler reluctantly admitted it on cross-examination that Brandon was with Mr. Honken a lot and did call him Dad. And Mr. Honken's statement in the tapes was that he had a kid, and that's what -- I'm sorry, not Mr. Honken; Mr. Cutkomp, he had a kid that -- kids he wanted to keep the weapon away from because they showed an interest in it.

So the government tried to show these kids were so young, but then there was Brandon there who was also one of the kids who was a little bit older than the rest of the two kids. And you note that Mr. Honken had the kids all the time and oftentimes during the conversations that were taped he kept referring to these children.

Now, if I could, I'd like to go back to the government's evidence with regard to the witnesses out in Colorado. Let me talk about another instruction you got preliminarily. The Court told you something about the weight of the evidence -- not something about the weight of evidence but that's exactly what the Court told you. He said -- the Court

3369

said the weight of the evidence is not determined merely by the

number of witnesses testifying as to the existence or nonexistence of any fact. Also the weight of the evidence is not determined merely by the number or volume of exhibits. The weight of evidence depends upon its quality, which means how convincing it is, and not merely upon its quantity.

And what my concerns are in this case is you will go back and say, Look at all of this evidence; look what the government produced. And I invite you to look and we invite you to look into that evidence.

But when you look into the volume of it, you also have to look at how it connects up. If it doesn't connect up, you can't fill in the blanks as a jury. And you can't go outside of what's come in in the courtroom as a jury and try to find some way because of who's dead here to convict someone who didn't do the crime. It's not the way it works.

The government has to show you in this courtroom over the last two months who, in fact, did it by the evidence, and the number or -- the number of exhibits don't mean a whole lot. You go by the quality.

And they've clearly said to you that this is a circumstantial case. And the circumstantial case is only as good as the bits and pieces of the circumstantial evidence that fits into it. And you have had a chance to hear with your own ears, observe with your own eyes the weaknesses of this case.

3370

It was so weak, they didn't even talk about how weak it was in their opening statement. They talked about a gentle stream that in 1993 had to be outside of the state of Iowa if it existed.

So let's go for a second now to Mr. McGee and finish up these inmates. Mr. McGee was an individual who the state

admits has been in prison for 22 years. Well, what's significant about his 22 years? He said he had been in solitary confinement for three straight years.

Remember when he came in here and he kept rambling and wouldn't stop talking? He said he'd never been in front of so many people in so long he just wanted to talk. Matter of fact, he posted his story on the Internet, 400 and some pages. Remember I told you I read a lot of it, and he says, No, I put a lot more than that on there. He was just anxious to talk to people. He was happy to be here.

But you know what else he said? You know, you can't help but feel sorry for people like that. He said, For 10 of the 22 years I've been in a cell all by myself. That's what he told you. Among all these murderers, this poor fella had been in a cell all by himself, and he was so happy to be moved somewhere and so happy to get out and see light and see a room this big. This man would have said anything to get here.

Again, you go back and you compare him to the people who were in state court and take a look at him with your own eyes. Use your own common sense to evaluate who this man was

3371

and what he said.

Now, if that's the quality of evidence that you want to convict Dust -- Mr. Honken on, I can't stop you. But if you apply the test of credibility when Mr. Loparo was getting out in three years who said he wouldn't have come here had those statements been made, said no such confrontation took place that Mr. McGee is describing, and that there was general circulation around about Mr. Honken's case and you heard Mr. Huffman who is out, who had no ax to grind when he came here said no type

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2940 of 3636

confrontation took place like that, and if you consider the fact that all the other people said that Mr. Honken had never had any such confrontation, then you have to go with what is considered your common sense judgment, not what you think may have been, not what these people may have made up and concocted amongst themselves, not what some desperate soul who'd been in solitary confinement for ten years had to say to you about who was moving around and who was here in the spiritual sense.

But you have to talk about look at the facts, folks. That's really what you have to deal with here. And that's what the government wants you to run away from, the pure hard, cold facts.

And we talked about Mr. McGee a little bit. Now let's talk about -- I want to put the slide up about Mr. Honken's case just for a second, and we'll talk about it. Remember in opening statements -- and I like to go back and refer to opening

3372

statements because I believe in the presentation of the case it ought to be consistent. We ought not waffle around from one position to the other much like the government is doing, but we need to stay consistent and not pick up themes as they jump out of the case.

Remember in opening statement what I told you? Remember I said that you'll find out Dustin had the only live case in Colorado? Now, did that turn out to be accurate, or did that turn out to be inaccurate? Did I tell you that people took a special interest in his case? I told you that's what would take place. All the inmates took a special interest in his case. I told you these folks, Mr. Tokars and Mr. Vest, would take a special interest in his case because it was a ticket for

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2941 of 3636

them. They got where they wanted to get, in the wit. sec. program.

Remember I said they stole his legal papers? They did. And, you know, to some folks that may not mean a lot. But you know what? We all know the seriousness of this case. You all know this man had a lawyer. You all know he had his discovery that he was working on. You know he's a very prolific writer. Can you imagine when that material started circulating around the prisons which everyone now acknowledges what they had in their hands?

Now, use your common sense. I mean, we're not talking magic. We're not talking about something that we're speculating

3373

about. We're talking about what the evidence shows.

And you might say, I don't want to go there. You might say, Well, I'll listen to those tapes. Well, you can listen to those tapes, but you have to also listen to this evidence also. And what else do they say? They read his legal mail, but more important than that, I told you about they monitored his mail; they monitored his phone calls.

And the government's going to get back up and say, Well, he's a smart kid. He knew they were monitoring his phone calls and monitoring his letters, but Mr. Honken would write letters to people outlining what he was facing and outlining what he was looking at.

But would you imagine him since 1993 there is no person on this planet, not one single person on this planet outside of those folks in the institution who walked into this courtroom, raised their right hand, sat there and subjected themselves to cross-examination and said, Mr. Honken told me he

did this. Don't you find that absolutely incredible? Since 1993. You're going to have to think about that when you go back in the jury room. You're going to have to sit down, and you're going to have to discuss that.

And no matter how much the government says, Well, you go and look at Mr. Vest and you look at the timing, and when you look at the timing, you look at the newspaper articles and you look at his legal papers floating all around that prison and you

look at how he conducted himself. And when you go back in that jury room, as we said during voir dire, you can't jump over the hoops here. You cannot jump over the hoops. You gotta do the long, hard work these complicated instructions call for.

And one other thing you need to recall: Do you recall when we all sat down and why there were so many of you when we started with and what the Court said? This is a big case. This is a case that's going to take a lot of time of your life. This is a case that we had to sit down and ask you what you knew about it, how you knew about it, what you heard about it. This is a case that's been all over the Internet from the evidence in the case.

Matter of fact, the prison circles are quicker than ours because he got his article that Mr. McGee -- Mr. Loparo knew Mr. McGee was testifying. So don't throw your common sense away when you get back in there and convict this man for something he didn't do because they brought some folks in here who you would never or no one else would ever want to be around to say that's what he did.

And they talked about survival in that institution. They talked about what you had to do. Isn't it amazing that

this kid survived in that mess? And then they say he admitted it and where a couple of them said he'd be dead if he had ever admitted it? But now they walk in and says, Oh, yeah, he admitted it. Well, you make the decision. You are the ultimate

fact finder. No one else is the ultimate fact finder.

Let's talk for a second -- I'm going to jump ahead, and then I'm going to move back for a minute, and then I'm going to close out. Let's talk for a minute about what's called the CCE charge. And Mr. Miller talked about it and read part of the instructions to you. I'm not going to do that. I'm going to concede what he says about five or more people either had to be in the organization at some point in time or had to supervise.

Now, I'm not going to give you a complicated legal argument. What I'm going to do is give you an old-fashioned, common sense argument on that because I don't want to get caught in the complications, and you're going to have those instructions back in there with you to work through it.

But just look for a second. Who did they say were part of this organizational structure? They listed them. Matter of fact, Mr. Miller called Angie his business partner several times.

Well, what does the evidence show? The evidence shows that Angie visited with Dustin at one point, brought him maybe $10,000. If you look at their best-case scenario, brought him $10,000 and wanted to hook up with the man, the blond kid from Arizona who was making this 97 percent meth, this woman who's 6 years older than him. She wanted the man, and he was the man.

Now, what else do we know? We know he had two customers. No one's disputing that. Terry DeGeus. And who was

the other one? Greg Nicholson.

Now, Angie's relationship was more with him as the lover-type thing. She writes a letter that they got into evidence about a business relationship, but yet we see no development of it. So if you want to take a one-sided view, you can say, Well, yeah, Angie was part of it, but then you're going to have to dig down in there and find out who Angie was really around during that time because you cannot remove her from the drug culture and the back stabbing and moving around from man to man that was going on there because that's in the record. So you can't remove those two things as you go back into the jury room.

So what are you going to have to do there? You're going to have to decide if it was a business relationship as she alleged in her letter, or was she so ticked off with him because Kathy Rick was the woman he was with beforehand and he was now getting ready to have a baby with her in August that Angie was so upset? You're going to get a chance to read the letter, and you're going to have to decide from that.

But what one did I want you to go to in these five or more that the government's talking about, one that boils down to good ol' fashioned thinking? Jeff Honken. Remember Miss Smidt, Marvea, testifying and Mr. Honken's sister testifying? Is there any way that Dustin could have told Jeff what to do? Remember that phone call Marvea got -- or not Marvea got, that Mr. Honken

got from his brother when she told him not to go to Arizona? She had tears in her eyes when she was talking about that.

Well, you use your common sense about what was going on. Who owned the house? Who was married? Who was six years older? Who minimized what their relationship was? Was it Mr. Honken when he went in and took 27 years, when he stood up and took it like a man and said what he was doing, or was it his older brother who had lured him out, who provided him the food, the money, the house? Who was it? You can use your common sense and determine and know who it was.

We've often used this term rocket scientist, but it does not take a rocket scientist when your own mama comes in and says you're going to do what your older brother tells you to do and when the sister who's younger than that says you're going to do what your older brother tells you to do.

Now, did he organize Jeff? Not in your wildest dreams. Does the evidence show he organized Jeff? You answer that. The answer has to be a resounding no. Who organized who in that, ladies and gentlemen of the jury? Whose six-year-old sibling controls -- whose younger six-year-old sibling controls the older one? All of us who have sisters and who are younger, we don't even get that kind of control, so we know what we're talking about, so you can know with an older brother who's the alpha dog. Remember that question that was asked?

So if Jeff and Angie would be out of the mix, then

they don't have five to get a CCE. You have to answer that in that fashion because that's what the evidence shows. There's no evidence that contradicts that.

Now, next I want to turn to the conspiracy. And you take the instructions, and you work with them. They're at instruction number 11. Instruction number 6 on the conspiracy,

this is what you'll have to work with. The government in its argument conceded, Mr. Miller conceded -- now, he may get back in rebuttal and say it was a mistake and he misspoke. But he conceded that the conspiracy ended in 1993 in March, but let's take a look at the evidence.

And the Court, as I told you earlier, has instructed you with regard to that evidence that this is the case being tried now, not some other case, and to meet head-on the fact that Mr. Honken did enter a plea of guilty -- and I don't want to get into the nuances of the plea, but take a look at the plea itself and the exact language in there. And if I got into the nuances you'll say, Well, he's making a legal argument to me, and I just want to make a pure factual argument to you in that.

Mr. Cutkomp said he stopped it. He said he came back to Iowa and he went to work down near Des Moines working in a factory down there putting stuff in buildings all around the state. He didn't see Mr. Honken for about two years he said. This is verified by Marvea Smidt, is verified by the other evidence in the case. There's no connection during that period

3379

of time of any significance except for the discussion about when his parents went to Africa and there was a gun that he might have gotten rid of at some point, but he admits at that time he hardly saw him. That's what Mr. Cutkomp's own testimony is.

Think for a second with me. Is there any evidence in the record to support that they were seeing each other in '93 and '94? So if the conspiracy ended, there could be no conspiracy murders to go with that. But you have to examine the instructions and put them in the context of that type of situation. You can't just make a jump. And what I mean by

that -- and this is all of our greatest fear, that you'll see these two dead kids and you'll say, We have to make the jump to that, and that would be the emotional jump.

But what you have to do really is look at an exact connection with the evidence of witnesses who testified in court. That's the only way you can make that connection. And if Mr. Cutkomp says that, where else do you go? Well, this is where you go. Remember Mr. Cutkomp said that they tried to make an hallucinogen at one point. They also tried to make a growth hormone at one point. They weren't even making methamphetamine.

But let me throw something out even better than that for you. In this record since 1993 except for that small amount of meth that Mr. Held said that -- the guy who worked at Kraft Foods said that Mr. Honken gave him, where is it in the record that they manufactured any more methamphetamine?

And not to confuse you or anything like that, but I want you to think when you go back into the jury room about this factor. If this young man can produce 97 percent pure meth and had studied it and had had the financial wherewithal -- remember this young man drove a $500 car. Remember that. That's all he's ever owned. You didn't see him with any huge amount of money except the money they spread out with the $3,000 there and the money Tim Cutkomp said he had at one point that he saw him with several years earlier.

If you, in fact, take into consideration what came into evidence in this case, no methamphetamine was ever produced by Mr. Honken after 1993, none. Where is it? Now, if he was able to produce 97 percent pure methamphetamine, do you really think he was trying to really produce it, or was he trying to

placate his so-called Angie? You decide that. You look at the evidence, and you look at what they presented on that issue.

Of course you can say, Well, that's a bunch of hullabaloo. He had all the stuff. He had all the junk out there, and he was manufacturing, and that's what he was doing in 1995. But start looking at it. Start looking at the production of it.

The government's going to get back up here and say, Well, yeah, he was gonna do it; he was gonna do it; he was talking about doing it back in '93; he said he was going to do it. But then you have to go back to the sentencing hearing and

see what he said and what he decided to do.

And you know what? Through all that period of time, one moment did Mr. Honken run away, did Mr. Honken hide, did Mr. Honken stay in Iowa? Did he? Absolutely. He never once told you they had no idea where he was. So he goes and blows two kids' brains out and then the mom of the kid and two other people and just sits around Iowa.

Use your common sense here. Use your common sense as to who had the way, who had the means, who had the methods, who had made the threats, and who was just talking and talking under circumstances of just a friend.

Let's talk for a second about this aspect of the case. We've talked about the CCE. We've talked about the conspiracy murders. And from the evidence I would submit to you there's no way to get there, not from the evidence in this record. But we want to talk about something else.

What if you decide that everything that lawyer said was just bunk? And it's not evidence. But if you took that

back into the jury room and you sat down and you said there was no floodplain there; there was no mistakes by the detectives; there was no -- they had fingerprints; they just didn't bring them in; they had all this stuff; they had mud in the car, mud in the house; they had all of this stuff; they had the physical evidence; even though they can't show this was a nine-millimeter and it would have blown all the way through the head, that's all

♀

bunk; physical evidence doesn't mean anything to us. Matter of fact, the fact that these people out in Colorado said these things, the fact that these people said these things in jail, you know, we want to believe it all. Suppose you got back in the jury room and you said that.

Doesn't matter what my feelings would be. It doesn't matter what the government's feelings would be because we don't win or lose in these cases. The Court told you that in its instructions. You do justice. You do what is fair. You do what is fair.

But what if you accepted everything that the government brought in and we took the equation out of these two little girls, this ten-year-old and this six-year-old little girl? Do you know what you would find by looking at all the evidence and you discounted everything? You would find -- and you accepted what Dustin said not in the context -- you take it out of context and you put it in the context the government wants you to put it in with these snippets -- you would find a man who killed someone so they wouldn't testify against him. That's the best you would find if you ignored everything else, if you ignored everything else.

But you can't ignore everything else. What you have

to do is go through the evidence and go through the evidence and examine it. And as you go through the evidence and examine it, you must base your verdict on the evidence and the law that's in

the instructions. That's all you can do when you evaluate it.

And in order to do that in this case, you're going to have to be sort of like in the words of the Bob Dylan song Forever Young: You have to be courageous; you have to stand upright; and you have to be strong. You have to do that in order to be able to deliberate in this case.

I reminded you in opening statement of the tremendous scientific tools that are available to our law enforcement officials. We know they were ignored. Mr. Honken's journey for justice has been filled with roadblocks, detours, potholes, and incomplete highways and people who came in and outright lied to you and admitted later that they were, in fact, lying.

You're the only people, the only people on this planet, who can correct this matter now. The time is now, and the place is here. In order to convict someone of a crime of this nature, the evidence has to be substantial. It has to be substantial to convict a young man of the magnitude of these crimes.

And the evidence in this case, as I told you from the moment I stood up, is based upon faulty detective work, faulty physical evidence, incomplete work, the failure to follow through, the failure to do the job that needs to be done.

This evidence is based on deals with convicted murderers as I call them, the trio of three who steal documents while denying their own criminal conduct. This is based -- this

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2951 of 3636

evidence is based upon -- that's come into this courtroom is on admitted liars. This young man's documents were perused, reviewed, copied, stolen -- not copied. I take that back. Were stolen, taken, reviewed, read while he was in prison and while he was in jail.

This is a case, ladies and gentlemen, that cannot be based upon newspaper articles but must be based upon what you review as the evidence when you go back. The evidence in this case that the government wants you to convict Mr. Honken on of these five murders and murders as they allege on the CCE and conspiracy defy the law of nature. Let them explain why in their whole case they never once mentioned the 1993 floods, this gentle stream as they call it that existed and the flood bed and the mud and the muck and the guck that they said this car drove through to get there and get out of that. It defies common sense. It defies a sense of justice, of fairness, and it defies a sense of justice.

We talked a little bit about the fact that when this case was over you might be left with a mystery as to how it happened. You all agreed it's not your job to solve this mystery. It was the government's job before they brought us all here. They have not done it. They have not come close to doing it. They didn't even admit in their opening statement that this was the type of evidence that they would bring in here and try to convict this young man on.

3385

When you go to the jury room, you have to step up and do your duty. Mr. Honken admitted his guilt in the

methamphetamine charge. He is paying his dues, and he's denied the killing. My work, Mr. Spies' work, and Mr. Rogers' work is done.

Again, I want to thank them because I wouldn't be here standing here without their hard work and their sacrifices from their families, from their job. Your verdict in this case should be a verdict of not guilty. And the final stage of Mr. Honken's journey for justice is going to be back downstairs or upstairs, wherever it is, in that jury room.

I want to thank you for your time. I want to thank you for your efforts, and I want to close with a story that some of you may have heard before. And I apologize if you have, in fact, heard it.

But once upon a time there was a young boy who went to a wise old man. And he was going to trick him because this man was so wise. So he put his hand behind his back, and he said, Old man, old man, I hear you're so wise. Tell me what do you think I have in my hand? The wise old man thought for a minute and said, I think it's a bird. And the little boy was taken a little aback, and he said, I'll trick him. What I'll ask him now, Is it alive or is it dead? If he says it's alive, what I'll do is crush it, and the bird will be dead. If he says it's dead -- I screwed that up.

3386

But he says the young man -- he would crush it if the old man said it was alive. But the bird in the hand is actually alive. And so if he says if it's dead, he'll kill it. If it's alive, what he'll do -- if he says it's dead, he says he'll let it fly out so he has it caught he thinks. So then he says, What is it? And the little boy looks at him eagerly. The old man

looks him straight in the eye, and he says, The answer is in your hands. And, ladies and gentlemen, that's where I'm leaving this case after eight and a half years, in your hands. Thank you.

THE COURT: Members of the jury, why don't you take a stretch break, and then we'll hear the rebuttal closing argument.

Please be seated.

Mr. Miller, whenever you're ready.

MR. MILLER: May it please the Court, counsel.

MR. PARRISH: Mr. Miller.

MR. MILLER: Members of the jury. It's my responsibility by virtue of the burden of proof to respond in rebuttal, and I will confine myself to that task. I'm not going to do other than respond to comments that have been made because that's the only appropriate role of rebuttal is respond to comments made, and I only have that role by virtue of the burden of proof in this case, and I will limit myself to that task and let you get on with yours.

♀

3387

However, again, I do appreciate your patience and trust that you folks understand that I would not be doing my job if I did not respond to some of the comments that we have heard from Mr. Parrish.

First and foremost and perhaps just slightly off the track but appropriately I reciprocate Mr. Parrish's expression of appreciation to everyone in this courtroom. Everyone has worked hard and long. Everyone has a job to do, and we respect the fact that everyone does it in good faith. We understand and appreciate the fact that you folks are here at considerable

sacrifice to yourselves, and we understand and appreciate that.

However, it's now time for you folks to do your job as jurors, to assess the evidence and decide what really happened, ascertain the truth and return a verdict that does justice.

I'm going to try to respond to Mr. Parrish's comments in the order in which they came in simply so that I can be sure that I respond to them and to nothing else. If I move back and forth a little bit, it's because, understandably, the argument did as well.

Yes, I confess I did present to you folks some ugly pictures. This case involves an ugly crime. And proof of that ugly crime required some ugly evidence. And that's the job of Mr. Williams and myself, and I don't apologize for having done that job. I don't believe we overemphasized that evidence. It is necessary to proof of the elements of the crimes charged

♀

which include malice aforethought, premeditation, and the killing of five people, yes, including two children.

We don't do so because it's emotional evidence, although obviously it is. How can it not be? But it is the nature of the crime. It is what happened. Gruesome crimes lead to gruesome evidence, and nobody here enjoys that fact. But it is the fact, and it's why we are here.

Mr. Parrish referred to my co-counsel's opening statement. I recall the opening statement on behalf of Mr. Honken referring to someone having placed a dog over a grave to try to mislead authorities, and yet the only evidence about a dog in this case, ladies and gentlemen, was from Mr. Honken's own mouth when he was recorded as saying it would hurt him more to kill a dog than all those

people.

Yes, Mr. Honken is in prison on a 27-year term, and that's no small matter. But he accepted responsibility for that and admitted that when he had to admit to it, when the evidence was overwhelming to that effect.

It's been suggested to you on behalf of Mr. Honken that after 1993 he delivered methamphetamine to no one to our knowledge as far as any of the evidence showed, and indeed I don't disagree with that.

However, in 1996 when he was operating that methamphetamine laboratory and was on the verge of producing

methamphetamine, authorities who had been monitoring his behavior, Narcotics Enforcement Agent John Graham and his colleagues, stepped in to prevent that happening. The defendant, through no credit to himself, was prevented from delivering additional methamphetamine in 1996. And Agent Graham testified and explained to you why he stepped in. That's dangerous business, not just the methamphetamine itself but the making of it is a dangerous, dangerous thing. And Agent Graham had a responsibility to that community, for the safety of people in a residential neighborhood not to allow that process to go to completion.

There's been a great deal made of the fact that 1993 was a memorable year in the state of Iowa, it was the year of great flooding. I think we all remember that year. A lot of manning of sandbags and doing without water service depending on what community you lived in at the time and depending upon what time of the summer that flooding hit your community.

But there's no evidence here, nor indeed would I

suggest do you have any recollection, of the entire state of Iowa being under water all at the same time.

The records that were produced in this case that show the rainfall in the Mason City area showed on July 24, 1993, 8/100 of an inch precipitation, less than 1/10 of an inch precipitation; on July 25, 1993, 16/100 of an inch precipitation, less than 2/10 of an inch precipitation; and on

♀

July 26, 1993, zero precipitation.

Again, ladies and gentlemen, no evidence in this record that the Mason City area on July 25, 1993, was flooded. If it was at all typical of Iowa, it certainly had a lot of rain at one point or another certainly much of that summer, but there's no evidence in this record that on July 25, 1993, that that floodplain was at that point under water.

Those '93 floods hit central Iowa at one point, hit northeast Iowa at another point, hit your neighborhoods at another point repeatedly through the summer, but we have no evidence as to specific dates, and we know for a fact that Greg Nicholson, Lori Duncan, and her children disappeared the night of July 25, 1993, and we know that they ended up at the bottom of that very shallow grave just a few feet away from that stream. That we know for a fact.

To suggest that they couldn't have been buried because it was under water is to suggest that they weren't buried at all, and that's not the case. They were buried, and they were buried right there a few feet away from that stream.

It's been suggested to you that on that tapes -- on those tape-recorded conversations between Tim Cutkomp and Dustin Honken that they were strategizing. Ladies and gentlemen,

during his sentencing hearing and in Exhibit 300, he admits himself -- and I quoted to you from that this morning -- that throughout those discussions and those conversations those two

men discussed the killing of witnesses, they discussed the killing of Dan Cobeen, they discussed the killing of Special Agent John Graham, the killing of Agent Dave Mizell, and the killing of government chemists. Exhibit 300, the defendant's own testimony at his sentencing.

No, Mr. Williams did not discuss admissions, incriminating statements made by Dustin Honken during opening statement. This case is based on circumstantial evidence, a chain of circumstances, a chain of events that can lead to only one logical and reasonable conclusion: The events that began with the arrest that included the coincidental timing of the disappearance of Greg Nicholson and the sudden withdrawal of a plea agreement; the luring by Dustin Honken's girlfriend, his pregnant girlfriend, luring DeGeus to his death; the drawing of maps to the bodies by Dustin Honken's girlfriend and business -- criminal business partner, that is the basis of the case that proves beyond any reasonable doubt that Dustin Honken is guilty.

And it is so much extra evidence and appropriate for you to consider that Dustin Honken did on multiple occasions make incriminating statements not just in Florence, Colorado, and not just in the Woodbury County Jail but in his own home when he was whispering to his friend Tim Cutkomp. That is powerful evidence, ladies and gentlemen, but it's just so much extra evidence on top of the circumstantial evidence, the chain of circumstances, that can lead you to only one logical

conclusion, and that is full knowledge of exactly who killed these people: Dustin Honken and Angela Johnson acting together.

Suggested to you that Dustin Honken is merely a chemistry nerd. He's a smart guy. He understands chemistry. He understands organic chemistry. Not a lot of people do. But that doesn't mean that he isn't also a criminal schemer and manipulator. And when you listened not just this morning but for hours on end to the entirety of those tapes, you learned that and learned that from Dustin Honken's own voice.

Suggested to you that Tim Cutkomp could make him say anything. But you heard there were extended comments made by Dustin Honken, and you can judge for yourselves whether anyone put those words into his mouth or whether they came out of his mouth of his own voluntary free will.

It's been suggested to you that there is no physical evidence in this case. There is physical evidence. We don't have a fingerprint. We don't have a transfer of DNA from assailant to victim or from victim to assailant. We don't have fiber evidence. Sometimes in some cases in some places such evidence is available for juries.

There is a piece of galvanized steel upon which something was melted down. And for some reason somebody saw fit to discard that piece of galvanized steel. It was perfectly good, could have been used to melt more things if you wanted to, but it got thrown away for some reason. And something got

melted on it for some reason, not just discarded but melted down, destroyed so totally that no one could ever use it as evidence.

There were five bullets pulled out of two graves. Every one of those bullets, according to the testimony of Scientist Victor Murillo, was consistent with and could have been fired from that -- from a Tec-9.

Is that identity? Is that the same thing as a fingerprint or a transfer of DNA? Of course not. But DNA, if there ever was any in this case, and fingerprints, if there ever were any, were destroyed by the worms over a period of seven years. And that happened because the killer of these people took the care to conceal his crime and to destroy the evidence, and he asks you today to reward him for his success in destroying evidence.

Agent Basler, veteran of the Iowa Division of Criminal Investigation, is a big boy, and I'm not going to stand up here and worry about defending his reputation. He's a supervisor in that very proud organization where he's worked for decades. He investigated a missing persons report relating to Mr. DeGeus in '93 and years later tried to take what the Mason City Police Department had in the way of a very difficult missing persons case relating to the Duncan family and years after the fact dig and find and turn over what evidence he could, and we brought that evidence here before you.

3394

And I would submit to you, ladies and gentlemen, that even though there are no fingerprints, there were none to be found. And even though there's no DNA fibers, there was none to be found. It was consumed by Mother Nature in that floodplain if it transferred from Dustin Honken to the victims. And if any speck of it transferred from the victims to Dustin Honken or Angela Johnson, it went down the drain of that shower in Angela

Johnson's home on the morning of July 26 at 5:00 a.m.

The Duncan house was examined for blood at Agent Basler's insistence because blood is a substance that can persist through years as we heard from Mr. Bush, and he looked, and he did not find, which is to say that if these people were killed in that home, they may have been killed without bloodshed, or the blood may not have been there seven years later, or they were killed elsewhere. We don't know.

Christi Gaubatz and her car, yes, Christi Gaubatz lied. She lied for years. And I don't condone that. But she was Angela Johnson's best friend. And we've already heard a little bit about Angela Johnson and what type of person that woman is. And might it not be reasonable for Christi Gaubatz to fear crossing Angela Johnson as well not to mention Dustin Honken?

But she kept that to herself, and she lied to authorities, and she lied to a grand jury until the year 2000 when Agent Basler sat her down and said, Ma'am, I know that you

3395

have more to tell us. And thank goodness he did, and thank goodness that Christi Gaubatz let go of that burden, got that terrible secret off her shoulders at that time. Better late than never. What a terrible burden it must have been for her to carry for those years. And I do not condone the fact that she carried it for those years.

But, ladies and gentlemen, I credit her with the fact that she ultimately did share it, and I think she told you that sharing what would lead -- information that would lead to the location of those children --

MR. PARRISH: Your Honor, I'm just going to object to

the credibility issue in the last couple of words and just ask him to rephrase it.

THE COURT: Objection's overruled.

MR. MILLER: Her car was a small car. It wasn't built to carry four adults and two children, but Christi Gaubatz told you that it did on occasion. It was the car that she could afford. And I think most of us have at one time or another -- maybe even still some of us drive a car that's too small to comfortably carry everybody, but we drive what we can, and Christi Gaubatz told you that that car has carried four adults and two children on occasion.

And you saw from the pictures themselves that it's the four-seater built to accommodate, not particularly comfortably, but to accommodate four adults, and in this case when a man and

a woman gag and bind two adults and take those two adults and those two small children to their death, he's not concerned about their comfort.

The claim that Christi Gaubatz never noticed any mud on that car, whether she was looking carefully for mud or not, there's no evidence and no -- nothing other than speculation as to whether that car went -- if that was the car that took these people to their fate went any further than the field entrance to the location of those -- that mass grave.

The tape recordings -- and yes, we did play excerpts from the tape recordings of the Tim Cutkomp/Dustin Honken conversations. Ladies and gentlemen, the context of those, again, the context of those conversations as admitted by Dustin Honken during his sentencing here in this courtroom in 1998 was, by his own admission, discussion of the killings, the plotting

and scheming to take the lives of Dan Cobeen, John Graham, Dave Mizell, government chemists. That was the context by his own admission.

And judge for yourself whether the excerpts we played for you were cut and pasted David Letterman style or if, rather, they were merely relevant -- a few of the many relevant excerpts from those tapes that showed Dustin Honken plotting and scheming, additional obstruction of justice, and that showed Dustin Honken making statements that at least impliedly incriminated him in the '93 murders.

Ladies and gentlemen, we only played a few portions here today with all due respect to the time available in final arguments. You spent one full day at least sitting in here listening to the entire tapes in their entirety, not edited but from beginning to end presented by Mr. Williams on behalf of the prosecution. Not cut and paste, played from beginning to end.

Nine 38 shells found near the grave site, I believe if you recall the evidence, those nine 38 shells were found in the year 2001 nearly a year after Special Agent J.D. Smith in October of 2000 searched the same area with a metal detector and found nothing.

Also found was a 38 slug that was not corroded. It was not in the grave and, unlike the five bullets that were pulled out of those two graves, was not corroded. Those shell casings and that bullet had nothing whatsoever to do with this crime, and they were not there in 2000 when J.D. Smith looked for them.

And let's talk just briefly about criticism of what the government does, criticism of what detectives do when they

search a crime scene. J.D. Smith ran metal detectors with his colleagues, ran metal detectors on a perimeter around that grave site. I may be wrong. It was perhaps 30 feet. I don't recall the exact distance. But if it was 30 feet, there's nothing to prevent any defense attorney from suggesting that he should have searched 40 feet. And had he searched 40 feet, there's nothing

♀

to suggest -- to prevent anyone from suggesting that he should have searched 50 feet.

And so as in any and every case where a criminal investigation is conducted, it doesn't take a great deal of imagination to come up with suggestions about something more that could have been done. But that's merely to speculate. They have to do what is reasonable to do.

And seven years after the fact, they looked high and low for what they could found -- what they could find, and what they did find was brought here for you to look at, evaluate, and conclude what really happened here.

Suggested to you that a 9-millimeter fired from a Tec-9 would pass through the skull of its victim and never stay, well, the suggestion that it was not a 9-millimeter Tec-9 that was used on Greg Nicholson. If you'll recall the testimony of Dr. Goodin, she recovered a bullet fragment from the head. Not only was one recovered from the head of Greg Nicholson but also from the head of Terry DeGeus. Exhibit 1005, bullet from the head of Terry DeGeus that has the characteristic lands and grooves consistent with the three bullets recovered from that grave, all of which are consistent with a Tec-9, admittedly with other firearms as well.

But I would submit to you that there's no evidence in

this case that a bullet fired from a Tec-9 will always pass through the skull without leaving any bullet fragment behind. I

think you can conclude from the evidence that it will pass all the way through the head of a small child but not necessarily an adult.

It's been suggested that the government -- the DCI should have tracked ammunition purchases, and I submit to you that there's no evidence that that would have been even possible.

No shell casings found. Indeed none were. What was found was brought to you. Those shell casings, if they were left at the scene, were lost to time if they were left at the scene and not picked up and if that is the exact location where the killings occurred and if the killings did not occur more than 30 or so feet away and the bodies not dragged the additional distance, but it's mere speculation. To suggest that the absence of a Tec-9 shell casing at the grave proves that this defendant didn't commit this crime is to ask you to speculate on that.

It's been suggested to you that there's testimony that Terry DeGeus was looking for his friend that summer. Christi Gaubatz testified to you that she recalls Terry DeGeus worried about locating Greg Nicholson at a time when she and Terry DeGeus happened to meet on a road, and that was well after the disappearance of Greg Nicholson. Of course he was worried. He knew that the other guy who sold drugs for Dustin Honken had disappeared, and he was worried about what that meant to his own

fate.

Suggested to you that the testimony of Scott Gahn disproves the guilt of the defendant. Ladies and gentlemen, Scott Gahn, again, was a man who in 1993 in the years preceding that was a heavy user of controlled substances and gave testimony which was within itself contradictory.

Your recollection is more important than mine, but he was on the stand twice. And if you recall his cross-examination the first time he was on the stand, he indicated he did testify before the grand jury and that that was well after the disappearance of Greg Nicholson which contradicted the testimony he gave last week that he thought his grand jury testimony was before the disappearance of Greg Nicholson.

If Dustin Honken mentioned to him that he, Dustin Honken, had a tape and if that happened the last time that those two talked, wouldn't it reasonably have happened at the time that Greg -- excuse me, that Dustin Honken approached Scott Gahn at his place of business and asked him about his grand jury testimony, grand jury testimony that occurred, ladies and gentlemen, well after the disappearance of Greg Nicholson?

Suggested to you that I conceded that Exhibit 48, this piece of galvanized steel, has no significance of evidentiary value. I'm not going to repeat what I said to you this afternoon, but I urge to you it has tremendous evidentiary value. No, it's not a fingerprint. It's not DNA, but it's

3401

proof that somebody melted something down that had lead and then threw that away.

It's proof, ladies and gentlemen, of destruction of

evidence, of concealment of a crime, activity that is the earmark of Dustin Honken, the man who plotted and schemed the destruction of evidence for hours on end in those tape recordings that you listened to four weeks ago, the portions of which you heard again this morning.

Yes, Dustin Honken remained in Iowa after his arrest in 1993. If you'll look at the order setting conditions of pretrial release, you'll note that he was required to stay in Iowa.

His drug business closed down in '93? I would urge to you it never closed down. Operations were suspended from time to time, but Dustin Honken was in the business of manufacturing methamphetamine. That is Dustin Honken's chosen profession and one that he pursued whenever he was capable of pursuing it.

Tim Cutkomp, yes, he had mental problems. Yes, his former wife, there was some reason to believe at some point, had an affair with the defendant, his former wife, not anyone to whom he was married at the time, and he explained to you what his feelings were about that.

The suggestion that he had 20 recorded conversations with Dustin Honken at Kraft was contradicted by Lori Lewis. And again, as with Scott Gahn, I would suggest to you that the

accuracy of the memory of either Tim Cutkomp or Scott Gahn is not something that they documented and had a job to document. Lori Lewis's job was to document the work that she did, and she told you that there were two attempts at recording conversations at Kraft, both of which yielded nothing, nothing because there was too much noise.

Defendant gave false testimony in this courtroom

claiming that there never was no videotape. Ladies and gentlemen, it's suggested to you that that's understandable because it might implicate him in the murders. Ladies and gentlemen, that was in 1998 that that false testimony was given here, and these bodies were not discovered until more than two years later.

It is brought to your attention that Dustin Honken never outright said to Tim Cutkomp that he killed these people, although I would submit to you that recorded conversations are virtually the same thing.

Nevertheless, I would also suggest to you that when a man goes to prison and meets people with whom he has something in common he's more likely to discuss frankly the subject of what they have in common. And in Florence, Colorado, and to some degree in the Woodbury County Jail, that includes some people with whom Dustin Honken has in common the fact that they have a history of violence including, in some cases, violence against witnesses, violence that subverts the very process that

we are involved in here.

It's been pointed out very accurately by Mr. Parrish that you can't wait seven years and expect good physical evidence. And of course that's true. But that's a delay that was caused by Dustin Honken himself when he buried those bodies, destroyed that evidence, concealed his crimes.

The Woodbury County Jail inmates were discussed at length. I'm not going to go through that and tax your patience too much longer, but bear in mind that while Dustin Honken entered the Woodbury County Jail as what one witness called a fish, someone new to incarceration, it wasn't long before he was

using his smarts and his ability to scheme to control and manipulate other inmates including Inmate Johnson who persuaded his girlfriend to come up with a thousand dollars to give to Dustin Honken's girlfriend and partner in crime Angela Johnson.

Putzier testified about an escape attempt, and I would suggest to you that that's been corroborated through the testimony of Lieutenant Redden and others including photographs of the damage that was done inside the Woodbury County Jail.

And, ultimately ladies and gentlemen, if Dustin Honken was so naive and so much a victim of the prey of other inmates in the Woodbury County Jail, how does that square with the fact that he in one case actually bonded out one of those inmates in possession of a map to Tim Cutkomp's residence and in another case attempted to do the same thing, Donaldson and Altimus?

Continuing criminal enterprise, ladies and gentlemen, there was a continuing criminal enterprise long before there was the first killing. Every manufacture of more than 100 grams of methamphetamine is a drug crime. Every delivery is a drug crime. And there were several of each before anybody was murdered.

There were more than five members of that conspiracy. In addition to Nicholson and DeGeus, there was Johnson; there was Jeff Honken who should, should, have paid for his involvement, but you can only prosecute where there's evidence, and there was not evidence on Jeff Honken; and Tim Cutkomp who did serve a prison term for it. Yes, all five of those, in addition to Dustin Honken, were engaged in that continuing criminal enterprise.

The Court's instruction, as I mentioned to you this

morning, indicates that there may be more than one organizer, manager, or supervisor of such an operation, and in this case there may have been to some degree a partnership. However, no one in that partnership did more to organize that operation than Dustin Honken. He was the man with the know-how. He was the chemist. He was the one who recruited the other participants. He was the one who told Greg Nicholson about the plans for the future growth of that drug business.

The conspiracy charges, the same evidence supports that, ladies and gentlemen.

Finally, the -- and at long last the Florence inmates, Tokars is doing five sentences. That's good. Five life sentences, that's good. That's appropriate. That's what he needs to serve. He read the defendant's presentence investigation and legal materials. Yes. The defendant went to him because he's a lawyer. He brought those materials to Fred Tokars.

Fred Tokars testified that he felt threatened as pointed out that, heck, all the inmates in that cellhouse knew that Tokars had had his wife killed and that he was a lawyer and a magistrate, a petty judge, but Tokars didn't know that because Tokars was a fish. It was his first time in. He was used to being a lawyer and a guy who had laundered people's money and in a municipal court handle their traffic tickets and what have you. He wasn't used to living inside a maximum security prison, penitentiary, and he was easily manipulated.

But when he received the information that he did receive, he felt for his own safety he needed to contact his attorney, and he did so, and his attorney contacted authorities.

Ron McIntosh, also serving life in prison without parole, and that's fair. He's been convicted of murder of a business associate. I don't believe he laughed about that. If you recall that he did, then so be it. It's probably my fault that I suggested to him that there was something unique about the fact that he successfully engineered an escape from prison

of his girlfriend by the use of a helicopter, and I apologize to everyone here if I made light of that fact because that is a serious crime, crime for which Ron McIntosh served years in prison.

But I think it was earlier in this case that it was suggested to you through another witness on cross-examination by one of the defense attorneys that the prisons are full of ludicrous schemes and dreams of getting out, including even helicopter escapes, and that's why I pointed out to you that that actually is not quite so ludicrous. It's actually been done even if only once by a guy who learned how to fly a helicopter in southeast Asia nearly 40 years ago.

Yes, he recounted to you some statements that don't jibe, the carrying of bodies across state lines. That didn't make any sense. But he also told you that there's a reason. Just as Tokars told you that he felt he was being tested when Mr. Honken told him what happened, Ron McIntosh told you there's perfectly good reason to twist the story around when telling a fellow inmate what happened.

Both talked about strangulations. Ladies and gentlemen, whether these people were strangled in Mason City or not is not anything that the evidence in this case can show because there's nothing but bones left. There's no soft tissue.

And even if they were only shot and never strangled, it's still consistent with Mr. McIntosh's explanation for why a fellow

inmate confessing to him would twist some of those details around.

Mr. Vest, we already showed you the multiple reasons why the information provided by Dustin Honken to Steven Vest that he in turn related to you was information that only the killer would have known. And there is no suggestion in the evidence in this case that the fact that those two children were executed by a bullet to the back of the head was ever in any of Dustin Honken's legal papers or news accounts, no evidence in this record that there was an explicit description of the babysitting duties of the next-door neighbor lady and the nature of the note written to her, no evidence in this record that the configuration of the body of Terry DeGeus as it was recovered from that grave was, in fact, consistent with what Dustin Honken described as playing with that body after the killing, moving that leg around like a four-speed shift. And yet all of those details came out and are confirmed by physical evidence found in connection with these crimes.

Ferguson was the man who was recruited to kill any one of those three killers. He told you he saw that report on CNN, and he told you the first thing he did was go straight to Dustin Honken and say, Hey, it's on TV.

He is a short timer, has less than three years left, but he told you why he was here: Because those schemes to escape and kill more witnesses and their families, including

their children, were schemes that he took seriously because people like Loparo and McGee and Dougherty are people who've actually done such things and that he, Steve Ferguson, felt that if they were successful in doing so he would feel that that blood was on his hands if he had that information and did not share it, and so he shared it.

He and the rest of these individuals, yes, they received wit. sec., security, inside prison, a transfer. Ladies and gentlemen, is that a benefit to any of them? I would submit to you, ladies and gentlemen, that the government cannot ask any witness to come into court and testify in a murder case against a defendant during the day and then go sleep under the same roof with him at night. That's common sense that the Bureau of Prisons has an obligation to try to keep, to the extent that they can, people safe inside those walls.

And Steven Vest who did wish to be transferred closer to his Kansas City-based family told you on redirect that since he's been in wit. sec. he's been living in a place that's even further away from Kansas City than is Florence, Colorado. That's the benefit Steve Vest got out of it, getting moved further away from his family.

Suggested to you that Mr. Huffman's testimony exonerates the defendant. If Dustin Honken did not confess to Neel Huffman, that only means that Neel Huffman is certainly one of many people to whom Dustin Honken never confessed. And if he

3409

made it known among some of his circle that he killed his rats and that everybody should kill their rats, that's not to suggest that he told everyone that, nor is it to suggest that he ever made it known other than to a very select few including those

who might provide him legal advice that he ever was involved in the killing of children.

Inmate Loparo testified and was contradicted by Mr. Huffman. Neel Huffman said that Dustin Honken said rats should be gotten rid of and that it was something he didn't want to admit, but I think you understand that Neel Huffman even admits that, yeah, they had weapons in prison including Dustin Honken. He didn't want to admit that.

Inmate Loparo came in here and told you that he was hardly even familiar with the use of the term rats. He hadn't heard that thrown around about killing rats. That was certainly contradicted by Mr. Huffman, ladies and gentlemen.

Joseph McGee isn't even in witness security. It's suggested to you that he would come here and say anything just for the opportunity to get out of solitary confinement. Joseph McGee, ladies and gentlemen, who told you that as a 37-year-old man he spent the last 22 years in prison, going into the adult prison system at age 15, having been a ward of the state since he was 11, who knows nothing other than life behind bars and what it means to be labelled a rat and what that is likely to mean to him, participated in schemes initiated by Dustin Honken

to engage in an escape, to come back here to Woodbury County and break out and that he was a willing participant of that scheme along with other escape artists like Loparo and Dougherty and he himself a man who has escaped in the past and was willing and more than willing to do that as long as all he thought this was was an escape adventure and all he thought this was was a case about the killing of rats because, as Joe McGee told you, if that's all it involved, he wouldn't be here.

Joe McGee who's got another 19 years to serve and has neither been offered nor asked for anything in exchange for his testimony who's going to go back to that hole told you, ladies and gentlemen, that if it was only adults it would be different. The reason he was here is because he was disgusted when Dustin Honken asked him, What's your problem, after McGee found out that two little children came out of that grave.

And I won't quote word for word. It's prison talk, but what he responded was, What's my problem? You killed two kids, you F. What's your problem? And that they had that confrontation and that at that point Dustin Honken said to him in justification of the killing of those children, They'd just grow up to be rats themselves. They were being raised by rats.

Ladies and gentlemen, Joe McGee told you, that man who's been nothing but an inmate his entire adult life told you, that if that's all it was, if it was only just those parents he wouldn't be here. What does he care about informants and rats?

3411

These people make choices. These people who engage in dealing in methamphetamine make choices as adults. They choose to get involved in a very dangerous business, and people get killed in that business.

But Joe McGee told you he was here because those little girls didn't make any choices and that he's here because they didn't have a chance, ladies and gentlemen. They didn't have those choices the adults had, and he's here because even today 11 years after their death those two little girls are here, right here, with us in this courtroom.

THE COURT: Members of the jury, we have two final instructions to go over. You will find those on page 94, so if

you'd turn to final instruction number 17, duty to deliberate, on page 94 of your set of instructions.

(The Court read final instructions numbers 17 and 18 in open court.)

THE COURT: Then what follows is the verdict form, and I want to go over that with you. We put it in kind of a chart format.

On page 2, Counts 1 through 5, witness tampering, then step 1, on each charge of witness tampering as charged through Count 1 through 5 in the indictment and explained in final jury instruction number 4, please mark your verdict. If you found the defendant not guilty of a particular count of witness tampering, do not consider the question in step 2 for that

count. However, if you found the defendant guilty of a particular count of witness tampering, please answer the question in step 2 of this verdict form for that count.

Step 2, prohibited intent. For each count of witness tampering for which you found the defendant guilty, please indicate the prohibited intent or intents for the murder of that witness.

Parentheses, where more than one intent was alleged, you may find more than one prohibited intent so long as you unanimously agree that each such intent has been proved beyond a reasonable doubt.

And then there's a place to check for the various counts, intent to prevent the victim from attending or providing testimony at a federal criminal case against Honken; intent to retaliate against the victim for providing information to law enforcement officers relating to the commission or possible

commission of federal drug-trafficking offenses; intent to prevent the victim from communicating to a law enforcement officer information relating to the commission or possible commission by Honken of federal drug-trafficking offenses; and intent to prevent the victim from communicating to a law enforcement officer information relating to the commission or possible commission by Honken of federal offenses, including witness tampering and violation of conditions of pretrial release.

♀

And then you'll notice that the only place you would put a checkmark, if at all, would be in any of the open or white boxes.

Then going to the next page, page 3, at the top it says Count 6, soliciting the murder of witnesses, step 1, verdict. On the charge of soliciting the murder of a witness as charged in Count 6 of the indictment and explained in final jury instruction number 5, please mark your verdict. Then there's a place to check not guilty or guilty.

And then in parentheses, if you found the defendant not guilty, do not consider the question in step 2. Instead go on to consider your verdict on Count 7. However, if you found the defendant guilty, please answer the question in step 2 of this section of the verdict form.

Then step 2, person or persons solicited and intended victims. If you found the defendant guilty of soliciting the murder of a witness in Count 6, please indicate the person or persons that defendant solicited to murder Timothy Cutkomp. Parentheses, so long as you unanimously agree, you may find that Dean Donaldson or Anthony Altimus or both were solicited to

murder Timothy Cutkomp, end of parentheses. And then there's a place to check Dean Donaldson was solicited to murder Timothy Cutkomp and another place to check Anthony Altimus was solicited to murder Timothy Cutkomp.

Count 7, conspiracy to tamper with witnesses and to

solicit the murder of witnesses. Step 1, verdict, on the charge of conspiracy to tamper with witnesses and to solicit the murder of witnesses as charged in Count 7 of the indictment and explained in final jury instruction number 7, please mark your verdict. There's a place to check not guilty or guilty.

If you found the defendant not guilty, do not consider the questions in step 2 and 3. Instead go on to consider your verdict on Counts 8 through 12. However, if you found the defendant guilty, please answer the questions in step 2 and 3 of this section of the verdict form.

Step 2, objectives of the conspiracy, if you found the defendant guilty of the conspiracy charged in Count 7, please indicate which one or more of the following offenses were objectives of the conspiracy. Parentheses, you must unanimously agree on which offense or offenses were objectives of the conspiracy. In deciding whether an offense was an objective of the conspiracy, you should consider its elements. The elements of the objectives are set forth in final jury instruction number 8.

And then there's a place to check, one, killing or attempting to kill another person with intent to prevent the attendance or testimony of that person in an official proceeding; two, killing or attempting to kill another person with the intent to prevent communication by that person to a law

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2978 of 3636

enforcement officer of information related to the commission or

possible commission of a federal offense; three at the top of page 4, knowingly using intimidation, physical force, threats, or otherwise corruptly to persuade another person with the intent to influence, delay, or prevent testimony of a person at an official proceeding; four, knowingly using intimidation, physical force, threats, or otherwise corruptly to persuade another person with the intent to hinder, delay, or prevent communication to a law enforcement officer of information relating to the commission or possible commission of a federal offense; five, soliciting a person to engage in a violent felony in violation of federal law.

Step number 3, overt acts, if you found the defendant guilty of the conspiracy charged in Count 7, please indicate which one or more of the overt acts alleged were committed in furtherance of the conspiracy. The overt acts alleged are listed in final jury instruction number 7, element 4, beginning on page 59. You must unanimously agree on which overt act or overt acts were objectives of the conspiracy. And then there are 19 of them with places for a checkmark.

Counts 8 through 12, conspiracy murder. Step 1, on each charge of conspiracy murder as explained in final jury instruction number 9, please mark your verdict. Then there's a place for Counts 8, 9, 10, 11, and 12 to check not guilty or guilty.

Parentheses, if you found the defendant not guilty of

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2979 of 3636

a particular count of conspiracy murder, do not consider the questions in step 2 and 3 for that count. However, if you found the defendant guilty of a particular count, please answer the questions in step 2 and 3 of this section of the verdict form for that count.

Then going to the top of page 5, step 2, objectives and quantity of methamphetamine. If you found the defendant guilty of a particular count of conspiracy murder, please indicate which one or more of the following offenses were objectives of the underlying conspiracy. To assist you in determining whether an offense was an objective of the underlying conspiracy, the elements of the objectives are set forth in final jury instruction number 10.

And then you'll see Counts 8, 9, 10, 11, and 12 across the chart with the name of the individual victim. And then there's an indication, distribution of 100 grams or more of actual pure methamphetamine; distribution of less than 100 grams of actual pure methamphetamine; distribution of 1,000 grams or more of a methamphetamine mixture. Next is distribution of less than 1,000 grams of a methamphetamine mixture. Next is manufacture of 100 grams or more of actual pure methamphetamine. Next is manufacture of less than 100 grams of actual pure methamphetamine. Next would be manufacture of 1,000 grams or more of a methamphetamine mixture. And next would be manufacture of less than 1,000 grams of a methamphetamine

3417

mixture.

Turning to the top of page 6, step 3, alternative, if you found the defendant guilty of a particular count of conspiracy murder, please also indicate whether you find the

defendant guilty of intentionally killing the victim or aiding and abetting another person to kill the victim.

Parentheses, you must unanimously agree on which alternative has been proved beyond a reasonable doubt. And then they have the victim and counts: Gregory Nicholson, Count 8; Lori Duncan, Count 9; Amber Duncan, Count 10; Kandi Duncan, Count 11; Terry DeGeus, Count 12 -- and then intentionally killing the victim or aiding and abetting another to kill the victim.

Counts 13 through 17, CCE murder, step 1, verdict, on each charge of CCE murder as explained in final jury instruction number 11, please mark your verdict.

Parentheses, if you found the defendant not guilty of a particular count of CCE murder, do not consider the questions in step 2 and 3 for that count. However, if you found the defendant guilty of a particular count, please answer the questions in step 2 and 3 of this section of the verdict form for that count, and then again it goes victims and counts and a place to check not guilty or guilty.

Step 2, existence of the CCE, series of violations, if you found the defendant guilty of a particular count of CCE

murder, please indicate which of the alleged violations constitute the series of three or more violations that were part of the CCE.

Parentheses, the violations alleged are listed in final jury instruction number 11, element 4, beginning on page 75. You must unanimously agree on which violations constitute the series. And then there's a place to check 1 through 13.

And then step 3, if you found the defendant guilty of

a particular count of CCE murder, please indicate whether or not -- I'm sorry, please indicate whether you find the defendant guilty of intentionally killing the victim or aiding and abetting another person to kill the victim.

Parentheses, you must unanimously agree on which alternative has been proved beyond a reasonable doubt. And then there's the victims and counts across the chart and then a place for intentionally killing the victim, aiding and abetting another person to kill the victim.

There's a date, a place for your juror numbers, and then the last page is a place for your juror signatures, and the juror signatures will remain confidential.

Now, a couple of other matters. If I do get a jury note while you're deliberating, I want you to understand the process that I go through. When I get the note, I make copies of it. I disclose it to all the lawyers and to Mr. Honken. We have a court reporter present. We discuss how to respond. I

3419

have to carefully listen to both sides, and then ultimately I have to decide how to respond. I almost always respond in writing, although I reserve the right to bring you back up in the courtroom and respond orally. But my general practice has been to respond in writing.

I only tell you that to not either encourage or discourage jury notes, but I know it must be frustrating that I don't respond as quickly as you would like me to to a note. And if I don't respond as quickly as you think I would, that's why. It's a process that's necessary to go through, and I go through that process every time I receive a jury note. Even if it's something that would appear to be very simple, out of fairness

to the parties, I need to disclose it and discuss it with them on the record.

Now, about -- two other matters. Then we'll get to the issue you're all waiting for: Who are the alternate jurors? After this length of time, I'm sure you're curious about that.

If you reach a unanimous verdict in this case, there will be some delay between when you reach your verdict and when you bring it up to me in open court and I announce the verdict in open court. And I just wanted to share with you the reason why.

There has been a request that people travelling from Mason City be allowed to be present when the verdict form is read, and I have granted that request. And so I had to make the

3420

decision did I deny it and speed up your process and not hold you hostage for four hours or would I grant the request, and I decided to grant the request. So that may affect your timing.

If you come back with a verdict in the morning, then four hours later we'll bring you back up the same day. If it's towards the end of the day, then we won't actually announce the verdict in open court. And I'm not going to have you even give me the verdict until it's time to do it in open court. The verdict will remain in the jury room, and if it's an overnight situation, then it's up to the -- then I would expect the foreperson and actually all of the jurors to examine the verdict and make sure that's the verdict form you filled out the day before.

Now, with regard to alternate jurors, I will shortly announce the number of the four individuals who remain as alternate jurors in this case. Just so that the other jurors

know this, I had originally said to you last week I believe that I would keep the alternates here in another room while you were deliberating. I've given that some more thought, and I've talked to the lawyers and the parties.

And I've decided to send the four alternates home but with some very strict admonitions about what you cannot consider. You can't talk about the case. And I'll go over that with the alternates.

And the reason why is that I'm allowed to do that

under the law and then bring you back if we need you during deliberations and also bring you back for the penalty phase, but I thought as long as you follow my instructions that I would let you go back home and not have to wait around. If we need you, we'll contact you and bring you back.

So here are the four alternates, and I'll just ask you to remain seated. I'm going to send the rest of the jurors down to the jury room, and then we'll discuss your role as an alternate juror. 914, 425, 280, and 968 are the alternate jurors. Those of you who are not alternate jurors will be the trial jurors to deliberate, and you're now free to go down to the jury room. And in a little bit we'll have all of the evidence brought down.

And again, like I told you on Thursday, if you want to go home now, that's fine. If you want to start your deliberations, that's fine. Just a suggestion: It's been an awfully long day for everyone. I would assume that the majority of you would want to go home.

MR. SPIES: I apologize for interrupting. You mentioned that the alternates would be brought back for the

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2984 of 3636

penalty phase. I think you meant --

THE COURT: I'm sorry. If there is a penalty phase. Thank you very much. Yes, absolutely. Thank you. If there is a penalty phase in this case, then the alternates would be brought back and you'd sit through the evidence on the penalty

phase. Thank you, Mr. Spies.

So the rest of the jurors are free to go back down, and I just need to talk to the alternates for just a minute.

Take your stuff with you if you're a deliberating juror. If you're an alternate, just leave it -- hold on to it, and I'll tell you what to do with it.

(Jury out at 5:35 p.m.)

THE COURT: Okay. Please be seated. Now, in sending you home, I want you to follow the following rules, and they're really the things that I've talked about all along.

Do not discuss this case with anyone else including a spouse or best friend. You're not allowed to discuss this case. Do not listen to or read any news reports about the case. Matter of fact, I'm instructing you not to look at the local news. You can watch the national news. If for whatever reason this were to come up, you need to turn it off immediately. And do not read any news reports about the case. Don't do any investigation. Don't go on the Internet and do anything because I want to put you in the same situation as the deliberating jurors where you have no outside influence.

You can leave your instructions and your notes on your chair. Carey will collect them, and they will remain private. No one, no one, including Carey will look at those notes or any comments you would have written on the jury instructions or

anything like that. They will remain totally confidential. And

if we need you back during deliberations, then those will be returned to you.

If there is a necessity for a penalty phase, then we are going to bring you back, and the clerk's office will notify you about when that will start. If there is a penalty phase, we'll take at least a day break between when the jury arrives at a verdict and when we start the penalty phase. But the clerk's office will notify you.

You're free to go now. When you go out in the hallway, I'd ask you to just stay for one minute, and if you would give any telephone numbers, cell phone numbers to Carey so that we could contact any of the four of you as quickly as possible in the event you're needed either for deliberations on the merits or if there is a penalty phase. Then we'd be able to contact you as expeditiously as possible.

Okay. You're all free to leave. Thank you.

(Alternate Jurors 914, 425, 280, and 968 exited the courtroom.)

THE COURT: Please be seated. Anything we need to take up?

MR. WILLIAMS: Your Honor, we did make a record with -- we didn't make a record. We met with your law clerk over the exhibits, and we agree with defense counsel to withdraw three exhibits that, while were not objected to, neither party used and we're just withdrawing. Those are Exhibits 50, 59, and

239.

THE COURT: Any objection to those exhibits being withdrawn?

MR. PARRISH: No, Your Honor.

THE COURT: Okay. Exhibits 50, 59, and 239 are withdrawn.

Does Carey know that?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: She's out in the hall.

MR. WILLIAMS: Yes.

THE COURT: Okay. Anything else we need to take up?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

THE COURT: And will you be here at 8:30 tomorrow morning, at least one of you?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. Mr. Parrish, anything else we need to take up?

MR. PARRISH: No. Do you want us -- we don't need to be here, do we? I mean, it takes about what? Five minutes to get down here?

THE COURT: Yeah, as long as you give Carey your cell phone numbers.

MR. PARRISH: Right, both cell phone and hotel. Either it will be one or the other.

3425

THE COURT: Yeah.

MR. PARRISH: And if there are questions, how do you want that handled?

THE COURT: Well, our local rule is that -- as I recall it that we need to spend 15 minutes trying to locate you,

and if we can't locate you, I can proceed without you. I'm not going to do that in this case. So you just give us all the phone numbers you can to reach you, and if I get a jury note, even if it's something simple, other than -- sometimes I get a note just saying we're going home for the evening. It doesn't require any input from me. It's informative. What I do then is just communicate that information to you as quickly as I can. But I wouldn't necessarily call you and have you come in because there's no reason to respond to it.

But if a jury note requires any type of response from me, I go ahead and bring you back here, and we'll have copies for you of the note by the time you get here. Oftentimes when we call you, we'll tell you what the note says so that you can be thinking about it on the way back so that we can quickly put together a response if we can.

MR. PARRISH: Okay.

THE COURT: Anything further?

MR. PARRISH: No, Your Honor.

MR. SPIES: The only thing I wondered is what you're going to do with Mr. Honken, or is that between the marshal

and --

THE COURT: That's really between the marshal, but I thought it would be better to have him here during the day because he has a right to participate in the response to any jury notes. And so I would think it would be easier if the marshals would bring him over in the morning. Do you have any objection to that?

MR. SPIES: I guess not.

THE COURT: Okay. Anything else?

MR. SPIES: No. Thank you.

MR. WILLIAMS: No, Your Honor.

THE COURT: I did want to say this. Mr. Honken, even though you have court-appointed lawyers, you couldn't have paid five million dollars to have a better defense than what you got from three -- these three gentlemen, and I see you nodding in agreement. And the government did a fabulous job.

I've been privileged to be involved in hundreds of trials. This is the best-tried case. There's -- I can't even -- second place doesn't even come to mind because this case was so well tried by both sides. And as a judge, that's exactly what you like to see. And it was just exceptionally well tried by both sides. And both sides were incredibly zealous, but they got along very well. And you don't see that in many cases either. And it goes to show you that a lawyer can be as zealous as possible but still be highly professional in how they treat

♀

3427

me and how they treat the other side. And that goes for both sides. It just couldn't have -- couldn't have asked any more from the lawyers in this case. You served your profession unbelievably well. Makes me proud to be a lawyer. Thank you. We'll be in recess.

MR. PARRISH: Thank you, Your Honor.

MR. WILLIAMS: Thank you, Your Honor.

(The foregoing trial was adjourned at 5:43 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR 1-25-05
Date

♀

INDEX

CLOSING ARGUMENT: PAGE:

MR. MILLER 3212

MR. PARRISH 3299

MR. MILLER 3386

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 2990 of 3636

VOLUME 16 10-11-04 witness testimony

Page 200

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, Plaintiff, vs. DUSTIN LEE HONKEN, Defendant. /

No. CR01-3047
Sioux City, Iowa
October 12, 2004
10 a.m.

VOLUME 17

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff: C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant: CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

♀

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Okay. The record should reflect that

Charles Rogers is here for Defendant Dustin Honken and both C.J. Williams and Tom Miller are here for the United States, and this is in response to the first and hopefully the last but probably not note that we'll receive from the jury.

The note says, Chief Judge Bennett, colon, may we please have the different pictures of witnesses to help us ID people. Thanks. Foreperson, 855.

I have prepared a tentative response just while we were gathering up the lawyers, and I've shared that response with the lawyers. The response is, Members of the jury, I've received a note signed by your foreperson, a copy of which is attached. In response to your note, I state the following: The photographs of witnesses used by the lawyers in closing arguments are classified as demonstrative evidence. Demonstrative evidence is allowed during the trial but under the federal rules is not allowed to go back to the jury room. This instruction should be taken together with preliminary and final instructions I previously gave you. The instructions must be considered as a whole. And it's entitled Response to Juror Questionnaire (sic) dated today's date and signed by me.

Does the government have any objection to this response?

3431

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Rogers, does the defendant have any objection to this response?

MR. ROGERS: No, Your Honor. And for the record, we were offered the opportunity to have Mr. Honken present while this question was considered and the response considered, and on his behalf I am waiving any right he might have had to be

present during this making of the record.

THE COURT: Okay. Thank you.

Any other record either lawyer would like to make?

MR. WILLIAMS: No, Your Honor. Thank you very much.

THE COURT: Thank you.

(The foregoing trial was adjourned at 10:02 a.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

1-25-05

Shelly Semmler, RMR, CRR Date

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, Plaintiff, vs. DUSTIN LEE HONKEN, Defendant. /

No. CR01-3047

Sioux City, Iowa
October 14, 2004
10:25 a.m.

VOLUME 18

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

APPEARANCES:

For the Plaintiff: C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant: ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn
Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

(after 10:27 recess) LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Okay. The record can reflect the fact that Dustin Honken is present in the courtroom with Lawyers Alfredo Parrish and Charlie Rogers, and both government lawyers are present.

Mr. Parrish, I think you've had a chance to speak with Mr. Spies.

MR. PARRISH: I have, Your Honor. We've reviewed the note with Mr. Spies you provided to us this morning, and we also reviewed the response, and we all agree that we would have no objection to the Court's response to the note as the Court has sent to us.

THE COURT: Okay. And just for the record, the jury note which was received a few minutes ago is addressed to me, Chief Judge Bennett, and it says, May we please have a new verdict form to fill out, period, thanks, and just signed with the word "jury."

I have prepared a response titled Response to Juror Question. Members of the jury, I have received a note, a copy of which is attached. In response to your note, I state the following: Yes. A new verdict form will be provided to you. It is so ordered, dated 14th day of October, 2004, signed by me.

Does the government have any objection to the response?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Any additional record that either side would like to make with regard to the jury note?

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: Your Honor, the record should reflect we've had an opportunity, adequate opportunity, to review this with Mr. Honken. We've explained to him our position on this matter, and we have no objection to the manner in which the Court has submitted it.

THE COURT: Okay. Thank you very much. We'll be in recess.

(Recess at 10:27 a.m.)

THE COURT: Okay. The record should reflect that Dustin Honken is present with his three defense lawyers, and both prosecutors are present. Most of us were in the courtroom -- I think Mr. Honken was not but I think the lawyers were when we were informed orally by my secretary who was told by one of the court security officers that the jury now has a verdict. And pursuant to our prior discussion which I believe was on the record but I just want to make sure that it will be a matter of record, I had made the decision to delay the taking of the verdict until -- for approximately four hours to give interested parties an opportunity to be present in the courtroom for the taking of the verdict who are traveling from the Mason City area.

3436

And so if that is still the agreement and everybody agrees to it, I would simply orally instruct one of our court security officers to tell the jury that we would take the

verdict at three o'clock this afternoon. Is there any objection to that from the government?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: Your Honor, the record should reflect that all of us have discussed this prior to today's date. We've had an opportunity to discuss it with Mr. Honken prior to today's date. We've had another opportunity this morning to meet with him and review this matter. We are in agreement, and we have no objections to taking the verdict at three o'clock this afternoon.

THE COURT: Okay. Then we'll see you all back here at three o'clock to take the verdict. Thank you.

MR. PARRISH: Thank you, Your Honor.

MR. WILLIAMS: Thank you.

(Recess at 10:44 a.m.)

THE COURT: Please be seated. The record should reflect Dustin Honken's present, all three defense lawyers, and both prosecutors. I wanted to make a record on the following: Apparently my office called the alternate jurors just to let them know that the jury was returning a verdict at three o'clock. I have been told that two alternates wanted to come,

3437

two did not. The plan is to keep the alternate jurors separate from the jury, not have them talk to them in any way, but once the 12-person jury is seated, to then bring the 2 alternates in through the door to my right, and have them seated on the end, one in the back row, one in the front row.

Then I will ask the foreperson if the jury's reached a unanimous verdict. If the answer is yes, I will then ask the

foreperson to hand the verdict to Carey. Carey will then give it to me. I will then read the verdict. I have decided not to put a verdict form up on the overhead. I just think it would be too complicated because you can't really read it and listen to what I'm saying. I'm just going to read the verdict.

If it's -- if it's not guilty on the last ten counts, then I'll discharge the jury; correct?

MR. WILLIAMS: That's correct, Your Honor.

THE COURT: And if it's guilty on one or more of the last ten counts, then I will send the -- I will explain to the jury that I want to make copies of the verdict form and I want the lawyers to go over it so that we'll be sending them back to the jury room.

We'll then send the jurors back to the jury room. I think I'll do that regardless of what the verdict is unless it's not guilty on all 17 counts. I think I will send the jury back to the jury room, have Carey make copies of the filled-out verdict form minus the last page which has their signatures on

3438

it, but the page that has their numbers on it will be included. And then we'll pass that out to the lawyers, give you all an opportunity to review it, see if there's any record that needs to be made. And then depending upon what happens with whether or not there's a record that needs to be made, we'll then bring the jury back. And depending upon what the verdict is, we'll go -- if it's guilty on one or more of the ten -- of the last ten counts, then we'll tell them to come back Monday for the penalty phase. And then I'll send them home with an admonition not to discuss this case and not to listen to any news reports, et cetera.

Any suggestions, comments, criticisms, critiques?

MR. WILLIAMS: Just two things. I suppose that if there's going to be a penalty phase you'll instruct that the alternate jurors will also be coming back to hear that?

THE COURT: Yes, right.

MR. WILLIAMS: And then the clerk's office will have to contact the other two that won't be here.

THE COURT: Right.

MR. WILLIAMS: And the other thing is Mr. Parrish came up to me before you took the bench just now to indicate that it's their desire that you give the same admonition to the entire jury that you gave to the two alternates, and that is don't even look at the local news, don't do anything during this weekend if there's a penalty phase. I indicated to Mr. Parrish

that we had no objection to that, and so I think it's a joint request by the parties that you give that.

THE COURT: And I agree I should give it.

MR. PARRISH: That is correct, Your Honor.

THE COURT: Yeah.

MR. PARRISH: And -- oh, were you through?

MR. WILLIAMS: Yeah, I am.

MR. PARRISH: I just had one last thing. And I don't know whether you normally do this in the courtroom, but in anticipation if there would be a penalty phase that the audience not react to any form of the verdict, I don't know how you do that.

THE COURT: I've never actually done that, but I was thinking about doing it in this case.

MR. PARRISH: Okay. That's -- I think we would

perhaps wish that you would do something like that in the event there is a penalty phase because they might see some reaction that may impact them from either of the families, and we've instructed our folks not to react in any way.

THE COURT: Okay. Thank you. Anything else?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. We'll see you back at three o'clock. Thank you.

(Recess at 2:40 p.m.)

THE COURT: Mr. Williams, are you ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: Yes, Your Honor.

THE COURT: Before we do that, I would ask everybody in the public area, the people who have attended the trial have been terrific, but because there may be a second phase to this trial, I'd ask everybody not to show any emotion -- I know that will be hard -- and not to react in any way because that might improperly influence the jury should there be the necessity of a penalty phase.

Let's have the jury brought in.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Juror 855, are you the foreperson of the jury?

JUROR 855: Yes, sir.

THE COURT: Has the jury reached a unanimous verdict in this case?

JUROR 855: Yes.

THE COURT: Would you please pass the verdict form to Carey, and then she'll give it to me.

And I'm going to review the verdict form, and then I'm going to announce it in open court. And then we're going to -- because it's a rather complicated verdict form, we're going to send you down to the jury room just for a few minutes while

copies are made for the lawyers. I want the lawyers to review the verdict form before we either discharge you or bring you back for the penalty phase, and so once they've reviewed it and we've had an opportunity to discuss it, then I'll bring the jurors back up, and we'll tell you what our next step will be.

And we'll have the alternate jurors -- two of the alternates are here, but you're not to discuss this case among yourselves until you've been discharged by me or until there's a penalty phase, and then there would be deliberations in the penalty phase.

Counts 1 through 5, witness tampering: Count 1, guilty; Count 2, guilty; Count 3, guilty; Count 4, guilty; Count 5, guilty. And each of the prohibited intents have been checked.

Count 6, soliciting the murder of a witness, guilty. Step 2, Dean Donaldson was solicited to murder Timothy Cutkomp, and also checked is Anthony Altimus was solicited to murder Timothy Cutkomp.

Count 7, conspiracy to tamper with witnesses and to solicit the murder of witnesses, guilty. Count (sic) 2, objectives of the conspiracy, all five objectives were checked.

Count 3 -- I'm sorry, step 3, overt acts: Overt acts 1 through 19 were checked.

Counts 8 through 12, conspiracy murder: Count 8, guilty; Count 9, guilty; Count 10, guilty; Count 11, guilty;

Count 12, guilty.

Step 2, objectives and quantity of methamphetamine: On each of Counts 8 through 12, distribution of 100 grams or more of actual pure methamphetamine was checked, and manufacture of 100 grams or more of actual pure methamphetamine were checked.

Step 3, intentionally killing the victim or aiding and abetting another to kill the victim: Counts 8 through 12 were checked with regard to intentionally killing the victim.

Counts 13 through 17, continuing criminal enterprise murder: Count 13, guilty; Count 14, guilty; Count 15, guilty; Count 16, guilty; Count 17, guilty.

Step 2, existence of the CCE, series of violations, violations 1 through 13 were checked.

Step 3 alternative, intentionally killing the victim or aiding and abetting another to kill the victim, in each of Counts 13 through 17, intentionally killing the victim was checked.

It's dated 10-14-04, and all of the jurors have signed with both their juror number on page 7 and their signature lines on page 8.

Mr. Parrish, would you like me to poll the jury?

MR. PARRISH: Yes, Your Honor.

THE COURT: Okay. Let me explain what a poll of the jury is. I'm going to ask you one question: Is this your true

and correct verdict? And the answer's either yes or no. And we will start in the back row with Juror 902, and you'll have to answer out loud so that the court reporter can take it down.

Juror 902, is this your true and correct verdict?

JUROR 902: Yes.

THE COURT: Juror 204?

JUROR 204: Yes, it is.

THE COURT: Juror 636.

JUROR 636: Yes.

THE COURT: Juror 855.

JUROR 855: Yes.

THE COURT: Juror 513.

JUROR 513: Yes.

THE COURT: Juror 857.

JUROR 857: Yes.

THE COURT: Juror 498.

JUROR 498: Yes.

THE COURT: Juror 806.

JUROR 806: Yes.

THE COURT: Juror 38.

JUROR 38: Yes.

THE COURT: Juror 646.

JUROR 646: Yes.

THE COURT: Juror 523.

JUROR 523: Yes.

♀

3444

THE COURT: Juror 963.

JUROR 963: Yes.

THE COURT: Okay. Members of the jury, we're going to

send you down to the jury room now, and it will take a few moments to make copies of the verdict, pass it out to the lawyers, and then we'll be back with you shortly. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated. We'll just wait until Carey has made sufficient copies for the lawyers.

Why don't the lawyers take whatever time you need to review it, and then when you've reviewed it, let me know.

MR. WILLIAMS: It's been reviewed on behalf of the United States, Your Honor, and we find it sufficient.

MR. PARRISH: We've reviewed it, Your Honor, and we believe that it's accurate.

THE COURT: Okay. There's nothing inconsistent, in other words --

MR. PARRISH: That's correct, Your Honor.

THE COURT: -- that would require any further deliberation.

MR. PARRISH: That's correct.

THE COURT: Okay. Now, I will bring the jurors back in, and I will give them an admonition not to discuss this case among themselves any further now that they've reached a verdict, not to discuss it with anyone else, and not to listen to any

news reports, both written and TV and radio, not to do any research, and then to come back Monday at -- I was thinking maybe 9 because when they got a chance to decide their hours, they picked 9:00 to come in and deliberate each morning rather than starting at 8:30. Anybody have any objection to that?

MR. WILLIAMS: No, Your Honor.

MR. SPIES: No, Your Honor.

THE COURT: Okay. And then I need to also advise the 12 trial jurors not to discuss this matter with the 2 alternates that are here and make sure the 2 alternates know that they're to come back on Monday as well.

Anything further, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: No, Your Honor.

THE COURT: Okay. Thank you.

(The jury entered the courtroom.)

THE COURT: Please be seated. Members of the jury, based on your verdict, there will be a penalty phase, and we're going to start the penalty phase on Monday. Given your preference for coming in at 9 in the morning for deliberations rather than 8:30, I've decided that we should start court during the penalty phase at 9 a.m. So we'll be back here Monday at 9 a.m.

I want to give you another cautionary instruction.

3446

Even though you did reach a verdict on the merits and you were allowed to deliberate and discuss this case fully among yourselves, there will be no further discussion of the case or any aspect of the case with anybody including among yourselves, including your spouses, best friend, children. And I'm going to ask you not to read any newspaper articles about it, not to listen to any radio or television reports about this case, not to do any independent research on the Internet or anywhere else about this case.

MR. WILLIAMS: Your Honor?

THE COURT: Yes.

MR. WILLIAMS: Would it be permissible if we approach just for a scheduling matter with you, sidebar?

THE COURT: Yes. Thank you.

(At sidebar on the record.)

MR. WILLIAMS: We thought it only fair to let the jury have some idea of what they're in for this next week.

THE COURT: Okay.

MR. WILLIAMS: And I think Leon and I both have a good-enough feel for where our case is going to be that I think you can let them know that we anticipate completing the penalty phase by next week. Do you think you agree?

THE COURT: Let me ask you this. What do you think about -- I really want to go to this judicial council meeting on Thursday.

♀

3447

MR. WILLIAMS: I think we'll be done by then. Don't you?

THE COURT: With the evidence?

MR. WILLIAMS: Yeah.

THE COURT: Well, but then I don't want to be gone during deliberations.

MR. WILLIAMS: Oh.

THE COURT: We'll just pass on that for now.

MR. SPIES: Thank you.

THE COURT: But you think the evidence will be concluded by Thursday?

MR. WILLIAMS: Yes.

THE COURT: Okay. Thank you.

(The sidebar was concluded.)

THE COURT: Members of the jury, the lawyers were kind

enough to inform me that they believe that the evidence in the penalty phase will be concluded by next Thursday. Like I said at the beginning of the trial, estimating a length of trial is difficult. It's a little bit easier because we're dealing with a shorter period of time. But just so that you all can plan your lives, they've represented to me that their best judgment as it is right now is that the evidence in the penalty phase will be completed by next Thursday.

Is there anything else I need to tell the jury, Mr. Williams, before I discharge them to go home?

3448

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Spies?

MR. SPIES: No, Your Honor.

THE COURT: Okay. Members of the jury, we'll see you back here at nine o'clock Monday morning when we'll start with -- let me just tell you what's going to happen Monday morning. You will have a set of preliminary instructions for the penalty phase. I believe there are five preliminary instructions that I have for you.

We're then going to have opening statements from the lawyers. Of course, the defendant has no obligation to give an opening statement. And then after opening statements, the government will start with their evidence. And then once the government has concluded their evidence in the case, then Mr. Honken and the defense will have an opportunity to put on evidence if they decide to do that.

So good luck to you, and we'll see you Monday at nine. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated.

Is there any other matter that we need to take up, Mr. Williams?

MR. WILLIAMS: Your Honor, my only thought was it may be advisable for us to meet as a group at 8 a.m. on Monday so that we can make sure we have a final set of preliminary jury

♀

instructions. The government has no objections to the final set that the Court has prepared at this point. But we need to make a record on that as well on Monday morning. That's the only other thing that I see outstanding that may need to be resolved.

THE COURT: I think we need to make a record before Monday morning because if there's a change on Monday morning, it takes too long to make 16 sets plus sets for the lawyers.

Are you prepared now, Mr. Spies or Mr. Rogers, at least with -- and all I'm asking now with regard to the preliminary instructions, the preliminary penalty phase instructions. Do you have any objections, or would you like some time yet this afternoon? Maybe we should all meet back in chambers and go over the preliminary instructions and then make a record on it if you don't feel you've had sufficient time.

MR. ROGERS: I believe we have had sufficient time, Your Honor, and we have discussed them in chambers, and all I think we have to do is make a record on the things that we've already brought up. I don't have anything additional with regard to the preliminary penalty phase instructions.

THE COURT: Yes. Okay. Thank you. We'll be in recess. Thank you.

(The foregoing trial was adjourned at 3:22 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.

1-25-05
Shelly Semmler, RMR, CRR Date

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, Plaintiff,

vs.

DUSTIN LEE HONKEN, Defendant.

No. CR01-3047

Sioux City, Iowa
October 18, 2004
8:15 a.m.

VOLUME 19

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff:

C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant:

ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn
Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Okay. Mr. Honken is present with his three lawyers, and the two government lawyers are present. We have a number of things to take up before we start the penalty phase at nine o'clock.

First item of business is I've just been notified that Juror Number 968, the one with morning sickness, is not here today. Fortunately she is alternate number 4. So we're obviously just going to go ahead and excuse her unless there's any objection from either side. I don't know how we could do anything but excuse her.

MR. WILLIAMS: No objection, Your Honor.

MR. SPIES: No, Your Honor.

THE COURT: Okay. Thank you. Juror 968 is excused.

With regard to the witness lists and exhibit lists in the penalty phase, I believe the parties have exchanged those. And does the defense have any objections to any of the witnesses that the government's going to be calling or any of the exhibits in the government's exhibit list?

MR. SPIES: No, Your Honor.

THE COURT: Okay. Then all of those exhibits are admitted into evidence.

* * * *

(Government Exhibits 1100 through 1113 were admitted.)

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3012 of 3636

* * * *

THE COURT: I understand that Exhibit 1107, the forensic report, probably will not be used.

MR. WILLIAMS: That's correct, Your Honor. That's their only -- if for some reason Dr. Cunningham goes someplace where we don't expect him to go, I don't anticipate putting that in.

And just to let the Court know and I've let defense counsel know, we have one additional photograph that we're getting this morning of a family member. I don't think that Mr. Spies is going to have an objection to that. We'll be marking that as an exhibit.

And then I've also advised Mr. Spies that we're going to be using the rings that were found and putting that into evidence as well, rings from Lori Duncan. I told Mr. Spies, and I don't think he has an objection to that, but I just want to make sure that everybody was aware of what we were doing on that.

THE COURT: Okay. Mr. Spies, any objection?

MR. SPIES: No. Mr. Williams has informed me the theory behind the government's offer on that, and so no, we don't have any objection.

And I likewise anticipated that Mr. Williams was only going to use the psychological report in rebuttal if necessary. So I think we're all on all fours.

♀

3454

THE COURT: Okay. Now, why don't we go through the exhibit numbers of -- the photograph, would that be 1112?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. And that's a photograph?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: And then what about the rings?

MR. WILLIAMS: I have not assigned a number to those yet. I think Sali's working on that right now.

THE COURT: Okay.

MR. WILLIAMS: I'll let you know before we get started this morning before the jury's brought in what number we've assigned to those.

THE COURT: Okay. And give me some context for those.

MR. WILLIAMS: Certainly, Your Honor. The testimony is going to be that Lori Duncan always wore a ring on her left ring finger. Bill Basler's going to testify there was no ring found with her body or in the grave site. We're going to have testimony from a man who was in 1995 a kid who found Lori's ring and her purse in a river northwest of Mason City and then combined -- and I've already told Mr. Spies where I'm going, so this is no surprise to anybody.

Combined with the testimony from the guilt phase that Lori Duncan had a spiral fracture on her hand, on the ring finger on the left hand, we're going to argue that somebody before or after she was dead took that ring off her finger.

♀

3455

THE COURT: And who's the witness that's going to testify about finding it?

MR. WILLIAMS: Josh Miller.

THE COURT: Okay. And then on the defendant's witness and exhibit list.

MR. WILLIAMS: Your Honor, just so I can make a quick note too, Mr. Miller had a accident involving a motorcycle and a

barbwire fence. Unfortunately part of the damage was to his neck, and so he had significant damage to his vocal cords. So he can barely talk. He talks in a whisper, but just to give the Court fair warning, that's -- he has that. I'll bring that out very quickly just to explain why he's barely able to talk, and then we'll make sure he gets real close to the microphone.

THE COURT: Okay. Thank you. Would it be easier for him to have a handheld mike and hold it do you think, or can he get close enough?

MR. WILLIAMS: You know, I think he's not going to testify until after the morning break, and we might bring him in and just experiment with him a little bit during the break.

THE COURT: Okay. Now, with regard to the defendant's witness list and exhibit list, does the government have any objections?

MR. WILLIAMS: No, Your Honor.

MR. SPIES: Your Honor, as I informed the Court and I also informed Mr. Williams too of our witnesses who've been

3456

struck from the witness list, Tim Cutkomp, number 7, and Rita Klipping, number 9 on our list, and those are not necessarily in the order they'll be called depending on how people arrive this afternoon.

THE COURT: Okay. Thank you. I'm going to go ahead and admit all of the defendant's penalty phase exhibits starting with BB and ending with FJ, and all the ones in between are hereby admitted.

* * * *

(Defendant Exhibits BB through FJ were admitted.)

* * * *

THE COURT: We did modify this morning final penalty phase instruction number 8, justice without discrimination, to add the following sentence at the end: The signature block signed with your names will be sealed which means that it will not be released to the public, may be faxed to the lawyers -- no, that was a joke. And I just wanted to see if anybody had any objection to that change in final penalty phase number 8.

MR. WILLIAMS: No, Your Honor.

MR. ROGERS: No, Your Honor.

THE COURT: Okay. Now, why don't we go ahead and make the record on the preliminary penalty phase instructions to the jury, instructions numbers 1 through 5. Does the government have any objection?

MR. WILLIAMS: No, Your Honor.

3457

THE COURT: Mr. Rogers?

MR. ROGERS: Yes, Your Honor, and these are all matters that we have taken up informally last week. Starting with instruction number 2 on page 4, there are 5 references to what are called eligibility aggravating factors.

Our position, Your Honor, is that the eligibility factors defined in Title 21, section 848(n) are not really aggravating factors. They are eligibility factors required as a matter of constitutional law under the Eighth Amendment based upon the Supreme Court cases of Enmund versus Florida and Tison versus Arizona; that they do not further narrow the class of defendants who may be subjected to the death penalty other than those who may constitutionally be subjected to the death penalty under any statutory scheme and that, therefore, they should not be weighed by the jury in determining the penalty.

There is another reference on page 9 of the same instruction that talks about weighing the factors and includes instructions to the jury to weigh aggravating factors found to exist in step 1 as well as those found to exist in steps 2 and 3.

And our contention, Your Honor, is that this violates the Eighth Amendment by placing a thumb on the death side of the scale which should not be there since these are not truly aggravating factors which narrow somehow the pool of defendants who might be subject to the death penalty, and they also do not

3458

in any way indicate that anybody who's potentially subject to the death penalty should be selected for the death penalty. So they serve neither a narrowing function or a selection function, and it's improper to call them aggravating factors and to weigh them.

Our only other objection, Your Honor, to the preliminary instructions has to do also with instruction number 2, page 6. Includes the nonstatutory aggravating factor. It's paragraph number 2 there for Counts 8 through 17, that the defendant obstructed justice by preventing the victim from providing testimony or information to law enforcement officers or by retaliating against the victim for cooperating with authorities.

Our position there, Your Honor, is as we explained in our informal discussions, is that that factor is, in fact, the gravamen of the offenses of which Mr. Honken was convicted in Counts 1 through 5. Those offenses in Counts 1 through 5 were not capital offenses at the time of their commission. That is a -- we believe a decision by Congress not to make them capital

at that time is equivalent to a decision that it not be a reason for imposing death. And, therefore, I think it's improper and contrary to the congressional intent to use elements of a noncapital offense as an argument for the death penalty for the same acts.

We have some -- I'll call it indirect support for that

position in the opinion of Judge Sachs in United States versus Peoples and Lightfoot, 74 Fed. Supp. 2d 930, where he basically says that since Congress -- and that was a Title 18 case, but enacting the Title 18 death penalty, Congress included certain categories of prior convictions which were a statutory aggravating factor. Judge Sachs reasoned that convictions which did not rise to that level were, therefore, not appropriate to be submitted as nonstatutory aggravating factors.

And I think that same reasoning would support our position regarding the use of the Enmund, Tison qualifying factors as aggravators.

Those are the only objections we have, Your Honor, to the Court's preliminary penalty phase instructions.

THE COURT: Thank you, Mr. Rogers. Those objections are overruled.

Anything else we need to take up this morning?

MR. WILLIAMS: Not that I'm aware of, Your Honor.

MR. SPIES: No, Your Honor. Thank you.

THE COURT: Okay. We'll see you back at nine o'clock. And just to make sure, the parties do want to give opening statements; is that correct?

MR. WILLIAMS: Yes, Your Honor.

MR. SPIES: Yes, sir.

MR. WILLIAMS: It will be brief.

THE COURT: We'll do the five preliminary instructions

first and then do openings and then start with the government's sentencing evidence. Thank you.

(Recess at 8:28 a.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Mr. Spies?

MR. SPIES: (Nodded head.)

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated. Members of the jury, we're going to start with the preliminary instructions on the penalty phase. Those have been passed out to you, and you should have a set of instructions.

Before we get to the preliminary instructions, I just wanted to give you kind of a heads-up about what's going to happen this morning. We're going to go through the five preliminary instructions. When we're done with the five preliminary penalty instructions, then we'll hear opening statements from the lawyers. And then after the opening statements, we'll start with the government's evidence. And then when we're done with the government's evidence, we'll go to the defense evidence.

If you'd please follow along, you each have a set. It's got the caption of the case, United States of America, Plaintiff, versus Dustin Lee Honken, Defendant. It's entitled Preliminary Penalty Phase Instructions to the Jury. And then if

you'd turn the page, preliminary penalty phase instruction number 1, introduction.

(The Court read preliminary penalty phase instructions numbers 1 through 5 in open court.)

THE COURT: Members of the jury, why don't you take a short stretch break, and then we'll hear the opening statements.

Thank you. Please be seated.

Mr. Williams?

MR. WILLIAMS: Yes, Your Honor. Thank you very much. May it please the Court, counsel.

Members of the jury, you found as a group that the defendant committed the most horrible of crimes, the intentional, premeditated murder of five people including two little innocent girls.

Our duty's not done, however, for Congress has imposed upon us and imposed upon you, the jury, to determine the appropriate sentence to fit the crimes committed by the defendant in this case. We recognize that this is the most important and weighty decision this group will ever make. Congress and the courts have determined that it's a group of citizens like yourself that are in the best position to determine what the appropriate punishment should be for a crime of this nature.

At the conclusion of this penalty phase, we're going to be asking you and arguing to you that the only appropriate

3462

punishment for the defendant in this case is the death penalty.

Now, the United States adopts and will rely primarily upon the evidence presented to you during the guilt phase to

prove those aggravating factors that the Court summarized for you during the preliminary instructions. Let me go through those very briefly for you.

First of all, we have the intentional murder. You, the jury, found based on the totality of the evidence presented to you during the guilt phase the defendant intentionally murdered five people.

We have the substantial premeditation and planning as another aggravating factor. During the guilt phase you heard evidence about the defendant plotting these murders; the fact that he planned these in advance; that he hunted for Greg Nicholson; that he borrowed Christi Gaubatz's car so that he would not be seen; that he had to have gone over to that house with a video camera and items like duct tape and rope in order to secure these people; and that there's evidence of some idea that he had of where to hide these bodies in the end.

Aggravating factor, the next one, is substantial abuse to the victims. That's under the particularly heinous or cruel manner or depraved manner, and that applies to Lori Duncan, Greg Nicholson, and Terry DeGeus.

During the guilt phase you heard evidence that Lori Duncan and Greg Nicholson were bound, that they had socks

stuffed in their mouths, duct tape wrapped around their faces, that they were shot multiple times, not just once but multiple times, and that Greg Nicholson had a fracture in the back of his neck.

With regard to Terry DeGeus, you heard during the guilt phase that he was shot multiple times and that his skull was left in many fragments.

Next aggravating factor applies only to Kandi and Amber, and that is the particularly vulnerable victims because of their age. You know from the evidence that Kandi was only ten years old and Amber was six years old.

Another aggravating factor is that the defendant killed more than one person in a single criminal episode. And you, the jury, found beyond a reasonable doubt during your deliberations on the guilt phase that that happened when he killed Lori Duncan, her two little girls, and Greg Nicholson in a single criminal episode on July 25, 1993.

There's an aggravating factor of future dangerousness, and during the guilt phase of this case, we presented evidence to you that addressed that factor. You heard the defendant in his own words, in his own voice, plotting, scheming. Now, that was with regard to the killing of Dan Cobeen captured on the video -- or on the audiotape with Tim Cutkomp.

You heard evidence that even when incarcerated in the Woodbury County Jail he attempted to escape. You heard evidence

♀

3464

that when sentenced and sent to a federal penitentiary he plotted further escape and retaliation to get out, to kill witnesses, to kill agents, to kill prosecutors and their families.

So we're relying primarily upon the evidence you've already heard. And that means during this phase of the trial our evidence is going to be short and it's going to be focused. It's going to be focused on two aggravating factors, one of which we've already talked about, and that is serious physical abuse. And that's going to be with regard to Lori Duncan. I'll talk to you about that in a minute.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3022 of 3636

The other one is going to be about a factor that we've not talked about yet, and that's called victim impact. Now, victim impact is something I'll discuss after I talk about serious physical abuse for a moment.

With regard to that, we're going to be presenting evidence during this penalty phase about a ring, about a ring that Lori Duncan always wore on her left hand, her class ring on her ring finger. And yet that ring was not found in the grave. It was not found on Lori Duncan's finger, what was left on it, on her bones. It was found two years after the murder in her purse located in a river near Fertile, Iowa, a town northwest of Mason City, Iowa.

You're going to hear from the young man who was then a boy who with a couple other friends found this purse and the

♀

3465

rings and a couple tokens to an amusement center in that purse. We're going to ask you to combine that information with what you heard during the guilt phase from Dr. Steadman who told you that on Lori's finger on her left hand on her ring finger there was a spiral fracture. We'll argue to you later what conclusion you should draw from that.

The last part of our evidence, the main part of our evidence during this penalty phase, is going to be evidence that we did not present to you during the guilt phase because it wasn't relevant to any of the elements of the crimes you were looking at, and that's the victim impact.

Victim impact, you've heard from the judge in the preliminary instructions, is one of the aggravating factors that a jury like you is entitled to consider in determining what the appropriate sentence should be in a case like this.

There's really two parts to the victim impact. One part is to tell you a little bit about the victims. Now, you know their names. You know their ages approximately. You know a little bit about them. But you don't know them as human beings. And it's our duty to let you know a little bit about them as human beings.

The other part of the victim impact is to tell you what their losses meant to those who loved them who are left behind. We're going to be presenting that evidence to you through family members and friends.

Now, we're not going to pull up every single family member. Some of the family members you heard of during the guilt phase -- heard from during the guilt phase.

We're going to present that evidence to you with just six family members, representatives of the families, and they're going to be talking -- a few are going to be talking for the many telling you about these victims and the impact it had on their lives and the lives of those who loved them.

Now, at the end of all of this penalty phase, it's going to be your duty as jurors as a group to go down and deliberate. It's going to be your duty to weigh all the aggravating factors. And if the defense puts on mitigating evidence, which it has no obligation to do, but if it puts on mitigating evidence, your job will be to weigh that evidence as well and ultimately determine what the appropriate sentence is to fit the crimes committed by the defendant in this case.

It's a serious, important task that you have, and we recognize that. Congress and the laws entrusted this decision to a group of citizens like you as the most capable decision

makers on this kind of an important case.

Ultimately when all of this case is done and I have a chance to argue before you, we're going to send you down to that jury room, and we're going to be asking you to be thinking seriously and hard about the defendant, the crimes he committed, and his victims. And we're going to ask you to return a verdict

to impose the death penalty. Thank you.

Thank you, Your Honor.

THE COURT: Mr. Spies?

MR. SPIES: May it please the Court, Mr. Honken, counsel, ladies and gentlemen of the jury.

First I want to extend to the Nicholson family, the Duncan family, and the DeGeus family the condolences and sympathies that they unquestionably deserve for the tragedy that brings them and you to this courtroom.

Why in the face of the horror that they had to suffer and that you've heard about for the last several weeks, why in the face of that horror and why in the face of the grief and the pain that is unimaginable and that you'll be hearing about today, why in the face of that should Dustin Honken face life in prison without any chance of release as opposed to death at the hands of an executioner?

In 1960 when Dustin's mother, Marvea Hamilton, and her then husband, Jim Honken, married, they, like all young couples, had aspirations and hopes for raising a family, for a rich future, for a happy future.

In 1962 they had a son, Jeff Honken, who you were introduced to and met in this courtroom.

Later on in 1968, Dustin Honken was born to Jim and

Marvea. By 1968, the marriage that gave rise to the birth of Jeff and Dustin was already beginning to deteriorate, burdened

by the savages and the ravages of alcoholism, depression, unimaginable loneliness, depression, neglect.

By 1977, the marriage of Marvea and Jim Honken broke apart. They had a little daughter Alyssa, and in the breakup of that marriage, Dustin Honken was devastated like any eight-year-old boy would be seeing his mother and father separate and go apart.

For several years after that, Dustin Honken had very little relationship with his dad. His dad quickly remarried, and in that remarriage he was left behind. His mother remarried and remarried a gentleman named Ron Smidt. After Dustin's mom remarried, the focus of her life and her attention was on her new husband. And again in that circumstance Dustin was left behind.

You're going to hear from members of Dustin's family, from people who were important in his life that notwithstanding this change in his life Dustin was an able, energetic, shy young boy. He liked school. He liked friends. He liked activities. He liked being with his family. He craved, like any young man would, any young boy would, a life with his father and mother.

But after his father left the family and remarried, you'll learn that his father slipped farther into the depths of alcoholism and, in fact, became so desperate by his alcoholism and his own sadness that he resorted to a life of crime, not only a life of crime but glamorizing for his own sons the life

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3026 of 3636

of crime. And you'll hear about the effect of that on Dustin Honken.

By Dustin's graduation from high school in 1985, his father was on the verge of robbing two banks and on his way to federal prison. And throughout this time he was nurturing and glamorizing his life of crime for Dustin, making it appear rich, important, distinguished. For Dustin Honken, not only had he lost a real family, but he was thrust into a family that was dysfunctional, damaging, and poisonous.

We know from the testimony at the earlier stage of this trial that Dustin Honken went down to Arizona to live with his brother Jeff in about 1986. He enrolled in community college in Arizona, spent a year and a half or so down there with his brother helping his brother in his brother's business.

He then returned to Iowa and moved to Britt, Iowa, where his mom and stepdad were living. He enrolled in community college in Mason City. He got a job at Wellborn Industries as you've heard about earlier in this trial.

And while at Wellborn Industries, he met a young woman named Kathy Rick. Kathy Rick had a young son Robby. She had another son on the way, Brandon, and she and Dustin became friends, and eventually they developed a relationship. And in this relationship after Brandon was born, Dustin Honken became Dad to Brandon.

That relationship continued for a couple of years.

3470

And as you also know from the testimony in this trial, Dustin developed a relationship with another young woman named Angie Johnson. Angie and Dustin had a child together, and that child, that daughter, was named after Dustin's mom, Marvea.

You'll hear from the testimony of Dustin's family and friends and the people that were important in his life that these children, in addition to the son that he had with Kathy Rick himself, Ryan, that these children became the focus of his life, the most important part of his life, but also a separate part of his life.

We know and you have found that he engaged in crime, that he engaged in a crime resulting in tragedy, and that tragedy cannot be ignored.

So why do I bring this up to you about Dustin's life, about his family, about his circumstance, about the glamorization of crime, the alcoholism, the tragedy of his father? It is absolutely not given to you as any sort of excuse or any sort of explanation other than to describe the man in whose hands you have been placed to decide his fate.

As Judge Bennett has told you in the preliminary instructions and as you know from the very outset of this case, this phase of Dustin's trial is not about forgiveness. It's about punishment. It's not about life versus death. It's about life in prison without any possibility of release or death.

Now, even though this portion of the case calls for

3471

you to weigh aggravating factors and mitigating factors, in reality what this case is about is your good judgment and your individual acts of conscience.

The evidence in this case we believe will show that there are good reasons, compelling reasons, why Dustin Honken should not be put to death but should be instead sentenced to life in prison.

And you will hear from a very important witness from

Texas, Mark Cunningham, the real ramifications of life in prison and how the federal Bureau of Prisons is equipped, trained, and specialized in dealing with the prevention of violence in prison and the quarantining of people who are a danger to people in prison and, of course, to people in the community.

At the end of this case, I'm going to ask you to not only count factors but to look into your hearts, look into your consciences, and, as you're required to do, decide for yourselves that Dustin Honken's life has meaning.

The weighing of factors and the consideration of factors is just that. And as Judge Bennett explained to you in his instructions and as you all recalled from the beginning of jury selection, under any state of affairs, death is never mandatory.

This case is not about whether such a horrible crime has only one appropriate punishment. This case is about what the appropriate punishment should be: Life in prison without

♀

3472

any release or death.

Why should Dustin Honken live? You will learn I believe from today and from what you have surmised as citizens of this community that in the Duncan family and the Nicholson family and the DeGeus family that love lives. And you will learn that in the Honken family, in Dustin Honken, love lives. And as parents and as children, as neighbors, as proud citizens of this state, you know that where love lives hope lives. And where there is hope there is room for redemption. And in Dustin Honken, in his long and doomed life, there is room for redemption. And where there is worth, there is room for life.

THE COURT: Mr. Williams, are you ready to call your

first witness?

MR. WILLIAMS: Yes, Your Honor. United States calls Ronda Francis.

RONDA FRANCIS, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated. Can you make yourself comfortable and adjust the chair, pull that chair up a little bit. And when you're ready, would you state your full name for us and spell your last name.

THE WITNESS: My name is Ronda Francis. It's R-o-n-d-a F-r-a-n-c-i-s.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

♀

3473

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Good morning, Miss Francis. Could you share with the jury just a little bit about yourself? How old of a woman are you, first of all?

A. That's not fair. I'm 47. I have three children, Josh, Mike, and Daniel, 23, 21, and 14, and a very good husband Jerry.

Q. Tell us a little bit about your education, ma'am.

A. I went to Britt, and I graduated from Britt. When I was younger, we did go to Mason City for a short while, but pretty much I've lived in Britt most of my life so . . .

Q. What do you -- do you work outside the house now?

A. Yes, I do. I work for Alliant Energy. I read the meters. I'm the one everybody gets mad at.

Q. You have to watch out for dogs I'm guessing.

A. Yes, I do. I've been bit a few times.

Q. Share with the jury a little bit if you would about your family. Your parents are who?
A. My parents are Ed and JoAnn DeGeus. I'm the oldest of the five, and then it's my brother Jeff, my sister -- my brother Terry and my sister Brenda and my brother Brian.
Q. Now, your parents, Ed and JoAnn, where do they live at now?
A. They live in Britt also, just about three miles from me probably.
Q. How long have they been in that house?

♀

A. Long time. I can't tell you the date. Probably since I graduated, and that's been over 25 years.
Q. Long-time residents.
Tell us a little bit about -- you named off a number of your siblings. Terry we know about and we'll talk about in more depth in a moment. But tell us a little bit about your other siblings. What do they do?
A. My brother Jeff works in Garner for the co-op. He drives a feed truck. He's done that for many, many years. My sister Brenda is an R.N. She works at Mercy in Mason City. And my brother Brian lives in Florida, and he works drywalling and odd jobs like that, hanging blinds in buildings and things like that.
Q. Growing up, what was it like in the DeGeus family amongst all those brothers and sisters?
A. Well, growing up back in my time I guess, we didn't have all the conveniences of today, so you learned to get along, to play together. We always did a lot of things together. We built snow forts and forts in the hay mow and all those things our mom and dad told us not to do.

Q. You lived out in the country; right?
A. Yes, we did.
Q. So out there you kind of relied upon each other, upon your brothers and sisters for playmates under that setting.
A. Yes, we did.

♀

Q. Tell us a little bit about Terry, your brother Terry, as a youngster. What was he like?
A. Terry was always very energetic. I guess you'd have to say most of our family are pretty athletic. And we always played a lot outside. We weren't in the house very often. And we did many, many different things. And Terry was always the one we turned to as like -- I guess you'd call him our champion. We had to -- one time they talked me into climbing this huge tree in our yard. And we got to the top of it, and I couldn't get down. And so Terry was the one who stayed behind me the whole time and tried to guide my feet down that tree and get me back to the ground because I was scared to death. And he was just always there when you needed someone, always.
Q. Out on the farm you had motorcycles and scooters and things like that?
A. Oh, yes, we did. We had dirt bikes, and we made little ramps and things and rode around the farm. First time my brother showed me how to ride it, he showed me how to shift all the gears, but he forgot to tell me how to downshift, so when I got -- we lived up a half-a-mile lane. When I got to the bottom, I didn't know what to do, so I had to lay the bike down on the dirt because there was big ruts that our semis that had left down there because it had rained, and so they had to run a half a mile to come and get me and help me back up out of that

ditch and make sure I was all right, and the bike was fine,

so -- but then they showed me how to downshift.

Q. Probably pretty helpful to you at some point.

A. Oh, yeah.

Q. Tell us a little bit, you and Terry had games you played with motorcycles underneath a semi trailer.

A. We used to -- we used to -- Dad would park his trailers there in the yard, and we would take them, and your bike would just fit under the trailer, and you had to be careful of your knuckles so you had to turn them under the handlebars, and he would be on one side, and I would be on the other, and we'd go flying underneath of those just to pass each other underneath, and you had to make sure your head went down and your fingers went under.

Q. As Terry grew up, became a little bit older, what was he like then?

A. Terry had a charisma about him. I learned a lot from his friends over the weekend. He was just always so happy, energetic, always a loving father to his daughter. His friends have all good things to say about him. He was a very loyal friend. And as a brother, I know that he would do anything for me.

Q. Did you and Terry share any talks, any discussions about the future?

A. Yeah. I remember one time after -- after Terry and Wendy were divorced, and Terry still spent a lot of time with Ashley,

and he'd gone up to the flea market in Forest City, and he liked collecting pretty different bottles and stuff, and he would always have these little -- I call them knick-knacks I guess, just fancy little bottles and stuff.

Well, so he had me up in his room, and he was showing me all this stuff, and he made sure to show me that he'd purchased a framed picture of the Lord.

Q. And that was something important to you?

A. Yes, it was.

Q. Tell us a little bit about your folks. Ed is your father. What kind of a man is he?

A. My dad is a very -- I guess first impressions, people would say he's a very gruff, very -- you look at him, and he exudes power. He -- you tow a strict line with my dad, but once you get to know him, he has the heart of a teddy bear. He's very easily emotional, but he keeps things inside of him all the time.

Q. Compare your father with Terry. Much alike?

A. Very much alike, almost so much alike that they had to squabble once in a while and turn and walk away from each other so they could come back the next day and work it out.

Q. Did Terry do some work for your dad?

A. Yes, he did. He used to help Dad all the time drive bulldozer and the backhoe, and Terry loved doing that kind of stuff. He was very good at it. Dad was very strict, and you

3478

had to do it his way. Sometimes they didn't see eye to eye on that.

Q. What kind of a worker was Terry?

A. Very good worker. All people that ever saw him on a job

knew that he worked hard. It's something that my -- that my father instilled in all of us.

Q. After Terry grew up, got married, had a child, did he remain close to the family?

A. Yes, he did.

Q. And would he come back for different events and different Christmases and things like that and participate in those events?

A. Yes, he did. We have many, many family pictures with Terry. And where you'd find Terry the most is on the floor with the kids playing.

Q. I want to share just a couple of those pictures with you.

THE COURT: If I may, I'm going to explain to the jury, all of the government exhibits and all of the defense exhibits are already admitted into evidence in the penalty phase. There was no objection, so they're in evidence. Thank you.

MR. WILLIAMS: Permission to publish, Your Honor.

THE COURT: You may.

BY MR. WILLIAMS:

Q. Can you take a look at that picture in front of you on that

3479

monitor?

A. Yep.

Q. Could you just share with the jury who all is in that picture?

A. My mom is in the middle, Terry's behind her. It's my son -- both of my sons, the youngest one there in front, and Ashley right at the very front. And in the back sitting on the couch is my -- is Allison, used to be Allison Stone. And that's

my house.
Q. How about this photograph there? What's going on here?
A. I'm pretty sure this looks like Christmas again. My sister's husband's in the doorway with the camera. And Ashley's there with a present or whatever they're looking at, and Brianna, my sister's daughter, is there, and the one on the couch is my dad's mother, my grandmother.
Q. And that's Terry standing up with his arm on the couch?
A. Yes, it is.
Q. Let's talk a little bit about what happened in this case. At some point did you and the other family members learn that Terry was missing?
A. Yes, we did. My mom called me, of course, right away, and she was upset and worried about what had happened to him. And it's been a very long, long journey, a very long, emotional journey. They were worried, and they tried to get the police to do a missing persons report. And it seems like that takes a

while sometimes, and they kept telling us that he was probably just gone and he'll be home; don't worry about it.
Q. As that time passed, as that became months and years of him missing, what impact did that have on you and the other members of your family?
A. It's an emotional journey that I wish on nobody ever. It's hard to have somebody -- it's hard to have somebody leave your life, but it's even harder not to know what happened to them for so long. It's emotional on everybody.

I heard in the instruction thing exceptional emotional, and I just thought, exceptional emotional harm, that's a good way to put it for our family. First you know that

he's missing, and then you hear the words that maybe he's just gone, and you know in your heart that he's probably not with us anymore. But -- but you hope -- because you don't have that specific fact in front of you, you hope that he's out there and that he's all right. And then when the truth hits you again, it's just a really long emotional ride.

It was very hard on my mother and father. My dad has diabetes now, and I'm sure that emotion had a lot to do with that. He took it very hard. My mom has struggled a lot. She -- she has to take antidepressants and sleeping pills to get a good night's sleep through it all and my sister pretty much too. And as blood pressure goes, I think most of us have high blood pressure now, so it's been a long, long journey.

Q. At some point you did get word that Terry's remains were finally found, and you've heard I think most of the evidence about what happened and how his remains were found. Any thoughts about -- that you've had about how your brother died?

A. We go back to the thing where, you know, we all believed in my brother, and he was our champion most of the time. And we knew when we found out what had happened that he fought hard. We were all surprised that he was caught unexpected. And we knew that he put up a fight. And I pray every day and I'm so thankful that he left Ashley with my mom and dad.

Q. Grieving process is a long one. You -- have you had some closure just even this weekend?

A. Yes, we did. We had a proper burial service for my brother and memorial.

Q. And how did everybody deal with that?

A. We had a wonderful, wonderful turnout. Living in a small

town, it's amazing how many people have thought and prayed for you through the whole thing, and that's what probably helped to keep me strong through it all.

So many of his friends were there, and, you know, they have so many good things to say. And they just tell all the time what a loyal, loyal, loyal, loyal friend my brother was and what a good father he was to Ashley. And they made sure that my mom and dad knew that, and I believe that it helped them immensely.

♀

Q. Did Terry love you and the other members of the family?
A. Yes, Terry loved all of us.
Q. And was that feeling shared by the rest of the family?
A. Yes, it was. My sons were quite young yet when Terry disappeared, and they still remember him to this day, and I am so proud of my sons for all that they've done and helped me through. They remember Terry as being strong and energetic and playing with them and doing things with them outside. And they just remember him as a happy, good dad to Ashley.
Q. Is Terry missed by the family?
A. Yes, terribly. One of the things that hurts the most from Terry being gone so long ago is that when the father's not there, it's hard to get your niece to be there all the time, and it was hard for her. So she kind of got away from us a little, but I think we got her back.
Q. When you think back about your brother, what do you miss most about him?
A. I miss my brother because he was always kind and always loving. He would be there -- he was -- he was a part of our family. Families, you link together, and you form a bond, and

he was a part of our bond. And so one of our links is missing. I miss the times we shared. I miss when we were younger and we would meet once in a while and have a beer, and he would always tease me about if I was out on a meeting, and I'd say, Yeah, but I have to go home soon.

♀

MR. WILLIAMS: Thank you very much. I have no further questions.

THE COURT: Mr. Spies, any questions?

MR. SPIES: I have no questions, Your Honor.

THE COURT: Thank you.

MR. WILLIAMS: United States calls Wendy Jensen.

WENDY JENSEN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. Would you state your full name, please, and spell your last name.

THE WITNESS: Wendy Jensen, J-e-n-s-e-n.

THE COURT: Thank you.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Good morning, Miss Jensen. You've testified before already before this jury. Could you just remind the jury how are you connected to Terry DeGeus?

A. I was his ex-wife.

Q. And tell the jury just a little bit about yourself.

A. Now?

Q. Sure.

A. I'm married to Clint. We live in Corwith. We have Ashley, and we have three boys, Tucker, Preston, and Bennett.

Q. And where do you live?

A. Corwith, on a farm.

Q. And do you work outside the house?

A. I'm a massage therapist, and I do bookkeeping for a trucking company.
Q. All your boys, how old are they now?
A. Twelve, nine, and eight.
Q. And Ashley is the oldest child then?
A. Yeah, just turned 21.
Q. Let's talk a little bit about Terry if we can. Tell the jury if you would, when did you first meet Terry DeGeus?
A. I was 16. It was the summer out of my sophomore year.
Q. Did you guys go to high school together?
A. No, he went to Britt. I went to Woden-Crystal Lake, small town up north.
Q. How did your relationship develop then over time?
A. Pretty much after we met we were inseparable. We got married -- that was in 1978 is when we met and got married in 1982.
Q. How long did your marriage last?
A. Seven years.
Q. And what was he like? What was Terry like as a husband to you?
A. He was a very good provider. He's very loyal. He's just the type of person if you met him, everybody loved him. There was just -- you couldn't help but like Terry.
Q. You had one daughter.
A. Yes.

Q. And how old was Ashley when you and Terry split up?

A.    She was five, just to turn six, just about six.

Q.    Now, you did get divorced at some point.  I think you testified during the guilt phase of this trial about how that came about.  Could you remind the jury what ended up leading to you and Terry splitting?

A.    Angie wanted him to get divorced so they could get married.

Q.    I assume, as with all couples who get divorced, that there is a certain level of animosity between the couple as that's going through.  But with you and Terry, did you -- was it a fairly amicable split in the sense that you shared the same attorney and so forth?

A.    Yeah, we rode together to the lawyer to do the paper signing and went out for lunch afterwards.  We just always got along together.

Q.    And as time went on, how did you and Terry -- how did your relationship continue?

A.    We spoke every weekend, once or twice during the week because we were always setting up meetings for him to go see Ash.  And it was just that he came to the house; he walked in, get a cup of coffee, sit down and talk with the family like he lived there, was part of it still.

Q.    Did you make -- how would you compare how well you guys got along as a couple versus friends?

A.    We were a lot better friends probably.

3486

Q.    Share with the jury if you would, even after you got married, was Terry a part of your life?

A.    Yes, he was.

Q.    Was he present at some significant events in your life?

A.    Yes.  When my husband and I -- my present husband and I had

our first boy, Tucker, Ashley was at her Grandma and Grandpa Buns' house, and it was a Sunday morning. She'd been at Sunday school, and so we called my mom and dad to tell her that she had a new baby boy. So when she got home from church, she was so excited, so the first person she called was her daddy. And he was in Clear Lake at Angie's house which was only about five minutes away. I was in Mason City at the hospital. So Terry came to the hospital with flowers and a card, came up, and the nurse is like, Your ex-husband's here, and my husband said, Let him in. He came over and gave me a kiss and a hug, and I had just had him probably a half an hour before, and my husband looked at Terry and said, Would you like to go see my son? So Clint and Terry went to see Tucker together.

Q. First person outside of you and your husband?

A. Yes.

Q. When you think back about the life that you and Terry had together before you got divorced, do you have favorite memories?

A. I always remember our honeymoon because the Monday after we got married we went to South Dakota. And he was so excited to get out of the state. He just could hardly stand it. So I did

3487

all the driving, and I told all our friends he was like a wide-eyed little two-year-old boy because he was just so excited about everything. We had to stop everywhere and take his picture by all the stuff out there. He was just like a little boy.

Q. Had he ever been outside the state of Iowa before?

A. Not that I remember, no.

Q. Let's talk a little bit about Terry as a father. You had Ashley together. How was he as a father to your daughter?

A. He was an excellent father. Whenever he came home from work, it was straight to Ashley. We have millions of pictures of the two of them together.
Q. And after you and Terry divorced, did he maintain contact with Ashley?
A. Always.
Q. I want to share a picture with the jury. What's the jury looking at there, Miss Jensen?
A. That's Ashley and Terry.
Q. And how old is Ashley in that photograph?
A. A year-old birthday party.
Q. After the -- I'm sorry?
A. Birthday party, at a birthday party.
Q. After the divorce did Terry continue to support you financially?
A. He always -- I always knew he would. It was just unspoken

♀

that if she needed something he was there. There was never any problem with that.
Q. What about the times that Terry would spend with Ashley after the divorce? How often would that be?
A. It was every weekend. Once in a while my mom and dad got her in between there, but pretty much every weekend.
Q. And how were they together as time went on?
A. They were great. I'd have a hard time getting her home a lot of times.
Q. Now, at some point you and the rest of the family learned that Terry had disappeared. Can you share with us what impact it had during that time period, that seven years that Terry was gone and you didn't know where he was?

A. Well, she went -- she was ten years old when he disappeared. And she just -- her dad hung the stars and the moon for her, so she held on to that the whole time that Dad would walk through that door any time. She always believed he'd come home.
Q. Ultimately the news came that that wasn't going to happen.
A. When she was 17. And it just turned her world upside down.
Q. How has Ashley dealt with this loss over the years?
A. It's been really, really, really hard with her.
Q. In what way?
A. Well, she was in fourth grade when he disappeared. And I live in a small town, and my husband and I, neither one of us

are from there, and somehow people talk or whatever. But she was teased horribly. She'd be on the school bus, and they'd be like, Hey, there's your dad dead in the ditch, and that went on for a year and a half, and then I couldn't take it anymore, so I took her out of there and took her to Kanawha Christian School, small private school, for two years.
Q. And did Ashley continue to struggle over the years?
A. Yes.
Q. Can you share that with the jury a little bit?
A. Well, she did the two years at Kanawha Christian, and that was fifth and sixth grade. Seventh grade I had her open enroll to go to Britt, but during that summer out of her sixth-grade year, she had talked to some of the girls that were in her class, and then she wanted to go back to junior high at Corwith-Wesley-Lu Verne, so I let her. And seventh and eighth grade were pretty good. But it seemed like every time that this would come back up in the papers and stuff, the teasing would

start again. And by the time she hit sophomore, it had got to her all over again. And she got in a little scuffle at school, and they expelled her.

Q. And the scuffle was about?

A. It was the gal that always teased her about her dad.

Q. Ashley get through school eventually?

A. No.

Q. Is Ashley living with you these days?

♀

A. No, she lives in Des Moines.

Q. I want to talk a little bit about the impact this has had on you. Do you still have feelings for Terry?

A. Once you're loved by Terry, it never, ever goes away.

Q. Do you miss him?

A. Yes. A lot of things never would have -- the stuff never would have happened to Ashley had he been there.

MR. WILLIAMS: I have nothing else.

THE COURT: Mr. Spies, any questions?

MR. SPIES: We have no questions, Your Honor.

MR. WILLIAMS: United States calls Ashley DeGeus.

ASHLEY DEGEUS, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. Would you state your full name, please.

THE WITNESS: Ashley DeGeus, D-e-G-e-u-s.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Good morning. How are you?

A. Fine.

Q. How old are you these days?
A. Twenty-one.
Q. And your mother said you're living in Des Moines.
A. Yes.

♀

Q. Are you going to school? Are you working?
A. I work at Claire's in Southridge Mall. I'm the assistant manager.
Q. And how long have you worked there?
A. Since beginning of August.
Q. I have to plead some ignorance. What is Claire's?
A. It's Claire's Boutique. It's a jewelry/accessory store.
Q. Do you enjoy that?
A. Yes.
Q. Terry DeGeus was your father. How old were you when he was murdered?
A. I had just turned ten.
Q. Describe your father for the jury if you would.
A. Allaround wonderful person. He was my knight in shining armor.
Q. How'd he treat you?
A. He treated me wonderful. He was always really, really good to me.
Q. What was the best part about your father?
A. Best part about my father? Everything to me.
Q. Do you have any favorite memories of him?
A. Him in general. Otherwise just every -- spending time with him riding in the semi when I was little, and he took me to the Lady of the Lake in Clear Lake.
Q. What's the Lady of the Lake?

A. The boat that they -- the big -- I don't know. Lady of the Lake. It's just like a big boat.
Q. Pleasure boat on Clear Lake?
A. Yes.
Q. When you guys would have time together on weekends after your parents got divorced, what are some of the things you would do with him?
A. Just spend time just me and him. We'd watch movies. He'd take me to the grocery store and get whatever I wanted for the weekend and just spending quality time with me.
Q. Did he spend a lot of weekends with you?
A. Almost every weekend.
Q. And did you look forward to those weekends?
A. Yes, I did.
Q. Can you share with the jury a little bit at some point you learned that your father had disappeared. Your mother shared with us a little bit about the impact it's had on you, but in your own words, what -- how did that affect you, that seven-year period of time when you didn't know where your father was?
A. It was really hard. When it first happened, I didn't like it when it rained outside because I didn't know if my dad had shelter. And I just always hoped he would come home. It was really hard.
Q. At some point you learned that your father wasn't going to come home.

A. Yes.

Q. What's that done to you?
A. It's taken a part of me away. It's done a lot. It's affected me in a lot of ways.
Q. You have your memories of your father.
A. Yes.
Q. Do you have any items that you keep that you remember your father by?
A. He had this pink fuzzy blanket on his bed, the ones like they have in motels, really fuzzy ones, and I have that blanket now, and all the fuzzy blankets remind me of him.
Q. Do you miss your dad?
A. Yes, I do.
Q. What do you miss the most about him?
A. Just him being there.
Q. On the night of November 5 of 1993, you were with your dad, and he dropped you off at your grandma's house.
A. Yes.
Q. Do you ever think about what if you had gone with him?
A. Yes, I do, all the time.
Q. Does that bother you?
A. Yes.
MR. WILLIAMS: Thank you very much. I have no further questions.
THE COURT: Mr. Spies?

MR. SPIES: We have no questions, Your Honor. Thank you.
THE COURT: Members of the jury, it's about 10:15 or so. We'll be in recess for 30 minutes. Please remember my cautionary instruction: Keep an open mind until you've heard

all of the evidence in the penalty phase, received my final penalty phase instructions, and listen to the closing arguments of the lawyers and then go back and deliberate. Thank you.

(The jury exited the courtroom.)

THE COURT: Any matters we need to take up, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Spies?

MR. SPIES: No, Your Honor.

THE COURT: Thank you. We'll be in recess.

(Recess at 10:17 a.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. SPIES: Yes.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Williams, ready to call your next witness?

MR. WILLIAMS: Thank you, Your Honor. The United States calls Kathy Nicholson.

KATHY NICHOLSON, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. Make yourself comfortable, and try and pull up the chair so you can speak directly into the microphones. Would you please state your full name and spell your last name.

THE WITNESS: Kathy Nicholson, N-i-c-h-o-l-s-o-n.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Miss Nicholson, I'd like you to share a little bit with the jury about yourself. Where are you from? What do you do?

A. I'm from Rudd, Iowa. I work at Hoover's Hatchery. It's a chicken hatchery.

Q. Tell the jury a little bit, Rudd is located where in relation to Mason City?

A. It would be east of Mason City, probably about 20-minute drive.

Q. How large of a metropolis is Rudd, Iowa?

A. Very, very, very small.

Q. And you work at a hatchery. What do you do there?

A. I -- we hatch chickens, and I ship them off to -- all over the United States.

Q. Is that a fairly large hatchery there?

A. It's a good-sized hatchery.

♀

Q. And how long have you worked there, ma'am?

A. Since March 2.

Q. At some point in your past, did you know somebody by the name of Greg Nicholson?

A. Yes.

Q. Could you share with the jury just a little bit about your relationship with Greg Nicholson?

A. Well, we met in junior high. We went together for six years. Then we got married, and we were married for nine years.

Q. Did you have any children together?

A. Yes, two daughters.

Q. Share with the jury a little bit if you would, during the time period that you and Greg were married, was he working?

A.    Yes.
Q.    What type of jobs did he work at?
A.    Pretty much our whole marriage he worked at Curry's Manufacturing.
Q.    And what did he do there?
A.    He was on the door line.  He was a lead man.  He had five people that worked under him.  And they manufactured steel doors.
Q.    Did he also have an outside interest in employment that he worked on?
A.    Oh, yes.  From the time I met him, he was always in a band, and he played every kind of music, country-western, top 40,

played for anniversaries, wedding dances, in bars.
Q.    Now, you met him when you were in junior high you said.
A.    Uh-huh.
Q.    Did he have a band that he played with even when he was in junior high?
A.    Yeah.  When I first met him, I was 13, and he was 15, and his -- he was in his family's band.  It was -- he played drums. His dad played rhythm guitar, and his sister played lead guitar.
Q.    And what was his dad's name?
A.    Jim Nicholson.
Q.    And what type of -- it was a country band?
A.    Yes.
Q.    How long did Greg play in that band then?
A.    I believe it was either -- somewheres around ten years.
Q.    And what type of instruments did Greg play?
A.    He played drums, lead guitar, bass guitar, harmonica.  He could play a little on the keyboard, just about everything in

the band.
Q. Was he any good?
A. He was very good.
Q. You said you and Greg had a couple children together. What are the children's names?
A. Our first daughter was born in '83, Kristin, and Jamie was born in '85.
Q. I'll share with you and the jury a photograph marked as

3498

Government's Exhibit 1112. For some reason I can't get it up on my computer, so I'm going to do it the old-fashioned way. Can you tell the jury about that photograph, please.
A. That would be myself and Greg, and Kristin's on my lap, and Jamie's -- it was soon after Jamie was born.
Q. In 1993 how old were your children?
A. Ten and eight.
Q. Now, at some point you and Greg split up. When was that?
A. That would be in 1989.
Q. And after you split up, describe for the jury if you would what kind of relationship did you maintain with Greg.
A. We maintained a relationship, a civil relationship for the children. He always paid child support every month on time. He took the girls every other weekend.
Q. And was that regular with him, taking the girls?
A. Yes.
Q. And how was he as a father?
A. He was a very good father.
Q. Over time after the initial divorce, did you and Greg grow closer, at least become friends again?
A. Oh, yes. Especially in the last year of his life, we had

become really close. We were getting back to the old friends we used to be.
Q. Have you ever remarried, ma'am?
A. Pardon me?

Q. Have you ever remarried?
A. No, I haven't.
Q. I want to take you back a little bit to the time where you and Greg were married. Can you describe what kind of a husband he was to you?
A. He was a good provider. He spent a lot of time with his band and that and his job, then spent a lot of time, you know, with the kids. We'd go on vacations.
Q. And did you follow his bands?
A. Oh, yeah, yeah. I truly enjoyed doing that.
Q. Other than the bands, did Greg have any hobbies?
A. He had a Harley. He loved riding that. Sometimes he'd give lessons. If somebody wanted some guitar lessons or drum lessons, he'd do that on the side once in a while. He also worked on show cars. He had his own show car that he'd take around to the car shows. And then he'd run -- he'd bring his P.A. system in so that there'd be speakers there for the announcements, and he'd run that and play music during the car shows. And he also helped other people that had show cars. He would redo their trunk. They carpeted it and all those kinds of things.
Q. And developed a talent in that area as well?
A. Yeah, yeah, so he had a lot of hobbies.
Q. You said he was a good father. What made him a good father to your daughters?

A. When he took time to spend with them, they had his undivided attention.
Q. Even after you divorced, did he miss any of the children's birthdays or holidays or things like that?
A. Oh, no, never.
Q. At some point after your divorce, did you become aware of Greg meeting a woman by the name of Lori Duncan?
A. Yes.
Q. And did you meet her at some point?
A. Yes, I did.
Q. And how did that happen?
A. Well, Greg was one to bring home his latest girlfriend over to my house versus his mom and dad's. I guess he -- my opinion was still worth something. And yeah, he brought Lori over to meet us. And they -- a week prior to his disappearance, he called up and asked if he could come and get the girls. He and Lori wanted to take all four of the girls swimming.
Q. And so did that happen then?
A. Yes.
Q. And this was a week before his disappearance?
A. Yes.
Q. Where did they go swimming at?
A. Big Blue.
Q. What's Big Blue?
A. It's a -- it's a pit in Mason City, sort of -- kind of sort

of in the middle of town where they excavated rock out of I guess and then there's a -- water left over.

Q. And so Kandi was ten, and Amber was six, and how old were your girls at that time then?
A. Ten and eight.
Q. Okay. So real close in ages then.
A. Yeah.
Q. What did you think of Lori Duncan when you met her?
A. Very nice, very nice lady.
Q. Directing your attention to July 25, 1993, did you have an opportunity to see Lori and Greg again on that day?
A. Yes, I did.
Q. And can you describe that for the jury, please.
A. They come riding up on Greg's Harley, just him and Lori. And they popped in for a visit. And they probably stayed, oh, at least two hours in the afternoon, Sunday afternoon.
Q. And what did they do when they were up there?
A. Oh, played with the girls, and we all visited.
Q. Now, at some point had you learned in the spring of 1993 that Greg had been arrested on drug charges?
A. Yes.
Q. Did you have an opportunity to talk to him about what was going on in his life at that point?
A. Yeah, I did. He didn't fill in all the details I guess to me, but yeah, it was -- it was quite the shock and quite the

wake-up call for him.
Q. And what did he tell you about what his plans were, if any, for his life at this point after this wake-up call?
A. Well, just that he was going to testify and that he would still be looking at some jail time. To me it didn't sound like too long of a time. And then afterwards he was still hoping to

get a band put together after he was out.

Q. And you and Greg, your relationship toward the end there after this had happened to him, any changes in your relationship?

A. Yeah. He was coming over on his way home from work quite regularly, two or three times a week.

Q. Did you see a change in the Greg you knew from before?

A. Yeah. He was more like the Greg that I married.

Q. Now, at some point did you and your girls learn that Greg had disappeared?

A. Yeah, I learned right after he didn't show up for court on Monday morning.

Q. There was about a seven-year period before his remains were found. Can you describe for the jury how did your girls deal with that?

A. Well, I explained everything to the best I could. But it's still hard for kids to understand, you know, when is Daddy coming home, you know, where is he, why did he leave without saying good-bye? Couldn't answer those questions.

3503

Q. Did you maintain contact with Greg's father, Jim?

A. Yes.

Q. And during that seven-year period, can you describe for the jury how was Jim dealing with this?

A. His dad really dealt -- he had a hard time dealing with it. He was really affected by the media, the articles in the newspaper. His health started going bad. He ended up having to retire early. The stress of the situation worsened him being sick.

Q. Now, in the fall of 2000, Greg's remains were discovered.

Can you share with the jury how did that affect you and your daughters?

A. Well, we finally -- we knew for sure, you know, because we didn't know whether he left on his own or what had happened. And in a way it was a little bit of closure. Now we know. But it was -- it was hard to deal with.

Q. Do your girls still talk about Greg, their father?

A. Oh, yes.

Q. Do they miss him?

A. Oh, most definitely.

Q. Despite the fact that there was a divorce, did your daughters still remain close to Greg?

A. Oh, yeah, yeah.

Q. And how about yourself? Do you miss Greg?

A. Yeah, I do.

♀

3504

Q. What do you miss most about him?

A. Well, even though we were divorced, I still went to listen to the band, and I'll probably miss that the most.

Q. Did you keep in touch with Greg's dad, Jim, after Greg's body was found?

A. Yes.

Q. And how did he take that knowledge?

A. He finally sounded like he had some relief in his voice when I talked to him.

Q. Now, you were able to have a funeral for Greg at some point?

A. Yes.

Q. And when was that?

A. September 11.

Q. Of this year?
A. This year, yeah.
Q. Did Greg's father attend that funeral?
A. Yes, he did.
Q. Is Greg's father still with us today?
A. No, he isn't. He passed away a short two weeks after we buried Greg.

MR. WILLIAMS: Thank you very much. I don't have any further questions of this witness.

THE COURT: Mr. Spies?

MR. SPIES: I have no questions, Your Honor. Thank

you.

THE COURT: You may step down.

MR. WILLIAMS: United States calls Robert Milbrath.

ROBERT MILBRATH, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated. Would you state your full name, please, and spell your last name.

THE WITNESS: It's Robert Milbrath, M-i-l-b-r-a-t-h.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Milbrath, I'd like you to share with the jury just a little bit about yourself to begin with. Where are you from? What do you do?
A. I live in Mason City. I am an auctioneer/truck driver.
Q. And how long have you been doing that?
A. I've been doing auctioneering for 2 years, and I've been

doing truck driving for about 23.
Q. After high school, did you have a stint in the military?
A. Oh, yeah. I did six years for the U.S. Army.
Q. And what kind of service did you do? I mean, where were you stationed?
A. I was in the Iowa National Guard where I was a transportation -- or part of the transportation unit.

♀

Q. So that worked out nicely transitioning to your --
A. Yeah, it helped me move into the civilian transportation.
Q. Where do you live at, sir?
A. I live in Mason City.
Q. And have you lived there your whole life?
A. Yes.
Q. I'd like you to share with this jury a little bit about your extended family and go through your parents and some of your siblings if you would.
A. My mom and dad, Dave and Marge Milbrath. I have a sister Lori Milbrath Duncan. I have a younger sister, Mary Buckley. I'm married to Connie Milbrath. I have a son named Brock.
Q. And how old is Brock?
A. Brock is 14.
Q. Do you have other nieces and nephews in your family?
A. My sister has a boy Brad and a girl Jada. And Lori had two girls, Kandi and Amber.
Q. And how old are your sister's children?
A. Brad is -- I believe he just turned 18, and Jada is 8.
Q. Your parents are who?
A. David and Marge Milbrath.
Q. And tell the jury just a little bit about your father.

What's he been doing for a living all these years?
A. My dad is an electrician. He did that back -- well, I should say he's an electrician and . . .

Q. That's been his profession?
A. Yeah, it's been his profession his whole life. He worked as an electrician for David Manufacturing for many years. That's something he's always done.
Q. Now, besides raising you all, did your mother work outside the home?
A. Yeah, she -- well, she was a -- stayed at home and raised us kids until we were old enough to take care of ourselves, and then she got a job at Metalcraft and has worked that position for -- I think she told me 25 years now.
Q. Now, this jury's heard that at the time of your sister Lori's death she lived down the block from your parents there in Mason City. How long did your parents -- have your parents lived in that house if you recall?
A. Let's see. She -- I believe they moved into that house after Lori was born, so they've been in that house about 40 years.
Q. Long time.
A. Long time.
Q. I'd like you to talk just a little bit if you would about your sister Lori, and let's just start off, growing up as kids, what kind of a sister was Lori to you and your siblings and to your parents?
A. Well, she was the typical older sibling, older sister. She very much looked out for me and my other sister Mary. She was

quite a tease, but yet if there was something that had to be done, she was very firm in letting us know that you had to do it. She was always there for you. If you needed something, she was there for you.

Q. Now, one of your sisters, Mary, testified previously. Did you and Lori and the rest of the kids, did you remain close over the years?

A. Yeah. We've all taken different paths of our life, but we remained in touch to talk and let each other know what we were doing and that we were still thinking about each other by, you know, giving a call or coming over and talking a little bit.

Q. Now, did Lori graduate from high school at some point?

A. Yes, she did. She graduated from Mason City High in 1981 and spent a couple of months at home until she decided to join the U.S. Navy. It's something my father did, and he wanted his kids to maybe experience that also.

Q. Showing you -- in front of you on the screen is a photograph marked 1100. What stage of Lori's life was that photograph taken, sir?

A. That appears to be her graduation photo from high school.

Q. Now, did Lori have a class ring like many students get when they go through high school?

A. Yeah, she got her class ring and wore it faithfully.

Q. I'm going to talk to you a little bit about later in her life she gets married, but after her divorce, did she wear that

3509

ring regularly?

A. Yes, she did. After her divorce she always wore her class

ring on her ring finger, her left-hand ring finger. Why particularly I don't know, but that's just something she wanted to do.
Q. And she always had it on her hand.
A. She always wore it.
MR. WILLIAMS: May I approach, Your Honor?
THE COURT: You may.
BY MR. WILLIAMS:
Q. Showing you what's been marked as Government's Exhibit 1113. There's a number of items in here, but at the bottom of this, do you recognize that ring there?
A. That is Lori's class ring.
Q. And is her name actually inscribed on the inside of that ring?
A. Yeah. It was something that you could have done. It says Lori Milbrath on the inside.
Q. Now, you indicated after high school graduation your sister went into the Navy.
A. Yes.
Q. How long did Lori serve in the Navy?
A. She served four years.
Q. And showing to the jury Exhibit 1101, is that a picture of your sister in her Navy uniform?

3510

A. Yes, it is. That'd probably be her graduation photo from the U.S. Navy.
Q. Now, while she was in the Navy, did she meet a gentleman she ended up marrying?
A. Yes, she did. She met J.P. Duncan.
Q. And J.P. Duncan was also in the Navy at the time?

A. Yes, he was.
Q. And they got married. That marriage last for a few years?
A. Yes, it did.
Q. And did they have a couple children through that marriage?
A. Yes, they did. They had Kandi and Amber.
Q. Now, in all the time that you knew Lori from high school up through her death, was Lori Duncan, Lori your sister, ever involved with drugs or drug activity or other criminal activity?
A. No. She was very much against it. She did not want to be around drugs at all. She did not want to know anybody or have her girls around drugs at all. It was just something that Mom and Dad had told us, something that -- don't do drugs, you know; they're going to corrupt you; they're going to hurt you. It's something she made comments to Kandi and Amber about.
Q. Now, at some point in her life she takes in Greg Nicholson. What is it about her personality from what you've just described that would have led to that?
A. Lori was very much a person that would be your friend first and a very helping person. I understand Greg needed some space

♀

3511

or a garage to put some band equipment, and Lori, being the person she is, offered her garage for storage and . . .
Q. Did you have some discussion with her at some point about Greg and whether she should be hanging out with him?
A. Yeah. The Sunday they disappeared, that earlier evening, I was just visiting -- my wife and I were just visiting Mom and Dad. And we were leaving to go home, and Lori come out of her house wanting to know if we wanted to go out to the races with them that night. And I said, No; I understand you're being friends with somebody that's supposed to possibly testify the

following day and had a drug history in the past. I said I didn't want nothing to do with that and told her to keep her distance away from this person. It didn't sound like a relationship that she would have ever tried to make happen or anything. And she said it wasn't that way, he just needed help, and he wanted to go out to the races and wanted to -- Lori to go with, and Lori saw us and wanted us to go with.

Q. Lori was going to give him the benefit of the doubt.

A. Exactly.

Q. Let's talk a little bit about the children that Lori had and was raising as a single parent there, Kandi and Amber. First of all, describe for the jury if you would the relationship that Lori had with her daughters.

A. It was a very loving relationship. She cared deeply for her girls. Her girls came first. There was not a day that she

didn't make sure they had exactly what they needed for the day. Get up in the morning and she made sure that the neighbor lady was going to get the breakfast prepared and get them on to school being that Lori had to be to work earlier.

Later that day after she worked her eight-plus hours, she would come home and make sure the girls got home safely and had supper every night on the table for them, made sure they ate good. And she would always let them play. And, of course, she was always wanting to -- something my father kind of bestowed on to Lori and I and Mary, you're independent, and she was kind of letting the girls be a little independent also.

Q. She keep a good house?

A. Very clean house. There was not a day I ever went over there that the house wasn't picked up and clean and orderly. I

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3064 of 3636

wish she would come over and do mine.
Q. Up on the screen is Exhibit 1102. Can you share with the jury just a little bit about that picture?
A. That -- I'm not particularly sure where the house is, but that would be Lori, Kandi, and Amber sitting on a couch that I gave them because they were in need of some furniture at one point in their life.
Q. Now, when J.P. and Lori were together as a couple with their kids, where were they living at at that time?
A. Say that again, please.
Q. Yeah. When J.P. and Lori were married with the kids, where

were they living?
A. They were living in Des Moines.
Q. And at some point after the divorce did Lori move back to the Mason City area?
A. Yeah. After J.P. and Lori finally split up and got a divorce, Lori finally moved back up to Mason City to kind of get away from the life down there.
Q. Now, Lori you said was working. Where was she working at?
A. She was working at Fieldstone Cabinetry in Northwood.
Q. And at that time back in the early '90s, was anybody else in the family working there?
A. Yeah. I was working there. I'd worked there for five years. And my other sister Mary also worked there. I believe she worked there for about nine years.
Q. And what shifts did you all work?
A. Lori and Mary worked the day shift, and I worked the nights.
Q. Given that, did you have any contact with them on a regular

basis then?
A. Yes. I would always go to work about half an hour, 45 minutes early. And that gave me a chance to see Lori and Mary in passing. We had about a half an hour layover from the time they quit work to the time I started. So I had a chance to always see my sisters for at least 10, 15 minutes out of every day.

♀

Q. Now, with all the hours that Lori was working, did she ever miss out with the kids on making sure they were able to go to different holidays and enjoy different events in their life?
A. No. She was very -- a family-oriented person. There was never a time that the kids had to miss out on anything.
Q. Showing you up on the screen 1103. What's the jury looking at there?
A. That would be Kandi and Amber getting ready for their Halloween night. I believe Kandi's dressed up as a possible gypsy. I'm not sure there. And, of course, Amber's Minnie Mouse.
Q. What are the type of things that Lori would do with the kids on weekends and holidays?
A. She wasn't -- on weekends after she moved back up to Mason City, money was a little tighter. She wasn't one to do a whole lot, having to watch her money. So play time outside, sitting on -- well, actually I going over -- Connie and I going over watching the kids play was something that happened quite frequently.
Q. How about fishing? Kids enjoy fishing at all? Lori take them out fishing?
A. She might have. Not with me in particular.

Q. Okay. Let me show you a photo. Do you recognize those two little girls?
A. That would be Kandi and Amber on a fishing trip. I'm

not -- I'm not positive where that would be at, though.
Q. I want to talk to you just a little bit about the children individually for a little bit. Kandi was the oldest at ten when she died. What was she like as a little girl?
A. She was very quiet. She was very, very close to her dad, J.P., and extremely close to Mom. She missed her -- she missed her dad quite a bit after they -- after Lori moved up to Mason City. So she was very much a person to sit and listen to the adult conversation, whatever that might have been. She was also the little mother, always watching out for Amber.
Q. How'd Kandi do in school?
A. She did okay. She had some problems. The exact problem offhand I don't recall, but she struggled just a little bit in school and needed some special education.
Q. Let's talk a little bit about Amber. Amber was six when she died. What was Amber like as a little girl?
A. She was -- she was the spitfire. She was the one that you didn't have to go and say, Play. She would get up out of bed and go play, and you'd have to go find her. She was -- she was always on the go. There was never a time that you didn't see her doing something with either her older sister or her cousin Brad or her friend behind the house.
Q. What were these two little girls like together, Kandi and Amber?
A. They were -- they were quite the -- not so much the sisters

but more like the mother and the daughter. Kandi was always trying to make sure Amber was doing the right thing and be in the right place at the right time, and Amber was more of just let me go, I'm playing.

Q. At some point you and the rest of the family learned that Lori and Kandi and Amber had disappeared. Can you share with the jury what impact that disappearance and the unknown for seven years had on you and the rest of your family?

A. It -- oh, it devastated us as a family to learn that Lori and the two girls just up and disappeared and couldn't find -- couldn't find them anywhere. Absolutely it -- it more so tore the farm -- the family apart than brought them together. It was -- it was one where Dad was constantly calling the police and asking them, Can you do this, can you look here, what about this? And the stress and the pressure on everybody was overwhelming.

Q. At some point you and the rest of the family ultimately learned what happened to Lori and Kandi and Amber. What impact has that had on your family?

A. To learn that your sister will never be there to talk to again, to know that the girls will never have a life, to know that they'll never experience a dance, a birthday, or anything, to know that maybe one day Lori might have met somebody else, married, experienced a different life than what she had before, the -- the fact to find out that one day somebody calls you up

3517

and says, We're sorry, but the remains have been identified as Lori and the girls, is something that you just don't ever want to hear. It -- it was very hard.

Q. How about your father? How's he taking this?
A. He's pretty much shut it out of his life. He doesn't want to talk a whole lot about it. It's something that I believe he feels is a little bit of his own fault knowing that the girls didn't want to go to the races that -- the races that night. They had come up and asked if they could spend the night with Grandma and Grandpa. And being a Sunday night and he was still working, it wasn't a good night for them to be able to watch the girls. So they had to say no and send them back home knowing -- not knowing that they'd never get a chance to see them again.
Q. And your father blames himself for that?
A. If he watched them girls that night, they'd be with us now.
Q. And your mother, how's she doing?
A. Bad. She's gone -- she's on medication. She has a hard time dealing with it. It's something where you -- again, if you go over and visit, you don't talk about it. You just don't want to upset the apple cart.
Q. Has she received some professional help to deal with this?
A. She's gone to the -- she's gone to the doctor to get some medication to help her get through this.
Q. And how about your sister Mary?
A. Mary's a lot like me. We can bear the full blow. We can

♀

talk about it. We can -- we can move on knowing that we finally did know what happened to Lori and the girls. It's not easy. It's not something you want to do. But it's something that we can deal with it at this time.
Q. Now, Jim or J.P. Duncan, the girls' father, after the divorce, did he still remain close to the girls?
A. Yes. There was never a weekend that went by that he didn't

come up and meet Lori either in Mason City or halfway from Des Moines to pick up the girls and be with them. It was something that he didn't want to lose touch with his daughters.
Q. Now, in the summer of 1993, did something happen to J.P.?
A. J.P. was being a good samaritan. He -- Des Moines was flooding pretty bad that year, so he had volunteered to sandbag a portion of Des Moines, and somewhere during the sandbagging he -- being in the dirty water he caught meningitis.
Q. What'd that do to him?
A. It put him in a wheelchair for the rest of his life. It's gave him very short-term memory.
Q. And has it affected his mental state as a result of this infection?
A. Yeah. He really can't remember who you are. He actually had trouble remembering one of his own daughters when he was up.
Q. There was a funeral this summer for Lori and the girls.
A. Yes.
Q. And did J.P. come to that?

3519

A. Yes, he did.
Q. Did you have a chance to talk with him there?
A. Yes, I did. I talked to him briefly. It wasn't the same J.P. I met years before. We knew each other well enough to kid back and forth, but again, having meningitis, he, for instance, called me like three different first names. It was just something that was a tragedy for him.
Q. Now, while talking with him there at that funeral, did you get the sense from talking to him that he understood what had happened?
A. No. I really feel that being in the state that he is he

did not grasp the whole idea that Lori and the girls are gone or what has happened to them.

Q. Did Lori have a close relationship with her parents?

A. It was -- I wouldn't say a close relationship, but it was a relationship. Lori and Mom and Dad didn't see eye to eye on the way she had done things. They wanted her to always do more or be better. And you could see -- you could see a lot of Dad in Lori. There was a lot of stubbornness in both of them, and they were constantly showing that towards each other.

Q. Beneath the stubbornness, was there love between them?

A. Of course. There was always -- there was always love. May not have seen eye to eye, but you always loved 'em.

MR. WILLIAMS: Thank you.

THE COURT: Mr. Spies, any questions?

♀

3520

CROSS-EXAMINATION

BY MR. SPIES:

Q. Mr. Milbrath, you have two rings there in front of you. And can you tell us where the other ring came from?

A. Lori had lots of different jewelry. I can't say I know if that was hers or not.

Q. Do you know that she had dated a man named Damian Deegan?

A. Yes.

Q. And do you know if that may have come from him?

A. It might have. Again, I'm not sure.

Q. Sure. And the last question, do you know where Ms. Duncan kept her rings when she wasn't wearing them?

A. No. I -- although I was over at her house many times, I didn't venture upstairs or ask her where she kept her jewelry.

MR. SPIES: Thank you.

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: No, Your Honor.

THE COURT: You may step down.

Members of the jury, why don't you take a stretch break.

And, Mr. Williams, are you ready to call your next witness?

MR. WILLIAMS: I am, Your Honor. United States calls Special Agent Bill Basler.

WILLIAM BASLER, PLAINTIFF'S WITNESS, SWORN

THE COURT: Thank you. Please be seated. Would you state your full name, please.

THE WITNESS: My name is William Wayne Basler.

THE COURT: Mr. Williams?

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Basler, the jury's plenty familiar with who you are and what you do for a living, and I'm just going to move to the point I want to talk to you about.

In this case as the case agent, were you familiar with the manner in which the remains of Lori Duncan were removed from the grave site off of Lark Avenue?

A. Yes.

Q. And just remind the jury a little bit when Mr. Hochrein or Special Agent Hochrein removed the remains from that grave, how were they packaged for ultimate further examination down at the lab?

A. The remains were packaged individually as best as they were able to make that determination. The bodies themselves were

wrapped individually, and the smaller bones, the artifacts, if you will, that were associated with each body were placed in paper bags and sent to the morgue with the bodies.

Q. Were you present at the morgue when the bodies were unwrapped and uncovered and examined?

A. Yes, I was.

♀

Q. And was that done on an individual victim-by-victim basis to begin with?

A. Yes.

Q. And in the course of going through the remains of Lori Duncan including any of the separate packaging of materials that may have been found that were attempted to be associated with her body, was any class ring found in those remains?

A. No.

Q. Now, you heard the testimony by Special Agent Hochrein that in the course of this grave settling some of the items would maybe commingle to some degree. With that in mind, was a class ring belonging to Lori Duncan found in any of the remains or any of the materials that were recovered from the Lark Avenue grave site?

A. No. There was no class ring found during the examination of the remains of any of those four people.

Q. Was a class ring ultimately found that belonged to Lori Duncan?

A. Yes.

Q. And where was it found at?

A. Lori Duncan's class ring was found in the summer of 1995 by three kids that were playing along the Winnebago River near Fertile, Iowa.

Q. Give the jury an idea if you will, Fertile, Iowa, is where in comparison to the Lark Avenue site.

A. It's north of the burial site and also west of that site.
Q. And was that class ring ultimately recovered by law enforcement?
A. Yes. The class ring was, as I mentioned, found by the boys that were playing along the river. Ultimately it was turned over to the Mason City Police Department. Again, this is in 1995 before our involvement. And then later when I became involved in the case, I got those rings from the Mason City Police.
Q. In front of you, sir, on the table is Exhibit 1113. Do you recognize that, sir?
A. Yes, I do.
Q. And what is it?
A. It's a bag that contains two rings, one of them being Lori's class ring, as well as two game tokens for the amusement center that's in the mall at Mason City.

MR. WILLIAMS: I have no further questions.

THE COURT: Mr. Spies?

MR. SPIES: Thank you.

CROSS-EXAMINATION

BY MR. SPIES:

Q. Agent Basler, is it your recollection from the investigation that the two rings shown in Exhibit Number 1114 were found inside a purse in the creek bank or the river bank near Fertile, Iowa?

A. Yes, I believe they were found in a purse in the river itself.

Q. All right. And is it also your recollection that the two rings were found inside a zippered compartment inside the purse?

A. That's my understanding.

MR. SPIES: Thank you.

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: No, Your Honor.

THE COURT: You may step down.

Ready to call your next witness?

MR. WILLIAMS: Thank you, Your Honor. United States calls Josh Miller, please.

JOSHUA MILLER, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated. Can you pull up your chair, and can you state your full name, please, and spell your last name.

THE WITNESS: Joshua Miller, M-i-l-l-e-r.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. And if you would, make sure you speak right into those microphones.

First of all, Mr. Miller, you're speaking in a

3525

whisper. Could you explain to the jury why that is

A. I got clotheslined by a wire snowmobiling.

Q. You were riding on a snowmobile and got clotheslined?

A. Yeah.
Q. And that did some serious damage to your throat.
A. Yeah.
Q. Can you tell the jury just a little bit about yourself, sir? How old are you?
A. Twenty-two.
Q. And how far did you go through school?
A. All the way through high school.
Q. Are you out working now these days?
A. Yeah.
Q. What do you do?
A. Mechanic, farmer, and fireman.
Q. Where are you from?
A. Fertile, Iowa.
Q. And I want to direct your attention back to June of 1995. How old were you in June of 1995?
A. Probably like 11.
Q. And when you were 11 years old living in Fertile, Iowa, did you have some young friends that you used to play with?
A. Yeah.
Q. And what were their names?
A. Eric Hagen and Troy Johnson.

3526

Q. Among other things that young boys do, did you and those friends of yours play near the Winnebago River outside Fertile, Iowa?
A. Yeah.
Q. Now, is there a dam on the river there near Fertile, Iowa?
A. Yeah.
Q. And at some point in June of 1995, did you and the other

boys find a purse in the river?
A. Yeah.
Q. Can you describe for the jury what you found.
A. It was a black purse about -- I don't know -- five by six, had rings in it and tokens and some pictures.
Q. And where was it at when you found it?
A. Oh, about a half mile down from the dam.
Q. And was it on the river bank, or was it in the river itself?
A. Right in the middle of the river.
Q. Now, how deep of a river is this outside the dam there?
A. Probably a foot, foot and a half.
Q. So were you able to just wade out into the river to retrieve it?
A. Yeah.
Q. Do you remember anything about the pictures that you found inside that purse?
A. Just there was a family on one of them. I vaguely remember

3527

what was on the pictures.
Q. In front of you, sir, is an Exhibit 1113, and there's a number of items in there. Do you recognize some of those items, sir?
A. Yep.
Q. And how do you recognize those? What do you recognize those to be?
A. The items that were in the purse.
Q. Once you and the boys found the purse and those items in the purse, what'd you do with it all?
A. We took this stuff out and threw the purse back in the

river.

Q. Now, you're 11-year-old boys. Any explanation for why you throw the purse back in the river other than 11-year-old boys?

A. Yeah, that's it.

Q. When you take that stuff out, the rings and those tokens there, what'd you do with those ultimately?

A. Took them to my parents, and I don't know if they called the family or the cops. I don't know.

Q. At some point you turned them over to your folks, and your folks turned them over to either the family or law enforcement at some point.

A. Yeah.

MR. WILLIAMS: Thank you. I don't have any other questions, Your Honor.

♀

3528

THE COURT: Mr. Spies?

MR. SPIES: I have no questions, Your Honor. Thank you.

THE COURT: You may step down.

MR. WILLIAMS: United States calls Brittany Asbe.

BRITTANY ASBE, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated there. Would you please adjust the chair so you can speak directly into the microphones. Thank you. Would you state your full name and spell your last name for us.

THE WITNESS: Brittany Asbe, A-s-b-e.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Miss Asbe, how old are you, ma'am?
A. I am 16 years old.
Q. And are you going to school?
A. Yep.
Q. Where do you go to school at?
A. North Central High School.
Q. Located where?
A. Manly, Iowa.
Q. And your parents are who?
A. Lisa and Brian Asbe.

♀

Q. How long have you lived in -- I'm sorry. Where do you live at now?
A. Mason City, Iowa.
Q. And how long have you lived there?
A. My whole life.
Q. And where in relation to the friend we're going to hear about, Amber, did you and your parents live?
A. Across the alley.
Q. Are you in the same house now as you were back then?
A. Yeah.
Q. And so the Duncan house is still back across the alley from you at this point.
A. Uh-huh.
Q. Is that a yes?
A. Yeah.
Q. The court reporter has to be able to take down yes or no if you can remember that.
A. (Witness nodded head.)
Q. I want to talk to you a little bit about the Duncan family.

At some point you came to know the little girls that lived across the alley from you. There were two girls, Kandi and Amber. Was one closer to your age than the other?

A. Amber was.

Q. And over the -- how many years did you guys all live across the alley from each other that you can recall?

♀

A. Two years.

Q. And during that two-year period, did you develop a friendship with either Kandi or Amber?

A. Amber, yeah.

Q. Did you see much interaction between the sisters there, Kandi and her sister Amber?

A. Just the fact that we played on the swing sets together, and we'd watch movies and Amber -- or Kandi was always there to walk her to school, and she'd always be around just in case we needed anything.

Q. As you and Amber were growing up, did you spend time at each other's houses?

A. Yeah, all the time. We were playing Barbies, and we'd go to her house and make apples and peanut butter in the Easy-Bake Oven, and we had lots of fun.

Q. What was Amber like as a little girl?

A. She was real fun, energetic. We were practically like the same people. If you put us together, we'd be two peas in a pod, practically like my best friend.

Q. Did you guys do things together outside of playing together, in other words, go to parties and things like that together?

A. No. Well, my birthday party but . . .

Q. You had a birthday party?
A. Yeah.

♀

Q. And was Amber at that birthday party?
A. Yeah, she was at both of them.
Q. In front of you is a photograph. Can you tell the jury about that photograph?
A. Amber's in the blue, and that's my friend Sarah.
Q. And where was this photograph taken?
A. My fifth birthday which would have been May 25, 1991 -- or 1993 I mean.
Q. Okay. So in May of 1993, just a couple months before Amber disappeared?
A. Yeah, two months.
Q. And what was Amber's favorite things to do as a little girl back then?
A. We used to ride our bikes around, Slip N' Slide, run around in our swimming suits, make food, watch movies, spend the night at each other's house.
Q. Do you have a favorite memory of Amber?
A. Just the Easy-Bake Oven.
Q. What about the Easy-Bake Oven?
A. Us cooking in it together because when -- after she had went away, I had my mom go out and buy one so I could make it because she wasn't there to help me at all.
Q. And was the Easy-Bake Oven over at the Duncan household?
A. Yes, it was.
Q. At some point did you learn that your little friend had

♀

disappeared?

A. I think I realized it in third grade when I was crying to my mom asking her why she had left and when was she coming back, and my mom told me that she would never be back and that there's a very slim possibility of her coming back.

Q. And how did that affect you?

A. I haven't been able to, like, have friends that were very close. I had one best friend other than her that I've been friends with since Amber, but it was very -- like it's very hard for her to leave me because I'm, like, scared that she's going to go away.

Q. At some point did you learn that Amber had, in fact, died?

A. Seventh-grade year I read the paper and started crying, and then my mom told me when I got home and comforted me.

Q. Now, at some point did you write a poem about Amber?

A. Yes, I have it right here.

Q. I'd like to have you share that with the jury if you would.

A. Okay. It's named Amber. She was only six when she left on a picnic, then the theft. She never would be able to get to the age of seven, for she was shot and sent to heaven. I never got to say good-bye. The nights I was scared, those nights I'd cry, wishing to see her face again, wishing that it'd never been. For my dear friend, I loved her so. I never wanted her to go. Of what -- only five and not aware of what would be ahead. Oh, what a scare. Amber isn't just a color. She was my best friend

♀

3533

forever together until the very end.

Q. Thank you for sharing that with us.

MR. WILLIAMS: I have no further questions.

THE COURT: Mr. Spies?

MR. SPIES: I don't have any questions. Thank you.

THE COURT: Thank you.

Mr. Williams, does the government have any additional evidence?

MR. WILLIAMS: No, Your Honor. The government rests its case in the penalty phase.

THE COURT: Okay. Members of the jury, we'll be in recess until 12:45 for your noon recess. Thank you.

(The jury exited the courtroom.)

THE COURT: Could I see the lawyers at sidebar just for scheduling?

We're in recess.

(At sidebar off the record.)

(Lunch recess at 11:51 a.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. SPIES: Yes.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Spies, are you ready to call your first witness?

MR. SPIES: We are, Your Honor. Yes. The defense

calls Barb Formanek.

BARB FORMANEK, DEFENDANT'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Can you adjust those microphones? Okay. Great.

THE WITNESS: Think it's okay, isn't it?

THE COURT: I think that's okay. And would you state your full name, please, and spell your last name.

THE WITNESS: Barb Formanek, F-o-r-m-a-n-e-k.

THE COURT: Okay. Thank you.

Mr. Spies?

MR. SPIES: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. SPIES:

Q. Good afternoon, Mrs. Formanek.

A. Good afternoon.

Q. Mrs. Formanek, could you tell the ladies and gentlemen of the jury where you live and how long you've lived there?

A. Okay. Now I live in Clear Lake, Iowa. We have lived there for 15 years.

Q. And before you moved to Clear Lake, Iowa, where did you live?

A. We lived in Britt, Iowa. We've lived there for 17 years.

Q. We've heard a lot of testimony about Britt, Iowa. Could you tell us just a little bit about what the community was like when you lived there for 17 years.

♀

3535

A. It was just a basic little town. Everybody knew everybody, and we owned the A&W there.

Q. And how long did you have an A&W store at Britt?

A. We had it for 17 years.

Q. Now, A&W I think is probably pretty well known by everybody. It's a root beer stand; right?

A. Yes.

Q. And when you were in Britt with your A&W store, did you have a drive-up facility?

A. Yes, we did.

Q. And did your attendants wear skates?

A. No.

Q. Okay.
A. No.
Q. Mrs. Formanek, you said, We had a store there. Who besides you had the A&W store?
A. My husband and I.
Q. Your husband's name is what?
A. Allan.
Q. And so approximately during what years did you have your A&W Root Beer store in Britt, Iowa?
A. From 1974 till 1992.
Q. Do you have a family?
A. Yes, we do. We have two daughters.
Q. All right. And where are they?

♀

A. Our youngest is in Phoenix, Arizona, and our oldest is in Minneapolis, Minnesota.
Q. Are you in the root beer business anymore?
A. No.
Q. How long have you been retired from the A&W franchise?
A. Since 1992, yes, 1992.
Q. Okay. When you were living in Britt, Iowa, or working in Britt, Iowa, did you also live in Britt, Iowa?
A. Yes, we did.
Q. And while you lived in Britt, did you know Marvea and Ron Smidt?
A. Yes, we did.
Q. And how did you know them?
A. Well, let's see. I think everybody knew everybody kinda in Britt. That's -- I don't know how we really became acquainted.
Q. Okay. Mrs. Formanek, did you also know their children

including Dustin Honken?
A.    Yes, we did.
Q.    And did you have children of about the same age, or was there any interaction between your children and Marvea's children?
A.    Our youngest daughter graduated with their oldest son, Jeff.
Q.    All right.  Now, you knew Dustin.
A.    Yes.

Q.    And how did you know Dustin?
A.    He used to come into the A&W and have fries with friends, just a -- and pretty soon he filled out an application, and we started employing him.
Q.    Okay.  I'm going to ask you to lean just a little bit more into the microphone there, please.
When did you hire Dustin to work for you at your store?
A.    Actually I think 1984, '85.
Q.    All right.
A.    I'm not really sure but in those years.  Before he graduated anyway.
Q.    Okay.  Before he graduated from high school?
A.    Yes, right.
Q.    And it may be a question that needs no answer, but what kind of work did he do for you there?
A.    He was a cook.
Q.    And tell us a little bit about the menu that he would have been cooking back then working at your store.
A.    A lot of broasted chicken, a lot of French fries,

hamburgers, hot dogs, everything. Lot -- we had a very large menu.

Q. All right. Mrs. Formanek, about how long or how many seasons did he work for you there at the A&W?

A. Actually we're talking 20 years ago, so I think a season

and a half, probably ten months.

Q. Was A&W a seasonal store, in other words, that you would close down during the wintertime?

A. We did, uh-huh. We operated from February till November.

Q. So do you recall when it was or what the reason was that Dustin stopped working for you when he was working for you in Britt?

A. He wanted to go work for his stepfather.

Q. Ron Smidt.

A. Ron Smidt, yes.

Q. Now, I'm going to ask you just a few questions about Dustin's work habits. Was he a good worker for you?

A. He was excellent. We thoroughly enjoyed him. He learned fast. He was neat. He did what we asked him to do. We had no problems with him whatsoever.

Q. Did you have a dress code at your store?

A. Absolutely. We all wore A&W uniforms; plus the cooks always wore hats.

Q. And I take it he abided by those instructions?

A. Very well, uh-huh.

Q. In addition, when he wasn't wearing an A&W Root Beer uniform, was he neat in appearance?

A. Yes, very good.

Q. Punctual in reporting for work?

A. Always.

Q. Did you have any difficulties with him at all working for you, Mrs. Formanek?
A. Not anything that I can recall. He did very well for us, very just a clean-cut, good kid.
Q. In addition to working regular hours at your store, was he willing to pitch in when you needed volunteers to help out?
A. Yes, very much so. If you want to hear an episode?
Q. Sure.
A. One time my husband and I were out of town, and we had a rain, a flood like, and it flooded our basement. So our oldest daughter was running it, Lori, and so Dustin was willingly and very much so helped Lori carry up all our sugar because we made all our root beer, and we're talking 40-pound bags. And I don't know how many it was, but they carried it up just so the sugar wouldn't get wet and dissolved. So she was very thankful for him that night.
Q. When Dustin worked for you, did he ever discuss with you his aspirations for what he wanted to do with his future?
A. Actually I don't know. He always wanted to get something that would make him money. He always wanted to be rich like a typical anybody.
Q. All right. Did he ever talk about buying your store?
A. Oh, yes, uh-huh. Yeah, we discussed that a lot. If I was really tired and -- I would have sold it to him that day, but it never came about.

Q. Now, after Dustin stopped working for you, Mrs. Formanek, did he continue to keep in touch with you, stop by and say hello?
A. Yes, uh-huh, till he graduated, uh-huh.
Q. And after he graduated, did you see him again?
A. We went out to Arizona one time because we always go to Arizona when we had our breaks. And we did go down to Tucson to see him in -- I think it was Hardee's where he worked one time, and I don't think he was there, so we didn't get to see him, but we knew he worked there because we asked. We asked the manager.
MR. SPIES: Mrs. Formanek, I know this visit to Sioux City has been an imposition on you and your family. I appreciate you being here. I don't have any questions. Mr. Williams may have some for you.
THE COURT: Mr. Williams?
MR. WILLIAMS: I have no questions, Your Honor. Thank you.
THE COURT: You may step down.
Ready to call your next witness?
MR. SPIES: Yes. We call Carol Honken to the stand.
CAROL HONKEN, DEFENDANT'S WITNESS, SWORN
THE COURT: Please be seated. Would you state your full name, please, and spell your last name.
THE WITNESS: Uh-huh. Carol Ann Honken, H-o-n-k-e-n.
THE COURT: Thank you.

3541

Mr. Spies?
MR. SPIES: Thank you, Your Honor.
DIRECT EXAMINATION
BY MR. SPIES:

Q. Good afternoon, Mrs. Honken. Miss Honken, could you tell the ladies and gentlemen of the jury where you live and how long you've lived there?
A. Uh-huh. I live in Garner, Iowa, and I've probably lived there 20 -- 26 years probably.
Q. All right. And for the benefit of those of us who are strangers to that part of the state, where is Garner in relation to Mason City?
A. Probably about 25 miles away.
Q. All right. Miss Honken, could you tell us how you're related to Dustin Honken?
A. I was married to Dustin's father.
Q. And during what period of time were you married to Dustin's father?
A. We were married in '77 I believe.
Q. And how long were you and he married?
A. We were married -- we were divorced in '86, so about 8 years.
Q. All right. Miss Honken, are you employed in Garner now?
A. No, I'm employed in Mason.
Q. Okay. And what kind of work do you do, please?

♀

3542

A. I work for Kraft Foods.
Q. Do you have a family?
A. Yes, I do.
Q. And who is in your family?
A. I have three sons and a daughter.
Q. And your daughter's name is?
A. Ann.
Q. All right. And is Ann your daughter with Dustin's father,

Jim Honken?
A. Yes.
Q. When was Ann born?
A. Ann was born in '78.
Q. Okay. Could you tell us, please, Miss Honken, how you and Dustin's father Jim met?
A. We met when I was living in Cherokee and he was -- happened to be down there in the town working at the time.
Q. What kind of work was Jim Honken doing when you met him in Cherokee?
A. I believe he was working out at the mental health. He was the boiler maker and was doing some welding and repair work there.
Q. So this was like a temporary assignment that he had in the Cherokee area?
A. Right.
Q. And where were you working at the time?

♀

A. I was working in a clothing store, Hope's Fashion Farm at the time.
Q. All right. Now, was Mr. Honken unmarried at the time that you met him?
A. Yes.
Q. He had been divorced from his first wife, Marvea?
A. Uh-huh.
Q. You'll have to answer yes.
A. Yes.
Q. Okay. Miss Honken, after you and Jim Honken met, did you strike up a friendship and then start dating?
A. Yeah. Yes, we did.

Q. And when was it again that you and he were married?
A. I believe it was in '77 sometime. I couldn't tell you -- I think it was in October or the end of September I guess it was. Been a lot of years ago.
Q. When you and Mr. Honken got married, where did you live?
A. Well, he was living in Britt, and I had a home in Cherokee, so I stayed there, and I suppose I stayed in Cherokee for a year or a year and a half, and then I moved to Britt, and then we bought a home in Garner.
Q. All right. About how long do you think you lived in Britt approximately before you moved to Garner, Iowa?
A. I don't know if we even lived there a half a year.
Q. Did you get to meet Jim Honken's children?

3544

A. Yes.
Q. And who in his family -- who of his children did you get to meet?
A. I knew all three of the children.
Q. And they again would have been?
A. Would have been Jeff and Alyssa and Dustin.
Q. All right. Did -- at any time did Dustin or Jeff or Alyssa live with you and Jim?
A. No.
Q. They were living with their mother in Britt, Iowa?
A. Right.
Q. Did you know Marvea Honken before she -- before you married Jim Honken?
A. No, I did not.
Q. And when you moved to Britt, did you have occasion to run into Marvea from time to time?

A. I'm sure we probably did through the children. The kids would once in a while come down to the house, yeah.
Q. Okay. Do you remember, Miss Honken, about how old Dustin Honken would have been when you and his dad, Jim, got married?
A. I would say he was probably about nine years old maybe, something like that.
Q. Do you remember Dustin back in those days?
A. Oh, yeah, yeah. He was a good -- he was a great kid.
Q. Could you describe him for us?

♀

3545

A. He was -- him and my -- he was always great to my little -- to Ann, the little one. And he never got into any kind of trouble. I mean, he was just a well-mannered, loving little boy, went to church and Sunday school all the time, and I would say that's probably a mother's dream to have a little boy who never, ever got into trouble. He was a good kid.
Q. Now, Ann would have been born when, Miss Honken?
A. In '78.
Q. All right. I have on the monitor immediately to your right Defendant's Exhibit CO.
A. Uh-huh.
Q. And granted the shadows are a little bit difficult, but could you tell us who is in Defendant's Exhibit CO?
A. Uh-huh. That's my little girl Ann then when she was little, and that's Dustin.
Q. And either from your excellent recollection or by judging of body types, can you tell us about how old Ann is in that picture?
A. Oh, my. She was maybe a year, year and a half old.
Q. Okay. Next, Defendant's Exhibit CO (sic), can you tell us

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3093 of 3636

who's in that picture?
A. Okay. That would be Dustin and Ann.
Q. Is it your recollection that would have been taken in your family home?
A. That was taken in Garner, uh-huh, in our family home.

♀

Q. Did Dustin get to spend any extended periods of time with you and your husband Jim?
A. Once in a while they'd come over, him and Alyssa would come over, and spend the weekend with us, uh-huh. Otherwise a lot of times we'd go and go down to their father's parents' home in Titonka, a lot of times on a Sunday, and we'd spend the afternoon with the kids and have dinner with his parents.
Q. Miss Honken, I'm going to ask you some questions about your marriage relationship with Jim; okay?
A. Uh-huh.
Q. Were there substance abuse problems or alcohol abuse problems in your marriage with Jim?
A. Yes.
Q. And could you tell us a little bit about that, please?
A. Well, when we first met, he did drink a lot, but I guess I never realized he was a total alcoholic. When Ann was probably four or five years old, he quit working, said he hurt his back, he didn't want to work anymore. I went and got a job down in Belmond at Eaton Corporation. And I was working 7 days a week, 12 hours a day.

We did sell our one home, and we bought another home, but he continued not to work. He said he put in a bunch of applications, but he really never did. And he was more or less staying home taking care of Ann at that time.

And this went on for quite a few years, and the

drinking kept getting worse. He would be fine until I would go to work, and then he would drink, and he would hide bottles all over the house, you know. And it got so bad that working 10 to 12 hours a day, I -- I just couldn't take not knowing what was going on with my daughter, so finally one night -- and I was working second shift where I would get home like two, three o'clock in the morning -- one of Ann's friends -- she was gone to her house to play with her little daughter. And when she brought Ann back, her dad was drunk, and so she picked up Ann and took her back home again and called me to tell me what was going on. So then when I got home the next day, I just -- I told him I could not live like this. I just told him to get out, and that was it.

Q. He left.

A. He left.

Q. Did Dustin's father describe for you the way he felt about the break-up of his first marriage to Marvea? Was that difficult for him?

A. I think it was very difficult for him. In fact, I don't think he ever quit loving his wife, and I know he loved his children dearly. Sometimes I wonder why he really married me. I don't know whether it was because I had a lot of money at the time, but he could not get over this. It's like even when his children came every weekend, he dwelled on it, of what happened to their marriage.

Q. Did he dwell on it in front of the children when they were

visiting?

A. Yeah, he would, but he never talked back -- I mean bad about their mother that I can recall. But I think he just -- he could not handle it mentally, and I think he drank himself to the point -- he just kept drinking.

Q. So when this drinking became a problem, you left Jim Honken in about what year?

A. It was probably during -- probably '85 I think. It's been a lot -- about '85 I believe. We were divorced in '86.

Q. What happened to Jim Honken after you left him?

A. He had -- I really don't know what he did. He had a bunch of buildings that he'd bought from the bank, and I know he'd go down there and sit and get drunk all the time. I know he got himself into trouble.

Q. In what way?

A. He went out and robbed a bank, couple banks really.

Q. The bank in Britt?

A. Yeah. He denies that ever happened, but yeah, the bank in Britt and then the one in Missouri or somewhere.

Q. Okay. Did you maintain any relationship with him after you left him?

A. When he was in prison, no. When he got out of prison, him and his daughter talked, and I talked to him, I mean, just as this man is my daughter's father, that's it. I do see him once

in a while now. He takes care of his grandchildren because they're at my home, so he does come up and see the grandkids and that, but that's as far as it goes.

Q. Miss Honken, was -- were the difficulties that Jim Honken had with drinking and his difficulties with the law, was that a

strain on your daughter Ann?
A. Oh, yes. Oh, yeah.
Q. In what way?
A. When -- she was little when all this happened, and some of it happened which we didn't even know about. It's like when he was on the run and loose and they captured him, the law didn't even tell Ann and I that he was caught. In fact, we were sitting having dinner, and it came over the TV set. Ann was devastated. I mean, it was like a total shock. She didn't want to go to school. She didn't want to do anything. The kids at school never let her forget it her whole life.
Q. They teased her.
A. Oh, yeah, horrid, yeah, yeah. She's the bank robber's daughter, you know. Oh, yeah.
Q. Was this a difficulty for Dustin too?
A. I'm sure it probably was, had to be. I know what my daughter went through. She -- to this day she hates it. I mean, she moved to Florida. She will never come back here and live, ever.
MR. SPIES: Miss Honken, thank you. I have no other

3550

questions for you. Mr. Williams may have some questions for you.
THE COURT: Mr. Williams?
MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:
Q. Good afternoon, Miss Honken. How old was your daughter at the time that Jim Honken was arrested for this bank robbery?
A. She was about seven or eight.

Q. All right. At that time, at the time of that bank robbery in 1986, Dustin Honken had already graduated from high school; isn't that right?
A. I'm not sure, but I would say probably had, yeah.
Q. Okay. Your daughter, what's she do now?
A. She works as a beautician in Florida.
Q. Okay. She's not been convicted of murdering five people, has she?
A. No.
Q. The bank that Jim Honken robbed in Britt, Iowa, that was the one that Marvea Smidt worked for; is that right?
A. Yes.
Q. Prior to this bank robbery conviction in 1986 and, frankly, prior to 1986, Jim Honken had never been convicted of any other crime, not even a misdemeanor crime, had he?
A. Not that I know of.

♀

3551

Q. Okay. It wasn't until 1986 that he gets convicted of any crime; is that right?
A. Yep.
Q. And it was in 1982 that he had his injury, work-related injury, that really started him down the road to drinking heavily; isn't that fair to say?
A. I think he drank before that, but I think it was all an excuse. I don't really think there was an injury.
Q. Okay. And your testimony was that Dustin never, ever got into trouble.
A. Not that I know of.

MR. WILLIAMS: I have nothing else.

THE COURT: Mr. Spies, anything further?

MR. SPIES: I have no other questions of this witness, Your Honor. Thank you.

THE COURT: You may step down.

Mr. Spies, ready to call your next witness?

MR. SPIES: Yes. Call Dave Honken to the stand.

DAVID HONKEN, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box there. Make yourself comfortable. You can adjust the chair so you can speak directly into the microphones. And when you're ready, would you state your full name, please.

THE WITNESS: My name is David Honken, H-o-n-k-e-n. I live in De Soto, Wisconsin.

♀

THE COURT: Mr. Spies?

MR. SPIES: Thank you.

DIRECT EXAMINATION

BY MR. SPIES:

Q. Mr. Honken, where is De Soto, Wisconsin?

A. It's just across the Mississippi River from Lansing, Iowa.

Q. Up in the northeast corner of Iowa across the river from there?

A. Yes.

Q. Mr. Honken, can you tell the ladies and gentlemen of the jury how you're related to Dustin Honken?

A. His dad is my brother. He would be my nephew.

Q. So Jim Honken is your brother?

A. Yes.

Q. Mr. Honken, could you tell us, please, how long you've lived in De Soto, Iowa (sic), and tell us a little bit about your family?

A. I've kind of retired in De Soto. My wife is from just real close there, and we decided to live by her relatives for a while. I moved there in 1994 permanently. We did have a place on the river before that, but we decided to move up permanently in about '94.
Q. Where did you live before you moved to De Soto, Iowa?
A. I lived in Hudson, Iowa. Before that we lived in Clear Lake, Iowa, for a while and in Waukee, Iowa. I kind of moved

around --
Q. Okay.
A. -- in my job.
Q. What type of business do you have, Mr. Honken?
A. I start -- I originally worked for a supermarket chain and then started in the convenience store business, and we had some convenience stores in Iowa and South Dakota.
Q. What were the name of your stores?
A. Pronto stores.
Q. Are you in the Pronto business now?
A. Yes. We've got one store that we built in Wisconsin in De Soto for my -- kind of built it for my daughter.
Q. Okay. And are you actively involved in managing or running any stores right now yourself?
A. Yes. I still do some consulting work in Iowa, buying and selling some stores for Krause Gentle and Casey's stores and some independents.
Q. Mr. Honken, you've told us you have a daughter. Do you have any other members in your immediate family?
A. I've got two boys and two girls.
Q. And a wife?

A. And a -- excuse me, a wife, yes.

Q. Didn't want to forget that. Mr. Honken, could you tell us, please, where did you and your brother Jim grow up?

A. We grew up in Titonka, Iowa. I left right after high

school to go join the Army, so I was gone kind of right out of high school and just never came back.

Q. All right. Mr. Honken, how much younger or older is your brother Jim from you?

A. He's one year younger.

Q. Now, I'm going to ask you some questions, Mr. Honken, about your family. Where did your mom and dad make their home?

A. Titonka.

Q. And are they still living?

A. No, they're both dead.

Q. Do you have any relatives in the Titonka area any longer?

A. Some in the Buffalo Center area and Lake Mills area and Forest City area.

Q. Okay. Mr. Honken, you left home then in about what year?

A. I got out of the Army -- I joined the Army in '54 and got out in '57, and I guess '54 I left the Titonka area.

Q. Was your brother still at home then?

A. Yes, he was. He was still in high school.

Q. Okay. And what became of your brother after high school?

A. He joined the Army about two years after I did I guess.

Q. What became of him, and where did he go?

A. He -- when he was in service, he served in Germany, and then when he came back, he lived in the Britt and Algona areas for most all the time.

Q. Now, we know I think from other evidence in this case that

in about 1960 your brother Jim married Marvea Hamilton.
A. Yes.
Q. Do you remember that event?
A. Yes.
Q. Were you there?
A. No, we weren't there.
Q. Okay.
A. But we -- we were kind of surprised that they didn't invite us but . . .
Q. All right. Did you come to have a relationship with your brother Jim and his wife Marvea?
A. Yes. We would get together at Christmas, and Marvea would invite us up at Thanksgiving. She was a good cook. So we would come to their place Thanksgiving and two or three times a year.
Q. Was drinking a problem for your brother?
A. Major.
Q. Could you describe that for the ladies and gentlemen of the jury, please?
A. Well, my folks were nondrinkers, and my dad said he stopped at his place one time and he said, you know, James was backing up to the door of his house with a pickup load of beer. And I said, Well, that sounds about right. But he just drank all the time.
Q. What do you mean by all the time?
A. Well, I guess I couldn't say at work because I didn't know.

3556

He worked away from home quite a bit, but on the weekends I

think he drank a lot, I mean, just all day long, just -- he'd get sober enough to go back to work I think.
Q. Did you observe that that was hard on his family?
A. Oh, major problem for the family.
Q. How so?
A. Well, he was always -- when he was drinking, he would get real surly and get tough with people, me and our family and just ornery.
Q. When Jim was drinking, Jim Honken was drinking, did he boast about his accomplishments in life?
A. He always bragged about how much more money he made than I did, and I just kind of kept quiet about it, but it was always, Boy, I'm making this kinda money; I can do this; I can do that, I guess till he got in jail. And then after that he came out, he kind of quit the bragging, but he still drank until he had the health problems. Then he quit -- I think he quit drinking.
Q. Okay. Was he free with his spending of his money?
A. Threw it away so there was nothing left.
Q. Did money become a problem in his marriage?
A. I'm not sure. It probably did.
Q. Did Mr. -- did Jim Honken have problems with fires around his house?
A. I think there was several fires, and when I would talk to him, he'd say, Hey, guess what happened? He said, My car burnt

♀

3557

up. It just happened he said, and it was stuff like that. He would never say anything happened, I mean, he did it or anything. He said, It just started on fire, and that's the way a house did and I think some other stuff, or he would pick up merchandise -- he would come with merchandise that was stolen,

and he would try to leave it at my parents' place, and they'd say, Don't bring that stuff around here. So he'd haul it off then, but a lot of that.
Q. Was that an embarrassment to you?
A. (Witness nodded head.) And my dad was really -- he says, Get that stuff out of here; I don't even want to see it.
Q. Mr. Honken, did you know Jim's children?
A. Oh, yes.
Q. And did you get to spend much time with them? I know you got together on holidays.
A. There was not a lot of time, but my kids were a little older, but they got along real well. They were all pleasant, friendly, no fighting or -- it was just a real -- no arguing or anything. It was a real nice get-together.
Q. Was your brother Jim a story teller?
A. He told a lot of stories, mostly bragging, so I would take it with a grain of salt and say maybe it happened, maybe it didn't happen, but it was that way a lot.
Q. Mr. Honken, what was your brother's attitude toward positions of authority, people in authority?

3558

A. He thought all sheriffs and policemen and judges and attorneys were all crooks. They were all out to get his money -- he thought he had money -- but get his money or put him in jail or put somebody in jail. They were all -- would do anything to get him put away.
Q. How long did that attitude persist?
A. To this day.
Q. Did you know -- you mentioned that you knew Marvea, his wife.

A. Yes.
Q. And that she was a good cook. Describe Marvea for us when you would visit the family home.
A. Well, actually my family liked her better than they did him. I mean, he was -- I guess he -- I didn't hear this now, but my wife told me that he did threaten a couple of my kids and me, but I just took it with a grain of salt because I knew it was just talk.
Q. Was it uncomfortable, though, for you to stop at his home?
A. I was afraid to stop because one time I'd stopped, and his house is probably 30 feet from the road that I had to come over to western Iowa on, and he would see me drive by, so a couple of times I said, I better stop. One time at night I stopped, and I just -- he was eating chili, and I just happened to walk around the table, and I looked at his face, and it was all beat up. I said, My God, what happened to you? And he said, Oh, I beat the

crap out of some guy. I says, Well, it don't look like it to me. And I said, You know, your personality really changes when you've been drinking. He said, Yeah, I know it. He said, I really get to be a nice guy when I'm drinking. I says, I think you got that backwards.
Q. Do you continue to see your brother today?
A. He came last year at my grandson's graduation from high school, and that was the last time I've seen him. I do call or he calls maybe every two weeks.
Q. Now, did you know Dustin as a young man?
A. Yes, not real well but just heard about him and that he was doing real well in school, and all our kids liked him.
Q. So you would see him at family gatherings?

A. Yeah.

Q. Did you meet any of Dustin's children?

A. No. I've just seen them at Alyssa's wedding.

Q. Okay. And he had his children with them?

A. Yes.

Q. Mr. Honken, is it difficult for you to talk about your brother?

A. Well, I did tell him, I said, I'm going to talk about you, just in case. He could be a problem. So I warned him it was coming.

MR. SPIES: All right. Mr. Honken, I have no other questions for you. Mr. Williams seated here may have some

questions for you.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Just a couple questions. Mr. Honken, in 1986, your brother Jim was kind of at the lowest point of his life; isn't that fair to say?

A. I would say so.

Q. He had been injured in 1982, and so he was on disability and without a job.

A. Yes.

Q. His drinking had increased.

A. Yes.

Q. His wife had just left him in 1986.

A. Yes.

Q. Didn't really have a home at that point; right?

A. No.

Q. Pretty vulnerable state in his life, wasn't it?

A. Yes.

MR. WILLIAMS: I have nothing further.

THE COURT: Mr. Spies, anything further for Mr. Honken?

MR. SPIES: Nothing else for Mr. Honken. Thank you, sir.

♀

THE COURT: You're excused. Thank you.

MR. SPIES: May we have a stretch break, Your Honor, to check outside?

THE COURT: Yes. Thank you. Members of the jury, why don't you take a stretch break.

MR. SPIES: Defense calls Sonny Onoo.

SONNY ONOO, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated there in the witness box. Make yourself comfortable. And try and adjust the chair so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name.

THE WITNESS: It's -- my legal name is K-a-z-u-o, Sonny, S-o-n-n-y, Onoo, O-n-o-o.

THE COURT: Thank you.

DIRECT EXAMINATION

BY MR. SPIES:

Q. Mr. Onoo, I'm going to ask you to move just a little bit closer to the microphones there, please. Thank you.

Mr. Onoo, please tell us where you live and what you do for a living.

A. I live in Mason City, Iowa. I still work as a consultant for a couple of Japanese business, and currently I have my own car dealership.
Q. Okay. And how long have you lived in the Mason City area,

Mr. Onoo?
A. About 30 years.
Q. And could you tell the ladies and gentlemen of the jury where you grew up and what got you to Mason City, Iowa.
A. I'm originally from Tokyo, Japan, and my family moved to United States when I was about 11. I had opportunity to come to -- as a foolish young man down to Albert Lea, Minnesota, to follow a girlfriend and liked it down here and decided to find a job and stay down here, and my involvement in martial arts led me to stay in Mason City.
Q. Now, Albert Lea, Minnesota, is right across the border from Iowa?
A. Yes, sir.
Q. Okay. And you moved to Albert Lea to follow a friend?
A. Yes.
Q. And tell us what you did in Albert Lea.
A. I worked as -- I got a job as -- actually in Bricelyn, Minnesota. My friends' parents owned a construction company called Jacobson Construction. They built grain elevators which I had no idea what that was. I got a job doing that and quickly learned what grain elevator was.
Q. Okay. And, Mr. Onoo, did you have any other skills besides construction when you lived in Minnesota?
A. Yes. I was -- from Japan, I always study karate and various martial arts, and I started -- had opportunity to start

teaching at the Albert Lea YMCA. This is in early '70s, and I had a couple of karate students that was a police officer and in law enforcement, and I got a job working with a lot of law enforcement officers.

Q. So you became something of a consultant to what? The Albert Lea Police Department?

A. One of my students was -- which I didn't know, he was a police officer named Officer Harris, and he did something to impress the captains and the chief in one of the incident that happened in Albert Lea, and they contact me shortly after that, and I got opportunity to teach Albert Lea Police Department as their tactical instructor.

Q. So is this a part-time sort of job that you had with the Albert Lea Police Department?

A. Yes, and consequently, you know, I always worked with law enforcement officers including Iowa state troopers and that type of thing so . . .

Q. So where did you go from there with your martial arts skills?

A. Some of you guys remember, but back in the early '70s when Bruce Lee thing was really big there was all --

Q. Bruce Lee, the movie star.

A. Right. All of a sudden there was a big demand for martial arts schools and that type of thing, and I had opportunity to open a club in Mason City, Iowa, and then from there I actually

3564

ran a karate school/health club type of business from like '74 to recently as probably about 10 years ago.

Q. Okay. And tell us about how you went about setting up a school for martial arts in Mason City.

A. Well, we were asked by YMCA in Mason City, Iowa, because we already had a club in Albert Lea, Minnesota, YMCA, and from that actually evolved into, you know, renting a property and having a regular karate school where I commuted from Albert Lea to Mason City for a period of probably about a year and a half or so.

Then I moved to Mason City. And, you know, as a young man, I was -- wanted to pursue my career, if there is such a thing, in martial arts. All I wanted to do was teach karate during the week and be able to earn enough money so I can live and go to karate tournament on weekends.

Q. So you were a competitive marshal artist as well.

A. Yes.

Q. Tell us a little bit about your career in competition.

A. From 1975 to 1987 I was a bantam weight, number one in bantam weight in what they call Professional Karate Association which is budding kickboxing league, and I did fairly well at that and won a few world championship and other form of competition where there's like three or four different kind of competition. One's called a form where you perform a pattern of movements, and other one's actually fighting, and there's a couple of different form of fighting, and every one of those I

3565

did fairly well.

Q. How long did you stay in competition?

A. Really it was about ten years ago.

Q. Then what happened?

A. The healing didn't happen as fast so . . .

Q. Mr. Onoo, in addition to competing and teaching, did you

also have a career in the entertainment industry?

A. It's one of those things that the martial arts has led me to many different avenue including teaching the police officers and law enforcement officers as well as being able to -- because my marshal art training, one of the -- a friend of mine I used to compete on the road with, his name was Eric Bichoff, and he became the president of World Championship Wrestling which is a division of Turner Sports, I guess now a division of AOL/Time Warner.

But one day he asked me to go to Japan because he was doing some business there, and he knew I spoke English and Japanese, so I went with him, and I got hired by them as a consultant. And then part of the deal was to bring all these Japanese wrestlers to United States to put on their television shows, and unfortunately none of them spoke English, so I became the evil Japanese wrestler manager.

Q. Okay. I take it you don't have that career anymore.

A. Time to time I still get a call to portray that character, especially in Japan where I'm also hated there.

♀

Q. Mr. Onoo, I want to go back now to your career teaching martial arts in Mason City; okay?

A. Yes. Okay.

Q. Tell us what your philosophy was as a teacher of martial arts when you were in Mason City teaching.

A. Well, one of the most important thing was we taught a lot of kids, and, you know, most important thing was -- because there was a misconnotation with a lot of parents about teaching kids how to fight, and that's not what we did, although it was part of it, but it was more of self-defense when it comes

fighting.

And what we did, most important thing we try to teach in a karate program was to self-discipline, and we had many rules in class that in order for you to reach higher level you had to have -- we wanted to make sure the kids knew that school was most important thing and this was extra, and so they would have to have a B average in schools, and so there was many rules like that that -- and if there was any fighting outside of school, they would -- unless, you know, that they can tell us they were defending themself, they were automatically dismissed from class.

Q. So your students had to meet some academic requirements in addition to not misbehaving by fighting outside of class.

A. We definitely got two different type of kids. Parents were bringing troubled kids, or parents were bringing kids with, you

know, lot of low self-esteem and try to give them self-confidence. Those are two different type of children we probably taught more than anybody else.

Q. Was one of your students Dustin Honken?

A. Yes.

Q. And do you remember approximately when it was that Dustin was a student of yours?

A. Well, you know, I didn't -- I think it was in '80s. You know, mid to early '80s I think.

Q. So Mr. -- Dustin Honken would have still been in school then?

A. Yeah. I do remember him and his mother coming in to sign up for class and not much more than that.

Q. Okay. Was -- how long was Dustin a student of yours?

A. You know, I think it's between two, three years that he participated. I mean, he -- I think he was teenager, and I do remember him getting taller than me so . . .

Q. Okay. Mr. Onoo, I understand that there are different grades or different levels of achievement in karate; am I right?

A. Yes, sir.

Q. And as students gain more proficiency in the martial arts, do they get a different color belt?

A. Correct.

Q. And would that be the same as students of yours?

A. Yes.

Q. Okay. And do you remember whether Dustin Honken developed some proficiency in the martial arts?

A. Yes.

Q. And do you remember today how far he progressed?

A. I know he made green belt which is probably about mid-level. The belt goes white, yellow, orange, green, blue, then purple, so I'm not sure he made purple belt, but I do remember -- matter of fact, I think I might have seen a photo of him and I, and it was him with a green belt on.

Q. Do you remember him -- was he a good student?

A. Yeah, he was quiet, you know.

Q. Shy?

A. Yeah, I think he had a hard time making eye contacts, at least certainly at the beginning, you know. I don't know if you would say shy, but a lot of kids are pretty quiet I think.

Q. Okay. And did he seem to be there for the right reasons, that is, to develop skills, self-confidence?

A. Yeah. If you ask me if he was there for which of those two

kids I described earlier, he would probably be the shy and quiet one that probably needed some -- you know, he was pretty skinny kid.

Q. Now, without getting into too many of the particulars of what you would teach, one of the skills you taught was fighting?

A. Yes.

Q. And describe how fighting played a part in your classes in

the instruction that you gave.

A. Well, there's two different type of thing. We taught -- self-defense was one -- if you say, you know, self-defense is one part, and self-defense generally is what to do when someone grabs you or attacking you, so it's not offensive part that you, you know, you -- the actual technique itself.

When you refer to other part of fighting, it's actually sports part of fighting where the person wear pads and some of the Olympic now they have them; they wear pads, and it's controlled blows so it's not -- it's not to hurt the other person. It's almost like what they would do with fencing. It's actually technique and scoring of the blows.

Q. Okay.

A. It's very well controlled. A lot of the divisions allow head contacts, and the blow has to be controlled. If there's any malicious intent or anything like that, the person will get disqualified.

Q. Was Dustin aggressive in class?

A. No, no. He was probably pretty average, you know.

Q. Tell us about his appearance. Was he -- did he take good care of himself personally?

A. Yeah, yeah. He was -- you know, obviously one of the

requirements, we had a set of rules, and they had to have a clean uniform, and your uniform had to be clean, and they wear white. Some of you guys know what they look like, but they look

like white pajamas so they could move around easily. And he was always neat in appearance.

Q. Now, when you had this class, did you have students of different ages together in the same building?

A. Yes.

Q. Was Dustin helpful with younger students of yours?

A. Yeah. When they achieve, you know, mid-level, they would always help me out when there's a new student that will come in. I mean, the class is divided up. It's beginner, intermediate, and advanced. And many of the intermediate and advance class students would sometime come earlier and help out the beginners.

Q. Now, when Dustin stopped taking classes from you, did you continue to have any kind of relationship with him?

A. Not really, but he would stop in once in a while, and, you know, I don't really recall what we would talk about but since -- I was always a car nut, though. That's why I'm in the car business now, and I think he had a lot of interest in that as well.

Q. Did you ever meet his father?

A. No, I don't think so.

Q. Okay. I'm going to surprise you, Mr. Onoo. I'm going to ask you to look at the monitor on your right, just to your right side next to your right arm.

A. Oh, okay.

Q. I'm going to ask you if you recognize the people portrayed

in that photograph.
A. I'm not sure that's me.
Q. No. I've been told today that that is not you, but I wonder if you recognized the person standing next to Dustin Honken.
A. I don't know who that is. I don't recall taking the picture, so I don't know if that's me or not.
Q. It wasn't the evil Japanese wrestler, though?
A. No, he wore dark glasses and had a colorful suit.
Q. Would that be similar to the garb Dustin would have worn in your class, or would he have worn a white dobak?
A. Yeah, Korean calls it dobak, and Japanese calls it Gi.
MR. SPIES: All right. Mr. Onoo, thank you. I appreciate your time with me today, and that's all the questions I have. Mr. Williams may have some questions for you.
THE WITNESS: Okay.
THE COURT: Mr. Williams.

CROSS-EXAMINATION

BY MR. WILLIAMS:
Q. Good afternoon, sir. How are you doing?
A. Pretty good.
Q. Good. One of the things you teach in karate on the defense side is the ability to disarm people; is that correct?
A. Yes.
Q. And that's a technique that you would have taught to Dustin

3572

Honken back in the 1980s.
A. You know, I don't know if we ever got into the level where

we would use weapons or that advance . . .

Q. Is it fair to say that as you were describing the principles and the philosophy of karate earlier it is one of self-defense or sport; is that correct?

A. Yes, sir.

Q. The goals are not to teach students to use force offensively.

A. Correct.

Q. Is that fair to say?

A. Yes, sir.

Q. And indeed the principle of karate and all martial arts is one of discipline to be using force only in self-defense.

A. Yes, sir.

Q. And never against the defenseless.

A. Never.

MR. WILLIAMS: Nothing further, Your Honor.

THE COURT: Mr. Spies, anything further?

MR. SPIES: No other questions. Thank you, Mr. Onoo.

THE COURT: You may step down. Thank you.

THE WITNESS: Thank you, sir.

THE COURT: Ready to call your next witness?

MR. SPIES: I think our next witness is from Eldora, Iowa, Your Honor. She may be downstairs. If we can take a

3573

quick break --

THE COURT: Are you talking like a 25-minute break?

MR. SPIES: No. Five or ten minutes.

THE COURT: Okay. Well -- okay. Why don't we take a ten-minute recess. Thank you.

(The jury exited courtroom.)

THE COURT: Thank you.

(Recess at 1:40 p.m.)

THE COURT: I understand we're out of witnesses, so I'm just going to bring the jury back in and say that we're out of witnesses and we'll start tomorrow at nine.

MR. WILLIAMS: Very good.

THE COURT: Okay?

MR. SPIES: Thank you, Your Honor.

THE COURT: Okay.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Members of the jury, that's actually going to conclude the evidence for today. The government's witnesses just went a whole lot faster than anybody anticipated, and so we've gone through what witnesses we have scheduled, so we're going to bring you back tomorrow morning at nine -- I guess you like coming in at nine because that's what you picked for your deliberations, so we'll see you tomorrow morning at nine o'clock.

♀

Please remember my cautionary instruction: Keep an open mind until you've heard all of the penalty evidence in the case, received my final instructions, had an opportunity to hear the closing arguments of the lawyers, go back to the jury room, receive the penalty phase exhibits and the other exhibits, and begin your deliberations. So it's very important you keep an open mind until all of that happens. Don't talk to anybody about the case or let anybody talk to you about the case, and we'll see you tomorrow morning at nine o'clock. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated. Are there any other matters we need to take up? I guess I'd like to talk about the scheduling of the remainder of the case. By my count the defense has five more witnesses. Would that be right, Mr. Spies?

MR. SPIES: Four or five, yes.

THE COURT: Four or five? And when do you estimate that you would be done with your witnesses?

MR. SPIES: I expect that we will be done early to mid-afternoon, perhaps late morning, but I'm speculating.

THE COURT: Okay. And how long do you think the closing arguments would be?

MR. SPIES: I don't think they're going to be very long, Your Honor. I think that the jury's pretty perceptive of the issues and where they need to go. So my intention is to not

3575

be very long.

MR. WILLIAMS: I was thinking about four and a half hours -- no. I think I'll be --

THE COURT: That's in the rebuttal part of your argument; right?

MR. WILLIAMS: Oh yeah, absolutely. No, I think I'm going to be maybe 20 minutes.

THE COURT: Are you going to be prepared to argue it tomorrow?

MR. WILLIAMS: I'm sorry?

THE COURT: Are you going to be prepared to argue tomorrow?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Because it doesn't sound like it's going

to take that long.

MR. WILLIAMS: No. It all depends really on what they put on tomorrow. We may have a rebuttal case. We'll have to see what they put on tomorrow, and that may take us through the rest of the day tomorrow, but I'll be prepared to do the closing arguments tomorrow if it moves as fast as today moved.

THE COURT: Mr. Spies?

MR. SPIES: I'll be prepared.

THE COURT: Okay. Why don't we just wait and see where we are tomorrow. We haven't really rushed anything. No point rushing it, but if we can get the arguments in, I think we

should.

Mr. Rogers, I think you were about to say something.

MR. ROGERS: I don't think you have officially on the record ruled on the government's motion in limine to preclude Mr. Honken from exercising allocution. Is that correct?

THE COURT: Well, that's correct, I haven't -- in one respect it's moot unless you indicate that that's what he's going to do.

MR. ROGERS: My understanding of the way we left it was that we had indicated that he wished to do so and you had indicated that you were going to probably grant their motion but you wanted to give us a chance to object on the record. Am I wrong about that?

THE COURT: Well, I think you're right about the last part which is the most important part, and that is I'm going to give you full opportunity to object on the record. But I wasn't sure you ever told me whether he was going to or not going to. But I did indicate that based on the split in the law -- I think

the Fourth Circuit and the Fifth Circuit said there is no right of allocution. The only case I believe that held that there is one is the district court, Judge Kay, from the federal district court in Hawaii.

MR. ROGERS: That is the case I have in front of me, Your Honor.

THE COURT: I'm the one that gave it to you as I

recall.

MR. ROGERS: Right. United States versus Chong, 104 Fed. Supp. 2d 1232. And I would indicate to the Court at this time that Mr. Honken has indicated a desire to exercise his right to allocution. I don't know that that's a final irrevocable decision, but I don't know that it has to be for you to rule on the government's motion.

THE COURT: Okay. Yeah. I think that's sufficient to require a ruling on the government's motion. For the reasons I indicated informally off the record, I'm more persuaded by the Fourth and Fifth Circuits than I am by Judge Kay, and so the government's motion in limine is granted.

MR. ROGERS: And our objection, just for the record, Your Honor, is that not only does it deny Mr. Honken his constitutional right to allocution if there is such a thing, but he also -- it also denies him his statutory right to allocution. And as posed in the government's motion, they are requiring him to -- in order to exercise his statutory right to allocution to waive his constitutional right to remain silent and not be subject to cross-examination, and we think that's an impermissible Hobson's choice and it violates his due process rights as well as his Eighth Amendment rights and, as I say, the

statutory right to allocution.

THE COURT: Well, all I'm ruling on is that there is no right to allocution. He's still free to be sworn and testify

if he would like to.

MR. ROGERS: I understand that.

THE COURT: Yeah. But I just wanted to make sure you understood that. I assumed that you did.

MR. ROGERS: Yes, sir. Thank you.

THE COURT: Okay. What about making -- I'm sorry. Mr. Williams?

MR. WILLIAMS: You were going the same place I think I was going. We might as well make a record at some point -- and I don't care when we do -- on the final instructions so that we're prepared to go if that becomes an issue tomorrow. And just so I could get a ruling from the Court -- obviously I'll do whatever you tell me to do -- but on whether the government will have an opportunity for a rebuttal closing argument because obviously that will impact how I'll structure my argument.

THE COURT: And that was the decision you cited at 74 Fed. Supp. 930?

MR. WILLIAMS: I don't have the cite in front of me right now I'm afraid. I took that downstairs.

THE COURT: Okay. Let me -- I haven't had a chance to look at it.

Who wants to make the argument for the defense? Mr. Spies or Mr. Rogers or . . .

MR. ROGERS: Your Honor, I can save the necessity of an argument. I have reviewed once again Title 21 section 848,

and in section 848(j), it does indicate that the government shall be permitted to reply in rebuttal to the defense's closing argument in the penalty phase, so I don't think it's an issue.

THE COURT: Okay. Thank you. Would you agree it's not an issue?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. What about the record on the final instructions? You want to take a short break and then do that?

MR. WILLIAMS: Certainly.

THE COURT: Mr. Rogers, are you ready? I mean, it's primarily your objections as I recall.

MR. ROGERS: Yes, and I can be ready after like a five-minute break.

THE COURT: Okay. Why don't we take a 15-minute break and then come back and make the record on the final instructions; okay?

MR. ROGERS: That's fine.

THE COURT: Okay. Thank you. We'll be in recess.

(Recess at 2 p.m.)

THE COURT: Okay. You ready to make your record on the final instructions?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Does the government have any objections to the final instructions?

MR. WILLIAMS: No, Your Honor.

3580

THE COURT: Mr. Rogers?

MR. ROGERS: Yes, Your Honor, and these will be very familiar from this morning's discussion of the preliminary

instructions.

With regard to final penalty phase instruction number 2 on page 17, 17 and 18, we object to the use of the term "aggravating factors" in describing the eligibility factors set forth in Title 21 section 848(n) with regard to the mental states required under Enmund versus Florida and Tison versus Arizona for the same reasons we stated this morning. I can just, I think, incorporate that argument by reference, and the word "aggravating" appears several places in instruction number 2. It also appears in instruction number 6 on page 28.

The weighing instruction tells them to weigh step 1 aggravating factors. We object to that for the reasons we set forth this morning.

Also on the verdict form, pages 2 and 3 also refer to those eligibility factors as aggravating factors, and we object to that language as well.

If I've left anything out, I would object every time that the step 1 eligibility factors are called aggravating factors or anything that refers to weighing them as aggravating factors for the reasons set forth this morning.

The other objection we have, Your Honor, is with regard to instruction number 4 on page 23 continuing over to

page 24. We object to the second numbered aggravating factor, that of obstruction of justice by killing witnesses, for the reasons we also set forth this morning which I would just incorporate those arguments at this time.

And I'd also object to the inclusion of that nonstatutory aggravating factor on page 4 of the verdict form.

Those are the only objections we have to the final

penalty phase instructions, Your Honor, and specifically do not have an objection to the final sentence that was added on to the final penalty phase instruction number 8.

THE COURT: Do you anticipate any changes in the 15 mitigating factors identified on pages 25, 26, and 27?

MR. ROGERS: I don't believe so, Your Honor. And I realize that if we do we better come up with them pretty soon. But I don't believe we will have any more.

THE COURT: Okay. Any other record you'd like to make on the instructions?

MR. ROGERS: No, Your Honor. Thank you.

THE COURT: Okay. Thank you. Those objections are overruled.

Government have any other record you want to make on the instructions?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Okay. Is there anything else that we need to talk about?

♀

3582

MR. WILLIAMS: Your Honor, only a minor scheduling matter. I didn't know if the Court was going to allow the same time frame after the jury announces a verdict for family members to travel to hear the verdict or not. And if the Court was inclined to do that, it turns out that it took a little bit more time than what we anticipated for people to get here. We had a couple family members miss the last verdict. We had three of them get tickets on the way over here trying to get here in time. And so if the Court's inclined to do that, we'd just ask that maybe it be moved to four and a half hours from the time the verdict comes in to allow family members to get over here.

THE COURT: Hmm.

MR. PARRISH: Let me -- let me weigh in on that just a second. Have you ever thought of the idea of -- we're just talking out loud here; right?

THE COURT: Right.

MR. PARRISH: -- waiting -- having the family wait somewhere depending on the time the jury would start their deliberation? And if they would go home at a particular time, they would know, and they could either go home and maybe come back or something like that that next morning. That might alleviate a little bit of the problem. Just thinking out loud there.

MR. WILLIAMS: Yeah, and that's a good idea. Let me explore that with the family just briefly tonight. I suppose it

does matter when they get the verdict -- or when they get the case to deliberate, what time of day.

The other problem we run into is we're running out of victim witness funds for housing these folks, and they're doubling up at this point. So to the extent that we can send them home and save that money, we're going to try to do that.

But let me talk with them, Judge, and I can get back to you on at least what our thoughts are tomorrow morning. But the family understands the difficulty, and we told them from the beginning that, you know, it may not be the case that they can have that kind of notice, and they obviously will do with whatever the Court's decision is on this.

THE COURT: Okay. I also want to try and get to that meeting in Minnesota Monday -- I'm sorry, Thursday afternoon, but I recognize that the timing of all this may preclude that.

What about the actual sentencing, because as I understand it, the jury's recommendation on these ten counts would be a mandatory recommendation? So on these ten counts, I must sentence the defendant pursuant to the jury verdict and the verdict form. Are you thinking that I would just immediately give the defendant his right of allocution and then go ahead and sentence him pursuant to the verdict form? And what about the other seven counts that aren't the subject of the penalty phase?

MR. WILLIAMS: I thought about that last night. Actually the first five counts are also mandatory life, so it's

not like there's going to have to be a presentence investigation report done or any calculations done on that.

THE COURT: What about 6 and 7?

MR. WILLIAMS: Six and seven there would be. Now, there's a couple different ways of dealing with that. One is to not have any sentencing hearing on it recognizing that the other counts will dictate what the sentence is. If there's some error, if the case is returned down after appeal, then that's something that could be taken up at a resentencing. Otherwise it's moot.

Probably the more intellectually honest way of doing it would be to go forward and actually have a sentencing hearing on those other counts so that if it goes up the circuit's got the whole thing done and fully prepared to make the decision whichever way it goes.

THE COURT: Are Counts 6 and 7 guideline counts?

MR. WILLIAMS: Yes, Your Honor. Yeah, Count 7 is a 20-year mandatory -- I'm sorry, maximum penalty. Count 6 is a 5-year maximum penalty, and they both come in under the

guidelines to the extent the guidelines are constitutional and apply which remains to be seen.

THE COURT: Any thoughts from the defense on how to handle the actual sentencing?

MR. ROGERS: Your Honor, I'm not as concerned about the guideline counts and the presentence investigation, although

♀

that is an issue. What I'm concerned about is the Court imposing sentence before having a chance to review and rule on post-trial motions under Rule 29 and Rule 33, and I think we need some time to file such motions, and I think you need to consider them. And so that's what I -- I think you'd lose jurisdiction to do so if you impose sentence. And so that's why we're kind of against that.

THE COURT: So you're asking me not to impose sentence.

MR. ROGERS: That's correct, Your Honor. I think we'll be asking for additional time in addition to the seven days provided by the rule to file such motions, maybe three weeks.

THE COURT: Mr. Williams?

MR. WILLIAMS: I can certainly abide by some additional time for filing post-trial motions. The point that Mr. Rogers raises I think is probably a good one. Technically I think the Court needs to rule on post-trial motions before imposing sentence in the end. And so we're probably better off putting off any formal sentencing pronouncement until the Court deals with these post-trial motions. Although I've not researched that issue, that seems to me my recollection of how it works.

As to an extension of time for filing post-trial motions, some extension of time I can understand, and I don't

have a problem with. As the Court knows, we're going to be moving into the second trial in this matter in March, and so I don't want to have a whole lot of delay, because the closer we get to that, obviously the more busy I'm going to be preparing for that trial. But a three-week period of time for filing post-trial motions is something that we can live with.

MR. ROGERS: In that regard, Your Honor, I know that having Mr. Honken as an inmate in the Woodbury County Jail during this trial is a strain on the marshal's service, and we would certainly be agreeable -- not only agreeable but we'd request -- that pending sentencing Mr. Honken be returned to the Bureau of Prisons and that he be brought back for sentencing. I think that's probably easier for the marshals.

Mike's here. Mike can tell us that. I think that's probably best for all concerned because if it's going to be a matter of a month or two, I think it's too much to expect them to keep him in the Woodbury County Jail under their beliefs about his status as a possible escape risk and all those things, and I think that the Bureau of Prisons is certainly equipped to handle him more than the county jail is over a long period of time when he doesn't have to be here every day.

THE COURT: Mr. Williams, anything else?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Well, I think what I'll probably do is give you your three weeks to -- I mean, are you talking about

three weeks in addition to the seven days?

MR. ROGERS: No, total of three weeks.

THE COURT: Total of three weeks to file post-trial motions? How much time do you think the government would need to respond?

MR. WILLIAMS: I think it would be sufficient if we had a week with the caveat that if I get into a bind I could request some additional time from the Court, but I think I could get a response on file within a week.

THE COURT: I think what I'll probably do is hold a hearing on the post-trial motions and then do the sentencing at the same time if I don't grant relief on the post-trial motions, so we'd just bring you back one time. That make sense? Is that kind of what you were thinking?

MR. ROGERS: Yes, Your Honor.

THE COURT: Yeah, that makes good sense. Okay. We'll do it that way. Anything else?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Okay. Thank you.

(The foregoing trial was adjourned at 2:30 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

1-26-05
Shelly Semmler, RMR, CRR                Date

3588

INDEX

WITNESS: PAGE:

RONDA FRANCIS

VOLUME 19 10-18-04 witness testimony
MR. WILLIAMS 3473

WENDY JENSEN
MR. WILLIAMS 3483

ASHLEY DEGEUS
MR. WILLIAMS 3490

KATHY NICHOLSON
MR. WILLIAMS 3495

ROBERT MILBRATH
MR. WILLIAMS 3505
MR. SPIES 3520

WILLIAM BASLER
MR. WILLIAMS 3521
MR. SPIES 3523

JOSHUA MILLER
MR. WILLIAMS 3524

BRITTANY ASBE
MR. WILLIAMS 3528

BARB FORMANEK
MR. SPIES 3534

CAROL HONKEN
MR. SPIES 3541
MR. WILLIAMS 3550

DAVID HONKEN
MR. SPIES 3552
MR. WILLIAMS 3560

SONNY ONOO
MR. SPIES 3561
MR. WILLIAMS 3571

*****

EXHIBITS:

1100 through 1113 3452

BB through FJ 3456

*****

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, Plaintiff, vs. DUSTIN LEE HONKEN, Defendant. /

No. CR01-3047
Sioux City, Iowa
October 19, 2004
8:46 a.m.

VOLUME 20

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

APPEARANCES:

For the Plaintiff:

C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant:

ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn
Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Okay. Mr. Honken is present with the three defense lawyers, and the two government lawyers are present. I understand we have some issues to take up prior to the jury coming in at nine o'clock. Mr. Rogers?

MR. ROGERS: Your Honor, we do have some -- a scheduling problem to bring to the Court's attention. We've advised the Court off the record via e-mail and via conversation this morning and also advised Mr. Williams by phone last night and again this morning Dr. Cunningham, our expert witness to rebut future dangerousness, is testifying in a case in Houston, Texas. He will be testifying today and cannot get here in time to testify in this court this afternoon, but he would be available tomorrow morning and will be available tomorrow morning.

We would ask -- the order of calling these witnesses is very important, especially at this stage in this kind of trial, and we had planned to close with our final witness, Marvea Smidt, and we would ask the Court's indulgence in allowing us to present our additional witnesses, our remaining witnesses, I guess today and then to present Dr. Cunningham and Mrs. Smidt tomorrow.

THE COURT: Okay. And if I do that, how long will you go today? What do you have? Like maybe three witnesses today?

Two or three?

MR. SPIES: Your Honor, we have one very short witness, the teacher that Mr. Honken had in high school. We have Sandy Fiems who is a friend of Jim Honken's, and then we have Alyssa Nelson, the defendant's sister, who'll take some time. She's a big picture witness. So I would guess we have conceivably maybe an hour and a half of testimony at most I would think.

THE COURT: Okay. Now, I understand that the government also has an issue about now wanting to do rebuttal. Have you all like agreed on anything?

MR. WILLIAMS: No, Your Honor. We just discussed it briefly. I'm not sure what the defense's position is on this. But I didn't find out -- and I'm not at all critical of the defense, and I don't want it to be taken that way. But Mr. Spies has let me know as much as he can as quickly as he can. I didn't get the final word on Mr. -- Dr. Cunningham's availability until last night. We've been anticipating in advance and I already have several witnesses here for the rebuttal case that we've flown up from out of state, two of whom have significant commitments that we pulled them out of to be able to come testify. And I hate to inconvenience these witnesses any more simply because Dr. Cunningham has another commitment that he couldn't get out of.

Although I think it works a disadvantage to the

3594

government for me to put on my rebuttal case before the defense has closed with their case and gives them more time to rebut my rebuttal and it kind of takes it out of order to some degree --

I think there's a disadvantage to the government -- I would nevertheless request permission to put on our rebuttal case after they complete their three witnesses today.

THE COURT: And is this rebuttal of things that are already in the sentencing phase record?

MR. WILLIAMS: Yes and no.

THE COURT: Well, tell me about the no.

MR. WILLIAMS: Well, I'd just as soon not disclose -- I'll tell you about the no. Yes, I can do that. The no is Dr. Carlson who is a former director, regional -- assistant director of the Bureau of Prisons who would testify to directly rebut some of the testimony anticipated by Dr. Cunningham. And we know what Dr. Cunningham's going to testify about because of disclosures by the defense and because I've read all the transcripts in a lot of the other trials he's testified in.

Our witness would come in -- and, frankly, the more I think about it, I think I could have put this on in my case in chief too -- is he's just going to testify about how the Bureau of Prisons is set up, what the different classifications, security classifications, are, how inmates are placed within the system, and how they can move in or out of higher security settings.

♀

THE COURT: And how does that in any way rebut what Dr. Cunningham is supposed to testify to?

MR. WILLIAMS: That's exactly what he's going to testify.

THE COURT: Well, if it's exactly what he's going to testify to, then it's not rebuttal because it's then cumulative.

MR. WILLIAMS: Well, yeah. Let me rephrase.

Dr. Cunningham I anticipate's going to testify that the Bureau of Prisons is an amazingly secure place with lots of gun towers and barbwire and, boy, don't worry about it because if you sentence Dustin Honken to life, the BOP can handle him, and they can make sure everybody's safe and no one's ever harmed again.

Dr. Carlson who has actually worked for the Bureau of Prisons is going to say that's bunk. They can do what they can, but in the end violence occurs and that these additional security settings only occur after violence has occurred. They only get placed into ad. max. or the controlled unit after you've already harmed somebody.

THE COURT: Now, is Dr. Cunningham the only -- I'm sorry. Is Dr. Carlson the only witness that you want to call out of order to rebut something that's not yet in evidence?

MR. WILLIAMS: Yes.

THE COURT: So the others are, in your view at least, proper rebuttal witnesses. You just want to take them out of order.

♀

3596

MR. WILLIAMS: Correct.

THE COURT: And Dr. Carlson is kind of an anticipatory rebuttal witness.

MR. WILLIAMS: Correct.

THE COURT: Okay. What's the defense position?

MR. SPIES: Well, first of all, addressing the issue of whether it's proper rebuttal, I don't think Dr. Cunningham's going to testify that there's no violence in the prisons, that there is violence in the prisons and the Bureau of Prisons knows how to deal with it. So I'm not sure, number one, that that is proper rebuttal.

But it's difficult to know whether it's proper or not without knowing what Dr. Cunningham's going to say. I expect he's going to say yes, murders occur in prison, fights occur in prison, but the Bureau of Prisons is designed to deal with it, and they've got preventative measures. They've got punitive measures they can take. So I don't believe that that's going to be proper rebuttal.

Number two, it's obviously obtuse because until the witness testifies --

THE COURT: You don't know whether it's proper rebuttal or not.

MR. SPIES: Yeah. How can I lodge a proper objection? And I grant you this is not Mr. Williams' fault. It's not my fault.

3597

THE COURT: It's nobody's fault. It's just those things that happen. And you're in a very difficult situation having to schedule witnesses on short notice. And I understand that. It's nobody's fault. Nobody's --

MR. SPIES: And so we run the risk of doing some substantial damage to the jury's consideration of proper sentencing factors without knowing whether the cart or the horse goes in first.

THE COURT: Because it could turn out to be not proper rebuttal.

MR. SPIES: Exactly. And as far as the other rebuttal evidence, obviously we don't know what that is. We don't know what it's intended to rebut, and so I can't address that.

THE COURT: But do you have any -- that's a different question than whether you have any objection to taking it out of

order.

MR. SPIES: Well, you know, again, I feel like I'm Alice in Wonderland here without having any notion how to address it. I can't know. You know, plainly we've been as cordial and accommodating in every respects as we can be, but -- and I don't want to deviate from that philosophy of cooperation. I know this has been a hardship on everybody. But I can't know whether it's going to be prejudicial to take it out of order.

THE COURT: Well, how could it be prejudicial to take it out of order?

MR. SPIES: Well --

THE COURT: I mean, may or may not be proper rebuttal, but you'd still have the same alleged prejudice whether you took it out of order or not out of order.

MR. SPIES: That may be so, but every trial and especially a murder trial is an ebb and flow. And I know that we can't always control that ebb and flow. But I -- and it's certainly within the sound discretion of the Court, but I believe that with the issues as grave and as important as they are here -- and I don't know what the inconvenience is to the government's witnesses or to the government -- I'm very concerned about the flow of the evidence here and how it's going to affect a jury on the most critical issue in this trial. So I'm sorry for giving you a long answer to your short question.

THE COURT: But the answer is --

MR. SPIES: It's within the sound discretion of the Court. I think it's going to be damaging, unduly prejudicial to Mr. Honken.

THE COURT: Mr. Williams?

MR. WILLIAMS: Let me give this suggestion, Judge, and I want to give a proffer to the Court in any event on what my rebuttal evidence is going to be because you know I don't like to surprise you with anything. So my suggestion would be this: We go through their witnesses this morning. We take a break, and at that point I can disclose to the Court and to the defense

exactly what my rebuttal case is going to be. My position's still going to be that it's proper rebuttal and that the defense is not significantly prejudiced. If anything, if anything, I think they're advantaged by the fact that I'm putting on --

THE COURT: Disclosing rebuttal before --

MR. WILLIAMS: And they have a whole 'nother day to come up with some surrebuttal to my rebuttal. I think I would -- and I don't like this. My preference, I'd let them put on their case, and I'd smack them with my rebuttal, and they would be sitting there --

THE COURT: And are you telling me -- that would be my preference too, that we let the defense finish their evidence and then you put on your rebuttal. Are you saying that these witnesses won't stay? I'm sure they're under subpoena.

MR. WILLIAMS: I can force them to stay. My concern is one of my witnesses we yanked out of a very important class that this could jeopardize his future by pulling him out of this class, and we tried to tell him we'd only take him out of class for two days, and this would be at least three days that we'd be taking him out which may jeopardize his ability to complete the course which may jeopardize his future goals. And I've got another witness who is having some family problems, and we yanked him out of his family problems to come up here.

THE COURT: But they should be able to testify tomorrow.

MR. WILLIAMS: Yes, they should be able to. I just hate to keep them over one more day. And like I said, if it was up to me, I'd wait and I'd -- I usually don't care too much about -- well, I do care. I usually am not willing to do this for witnesses, jeopardize my case, but I just feel guilty about these particular witnesses to do this to them.

So my request will continue to be -- and I agree with Mr. Spies, of course -- it's within the sound discretion of the Court to make a decision. But I suggest we wait until the break. I'll disclose what we have, and then you can make a more informed decision at that time.

THE COURT: Okay. And, Mr. Spies, I'm going to want you to respond to Mr. Williams' argument, that if anything, the government's prejudiced by taking them out of order, not the defense when we take the break.

MR. SPIES: All right.

THE COURT: I'm going to make a partial ruling. On the defense request to not put on Mr. Honken's mother until your last witness, I'm going to sustain that request, so you'll be allowed to put on what evidence you can today and then tomorrow call Dr. Cunningham assuming he makes it, and if he doesn't, then we'll continue it because you obviously have a right to put on the witness. It's not your fault. It's nobody's fault. He's in another trial. He's scheduled pretty tight, but those things happen.

And so I'm going to allow you to do that. And then I'll reserve ruling until after the break on whether or not to allow the government to take -- I'm not inclined to allow Dr. Carlson to testify prior to Dr. Cunningham. I think one thing that could happen is that they may decide then not to call Dr. Cunningham and then we have a -- I think we have a problem. And it might not be a bad strategy for the defense to do that, particularly if they could elicit some of the things they could have from Dr. Cunningham through Dr. Carlson out of order. Then we'd be stuck with a situation of you calling a rebuttal witness that -- and they don't have a witness to rebut, and that could be fraught with problems.

MR. WILLIAMS: I'll offer Dr. Carlson to them. They can call him in their case in chief.

THE COURT: So I doubt very much -- I'm just giving you a heads-up -- whether I'm going to allow you to call Carlson out of order.

MR. WILLIAMS: I understand.

THE COURT: But the other witnesses -- I don't know how many there are -- I'd be more inclined to allow you to do, but I still want to reserve ruling, and I hate to inconvenience witnesses. I hate to inconvenience jurors. But, you know, we're in the very serious aspect of an incredibly serious and difficult case. And I just don't want to take any chances that I don't have to take. I would regret having to inconvenience

3602

witnesses, but I'd regret reversible error a little bit more than the inconvenience of witnesses. So just kind of a heads-up of where I'm leaning.

Ready to have the jury brought in in a minute or so?

MR. SPIES: Yes, we are.

MR. WILLIAMS: Yes.

THE COURT: Thank you.

(Recess at 9 a.m.)

THE COURT: Ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. SPIES: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated.

Mr. Spies, are you ready to call your next witness?

MR. SPIES: I am, Your Honor. The defense calls Dennis Brumm to the stand.

DENNIS BRUMM, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. Make yourself comfortable, and please -- and can you scoot that chair up a little bit so you can talk directly into the microphones? And when you're ready, would you state your full name and spell your last name for us.

THE WITNESS: Dennis William Brumm, last name B as in boy r-u-m-m.

THE COURT: Thank you.

♀

Mr. Spies?

DIRECT EXAMINATION

BY MR. SPIES:

Q. Good morning, Mr. Brumm.

A. Good morning.

Q. Mr. Brumm, could you please tell us, sir, where you live, and tell us about your family.

A. First of all, I thought the first day of going into my teaching classroom was difficult. This may be a second.
Q. Okay.
A. I live in Britt, Iowa, married to my wife Judy, and have three daughters and since retired from teaching.
Q. Okay. And, Mr. Brumm, if you weren't here in Sioux City, Iowa, sitting in the federal courthouse, where would you be this morning?
A. I would be sitting like this on a patio overlooking Big Thompson Canyon in Estes Park, Colorado, is where I would be now.
Q. Okay. So you cut that short to come in here this morning.
A. Yes, I did.
Q. Mr. Brumm, we appreciate you being here, and I'd like to ask you how long have you lived in Britt, Iowa?
A. Since 1961.
Q. And tell us a little bit about your educational background and what got you to Britt, Iowa.

3604

A. I got my bachelor's degree at Upper Iowa University, master's degree at Southwestern Oklahoma, and did advanced study at the University of Arizona in Tucson and started teaching in '61 after my bachelor's degree, went into teaching in a job in Britt, Iowa.
Q. And what school did you teach in Britt?
A. West Hancock Community Schools.
Q. What communities were served by West Hancock?
A. Now it's Britt and Kanawha. First when I went it was just Britt, but now it's Britt and Kanawha.
Q. Okay. And we've, of course, heard that Britt, Iowa, is

about how far from Mason City?
A. Right at 30 miles.
Q. Okay. And did you live right in the town of Britt, or did you live in the outskirts?
A. Right in town.
Q. Are there outskirts?
A. You go a few blocks either way, you'll be in the outskirts.
Q. Mr. Brumm, tell us, please, what your teaching duties were when you were a teacher in Britt, Iowa.
A. I taught mathematics, high school level.
Q. And just to raise the anxiety levels of those of us who struggled in high school mathematics, what classes did you teach?
A. Started with eighth grade but mainly through the years was

algebra and geometry.
Q. All righty. And again, what years did you teach at Britt?
A. 1961 to 1997, 36 years.
Q. Congratulations.
A. Thank you.
Q. Among the students that you had at Britt, Iowa, was Dustin Honken one of your students?
A. Yes, he was.
Q. Now, I wanted to ask you also in addition to your full-time teaching responsibilities at Britt, did you do anything else in coaching or anything else in your teaching at Britt?
A. First few years I helped assist in -- football coach, first years, and then I went into officiating high school sports, and I did that for 31 years.
Q. Okay. So your capacity in knowing Mr. Honken was how? As

a teacher?
A. Yes.
Q. And do you recall whether he was an athlete of any sort?
A. Not really, no.
Q. Okay. What classes did you teach for Mr. Honken?
A. I know algebra for sure, and I don't remember now if -- when I started teaching geometry if he was in the class or not. I didn't teach geometry right away. I started teaching it a little bit later, and I don't remember if he was in the geometry class or not.

Q. Did you teach any of the other Honken children?
A. Yes.
Q. And do you remember who they were?
A. Jeff and Alyssa.
Q. Okay. Was Dustin an A student?
A. Pardon?
Q. Was Dustin an A student?
A. No.
Q. Okay. And you had the benefit of looking at his grade transcript recently?
A. Yes.
Q. Okay. Do you remember Dustin as a student?
A. Yes, I do.
Q. And tell the ladies and gentlemen of the jury what you remember about Dustin as a student at Britt High School.
A. As far -- he was average student I guess in math; like most that age, probably could work a little harder but enjoyed him in class. He was sort of a neat student in class, got along fine with him. We had a good relationship.

Q. Okay. Did he ever cause you any problems in class acting up, creating disturbances?
A. Not -- no.
Q. Okay. Did you ever have a need to have him disciplined by the administration at the school?
A. Not at all that I can recall, no.

Q. Do you remember any of his friends?
A. Yes.
Q. Who was a friend of his?
A. Well, Tim.
Q. Tim Cutkomp?
A. Yes.
Q. Okay. They seemed to interact well?
A. Yes.
Q. The next thing I want to ask you about, Mr. Brumm, is whether you knew Dustin's parents, Marvea and Jim. Did you know them as well?
A. Yes, I did.
Q. And did you have occasion to interact with them either in school or outside of class?
A. Not too much. Jim I did.
Q. Okay. In what sort of circumstance was that?
A. I worked with him for a summer or two at the Co-op Oil gas station when I did summer work there, and I greased cars and things and pumped gas, and he was like the mechanic there.
Q. Okay. So how long did you think you worked with Mr. Honken, Mr. Jim Honken?
A. One summer for sure and maybe two. I can't recall.
Q. And could you describe him for the ladies and gentlemen of

the jury, what kind of a gentleman he was?
A. I got along fine with him. He was always -- a couple times

anyway he had some ideas of -- wanted me to invest a little money or something or had some little idea that we could make some money on something. Of course, I didn't -- at that stage didn't have any extra money, so I never -- I just said no, and it was sort of left at that.
Q. Okay. Since Dustin Honken left Britt, Iowa, have you seen him again?
A. No.
Q. Today's the first day?
A. Yes.
MR. SPIES: Mr. Brumm, I appreciate your being with us here this morning. I have no other questions.
THE COURT: Mr. Williams, any questions?
MR. WILLIAMS: No questions, Your Honor. Thank you.
THE COURT: You may step down.
MR. SPIES: Your Honor, the defense calls Sandy Fiems to the stand.
SANDRA FIEMS, DEFENDANT'S WITNESS, SWORN
THE COURT: Okay. Please be seated. Make yourself comfortable. Try and adjust the chair so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your last name for us.
THE WITNESS: Sandra May Fiems, F-i-e-m-s.
THE COURT: Thank you.
Mr. Spies?

DIRECT EXAMINATION

BY MR. SPIES:

Q. Good morning, Miss Fiems.

A. Yes.

Q. How are you doing this morning?

A. Fine.

Q. Okay. Miss Fiems, tell us where you live and how long you've lived there.

A. I live in Eldora, Iowa. I've lived there about four years, and before that I lived in Steamboat Rock.

Q. And for the benefit of those of us who aren't familiar with that area, tell us where Eldora is, say, in relation to Mason City.

A. Eldora is about 45 miles east of Waterloo and about 85 south of Mason City.

Q. Okay. And what about Steamboat Rock? Where is that?

A. It's four miles from Eldora.

Q. All righty. And are you a native Iowan? Is this where you were born and raised?

A. I was born and raised in Marshalltown.

Q. All righty. And what got you from Marshalltown to Eldora?

A. Well, when I graduated from high school, I moved to the Quad Cities, Davenport, Iowa, and then got married, and we went to Michigan for him to finish college, and then back to Eldora is where he worked.

♀

3610

Q. All right. Are you married now?

A. No, I'm single.

Q. Okay. Do you have children?

A. Yes, I have four.

Q. And what are their names and approximate ages?
A. Nolan is 35. He lives in Italy. Connie is 33. Justin is 29, and Tani is 27.
Q. All right. And one of your daughters is in law enforcement; right?
A. Right.
Q. Which one is what that?
A. Tani.
Q. And what kind of work does she do?
A. She's a state narcotics officer.
Q. But that's not the reason you're here, is it?
A. No.
Q. Miss Fiems, can you tell the ladies and gentlemen of the jury how you know the Honken family.
A. Jim was my neighbor, and we got acquainted, and I eventually moved in with him, and then I got to know Dustin and Alyssa, and I met Jeff once.
Q. And where was it that you were living when you met Jim Honken?
A. I was living in Steamboat Rock. He was my neighbor.
Q. Okay. And what was Mr. Honken doing in Steamboat Rock

aside from living there? Was he working there?
A. He was building a Pronto store for his brother David.
Q. All right. And were you employed there in Steamboat Rock at the time?
A. No. I worked in Eldora at a nursing home. I'm a licensed practical nurse.
Q. I see. So do you know about what year it was that you would have met Jim Honken?

A. Must have been about '91.

Q. And tell us about how you met. Just over a backyard fence?

A. He came to my door, knocked on my door one day, and I don't remember much more than that now.

Q. Then you became friends.

A. Yes.

Q. And what became of your friendship with him?

A. I moved in with him, and we were together a couple years. I lived with him two different times.

Q. Okay. So the first time would have been in the early 1990s?

A. Yes.

Q. And that would have been for a couple of years?

A. I think so.

Q. And then what was the second time that you would have lived with Mr. Honken?

A. He had had a medical problem and was in the university

♀

hospital, and then he was court ordered to a nursing home, and he couldn't go home until he had somebody to live with him, and I'd been living in Davenport and was coming home, so I told him that I would move in with him.

Q. Okay. And do you know about how long it would have been the second time that you lived with Mr. Honken, how long you lived together?

A. It might have been about a year.

Q. Does Mr. Honken live in Steamboat Rock now?

A. Yes, he does.

Q. And do you have any continuing relationship with him?

A. We have a friendship, and he comes to town about every

morning, and he stops and talks to me for a while, and then he goes back home.

Q. Okay. I'd like to go back to the first time that you and Mr. Honken lived together in the early 1990s; okay?

A. Okay.

Q. Was -- you said that Mr. Honken had been working on a Pronto store there in Steamboat Rock?

A. Right.

Q. Did he have other employment that you knew about?

A. No.

Q. And when that project was done, he was living with you.

A. I was living with him in his home.

Q. Right, okay. And tell us about your interaction with

♀

3613

Mr. Honken and how you got to know his children.

A. His kids wanted to come and visit, and Alyssa came every once in a while, and Dustin came quite often.

Q. And you said you saw Jeff one time?

A. Yes.

Q. All right. Now, was Mr. Honken, Mr. Jim Honken, on parole at that time?

A. Yes, he was.

Q. He had served some time in federal prison; am I right?

A. Right.

Q. And did he have to check in with a parole officer, or do you know what arrangements he had?

A. A lot of the time the parole officer would stop at the house.

Q. Could you tell the ladies and gentlemen of the jury, Ms. Fiems, about Jim Honken, what kind of a man he was and what

you observed about him.

A. To me he was easy to get along with. I like the temperature cool, and he was all right with that. And he would cook part of the time, and I would cook part of the time. He was never abusive to me. He drank an awful lot during the time that I was there, and I'd say he was inebriated about 98 percent of the time.

Q. Did his drinking become a problem in your relationship with him?

♀

3614

A. Eventually, yes, and I moved out, but we still remained friends. He called me one night, and I called an ambulance for him, and he was really in bad shape. He'd lost a lot of blood. There was blood all over his house. He looked like he was -- he looked like he was dead almost, he was so pale. He'd lost so much blood.

Q. Now, let's talk, Ms. Fiems, about the visits that his children would make to him. He was, of course, divorced from Marvea at that time; right?

A. Yes.

Q. And on what sort of schedule or how often would Dustin come to visit, for example?

A. I think he came about once a week or once every two weeks anyway.

Q. When Dustin would come to visit his dad, would he come alone, or would he come with somebody else?

A. No, he'd bring his two boys, Brandon and Ryan.

Q. Brandon and Ryan were his --

A. Kathy's.

Q. Kathy's children.

A. Yeah.
Q. Kathy Rick.
A. Yeah.
Q. What would Dustin and his children do when they came to visit Dustin's dad?

♀

A. Oh, the kids liked to ride the John Deere mower, and I think that was the big draw for them to come. They really thought that was neat.
Q. And how did Dustin seem to get along with his dad?
A. Very well. They seemed to have a good relationship. I know Dustin was very disappointed about the drinking.
Q. And how do you know that?
A. Because he told me that.
Q. Did he try to help his dad with his drinking problems?
A. I don't think there's much you can do, but he -- at one time I told him that Jim was really drinking really bad, and he called the parole officer, and Jim was ordered into the VA to dry out.
Q. Dustin called his parole officer?
A. Yes.
Q. Now, when Dustin would come to visit, did he ever bring friends along too?
A. Yes. He often brought Tim Cutkomp along with the kids too.
Q. All right. Did you ever meet Dustin's daughter Marvea?
A. Yes, once or twice. I didn't see her so much.
Q. Okay. Now, I'd like to ask you -- you said that Jim Honken was inebriated a lot of the time, and how would he behave when he was intoxicated?
A. Oh, he lied a lot, and he told big -- he told big stories.

He never -- we were all right when he was drinking, but one time

we went to a bar, and he almost got into a fight.

Q. Did he like to brag?

A. Yeah, very much he liked to brag.

Q. What did he like to brag about?

A. Oh, he told me he was in the CIA, and I think I've kind of blocked the stories out.

Q. Miss Fiems, could you tell us a little bit about your observations of Dustin as a parent when he would come over to his dad's house to visit.

A. I really admired Dustin with his kids. He would bring them, and lots of times I think guys would -- well, there's a woman there; she can take care of them, but Dustin always took care of his kids. If he told them to do something like telling Brandon to go to the bathroom, if Brandon didn't do it, Dustin got up and took him, and he never yelled at the kids. He never hit the kids. I just -- I really admired him as a father.

Q. Now, did you ever get to meet Kathy Rick?

A. Yes, I did.

Q. All right. She would come sometimes with Dustin?

A. Yes, and Jim and I went up to her house too.

Q. Okay. Did you know Marvea, Dustin's mom?

A. No. I saw her once. Jim and I went up and took the boys out for lunch, and when we took them back, I saw her. She was at the door.

Q. Okay. When was the last time you saw Dustin?

A. Probably eight years ago.
Q. Until today.
A. Uh-huh.

MR. SPIES: Miss Fiems, thank you very much for your time with us this morning. Mr. Williams may have some questions for you.

THE WITNESS: Okay.

THE COURT: Mr. Williams?

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Morning, ma'am. You indicated during your testimony that on occasion Dustin Honken would bring Tim Cutkomp --
A. Yes.
Q. -- with him to your house. It's true, is it not, that you noticed that Dustin Honken treated Tim Cutkomp like a puppy dog and ordered him around quite a bit.
A. I said that at one time, yeah.

MR. WILLIAMS: I have nothing else.

THE COURT: Mr. Spies, anything else for this witness?

MR. SPIES: No other questions for Miss Fiems. Thank you.

THE COURT: Thank you. You may step down.

Members of the jury, why don't you take a stretch break.

Ready for your next witness?

ALYSSA NELSON, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated. Would you state your full name, please.

THE WITNESS: My name is Alyssa Marvea Nelson.

THE COURT: Thank you.

Mr. Spies?

MR. SPIES: Thank you.

DIRECT EXAMINATION

BY MR. SPIES:

Q. Good morning.

A. Morning.

Q. Today you are Alyssa Nelson, the sister.

A. Yes, I am.

Q. And you've testified earlier in the case. You are also a probation/parole officer for the state of Nebraska?

A. Yes.

Q. And we know from your earlier testimony that you're married. Remind us again how long you've lived in the area and who you're married to.

A. I'm married to Clint Nelson, and I have lived in this area since approximately 1991.

Q. And you're, of course, Dustin's sister.

A. Yes, I am.

Q. All right. Ms. Nelson, I'd like to have you describe your family and a little bit about your growing-up years, so we're

♀

going to start with your telling us, please, where you were born and raised.

A. I was born in 1971 in Britt, Iowa. And do you want me to include my stepsiblings, because I was raised with them also?

Q. Sure. Let's go through the family constellation.

A. Okay. I was born to Jim and Marvea Honken in 1971, and they divorced I believe in 1976. My eldest stepsibling is Bruce Smidt, and then it goes my biological brother Jeff Honken, and

then it goes my stepsister Carmen Smidt. Then it goes my biological brother Dustin Honken, and then it's me, and then it's my half sister Ann Honken.
Q. Okay. From where you were born and raised, where did you live after that?
A. After I graduated from high school in 1989, I went to Waldorf College, and while I can say that I went to college and I was supposed to stay in the dorms, but I think I lived more at home than I was actually -- than I was living in the dorms.
Q. Okay. And where did you go after you graduated from college?
A. Well, I went to Morningside College, and I graduated from there in '93, and then I met my husband, and I stayed in Sioux City and eventually moved to South Sioux City and got married and lived here since.
Q. Do you have a family of your own now?
A. Yes, I do.

3620

Q. Who's in your family?
A. I have my son Nolan Nelson who will be eight in January, and I have twin daughters, MaKayla and Brianna Nelson, who will be seven October 30.
Q. Twins.
A. Yes, I do.
Q. Okay. Tell us what jobs you've had, Ms. Nelson, since you graduated from college.
A. Since I graduated from college, I've only had two jobs. I worked at the Boys and Girls Home in Sioux City, Iowa, for five years. I started out kind of as a -- nightshift as just a night counselor, and then I worked my way up to be a supervisor of an

all-male sexual conduct disorder unit where I helped implement the mental health program, and I eventually stepped down since I became pregnant with my son Nolan, went to the seven-to-three shift over in the South Sioux City shelter. And then after I had my son and my daughters, then I became a probation officer in Dakota County.
Q. And you've been a probation officer for how long?
A. It will be seven years in January.
Q. Where did you live when you lived with your brother Dustin?
A. I lived in Britt, Iowa.
Q. And did you have the same family home during that entire time when you lived with Dustin?
A. Pretty much. We lived at 83 Third Street Southwest in

Britt.
Q. And tell the ladies and gentlemen of the jury what kind of home you lived in when you lived there in Britt with Dustin.
A. Oh, we had a good time. We lived in this huge old -- it was probably over a hundred years old, in this huge stucco house that was -- had bats in it which I was terrified of, and Dustin was too. And it was -- I mean, every floorboard creaked in the entire house. Had a two-story home, very cold. I think it had the original furnace in it, had -- I think a puff of hot air came out of it the whole entire winter. Dustin and I used to fight over the furnace in the wintertime, the one furnace that all the hot air used to come over.
Q. Mrs. Nelson, did you live in the town itself of Britt?
A. Yes.
Q. And this was a small town I take it.
A. Yes, very small.

Q. Everybody knew everybody's business?
A. Everybody knew everybody's business. They still do.
Q. Was growing up with Dustin all peaches and cream?
A. No. We're normal brother and sister, just like every other one.
Q. He was three years older than you?
A. Yes.
Q. Okay. I'm going to show you a photograph, Defendant's Exhibit CQ. It will show on the monitor there on your right.

And could you tell the ladies and gentlemen of the jury what's portrayed in Defendant's Exhibit CQ.
A. That's Dustin and I at our Grandma and Grandpa Honken's house in Titonka, Iowa, and we are playing checkers before church on a Sunday morning, and Dustin was always better at games than I was. At least he thought he always was. But he always had to try to teach me how to do different things with the different games.
Q. Now, you said that your grandmother and grandfather lived Titonka. Would this be on your mom's side?
A. No, that was my father's parents.
Q. All right. And where did your mother's parents live?
A. They lived in Garner, Iowa.
Q. Now, approximately how far from Britt were your grandparents living?
A. My paternal grandparents?
Q. Yes.
A. Oh, jeez, I'm thinking -- I'm going to guess probably about a 45-minute drive from Britt to Titonka.
Q. And your maternal grandparents, where did they live?

A. They lived in Garner, Iowa.
Q. And that was just down the road a ways?
A. Like 20 miles, around there.
Q. Tell us about your brother Jeff.
A. Well, he's nine years older than me. I didn't really grow

up with Jeff just because of the age difference. I know Dustin much better than Jeff obviously because of the age difference. Jeff wasn't really around when I was growing up. He was -- you know, I remember him graduating from high school when I was like ten years old or something like that.
Q. And then did he go off after he graduated?
A. Yeah, he left the house right away. He wasn't around.
Q. Okay. So you're closer to your brother Dustin than to Jeff?
A. Yes, very much so.
Q. I'd like you to tell us, Alyssa, about what it was like growing up in Britt, Iowa, and specifically your relationship with your mom and your dad. Tell us first about your mom and what her role was like as a mom in your home in Britt when you and Dustin were living there.
A. Well, my mom is what everybody, all of our friends, always wanted. Dustin's friends and my friends, they all wanted my mom, our mom, to be their mom. Everybody, all of our friends, always came to our house after school. Everybody wanted to eat supper at our house. Everybody wanted to stay overnight at our house, and Mom didn't treat people like a guest at our house. They were like one of the kids. Everybody was accepted at our house. And growing up in our house, it was, well, as a family. And with our stepfather, you know, our stepfather, he was always

there for us. You know, he's a quiet guy. You know, he

wouldn't come to you and tell you he loved you. You know, that's just not his style.

Q. You're talking about Ron?

A. I'm talking about Ron, excuse me. I grew up with Ron more knowing him as my father since I was only about five or six since my parents divorced. But it was a good family. You know, we had our ups and downs like any other family does.

Q. Now, you described the two-story stucco house in Britt. Was this a house that your mom and you all moved into after she married Ron Smidt?

A. Yes.

Q. All right. Tell us about the house that you lived in when Jim Honken and your mom were still husband and wife.

A. Well, I can't remember a whole lot. I remember that it was -- there was two stories to it, and I remember there was a spiral staircase going upstairs, and I remember I had a canopy bed -- I do remember that -- and it was all pink. I don't really remember much just because of my age at the time.

Q. So when your mom and your dad, Jim Honken, divorced, about how old were you?

A. I was about five, six, around there.

Q. Do you remember much about your dad, Jim, being at home when you were -- when they were still married?

A. I remember certain scenarios, things that stay with your mind, you know, the kind of flashbacks that you remember, you

know, not always the good things.

Q. What do you remember about your dad at home?
A. Oh, I remember him being passed out on the couch when I was little. I remember stuff like that. He didn't -- he wasn't around much just for the fact that he was construction. You know, he worked a lot. And my mom was there. She was the sole caretaker of all of us.
Q. So when your dad was home -- would he be gone during the week?
A. Yes.
Q. And then he'd be home on weekends?
A. To the best of my recollection, yes, that's when he would be home.
Q. Do you remember any family trips that you took together when your mom and Jim were together?
A. No.
Q. Special holiday activities that you would enjoy?
A. I don't ever recall anything like that.
Q. You said your dad would drink to the point of passing out?
A. Yes.
Q. How did his drinking affect your family?
A. Well, you know, I mean, I know that my mom always tried to, you know, do family stuff like the 4th of July, you know, we would -- us kids, you know, you get excited about going to fireworks show and stuff like that and, you know, Good, Dad's

♀

going to go with us, because, you know, he's gone all during the week. And then you come to find out it's time to go, and here your dad is passed out on the couch and he can't go. Here's Mom left holding the bag again. She, you know, takes all of us anyway, you know, but there's always that certain point of

disappointment, you know. There's that disappointment that never goes away.

Q. You were pretty young when your mom and dad broke up.

A. Yes.

Q. And do you remember the breakup of your family, of your mom and dad's marriage?

A. I remember my mom sitting the three of us down, Jeff, Dustin, and myself, on my canopy bed in Hutchins. That's just on the outskirts of Britt. And I was sitting with the boys, and Mom was saying, Well, you know, we're going to get a divorce. And I didn't understand what the word divorce meant. And I can't remember whether it was Jeff or Dustin. And I asked Mom, I said, Well, what's a divorce? And like I said, I can't remember which one of the boys said, Well, you know, dummy, it means that Mom and Dad aren't going to live together anymore. And I just remember I started crying. I mean, you know, I didn't understand the whole concept, you know. And that's about all I remember. And the next thing I do remember is that, you know, I was walking around with my doll in this huge house in Britt, Iowa, you know. That's . . .

♀

Q. How did your brothers react to your mom and dad breaking up?

A. Well, I know that Jeff was very angry because Jeff was kind of forced into the, you know, the fatherly role, you know, all those years because, you know, our father wasn't there. So Jeff was forced into taking care of everything. He was the one that was looking out for everybody else. You know, the father wasn't there, so Jeff was looking after Mom. He was looking after Dustin. He was looking after me. He was angry because then all

of a sudden here comes a stepfather, and that role's taken away.
Q. And what about Dustin?
A. Dustin was kind of left out in the wind to flutter by himself. I think he was kind of looking for a place for him to fit. You know, he didn't know where he fit.
Q. So your mom then married Ron Smidt.
A. Yes, he did -- yes, she did.
Q. And you then moved from the house in Hutchins to Britt?
A. Yes.
Q. Okay. And how long again did you all live in Britt?
A. We've always lived in Britt after Hutchins, our family has.
Q. And what became of your dad Jim? Where did he go?
A. Well, he lived in -- he lived in Britt for a while, and then he -- as far as I know, then he went to Garner, and then he went to prison, and then he went to Steamboat Rock.
Q. When your mom married Ron Smidt -- and could you tell us,

♀

3628

please, how you spell Smidt.
A. S-m-i-d-t.
Q. -- how did life change for you when you had a stepdad and you lived in a new house, a new old house in Britt?
A. Well, you know, each one of us were affected differently. You know, we were used to having our mom by ourselves, you know, I mean, for so many years because, you know, Dad wasn't around, so Mom did everything. Mom was a single parent basically. We were all very jealous of Ron, our stepfather, because we had Mom's undivided attention.
Q. And how did your mom change when she got married to Ron?
A. Well, I think my mom felt torn. She felt her loyalty toward her new husband, and yet she still had three small

children. It was very hard for her.

Q. Did her attentions and her focus change when she married Ron?

A. Yes, they did.

Q. In what way?

A. Well, you know, Ron came into the family also with two children of his own, and that also caused turmoil. You take two different families and you throw them together and expect it to work overnight, it doesn't always work like that. You know, there's a lot of chaos at first until the very end. We had many upsets in our family.

At first, you know, when everything happened, you

know, you know, Mom and Ron, they would -- you know, they'd go out occasionally when they could afford it, you know, and we never had babysitters before, you know, and Jeff would have to watch us, you know, and I remember just crying because I was always used to having my mom there all the time. I remember I used to pull out her favorite coat because my mom always wears this certain perfume, and I used to lay on it because it used to smell like her because I used to miss her all the time, just remind me of her, you know. Sorry.

Q. Let's talk for a minute about your dad. Your dad, you said, moved to Britt as well?

A. Yes, he did.

Q. And where did he move to?

A. He moved -- after Britt he moved to -- he lived in some small house. It was called -- down by this little bar called the Pol-In. It was kind of on the outskirts, not the out -- still in Britt, but it was kind of on the edge of Britt.

Q. And he got married too; right?
A. Yeah, he married Carol Honken or used to be Carol Peters.
Q. Tell us about yours and Dustin's interaction with your dad after he got married to Carol.
A. Well, you know, I remember Dad bragging Carol up, Oh, yeah, this woman's real high class, you know; she's real great -- and she had three sons of her own when she came into the marriage that were older -- And she's got a lot of money, you know; she's

♀

real great.

And we met her and stuff, and she seemed to be a nice-enough lady, and she was nice to us, but, you know, we didn't really -- you know, we went on weekends, you know, our regular weekends to go visit and stuff like that. But at first we thought things were going to be okay, but, you know, it was the same old stuff, just a different lady with him. That's all.
Q. What do you mean by the same old stuff?
A. You know, my dad never changes. I mean, every time you see him, he always had a drink in his hand, he's always drunk. He never changes. When he drives he's got a flask of whiskey or vodka underneath the seat. He doesn't ever change.
Q. So because you were living in the same town, did you go over there and spend weekends or just go over to visit? How did that work?
A. Well, at first after the divorce, you know, we had to go over pretty regularly because, you know, that's kind of how the divorce was set up, you know, and we used to have to go over, and we'd spend weekends and stuff like that, or we'd go over on holidays and -- you know, and everything seemed, you know, okay. And it started getting less and less because I really didn't

want to go over there because, you know, of my dad's drinking. And Dustin can handle it better than I can, you know.

Q. Tell us how your dad, Jim, and your mom, Marvea, got along after their divorce. Did they have any interaction that you

observed?

A. Not really because my dad -- it's almost like my dad just -- he always said bad things about my mom mainly when he was drinking. He'd always call her a whore.

Q. He would say that to you?

A. Yeah. He used to chase me around the house and tell me that my mom was a whore and tell me that I'm stupid and I'm fat and no man's ever going to want me and I'm just like my mother, and I remember running from him and trying to block it out and going in a corner and going in like a fetal position trying to block it out, and he wouldn't shut up. And I wouldn't go there anymore, and I wouldn't tell my mom why because I didn't want her to know my dad's still calling her a whore. You don't want to hear that about your mom, and I'm close to my mom.

Q. When you visited your dad, would Dustin go with you?

A. Yeah, he did sometimes but not toward the end. I had to go by myself, and the only reason I started going by myself is because they had Ann, and I felt like I had to go there because I wanted -- there's a certain part of me that wanted to protect her because I knew what my dad was like. I felt like I had to watch out for her because I knew that she was being left alone with my dad.

Q. Did your dad have a job when he was living in Britt?

A. In Britt?

Q. Yes.

A.   Not to my knowledge he never had a job.  He always just
seemed to be sitting at home watching TV and drinking.

Q.   Now, you were going to school in Britt.

A.   Yes.

Q.   Dustin was going to school.

A.   Yes.

Q.   Did your dad participate in any of your school activities?

A.   No.

Q.   Come to visit your teachers?

A.   No.

Q.   Go to school plays, things like that?

A.   No.

Q.   Did your dad get involved in criminal activity?

A.   Yes.

Q.   How?

A.   Well, he robbed a bank.

Q.   The bank in Britt?

A.   Yes, he did.

Q.   He rob another bank?

A.   Yes, the one in Missouri.

Q.   Steal things?

A.   What he used to brag about.  He didn't say any specifics, but, you know, he used to always talk about how easy things were to rip off, or, you know, he was always bragging about something.

Q.   How did you find out that the bank in Britt had been

robbed?
A. Dustin confided in me.
Q. What did he tell you?
A. He told me what happened. Dustin and I are close, you know. I always knew that if I had a problem I could go to Dustin, something that we didn't want to hurt Mom, you know, and he knows that.
Q. What did Dustin tell you about his dad and your dad robbing the bank?
A. Carol and Dad had just -- Carol had just kicked Dad out because of his being drunk all the time, and Dad was living in some kind of shack that didn't have any heat or anything, and he called Dustin. He was drunk, told Dustin where he was staying at, and he had just a little electric heater. And, of course, Dustin felt bad for him, you know, and he didn't have any food or anything, and so Dustin had been taking food from our house and bringing it to him. And Dad was drunk, and he said he had a plan. He said, Dustin, I need your help. If you don't help me, I'm going to kill myself. If you don't help me, I'm going to kill myself. And he told Dustin, Go get your mom's bank key. Make a copy of it, and give it to me. So he did.
Q. Your dad robbed the bank.
A. Yes, he did. And that's all. And Dustin, you know, he came and he told me. He said, Alyssa, I didn't feel like I had

any other choice. He says, Dad was going to kill himself.
Q. Your dad was arrested.
A. Yes.
Q. And did that become news in Britt, Iowa?
A. Oh, yeah, very much so.

Q. I'm going to show you on the monitor to your right an excerpt from the newspaper about an armed robbery at the First State Bank in Britt. It's Defendant's Exhibit ES. Do you remember that publicity?
A. I remember it but refused to read newspapers because it hurt too much.
Q. Your dad was living in Garner when he was involved in this?
A. Yeah, he was, in a shack.
Q. When your dad got prosecuted and eventually sent to prison for the Missouri bank robbery, did people in town know it was your dad?
A. Oh, yeah.
Q. How did you find out that they knew?
A. Well, everybody knows everything, and it's kinda hard when we have a unique last name. There's not very many Honkens around.
Q. Were you teased about it?
A. Oh, yeah. I was often referred to as the bank robber's kid, you know, kind of hard to live down, you know.
Q. Did your -- when your dad went to prison, did you go to visit him?

3635

A. No.
Q. Did Dustin go to visit him?
A. Yes.
Q. Did your brother Dustin have a different relationship with your dad than you did?
A. Yes, he did.
Q. And your brother Jeff as well?
A. Yes.

Q. How were their relationships with your dad different than yours?
A. Dustin and Jeff, they had more -- they were around my dad more than I was. I would -- I was more sheltered from my father. My dad wasn't as much interested in me than he was with the boys because I was a girl. I probably couldn't do anything for him. I was of no use to him. He couldn't make any profit off of me. Dustin and Jeff were more of his lackeys, his buddies. He could brag to them. He could get them to do stuff, you know. That's all -- in my mind, he used them half the time.
Q. Did you know the DeGeus family?
A. I knew Brian.
Q. And Brian was one of the DeGeus boys?
A. Yes.
Q. And how did you know Brian DeGeus?
A. I knew Brian from -- he used to kind of be friends with

♀

Dustin growing up.
Q. And did they pal around together?
A. Yeah. I remember they used to trade Matchbox cars.
Q. They get in trouble together?
A. Yeah, they did once.
Q. What was that?
A. Oh, I think it was more of a dare from school. My mom took all of us to Mason City to K-Mart, and Mom and I went one direction, and Dustin and Brian went another direction, and I think they -- I don't know what they took. They took like a little Matchbox car, and all of a sudden we heard on the speakers, you know, Marvea Smidt, come to the back of the store; Marvea Smidt, come to the back of the store.

And go to the back of the store, and here's Dustin and Brian, and it was the -- you know, the store security, and here they had taken, you know, little Matchbox cars. I can't remember what they took, but -- and my mom was so mad. I remember she took them two and marched them right out to the car and made them sit in the car, and Mom said, you know, I'm not going to let you two ruin my trip to Mason City to the K-Mart. You two are going to sit in here; you're not moving, and Mom -- I was scared -- she was mad, so we went right back into K-Mart, finished our shopping, but those two had to sit in the car. They were in seventh grade.

Q. Let me move you now to Dustin's high school days in Britt,

Iowa. We heard from Mr. Brumm that he went to high school in Britt. And you went to high school there as well.

A. Yes, I did.

Q. And what kind of a guy was your brother Dustin in high school?

A. He was very well liked.

Q. Who were some of his friends?

A. Oh, he hung out with Tim Cutkomp and Todd Olson. Those are his main friends.

Q. Did Dustin work when he was in school?

A. Yes, he did.

Q. What kind of jobs did Dustin have?

A. Oh, he -- well, I worked with him at the A&W for a short period of time before he went to work for my stepfather out at Smidt Motors. I worked with him too.

Q. In addition to working like at the A&W and working for his stepdad, did Dustin do any babysitting?

A. Oh, yeah.

Q. When did he babysit?

A. It was before he was 16, before he had a car, you know. He rode a bike just like, well, everybody, or a moped, you know.

Q. Did he have regular babysitting jobs?

A. Yeah, he babysat quite a bit. And there's just -- excuse me. There's just the one that sticks in my mind. Dustin had to have been maybe about 13, around there, 14, and it was down like

in the trailer courts, and, you know, in Britt, you know, kids who live in the trailer courts are always kind of looked down upon. They had -- you know, they were poor, you know. They were kind of teased, and this kid in particular because he had a harelip, and he came -- his mom was a single mom. And, you know, in Britt, single mom, kid with a harelip, live in a trailer court, that's a target. You know, kids are cruel. We all know that.

And for a kid that age, he took it upon himself to babysit the kid, the little boy. He had no self esteem because kids used to tease him. Dustin took it upon himself to babysit that kid and help him with his self esteem. And Dustin was a well-liked kid. People didn't tease Dustin because they liked him. And if you see a kid, a boy, that other people look up to and that like him with a kid that, you know, the other kids are going to sit there and think, oh, wow, what's he doing with him? They're going to start respecting him a little bit more. You know, he took this little boy with this harelip and stuff underneath his wing to help him.

By the end of that summer, that little boy, you could tell he felt better about himself. I remember how proud I was

of Dustin for that. And I never told him that.
Q. Alyssa, as your brother was growing up going through high school, what were his aspirations, his plans for the future?
A. Well, like any other natural kid, he wanted to do many

different things. He changed his mind a lot.
Q. Okay. What were some of his plans?
A. Well, Dustin likes to argue. He's good at it. He wanted to be a prosecuting attorney, and I think he would have did a very good job at it. He wanted to be a chemist because he's good at -- he's smart. I can't remember the other ones, but those are the two that stick in my mind.
Q. Dustin eventually graduated from high school, and do you remember where Dustin went after he left high school?
A. He went out to Arizona.
Q. To be with his brother Jeff?
A. Yes.
Q. And about how long was he down there if you recall?
A. He was down there for about maybe a year or two.
Q. And then he came back to Britt?
A. Yes.
Q. And what did he do when he came back to Britt?
A. He went to NIACC, I believe.
Q. And NIACC is North Iowa Area Community College?
A. Yes, it is.
Q. Did he live at home, or did he live in a dorm?
A. He lived at home with my parents.
Q. Did he get a job as well?
A. Yes, he did.
Q. Where did he go to work?

A. He went to work for Ron out at Smidt Motors pulling parts off the cars.
Q. Did he eventually develop a relationship with a woman named Kathy Rick?
A. Yes, he did.
Q. And about when was that if you have any way of placing that in perspective?
A. Well, he was working at Wellborn, somewhere in there, and he met Kathy Rick, and I remember him telling me that, you know, she was having a hard time with her ex-husband, you know, and she was pregnant. And he befriended her, was helping her through the pregnancy. And he was there for Brandon's -- for Brandon's birth, and he was there, helped raise Brandon, and then she got pregnant with Ryan.
Q. And Ryan is Dustin's son.
A. Yes.
Q. Would Dustin bring Kathy's children and his own son over to your house at Britt?
A. Yes.
Q. And tell us about his interaction with -- first with Brandon.
A. Brandon is my nephew, maybe not by blood but by every other means. He calls me Aunt Lyssa. Brandon is Dustin's son. He calls my mom Grandma. He knows he's biologically not Dustin's, but he still calls him Dad. And Dustin is very good with his

♀

3641

kids. He gives them -- you know, Brandon was having some problems in school. Some kids were picking on him because, you

know, you know, he's kind of going through the awkward stage, you know, the buck teeth, the big ears, that kind of stuff, and he's a target. And Dustin's given him some pointers of, you know, you gotta chin up, you know; you gotta talk things through; you gotta learn how to deal with things, you know.

Q. Tell us about Ryan as a baby. What was Ryan like?

A. Ryan was a cute baby. Dustin used to change diapers. It was kind of comical. I never thought he'd do that. He was a good baby. Dustin was always there for him changing diapers, feeding him. The kids were always with Dustin.

Q. Ryan was, I take it, a surprise.

A. Very much so.

Q. But welcomed in your home?

A. Yes.

Q. Welcomed in the family?

A. Yes.

Q. Did you know Angie Johnson?

A. Yes, I did.

Q. And did Dustin also have a baby with Angie Johnson?

A. Yes.

Q. And her name is Marvea.

A. Yes, it is.

Q. Named after your mom.

3642

A. Yes.

Q. Describe Marvea for us.

A. She's a happy little girl who misses her daddy. She doesn't have either parent right now. She likes to play with makeup. She likes music, and she loves her Grandma Marvea more than anything.

Q. I want to go backwards just a little bit to when your brother Dustin was arrested back in 1993 and charged with drug crimes. Do you remember that?
A. Yes, I do.
Q. Was he living at home with you then?
A. Yes, he was.
Q. And about how old were you in 1993?
A. I was probably about 21.
Q. Excuse me?
A. About 21 I believe, 1993 I'm thinking.
Q. Where were you living then?
A. I was in Sioux City. I was living off campus. I was going to college. And then I would come home, you know, every summer. I was probably home about every other week anyway on the weekends.
Q. And again, Dustin was arrested later and prosecuted again for a drug crime. Do you remember that?
A. Yes.
Q. Were you a probation and parole officer when Dustin was

♀

arrested the second time and eventually sent to prison?
A. That was what? In 19 -- 1996?
Q. '96.
A. No, I was not.
Q. Your brother did go to prison.
A. Yeah.
Q. And has been in prison for many years.
A. Yeah.
Q. What's your relationship with your brother now?
A. It's good. I mean, we write each other letters. He calls

me on the phone. He's still the big brother, you know. He still, you know, tells me what to do sometimes, you know, but in a good way, gives me constructive criticism, and always tells me he loves me.

Q. What's his relationship with his children now?

A. He writes them and calls them all the time, you know, and keeps in contact with them at least on a weekly or biweekly basis.

Q. What's Dustin's role in your life now?

A. I just miss him so terribly. If you had asked me how many years, ten years ago, anything like this, that I would be up here sitting in this chair today sitting in front of you people crying my eyes out, begging for my brother's life, I wouldn't have believed you. This is one of the worst nightmares anybody can go through besides what the victims' families have gone

through.

Q. Alyssa, does Dustin have value in your life?

A. More value than I can measure.

Q. In what way?

A. Dustin is a piece of me. He makes a part of me. If he's gone, a part of me goes too.

Q. Does he support you?

A. Yes, he does.

Q. Encourage you?

A. Yes.

Q. Have you imagined life without him?

A. Have I what?

Q. Imagined life without him.

A. I try not to, but how can I not when he's facing this? I

have to. I don't want to, but I have to.

MR. SPIES: I have no other questions, Your Honor.

THE COURT: Mr. Williams, you may cross-examine.

MR. WILLIAMS: Your Honor, could we approach for just a moment?

THE COURT: Yes.

(At sidebar on the record.)

MR. WILLIAMS: Before I go someplace, I just want to warn the Court where I'm going and make sure it's okay.

THE COURT: Okay.

MR. WILLIAMS: Honken was convicted in 1986 of car

theft, a theft second, and what he did was stole a car, and he stole some tools in order to rip the car apart for parts. He was convicted. He got a deferred judgment, was placed on probation for two years. I think they've opened the door to that not only with this witness but with the other witnesses, and I want to go there with this witness, but I didn't want to do it without alerting you that that was my intent.

THE COURT: Mr. Spies?

MR. SPIES: Well, that's okay. We were going to get into it anyway with his mother.

THE COURT: Okay. Fine. Thank you.

MR. WILLIAMS: Thank you.

(The sidebar was concluded.)

THE COURT: Mr. Williams, you may cross-examine.

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Ma'am, I just have a few questions for you. Just to put a

time frame on this, the bank robbery that your father committed occurred on June 2 of 1986; is that correct?

A. I believe so.

Q. And the defendant, Dustin Honken, would have graduated from high school just that year, in May of 1986.

A. Yes.

Q. You talked about Dustin stealing a Matchbox car when he was

♀

a young man. When he was in high school, he actually stole another car, a real car, didn't he?

A. I believe so.

Q. And he was convicted of stealing that car and stealing some tools that was used to rip that car apart for car parts, convicted of theft second.

A. I don't know anything about the tools.

Q. Okay. And was actually convicted of that crime and placed on probation for three to five years back in 1986.

A. I don't remember about the probation.

Q. And you indicated that at one point Brandon got into some difficulties at school with some kids picking on him. Do you remember that part of your testimony?

A. Yes.

Q. In fact, your brother's advice to Kathy Rick was not to have Brandon go rat these kids out to the teachers but to actually fight the kids so he could earn respect from them. Wasn't that the advice your brother gave to the mother of his child?

A. I never heard that.

MR. WILLIAMS: I have nothing else, Your Honor.

THE COURT: Mr. Spies, any redirect?

MR. SPIES: No, Your Honor. Thank you.

THE COURT: Okay. Members of the jury, it is about ten after ten. We're going to take a 25-minute recess and

then -- well, why don't we make it 30 minutes. Please remember my cautionary instruction. Keep an open mind until you've heard all the evidence in the case, received my final penalty phase instructions, heard the closing arguments of the lawyers, and go back to the jury room to begin your deliberations. Thank you. We'll be in recess for 30 minutes.

(The jury exited the courtroom.)

THE COURT: Okay. Please be seated.

So, Mr. Spies, you're out of witnesses today; is that right?

MR. SPIES: I am, Your Honor, yes, sir.

THE COURT: Okay. What's the likelihood that Cunningham will not be here to testify tomorrow?

MR. SPIES: My last contact with him, Your Honor, was last night, and you're asking me logistically or tactically?

THE COURT: Logistically.

MR. SPIES: Logistically, my understanding was he was to begin his testimony at ten o'clock this morning in Houston, Texas. He foresaw that he would begin cross-examination at about two o'clock, but he's made arrangements to get a night flight back to Omaha or Sioux City, whichever can get him here closest and fastest. So he's given us assurances he will be here tonight and available tomorrow morning.

THE COURT: Fastest is a Continental flight directly from Houston to Omaha.

MR. SPIES: Yeah.

THE COURT: Okay. Mr. Williams, where do we stand now on your situation with regard to rebuttal?

MR. WILLIAMS: May I have just a minute?

THE COURT: Sure.

MR. WILLIAMS: We've had a chance to talk with our witnesses, and they are prepared to stay for tomorrow. So I'll tell you what. I'm going to withdraw my request to put on my rebuttal case now, and I'll save it.

THE COURT: Okay. Why don't we do this. So I'm just trying to figure out the scheduling now. It looks like we'll probably have a pretty full day tomorrow. Would that be a good guess, Mr. Spies?

MR. SPIES: I'm not paying any attention to how long Alyssa Nelson was on the stand. Her mother, Dustin's mother will be on the stand probably about one and a half times that.

THE COURT: She was on the stand for an hour and nine minutes.

MR. SPIES: Yeah, and then Dr. Cunningham I think is going to be comparatively short because we've abbreviated his testimony somewhat, but I don't know because I've never had him in court before. And so I would guess that assuming we start at nine o'clock we're going to take up, if not all of the morning, certainly the bulk of the morning tomorrow. I'm sorry I can't be more precise.

3649

THE COURT: No, no, that's a good-enough indication.

Mr. Williams, what do you think your case will then

take in rebuttal and your cross-examination? And I guess my question is is there much likelihood we're going to actually submit it tomorrow, or do you think we'll be back on Thursday to do final instructions and closing?

MR. WILLIAMS: I don't think my rebuttal case is going to take that long. I will tell the Court that we may have as many as seven witnesses on a rebuttal case, but each one of them is going to be pretty short. If they got done by noon, I would be surprised if we weren't done by the afternoon break. So I think we would be prepared to argue tomorrow afternoon. You know, worst-case scenario, conservatively, no. Conservatively we'd argue this thing on Thursday morning.

THE COURT: Do the instructions maybe tomorrow afternoon, argue Thursday morning depending on where we are.

MR. WILLIAMS: Certainly we can do that.

THE COURT: Will both sides be prepared to argue tomorrow if we can comfortably fit it in?

MR. WILLIAMS: Yes, Your Honor.

MR. SPIES: Yes, Your Honor.

THE COURT: Because I don't really want to -- I don't like to give the other side the rebuttal the next day, so I'd like to finish up. If we can't argue tomorrow and get all the arguments done, then we'll probably argue first thing Thursday

morning.

MR. WILLIAMS: Certainly.

THE COURT: And do the instructions on Wednesday afternoon.

Okay. What I think I'll do is just go ahead and bring the jury up if we can round them up from their break and explain

to them that due to unforeseen scheduling matters that's going to be it for today and tell them we'll see them tomorrow at nine o'clock and there's a chance that it may get submitted tomorrow but more than likely on Thursday. Anybody have a problem with that?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Spies?

MR. SPIES: No, Your Honor.

THE COURT: Okay. Can we -- if we can get the jury back in, I'd appreciate it.

DEPUTY FULLER: It will just be a few minutes, Your Honor.

THE COURT: That's fine.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated. I think you know I would not cut your break short without good reason, so I didn't feel there was any reason to delay this any further. We're done for the day. It's a scheduling problem that nobody could have predicted.

♀

I first learned about it about 9:30 last night. It was really too late to contact everybody. I knew it was going to be a short day today. I just didn't know how short. And there's some scheduling difficulties neither of the parties could foresee. It's absolutely nobody's fault. There's nobody to blame. It's just one of those things that happens. I regret it because I know how valuable your time is and how hard we work not to waste any of your time or inconvenience any of you. But it's just a situation where it was totally unavoidable.

And so we're going to send you home for the day.

We'll be back tomorrow morning at nine o'clock. Here's what I think will happen tomorrow. It's always subject to be unpredictable. I think we will finish all the evidence tomorrow. There's a chance we may get to instructions and an outside chance that we would get to closing arguments. I think that would be unduly optimistic to predict that. And so my best prediction is we'll finish all of the evidence. We may get to the final instructions.

In any event, we'll be back Thursday morning at nine o'clock to do whatever we have left, either final instructions and closing arguments or just closing arguments. So I'm fairly confident you'll be able to begin your deliberations some time on Thursday.

Again, I apologize for the inconvenience. And please remember my cautionary instruction: Keep an open mind until

you've heard all of the evidence; had a chance to receive my final penalty phase instructions; hear the closing arguments of the lawyers; most importantly, go back to the jury room and receive all of the penalty phase evidence and begin your deliberations. So we'll see you tomorrow morning at nine o'clock. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated.

Any matters we need to take up, Mr. Spies? Anything you can think of? Mr. Parrish?

MR. PARRISH: Your Honor, there is a matter after the public is excused we'd like to address with the Court, please. Thank you.

THE COURT: Okay. Anything from the government?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. We'll be in recess, and why don't I -- do you want to just talk in chambers, or do you want to talk on the record with the defendant present?

MR. PARRISH: It should perhaps be on the record with Mr. Honken present also. It won't be very long.

THE COURT: Why don't we take a -- okay. Why don't we take a 30-minute recess. I'm a little bit confused. Are you asking me to seal the courtroom?

MR. PARRISH: Well, yes. And, Your Honor, you could perhaps once you hear the record then make a determination if it

3653

ought to be -- and I understand the Court's concern with that, but it would perhaps be more appropriate outside the public.

THE COURT: Okay. We'll be in recess for 30 minutes. Thank you.

(Recess at 10:22 a.m.)

THE COURT: Please be seated.

Mr. Parrish?

MR. PARRISH: Thank you, Your Honor. May it please the Court and counsel. Your Honor, we wanted to address one matter --

MR. ROGERS: Excuse me, Mr. Parrish. Did you realize members of the press were present? I'm just calling that to his attention.

THE COURT: Yeah, it's gotta be open to the public. I appreciate that. But it's not a ground to seal the record.

MR. PARRISH: Right. I'm sorry. I thought I discussed that when we walked back in there.

MR. ROGERS: It went over my head.

MR. PARRISH: Thanks, though, Mr. Rogers. May it please the Court and counsel. Your Honor --

THE COURT: Let me ask you this. Nobody's asking me to seal it.

MR. PARRISH: I would.

THE COURT: On what grounds?

MR. PARRISH: On the grounds that it may be matters

♀

that could, in fact, be released that could affect deliberation. I realize the Court has instructed the jurors not to read the articles, but if family members are here, other people are here, it could have some impact on the remaining deliberative -- and I think the Court's term is we're at a very critical point, a serious point, a difficult point in the case. I think we all know from day one we would be at this particular point. I think it involves issues that could have some impact, and I think the Court could hear the argument briefly and at that point decide if it was necessary or may impact the public or public could be advised later as to what those issues would be.

I've discussed it briefly with the government. I'm not sure what the government's position is. But I'm not sure they would oppose the motion to at least seal it for this purpose.

THE COURT: What's the government's position, Mr. Williams?

MR. WILLIAMS: Your Honor, the Code of Federal Regulations regulates my position on this, and the code requires us to oppose any closing of any hearing absent a finding by the Court that to close -- to not close the hearing would jeopardize the defendant's right to a fair trial and that there's no other

least restrictive means to do so. And under these circumstances, my inclination is that it need not be closed based on what I understand is going to be discussed here.

THE COURT: And based on what I understand too, I think I'm going to overrule your motion to seal the record, and we'll do it in the light of public.

MR. PARRISH: That's fine, Your Honor.

THE COURT: Thank you.

MR. PARRISH: Your Honor, again, as we briefed the Court on this point just briefly beforehand, this is a matter we feel we are obligated to make regarding this matter. I mean no disrespect to the Court in making it. I feel it's an obligation on our behalf representing Mr. Honken on this most important issue.

Yesterday during the testimony of three impact witness statements, Ashley DeGeus, Wendy Jensen, Brittany Asbe, when they were testifying, specifically Ashley DeGeus when she was testifying, when she specifically began talking about her dad and what he meant to her, in making personal observations with regard to the Court's response to that testimony, the Court became somewhat emotional during that testimony as anyone could understand. It's been difficult for all of the parties and lawyers involved in this case to hear testimony of that nature and also much of the other testimony.

Also when Wendy Jensen testified, Your Honor, the Court when the -- when she specifically testified about when the mother received flowers from Mr. DeGeus and brought them to the hospital after the birth of her son, the Court again became

somewhat emotional and responded in an emotional manner.

And then finally when Brittany Asbe testified and a poem was being read by this young lady, the Court again responded in an emotional manner at that point.

The Court has provided an instruction to the jury -- I believe it's number 10 in the penalty phase on page 33 -- where it talks about any conduct on its part. However, we believe that the response as demonstrated is distressing in one sense, that at one point jurors had an opportunity after the Court asked did Mr. Spies have any additional questions, it appeared that several of the jurors may have watched part of this reaction by the Court which could influence them or could influence them as to the Court's thinking. The question is did it possibly influence them. We don't know.

During that response of those three specific witnesses except for one juror, there were no emotional responses by the jury that were observable.

It's our position that having the jury make those observations put them in a situation where the instruction that was given to them that no conduct by the Court or actions by the Court puts it outside of that category but yet puts it in the category where that response or that observation may be over and beyond a curative instruction in that area.

For those reasons, Your Honor, we believe based upon the Court's response and the potential of the jurors having an

3657

opportunity to observe that specifically on the victim impact statement we would move for a mistrial. Mistrial would be based upon the fact that it could have some undue influence on the

jury. We believe that it demonstrates, whether rightful or wrongfully, that the jury may believe that the Court has some idea of how it feels about this case expressed to the jury.

Further, Your Honor, in terms of an inquiry to this particular jury, if the Court even believes it reaches that threshold, it would be difficult to have this Court make an inquiry to the jury if they made those observations and, if anything, what impact it would have on the jury for this Court to make an inquiry to the jury. We believe for that matter this Court should not make any inquiry as to what the observations might have been and whether or not it might impact their decisions.

Your Honor, we don't take this -- it's not any effort to embarrass the Court. We know it's a difficult situation for everybody. However, at this critical and serious stage of the case, it's important that the jury not be influenced or think the Court may be thinking in any particular way. And I -- it's an area where none of us have ever been before. We don't take this statement lightly. We had long discussions about it and how best to approach it.

I did discuss with the government the issue earlier this morning and our concern about it. And we believe not only

was it demonstrated by the Court's actual emotional expressions on the face but also in terms of at a couple of points during the exchange of one counsel to the other counsel the Court's voice was, in fact, cracking, and it did demonstrate some emotional response. And while it may be that those responses had to be there, it's not anything we believe was intentional on the Court's part or anything like that. But it is something

that we believe could have some impact on the jury's decision making. Thank you, Your Honor.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Your Honor, I premise these comments with the fact I've not done any research nor has the defense cited any authority that even if the Court had any emotional response that it would support a motion for a mistrial. So I have not done the research, and I will just -- if that becomes an issue down the road.

First of all, we did not see the same response apparently the defense believes it saw. Certainly I didn't because my focus was on the witnesses. I do recall that I think on the last witness you had a frog in your throat, but that could have been anything having nothing to do with emotional response. So I don't know that we saw that same response.

And in any event, I don't think it's clear that the jury -- if there was one, I don't think it's clear the jury saw

3659

that response.

Even assuming that the jury did see -- there was a response and the jury saw it, the Court's instructions makes it clear that the Court has no opinion on the outcome of this case or what the verdict ought to be, and they're clearly instructed in that direction.

And I don't think a conclusion can be drawn -- even assuming, again, the Court had an emotional response to that testimony, I don't think a conclusion can be drawn on the merits of the case or what the Court believes the proper punishment should be simply because the Court has empathy for the plight of

these victims. The defense has expressed empathy for the plight of these victims. And even if there was an emotional response, the most that it shows is that we're all human, that we can all have sympathy for what happened to the family and to the victims, but that doesn't mean that the Court has made up its mind or is in any way telegraphing to the jury what the proper punishment ought to be.

This -- the attorneys representing Dustin Honken have sympathy for the victims in this case they've expressed, but they are most certainly not advocating that he receive the death penalty. And so simply an emotional response from the Court doesn't prejudice the defendant because it doesn't telegraph anything other than empathy for the victims.

Finally, to the extent that the defense believes that

something needs to be done, mistrial is not the answer. If anything, a further curative instruction or revamping the instruction the Court already has in there could resolve any problems. Off the top of my head, something to the effect of you've heard emotional testimony in this trial by both sides; there may or may not have been emotional responses by court staff, court security officers, marshals, or other people in the audience, and you are not to reach any conclusion or make your decision based on any emotional response by any people in the courtroom and make your decision just based on the evidence and your weighing of the aggravating and mitigating factors, something to that extent. To the extent that anything needs to be done curative, I think that would certainly resolve any problem.

THE COURT: Mr. Parrish?

MR. PARRISH: Your Honor, let me just preface again, this is tough testimony for everybody. I think I did allude to it in my closing argument. Mr. Spies has discussed it in his argument. It's not easy for any of us, particularly those of us who have kids, to go through this. So in no way am I trying to put the Court in a difficult position.

However -- and I think what the government says, you know, may be a remedy. How -- but the problem here is if the jury has thoughts that because the Court responded in a particular way it might have in some way influenced their

♀

3661

decision is I think where we have to go in the evaluation of what happened.

And, you know, is that a requisite -- is that instruction sufficient? I don't know, but I think it's something to be thought about.

We did go online and try to do some research on the issue last night. We were not able to come up -- and we spent some time on Westlaw, and I think someone spent some time on Lexis to try to get us to frame it in a way for the Court to address it, but we at this point have not been able to find anything yet of what area it might fall in.

But I believe the Court is the only one who can really answer, you know, basically its thoughts with regard to this matter and whether or not the jury might have made some observations about it. But again, Your Honor, I hope the Court understands why we had to make this motion.

THE COURT: Of course I do. Your obligation is singularly to your client and to be a zealous advocate.

MR. PARRISH: But the Court knows I have nothing

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3193 of 3636

but -- and we all have nothing but great respect for this Court and its hard work in this matter.

THE COURT: It is hard work, and I'm not even taking it personally. You have a job to do. You raised it in the most professional way. You didn't raise it as timely as you could have, but that's because you wanted to give it some thought, and

I think that's obvious to me that you didn't want to just jump up and do it yesterday when I sent the jury home or even this morning.

MR. PARRISH: Quite frankly, we didn't even want to raise it, Your Honor, but I just think we're just obligated to.

THE COURT: I agree with you. You're obligated to raise any issue on behalf of your client that you think is appropriate to raise. And so you've done that.

MR. PARRISH: Thank you, Your Honor.

THE COURT: Thank you. Anything else anybody would like to add?

MR. PARRISH: No, Your Honor.

THE COURT: Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: I'm going to deny the motion for mistrial. I'm certainly open to modifying final penalty phase instruction number 10, particularly if the parties can agree on any language they would like. And it's not a waiver of your motion for mistrial.

Do you have any thoughts about whether or not you would want some form of modification to -- we haven't done final instruction number 10 yet, so the jury would never know it's been modified. And actually had I thought about the language

you suggested before we drafted the instructions, I probably would have included it in an anticipatory way.

So why don't I give the parties some time to think about that, and then we've got -- one thing we have today is some time. So would the parties like to think about that and then we'll meet back this afternoon?

MR. PARRISH: Yeah, this afternoon is fine. I did find one typo.

THE COURT: Oh, okay. Well, good.

MR. PARRISH: I think it's on page 33, and maybe it's been corrected already. I don't see Roger here, but "nothing I have said or done during the either the," there's an extra "the" in there. But other than that, we can work on it, Your Honor. We might want to look at a couple cases, I mean, and we can meet early in the morning too. It doesn't matter.

THE COURT: Well, I'd just as soon get it resolved today, but if you want to take some time -- do you want to meet back at four o'clock today?

MR. PARRISH: That's fine. That's fine.

THE COURT: Okay. Mr. Rogers?

MR. ROGERS: I have a suggestion, Your Honor, that is related to the motion you've already denied to seal this hearing, and it certainly would not further the purpose of the jury not being influenced by any emotions the Court may have displayed for them to hear somehow that the defense moved for a mistrial based upon that display.

So I would suggest that the Court give sort of a

limited gag order, if you will, to the media representatives present that nothing about the contents of this hearing be published until after a verdict in the penalty phase. That's one of those lesser restrictions Mr. Williams was talking about that occurred to me while he was saying that.

THE COURT: Mr. Williams?

MR. WILLIAMS: I have to plead ignorance in this area of the law. I've not researched what the Court's authority is to issue a gag order on the press. My gut reaction is never to gag the press, but that's just a gut reaction. It's not an informed one under the law. So I don't know that I have a position, certainly not a well informed one at this point.

MR. PARRISH: Your Honor, I can say yourself being probably the premier First Amendment lawyer sitting here you probably have a better idea of that than anyone here.

THE COURT: I appreciate your suggestion, Mr. Rogers, but I'm going to decline to issue a gag order. Thank you.

Anything else? We'll see you at four o'clock.

MR. SPIES: One other matter, Your Honor, and it relates to the substance of why we're here. We understand from Mr. Williams that the government may call rebuttal witnesses, and we would ask for the disclosure of any Jencks materials as to rebuttal witnesses. I know that they've given us notice about Dr. Carlson, and they furnished us with materials concerning him, but I think we stand in the virtual position of

3665

entitled to Jencks materials on any rebuttal witnesses, so we'd move for that.

THE COURT: Do you have any Jencks material on any

rebuttal witnesses?

MR. WILLIAMS: I do, Your Honor, and . . .

THE COURT: What's your position as to whether or not the Jencks Act applies?

MR. WILLIAMS: Well, I don't think it -- it applies, but technically it only applies after they testify. Under the Jencks Act, I only have to disclose the statements after they testify. And given it's solely rebuttal evidence, I don't think I have an obligation to provide that to the defense in advance of putting on my case.

Would you allow me some time to think about that issue before four o'clock today, because my concern is some of the stuff that Marvea may testify about may also apply to some of these issues? And I'm somewhat concerned about disclosing where I'm going with my case before they finish theirs. But I can give you a position on that at four o'clock today.

THE COURT: Well, before you do that, let me ask you this. Do you have any authority that you're entitled to the material prior to the witnesses testifying other than the kind of practice in the Northern District?

MR. SPIES: No, other than the ordinary comity afforded the parties under the United States attorney's customs

and practices, no. I mean, I understand what the Jencks Act requires.

THE COURT: And the fact is that the Northern District of Iowa U.S. Attorney's Office discloses materials sufficiently in advance of what the Jencks Act requires in a routine way. But do you know of any case or any argument that that means that they can't rely on the plain meaning of the text of the Jencks

Act any time they want?

MR. SPIES: No. I understand that a sterile reading of the act does not require disclosure in advance. I just thought it would help to expedite and streamline and avoid further disruption in what's going to be a difficult day anyway.

THE COURT: Well, you can do what you want. I don't know of any authority that I would have to require you to disclose it early. And particularly with regard to rebuttal witnesses, I think that's for you to decide, less of a policy reason to disclose it early than there would be on, you know, a case-in-chief witness.

MR. WILLIAMS: I will give it some careful thought. I'm sympathetic both to the points that Mr. Spies has brought up and to the concern that it could cause further delay.

THE COURT: How extensive would the Jencks Act material be? Do you know in terms of pages?

MR. WILLIAMS: Maybe 30 pages total.

THE COURT: All relative to the rebuttal testimony?

MR. WILLIAMS: Yes.

THE COURT: Okay.

MR. WILLIAMS: My inclination right now is to go ahead and turn it over, but I just want to give it some thought and talk it over with my trial team before I do that.

THE COURT: That's fine. Anything else?

MR. WILLIAMS: No, Your Honor.

THE COURT: Anything else from the defense?

MR. SPIES: No, Your Honor. Thank you.

THE COURT: Thank you. We'll be in recess.

(Recess at 11:15 a.m.)

THE COURT: Please be seated. Based on the in-chambers discussion concerning a revised final penalty phase instruction number 10 entitled Concluding Instruction, it's been modified in light of the discussion of the lawyers, and I want to make sure that the defense is actually requesting that I give this instruction. Mr. Spies? Mr. Rogers?

MR. ROGERS: I was looking for the modified one.

THE COURT: Can you go to the podium?

MR. ROGERS: Thank you, Your Honor. Subject to the record previously made, Your Honor, and certainly without waiving our motion for mistrial and the basis for it and asserting on the record our belief that this instruction does not obviate the necessity of a mistrial, we do request the giving of this instruction.

3668

THE COURT: Any record the government would like to make with regard to final penalty phase instruction number 10 entitled Concluding Instruction?

MR. WILLIAMS: No, Your Honor. We have no objection.

THE COURT: Okay. Now, with regard to the change in language on page 25 of your first mitigator, are you satisfied with that change in language?

MR. ROGERS: Yes, Your Honor, and this is being done at our request.

THE COURT: Okay. Does the government have any objection to it?

MR. WILLIAMS: No objection, Your Honor.

THE COURT: Okay. Any other -- and then obviously the verdict form will be changed accordingly. We've actually made the change in the verdict form. It takes a little while to

print it out because the printer has to think when it prints out the verdict form. It takes longer on charts, but we've gone ahead and made that change. And then there's some additional record you want to make. But anything else on the instructions?

MR. ROGERS: Nothing else on the instructions, Your Honor. Thank you.

THE COURT: Okay. Mr. Parrish?

MR. PARRISH: Thank you, Your Honor. May it please the Court and counsel. Your Honor, at this time we wanted to expand on the record we made earlier today regarding this

matter, and we'll have the Court take into consideration the earlier record that was, in fact, made. I believe I stated in the record at that point that at three phases of the victim impact testimony we saw the Court express emotion, and at this time, Your Honor, I want to expand that record for the purposes of clarity of the record.

During each of those times, Your Honor, when I just made the statement this morning that it was emotion, I wanted to indicate that the observations made by myself was that the Court did visibly cry during each of those --

THE COURT: Well, that's absolutely false, Mr. Parrish, but that's your observation.

MR. PARRISH: I understand, Your Honor.

THE COURT: I can guarantee you I didn't cry.

MR. PARRISH: I understand.

THE COURT: But you go ahead and make your record. Excuse me.

MR. PARRISH: And the Court's expression reddened, and the Court on a couple of occasions raised its head into the air

and I believe in an effort to contain the Court's emotion, that it happened during Miss DeGeus's -- Ashley DeGeus's testimony, Wendy Jensen's testimony, Brittany Asbe's testimony I believe. And also it happened where the Court on two occasions when asking Mr. Spies to cross-examine had a catch in his throat to try to -- in asking Mr. Spies if he wanted to go forward with

3670

cross-examination. The Court's also facial expression changed substantially during each of the time the testimony was offered with regard to these three people's testimony.

On one occasion at a minimum I observed a couple of the jurors look at the Court during the expression on the Court's face, then quickly look away at that point when they looked toward the Court at that point.

In asking around last night about the matter, I did, in fact, ask persons on the defense team their observations without any input from myself as to their observations. I believe the observations would be consistent that the Court showed emotions during the time of Wendy Jensen's testimony, specifically during the testimony of Terry DeGeus going to the hospital with flowers to meet her son and also with regard to the expression of some -- expression of emotion by the Court after Brittany Asbe's reading of the poem, that there was some difficulty that the Court had in asking Mr. Spies if he had any questions with regard to cross-examination.

I know the -- and not to quibble with what Mr. Williams indicated as a frog in the Court's throat, I thought it was basically a catch in the voice of the Court when it tried to express to Mr. Spies did he have additional questions which seems to have been said at the time when the

jury normally looks to the Court for a follow-up on any further questions that the Court might have, that that happened on two

separate occasions. I believe that was between the testimony of Miss Jensen and Brittany Asbe.

Your Honor, we believe that that display by the Court, how ever the Court would describe it -- and I understand Court has given its interpretation of what it believes to be the case, and obviously I would, you know, not dispute the Court's own interpretation of what it says. I can only go by what my observations may have been.

But we believe that display of emotion in front of the jury at that juncture deprives the jury of the appearance of impartiality by the Court. Clearly it's emotional testimony. I'm not faulting the Court for it. I mean, we've gone through the same thing. But I believe that a juror could get the impression that the Court is influenced somewhat by the testimony to the extent that it favors that testimony as opposed to the -- any other testimony that might be presented by the defense in this matter.

We also believe that if it's taken at the time or expressed at the time that the government is putting on its victim impact testimony it could influence, at a minimum, even one juror which we think would deprive Mr. Honken of a fair trial before an impartial judge as guaranteed by the Fifth Amendment. If a juror was influenced to some extent, it could deprive them of a juror who could have been influenced by what the juror observed, rightfully or wrongfully, whatever their

observation might have been, but it gave them the impression even that the Court was bothered by it. To the extent of that expression, it would deprive them of their Sixth Amendment right and also could impact the Eighth Amendment right of Mr. Honken.

In summary, Your Honor, two things we'd like to say. Number one, obviously it's human, as Mr. Williams said, for the Court to respond to testimony in that manner, and obviously we're not criticizing the Court in any way for that but only ask the Court to consider what impact it may have had on a juror, and we certainly appreciate the effort the Court has made in giving us an instruction to work with that. We worked hard on trying to do some research on the issue but could not find any specific cases, and I wanted to make sure that the Court knows that we have been working for most of the afternoon trying to find some cases that would, in fact, assist us with this matter.

The thing I think that we believe the Court ought to look at -- and I realize the Court has made its decision, and I'm not really rearguing, but for the record two things we wish the Court to do, and obviously we can't require the Court to do anything.

But the jury, particularly in a case like this, you can obviously look at the jury and know that they have great respect for this Court as all of us have, and they look to this Court for guidance, and they look to this Court and its reaction to matters as to how they're going to respond to some extent.

3673

Obviously they don't have to, but that's the nature of the beast in the judiciary. So we believe they look to the Court as the arbiter or the neutral authority in such a hot contested matter.

And the last thing we'll ask the Court to do -- and if

I've misconstrued or mischaracterized what my observations might have been, you know, all I could say is I would apologize, but I believe based upon my record and my conversations with other individuals around, they tend to believe that there was some display of emotion to the extent that supports a meritorious argument at least with regard to this matter.

If the Court believes I mischaracterized it in any way, I would just ask the Court to clarify that because it could be a -- I believe it's a unique matter. It is something that the Court may have to consider later on and may even -- as well as I know this Court, is considering as we speak right now. I don't think you took it lightly at all when it was first initiated. I don't think you took it lightly at all in your efforts to prepare an instruction. I think that would be helpful to us to get around this issue, but clearly it's an issue I believe as the Court recognizes that we do have to contend with to some extent. Thank you, Your Honor.

THE COURT: Thank you, Mr. Parrish. You don't have anything to apologize for. We just have different perceptions of what happened. With -- I will say this. I do have a catch in my voice. I'm actually being treated by an ENT and a

3674

pulmonologist to try and figure out what's causing the catch in my voice. It's been hard for me to read the instructions.

And I think there was some emotion in my voice, though. I mean, it was very emotional testimony. And I'm not trying to say that my voice was without some emotion to it beyond the kind of catch that I have. It was very emotional for everybody. I tried to do the best I could. We don't have a tape recording to play back my voice. I mean, I do have a catch

which I think has been obvious because I have this chronic cough and catch that causes me to actually catch my words and have to repeat them.

But I don't know what to say because I'm not -- I don't think now is the time to turn this into an evidentiary hearing on the point. I assume that that may come and probably will come at a later day. But I'm not sure now's the time, and you didn't ask to put on any evidence. And so I think I'm just going to leave it at that.

But like I said earlier today, your singular obligation is to Mr. Honken, to represent Mr. Honken as zealously as you can and to raise every argument that you think you need to raise on his behalf. And that's what you're doing. So nobody has a problem with that.

MR. PARRISH: Thank you, Your Honor.

THE COURT: Mr. Williams, anything you want to add?

MR. WILLIAMS: I guess just to make sure on the record now, the -- nobody on the government side -- and I guess I only talked to Bill Basler and Tom Miller -- and myself, none of us saw any tears, any crying, anything like that. I'm not saying that -- because I wasn't looking at you most of the time, so I don't know personally. But I didn't observe it.

And I'm not saying that -- as the Court admitted, you know, there may have been some emotion in your voice, but beyond that, none of us observed any crying. And that's at least our perspective on it. I understand the defense has a different perspective on it, but that's our . . .

THE COURT: For whatever it's worth, I asked my law clerk. She said she didn't observe anything.

MR. PARRISH: Your Honor.

THE COURT: Yeah.

MR. PARRISH: I need to correct that. I asked Mr. Williams this morning -- I talked to him earlier. His recollection at this moment is not exactly what we discussed this morning. Mr. -- and I don't want to speak for Mr. Miller or Sali. I asked permission to go speak to Sali this morning when I came in, and I'm not speaking for either of them, but that's not my recollection of seeing no emotion if that's what Mr. Williams is saying.

MR. WILLIAMS: No. What I'm saying is we saw no crying, no tears, no crying from the Court.

MR. PARRISH: She did say she saw no tears. She did

not say she did not see any emotion. I think that is not -- when I got permission to interview her, that is not what she said.

MR. WILLIAMS: Just so we're clear because to some degree there's an allegation I misrepresented something here, I wasn't privy to any conversation between Mr. Parrish and Sali Van Weelden, so nothing I said -- I've not talked to her. I don't know what she saw. She's not told me what she saw, and she certainly didn't tell me what she told Mr. Parrish today, so I don't know about that.

THE COURT: Any other record anybody would like to make?

MR. PARRISH: No, Your Honor.

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Anything else we need to talk about? Oh, this rebuttal issue?

MR. WILLIAMS: Rebuttal issue, and I think it's probably best handled if I give you a quick preview of where we're going with our rebuttal evidence, and then the defense can make whatever objection they deem appropriate.

The rebuttal evidence that I understand they're objecting to has to do with a bank robbery that occurred back in 1986. There's a couple things that have come up during this trial not the least of which is the mitigating factors identified by the defendant that he's not had a history of

♀

violent behavior, he's not had a history of -- now significant history of criminal convictions, previously a significant history of criminal conduct.

Beyond that, during the evidence, most certainly the image, the impression, that the defense has attempted to paint for the jury is that other than these murders Mr. Honken was a good little boy who always did everything right. In the words of Carol Honken, never, ever got into trouble and that he grew up, went to school, was a good student, average student, went to college, just a law-abiding citizen who, lo and behold, in 1992 apparently starts down the road of criminal conduct.

In particular today during the testimony of Alyssa Nelson, she testified that she found out about the Britt bank robbery, Dustin confided in her about the robbery, that Carol had kicked Dad out, Dad was living in a shack without heat, Dustin was called by him, he was drunk, he told Dustin where he was staying, Dustin took food to him, and that Dustin told Alyssa that his dad told him, I've got a plan; if you don't help me, I'm going to kill myself, and had Dustin make a copy of his mom's pass key to the bank, and Dustin claimed he had no other

choice than to do this because his dad was going to kill himself.

The evidence the government intends to put on tomorrow is from six witnesses to rebut that specific allegation. The first witness is Kenny Hansen. Kenny Hansen was a person who

was a couple years ahead of Honken in the school. Kenny Hansen was approached a couple months before the robbery in June of 1986. Honken approached him about committing the robbery, had a plan, a detailed plan in mind --

THE COURT: When you say Honken, you're meaning Dustin Honken or Jim Honken?

MR. WILLIAMS: Yes, I'm sorry. I'll make it clear. The defendant approached Kenny Hansen about robbing the bank; had a very detailed plan about how it was to be done, what door was to be entered; once they went inside, there was going to be an old lady working there; that once they got inside, the old lady should be shoved into the bathroom; that the door should be secured; whoever robs the bank should be wearing a mask that fully covers the face; they should have surgical gloves on their hands, a very detailed plan.

Kenny Hansen is expected to testify that he probably would have gone through with it. He didn't go through with it. He knows that at some point he was told by one of our other witnesses, Mark Johnson, that the plan was for Honken to kill him, for the defendant to kill him, but he doesn't recall if that was the specific reason why he did not go through with the bank robbery.

The next witness is Alan Johnson. Alan Johnson will testify that he was a year ahead of the defendant in school,

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3208 of 3636

that he graduated from high school in May of 1985, and prior to

graduating from high school in May of 1985 had had detailed discussions with the defendant about robbing the Britt bank, the same type of details, the same type of scenario, the same type of plan.

Alan Johnson then went to the Army, was discharged from the Army in February of 1986. And sometime between February of 1986 and the bank robbery in June of 1986, Alan Johnson's expected to testify that he was approached by the defendant and asked to kill Kenny Hansen who was going to be robbing the bank and that they would split the money.

Mark Johnson, Alan Johnson's brother, will also testify to being approached by the defendant in the spring of 1986; that the defendant had a plan for the bank robbery; again detailed the plan to Mark Johnson which coincides in detail with Ken Hansen and Alan Johnson; that the defendant also asked him to help kill Kenny Hansen after he committed the bank robbery; that they were going to dispose of the body by throwing the body into a manure lagoon; that the defendant told him that the chemicals in that lagoon would eat away all of the remains including the bones and the body would never be found and that they would split the money.

Mark Johnson will testify that he then went to Kenny Hansen and told Kenny Hansen of the plan at which point Kenny Hansen responded that he was not going to go through with the plan.

Within about a month of the approach of Kenny Hansen to rob this bank, the bank was robbed. The bank was robbed using a key, we heard from the defendant's own testimony here today, obtained by the defendant. The bank robbery occurred in a manner identical to that described by the defendant.

Bill Basler would testify that he interviewed the defendant in connection with this bank robbery back in 1986. The defendant denied ever talking to anybody else about any plan to rob a bank. The defendant also told Mr. Basler, admitted that he was with his father the night before the bank robbery on June 1 of 1986.

Beverly Meyland, M-e-y-l-a-n-d, will testify that she was the teller of the branch bank for the First State Bank in Britt, Iowa, and that she was the teller who was robbed on the morning of June 2 of 1986; that she was, in fact, approached by a man wearing a mask around his face; that he had -- and I don't recall if she saw gloves on his hands or not. That part I don't remember right now but that she was, in fact, put into the bathroom, the door was tied shut, and that she was told to stay there for ten minutes.

And then finally Police Officer Charles Stubbe will testify that he arrested the defendant's father, James Honken, on June 6 I believe or June 8 of 1986, arrested him in response to a citizen complaint about a man slumped over a steering wheel in a car. When he approached the man, he was inebriated. The

♀

3681

man identified himself as James Honken; that the officer saw cash in the backseat on the floor. He arrested Mr. Honken, Mr. James Honken, and when he searched the vehicle found approximately $12,000 in U.S. currency, a ski mask, gloves, and

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3210 of 3636

a loaded handgun in the backseat. And I forgot to say the handgun was part of the scheme as outlined by the defendant and was actually used -- the teller will say the gun was actually used during the robbery.

The government believes this is in direct rebuttal to the picture painted by the defendant today that his father is this evil man who led him into a life of crime by bragging about his criminal exploits and that he was talked into getting a pass key for his father to rob the bank, and our evidence is that's simply not true, and it goes to the mitigating factor the defense has alleged that the defendant's not been involved in significant criminal conduct and not been involved in violent behavior before.

THE COURT: Doesn't it also rebut the testimony of Mr. Honken's motivation for getting the key from his mother, Dustin Honken's motivation?

MR. WILLIAMS: Yes. And I guess I meant to be saying that, but it rebuts the allegation that his only involvement in this was to go --

THE COURT: Was under duress.

MR. WILLIAMS: Right. It most certainly was not

3682

according to the testimony we have. I understand the defense will say they should reach a different conclusion, but it's certainly evidence that rebuts that.

THE COURT: Right. Why isn't it proper rebuttal testimony?

MR. SPIES: Well, there are a couple reasons, Your Honor. Number one, my recollection from Alyssa Nelson's testimony was that she said that Dustin Honken told her that he

had gotten the key from his mother because his dad was desperate for help or words to that effect and if he didn't -- if Dustin didn't help him -- and I think Shelly read back the portion of the transcript to me -- if Dustin did not help him by getting a key he would kill himself. He did not tell Alyssa Nelson any other details about the robbery, of her father's involvement in the robbery, of Dustin Honken's involvement in the robbery, but that his motivation was based on the father's cry for help.

We understand that the rules of evidence may not strictly apply here, but there's still a standard that evidence introduced can't substantially outweigh its probative value, substantially confuse, or otherwise mislead the jury.

Now, Mr. Williams has provided me with the so-called Jencks materials about half an hour ago. I've not had a chance to review them. It appears to me that the only portions of this that were in the government's discovery file in this case included recent interviews of Mark Johnson and perhaps a recent

♀

3683

interview of Kenneth Hansen. All of the other materials appear to be from a Division of Criminal Investigation file from 1986 including an interview of Dustin Honken in 1986 that I've never seen before. It may have been subject to discovery in this case but not something that I ever recall seeing in the discovery.

We think that, number one, the only thing that Alyssa Johnson (sic) has testified to is about what Dustin Honken told her about why he got the key to the bank and that it was his father's desperation.

Number two, all of the details about this robbery, including other plans, complicity of other people goes far afield of Dustin Honken's involvement in the case, if any,

beyond getting a key for his father. Discussions about killing a potential participant is far afield of any of the issues raised in the defendant's mitigation case and would I think substantially outweigh any probative value. And the testimony likewise would be misleading, confusing, and certainly potentially excessively prejudicial to Mr. Honken.

As far as bringing the bank teller in, I can't see that there is any probative value in that. Potentially Bill Basler's testimony that Dustin Honken gave him an inconsistent explanation for what he knew about the bank robbery and about the key may be probative in the sense that it contradicts or refutes what Alyssa Nelson said Dustin Honken told her.

But I don't know when any of these witnesses were

3684

garnered for rebuttal or whether this material was available to the government, particularly the interview of Dustin Honken in 1986, whether that was available to the government for disclosure to the defense potentially in preparation for this trial. But so far as I know, the interviews of Mark Johnson and Kenneth Hansen were the only materials in the discovery file.

THE COURT: Why would they have had any duty to disclose it except if they were going to use it in rebuttal in the penalty phase?

MR. SPIES: Well, the interview of Dustin Honken I think would have been germane to the preparation of the defendant's defense in this case because certainly his relationship with his father, his father's involvement in criminal activity has long been known to the government.

Moreover, so far as I know, there was never any conviction of anybody in the Britt bank robbery case.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3213 of 3636

Mr. Honken pleaded -- Mr. James Honken pleaded guilty to a bank robbery in Missouri and was never prosecuted for the bank robbery in Britt, Iowa.

So we have information about a crime that was -- did not lead to a criminal conviction of anybody, testimony that's far afield from Mr. Honken's complicity in the murders in this case in 1993. And it is so remote, so confusing at best, and misleading --

THE COURT: It wasn't remote enough for you to go into

it on your evidence in mitigation. You're the one that elicited the testimony about the bank robbery.

MR. SPIES: The evidence went, Your Honor, to Mr. Honken's relationship with his father and not to complicity in a robbery seven years before the -- before this case.

THE COURT: Yeah, but it was apparently not sufficiently remote that you're the one that raised it.

MR. SPIES: To ask about what Dustin knew about his father's role in the case.

THE COURT: Well, that's my point.

MR. SPIES: It went to the limited role of getting a key for his father: If we're going to try a bank robbery case, it's going to be pretty far afield.

Now, like I said, to be hypothetical about it, I think that any statements that Mr. Dustin Honken gave to Bill Basler about what he knew about the bank robbery to the extent that they were inconsistent with what Dustin Honken told his sister could be germane. But to get into murder plots that never --

THE COURT: Well, we're not going to get into that. The test as I understand it in sentencing is really -- isn't it

the same as the 403 balancing test?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Yeah. And it's clearly more prejudicial than probative. We're not having testimony in the sentencing phase about some remote plot how many years ago -- I understand

why you think they opened the door, and I understand why you want to use it, but that's a no-brainer. To me it's just so clearly prejudicial and it far -- we're into the remote area of what's probative that the prejudice so far outweighs any probative value. So if I made my notes correctly, the Kenny Hansen -- was it Mark Johnson -- I didn't write down the other name.

MR. WILLIAMS: Alan Johnson.

THE COURT: Alan Johnson, any testimony at all about Dustin Honken allegedly telling either one of those fellas or anybody else that you might call in rebuttal that he was going to murder somebody, that's out. That's out for sure. Is there anything you don't understand about that part of my ruling?

MR. WILLIAMS: Not at all, Your Honor. I can't say I agree with it, but I understand, and we'll abide by it.

THE COURT: Right. Wouldn't expect you to agree. That's never actually been the test.

MR. WILLIAMS: That's right.

THE COURT: Or I wouldn't be able to make any rulings; right?

MR. WILLIAMS: That's right.

THE COURT: Okay. I think it is, though, proper rebuttal testimony, but I don't want to turn this into a mini-sideshow bank robbery case. And so I think, you know, the

planning and the plotting of the bank robbery and the manner in

which the bank robbery carried out could be viewed -- I'm not saying it will be -- could be viewed by a reasonable juror of rebutting Alyssa Nelson's testimony about Dustin only did it because he was worried about his father killing himself.

Now, it's not totally inconsistent with that. But it does -- I think it does tend to undermine that, although you could -- both things could be true. He could have done all the plotting and decided not to do it and then at the last second the father said it, but I think that's for the jury to sort out.

Why do you need to have the actual woman who was robbed come in, though? Because she's going to verify some of the details?

MR. WILLIAMS: That's correct. I mean, this only makes sense to the extent that it shows that the robbery carried out by the defendant's father was carried out in precisely the manner and under the circumstances as outlined by the defendant a year before the robbery took place. And that's -- and then the same thing with the police officer. What he caught James Honken with is consistent with the plan as set out by the defendant long before the robbery took place.

Now, we could -- because the rules of evidence don't apply, we could get all that out through Special Agent Bill Basler in a summary form which would obviously shorten things up. But I'm concerned -- I don't want to have an allegation on an appeal then that I didn't abide by the rules of evidence and

somehow deprived the defendant of some rights.

THE COURT: Well --

MR. SPIES: Your Honor, may I interject just one short element on this?

THE COURT: Yes.

MR. SPIES: I understand that from other material -- and I don't even remember where I got it -- that this bank teller woman was so traumatized by this event that she's never been the same. And I cannot begin to imagine what's going to happen to her when she starts recounting this and has some traumatic reaction to something that I understand has caused her deep emotional pain, and I just can't see the benefit of doing it other than to generate some undue prejudice for the defendant.

THE COURT: Well, I was going to say that if she's allowed to testify, you know, her fear and how she felt and the trauma, that's not relevant to any purpose that you've indicated you want to call her. You want to call her to verify certain details.

MR. WILLIAMS: And I will not elicit in the slightest degree any thoughts, emotions, reactions she had. It will be only, You went to the bank. When you went to the bank, what happened? A man approached me. What did he look like? He had this on. What happened? I got the money out of the till for him. Then what happened? He put me in the bathroom and tied

off the door, told me not to open it for ten minutes. That would be the sum total of her testimony.

THE COURT: Have you actually interviewed her personally?

MR. WILLIAMS: Yes, yes.

THE COURT: Do you have any concern about your ability to narrowly elicit that testimony?

MR. WILLIAMS: I don't.

THE COURT: Do you have any concerns that Mr. Spies had about she's been so emotionally traumatized by this that there's a likelihood that there could be some problems in her testimony?

MR. WILLIAMS: Not that I'm aware of. And just so we have a firm record on this too, to the extent that the defense has alleged a failure to disclose this stuff in advance, we found out about this because we got word through a third party about Mark Johnson. We interviewed Mark Johnson in September as this trial was going and found out that Mark Johnson had already been interviewed by the defense team mitigation specialist to whom he disclosed this entire plot.

And the defense team has also interviewed this bank teller. At least Rick -- I'm sorry, their mitigation specialist, Lisa Rickert, has. So in some degree they may know more about this whole thing than I do. I'm not aware of any emotional problems this teller has had about this bank robbery.

So they may be advantaged on that issue more than I am. It's certainly something I can cover with the teller again tomorrow before I put her on.

THE COURT: Now, how many witnesses are you hoping to call on this bank robbery issue?

MR. WILLIAMS: Six.

THE COURT: Okay. Let's just go through them again.

MR. WILLIAMS: Ken Hansen, Alan Johnson, Mark Johnson, Bill Basler, Beverly Meyland, and Charles Stubbe, S-t-u-b-b-e.

THE COURT: And what's the last one going to testify to?

MR. WILLIAMS: The last one is that police officer who arrested James Honken and found those items.

THE COURT: And Hansen, Johnson, and Johnson corroborate each other, at least allegedly.

MR. WILLIAMS: Correct.

THE COURT: How long do you think their testimony would be?

MR. WILLIAMS: I don't anticipate the direct examination of any one of these witnesses to exceed 15 minutes, and some of them will be significantly shorter than that. For example, the teller, Miss Meyland, and the police officer on the arrest, Mr. Stubbe, could be ten minutes. Mr. Basler could be ten minutes.

THE COURT: Mr. Spies, anything else you'd like to

♀

add?

MR. SPIES: Well, I just want to make sure I understand clearly. I don't believe the government is contending that Dustin Honken committed this robbery. And to the extent that they're trying to prove that James Honken committed this robbery, again it seems to me to be not rebuttal. I mean, I think that if there was any implication in Alyssa Johnson's -- Alyssa Nelson's testimony, it was that yes, her dad committed this robbery, she was teased about it all through school, and that Dustin Honken said that he got a key for his dad.

THE COURT: Yeah, but the clear implication was that Dustin Honken had no involvement in the planning of the crime.

I mean, that's the clear implication of it.

MR. SPIES: The implication was that he got a key for his dad and his dad committed the robbery, but to have the bank teller come in and testify that some unnamed person, unidentified person, traumatized her and robbed her --

THE COURT: Nope, nope, we're keeping that out. She's not going to be allowed to testify about any trauma.

MR. SPIES: All right. I don't see any probative value of the bank teller, but I wanted to make sure that they weren't trying to imply that Dustin Honken committed this bank robbery.

THE COURT: I think the bank teller allegedly

corroborates the details of the scheme and that Dustin Honken's alleged prior knowledge of the details of the scheme at least could be viewed as being inconsistent with the impression left in Alyssa Nelson's testimony that he was a mere pawn and his only involvement was to keep his dad from committing suicide.

MR. SPIES: Well, I think as the Court said just a moment ago, these scenarios are not inconsistent.

THE COURT: Well, I think they're inconsistent, but they're not -- they're not -- I think a reasonable fact finder could view them as inconsistent, or they could -- you know, if you have a vivid imagination, you could harmonize the two.

MR. SPIES: Well, I thought you just said they were not necessarily inconsistent, and so I think that the test, though, is --

THE COURT: But a reasonable fact finder could find that they are, so, therefore, it's relevant. It's not conclusive. Does it conclusively establish that Jim Honken did

not say to Dustin Honken, I won't commit suicide? No. Does it undermine that and tend to make it less believable? Of course it does in my view.

MR. SPIES: And again, I don't see how the bank teller lends weight to or against that.

THE COURT: Because she corroborates details that Dustin Honken told an individual a considerable period of time before that.

♀

MR. WILLIAMS: Now, Your Honor, if the defense wants to stipulate to allow me to bring in that testimony from the teller and, frankly, even from the police officer, Mr. Stubbe, through Bill Basler, I will gladly do that, but I do not want to have that without a full waiver of the defendant against any alleged violation of the rules of evidence or any prejudice from not being able to cross-examine those witnesses. If that's where they want to go, I'm willing to do that, but I want a full waiver and a waiver by the defendant as well before I do that.

MR. ROGERS: Your Honor, may I be heard in this matter?

THE COURT: Yes.

MR. ROGERS: Thank you. A couple of things. The easiest one first. Title 18 section 3432 gives us a right to notice of the witnesses to be called against us three days prior to the commencement of trial. I don't think that that is limited to merits phase witnesses, and I don't think that it excludes rebuttal witnesses or potential rebuttal witnesses.

There is a case I'll advise the Court of from 1895 called Goldsby versus United States -- it's at 160 U.S. 70 -- that does say that under a different statute which gave a

witness -- or a defendant the right to 2 days' notice of -- or 48 hours' notice of witnesses against him that that did not include rebuttal witnesses because otherwise you could never have a trial because you never know who the rebuttal witnesses

♀

are going to be necessarily 48 hours before you're going to call them.

However, that obviously doesn't apply here where the commencement is not -- the time is not before the witness is called. The time is before the beginning of the trial. I think we have the right under the statute to proceed to trial with a witness list in hand, and Mr. Basler's clearly on the witness list. None of these other people are.

THE COURT: Well, how -- how could you know ahead of time what your rebuttal witnesses would be before the trial starts?

MR. ROGERS: I think that's the whole idea. I think it's to alleviate this kind of trial by ambush. I think it recognizes the fact that death is different. Now, this is a statute that was enacted long before there were merits phases and penalty phases and any of that Eighth Amendment jurisprudence.

THE COURT: But you think -- well, how could you disclose rebuttal witnesses that you didn't know you were going to necessarily call?

MR. ROGERS: And the answer to that is you can't. Therefore, you don't get to call them.

THE COURT: Well, who's ambushing who?

MR. ROGERS: Neither side -- well, quite frankly --

THE COURT: I thought you were claiming you were being

ambushed, but under your theory it seems to me --

MR. ROGERS: I thought you were talking under your hypothetical. The notion is that the defendant in a capital case has the right to prepare his defense with the knowledge of who the witnesses will be, and so there's no corresponding requirement that the defendant disclose witnesses to the government.

THE COURT: Well, precisely because that's the case, how are they supposed to list rebuttal witnesses before the trial starts? That's their problem under your theory.

MR. ROGERS: My short answer is they shouldn't get rebuttal witnesses unless they happen to be people they listed and decided not to call or listed and called and, like Mr. Basler, now want to call again.

Leaving that aside because like I say, there is a Supreme Court case that, construing a different statute, says they don't have to disclose the rebuttal witnesses, I want to look at the statute that specifically applies to the penalty phase in this case, and that's Title 21 section 848(j) which says in pertinent part that information can be presented relevant to such mitigating or aggravating factors regardless of its admissibility under the rules of evidence except that information may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

THE COURT: I'm sorry. Which subsection are you under

now?

MR. ROGERS: (j).

THE COURT: (j), yes.

MR. ROGERS: Right kind of in the middle?

THE COURT: Yes.

MR. ROGERS: This evidence I don't think is relevant to the mitigating factor number one, since we've changed it to reflect not criminal conduct but criminal convictions. It's not relevant to mitigating factor number two because it's not evidence that Mr. Honken engaged in violent behavior. Talking about violent behavior is not engaging in violent behavior.

And if it's relevant to anything, it would be I guess to our -- let me get you the number of it -- number 11, Dustin Honken's father, Jim Honken, was an alcoholic convict who was proud of his criminal lifestyle and who bragged to his sons about his crimes. How does this evidence -- how is that -- I mean, that was the reason that the evidence was elicited from Alyssa Honken. How does this rebut that? How is that relevant to that mitigating factor?

THE COURT: Well, the next sentence that you left off says, The government and the defendant shall be permitted to rebut any information received at the hearing. And I realize it goes on.

MR. ROGERS: It goes on.

3697

THE COURT: But this was information received at the hearing that you put into evidence. Nobody required you to elicit that testimony.

MR. ROGERS: We put in evidence relevant to a mitigating factor. That doesn't mean they can bring in evidence

that's not relevant to any aggravating or mitigating factor pled. And here's the problem with that, Judge, is that they are required to give us notice of their aggravating factors, and that limits their proof, and this is a way of getting through the back door evidence of an unpled aggravating factor that . . .

THE COURT: I don't know whether it's that or not. But I keep coming back to the fact you're the one that injected it into the trial. And it seems to me the government ought to have a fair opportunity to rebut the evidence.

MR. ROGERS: I think if they rebut it they have to rebut what makes it relevant. And what makes it relevant is to show that Jim Honken was an alcoholic criminal. And this evidence does not rebut that. In fact, the evidence of Officer Stubbe tends to establish that. He's passed out in the car with the money and the gun and the ski mask.

I mean, I think when you measure its probative value and you weigh it against the risk of prejudice, confusion of issues, misleading the jury, the probative value is how closely does it relate to the aggravating or mitigating factor which is

the reason for it being introduced in the first place. And the danger of misleading and confusing is certainly shown by the fact that it doesn't relate to any of the pleaded factors. Yet it has a very, very extreme potential for being viewed as an uncharged aggravating factor by the jury.

And so I think that needs to inform your decision based upon the statutory provision I read which is parallel to Rule 403 of the Federal Rules of Evidence.

THE COURT: Mr. Williams?

MR. WILLIAMS: I can't see how you could ever interpret any statute that would require the government to, in advance of trial, list its rebuttal witnesses. It just makes no logical sense to me. Frankly, if you also read Title 18, 3432, the plain language of it says the government has to produce the witnesses -- let me re-read this. Shall be furnished with a copy of the indictment and a list of the veniremen and of the witnesses to be produced on the trial for proving the indictment. Has nothing about even producing witnesses to prove the appropriate penalty.

So, you know, if we prove the indictment, we listed all our witnesses when we prove the indictment, the jury's found him guilty of the indictment, the only question left is the death penalty. That aside --

THE COURT: Yeah, I think you ought to set that one aside.

3699

MR. WILLIAMS: Yeah, that aside --

THE COURT: Because didn't you have to allege the aggravators in the indictment?

MR. WILLIAMS: Yes, I did. Yeah, you're right. You're right. I just can't imagine that we would be required to -- we would be barred from ever presenting any rebuttal evidence unless we, with a magic crystal ball, were able to predict where they were going to go with their case.

THE COURT: I can't imagine that it could be construed that way either.

MR. WILLIAMS: They brought this up. They put it into evidence. They knew about it in advance. You know, they knew this evidence was out there. They knew the defendant was

involved in this planning beforehand. They elicited this testimony from Alyssa knowing this information behind them. So they walked into this, and they walked into it with their eyes wide open, and I don't think it's -- it's only fair that the government be able to respond to what they put into the record today suggesting that poor Dustin Honken was coerced by his father under duress to provide a key to the bank. And I think we have the right to get into it.

THE COURT: Here's what we're going to do. I want to take a recess and read -- and have a copy of Alyssa Nelson's testimony on this issue and take a little bit and look it over and then decide and make my final ruling on it.

But let me ask you this before we do that. Mr. Rogers raises an interesting point. This evidence that they adduced, what do you claim it was relevant for? I mean, why don't we have Mr. Spies answer it. He's the one that put on the evidence.

MR. SPIES: Yeah. It supports our mitigating factor that Dustin Honken's father, James Honken, was an alcoholic convict who bragged about his exploits and was proud of his criminal lifestyle. And I think we had another -- yeah, that's the factor that it goes to, and that's what we think it supports, him being an alcoholic convict proud of his criminal lifestyle and its influence parenthetically on Dustin Honken being here in this courtroom and asking the jury to understand that background and his character, personality as we're wanting to do.

THE COURT: How does your proposed rebuttal testimony rebut that?

MR. WILLIAMS: I guess I look at it this way. If they believe that evidence was relevant toward that mitigating factor, then evidence rebutting that evidence rebuts that mitigating factor. They can't have it both ways. They can't say that evidence was relevant for a mitigating factor but the government's precluded from putting on any rebuttal evidence about that evidence because it's irrelevant. They can't have it both ways. It's either relevant to a mitigating factor or it's

not. And if they put it on, they claim it's relevant to that mitigating factor, then evidence rebutting it is relevant to that mitigating factor.

THE COURT: Mr. Spies?

MR. SPIES: Well, that's why I was asking Your Honor whether the government was contending that Dustin Honken committed this robbery as opposed to his father. If it's undisputed that his father committed this robbery, was caught with the money in an alcoholic condition, then it's not rebutting. It's substantiating our position, and it's not rebuttal. But where the government seeks to take this is far afield of that, and that's what we think is unduly prejudicial.

THE COURT: Well, why don't we take a short recess, and we'll see if we can get the realtime transcript. Thank you.

(Recess at 5:13 p.m.)

THE COURT: Please be seated. Any other record, Mr. Spies? Oh. Do we want to wait for Mr. Rogers?

MR. PARRISH: I thought he was here. I don't know where he went.

THE COURT: I'll tell you what. I won't tell him you didn't notice he was missing.

MR. PARRISH: Please don't.

THE COURT: Is that a deal?

MR. PARRISH: That's a good deal.

THE COURT: Okay. I won't tell him that. Why don't

we wait for him.

(Mr. Rogers entered the courtroom.)

MR. ROGERS: No need to wait for me, Judge.

THE COURT: No, I thought there was a need to wait for you. Reminds me of several times when I've come in to make a record and I started making a record and then I look and there's no Shelly. I forgot to have a court reporter.

MR. ROGERS: She is essential. I'm not.

THE COURT: Okay. At the risk of adding a little levity to what has been a tough day, I assume this was not the "participated in any one-on-one father/son activities with Dustin" that you're referring to in mitigator number 13, is it?

MR. ROGERS: That's correct.

THE COURT: Okay. Just wanted to make sure I have that correct today.

MR. ROGERS: It couldn't be one on one because they got all these other guys involved.

THE COURT: Any other record you want to make?

MR. WILLIAMS: Not on behalf of the United States, Your Honor.

MR. SPIES: I don't believe so, Your Honor. Thank you.

THE COURT: Well, I'm going to allow it as I indicated, but you need to be very, very careful, Mr. Williams, not to get into the -- what I'll call the 403 matter with regard

to any alleged murders or anything even close to that because that's not going to be part of the sentencing phase evidence. I think you understand -- you disagree with it, but I think you understand it. Right now I'm only worried that you understand it.

MR. WILLIAMS: I fully understand it, Your Honor.

THE COURT: Okay. Anything else?

MR. WILLIAMS: We did talk briefly while you were out getting this transcript with Mr. Spies. It's my understanding that the defense is willing to allow the testimony of the teller to be introduced --

THE COURT: Through Agent Basler?

MR. WILLIAMS: Right, through Agent Basler without an objection to any Sixth Amendment violation or evidentiary objection to it. And if that's the case, I'd like to have the defendant agree to that on the record as well.

THE COURT: Okay. Mr. Honken, do you agree with that?

THE DEFENDANT: Yes.

THE COURT: Okay. Any other record you want to make with regard to that?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Mr. Spies?

MR. SPIES: Nothing regarding that, Your Honor. I did want to alert the Court, though, I've been in contact with Dr. Cunningham's office. As of last report he was still on the

stand in Houston. His office in suburban Dallas has been trying all day to get flights based on when he can get out of Houston.

They've been trying to get flights out of Houston, out of Fort Worth, and I don't know Texas well enough, but the last report as of about five minutes --

THE COURT: It's not Fort Worth. That's if you're flying out of Dallas. It's just Houston -- there are two airports in Houston, Houston International and I think Hobby Downtown Airport.

MR. SPIES: There was one flight that was sold out; they could not get him up here. The best plan now is he can get into Sioux City tomorrow morning at about 8:30. That's what I believe to be the lay of the land right now. So you're probably more familiar with getting in and out of Sioux City than I am. But as of a few minutes ago, that was the best plan. They were still working on seeing if he could get on that flight through Minneapolis to get to Sioux City tomorrow morning.

So what I'm driving at here is by the time he gets here, he's going to need to set up his PowerPoint presentation, and I'm just going to beg the Court's patience and indulgence, and I'll keep you posted either by e-mail --

THE COURT: No more e-mails today. Just let me know in the morning. But yeah. No, I understand he may not get to the courthouse till, you know, 9:30 or so. But we'll still be -- let's see. You have Mom first; right?

3705

MR. SPIES: Well, we're going to put Mom last.

THE COURT: Oh, I see. Oh, I see the problem. The problem is -- is he the first witness in the morning?

MR. SPIES: Yes.

THE COURT: I see the problem.

MR. SPIES: We're going to try to expedite it by

having somebody waiting there for him to bring him here straight to the courthouse without undue delay, and we'll just keep you posted in the morning.

THE COURT: Okay. Well, I'll make you a deal: We won't start without him. How's that?

MR. SPIES: Sold.

THE COURT: Now, let me ask you this. If it turns out that for whatever reason he's not on the 8:30 flight to Sioux City tomorrow morning, there's some other mixup and whatever, I told you you can put Mom on last. I'm not going to back off on that. You're going to put Mom on last. How about taking his rebuttal testimony out of order? There's no real problem with that, is there? If we have to -- the preference would be not to do it. If it's simply waiting half an hour, 45 minutes for Mr. Cunningham to get here and get set up --

MR. SPIES: No, I think that might even be the preferred method just so Dr. Cunningham doesn't come in here breathless, disheveled, and out of sorts.

THE COURT: But I would have to explain to the jury

3706

that we'd be taking the government rebuttal testimony out of order, and I'll explain what that means. But why don't we see if that's the situation we're in tomorrow morning.

MR. SPIES: Yeah.

THE COURT: But you're saying you don't think you have a problem with it.

MR. SPIES: No, I don't think so, especially on this peripheral issue, collateral issue.

THE COURT: I appreciate you adding that.

MR. SPIES: Yeah. Thank you.

THE COURT: Are you going to have any other rebuttal? Without disclosing what it is, do you have any other rebuttal other than the bank robbery rebuttal?

MR. WILLIAMS: No. Just perhaps in response to Dr. Cunningham, we have Peter Carlson listed as a witness. He's our expert. He flew in today. I flew him back. I may fly him back tomorrow. I haven't made that decision yet, but I may be having him come back tomorrow. But again, without hearing the testimony, I don't anticipate any other rebuttal testimony, but I don't know what Marvea or Dr. Cunningham's going to say at this point.

THE COURT: Now, are the lawyers going to be around on Friday if the jury's deliberating on Friday?

MR. PARRISH: We can be. That's correct. If they're deliberating, yes, we'll be here. Right. No problem.

♀

THE COURT: Okay. I just wanted to make sure --

MR. PARRISH: We would've waited until last Friday if they had wanted to stay out till last Friday.

THE COURT: I'm sure you would have. I'm sure you would have.

MR. PARRISH: We'd have probably welcomed that too, quite frankly.

THE COURT: I can't get you here on Fridays, but the jury can.

MR. PARRISH: Absolutely.

THE COURT: That's where the power is, Seventh Amendment, Sixth Amendment in criminal cases. Okay. Thank you. We'll be in recess.

(The foregoing trial was

adjourned at 5:32 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR 1-29-05
Date

♀

3708

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| DENNIS BRUMM | | |
| | MR. SPIES | 3603 |
| SANDRA FIEMS | | |
| | MR. SPIES | 3609 |
| | MR. WILLIAMS | 3617 |
| ALYSSA NELSON | | |
| | MR. SPIES | 3618 |
| | MR. WILLIAMS | 3645 |

*****

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR01-3047 |
| Plaintiff, | Sioux City, Iowa<br>October 20, 2004<br>8:32 a.m. |
| vs. | |
| DUSTIN LEE HONKEN, | |
| Defendant. / | VOLUME 21 |

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | C. J. WILLIAMS, ESQ.<br>Assistant United States Attorney<br>Suite 400 - Hach Building<br>401 First Street Southeast<br>Cedar Rapids, IA 52401 |
| | THOMAS HENRY MILLER, ESQ.<br>Iowa Attorney General's Office<br>Area Prosecutions Division<br>Hoover State Office Building<br>Des Moines, IA 50319 |
| For the Defendant: | ALFREDO PARRISH, ESQ.<br>Parrish, Kruidenier, Moss, Dunn<br>Boles, Gribble & Cook<br>2910 Grand Avenue<br>Des Moines, IA 50312 |
| | LEON F. SPIES, ESQ.<br>Mellon and Spies<br>Suite 411<br>Iowa State Bank Building<br>Iowa City, IA 52240 |
| | CHARLES M. ROGERS, ESQ.<br>Wyrsch, Hobbs & Mirakian<br>Suite 1300<br>1101 Walnut Street<br>Kansas City, MO 64106 |
| Also present: | William Basler |

Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

(Proceedings reconvened outside the presence of the jury in the presence of the Court, Mr. Williams, Mr. Miller, and Mr. Parrish.)

THE COURT: I just wanted to make a brief record. I know the defendant's not here, but this just involves scheduling. If you want to make a further record when the defendant is present, that's fine. Your expert's not coming till 10:30 now?

MR. PARRISH: That's what I understand, Your Honor. And Julie is going to go down and pick him up as soon as he gets in. Mr. Spies had to go down and see Mr. Honken for a minute, so I'm just kind of the fill-in person here. I did know that for a fact.

THE COURT: Okay. Mr. Williams, if you don't want to put your witnesses on out of order, that's fine. We can just wait and start at 11:00.

MR. WILLIAMS: Yeah, I'd just as soon not put my witnesses on out of order. I know -- I regret that because I know it goes off scheduling, but one of my concerns is when Marvea testifies, I don't know what she's going to say, and I don't know if she's going to touch on any things that my rebuttal witnesses are going to touch on.

THE COURT: Yeah. I mean, we could make Marvea testify, then take the expert when he comes out of order and then finish with her, but I said that she could testify last, so

I'm going to stick with that.

But I don't think it's fair to make you put your witnesses on out of order if you don't want to.

MR. WILLIAMS: And I appreciate that, Your Honor.

THE COURT: So we'll just --

MR. WILLIAMS: It may not be a problem. I'm just not sure what she's going to say, if anything, on those subjects, so I'd just as soon not do that. I don't think -- I still think we're going to finish the evidence today because I do think that these rebuttal witnesses are going to move fast. I'm going to go in very surgically and get just the facts out very quickly and be done with it, so I'd be surprised if my rebuttal case took much more than half an hour, 45 minutes.

THE COURT: Yeah, and we'll just, you know, finish tomorrow. Is that a problem?

MR. PARRISH: I don't see that as a problem, Judge. I'll let Mr. Spies know. I think what he had anticipated when we just left -- I went and met Mr. Honken real early. Mr. Spies came over. He wanted to talk to him about a couple of witnesses because he thought they were going to be out of order. I'll just go let him know -- he's down at the marshal's office now -- that Mr. Williams has indicated he wants to wait, and I think he said with regard to his expert he didn't think he was going to call him.

MR. WILLIAMS: Right.

3713

MR. PARRISH: His expert witness.

THE COURT: Carlson?

MR. WILLIAMS: Right. Too many conflicts on his

schedule to get him back in here, so I'm just not going to call him.

THE COURT: If you want to bring him back tomorrow . . .

MR. WILLIAMS: I don't want to do it to the Court. I don't want to do it to him. I think what Cunningham's going to say -- I think I'm prepared to deal with Dr. Cunningham, and we'll just do it that way.

MR. PARRISH: Not speaking out of school, but I think those issues that you guys have been going back and forth on have been taken care of on the issue that Carlson would come in on.

MR. WILLIAMS: Probably, yeah.

THE COURT: I guess the bottom line is up until you rest, you still have the right to call Carlson if you want to.

MR. WILLIAMS: I understand that, and I appreciate that, Your Honor.

MR. PARRISH: Let me update Leon.

MR. WILLIAMS: Just for scheduling purposes just to let you know, I don't think we'll be doing that.

(Mr. Spies entered the courtroom.)

MR. SPIES: Morning, Your Honor.

3714

THE COURT: Good morning, Mr. Spies. Mr. Cunningham, Dr. Cunningham, wasn't able to get to Minneapolis last night?

MR. SPIES: Right. The first flight he could get in will have him arriving at Sioux City at 10:32. Julie from our trial team is going to be waiting there at the airport to bring him right to the courthouse. I called Mr. Williams about that last night.

THE COURT: Yeah. Well, I think what we'll do is just tell the jury that there's going to be a delay this morning and we won't be starting till somewhere around 11:00 because it will take at least that long for him to get here I would think depending on whether he checked a bag or not. That work?

MR. SPIES: Yeah.

THE COURT: Unless you'd like to call Mom at nine o'clock and then take a break in her testimony and then put Cunningham on and then finish with Mom, but I take it you don't want to do that.

MR. SPIES: No. I'd rather not break the flow of her testimony, Your Honor.

THE COURT: How long will her testimony take?

MR. SPIES: Mom's testimony?

THE COURT: Yeah. Couple hours probably?

MR. SPIES: At the very outside, yeah.

THE COURT: Okay. Why don't we just tell the jury -- you don't object to starting at 11, do you?

3715

MR. WILLIAMS: No, Your Honor.

THE COURT: You're not asking me to require them to put Mom on.

MR. WILLIAMS: I'm not.

THE COURT: Okay. Rick, why don't you just tell the jury that there's going to be a delay and we hope to start sometime around 11:00; okay? Thank you. Anything else?

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: No, Your Honor, thank you.

THE COURT: Anything else?

MR. SPIES: One matter, Your Honor.

THE COURT: Yeah.

MR. SPIES: It's strictly a housekeeping deal. I just want to make sure that I understand the status of the record concerning our hearing yesterday afternoon on the proposed government's rebuttal testimony concerning the bank robbery, that my objection to that will be construed as a motion in limine under Rule 103 and that the Court's ruling permitting the -- or describing the parameters of allowing the rebuttal testimony is now a ruling under 103 and I don't need to relodge objections during the course of trial to preserve my objection to that testimony, our objection to that testimony, under 103(a)(2) that the Court has made a definitive ruling on the government's offer to admit rebuttal evidence and that I need not renew an objection to preserve a claim of error for appeal.

THE COURT: Well, I think my ruling falls under 103(a)(2). Whether or not it was a motion in limine or not I don't know. You never called it that.

MR. SPIES: Okay.

THE COURT: But it was a definitive ruling both admitting and excluding evidence.

MR. SPIES: Right.

THE COURT: Right. Okay. Thanks.

MR. SPIES: Thank you.

THE COURT: Anything else?

MR. WILLIAMS: No, Your Honor.

MR. SPIES: No, Your Honor.

THE COURT: Okay. Thank you.

(Recess at 8:40 a.m.)

(Proceedings reconvened in the presence of all counsel

and the defendant.)

THE COURT: Ready to have the jury brought in?

MR. SPIES: The witness is in the restroom, Your Honor. He'll be here in 30 seconds.

THE COURT: Everybody can be seated until we get the witness in.

Okay. Ready to have the jury brought in?

MR. SPIES: Yes.

MR. WILLIAMS: Yes.

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated. Sorry for the delay. We had some additional scheduling problems.

Mr. Spies, you ready to call your next witness?

MR. SPIES: Yes, we call Dr. Mark Cunningham to the stand.

MARK CUNNINGHAM, DEFENDANT'S WITNESS, SWORN

THE COURT: Okay. Please be seated. When you're settled in, could you state your full name, please, and spell your last name.

THE WITNESS: Yes, sir. Mark Douglas Cunningham, C-u-n-n-i-n-g-h-a-m.

THE COURT: Thank you.

Mr. Spies?

MR. SPIES: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. SPIES:

Q. Good morning.

A. Good morning.

Q. Dr. Cunningham, you've given us your name. Could you tell

us, please, where you live and where your professional address is.
A. Yes, sir. I live in the Dallas, greater Dallas, Texas, area. The address is 417 Oak Bend, Suite 260, Lewisville, spelled L-e-w-i-s, Lewisville, Texas.
Q. And for those of us unfamiliar with those environments,

tell us where Lewisville is in relation to greater Dallas.
A. It's northwest suburban Dallas, west of the tollway, northeast of the airport.
Q. Okay. And you've just flown in this morning from Texas; right?
A. Yes, sir, I have.
Q. And we appreciate your being here.
A. Thank you, sir.
Q. Doctor, could you tell us, please, what your occupation is?
A. I'm a clinical and forensic psychologist in private practice.
Q. And how long have you been in private practice as a clinical and forensic psychologist?
A. Twenty -- little bit over 23 years.
Q. And could you tell us, please, what a clinical psychologist is or maybe, first of all, just so we don't miss anything, what a psychologist is.
A. Yes, sir. A psychologist is a mental health specialist who has advanced training, typically a doctorate degree in psychology, and provides testing, evaluation, consultation, may teach in a university setting. And it's a -- it's a position where somebody may be an academician or scientist or may be a practitioner.

Q. And a clinical psychologist?
A. Clinical psychology involves the evaluation and treatment

of psychological disorders. It's what you would think a psychologist would do in practice in terms of interviewing and testing and psychotherapy.
Q. Okay. And you've also said that you're also a forensic psychologist. And we've heard during the course of this trial about forensic anthropologists. We've heard about forensic pathologists, forensic document examiners. Could you tell us, please, what a forensic psychologist is.
A. Yes, sir. Forensic psychology is any way that psychological research or data or methods can be used to inform some issue before the Court. Essentially it's court-related psychology. And that may range all the way from evaluating the suitability of parents in a child custody situation or psychological injuries in a civil case or in criminal court, things like competency to stand trial or mental state at time of offense or sentencing determinations such as are being considered today.
Q. Okay. And could you tell us, please, are you licensed as a psychologist?
A. Yes, sir, I am.
Q. And could you tell us where you hold a license to practice psychology.
A. Yes, sir. I'm licensed as a psychologist in Texas, Louisiana, Arkansas, South Carolina, Tennessee, Illinois, Indiana, Colorado, Idaho, Oregon, Arizona, New Mexico,

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3243 of 3636

Connecticut. I may have left out some of them. I'm licensed in 13 states.

Q. So your practice is a nationwide practice?

A. Yes, sir, it is.

Q. Okay. Doctor, could you summarize for the ladies and gentlemen of the jury and for us the education that led up to your becoming a psychologist.

A. Yes, sir. I got my undergraduate degree from Abilene Christian College with majors in psychology and mass communications and graduated with high honors.

I then attended graduate school at Oklahoma State University in a program that's accredited by the American Psychological Association as the doctoral -- approved doctoral training program in clinical psychology and received both my master's and doctorate from Oklahoma State.

I did a one-year clinical psychology internship at the National Naval Medical Center in Bethesda, Maryland -- that's the large Navy hospital in suburban Washington, DC -- and was an active duty psychologist -- active duty Naval officer and clinical psychology intern.

I then took a -- I was then assigned as a staff psychologist at the Naval Submarine Medical Center in Groton, New London, Connecticut. The submarine base there at the time was the primary submarine facility for the Navy on the Atlantic coast, and I was an active duty Naval officer and clinical

♀

3721

psychologist there for several years.

While I was there I did two years of part-time post-doctoral study at Yale University and also taught part time

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3244 of 3636

in the community college system there.

I left the Navy in 1981 and took a full-time academic position as an assistant professor of psychology at a small private university in Abilene, Texas, and started a practice there at the same time. And then since 1983 I've been exclusively in practice. I resigned the academic role, have been exclusively in practice and have participated extensively in continuing education study since that time.

Q. Now, I believe we've also heard during the course of this trial, Doctor, about the concept of board certification.

A. Yes, sir.

Q. And are you board certified?

A. Yes, sir, I am.

Q. And could you tell us what board certification is and in what areas you hold that certification.

A. Yes, sir. I'm board certified in forensic psychology which is a specialization area within psychology. Board certification in psychology is quite different than it is in medicine in that in medicine it's typical that board certification is pursued pretty quickly after the residency, after the specialization apprenticeship.

In psychology you're not even eligible to sit for a

board exam until you're at least five years out from your Ph.D., and it's intended to represent the highest levels of practice, so it's typically not even attempted until a mid-career level.

It's a very arduous credentialing process that involves submission of a work sample which are a couple of reports in the forensic arena that you've performed that are extensively supplemented by case law and analysis of statutes

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3245 of 3636

and ethical considerations and research that may bear on the issues that are being analyzed in the report.

That's reviewed, critically reviewed, by two board-certified forensic psychologists. If they think that that represents sufficient sophistication in the field, you're allowed to sit for an oral exam where three board-certified forensic psychologists can ask you anything in the field that they want to for several hours.

I spent 7 or 8 months studying 30 hours a week or more for that oral exam.

Q. Okay. And so you are board certified.

A. Yes, sir.

Q. Now, you told us that at the outset of your career that you did do some teaching work and you had an academic position.

A. That's correct.

Q. Are you involved in academics now?

A. No, sir, not in a university setting. I provide continuing education workshops under the auspices of the American Academy

♀

3723

of Forensic Psychology. That's the board certified -- the scholarly association of board-certified forensic psychologists, and I provide full-day workshops for that organization.

Q. Even though you're not a teacher as such, do you write scholarly publications and have them published in journals that are related to mental health and mental health and the law?

A. Yes, sir. I have been very extensively involved in publishing and research efforts across the last six years. I've coauthored I think 12 peer-reviewed papers, a couple of book chapters. A couple of my reports have been published as models in a case book and then four or five other professional papers

as well.
Q. Okay. And have you also written chapters for books?
A. Yes, sir. I was the invited first author of a chapter in the recently published Handbook of Psychology. The Handbook of Psychology is a 12-volume set that's intended to represent the state of the art of psychology at this time. One of those volumes is on forensic psychology, and I was asked to author the chapter on capital sentencing evaluations for that text. And I asked a colleague of mine, Dr. Alan Goldstein, a forensic psychologist in New York, to coauthor that with me.
Q. And so have you written, Doctor, in the fields of capital sentencing and in the fields of issues dealing with death row inmates?
A. Yes, sir. That's been the primary focus of most of these papers.

Q. Okay. Now, in addition to that, Doctor, have you also become familiar with and done research yourself in the areas of criminal violence including criminal violence that occurs in correctional settings?
A. Yes, sir, I have.
Q. And could you just give us a thumbnail sketch of some of the work you've become familiar with and the work that you've done yourself in those areas.
A. Sure. Some of the peer-reviewed papers that I've written in this arena have involved a synthesis and critical analysis of other research that's been done in this field. Then there are also some studies that I have been involved in that have represented direct research.

For example, with some colleagues, we tracked inmates

in the Indiana prison system who had been sentenced to death and then because of commutations or retrials had had that death sentence removed and were in prison in the general prison population. And we examined the disciplinary records of those offenders to see how these capital offenders behaved in prison.

Another study that is in press, which means it's passed peer review and is simply awaiting printing, involves looking at the disciplinary records of about 3,000 inmates in a maximum security prison in Missouri including inmates who were sentenced to death, but in Missouri their death sentence inmates

are not confined on a segregated death row. They're mainstreamed in the general prison population with other inmates so that they share cells and recreation and work and that sort of thing with inmates who are sentenced to life without parole or to a various term of years.

And we examined the disciplinary records of the death-sentenced inmates, the life-without-parole inmates, and the parole-eligible inmates in this facility over a ten-year period of time which was a statistical examination of whether that was a prudent program for the Missouri Department of Corrections to participate in.

And I'm currently involved in analyzing data on 50,000 inmates in Florida and looking at their disciplinary records.

Q. Doctor, have you testified in court before?

A. Yes, sir, I have.

Q. And I think that answer was going to be obvious.

A. Yes, sir.

Q. And in what sorts of courts have you testified and about how many times?

A. I've testified in military courts, in state district courts, and in federal courts, and I've testified over 200 times.

Q. Okay. And are you here today from Texas to help us understand some issues dealing with the government's allegation about future dangerousness in this case?

♀

A. Yes, sir, that's correct.

Q. Now, I want to ask you, you're not here to offer an opinion about whether Dustin Honken is dangerous, are you?

A. No, sir.

Q. Have you ever worked for the Bureau of Prisons?

A. No, sir.

Q. Have you ever worked with Bureau of Prisons -- federal Bureau of Prisons officials and staff?

A. No, sir. I've never been a paid consultant. I have gotten briefings and tours from those individuals but have never been part of that organization or a paid consultant.

Q. Is there a body of information in the professional world about federal correctional institutions, inmate characteristics and behavior, violence in prison that you relied upon and have become familiar with?

A. Yes, sir. Some of that information is in the public domain. Some of it is scholarly source material. Some of it is in the public domain but is made available to me as I have worked on other federal cases and in the process of discovery have been provided with extensive information about facilities and rates of violence and that sort of thing within federal prison facilities that are not generally known even within the professional community because that information is otherwise not

available.

Q. Have you yourself actually viewed and visited federal

correctional institutions?

A. Yes, sir. In November of 1997 I toured ADX, Florence which is the super-maximum facility. It's the most secure facility in the Bureau of Prisons. I toured that facility again in January of this year. To my knowledge, I am one of three nonfederal employee psychologists who have ever toured the facility.

In January of 2002 I toured the U.S. Penitentiary at Marion which is a facility in its security that is mid-level between the other U.S. penitentiaries and ADX, Florence.

Q. Okay. In addition to viewing actual facilities and becoming familiar with information about the federal correctional institutions in the United States, have you yourself also developed an expertise based on your specialized knowledge about the federal Bureau of Prisons including their policies, their procedures, and their facilities?

A. Yes, sir.

Q. And have you also developed specialized knowledge, including the conditions facing a prisoner who is facing life imprisonment in a federal correctional institution?

A. Yes, sir.

Q. In discussing with us the issues that I'm going to be asking you about this morning, could you tell us generally what kind of information you're relying on in the opinions and the information you're going to give us today.

A. Yes, sir. I'm relying on regulations and descriptions of

Bureau of Prisons facilities. Some of that is available in the public domain from the Bureau of Prisons. I'm relying on statistical data that has been provided to me about rates of violence in the Bureau of Prisons, in U.S. penitentiaries specifically, in ADX, Florence specifically, on the control unit of ADX.

I'm also relying on the briefings that I have obtained as I toured ADX as well as on scholarly research studies that bear on this as well.

Q. Now, the information you've just described for us, Doctor, is this the type of information that would be reasonably relied upon by mental health professionals, namely forensic psychologists, specialists in knowledge about the federal Bureau of Prisons and other correctional professionals similar to you?

A. Yes, it is.

Q. Okay. Now, the information you're about to give, would it be helpful to the jury in explaining your testimony for them to view some slides that you've prepared and some illustrations and some photographs?

A. Yes, sir, it would.

Q. Do you think it would help them to understand your testimony?

A. Yes, sir.

MR. SPIES: With the permission of the Court, Your Honor, I would ask that Dr. Cunningham be permitted to, if

3729

necessary, range from the witness stand and use his computer to show us some slides.

THE COURT: Sure. Would you like to have a lavaliere mike? Or as long as you're at the mikes, you'll be fine. But

if you walk to your computer, the acoustics aren't very good without amplification, so we do have a lavaliere mike if you'd like to wear that.

THE WITNESS: I should be able to do this from here. Is this a touch screen sensitive?

THE COURT: Yes.

THE WITNESS: I would only need to get up if my computer locks up, and then I have to manually touch it. Sometimes it overloads the remote.

THE COURT: Okay. Thank you.

BY MR. SPIES:

Q. Dr. Cunningham, we just mentioned for the jury in kind of laying the foundation for your testimony this morning that you're familiar with the government's allegation about future dangerousness in this case. And why is it important for the jury to understand issues about security and related topics in their assessment of that allegation?

A. Yes, sir. Most simply, risk is always a function of context. In other words, if I want to determine what's the risk that somebody will cause serious injury to somebody else, it's critically important to specify in what context, in what

confinement will they be held with what security, and that's why this makes a difference because the security that can be brought to bear significantly impacts on what the likelihood is of violence, whether it's violence that's personally carried out or whether it's an attempt to order others to commit violence.

Q. Okay. And what kinds of -- what types of violence are you going to be addressing with us this morning?

A. I'm going to be addressing two types of violence. One is

violence that might be ordered, in other words, the attempt to secure somebody else to carry out violence for you, particularly carry out violence for you in the free community, and also the risk or what conditions of confinement can be brought to bear that address opportunities to personally behave in a violent way while in prison.

Q. Okay. Doctor, I'm going to ask you to, first of all, talk about that first type of violence you've discussed, that is, ordering violence in the community. And could you tell us, please, as you address that topic how the Bureau of Prisons and its interaction with the community affects that type of violence, violence in the community.

A. Yes, sir. In analyzing the risk that an inmate may attempt to secure violence in the community, may try to gain someone else's cooperation to effect violence in community, there are three -- at least three primary components to think through.

The first of these is motive. In other words, as this

3731

person has made threats or attempted to secure violence before, was that -- was the motive an attempt to avoid prosecution? If it were and that prosecution is now concluded, there may no longer be a motive for them to act.

Alternatively, was the motive one of retaliation? Was it independent of prosecution? Was it simply a payback, retaliatory in nature? In that case the motive would persist. That's the first issue to question.

The second aspect is what capability does this person have? In other words, do they have continuing control over a criminal organization or terrorist organization of some sort? It's kind of who you gonna call? Is there somebody who they can

call upon to effect this who's in the community?
Q. Would an example of that be, for example, without besmirching anybody, a member of the Mafia like John Gotti in prison as part of a criminal organization?
A. Yes, sir.
Q. Or a member of a drug cartel from Mexico or Columbia?
A. Yes, sir, good examples.
Q. Okay.
A. Alternatively, does this person have significant economic assets? Do they still have a good deal of money that they could use to purchase this from someone?

Then the third component is if, in fact, motive is identified as continuing to be present and even capability is

identified as being present, what kind of prevention is available? What measures can be brought to bear that would limit this person's opportunity to communicate this intent?
Q. And so how would we go about assessing, Doctor, what, for example, conditions of confinement or other restrictions could be imposed by federal correctional officials in the Bureau of Prisons to deal with prevention?
A. There are a number of available interventions that can be brought to bear if there is a conclusion that there is significant risk that warrants this kind of restriction.

First, communication with other individuals can be severely limited, nearly banned but certainly severely limited. Those communications can be very limited in their frequency. The list of who someone is allowed to communicate with may be very, very short, could be a spouse or mother or a very small group of individuals.

Q. Let me interrupt you for a minute, Doctor. So, for example, when an inmate is put into a federal correctional institution, are they required to have an approved list of who they can write to, who they can phone to, phone with?

A. Yes, sir, that's correct. And here we're talking about restrictions that are well beyond what would be applied to the typical inmate. This is under an assumption that Mr. Honken or another inmate were identified as being a significant risk to communicate an intent to do violence in the community. Then

3733

that restriction of who contact is with and what degree of monitoring of that contact occurs.

And so whether we're talking about letters or telephone or visitation, the frequency, the sources of who this person is allowed to communicate with and the scrutiny of those communications and documents or monitoring of telephone conversations can be applied.

And that's the third point, that there is, in fact, capability to monitor, closely monitor, correspondence, telephone, and visitation communications.

In some instances, it may even be that attorney consultations are monitored if there is concern that an attorney might be used as a conduit for communication.

Q. Could you give us an example of that where that's actually been imposed?

A. Yes, sir. In -- there are two cases that come to mind. One is the Ramsey Youssef case, the individual who conspired to try to blow up the World Trade Center back in the early '90s with the truck bombs that were underneath the facility and also Luis Felipe who was a gang leader of the Latin Kings and Queens

out of New York where those kinds of conditions of confinement were explored, where there was even the potential for monitoring communications with the attorney by having a special master present.

Q. So in addition to restricting communications that might be

a mechanism for committing violence in the community, what other restrictions can the federal Bureau of Prisons use to prohibit violence in the community?

A. Well, this applies both to limiting contact with inmates and individuals in the community. The other has to do with the nature of the facility that the inmate is placed in.

This is an overview of the custody options that are available within the federal Bureau of Prisons, and the arrow indicates that these range from the least secure down to the most secure here at the bottom. So we start with minimum-security prisons, and those range up through the low-, medium-security prisons, what's called high security, U.S. penitentiaries. Then USP, Marion exists as a mid-level facility that is midway between the regular USPs and ADX, Florence.

There are also prisons within the prison -- there are also -- there's a prison within the prison in many U.S. penitentiaries called the secure housing unit or the SHU where an even more secure level of confinement can be brought to bear in terms of movement or contact with other inmates or shackling or staff supervision or that kind of thing.

Then an inmate may be designated to the most secure facility within the Bureau of Prisons which is ADX, Florence. This is a facility in southwestern Colorado about 90 miles southwest of Colorado Springs, and I'll talk some more about

that facility subsequently.

Even within that super-maximum setting, there is an even more secure -- there are a couple of more secure settings. There's a high-security unit for individuals who require even more intensive security. And there's also what's called the control unit which is intended to represent almost the highest level of security that can be brought to bear within the Bureau of Prisons.

Q. Doctor, could you describe for us, please, some of the features that would distinguish, say, a minimum-security prison from a medium-security facility? How would we know by looking at it or becoming familiar with what goes on inside?

A. Yes, sir, be glad to. There are a number of indicators of security level. One of them is the nature of the outer wall or fence that may range from having almost no external barrier to having a double fence with coils of razor wire between, maybe electrified, maybe movement detection devices that are between the fences so that -- the integrity of the walls around the facility and the redundancy of that external facility.

For example, at ADX, Florence, this is a facility that's designed not only to keep inmates from breaking out but also to withstand attempts to break out someone from the outside if you had an organization that had that capability. So the staff, they're trained with Army units, and it has a highly reenforced perimeter around it.

That's the second element which are the nature of

whether there are gun towers around a facility and what degree of external patrols there are. Additionally there are things like perimeter detection devices as you move up that security sequence.

One of the characteristics of increasingly secure prisons is what's called concentric layers of security which means that as you access the interior of the prison you go through multiple barriers where there are grates, walls of bars that are electronically controlled by secure control centers or pickets so that it simply isn't a function of being able to break out if you got through one door, but it's door after door after door that the inmates are layered within.

With increasing levels of security, the type of housing changes as well in terms of the nature of the cells and the nature of the units that comprise these. So you may go from an open bay dorm to single cells that have two doors before you get out of the cell. And I'll present one of those later on.

As you move up that security sequence, there is also increasing control over the movement of inmates. In other words, in a lower-security facility, the inmates may range within the facility with limited supervision. As you move up the security sequence, there is increasing continuous observation of the inmates and staff presence, and as you continue to move up, the inmate may be handcuffed behind his back and double or triple escorted everywhere he goes. And so

3737

there is increasing control of movement.

And then as you move up that security sequence, you also have greater intensity of staff and more continuous supervision.

Q. So, Doctor, this kind of outline of measures can be used, depending on the security level. Is there a way for us to figure out how successful these sorts of measures can be in restricting violence?

A. Yes, sir, there is. One way to do that is to look at how often somebody is killed in prison or in federal prison, for example.

Q. And what you just put up here on our screen is rates of inmate and staff homicide. Is that what you're talking about?

A. Yes, sir, that's correct. One of the ways that you can identify how successful these procedures are is by looking at the rate of homicide in prison which is much lower than people would popularly think from watching Oz on HBO or popular media sorts of things.

For example, the rate of homicide in the Bureau of Prisons, inmate-on-inmate homicide, is about 6 per 100,000 inmates per year. In state prisons nationwide it's about 5.6 per 100,000 inmates.

Now, to give you some basis of comparison, we can look at the community at large -- sorry -- which is right down here. And so, for example, in the general population of the United

3738

States, the rate of homicide is 5.6 per 100,000 community residents per year. In major cities like Chicago or Minneapolis, the rate is significantly higher: 12 per 100,000 in Minneapolis, 22 per 100,000 in Chicago. Gary, Indiana's, like 70 per 100,000.

Now, notice that the rate of homicide in prison even though prison is full of felons and many of them violent felons, that the rate of homicide in prison is comparable to the rate of

homicide in the open community and, depending on your community, may even be less. Pretty significant indication that prison works.

Q. Now, you've identified for us comparing inmate-on-inmate homicide to the general murder rate and negligent homicide rate in the United States. What about inmate-on-staff homicide?

A. Thankfully, that is extraordinarily rare. In state prisons nationwide that rate is about 1 per million inmates per year. In state prisons nationwide, about 47 percent of the inmates are serious violent felons, and about 12 percent are homicide or murder offenders, and yet the rate of this is extraordinarily low.

In federal prison, the rate is less than 1 per 500,000 inmates per year. The last time a correctional staff member was killed in the Bureau of Prisons was in 1997, and so we're 7 years out from that. That rate is also beginning to approach one per million inmates per year, so that's an event that's

♀

extraordinarily unlikely.

Q. Now, Doctor, I'd like to turn your attention to capital inmates, that is, people facing life in prison or death. And are there statistics or information available to help us learn about those types of inmates who are housed in federal correctional institutions?

A. Yes, sir. We can look at where they're housed. That's quite easy. We're back at our chart of looking at custody options from highest to lowest. The area that's indicated in yellow is where individuals who are convicted in federal court of capital murder but not sentenced to death, where are they gonna go? Well, they're going to go to at least a USP, at least

a U.S. penitentiary, or higher.

Q. All right. And you've identified for us some of those facilities, and we talked about Marion. That's in Marion, Illinois?

A. Yes, sir.

Q. And also the facility in Florence, Colorado; right?

A. Yes, sir. ADX -- there is a U.S. penitentiary in Florence, but ADX, the administrative maximum, is separate. It's a separate designation than U.S. penitentiaries.

Q. And I think you mentioned this term earlier. Is that the so-called super max prison in Colorado?

A. Yes, it is.

Q. Now, just to be clear here, the decision about where an

♀

inmate goes is made by the professionals in the Bureau of Prisons; right?

A. That's correct.

Q. And there are all sorts of sources of information that the Bureau of Prisons relies upon in making those what you call designations?

A. That's correct. The Bureau of Prisons is a subagency within the U.S. Department of Justice, and so they're getting input from the Department of Justice in full knowledge of the individual's criminal history, correctional history, psychological status, security needs. Those professionals will evaluate all of that information in consultation with the U.S. Department of Justice, determine what level of security is appropriate.

Q. Now, how do we know, Doctor, that these are the types of secure or security settings that a person facing life

imprisonment without parole would be sent to? How do we know that?

A. This is specified in the Security Designation and Custody Classification Manual of the U.S. Bureau of Prisons, that a male inmate with more than 30 years remaining to serve, including nonparolable life sentences, which is what a capital offender faces, shall be housed in a high-security-level institution -- that's a USP -- unless the public safety factor has been waived.

Q. And you just indicated that life imprisonment is without

parole.

A. That's correct.

Q. No release.

A. That's correct.

Q. Doctor, can you identify in the federal Bureau of Prisons system some of the facilities that are available for these types of inmates and what their population looks like?

A. Yes, sir, I can. This is a listing of the U.S. penitentiaries and their census or their inmate population as of about ten days ago. At this point -- and notice as well that I've identified USP, Marion as a mid-level facility and separated it by a line from the other U.S. penitentiaries.

Q. Okay. And so these would all be facilities to which a life-sentenced inmate could go?

A. Yes, sir, at least this level if not higher.

Q. All right. And they all have the sorts of security facilities including restriction of movement, staff intervention, restriction of communication that you described for us earlier?

A. Yes, sir. This is high-security confinement, and so you

have double fences, concertina or razor wire, gun towers, concentric layers of security, intensive staff ratios, monitoring of communications, approved visiting list, those kinds of things.
Q. Now, earlier in the trial, Doctor, we had testimony from a

number of inmates from some of these federal correctional institutions, some of which I'm sure the jury will recognize this morning, but could you give us an idea of what a cell in one of these facilities looks like?
A. Yes, sir, I can. This is a diagram of a cell at the U.S. penitentiary at Florence, Colorado, not ADX, Florence, not the super max but a U.S. penitentiary. You'll notice that the individuals are double celled, so there is a bunk bed here. There is a -- your entrance to the cell is here, and there will be a sliding grate door or a sliding -- it may be a solid door with a window or a grate door like a bar door that slides.
There's a toilet, stainless steel toilet, a sink, a small stand, a book shelf. This area is a pipe chase. That's access from the hall, and it allows them to work on the plumbing. Some facilities even change the light without physically entering the cell or risking leaving tools laying around or that kind of thing.
Q. Okay. And how many inmates would be in a cell like that?
A. There would be two inmates in this sort of cell.
Q. Okay. Now, we talked a little bit earlier, Doctor, about homicide rates in federal correctional institutions. Do you also have information about assault rates?
A. Yes, sir.
Q. And let's talk about that.

A.   This slide identifies assault rates in the U.S.

penitentiaries, and this is looking at an annual incidence of the number of inmates involved in these. You'll notice here at the bottom in terms of the homicide rate at USPs that that rate is 1.25 per 10,000 inmates per year. In other words, for every 10,000 inmates in a USP, one and a quarter inmates is killed.

Now, of course, on the ratio we were looking at earlier, that's 12.5 per 100,000 inmates per year, so the homicide rate is higher in the USPs than it is in the other Bureau of Prisons facilities but still is in some ways surprisingly low given the seriousness of the offenders who are housed there.

As we look at the other types of offenses, about 1 percent will -- in any given year will assault another inmate with a weapon.

About 2 percent will assault another inmate without a weapon.

About 3 percent will assault a staff member without a weapon.

And less than half a percent will assault a staff member with a weapon.

Q.   So that number up in the upper right is a .4 percent?

A.   .4 percent. That's a half of a percent, like two per -- that's like 1 per 200 inmates per year, and these are in the USPs. This is not Bureau of Prisons wide. These numbers are based on the USP incidents from data provided to me by the

Bureau of Prisons in discovery.

Q. In what ways, Doctor, can the staff at United States penitentiaries control this kind of behavior, control assaultive behavior either on staff members or on other inmates?

A. Well, there are a number of approaches that can be brought to bear in any prison system including in the Bureau of Prisons and in U.S. penitentiaries to control inmates that are disruptive or violent.

One way to respond is to treat them. Sometimes inmates are disruptive or violent as an expression of a mental illness, and in that case there may be counseling or medication services that are available or even things like anger management classes and stress management and those sorts of things.

Another approach is to bring consequences to bear, to discipline these inmates. Sometimes the public's under the illusion that somebody who's serving life without parole has nothing to lose so why wouldn't they act bad? The nature and the reality of prison, though, is that there is always something to lose.

And so, for example, you're eating institutional food day in and day out. Your ability to purchase a package of potato chips or some cupcakes is extraordinarily important, and so if you behave in a disruptive way, if you have disciplinary infractions, they may take away that privilege from you.

Now, these cells are extraordinarily small and

3745

confining, and so your ability to come out of the cell to go to work or to interact with other inmates becomes extremely important. And so one way to discipline you is to restrict you to that cell, even to restrict you to single cell for an extended period of time.

They can also take away your access to recreation privileges or to the job that you go to.

It isn't that when life without parole inmates get to prison that they have somehow magically changed. But what does happen is there is a realization that they're going to be here for the rest of their lives, and they can either make that experience extraordinarily difficult on themselves and spend their life in a walk-in closet essentially, or they can cooperate with the program and be able to come out of their cell and go to a job and interact with other inmates and make it somewhat more tolerable.

This is illustrated in the research that we collected in Missouri where we found that the inmates that are sentenced to death but were circulating in the general prison population and the inmates that were serving life without parole were about half as likely to be involved in assaults as inmates who are parole eligible. And the rates of the assaults, the rates of the death sentenced and the life without parole, their rate was about one-sixth the rate of assaults of the parole-eligible inmates across a ten-year period of time in a high-security

prison in Missouri.

So it's an illustration that the severity of the offense is not a good predictor or the length of the sentence is not a good predictor of who's going to be violent in prison.

Q. Now, in addition to discipline within an institution, are there also ways you can move a person from one institution to another as punishment or control?

A. Yes, sir. With -- as the number of disciplinary infractions increase and the seriousness of those increases,

then the custody level of the inmate is incrementally raised.

So, for example, if the offender is already in a U.S. penitentiary, then he might be moved to the secure housing unit or he might be moved up to USP, Marion, mid-level facility, or he might be moved up to ADX, Florence or to one of the more secure units within ADX, Florence. And so there are increasing levels of security even in terms of facility or the unit the inmate is assigned to in response to their own conduct.

Q. Putting the squeeze on.

A. Well, it's realistically responding to their behavior and the degree of security that they've demonstrated that they require.

Q. Doctor, let's briefly look at some of the features that are used to impose these kinds of restrictions and what some of these security measures are.

A. Yes, sir. Some common features of the security measures,

particularly as you move up from the USP level to more secure levels of confinement, the inmate is single celled. There is very limited movement. That's popularly called 23 and 1 which means that you are locked up in your cell by yourself 23 hours a day, and you get out an hour a day 5 days a week where you're escorted to another little bit larger indoor area or a larger outdoor area where you're allowed to exercise for an hour. And then you're shackled and carried back to the cell.

When the inmate is handled by the staff, when he's moved, he is handcuffed. He's restrained. Typically what happens is the inmate backs up to the food slot that's in his door and is handcuffed behind his back, may have his ankles shackled depending on the unit he's on. Then the cell door is

opened, and when he's moved, he's escorted by a staff member that has ahold of those handcuffs behind his back and by another correctional staff officer or two who are holding batons.

Now, additionally, when he's taken out of his cell, they may do a wandover with him with a metal detector as well as pat him down, feel his hair, look in his mouth, and that kind of search may be done going and coming into a cell. If he's going to be escorted off the unit for some reason, often he is placed in what's called a Martin chain so that the handcuffs themselves are anchored to a belly chain, and the connection between the handcuffs is locked up into a black box so that the inmate can't access the locking mechanism to tamper with it if he somehow

secreted a handcuff key.

The exercise that occurs may be solitary. In other words, he may exercise by himself, or it may be small group, 2, 3, 4, up to 12 inmates.

And then there are frequent searches of the inmate as well as his cell area.

Q. Okay. Doctor, earlier you were showing us some of the custody options that are available, and you said that those designations and the decision about where an inmate goes is made by the Bureau of Prisons; right?

A. That's correct.

Q. And you described for us some of those facilities including the high-security unit at Marion and ADX in Florence; right?

A. That's correct.

Q. And does ADX stand for something, or is it just a shorthand?

A. Yes, sir. It's an abbreviation for administrative maximum,

and so it's described as ADX, Florence. Like the USP stands for U.S. penitentiary, ADX stands for administrative maximum.

Q. And if we were to look at some pictures of the administrative maximum security facility at Florence, do you think it would help us understand what being locked down in a facility like that means?

A. Yes, sir, it would.

Q. And you've got some.

♀

A. Yes, sir, I do.

Q. Good. What do we have there?

A. Here we're on a hill looking down on the ADX portion of the prison complex that's at Florence, Colorado. This is a relatively large complex that has a U.S. penitentiary within its confines. I believe it has an FCI, a medium-security facility. It has ADX, Florence there, and so it's a larger facility. This is looking at the ADX facility which is geographically separated from the others within this prison complex.

Q. May I interrupt you for a second?

A. Yes, sir.

Q. How did you get this picture?

A. This picture was one that I found from a commercial photography company that had taken pictures of ADX when the facility opened. Some of them had Janet Reno in the picture who was the United States attorney general at that time. And so I was able to obtain the rights to use these from this professional photography company.

Q. So this is no breach of security that you're using these photographs today.

A. No, sir. I initially found these on the Internet and then

contacted the company to talk about the pictures.

Q. All right. I apologize for the interruption. Tell us a little bit more before we move on.

A. Yes, sir. As you're looking at this, you'll see that you

have a double-perimeter fence here of chainlink razor wire. These are the very secure -- I'm sorry. I'm having a hard time. These are the very secure gun towers that surround the facility.

Q. Those are the cylindrical objects with the silver band around the top?

A. Yes, sir, that's correct. And then you have other buildings within the prison that you see within the fence. One of the things you get a sense of here is the barrenness of the surrounding area. This prison complex is in the middle of nowhere southwest of Colorado Springs. There's a very small town of Florence, Colorado, that is probably four or five miles away. But it is a very open, semi-arid expanse that's around this facility where you would certainly detect the movement of any sizable number of people or a vehicle from some distance away if they were coming from off the road.

Q. Do you have a closer photo of some of the facilities you just described for us?

A. Yes, sir, I do.

Q. And does this depict a closer view of the perimeter fence and the gun towers you've described for us?

A. Yes, sir, it does. You'll notice both the massive nature of these towers. You also see the piles of the razor wire that is between the fences that almost entirely fills the expanse between the two fences. It's stacked in descending coils so that you may have five coils on the first level and then four

and then three as you pile it up. Razor wire is -- it's like a band of razor -- a continuous band of razor blade that at intervals about this far apart has -- it's cut so that it juts out like this in sharp points so that it's very easy to become entangled in it, and it has a stabbing effect in terms of restraining somebody who's caught in it.

Q. Okay. Doctor, the next set of questions I'm going to be asking you about are about the interior of these facilities.

MR. SPIES: And, Your Honor, this may be a -- I don't know what you're --

THE COURT: We're going to go till about 12:30.

MR. SPIES: Okay. Thank you.

BY MR. SPIES:

Q. Let's next go, Doctor, to the interior, and tell us, please, what the slide that we're looking at now portrays.

A. Yes, sir. This portrays a central picket or control bubble within the prison itself, and you have stairs ranging up and down. The bubble sits kind of midway between two floors so that there is a range of cells here that's half a stairway up and a range of cells below it that are half a stairway down, and those radiate like spokes off of this secure bubble. The doors are electronically operated from within the bubble, and so the staff is -- you have staff that's in this area that is controlling electronically the doors that access that unit as well as opening the doors that are on the unit.

The staff members themselves are wearing a

walkie-talkie. They're wearing microphones, and so when they want a door open, they don't get out a key for it. Instead they call to the picket or the control bubble identifying which cell they would like opened, and that's then done electronically.

Q. Do you have a diagram that would show this bubble concept, this spoke that you described?

A. Yes, sir, I do. Here you see that central picket, and then radiating off of that are the cells. You also see the outside recreation areas are here. Interior recreation areas are here. In other words, when the inmates are escorted to exercise, they may be taken to one of the interior areas, or they may be escorted to an exterior one.

You also see a drawing of a closeup of the cells in terms of how they're stacked with these two floors. Part of what you get a sense of here is how narrow the cells are. The photographs that I'll show in a few minutes of the interior cell are taken with a wide-angle lens, so it makes the cell seem much larger than it is. In fact, it's about 70 square feet in size. And when you stretch your arms out either way, you're only about six or eight inches off of either side of being able to touch the wall. And you get some sense of that by looking at this schematic drawing.

Q. Okay. Let's take a look at hallways going into the cell area.

♀

3753

A. This is looking down one of the runs through the electronically operated grate door that would be open to access a particular hallway.

Q. Now, you just told us, Doctor, that you -- you started to describe the dimensions, rough dimensions, of a cell in ADX.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3272 of 3636

A. Yes, sir.

Q. Do you have a diagram that would help us understand that more?

A. Yes, I do. Here you have a couple of features of these cells at ADX. First, the hallway is out here, and in accessing a cell, there is first a solid door that's going to slide open, and that allows you to step into a vestibule which is right here. Now, the inmate, though, is still behind a grate, a sliding bar door. That allows movement up and down the hall without the inmate being able to throw something out into that area.

Now, all the cells are on one side of the hall. Let me back up a slide. All the cells are on only one side of the hall. That way it's not as if you can get the attention of another inmate and signal to them across the way because all the cells are just on one side.

Within the cell there is a single-piece stainless toilet/sink unit that has a push button little water fountain that you get a drink from and would wash your hands from. This stainless steel one-piece apparatus, there's not a toilet seat.

♀

They don't want anything the inmate could tear off and use as a battering weapon. And, in fact, there's not even a roller for the toilet paper. Instead the toilet paper -- well, I'm not sure I can -- right here. There's a hole in that stainless sink that the toilet paper just goes into.

The cell itself consists of -- in addition to that stainless steel sink, there is a concrete stool. There is a concrete bed. There is a concrete shelf. Concrete stool, concrete shelf, kind of desk/shelf area. There is a concrete

shelf that a low-voltage television goes on. That's how much of the programming, educational programming, information that comes into the inmates comes in on this low-voltage television. Then there is a stainless steel shower in the back of the cell that has push button controls.

One of the features of the construction of a cell is that the stool and the bed and the shelf -- the concrete desk/shelf on the wall are poured into the structure of the cell. In other words, this was all done in a continuous concrete pour. There's no crevice between the bed and the floor. There's a solid concrete bed that simply has a trough in it that provides a little bit of storage area for the inmate. But there's nothing to tear out. There's no surface to slide something under. It's a continuous pour into the structure of the cell.

The window that's here in the back of the cell faces

an interior recreation area. There aren't any windows that face the outside perimeter of the facility. So the inmate is -- never has a good sense of what direction his cell is facing. He may be able to see a little bit of blue sky from the top of the outdoor recreation area but never has any information about his orientation with the geography of the place or what the external perimeter patrols consist of or what their schedule is.

Q. Now, Doctor, do you have a diagram that would show kind of in a stacking way how these cells are oriented in ADX?

A. Yes, sir. Again, this shows -- this is essentially a cutaway between the two floors, and it gives you a sense again of the narrowness of the cells. It shows the vestibule nature of them here obviously. There's a wall here and a solid sliding

door. Step into the vestibule, and then there is a sliding grate.

Now, what that allows is that as medical or psychological or -- staff or correctional personnel need to interact with the inmate, they can open the door, step into the vestibule. The inmate is still back behind those bars. And it's always more than one staff member present including a staff member with a baton to help provide additional security while that face-to-face contact is occurring.

Q. Now, in addition to this diagram, Doctor, do you have an actual photograph of what a cell looks like at ADX, Florence?

A. Yes, sir, I do.

Q. And tell us again what some of the features are of this cell.

A. Yes, sir. This is standing in the -- at the entrance of the cell, just inside the grate door, and looking toward the back of the cell. Again, this is taken with a wide-angle lens, and so it's making this seem much wider than the actual seven feet across or so that this cell is from this dimension to this dimension. It's, in fact, very tight here.

This shows you this single-piece sink, drinking fountain, toilet apparatus. That's the push button control, and that's where the water comes out. That's the stool, small desk area. Again, the concrete is poured into the surface of the structure of the cell. That's the trough, the window that faces the outside recreation area, and the stainless steel shower.

Q. Okay. And do we have another view of this cell? There you go.

A. Yes, sir. This is standing back in the shower area and

looking toward the doors of the cell. And you have two different doors. This is what we call a grate wall, g-r-a-t-e, and this door will electronically slide open. Then there's the vestibule. Then there's the sliding steel door out here.

Now, one of the things you'll notice is this cutaway in the grate door. And what that allows is when the inmate backs up to be handcuffed behind his back, the staff member grabs on to the handcuffs, then calls for the door to be opened

so that he continuously has control of the inmate and doesn't have to handcuff him, turn loose of him, and then ask for the door to be open but instead has control of the inmate at all times.

When he brings the inmate back to the cell, it's the same procedure. The inmate steps into the cell. He has him by the handcuffs, calls for the door to be shut. That door slides around his hand. Then he can release the inmate and uncuff him.

Q. Now, you told us earlier about a mechanism for transporting inmates from one area of the ADX to another either using a single guard or correctional officer or multiple ones. Do you have an example of that?

A. Yes, sir. This is a picture of an inmate being escorted. In this case this would be a -- what is called a general population inmate or one of the lower levels of security within this incredibly secure facility. You know that because he's only being double escorted. Here's the staff member that has ahold of the handcuffs behind his back, and he's escorted with one staff member with a baton. If he were on the control unit, for example, there would be an additional officer standing there with a baton as well.

The batons -- you see the baton in his hand here -- these are wooden batons that have a round metal tip to them. And they're sometimes called rib spreaders. They can be used as a thrusting weapon into the ribs where they would spread the

cartilage, or they can be used as a laterally used device to control the inmate as well.

Q. Now, you have another photograph, Doctor, that would show how an inmate in ADX could communicate with somebody, be it a lawyer or staff.

A. Yes, sir. This is a visitation booth from the inmate's side. And so the inmate would come into this area and sit down on the stool and would speak over the phone. There is a very thick specialized type of glass that is between the inmate and the visitor. Glass has a very high hammer rating. That means you can beat on it with a hammer for an hour or so before you get a hole the size of a quarter, and so it's quite secure in its strength and integrity. Then the other side that you're seeing here is where the visitors would come in, and they would sit on this side.

Q. And visitors would be monitored as well when they're in a facility like this?

A. Yes, sir. The visitors are very thoroughly searched and wanded and that sort of thing. There's a restricted list of who can come into visit. And then those telephone conversations are monitored and recorded.

Q. Okay. What about -- we've seen some of the wall structures, some of the floor structures. How is the top of a facility like this constructed to provide security?

A. This is a view of one of the outside recreation areas. So

you see a basketball goal down here. The feature that's important here, though, is that the tops of the outdoor recreation areas are covered with a girder system as well as a chainlink or net-type covering so that it's open air, but you've reenforced the top of that to prevent helicopter extractions.

Q. Now, Doctor, we've seen some of the facilities at ADX, Florence. We've heard testimony during this trial from inmates who have been there. Is there still violence in a secure facility like this?

A. Yes, sir, there is.

Q. And could you tell us a little bit about that and how it occurs?

A. Yes, sir. This is a chart that reflects the assaults by year. At the top there is the area that this data's taken from, and this was again provided to me by the Bureau of Prisons. And this is the different types of assaults, inmate on inmate with a weapon, on an inmate without a weapon, on staff with a weapon, on staff without a weapon. And this is the average daily census across those years from 1996 to 2002.

There are -- the vast majority of the assaults are on staff without a weapon, and those heavily consist of throwing fluids on the officers or attempted head butts or pulling away when the inmate is otherwise restrained or is being shackled, kick their leg out so that the officer's hand is pulled into the bars or his knuckles are scraped.

Q. Those are all classified as assaults?

A. Yes, sir.

Q. Okay. And you also have information there about homicides and escapes.
A. Yes, sir. There has been no homicide of inmate or staff in ADX since it opened. There has been no escape from ADX since it opened, and that's with the worst of the worst that are sent to ADX. They have anywhere from about 350 to just over 400 out of a Bureau of Prisons population of just over 150,000.
Q. Now, for the past several minutes, Doctor, we've been talking about ADX, Florence which is the super max facility in Florence, Colorado; right?
A. That's correct.
Q. And is this facility, the administrative maximum, a permanent place of residence for an inmate sentenced by the Bureau of Prisons or designated by the Bureau of Prisons?
A. For most of the inmates that are there, it's not intended to be a permanent placement. Now, how long that placement lasts is up to the Bureau of Prisons. And there are individuals who are there that it may be difficult to identify what's going to change that would cause them to be taken to another facility.
Q. And tell us a little bit about that.
A. There are 9 units or 9 -- yes, 9 units at ADX with about 60, 65 cells per unit. Now, three of those are general population units. The inmates are in the cells like I described

3761

a few minutes ago, the vestibule cells, single celled. And those inmates exercise in small groups. When they're taken to exercise, they are in restraints, and they're escorted by one officer who's holding the handcuffs behind the inmate's back and another who is carrying a baton, and they come out about 12 hours a week to exercise. They eat their meals, though, in

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3279 of 3636

their cell, and they shower in their cell.

An inmate has to be on this unit at least 12 months before he can move up anywhere else and may be there longer than that depending on his conduct or depending on the appraisal of his continuing risk. It's not as if an inmate can simply decide, I'm going to go along with the program and act right, and they're going to forget about all those other things that brought me here in the first place. They're appraising the continuing risk as they evaluate if an inmate is ready to be moved up.

If this is done successfully and the security appraisal identifies it's appropriate, then he may move up to an intermediate unit. On this unit there's no longer the vestibule cell. Instead there's just a single sliding solid door on the cell. And these inmates come out several hours a day, 15 or 20 or so at the same time. And they eat their meals in a common area.

Now, when the staff is interacting with them, they're still handcuffed behind their backs and escorted. But the doors

are open where they can come out with each other part of the day. And that -- they're going to be in that setting for at least seven months before an appraisal is made whether they can be moved.

Then there's a transitional unit. Here they're escorted off the unit unrestrained in small groups as they go to programming areas and that kind of thing, and they're on that for at least five months. What's happening is is that you're gradually trying to move them back toward what life would be like in a regular U.S. penitentiary if, in fact, they seem to be

cooperating and that seems to be an appropriate security decision.

And then for at least a year they're on a pretransfer unit where they come out of their cells, they're around staff, and are not shackled. They work for half a day for a prison-related enterprise called UNICOR, and they eat their meals in kind of an institutional dining hall setting, have to do that for at least a year.

Now, if they act out, obviously this might be continued, or they might be dropped back down to some greater level of security and have to start this process over again. It's going to take an inmate who's assigned to ADX, Florence at least three years to transition out, but he might be there much longer than that.

Q. Okay. Now, could you -- you've described this way of

3763

transitioning inmates out of ADX back into a United States penitentiary.

A. Yes, sir.

Q. And could you talk with us a little bit about a United States penitentiary and how it differs from the super max at Florence.

A. Well, this is a picture of one of the intermediate transition units at ADX where you notice there is simply a single door, not a vestibule door. That's going to be what you have at a U.S. penitentiary, that there is a single door, that inmates come out of their cells a good part of the day and go to jobs and go to programming or recreation and that sort of thing. They're still highly supervised, but their movements are not being shackled.

At ADX, by contrast, the intensity of supervision is much greater. They're single celled instead of double celled, and you have much greater security in shackling and controlled movement, that sort of thing.

Q. Now, Doctor, you told us a moment ago that if an inmate acts out. Is that like creates problems?

A. Yes, sir, and particularly behaves in a violent fashion.

Q. And if they do behave in a violent fashion, what happens to them?

A. Well, if their security level warrants it, they may be assigned to what's called the control unit which is intended as

a longer-term placement for the most dangerous inmates within the Bureau of Prisons. The instruction says it's intended to place into a separate unit those inmates who are unable to function in a less-restrictive environment without being a threat to others or to the orderly operation of the institution.

Q. And how do the correctional staff, the experts at a federal correctional institution, decide who goes there?

A. Well, then that's a matter that's specified in the regulations. The warden shall consider the following factors in a recommendation for placement in the control unit.

Q. And who makes the recommendation?

A. That recommendation would be made by the warden or by the Department of Justice.

Q. Okay.

A. It may be based on an incident during confinement in which the inmate has caused injury to others. It may be an incident in which the inmate has expressed threats to the life or well being of other persons that require that degree of custody or

possession of deadly or dangerous weapons or drugs, rioting, escape, an attempted escape, and on occasion the nature of the offense for which the person was committed.

Typically it wouldn't be the offense alone that sent you to the control unit, but it's the offense in combination with other risk factors and security needs.

Q. Now, what happens when a person goes into this control

unit? What security is there for correctional staff and for other inmates in the control unit?

A. Well, the inmates in the control unit are single celled. They're in their cell 23 hours a day. They have a vestibule cell with a sliding outer steel door and the inner grate door.

On the control unit, their legs are shackled for movement as well as being handcuffed behind their back, and they're escorted with three officers now, one holding the handcuffs and two with batons. They get seven hours of exercise a week by themselves, and they eat their meals in their cell, and the duration of this confinement by regulation is until they're able to function in a less-restrictive environment without posing a threat to others or to the orderly operation of the institution.

Q. So the decision to put an inmate in this control unit and how long they stay there are made not only by a variety of factors but by people with expertise in controlling inmate behavior.

A. Yes, sir, that's correct. The warden makes a -- or the Department of Justice makes an initial recommendation for the control unit. That -- there is then a review committee that consists of the regional director for the central region as well

as the assistant director of correctional programs as I recall out of Washington or their designees. And they then review -- there is an internal hearing about whether this person should be

placed on the control unit or not, and they're going to make a decision about that.

Then once the person gets to the control unit, there is a review by those same individuals every 60 to 90 days. It's not like they just throw somebody -- throw the key away, but instead every 60 to 90 days they again review the continuing need for this person's placement on the control unit.

Q. Doctor, even though you have these significant restrictions on movement, on access, efforts are made to control the movement with handcuffs, multiple correctional officers, access to food and so forth, are there still assaults on correctional staff in the ADX control unit?

A. Yes, sir, there are.

Q. Tell us about the frequency of that and the severity of it.

A. Well, I had the opportunity to review the disciplinary write-ups for all of the staff assaults that occurred in the control unit between the time the facility opened in December 1994 through June 2001. During this time there were 17 incidents, 14 minor assaults and 3 attempted or threatened minor assaults on staff.

Now, of those 17, 10 of them were committed by the same inmate. And so apart from him, then there are only six total inmates involved. The other five were engaged in a total of seven incidents. And you can see what these consist of: There are nine throwing unknown liquid or feces or spitting in

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3284 of 3636

the face of the officer; one kicking the foot forward as the shackles were being removed jerking the officer's hand into the bars; one pulling away there as he comes into his cell; and then throwing a tray full of water and a carton of milk at the officer -- in other words, as soon as he's uncuffed, he immediately ran and got those things and threw them back at the officers -- one throwing his head back against the officer's face, what's called a head butt; one attempting to pull away from the officer while being escorted so that it scraped the officer's hands; one grabbing the officer's shirt and pulling him into the bars.

And then of the attempted and threatened, there were two attempted or threatened throwing of liquid and one attempted head butt.

So, again, across a 7-year period of time, 6 1/2-year period of time, with approximately 70 inmates at any given time who are considered to be absolutely those that require the greatest security, this is the limited nature of the violence that occurred.

Q. On top of this, the control unit, is there even a still more secure facility for troublesome inmates? And by troublesome, I mean very violent and unable to be controlled in the control unit.

A. Yes, sir. Within the facility at ADX, Florence are four what I would describe as super cells. And those cells are here

3768

and here and here and here. These are cells that are designed so that there is greater isolation of the inmate and minimal

handling of the inmate that's required by the staff. And I'll describe to you the operation of these cells.

This is the outer hallway here, and there's a door that's here that accesses then this -- the rest of this cell. The inmate is behind a grate bar right here, a wall of bars.

Now, if you wanted to send the inmate to outdoor recreation, you would electronically open this door, and he would step into the vestibule. Then you would electronically open this door, and he would step into the recreation area. Of course, the door would shut behind him. In other words, now he can be allowed to go to recreation, and you haven't had to go through that shackling procedure.

If you wanted to send him to indoor recreation, you would open this door. He steps in here. Open this door, he steps in here, this door, and now he's in the interior recreation area.

If he was to go to visitation, you would open this door, this door, and he comes in, and he sits down right here. The visitor comes down the hall and accesses this closet from this side.

Now, for a number of years these cells were not utilized at all. They had never been used. More recently they have been identified as cells that terrorists might be kept in.

3769

My understanding is that there's a single one that's occupied now by Ramsey Youssef, but those are facilities should the need warrant it that are also part of ADX.

Q. Okay. Doctor, all of the facilities that you've told us about this morning from the United States penitentiaries and the medium- to high-security level, the administrative super max

prison at Florence, Colorado, the control units, the special housing units, are all facilities available for the sentencing, incarceration, and punishment of a person sentenced to life without parole?

A. To the extent that they're thought needed, they'll be at a U.S. penitentiary level. After that it's what security that's identified as necessary to appropriately contain them.

Q. Now, we've also heard that there are incidences of moonshining, creating alcoholic beverages, exchange of drugs. Those things happen in federal penitentiaries, don't they?

A. Yes, sir, they do. Those are things that would happen in a U.S. penitentiary. As you move up that security level, the potential to do that sort of thing is much more restricted because of limited opportunity and so much tighter observation and supervision.

Q. Once again, the decisions about where a person is placed, what kind of restrictions are placed upon their movement within a facility are all made by correctional professionals of the federal Bureau of Prisons.

♀

A. That's correct.

Q. They know what they're doing?

A. They are outstanding professionals who are very competent and capable at the jobs they do.

Q. Life in prison without parole is not, however, a pleasant experience for those people in there, is it?

A. No, sir.

MR. SPIES: Thank you, Doctor. I have no other questions.

THE COURT: I think now would be an appropriate time

to take our noon recess. It's 12:30. We'll be in recess for the jurors to have lunch for 45 minutes, and we'll start up at 1:15.

Please remember my cautionary instruction about keeping an open mind until you've heard all of the evidence, had a chance to receive my final instructions, hear the closing arguments of the lawyers, and begin your deliberations. Thank you.

(The jury exited the courtroom.)

THE COURT: Any other matters we need to take up, Mr. Spies?

MR. SPIES: No, Your Honor.

THE COURT: Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Thank you.

♀

(Lunch recess at 12:29 p.m.)

THE COURT: Ready to have the jury brought in?

MR. SPIES: Yes.

MR. WILLIAMS: Yes.

THE COURT: Okay. Thank you.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated. Hope you had a good lunch.

And, Mr. Williams, whenever you're ready, you may cross-examine Dr. Cunningham.

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Good afternoon, sir.

A. Good afternoon.
Q. One of the things you talked with this jury about was I think where you had a slide entitled Analysis of Continuing Risk of Ordering Violence in the Community, and what you were talking about there was the ability of an inmate to have somebody on the outside or perhaps in another institution commit violence for them --
A. Yes, sir.
Q. -- if they weren't able to do it themselves? And you'd said that one of the motives could be to avoid prosecution, and it could be to retaliate as well.

A. Yes, sir.
Q. And if it was to retaliate, that would be more likely then that that violence would, in fact, occur if that was a motivation.
A. There's continuing motivation, yes, sir. That's not one that would be resolved by the conviction.
Q. Sure. And when you talked about the capability, you said that there was two things, two prongs, to the capability. One is whether the person was tied to some type of organization, and that could be even a group within the prison that they're tied with.
A. Potentially, yes, sir.
Q. And another way was you said if they had economic ability to carry something out.
A. Yes, sir.
Q. Okay. And would economic capability include the ability of an inmate to sell something of value, say, for example, a methamphetamine recipe or the knowledge of how to manufacture

methamphetamine as something that could be sold by an inmate to somebody either on the outside or to another inmate as something of value in exchange for them to help him carry out some act of violence?

A. If it were highly specialized knowledge, in other words, if it's not available elsewhere, then it might have value. I'm not sure how secret methamphetamine recipes are as that's widely

♀

manufactured in the United States. But yes, sir, if they have some knowledge that could be very valuable to someone, that also could be an asset they could make use of.

Q. Somebody particularly good at manufacturing methamphetamine would be in possession of more valuable information.

A. You know, I'm not familiar enough with how unknown methamphetamine manufacturing is to know whether that's knowledge that has value or not.

Q. Okay. And you were talking about -- when you were talking about this outside violence, you were indicating that the Bureau of Prisons can monitor the mail that goes out by inmates?

A. Yes, sir, restrict it or monitor it.

Q. Okay. And so are inmates allowed to communicate with other inmates in other institutions?

A. Not typically in a direct sort of way, and that may be the limitations that are placed on who they're allowed to correspond with. As a condition of confinement, communication with other inmates may be banned if that's identified as a significant risk.

Q. And if it's banned, then this highly professional Bureau of Prisons staff could keep that from happening.

A. They can put pretty extraordinary limitations on it. Now,

is it possible for an inmate to shout into the toilet and potentially have another inmate hear it or that kind of thing? It isn't necessarily that that is cut out all together, but very

serious restrictions can be placed on it. To my knowledge the communication like that that has circumvented the scrutiny of corrections officers has involved senior prison gang members who may have a code system for communicating with each other but is not typically part of the rank and file. And as they talk about special conditions of confinement for Ramsey Youseff or Luis Felipe, I'm reasonably confident they've been able to impose those and meet the court's requirement of restricted communication.

Q. Inmate could send communication to another inmate by simply marking the envelope "legal mail."

A. If their attorney cooperated with that, and that's why in some of these cases there were restrictions that were placed on attorney-client communications where there was a court master that was monitoring those.

Q. Communications could be obtained by having an inmate send a message to a family member who then sends it on to another inmate, indirect communication in that manner; right?

A. Yes, sir. If that were -- if it slipped past the monitoring and if, in fact, the list of who this person could correspond with represented individuals who were interested in furthering a criminal conspiracy, it's possible that that could occur.

Again, the professionals that are reviewing the list are well aware of the risk that it represents and I would expect

would maintain pretty careful consideration of who that communication was allowed with.

Q. You talked about moonshining operations that occur within a prison. And how is it that inmates would pay another inmate for moonshine that would be produced?

A. There is an internal economy that exists within prisons, again, that staff is pretty aggressively trying to interfere with, but it may be that as cigarettes or drugs or commissary -- some of these things -- some things of value the inmates have legitimate access to like their commissary, so someone might then trade some of the groceries that they could legitimately buy from the commissary for alcohol. They might trade sex for alcohol. They might have access to cigarettes that they trade. So there are -- certainly there is the potential that someone might purchase alcohol that they didn't make themselves.

Q. Now, inmates don't have cash in prison; right?

A. That's correct.

Q. But they have cash on their accounts that they can use and draw off of in order to buy commissary items.

A. That's correct.

Q. Okay. And so the monitoring system that you've described that the BOP has to prevent this type of illegal activity or contact and so forth, that same monitoring system could be used to prevent an inmate from making moonshine and selling it by having another inmate transfer money to a family member to

launder that money to send it back into that inmate who produced the moonshine in that account; right?

A. Yes, sir, theoretically, that's correct.

Q. You talked about escorting inmates out of the institution or even within the institution using what you described as a black box?
A. Yes, sir.
Q. Okay.
A. Belly chain and shackling.
Q. And you said the black box is designed to keep an inmate from being able to access the locks in order to get out from underneath the handcuffs.
A. Makes it much more difficult, yes, sir.
Q. Okay. It's not impossible, though, is it?
A. No. It's possible to defeat a black box. It's not easy, particularly if you are being double or triple escorted in the process. That's why it's used, because it's an additional and relatively successful additional mechanism of control.
Q. You would agree with me, though, you can defeat a black box and handcuffs.
A. It's possible, yes.
Q. Inmate can and they do use wires, pieces of wires. They can manufacture handcuff keys out of toothbrushes, things like that.
A. Yes, sir. The reason for the black box is to block access

to that locking mechanism so that it's more difficult to get to. It's possible that somebody of extraordinary arm and wrist strength might be able to pop their handcuffs and defeat a box in that way. It's not easy to get to the locking device on it.
Q. But if you trained at it and worked at it with other inmates, you could find a way to get out of that black box, couldn't you?

A.    It's not easy to do.  Again, it is an effective security mechanism.  Nothing is absolutely foolproof.

Q.    And so we're clear, the security measures we've talked about today, that you've talked about today, are the security measures that exist at a federal prison; right?

A.    Yes, sir.

Q.    You've not rendered any opinion or given any statistics or given any instruction to this jury about the security measures that might be in place, say, if -- say if an inmate was writted out to appear at a trial like this and was housed in a local jail; right?

A.    No, sir, other than inmates that are seen as being at risk are designated as central monitoring cases.  In other words, their movement is approved at the central office so that they make sure that who this person is and what their level of risk and what escorts they require are brought to bear, and it helps ensure that inmates that are seen as being a greater risk have greater resources that are brought to them, so there are

procedures like that for designating particular inmates for special handling when they're moved.

Q.    When you talked about the ADX and the control unit and so forth, just so we're very clear with this jury, an inmate who has been convicted of capital murder in the federal system and is sentenced to life instead of the death penalty will never be placed in ADX or control unit unless they first commit some type of violence against an inmate or another staff member that requires the heightened increase in security.

A.    No, sir, that's not correct.  In most cases an inmate who is convicted of capital murder in federal court and sentenced to

the BOP for a term of -- for life without parole does not go to ADX. But there are individuals who have been deemed a risk even before they enter the general prison population so that they went to ADX rather than a USP. They went directly from their capital trials to ADX. And so that does happen. It's the minority of inmates who require that additional security, but it has happened.

Q. And so if I'm clear, you said that inmates will be -- inmates who are in that category, they've been convicted of capital murder in federal court and they've been sentenced to life in prison, will be at least at a USP level, United States penitentiary level.

A. Yes, sir, unless the public safety factor has been specifically waived.

♀

3779

Q. Okay. And that can be waived; right?

A. Oh, yes, sir. Again, at the highest levels within the Bureau of Prisons, if they identify after carefully evaluating this inmate that they don't require USP security, then they may waive that public safety factor.

Q. So there are federal inmates who have murdered multiple people who are actually housed in FCIs.

A. I don't know if there are any that have killed multiple people that are in FCIs. The last list that I saw of federal capital inmates who had been sentenced to life row or death at their trials, there were a few on that list who were at FCIs. I'm not familiar with the nature of their offenses.

Q. And just so we're clear, the FCI is the second-lowest level of security facility within the Bureau of Prisons.

A. No, sir. It's just below a USP.

Q. And then below the FCI is a camp.
A. You know, I'd have to look on my list again. You have -- I believe you have the camps and then you have low and then you have FCIs and then you have the USPs.
Q. Now, you would agree with me that the best predictor of future behavior is past behavior.
A. Yes, sir, assuming that your context of prediction is sufficiently similar. In other words, under the same conditions, if those continue without any intervention, without any change, then that's true. If your context is significantly

different, then behavior doesn't transfer so well.

MR. WILLIAMS: I have nothing else, Your Honor.

THE COURT: Mr. Spies? Excuse me. Mr. Spies.

MR. SPIES: Thank you.

REDIRECT EXAMINATION

BY MR. SPIES:

Q. Doctor, you were asked about ways in which inmates can, in general correctional institutions, federal correctional institutions, engage in illicit communication between inmates and engage in production of moonshine, can engage in the trading of drugs, sex, and so forth. As the security levels increase as you've described for the jury this morning, does the possibility of those illicit activities diminish?
A. Yes, sir, it becomes increasingly difficult, particularly as these very competent professionals in the Bureau of Prisons identify who is at communication risk, who do they need to be careful of, who's a prison gang leader, or those kinds of things and bring additional conditions of confinement to bear.
Q. Okay. And as you've acknowledged, nothing is foolproof.

A. That's correct. ADX to date has been foolproof against escape and has been foolproof against homicide. And so at this point it's foolproof in that way. It hasn't stopped all assaults, but it's very effective in controlling these inmates.

Q. And similarly, the decision about whether a capital defendant goes to a United States penitentiary or to the super

max prison that you've described for us this morning, those are decisions that are made by correctional professionals based on a variety of factors including not only the crime of conviction but other predictors of trouble or violence including history of substance abuse, family connections, a wide variety of factors.

A. That's correct.

Q. And the only way to be absolute about preventing people from committing further assaults in or out of prison, homicides in or out of prison, would be to lock them up in a bottle.

A. Yes, sir, that's correct.

MR. SPIES: Thank you.

THE COURT: Mr. Williams, any recross?

RECROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Sir, the only way to be absolutely sure that somebody's not going to commit future violence is to execute them.

A. Yes, sir. After they're dead they can't. Now, during the time they're on death row, they're having interaction with staff and inmates and that sort of thing, and so you've got how ever long that takes, five, seven, ten years, that they are going to be interacting with people regardless unless you've locked them down in super secure settings.

MR. WILLIAMS: I have nothing further, Your Honor.

THE COURT: Mr. Spies, anything further?

MR. SPIES: Nothing else, Your Honor. Thank you.

THE COURT: You may step down, Dr. Cunningham.

THE WITNESS: Thank you, sir.

THE COURT: Ready to call your next witness?

MR. SPIES: We are.

THE COURT: Want to take a short stretch break, allow Dr. Cunningham to disconnect his laptop?

MR. SPIES: Yes, please.

THE WITNESS: Thank you, sir.

THE COURT: Do you have your other laptop ready to go?

MR. SPIES: Yes.

MR. PARRISH: I think we do.

THE COURT: Okay. Are you ready to call your next witness?

MR. SPIES: Thank you. Call Marvea Honken to the stand.

MARVEA SMIDT, DEFENDANT'S WITNESS, SWORN

THE COURT: Please be seated. Make yourself comfortable. Would you state your full name, please.

THE WITNESS: Marvea Mary Smidt, S-m-i-d-t.

THE COURT: Thank you.

Mr. Spies?

MR. SPIES: Thank you.

DIRECT EXAMINATION

BY MR. SPIES:

Q. Mrs. Honken -- I'm sorry. Mrs. Smidt, could you tell us,

please, where your family came from in the state of Iowa.

A. Where I came from originally? From Garner, Iowa.

Q. Okay. And has your family always lived in the state of Iowa?

A. Yes, they have.

Q. And once again, remind us and the members of the jury who all are your children.

A. I have Jeff, and I have Dustin, and I have Alyssa.

Q. Okay. And where do you now live?

A. I live in Britt, Iowa, at 970 Old Highway 18 in Britt.

Q. And you're married to?

A. To Ron Smidt.

Q. Could you tell us, please, Mrs. Smidt, how you went through school? Where did you begin going to school, and where did you go when you got through high school?

A. I started kindergarten in Iowa, in Garner, Iowa, and I graduated from Garner, Iowa, and that's as far as I went.

Q. When you graduated from high school, where did you go from there?

A. I got married shortly after I graduated from high school.

Q. Where did your mom and dad live?

A. My mother was originally from Crystal Lake, Iowa, and my dad was originally from Goodell, Iowa.

Q. And when you were living with your mom and dad, where were you living?

♀

3784

A. In Garner.

Q. Okay. And did your mom and dad -- are they still living, by the way?

A. No, they're not.
Q. When did you leave your family home to go out on your own?
A. I left my family home when I got married, and that would have been -- I got married in 1960, and I graduated in '59.
Q. Did you work while you were in high school?
A. Yes, I did.
Q. What kind of work did you do?
A. At that time I would go to school half days, and then I worked for Northwestern Bell the other half.
Q. All right. Did you ever work in a restaurant?
A. Yes, I did.
Q. Where was that at?
A. It was called Hull's Cafe.
Q. Mrs. Smidt, you married James, Jim, Honken.
A. Yes.
Q. And what year did you and he marry?
A. 1960.
Q. And could you tell the ladies and gentlemen of the jury how you and Jim Honken, Dustin's father, met.
A. I first met Jim when I was 16 years old and I was working at Hull's, in a restaurant. He had gotten out of service, and he was working on construction. He's six years older than I am,

and I met him while I was working at the restaurant.
Q. And you have on the monitor to your right Defendant's Exhibit CC. Is that a picture of your wedding day?
A. Yes, it is.
Q. And you said you met Jim Honken how?
A. While I was working at a restaurant.
Q. How old were you then?

A. The first time that I met him, I was 16.
Q. And how old was he?
A. Well, he was six years older than I.
Q. Okay. And what was your age when you married?
A. I was 18.
Q. And he then would have been?
A. Well, 24.
Q. After you and he married, where did you make your home?
A. In Algona, Iowa.
Q. And again, whereabouts is Algona?
A. From Britt it's probably about 30 miles west.
Q. What kind of work was Jim Honken doing when you and he married?
A. He was in construction.
Q. And where was he working?
A. I don't know, you know, the company or anything. I can't remember that.
Q. Did he work in one fixed location, or did he travel in this work?

A. Well, later on he traveled. When we were first married, he just worked construction, and then I think he was a car salesman for a while, and then he kind of went on his own with his own drag line.
Q. Okay. Where was your first home together as husband and wife?
A. It was in Algona, Iowa.
Q. All right. And then how long did you live in Algona?
A. Probably for about a year.
Q. And from there where did you go?

A. To Clear Lake.
Q. And how long did you live in Clear Lake approximately?
A. Probably about a year. That's where my oldest son was born, when we lived in Clear Lake.
Q. Did you work during the early days of your marriage?
A. No, I did not. I was not allowed to.
Q. Excuse me?
A. I was not allowed to.
Q. What do you mean by that?
A. Well, he wasn't going to have a working wife.
Q. Did you enjoy working?
A. Yes, I did.
Q. When permitted to?
A. I liked working for Northwestern Bell.

Q. So your husband's view of marriage was that you were to be a stay-at-home wife?
A. That's correct.
Q. When you met and began your life with Jim Honken, was alcohol a feature of your marriage?
A. Yes, it was.
Q. Could you describe that for us, please?
A. I was awful young and naive when I married Jim. I came from a family that was really stable and good, but my father also was a drinker, so when I got married, I guess I really didn't think anything of it. You know, I mean, you just go from one to another.
Q. So you let it be.
A. Yeah, I let it be. Yes.
Q. As your marriage progressed, did you stay in one community

for very long, or did you eventually end up moving to a new town?
A. When we lived in Clear Lake, that's where Jeff was born, over in Mason City, and my husband then owned a pawn shop in Mason City at that time. And from there we moved to -- well, it was Hutchins. It's right outside Britt. It's just a little bitty town outside of Britt.
Q. Okay. You had children, of course.
A. I had Jeff.
Q. And when was Jeff born?

A. In 1962.
Q. Where were you living when Jeff was born?
A. I was living in Clear -- we were living in Clear Lake.
Q. Whereabouts?
A. In Clear Lake when Jeff was born. He was born in Mason.
Q. And was your pregnancy with Jeff a normal pregnancy? Because it was your first; right?
A. Yes, uh-huh.
Q. Were there any difficulties during your pregnancy with him?
A. Not then. Just at the end I had to have him Cesarean section.
Q. So Jeff would have been delivered in a hospital.
A. Yes.
Q. And was that the Clear Lake hospital?
A. That was Mercy Hospital in Mason City.
Q. Did Jim accompany you to the hospital for your son's birth?
A. Yes, he did.
Q. And because you had a Cesarean delivery, were you required to stay in the hospital a little bit longer than --

A. Yeah, I had a lot of difficulties afterwards, and so I was in the hospital ten days with him.
Q. Okay. And could you tell the ladies and gentlemen of the jury how you left the hospital.
A. By the back door.
Q. What do you mean by that?

♀

3789

A. He just -- when they came, they were going to discharge us at that time, he run me through the hospital to the back door to leave with the baby.
Q. Your husband did?
A. Yes, he did.
Q. Was that embarrassing to you?
A. Yeah. I didn't know why. I didn't understand it.
Q. Where did you -- did you continue to live in Clear Lake then for a period of time?
A. Yes.
Q. And did you make any moves from Clear Lake after Jeff was born?
A. We moved to Britt or Hutchins. That was right outside Britt, a little town, had an elevator, and it had a little grocery store, and it had a restaurant at that time.
Q. Was your family then just you, Jim, and Jeff at that time?
A. That's right.
Q. Okay. So you moved to Britt, Iowa.
A. Yes.
Q. Where a lot of what we've heard about in this courtroom took place.
A. Uh-huh.
Q. Did your husband's drinking continue to be a problem when

you moved to Britt?
A. Yes.

Q. And you had a family home in Britt.
A. Yes.
Q. Did your husband work outside of town?
A. Well, when we first moved to Britt, he worked as a mechanic at the Farmers Co-op. I can't remember how long he worked there. And then after that then he started with the boiler makers.
Q. And a boiler maker is someone involved in plumbing and sheet metal?
A. Well, he travelled. He travelled a lot and everything, and what it was is they worked on these big anhydrous ammonia plants and things like that.
Q. Okay. Now, you said he worked at a co-op in Britt for a while?
A. Yes, he did.
Q. Was that the co-op that Mr. Brumm described for us the other day?
A. That's right.
Q. So when he would go out of town to work, how long would he be gone away from Britt?
A. Well, it depended on the job, how long the job would be or when he could get home.
Q. Did he come home on weekends then or whenever he was not on a job site?
A. Yes.

Q. And what sorts of activities and engagement did he have with you and with your young son Jeff when he returned home?
A. I can never remember a vacation or we really didn't -- we really didn't do much of anything.
Q. Did he drink when he came home?
A. Yes, he did.
Q. Did you become pregnant again when you were living in Britt?
A. Yes, in 1966 I had a little boy that died.
Q. And his name was what?
A. Matthew.
Q. And how old was he when he passed away?
A. A day.
Q. And where is he now?
A. He's buried in Britt.
Q. Was that a difficult pregnancy for you?
A. Yes, it was.
Q. Was it also -- was your son also delivered by Cesarean?
A. Yes, he was.
Q. And when you got out of the hospital, did you have funeral services for Matthew?
A. There was funeral services while I was in the hospital. Jim went and had graveside rites. I never got to see Matthew.
Q. That was difficult for you.
A. Yes.

♀

3792

Q. When you got home from the hospital, was there a place in your home for Matthew?
A. There was before, but when I got home, everything was gone.
Q. How did you and Jim, your husband, deal with your son's

death?

A. It was just very, very difficult. I mean, you know, you lose a little baby, and I never got to see him. I didn't get to see a picture, nothing.

Q. You continued to live in Britt.

A. (Witness nodded head.)

Q. And did Jim have the same job and continue to work outside -- out of your home?

A. Yes.

Q. And outside of town?

A. Yes.

Q. Were you permitted to have a home -- I mean an occupation of your own?

A. No. I kind of took in sewing and things like that is what I did because I enjoy sewing.

Q. And, of course, you had a young son.

A. Uh-huh.

Q. Probably full time?

A. Yes, I did.

Q. You became pregnant again?

A. Yes, I did.

♀

Q. With Dustin.

A. With Dustin.

Q. And in what year and month was Dustin born?

A. He was born March 22 of 1968.

Q. And was he born in Britt?

A. No. He was born in Burlington, Iowa.

Q. How did that come to be?

A. We closed up the house for a year, and I moved with Jim.

We didn't live in Burlington. We lived in a little town across the river in a trailer, and Dustin was born in Burlington.

Q. How long did you live in the Burlington, Iowa, area after Dustin was born?

A. I don't know. I think it was within a year that we moved back home.

Q. Back home to Britt?

A. Yes.

Q. Okay. So you now had two young sons.

A. Uh-huh.

Q. And you were caring for them in your home in Britt.

A. Yes.

Q. Tell us what Jim's role was in taking care of your sons.

A. I can't remember Jim ever changing a diaper or doing anything. He never -- he wanted children. He really wanted children, but then he never -- after they were here, it was just -- just never -- never did anything with them.

♀

Q. So you were the person solely responsible for taking care of your children?

A. Yes, I was.

Q. And did Jim continue with his drinking?

A. Yes.

Q. How in the day-to-day life of your family did that affect you and affect your young boys?

A. Well, when he was home and everything, he'd always make promises he'd take us here or there or whatever. And, you know, you always have hopes that -- someday that it's going to come about, you know. You always think, okay, we're going to get to do this, you know. And it just seemed like it just never would

come about. You know, we were going to go here or just some celebrations or things like that. And the 4th of July it was usually Mom and I that always would take the kids.

Q. I'm showing you Defendant's Exhibit BT. Is that a photograph of you, Jim, a young Jeff and a very young Dustin?

A. Yes, it is.

Q. Do you know where that photograph was taken?

A. That was at my mother's, uh-huh.

Q. And where did she live?

A. In Garner.

Q. All right. You continued to live in Britt for many years; am I right?

A. Yes.

3795

Q. And as you lived in Britt, did you again take any employment outside of the home while you were married to Jim?

A. No, I didn't.

Q. You were primarily responsible for the care of your children?

A. Yes.

Q. Did your parents have any role in helping you to care for your two young sons?

A. I mean, they -- my mom and dad were really good and everything, but when Jim and I were having problems -- you see, when Jim and I got married -- maybe I'll have to explain this. I was born and raised Catholic, very strict Catholic, and he was born and raised Lutheran. Well, my folks, of course, didn't want me to get married. I was too young which was true. So they went and hid my birth certificate and everything because at that time you had to prove that you were how old to get married.

And so Jim and I at the time, we said we'd join a church together, so we went and got married in a Presbyterian church. My folks said that they would not attend my wedding because of this leaving the Catholic church. Mom drug me to the monsignor and everything, and I told -- I was told I was going to hell because I was leaving the church. But I just thought this was the best way to do it.

So we -- we got married then in the Presbyterian church. His folks did come. It was just his folks, and it was

3796

a friend of Jim's, a best friend of mine, and at the last minute my folks decided that they would come. They broke down and came since I'm the oldest one in the family I guess, you know, too.

But Mom and Dad were a really good one to say if you make your bed you lie in it, so, I mean, that was told to me, so they were so against me marrying him in the first place. But when the kids came, you know, I mean, they loved their grandchildren. I mean, they loved their grandchildren.

Q. You had a third child; right?

A. Yes.

Q. And that's Alyssa.

A. Yes.

Q. When was Alyssa born?

A. April 28 of 1971.

Q. Were you still living in Britt when Alyssa was born?

A. Yes.

Q. Still maintaining a full-time job as a homemaker and mother?

A. Yes.

Q. Was Jim working outside the home?

A. Yes.
Q. And where was he working when Alyssa was born?
A. I don't know where he was working when Alyssa was born, but my mother -- my mother brought Alyssa and I home from the hospital.

♀

Q. And why was that?
A. He wasn't there.
Q. Did Jim's absence from the home create a strain for you?
A. It wasn't just the absence, but when he was home, you know, you would think that he'd be a better father and husband than he was, and he wasn't. But I should have left Jim a long time ago, but I wasn't strong enough to do that. I didn't have job skills and that, and back then it just -- I don't know. I didn't have any support or anything. It makes me so angry that I never left him a long time ago before -- it's my fault.
Q. Was Jim at all involved in your children's lives, in their activities at home, their activities at school?
A. No, he never went to one single conference or anything.
Q. Did you go on family vacations, family trips?
A. No.
Q. Go to festivals, holiday activities together?
A. No. Well, just, you know, when my mom had something or his mom had something we would.
Q. Was this a strain on your marriage?
A. Of course it was.
Q. Did you have emotional difficulties yourself, Marvea, Miss Smidt, in coping with your husband's drinking, his absence, and his attitude toward family life?
A. Yes, I did. I just didn't have any self-esteem at all.

You see, when -- I was 18 years old, and I had an exploratory

operation because they thought there was something wrong with me, and then I had four Cesarean sections after that. So my body didn't look very good, of course, with all this stuff. So I was always told that nobody, no man would ever want me because my body was so ugly.

Q. Who told you that?

A. My husband.

Q. Did you seek any kind of professional help for how you were feeling?

A. Not then. I went to see a counselor when things were really breaking up with Jim and I. I just couldn't take it, and I wanted him to go to a counselor with me. And he refused to go because he said it was all my fault, so I went by myself.

Q. Did you get medication for your feelings?

A. No.

Q. Do you think you were depressed?

A. Oh, I'm sure I was.

Q. I'd like to ask you some questions now about Dustin; okay?

A. Okay.

Q. When Dustin became of age, did he go to school in the public schools in Britt, Iowa?

A. Yes, he did.

Q. And before we get to his school days, was he an easy boy to raise?

A. Yeah, he was. He was -- you know, he was -- he was my

early walker. I mean, Jeff was just kind of easy going and everything like that, you know, and he was quite old when he started walking, but Dustin was about nine months old, and he could climb in my cupboards, and he'd walk.
Q. Was he born with blue eyes?
A. Yes.
Q. And blond hair?
A. Yes, kind of stringy blond hair.
Q. Towhead do they call that?
A. Yes.
Q. How did he and Jeff get along as youngsters?
A. Well, Jeff was a lot older than he was and everything, and I can't remember lots of things, you know, with Jeff. I remember more things with Dustin and Alyssa because they were so close in age.
Q. Was what my colleague would call the alpha dog Jeff, that is?
A. Well, he was put in a position at an early age of being my -- the male dominance in the house, too early of an age.
Q. Looking at Defendant's Exhibit BV that you have there on the monitor, is that a picture of Jeff and Dustin?
A. Yes, it is.
Q. And it looks like Jeff is standing over Dustin's tricycle?
A. Could be, yeah.
Q. So just doing the calculations roughly, how much older was

3800

Jeff than Dustin?
A. Six years.
Q. Did Dustin enjoy the usual childhood activities growing up in Britt, Iowa?

A. Yes, yes, he did.
Q. Like coloring, playing outside, being with friends?
A. Yes, uh-huh.
Q. So could you tell us briefly, Mrs. Smidt, about the school system in Britt, Iowa, as it was back when Dustin was growing up? What kind of schools were there?
A. Well, there was just one public school. It went from kindergarten, and then, you know, they went on to junior high and high school.
Q. And were these all contained in one building, or was it a separate elementary school and secondary school?
A. It was separate.
Q. Okay. So did you enroll Dustin then in elementary school in Britt, Iowa?
A. Yes, I did, uh-huh, yes.
Q. Before we get to his school days, I wanted to show you just another picture of your three children. That'd be -- on the jury's left would be Dustin, in the center would be Alyssa, and on the far right would be Jeff?
A. Yes.
Q. Do you know about what age this would have been taken?

3801

A. Well, Alyssa must have been between a -- I think about a year old because I remember that picture was taken in the home, and I bought outfits so they all matched. And Alyssa -- the photographer was late, and Alyssa fell asleep, and when she woke up, she was sucking on the ribbon on her dress, and it was all wrinkled, and I remember just thinking, oh, no, that was going to show in the picture, you know, that her ribbon was all wrinkled.

Q. So you actually had a photographer come to the home to take that picture?
A. Yes.
Q. And did your youngest son Dustin make some preparations for the photographer to arrive to take this picture?
A. Well, it was said -- it was kind of funny because he comes in, and the photographer said, Well, what's your name, little boy? And he says, Dustin. And the photographer said, Oh, that's nice that you're helping your mommy.
Q. Did Dustin have any difficulties adjusting to going to school, being away from you in the schoolhouse?
A. No. He was anxious. I think, you know, when it's the second one, you know, they always want to go to school.
Q. Uh-huh. And let me show you Defendant's Exhibit BE. Is this a typical school photo of Dustin at Britt Elementary?
A. Yes.
Q. In addition to going to school, did Dustin participate in

3802

activities like scouting, church activities?
A. Yes, he did. He was in Cub Scouts because I was a den mother, and then, of course, with any -- with the church and everything, yes.
Q. This would have been what? Cub Scouts?
A. Cub Scouts, yes, uh-huh.
Q. And did your family attend church in Britt?
A. Yes, we did.
Q. What church did you attend?
A. First Lutheran Church.
Q. Okay. Were -- did all of the family members attend church, all of your family?

A. Jim never went when I was married to him, but the kids and I did because I taught Sunday school.
Q. What area of Sunday school did you teach?
A. I always liked to teach about the 4th grade. I enjoyed about that age because they were -- they could ask questions and were real inquisitive and that, and I liked that age.
Q. Next I'd like to show you a photograph, Defendant's Exhibit CT. And can you tell us, Mrs. Smidt, what that's a photograph of if you recall?
A. That's when we lived in town and I was a den mother, and that was a little -- a troop that came and met at the house for Cub Scouts.
Q. Back in the days when they still delivered milk to the

door?
A. Oh, yes. We went through a lot of milk.
Q. And this would have been a picture of a scouting group that you were the den mother for?
A. Yes.
Q. Okay. And which one of those if we can tell is Dustin?
A. He's the one -- it would be -- he's got the white and the red shirt on there.
Q. Okay. Did he enjoy interacting with kids in his neighborhood, in the town of Britt?
A. Yes.
Q. How big was Britt do you think at the time that Dustin was in elementary school?
A. I don't think Britt's really ever grown very much. And what'd I say it was? I can't remember. About 3,000 did I -- I can't even remember now. But it just hasn't grown, you know.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3316 of 3636

It's pretty well stayed the same.

Q. Next, again, to illustrate your life in Britt, I'm going to show you Defendant's Exhibit CZ. And can you tell us what Exhibit CZ is?

A. I think that's when he went to camp.

Q. What kind of camp was this that Dustin would have been at?

A. We always had Riverside Bible camp and -- in Story City, and that's where the kids go when they were confirmed, and Dustin loved camp. He went to -- went there, and then for how

♀

many summers after that till like -- I don't know how old he was, he went to the Baptist camp in Ventura.

Q. Just for the record, which photograph -- which face in that photograph is Dustin?

A. He's got the white and -- he's way over to my right.

Q. All right. On the far right with the V-neck?

A. Uh-huh.

Q. Do you know who the gentleman is sitting there behind him with the tie?

A. No, I don't.

Q. Okay. Can you tell whether those are beer cans or pop cans against the wall there?

A. They're pop cans.

Q. Okay. Mrs. Smidt, what were some of Dustin's favorite friends and activities growing up in Britt, Iowa?

A. Well, him and Tim were -- Tim Cutkomp were friends from really little on up, and Todd Olson, and he was friends with Brian DeGeus, and there was quite a few. I can't remember all the names. But Tim and Todd, of course, were the ones all the way through.

Q. You mentioned Brian DeGeus.
A. Uh-huh.
Q. Do you know the DeGeus family?
A. Yes, I do.
Q. Ed and JoAnn DeGeus?

♀

A. Yes, I do.
Q. And how do you know them?
A. At one time I -- when Ron and I were married, the first time I -- when I got a job, I worked -- I managed a Casey's store, and JoAnn worked for me.
Q. Were you social friends also?
A. No, we weren't.
Q. You go to church together?
A. We both belong to the same church, yes.
Q. Have you had a chance to visit with them here?
A. I've said hi. Of course I've said hi.
Q. Although we can probably imagine, tell us how Jeff and Alyssa and Dustin interacted when Dustin was young.
A. Well, when Ron and I got married, Carmen came to live with us too which was Ron's daughter. So there was four children. And they all got along, you know, pretty good. It was difficult. I wasn't used to a girl because she was about 12 years old when she lived with -- came to live with us when we got married. But we always ate all our meals together. Back then it was, you know, you just eat all your meals together. It isn't quite like it is today it seems like. But everybody -- we had our ups and downs, but everybody got along.
Q. Again, tell us what role your husband Jim had as your children were growing up through childhood and into adolescence

in Britt.

A. Well, when Jim and I got divorced, of course, I stayed in Britt, and Jim was there for a while, and then him and Carol got married and lived in Garner. The boys were very torn, especially, you know, when Jim and I got a divorce. I still remember my oldest son saying, I'm not going to live with either one of you. I'm going to go live with the Cooks.
Q. We're going to get to that in just a minute.
A. Okay.
Q. What do you think, Mrs. Smidt, led to the deterioration of your marriage with Jim Honken?
A. His drinking, and I just didn't -- I didn't love him anymore. I couldn't. I couldn't. And I don't know really if I ever did.
Q. Was his activity as a father meaningful to you and your children? His role as a father, did it have much impact on your children?
A. Well, I don't exactly know how to put that. You know, he wasn't there that much. That's what -- they really didn't have a -- when they were young, they didn't have a role model of a father, you know, to really -- to grow up with. I mean, you know, he was there, and he -- you know, and it was just -- he promised them things, and, you know, if he would, he'd follow through if he bought them things and things like that, but as far as really a father-father, my idea of a father, no, he wasn't.

Q. Okay. Did your marriage to him then deteriorate?

A. Yes.
Q. Collapse.
A. Yeah.
Q. Collapse because of his drinking?
A. Well, that, and I'm sure part was my fault too. You know, I mean, it takes two. It isn't just one.
Q. What did you do when your marriage collapsed?
A. I think I was out to prove that I needed somebody; I didn't have anybody. I never had anybody for a long time, and eventually I met Ron.
Q. Ron Smidt.
A. Yes.
Q. And where was he living?
A. In Britt.
Q. Was he married at the time?
A. Yes, he was.
Q. Did you have a relationship with Ron Smidt?
A. Yes, I did.
Q. Before you were divorced.
A. Yes, I did.
Q. When did you and Jim then decide that your marriage was over and that you needed to divorce?
A. Would have been in 1976 we got a divorce.
Q. Was it a peaceful divorce?

A. We both had the same -- we had the same lawyer.
Q. How did your children, Dustin and Jeff and Alyssa, respond to the breakup of your marriage to Jim?
A. It hurt Jeff really bad because, you know, he was, well, lots older. You know, he was in high school. And he used to

have friends down the road because, like I said, when we lived in Hutchins, it was between -- it was like, oh, a couple miles to Britt. And between there, there was this family that had a lot of kids, and he always played with one of the boys. And they were really good people, and that's when he said, I'm not going to live with either one of you; I'm going to go live with the Cooks. But I think Alyssa was too young. She was little. Dustin, you know, would just go along and more or less, you know, with Jeff, you know, with what Jeff said.

Q. So what was the custody arrangement that you and Jim had when your divorce was final?

A. Jim told me that -- we had owned the house, and then we had a little piece of land that we raised some hogs on, and I think there was a couple ponies at one time. And he said, You can have the furniture; I'm going to take that land. We'll sell the house, and we'll pay all the bills. And what's left we'll split. And I said, Okay.

Q. And the arrangements for the children, were they going to remain with you, were they going to remain with Jim? Or what was the arrangement?

3809

A. To remain with me.

Q. Okay. Did you offer a split custody arrangement?

A. Yes, I did. Of any of the kids like you'd say that Jim really liked or really -- I don't know what it was, but he had always a fondness, the best one of the children he liked -- I won't say the best but the one he paid more attention to or anything was Dustin. And we talked, and I said, you know, with the kids, what -- you know, I didn't know -- I didn't know how to put it, but I guess I felt in a way that, you know, this is

my part too, and I'm the one that wants out of the marriage. I was the one that wanted out. And I said, With the kids, if you want Dustin -- because that was the one -- he never paid attention to the other two; he just didn't pay attention to the other two; it was always Dustin -- that Dustin could live with you.

Q. And was that the arrangement you made?

A. No, Dustin lived with me.

Q. What happened with Jim wanting Dustin?

A. Jim didn't want any of the kids.

Q. Excuse me?

A. Jim didn't want any of the kids then. He didn't want any.

Q. But Dustin was closest to Jim?

A. Yes, he was.

Q. Did you stay in the town of Britt when you and your husband Jim broke up?

3810

A. I moved into a large stucco house in Britt with the children.

Q. I'm showing you Defendant's Exhibit BW. Is that the house in which you and your children moved into?

A. Yes, it is.

Q. Of course, Ron Smidt had a divorce from his wife?

A. Yes, he did.

Q. And this was the home in which he lived, or is this a different home that you bought?

A. Okay. This house belonged to a single man, and when Ron left his family, he moved out and rented a room in this house, and then we -- eventually we bought the house from John Roberts.

Q. So did Ron have children as well?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3322 of 3636

A. Yes, he did.
Q. And did they live with you as well?
A. Carmen did.
Q. Okay. Carmen was his daughter?
A. Yes.
Q. And who else was in his family?
A. Bruce was, but he was graduating from high school at that time, so he was going off to college.
Q. So you now had an instant blended family.
A. Yes, we did.
Q. How did that go?
A. It wasn't easy.

Q. How did that blended family eventually reach some kind of equilibrium?
A. It just took time. Carmen was a very angry young girl. She loved her father very, very much. That's why she came to live with us. And I had taken her father away from her, and at that time I wish there would have been someplace I would have known for -- to get some, you know, counseling for a family like that. But eventually Carmen and I did go for counseling, and Carmen and I love each other today.
Q. How did the children, your children, take to Ron as a dad?
A. Ron's very quiet, very private man. Alyssa, of course, took to him right away because she was looking for a daddy, and the boys had -- their father had so much influence, you know. Just kept telling them, Make sure you don't call him Dad, so when Alyssa wanted to call Ron Dad, the boys would say, No, you can't call him your dad because that's not your dad.
Q. So she was kind of lost in the middle?

A. Yes, so she came up with -- and to this day she calls him Pop.

Q. How did Dustin take to living in this new family?

A. Dustin about at age nine said to me one day, he says, Momma, I want to go live with Dad. And I looked at him, and I said, Well, Dustin, you're not going to. I says, You're going to stay here and live with us. But when you're 12 years old, if you still decide that you want to live with your dad, then you

♀

3812

can. But when he was 12 years old, he could see through things and things and that, and he didn't want to live with his dad then.

Q. Did he continue to see Jim?

A. Yes.

Q. And was Jim living in Britt yet?

A. Jim's living in Garner.

Q. And he married Carol; right?

A. Yes, uh-huh.

Q. Did you know Carol before she and Jim married?

A. No, I didn't.

Q. And again, how far is Garner from Britt?

A. It's 12 miles.

Q. Would Dustin go to visit Carol and Jim?

A. Yes, he did.

Q. Overnights?

A. Yes.

Q. Did you get feedback from your children about their visits to Jim and to Carol, about how things were going when they visited their dad?

A. They would just -- you know, when they'd come home and

things like that, they never -- they never said a whole lot. I just know a lot of times once in a while it was said, you know, that their dad was, of course, still upset with me and wouldn't say some nice things to them about me.

♀

Q. So by the time you married Ron Smidt, all your children were still with you in your home together; right?
A. Yes.
Q. And the kids were going to school or ended up going to school in Britt.
A. Yes, they did.
Q. Now, you said that Dustin would go to visit his dad. His dad was living in Garner, Iowa. Do you know when this picture was taken? This is Defendant's Exhibit CG.
A. No, I don't, but it looks like it would be at Jim's folks' house, but I'm not sure.
Q. In whose house?
A. In Jim's folks' house, but I'm not sure.
Q. And is that a picture of Jim?
A. Yes, it is.
Q. With Dustin.
A. Yes.
Q. Dustin, as you said, attended the elementary schools in Britt, Iowa; right?
A. Yes.
Q. And as he grew, he continued to have a fairly normal childhood in Britt?
A. Yes, he did.
Q. Were you concerned about his relationship with his dad?
A. I was concerned with, I mean, not only him, but, you know,

with the other kids too because, I mean, it was just always -- there was never any nice things ever said about me or anything like that, and I just didn't think that, you know, kids should be subjected to that.  I had to bite my tongue lots of times not to say anything about him, but I always tried not to.
Q.    So as Dustin went from elementary school then toward junior high or secondary school, did he work outside your home?
A.    Dustin -- you know, I think he first started working for Ron.  You know, all the boys, all three of them, worked for Ron.
Q.    And again, what kind of business did Ron Smidt have in Britt?
A.    He had a salvage yard.
Q.    So what kind of work did the boys do working at Ron's business?
A.    They would take parts off of cars and that for Ron.
Q.    Did Dustin participate in church activities in Britt?
A.    Yes.  He was confirmed, and then he would go -- he went to Luther League.
Q.    And showing you what's next to you as Exhibit CV, is that a picture of you, Ron, and Dustin?
A.    Yes, it is.
Q.    And when was that picture taken?
A.    That was his confirmation.
Q.    Into again what church?
A.    In the First Lutheran Church.

Q.    Do you know about how old he was when that confirmation

took place?
A. He'd have to be 13. He was always little, so I think he was about 13.
Q. Okay. Did Dustin and Jeff and Alyssa continue to have a relationship with Jim's parents?
A. Yes, very much so.
Q. And where did Jim's parents live?
A. In Titonka.
Q. In where?
A. Titonka, Iowa.
Q. And are they alive today?
A. No, they're not.
Q. Did Jim continue to have a good relationship with his parents?
A. You know, I think so. I mean, you know, I never saw anything, you know, that he didn't.
Q. Okay. And what you have next to you, Defendant's Exhibit CD, is that a picture of Jim with his father?
A. Yes. He was closer to his mother than his father, though.
Q. As Dustin went into high school, did he participate in ordinary social events and have girlfriends and friendly relationships with both boys and girls?
A. Yes, he did.
Q. Showing you Defendant's Exhibit BI, can you tell us who

3816

that is?
A. That's Dustin and a friend for the junior prom.
Q. And -- okay. Did he enjoy doing things like that, dressing up?
A. Yes, he did.

Q. Was he careful about his appearance?
A. Very much so.
Q. How so?
A. Oh, he had to make sure that his hair was just exactly right because he'd have a fit if one little hair was out of place or anything like that and his clothes and everything. He was -- made sure that he always wanted to look just really good.
Q. How did he like working taking cars apart?
A. Didn't like that because he got his hands dirty. But then Ron always said of the three boys he was the best worker.
Q. Showing you Defendant's Exhibit BK, can you tell us when this would have been taken?
A. That would be the senior prom.
Q. At Britt or at Hancock High School?
A. Yeah, at that time it was Britt.
Q. Okay. And who's the young lady in Exhibit B K?
A. That would be Sherry.
Q. Did Dustin develop a special friend as he grew up in Britt?
A. Yeah, Tim.
Q. Tim Cutkomp?

♀

A. Yes.
Q. And Defendant's Exhibit CW, is that a picture of Tim and Dustin?
A. Yes, it is.
Q. Do you know when that picture was taken?
A. No, I don't. Must have been graduation.
Q. Okay. That's Dustin holding his graduation cap and gown?
A. Yes, yes.
Q. As Dustin grew older into his teen years, he continued to

have a relationship with his dad?
A. Yes, he did.
Q. Was his dad still living in Garner?
A. Yes.
Q. And did Dustin have a relationship with -- I mean did Jeff continue to live in the Garner area as Dustin got into high school age?
A. Well, Jeff, when he graduated, was there for a while, and then he went out to Arizona.
Q. As Dustin reached graduation age, did he have aspirations for what he wanted to do when he got out of high school?
A. He never really said any one thing. There was just lots of different -- different ideas, you know, and things that they would throw around that he wanted to be. But like most young people that age, he wasn't real sure.
Q. Did he plan on staying in the neighborhood, though, in the Garner/Britt area?

A. At that time his dad had said something about him going to work with him.
Q. This would be Jim?
A. Yes.
Q. Going into work in what kind of business?
A. Oh, something with the boiler makers.
Q. Now, we heard from Sonny Onoo that Dustin had an interest in karate or martial arts.
A. Yes, he did.
Q. He took classes for that in Mason City?
A. Yes, he did.
Q. And how did he get there? Did you take him there?

A.    No.  I remember going over there once with him and that, but no, I did not.
Q.    Did he have other interests and hobbies, things that he liked to do when he was in high school?
A.    He liked cars and girls.
Q.    Okay.  Now, specifically, did his interest in cars get him into legal trouble?
A.    Yes, it did.
Q.    In fact, what year did Dustin graduate from high school?
A.    '87.
Q.    '86 maybe?
A.    '86.

3819

Q.    And in that summer after graduation, did he get arrested for stealing a car?
A.    Yes, he did.
Q.    And was he prosecuted by county authorities?
A.    Yes.
Q.    And did he end up pleading guilty?
A.    Yes.
Q.    Did he receive probation for that car theft?
A.    Yes, he did.
Q.    Deferred judgment?
A.    Yes.
Q.    And a deferred judgment meant that it was off his record after he completed his probation?
A.    That's correct.
Q.    As Dustin was in and getting out of high school, where was Jim living when Dustin graduated from high school?
A.    In Garner.

Q. Did Jim's relationship with Carol Honken eventually break up?
A. Yes, it did.
Q. And how did you learn about that?
A. It must have been through Dustin or Alyssa I'm sure. I can't remember that.
Q. What became of Jim when his marriage to Carol Honken broke up? Do you know where he went?

A. No.
Q. Did he eventually get into legal trouble?
A. Yes, he did.
Q. Did he get arrested for a bank robbery in Missouri?
A. Yes, he did.
Q. And eventually go on the run?
A. Yes, he did.
Q. And after he was captured, did he end up going to federal prison?
A. Yes, he did.
Q. Mrs. Smidt, early in this trial you testified about Dustin going to Arizona. Now, he went to Arizona a couple of times; am I right?
A. That's correct.
Q. And the first time would have been shortly after he graduated from high school?
A. Yes.
Q. And what was his plan when he went down to Arizona?
A. To go to college.
Q. And did he enroll in college?
A. Yes, he did.

Q. Was your brother Jeff -- I mean was your son Jeff living down there?
A. Yes, he was.
Q. And Dustin went down there to Arizona to go to school.

A. Yes, he did.
Q. What'd you think of that idea?
A. Well, you know, at the time, the first time when he was going to go, I thought probably at that time it was a good idea because he didn't know what he was going to do or anything like that, so I thought that was okay.
Q. Did you have any continuing relationship with Jim Honken when he went to federal prison?
A. No, I did not.
Q. Did you ever go up and visit him?
A. No, I did not.
Q. Was this kind of the culmination of his criminal activity as you understood it? And by that I mean were there things that had occurred during your marriage with him leading up to his conviction in federal court that caused you concern about his legal activity?
A. Yes.
Q. Give us some examples of things you were worried about of things he was doing during your marriage and up to the time of your divorce.
A. I have no proof of anything. When we were married at first and he had went into a business of his own, he had a drag line, and all of a sudden for some reason the drag line got all wrecked. And he collected the insurance money.
When we lived in Hutchins, we had -- there was an

unattached garage. It was more of a -- it was bigger than a garage, but we had stored stuff in there, and there was a car in there, and that all caught on fire and smoke had -- the house had smoke damage. And I had a mommy cat and three kittens that were in this building, and for some reason they escaped harm. They were up on my porch.

Came back from Burlington once, and there was a bunch of outboard motors in the back of a pickup that he went and stored someplace. I don't know what happened to them, but, I mean, there wasn't just one. There was a whole bunch of them.

Just things, like I said, I have no proof of anything, but I just know that he got money from all this.

Q. How long was Dustin gone when he went down to Arizona the first time to go to school? Do you remember?
A. No, I don't.
Q. And when he came back from Arizona, did he come back and live in your family home in Britt?
A. Well, that's when he came back and went to NIACC.
Q. Okay. And NIACC again is what?
A. North Iowa Community College.
Q. Located in Mason City?
A. In Mason City, yes.
Q. Did he enjoy going to college in Mason City?
A. Oh, yes, he did.
Q. And did he live on campus there?

3823

A. Yes, he did.
Q. What did he look forward to about school, and what were his

hopes in going to college if you remember?

A. Well, when he was in -- I was just so happy that he was going to college because I never got a college education. I mean, there just wasn't money for me to go to college or anything. That was told to me. And so that was one thing with all my children. I just wanted them to go to college so bad because I never had the chance. So I always pushed the college.

And Jeff didn't go to college out of high school, and Dustin didn't go. You know, he was going to go down to Arizona and go, and I was happy about that. But then when he came back, he went to NIACC, and he was doing so well, and he was even in the dorms and that he was -- I don't know what they call it, but they're kind of a head of everything in the dorms, and you have to have a certain grade point average to get to be that, and he was that. And I just thought, oh, boy, you know, he's going to really make something of himself, and I was so proud of him.

Q. In addition to going to school at NIACC, Mrs. Smidt, did Dustin also get a job at Wellborn Industries?

A. Yes, he did.

Q. And Wellborn Industries we've heard about a few times during trial, where was that located? Do you know?

A. In the industrial park in Mason City, Iowa.

Q. And what did Dustin do for Wellborn Industries? Do you

3824

know?

A. I don't know exactly.

Q. Okay. While he was working there, did he meet a young woman named Kathy Rick?

A. Yes, he did.

Q. Tell us about Kathy Rick.

A. The first time I met Kathy I think was in the shopping center, and Dustin was with me, and Kathy was pregnant, and Dustin introduced me, you know, and he said, Mom, this is Kathy. You know, this is Kathy, Kathy Rick, you know, and I work with her.
Q. Was she married at the time?
A. I think they were probably separated.
Q. And so she was what? A friend of Dustin's?
A. Well, that's the way I took it at the time, yes.
Q. What did Dustin say about Kathy? What did he like about her?
A. He said he'd never met a more intelligent woman than Kathy.
Q. So did she have any children at that time when she was pregnant?
A. Yes, she had Robby.
Q. Okay. And about how old was Robby -- do you remember -- when you first met Kathy?
A. Probably six years old maybe.
Q. Did Dustin continue to have a friendship that developed

3825

into a dating relationship with Kathy Rick?
A. Yes, he did.
Q. And what became of that relationship?
A. Well, he was with Kathy all the time when she was pregnant with Brandon, and he helped name Brandon. And then afterwards, of course, then down the line then they had Ryan together.
Q. So Brandon would have been Kathy's child by her husband, former husband?
A. That's correct.
Q. Did Dustin take an interest in her pregnancy and the birth

of Brandon?
A. Yes, he did.
Q. And was he with Kathy when Brandon was born?
A. I believe he was. I'm not real sure, but I believe he was because I know, you know, he helped name him and everything.
Q. Did he develop a --
THE COURT: Mr. Spies, can I interrupt you for a second and give the jury a stretch break, just a stretch break?
MR. SPIES: Sure.
THE COURT: Thank you.
Thank you. Please be seated. We'll go till about three, and then we'll take our afternoon break.
BY MR. SPIES:
Q. Did Dustin develop a father/son relationship with Brandon?
A. Yes, he did.

3826

Q. And consider Brandon like a son?
A. Yes.
Q. Do you know how Brandon was named?
A. Well, I know Dustin helped with Brandon and William was after Kathy's dad.
Q. So did Dustin develop a closer relationship with Kathy then after Brandon was born?
A. Yes, he did.
Q. Was Dustin still going to school at NIACC?
A. Yes.
Q. Okay. And was Kathy welcomed into your home?
A. Of course.
Q. Develop a mother/daughter relationship with you?
A. Yes.

Q. We've heard yesterday that -- from Sandy Fiems that when Jim Honken got out of federal prison that he began living a short time thereafter with Sandy Fiems. Did you know Sandy Fiems before?
A. No, I didn't.
Q. Or develop any kind of a friendship or relationship with her?
A. No, I didn't.
Q. Do you know where Jim was when he got out of federal prison?
A. Well, I think that's when he was in Steamboat Rock.

♀

Q. Yeah. Did the kids go to visit Jim in Steamboat Rock?
A. Yes, yes, they did.
Q. Try to maintain a relationship with their father?
A. Yes.
Q. Now, we also heard from your testimony earlier in this trial, Mrs. Smidt, that in about 1992 Dustin moved from Iowa down to be with his brother Jeff again.
A. That's right.
Q. And you thought and I believe you testified to the jury that at the time he went to visit his brother you thought that was a bad move.
A. Yes, I did.
Q. And tell us again why you believe that.
A. Because he was just doing so good in school, and I just wanted him to complete going to school. I just really wanted him to do that.
Q. And did Tim also go down to Arizona?
A. Yes, he did.

Q. Did Dustin come home for Christmas?
A. I know he came home at different times, yes.
Q. Did you learn that Kathy, Kathy Rick, was pregnant again after she had Brandon?
A. Yes.
Q. And what did you know about that pregnancy?
A. I mean, I . . .

♀

Q. Did you know that Dustin was the father?
A. Yes.
Q. Okay. And what did Dustin tell you about the pregnancy, and how did you learn about it?
A. He just told me that, you know, Kathy was pregnant, and I guess I -- I can't remember my reaction at the time or anything like that.
Q. But Ryan, their son, was born?
A. Yes.
Q. And was Dustin with Kathy when Ryan was born?
A. Yes, he was. So was I.
Q. Tell the ladies and gentlemen of the jury what Dustin felt about having a son of his own. And by that I mean a blood son of his own.
A. He was all excited, especially when they brought Ryan out to look at. He looked just like Dustin when he was a baby, just exactly. And Kathy had to have him C-section. I remember her saying, Here, Marvea, you hold him; I can't, because they came and put him on her stomach at the time, and it hurt, and she says -- and I looked down at that little baby, and it just looked just like Dustin, exactly. He always has. Dustin was so proud of him.

Q. Mrs. Smidt, I'm going to show you just a few photographs and ask you to describe them for the jury.
A. Okay.

Q. Okay?
A. Uh-huh.
Q. First Exhibit DP.
A. That's Dustin and Brandon.
Q. That's Dustin and Brandon?
A. Yes.
Q. Okay. And Brandon, I take it, would be the little boy at the ship's wheel there.
A. Yes. That's Dustin and Brandon.
Q. Pardon me?
A. That's Dustin and Brandon.
Q. Can you tell where that photograph was taken?
A. I'm not real sure. I think it was at Kathy's.
Q. You told us about the birth of Ryan. Is this a picture of Dustin and Ryan when Ryan was a newborn?
A. Yes, it is.
Q. Even though Kathy and Dustin were not married at that time, was Kathy welcomed as a member of your family?
A. Of course.
Q. And Ryan as well.
A. Of course.
Q. Did Dustin enjoy his role as a father?
A. Yes, very much.
Q. And showing you Defendant's Exhibit DQ, can you tell us who's in that photo, please?

A. That's Dustin and Ryan.
Q. Where was that photograph taken?
A. That's at Kathy's.
Q. Okay. Where was Kathy living then?
A. In Mason City.
Q. All right. Did she and Dustin live together?
A. No.
Q. Okay. Was Dustin still going to school at NIACC and working?
A. Yes.
Q. Now, we know from the testimony in this trial that in about 1993 Dustin was arrested for a drug crime.
A. Yes.
Q. Do you remember that time?
A. Yes, I do.
Q. And he was released from custody, and, as I understand from testimony earlier in this trial, Dustin went to work for your husband Ron then?
A. Yes.
Q. Okay. Was he living at home with you in Britt, Iowa, when he was released from custody and working for your husband?
A. Yes, he did.
Q. And again, what kind of work was Dustin doing for your husband?
A. The same as what he always did. He, you know, took apart

3831

cars with parts and just did everything, you know, I mean, helped Ron.

Q. Did you also learn that he had a relationship with another woman?
A. Yes, I did.
Q. And her name?
A. Angela, Angela Johnson.
Q. How did you learn about his relationship with Angela?
A. I can't exactly remember. She didn't come to the house very much or anything, just once in a while. And I didn't -- of course, at first I didn't think -- I thought they were just friends.
Q. Now, as Dustin was living with you in your home in -- or living in Britt, did Brandon spend time at your home and enjoy Christmas holidays, Thanksgiving holidays, and major holidays with you and the rest of your family?
A. Of course.
Q. And Defendant's Exhibit DQ, is that a photograph of Dustin and his son Brandon?
A. Ryan. That's Ryan.
Q. Ryan, I'm sorry.
A. Yes, that's Dustin and Ryan.
Q. Now, later did you learn that Angie Johnson was pregnant and was carrying Dustin's son?
A. Yes.

3832

Q. Daughter, I'm sorry.
A. Yes.
Q. And was Dustin with Angela when their daughter was born?
A. Yes, he was.
Q. And showing you Defendant's Exhibit DL, is that a photograph of Dustin and his daughter?

A. Yes, it is.
Q. And the daughter's name?
A. It's Marvea.
Q. Same spelling?
A. Yes, it is.
Q. Tell us and the jury his reaction to being a father again.
A. Well, he was real happy to have a little girl. He had a little boy. Now he had a little girl.
Q. And was Dustin active in raising and caring for all of his children?
A. Yes, he was.
Q. Showing you Exhibit DJ, can you tell the ladies and gentlemen of the jury who's in Exhibit DJ?
A. That's myself and Dustin in the middle with Marvea, and that's my mom.
Q. And where was this photograph taken?
A. I think that was at Angie's house. I'm not real sure, but kind of looks that way. I'm not sure.
Q. What's your mom's name?
♀
3833
A. Opal. I'm sorry. She's been gone two years, and I haven't got over it yet.
Q. As with Ryan, was Kathy's son Brandon also welcomed into the family like a son?
A. Yes.
Q. And did -- as with Ryan and with Brandon, did Dustin continue to enjoy being a father to his daughter?
A. Yes, he did.
Q. And can you tell us what's shown in Defendant's Exhibit DH that you have up there in front of you on the monitor?

A. That's Dustin and Marvea.
Q. Do you know where that photograph was taken?
A. At my house.
Q. Do you have an idea of when that photo was taken?
A. It must have been Christmas because that's Dustin's sock up there because I made socks for all the kids when they were little, and they still have them.
Q. Now, Dustin, we learned, was back in Mason City or moved to Mason City at some point, am I right, after Marvea was born?
A. Yes.
Q. And how long did he live in Mason City?
A. I don't know.
Q. Okay. In April of 1996, we heard early in this case and throughout this case that Dustin was arrested again.
A. Yes.

3834

Q. And when he was arrested, he was placed on pretrial release, and was he required to live with you?
A. Yes, he was.
Q. And eventually that pretrial release was revoked; right?
A. That's correct.
Q. And he was taken to jail.
A. That's right.
Q. Before Dustin was taken to jail and eventually sentenced and sent to prison, did Dustin enjoy spending time with all of the family members and sharing his children with you, your parents or your mother and other family members?
A. Yes, he did.
Q. We have a short video. Do you think that that would help to illustrate Dustin interacting with you and his children?

A. Okay.
Q. While we're about to get this underway, Mrs. Smidt --
THE COURT: Do you need to take a break now, or do you want to go ahead with it?
MR. SPIES: I think we'll be okay. Thank you.
THE COURT: Okay.
(Defendant's Exhibit FF was played in open court.)
BY MR. SPIES:
Q. Can you tell us who's shown in the scene that we have right there in front of us?
A. That's Ryan and myself. That's Brandon.

MR. SPIES: Yeah, Your Honor. We do need a short break. I'm sorry.
THE COURT: Okay. Members of the jury, we'll take our afternoon recess right now. It is about a quarter to three. We'll be in recess for about 25 minutes or so. Please remember my cautionary instruction about keeping an open mind until you've heard all of the evidence in the case. Thank you.
(The jury exited the courtroom.)
THE COURT: Rick Hunt magically appeared, so he'll be able to help you if you have any technical problems. We'll be in recess.
Mr. Murphy, could I see you for a minute too?
(Recess at 2:48 p.m.)
THE COURT: Mr. Spies, ready to have the jury brought in?
MR. SPIES: Ready.
THE COURT: Mr. Williams?
MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. Thank you.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Spies, you may continue your direct examination.

MR. SPIES: Thank you.

BY MR. SPIES:

Q. Mrs. Smidt, I think we're ready to roll these few short

video snippets.

A. Okay.

Q. And if you could tell us, please, looking at the monitor there to your right, before we roll this first little segment, could you tell us, please, where this scene was filmed and who's that sitting on your lap?

A. That's Ryan, and that's at my house.

Q. Okay.

(Defendant's Exhibit FF was played in open court.)

Q. And could you tell us who the young women are sitting there hugging?

A. That's Alyssa and Ann.

Q. And Ann is?

A. Is Alyssa's half sister.

Q. Okay. Thank you.

(Continuation of Defendant's Exhibit FF.)

Q. Mrs. Smidt, who's the youngster with the black and white sweater whose back is to us?

A. That's Robby.

Q. That would be Kathy Rick's oldest son.

A. Yes.

(Continuation of Defendant's Exhibit FF.)

Q. Now, Mrs. Smidt, are you able to tell us, does this scene look familiar to you?
A. No.

Q. Okay. We heard yesterday I think from Sandy Fiems that Dustin enjoyed giving the kids rides on the lawn tractor at his dad's house. Do you remember that testimony?
A. Yes, I do, but I remember the kids always telling me how much fun they had doing that.
(Continuation of Defendant's Exhibit FF.)
Q. Now, can you tell us who's riding on Dustin's lap there?
A. That's Brandon.
Q. Okay. And do you recognize the adults in this photograph? May be difficult for you to see.
A. I don't know. I think that's Sandy sitting down, but I can't be . . .
(Continuation of Defendant's Exhibit FF.)
Q. Mrs. Smidt, can you tell us who's shown from left to right in this photograph?
A. That's my mom, and I've got Marvea, and then it's Brandon, and that's my mother-in-law Helen.
Q. And the little boy with the cast on his arm?
A. That's Brandon I think.
(Continuation of Defendant's Exhibit FF.)
Q. And we just heard Ryan. Is that Ryan being handed over there to you?
A. Yes, it is.
Q. And who's handing Ryan to you?
A. Tim Cutkomp.

(Continuation of Defendant's Exhibit FF.)

Q. And again, the man who we see leaning into the front door of the car, is that Tim Cutkomp?

A. Yes, it is.

Q. A welcome member of your family?

A. Yes.

(Continuation of Defendant's Exhibit FF.)

Q. All of Dustin's children welcome members of your family.

A. Of course.

Q. Brandon called Dustin Dad?

A. Yes, he did.

Q. And what does Dustin call Brandon?

A. That's his son.

Q. And what does Marvea call Dustin?

A. Dad.

Q. What does Dustin call Marvea?

A. That's his little princess.

Q. And Ryan?

A. Ryan, Dustin's his dad.

Q. And what does Dustin call Ryan?

A. He's a little man.

Q. Dustin has been in prison now how long?

A. It has been nine years. I don't even know.

Q. He's been at the United States Penitentiary in Florence; right?

3839

A. Yes.

Q. And the United States Penitentiary in Marion?

A. Yes.

Q. Tell us about when you get to visit Dustin. How often do you get to see him?
A. Well, when he was first in the Woodbury County Jail, I got to see him more because I'd come, and you could see them on weekends, and I'd come visit him. When he went to Florence, of course, that's a long ways away. I only got -- I got there once to see him. And then when he was in Marion, I got to see him once.
Q. Okay. Now, Dustin's children, Brandon and Ryan and Marvea, do they get to visit their dad?
A. Marvea saw Dustin in Florence, and Ryan, I took -- my daughter Alyssa and I took Ryan and Brandon to see their dad in Marion.
Q. I want to show you Defendant's Exhibit DR. Can you tell the ladies and gentlemen of the jury who's shown in Defendant's DR?
A. Just a minute. That's Marvea and Ryan.
Q. Marvea, of course, is the little girl on the right and Ryan on the left.
A. Yes.
Q. Do you know about what ages they would have been in this photograph just roughly?

♀

3840

A. They're about six months apart, so I don't know, between two maybe and three.
Q. Okay. Defendant's Exhibit DW, who's in that picture?
A. Marvea and Ryan.
Q. Do you know where this picture was taken?
A. That was at my house in Britt.
Q. Could you describe for the ladies and gentlemen of the

jury, Mrs. Smidt, what contact aside from personal visits that Dustin has with his children now.
A. He calls them, and then they write back and forth.
Q. And where physically do the children -- do his children live now?
A. Ryan lives with his mother, and Marvea lives with her aunt and uncle.
Q. And Brandon, of course, with his mom?
A. With his mother, of course, uh-huh.
Q. And where does Kathy Rick live now?
A. In Minnesota.
Q. Okay. Do you hear from Dustin yourself?
A. Yes, I do.
Q. And do you hear from Kathy about how the -- their sons are doing?
A. All the time.
Q. Could you describe Brandon for the jury? How old is he now?

A. Brandon would be 14.
Q. And describe him for us, please.
A. Brandon's small for his age, and he's blond. He's a nice-looking boy. He takes things very seriously. He plays hockey I think for self-esteem. He -- his aspirations are to go into the service and be a Navy Seal. That's what he talks about all the time.
Q. In Dustin's correspondence with Brandon, does he encourage Brandon?
A. Yes, he does.
Q. Express his love?

A. Yes, he does.
Q. Express interest in Brandon's activities?
A. Yes, he does.
Q. Tell us about Ryan. How old is Ryan now?
A. Ryan's 11.
Q. And tell us a little bit about Ryan.
A. Ryan's a very smart little boy. He likes sports. He wants to be a basketball player because he's very good at basketball, and that's all he can think about right now is basketball because the only things he likes to wear, of course, are the jerseys, you know, and things like that. He's very fussy the way he looks, always has to have his hair combed right and everything. He reminds me a lot of his dad when he was little.
Q. Does he resemble his dad?

3842

A. Yes, he does.
Q. I'm going to show you Defendant's Exhibit DC. Is that Ryan?
A. Yes, it is.
Q. And do you know where that picture was taken?
A. That was taken when we visited Marion. That was in the motel room.
Q. Did you take the kids to Marion to visit their dad?
A. Yes, Alyssa and I did.
Q. And tell us about Marvea.
A. Marvea's very artistic, typical little girl. She loves makeup and things, but yet there's a tomboy side to her too. She loves to play outside. She's going to be very tall, Marvea is. Her hair is down to the middle of her back. That's the way her daddy wants it, so that's the way she says she's going to

keep it. She's just a very loving little girl. She stays with me, and always her prayer at night is, Please, dear God, please send Mommy and Daddy home safe, because she misses them, both of them, just terrible.

Q. When she stays with you, Mrs. Smidt, does she talk about the letters she gets from her dad?

A. Yes, she does.

Q. And what does she think of those letters?

A. Well, she's always called the little princess, or one time it was -- he called her sweet pea, and she says, Grandma, why

♀

did he call me sweet pea? What's a sweet pea? I said, That's a pretty little flower that smells good. So I got my seed catalog out and showed her pictures of sweet peas. Then she thought they were pretty. So she liked that.

Q. Does she like to save her letters from her dad in a special way?

A. Yes. She stayed with me up until she moved. She stayed with an aunt that was more local, and she came over to my house a lot. She spent like a whole month and went to Bible school and -- in Britt. And she decorated a shoe box, and she put all our letters from her daddy in the shoe box. And I saved them all so she could have them.

Q. Is Dustin able to send his children gifts?

A. Yes, he is.

Q. What kind of gifts does he send his children?

A. He has sent Marvea a heart locket, you know, saying that's his heart. He's sent them some other necklaces to the boys that some inmates had made. You know, they make a lot of different things, some chalk prints of horses and birds, and then we have

one great big picture that he sent that somebody had made of a chalk picture of Ryan that is just gorgeous. I mean, it's beautiful. He's just -- you know, send them just little mementos here and there.

And then at Christmastime he enrolls in the Angel Tree program which is a wonderful program for inmates. I don't know

if you've ever seen Christmas trees up in malls or in churches, and they'll have these angels on them, and they'll have the name of a child, and the child is someone that their mother or father or both are incarcerated. And they take these home, and there's a certain amount of money that they can spend, like they'll take one that says clothes or toys. And usually there's a number they can contact someone to ask them like what would this child like or what size clothing does this child wear. And then these gifts are -- and I'm the contact for Marvea and Brandon and Ryan, and then the church group or something, they collect them, and then they bring them to me, and they're all wrapped, and on the outside it says Angel with the name, and it said, Merry Christmas, love from Daddy. So if you ever see one of those, do it.

Q. Does Dustin like to read?

A. Yeah, he really -- yes, he does.

Q. Does he like to talk with you about the books that he's reading?

A. Oh, yes, because I get a lot of books for him.

Q. Is he interested in what his children read?

A. Yes, very much so.

Q. And how does he share his children's interest in reading and participate in their reading?

A. Well, Ryan, of course, likes Harry Potter like most young ones, and Ryan likes to read, so Dustin makes sure that he'd get

the Harry Potter books so then when he would talk to Ryan that Dustin knew all about Harry Potter and they could talk about Harry Potter. He wanted me to get Aesop's Fables for Marvea, and so he got Aesop's Fables. And so they discuss the books on the phone or in the letters. They discuss what's being read.

Q. Does Dustin try to improve himself by reading and by other activities in prison?

A. Yes, he does.

Q. And does he take pride in continuing to keep interested and interesting to you and to the rest of his family?

A. Yes. It wasn't very long ago he was interested in learning how to draw, and I can't say that he was ever very artistic, but he knows Marvea is. Marvea really likes to draw. So I sent him books on water colors and chalk drawings and things like that. And so he wanted to try to make something for her so he could say, Look, Daddy can do it too.

Q. Mrs. Smidt, could you describe for the ladies and gentlemen of the jury what Dustin's role is in your family now.

A. Well, he's just still our son. I mean, you know, he's very important. We talk on the phone every week if we can, and right now he can call on Saturdays, and he's been calling me. I make sure I'm there. I write him still every week. He writes back. We discuss anything from politics to just anything, and I ask him different questions and his views, and I value them very much, and we -- just like we're just -- we talk.

Q. Tell us about his relationship with your husband Ron.
A. Ron loves Dustin very much. Ron's kind of an emotional person. He supports Dustin completely. He wanted to be here, but he's hauling beans for a farmer right now, and we just couldn't afford to have him here all the time. And he's not sleeping or anything because he feels like he should be here supporting Dustin and me, and he's just been kinda financially unable to, and I think he'll be here tomorrow.
Q. Now, you told us that you and Ryan and Brandon and Marvea were able to visit Dustin when he was in Marion.
A. Yes.
Q. And when was that trip?
A. That was in June.
Q. Of this year?
A. Yes.
Q. Okay. And did your daughter Alyssa go with you?
A. Yes, she did.
Q. I'm going to show you Defendant's Exhibit DD. And could you tell us, please, left to right who's in Defendant's Exhibit DD.
A. That's Ryan, and then there's Marvea drinking her root beer. And then there's Brandon, and then it's Alyssa.
Q. And where was that picture taken?
A. We ate lunch at a Red Lobster.
Q. And finally I'm going to show you Defendant's Exhibit DE.

3847

A. That's Ryan and Brandon and Marvea, and that's outside the motel where we stayed.
Q. And this is how they looked in June of this year?

A. Yes, it is, because you can see Ryan's almost as tall as his brother.

Q. We have a number of exhibits here, Mrs. Smidt, of letters that Dustin has written to Ryan and to Brandon and to Marvea from -- just a sample from 1997 through part of 19 -- of 2003. Have you had a chance to look briefly at some of these letters?

A. Have I?

Q. Yes.

A. Some, yes.

Q. And are these representative and characteristic of the sentiments that Dustin has expressed to his children?

A. Yes, it is.

Q. Encouragement that he's given to them, admiration and fondness that he's shown for them and their activities?

A. Yes.

Q. Urging them to do their best and to be helpful to their mom and to their grandma?

A. Yes.

Q. Asking about what they're doing in school and encouraging them to do their best in school?

A. That's correct.

Q. Asking them about their summer activities and what they've

♀

3848

been reading.

A. Yes. Reading's very important. And he wants them to, you know, read a lot.

Q. Asking Ryan what kind of fish he's been catching when he's been fishing.

A. Yes.

Q. Apologizing when he's not able to call.

A. Yes. He always would call me if he was only allowed one phone call. And he'd say, Make sure and call the kids and tell them why I can't call them.

Q. Sharing with them his favorite Christmas carols?

A. Yes.

Q. Talking about how fond he was of reading The Hobbitt and asking about Marvea's interest in The Hobbitt?

A. Yes.

Q. Thanking them for pictures and gifts that they have sent him?

A. Yes.

Q. How can Dustin love his children being so far away?

A. You know, you always love your children whether you're far away or if you're really close. It's the quality that you spend with them whether it's on the phone or if it's by letter. It's the encouragement that he has been giving them and that they -- they just know that their dad cares. They know that. I mean, there's no doubt about it. They talk about him. They know he's

3849

in jail. They know that. But they still love their dad. If you would have seen them when we took them to Illinois, Ryan just hung on every word he said. And they were just so happy to get to go because they love him. That's their dad.

Q. Mrs. Smidt, do they know Dustin's situation today?

A. They know most of it, yes, they do.

Q. Have you thought what they feel about Dustin's situation and what it means to them?

A. Marvea, of course, still -- still has a hope that Daddy and Mommy are going to come home. I think she's always going to have that hope. They just need that contact with them because

it's just so important. It's just so, so important. I just couldn't -- I can't even put into words how important it is to them because that's their dad, and that's just -- I don't care maybe -- it's just like Mom when she died, and she was 87 years old. That's my mom. I miss her terribly. You don't know how many times I try to lift the phone up to call her. She's not there. And these kids, they wait for their dad to call. They wait for a letter because that's their dad.

Q. How will that affect them if their father's executed?

A. I don't even want to think about it. They've got a lot of years to live. Brandon's 14; Ryan's 11; Marvea's 10. And I know this is a terrible thing and there's been young people that have had a lot of things, but why put any more people through this? Why put any more young people through this? They've --

3850

they've got their whole life ahead of them. I don't know what's going to happen. Ryan and Brandon have their mommy. Marvea doesn't. Marvea's got to hold on to something. She's got to hold on to something.

Q. Could you tell us finally how you feel about the loss of your son Dustin.

A. I haven't even wanted to think about it. I'd be just devastated, of course. I love my children so dearly. We went through a lot of stuff, lots of stuff together. I really don't know. I really don't know. I don't want to think about it, can't, can't. I love him so much. Anyway, life in prison's bad enough. I still don't have him then. I just don't know what to say. I can't say any more.

Q. If you're alive, where will you lay Dustin to rest?

A. What?

Q. Where will you lay Dustin to rest?
A. By Matthew. I'm sorry.

MR. SPIES: Thank you, Your Honor.

THE COURT: Mr. Williams, you may cross-examine.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Ma'am, after your ex-husband James Honken was arrested for the bank robbery, the probation office had to make out a presentence investigation report, and in that probation report -- you're familiar with those because you had been

contacted by probation about your son Dustin Honken as well; right?
A. Yes.
Q. And you were contacted by the probation office in relation to James Honken's probation report as well back in 1987.
A. I can't even remember that.
Q. And do you remember telling Ron Telecky, the probation officer back in 1987, that James Honken was a good father and a good provider?
A. He was a good provider.
Q. And a good father.
A. I might have at that time.
Q. In fact, your daughter Alyssa went with James Honken to visit Dustin Honken at the prison in Marion, didn't he -- didn't she?
A. Yes, she did.
Q. In fact, Jim Honken paid for that visit that you've talked about with the kids to the prison in Marion, didn't he?
A. He paid for half of it.

Q. When was Ryan born, ma'am?

A. Ryan's 11.

Q. He was born in August of 1993?

A. Yes.

Q. That happy Christmas videotape we saw would have been taken in December of 1993.

A. I imagine around in there someplace.

MR. WILLIAMS: I have nothing else. Thank you.

THE COURT: Mr. Spies, anything further?

MR. SPIES: No, Your Honor. Thank you very much.

THE COURT: You may step down.

THE WITNESS: Thank you.

THE COURT: Mr. Spies, do you have any additional evidence?

MR. SPIES: No, we have no other evidence, Your Honor. We just want to be assured that all of our exhibits have already been received as I recall.

THE COURT: They have been. Thank you.

Mr. Williams, does the government have any rebuttal evidence?

MR. WILLIAMS: We have a short rebuttal case, Your Honor.

THE COURT: Okay. Members of the jury, why don't you take a stretch break. Are you ready to call your first rebuttal witness?

MR. WILLIAMS: I am, Your Honor. United States calls Kenneth Hansen.

KENNETH HANSEN, PLAINTIFF'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness

box. You can adjust the chair and the microphones so you can speak directly into the microphones. Can you scoot the chair up

a little bit? There you go. And when you're ready, would you state your full name, spell your last name for us.

THE WITNESS: Kenneth J. Hansen, H-a-n-s-e-n.

THE COURT: Mr. Williams.

MR. WILLIAMS: Thank you, Your Honor.

REBUTTAL EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Hansen, how old are you, sir?

A. Thirty-seven.

Q. Where do you live at?

A. Colby, Kansas.

Q. What do you do for a living, sir?

A. I'm a oil field mechanic.

Q. Where are you from originally?

A. Britt, Iowa.

Q. And did you grow up in Britt, Iowa?

A. Yes.

Q. When you grew up, did you come to know somebody by the name of Dustin Honken?

A. Yes.

Q. Where in high school were you guys in relation to each other?

A. I believe he was one year behind me.

Q. How would you describe your relationship with Dustin Honken back in the high school period, 1985, 1986?

A. Very limited.
Q. You associated together?
A. Yes, on a few occasions.
Q. Did you get yourself in some trouble from time to time back in those days right out of high school?
A. Yes.
Q. And did you have a conversation with Dustin Honken at some point about a bank robbery?
A. Yes, I did.
Q. And would that have been in June -- I'm sorry. Would that have been in 1996?
A. '86.
Q. I'm sorry. 1986?
A. Yes.
Q. Thank you. What did -- let me put it this way. Did Dustin Honken outline to you any plan for robbing a bank?
A. Yes, he did.
Q. Did he want you to participate in that robbery?
A. Yes.
Q. And in relation to that request to have you participate in the robbery, did he lay out the plan for how that robbery was to occur from the time of how you got into the bank to the point of getting out of the bank?
A. Yes.
Q. And what did he lay out that plan to be?

3855

A. He was going to get the keys from his mother. She worked at the bank. She brought them home on the weekends. And he was going to get the keys from her, have a duplicate made, get that to me, and then we was going to go to the back door when an

elderly lady was working. I don't recall her name, but she was working. He wanted to do it specifically when she was working. Was going to go in the back door, put her in the bathroom which was right next to the back door, go inside, get the money, out the back.

Q. In outlining this plan to you, did he describe what you should wear or the two of you should wear?

A. Yes. He wanted to make sure that we wore taller shoes so that it would mess with the heighth and baggie clothes, make sure that our faces and the whole head was covered so --

Q. With what?

A. With a ski mask or something.

Q. What about your hands?

A. Latex gloves.

Q. And was a weapon to be used in this robbery?

A. It was going to be a handgun.

Q. Did you ultimately go through with that robbery?

A. No, I did not.

MR. WILLIAMS: I have no further questions.

THE COURT: Mr. Spies?

REBUTTAL EXAMINATION

3856

BY MR. SPIES:

Q. Mr. Hansen, in addition to knowing Dustin Honken, you also were friends with Brian DeGeus?

A. Yes.

Q. And, in fact, you worked for Ed DeGeus, didn't you?

A. Yes.

Q. In fact, in November of 1985, you and Brian DeGeus and Dustin Honken and Tim Cutkomp and Mark Johnson and Alan Johnson

got involved in stealing a car.
A. I don't think Alan was there.
Q. Okay. Everybody else was there.
A. Yes.
Q. And the object was to steal a car so that Tim Cutkomp could strip it down and use some parts from it.
A. No, I was going to strip it down for Tim Cutkomp.
Q. Pardon me?
A. I was going to do the work for Tim Cutkomp. He was needing the parts.
Q. I see. And so you got involved in this car theft. And, in fact, Dustin eventually was charged with that car theft; right?
A. That I do not recall.
Q. Well, you weren't charged with it.
A. No, I got a walk.
Q. Excuse me?
A. I did not get charged, no.

♀

3857

Q. Okay. But you helped steal a car?
A. Yes, I did.
Q. Okay. And Dustin got charge -- do you know if Dustin got charged?
A. No, I do not. I do not recall who got charged. I know I was drug in there and questioned about it.
Q. Okay.
A. The plan was laid out by Dustin. We was actually going to Des Moines to steal a car.
Q. Right. But a car was stolen, and you were involved in that.
A. Yes.

Q. With these other guys.
A. Yes.
Q. And you -- as a result of your cooperation, though, you cooperated, and you told the authorities what you'd done?
A. Excuse me?
Q. You cooperated, and you told the authorities what you had done in stealing this car?
A. Yes.
Q. Now, did you know Dustin's dad Jim?
A. Not really.
Q. Well, when you stole this car, you took it to Jim Honken's garage or shed, didn't you?
A. Yes.

Q. Did you ever -- do you recall ever meeting Jim Honken?
A. Yeah, I met him one time in Britt over -- it was on the west end of town.
Q. Had he been drinking?
A. Who?
Q. Jim Honken.
A. I do not recall.
Q. Did you ever hear any conversations between Dustin Honken and his dad about robbing a bank?
A. Between the two?
Q. Yes.
A. I only seen the two together one time.
MR. SPIES: Thank you. No other questions.
THE COURT: Anything further, Mr. Williams?
MR. WILLIAMS: No, Your Honor.
THE COURT: You may step down.

You ready to call your next witness?

MR. WILLIAMS: Alan Johnson.

ALAN JOHNSON, PLAINTIFF'S WITNESS, SWORN

THE COURT: Please be seated in the witness box. Try and adjust the chair and the microphone so you can speak directly into the microphones. And when you're ready, would you state your full name, please, and spell your full name.

THE WITNESS: Alan James Johnson, A-l-a-n J-a-m-e-s J-o-h-n-s-o-n.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

REBUTTAL EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Johnson, how old are you, sir?

A. Thirty-seven.

Q. How far did you go through school, sir?

A. I have about two years of college.

Q. What do you do for a living?

A. I own a painting company in Florida.

Q. A painting company?

A. Yes.

Q. And where at in Florida do you live?

A. Fort Lauderdale.

Q. Do you have a twin brother?

A. Yes.

Q. And his name is?

A. Mark.

Q. Where did you grow up, sir?

A. Britt, Iowa.

Q. And when you grew up in Britt, Iowa, did you come to meet somebody named Dustin Honken?
A. Yes.
Q. Was Dustin Honken in the same class with you?
A. No. He was a year behind.

♀

Q. Did you have contact with him in high school, though?
A. Yes.
Q. And how would you describe for the jury your relationship with Dustin Honken in senior high school?
A. We were casual friends.
Q. Directing your attention to -- I want to put some time frames on this. What year did you graduate from high school?
A. 1985.
Q. And did you immediately thereafter enter the service?
A. Yes, I did, May 29.
Q. So any contact you would have had with Dustin Honken would have been prior to you entering the service in May of -- well, let me do it this way. I want to talk about any contact you had with Dustin Honken prior to you entering the service in May of 1985. Do you understand the time frame I want to talk about?
A. Yes.
Q. You would have still been in high school.
A. Yes.
Q. The defendant would have been a junior in high school.
A. Yes.
Q. And during the time period you had contact with him in high school, did you ever discuss with him robbing a bank?
A. Yes, I did.
Q. And in these discussions, did the defendant lay out for you

a plan for robbing a bank?

A. Yes.
Q. What bank was to be robbed?
A. The drive-through bank, First State Bank.
Q. And located in what town?
A. Britt, Iowa.
Q. And in describing to you the plan for robbing the bank, that drive-through bank, what details did he have planned out from the point of making entry into the back of the bank to the point of leaving the bank?
A. A key was going to be made to gain entry. The door was going to be -- it would be when there was a -- payroll there. When the lady that worked there came to work, we was going to unlock the door and crack it open and then knock on it. When she came to the door, we was going to force it open. She was going to be put in the bathroom, take the money, and then come out and motion for the person in the car to come.
Q. Did -- I'm sorry?
A. To come and pick them up.
Q. Did the defendant outline for you what this -- the robber should wear while doing this?
A. I believe it was all black, but I'm -- I don't really recall real clear.
Q. Do you recall whether he said anything about whether they should wear a mask or anything?
A. I honestly don't remember.

Q. Do you recall whether he indicated anything about whether the robber should use a weapon?
A. I really don't remember.
Q. Very good. Did he ever mention to you anybody that he had talked to about participating in this bank robbery with him?
A. It was just me and him and Tim.
Q. Tim Cutkomp.
A. Tim Cutkomp.
Q. You ended up graduating in May of 1985.
A. Yes.
Q. You never participated in any bank robbery.
A. No.
MR. WILLIAMS: I have no further questions.
THE COURT: Mr. Spies?

REBUTTAL EXAMINATION

BY MR. SPIES:
Q. Mr. Johnson, you were discharged from the Army in what? 1986?
A. Yes.
Q. And was that a medical discharge?
A. No.
Q. What type of discharge was it, sir?
A. It was a general under honorable conditions.
Q. Meaning what?
A. Meaning I voluntarily terminated my airborne status in

♀

which the first sergeant of my company construed as unsatisfactory performance.
Q. I'm sorry?
A. The first sergeant in my company which was the 82nd

Airborne construed my voluntary termination of my airborne status as unsatisfactory performance.

Q. Mr. Johnson, when you -- you were interviewed about this robbery in Britt, Iowa; right?
A. Could you repeat that?
Q. Yeah. Were you interviewed about the robbery in Britt, Iowa?
A. Yes, yes, I was.
Q. And when were you first contacted in relation to this trial about coming up to testify against Mr. Honken?
A. I believe two weeks ago.
Q. Okay. And in preparation for your coming up here to testify in rebuttal against Mr. Honken, were you shown any of the interviews that you had done back in 1986 about this bank robbery?
A. Yes, I was.
Q. Did you have a chance to read those over?
A. Yes.
Q. Okay. But you were interviewed on June 3, 1986. Do you remember that?
A. Yes.

Q. And you were also interviewed on June 26, 1986; right?
A. (Witness nodded head.)
Q. And in the June 3, 1986, interview, didn't you tell investigators that Dustin had never talked to you about a bank robbery?
A. Yes, I did.
Q. But he always had some kind of a deal going?
A. Yes, I did.

Q. And he was always asking Tim Cutkomp for money?
A. Yes.
Q. And you told investigators on June 3 that you were with Tim and Dustin at the Bonanza Steakhouse on June 2 when this robbery took place; right?
A. Yes, that's what I told them.
Q. And you told investigators that Tim and Dustin didn't know anything about the robbery.
A. Right.
Q. Okay. But that Dustin was kind of shaken and fidgety.
A. Yes.
Q. And wanted to go home because his mom was worried about him.
A. That's what I said, yes.
Q. And on June 26, 1986, you told investigators that your mother had told you that Dustin had had a key made to that bank three days before the robbery.

3865

A. Yes.
Q. And you told investigators that you and Tim and Dustin had discussed how you were going to do the robbery; right?
A. I don't remember that.
Q. And according to you, the plan that you and Tim and Dustin had worked out, Tim thought it would work.
A. Yes.
Q. And Tim was going to set up Dustin because Tim had lost money on the theft of this car from Jewell, Iowa.
A. I said that at the interview. I honestly don't remember that, but if it's in the paper, I said it, so yes.
Q. You also told investigators that Jim Honken knew how to get

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3370 of 3636

rid of stolen property; right?
A. Yes.
Q. And that Dustin was afraid of his dad because his dad had mob friends in Kansas City.
A. Yes.
THE COURT: Mr. Williams, anything further?
MR. WILLIAMS: No, Your Honor.
THE COURT: You may step down.
Have any additional evidence?
MR. WILLIAMS: Yes, Your Honor. Mark Johnson.
MARK JOHNSON, PLAINTIFF'S WITNESS, SWORN
THE COURT: Please be seated in the witness box. You can adjust the chair and the microphone so you can speak

directly into the microphones. Can we get you to scoot that chair up a little bit? And would you state your full name, please, and spell your last name.
THE WITNESS: Mark Elmer Johnson, J-o-h-n-s-o-n.
THE COURT: Mr. Williams?
MR. WILLIAMS: Thank you, Your Honor.

REBUTTAL EXAMINATION

BY MR. WILLIAMS:
Q. Mr. Johnson, how old are you, sir?
A. Thirty-seven.
Q. And what do you currently do for a living?
A. Active Army.
Q. And what -- you're in the United States Army.
A. Yes, sir.
Q. What's your rank now?
A. Staff sergeant.

Q. And where are you stationed at?
A. 100th Division in Louisville, Kentucky.
Q. How long have you been in the U.S. military?
A. Eighteen years.
Q. Where did you grow up, sir?
A. In Britt, Iowa.
Q. And when you grew up in Britt, Iowa, did you come to know Dustin Honken?
A. Yes, sir.

♀

Q. He was behind you a year in your class?
A. Yes, sir.
Q. Your brother Alan went straight into the military in May of 1985. Does that sound right?
A. Yes, sir.
Q. Did you go into the military at that same time?
A. A year later. It was April of 1986.
Q. During the time period that you were in high school with Dustin Honken, how would you describe your relationship with him at that time?
A. In high school we were friends. I mean, pretty much everybody in high school were friends because it's a small high school.
Q. And did you continue a friendship with him until you went into the military in 1986?
A. Yes, sir.
Q. While you were in high school up to the point that you went into the military, did the defendant ever talk to you about a plan to rob the Britt bank?
A. Yes, sir, at his mom and dad's house. I was over at his

mom and dad's house, and at the time he was showing me one of his dad's guns, and while he was showing it to me, he said --
Q. Let me ask you this. I want to make sure that we're on the same page on this. Did he describe for you a plan for how to rob the bank?

A. Yes, sir.
Q. Okay.
A. He said --
Q. And just so we're clear on this as well, did he describe -- could you repeat for us how he described that robbery was to occur from the time of entry into the back of the bank until the robber left the bank?
A. Yes, sir. He told me that he had gotten his mom's key and made a copy of it to the drive-through bank and that he was going to have Kenny Hansen go into the bank, put the woman into the bathroom, and then get the money and then leave.
Q. Did he tell you anything about what the robber was to wear?
A. No, he didn't other -- well, other than a ski mask.
Q. Other than a ski mask?
A. Yes, sir.
MR. WILLIAMS: I have no further questions, Your Honor.
THE COURT: Mr. Spies?

REBUTTAL EXAMINATION

BY MR. SPIES:
Q. Mr. Johnson, were you interviewed by the police about this bank robbery?
A. No, sir. I was in basic training.
Q. You were interviewed eventually by investigators about the

bank robbery and the discussion you just had with Mr. Williams;

right?
A. Are you meaning right after the incident happened or --
Q. No. I mean some years later.
A. Yes, yes, sir.
Q. And when were you first contacted about testifying against Mr. Honken in this case?
A. Excuse me?
Q. When were you first contacted about coming up here to testify against Mr. Honken in this case?
A. As far as to come testify against him, it was like I suppose last week or something they had notified me or called me. John Graham had called me and asked me if I knew anything per se about Dustin.
Q. Mr. Johnson, you and Dustin were a part of a circle of friends, weren't you?
A. Yes, sir.
Q. And among your friends were Brian DeGeus and Kenny Hansen, Tim Cutkomp?
A. Yes, sir.
Q. And you guys had been involved together in November of 1985 in stealing a car; right?
A. Yes, sir.
Q. That was a car that was stolen from Jewell, Iowa?
A. Yes, sir.
Q. This was a Trans Am that was going to be stolen and chopped

up into parts to fix up Tim Cutkomp's Trans Am.

A. Yes, sir.
Q. And you were a full participant in that; right?
A. Yes, sir, I was in the car.
Q. And -- but you didn't get charged for it.
A. No, sir.
Q. In fact, Kenny Hansen and Dustin Honken took a fall for you, didn't they?
A. Yes, sir.
Q. So that you could get into the military and pursue your career.
A. Yes, sir. I'd already been in the military, but that was so I could continue to be in the military.
Q. And in November of '85 when you participated in the theft of this car, you would have been 18 years old?
A. Yes, sir.
Q. Dustin was 17.
A. Yes, sir.
Q. Now, you told us that you went over to Dustin's mom and dad's house. Was this in Britt, Iowa?
A. When?
Q. When you talked about this robbery.
A. Yes, sir. It was at his mother and father's house.
Q. Okay. Where his mother Marvea lived?
A. Yes, sir, right on Third Street.

Q. Okay. And Jim Honken lived there?
A. No.
Q. Where did Jim Honken live?
A. I have no idea, sir.
Q. Did you know Jim Honken?

A. I never met the man, sir.
Q. Well, after you stole this car, didn't you take the stolen car to Jim Honken's shed out in --
A. Yes, sir, in Garner.
Q. Yeah. And you chopped it up there?
A. Yes, sir.
Q. Was Jim Honken there?
A. No, sir, he was never there.
Q. Did Dustin's dad Jim help hide the car for you?
A. I don't know, other than it was in his garage in Garner, sir.
Q. Where were you when this bank robbery happened?
A. I was in basic training, sir.
Q. Okay. So you never were a witness to any conversation between Dustin and his dad about this bank robbery.
A. No, sir.
MR. SPIES: Thank you.
THE COURT: Mr. Williams?
MR. WILLIAMS: Just a couple quick questions.

REBUTTAL EXAMINATION

3872

BY MR. WILLIAMS:
Q. Mr. Johnson, prior to the time that you were ever contacted by law enforcement about this bank robbery information, were you, in fact, contacted by some member of the defense team and questioned about it?
A. Yes, sir.
MR. WILLIAMS: No further questions.
THE COURT: Mr. Spies, anything further for this witness?

MR. SPIES: Nothing else, Your Honor. Thank you very much.

THE COURT: You may step down.

THE WITNESS: Thank you.

MR. WILLIAMS: United States calls its final witness, Bill Basler.

THE COURT: You've been through this a few times.

MR. BASLER: Yes, sir.

WILLIAM BASLER, PLAINTIFF'S WITNESS, SWORN

THE COURT: Thank you. Please be seated. When you're settled in, would you state your full name, please.

THE WITNESS: My full name is William Wayne Basler.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

REBUTTAL EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Basler, we've gone through your professional background. But in 1986 were you a special agent with the Iowa Division of Criminal Investigation stationed in Mason City, Iowa?

A. Yes.

Q. In that capacity did you participate in the investigation of the robbery of the First State Bank in Britt, Iowa, which occurred on June 2 of 1986?

A. Yes, I did.

Q. We've heard already from a defense witness that this robbery was committed by James Honken. What I wanted to ask you about, after the robbery occurred, was the teller ultimately interviewed?

A. Yes. The day of the robbery, I did an interview with the only employee at the bank when it was robbed. The teller's name was Beverly Meyland.

Q. And this was a small branch bank?

A. Yes, literally a small branch bank, a very small facility that accommodated drive-in banking.

Q. Was there any forced entry into the bank as part of your -- that you discovered as part of your investigation?

A. No. When I interviewed Mrs. Meyland, she was a cautious woman by nature, and she had a specific memory of checking the back door of the bank before she went in to make sure that it was locked. It was the type of lock that if it was locked you

♀

couldn't turn the knob, and she remembered that the door was locked when she went into the bank that morning.

Q. Did she describe for you what happened to her once she went into the bank that morning?

A. Yes, she did.

Q. And what did she tell you happened?

A. She told me that the first thing that she did was open up the vault which apparently required a key and a spin dial and took -- after the vault was opened, she took a drawer of money out of the vault and took it to the teller station and then returned to the vault area.

Q. And what happened when she returned to the vault area?

A. She told me that she had to get down on her knees in order to get into the safe itself, and while she was in that position, she noticed someone standing behind her in the vicinity of where the bathroom is in the back of the bank.

Q. Did she describe what this person looked like?

A. Only generally. She described the person as being medium heighth, slender build, and wearing all dark clothing.
Q. Did she indicate whether this person had a mask or some type of cover on?
A. Yes. She told me that the robber not only was wearing a full mask over his face but also was wearing gloves and was carrying a weapon.
Q. What happened at that point?

A. She was instructed to put the money from the safe into a bag, and then she was told to go into the bathroom of the bank, and she complied.
Q. Was the bathroom door secured in some manner?
A. She told me that when she went in the bathroom she locked the door and kept her foot against it because she was afraid. Later she heard what she believed to be the robber leaving the bank and decided to come out of the bathroom. When she tried to come out, she found that the door had been tied shut from the outside.
Q. She ultimately free herself?
A. Yes, she did.
Q. And did she contact the police?
A. Yes, she contacted the main bank, and they contacted the police.
Q. As part of your investigation, did you interview the defendant, Dustin Honken, concerning his knowledge of this bank robbery?
A. Yes, I did, two times. The first time I believe was the day of the robbery, and the second time was after his father had been arrested for the robbery.

Q. Where did the defendant say he was on the day of the bank robbery on June 2, 1986?
A. Mr. Honken, Mr. Dustin Honken, told me that he had been working for his stepfather, Ron Smidt.

♀

Q. Did you ask him whether he had ever discussed robbing that bank with anybody else?
A. I did. I asked him a series of three questions. I asked him if he had committed the robbery, and he said no; asked him if he knew who had committed the robbery. He said no. I asked him if he had ever planned to have a robbery committed at the bank, and he said no.
Q. Did you ask him if he had -- through his mother's employment for the Britt bank had access to the inside of the bank during working hours?
A. Yes. He told me that in the weeks previous to the robbery he had been in the drive-in bank that was robbed to visit his mother and also said that he had been in the back of the bank in order to use the restroom.
Q. And did he -- did you ask him about the keys to the bank?
A. Yes, I did.
Q. And what did he tell you about that?
A. He told me that he did not know that his mother had a key to the drive-in bank until the day of the robbery.
Q. Did he indicate whether he knew the sole employee of that drive-through bank, Beverly Meyland?
A. Yes. He said that he knew her.
Q. And did he indicate to you where he was on June 1, the day before the bank robbery?
A. Yes. He said that he had been visiting his grandparents in

Titonka.
Q. Did he indicate whether he had any contact with his father during that time period?
A. Yes. He said that he had met his father at the grandparents' house in Titonka.
Q. Not in some shack that the father was living in someplace.
A. No.
MR. WILLIAMS: No further questions.
THE COURT: Mr. Spies?
MR. SPIES: May I have just a minute, Your Honor?

REBUTTAL EXAMINATION

BY MR. SPIES:
Q. Agent Basler, the teller who was victimized in this bank robbery described her assailant as wearing a Halloween mask with protrusions on top; is that right?
A. Yes, it is.
Q. You've investigated, I know, many, many bank robberies.
A. Really not that many, but a few over the years. Primarily that investigation at least was done by the FBI.
Q. During your interview of Dustin Honken -- you interviewed him you told us on two occasions. You first interviewed him on June 2, 1986?
A. Yes, sir.
Q. And that was the day of the robbery.
A. Yes, sir.

Q. Pardon me?

A.    Yes, sir.
Q.    All right.  And the second time you interviewed him was on June 9, a week after the robbery.  And as you said, his father had already been arrested, and his father was arrested in Cherokee, Iowa; right?
A.    Yes, that's correct.
Q.    Were you the lead agent on this investigation, by the way?
A.    No, I wasn't.  My partner at the time, Special Agent Hoil, was the case agent or the lead investigator.  I was assisting him.
Q.    Now, in your interview of Dustin Honken on June 2, 1986, this would have been about two and a half months after his 18th birthday; right?
A.    Approximately.
Q.    And you've told us that he denied knowledge about the details of the robbery.
A.    That's right.
Q.    And he's told you, as you told us, that he said he didn't know that his mom had a key to the branch bank.
A.    That's right.
Q.    You questioned him again on June 9.  His dad had just been arrested in Cherokee, Iowa.
A.    Yes.
Q.    And you knew that.

♀

3879

A.    Yes, I did.
Q.    And you told Mr. Honken that his dad had been arrested.
A.    I don't know if I told him, but I believe that he was aware of it.
Q.    Okay.  And at that time Mr. Honken told you that his dad

had had a falling out with his wife.
A. Yes.
Q. And that his dad had been staying at a building in Garner.
A. Was that a question?
Q. That's a question.
A. Yes, sir.
Q. And that he had gotten a call from his dad just recently wanting Dustin to buy him a tent.
A. Yes.
Q. Right? Now, on that very day that you interviewed Dustin Honken on June 9, 1986, he was arrested for car theft, wasn't he?
A. I'm not aware of that.
Q. Well, you knew -- well, I'll get back to that in just a minute. You told us that Jim Honken was arrested in Cherokee, Iowa, and he was arrested there on June 6, 1986; right?
A. I believe that's right. I don't believe I said that, but I think you're accurate.
Q. And from your investigation of this bank robbery, you knew that Mr. James Honken had been arrested for a robbery of a bank

3880

in Missouri.
A. No, I did not know that.
Q. You do not know that?
A. I know it now. I didn't know it back in 1986.
Q. All right. And you know that Jim Honken went to prison for the robbery of the bank in Missouri; right?
A. Yes.
Q. And that robbery occurred just days after the robbery in Britt.

A. That I don't know.

Q. Well, do you know any of the details about Mr. James Honken's arrest in Cherokee, Iowa?

A. Only that he was arrested in Cherokee and the arrest was precipitated by him being found in his vehicle by a local officer.

Q. And that officer found Jim Honken slumped over the wheel of a car in front of the VFW in Cherokee, Iowa.

A. I believe that's right, yes.

Q. And they found a stack of money on the floor of the back -- backseat of the car.

A. Yes.

Q. They found a gun under the seat.

A. That's right.

Q. They found a high-powered rifle in the trunk of his car.

A. Yes, sir.

3881

Q. They found a briefcase full of money in the trunk of his car.

A. Yes.

Q. They found road maps for Nebraska, Iowa, Texas, Louisiana, and Minnesota in the car.

A. I don't know that.

Q. Well, when Mr. Jim Honken was revived, he was intoxicated, wasn't he?

A. That's my understanding, yes.

Q. And the first thing he told the officers when they woke him up was, How are things in Britt tonight?

A. I'm not aware of that.

Q. Did they ask him where he was at and he later said he

thought he was in South Dakota?
A. He may have. I was not there obviously, and I don't recall.
Q. Well, as you were investigating the bank robbery in Britt, Iowa, did you find that there was a search warrant that was obtained for Mr. Jim Honken's car and motel room in Cherokee, Iowa?
A. No. Again, the primary investigator, the case agent, was my partner, Terry Hoil. My involvement was to assist with the interviews on the bank robbery.
Q. Okay. Well, moving back to your interview in your investigation of Dustin Honken, Agent Basler, you knew that --

3882

you knew then and you know now that Dustin Honken was charged with stealing a car with Brian DeGeus, Mark Johnson, Kenny Hansen, Tim Cutkomp in November of '85.
A. I know it now certainly. I didn't know it then.
Q. And you know that he got a deferred judgment for that car theft.
A. I know that now, yes.
Q. Well, in your investigation into the robbery of the Britt bank, you know that when Mr. Honken pleaded guilty to that car theft and was sentenced he told the county attorney that he had gotten a copy of his mother's key to that bank.
A. Are you asking if I knew that?
Q. You knew that.
A. No, I did not know that.
THE COURT: Mr. Williams, anything further for this witness?
MR. WILLIAMS: No, Your Honor.

THE COURT: You may step down.

Government have any additional rebuttal evidence?

MR. WILLIAMS: No, Your Honor.

THE COURT: Does the defense have any surrebuttal evidence?

MR. SPIES: No, Your Honor, no surrebuttal.

THE COURT: Could I see the lawyers at sidebar just for one quick second on scheduling?

♀

(At sidebar off the record.)

THE COURT: Members of the jury, that concludes the evidence in this case, so we're going to bring you back tomorrow morning at nine o'clock. I have ten final penalty phase instructions for you. We'll go through the first nine and the verdict form. Then we'll hear closing arguments from the lawyers. Then we'll go through final penalty phase instruction number 10, and then you'll go down and deliberate.

So we'll see you tomorrow morning at nine o'clock. Thank you.

(The jury exited the courtroom.)

THE COURT: Please be seated. Are there any matters we need to take up, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Spies?

MR. SPIES: No, Your Honor. Thank you.

THE COURT: Okay. We'll see you tomorrow morning. Why don't we meet in here at 8:30 just to go over any last-minute issues; okay?

MR. WILLIAMS: Very good.

THE COURT: Thank you. We'll be in recess.

(The foregoing trial was adjourned at 4:28 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

2-1-05

Shelly Semmler, RMR, CRR Date

♀

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| MARK CUNNINGHAM | | |
| | MR. SPIES | 3717 |
| | MR. WILLIAMS | 3771 |
| | MR. SPIES | 3780 |
| | MR. WILLIAMS | 3781 |
| MARVEA SMIDT | | |
| | MR. SPIES | 3782 |
| | MR. WILLIAMS | 3850 |
| KENNETH HANSEN | | |
| | MR. WILLIAMS | 3853 |
| | MR. SPIES | 3856 |
| ALAN JOHNSON | | |
| | MR. WILLIAMS | 3859 |
| | MR. SPIES | 3862 |
| MARK JOHNSON | | |
| | MR. WILLIAMS | 3866 |
| | MR. SPIES | 3868 |
| | MR. WILLIAMS | 3872 |
| WILLIAM BASLER | | |
| | MR. WILLIAMS | 3872 |
| | MR. SPIES | 3877 |

*****

3885

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, No. CR01-3047

Plaintiff, Sioux City, Iowa
October 21, 2004
vs. 8:34 a.m.

DUSTIN LEE HONKEN,

Defendant. VOLUME 22
/

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

3886

APPEARANCES:

For the Plaintiff: C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant: ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn
Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Okay. Just a couple of matters on the record this morning. The defendant's personally present with all three defense lawyers, and the two government lawyers are present.

Just out of an abundance of caution, with regard to final jury instruction number 7, the defendant's right not to testify, that was included in all of the preliminary sets, all the sets. It's never changed. But I don't actually specifically recall that the defense ever actually requested that language. And it's -- at least in the merits phase it's error to give it without a request from the defendant, although you didn't object to it, so I assume it was the same as a request.

MR. ROGERS: I don't know that that's the same, Judge, but we do request it, and I think it was in the packet that we submitted which I think is a request.

THE COURT: Okay. Thank you. I didn't think there was a problem, but I just wanted to check.

Couple of other things on my list, and then I'll see if there is anything on the parties' list. I'm assuming -- but we didn't really discuss it -- that all the exhibits that have been admitted in the entire trial, i.e., the merits phase exhibits, go back to the jury?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Is there any dispute about that?

MR. SPIES: I don't believe so, Your Honor, no, sir.

THE COURT: Okay.

MR. WILLIAMS: While we're on exhibits, just very quickly, Your Honor, Exhibit 916 was a crime scene videotape that we never gave to the law clerk to send down to the jury. Carey noticed that that was one missing. I got on the phone with Mr. Spies I believe, and it was agreed that that was an exhibit jointly withdrawn even though they had no objection to it. It never did go to the jury. I don't think we ever made a record of it, though.

THE COURT: Okay. So 916 is considered withdrawn?

MR. SPIES: That's right, Your Honor, yes.

THE COURT: Okay. What about the four-and-a-half-hour request for a delay from when the jury reaches a verdict?

MR. WILLIAMS: None requested at this point.

THE COURT: Oh, you're not requesting it.

MR. WILLIAMS: Not requesting it, Your Honor.

THE COURT: Okay. Then I think I'll specifically tell them that there won't be a delay because they might be expecting that there would be.

MR. WILLIAMS: Sure.

THE COURT: Do you have any objection if I say -- I can just say there won't be a delay or I can say the parties

3889

have not requested that there be a delay, therefore, there won't be a delay. Do you have any preference for how you want me to characterize it?

MR. WILLIAMS: I think simply just saying there won't be a delay --

THE COURT: Okay.

MR. WILLIAMS: -- is fine with us.

THE COURT: Okay. Do you have any objection to that --

MR. SPIES: No, I don't, Your Honor.

THE COURT: -- if I just say there won't be a four-and-a-half-hour delay?

And then we've agreed that we'll take our 25-minute recess following the government's finishing their opening closing argument before you go, Mr. Spies. We'll take our recess. That will allow you an opportunity to set up, make sure all the equipment's working and everything.

MR. SPIES: Thank you.

THE COURT: Okay. Anything else on the parties' list?

MR. WILLIAMS: No, Your Honor.

MR. SPIES: I'm sorry?

THE COURT: Anything else that we need to take up?

MR. SPIES: No, Your Honor.

THE COURT: Or anything else we need to make a record of this morning?

♀

3890

MR. SPIES: I think not.

THE COURT: Okay. Thank you. I'll just come in a couple minutes early just to check, but we'll plan on starting at nine o'clock; okay?

MR. WILLIAMS: Very good.

THE COURT: Thank you.

(Recess at 8:38 a.m.)

THE COURT: There was one quick matter I'd like to take up. My secretary actually raised it with me, and that is the alternates would like to come back for the verdict, and so would anybody object to an hour-and-15-minute delay from when we first get word that there's a verdict? Then what my secretary will do, she'll call the alternates, and they can come back?

MR. WILLIAMS: No --

THE COURT: And it's going to take a while to get everybody together anyway, and it wouldn't be much of a delay. But I just think because the alternates have put in such a big chunk of time it's just a matter of courtesy to the alternates should they want to come for the verdict. But I just wanted to run it by the parties.

MR. WILLIAMS: No objection on behalf of the United States.

MR. SPIES: We think that's appropriate, Your Honor, and we consent.

THE COURT: Okay. Thank you. Anything else we need

3891

to take up before we bring the jury in at nine?

MR. SPIES: No, Your Honor.

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Thank you.

(Recess at 8:46 a.m.)

THE COURT: Ready to have the jury brought in, Mr. Williams?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Mr. Spies?

MR. SPIES: Yes.

THE COURT: Thank you.

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated. Let me review for you what's going to happen this morning. In just a minute we'll ask you to pass your preliminary penalty phase instructions. We'll collect those. Then Carey will pass out a new set entitled Preliminary and Final Penalty Phase Instructions to the Jury. There are ten penalty phase instructions and a verdict form. We will then go over the first nine penalty phase instructions and the verdict form. Then we'll have the closing arguments from the lawyers. Like the merits phase, the government goes first; then the defense goes. Then the government gets a rebuttal.

I'll then excuse the alternate jurors. We'll then send you down to the jury room to begin your deliberations, and

3892

you'll have all of the exhibits, both the merits phase exhibits and the penalty phase exhibits, brought down, and then you'll begin your deliberations. You'll be able to deliberate as long as you want.

With regard to tomorrow, you can deliberate on Friday if you want to. If you don't want to deliberate on Friday, you don't have to. My policy has always been to let the jury decide their time for deliberations. So I'm not going to dictate to you when and at what times you need to deliberate.

So if you'd pass your set of instructions, you can pass it this way, and Gary will collect them, and then Carey will pass out at the other end a new set of instructions.

Okay. And I think it might be helpful if we just took a look at them together because I just want to go through the table of the contents. It's entitled Preliminary and Final

Penalty Phase Instructions to the Jury. There are the first five preliminary instructions that we've already read together. And then there are penalty phase instructions. The first one is introduction. Then the second one is step 2, eligibility aggravating factors -- I'm sorry, step 1, eligibility aggravating factors. And jury instruction number 3 is step 2, statutory aggravating factors. Jury instruction number 4 is step 3, nonstatutory aggravating factors. Jury instruction number 5 is step 4, mitigating factors. Jury instruction number 6 is weighing the factors. Number 7 is the defendant's right

♀

not to testify. Number 8 is justice without discrimination. Number 9 is entitled verdicts, and 10 is the concluding instruction, and then we have the penalty phase verdict form.

So if you would please turn to page 15, follow along with me, final penalty phase instruction number 1, introduction.

(The Court read final penalty phase instructions numbers 1 through 9 in open court.)

THE COURT: I'm going to save final penalty phase instruction number 10, concluding instruction, until after the closing arguments, but if you'd please turn to the verdict form which is attached to each of your sets of instructions, it is 11 pages long.

The first page is a cover sheet. Page 2 starts with step 1, eligibility aggravating factors. And on the right-hand side we have the victims' names and the counts, Counts 8 through 17. And then step 1, eligibility aggravating factors, for each count, which one step 1 aggravating factor, if any, do you unanimously find the prosecution has proved beyond a reasonable doubt? Step 1 aggravating factors are identified and explained

in final penalty phase instruction number 2.

You must unanimously agree on one and only one of these factors as to a particular count to impose the death penalty for that count. Do not find more than one of these factors for any count. Please put a checkmark in the column for any count for which you find a particular aggravating factor has

been proved.

And then there's the defendant intentionally killed the victim identified in the count in question. And then there's a place to check in Counts 8 through 17. And then the defendant intentionally engaged in conduct including (sic) that the victim in question be killed or that lethal force be employed against the victim, which resulted in the death of the victim. And then there's a place in Counts 8 through 17. If you unanimously found one step 1 aggravating factor for a particular count, you may consider that factor in step 5 below. Also go on to step 2.

However, if you did not find any step 1 aggravating factor for a particular count, you cannot impose the death penalty on that count. Therefore, do not consider any more steps for that count. Indeed (sic) you must impose a sentence of life imprisonment for that count in step 5.

Turn the page to page 3, step 2, statutory aggravating factors. If you found one step 1 aggravating factor for a particular count, which one or more of the step 2 aggravating factors, if any, do you unanimously find the prosecution has proved beyond a reasonable doubt for that count? Step 2 aggravating factors are identified and explained in final penalty phase instruction number 3. You must unanimously agree

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3395 of 3636

on one or more of these factors as to a particular count to impose the death penalty for that count. Please put a checkmark

in the column for any count for which you find a particular aggravating factor has been proved.

Again, it has the victims, Counts 8 through 17, on the right-hand side of the chart. And then the defendant committed the offense in question after substantial planning and premeditation. Then there's a place to check for any Counts 8 through 17. Then it's the defendant committed the offense in question in an especially heinous, cruel, or depraved manner in that it involved torture or serious abuse of the victim. You may find torture, serious physical abuse, both, or neither for any particular count. And then there's a place for torture, a place for serious physical abuse for all of the counts except 10, 15, 11, and 16 that are shaded out. And then the next aggravator is the victim was particularly vulnerable due to her young age. And that only applies to Counts 10, 15, 11, and 16, and there's a place to check if you so find.

If you unanimously found at least one step 2 aggravating factor for a particular count, you may consider that factor or those factors in step 5 below for that count. Also, go to step 3 for that count.

However, if you did not find any step 2 aggravating factors for a particular count, then you cannot impose the death penalty for that count. Therefore, do not consider any more steps for that count. Instead you must impose a sentence of life imprisonment for that count in step 5.

Next page, page 4, again, it has the victims and counts on the right-hand side. On the left-hand side, step 3, nonstatutory aggravating factors. If you found one step 1 aggravating factor and at least one step 2 aggravating factor for a particular count, which one or more of the step 3 aggravating factors, if any, do you unanimously find the prosecution has proved beyond a reasonable doubt? Step 3 aggravating factors are identified and explained in final penalty phase instruction number 4. Please put a checkmark in the column for any count for which you find a particular aggravating factor has been proved.

The defendant would be a danger in the future to the lives and safety of other persons. That applies to Counts 8 through 17. The defendant obstructed justice by preventing the victim from providing testimony or information to law enforcement officers or by retaliating against the victim for cooperating with authorities, and then there's a check box for Counts 8 through 17. The defendant intentionally killed one or more persons in a single criminal episode. That does not apply to Counts 12 and 17, but it applies to the other counts. The effect of the crime upon the victim's family was injurious. And there's a check box there for Counts 8 through 17.

If you unanimously found at least one step 3 aggravating factor for a particular count, you may consider that factor or those factors in step 5 below for that count. Whether

3897

or not you find any step 3 aggravating factors, go on to step 4.

Step 4 is the same chart setup with the victims and counts on the right-hand side. Then on the left-hand side, step

4, mitigating factors, which mitigating factors, if any, do you find that the defendant has proved by the greater weight of the evidence for a particular count? Mitigating factors specifically asserted by the defendant are identified for you in final penalty phase instruction number 5. You may also identify any other mitigating factors that any juror finds. Please indicate the number of jurors finding any mitigating factor in the column for any count for which those jurors find that the mitigating factor applies.

Then there's the victims and counts on the right-hand side and then the list of mitigating factors: Dustin Honken does not have a significant history of criminal convictions prior to the offense at issue here.

Dustin Honken does not have a history of violent or assaultive behavior prior to the offenses at issue here.

Dustin Honken loves his son Ryan. Dustin Honken is loved by his son Ryan, and the execution of Dustin Honken would cause his innocent son extraordinary emotional harm.

Dustin Honken loves his daughter Marvea. Dustin Honken is loved by his daughter Marvea, and the execution of Dustin Honken would cause his innocent daughter extraordinary emotional harm.

♀

3898

Dustin Honken loves Kathy Rick's son Brandon, and he has always treated Brandon as if he were Dustin Honken's biological son.

Page 6, mitigating factors are continued. Dustin Honken is loved by Kathy Rick's son Brandon, and the execution of Dustin Honken would cause Kathy Rick's son Brandon extraordinary emotional harm.

Dustin Honken is loved by his mother and stepfather, Marvea and Ron Smidt, and the execution of Dustin Honken would cause them extraordinary emotional harm.

Dustin Honken is loved by his sister Alyssa Nelson, and the execution of Dustin Honken would cause his sister Alyssa Nelson extraordinary emotional harm.

Dustin Honken's father, Jim Honken, was an alcoholic convict who was proud of his criminal lifestyle and who bragged to his sons about his crimes.

As an infant, Dustin Honken did not experience normal parental love and nurturing because his mother Marvea was depressed and unhappy in her marriage to Jim Honken.

Jim Honken worked out of town Monday through Friday, and Jim Honken was usually intoxicated all weekend.

Page 7, the step 4 mitigating factors continue. Dustin Honken's father, Jim, never participated in caring for Dustin by holding him, feeding him, or changing his diapers, never played ball with him or participated in any one-on-one

3899

father/son activities with Dustin.

Dustin Honken's natural parents, Jim and Marvea Honken, were divorced when Dustin Honken was only 8 years old, and Dustin had only sporadic contact with Jim Honken between the ages of 8 and 15.

Since being incarcerated in the federal Bureau of Prisons, Dustin Honken has generally been a well-behaved inmate. He has received only three citations for disciplinary infractions in over seven years, two for possession of a homemade alcoholic beverage and one for fighting without serious injury.

Residual or lingering doubts as to Dustin Honken's guilt or innocence or his role in the offense even though those doubts did not rise to the level of reasonable doubts during the merits phase of the trial.

And then page 8, step 4 mitigating factors continued, mitigating factor. Then there are one, two, three, four, five spaces for you to find any additional mitigating factors. And you can always -- if there are more mitigating factors that you find other than that, you can write those on the back of the page 8 verdict form.

And then down at the bottom, in step 5 for each count satisfying steps 1 and 2, each of you must weigh any mitigating factors -- factor or factors that you individually found to exist in this step. Each of you may also weigh any mitigating

factor or factors that another or others of your fellow jurors found to exist.

And then step 5 on page 9, again, the victims and counts on the right-hand side. On the left-hand side, step 5, weighing the factors. After weighing the aggravating factors found in steps 1 and 2 and any aggravating factors found in 3 and any mitigating factors found in step 4 as explained in final penalty phase instruction number 6, what sentence do you impose for each eligible count? Please put a checkmark in the column for any count for which you find a particular sentence must be imposed. There are Counts 8 through 17, a sentence of death, a sentence of life imprisonment without the possibility of release.

And then there's the certification: By signing below by juror number and then by name, each juror certifies that

considerations of the race, color, religious beliefs, national origin, or sex of the defendant or any victim was not involved in reaching his or her individual decision and that the individual juror would have made the same determination regarding a sentence for the crime or crimes in question regardless of the race, color, religious beliefs, national origin, or sex of the defendant or the victim or victims. See final penalty phase instruction number 8.

There's a place to date it. Then there's a place for the juror numbers starting with the foreperson and the other 11

3901

jurors going on to page 10. And then page 11 is a place for the actual juror signatures.

Why don't you all take a stretch break.

Thank you. Please be seated.

Mr. Williams, you may proceed with your closing argument.

MR. WILLIAMS: Thank you, Your Honor. May it please the Court, counsel, members of the jury.

July 25 of 1993, the defendant and Angela Johnson forced their way into Lori Duncan's house at gunpoint. In there they forced Greg Nicholson to make a videotape allegedly exonerating the defendant from his involvement in drug activity.

We know from Marge Milbrath this took place sometime right around dinner because the food was still out on the table. Your logic tells you the defendant and Angela Johnson aren't going to transport these people to their final site of burial until dark, so some time must have transpired in that house while these people are being held at gunpoint. We know the videotape is made.

What happens after that, exactly how and where the defendant kills these victims, we'll never know because the defendant has given various versions of that to other inmates, but the version that makes the most sense is the version that he gave to Steve Vest. It fits with logic. It fits with the forensic evidence that we have in this case, that after that

♀

videotape was made, the defendant and Angela Johnson tied up Greg Nicholson, put a little girl's sock in his mouth, and taped his mouth shut with duct tape, that they did the same thing with Lori Duncan, and those little girls were watching this. Those little girls saw their mother bound and gagged in front of them.

They're then placed in some vehicle and driven out to this remote site. We know because Special Agent Basler drove that same route that that route took 11 minutes to drive. Eleven minutes in that car with those little girls sitting there with their mother bound and gagged and tied. Greg Nicholson knows the defendant. He knows what's going to happen to him, doesn't he? He knows what his fate is. And Lori Duncan's guessing. Those little girls are wondering.

They get out to that site, and the defendant takes Greg Nicholson and Lori Duncan out into the woods and walks them out there. They're tied. They're gagged. Who gets shot first between them? Greg Nicholson most likely. He's got a gunshot in the back of the head. Most likely he's going to take down -- the defendant's going to take down the person that's most capable of resisting. In all likelihood it's Greg Nicholson that gets shot first, and Lori Duncan knows that.

Lori Duncan sees Greg Nicholson go down, and she knows what she's doing. Can she scream out? Can she scream for help?

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3402 of 3636

Can she even start to run with her little girl's sock in her mouth? And then she's gunned down.

Then the defendant walks back up to the car, and he gets those little girls out of the car. Remember? They're hugging. They're hugging each other in the back of the car. And he walks them out. Now, it's a July night, July 25. It's hot. So the girls, you know, don't have any shoes or socks on their feet. They're walking through that tall grass that we know is there in that burial site. They're feeling that grass brush against their legs. They can probably see the lights of Mason City over in the distance. Do they see their dead mother laying on the ground? What's going through those little girls' minds at this point? What terror are they feeling at this moment when the defendant takes a gun and intentionally puts it up against the back of a little girl's head and pulls the trigger and then does it again? What kind of man can do that?

What kind of man after doing that and having his own son born can three months later lure Terry DeGeus out to a site knowing what he's done, knowing what the consequences are, and murder another human being and then a month later -- you saw the video -- have a happy Christmas with his family?

The judge has instructed you on what your job is in this case, and you have to weigh the facts of this case, and those are the facts of this case, the unescapable facts of this case.

I'm going to be talking to you about the aggravating factors in this case that the government proved, and the first

one is the gateway factors. The Court went through that with you. It's either the intentionally killing of a victim or the intentionally engaging in conduct intending the victim be killed. Step 2 aggravating factors, substantial planning and premeditation, the serious physical abuse that applies to Greg Nicholson, Lori Duncan, Terry DeGeus and the vulnerable victims, Kandi and Amber.

And the step 3 nonstatutory aggravating factors, the future danger that the defendant poses to other people, the obstruction of justice he engaged in, killing more than one person in a single episode, and the impact on the victims and their families. I'm going to take these one at a time and talk to you about them.

The intentional killing: You all found in the guilt phase beyond a reasonable doubt that the defendant intentionally and with premeditation killed Greg Nicholson so that he would not have to go to jail for ten years.

You found in the guilt phase that the defendant intentionally and with premeditation gunned down Lori Duncan and her two little girls because they could tell on him about what he was doing to Greg Nicholson.

And you found during the guilt phase that the defendant intentionally and with premeditation killed Terry DeGeus because he was a potential witness against him and he had to eliminate the last of those potential witnesses.

♀

3905

Premeditation is something that Mr. Miller talked to you about in the guilt phase. Premeditation can be as easy as taking a clip, putting it in the gun, racking a round in the chamber, and putting it up against the head of somebody and

pulling the trigger. That's premeditation.

What we're talking about here is substantial premeditation and planning. And why is that an aggravating factor? Think about that. Why is that an aggravating factor calling for the death penalty? Because this wasn't a crime of sudden passion. This wasn't a crime of reacting to something. This wasn't a defendant found -- finding himself in a circumstance not knowing a way out and thinking, oh, I'll shoot somebody.

The reason this is an aggravating factor is because this is evil. This is somebody who can think long and hard and rationally about how he's going to slaughter people and think about what he did in this case. We know that he literally hunted down Greg Nicholson, that he developed a plan for gaining entry into the house, that they intentionally borrowed Christi Gaubatz's car because they didn't want to be found. That's thinking long in advance about how he's going to do this crime.

We know that he purchased a handgun through his girlfriend Angela Johnson. Now, think about the purchase of that handgun. Angela Johnson was actually the person who bought the gun. But who do you think went in there? Who's the person

3906

who gets into guns, who has gun magazines in his locker at work? Who do you think walked into that pawn shop with her and looked over the display and decided that's going to be my murder weapon there? Do you think Angela Johnson picked it out? Defendant picked it out.

And we also know from the testimony and from the facts of this case that a videotape was taken, that the defendant came to that site, came to the Duncan house, with a video camera with

him thinking in advance. He was planning this substantially in advance.

We also know that he thought this out long and hard. You remember the Poor Man's James Bond book, copyright 1991, that was seized from the defendant's house in 1996? Remember this page from it? Remember the language on this suggesting that if you really want to do a good job in making sure that you have a more effective gag you stuff a piece of cloth in their mouth and use duct tape across it? You don't think this defendant was thinking this out far in advance on exactly how he was going to do this?

We know that he buried Greg Nicholson and the Duncan family in a remote site. This is somebody who thinks these things out in advance. Do you think after abducting these people that he just started driving around looking for a possible spot, or do you think this defendant knew exactly where he was going to bury these people, had cased it out, had found a

♀

place that he knew was secluded, some woods that nobody would go to?

And then let's talk for a moment about the killing of Terry DeGeus. That again was a plan that was substantially premeditated and planned out by the defendant. He and Angela Johnson had to come up with a scheme because, you know, at this point we know Terry is frightened. Terry's wondering where Greg Nicholson is. He knows Greg Nicholson's missing. He is worried that he's going to be the next target. The defendant himself told Tim Cutkomp, These guys are skeptical, and they knew, they knew that Terry DeGeus was going to be skeptical.

So they had to come up with a plan. They had to think

about it long and hard, how are we going to lure Terry DeGeus out to that site? And so they use Angela Johnson and his affection for Angela Johnson as a method to do that.

And again, they lure him out to a remote site. And remember he has a baseball bat with him. Remember that testimony? Brought a baseball bat intentionally because he was going to make Terry DeGeus pay. So not only did he remember the gun, but he also remembered to bring along a baseball bat just because this is going to be sport.

If you have any doubt in your mind at all that these murders occurred with substantial planning and premeditation, think ahead in time to what happened the next time the law enforcement officers caught the defendant. Think about the

3908

substantial planning and premeditation he went through in 1996 to kill Dan Cobeen. You heard about that on the tape, surveillance of Dan Cobeen's place, trying to figure out how to get out of the ankle bracelet and defeat that. Substantially planned that murder.

And then during that same time, he substantially planned killing Special Agent John Graham, trying to locate where he was, ask people at work about where he lived, got a directory, city directory, with the G on there.

He was trying to figure out which was the key link in the chain of custody so that he could eliminate that key link and get out of these crimes in 1996.

And then finally when he's caught doing this, plotting this by Tim Cutkomp recording the tapes with him, he plots Tim Cutkomp's murder. Think of the substantial planning he did there. You found it as part of your guilt verdict in this case,

that the defendant solicited Dean Donaldson to get out of jail and go kill Tim Cutkomp and went to the point of drawing a map to where he lived, giving him details about how to kill him.

The defendant plans, schemes, thinks out these things long in advance. You found as part of your verdict in Count 6 that after Dean Donaldson didn't go through with the murder of Tim Cutkomp he didn't give up, did he? He went to Anthony Altimus, and Anthony Altimus was going to do it for him. And he almost got it done, almost got it done, few dollars short.

And then finally if you have any doubt at all that this defendant substantially premeditated and planned these murders, again, think forward in time. Think about his escape attempt out of the Woodbury County Jail to do exactly that with Tim Cutkomp, and think about his plans for escaping and retaliating against people from the Florence facility.

Now, another statutory aggravating factor is substantial abuse, torture, committing these crimes in a particularly cruel, heinous manner. There are some facts that you could find torture, but the government submits you don't need to get there. Go toward substantial abuse, because the defendant substantially abused, physically abused the victims in this case, Greg Nicholson, Lori Duncan, and Terry DeGeus. Let's talk about that for a little bit.

Greg Nicholson, as I've talked about, was bound and gagged. And he was shot multiple times, not just once. Dr. Steadman talked about more than one bullet coming from his body and one from the head.

Lori Duncan, bound, gagged, shot multiple times. This is unnecessary, but think about the ring in this case. Think

about her ring. Remember the testimony about that? Robert said she always wore this ring on her left hand after she got divorced, always wore it here. And yet when the grave was dug up, her ring wasn't there, wasn't on the bone that was left of her hand. It wasn't found in the bottom of the grave. Her ring

♀

was found in a stream, in a river miles away, miles away downstream from a dam.

Now, think back about the way this defendant thinks, the way he plans, the way he schemes. Her name was in that ring. Do you think it was accidental, do you think it was accidental, that her ring was found downstream from a dam miles away from the burial site, or do you think this defendant's thinking this out thinking, I've got to divert the police from any chance of finding this body, so I'm going to throw her ring that the police can find with her name in it, and I'm going to throw it in this river?

And when did he take that ring off her finger? We know that there was a spiral fracture to her finger, her ring finger on her hand as testified to by Dr. Steadman. Did he rip it off her hand while she was still alive? Did he rip it off her hand when she was dead? The Court told you in the instructions, for substantial physical abuse, it doesn't matter whether she was alive or dead when he ripped that off her hand.

Terry DeGeus, shot multiple times. We know that his skull was shattered. Remember the testimony from Steve Vest about the defendant playing with the defendant's leg when he buried him pretending like it was a gear shift singing as he buried Mr. DeGeus?

Vulnerable victim is another statutory aggravating

factor. This applies to Kandi Duncan. Kandi Duncan was ten

years old. Amber Duncan was six years old.

But if you have any doubt at all about them being vulnerable victims, I want you to think about this. That's their skulls. Think about vulnerable victim. When those girls went out into the woods, when the defendant took them out into the woods, did they run from the car? They've heard gunshots. They're hugging each other. They're afraid. But do either one of them run? They're not bound. They're not tied up. Neither one of them run. They walk out into the woods with the defendant, and he has to shoot one of them first. Can't shoot them both at the same time. It's not a double-barreled gun, so he has to shoot one of them first.

Which one does he pick? Kandi? Amber? Probably shoots Amber first. She's older. Maybe she can run faster. So he puts the gun up against her head, and he pulls the trigger and you know from Dr. Steadman literally blows her face off. Look where he put the bullet on her skull.

Now, what does Amber do at this point? Does Amber run? The defendant was able to put the gun up against Amber's head at almost the exact same location that he did on Kandi. Amber was so vulnerable that even when she sees her sister blown away in front of her she can't run. She stands there, and the defendant shoots her.

Let's talk about future dangerousness for a little bit. It's a nonstatutory aggravating factor. You all know this

defendant by now better than anybody else, I guarantee you far better than Dr. Cunningham knows him. And we know what this defendant's capable of in the future. We know it from his own words. Remember this part of the tape? This is when he's talking to Tim Cutkomp, and he's talking about Dan Cobeen here. And he's so angry at Dan Cobeen, that Dan Cobeen could do this to him, that he's vowing revenge.

(A portion of an audio recording was played in open court.)

MR. WILLIAMS: Incarceration, we know, doesn't deter this defendant. He was incarcerated in the Woodbury County Jail and still plotting to kill. He's not deterred by law enforcement. He plotted to kill law enforcement officials and their families, plotted to kill witnesses and their families. And then when other inmates in the federal institution turned against him and cooperated with authorities, he plotted to kill them too even within the institution, tried to recruit Mr. Ferguson to help him kill some of those witnesses.

The defendant will plan an escape. You know how this defendant thinks now, don't you? You know what he's capable of. You know how intelligent he is. You know how he schemes and plans and thinks.

Now, Dr. Cunningham tells you, Well, jeez, look at all these pictures of the barbed wire fences and the gun towers, and look how well the BOP can do. Bureau of Prisons can take care

♀

of this person and secure him so he's not a future danger. Even shows a nice pie chart and some statistics up there.

So I guess what we should do is we should tell Fred Tokars and the other witnesses, Mr. Vest, Don't worry about it,

guys. Don't worry about it. Don't worry about whether you're going to get shanked in jail some day by somebody carrying out a favor maybe for a meth recipe from the defendant because we had Dr. Cunningham come in court, and he gave us this nice pie chart with these statistics, so the chances of that happening are pretty slim, so don't worry about it.

And I suppose we should call up Tim Cutkomp and say, Tim, don't worry about it. You don't have to worry about people knocking on your door because Dr. Cunningham came in, and he gave us a nice pie chart and some statistics, so really you have nothing to worry about despite what you know about this defendant.

Should I tell Special Agent John Graham and his family, Don't worry about it, John. Don't worry about people knocking on your door at night because Dr. Cunningham came in here, and he showed some nice pictures of the prison and gave us a nice pie chart and some stats?

You all know what this defendant is capable of. He said so on the tapes, time's on his side. He'll wait. He's not in a hurry. He'll go to prison. He'll behave as he needs to do for a while until he gets down into a lower classification.

♀

3914

Dr. Cunningham admitted to you that he could get into a FCI. But make no doubt we know from the defendant's own words, he vowed revenge.

Obstruction of justice is another nonstatutory aggravating factor. In this case you found that in Counts 1 through 5 already. Beyond a reasonable doubt you found the defendant killed these people because they're witnesses or potential witnesses. There's no doubt about that aggravating

factor.

And that aggravating factor is the most ruthless form of obstruction of justice there is. This isn't bribing a witness. This isn't trying to intimidate somebody not to testify. This is brutally killing people not only because they testified or might testify or have testified, but on the off chance that there might be an outside chance that Terry DeGeus might testify, might as well kill him too. This type of obstruction of justice strikes at the very heart of the criminal justice system.

Nonstatutory aggravating factor, killing more than one person in a single criminal episode, no doubt about that. And why is that, why is that, an aggravating factor calling for the death penalty? Think about it. If we're trying to figure out whether somebody is so bad that there's no alternative but to execute them, we're looking for somebody who is so evil that they can kill and kill and kill and kill one right after the

other in a single episode.

And finally victim impact, you heard the testimony of family members in this case. You heard that these victims are not just names, just not somebody from the past, that they were living, breathing, dreaming, playing people that loved and were loved by other people and whose loss to this day causes their families to lose sleep, to suffer from depression, they're under medication. When you're thinking about the appropriate penalty in this case, you think about this impact to these family members.

Many, many weeks ago when we started the jury selection process in this case, Mr. Miller and I went through

the process of asking you all questions. During that time we asked you this question, each and every one of you. We said, In the appropriate case, do you have the courage to sign your name to a piece of paper to impose the death penalty on another human being, and each of you said yes. This is the appropriate case, ladies and gentlemen.

Defendant chose to put us all here today. He chose the path that led to this courtroom, that led to putting you all in the position of making this decision.

Now, the defense in the penalty phase put on some evidence about what they are portraying as an unfortunate childhood, but you think about it. Was his childhood really any that different from the vast majority of people? Sure, he had

divorced parents. He had a father that drank too much. But he grew up in a small town in Iowa, went to high school there, had all he needed to.

This isn't some kid living in inner city Chicago someplace with a crack mother or no mother at all. This isn't some poor person who has known nothing but a life of crime since they were four years old. This is a relatively privileged person living in the middle of Iowa with opportunities, opportunities to go to college, opportunities to get jobs. He chose the path he took. He wasn't forced there. And he knew that he was choosing that and consciously. We know that from his own words.

(A portion of an audio recording was played in open court.)

MR. WILLIAMS: The defendant chose to put himself in this position, ladies and gentlemen.

Defendant chose this path knowing what the consequences were, including the death penalty.

(A portion of an audio recording was played in open court.)

MR. WILLIAMS: Defendant chose to violate the rules of humanity in this case.

(A portion of an audio recording was played in open court.)

MR. WILLIAMS: Defendant's mind-set are there are no

♀

rules in war, but you know what? Even in war, even in war, no civilized country, no civilization sanctions the intentional murder of children. Not even in war do we sanction that.

Defendant thinks more of his dog --

(A portion of an audio recording was played in open court.)

MR. WILLIAMS: -- than he does of people, and he has no conscience.

(A portion of an audio recording was played in open court.)

MR. WILLIAMS: Ladies and gentlemen, this is the appropriate case, appropriate case, for the death penalty when the defendant goes out and intentionally, with premeditation guns down a federal witness, Greg Nicholson. That justifies the death penalty.

But if that's not enough, if that's not enough, three months later -- long time to think about what he's done -- the defendant goes out and intentionally and with premeditation guns down a potential federal witness. If one's not enough, combined they justify the death penalty.

But if you still have any doubt at all, if you have even the slightest doubt at that point, think about this. Think about Lori Duncan, Lori Duncan, whose only crime in this world, if you call it that, was that she had a big-enough heart and was naive enough to tie herself to Greg Nicholson because she saw

♀

somebody who was trying to turn his life around after he got caught, who never was involved with any criminal activity, never involved with drugs, and the defendant killed with premeditation and intentionally murdered that young single mother.

And if that's not enough yet for the death penalty, think about those little girls, those innocent little girls. The murder of children is an unspeakable, unholy, and unforgivable act. Defendant intentionally murdered those two little girls, the slaughter of innocence. If this case, if these facts don't call for the death penalty, then what case does? If not now, when? United States asks that you impose the death penalty on the defendant in this case.

Thank you, Your Honor.

THE COURT: Members of the jury -- excuse me. Members of the jury, we're going to take a 25-minute recess and then come back and hear from Mr. Spies. So we'll see you back here in 25 minutes. Thank you.

(The jury exited the courtroom.)

THE COURT: Counsel, anything we need to take up?

MR. WILLIAMS: No, Your Honor.

MR. SPIES: No, Your Honor.

THE COURT: Okay. Thank you. See you back here in 25 minutes.

(Recess at 10:22 a.m.)

THE COURT: Mr. Spies, are you ready to have the jury

brought in?

MR. SPIES: (Nodded head.)

THE COURT: Mr. Williams?

MR. WILLIAMS: Yes, Your Honor.

(The jury entered the courtroom.)

THE COURT: Please be seated.

Mr. Spies, whenever you're ready.

MR. SPIES: Thank you, Your Honor. May it please the Court, Mr. Honken, my good friends, counsel.

This is a tortuous time for any professional, and I will be brief with you this morning. Monday morning when I had an opportunity to visit with you briefly about this important and critical stage not just of a trial but of a man's life, I asked the question why, why in the face of the unspeakable horror that your verdict has propelled Mr. Honken to and in the face of the overwhelming and unimaginable sadness that we all witnessed and can imagine in the lives of several families, why in the face of all that should my client, Dustin Honken, live?

We've had an opportunity over the past couple of days to not only review what brought us here in the first place but also to learn a little bit more about Dustin Honken the man and his family. And before talking about those few brief glimpses of him, I'd like to remind us where the Court has urged us to go this morning.

First of all, we start from the premise that in your

reckoning today your decision about whether Dustin Honken should

live a punishment of life in prison or whether he should die is based on the foundation that a death sentence must be unanimous. And as Judge Bennett has told you, if any of you finds that a sentence of death is not called for, then the death sentence cannot be imposed. And you must then enter a verdict imposing a life imprisonment without the possibility of release.

What that means in practical terms for each one of you is that today we have not a jury of 12, but we have 12 juries of 1, and each of you must consider all of the factors that Judge Bennett has urged you to consider, commanded you to consider as well as the facts that we've reviewed the past few days.

Next we know from the Court's instructions that the process that you're engaging in, as I told you on Monday, is more than just a calculation. It's more than just a mathematical formula. This weighing is not a mechanical process, but as the judge has instructed, you must not simply count the number of aggravating factors, the number of mitigating factors, subtract, and come up with a balance and based on that balance make a judgment of what you think this man's life holds ahead.

As the judge also told you, one mitigating factor can outweigh all of the aggravating factors listed by the government in its indictment and in the verdict forms and that all the aggravating factors standing alone may not call for a sentence

of death.

As the judge told you at the beginning of his instructions, as we reminded you during the course of our jury selection process in those few brief moments we had an opportunity to talk with you and to meet you and to learn about

your thoughts, to learn about your beliefs, a death sentence is never required. Regardless of your findings with respect to any aggravating factors or any mitigating factors, you are never required to impose a death sentence. You are never required to impose a death sentence.

Finally, the law makes clear and Judge Bennett has told you that your deliberations are finally individual acts of conscience. If any of you finds that the death penalty is not necessary, the verdict of the jury must be life in prison without release. And because your decision is an expression of conscience, it should be given the greatest respect, and the decisions of your fellow jurors should be given the greatest respect.

Back at the close of the merits phase of this case, one of the instructions that the Court told you in reaching your deliberations was that you were not to do violence to the judgment of others. And each of you in your quiet way as you deliberate on the future of Dustin Honken should look not only into your hearts and your souls but give respect and deference to the feelings and the opinions of your fellow jurors. You are

truly today 12 juries of 1.

Let's review some of the features that I've asked you to consider in weighing this important and unimaginable decision that you're about to make.

We have tried to show throughout the course of the past couple of days not only the Dustin Honken who stands here a defendant accused and now convicted of the most horrible of crimes, but there's more to him. There's more to his family. There's more to the substance of him that you need to consider

in deciding his fate.

We know that Dustin Honken's family began as all families do with promise, expectation, a young couple married in 1960 starting off a family, a family that started off with the birth of a child, the loss of a child, the birth of another child.

Dustin Honken was part of that promise, and we heard through his family and through his friends, through his teachers, through his employers that Dustin Honken had promise, he had expectations of his own, he had dreams of his own.

We know that those dreams were tempered, were influenced by a father whose alcoholism fractured the family, led to despair, belittling, isolation, loneliness of his family, belittling of his daughter, contempt for his role as a father. And we know from the testimony of those who were around Dustin that his father played a great role in influencing him, in

helping him to judge how to behave, how to treat other people, how to influence and take care of one's self.

Now, we know that Jim Honken is not on trial here, and we do not expect him to be on trial here today, nor should he be. But we know that his influence was great not only with Dustin Honken but with his brother. His influence over his sister was great as well, and they tried in their own ways to repel that influence throughout their lives.

Jim Honken was a braggart. He was a drunk. He was a convict. He boasted about his accomplishments as his brother's told you. He boasted about his criminal past.

We also know that he was a bank robber, he went to prison for bank robbery. And much was made yesterday about this

bank robbery and whether it should or shouldn't have an influence on your decision about Dustin Honken. The simple fact of this bank robbery is this: The very fact that it came up in discussions between a father and son, that it became a factor in conversations among friends reveals something about the nature of the way Dustin Honken grew up and the way he learned.

Whether this plot was hatched a month before, a year before, or three days before that bank was robbed, Jim Honken robbed that bank. Jim Honken robbed another bank in Missouri. Jim Honken went to federal prison for those bank robberies, not Dustin Honken.

But the remarkable thing about this story is that the

fact that Dustin Honken was exposed to this poisonous environment, an environment that was fractured by alcoholism, by loneliness, by despair, notwithstanding those facts, Dustin Honken had qualities. He exerted efforts to emerge from that loneliness, that despair, and that fractured family.

What else have we learned about Dustin Honken over the past couple of days? We know that, as we've said, he had aspirations and dreams that were influenced by his father. But nonetheless, he had many good qualities, and you learned about those good qualities to the extent that we've been able to show them to you. We know that he had a job, that he took care in his work as a youngster. We know that he befriended a little boy in a trailer court and took that little boy under his wing. We know that he cared for his sister and took his sister under his wing, encouraged her and supported her in the best ways he knew how.

We knew that he had friends and developed friendships.

We knew that he was active in school and enjoyed the facilities of school and looked forward to a career, looked forward to promise.

But Dustin Honken was more than just an assemblage of ideas, an assemblage of accomplishments, an assemblage of years and days gone by. We know that none of this tells us anything more about the crime that was committed, but it does tell us this about Dustin Honken: At no time as I told you on Monday or

at no time during the past few days are we asserting that Dustin Honken should be excused or that there was any justification for what you found him guilty of in his background or his upbringing. But it was important for you to understand the substance of this man and how he should now be treated.

Dustin Honken, the person you've convicted of murder, is also the Dustin Honken who befriended Kathy Rick and befriended a young woman pregnant by another man's child. She attended -- he attended the birth of that child, took that child to his own heart and became the father to Brandon Rick. This was an exceptional gesture by a young man coming from a family with few skills in those regards. He took young Brandon into his heart, became Brandon's father.

We know also, of course, that he had a child by Kathy Rick later on and that Ryan became his son, is his son yet today, of course. We also know he had another child by Angela Johnson, and young Marvea became another important feature in his life and is today.

The remarkable thing about Dustin, the child, and Dustin, the father, is that notwithstanding the huge influence, the huge burdens placed upon him as a youngster -- and we do not

claim that he came from a family devastated by crack cocaine or that he lived on the streets of Chicago or grew up from the streets of Detroit. But he met the same burdens, the same handicaps of many young people in our society and

notwithstanding the influence of his father, the influence of alcoholism and loneliness in his family was able to resurrect some good in his heart to become a father, a caring father, a devoted father, and a caring brother and son.

The Court has imposed upon you a duty of not only reviewing the facts of the crime that you found Dustin Honken guilty of but also to personalize and to examine Dustin Honken and to make the punishment fit not only the crime that you found him guilty of but to fit the man.

We know from what we have learned about Dustin that he has qualities that are important to all of us. And as we review those qualities, we know that the responsibilities vested in you are the same responsibilities that you would want invested in any one of us as they judge you.

We know, of course, Dustin's going to spend the rest of his life in prison and that he will die in prison. Mark Cunningham came here from Texas to describe the features that will be used to punish Dustin Honken for the rest of his life. We know from Dr. Cunningham's testimony that Dustin will be placed in a secure facility, that he will be under the careful supervision of trained professionals, and that if there is any notion of threat, any notion of danger, that those trained professionals will deal with that threat and deal with that danger.

I am saddened by the disdain that the government

appears to cast on Dr. Cunningham's testimony because all of the information Dr. Cunningham gave you was information obtained from the government itself. And they are the trained professionals, and they know what they are doing. Dustin Honken will not pose a danger in the future. Any danger, real or imagined, will be taken care of for the rest of Dustin Honken's life.

You now know and we all know that Dustin Honken will die in prison, that he will die an outcast in a world of outcasts. Dustin Honken will die alone in prison.

The judgment that the Court is asking you to make on Dustin Honken is a judgment of whether or not his punishment should be that lonely life in prison until God takes him away or whether that life in prison should end at the hands of an executioner. There is no guidance other than your conscience to help you make that decision. And as I said, today you are 12 juries of 1.

In thinking about justice for Dustin Honken, there are few things that I can tell you that you don't already know. We all know that you respect life. We all know that you respect neighbors, that you respect family, that you respect friends. As you balance those features together, there is little wisdom that I can give you in this historic moment. There is no wisdom that any of us can lend to you.

Abraham Lincoln, though, at a time when our nation was

on the verge of disintegration, when feelings of vengeance and

retribution were going through our country, urged us all, urged his countrymen, to not be bound, not be driven by vengeance, not to be driven by retribution but instead to look to the better angels of our nature. And I am urging you to look to the better angels of your nature as you decide Dustin Honken's fate.

The vengeance and the hurt and the pain that we all feel for the families of Lori Duncan and for Terry DeGeus and for Greg Nicholson is a real pain. In balancing that pain and in balancing that sadness, we have to look also to the family and the pain of Dustin Honken and his children. There is nothing in the execution of Dustin Honken that will bring Kandi or Amber Duncan back to life. There's nothing in the execution of Dustin Honken that will bring Lori Duncan or Terry DeGeus or Greg Nicholson back to life.

In arguing if not this case then what case, the government has asked you to set aside your feelings of the preciousness of life, to be dictated by vengeance, to be dictated by retribution.

Another great leader of our civilization at a time when the world was swept by the urge for punishment and the urge for retribution looked to his countrymen and said, I beseech you, pray that you are not mistaken.

Dustin Honken's life is a life of real meaning to his children. It's a life of real meaning to his family. It's a

3929

life of real meaning to him. We have heard testimony of many families who have been fractured by death and by sadness. And yet in those testimonies we heard about love, and we heard from Dustin Honken's family about the importance of love. As you reviewed the exhibits that have been admitted here, the letters

to the children, the letters from the children, you'll see that love still lives in Dustin Honken. And as I told you on Monday, where love lives, hope lives. And where there is hope, there is room for reconciliation and redemption.

Ladies and gentlemen of the jury, there is worth in Dustin Honken. Can you truly say in looking at Dustin Honken that there is absolutely no hope? Can you truly say that there is no reason now or in the future for Dustin Honken to live?

On his behalf, I pray that you are not mistaken.

THE COURT: Mr. Williams, you may give your rebuttal closing argument.

MR. WILLIAMS: Thank you, Your Honor.

I will be brief, ladies and gentlemen. We heard about the father again, and let me just talk to you about that for a minute.

We have no obligation to prove who committed that bank robbery in 1986, nor is that really at issue other than this: The defense has attempted to shift the blame to the father. And think about the pattern that you all are aware of.

Back in nineteen eighty -- or I'm sorry, 1998 when the

defendant was being sentenced for the drug case and he was being questioned, he blamed Tim Cutkomp. Oh, yeah, I said all those things, but really it's Tim Cutkomp who was, you know, in this murderous rage; and therefore, you know, I said these things to calm him down. So he blamed Tim Cutkomp when he was sentenced in 1998.

Come to trial here, that's not going to work because Angela Johnson, the defendant's girlfriend, drew the maps to the bodies, and so how can we possibly blame Tim Cutkomp for it? So

now, now, the theory will be we'll blame Angela Johnson and Terry DeGeus. Yeah, that's right. They killed them. And then Angela Johnson must have killed Terry DeGeus.

Then you found him guilty of these murders, so that doesn't work.

So now we're at sentencing, and the blame shifts again. And now it's to the father. Let's think about this father. Father had an alcohol problem -- no doubt about it -- suffering from alcoholism. But in 1986 you heard from his own brother, from Dave Honken, where he was at. I asked him. I said, At that point in his life, he had no job. He was on disability. His wife had kicked him out of the house. He had no place to live, and he was drinking heavily. He was at a particularly vulnerable state in his life.

Take that in conjunction with the fact that you know because of the evidence we had yesterday that the defendant was

planning this bank robbery a year before it occurred. He was planning it exactly the way it went down. So in your mind you come to the conclusion who abused who? Who influenced who here?

Jim Honken had no criminal history. You heard that from Carol Honken. Defendant didn't even have -- or Jim Honken didn't even have a misdemeanor conviction until 1986.

Poisonous atmosphere, it's the defendant's poisonous atmosphere that he used his own father in 1986, found him at a particularly vulnerable state and used his father to commit the bank robbery that he had planned, that he had tried to talk other people into committing for him. He used his father just like he used Tim Cutkomp.

Defense talks to you about children, the defendant's

children, and the impact this will have on them. Keep in mind again, ladies and gentlemen, it's the defendant who chose the path that brought us all here today including his children.

Where was the defendant's children in his mind when he put the gun up against little Amber's head and pulled the trigger? He knew what the consequences were, the consequences not just to him, not just to killing little children, but the consequences to him, to his family, to his own children. What was he thinking then?

This is not a case where you should be showing mercy. Mercy -- mercy is for a case where the circumstances of the crime call for compassion: A mother steals food to feed her

children; an elderly man whose wife is suffering from cancer and she's 95 years old and in pain every day helps her to her death and kills her to save her that suffering. Then you don't excuse the crime. You convict them for that crime, but you show compassion and mercy in the punishment because of the circumstances.

The circumstances of this crime do not call for any kindness, do not call for any mercy. It calls for justice.

Throwing out quotes, I'll throw out a quote. Edmund Burke, he's an Irish philosopher from the 18th century, and he said this: The only thing necessary for evil to triumph is for good men to do nothing. Let that not be said about you.

Finally, the defense says that you are 12 juries of 1. You are 1 jury of 12. In order to impose the death penalty in this case, it must be unanimous. Now, as a consequence of that, that decision does not rest on any one individual shoulder of this jury. Each of you individually told us that you could, in

the appropriate case, sign a verdict form that would impose the death penalty on another person. But to do that, you do that as a group. And as a group there's strength.

This is not -- the decision to impose the death penalty does not rest on any one individual shoulder. It rests on this jury as a group. And as a group, the United States asks you to go back and deliberate. We know this is a hard decision. We know these are the most serious of consequences. But you

know the facts of this case. You know this defendant. You know what he did. And you know what he's capable of. And you know what justice requires. Thank you.

THE COURT: Members of the jury, we have final penalty phase instruction number 10 on page 33 of your set of instructions, and it's entitled Concluding Instruction, page 33. I'll give you a moment to find it in your sets.

(The Court read final penalty phase instruction number 10 in open court.)

THE COURT: Just a few more details. If you decide not to deliberate on Friday, that's fine, but I'd appreciate it if you would let me know with a note so that I can let the lawyers and Mr. Honken and the families know that there will be no deliberations on Friday.

I need to dismiss the alternate jurors. I think you all know who they are -- you are, but I will cover it. It's Juror Number 914, 425, and 280, but I'm going to give you the following admonition, because if we lose jurors, you may be called back to participate in the penalty phase deliberations. I'm instructing you not to discuss this case with anyone. Don't let anybody talk to you about the case. Don't read any news

reports, listen to any radio reports, do any independent research on your own until after the jury has returned a verdict on the penalty phase.

So in a sense you'll be on call if we would need any

of the alternate jurors. There won't be a four-hour delay from when you reach the verdict until we announce it in open court, but there will be about an hour-and-a-half delay. And that would allow us to gather all the participants and also let the alternate jurors know that you've reached a verdict so that if they want to be here when the verdict is read in open court they can be.

And on behalf of the judges and employees of the Northern District of Iowa, I wanted to thank the alternate jurors for your service in this case.

You may go down to the jury room and begin your deliberations, and we'll have all of the evidence that has been admitted in the merits phase and the penalty phase brought down to you. Good luck in your deliberations.

(Jury out at 11:17 a.m.)

THE COURT: Please be seated.

Are there any matters we need to take up, Mr. Williams?

MR. WILLIAMS: I just have a couple -- I guess I'll call them housekeeping matters. I think that I'd like to address to the Court, frankly, at sidebar to at least let you know what I think they are, and then you can obviously decide.

THE COURT: Okay. We can have a sidebar after I declare a recess.

MR. WILLIAMS: Correct.

THE COURT: Anything from the defense?

MR. SPIES: No, Your Honor. Thank you.

THE COURT: Okay. Thank you. We'll be in recess.

(Recess at 11:18 a.m.)

THE COURT: Okay. Let's go on the record. Mr. Honken is personally present with the three defense lawyers, and Mr. Williams is here on behalf of the U.S. Attorney's Office.

Earlier today I received a note. It said, Chief Judge Bennett, due to prior commitments, we will not be deliberating on Friday, October 22. We plan to continue deliberations on Monday, October 25, at 8:30 a.m. Thank you. Not signed by anybody. And that's been shared with defense counsel.

And then there was a request by -- a conditional request by the defense that I give a cautionary instruction before they leave, and I've gone ahead and prepared -- it's just a draft -- supplemental instruction number A, conduct of the jury. I provided it to all of the lawyers, and I wanted to ask you if you're satisfied with the language. And if you are, do you want me to send it down to the jury room? And if you do, when do you want me to do it or any other questions that you might have? What's the government's position?

MR. WILLIAMS: Your Honor, the only thing that I see about this proposed language, in the last paragraph, the words "about this case" are italicized, and I'm just concerned that by italicizing those words, some juror may try to read something

into that that it's okay to do an investigation or research about, say, the death penalty generally or something like that.

As long as it's not about this case, it's okay to do all the research you want. And I think if you just put that in plain casing and not italicized --

THE COURT: Sure.

MR. WILLIAMS: -- it won't overemphasize that there's something to be distinguished between this case and research generally.

THE COURT: I don't have any problem putting it in non-italicized.

MR. WILLIAMS: I don't think it's a big deal. But I saw that, and I wondered if there was some meaning behind it.

THE COURT: Sure. And I don't even know why it got in there in the first place.

MR. PARRISH: I have no problem with that.

MR. WILLIAMS: The only other thing is I've talked with Mr. Parrish, and he's suggesting I think on the third paragraph -- and I don't have any objection to this -- on the second line where it says, Involved with it or listen to any, I think we should insert "local or national radio or television reports about this case," just emphasize that there are some local --

THE COURT: Okay. I was a little bit -- we're now on the paragraph that starts, Third?

3937

MR. WILLIAMS: Correct, Your Honor.

THE COURT: Do not read any local or national news stories. No? I'm sorry.

MR. WILLIAMS: Yeah, that would be -- I didn't think about it, but if we're going to qualify, we probably should put it there and down below, On the radio and television, so say,

Local or national news stories or articles, and then down below, Or listen to any local or national radio or television reports about this case.

THE COURT: Okay. I think that's a good suggestion. Is that --

MR. PARRISH: Is there a question we could avoid all? Is that asking too much to avoid all local news during the course of the deliberation? And the reason I say that, Judge -- I just highlighted when Mr. Williams and I were chatting -- the flash that I saw of some concern popped on yesterday on a -- I think it was Channel 4 is what I saw. I have not been watching any news. But it showed Mr. Honken in an orange jumpsuit with guards around him, and that was the leadoff flash.

My concern if they were to avoid any local news stories or newspapers during the deliberative process, it might be -- and I don't know whether that's asking too much, but I think it would be something --

THE COURT: I don't think it's asking too much for them not to listen to any local news or radio reports.

♀

3938

MR. PARRISH: Or read the local newspaper.

THE COURT: Yes.

MR. PARRISH: That's what we would like.

MR. WILLIAMS: I have no objection to that, Your Honor.

THE COURT: Well, I think in the -- here's -- I wasn't going -- I wasn't going to tell them not to read any local newspapers because -- I mean, I guess we could. And my thinking was that you can see the article and not read it.

MR. PARRISH: Correct.

THE COURT: Whereas if you just turn on the local news, you could see that picture that you've described before you'd even have a chance to shut it off.

MR. PARRISH: That's the problem I was concerned about, and I know in the past what we've had them do is tell jurors as a favor while this process is going on, if the local news comes on, just walk out. Now, by chance, the way they do the news nowadays, obviously they may see a flash which is unavoidable the way they promote news shows. But my thought is, boom, the minute they know the six o'clock news comes on if they have a habit, just walk out of the room and come back at a later point.

MR. WILLIAMS: And the same concern that the defense has raised on this I think, frankly, might relate to the newspaper. If they have that same picture, a still picture on

♀

the front page of the news, them being exposed to that, it has about as much --

THE COURT: Well, here's what I'm thinking.

MR. WILLIAMS: Okay.

THE COURT: If you make it too extreme, they're going to violate it, it seems to me. If somebody told me I couldn't read the newspaper at all, I think I'd read the newspaper and just make sure I avoided any article about it, but that's just me because I know I could follow the admonition and probably have somebody cut the newspaper article out ahead of time. But to tell me I couldn't read the newspaper at all, I mean, I've never gone a day in my life without reading a newspaper, and I'm not about to start now because some judge told me that. But that's just how I'm looking at it.

I would certainly follow -- the intent of it is to not read anything about the case, but I think if we tell them not to read a newspaper, I mean, I'll tell them that if you want me to, but I just think there's not much likelihood they're going to follow that. I think if we tell them not to read any articles about this case and I draw a distinction between the news and the television media based on what we said -- I also know the local newspaper, they're not -- I don't think they were over here taking any pictures. They haven't had a single picture yet, have they, other than the --

MR. PARRISH: The Mason City Globe Gazette on their

website does, in fact, carry a photograph of Mr. Honken in the orange jumpsuit.

THE COURT: And that's right on the web page because I've seen it.

MR. PARRISH: Right on the web page.

THE COURT: Let's just go through this again, and tell me what you want. You want me to tell them not to --

MR. PARRISH: To read any local -- are you starting with third, Judge?

THE COURT: Yes, I'm on three, I think.

MR. PARRISH: All right. Do not read any local news stories -- I would say local or national news stories about this case. I'd prefer no local newspapers at all, but if you --

THE COURT: Okay. If you prefer that, I'll put it in there.

MR. PARRISH: I would, Your Honor, just in an overabundance of caution, nor listen to any local radio news programs or local news television programs.

THE COURT: Or listen to any local radio or local television news.

MR. PARRISH: Right.

THE COURT: And take out "about the case."

MR. PARRISH: That's correct.

THE COURT: We're just asking them not to read any local newspapers and not to listen to any local radio or

television news.

MR. PARRISH: That's correct. And then in your fourth paragraph, you really take care of the residual issues there.

THE COURT: And do you have any problem changing the italics from the "about this case?"

MR. PARRISH: None whatsoever.

THE COURT: Why don't we go ahead, Roger, make those changes, print it out, and then we'll take another look at it.

MR. MASTALIR: Are we taking out all references to national now?

THE COURT: Well, yeah, I was wondering about that too.

MR. MASTALIR: We could say, Local newspapers and national news stories or articles.

THE COURT: Why don't we do the prohibition on watching any local news, and then the prohibition would only be on any national news about this case. That make sense?

MR. PARRISH: That does. That does.

MR. WILLIAMS: Yes.

THE COURT: Okay. We're off the record now.

(A discussion was held off the record.)

THE COURT: Okay. We're back on the record, and we

made some revisions to supplemental instruction number A, and I just wanted to make sure that no party has an objection to it and that I will instruct the CSOs to give it to the jurors when

the jurors decide that they'll be leaving for the day. Does the government have any objections?

MR. WILLIAMS: No, Your Honor.

THE COURT: Does the defense?

MR. PARRISH: No, Your Honor. The record should reflect that we've had an opportunity to discuss this matter amongst ourselves, also discuss it with Mr. Honken who's present in the courtroom. We have reviewed it. We reviewed the changes the Court has made to it, including the note that was sent, and at this time we would have no supplemental objection to supplemental instruction A, conduct of the jury.

THE COURT: Okay. Thank you. Anything else we need to make a record on?

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: No, Your Honor.

THE COURT: Okay.

MR. PARRISH: I should also say we have no objection to the manner in which the Court wants to pass it to the jury.

(Recess at 2:44 p.m.)

THE COURT: Okay. The defendant, Mr. Honken, is personally present along with three defense counsel and both government lawyers. A few minutes ago I was informed by my secretary of something, and I told her that she would have to tell the lawyers what she knew and that I didn't want to discuss it with her. I intended that to be on the record with the court

reporter. I wasn't -- I didn't obviously make myself clear enough because apparently she came in and told the lawyers, but I now want her to tell us on the record what she knows, and I'll ask her to grab the microphone or go into the witness box. And other than her telling it to me initially, I haven't discussed it with her.

MS. GILL: Okay. This afternoon I was approached by Deputy Clerk Suzanne who deals with the jurors, pays them, answers questions about hotels, and stuff like that. One of them called her over and said -- indicated that there had been a vote as to whether or not they were going to deliberate on Friday. The majority was that they were not. She was in the minority. She wanted to deliberate.

She then asked Suzanne if she could get some sort of permission not to have to go into work tomorrow even though they were not going to be deliberating.

She said she didn't want to go into work because her boss had said two things to her, one of which was "guilty," another one of which was "fry him." And that's basically what I was told, and then I informed Judge Bennett.

THE COURT: Did you tell them the part that you told me about that she wanted a note, because you told --

MS. GILL: She wanted some sort of indication from the Court or somebody that she did not have to go to work tomorrow even though they were not deliberating.

3944

THE COURT: Okay. Now, I would suggest that we bring in the clerk, Suzanne Carlson, and have her tell us what she

knows before we figure out what we're going to do next. Anybody object to that?

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: Sounds like a good plan.

THE COURT: Also I want to tell you one other thing on the record. I had to make a decision because as soon as Jennifer told me this, I said, I don't want to talk to you about it; call the lawyers; we'll get them over here. But then I was told that the jurors were in the process of leaving. So rather than keep all of the jurors here, I made the decision that the jurors could leave except for the juror in question. So she's remaining downstairs in case we need to talk to that juror.

Okay. Suzanne Carlson just came in the room. And, Suzanne, you and I haven't discussed this at all. I haven't had any discussion with you. But why don't you tell us what transpired this afternoon and when it transpired, where it transpired, who it transpired with, but I don't want you to use the juror's name, just their juror number if you know.

MS. CARLSON: Okay. One of the court security officers asked me to come down to the jury room, one of the jurors had a question. And this was approximately -- it was right before they were to leave, about a half hour ago maybe. I went down there. One of the jurors said that she didn't feel

3945

comfortable going back to work because her boss was making inappropriate comments to her and wondered if she could have an excuse for the rest of the day today and tomorrow because she didn't want to return to work.

I then said I would check on it, and then she went on further to say that her boss would walk by her desk and say

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3439 of 3636

"killer, killer, killer," kind of whisper, and then he would also walk by and say "fry him, fry him, fry him," and he wouldn't say it directly to her, but he would walk by and whisper that in passing.

So I told her that I needed to take her comment upstairs. She then told me that she did not want this to be broadcast in the papers. She was adamant about it not being made a big issue out of. She just wanted an excuse for work. She didn't want anyone to know who she was and that she had these things going on at work. She began to get teary eyed, and she wanted -- she said, Can you come through for me on this one? So I said I would check on it.

So I ran upstairs. I spoke with Jen, your secretary. I spoke with Carey, and I let them know what was going on. And then Jen spoke with you, and then we decided to bring everybody in.

THE COURT: Thank you.

Mr. Williams.

MR. WILLIAMS: The identity of the juror, obviously

not the name but the juror number, I don't know if we know that, but I think to make a record if we know that --

THE COURT: I don't know it.

MR. WILLIAMS: Yeah, I know. And I don't know if Suzanne knows the juror's number.

MS. CARLSON: I could go to my desk and grab it.

THE COURT: Okay. Why don't you go check just so that you can report it.

No smirking, Mr. Rogers.

MR. ROGERS: Sorry, Judge. I didn't know I was. It's

maybe a look of bewilderment that's been misunderstood.

THE COURT: I was being facetious when I said that.

MR. ROGERS: Okay.

MS. CARLSON: It's Juror Number 523.

MR. WILLIAMS: I guess I have two other things. One is I wasn't sure if I heard this correct, Suzanne, but was she saying -- was the boss saying "killer," k-i-l-l-e-r, or "kill her" or "kill him"?

MS. CARLSON: K-i-l-l-e-r.

MR. WILLIAMS: Okay. And then any time frame on when these statements were made? Did she give any more information on that?

MS. CARLSON: She did not give me a time frame. She just said that this had happened before when she went back to work on Fridays, and that's why she said she did not want to go

♀

back to work this Friday.

MR. WILLIAMS: I don't have anything else.

THE COURT: Well, what do you suggest we do?

MR. WILLIAMS: My suggestion is I think this juror has been tampered with. I don't think it's a juror that should remain on the jury. I think that that juror should be struck and we should substitute in a alternate juror. My concern is at this point the juror's been tampered with, the juror's feeling pressured, and the juror could vote for the death penalty because she feels that if she doesn't vote for the death penalty she's going to have heck to pay back at the office. And I just don't think under those circumstances -- if she's this upset and crying about it, I think we need to strike her and substitute in an alternate juror.

THE COURT: Who's going to speak for the defense?

MR. PARRISH: Yes, Your Honor. I think that's a suggestion, but it's not close to the problem that we're facing here. The depth of the problem is much greater. If it started earlier, if comments were made earlier that goes to the earlier verdict, it creates an extremely serious problem. Substituting the juror is not the answer because if it's engendered in the original verdict, that's the real problem here. And I think inquiry, further inquiry, is needed.

As I understand the comment from the deputy clerk which was our issue when we first came in, when did it start, it

3948

appeared it may have started on Fridays precluding -- preceding the original verdict.

She has a duty to disclose, and as Mr. Williams has readily admitted, it does appear to be jury tampering. It would be jury tampering that preceded the original verdict. It appears to be at least in that case. We can't say with an exact obviously. But also further inquiry should be made if it's jury tampering to the boss who has, in fact, tampered with her. She had reporting duties that were placed on her as a juror.

We're glad it happened, it's been disclosed at this point, but it seems that the disclosure could possibly have been made sooner, and not saying that she didn't not make the reporting in a timely manner, but it seems like it was almost by accident and the alertness of your court personnel that really brought it out as opposed to a juror.

And what really disturbs me, quite frankly, is, Can you come through for me on this one? That's kind of a little bit of a scary statement. So that's where we are right now. I

think the Court has to -- and we all probably need to do some research on this and see did it impact the original verdict.

THE COURT: What exactly are you asking me to do? When I say now, either today or tomorrow.

MR. PARRISH: I gotcha.

THE COURT: Yeah. I just want to be real clear.

MR. PARRISH: I think we should perhaps, Your Honor,

do further inquiry with the Court, with us perhaps, because this is such a delicate matter, submitting to the Court what questions we think if you feel like posing it to the juror rather than us as advocates to get involved in any way at this point, then follow up perhaps after you do your initial inquiry of the juror, and I think that inquiry ought to be made with us present, quite frankly, and with Mr. Honken present.

THE COURT: Absolutely. I wouldn't make an inquiry without all the lawyers and the defendant present.

Here's my suggestion.

MR. PARRISH: Okay.

THE COURT: My suggestion is that we defer until tomorrow questioning the juror. They're not going to be deliberating. She's not going to have any other contact with the other jurors because they're gone, that we bring the juror in and explain that she's not in trouble in any way because I want to try and put her at ease, just explain that she's not in any trouble but that we are going to bring her back tomorrow and there will probably be some questioning of her.

MR. PARRISH: Mr. Spies just raises a very interesting point.

THE COURT: Yes.

MR. PARRISH: And not to -- but this is a public record being made now.

THE COURT: Yes.

MR. PARRISH: We have had the anonymity of this juror. Quite frankly, if it appears tomorrow, the issues may become even more complicated with regard to her because we don't know what her job situation is, where she works or he works -- I think it's 523 -- he or she works -- I'll keep it in that context -- what pressures could be brought to bear on her or her family if this is a situation taking place during her deliberations, so it could create some fairly serious problems I think down the road with this being a public hearing now.

Now, it may be in the interest of the Court and maybe if the government has no problems with it we could perhaps discuss some resolution without it being a public hearing because I think it could involve some matters that go beyond the immediacy of the trial.

THE COURT: I'm sorry, but I'm not tracking what you're saying. What are you asking me to do?

MR. PARRISH: I think we need to close the hearing or consider that -- let me put it that way -- because of the delicate nature of the matter.

MR. WILLIAMS: Well, Your Honor, I think your suggestion's a good one; I think, frankly, we defer this until tomorrow including the decision on whether the hearing should be closed or not closed and give us all a chance to think about that and think whether a closed hearing is appropriate or not, don't take any further action on it today, let the juror come

back tomorrow, and then we can all have the time to research this between now and tomorrow and hopefully figure out what we need to do.

MR. PARRISH: The problem is with Mr. Honken's rights being obviously more important than the government's at this point because of the nature of the comments, the immediacy of the disclosure or additional disclosure by her would be in his interest, and I think if you do a balancing test, the government, after hearing the comments, would have no problem with a delay. Clearly Mr. Honken's rights are going to be implicated more seriously and adversely by a delay.

THE COURT: Well, how are they implicated by waiting till tomorrow to question the juror?

MR. PARRISH: If it's in the newspaper, it becomes a huge matter with her personally because of the anonymity issue. We don't know or we're at a huge disadvantage -- at least Mr. Honken would be -- in gathering that disclosure with regard to information that she might have available concerning her job, her work, what information she might have given because we don't know what pressures could be brought to bear at this point. And I think we should I think lean in favor of immediate initial questioning of the juror, at least to start making some record. I think the matter is of most serious -- which the Court is obviously --

THE COURT: Well, it obviously is, but that doesn't

3952

answer the question of whether we should wait until tomorrow to question her so that we could all do some legal research on it.

MR. PARRISH: Right. Had it come out, say, through --

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3445 of 3636

THE COURT: Well, let me ask you this. Do you agree that she should be discharged as a juror?

MR. PARRISH: No, not at this point.

THE COURT: Until she's questioned.

MR. PARRISH: Absolutely. And we need to know did she have this discussion with other jurors.

THE COURT: Right. Well, there's lots of things we need to know. No, no, no. I agree with you. We need to know when it started, what was said, how often it was said, if she's ever disclosed it to any other jurors. Of course we need to know all that. The only question is do we need to know that right now, or do we need to wait until tomorrow to find out that information?

MR. PARRISH: Excuse me one second, Your Honor.

THE COURT: Yes.

MR. PARRISH: I think the issue that's been brought up, Your Honor, it's obviously now in the press. There's nothing that will stop it. It will be printed tomorrow morning.

THE COURT: Now, just -- I just want to make sure I understand. How does that potentially -- what are the potential ramifications of that?

MR. PARRISH: She says, first of all, she did not want

3953

this in the papers. It has now been disclosed. She reads it. Her boss reads it. She might be facing holy hell for all we know, and we don't know the nature of her job or how it ties in. Those are questions that ordinarily during voir dire we may know and have a feel for. We don't know at this point. So it creates a broader issue for us to have to explore. That's why I believe it's important at least without any influence to get a

so-called un -- not a -- unfiltered view of this juror. And the only way we will get an unfiltered view is now. I don't anticipate that the view would be unfiltered by tomorrow morning.

THE COURT: Mr. Williams?

MR. WILLIAMS: I think if we just ram through this tonight without thinking through and looking at the research to know exactly what questions we should be asking we pose a problem or pose likelihood of actually creating more of a problem than we're solving. I don't see that the potential that it's going to hit the paper is going to resolve or we're going to exacerbate the problem we have, frankly, any more than it is right now. And I think given that, I think we're better off taking some time to look at this carefully before we just start running down this.

THE COURT: Mr. Parrish?

MR. PARRISH: You could sequester the juror. If the government feels that they want to wait overnight, sequester the

juror, and she can't go home, can't communicate with parties at all related to the matter. If they feel that strongly about it, they're just saying they want to do research, sequester the juror.

THE COURT: Mr. Williams?

MR. WILLIAMS: I guess I'm just not following what -- if she goes home, she already has instructions not to read the paper, see the press, or anything else, how going home to her family and coming back tomorrow morning is going to in any way jeopardize the process we're going through to try to figure out what to do or what the outcome of this activity is. I just

think to sequester a juror under these circumstances isn't called for. But I guess I don't have an objection to it as much as I just don't think it's necessary.

MR. PARRISH: The only issue is what would be the harm if you had follow-up questions or if anyone had follow-up questions tomorrow because her duty to report, if the statement is accurate as she told the deputy clerk, that he's been making inappropriate comments to her, would walk by her desk means that it's happened more than one time and appears to have happened on Fridays. If it happened before the verdict, the original verdict in the merits phase, there are problems here.

THE COURT: Well, there could be. I recognize that. Sure.

MR. PARRISH: Exactly. And that's our concern.

♀

3955

THE COURT: But why does that -- but what impact would waiting till tomorrow have on that concern?

MR. PARRISH: The fact that -- and I think, Your Honor, you have to cloak it in the terms of what we know now about her which is, you know, what her job duties are, not where she works, the type company, the influence that company might have on her or her family, her rights, et cetera, and whether or not if she had some opportunity through phone calls since she wasn't reporting, you know, immediately as had been your requirement that you've laid out in your instructions, did that give her some opportunity -- I'm not saying she's a bad juror or anything like that. Does that give her an opportunity to get the sort of filter at all is a different matter than what is out here right now. And I understand the ultimate issue is the search for the truth; right? As Mr. Williams likes to say it,

the search for the truth is best done untouched by other hands except the Court in this case. That's my thought.

MR. ROGERS: Your Honor, may I be heard a minute on the same --

THE COURT: Yeah, but I always have a hard time hearing you, so why don't you go to the podium.

MR. ROGERS: Thank you.

THE COURT: You can raise the podium up, please.

MR. ROGERS: This -- okay. If I know how. I was taught to drive it once. How's this?

THE COURT: Better. Thank you.

MR. ROGERS: Thank you. It seems to me that if the juror is scheduled to work tomorrow, the juror will be told to come here tomorrow instead, the juror will have to report to the job that she will not be or he will not be at work tomorrow, that that might involve some conversation with this same boss which is what we're trying to find out about anyway, and I think by questioning the juror now we can certainly do better at that than we will be able to do tomorrow.

It also seems to me that if we're going to spend time doing research on legal issues that it might be better to have more facts to start doing the research with.

MR. PARRISH: Your Honor, I guess I don't understand the government's opposition to wanting to interview her now. We interview jurors all the time on moments' notice. I don't -- I guess I clearly don't understand their objection. Jurors are talked to ad infinitum when matters come up, and we've been doing it all during the trial, but now all of a sudden they don't want to talk to a juror on what has been the most

important jury issue that has come up in the case. I'm puzzled by the government's position.

MR. WILLIAMS: Well, I don't want to have the defense trying to read anything into this other than the Court's suggestion was we send the juror home and think about it, and I don't think the defense was jumping to a conclusion that the

Court had some ulterior motive, and they shouldn't jump to the conclusion that I have any ulterior motive either. I think the Court's suggestion was simply a convenient one for the juror, and that's my only position. I think it's more convenient for the juror. If the defense thinks somehow that they're being disadvantaged by not questioning the juror right now, I don't have an opposition to that either. I just think it's more convenient to send the juror home, and I think it gives us a chance to do some research, but I don't want anybody thinking that we have some ulterior motive or we thought we have some advantage by having this happen tomorrow versus today.

THE COURT: If we bring the juror up now to question the juror, I suppose you all want me to do it.

MR. PARRISH: You're much better at that.

THE COURT: Oh, no. I don't get to question people anymore. That's the lawyers' job.

I mean, are you then going to want me -- once we find -- once we question what happened, are you then going to want me to ask questions about how, if at all, it could have affected her verdict?

MR. PARRISH: When it started would be -- I think is the -- when did it start, and I think then that may be sufficient. It may solve all our problems.

THE COURT: Well, what if it started prior to the jury's deliberation on the verdict?

MR. PARRISH: Then I think we might want to take a break. Mr. Spies would suggest, Your Honor, that that would be the starting point and then we can take a break and go from there because the juror can impeach their own verdict, so I think what we need to do -- those are the operative questions. I don't think they're extremely difficult to ask in light of the record already made. Either she's going to support that or not support it and give us a date, and we're basically done.

THE COURT: Well, I'll do the questioning, but if I'm unsure, I'm going to send the juror out and then talk to the lawyers or have a sidebar before I go any farther. So initially I'm just going to find out what is the nature of her concern and what happened, and you stick to the kind of when did it happen, what was said, and not get into at this point what impact, if any, did it have on the verdict.

MR. PARRISH: Absolutely.

THE COURT: Although I recognize that at some point we may need to do that.

MR. PARRISH: Absolutely, and I think that's the only inquiry as I understand it we need to make at this time. I'm not sure the government disagrees with it.

MR. WILLIAMS: No. I'm in agreement.

THE COURT: Now, whether or not we discharge the juror and whether or not we do that today or tomorrow or at some other time, do you have any objection if I tell the juror that I will

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3451 of 3636

give her an order indicating that she doesn't have to go to work tomorrow and that if she prefers we can fax that order to her boss so that she doesn't have to go to work tomorrow? Do you have any problem -- and that's not suggesting one way or the other whether she gets excused as a juror or whether there's ultimately a mistrial or whether it's granted. I'm trying to solve not the entire problem that we have. I'm trying to only solve this juror's concern about going to work tomorrow.

MR. PARRISH: Your Honor --

THE COURT: So would you have any problem if I told her that I will be issuing an order that can be faxed to her employer?

MR. PARRISH: Your Honor, that's an excellent suggestion, and we are in agreement with that. Our only thought is, again, the issue of some type of gag order, and we have not had a chance to look at these rules, et cetera, yet. But, you know, I know you've gone to lengths in terms of the anonymity. Would that end at this point? Is there some way you could, in fact, protect her interest or his interest in this matter?

THE COURT: It's not so much a question of anonymity -- I can't say the word -- as I see it because we won't still know who the juror is. And -- but the problem is her boss who knows who it is, whether it's -- I mean, her boss obviously knows her name and knows who it is, so it's not a question whether it's anonymous anymore. It's a question of

3960

whether this problem that this juror's having will now be disclosed to her boss.

MR. PARRISH: Right. And you recall, Your Honor --

and I don't have your ruling in front of me, but as you've explained to the jurors and also your rationale when we first started this case, this was the whole purpose you were seeking to avoid because of the nature of this case. And as I go back to your rationale just off the top of my head, that was one of the point of analysis that you put into your order, and it looks like it's being defeated by this process.

THE COURT: So what are you asking me to do?

MR. PARRISH: No, I'm just saying -- again I'm going to ask to close the hearing. The press probably won't like me much after this, but, you know, I can wear those on my shoulders, but I think we should give that serious consideration.

THE COURT: And the standard for closing the hearing is that it could affect the substantial rights of either party I believe and that there's no least-restrictive means to do it.

MR. PARRISH: None that we know of at this moment in the manner in which this has come up, and I think the notice question could be taken care of because of the emergency nature of the matter because they're in the middle of deliberation.

THE COURT: But isn't the problem that even if I close the hearing once we bring the juror in that the press has enough

3961

information now that the cat is out of the bag, so to speak?

MR. PARRISH: I did look back at some point, and I know some members of the press I've become familiar with are in the hearing. Your Honor, I hate again to suggest this, but you may want to consider some type of gag order. I'm sure I'm not endearing myself at all, but I believe it's something that we have to consider.

THE COURT: Mr. Williams, your thoughts?

MR. WILLIAMS: I wonder if a request to the press to not print this or to disclose this publicly until this case is over and if they would agree to do that, that would be a less-restrictive means if they would give us that assurance that they wouldn't do that. It's just a thought.

THE COURT: I am going to close the remainder of the hearing because I think it meets the standard for a closed hearing. Off the top of my head, I don't know the standards for issuing a gag order. I think I have a good idea of what they are, but I don't have them right in front of me, and I obviously have great respect for the First Amendment, and I'm not going to issue a gag order if I'm not sure I'm on solid grounds to do it, so I won't issue a gag order.

Does the defense have any objection to me requesting the press in the room to voluntarily not disclose this information until after there's been a verdict?

MR. PARRISH: Your Honor, I don't want to put you in

3962

that position. I think --

THE COURT: Well, I'll be glad to request it.

MR. PARRISH: But I think I would be putting you in a tough situation for you to request it. I would request it, but I don't want to put you in a position of having to request that.

THE COURT: Well, I don't mind that. I just don't want to do it over your objection. I assume you have no objection because I think you wanted me to issue a gag order.

MR. PARRISH: Right.

THE COURT: And I'm -- and you may be well justified in that request, and maybe I should, but I'm not going to

because I'm not sure I'm on sound-enough footing, but I don't have any problem making a voluntary request.

MR. PARRISH: Excuse me just a second, Your Honor.

Your Honor, we won't oppose a request. I know it's a difficult position to put the Court in, and if you don't think they meet the standard of a gag order or a closed hearing, it is a tough, tough situation for all of us.

THE COURT: I am going to close the hearing from hence forward.

MR. PARRISH: Right. Well, I think to protect the juror's anonymity and how it might affect her family, et cetera, his family, et cetera, it's just awful important I think that the press at least in this type of case understand that their responsibility sometimes might meet a situation like this where

3963

they don't print it tomorrow morning.

THE COURT: Well, I think they understand their rights under the First Amendment far better than they understand their responsibilities, but that's just a personal viewpoint. But anyway, I'm going to respectfully request that the press not disclose this matter until after the jury has arrived at a verdict, but it's only a request.

Okay. We're going to go ahead and close the remainder of the hearing and ask that everybody not part of the court leave.

MR. LINK: Can we address the Court?

THE COURT: You'll have to come to the podium. Did you say you wanted to address me? You'll have to come to the podium. I'll be happy to address you.

MR. LINK: I'm not an attorney and --

THE COURT: Why don't you tell us who you are. I know who you are.

MR. LINK: My name is Bob Link. I'm a reporter with the Globe Gazette in Mason City. We heard your request, and if you think you're in a tough spot right now, we understand the nature of this case; we followed it very closely. We have great respect for the Court, but we have editors and publishers and legal advisors who will also be directing us.

THE COURT: Oh, I understand that completely.

MR. LINK: And that's all I'd like to say.

THE COURT: No, and I appreciate that. And I do understand that. It's not your call to make, that you have editors and newspaper owners and legal advisors. I fully understand that. And that's why it's just a request.

MR. LINK: Okay.

THE COURT: And I appreciate that. I appreciate your comments very much.

MR. LINK: Thank you.

MR. FOSS: Judge, my name's Justin Foss. I'm from KIMT out of Mason City, and my request was just a clarification. Was that the entire matter that since the Court adjourned this afternoon you requested?

THE COURT: Yeah, yeah, it's just a request. Yes. You can report it fully, but I'm asking that you withhold any news reports about it until after the jury has reached a verdict in the case. And I understand that you may not either want to or be in a position to honor the request. I understand that. But it's a request. Thank you.

Is there any reason why we need Suzanne Carlson to

stay? I don't believe so.

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: No, Your Honor. We can't think of any. Thank you.

THE COURT: Actually you don't need to stay in the courtroom, but I'd like you to stay until we're done with the

♀

juror because the jurors are used to seeing you. Do you check them out? Yeah. Okay. Are we ready to have Juror 523 brought up?

MR. WILLIAMS: Yes, Your Honor. Just so we're sure, we're not going to make any inquiry at this point into any of the deliberation process or anything like that.

THE COURT: Correct.

MR. WILLIAMS: Correct. Very good.

THE COURT: Okay.

MR. PARRISH: Yes, Your Honor. And only thing I would say, I think it's important, as you said, initially to assure this juror that she hasn't done anything wrong by giving us this information.

THE COURT: Right, right.

MR. PARRISH: Sometimes they get awful nervous about it thinking they've screwed up or something.

THE COURT: Right. I think I'm pretty good at doing that, so I'll try and put her at ease. She'll be a lot more at ease than I am.

(Juror 523 entered the courtroom.)

THE COURT: Hi, Juror 523. If you'd just sit down in one of the chairs in the jury box, and we'll get you a microphone. Can we get her the microphone? Please be seated.

Juror 523, this is a closed hearing, so it's just the defendant, the lawyers, and the court personnel. No members of

the media are here, although they were here a little bit earlier.

And so I just want to tell you that Suzanne Carlson from the clerk's office reported to my secretary that you had had some discussions with her. My secretary then informed me of that. I was bound under my obligation to then inform the lawyers and Mr. Honken, and that's why we've asked you to come up.

I want to tell you right at the beginning, you're not in any trouble. You didn't do anything wrong. Nobody is in any way the least bit upset with you. Matter of fact, it was good that you said something, so it gives us an opportunity to find out what happened. And I brought you up here after consulting with the lawyers so that we could find out what's going on and what's happened, but I just want to assure you that you haven't done anything wrong. Nobody's in the least bit upset with you. But we need to know what's actually happened, and that's why I called you up.

I also want you to know that with regard to going to work tomorrow, I'll be issuing an order excusing you from work tomorrow and so that you won't have to have any contact with your employer tomorrow. We'll just -- if you give us a fax number and who to address it to, then we'll fax that to your employer so they'll know why you're not coming into work tomorrow; okay?

JUROR 523: But it's not going to state what I say.

THE COURT: No, it's not going to state what you say. It's simply going to state, Dear Employer, Juror 523 -- I'll actually have to find out what your name is and use it -- is excused from working tomorrow or something like that. It's not going to give any reason why.

JUROR 523: Okay.

THE COURT: Okay? Now, can you tell us what the situation is.

JUROR 523: I have a boss at work that likes to make comments as he walks by my desk, and I've put up with him a few days now, and he works on Friday with me, and he'll walk by and say things like "guilty, guilty, guilty," and "when are you gonna burn him" and other comments that I would just like not to have to listen to. I would love to come in and do my job. And he's the only one that makes the comments. Nobody else talks to me about it. And he doesn't really stop and talk to me about it. He just says it as he's walking by. But the comments are still made, and I just don't want to listen to him.

THE COURT: Now, let me just ask you this. Is this your immediate supervisor?

JUROR 523: No.

THE COURT: When you call him your boss, tell us how high up the chain he is.

JUROR 523: He's the top dog.

3968

THE COURT: Okay. The top dog? What would his title be if he has a title? Top dog?

JUROR 523: Chief executive officer.

THE COURT: Okay. Chief executive officer at the

company?

JUROR 523: But now it's not going to say that in the note.

THE COURT: No, it won't say that in the note.

JUROR 523: I don't want to get myself in trouble. I've been there 25 years. He's only been there a year and a half.

THE COURT: And nobody wants to get you in trouble, no. I'm just going to say, Dear Employer, the following named juror -- and then I'll give your name -- is excused from work tomorrow by virtue of her jury service.

JUROR 523: Sounds good.

THE COURT: Okay. Now, I need to know a few more things. When did your boss first make a comment to you?

JUROR 523: Monday.

THE COURT: Would that be Monday of this week?

JUROR 523: Yeah. He said the "guilty, guilty, guilty" before I even started my service. And then he said it a few more times just in passing by, but then the other comment he made just Monday.

THE COURT: Okay. Let's back up to when you first

3969

heard your boss make a comment.

JUROR 523: Right after I found out I was picked, which was -- I was in panel L. It was just like the week before I think we did it. I want to say I was picked like on a Wednesday, and by the following Tuesday we had to report.

THE COURT: Okay. Now, let's just back up a little bit just so we're clear. Do you recall exactly what panel you were on?

JUROR 523: L.

THE COURT: There's no way I would recall.

JUROR 523: L.

THE COURT: And did he make any comments to you before you reported to jury service on panel L?

JUROR 523: No.

THE COURT: Okay. Did the comments start --

JUROR 523: Well, I take that back because all along I think they've been trying to tell me to get out of it. You know, they wanted me out of the jury service, so indirectly he made comments to that effect, but I wasn't going to let that stop me.

THE COURT: What comments were made to that effect?

JUROR 523: Well, I think they expect us all to try to get out of jury duty. You know, they don't want to miss an employee because they've scaled back so far. It's a burden on everybody to have one person gone, but you know what? Everybody

3970

here's sacrificing, so I just -- I wasn't going to say anything.

THE COURT: Just tell me a little bit more about what type of comment was made to you by your boss about getting out of jury service.

JUROR 523: Told me I should have stood up in court and said hang him.

THE COURT: And do you remember when he said that? Was that before you actually reported to jury service on panel L, or was it after if you remember?

JUROR 523: It was -- I think it was -- it was the day that he found out that I was picked as one of the 18. You know, it was -- it might have been right before that, you know, when I

had to go to report as one of the 75. It was probably right in that time frame.

THE COURT: In the time frame between when you first came in on your panel and when you found out you had to report later to the larger group?

JUROR 523: Right. Well, no, the 75, the group of 75. It was in between that time frame.

THE COURT: In between --

JUROR 523: Once I was told that I was coming back --

THE COURT: To the larger group of 75.

JUROR 523: -- to the larger group, uh-huh.

THE COURT: But before you actually came back that day.

♀

JUROR 523: Probably.

THE COURT: Okay. And then was it just one comment, or was it more than one comment?

JUROR 523: It's only the one comment.

THE COURT: Okay. So then you come back on the big day where we have 76 or so jurors here, and you wind up getting selected.

JUROR 523: Uh-huh.

THE COURT: And then that date would have been --

JUROR 523: Do you want me to look at my calendar?

THE COURT: Well, no. I actually -- anybody remember?

MR. WILLIAMS: September 7.

THE COURT: That's what I was thinking, September 7.

JUROR 523: That was the day we started court, was it not?

THE COURT: I think September 7 was the date that we

brought all 75 back, 75 or so. But anyway, it's right around that time period.

JUROR 523: Okay.

THE COURT: Okay. And then on that day you would have learned that you were picked as a juror; right?

JUROR 523: Uh-huh.

THE COURT: Okay. Then when was the next comment made by your boss if you can recall?

JUROR 523: You know, he said the "guilty, guilty,

guilty" in there at one point, but I'm not -- and he said it several times, but I'm not -- you know, I just kind of blew it off and ignored him. No comment was made back to me. So I don't remember when.

THE COURT: Okay. Between when you started on or about September 7 and this past Monday, how often did your boss make any comments to you about this case?

JUROR 523: At least twice.

THE COURT: And do you remember approximately when they were in that time period?

JUROR 523: I can say one was on Monday. He wasn't there on Tuesday when I went to work.

THE COURT: One was on Monday of this week?

JUROR 523: Yes. That's when he asked me when I was going to fry him, how long's it gonna take? And I just ignored him.

THE COURT: You didn't respond in any way?

JUROR 523: Not at all.

THE COURT: Did you ever respond in any way to any of the comments your boss made?

JUROR 523: Nope. He does it as he's walking by my desk to the bathroom, so I just ignore him. Most of them will say to me -- most of the guys will say to him, You can't make any comments to her and -- but he still does.

THE COURT: Okay. Now, are there any other comments

that your boss has made to you other than what you've told us about?

JUROR 523: No.

THE COURT: I'm going to ask you to go back down to the jury room for a few minutes while I talk to the lawyers, and then we'll bring you back in; okay?

(Juror 523 exited the courtroom.)

THE COURT: Mr. Williams?

MR. WILLIAMS: I'm not aware of any further inquiry to be made at this point, Your Honor.

THE COURT: Do you need some more time to consult among yourselves?

MR. PARRISH: I think we're in agreement with Mr. Williams. I think at this point, Your Honor, we ought to start doing a little work on the issues that might have come up from the questioning but no further inquiry.

THE COURT: Do you want me to make any further inquiry?

MR. PARRISH: No, Your Honor. I think you've done an excellent job in that area.

THE COURT: I don't know about that.

MR. PARRISH: That's my assessment. Let me put it that way.

THE COURT: Let me ask this. What do you want me to

tell her now?

MR. PARRISH: I guess we could clarify the dates on it. I had down that we should fry him as being Monday. Now, those are what my notes reflect. I think there was some question about that. Did you have that down in your notes?

MR. WILLIAMS: That's what I had down too.

MR. PARRISH: Okay.

THE COURT: But I think there was a comment that he said "guilty, guilty, guilty" prior to Monday.

MR. PARRISH: Exactly.

MR. WILLIAMS: Right. That's a different issue.

THE COURT: Now, let me just check in with everybody. You don't want me to make any further inquiry of this juror at this time.

MR. WILLIAMS: That's correct, Your Honor.

MR. PARRISH: That's correct, Your Honor.

THE COURT: You have no objection to me faxing the note to the employer.

MR. WILLIAMS: That's correct, Your Honor.

MR. PARRISH: That's correct.

THE COURT: Okay. Now, I don't want to leave the juror with a misimpression about the situation of the press being in the courtroom for a while, and I'm afraid that she might have a misimpression, so I would like to be able to tell her that while this portion of the hearing was sealed and while they don't know her number -- am I right about that, that her

number was disclosed after we sealed the courtroom?

MR. PARRISH: I believe, Your Honor, Mr. Williams asked for it as part of the record, not blaming him any.

THE COURT: He asked before.

MR. PARRISH: He asked to make a full record.

THE COURT: That's right. He did. Right. Thank you. So they do know her number which is not of a whole lot of import. But, you know, chances are they're not going to comply with my voluntary request.

MR. PARRISH: Is that from representing so many of them over the years, Judge?

THE COURT: Yeah, that's right, and -- well, I won't say any more. I think they understand their rights far better than their responsibilities, but that's just a philosophical dispute. So I think I need to prepare her for the fact that there may be something in the newspapers and on the media.

MR. SPIES: Except she's not supposed to be reading that.

THE COURT: Well, I understand that. I understand that. But I -- and I'll remind her that she's not supposed to do any of that. But I think I need to tell her that there may be something. I just don't want her to have a false sense of security and feel that I somehow misled her. That's what I'm trying to avoid. We've got a big-enough problem without adding to it. And so I want to make sure nobody has a problem with me

explaining that to her.

MR. ROGERS: Judge, do you want to take another look at what the standards are for a gag order? It seems to me that something like this that occurs within the context of jury

deliberations ought to really outweigh the interest of the public in knowing it now rather than three days from now.

THE COURT: Well . . .

MR. ROGERS: And I'm not -- I never practiced in that area, so I'm not claiming expertise. But if this does not meet the standard for a gag order, I don't know what would.

THE COURT: Well, we can take a quick look at it, but the press may be gone. So I'll be glad to look at it very quickly. But what do you want to do about -- are we going to ask the juror to come back tomorrow, or are we just going to meet tomorrow and make a record as to what ought to be done?

MR. WILLIAMS: My suggestion is that we leave our options open by letting the juror know that there is a potential we may request her to come back tomorrow. Obviously we have a way of communicating with her, of contacting her.

THE COURT: Right.

MR. WILLIAMS: And I think we all need to do research to figure out if there's a need to bring her back tomorrow before we do that. If we do, we'll have time tomorrow to have that done.

THE COURT: Any objection to doing it that way,

♀

3977

Mr. Parrish?

MR. PARRISH: No, Your Honor.

THE COURT: Okay.

MR. WILLIAMS: It also lends credence to the Court's order that because we may need her tomorrow, so, therefore, she can't go to work.

THE COURT: Right, right. Okay. With everybody's permission, we'll bring Juror 523 back in.

(Juror 523 entered the courtroom.)

THE COURT: Juror 523, if you'd please be seated for a minute, I have a few other things I'd like to talk to you about.

Again, thank you for bringing this to our attention. You haven't done anything wrong. You've been a terrific juror, and it was important that we know about it, so we all appreciate that.

I did want to clarify with you that while the -- when you were giving us information it was a sealed hearing, and that will remain sealed for as long as I know. But there was some discussion about this situation when the press was present. So, for example, Suzanne came in and told us what she knew, and my secretary, Jennifer, came in and told us what she knew based on her discussions with Suzanne, and the press was here for that. Now, the press does not know your name.

I then asked the press to voluntarily not disclose any of this information or write about it until after the jury's

3978

reached a verdict. They may or may not honor my request. So there may be something in the news media about this, but you wouldn't be identified by name, and I just -- I didn't want you to be surprised if there was.

Now, you're still under the admonition that you can't read anything or listen to any reports about it. So I don't know if you'll know if there's anything written. You're not supposed to find out. But others obviously may try and say something to you, and you should do what you've done, just not engage in any conversation, not respond, walk away.

We may need to visit with you more about this tomorrow. I don't know yet. And so we're not going to ask you

to come in at any specific time tomorrow. But if you'll give Suzanne all the contact numbers that we can reach you, we'll obviously give you plenty of time to come in. I don't know if we're going to need you tomorrow or not. But we might. And I just wanted to make you aware of that.

Is there anything else that we need to talk about maybe at sidebar that I should be informing Juror 523 of?

MR. PARRISH: Oh, I'm sorry. No, Your Honor, I can't think of anything.

MR. WILLIAMS: No, not that I'm aware of.

THE COURT: Now, do you have any questions for me?

JUROR 523: I don't think so.

THE COURT: Okay. Thank you. The plan is we'll see

you -- you'll be coming back Monday for deliberations, but if we need you tomorrow, we'll let you know; okay?

JUROR 523: Okay.

THE COURT: I'd just advise you not to discuss this matter with anybody else, not with any of the other jurors, not with anybody else, and just hang in there and do the best you can; okay?

JUROR 523: All right.

THE COURT: Okay. Thank you.

JUROR 523: Thanks.

THE COURT: Good night.

JUROR 523: Night.

(Juror 523 exited the courtroom.)

THE COURT: Okay. Please be seated. Other than Mr. Rogers' request to review the standards for a gag order and issue one, is there anything else that either the government or

the defense is asking me to do at this time? That's my first question. Anything else you're asking me to do?

MR. PARRISH: It would be helpful -- Shelly has worked so hard, Your Honor, and I hate to make this request, but a transcript I'm sure for both sides would be helpful, and I think to narrow down these dates and also see if it impacted her general voir dire questioning that the Court asked. I think all of us recall that the Court asked specifically all the jurors did anyone talk to them about the case when they came back in

♀

3980

when we had the 75 people there. I'm not asking her to get that. But I think to help us focus on that area, if she would get the transcript for today ready.

THE COURT: You'd like a transcript of this entire proceeding both before it was sealed and after.

MR. PARRISH: That's correct, Your Honor.

THE COURT: Okay. And I assume the government would like one too?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. Let me ask Shelly. When would you be able to have that transcript available?

THE REPORTER: Would you want realtime uncertified or certified?

THE COURT: Let me ask it both ways. If we have realtime uncertified, we could print that out now, and when could you get us a certified transcript?

THE REPORTER: I would say within two hours.

THE COURT: How would you feel about getting it -- Shelly's worked so hard, I'd hate to ask her to work tonight. What about an uncertified transcript now and a certified

transcript by about ten o'clock tomorrow morning?

MR. PARRISH: Your Honor, we'd be very happy with that. That's more than --

THE COURT: Knowing Shelly better than that and how hard she's worked, I know she'll have it done before that. Ten

♀

o'clock tomorrow's fine.

MR. PARRISH: That's fabulous.

THE COURT: Now, are we then planning on meeting tomorrow?

MR. PARRISH: Well, I'm packed, and I was getting ready to walk out. I was calling Jennifer just to ask her, Give me the word when we can leave. She says, I was just getting ready to call you. So we'll unpack, and we'll be squared away.

THE COURT: I have eight sentencings tomorrow. Fortunately I read the PSIRs in seven of eight. I have one to go.

MR. PARRISH: You let us know what time, Your Honor.

THE COURT: Well, no. I just -- this is obviously more important. I'll see what we can do about moving some of the sentencings around. You want to just meet tomorrow morning like at quarter -- I think my first sentencing is 8:15?

THE REPORTER: Yes, Judge.

THE COURT: You want to meet at 7:45 even if it's informal -- or we can do it on the record formally -- but just meet and kind of see where we're at?

MR. PARRISH: I think that's an excellent idea. We have our research stuff still set up in our room, so we can get busy on our stuff, and I'm sure Mr. Williams -- that would be great for us.

MR. WILLIAMS: It will be fine.

♀

THE COURT: Okay. Okay. I have to check on the gag order. I've got to get the note to the employer.

Now, if I decide that I can issue a gag order -- you all -- why don't the lawyers wait around for a little while.

MR. PARRISH: That's fine.

THE COURT: Okay. And why don't we have the marshals take Mr. Honken back to his cell but not take him back to the jail yet.

MR. PARRISH: That's fine.

THE COURT: Let me try and get this gag order issue resolved, and we'll see where we're going on that. And anything else we need to do on the record at this time?

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: No, Your Honor.

THE COURT: Thank you.

(The foregoing trial was adjourned at 4:41 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR — 10-21-04 Date

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, Plaintiff, vs. DUSTIN LEE HONKEN, Defendant. /

No. CR01-3047
Sioux City, Iowa
October 22, 2004
7:44 a.m.

VOLUME 23

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

APPEARANCES:

For the Plaintiff:

C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant:

ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Please be seated. Good morning.

MR. WILLIAMS: Good morning.

MR. PARRISH: Good morning, Your Honor.

THE COURT: Okay. Let's hear your current thinking. Mr. Williams?

MR. WILLIAMS: Current thinking, first of all, is to close this hearing if it's not already closed.

THE COURT: Okay. I'm going to go ahead and close this hearing because it would potentially adversely affect the defendant's right to a fair trial. And whatever the other standards are for a closed hearing, I find that they're met in this case.

MR. WILLIAMS: Thank you, Your Honor. The next matter I think --

THE COURT: Just a second. Does the defense have any objection to me closing the hearing?

MR. PARRISH: We support that.

THE COURT: Okay. Thank you.

MR. WILLIAMS: The next step I think in this process, it appears to the government, is that we need to remove this juror from the panel currently deliberating on the penalty phase given that there's been outside contact under the Remmer analysis. It creates a presumption of prejudice, and until we

resolve whether, in fact, prejudice has occurred which we're going to need some evidentiary hearings on, I think it would be remiss for us not to at least try to limit the damage done by removing this juror, substituting in an alternate juror for the remainder of the deliberations for the penalty phase.

THE COURT: Now, let me ask you this. Have you had a chance to read the two decisions, Johnson and Webster?

MR. WILLIAMS: I've had an opportunity to glance at the pertinent portions of them, Your Honor. I can't say I've read them from front to back.

THE COURT: Let me ask you this, and we have time this morning. My secretary moved my sentencings. I think we're going to spend a while on this. We're not going to rush. But have you thought about just on this issue as an alternative relying on Rule 23(b)(3) which says, Court order for a jury of 11. After the jury has retired to deliberate, the Court may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the Court finds good cause to excuse a juror?

And I think I did have my clerks pass out to you -- under 21, 848(j)(2) (sic), it says, A jury empanelled under paragraph (1)(B) shall consist of 12 members unless at any time before the conclusion of the hearing the parties stipulate with the approval of the Court that it shall consist of any number less than 12.

♀

3987

I don't read that as a bar or read it in any way inconsistent with Rule 23(b)(3) because it says, At any time before the conclusion of the hearing. I think what that means

is you can't -- it's actually consistent with Rule 23(b). You can't do that substitution until they've begun deliberations, but once they begin to deliberate -- in other words, this 848(j)(2) is not a bar to deliberations of less than 12. It's a bar to conducting a sentencing hearing with less than 12 jurors. Once they begin deliberations, I don't see this as being a bar, and I don't know of anything else in Title 21, 848, that would be inconsistent with simply relying on Rule 23(b)(3). So I'm not sure which of the two alternatives is the best. I haven't decided that yet.

MR. WILLIAMS: Yeah, and I think you can go either way on this issue, and I don't know that the government has a position on which one's better either. And perhaps given that we have two possibilities, perhaps it's up to the defense to choose the remedy between the two of them.

THE COURT: There is some case law, you know, that we provided you, the Johnson and Webster case. There doesn't appear to be any cases that have applied Rule 23(b)(3) to this context, but I'm not so concerned about the fact that there's no case law. But I'm just throwing that out.

Okay. Anything else you want to talk about this morning?

3988

MR. WILLIAMS: Not at this point. I think we need to handle one problem at a time would be my thought.

THE COURT: Okay.

MR. WILLIAMS: I can tell you where the rest of my thoughts are going in summary form, and that is I think we need to pull in this juror today. I think we need to do further examination of her, and the government's going to request a

further evidentiary hearing including perhaps coworkers from her job, her spouse, and other people to determine the extent of the influence that's been made here to determine whether she was influenced to the point where it influenced her ability to be a fair and impartial juror.

THE COURT: Okay. But other than bringing her in today, we don't have -- even if you're entitled to an evidentiary hearing, we don't have to do that today or while the jury's deliberating.

MR. WILLIAMS: Correct.

THE COURT: But your view is under no circumstances should Juror 523 be allowed to deliberate.

MR. WILLIAMS: Absolutely.

THE COURT: Okay.

MR. WILLIAMS: And then the last thing is the government believes that it may be appropriate to sequester the jury for the remainder of their deliberations starting today.

THE COURT: Okay. Mr. Parrish.

♀

3989

MR. PARRISH: We appreciate those offers being presented by the government today, but it doesn't come close to grasping the gravity of the issue we're facing right now. And what we'd like to do, Your Honor, is we've separated the arguments into three parts --

THE COURT: Okay.

MR. PARRISH: -- that we think the Court ought to understand and consider as part of the process. We're going to address it from three angles. Mr. Rogers will be addressing it from the angle of the death penalty issue and the gravity of the matter in which we're facing. I will address the overall impact

of the juror and the various orders issued by the Court prior to this time and show how it impacts on where we are right now. And Mr. Spies will be addressing the issue of how it has affected the trial at this point and the constitutional implications and how it will impact Mr. Honken.

THE COURT: Okay.

MR. PARRISH: Thank you.

THE COURT: Mr. Rogers?

MR. ROGERS: May it please the Court. Your Honor, I want to preface my remarks by saying that I hold this Court in high respect. I think that you are and have been doing your best to balance the competing interests that have been brought before you. But, frankly, Your Honor, I am appalled by the issues as the Court has framed them this morning with regard to,

3990

well, do we seat an alternate or do we go with 12 jurors.

THE COURT: Well, I understand there are other issues, and I understand you're going to be moving for a mistrial and all that, but that wasn't my job to do that, Mr. Rogers.

MR. ROGERS: I understand that, but let me give you my global --

THE COURT: Well, what exactly are you appalled about?

MR. ROGERS: I am appalled because it seems to me as if the Court is looking for a way to continue this trial towards some sort of unstated goal of a death sentence which would withstand appeal. That's what I find appalling.

THE COURT: Well, I find your observation appalling.

MR. ROGERS: Thank you. And I appreciate that, and I invite that because as I prefaced my remarks, I have a great deal of respect for the Court, and I don't think that you're --

like I said, I think you're trying to be fair and balance the interests, but I think --

THE COURT: By starting off with these issues that the government raised, I wasn't precluding you from raising any other issue.

MR. ROGERS: I understand that.

THE COURT: But it's not my job to raise those issues.

MR. ROGERS: I understand that, Your Honor, and let me then raise them. First of all, this is a different kind of case. This is a different kind of jury deliberation. This is a

different area than that contemplated by the rule regarding substitution of jurors. That rule has not been amended substantively since the reenactment of the federal death penalty either under Title 18 or under Title 21.

THE COURT: So what conclusion would you draw from that?

MR. ROGERS: Well, let me put the whole thing in what I see is the context. There have been a series of decisions throughout this trial where the Court has been required to balance Mr. Honken's right to a fair trial and a capital trial, a fair capital trial, and the Supreme Court has recognized that death is different. There have been a series of decisions where the Court has been required to balance security concerns, the Court has been required to balance the possibility for an anonymous jury, the Court has been required to balance the possibility of closing a hearing or issuing some sort of gag order on the press in each of those instances.

The competing interest has been found to have outweighed Mr. Honken's interest in a fair trial until yesterday

afternoon when a hearing was closed after the information was already on the record, in the press, was on the Siouxland page of the Sioux City Journal this morning. It was the leadoff story on the six o'clock local news on the NBC affiliate. I think it's Channel 4.

I don't think there's any way that Mr. Honken, A, got

♀

a fair trial in the merits phase of this case and, B, can have any hope at a fair penalty phase trial under these circumstances.

The government brought up the Remmer case, and there's two of them, and they basically say the same thing, and they basically say even after a verdict that this type of contact with a juror is presumptively prejudicial. They found with no greater showing than the kind of showing we've had here, the showing of the improper contact, the jury tampering, if you will, that that was prejudicial and ordered a new trial.

Mr. Spies is going to discuss in detail the case law in that regard. But I think that we need to start off from the recognition and the realization that that is the issue here. It's not how do we go forward. The issue is can we go forward, and the answer I think in fairness to Mr. Honken and his rights to a fair trial is a resounding no, we cannot.

Sequestering the jury starting today, we haven't had a chance to consult about that, but it's obviously another locking of the barn door after the horses are way down the road. So I think that we need to look at the big picture, and the big picture is that this trial has been contaminated from before the jury was sworn and that that contamination has permeated the trial.

The decisions that have been made throughout have kept us from discovering this contamination earlier, the anonymous

jury part. They have not -- they have exacerbated I guess the impact of yesterday's revelation in terms of the media, the press. There is no way that anyone who -- we don't know who these jurors are, but they know who they are, and their coworkers and their employers know who they are. And the coworkers and employers are not subject to the Court's admonition not to read the local paper. And there's no way that anybody who has a subordinate employee who is on this jury is not looking at that paper and saying, You think that's my person? It's got to have permeated the entire process, and I think we need to start looking at the big picture and the total shambles that has become of Mr. Honken's fair trial.

So that's why I'm disturbed -- I guess appalled was a little strong -- why I'm disturbed by the focus on the end stage minutia. I'll turn it over to Mr. Spies.

THE COURT: You still haven't actually asked me to do anything.

MR. PARRISH: We will, Your Honor. We'll ask --

THE COURT: Okay. But what was the purpose of all of that if you're not asking me to do anything?

MR. PARRISH: Set the stage.

MR. ROGERS: I will make a request, Judge. We're asking for a mistrial.

MR. PARRISH: May it please the Court and counsel. Your Honor, I'm just going to address the specific points.

Mr. Spies will close at the end with the impact of the trial.

We want to go back, and I want to dovetail off Mr. Rogers' point and take the Court back, as he said, to where we are in a case that we're now trying to take a person's -- another human being's life. I think we need to start back with the voir dire, and that's my job this morning, to point out to the Court and remind us where we were -- I think Mr. Williams clearly picks up the seriousness of this matter. His remedy doesn't quite reach it, but when he says we gotta have an evidentiary hearing, you read Remmer, you read the other cases, the Tucker case from the Eighth Circuit, they said that's where you have to start. So we all know that.

The question is how do we get there and can we let this contaminated process continue. We cannot.

Let's go back to the general voir dire. The questions that were asked and now impacted just by where we are with what this juror answered, 523 answered, yesterday, these are your questions you agreed upon. Since we -- let me start with the first one.

Since we talked with you individually, have any of you been approached or -- by or conversed with anyone concerning your potential service as a juror in this case? Clearly she was approached. Clearly she was conversed.

With anyone, let's talk about who anyone is. She was approached by her boss. He told her to say, Just hang the guy

and you would have been off jury service.

Second, she was also approached throughout the trial. We don't know how many times at this point, but Mr. Williams

wants to say, Well, let's do it through a process of a hearing after this jury continues. You can't.

This is the other reason why: Because she has also disclosed that other employees were telling the boss he shouldn't be talking to her about that. That should have been reported. That was not reported.

Let's go to another question that you asked -- subsequent reaction to individual questioning -- when the 75 people were here. And again, we went on record, Your Honor, saying maybe this is not the way to do this. And we're not blaming anybody here. We're not here to cast blame. We're here to see where do we go from here with Mr. Honken's life.

Since we talked with you individually, have any of you heard someone else express an opinion concerning the guilt or innocence of the defendant or the appropriate punishment of the defendant in the event of a guilty punishment -- verdict? Guilty, guilty, guilty; killer, killer, killer; if he says something, you hang him, these are the comments this juror heard from day one of the process. Not only did she hear them, she did not report them. At least that's what we know at this point. She did not report it when we sat out here with the 75 people.

♀

3996

Now, since we talked with you individually, have any of you been exposed to any media accounts including through the Internet about the case was the other question you asked, and these are questions we proposed and you asked.

Well, if her boss didn't hear about them, her CEO who she's so fearful of her job of, if the boss didn't hear that from the press, where else did he hear it from to be able to

expose it to her, another reason why she should have disclosed, not at the 75-person hearing that we had but throughout the process.

Now, let's fast-forward, Your Honor, to your preliminary instructions. I believe it's instruction 20. If anyone talks to you about this case or attempts to approach you in any way, you have a duty. That's what you told them. Instruction 21, I'm sorry. This is the third one on page 43. When you're outside the courtroom, do not let anyone tell you anything about the case or about anyone involved with it until the trial has ended and your verdict has been accepted by me. If someone should try -- and her question is, Well, he tried; I didn't listen or whatever. That won't fly because her boss is talking to her, putting her in fear of her job. If anyone should try to talk to you about the case during the trial, please report it to me.

Judge, she never made an assertive report to you about the case. It came out inadvertently through the alertness of

your staff and how you've trained your staff to accept and deal with situations like this.

Judge, this should have been reported day one of trial, should have been reported during the voir dire process, so I think we need her voir dire exchange prepared so we can take a look at it in this most serious matter.

We also, Your Honor, have to look at if she knew --

THE COURT: Mr. Parrish, let me just interrupt you. I didn't understand that last phrase, so I think we need her -- oh, I see, her voir dire. We want a transcript of what she said.

MR. PARRISH: Exactly, to be able to review it and understand did she understand the process.

THE COURT: Right.

MR. PARRISH: And, of course, you asked them also in your general voir dire questioning to the 15 panel people in L which she acknowledged she was in, Have you read or heard anything about this case; did anyone try to talk to you about this case? You asked her on the witness stand. That was our main focus of why we went through all of this hard work to do this.

But be that as it may, those are just the beginning of the serious problems that we have here. She never made a disclosure. It slipped out. Judge, they took a vote in the jury room as to whether or not she would work or not work. She

♀

3998

lost the vote. She was in the minority of the vote. Are you going to tell me she didn't say, well, using our common sense here, we're all sitting here trying to protect Mr. Honken's rights, do we really believe with our years of experience that she didn't mention this to another juror or it didn't come up during the vote that she wanted to go home or maybe she through these jurors in two months formed some bond where she would mention to another juror, Hey, I'm a little concerned about my boss; this is what he's saying to me.

Judge, this panel is contaminated. And I think we have to look at it before we can have these people decide whether this man lives or dies. That's what we're talking about here, whether he lives or dies, and so I think we have to go back --

THE COURT: You think I don't understand that,

Mr. Parrish?

MR. PARRISH: I know you understand it, but you told us it was our job to emphasize the point. We are going to emphasize it. We're going to try to bring the Court and the government to where we believe as human beings what we ought to have. The judicial process itself is flawed. Now we're looking at a flaw within the judicial process, and we're trying to split hairs. We can't split hairs on a man's life, Your Honor, and that's what we're here to talk about this morning.

Now, be that as it may from everything that's taken

3999

place, we have another place we have to go with this exchange. These other jurors have a duty to report if, in fact, they were aware of it. They may have been aware of it as early as the guilt phase in the exchange, or maybe she wasn't being completely honest or candid with the Court, and that was not explained to the Court or to us.

So Mr. Honken never made an intelligent choice with regard to this juror. This other juror stood up and said, I've seen -- I've looked in his eyes, and that look was a look of guilt. Her boss, who she's fearful of her job, has been telling her that since day one, and she's been sitting in that jury room deliberating on the fate of this man's life. She should have told us. She was obligated to tell us. You instructed her to tell us, and she has not told us, and she sat through there through three days of deliberations without telling us that, and she sat through the evidence without telling us that, giving us no opportunity to explain or respond or strike or question her.

And as quickly as you struck the juror who made the other statement, Judge, I am totally confident had you, in fact,

known that about Juror 523, she would have been struck as fast, if not quicker, than the other juror. There's not a doubt in my mind about that.

So she did not report it. She did not tell anyone. She did not, in fact, come out and let us know. We could not make an intelligent choice with regard to what her thoughts were

with regard to Mr. Honken. Could it have contaminated the jury pool? We need to find that out. This deliberative process should be halted, suspended, stopped. This is a lot more important finding out what happened, why it fell apart at this juncture of the proceeding than trying to reach some ultimate decision, whatever that decision might be, based upon the rules you established, some we opposed vigorously and some we went along with. But that process now was not followed even with the rigidity of the rules that were set there.

THE COURT: Now, which ones did you oppose vigorously? What rules did you oppose vigorously?

MR. PARRISH: The anonymous jury. We fought it like crazy.

THE COURT: Okay. And how would that -- had I ruled the other way on that, how would that have changed this?

MR. PARRISH: Several ways. Okay. CJA issues, but it would have changed this because normally what we do as we've explained to the Court, we have our investigators get background information. We can get houses, where people live, what they look like, where they work, do they work for a construction outfit, do they work somewhere else, and what are these people like who supervise them? We would have had all these ideas in our head when we sat down with that juror.

But we're sitting down looking at a number now, so we are handicapped I believe as opposed to normal cases that I

know -- Mr. Spies, Mr. Rogers and I have discussed this, how we prepare. In a death penalty case I imagine we would have prepared a lot harder than cases that would have required life penalty.

So in that instance our approach to this jury would have been a little bit different. And we would have had a little bit more feel of this jury now as opposed to a group of numbers walking around.

Did other people talk to them? Did they go home? Did they express to their spouses some problem that this juror had expressed to them and they're glad they don't have the same situation that she's living in every day?

So these are questions that we believe a normal human being would ask in this type of situation, the most serious decision as you've told them, as each of these lawyers have told them that they will make. This is the most difficult decision they will make in their entire lives, and so the question is are we going to let a CEO who she's afraid of losing her job from impact that decision. It has to be a resounding no.

Are we entitled to a hearing? The government agrees that we are. What we differ from is do we get the hearing now and we let the process go on. I think we've outlined in the voir dire issues and in the jury selection issues and the impact on Mr. Honken's choices reasons why we think it cannot go on.

And let me conclude with a couple of notes that I made

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3488 of 3636

specifically last night about Juror 523. And this is without getting into the hearing process.

One, did she talk to other jurors? We don't know. Was she talked to? Yes, we do know that. Was she talked to during the course of the trial? Yes, we do know that. Did she report it? No, she did not. Did she violate her oath by not reporting it? Yes, she did. Did she speak about the other coworkers speaking with her boss about the fact? No, she did not.

Did she tell the Court this was going on? No, she did not. Was it taking place during the deliberation on the guilt phase? Yes, it was. Did it impact the jury on the guilt phase? We don't know because she has not disclosed it. It was only disclosed inadvertently. Did the boss get media accounts and circulate them to other coworkers during the course of the trial? We don't know. Did her boss relate to her what his thoughts might have been based upon media accounts, or were there conversations that she had with him that precipitated his conversations? We don't know. Did they take place before the guilty verdict? Yes, they did. Does that impact the guilty verdict? Yes, it does.

The question then becomes did it impact and contaminate the juror process. You don't even have to go there in the guilt phase to get to that point because we know based upon the rules you established that she never answered the

questions correctly throughout the process. And more importantly than all of that, we have no way to correct the decisions that were being made by this juror because we just learned about it right now.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3489 of 3636

I will respond later to whether or not sequestering is the proper method now. It's not. I think Mr. Rogers has clearly addressed that. It's too late. The horses are gone. We can't close the barn door. And that's where we'll leave it, Your Honor, at this point.

THE COURT: Thank you, Mr. Parrish.

Mr. Spies?

MR. SPIES: As you might imagine, defense counsel went to the mountain top last night. I don't have a great deal additional to add, Your Honor. I think Mr. Parrish has identified the problem areas that we think require not only close scrutiny by the Court after an evidentiary hearing, the dimensions of which we're not quite prepared to address, but clearly we're concerned about the juror's violation of her oath in failing to disclose extraneous communications, extrajudicial communications during the course not only of her being considered as a juror, during the course of the jury's consideration of the evidence at the merits phase of the trial, during the deliberative process and the merits phase of the trial, and now during the penalty phase of the trial and presumably during the deliberation process at the penalty phase.

The juror has been dishonest in her response to voir dire questions during the general voir dire, the panel of 75 or 76. She has placed the defense in the untenable and obviously difficult position of not being able to exercise an intelligent choice in making a challenge for cause or in being able to make an intelligent, informed decision about whether to strike her during the jury selection process.

Her failure to follow the Court's instructions is

obviously a matter of grave concern to all of us, and as Mr. Parrish and Mr. Rogers have said, we think that it has fatally tainted the deliberative process in this, the most gravest of cases.

You asked Mr. Parrish about how the issue of jury anonymity has put us in a position different than any other sort of trial, and I think we've pondered that at some length as to how anonymity has affected the course of trial.

And perhaps we can put our thinking caps on and deduce from what we heard from Juror Number 523 yesterday exactly how this may have affected her. It may have emboldened her CEO to make overtures, taunts, gestures toward her that he or she thought could be gotten away with because this juror is anonymous to everybody in the courtroom but certainly, as Mr. Parrish said, not anonymous to anyone else out there.

I mean, jurors have told their bosses. They've obviously told their family. They've told their friends that

they are jurors. In an ideal world, they would have told all of those people, Don't even talk to me about my service as a juror in the Honken case.

But we now know, of course, and we know from our long experience -- Mr. Parrish in his 30 or 40 murder trials I'm sure has debriefed jurors, and we have all learned that there are extraneous, extrajudicial contacts that take place during trial.

So the anonymity may have affected Juror 523 and the way that she was interacted with by her boss. We also are concerned about juror anonymity and piercing that anonymity in the event that we need to conduct a broad evidentiary hearing not only on the influence of Juror 523's interactions with her

coworkers and her boss but also on the influence of Juror 523 on the other jurors during the deliberative process and the scope of that.

So in sum, we're concerned about the nondisclosure, juror perjury, violation of the oath, dishonesty during the jury selection process, the impact of her dishonesty and nondisclosure on Mr. Honken's ability to make an informed decision during jury selection, and on obviously our approach to other jurors had that disclosure been made either during the jury selection process or during the course of deliberations at the merits phase or the penalty phase.

We believe that based on United States versus Jim Guy Tucker, United States Court of Appeals for the Eighth Circuit

decision in 1998 reported at 1307 F. 3d 1016, that Mr. Honken is entitled to an evidentiary hearing on both the nature of the extraneous contact with Juror 523; the scope and dimensions of it; whether Juror 523 is, in fact, being completely candid with the Court about the number of contacts; the nature of that contact; the extent of that influence on the juror with other prospective jurors.

As Mr. Parrish rightly pointed out, there was some discussion about whether the jury should deliberate today. There was a vote taken about the inconvenience or convenience of further deliberations today on all the jurors. We're concerned that Juror 523 revealed that her boss was going to have his way with her or her way with her if she didn't report to work.

And I think even the transcript that our reporter prepared for us revealed that -- or maybe it was Ms. Carlson in her colloquy with the Court and counsel yesterday where this

juror, 523, implored the clerk, Can you help me get out of this? That is graphic evidence of the dimensions of the concern that this juror has, and it may be reflective of the extent to which she revealed this concern to other jurors. And again, only with an evidentiary hearing can we know the full extent of that.

So in sum, Your Honor, we believe that having only pulled on this thread a little ways and not knowing what's going to happen when we keep pulling on it, how much of Mr. Honken's rights to a fair trial and due process are going to be unraveled

4007

by what started out yesterday with just a random comment from a juror to the clerk, and when we start pulling on this thread, it may be that Mr. Honken's rights to a fair trial, due process of law, the effective assistance of counsel, his right to a jury of his peers untarnished and untainted by outside influence is going to come completely undone.

And at the very least, if this were a garden-variety drunk driving case, we'd have the duty of an inquiry into this. But we've got our guns loaded, and we're ready to go on this. And we want to pull this thread. We have to pull this thread.

THE COURT: Okay. Why don't you get specific and tell me exactly what you're asking me to do.

MR. SPIES: Well, what we're asking you to do, Your Honor, is to commission us to find out the scope of the evidentiary hearing that we are entitled to.

Now, here's the other way that we think that the jury anonymity and the posture that we're all in affects us. Should we halt jury deliberations while we conduct this evidentiary hearing, or should we at least halt deliberations while we figure out what we're going to do with this evidentiary hearing?

It may be that we need to have all of the jurors examined under oath to determine not only the knowledge that they have about Juror 523, the comments that she heard from her CEO, whether those comments were discussed with one or more other jurors, whether other jurors have been subjected during the vote on

whether to deliberate on Friday about this matter and whether other jurors expressed similar concerns, because we know it was a split vote, that Juror 523 reported she was in the minority, and it may have been that these other commitments that the jurors reported in their note to the Court were commitments that their bosses said, You better get here on Friday and do your job or you're going to be in big trouble; and Mr. Honken be damned, you be here on Friday. We don't know what took place during that vote on whether to deliberate.

So what I'm asking the Court to do is this: Give us a reasonable opportunity to determine the scope of the evidentiary hearing that we believe is compelled by United States versus Tucker; suspend deliberations by the jury in the penalty phase pending that evidentiary hearing; come up with some method of insulating this jury from further contamination; and once we are armed with the evidence and the perspective that we so desperately need from Mr. Honken, then determine what we're going to do.

But I think you can see down the road where we're headed. But granted, defense lawyers I think are notorious for perhaps having an altered perspective, but we're extremely concerned about this, and I know Mr. Honken is extremely concerned.

THE COURT: Well, contrary to Mr. Rogers' opening

remarks, I'm extremely concerned about it. I didn't get much

sleep last night.

MR. SPIES: No, and we know you were, and I could see it on your face yesterday.

THE COURT: And as soon as it was reported to me, I could envision the magnitude of the problem which is why I immediately brought it to your attention and didn't just brush it off as a "juror needs a note/excuse from work" problem. So are you actually moving for a mistrial right now?

MR. SPIES: I can forecast that we will move for a mistrial, but I think that we haven't been able to draw a bead on the full scope of the problem, and I think we need to be armed with that information.

THE COURT: So I'm not trying to put words in your mouth. Is it your view that you need the evidentiary hearing before you can actually move for a mistrial?

MR. SPIES: That's right.

THE COURT: So you're not actually moving for a mistrial at this point.

MR. SPIES: No.

THE COURT: But with the assurance that you will be at some point.

MR. SPIES: Yes.

THE COURT: Okay. Anything else you'd like to say?

MR. SPIES: Thank you. No.

THE COURT: Thank you.

Mr. Williams.

MR. WILLIAMS: Your Honor, I understand the defense's concern, but it's replete with a lot of speculation, a lot of speculation about what has happened, what may have happened, what may have influenced them, what impact, if any, the anonymous jury had on any of this stuff. I'm not in any way suggesting that they don't have a right to be concerned about this, but there's a lot of speculation in there and a lot of --

THE COURT: They have more than a right. They have a duty to be concerned.

MR. WILLIAMS: Absolutely.

THE COURT: Right.

MR. WILLIAMS: And it's just a parade of horribles at this point that has been espoused without any real facts behind it which I think is also the reason they want an evidentiary hearing. But I think there's a couple different issues we've got going here.

One is we have a juror who has potentially been impacted, potentially been impacted to the point where she was an unfair juror, potentially to the point where the Court needs to declare a mistrial. We don't know. There's a lot of things we have to look into.

But at this point the only information we have is that this one juror had passing comments made to her by a guy who had only been at that plant or at her factory or at her job for a

♀

year and a half while she's been there for a long time and her response was, I blew it off, his comments. While she may have been impacted, there's no evidence and no suggestion that her personal situation at all impacted the rest of the jury.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3496 of 3636

Absent some evidence of that, I don't think there's a basis for stopping deliberations or to conclude or jump to the conclusion that the rest of the jury's been in any way improperly influenced by what may have happened to this individual juror.

I think that by pulling in that juror today and asking her some pointed questions including, Did you talk to anybody else on the jury about these issues; did you relate this to anybody else? If the answer to that is no, then I think the Court can conclude at this point this is an individual juror problem, we move forward with deliberations by substituting in another juror, and then we can look back as the defense wants to -- and we should -- to determine if the problems with this juror were so serious that the entire trial's been jeopardized.

But I think that's something that is separate from the question about whether we can move forward with the jury we have right now.

If we call her in and she says, Yeah, I did share this with the other jurors, then I think we need to pull in the other jurors, question them to determine if they, in fact, were told about this and whether -- you know, how often, when, and so

♀

forth to determine if that impacted them.

On the other hand, if she says, No, I didn't share this with anybody else, then I think we move forward with the jury we have at this point absent her, either substituting in an alternate or just going with the 11.

THE COURT: Let me ask you about one thing you said. You were talking about bringing the jury in, whether they were told about this and whether -- you know, how often, when, and so

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3497 of 3636

forth to determine if that impacted them. I see. Okay. Because I think we can ask questions about what did they hear, how often did they hear it, when did they hear it, who did they hear it from, and all of those questions. I don't think we can ask a question about the impact, though.

MR. WILLIAMS: Absolutely.

THE COURT: Okay. Well, I haven't read the Tucker -- Jim Guy Tucker case since I think it was decided, so I want to read that. I'd like to take a recess.

MR. WILLIAMS: The Tucker decision, just to alert you, doesn't help much other than it kind of tells you what not to do.

THE COURT: In situations like this, that's sometimes as helpful as what to do. I think you need to know both, but what not to do is helpful too.

MR. PARRISH: Your Honor, there are a couple of other cases. You might want to look at the Mattox case. That's 146

U.S. 140, 13 Supreme Court 50. That's an 1892 capital case, and it quotes -- and then there's a Stockton v. Virginia case, 852 Fed. 2d 740 -- that's a Fourth Circuit case where a defendant was granted a new trial during the punishment phase where they'd gone to a diner and they said to the jurors -- the owner said, I hope they fry that son of a bitch, and they gave him a new trial in that case. And then the Remmer case, as both Mr. Rogers and Mr. Spies has said, both address the fact of the hearing.

THE COURT: Do you have a cite to the Remmer case?

MR. PARRISH: Yes, sir, Your Honor. It's 347 U.S. at 229, 350 U.S. 377.

MR. ROGERS: Same case after the remand.

MR. WILLIAMS: There's two Remmer decisions.

THE COURT: Right, yeah. Anything else before we take a recess?

MR. WILLIAMS: No, Your Honor.

MR. SPIES: No, Your Honor, but I think you'll see the Jim Guy Tucker case cites a lot of these cases, and you'll find it pretty helpful.

THE COURT: Okay. Why don't we take a recess for about an hour and then come back at 9:30 and have further discussion about it; okay?

MR. SPIES: Thank you. We appreciate your time this morning, Your Honor.

THE COURT: Thank you.

MR. WILLIAMS: Your Honor, if we can just -- I don't know if the Court wants to do this or not, but I don't know how far this juror's away. I don't know if everybody's leaning toward the idea of talking to her today. Should we make a preliminary contact with her to suggest she's going to have to come in at some point and give her some notice or not?

MR. PARRISH: Oh, I was just responding to his, Your Honor. My thought is that I think it's too big a matter -- and I know the Court's saying we shouldn't rush through it, but I think we ought to be thinking about Monday from our interpretation of those cases and what we're entitled to as the scope of evidentiary hearing if the Court decides to do it. I see no need to do it this afternoon.

THE COURT: Well, why don't we talk about that at 9:30.

MR. WILLIAMS: Very good.

THE COURT: Okay? Thank you.

(Recess at 8:33 a.m.)

THE COURT: Please be seated. We are still in closed session. Is that the request of the parties, Mr. Williams?

MR. WILLIAMS: Yes, Your Honor.

MR. PARRISH: It is, Your Honor.

THE COURT: Okay. Mr. Williams, any further thoughts?

MR. WILLIAMS: Frankly, no, Your Honor. I think our position remains the same. I think we pull in this juror today.

♀

We ask her as many questions as we can including whether she talked to any other jurors about this matter, and then we go from there.

THE COURT: Well, when you say we ask her as many questions as we can, are you talking about turning this afternoon into a evidentiary hearing on --

MR. WILLIAMS: We can approach it a couple different ways. One is we could have a limited evidentiary hearing to determine the extent to which she communicated any of these matters to the rest of the jury. And if the defense insists at that point that we delay any further evidentiary hearing, then I suppose we could do that.

The government's prepared to go forward and do a full evidentiary hearing with regard to this juror, although I don't think that necessarily completes the evidentiary analysis. But at least with this juror we can fully question her concerning these statements again, when and how they were made, what other statements may have been made to her, what statements she made to other people outside of the jury, if any, concerning these statements and so forth. I think there's a whole host of

questions that need to be asked of this juror. But we could approach it two different ways: Limited evidentiary hearing or a full one at least on this juror today.

THE COURT: Okay. From the defense? And I'll waive the single-lawyer rule.

MR. PARRISH: Thank you, Your Honor.

MR. SPIES: Your Honor, I have to apologize to the Court. Last night in my hurried reading of the United States versus Jim Guy Tucker case, I think I failed to appreciate the Eighth Circuit's consideration that the issues -- the factual issues of the case.

Having reread it over the break and looking now at 137 F. 3d starting at 1032, this is where the Court of Appeals distinguishes the analysis in weighing allegations of cases in which a juror considers extraneous factual information as opposed to the situation in which a juror has been subjected to intense emotional pressure.

And having reread that case and those provisions during the break, the defendant now moves for a mistrial on grounds that the record is sufficiently complete based on what Juror 523 said yesterday about being pressured by her boss before the group of 75 to get out of jury service by saying, I want to hang him; to the comments made by -- to Juror 523 by her boss, Guilty, guilty, guilty; by statements made by her boss on repeated occasions; by statements made by her boss, Fry him, or, When you gonna burn him?

The Eighth Circuit said at 1032, Contamination of a different kind occurs when, rather than being exposed to a fact not in evidence, a juror is subjected to psychological pressure

by an outsider trying to coopt that juror's vote. In such a

case, the effect on the particular juror is intense and can be harmful to the litigants, even though the rest of the jury remains unaware of the impropriety and even though no extraneous evidence is admitted.

And then the court in evaluating the Remmer versus United States case said the Supreme Court reversed holding that the bribery attempt did indeed affect the state of mind of the one juror involved and that this deprived the defendant of a fair trial.

So the court further analyzes additional cases in which that a reasonable possibility that the extraneous contact affected the verdict and the emotional pressure brought to bear on one juror is sufficient to scuttle the defendant's right to a fair trial.

The record is sufficient here, Your Honor. This Court has the ammunition, the right, the duty to declare a mistrial.

THE COURT: Let me ask you this, Mr. Spies, on a technical issue. Is it actually a mistrial once the jury's reached a verdict, or is it a new trial? It could be a mistrial with regard to -- this is just speaking hypothetically.

MR. SPIES: Yeah.

THE COURT: Seems to me it could be a mistrial with regard to the penalty phase, but do I have the ability to order a mistrial --

MR. SPIES: Oh, I see what you mean. The trial has

already taken place.

THE COURT: -- at merits phase because they've actually reached a verdict.

MR. SPIES: Yeah. My shirt sleeve opinion is the Court would have to order a new trial on the merits phase because the contamination occurred prior to and during the merits phase.

THE COURT: Yeah, well, that's not the issue. The issue is what's the remedy. Is it a mistrial or --

MR. SPIES: Right.

THE COURT: Right.

MR. SPIES: So I misspoke. It should be a new trial.

THE COURT: Well, I'm not sure, but I would take your motion for mistrial as a motion orally amended as a motion for new trial.

MR. SPIES: Thank you.

THE COURT: I'll be happy to hear from any of the lawyers who want to add to it. That's fine.

MR. ROGERS: In the alternative, I assume mistrial; in the alternative, new trial. Is that -- just to cover our bases since we have not researched that issue?

THE COURT: Right.

MR. ROGERS: Thank you.

THE COURT: Mr. Williams?

MR. WILLIAMS: I think it's premature. The Tucker

case stands for the proposition that in that case there was an incomplete record, and in this case there's an incomplete record. We know from this juror, far from the intense psychological pressure the defense wants to characterize this as, she repeatedly said in her limited questioning yesterday she

ignored it, she ignored it and blew it off. And it at least is at this point an ambiguous record on the extent to which this juror was influenced.

I think we're still in the same position where I agree with the Court's analysis, to move for a new trial as to the guilt phase. They can move for a mistrial as to the current penalty phase. But given the status of where we are in this case and how much has gone into it, if we can protect the current jury who's deliberating minus this juror and not allow them to be contaminated and absent some evidence that they have been contaminated -- and there is none on this record -- they should be allowed to deliberate.

Now, if we're all wrong, if on appeal or if on review you look at this and you decide we're wrong and that even the penalty phase was contaminated, if after an evidentiary hearing after deliberating we question them and they say, Yeah, she passed along those comments to us and we all thought, yeah, well, let's do it, then we're all obviously in a different boat and we have a new trial. At this point we don't know the answer to those questions.

4020

I think the more prudent and practical solution at this point is to try to determine if we can salvage the current jury we have if they've not been affected, allow them to deliberate, and then obviously we are all going to be doing a lot of work on this case after this to figure out the extent to which these comments may have done damage to the defendant's right to a fair trial. That's my suggestion.

THE COURT: Mr. Spies?

MR. SPIES: Well, with all due respect, I think the

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3504 of 3636

government is missing the point. The point is --

THE COURT: That phrase has kind of lost its meaning today, but in any event . . .

MR. SPIES: I'm sorry?

THE COURT: That's all right.

MR. SPIES: Okay. Well, I think the issue's the integrity of the judicial process and the defendant's right to a fair trial. The Eighth Circuit addressed the very concern that Mr. Williams raised in pointing out that even -- and it cites a Fourth Circuit case again at page 1032 in which a -- it was a habeas case but even where the juror exposed to this extraneous influence did not tell the other jurors about the incident and testified that he, the juror, listened to all the evidence and based his vote on the evidence. The Fourth Circuit said that's not good enough, that if there's a reasonable possibility of an influence --

♀

THE COURT: But, Mr. Spies, that goes to the question of whether or not you're ultimately entitled to relief. It doesn't go to the question of the timing of the relief.

MR. SPIES: Well, the timing of the relief was I think dictated by the posture of that case. I mean, that came up in a habeas case.

THE COURT: Right. But I think what Mr. Williams is suggesting, that the case can proceed to verdict and everything can be handled on post-trial motions. I understand that's not what you're requesting.

MR. SPIES: Yeah. Well --

THE COURT: But the issue that you raise, it goes to the merits of whether or not you're entitled to relief it seems

to me, not the question of should there be a new trial granted now on the merits phase and a mistrial on the penalty phase or should the case be allowed to continue and then look at it post-trial for all of the possible options that there could be post-trial.

MR. SPIES: Here I think is what our position is: Our position is that the record at this point based not only on Juror 523's testimony to the Court yesterday but on the clerk's statement to the Court that this juror said, Can you help me get out of this -- she did not want to go to work today; she was afraid of what her boss was going to do -- the record is sufficient at this point, Your Honor, that it's the defendant's

position for this Court to stop the train.

THE COURT: Mr. Williams?

MR. WILLIAMS: Your Honor, two things. One is that there's an Eighth Circuit case, United States versus Bohr, B-o-h-r, 521 F. 2d 1294. It's an Eighth Circuit case from 1978. And it says that the preference is -- when a juror is subject to outside influences and that becomes known to the Court during some recess or some other matter, the preference is to substitute an alternate juror and to proceed.

The record as it sits right now is that there's nothing, nothing, to indicate the rest of this jury has been affected by what has happened to the single juror. Whether what's happened to this single juror is sufficient for a new trial is a separate issue from what we need to do at this point. The defense may be right. We may have such a problem that we need a new trial, but we don't know that at this point.

We also know that this analysis is subject to harmless

error analysis and, in part, harmless error analysis on the weight of the evidence. The Eighth Circuit has said before that there was sufficient evidence based on simply the sentencing transcript to find that the defendant killed people. The government will maintain that there was overwhelming evidence of the defendant's guilt in this case, and we will have asked this Court and, if necessary, ultimately the Eighth Circuit to analyze what may have happened to the single juror against the

avalanche of evidence that we presented in this case showing the defendant committed these murders.

So we are far from resolving the issue about whether a new trial is necessary. I think we need to figure out right now what do we do with this jury, and the government's made its recommendation on where we go.

THE COURT: Mr. Spies?

MR. SPIES: I don't think we have anything additional to offer, Your Honor.

THE COURT: Okay. Here's what I'm going to do: I'm going to take your motion for mistrial, slash, new trial under advisement. I'm not going to rule on it at this time. I plan on proceeding with the penalty phase, although I haven't decided whether to rely on the Rule 23 and go with 11 or use a substitute alternate juror.

I propose that we bring the Juror 523 in this afternoon solely to -- and just hear me out, and then I want you to respond to what I'm saying. This is a tentative program. We bring Juror 523 in solely to ascertain if she told any of the other jurors anything about her boss's comments. Whether she says yes or no, I'm open to the possibility then on Monday of

bringing each juror in individually and asking them individually.

I'm also open to the possibility of some further cautionary instruction, although that would, I think, depend on

♀

what Juror 523 says and, if we question each of the 11 jurors individually, what they might say.

And when I say the 11 jurors individually, it could be 12 jurors individually if I ultimately rule to substitute.

And then I think there will clearly be post-trial motions. There will be an evidentiary hearing. There will be an opportunity to bring the juror in in the context of an evidentiary hearing and fully explore everything and then take a exceptionally hard look at this on the post-trial posture of the case. So . . .

MR. WILLIAMS: That procedure is quite acceptable to the government.

MR. PARRISH: Let's go back again to yesterday afternoon when I said let's stop the juror now before she gets away because what's going to happen to the public did, in fact, happen. The government was opposed to it. Our position is let's take the juror now; let's find out what she knows. I even suggested sequestering. Again this morning the government comes in and says sequestering the whole jury may not be a bad idea.

There's a symmetry working in this court right now where experience is really I think something that the Court ought to look at closely here in its evaluation of what may be best for everyone. And I know the Court doesn't like to go there sometimes when I bring that up, but it's not the fact we have not been here before. We have been here before in many

other cases at this same juncture. I cannot count the number of cases where this experience that we're experiencing right now, not where a person's life is at stake but where, in fact, life penalty is at stake.

But the question I think we all have to ask us in this symmetry, do we want to be here when a jury comes in that we can take without throwing up and being true to ourselves and true to our systems and what we believe this system is all about and for 41 years we've had in this state and be happy to resolve this on post-trial motions? I think we all have to take a good look inside of ourselves and see what's out here and see what we're about to do.

But I say that as a preface to this. We have not begun to see -- and this is my prediction for the future, same as I made the prediction when we brought 75 people in here and we tried to go through these questions with them -- there will never be so much backtracking or minimizing as this Court will see once we start the hearing process, as the Court expressed some doubt itself yesterday as to whether or not headlines being presented out will stop these other 11 jurors or other alternates from reading, jury tampering being an issue. They will know about it. The anonymity protects them, and Mr. Honken will have the most difficult job now of exploring that bubble and finding out what's inside of their heads as they go through this process. It will become so difficult.

4026

Had we not insisted yesterday that that juror be

questioned, if she'd walked in today, it would even be more difficult to have gotten those questions out. And you can see from the transcript how she began to minimize what her boss was doing as opposed to what she told the jury clerk.

What's going to happen next week if we do have to accept the, which we will obviously, overruling of the mistrial motion and we go in and do the hearing, this is what we're going to have to do, Your Honor. It's not just talking to this one juror if the Court decides that's the standard. I think Mr. Spies' standard as he's laid out in the Tucker case is the true standard in the Eighth Circuit.

THE COURT: Well, I haven't ruled on what the standard is.

MR. PARRISH: I understand.

THE COURT: I haven't ruled on what the scope of the evidence would be in the hearing.

MR. PARRISH: Absolutely, Your Honor.

THE COURT: I'm saying it's inappropriate to do that hearing now. That's all I'm saying. You disagree with that. I understand that.

MR. PARRISH: Right. But let me tell you why --

THE COURT: Okay.

MR. PARRISH: -- and in terms of where you lay out the time span here and should deliberations keep going. If 523 is

4027

brought in today, we're not going to be prepared because we're in territory that we don't understand or fully appreciate as you can tell from the progression of this hearing. I'm not sure any of us do. We're all grappling with our experiences right now.

It seems to me that these coworkers are going to have

to be brought in. It seems to me her CEO is going to have to be brought in. It seems to me that she's going to have to be brought in to explore who else she talked to other than the clerk of court saying, Can you help me out? Did she talk to her family about it and other people? That's the extent of this hearing. Then we're going to have to find out from these other jurors. We're not prepared, I don't believe, to make this inquiry this afternoon, and to do a piecemeal inquiry is going to make it even worse.

THE COURT: I just disagree with that.

MR. PARRISH: I understand that, Your Honor.

THE COURT: I think the appropriate thing is -- just so that I'm clear is to find out now if Juror 523 said anything to the other jurors and then in post-trial proceedings fully explore everything that you've indicated.

MR. PARRISH: Right. But post-trial means that somewhere along the line in this process that we know now is a abomination of the system, are we going to allow inside of ourselves, inside of who we are and what we represent to the system, going to allow a verdict to walk in under these

♀

4028

circumstances? I know myself -- and I can only speak for my own heart.

THE COURT: Well, you reached a conclusion already about the circumstances where I haven't.

MR. PARRISH: I understand that, but the process is what we're --

THE COURT: And the proper -- well, you just make any other record you want.

MR. PARRISH: Right. And I'm saying in that process

are we comfortable -- and obviously you're saying you may be -- with letting the process continue knowing that there was a juror on there based upon the record that's made at this point with those kind of questions when a man's life is at stake, and I guess that's the question we ultimately have to answer if we move it to post-trial because standards change, positions change. We're finding this out right now. It's not like we're finding out post-trial. We know now what it is. It's not like in Jim Guy Tucker --

THE COURT: There's a lot of things we don't know because there hasn't been a full evidentiary hearing.

MR. PARRISH: But we do know, Judge, that she said, Fry him. We do --

THE COURT: And it may be enough, Mr. Parrish, on the record yesterday to ultimately set aside the verdict and grant a new trial. I understand that. But that's not a decision I'm

going to make this morning.

MR. PARRISH: But it is I believe also enough to stop any further deliberation with regard to the penalty phase.

THE COURT: Do you have any case that suggests that I should stop the deliberations?

MR. PARRISH: We don't have any case that suggests that, but on our good common sense, our experience, what we believe that this system is all about, what we feel is a comfort level for ourselves when a human being's life is at stake, these are the things when all law runs out that we as human beings in this state have been taught to believe in. This is when we have to look inside of ourselves and see do we want to sit here with that in our hands with this process flawed the way that it

appears to be flawed and how it continues, that flaw continues without being corrected.

The boat is not sitting upright at this point. It's tilted. And I think the process is important, Your Honor, but when we discover for ourselves a flaw in the process, the question becomes, you know, what do we do? Should Mr. Honken be required at this point with his life at stake to let 11 people go forward? Should he be required for us to give him advice to, okay, let an alternate on when you might be going in front of a contaminated jury? Of course, if you tell us we have to do that, we have no choice. Obviously we have to do it. But we all know -- even Mr. Williams has acknowledged when he first

came in this morning -- that the process was skewed to some extent right now.

THE COURT: We have a super serious problem --

MR. PARRISH: We do.

THE COURT: -- that may -- that may -- if I were to rule on it today or next week or next month could very well result in a complete new trial. I understand that. Our disagreement is whether I should rule now or whether I should take everything under advisement, let the jury continue with their deliberations, and then examine it post-trial. That's -- and I just disagree with you as to how to manage the rest of the trial.

MR. PARRISH: Right, and I understand that, Your Honor, but you said a couple of things, one that you said yesterday. You said they're not deliberating now which gave us some sort of safe harbor. If you put them back into the deliberative process, there's no longer the safe harbor. Then

if you move it into the post-trial situation, the standards change. The standards of the new trial changes. The standards of what you can do as a remedy changes. The burden increases on Mr. Honken at that point. That's -- I'm sure that's why the government wants us to go there, and I'm not -- we're not saying there's any ill will or anything like that.

THE COURT: Well, Mr. Parrish, I'm not sure you're correct when you say the standards change because Mr. Spies I

think conceded -- and I'm not even asking for him to concede anything at this point because we -- nobody should concede anything nor do I deem it being conceded -- that it actually is a new trial standard now with regard to the merits. So if I make that decision today or I make it a month from now, the standard does not change.

MR. PARRISH: Well, there's a different standard between a mistrial motion and a new trial motion.

THE COURT: But he told me that it was really a motion for new trial because the verdict's already been reached.

MR. PARRISH: Right, and I think Mr. Rogers talked about the fact that it could be a nebulous area that we have not really fully explored because if it contaminates the first part of the trial and she didn't disclose it --

THE COURT: Then the second part is obviously contaminated.

MR. PARRISH: True. But is the first part so contaminated that it must meet -- which standard do we look at? The mistrial standard? You know, it's almost like the dismissal and the mistrial and the new trial standards. You know, those are the things that we haven't fully fleshed out, so what do we

need to know? And I guess the question is do we really need to do this this afternoon? Do we really need to get the jury back on Monday morning? Can't we have time considering what we found out today to come in with some refreshment in our minds and

hearts and spirits on Monday morning without this jury running? You even said at one point that the jury is not deliberating to the extent -- and I don't have your exact words here -- that -- and I used it as a safe harbor period. That's what I was . . .

THE COURT: Okay. Mr. Rogers.

MR. ROGERS: Thank you, Your Honor. First of all, I want to apologize to the Court because one of the things that you did this morning that upset me has triggered some thought in my mind along with the discussion we've had more recently.

THE COURT: Before you say anything, I want to just say something if I may.

MR. ROGERS: Sure.

THE COURT: I fully expected you all to move for a mistrial. That came as no surprise. I simply started with the government because I usually start with the government. They're the first party. And the government could have moved for a mistrial, but I didn't expect that they would. So I was talking to them about the juror replacement issues. I think you interpreted that as somehow I've made up my mind that this -- but my mind is not made up about any of these issues.

MR. ROGERS: Good.

THE COURT: It is an incredibly serious matter.

MR. ROGERS: I appreciate that, Judge, and I know you appreciate --

THE COURT: Well, I'm not going to predict what I'm

going to do on post-trial motions because I don't know everything yet. But this is -- this is the most grave issue that has ever arisen in any case that I've ever had, and that would be true if it was a, quote, routine drug case. This is a death penalty case. I understand the magnitude of it.

MR. ROGERS: I know that, Your Honor. What I --

THE COURT: And I realize you don't like a lot of my rulings, and the government doesn't like a lot of my rulings. I'm sure they were just thrilled about my ruling on residual doubt and other rulings that I've made. And we can revisit those. I don't think it's particularly productive. Apparently you did. That's okay. I want you to make whatever record you want to make. Nobody in this courtroom wants you to review each and every one of my rulings in the Court of Appeals more than I do. One of the great things about being a district court judge is I don't bind anybody, including myself. I'm free to change my mind. I don't bind anybody.

And so I have never shied away from having parties appeal or have my rulings reviewed. I find great solace in the fact that I'm not final. I have tough decisions to make often without a whole lot of reflection, sometimes with reflection. I understand that I'm wrong, and nobody wants you to appeal my rulings more than I do. And I mean that from the bottom of my heart. I've always felt that way as a judge. I have encouraged in written rulings parties to appeal my rulings, but I have to

make the call.

MR. ROGERS: I understand that.

THE COURT: That's what I get paid to do. Whether I'm right or wrong, I have to make it to the best of my ability. And I will tell you I have done that in this case. I'm not saying I've been right. I've done it to the best of the limited abilities that God has given me.

MR. ROGERS: What I'm trying to say is that the standards of review vary when we're talking about a motion directed to a verdict which has been received as opposed to a motion directed to a mistrial. And you pointed that out to Mr. Spies, and I, without doing further research and not conceding anything, think you may well be correct about that with regard to the merits phase. However --

THE COURT: But let me ask -- okay. No. Go ahead. I guess my point was if the merits phase is invalidated, the penalty phase has to be invalidated.

MR. ROGERS: That's correct. But if the merits phase is not invalidated, that does not mean the penalty phase should go forward. And what I'm suggesting is that the Court should take a long, hard look at granting the motion for mistrial with regard to the penalty phase and, therefore, setting a post-verdict hearing with regard to the guilt phase, the merits phase.

And that is what, in fact, the statute that you cited

this morning that got me all in a lather contemplates because you look at section 848(i), and it talks about the penalty trial being before a jury which is in subsection (A), the jury which heard the merits phase, or in subsection (B), a jury empanelled for that purpose if, and if you look down to little Roman numeral 3, the jury which determined the defendant's guilt has

been discharged for good cause. And that sounds awfully much to me like the standard for a mistrial.

If the jury is discharged for good cause -- and in addition to the things which were established with Juror 523 yesterday, the good cause for discharging this jury includes the publicity which has occurred overnight and between the closing of the hearing yesterday and your futile request to the media which was also, by the way, reported in the Sioux City Journal as you may notice, I believe, Your Honor, that the substance of those media articles are a fit subject for judicial purpose for the purpose of this argument or subject for judicial notice for the purpose of this argument.

And what we have to do at a very minimum at a hearing on the propriety of declaring a mistrial in the penalty phase is quiz each individual juror to ascertain if they were exposed to that kind of publicity. If we quiz them about that kind of publicity, clearly they cannot continue to deliberate on the penalty phase.

However, if we defer quizzing them, then they will

4036

have rendered a verdict, a verdict in which they will be personally vested, the hardest decision they've ever made in their lives that they will feel the necessity of defending. And that cannot help but skew the process.

And so that's why with regard to the verdict that has not yet been rendered a mistrial is the appropriate remedy. That's all I have to say. Thank you.

THE COURT: Mr. Williams?

MR. WILLIAMS: I just disagree. There is nothing in this record to suggest that the rest of this jury has been in

the slightest bit infected by what happened to this one individual juror.

So for the defense to be moving for a mistrial at this point, if this juror is removed from the remainder of that jury, what are they relying on to suggest that that jury has been tainted in any way such that they can't give this defendant a fair trial on the penalty phase? And if you look at this record, there's nothing to support that the rest of this jury has been tainted.

So from that standpoint, I just don't think there's any valid factual basis for a mistrial motion as to the penalty phase.

To the extent that the defense believes we need to question the individual jurors on Monday about whether they've been exposed to the publicity, they indicate we need to do that,

♀

4037

but they indicate by doing that we've then infected the jury. I disagree. I think we can -- if that's their concern, we can pull the jury in on Monday and we can ask them, Have you over the weekend been exposed to any media about this case? If so, please describe it for us, and if so, does that affect your ability to be fair and impartial on this jury, just like we did when we were picking them to begin with.

So I don't know that an inquiry into any media coverage on this case over the weekend is going to somehow magically taint this jury.

So the bottom line is the government believes that the Court's proposed method of dealing with this is the correct one and one that should be adopted.

THE COURT: Mr. Rogers, anything else you'd like to

add?

MR. ROGERS: No, Your Honor. Thank you.

THE COURT: I am going to take your renewed motion for mistrial in the penalty phase under advisement. I'm going to rethink it. I am inclined to follow the initial impression that I had as to what to do when I got up at 3:30 this morning. Before I met with my law clerks for a couple hours, before I've heard all the arguments of the lawyers, my initial inclination was to, assuming there would be a motion for mistrial, reserve it, proceed with the deliberations, and take an incredibly hard look at it on post-trial motions.

♀

And I think you probably know this. I believe I've set aside more jury verdicts in my short ten years than any district court judge in the circuit. So I have a demonstrated record of not being shy about setting aside a jury verdict if I think there's been a problem.

But I just think from a -- knowing all of the factors that I know now, reading all of the cases that I know, my general philosophy of trial management, my deep concern for the individual rights of Mr. Honken, my concern to give both parties the best, fairest trial I can, that it is the best way to proceed. I don't expect anybody to agree with me. I have no problem with the fact that you see it differently.

And I am going to reconsider and take a look at it this weekend and decide should I come in on Monday morning and declare a mistrial on the penalty phase. I'll be glad to rethink that. You've raised some good arguments, and I want to have a full, fair, and complete opportunity to consider those arguments.

But for now this is what I intend to do: I'm reserving ruling on your motions. We're going to bring Juror 523 back this afternoon. We haven't notified her at all. I am going to question the juror solely on the issue of whether or not she disclosed any of the incidents with her boss to the other jurors. I am not turning it into a full-blown evidentiary hearing. There will be ample opportunity to do that post-trial.

That is the only area of inquiry that I plan on asking.

Now, I'm open to other suggestions, but I'm not open to turning it into a full-blown evidentiary hearing. That's going to come in the post-trial motion phase. If there are other questions that should be asked that relate to the potential for taint to the other members of the jury, I will certainly consider asking those questions.

Then on Monday I'm open to the possibility of questioning each individual juror regardless of what the answer to the questions are by Juror 523 to see if, in fact, Juror 523 did say anything about the incidents with her boss.

I'm also open to the possibility of questioning them about whether they've read any media about it. They're going to know about the issue when I -- because if we start questioning them, they're obviously going to know there's something, there's some reason why I'm bringing them in individually and asking them if Juror 523 -- I think we have to give them some information to know so that they can respond to the question, so I think we'll have to say something about, Did Juror 523 mention anything about what her boss may have said, or something like that. But that's how I intend to proceed.

MR. PARRISH: Your Honor, is there any possibility --

we're at -- you know, we basically were closing down our shop. Could we do that this morning which was --

THE COURT: Oh, try and get the juror in as quickly as

we can?

MR. PARRISH: Right. The problem is, you know, I'm sure the government has their staff here downstairs. We don't have it. We're going to have to drive back to our offices.

THE COURT: Is your question can we do it as quickly as we can get the juror here?

MR. PARRISH: That will help us because we need to get a full brief ready on our issues to help you see that our side is the correct side which we strongly believe in, Your Honor.

THE COURT: I know you do. I know you do.

MR. PARRISH: It's the only right way to do this matter.

THE COURT: Well, I don't agree with that. I think there are a number of ways to do it.

MR. PARRISH: I understand.

THE COURT: You think you're the -- you have the sole repository of what's right. The government does too, and I don't think I do. I just have to make the decision.

MR. PARRISH: Let me tell you this. This is the closest the government has come through this entire trial of agreeing with us on basic principles as to what's involved here. And if you look at their position and our position, except for how you remedy it, we're really not that far apart, and I was surprised that they had come to that point when they started this morning after they read the cases, and we were basically

flying by the seat of our pants and experience yesterday when we were sitting there. And I think in the end run I think we'll be right. But anyway, to say that -- as Leon says -- he tugs on my coat -- can do it ASAP, and I'll shut up.

THE COURT: I'll have the clerk's office call the juror. We'll get her down here as soon as we can, and after she arrives -- we'll try and get an estimate of when she's going to be here and then give you a heads-up on that. And then as soon as she arrives, we can go ahead and do the questioning.

But I think we need to have some discussion about the questions to be asked. And so why don't we do this. Why don't we take a 15-minute recess so that we can try and contact the juror, get her on her way here. And then we can reconvene to talk about the questioning of Juror 523.

MR. PARRISH: That's fine, Your Honor.

THE COURT: Okay. Thank you.

(Recess at 10:17 a.m.)

THE COURT: Please be seated. At the request of both parties, we're still in closed session; is that correct?

MR. WILLIAMS: That's correct, Your Honor.

MR. PARRISH: That's correct, Your Honor.

THE COURT: Okay. I have word from the marshals that the juror will be here right around 11:00.

Now, at the risk of repeating the parsing of the language that we had yesterday in a supplemental instruction to

4042

the jury that almost now looks comical, I ran the risk of telling you ahead of time I think this is the question I would

like to ask.

MR. WILLIAMS: No objections.

THE COURT: I'm sure Mr. Rogers can parse it several ways.

MR. ROGERS: I'm yielding the floor to the master parser.

MR. PARRISH: Your Honor, are you saying that's the limit of the questions, or would you go further?

THE COURT: Depending on what the answer is. If the answer's no, I'm probably not going to go further. If the answer's yes, I would plan on doing kind of the who, what, where, when questions to elicit all the information we could about when a comment was made to another juror, what was said.

MR. PARRISH: What about family being added in that?

THE COURT: This juror talking to her family about it?

MR. PARRISH: Her friends about it, right.

THE COURT: No, because here's why.

MR. PARRISH: Okay.

THE COURT: I think that is a perfectly appropriate question in a post-trial situation, that and many others. I don't think it's appropriate to try and ascertain if any other jurors -- Mr. Rogers, you look shocked. How would Juror 523 telling her family impact on the other jurors?

4043

MR. ROGERS: I don't know that it would impact on the other jurors. I don't know that her talking with her family would impact on other jurors, but I think her answer to that question might impact on your assessment of her answers to other questions about who she's talked to about it if you see what --

THE COURT: You mean -- if I'm understanding you, you

would like me to ask who else she's talked to about this and then if she -- and then infer from any of those answers that she may have talked to the jurors even though she told us she didn't? Is that kind of it?

MR. ROGERS: That's kind of what I'm trying to say, yeah.

THE COURT: Yeah.

MR. ROGERS: And I don't know what her answers will be to any question, but I think it defies common experience that a juror would be subject to this kind of pressure and feel about it so threatened that she took the step of asking for a note to keep her from going back to the atmosphere where the pressure is taking place without mentioning it to a soul. That just seems hard to believe. And so if she says --

THE COURT: Well, I don't find it super hard to believe. I would say it's unlikely.

MR. ROGERS: Okay.

THE COURT: I would say it's unlikely.

MR. ROGERS: That I think makes my point.

4044

THE COURT: Yeah, but that's not the focus of my inquiry today, so I'm not going to ask that, but I understand what you're saying. And I'm sure that will be fully explored. I just think the better way to do it -- because all we would be able to do would be infer things, that if she told A, B, C, and D, therefore, she might have told Juror 902, seems to me the better way would be to ask Juror 902. Do you disagree with that? That's fine.

MR. ROGERS: I don't necessarily disagree with that.

THE COURT: Yeah.

MR. ROGERS: What I'm puzzled about -- it's the same point I raised and the same point you were discussing sort of before we took the recess -- it's hard to ask -- when are we going to ask Juror 902, under what circumstances, and if we do it and then Juror 902 continues to deliberate, what have we done to ourselves? And that's a real quandary.

THE COURT: So let's start with this question. Do you have any concerns about this question? Then we'll get to the other questions that you think I should ask.

MR. PARRISH: Oh, none.

MR. SPIES: No, we have no objection, Your Honor.

THE COURT: Now, what other questions do you think I should be asking?

MR. SPIES: You think we're the three stooges, don't you?

♀

4045

THE COURT: No. Actually that metaphor never crossed my mind. But you know what? It's kind of like the white elephant.

So -- excuse me. Mr. Rogers, you're suggesting that I should ask Juror 523 who else she may have discussed her boss's comments with.

MR. ROGERS: That's correct, Your Honor, maybe specifically her husband or other family members.

THE COURT: And the purpose of asking that question is to try and determine kind of her credibility of the answer to the question -- to my first question? That's the purpose of it?

MR. ROGERS: That's certainly one purpose of it. Obviously we're -- you know, her answer might also be useful, depending on what her answers are, down the road if we ever get

there.

THE COURT: Anything else you think I should ask Juror 523?

MR. ROGERS: I am concerned about the information we received that they had taken a vote about whether or not to deliberate today, and I would be interested in knowing how that vote was taken. Was it done by paper ballot? Was it done orally? Were there discussions of reasons for and against --

THE COURT: I think that invades the deliberative process of the jury. I'm not going to ask that. I might ask, as kind of a follow-up to this question, Are you sure during any

♀

vote that may have been taken on whether to deliberate on Friday this subject did not come up?

MR. ROGERS: That meets the concern. It's -- I'm never one to ask one question when kind of 15 will do is kind of my theory.

THE COURT: Would you like me to ask that question?

MR. ROGERS: Yes, Your Honor.

THE COURT: Because that's a likely place that it could have come up if it came up, and so it's kind of a way of refreshing the juror's recollection and probing without being too heavy-handed about it.

MR. ROGERS: I agree with that. Will she be sworn during this inquiry or remind her that she's still sworn?

THE COURT: Yeah, I can certainly remind her that she's still sworn.

MR. ROGERS: Thank you.

THE COURT: Would you like me to do that?

MR. PARRISH: Yes, I think that's important.

MR. ROGERS: Yes, Your Honor.

THE COURT: Okay. Now, does the government have any objection to me reminding her that she's sworn and asking a follow-up question about whether this subject about comments of the boss came up in any discussion that the jurors might have had yesterday about whether to deliberate today or not?

MR. WILLIAMS: No to both of those. I think to ask

the questions about have you talked about this with your family members and so forth, I think there we're moving far afield. If it's a question of did -- the question the Court has and the follow-up question, are you sure you didn't bring it up at all during the vote, those the government has no objection to. The government has no objection to reminding the juror that she's still under oath.

THE COURT: Okay. Any more on Juror 523?

MR. ROGERS: Your Honor, we'd ask that the Court also inquire if she has received any contacts from the boss or coworkers regarding this issue since she left the courtroom yesterday.

THE COURT: And what would the purpose of that question be?

MR. ROGERS: I think to inform your review of whether to grant a penalty phase mistrial because if, in fact, she has been approached by her boss saying, What did you do, rat me out, you're fired, that might be something we want to know about the pervasiveness of this issue in the community and whether we can go forward with this penalty phase.

THE COURT: Mr. Williams?

MR. WILLIAMS: I just don't see the purpose for asking

that question. It seems to me she's out of this jury from here on. This is certainly a question that can be asked of her after this to find out, again, the extent to which this was an issue

that so affected her that she couldn't be a fair and impartial juror. But for the limited purpose for what we're doing here today, I don't think this is an appropriate question to be asking her right now.

THE COURT: Mr. Spies, you were standing.

MR. SPIES: Well, I don't agree with Mr. Williams' assessment of it, but I think it could also reflect on the intensity of the psychological or emotional influence being brought on her.

THE COURT: Yeah, but that's an issue that I've ruled is for post-trial.

MR. SPIES: Right. And I understand that. But to the extent it also reflects on her credibility or her ease in disclosing even answers to these questions to you, I think it might be good to know in a circumspect, diplomatic way when she faxed -- when the Court --

THE COURT: Well, then we ought to have you ask the question.

MR. SPIES: I'd be glad to if I could borrow your robe, please. I think that it can be put in a diplomatic way so it doesn't add to her anxiety about it because I don't know how you handled the order that was prepared for her to give to her boss, whether it was faxed from the Court to her boss, whether she took it to her boss.

THE COURT: It was faxed from the courthouse -- I

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3529 of 3636

don't know -- to her boss, to her company. I don't actually know that it was directed to -- we can get a copy of it and show you, but I don't know any of the details of it.

MR. SPIES: All right. That I think is the justification or at least our theorizing about the purpose of that limited inquiry.

THE COURT: I'm not going to ask that.

Now, I'd like to move on unless you want -- any other thing you want to comment on with regard to Juror 523?

MR. SPIES: No, Your Honor.

THE COURT: Okay. If we go ahead with the penalty phase deliberations on Monday either asking jurors questions, you know, about whether Juror 523 disclosed anything or not, just setting that aside, I want to know the parties' positions about whether to proceed with 11 jurors or to proceed with an alternate juror, understanding that you object to any proceeding. I understand that completely. You can continue to make any record on that. I don't think it's necessary, but I'm asking if we proceed -- not asking you to waive any objections -- do you have a preference for proceeding under Rule 23 with 11 or proceeding with an alternate with 12?

MR. ROGERS: May I consult a moment?

THE COURT: Yes.

DEPUTY WALHOF: Juror's here, Judge.

MR. ROGERS: Your Honor, I've been reminded that

4050

probably the alternates will be brought back Monday anyway, all three alternates, to further our inquiries, and so we would like to delay that decision and do some more research and some more

consideration and understanding we don't think either is right, proper, or legal. We don't want to have to pick between the lesser -- pick the lesser of the evils --

THE COURT: Well, I'm asking you too.

MR. ROGERS: Right. And what I'm asking to do --

THE COURT: I'm asking you to tell me now. You can tell me if you change your mind, but I'm asking you to tell me now.

MR. ROGERS: Having --

THE COURT: And let me just preface it by saying I wasn't planning on bringing all three alternates back. I would bring one alternate back if the decision is made to substitute an alternate.

MR. PARRISH: Let me -- let me do this, Your Honor. What we have, we have voluminous notes on all the jurors. I think this involves a reasoned decision that all three of us need to talk about, we need to discuss with Mr. Honken, and I know the Court wants us to make a decision right now.

Again, I'd ask the Court could we balance the inconvenience to three people, let us have some time to go back through our notes? We'll have to look at whatever number that juror is.

4051

THE COURT: Juror 914 is the other alternate.

MR. PARRISH: Right. And then we have to balance those 11 people, do we want to stick with 11 people and make that call, or do we want that Number --

THE COURT: 914.

MR. PARRISH: -- 914, go through our notes on that individual, and I realize you want us to decide right now.

THE COURT: No, that's a reasonable request.

MR. PARRISH: It's a tough decision.

THE COURT: I know it is. That's a reasonable request. You want to review the notes on 914. Absolutely.

MR. PARRISH: Right. But we also want to review -- and we have this worked out -- what are the dynamics of these 11 people making the decision without Number 523 in the process.

THE COURT: Right, and you may want to talk to your jury consultant.

MR. PARRISH: That's true. That's true. That might help.

THE COURT: Or you may not want to. But you want to have time to decide whether you want to talk to your jury consultant or not.

MR. PARRISH: We do, Your Honor. It's a tough decision, you know, considering all the ones we had to make last night, the arguments this morning. I just think if we had time we could make a more intelligent decision. If we make the wrong

♀

4052

decision, this is going to haunt us too if we make the wrong decision on those people. And I realize --

THE COURT: I think I was wrong in trying to rush you into a decision. I didn't think I fully appreciated the factors that you need to look at, and I recognize that you haven't had time to look at those factors. So we can defer that until Sunday when we have a hearing.

MR. PARRISH: That would help us, Your Honor. But it's an easier decision for the government. I'm not saying they've had all easy decisions but for them to make that decision --

THE COURT: Yeah, much easier than your call. I understand that.

MR. PARRISH: We have all other kind of dynamics including how we selected the jury because there was a method to our madness, believe it or not, to how we selected the merit phase and how we selected penalty phase jurors as how they would evaluate the evidence.

THE COURT: I'm fully persuaded that you need the weekend to make this decision.

MR. PARRISH: Thank you, Your Honor. Thank you.

THE COURT: And that I was unreasonable in requesting you to make it now. I just didn't appreciate the factors that you had to consider. Being informed of those, I immediately saw that you can't make this decision this quickly.

♀

Okay. The juror's here. I'd like to take a short recess and then come back, and we'll bring the juror in.

(Recess at 10:49 a.m.)

THE COURT: Everybody can be seated. Sorry.

MR. SPIES: Excuse us.

MR. PARRISH: We were trying to get on the listserve on the question you posed.

We're prepared to go.

THE COURT: Well, I'd just as soon wait for Mr. Rogers.

MR. PARRISH: Okay. He may be -- we were trying to get ideas of how to answer your questions on the jurors, the 11 or the 13, and I don't know whether he went to try to call -- we were trying to see if we could get on our listserve -- put it out on a listserve since we have to do what we have to do. I

can go check and see.

THE COURT: Now, before I bring Juror 523 in, I just want to make sure -- I think there is one thing that we agree on and probably only one thing today, and that is that Juror 523 at the end of my questioning should be discharged as a juror.

MR. PARRISH: That was one of the issues that we were just kind of talking about.

THE COURT: Oh. So you want her to deliberate?

MR. PARRISH: Well, not deliberate, but I think what we do with her in the interim is a little bit of a problem. We

♀

4054

haven't really --

THE COURT: Yes, I meant discharged from deliberations, and then we can talk about what instructions to give her.

MR. SPIES: May we ask the Court to just let her know that we have some more decision making to make and that we'll be in touch with her -- I mean, I don't want to put her off, but I don't know that she's here awaiting a decision about whether she's going to continue or not. And I don't want -- I think if you discharge her from jury duty that's going to send a signal to her employer obviously, and that employer may be a witness, and I would just rather keep -- try to freeze the situation as much as we can to prevent any dilution or alteration of the evidence that's out there that we don't know about yet. So I would ask that you not discharge her until we have some measured approach about what to do next.

THE COURT: Are you contemplating any scenario that you're going to ask that she continue to deliberate? Or do we just have a disagreement over what the word "discharge" means?

MR. SPIES: No. I guess I don't foresee any scenario where she could continue with deliberations given the danger of further contamination and, you know, all the things we talked about earlier this morning. But I think what we're concerned about is maintaining a body of evidence out there that may be important to the Court's consideration or our consideration down

♀

the line. So I would ask again that we just --

THE COURT: Well, okay. I'm sorry. Go -- ask again what?

MR. SPIES: That we defer telling her this morning that she's discharged from jury service.

THE COURT: Well, what's going to happen between now and Monday that could change that?

MR. SPIES: Well, I think investigating all the possibilities that we need to do to inform you what we'd like to happen.

THE COURT: Well, but bringing her back on Monday creates a further problem of contact with other jurors. So, I mean, if we're quibbling over what the word "discharge" means, I can say that she's -- she will not be coming back Monday, will not be participating in further deliberations but because her presence may be necessary at further proceedings in this case she's not formally discharged as a juror.

MR. SPIES: Your Honor, could we take this up after we talk to the juror? I mean, I really do -- I'm very concerned about --

THE COURT: Well, I need to be able to tell her something. You want me to then send her back down and then --

MR. SPIES: Yeah, either that or tell her that the

Court staff will call her later in the day. But I really do want to think about the evidentiary directions this case might

♀

take depending on what her response is.

THE COURT: Okay. But if we have the court staff call her later in the day and say you're not coming in on Monday, then I'm not in a position to give her any further instructions or admonitions, and I'm not going to have an ex parte discussion with her because you'd be the first one to raise holy heck about that, as well you should.

MR. SPIES: Well, I'm contemplating that we'll confer about this after we hear what her responses are.

THE COURT: Okay. Then you want me to keep her here after the responses to the questions, send her back down to the jury room, and then we'll decide what further instructions that I should give her.

MR. SPIES: Yes.

THE COURT: That's fine. I don't have a problem with that.

Government have any objection to that?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Okay. Are you ready to have Juror 523 brought in?

MR. SPIES: Yes.

MR. WILLIAMS: Yes.

(Juror 523 entered the courtroom.)

THE COURT: Good morning.

JUROR 523: Good morning.

♀

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3536 of 3636

THE COURT: Gary, would you get the microphone, please, for the juror? Thank you. Please be seated.

Thank you for coming in on such short notice. I have a couple questions for you. At any time did you tell any other jurors, including any alternate jurors, about the comments your boss made to you or mention in passing that comments of any kind had been made to you by your boss?

JUROR 523: Yesterday I -- I voiced concern about not meeting today because I said that, you know, it's hard for me to go back to work. And a lot of the other jurors, they don't go back to work. You know, you've got a lot that drive in or whatever. They go back to the motel, and they can do what they want, go to a movie. But a couple of us, three of us, have to go back to work. So my concern was I want to get this done. I want to get my life back. So I said to 'em -- I said to 'em yesterday that yeah, he had made comments about the "guilty, guilty, guilty." So yes, I did say that to them, so they were aware of it. But, you know, we were -- we voted, and I was in a minority. So we didn't get to deliberate today.

THE COURT: Okay.

JUROR 523: So I'm frustrated by this because they don't -- you know, like when we get off at two, my boss has told me, It's my time now; you get to work. And so, you know, you come in here, and you work hard all morning, and then you have to shut this off, and then you have to turn another gear and go

4058

back to work and turn that on. And it is -- it's getting more difficult as the trial goes on which is why I asked not to go to work today because it just is. I mean, I want to get this done

and over with, and I really wish we would have deliberated today.

THE COURT: Now, what exactly do you recall telling the other jurors?

JUROR 523: Just that my boss had said that and that -- you know, that he's made comments walking by my desk. That's -- that's -- I think that's all I said.

THE COURT: Now, was this to the entire group of jurors?

JUROR 523: I don't think so. I think the first time I said it was in the van going in or going back on one of the times when we got off like at two is when I said it the first time, that it's really tough and that most of those guys don't go back to work, and I made the comment that they just don't realize how tough it is to go back, you know, when you have a boss that says things. I'm not even sure if I said that at that time.

THE COURT: Okay. And do you remember when that first time might have been?

JUROR 523: Probably in the last week.

THE COURT: Can you think real hard about that? Was it before the verdict on the merits of the case?

4059

JUROR 523: No.

THE COURT: Was it after the verdict on the merits case?

JUROR 523: It was after that and while we were doing this.

THE COURT: When you say this, you mean the penalty phase?

JUROR 523: Yes.

THE COURT: Are you sure about that?

JUROR 523: I think it was, but, you know, this is really nervous -- making me nervous, I mean. I don't remember.

THE COURT: And let's -- I just want to try and jog your memory a little bit. In that first time in the van, do you recall how many jurors were with you?

JUROR 523: Six.

THE COURT: And can you recall as precisely as you can recollect what it is that you said?

JUROR 523: I just said -- I'm positive that I said it's tough going back to work because it's hard to turn this off and turn on your gears for work. And I'm not even gonna say a hundred percent sure that I said to them things that he had said. I'm not. I'm not a hundred percent sure I said it in there.

THE COURT: In the van.

JUROR 523: Yeah.

♀

4060

THE COURT: Okay.

JUROR 523: I know I voiced my concern about how easy it is for those guys to just go and go -- go home, you know, but I don't have that opportunity.

THE COURT: And now yesterday why don't you try and recall for us as precisely as you can what it is that you said yesterday.

JUROR 523: Well, yesterday -- and I'm not even sure if I said what he said. I just kind of commented that my boss can be a jerk and that it isn't as easy for me just to go back to work and be there all day. If I could just go to work and do

my job, it'd be great. And that was when they said, well, then maybe you should say something to Suzanne so . . .

THE COURT: Now, was that in front of the entire group of jurors?

JUROR 523: No. There was four -- three of us, three others.

THE COURT: Had some already left for the day?

JUROR 523: No. We were all down there. But we -- you know, we had talked -- we discussed about doing the verdict -- or doing --

THE COURT: Well, I don't want to get into actually what you discussed.

JUROR 523: Well, but we discussed whether we were going to meet today. That's all I'm going to say.

♀

THE COURT: Okay.

JUROR 523: We were discussing that, and then, you know, a few people voiced their reasons why they didn't want to, and then a few people voiced why they wanted to, and those that didn't won out. So then we went on and deliberated.

Then we were finishing for the day, and we were out in the hallway waiting for the vans, and I had just kinda said, you know, it's really gonna be tough going back to work, and a couple others voiced the same thing. And so it was just in that group outside the bathroom in the hallway there. So it wasn't the whole jury.

THE COURT: And do you recall what you said to that smaller group of jurors?

JUROR 523: Just that I really didn't want to go to work today, that it's just tough meeting the public and to talk

to people. It just -- it's getting tougher and tougher. And two others said the same thing.

THE COURT: And do you have a recollection of whether you mentioned your boss's comments?

JUROR 523: I don't. I don't think I said anything about 'em yesterday.

THE COURT: Would the lawyers like to ask any follow-up questions? Mr. Williams?

MR. WILLIAMS: By chance, ma'am, do you happen to remember the numbers of the jurors that you spoke with

4062

yesterday, that you would have made these comments to out in the hallway?

JUROR 523: Well, that were kinda -- yeah, two of them. I know two of them.

MR. WILLIAMS: And we don't want names, but do you remember their numbers?

JUROR 523: Yeah.

MR. WILLIAMS: Can you tell us those numbers?

JUROR 523: 902.

MR. WILLIAMS: Okay.

JUROR 523: And 38. I don't know the other one.

MR. WILLIAMS: And as I understand it, your best recollection is that while you expressed these concerns, you know, about having to go back to work and so forth, do you recall ever at any point passing on to any of the other jurors the comments your boss has made to you?

JUROR 523: You know, I might have said it, but I don't recall. I -- I -- I might have said it in the van. I just -- I don't recall saying it in front of the whole group.

You know, most of the time I sat in the other room all by myself so -- or with just a few of them. I didn't sit with the main group. So I didn't really socialize with the whole group. Kind of there was five of us in one room, and the majority of them were in the other room. So I didn't really talk with them all.

THE COURT: Mr. Williams, any additional questions?

MR. WILLIAMS: Just a moment?

No, nothing else, Your Honor.

THE COURT: Would any of the defense lawyers like to ask Juror 523 any questions?

MR. PARRISH: Not at this time, Your Honor.

THE COURT: Okay. Thank you. Ma'am, I'm going to have you go downstairs for a little bit, and then I'll bring you back up; okay? Thank you.

(Juror 523 exited the courtroom.)

THE COURT: Please be seated.

Mr. Rogers?

MR. ROGERS: Mr. Honken told me you were looking at me.

THE COURT: Pardon me?

MR. ROGERS: Mr. Honken told me you were looking at me, so I turned around to see if that was, in fact, the case.

THE COURT: I just wanted to know if you had anything you wanted to say.

MR. ROGERS: Your Honor, at this time I think the record is sufficient for the Court to reconsider our motion for a mistrial on the penalty phase. It I think would take an exercise in camel swallowing and gnat straining to not see that.

THE COURT: Mr. Williams?

MR. WILLIAMS: Well, I just disagree. We have at best a very ambiguous record at this point about whether she made any

comments to anybody else about what her boss had said. Absent questioning the other jurors about two things -- one, did she make those comments and, two, what their response to those comments were, if any -- I don't think there's a record to reach any conclusion that anything she said in any way jeopardized the rest of it.

And, of course, when -- if she, in fact, said these comments, if any of the jurors say, Yeah, she mentioned to me her boss's comments, obviously we need to know when that occurred.

THE COURT: Well, let me ask you this: Is it an appropriate inquiry when the jury is deliberating to not only ask the questions that you suggested but to ask if Juror 523's comments about her boss, if any, were made to the jurors, would affect their ability to be fair and impartial?

MR. WILLIAMS: No, I don't think that's improper. In other words -- reverse it; it's a double negative -- I think that would be a proper question.

THE COURT: Well, I'm going to reserve ruling on your renewed motion for mistrial until after I've had an opportunity to question the jurors on Monday morning. And I'd have the same question for the defense team that I just asked Mr. Rogers (sic): Is it permissible to ask the question about whether -- if any comments were made by Juror 523 about her boss's comments, would that affect their ability to be fair and

impartial in deliberating on the penalty phase?

MR. ROGERS: Your Honor, I'm turning to Rule 606 of the Federal Rules of Evidence, particularly 606(b), and that may not apply because we're not talking about the validity of an existing verdict, but I think if we were talking about the validity of an existing verdict, that would be an inquiry into their mental processes.

THE COURT: Correct, but that's not what we're talking about.

MR. ROGERS: But that's not what we're talking about, and --

THE COURT: And I think you've probably all been in trials where things have happened and jurors were brought in during the course of the trial and that inquiry was made.

MR. ROGERS: Right. In this case our view is that under the Remmer case we have now evidence, pretty substantial evidence -- her first answer to you was, I told them about the "guilty, guilty, guilty." And so I don't think the record is as equivocal as Mr. Williams does.

But I also think that the record of the subsequent examination of the juror showed just exactly what we feared would happen in terms of minimizing and backpedaling to some extent on what she had already said.

Leaving that aside, I think that under the Remmer case, cases -- they both have the same basic rule -- the burden

is on the government to show that there's not a possibility of influence. And I think now that this -- when we're talking about this kind of extraneous information or comment or influence -- I guess influence is the word I'm looking for -- on

the jury, the problem is if we come in and interrogate the jurors, we're -- and we -- obviously that's a minimum of what has to be done if we're going to proceed -- it enhances the influence.

THE COURT: My question is is it a permissible question to ask the jurors on Monday morning?

MR. ROGERS: I guess my answer which is a lot shorter than the one I'm giving is I don't know.

THE COURT: That's a perfectly acceptable answer. Okay. What do you want me to do with Juror 523?

MR. PARRISH: I think you're going to have to restrict her from talking about this matter with anyone.

THE COURT: To anybody.

MR. PARRISH: Right. She's going to have to be under the admonitions that you place on all the other jurors. I think, as Mr. Spies says, at this point I don't think you can discharge her from her duty as a juror, and I believe that just with regard to that specific question that we should leave things status quo including the deliberation which I think you've alluded to already on Monday. There would be no deliberations starting Monday morning. I think that's where we

4067

are. We walk in Monday morning after we've done some additional work on this matter and be ready to go with some questions which I assume we could submit over the weekend to the Court that we think might be reasonable if you do ask the jurors any questions.

THE COURT: Let me -- I'm a little bit confused by what you're saying. You don't want me to discharge her. But are you saying that I should bring her back Monday morning in

the jury pool?

MR. PARRISH: Well, no. I think the question -- and maybe I misunderstood you. The question is what do we do with her? We give her an admonition so she can't talk with anyone, but at some point further inquiry is going to be necessary. And when you choose to make that call, you know, obviously we'll go along with whatever date and time and place that might be. But as for right now, she is not discharged, she cannot -- you have to keep your authority over her I believe as a Court.

THE COURT: Right. But -- and I think we're kind of parsing "discharge." I would -- here's what I would like to be able to do. I'm happy to tell her that she is not discharged as a juror, that she cannot talk to anyone including her husband if she has one or anybody about this case, about any of the questions we've asked. She can't talk about any aspect of this case with anyone, period. But I think I have an obligation to let her know she's not going to be deliberating on Monday. And

4068

to bring her back on Monday and run the risk that she would be in with the other jurors, I don't see the -- I think that's a greater danger.

MR. PARRISH: Right. I guess I wasn't looking at the mechanics, and now that you present it in that fashion, there is a mechanical problem with where you place her and where she will be. Yes, I understand that problem now that you put it in that context, and maybe that's best that she not come in and be subjected to if you call her or some staff person call her. I see what you're getting at.

THE COURT: Yes.

MR. PARRISH: I was not even thinking in that --

THE COURT: I'm sorry I didn't make myself clear enough.

MR. PARRISH: No. You did. I wasn't thinking in that realm. But you're absolutely right.

THE COURT: I guess I can't envision any scenario where she would be back here on Monday deliberating with the other jurors.

MR. PARRISH: You're absolutely right.

MR. SPIES: And if I may pipe in, Your Honor, my concerns about what to do with her in terms of contaminating some other evidence that might be out there, I think that she by her testimony this morning has made what her boss said and whether we need to bring in any collaterals, you know, other

4069

people at work, pretty unnecessary.

THE COURT: But I think we should reserve, preserve, reserve the ability to do that because you may next week or the week after think it's necessary.

MR. SPIES: Right.

THE COURT: I guess what -- see, here's what I'm getting: I'm getting inconsistent responses. Mr. Parrish says I shouldn't discharge her. And according to you, I guess I should discharge her.

MR. PARRISH: Bring her in mechanically I think is where we are.

THE COURT: But Mr. Spies just said there was no reason to ever bring her in again. That's a paraphrase of what he said.

MR. PARRISH: No. I was asking what did he mean by ever, but I think the question is I forgot about the mechanics

of it. You're absolutely right on the mechanics. The question of discharge, I think that's something you could resolve without our involvement in it but being sure that she would be available should we need her later.

But I think you're right. I think he's absolutely right. You don't bring her in, and the process that we're using -- and obviously we don't know all of the details of that, nor should we at this point -- the way the matter has been set, I completely forgot about that. I was thinking solely in terms --

♀

4070

THE COURT: That's okay. There's a lot to be thinking about. It's just very stressful on everybody. I understand that.

MR. PARRISH: It is. You're absolutely right.

THE COURT: So just to review, I can bring her in. I can tell her that she is not discharged as a juror, and what I mean by that, there is a reasonable probability that she may have to come back at some further date and be questioned about this. Do you have any problem with me telling her that? But that while she's not -- and that as part of not being discharged she can't talk to anyone about this case but that she will no longer be deliberating with the jury and there's no need for her to come in on Monday and if we do need her, she will be contacted about when she needs to come in if at all.

MR. PARRISH: That's correct, Your Honor.

THE COURT: Do you have any problem with that, Mr. Spies?

MR. SPIES: No, no.

THE COURT: Mr. Rogers?

MR. ROGERS: No, Your Honor.

THE COURT: Okay. Does the government have a problem with it?

MR. WILLIAMS: No, except the -- earlier when you were talking about what you would tell her, you also said that she would not only not talk to anybody about this case but that also

includes any of the questions we asked her today or anything on this subject, and with the caveat that that's going to be part of the judge's instructions to her, the government thinks that's an appropriate way to proceed.

THE COURT: Okay.

MR. PARRISH: We join in that.

THE COURT: Okay. And before I send her off her way as an un -- as a not-discharged juror who will not be deliberating, I'm going to look up at both counsel and see if you think there's something else I should say, and then we can have a sidebar.

MR. PARRISH: That's fine.

THE COURT: Okay? I'll just kind of look up, and I'll just say, I want to check with the lawyers before I let you go. I'll look up. And if -- and you can just say let's have a sidebar if you're not satisfied with what I've told the juror.

MR. PARRISH: That's fine.

THE COURT: Okay? I just want to make a few notes. Ready to have 523 brought back in?

MR. PARRISH: Yes, Your Honor.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. Thank you.

(Juror 523 entered the courtroom.)

THE COURT: Please be seated. Juror 523, I wanted to

again thank you for coming in today. I am not discharging you

as a juror, but your status is changing, and here's what I mean by that. You will be relieved from any further deliberations in the case, so you won't be deliberating with the jurors any longer.

And when I say you're not discharged, here's what I mean by that: There is a reasonable possibility that at some later date we may have you come back here and testify about some of the things that we've discussed. I don't know if that's going to happen or not. I just don't know. And our clerk will give you notice of that, as much notice as we can give you.

Therefore, you cannot talk to anybody about this case, and I mean you cannot talk to anyone. You can't talk to a spouse if you have one. You can't talk to children. You can't talk to your boss about it. You can't talk to anybody. You can't talk to any of the jurors who were potential jurors back in August or who are on the jury now or any alternates. I mean nobody. You can't talk to anybody about this case.

And you can't talk to anybody about the questions that we asked you today, why we brought you in today, the answers you gave, or any of the questions or answers that you gave yesterday or why we brought you back in yesterday or today. Do you have any questions about that?

JUROR 523: So I'm done?

THE COURT: Yeah, you're done for now. But I'm not discharging you as a juror because I want you to be subject to

my instructions about not talking to anybody. And I think actually it will be pretty easy that way.

JUROR 523: I'm not talking to anybody about it.

THE COURT: Okay. But if anybody does ask you, blame it on me. You can say you'd love to talk to them, but that federal judge sitting up there in that black robe shook his finger at me and said don't talk to anybody.

JUROR 523: That's what I've been telling everybody anyway.

THE COURT: And believe me, I'll be glad to take the blame for that because that's just part of my job, and I don't want -- I want you to -- I don't want you to feel uncomfortable about anything. I want you to try and be as at ease as you can be. I want you to try and get back to your life. But I don't want you to talk to anybody at all. And I think the easy way to say it is, you know, the judge made me promise not to talk to anybody, and I think I'm going to do that. Do you promise me you won't talk to anybody about this case?

JUROR 523: I won't, but they're all going to wonder why I'm back.

THE COURT: Of course they will. And I think you can just say you can't talk about it.

JUROR 523: Thank you.

THE COURT: And believe me, blame me. I get blamed for a lot of things, some of which I'm responsible for, some of

4074

which I'm not. I'm used to it. I've got broad shoulders. I can take all the heat, and I really do mean that. I want you to blame me because you shouldn't -- you bear no responsibility here.

JUROR 523: But I do because I put up with it and should have said it --

THE COURT: Don't worry --

JUROR 523: Still, you know, and I know I said -- when I sat downstairs in the jury room, you know, there was five of us that sat in one room, and the majority of them sat in the other room. And I guess at least two of those were alternates, so, I mean, I didn't really have a lot of contact with the jury, but, you know, on the possibility that I may have, I understand.

THE COURT: Okay. But from now on in, the answer is, I can't talk to you about it.

JUROR 523: Yeah. It always has been.

THE COURT: Okay. Well, let's repeat it.

JUROR 523: I can't talk to you about it.

THE COURT: The federal judge has told me I can't talk to you about it; right?

JUROR 523: Correct.

THE COURT: And that's true. I've told you and I've instructed you not to. And I'm ordering you not to if there's any -- it's not a favor. It's not a request. It's a United States District Court for the Northern District of Iowa court

4075

order by the chief judge. I'm not trying to pull rank on you, but I want to impress upon you how important it is that you not talk to anybody about this case. Do you understand that?

JUROR 523: Absolutely.

THE COURT: Okay. And I think hopefully people will leave you alone when you say the federal judge has ordered me not to talk about it; okay?

Now, I just want to check with the lawyers.

MR. PARRISH: Nothing, Your Honor. Thank you.

THE COURT: Anything from the government?

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Okay. Juror 523, good luck to you. Thank you.

(Juror 523 exited the courtroom.)

THE COURT: Please be seated. Is there anything else you want to talk about now?

MR. PARRISH: You mean the alternates?

THE COURT: We can talk about the alternates, yeah. Oh, no, not --

MR. PARRISH: She said --

THE COURT: Okay.

MR. PARRISH: She just said when she was sitting in that room with five other people, two of them happened to be alternates. That's a real problem.

THE COURT: Just clarify that for me.

♀

4076

MR. PARRISH: Well, if she was sitting there chatting about what her boss said and the circumstances -- first of all, she's not supposed to be talking to the case about anyone (sic), and if she's talking and having a discussion, we're going to have to bring some alternates to discuss with them, not just the other jurors, to find out which alternates were in the room and what did they hear and what did they see at what point in time.

THE COURT: And we should do that on Monday.

MR. PARRISH: Exactly. We were just talking about the other jurors first, but now we have to expand it to the alternates.

THE COURT: Right. I don't disagree with that. Does

the government disagree with that?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Now -- so the plan is to bring all of the jurors and all of the alternates in and then question them Monday morning. Without waiving anything -- and you don't have to repeat everything but -- and that you disagree with every ruling I've ever made in my life that goes against you. You don't have to repeat that. I understand that. I expect you to disagree with it.

But the plan going forward based on the rulings that I've made today would be to bring all of the jurors and all of the -- I think we have what? Three alternates remaining? Bring those in and then question them about their exposure, if any, to

♀

Juror 523's comments. Is that the general plan?

MR. PARRISH: Yes, Your Honor.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Okay. Now, when would you like to meet next about how we are going to implement that plan?

MR. PARRISH: What about 7:30 Monday morning? That would give us time to research these issues, particularly the issue of -- that you posed to us of the 11 and 12, I mean considering, you know, we get past the alternate issue because if -- the other problem that's crept up obviously, if the alternates are contaminated, where do we go? Are we only left with that one choice then? So I would say 7:30 Monday. Mr. Spies and Mr. Rogers and I can talk on the phone and exchange e-mails over the weekend and be back here.

THE COURT: That would give us an hour and a half.

MR. PARRISH: Right.

THE COURT: And then we could always keep them waiting.

MR. WILLIAMS: It will give us an hour. If you recall the note from the jurors, they were coming in at 8:30 on Monday morning.

THE COURT: They were coming in at 8:30. I forgot that.

MR. WILLIAMS: So if we want to stop them from deliberating, that's one option. The other option is handle

♀

what we're going to handle between 7:30 and 8:30.

THE COURT: No sentiment for doing it Sunday night?

MR. WILLIAMS: Pardon me?

THE COURT: No sentiment for doing it Sunday night?

MR. WILLIAMS: Frankly I'm not sure it's going to take a lot of time to figure out the questions we're going to be posing to these jurors.

THE COURT: Okay. Let's just talk about the procedure. Here's what I'd like to do. I will formulate a question or two, and then I'll just fax it to you all so you can be thinking about it. And hopefully you can parse it not in my presence and make any alternative suggestions by fax or e-mail. If you use e-mail, use my court e-mail. And obviously if you e-mail me, you have to e-mail the other side, but that hasn't been a problem. So we can maybe get a little bit of a head start on Monday morning's work.

MR. PARRISH: I think the jury when they walk in at 8:30 or whatever with only 11 jurors, they're probably going to have a pretty good idea that there are some issues, so I don't think their deliberation's going to be an issue.

MR. WILLIAMS: Just a mechanical problem or issue I suppose is we should probably have the jurors instructed that they are not to deliberate when they show up on Monday morning.

THE COURT: Right.

MR. WILLIAMS: I also wonder if mechanically when the

Court has the alternates come in whether the alternates should be kept separate from the rest of the jury as we go through this process.

MR. PARRISH: Right, which I think poses a question. I guess I'm confused also not by your comment. I think you're exactly right. But I'm just curious -- and this might be just a rhetorical question -- why were the alternates with the jury at any point during the deliberation? I guess I'm puzzled by that, and I don't know mechanically what's going on, and that's not my business. But I --

THE COURT: It's a great question.

MR. PARRISH: Right. It's a rhetorical question in my sense, but why were they ever together during any deliberation?

MR. WILLIAMS: My guess is they weren't. My guess is generally she would hang out with a different group down there while we were waiting up here while the alternates were part of this group this week was my read on this. So I don't think she was talking about deliberations. I think she was talking about --

THE COURT: Yeah, I think she was talking about during the penalty phase evidence this week when the alternates were sitting in on the evidence.

MR. PARRISH: Right. But she said during that discussion she was talking about guilty, guilty, guilty which

is -- I mean, I guess I'm evaluating her statements, and I

probably shouldn't be evaluating them aloud, but I assume that's what she's talking about, but we're just assuming that. I guess I'm just confused by that discussion, by that comment.

THE COURT: Well, it's not totally free from doubt.

MR. PARRISH: I just have a real problem with that statement.

THE COURT: I'm just kind of thinking out loud now. And I just want to make sure I have a clear understanding. The reason for bringing the alternates in on Monday is potentially twofold: One, to determine whether or not they heard any Juror 523 boss's comments, and the other reason would be if we do go ahead with the penalty phase and we do substitute an alternate. Those are the two reasons why we're bringing the alternates back.

MR. PARRISH: That's correct, and we'd have to determine which two were there since she referred to two alternates. As far as she knows, there were two alternates there, but we don't know for sure. Those would be the two reasons, Your Honor.

THE COURT: Okay. Anything else you want to take up?

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: All I would say before we leave is that this is not anybody's fault. I mean, nobody here created this situation, and I think over the weekend we all have to think about that as how it started. It's a difficult situation, but

none -- no party here created it.

THE COURT: That's not what I understood Mr. Rogers to say, but that's fine.

MR. PARRISH: Oh, you didn't -- he didn't mean that you created it.

THE COURT: Well, by my anonymous jury ruling, for example.

MR. PARRISH: I don't think he meant it in that -- I think he meant the impact of and how we resolve it I think was his context.

THE COURT: But there's no profit in casting blame.

MR. PARRISH: You're absolutely right.

THE COURT: The only thing to do is figure out what to do and make the call and proceed ahead with it. So okay. Good luck to everybody. Safe travels, and we'll see you back on Monday morning at 7:30. Okay. Thank you.

(The foregoing trial was adjourned at 11:42 a.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

2-2-05

Shelly Semmler, RMR, CRR — Date

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3558 of 3636

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, Plaintiff, vs. DUSTIN LEE HONKEN, Defendant. /

No. CR01-3047

Sioux City, Iowa
October 25, 2004
7:31 a.m.

VOLUME 24

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

APPEARANCES:

For the Plaintiff:

C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant:

ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn
Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Good morning. Please be seated. For the same reason the prior hearings were closed, I'm going to close this hearing as well. Any record either party wants to make at this time, Mr. Williams?

MR. WILLIAMS: No, Your Honor. We've reviewed the Court's proposed instructions as we have exchanged e-mails over the weekend. The government does not have any objections to the Court's instructions, both already given to the jury this morning and the ones the Court proposes to provide to them.

We were also just handed your -- by Roger, your clerk, the proposed questions you intend to pose to the jurors here. And the government has no objection to those.

I did find one other case cite last night that also supports the procedure of being able to ask the jury while they're deliberating whether any outside influence could affect their ability to be fair and impartial, and it's United States versus Williams. It's a DC Circuit case from 1987, and the cite is 822 F. 2d 1174.

And the bottom line on that case, again, there was an outside influence. The court did precisely as what you're doing. It was not a death penalty case. It did not have the nuance we have here of one verdict on the guilt and then another one pending on the penalty phase, but the DC Circuit praised the

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3560 of 3636

district court for taking these efforts.

The one thing I've noticed in the cases both cited by the Court and Williams is that appellate courts have approved limiting instructions to the jury in addition to the questioning.

So the government has two ideas. One is if the jurors come in and none of them have heard or recall any statement by Juror 523, that nevertheless the Court reinstruct the jury that they are to consider nothing but the evidence in this case and arguments by counsel --

THE COURT: That's what supplemental instruction F was intended for that I hadn't e-mailed you because we just worked on it this morning. It's just a draft.

MR. WILLIAMS: Yeah, I've not seen that. I'm sorry. I thought this was the ones we already received. I'll take a quick look at that.

THE COURT: Who's going to speak for the defense?

MR. ROGERS: I don't see the lavaliere mike, Judge. I'll have to move to the podium.

As we stated by e-mail, Judge, we have no objection to supplemental instructions B and C which I assume have already been distributed to be given to the jury and also to supplemental instruction E for the alternate jurors.

We do object to either version of supplemental instruction D, and for the record, we would like to renew at

4086

this time our motion for mistrial in the penalty phase which the Court has taken under advisement. And I want to argue that a little bit if I can.

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3561 of 3636

THE COURT: Well, let's get through some of the other issues before you argue that.

MR. ROGERS: It's hard to do, to talk about the other issues without --

THE COURT: Mr. Rogers, let's get through the other issues before you argue that.

MR. ROGERS: Well, we do have objections to instruction D. I don't think even if we propose to give that instruction that this instruction is detailed enough about what their deliberations should be. I believe that these --

THE COURT: Well, what about D in conjunction with F? I'm not sure you've had a chance to actually look at F yet.

MR. ROGERS: F does flesh out D to some extent. I will quibble with the word "continue" in the first line because what I think they're supposed to be doing is begin anew, not continue.

THE COURT: Well, it depends I think.

MR. ROGERS: Pardon?

THE COURT: I think it depends on whether you substitute a juror or not.

MR. ROGERS: That's true.

THE COURT: So you're right if -- if it's a

♀

4087

substitution, I think the substitution instruction makes it clear that they start anew, but this one should reflect that as well too.

MR. ROGERS: And I also think that if we are in the start-anew mode that they should be given new forms of verdict, blank forms of verdict for the penalty phase. I think the old blank forms of the verdict should be collected because I don't

think you can meaningfully start anew if you just bring somebody new in, here's what we've already done.

THE COURT: So just give them new sets of verdict form?

MR. ROGERS: New sets of verdict form and tell them that's what you're doing and tell them --

THE COURT: Yeah.

MR. WILLIAMS: And I'll join in with Mr. Rogers. I think it would probably be good to collect the old ones because I think from the pattern we've seen with this jury on the guilt phase, they may be drafting or filling these out as they go.

THE COURT: Okay.

MR. ROGERS: I believe that's all I have to say about the instructions.

THE COURT: Okay. What about -- and we'll get to your argument on the mistrial motion.

MR. ROGERS: I'm sure we will.

THE COURT: Yes, we will. What about the issue of if

♀

4088

I don't grant the mistrial motion and if it proceeds going with 11 jurors or replacing a juror?

MR. ROGERS: Understanding for the record that we are strenuously objecting to the --

THE COURT: You know, that's so obvious, but you can rephrase it every time you want to, but it's --

MR. ROGERS: I've done too much habeas work to keep from doing something like that, Judge.

THE COURT: Well, I appreciate that.

MR. ROGERS: The problem is until we know from this morning's examination which jurors, if any, are tainted, we

don't know what alternate we're talking about, and we don't know whether either of these options would be a viable option at that stage depending on the number of jurors who have been tainted.

And so having -- having said that as a general rule without knowing who we're talking about -- and it does make a big difference who we're talking about -- I think 12 including an alternate is preferable to 11, but I don't think --

THE COURT: But it's subject to things developing this morning.

MR. ROGERS: Subject to things developing this morning.

THE COURT: That's a great answer.

MR. ROGERS: All right. Thank you.

THE COURT: I appreciate you want to reserve until you

know as much information as you can before you make the final decision. I can appreciate that.

MR. ROGERS: We've sort of divided up discussion this morning, so let me yield the floor to co-counsel.

THE COURT: Okay. Well, the floor's been yielded.

MR. ROGERS: We're not sure who to.

MR. PARRISH: We just had some mechanical questions, Judge, about the procedure unless you've pretty much outlined your procedure. There are three things we wanted to add for your consideration.

THE COURT: Okay.

MR. PARRISH: One, in looking at the transcript, we're not sure that 523 was reminded that she was under oath, and I think when each juror comes in, the preference would be that they be reminded that they are, in fact, under oath.

The second is is it possible for them to take the witness stand as opposed to being questioned from the box?

THE COURT: I'm not going to do that. I'm going to question them from over there.

MR. PARRISH: That's fine. I was just telling you what our preference would be.

And the last thing is that they continue to be separated once they have been questioned, not go back -- even though you have instructed them on the point, that they go back to a room separated from the other jurors.

♀

4090

THE COURT: We don't have 12 different rooms to put them in.

MR. PARRISH: That's fine. But I meant if --

THE COURT: I appreciate you making those requests --

MR. PARRISH: As they would come up and be questioned, not 12 different rooms but separate rooms from the room that they come out of to come up to the courtroom.

THE COURT: Oh, I see, that after a juror is questioned, then they go to a room consisting of other jurors who have also been questioned.

MR. PARRISH: That's correct.

THE COURT: Yes, we can certainly accommodate that request.

MR. PARRISH: Thank you.

THE COURT: Now, let me ask, do the CSOs understand that?

CSO SAUNDERS: I do.

THE COURT: I assume we'll just use Judge Zoss's deliberation room.

CSO SAUNDERS: We can.

THE COURT: So that after a juror's brought up and questioned, then they'll be taken down to Judge Zoss's deliberation room. So we'll keep the jurors who have been questioned separated from the jurors who have not been questioned.

♀

4091

DEPUTY FULLER: Judge?

THE COURT: Yes.

DEPUTY FULLER: They were going to put the alternates --

THE COURT: I can't hear you, so you'll have to use the microphone.

DEPUTY FULLER: Your Honor, they were going to put the --

THE COURT: Well, then find another place to put the alternates.

DEPUTY FULLER: Okay.

MR. PARRISH: And I assume, Your Honor, at the end of the process that the Court has outlined including the suggestion for questions, you would then give us an opportunity to argue the various motions I take it. Is that the procedure as the Court is going to --

THE COURT: Well, very brief argument, yes.

MR. PARRISH: That's fine.

THE COURT: Yeah.

MR. PARRISH: That's fine.

THE COURT: And I don't think I'm going to allow the parties to question the jurors.

MR. PARRISH: I think we're in agreement with that.

THE COURT: And I didn't know if you -- I mean, I don't have super strong feelings one way or the other.

MR. PARRISH: Ours are strong that the parties should not question.

THE COURT: Okay.

MR. PARRISH: It only should be from the Court.

THE COURT: Okay.

MR. PARRISH: And we reviewed the questions that were asked -- it was -- based upon those questions asked by Mr. Williams and our review of the case law, it really ought to be restricted to the Court.

THE COURT: Now, I think what I'll do, though, is before I release -- you know, we don't know what the answers are going to be, and, therefore, I don't know what my follow-up questions are going to be. So what I think I'll do is before I release each juror, we'll have a sidebar to determine whether or not you want me to ask any other follow-up questions.

MR. PARRISH: The other question we had, Your Honor, which you told us to think about over the weekend -- and I think if you would turn to -- and if you have it -- we have copies of it if you don't -- your voir dire questions, your general voir dire questions that you asked them about?

THE COURT: I don't have them handy.

MR. PARRISH: We do have a copy. I believe the government may have a copy of it. May I approach a minute, Your Honor, just to show you those questions?

THE COURT: Yes. Thank you.

MR. PARRISH: Your Honor, if you'd look at a couple of them where you asked if you heard, read, or seen anything about this case, and it would be since the beginning of deliberations, we think that would be an appropriate follow-up question to ask.

THE COURT: Well, but for this incident, there would be no reason to ask this question.

MR. PARRISH: That's what our concern is, that -- and I realize you have instructed them. But, Judge, I mean, I'm not using myself as a judge of the comments, but I believe that the discussions would be quite pervasive around the state on this issue, and the headlines -- they could think somehow that it was Mr. Honken involved in the jury tampering if they just saw the headlines.

And our other concern is that the Juror 523 said two other people had some of the same concerns that she had. Now, whether or not she's being completely frank about it, I don't know.

THE COURT: I'm sorry. Run that by me again.

MR. PARRISH: If you look at the transcript, she says that two other jurors had expressed some of the same concerns about going back to work, intimating that they may have been pressured also, and I believe on page 7 of the supplemental transcript where she refers -- she ends up her quote by saying, It's just -- it's just getting tougher and tougher, and two others said the same thing.

♀

4094

THE COURT: Yeah, but I don't read it that way.

MR. PARRISH: Okay. That's fine.

THE COURT: I just read it differently. I think the

deliberations are tougher and tougher.

MR. PARRISH: Okay. That's our --

THE COURT: What's the government's position?

MR. WILLIAMS: First of all, Judge -- and I couldn't find the case right offhand -- I don't have an objection to you having the jurors sworn, but there's a case -- and I can't find it right now -- that says that's fine to question them without swearing them in anew, and it's within the Court's discretion.

THE COURT: I don't think Mr. Parrish asked me to swear them in again. I think he asked me to remind them they're under their juror oath.

MR. PARRISH: That's correct.

MR. WILLIAMS: And I have no objection to that. I just wanted to point that out to the Court. I wasn't quite sure where it was going.

With regard to the additional questions about publicity, I guess I don't have an objection to that. I think it would be subject to the same follow-up question that you have regarding contact with 523, and that is even if you've heard this, any outside -- or if you've heard anything about publicity on this case, does it affect your ability to be fair and impartial from here on out. But as I understand, the defense is

4095

asking the Court ask questions of the jurors about publicity, and in general we don't have an objection to that.

THE COURT: And is the question you want me to ask is about any media accounts about the case?

MR. PARRISH: That's correct, and it's has anyone approached you or made any statements. I think you phrased it in a very good way in your general voir dire. Actually there

should be two of them.

THE COURT: Yeah, I realize why you kind of want me to open it all up, but there's no evidence that that's happened. We have one juror -- as I understand the procedures in this type of case, it's supposed to be the least intrusive into their deliberations as possible.

MR. PARRISH: And we don't dispute that. We would accept that, as least intrusive. However, if it's out there on the record subject to various interpretation, I believe that it would be acceptable process to at least ask. It really does not interfere, but it does go to the question of extraneous contact.

THE COURT: Okay. I think -- but there's no evidence of any extraneous contact. And you wouldn't have a right in the normal scheme of things to call that into question just because you want the judge to question the jurors about extraneous contact which can happen in any case.

MR. PARRISH: Right. I would just say --

THE COURT: What if I did this? Since you have

started your penalty phase deliberations, have any of you been exposed to any media accounts about this case?

MR. PARRISH: That would be acceptable. And, Your Honor, the only one I would add for your consideration -- I understand you're indicating that the juror did not express that, but if it could be subject to two interpretations as to what she said, I think what's important is that on page 2, subsequent reaction to individual questioning, since the penalty phase began, have you -- any of you heard someone else express an opinion concerning the guilt or innocence of the defendant or the appropriate punishment for the defendant in the event of

guilt outside of the jury box? We won't go into the jury box. But if she has expressed that opinion, that may be covered by your first question to them. But as a follow-up question, I think it may be appropriate in light of your initial question and may be more probative.

I think Mr. Spies, Your Honor, is going to conclude with what issues he has on the questioning.

THE COURT: Okay.

MR. SPIES: Your Honor, this is the only thing I wanted to chime in. As we ruminated about this over the weekend, we were concerned about the media accounts of an inquiry into jury tampering by an employer. I forget how the news stories came out, but presumably many of these people went back to work on Friday, and I can imagine that there were a lot

♀

of employers who were apprehensive that they might have been the target or the subject of this inquiry and that the employers might have said something to their juror employees.

And that's why we were concerned about exposure to media accounts or whether somebody approached them on Friday or over the weekend saying, Is it me, and what did you say? So that's why we were concerned about the Court making some inquiry.

THE COURT: And why don't you tell me the language that you suggest for that question.

MR. PARRISH: I think you have language -- do you want to use these? I think you have good language in your questions, Judge, that you -- at our suggestion when the trial first started. If you take -- and I was just showing Mr. Williams. If you take 2, page 2, and go to subsequent reaction to

individual questioning, you could change that to, I assume, penalty phase if that's the preferred subject matter. That might be one approach, just take that question and just substitute the language there.

THE COURT: Then wouldn't we have to change the guilt or innocence?

MR. PARRISH: Exactly. Oh, right, right, right, right, because inside the jury room we don't want to know anything about. It's just outside the jury room is our only question because they couldn't express what was going on inside because

I'm sure the people have expressed themselves.

THE COURT: Okay. Now let's get to your argument on the mistrial motion.

MR. ROGERS: I spotted my microphone.

Your Honor, our position is based on an ordinary reading of the plain language of the statute which controls this proceeding which is section -- Title 21, section 848(i). And it says that the penalty phase shall be heard -- or the penalty should be decided by the jury which determined the defendant's guilt. That is in this case an ascertainable, indisputable group of 12 people, those who put their numbers on the bottom of the verdict form, the merits phase verdict form, and who signed their names on the final page which is under seal. There's no question in anybody's mind as to what individuals constitute the jury which determined Mr. Honken's guilt.

It is no longer possible due to this extraneous influence and taint to have the penalty phase heard and determined by that jury because a member of that jury is -- has been tampered with and is, therefore, disqualified. Section

848(i) deals with that situation, because it talks about where there is good cause for discharging the penalty -- the jury which has determined the defendant's guilt. Clearly there is. It says in that event we proceed under subdivision (B) which -- 1(B) which talks about empaneling another jury of 12 to determine the penalty phase. That is the procedure which is

♀

clearly contemplated by the statute which governs this proceeding, and that's the procedure we're asking the Court to follow.

We are fully cognizant that by moving for a mistrial we're waiving a potential penalty phase double jeopardy claim. But we're making that motion anyway.

Your Honor, looking at Rule 23 which is the other alternative -- one other alternative suggested by the Court, first of all, our position is that Rule 23 which permits a jury of 11 was, in fact, with regard to the penalty phase in capital cases I guess overruled or repealed to that extent, whatever the phrase is -- rendered inapplicable maybe is a better phrase -- by the enactment of section 848 which occurred after the enactment of Rule 23. Rule 23 I think was enacted in 1983. Section 848 was enacted I believe in 1984 to take effect in 1987. And so it's the later statute. Where there's a conflict if there is, the later statute controls.

Further, if you look at the scheme as a whole in section 848 and the reasons for the scheme as a whole, it contemplates that the penalty in a capital case will be determined by, as Mr. Spies put it so eloquently in his argument, 12 juries of 1, that Mr. Honken is entitled to a life sentence unless 12 individuals independently decide that the

death penalty must be imposed.

And that is a really high bar for the government to

meet, and it sets this case aside from the usual case in which sections -- or Rule 23 and the amended Rule 24 apply. And for those reasons we think that the only choice available to the Court is, in fact, the choice of a mistrial in the penalty phase.

The other thing that I would remind the Court is one of the issues that has been present throughout this case beginning in jury selection is the issue of residual doubt. And it is impossible to substitute an alternate who did not participate in the deliberations in the merits phase who can give appropriate weight and consideration to any residual doubts when that alternate did not have the opportunity to debate those doubts, have them tested in the crucible of merits phase deliberation and make at that time perhaps a reservation of, well, yeah, maybe that's not a reasonable doubt, but that's still something that's going to keep me as an individual from voting for death. And you'll recall that --

THE COURT: Of course, that assumes you have the right to the residual doubt instruction.

MR. ROGERS: Well, I think we've already assumed that, and we have that instruction, so, you know, this deliberation is being held in the context of that instruction.

THE COURT: Well, but your argument would be harmless error if it was inappropriate to give that instruction. But I'm not going to debate it with you. You just make your record,

because I have some work I need to do. So you make your record.

MR. ROGERS: And this is work we need to do, Judge.

THE COURT: I'm going to let it go. I'm not persuaded by your arguments, so it's you making a record, and we can really do it at a later time when the jury's deliberating, but I want you to make all the record you want to make.

MR. ROGERS: I believe that's all the record I need to make right now. Thank you.

THE COURT: Is there anything else you want to add, you can. Does the government have any response?

MR. WILLIAMS: No, Your Honor. We think the Court's already analyzed this case, and we're not persuaded either by their arguments for it. Frankly, the case law and Rule 23 and Rule 24 are set up for practical solutions. Case law supports the substitution in of an alternate juror in these circumstances, and we don't think 848's procedure somehow supplants the practical solutions arrived at by Congress in Rule 23 and 24.

THE COURT: Well, it may. I have an open mind that it may, but I'm just going to not make that decision this morning.

MR. WILLIAMS: Nothing else, Your Honor.

THE COURT: Okay. Any other record either side would like to make?

MR. SPIES: The only other -- I don't know how to pose it. You're good at asking jurors questions and eliciting I hope

candid responses, but I think important for you to have in the back of your mind as you make inquiry of the jurors, Your Honor, that obviously any juror is going to be reluctant to admit to wrongdoing, and I know in your gentle way that you will

encourage the jurors to be as frank as possible, and that's my only word of encouragement to the Court.

THE COURT: I appreciate that. I appreciate that, because it's a very awkward situation.

MR. SPIES: Yes.

THE COURT: Particularly for the jurors. For everybody else but particularly for a juror because they're not used to the federal court experience. So I appreciate that, and I'm pleased that you reminded me of that.

Anything else?

MR. SPIES: No, Your Honor.

MR. PARRISH: No, Your Honor.

THE COURT: Okay. Thank you very much. We'll be in recess I think till about 8:30.

(Recess at 8:01 a.m.)

THE COURT: Please be seated for a minute. Here's what I'm planning on doing. I'm planning on bringing all of the penalty phase deliberating jurors in minus obviously 523 and simply read them supplemental instruction number C and give them a copy of it. I made a slight change that I think you were notified of. I decided I didn't really like the language, Owing

4103

to unforeseen developments in this case, so I just thought I would start, It has become necessary for me to interview each of you individually. Anybody have a problem with that?

MR. PARRISH: No, Your Honor.

MR. WILLIAMS: No, Your Honor. And just to reflect as well, your old C had that the parties would do questioning as well.

THE COURT: Right, and I took that out as well based

on our discussion. And so -- and then I'll explain to them that they'll be going back down to the jury deliberations rooms. We'll be bringing them up one at a time to interview them. When they're done with the interview, they'll go to another jury deliberation room until I've interviewed all of the jurors and then they'll be back together; okay?

MR. WILLIAMS: Very good.

MR. PARRISH: Thank you, Judge.

THE COURT: Thank you.

(The jury entered the courtroom.)

THE COURT: Good morning. Please be seated. I'm going to ask Carey to pass out a very short supplemental instruction number C for each juror, and then I'm going to read that. Okay. Looks like everybody has one. Please follow along with me.

Supplemental instruction C, special conduct instruction. It has become necessary for me to interview each

4104

of you individually in turn here in the courtroom. While you are waiting for your individual interview, you are not to discuss anything about this case or your deliberations with anyone, including other jurors. You are also not to speculate on the reasons for the individual interviews. After you have been interviewed individually, you are not to disclose to other jurors or anyone else the questions asked of you or your answers to those questions. Dated this 25th day of October, 2004, signed by me, Mark Bennett.

Now, here's what we're going to do. We're going to send you back down to the jury room. Then I'm going to bring you each up one at a time. I don't think it will take very long

at all. But then when I'm done interviewing you, then we're going to send you to another room so that in that room will be the people who -- you'll gain a juror each time I interview you. They'll go down to that room. So the ones that haven't been interviewed won't have contact with the ones that have already been interviewed. And then when I'm done with the interviews, I'll let you know what we're going to do next.

So please go back down to the jury room. We'll bring you back up. We'll just do it in the order. We'll start with 902 in the back row and then come down the full back row and then down the full front row. So, Juror 498 here, you'll be last.

(The jury exited the courtroom.)

4105

(Juror 902 entered the courtroom.)

THE COURT: Juror 902, why don't you just sit in the first chair, and Rick's going to give you a microphone. Thank you. Everybody please be seated. Good morning.

JUROR 902: Good morning.

THE COURT: At any time did Juror 523 tell you or did you hear her tell any other juror or anyone else about any comments her boss may have made to her about this case including any statements about what the outcome should be?

JUROR 902: No. I heard her tell people that her boss was giving her --

THE COURT: Can you hold the microphone up a little closer?

JUROR 902: -- was giving her a hard time at work, but she never said what he was saying. I mean, I never heard her say what he was saying to her.

THE COURT: Okay. That's fine. Since you began your penalty phase deliberations, have you been exposed to any media accounts of this case?

JUROR 902: No.

THE COURT: Since you began your penalty phase deliberations, have you heard any nonjuror express an opinion about the appropriate punishment of the defendant?

JUROR 902: No.

THE COURT: Okay. Thank you. You're excused.

♀

(Juror 902 exited the courtroom.)

MR. PARRISH: Your Honor, you had indicated to us you were going to remind them and I think the government had no objection --

THE COURT: Oh, that's right, that they're under oath. Thank you. I simply forgot to do that.

(Juror 204 entered the courtroom.)

THE COURT: Good morning, Juror 204. Be seated, please, in the first chair.

JUROR 204: Good morning.

THE COURT: Good morning. I just wanted to remind you that you're under oath, and I have a couple questions for you. At any time did you hear Juror 523 tell you or did you hear her tell any other juror or anyone else about any comments her boss may have made to her about this case including any statements about what the outcome should be?

JUROR 204: I think I heard her say once that her boss -- she always wanted to hurry up and get the case done, so she said that her boss would make -- excuse me, would make comments to her.

THE COURT: And did she say what those comments were?

JUROR 204: Not that I can recall.

THE COURT: Since you began your penalty phase deliberations, have you been exposed to any media accounts of this case?

♀

JUROR 902: I've had people at work come up to me and try to say stuff to me, but I'd say, Please don't talk to me.

THE COURT: And what type of things would they try and say to you?

JUROR 902: Once they mentioned, I hear you guys had pizza today for lunch, and they just kind of report. They've said, Oh, you got out early yesterday?

THE COURT: Have any of those comments in any way affected your ability to be fair and impartial in the penalty phase?

JUROR 204: No.

THE COURT: I just want to check with the lawyers to see if there are any follow-up questions; okay?

JUROR 204: Okay.

MR. PARRISH: We have none, Your Honor.

THE COURT: Pardon me?

MR. PARRISH: None.

THE COURT: No?

MR. PARRISH: That's correct, we have none.

MR. WILLIAMS: No, Your Honor.

THE COURT: Thank you. You're excused.

(Juror 204 exited the courtroom.)

(Juror 636 entered the courtroom.)

THE COURT: Please be seated. Good morning, Juror

636.

JUROR 636: Good morning.

THE COURT: I just wanted to remind you that you're under your juror oath, and I have a few questions for you this morning.

At any time did you hear Juror 523 tell you or did you hear her tell any other juror or anyone else about any comments her boss may have made to her about this case including any statements about what the outcome should be?

JUROR 636: I don't recall hearing her say what her boss said. I do remember her saying that -- something like she's harassed or something. I took it to mean as being away from work and sitting on a jury.

THE COURT: And do you recall when that comment may have been made?

JUROR 636: I really don't. I can't tell you if it was before the verdict or after.

THE COURT: Okay. You just don't recall.

JUROR 636: I don't.

THE COURT: Now, since you began your penalty phase deliberations, have you been exposed to any media accounts of this case?

JUROR 636: No.

THE COURT: Since you began your penalty phase deliberations, have you heard any nonjuror express an opinion about the appropriate punishment of the defendant?

JUROR 636: No.

THE COURT: Now, I want to return to what you recall Juror 523 telling you, and I want to ask you this. Has anything you may have heard about Juror 523's boss's comments affected in any way your ability to be fair and impartial in your penalty phase deliberations?

JUROR 636: No.

THE COURT: Okay. Any follow-up questions?

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: Just a reminder, Your Honor, I think, and the questions have been asked now but the reminder that preceded that.

THE COURT: Oh, that she's under oath?

MR. PARRISH: Yeah.

THE COURT: Okay. Did you understand that you're still under your juror oath?

JUROR 636: Yes.

THE COURT: Thank you. That's all the questions we have. Thank you.

(Juror 636 exited the courtroom.)

MR. PARRISH: I think you may have asked that.

THE COURT: I thought I did, but no harm in a second chance.

(Juror 855 entered the courtroom.)

THE COURT: Please be seated. Good morning, Juror

4110

855.

JUROR 855: Hello.

THE COURT: I just want to remind you that you're still under your juror oath, and I have a few questions for you

this morning.

JUROR 855: Okay.

THE COURT: At any time did Juror 523 tell you or did you hear her tell any other juror or anyone else about any comments her boss may have made to her about this case including any statements about what the outcome should be?

JUROR 855: Not about the outcome, but she made comments like on the bus how her boss was giving her a hard time about being a juror and being on this case.

THE COURT: And do you recall specifically what Juror 523 said on the bus?

JUROR 855: Just that her boss is being really rude to her, comments like that. She never said like what she should do about it, just that he's being kind of rude when she -- when we got out early, she really hesitated about wanting to go back and go back to work on Fridays.

THE COURT: Okay. And did you remember how often you heard those comments?

JUROR 855: I want to say maybe once or twice a week, could have been more or less. We really didn't sit close to each other on the bus, so I was always in the back, and she'd be

♀

4111

in the front, so everybody would be talking, and I really didn't hear too much, but a couple times I did sit by her, she always kind of made a couple comments that I can remember anyway.

THE COURT: And do you recall when you first heard the first comment?

JUROR 855: I want to say a couple weeks into it.

THE COURT: A couple weeks into the start of the trial?

JUROR 855: Yes, yeah, maybe two or three.

THE COURT: So that would probably be some time in September?

JUROR 855: Yes, sir.

THE COURT: Now, has anything you may have heard about Juror 523's boss's comments affected in any way your ability to be fair and impartial in your penalty phase deliberations?

JUROR 855: No, sir.

THE COURT: Since you began your penalty phase deliberations, have you been exposed to any media accounts of this case?

JUROR 855: No.

THE COURT: And since you began your penalty phase deliberations, have you heard any nonjuror express an opinion about the appropriate punishment of the defendant?

JUROR 855: No, sir.

THE COURT: That's all the questions I have.

♀

MR. PARRISH: None, Your Honor.

MR. WILLIAMS: None, Your Honor.

THE COURT: Okay. Thank you.

JUROR 855: Okay.

(Juror 855 exited the courtroom.)

(Juror 513 entered the courtroom.)

THE COURT: Good morning.

JUROR 513: Morning.

THE COURT: Please be seated. Juror 513; is that correct?

JUROR 513: Yes.

THE COURT: Okay. I just wanted to remind you that

you're still under your juror oath, and I'll have a few questions for you this morning.

At any time did Juror 523 tell you or did you hear her tell any other juror or anyone else about any comments her boss may have made to her about this case including any statements about what the outcome should be?

JUROR 513: Only on Thursday.

THE COURT: Thursday of last week?

JUROR 513: Uh-huh.

THE COURT: And can you tell us where that took place, where you heard the comments?

JUROR 513: In the little -- not in the room itself but where the refrigerator and stuff is.

♀

4113

THE COURT: Okay. Kind of the entryway before you go into the jury deliberation room?

JUROR 513: Yes.

THE COURT: Do you recall approximately what time of day it was?

JUROR 513: No, I don't.

THE COURT: Okay. And do you recall what you heard?

JUROR 513: She just said that he walks by making remarks such as "fry him" and stuff, but that's all.

THE COURT: And was that the first time you heard Juror 523 say anything?

JUROR 855: Yes.

THE COURT: Was there any other time that you heard Juror 523 say anything?

JUROR 513: No, because she usually sits in the other room when we're at break and stuff, so I don't have much contact

with her to . . .

THE COURT: Now, has anything about Juror 523's comments about her boss affected in any way your ability to be fair and impartial in your penalty phase deliberations?

JUROR 513: No, not at all.

THE COURT: Since you began your penalty phase deliberations, have you been exposed to any media accounts of this case?

JUROR 513: No.

♀

THE COURT: And since you began your penalty phase deliberations, have you heard any nonjuror express an opinion about the appropriate punishment of the defendant?

JUROR 513: No.

THE COURT: Okay. That's all the questions I have. I'm going to see if the lawyers want me to ask any follow-up questions.

MR. PARRISH: May we approach, Your Honor?

THE COURT: Yes.

Ma'am, I'm going to just ask you to step out for a minute while I talk to the lawyers.

(Juror 513 exited the courtroom.)

(At sidebar on the record.)

MR. PARRISH: I don't know whether you want to follow up. It may not be something you want to do at this point. She said she heard the comments such as "fry him" which indicate there may have been some other comments that she might have heard other than that she said such as "fry him," but I think it may be appropriate to say, Well, what other comments similar to that did you hear?

THE COURT: I'll be glad to ask that.

MR. WILLIAMS: The only other thing, Judge, I would suggest is she couldn't remember the time, but I think we could establish was this before or after you ended deliberations for the day to kind of narrow down the time.

(The sidebar was concluded.)

MR. PARRISH: Judge, what about any other jurors who were around her at the time?

THE COURT: Okay.

MR. PARRISH: And I don't think Mr. Williams has any objection.

MR. WILLIAMS: No objection.

THE COURT: Okay. Let's bring Juror 513 back in.

(Juror 513 entered the courtroom.)

THE COURT: Thank you. Please be seated. I do have a couple follow-up questions. You indicated that the comment by Juror 523 about her boss might have been such as "fry him"?

JUROR 513: Yes.

THE COURT: Were there any other comments you heard Juror 523 make about what her boss said?

JUROR 513: There was one that she said, but I don't remember, you know, the exact. You know, it had to do with the same -- and that was at the same time.

THE COURT: Okay. That would be the same time on Thursday?

JUROR 513: (Nodded head.)

THE COURT: You'll have to answer out loud. Sorry.

JUROR 513: Sorry. Yes.

THE COURT: That's okay. Now, did any other jurors to

your knowledge hear Juror 523 say that comment?

JUROR 513: Well, there was a group of us standing around, so I couldn't tell you which ones it all were, but there were others that were standing around.

THE COURT: Okay. Now I want to ask you about the time you think the comment was made and see if this helps. Was it made before or after you concluded your deliberations for the day on Thursday?

JUROR 513: Before.

THE COURT: Before you concluded your deliberations.

JUROR 513: Uh-huh.

THE COURT: Do you know how much before?

JUROR 513: Maybe a half hour, you know. It was after dinner. I think we'd taken one break before.

THE COURT: Okay.

JUROR 513: Before I had heard her.

THE COURT: Okay. Any more follow-up questions?

MR. PARRISH: No, Your Honor. Thank you.

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Thank you.

(Juror 513 exited the courtroom.)

(Juror 857 entered the courtroom.)

THE COURT: Please be seated. Good morning, Juror -- is it 857?

JUROR 857: Yes.

THE COURT: I just wanted to remind you that you're

under your juror oath, and I have a few questions for you this

morning. Excuse me. I'm having some throat and stomach problems.

At any time did Juror 523 tell you or did you hear her tell any other juror or anyone else about any comments her boss may have made to her about this case including any statements about what the outcome should be?

JUROR 857: No.

THE COURT: Since you began your penalty phase deliberations, have you been exposed to any media accounts of this case?

JUROR 857: No.

THE COURT: Since you began your penalty phase deliberations, have you heard any nonjuror express an opinion about the appropriate punishment of the defendant?

JUROR 857: No.

THE COURT: Thank you. Just hang on for one second. I want to see if there are any follow-up questions by the lawyers.

MR. PARRISH: No, Your Honor.

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Thank you.

(Juror 857 exited the courtroom.)

(Juror 806 entered the courtroom.)

THE COURT: Please be seated. Good morning, Juror

4118

806.

JUROR 806: Good morning.

THE COURT: Good morning. I just wanted to remind you that you're still under your juror oath, and I have a few questions for you this morning.

JUROR 806: Okay.

THE COURT: At any time did Juror 523 tell you or did you hear her tell any other juror or anyone else about any comments her boss may have made to her about this case including any statements about what the outcome should be?

JUROR 806: She said that she didn't want to go to work because he was making comments, but I didn't -- I didn't talk to her, don't know her, and she didn't say anything.

THE COURT: Now, when did you hear that from Juror 523? Do you recall?

JUROR 806: Just when she was asking for that excuse.

THE COURT: Okay. Would that have been last Thursday?

JUROR 806: Yeah.

THE COURT: And would that have been before or after you concluded your deliberations for the day?

JUROR 806: Well, I think it was at the end.

THE COURT: Okay. But was it after you concluded your deliberations for the day?

JUROR 806: Oh, yeah, yeah, because she was sitting down, and she said, I'm going to get an excuse. That's all I

♀

know.

THE COURT: Now, has anything you may have heard about Juror 523's boss's comments affected in any way your ability to be fair and impartial in your penalty phase deliberations?

JUROR 806: No.

THE COURT: Now, since you began your penalty phase deliberations, have you been exposed to any media accounts of this case?

JUROR 806: No.

THE COURT: Since you began your penalty phase deliberations, have you heard any nonjuror express an opinion about the appropriate punishment of the defendant?

JUROR 806: No.

THE COURT: Any follow-up questions?

MR. PARRISH: May we approach, Your Honor, just a second?

THE COURT: Ma'am, I'm going to ask you to just go outside for a minute while I meet with the lawyers. Thank you.

(Juror 806 exited the courtroom.)

(At sidebar on the record.)

MR. PARRISH: The only one, Your Honor, I think is did she know any of the other jurors who were around at the time the comment was made about the boss.

THE COURT: Okay. Well, do you want me to ask if -- just who was around, because it's kind of hard for somebody to

give an opinion as to whether somebody else heard something. We want to just find who was around or whether somebody might have heard?

MR. PARRISH: Both, but not what they heard.

THE COURT: Okay.

(The sidebar was concluded.)

THE COURT: Bring her in, please.

(Juror 806 entered the courtroom.)

THE COURT: Please be seated. Ma'am, were there any other jurors present when you heard Juror 523 make this comment?

JUROR 806: I don't know. She just said she was going to get permission not to go to work. That's all I know.

THE COURT: And do you know whether there were any

other jurors present when you heard that comment?

JUROR 806: I don't know. We were just standing -- you know, just -- when we were going to go to the van, she didn't get in our van.

THE COURT: Okay.

JUROR 806: So that's all I know.

THE COURT: Okay. Any other follow-up questions?

MR. PARRISH: No, Your Honor. Thank you.

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Thank you.

JUROR 806: Okay. Thank you.

(Juror 806 exited the courtroom.)

♀

4121

(Juror 38 entered the courtroom.)

THE COURT: Please be seated. Good morning, Juror 38.

JUROR 38: Good morning.

THE COURT: I just wanted to remind you that you're still under your juror oath, and I have a few questions for you.

Here's the first question: At any time did Juror 523 tell you or did you hear her tell any other juror or anyone else about any comments her boss may have made to her about this case including any statements about what the outcome should be?

JUROR 38: Briefly.

THE COURT: Okay. Why don't you tell us about it.

JUROR 38: She had just mentioned that her boss was giving her a bad time and she didn't feel comfortable going back to work.

THE COURT: And when did you hear her make that comment?

JUROR 806: Friday -- or Thursday.

THE COURT: Okay. Had you heard her make any comments like that prior to Thursday?

JUROR 38: No.

THE COURT: And do you recall where you were physically located when you heard this comment?

JUROR 38: Actually we were waiting to leave.

THE COURT: Had you concluded your deliberations for the day?

♀

JUROR 38: Yes.

THE COURT: Were other jurors present when you heard this comment?

JUROR 38: Yes.

THE COURT: Do you recall the juror numbers of who was present?

JUROR 38: I don't know the juror numbers.

THE COURT: Okay. And do you know whether or not they heard the statement?

JUROR 38: I'm sure, yes, but I think there was only one other person there that I know of.

THE COURT: Okay. Now, has anything you may have heard about Juror 523's boss's comments affected in any way your ability to be fair and impartial in your penalty phase deliberations?

JUROR 38: No.

THE COURT: Now, since you began your penalty phase deliberations, have you been exposed to any media accounts of this case?

JUROR 38: No.

THE COURT: Since you began your penalty phase

deliberations, have you heard any nonjuror express an opinion about the appropriate punishment of the defendant?

JUROR 38: No.

THE COURT: Okay. Any follow-up questions from the

lawyers?

MR. PARRISH: No, Your Honor.

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Thank you.

(Juror 38 exited the courtroom.)

(Juror 646 entered the courtroom.)

THE COURT: Please be seated. Good morning, Juror 646.

JUROR 646: Good morning.

THE COURT: I just wanted to remind you as I have all the other jurors that you're still under your juror oath, and I have a few questions for you this morning.

First question, at any time did Juror 523 tell you or did you hear her tell any other juror or anyone else about any comments her boss may have made to her about this case including any statements about what the outcome should be?

JUROR 646: She said that she wanted an excuse from work on Friday because her boss -- she didn't want to go to work and her boss expected her to be at work whenever she wasn't in court, but she didn't repeat any comments that he made, just that he was giving her a hard time about -- like if we got out early, she had to go to work.

THE COURT: And where were you physically located when you heard this comment?

JUROR 646: I was sitting at the end of the juror

table, and she was like two seats around -- two seats away from me.

THE COURT: And had you concluded your juror deliberations for the day?

JUROR 646: Yes.

THE COURT: And you were all waiting to --

JUROR 646: We were deciding whether to deliberate on Friday, and a couple of the other jurors had other commitments and didn't want to deliberate on Friday, and that was the context of her comment. She wanted a note to get out of work.

THE COURT: And do you know how many other jurors were present when she made that comment?

JUROR 646: I think the door was open and we were kind of waiting for the vans, so I think -- I'm not sure if we were all sitting in there. I think we were like in and out. It was at the end of the day, and we were just deciding whether to come back on Friday. I guess I don't remember that for sure.

THE COURT: Okay. Now, has anything you may have heard about Juror 523's boss's comments affected in any way your ability to be fair and impartial in your penalty phase deliberations?

JUROR 646: No. You know, several of us felt that her boss must be a jerk because I'm getting no pressure from my job at all, and I appreciate that. I guess I felt sorry for her, but she didn't -- she didn't say what he said, just that he was

giving her trouble about not being at work when she wasn't here.

THE COURT: Okay.

JUROR 646: And it is hard to go to work. I mean, you're exhausted at the end of the day, and you don't want to go into work.

THE COURT: And I just wanted to make sure if in any way the comments by Juror 523 have affected your ability to be fair and impartial in your penalty phase deliberations.

JUROR 646: No, I don't believe so.

THE COURT: Since you began your penalty phase deliberations, have you been exposed to any media accounts of this case?

JUROR 646: No.

THE COURT: And since you began your penalty phase deliberations, have you heard any nonjuror express an opinion about the appropriate punishment of the defendant?

JUROR 646: No.

THE COURT: Okay. That's all the questions I have. I'm going to just see if the lawyers have any additional questions.

MR. PARRISH: No, Your Honor. Thank you.

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Okay. Thank you.

(Juror 646 exited the courtroom.)

(Juror 963 entered the courtroom.)

4126

THE COURT: Please be seated. Good morning, Juror 963.

JUROR 963: Good morning.

THE COURT: I just wanted to remind you that you're still under your juror oath, and I have a few questions for you

this morning.

At any time did Juror 523 tell you or did you hear her tell any other juror or anyone else about any comments her boss may have made to her about this case including any statements about what the outcome should be?

JUROR 963: On Thursday when we were discussing whether to deliberate Friday, she indicated that she did not want to take off, she wanted to deliberate, and she would have voted for that.

THE COURT: Did she indicate any comments her boss may have made?

JUROR 963: She said that her boss had made some comments about that that made her uncomfortable.

THE COURT: Did she tell you what those comments were?

JUROR 963: I -- no, I don't believe so.

THE COURT: Now, is there anything about the comments that you heard Juror 523 say about her boss that affect in any way your ability to be fair and impartial in your penalty phase deliberations?

JUROR 963: No, it wouldn't.

4127

THE COURT: Since you began your penalty phase deliberations, have you been exposed to any media accounts of this case?

JUROR 963: No, I haven't.

THE COURT: Since you began your penalty phase deliberations, have you heard any nonjuror express an opinion about the appropriate punishment of the defendant?

JUROR 963: No.

THE COURT: I'm just going to check with the lawyers

to see if they want me to ask any follow-up questions.

JUROR 963: Okay.

MR. PARRISH: Thank you, Your Honor. None.

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Thank you.

(Juror 963 exited the courtroom.)

(Juror 498 entered the courtroom.)

THE COURT: Please be seated. Good morning, Juror 498.

JUROR 498: Good morning.

THE COURT: I just wanted to remind you that you're under your juror oath, and I have a few questions for you this morning.

At any time did Juror 523 tell you or did you hear her tell any other juror or anyone else about any comments her boss may have made to her about this case including any statements

about what the outcome should be?

JUROR 498: The only time I specifically remember her saying that was last Thursday, that her boss had made comments to her and she didn't feel comfortable going to work on Friday.

THE COURT: And do you recall -- did she share with you what those comments were that her boss may have made?

JUROR 498: She just said he'd make comments when he'd walk by her desk.

THE COURT: And did she tell you what those comments were?

JUROR 498: I don't remember what she said they were.

THE COURT: Where were you physically located when Juror 523 made this statement?

JUROR 498: I think we were down in the jury room.

THE COURT: Do you remember was it before or after you concluded your deliberations for the day?

JUROR 498: I want to say it was after, but it could have been right before we concluded for the day too.

THE COURT: I don't want to suggest anything, but could it have been while you were discussing whether or not to deliberate on Friday?

JUROR 498: That could have been.

THE COURT: Do you recall whether any other jurors heard Juror 523's comments about her boss?

JUROR 498: I'm sure other people heard it. I don't

remember if we were -- I mean, I think I was sitting almost close to her, so I know that I heard it, and I'm sure other people did too.

THE COURT: Now, has anything you may have heard about Juror 523's boss's comments affected in any way your ability to be fair and impartial in your penalty phase deliberations?

JUROR 498: No.

THE COURT: Since you began your penalty phase deliberations, have you been exposed to any media accounts of this case?

JUROR 498: No.

THE COURT: Since you began your penalty phase deliberations, have you heard any nonjuror express an opinion about the appropriate punishment of the defendant?

JUROR 498: No.

THE COURT: Okay. I'm just going to check with the lawyers to see if they have some follow-up questions.

MR. PARRISH: If we could approach, Your Honor.

THE COURT: Ma'am, I'm going to have you step out of the courtroom while I have a chance to talk to the lawyers, and then we'll bring you back in. Thank you.

(Juror 498 exited the courtroom.)

(At sidebar on the record.)

MR. PARRISH: We were going to save you time from getting down from the bench and do it from the microphones.

♀

That's what C.J. suggested. The only thing I thought is she said not what other people heard but she couldn't remember exactly what the comments were. I wondered would she have any idea what the comments were.

MR. WILLIAMS: Or do you remember the general --

MR. PARRISH: Context, general nature of it.

MR. WILLIAMS: Something like that.

MR. PARRISH: And that's all we had.

THE COURT: While I've got you up here, let me ask you this. What time are the alternates supposed to come in?

THE CLERK: They're supposed to be here by ten.

THE COURT: What do you suggest we do next?

MR. WILLIAMS: Well, I think we overestimated the amount of time it was going to take to get through this which is unfortunate, but -- and so I think just to keep them from deliberating, I think it would be good for you to bring them back up, say, Okay, thank you very much. I'm reminding you don't do anything at this point until I give you further instructions. You can talk about the weather, sports, whatever you want to do. Just don't deliberate.

MR. PARRISH: Have you done that already?

THE COURT: I think I want to remind them again. And just refresh my recollection now. With regard to the alternates, the alternates would not have been here on Thursday, but we want to find out if they -- I mean, they weren't

physically present on Thursday.

MR. PARRISH: Right.

THE COURT: But we want to find out if they heard any comments at some other time.

MR. PARRISH: Right.

THE COURT: But I'll just ask the question neutral, have you heard any comments any time?

MR. WILLIAMS: I think the way you have it worded now, isn't that just basically the same thing?

THE COURT: At any time, yeah.

MR. PARRISH: And I think it was triggered by the fact 523 said a couple alternates were there based upon her earlier testimony in this matter. But I thought what we could address -- you say once we have some free time, I think Mr. Spies is going to address specifically some comments by these jurors.

THE COURT: Okay. Right.

MR. PARRISH: While we're waiting.

THE COURT: Right. I assumed that.

(The sidebar was concluded.)

THE COURT: Let's bring Juror 498 in, please.

(Juror 498 entered the courtroom.)

THE COURT: Please be seated. Juror 498, I just wanted to follow up on your observation that you couldn't remember exactly what Juror 523 said. Do you have any general

understanding about what the comments were if you can recall?

JUROR 498: I'm sure they were negative comments about what he thought the outcome could be, but I don't remember specifics. I mean, I -- I could speculate on what I think she heard -- or what I think I heard, but I think she said like "hang him" or something like that or "guilty, guilty, guilty" but . . .

THE COURT: Now, if you heard those comments, I'm going to ask you again, would they in any way affect your ability to be fair and impartial in your penalty phase deliberations?

JUROR 498: No.

THE COURT: Okay. Any follow-up questions from the lawyers?

MR. PARRISH: Thank you, Your Honor. None.

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Thank you.

(Juror 498 exited the courtroom.)

THE COURT: Can you close the door, please?

Please be seated. Now, before we bring the jurors up, do you have any -- I'd like to give them a reason why there's going to be a delay this morning. Is there any downside in telling them that we've asked the alternate jurors to come in and I want to question the alternate jurors along the same lines? Anybody have any problem with that?

♀

4133

MR. SPIES: No, I think that'd be a perfect explanation that's a nonthreatening sort of thing.

THE COURT: And then we'll tell them to remain in the jury room but to not conduct any further deliberations until they hear further from me.

MR. SPIES: That's right.

MR. WILLIAMS: No objection.

THE COURT: Okay. Let's have the jury panel brought up.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated. Members of the jury, I wanted to thank you for your cooperation this morning, and I want to explain what's going to happen next. After consultation with the parties, we're also bringing in the three remaining alternate jurors, but I don't think they're going to get to the building till around ten or a little bit before, and then I'm going to question them just like I did each of you, so it will take us a little bit of time to do that.

And so I'm going to send you down to the jury room, ask you not to conduct any further deliberations, just be as patient as you can. And as soon as I'm in a position to advise you of what's going to happen next, I will either through a written instruction or bringing you back in the courtroom or perhaps both.

So my instruction to you now is to go down to the jury

room and be as patient as you can be but conduct no further deliberations on the penalty phase. And don't discuss among yourselves or speculate as to why I have questioned each one of you or why I'm questioning the alternate jurors. So I'll be -- I know your time is very valuable to me. Believe me, I understand that. And I'll be back with you as soon as I can.

Thank you.

(The jury exited the courtroom.)

THE COURT: Thank you. Please be seated.

Mr. Williams, any further record you want to make at this time?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Be happy to hear from any and all of the defense lawyers.

MR. SPIES: Well, Your Honor, I think depending on what responses we get from the alternate jurors, I'm trying to establish by triangulation here what contact Juror 523 had. My recollection from her testimony last week was that she had spoken she thought with Juror 902 and Juror 38. 902, the first juror that we examined this morning, said that she heard 523 say that her boss had given her a hard time at work but not any comments about what the -- her boss had been saying to her about the subject matter of what her verdict should be or what her boss thought about the case. I'll have to relook at that transcript of Juror 523's testimony. But I think there's some

conflict there, but I'll take a closer look at that.

But again, I think this goes to the general subject area that I was concerned about earlier, the completeness and candor of each of the jurors, but aside from that, we'll have to see what the alternates say because it's my recollection also from Juror 523 was she had spoken with -- I think she said two alternates, and that may have been in this group waiting for the van, but if the alternates weren't here on Thursday, then those comments to the alternates must have occurred at some other time.

THE COURT: Or they weren't made to the alternates, right.

MR. SPIES: Right. So subject to those comments, we'll wait to see what the alternates have to say.

THE COURT: Okay. Anybody else want to weigh in?

MR. PARRISH: No, Your Honor.

THE COURT: Okay. We'll notify you as soon as the alternates are in the building. Thank you.

(Recess at 9:19 a.m.)

THE COURT: Please be seated. I understand the three alternate jurors are in the building. They're down in the bankruptcy court. Do you want to follow the same procedure where we bring all three in and tell them what I'm going to do, or do you just want to bring them up one at a time?

MR. WILLIAMS: Your Honor, on behalf of the

♀

government, it's your pleasure. I don't think it matters either way.

THE COURT: Well, I think the instruction that we gave them would be E which they've already received; correct?

MR. MASTALIR: Yes.

THE COURT: Which tells them that we'll be bringing them up to the courtroom for further instructions shortly after their arrival. So why don't we just bring them one at a time. There's only three.

MR. SPIES: That's fine with the defendant, Your Honor.

THE COURT: But I think we should keep them sequestered, so after the first one's questioned -- here's what I suggest doing. Why don't you bring three of them up.

There's -- well, you just have to find a place for them, and then when we question the one, they can go down to the bankruptcy courtroom; question the second one, go down to the bankruptcy courtroom; question the third, they can go down to the bankruptcy courtroom. And then I'll need to meet with the lawyers and figure out what we're going to do next.

CSO PERSINGER: We have two rooms set up.

THE COURT: Fine. So bring our first alternate juror up.

(Alternate Juror 914 entered the courtroom.)

THE COURT: Please be seated in the first chair there.

Everybody can be seated.

Sir, are you Juror 914?

JUROR 914: Yes.

THE COURT: Okay. I just want to remind you that you're still under your juror oath, and I have at least one question, maybe more, for you this morning.

At any time did Juror 523 tell you or did you hear her tell any other juror or anyone else about any comments her boss may have made to her about this case including any statements about what the outcome should be?

JUROR 914: I heard her -- she told me once that her boss was saying something but . . .

THE COURT: Did she tell you what her boss was saying?

JUROR 914: I believe she did.

THE COURT: Okay. Do you recall what it was?

JUROR 914: No, I don't.

THE COURT: Do you recall when you had this conversation?

JUROR 914: Not for sure. It's probably been a couple weeks.

THE COURT: To the best of your knowledge, was it before the jury reached a determination on the merits or after if you can recall?

JUROR 914: I can't recall for sure.

THE COURT: And do you recall any more specifics about

♀

what she may have said that her boss said?

JUROR 914: No.

THE COURT: Now, if you were to become a juror in the penalty phase deliberations, would anything Juror 523 have said about her boss's comments affect in any way your ability to be fair and impartial in your penalty phase deliberations?

JUROR 914: No.

THE COURT: Now, since the penalty phase deliberations began, have you been exposed to any media accounts of this case?

JUROR 914: No.

THE COURT: And since the penalty phase deliberations began, have you heard any nonjuror express an opinion about the appropriate punishment of the defendant?

JUROR 914: No.

THE COURT: Okay. I'm going to see if the lawyers want me to ask any follow-up questions.

MR. PARRISH: We do have one, Your Honor.

THE COURT: Okay. Well, I'm going to ask you to step out for a minute. Then I'm going to meet with the lawyers. Then I'm going to bring you back in.

(Alternate Juror 914 exited the courtroom.)

(At sidebar on the record.)

MR. PARRISH: It would be the general comments that he may have heard similar to the follow-up question you asked the other juror, and then the other question would be were other

jurors around to hear anything? Did he hear it in the van or the jury room or where he might have heard it which might give us some idea where he might have heard it?

THE COURT: Thank you.

(The sidebar was concluded.)

THE COURT: Can we bring the juror in, please?

(Alternate Juror 914 entered the courtroom.)

THE COURT: Thank you. Everybody please be seated. Juror 914, even if you can't recall the specifics of what Juror 523 said, can you tell us anything about what the general nature of the comments might have been?

JUROR 914: I can't re -- I can't remember.

THE COURT: And where did this conversation take place or the comments by Juror 523 take place?

JUROR 914: I believe it was in the hallway downstairs.

THE COURT: And were there other jurors present if you recall?

JUROR 914: Not at that time.

THE COURT: Okay. Was there another time where you heard Juror 523 make comments?

JUROR 914: No.

THE COURT: Okay. Any other follow-up questions by the lawyers?

MR. PARRISH: No, Your Honor. Thank you.

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Thank you. We'll be with you shortly after we talk to the other two jurors.

(Alternate Juror 914 exited the courtroom.)

(Alternate Juror 280 entered the courtroom.)

THE COURT: In the first chair, please, Juror 280. Thank you. Please be seated. Good morning.

JUROR 280: Good morning.

THE COURT: Thank you for coming in. I want to remind you, Juror 280, that you're still under your juror oath, and I have a couple of questions for you this morning.

At any time did Juror 523 tell you or did you hear her tell any other juror or anyone else about any comments her boss may have made to her about this case including any statements about what the outcome should be?

JUROR 280: No, I have not heard anything about that.

THE COURT: Okay. Since the penalty phase deliberations began, have you been exposed to any media accounts of this case?

JUROR 280: Nothing directly, no.

THE COURT: Okay. Why don't you tell us what that means, nothing directly.

JUROR 280: Just the comment that "sounds like you might be going back to Sioux City."

THE COURT: Oh, and who made that comment?

JUROR 280: Just people that knew that I was a juror, and I said, I know nothing about it.

THE COURT: Okay. Did they tell you why they thought you might be going back to Sioux City?

JUROR 280: Nope, and I didn't ask.

THE COURT: Okay. Now, is the fact that other people may have told you and correctly predicted that you'd be coming back to Sioux City, would that in any way affect your ability to be fair and impartial in the penalty phase if you were to now serve on the jury in the penalty phase?

JUROR 280: No, I don't believe so, because I've been sitting here the whole time. They haven't been. I heard everything firsthand, and all these people that think they know things have not heard anything so . . .

THE COURT: Okay. But with regard to these people who think they know things, have they made any comments or shared any opinions with you?

JUROR 280: No.

THE COURT: Okay. Since the penalty phase deliberations began, have you heard any nonjuror express an opinion about the appropriate punishment of the defendant? Want me to read that to you again?

JUROR 280: Yeah, I think I know what you're saying. I think I'd be dishonest in saying that the insinuations I think have been heard. When you're not sequestered, I think that's

just something that insinuations are heard. But as I said, I'm the one that's been here, so whatever insinuations are out there, I don't feel like it would affect my decision.

THE COURT: Can you tell us about any insinuations?

JUROR 280: You want me to say the comments?

THE COURT: Yeah.

JUROR 280: Things like "we'll get him now," or it was just insinuation-type things like that.

THE COURT: And how often did you hear comments like that?

JUROR 280: Probably a couple times.

THE COURT: And when did you hear those comments?

JUROR 280: Those are in my hometown, people that know that I'm on the jury.

THE COURT: And can you put a time frame on them for us?

JUROR 280: I guess I really can't.

THE COURT: Was it before or after the jury reached a decision on the merits of the case?

JUROR 280: I think it was after that.

THE COURT: Would any of these comments in any way affect your ability to be a fair and impartial juror if you were placed as a juror on the penalty phase?

JUROR 280: No, I don't believe they would.

THE COURT: Do you have any -- is there a chance that

they might, that any of these comments could affect your ability to be fair and impartial?

JUROR 280: I don't think so, because, like I said, I'm the one that's been sitting here for five weeks. I know what's been done here as opposed to what everybody else thinks the media has said which I have no idea what, but I'm the one that's been here, and I don't think that that would affect me in any way.

THE COURT: Okay. Do any of the lawyers want me to ask any follow-up questions?

MR. PARRISH: No questions, Your Honor. Thank you.

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Okay. Thank you.

(Alternate Juror 280 exited the courtroom.)

(Alternate Juror 425 entered the courtroom.)

THE COURT: Please be seated. Good morning, Juror 425.

JUROR 425: Good morning.

THE COURT: I just want to remind you that you're still under your juror oath, and I have a few questions for you this morning.

The first question is at any time did Juror Number 523 tell you or did you hear her tell any other juror or anyone else about any comments her boss may have made to her about this case including any statements about what the outcome should be?

♀

JUROR 425: No, sir.

THE COURT: Okay. Now, since the jury began their penalty phase deliberations, have you been exposed to any media accounts about this case?

JUROR 425: No.

THE COURT: Okay. And since the jury began your penalty phase -- since the jury began the penalty phase deliberations, have you heard any nonjuror express an opinion about the appropriate punishment of the defendant?

JUROR 425: No, I haven't.

THE COURT: If you were to serve as a juror on the penalty phase, is there any reason why you could not be a fair and impartial juror in the penalty phase deliberations?

JUROR 425: No.

THE COURT: Any follow-up questions?

MR. PARRISH: No, Your Honor. Thank you.

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Thank you. We'll be back with you when we can be. Thank you.

(Alternate Juror 425 exited the courtroom.)

THE COURT: Please be seated. Mr. Williams?

MR. WILLIAMS: I have no record to make, Your Honor.

THE COURT: The defense?

MR. SPIES: Beg pardon?

THE COURT: Pardon me?

♀

4145

MR. SPIES: I beg your pardon?

THE COURT: Do you have a record you'd like to make?

MR. SPIES: Just only argument, Your Honor.

THE COURT: Okay.

MR. SPIES: Well, here's what I think the posture of the case is now, Your Honor. Hearkening back to when Juror 523 came in but even before that when the jurors first sent the Court a note on Thursday afternoon -- my recollection was that it was fairly early in the afternoon on Thursday where they informed the Court that due to prior commitments they would not be deliberating on Friday, October 22 and wanted to resume this morning -- given the testimony from the jurors today, I think that the decision not to deliberate on Friday was made early in the afternoon. After that decision was made by the majority of the sitting jurors, they then continued to deliberate for a couple of hours into Thursday afternoon.

What that tells us circumstantially is that even after the vote was made and even after Juror 523 expressed her

minority view that she did not want to not deliberate on Friday and had informed a number of jurors about her concern about the comments that her boss had been making, the jurors then did continue to deliberate.

We can also infer that prior to those couple of hours of deliberation on Thursday that some jurors heard either that day on Thursday or earlier that the boss was making comments

about "guilty, guilty, guilty" or "fry him."

By our assessment, Your Honor, there were at least 5 jurors that were privy to Juror 523's concerns about her boss. There were I believe at least three of those jurors who heard her describe her boss's comments as negative. Juror 513 said that she heard Juror 523 say that the boss said, Fry him, that that comment was made before deliberations were concluded on Thursday. Juror 498 heard the comment "guilty, guilty, guilty" and "hang him." Our jury foreperson, Juror Number 855, said that the comments were being made once or twice a week about the boss giving her a hard time. This presumably would have gone back into the faltering deliberations on the guilt phase.

So I think there is a basis from our perspective that Juror 902 heard the comments by 523 about her boss, Juror 855 who heard 523 describe problems with 523's boss, Juror 513 who heard the "fry him" comments prior to the conclusion of deliberations on Thursday past, Juror 38 who also heard the comments about the boss giving 523 a hard time, and Juror 498 who, quite candidly, heard the negative comments about "guilty, guilty, guilty" and "hang him" have all been to a greater or lesser extent tainted by Juror 523's comments.

Alternate 914 corroborates what Juror 523 said last

week that she had spoken with at least two alternates. Alternate Number 280 likewise corroborates 523's comments that -- I'm sorry, yeah, Number 280, although she said she had

heard nothing from 523, Juror 523, did say that she thought she had spoken to two alternates.

This is very much, Your Honor, like Stockton versus Virginia in which the United States Court of Appeals For the Fourth Circuit in reflecting on the impact of a comment made by a restaurant owner during the sentencing deliberations in a state capital case in which the --

THE COURT: Yeah, I've read the case. I'm real familiar with it.

MR. SPIES: Well, anyway, I think the posture of the case is this, Your Honor, is that we now have prospectively three to five trial jurors, two alternate jurors, one of whom has revealed -- one alternate juror who has revealed additional insinuations or additional comments by townspeople that the confidence in any verdict that comes from this group of persons, it is going to be remarkably low to nonexistent, and I think that generally is the posture of the defense.

THE COURT: Well, but having said all that, what are you asking?

MR. SPIES: We're asking for a mistrial.

THE COURT: Okay. Mr. Williams?

MR. WILLIAMS: There's no ground for a mistrial at this point, Your Honor. The record reflects that each and every one of these jurors without reservation said that any comments they may have heard from Juror 523 will not affect their ability

to be a fair and impartial on the penalty phase. The Court has previously instructed them that they are to reach their opinion only on the evidence and the arguments of counsel. Jurors are presumed to follow those instructions, and the Court has drafted instructions to remind them of those duties once they continue to deliberate.

So the government thinks that there is not grounds for a mistrial. We don't think a presumption applies in this case under these facts, and we would ask the Court move forward and have this jury deliberate on the penalty phase.

The government has no position whether it goes forward with 11 jurors or with an alternate. We think that's a call for the defense to make.

THE COURT: Well, I'm going to reserve ruling on your motion for mistrial which in some respect may convert it into a motion for new trial, but I'm not going to grant a mistrial at this time. So I guess I'm either denying it or reserving ruling on it.

I've previously asked you on several occasions about if the matter were to proceed to verdict on the penalty phase did you want to proceed with 11 or replace Juror 523, and I'm certainly open to any suggestions that you have or some other suggestion.

MR. ROGERS: This is probably some other suggestion, Your Honor, and I don't want to beat a dead horse, but I do

4149

think that for the record we need to specifically request that jurors who we believe have been tainted be excused from further service.

THE COURT: Okay. Well, I think that was implicit in Mr. Spies' comments, but it's always better to make it explicit, and you've certainly done that.

MR. ROGERS: All right. And having said that, we would also point out that all of these jurors, including the alternates, have been under a duty to report any type of improper comment or contact. None have done so. And it particularly concerns me with regard to Juror 914 who is the first alternate because obviously any comment that he heard from Juror 523 occurred well before --

THE COURT: I understand that, but I'm asking you what you are asking me to do now having either denied or reserved ruling on your motion for mistrial. And I want it specific as to what you're asking me to do.

MR. ROGERS: I'm asking you to strike Juror 914 from the list of alternates on the basis that he was subjected to comments from Juror 523 which he did not report until now and now it's too late. He does not remember or he asserts that he does not remember what those comments were. And so we can't explore that.

THE COURT: What else are you asking me to do?

MR. ROGERS: If the question is would we rather

proceed with seating an alternate than with 11 jurors, we would, subject to our extensive and continuing and infinite objections.

THE COURT: Absolutely. Which alternate?

MR. ROGERS: 425's I think the only one that's untainted.

THE COURT: Does the government have any objection to replacing Juror 523 with Juror 42 -- with Alternate 425?

MR. WILLIAMS: No, Your Honor. I just want to make sure we're on record too by not conceding in any way that we believe that any of these jurors are tainted. We think the record does not support that, but we have no objection to substituting 425.

THE COURT: Roger, have you been able to pass out revised supplemental instruction number F?

MR. MASTALIR: I have, Judge.

THE COURT: Okay. And we would put -- assuming I put Juror 425 on, the second paragraph which is the alternate paragraph with regard to 11 members goes out. Do the parties have any objection to the remaining portion of the instruction?

MR. WILLIAMS: No, Your Honor.

MR. SPIES: No, Your Honor.

THE COURT: Now, I still have to rule on -- well, I'm going to go ahead and replace Juror 523 with 425, but also pending before me is defendant's motion to strike Alternate Juror 914. And I'm not -- that's denied. And so we need to

♀

talk about the mechanics of it.

My suggestion would be that we bring all of the jurors back into the courtroom including the three alternate jurors, that we pass out supplemental instruction number F and I read that to the jurors and also pass out the new verdict forms which are referenced in supplemental instruction number F, and then I send the jurors down to deliberate. And then after they leave, I'll ask the two alternates to remain, and I'll give them a cautionary instruction about not discussing anything about this case with anybody else and not letting anybody talk to them about the case and not reading anything, doing any investigation

and the like. Does anybody have any objection to proceeding in that fashion?

MR. SPIES: No.

MR. WILLIAMS: No.

THE COURT: Okay. Then we'll just take a moment to -- we were having some printer problems printing the verdict form. Have those been solved?

MR. MASTALIR: I think so. I need to make sure that we got enough copies ultimately.

THE COURT: Okay.

MR. MASTALIR: And I need to revise and print --

THE COURT: Right. We'll take a short recess until we can have supplemental instruction number F revised and then make sure we have sufficient copies of the verdict forms.

Is there any other record either side would like to make at this time, Mr. Williams?

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Mr. Spies?

MR. SPIES: No, Your Honor.

THE COURT: Okay. Thank you.

(Recess at 10:33 a.m.)

THE COURT: Please be seated. Just to review what I'm going to do, I'm planning on bringing all of the jurors, including the alternates, up. We'll be passing out supplemental instruction F, deliberations. Each of the jurors and I guess the alternates can have that and follow along with me. I'll then instruct the jurors to go back down and deliberate, keep the two alternates, and then give them a cautionary instruction.

Anybody have any problem with how I intend to proceed?

Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Without waiving any and all of the objections that you've made since last Thursday and before.

MR. SPIES: Subject to that preface, no.

THE COURT: Thank you. How about going all the way back to when the indictment was filed? Would that --

MR. ROGERS: And preindictment as well.

MR. PARRISH: Session still closed, Your Honor?

THE COURT: No, I'm going to open it up. It's open.

♀

4153

Any objection to having it open?

MR. PARRISH: No, Your Honor.

MR. WILLIAMS: None.

THE COURT: Thank you for reminding me of that, Mr. Parrish.

MR. PARRISH: It was Mr. Spies.

(The jury entered the courtroom.)

THE COURT: Thank you. Please be seated. Carey is now going to pass out what I've labelled as supplemental instruction number F entitled deliberations and then a new clean set of verdict forms. And then once it's passed out, we'll go over the special instruction number F. There aren't any verdict forms for two of the alternates, but it will become clear once I read the instruction.

Okay. If you would please follow along with me, supplemental instruction F, deliberations. Juror 523 has now been replaced with an alternate juror, Juror 425. You should not speculate on the reasons that Juror 523 has been replaced. You are instructed to begin anew your penalty phase

deliberations and to provide Juror 425 a full opportunity to participate in your discussions and determinations.

You must now begin anew your deliberations to determine whether imposition of a sentence of death is called for in this case or whether the defendant should instead be sentenced to life imprisonment without the possibility of

release for commission of the crimes in Counts 8 through 17. Beginning your deliberations anew means that you cannot consider any opinion previously expressed by any juror, including Juror 523, but must instead begin your discussions and deliberations concerning the penalty phase from the very beginning.

The decision of what sentence to impose is left exclusively to you, the jury. I must remind you again that your decisions must be based only on the evidence that was presented during the merits phase and the penalty phase in this case, not on any information or opinions that you may have heard from any other source. Therefore, you must disregard the opinions of anyone except for your fellow jurors about the appropriate penalty in this case.

Also, nothing that I have said in any of my instructions and nothing that I have said or done during either the merits phase or the penalty phase of the trial has been said or done to suggest to you what I think your decision should be. I have no opinion about what your decision should be.

To assist you in beginning your deliberations anew, I am giving you new copies of the penalty phase verdict form in this case. The court security officer will collect and destroy your original copies.

Dated this 25th day of October, 2004, signed by me,

Mark W. Bennett, Chief Judge, United States District Court, Northern District of Iowa.

And so I'm going to now send you down to begin your deliberations anew. And I'm going to ask that the two remaining alternate jurors stay put -- that would be Alternates 914 and 280 -- so I can give you a cautionary instruction. So would the deliberating jurors please go down to the jury room at this time. Thank you.

(Jury out at 10:50 a.m.)

THE COURT: Please be seated. To our two alternate jurors, I'm going to give you a similar instruction that I gave you before.

You are still under oath, and you are still alternate jurors in the case. As a result of that fact, you cannot let anyone tell you anything at all about this case. You cannot discuss this case with anyone. You can't listen to any news media reports about this case. You can't do any independent research on the Internet or anywhere else about this case. And you have to refrain from discussing this case with absolutely anybody, reading anything about the case, listening to anything about the case until after the verdict has been accepted by me and all of the jurors have been discharged.

Is there anything else that the government thinks that I should tell the alternate jurors?

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Mr. Spies?

MR. SPIES: No. Thank you.

THE COURT: Okay. So I would suggest that you just go back to your -- well, you can do whatever you want, but don't let anybody talk to you about the case. There's no requirement that you remain in the building. If you'd like to stay in the building, the CSOs will put you in a room separate from the jury so that you would have no contact with the deliberating jurors, but I'm not going to require that.

So as soon as we get a CSO to open the door -- one is on the way -- then the CSO will take you out of the courtroom. Gary? Okay. The two alternates are free to leave. Thank you.

(Alternate Jurors 914 and 280 exited the courtroom.)

THE COURT: Please be seated. Is there any other record the government would like to make at this time?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Any other record the defense would like to make at this time?

MR. PARRISH: Your Honor, you indicated earlier this morning that we were under some not really time factors, and you gave us plenty of opportunity to make the record on the pertinent issues. You, however, indicated after the jury -- if they were to start deliberating again we might address other matters regarding the motions that you've taken under consideration. I'd be very brief, but I would like the Court to consider a couple of factors that were assigned to me on this matter.

♀

4157

THE COURT: That's fine. Sure.

MR. PARRISH: No, I won't address any matters that I think are outside of the record on the . . .

I was supposed to address kind of like the clean-up matters, Your Honor, that we'd ask the Court to consider on matters that are still pending, those motions that are still pending. One thing that we ask the Court to bear in mind in thinking through this process the next few hours or few days or how ever the Court is going to think through it that it bear in mind a couple of factors.

One, with the issues that might pertain to an appeal in a state that for 41 years did not have the death penalty and realizing this is a federal matter, that hearing that appeal from the Eighth Circuit if that matter is ever addressed -- and we don't even know, but one thing I think the Court ought to bear in mind, the persons assigned -- if you look at the history of why we created the circuits, so different states could have inputs into the decision-making process on the federal level.

Interesting enough, on this matter, Mr. Colloton would be out of the mix. Mr. -- Judge Melloy would be out of the mix. Judge Hansen would be out of the mix. Those people who would be sitting on the Eighth Circuit who may ultimately hear any issues if they should come up regarding any of these matters would be people who may have a death penalty policy in that state.

So I ask the Court just as a theoretical matter -- and

4158

I realize the Court cannot consider that as a factor in the decision, but theoretically the Court has to look at ultimately, because the Court had made comments at some point that an appellate court may look at it and that policy input, even though it may be on a very, very low level, would come into play just in their thought processes I would think, so I ask the Court to look at that.

The other thing we want to do is comment to the Court on the hard work over the weekend that it has done on these important issues. We think that the Court has worked diligently on these matters in order to get the matter back into the full posture.

I just want to reiterate one thing that we think is kind of the hallmark or the theme as to what is taking place, and that is -- Your Honor, and that is the confidence in the result. And that's what we'd ask the Court to consider in its evaluation of everything that has taken place. Is it the message, no matter what the result may be, that we would want our citizens who for 41 years has not made this a policy by accident but a policy by design that in this state and, of course, it perhaps was not an act of divine intervention that led to this but some strange quirk for some reason at this moment interjected itself into this process in a very serious way, and we ask the Court to take that matter into consideration as it evaluates and rethinks what has taken place over the

4159

last -- the last few days and few hours and hard work that was processed by everyone.

And the other thing we would ask the Court to consider finally is now that this matter has been done and the judge -- and the jury has been reinstructed, that these matters that have now been addressed with regard to the merits phase, that the Court relook at that position and determine if, in fact, further inquiry may be needed or if there is sufficient information already out there to consider this Court evaluating the impact on the merits phase of this case. We ask the Court to take that into consideration as it rethinks these issues which the Court

indicated that it would do.

And the final thought I have for the Court at this moment is that we're all sort of maybe running on fumes here because of all the work that both sides have put into this difficult task. But I think ten years from now after all is said and done and we look back, we have to look back to see if we've really done the job and do we want the result that may come out of this matter. Thank you, Your Honor.

THE COURT: I appreciate your comments.

Mr. Williams?

MR. WILLIAMS: Well, Your Honor, I think the defense has invited you to make a decision, a legal decision, based on what appearance this is going to have to other people and based upon what the possible makeup may be of the Eighth Circuit court

♀

of appeals. I know this Court to make its decision based on the law and the facts of the case, and that's all the government would ever ask you to do.

THE COURT: And that's what I'm going to try to do to the best of my ability.

Do you want to revisit the earlier schedule that we set up about post-trial motions before the latest developments?

MR. PARRISH: I'm sorry, Your Honor. You said adhere to that --

THE COURT: No, do you want to revisit it? And also perhaps at some point perhaps back in chambers we might want to discuss -- or the parties could ask for it in their moving papers -- about an evidentiary hearing. I don't normally -- I don't grant evidentiary hearings on post-trial motions unless there's a request for one, so it's not something I would

typically set. But I understand that there may be a request for one in this case. And I think we have some ground rules that we need to lay out about kind of the scope of the evidentiary hearing and how that evidence would be made available to both sides and the like. So I'm not saying that that's anything we have to do now, but we can all put our thinking caps on about that.

I think in light of the developments -- and I realize this is one of the few things I've flipflopped on -- I don't think I'm going to go ahead and sentence Mr. Honken after I

receive the jury verdict. I think I'm going to defer sentencing until I've ruled on all post-trial motions if there's no objection to doing it that way.

MR. ROGERS: No, Your Honor. In fact, I think we requested earlier that you do it that way, and I think you've sort of borne this out.

THE COURT: Any other record either side would like to make?

MR. WILLIAMS: No, Your Honor. Thank you.

MR. PARRISH: No, Your Honor.

THE COURT: And I wanted to echo Mr. Parrish's comments. It's been a very difficult time for all the lawyers, for Mr. Honken, certainly for me this weekend. We had a lot of exchanges in information and cases, and I just appreciate the highly professional way that everybody acted towards me and towards each other in what is obviously a difficult situation for everybody. We'll be in recess. Thank you.

(The foregoing trial was adjourned at 11:01 a.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR 2-4-05 Date

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3628 of 3636

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA, Plaintiff, vs. DUSTIN LEE HONKEN, Defendant. /

No. CR01-3047
Sioux City, Iowa
October 27, 2004
3:02 p.m.

VOLUME 25

EXCERPT OF TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARK W. BENNETT
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

♀

APPEARANCES:

For the Plaintiff:

C. J. WILLIAMS, ESQ.
Assistant United States Attorney
Suite 400 - Hach Building
401 First Street Southeast
Cedar Rapids, IA 52401

THOMAS HENRY MILLER, ESQ.
Iowa Attorney General's Office
Area Prosecutions Division
Hoover State Office Building
Des Moines, IA 50319

For the Defendant:

ALFREDO PARRISH, ESQ.
Parrish, Kruidenier, Moss, Dunn Boles, Gribble & Cook
2910 Grand Avenue
Des Moines, IA 50312

LEON F. SPIES, ESQ.
Mellon and Spies
Suite 411
Iowa State Bank Building
Iowa City, IA 52240

CHARLES M. ROGERS, ESQ.
Wyrsch, Hobbs & Mirakian
Suite 1300
1101 Walnut Street
Kansas City, MO 64106

Also present: William Basler

Court Reporter: Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

(Proceedings reconvened outside the presence of the jury.)

THE COURT: Mr. Williams, Mr. Miller, ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor. Did you want to make a short record?

THE COURT: Yeah. Why don't we be seated for a minute. I have discussed with the lawyers back in chambers the process for taking the verdict this afternoon. I just came back from the doctor, and I don't have much of a voice, and so what we'll do is I will ask the foreperson if the jury's reached a verdict. I assume the answer will be yes.

He'll take the verdict form, and we'll use our standard procedure. He'll hand it to Carey. I will then review the verdict form. After I've reviewed it, we will then show it on the -- we're going to put it up on the digital document camera starting with page -- well, we'll start with the cover sheet and then go to page 2, and we'll do each page long enough so that particularly the lawyers can look at it.

Then when we get to page 9 which is the step 5 weighing factors and the ultimate decision on whether or not it's a sentence of death or a sentence of life on each of the counts, I will actually read that. Then Carey will put page 9 up on the digital document camera.

If it is a sentence of death on all counts, I will

then poll the jury. If there is a life sentence on one or more counts, I will then ask the foreperson as to any counts on 8 through 17 where life was imposed, was that finding unanimous, in other words, did all 12 jurors agree on a life sentence.

And then at that point, I think we'll use the same proceeding I did on the merits. I'll send the jury back down to the jury room. I'll give the lawyers an opportunity to see if there's any further record that needs to be made on the verdict form, if for any reason we would have to send the jury back to deliberate. Once that decision is made, I'll bring the jurors back up and then discharge them.

Any objection to proceeding in that manner, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Mr. Parrish?

MR. PARRISH: No, Your Honor.

THE COURT: Okay. You ready to have the jury brought in?

MR. WILLIAMS: Yes, Your Honor.

MR. PARRISH: Yes, Your Honor.

THE COURT: Thank you.

(The jury entered the courtroom.)

THE COURT: Please be seated. Juror 855, has the jury reached a verdict on the penalty phase deliberations?

JUROR 855: Yes, sir.

♀

4166

THE COURT: Okay. Would you please hand that to my law clerk Carey. She will hand it to me. And then before I review it, I want to tell the jury what the procedure will be.

I just came from the ear, nose, and throat doctor. I have very little voice today, and I've had a problem throughout the trial. We're going to actually put the verdict form up on the big screen. You each have to look at it very carefully because I'm ultimately going to poll you to see if that's your verdict. But when we get to the last page, I will actually read that out loud before it goes up on the screen.

Carey, if you would please put page 1 which is just the caption and then go to page 2 which is step 1, eligibility factors.

Go to page 3, please, which is step 2 statutory aggravating factors.

Would you go to the next page, please, page 4, nonstatutory aggravating factors.

Step 4, mitigating factors, page 5.

Next page, please, which is step 4, mitigating factors continued, page 6.

Next page, please, which is step 4, mitigating factors, continued, page 7.

Next page, please, which is step 4, mitigating factors, continued, page 8.

I will read page 9, step 5, weighing the factors.

♀

4167

After weighing the aggravating factors found in steps 1 and 2, any aggravating factors found in 3, and any mitigating factors found in step 4 as explained in final penalty phase instruction number 6, what sentence do you impose for each eligible count?

Count 8, Greg Nicholson, life sentence; Count 13, Greg Nicholson, life sentence.

Count 9, Lori Duncan, life sentence; Count 14, Lori

Duncan, life sentence.

Count 10, Amber Duncan, a sentence of death; Count 15, Amber Duncan, a sentence of death.

Count 11, Kandi Duncan, a sentence of death; Count 16, Kandi Duncan, a sentence of death.

Count 12, Terry DeGeus, a life sentence; Count 17, Terry DeGeus, a life sentence.

Now, before I poll the jury to determine whether that's your true and correct verdict -- well, no, I think I'll go ahead and poll each of you. Then I have another question.

Juror 902, is that the true and correct verdict?

JUROR 902: Yes, it is.

THE COURT: Can we get the microphone so our court reporter can get it down? Thank you. Is that a true and correct verdict?

JUROR 902: Yes, it is.

THE COURT: Juror 204?

JUROR 204: Yes, it is.

♀

THE COURT: Juror 636?

JUROR 636: Yes, it is.

THE COURT: Juror 855?

JUROR 855: Yes, it is.

THE COURT: Juror 513?

JUROR 513: Yes, it is.

THE COURT: Juror 857?

JUROR 857: Yes, it is.

THE COURT: And what's your juror number? I'm lost now.

JUROR 498: 498.

THE COURT: That's right, 498. Is that a correct verdict?

JUROR 498: Yes.

THE COURT: Next juror, please.

JUROR 963: Yes, it is.

THE COURT: Next juror, please.

JUROR 425: Yes, it is.

JUROR 646: Yes.

JUROR 38: Yes.

JUROR 806: Yes, it is.

THE COURT: Now, could you hand the microphone back to the foreperson, 855, please? Thank you.

Now, Mr. Foreperson, as to any counts where life imprisonment was imposed which would be Counts 8, 13, 9, 14, 12,

♀

and 17, was the finding of the jury unanimous? In other words, did all 12 jurors agree on a life sentence?

JUROR 855: No, Your Honor.

THE COURT: Okay. I'm going to send you all down to the jury room now just for a minute so I can discuss it with the lawyers, and then we'll see if we need to bring you back, but I'd like you to stay in the jury room until I come down and discharge you. Okay. Thank you very much.

(The jury exited the courtroom.)

THE COURT: Please be seated. Is there any additional record that needs to be made with regard to the jury, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Any of the defense lawyers?

MR. PARRISH: No, Your Honor.

THE COURT: I didn't think so, but I wanted to make sure we had this opportunity.

Any other record we need to make at this time?

MR. WILLIAMS: No, Your Honor.

MR. PARRISH: No, Your Honor.

THE COURT: Okay. We'll be in recess. I'm going to go down and discharge the jury. Thank you.

We need to make sure that the verdict form is filed, and I'll ask Carey to make copies of the verdict form for all of the lawyers in the case. Thank you.

(The foregoing trial was concluded at 3:16 p.m.)

♀

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Shelly Semmler, RMR, CRR — 2-4-05 Date

VOLUME 25 10-27-04 witness testimony

Page 8

Case 3:09-cv-03064-MWB-LTS Document 284-72 Filed 06/23/11 Page 3636 of 3636