# EXHIBIT 1

G

WW George W. Woods, Jr. MD

1-866-646-0509

E-mail:gwoods@georgewoodsmd.com

Oakland Seattle Atlanta San Antonio

October 5, 2009

I am a licensed physician specializing in neuropsychiatry. I am in private practice focusing on neuropsychiatry, psychopharmacology, workplace safety, and forensic consultations. My business addresses are 701 McGill Park Avenue NE, Atlanta, Georgia, 30312; 1511 M Ms. Johnson's symptom presentation mimics Bipolar Disorder and temporal lobe dysfunction shares many of the Bipolar spectrum symptoms. In Ms. Johnson's case, these co-morbid symptoms, or symptoms could be part of both disorders, are mood lability, impaired judgment, irritability, and significant drug use, and propensity for dissociation.

There is a high correlation between aberrant electrical activity and bipolar disorders. Research from the 1980s noted that a subset of patients with Bipolar Disorder and seizures, when treated with anticonvulsant medication, showed a significant decrease in their bipolar symptoms. In the ensuing years, anticonvulsants, particularly Tegretol, Depakote, and Lamictal, have supplanted Lithium as the treatment of choice for Bipolar Disorder.

Although the neurological presentation focuses Ms. Johnson's symptoms toward temporal lobe dysfunction with manic-like presentations, her experience with Zoloft, particularly, would likely been have similar, since antidepressants can precipitate increased symptoms of mania in persons with Bipolar Disorder, a phenomenon called the "Manic Switch."

Sycamore Avenue # 258, Hercules, California, 94547; and 139 Harmon Drive, San Antonio, Texas, 78209.

## I.       Curriculum Vitae

I am a Fellow of the American Psychiatric Association, a member of the California Psychiatric Association, and the Northern California Psychiatric Association. I am a member of the American Neuropsychiatric Association, and the American Psychological Association. I am

1

also a member of the American Association of Individuals with Intellectual and Developmental Disabilities (AAIID)

I am the current Secretary General of the International Academy of Law and Mental Health, based at the University of Montreal. I am also on the Scientific and Executive Committees of the International Academy of Law and Mental Health. I am a past member of the Advisory Board of The Health Law Institute of the College of Law, DePaul University. Currently, I am on the Advisory Board of the Center for African Peace and Conflict Resolution, California State University, Sacramento, California; and the Global Advisory Board for Humiliation and Dignity Studies, Trondheim University, Norway, and Columbia University, New York, New York.

I teach Clinical Aspects of Forensic Psychiatry to Third and Fourth year residents at Morehouse School of Medicine, Department of Psychiatry. I am also on the Faculty of the Department of Educational Leadership and Public Policy, California State University, Sacramento.

I was on the faculty of the University of Washington, Bothell campus, where I taught a course on Mental Illness and the Law. From 1996 through 2000, I taught in the postgraduate Forensic Psychiatry Fellowship at the Department of Psychiatry at the University of California, Davis, California, Medical Center.

I received by Bachelor's degree in 1969 from Westminster College in Salt Lake City, Utah. I received my medical degree from the University of Utah Medical Center in 1977. I completed a medical internship at Alameda County Medical Center, Oakland, California; then completed my residency at the Pacific Medical Center in San Francisco, California in 1981, where I was Chief Resident my senior year. I then participated in a National Institute of Mental Health/American Psychiatric Association (NIMH/APA) Fellowship in 1982. I received my board certification in psychiatry in 1992.

The American Neuropsychiatric Association delineates the difference between traditional psychiatric practice and the practice of neuropsychiatry: Neuropsychiatry is the area of psychiatry concerned with the biopsychosocial treatment of disorders associated with brain dysfunction. A neuropsychiatric approach permits a broad conceptualization of a clinical problem that transcends a basic psychiatric or neurologic paradigm.

The neuropsychiatric assessment is data driven. The collection of the data and their synthesis into a coherent formulation serve to distinguish neuropsychiatry as a unique clinical discipline. @ (American Neuropsychiatric Association (ANPA) Web Page)

The medical training I have undertaken, since my residency, has been geared toward a neuropsychiatric practice that combines an understanding of the relationships among psychiatric disorders, brain dysfunction, metabolic disruption, and endocrine abnormalities. This medical

2

training has been supplemented with training in neuroanatomy and neuropsychological investigation, psychopharmacology, neuroimaging, and other relevant subjects, such as sleep disorders, mental retardation, developmental disability, and dysmorphology (the study of structural abnormalities often related to developmental disorders).

The American Neuropsychiatric Association recommends that this depth and breadth of training be required in order to practice neuropsychiatry, and recognizes this type of training as unique from and synergistic with both traditional psychiatric and neurological practice.

The approach represents a fundamental departure from the traditional psychiatry and neurology in several ways. The reciprocal influences of psychology and cerebral dysfunction are appreciated. Both processes are, of course, brain-related. However, each has its own unique and significant influence on behavior. Localization of signs and symptoms in the brain takes precedence over standard psychiatric diagnosis. Therefore, a more comprehensive assessment of mental status in undertaken. (ANPA web page)

The training encouraged by the American Neuropsychiatric Association is explicit:

Develop clinical expertise regarding the psychiatric care of persons with disorders of brain function to include diagnostic skills, neurologic and mental status examinations, cognitive testing, electrophysiological testing, neuroimaging, differential diagnosis, crisis intervention, application of time-limited psychotherapy, and referral for rehabilitative therapies.

Gain broad knowledge in the field of neuropsychiatry though extensive exposure to the core literature in neuropsychiatry, neuropsychology, and behavioral neurology. Neuroanatomy and neurochemistry of behavior should be emphasized.

Gain an advanced understanding of psychopharmacology, including neuropsychopharmacology, with special emphasis on anticonvulsants, psychostimulants, and the interactions of psychotropic medications with other medications on the central nervous system. (ANPA web Page)

My early medical training focused on primary care medicine as well as psychiatry. My internship at Alameda county Medical Center (Highland Hospital, Oakland, California) was not in psychiatry. Rather, I chose to complete a rotating medical internship, which included internal medicine, general surgery, orthopedic surgery, emergency medicine, and obstetrics/gynecology. During my psychiatric residency at Pacific Presbyterian Hospital, in San Francisco, California, I took specialized neurological electives at Kaiser Permanente Hospital, Oakland, California. These electives were extended, three month clerkships, where I was assigned to the Neurology department, conducting neurological examinations and diagnosing neurological disorders, including movement disorders, headache disorders and central nervous dysfunctions, among others.

3

Case 3:09-cv-03064-MWB-LTS     Document 284-81     Filed 06/23/11     Page 4 of 119

During the last year of my psychiatric residency, I also practiced general medicine as a family practitioner in Blythe, California. I ran a medical clinic for the Clinica De La Raza, a medical clinic developed by the United States Farmworkers. After graduation from my psychiatric residency, I worked as an emergency room physician in both medical and psychiatric emergency rooms in Alameda and Contra Costa Countries in California.

I participated in a National Institute of Mental Health/American Psychiatric Association (NIMH/APA) Fellowship directly after my residency. During the fellowship, I developed the first medical/psychiatric unit at Pacific Presbyterian Hospital. This unit administered to patients with either medical illnesses that had psychiatric manifestations or psychiatric patients with severe medical illness that could not be treated effectively on regular medical units. Many of these patients had developmental disabilities, neurological impairments, and significant drug interactions that required diagnosis and monitoring, or unusual symptom presentations due to the multiple disorders from which these patients were suffering.

The focus of my American Psychiatric Association/National Institute of Mental Health Fellowship was Geriatric Psychopharmacology, the study of medication use with elderly populations. Geriatric Psychopharmacology is an extremely valuable approach to the study of psychopharmacology in general. The elderly present several pharmacologically-related challenges. First, many elderly people are on a variety of medications; therefore, an understanding of drug interactions is paramount. Second, changing metabolism and body composition must be taken into consideration when understanding the effect of drugs in the elderly, considerations that may appear to be less important when working with a younger adult population. Third, due to the above factors, neurological phenomena like delirium, confusion, altered states of consciousness, and organically-derived psychotic states occur more commonly in the elderly, and must be appropriately diagnosed and treated.

Although this training was with geriatric populations, the medical/psychiatric/neurological/pharmacological training and experience I gained during this period is relevant to other patient populations, particularly with mentally retarded clients in my clinical practice, as well as forensic populations. Both populations experience a higher incidence and greater interaction of drug, mental and neurocognitive problems than the general population.

After my APA/NIMH Fellowship, I become the Director of Outpatient Geriatric Services for the San Francisco Family Services Agency. In this position, I conducted home visits with elderly patients who manifested psychiatric symptoms. Neurological intervention and medical examinations were frequently required.

From 1983 through 1990, I provided neuropsychiatric care at Crestwood Manor, Vallejo, California, a long term psychiatric facility, dedicated to treating severely ill patients, often with mental retardation and accompanying mental disorders. Many of these patients came from state hospitals with atypical presentations. Atypical presentation of psychiatric symptoms is common

4

among forensic populations as well, particularly in this time of decreased community mental health services and limited availability for intensive treatment. Many mentally retarded clients manifest a "Cloak of Competence," which must be recognized as an attempt to mask deficits that define mental retardation. Many of Crestwood's clients also had multiple, co-occurring disorders that required an understanding of pharmacology, neurology, and psychiatry, as noted by the American Neuropsychiatric Association.

Neurocare Corporation, a head-injury and neurological disorders treatment facility in Concord, California, hired me in 1991 specifically to work with neurologically impaired individuals who had psychiatric manifestations of their cognitive impairments. A multidisciplinary environment, the Neurocare treatment team consisted of neurologists, neuropsychiatrists, neuropsychologists, and social workers. An intimate knowledge of brain/behavior relationships was required in order to avoid misdiagnosis of atypical symptom presentations.

During this same period, I was a psychiatric and pharmacological consultant to the Triumph Over Pain (TOP) Rehabilitation Program in Kentfield, California. Kentfield Rehabilitation Hospital was one of the premier rehabilitation facilities in Northern California. I was responsible for monitoring complex drug regimens with medically ill individuals. Many neuropsychiatric drugs are used in the treatment of pain patients, including antidepressants, anti-anxiety agents, anti-epileptics, and anti-psychotics. Often, these drugs are not utilized for their primary psychiatric indication. For example, anti-psychotics, anti-depressants, and anti-seizure medications may be effective in diabetic limb and phantom pain.

Due to the physical debilitation of many of these patients, as well as the multiple medications necessary for many of these patients' rehabilitative efforts, neurological complications are common. Delirium and agitation appear frequently in this physically comprised population.

Personality Disorders, substance abuse, and malingering are all found more commonly in chronic pain patients, according to the medical literature. Determination of malingering, as well as recognizing the impact of personality disorders, if they were present, was a crucial component of effectively treating this challenging population. Differentiating substance use from substance abuse was also necessary for successful clinical intervention. During this time period, I also was the Medical Director of a successful pain management program at Doctors Hospital, in Pinole, California.

Sleep disorders, the evaluation of disorders in the architecture of sleep, is a seminal, although often overlooked, component of medical illness, psychiatric disorders, and pharmacological interventions. Sleep disruption is frequently the first overt symptom of an underlying medical, neurological, or psychiatric disorder. Disruption of sleep can be found in almost all neuropsychiatric disorders. Substance abuse is also often related to impairment of

5

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 6 of 119

normal sleep patterns. From 1990 through 1995 I served as the Coordinator and Psychiatric Consultant to the Insomnia Division of the Doctors Hospital, Pinole, California, Sleep Disorders Center. Fred Nachtwey, MD, a Board Certified neurologist, and Richard Sankary, MD, a Board Certified pulmonologist, were the other coordinators of this clinic.

We evaluated and treated sleep disordered patients for neuropsychiatric disorders such as anxiety and depression, as well as neurologically-derived disorders related to the dysfunction of the sleep centers of the brain, or pulmonary problems, like Sleep Apnea. A thorough understanding of sleep architecture was required, since the phase of sleep architecture in which the sleep disorder occurs can often be of diagnostic significance.

From 1990 through 1995, Doctors Hospital contracted with me to provide Consultation-Liaison services to the general medical hospital. This contract also extended to Brookside Hospital in San Pablo, California. Consultation-Liaison Psychiatry is the practice of neuropsychiatric evaluation of medically ill patients. My evaluation of chronically ill patients, developmentally disabled, neurologically comprised patients, and sleep disordered patients was a natural outgrowth of my practice and clinical experience.

I served as the Clinical Director of the New Beginnings Chemical Dependency Program at Doctors Hospital from 1990 through 1994. New Beginnings evolved from a program limited to treating solely chemically dependent patients to a program that treated patients who presented with what are called co-occurring disorders. Persons with co-occurring disorders are persons who have multiple psychiatric disorders, which is the norm, rather than unusual. Many persons with neuropsychiatric disorders attempt to self-medicate their symptoms.

The New Beginnings Program had the advantage of being housed within Doctors Hospital, a general medical hospital. Consequently, I consulted to the general hospital on issues of pharmacological interactions as well as co-occurring disorders.

The Director of Nursing at Doctors Hospital contracted with me to reorganize medical rounds in the Intensive Care Unit, in order to make the Unit more responsive to neurological disorders and drug interactions that might appear as neuropsychiatric disorders and neuropsychiatric symptomatology. I rounded with nurses, internists, cardiologists, neurologists, and hospital pharmacologists on all patients in the Intensive care unit. During this period I was named Outstanding Medical Director of Psychiatric, Rehabilitation, and Recovery Hospitals for National Medical Enterprises.

Appointed as Senior Consulting Addictionologist by Doctors Hospital in 1994, I oversaw complex withdrawals and detoxifications, and developed research protocols for the use of new medications for opiate withdrawals and sedation in the intensive care units.

I have consulted with neuropsychologists on neuropsychological tests, including the Halstead Reitan Battery. I have also studied other psychometric instruments, including, but not

6

limited to, the Minnesota Multiphasic Personality Inventory (MMPI_1 and 2), the Millon Clinical Multiaxial Inventory, the Personality Assessment Inventory, the Rorschach, and instruments measuring effort.

Doctors Hospital had a Single Photon Emission Computerized Tomography (SPECT), which was utilized to determine brain function. I also studied the Magnetic Resonance Imagining (MRI) and Cathode Scans (CT), focusing on the different uses of structural imaging and functional imaging, like the SPECT and the Positive Emission Tomography (PET).

I subscribe to various neuropsychiatric journals, including the American Neuropsychiatric Association's journal (The Journal of Neuropsychiatry and Clinical Neurosciences), and CNS Spectrums; as well as the American Journal of Psychiatry, Psychiatric Annals and Journal of Clinical Psychiatry. I also subscribe to the Psychiatric and Neurologic Clinics of North America. I subscribe to the New England Journal of Medicine.

I joined the faculty of the University of California, Davis, Medical School, Department of Psychiatry, in 1996. For the next four years, I taught Forensic Psychiatry and Criminal Responsibility to psychiatrists in the Postgraduate Forensic Fellowship. I am currently on the faculty of Morehouse School of Medicine, Department of Psychiatry, Atlanta, Georgia. I teach third and fourth year residents Clinical Aspects of Forensic Psychiatry.

At the request of Kenyan and Tanzanian Medical Societies in 1998, I assisted their nations in developing mental health delivery services after the Kenyan/Tanzanian Embassy bombings. The initial focus of the project centered on the acute trauma suffered by survivors and families of those killed and injured in the bombing. Appropriate diagnosis and treatment for trauma survivors required assessment of and treatment for pre-existing psychiatric and neurologic disorders and an appreciation of the consequences of chronic exposure to trauma that predated the bombings.

In December 2004, I had the privilege of working at Kidongo Chekundu Mental Hospital, Zanzibar, Tanzania. Understanding the culture of your patient as well as their possible disease was drilled into me by the Zanzibarean medical staff. Their persistence reinforced my recognition of the value of knowing your patients, intimately, over time.

Prior to being installed as Secretary General, I was asked by the International Academy of Law and Mental Health to spearhead a joint human rights effort to establish a forensic medicine initiative at Makerere University in Kampala, Uganda. This effort, started in November, 2006, is ongoing.

My appointment to Morehouse College of Medicine, as well as my involvement in Tanzania, Uganda, Zanzibar, and Kenya reflect the transition in main stream psychiatric thought from the minimization of culture in determining psychiatric intervention to the recognition that,

7

even in disciplines that appear to be scientifically grounded like psychopharmacology, a deep understanding of the cultural nuances in neuropsychiatric evaluation is absolutely necessary.

I maintain a private clinical practice in geriatric psychiatry, neuropsychiatry, psychopharmacology, and psychotherapy in Oakland, California.

## II.    Referral Questions

At the request of counsel, I performed a neuropsychiatric evaluation of Ms. Angela Johnson, a 45 year old divorced white female.  The specific referral questions I was asked to address are:

- Was the defendant's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge?

- Could the defendant have reasonably foreseen that her conduct in aiding and abetting Dustin Honken, would cause, or would create a grave risk of causing, death to any person.

- Did the defendant aid and abet Dustin Honken while under severe mental or emotional disturbance?

- Was the defendant under unusual and substantial duress when she aided and abetted Dustin Honken's commission of the charged offenses, regardless of whether the duress was of such a degree as to constitute a defense to the charge?

- Did the defendant's impairments and medications affect her ability to rationally assist her counsel prior to and during the trial?

- Did the defendant's impairments and medications inform her demeanor at trial?

- Was the defendant's use of profanity and verbal threats consistent with her longstanding neurological, psychiatric, and psychological impairments?

8

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 9 of 119

## III. Materials Reviewed/Bases for Analysis

In order to answer these referral questions, I interviewed Ms. Johnson over the course of two days, August 5th and 6th, 2009. I performed a neurological examination of Ms. Johnson, limited to some degree by the lack of visual privacy in the room.

I also reviewed multiple materials, including, but not limited to the records and testimony of Mark Cunningham, PhD, Marilyn Hutchison, PhD, and William Logan, M.D. I reviewed the IQ and neuropsychological battery of Michael Gelbort, PhD. I reviewed the medical records from the various county jails in which Ms. Johnson was housed, including the Woodbury County Jail. I reviewed declarations from a number of family members, persons who lived with Ms. Johnson and her family while she was growing up. I reviewed testimony from the trial, and discovery from the investigation. These are the types of materials relied upon in coming to an expert opinion.

## IV. Clinical Formulation

The following is a preliminary formulation, to be supplemented after further testing and analysis.

### A. Angela Johnson's Childhood

Angela Johnson was born into a cognitively impaired family, a family in which the abnormalities of their brains manifested in paranoid, delusional, and, in the long run, violent behavior.

Ms. Johnson's early life was fertile ground for the development of complex trauma. Complex trauma must be differentiated between simple trauma as described in the Diagnostic and Statistical Manual-IVTR (DSM-IVTR). The DSM-IVTR describes Type I trauma, typically a single incident or event. Complex trauma is caused by ongoing, chronic, often pervasive stressors.

The role of parents in the modulation of stress is paramount in a child's life, and Ms. Johnson's parents' roles heightened rather than modulated the stress experienced by her. Parents model for children appropriate responses to various stressors in life, so the child will be able to respond directly and in a manner that fits the degree of stress presented.

> ...Although both adults and children may respond to a traumatic event with generalized hyperarousal, attentional difficulties, problems with stimulus discrimination, inability to self-regulate, and dissociative processes, these problems have very different effects on young children than they do on mature adults. For example, Pittman (1995) showed that people who developed PTSD secondary to child abuse had more profound physiological

9

dysregulation in response to nontraumatic stimuli than people who developed PTSD as adults. In addition, interpersonal traumas are likely to have more profound effects than personal ones ... Particularly early in life, the social context plays a critical role in buffering an individual against stressful situations, and in building the psychological and biological capacities to deal with further stresses. The primary function of parents can be thought of as helping children modulate their arousal by attuned and well-timed provision of playing, feeding, comforting, touching, looking, cleaning, resting-in short, by teaching them skills that will gradually help them modulate their own arousal ... In children who have been exposed to severe stressors, the quality of the parental bond is probably the single most important determinant of long-term damage ... (Bessel Van Der Kolk, Traumatic Stress: The effects of Overwhelming Experience on Mind, Body, and Society; Guilford Press, New York, London, 1996, page 184-185)

These buffering qualities, such as playing and comforting, were absent in Ms. Johnson's home, replaced by ongoing terror, masked as religious fervor. The terror was a manifestation of the neurological abnormalities shared by generations of Ms. Johnson's family.

