## US v. Angela Johnson

Summary Prepared by Ronald P. Walker, M.A. (FBI, ret.) and James A. Wright, M.P.A. (FBI, ret.)

## SOURCES OF INFORMATION

[1]   Superseding Indictment, CR00-3034, 08/23/02

[2]   Superseding Indictment, CR01-3046, 08/23/02

[3]   Prosecution Memorandum, 05/18/01

[4]   Addendum to Prosecution Memorandum, 02/12/01

[5]   Benton County Jail records

[6]   Blackhawk County Jail records

[7]   Linn County Jail records

[8]   Educational Records of Angela Johnson

[9]   Police Interview of Angela Johnson, 06/11/96

[10]  Clear Lake, IA, Police Department records

[11]  Drug Enforcement Administration reports

[12]  Iowa Division of Criminal Investigation reports

[13]  Allen Memorial Hospital records regarding Angela Johnson



## BRIEF SYNOPSIS OF INSTANT CHARGED OFFENSE

In March 1993, Dustin Honken was arrested during a controlled meeting with a cooperating witness (Gregory Nicholson) and was subsequently charged with a methamphetamine trafficking conspiracy in violation of 21 U.S.C, Section 846.  Mr. Honken was subject to a 10-year mandatory minimum penalty.  He was released on pretrial release with the special condition that he have no contact with the cooperating witness.  On 07/25/93, Mr. Honken and Angela Johnson located Mr.

Nicholson at the home of Lori Duncan.  Also present in the home were Ms. Duncan's two small children, ages six and ten.  Mr. Honken forced Mr. Nicholson to make a videotape in which Mr. Nicholson exonerated Mr. Honken.  Mr. Honken and Ms. Johnson then took Mr. Nicholson, Ms. Duncan and her two daughters to a remote location near Mason City, IA, where the defendant murdered the two adults and two children with a firearm previously purchased by Ms. Johnson.  Each of the victims was shot in the head execution style by the defendant. Ms. Johnson assisted by controlling the children while Mr. Honken killed the adults.  The four bodies were buried by Mr. Honken and Ms. Johnson in a mass grave and were successfully hidden until they were discovered in the fall of 2000.  Because of Mr. Nicholson's disappearance, the charges against Mr. Honken were dismissed in March 1995.  Mr. Honken and Ms. Johnson reportedly have each made admissions about the murders [8, pp. 1-3: US v. Honken].

The federal Grand Jury continued its investigation into Mr. Honken's drug trafficking, identifying Terry DeGeus as a drug co-conspirator. During the fall of 1993, Mr. DeGeus expressed concerns that he would be charged or called to testify before the federal Grand Jury.  Ms. Johnson was called before the Grand Jury in October 1993.  On 11/05/93, Ms. Johnson contacted Mr. DeGeus (a former boyfriend) with a message to meet her that evening.  Mr. DeGeus went to meet with Ms. Johnson, and never returned.  Ms. Johnson lured Mr. DeGeus to a remote location where Mr. Honken, armed with a firearm and baseball bat, waited.  Mr. Honken killed Mr. DeGeus by shooting and beating him, and then buried the body in a shallow grave near Mason City, IA with Ms. Johnson's assistance.  Mr. DeGeus' skeletal remains were recovered in the fall of 2000.  Mr. Honken and Ms. Johnson have made admissions regarding the murder of Mr. DeGeus [8, p. 3: US v. Honken].

A joint state/federal investigation in 1995 revealed that Mr. Honken and a co-conspirator (Timothy Cutcomp) continued to manufacture methamphetamine.  Mr. Honken recruited Daniel Cobeen to assist in the methamphetamine manufacturing.  A methamphetamine laboratory was ultimately seized at Mr. Honken's residence, and he was arrested.  While jailed in the Woodbury County Jail, Mr. Honken solicited inmates to murder Mr. Cutcomp and Mr. Cobeen.  While incarcerated in federal prison beginning in 1998, he expressed plans to various inmates and solicited various inmates to escape from custody and kill witnesses and others involved in the investigation and prosecution of his case.  He also made admissions about his murders

of Mr. Nicholson, Mr. DeGeus, and the Duncan family [7, pp. 8-14: US v. Honken].

