DANIEL A. MARTELL, Ph.D

507 NEWPORT CENTER DRIVE, #200

NEWPORT BEACH, CALIFORNIA 92660

FORENSIC PSYCHOLOGY
AND NEUROPSYCHOLOGY

(714) 760-0422

FAX (714) 644-0535

June 10, 1997

PLAINTIFFS
EXHIBIT
133



Honorable John C. Keeney
Acting Assistant Attorney General
Criminal Division
Room 2107
United States Department of Justice
10th Street & Constitution Ave., N.W.
Washington, D.C.    20530

By Hand Delivery

Dear Mr. Keeney,

I am a forensic neuropsychologist and have been retained frequently by the United States as an expert witness, particularly in capital cases. I am writing to seek your assistance with a problem that has arisen out of my recent consultation with the United States Attorneys Office for the District of New Mexico, in the matter of _United States_ v. _Everett Spivey_ (Crim. No. 95-491-LH). This was a capital murder case, brought under 21 U.S.C. 848. Upon referral by DOJ Attorney Robert Lipman, I was retained in January of 1997 by the U.S. Attorney's Office in Albuquerque to conduct a pre-trial evaluation of Mr. Spivey, in anticipation that evidence of mental impairment would be presented by the defense in mitigation if he was convicted at trial.

As the dozens of AUSA's with whom I have worked will attest, I have a national reputation as a very effective expert witness who brings the highest level of professionalism, competence, and integrity to the cases I accept. As my curriculum vita indicates, for the past several years I have been regularly invited to lecture to various state and national government attorneys' organizations about mental health issues, and in the past two years I have twice been sought out by the DOJ's Office of Legal Education to lecture for senior litigators in the U.S. Attorney's Office regarding mental issues that arise specifically in capital litigation and homicide cases.

I believe I was brought into the Spivey case because of my experience and reputation, a reputation that was impeccable and unblemished. Unfortunately, problems arose because of the manner in which this case was handled; problems that have left me extremely distressed and that I believe have damaged my reputation and my financial status. I write this letter to summarize the facts as I understand them, to explain the harm that has come to me as a result, and to seek your assistance in rectifying the situation.

Briefly, my examination was ordered by Judge C. Leroy Hansen of the U.S. District Court in Albuquerque. Because the examination was to be conducted pre-trial, Judge Hansen's order precluded my sharing the findings of the examination with either the government or defense counsel, until such time as the defendant was convicted and decided to introduce mental evidence in mitigation at the penalty phase.

I arrived in Albuquerque on March 27, 1997, and that evening met for a briefing with the prosecution team, consisting of lead AUSA Elizabeth Martinez, AUSA Mary-Kay McCulloch, a young male AUSA, Det. Greg Marcantel, and TFO Matt Thomas. During that meeting I was made aware that members of the team felt that Mr. Spivey seemed intensely focused or fixated on the prosecutors in general, and on Ms. Martinez in particular.

The following day (March 28, 1997) I examined Mr. Spivey at the Sandoval County Jail in Albuquerque. After my examination had been formally completed, I advised Mr. Spivey that we were finished. We had been locked in a private room together. I then signaled to the corrections officer that we were done and wished to leave. The officer indicated that it would be a few minutes before he could let us out. During the ensuing interval, as I was packing up my equipment, Mr. Spivey made the unsolicited comment that he felt sorry for the prosecutor in the case, and felt that she was a "tortured soul." This comment caught my attention, because of conversation the evening before during the introductory briefing regarding his apparent fixation on the prosecution team.

After leaving the correctional facility at the end of the examination day, Det. Marcantel extended an invitation from AUSA Martinez for me to join the prosecution team for dinner that evening. I had previously been told by Det. Marcantel that members of the team often got together for cook-outs at AUSA Martinez's home. I accepted the invitation, with the explicit and stated understanding that everyone was aware of the court's order regarding the findings from my examination, and would respect that order. This was discussed with Det. Marcantel at the time of the invitation, with AUSA McCulloch who picked me up and drove me to AUSA Martinez's home, and with AUSA Martinez when I arrived there. Present at the party besides myself were AUSA Martinez, AUSA McCulloch, TFO Agent Matt Thomas (Albuquerque Sheriff's Office) and his wife, and another couple whom I recall to have been attorneys, although it may be that they were investigators who worked for either the local D.A.'s office or the U.S. Attorney's Office. Later in the evening we were joined by Det. Greg Marcantel and his girlfriend.

During the early part of the evening as dinner was being prepared, the guests were standing in the kitchen discussing the events in court that day (jury selection was underway). At one point during this conversation, AUSA Martinez and AUSA McCulloch began discussing Mr. Spivey's behavior in the courtroom that day, and his apparently inappropriate focus on Ms. Martinez. This was the same concern that had been brought up during the briefing the night before.

