# PROSECUTION MEMORANDUM

**To:**   United States Attorney

**From:**   AUSA Patrick J. Reinert

**Date:**   May 18, 2001

**Re:**   Recommendation That the Death Penalty Be Sought Against Defendant **Angela JOHNSON** and Prospective Defendant **Dustin HONKEN**

Request for Authorization to Seek the Death Penalty Under 18 U.S.C. § 1512 and 21 U.S.C. § 848(e) Against Defendant **Angela JOHNSON** and Prospective Defendant **Dustin HONKEN**.

TIMETABLE:

**IMMEDIATE** -- The trial of **Angela JOHNSON** is set to begin on January 14, 2002.

## I. INTRODUCTION

This memorandum is prepared pursuant to § 9-10.000 of the <u>United States Attorneys' Manual</u> ("the Protocol") which, to promote consistency and fairness in the Department's death penalty decision-making process, charges the United States Attorney, the Attorney General's Review Committee, and the Attorney General with the responsibility to consider whether it is appropriate to seek the death penalty.

This memorandum requests authorization to seek the death penalty under 18 U.S.C. § 1512 and 21 U.S.C. § 848(e) against defendant **Angela JOHNSON** ("JOHNSON") and prospective defendant **Dustin HONKEN** ("HONKEN").

**HONKEN** and **JOHNSON** committed the capital murder discussed herein to further **HONKEN'S** methamphetamine manufacturing and distribution activities. Specifically, **HONKEN** and **JOHNSON** killed three adults and two children in order for **HONKEN** to avoid prosecution for a methamphetamine manufacturing and distribution conspiracy charged in March 1993 to further **HONKEN'S** drug trafficking conspiracy/continuing criminal enterprise. Gregory Nicholson ("Nicholson"), age 34, was a cooperating defendant who made a controlled delivery of currency to **HONKEN** to pay a drug debt. While Honken was on pretrial release, **HONKEN** and **JOHNSON** located Nicholson at the home of Nicholson's friend, Lori Duncan. Duncan had no

** LIMITED OFFICIAL USE **


PLAINTIFFS
EXHIBIT
138

known connection to illegal drug transactions. On July 25, 1993, **HONKEN** and **JOHNSON** went to the Duncan home and forced Nicholson to make a videotape falsely exonerating **HONKEN**. Nicholson; Lori Duncan, age 31; and Lori Duncan's two daughters, Amber Duncan, age 6 and Kandi Duncan, age 10, were taken to a remote location and shot execution style. Their four bodies were buried by **HONKEN** and **JOHNSON** in a mass grave and were successfully hidden (until they were discovered in the fall of 2000). On November 5, 1993, in an effort to further thwart the continuing Grand Jury investigation, **HONKEN** and **JOHNSON** killed Terry DeGeus ("DeGeus"), age 32, a drug co-conspirator of **HONKEN**, to ensure he would not testify before the Grand Jury. **JOHNSON**, who previously dated DeGeus, accompanied DeGeus to a remote location where **HONKEN** waited with a firearm, a baseball bat, and several shovels. DeGeus was unaware that **HONKEN** was waiting at the remote location. **HONKEN** shot DeGeus multiple times and ultimately beat DeGeus to death with the bat. DeGeus's body was buried in a shallow grave. His skeletal remains were recovered in the fall of 2000. The death penalty should be sought because this case involves the murder of multiple federal witnesses and potential witnesses to prevent testimony in federal trial and the Grand Jury. The murders allowed **HONKEN** to avoid the consequences of his criminal conduct and to allow **HONKEN** and **JOHNSON** to continue drug trafficking activities. The death penalty is also appropriate because of the child victims and their mother, who were innocent third parties, and the exceptionally heinous method of the murders. As to **HONKEN**, there is information that, while in custody, he has continued to attempt to eliminate a prosecutor and other witnesses; therefore, he has shown a high level of future dangerousness.

## II. FEDERAL INTEREST

A.    Relative Strength of State/Federal Interest

1. Nature of the potential capital offenses

In March 1993, a Northern Iowa drug investigation revealed the relationship of **HONKEN** with Nicholson and DeGeus. Subsequent investigation revealed the involvement of Tim Cutkomp, Jeff Honken, and others. In a search, over 100 grams of pure methamphetamine was seized from Nicholson's residence in early March 1993. Nicholson cooperated with law enforcement, met with **HONKEN** in a controlled transaction on March 21, 1993, and subsequently testified before the Grand Jury. During the controlled meeting, **HONKEN** quoted the price for a kilogram of methamphetamine and other matters. **HONKEN** was subsequently charged with a methamphetamine trafficking conspiracy in violation of 21 U.S.C. § 846. **HONKEN** was subject to a 10-year mandatory minimum penalty. **HONKEN** was released on pretrial release with the special condition that he have no contact with cooperating witness

** LIMITED OFFICIAL USE **

Nicholson. On July 25, 1993, **JOHNSON** and **HONKEN** located Nicholson at the home of Lori Duncan, along with Lori Duncan and Duncan's two small children. Nicholson was forced to make a videotape in which Nicholson exonerated **HONKEN**. After the videotape was completed, **HONKEN** and **JOHNSON** took Nicholson, Lori Duncan, Amber Duncan, and Kandi Duncan to a secluded area near Mason City, Iowa. At that secluded location, **HONKEN** murdered Nicholson, Lori Duncan, Amber Duncan, and Kandi Duncan with a firearm purchased by **JOHNSON**. Each of the victims was shot in the back of the head and killed execution style by **HONKEN**. **JOHNSON** assisted by controlling the children while **HONKEN** killed the adults. All four victims were buried together in a shallow mass grave. **HONKEN** and **JOHNSON** have each made admission about their murder of Nicholson and the Duncan family. The mass grave was found and the victims' skeletal remains recovered in the fall of 2000. Because of Nicholson's disappearance, the initial charges against **HONKEN** were ultimately dismissed.

The federal Grand Jury continued its investigation into the drug trafficking relationship of **HONKEN** with DeGeus and others. In the fall of 1993, DeGeus began to express to his mother and others his concerns that he would be charged or called before the federal Grand Jury. **JOHNSON** was called before the Grand Jury on October 27, 1993. On November 5, 1993, **JOHNSON** called DeGeus and left a message that DeGeus was to meet **JOHNSON** that evening. DeGeus left to meet **JOHNSON** and never returned. Both **HONKEN** and **JOHNSON** have made admissions in which they each detail the shooting and murder of DeGeus. **JOHNSON** lured DeGeus to a remote location where she knew **HONKEN** was waiting. **HONKEN** had a firearm and a bat which he used to kill DeGeus. DeGeus' skeletal remains were recovered from a shallow grave in rural Mason City, Iowa, in the fall of 2000.

2. **Identity of Offenders**

    a.    Dustin **HONKEN**

    b.    Angela **JOHNSON**

3. **Identity of Victims**

    a.    Gregory Nicholson, cooperating witness, previously a drug co-conspirator of **HONKEN**

    b.    Lori Duncan, friend of Nicholson, witness to **HONKEN'S** illegal contact with Nicholson, potential witness about **HONKEN** and **JOHNSON**'s criminal conduct directed at Nicholson, Amber Duncan, and Kandi Duncan

** LIMITED OFFICIAL USE **

c.     Amber Duncan, six-year-old daughter of Lori Duncan, witness to **HONKEN**'s illegal contact with Nicholson, potential witness about **HONKEN** and **JOHNSON'S** criminal conduct directed at Nicholson, Lori Duncan, and Kandi Duncan.

d.     Kandi Duncan, ten-year-old daughter of Lori Duncan, witness to **HONKEN'S** illegal contact with Nicholson, potential witness about **HONKEN** and **JOHNSON'S** criminal conduct directed at Nicholson, Lori Duncan, and Amber Duncan.

e.     Terry DeGeus, potential grand jury witness, previously a drug co-conspirator of **HONKEN**

## 4. The Investigation Was Conducted Primarily:

a.     As part of an OCDETF investigation (Forseti's Quest, WCIAN 051) sponsored by the federal Drug Enforcement Administration ("DEA") in concert with the Iowa Division of Criminal Investigation ("Iowa DCI"), the Iowa Division of Narcotics Enforcement ("Iowa DNE") and the Federal Bureau of Investigation (FBI).

b.     Informants and cooperating witnesses were developed by both federal and state authorities to jointly investigate and prosecute this matter.

c.     The federal Grand Jury was used extensively from 1993 through the present to develop the investigation.

## 5. The Prosecution May:

a.     Lead to the disclosure of other violations which are peculiarly within the federal jurisdiction, specifically CCE Murder (21 U.S.C. § 848(e)), use of a firearm (18 U.S.C. § 924(c)), false statements and perjury (18 U.S.C. §§ 1001, 1621, 1622, and 1623), other related offenses, and the disclosure of other violations which are with the state's jurisdiction; specifically, murder in violation of Section 707.2, Code of Iowa.

b.     Assist in an ongoing investigation by federal or state authorities into drug-related criminal conduct in North Central Iowa.

\*\* LIMITED OFFICIAL USE \*\*

**B.      The Extent to Which the Criminal Activity Reached Beyond the
Local Jurisdiction**

1.   The drug-related criminal conduct involved conduct in Arizona, Iowa, and
Minnesota. The conduct involved the procurement of chemicals and other raw
materials to produce methamphetamine in both Arizona and Iowa for redistribution in
Northern Iowa and Southern Minnesota. The potential capital offenses were directly
related to these offenses and were conducted specifically so **HONKEN** could avoid
criminal responsibility for the drug crimes and continue his illegal drug activities.

2.   **HONKEN**'s drug trafficking organization and the murder of the five
individuals had a significant impact on the District.

3.   The five murders occurred in the Mason City, Iowa, area, within the
Northern District of Iowa.

4.   Evidence has been procured using Grand Jury subpoenas from various
individuals, chemical distributors, banks, federal prisons, credit card companies, and at
numerous locations outside of the district.

5.   The victims were killed because of their status or potential status as
witnesses in the federal drug investigation.

**C.      Relative Ability and Willingness of the State to Prosecute Effectively**

1.   The state has assigned an Assistant Attorney General and a state
DCI Agent to assist in the investigation and prosecution of this case.

2.   The state lacks the investigatory, prosecutorial and judicial resources
necessary to undertake prosecution promptly and effectively. This is a complex case
stretching over a number of years and involving multiple federal criminal acts. The drug
case began as a federal matter and the homicide investigation was conducted with
extensive use of federal tools, including the Grand Jury. This case will require a
prosecution team. Federal authorities can provide more adequate resources to
undertake this prosecution.

**D.      Legal or Evidentiary Problems That Might Attend Prosecution:**

1.   The investigative procedures used were almost exclusively federal (Grand
Jury, use immunity, witness protection). **HONKEN**'s status as a federal inmate has
resulted in additional Grand Jury subpoenas being needed and the use of witness
protection and separation to protect inmates who have heard **HONKEN's** admissions.

** LIMITED OFFICIAL USE **

The federal procedures were critical in making this investigation successful.

2. State's evidentiary rules – such as those concerning "similar act" evidence (404(b)), co-conspirator hearsay (801(d)), and accomplice testimony are more limiting and present a potential impediment to a successful prosecution. Federal evidentiary rules and additional charges available are expected to make more evidence of **JOHNSON and HONKEN'S** misconduct admissible. Recently, the Iowa Supreme Court found the exclusionary rule under the Iowa Constitution does not have a good faith exception, like *Leon*, which could constrain a state prosecution of this matter.

3. While incarcerated on the instant offense, **JOHNSON** made admissions to Robert McNeese ("McNeese"), another federal inmate. **JOHNSON'S** admissions detailed her involvement in the murders of each of the victims. Ultimately, **JOHNSON** drew a map to the locations of the five bodies which led to the recovery of the bodies. **JOHNSON'S** admissions to McNeese and the evidence derived therefrom are the subject of a motion to suppress on a *Massiah* claim. The recent case of *Texas v. Cobb*, 121 S. Ct. 1335 (2001) will allow **JOHNSON** to be charged on new offenses, including Title 21, United States Code, Section 848(e), and the use all of her admissions, including any information potentially suppressed after the *Massiah* hearing.

4. **HONKEN** was previously prosecuted and sentenced on a methamphetamine manufacturing conspiracy occurring between 1993 and 1998, in violation of 21 U.S.C. § 846. This prior conviction will require analysis of the double jeopardy implications to a subsequent prosecution for murder under 21 U.S.C. § 848(e).

5. The murders committed by **HONKEN** and **JOHNSON** occurred in 1993, prior to the effective date of Title 18 death penalty procedures under the Crime Act of 1994. Although the Title 18 murders were always subject to a capital penalty under the statute, the absence of constitutional sentencing procedures may lead to ex post facto litigation.

6. Iowa's accomplice-corroboration rule would impede a successful murder prosecution -- under Iowa law, a defendant cannot be convicted solely on accomplice testimony. Thus, even if the County Attorney were able to investigate the case and obtain the cooperation of accomplices, the state's accomplice-corroboration rule would potentially preclude a successful prosecution.

** LIMITED OFFICIAL USE **

E.     **The Cooperative Attitude Between the State and Federal Officials in This Investigation Enhances the Likelihood of a Successful Prosecution**

### III. OVERVIEW OF THE CASE

A.  Victims

1.  Gregory Nicholson

    a.  Age – DOB: 1/5/69, age at death: 34-years-old
    b.  Nicholson was divorced and had two daughters.
    c.  Nicholson was a co-conspirator of **HONKEN** in the drug trafficking activities. Nicholson was one of **HONKEN'S** primary customers for methamphetamine during early 1993.
    d.  Nicholson was a methamphetamine customer of **HONKEN**. Nicholson had no blood relationship with either **HONKEN** or **JOHNSON**.

