# ADDENDUM TO PROSECUTION MEMORANDUM



**To:** United States Attorney

**From:** AUSA C.J. Williams

**Date:** February 12, 2001

**Subject:** Recommendation that the Death Penalty be sought against defendant **Angela JOHNSON** and prospective defendant **Dustin Honken**

---

## I.     INTRODUCTION

This is an Addendum to the Prosecution Memorandum submitted by AUSA Patrick J. Reinert and SAUSA Thomas Miller regarding the same defendant and prospective defendant. The Addendum was necessitated by the creation of a "wall" separating AUSA Reinert, SAUSA Miller, and the rest of the prosecution team from evidence obtained through a jailhouse informant. Paragraph III(C)(25) of the Prosecution Memorandum relates that JOHNSON provided information about the murders to Robert McNeese after JOHNSON's arrest in this case. Because JOHNSON's Sixth Amendment right to counsel had attached, a separate team of investigators and prosecutors, referred to as the "Taint Team," was established to investigate any leads generated as a result of JOHNSON's contact with McNeese. Out of an abundance of caution, a wall has been maintained even after all contact ended between JOHNSON and McNeese. Accordingly, only members of the Taint Team have been privy to the evidence developed through the use of the jailhouse informant.

After consultation with the Capital Crimes Unit, the decision was made to submit this additional information in the form of an Addendum to the Prosecution Memorandum in order to maintain this wall for the present time. This additional information should be considered under the relevant portion of the prosecution memorandum. Accordingly, reference is made to the appropriate portions of the prosecution memorandum where the information in this addendum logically belongs.

## II.     EVIDENCE OBTAINED AS RESULT OF CONTACT WITH JAILHOUSE INFORMANT.

The information below should be added under Section III(C) of the Prosecution Memorandum. Accordingly, the paragraph numbers begin where that section leaves off at paragraph 26.

> 27.     JOHNSON and McNeese exchanged letters with each other while in the

Office of United States Attorney
Northern District of Iowa
P. O. Box 74950
Cedar Rapids, IA 52407-4950
Voice (319) 363-0091   Fax (319) 363-1990

** LIMITED OFFICIAL USE **

PLAINTIFFS EXHIBIT
139

Benton County jail. They also spoke with each other through the opaque window of JOHNSON's jail cell, which looked out upon the exercise yard. Through these letters and through these conversations, JOHNSON made a number of admissions to McNeese. JOHNSON made admissions to McNeese because she wanted his assistance in escaping from jail, in killing one of the jail employees, and/or in soliciting an inmate serving a life sentence to admit to committing the murders. Toward this last objective, it was necessary for JOHNSON to give adequate details about the murders to McNeese so that the person who confessed to the murders would be believed by law enforcement.

28. Regarding the escape and killing of the jail employee, JOHNSON indicated to McNeese that one of the jail guards treated JOHNSON poorly. JOHNSON was intent on escaping from the county jail, and told McNeese that on the way out she was going to kill the jail employee. JOHNSON had family members visit her at the jail and take video of the outside of the jail for purposes of planning the escape. JOHNSON also had her family look up information about the jail employee, including the type of car she drove. McNeese reported that JOHNSON was going to have the employee followed in order to plan how to harm her. JOHNSON indicated that her boyfriend would help with the escape attempt. JOHNSON invited McNeese to escape with her.

29. Regarding the murders, JOHNSON provided great detail about the murders to McNeese. She described how she and Honken had killed Nicholson, Duncan and the two girls. She indicated that they had taken them to a field and that Honken had shot them all. She stated that they were all four buried in the same grave, with Lori Duncan on top. To aid the person who would claim responsibility for the murders, JOHNSON drew a map indicating the location of the bodies. These four victims were located in a small wooded area near some railroad tracks, close to Mason City, Iowa. The map contained several other landmarks, including named roads.

30. JOHNSON also provided information to McNeese about the murder of Terry DeGeus. She claimed that she shot DeGeus with the aid of Honken. She stated that DeGeus was shot several times and she made him get down on his knees, like he used to do to her when he previously beat her. Again, to aid the person who would claim to be the killer, she drew a map to the location where DeGeus was buried. The map indicated that he was buried behind an abandoned farm house near Mason City, Iowa.

31. The United States was able to get JOHNSON'S original, hand-drawn

maps from McNeese. Based on the maps and other corroborating information, the United States obtained search warrants for both pieces of land on which the bodies were allegedly located. The two sites were within five miles of each other, located southwest of Mason City, Iowa.

32. On October 12, 2000, search warrant teams began search and excavation work at both sites. The search at the DeGeus site ("burial site 2") was initially unsuccessful. A search of the Nicholson/Duncan site ("burial site 1"), however, was successful. Starting in the afternoon of October 12, 2000, and continuing until October 13, 2000, all four victims were found and recovered. All four victims have been identified from dental charts and/or DNA examinations.

33. At burial site 1, agents found one or more small animals buried on top of the bodies. Initial review indicates that the animals were buried at some time after the humans were buried, as there was decomposed plant material between the animal and the human remains. An examination of the animal remains indicated that there was the complete remains of an opossum. In addition, there was the head of a shrew. (ANGELA JOHNSON is known to be a follower of witchcraft and other occult-type religious practices). Beneath the animals, the victims were buried in the following order: Amber Duncan, Kandi Duncan, Lori Duncan and Gregory Nicholson. In other words, Amber was in the bottom of the grave and Nicholson was on top of the other victims.

