
PLAINTIFFS
EXHIBIT

# PARK DIETZ & ASSOCIATES, INC.
## Forensic Consultants in Medicine and the Behavioral Sciences

**Administrative Offices**

2906 Lafayette
Newport Beach, CA 92663
Tel: 949-723-2211
Fax: 949-723-2212
Email: expert@parkdietzassociates.com
Website: www.parkdietzassociates.com

**Daniel A. Martell, Ph.D., ABPP**

2906 Lafayette
Newport Beach, CA 92663
Tel: 949-760-0422
Fax: 949-786-7478
Email: damartell@aol.com

**Forensic Psychiatry**
Park Dietz, MD, MPH, PhD
   President
Eugene Beresin, MD
Bennett Blum, MD
John Bradford, MB, ChB
Graham Glancy, MB, ChB
Bruce Harry, MD
Mark J. Hauser, MD
Joseph Kenan, MD
Stuart Kleinman, MD
Daryl Matthews, MD, PhD
Steven Pitt, DO
Gregory Saathoff, MD
Esperanza Salinas, MD
Rene Sorrentino, MD
Sheila Wendler, MD

**Forensic Pathology**
Tracey S. Corey, MD
Judy Melinek, MD
George R. Nichols II, MD

**Forensic Neurology**
David Griesemer, MD
Helen Mayberg, MD

**Forensic Psychology**
Joel Dvoskin, PhD
Stephen D. Hart, PhD
Kirk Heilbrun, PhD
Elizabeth Loftus, PhD
Daniel A. Martell, PhD
Ronald Roesch, PhD
Erin Spiers, PsyD

**Forensic Social Work**
Cheryl Regehr, PhD
Janet I. Warren, DSW

**Criminology**
Larry Ankrom, MS (FBI ret.)
Kenneth Lanning, MS (FBI ret.)
Gregg McCrary, MA (FBI ret.)
Ronald Walker, MA (FBI ret.)
James Wright, MPA (FBI ret.)

**Security**
Bernard Banahan
Robert Hayes, CPP, CFE
Steve Howell

**Medical Strategist**
Steven Ainbinder, MD

June 30, 2009

Michael Wiseman, Esq.
Chief, Capital Habeas Corpus Unit
Federal Community Defender for the
Eastern District of Pennsylvania
Suite 545 West -- The Curtis Center
Philadelphia, PA 19106

### RE: *USA v. Billie Jerome Allen* (E.D. Missouri)

Dear Mr. Wiseman,

I am writing today to convey the findings and opinions arising from my examination of Mr. Allen pursuant to the above captioned matter.

## Referral Questions

(1) Please review the psychological testing of Mr. Allen conducted by Dr. Michael Gelbort at the time of trial in 1998, and provide the Court with an opinion regarding the scope and adequacy of the testing he performed relative to the forensic circumstances of the case, with attention to the extent of the testing conducted, the norms applied to the obtained test data, and the resulting opinions offered.

(2) To the extent that Dr. Gelbort's psychological examination of Mr. Allen fell short of the standard of care in place at the time of Mr. Allen's trial, please conduct your own examination of him, employing tests, norms, and procedures that were in use and generally accepted at that time, in order to provide the Court with opinions regarding what should have been presented by Mr. Allen's defense.

(3)   Please provide the Court with opinions regarding any mitigating evidence identified in the course of your forensic examination that was either not presented, or not fully addressed at the time of his capital sentencing proceedings.

## Basis for Opinions

## Scope of Examination and Informed Consent

I personally examined and tested Mr. Allen at the Federal Correctional Institution in Terre Haute, IN on 02/05/09, 02/06/09, and 04/01/09 for a total of approximately 13.5 hours. The examinations were conducted in a quiet, private interview room in the attorney visiting area. Mr. Allen's hands were not restrained during any of the neuropsychological or psychodiagnostic testing, although he was handcuffed to a belly chain during the 04/01/09 interview-only portion of the examination.

Mr. Allen was informed that I had been retained by the Federal Community Defender's office; of the nature and purpose of the examination; of the limits of confidentiality in this forensic context; and of the lack of any treating relationship between us. He provided his informed consent to participate in the examination.

## Tests Administered

Structured Neuropsychological Interview
Neuropsychological History Questionnaire
Mental Status Examination
Validity Indicator Profile
  -Nonverbal Test
Rey's 15 Item Memory Test
Test of Memory Malingering
Wechsler Adult Intelligence Scale-III
Wechsler Memory Scale – III
California Verbal Learning Test
Halstead-Reitan Neuropsychological Test Battery
  -Booklet Category Test
  -Seashore Rhythm Test
  -Speech Sounds Perception Test

-Portable Tactual Performance Test
-Finger Oscillation Test
-Strength of Grip (Smedley Hand Dynamometer)
-Reitan-Klove Sensory-Perceptual Examination
-Tactile Form Recognition
-Aphasia Screening Test
-Trail Making Test, Parts A & B
-Lateral Dominance Examination
Grooved Pegboard Test
Tests of Motor Sequencing and Control
Wisconsin Card Sorting Test
Stroop Test
Controlled Oral Word Association Test (F-A-S)
Animal Naming
Boston Naming Test
Benton Facial Recognition Test
Hooper Visual Organization Test
Interview Schedule for the Psychopathy Checklist - Revised
Personality Assessment Inventory

## Materials Reviewed

I have reviewed and considered the following background materials:

(1) Direct Appeal Opinion.
(2) Transcripts of Penalty Phase testimony from the following dates:
- 03/02/98
- 03/03/98
- 03/04/98
- 03/05/98
- 03/06/98
- 03/09/98
- 03/10/98
(3) Mr. Allen's Birth Certificate.
(4) Report of Daniel Cuneo, Ph.D.
(5) Neuropsychological Evaluation report of Michael Gelbort, Ph.D.
(6) Notes and raw test data from Dr. Gelbort's examination.
(7) Report of Dean Yutzy, M.D.
(8) Raw data and C.V. from Richard Wetzel, Ph.D.

(9)  Mr. Allen's Clayton School records.
(10) Mr., Allen's Sumner School records.
(11) Mr. Allen's medical records from Metropolitan St. Louis Psychiatric Center.
(12) Mr. Allen's medical records from St. Louis Children's Hospital.
(13) Mr. Allen's pediatric medical records from Eugene Grabau, M.D.
(14) Mr. Allen's medical records from St. Louis City Hospital.
(15) Mr. Allen's Franklin County Prison records.
(16) Mr. Allen's Probation and Parole records.
(17) School records for Mr. Allen's sister, Nicole Petty.
(18) School records of Angela Allen.
(19) School records of Yvette Allen.
(20) Declarations of:
    (a)  Juanita Petty Allen
    (b)  Nicole Petty
    (c)  Angela Allen
    (d)  Billy Wayne Allen
    (e)  Cathy Toliver
    (f)  Brady Toliver
    (g)  Claude McClemore
    (h)  Raymond Petty
    (i)  Darletta Tabb
    (j)  Tyrone Jones
    (k)  Samuel Moore
    (l)  Antonio Rycraw
    (m)  Johnnie Grant
    (n)  Shirlene Grant

## BACKGROUND INFORMATION

Billie Allen was convicted of armed robbery by force in which a killing occurred, and carrying or using a firearm during a crime of violence and committing murder, and was sentenced to the death penalty. He is appealing that sentence.

The sections below will review important historical findings, both from my examination of Mr. Allen and from the available records listed above.

## **Medical History**

Mr. Allen's medical history is notable for numerous disorders and conditions that placed him at risk for the development of mental illness and central nervous system damage.

### **In-Utero Exposure to Teratogens**

According to numerous witnesses, Mr. Allen's mother Juanita smoked cigarettes and drank alcohol during pregnancy, placing him at significant risk for a wide range of well known physical and mental defects.  Maternal cigarette smoking during pregnancy has been clearly linked to Learning Disabilities, Attention Deficit-Hyperactivity Disorder, and other behavioral disorders.[1]  Alcohol abuse during pregnancy significantly increases the risk of fetal alcohol spectrum disorders.[2]

---

[1] Centers for Disease Control and Prevention. (2001, April). *Women and smoking: A report of the Surgeon General – 2001*. Retrieved from http://www.cdc.gov/tobacco/sgr/sgr_forwomen/index.htm

Butler, N. & Goldstein, H.  (1973). Smoking in Pregnancy and Subsequent Child Development. *British Medical Journal*, 4, 573-575.

