# Report of Forensic Neuropsychological Examination

## United States

## v.

## Angela Johnson

### Daniel A. Martell, Ph.D., A.B.P.P.

**Semel Institute for Neuroscience and Human Behavior**

**David Geffen School of Medicine at U.C.L.A.**

**and**

**Park Dietz & Associates, Inc.**

**2906 Lafayette**

**Newport Beach, CA 92663**



GOVERNMENT
EXHIBIT
PPP
09-CV-3064 MWB

# Table of Contents

I.   Reason for Referral                                         1

II.  Scope of Examination and Informed Consent                  1

III. Materials Reviewed                                          2

IV.  Tests Administered                                          3

V.   Examination Findings                                       4

     A. Behavioral Observations and
        Mental Status Examination                               4

     B. Psychodiagnostic Test Results                           6
             1.  Data validity                                  6
             2. Test Findings                                   6

     C. Neuropsychological Test Results                         6
             1.  Data validity                                  7
             2. Test Findings                                   7

     D. Mental State at the Time of the Offenses               9
             1. Obtaining and disposing of the
                murder weapon                                  10
             2. The Nicholson/Duncan homicides                10
             3. The DeGeus homicide                           11

VI.  Summary of Opinions                                       11

VII. Table 1: Normative Neuropsychological Profile             15

ii

Case 3:09-cv-03064-MWB-LTS   Document 304-9   Filed 08/10/11   Page 2 of 20

PPP-P02

# PARK DIETZ & ASSOCIATES, INC.
## Forensic Consultants in Medicine and the Behavioral Sciences

**Daniel A. Martell, Ph.D., ABPP**

**Administrative Offices**

2906 Lafayette
Newport Beach, CA 92663
Tel: 949-723-2211
Fax: 949-723-2212
Email: expert@parkdietzassociates.com
Website: www.parkdietzassociates.com

2906 Lafayette
Newport Beach, CA 92663
Tel: 949-760-0422
Fax: 949-786-7478
Email: damartell@aol.com

**Forensic Psychiatry**
Park Dietz, MD, MPH, PhD
   President
Eugene Beresin, MD
Bennett Blum, MD
John Bradford, MB, ChB
Graham Glancy, MB, ChB
Bruce Harry, MD
Mark J. Hauser, MD
Joseph Kenan, MD
Stuart Kleinman, MD
Daryl Matthews, MD, PhD
Steven Pitt, DO
Gregory Saathoff, MD
Esperanza Salinas, MD
Rene Sorrentino, MD
Sheila Wendler, MD

**Forensic Pathology**
Tracey S. Corey, MD
Judy Melinek, MD
George R. Nichols II, MD

**Forensic Neurology**
David Griesemer, MD
Helen Mayberg, MD

**Forensic Psychology**
Joel Dvoskin, PhD
Stephen D. Hart, PhD
Kirk Heilbrun, PhD
Elizabeth Loftus, PhD
Daniel A. Martell, PhD
Ronald Roesch, PhD
Erin Spiers, PsyD

**Forensic Social Work**
Cheryl Regehr, PhD
Janet I. Warren, DSW

**Criminology**
Larry Ankrom, MS (FBI ret.)
Kenneth Lanning, MS (FBI ret.)
Gregg McCrary, MA (FBI ret.)
Ronald Walker, MA (FBI ret.)
James Wright, MPA (FBI ret.)

**Security**
Bernard Banahan
Robert Hayes, CPP, CFE
Steve Howell

**Medical Strategist**
Steven Ainbinder, MD

July 7, 2011

Charles J. Williams, Esq.
Assistant United States Attorney
United States Attorney's Office
401 First St, S.E.
Suite 400
Cedar Rapids, Iowa 52401

## RE: <u>U.S. v. Angela Johnson</u>

Dear Mr. Williams,

I am writing today to convey the findings and opinions arising from my recent examination of Ms. Johnson pursuant to the above captioned matter.

## Reason for Referral

You have asked that I review additional records and conduct a new examination of Ms. Johnson in order to provide the Court with an independent opinion regarding the findings provided by the defense experts in this case.

## Scope of Examinations and Informed Consent

I examined and tested Ms. Johnson in a private room at the Federal Medical Center at Carswell, Texas on 03/23/2010 and 03/24/2010 for a total of approximately seven hours.

The interview portions of the examination were recorded using videotape on the first day, and audiotape on the second day due to an equipment malfunction. Female corrections officers were stationed in an adjoining room with a glass window where they could observe Ms. Johnson but not hear our conversations.

