# PARK DIETZ & ASSOCIATES, INC.
## Forensic Consultants in Medicine and the Behavioral Sciences

**Administrative Offices**

2906 Lafayette
Newport Beach, CA 92663
Tel: 949-723-2211
Fax: 949-723-2212
Email: expert@parkdietzassociates.com
Website: www.parkdietzassociates.com

**Forensic Psychiatry**

Park Dietz, MD, MPH, PhD
    President
Eugene Beresin, MD
Bennett Blum, MD
John Bradford, MB, ChB
Andre Derdeyn, MD
Graham Glancy, MB, ChB
Bruce Harry, MD
Mark J. Hauser, MD
Joseph Kenan, MD
Stuart Kleinman, MD
Daryl Matthews, MD, PhD
Steven Pitt, DO
Richard T. Rada, MD
Gregory Saathoff, MD

**Forensic Pathology**

Tracey S. Corey, MD
George R. Nichols II, MD

**Forensic Neurology**

David Griesemer, MD
Helen Mayberg, MD

**Forensic Psychology**

Joel Dvoskin, PhD
Thomas Grisso, PhD
Stephen D. Hart, PhD
Kirk Heilbrun, PhD
Elizabeth Loftus, PhD
Daniel A. Martell, PhD
Ronald Roesch, PhD

**Forensic Social Work**

Cheryl Regehr, PhD
Janet I. Warren, DSW

**Criminology**

Kenneth Lanning, MS (FBI ret.)
Gregg McCrary, MA (FBI ret.)
Ronald Walker, MA (FBI ret.)
James Wright, MPA (FBI ret.)
John Yarbrough (LASD ret.)

**Security**

Robert Hayes, CPP, CFE
Bernard Banahan

May 27, 2005

Matt Whitworth, Esq.
Roseanne Ketchmark, Esq.
Office of the United States Attorney,
Western District of Missouri
Charles Evans Whittaker Courthouse
400 East 9th Street, Fifth Floor
Kansas City, Missouri 64106

re: US v. Angela Johnson

Dear Mr. Whitworth and Ms. Ketchmark:

Please see the attached report of our expert opinions concerning the above referenced case. Based so far solely upon the case materials we were sent and our interview with the defendant, we were asked to offer our respective expert opinions in possible rebuttal to expert testimony in favor of mitigation if she is ultimately found guilty of a potentially capital crime.

As you know, we were not allowed to review a great deal of the evidence that related to the instant offense. We were also unable to review any expert reports from mitigation experts who will be testifying in the penalty phase of Ms. Johnson's trial, assuming that she is found guilty. Thus, we have no idea what the defense mitigation experts will offer as their expert opinions, or whether we will agree with them. Finally, though we have requested the ability to interview several collateral sources of information, so far this has not been possible.

Without reviewing the reports of mitigation experts, we are in the unusual position of having to make informed guesses about the testimony we may be asked to rebut.

Despite these limitations, we hope that the attached report is useful to you, and look forward to hearing from you at your earliest convenience.

Sincerely,

GOVERNMENT
EXHIBIT
*RRR*
09-CV-3064 MWB

Joel A. Dvoskin, Ph.D., ABPP        Daniel Martell, Ph.D., ABPP
Diplomate in Forensic Psychology    Diplomate in Forensic Psychology

## Expert Report of Joel A. Dvoskin, Ph.D., ABPP

At the request of U.S. Attorneys Roseanne Ketchmark and Matt Whitworth, I was asked to review case materials concerning the case of U.S. v Angela Johnson, and to offer my expert opinions in possible rebuttal to expert testimony in favor of mitigation if she is ultimately found guilty of a potentially capital crime. For legal reasons that were not entirely clear to me, I was not allowed to review a great deal of the evidence that related to the instant offense. More importantly, I was also unable to review any expert reports from mitigation experts who will be testifying in the penalty phase of Ms. Johnson's trial, assuming that she is found guilty.

Without reviewing the reports of mitigation experts, I am in the unusual position of having to make informed guesses about the testimony I may be asked to rebut. It is, of course, also likely that in some ways I will agree with the opinions of mitigation experts.

That being said, there are several likely areas in which mitigation experts might be expected to testify. Because Ms. Johnson was asked to take several neuropsychological screening tests, it seems not unlikely that the defense may offer evidence of alleged neuropathology, including possibly the Attention Deficit Disorder from which she claims to suffer. Because I do not specialize in neuropsychology, I referred these issues to my colleague and neuropsychologist Daniel Martell, Ph.D., ABPP. Dr. Martell's expert report can be found below.

A second issue that is likely to be raised by the defense in the penalty phase concerns Ms. Johnson's self-reported history of physical, emotional and possibly sexual abuse as a child.

A third issue that is likely to be raised in mitigation is Ms. Johnson's self-reported history of abuse at the hands of an intimate partner, Terry DeGeus. This abuse is corroborated by a restraining order obtained by Ms. Johnson against Mr. DeGeus, and the interview of her ex-husband, Arlyn Johnson.

A fourth issue that is likely to be raised in mitigation is whether or not Ms. Johnson will be safely manageable within a federal prison.

Finally, it is possible that a mitigation expert might opine that Ms. Johnson suffers from some sort of serious mental illness.

I will speak to these issues below. Please note that the information and opinions contained in the report are based entirely on the case materials I was allowed to review and the interview with Ms. Johnson. It is possible that additional or contradictory information could result in different conclusions.

## Sources of Information

[1]     Superseding Indictment, CR00-3034, 08/23/02

[2]     Superseding Indictment, CR01-3046, 08/23/02

[3]     Prosecution Memorandum, 05/18/01

[4]     Addendum to Prosecution Memorandum, 02/12/01

[5]     Benton County Jail records

[6]     Blackhawk County Jail records

[7]     Linn County Jail records

[8]     Educational Records of Angela Johnson

[9]     Police Interview of Angela Johnson, 06/11/96

[10]    Clear Lake, IA, Police Department records

[11]    Drug Enforcement Administration reports

[12]    Iowa Division of Criminal Investigation reports

[13]    Allen Memorial Hospital records regarding Angela Johnson

In preparing thus report, Dr. Martell and I relied in part on summaries of the information sources listed above, prepared by Ronald P. Walker, M.A. (FBI, ret.) and James A. Wright, M.P.A. (FBI, ret.).

In addition to the sources of information listed above, Dr. Martell and I interviewed Angela Johnson on April 23, 2005 at the Woodbury County Jail, in Sioux City, Iowa. The interview lasted approximately 5 hours, and was preceded by our disclosure of our roles in the case, the circumstances of the interview, the purposes of the interview, and the fact that we would have no confidential therapeutic relationship with Ms. Johnson. She acknowledged that she was aware that the results of our interview and our expert opinions would not be held confidential, and were likely to be offered by the US Attorney in court. After acknowledging that she understood all of the above, Ms. Johnson agreed to the interview.

Pursuant to an agreement between the parties, Dr. Martell and I created a digital audio recording of our entire interview with Ms. Johnson. A copy of this was shared with

defense counsel, however, per our instructions, we did not share a copy with the US Attorney's Office.

As instructed, we also did not question Ms. Johnson about the instant offense itself.

Ms. Johnson informed us that she had seen three defense experts prior to our interview. These included a Dr. Logan, a Mary Hutchinson – Ms. Johnson was unclear about the appropriate honorific, so I will refer to her as Dr. Hutchinson -- and a Dr. Gelbort. She reported that she discussed with Dr. Logan her childhood and her problems with men. With Dr. Hutchinson, Ms. Johnson reported that she discussed her "relationship with (her) Dad" and took several tests, one of which she described as the "London Towers." Finally, she reported that she and Dr. Gelbort "did not talk a lot." She stated, "He just gave me tests." Ms. Johnson stated that she did not recall ever meeting with Dr. Mark Cunningham, who we had been told was to be a mitigation expert witness.

Ms. Johnson was asked if she had been informed of any expert findings. She reported that Dr. Logan told her that she was "always looking for love," that she was "easily manipulated by men." She reported that she agreed with these findings, though she stated, "I hate to admit it." She added that Dr. Logan told her that she took methamphetamines as "self-medication" for an untreated depression.

Regarding the findings of Dr. Hutchinson, Ms. Johnson laughingly stated that Dr. Hutchinson found her to be a "super person." Turning more serious, Ms. Johnson reported that Dr. Hutchinson told her that she "had problems with men stemming from the relationship (she) never had with (her) father."

Ms. Johnson reported that Dr. Gelbort "gave (her) no findings."