The organization and functional capacity of the human brain depends upon an extraordinary set and sequence of developmental and environmental experiences that influence the expression of the genome (Perry and Pollard 1998; Teicher 2000, 2002). Unfortunately, this elegant sequence is vulnerable to extreme, repetitive, or abnormal patterns of stress during critical or circumscribed periods of childhood brain development that can impair, often permanently, the activity of major neuroregulatory systems, with profound and lasting neurobehavioral consequences (Teicher 2000; Heim and Nemeroff 2001; Repetti 2002; Gutman and Nemeroff 2002; Gorman 2002; De Bellis and Thomas 2003a; Bremner and Vermetten 2001). Now, converging evidence from neurobiology and epidemiology suggests that early life stress such as abuse and related adverse experiences cause enduring brain dysfunction that, in turn, affects health and quality of life throughout the lifespan. An expanding body of evidence from rodent, primate, and human research suggests that early stressors cause long term changes in multiple brain circuits and systems (Sanchez 2001; Bremner 2003a). (Anda et al, *The enduring effects of abuse and related adverse experiences in childhood: A convergence of evidence from neurobiology and epidemiology*, European Archives of Psychiatry and Clinical Neuroscience (2006) 256 : 174)

Ms. Johnson underwent a ritualized terror in her childhood that even her mother, one of the perpetrators, cannot speak of. Under the neurologically-derived hyper religiosity of her mother and grandmother, Mr. Johnson was consistently abused and, ironically, Ms. Johnson was often "exorcised," as her personal terror was described, due to the very neurological abnormalities that created her mother's and grandmother's religious terrorism.

Ms. Johnson, who was a small and slender child, was regularly "exorcised," which typically consisted of being held down against her will by several grownups, being hit, shaken,

10

thrown and beaten, in the hopes of curing the "deaf and dumb demon." Her inability to respond, the behavior that was translated into the "deaf dumb demon," was representative of absence seizures, complex partial seizures that do not always cause clonic tonic motor movements, the violent shaking commonly associated with seizures. Ms. Johnson's deaf and dumb demon, a visible sign of the inherited aberrant electrical activity in Ms. Johnson's brain, was the catalyst for her mother, herself suffering from the same inherited aberrant electrical activity, to repeatedly abuse Angela Johnson.

## B.     Ms. Johnson Suffers From Profound, Complex Trauma

These rituals, performed over critical developmental childhood years, coupled with multiple moves, sexual abuse by a caregiver, perceived abandonment by her father, and cognitive deficits, were the foundation for the profound, complex trauma from which Ms. Johnson suffered, documented abuse from the hands of those that were supposed to love her, abuse that, itself, was the product of multigenerational cognitive impairment.

Complex trauma, the type experienced by Ms. Johnson, leaves a much larger footprint than Type I trauma described in DSMIV-TR. The irrational behaviors that often result from complex trauma shape neurological, academic, social, emotional, and contextual landscapes with well-documented symptoms.

> We define *complex psychological trauma* as resulting from exposure to severe stressors that (1) are repetitive and prolonged, (2) involve harm or abandonment by caregivers or other ostensibly responsible adults, and (3) occur at a developmentally vulnerable times in the victim's life, such as early childhood or adolescence (when critical periods of brain development are rapidly occurring or being consolidated, see Ford, Chapter 2, this volume). (Treating Complex Traumatic Stress Disorders: an evidence-based guide; Guilford Press, 2009 Ford et al, page 13)

> *Complex posttraumatic sequelae* are the changes of mind, emotions, body, and relationships experienced following complex psychological trauma, including severe problems with dissociation, emotion dysregulation, somatic distress, or relational or spiritual alienation, hereafter referred to as complex traumatic stress disorders. (Ford et al, page 13)

It was the ritualized trauma that allowed Ms. Johnson to stick pins in her arm, with no show of emotion. It was also the ritualized trauma that allowed Ms. Johnson to fall apart at the smallest sign of true stress, as her daughter and sisters describe. It was the ritualized trauma that allowed Ms. Johnson to "go to her special space," as described by her sisters and Ms. Johnson, and dissociate from life threatening reality. Ms. Johnson describes dissociative experiences, developing out of body experiences to escape from the "rebuking," designed to break her. She imagined herself somewhere else, or she lost herself. Ms. Johnson also describes becoming conscious occasionally while she was getting rebuked, perhaps coming into a postictal state, a

11

clinically significant period following a seizure.  Her sister reported that Ms. Johnson returned from her dissociative episodes at times and announced, "I'm back."

### C. Ms. Johnson Suffers From Electrical Abnormalities: Temporal Lobe Dysfunction/Seizures

Ms. Johnson's profound emotional impairments, secondary to the complex trauma, were augmented by the electrical abnormalities Ms. Johnson experienced.  This aberrant electrical activity was inherited from her mother, Jean, who inherited it from her mother.

### i. Description of Temporal Lobe Dysfunction

We describe a new syndrome of familial temporal lobe epilepsy in 38 individuals from 13 unrelated white families. The disorder was first identified in 5 concordant monozygotic twin pairs as part of a large-scale twin study of epilepsy. When idiopathic partial epilepsy syndromes were excluded, the 5 pairs accounted for 23% of monozygotic pairs with partial epilepsies, and 38% of monozygotic pairs with partial epilepsy and no known etiology. Seizure onset for twin and nontwin subjects usually occurred during adolescence or early adult life. Seizure types were simple partial seizures with psychic or autonomic symptoms, infrequent complex partial seizures, and rare secondarily generalized seizures. Electroencephalograms revealed sparse focal temporal interictal epileptiform discharges in 22% of subjects. Magnetic resonance images appeared normal. Nine affected family members (24%) had not been diagnosed prior to the study. Pedigree analysis suggested autosomal dominant inheritance with age-dependent penetrance. The estimated segregation ratio was 0.3, indicating an overall penetrance of 60% assuming autosomal dominant inheritance. The mild and often subtle nature of the symptoms in some family members may account for lack of prior recognition of this common familial partial epilepsy. This disorder has similarities to the El mouse, a genetic model of temporal lobe epilepsy with a major gene on mouse chromosome 9, which is homologous with a region on human chromosome 3. (Berkovic et al, *Familial temporal lobe epilepsy: a common disorder identified in twins*; Annals of Neurology, 1996,

Temporal lobe dysfunction, a well-documented source of psychotic-like behaviors, often with ritualistic, hypermoral, and hyperreligious overtones, appears to run in the maternal side of Ms. Johnson's family.  The table below describes the kinds of behavior associated with temporal lobe dysfunction; many of these behaviors describe Ms. Johnson's grandmother, mother, and her own behavior.

12



fb⁵⁵

**TABLE 1. Characteristics Historically Attributed to Temporal Lobe Epilepsy**[a]

| Inventory Trait | Reported Clinical Observations |
| --- | --- |
| Emotionality | Deepening of all emotions, sustained intense affect. |
| Elation, euphoria | Grandiosity, exhilarated mood; diagnosis of manic-depressive disease |
| Sadness | Discouragement, tearfulness, self-deprecation; diagnosis of depression, suicide attempts. |
| Anger | Increased temper, irritability. |
| Aggression | Overt hostility, rage attacks, violent crimes, murder. |
| Altered sexual interest | Loss of libido, hyposexualism; fetishism, transvestism, exhibitionism, hypersexual episodes. |
| Guilt | Tendency to self-scrutiny and self-recrimination. |
| Hypermoralism | Attention to rules with inability to distinguish significant from minor infractions; desire to punish offenders. |
| Obsessionalism | Ritualism; orderliness; compulsive attention to detail. |
| Circumstantiality | Loquacious, pedantic; overly detailed, peripheral. |
| Viscosity | Stickiness; tendency to repetition. |
| Sense of personal destiny | Events given highly charged, personalized significance; divine guidance ascribed to many features of patient's life. |
| Hypergraphia | Keeping extensive diaries, detailed notes; writing autobiography or novel. |
| Religiosity | Holding deep religious beliefs, often idiosyncratic; multiple conversions, mystical states. |
| Philosophical interest | Nascent metaphysical or moral speculations, cosmological theories. |
| Dependence | Cosmic helplessness, "at hands of fate"; protestations of helplessness. |
| Humorlessness | Overgeneralized ponderous concern; humor lacking or idiosyncratic. |
| Paranoia | Suspicious, overinterpretative of motives and events; diagnosis of paranoid schizophrenia. |

[a] Adapted from Bear and Fedio,[30] with permission.

In addition to these behavioral manifestations, brief **psychotic episodes** can also develop when seizures are infrequent or fully controlled. These psychoses last from days to weeks, they are usually self-limiting, and their separation from postictal psychoses may be difficult. The favored description is of an alternating psychosis, i.e., a brief psychosis alternating with periods of increased seizure activity such that the seizures and psychosis appear antagonistic. The phenomenology is characterized by paranoid delusions and auditory hallucinations, but multiple other features, including affective symptoms, may

13

Case 3:09-cv-03064-MWB-LTS     Document 284-81     Filed 06/23/11     Page 14 of 119

occur. (Sachdev et al, *Schizophrenia-Like Psychosis and Epilepsy: The Status of the Association*, American Journal of Psychiatry *155:3, March 1998*, page 327.)

### ii. Family History of Temporal Lobe Dysfunction

Jean Johnson, Ms. Johnson's mother, continues to suffer from perceptual disorders, including auditory and visual hallucinations, as well as profound religiosity. She has a life long history of behaviors recognized as temporal lobe based: heightened emotionality, guilt, obsessionalism, circumstantiality, sense of personal destiny, hypergraphia, dependence, paranoia, and humorlessness. Angela's mother's mother was also a woman with apparent religious delusions, auditory hallucinations, intense emotionality, and dependence. Yet there is not the significant social deterioration typically seen in shizophreniform disorders such as schizophrenia, particularly when not treated. Rather, a labile, heightened affect, poor social functioning and suggestibility, manifested by the inability to effectively problem solve in real world circumstances are neurocognitive traits Ms. Johnson shares with her mother.

### iii. Angela Johnson's Temporal Lobe Dysfunction

Angela Johnson has many signs of temporal lobe dysfunction. She had difficulty in school, not learning to read and write until the third grade, and only after intense instruction by her older sister. She was placed in special education throughout her school years. She could not learn how to make change, and although she worked as a waitress for her mother in her early teens, could not add or make change for customers' checks. Her work supervisors made special arrangements for restaurant cashiers to make total and make change for checks. Many of these academic functions require intact temporal lobes.

Ms. Johnson's IQ testing, administered prior to her trial, also reflect left hemisphere vulnerability, in the face of overall adequate intellectual functioning. Ms. Johnson's Verbal IQ, more sensitive to left temporal functioning, was 18 points lower than her performance IQ, which is more sensitive to right hemisphere functioning. There are specific motor tasks that, due to right hand dominance, will also be focused in the left temporal lobe. For example, Ms. Johnson and her sister appear to have a tremor of the right leg, consistent with left motor strip involvement.

Ms. Johnson's intellectual testing captured her extremely limited fund of knowledge. She did not know how many weeks there were in a year, guessing 48. Vocabulary, Similarities, Mathematics, and Information were her lowest subtests on her intelligence testing.

Ms. Johnson also has a remarkable history of migraine disease, which is a soft sign of neurological dysfunction. Her migraines are accompanied by a gastrointestinal aura, severe, and debilitating.

14

Ms. Johnson's symptom presentation mimics Bipolar Disorder and temporal lobe dysfunction shares many of the Bipolar spectrum symptoms. In Ms. Johnson's case, these co-morbid symptoms, or symptoms could be part of both disorders, are mood lability, impaired judgment, irritability, and significant drug use, and propensity for dissociation.

There is a high correlation between aberrant electrical activity and bipolar disorders. Research from the 1980s noted that a subset of patients with Bipolar Disorder and seizures, when treated with anticonvulsant medication, showed a significant decrease in their bipolar symptoms. In the ensuing years, anticonvulsants, particularly Tegretol, Depakote, and Lamictal, have supplanted Lithium as the treatment of choice for Bipolar Disorder.

Although the neurological presentation focuses Ms. Johnson's symptoms toward temporal lobe dysfunction with manic-like presentations, her experience with Zoloft, particularly, would likely been have similar, since antidepressants can precipitate increased symptoms of mania in persons with Bipolar Disorder, a phenomenon called the "Manic Switch."

## D. Methamphetamine Abuse

Ms. Johnson suffers from methamphetamine abuse, severe, chronic, currently in institutional remission. Methamphetamine can have lasting effects on the brain, so observing the testing after she had been off the drug for a significant period of time is important. This is especially true since the behavioral effects of methamphetamine can last long after the drug has been metabolized.

Methamphetamine's primary neuroanatomic focus is the frontal lobes, although there are other parts of the brain impacted by amphetamine compounds. Two tests of frontal lobe function, The Wisconsin Card Sorting Test and the Booklet Category Test, were within normal limits. Yet Ms. Johnson's symptoms of mood lability, altered spirituality, impaired strategic thinking, losses of consciousness, heightened emotionality, and headaches continue, requiring looking past methamphetamine use as the primary disorder.

Ms. Johnson's methamphetamine use further eroded her ability to effectively judge and respond accordingly. We are now seeing the interaction, for example, between the paranoid scanning associated with trauma, the paranoid ideation of her temporal lobe impairment, and the added paranoia of the methamphetamine. These are the symptom interactions that, much like drug interactions, lead to atypical and severe presentations and behaviors.

## E. Dissociation

Ms. Johnson has a maternal history of a religiously delusional mother and grandmother who experience auditory, visual, and tactile hallucinations, among other perceptual disorders. She has cognitive testing suggestive of left hemisphere dysfunction, and she has, all her life,

15

manifested symptoms of deepened emotionality, irritability, impaired judgment, and altered spirituality.

Ms. Johnson's familial neurological inheritance led to the profound destruction of her will. Ms. Johnson describes dissociative experiences, out of body experiences to escape from the "rebuking," designed to break her. She imagined herself somewhere else, or she lost herself. Ms. Johnson also describes becoming conscious occasionally while she was getting rebuked, perhaps coming into a postictal state. Her childhood trauma's most important clinical symptoms, in terms of her trauma, are Ms. Johnson's dissociation and her affective dysregulation. These symptoms are synergistic with her temporal lobe dysfunction, particularly in times of stress, to overwhelm her functioning.

Dissociation, as defined by Spiegel et al is:

"The exclusion from consciousness and the inaccessibility of voluntary recall of mental events, singly, or in clusters, of varying degrees of complexity, such as memories, sensation, feelings, and attitudes." Spiegel et al, Dissociation: Culture, Mind, Body; American Psychiatric Press, 1994, page 60.

Ms. Johnson, in her childhood, dissociated multiple times over years of ritualistic abuse, Many of her rebukings may have been in response to absence seizures, rendering her the deaf and dumb demon. Dr. Dvoskin acknowledges Ms. Johnson's abuse history, now well-documented, met the criteria for traumatic disease.

Ms. Johnson's symptoms are synergistic, in the same way cholesterol impacts heart disease. Her symptoms of cognitive dysfunction, deepened emotionality, mood lability, impaired judgment, and poor decision making are augmented by her trauma symptoms, her dissociation, loss of self, hyperreactivity, and inability to modulate her emotional state.


**V.    Mental Status Examination of Angela Johnson**

Angela Johnson is a white female who looks younger than her chronological age of 45. She was dressed appropriately. She flung her hands up, initially using broad gestures, in an attempt to control her extreme anxiety. As each interview progressed, she became less anxious, although not less symptomatic in other ways.

Ms. Johnson's level of consciousness was variable. Throughout my two interview periods, Ms. Johnson had moments when she did not spontaneously answer my question. She would blink, look away, and then say, "What?" She describes periods when a person's voice sounds muffled, or she loses time. She stated, "Sometimes I go deaf" and don't hear what people say. She notes that she often will have to reread pages of a book she has just read. What

16

she describes is not a retrieval of memory problem. Rather, it appears as brief losses of consciousness, consistent with absence seizures, among other possible cognitive impairments.

Ms. Johnson regularly shook her right leg, consistent with a tremor. The right leg is, of course, controlled by the left motor strip, imbedded in the left hemisphere of her brain.

She attended to the environment appropriately, although she tended to be easily distractible.

Her language comprehension was within normal limits. Her understanding of complex sentences was good, although she would often ask to hear the question again. Her voice was normal in tone, although occasionally rapid. She was able to follow simple commands, and was hesitant with more complex (3 step) commands. She typically, with reassurance, could complete a 3 step command. Speech was fluid, both spontaneous and impulsive, often requiring redirection. There were no signs of perseveration. Her language usage was not complex. She was able to name common objects like a fork, a comb, and a coin. She was able to name simple colors and shapes.

Ms. Johnson was able to name body parts appropriately. She could determine coin denomination in both hands. She experienced writing on her left palm to be reversed, reflecting sensorimotor abnormalities.

The authors show convincingly that a left inferior temporo-occipital area is differentially engaged in normal control subjects as early as 180 msec after onset of the visual word. It is important that both the electrophysiological and the anatomical data are consistent with results obtained by other methods (eg, depth electrodes and positron emission tomographic results [7, 81]). Salmelin and colleagues [3] suggest that the primary reason for adult dyslexia is probably the left inferior temporoparietal area dysfunction implicated by their study. (Poeppel et al, *Magnetic Source Imaging and the Neural Basis of Dyslexia*, Annals of Neurology, Volume 40, Issue 2, page 137)

Ms. Johnson's thought processes reflected tangentiality and, at times, flight of ideas. Her thought content displayed some referential thinking and oddities of thought, including hyperreligiosity, beliefs in spiritual concepts like ghosts, aliens, and witches. She acknowledged childhood auditory, visual, and tactile hallucinations. She also describes an "engine" in her head, a constant noise that has been in her head her entire life. Seroquel initially quieted this noise, but it has returned.

Affective range was extremely broad. Ms. Johnson was often literally laughing and crying at the same time. This was accompanied by a deepened emotionality on both poles. As noted before, she strode into the room with her arms outstretched. At other times, she was sitting in her chair, almost in a fetal position.

17

Mood was labile, with little impediment on either end.  Her sense of humor, while ready, was often inappropriate to the content of the interview.  She denied suicidality.  She was future oriented, in terms of recognizing the potential options for her future.

Insight was impaired by her heightened emotionality and mood lability.  She acknowledged that her emotionality prevented her from being able to work through a problem, even if she had the technical ability to do so.  She understands her current circumstances.  Her ability to describe her personal psychological state is impaired by significant negativity.

Judgment is grossly impaired by her disinhibition and affective dysregulation.  Ms. Johnson acknowledged poor decision making skills.  She is unable to develop strategies to solve certain problems.

Ms. Johnson could not describe how to divide 54 by 3.  She did describe a strategy of multiplying 5 x 3, which would give you 15, then adding three 15s, which would give you 45.  She was unable to solve this problem in her head.

Her constructional ability was impaired.  She was asked to draw a clock and make the hands say 6:25.  She initially drew 3 hands, erased one hand, and the other hands were placed backward on the clock to read 5:35.

Abstract thought was impaired.  Consistent with limited IQ testing at the time of her trial, her impaired similarities and vocabulary, plus a poor fund of information, limit abstracting ability.

## VI.    Prior Observations by Government Experts

Ms. Johnson's cognitive deficits, and the impairment in mood stability resulting from her cognitive dysfunction, were recognized by other experts in earlier evaluations.  Dr. Martell listed symptoms consistent with temporal lobe dysfunction in his report.