On 08/30/01, a federal Grand Jury returned a seventeen-count indictment charging Mr. Honken with the murders of three adults and two children in order to avoid prosecution for a methamphetamine manufacturing and distribution conspiracy originally charged in March 1993 to further his drug trafficking conspiracy and continuing criminal enterprise. The indictment also charges Mr. Honken solicited others in a murder for hire scheme intended to result in the death of additional witnesses [7, 8: US v. Honken].

On 08/23/02, a federal Grand Jury returned a similar seven-count indictment against Angela Johnson. A ten-count superseding indictment dated 08/23/02 charged Ms. Johnson with the manufacture and distribution of methamphetamine in addition to charges she aided and abetted Mr. Honken in the murders of Gregory Nicholson, Terry DeGeus, and Lori Duncan and the two Duncan children [1, 2].

## MEDICAL EXAMINER'S REPORT

Dennis Klein, M.D., a forensic pathologist employed by the Iowa State Medical Examiner's Office, conducted the post-mortem examinations of the remains of Gregory Nicholson, Lori Duncan, Kandi Duncan, and Amber Duncan. Julia Goodin, M.D. is the Medical Examiner for the State of Iowa, and conducted the post-mortem examination of the remains of Terry DeGeus. The results of these autopsies are summarized in an Addendum to Prosecution Memorandum, and are noted as follows [4, pp. 3-4]:

- Gregory Nicholson was bound with a clothesline-type cord around his wrists. A gag consisting of a green sock was secured to his head by duct tape; the tape was wrapped around his head, covering the eyes and mouth. Mr. Nicholson was shot once in the back of the head and once in his upper-right back. Multiple perimortem fractures to neck vertebrae, consistent with a twisting or rotational injury, were also noted.

- Lori Duncan was gagged with a sock held in place by duct tape. The tape was wrapped around her head, covering her eyes as well as her mouth. Her hands and feet were bound with a clothesline-type rope. Ms. Duncan was shot once in the head, with the entry wound located behind the right eye and an exit wound on the left forehead. Ms. Duncan was also shot from

behind in her upper back at least one, and possibly twice. A bullet wound to her forearm was also observed, which may have resulted from the bullet that entered her back. Two perimortem hairline fractures were noted; one was located on a bone in her left hand, possibly caused by a twisting injury, and the other was located on her upper-right pelvis bone, probably resulting from a fall or compression.

- Kandi Duncan was not bound or gagged. A single bullet wound was noted to the back of her head.

- Amber Duncan was not gagged, but appeared to have been bound with a pair of men's underwear briefs. Her arms were placed through the leg holes of the briefs, and the briefs were pulled down over her head. She had a single bullet wound to the back of her head.

Terry DeGeus' skull was very badly fractured. He was shot in the head at least once, but the location of the entry wound could not be determined due to the extensive skull fracture. The skull fractures did not appear consistent with blunt force trauma. It appeared as if the fractures resulted from the gunshot. Mr. DeGeus was also shot once in the lower left arm and possibly once in the mid-section and once at his waist.

## PERSONAL HISTORY OF THE MS. JOHNSON

Family History

Angela Jane Johnson was born in Burlington, WI on 01/17/64 to James Jeffery Johnson and Pearl Jean Johnson, nee Gomez. At the time of her birth, her mother was 24 years of age. Her father was 22 and employed at a laborer at American Motors [8; 5, A002930; pp. 1, 3].

She has four siblings, Wendy Jean, born 1/4/1962; Jamie Jo, born 11/24/1965; James Jeffrey, Jr., born 3/2/1967; and Holly Justine, born 2/5/1973 [5, A002949; 5, A002922; pp. 2 – 4].

Education History

Education records made available for review reveal Ms. Johnson attended Forest City Community School in Forest City, IA, first enrolling on 01/03/72. School records for 5th and 6th grades indicate Ms. Johnson achieved grades of "A" in virtually all subjects during both

academic years.  She attended 7th and 8th grades at Forest City Community School, achieving predominantly grades of "S" in most academic subjects.  It was noted she withdrew from school on 10/09/98 [8].

Employment History

Ms. Johnson's ex-husband advised that he knew that she had been a dancer at one time and that she was careful where she danced so as not to ruin her reputation [11, A000724].

Norman Olson advised that Ms. Johnson worked for him for three years, between 1990 and 1992, at the Country Kitchen restaurant in Clear Lake, IA.  He described her as a "great employee."  Ms. Johnson left his restaurant to work at the Country Club in Mason City, IA [10, A000727].