Case 3:09-cv-03064-MWB-LTS    Document 304-3    Filed 08/10/11    Page 2 of 8

At that time, I interrupted the conversation of AUSAs Martinez and McCulloch and asked AUSA Martinez for legal advice regarding the parameters of the court's order. Out of an abundance of caution, I framed my question as a hypothetical with facts closely mirroring the Spivey case. In essence, I asked whether a comment made by a defendant after an examination was formally concluded would be covered by the court's order. More specifically, I clarified that the comment was not made in response to questioning by the doctor, and that the content of the comment had no bearing on the doctor's examination or opinions in the case.

AUSA Martinez conferred with AUSA McCulloch and others in the room about this question, and advised me that such a comment was not covered by the court's order. At that time, staying with the hypothetical, I stated that the defendant may have stated that he felt sorry for the prosecutor, and that she had a "tortured soul." This was the entire extent of the information disclosed. There was a brief discussion by everyone about the matter, and then the conversation moved on.

I am a psychologist, not an attorney, and in consulting to the New Mexico U.S. Attorney's Office, I properly and reasonably relied upon the guidance of the lawyers with regard to the law. I engaged in absolutely no professional misconduct. I sought legal advice from AUSAs Martinez and McCulloch, and acted in good faith in keeping with that advice. At least two attorneys from the office who were assigned to the Spivey case conferred with each other regarding my question as to the parameters of the court's order. After conferring, they advised me that a disclosure such as the one at issue was not prohibited.

The following day (March 29, 1997) I was taken by Det. Marcantel for a walk-through of the crime scene, after which we returned to the New Mexico U.S. Attorney's Office so that I could review evidence there. Both AUSA Martinez and AUSA McCulloch were present. While at the U.S. Attorney's Office, I had a discussion with Ms. Martinez regarding the fact that defense counsel had interrupted my examination to advise me that the examination could not be videotaped and that Mr. Spivey would not discuss any facts relating to the charged offenses with me. AUSA Martinez subsequently wrote a letter to defense counsel requesting that the same limits be placed on their experts. The contents of Ms. Martinez's letter apparently led the defense to believe that impermissible disclosures had been made. After receiving the letter, counsel for the defense made a motion for a Kastigar hearing in response to AUSA Martinez's letter, asking that the prosecution team be removed from the case based on the assertion that I had disclosed information to the prosecution regarding my exam. These allegations were entirely unrelated to the alleged disclosure that I have described above.

Pursuant to the defense's motion for a Kastigar hearing, AUSA Martinez & AUSA McCulloch prepared an affidavit for me to sign. The affidavit that they sent me dealt directly with the issues raised by the defense's motion, but no mention was made in the affidavit of the hypothetical discussed at the dinner during which I made the alleged disclosure. I complied with the AUSA's request

and signed the affidavit, again in full good faith, with the expectation that the Office of the United States Attorney would not prepare a document asking me to swear to something that was not true or sufficiently complete. Every word of the affidavit is true, and I would not have signed it were it untrue. It is my understanding that AUSA Martinez then submitted my affidavit to the court. Ultimately, the court denied the defense's motion, based in part on the representations in the affidavit.

Apparently at some point during the week of April 28th, Mr. Bob Gorence (the First Assistant in the New Mexico office) upon reviewing the affidavit, decided to conduct his own investigation regarding the dinner party at Ms. Martinez's home the night of my examination. All that I know about this investigation has come from my conversations with Mr. Gorence over the ensuing weeks. My understanding from him is that there were differing recollections of what transpired among the persons he interviewed. Some stated that there had been no disclosure. However, according to Mr. Gorence one of the case agents (apparently TFO Matt Thomas), related that I had made the statement about Mr. Spivey feeling sorry for the prosecutor and feeling that she was a tortured soul. As I understand it, TFO Thomas did not mention my use of the hypothetical, nor did he mention my asking for legal advice prior to making the statement. I do not know if anyone has asked him about those issues since his initial statement. However, he did relate to Mr. Gorence that AUSA Martinez was present and that she reacted to the disclosure with excitement.

Mr. Gorence then called me at my office in California on or about May 1, 1997 to ask me about these events. I was not expecting his call, and did not know the nature of the controversy that had developed. I told him the truth. Being caught off guard at the time of this call, I only vaguely remembered using a hypothetical, I did not remember why the hypothetical was employed. After hanging up, I gave this considerable thought and called him back to clarify exactly what had happened as best as I could remember it, including the facts as I have described above.

From the point of my first conversation with Mr. Gorence, I have had no further contact with AUSA Martinez or anyone from the New Mexico U.S. Attorney's Office other than Mr. Gorence.