2.  Lori Duncan

    a.  Age – DOB: 11/22/61, age at death: 31-years-old
    b.  Lori Duncan was divorced and had two children, listed below.
    c.  Lori Duncan had no involvement in the criminal activity of **HONKEN** and **JOHNSON**.
    d.  Lori Duncan had no relationship to **HONKEN** or **JOHNSON**.
    e.  Lori Duncan had known Nicholson for a very brief time prior to her murder and allowed Nicholson to hide from **HONKEN** at her residence.

3.  Kandi Duncan
    a.  Age – DOB: 6/10/83, age at death: 10-years-old
    b.  Kandi Duncan was an unmarried child.
    c.  Kandi had no involvement in criminal activities.
    d.  Kandi had no relationship to **HONKEN** or **JOHNSON**.

4.  Amber Duncan
    a.  Age – DOB: 7/16/87, age at death: 6-years-old
    b.  Amber Duncan was an unmarried child.
    c.  Amber had no involvement in criminal activities.
    d.  Amber had no relationship to **HONKEN** or **JOHNSON**.

\* \* LIMITED OFFICIAL USE \* \*

     5.    Terry DeGeus
        a.    Age – DOB: 11/19/60, age at death: 32-years-old
        b.    Terry DeGeus was divorced and had one child.
        c.    DeGeus was a coconspirator of **HONKEN** in the drug trafficking activities. DeGeus was one of **HONKEN'S** primary customers for methamphetamine during early 1993.
        d.    DeGeus was a methamphetamine customer of **HONKEN**. DeGeus had no blood relationship with either **HONKEN** or **JOHNSON**. DeGeus was formerly the boyfriend of **JOHNSON**. **JOHNSON** began dating **HONKEN** in early 1993.

## B.     The Background of the Offense

1. <u>Nexus</u>: **HONKEN** was the organizer or leader of a methamphetamine manufacturing and distribution conspiracy involving five or more individuals, including Gregory Nicholson, Terry DeGeus, Timothy Cutkomp, Jeffery Honken, and others. **HONKEN** was charged with a federal drug conspiracy subject to a 10-year minimum sentence in March 1993 and was released on pretrial release with the special condition that **HONKEN** have no contact with Gregory Nicholson. The first four victims (Nicholson and the Duncan family) were killed to prevent them from testifying against **HONKEN** in his 1993 prosecution. After the murder of Nicholson and the Duncan family, the Grand Jury continued its investigation into **HONKEN'S** drug trafficking organization. **JOHNSON** testified before the Grand Jury regarding her knowledge of the drug trafficking relationship between **HONKEN** and DeGeus a few days prior to DeGeus' murder. DeGeus expressed concern that he would be subpoenaed or arrested immediately prior to his murder. On March 3, 1995, the charges against **HONKEN** were dismissed. **HONKEN**'s drug-related criminal conduct continued until a search of his residence and the seizure of a methamphetamine-producing laboratory on February 7, 1996. After **HONKEN**'s arrest for the new charge, **HONKEN**, with the assistance of **JOHNSON**, sought to find cooperating individuals and also sought to have individuals released from a county jail to harm cooperating individuals. **HONKEN** continued, while in prison, to seek individuals to move the bodies and kill cooperating individuals. **JOHNSON** was indicted on July 26, 2000, and charged with five counts of aiding and abetting a murder of an individual to prevent his/her testimony in violation of Title 18, United States Code, Section 1512, one count of aiding and abetting the solicitation to commit a crime of violence in violation of Title 18, United States Code, Section 373, and one count of conspiracy in violation of Title 18, United States Code, Section 371. **JOHNSON**, while a pretrial detainee, gave McNeese details of the murders so McNeese could find someone to falsely confess to the crimes and **JOHNSON** could be released.

2. Time frame of offenses and predicate or related offenses: 1992 - 2000

** LIMITED OFFICIAL USE **

   3. Geographic area of offenses and predicate or related offenses: The methamphetamine was initially produced in Arizona and distributed in Northern Iowa and Southern Minnesota. The murders occurred in Northern Iowa.

   4. Number of people involved in offense and predicate or related offenses: 5 – 10 individuals (5+ in the drug offenses and additional individuals in the related offenses)

   5. Scope of offense: **HONKEN**'s drug trafficking laboratory in Arizona produced more than 2 kilograms of methamphetamine in 1993 with an approximate street value in Mason City of $200,000 to $300,000 (assuming normal cutting and distribution in 1 ounce quantities). In a telephone call on August 11, 2000, from **HONKEN** in U.S.P. Florence to **JOHNSON's** sister, Holly Dirksen, **HONKEN** stated Jeff Honken made $100,000 in the drug business operated by Dustin **HONKEN**. The methamphetamine was manufactured by **HONKEN** and Cutkomp and delivered with a cutting agent to Nicholson and DeGeus in Mason City. Both Nicholson and DeGeus redistributed the methamphetamine to various customers. Prior to **JOHNSON** becoming involved with **HONKEN** she dated DeGeus and is believed to have been one of his methamphetamine customers. After **HONKEN**'s arrest in 1996, he continued his obstructive conduct while in jail, with the assistance of **JOHNSON**. **HONKEN** sought to have inmates bonded out of jail to kill Timothy Cutkomp ("Cutkomp"), after Cutkomp decided to cooperate. When his efforts to have someone bonded out failed, **HONKEN** and another inmate, Dennis Putzier ("Putzier"), attempted to escape from the county jail and personally continue **HONKEN'S** obstructive conduct. **JOHNSON** assisted while **HONKEN** was a pretrial detainee, by attempting to secure the release of a person **HONKEN** wanted to use as a hit man.

## C.      Summary of Events

   1. In late 1992 through early 1993, **HONKEN** and Timothy Cutkomp manufactured over 2 kilograms of methamphetamine. In the manufacturing operation the methamphetamine was produced in Arizona with the assistance of Jeff Honken and Cutkomp. They sold the methamphetamine to two individuals in Mason City, Iowa: DeGeus and Nicholson. DeGeus and Nicholson sold the methamphetamine to numerous other individuals.

   2. On March 17, 1993, law enforcement officials executed a search warrant on Nicholson's residence and seized more than 148.34 grams of 97% pure methamphetamine (143.89 grams of actual methamphetamine). Nicholson agreed to cooperate and identified **HONKEN** as his source of supply. Nicholson told the officers **HONKEN** was scheduled to come to Mason City and collect currency Nicholson owed to **HONKEN** for methamphetamine.

** LIMITED OFFICIAL USE **

3. On March 21, 1993, Nicholson made a recorded, controlled delivery of $3000 to **HONKEN** to pay a pre-existing drug debt. Immediately after the meeting, **HONKEN** was arrested. Agents seized a drug ledger from **HONKEN** showing debts owed by DeGeus and Nicholson. In the hotel room where **HONKEN** was staying, agents found evidence that **JOHNSON** had been with **HONKEN** the prior evening. **HONKEN** was charged in federal court on a criminal complaint and released on pretrial release with a condition that he have no contact with Nicholson.

4. On April 20, 1993, Nicholson testified before the Grand Jury and **HONKEN** was indicted.

5. In June 1993, **HONKEN** expressed a willingness to enter a plea of guilty to a drug trafficking conspiracy with a 10-year mandatory minimum penalty.

6. On July 3, 1993, **JOHNSON** filed an application to purchase a handgun in Cerro Gordo County, Iowa.

7. On July 7, 1993, **JOHNSON** purchased a Tech-9, 9 mm semi-automatic handgun, serial number 127849, at a pawn shop in Waterloo, Iowa, approximately 90 miles from her home in Mason City, Iowa.

8. On July 25, 1993, **JOHNSON** and **HONKEN** located Nicholson at Lori Duncan's residence in Mason City, Iowa. **JOHNSON** used a ruse to gain entry to the home and allowed **HONKEN** to enter as well. Nicholson, Lori Duncan, Kandi Duncan, and Amber Duncan were held at gunpoint while Nicholson was forced to make a videotape in which he exonerated **HONKEN** of any wrong doing. After completing the videotape, **HONKEN** and **JOHNSON** took Nicholson, Lori Duncan, Kandi Duncan, and Amber Duncan to a rural location near Mason City. At that location, **JOHNSON** kept Amber and Kandi Duncan in the vehicle while **HONKEN** took Nicholson and Lori Duncan into a nearby stand of trees and shot them execution style. **HONKEN** subsequently took Amber and Kandi Duncan to the same location and shot them execution style (signal gunshot in the back of the head). All four victims were buried in a mass grave and were not recovered until over seven years later, in the fall of 2000.

9. On July 30, 1993, **HONKEN** told the court he no longer desired to enter a plea of guilty and his case was set for trial. Due to the unavailability of Nicholson, **HONKEN's** trial was continued indefinitely.

10. At an unknown time between July 1993 and March 1995, **HONKEN** gave a videotape of Nicholson to **HONKEN's** attorney, David Thinnes. This videotape showed Nicholson making statements exonerating **HONKEN**. This tape was subsequently returned by Thinnes to **HONKEN**.

** LIMITED OFFICIAL USE **

11. The Grand Jury's investigation into **HONKEN'S** drug organization continued. On October 27, 1993, **JOHNSON** testified before the federal Grand Jury and was questioned about the drug trafficking relationship between DeGeus and **HONKEN**.

12. On November 5, 1993, **JOHNSON** contacted JoAnn DeGeus, the mother of Terry DeGeus, and requested Terry DeGeus contact **JOHNSON**. Terry DeGeus dropped his daughter, Ashley, off at JoAnn DeGeus' residence, stating he had to meet **JOHNSON** and would return soon. Between 6:30 pm and 7:00 pm DeGeus stopped at Gunther's Grocery Store in Britt, Iowa, where he talked to Rhonda Hanson. DeGeus told Hanson that DeGeus was on his way to Mason City to meet with **JOHNSON**.

13. On November 5, 1993, **JOHNSON** and **HONKEN** met with Terry DeGeus at a remote rural location near Mason City, Iowa, and killed DeGeus. DeGeus was shot multiple times and beaten prior to his death. **HONKEN** and **JOHNSON** buried DeGeus in a shallow grave in a farm field. DeGeus' body was not discovered until in the late fall of 2000.

14. In an interview with a local sheriff's deputy on November 22, 1993, **JOHNSON** admitted meeting with DeGeus on the evening of November 5, 1993.

15. On March 3, 1995, the 1993 federal charges against **HONKEN** were dismissed.

16. In September 1995, a joint state/federal investigation of **HONKEN** began anew. **HONKEN** was suspected of manufacturing methamphetamine at his residence in Mason City, Iowa. Daniel Cobeen ("Cobeen") came to drug investigators and agreed to cooperate in that investigation. Cobeen engaged in monitored, controlled meetings with **HONKEN** and others involved in the manufacturing of methamphetamine. At one point Cobeen was instructed by **HONKEN** that Cobeen had to meet with **JOHNSON** so **JOHNSON** could approve Cobeen working in the methamphetamine lab. As part of the joint investigation, on February 7, 1996, a federal search warrant was executed at **HONKEN's** residence in Mason City, Iowa. Officers recovered a methamphetamine-producing laboratory.

17. On April 9, 1996, Cobeen testified before the federal Grand Jury. The testimony served as part of the basis for the indictment of **HONKEN** and Timothy Cutkomp for conspiracy to manufacture methamphetamine and other related charges. After their arrests for the new offenses, both **HONKEN** and Cutkomp were placed on pretrial release.

18. In May 1996, Cutkomp agreed to cooperate and described **HONKEN'S** plan to destroy evidence and kill individuals involved in his investigation and

** LIMITED OFFICIAL USE **

prosecution, including Cobeen and Iowa DNE Special Agent John Graham. Cutkomp also stated **HONKEN** told Cutkomp that **JOHNSON** was an investor in the Mason City methamphetamine laboratory. Cutkomp began a series of recorded, controlled meetings with **HONKEN** and discussed the plan to destroy evidence and harm individuals, including Cobeen and Special Agent John Graham. **HONKEN** was arrested on June 10, 1996, and his pretrial release was subsequently revoked.

19. During his time on pretrial release, **HONKEN** arranged to obtain a handgun. On June 11, 1996, **JOHNSON** contacted Rick Held and indicated that they would not "need that pup anymore" or words to that effect, thereby canceling the order for the firearm.

20. On June 11, 1996, a search warrant was executed and chemicals used to manufacture methamphetamine were seized from a storage shed at **JOHNSON'S** residence in Mason City, Iowa.

21. On June 13 and 14, 1996, agents obtained documents from **HONKEN'S** locker at Kraft Foods. Among the documents was a page from the Mason City Directory that included the name Graham. SA Graham resides in Mason City. Agents also found numerous papers and magazines relating to firearms and electronics. One document was an order form for books or videos entitled "Full Auto Conversion of the SKS Rifle," "How to Make a Silencer for a .22," "How to Make Disposable Silencers, Vol. II," and "The Ruger 1022 Exotic Weapons System." The order form was in the name of Belen Butterfield. Butterfield told agents that in February or March 1996, she agreed to receive a package at her residence for **HONKEN**. **HONKEN** told Butterfield that he needed to order something and wanted it sent to her residence.

22. Between about June 10, 1996, and February 24, 1998, **HONKEN**, was incarcerated in the Woodbury County Jail. Between June 1996 and August 14, 1996, **HONKEN** met with Dean Donaldson ("Donaldson") and provided instructions to Donaldson for Donaldson to murder Cutkomp. **HONKEN** arranged to have another associate put up bond to obtain Donaldson's release. Donaldson was subsequently released on bail but failed to follow through with **HONKEN's** plan.