34. Gregory Nicholson had been bound with clothesline type cord tied around his wrists. He had been gagged with a green colored sock which had been secured with duct tape wrapped around his head. It appears as if his eyes had been covered by the tape, as well as his mouth. Nicholson was fully clothed at the time of his death, though his left shoe was missing and was not found at the crime scene. Nicholson was shot once in the back of the head, and once in his upper-right back. His remains also indicate multiple pari-mortem fractures to neck vertebrae, consistent with a twisting or rotational injury.

35. Lori Duncan had been gaged with a sock in her mouth, held in place with duct tape. She also had duct tape wrapped around her head and covering her eyes. He hands and feet were bound with cloths-line like rope. She was fully clothed at the time of her death, though like Nicholson, she was missing her left tennis shoe and it was not found at the crime scene. Lori Duncan had been shot once in the head; it appears that the entry wound was behind the right eye with an exit wound on the left forehead. She was also shot from behind in her upper back at least once, possibly twice. She also had a bullet wound to her forearm;

however, this could be a separate gun shot wound or it could be the result of the same bullet(s) that entered her back. Lori Duncan also had two pari-mortem hairline fractures, one to a bone in her left hand that was probably caused by a twisting injury, and one to her upper-right pelvis bone that was probably caused by a fall or compression.

36. Kandi Duncan was not bound or gaged. She was fully clothed at the time of her death. She had a single bullet hole in the back of her head.

37. Amber Duncan was not gaged, but was bound in an odd manner. She had he arms through what appears to be the leg holes of a man's pair of underwear briefs, pulled down such that her head was inside of the underwear. She also had a single bullet hole in the back of her head.

38. On November 7, 2000, a search of burial site 2 was resumed. The second attempt was successful. The search recovered the remains of Terry DeGeus, who was buried face-down in a shallow grave. His skull was very badly fractured. DeGeus was shot at least once in the head, though the location of the entry wound is not clear because of the fracturing of the skull. The skull fractures appear to be inconsistent with blunt force trauma; rather, the skull appears to have shattered as a result of the bullet wound. DeGeus was also shot once in the lower-left arm, and possibly once in the mid-section and once at his waist (there is on his pelvis bone what appears to be a nick caused by a bullet). His remains were identified through dental records. He also had his identification on him and his name written in his underwear (DeGeus had previously been housed in a halfway house).

39. It should be noted that McNeese indicated that JOHNSON told him about the murder of a sixth individual. According to McNeese, JOHNSON told him that in April 2000, she and another person (whom she apparently did not name) killed a man named Tim, last name unknown, who was from Arizona. Allegedly it was a drug-related killing and he was buried near where DeGeus was buried. McNeese gave JOHNSON the name of his attorney in New York and told her to draw a map to this person's grave and send it to his attorney, which McNeese believes she did.

40. During the initial search of burial site 2 in October 2000, several small bone shards were located on top of the soil near where DeGeus was found. These shards could not have come from DeGeus's body, we now know. DNA testing is being performed on the shards to determine if they are from a human. The subsequent search of burial site 2 failed to turn up any additional bone shards or other evidence indicating that another victim was buried near the site. During this second search, nearly an acre

of land was carefully searched looking for signs of this sixth victim, with no results. At this point, the United States believes that this information is not to be believed. Whether the false information came from McNeese or JOHNSON is difficult to determine at this time.

The following information references the Prosecution Memorandum, Section III(D)(1) – Significant Cooperating & Uninvolved Witnesses.

J.D. Smith, Special Agent Iowa Division of Criminal Investigation. Special Agent Smith was in charge at the crime scenes where the victims' remains were recovered. Special Agent Smith will testify about efforts to locate the burial sites based on the maps obtained from McNeese and the execution of search warrants to recover the remains. He will be able to testify about the recovery of the remains and other artifacts found at the grave sites.

Dennis Klein, M.D., forensic pathologist. Dr. Klien is employed by the Iowa State Medical Examiner's Office. He conducted the autopsies of the remains of Nicholson, Lori Duncan and the children. He will testify based on his examination regarding the identity of the victims and the cause and manner of death.

Julia Goodin, M.D., forensic pathologist. Dr. Goodin is the Medical Examiner for the State of Iowa. She conducted the autopsy of Terry DeGeus's remains and will testify about his identity and the cause and manner of death.

Dawnie Steadman, forensic anthropologist. Dr. Steadman is a forensic anthropologist on contract with the Iowa State Medical Examiner's Office. She identified and separated the bones for each of the victims and reconstructed their remains. She also examined the remains for signs of pari-mortem and post-mortem injuries. She will testify, based on her examination, regarding the cause of death of each of the victims.

Vic Murillo, criminalist, Iowa State Crime Laboratory. Mr. Murillo will testify about his examination of bullets and shell casings found at the scenes of the murders. He will testify that the weapon used in the murders is consistent with a firearm using 9mm ammunition.