Huestis, M. A., & Choo, R. E. (2002). Drug abuse's smallest victims: In utero drug exposure. *Forensic Science International*, 128 (1–2), 20–30.

Makin, J., Fried, P. A., & Watkinson, B. (1991). A comparison of active and passive smoking during pregnancy: Long term effects. *Neurotoxicology and Teratology, 13*, 5-12.

McCartney, J. S., Fried, P. A., & Watkinson, B. (1994). Central auditory processing in school-age children prenatally exposed to cigarette smoke. *Neurotoxicology and Teratology, 16*, 269-276.

Streissguth, A.P.; et al . (1984).  Intrauterine alcohol and nicotine exposure: Attention and reaction time in 4-year-old children. *Developmental Psychology*. 20(4), 533-541.

Wakschlag. L.S., Lahey, B.B. Loeber, R. et al.  (1997). Maternal Smoking During Pregnancy and the Risk of Conduct Disorder in Boys. *Archives of General Psychiatry*, 54(7): 670-676.

U.S. Department of Health and Human Services. *The Health Consequences of Smoking: A Report of the Surgeon General, 2004.*  Centers for Disease Control and Prevention, Office on Smoking and Health, Atlanta Georgia, May 2004.

The *Surgeon General's Advisory on Alcohol Use in Pregnancy* states, in significant part:

> Thirty-two years ago, United States researchers first recognized fetal alcohol syndrome (FAS). FAS is characterized by growth deficiencies (or, decreased growth), abnormal facial features (specific facial features), and central nervous system (or, brain) abnormalities. FAS falls under the spectrum of adverse outcomes caused by prenatal alcohol exposure called Fetal Alcohol Spectrum Disorders (FASD). The discovery of FAS led to considerable public education and awareness initiatives informing women to limit the amount of alcohol they consume while pregnant. But since that time, more has been learned about the effects of alcohol on a fetus. It is now clear that no amount of alcohol can be considered safe.
>
> Based on the current, best science available we now know the following:
>
> > • Alcohol consumed during pregnancy increases the risk of alcohol related birth defects, including growth deficiencies, facial abnormalities, central nervous system impairment, behavioral disorders, and impaired intellectual development.
> > • No amount of alcohol consumption can be considered safe during pregnancy.

---

Centers for Disease Control and Prevention (CDC). *What Do We Know About Tobacco Use and Pregnancy*. June 11, 2007.

[2] National Institute on Alcohol Abuse and Alcoholism (2000, December). *Fetal alcohol exposure and the brain* (Alcohol Alert No. 50). Retrieved from http://www.niaaa.nih.gov/publications/aa50.htm

Cornelius, M. D., Day, N. L., Richardson, G. A., & Taylor, P. M. (1999). Epidemiology of substance abuse during pregnancy. In P. J. Ott & R. E. Tarter (Eds.), *Sourcebook on substance abuse: Etiology, epidemiology, assessment, and treatment* (pp. 1–13). Needham Heights, MA: Allyn & Bacon, Inc.

- Alcohol can damage a fetus at any stage of pregnancy. Damage can occur in the earliest weeks of pregnancy, even before a woman knows that she is pregnant.
- The cognitive deficits and behavioral problems resulting from prenatal alcohol exposure are lifelong.
- Alcohol-related birth defects are completely preventable.

\*    \*    \*    \*

In the United States, FAS is the leading preventable birth defect with associated mental and behavioral impairment. There are many individuals exposed to prenatal alcohol who, while not exhibiting all of the characteristic features of FAS, do manifest lifelong neurocognitive and behavioral problems arising from this early alcohol exposure. In the United States, the prevalence of FAS is between 0.5 to 2 cases per 1,000 births. It is estimated that for every child born with FAS, three additional children are born who may not have the physical characteristics of FAS but still experience neurobehavioral deficits resulting from prenatal alcohol exposure that affect learning and behavior.

The outcomes attributable to prenatal alcohol exposure for the children of women whose alcohol consumption averages seven to 14 drinks per week include deficits in growth, behavior, and neurocognition such as problems in arithmetic, language and memory; visual-spatial abilities; attention; and deficits in speed of information processing. Patterns of exposure known to place a fetus at greatest risk include binge drinking, defined as having five or more drinks at one time, and drinking seven or more drinks per week.

Mr. Allen's mother states that she began drinking alcohol at age 16, and that she drank alcohol and smoked cigarettes while she was pregnant with all of her children, including Mr. Allen. [Declaration of Juanita Petty Allen, p. 2]

This is corroborated by several witnesses. Mr. Allen's uncle, Billy Wayne Allen, states, "Juanita could drink alcohol like a man. She drank for as long as I knew her, including when she was pregnant with Billie and her other kids." [Declaration of Billy Wayne Allen, p. 3]

Cathy Toliver, a life-long friend of Juanita's reports, "Even when she was pregnant with her kids, Juanita got herself drunk almost every day." [Declaration of Cathy Toliver, p. 2] This was also described by another friend, Darletta Tabb, who observed, "Juanita drank frequently as an adult. She didn't stop drinking when she was pregnant with Billie. Back then, people didn't know that drinking while you were pregnant could cause any harm to the baby." [Declaration of Darletta Tabb, p. 1]

## Early Childhood Behavioral Disorders

**Pica.** Mr. Allen was diagnosed with Pica in early childhood, and he reported that he continues to engage in this behavior to the present day. Pica is a psychiatric disorder characterized by an appetite for substances that are largely non-nutritive (e.g., paint, plaster, string, hair, or cloth) or an abnormal appetite for some things that may be considered foods, such as food ingredients (e.g., flour, raw potato, raw rice, starch, ice cubes, salt, blood). In order for these actions to be considered pica, they must persist for more than one month at an age where eating such objects is considered developmentally inappropriate. Poverty, neglect, lack of parental supervision, and developmental delay increase the risk for the condition. [See DSM-IV-TR, p. 103-105]

Psychosocial factors associated with the development of pica include:

- Stress: Maternal deprivation, parental separation, parental neglect, child abuse, and insufficient amounts of parent/child interactions
- Low socioeconomic status

   -The ingestion of paint is most common in children from low socioeconomic families and is associated with lack of parental supervision.

   -Malnutrition and hunger also may result in pica.

- Other risk factors

   -Parent/child psychopathology

   -Family disorganization

- Environmental deprivation

- Brain damage

- Mental retardation

- Developmental disorders

Mr. Allen's early childhood medical records make frequent mention of his problem with Pica, with an onset well before age 3. Dr. Grabau's notes indicate that he was treated for Pica with cobalt chloride. [10/25/1982 treatment note]

Pica is also reflected in his treatment notes from St. Louis Children's Hospital at age 3, which indicate that he suffered from the disorder, together with his history of lead poisoning and febrile convulsions:

> It is interesting that a history of pica was obtained and patient has been treated in the past for lead poisoning and seizures, probably febrile. [St. Louis Children's Hospital progress notes, 09/08/1980; age 3]

This is notable because there is a clear association between pica and lead poisoning, with the later development of neurobehavioral, psychoeducational, socio-emotional, medical, and neuropsychological consequences,[3] and it was undoubtedly the case with Mr. Allen that pica resulted in lead poisoning (see below).

Although Dr. Grabau's notes indicate that Mr. Allen's Pica had diminished and had been replaced by mouthing items without swallowing around age 3, [Dr. Grabau's treatment notes] Mr. Allen recalled continuing to engage in this behavior when he was, "young,

---

[3] Donovick, P.J., & Burright, R.G. (1992). Lead poisoning, toxocariasis, and pica: Links to neurobehavioral disorders. In Isaacson, Robert L. and Jensen, Karl F. (Eds), *The vulnerable brain and environmental risks, Vol. 1: Malnutrition and hazard assessment; Vol. 2: Toxins in food.* New York, NY, US: Plenum Press, p. 127-146.