On the first day of the exam, the institution was undergoing a fire alarm inspection, and the alarm would sound at periodic intervals, making it difficult to hear and maintain a normal conversation. Neuropsychological testing was deferred during this time due to the distraction.

Ms. Johnson was informed that I was retained by the United States Department of Justice, of the lack of confidentiality in this forensic context, and of the lack of any treating relationship between us. She remembered me from our previous examination, and provided her informed consent to participate in the current examination.

Subsequent to that examination Ms. Johnson changed her position regarding her participation in the instant offenses, and made statements to Dr. Woods implicating herself in the crimes. As a result, I requested an additional opportunity to examine Ms. Johnson in order to re-open my examination of her mental state at those times. That request was granted, and I again examined her on 06/20/2011 at the Sioux City Jail, for approximately one hour and 40 minutes. The examination was recorded in its entirety on video.

Ms. Johnson was again advised that I was retained by the United States Department of Justice, of the lack of confidentiality in this forensic context, and of the lack of any treating relationship between us. She again recognized me from our prior visits, and provided her informed consent to participate.

Prior to entering the examination area, I was approached by Lindsay J. Runnels, Esq. who cordially introduced herself and explained that she was one of Ms. Johnson's attorneys and would be available throughout the examination should the need arise for Ms. Johnson to speak with her. She gave me her card and her cell phone number. I advised Ms. Johnson that Ms. Runnels was there at the beginning of the examination, should she wish to consult with her.

**Materials Reviewed**

Since my original report in this matter co-authored with Dr. Dvoskin, I have reviewed the following materials:

(1)   Report of Dr. George Woods, 10/05/2009.
(2)   Report of Dr. George Woods, 05/26/2011.

(3)    Report of Dr. Myla Young, 03/21/2011.
(4)    Raw neuropsychological test data from Dr. Myla Young.
(5)    Ms. Johnson's medical records from FMC Carswell.
(6)    Ms. Johnson's mental health records from the Mental Health Center of North Iowa.
(7)    Ms. Johnson's Mercy Medical Center records.
(8)    Relevant portions of Ms., Johnson's Section 2255 Motion, including Exhibits 1, 27, 28, 29, and 30.
(9)    Report of MRI scan of Ms. Johnson's brain, 02/08/2011.
(10)   Report of EEG, 02/08/2011.
(11)   Report of brain PET/CT scan, 02/07/11.
(12)   Dr. Mark Cunningham's c.v. and testimony transcript.
(13)   Alyssa Johnson testimony transcript.
(14)   Jamie Jo Hayes testimony transcript.
(15)   Pearl Johnson testimony transcript.
(16)   Robert McNeese trial testimony transcript.
(17)   Christy Gaubatz trial testimony transcript.
(18)   Sara Bramow trial testimony transcript.
(19)   Maps and notes made by Ms. Johnson regarding the locations of the victims' bodies.

## Tests Administered

During the course of the examination, the following battery of tests and procedures was administered to Ms. Johnson:

Structured Neuropsychological Interview

Validity Indicator Profile (VIP)

   Verbal Subtest

Rey's 15 items

Tests of Verbal Fluency (F-A-S)

Animal Naming Test

Hooper Visual Organization Test

Wechsler Adult Intelligence Scale – III subtests:

Case 3:09-cv-03064-MWB-LTS    Document 304-9    Filed 08/10/11    Page 5 of 20

PPP-P05

Vocabulary

Similarities

Arithmetic

Boston Naming Test

Benton Visual Retention Test

California Verbal Learning Test

Minnesota Multiphasic Personality Inventory – II (MMPI-2)

Personality Assessment Inventory (PAI)

Detailed Assessment of Posttraumatic Stress (DAPS)

Dissociative Disorders Interview Schedule (DDIS)

It was anticipated that additional tests would be administered, but Ms. Johnson recognized that she had recently taken those tests for Dr. Young, so they were not re-administered in order to avoid practice effects.

## Examination Findings

## Behavioral Observations and Mental Status Examination

At time of my March 2010 examination, Ms. Johnson presented for testing on both days dressed in prison-issued tan scrubs and appeared clean and well groomed. She had long brown hair that extended past her shoulders. She was pleasant and cooperative throughout both examination days.