## BRIEF SYNOPSIS OF INSTANT CHARGED OFFENSE

In March 1993, Dustin Honken was arrested during a controlled meeting with a cooperating witness (Gregory Nicholson) and was subsequently charged with a methamphetamine trafficking conspiracy in violation of 21 U.S.C, Section 846. Mr. Honken was subject to a 10-year mandatory minimum penalty. He was released on pretrial release with the special condition that he have no contact with the cooperating witness. On 07/25/93, Mr. Honken and Angela Johnson allegedly located Mr. Nicholson at the home of Lori Duncan. Also present in the home were Ms. Duncan's two small children, ages six and ten. Mr. Honken allegedly forced Mr. Nicholson to make a videotape in which Mr. Nicholson exonerated Mr. Honken. Mr. Honken and Ms. Johnson then allegedly took Mr. Nicholson, Ms. Duncan, and her two daughters to a remote location near Mason City, IA, where Mr. Honken allegedly murdered the two adults and two children with a firearm previously purchased by Ms. Johnson. Each of the victims was shot in the head execution style. Ms. Johnson allegedly assisted by controlling the children while Mr. Honken killed the adults. The four bodies were

RRR-P04

allegedly buried by Mr. Honken and Ms. Johnson in a mass grave and were successfully hidden until they were discovered in the fall of 2000. Because of Mr. Nicholson's disappearance, the charges against Mr. Honken were dismissed in March 1995. Mr. Honken and Ms. Johnson reportedly have each made admissions about the murders.

The federal Grand Jury continued its investigation into Mr. Honken's drug trafficking, identifying Terry DeGeus as a drug co-conspirator. During the fall of 1993, Mr. DeGeus reportedly expressed concerns that he would be charged or called to testify before the federal Grand Jury. Ms. Johnson was called before the Grand Jury in October 1993. On 11/05/93, Ms. Johnson allegedly contacted Mr. DeGeus (a former boyfriend) with a message to meet her that evening. Mr. DeGeus went to meet with Ms. Johnson, and never returned. Ms. Johnson allegedly lured Mr. DeGeus to a remote location where Mr. Honken, armed with a firearm and baseball bat, waited. Mr. Honken allegedly killed Mr. DeGeus by shooting and beating him, and then buried the body in a shallow grave near Mason City, IA with Ms. Johnson's assistance. Mr. DeGeus' skeletal remains were recovered in the fall of 2000. Mr. Honken and Ms. Johnson have reportedly made admissions regarding the murder of Mr. DeGeus.

A joint state/federal investigation in 1995 revealed that Mr. Honken and a co-conspirator (Timothy Cutcomp) continued to manufacture methamphetamine. Mr. Honken allegedly recruited Daniel Cobeen to assist in the methamphetamine manufacturing. A methamphetamine laboratory was ultimately seized at Mr. Honken's residence, and he was arrested. While jailed in the Woodbury County Jail, Mr. Honken allegedly solicited inmates to murder Mr. Cutcomp and Mr. Cobeen. While incarcerated in federal prison beginning in 1998, he reportedly expressed plans to various inmates and solicited various inmates to escape from custody and kill witnesses and others involved in the investigation and prosecution of his case. He also reportedly made admissions about his murders of Mr. Nicholson, Mr. DeGeus, and the Duncan family.

On 08/30/01, a federal Grand Jury returned a seventeen-count indictment charging Mr. Honken with the murders of three adults and two children in order to avoid prosecution for a methamphetamine manufacturing and distribution conspiracy originally charged in March 1993, and to further his drug trafficking conspiracy and continuing criminal enterprise. The indictment also charged that Mr. Honken solicited others in a murder for hire scheme intended to result in the death of additional witnesses.

On 08/23/02, a federal Grand Jury returned a similar seven-count indictment against Angela Johnson. A ten-count superseding indictment dated 08/23/02 charged Ms. Johnson with the manufacture and distribution of methamphetamine in addition to charges she aided and abetted Mr. Honken in the murders of Gregory Nicholson, Terry DeGeus, and Lori Duncan and the two Duncan children.

RRR-P05

## MEDICAL EXAMINER'S REPORT

Dennis Klein, M.D., a forensic pathologist employed by the Iowa State Medical Examiner's Office, conducted the post-mortem examinations of the remains of Gregory Nicholson, Lori Duncan, Kandi Duncan, and Amber Duncan. Julia Goodin, M.D. is the Medical Examiner for the State of Iowa, and conducted the post-mortem examination of the remains of Terry DeGeus. The results of these autopsies are summarized in an Addendum to Prosecution Memorandum, and are noted as follows:

- Gregory Nicholson was bound with a clothesline-type cord around his wrists. A gag consisting of a green sock was secured to his head by duct tape; the tape was wrapped around his head, covering the eyes and mouth. Mr. Nicholson was shot once in the back of the head and once in his upper-right back. Multiple perimortem fractures to neck vertebrae, consistent with a twisting or rotational injury, were also noted.

- Lori Duncan was gagged with a sock held in place by duct tape. The tape was wrapped around her head, covering her eyes as well as her mouth. Her hands and feet were bound with a clothesline-type rope. Ms. Duncan was shot once in the head, with the entry wound located behind the right eye and an exit wound on the left forehead. Ms. Duncan was also shot from behind in her upper back at least once, and possibly twice. A bullet wound to her forearm was also observed, which may have resulted from the bullet that entered her back. Two perimortem hairline fractures were noted; one was located on a bone in her left hand, possibly caused by a twisting injury, and the other was located on her upper-right pelvis bone, probably resulting from a fall or compression.

- Kandi Duncan was not bound or gagged. A single bullet wound was noted to the back of her head.

- Amber Duncan was not gagged, but appeared to have been bound with a pair of men's underwear briefs. Her arms were placed through the leg holes of the briefs, and the briefs were pulled down over her head. She had a single bullet wound to the back of her head.

Terry DeGeus' skull was very badly fractured. He was shot in the head at least once, but the location of the entry wound could not be determined due to the extensive skull fracture. The skull fractures did not appear consistent with blunt force trauma. It appeared as if the fractures resulted from the gunshot. Mr. DeGeus was also shot once in the lower left arm and possibly once in the mid-section and once at his waist.

RRR-P06

## PERSONAL HISTORY OF MS. JOHNSON, ACCORDING TO CASE RECORDS

Family History

Angela Jane Johnson was born in Burlington, WI on 01/17/64 to James Jeffery Johnson and Pearl Jean Johnson, nee Gomez. At the time of her birth, her mother was 24 years of age. Her father was 22 and employed as a laborer at American Motors.

She has four siblings, Wendy Jean, born 1/4/1962; Jamie Jo, born 11/24/1965; James Jeffrey, Jr., born 3/2/1967; and Holly Justine, born 2/5/1973.

Education History

Education records made available for review reveal that Ms. Johnson attended Forest City Community School in Forest City, IA, first enrolling on 01/03/72. School records for 5th and 6th grades indicate Ms. Johnson achieved grades of "A" in virtually all subjects during both academic years. She attended 7th and 8th grades at Forest City Community School, achieving predominantly grades of "S" in most academic subjects. It was noted she withdrew from school on 10/09/98.

Employment History

Ms. Johnson's ex-husband (Arlyn Johnson) advised that he knew that she had been a dancer at one time and that she was careful where she danced so as not to ruin her reputation.

Norman Olson advised that Ms. Johnson worked for him for three years, between 1990 and 1992, at the Country Kitchen restaurant in Clear Lake, IA. He described her as a "great employee." Ms. Johnson left his restaurant to work at the Country Club in Mason City, IA.

Mr. Olson was aware that when the manager at the Mason City County Club moved to the Urbandale Country Club, Ms. Johnson moved to Urbandale to work for him. No dates of employment were provided.

George Barlas advised that Ms. Johnson began working at the North Beach Restaurant in September or October 1998 and moved into an apartment over the restaurant. Rent for the apartment was $250 per month. Mr. Barlas reported that Ms. Johnson was a "very good" employee during her first year. After that, she traveled to be with her new boyfriend whose name he could not recall. Ms. Johnson was terminated in June 2000 after she did not show up for work on a Saturday night. Mr. Barlas recalled that she became "very cranky" toward the end of her employment.

RRR-P07

Military History

No military service is reported.

Marital and Relationship History

Arlyn Johnson advised that he was married to Ms. Johnson from about 1982 until they divorced in 1985. He first met her in the spring of 1981 and they were married within a year. The couple had one daughter, Alyssa Johnson, born 8/7/1983.

Mr. Johnson further advised that Ms. Johnson was in a relationship with Terry DeGeus, but did not know how they met. During the time she was with him, Mr. Johnson saw her with bruises and knew that Mr. DeGeus beat her. He said she had a difficult time breaking off the relationship and, for a time, had taken out a restraining order during a time when she was dating Dustin Honken.

However, Mr. Johnson reported that he first met Mr. Honken a month or two after Mr. Honken started dating Ms. Johnson, in September or August 1995. He said he seemed like a "nice guy" and that he was always nice to Ms. Johnson and Alyssa. Mr. Johnson believed that Mr. Honken took good care of his daughter and, to his knowledge, never did "lay a hand" on Ms. Johnson.

Benton County Jail records indicate fiancé Rodney Nicholson, born 3/28/1965, visited Ms. Johnson while she was housed there.