Her observable affect impressed as broad, bright, and comfortable. She was affable, easy-going, and laughed easily during the examination. However, there were also periods of emotional lability during which she cried openly, particularly when discussing her court proceedings and her children. (Dvoskin/Martell, page 31)

She did endorse a number of behavioral symptoms in childhood, including:

o Behavioral problems at home: leading to multiple "rebukings" from her hyper-religious mother and grandmother

o Behavioral problems at school: including difficulty paying attention

18

o Bedwetting 2x per week until the 4th grade

o Nail biting and picking at her fingers

o Difficulty paying attention

o Depression: "I'm sure I was depressed my whole life."

o Aggression: Fights with her sister, and at school

o Shyness: "Came as I got older."

o Nightmares: "Bad dreams about my mother; pig and rabbit things."

o Poor self-esteem: "Mom beating devils out of me; made me feel stupid

and ugly."

o Unpredictable: "I've always been impulsive."

o Frustrates easily: "If I couldn't do or accomplish something."

o Daydreaming

o Easily distracted: "Couldn't concentrate; now it's OK."

o Fidgety / Trouble sitting still: "foot rocking" (Dvoskin/Martell, page 31)

Dr. Martell noted distractibility, a "foot rocking," daydreaming, depression, difficulty paying attention, and difficulty paying attention at school. Dr. Dvoskin noted the shaking of Ms. Johnson's right leg as well.

Her motor behavior was remarkable for intermittent restlessness and nervous shaking of the right leg and foot, which she was aware of and attributed to anxiety. She made good eye contact. (Dvoskin/Martell report, page 29)

VII.  **Present Diagnoses** (based on the DSM-IV-TR Multiaxial system)

I.

A. MOOD DISORDER SECONDARY TO A GENERAL MEDICAL CONDITION. TEMPORAL LOBE DYSFUNCTION.

B. POST TRAUMATIC STRESS DISORDER, COMPLEX, SEVERE, CHRONIC

C. SUBSTANCE ABUSE, METHAMPHETAMINE, IN INSTITUTIONAL REMISSION

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 20 of 119

II. DEFERRED

III.

A. HISTORY OF DAYDREAMING, RIGHT LOWER EXTREMITY INTENTION TREMOR, ACADEMIC IMPAIRMENTS, STATISTICALLY SIGNIFICANT DECREASED VERBAL PERFORMANCE ON IQ TESTING, DEEPENED EMOTIONALITY, HYPERSEXUALITY, ALTERED SPIRITUALITY, LOSING TIME; CONSISTENT WITH TEMPORAL LOBE DYSFUNCTION.

B. HISTORY OF MIGRAINES WITH GASTROINTESTINAL AURAE, PHOTOPHOBIA.

IV. LEGAL PROBLEMS

V. 60

## VIII. Ms. Johnson's Diagnoses at the Time of Trial

I.

A. MOOD DISORDER SECONDARY TO A GENERAL MEDICAL CONDITION. TEMPORAL LOBE DYSFUNCTION.

B. POST TRAUMATIC STRESS DISORDER, COMPLEX, SEVERE, CHRONIC

C. SUBSTANCE ABUSE, METHAMPHETAMINE, IN INSTITUTIONAL REMISSION

D. ZOLOFT INTOXICATION, ACUTE

II. DEFERRED

III.

A. HISTORY OF DAYDREAMING, RIGHT LOWER EXTREMITY INTENTION TREMOR, ACADEMIC IMPAIRMENTS, STATISTICALLY SIGNIFICANT DECREASED VERBAL PERFORMANCE ON IQ TESTING, DEEPENED EMOTIONALITY, HYPERSEXUALITY, ALTERED SPIRITUALITY, LOSING TIME; CONSISTENT WITH TEMPORAL LOBE DYSFUNCTION.

B. HISTORY OF MIGRAINES WITH GASTROINTESTINAL AURAE, PHOTOPHOBIA.

C. METHAMPHETAMINE ABUSE, CHRONIC, SEVERE

20

IV. LEGAL PROBLEMS

V. 40

Ms. Johnson's mental state was impaired at the time of trial. Ms. Johnson's medication regimen during her incarceration, particularly in Woodbury County Jail at the time of her trial, was contraindicated in a person with dysfunction of the temporal lobe, as noted in the Persinger article above. The combination of Seroquel, a D2 antagonist antipsychotic, and Zoloft, identified by Astra Zeneca as having double the incidence of seizure activity than placebo, was the medication regimen Ms. Johnson was taking during the time leading up to her trial. These medications were increased precipitously just days into Ms. Johnson's trial. Zoloft, already at 200mg. per day more than 4 times the recommended dosage, was increased to 300mg per day, 100mg. above the 50mg-200mg dosage Goodman and Gilman's The Pharmacological Basis of Therapeutics, 11th edition describes as an "extreme dose.' (Goodman and Gilman's, page 435, table 17-1).

Ms. Johnson reported to medical staff at the jail that she was unable to tolerate the stress of the trial. Her family noted that her behavior changed noticeably after trial started. She appeared child like and in a daze, according to her daughter and sisters, who also reported Ms. Johnson was "different" from the way she was before trial. She was barely able to stay awake and experienced the trial as "a blur." She felt hopeless and helpless and believed that "there was nothing we could do to change things," according to her sister, who worried that Ms. Johnson would commit suicide. She had great difficulty "staying awake and not falling asleep." The medications made her a "zombie." She felt "hopeless" and "was unable to do anything that mattered." Her sister observed that "it didn't seem like Angie understood that she was on trial and that this was very serious. For instance, after I testified, she gave me a big smile and waved at me, like we were in school."

The symptoms she and others describe are consistent with Zoloft toxicity. Zoloft has known cognitive side effects, including agitation, irritability, increased depression, and suicidal ideation. Ms. Johnson experienced each of these, consistent with both her circumstances and her faulty medication regimen.

**Forensic Formulation**

- **Was the defendant's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge?**

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 22 of 119

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that Ms. Johnson was suffering from Complex PTSD and Temporal Lobe dysfunction and methamphetamine abuse at the time of the offenses. Her capacity to conform her conduct to the requirements of law was significantly impaired by these disorders, which manifested themselves under ordinary circumstances in grossly impaired judgment and insight, inability to develop strategies, problem solve, and understand consequences. Extreme stress would have also exacerbated her underlying paranoia, hyperractivity, and dissociative reactions. Her pregnancy would have significantly heightened her mood lability. The lingering affects of methamphetamine use would also have increased her already abnormal paranoid feelings.

- **Could the defendant have reasonably have foreseen that her conduct in aiding and abetting Dustin Honken, would cause, or would create a grave risk of causing, death to any person.**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that Ms. Johnson was incapable as a result of impairments in judgment and insight, and in ability to plan and predict consequences, of understanding and predicting outcomes of situations in a normal way.

- **Did the defendant aid and abet Dustin Honken while under severe mental or emotional disturbance?**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that Ms. Johnson was suffering from Complex PTSD and Temporal Lobe dysfunction at the time of the crimes. These conditions result in severe mental and emotional disturbances. Ms. Johnson's conditions alone and in combination render her unable to moderate her emotions and impulses normally. Her moods are extremely labile, cycling inappropriately from grandiosity to depression. She dissociates and functionally disappears from consciousness periodically as result of her disorders. All of these conditions are exacerbated by incidents of extreme stress, methampehamine use and withdrawal, and pregnancy.

- **Was the defendant under unusual and substantial duress when she aided and abetted Dustin Honken's commission of the charged offenses, regardless of whether the duress was of such a degree as to constitute a defense to the charge?**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that Ms. Johnson was under unusual and substantial duress at the time of the offenses. Dustin Honken has been described as a calculating and manipulative person. As a result of Ms. Johnson's brain impairment, she has attempted throughout her life to attach herself to others who can make up for her inability to develop strategies, solve problems, and overcome various barriers to everyday living. Her disorders render her susceptible and paranoid, emotionally labile, and unable to think things through. Ms. Johnson's disorders rendered her extraordinarily vulnerable to the influence of a person like Honken.

22

- **Did the defendant's impairments and medications affect her ability to rationally assist her counsel prior to and during the trial?**

Ms. Johnson was at the upper limit of her antidepressant medication, Zoloft, at the start of her trial. The 200mg daily was what is described by Goodman and Gilman as the upper limit of the "extreme" dose. She had consistently complained of nausea and occasional diarrhea, symptoms of serotonin toxicity. She had also complained of headaches, another symptom of Zoloft intoxication. However, Ms. Johnson has experienced headaches her entire life.

Ms. Johnson presented as "hypomanic" even while on Zoloft 200mg. Dr. Logan appropriately considered the diagnosis of Bipolar Disorder, whose symptoms, including mood lability, impaired judgment, and irritability, among others, are also found in Temporal Lobe dysfunction. Dr. Martell described Ms. Johnson's mood as "labile."

When her antidepressant was increased to 300mg daily a couple of days into her trial, Ms. Johnson was no longer a part of the process. She was unable to focus, drawing most of the day. She waved to family members, and her affect was often inappropriate. Her serotonin toxicity, with extreme levels of her antidepressant Zoloft, impaired her ability to rationally assist her attorneys during trial.

- **Did the defendant's impairments and medications inform her demeanor at trial?**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that the combination of Ms. Johnson's mood impairments, dissociative tendencies, sleep disorders, trauma history, and medications caused and explained her disengaged appearance, largely flat and absent affect, and inability to show emotion at trial.

- **Was the defendant's use of profanity and verbal threats consistent with her longstanding neurological, psychiatric, and psychological impairments?**

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty that Ms. Johnson's use of profanity and verbal threats are consistent with a history of hyperreactivity, hypervigilance, and affective dysregulation.

Thank you for allowing me to examine Ms. Johnson,



23

George Woods, MD

24

# EXHIBIT 2

## Declaration of Melissa Marie Friesenborg

I, Melissa Friesenborg declare the following:

I was Dustin Honken's girlfriend for about nine months from the middle of 1992 through March 1993 at which time he was arrested for manufacturing methamphetamine, although I had no idea at the time why he was arrested. I was 23 then. I first dated Dustin when I was 18 or 19 and living in Iowa, where I grew up. He was just moving to Arizona and the long-distance dating did not work out so we broke up. There is something magical about relationships when you're that age. Anyway, that was true for me, but we hardly saw each other and I really didn't know him. Of course, as things turned out, I never really knew him, no one did. Dustin only gave out the information he wanted me to know or hear whether or not it was true.

I was introduced to Dustin by my friend Tim Cutkomp, whom I met at Des Moines Community College, in Urbandale. At that time, Dustin was still going to NIACC, Northern Iowa Area Community College. Tim and I were good friends and we hung out together in a group that included his cousin Todd Olson. Tim and I were never romantically involved, not even close, although Dustin suspected that Tim and I had been closer than we were. Tim was just someone I trusted and hung out with. I'm not sure Dustin had a friend he didn't use or hook up with in a romantic way, which was why he couldn't understand how Tim and I could just be friends.

I met Shelly Geppert, the woman Tim would marry, just once in passing, but we never talked. Tim told me that Dustin didn't like Shelly and that the feeling

1

was mutual.

I moved from Iowa to Arizona in September 1992 after I received my B.A. in social work to be near Dustin and because I couldn't stand the weather in Iowa. Arizona had been my dream-destination for quite some time.

Dustin made it possible, made it easy. He had the ability to make you feel like you were taken care of. He picked out my apartment and assisted with the rent. He and Tim were the only people I knew in Arizona. When I told Dustin I was depressed because I didn't know anyone in Tucson, he got me a membership in a gym and got me a personal trainer, which oddly enough ultimately resulted in my starting my own business last year, a Pilates studio. I do believe that everything that happens in life has a purpose.

I was a social worker in a nursing home until I was promoted to Alzheimer's unit director. Then for five years I was a hospice social worker. After that I was the Southern Arizona AIDS Foundation volunteer coordinator, before becoming its support services manager. Last September, I opened my Pilates studio where I also put my social work experience to use. I see Pilates as a way for people to self-improve and that often requires us to spend a little time talking, debriefing, allowing them to decompress from the stresses they experience in their daily lives.

Dustin would tell you we lived together but that was never true. I saw him at most twice a week. He was always traveling on what I thought was computer business, a business he shared with his brother Jeff. Very often, he stayed at a house way out of town that he shared with Tim. Dustin furnished my apartment

2

with expensive bedroom and living rooms sets, as well as electronics. He paid cash for all his purchases and gave me cash too. I assumed that his brother paid him in cash and that theirs was a cash business. I know how naïve this sounds, but I never asked any questions, not because I was afraid of the answers, but because I was sure I knew what was going on, computer work with panels. I often dropped Dustin off at Pima Community College in the morning when he stayed over. I was 23, just out of college and from a small town in Iowa. If I need an excuse for being so naïve, I guess that would be it.

I don't nag. I don't fight; I choose not to participate, which doesn't always win favors. So I didn't ask him much and when he told me out and out lies I didn't question it because I didn't care. He never wanted me to deposit cash in the bank. I asked him why and he said "just because." I didn't question it. Once, the only time I went to the house that he and Tim lived in outside of town, they took me out to a shed and I saw some garbage cans filled with white powder. I don't know why they took me out there, but there was a noxious smell and they took me back to the house really quickly. I asked what it was all about and they said they were making gold. It wasn't the only time they told me that. I just thought they were being stupid or they thought I was an idiot and maybe they were right. But the truth is I didn't care. It wasn't even that I didn't want to know—I really just didn't care.

Still, part of me as a woman feels pretty stupid, beyond naïve. After he was arrested and this all came out and my family heard about it, it was embarrassing to say the least—humiliating. I'm not crying because of my

3

stupidity—it was part of my life, a bump in the road—I'm crying for all the people who were hurt, and all the consequences.

I saw Dustin twice after his arrest in Iowa, asked how he was doing. He told me that he wasn't worried about the charges and that he was going to take care of it. I certainly didn't know he meant to kill a witness—I didn't even know the witness's name or what he was a witness to. Dustin always made you believe everything was going to be O.K. That was one of his greatest abilities.

At the end of May 1993, I had already moved out of that fancy apartment in Rio Cancion because I could no longer afford it. I never wanted it. It was affluent. He set me up pretty high. I don't like fancy things. I don't need them. I've never coveted them. The apartment, the furnishings, the stereo equipment was all his doing. We never even listened to the stereo. It was just stuff to me, but he wanted it.

Both times I visited him in Iowa after his arrest, it was at his mother's house where he was confined. We stayed in separate rooms. We had already stopped having sex long ago. The truth is I have only one or two memories of ever having sex with him, so I guess you could say it wasn't memorable. But the reason I stopped seeing him for good after that was because I found a portfolio in his room, like an artist's portfolio. It was filled with professionally done, large-scale photos of a woman posing. In some she wore leather, but they weren't risqué. In a few others, she was with a child. I asked Dustin who she was and why did he have them. He said it was Angela Johnson. This happened during the weekend of July 4th, 1993.

4

I need to say a few things here. I once hung out with Angela Johnson's brother Jimmy when my family lived in Forest City, Iowa, which was until I finished eighth grade. He and I hung out in the same circle from about the sixth through the eighth grades. I was around 12 years old when I had a crush on him. The Johnson family was known in town as "crazy." Jimmy used to get teased all the time. Angela was much older. She seemed very old, the way people do when you're so young. I imagine she had gotten teased too, like Jimmy was, but I really don't know. I just know how mean kids can be to each other. I was angry when I saw those photos and I asked him what he was doing with pictures of someone as crazy as Angela, because as I say that was the Johnson's reputation. I was angry at Dustin. He told me Angela was a convenience. He needed her he said, but he wouldn't tell me why when I asked. That was it for me. That was the end. The portfolio cinched it. That and Kathy Ricks was calling the house all the time I was there and Dustin was speaking to her privately. I never saw him again until I testified at his trial.

The other thing I wanted to say here is that even then, on July 4, 1993, I had no idea why Dustin had been arrested. When I asked him he said it was for something that sounded blasé as innocuous as a traffic ticket, but that didn't jive with his being confined to the state of Iowa, which was why I had to come there as opposed to his coming to Arizona to see me. By then, I didn't know what to believe.

The day he was arrested in Iowa, I was supposed to pick him up at the

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 31 of 119

airport, but he wasn't on the plane. He had told me he was going to Texas on computer business. In the middle of the night I got a call from Tim, who told me to go to my freezer and destroy what I found. There were brown vials in there. I was freaked out. I never saw them before and didn't know when they were put there. There were several bottles. I opened them and poured out the contents. It was liquid. I think it was colorless. My only thought was that they weren't mine and they weren't supposed to be there or Tim wouldn't have called in the middle of the night. I didn't think I was breaking the law. I just didn't think about it at all, but I definitely felt that getting rid of them was an act of self-preservation.

Jeff came by the house sometime after this happened and left with cartons of stuff that was in my den. Tim was planning to move back to Iowa to be near his children and they had shut the house and moved some boxes and some of Dustin's clothes into my apartment. Dustin has planned to move in with me, but I hadn't given it much thought about whether it was a good thing or not, but part of me had still hoped to find that essence of what we had when I was 18 or 19. It sounds foolish, maybe, but then I still thought we could have gotten there. That's how convincing he was.

Months after his arrest, I began to wonder what jeopardy, if any, I had put myself in when I emptied those vials. I don't know what made me start worrying or when I started to worry. I called my friend Tom Kinsey, who happened to be Webster City Iowa police officer. I had once dated his friend and we had hung out in the same circle. I didn't call him as a cop; I called him as a friend who would have legal information, not to hurt Dustin. I asked him if I had done

6

anything wrong. Eventually, a DEA agent and a U.S. attorney spoke to me. They gave me some kind of use immunity agreement.

In retrospect, I think every woman Dustin was with had a purpose. To be honest, I'm still searching for mine. I've blocked him out, but it seems that every three to five years, he is somehow brought back into my life. I almost expected you to call. Kathy Ricks, who I never met and don't remember ever speaking to, was his family woman. His complaint about her was that she was too needy. Anyway, I never knew she was still in his life when I was with him, let alone that they had a child. He had told me that he used to date her and that she was crazy.

Angela and he apparently shared a common interest, methamphetamine, although I never knew that at the time. I didn't even know that Dustin used the drug except for one time in January 1993 when he brought us a little to try. Everything was compartmentalized. Nobody knew who he was. I'm not sure he did.

Me, I like to think I was his attempt at normalcy, some stability in his life. I was educated; I had dreams, but he never put the effort in. I think it bothered him that I didn't need him, even though I think he was once attracted by that. I moved to Arizona to be with him because as I said I was hoping to recover the magic I had with him when I was 18 or 19. It never happened, never came close. Dustin bought me an engagement ring, but it was on lay-away, so I never wore it. What's funny is that I never remember him proposing. I never really imagined a life together with him, never saw us settled, because we never had a life

7

together. I guess in retrospect I wasn't invested much. With the experience of 20 years of being in relationships since Dustin, I know now that we never had one in any real sense.

Dustin took from me my ability to trust in relationships. Dustin was such a good liar, and at the same time made me feel so special and so good—I can't let that happen to me again.

I never liked Jeff and the feelings were mutual. I think he was a really smarmy. I can't believe they never arrested him, too.

In the fall of 1993, Todd Olson came to my apartment. He had been living in Arizona, but we weren't in contact. He called from out of the blue and came over and asked how I was doing. I was very surprised at the visit, but thought it nice he cared enough to check up on me.

A very short time later I started getting phone calls from Dustin, which I didn't pick up. He reached me at work to say he was in town with a U-Haul truck and had come to pick up his furniture. That's when I put together the visit from Todd and Dustin showing up. Todd had been sent to scope out my place. Angela Johnson was with Dustin when he picked up the stuff, which neighbors had helped me carry outside. Angela called me that day to ask me to cooperate with Dustin. She wasn't threatening at all but it really upset me that Dustin would have her call me to do his bidding. Dustin was threatening when he called me—I can't quite explain it. It wasn't explicit, but he scared me as if I would be harmed if I didn't give him back the furniture. Taking the furniture was a really low and shady thing to do. I didn't see him when he got the furniture and he never contacted me

8

Case 3:09-cv-03064-MWB-LTS   Document 284-81   Filed 06/23/11   Page 34 of 119

again. Jeff had long ago already come and taken back the electronics.