Mr. Olson was aware that when the manager at the Mason City County Club moved to the Urbandale Country Club, Ms. Johnson moved to Urbandale to work for him.  No dates of employment were provided [10, A000727 – 728].

George Barlas advised that Ms. Johnson began working at the North Beach Restaurant in September or October 1998 and moved into an apartment over the restaurant.  Rent for the apartment was $250 per month.  Mr. Barlas reported that Ms. Johnson was a "very good" employee during her first year.  After that, she traveled to be with her new boyfriend whose name he could not recall.  Ms. Johnson was terminated in June 2000 after she did not show up for work on a Saturday night.  Mr. Barlas recalled that she became "very cranky" toward the end of her employment [12, A000735 – 736].

Military History

No military service is reported.

Marital and Relationship History

Arlyn Johnson advised that he was married to Ms. Johnson from about 1982 until they divorced in 1985.  He first met her in the spring of 1981 and they were married within a year.  The couple had one daughter, Alyssa Johnson, born 8/7/1983 [11, A000722; 5, A002925].

Mr. Johnson further advised that Ms. Johnson was in a relationship with Terry DeGeus, but did not know how they met. During the time she was with him, Mr. Johnson saw her with bruises and knew that Mr. DeGeus beat her. He said she had a difficult time breaking off the relationship and, for a time, had taken out a restraining order during a time when she was dating Dustin Honken [11, A000723].

However, Mr. Johnson reported that he first met Mr. Honken a month or two after he started dating Ms. Johnson, in September or August 1995. He said he seemed like a "nice guy" and that he was always nice to Ms. Johnson and Alyssa. Mr. Johnson believed that Mr. Honken took good care of his daughter and, to his knowledge, never did "lay a hand" on Ms. Johnson [11, A000724].

Benton County Jail records indicate fiancé Rodney Nicholson, born 3/28/1965, visited Ms. Johnson while she was housed there [5].

<u>Mental Health History</u>

On 10/13/00, while incarcerated in the Black Hawk County Jail subsequent to her arrest in instant matter, Ms. Johnson attempted suicide by hanging. Investigation at the jail revealed that Ms. Johnson fashioned a rope and noose by tying a bed sheet to the second floor railing in her pod at the jail. She then reportedly climbed over the rail with the bed sheet secured around her neck. The site of the attempt was in an area near the restrooms and shower, and not covered by surveillance cameras. However, the attempted suicide was quickly discovered, and she was taken by ambulance to Allen Memorial Hospital [6, A002984-002994].

Ms. Johnson's suicide attempt occurred after she reportedly learned from her mother or daughter during a telephone call on 10/13/00 that investigators had recovered the bodies of the five murder victims cited in her indictment. At approximately 4:05 PM, Ms. Johnson had requested permission to use the telephone. It was later reported she spoke with her daughter, who informed Ms. Johnson that her boyfriend notified the authorities regarding the whereabouts of the bodies. Other jail reports, however, noted the murder victims' bodies were recovered using a map previously drawn by Ms. Johnson. Ms. Johnson's suicide attempt occurred at approximately 4:20pm [6, A002984-002994].

An inmate (Theresa Milton) who described herself as a friend of the defendant reported Ms. Johnson previously asked her how she would

attempt to commit suicide. The inmate told Ms. Johnson she would use a sheet. On 10/12/00, Ms. Johnson spoke with her daughter and learned her appeal had been denied. She spoke about suicide, but Ms. Milton did not believe the defendant was serious. Ms. Johnson also spoke with her sister on the day prior to the suicide attempt to make arrangements for the care of her children "if anything happened to her." On 10/13/00, Ms. Johnson reportedly acted differently, and watched the guards closely. She spoke with her daughter on the telephone, and asked Ms. Milton for paper and a pen. Shortly thereafter, the defendant attempted suicide [6, A002999-003000].

While being transported to the hospital after the suicide attempt, Ms. Johnson was combative, requiring the application of restraints. Ms. Johnson continued to refuse to cooperate and remained combative and unmanageable upon arrival at the hospital. She required intubation at the ER to allow for a complete examination and examination of the neck for a C-spine injury. No C-spine injury was noted, and Ms. Johnson was transferred to the ICU for further inpatient management. She was discharged on 10/14/00 [6, A002997 & A003102-003108].