Over the next two days, meetings were held behind closed doors with the defense, and a plea bargain was offered. Initially, Mr. Spivey refused the offer. On Sunday morning May 4th, I was asked by Mr. Gorence to fly to Albuquerque and to be available to testify at an evidentiary hearing scheduled for Monday morning. As I was en route, I understand from First Assistant Gorence that United States Attorney John Kelly himself went to the defendant's call to encourage Mr. Spivey and his attorneys to accept the offer, which the defendant ultimately did. Before leaving Albuquerque the next afternoon, at his request I provided First Assistant Gorence with a written statement regarding the events as they transpired at AUSA Martinez's home on the evening in question.

Within a day of the plea arrangement, I learned that there was a rumor among the national network of capital defense lawyers that I had signed a false affidavit and that the Office of the U.S. Attorney in New Mexico would confirm this allegation. This misleading information released by defense counsel through the Federal Public Defender's Office, was based at least in part on the version of events promulgated during conversations with the New Mexico United States Attorney's Office. This is evidenced by the fact that IFO agent Matt Thomas who had been interrogated by First Assistant Gorence regarding the Spivey case, was subpoenaed by the defense to testify in rebuttal to my testimony in a capital case in Pennsylvania (Commonwealth v. Strong), during which I was cross-examined about this matter.

There was also an inaccurate front-page newspaper article in the Albuquerque Journal on May 7th, naming me as the reason for the government's surprise plea agreement in the Spivey case. My office had received a call from the Journal reporter seeking confirmation that I had filed a fraudulent affidavit in the Spivey case. I immediately called Mr. Gorence, who downplayed the press's ability to go anywhere with the story. This effectively discouraged me from responding to the Journal reporter's call. After the story appeared the next day however, I received a call from Mr. Gorence indicating that the U.S. Attorney had also gotten a call from the Journal seeking confirmation that I had filed a fraudulent affidavit in the Spivey case. Mr. Gorence indicated that U.S. Attorney Kelly had advised the Journal that if they printed that language, they would likely hear from my attorney. I was never notified before the story came out that the U.S. Attorney had been called.

The rumor that I signed a false affidavit implies that the affidavit prepared by the New Mexico U.S. Attorney's Office should have said more than it did. Whether it in fact should have said more than it did is not an issue that I was then or am now in a position to evaluate. Rather, it is a legal question for which I would even today rely on the guidance of the AUSA on the case. When the AUSAs who condoned and witnessed the alleged disclosure wrote the affidavit without mentioning the disclosure, I relied on their legal judgment that it did not need mentioning. Further, I noted that copies of the affidavit that were faxed to me indicated that they were also being faxed directly to DOJ in Washington, D.C., for review. I reasonably expected that DOJ was being made aware of all of the facts, including the motions that the defense had filed, and knew what I was being asked to sign.

As things have turned out, I feel that I have ended up the "scapegoat" in this matter, a circumstance which I find disheartening and unacceptable. An evidentiary hearing before the court would have established the true state of affairs. But Mr. Gorence made it clear that the New Mexico U.S. Attorney's Office wished to avoid a finding of prosecutorial misconduct at a Kastigar hearing. Because the hearing did not occur, my professional integrity has been unfairly impugned without an opportunity to air all of the facts before the court.

Mr. Gorence has said that the investigation undertaken by the New Mexico U.S. Attorney's office to date has resulted in differing recollections of what transpired in the conversation at Ms. Martinez' home. However, I am firm and unshakable in my recollection of what happened, and I would find it extraordinarily shocking if AUSA Martinez and AUSA McCulloch would not support the truth by admitting that they advised me I could properly make the limited disclosure that I did, and that they wrote the affidavit with full knowledge of exactly what had transpired and knowing exactly what conventions govern such affidavits.

During the week following the plea, First Assistant Gorence advised me that he had prepared a letter detailing the procedural history of the case which he said would be sent to DOJ. Initially, he advised me that U.S. Attorney Kelly had suggested that I be given a copy of the letter. However, once it was completed Mr. Gorence informed me that it was privileged, and that it would not be appropriate for me to have a copy. He indicated that the letter had been sent to Attorney Kirby Heller on the capital case committee of the Criminal Division at DOJ, and that I should direct all future inquiries to her. I placed several calls to Ms. Heller's office, and she did call back to advise me that she is not yet prepared to discuss this matter with me.

I have already been removed from major cases and lost significant income because of the failure of the New Mexico U.S. Attorney's Office to set the record straight, resulting in defamatory rumors and newspaper accounts. This situation is unfair to me and hinders my work and that of the other federal and state prosecutors who are relying on me for assistance in their cases.