23. After Donaldson was returned to state custody in December 1996, Donaldson began to cooperate and provided details about **HONKEN'S** plan to kill Cutkomp. Donaldson stated that **HONKEN** had arranged to provide bail money for Donaldson and solicited Donaldson to kill Cutkomp after Donaldson's release. Donaldson said that he had several documents relating to the plan to kill Cutkomp and had stored the documents. Agents executed a search warrant and obtained the documents. Agents recovered: 1) a letter of introduction to Jay Lien to obtain a hydrogen gas tank Lien was storing for **HONKEN** and which was needed to manufacture methamphetamine; 2) a list of various chemicals and books needed to

** LIMITED OFFICIAL USE **

manufacture methamphetamine, which was dictated by **HONKEN**; 3) a rough map which showed the farm house where Cutkomp's parents lived and locations designated as places for Donaldson to abduct and kill Cutkomp; 4) a calender showing Cutkomp's work schedule; and 5) a handwritten letter of introduction from **HONKEN** to Rick Held (from whom **HONKEN** had arranged to obtain a firearm while on pretrial release), along with other documents. (See witness summary for additional details)

24. After Donaldson returned to jail without killing Cutkomp, **HONKEN** approached Anthony Altimus ("Altimus") for the purpose of killing Cutkomp and Cobeen. Between December 1996 and January 1997, **HONKEN** met with fellow Woodbury County Jail inmate, Andrew Johnson, and agreed to have **JOHNSON** meet with Andrew Johnson's ex-wife, Colleen Birkey ("Birkey"), to obtain cash in trade for a methamphetamine recipe. The cash was to be used to provide bail for Altimus. Between December 1996 and January 1997, **JOHNSON** met with Birkey in the Fort Dodge area and obtained $1000 from Birkey. During about January 1997, **JOHNSON** went to Lederman Bail Bonds in Sioux City, Iowa, and attempted to post bail for Altimus. **JOHNSON** falsely presented herself to Lederman Bail Bonds as a relative of Altimus.

25. Both **HONKEN** and **JOHNSON** made admissions about their involvement in the murders of Nicholson, Lori Duncan, the Duncan children, and DeGeus. Many of these admissions by **HONKEN** were made during discussions in which **HONKEN** was soliciting individuals to join in the conspiracy to kill cooperating individuals so **HONKEN** could be found not guilty or have charges dismissed.

26. After **JOHNSON'S** arrest and detention for the charges set forth in the attached indictment, **JOHNSON** approached fellow inmate McNeese and made various admissions. **JOHNSON** also solicited McNeese's assistance in finding someone to falsely confess to committing the murders of Nicholson, Lori Duncan, Amber Duncan, Kandi Duncan, and Terry DeGeus. See Addendum to prosecution memorandum separately submitted.

D.      **Key Evidence**

1. Significant Cooperating & Uninvolved Witnesses

Frank Stearns, Detective for the Mason City Police Department. On March 17, 1993, Stearns executed a search warrant at the Mason City, Iowa, residence of Nicholson. Approximately five ounces of 97% pure methamphetamine was seized (143.89 grams actual). Also seized were four empty, brown lab bottles containing residue of methamphetamine. Nicholson confessed his involvement in a drug distribution conspiracy and identified **HONKEN** as his supplier. The methamphetamine was delivered by **HONKEN** to Nicholson in the brown lab bottles along with instructions

** LIMITED OFFICIAL USE **

how to cut or dilute the methamphetamine for redistribution. Nicholson stated he had obtained methamphetamine on eight occasions in quantities ranging from 4 to 8 ounces on each occasion. Nicholson agreed to cooperate in the investigation of HONKEN and others.

On March 21, 1993, Nicholson, while wearing a transmitting device, participated in a conversation with HONKEN. Nicholson and HONKEN discussed their methamphetamine distribution conspiracy. During their conversation, HONKEN obtained payment for past deliveries of methamphetamine and identified DeGeus as another distributor for HONKEN in North Central Iowa. They also discussed the price HONKEN would charge for 1 kilogram of methamphetamine. Nicholson gave HONKEN $3,000 in payment for a drug debt. After he completed this transaction, HONKEN was arrested for delivery of a controlled substance. Also arrested was Timothy Cutkomp, an associate of HONKEN, who accompanied HONKEN to the meeting with Nicholson. Seized from HONKEN was a drug note reflecting prior sales to "T-man" (Terry DeGeus) and "G-man" (Greg Nicholson).

David Mizell, Special Agent for DEA. On March 26, 1993, HONKEN was charged in a criminal complaint and appeared in federal court, where he was released on an unsecured signature bond.

On April 20, 1993, Nicholson testified before the federal Grand Jury. HONKEN was indicted later the same day.

On July 8, 1993, through his attorney, HONKEN indicated he desired to plead guilty to the methamphetamine conspiracy charged in the indictment. The negotiated plea would have subjected HONKEN to a federal prison sentence of at least 10 years. HONKEN was scheduled to enter his guilty plea on July 30, 1993. On July 30, 1993, HONKEN informed the United States and the Court that he no longer wanted to plead guilty.

On August 5, 1993, SA Mizell learned that Nicholson had failed to appear for a July 26, 1993, proceeding in Iowa District Court. A federal material witness warrant was issued for the arrest of Nicholson in the case of *United States vs. HONKEN*, but Nicholson was never located.

On October 27, 1993, Angela JOHNSON appeared before the federal Grand Jury. JOHNSON was questioned specifically about HONKEN'S relationships with Nicholson and DeGeus.

In 1995, because of the continued inability to locate Nicholson, charges against HONKEN were dismissed.

** LIMITED OFFICIAL USE **

In the fall of 1995, SA Mizell began an investigation into **HONKEN'S** new methamphetamine laboratory in Mason City, Iowa. On February 7, 1996, a search warrant was executed on **HONKEN'S** residence and a methamphetamine producing-laboratory was seized.

In 1998, **HONKEN** was convicted of a felony drug conspiracy. Since the spring of 1998, **HONKEN** has been an inmate of the United States Penitentiary in Florence, Colorado ("USP Florence").

Gregory Nicholson (Grand Jury testimony)(deceased). Gregory Nicholson testified before the Grand Jury on April 20, 1993. Nicholson indicated he had met **HONKEN** in the summer of 1991 through Scott Gahn. Gahn introduced Nicholson to **HONKEN** because **HONKEN** had some marijuana he was attempting to sell. Nicholson purchased marijuana from **HONKEN** soon thereafter. Between the summer of 1991 and the summer of 1992, Nicholson purchased marijuana from **HONKEN** three to four times. The largest quantity of marijuana Nicholson purchased from **HONKEN** was 8 to 10 pounds of marijuana. Nicholson purchased marijuana from **HONKEN** on credit and paid **HONKEN** back after Nicholson had sold the substance. Beginning in the summer of 1992, Nicholson began to purchase methamphetamine from **HONKEN** Nicholson purchased 3 to 5 ounces of methamphetamine on each occasion. The methamphetamine would be packaged in brown laboratory jars. **HONKEN** also provided inositol, a white powder cutting agent, to Nicholson to mix with the methamphetamine in a 50/50 mix before it was sold. **HONKEN** fronted the methamphetamine to Nicholson so Nicholson could resell it. **HONKEN** charged Nicholson initially $1,600 per ounce and later brought the price down to $1,200 per ounce of methamphetamine. Nicholson described purchasing methamphetamine from **HONKEN** approximately eight times from the summer of 1992 until March 1993. Nicholson stated he obtained 4 to 5 ounces of methamphetamine on two to three occasions and on the last two to three occasions, he obtained between 8 and 10 ounces of methamphetamine. In addition to **HONKEN'S** sale of methamphetamine to Nicholson, **HONKEN** would use Nicholson's residence as a storage location for methamphetamine. **HONKEN** told Nicholson that **HONKEN** had another customer for methamphetamine named Terry DeGeus. On the day Nicholson testified before the Grand Jury, he still owed between $6,000 and $8,000. Nicholson stated that Cutkomp had come to his residence on a few occasions and collected money for **HONKEN**. Nicholson stated when he first had transactions with **HONKEN**, **HONKEN** was living in the Mason City area, and later **HONKEN** moved to Arizona.

Kristin Thompson (cooperating witness). Prior to **HONKEN'S** charge in March 1993 Thompson knew Terry DeGeus and **JOHNSON**. Thompson knew Terry DeGeus was getting methamphetamine from an out of state source along with powder used to cut or dilute the methamphetamine. Thompson was aware in 1992 **JOHNSON** owed approximately $2,400 to Terry DeGeus for methamphetamine. DeGeus told

** LIMITED OFFICIAL USE **

Thompson DeGeus was to pick up methamphetamine from **HONKEN** on the day **HONKEN** was arrested in March 17, 1993.

Melissa Friesenborg, former girlfriend of **HONKEN** (cooperating witness). Melissa Friesenborg met **HONKEN** through Cutkomp and moved to Arizona to be with **HONKEN** in November 1992. In January 1993, Friesenborg learned of **HONKEN'S** drug activities when **HONKEN** offered Friesenborg a white powder, he called "crank" (a street term for methamphetamine). In March of 1993, a few days after **HONKEN** was arrested in Iowa, **HONKEN** contacted Friesenborg and told her to destroy glassware **HONKEN** had stored at her apartment. Friesenborg destroyed the glassware as instructed.

David Thinnes, Former Attorney for **HONKEN** (Crime Fraud exception to Privilege). David Thinnes is a member of the federal bar and was **HONKEN'S** attorney in 1993. On July 8, 1993, on behalf of **HONKEN**, Thinnes informed the government that Honken intended to enter a plea of guilty. The plea would have subjected **HONKEN** to a federal prison sentence of at least 10 years up to life imprisonment. **HONKEN** was scheduled to enter his guilty plea on July 30, 1993.

On July 30, 1993, **HONKEN** withdrew his offer to plea and demanded a trial. On or about the same date, **HONKEN** provided Thinnes with a videotape, and informed Thinnes that the videotape showed Nicholson exonerating **HONKEN**. On August 2, 1993, Thinnes viewed the videotape. The tape showed a seated adult male talking to the camera. The tape was approximately two to three minutes' duration. The man addressed himself to "Dustin" and apologized for getting Dustin in trouble.

Thinnes advised Assistant United States Attorney Patrick Reinert that he had possession of a videotape of Nicholson exonerating **HONKEN**, but refused the government's request to allow the government to view the tape.

In 1995, because of the continued unavailability of Nicholson, the government dismissed its case against **HONKEN**. Thinnes returned the videotape to **HONKEN**.

Veronica Walton, employee of Duee's Pawn Shop, Waterloo, Iowa. On July 7, 1993, **JOHNSON** purchased an Intratec Tec-9 semiautomatic pistol, serial #127849 at Duee's Pawn Shop. Walton will identify records of that transaction, including an Application and Permit to Acquire Handgun and the sales record. These records are in **JOHNSON'S** name.

Scott Gahn (cooperating witness). Scott Gahn initially met **HONKEN** when **HONKEN** worked at Wellman Industries in North Central Iowa. **HONKEN** approached Gahn about Gahn selling cocaine for **HONKEN**. Gahn suggested **HONKEN** meet Nicholson. **HONKEN** told Gahn he already knew Nicholson and had sold cocaine to

** LIMITED OFFICIAL USE **

Nicholson already. **HONKEN** subsequently moved to Arizona. Later, Gahn realized Nicholson was obtaining methamphetamine from **HONKEN** because Gahn attempted to obtain methamphetamine from Nicholson and Nicholson told Gahn that he was unable to deliver methamphetamine because **HONKEN** was late for a delivery of methamphetamine.

During the summer of 1993, **HONKEN** asked Gahn to tell him the whereabouts of Nicholson. **HONKEN** seemed desperate to find Nicholson.

Phyllis Proscovec, cooperating witness. Phyllis Proscovec was Lori Duncan's next-door neighbor. Duncan had two children: Kandi, age 10, and Amber, age 6. Proscovec cared for the children while Lori Duncan was at work. In mid-July 1993, Greg Nicholson moved into Duncan's home. On the evening of Sunday, July 25, 1993, Proscovec spent approximately two hours at the Duncan residence. Duncan made no comment indicating an intention to leave her home. On Monday, July 26, 1993, Proscovec went to the Duncan house to wake Kandi and Amber. The door was locked. She knocked on both doors, but got no response. When she returned home, Proscovec discovered a note on her door. The note read, "Phyllis, had to leave on short notice, will be in touch shortly. Love, Lori." Proscovec will identify the note.

Marge Milbrath, mother of Lori Duncan, cooperating witness. Lori Duncan and her daughters visited Lori Duncan's parents on July 24, 1993. Lori Duncan made no mention of any intention to leave her home. Nicholson had recently moved in with Lori Duncan.

On the morning of Monday, July 26, 1993, while driving past Lori Duncan's home, Milbrath noticed that the curtains were still drawn, which she found unusual. She again noticed the curtains drawn that afternoon. After speaking with Phyllis Proscovec, Milbrath contacted Lori Duncan's landlord and obtained entry to the house. No one was home. The house was unusually messy, but Milbrath did not notice anything missing. Lori Duncan's car was parked on the street, and Nicholson's truck was in the driveway. Milbrath never again saw or heard from her daughter or grandchildren.

In June of 1995, Milbrath identified two rings that were among personal effects found in a river near Fertile, Iowa, approximately twenty miles from Mason City. Both rings were the property of Milbrath's daughter, Lori Duncan.

Milbrath will identify the two rings which belonged to Lori Duncan.

Cindy Hicok, cooperating witness. Hicok was a friend and coworker of Lori Duncan. Hicok introduced Lori Duncan to Nicholson. Nicholson began seeing Lori Duncan in July 1993. Nicholson moved into Lori Duncan's home approximately one week before July 26, 1993.

* * LIMITED OFFICIAL USE * *

At approximately 6:00 a.m. on Monday, July 26, 1993, Hicok drove to Lori Duncan's home to pick up Lori Duncan on Hicock's way to work. When Lori Duncan did not come out, Hicok went to the door and knocked, but there was no response.

Joshua Miller, Eric Hagen, or Troy Johnson, cooperating witnesses. Miller, Hagen, and Johnson are former residents of Fertile, Iowa. On June 19, 1995, as juveniles, while playing in a river near the town of Fertile, Iowa, Miller, Hagen and Johnson discovered a purse. Inside the purse were two library cards, a picture holder with pictures, two game tokens, several coins, Lori Duncan's driver's license, a woman's friendship ring, and a woman's class ring with the inscription, "Lori Milbrath, Mason City High School, 1980." Everything except the coins and the two rings were thrown back into the river. Ultimately, the rings were turned over to law enforcement.