Motta, R.W., & Basile, D.M. (1988). Pica. In L. Phelps (Ed). (1998). *Health-related disorders in children and adolescents: A guidebook for understanding and educating.* Washington, DC, US: American Psychological Association, p. 524-527.

between ages eight and eleven," indicating an exacerbation of the disorder.

We discussed his history of this behavior in some detail. He described ingesting a wide variety of materials, including:

- Drywall
- Crayons
- Pencils
- Pennies
- Glue
- Paper
- Dirt
- Tree branches
- Paint (both peeling and liquid)
- Motor oil
- "Goop" hand cleaner
- Cotton batting from a couch
- Bug spray "with a skull and crossbones on the can"
- Sticks of butter
- Frying grease

He described eating peeling paint and plaster off of the wall in his room. He also remembered eating gold paint chips from a radiator in his room, reflecting that at the time, "it made me feel rich because I was eating gold."

He was unable to explain why he engaged in this behavior, other than to say, "I stopped caring at an early age." He stated that he "experimented with it, I'd see characters eat stuff with a skull and crossbones in cartoons, and they don't die, so I wanted to try it."

He also reported that this condition continues to the present day. He stated that he still eats his paint in prison, as well as paper and fingernails.

**Enuresis.** By 1983 (at age 6) Mr. Allen was still a bed wetter, and also had diurnal (daytime) enuresis. [Dr. Grabau's Progress notes, 10/13/1983]

This behavior is often reflective of neurodevelopmental delays, as well as situational psychological stress in childhood.[4]

## Early Childhood Medical Disorders

**Lead poisoning.** Mr. Allen has a documented history of lead poisoning at a very early age, beginning when he was approximately one year old, and tied by medical staff to his history of pica:

> First admission. HGP Fever and convulsion [illegible] 1 yr old … & found to have lead poisoning.
> Second admission HGP convulsion and fever and ^ lead.
> [Largely illegible/ poor photocopy of Doctors note, undated, St. Louis City Hospital Records]
>
> PMH [pre-morbid history] Pb poisoning, asthma, hosp at 1 ½ yrs … febrile convulsions at 1 ½ yrs , on phenobarb X 6 mos – discovered Pb poisoning, had second convulsion w/ high fever at 2 y/o on phenobarb x 2 mos Mom d/c'd phenobarb c/o "acting crazy" + PICA – prescribed clear liquid "cobalt."
> [St. Louis Children's Hospital admission note, 09/07/1980]
>
> It is interesting that a history of pica was obtained and patient has been treated in the past for lead poisoning and seizures, probably febrile. [St. Louis Children's Hospital progress notes, 09/08/1980; age 3]
>
> + Pb poisoning Rx'd in the past, 2 previous febrile seizures.
> [St. Louis Children's Hospital Discharge Summary, 09/18/1980]
>
> History of ^ lead level. [Doctor's note, undated, St. Louis City Hospital Records]

There is an extensive literature on the long-term neuropsychological consequences of lead-induced neurotoxicity,[5] including:

---

[4] Robson, L.M. (1997). Diurnal Enuresis. *Pediatrics in Review,* 18: 407-412.

[5] Boivin, M.J. & Giordani, B. (1995). A risk evaluation of the neuropsychological effects of childhood lead toxicity. *Developmental Neuropsychology,* 11(2), 157-180.
(con't.)

- cognitive impairment specifically involving executive (frontal lobe) functioning;

- impaired neurobehavioral development, attentional ability, and academic performance;

- impairment of reading skills, and deficits in vocabulary, fine motor skills, reaction time, and hand-eye coordination;

- disturbed social behavior and antisocial acts; and

- future failure to graduate from high school, lower class standing, and greater absenteeism.

It is also notable that there is evidence of increased risk for problems with educational achievement and vulnerability to cognitive deficits for lead-exposed youth from more disadvantaged backgrounds such as Mr. Allen grew up in.

**Febrile seizures.** Whether the direct result of lead poisoning, or an occult infectious process resulting in fevers possibly related to pica, Mr. Allen has a documented history of febrile convulsions, apparently beginning at 1 ½ years of age, and continuing for several months, requiring multiple hospital emergency room visits, diagnostic work-ups, and prophylactic treatment with anticonvulsant medication:

---

Needleman, H.L., Schell, A., Bellinger, D., Leviton, A., et al. (1990). The long-term effects of exposure to low doses of lead in childhood: An 11-year follow-up report. *New England Journal of Medicine*, 322(2), 83-88.

Canfield, R.L., Gendle, M.H., & Cory-Slechta, D.A. (2004). Impaired neuropsychological functioning in lead-exposed children. *Developmental Neuropsychology*, 26(1), 2004, 513-540.

Needleman, H,L., Riess, J.A., Tobin, M.J., Biesecker, G.E., & Greenhouse, J.B. (1996). Bone lead levels and delinquent behavior. *JAMA: Journal of the American Medical Association*, 275(5), 363-369.

Ris, M.D., Dietrich, K.N.; Succop, P.A., et al. (2004). Early exposure to lead and neuropsychological outcome in adolescence. *Journal of the International Neuropsychological Society*, 10(2), 261-270.

> PMH [pre-morbid history] Pb poisoning, asthma, hosp at 1 ½ yrs … febrile convulsions at 1 ½ yrs , on phenobarb X 6 mos – discovered Pb poisoning, had second convulsion w/ high fever at 2 y/o on phenobarb x 2 mos Mom d/c'd phenobarb c/o "acting crazy" + PICA – prescribed clear liquid "cobalt."
> [St. Louis Children's Hospital admission note, 09/07/1980]

He was seen in the Pediatric Intensive Care Unit at St. Louis City Hospital after transfer from another facility with fever of 105 degrees, treated with aspirin and alcohol sponging. The next day his fever went up again, and penicillin was given. That afternoon, he developed "generalized tonic & clonic type of activity of both arms accompanied with frothing saliva followed by sleepiness. The seizure lasted for about 5 min." There was a concern that the condition could be related to his high lead levels. [Admission note, undated but he was noted to be "age 2," St. Louis City Hospital Records]

> Fever and seizure of 1 day duration. He had a seizure earlier. Now the child seen at the ER and had been staff[ed]. Temp. 103 degrees … Diagnosis: Febrile Convulsion. [Emergency Room Note, 09/28/79]

His condition at this time was serious enough that the attending physician ordered both a sleep-deprived EEG that was performed on 9/30/79, and a Lumbar Puncture. [St. Louis City Hospital Records]

> Since this is the third febrile convulsion that he would be treated with Phenobarbital for two years then d/c. [Neurology Consultation Note, 10/4/79]

> Treated with Phenobarbital 10/5/79, 2 tsp bid x 1 month. [St. Louis City Hospital Records]

Febrile convulsions, although usually relatively benign, can be associated with a range of adverse neurological outcomes and neurobehavioral complications, particularly when there are multiple recurrences, as was the case with Mr. Allen.[6]

---

[6] Kölfen, W.; Pehle, K.; König, S. (1998). Is the long-term outcome of children following febrile convulsions favorable? *Developmental Medicine & Child Neurology*, 40(10), 667-671.

**Asthma.** Mr. Allen reported that he was diagnosed with asthma in childhood, that he had been under a doctor's care and prescribed an inhaler, and that he had been hospitalized for severe attacks. This account is well supported by his contemporaneous medical records.

A Nursing Assessment completed when he was three years old indicates a history of asthma since he was one-and-a-half. [St. Louis Children's Hospital records, 09/07/1980]

Elsewhere, the records indicate that he was diagnosed with asthma at age 5. Medical records from the Ambulatory Care department of St. Louis Children's Hospital note that he was treated at the hospital for asthma on 02/12/82: "5 y/o boy with history of asthma began wheezing this afternoon."