She reported currently taking the antidepressant medication Wellbutrin, 150 mg each morning for the past six months, "so I'm not so weepy." She stated that she was previously treated for "a couple years" with Seroquel, 300 mg for sleep; and Zoloft, 300 mg for depression. She related that, "county jail was horrible. When I got here I didn't feel I needed all that to get through the day. I just feel so much better."

PPP-P06

Her motor behavior was graceful and coordinated, with no observable abnormalities of posture or gait. There was no evidence of leg tremor or leg bouncing as has been described by other examiners.

Her speech was produced at a normal rate and volume with clear articulation and a normal quantity of output. Her thoughts were expressed in a logical, coherent, and goal-directed fashion, with no evidence of formal thought disorder. There was also no evidence of unusual sensory experiences (i.e., auditory, visual, tactile, gustatory, or olfactory hallucinations) or fixed false beliefs (delusions).

Her observable affect was bright, and broad in range and intensity. She was seen to become irritable when dealing with the corrections officers, was emotionally labile at times, and cried effusively when discussing her children. Her affect was appropriately related to her mood and the content of her thoughts. She described her appetite as "pretty good," and stated that she has lost 30-40 pounds though a better diet with "fewer carbs" and exercise. She reported participating in a "Biggest Loser" contest at the facility, and losing 14 pounds over the past three weeks. She described her sleep as "good." When asked about her social relationships, she stated, "I get along with almost everybody." She reported no anhedonia or change in libido. She did report that she has been "more emotional" since discontinuing her medications, and began to weep while discussing her children. When asked about her memory and cognition, she reported that there was, "a lot in my past that I don't remember, but I remember everything that's happy now." Her underlying mood was inferred to be euthymic. Her insight was good.

During my follow-up examination on 06/20/2011 her affect was markedly different. She arrived for the examination and stated that she was expecting audiotape, not videotape; but consented when I explained to her that my understanding was that the exam would be videotaped. She complained that she was sick and had a sore throat, and would put her hand to her throat periodically and grimace when swallowing from time to time.

Case 3:09-cv-03064-MWB-LTS    Document 304-9    Filed 08/10/11    Page 7 of 20

When she began describing her role in the crimes, she became very emotional, covered her face with her hands and wept almost continuously throughout her account. However when asked clarifying questions later, she stopped crying and became argumentative and a bit angry when confronted about the details of her behavior and discrepancies in her accounts to different witnesses.

## Psychodiagnostic Test Results

**Data validity.** The MMPI-2, PAI, and the DAPS all have validity scales built into them to detect efforts to manipulate the test results. In Ms. Johnson's case, the validity indicators from all three tests indicated that the results were valid and interpretable. There was no evidence of any effort by Ms. Johnson to distort the test findings.

**Test findings.** Results from the PAI, DDIS, and the MMPI-2 were indicative of (1) drug dependence, and (2) a severe personality disorder characterized by antisocial, borderline, and paranoid personality features.

Her test profiles reflect a woman with chronic psychological maladjustment who is immature, alienated, and prone to manipulating others. She is experiencing low morale and a depressed mood at the present time, but no Axis I diagnosis was indicated on these broad-range tests, including no evidence of Dissociative Disorders or Bipolar Disorder as suggested by Dr. Woods.

However, the findings from the DAPS were consistent with a diagnosis of Posttraumatic Stress Disorder. She identified the most significant stressor in her lifetime as being, "Threats made to me by another to not share information that resulted in my current situation, I think about it every single day." [DAPS test protocol]

## Neuropsychological Test Results

In this section, I will consider the all the neuropsychological test data in their entirety, including data from the examinations by Dr. Gelbort, Dr. Young, and the present examiner.

PPP-P08

My analysis of the test data collected by other doctors in this case proceeded in the following manner. First, I inspected each available test protocol to establish that the test had been administered in a manner consistent with standard practice. Then I double-checked the scoring of test items and the mathematical calculations required in order to arrive at raw test scores and indexes. Finally, I checked to be sure that all the raw test scores had been converted to standardized scores on the basis of proper norms. This meant comparing Ms. Johnson's performance to that of her peers, i.e., comparing her scores to the norms for other persons her age, sex, and wherever possible to persons with a comparable educational background and/or Full Scale IQ score. I was guided in this process by the American Psychological Association's Standards for Educational and Psychological Testing, and the Specialty Guidelines for Forensic Psychologists.

All of Ms. Johnson's test data are summarized in Table 1, attached at the end of this report.

**Data validity.** Multiple tests for effort and malingering were administered to Ms. Johnson, both by Dr. Young and by this examiner, and they all indicate that Ms. Johnson was putting forth a good effort and not attempting to manipulate the test results.