Mental Health History

On 10/13/00, while incarcerated in the Black Hawk County Jail subsequent to her arrest in the instant matter, Ms. Johnson attempted suicide by hanging. Investigation at the jail revealed that Ms. Johnson fashioned a rope and noose by tying a bed sheet to the second floor railing in her pod at the jail. She then reportedly climbed over the rail with the bed sheet secured around her neck. The site of the attempt was in an area near the restrooms and shower, and not covered by surveillance cameras. However, the attempted suicide was quickly discovered, and she was taken by ambulance to Allen Memorial Hospital.

Ms. Johnson's suicide attempt occurred after she reportedly learned from her mother or daughter during a telephone call on 10/13/00 that investigators had recovered the bodies of the five murder victims cited in her indictment. At approximately 4:05 PM, Ms. Johnson had requested permission to use the telephone. It was later reported that she spoke with her daughter, who informed Ms. Johnson that her boyfriend notified the authorities regarding the whereabouts of the bodies. Other jail reports, however, noted the murder victims' bodies were recovered using a map previously drawn by Ms. Johnson. Ms. Johnson's suicide attempt occurred at approximately 4:20pm.

RRR-P08

An inmate (Theresa Milton) who described herself as a friend of the defendant reported that Ms. Johnson previously asked her how she would attempt to commit suicide. The inmate told Ms. Johnson she would use a sheet. On 10/12/00, Ms. Johnson spoke with her daughter and learned her appeal had been denied. She spoke about suicide, but Ms. Milton did not believe the defendant was serious. Ms. Johnson also spoke with her sister on the day prior to the suicide attempt to make arrangements for the care of her children "if anything happened to her." On 10/13/00, Ms. Johnson reportedly acted differently, and watched the guards closely. She spoke with her daughter on the telephone, and asked Ms. Milton for paper and a pen. Shortly thereafter, the defendant attempted suicide.

While being transported to the hospital after the suicide attempt, Ms. Johnson was reportedly combative, requiring the application of restraints. Ms. Johnson continued to refuse to cooperate and remained combative and unmanageable upon arrival at the hospital. She required intubation at the ER to allow for a complete examination and examination of the neck for a C-spine injury. No C-spine injury was noted, and Ms. Johnson was transferred to the ICU for further inpatient management. She was discharged on 10/14/00.

Hospital records report Ms. Johnson has a past medical history of depression, and had been prescribed Celexa 20mg, Serzone 75mg, Excedrin PM, Advil Migraine, and Trazodone.

In a letter to her daughter dated Saturday the 7th (10/7/2000), Ms. Johnson wrote that she had seen a "real doctor" who took her off Serzone and put her on "a stronger antidepressant" and "sleeping pills".

Among items found during a search of Ms. Johnson's cell were letters to her fiancé, sister, and daughter that appear to refer to her attempted suicide:

In a letter addressed to "Rodney (My Man)" she wrote, "I'm sorry baby, there was just no other way" and assures him he and Alyssa "can get through this . . ." She asks him not to let Alyssa hate her for "this".

In a letter to Alyssa, she wrote, "I'm so sorry that everything had to turn out like it did." She also wrote that she knew that they were not going to let her out and she could not stand the thought of going to a maximum security prison and she would only do "this" as a last resort. She assured Alyssa that she (Alyssa) knows the truth and that while "someone might know about something <u>does</u> <u>not</u> mean they took part in it." She then went on to advise how some of her property was to be distributed.

In a letter to her sister Holly, she wrote the she could not go to prison and requested her body be cremated. She wrote the same message as above, asserting that "knowing about something" does not mean she took part in it.

Substance Abuse History

Ms. Johnson's ex-husband advised investigators that when he first met her, she was using marijuana. He also advised that when she was with Terry DeGeus, they "shared common powder interests." In March 1995, when he was visiting her residence, she asked Mr. Johnson if he was interested in some methamphetamine. They did "a line" of methamphetamine together. He sometimes obtained enough of the drug from her for personal use and she offered to get him more.

Criminal History

Prior to instant charges, Ms. Johnson has a record of numerous traffic violations which led to her being charged as a habitual violator in 1998 and again in 2000.

Incarceration

Ms. Johnson was indicted on five counts of aiding and abetting murder on 7/26/2000, and was arrested on 7/29/2000. She was initially incarcerated in the Benton County Jail, Vinton, IA.

She was moved to the Black Hawk County Jail on 10/3/2000.

After her attempted suicide while an inmate at Black Hawk County Jail, she was discharged from Allen Hospital on 10/14/00, to the Linn County Jail to await trial.

Disciplinary History While Incarcerated

Linn County Jail records indicate that from 12/07/00 to 01/29/04, Ms. Johnson received 89 "Behavior Warnings." The warnings were issued for a wide variety of infractions, and included the following: running the block; laying in bed with another inmate; failure to lay on bed during lockdown; passing letters under door to another inmate; disrespect; failure to follow order; using racial epithet; palming/hiding medication; attempting to instigate an arguments; defiant behavior; covering night light.

Ms. Johnson was the subject of several Inmate Incident Reports while at the Linn County Jail, including the following:

- On 11/15/00, Ms. Johnson was involved in an argument with another inmate. They were warned to stay away from each other or be locked down.

- On 12/28/01, Ms. Johnson was charged with assaulting another inmate. Her cellmate reported that Ms. Johnson shoved her after they engaged in an argument over the cellmate's body odor. The cellmate complained that Ms. Johnson had "taken it upon herself to control the actions . . . of other inmates" and she felt the need to press charges against her. Assault charges were filed and eventually

RRR-P10

dropped in District Court. Ms. Johnson was found guilty in disciplinary hearing and sentenced to ten days in a Behavior Modification Cell (BMC).

- On 02/02/01, she was found to be in possession of unauthorized items, including paper, envelopes, paperclip, cardboard, and a match stick taped under her bed. She admitted having the items, but stated the match stick was "planted there to get her in trouble." She received five days in BMC, with two days suspended.

- On 03/23/02, Ms. Johnson was cited for disruptive conduct after she was observed yelling at other inmates during recreation. At her hearing, she admitted being involved in an argument, but explained that she was provoked and witnesses verified her story. She was found guilty and sentenced to five days of administrative segregation, with credit for time served.

- On 1/1/04, Ms. Johnson was given a warning after a shakedown found excessive pictures on the wall of her cell and her bedding in the day area.

- On 01/28/04, Ms. Johnson was cited for assaulting another inmate by pulling her hair, hitting her in the head with her fist, and pushing her into a wall. While acknowledging the material facts of the report, Ms. Johnson claimed there were mitigating circumstances and claimed self-defense. The report noted Ms. Johnson is "twice as big and twice as old as the other combatant." She received five days BMC, with no credit for time served.

- On 5/3/04, Ms. Johnson was given two weeks commissary restriction for having bedding in the day area.

- On 6/27/04, Ms. Johnson was given a warning after she argued about having to put her shirt on. She repeatedly stated, "Fuck you" as she put it on.

Ms. Johnson filed several grievances while incarcerated in the Linn County Jail, including the following:

- On 12/29/00, she complained about being maintained on suicide watch after the doctor recommended she be taken off the watch.

- On 3/24/2002, Ms. Johnson complained that a correctional officer had been treating her "very rudely" since she declined the officer's request that she kick another inmates "ass." By way of relief, she requested an apology.

- On 3/24/2002, Ms. Johnson complained that she was not being treated fairly. She claimed that she had recently been called "murderer" by an inmate, which she responded to by telling her those were "fighting words"

as she walked toward her. For that, she was put in isolation for 24 hours to "cool down."

- On 7/27/2002, she again complained about the correctional officer "being on her case." She claimed the officer yelled and swore at her and hurt her feelings every time the officer worked.

- On 10/22/2002, there was another grievance against the same correctional officer. Ms. Johnson complained that she did not turn on her television at the proper time.

- On 1/19/2004, Ms. Johnson complained that she was treated differently than other federal detainees.

## BEHAVIOR OF MS. JOHNSON PROXIMAL TO KNOWN/CHARGED OFFENSES, FROM CASE RECORDS

On 7/3/1993, Ms. Johnson reportedly filed an application to purchase a handgun in Cerro Cordo County, IA. Four days later, on 7/7/1993, she reportedly purchased a Tech-9, 9 mm semi-automatic pistol at a pawn shop in Waterloo, IA. On 7/25/1993, Mr. Nicholson, Ms. Duncan and her two daughters were killed.

Christi Gaubatz advised that she and Ms. Johnson were best friends and she frequently babysat for Ms. Johnson. During the summer of 1993, she reportedly babysat on a daily basis while Ms. Johnson and Mr. Honken were trying to locate Mr. Nicholson. On those nights they regularly returned to the residence around midnight. One evening, Ms. Johnson reportedly asked to borrow her car and did not return to the residence until about 5:00 AM the next morning. After that night, they stopped looking for Mr. Nicholson.