Tim was faithful to Dustin, out of fear or stupidity I don't know. I think Dustin was manipulative when it came to Tim. Tim had no car and Dustin would leave him for days on end in that house outside of town with no way to get around. Tim would complain, but he seemed to have no choice. He and Tim used to go to girly bars. Dustin would tell me he was doing it for Tim. He was always helping other people. He never did things for himself. I don't mean to sound bitter, but I do say that sarcastically. Dustin was a selfish person.

Dustin lied about his girlfriends in Iowa. He never told me he had a child. He lied about his business. He lied about his whereabouts. The day he was arrested in Iowa, I thought he was in Texas on computer business. Once I learned all the lies and saw the whole picture, I realized he was such a good manipulator I didn't know it was happening. I knew a different Dustin, the Dustin he wanted me to know, not the Dustin who had other girlfriends, a child, manufactured meth and was a murderer. I think something was shut off in Dustin, in his head.

I was fortunate to have friends, really good people to help me get through all this.

I testified at Dustin's trial and in front of a grand jury. Had I been contacted by Angela Johnson's lawyers, I would have given them this information, and I would have testified at her trial if I had been subpoenaed.

In August 2009, an investigator working on her case asked me to tell him about my time with Dustin. I told him what I knew to the best of my recollection. I

9

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 35 of 119

did not write this declaration myself but I have read it carefully and it says what I told the investigator when we spoke twice on August 8th and twice again today.

I declare, under penalty of perjury, that the foregoing 10-page declaration is true and correct.

Executed by me this 10th day of August 2009, in Puma County, Arizona.


_Melissa Friesenborg_
Melissa Friesenborg

# EXHIBIT 3

## Declaration of Alan James Johnson

I, Alan Johnson, declare the following:

I grew up on a farm in Britt, Iowa, the same town that Dustin Honken was raised in. Dustin and Tim Cutkomp, who was held back once, graduated a year behind me. Dustin hatched a plan to rob the bank in Britt during study halls in my senior year in Britt High School, which is now called West Hancock High. He used Tim and me as a sounding board, and the plan was for the three of us to rob the bank.

I early enlisted in the Army at the start of my senior year and left town the day after I graduated. I never did rob that bank. In August 1986, after I left the army with a general discharge under honorable conditions, I was about to run a 10K race in Britt when the FBI pulled me in and took my deposition about that bank robbery plan because that bank was robbed either just before or just after I returned to Britt.

The biology teacher who ran our study hall had overheard Dustin, Tim and me talk about robbing the bank, and when it was robbed he mentioned me to the FBI. That's why they wanted to talk to me. The teacher, Mr. Grandgette—he died of cancer—had seen Dustin's drawings of the layout of the bank. Dustin's mom worked at the bank and he was going to copy her key. He knew the alarm code because his mother had no memory for it so she kept it written down and carried it in her purse. This was Britt after all. Main Street on Friday and Saturday nights was filled with teenagers cruising back and forth and that's where the cops were. The bank was a drive-through and kids would always stop and park there. Our

plan was to use two cars and block the drive-through and rob the bank. Nobody was in the bank at night. I was a kid—just talking about how to get a Ferrari or something. To Dustin, it was real.

I forgot about that deposition until it was shown to me when I was asked to testify against Dustin Honken in his murder trial. The government offered to pay my way, but because two children were murdered I refused any compensation. They showed me my deposition to refresh my memory before I testified.

I left Britt for good in 1986 and moved to Fort Lauderdale where my dad got me a painting job with his friend. There were no jobs in Britt.

Dustin was a master at manipulating other people to get them to do what he wanted. He enjoyed causing others pain even if there was no benefit to him. He once hit me with a bullwhip and stripped the skin right off my nose.

Tim Cutkomp was a decent guy except when he was around Dustin. The only time I ever planned a crime was the time I spent with Dustin. That's the effect Dustin could have on you. He had the gift of gab, a golden tongue. He could make people do stupid and nasty things, things they would never otherwise do. He was goofy looking. It's not nice to say, but he looked like a mole. Still, the girls all liked him because he could talk his way into and out of any situation.

There was this one girl—the most beautiful girl I've ever seen, I mean ever seen. Now there's a girl that if she asked me out I wouldn't have waited to start dating until after I got out of the Army. Her name was Sherry Slauson. She was

2

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 39 of 119

from Garner, a town nearby. Dustin treated her just like he treated Tim, like a slave, there to do his bidding. Dustin was a couple of years older than her. My mindset is that I treat a woman with respect—that's how I was raised by my father. I couldn't stand the way Dustin treated her, the way he ordered her to do things.

One time Dustin's young sister Alyssa was having a sleepover, although I didn't know that at the time. I was walking by the house and I stopped by because some lights were on. Anyway, I walked in and Dustin and Tim each were messing around with 12 or 13-year old girls on the couch while Alyssa and the other girls were upstairs sleeping. I asked them what they thought they were doing. I told them it was wrong, crazy. I mean they were 18. Dustin told me to mind my own business.

I left the house and called Sherry and told her. She didn't believe me, but she must have called Dustin because he was really angry at me. I asked Tim the next day what he could have been thinking, and he said, "Alan, I wouldn't have done nothing," and I said, "Yeah, but what would Dustin have done?" People don't change. That was Dustin, taking any advantage he could get. Anyway, I probably saved those two girls years of therapy and Sherry never went out with him again.

I don't think he ever beat Sherry up, but there are things worse than being hit. There's mental abuse that can be much worse. Dustin messed with people's minds.

He and Tim told me that they would often go to Minneapolis to roll

3

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 40 of 119

homosexuals. They chose homosexuals because they figured they would have more money than straight guys who spend all their money on girls. They took karate lessons together and after the lessons they punched the windows out of cars. Tim would never even think about doing those things on his own. Tim is just a big dumb guy who would step in front of a bus if Dustin told him to. And it wasn't just Tim. Dustin had that effect on everyone, even his teachers when Dustin didn't do his homework would be under his spell.

I couldn't afford karate lessons, but I had a Thai friend who was a tournament kick- boxer who taught me some stuff. This was my only connection to Dustin outside of school, the only time we hung out together. We went to this deserted house and Dustin and Tim would teach me what they learned in karate class. Dustin only taught me because he got to hurt me and Tim did it because he got a break from being beat up by Dustin because Dustin was busy beating up on me. I taught them what I knew about kick-boxing. Once after Dustin kicked me really hard in the head, I got lucky and got him in the ribs. He thought I'd cracked them. When I turned away, he kicked me so hard in my back that I quit working out with them. That was Dustin. He would always get back at you and he always waited until your back was turned.

Because I had pre-enlisted in the army, the recruiter, a former Green Beret, would show me and the three others who pre-enlisted how to march and drill and stuff, so we would be prepared when we reported for duty. Because I pre-enlisted I got to choose airborne. I tried to talk Dustin and Tim into enlisting and Dustin asked to meet the Green Beret who was a martial arts expert. Dustin

4

Case 3:09-cv-03064-MWB-LTS     Document 284-81     Filed 06/23/11     Page 41 of 119

asked the recruiter to teach him some martial arts stuff and the recruiter said, "I'll teach you all I know, just sign right here." That was the last he heard from Dustin who always wanted something for nothing.

I am a law-abiding citizen. I work six to seven-day weeks in my own painting business in Fort Lauderdale, Florida. Back in high school, I spent my time in the basement reading books. That's what I did with my time.

To be honest, I always wanted to be FBI or Secret Service. I got 90s whenever I took a law enforcement test, but I was too old by the time I raised my wife's kids and I couldn't afford the pay cut before that. In 2003, I was a U.S. Customs officer at Miami-Dade Airport and went through federal law enforcement training at the center in Brunswick, Georgia. I was voted almost unanimously as the one in my class everyone wanted to work with. It would have been unanimous except I voted for someone else. They let me keep my painting business when I went through the training and when I had my job. I would do my painting on weekends. Then I went to work for ICE and they sent me back for seven months intensive language school, and they still let me keep my business. But my marriage was falling apart because I worked all the time, so I resigned from ICE for my wife, but it didn't save the marriage. I still regret that I resigned. I'm two courses short of an A.A. degree in criminal justice and an A.S. degree in crime scene technology.

I'm telling you all this because it's important for you all to know how I feel about crime and criminals. I don't know Angela Johnson so I have no reason to help or hurt her. I can't possibly know for sure, but if she took part in a murder

5

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 42 of 119

with Dustin I feel strongly that Dustin's domination and evilness must have played a part. I know how he treated Sherry and Tim, so I feel bad for her because he must have treated her the same or worse. Dustin had no regard for anyone but himself.

I think Dustin liked hurting people even back then when I knew him. He enjoyed dominating other people, always being in control. He always got more than even if he thought you slighted him.

Had I been contacted by Angela Johnson's lawyers, I would have provided the information in this declaration and would have testified at her trial if asked to do so.

An investigator currently working on her case asked me to tell him about my experiences with Dustin and what I observed about him and I told him what I knew to the best of my recollection. I did not write the declaration myself but I have read it carefully and it says what I told the investigator when we spoke yesterday.

I declare, under penalty of perjury, that the foregoing 6-page declaration is true and correct.

Executed by me this 2nd of August 2009, in Broward County, Florida.

Alan Johnson

6

# EXHIBIT 4

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 44 of 119

# DECLARATION OF SCOTT TRACY GAHN

I, Scott Tracy Gahn declare the following:

My name is Scott Tracy Gahn and I reside at 694 1st SE, Mason City, Iowa. I was previously interviewed by the DCI, testified before a grand jury in 1993 and subsequently gave testimony in the trial of Dustin Honken. I do not know Angela Johnson. I am giving this declaration to reaffirm and elaborate on my prior interviews and testimony and to provide information that was not recorded or asked of me previously.

In reference to my Grand Jury Testimony of October 27, 1993, Pg. 10, lines 10-22, these threats were verbatim and for real. I feared Dustin Honken. From my original meetings with Dustin Honken, I knew he was evil. His sole desire was to be completely in control of people's lives. In my opinion, he derived no pleasure from the money, drugs or, obtaining material things. He wanted to be the controlling king, untouchable and dominant in his own little crime ring. I knew from personal contact he was capable of anything to get what he wanted. When he told me in front of my house, that people had better start taking "me seriously or I'm going to start whacking people," I took him for his word. He meant it. He was nobody to mess with and I bailed out of the scene.

When he was attending NIACC, I was taking classes there also. That's when the marijuana was passed and I brought the money to Dustin Honken back from Greg Nicholson. He always had Tim Cutkomp on his side, like he was his little muscle man.

On numerous occasions he offered me money and drugs to be a collector and distributor of his drugs. I always said no. I did drugs. I did not sell them.

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 45 of 119

At the club Exsess, that I was trying to establish, he said that if I could give him Nicholson, he would give me the biggest and badest Harley I had ever seen. He knew that was a soft spot for me because I had just had to sell my own bike to divide proceeds in a divorce proceeding. This is a perfect example of his manipulation and an attempt to suck me into his drug circle. Thank God I did not know where Nicholson was living. A fellow band member called Nicholson to come down to my club and he did. And that's how I knew he was in town. Dustin Honken was desperate to find him. The day Dustin Honken came in the club after Greg had been there, I played it cool, but I had chills down my spine. I knew what was coming, that's why I had disassociated myself from Dustin Honken. Greg Nicholson may have deserved time for his illegal activities but he did not deserve to die on a drug deal gone bad.

Dustin Honken was evil and was capable of doing anything. He had threatened to kill children before and I took that to mean he would kill my children if I messed him over – and look what happened. It eventually happened. I was right about my instincts, history with Dustin Honken and my family. History proved it. My instincts were right.

In my opinion Dustin Honken should fry in hell and I would light the fire. As far as Angela Johnson is concerned, I do not know if she was seduced by money and the life style that was offered to me by Dustin Honken or, she may have acted out of fear. I have no opinion or knowledge of her acts. But in my opinion, Dustin Honken would roll his own mother to save himself. He is evil, cold, smart, non emotional and calculating.

I met Dustin Honken at Wellborn Industries in about 1987-1988. During my acquaintance with Dustin Honken, he told me that the cops had been trying to pin a bank robbery on him since high school, but they couldn't do it. He never said he did not do it. And, he said it with pleasure like

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 46 of 119

a badge of honor- you can't touch me. His attitude was that he was too smart, he had others to do his dirty work and he was untouchable. Almost like I did it or I'm going to do it— prove it. Arrogant. Dustin Honken once mentioned that the police were still looking for the counterfeit plates that his father had, who I understood was in prison in Minnesota, and Dustin said they'll never get them. Which to my knowledge they never have done so. I related this information to Bill Basler, and it was brushed off as BS. Again, another example of Dustin wanting to be the king pin in his own little world of drugs, controlling people and power. I believe it is possible that any woman in Dustin Honken's life would just be a disposable pawn. He only cared about himself. This was all about Dustin Honken.

Dustin Honken was all about power. He always wanted someone bigger to enforce his wishes. He had to be in control. Again, back to the power. If he was angered enough himself, he would do it himself, just like he told me.

In 2004, in the basement of the Iowa State Patrol Office, I was interviewed by Special Agent Basler and a prosecutor regarding the incident where Dustin Honken threatened to start whacking people. My response to Dustin Honken was I gave him $700 dollars and told him not to show up in front of this house again or I would take a baseball bat to him. I also told him to bring a gun because I was not stopping. No warning, no stopping. He threatened me and my family and I told him flat out don't ever come over here again or I'll take a baseball bat to you. The prosecutor looked at Special Agent Basler and said, "Has this guy had a mental health evaluation?" I thought to myself, "fuck you dude go back to the suburbs." I felt I was there putting my neck and life out on the line to do the right thing and how dare the prosecutor say something like that.

I demanded and did not testify before the grand jury without written and notorized full immunity that is referenced at Pg 4, Ln 13 of Grand Jury testimony.

I am still in fear of Dustin Honken if he were ever to be released. I believe he would go on a rampage and kill until he was killed.

Had I been contacted by Angela Johnson's lawyers, I would have provided the information in this declaration and would have testified at her trial if asked to do so.

An investigator currently working on her case asked me to tell her about my experiences with Dustin and what I observed about him and I told her what I knew to the best of my recollection. I did not write the declaration myself but dictated to her and I have read it carefully and it says what I told the investigator when we spoke.

I declare, under penalty of perjury, that the foregoing four page declaration is true and correct. Executed by me this 12th of August 2009, in Cerro Gordo County, Iowa.

SCOTT TRACY GAHN

Page 4 of 4 Pages

# EXHIBIT 5

3590

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,　　　　　　　　No. CR01-3047

　　　　　Plaintiff,　　　　　　　　　　Sioux City, Iowa
　　　　　　　　　　　　　　　　　　　　October 19, 2004
　　vs.　　　　　　　　　　　　　　　　8:46 a.m.

DUSTIN LEE HONKEN,

　　　　　Defendant.　　　　　　　　　　VOLUME 20
　　　　　　　　　　　　　　　　／

　　　　　　　EXCERPT OF TRANSCRIPT OF TRIAL
　　　　　　BEFORE THE HONORABLE MARK W. BENNETT
　　　CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

Case 3:09-cv-03064-MWB-LTS　　Document 284-81　　Filed 06/23/11　　Page 50 of 119

not say she did not see any emotion. I think that is not --
when I got permission to interview her, that is not what she
said.

MR. WILLIAMS: Just so we're clear because to some
degree there's an allegation I misrepresented something here, I
wasn't privy to any conversation between Mr. Parrish and Sali
Van Weelden, so nothing I said -- I've not talked to her. I
don't know what she saw. She's not told me what she saw, and
she certainly didn't tell me what she told Mr. Parrish today, so
I don't know about that.

THE COURT: Any other record anybody would like to
make?

MR. PARRISH: No, Your Honor.

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Anything else we need to talk
about? Oh, this rebuttal issue?

MR. WILLIAMS: Rebuttal issue, and I think it's
probably best handled if I give you a quick preview of where
we're going with our rebuttal evidence, and then the defense can
make whatever objection they deem appropriate.

The rebuttal evidence that I understand they're
objecting to has to do with a bank robbery that occurred back in
1986. There's a couple things that have come up during this
trial not the least of which is the mitigating factors
identified by the defendant that he's not had a history of

violent behavior, he's not had a history of -- now significant history of criminal convictions, previously a significant history of criminal conduct.

Beyond that, during the evidence, most certainly the image, the impression, that the defense has attempted to paint for the jury is that other than these murders Mr. Honken was a good little boy who always did everything right. In the words of Carol Honken, never, ever got into trouble and that he grew up, went to school, was a good student, average student, went to college, just a law-abiding citizen who, lo and behold, in 1992 apparently starts down the road of criminal conduct.

In particular today during the testimony of Alyssa Nelson, she testified that she found out about the Britt bank robbery, Dustin confided in her about the robbery, that Carol had kicked Dad out, Dad was living in a shack without heat, Dustin was called by him, he was drunk, he told Dustin where he was staying, Dustin took food to him, and that Dustin told Alyssa that his dad told him, I've got a plan; if you don't help me, I'm going to kill myself, and had Dustin make a copy of his mom's pass key to the bank, and Dustin claimed he had no other choice than to do this because his dad was going to kill himself.

The evidence the government intends to put on tomorrow is from six witnesses to rebut that specific allegation. The first witness is Kenny Hansen. Kenny Hansen was a person who

was a couple years ahead of Honken in the school. Kenny Hansen was approached a couple months before the robbery in June of 1986. Honken approached him about committing the robbery, had a plan, a detailed plan in mind --

THE COURT: When you say Honken, you're meaning Dustin Honken or Jim Honken?

MR. WILLIAMS: Yes, I'm sorry. I'll make it clear. The defendant approached Kenny Hansen about robbing the bank; had a very detailed plan about how it was to be done, what door was to be entered; once they went inside, there was going to be an old lady working there; that once they got inside, the old lady should be shoved into the bathroom; that the door should be secured; whoever robs the bank should be wearing a mask that fully covers the face; they should have surgical gloves on their hands, a very detailed plan.

Kenny Hansen is expected to testify that he probably would have gone through with it. He didn't go through with it. He knows that at some point he was told by one of our other witnesses, Mark Johnson, that the plan was for Honken to kill him, for the defendant to kill him, but he doesn't recall if that was the specific reason why he did not go through with the bank robbery.

The next witness is Alan Johnson. Alan Johnson will testify that he was a year ahead of the defendant in school, that he graduated from high school in May of 1985, and prior to

graduating from high school in May of 1985 had had detailed discussions with the defendant about robbing the Britt bank, the same type of details, the same type of scenario, the same type of plan.

Alan Johnson then went to the Army, was discharged from the Army in February of 1986. And sometime between February of 1986 and the bank robbery in June of 1986, Alan Johnson's expected to testify that he was approached by the defendant and asked to kill Kenny Hansen who was going to be robbing the bank and that they would split the money.

Mark Johnson, Alan Johnson's brother, will also testify to being approached by the defendant in the spring of 1986; that the defendant had a plan for the bank robbery; again detailed the plan to Mark Johnson which coincides in detail with Ken Hansen and Alan Johnson; that the defendant also asked him to help kill Kenny Hansen after he committed the bank robbery; that they were going to dispose of the body by throwing the body into a manure lagoon; that the defendant told him that the chemicals in that lagoon would eat away all of the remains including the bones and the body would never be found and that they would split the money.

Mark Johnson will testify that he then went to Kenny Hansen and told Kenny Hansen of the plan at which point Kenny Hansen responded that he was not going to go through with the plan.

Within about a month of the approach of Kenny Hansen to rob this bank, the bank was robbed. The bank was robbed using a key, we heard from the defendant's own testimony here today, obtained by the defendant. The bank robbery occurred in a manner identical to that described by the defendant.