Hospital records report Ms. Johnson has a past medical history of depression, and had been prescribed Celexa 20mg, Serzone 75mg, Excedrin PM, Advil Migraine, and Trazodone [6, A003104-003107].

In a letter to her daughter dated Saturday the 7th (10/7/2000), Ms. Johnson wrote that she had seen a "real doctor" who took her off Serzone and put her on "a stronger antidepressant" and "sleeping pills" [6, A003076].

Among items found during a search of Ms. Johnson's cell were letters to her fiancé, sister, and daughter that appear to refer to her attempted suicide:

In a letter addressed to "Rodney (My Man)" she wrote, "I'm sorry baby, there was just no other way" and assures him he and Alyssa "can get through this . . ." She asks him not to let Alyssa hate her for "this" [6, A003014].

In a letter to Alyssa, she wrote, "I'm so sorry that everything had to turn out like it did." She also wrote that she knew that they were not going to let her out and she could not stand the thought of going to a maximum security prison and she would only do "this" as a last resort. She assured Alyssa that she (Alyssa) knows the truth and that while "someone might know about something <u>does</u> <u>not</u> mean they took part

in it." She then goes on to advise how some of her property is to be distributed [6, A003015 – 3017].

In a letter to her sister Holly, she wrote the she could not go to prison and requested her body be cremated. She wrote the same message as above regarding knowing about something does not mean she took part in it [6, A003022].

Substance Abuse History

Ms. Johnson's ex-husband advised investigators that when he first met her, she was using marijuana. He also advised that when she was with Terry DeGeus, they "shared common powder interests." In March 1995, when he was visiting her residence, she asked Mr. Johnson if he was interested in some methamphetamine. They did "a line" of methamphetamine together. He sometimes obtained enough of the drug from her for personal use and she offered to get him more [11 A000723 – 724].

Criminal History

Prior to instant charges, Ms. Johnson has a record of numerous traffic violations which led to her being charged as a habitual violator in 1998 and again in 2000 [10].

Incarceration

Ms. Johnson was indicted on five counts of aiding and abetting murder on 7/26/2000, and was arrested on 7/29/2000. She was initially incarcerated in the Benton County Jail, Vinton, IA [5, 3, p. 8].

She was moved to the Black Hawk County Jail on 10/3/2000 [6].

After her attempted suicide while an inmate at Black Hawk County Jail, she was discharged from Allen Hospital on 10/14/00, to the Linn County Jail to await trial [7].

Disciplinary History While Incarcerated

Linn County Jail records indicate that from 12/07/00 to 01/29/04, Ms. Johnson received 89 "Behavior Warnings." The warnings were issued for a wide variety of infractions, and included the following: running the block; laying in bed with another inmate; failure to lay on bed during lockdown; passing letters under door to another inmate;

disrespect; failure to follow order; using racial epithet; palming/hiding medication; attempting to instigate an arguments; defiant behavior; covering night light [7, A005585-005590].

Ms. Johnson was the subject of several Inmate Incident Reports while at the Linn County Jail, including the following:

- On 11/15/00, Ms. Johnson was involved in an argument with another inmate. They were warned to stay away from each other or be locked down. [7]

- On 12/28/01, Ms. Johnson was charged with assaulting another inmate. Her cellmate reported that Ms. Johnson shoved her after they engaged in an argument over the cellmate's body odor. The cellmate complained that Ms. Johnson had "taken it upon herself to control the actions . . . of other inmates" and she felt the need to press charges against her. Assault charges were filed and eventually dropped in District Court. Ms. Johnson was found guilty in disciplinary hearing and sentenced to ten days in a Behavior Modification Cell (BMC). [7, E001106, 1108,1125 – 1126, 1129]

- On 02/02/01, she was found to be in possession of unauthorized items, including paper, envelopes, paperclip, cardboard, and a match stick taped under her bed. She admitted having the items, but stated the match stick was "planted there to get her in trouble." She received five days in BMC, with two days suspended. [7, A005602-005605]

- On 03/23/02, Ms. Johnson was cited for disruptive conduct after she was observed yelling at other inmates during recreation. At her hearing, she admitted being involved in an argument, but explained that she was provoked and witnesses verified her story. She was found guilty and sentenced to five days of administrative segregation, with credit for time served. [7, A005616-005622, E001141]