For example, shortly after my examination of Mr. Spivey I was referred a second capital case from the New Mexico U.S. Attorney's Office (United States v. DeLa Torre; Case #95-538-MV). Even as the controversy in Spivey was unfolding, I received a contract from the same U.S. Attorney's Office in New Mexico for my services in DeLa Torre. On May 2, 1997 I called to speak with Tom English, the AUSA on the case, and was advised that he had been told by his supervisor that he could not use me.

As another example, I had also been consulting for several weeks on a federal capital case for the New Jersey United States Attorney's Office, United States v. Moses Clary (Case Number 96-576 (J.H.R.)). Records had been sent, and an examination had been scheduled for May 21 and 22, 1997. However, on Friday May 16th, I received a call from AUSA Paul Zoubek of the New Jersey office, informing me that he had heard about the "problem" in New Mexico. He informed me that although he understood that this was probably not my fault, he had conferred with United States Attorney Faith Hochberg, that they both felt that they had to do what was best for their case, and that my services were no longer needed.

I anticipate that left uncorrected, these false and misleading allegations will cause me to lose more work in the future. For example, I have been consulting under contract with the U.S. Attorney's Office for several months as a potential testifying witness in the federal capital case of United States v. Theodore Kaczynski, the alleged "Unabomber." This is obviously an extremely important case, both for the government and for me professionally.

I also have been a regular consultant to the U.S. Attorney's Office in Chicago. I received a call on May 28th from AUSA Dan Gillogly of that office (for whom I am currently consulting in the matter of U.S. v. Dorothy Rivers). He indicated that they had received word through a national meeting of U.S. Attorneys over the Memorial Day weekend in Santa Fe, New Mexico (which he did not personally attend) about the "situation" in the Spivey case, and that he had received copies of the Albuquerque newspaper articles about me. Mr. Gillogly informed me that there had been a meeting of all the AUSAs in the Chicago office who use my services (I have been consulted on at least 10 cases there over the past two years), and that they had decided not to remove me from current cases, in part because they understood that AUSA Martinez was in trouble over this situation. However, Mr. Gillogly also indicated that pursuant to Giglio, the office would have to prepare a letter to be given to defense counsel in any case I am retained on disclosing what had transpired in New Mexico. This concerns me for two reasons. First, having to make such a disclosure can only serve as a disincentive to AUSA's who would otherwise want to retain my services in their cases. But more importantly, I am concerned about what the precise content of such a letter would be.

After seeing the Journal article, a senior colleague from my office called U.S. Attorney Kelly in Albuquerque to discuss the situation. Mr. Kelly apparently advised him that the "good" news was that there had been no judicial finding about how I conducted myself, but that the "bad" news was that the situation would remain ambiguous and may not get resolved in an official fashion, although he said I should be able to explain what happened to the satisfaction of the court. Mr. Kelly stated that it was not his job to determine what happened, but indicated that his office certainly was not telling DOJ that I lied or misled the court. However, Mr. Kelly also advised my colleague regarding the Giglio policy and the need to turn over information about the incident. Finally, he advised that I explain the matter in writing to DOJ if necessary.

It is my understanding that Attorney General Reno's Policy Regarding the Disclosure to Prosecutors of Potential Impeachment Information Concerning Law Enforcement Agency Witnesses ("Giglio Policy") dated 12/9/96 indicates at paragraph 6 that, "Allegations that cannot be substantiated, are not credible, or have resulted in the exoneration of an employee generally are not considered to be potential impeachment information."

Hence, I believe an expeditious exoneration from the Department is imperative. Specifically, I seek a letter from DOJ exonerating me with regard to the disclosure and the affidavit in the Spivey matter, by indicating that I sought,

Case 3:09-cv-03064-MWB-LTS    Document 304-3    Filed 08/10/11    Page 7 of 8

and I followed the AUSA's advice regarding the scope of the judge's order and whether the disclosure could be made to them; that the New Mexico U.S. Attorney's Office wrote the affidavit; that I signed it believing it to be true on the basis of the advice given me by AUSAs Martinez and McCulloch concerning the scope of the protective order; and that I have done nothing wrong.

If receiving this exoneration requires a formal, independent investigation, I would ask your assistance in ordering such an investigation, and I assure you of my fullest cooperation. I feel this is the fair and honorable thing to do, and I hope that you will see it that way, too.

Sincerely,

Daniel A. Martell, Ph.D.

cc: Honorable Mark M. Richard,
    Deputy Assistant Attorney General

    Kirby Heller, Esq.
    Senior Counsel, Office of Policy Development

Case 3:09-cv-03064-MWB-LTS    Document 304-3    Filed 08/10/11    Page 8 of 8