JoAnn DeGeus, cooperating witness. JoAnne DeGeus is the mother of Terry DeGeus. JoAnne DeGeus saw Terry DeGeus on a daily basis. In the summer and fall of 1993, Terry DeGeus was obsessed with his former girlfriend, Angela JOHNSON. JOHNSON was seeing HONKEN at that time. When Nicholson disappeared, Terry DeGeus became upset. During the fall of 1993, Terry DeGeus anticipated receiving a federal Grand Jury subpoena. Approximately one week before his disappearance, Terry DeGeus asked his mother if a subpoena had arrived. Terry DeGeus acted extremely nervous.

On Friday, November 5, 1993, JoAnn DeGeus received a telephone call from JOHNSON. JOHNSON asked Mrs. DeGeus to have Terry call her. When Terry DeGeus stopped at her house after work that day, Mrs. DeGeus gave him the message to call JOHNSON. Later that evening, Terry DeGeus delivered his daughter, Ashley, to Joanne DeGeus' home. Terry DeGeus stated that he was going to meet JOHNSON, and that Ashley could wait up for him to return. Terry DeGeus then left. She has not seen or heard from her son since that time.

JoAnne DeGeus later called JOHNSON and accused JOHNSON of knowing what happened to Terry DeGeus. JOHNSON claimed Terry DeGeus never showed up.

Ashley DeGeus, cooperating witness. Ashley DeGeus is the daughter of Terry DeGeus. Ashley DeGeus remembers the day her father disappeared. She was 10-years-old at the time. She had been planning to spend the weekend with her dad. That evening, her father told her he had to go to JOHNSON'S house because JOHNSON wanted to talk to him. He was also planning to pick some things up from JOHNSON. Ashley often went with her father to JOHNSON'S residence and remembers JOHNSON having a daughter approximately her age. But on this occasion Terry DeGeus left her with her grandparents, saying he would return by 12:30 am.

** LIMITED OFFICIAL USE **

Ashley got frightened when 12:30 a.m. passed and her father did not return. Ashley awoke her grandparents. Nothing like this had ever happened before with her father. She never again saw or heard from her father.

Sometime in the winter of 1993, Ashley called **JOHNSON** to ask about her father. **JOHNSON** claimed he had never showed up that night.

Rhonda Hanson, cooperating witness. Hanson was a friend of Terry DeGeus. Hanson saw DeGeus at a Britt, Iowa, grocery store at approximately 7:00 p.m. on November 5, 1993. DeGeus told her that he was going to Mason City to see **JOHNSON**. Hanson has not seen or heard from DeGeus since that occasion.

Sherri Kunkel, cooperating witness. Kunkel knew both DeGeus and **JOHNSON** during the time DeGeus and **JOHNSON** were dating. **JOHNSON** gave methamphetamine to Kunkel for Kunkel's use on three to four occasions.

Wendy Jensen, cooperating witness. Jensen is Terry DeGeus' ex-wife. Jensen's daughter, Ashley, visited her father, Terry DeGeus, on most weekends. Ashley was with her father on November 5, 1993. Following DeGeus' disappearance, Jensen telephoned **JOHNSON** to inquire about **JOHNSON'S** meeting with DeGeus on the evening of his sudden disappearance. **JOHNSON** denied that DeGeus showed up. Jensen questioned **JOHNSON** further, at which point **JOHNSON** admitted that DeGeus had stopped to see her that night, but claimed that DeGeus had then left to go to Mason City to visit friends.

Jensen has not seen or heard from DeGeus since November 5, 1993.

Robert Gerdes, Sheriff of Hancock County. On November 10, 1993, Ed DeGeus reported his son missing. On or about November 22, 1993, Gerdes interviewed **JOHNSON**. **JOHNSON** told then Deputy Gerdes that on November 5, 1993, she came out of work at the Mason City Country Club to find DeGeus waiting for her, parked beside her car. **JOHNSON** said she got in the car beside DeGeus. **JOHNSON** said that they talked about her October 26, 1993, federal Grand Jury testimony. **JOHNSON** said that she then told DeGeus that she was tired and wished to leave. According to **JOHNSON**, DeGeus said that he was going to Mason City, where he had things to do and people to see. **JOHNSON** reported that DeGeus then left and that she has not seen him since.

Daniel Cobeen, cooperating witness (immunized in drug case). In October, 1995, Daniel Cobeen, a co-worker of **HONKEN** at Kraft Foods, reported that **HONKEN** solicited Cobeen's involvement in a methamphetamine manufacturing and distribution business. Iowa DNE Special Agent John Graham asked Cobeen to cooperate in an

investigation. Cobeen agreed to help. Cobeen's cooperation provided information that led to the 1996 arrest and eventual conviction of **HONKEN** and Cutkomp on federal drug charges.

While Cobeen was working undercover for DNE, **HONKEN** told Cobeen that **HONKEN'S** 1993 charges had been dismissed after the witnesses against him disappeared. **HONKEN** stated that these witnesses "will not be heard from again." **HONKEN** bragged to Cobeen that he knows how to get rid of people, and that he had made Nicholson disappear. **HONKEN** also made admissions about his earlier methamphetamine production in 1993 in Arizona.

Cobeen worked for **HONKEN** in the clandestine methamphetamine laboratory and helped Cutkomp and **HONKEN** obtain necessary chemicals for the production of methamphetamine. He also helped **HONKEN** establish a mail box drop under a false business name of Cytomex. **HONKEN** described **JOHNSON** as an investor in the methamphetamine laboratory, having invested $2500 to $3000.

Timothy Cutkomp, cooperating drug defendant witness. Timothy Cutkomp is a former friend and drug associate of **HONKEN**. Cutkomp assisted **HONKEN** in the manufacture of methamphetamine in Arizona for sale to Nicholson and DeGeus. After **HONKEN** and Cutkomp were arrested in 1993, **HONKEN** discussed the possible effect on their cases if Nicholson and DeGeus did not testify. After Nicholson's disappearance, **HONKEN** became concerned that DeGeus might talk to the Grand Jury.

In 1993, **HONKEN**, in conversation with Cutkomp, described a detailed "hypothetical" in which Nicholson was forced to make a videotape exonerating **HONKEN**, after which Nicholson, his girlfriend, and her daughters were all killed. **HONKEN** asked Cutkomp to deliver a videotape to authorities and to claim that Cutkomp had received it from Nicholson. Cutkomp refused **HONKEN'S** request. In later conversations with Cutkomp, **HONKEN** described how **HONKEN** found Nicholson through Scott Gahn.

**HONKEN** told Cutkomp that Nicholson, Duncan, and her children were buried far away and deep enough that **HONKEN** was not worried about the frost causing the bodies to surface. **HONKEN** said that DeGeus was buried nearby and **HONKEN** was worried about the frost causing his body to surface. **HONKEN** also asked Cutkomp if he knew how deep farm equipment went into the soil. **HONKEN** talked about getting a backhoe and kiln, digging up the bodies and then burning them to completely destroy the remains.

** LIMITED OFFICIAL USE **

During the winter of 1993 - 1994, following the disappearance of DeGeus, HONKEN brought a large black handgun to Cutkomp. Cutkomp's description of the firearm is consistent with a Tech-9 handgun. At HONKEN's request, Cutkomp used his father's welding equipment to cut up and melt the gun. Cutkomp and HONKEN then disposed of the scrap by strewing it along a ditch in rural Hancock County. Years later, Cutkomp led investigators to the ditch, where they succeeded in locating a small portion of the melted metal. Cutkomp is unfamiliar with firearms, but drew a picture of the weapon for investigators.

On February 7, 1996, a search warrant was executed at the Mason City residence of HONKEN. On April 9, 1996, HONKEN and Cutkomp were indicted in federal court for manufacturing methamphetamine. HONKEN and Cutkomp were arrested and, shortly thereafter, were once again placed on pretrial release. While free on bond Cutkomp negotiated an agreement to cooperate in the government's investigation of HONKEN. Thereafter, Cutkomp participated in monitored conversations with HONKEN.

After their 1996 arrests, in unmonitored conversations, HONKEN told Cutkomp that they had nothing to worry about if Cobeen disappears. HONKEN said that JOHNSON was urging him to "take care of business."

HONKEN was tape-recorded seeking Cutkomp's assistance in murdering Cobeen, Iowa DNE Special Agent John Graham, and other witnesses against him, including DCI drug analyst Nila Bremer, DEA Special Agent David Mizell, and a DEA chemist. HONKEN said he knew where Special Agent John Graham lived.

During their monitored conversations, HONKEN said that regardless of the situation, one can get out of the problem if he is determined enough or ruthless enough. HONKEN also described how hard it was to handle "last time." HONKEN said that it was very difficult to find them. HONKEN said that one of Nicholson's friends "has a very big mouth."

In June of 1996, HONKEN'S bond was revoked and he was placed in Woodbury County Jail.

Dean Donaldson, cooperating witness (state inmate). Dean Donaldson is a former state prisoner who was housed with HONKEN at Woodbury County Jail from June 1996 through August 1996.

In August 1996, HONKEN approached Donaldson and sought to involve Donaldson in HONKEN's plan to murder Cutkomp and intimidate Cobeen so Cobeen would not testify against HONKEN. During these conversations, HONKEN bragged

** LIMITED OFFICIAL USE **

that he had killed Nicholson, DeGeus, and the Duncans. **HONKEN** gave Donaldson detailed instructions, directions, and the name of someone who could help him obtain a weapon. Most of the information **HONKEN** provided was reduced to writing by Donaldson. Two letters of introduction, however, addressed to **HONKEN'S** girlfriend and the man who **HONKEN** claimed would provide Donaldson with a gun, were written and signed by **HONKEN**.

During their conversations, Donaldson wrote down what **HONKEN** wanted him to do, as **HONKEN** would not write it down for him. **HONKEN** said that his girlfriend, Angie, would kill anyone in a minute. **HONKEN** said that a gun was used to kill this big guy (DeGeus) in Mason City and that DeGeus was taken to an abandoned farm and shot. **HONKEN** said that DeGeus was shot two times and that they do not drop like they do on television. **HONKEN** said that the others were not shot, but rather were strangled with a drop cord. **HONKEN** said that dead bodies are real heavy. **HONKEN** said that **JOHNSON** was with him when he killed the family.

**HONKEN** told Donaldson that **HONKEN** knew someone who had a back hoe and was concerned about the bodies surfacing. **HONKEN** also was concerned about **JOHNSON**, stating her downfall was drugs.

**HONKEN** said that he met the DeGeus at an abandoned farm house. **HONKEN** said DeGeus pleaded and said, "I'll pay you," and was shot again because DeGeus kept approaching **HONKEN**. **HONKEN** said DeGeus used to go with **JOHNSON**. **HONKEN** said that **JOHNSON** had obtained the gun because **HONKEN** was a felon and could not acquire a gun.

**HONKEN** said that his best friend, Cutkomp, had turned on him. **HONKEN** gave Donaldson a description of Cutkomp, Cutkomp's work schedule, a description of his vehicle, and directions to where Cutkomp and his parents lived. **HONKEN** told Donaldson that if he had to, Donaldson should kill the parents also.

**HONKEN** told Donaldson that killing does not bother **HONKEN**. **HONKEN** said that **HONKEN** and **JOHNSON** drove to the house of a witness, and that they killed him in that house. **HONKEN** told Donaldson that it does not bother **HONKEN** to kill children.

**HONKEN** told Donaldson that **HONKEN** had killed four people, including a big guy who owed him $30,000. **HONKEN** said he had also killed a witness against **HONKEN**, a female associate of the witness, and a child.

**HONKEN** told Donaldson that if Cutkomp was not a witness, **HONKEN'S** sentence would go down to about three years. **HONKEN** described how he handled his 1993 charges. **HONKEN** said that he shot DeGeus twice. **HONKEN** described

** LIMITED OFFICIAL USE **

strangling the other four victims. **HONKEN** said that it was **JOHNSON's** idea to murder the victims at the couple's house. **HONKEN** said he buried the first four victims with a backhoe. **HONKEN** expressed concern about the bodies surfacing.

**HONKEN** said that **HONKEN** would have had Cobeen and the others killed if he had not been rearrested. Honked intended to kill Cobeen, the federal prosecutor, a chemist, and **JOHNSON**. **HONKEN** said that he intends to kill the prosecutor and all of his family, and that he has driven past their residence in Cedar Rapids, Iowa.

**HONKEN** told Donaldson that he would arrange for Donaldson's release from jail if Donaldson would agree to carry out the killing of Cutkomp. On August 14, 1996, Donaldson's bond was posted by one of **HONKEN'S** girlfriends, Kathy Rick.

Donaldson failed to carry out his agreement to kill Cutkomp. Approximately three months later, Donaldson failed to appear for a scheduled hearing and was returned to Woodbury County Jail, where **HONKEN** was still being held.

In December 1996, Donaldson instructed his attorney to contact law enforcement authorities. After he was interviewed, Donaldson provided authorities with the location of the documents that he and **HONKEN** had made in preparation for Cutkomp's murder. These documents, which included two letters of introduction written by **HONKEN**, were seized through use of a federal search warrant.

William Dean, cooperating witness (state inmate). During the summer of 1996, William Dean was an inmate housed at the Woodbury County Jail.

Dean was housed in the same cell block as Donaldson and **HONKEN**. Dean heard **HONKEN** offer to bail Donaldson out of jail if Donaldson would agree to do some things for **HONKEN**. Donaldson was supposed to pick up some chemicals for manufacturing methamphetamine. Donaldson was also supposed to "take care" of a witness.

During these conversations, **HONKEN** described how he had used a phone cord to strangle someone. **HONKEN** also made a comment about the weight of a dead person being heavier. Sometime after these conversations, Donaldson was bailed out of jail.

Dan Lederman, cooperating witness. Dan Lederman is the proprietor of Lederman Bail Bonds. In August 1996, he sold a bail bond to Kathy Rick on behalf of Dean Donaldson.