He was also seen for same problem on 10/24/82 after having been taken to the hospital and given an injection the night before. [St. Louis Children's Hospital notes]

By age 6 he had had five emergency room visits for asthma attacks, and was seen in the ER for the sixth time on October 2, 1983 after an attack lasting five hours. [St. Louis Children's Hospital notes]

On 11/10/1984 he was seen in the ER again after an attack lasting 12 hours. [St. Louis Children's Hospital notes]

This asthma history is notable for its potential neuropsychological consequences. Hypoxia (insufficient oxygen supply to the brain), as well as the medications used to treat the condition have documented effects on neurobehavioral and cognitive functioning of the developing brain, and poorly controlled asthma is related to school learning problems (which are known to have been present in Mr. Allen).[7]

---

MacDonald, B.K., Johnson, A.L., et al. (1999). Febrile convulsions in 220 children - neurological sequelae at 12 years follow-up. *European Neurology*, 41(4), 179-186.

[7] Annett, R.D., & Bender, B.G. (1994). Neuropsychological dysfunction in asthmatic children. *Neuropsychology Review,* 4(2), 91-115.

Dunleavy, R. A. & Baade, L.E. (1980). Neuropsychological correlates of severe asthma in children 9-14 years old. *Journal of Consulting and Clinical Psychology,* 48(2), 214-19.

**Learning problems.** Dr. Grabau noted that Mr. Allen was seen for, "doing poorly in school – poor reader," on 05/27/88, and prescribed imipramine 10 mg., an antidepressant medication that is also used to treat attention deficit disorders in pediatric patients.
[Dr. Grabau's Progress notes, 05/27/1988]

During the present examination, Mr. Allen reported a history of delay in learning to read; behavioral problems at school (fighting); nail biting; difficulty paying attention; nightmares (recurrent dreams of being shot and killed while sitting in the dark in his backyard) with onset at age 10-11 and continuing to the present; poor self-esteem and "insecurity" due to being skinny and having an obvious skin condition; and difficulty focusing attention (mind wanders, "zone out" or trance-like episodes).

This is also reported by his mother:

> He was picked on in school and in the neighborhood. He was also a sickly child, which made it even more difficult for him to be accepted. .. He was always fidgety and jumping, and had lots of trouble paying attention to things." [Declaration of Juanita Allen, p. 3]

His basketball coach, Tyrone Jones, also noted that Mr. Allen was "mentally slow and that despite having, "the heart to be a better player:"

> He had a very hard time learning the basketball plays that we would run during the games, In fact, I would say that he wasn't able to learn many of the plays. I had to modify the plays for Billie and make it real simple so he could participate in the games. Billie always has a goofy look about him, like he didn't quite get what was happening. [Declaration of Tyrone Jones, p. 1-2]

---

(con't.)

Hopkins, R.O. & Bigler, E.D. (2008). Hypoxic and anoxic conditions of the CNS. In J. Morgan & J. Ricker (Eds), *Textbook of clinical neuropsychology. Studies on neuropsychology, neurology and cognition.* New York, NY: Psychology Press, pp. 521-535.

Similar behavioral observations were described by another childhood acquaintance, Johnnie Grant:

> He came to play softball in the games that Sam Moore set up in our neighborhood.  Billy couldn't play at all.  He would do things like hit a ball and then run straight to second base.  All the kids laughed at him and made fun of him.  [Declaration of Johnnie Grant, p. 1]

**Eczema.**  Mr. Allen reported that he has had a life-long problem with eczema, a skin condition involving in his case the upper arms and entire legs.  This disorder was obvious to others, and the source of name-calling a ridicule for him while in school:

> He was a funny looking little kid because of this bad skin condition he had.  Other kids made fun of him, and it seemed like he didn't have many friends."  [Declaration of Billy Wayne Allen, p. 4]

Medical records from the Ambulatory Care department of St. Louis Children's Hospital note that his skin condition was also observed by clinic staff on 05/03/81.

**Mild closed head injuries.**  Mr. Allen reported a history of head injuries, including: (1) slipping on ice on the way to school at age 13 and hitting his head, resulting in being sent home by the school nurse; (2) "busting my head on a fence in the front yard" when he was 15 [in reviewing the record, this actually appears to be a reference to abuse by his Uncle Jerome when he was 7, as documented below]; (3) being knocked unconscious "for a few minutes" by a blow to the right frontal area of his head while, "sticking up for a kid who was getting bullied" at age 14 or 15 – however he stated that he did not seek treatment; and (4) being hit in the right frontal area with a gun during a robbery when he refused to give up his money at age 16 or 17 (but with no loss of consciousness).

Of these injuries, there appear to be two with witnesses and/or contemporaneous documentation.  The most well documented involved an episode of abuse by his uncle Jerome at age 7 that resulted in an Emergency Room visit and follow-up with his pediatrician:

> He was a bully toward everyone, but he was especially rough on Billie. Once Jerome was picking on Billie and he threw Billie into a gate outside the house. Billie's head was badly injured and he had to go to the hospital. [Declaration of Nicole Petty, p. 1-2]

> 7 y.o. B/M who fell on gate circa 1 hour ago. No LOC. 2cm lac in back of head. [Emergency Room Medical Record, 4/18/1985]

> Head injury to rt. occipit from fall on April 18, 1985, requiring sutures. [Dr. Grabau's Progress notes, 04/25/1985]

Closed head injuries like this one, even without loss of consciousness, can be associated with significant neurobehavioral deficits.[8]

In addition, childhood acquaintance Antonio Rycraw describes Mr. Allen's history of being beaten by members of street gangs in his neighborhood, including an episode of pistol whipping him in the head:

> As we got older, he got beat up a lot on the street. The 6-0 gang, which hung out up by Garfield, was always jumping him, a group of them surrounding him and punching and stomping on him. One time I even saw them pistol whip him in the head up on Cote Brillante. [Declaration of Antonio Rycraw, p. 1]

### Family Environment

In discussing his family dynamics, Mr. Allen related that, "emotions weren't shared. My family didn't talk about emotions and feelings." He reported that he was raised by his mother, as "I saw what drugs did to my father and uncle ... they declined from respected community members to junkies – it kept me away from using [heroin]." He said, "I learned the 'rules of the game' early from my father and uncle. All I knew was the street life."

This report is supported by his uncle:

---

[8] Binder, L.M. (1986). Persisting symptoms after mild head injury: A review of the postconcussive syndrome. *Journal of Clinical and Experimental Neuropsychology,* *8*(4), 323 – 346.

> But worse than the act of selling drugs, we introduced Billie to the "easy" life. We taught him all the wrong stuff. Instead of teaching him hard work we taught Billie about crime and drugs. We did not teach him the value of people, but only taught him about getting things. We taught him about jewelry and liquor, but not about hard work. To say that we were a bad influence on him would not even begin to tell the story. He was with us when we were surrounded by the illegal activities of drug dealers, drug users, and prostitutes. He was still a little kid, but oh we thought this was cool. [Declaration of Billy Wayne Allen, p. 5]

With regard to strictness and discipline, he stated that early in his life the community in which his family lived was good, "before drugs hit, it was like a big family. However, as drugs became more prevalent in the neighborhood, he reported that "things had to be strict" as the community deteriorated.

He indicated that his mother had also developed problems with alcohol and drugs, which got worse after her boyfriend committed suicide: "When she gave up, I gave up."

**Child abuse and neglect.** Witnesses to Mr. Allen's infancy and early childhood describe severe neglect and abuse:

> Juanita is a dear friend, but the truth is that she was a terrible mother. She was too wrapped up in her own depression, alcoholism, confusion and in her own survival and happiness. When Billie and her other kids were babies, Juanita would not change their diapers for days at a time. They were just left to lie in their own filth. When Billie began to cry, she would stand over him in his crib and just look at him, smoking her cigarettes, dropping ashes right on him. She would not pick up and comfort him. [Declaration of Cathy Toliver, p. 2]

When asked if he has ever been abused, physically, sexually, or emotionally, Mr. Allen replied that he felt "traumatized" by his neighborhood environment, and that at home he received "whoopin's," which he described as including being sent to "pick a switch", being hit with a belt, hit with an extension cord, slapped, and "punched in the

mouth one time." He stated that these "whoopin's" would occur weekly, "for little provocation."