She was clinically depressed at the time of Dr. Gelbort's testing per his interview notes, and has been treated with medication for depression for several years. Dr. Young does not address her psychiatric condition, but notes that she was on antidepressant medication at the time of her testing. At the time of the current testing she was again being treated with an antidepressant but continued to display emotional lability. This is relevant to the neuropsychological test validity because depression is known to adversely affect the test results, and may account for some of the test performance seen in this case.

**Test findings.** Taken as a whole, these data reveal a woman operating overall in the Low Average range of intelligence and neurocognitive abilities when compared to national population norms. The significant difference between her Verbal and Performance IQ

PPP-P09

scores seen at the time of Dr. Gelborts testing with the WAIS-III, is no longer seen on Dr. Young's testing the with the updated WAIS-IV.

Her Low Average intellectual functioning serves to define the range of expectation for gauging for her overall neuropsychological strengths and weaknesses. In that context, she shows a specific pattern of neurobehavioral strengths and weaknesses as follows:

Strengths:

1. Memory functioning;

2. Verbal fluency; and

3. Tactile problem solving ability.

Weaknesses:

1. Mild impairment in Math achievement – probably reflecting a specific learning disability;

2. Mild fine motor impairment in the non-dominant (left) hand seen in fine motor speed (finger oscillation) and fine motor dexterity (grooved pegboard test);

3. Mild to severe impairments recruiting some frontal lobe functions, but not others. Mild impairment was seen for effective visual scanning, and the ability to switch accurately between competing stimuli, while severe impairment was seen on one test of her ability to inhibit a usual response in favor of an unusual one (Color-Word Interference). However, her scores for other executive functions were within normal limits, including divided attention, problem solving, and abstract reasoning;

4. Severe impairment in perception and processing of interpersonal emotional expression (CATS). This particular deficit is consistent with her longstanding history of methamphetamine abuse which affects the limbic system, the area of the brain responsible for emotional processing.

Structural neuroimaging of Ms. Johnson's brain revealed:

> Small scattered bilateral subcortical and periventricular FLAIR
> and T2 hyperintensities involve the deep white matter of
> bilateral cerebral hemispheres.  [02/08/2011 MRI scan report,
> p. 1]

This scan pattern is also consistent with Ms. Johnson's history of
methamphetamine abuse.

Functional neuroimaging revealed a normal PET scan and a normal
electroencephalogram.  [02/07/2011 PET scan report, and 02/09/2011
EEG report]

When considered in concert with her history and the results of her
neurological testing, her pattern of neuropsychological test
performance most likely reflects the consequences of chronic
methamphetamine use in addition to a pre-existing learning disability
for mathematics in a woman of Low Average intelligence.

### Mental State at the Time of the Offenses

During my examination in March of 2010, Ms. Johnson adamantly
denied being present for, or involved in, the instant offenses.
However, during her most recent examination by Dr. Woods she made
statements admitting her involvement.  [See report of Dr. Woods,
05/26/2011]

During my re-examination of her in June of 2011 regarding the instant
offenses, she essentially repeated what she had previously told Dr.
Woods.  She implicated Mr. Honkin as the controlling force in the
homicides, and stated that she only did what she did because he
threatened to kill her and her daughter.  She quoted Mr. Honkin as
telling her, "You're either with me or against me."

However, the version of events she provided was inconsistent at
several points, both internally and with what she told Dr. Woods, and
what she allegedly told Christy Gaubatz, Sara Bramow, and Robert
McNeese.

**Obtaining and disposing of the murder weapon.** She told me she purchased the murder weapon "for protection" with Mr. Honkin's assistance, and then immediately gave it to Mr. Honkin and never saw it again except for murders. She stated that despite requesting instruction in the use of the weapon she was never trained to use it, but later changed her account to say that she was only told how to engage and disengage the safety. She claimed that she did not place the weapon in the closet of Ms. Gaubatz's house where it was found; rather Mr. Honkin did, and he was the one who got rid of it after it was discovered.

**The Nicholson/Duncan homicides.** She admitted that before approaching the Duncan house, she secreted the gun in a cosmetic bag and kept it hidden there so as not to arouse suspicion as she approached the house, and when the residents opened the door.

She was vague about the ruse she used to get in house, claiming she told the victims she wanted to use the phone - but gave more detailed accounts of the ruse to other witnesses, e.g., that she asked to see a phonebook or was making a sales demonstration call and was lost.