Ms. Gaubatz also advised that during the fall of 1993, Ms. Johnson told her that she was pregnant by Mr. Honken and she feared what Mr. DeGeus, her former boyfriend who had been "stalking" her, would do if he found out. Ms. Johnson asked Ms. Gaubatz to accompany her to a meeting with Mr. DeGeus at a restaurant in Mason City, IA, which she did. She waited in the car, but could see the couple arguing. When Ms. Johnson returned to the car, she said, "He can't be around, anymore." Ms. Gaubatz said it was soon after that that Mr. DeGeus disappeared. Later in 1993, Ms. Gaubatz reportedly found a cosmetic bag in a closet in her home and, when she looked inside, saw a "large black handgun." Believing the gun belonged to Ms. Johnson she called her and told her to remove the gun. She reported that Ms. Johnson came to the residence immediately and removed the gun.

On 11/5/1993, Ms. Johnson reportedly contacted Terry DeGeus' mother and asked that she tell him to contact her. Later that evening, Mr. DeGeus reportedly dropped his daughter at his mother's house, telling her that he had to meet Ms. Johnson and would return by 12:30 AM. Mr. DeGeus spoke to an acquaintance at a grocery store between

RRR-P12

6:30 PM and 7:00 PM and told her that he was on the way to Mason City to meet Ms. Johnson. He was not seen alive after that time. Several days later, Mr. DeGeus' mother reportedly telephoned Ms. Johnson to ask about her son. She claimed he did not show up for their meeting. Sometime later, Mr. DeGeus' ex-wife allegedly called Ms. Johnson, who initially told her that Terry DeGeus did not show up that night. Later in the conversation she admitted that he did stop by to see her, but then went to Mason City to see friends.

Incident to a missing persons report filed on 11/10/1993, by Mr. DeGeus' father, Ms. Johnson was interviewed by law enforcement officers. She told them that when she got off work on 11/5/1993, Mr. DeGeus was waiting for her. She got into his car and they talked about her 10/2/1993 Grand Jury testimony. He then left, saying he had things to do and people to see in Mason City.

While in jail, Mr. Honken allegedly arranged for fellow inmate, Anthony Altimus, to kill Messrs. Cutkomp and Cobeen after he arranged for Altimus to be bailed out of jail. Mr. Honken allegedly had another inmate's wife meet with Ms. Johnson who would give her $1,000 in exchange for a methamphetamine recipe. The money was then to be used to bail out Mr. Altimus. In January 1997, Ms. Johnson reportedly appeared at a bail bond agency in Sioux City, IA, and presented herself as a relative of Mr. Altimus in an attempt to post bail for him.

## STATEMENTS AND DISCLOSURES ATTRIBUTED TO MS. JOHNSON REGARDING THE ALLEGED OFFENSES

Ms. Gaubatz, advised that in early 1994, Ms. Johnson told her she needed to get something "off her chest." She reminded her of the evening she borrowed Ms. Gaubatz' car and stated that on that night she and Mr. Honken went to a residence in Mason City, IA, where she pretended to be a sales person in need of the use of a telephone. After she was allowed entry, Mr. Honken reportedly followed her inside and, armed with a gun, forced Mr. Nicholson to make a video tape. The two then allegedly forced Mr. Nicholson, Ms. Duncan and her children to accompany them in Ms. Gaubatz' car. They drove to a wooded area where Mr. Honken allegedly shot them all, one at a time. They were then buried in one grave. Ms. Gaubatz said that as Ms. Johnson was relating the above, she was "extremely emotional."

Later, the same year, Ms. Johnson also reportedly told Ms. Gaubatz about luring Mr. DeGeus to a remote location where Mr. Honken was waiting to kill him. Ms. Gaubatz said she was not as emotional when describing Mr. DeGeus' murder.

On 6/11/1996, law enforcement officers interviewed Ms. Johnson at her place of employment. When told they wanted to talk to her about Dustin Honken, she became visibly upset and stated she felt he had done nothing wrong and was being harassed. She told the investigators she would meet them at her residence after she got off work.

She did meet them at her residence and consented to a search of the premises. Nothing was seized as a result of the search. She then agreed to meet them at the Urbandale Police Department for further, non-custodial interview.

Ms. Johnson was asked what she thought had happened to Greg Nicholson and Terry DeGeus, to which she answered she thought they had "just left the area." She claimed that the last time she saw Mr. DeGeus was a few days before he was reported missing. At that time, he was reportedly acting "strange" and "seemed depressed".

Ms. Johnson advised investigators that Mr. Honken was not making methamphetamine, but doing research for a book he was writing on precursor chemicals for making the drug. She was asked if she had given him any money for his research. She answered that she had not, but she owed his father $5,000 and had been making payments toward paying off the debt.

Ms. Johnson was asked for consent to search her house in Clear Lake, IA, to which she agreed, but only if she was there for the search. About 45 minutes into the interview, Ms. Johnson terminated the interview, but agreed to resume the interview the next morning. When she did not appear for the interview the next morning, she was contacted and advised she was "done talking" because a search warrant had been executed at her house in Clear Lake the night before.

On 6/11/1996, a search warrant was executed and chemicals used to manufacture methamphetamine were reportedly seized from a shed at Ms. Johnson's residence in Mason City, IA.

Robert McNeese and Ms. Johnson allegedly exchanged letters and conversed while both were prisoners in the Benton County jail. Mr. McNeese is a cooperating witness who advised Ms. Johnson made numerous admissions to him because she wanted his assistance in escaping from the jail and in locating a prisoner serving a life sentence to confess to committing the murders for which she is charged.

Ms. Johnson reportedly told Mr. McNeese that when she escaped, she wanted to kill one of the jail guards who treated her badly. She claimed to have had a family member take videos of the jail to assist in a plan to escape and develop information about the guard, including what kind of car she drove. She was also going to have the guard followed by a family member. She reportedly invited Mr. McNeese to escape with her.

Regarding her plan to have someone else take credit for the murders, it was necessary to provide enough information about the crimes for that person to be credible. According to Mr. McNeese, she told him she and Mr. Honken took Mr. Nicholson, Ms. Duncan and her daughters to a field where Mr. Honken shot them all. They were then buried in the same grave.

Regarding the murder of Mr. DeGeus, she reportedly said that she shot him several times after making him get on his knees, "like he used to do to her when he previously beat her."

Ms. Johnson allegedly drew maps of both burial sites for Mr. McNeese, which included landmarks and named roads. The maps were turned over to authorities and search warrants were obtained for both sites. A search for the sites commenced on 10/12/2000, and all bodies were ultimately located.

It was noted that the complete remains of an opossum and the head of a shrew were found in the grave with multiple bodies. The animal remains were separated from the bodies by a layer of decomposed plant material, suggesting the animals were placed in the grave sometime after the victims. It was also noted that Ms. Johnson "is known to be a follower of witchcraft and other occult-type religious practices".

## STATEMENTS ATTRIBUTED TO MR. HONKEN REGARDING MS. JOHNSON

### Timothy Cutcomp

Mr. Cutcomp, a co-conspirator in drug charges against Mr. Honken, reported that after their arrests in 1996, Mr. Honken told him that they would have nothing to worry about (regarding charges against them) if Mr. Cobeen disappeared. He also told him that Ms. Johnson was urging him to "take care of business".

Mr. Cutcomp advised he was told by Mr. Honken that Ms. Johnson had invested between $2,500 and $3,000 in the Mason City methamphetamine laboratory. It was also reported that Mr. Honken told Mr. Cutcomp he would have to meet with Ms. Johnson so she could approve of his working in the laboratory.

### Dean Donaldson

Mr. Donaldson, a witness who was an inmate with Mr. Honken, reported that Mr. Honken told him his girlfriend, Angie, would "kill anyone in a minute." Mr. Honken also told him he was concerned about Ms. Johnson because "her downfall was drugs." Mr. Honken intended to kill her, in addition to other witnesses against him, a prosecutor, and law enforcement personnel.

According to Mr. Donaldson, Mr. Honken told him that it was Ms. Johnson's idea to murder Gregory Nicholson, Lori Duncan, and Ms. Duncan's children.

### Fredric Tokars

Mr. Tokars is a federal inmate and cooperating witness who was incarcerated with Mr. Honken in 1998. According to Mr. Tokars, during discussions he had with Mr. Honken

RRR-P15

in which Mr. Honken told him he knew that he had killed witnesses in his (Mr. Tokars') case and asked for assistance with his case. He said that he wanted Mr. Cobeen killed and Messrs. Cutcomp and Donaldson intimidated. He said that Ms. Johnson helped him the last time and would help him again. He also told him he was concerned that Ms. Johnson might incriminate him in the earlier murders. He wanted Mr. Tokars to find someone to kill Mr. Cobeen and then kill Ms. Johnson to "tie up all loose ends."