Bill Basler would testify that he interviewed the defendant in connection with this bank robbery back in 1986. The defendant denied ever talking to anybody else about any plan to rob a bank. The defendant also told Mr. Basler, admitted that he was with his father the night before the bank robbery on June 1 of 1986.

Beverly Meyland, M-e-y-l-a-n-d, will testify that she was the teller of the branch bank for the First State Bank in Britt, Iowa, and that she was the teller who was robbed on the morning of June 2 of 1986; that she was, in fact, approached by a man wearing a mask around his face; that he had -- and I don't recall if she saw gloves on his hands or not. That part I don't remember right now but that she was, in fact, put into the bathroom, the door was tied shut, and that she was told to stay there for ten minutes.

And then finally Police Officer Charles Stubbe will testify that he arrested the defendant's father, James Honken, on June 6 I believe or June 8 of 1986, arrested him in response to a citizen complaint about a man slumped over a steering wheel in a car. When he approached the man, he was inebriated. The

man identified himself as James Honken; that the officer saw cash in the backseat on the floor. He arrested Mr. Honken, Mr. James Honken, and when he searched the vehicle found approximately $12,000 in U.S. currency, a ski mask, gloves, and a loaded handgun in the backseat. And I forgot to say the handgun was part of the scheme as outlined by the defendant and was actually used -- the teller will say the gun was actually used during the robbery.

The government believes this is in direct rebuttal to the picture painted by the defendant today that his father is this evil man who led him into a life of crime by bragging about his criminal exploits and that he was talked into getting a pass key for his father to rob the bank, and our evidence is that's simply not true, and it goes to the mitigating factor the defense has alleged that the defendant's not been involved in significant criminal conduct and not been involved in violent behavior before.

THE COURT: Doesn't it also rebut the testimony of Mr. Honken's motivation for getting the key from his mother, Dustin Honken's motivation?

MR. WILLIAMS: Yes. And I guess I meant to be saying that, but it rebuts the allegation that his only involvement in this was to go --

THE COURT: Was under duress.

MR. WILLIAMS: Right. It most certainly was not

# EXHIBIT 6



United States Attorney
Northern District of Iowa

*Mailing Address:*
*P. O. Box 74950*
*Cedar Rapids, Iowa 52407-4950*
*(319) 363-6333*

*Shipping Address:*
*401 First Street S.E.*
*Suite 400*
*FAX (319) 363-1990*
*TTY (319) 286-9258*

October 10, 2001

Alfred Willett
Terpstra & Epping
Higley Building
118 Third Avenue SE, Suite 500
Cedar Rapids, IA 52401-1424

Re:   United States v. Angela Johnson

Dear Mr. Willett:

During our October 1, 2001, meeting with you and Patrick Berrigan, you and Mr. Berrigan proposed a potential resolution to this case. In our discussion, you and Mr. Berrigan indicated your client may be willing to plead guilty if she can be assured of reaching a 20-year sentence at the end of the case.

As you know, this is a case in which the United States is prepared to seek the death penalty for your client's involvement in the murders of five individuals. A concession to even a life term is a significant benefit for your client. In your oral plea proposal, you and Mr. Berrigan discussed the fact that your client would be willing to cooperate in order to receive a 20-year sentence. In the right circumstance, our office may not be opposed to negotiating a settlement to this case, which could include a sentence other than the death penalty or life imprisonment. However, in my opinion, a 20-year term, which equates to only four years per murder, is unconscionable.

In the event your client desires to attempt to resolve this matter short of trial and cooperation is part of her proposal, we need to interview your client pursuant to a proffer agreement, assess her credibility and value to the government, and then negotiate terms of any plea agreement.

Sincerely,

CHARLES W. LARSON, SR.
United States Attorney

By:

PATRICK J. REINERT
Assistant United States Attorney

PJR/hpv
cc: Patrick Berrigan

# EXHIBIT 7

I am going to be as clear as I can. I want to plead guilty. I do not want to wait for any more rulings, not even the 8th crt. I am asking you to get me the best deal you can and I will cooperate. At this point I will confess to Killing the Pope. I have not touched my Kids in THREE YEARS now and I've had it. Please get me out of here and into a prison as close to my Kids as possible. That is all I ask.

Thank you,

Angela Johnson

TOTAL P.02

# EXHIBIT 8



# U. S. Department of Justice

*United States Attorney*
*Northern District of Iowa*

| *Malling Address:* | *Shipping Address:* |
|---|---|
| P.O. Box 74950 | 401 First Street S.E. |
| Cedar Rapids, Iowa 52407-4950 | Suite 400 |
| (319) 363-6333 | Cedar Rapids, Iowa 52401-1825 |
| August 12, 2004 | FAX (319) 363-1990 |

Mr. Alfred E. Willett
Attorney at Law
Suite 500                                    **VIA TELEFAX AND MAIL**
118 3rd Ave. SE
Cedar Rapids, Iowa 52401

      Re:    *United States v. Angela Johnson,*
              Northern District of Iowa Criminal No. CR 01-3046MWB

Dear Mr. Willett:

      This letter is to confirm our telephone conversations today concerning the above-captioned matter.

      We spoke by phone with all counsel for Angela Johnson and Dustin Honken this morning. We discussed the pending global plea proposal submitted by counsel for Honken and on behalf of your client. That proposal would allow Honken to plead guilty and receive a life sentence and would allow your client to plead guilty and be sentenced to twenty years imprisonment. As we discussed, I anticipate this proposal will be formally rejected by the Department of Justice later today or tomorrow.

      In an effort to determine whether we may be able to agree to another resolution of this matter, we spoke by phone this afternoon. As we discussed, you have stated in previous correspondence to AUSA Williams that your client would be willing to cooperate with the government in the prosecution of Dustin Honken, including testifying against Honken. However, you have had concerns about your client submitting to a formal proffer prior to our office extending a formal Department of Justice approved plea proposal to your client.

      In regards to your concern, I advised you that the Department of Justice is unlikely to forego pursuit of the death penalty in this case unless, at a minimum, it could be shown that the circumstances have substantially changed since the Department directed our office to pursue imposition of the death penalty against your client. Any decision to withdraw the pursuit of the death penalty would have to be made by the Department of Justice and not by our office. Nonetheless, the input of our office would be considered. While I have no prior first-hand experience with the process, it is my understanding from discussions with others that a defendant's newfound willingness to plead guilty, standing alone, is generally insufficient to get a plea approved where a decision has already been made that the death penalty is warranted for the crime.

1

In light of the above and the impending trial of Dustin Honken, I thought it prudent to try to determine one last time whether there are any terms to which we can agree to have your client plead guilty and cooperate. As you know, if Honken is found guilty and the death penalty is imposed, it will be too late for your client to request the Department to forego pursuit of the death penalty against her.

I discussed with you the possibility of having your client submit a full proffer to a taint team. Under such an agreement, your client would submit information which could not be used against her. She would also have to agree to a polygraph, the results of which could not be used against her. This proffer and polygraph would be done pursuant to a separate written agreement.

If we were satisfied your client had provided complete and truthful information, we would be willing to submit for the Department's approval, a proposed plea agreement for your client's consideration. The basic terms of the plea agreement would require your client's plea of guilty to a group of charges which would carry a mandatory life sentence. Your client would be required to cooperate and testify in the prosecution of Dustin Honken. In exchange, we would seek authorization to not pursue imposition of the death penalty against your client. A successful proffer and agreement to testify could be critical to a possible finding of changed circumstances such as might warrant withdrawal of the death penalty notice, however, there is no guarantee. We would also be willing to consider whether it would be possible to arrange for your client's sentence to be served in Iowa or nearby to Iowa.

Please understand that this is not a formal plea offer. As you know, any such offer must be first authorized by the Department of Justice and would be made by separate letter. This is only intended as a proposed framework for working toward submission of a proposed plea agreement to the Department of Justice for their consideration. There is no assurance that a plea agreement conforming to the broad terms outlined herein would be authorized by the Department. However, this proposal is intended to minimize any risk to your client that any proposal along the lines addressed herein may not be authorized by the Department.

I am submitting this letter to you today at your request so that you may discuss it with your client in the morning. Given the possibility your client could assist in the Honken trial, time is of the essence. Please keep the contents of this letter confidential between you, your co-counsel and client. If your client is interested in attempting to resolve this matter in accordance with this letter, it is critical that you so notify me by not later than 2:00 p.m. tomorrow, August 13, 2004. If I have not heard from you by that time, I shall consider this offer to have been rejected and it should be deemed to have been formally withdrawn.

Of course, if you have any questions, please don't hesitate to let me know.

Thank you for your time and consideration.

Sincerely,

CHARLES W. LARSON
United States Attorney

By

RICHARD L. MURPHY
Assistant United States Attorney

2

EXHIBIT 9

Berrigan letter to Williams 3/19/2005

"Proffer"

(Missing from attachments from online docket)

# EXHIBIT 10

# ATSON & DAMERON, LP

## TRIAL ATTORNEYS

Henri J. Watson • Russell S. Dameron

Patrick J. Berrigan • Kathleen M. Hagen• •Michael D. Wallis• •Jesse B. Garcia• •Jason Billam••

Of Counsel: Ramón Murguia

•Licensed in MO & KS

••Licensed in Kansas only

---

November 22, 2000

Dr. William S. Logan, M.D.
228 W. 4th St.
Kansas City, Missouri 64105

> Re:    *United States v. Angela Johnson*
> *Northern District of Iowa No. CR00-3034-MWV*

Dear Dr. Logan:

Please find attached a series of newspaper articles which will give you some background on the case in which Al Willett and I have undertaken to represent Ms. Angela Johnson, a thirty-six year old woman now charged with five counts of capital murder in the United States District Court for the Northern District of Iowa. Although the case will be tried in Sioux City beginning on January 14th, *2002*, the preliminary proceedings are taking place in Cedar Rapids, and Ms. Johnson is being held in Cedar Rapids at the Linn County Jail downtown.

Having met with Ms. Johnson for two hours on Monday, November 20th, and having spoken to Al Willett about Ms. Johnson on several occasions, I can tell you that she is not presently psychotic and appears to have no immediate mental health concerns. She did attempt suicide by hanging shortly after receiving the news that the jail inmate she had confided in about her case had turned all of that incriminating information over to the government. This was almost two months ago now, and Angela seems to have recovered fully.

Also included are preliminary interviews with two of Angela's four siblings, and one interview of Angela. Of course, we will have much more information for you about Angela's background as our investigation proceeds, but these reports will at least give you a hint that she has had a somewhat troubled upbringing.

Al and I are preparing to submit our request to the court to retain your services in this case. We will need a competency determination, although, frankly, that does not seem to be an issue presently. More importantly, we need to evaluate Angela's mental state both at the time of the commission of the alleged murders (July and November 1993), and at the time she purportedly made incriminating statements to the government's snitch, Robert McNeese. We will be engaged in a suppression motion regarding Angela's alleged statements to McNeese at a hearing to take place some time in February, 2001. Therefore, it will be important to have at least a preliminary indication by that time as to whether Angela's mental state made her unusually susceptible to coercion and/or enticement by McNeese in obtaining these alleged statements.

---

2500 Holmes, Kansas City, MO 64108 • wdlaw@kctriallawyers.com • Fax:(816) 221-1636 • (816)474-3350

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 66 of 119

Dr. William S. Logan, M.D.
November 22, 2000
Page 2

In order to get you started, and to obtain the court order that will be necessary to get you paid, Al and I need a preliminary estimate of your fees and expenses in this case, which should include the probability of testifying at trial, and at least one pretrial hearing. If you could provide your hourly fees, estimated expenses and an educated guess on the amount of time needed to assist us based on your work in past capital cases, perhaps we can come up with some numbers to submit to the magistrate judge. It would be prudent to estimate liberally, Dr. Logan, and then everyone will be pleased if we submit bills below the estimate.

I am very much looking forward to working with you once again. Even if Angela does not have significant mental issues that impact upon her first phase defense (which is "I didn't kill anyone"), I suspect that you will uncover issues in her family history and growing up that will perhaps show her susceptibility to being dominated by a man as intelligent, forceful and domineering as Angela's boyfriend and co-defendant, Dustin Honken.

Obviously, all of our usual rules of legal engagement apply in this case, including the need for strict confidentiality to preserve both the doctor/patient and attorney/client privileges. After you have had a chance to review these materials, I will set up a conference call with you and Al, and we can discuss further how to best proceed. Meanwhile, I have enclosed the applicable federal statutes regarding first degree murder, the defense of mental disease or defect, and how mitigation evidence is defined.

Once again, thank you Dr. Logan for your generosity in assisting us in Angela's case. We well realize the extraordinary sacrifice of your time and energy given the geographic distances involved here and the very serious nature of the case. Hopefully, your talent and energy will help bring us to a satisfactory result.

Very truly yours,

Patrick J. Berrigan
Trial Lawyer

PJB:vem

cc:    Al Willett

EXHIBIT 11 through 24

Juror and Grand Jury Material

(Sealed)

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 68 of 119

# EXHIBIT 25

Bates   A205

# IOWA DIVISION OF CRIMINAL INVESTIGATION
## DEPARTMENT OF PUBLIC SAFETY

INTERVIEW:                                    CASE# 9605382
                                              TYPED BY: SHARON

NAME:            PHYLLIS PROSCOVEC

ADDRESS:         623 NORTH VAN BUREN

                 MASON CITY, IOWA

SEX:             FEMALE

RACE:            CAUCASIAN

BIRTH DATE:      09-21-34

SOC SEC#:        UNAVAILABLE

EMPLOYMENT:      NONE

OCCUPATION:      RETIRED

PHONE: (RES)     515-424-6216

        (BUS):

DATE:            FEBRUARY 23, 1997

TIME:            10:28 A.M.

PLACE:           PROSCOVEC RESIDENCE, MASON CITY

CASE AGENT / GEO:      SPECIAL AGENT WILLIAM BASLER

BY:                    SPECIAL AGENT WILLIAM BASLER

DATE DICTATED:         MARCH 25, 1997

PURPOSE:  THE PURPOSE OF THIS INTERVIEW WAS TO ASCERTAIN INFORMATION

FROM PHYLLIS PROSCOVEC IN REGARD TO LORI DUNCAN.

## SYNOPSIS

DURING THE INTERVIEW, PROSCOVEC STATED THAT SHE LIVED IN THE HOUSE DIRECTLY NORTH OF THE HOUSE BEING RENTED BY LORI DUNCAN.

PROSCOVEC STATED THAT SHE REMEMBERS THE TIME WHEN LORI DISAPPEARED QUITE CLEARLY, REMEMBERING THAT ON MONDAY MORNING AT APPROXIMATELY 7:50 A.M., PROSCOVEC HAD GONE OVER TO LORI'S HOUSE TO GET THE KIDS UP FOR SCHOOL WHICH SHE NORMALLY DID. PROSCOVEC WENT ON TO STATE THAT LORI WOULD LEAVE EARLY TO GO TO WORK AND PHYLLIS WOULD GO OVER TO GET THE KIDS UP AND GET THEM OFF TO SCHOOL.

CASE # 9605382

INTERVIEW – PHYLLIS PROSCOVEC – (CON'T)

ON THAT PARTICULAR MONDAY MORNING, PHYLLIS STATED THAT SHE KNOCKED AND KNOCKED ON BOTH THE FRONT AND THE BACK DOOR OF LORI'S HOUSE AND GOT NO RESPONSE. PROSCOVEC RECALLED THAT LORI'S RED CAR WAS PARKED OUT FRONT IN THE STREET AND PROSCOVEC STARTED TO GET CONCERNED DUE TO THE FACT THAT THE KIDS HAD TO BE TO SCHOOL IN AN HOUR.

PROSCOVEC STATED THAT SHE FINALLY PUSHED ON THE FRONT DOOR OF LORI'S HOUSE AND IT OPENED, AT WHICH TIME SHE WENT IN AND FOUND NOBODY HOME, EXCEPT THE DOG.

PROSCOVEC STATED THAT THE DOG HAD CAUSED QUITE A LOT OF DAMAGE IN THE HOUSE TO THE SOFA AND THE CURTAINS, AND THAT IT HAD TAKEN PHYLLIS AND LORI'S MOTHER TWO DAYS TO CLEAN UP THE MESS.

PHYLLIS STATED THAT LORI DUNCAN IS USUALLY VERY CLEAN, BUT THAT PARTICULAR MORNING THE HOUSE WAS REAL DIRTY, WITH DISHES BEING IN THE SINK AND FOOD BEING LOCATED ON T.V. TRAYS.

PHYLLIS STATED THAT SHE LAST SAW LORI DUNCAN ON THE SUNDAY EVENING PRIOR TO LORI'S DISAPPEARANCE. PHYLLIS STATED THAT SHE HAD BEEN INVITED OVER TO LORI'S RESIDENCE THAT EVENING FOR COFFEE AND CAKE. DURING THAT VISIT, LORI COMMENTED THAT GREG NICHOLSON WASN'T HOME DUE TO THE FACT THAT GREG HAD " TO GO DO SOME BUSINESS" WITH SOME FRIENDS OF HIS. PHYLLIS STATED THAT SHE HAD GONE OVER TO LORI'S THAT EVENING BETWEEN 7:30 P.M. AND 8:00 P.M. AND HAD STAYED FOR APPROXIMATELY AN HOUR.

PHYLLIS WENT ON TO STATE THAT AFTER RETURNING HOME THAT EVENING, PHYLLIS WENT TO BED AFTER WATCHING THE NEWS AND NOTICED THAT GREG'S CAR HAD NOT YET RETURNED TO LORI'S HOUSE. SHORTLY THEREAFTER, PHYLLIS STATED THAT LORI CALLED HER ON THE TELEPHONE AND ASKED IF LORI COULD COME OVER TO PHYLLIS'S HOUSE WHICH SHE DID. WHEN LORI ARRIVED, PHYLLIS STATED THAT SHE WAS CRYING AND COMMENTING THAT GREG DID NOT WANT HER ANYMORE. PHYLLIS WENT ON TO STATE THAT LORI STAYED FOR A WHILE LONGER AND THEN WENT HOME, AT WHICH TIME PHYLLIS LOOKED OUT THE WINDOW AND NOTICED THAT GREG'S CAR WAS PARKED BEHIND THE HOUSE.

ON THE MONDAY THAT LORI DISAPPEARED, WHEN PHYLLIS RETURNED HOME, SHE FOUND A NOTE BETWEEN HER FRONT DOOR AND HER STORM DOOR WHICH READ, "PHYLLIS, HAD TO LEAVE ON SHORT NOTICE, WILL BE IN TOUCH SHORTLY. LOVE, LORI". A COPY OF THIS NOTE WILL ACCOMPANY THIS INTERVIEW AS AN EXHIBIT.

ON THE MONDAY LORI DISAPPEARED, PHYLLIS STATED THAT GREG'S CAR WAS ALSO GONE.

PHYLLIS STATED THAT LORI HAD A LOT OF FRIENDS WHO WOULD OFTEN STOP BY HER HOUSE TO VISIT HER.

CASE # 9605382

INTERVIEW -  PHYLLIS PROSCOVEC – ( CON'T)

PHYLLIS STATED THAT GREG HAD ONLY BEEN STAYING AT LORI'S HOUSE FOR ABOUT A WEEK BEFORE THEY DISAPPEARED, WITH GREG MOVING IN AFTER LORI'S PREVIOUS BOYFRIEND.  DAMIEN (PHONETIC).  HAD MOVED OUT.   PHYLLIS STATED THAT SHE THINKS DAMIEN MOVED OUT BECAUSE OF LORI'S TWO LITTLE GIRLS.

PHYLLIS STATED SHE WAS NOT AWARE OF ANYTHING BEING MISSING FROM LORI'S HOUSE, NOR DID IT APPEAR THAT ANY PACKING HAD BEEN DONE.

PHYLLIS STATED SHE WAS VERY CLOSE TO LORI AND HAS NEVER HEARD FROM LORI SINCE THAT DAY OF HER DISAPPEARANCE.

HAVING NOTHING FURTHER TO ADD, THE INTERVIEW WAS CONCLUDED AT APPROXIMATELY 11:07 A.M.

END OF INTERVIEW.