- On 1/1/04, Ms. Johnson was given a warning after a shakedown found excessive pictures on the wall of her cell and her bedding in the day area. [7]

- On 01/28/04, Ms. Johnson was cited for assaulting another inmate by pulling her hair, hitting her in the head with her fist, and pushing her into a wall. While acknowledging the material

facts of the report, Ms. Johnson claimed there were mitigating circumstances and claimed self-defense. The report noted Ms. Johnson is "twice as big and twice as old as the other combatant." She received five days BMC, with no credit for time served. [7, A005627-005631, E001165]

- On 5/3/04, Ms. Johnson was given two weeks commissary restriction for having bedding in the day area. [7]

- On 6/27/04, Ms. Johnson was given a warning after she argued about having to put her shirt on. She repeatedly stated, "Fuck you" as she put it on. [7]

-

Ms. Johnson has filed several grievances while incarcerated in the Linn County Jail, including the following:

- On 12/29/00, she complained about being maintained on suicide watch after the doctor recommended she be taken off the watch. [7, E001166]

- On 3/24/2002, Ms. Johnson complained that a correctional officer had been treating her "very rudely" since she declined the officer's request that she kick another inmates "ass." By way of relief, she requested an apology. [7, E001169]

- On 3/24/2002, Ms. Johnson complained that she was not being treated fairly. She claimed that she had recently been called "murderer" by an inmate, which she responded to by telling her those were "fighting words" as she walked toward her. For that, she was put in isolation for 24 hours to "cool down." [7, E001171 – 1172]

- On 7/27/2002, she again complained about the correctional officer "being on her case." She claimed the officer yelled and swore at her and hurt her feelings every time the officer worked. [7, E001173]

- On 10/22/2002, there was another grievance against the same correction officer. Ms. Johnson complained that she did not turn on her television at the proper time. [7, E001175]

- On 1/19/2004, Ms. Johnson complained that she was treated differently than other Federal detainees. [7, E001181]

## BEHAVIOR OF MS. JOHNSON PROXIMAL TO KNOWN/CHARGED OFFENSES

On 7/3/1993, Ms. Johnson filed an application to purchase a handgun in Cerro Cordo County, IA. Four days later, on 7/7/1993, she purchased a Tech-9, 9 mm semi-automatic pistol at a pawn shop in Waterloo, IA. On 7/25/1993, Mr. Nicholson, Ms. Duncan and her two daughters were killed [3, p. 10].

Christi Gaubatz advised that she and Ms. Johnson were best friends and she frequently babysat for Ms. Johnson. During the summer of 1993, she babysat on a daily basis while Ms. Johnson and Mr. Honken were trying to locate Mr. Nicholson. On those nights they regularly returned to the residence around midnight. One evening, Ms. Johnson asked to borrow her car and did not return to the residence until about 5:00 AM the next morning. After that night, they stopped looking for Mr. Nicholson [3, p. 34].

Ms. Gaubatz also advised that during the fall of 1993, Ms. Johnson told her that she was pregnant by Mr. Honken and she feared what Mr. DeGeus, her former boyfriend who had been "stalking" her, would do if he found out. Ms. Johnson asked Ms. Gaubatz to accompany her to a meeting with Mr. DeGeus at a restaurant in Mason City, IA, which she did. She waited in the car, but could see the couple arguing. When Ms. Johnson returned to the car, she said, "He can't be around, anymore." Ms. Gaubatz said it was soon after that that Mr. DeGeus disappeared. Later in 1993, Ms. Gaubatz found a cosmetic bag in a closet in her home and, when she looked inside, saw a "large black handgun." Believing the gun belonged to Ms. Johnson she called her and told her to remove the gun. Ms. Johnson came to the residence immediately and removed the gun [3, p. 35].

On 11/5/1993, Ms. Johnson contacted Terry DeGeus' mother and asked that she tell him to contact her. Later that evening, Mr. DeGeus dropped his daughter at his mother's house, telling her that he had to meet Ms. Johnson and would return by 12:30 AM. Mr. DeGeus spoke to an acquaintance at a grocery store between 6:30 PM and 7:00 PM and told her that he was on the way to Mason City to meet Ms. Johnson. He was not seen alive after that time. Several days later,

Mr. DeGeus' mother telephone Ms. Johnson to ask about her son. She claimed he did not show up for their meeting. Sometime later, Mr. DeGeus' ex-wife called Ms. Johnson who initially told her he did not show up that night. Later in the conversation she admitted that he did stop by to see her, but then went to Mason City to see friends [3, pp. 11, 18 – 19].