** LIMITED OFFICIAL USE **

May 16, 2001
Page 24

Kathy Rick, cooperating witness. Kathy Rick is a former girlfriend of HONKEN. During 1993, Rick became pregnant by HONKEN. She has maintained a relationship with HONKEN since that time. Also during 1993, another one of HONKEN'S girlfriends (JOHNSON) also became pregnant by HONKEN.

During August 1996, HONKEN asked Rick to post a bail bond for a fellow Woodbury County Jail inmate of HONKEN named Dean Donaldson. Rick complied with HONKEN'S request, placing a lien on her house for that purpose.

Terry Bregar, cooperating witness (federal inmate). Between November 6 and November 20, 1996, Terry Bregar was a federal inmate housed in the Woodbury County Jail. Bregar and HONKEN became acquainted largely due to their common interest in, and incarceration for, methamphetamine manufacturing. Bregar and HONKEN discussed and compared different methods for manufacturing methamphetamine.

During these conversations, HONKEN discussed the methamphetamine manufacturing charges then pending against him. HONKEN said that his best friend had worn a wire (recording device). HONKEN said that the government, through HONKEN's friend, was trying to connect HONKEN with the disappearance of witnesses in 1993. HONKEN said that he had already said too much on tape.

HONKEN told Bregar that HONKEN had been arrested for manufacturing drugs in 1993. HONKEN said that the 1993 case was ultimately resolved because the government ended up with no witnesses. HONKEN said that the witnesses just disappeared. While making this statement, HONKEN used his hand to make the gesture of a pistol being fired.

HONKEN said he had bailed out another inmate to take care of some matters for HONKEN. When HONKEN later learned that the inmate had done nothing, HONKEN became extremely angry and agitated.

HONKEN told Bregar that HONKEN was deeply concerned that JOHNSON could cause him a great deal of problems in addition to the drug case pending against him. HONKEN said that JOHNSON had held up well under interrogation so far, but HONKEN was concerned about JOHNSON'S ability to withstand interrogation in the future.

Anthony Altimus, cooperating witness (state inmate). Anthony Altimus, a/k/a Anthony Bugh, is a former Woodbury County jail inmate. In December 1996, HONKEN approached Altimus and asked Altimus and another inmate to kill Cutkomp for him.

** LIMITED OFFICIAL USE **

HONKEN said that HONKEN had killed three witnesses against him in 1993. Altimus asked for proof. HONKEN had HONKEN'S mother mail newspaper clippings, which HONKEN read to Altimus.

HONKEN said that HONKEN had bonded out Donaldson, who is a "rat." HONKEN offered to bond out Altimus if he would kill Cutkomp. HONKEN wanted to know if Atlimus could kill children, if necessary. Altimus assured HONKEN that Altimus could. HONKEN and Altimus developed a plan to bond out Altimus to kill Cutkomp. JOHNSON was to bond out Altimus and set up the killing. If Altimus could not kill Cutkomp, he was to kill a family member. The scheme fell through when JOHNSON went to D & R Bail Bonds and posed as Altimus' sister but was unable to obtain a necessary cosigner for Altimus' bond.

Anthony Johnson, cooperating witness (state inmate). Between December 1996 and January 1997, HONKEN met with fellow Woodbury County Jail inmate, Andrew Johnson, and agreed to have JOHNSON meet with Andrew Johnson's ex-wife, Connie Birkey, to obtain cash in trade for a methamphetamine recipe. The cash was to be used by HONKEN and JOHNSON to provide bail for Altimus.

Connie Birkey, cooperating witness. Between December 1996 and January 1997, JOHNSON met with Birkey in the Fort Dodge area and obtained $1,000 from Birkey. Birkey met with JOHNSON at the request of her ex-husband, Anthony Johnson.

Rick Angle, cooperating witness. Rick Angle is an employee of D & R Bail Bonds. In December 1996, D&R Bail Bonds of Sioux City, Iowa received a visit from a woman claiming to be the sister of Anthony Bugh (Altimus). The woman offered money for Bugh's bond, but did not succeed in obtaining a bond when she was unable to obtain a cosigner.

Dennis Putzier, cooperating witness (federal inmate). Putzier was a state inmate being held in the Woodbury County Jail in a cell block adjacent to HONKEN during 1996. Putzier was friends with Donaldson prior to HONKEN bonding Donaldson out of jail. Prior to Donaldson being bonded out of jail by HONKEN, Donaldson told Putzier that Donaldson had to "do some things" for HONKEN. After Donaldson was bonded out, HONKEN began sending notes to Putzier by sliding them from HONKEN'S cellblock to the adjoining cellblock where Putzier was housed. HONKEN admitted HONKEN had bonded Donaldson out and was concerned because Donaldson had documents which could be used to harm HONKEN, including a map. During this time, Putzier was in the process of attempting to escape from the Woodbury County Jail by breaking through the exterior wall of his cell. Putzier's progress was slowed when he hit a steel reinforcing bar in the concrete wall. HONKEN told Putzier that HONKEN

** LIMITED OFFICIAL USE **

would find something to cut through the bar. **HONKEN** told Putzier that **JOHNSON** would get a hacksaw blade if necessary. **HONKEN** told Putzier that Putzier could stay with **JOHNSON** after Putzier escaped. **HONKEN** took steps to pick the lock between the cell blocks and break through the wall between the cell blocks so he could escape with Putzier. After **HONKEN'S** attempts to break through to Putzier's cell block were unsuccessful, **HONKEN** told Putzier that **JOHNSON** would assist Putzier after Putzier escaped. **HONKEN** also told Putzier that **HONKEN** needed Putzier to find Donaldson and retrieve **HONKEN'S** papers, and would pay Putzier $10,000 and some unspecified quantity of drugs if Putzier killed Cutkomp for **HONKEN**. **HONKEN** told Putzier that **JOHNSON** knew where Cutkomp lived and would assist Putzier in the murder of Cutkomp. **HONKEN** told Putzier that if Cutkomp were killed the government would have drop its charges, like they did in 1993. Putzier pled guilty to attempting to aid in the escape of a federal prisoner, that is **HONKEN**.

Ronald McIntosh, cooperating witness (federal inmate). Ronald McIntosh was an inmate of the United States Penitentiary in Florence, Colorado, when McIntosh met **HONKEN** when **HONKEN** was first placed in USP Florence after **HONKEN'S** drug sentencing in 1998. McIntosh has a reputation as a jailhouse lawyer. Approximately five months after he met **HONKEN**, **HONKEN** asked McIntosh, "If a guy's dead and you take him across a state line, is it a federal crime?" McIntosh asked **HONKEN** why **HONKEN** would do that, to which **HONKEN** responded, "We didn't know we crossed a state line." **HONKEN** further stated, "We killed them," and "we drove about twenty miles and buried them."

While in federal prison, **HONKEN** became a member of a group known as the Odinists, who are engaged in identifying and intimidating informants within the prison system. In various conversations with McIntosh, **HONKEN** said, "I killed my rats. Everybody should kill their rats." In response to questioning from McIntosh, **HONKEN** said that **HONKEN** had strangled his rats. **HONKEN** said, "I strangled the rat and his girl, and she suffocated the kids because they wouldn't shut up." **HONKEN** further stated, "They were witnesses. I had to kill them."

**HONKEN** advised that he had two girlfriends, and has fathered a child by each. The girlfriend that **HONKEN** describes as a retired stripper was the one who, according to **HONKEN**, suffocated the two children the night **HONKEN** strangled the rat and the rat's girlfriend.

At **HONKEN'S** request, McIntosh typed a letter to a "legal research service" run by a former USP Florence inmate, inquiring whether **HONKEN'S** former attorney could be compelled to testify about a videotape. **HONKEN** told McIntosh that the tape was one that **HONKEN** forced the informant to make before **HONKEN** strangled him.

* * LIMITED OFFICIAL USE * *

HONKEN has also told McIntosh that HONKEN also killed another male on a different occasion. HONKEN said that "they" thought he was an informant. In describing the informants against him, HONKEN said, "We killed them."

In describing the killing of the first four victims, HONKEN said that HONKEN and a female went into a house where the woman and her children were present. HONKEN said that HONKEN did not know the woman and children would be present. HONKEN said that the four bodies were transported and then buried together.

Fredric Tokars, cooperating witness (federal inmate). Fredric Tokars is a former inmate at the United States Penitentiary in Florence, Colorado, where he met HONKEN. Tokars was incarcerated at USP Florence when HONKEN arrived at the institution in late spring or early summer 1998. Tokars is a former attorney serving a life term for the murder of his wife in a federal RICO prosecution. HONKEN approached Tokars and told Tokars that Tokars was someone who could help HONKEN. HONKEN told Tokars that HONKEN had heard that Tokars refused to cooperate with the government and that Tokars had killed witnesses in his own case. Tokars told HONKEN that he never cooperated with the government in his case and never testified against any of his coconspirators.

HONKEN tried to befriend Tokars and eventually asked Tokars to help him with the appeal of his sentence. HONKEN let it be known to Tokars that he was aware of Tokars' case and knew his background and that other prisoners did not need to know about it. Tokars understood this as a form of extortion. Tokars is a former prosecuting attorney and former municipal judge who is serving a life sentence. HONKEN told Tokars details concerning Tokars' prosecution.

HONKEN told Tokars how much like HONKEN Tokars was in that HONKEN had killed witnesses. HONKEN said, "You've murdered witnesses and so have I." HONKEN told Tokars, "I killed the witnesses in my first case and was prepared to kill witnesses in my second case."

HONKEN wanted Tokars to file motions to get HONKEN'S case back in court. HONKEN said HONKEN would kill witnesses involved in HONKEN'S case. HONKEN wanted to have Cobeen killed and have Cutkomp and Donaldson intimidated. HONKEN said that JOHNSON had helped him the last time and would do so again.

HONKEN said his old attorney (David Thinnes) had been subpoenaed to court about a videotape. HONKEN and Tokars talked about the tape and HONKEN provided details as to how it was made. HONKEN stated that the tape was of Nicholson, and that HONKEN had then killed Nicholson. HONKEN said he was

** LIMITED OFFICIAL USE **

concerned about **JOHNSON** cracking and incriminating him in the murders. **HONKEN** wanted Tokars to find someone to kill Cobeen, rebury the bodies, then kill **JOHNSON** to tie up all loose ends.

        **HONKEN** said that in 1993, as his court date was coming up, he had already agreed to plead guilty. **HONKEN** said that he made up his mind he was not going to prison. **HONKEN** decided that he had to make a video and then kill the witness. **HONKEN** said he asked his attorney whether a video, if it existed, would have an impact on his case. **HONKEN** said his attorney indicated it would be helpful, but that he would need someone to authenticate the video. **HONKEN** said he was planning on having Cutkomp authenticate the tape. **HONKEN** said that the other problem identified by his attorney was if Nicholson showed up after the tape was made. **HONKEN** said that he told his attorney, "This guy is not going to show up."

        **HONKEN** told Tokars that **HONKEN** and **JOHNSON** went to a pawn shop, where **JOHNSON** purchased a gun. **HONKEN** said **HONKEN** was concerned that the gun was linked to **JOHNSON**.

        **HONKEN** told Tokars that **HONKEN** had a hard time finding Nicholson. Finally, a friend that kept in touch with Nicholson told **HONKEN** where to find him.

        **HONKEN** said that **HONKEN** and **JOHNSON** went to Nicholson's house with a camera in a duffel bag. **HONKEN** and **JOHNSON** parked down the street and walked to the house looking like a couple on a walk. **HONKEN** said they were easily able to gain entry to the house.

        **HONKEN** was in one room with Nicholson making the tape. **JOHNSON** was with Lori Duncan and the two girls in another room. **HONKEN** said that **HONKEN** forced Nicholson to make the video and that everything was calm up to that point. On the video, Nicholson said that **HONKEN** was not involved in the manufacturing of drugs. **HONKEN** said that after Nicholson made the video, **HONKEN** struck him in the head with the gun, then strangled him with a cord. **HONKEN** said that strangling Nicholson was easy, as Nicholson was unconscious.

        **HONKEN** told Tokars that after **HONKEN** was done with Nicholson, he went into the room with **JOHNSON**. At this point, a commotion started and **JOHNSON** began trying to subdue the girls. **HONKEN** struck Lori Duncan in the head with the gun, which incapacitated her. **HONKEN** said that the girls then began crying. **HONKEN** then strangled Lori Duncan. **HONKEN** said that Lori Duncan did not struggle and they are easier to kill if they are unconscious, as they don't struggle.

\*\* LIMITED OFFICIAL USE \*\*

While **HONKEN** was strangling Lori Duncan, **JOHNSON** was restraining the two girls. **HONKEN** said that **JOHNSON** then began strangling the girls. **HONKEN** said that **HONKEN** helped with this after **HONKEN** finished with Lori Duncan. **HONKEN** described **JOHNSON** as a full participant, fully capable of doing anything **HONKEN** could do.

**HONKEN** said they had to clean up afterward and that it was important to be meticulous. He said they cleaned thoroughly.

**HONKEN** told Tokars that they used **JOHNSON'S** car to transport the bodies.

**HONKEN** said that he had already planned on where to dispose of the bodies. All four bodies were buried in the same hole. The bodies were buried at night. **HONKEN** said that **HONKEN** did not think the bodies were deep enough.

**HONKEN** said that whenever **HONKEN** gets out of prison, regardless of how long that takes, he will kill Cutkomp, Cobeen, and Donaldson. **HONKEN** also said that he wanted **JOHNSON** removed so **JOHNSON** cannot testify against him.

Tokars asked **HONKEN** about Lori Duncan and her daughters. **HONKEN** replied that he did not know they were going to be there and thus, it was not his fault.

**HONKEN** said that when he changed his mind about pleading guilty, Thinnes became concerned. **HONKEN** said that **HONKEN** and Thinnes talked about the video and Thinnes said the tape would not be that helpful if Nicholson walked in and testified it was made under duress. **HONKEN** said that he told Thinnes that would not happen.