During a subsequent interview, he stated that the, "whoopin's made me hate my Mom, my sisters, my life. … If you're going to beat me for nothing, then I'll do something really bad so at least I deserve it."

His mother Juanita Allen admits beating him:

> I'm sorry to say that I would take my anger and frustration out on him physically. I would use a belt, an extension cord, or any object within reach to hit Billie. Sometimes I slapped him across the mouth. When I was drinking, I was a mean drunk.
>
>     *            *            *
>
> I did not only abuse Billie physically, but I would treat him differently from my three daughters. There was just something about Billie, about his problems and about the difficulties with his behavior that just lit my fuse. I could not control myself. So, sometimes I just wanted him out of my sight. There were periods of time when I would throw him out of the house and not let him back in for days. … I did this even while he was a young boy." [Declaration of Juanita Petty Allen, p. 2-3]

Juanita Allen's abusiveness is also described by Cathy Toliver who states:

> Juanita was especially hard on Billie. From the time he was a toddler when she would shake him until he was a full grown teenager, she physically abused him. She whipped Billie with belts. She threw shoes and knives at him. She beat him with broomsticks and even with the back of a butcher knife. She verbally abused him, calling him a "motherfucker," calling him stupid, telling him she wished he wasn't her son. … She took her anger out on the boy his whole life." [Declaration of Cathy Toliver, p. 3-4]

This was also observed by her son Brady Toliver, who was the same age as Billie growing up:

> She used to call him names and cuss at him. She called him stupid. Sometimes Juanita would lose her mind and go crazy on

Billie.  She would scream at him and hit him or throw any object that was close to her at him.  She threw shoes, an iron, and I even saw her throw a pan off the stove at Billie.  It was never a regular whooping.  There was never an explanation after the beatings." [Declaration of Brady Toliver, p. 1]

Similar observations are provided by Mr. Allen's sister Angela, who states:

Juanita was not a loving mother.  She was cruel to the children in the family and especially to my brother Billie and myself.  ... My mother became more and more cruel toward Billie.  She would yell at him and call him terrible names.  She locked him out of the house all the time.  I'm not sure where he stayed when this happened.  This happened often.  One night when she had locked the door on him, he started banging on the door for her to let him in.  Billie kept pounding on the door until my mother got a knife, opened the door, and threatened to kill him with it if he didn't stop.  ... I was so afraid that I called the police ... Each time she locked him out, he would come back and be even more disturbed and out of control." [Declaration of Angela Allen, p. 2]

Mrs. Allen's abuse is also described by her daughter Nicole, who describes her mother as getting:

...angry at frustrated at Billie for any little thing.  She would yell and scream at Billie and beat him with a shoe, a cord, or anything else within her reach.  She also started locking Billie out of the house whenever he came home after dark. [Declaration of Nicole Petty, p. 1]

She also described physical abuse of Mr. Allen by his uncle Jerome:

He was a bully toward everyone, but he was especially rough on Billie.  Once Jerome was picking on Billie and he threw Billie into a gate outside the house.  Billie's head was badly injured and he had to go to the hospital.  ... Both the beatings and the verbal abuse were unprovoked and definitely not what anybody would consider legitimate discipline." [Declaration of Nicole Petty, p. 1-2]

Mr. Allen's cousin Claude McClemore also witnessed his mother's abusive behavior, stating:

> Billie liked to stay out of the house because he got whooped there a lot.  When he was young, Juanita grab Billie [sic], rough him up, and beat him with thick belts, extension cords, high-heeled shoes, whatever she could put her hands on.  When I stayed over for a weekend, Juanita usually beat Billie at least one or twice, even though we weren't in the house most of the time.  Billie got beaten for pretty much anything.  Juanita beat him if he slammed a door, if he talked back, if he didn't do what she said right away, if he broke something.  Sometimes, Juanita was just drunk and angry and  beat Billie for no real reason." [Declaration of Claude McClemore,
> p. 2]

Similar accounts of Juanita Allen's alcoholism and concomitant child neglect and abuse are also provided by other witnesses, including Shirlee Grant, and her son Johnnie Grant, who was a childhood friend of Mr. Allen's.  [Declarations of Shirlee and Johnnie Grant]

There is a substantial scientific literature showing that the abuse and violence Mr. Allen experienced in the home (coupled with the violence he encountered and witnessed in his surrounding community, described below) placed him at significant risk for the development of psychiatric disorders, including Depression and Posttraumatic Stress Disorder.[9]

---

[9]  Famularo, M., Kinscherff, R., & Fenton, T.  (1992).  Psychiatric diagnoses of maltreated children: Preliminary findings. *Journal of the American Academy of Child & Adolescent Psychiatry, 31*(5), 863-897.  [ADHD, ODD, & PTSD]

McCloskey, L.A., & Walker, M.  (2000).  Posttraumatic stress in children exposed to family violence and single-event trauma. *Journal of the American Academy of Child & Adolescent Psychiatry, 39*(1), 108-115.

Kaplan, S.J., Pelcovitz, D., Salzinger, S., Weiner, M., Mandel, F. et al.  (1998). Adolescent physical abuse: Risk for adolescent psychiatric disorders. *American Journal of Psychiatry, 155*, 954–959.

Margolin, G., & Gordis, E.B.  (2000). The effects of family and community violence on children. *Annual Review of Psychology, 51*, 445-479.

## **Traumatic Life Events**

As a child Mr. Allen suffered both violent abuse in the home, as well as life-threatening traumatic experiences from living in a community best characterized as an urban war zone; life conditions that transform the "developmental challenge" of violence into developmental harm as the accumulation of risk factors associated with violence in the community exceeds the capacity of the child's resilience.[10] In Mr. Allen's case, his reservoir of resilience was already significantly attenuated by the host of physical and neurobiological risk factors he experienced or was exposed to, as well as the violent and unstable family environment in which he was raised.

The burden of these life stressors was profoundly intensified by the emotional suffering associated with the repeated loss of close friends and family members to gun violence as his neighborhood descended into drugs and crime. When he was just four or five years old he is reported to have witnessed a man getting shot in front of him in a liquor store that Cathy Toliver's family ran. [Declaration of Cathy Toliver, p. 3] There is a substantial literature on the harmful effects that simply witnessing violence has on children, including increased risks of psychopathology,[11] and future violent criminal behavior.[12]

---

[10] Garbarino, J. (2001). An ecological perspective on the effects of violence on children. *Journal of Community Psychology, 29*(3), 361-378.

Berton, M., & Stabb, S. (1996). Exposure to violence and Post-Traumatic Stress Disorder in urban adolescents. *Adolescence, 31*, 489-498.

Schwartz, A., Bradley, R., Sexton, M., Sherry, A., & Ressler, K. (2005). Posttraumatic stress disorder among African Americans in an inner city mental health clinic. *Psychiatric Services, 56*, 212-215.

Parson, Erwin A., (1994). Inner city children of trauma: Urban violence traumatic stress response syndrome (U-VTS) and therapists' responses. In J.P. Wilson & J.D. Lindy (Eds.) . *Countertransference in the Treatment of PTSD*. New York: Guilford Publications, Inc., (pp 157-178).

[11] Augustyn, M.,& Groves, B.M. (2005). Training clinicians to identify the hidden victims; Children and adolescents who witness violence. *American Journal of Preventive Medicine, 29*(5, Suppl2), 272-278.

Pelcovitz, D., Kaplan, S., DeRosa, R., Mandel, F., & Salzizner, S. (2000). Psychiatric disorders in adolescents exposed to violence and physical abuse. *American Journal of Orthopsychiatry, 70*, 360-369.

When he was 15 years old, he suffered the killing of his friend Dennis Noble and the shooting of his cousin Cory Roy, both of whom were shot on the streets in his neighborhood during that year. Two years later, his best friend Marquis Taylor was shot and killed in front of him while they were coming home from basketball practice on May 3, 1995, when he was 17 years old. The cumulative impact of these life traumas on Mr. Allen was psychologically devastating, particularly when considered in conjunction with his family history of neglect, physical abuse, and abandonment.