She stated that she made the effort to gain entry into the house because the victims did not know her and would be less suspicious.

Once inside she stated that she pulled the gun on the victims, made them sit on the couch in the living room, and held the gun on victims while Mr. Honkin made the tape, gagged & bound the adult victims hands and legs, and then cut the tape off their legs and made them walk to the truck outside.

She denied to me that the Duncan children ever left the couch in the living room, but told Dr. Woods and others that she took them and their mother upstairs to pack a suitcase, "under the guise of packing for a trip," while Mr. Honkin forced Mr. Nicholson to make the exonerating video alone downstairs. [cf. Dr. Woods report, p. 51; testimony transcripts]

When pressed to provide additional details about her role in the offense, she was vague or claimed not to remember. She stated that

PPP-P12

essentially Mr. Honkin did everything, and she just stood there and watched.

She stated that she drove the truck to the site where the murders occurred, with the children in the front seat and Mr. Honkin and the adult victims in the back. She stated she just walked off and did not see or hear any of the murders. She claimed that she did not dig or help to dig the graves, and did not place bodies therein. When asked about the detailed maps and notes she had prepared, she reported that they were based on information Mr. Honkin had told her after the fact, rather than firsthand experience.

**The DeGeus homicide.** With regard to the murder of Mr. DeGeus, Ms. Johnson denied any preplanning, and said the meeting was to discuss the Grand Jury testimony of a third party. This is at odds with what she told Dr. Woods, where she stated that she "startled" at the gunshot despite knowing that the shooting was planned. She denied shooting Mr. DeGeus, and said she only told Mr. McNeese that to enlist his help. She stated she did not observe the murder, did not dig the grave, did not see the shovel, and that she had tried to talk Mr. DeGeus into leaving before the homicide because the location did not look right to her.

When asked why many of these exculpatory details did not appear in her proffer (for example that her life and that of her daughter had been threatened) she stated that she had just signed what she was given. When asked why the details of her accounts to others about the crimes were different, she either denied telling them some facts, or was somewhat vague and essentially asserted that what she had told me was accurate, and what they have said is not.

### Summary of Opinions

Angela Johnson is currently appealing her capital conviction. Based on the materials that I have reviewed, the test data that have been developed, and my three examinations of her over the years, I have come to the following opinions to a reasonable degree of neuropsychological certainty:

Her psychodiagnostic testing shows:

- Evidence of Post-Traumatic Stress Disorder

- Evidence of a chronic Personality Disorder

- Evidence of Drug Dependence

- No evidence of Dissociative Disorders

- No evidence of Bipolar Disorder

Her records clearly indicate past diagnoses and treatment for depression, however there is no evidence of a bipolar diagnosis in the past, and no evidence of it appears in her psychodiagnostic testing.

Dr. Woods provides no specific evidence of a past manic episode or "switch." Many of the symptoms he appears to rely on to support his diagnosis of Bipolar Disorder and/or temporal lobe dysfunction are non-specific to Bipolar disorder or temporal lobe dysfunction, and are commonly seen in other disorders consistent with Ms. Johnson's history including learning disability, methamphetamine abuse, and alcohol abuse.

The neuropsychological testing, in concert with the findings from both structural and functional neuroimaging, is most consistent with her history of learning disability and damage from methamphetamine and alcohol abuse.

Her EEG was reported to be within normal limits with no temporal lobe findings, contraindicating temporal lobe electrical dysfunction as suggested by Dr. Woods.

With regard to Ms. Johnson's mental state at the time of the offenses, the variations in her self-report make it difficult to assess her ability to appreciate the wrongfulness of her conduct, or to conform her conduct to the requirements of the law.

Several behaviors to which she admits reflect that she was able to appreciate the wrongfulness of what she was doing, and that she was able to control her behavior in such a way as to maximize the

PPP-P14

likelihood of achieving her goals while minimizing her risk of attracting attention, losing control of the victims, and/or getting caught.

For example, the fact that she stated that she hid the murder weapon in her cosmetic bag so as not to arouse suspicion while approaching and gaining entry into the Duncan house shows both knowledge of the wrongfulness of what she was doing, and a conscious effort to reduce her risk of detection.

The fact that she used a ruse to gain entry into the Duncan house (rather than drawing the weapon and forcing her way inside, for example) shows her capacity to conform her conduct when it suited her plan, was intact.