Mr. Honken reportedly also told him that he and Ms. Johnson had purchased a gun at a pawn shop and he was worried that the gun used in the murders was linked to Ms. Johnson.

Regarding the murders, Mr. Honken allegedly told Mr. Tokars that he and Ms. Johnson parked down the street from the residence and, carrying a camera in a bag, walked down the street "like a couple on a walk." Once they were "easily" able to enter the house, he remained in one room with Mr. Nicholson where he forced Mr. Nicholson to recant his allegations in front of the video camera, after which he hit him in the head with the gun and strangled him with a cord. He said he then went into the room where Ms. Johnson was holding Ms. Duncan and her daughters. He hit Ms. Duncan with the gun and strangled her while Ms. Johnson restrained the children. Ms. Johnson then strangled the children. They used Ms. Johnson's car to transport the bodies to a prearranged location where they were buried in a common grave.

Mr. Honken reportedly said that Ms. Johnson was a full participant in the murders and "fully capable of doing anything" he could do.

Regarding the murder of Mr. DeGeus, Mr. Honken allegedly told Mr. Tokars that he learned that Mr. DeGeus was going to testify against him. Ms. Johnson reportedly lured Mr. DeGeus to a remote site, telling him that she and Mr. Honken were not getting along and she wanted to meet him. She also told him she had some drugs. He said he and Ms. Johnson arrived at the scene before Mr. DeGeus. When he did arrive, Mr. Honken shot him. They then placed his body in the trunk of Ms. Johnson's car and drove him to the burial site.

<u>William LeBaron</u>

Mr. LeBaron is a federal inmate and cooperating witness who was incarcerated with Mr. Honken. He reported that Mr. Honken told him about the murder of Mr. Nicholson, Ms. Duncan, and her children and said that Ms. Johnson helped him dig the grave where the bodies were buried.

<u>Steven Vest</u>

Mr. Vest is a federal inmate and cooperating witness who was incarcerated with Mr. Honken in 2000. He reported that Mr. Honken told him that he manufactured methamphetamine in Arizona and transported it to Iowa to sell. One of his customers

was Terry DeGeus, who was dating Ms. Johnson. Mr. DeGeus owed Mr. Honken $30,000 and Ms. Johnson brought him (Mr. Honken) $10,000 in partial payment of the debt. She told him she was selling drugs for Mr. DeGeus. He said that he developed a personal relationship with Ms. Johnson and they started dating.

Mr. Honken also allegedly told Mr. Vest that when he was released after arrest on drug charges, he and Ms. Johnson determined Mr. Nicholson would have to be killed in order for Mr. Honken to avoid conviction. He said Ms. Johnson gained entry into the residence before him and held the occupants hostage until he entered. He then forced Mr. Nicholson to record a statement exonerating him. He then forced Ms. Duncan to write a note telling a neighbor they were leaving. They took the victims to a field where Mr. Nicholson and Ms. Duncan were shot while Ms. Johnson stayed at the car with the children. Mr. Honken returned to the car, removed the children, and shot them in the back of the head.

Regarding the murder of Mr. DeGeus, Mr. Vest reported that Mr. Honken told him that Ms. Johnson lured him to a remote area where Mr. Honken was waiting. He said he and Mr. DeGeus were in the car talking when Ms. Johnson entered the car and told him she was cold. He took that as "guidance" from her to do what they planned (kill Mr. DeGeus). He shot him multiple times and beat him with a baseball bat. He and Ms. Johnson buried Mr. DeGeus' body at the scene and drove his car to a car wash to wash blood spatter from the exterior of the car.

## LAY WITNESSES' SIGNIFICANT OBSERVATIONS ABOUT MS. JOHNSON

### Arlyn Johnson

Mr. Johnson advised that Ms. Johnson had "a very hot temper" that Dustin Honken was most capable of handling. He said Mr. Honken would listen to her, let her vent, and give her time before trying to talk to her. Ms. Johnson's ex-husband advised that Ms. Johnson was "never wrong" when arguing.

### Carol Lou Steiner

Ms. Stenier advised that she was an inmate in the Benton County Jail for about three weeks after Ms. Johnson was first housed there upon her arrest in July 2000. Ms. Steiner opined that Ms. Johnson had a "mean streak," though she never "showed it" while they were in jail together. She said Ms. Johnson cried a lot. She recalled that near the end of her stay in jail, Ms. Johnson's attorney gave her some depositions to read and, while reading one, she commented without elaboration that her boyfriend was planning on killing her.

### Kimberly K. Young

Ms. Young advised that she was a weekend inmate at the Benton County Jail when Ms. Johnson was brought there on 7/29/04. They shared a cell for two weekends. She described Ms. Johnson as having "an attitude." Ms. Johnson never told her what she was arrested for, only that she had been arrested at her sister's house and that, in the past, the police had searched her house for drugs. She said that she was always very secretive, never mentioning names, even when talking on the telephone.

## EXPERT OPINIONS

### Neuropsychological impairment and Attention Deficit Disorder

Please refer to the expert report of Daniel Martell, Ph.D., ABPP, below.

### Ms. Johnson's Alleged History of Physical, Emotional, and Possibly Sexual Abuse as a Child

So far, my opinions regarding this issue are based entirely on Ms. Johnson's self-report during our interview of April 23, 2005.

Ms. Johnson reported that during or after her parents divorce, she was sleeping in her mother's bed, and heard a noise that turned out to be her father, who was hiding under the bed. She reported that her father had broken in, and assumed that he meant harm to his estranged wife. However, no harm came to Ms. Johnson as a result of this event, and she related it without expressing on any belief that she had been emotionally traumatized.

Ms. Johnson reported that she "never liked school, ever." She states that she thinks she "had ADD." She states that she "got bullied a lot," but denies knowing why, stating, "Some kids didn't like me."

Ms. Johnson stated that the only positive male figure in her life was her "Dad's Mom's husband" (i.e., her father's stepfather.) She called this man "Grandpa," despite the fact that she report seeing him only once per year.

Ms. Johnson reports that her mother disciplined her often, stating, "She was a hitter. She used a thick, wide belt. It seems like it was every day, but it wasn't." Ms. Johnson went on to say, "she'd lose her temper when we 'fucked up' (sic)." Ms. Johnson proclaimed somewhat proudly that she was a "noble child" who would confess to things she had not done to protect her siblings from these beatings. She stated, "I always want to protect everybody. I am always for the underdog."

During her elementary school years, Ms. Johnson reports that her maternal grandmother, Florence Jensen, and her husband came to live with Ms. Johnson's family. She reports that they and her mother, believing her to be troubled by "evil spirits," would hold her down for hours at a time and pray loudly over her. These episodes were called

"rebukings." Looking back, Ms. Johnson refers to this as the period during which her mother had a "religious disorder."

In discussing these "rebukings," Ms. Johnson described herself as having control over their duration. Early on, she would stubbornly refuse to say the things that mother and grandmother wanted to hear. Soon, however, she realized that it was easier to simply tell them what they wanted to hear and each episode would end rather quickly. Nevertheless, by her self-report, it appears that Ms. Johnson experienced these episodes as abusive.

With the exception of her "religious disorder," Ms. Johnson describes her mother as a good and caring parent. Nevertheless, the family moved quite a bit. At one point Ms. Johnson claims that her mother took the family to live in a place called the "Teardrop Orphanage," run by Ted and Bob Dillo. She described it as a "terrible place." Apparently, because the orphanage was a working farm, she was forced to take care of farm animals, including pet rabbits. She described one experience that she calls "traumatizing" where a rabbit was killed, skinned, and gutted, and then she was forced to eat it for dinner. She states that they knew that she was afraid of pigs, and nevertheless made her take food scraps to add to the pig slop. She described this as playing "mind games" with her.

Ms. Johnson states that Ted molested her older sister, Wendy. She adds, "Wendy said he molested me too, but I don't remember. I don't think I was molested. Wendy said us girls had to take turns going into Ted's room to take 'naps' but I don't remember that. At one time he made me feel uncomfortable, but I told him to never get near me again, to never touch me again. I don't think he ever did. That was in the third grade."

Ms. Johnson described an incident in approximately the third grade were a "boy's knee accidentally broke my nose. They thought it was my mother (i.e., child abuse.) They made me go to the retard school (sic), but I was not there long." (This account frankly made little sense to me, but without the opportunity to interview collateral informants, I have no way to know what if anything actually happened.)

Ms. Johnson reported that during grade school, as part of her mother's "religious disorder," the family was required to fast "all the time."

In grade school, Ms. Johnson reports that her grades were not good, that she was smoking cigarettes, and hanging out with her older sister, Wendy. During this time she began to use beer and marijuana and reports that she "liked being high." However, she reports that she "always got caught," and that her mother would ground and hit her. However, at age 14, she states "we came to an understanding that she wasn't going to hit me any more."

Ms. Johnson reports that she would visit her father in the summer, but did not get along with her stepmother, named Cookie, who reportedly said "terrible things" to her.