6

(THIS DOCUMENT IS A COPY OF THE NOTE LEFT BEHIND FROM LORI DUNCAN TO PHYLLIS PROSCOVEC HER NEXT DOOR NEIGHBOR THE DAY SHE DISAPPEARED WITH GREG NICHOLSON.)  THE NOTE SAYS THE FOLLOWING:

PHYLLIS   HAD TO LEAVE ON A SHORT NOTICE WILL BE IN TOUCH SHORTLY

LOVE, LORI

# EXHIBIT 26

# MEDICAL SUMMARY OF FEDERAL PRISONER/ALIEN IN TRANSIT
## U.S. Department of Justice

**TB Clearance** ❏ Yes ❏ No

1) PPD Completed: _____ / Date

Results: _____

2) CXR Completed: _____ / Date

Results: _____

3) Health Authority

Clearance: _____

Sign _____ Date _____

Note:
Dates listed above must be within one year of this transfer.

## I. PRISONER/ALIEN

Name: _____    Prisoner/Alien Reg. # _____    D.O.B: _____

Departed From: _____    Date Departed: _____

Destination: _____    Reason for Transfer: _____

Dist. Name: _____    Dist. # _____    Date in Custody: _____

## II. Current Medical Problems

1. _____
2. _____
3. _____
4. _____
5. _____
6. _____

## Medication Required For Care En Route

| Medication | Dose | Route | Instructions For Use (Include proper time for Administering) | Stop |
|---|---|---|---|---|
| _____ | _____ | po | _____ | |
| 2olift | 100 _____ | _____ | _____ | |
| _____ | 800 _____ | _____ | _____ | |
| _____ | _____ | _____ | _____ | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Additional Comments: _____

## III. SPECIAL NEEDS AFFECTING TRANSPORTATION

Is prisoner medically able to travel by BUS, VAN or CAR?   ☑ Yes   ❏ No   If no, Why not?

Is prisoner medically able to travel by airplane?   ❏ Yes   ❏ No   If no, Why not?

Is prisoner medically able to stay overnight at another facility en route to destination?   ❏ Yes   ❏ No   If no, Why not?

Is there any medical reason for restricting the length of time prisoner can be in travel status?   ❏ Yes   ☑ No   If yes, state reason:

Does prisoner require any medical equipment while in transport status?   ❏ Yes   ❏ No   If yes, What equipment?

Sign & Print Name- Certifying Health Authority.   Phone Number:   Date Signed:

White - Prisoner File

White - Prisoner File

Form USM-553
(Rev 11/98)

Case 3:09-cv-03064-MWB-LTS Document 284-81 Filed 06/23/11 Page 78 of 119

| Hardin County | ectional Center | Medication Administration Record | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Medication. | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| seroquel 200 mgm daily | 2200 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| multivitamin daily | 2200 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| zoloft 200 mgm daily | 2200 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ortho tri-cyclen 1 tab daily | 2200 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ibuprofen 800 mgm twice a day during the week of her period | 1200 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | 2200 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

Height: 5'07"  Weight: 175  DOB: 1-17-64  SBX: Female  Special Diet: None  Allergies: Augmentin

Initials = Medication Given  0 = Not Given  DC = Discontinued  R = Refused  V = Vomited

Name: Johnson, Angela

DOB 1-17-64

Allergic to augmentin

Dr. Brown (not the Dr. Brown in Sioux City DEA# is BB4656104)

Month: November  Cell: B 3
December 64

JAIL DIVISION



Woodbury County Sheriff's Office
P.O. Box 3715-SIOUX CITY, IOWA 51102

GLENN J. PARRETT, SHERIFF
GREGORY T LOGAN, CHIEF DEPUTY

PHONE: (712)279-6040
FAX: (712)279-6045

# FAX COVER SHEET

DATE: 4/7/05

TO: Drilling

TIME:

PHONE:

FAX: 274-1293

PHONE: (712)279-6040
FAX: (712)279-6045

FROM: Dan

RE: Johnson, Angela   DOB 1/17/64   D. Grote PAC
Allergy to Augmentin
See med orders
We will take care of the IBU et vitamins

Number of pages including cover sheet: 2

NOTES: Betsy will also pick these up later tonight



Case 3:09-cv-03064-MWB-LTS   Document 284-81   Filed 06/23/11   Page 80 of 119

Hardin County Correctional Center — Medication Administration Record — Prescription

| Medication | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| seroquel 200 mgm daily | 2200 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| multivitamin daily | 2200 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| zoloft 200 mgm daily | 2200 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| orth tri-cyclen 1 tab daily | 2200 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ibuprofen 800 mgm twice a day during the week of her period | 1200 | CH | O | O | O | O | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | 2200 | | O | O | O | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| Height:5'07" | Weight:175 | DOB:1-17-64 | SEX: Female | Special Diet: None | Allergies: Augmentin |
|---|---|---|---|---|---|
| Initials = Medication Given | 0 = Not Given | DC = Discontinued | R = Refused | V = Vomited | |

Name: **Johnson, Angela**       Month: April       Cell: C3



## Woodbury County Sheriff's Office
P.O. Box 3715-SIOUX CITY, IOWA 51102

GLENN J. PARRETT, SHERIFF
GREGORY T LOGAN, CHIEF DEPUTY

PHONE: (712)279-6040
FAX: (712)279-6045

# FAX COVER SHEET

DATE: 5/5/05

TO: Tammy J
O. Nolon PA-C

FROM: Dan RN

TIME:

PHONE:

FAX: 252-3157

PHONE: (712)279-6040
FAX: (712)279-6045

RE: jail Visit 5/6/05

Sorry, fax machine out of commission earlier today

Number of pages including cover sheet:

Gillaspie, David P.H.
1hr     DoB 10/23/85
         SS# 567152787

NOTES:

Johnson, Angela
1hr    DoB 11/17/41
       SS# 481862690

# MONTHLY PHYSICIANS ORDERS AND MEDICATION ADMINISTRATION RECORD
(SEE CHART FOR INIT. - SIGNATURE RELATIONSHIP)

Woodbury County Jail

MO. 12  YR. 04

PRESS HARD USING BALL POINT PEN

| INIT. = GIVEN | INIT. | SIGNATURE | INIT. | SIGNATURE | INIT. | SIGNATURE |
|---|---|---|---|---|---|---|
| R = REFUSED | | | | | | |
| V = VOMITED | | | | | | |
| O = HELD | | | | | | |
| Ø = HOME | BSA | R Smith Anand RN | | | | |

Case 5:05-cv-03006-MWB-TJS Document 104-81 Filed 06/23/14 Page 82 of 119

| DT. ORDERED | MEDICATION – DOSE – ROUTE | TIME | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Seroquel 200mg tablets ① tab po @ HS | 2000 | | | | | | | | | | | | | | | | | | | | ▷BSA | | | | | | | | | | | |
| | Zoloft (sertraline) 100mg tablets ② tabs po @ HS | 2000 | | | | | | | | | | | | | | | | | | | | ▷BSA | | | | | | | | | | | |
| | Ortho tri-cyclen tablets ① tab po daily @ HS | 2000 | | | | | | | | | | | | | | | | | | | | ▷BSA | | | | | | | | | | | |
| | | PULSE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | BLOOD PRESSURE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | WEIGHT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

ALLERGIES:
Augmentin

DIAGNOSIS AND SPECIAL NOTES:
dysmenorrhea
psychiatric difficulties

federal - booked 12-19-04
orders obtained 12-21-04

(ABBREVIATIONS)
R.D. – RIGHT DELTOID
L.D. – LEFT DELTOID
I.V. – I.V. TUBING
R.L.T. – RIGHT LATERAL THIGH
L.L.T. – LEFT LATERAL THIGH
R.G. – RIGHT GLUTEUS – UPPER – OUTER QUADRANT
L.G. – LEFT GLUTEUS – UPPER – OUTER QUADRANT

MED. REVIEW BY – SEE REVERSE FOR COMMENT.

| LAST NAME | FIRST | INIT. | SEX | BIRTHDAY | DIET | CASE # – ADMISSION # |
|---|---|---|---|---|---|---|
| Johnson | Angie | | F | 1-17-64 | | 15357 |

Brown DEA # BB4656104

Case 3:09-cv-03064-MWB-LTS   Document 284-31   Filed 06/23/11   Page 83 of 119

# MONTHLY PHYSICIANS ORDERS AND MEDICATION ADMINISTRATION RECORD
(SEE CHART FOR INIT. – SIGNATURE RELATIONSHIP)

**MO.** 2   **YR.** 05   Woodbury County Jail

PRESS HARD USING BALL POINT PEN

| | INIT. = GIVEN | INIT. | SIGNATURE | INIT. | SIGNATURE | INIT. | SIGNATURE |
|---|---|---|---|---|---|---|---|
| | R = REFUSED | | | | | | |
| | V = VOMITED | | W Nettie RN | | | | |
| | O = HELD | | BSA B Singh-Chandhu RN | AE | A S Edwards | | |
| | Ø = HOME | | | | | | |

| DT. ORDERED | MEDICATION – DOSE – ROUTE | TIME | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10-27-04 | multivitamin tablets (1) tab po daily | 2000 | | | | | | | | | BSA | BSA | BSA | AE | AE | BSA | | | | | | | | | | | | | | | | | | |
| 10-27-04 | seroquel 200 mg tablets (1) tab po @ HS | 2000 | | | | | | | | | BSA | BSA | BSA | AE | AE | BSA | | | | | | | | | | | | | | | | | | |
| 10-27-04 | zoloft 100 mg tablets (2) tabs po @ HS | 2000 | | | | | | | | | BSA | BSA | BSA | AE | AE | BSA | | | | | | | | | | | | | | | | | | |
| 11-9-04 | tri-sprintec tablets (1) tab po daily | 2000 | | | | | | | | | BSA | BSA | BSA | AE | AE | BSA | | | | | | | | | | | | | | | | | | |
| | ibuprofen 800 mg tablets (4) tabs po BID during week of menstrual cycle PRN | 1200 2000 | | | | | | | | | | | | AE | AE | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | PULSE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | BLOOD PRESSURE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | WEIGHT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

**ALLERGIES:** augmentin

**DIAGNOSIS AND SPECIAL NOTES:** depression, dysmenorrhea

| (ABBREVIATIONS) | |
|---|---|
| R.L.T. – RIGHT LATERAL THIGH | |
| R.D. – RIGHT DELTOID | L.L.T. – LEFT LATERAL THIGH |
| L.D. – LEFT DELTOID | R.G. – RIGHT GLUTEUS – UPPER – OUTER QUADRANT |
| I.V. – I.V. TUBING | L.G. – LEFT GLUTEUS – UPPER – OUTER QUADRANT |
| | MED. REVIEW BY – SEE REVERSE FOR COMMENT. |

| LAST NAME | FIRST | INIT. | SEX | BIRTHDAY | DIET | CASE # – ADMISSION # |
|---|---|---|---|---|---|---|
| Johnson | Angela | | F | 1-17-64 | | 15357 |

Hardin County Correction

# MONTHLY PHYSICIANS ORDERS AND MEDICATION ADMINISTRATION RECORD
(SEE CHART FOR INIT. – SIGNATURE RELATIONSHIP)

MO. 4  YR. 05

Woodbury County Jail

PRESS HARD USING BALL POINT PEN

| INIT. = GIVEN | INIT. | SIGNATURE | INIT. | SIGNATURE | INIT. | SIGNATURE |
|---|---|---|---|---|---|---|
| R = REFUSED | DN | DNystrom R | | | | |
| V = VOMITED | | | | | | |
| O = HELD | AE | A EDewer RN | | | | |
| Ø = HOME | BSA | B Singh Arora RN | | | | |

| DT. ORDERED | MEDICATION – DOSE – ROUTE | TIME | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | seroquel 200 mg tablets ① tab po @ HS | 2000 | | | | | ▶ | BSA | BSA | BSA | AE | R | R | BSA | BSA | BSA | BSA | | | | BSA | BSA | BSA | BSA | | AE | | BSA | BSA | BSA | BSA | | |
| | multivitamin tablets ① tab po @ HS | 2000 | | | | | ▶ | BSA | BSA | BSA | AE | R | R | BSA | BSA | BSA | BSA | | | | BSA | BSA | BSA | BSA | | AE | | BSA | BSA | BSA | BSA | | |
| | zoloft 100 mg tablets ② tabs po @ HS | 2000 | | | | | ▶ | BSA | BSA | BSA | AE | R | R | BSA | BSA | BSA | BSA | | | | BSA | BSA | BSA | BSA | | AE | | BSA | BSA | BSA | BSA | | |
| | ortho tri-cyclen tablets ① tab po @ HS | 2000 | | | | | ▶ | BSA | BSA | BSA | AE | R | R | BSA | BSA | BSA | BSA | | | | BSA | BSA | BSA | BSA | | AE | | BSA | BSA | BSA | BSA | | |
| | ibuprofen 200 mg tablets ④ tabs po BID during week of menstruation | 1200 | | | | | | | R | R | | | | | | | | | | | | | | | | | | | R | | | | | |
| | | 2000 | | | | | | | | R | | | | BSA | BSA | BSA | | | | | BSA | BSA | BSA | BSA | | AE | R | R | | | BSA | BSA | |
| | tylenol 500 mg tablets ② tabs po QID PRN | 0800 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | 1200 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | 1600 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | 2000 | | | | | | | | | | | | BSA | BSA | BSA | | | | | BSA | BSA | BSA | BSA | | AE | R | BSA | BSA | BSA | BSA | | |
| | PULSE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | BLOOD PRESSURE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | WEIGHT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

ALLERGIES: Augmentin

DIAGNOSIS AND SPECIAL NOTES:
depression
dysmenorrhea

federal - booked 4/6/05

(ABBREVIATIONS)
R.L.T. – RIGHT LATERAL THIGH
R.D. – RIGHT DELTOID      L.L.T. – LEFT LATERAL THIGH
L.D. – LEFT DELTOID      R.G. – RIGHT GLUTEUS – UPPER – OUTER QUADRANT
I.V. – I.V. TUBING      L.G. – LEFT GLUTEUS – UPPER – OUTER QUADRANT
MED. REVIEW BY – SEE REVERSE FOR COMMENT.

LAST NAME  FIRST  INIT.
Johnson, Angela

SEX: F

BIRTHDAY 1-17-64

DIET

CASE # – ADMISSION #

(AM) 1 2 3 4 5 6 7 8 9 10 11 12 (PM) 1 2 3 4 5 6 7 8 9 10 11 12

Case 3:08-cv-03064-MWB-TJS  Document 194-81  Filed 01/22/11  Page 84 of 119

# MONTHLY PHYSICIANS ORDERS AND MEDICATION ADMINISTRATION RECORD
(SEE CHART FOR INIT. - SIGNATURE RELATIONSHIP)

**MO.** 5  **YR.** 05

Woodbury County Jail

PRESS HARD USING BALL POINT PEN

| INIT. = GIVEN | | | |
|---|---|---|---|
| R = REFUSED | | | |
| V = VOMITED | | | |
| O = HELD | | | |
| ∅ = HOME | | | |

INIT. / SIGNATURE / INIT. / SIGNATURE / INIT. / SIGNATURE

BSA — B Singh-Anand RN

| DT. ORDERED | MEDICATION – DOSE – ROUTE | TIME | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | seroquel 200mg tablets ① tab po @ HS | 2000 | BSA | ∅ | BSA | BSA | BSA | BSA | BSA | | ∅ | BSA | BSA | BSA | BSA | CS | NS | ∅ | BSA | BSA | BSA | BSA | | AF | ∅ | BSA | BSA | BSA | BSA | | NS | Sm | |
| | multivitamin tablets ① tab po @ HS | 2000 | BSA | ∅ | BSA | BSA | BSA | BSA | BSA | | ∅ | BSA | BSA | BSA | BSA | CS | NS | ∅ | BSA | BSA | BSA | BSA | | ∅ | BSA | BSA | BSA | ∅ | NS | Sm | | | | |
| | Zoloft 100mg tablets ② tabs po @ HS | 2000 | BSA | ∅ | BSA | BSA | | | Discontinue | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | ortho tri-cyclen tablets ① tab po @ HS (same as tricessa tablets) | 2000 | BSA | ∅ | BSA | BSA | BSA | BSA | NOT | | ∅ | BSA | BSA | BSA | BSA | CS | NS | ∅ | BSA | BSA | BSA | BSA | | AF | | BSA | BSA | BSA | BSA | | Sm | | | |
| | ibuprofen 200mg tablets ④ tabs po BID during week of menstruation | 1200 / 2000 | BSA | ∅ | BSA | BSA | BSA | BSA | NOT | | BSA | BSA | BSA | BSA | BSA | | CS | ∅ | BSA | BSA | BSA | BSA | | AF | | BSA | BSA | BSA | BSA | R | | | | |
| | tylenol 500mg tablets ② tabs po QID PRN | 0800 / 1200 / 1600 / 2000 | BSA | ∅ | BSA | BSA | BSA | BSA | R | | | BSA | BSA | BSA | BSA | R | | | BSA | BSA | BSA | BSA | | AF | | BSA | BSA | BSA | BSA | | | | | |
| 5/6/05 | Zoloft 100mg tablets ③ tabs po daily (300mg total) | 2000 | | | | BSA | NOT | | ∅ | BSA | BSA | BSA | BSA | CS | NS | ∅ | BSA | BSA | BSA | BSA | | AF | | BSA | BSA | BSA | BSA | | NS | Sm | | | | |

| PULSE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BLOOD PRESSURE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| WEIGHT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

**ALLERGIES:** augmentin

**DIAGNOSIS AND SPECIAL NOTES:** depression, dysmenorrhea

federal - booked 4/6/05

(ABBREVIATIONS)
R.D. – RIGHT DELTOID
L.D. – LEFT DELTOID
I.V. – I.V. TUBING
R.L.T. – RIGHT LATERAL THIGH
L.L.T. – LEFT LATERAL THIGH
R.G. – RIGHT GLUTEUS – UPPER – OUTER QUADRANT
L.G. – LEFT GLUTEUS – UPPER – OUTER QUADRANT
MED. REVIEW BY – SEE REVERSE FOR COMMENT.

**LAST NAME - FIRST - INIT.** Johnson, Angela

**SEX** F  **BIRTHDAY** 1-17-64  **DIET**  **CASE # – ADMISSION #** 15357

Case: 5:05-cv-04106-MWB Document: 26-4 Filed: 09/05/08 Page: 85 of 119.

# MONTHLY PHYSICIANS ORDERS AND MEDICATION ADMINISTRATION RECORD
(SEE CHART FOR INIT. – SIGNATURE RELATIONSHIP)

Woodbury County Jail

**MO.** 6  **YR.** 05

PRESS HARD USING BALL POINT PEN

| INIT. = GIVEN | INIT. | SIGNATURE | INIT. | SIGNATURE | INIT. | SIGNATURE |
|---|---|---|---|---|---|---|
| R. = REFUSED | SL | | SdS | Tracy Smith | | |
| V = VOMITED | JJ | | | | | |
| O = HELD | SM | S. Michaud | Ael | A Edwards | | |
| Ø = HOME | BSA | B Singh-Anand RN | RO | | MP | Mark Price |

ALLERGIES: augmentin

DIAGNOSIS AND SPECIAL NOTES:
depression
dysmenorrhea

Cradles w/ meds @HS

federal- booked 4/6/05

(ABBREVIATIONS)
- R.L.T. – RIGHT LATERAL THIGH
- R.D. – RIGHT DELTOID
- L.L.T. – LEFT LATERAL THIGH
- L.D. – LEFT DELTOID
- R.G. – RIGHT GLUTEUS – UPPER – OUTER QUADRANT
- I.V. – I.V. TUBING
- L.G. – LEFT GLUTEUS – UPPER – OUTER QUADRANT

MED. REVIEW BY – SEE REVERSE FOR COMMENT.