Incident to a missing persons report filed on 11/10/1993, by Mr. DeGeus' father, Ms. Johnson was interviewed by law enforcement officers. She told them that when she got off work on 11/5/1993, Mr. DeGeus was waiting for her. She got into his car and they talked about her 10/2/1993 Grand Jury testimony. He then left, saying he had things to do and people to see in Mason City [3, p. 19].

While in jail, Mr. Honken arranged for fellow inmate, Anthony Altimus, to kill Messrs. Cutkomp and Cobeen after he arranged for him to be bailed out of jail. He had another inmate's wife meet with Ms. Johnson who would give her $1,000 in exchange for a methamphetamine recipe. The money was then to be used to bail out Mr. Altimus. In January 1997, Ms. Johnson appeared at a bail bond agency in Sioux City, IA, and presented herself as a relative of Mr. Altimus in an attempt to post bail for him [3, p. 13].

## STATEMENTS AND DISCLOSURES ATTRIBUTED TO MS. JOHNSON REGARDING THE ALLEGED OFFENSES

Ms. Gaubatz, advised that in early 1994, Ms. Johnson told her she needed to get something "off her chest." She reminded her of the evening she borrowed Ms. Gaubatz car and stated that on that night she and Mr. Honken went to a residence in Mason City, IA, where she pretended to be a sales person in need of the use of a telephone. After she was allowed entry, Mr. Honken followed her inside and, armed with a gun, forced Mr. Nicholson to make a video tape. The two then forced Mr. Nicholson, Ms. Duncan and her children to accompany them in Ms. Gaubatz' car. They drove to a wooded area where Mr. Honken shot them all, one at a time. They were then buried in one grave. Ms. Gaubatz said that as Ms. Johnson was relating the above, she was "extremely emotional" [3, p. 35].

Later, the same year, Ms. Johnson also told Ms. Gaubatz about luring Mr. DeGeus to a remote location where Mr. Honken was waiting to kill him. Ms. Gaubatz said she was not as emotional when describing Mr. DeGeus' murder [3, p. 35].

On 6/11/1996, law enforcement officers interviewed Ms. Johnson at her place of employment. When told they wanted to talk to her about Dustin Honken, she became visibly upset and stated she felt he had done nothing wrong and was being harassed. She told the investigators she would meet them at her residence after she got off work [9, A000704].

She did meet them at her residence and consented to a search of the premises. Nothing was seized as a result of the search. She then agreed to meet them at the Urbandale Police Department for further, non-custodial interview [9, A000704].

Ms. Johnson was asked what she thought had happened to Greg Nicholson and Terry DeGeus, to which she answered she thought they had "just left the area." She claimed that the last time she saw Mr. DeGeus was a few days before he was reported missing. At that time, he was acting "strange" and "seemed depressed" [9, A000704].

Ms. Johnson advised investigators that Mr. Honken was not making methamphetamine, but doing research for a book he was writing on precursor chemicals for making the drug. She was asked if she had given him any money for his research. She answered that she had not, but she owned his father $5,000 and had been making payments toward paying off the debt [9, A000705].

Ms. Johnson was asked for consent to search her house in Clear Lake, IA, to which she agreed, but only if she was there for the search. About 45 minutes into the interview, Ms. Johnson terminated the interview, but agreed to resume the interview the next morning. When she did not appear for the interview the next morning, she was contacted and advised she was "done talking" because a search warrant had been executed at her house in Clear Lake the night before [9, A000705].

On 6/11/1996, a search warrant was executed and chemicals used to manufacture methamphetamine seized from a shed at Ms. Johnson's residence in Mason City, IA [3, p. 12].

Robert McNeese and Ms. Johnson exchanged letters and conversed while both were prisoners in the Benton County jail. Mr. McNeese is a cooperating witness who advised Ms. Johnson made numerous admissions to him because she wanted his assistance in escaping from the jail and in locating a prisoner serving a life sentence to confess to committing the murders for which she is charged [4, p. 2].