**HONKEN** said that **HONKEN**, **JOHNSON**, and Thinnes are the only ones who have seen the videotape. **HONKEN** later got the video back from Thinnes and destroyed it.

Tokars reported that he and **HONKEN** discussed **HONKEN'S** case between August 1998 and December 1998, when Tokars was transferred to a different prison. Throughout their conversations, **HONKEN** was soliciting advice and also seeking help from Tokars in obtaining outside assistance in exhuming and reburying the bodies and killing potential witnesses.

During this period, **HONKEN** also described to Tokars the killing of **JOHNSON**'s ex-boyfriend (DeGeus). **HONKEN** said that **JOHNSON**'s former boyfriend, like Nicholson, had also been selling drugs for **HONKEN**. **HONKEN** described **JOHNSON**'s ex-boyfriend as a biker-type who was an irresponsible type of person. **HONKEN** had gotten word that DeGeus was going to testify against **HONKEN**. **HONKEN** said that **HONKEN** waited as long as he could before taking action about the ex-boyfriend. **HONKEN** said that **JOHNSON** called the former boyfriend on the phone

and lured him to the site by telling him she and **HONKEN** were not getting along and she wanted to meet with him. She also told DeGeus she had some drugs. DeGeus agreed to meet with **JOHNSON**. The meeting was out in the country, on a road where no one would see them. **HONKEN** and **JOHNSON** drove to the scene in her car and arrived before the ex-boyfriend.

According to **HONKEN**, when the ex-boyfriend arrived, **HONKEN** shot and killed him. **HONKEN** said he shot the man a couple of times and he began to beg for his life. The ex-boyfriend thought he was being killed because of money he owed **HONKEN**. After the first shot, according to **HONKEN**, the ex-boyfriend started moving towards **HONKEN**, saying, "Don't worry about the money." The man kept moving towards **HONKEN** and **HONKEN** kept shooting. **HONKEN** said that he shot him because the man was going to testify against him and **HONKEN** didn't think he could strangle him.

**HONKEN** told Tokars that bodies are heavy when they are dead. **HONKEN** told Tokars the ex-boyfriend was big and hard to carry. **HONKEN** told Tokars that the ex-boyfriend was killed, placed in the trunk of **JOHNSON'S** car, transported, and buried all in the same night.

**HONKEN** was not remorseful during any of the conversations about the deaths or the plans to kill others. **HONKEN** maintained to Tokars that being kept from his own kids is a worse crime.

**HONKEN** said that he later destroyed the gun and threw it into a drainage ditch. **HONKEN** said that he took the gun to Cutkomp's father's farm and got Cutkomp to help him cut it with a torch and melt it onto a piece of metal. **HONKEN** said that they destroyed the gun sufficiently so it did not look like a gun.

**HONKEN** told Tokars that **HONKEN** was trying to kill Cobeen while he was out on pretrial on his second charge. **HONKEN** also talked about plans he had to kill Special Agents Graham and Mizell. **HONKEN** said he knew where Special Agent Graham lived, having learned that from a friend at work. **HONKEN** also knew where Cobeen lived and had driven past his house. **HONKEN** said that he was prepared to carry out these killings but was caught and placed back in jail.

**HONKEN** said that **HONKEN** was worried about people **HONKEN** had talked to while in county jail. **HONKEN** said that **HONKEN** had talked to an Anthony Altimus and someone named Putzier. **HONKEN** said **HONKEN** had **JOHNSON** bond someone named Donaldson out of jail to kill Cutkomp. **HONKEN** said that **HONKEN** had provided a plan, a map, detailed information, and access to a gun, but that Donaldson was a drug addict and did not carry through with the plan.

** LIMITED OFFICIAL USE **

Tokars said that Tokars never gave **HONKEN** the name of a hit man, but did admit that he had represented a group known as the Dixie Mafia for fifteen years and this group was involved in guns, methamphetamine, and chop shops. **HONKEN** told Tokars that he wanted Cobeen killed prior to the bodies being moved, as proof that the hit man is legitimate. **HONKEN** said that he did not plan to have **JOHNSON** killed right away.

William LeBaron, cooperating witness (federal inmate). William LeBaron is a federal prisoner currently incarcerated in federal prison. LeBaron is serving four life sentences without the possibility of parole. LeBaron had previously been incarcerated at USP Florence with **HONKEN**, until LeBaron was transferred to another institution in approximately January/February 2000. LeBaron first met **HONKEN** when **HONKEN** was newly arrived at USP Florence. They were both housed in a non-smoking unit together. LeBaron stated that **HONKEN** frequented LeBaron's cell and visited with LeBaron's cell mate Joe Dockerty. LeBaron stated both Dockerty and **HONKEN** were associated with the Odinist group in prison. Regarding the murders, LeBaron stated that **HONKEN** seemed very nervous and talked to numerous individuals in the unit about the murders in Iowa, including Fredric Tokars. **HONKEN** told LeBaron that **HONKEN** was cooking methamphetamine in Arizona and selling the methamphetamine in Iowa. **HONKEN** stated two individuals in Iowa obtained the methamphetamine from **HONKEN** and were witnesses or potential witnesses against him. LeBaron stated that **HONKEN** mentioned one individual's name was Greg and the other was Terry DeGeus. **HONKEN** indicated he had killed Nicholson, Lori Duncan, and Lori Duncan's two children because he did not want to go to prison. **HONKEN** told LeBaron that the first four bodies were on farmland and **HONKEN** described digging the hole for the bodies. **HONKEN** told LeBaron that **HONKEN'S** girlfriend (**JOHNSON**) assisted in digging the hole to bury the bodies. LeBaron stated that **HONKEN** was training in martial arts with another federal prisoner so when **HONKEN** got out of prison he would be able to kill individuals who placed him in prison, including the prosecutors, a DEA agent, and a local police chief in the town where **JOHNSON** was living at that time. **HONKEN** told LeBaron that he desired to kidnap Cutkomp and paralyze Cutkomp with some type of drug so Cutkomp could watch while **HONKEN** and others tortured Cutkomp's family.

Additionally, **HONKEN** told LeBaron that one of the witnesses **HONKEN** had killed had been forced to make a videotape exonerating **HONKEN** prior to the murder. **HONKEN** was worried that **HONKEN'S** attorney would have to testify about the content of that tape and the fact that **HONKEN** had given the tape to the attorney.

**HONKEN** also told LeBaron that he intended to bring individuals back from USP Florence and break out of the county jail where they were to be held until trial.

\*\* LIMITED OFFICIAL USE \*\*

<u>Steven Vest, cooperating witness (federal inmate)</u>. Steven Vest, BOP No. 07767-045, is incarcerated in federal prison, serving a life term for murder while engaged in a continuing criminal enterprise. During 2000, Vest was a cell mate of prisoner Ronald McIntosh. Vest was aware that McIntosh was friends with **HONKEN** and had met **HONKEN** on a few occasions when **HONKEN** visited McIntosh in Vest's cell. While incarcerated in USP Florence, Vest had occasionally provided information to BOP Officials about crimes committed within the prison. After McIntosh was transported out of USP Florence, **HONKEN** approached Vest and told Vest that McIntosh was a cooperator with the government. Over a series of conversations, **HONKEN** made admissions to Vest about **HONKEN'S** involvement in the 1993 murders, detailed **HONKEN'S** future plan to escape from a county jail when he is brought back to the Northern District of Iowa for trial on the 1993 murders, and **HONKEN** invited Vest to join in that plan.

Regarding the plan to escape, **HONKEN** told Vest that **HONKEN** intended to request a number of individuals be brought back from USP Florence to testify as witnesses for him. **HONKEN** believed that he would be incarcerated in the Woodbury County Jail, where he had previously been incarcerated between 1996 and 1998. **HONKEN** described the interior of the jail and the methods used by the jailers to take inmates in solitary confinement to the showers. **HONKEN** had been training in martial arts and planned to use that skill to subdue a guard and take his keys which would allow **HONKEN** to release the rest of the inmates. **HONKEN** then planned to kill guards, obtain firearms, and leave the area of the jail in a vehicle belonging to one of the deceased guards. **HONKEN** then planned to drive south to Omaha, Nebraska, and rob a bank to obtain currency. **HONKEN** then planned to purchase a car and travel through Minnesota to Canada. Once in Canada, they would obtain false identity documents and train in military tactics so they could later re-enter the country and kill Tim Cutkomp, Special Agent William Basler of the Iowa DCI, Special Agent John Graham of the Iowa DNE, Assistant United States Attorney Patrick Reinert, and others. **HONKEN** planned to torture the families of his victims and kill them prior to killing his victims and others so they could be forced to watch the deaths of their families. **HONKEN** then planned to remove the heads of his victims and take them back to Canada with him in order to strike psychological terror into the families of his victims. **HONKEN** also indicated he would take the skulls of his victims and make bowls out of them.

Regarding the 1993 murders, **HONKEN** told Vest that **HONKEN** had been arrested for manufacturing methamphetamine. **HONKEN** stated he manufactured the methamphetamine in Arizona and brought it to Iowa for resale. **HONKEN** identified two customers as Terry DeGeus and Gregory Nicholson. **HONKEN** stated at one point DeGeus owed $30,000 to **HONKEN** and **JOHNSON** was dating DeGeus and brought $10,000 to **HONKEN** from DeGeus. During that meeting, **JOHNSON** told **HONKEN**

** LIMITED OFFICIAL USE **

that in fact, **JOHNSON** was selling the drugs for DeGeus. **JOHNSON** and **HONKEN** then struck up a personal relationship and **JOHNSON** began to date **HONKEN**. On the day of his arrest in 1993, **HONKEN** stated that Nicholson wore a recording device and that people had been arrested for drug trafficking in Minnesota. After his arrest and subsequent release, **HONKEN** and **JOHNSON** determined that the only way for **HONKEN** to avoid responsibility for his drug trafficking conduct was to kill Greg Nicholson. **HONKEN** stated **JOHNSON** held Nicholson hostage and **HONKEN** then came into the residence and made a videotape in which Nicholson exonerated **HONKEN**. They then directed the woman in the residence to write out a note to a neighbor indicating they had to leave. **HONKEN** and **JOHNSON** then took Nicholson and the woman (Lori Duncan) to a field where they were shot. During the time when Nicholson and Duncan were shot, **JOHNSON** was with Amber and Kandi Duncan. At the sound of the gunshots, the children became frightened and **HONKEN** stated that **JOHNSON** told the children not to be frightened, that they were just firecrackers. **HONKEN** then returned to the car where **JOHNSON** was with the children, took the children, and shot them in the back of the head. **HONKEN** and **JOHNSON** then buried all the victims in a common grave. **HONKEN** explained that he had to kill the Duncan family along with Nicholson because they were all witnesses or potential witnesses against him.

**HONKEN** told Vest that after the murders of Nicholson and the Duncan family, **HONKEN** stated he was concerned about DeGeus cooperating with the authorities. **HONKEN** expressed his concerns to **JOHNSON**. **JOHNSON** was still in contact with DeGeus so they decided to murder DeGeus. **JOHNSON** called DeGeus and lured him to a remote area near Mason City. **HONKEN** was at the location when **JOHNSON** and DeGeus arrived, with a pistol. DeGeus began to talk to **HONKEN** about the $30,000 debt that he owed to **HONKEN**. **JOHNSON** then got into the car and told **HONKEN** she was cold. **HONKEN** stated he took this as guidance from **JOHNSON** to complete what they had planned to do. **HONKEN** stated he told DeGeus that **HONKEN** was worried about DeGeus telling the authorities about their drug trafficking relationship. **HONKEN** shot DeGeus multiple times and heard DeGeus still moaning and alive. **HONKEN** then went to the car and got an aluminum baseball bat which he had purchased for the purpose of beating DeGeus. **HONKEN** took the bat and beat DeGeus until **HONKEN** was so tired he could not lift his arms and beat him any further. **HONKEN** stated that **HONKEN** then got Johnson to assist in pulling DeGeus' body out into the field where it was to be buried. When they first went to pull the body, DeGeus made a sound and was apparently still alive. **HONKEN** took a shovel and ultimately finished murdering DeGeus. **HONKEN** and **JOHNSON** then dragged DeGeus out and buried him in the field. **HONKEN** and **JOHNSON** took DeGeus' car to a car wash to remove any blood spatters from the exterior of the vehicle and left it at a location where it could be easily found. **HONKEN** stated at the time of the murder of DeGeus, **JOHNSON** was four to five months pregnant with **HONKEN'S** child. **HONKEN** stated that he later melted down the firearm he used in the murders.

** LIMITED OFFICIAL USE **

Robert McNeese, cooperating witness (federal inmate). Robert McNeese is a federal prisoner formerly housed in the same facility as **JOHNSON** after her arrest in July 2000. During the course of his contact with **JOHNSON**, **JOHNSON** solicited McNeese's assistance in finding someone to falsely confess to the murders of Nicholson, Lori Duncan, Amber Duncan, Kandi Duncan, and Terry DeGeus. **JOHNSON** provided McNeese with details of the murders and the location of the bodies. For additional details see the addendum drafted by the segregated investigative team (Taint team). This team was developed to handle the information from McNeese, since **JOHNSON** was a represented person at the time of her contact with McNeese.

J.D. Smith, Special Agent Iowa Division of Criminal Investigation. See, Taint team Addendum.

Dennis Klein, M.D., forensic pathologist. See Taint team Addendum.

Julia Goodin, M.D., forensic pathologist. See Taint team Addendum.

Dawnie Steadman, forensic anthropologist. Steadman examined the five skeletons recovered. See Taint team Addendum.

Vic Murillo, criminalist, Iowa State Crime Laboratory. Murillo is a firearms examiner. See Taint team Addendum.

Christi Gaubatz, cooperating witness. Christi Gaubatz is a former friend of **JOHNSON**. During and prior to 1994, Gaubatz and **JOHNSON** were best friends. They both resided in Clear Lake, Iowa, and often spent time together. Gaubatz also frequently baby-sat for **JOHNSON**.