With regard to Marquis, he stated, "I only had one friend I talked to, and he got killed." He describing feeling "devastated." He said that they, "Had a dream to get out together and escape" from the environment around them. He described Marquis as his best friend, stating, "He treated people right. We used to tell people we were brothers." He said, "I took my first adult case for him" indicating that he took the rap to spare his friend.

---

Stacey Nofziger, S. (2004). *Correlates and Consequences of Juvenile Exposure to Violence: A Replication and Extension of Major Findings from the National Survey of Adolescents, Executive Summary*. Washington, D.C.: U.S. Department of Justice, National Criminal Justice Reference Service.

Howard, D.E., Feigelman, S., Li, X., Cross, S., & Rachuba, L. (2002). The relationship among violence victimization, witnessing violence, and youth distress. *Journal of Adolescent Health.*, *31*(6), Dec 2002, 455-462.

Osofsky, J.D., & Scheeringa, M.S. (1997). Community and domestic violence exposure: Effects on development and psychopathology. In Cicchetti, D, & Toth, S.L. (Eds.), *Developmental perspectives on trauma: Theory, research, and intervention. Rochester symposium on developmental psychology, Vol. 8*. Rochester, NY, US: University of Rochester Press, pp. 155-180.

Widom, C.S. (1997). Child abuse, neglect, and witnessing violence. In Stoff, D.M., Breiling, J, & Maser, J,D. (Eds), *Handbook of antisocial behavior*. (Hoboken, NJ, US: John Wiley & Sons Inc., pp. 159-170.

[12] Eitle, D., & Turner, R.J. (2002). Exposure to community violence and young adult crime: The effects of witnessing violence, traumatic victimization, and other stressful life events. *Journal of Research in Crime and Delinquency, 39*(2), 214-237.

He described problems that he experienced as a result of his abusive home environment and the traumas he experienced in the community, with symptoms including:

- Shutting down emotionally
- Psychic Numbing
- Disengaging from the environment
- Not wanting to be attached to anything emotionally

He stated that he continues to have intrusive memories and obsessive thoughts regarding these events, and reported thinking to himself, "Why?  What if... How?" "I wish it would have been me." "We both had a lot to offer but he had more." "The neighborhood took my peace of mind, I had no peace."

He also described a sense of a foreshortened future: "I never thought I'd make it to 21.  It changed my world view.  ...  I always thought my next day was going to be my last."  He described living in the moment, "I wanted to enjoy it as much as I could."

He described attempting suicide by playing Russian Roulette twice when he was 17.  When the gun did not go off, he stated, "I took it was a sign to try to do good."

Others describe additional behavioral symptoms of PTSD, particularly an exaggerated startle response:

> I remember Billie in those times being incredibly frightened.  I remember watching him walk down Taylor Avenue and I could see how stressed out he was.  It was like his head was on a swivel; he was so scared that someone was going to kill him.  In our neighborhood, we described Billy as "scarey," which means that he was frightened easily; it does not mean that Billie would frighten people.  For example, if kids were standing in a group, someone would stomp their foot suddenly and Billie would jump and start running away.  Then everyone would laugh at Billie and he would try to play it off.  Billie had a lot of pent up stress when he was a teenager.  [Declaration of Samuel Moore, p. 3]

Long-term exposure to serious, potentially lethal violence, particularly exposure to firearm violence, places teenagers at risk for a host of

adverse behavioral outcomes, including impulsivity, substance abuse, truancy, and risk for violence and criminal activity later in life.[13] "[W]e estimate that being exposed to firearm violence approximately doubles the probability that an adolescent will perpetrate serious violence over the two subsequent years" (Bingenheimer, et al., 2006).

## Psychiatric History

Mr. Allen stated, "I was depressed from 17-21." He reported that his first psychiatric contact was at age 18 or 19 at a psychiatric walk-in clinic. "I didn't go in – don't know how to ask for help – that's the way my family is – just keep it balled up – just keep it in." He described feeling a sense of panic, "I felt trapped in the lobby."

He reported that he had a second contact, "I came back on my own again, just couldn't go in – couldn't admit I had a problem. I wanted to feel normal. Admitting I had a problem meant that I wouldn't feel normal no more." Mr. Allen's difficulty in pursing psychiatric treatment has been shown to be a common phenomenon among low-income, urban African Americans experiencing symptoms of posttraumatic stress disorder.[14]

His history is positive for suicidal ideation and behavior. He stated that he tried to hurt himself "a few times," the first being Marquis Taylor got killed. He reported thinking, "If I'm going to die anyway...."

---

[13] Bingenheimer, J., Brennan, R., & Earls, F. (2005) Firearm violence exposure and serious violent behavior. *Science, 308,* 1323-1326.

Patchin, J., Huebner, B., McCluskey, S.V., & Bynum, T. (2006). Exposure to community violence and childhood delinquency. *Crime and Delinquency, 52,* 307-322.

Chaiken, M.R. (2000). *Violent Neighborhoods, Violent Kids.* Washington, D.C.: U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention.

Shafer, J.N., & Ruback, R.B. (2002). *Violent Victimization as a Risk Factor for Violent Offending Among Juveniles.* Washington, D.C.: U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention.

[14] Davis, R., Ressler, K., Schwartz, A., Stevens, K., & Bradley, R. (2008). Treatment barriers for low-income, urban African Americans with undiagnosed posttraumatic stress disorder. *Journal of Traumatic Stress, 21,* 218-222.

and stated that he took pills. "I didn't want to live, but I couldn't take my life." He also related the Russian Roulette episodes described above.

**Diagnosis of depression.** Records from Metropolitan St. Louis Medical Center indicate that Mr. Allen presented at the hospital at age 21 with suicidal ideation related to "psychosocial stressors" including being kicked out of his house and the "death of friends." He was diagnosed with a depressive disorder by Dr. C. Wuertz, who offered him an inpatient evaluation that he refused. Because he did not meet criteria for involuntary commitment, he was discharged. [Metropolitan St. Louis Medical Center records, 02/11/1997]

**Substance abuse.** Mr. Allen reported that he started to drink alcohol and smoke marijuana "heavily, heavily," "after my first few friends died." He stated that he would, "drink and smoke weed all day." His drink of choice was "Everclear 180 proof."
He denied using other drugs.

## School History

Mr. Allen reported that his early experiences in school were good, but that his behavior and attendance fell off as he got older, to the point that he was expelled in the 10th grade for having "words" with the vice-principle.[15]

When asked if he liked school, he stated, "Early on, yeah. But when I got to the city school I hated it. [The school environment] made you feel worthless – like anything you did was a waste of time."

He related that his teachers would have characterized him as "calm, easy going" and that if he was challenged, he would "step up," but that if he was bored he didn't seem to care.

---

[15] School records indicate that he "trespassed on Sumner School premises and committed a Type III Offense (Insubordination/Disrespect) that was prejudicial to good order and discipline in the school and violated the Uniform Code of Student Conduct [Expulsion letter, St. Louis Public Schools, 05/05/1994] ." It appears that he called two school officials "motherfuckers." [Expulsion Recommendation Form, 04/25/1994]

He described his behavior at school as generally good. "I was always known as an artist." He stated that was involved in a couple of fights during school, including one in the county school when another boy called him a "nigger" and he hit him, resulting in his being suspended for one day. The also reported being involved in "a couple" of fights in the city school, and getting into trouble for skipping school when he got older. He described his social adjustment at school as "OK," and stated that he had "a few" close friends.

Mr. Allen's older sister Nicole Petty states that Mr. Allen was unable to keep up with the other kids in the Clayton County schools, and that he experienced a "complete shock" when he transferred to Turner Middle School in the city, were drugs and other illegal activities were rampant. [Declaration of Nicole Petty, p. 1]

His mother noted:

> He was picked on in school and in the neighborhood. He was also a sickly child, which made it even more difficult for him to be accepted. .. He was always fidgety and jumping, and had lots of trouble paying attention to things. [Declaration of Juanita Allen, p. 3]

As noted above, it appears that Mr. Allen had a history of learning problems that were treated with medication.