The fact that she told Dr. Woods she took mother and kids upstairs "under the guise of packing for a trip" shows that she knew what she was doing was wrong, and needed a plausible explanation to secure the control and cooperation of the victims, and reduce her risk of having them escape or call for help.

During the DeGeus homicide, the fact that she told Dr. Woods that she knew that the plan was to shoot him and yet lured Mr. DeGeus into the situation and did not warn him, despite telling this examiner that the situation did not look right to her and that she tried to talk him into leaving, shows that she retained the capacity to appreciate the wrongfulness of what she was doing and was able to choose to behave as she did.

Finally, there is the issue of the amount of time that passed between the offenses themselves and Ms. Johnson neuropsychiatric evaluations. The effects of intervening years of substance abuse on her brain functioning make it more likely than not that she was functioning at a higher level at the time of the crimes than she was at the time of her subsequent examinations.

Based on these behaviors to which she admits, there is evidence that might assist the trier of fact in determining that Ms. Johnson's neuropsychiatric status did not significantly reduce her ability to

appreciate the wrongfulness of her conduct, or to conform her conduct to the requirements of the law.

Thank you for the opportunity to consult on this challenging case. If you have any questions regarding my findings or opinions, I will be happy to discuss them with you, and I can be reached directly at (949) 732-2211.

Sincerely,

Daniel A. Martell, Ph.D. A.B.P.P. (Forensic)
Semel Institute for Neuroscience and Human Behavior
David Geffen School of Medicine at U.C.L.A.

Fellow, American Academy of Forensic Psychology
Fellow, National Academy of Neuropsychology
Fellow, American Academy of Forensic Sciences

PPP-P16

**Normative Neuropsychological Profile: Angela Johnson**

1 = Testing by Dr. Gelbort, 1/24/2005
2 = Testing by Dr. Young, 10/07/2009
3 = Testing by Dr. Martell, 02/23/2010
(Scores Normed for Sex=Female, Age=At Time, Education=10th, IQ=91)

```
Test                 Score   -3      -2      -1    Average  +1      +2      +3
INTELLIGENCE(WAIS-3/WAIS-4) .     .      |       |       |       .       .
Full Scale IQ        91  89 .     .      | 21    |       |       .       .
 Verbal IQ           84      .    .      1       |       |       .       .
   Vocabulary        6 6 8 . .      12|      3 |      |       .       .
   Similarities      5 9 10. . 1   |     2  3      |       .       .
   Arithmetic        7 7 8 . .      12    3 |      |       .       .
   Digit Span        9   7 . .      2     1 |      |       .       .
   Information       8   8 . .      | 12    |       |       .       .
   Comprehension     9     . .      |     1 |      |       .       .
 Performance IQ      102     .     .      |       |1      |       .       .
   Pict. Completion  12      .     .      |       |     1 |      .       .
   Digit Symbol      9       .     .      |     1 |      |       .       .
   Block Design      9   7 . .      2     1 |      |       .       .
   Matrix Reasoning  12  8 . .      | 2    |     1 |      .       .
   Pict. Arrangement 10      .     .      |       1       |       .       .
   Symbol Search     -   9 . .      |     2 |      |       .       .
   Visual Puzzles    -  12 . .      |       |     2 |      .       .
   Coding            -  10 . .      |       2       |       .       .
Verbal Comp.         80  85 . .    1 2      |       |       .       .
Perceptual Org.      105 92 . .      | 2    | 1    |       .       .
Working Memory       -- 83 . .      2|      |       |       .       .
Processing Speed     -- 105 . .      |       |2      |       .       .
                            .     .      |       |       |       .       .
ACHEIVEMENT TESTING (WRAT-3).     .      |       |       |       .       .
   Reading           94 HS  .     .      |     1 |      |       .       .
   Spelling          90 HS  .     .      |    1  |      |       .       .
   Arithmetic        79 6 gr.. .    1  |      |       |       .       .
WIAT-II                     .     .      |       |       |       .       .
   Word Reading      97  .     .      |     2|      |       .       .
   Comprehension     103 .     .      |       |2      |       .       .
   Decoding          91  .     .      |    2  |      |       .       .
   Reading Composite 94  .     .      |     2 |      |       .       .
   Numerical Ops     83  .     .      2|      |       |       .       .
   Math Reasoning    83  .     .      2|      |       |       .       .
   Math Composite    83  .     .      2|      |       |       .       .
                            .     .      |       |       |       .       .
```