**Opinion:**

**Without the ability to confirm these self-reported experiences with collateral interviews, the following opinion is based solely on Ms. Johnson's self-report:**

**If these experiences actually occurred in the manner described by Ms. Johnson, or if these are her sincere recollections of those experiences, it is very likely that she experienced her "rebukings" as abusive, confusing, and traumatic. Research suggests that children who are physically or sexually abused or severely neglected are at increased risk of delinquent behavior or adult crime. In an inner-city sample, that risk rose from 20% in the control group to 30% in the group that was abused or neglected. Thus, while there is an increased risk of crime and delinquency, it is also true that 70% of the abused and neglected sample were not detected as committing delinquent or criminal acts.**

<u>Ms. Johnson's Self-Reported History of Domestic Violence as an Adult</u>

According to Ms. Johnson, her first marriage, at age 16 to Steve (LNU), lasted only nine months. She reported no abuse during this marriage.

According to Ms. Johnson, her second husband was Arlyn Johnson (AJ), who she started dating at approximately age 18. She had been taking birth-control pills, but reports that she "ran out." She did not refill the prescription, and subsequently became pregnant with her first child, Alyssa. She describes AJ as a "good guy," but states that she was not in love with him. She reported no abuse during this marriage. She describes him as "mellow" and a good provider, but complains that "life was boring." When asked if she preferred men who "lived closer to the edge," Ms. Johnson smiled and said "yes."

While still married to AJ, Ms. Johnson reports that she had an affair with Kirby Thompson, who, she states, "turned me onto cocaine." She recited a long list of drug she had tried, and stated that cocaine did not "impress" her. It was at this time that Ms. Johnson reports that she first began to use "crank." Smiling broadly, Ms. Johnson stated, "Crank made me feel like I could jump tall buildings in a single bound. I liked it." Later, she stated that she "loved" crank. Except when she was pregnant, Ms. Johnson went on to report that she has been using crank regularly ever since. She describes herself as having been a "functional user," and denies that her drug use ever prevented her from being a good worker or a good mother.

When she told AJ that she wanted to leave him, Ms. Johnson reports that he "made her" see a psychiatrist. She reports that the psychiatrist "said I just didn't love him." However, Ms. Johnson also states that she was told that she was depressed and "not a happy person."

Case 3:09-cv-03064-MWB-LTS    Document 304-11    Filed 08/10/11    Page 20 of 32

RRR-P20

Ms. Johnson reports that she met Terry DeGeus in 1989. She reports that he "took (her) breath away. He was the sexiest man in the world. He was married and had a daughter (Ashley) who was the same age as Alyssa. He worked construction and drove a truck. He was handsome and buff." Regarding his physique, Ms. Johnson described Mr.DeGeus as "ripped."

It was during her relationship with Mr. DeGeus that Ms. Johnson first reports experiencing domestic violence as an adult;

> "(Terry) was good with Alyssa, and a good father to Ashley. But we both got into crank, big. He got a little bit out of control. He got paranoid and obsessive about me, very jealous. Most of my friends were guys, and Terry was possessive and abusive. He hit me, openhanded at first, then progressed to hitting me with fists. No broken bones."

Ms. Johnson described one severe beating, which brought the police. She states that her "face was a bloody mess." Somehow, her ex-husband and friend "A.J. got involved." She reports that Terry was later apologetic. Nevertheless, Ms. Johnson reports that she "left the next day for three months in Wisconsin." Eventually, she "forgave Terry and got back with him. He really was sorry." Later she reports the abuse began again, so she moved to Ventura, and that she tried to "ease off" of her relationship with Mr. DeGeus; "not a breakup, just to slow it down."

However, Ms. Johnson reports that Mr. DeGeus began to "stalk" her. He would block her car so that she could not leave for work, and demand to talk with her. He would reportedly follow her home. Ms. Johnson moved again, to Clear Lake, and began to see other men "on the down low," so Mr. DeGeus would not find out about it.

During this period of separation, Ms. Johnson described being raped by Mr. DeGeus, and reports that she feels bad because her daughter could hear it happening. This was one of only three times during the interview that Ms. Johnson appeared to cry. (The other times were when she talked about not getting to see her children, and when she recounted the prospective jurors being asked if they could "kill her.")

Note – Mr. DeGeus' abuse of Ms. Johnson is corroborated by a restraining order she obtained against him, and the interview of her ex-husband, Arlyn Johnson.

According to Ms. Johnson, Mr. DeGeus owed Dustin Honken $20,000 for drugs. Mr. DeGeus gave Ms. Johnson $8,000 to give to Mr. Honken in partial payment of the debt. Ms. Johnson met Mr. Honken, who she had never met before, at the Burger King, where she gave him the money. She asked him not to give any more drugs to Mr. DeGeus. Mr. Honken asked Ms. Johnson to begin to deal drugs for him, and she reports that she agreed "to help with Terry's debts."

Shortly thereafter, Ms. Johnson and Mr. Honken began to date "lightly." Mr. Honken lived in Arizona. Regarding Mr. Honken, Ms. Johnson stated:

> "We first slept together the night Dustin got busted. Dustin was going to relocate me to Arizona. He made the crank. It was good. Dustin was a book smart. Did I like him? He was all right. He was going to be my dope connection. I figured he was going to be my sleeping-together dope guy."

Later, in an apparent contradiction, Ms. Johnson denied that she had ever received crank from Mr. Honken.

After Mr. Honken was arrested, Ms. Johnson visited him in jail and picked him up when he was released because she didn't want him to think that she had "set him up." Ms. Johnson stated that Mr. Honken was never violent with her, though she is quite angry at him because he "had another girl on the side," and "mind-fucked" (sic) her by manipulating and lying. In 1994, Ms. Johnson gave birth to their child, Marvea.

Interestingly, Ms. Johnson reports that she has "more than an average temper. I get mad quick. I don't like being fucked (sic) with. I didn't have a temper with Terry, but I did have a temper with Dustin."

**Opinion:**

**It appears clear that Ms. Johnson was the victim of domestic violence as an adult, but only at the hands of her boyfriend Terry DeGeus, who is one of the victims of the alleged instant offenses. However, unlike some victims of domestic violence, Ms. Johnson retained a sense of autonomy. For example, she left him successfully the day after his first assault, and returned to him three months later after forgiving him. Later, he appeared to influence her behavior, by forcing her to hide her other relationships out of fear of his reaction, and by stalking her.**

**Even by her own self-report, there is no reason to believe that Ms. Johnson was ever the victim of violence at the hands of defendant Dustin Honken. There is no reason so far to believe that domestic violence played any role in the instant offenses, with one exception: It is possible that Mr. DeGeus's murder was in part committed in retribution for his violence against Ms. Johnson, but without the ability to interview her or Mr. Honken regarding the instant offense, this inference is tentative at best.**

<u>Can Ms. Johnson Be Safely Managed within a Federal Prison?</u>

As noted above, Ms. Johnson has at times been a challenging inmate. Both by her self-report and a review of correctional records, she clearly appears to have become comfortable within a correctional environment. Most of her disciplinary violations appear typical of jail detainees and inmates who try to "work the system" to make their

lives as comfortable as possible. Despite the fact that the instant offense marked her first incarceration, her frequent rule violations are of the type commonly found among experienced inmates, suggesting that she adapted rather quickly to the correctional environment.

Ms. Johnson made it clear to me that she is quite able to protect yourself within a correctional setting. She probably spoke of her ability and willingness to stand up to other inmates who might try to "run something on her unit." Clearly, even by her self-report, Ms. Johnson has achieved a level of leadership, not necessarily positive, within the correctional environment.

Ms. Johnson states that she "never had a problem with (correctional officers). "I had problems with other inmates that mattered in this jail. But I'm not in with the 'bottom feeders' here." She explained that she has a very low opinion of certain types of inmates, and suggested that the African-American inmates were more likely to "run games," but that they would not be allowed to do so on "(her) unit."

On the other hand, these behaviors are very typical within any correctional setting, and are typically easily managed by a skilled and experienced correctional staff, such as one would find in a federal prison. Thus, it is my opinion that there is no reason to believe that Ms. Johnson could not be safely managed within a federal correctional facility if that is her sentence.

I should add a cautionary note about the possibility of an impulsive suicide attempt, similar to that made by Ms. Johnson after she became aware that the bodies of her alleged victims had been discovered. It is certainly not unlikely that Ms. Johnson would pose an acute suicide risk soon after receiving bad news, such as a finding of guilt or a severe sentence, until she has time to process this bad news and adjust to it.

**Opinion:**

**Despite the fact that Ms. Johnson appears to have relatively little respect for correctional rules, there is no reason known to me that she should not be relatively typical of most female inmates in that regard. Nor is there any reason known to me to believe that she would not be safely manageable by a skilled and experienced correctional staff.**

Does Ms. Johnson Suffer From a Serious Mental Illness?