LAST NAME / FIRST / INIT.: Johnson, Angela
SEX: F
BIRTHDAY: 1-17-64
CASE # – ADMISSION #: 15357
Nolan PA-C

| DT. ORDERED | MEDICATION – DOSE – ROUTE | TIME |
|---|---|---|
| | Seroquel 200 mg tablets — ① tab po @ HS | 2000 |
| | multivitamin tablets — ① tab po @ HS | 2000 |
| | trinessa tablets — ① tab po @ HS | 2000 |
| 5/6/05 | zoloft 100 mg tablets — ③ tabs po @ HS (total = 300 mg) | 2000 |
| | ibuprofen 200 mg tablets — ④ tabs po BID during menstrual period | 1200 / 2000 |
| | tylenol 500 mg tablets — ② tabs po BID PRN | 0800 / 1200 / 1600 / 2000 |

| Medication | Time | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| seroquel 200 mgm daily | 2200 | mH | Bm | mH | U | DH | AmH | TR | mHRB | | | | | | | | | | | | | | | | | | | | | | | | |
| multivitamin daily | 2200 | mH | Bmh | mH | mH | MH | TR | mHRB | | | | | | | | | | | | | | | | | | | | | | | | | |
| zoloft 200 mgm daily | 2200 | mH | BmmH | mH | mH | TR | mHRB | | | | | | | | | | | | | | | | | | | | | | | | | | |
| orth tri-cyclen 1 tab daily | 2200 | mH | Bm | mH | mH | mH | TR | mHRB | | | | | | | | | | | | | | | | | | | | | | | | | |
| ibuprofen 800 mgm twice a day during the week of her period | 1200 / 2200 | 0 / mHBm | 0 / mHmH | cH / mHmH | RB / | 0 / | 0 / | CR / | | | | | | | | | | | | | | | | | | | | | | | | | |

| | | | |
|---|---|---|---|
| Height:5'07" | Weight:175 | DOB:1-17-64 | SEX: Female | Special Diet: None | Allergies: Augmenti[n] |
| Initials = Medication Given | 0 = Not Given | DC = Discontinued | R = Refused | V = Vomited | |

**Name:Johnson, Angela**          **Month:February**     Cell: C3

Case 3:09-cv-03064-MWB-LTS   Document 284-81   Filed 06/23/11   Page 87 of 119

# Medical Request Form
## Woodbury County Sheriff's Office

Name: Angie Johnson    Date of Request: Sat 2·12·05

Date of Birth: 1·17·64    Section: I · 14

Nature of Problem or Request: Swollen tooth (BAD)

How Long Have You Had This
Condition? two days

Name of Treating
Physician(s): NONE

Do You Have Any Allergies? Augmentin

I CONSENT TO BE TREATED BY THE MEDICAL STAFF FOR THE CONDITION
DESCRIBED. I UNDERSTAND THAT THE WOODBURY COUNTY JAIL MAY
CHARGE ME FOR SOME OF THESE SERVICES AND DEDUCT THE AMOUNT
FROM MY COMMISSARY ACCOUNT. I UNDERSTAND THAT IF I DO NOT
HAVE THE MONEY TO PAY THESE CHARGES THAT THE AMOUNT DUE MAY
BE DEDUCTED DURING ANY FUTURE STAY AT THE WOODBURY COUNTY
JAIL. **I ALSO UNDERSTAND THAT I WILL GET HEALTH CARE EVEN IF I
CANNOT PAY.**

Inmate Signature
(Required): _Angie Johnson_

GIVE THIS REQUEST TO AN OFFICER OR A NURSE WHEN THEY VISIT YOUR
SECTION. YOUR CONDITION WILL BE EVALUATED BY THE NURSING
STAFF. YOU MAYBE REFERRED TO THE DOCTOR UPON THE NURSES
RECOMMENDATION.

## DO NOT WRITE BELOW THIS LINE
### Nurses Notes

Date: 2|14|05
Allergies: See Above
BP _____ P _____ R _____ T _____
Plan: (R) cuvle discomfort Vs Trauma indicated. No swelling Noted
today. Will Monitor ———— Dw RN

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 88 of 119



# S I O U X L A N D
### M E N T A L   H E A L T H   C E N T E R

## PSYCHIATRIC MEDICAL EVALUATION  [>]

**NAME:**  Angela Johnson          **DATE:**  May 6, 2005
**DOB:**  01-17-64              **TIME:**  one hour

The patient was seen for a formal intake during rounds at the Woodbury County Jail.

**IDENTIFYING DATA:**
Angela is a 41 year old divorced Caucasian female currently residing in Woodbury County Jail and requesting for assistance with depression and anxiety.

**HISTORY OF PRESENT ILLNESS:**
Please note that Angela was resistant to this evaluation. She would not willingly offer any information and reluctantly offered answers to any questions. She stated frequently throughout the interview that she didn't see the point in doing this, all she wanted was to get her meds increased, not have an evaluation. I did explain to Angela the reason for doing the evaluation several times and did offer to end the session if this was making her uncomfortable. She did, however, want to continue so that we could adjust her medication, but as stated above, was reluctant to answer any questions. I cannot guarantee the validity of the information. Angela reports that she wanted help because her stress level is too high as she is currently on trial. She is specifically asking for her Zoloft to be increased because she believes it will help her stress level and help her get through her trial. When asked why the Zoloft was originally prescribed, Angela states "I've been on it for years because I have been in jail a long time." "I've been terribly depressed and have been having a hard time even helping in my own defense." Currently, Angela is taking Zoloft 200 mg daily and Seroquel 200 mg q hs. These were prescribed by Dr. Saftar at the Abby Center in Cedar Rapids, Iowa. She has been on these doses of the current medications for about a year. She reports that the medications have been working, but she noticed they weren't working as well the last couple of months. She has been in Woodbury County Jail for three weeks. She is charged with five counts of murder. Her trial started three weeks ago.

**PAST MEDICAL HISTORY:**
Angela reports being **ALLERGIC TO AUGMENTIN**. She denies any history of surgery. She denies any history of major illnesses or injuries and denies any chronic illnesses. She is currently on the above medications plus an oral contraceptive.

Making a Difference in People's Lives

## PAST PSYCHIATRIC HISTORY:

Angela reports that she had seen a Dr. Logan and Mary Hodges, both of them are in Kansas City, Missouri. They both did evaluations for her defense team. She states that Dr. Logan evaluated her medication at the time of his evaluation and thought that they were appropriate. This was 6 months ago. Angela reports that her last visit with Dr. Saftar was about one year ago. She saw him for a total of 4 years. She denies any other prior psychiatric history.

## SOCIAL HISTORY:

Angela reports that she was living Clear Lake, Iowa before her arrest with her two children who are now ages 21 and 11. They are both daughters. She has been married one time from 1981 to 1986. She was employed at the time of her arrest. She had been working at North Beach Restaurant in Clear Lake, Iowa. When asked what she did at the restaurant, she replies "I did everything." She worked there for two years. Angela's highest level of education is 9th grade plus GED. She has no military history. Legal history includes only the current charges. She was arrested originally in July 2000. She has been incarcerated in various county jails since that time. She has been in Harden County, Lynn County, and Benton County prior to coming to Woodbury County to stand trial. She is possibly facing the death sentence. In regards to substances, she reports starting to drink alcohol at age 16. Her last drink was some time in the year 2000. Prior to her arrest, Angela reports that she would drink a glass of wine once every couple of months. She has a history of using methamphetamine beginning at age 21. Her last use was in the year 2000. She did use daily. She denies any IV use.

## FAMILY HISTORY:

Angela reports that her mother is healthy. She has no psychiatric history or substance abuse history. Her father has a heart arrhythmia. He has no psychiatric or substance abuse history. Angela has one brother and three sisters all of whom are healthy without psychiatric histories or substance abuse problems. She reports her children are healthy.

## MENTAL STATUS EXAMINATION:

Angela is alert and oriented times three. She is minimally cooperative. She is in no acute distress. She is moderately groomed, well nourished. She appears her stated age. Mood is described as depressed and anxious. Affect is mood congruent and appropriate. She is also noted to be irritable. Thought processes are logical and goal oriented. Concentration is intact. Psychomotor activity within normal limits. Speech is of a normal rate and volume. Thought content is negative for any obsessions, compulsions, phobias, hallucinations, or delusions. She denies any suicidal or homicidal ideation. Abstractions are noted to be within normal limits. IQ appears to be average. Immediate, recent, and remote memories are intact. Judgement and insight appear to be average as she does recognize her mental illness and need for further treatment.

**INITIAL FORMULATION:**
Angela is a 41 year old divorced Caucasian female currently on trial for five counts of murder. She is facing the death penalty. Since her trial began, she has noticed an increase in depression and anxiety and is asking for assistance for medication.

**DIAGNOSTIC IMPRESSION:** [{]

Axis I:    Major Depressive Disorder
              Generalized Anxiety Disorder both of these recently
                   exacerbated by beginning her trial

Axis II:  No diagnosis

Axis III:  Without acute illness

Axis IV:  Problems with the legal system

Axis V:  Current GAF 50

**PLAN:**
I reviewed my impressions with Angela including diagnosis and need for treatment. We discussed the risks and benefits of medication including side effects and at this time, mutually agreed to an increase in her Zoloft to 300 mg daily. We will continue the Seroquel 200 mg q hs. I will follow up with Angela as needed.

Dawn Nolan, PA-C

DN/tj

Date Transcribed: May 6, 2005
Date Filed:    _____

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 91 of 119

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 92 of 119

| Facility Name | | | Address | | | |
|---|---|---|---|---|---|---|
| WC Jail | | | | | | |

| Last Name | | First Name | | Attending Physician | Room No. | Admission No. |
|---|---|---|---|---|---|---|
| Johnson | | Angela | | Ben Roberts DC | | |

| Date Ordered | Date Discontinued | ORDERS |
|---|---|---|
| 5-6-05 | | ↑ Zoloft to 300 mg PO daily. |
| | | |
| | | |
| | | |
| | | |

| Signature of Nurse Receiving Order | Time | Signature of Physician | Date |
|---|---|---|---|
| DN RN | 1010 | | 5-6-05 |

PHYSICIAN'S TELEPHONE ORDERS

Form 990 © BRIGGS Des Moines, IA 50306 (800) 247-2343



Date 4/23/05 at 1530
Incident: J05-3793
Reference:  Argument between Inmate Johnson, Angela MID#15357 and Hoffer, Chasity MID#7269. Information only

On the above date and time, I Co Stamm was helping the trustees prepare the supper meals when somebody was pounding real loud at H block.  Officer Scott and Officer Wingert went to see what the matter was.  He advised master to lock down H block.  Officer Scott came back into the kitchen and advised me that inmate Johnson and inmate Hoffer were involved in a verbal altercation.  He said they didn't physically fight but it looked like they were about ready to.  Officer Scott advised Co Nelson of the incident.  They were doing headcount and pushing food carts so he advised me to go in and talk with them.  After I returned the trustees to G block, Officer Scott let me into H block.  I went to room to room and talked to the inmates.  Officer Larson came into H block when she was done passing meds.   It was the consensus of the block that inmate Hofer, Chasity was bullying and  telling the inmates that inmate Johnson, Angela was a baby killer.  Inmate Johnson was out all day so inmate Hoffer was trying to cause problems and get the other inmates on her side.  When inmate Johnson came back the other inmates told her what inmate Hoffer had been saying all day.  Inmate Johnson went up to inmate Hoffer to confront her and of course an argument started.  Inmate Johnson said she didn't care what she said about her but she didn't want Hoffer talking about inmate Barker.  Inmate Barker also told me that inmate Hofer threatened to beat her up because she was friends with inmate Johnson.  I advised Inmate Hoffer to pack up so we could move her.  She told me we were always picking on her and she was getting real tired of it.  I advised her she needed to quit causing problems.  She needed to keep quiet and change her attitude.  She was moved to I block and advised if there were any other problems she would be moved to temp holding.

Co Stamm reporting.

Case 3:09-cv-03064-MWB-LTS     Document 284-81     Filed 06/23/11     Page 93 of 119

EXHIBIT 27

Pearl Jean Johnson Declaration 9/27/2009

(Missing from attachments from online docket)

# EXHIBIT 28

DECLARATION OF WENDY JACOBSON

I, Wendy Jacobson, declare as follows:

I am Anglea Johnson's oldest sister and spent my childhood trying to protect her and my other siblings. By the time I was 10 years old, I spent my time thinking and planning to run away and take my siblings with me. I fantasized I could take my little family and go live in a box car, they way I had read about in a children's novel. My sisters and brother have grown up and become independent, except for Angela, who will always need me, very much like she needed me when she was growing up.

Angela was always my special little sister; she was the next in line to me, and I tried to teach her everything I knew. She followed me around like a little lamb and couldn't be two feet away from me. She needed me to protect her from our mother who had no patience with little children and became enraged all the time. Our mother beat us even when we were very small children and still living with our father. She lost her temper over anything, did not allow us to play and make a mess in the house, and did not want us to make any noise. She hit us hard and left us with bruises and red marks. Sometimes she used a belt; sometimes she used her hands or other objects. She beat us until she got exhausted. It did not seem like punishment; it seemed more like her anger.

Our life got much worse after our father and mother divorced, and we began to move from place to place living with all kinds of different people, some of whom were very bizarre and mentally ill. We moved from Iowa to Colorado and back to Iowa and then to Kansas and back to Iowa and then from city to city. Sometimes, my mother's mother lived with us, and sometimes my mother convinced other people to live with us, like Maxine Abbott who was her

Παγε –1–

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 96 of 119

best friend for years.   Mother and my grandmother made up their own weird religion that they brainwashed us children with, but we did not know any better.   We lived one life inside the house and kept it secret from the outside world.   People in the community shunned us, made fun of us, and ridiculed us, so we learned to stick together to protect each other.   Other kids bullied and fought us because we were different and unprotected.   We never asked teachers to help us because we were taught at home to keep secrets and not tell people what we did at home.   We believed it would be terrible if we told others what happened at home.   Needless to say, we did not bring friends home to see what went on.   We did not know we could go to our father for help because we believed he abandoned us and did not want us.   When we were small, Mother moved us from place to place without telling him our whereabouts.   He remarried and it was clear to us kids his new wife did not want us around.   We never understood why we had to live in such poverty and why he didn't help us financially.

Our mother has always been different from any one else I've ever known.   She hears and sees things that others do not hear or see.   She sees special meanings in ordinary events.   She believes she has special powers to heal.   Although she believes these things are God speaking to and through her, her beliefs are not from any particular church or religion.   She and sometimes her friends made it up as they went along.   For instance, my mother believed in laying out in the spirit, laying on hands, fasting, speaking in tongues, and accepting God's gifts.   She interpreted everything that happened as a sign from God with special meaning for her, or worse, a sign from the devil.   She believed that demons and devils and evil spirits lived in us children and tried to take us over.   She fought these demons and devils by having these special rituals that she made up.   One time, she decided that her girl friend Maxine, was possessed by a rhinoceros demon so

Παγε –2–

she made Maxine stand on one foot while they chanted and tried to make the rhinoceros demon leave Maxine's body. That may sound funny today, but most times Mother's ideas were terrifying and hurtful to us children.

Angela got the worst of it, because Angela always had trouble learning. Angela could not learn to read, write, add, and tell time until she was in the third grade. I spent hours and hours teaching her how to tell time and how a quarter past three didn't mean there was a quarter, as in a coin, on the clock. She always had trouble in school and was in special education classes. Angela had to quit school after the eighth grade to work in our mother's restaurant as a waitress. She was a good waitress but she could not make change or operate the cash register. We had to make special arrangements to be sure that someone else took care of the customer's checks.

Mother and her friend or our grandmother were always on the lookout for signs of the devil or demons and they watched every little thing we did to see if we had the devil in us. As children, we came to believe that the devil or demons were in us and were terrified of our own selves. It was very confusing to think that another being or thing could take over our bodies and minds and destroy us. Mother's decision that we were showing sings of being possessed did not make any sense to us and came out of the blue from hour to hour or day to day. If she thought she observed something demon like in us or our behavior, she immediately began to exorcise or get rid of the spirit. Everyone of us kids but Angela figured out how to avoid her thinking we were possessed or how to show the demon had left us if we were possessed. Angela could never figure out how to change her behavior so Mother would not want to exorcise her.

Mother made up names for all these demons and at one time named them after twelve

Παγε –3–

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 98 of 119

Indian tribes like Algonquin. She also made up a special demon for Angela and announced that Angela was possessed by the Deaf and Dumb Demons. She and my grandparents did terrible things to Angela to get rid of the Deaf and Dumb Demons. They held her down on the floor or on the dining room table, they put her in a closet, they hit, shook, and screamed at her, they threatened her, they chanted over her, and they stayed ever alert to see if she showed any signs that they needed to do it again. These exorcisms happened over and over again and terrified Angela. She screamed, begged, cried, and ran from them, but they caught her and held her down. She fought back as hard as she could to make them let her go, but they never gave up. She was totally powerless and no one protected her. I couldn't protect her, either, even though I tried to make them stop hurting her.

Angela has always went into her own world. We called it her "special place," where she would go in her mind and stay for awhile. When she came out of her special place, she'd say, "I'm back." At other times, she seemed to check out of what was going on for a few seconds and then come back as if she hadn't left. She had to ask me to repeat things all the time. It infuriated my mother who decided Angela was possessed by the Deaf and Dumb Demon and that's why Angela didn't respond when Mother called her. I have seen videos of children who have petit mal or absence seizures, and they look exactly like Angela looked when she went into a daze.

My mother also goes into a daze like Angela does. Mother calls herself scatter brained, and she's right. She jumps from one subject to the next, repeats herself as if she hasn't already told us the same thing, and forgets what she's said. She still hears voices and has visions, but now that we're all grown and gone from home, we just tolerate it as best we can because we can't

Παγε –4–

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 99 of 119

change her mind about anything. Much of what she believes doesn't make sense, but I can't convince her of it. She is still very, very emotional, cries easily, feels helpless, and gets very anxious. She was never able to learn to drive and does everything possible to avoid leaving the house, making friends, or joining any activity. Very rarely, she'll go out shopping with my sister, but then walk up to a complete stranger and start talking to the stranger about her visions and voices. Some strangers are polite and listen; others walk away.

At one time, Mother moved to Texas, lived near me, and opened a small thrift store. She could not make a penny because when people came in to shop, she immediately wanted to exorcise them, lay hands on, or tell them about her voices and visions. When she was alone with my husband, she called herself anointing him to get the male demon out of him or some such. My sisters and I have had to forbid her from doing weird things to our daughters, but we caught her sneaking around and anointing, baptizing, and healing them. Our daughters are old enough now so that we don't have to worry about it, and they understand that their Grandmother is off the charts but love her anyway.

In many ways, Angela is like our mother. Neither one of them can really function on their own. Angela tried as hard as she could, and worked hard, just as Mother worked hard. They are both so gullible, though, they believe anything and can't plan ahead to know what will work and what won't work. Just like my mother's thrift store could not make enough money to stay open, Angela's attempt to own her own business failed. She opened and had to close her bar within a year. Angela always had to move from place to place after she moved out – just like my mother always moved from place to place, from one failed idea to the next. Angela also depended on other people, the same way Mother needed others.

Παγε –5–

Angela depended on other people to help her manage day to day life. She got her own places to live in but lost them and had to move in with me or my sister or a friend. She worked hard but never had enough money to make ends meet. I used to send her boxes of food to be sure she and the girls had something to eat. The only way we was able to move away from Mason City was when her friend and boss gave her a job and set her up in Des Moines. Even then, she spent her time coming back to Mason City.

Angie was always very emotional. Her moods switch from high to low, happy to depressed, and okay to terrible in a minute. Sometimes she cries and laughs at the same time, but both are intense. She never was able to control her emotions and did not seem to understand that her emotions were so much different from everyone else's. She'd get upset over the most insignificant and silly things, like a simple request. One time my daughter left her jacket at Angela's home, and I asked Angela to return it. It infuriated Angela and frustrated her when she didn't do what was expected of her. She was a neat freak who could not tolerate anything being out of order, so it was really hard on kids to be around her. When she got depressed, she cried and cried and felt like things would never be better.