Ms. Johnson reportedly told Mr. McNeese that when she escaped, she wanted to kill one of the jail guards who treated her badly. She claimed to have had a family member take videos of the jail to assist in a plan to escape and develop information about the guard, including what kind of car she drove. She was also going to have the guard followed by a family member. She invited Mr. McNeese to escape with her [4, p. 2].

Regarding her plan to have someone else take credit for the murders, it was necessary to provide enough information about the crimes for that person to be credible. According to Mr. McNeese, she told him she and Mr. Honken took Mr. Nicholson, Ms. Duncan and her daughters to a field where Mr. Honken shot them all. They were then buried in the same grave [4, p. 2].

Regarding the murder of Mr. DeGeus, she said that she shot him several times after making him get on his knees, "like he used to do to her when he previously beat her" [4, p. 2].

Ms. Johnson drew maps of both burial sites for Mr. McNeese, which included landmarks and named roads. The maps were turned over to authorities and search warrants were obtained for both sites. A search for the sites commenced on 10/12/2000, and all bodies were ultimately located [4, p. 3].

It was noted that the complete remains of an opossum and the head of a shrew were found in the grave with multiple bodies. The animal remains were separated from the bodies by a layer of decomposed plant material, suggesting the animals were placed in the grave sometime after the victims. It was also noted that Ms. Johnson "is known to be a follower of witchcraft and other occult-type religious practices" [4, p. 3].

## STATEMENTS ATTRIBUTED TO MR. HONKEN REGARDING MS. JOHNSON

Timothy Cutcomp

Mr. Cutcomp, a co-conspirator in drug charges against Mr. Honken, reported that after their arrests in 1996, Mr. Honken told him that they would have nothing to worry about (regarding charges against them) if Mr. Cobeen disappeared. He also told him that Ms. Johnson was urging him to "take care of business" [3, p. 21].

Mr. Cutcomp advised he was told by Mr. Honken that Ms. Johnson had invested between $2,500 and $3,000 in the Mason City methamphetamine laboratory. It was also reported that Mr. Honken told Mr. Cutcomp he would have to meet with Ms. Johnson so she could approve of his working in the laboratory [3, pp. 11 – 12].

Dean Donaldson

Mr. Donaldson, a witness who was an inmate with Mr. Honken, reported that Mr. Honken told him his girlfriend, Angie, would "kill anyone in a minute." Mr. Honken also told him he was concerned about Ms. Johnson because "her downfall was drugs." Mr. Honken intended to kill her, in addition to other witnesses against him, a prosecutor, and law enforcement personnel [3, pp. 22 – 23].

According to Mr. Donaldson, Mr. Honken told him that it was Ms. Johnson's idea to murder Gregory Nicholson, Lori Duncan, and Ms. Duncan's children [3, p. 23].

Fredric Tokars

Mr. Tokars is a federal inmate and cooperating witness who was incarcerated with Mr. Honken in 1998. According to Mr. Tokars, during discussions he had with Mr. Honken in which Mr. Honken told him he knew that he had killed witnesses in his (Mr. Tokars') case and asked for assistance with his case. He said that he wanted Mr. Cobeen killed and Messrs. Cutcomp and Donaldson intimidated. He said that Ms. Johnson helped him the last time and would help him again. He also told him he was concerned that Ms. Johnson might incriminate him in the earlier murders. He wanted Mr. Tokars to find someone to kill Mr. Cobeen and then kill Ms. Johnson to "tie up all loose ends." [3, pp. 27 – 28]

Mr. Honken also told him that he and Ms. Johnson had purchased a gun at a pawn shop and he was worried that the gun used in the murders was linked to Ms. Johnson [3, pp. 28].

Regarding the murders, Mr. Honken told Mr. Tokars that he and Ms. Johnson parked down the street from the residence and, carrying a camera in a bag, walked down the street "like a couple on a walk." Once they were "easily" able to enter the house, he remained in one room with Mr. Nicholson where he forced Mr. Nicholson to recant his allegations in front of the video camera, after which he hit him in the

head with the gun and strangled him with a cord. He said he then went into the room where Ms. Johnson was holding Ms. Duncan and her daughters. He hit Ms. Duncan with the gun and strangled her while Ms. Johnson restrained the children. Ms. Johnson then strangled the children. They used Ms. Johnson's car to transport the bodies to a prearranged location where they were buried in a common grave [3, pp. 28 – 29].