During the early to mid-summer of 1993, Gaubatz baby-sat for **JOHNSON** on a daily basis, while **JOHNSON** and **HONKEN** went looking for Nicholson. **JOHNSON** and **HONKEN** regularly returned at approximately midnight.

One night during the summer of 1993, **JOHNSON** and **HONKEN** asked to borrow Gaubatz's car. Gaubatz agreed to let them do so. On this occasion, **JOHNSON** and **HONKEN** did not return until approximately 5:00 a.m. When they did return, Gaubatz was lying in the dark on the living room couch. **HONKEN** and **JOHNSON** whispered to each other, then went to the bathroom, where both **HONKEN** and **JOHNSON** showered. After that night, **JOHNSON** and **HONKEN** ceased looking for Greg Nicholson.

** LIMITED OFFICIAL USE **

During the fall of 1993, **JOHNSON'S** relationship with DeGeus worsened. DeGeus had been physically abusive to **JOHNSON** in the past and had stalked **JOHNSON** since their breakup. **JOHNSON** confided in Gaubatz that **JOHNSON** was pregnant by **HONKEN** and that she feared for her safety should DeGeus discover that fact. At **JOHNSON'S** request, Gaubatz accompanied **JOHNSON** to a meeting with DeGeus at a Mason City fast-food restaurant. Gaubatz waited in the car while **JOHNSON** and DeGeus met. Gaubatz could see that **JOHNSON** and DeGeus were arguing. After **JOHNSON** returned to the car, **JOHNSON** stated, "He can't be around, anymore." Shortly thereafter, DeGeus disappeared.

In late 1993, following DeGeus's disappearance, Gaubatz noticed a cosmetics bag, which did not belong to Gaubatz, in one of the closets in Gaubatz's home. Gaubatz opened the bag and observed a large black handgun. Gaubatz immediately telephoned **JOHNSON** and demanded that **JOHNSON** retrieve the gun. Gaubatz believed the gun was **JOHNSON'S**, as **JOHNSON** was the only other person who had ready access to Gaubatz's home. **JOHNSON** immediately went to Gaubatz's house and took the gun.

Early in 1994, Gaubatz received a telephone call from **JOHNSON**. **JOHNSON** was crying and asked Gaubatz to come to **JOHNSON'S** home. After Gaubatz arrived, **JOHNSON** told Gaubatz that **JOHNSON** had something she needed to "get off her chest." **JOHNSON** asked Gaubatz if Gaubatz recalled a night the previous summer (1993) when **JOHNSON** and **HONKEN** had borrowed Gaubatz's car. Gaubatz did remember that night. **JOHNSON** stated that on the night in question, **JOHNSON** and **HONKEN** went to a residence in Mason City. **OHNSON** stated that **JOHNSON** had posed as a cosmetics sales representative and gained entrance to the Duncan house by claiming to be lost and needing to use a telephone. **JOHNSON** stated that as soon as she entered the home, **HONKEN** followed her inside, armed with a gun. **JOHNSON** said Nicholson was at the house with a woman and two children. **JOHNSON** said **HONKEN** forced Nicholson to make a videotape. **JOHNSON** said **HONKEN** then forced the four people to travel with **HONKEN** and **JOHNSON** to a wooded location in the country. **JOHNSON** then described **HONKEN** taking first Nicholson, then the woman, then the two children from the car and shooting and killing them one at a time. **JOHNSON** said that the four victims were then buried together at that location. **JOHNSON** was extremely emotional as she described these events.

Later in 1994, **JOHNSON** also confided to Gaubatz that **JOHNSON** and **HONKEN** had also killed DeGeus. **JOHNSON** said **JOHNSON** had met DeGeus at a location in the country where **HONKEN** was waiting, armed with the handgun. **JOHNSON** described DeGeus as being very hard to kill. **JOHNSON** was not nearly as emotional when she described DeGeus' murder.

** LIMITED OFFICIAL USE **

2. Significant Physical and Forensic Evidence - Ballistics, Fingerprints, DNA, etc.

a. Application and Permit to Acquire Handgun

b. Sales Receipt, Duee's Pawn Shop

c. Handwritten note addressed to "Phyllis" left on door July 25, 1993

d. Woman's friendship ring

e. Woman's class ring with inscription, "Lori Milbrath, Mason City High School, 1980"

f. Audiotape of May 24, 1996, conversation between Cutkomp and **HONKEN**

g. Audiotape of March 17, 1993, meeting between Nicholson and **HONKEN**

h. Note seized in March 1993, reflecting drug debt of Nicholson and DeGeus

i. Grand Jury transcript of **JOHNSON**

j. Grand Jury transcript of Nicholson

k. 1993 federal release conditions imposed on **HONKEN**

l. Map locating DeGeus grave and Nicholson/Duncan grave

m. Bullet(s) recovered from scene or skull of any of the victims

n. Physical evidence in possession of Taint team

o. Forensic examination/reports

p. Letters of introduction for Dean Donaldson

q. Records from drug companies for the production of methamphetamine by **HONKEN**

r. Lab reports on drug production and seized drugs in 1993.

** LIMITED OFFICIAL USE **

4.  Significant Evidentiary Issues/Problems

    a.  The information obtained from **JOHNSON** by fellow prisoner McNeese may not be admissible against **JOHNSON**, since **JOHNSON** was represented by counsel and McNeese may be considered a government agent.

    b.  Some of the admissions made by **JOHNSON** and **HONKEN** may be admissible against the other defendant as a co-conspirator statements in furtherance of a continuing conspiracy to obstruct justice.

5.  Anticipated Defenses (and Responses Thereto)

    a.  It is anticipated both **HONKEN** and **JOHNSON** will assert ex post facto claims against the application of the death penalty under Title 18. **HONKEN** is anticipated to assert a claim of double jeopardy to a continuing criminal enterprise murder under Title 21, United States Code, Section 848(e) based upon his prior Title 21, United States Code, Section 846 conviction and sentence.

## IV. STATUTE(S) VIOLATED, PROOF, AND OTHER RELEVANT FACTS

A.  **18 U.S.C. 1512 (a)(Witness tampering & Aiding and Abetting Resulting in Death)**

1.  The Statute

    (a) (1) Whoever kills or attempts to kill another person, with intent to -
    (A) prevent the attendance or testimony of any person in an official proceeding;

    (B) prevent the production of a record, document, or other object, in an official proceeding; or

    (C) prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings; shall be punished as provided in paragraph (2).

    (2) The punishment for an offense under this subsection is -

** LIMITED OFFICIAL USE **

(A) in the case of murder (as defined in section 1111), the death penalty or imprisonment for life, and in the case of any other killing, the punishment provided in section 1112; . . . .

2. Elements of the Offense (including predicate offense)

    a.    Defendant killed or aided and abetted the killing or attempted killing of another person;

    b.    The killing was malice aforethought;

    c.    The killing was premeditated, willful, deliberate, or malicious;

    d.    The killing was committed with the intent to prevent the attendance or testimony of any person in an official proceeding <u>or</u> to prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense, that is conspiracy to distribute and manufacture methamphetamine or a violation of conditions of . . . . release pending judicial proceedings

3. Anticipated Proof and Other Pertinent Facts

    a.    <u>Element-by-Element Analysis</u>. 1) Each of the five victims are deceased and were killed by **HONKEN** and **JOHNSON**. 2) Tax, bank, school and other records confirmed that the victims were deceased, even prior to the recovery of their remains. 3) **JOHNSON** purchased the firearm immediately prior to the murders, assisted in gaining access to the victims by searching for Nicholson, used a ruse to enter the Duncan home, and lured DeGeus to a meeting with **HONKEN**. **HONKEN** killed the victims, then buried the victims. 5) The intent is established by the forced production of a videotape exonerating **HONKEN**, the timing of the first four murders immediately prior to **HONKEN'S** scheduled guilty plea, and the murder of DeGeus immediately after **JOHNSON'S** Grand Jury testimony regarding the relationship of DeGeus and **HONKEN**. The murders of Lori, Kandi, and Amber Duncan kept each of them from reporting **HONKEN'S** obstructive conduct and contact with Nicholson to law enforcement officials which would have resulted in revocation of **HONKEN'S** pretrial release and additional charges.

\*\* LIMITED OFFICIAL USE \*\*

b.    Defendant-by-Defendant Analysis

(1)    **HONKEN**

Proof that **HONKEN** was involved includes numerous admissions made by **HONKEN**, the manufacture and transfer of the Nicholson video tape to **HONKEN'S** former counsel, audiotapes with admissions by **HONKEN**, the timing of **HONKEN'S** decision to not enter a guilty plea, placement of **HONKEN** on pretrial release and subsequent obstructive attempts to harm cooperating individuals and law enforcement officials involved in the investigation and prosecution of his case.

**HONKEN** located Nicholson through others, produced the Nicholson video tape, and provided the tape to his former lawyer. With the assistance of **JOHNSON, HONKEN** killed Nicholson and the Duncan family. **HONKEN** ran the drug manufacturing and distribution conspiracy. **HONKEN** had **JOHNSON** bring DeGeus to a remote location where **HONKEN** shot DeGeus. **HONKEN** destroyed the videotape and the firearm. **HONKEN** signed the pre-trial release conditions which identified Nicholson as a potential witness and prohibited contact between **HONKEN** and Nicholson.

The theory of liability for **HONKEN** is that he was the principal offender and was the individual who actually performed the physical acts necessary to kill the victims.

(2)    **JOHNSON**

Proof that **JOHNSON** was involved includes **JOHNSON'S** multiple admissions about the murders, **JOHNSON'S** purchase of the Tech-9, 9 mm handgun immediately prior to the murder of Nicholson and the Duncan family, and **HONKEN'S** statements made in furtherance of the continuing conspiracy to harm witnesses and cover up the drug trafficking activities and the murders.

**JOHNSON** purchased the murder weapon and assisted in locating Nicholson. **JOHNSON** gained entry to the Duncan home by using a ruse. **JOHNSON** secured the Duncan

** LIMITED OFFICIAL USE **

family while **HONKEN** forced Nicholson to make a videotape exonerating **HONKEN**. **JOHNSON** secured the juvenile witnesses while **HONKEN** killed Lori Duncan and Nicholson. **JOHNSON** was at the scene of the murder of all five victims. **JOHNSON** lured DeGeus to a remote meeting with **HONKEN** days after she was questioned about the relationship between **HONKEN** and DeGeus before the federal Grand Jury. **JOHNSON** was at the scene at the time of DeGeus' murder and assisted in burying his body. After the weapon was discovered by Gabautz, **JOHNSON** took the murder weapon.

The theory of liability for **JOHNSON** is aiding and abetting **HONKEN's** criminal conduct and as principal offender under *Pinkerton*. The murders were committed to allow **HONKEN** to avoid responsibility and to continue in his drug trafficking activities.

**B.** **21 U.S.C. 848(e) (HONKEN While Engaged In)(JOHNSON In Furtherance Of)**

1. The Statute - 21 U.S.C. § 848(e)
   a. any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) . . . who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results [shall be guilty of an offense].

2. Elements of the Offense (including predicate offense)

   a. **HONKEN** (848(e))

      1. The killing of one or more of the victims resulted.

      2. The killing of one or more of the victims occurred while **HONKEN** was engaging in a continuing criminal enterprise or a conspiracy to manufacture, distribute or possess with intent to distribute 100 grams or more of pure methamphetamine or one kilogram or more of a mixture containing a detectable amount of methamphetamine.

      3. **HONKEN** either intentionally killed or counseled,

** LIMITED OFFICIAL USE **

commanded, induced, procured, or caused the intentional killing of one or more of the victims.

b.   **JOHNSON** (848(e))

1.   The killing of one or more of the victims resulted.

2.   The killing of one or more of the victims occurred in furtherance of a continuing criminal enterprise or a conspiracy to manufacture, distribute or possess with intent to distribute 100 grams or more of pure methamphetamine or one kilogram or more of a mixture containing a detectable amount of methamphetamine.

3.   **JOHNSON** either intentionally killed or counseled, commanded, induced, procured, caused or aided and abetted the intentional killing of one or more of the victims.

3.   Elements for Title 21 Conspiracy/distribution & manufacture

a.   Conspiracy - 21 U.S.C. 846

1.   Two or more persons came to an agreement or understanding to distribute, possess with intent to distribute or manufacture methamphetamine.

2.   The defendant joined in the agreement or understanding while it was in effect; and

3.   The defendant did so knowingly.

b.   Continuing Criminal Enterprise 21 U.S.C. 848(c)

1.   A defendant commits any felony violation any provision of Title 21;

2.   Which is part of a continuing series of drug violations;

3.   In concert with five or more persons

* * LIMITED OFFICIAL USE * *

4.	In which the defendant serves as a organizer, supervisor or manager; and

5.	From which the defendant receives substantial income.

5.	Anticipated Proof and Other Pertinent Facts

a.	Element-by-Element Analysis 1) **HONKEN** was the leader of a methamphetamine manufacturing and distribution network involving five or more persons from 1992 through at least 1998. The five individuals include **HONKEN**, Cutkomp, Jeffery Honken, Terry DeGeus, Gregory Nicholson, David Patrick, **JOHNSON**, and others. The quantity of methamphetamine seized in March of 1993 from Nicholson's residence was more than 100 grams of pure methamphetamine. This alone subjected the conspiracy and the distribution of that quantity to the 21 U.S.C. 841(b)(1)(A) penalty. **HONKEN** had made more than three deliveries to Nicholson and DeGeus and continued his methamphetamine manufacturing activities. Each of the five victims was a witness or potential witness in the drug trafficking investigation and prosecution of **HONKEN**. Although the drug trafficking and manufacturing activities stopped when **HONKEN** was arrested and jailed in 1996, the efforts by **HONKEN** and **JOHNSON** to identify cooperators and harm additional witnesses to avoid **HONKEN'S** conviction and sentencing for the drug trafficking activity furthered the goals of the continuing criminal enterprise and thereby extended the length of the conspiracy. 2) **HONKEN** directed the purchase of the firearm by **JOHNSON**. **HONKEN** was the principle beneficiary of the murders by ensuring witnesses' silence about his drug trafficking and obstructive conduct. **HONKEN** admitted directing the murders of the five victims. **JOHNSON** and **HONKEN's** murder of the five witnesses furthered the goals of the drug conspiracy and were committed during the course of the conspiracy. 3) Each of the five victims is deceased and was killed by **HONKEN** and **JOHNSON**. **JOHNSON** purchased the firearm immediately prior to the murders and assisted in gaining access to the victims by searching for Nicholson, using a ruse to enter the Duncan home and lured DeGeus to a meeting with **HONKEN**. **HONKEN** killed the victims and buried the victims. Tax, bank, school and other records confirmed that the victims were deceased even prior to the recovery of their remains.