**Employment History**

Mr. Allen reported that after leaving school he did odd jobs, and joined the Job Corps, but, "didn't feel like I belonged." He recalled that he has had seven or eight jobs, mostly in the fast food industry. "Inside, I always knew I was better that what I was doing, but I couldn't shake the doubt." "Why try when someone can shoot you in the back at any second?"

## Examination Findings

## Behavioral Observations and Mental Status Examination

Billie Allen is a 31-year-old, right-handed African American man who presented for testing neatly dressed in tan prison-issued scrubs with a grey long-sleeved t-shirt underneath. He was friendly, engaging, and cooperative thought out all three days of examination, and worked diligently on the testing.

He arrived on crutches and walked with a limp due to an injury to his right knee while playing basketball, although his motor behavior was otherwise well coordinated and graceful.

His speech was produced at a normal rate and volume, with a normal quantity of output in February, but slightly pressured speech in April. His thoughts were free from fixed, false beliefs (delusions), although on all occasions he complained of obsessive and racing thoughts, and having "too many thoughts in my head." There was no evidence of abnormal sensory experiences, including auditory, visual, tactile, olfactory, or somatic hallucinations. However, he did complain of occasionally experiencing visual phosphenes (brief spots of light in the visual fields brought on by eye movement).

Emotionally, his observable affect was "stressed," sad, and anxious. This presentation was stable through out all three days I spent with him, although he was more acutely distressed and symptomatic during my second examination in April. He stated, "I don't care anymore. I just work all day. [Q: What do you do?] 15 different projects; plays, novels, comic strips, drawings, help others." "I'm the guy who mediates things. I can have a good conversation with anybody."

He initially stated that he has difficulty falling to sleep, and trouble sustaining sleep due to obsessive thoughts, reporting that he gets about five hours of sleep per night. He reported a long history of nightmares that he described as recurrent dreams of being shot and killed while sitting in the dark in his backyard, with an onset at age 10-11 and continuing to the present. In April he said that his sleep had decreased, "I give up my sleep time to help others. I can't sleep all day, my mind will eat me alive."

He used an analogy, stating, "If you don't milk a cow, it will die," as a way of describing the internal pressure he is experiencing to get his racing thoughts out of himself. "I'm tired of fighting … at least when your dead you don't have to worry about trying anymore."

He began the second interview by producing a number of his drawing and artwork, much of which reflected both a significant talent in their technique, and significant emotional turmoil in their content.

He described experiencing obsessive, ruminative thoughts, consistent with persistent re-experiencing of the traumas in his life. He described these as intrusive thoughts with an internal sense of psychic discomfort and feelings of pressure to express or discharge this negative affect, "These thoughts, get 'em out, get 'em out: failures; thing I want to achieve; things I want to correct; things I want to say; things I should have said; relationships; look for things I succeeded at or not; life; death; Basically, 'what does my life mean – what is my purpose in life?' Am I a good person or am I a bad person?'"

He reported feeling compelled to get his thoughts and feelings down on paper via writing, drawing, and painting. He described grappling with how to, "let this rage out." "What would I do? What would people think?" "I just want to slow down. I want just for a month for it to slow down – not think about anything. I just can't slow down."

He also discussed depressive ideation, including thoughts about using the death penalty as a form of assisted suicide. "I'm tired. For me, I'm just tired." While he endorsed suicidal ideation, he also stated, "self-preservation will stop me from doing it, but the thought is still there. … I want to live, but I don't care if I do or don't." He described "hopelessness" stating, "I just want to stick a knife in my neck and kill myself," but then stating that he channels that feeling into, "working and drawing."

He said that intrusive thoughts interfere with his sleep, and that he experiences periods of increased activity ("painting, drawing, writing poetry, journal, stories, novels, screenplays, books.") interspersed with periods of decreased activity. There was evidence of increased production of speech and ideas. There also appears to be hypergraphia, although he did not bring any of his writings to the examination. He described becoming "irritated a lot quicker now,"

stating, I'm tired of the 'bullshit' – when you try to grow – that's when the B.S. comes your way – just put the damn needle in and get it over with, man."

He described using his artwork to express feelings he can't verbalize or write. "I put me in my art. … With what I saw at such a young age, it's like I lock myself up mentally – like I know what's out there, I know there's a better way, but I just can't get there." He described a "fear of success" that seemed to more accurately reflect a paralyzing fear of failure, and uncertainty with regard to his own abilities and the responses he could anticipate from his environment.

## Psychodiagnostic Test Results

**Test validity.** All of the validity indicators built into the PAI were within normal limits, indicating that the resulting profile provides a valid picture of Mr. Allen's current level of psychological functioning. Due to his circumstances however, he could not answer a number of questions regarding drug and alcohol use, rending the scales based on those items uninterpretable.

**Test findings.** The psychodiagnostic testing (PAI) reveals depression, and enduring symptoms of PTSD. With regard to depression, there is evidence of elevated cognitive, affective, and physiological signs and symptoms as well as suicidal ideation. Evidence of PTSD includes reexperiencing the trauma, recurrent distressing dreams, feelings of guilt, hypervigilance, diminished interest in significant activities, and feelings of detachment or estrangement from others

A computerized interpretive report provided the following description based on his goodness-of-fit index for PAI Cluster 2 psychopathology:

> This pattern suggests a person who is severely depressed and withdrawn. These individuals are unhappy with their life circumstances and report experiencing the effects of major stressors in both the past and present. They see little hope for improvement in these circumstances and they think about suicide as a solution to their problems. They feel cut off from the people around them, whom they see as unsupportive and uncaring; they probably harbor a fair degree of resentment toward the few people in their lives who are close to them. Their

self-esteem is quite low, and they view themselves as ineffectual and powerless to change the direction of their lives.  They are having difficulty concentrating and making decisions, and their preoccupations and anxiety are likely to impair their ability to think clearly.  They are also experiencing what appear to be a number of somatic manifestations of their current stress. The most common diagnoses for these patients involve <u>Major Depressive Disorder</u>, <u>Dysthymic Disorder</u>, or an <u>anxiety disorder</u> (most likely <u>Posttraumatic Stress Disorder</u>).  [PAI Interpretative Explorer Report]

## <u>Neuropsychological Test Results</u>

**Data validity.**  Mr. Allen's level of effort during the neuropsychological testing was evaluated with multiple measures (Rey's 15 Items, Validity Indicator Profile, Test of Memory Malingering), all of which indicated that he was compliant with the testing and put forth a good effort. There was no indication of exaggeration or malingering.  Hence the neuropsychological test data obtained during the present examination are believed to provide an accurate indication of his current level of neurobehavioral functioning.

**Test findings.**  A comprehensive neuropsychological assessment was administered to Mr. Allen, including the full Halstead-Reitan test battery and allied procedures as listed above. In order to interpret Mr. Allen's test performances properly, all the raw test scores have been converted to standardized scores on the basis of published norms available at the time of his trial and sentencing.  This means comparing Mr. Allen's performance to that of his peers, i.e., comparing his scores wherever possible to norms for other persons of his age, sex, and education.  I was guided in this process by the American Psychological Association's <u>Standards for Educational and Psychological Testing</u> and the <u>Specialty Guidelines for Forensic Psychologists</u>.

Mr. Allen is functioning within the average range intellectually, with a Full Scale I.Q. score of 100, although his visual-spatial problem solving skills are operating at a significantly higher level than his verbal skills (PIQ = 110 >VIQ = 92).  However, in the context of overall average intellectual functioning, he demonstrated a number of deficit areas consistent with his history of exposure to neurotoxins, febrile convulsions, asthma, and mild head injuries.

His score on the Working Memory Index of the WAIS-III was impaired relative to his overall level of intellectual functioning, in part due to a significant weakness in Arithmetic skills.

Mr. Allen's WMS-III General Memory, Immediate Memory, and Auditory Delayed Memory indexes were all significantly lower than expectation based on his Full Scale I.Q. He also displayed substantial impairment in verbal learning, with scores on the major CVLT measures falling two to three standard deviations below the mean, together with significant intrusions of erroneous material and a mild degree of perseveration.