Case 3:09-cv-03064-MWB-LTS    Document 304-9    Filed 08/10/11    Page 17 of 20

PPP-P17

Normative Neuropsychological Profile: Angela Johnson

1 = Testing by Dr. Gelbort, 1/24/2005
2 = Testing by Dr. Young, 10/07/2009
3 = Testing by Dr. Martell, 02/23/2010
(Scores Normed for Sex=Female, Age=At Time, Education=10th, IQ=91)

| Test | Score | -3 | -2 | -1 | Average | +1 | +2 | +3 |
|---|---|---|---|---|---|---|---|---|
| **MEMORY FUNCTIONING** (WMS-3) | | | | | | | | |
| General Memory | 130 | | | | | | 1 | |
| Auditory Imm. | 108 | | | | | 1 | | |
| Visual Imm. | 127 | | | | | | 1. | |
| Immediate Memory | 122 | | | | | | 1 | |
| Auditory Delayed | 117 | | | | | 1 | | |
| Visual Delayed | 132 | | | | | | .1 | |
| Aud. Recog. Delay | 120 | | | | | | 1 | |
| Working Memory | -- | | | | | | | |
| **WMS-IV** | | | | | | | | |
| Auditory | 109 | | | | | 2 | | |
| Visual | 96 | | | | 2 | | | |
| Vis. Working | 94 | | | | 2 | | | |
| Immediate Memory | 98 | | | | 2 | | | |
| Delayed | 108 | | | | | 2 | | |
| **Rey's Complex Figure** | | | | | | | | |
| Immediate | 25 | | | | | 2 | | |
| Delayed | 26 | | | | | 2 | | |
| Recognition | 26 | | | | 2 | | | |
| **Benton Visual Retention Test** | | | | | | | | |
| Correct | 9 | | | | 3 | | | |
| Errors | 1 | | | | 3 | | | |
| **California Verbal Learning Test-2** | | | | | | | | |
| Trial 1 | 6 | | | 2 | | | | |
| Trial 5 | 14 | | | | | 2 | | |
| Total 1-5 | 52 | | | | | 2 | | |
| List B | 4 | | | 2 | | | | |
| Short Delay Free | 12 | | | | | 2 | | |
| Short Delay Cued | 9 | | 2 | | | | | |
| Long Delay Free | 11 | | | | 2 | | | |
| Long Delay Cued | 12 | | | | 2 | | | |
| Recognition | 14 | | | | 2 | | | |
| **California Verbal Learning Test** | | | | | | | | |
| Trial 1 | 9 | | | | 3 | | | |
| Trial 5 | 15 | | | | | 3 | | |
| Total 1-5 | 65 | | | | | 3 | | |
| List B | 8 | | | | 3 | | | |
| Short Delay Free | 12 | | | | 3 | | | |
| Short Delay Cued | 12 | | | | 3 | | | |
| Long Delay Free | 12 | | | | 2 | | | |
| Long Delay Cued | 11 | | | 3 | | | | |
| Recognition | 14 | | | 3 | | | | |

Case 3:09-cv-03064-MWB-LTS    Document 304-9    Filed 08/10/11    Page 18 of 20

PPP-P18

Normative Neuropsychological Profile: Angela Johnson

1 = Testing by Dr. Gelbort, 1/24/2005  
2 = Testing by Dr. Young, 10/07/2009  
3 = Testing by Dr. Martell, 02/23/2010  
(Scores Normed for Sex=Female, Age=At Time, Education=10th, IQ=91)