Ms. Johnson presented herself as an attractive, moderately obese woman who appears her stated age. She communicates in a somewhat seductive style that suggests a histrionic personal style; however, she was quite pleasant and apparently cooperative with the interviewers. Her speech was normal in form, rate, and volume. She was oriented to time, person, place, and situation. Her affect was generally appropriate to the situation.

RRR-P23

She reported that she is "better at figuring stuff out and taking complex instructions." She reported a belief that she has suffered from attention deficit disorder for most of her life, but believes that her current medication (Zoloft) has "cured" her ADD. She claimed to have received her GED three years ago, though she stated that she had previously lied about having achieved her GED.

Ms. Johnson claimed to have memory problems, but on interview and according to psychological testing, her memory is excellent. (See Dr. Martell's report.) She stated that she has "always been very impulsive." She described herself as not excitable or hyperactive, but very stubborn. She reported no problem in making and keeping friends. She described herself as "very organized," and stated that she tries to control her emotions.

Ms. Johnson described herself as suffering from a longstanding depression, dating back to her childhood, which she described as "exhausting." She stated that she is currently taking Zoloft, which she "loves." I note that she reported a history of two prior suicide attempts. These are discussed in greater detail by Dr. Martell below.

Ms. Johnson is also taking Seroquel, which she reported to have been prescribed to help her sleep. Sleep difficulties are common in jails, both because of noise as well as depression. Ms. Johnson reported that she first became aware of Seroquel when she obtained some from another inmate for whom it had been prescribed.

Ms. Johnson stated that at age 13, "I think when I was younger, it seemed like there was always something going on, some activity in my head like a motor running. It didn't bother me, but it stopped when I started taking. I thought it was in my head. I could ignore it, but it got worse when I was upset. It is gone now, because of the Seroquel. Crank also made it go away." Otherwise Ms. Johnson denied any auditory or visual hallucinations or delusions.

**Opinion:**

**Because of the circumstances, and without interviewing collateral informants, it is difficult to know the source of Ms. Johnson's stated experience of "hearing a motor running" in her head. There is no other evidence of thought disorder, either in regard to form or content.**

**Again, without the ability to interview collateral informants, it is difficult to be sure, but it seems quite likely that Ms. Johnson has been depressed, at least on and off, at various times in her life. This would be especially likely after her arrest on potentially capital charges. Her depression appears to be in good remission at the present time.**

**There is no evidence that either of these possible psychological experiences or conditions have interfered with her ability to function in any significant way. By**

RRR-P24

her self-report, Ms. Johnson has been a successful employee at a variety of jobs and a successful parent.

Other than the instant offense, the one area of her life that could be described as especially unsuccessful is Ms. Johnson's frequent and continuous use of methamphetamine. Ms. Johnson gave two different reasons for using crank. Quoting defense experts, she reports that she was "self-medicating" her depression. However, she also told us quite convincingly that she takes this drug because she "loves it." She was able to voluntarily stop taking crank during her pregnancies, and just as voluntarily resumed as soon as she believed that it would not hurt her children.

There is no reason known to me that Ms. Johnson would be characterized as having a serious mental illness. Nor is there any reason to believe that mental illness played a significant role in the instant offenses.

## CONCLUSIONS

Please note that the information and opinions contained in the report are based entirely on the case materials I was allowed to review and the interview with Ms. Johnson. It is possible that additional or contradictory information could result in different conclusions.

Thank you for the opportunity to review this interesting case.

RRR-P25

## Expert Report of Daniel A. Martell, Ph.D., ABPP

### Referral Question

This examiner has been asked to review the neuropsychological test data and notes from Dr. Gelbort's examination of Ms. Johnson, and to conduct an independent examination of her in order to provide rebuttal testimony, should her case proceed to a penalty phase in which she places her mental condition at issue.

### Scope of Information and Limitations of Opinion

This report is being generated without the benefit of significant background data and corroborative information regarding Ms. Johnson, including reports from other experts, which may become available in the future. Should these additional data become available, the findings and opinions expressed herein are subject to change or modification based on the new information.

In addition to the materials listed at the beginning of this report, I have had the opportunity to review Dr. Gelbort's interview notes and raw neuropsychological test protocols, including:

(1)     Wechsler Adult Intelligence Scale – III (WAIS-3)
(2)     Wechsler Memory Scale – III (WMS-3)
(3)     Halstead Category Test
(4)     Trail Making Test Parts A & B
(5)     Wide Range Achievement Test – III  (WRAT-3)

### Review of Dr. Gelbort's History and Neuropsychological Test Data

Ms. Johnson was examined at the Hardin County Jail by Dr. Gelbort on 1/24/2005. She was 41-years-old at that time. He provided copies of his notes and raw test data for review prior to this writer's examination of her. His notes reflect the following history obtained from her and behavioral observations at the time of testing:

**Birth and development**. Ms. Johnson reported being the product of a normal pregnancy, but a breach birth following a long labor. She reported achieving developmental milestones such as walking and talking within normal limits.

**Education and work history**. She reported dropping out of school in the 9th grade, but obtaining her GED two years prior to Dr. Gelbort's examination. During school, she reported getting into trouble for fighting, smoking, and cutting class. She reported that her employment history included waitressing most of the time, although she worked as an exotic dancer in Des Moines for one year, from 1988-89.

**Neuropsychiatric history**.  She reported a history of headaches that may have been diagnosed as migraines, during which she feels nauseated.  She stated that these have occurred throughout her life, and continue approximately one time per week.  She treats them with Tylenol.

With regard to head injury, she reported to Dr. Gelbort that she was in an abusive relationship from 1989 through 1992, and that her boyfriend would hit her in the head, leading to periods of confusion, although she did not know if she ever lost consciousness during these events.

Approximately one year prior to Dr. Gelbort's exam, she stated that she was rushed to the ER following an allergic reaction to an antibiotic, relating that her "heart stopped and [she] quit breathing."  Dr. Gelbort's notes state that she had an altered sensorium and awareness, dissociated, and was admitted for "about 4 hours."

She also reported a positive history of suicidal behavior.  She told Dr. Gelbort that while she was in the Waterloo Jail, "I hung myself.  I don't remember it, when they tried to resuscitate me I had a seizure and bit off part of my tongue."  She reported being taken to the ER.  She also reported an overdose when she was 15-years-old during which she took a bottle of aspirin (circa 50) that "made me sick."

With regard to substance abuse, Ms. Johnson also told Dr. Gelbort that she has a long history of using Methamphetamine, beginning at age 22-23; and that she has used it regularly since 1989, "every day."  She referred to it as "my antidepressant," and indicated that she used it until time of her arrest; one line a day or several times a day.

Finally, Dr. Gelbort's notes reflect evidence of depression.  Mr. Johnson reported, "I am very depressed," and stated that she was being treated with Zoloft 200 mg (her preferred antidepressant) x 2 years, and with Seroquel, 200 mg (for sleep).

**Neuropsychological Test Findings**

Analysis of the test data collected by Dr. Gelbort proceeded in the following manner.  First, I inspected each available test protocol to establish that the test had been administered in a manner consistent with standard practice.  Then I double-checked the scoring of test items and the mathematical calculations required in order to arrive at raw test scores and indexes.  Finally, I checked to be sure that all the raw test scores had been converted to standardized scores on the basis of proper norms.  I was guided in this process by the American Psychological Association's Standards for Educational and Psychological Testing and the Specialty Guidelines for Forensic Psychologists.

Two minor scoring problems were identified in the administration of the WAIS-3 Vocabulary subtest (no credit was given for items #9 and #20, despite Mr. Johnson providing 1-point answers), but correcting this had no impact on her overall IQ scores.

Also, Dr. Gelbort chose not to administer some subtests in both the Wechsler IQ and memory scales – which made calculation of some index scores impossible.

A table is appended at the end of this report that summarizes Ms. Johnson's test scores in graphic form as compared to other women of her age and education.

**Academic achievement.** On the WRAT-3, Ms. Johnson demonstrated Reading and Spelling abilities at the High School level. However, her arithmetic abilities are not as well developed, falling at the 6th grade level, and hence represent an area of weakness for her.

**Intellectual functioning.** Testing with the WAIS-3 revealed that Ms. Johnson has a Full Scale IQ in the "Average" range (91), with a Verbal IQ in the "Low Average" range (84) and a Performance IQ in the "Average" range (102). The 18-point difference between her verbal and performance IQ scores is statistically significant ($p < .05$), occurring in only 10.7% of the normative population. This finding indicates that her verbal abilities are not as well developed as her visual-spatial problem solving skills, and reflects her lack of formal education after the 9th grade.

There was no significant "scatter" among the subtest scores that make up either her Verbal or Performance IQ scores, indicating that her skills are consistent and evenly developed within each of these fundamental intellectual domains.