Angela always had a lot of medical problems, but our mother did not believe in doctors. Angela had terrible headaches, back aches, and colds. We moved around all the time and got sick everywhere we went, but our mother interpreted it as devils so we learned to keep quiet about it. Plus if we were sick and stayed home from school, Mother made us fast. If we went to school, we got free lunches, so we always tried to go to school. Angela was a little, scrawny kid, whose right leg shook all the time (like mine) and who went in and out of contact with reality. She grew so numb to pain that she used to stick pins straight into her arms and walk

Παγε –6–

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 101 of 119

around without showing any pain.

I was really worried about Angela when she got together with Dustin. By then, she was a nervous wreck and at the end of her rope with fighting off Terry DeGeus. Her life was falling apart, and she acted as if bringing Dustin into her life would solve problems. None of us knew Dustin at first, so we were fooled into thinking it might be good for her, but it soon became apparent that Angela was in real trouble. Holly and I knew that her addiction to methamphetamine was way beyond control, that she was acting irrationally, and that her emotions were all over the board. We could not believe she had gotten pregnant because she was definitely not able to raise one child, Alyssa, much less another new baby. Our worst nightmares came true after Dustin was arrested and Angela continued to be involved with him. We could not understand what hold he had on her.

By the time Angela was arrested in 2000, her entire life had fallen apart. She had lost her home, was unable to work, had no income or money, and could not take care of her daughter. Her emotions were beyond out of control and whip lashed between complete fear and grandiosity. We all tried to help her the best we could before the arrest, but she was incapable of coming up with or following a sensible and practical plan. After she was arrested, she made absolutely no sense. Those first months were insane. She called me crying, sobbing, and pleading for help. She talked about killing herself, cutting her ankles so she would bleed to death, or hanging herself. She attempted suicide and was placed on medication, but the medication only worked at first. It was hard for the doctors to figure out which medication worked, and they had to switch medication all the time. She continued to talk about suicide

Παγε −7−

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 102 of 119

even after she was put on medication.

Angela got along with her attorneys at first but she believed they ignored her and would not follow up her requests and leads for investigation. She was very frustrated and irritated with them and called me many times crying and upset. None of us in the family knew how to investigate or help the attorneys so we depended on them to tell us what to do. They had a mitigation specialist who talked to us and the attorneys talked to us, but it was pretty clear they did not investigate the actual offenses Angela was charged with. As a result of my experiences in Angela's trial, I decided to return to college and learn about the criminal justice system and the law so that I can help others in Angela's situation.

I tried to support and stay involved with Angela as much as possible during the trial because I really feared she would commit suicide. After the trial started, she seemed to be in a daze and child like at times. She sat at the defendant's table drawing with colored pencils as if she were in elementary school. At the end of testimony, when I got down to leave the witness stand, she looked up and waved, as if we were seeing each other for the first time. When we met her outside the courtroom, she did not talk about the offense. Before the trial, she talked about it all the time because she was so upset and worried. I could tell that she was very depressed and very different, as if she were a zombie, especially in the mornings in court. Sometimes she sat there like she was not aware of what was going on and as if she was not in any pain at all. She looked like she had no feelings. I knew differently because she was devastated by the deaths of all those people. I could not understand why she showed no emotions in trial. When I asked her about it, she got very irritated and cut me off.

In July 2009, a mitigation specialist working on Angela's case asked me to tell her about

Παγε –8–

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 103 of 119

my life experiences.  I told her what I knew to the best of my recollection. If I had been asked this information by Angela's attorney either in an interview or at trial, I would have provided this information.  I did not write this declaration myself but I have read it  carefully and it says what I told the mitigation specialist when we spoke.

I declare, under penalty of perjury, that the foregoing seven page declaration is true and correct.  Executed by me this _27th_ day of September, 2009, in _Mason City_, Iowa.

_Wendy Jacobson_
Wendy Jacobson

# EXHIBIT 29

## DECLARATION OF HOLLY DIRKSEN

I, Holly Dirksen, declare:

I am Angela Johnson's youngest sister. We grew up together but I am several years younger than she is so our experiences at home were very different. I benefitted from stability that my mother was not able to provide my older sisters and brother, and I was not exposed the way Angela was to bizarre and cruel treatment.

I am the guardian of Angela's second child, Marvea Johnson, who lives with me and attends school locally. I work as a home health care worker, which is similar to a traveling nurse's aide, a position I have held for 15 years. I provide home care for people who have returned from the hospital and are likely to get well; it is very rewarding to see people do well after serious illnesses, and I try hard to do my best for them to assist in their recovery. Many of my patients have been with me for years, and I value the opportunity to serve them.

I visited Angela often in 1992 and 1993, and moved in with her in 1994, when my daughter was a little more than a year old. It was the worst year of Angela's life. Angela was shattered and stepped out of herself in 1993; she was literally insane that year. Angela always had little ability to control her emotions which were up and down, up and down, happy for five seconds and then totally different. Her temper went off for no reason at all and no one could predict or guess what set it off. Once she got mad, she just got madder and madder, and no one could calm her down. She got so mad she tore up clothes, threw things on the floor and against the wall, screamed, and yelled. She got mad over silly things like when I put pink and blue clothes together in the laundry or the children made a mess. When she was sad, it was the same

Παγε –1–

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 106 of 119

thing – as sad as sad could be. She cried and sobbed with deep grief and pain. At the moment of her sadness, she was completely wrapped in it. When she was up and not sad or upset, she was on top of the world. When she got in these moods, she said she felt like she was queen of the world, even when she had absolutely nothing. That's the way her moods went, from one extreme to the other.

It got in worse in 1993. Living with Angie was like living in a rant all the time. She could not control her emotions. She stayed in bed for days and then worked nonstop. She was always moving, shaking, talking, working, and doing something just for the sake of moving. Angie was unpredictable. I moved out in the spring of 1995 because it was too insane trying to live with her. Anything could set her off, and she stayed irritated and upset, angry with everyone and everything for little or no reason.

Angela grew crazier by the minute for every minute she spent with Dustin Honken. She and I were very close and spent a lot of time together. Her mood swings got worse. She was always paranoid and had to sleep with lights on, but she also believed that others were out to get her. Her pregnancy made everything worse. Angela lived in absolute terror that Terry DeGeus was going to kill her when he found out she was pregnant, but she was convinced she could not do anything about it. She was just as worried, if not more, about Dustin. She was pregnant with Dustin's child and worried that he was not going to end his relationship with his other pregnant girlfriend, who called and taunted her frequently. Angela was never any good with finances, but her debt grew way beyond her ability to pay it because Dustin convinced her to give her money to him. She was pregnant and her hormones seemed to push her over the edge. She had to stop doing drugs because she was pregnant, and she became terribly depressed and barely able to

Παγε –2–

Case 3:09-cv-03064-MWB-LTS   Document 284-81   Filed 06/23/11   Page 107 of 119

move off the couch at times. The slightest thing irritated and overwhelmed her.

Angela was a clean freak and could not stand it if anything was out of place. She used to get me up so we could scrub the dirt out of the cracks in the floors with Murphy Oil and a brush at 2:00 a.m. She could not let anything lay around on a table or counter. She came to my home once, walked in, got the vacuum cleaner and started vacuuming because she saw wood chips on the floor near the fireplace.

I was with Angela the day she found out she was pregnant. Angela came to my house that day and was desperate. She was so stressed out that she couldn't enjoy anything and was beside herself. She was worried she was pregnant but could not figure out what to do. I calmed her down by explaining to her we could get a home pregnancy test and take it from there. Angela had always been very careful with birth control, so her getting pregnant was a sign of how out of sorts she was. She was usually so careful, but she really fell apart in 1993 and everything fell apart in her life. She was crazy. She worked double shifts, was always flying and moving, and never tired – even after she quit drugs when she found out for sure she was pregnant. She was worried about losing her house and her credit but Dustin didn't care. He used up her credit card. Dustin lived high on the hog when he was away from Angie and had everybody fooled. He ruined Angie. His excuse for not helping Angie pay bills was that he had to pay back his college loans.

Angela was never realistic and always gullible; she had no judgment about people at all. She called me after she met Dustin and told me how he was really a big time drug guy, even a drug lord. I had learned never to trust Angela's opinion about other people, especially men who could take advantage of her, so I did not necessarily believe what she told me. Even though

Παγε –3–

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 108 of 119

Angela said Dustin was a drug lord, I was relieved because it meant she was moving away from Terry. Angela never was able to live independently and on her own; she always depended on friends, her family, or men to help her. She always needed someone to make things work for her and she did not want to be alone. Even though she needed other people to be around her, she was the one who always worked. Angela worked twice as hard as everyone else and never expected to do otherwise.

I hoped that Dustin being present would make Terry leave Angela alone. I really worried that Terry would kill her. Terry threatened to cut out Angela's baby and kill her and the baby if she ever got pregnant. He was uncontrollable and totally obsessed with Angela. When he attacked, stalked, and threatened Angela, she went to police but they were as powerless as she was to do anything to keep Terry away. He turned up in the middle of the night, at her job, and followed her in her car. Angela's daughter was as terrified of him as I was.

Angela was so geared up and manic, she stayed up for days and days after she met Dustin. She was very attracted to him because he was the first guy she had anything to do with who could pass for normal – he'd even been to college. He always acted like he was smarter than everyone, and Angela really admired his college education. She had not even finished high school. Angie practically worshiped him and didn't see how he controlled, manipulated, and took advantage of her.

Dustin knew how to play with Angie's mind and make her believe things were not the way they were. He had taken psych classes in college and knew tricks. Dustin could show you a picture of an orange and make you believe it was a banana. He tried to manipulate me but I would o't have anything to do with it. Dustin tried to get me to talk with him about how much

Παγε –4–

he loved Angie but I saw through it and could see he was manipulating me. Dustin played mind games on Angela. He was much smarter than she was.

I got to know Tim Cutkomp a little because he visited Dustin frequently. Tim and Dustin were very close. Tim always came to Angela's house to visit Dustin. He did what Dustin told him to do. Dustin controlled Tim the same way he controlled Angela.

One time at Angela's, I opened the door to the bathroom and found Dustin, Angela, and Cristie Gaubatz weighing white powder on scales. Cristie was in the middle of selling with Angela and Dustin.

Angela got ideas and then obsessed on them. Once she got an idea, she couldn't let go of it. She did meaningless stuff, anything to be active. She was up for days and then slept for days. She was always like that. Her bottom half was always moving and shaking. She couldn't keep her legs still.

Angela did lots of things that made no sense. She'd stay up for days – even when she wasn't on drugs like when she was pregnant – and make things, things that you could make during regular day time hours. Then she'd crash and stay in bed for days.Angela never announced or decided in advance what she was doing. She showed up without announcement; she blew in like the wind, expected everybody to be happy, and then she'd blow out. She'd get an idea and go at it. One time, she came in my house, looked at my kitchen, and announced that the wall trim had to go. She immediately started ripping it down, while I stood there telling her she'd gone crazy. Then she left. I had bible study that night and everyone saw my kitchen with holes in the wall. That was Angela – crazy.

In 1996, Angela was really unstable. She had lost her house in Clear Lake and moved to

Παγε —5—

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 110 of 119

Des Moines where a friend offered her a job. She could not get out of bed. Verleen, her boss in Des Moines, got her out of bed and became Angela's crutch. Angela depended on Verleen for survival. Angela always worked hard and thought she was in control of everything but in reality she depended on everyone else to get from one day to the next and to take care of the kids.

I worried so much about Angela that I drove to Des Moines and went to the court to try and get Angela committed. Angela was spinning out of control and manic.I met with three or four doctors, but the doctors didn't commit Angela. I worried about Angela because Angela talked about killing herself so much. Angela attempted suicide once as a kid; she took a whole bottle of Excedrin and it made her sick. She had to go to the hospital.

Angela flipped out when anything went wrong. She got so emotional she couldn't do anything. One time Alyssa broke a key in the ignition, and Angela flipped out, crying and shaking. My husband had to go to the parking lot and help them. Another time, Angela lost her purse and fell apart, crying and sobbing. She couldn't keep her emotions under control. She was so upset over the lost purse she said she was going to kill herself.

Through it all, she believed what ever men told her. One guy who came along after Dustin, promised her if she moved in with him, he'd support her and her kids in exchange for her fixing up his house. She did her part – she worked night and day fixing up his house. He quit his job and stayed home and never supported her. She had to move out of his place and live with me. I heard her in the bathroom, sobbing and crying, certain that she would never recover. She had no home and was not able to see the future. She was stuck and unable to make a plan or do anything to help herself. I found a trailer she could move into, and my husband and I moved her in and set her up.

Παγε –6–

Case 3:09-cv-03064-MWB-LTS     Document 284-81     Filed 06/23/11     Page 111 of 119

Angela's attorney, Pat Berrigan came to my house with Mary Goody to talk with me and Alyssa. Pat Berrigan sat down on my couch and fell asleep. I wondered if he was taking medication, had physical problems or if he was exhausted from working hard on Angela's case, but I also thought it was very peculiar.

Angela didn't know anything about her rights. When she was first arrested, she asked me to call Dustin's lawyer to find out what to do. She flipped out when she was arrested. She was in withdrawal and couldn't make sense out of anything. She threatened to slash her ankles and kill herself. She wigged out again in Cedar Rapids and started talking non stop, calling all the time, saying anything that came to her mind.

At trial, Angela wasn't herself. When we met with her outside the courtroom, Angela only talked about the family. This was very different than before trial when she was very worried. Before trial she told us she and her attorneys argued a lot. She wanted the attorneys to investigate her case, but the attorneys did not want to investigate her innocence. She was really irritated with her attorneys. After trial started, she wasn't her normal self and didn't show any interest in the case. She acted like she was not in a trial, as if it was all hopeless.

In July 2009, a mitigation specialist working on Angela's case asked me to tell her about my experiences with Dustin Honken and Angela's mental state. I told her what I knew to the best of my recollection. If I had been asked this information by Angela's attorney either in an interview or at trial, I would have provided this information. I did not write this declaration myself but I have read it carefully and it says what I told the mitigation specialist when we spoke.

I declare, under penalty of perjury, that the foregoing seven page declaration is true and correct. Executed by me this _27,_ day of September, 2009, in _Mason City_ Iowa.

Παγε –7–

_Holly Dirksen_
Holly Dirksen

Παγε –8–

# EXHIBIT 30

## DECLARATION OF ALYSSA JOHNSON

I, Alyssa Johnson, declare as follows:

I am Angela Johnson's oldest daughter. I have worked hard to improve myself. I went to community college and finished my AA degree in Business. I have learned how to manage retail stores and enjoy the challenge. I am raising my daughter, Angelea, and have a positive relationship with her father; she is doing well in school.

My mother and I are very close. She has always confided in me, so we were more like close friends once I became a teenager. I was more mature than most teens because I had to grow up fast, rear my little sister, Marvea, and take care of my mother when she needed me.

My mother is a wonderful, giving and loving woman who was never able to look out for herself, regardless of how hard she tried. She believed every story she heard, always saw the best in people, and could not understand how things always went sideways on her. When I was a teenager, I had to look out for her because she just didn't have any common or practical sense.

She worked as hard as she could, sometimes working two shifts in the same day. It was all she could do to support us, but from time to time we had to live with one of her sisters or friends when my mother wasn't able to keep up with day to day demands of working, paying all the bills, balancing a budget, and being a single mom.

All of my mother's emotions were intense. There were times my mother lost all control of herself and could not think clearly. Sometimes it was over little things, like when we lost car keys, she lost her purse, the dishes weren't done, or something in the house was misplaced. She flew into rages that made no sense over insignificant things, screaming, crying, and stomping

Παγε –1–

around until she exhausted herself. She stayed mad and upset for a long time. When she was sad, she cried and sobbed because she could not fix things and make it better for us. Sometimes, when she was happy, she was on cloud nine, as if she were the luckiest person in the world. She was obsessed with keeping everything in order and could not handle it if anything was out of order. She was more than neat and scrubbed everything like there was no tomorrow, staying up all night to clean the house.

My mother had terrible episodes of depression in between her times of activity. When she was depressed, she could barely move or do anything. She stayed in bed, in her room, or on the couch, as if she were so sick she had no energy. I worried about these moods when they came over her, but just did my best to be there for her. After my little sister was born, I had to take care of her when mother was so depressed she couldn't do anything. I spent a lot of time at my dad's but always worried when I was there about how my mother was doing alone, without me. She really couldn't take care of herself when depression came on. It was the exact opposite when her mood changed and she started projects or new jobs. She went from one extreme to the other. At the other end of depression was her thinking everything was perfect, wonderful, and marvelous, even when I knew we were headed for disaster. Nothing could change her mind, though. She had absolutely no judgment; it was like she was in another world.

She had a tremendous amount of energy and went at projects full blast until she collapsed. She never learned to take things slowly, to save some energy for later on, or to spread work out. When she had a project at home, like building furniture or repairing something that was broken, she started the project and didn't stop until she was finished, even if it meant she stayed up for days.

Παγε –2–

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 116 of 119

She fell apart when she had problems. She panicked, froze, or came up with plans that made no sense. For instance, Terry DeGeus made her crazy with fear. He beat her, threatened her, followed us in his car, slept in the shed in our back yard, broke into our house, and threatened to kill her. She called the police, but they were not able to keep him away. She decided that we had to move to be safe, but we only moved a few miles up the road where anyone, including Terry, could find us. Before Dustin moved in, we moved from house to house, and motel to motel. But my mom had no sense about it and only moved from one local town to the next; she should have moved far away but my mother was afraid to be away from her family.

I lived at home with my mother when Dustin Honken came into our lives. My mother made one bad decision after the next, including letting him live with us. I never cared for him because I could tell he took advantage of my mother. She never believed she was very smart, and she thought Dustin was really intelligent and well educated. She acted like he was going to solve all her problems when I knew he was just looking out for himself. She never had any money because she loaned or gave it to him. He didn't help with my little sister, who was his daughter, and always had an excuse for being busy or having to go someplace else. I saw Dustin control my mother. He gave her drugs; that's how he controlled her.

The pregnancy with my little sister changed my mother. She was irritated, stayed on the couch for days, and was really depressed. She complained and argued about everything. She was miserable. She was tired all the time. She never seemed happy or laughed. She worked two shifts to make enough for us to live on. The only job my mother ever had was as a waitress; that's all she knew how to do.

Παγε –3–

I attended a lot of the trial, whenever I could. I took a seat so I could see part of my mom's face. My mother seemed deaf and blind to the trial. She sat there at the trial next to her attorneys drawing with colored pencils they got her. She looked different; she didn't act like she had been acting in jail. It was as if the trial wasn't going on. Usually my mother is real up and has lots of energy – if she is not in depression. At her trial it was like she wasn't even all there. She asked about the family but didn't talk about the trial at all. One day I brought my guitar because I thought I could play it and cheer up my mom. She just did not seem like herself, but the marshal wouldn't let me play it in that little holding area.

I did not understand a lot about the trial. It seemed to me that the trial should not have been in the same town where Dustin's trial was held because everyone knew about it. I was also upset because my mother's attorneys never investigated the actual offense. At the beginning my mother told us she begged her attorneys to investigate everything but she lost hope when they ignored her. Everyone in the family just about fell out of our seats when her attorney stood up at the beginning of the trial and announced that she was guilty. We didn't understand what would make him say that and why he would not have talked with us and warned us or our mother beforehand.

In July 2009, a mitigation specialist working on my mother's case asked me to tell her about my experiences with Dustin Honken and my mom's mental state. I told her what I knew to the best of my recollection. If I had been asked this information by my mother's attorney either in an interview or at trial, I would have provided this information.. I did not write this declaration myself but I have read it carefully and it says what I told the mitigation specialist when we spoke.

Παγε –4–

Case 3:09-cv-03064-MWB-LTS    Document 284-81    Filed 06/23/11    Page 118 of 119

I declare, under penalty of perjury, that the foregoing five page declaration is true and correct.   Executed by me this _____ 26th _____ day of September, 2009, in Mason City, Iowa.

Alyssa Johnson

Alyssa Johnson

Παγε –5–