Mr. Honken said that Ms. Johnson was a full participant in the murders and "fully capable of doing anything" he could do [3, p. 29].

Regarding the murder of Mr. DeGeus, Mr. Honken told Mr. Tokars that he learned that Mr. DeGeus was going to testify against him. Ms. Johnson lured him to a remote site, telling him that she and Mr. Honken were not getting along and she wanted to meet him. She also told him she had some drugs. He said he and Ms. Johnson arrived at the scene before Mr. DeGeus. When he did arrive, Mr. Honken shot him. They then placed his body in the trunk of Ms. Johnson's car and drove him to the burial site [3, pp. 29 – 30].

William LeBaron

Mr. LeBaron is a federal inmate and cooperating witness who was incarcerated with Mr. Honken. He reported that Mr. Honken told him about the murder of Mr. Nicholson, Ms. Duncan, and her children and said that Ms. Johnson helped him dig the grave where the bodies were buried [3, p. 31].

Steven Vest

Mr. Vest is a federal inmate and cooperating witness who was incarcerated with Mr. Honken in 2000. He reported that Mr. Honken told him that he manufactured methamphetamine in Arizona and transported it to Iowa to sell. One of his customers was Terry DeGeus who was dating Ms. Johnson. Mr. DeGeus owed Mr. Honken $30,000 and Ms. Johnson brought him (Mr. Honken) $10,000 in partial payment of the debt. She told him she was selling drugs for Mr. DeGeus. He said that he developed a personal relationship with Ms. Johnson and they started dating [3, pp. 32 – 33].

Mr. Hoken also told Mr. Vest that when he was released after arrest on drug charges, he and Ms. Johnson determined Mr. Nicholson would have to be killed for him to avoid conviction. He said Ms. Johnson gained entry into the residence before him and held the occupants

hostage until he entered. He then forced Mr. Nicholson to record a statement exonerating him. He then forced Ms. Duncan to write a note telling a neighbor they were leaving. They took the victims to a field where Mr. Nicholson and Ms. Duncan were shot while Ms. Johnson stayed at the car with the children. Mr. Honken returned to the car, removed the children, and shot them in the back of the head [3, p. 33].

Regarding the murder of Mr. DeGeus, Mr. Vest reported that Mr. Honken told him that Ms. Johnson lured him to a remote area where Mr. Honken was waiting. He said he and Mr. DeGeus were in the car talking when Ms. Johnson entered the car and told him she was cold. He took that as "guidance" from her to do what they planned (kill Mr. DeGeus). He shot him multiple times and beat him with a baseball bat. He and Ms. Johnson buried Mr. DeGeus' body at the scene and drove his car to a car wash to wash blood spatter from the exterior of the car [3, p. 33].

## LAY WITNESSES' SIGNIFICANT OBSERVATIONS ABOUT MS. JOHNSON

### Arlyn Johnson

Mr. Johnson advised that Ms. Johnson had "a very hot temper" that Dustin Honken was most capable of handling. He said he would listen to her, let her vent, and give her time before trying to talk to her. Ms. Johnson's ex-husband advised that Ms. Johnson was "never wrong" when arguing [11, A000722 – 724].

### Carol Lou Steiner

Ms. Stenier advised that she was an inmate in the Benton County Jail for about three weeks after Ms. Johnson was first housed there upon her arrest in July 2000. Ms. Steiner opined that Ms. Johnson had a "mean streak," though she never "showed it" while they were in jail together. She said Ms. Johnson cried a lot. She recalled that near the end of her stay in jail, Ms. Johnson's attorney gave her some depositions to read and, while reading one, she commented without elaboration that her boyfriend was planning on killing her [5, A002916 – 2917].

### Kimberly K. Young

Ms. Young advised that she was a weekend inmate at the Benton County Jail when Ms. Johnson was brought there on 7/29/04. They shared a cell for two weekends. She described Ms. Johnson as having "an attitude." Ms. Johnson never told her what she was arrested for, only that she had been arrested at her sister's house and that, in the past, the police had searched her house for drugs. She said that she was always very secretive, never mentioning names, even when talking on the telephone [5, A002982 – 2983].