** LIMITED OFFICIAL USE **

b.    Defendant-by-Defendant Analysis

1.    **HONKEN**

Proof that **HONKEN** was involved includes numerous admissions made by **HONKEN**, the manufacture and transfer of the Nicholson video tape to **HONKEN'S** former counsel, audio tapes with admissions by **HONKEN**, the timing of **HONKEN'S** decision to not enter a guilty plea, placement of **HONKEN** on pretrial release and subsequent obstructive attempts to harm cooperating individuals and law enforcement officials involved in the investigation and prosecution of his case. **HONKEN** developed the methamphetamine production method, created false business fronts to assist in the acquisition of chemicals, recruited accomplices for drug trafficking and obstructive activities, and directed the manufacturing and distribution activities. **HONKEN'S** admissions detail his killing of each of the five victims.

**HONKEN** developed a sophisticated methamphetamine production method while he was a student at a community college in Mason City, Iowa, in 1992. **HONKEN** located Nicholson through others, produced the Nicholson video tape, and provided the tape to his former lawyer. With the assistance of **JOHNSON**, **HONKEN** killed Nicholson and the Duncan family. **HONKEN** ran the drug manufacturing and distribution conspiracy. **HONKEN** had **JOHNSON** bring DeGeus to a remote location where **HONKEN** shot DeGeus. **HONKEN** destroyed the videotape and the firearm. **HONKEN** signed the pre-trial release conditions which identified Nicholson as a potential witness and prohibited contact between **HONKEN** and Nicholson.

The theory of liability for **HONKEN** is that he was the principal offender who directed the drug trafficking activities and was the individual who actually performed the physical acts necessary to kill the victims.

2.    **JOHNSON**

Proof that **JOHNSON** was involved includes **JOHNSON'S** multiple admissions about the murders, **JOHNSON'S**

** LIMITED OFFICIAL USE **

purchase of the Tech-9, 9 mm handgun immediately prior to the murder of Nicholson and the Duncan family, and **HONKEN'S** statements made in furtherance of the continuing conspiracy to harm witnesses and cover up the drug trafficking activities and the murders. During the course of the conspiracy, **HONKEN** informed other conspirators that **JOHNSON** was an investor in his 1996 methamphetamine lab and that she had to approve of Cobeen's participation in the methamphetamine lab. Seized from **JOHNSON'S** abandoned residence on June 1996, were chemicals and glassware used in the manufacturing of methamphetamine. In 1998, **JOHNSON** solicited an undercover agent to collect a debt **JOHNSON** stated was a drug debt.

**JOHNSON** purchased the murder weapon and assisted in locating Nicholson. **JOHNSON** gained entry to the Duncan home by using a ruse. **JOHNSON** secured the Duncan family while **HONKEN** forced Nicholson to make a videotape exonerating **HONKEN**. **JOHNSON** secured the juvenile witnesses while **HONKEN** killed Lori Duncan and Nicholson. **JOHNSON** was at the scene of the murder of all five victims and assisted in burying all five victims. **JOHNSON** lured DeGeus to a remote meeting with **HONKEN** days after she was questioned about the relationship between **HONKEN** and DeGeus in the Grand Jury. **JOHNSON** was at the scene at the time of DeGeus' murder. After the weapon was discovered by Gaubautz, **JOHNSON** took the murder weapon.

The theory of liability for **JOHNSON** is that she aided and abetted **HONKEN** in the murders, establishment of the second methamphetamine laboratory, and subsequent attempts to locate and harm witnesses.

## V. DEFENDANTS

A. **HONKEN**

1. Age: 3/22/68 (33)
2. Education: High School graduate, some college
3. Employment history: January 1994 to April 1996 Kraft Foods, Mason City, IA

** LIMITED OFFICIAL USE **

4. Mental health information: September 1997 examination conducted at MCC - Chicago showed Axis I: Adjustment Disorder with Anxiety, methamphetamine abuse and Adult Antisocial Behavior; and Axis II: Personality Disorder NOS, with antisocial and Borderline features. Conclusion: No mental disease or defect.

5. Other personal history: father of 2 children, including a child with Angela **JOHNSON**

6. Criminal history

    a.    <u>Charged Offenses</u> --

        1.    January 26, 1987, Theft 2nd Degree, Iowa District Court Hancock County. **HONKEN** was originally charged with 1st Degree Theft and 2nd Degree Burglary and faced a total potential prison sentence of up to 20 years. His charge was reduced by plea agreement to Theft in the 2nd degree a Class D felony punishable by up to 5 years imprisonment. **HONKEN's** conduct involved stealing a car with Timothy Cutkomp. **HONKEN** received a deferred judgment and was placed on probation for a period of 3 - 5 years. He completed his probationary period and was discharged on February 11, 1991.

        2.    March 21, 1993, Conspiracy to distribute methamphetamine, U.S. District Court Northern District of Iowa. The defendant's conduct in manufacturing and distributing methamphetamine prior to March 21, 1993, is described above. Due to the murder of Nicholson and the other potential witnesses, this charge was dismissed. The defendant was subject to a ten year mandatory minimum penalty up to life imprisonment for this offense.

        3.    **HONKEN** was convicted of 1) conspiracy to manufacture and distribute methamphetamine between 1992 and 1996 and 2) attempted manufacture of more than 100 grams of pure methamphetamine on or about February 7, 1996, U.S. District Court Northern District of Iowa, based upon a superseding indictment filed on July 10, 1996. The defendant was also charged with the possession of glassware and listed chemicals with the intent to manufacture methamphetamine. The glassware and chemicals charges were dismissed as part of a plea. The maximum term of imprisonment the defendant faced based

* * LIMITED OFFICIAL USE * *

upon the initial charge was up to life imprisonment plus 24 years. The court imposed a guideline sentence of 324 months without parole.

b.      Uncharged Offenses

While **HONKEN** was on pretrial release in 1996 and while he was being held pretrial in the Woodbury County jail, **HONKEN** attempted to obtain a firearm, solicited individuals to commit crimes of violence (harm witnesses), and took steps to escape from the jail. These offenses were not prosecuted, but the matters were presented to the district court to use in sentencing. The United States did not prosecute these offenses in order to promote judicial economy. Proof of these offenses will be offered at trial and sentencing as evidence of the defendant's mental state, the intent to prevent the witnesses from testifying, etc.

B.      **JOHNSON**

1.  Age: 1/17/64 (37)
2.  Education: GED, no high school diploma
3.  Employment history: employment as a waitress, last employer North Beach Lounge, 1998 - 2000
4.  Mental health information: After the discovery of the victims' remains in the fall of 2000, **JOHNSON** attempted suicide. There is no indication by the defendant's counsel of any mental disease or defect.
5.  Other personal history: The defendant has two children, one of which is also the daughter of **HONKEN**.
6.  Criminal history

    a.      Charged Offenses

    No criminal charges or convictions other than traffic violations. In 1997 and 1998, the defendant was found to be a habitual offender for commission of multiple minor traffic offenses.

    b.      Uncharged Offenses -- for each uncharged offense

    1.      During the 1995 – 1996 investigation of **HONKEN**, both Cutkomp and Cobeen stated **JOHNSON** was a financial investor in the methamphetamine laboratory operated at **HONKEN'S** residence. Cutkomp also advised that

* * LIMITED OFFICIAL USE * *

JOHNSON had allowed her residence in Mason City to be used as a methamphetamine laboratory and storage facility in 1993 and 1995. On June 11, 1996, agents executed a federal search warrant on a residence JOHNSON had recently occupied at #5 19th Street, Clear Lake, IA. In and around a shed located on the property, agents seized chemicals, glassware, and materials consistent with methamphetamine production, including a bottle of acetic acid. From the interior of the residence, agents seized a pressure valve which could be used in the production of methamphetamine and items showing a relationship between HONKEN and JOHNSON. Charges were not pursued based on the items seized due to the possibility of multiple access to the property and a lack of additional evidence at that time which would have ensured a successful prosecution. Evidence of these items seized will be offered at trial to show JOHNSON'S involvement in the methamphetamine production by allowing her home to be used to store materials. This evidence will be offered at trial to show other actions JOHNSON took to further the CCE or otherwise participate in the violence.

2. On December 18, 1996, a federal search warrant was executed on JOHNSON'S apartment at 3257 NW 86th Street, #710, Urbandale, Iowa. During the search, officers seized a partially consumed marijuana cigarette, powdery drug residue, address books, and documents linking JOHNSON to HONKEN and others involved in the methamphetamine conspiracy, including Tim Cutkomp and Terry DeGeus. JOHNSON was not charged with the possession of the small quantity of marijuana seized during the search. The materials seized will be offered to show the links among JOHNSON, HONKEN, and others involved in the manufacture and distribution of methamphetamine.

3. In 1998, after HONKEN was incarcerated, an undercover investigation into JOHNSON'S drug trafficking activities was conducted by the Iowa Division of Narcotics Enforcement. An informant and an undercover DNE agent met with JOHNSON and attempted to collect debts and obtain methamphetamine from JOHNSON. Although the agents were unsuccessful in obtaining methamphetamine from JOHNSON, they were able to obtain a note reflecting a drug debt owed to JOHNSON, and JOHNSON'S statements in which she states that she would like to be a "hit woman" or

contract killer. There were no charges stemming from this conduct due to a lack of sufficient evidence which would ensure a successful prosecution. Evidence of this conduct will be offered on the issue of intent and knowledge on both the Title 18 and Title 21 offenses.

## VI. DEFENSE PRESENTATION[1]

A.    Written Submissions. Both **HONKEN'S** and **JOHNSON'S** counsel were invited to submit matters and/or meet with the United States Attorney to discuss the death penalty. Identify by date the submissions by defense counsel relating to the death penalty

B.    Oral Presentations.

### 1. JOHNSON

On April 11, 2001, a meeting was held in the United States Attorney's Office to allow counsel for Angela **JOHNSON** to present mitigation information. Present were United States Attorney Stephen J. Rapp, First AUSA Judith Whetstine, SLC Robert Teig, Sioux City Branch Chief Janet Petersen (via video conference), and defense counsel Alfred Willett and Patrick Berrigan. USA Rapp first explained why the line AUSA assigned to this matter was not present. That AUSA was not present in order to avoid any potential taint problems relating to the current *Messiah* litigation. The Criminal Chief was also not present for similar reasons. The likely potential for the filing of a charge under 21 U.S.C. § 848(e) was also discussed. As a final preliminary matter, defense counsel was advised that the USAO planned to send its recommendation to the Department of Justice by the end of April.

---

[1]The "Protocol" (USAM 9-10.000) contemplates:

> •    that defense counsel will be invited to meet with the United States Attorney and will be given the opportunity to present any reasons why the death penalty should not be sought (See Protocol, § B); and

> •    that any material submitted by defense counsel in opposition to the death penalty will be forwarded to the Department (See Protocol, § C).

** LIMITED OFFICIAL USE **

Defense counsel said they were not likely to submit a written mitigation statement, but orally made a brief presentation. The first point made was that **HONKEN** had a greater culpability than **JOHNSON** and that **JOHNSON'S** participation was minor compared to that of **HONKEN**. It was argued that **JOHNSON** gained nothing from the murders and that only **HONKEN** benefitted.

Counsel next presented a duress mitigation claim. It was argued that **JOHNSON** had long been under the substantial domination of **HONKEN**. The two had been together over ten years, and there was a reference made to some history of physical abuse.

Counsel confirmed that **JOHNSON** has no criminal record other than traffic violations.

These were the only matters in mitigation which were presented by **JOHNSON'S** attorneys. They were asked to submit any written presentation to the USAO no later than April 17, 2001, so that the matter could be submitted to the Department by the end of April.

## 2. HONKEN

**HONKEN'S** counsel was requested to submit matters in writing and orally. **HONKEN'S** counsel indicated he would submit mattes, but to date **HONKEN** has submitted no matters for consideration. See attached correspondence (Tab 1).

C.      Discuss and respond to defense presentations concerning

The defendant's claim of duress is not supported by the evidence. Undercover contact with **JOHNSON** and admissions by **JOHNSON** to others do not support a claim of duress or domination by **HONKEN**. Although

**JOHNSON** has no significant criminal history, the aggravating factors of her offense clearly outweigh any mitigating factors.

* * LIMITED OFFICIAL USE * *

Attachments:

Tab 1:   Correspondence with **HONKEN'S** Attorney

Tab 2:   Title 18 Death Penalty Evaluation Form for defendant **JOHNSON**

Tab 2:   Title 21 Death Penalty Evaluation Form for defendant **JOHNSON**

Tab 3:   Title 18 Death Penalty Evaluation Form for defendant **HONKEN**

Tab 4:   Title 21 Death Penalty Evaluation Form for defendant **HONKEN**

Tab 5:   Current Indictment of **JOHNSON**

Tab 6:   Proposed 21 U.S.C. § 848(e) and 18 U.S.C. § 1512  Indictment of **HONKEN**

Tab 7:   Proposed 21 U.S.C. § 848(e) Indictment of **JOHNSON**

Tab 8:   Victims' Family Correspondence

** LIMITED OFFICIAL USE **