On tests of executive functioning, although he performed within normal limits on some measures, his scores on both the Color-Word and Interference trials of the Stroop Test were moderately impaired (two standard deviations below the mean); an indication of frontal lobe impairment involving impulse control (which was observed behaviorally during testing as well.) His score on a test of verbal fluency (F-A-S) was also mildly impaired, again indicating a deficit in executive functioning.

In addition, there was evidence of significant aphasia on the Boston Naming Test, where his score was in the range of severe impairment, falling four standard deviations below normal for his age and education (Heaton norms).

His score on the Neuropsychological Deficit Scale, a composite measure based largely on the Halstead-Reitan Neuropsychological Test Battery, was in the range of mild brain damage (NDS score = 29, cutoff for normal = 25). There was evidence of left-sided impairments in both motor strength and manual dexterity, with scores on both the hand dynamometer and grooved pegboard tests falling in excess of one standard deviation below the mean. Tactual form recognition was mildly impaired bilaterally. In addition, mild impairment in auditory attention was observed on the Speech Sounds Perception Test.

On the basis of these test results, he clearly meets criteria for a diagnosis of Dementia due to Multiple Etiologies (maternal cigarette smoking; maternal alcohol abuse; lead poisoning; recurrent febrile convulsions; uncontrolled asthma; and one or more mild head injuries).

I base this opinion on his history and the fact that Mr. Allen's test performance revealed significant impairments in memory, together with impairments in language, motor skills, and executive functioning, consistent with frontotemporal dementia.

## Summary and Forensic Opinions

This evaluation was requested in order to address three main referral questions. I will turn to these below, and summarize my findings and opinions for each.

(1)   **Please review the psychological testing of Mr. Allen conducted by Dr. Michael Gelbort at the time of trial in 1998, and provide the Court with an opinion regarding the scope and adequacy of the testing he performed relative to the forensic circumstances of the case, with attention to the extent of the testing conducted, the norms applied to the obtained test data, and the resulting opinions offered.**

Dr. Gelbort's evaluation was informed by an inadequate and incomplete set of background materials, and therefore fell short of the standard of care expected in forensic practice due to a failure to recognize the full extent of Mr. Allen's neurobehavioral history, particularly in view of the fact that this was a capital case.

It appears that he undertook a brief "screening" battery of neuropsychological tests, rather than the comprehensive examination that a full appreciation of Mr. Allen's history would have clearly indicated. Unfortunately, he also relied on outdated test materials, ignored normative databases, and did not integrate his findings with the extant research literature, largely because he was not made aware of the full extent of Mr. Allen's neuropsychiatric history by defense counsel at that time.

He chose not to administer a full Halstead-Reitan Battery, neglecting to administer five out of 11 tests including: the Tactual Performance Test, the Speech Sounds Perception Test, the Seashore Rhythm Test, the Finger Oscillation Test, and the Tactile Form Recognition Test. Further, he mis-administered some of the parts he did give such as grip strength, where it appears he did not use the Hand Dynamometer

apparatus, and did not record any obtained scores, yet reported findings as if he had done so. Failing to administer the complete H-R battery severely undermines its diagnostic utility for accurately detecting brain damage.

Next, he relied on versions of the Wechsler Adult Intelligence Scale and the Wechsler Memory Scale that were out of date. Worse, he failed to administer the complete Wechsler Memory Scale-Revised, and neglected even to score the portions that he did administer, rendering accurate interpretation impossible.

He did not rely on available up-to-date norms for the interpretation of the test data, relying instead on his own unreliable, impressionistic, and idiosyncratic interpretations of test performances that in many cases he did not actually score.

Because he was not provided with a complete neurobehavioral history, and decided to administer a brief and incomplete examination and test battery, Dr. Gelbort failed to identify all of Mr. Allen's neurobehavioral deficits; failed to reach the proper diagnosis; and therefore was unable to tie together Mr. Allen's history and test performances appropriately and completely for the trier of fact.

Further, Dr. Gelbort failed to test for psychopathology, which was standard practice in neuropsychology at that time, and serves to place neuropsychological test findings into their overall proper context.

Dr. Gelbort also failed to administer any standardized tests of effort or malingering that could have been used to support the veracity of his test findings when confronted on cross-examination by Mr. Holtzhauser; or, had they shown a lack of effort by Mr. Allen at that time, could have served as the basis for a re-examination and acquisition of a valid data set.

Finally, Dr. Gelbort failed to investigate the extant research literature adequately in order to tie Mr. Allen's history to his neurobehavioral deficits and psychosocial outcomes.

**(2)    To the extent that Dr. Gelbort's psychological examination of Mr. Allen fell short of the standard of care in place at the time of Mr. Allen's trial, please conduct your own examination of him, employing tests, norms, and procedures that were available and in use at that time, in order to provide the Court with opinions regarding what should have been presented by Mr. Allen's defense at that time.**

The findings from my examination and testing of Mr. Allen are described in detail above, and will be summarized briefly here. I administered a comprehensive test battery, including tests of psychopathology and malingering, and interpreted those data on the basis of norms comparing Mr. Allen to others of his age, sex, and education.

Based on that examination and my review of his history and records, I was able to reach a number of opinions about his psychiatric and neuropsychological functioning that should have been presented to the jury at the time of his capital sentencing, including:

- That Mr. Allen's complicated history of risk factors for brain damage and psychiatric disorder; including his abusive and dysfunctional family environment, fetal and early childhood exposure to neurotoxins, febrile seizures, uncontrolled asthma, head injuries, learning disability, and community exposure to trauma and gun violence all had direct implications for his neuropsychological status, mental state, and behavior.

- That Mr. Allen had brain damage that impacted his neurobehavioral functioning in multiple areas, including memory, language, motor skills, and executive functioning including impulse control.

- That the neuropsychological testing supports a diagnosis of Dementia due to Multiple Etiologies, a neuropsychiatric disorder that influenced his behavior.

- That psychodiagnostic testing indicates that Mr. Allen suffers from symptoms of an Affective disorder (Major Depression or Bipolar II Disorder) together with Post Traumatic Stress Disorder.

- That Mr. Allen was effortful and not malingering during testing.

(3)  **Please provide the Court with opinions regarding any mitigating evidence identified in the course of your forensic examination that was either not presented, or not fully addressed at the time of his capital sentencing proceedings.**

As detailed in the body of this report above, Mr. Allen was exposed to multiple neurotoxic substances, both in-utero and in very early childhood, that resulted in a complicated cascade of medical and neurobehavioral disorders that then interacted synergistically with a family environment of neglect and abuse to produce both brain damage and psychiatric disorders; all in the larger social context of a deteriorating community environment plagued by violence, drugs and crime.

The additive burden of each of these factors exacted a significant toll on Mr. Allen's neuropsychological and psychosocial development, yet there was in the testimony a lack of any synthesis or "connecting the dots" for the jury to present this evidence in a complete and integrated fashion.

Many people from Mr. Allen's background experience stressful life experiences.  However, even in that context, his life experiences were not only excessive but psychiatrically devastating, resulting in life-long psychiatric distress and neurobehavioral abnormalities.

Although some of his significant biopsychosocial life stressors were touched on in testimony at the time of his sentencing, a full exploration of those stressors and their linkages to his subsequent psychiatric damages was not carefully or completely presented. Strikingly, absolutely no expert testimony was presented at trial about his physical abuse, neglect, and abandonment in the home.  There was a wealth of scientific literature available at that time connecting

Mr. Allen's maladies and life experiences to the very outcomes that he had experienced in life up to and including the instant offense itself, that was not put before the jury but should have been.

Thank you for the opportunity to consult on this complicated and challenging case. If you have any questions regarding my findings or opinions, I will be happy to discuss them with you, and I can be reached directly at (949) 732-2211.

Sincerely,

Daniel A. Martell, Ph.D. A.B.P.P. (Forensic)
Assistant Clinical Professor of Psychiatry and Biobehavioral Sciences
Semel Neuropsychiatric Institute
David Geffen School of Medicine at U.C.L.A.