| Test | Score | c1 | c2 | c3 | c4 | c5 | c6 | c7 | c8 |
|---|---|---|---|---|---|---|---|---|---|
| **FRONTAL LOBE/EXECUTIVE FUNCTIONING** | | | | | | | | | |
| **Wisconsin Card Sort** | | | | | | | | | |
| Errors | 24 | | | 2 | | | | | |
| Persev. Resp. | 10 | | | | 2 | | | | |
| Persev. Errors | 10 | | | | 2 | | | | |
| **Verbal Fluency** | | | | | | | | | |
| F-A-S | 57 | | | | | | 3 | | |
| Animals | 23 | | | | | 3 | | | |
| **CPT-II** | | | | | | | | | |
| ADHD | | | | Inconclusive | | | | | |
| Neurological | | | | Inconclusive | | | | | |
| **UPSIT** | 35 | | | 2 | | | | | |
| **D-KEFS** | | | | | | | | | |
| **Trail Making Test** | | | | | | | | | |
| Visual Scanning | 4 | | 2 | | | | | | |
| Number Sequencing | 7 | | | 2 | | | | | |
| Letter Sequencing | 7 | | | 2 | | | | | |
| Letter-Number Switch1 | 9 | | | | 2 | | | | |
| Motor Speed | – | | | | | | | | |
| Combined Number Letter | 7 | | | 2 | | | | | |
| **Verbal Fluency** | | | | | | | | | |
| Letter Fluency | 12 | | | | | 2 | | | |
| Category Fluency | 7 | | | 2 | | | | | |
| Category Switch Cor. | 10 | | | | 2 | | | | |
| Category Switch Acc. | 5 | | 2 | | | | | | |
| **Design Fluency** | | | | | | | | | |
| Filled Dots | 10 | | | | 2 | | | | |
| Empty Dots | 10 | | | | 2 | | | | |
| Switching | 9 | | | | 2 | | | | |
| Total Correct | 10 | | | | 2 | | | | |
| Combined Total | 10 | | | | 2 | | | | |
| **Color-Word Interference** | | | | | | | | | |
| Color Naming | 10 | | | | 2 | | | | |
| Word Reading | 9 | | | | 2 | | | | |
| Inhibition | 1 | 2 | | | | | | | |
| Inhibition/Switching | 6 | | | 2 | | | | | |
| Combined Name+Reading | 10 | | | | 2 | | | | |
| **Sorting Test** | | | | | | | | | |
| Free Correct | 11 | | | | | 2 | | | |
| Free Description | 10 | | | | 2 | | | | |
| Sort Recognition | 7 | | | 2 | | | | | |
| Combined Description | 8 | | | 2 | | | | | |
| **20 Questions Test** | | | | | | | | | |
| Initial Abstraction | 7 | | | 2 | | | | | |
| Total Questions | 10 | | | | 2 | | | | |
| Weighted Achievement | 11 | | | | | 2 | | | |
| **Tower Test** | | | | | | | | | |
| Total Achievement | 13 | | | | | | 2 | | |

Case 3:09-cv-03064-MWB-LTS    Document 304-9    Filed 08/10/11    Page 19 of 20

PPP-P19

Normative Neuropsychological Profile: Angela Johnson

1 = Testing by Dr. Gelbort, 1/24/2005
2 = Testing by Dr. Young, 10/07/2009
3 = Testing by Dr. Martell, 02/23/2010
(Scores Normed for Sex=Female, Age=At Time, Education=10th, IQ=91)

| Test | Score | | -3 | -2 | -1 | Average | +1 | +2 | +3 |
|---|---|---|---|---|---|---|---|---|---|
| **FRONTAL LOBE/EXECUTIVE FUNCTIONING** | | | | | | | | | |
| **CATS** | | | | | | | | | |
| Affect Recog. | | 25 | 2 | | | | | | |
| Prosody Recog. | | 12 | 2 | | | | | | |
| Emotional Recog. | | 47 | 2 | | | | | | |
| | | | | | | | | | |
| **HALSTEAD-REITAN BATTERY** | | | | | | | | | |
| Impairment Index | | | | | | | 2 | | |
| Categories Test | 52 | 46 | | | 1 | 2 | | | |
| Finger Tapping | | | | | | | | | |
|  Dominant | | 41.8 | | | 2 | | | | |
|  Non-Dominant | | 34.2 | | 2 | | | | | |
| Grooved Pegboard | | | | | | | | | |
|  Dominant | | 65 | | | | 2 | | | |
|  Non-Dominant | | 88 | | 2 | | | | | |
| Trails A | 25 | 25 | | | | | 1 2 | | |
| Trails B | 54 | 88 | | | 2 | | 1 | | |
| Seashore Rhythm | | 25 | | | 2 | | | | |
| Speech Perception | | 8 | | | 2 | | | | |
| Tactual Performance Test | | | | | | | | | |
|  Total | | .33 | | | | | 2 | | |
|  Memory | | 9 | | | | | | 2 | |
|  Localization | | 7 | | | | | | 2 | |
| | | | | | | | | | |
| **LANGAUGE FUNCTIONING** | | | | | | | | | |
| Boston Naming Test | | 53 | | | 3 | | | | |
| | | | | | | | | | |
| **VISUAL ORGANIZATION** | | | | | | | | | |
| Hooper Visual Org. | | 28 | | | 3 | | | | |

Case 3:09-cv-03064-MWB-LTS    Document 304-9    Filed 08/10/11    Page 20 of 20

PPP-P20