**Memory functioning.** Ms. Johnson's performance on the WMS-II revealed a significant strength in her memory abilities, when compared to her "Average" overall intellectual functioning. Her General Memory score fell in the "Very Superior" range (130). Within her extremely high level of functioning however, it is notable that her Visual Memory abilities are operating at a significantly higher level than her Auditory Memory abilities. This pattern is observed for both immediate and delayed recall, reflecting the overall superiority of her visual memory skills.

**Executive functioning.** Ms. Johnson completed several tests that tap executive functioning, including her higher-order problem-solving ability [Halstead Categories Test] and ability to switch quickly and efficiently between competing stimuli (multi-task) [Trails A&B]. Scores on each of these tests was within normal limits, indicating no impairment in her executive control functions.

### Dr. Martell's Examination Findings

Ms. Johnson was examined jointly by Dr. Martell and Dr. Dvoskin on April 24, 2005 in a quite, private room at the Woodbury County Jail in Sioux City, Iowa. The examination was audio-taped in its entirety with Ms. Johnson's informed consent. The nature and purpose of the examination, as well as the lack of confidentiality were explained to her, and her consent for the examination was obtained by Dr. Dvoskin at the beginning of the day, and reiterated by this examiner during the afternoon.

RRR-P28

## Behavioral Observations and Mental Status Examination

Angela Johnson is a 41-year-old, right-handed Caucasian woman who presented for this examination well groomed and neatly dressed in an orange jail-issued scrubs and sandals. She had long light-brown hair that extended well down her back. Her hands were unrestrained. She was cooperative, outgoing, and friendly throughout the examination.

Her motor behavior was remarkable for intermittent restlessness and nervous shaking of the right leg and foot, which she was aware of and attributed to anxiety. She made good eye contact.

Her speech was produced at a normal rate and volume, with clear articulation and a normal quantity of output. Her thoughts were expressed in a logical, coherent, and goal-directed fashion, with no tangentiality, loosening of associations, or other indicia of formal thought disorder. There was no current evidence of obsessive thinking, although she did seem preoccupied with thoughts of her children at times. The content of her thoughts was free from fixed, false beliefs (delusions) and significantly unusual sensory experiences (i.e., auditory, visual, gustatory, olfactory or tactile hallucinations). However, she did describe when she was younger hearing "like a motor running in my head. ... I can hear it, but not with my ears." She stated that this began when she was 13-years-old, and stopped when she began taking Seroquel while in jail. She stated that she did not have the ability to voluntarily control or stop it, but that, "I can ignore it." She also reported that the experience was worse when she was lying down.

Her observable affect impressed as broad, bright, and comfortable. She was affable, easy-going, and laughed easily during the examination. However, there were also periods of emotional lability during which she cried openly, particularly when discussing her court proceedings and her children. Overall, her affect was appropriately tied to her mood and the content of her thoughts. She described decreased appetite and weight loss secondary to trying to lose weight. She stated that she has gone from a high of 240 pounds, to approximately 190 pounds at the time of this examination. She described her sleep as good secondary to taking Seroquel. Without the sleeping medication, she stated that she is prone to obsessive thoughts that keep her up at night. She stated that she has had no sex drive since her incarceration, which she attributed to the side-effects of taking Zoloft. Her underlying mood impressed as euthymic and slightly expansive. Her insight into her current situation was good.

She continues to be treated with Zoloft, 200 mg. for depression, and Seroquel, 200 mg. for sleep, with good effect.

## Additional Neuropsychiatric History Obtained

In addition to the history obtained by Dr. Gelbort and Dr. Dvoskin, which will not be reiterated here, Ms. Johnson did report greater than 20 beatings to her head during her abusive relationship, but stated that none resulted in a loss of consciousness.

When asked about her childhood development, she clarified that her mother did not smoke, drink, or use drugs while pregnant with her. She did endorse a number of behavioral symptoms in childhood, including:

- Behavioral problems at home: leading to multiple "rebukings" from her hyper-religious mother and grandmother
- Behavioral problems at school: including difficulty paying attention
- Bedwetting 2x per week until the 4th grade
- Nail biting and picking at her fingers
- Difficulty paying attention
- Depression: "I'm sure I was depressed my whole life."
- Aggression: Fights with her sister, and at school
- Shyness: "Came as I got older."
- Nightmares: "Bad dreams about my mother; pig and rabbit things."
- Poor self-esteem: "Mom beating devils out of me; made me feel stupid and ugly."
- Unpredictable: "I've always been impulsive."
- Frustrates easily: "If I couldn't do or accomplish something."
- Daydreaming
- Easily distracted: "Couldn't concentrate; now it's OK."
- Fidgety / Trouble sitting still: "foot rocking"

She also endorsed a number of medical problems, including:

- Childhood headaches
- Fainting spells while pregnant with Alyssa
- Near drowning at age 12, pushed under water while sick, doesn't remember if she lost consciousness
- Broken right ear drum at age 6 with mild hearing loss
- Eczema below her left eye when under stress
- Adult-onset of allergy to freshwater fish, resulting in hives, restricted airway, and swollen eyes
- Broken nose in the third grade when a boy hit her with his knee

RRR-P30

## Diagnostic Impression

| | | |
|---|---|---|
| Axis I: | 304.40 | Amphetamine Dependence, In a Controlled Environment |
| | 296.3 | Major Depressive Disorder, by history, in partial to full remission |
| | R/O 315.1 | Mathematics Disorder |
| | R/O 314.00 | Attention-Deficit/Hyperactivity Disorder |
| Axis II: | | Deferred |
| Axis III: | | R/O anoxia due to hanging and allergic reaction to antibiotic |
| Axis IV: | | Incarceration; Capitol litigation; separation from children and family |
| Axis V: | | GAF = 80 |

## Summary and Conclusions

Angela Johnson is a 41-year-old Caucasian woman with a longstanding history of methamphetamine abuse and major depression. As noted by Dr. Dvoskin, she reports a history of ritualistic religious "rebukings" by her mother and grandmother as a girl, and possible psychological and sexual abuse (which she states does not recall) while at the Teardrop Orphanage with her mother and sister.

Her neuropsychological testing reveals a pattern of strengths and weaknesses, but no significant brain impairment. She has an average IQ, but with her visual-spatial problems solving abilities functioning at a higher level than her verbally-mediated cognitive skills. Her greatest relative strength is that she has very superior memory functioning, especially for visual stimuli. Her greatest relative weakness is a mild impairment in her mathematics achievement. Further information would be needed in order to rule-out a history of Mathematics Disorder, and/or Attention-Deficit/Hyperactivity Disorder.

Normative Neuropsychological Profile: Angela Johnson
\* = Testing by Dr. Gelbort, 1/24/2005
(Scores Normed for Sex=Female, Age=41, Education=9th/GED, IQ=91)

| Test | Score | -3 | -2 | -1 | Average | +1 | +2 | +3 |
|------|-------|----|----|----|---------|----|----|----|
| **INTELLIGENCE** (WAIS-3) | | | | | | | | |
| **Full Scale IQ** | 91 | | | | \* | | | |
| Verbal IQ | 84 | | | \* | | | | |
| Vocabulary | 6 | | | \* | | | | |
| Similarities | 5 | | \* | | | | | |
| Arithmetic | 7 | | | \* | | | | |
| Digit Span | 9 | | | | \* | | | |
| Information | 8 | | | | \* | | | |
| Comprehension | 9 | | | | \* | | | |
| Letter-Number Seq. | -- | | | | | | | |
| **Performance IQ** | 102 | | | | \* | | | |
| Pict. Completion | 12 | | | | | \* | | |
| Digit Symbol | 9 | | | | \* | | | |
| Block Design | 9 | | | | \* | | | |
| Matrix Reasoning | 12 | | | | | \* | | |
| Pict. Arrangement | 10 | | | | \* | | | |
| Symbol Search | - | | | | | | | |
| Verbal Comp. | 80 | | | \* | | | | |
| Perceptual Org. | 105 | | | | \* | | | |
| Working Memory | -- | | | | | | | |
| Processing Speed | -- | | | | | | | |
| **MEMORY FUNCTIONING** (WMS-3) | | | | | | | | |
| **General Memory** | 130 | | | | | | \* | |
| Auditory Imm. | 108 | | | | \* | | | |
| Visual Imm. | 127 | | | | | | \* | |
| Immediate Memory | 122 | | | | | | \* | |
| Auditory Delayed | 117 | | | | | \* | | |
| Visual Delayed | 132 | | | | | | \* | |
| Aud. Recog. Delay | 120 | | | | | \* | | |
| Working Memory | -- | | | | | | | |
| **HALSTEAD-REITAN BATTERY** | | | | | | | | |
| Categories Test | 52 err. | | | \* | | | | |
| Trails A | 25sec | | | | \* | | | |
| Trails B | 54sec | | | | \* | | | |
| **ACHEIVEMENT TESTING** (WRAT-3) | | | | | | | | |
| Reading | 94 HS | | | | \* | | | |
| Spelling | 90 HS | | | | \* | | | |
| Arithmetic | 79 6 gr. | | | \* | | | | |

RRR-P32