# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA

ANGELA JOHNSON,

           Petitioner,

vs.

UNITED STATES OF AMERICA,

           Respondent.

No. C 09-3064-MWB
(No. CR 01-3046-MWB)

       _____

**POST HEARING BRIEFING IN SUPPORT OF SECOND AMENDED MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY, AND REQUEST TO FILE ADDITIONAL BRIEFING**

Michael Burt
Law Office of Michael Burt
600 Townsend Street, Suite 329E
San Francisco, California   94103
415-522-1508 (tel.)
415-522-1506 (fax)
Michael.Burt@prodigy.net

Marcia A. Morrissey
Attorney at Law
2115 Main Street
Santa Monica, California  90405
310-399-3259 (tel.)
310-399-1173 (fax)
MorrisseyMA@aol.com

September 1, 2011
San Francisco, California

# TABLE OF CONTENTS

Page No.

I.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**PRETRIAL PHASE**

**COURT CLAIM NO. ONE**

Court Claim 1 – Failure to Pursue A Disposition for a Sentence Less than Death . . . . . . . . . . . . 5

    1.  Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    2.  Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**MERITS PHASE**

**COURT CLAIM NO. EIGHT**

Court Claim 8 – Demeanor and Competence: Failure to Reduce Petitioner's Medication or to
Address the Effects of the Medication on her Demeanor at Trial and her Ability
to Participate in her own Defense, in Violation of her Right to Due Process and a Fair Trial  . . 34

    1.  Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    2.  Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        A.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        B.  The Medications  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

        C.  Capital Jurors Want to See Remorse . . . . . . . . . . . . . . . . . . . . . . . . . 41

        D.  What Angela's Jury Wanted to See, What They Saw, and
            What They Were Told by the Government . . . . . . . . . . . . . . . . . . . . 42

        E.  What Diligent Counsel Would Have Done Regarding Angela's
            Demeanor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

        F.  How Counsel Allowed Ms. Johnson to Become the Government's
            Exhibit A in Aggravation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

        G.  Ms. Johnson Has Demonstrated Prejudice  . . . . . . . . . . . . . . . . . . . 47

**MITIGATION PHASE**

Overview of Mitigation Ineffectiveness Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

i

1.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

2.     The Evidence of and Jury's Findings Regarding Aggravation
Presented at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

3.     The Evidence of and Jury's Findings Regarding Mitigation
Presented at Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

4.     The Evidence of Mitigation That Could and Should Have Been
Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

## COURT CLAIM NO. EIGHTEEN

Court Claim 18 – Confrontation of Aggravating Evidence: Failure to Present Evidence of BWS to Explain the Relationship Between Petitioner and Terry DeGeus to Rebut the Prosecution's Theory of her Motive for Killing Him . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

## COURT CLAIM NO. NINETEEN

Court Claim 19 – Confrontation of Aggravating Evidence: Failure to Present Readily Available Evidence About Dustin Honken to Refute the Prosecution's Argument that Angela Johnson Was "Worse" than Honken . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

## COURT CLAIM NO. TWENTY

Court Claim 20 – Confrontation of Aggravating Evidence: Failure to Use the Prosecution's Arguments at Dustin Honken's Trial as Party Admissions to Rebut the Government's Evidence that Petitioner was "Worse" than Honken . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

## COURT CLAIM NO. TWENTY-ONE

Court Claim 21 – Confrontation of Aggravating Evidence: Failure to Discover and Present Information Regarding Dustin Honken's Plans to Kill Prosecutor Reinert and his Family and Honken's Membership in a White Supremacist Prison Organization . . . . . . . . . . . . . . . . . . . . . 87

## COURT CLAIM NO. TWENTY-TWO

Court Claim 22 – Confrontation of Aggravating Evidence: Failure to Address Aggravating Evidence at the Merits and Mitigation [sic] Phases of the Trial . . . . . . . . . . . . . . . . . . . . . . . . . 94

## COURT CLAIM NO. TWENTY-THREE

Court Claim 23 – Confrontation of Aggravating Evidence: Failure to Limit Future Dangerousness Evidence to Future Danger in Prison . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

Case 3:09-cv-03064-MWB-LTS    Document 311-1    Filed 09/01/11    Page 3 of 225

## COURT CLAIM NO. TWENTY-FOUR

Court Claim 24 – Confrontation of Aggravating Evidence: Failure to Object to Kathy Rick's Triple Hearsay Testimony About Petitioner's Alleged Possession of a Gun . . . . . . . . . . . . . . . 103

## COURT CLAIM NO. TWENTY-FIVE

Court Claim 25 – Confrontation of Aggravating Evidence: Failure to Object to Kyla Davis's Testimony that Petitioner Tried to Find Out Where She Lived and What Car She Drove . . . . 104

## COURT CLAIM NO. TWENTY-SIX

Court Claim 26 – Prosecution Misconduct: the Prosecution's Failure to Correct False Testimony at Angela Johnson's Trial Violated the Fifth and Eighth Amendments to the Unites States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

## COURT CLAIM NO. TWENTY-SEVEN

Court Claim 27 – Prosecution Misconduct: the Prosecution's Violation of *Brady v. Maryland* by Failing to Disclose Dustin Honken's Planned Violent Attack on the Trial Prosecutor and His Association with a White Supremacist Prison Organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

## COURT CLAIM NO. TWENTY-EIGHT

Court Claim 28 – Prosecution Misconduct: the Prosecution's Violation of Petitioner;'s Rights Under the Sixth and Eighth Amendments and the Due Process Clause by Presenting Inconsistent Arguments at Her Trial and That of Her Co-Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

## COURT CLAIM NO. TWENTY-NINE

Court Claim 29 – Ineffective Mitigation: The Testimony of Holly Dirksen . . . . . . . . . . . . . . . 115

## COURT CLAIM NO. THIRTY

Court Claim 30 – Ineffective Mitigation: The Testimony of Douglas Book . . . . . . . . . . . . . . . 118

## COURT CLAIM NO. THIRTY-ONE

Court Claim 31 – Ineffective Mitigation: The Testimony of Susan Marsolek . . . . . . . . . . . . . 121

## COURT CLAIM NO. THIRTY-TWO

Court Claim 32 – Ineffective Mitigation: Failure to Provide Psychiatric Pharmacologist Roswell Lee Evans with Data Regarding Petitioner's Drug History, Rendering His Expert Testimony Virtually Irrelevant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

Case 3:09-cv-03064-MWB-LTS    Document 311-1    Filed 09/01/11    Page 4 of 225

**COURT CLAIM NO. THIRTY-THREE**

Court Claim 33 – Ineffective Mitigation: Use of Multi-Faceted, Overly-Complicated Yet Incomplete Mitigating Factors for the Jury to Weigh Rather than Simple, Straight-Forward Facts that Encompassed All of the Mitigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

**COURT CLAIM NO. THIRTY-FOUR**

Court Claim 34 – Failure to Prepare Mitigation: Failure to Investigate and Present Evidence Regarding Angela Johnson's Mental State at the Time of the Offenses . . . . . . . . . . . . . . . . . . 140

      A.      Defense Mental Health Testimony at Trial . . . . . . . . . . . . . . . . . . . . . . . . . 142

      B.      Trial Counsel's Rationales Were Not Reasonably Tactical or Strategic . . . 151

            1.      Diverting the Jury's Attention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

            2.      Avoiding Government Experts Questioning Petition About the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

            3.      Relying on a Mental State Defense without Presenting Mental State at the Time of the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

      C.      The Evidence that Could Have Been Presented . . . . . . . . . . . . . . . . . . . . . 161

            1.      Evidence Known to the Mental Health Experts in 2005 . . . . . . . . . 161

            2.      Evidence that Reasonably Effective Counsel Should Have Developed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162

      D.      Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

**COURT CLAIM NO. THIRTY-FIVE**

Court Claim 35 – Failure to Prepare Mitigation: Delay in Hiring Dr. Gelbort, Failed to Follow-Up on His Recommendations, Failed to Instruct Him to Conduct a more Thorough Battery of Neuropsychological Tests, Failed to Retain Another Neuropsychologist When Gelbort Inexplicably Refused to Testify, Failed to Incorporate His Helpful Findings and Diagnosis Into the Testimony of the Experts Who Did Testify and Failed to Conduct Additional Neuropsychological and Neuroimaging Testing of Petitioner . . . . . . . . . . . . . . . . . . . . . . . . . 171

**COURT CLAIM NO. THIRTY-SIX**

Court Claim 36 – Failure to Prepare Mitigation: Failure to Introduce Evidence of, and Give The Trial Experts Records Concerning the 1996 Diagnosis of Petitioner With Depression and Dependent Personality Features . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

iv

## COURT CLAIM NO. THIRTY-SEVEN

Court Claim 37 – Failure to Prepare Mitigation: Failure to Offer Expert and Lay Testimony That Angela Johnson Was Under the Substantial Influence of Dustin Honken ................ 178

    A.       Events at Trial ........................................... 179

    B.       Evidence Available to Counsel ................................ 181

    C.       Prejudice ............................................... 185

## COURT CLAIM NO. THIRTY-EIGHT

Court Claim 38 – Failure to Prepare Mitigation: Failure to Introduce the Statement of Phyllis Prosovec to Support Residual Doubt ............................................ 186

## COURT CLAIM NO. THIRTY-NINE

Court Claim 39 – Failure to Prepare Mitigation: Failure to Offer Dustin Honken's Letters to Impeach the Mitigation Phase Testimony of Steven Vest to Support Residual Doubt ....... 189

## COURT CLAIM NO. FORTY

Court Claim 40 – Failure to Prepare Mitigation: Failure to Impeach Steven Vest by Presenting Evidence that Honken Lied About Petitioner's Role in the Offenses to Support Residual Doubt ...................................................................... 192

## COURT CLAIM NO. FORTY-ONE

Court Claim 41 – Failure to Prepare Mitigation: Failure to Introduce Petitioner's Offer to Plead Guilty as Evidence in Mitigation ................................................ 195

## COURT CLAIM NO. FORTY-TWO

Court Claim 42 – Failure to Prepare Mitigation: Failure to Present Evidence of Remorse Through Expert Testimony ................................................... 197

## COURT CLAIM NO. FORTY-THREE

Court Claim 43 – Failure to Prepare Mitigation: Failure to Elicit Evidence of the Effect of Petitioner's Excution on Her Family Members ................................... 202

## COURT CLAIM NO. FIFTY-SIX

Court Claim 56 – The Bureau of Prisons' Method of Carrying Out the Petitioner's Execution by Lethal Injection Violates the Fifth and Eighth Amendments, the Administrative Procedure Act and the Controlled Substances Act ......................................... 206

VI.     Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

vi

# TABLE OF AUTHORITIES

**Page No.**

*Abdul-Kabir v.Quarterman*,
550 U.S. 223, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Andrews v. United States*,
373 U.S. 334, 83 S.Ct. 1236, 10 L.Ed.2d 383 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Atkins v. Virginia*,
536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . .

*Barefoot v. Estelle*,
463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . .

*Beardslee, v. Woodford*,
395 F.3d 1064 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Bivens, v. Six Unknown Fed. Narcotics Agents*,
403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Bobby v. Van Hook*,
558 U.S. ——, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Brady v. Maryland*,
373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Carter v. Bowersox*,
265 F.3d 705 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Clemmons v. Delo*,
124 F.3d 944 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Commonwealth v. Louraine*,
390 Mass. 28, 453 N.E.2d 437 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Cullen v. Pinholster*,
563 U.S. ___, 131 S.Ct. 1388 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Dando v. Yukins*,
461 F.3d 791 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Enmund v. Florida*,
458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . .

*Fero v. Kerby*,
39 F.3d 1462 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Florida v. Nixon*,
543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . .

vii

*Fulks v. United States*
         2010 WL 3069390  (D.S.C. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Glenn v. Tate*,
         71 F.3d 1204 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Graham v. Collins*,
         506 U.S. 461, 113 S.Ct. 892, 122, L.Ed.2d 260 (1993) . . . . . . . . . . . . . . . . . . . . . . . . .

*Heffernan v. Norris*,
         48 F.3d 331 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Higgs v. United States*,
         711 F. Supp.2d 478 (D.Md. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Hill v. McDonough*,
         547 U.S. 573, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006) . . . . . . . . . . . . . . . . . . . . . . . . .

*Holloway v. Arkansas*,
         435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Houston v. Secretary, Dept. of Corrections*,
         2007 WL 1362921 (M.D.Fla. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*In re Pray*,
         133 Vt. 253, 336 A.2d 174 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Johnson v. Bagley*,
         544 F.3d 592 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Jones v. Barnes*,
         463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . .

*Kingsberry v. United States*,
         202 F. 3d 1030 (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Kyles v. Whitley*,
         514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Lambright v. Stewart*,
         220 F.3d. 1022 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Lockettt v. Ohio*,
         438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Lenz v. Warden*,
         579 S.E.2d 194 (Va. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Lopez-Angel v. United States*,
         2011 WL 2489960 (N.D.Iowa 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Mathison v. United States*,

Case 3:09-cv-03064-MWB-LTS   Document 311-1   Filed 09/01/11   Page 9 of 225

2011 WL 2635863 (N.D.Iowa 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Matthews v. Parker*,
2011 WL 2518895 (6th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Massiah v. Unied States*
377 U.S. 201 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Mitchell v. United States*,
2010, WL 3069390 (D.S.C. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Moss v. United States*,
323 F.3d 445 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Napue v. Illinois*,
360 U.S.264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Oregon v. Stevens*,
319 Or. 537, 879 P.2d. (Or. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Padilla v. Kentucky*,
__ U.S. __, 130 S. Ct. 1473 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Paul v. United States*,
534 F.3d 832 (8th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Penry v. Lynaugh*,
492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) . . . . . . . . . . . . . . . . . . . . . . . . .

*Penry v. Johnson*,
532 U.S. 782 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*People v. Savvides*,
1 N.Y. 2d 554, 154 N.Y.S. 2d 885, 136 N.E. 2d (2001) . . . . . . . . . . . . . . . . . . . . . . . . .

*Porter v. McCollum*,
130 S. Ct. 447, 175 L. Ed. 2d 398 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Ramsey v. Bowersox*,
149 F.3d. 749, (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Riggins v. Nevada*,
504 U.S. 127, (1992) (Kennedy, J. concurring) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Riley v. McDoniel*,
2010 WL 3786070 (D.Nev. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Roane v. Holder*,
Civil Action No. 1:05-cv-02337 (D.D.C. 7/28/11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Roe v. Delo*,
160 F.3d 416 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

ix

*Rompilla v. Beard*,
   545 U.S. 374, 125 S.Ct. 2456 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Sears v. Upton*,
   __U.S. __,130 S. Ct. 3259, 177 L. Ed. 2d 1025 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Sinisterra v. United States*,
   600 F.3d 900 (8th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Slack v. McDaniel*,
   529 U.S. 473 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Sochor v. Florida*,
   504 U.S. 527, 112 S.Ct. 2114, 119 L.Ed. 2d 326 (1992) . . . . . . . . . . . . . . . . . . . . . . . . .

*Solomon v. United States*,
   2008 WL 5331860 (S.D.Ohio 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*State v. Gwaltney*,
   77 Wash.2d 906, 468 P.2d 433 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*State v. Hess*,
   207 N.J. 123, 23 A.3d 373 (NJ 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*State v. Maryott*,
   6 Wash.App. 96, 492 P.2d 239 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*State v. Murphy*,
   56 Wash.2d 761, 355 P.2d 323 (1960) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Strickland v. Washington*,
   466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . .

*Tennard v. Dretke*,
   542 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Tison v. Arizona*,
   481 U.S. 137, 107 S.Ct. 1676, 95 L. Ed. 2d 127 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Allen*,
   247 F.3d 741 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Barrett*,
   8 F.3d 1296 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Bagley*,
   473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Bigeleisen*,
   625 F.2d 203 (8th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Cooper*,
   2011 WL 3559929 (10th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Cooper*,
91 F. Supp. 2d 90 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Fell*,
2005 WL 1634067 (D.Vt. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Flores*,
63 F.3d 1342 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Flores*,
360 F.3d 135, 145 (2nd Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Garza*,
77 F.3d 481 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Gilbert*,
120 F. Supp. 2d 147 (D. Mass. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Gordon*,
156 F.3d 376 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Hall*,
152 F.3d 381 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Hammer*,
564 F.3d. 628 (3rd Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Hernandez*,
450 F. Supp. 2d 950 (N.D. Iowa 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Johnson*,
196 F. Supp. 2d 795 (N.D. Iowa 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Johnson*,
239 F. Supp. 2d 897 (N.D. Iowa 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Johnson*,
362 F. Supp. 2d 1043 (N.D. Iowa 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Johnson*,
377 F. Supp. 2d 686 (N. D. Iowa 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Johnson*,
378 F. Supp. 2d 1051 (N.D. Iowa 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Johnson*,
383 F. Supp. 2d 1145 (N.D. Iowa 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Johnson*,
403 F. Supp. 2d 721 (N.D. Iowa 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Jones*,
132 F. 3d 323 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Case 3:09-cv-03064-MWB-LTS    Document 311-1    Filed 09/01/11    Page 12 of 225

*United States v. Lee*,
374 F.3d 637 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Mikos*,
539 F.3d 706 (7th Cir.2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Mitchell*,
502 F.3d 931 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Moussaui*,
282 F. Supp. 2d 482 (E.D.Va. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Peoples*,
74 F. Supp. 2d 930 (W.D. Mo. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Pepin*,
514 F.3d 193 (2nd Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Sampson*,
335 F. Supp. 2d 166 (D.Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Sanfilippo*,
564 F.2d 176 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Stitt*,
459 F.3d. 483 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Taveras*,
436 F. Supp. 2d 493 (E.D.N.Y 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Traveras*,
424 F. Supp. 2d 446  (E.D.N.Y 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Weston*,
206 F.3d 9 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Whitten*,
610 F.3d 168 ( 2d. Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Wanatee v. Ault*, (*Wanatee I*)
39 F. Supp. 2d 1164 (N.D. Iowa 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Wanatee v. Ault*, (*Wanatee II*)
101 F. Supp. 2d 1189 (N. D. Iowa 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Wiggins v. Smith*,
539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Williams (Terry) v. Taylor*,
529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

xii

*Williamson v. United States*,
2011 WL 2580331 (N.D.Iowa 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Willis v. Cockrell*,
2004 WL 1812698 (W.D.Tex.2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Worthington v. Roper*,
631 F.3d 487 (8th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## FEDERAL STATUTES

18 U.S.C. § 3592 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

18 U.S.C. § 3593 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

21 U.S.C. § 848 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

28 U.S.C. § 2241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

28 U.S.C. § 2253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

42 U.S.C. § 1982 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Case 3:09-cv-03064-MWB-LTS   Document 311-1   Filed 09/01/11   Page 14 of 225

## I.   Introduction

In an ideal world this post-hearing brief would have attempted to address each and every factual issue and legal claim raised during the course of a lengthy evidentiary hearing and in the Second Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody [Doc. 263](hereinafter "Second Amended Motion"). However, this is not an ideal world and the Court has set forth very specific guidelines on what this post-hearing briefing should and should not contain.

Most importantly, the  Court originally ruled that the brief may not exceed one hundred pages, but then indicated it was having qualms about setting such a limit in a capital case.  [Doc. 279](H.Tr. 4932) [1].  The hundred-page limitation was specifically intended to get Ms. Johnson's counsel to prioritize the claims (H.Tr. 4577). Ms. Johnson has prioritized her claims in this brief but because of the legal and factual complexity of those claims she has not been able to effectively make her arguments within the hundred page limit. Hence, she files with her brief a motion to file an oversized brief, an eventuality which was contemplated by the Court at the last calling of this case. (H.Tr. 4932)

Second, although the Court has indicated that it was "not going to put any limits on what you brief", it has also indicated that "I don't want or need any briefing on the guilt-phase issues....You're free to brief them. I'm just saying I don't feel I need it, and I don't want it. I'm obviously going to read and consider anything you file. But I'm just telling you what I need and want. I don't want any." (H.Tr. 4577).[2] Third, the Court has indicated that "I do want [briefing]

---

[1] References to sequentially numbered pages of the transcript of the trial proceedings before this Court are cited as "Tr." followed by a page citation.  Transcripts of jury selection are cited as "V.D.", followed by a page citation.  Transcripts of other district court proceedings are cited as "Tr." followed by the date of the proceeding and a page number, or as "Honken Tr." followed by a page citation to the trial transcripts of co-defendant Dustin Honken.   The evidentiary hearing transcripts are cited as H.Tr., followed by a page number.   References to Exhibits are to Hearing Exhibits unless otherwise noted.

[2] The reason why the Court does not want any briefing on guilt phase ineffectiveness issues is readily apparent from the Court's comment concerning the guilt phase claim that

1

on ineffective assistance of counsel with regard to mitigation..."(*Id.*)  Fourth, the Court indicated "I'm also interested in claim 3."(*Id.*, 4580)  Fifth, the Court indicated that "I have some mild interest in claim 4..." (*Id.*, 4580) Lastly, the Court raised an issue with respect to claim 10, stating "[a]nd on your claim 10 issues, aren't all of those precipitous? " (*Id.*)

This post-hearing brief was will of course respect the Court's preferences regarding the the subjects to be briefed. It will therefore focus primarily on those penalty phase claims that the Court has expressed an interest in, although in line with the Court's ruling that there are no limits on the claims that can be briefed , there will also be discussion of two additional claims (the plea claim (Claim No. One) and the demeanor and competency claim (Claim No. Eight), that the Court has not expressed an interest in.  However, this approach does create a dilemma for Ms. Johnson because it  requires the defense to abandon briefing on guilt phase and some penalty phase issues that it believes are meritorious, thus preventing her from convincing this Court that its initial, pre-briefing impressions of these claims is incorrect.

Also, if the Court ultimately denies Ms. Johnson's motion in it's entirety, there will undoubtedly be an appeal to the Eighth Circuit. If the Court denies guilt phase relief, but grants penalty relief under *Strickland*, there can be no immediate appeal by either side, although the theoretical possibility of an appeal still exists in the event that Ms. Johnson is sentenced to life after a penalty retrial and resentencing, the government then appeals that resentence, and/or the defense appeals or cross appeals on guilt phase issues.[3]

---

counsel was ineffective for failing to challenge the admissibility and weight of the government's handwriting expert. The Court stated: "if you want to pursue issues like the handwriting, you know, to me that's a ridiculous issue because *the case was not defensible in my view*..." (H.Tr. 4578, emphasis added). *See also,* H.Tr. 3709 ("...[T]he evidence against Miss Johnson was beyond overwhelming...") If Ms. Johnson is reading the Court correctly, the Court is indicating that it will reject all guilt phase ineffectiveness claims in this case, not necessarily because it disagrees with the defense's assertion that the trial team performed deficiently at the guilt phase, but because the Court believes that the defense cannot establish prejudice given the overwhelming weight of the government's guilt phase evidence.

[3]  *See also*, *Andrews v. United States*, 373 U.S. 334, 83 S.Ct. 1236, 10 L.Ed.2d 383 (1963)(The court of appeals did not have jurisdiction over a government appeal because the

2

Under §§ 2253 and 2255, an appeal as to any claim may not proceed unless Ms. Johnson obtains a certificate of appealability on that specific claim, either from this Court or from the Eighth Circuit. The same substantive standard governs issuance of the pre-AEDPA Act certificate of probable cause and the post-AEDPA Act certificate of appealability. Both certificates issue only if the applicant makes a substantial showing of the denial of a constitutional right. *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Ramsey v. Bowersox*, 149 F.3d 749, 759- 760 (8th Cir.1998), citing *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). To obtain a certificate of appealability, a party must explain why the rejected issues meet the substantial showing standard, and the explanation must be supported by specific law and facts from the record. 149 F. 3d at 760. But in examining a petitioner's application to appeal from the denial of a habeas corpus petition, "obviously the petitioner need not show that he should prevail on the merits. He has already failed in that endeavor." *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983)(internal quotations omitted).

The Ninth Circuit discussed the COA standard in *Lambright v. Stewart*, 220 F.3d 1022, 1024 (9th Cir. 2000). The Court, citing *Barefoot*, held that the standard is "modest", that "[i]n a capital case, the nature of the penalty is a proper consideration in determining whether to issue a certificate of [appealability]....", that a court should "resolve any doubt about whether the petitioner has met the *Barefoot* standard in his favor", and that "we must be careful to avoid conflating the standard for gaining permission to appeal with the standard for obtaining a writ of habeas corpus." *Lambright* at 1025. The Court continued:

> This general principal [that the COA standard is lower than the standard to prevail on the merits] reflects the fact that the COA requirement constitutes a

---

district court's judgment did not become final until it granted one of the four remedies listed in § 2255: discharging the prisoners, resentencing them, granting them a new trial, or correcting their sentences); *United States v. Hammer*, 564 F.3d 628 (3rd Cir. 2009)(an order vacating death sentence was not final and appealable prior to resentencing, and an order denying motion as to guilt phase did not become final prior to resentencing); *United States v. Stitt*, 459 F.3d 483 (4th Cir. 2006)(same) .

3

> gatekeeping mechanism that prevents us from devoting judicial resources *on frivolous issues* while at the same time *affording habeas petitioners an opportunity to persuade us through full briefing and argument of the potential merit of issues that may appear, at first glance, to lack merit*.

*Id.* (emphasis added).

In non-capital 2255 cases, this Court's practice seems to be to combine its ruling on the issue of whether a certificate of appealability should issue with its decision granting or denying relief on the merits. *See e.g., Mathison v. United States*, 2011 WL 2635863 at * 15-16 (N.D.Iowa 2011); *Williamson v. United States*, 2011 WL 2580331 * 8 (N.D.Iowa 2011); *Lopez-Angel v. United States*, 2011 WL 2489960 * 8 (N.D.Iowa 2011). However, in these non-capital cases, the parties had not been burdened in their briefing on the merits by any page or subject matter limitations. As this Court remarked on August 9, 2011, "I've never put a limit, and it seems odd that I would do it in a death penalty case." (H. Tr. 4932).

If this Court's normal practice is followed here, the Court will be deciding in this capital case both whether certain claims have merit and whether a certificate of appealability should be issued on the basis of post-hearing briefing that does not address those claims because of the Court's page limitation and stated preferences. This approach would deny Ms. Johnson her opportunity to persuade this Court "through full briefing and argument of the potential merit of issues that may appear, at first glance, to lack merit." *Lambright* at 1025. Ms. Johnson therefore requests that before the Court decides the merits of any of her claims that she be allowed to file additional briefing as to any claim not addressed in this post-hearing briefing. In the alternative, and at the very least, she requests that before the Court decides whether to issue a certificate of appealability that she be allowed to file additional briefing on that issue as to any claim not addressed in this post-hearing briefing.

Ms. Johnson will now proceed to address those claims that the Court has expressed an interest in, as well as Claim No. One and Claim No. Eight because she believes that these claims is particularly meritorious. In choosing to focus on these two claims, she has kept in mind the Court's admonition to prioritize the claims, but she also wishes to stress that by focusing on

4

certain claims she is in no way conceding that claims not discussed are therefore not meritorious. The simple fact is that not all claims she raises can be discussed effectively within a brief of any reasonable length. The briefing is organized pursuant to the Court's Order Regarding Claim Identification [Doc. 287].

**II.     Claims for Relief**

**PRETRIAL PHASE**

**COURT CLAIM NO. 1 – Failure to Pursue a Disposition for a Sentence of Less Than Death**

The evidence presented to this Court during the evidentiary hearing overwhelmingly shows that trial counsel in this case were prejudicially ineffective in failing to effectively pursue a disposition for a sentence of less than death. The testimony of  Richard Burr, Russell Stetler, and Sean O'Brien, and even the testimony of the trial team, demonstrated to the Court what the prevailing standard of practice was in relation to plea negotiations in a capital case. That same testimony, as well as an abundance of documentary evidence and the testimony of government counsel and of co-counsel Leon Spies, demonstrated that the prevailing standard of practice was not met in this case, with disastrous consequences for Ms. Johnson.

As all of Ms. Johnson's *Strickland* experts testified, and as the trial team itself acknowledged, the prevailing standards of practice governing death penalty litigation are set forth in the American Bar Association's Guidelines for the Appointment and Performance of Counsel In Death Penalty Cases (1989)(Exh.1, pp. 1-133)(hereinafter "1989 ABA Guidelines"), and in  the Guidelines for the Appointment and Performance of Counsel In Death Penalty Cases (2003 Revised Edition)(Ex. 1, pp. 133-268)(hereinafter "2003 ABA Guidelines"). The U.S. Supreme Court has observed that the ABA Death Penalty Guidelines establish the "prevailing norms of practice" that serve to measure counsel's performance under the Sixth Amendment *(Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (finding counsel ineffective for failing to adhere to the 1989 Death Penalty Guidelines); *see also, Padilla v. Kentucky*, __ U.S. __, 130 S. Ct. 1473, 1482 (2010) ("We long have recognized that '[p]revailing norms of practice as reflected in

5

American Bar Association standards and the like ... are guides to determining what is reasonable ... .'".);  *Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005) (citing the 2003 Death Penalty Guidelines in finding capital counsel's performance deficient). Cf., *Bobby v. Van Hook*, 558 U.S. ——, ——, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009) (per curiam)(Restatements of professional standards can be useful as "guides" to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place.); *Sinisterra v. United States*, 600 F.3d 900, 909 (8th Cir. 2010)(same).

Guideline 10.9.1 of the 2003 ABA Guidelines (Exh. 1, p. 228) imposes upon counsel "at every stage" of a capital case the "obligation to take all steps that may be appropriate in the exercise of professional judgment . . . to achieve an agreed-upon disposition." *See also,* 1989 Guidelines, Guide 11.6.1(Exh. 1, p. 18)("Counsel should explore with the client the possibility and desirability of reaching a negotiated disposition of the charges rather than proceeding to a trial.").   In this case, Ms. Johnson's attorneys utterly failed to comply with these Guidelines. They failed to appreciate the seriousness of petitioner's case and the likelihood of a death verdict at the outset, despite the advice of their experienced mitigation specialist Mary Goody.

The government repeatedly reached out to defense counsel, seeking to enter into a negotiated settlement of this case.  Trial counsel, however, persisted in proposing to the government an unrealistic 20-year sentence, despite having been clearly informed that such a term was "unconscionable" and would not be accepted by the prosecution. Despite two letters from Ms. Johnson stating that she wanted to plead guilty and cooperate, they failed to take immediate action towards a settlement of the case because of a unrealistic view that the Eighth Circuit would affirm the Court's *Massiah* ruling, and because of their belief that it was their decision, not Ms. Johnson's, as to whether a plea should be offered and what the terms of that plea should be. *See also, Florida v. Nixon*, 543 U.S. 175, 187, 125 S.Ct. 551, 560, 160 L.Ed.2d 565 (2004)(the accused has the ultimate authority to decide whether to plead guilty)*; Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)(same). They unreasonably believed, contrary to all indications from the government, that if the Eighth Circuit ruled in

6

petitioner's favor, there would not be a capital prosecution.  They took a rigid position that petitioner would not proffer unless there was a plea agreement in place, despite the fact that their client was not insisting on this procedure, despite the local practice in the Northern District of Iowa, and despite indications from the government that such a proffer would in all likelihood secure the approval of a plea from Main Justice in Washington, D.C.  They rejected offers that they proffer to a taint team.  It did not occur to counsel that they could obtain a proffer agreement that included a promise that petitioner's statements could not be used against her without her consent, even though Dustin Honken secured such a clause in his proffer agreement. They unreasonably waited to proffer until the eve of trial, after Dustin Honken had been convicted and at a time when the prosecution had no incentive to settle Ms. Johnson's case.

Petitioner was prejudiced by the errors and omissions of her attorneys – she has been sentenced to death.  But for her counsel's ineffectiveness, there is a reasonable probability that her case would have been settled without a trial for a sentence of less than death.

The following facts, were proven in support of this claim.

### 1.        Factual Background

When Mary Goody first became involved in Ms. Johnson's case, she received a one and one half to two inch package of discovery (H.Tr. 70, 72).  After reading this discovery, her assessment was that "this was a case that should plead and needed to plead and that . . . it was an LWOP case."  (*Id*., 72)  *See also, Id.* at 74 ("this is not a case that needs to be tried").  Her assessment was based on the existence of evidence of substantial planning, an ongoing methamphetamine operation, details in the McNeese materials that only a participant could have known, a motive for both petitioner and Honken to kill DeGeus, the number of victims, and the length of time between the deaths of Nicholson and the Duncans and the death of DeGeus (*Id*., 73).

Ms. Goody told the defense team that her recommendation was that "they plead this case and they plead her to LWOP and that I felt that was a good and doable resolution." (*Id*., 99; *see also, Id*. at  270)  There was no discussion among the defense team about how to implement this

7

recommendation. (*Id.*)  In fact, there was some disagreement about her assessment of the case. (*Id.*, 99)  Ms. Goody explained: "I know they were talking numbers and I was saying no, you – this – you don't need to be looking at numbers here.  Numbers aren't going to get you anywhere. This case should be – is a life case, and it needs to be pled to that."(*Id.*, 99-100)  The lawyers 'were clinging to this idea that they could get her a term of years somewhere around 20 years."(*Id.*, 116).  Ms. Goody did not think that they would ever get anything less than life for petitioner (*Id.*).  She understood that a 20-year sentence was "the deal that was initially discussed . . . [b]efore the bodies were discovered." (*Id.*, 118)  Ms. Goody did not believe it was rational to think that the pre-bodies offer of 15 to 20 years could be obtained in December of 2001, because "[a]ll bets are off" once the bodies had been discovered (*Id.*, 119).  *See also, Id.*, 270 (defense counsel's theory that they could settle the case for a term of years was irrational, given the facts of the case and the number of victims).

The pending *Massiah* litigation did not affect Ms. Goody's recommendation that this was an LWOP case (*Id.*, 120).  Even if the McNeese evidence was suppressed, the defense would still have to deal with Christie Gaubatz and the fact that petitioner bought the gun (*Id.*, 120, 283). However, Mr. Willett and Mr. Berrigan believed that the McNeese evidence was likely to be suppressed, that the suppression of this evidence would change the nature of the case, and that the government would not seek the death penalty for petitioner (*Id.*, 121-22).  Because the lawyers had been working on this case for some time and Ms. Goody had just become involved, she felt that she had to take their word for how they were feeling about it (*Id.*, 121).

There was, according to Ms. Goody, no coherent team plan about a plea strategy[4] (*Id.*, 122).  In fact, before Ms. Goody's first meeting with petitioner, Mr. Berrigan instructed her not to discuss a plea (*Id.,* 69).  Mr. Berrigan gave her the impression that they had the plea situation under control, that the lawyers were doing what they needed to do to get a plea, and that her job

---

[4]  Ms. Goody also wanted to get the team engaged in trying to do something about petitioner's conditions of confinement, because she felt that it would help move them along towards resolving the case by a plea (*Id.*, 131).

8

was to start working on mitigation[5] (*Id.*).  Thereafter, Ms. Goody never discussed a plea with petitioner (*Id.*, 117).  She explained that:

> No one asked me to engage with her in a conversation about a plea.  Ordinarily that would be something that we would do as a – in teams or individually or we would have a game plan set up with that.  But my idea of what the plea should be did not agree with their idea.  [¶]  And so I thought that they – I really got the impression that they were just wanting to wait on that and that that was a kind of tack that was taken on a lot of issues surrounding conversations about pleas and that sort of think.  Let's just wait and see.  They were waiting and seeing what was going to happen with particular things.

(*Id.*, 117-118).

Mr. Berrigan also instructed Ms. Goody not to discuss the facts of the crime with petitioner (*Id.,* 69).   She described this instruction as unusual and problematic: "There's a problem because the facts of the crime and the mitigation exist in a continuum, if you will.  And, therefore to separate them out or to not address one or the other is not – means that the mitigation investigation will be substandard." (*Id.*, 74).

The "wait and see" thinking because of the pending *Massiah* litigation[6] "fueled [an] idea that [Ms. Goody] would stop working on the case for awhile."[7] (*Id.*, 121)  Around May 2002, Mr. Berrigan instructed Ms. Goody that she was to stop working on petitioner's case (*Id.*, 131). Ms. Johnson's defense counsel had no team meetings to speak of, and most, if not all of Ms. Goody's communication was with Pat Berrigan.  She testified that: "I allowed myself to be lulled into this feeling that waiting was okay." (*Id.*, 158).

---

[5] This approach did not conform to the ABA Guidelines, which state that the team should act together to work towards a negotiated disposition (*Id.*, 69-70). As Richard Burr explained it, "[o]nly in a collaborative process can we move towards the goal of not making mistakes."(H.Tr. 683).

Mr. Berrigan disavowed involvement by Ms. Goody.  He stated: "I don't rely on the mitigation investigator to negotiate a plea with the client.  That's not their job."  (*Id.*, 2060).

[6] A "wait and see" approach is not consistent with the Guidelines (*Id.*, 118).

[7] There were other reasons why work on the case did not begin until late in 2001.  Mr. Berrigan had another capital murder trial in April 2001, the same month as the *Massiah* hearing (*Id.*, 121).  In August of 2001, Mr. Berrigan had open heart surgery.  As a result, Ms. Goody didn't see petitioner for the first time until October 2001 (*Id.*, 121).

9

Patrick Berrigan believed that there was less than a one percent chance that petitioner would be found not guilty (H.Tr. 2935, 2939).  Mr. Willett, in his initial telephone conversation with Mr. Berrigan, told him that a plea for life without parole may be offered (*Id.*, 581).  Mr. Berrigan knew, from reading the detention hearing transcript, that there was a lot of evidence against petitioner even before the McNeese maps came into the possession of the prosecution (H.Tr. 2013-20).  When he first came into the case, he wanted to get a plea,[8] but he could not do that without having the discovery; he needed to know the government's case and to sit down with petitioner (*Id.*, 2039).  Mr. Berrigan testified that it is best to resolve a potentially capital

---

[8]  Mr. Willett testified that the first time Mr. Berrigan met Ms. Johnson, he told her that she needed to plead guilty, to strike a plea bargain, and to do it now.  (*Id.*, 588).  Petitioner asked him if he wanted to discuss the facts of the case, and Berrigan responded that we can talk about the facts all day long but it will not change the outcome.  (*Id.*).  This first meeting "went poorly." (*Id.*, 588).   Thereafter, Ms. Johnson and Mr. Berrigan became entrenched in their relative positions (*Id.*). The flaw in this approach was pointed out by Richard Burr:

> [T]he team needs to...develop a relationship of acceptance and trust between the team and the client. And you can't do that by confronting the client from the outset. You have to...take the client where he or she is and develop acceptance...and then understand that this client like many of our clients are in denial....You also...try to figure out whether the denial...has some aspects of being informed by mental illness. And you can't do that without information beyond the client, so your mitigation investigation has to get cranked up pretty quickly.

(H.Tr. 699-700). *See also,* H.Tr. 4165 (ability of the defense team to negotiate the case "broke down in the very beginning" when the lawyers by their conduct began erecting 'barrier[s] to communication")(testimony of Sean O'Brien). Mr. OBrien, who was Mr. Berrigan's former boss at the Public Defender's Office, testified that "Pat I think has always understood that client rapport is not his strength but...if you know that's not your strength then it's absolutely critical that you bring someone on to the team who can compensate for your [lack of] strength. It's a matter of mixing strengths and weaknesses so that you have a cohesive unit ready to move things forward."  (H.Tr. 4169).
  Unfortunately, the defense team delegated the task of building client rapport to Nancy Lanoue, a well meaning paralegal who was unfortunately sending Ms. Johnson the wrong message regarding the plea. As Richard Burr and others testified, this was a "terrible mistake" because it resulted in "team splitting" (H.Tr. 701). The reason a paralegal cannot be tasked with the responsibility of building a relationship of trust and confidence with the client is that the process of building rapport with the client requires "somebody who is fully knowlegeable in the law, somebody who can address the issue of the seriousness of the case", so that the client can "make an informed decision." (H.Tr. 1703)(testimony of Russell Stetler).

10

case early on and that it gets harder to do so once the Department of Justice in Washington, D.C., is involved[9] (*Id.,* 2129).  Negotiating an early plea in this case was difficult because of the initial problems with obtaining discovery (*Id.,* 2129), which impeded his ability to investigate and negotiate a plea (*Id.*, 2040).

Mr. Willett was not of the same mind as Mr. Berrigan regarding a plea. According to Dean Stowers, "Al wanted to go to trial on the case . . . . he told the government to pound sand . . . early on in the case, you got no bodies, no evidence . . . this kind of thing, this kind of bravado if you will. [¶] And then the client was responding to that." (*Id.*, 1115).  *See also, Id.*, 204, 1119-20 (Willett wrote to petitioner that he looks forward to getting her home and to her wearing something other than jail clothes); *Id.*, 1118, 1122 (early on Willett told Reinert there wasn't going to be a plea in this case, we're going to trial, there's no point in having any discussions). When Mr. Berrigan was confrontational with petitioner about her denials of guilt, Willett "sort of launched to her defense somewhat which . . .Angie responded to favorably." (*Id.*, 1115).  Mr. Willett's idea about going to trial persisted through the duration of the case preparation; they were at cross purposes, not presenting a consistent and unified front because they disagreed on whether to plead or go to trial (*Id.,* 1116, 2044).  Mr. Stowers states that "it was apparent throughout the case . . . that there was different views as to what message the client should be receiving about where she needed to be in terms of her thinking about her situation and her case." (*Id.*, 1116).

Russell Stetler explained to the Court that in the capital case plea negotiation process, "[t]here's nothing worse than mixed messages." (H.Tr. 1696)  He further explained that although " it makes perfect sense from a client's point of view to want to hear from everybody..., if there's any dissent within the room, that is devastating to the possibility of resolution because a client understandably will focus on that and cling to a more hopeful belief about the evidence if

---

[9]  Mr. Berrigan was not aware that before June 7, 2001, the local U.S. Attorney could plea and authorize capital cases without Department of Justice approval (*Id.,* 2129).  Mr. Stowers was aware of the change in the protocol (*Id.*, 1157-58).

11

anybody sounds that." (*Id.*) Mr. Berrigan agreed that in Ms. Johnson's case,

> [T]he biggest problem is that we were not presenting a consistent and unified front on the issue of plea versus trial. And to the extent I was advocating for a plea, Mr. Willett I felt was not–didn't have the same position. And so when Miss Johnson has the choice between those alternatives and one is couched in this idea that you could win, that's an impediment for me because when we're talking about a plea we're talking about a significant period of time incarcerated which is not ...anything anybody looks forward to.

(H.Tr. 2044-2055).

Yet despite the mixed messages the lawyers were sending Ms. Johnson, Mr. Berrigan testified that Ms. Johnson was not unequivocally opposed to a plea agreement and there were times when she told him she wanted to plead guilty (*Id.,* 2133).

On March 8, 2001, Mr. Reinert wrote a letter to Mr. Willett and Mr. Berrigan in which he made what he described as a "tentative offer" to "resolve this case by guilty plea in exchange for the United States not seeking the death penalty." (Exh. 48, pp. 7-8)[10]. The letter indicated that the

---

[10] The March 8, 2001 date of this letter is significant. In its ruling on petitioner's motion to compel discovery, the Court indicated that "there is no showing that anyone other than the Attorney General had ultimate authority with regard to any plea offer in a capital case." [Doc. 218, p. 3]. However, at page 17, n. 2 of his motion petitioner demonstrated quite conclusively that under the death penalty protocol as it existed prior to June 6, 2001, U.S. Attorneys in the field could dispose of federal capital cases, once charged, without advance approval or review by the Attorney General or Main Justice. [Doc. 160-1, p. 17 n. 2]. AUSA Richard Murphy so testified in this case on May 2, 2011 (H.Tr. 1158).

Moreover, the Court's analysis seems to assume that the local U.S.' Attorney's recommendation has no relevance to the Attorney General's decision to seek or not to seek the death penalty. Historically, this has not been the case. *See also,* Stephen Klein, Richard Berk, and Laura Hickman, Race and the Decision to Seek Death in Federal Cases (Rand Corp. 2006), p. 21, available at http://www.rand.org/pubs/technical_reports/TR389.html. ("[T]he USAO's and the AG came to the same conclusion for 544 (91 percent) of the 598 defendants they considered in common.").

As a former member of the Capital Case Review Committee has written,

> U.S. Attorneys are required to provide a recommendation whether to seek the death penalty or not, and reasons for that recommendation. They may not remain agnostic on this ultimate question.
>
> The U.S. Attorney's recommendation carries great, although not dispositive, weight with the Committee. This is particularly so when the recommendation is against seeking death in a death-eligible case. Such "no death" recommendations are almost always accepted, not just because of the traditional autonomy of the U.S. Attorneys, but also because U.S. Attorneys

12

government needs to "expeditiously determine if your client will resolve this by guilty plea in exchange for us not seeking death. If we are authorized to seek death, there will be no further negotiations to resolve this case, and it will proceed to trial as a capital case." A deadline of April 15, 2001, for resolution of the case was set. Mr. Berrigan responded on March 16, 2001, indicating that mid-April was not realistic and asking for a deadline of mid-May. He also stated that "negotiations cannot be productive until the uncertainty of the strength of the government's case is decided in the pending *Massiah* litigation." Mr. Reinert responded on March 30, 2001, stating that the case can by appropriately tried as capital with or without the evidence that is the subject of the *Massiah* hearing (*Id.*, 1143). Mr. Stowers met with Ms. Johnson on April 3, 2001, and he testified there was no discussion of the government's settlement deadline, the effect of the case going to Washington, D.C., and the need to discuss settlement (*Id.*, 1144-45).

Also beginning on March 8, 2001, Mr. Reinert authored a series of internal memoranda documenting the great threat that Honken posed to Reinhert's personal safety. There was: (1) a March 8, 2001 internal memorandum to District Security Manager Steve Badger in which Reinert outlined evidence of renewed death threats by Dustin Honken against AUSAs and case agents, and indicated that because of these threats and the fact that Honken was one of the leaders in the Odinists white supremacist group at USP Florence, he was " a serious threat, not only if he escapes, but also while he is incarcerated " (Exh. 48, pp. 5-6); (2) a April 9, 2001 internal memorandum to District Security Manager Steve Badger in which Reinhert indicated that at the time of the last threat by Honken, the Department put a new alarm system in his house, paid for monitoring for a period of time, and put a remote starting device on his vehicle, and that "since [his] last threat from Dustin Honken, [Reinert had] moved and changed vehicles"

---

generally exercise great care in submitting their recommendations and are presumed to know their local communities, jury pools, judges, and the overall strengths and weaknesses of their particular case far better than Main Justice personnel.

Rory Little, *The Federal Death Penalty: History and Some Thoughts About The Department of Justice's Role*, 26 Fordham Urb. L.J. 347, 422 (1999).

13

(Exh. 48, p. 18), and (3) a July 27, 2001 internal memorandum to Scott Jennings of the FBI requesting that the FBI open an investigation into Honken's involvement in a conspiracy to escape and murder various officials (Exh. 48, p. 31). These internal documents explain the government's strong motivation to convict and secure a death sentence against Dustin Honken and to secure Angela Johnson's cooperation in order to do so.

On May 18, 2001, with trial set to begin in Ms. Johnson's case on January 14, 2002, Mr. Reinhert sent a written memorandum to the U. S. Attorney recommending that the death penalty be pursued against both defendants (Exh. 138). The memorandum specifically notes that as to Honken, "there is information that, while in custody, he has continued to attempt to eliminate a prosecutor and other witnesses; therefore, he has shown a high level of future dangerousness." (*Id.,* 2). Importantly, the memorandum also indicates that Ms. Johnson's lawyers did not provide any mitigating input to Mr. Reinhert that could have been relied upon by the U.S. Attorney to approve of a plea or to decide that the death penalty not be sought against Ms. Johnson. Thus, the memorandum notes that "[t]here is no indication by the defendant's counsel of any mental disease or defect." (Exh. 138, p. 46). The memorandum also states: "Defense counsel said they were not likely to submit a written mitigation statement, but orally made a brief presentation." (*Id.* p. 49) The only points made in the "brief presentation" were that Honken had a greater culpability than Johnson, that Johnson's participation was minor compared to that of Honken, that Johnson had long been under the substantial domination of Honken, and that Johnson has no criminal record other than traffic violations (*Id.*)[11] The memorandum notes: "These were the only matters in mitigation which were presented by Johnson's attorneys. They were asked to submit any written presentation to the USAO no later than April 17, 2001 , so that the matter could be submitted to the Department by the end of April." (*Id*., 49)

No such letter was ever submitted. The Johnson defense also waived its right to appear

---

[11] With respect to the substantial domination theme, Mr. Berrigan testified that " I don't think at this point we had developed that evidence, but I think I was hopeful we  would have that evidence.....I mean, at his point [eight months into the case] I didn't know...hardly anything about Dustin Honken's background, if anything at all." (H.Tr. 2126).

before the Death Penalty Committee in Washington, choosing instead to appear by videoconference on December 10, 2001 (H.Tr. 2152-2155). Prior to the meeting, Mr. Berrigan wrote to Mr. Willett to inform him that he "had serious reservations as to the productivity of this meeting." (H.Tr. 2152). While the hour-long meeting was taking place, he wrote in his notes,."waste of time." The subject of a plea was not discussed (Id., 2155).  Mr. Berrigan claimed that "it was generally thought of in the federal death penalty community that these meetings with the Department of Justice were usually not particularly helpful or productive..."[12]

Despite his recommendation and the lack of defense interest, Mr. Reinhert testified that he continued to make efforts to resolve the case (H.Tr. 2547). However, the Johnson defense team did not follow up on his earlier overtures to them to settle the case (*Id.* 2548).

On August 3, 2001, Mr. Stowers met with petitioner.  His notes include the words "life," "subst" and "25 yrs." (*Id.*, 1153).  They reflect the concept that there would be a plea entered, the starting sentence would be life, and she would substantially assist the government and end up with a final sentence of 25 years (*Id.*).

On October 1, 2001, while the *Massiah* litigation was still pending (*Id.*, 600),  petitioner authorized plea negotiations (*Id.*, 599).   That same day, Berrigan and Willett met with Messrs. Reinert, Williams and Murphy; Berrigan's notes indicate that he offered a plea of 20 years and that Reinert seemed interested, but Murphy and Williams less so (*Id.*).  However, in a letter to defense counsel written after the meeting, Mr. Reinert stated that that government may not be

---

[12] Two prominent members of the federal death penalty community testified just the opposite. Richard Burr testified that the authorization process was an "absolutely critical part of the case", both for plea bargaining purposes and for purposes of determining whether or not the case is going to proceed as a death case. (H.Tr. 685-686)  Russell Stetler explained to the Court how the defense's lack of involvement in the authorization process was a "missed opportunity" to engage in plea discussions directly with the decision-makers in Washington. (H.Tr. 1795-1796, 3246). In his words, " that's a very important opportunity to open the negotiation at the highest possible level or at least to state your case in the clearest possible terms and to put it in writing so that it's your words that are going to be conveyed to all the decision makers back in Washington as opposed to someone else's summary. So I think, you know, that's a critical opportunity and should not have been lost." (*Id.*)

15

opposed to a settlement for a sentence other than death or life imprisonment, but that a 20-year sentence was "unconscionable;" and that settlement would require an interview of petitioner under a proffer agreement followed by negotiation of the terms of the case settlement (H.Tr. 1185-86, 2143, 2145; Exh. 48, PLSP 35). Despite this pronouncement by Mr. Reinert, Mr. Stowers testified that at this point he thought there was a reasonable chance of getting a 20-year term (*Id*., 1186-87).

On February 27, 2002, Mr. Berrigan wrote to petitioner after Mr. Reinert approached him regarding their plea discussions last year. He told her that Reinert indicated the government was not wed to a life sentence, but would consider 40 years with pre-agreed downward departures if certain conditions were met. Berrigan's response was that 40 years was a life sentence and that the defense would need closer to 20 years with a guaranteed scenario that would not subject petitioner to additional time.

On April 25, 2002, the government filed its notice of intent to seek the death penalty against Ms. Johnson [Doc. 49].

On August 3, 2002, Mr. Reinert told Dean Stowers that he wanted to resolve this case by plea and agreed with the concept of a Rule 11(e)(1)(C) plea to a term of years arrived at by reduction for substantial assistance being factored in (*Id*., 618, 1182-84). Mr. Reinert also agreed to travel to Des Moines in order to meet with the defense team to discuss this disposition (*Id*., 1189-90). Mr. Stowers was told by the prosecution that they wanted a plea (*Id*., 1190).

There was a meeting in Des Moines on August 21, 2002. The prosecution spoke of petitioner cooperating against Dustin Honken and about a joint plea with Honken getting life. Mr. Berrigan testified that during this meeting, Mr. Reinhert told him that he "want[ed] death for Honken and A.J. cooperating, but he could also do double joint plea with Dustin getting LWOP." (H.Tr. 2144; Exh. 46). The prosecutors were not specific on a term for petitioner, but Berrigan's impression was that their offer of high teens, low 20's was "not out of wack." They indicated that a settlement for petitioner would involved a proffer and possibly a polygraph (*Id*., 621-22, 1190-96). Mr. Miller testified that during the meeting he "well may have made" the

16

comment to the defense lawyers that "he and Pat R[einhert] had talked early on about offering A.J. 10 to 15 years for information leading to discovery of the bodies." (H.Tr. 1005-1006).  Both Mr. Berrigan's and Mr. Stowers' notes reflect this disclosure (Exh. 46; Exh. 51, p. 43).  Both Mr. Stowers and Mr. Berigan confirmed that this disclosure had taken place. (H.Tr. 1122, 1154, 1191, 2144).

Mr. Berrigan received a letter from petitioner dated October 24, 2002, asking "[c]an you just get me a deal and get me out of here please? I have not touched my girls in almost 2 ½ years . . . .  All that I ask is that you push to get a deal made and get me on my way." (*Id*., 2138-40).  Mr. Berrigan testified he understood from this letter that Ms. Johnson was ready to plead guilty, did not care about the proffer process, and just wanted to get a deal (*Id*., 2140-42).  He explained:

> . . . this comes in the context of our – you know, the hang-up at this point, part of it, is this whole proffer situation.  And the other thing she's telling me here is I don't care.  You guys are arguing about this proffer stuff and should we make a proffer first, and I don't care.  That's your – let's just go; let's get going.  So that's what I read when I read this letter.

(*Id*., 2142).

Mr. Berrigan testified that, in addition to his position on not proffering until there was a plea proposal from the government, there was the issue of a term of years (*Id*., 2142).  Although in October 2001 Mr. Reinert had described his offer of 20 years as "unconscionable" (*Id*., 2143, 2145), Mr. Berrigan stated:

> Later 20 was unconscionable, but that wasn't their initial position.  And 20 is – 20 is a light sentence.  I wasn't expecting we'd get 20, but from a negotiating perspective, I wanted us to be talking about numbers not a life sentence.

(*Id*., 2143).  *See also Id*., at 1188 (20 years was a negotiation position, not a drop-dead number given to he government; it was to start discussions again and try to get the case worked out). Mr. Berrigan and Mr. Stowers acknowledged that 20 years was their number, not Ms. Johnson's; she did not tell them there would not be a deal unless she got 20 years[13]  (*Id*., 1189, 2143).  She was

---

[13]  Mr. Berrigan testified that as far as he knows, the first mention of a 20 year sentence to Ms. Johnson was in a letter he wrote on October 9, 2001, in which he says "we told the

17

very much a rookie in the system and dependent on her attorneys to tell her what the case was worth from a bargaining standpoint (*Id*., 2144).

In letters dated May 10, 2003, written to Mr. Berrigan and Mr. Stowers, Ms. Johnson stated:

> I want to be as clear as I can. I want to plead guilty. I do not want to wait for any more rulings, not even the 8th crt. I am asking you to get me the best deal you can and I <u>will</u> cooperate. At this point I will confess to killing the Pope. I have not touched my kids in THREE YEARS now, and I've had. Please get me out of here and into a prison as close to my kids as possible. That is all I ask. Thank you.

(*Id*., 630; Exh. 67, MCN 03-002969-MCN 03-002970). Mr. Stowers sent his letter to Mr. Berrigan (*Id*., 2207), and shortly thereafter Berrigan and Willett visited Ms. Johnson at the jail (*Id*., 633, 2207). Mr. Berrigan's notes of that interview include the following:

> Talked a lot about the Eight Circuit still sitting on Angie's case, possible effects on plea negotiations. This all for naught as Angela's first and primary concern is having to stay in the Linn County Jail. Willing to testify against Dustin Honken including cooperation!

(*Id*., 2207). At this meeting, Mr. Berrigan "push[ed] the plea proposition" while Mr. Willett painted "a more optimistic view of the evidence and prospects." (*Id*., 634-35, 2208). Mr. Berrigan testified that Ms. Johnson made it clear that she was willing to testify against Dustin Honken and provide whatever cooperation the government wanted (*Id*., 2209, 2219). Petitioner wanted to cooperate against Dustin Honken because of his attempt to take custody of Marvea away from petitioner's family, Honken's wanting to kill her, and Honken's own statements implicating her (*Id.,* 2218-19). According to Mr. Berrigan, at this point Ms. Johnson is "sick and tired of the situation and wants to plead guilty, cooperate. She's going to do whatever she can." (H.Tr. 2208-2209) "She's clearly on board." (H.Tr. 2210).

From this point forward, establishing a factual basis for a plea was not going to be a problem because "[i]t's not unusual ...for clients to...take inconsistent position as the litigation goes on." (H.Tr. 2211). Mr. Berrigan testified:

---

government that we might be interested in a deal for 20 years. Much to my surprise, they did not reject our number as being completely out of the question." (*Id*., 2143; Exh. 72A, BP-1, p. 232).

18

I can get that done. I've done it for years. I've had well over 50 capital cases, and the vast majority of those resulted in guilty pleas, and it's not an easy process frequently, but I was confident I could get it done with Miss Johnson.

(H.Tr. 2212)

When asked why he was not talking to the government the next day about Ms. Johnson's clearly expressed desire to plead guilty and cooperate, Mr. Berrigan replied:

I'm not sure. I'm not sure. I think we were waiting. We were waiting for the Eighth Circuit. In hindsight that doesn't seem to make a lot of sense, but I think that's what was going on.

(*Id*., 2209-10). Despite the fact that Ms. Johnson was willing to plead and did not want to wait for the Eighth Circuit, Mr. Berrigan believed that his negotiating position would be strengthened if Judge Bennett's ruling was affirmed and he was hopeful that that would happen (*Id.,* 2210-11). Mr. Stowers was less hopeful about the Eighth Circuit; he suspected that it would "find an illegitimate way to reverse [this Court's ruling]." (*Id*., 1138).

On June 7, 2003, Mr. Berrigan called Patrick Reinert regarding petitioner's desire to plead guilty and cooperate and told him that they would like a 20 year sentence (*Id.,* 2217-18). Mr. Berrigan testified that 20 years was his idea, not petitioner's; she did not mention 20 years at the jail meeting on May 22, 2003, and she left it to him to get her the best deal possible (*Id.,* 2218, 2222). Mr. Berrigan put 20 years on the table because the last time he had discussions with petitioner it was about 20 years (*Id.,* 2218, 2222). He is not sure why he mentioned the 20 years, because Mr. Reinert had already rejected that number as unconscionable (*Id.*). He testified that:

I wanted the government to start talking about numbers. By that I mean terms of years, not life. They eventually came up with 40 years which was the substantial equivalent of life. I didn't necessarily think they'd accept 20, but I thought we'd at least engage in a dialogue about what an acceptable number would be.

(*Id*., 2223).

Mr. Reinhert's notes for this meeting indicate that Ms. Johnson was "willing to cooperate", but that "they would like 20 year sentence." Mr. Reinhert wrote in his note: "we need proffer first." (Exh. 48, p. 41).

On June 7, 2003, Mr. Berrigan wrote a letter to petitioner that accurately reflects his discussion with Patrick Reinert about a plea (*Id*., 2229-30). He told her that Reinert was of the

19

opinion that the Department of Justice would not authorize a sentence below life imprisonment for petitioner, even if she cooperated against Honken; that he told Reinert he would discuss this with her, but he was pessimistic about an agreement unless the sentence was "substantially below life imprisonment;" and that "[h]opefully if we win in the Eighth Circuit the government's position will change in our favor (*Id*., 2230).

Mr. Berrigan admitted that Ms. Johnson did not say that she would plead only if the sentence was substantially below life (*Id*., 2231). As for his suggestion that a victory in the Eighth Circuit would change the prosecution's position, Mr. Berrigan acknowledged that he did not advise petitioner that if they lost in the Eighth Circuit they would lose the opportunity to plead to life (*Id.*, 2231); that he did not discuss their chances in the Eighth Circuit with Mr. Stowers before telling petitioner that their position would be stronger once that court ruled (*Id.*, 2232); and that he never conveyed to petitioner the reality of Eighth Circuit practice in death penalty cases (*Id.*, 2234).

On June 9, 2003, Mr. Reinhert wrote to Mr. Berrigan that Ms. Johnson's cooperation against Honken "could result in a lesser sentence than the death penalty", but that he would first need a proffer from Ms. Johnson. He agreed "to consider all of [Ms. Johnson's] information, the totality of the circumstances, and her role in the criminal conduct compared to the role of others, and keep an open mind regarding a disposition this office would recommend to the Attorney General." (Exh. 48, p. 42).

On June 10, 2003, Mr. Reinert wrote to Mr. Berrigan, stating that a plea would require full cooperation from Ms. Johnson (*Id.*, 2227; Exh. 48, pp. 45-46; that 20 years was not realistic sentence (*Id.*, 2228); that he was open to engaging in discussions to work towards amiable resolution of this case (*Id.*, 2234-35); and that the first step in the process would have to be an interview of petitioner (*Id.*, 2234-35).

Mr. Berrigan rejected this proposal because it required a proffer before a plea agreement[14]

_____

[14] At this time, Mr. Willett also took the position that a pretrial proffer would not occur before there was a plea agreement proposed by the government, as did Mr. Stowers. (*Id*., 649,

20

(*Id.,* 2235).  He did not talk to petitioner before he rejected it; he explained that "Miss Johnson's trusting me to get her the best deal possible, and I thought this idea of proffer first was ridiculous." (*Id.,* 2235).  Subsequently, there were attempts by the government to meet Mr. Berrigan's concerns about proffering without a plea proposal, such as a suggestion by Mr. Murphy that Ms. Johnson proffer to taint team (*Id.,*1227-28,  2235).  This was not acceptable to Mr. Berrigan; his concern was not what the government would learn as a result of a proffer, but their insistence on the proffer before they were willing to negotiate an agreement (*Id.,* 2235-36, 2239).  He testified that he wanted the local prosecutors to go to the Department of Justice and tell them petitioner was going to testify and they wanted a life sentence for her (*Id.,* 2240).

When the Court's suppression of the McNeese evidence was reversed by the Eighth Circuit, the nature of the case changed (H.Tr. 2024).  Mr. Berrigan had never heard a good explanation of how petitioner could draw a map to the bodies without implicating herself in the murder and this alone made the case one that needed to plead (*Id.,* 2043).

Mr. Willett had told Berrigan that the practice in Iowa is to proffer before the government tenders a plea agreement (*Id.*, 2048, 2227),[15] but Mr. Berrigan thought this practice to be unreasonable, similar to the discovery practice in the district (*Id.*, 2047, 2227).[16]  He did not inquire of resource counsel Kevin McNally or Richard Burr to determine whether his plea before proffer position was reasonable (*Id.,* 2227).

In 2004, there was a global proposal submitted by Dustin Honken's counsel that Honken would plead guilty for a life sentence and petitioner would plead guilty for a 20 year sentence (*Id.,* 2237).  Ms. Johnson authorized this proposal, which was not an *Alford* plea (*Id.,* 2899).

---

1208-11).

[15]  Mr. Stowers "never felt there was a hard and fast rule about how [plea negotiations] were done" in the Northern District of Iowa.  (H.Tr. 1075-76).

[16] Guideline 10.9.1 (B)(7) of the 2003 ABA Guidelines provides that "counsel should know and fully explain to the client...the practices, policies and concerns of the particular jurisdiction, the judge and prosecuting attorney...and any other person or entities which may affect the content and likely results of plea negotiations."

21

No one seemed to believe that the Department of Justice would accept this proposal. (*Id.,* 1226, 2237-38).

If both Honken and Ms. Johnson pled guilty for life sentences the case would have ended. (*Id.,* 2243). However, Mr. Berrigan did not think that a life sentence petitioner was fair: "I don't think to this day that Angela Johnson shares equal culpability with Dustin Honken for these murders, and I'll never believe it, but the government treats them exactly the same." (*Id.,* 2244). Consequently, during the joint plea he still insisted on 20 years even though he learned from government counsel that "what DOJ wanted was life and life." (HT, 2237-2238).

During the joint plea negotiation with the Honken team, time was of the essence for Honken because his trial was about to start. Mr. Parrish was trying to push the Johnson team along so that he could get Honken's case pled (*Id.,* 2904-05). Mr. Berrigan did not believe that time was of the essence for petitioner, because she could always testify against Honken if he went to trial (*Id.,* 2905). Consequently, at a meeting on August 12, 2004, Mr. Berrigan told the prosecutors and the Honken team that petitioner was not going to take life and that there was no point to the meeting (*Id.,* 2906).

On August 12, 2004, Mr. Murphy sent a letter giving Mr. Berrigan an August 14th deadline to get back to him on a proposal that petitioner proffer, and if the government is satisfied they would submit a plea proposal to the Department of Justice for a mandatory life sentence and consider whether it is possible for petitioner to serve that sentence in Iowa or nearby to Iowa (*Id.,* 2914).[17] Berrigan sent a letter to Mr. Murphy rejecting his offer and let the deadline pass (*Id.,* 2914-16). Mr. Berrigan testified that he rejected this offer by the government

---

[17] The letter stated that "I anticipate the life and 20 proposal will be formally rejected by DOJ later today or tomorrow", but also stated that if we were satisfied your client had provided complete and truthful information, we would be willing to submit for the Department's approval a proposed plea agreement for your client's consideration. The basic terms of the plea agreement would require your client's plea of guilty to a group of charges which would carry a mandatory life sentence. Your client would be required to cooperate and testify in the prosecution of Dustin Honken. In exchange, we would seek authorization to not pursue imposition of the death penalty against your client (H.Tr. 2238-2240; Exh. 52, p. RS 13-906)

22

even though "[t]here wasn't any downside" to what the government was proposing, other than "life is the sentence", and Angela was "going to have to go through that process without knowing what's going to happen." (H.Tr. 2241). He testified that it was his decision to reject the offer, based on the requirement that a proffer precede a plea agreement, and this was mot a matter left to petitioner's discretion: "Angela's not a lawyer. She doesn't know kinda how these things work or how it's supposed to work particularly regarding proffers." (*Id.,* 2917). Mr. Berrigan did not tell Mr. Murphy that he needed to talk to Ms. Johnson about what her options were at that point; he thought he had an ethical obligation to tell her about any plea proposal on the table[18] but his personal feeling was that the proposal was "ridiculous." (*Id.,* 2918).

On October 19, 2004, petitioner wrote to her brother and sister-in-law, Jim and Shelley Johnson, that "I'd like nothing more than to testify against [Honken], but my attorneys won't allow it unless I get an iron-clad deal first." (*Id.,* 2927-28; Exh. 84, 50). When Mr. Berrigan read this letter, he remarked that "[a]pparently she's gotten at least my perspective which is we need to have a deal." (*Id.,* 2928).

On October 14, 2004, Dustin Honken was convicted and on October 27th, the jury recommended death. At this point, the government's need for petitioner's cooperation significantly dissipated and her leverage for a plea bargain was essentially lost (*Id.,* 2244, 2931). The only motive for the government to settle at that point was to avoid a three-month trial (*Id.,* 2244). Mr. Berrigan said that after Dustin Honken got the death penalty, Ms. Johnson's attorneys should have dramatically stepped up their efforts to plead the case; at that juncture, their expectation of a term of years drastically diminished and the prospect of a death sentence became much more real (*Id.,* 2937-38).

Ultimately, Mr. Berrigan proffered to the trial prosecutors, not the taint team, without having a plea in place (*Id.,* 2241). He explained that he "gave up on the idea that we could get it done without a proffer." (*Id.,* 2241). However, by that time Dustin Honken had been convicted

---

[18] Mr. Stowers and Mr. Willett went to see petitioner on August 13th to talk about the August 12th letter. (*Id.,* 2916).

23

and the prosecutors were not willing to say they would support a plea for a life sentence (*Id.,* 2242-43). Mr. Berrigan wrote the proffer that was submitted to the trial prosecutors (*Id.,* 2080). He discussed the proffer with petitioner in advance, told her what was required to get life and she was agreeable to it (*Id.,* 2080-81). He based petitioner's proffer on Dustin Honken's proffer (*Id.,* 2081).

Mr. Berrigan testified that Ms. Johnson's providing a factual basis for a plea was not a problem (*Id.,* 2921-22). It is not unusual for clients to take inconsistent positions, and he was confident he could get a factual basis for the plea (*Id.,* 2211-12). The difficult part for clients such as Ms. Johnson is not telling what happened, but the acceptance of a sentence of life without the possibility of release (*Id.,* 2924). Mr. Berrigan's previous refusals to let Ms. Johnson proffer before there was a plea agreement were not because she would not provide a factual basis for the plea; it was the absence of a plea agreement that caused Mr. Berrigan to reject this procedure (*Id.,* 2918-19). *See also, Id.* at 2920 (obtaining a factual basis from petitioner was not a stumbling block to a plea; the main obstacle was the government's position that the proffer would be required before they would tender an agreement).

On March 22, 2005, petitioner wrote to Nancy Lanoue that she was going to have to plead guilty and take life without parole to get this case resolved, that she didn't even care, and that she just wanted it to be over (*Id.,* 2929). Mr. Berrigan described he and petitioner as being on the same page at this point in their relationship (*Id.,* 2929). He added testified that petitioner may not have cared about getting a deal first, but he did (*Id.,* 2930).

Mr. Berrigan did not consider proposing to proffer to a taint team with an agreement that the proffer could not be used against the petitioner if there was no plea agreement (*Id.,* 2933). It simply did not cross his mind, but he would have considered it (*Id.,* 2933-34). He acknowledges that Dustin Honken proffered under an agreement that statements made could not be used against him without his consent, which is not a standard stipulation in a proffer agreement (*Id.,* 2945-47).

    **2.**       **Argument**

24

Based on all of the foregoing evidence, Ms. Johnson has established that she is entitled to relief on her Sixth Amendment ineffective assistance of counsel plea claim under the standards announced by this Court in *Wanatee v. Ault*, 39 F. Supp. 2d 1164 (N.D. Iowa 1999)(*Wanatee I*), *Wanatee v. Ault*, 101 F. Supp. 2d 1189 (N. D. Iowa 2000)(*Wanatee II*), aff'd 259 F. 3d 700 (8th Cir. 2001), and *U. S. v. Hernandez*, 450 F. Supp. 2d 950, 974-983 (N.D. Iowa 2006), and by other cases to be discussed below.

Under those cases , because there is a "clearly established" right to effective assistance of counsel during discussion of a plea offer, *Strickland 's* two-part test applies to ineffective assistance claims arising out of the plea process. *Wanatee II*, 101 F. Supp. 2d at 1198-1199. Consequently, Ms. Johnson must establish both deficient performance and prejudice, and this she has clearly done.

Regarding deficient performance, there can be no doubt that counsel performed deficiently in the plea process under the Sixth Amendment and the ABA Death Penalty Guidelines. The Commentary to Guideline 10.9.1 of the 2003 ABA Guidelines succinctly states: "The entire defense team must work from the outset of the case with the client and others close to [her] to lay the groundwork for acceptance of a reasonable resolution." (Exh. 1, p. 233). Although counsel's failures were many, they were helpfully summarized in the testimony of Russell Stetler, whose careful and exhaustive review of the record in this case led him to the firm conclusion that the trial team's plea efforts were deficient in five fundamental respects:  (1) the failure to assemble a functional as opposed to a dysfunctional team; (2) the failure to analyze the high risk of a death sentence in this case; (3) the failure to adequately apprise Ms. Johnson of the applicable law, the weight of evidence, and of other information for making a fully informed decision; (4) the failure to integrate the mitigation investigation into a strategy to resolve the case; and (5) the failure to take advantage of the insights of the mitigation specialist and the mental health professionals about how best to communicate effectively with Ms. Johnson about the plea (H.Tr. 1734-1735). This conclusion, buttressed by the testimony of Richard Burr, Sean O'Brien, and of the trial team itself, is simply unassailable. In the opinion of learned counsel Pat Berrigan, which he expressed

to a reasonable degree of professional certainty, the trial team "mishandled" the plea negotiations in this case; they "messed that up completely" because "[t]here were opportunities to get the case resolved..." (H.Tr. 3178). *See also,* H.Tr. 4165 (ability of the defense team to negotiate the case "broke down in the very beginning" when the lawyers by their conduct began erecting 'barrier[s] to communication")(testimony of Sean O'Brien).

The government has claimed in its Amended Resistance that counsel was not ineffective because aside from Ms. Johnson's own explicit direction to her trial attorneys on May 10, 2003 (Exh. 67, pp. MCN 03-002969-MCN 03-002970) ("I am going to be as clear as I can[;] I want to plead guilty"), "[d]efendant has provided no other evidence, before or after this note, showing any willingness to plead guilty." (Amended Resistance, Doc. 27, p. 25). In its Resistance to Petitioner's Motion to Compel Discovery, the government goes even further, claiming that petitioner "never has offered to plead guilty..." [Doc. 163, p. 6].  As demonstrated above and in the May 10, 2003 letter, this is not in fact the case. In any event, in *Wanatee I*, where no such contemporaneous evidence of the client's desire to plead was produced and in fact there were indications that "Wantee did not *want* to plead guilty", this Court held that the fact that the defendant did not want to plead guilty "is irrelevant to whether counsel was ineffective for failing to inform Wanatee of the facts and law applicable to his case in order to allow him to make an informed choice about accepting or rejecting the plea agreement." 39 F. Supp. 2d at 1171. *See also, U. S. v. Hernandez*, 450 F. Supp. 2d at 975 (""[T]he fact that a defendant did not appear to want to plead guilty, rather than go to trial, was no impediment to an 'ineffective assistance' claim that he was improperly advised about whether or not to go to trial or to plead guilty."). Ms. Johnson  has demonstrated at the evidentiary hearing that she was "improperly advised about whether or not to go to trial or to plead guilty." Indeed, it appears quite clearly from the evidence that she was not advised *at all* about any of the important facts and considerations bearing upon her plea options *before* critical decisions were cavalierly made not by her, but by her lawyers. This lawyer-centered approach violated her right to the effective assistance of counsel, for as the Supreme Court held in *Florida v. Nixon*, 543 U.S. at 187, "[a]n

26

attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy", but, in addition, "certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate. A defendant... has the ultimate authority to determine whether to plead guilty..."

*Wanatee* I also holds that in addition to deficient performance, a defendant must also establish prejudice by showing that the plea bargain would have resulted in a lesser sentence than what was received at trial, and that "but for counsel's advice, [s]he would have accepted the plea." 39 F. Supp. 2d at 1171.  Ms. Johnson has satisfied both prongs of the prejudice test.

Regarding the first prong, a letter written to the defense by AUSA Reinert on October 10, 2001 (Exh. 67, p. MCN 01- 001205), documented the defense lawyers totally unreasonable position that Ms. Johnson may be willing to plead guilty if she could be assured of a sentence of twenty years. Mr. Reinert reasonably replied that "[i]n the right circumstances (cooperation), our office may not be opposed to negotiating a settlement to this case, which would include a sentence other than the death penalty or life imprisonment", but that in his opinion "a 20 year-term, which equates to only four years per murder, is unconscionable." [19] A sentence of "other than the death penalty or life imprisonment" is certainly less than the death sentence which Ms. Johnson received after trial and thus the first prong of the prejudice inquiry is satisfied.

Similarly, a note contained in Mr. Stower's file dated August 3, 2002, (Exh. 51, p. 42), indicates that AUSA Reinert advised Mr. Stowers that "he wants to resolve case by plea" and he "seemed to agree with concept of Rule 11(e)(1)(c) plea to term of years arrived at by reduction

---

[19] This Court has agreed with Mr. Reinert's assessment, stating that
> THE COURT: Well, you know, it's not that often I agree with the government, but their characterization of 20 years as -- I don't remember the word, something like ludicrous -- is pretty accurate at the point you got in the case at least. You couldn't have expected a 20-year plea. I mean, Reinert's right. You know, three Thanksgivings ago I think I gave out three life sentences in that week on drug cases. I mean, that's pretty standard fare in the Northern District, so to expect 20 years on a case like this is . . .

(H.Tr. 1239-1240)

27

for substantial assistance being factored in." A note in Mr. Stower's file dated August 21, 2002, indicates that AUSAs Reinert and Murphy advised Mr. Stowers on August 21, 2002, that "they would have offered 10-15 years prior to recovery of bodies." (Exh. 51, p. 43). A note contained in Mr. Berrigan's file dated August 21, 2002 indicates that AUSA Miller "reflected that he & Pat R. had talked early on about offering A.J. 10-15 years for information leading to discovery of bodies" and that Reinert "claim[ed] to want death for Honken & A.J. cooperating but he can also do double/joint plea w/ Dustin getting LWOP." (Exh. 46). Importantly, Mr. Berrigan unreasonably deduced from this disclosure of an inter-Departmental communication that since the government was willing to offer 10-15 years *before the bodies were discovered*, that "our high teens, low 20's offer was not out of whack." (*Id.*). In any event, an offer of 10-15 years before the bodies were discovered, and an offer of a "term of years" after the bodies were discovered are both below the death sentence that Ms. Johnson received after her lawyers stubbornly insisted on a twenty year offer with no proffer.

Again, a note contained in Mr. Berrigan's file dated June 30, 2004 indicates that Charlie Rogers reported that "Miller wd. be happy to see a double plea with life imprisonment for Dustin Honken and 30 yrs. for Angela." (Exh. 67, p. MCN 04-003496). Instead of offering such a plea, which again was below the death sentence received after trial, Mr. Johnson's lawyers authorized Mr. Rogers to write a July 17, 2004 letter to the U.S. Attorney on behalf of both defendants in which he stated that both defendants "would enter pleas of guilty if Mr. Honken receives a life sentence (or group of life sentences) and Ms. Johnson's sentence totaled twenty years" (Exh. 48, p. 69-71). This offer, which again contained the "unconscionable" twenty year offer earlier rejected by the government was doomed to failure and indeed on July 26, 2004 Mr. Williams let slip that his office was not even recommending that D.O.J. accept the plea (H.Tr. 2899; Exh. 67, p. MCN 04-003558).[20]

---

[20] Mr. Williams' Resistance to the discovery motion claimed that "this statement was with regard to a plea offer proposal made by Honken, not Petitioner." [Doc. 163, p. 7]. This assertion is refuted by the plea letter and by a sentence on the very same page of the Resistance:

28

Finally, a note contained in Mr. Berrigan's file dated August 12, 2004 indicates that Mr. Murphy told all defense counsel that D.O. J. was considering "life plus 20 for A.J." but that "D.O.J. wants life + life." (Exh. 67, pp. MCN 04-003577-3579). An August 12, 2004 letter written to the defense by AUSA Murphy states that "[i]f we were satisfied your client had provided complete and truthful information, we would be willing to submit for the Department's approval, a proposed plea agreement...[the] basic terms of [which] would require your client's plea of guilty to a group of charges which would carry a mandatory life sentence." (H.Tr. 2238-2240; Exh. 52, p. RS 13-906) Thus, even at this point, defense counsel could have settled the case for a life sentence, which was less than the death penalty she received. Prong one of the prejudice inquiry is clearly established.

Regarding the second prong of the prejudice inquiry, this Court concluded in *Wanatee I* that the prejudice inquiry does *not* focus on the defendant's bare unwillingness to enter into a cooperation agreement with the government, but rather "the question is whether the petitioner would have agreed to the plea bargain 'if properly advised.'" 39 F. Supp. 2d at 1171. On this point, the evidence at the evidentiary hearing has demonstrated that Ms. Johnson was never advised of her significant plea options prior to the discovery of the bodies, and that following the discovery of the bodies her lawyers, without her input, held out for an "unconsionable" sentence of twenty years with no proffer, and then her trial team realized too late, following the conviction and death sentence of Honken, that a sentence up to and including a life sentence and a proffer should have been offered when the government desperately needed her to get a guilty verdict and death sentence against Mr. Honken. That Ms. Johnson ultimately agreed to plead to a life sentence and provide the government with a proffer is strong evidence that had she been properly advised she would have agreed to and could have complied with the plea offers which were repeatedly held out to her counsel at a time when she had considerable leverage in the case.

---

"The 'plea' to which Petitioner refers was an offer Honken's counsel floated about a proposed *joint plea by Honken and Johnson* in which Honken would plead to a life sentence and Johnson would serve 20 years." (*Id.*)(emphasis added)

29

*See also, Wanatee I* , 39 F. Supp. 2d at 1175 (trial counsel's efforts to reopen a plea offer, ultimately rejected by the government, was evidence which indicated a reasonable probability that the petitioner would have accepted an earlier plea); *Wanatee II*, 101 F. Supp. 2d at 1200 (requiring that the court consider whether the petitioner has shown that he "could have performed" the plea agreement.)

*Wanatee II* discusses one additional requirement to a successful plea claim: " 'Logic dictates...that to establish...prejudice, the petitioner must begin by proving that a plea agreement was formally offered by the government.' " 101 F. Supp. 2d at 1200, quoting *Kingsberry v. U. S.*, 202 F. 3d 1030, 1032 (8th Cir. 2000). However, In *Wantee II*, this Court found this condition satisfied even though it was "undisputed that there was no written offer of a plea agreement and...no written plea agreement was ever prepared or executed." 101 F. Supp. 2d at 1202. The Court reasoned that the question of whether an offer was made "depends upon evidence about the prosecutor's conduct, i.e., evidence that the prosecutor made (or did not make) a written or oral plea offer." (*Id*. 1201-1202). An oral offer was found to exist in *Wanatee II* even though the government's oral offer was contingent: "The respondent has never previously denied that Wanatee was offered the opportunity to plead guilty to second-degree murder, if he agreed to 'cooperate' with the prosecution before the trial information was filed. To the extent the respondent now attempts to raise such an objection, that objection is overruled." (*Id.*, 1202). Here, at the very least, Mr. Reinert's letter of October 10, 2001 and Mr. Murphy's letter of August 12, 2004 constitute contingent plea offers within the meaning of *Wanatee II*.

Further, the Supreme Court has suggested, and several courts have concluded, that to establish prejudice in a plea context, it is not necessary to show that a formal plea offer has in fact been made. *See also, Holloway v. Arkansas*, 435 U.S. 475, 488, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978)("[I]n this case [a conflict of interest] may well have precluded defense counsel ... from exploring *possible plea negotiations* and the possibility of an agreement to testify for the prosecution, provided a lesser charge or a favorable sentencing recommendation would be acceptable.")(emphasis added); *Moss v. U.S.*, 323 F.3d 445, 465 (6th Cir. 2003)("At a minimum,

30

*Holloway* requires a defendant alleging that his attorney's conflict of interest prevented the exploration of plea negotiations to demonstrate that *the government was willing to extend, or consider, an invitation to commence plea negotiations*.")(emphasis added); *Id.* at 468 ("[P]etitioner must demonstrate that the government was willing to accept or extend an invitation to plea negotiations."); *Solomon v. United States*, 2008 WL 5331860 * 6 (S.D.Ohio 2008)("A prisoner alleging that his trial counsel failed to pursue plea negotiations must demonstrate deficient performance on the part of counsel and that there is a reasonable probability that he would have pleaded guilty but for counsel's advice. [citing *Moss* at 468]. Additionally, the petitioner must demonstrate that the government was willing to accept or extend an invitation to plea negotiations."); *Houston v. Secretary, Dept. of Corrections*, 2007 WL 1362921 *3 (M.D.Fla. 2007)(same). *See also, United States v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998) (defendant suffered prejudice, even though the government had not made a formal plea offer, because "he did not have accurate information upon which to make his decision to pursue further plea negotiations or go to trial" due to counsel's errors)

These cases are all consistent with this Court's conclusion in *Wanatee I* that the prejudice inquiry does *not* focus on the defendant's bare unwillingness to enter into a cooperation agreement with the government, but rather "the question is whether the petitioner would have agreed to the plea bargain 'if properly advised.'" 39 F. Supp. 2d at 1171. Similarly, the prejudice inquiry should not focus on the government's bare unwillingness to enter into a formal plea agreement, but rather the question should be whether the government would have agreed to the plea bargain if counsel had discharged their duty "at every stage of the case...to take all steps that may be appropriate in the exercise of professional judgment...to achieve an agreed-upon disposition." 2003 ABA Guidelines, Exh. 1. Here, it is more than reasonably probable that had counsel performed this duty the government would have been more than "willing to extend, or consider, an invitation to commence plea negotiations." *Moss*, 323 F.3d at 465.

In this regard, it is significant that it was the government, and not the defense, that kept pushing the idea of Ms. Johnson's pleading for a sentence less than death, even after the case

31

was authorized as a capital prosecution and even after Ms. Johnson's counsel kept coming back to the government with the same "unconscionable" offer. It was also the government that was proposing inducements, such as a proffer to an outside taint team, and the promise of housing in an Iowa facility. It was also the government that had the strong incentive to push the plea because of its perception of Honken's extreme dangerousness and its need to secure Ms. Johnson's cooperation in order to obtain a death sentence against him.

In response to multiple attempts by the government to settle the case, the defense obstinately took an "unconscionable" stance that ignored local and federal death penalty plea practice and deliberately bypassed important opportunities to communicate the mitigating aspects of their case to important decision-makers such as the local U.S. Attorney and the Capital Case Review Committee in Washington. In these circumstances, when defense counsel was offering the decision-makers nothing but noise and bluster, it is not surprising that, as Mr. Williams recently averred, "[n]either the Attorney General, nor any of his representatives, ever authorized the U.S. Attorney's Office to accept a guilty plea allowing for a penalty of less than death for Angela Johnson." [Doc. 308]. But this observation should be "irrelevant", just as the client's unwillingness to plead guilty in *Wanatee I* was "irrelevant" because the real issue should be "whether the [government] would have agreed to the plea bargain 'if properly advised'" and informed by competent defense counsel. 39 F. Supp. 2d at 1171

Had counsel performed competently in the plea process, including the timely development, documentation and presentation at the plea stage of the mental health and other mitigating evidence that she has developed in post-trial proceedings, there is at least a reasonable probability that, in order to secure her cooperation against Honken, the government would have entered into a plea agreement with Ms. Johnson for a life sentence, either before or after authorization. As Richard Burr explained to the Court, and as the case statistics and summaries provided to the Court in Exh. 9 and 9-A substantiate, "in multiple-killing cases, it [was] not uncommon for John Ashcroft to have approved plea agreements for those [cooperating] people playing facilitator roles, sometimes [even] playing...actual killer roles." (H.Tr. 732) Indeed, if

32

one examines the 621 potential federal capital cases set forth in Exh. 9A that were reviewed by the Ashcroft Administration, the vast majority of them were not even authorized for capital prosecution, a significant proportion of them settled for a sentence less than death, both before and after authorization, and only seventeen of them resulted in a sentence of death. (H.Tr. 3209-3210).

Abstract statistics aside, it appears quite clearly from the government's actions and words in this case that the government was ready, willing, and able to settle the case and that Ms. Johnson had at least six things going for her which could and would have led to a plea agreement: (1) she was not the actual killer; (2) the government badly wanted her testimony to secure a death sentence; (3) she had no prior criminal convictions; (4) she had compelling mitigating evidence; (5) she was a woman; and (6) she was a mother. All of these facts, and others set forth above compel the conclusion that it is reasonably probable that the government would have offered a life sentence if defense counsel had not performed deficiently during the plea phase of the case.

Because Ms. Johnson has established both deficient performance and prejudice, she is entitled to relief on her plea claim. The appropriate relief in this case is that Ms. Johnson should be resentence to life imprisonment, the sentence she would have received had her lawyers performed effectively in the plea process. *See also, Wanatee II*, 101 F. Supp. 2d at 1214.

**MERITS PHASE**

**COURT CLAIM 8 – Demeanor and Competence: Failure to Reduce Petitioner's Medication or to Address the Effects of the Medication on her Demeanor at Trial and Her Ability to Participate in Her Own Defense, in Violation of Her Right to Due**

33

**Process and a Fair Trial** [21]

**1. Factual Background**

On May 6, 2005, two days after the opening statements at the guilt phase of her trial, Angela Johnson's medication was increased by Dawn Nolan, a Physician's Assistant at the Woodbury County Jail. (Exh. 133, # 26, p. 91). Ms. Nolan diagnosed Ms. Johnsson under Axis I with a "Major Depressive Disorder" and a "Generalized Anxiety Disorder", "both of these recently exacerbated by beginning her trial." (*Id.*) Thereafter, Ms. Johnson received 300 mg of Zoloft and 200 mg of Seroquel daily during her trial.[22] The increase in Zoloft to 300 mg daily, in combination with other drugs and Ms. Johnson's psychiatric dsabilities had a marked effect on Ms. Johnson's demeanor and ability to understand and participate in her capital trial. As Dr. Woods explained in his report, which stands unrebutted by Dr. Martell on this point: "Ms. Johnson was prescribed psychiatric medications during her pretrial incarceration that were consistently maximum doses. She complained of symptoms consistent with medication side effects for much of her incarceration. Eventually, her medication dosages were increased to levels much higher than recommended by leading authorities. Ms. Johnson suffered severe side

---

[21] Although this claim, pursuant to the Court's Order Regarding Claim Identification is designated as a "Merits Phase" claim which includes the issue of competency to stand trial, in accordance with the Court's stated briefing preferences the focus of the argument will be on the effect of medication on Ms. Johnson's penalty phase demeanor. By taking this focus, Ms. Johnson in no way wishes to abandon or denigrate her demeanor claim as to it relates to the guilt phase or her competency claim. Although the Court expressed considerable hostility to the competency claim, it is important to note that it is extensively well documented in the reports and testimony of Dr. Woods and other witnesses, including observers at trial, and that Sean OBrien in particular was of the opinion that there was a "big glaring hole" in the trial defense mental health evaluations in this case in failing to address the issue of competency in the specific context of plea negotiations. (H.Tr. 4193). Ms. Johnson hopes that if the Court grants her request for supplemental briefing she will be able to persuade the Court that its initial impressions of the competency claim are in error.

[22] Before her medication was increased, petitioner was at the upper limit of the antidepressant medication Zoloft. Prior to the increase in the medication, petitioner had complained of nausea and occasional diarrhea, symptoms of serotonin toxicity. (Exh. 133, # 1, p. 23). Petitioner presented as hypomanic even while taking 200 mg of Zoloft. (*Id.*)

34

effects of this toxic dosages during her trial, and the side effects impacted her presentation before the jury and trier of fact." (Exh. 107, Woods Final Report, 5/25/11, p. WOD 000100) . *See also, Id*. at WOD 000169 ("It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that the combination of Ms. Johnson's cognitive and psychiatric impairments and medications caused and explained her disengaged appearance, largely flat and absent affect, and inability to show emotion at trial.")

The description by Lisa Dahl of Ms. Johnson's courtroom demeanor before her medication was increased is instructive. Ms. Dahl described petitioner's demeanor during jury selection as at times "girly or giddish" and at times "harsh" or "judgmental." (H.Tr. 338) Ms. Dahl described petitioner as engaged in the jury selection process, drawing pictures of jurors, taking notes, and sharing her reactions to jurors. (*Id*., at 339).[23] Ms. Dahl's concerns about petitioner's demeanor caused her to advise trial counsel that they needed to work on calming her and that she needed to maintain her composure so that she did not appear judgmental. (*Id.,* at 350-51).

After the increase in Zoloft, there was a dramatic change in petitioner's demeanor, which is described by a number of different persons who attended the trial. Nancy Lanoue was at petitioner's trial every day except during jury selection. She testified petitioner seemed out of it, almost like she was drugged. (H.Tr. 430-41). Melissa Launspach was present in the courtroom during the penalty phase, and was able to observe petitioner during breaks and lunch as well as going to and from the courtroom. Ms. Johnson doodled a lot, with her head down on her paper. (H.Tr. 509). Although she would raise her head at times, for the most part she looked down at

---

[23] She was engaged in this note-taking behavior even though her learned counsel Mr. Berrigan "might have asked her or suggested she not take notes during voir dire particularly." (H.Tr. 3170) A note in his trial file states: "I don't like clients taking notes because it suggests to the jurors, number one, you are judging them; number two, you are preparing your appeal already." (*Id.* 3169; Exh. 98) He elaborated at the hearing: "I do think that is a very bad idea....I don't think it's generally a good idea that a client would be taking notes while we're questioning jurors particularly." (*Id.* 3170). Nevertheless, he observed Ms. Johnson both "spacing out" and taking notes during the course of the jury selection. (*Id*.)

35

the table.  Ms. Launspach described petitioner's demeanor as "disinterested."  She did not notice her responding to friends and family members with consistent emotion, but only when she first saw them.  (H.Tr. 510).

Dean Stowers testified that petitioner, particularly during the guilt phase, "most often was looking down and doodling and drawing pictures and this sort of thing in a note pad and appeared to be very detached from the proceedings themselves . . . ."  (H.Tr. 1558).  He attributed her behavior to "her need to keep some kind of psychological separation . . . or mental separation from the evidence of the crimes."  (*Id.*).   Alyssa Johnson attended the trial as often as she could and sat behind her mother, at an angle so that she could see some of her face.  She testified that her mother "would just sit there with a very blank expression on her face."   It did not seem to Alyssa that petitioner was hearing everything, understanding and taking in the actual proceeding.  Petitioner's demeanor was different from the mother Alyssa knew, who had always been happy-go-lucky and upbeat.   (H.Tr. at 1657).  When Alyssa visited her mother at the U.S. Marshal's Office during breaks in the trial proceedings, she found her "different," explaining that it did not seem as though she had just walked out of a courtroom, and she found it odd that her mother spoke of the proceedings "very minimal[ly]."  (*Id.*, 1658).

Wendy Jacobson was able to observe petitioner while she testified, after she testified and at the Marshal's Office during breaks (H.Tr. 1949).  During the trial, petitioner seemed to be scribbling circles on paper, like a kindergartner, and did not seem to be aware of the intensity, magnitude and seriousness of the trial (*Id.*, 1949-50).  During Ms. Jacobson's visits with petitioner at the Marshal's Office, she did not seem to comprehend what was going on; she seemed to be confused, in a childlike state.  Ms. Jacobson did not think her sister behaved in a manner appropriate for someone who was on trial for her life in a death penalty case (*Id.*, 1950-51).

Patrick Berrigan testified that during trial, petitioner "mostly scribbled and drew pictures." He did not remember a lot of substantive writing. "She had some lucid moments and other times where she didn't appear to be with it, so she was kind of in and out."  (H.Tr. at 3136-37).

36

According to Mr. Berrigan, petitioner was "spacing out during the trial." (H. Tr. 3137, 3168) He did not know if this was a defense mechanism, because petitioner did not want to hear the testimony or she was afraid of how she might react. Mr. Berrigan vividly remembers buying little boxes of candy, Nibs, for petitioner during trial. "I bet she went through a dozen boxes of those things during the trial. And I was at the time thinking, well, you know, it's better if she's zoned out than if she's going to react. (H.Tr. 3137-38). Although he cannot say whether petitioner was zoning out "voluntarily or involuntarily," he states unequivocally that when she zoned out she was not paying attention to the proceedings. (*Id*., at 3138-39).

Dr. Cunningham testified that he saw Ms. Johnson a few days after her medication was increased and that he did not observe anything that caused him concern that she was sedated, confused, lethargic, overly agitated. (H.Tr. 3865). However, he also testified that with a drug like Zoloft, " two days later is too soon to know what the full effects of this increased dosage will be." (H.Tr. 3864)

Based on all the evidence, which is reviewed exhaustively by Dr. Woods at pages WOD 000162- WOD000173 of his May 25, 2011 report (Exh. 107), there can be no doubt that there was a dramatic difference in petitioner's behavior after, and as a direct result of, the decision to increase her medication. Yet trial counsel did nothing. They did not monitor her medication, they did not question her flat affect, her scribbling with her head down, her "zoning out" or any of the behavior that troubled many observers at her trial. Rather, they seemed relieved that their client was not reacting to the evidence, and were content to have petitioner sitting in court in a zombie-like state because they viewed this as an improvement of her pre-medicated behavior.

Petitioner was prejudiced by trial counsel's failure to monitor and adjust the medication that she was taking during her trial. This medication altered her demeanor and presentation in the courtroom (*Riggins v. Nevada*, 504 U.S. 127, 142 (1992) (Kennedy, J. concurring)), made her so calm and sedated as to appear cold, unfeeling and lacking in remorse, and rendered her incompetent to stand trial.

    **2.**      **Argument**

37

### A.   Introduction

Capital jurors are called upon to make a decision about whether another human being should live or die. As such, they want to know as much as they can about that person. If the defendant does not testify, the only direct access they will have to her heart and soul is their observations of her at trial.[24] As a result, counsel should be keenly aware of any factors that may affect the defendant's appearance or demeanor in a way that could be negatively misinterpreted by the jury. Counsel failed to do that here, and as a result, the jury – which counsel knew was carefully observing their client– believed that she lacked remorse. As Justice Kennedy has pointedly noted, "[i]n a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies." *Riggins*, 504 U.S. at 143-44 (Kennedy, J., concurring). *See also, Atkins v. Virginia*, 536 U.S. 304, 320-21, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (noting that one reason for a "categorical rule making [mentally retarded] offenders ineligible for the death penalty" is that "their demeanor may create an unwarranted impression of lack of remorse for their crimes"); *United States v. Whitten*, 610 F.3d 168, 201-202 ( 2d. Cir. 2010)(quoting Justice Kennedy's observations in *Riggins* and research studies on this issue in justification of reversal of federal death verdict based on prosecutor's improper argument about lack of remorse); *Willis v. Cockrell*, 2004 WL 1812698 (W.D.Tex.2004)(finding prejudicial ineffectiveness because counsel failed to discover and remedy fact that client's trial demeanor was caused by psychiatric medications) .

---

[24] As Mr. O'Brien eloquently put it, " when you talk about remorse, not just about the evidence you heard from the witness stand, but Ms. Johnson is being watched like a hawk from [the Court] and by 12 members of the jury, so she's being watched by 13 hawks to look for evidence of remorse or emotional reaction to the evidence as it's coming in. And so they're drawing judgments from that as well as drawing judgments or not drawing judgments based on expert testimony they're hearing." (H.Tr. 4223). This testimony certainly must have rung true to this Court, who has written in the context of the defendant's right of allocution in non-capital sentencing that two of the basic principles of allocution are "a sincere demeanor", and "an expression of genuine remorse." Mark Bennett, *Heartstrings or Heartburn: A Federal Judge's Musings On Defendant's Right and Rite of Allocution*, THE CHAMPION, March 2011, p. 27. As the Court noted, "[i]t is hard to fake anguish. One can sense it." (*Id.* p. 28).

38

### B. The medications

Based on his extensive review of Ms. Johnson's jail medication records and his conclusion that Ms. Johnson has long suffered from multiple organic and psychiatric impairments, including temporal lobe dysfunction, Dr. Woods concluded:

> Ms. Johnson's mental state was impaired at the time of trial. Ms. Johnson's medication regimen during her incarceration, particularly in Woodbury County Jail at the time of her trial, was contraindicated in a person with dysfunction of the temporal lobe. The combination of Seroquel, a D2 antagonist antipsychotic, and Zoloft was the medication regimen Ms. Johnson took during the time leading up to her trial. Her prescription for Zoloft was increased precipitously, just after opening statements were made in Ms. Johnson's trial. Already at 200mg per day, the prescription was increased to 300mg per day. That dosage is 150mg to 200mg above the 100mg-150mg dosage described as the usual daily dose....
> The symptoms she and others describe are consistent with Zoloft toxicity. Zoloft has known cognitive side effects, including agitation, irritability, increased depression, and suicidal ideation. Higher dosages (200mg and 400mg) cause mood deterioration. Ms. Johnson experienced each of these symptoms, consistent with both her circumstances and her faulty medication regimen.

(Exh. 107, WOD 000163)

> As Dr. Woods also explains

> Angela's cognitive abilities, impaired as they already were, became increasingly disordered, secondary to the elevated Zoloft dosages. As Ousterhoudt noted, long term elevated dosages may accumulate, creating increasingly toxic impairment, actually causing a deterioration of the brain the medications are trying to fix. This toxicity is part of the predicament of trying to treat brain-impaired persons with psychiatric medications that are designed to treat mental illness, not necessarily cognitive deficits. While attempting to fix the depression, the side effects of the same medication may impair other areas of cognitive functioning, like sedation, motor functioning, attention, and focus.
> Ms. Johnson's disinhibition was evident during the trial. She was not able to effectively participate in her defense and is often described as "detached." In short, her Zoloft toxicity, combined with her multiple impairments, disengaged her from the legal proceedings...

(Exh. 107, WOD 000168-169)

Defense counsel was oblivious that the increase in medication dramatically altered Ms. Johnson's demeanor and presented a false picture of her to the jury and judge. As set forth above, the drugs caused Ms. Johnson to have a flat affect, to appear uninvolved, disinterested, and unconcerned, and to be unable to show her remorse, pain, and intense suffering.

This is significant. Medication at trial "can prejudice the accused in two principal

39

ways: (1) by altering h[er] demeanor in a manner that will prejudice his reactions and presentation in the courtroom, and (2) by rendering h[ er] unable or unwilling to assist counsel." *Riggins v. Nevada*, 504 U.S. 127, 142 (1992) (Kennedy, J., concurring). Although this Court has expressed considerable skepticism as to whether the first type of prejudice has been demonstrated in this case, there is uncontradicted evidence as to the second type of prejudice.

"It is a fundamental assumption of the adversary system that the trier of fact observes the accused throughout the trial, while the accused is either on the stand or sitting at the defense table. This assumption derives from the right to be present at trial, which in turn derives from the right to testify and rights under the Confrontation Clause .... At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome
of the trial." *Riggins v. Nevada*, 504 U.S. 127, 142 (1992) (Kennedy, J., concurring).

For example, medication can "creat[e] a prejudicial negative demeanor in the defendant-making h[er] look nervous and restless, for example, or so calm or sedated as to appear bored, cold, unfeeling, and unresponsive .... That such effects may be subtle does not make them any less real or potentially influential." *Id.* at 143 (citing an Amicus Brief of the American Psychiatric Association). *See also, United States v. Weston*, 206 F.3d 9, 20 (D.C. Cir. 2000)(Tatel, J., concurring)("[J]urors' perceptions of [a defendant's] character could be adversely affected if as they watch [her] react to particularly emotional testimony-for example the testimony of the [victim's] co-workers-[her] expression is "masklike" or [s]he is constantly rhythmically moving. The tendency of psychotropic medication to flatten or deaden emotional responses could also be damaging, particularly if the government seeks the death penalty, for the jury would then be especially sensitive to [the defendant's] character and any demonstrations of remorse (or lack thereof).").

### C. Capital jurors want to see remorse

40

Little is of more importance to capital jurors than expressions of remorse from the defendant. *See also, United States v. Whitten*, 610 F.3d 168 at 201 ("[T]he district court acknowledged that lack of remorse and future dangerousness (as evidenced, in part if not in whole, by a lack of acceptance of responsibility) were among the most influential factors that moved the jury to return a verdict of death. That insight accords with experience, intuition, and research.") [25]

In one study, "sixty-nine percent of the death jurors who participated in the study (fifty-four of seventy-eight jurors) pointed to lack of remorse as a reason for their vote in favor of the death penalty. Many of those jurors cited it as the most compelling reason for their decision." Scott E. Sundby, *Remorse and the Death Penalty*, 83 Cornell L. Rev. 1557, 1560 1997-1998. *See also,* Stephen P.Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rv.1538, 1560 (1998) (almost forty percent of death-qualified jurors more likely to impose death if the defendant made "no expression of remorse.") Indications of remorse come not only from the defendant's words, but from her appearance: "At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence,

---

[25] The Second Circuit cited the following in support of this statement: "See, e.g., *Riggins v. Nevada*, 504 U.S. 127, 143, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (Kennedy, J., concurring) ("In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative...."); *United States v. Mikos*, 539 F.3d 706, 724 (7th Cir.2008) (Posner, J., concurring in part and dissenting in part) (citing studies and articles supporting this proposition); Michael A. Simons, *Born Again on Death Row: Retribution, Remorse, and Religion*, 43 Cath. Law 311, 322 (2004) ("The importance of a defendant's remorse in capital sentencing is well documented. Empirical studies of capital juries have demonstrated that a defendant's remorse (or lack of remorse) is one of the single most important factors in the jury's sentencing decision." (footnote omitted)); Theodore Eisenberg, Stephen P. Garvey, & Martin T. Wells, *But was he sorry? The Role of Remorse in Capital Sentencing*, 83 Cornell L.Rev. 1599, 1633 (1998) ("In short, if [South Carolina] jurors believed that the defendant was sorry for what he had done, they tended to sentence him to life imprisonment, not death."); William S. Geimer & Jonathan Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Cases*, 15 Am. J.Crim. L. 1, 51–53 (1987–88)." 610 F.3d 168 at 201 n. 25

41

combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial." *Riggins v. Nevada*, 504 U.S. 127, 142 (1992) (Kennedy, J.,concurring).

### D. What Angela's jury wanted to see, what they saw, and what they were told by the government

In this case, it is clear not only from empirical research and plain common sense that the jury was assessing Angela's demeanor. At least two of the jurors who convicted Angela noted in their questionnaires that they would be seeking signs of remorse: Juror 513 reported that "[t]he personal accord they take for the crime, whether they feel sorry for it should all be taken into consideration." [Doc. 26, Exh. 21 at p. 10.] Similarly, Juror 600 said that his "opinion would be greatly affected by the attitude of the convicted. Did she show remorse when found guilty or not have any emotion." [Doc 26, Exh. 22 at p. 12. Juror 600 reiterated this position in V.D. 2498. Juror 600 was hardly the only juror yearning to see remorse from Ms. Johnson at trial. The theme of remorse was pervasive in voir dire. *See*, *e.g.*, V.D. 1008/23-1010/8 ("A: I guess if they don't show remorse, once again, they just don't care. Q: Okay. Would you expect a person to show remorse in order to have consideration for a life sentence? A: Yes."); V.D. 1590/24-1591/8 ("A: I think a big factor in my mind is if the defendant has shown any remorse or not. Q: All right. A: I sound kind of wishy washy this way, but if – you know, if there's no remorse, I don't care what I did, I don't care if anybody knows and what they feel and everything, you know, I'd be like, well, you know, maybe they do deserve that. But if they – if they show remorse, you know, maybe sitting in prison for the rest of their life having to think about it every single day is a harsher punishment than being put to death."); V.D. 361/13-362/6 ("Q: Okay. And you were asked, Why do you feel this way, or what are some of the reasons for your beliefs? I think those who show no remorse whatsoever should be punished to the full extent. Does that sound accurate? A: That does. Q: And when you say the full extent, does that mean the death penalty? A: Yes.); V.D. 600/23-601/17 ("A. If somebody were admitting and pleading guilty with no care about it, had shown no remorse, I think in that way I would think the death penalty would be the

42

right thing to do."); V.D. 961/8-16 ("Q: Let me talk about one of the answers you had in there. It asked about your thoughts on the death penalty, and you said, If there's absolutely no doubt and this was a horrendous crime with no sense of remorse from the criminal, then I would believe in the death penalty. It would depend on the reasons behind the crime. If it came from the results of much continued abuse to the criminal from the victim, I wouldn't necessarily agree with the death penalty. Do you remember writing something like that? A: Yes, I do."); V.D. 1546/25-1547/10 ("A: My mind is set pretty solid how I explained before. If the murderers that did the killing, there's no remorse and no remorse killing the people and – my mind is pretty well set for that direction… Q: So if it was an intentional murder without any remorse, you'd be leaning pretty heavily toward the death penalty? A: Yes, I would.").

Then, at trial, the jury sent a note to the Court, saying they could not see Ms. Johnson from the jury box and wanted to "see her reactions." (V.D. 719-20.) Once again the jury put defense counsel on notice (as if they needed further notice) that they were looking for Ms. Johnson's emotional reactions to the testimony, yet counsel still did nothing to address the effect of Angela's medication with the jury. What the jury saw was a woman sitting at the defense table, drawing pictures, munching on candies, essentially expressionless. According to counsel, Angela appeared to be "somewhere else" for much of the trial.

Though defense counsel, notwithstanding voir dire, notwithstanding the jury's request at trial, and notwithstanding the Supreme Court decision in *Riggins*, was apparently unable to understand the importance of showing remorse in a murder case, the government certainly understood. The government made sure to argue lack of remorse to the jury in the penalty phase: "And remorse, there's no evidence, not a shred of evidence of remorse in this case." H.Tr. 4032.

43

### E. What diligent counsel would have done regarding Angela's demeanor

Counsel were on constructive and actual notice that the jury was examining Angela's demeanor, and that demeanor was a critical issue in the penalty phase.[26] As a result, they should have been aware of any factors that would impact her demeanor, and either change those factors or make sure those factors were explained to the jury so that the jury could not draw aggravating inferences from them. Finally, counsel should have considered how any instructions they gave Angela regarding her behavior would play out in front of the jury, especially since lead counsel Berrigan strongly believed that clients should not be taking notes in the presence of the jury " because it suggests to the jurors, number one, you are judging them; number two, you are preparing your appeal already." (*Id.* 3169; Exh. 98) .

The steps counsel should have taken to alleviate the harm caused to Ms. Johnson by her medications and mental impairments were outlined by Sean O'Brien:

> Q. And in terms of this demeanor issue you're talking about, did the defense lawyers have an obligation to know what medication she was taking and to monitor how her demeanor was appearing in court and if there were issues to suggest the kind of instruction that you're suggesting?
>
> A. Oh, I think absolutely they do. Their duty is in multiple layers. I mean, number one, they need to know minute to minute what medication their client's taking particularly at the time of trial that they know the answer to that question. Is her demeanor, is her ability to participate in the proceedings being affected by medication or by the underlying condition for which she is being medicated? That's very important.
>
> And then the next is that absolutely the mental health experts should be asked to testify about the effect of the medication on the client's demeanor in the courtroom. I mean, it's important for the jury to know that. The mental health experts help you explain to the jury the significance of what they're seeing. And there are multiple ways that experts can really, really help your mental health case.
>
> Q. So you can address it in the testimony and through instructions.

---

[26] Indeed, the defense submitted an instruction on remorse, which read: "Angela Johnson has felt genuine remorse for the role that she played in the deaths of Greg Nicholson, Lori Duncan, Terry Degues, and particularly Kandi and Amber Duncan, which remorse will continue to plague her conscience everyday of her life." [Doc. 544, p. 7]. Although the wording of this factor, like many of the defense's proposed mitigating factors, was problematical the submission of the instruction indicates the defense's recognition of the importance of remorse to the penalty phase.

44

A. And through jury instructions, absolutely.[1]

(H.Tr. 4226-4227)

Mr. O'Brien's testimony is consistent with the position taken by the American Bar Association on the medication issue and should be credited as establishing the applicable standard of practice regarding the medication issue. *See also,* 2 American Bar Association Standards for Criminal Justice, Mental Health Standards (ABA Criminal Justice Mental Health Standards), Standard 7-4.14 (2d ed. 1986 Supp.)("If the defendant proceeds to trial with the aid of treatment or habilitation which may affect demeanor, either party should have the right to introduce evidence regarding the treatment or habilitation and its effects and the jury should be instructed accordingly.").

Counsel in this case should have known that their client was being heavily medicated, and they should have taken one or more of the remedies outlined above. Their failure to do so constituted deficient performance. *See also, Heffernan v. Norris*, 48 F.3d 331, 334 (8th Cir. 1995)("[I]f the State involuntarily medicated an in-custody criminal defendant to the extent that presentation of an insanity defense was compromised, or the defendant was unable to cooperate in the defense and would present a bad image to the jury, trial counsel would know to object and to argue that a trial under such circumstances would not comport with due process.")

Had counsel performed reasonably, they could have explained to the jury through their experts and/or in instructions that Angela suffers from complicated impairments in her moods that cause her to react inappropriately and disable her from regulating her intense and rapidly cycling emotions, particularly in reaction to stress. These problems require stabilization with medications that can sometimes swing the defendant's emotionality too far the other way, causing the patient to appear flat where normal people would react. Counsel could have

---

[1] Regarding instructions, Mr. OBrien testified: "You...need to tell the jury that this person is receiving twice -- two or three times the normal dosage of Zoloft or medication so that you might expect that her responses, her emotional responses, today are going to be very blunted because we medicated her heavily to get her through this. The jury would need to know that as well....Mitigation instructions in particular are uniquely the defense counsel's responsibility." (H. Tr. 4225)

45

reminded the jury that their experts had explained that Angela's trauma history resulted in her dissociating and numbing herself to stressful events. Their experts could have told the jury that Angela was having extreme difficulty sleeping, which could also have explained her disengaged appearance. They could have simply told the jury that in helping to assist Angela to endure this incredibly stressful trial, they instructed her to sit quietly and draw, which she did to calm herself down, so that her constellation of impairments did not get the best of her.

### F. How counsel allowed Ms. Johnson to become Government's Exhibit A in aggravation

Although counsel knew that Ms. Johnson was on a variety of medications during the lead up to trial, apparently they did not think this sufficiently important to ask her jail doctor what medications she was on, to request her records regularly from that facility, or to ask the doctor to inform them regarding any changes in her mediation. As a result, they did not know the side effects of her medications, nor that her dose of Zoloft was increased by over thirty percent during the course of the trial. Counsel therefore could not provide this information to Dr. Logan so that he could advise them on the effects these medications might have on Angela. Moreover, counsel failed to ask Dr. Logan while he was on the stand to opine on any demeanor-affecting side effects these medications might have. Counsel did not ask any of their experts to address why Angela was behaving the way she was in light of the physical and psychiatric impairments they knew she had: depression, dissociative tendencies, sleep disorders, numbing reactions to stressors and others. Finally, counsel told Angela not to show any emotion, but instead to draw pictures and eat candy while the jury decided whether she regretted assisting in the murders of five people including two children. They allowed her to engage in such behavior even though leaned counsel Berrigan thought it was prejudicial to have her drawing or taking notes in front of the jury. Based on Angela's appearance and her silence during the penalty phase, the Government was able to argue, "And remorse, there's no evidence, not a shred of evidence of remorse in this case." H.Tr. 4032. The government's emphasis on this factor payed off. Only 3 jurors found that Ms. Johnson felt remorse for her role in the killing of Gregory Nicholson and

46

Lori Duncun, only 5 jurors found that Ms. Johnson felt any remorse for her role in the killing of the children, and only 4 jurors found that Ms. Johnson felt any remorse for her role in the killing of Terry DeGeus. [Doc. 593]

### G.    Ms. Johnson has demonstrated prejudice

"At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial." *Riggins v. Nevada*, 504 U.S. 127, 142 (1992) (Kennedy, J.,concurring). "In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies." *Riggins*, 504 U.S. at 143-44 (Kennedy, J., concurring) *See also,* John H. Blume, et. al., *Competent Capital Reorientation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation*, 36 Hofstra L. Rev. 1035, 1037, 1050 (2008)("The empirical information—primarily the Capital Jury Project ("CJP") studies—reveals that...jurors choose the appropriate penalty based on their assessment of the defendant's remorse (or the lack thereof)" and "[t]he demeanor of mentally ill defendants,whether medicated or unmedicated, is particularly likely to convey a false impression of the defendant's feelings about his crime...").

The problem of the medicated client long predates the Supreme Court's 1992 decision in *Riggins,* and courts long before that decision have recognized the prejudice which flows from having a heavily medicated client presented to the jury without any expert evidence or jury instructions to guide them. Some of those decisions are cited approvingly by the Eighth Circuit *Heffernan v. Norris*, 48 F.3d 331, 334 (8th Cir. 1995), where the court concluded that "[p]rior to *Riggins*, if the State involuntarily medicated an in-custody criminal defendant to the extent that presentation of an insanity defense was compromised, or the defendant was unable to cooperate in the defense and would present a bad image to the jury, trial counsel would know to object and to argue that a trial under such circumstances would not comport with due process. The Supreme Court may not have considered these issues before *Riggins*, but both the issues and the Court's

47

likely favorable response to those issues were reasonably anticipatable to competent trial attorneys.". In support of this statement, the court cited *In re Pray*, 133 Vt. 253, 336 A.2d 174 (1975); *Commonwealth v. Louraine*, 390 Mass. 28, 453 N.E.2d 437 (1983); *State v. Murphy*, 56 Wash.2d 761, 355 P.2d 323 (1960) (en banc); and *State v. Maryott*, 6 Wash.App. 96, 492 P.2d 239 (1971)). Interestingly, the *Pray* case puts the burden on the state to disclose to the jury that the defendant has been medicated: "The State has the obligation, the duty, to put before the jury all of the relevant facts in its possession. The extent and kind of these mood-altering, mind-affecting drugs was such a fact. The burden could not be shifted to the defendant or his counsel, since the post-conviction hearing clearly established that neither the significance nor the measure of the drugs administered was ever fully revealed to them." (133 Vt. at 257). The court overturned a murder conviction in post conviction proceedings because

> [T]he jury never looked upon an unaltered, undrugged Gary Pray at any time during the trial. Yet his deportment, demeanor, and day-to-day behavior during that trial, before thrie eyes, was a part of the basis of their judgment with respect to the kind of person he really was, and the justifiability of his defense of insanity. At the very least, they should have been informed that he was under heavy, sedative medication, that his behavior in their presence was strongly conditioned by drugs administered to him at the direction of the State, and that his defense of insanity was to be applied to a basic behavior pattern that was not the one they were observing. In fact, it may well have been necessary, in view of the critical nature of the issue, to expose the jury to the undrugged, unsedated Gary Pray, at least, insofar as safety and trial progress might permit. A life sentence ought not to rest on the shaky premise that an undisclosed behavioral alteration, brought about by the State, did not affect the jury's resolution of the issue of insanity. The matter must be retried.

(133 Vt. at 257)

In *Commonwealth v. Louraine*, 390 Mass. 28, 453 N.E.2d 437, 444 (1983) the Massachusetts Supreme Court adopted similar reasoning, but went beyond *Pray* in concluding that " [t]he ability to present expert testimony describing the effect of medication on the defendant is not an adequate substitute. At best, such testimony would serve only to mitigate the unfair prejudice which may accrue to the defendant as a consequence of his controlled outward appearance. It cannot compensate for the positive value to the defendant's case of his own demeanor in an unmedicated condition."

48

In *State v. Murphy*, 56 Wash.2d 761, 768 355 P.2d 323 (1960) the Washington Supreme Court ordered a new trial in a capital case where " it reasonably appears in the instant case that the attitude, appearance, and demeanor of the accused may have been influenced by the tranquilizer drugs, administered to him under at least a semblance of authority or approval from the public officers who had custody over him, and taken by the accused apparently without awareness of their probable effect upon him." *See also, State v. Gwaltney*, 77 Wash.2d 906, 909, 468 P.2d 433 (1970)("The inability of a defendant to effectively express to a judge or jury his true emotional feelings on a subject is a fact that can be adequately explained to the trier of fact by either the defendant himself or by another witness. It is not a fact of which a judge or jury cannot be appropriately and effectively advised."); *State v. Maryott*, 6 Wash.App. 96, 492 P.2d 239 (1971)(reversing conviction of a medicated defendant because "[i]n the instant case, as in *Murphy*, the demeanor and attitude of the defendant are of particular significance.").

In this case had counsel discovered and properly addressed the medication issue, there is a reasonable probability that when the jury looked at Angela Johnson, they would have seen a profoundly disturbed person whose body and brain were so unable to control her moods and emotions that she required extremely high doses of medication, a person racked with insomnia that was gorging on caffeinated candies to stay awake, a person likely re-experiencing the traumas of her childhood and trying to protect herself from them, and a grown woman in whose hand counsel had to put a crayon to keep her from breaking down. But the jury never had a chance to see the real Angela Johnson. Because of counsel's failures, they mistook a drugged woman for a cold, uninterested, compassionless, remorseless killer. This is no way to convict and sentence a criminal defendant to death. There is a reasonable probability that had counsel acted reasonably, one juror would have voted to spare her life. Ms. Johnson is entitled under the Sixth and Eighth Amendments and the Due Process Clause to a new trial.

49

**Overview of Mitigation Ineffectiveness Claims**

      **1.**           **Introduction**

Ms. Johnson will elaborate on the law regarding ineffective assistance of counsel within the context of each ground for relief. The following introductory comments are appropriate here.

Ms. Johnson "had a right – indeed, a constitutionally protected right – to provide the jury with the mitigating evidence that [her] trial counsel either failed to discover or failed to offer." *Williams (Terry) v. Taylor*, 529 U.S. 362, 393(2000). In a series of cases, including *Williams (Terry)*, the Supreme Court has explained the responsibility of capital counsel to conduct a thorough and timely investigation in preparation for the penalty phase of a capital trial. *See also, Williams (Terry)*, 529 U.S. at 395-96 (counsel prejudically ineffective when they failed to begin to prepare for penalty phase until one week prior to trial; failed to investigate defendant's harsh childhood, including abuse and neglect, or obtain records showing the same; counsel had "an obligation to conduct a thorough investigation of the defendant's background"); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003)(counsel's penalty-phase performance was prejudically ineffective when "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources."; investigations into mitigating evidence "should comprise efforts to discover all reasonably available mitigating evidence ."); *Rompilla v. Beard*, 545 U.S. 374 (2005) (counsel prejudically ineffective when he did not conduct thorough investigation and failing to review documents that would be offered in aggravation); *Porter v. McCollum*, __U.S.__, 130 S. Ct. 447, 451, 175 L. Ed. 2d 398 (2009)(counsel who presented mitigation themes of intoxication and good family relationships was nevertheless prejudically ineffective because he failed to present evidence of defendant's abusive childhood, his heroic military service, and the fact that he "suffered from brain damage that could manifest in impulsive, violent behavior."); *Sears v. Upton*, __U.S. __130 S. Ct. 3259, 3264-3266, 177 L. Ed. 2d 1025 (counsel did present *some* mitigation evidence, but he was nevertheless prejudically ineffective in failing to present evidence of

abusive childhood background and evidence that defendant had "significant frontal lobe brain damage" and a "'profound personality disorder'")("We have certainly never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant.")

Under these cases, while it is true that judicial scrutiny of counsel's performance must be highly deferential, such deference is not owed when counsel's decisions are not based on full, thorough, complete, and timely investigation. *Wiggins v. Smith*, 539 U.S. 510, 528 (2003) ("As we established in *Strickland*, 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' [*Strickland*], 466 U.S. at 690-691"). *See also, Sears v. Upton*, 130 S. Ct. at 3265 ("The [state postconviction trial] court's determination that counsel had conducted a constitutionally deficient mitigation investigation, should have, at the very least, called into question the reasonableness of [trial counsel's chosen mitigation] theory."); *Johnson v. Bagley*, 544 F.3d 592, 602 (6th Cir. 2008)("[A]n unreasonably truncated mitigation investigation is not cured simply because some steps were taken prior to the penalty-phase hearing and because some evidence was placed before the jury."), citing *Rompilla*, 545 U.S. at 382-83, 125 S.Ct. 2456 (holding an investigation objectively unreasonable where the lawyers spoke to the defendant, five family members and three mental health witnesses). [1]

---

[1] The requirement for counsel to perform thorough, not last-minute, investigations before a mitigation hearing is further reinforced by the 2003 ABA Guidelines: "The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses (e.g., by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluations (including competency, mental retardation, or insanity), motion practice, and plea negotiations." (Commentary to ABA Guidelines 10.7, Exh. 1 at 219). The Commentary to Guideline 10.7 also explains that preparing for the mitigation phase of trial " 'requires extensive and generally unparalleled investigation into personal and family history.'" *Id.* at 218, quoting, Russell Stetler, *Mitigation Evidence in Death Penalty Cases*, THE CHAMPION, Jan./Feb. 1999, at 35. *See also, Glenn v. Tate*, 71 F.3d 1204, 1207 (6th Cir. 1995) (holding that counsel's failure to make any significant preparations for the mitigation phase until after the conclusion of the guilt phase was itself "objectively unreasonable" and prejudicial when counsel failed to uncover significant mitigating evidence, including evidence of organic brain damage).

51

Ms. Johnson is confident that the Court will conclude based on abundant evidence that trial counsel failed to fulfill their constitutional duty to conduct a full, thorough, complete, and timely mitigation investigation in Ms. Johnson's case, including investigation on the issue of lingering doubt, which implicates the guilt phase investigation.

First, the present record is replete with admissions by the trial team that the guilt and penalty phase investigations were not full, thorough, complete, or timely:[2]

**Mary Goody**:  H. Tr. 112 (admitting that she was overwhelmed because of time constraints); H. Tr. 126 (stating that she was instructed to stop her investigation despite the need to have work done because of the *Massiah* ruling.); H. Tr. 167 (admitting per her declaration for funds in April 2005 that her investigation was still at the preliminary phase, i.e. she had no meaningful interaction with the defense team, with experts, or involvement in the plea process.) H Tr. 173 ( admitting that as late as 2005 they still were not meeting the minimum standard of practice with regards to investigation); H Tr 178-179 (admitting to failure to complete inter-generational investigation per the ABA guidelines); H Tr 184-194 (admitting that failure in interviewing witnesses in a timely manner resulted in failure to discover aggravating evidence possessed by Doug Book and failure to develop Gelbort evidence); H Tr. 242-243 (admitting to failure to investigate and discover impeachment evidence on Vest and Honken.); H. Tr 296  ("I honestly don't believe that the investigation that was done throughout her case was

---

[2] The only person on the team that did not admit to doing anything wrong, ever, was Mr. Willett. However, his testimony on how well the case was prepared and tried conflicts with the testimony of every other team member. Moreover, his credibility is further suspect because during the hearing he seemed to be suffering from a case of selective amnesia. Analysis of his testimony will reveal that despite being given his file well in advance of the hearing, he had memory issue responses ("I can't recall"; "I don't remember") 156 times when he was questioned by Ms. Morrissey on direct and redirect. In contrast, he had memory issue responses only 6 times when he was questioned by Mr. Williams on cross-examination and re-cross. As one court bluntly put it, "[a] person cannot engage in selective amnesia when questioned by opposing counsel and have perfect recollection when questioned by his own counsel and maintain a high level of credibility." *In re Mickler*, 324 B.R. 305, 317 (Bkrtcy.W.D.Ky. 2005).

constitutionally adequate.");  H. Tr. 321 ( agreeing that there was *no* guilt phase investigation and that penalty phase investigation was "inadequate").

**Dean Stowers:** H Tr 1077 ("And to be honest with you, I think that there was no actual -- there was no actual defense factual investigation that was independent of discovery as it related to the [confessions]." I think there was very, very little done to investigate from independent witnesses, namely other inmates in the county jail, what was really going on there with regard to McNeese, Angela, and that sort of thing."); H Tr (1080-1083)(admitting that he was told by Willett not to direct investigations and as of April 2001 no investigative work product had been given to him by Willett); H Tr 1151 (admitting that no meaningful degree of pre-authorization investigation had taken place as far as he was aware); H Tr. 1173-1174 (admitting that no investigation efforts had taken place to locate Phyllis Prosovec as of 2002); H Tr 1349-1350) (" [T]here wasn't a ton of fact-based investigation relating to the guilt/innocence portion  case...[at] any point. I guess what I'd say is that, frankly, there didn't seem to be a lot to investigat there in great detail, and I think that was part of the general thinking"); H Tr. 1361 ("I think [the case] was lacking in factual investigation...and it's hard to argue it wasn't.")

**Pat Berrigan:** H Tr 2070 (testimony that he didn't have Goody doing investigative work because he didn't have funding up and running); H Tr 2118 ( admitting that there was a failure to investigate Prosovec); H Tr 2123 (admitting that there was a failure to investigate Gaubatz); H. Tr. 2201 (admitting he did no independent investigation before rejecting an alibi defense); H. Tr. (test H Tr 3024-3025 ( admitting he had no "excuse" for the team's failure to interview many of the witnesses on the witness list submitted to the court for mitigation, other than that the team was "sitting on [their] hands" waiting on the *Massiah* issue.); H Tr 3179 ("There was a lot more that could have been done investigating abuse that took place in Angela's childhood", and "I thought we fell down on the stuff that was going on [at the orphanage].")

**Ray Cornell**: H. Tr. 1842 (stating that he had "many concerns" about the case he would take to his "grave" because he "screwed up" the investigation for personal problems and he feels that he let Angela down. ); H. Tr. 1877-1878 (stating that he lacked computer access to track

53

down Prosovec); H Tr. 1880 (stated that in opinion, duing his tenure, investigation was not "properly done"; "not even close.")

**Rose Nevins**: H. Tr. 1939 ( admitting that she did not do a complete investigation on guilty or penalty phase during the 20-24 months she was on the case.)

**Gordon Gratius**: H Tr. 2317-2319 (stating he was not receiving Cornell's work product despite several requests from Willett; consequently he learned about Prosovec when she was already dead.); H. Tr. 2388-2389 ( believes that Cornell failed to meet minimally adequate guilt phase investigation standards because he never saw any of Cornell's work product.); H. Tr. 2357 ( stating that he spent investigative money primarily serving subpoenas.); H. Tr. 2321-2322 (stating that the defense team never asked him to investigate Honken's propensity to be a bad guy); H. Tr. 2332 (stating that aytipically with his paractice in criminal cases he was never given the government's witness list and asked to develop impeachment material); H. Tr. 2342 (stating that was wsa never asked to  substantiate defense themes in conjunction with fact based investigation); H. Tr. 2356 (stating he was never asked to investigate Degeus's background for violence against Johnson.); H.Tr. 2412-2415 ( describing in detail various themes he had thought of with regards to guilt phase investigation that never got developed because the trial team had "issues" in their lives and "business"); H. Tr. 2351-2352 ( stating that he left approximately $ 25,000 "on the table" in unused investigative funds and indicating that  he asked  Willett about a month before trial, " Are there any witnesses that you want to serve or interview or backgrounds or anything like that? Is there anything we can do, you know, you want done? We're getting a month or two away from trial", and Willett said, "I've talked it over with Dean, and...you're probably done on the investigation now because Dean wants to take that money and bring up his secretary for the trial..."). H. Tr, 2353 (stating, in answer to the question of whether he had done a comprehensive guilt phase investigation, "No, I didn't do hardly any. It was the worst job I've done in 40 years.")

These admissions are significant. "Because advocacy is an art and not a science, ... [counsel's] *strategic choices* must be respected," *if* they were "made after thorough investigation

54

of law and facts relevant to plausible options." *Strickland*, 466 at 690, 104.(emphasis added) However, where counsel themselves admit that their decision-making was not "tactical" and was not based on reasonable investigation, there are no "strategic choices" to respect. See, *Carter v. Bowersox*, 265 F.3d 705, 716 (8th Cir. 2001)("The presumption that counsel's failure to raise [an argument] was a tactical decision, however, is undermined by counsel's affidavit that the [argument] was simply overlooked."); *Roe v. Delo*, 160 F.3d 416, 419 (8th Cir.1998)(same). In Mr. Berrigan's own words, "I can't say that [the failure to call witnesses ] was tactical....Some of those folks we didn't get around to talking to. Now, ...I wouldn't classify it as tactical." (H. Tr. 3022). And as *Sears v. Upton*, teaches, a  determination or admission that counsel had conducted a constitutionally deficient mitigation investigation," should ... at the very least, cal[l] into question the reasonableness of [trial counsel's chosen mitigation] theory." 130 S. Ct. at 3265

Second, this Court has already made it clear that based on its reading of the record, "I think they fell down woefully on mitigation, woefully. There is massive ineffective assistance of counsel on mitigation in my view. Now, whether there's prejudice, you know, that is going to be a tougher call." (H.Tr. 3668). *See also* H.Tr. 3298-3299, Court  stated that " it would be quite easy to write an opinion criticizing the lawyers in this case in virtually every area including the plea negotiations....[A]nd there's many things I think I could point to that they probably should have done better. Whether it falls below the Sixth Amendment standard I haven't quite sorted out yet. That doesn't strike me as a huge leap."). Given theses comments and others like them throughout the hearing, and the fact that the trial team itself acknowledged many deficiencies in both their investigation and presentation of mitigating evidence, we suspect that what the Court is most concerned about with respect to Ms. Johnson's penalty phase ineffectiveness claims is not so much the issue of performance, as it is the issue of prejudice. A general discussion of this issue might therefore assist the Court.

Under *Strickland*, prejudice is established when a petitioner shows that there is a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine

55

confidence in the outcome. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). Such a probability can

be shown by less than a preponderance of the evidence:

> The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

*Strickland*, 466 U.S. at 694. *See also, Porter v. McCollum*, 130 S. Ct at 455-456 ("We do not

require a defendant to show 'that counsel's deficient conduct more likely than not altered the

outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to

undermine confidence in [that] outcome.'"); *Paul v. United States*, 534 F.3d 832, 837 (8th Cir.

2008)("A reasonable probability is less than 'more likely than not,' but it is more than a

possibility.")

Moreover, with respect to any claim of penalty phase ineffectiveness, prejudice is

established if there is a reasonable probability that even one juror would have voted for life

imprisonment. *Wiggins*, 539 U.S. at 537 ("Had the jury been able to place petitioner's

excruciating life history on the mitigating side of the scale, there is a reasonable probability that

at least one juror would have struck a different balance."). *See also, Matthews v. Parker*, _ F.3d ,

2011 WL 2518895 * 15 (6th Cir. 2011)("Under federal law, one juror may prevent the death

penalty by finding that mitigating factors outweigh aggravating factors.... [Therefore,] the

prejudice prong is satisfied if there is a reasonable probability that at least one juror would have

struck a different balance.")(internal quotations and citations omitted); *Paul v. United States*, 534

F.3d at 839 (evaluating prejudice by this standard).

"To assess that probability, [a court must] consider 'the *totality* of the available

mitigation-both that adduced at trial, and the evidence adduced in the habeas proceedings'-and

'reweigh it against the evidence in aggravation.'" *Porter v. McCollum*, 130 S. Ct at 453, 454,

citing *Williams*, supra, at 397-398 (emphasis added). *See also, Wong v. Belmontes*, __ U.S.

__130 S.Ct. 383, 386, 175 L.Ed.2d 328 (2009)(In evaluating prejudice, "it is necessary to

consider *all* the relevant evidence" including "the entire body of mitigating evidence (including

the additional testimony [counsel] could have presented) against the entire body of aggravating

56

evidence necessary to consider.")(emphasis in original) [3] That same standard "will necessarily require a court to 'speculate' as to the effect of the new evidence-regardless of how much or how little mitigating evidence was presented during the initial penalty phase....In all circumstances this is the proper prejudice standard for evaluating a claim of ineffective representation in the context of a penalty phase mitigation investigation." *Sears v. Upton*, 130 S. Ct. at 3266-3267. Accord, *Paul v. United States*, 534 F.3d at 839 ("...[A]n evaluation of this contention requires a 'predictive judgment' about how jurors would have weighed the totality of the evidence, including the new evidence that [petitioner] now cites...")

In accordance with these cases, Ms. Johnson will turn to a brief overview of the major elements of the prejudice inquiry.

**2.      The Evidence of And Jury's Findings Regarding Aggravation Presented at Trial**

A detailed summary of all the evidence presented in aggravation is beyond the scope of this one hundred page brief and is unnecessary in any event because the Court is well familiar with that evidence and has already comprehensively summarized it in its two hundred and ninety page order denying motion for new trial [Doc. 683]. *See also, United States v. Johnson*, 403 F.Supp.2d 721 (N.D.Iowa 2005). Only the more salient points of the Court's analysis will be highlighted here.

---

[3] The Court's focus on the "totality" or "entire body" of the mitigating evidence is an important one in this case because of the sheer number of categories of mitigating evidence that trial counsel failed to present. Under the Eighth Circuit's usual approach of rejecting claims of cumulative error, it would be tempting to treat each category of excluded mitigating evidence separately, asking as to each one of them whether exclusion of that category, viewed in isolation, would have lead to a differant result. Such an approach is flawed under the "totality" approach set forth in *Porter* and *Belmontes*, as the Eighth Circuit itself has recognized. *See also, Worthington v. Roper*, 631 F.3d 487, 506 n. 12 (8th Cir. 2011)("To be sure, 'it is necessary to consider *all* the relevant evidence that the [factfinder] would have had before it if [counsel] had pursued the different path.'")(quoting *Belmontes*)(emphasis in original). Cf., *Matthews v. Parker*, __ F.3d , 2011 WL 2518895 * 18 (6th Cir. 2011)("To evaluate whether counsel's investigation was deficient, we compare the net effect of the undiscovered and unpresented evidence, viewed cumulatively, with the evidence trial counsel [discovered and] presented on Petitioner's behalf.")(internal quotations and citations omitted)

57

The aggravating nature of the crimes are set forth at the beginning of the Court's opinion: "Two of the murder victims were children, ages 6 and 10, who like their mother had had the misfortune to be at home when Johnson and Honken came looking for one of Honken's drug dealers whom Honken and Johnson suspected of cooperating with law enforcement officers. The two children, their mother, and the drug dealer were shot to death in one episode and buried in a single grave. A second drug dealer, who was Johnson's ex-boyfriend, and whom Honken and Johnson also suspected had or might cooperate with law enforcement officers, was shot and beaten to death in a separate episode more than three months later and buried at a different burial site. Although the police suspected Honken and Johnson in the disappearances of these five victims, the two were not indicted on capital charges until 2001, after the discovery of the victims' graves." 403 F. Supp. 2d at 737.

This basic factual scenario went essentially unchallenged by Ms. Johnson's lawyers. As the Court noted, "[i]In the course of the 'merits phase,' during ten trial days, the government called forty-five witnesses, submitted into evidence two-hundred-twelve exhibits, and used two demonstrative exhibits. Johnson rested without calling any witnesses or submitting any exhibits or other evidence." 403 F. Supp. 2d at 737

However, although Ms. Johnson's lawyers did not put on any evidence, they foolishly asserted a factually unsupported guilt phase "defense", a fact which no doubt contributed illegitimate weight to the government's case in aggravation at the sentencing phase. This perilous "defense" was built on the absurd assertion that although Ms. Johnson was admittedly present at the Nicholson/Duncan crime scene and admittedly facilitated all five murders by her conduct, she was nevertheless not guilty because she did not act with the purpose of causing the victims' death, even Terry DeGeus's death, where "the credible evidence in this case does not support the conclusion that Johnson was aware that Dustin Honken intended to kill Terry Degues when she called Terry DeGeus to meet him much less that Angela Johnson was present when Terry DeGues was killed by Dustin Honken.". (H.Tr. 2292-2297, 2316).

58

The "defense" was built on overblown rhetoric, not evidence. See e.g., H.Tr. 36 ("Guilt by association is unjust...At best, the evidence in this case will be that...Angela Johnson was in love and very much involved with...Dustin Honken.")(opening statement of Mr. Willett); 2294 ("The defense is confident that the big holes in the government's case...that you have also seen these holes and problems as well. The defense trusts that in a case riddled with unanswered questions you will see an abundance of doubt, an abundance of reasonable doubt.")(closing argument of Mr. Willett.); 2325 ("And Angela Johnson cannot be found guilty merely due to her association with Justin -- Dustin Honken.  That wouldn't be justice, ladies and gentlemen.  It would be a travesty of justice.")

At the same time, and because the defense's rhetoric was obviously false, Ms. Johnson's own lawyer's resorted to character assassination of her in order to explain away an abundance of damaging evidence, a "tactic" that would cast its ugly shadow into the penalty phase. See e.g., H.Tr. 38 ("Angela Johnson thought she was strong, tough, resilient, but you will see from the evidence that she was scared, weak, and selfish. She repeatedly lied to people about what she knew about Dustin Honken and the four people that he killed....She lied to her family, to her friends, to law enforcement, to grand jurors, but she lied to herself most importantly.") (opening statement of Mr. Willett); H.Tr. 2292 ("Ladies and gentlemen of the jury, Angela Johnson has done some regrettable things in reference to this case.  She  failed to stop, if she could have, Dustin Honken from putting four people, including two little girls, to death on July 25, 1993. When she learned of what he had done, she participated  in the cover-up which followed.  She lied over and over again to her friends, to her family, police officers, and grand jurors  about knowing about what Dustin Honken had done.  She lied about  being involved in drugs, although most people in that business lie about it even when they're caught red handed selling drugs to snitches and undercover cops.  She failed to report Dustin Honken to the proper authorities, a decision only partly explained by the fact that she was carrying his child....As was mentioned during the defense's opening  statement, there is a lot that Angela Johnson did wrong during her

59

relationship with Dustin Honken, a lot to be angry, even disgusted with her about.  She was

weak, selfish, insensitive,  and dishonest.")(cclosing argument of Mr. Willett) [4]

     This unsupported "defense" was quickly rejected by the jury. As the Court noted, after

less than a day of deliberations in a complex case, "[t]he jury returned a verdict on the afternoon

---

[4] The reason why the assertion of such a factually unsupported and prejudicial guilt phase defense was so aggravating bears some emphasis. As noted above, this Court has already concluded that "...the evidence against Miss Johnson was beyond overwhelming..." and that therefore " the case was not defensible." (H.Tr. 3709, 4578). "It was obvious, or should have been, that the sentencing phase was likely to be the stage of the proceedings where counsel can do his or her client the most good." *Glenn v. Tate*, 71 F.3d 1204, 1207 (6th Cir. 1995)(internal quotation omitted). Instead of acknowledging the obvious, or, at the least, attempting to challenge it with credible guilt phase mental health evidence, the defense engaged in the useless charade of presenting a non-viable and prejudicial mental state defense. The damage that counsel did by ignoring the obvious in this case was aptly described by the Supreme Court in *Florida v. Nixon*, 543 U.S. 175, 187, 125 S.Ct. 551, 560, 160 L.Ed.2d 565 (2004),

     In such cases, "avoiding execution [may be] the best and only realistic result possible." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.9.1, Commentary (rev. ed.2003), reprinted in 31 Hofstra L.Rev. 913, 1040 (2003).

     Counsel therefore may reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared. Unable to negotiate a guilty plea in exchange for a life sentence, defense counsel must strive at the guilt phase to avoid a counterproductive course. See Lyon, *Defending the Death Penalty Case: What Makes Death Different?* 42 Mercer L.Rev. 695, 708 (1991) ("It is not good to put on a 'he didn't do it' defense and a 'he is sorry he did it' mitigation. This just does not work. The jury will give the death penalty to the client and, in essence, the attorney."); Sundby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty*, 83 Cornell L.Rev. 1557, 1589-1591 (1998) (interviews of jurors in capital trials indicate that juries approach the sentencing phase "cynically" where counsel's sentencing-phase presentation is logically inconsistent with the guilt-phase defense); *Id.*, at 1597 (in capital cases, a "run-of-the-mill strategy of challenging the prosecution's case for failing to prove guilt beyond a reasonable doubt" can have dire implications for the sentencing phase).

543 U.S. at 191

     In such cases, as *Nixon* holds, " counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in a useless charade." *Id.* (internal quotation and citation ommitted). By the same logic, counsel should be deemed ineffective in this case when they plowed ahead with a "useless charade" of a guilt phase defense which had "dire implications for the sentencing phase."

60

of May 24, 2005, finding Johnson guilty of 'aiding and abetting' the murders charged in all ten capital counts." 403 F. Supp. 2d at 751.

As the Court also noted, no evidence by either side was offered in the eligibility phase. (*Id.*, 752). The government asserted only one of the four "gateway aggravating factors" identified in 21 U.S.C. § 848(n)(1) in the "eligibility phase," that factor being that Johnson "intentionally engaged in conduct intending that the victim [s] be killed or that lethal force be employed against the victim[s], which resulted in the death of the victim[s]." 21 U.S.C. § 848(n)(1)(C). The government asserted only the following three "statutory aggravating factors": for Counts 1 through 10, that Johnson "committed the offense after substantial planning and premeditation," 21 U.S.C. § 848(n)(8); for Counts 1 and 6 (Gregory Nicholson), 2 and 7 (Lori Duncan), and 5 and 10 (Terry DeGeus), that Johnson "committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim," 21 U.S.C. § 848(n)(12); and for Counts 3 and 8 (Kandi Duncan) and 4 and 9 (Amber Duncan), that "[t]he victim was particularly vulnerable due to ... youth." 21 U.S.C. § 848(n)(9).

The "eligibility phase" was submitted to the jury at 10:30 a.m. on May 31, 2005, and the jury returned its "eligibility phase" verdict at 1:33 p.m., finding Johnson "eligible" for the death penalty on all ten capital counts. Somewhat more specifically, the jury found that, for all ten counts, "[t]he defendant intentionally engaged in conduct intending that the victim in question be killed or that lethal force be employed against the victim, which resulted in the death of the victim." 403 F. Supp. 2d at 751.

As to the "statutory aggravating factors," the jury found that "[t]he defendant committed the offense in question after substantial planning and premeditation" *only* as to Counts 5 and 10, which charged the killing of Terry DeGeus, but did not so find for the other eight counts, which charged the killings of Nicholson and the Duncans, on which this statutory aggravating factor had also been asserted. The jury also found that the killings of Gregory Nicholson in Counts 1 and 6, Lori Duncan in Counts 2 and 7, and Terry DeGeus in Counts 5 and 10, the only killings

61

for which this statutory aggravating factor was submitted, had each been committed "in an especially heinous, cruel, or depraved manner," in that each killing involved *both* "torture" and "serious physical abuse." Finally, the jury found that, in the killings of Kandi Duncan in Counts 3 and 8, and Amber Duncan in Counts 4 and **,** the only killings for which this "statutory aggravating factor" was submitted, "[t]he victim was particularly vulnerable  due to her young. (Id. at 753)

Although three statutory aggravating factors were thus found it is important to stress that the weight of all three of them could have been diminished significantly if the defense had developed and  presented overwhelming mitigating evidence, described below, that it was Dustin Honken, and not Angela Johnson, who was the mastermind behind, and who actually carried out the killing and torture of all five victims, and who, according to the government's theory in the Honken trial, was also responsible for manipulating Ms. Johnson into her aiding and abetting involvement in these offenses.

Further, two of these aggravating factors,  21 U.S.C. § 848(n)(8) ("*The defendant committed the offense* after substantial planning and premeditation"), and 21 U.S.C. § 848(n)(12)( "*The defendant committed the offense* in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim"), could have been eliminated altogether, or their weight greatly diminished, if the defense had done their homework and discovered that  both of these factors require that the "defendant" have committed the offense, not a co-conspirator. By the time of Ms. Johnson's trial, the language used in 21 U.S.C. § 848(n)(12), which is also used in 18 U.S.C. § 3593(a)(6),  has been construed to mean that the defendant himself, and not his coconspirators, must commit the offense in an especially heinous, cruel, or depraved manner . *United States v. Hall*, 152 F.3d 381, 415(5th Cir. 1998). The Eighth Circuit had applied the same reasoning to 18 U.S.C. § 3592 (c) (5)("The defendant, in the commission of the offense,...knowingly created a grave risk of death to 1 or more persons...'). *United States v. Allen*, 247 F.3d 741, 787(8th Cir. 2001), *vacated on*

62

*other grounds*, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002). See also, *Tison v. Arizona*, 481 U.S. 137, 149, 156-57, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (holding that major participation in a felony, combined with reckless indifference to human life, is sufficient to satisfy the culpability requirement for a sentence of death "when that conduct causes its natural... lethal result"); *Enmund v. Florida*, 458 U.S. 782, 798, 801, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) ("the focus must be on [the defendant's] culpability, not on that of those who... [killed] the victims"); *Lockett v. Ohio*, 438 U.S. 586, 604-05, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (finding that the Constitution requires an individualized consideration regarding whether a sentence of death should be imposed); *United States v. Moussaoui*, 282 F.Supp.2d 480, 485 (E.D.Va. 2003), *revd in part on other grounds*, 382 F.3d 453 (4th Cir. 2004) ("To withstand constitutional scrutiny, any sentence of death in this case must be predicated on what the defendant, himself, actually did, not on what he may have wanted to do or on what his alleged co-conspirators were able to accomplish on their own.").

Ignorant of these cases[5], the defense made no attempt, either pretrial or during the eligibility phase,  to argue the inapplicability of these factors based on the argument that Ms. Johnson had not in fact "committed the offense."[6] Although Ms. Johnson has raised in her

---

[5] We know that the defense was ignorant of these cases because on direct appeal of Ms. Johnson's case, the Eighth Circuit noted that "Johnson does not challenge on appeal the instructions the district court gave on the statutory aggravating factors, and she provides no authority for her suggestion that this aggravating factor required her to personally commit the murders." *United States v. Johnson*, 495 F.3d 951, 975 ( 8th Cir. 2007). Such authority certainly existed. In addition to the cases cited in text, while Ms. Johnson's case was pending on direct appeal two other federal courts addressed the issue. See, *United States v. Diaz*, 2007 WL 2349286 * 5 (N.D.Cal.,2007)("Here, as in *Hall*, the language of the statute requires that the jury focus on the acts of the defendant."); *United States v. Concepcion Sablan*, 555 F.Supp.2d 1177, 1189 (D.Colo.,2006)("I agree with Defendant that the fact he can be sentenced to death based on complicity principles... is not relevant to whether this aggravating factor is appropriate as to him. The two are separate issues. Regardless of whether Defendant can be found guilty under a complicity theory, the heinous or depraved aggravating factor cannot be presented as to Rudy Sablan unless the evidence shows it is appropriate as to him.")

[6] During the eligibility phase, Mr. Stowers focused his argument on "whether or not Angela Johnson substantially planned and premeditated these killings" and on whether the

63

second amended petition  counsel's mishandling of this issue as yet another instance of counsel ineffectiveness, the focus here is on the issue of prejudice, not performance. How much weight should be given to two of the three statutory aggravators in this case when there is grave doubt that they are even legally applicable ? Ms. Johnson's answer is "not much". See, *Sochor v. Florida*, 504 U.S. 527, 532, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992) ("Employing an invalid aggravating factor in the weighing process creates the possibility of randomness by placing a thumb on death's side of the scale, thus creating the risk of treating the defendant as more deserving of the death penalty"). And although the vulnerable victim aggravator was certainly proved up in this case, the weight of even that mitigator is diminished somewhat by the fact that the great weight of the evidence established that it was Dustin Honken and not Angela Johnson who killed the children, and the jury in Ms. Johnson's case rejected the allegation that she committed the murders of the children and of Nicholson and Duncan after substantial planning and premeditation. Indeed, the "the lack of certainty in the record concerning the precise involvement of Angela Johnson in these crimes" led this Court to conclude that "this haunting uncertainty alone is sufficiently mitigating to foreclose my vote for the death penalty." 403 F. Supp. 2d 721, 896

On May 31, 2005, a day-and-a-half were devoted to presentation of the government's "penalty phase" case, which consisted of fourteen witnesses, including relatives of the victims who provided "victim impact" testimony, and thirty-four exhibits. Undoubtedly the most important witness the government presented was Mr. Vest whose account of what Mr. Honken told him about Ms. Johnson's involvement in the crimes served as the centerpiece for the government's argument that Ms. Johnson was even more culpable than Mr. Honken. As is demonstrated below, there was substantial evidence which the defense could and should have presented impeaching both Honken and Vest. As also argued below, there was also substantial

---

killings involved torture. (Tr. 2485, 2493-2497). He never argued that Ms. Johnson had not personally committed the murders and that therefore the two factors did not apply to her. Mr. Williams for obvious reasons did not mention this requirement either.

64

evidence of emotional execution impact evidence which the defense could and should have presented to counteract the emotional impact of the government's victim impact witnesses.

Based on the evidence it heard from both sides, the jurors rejected a finding that "[t]he defendant would be a danger in the future to the lives and safety of other persons" as to all counts, but unanimously found the other three "non-statutory aggravating factors" asserted by the government as to all counts on which they were asserted, obstruction of justice (Counts 1 through 10), aiding abetting multiple murders in a single episode (Counts 1 through 8), and injurious effect upon the victim's family (Counts 1 through 10). Although these non-statutory aggravating factors are entitled to some weight, they pale in comparison to the statutory and non-statutory aggravating factors found with respect to Mr. Honken, especially the findings that he "intentionally killed more than one person in a single criminal episode" and that he "would be a danger in the future to the lives and safety of other persons.". [Doc. 547]

3.      **The Evidence Of And Jury's Findings Regarding  Mitigation Presented At Trial**

Johnson began presenting her "penalty phase" case on the afternoon of June 2, 2005, and her case continued through the next three-and-one-half trial days. Johnson's "penalty phase" case consisted of twenty-six witnesses, including three mental health experts, a psychopharmacologist, Johnson's daughter by Dustin Honken and other members of her family, and eighty-five exhibits. The most prominent feature of the defense's case in mitigation was that it was limited in scope. Based on the defense's representations and concessions, the Court instructed the jury in Final Penalty Phase Instruction No. 5 : "You have heard expert testimony concerning Angela Johnson's mental condition. This evidence has not been offered for the purpose of explaining Angela Johnson's mental state at the time of the charged killings, and you cannot consider it for that purpose. You may, however, consider it for any other purpose".

65

Based on the evidence presented in mitigation, all jurors rejected three of Johnson's "mitigating factors" as to all counts[7], but at least one juror found each of the other eighteen "mitigating factors" expressly asserted by counsel for one or more counts, and two jurors identified Johnson's suicide attempt as an additional "mitigating factor."[8] However, no juror found "[a]ny residual or lingering doubts as to Angela Johnson's guilt or innocence or her role in the offenses."

The "penalty phase" of Johnson's trial was submitted to the jury at 11:54 a.m. on June 20, 2005.The jury returned its "penalty phase" verdict the next day, June 21, 2005, at 3:35 p.m., unanimously recommending the death penalty for the killing of Lori Duncan, as charged in Counts 2 and 7, Kandi Duncan, as charged in Counts 3 and 8, Amber Duncan, as charged in Counts 4 and 9, and Terry DeGeus, as charged in Counts 5 and 10, but recommending "[a] sentence of life imprisonment without possibility of parole" for the killing of Gregory Nicholson, as charged in Counts 1 and 6.

One of the most striking points in the Court's new trial decision is contained in the first paragraph, where the Court notes that "while Honken's jury had recommended the death penalty only for the counts charging the killings of the children, Johnson's jury recommended the death penalty not only for the killings of the children, but for the killings of two of the three adults, as well." 403 F. Supp. 2d at 736. How could such a result have occurred, given the relative

---

[7] The "mitigating factors" rejected by all jurors as to all counts were the following: "(1) even though Angela Johnson is guilty as an aider and abettor, her participation was relatively minor as compared to Dustin Honken's role in these murders"; "(12) Angela Johnson suffers from anxiety and depression as a result of experiences endured in childhood, and these mental conditions have hampered her ability to make intelligent, thoughtful, and wise choices in many of the important decisions in her life"; and "(19) although she is guilty of these murders, Angela Johnson was pregnant by Dustin Honken with her daughter, Marvea, at the time of the murders and, as a result, was in a disadvantaged position to resist Mr. Honken, leave him, or turn him in to authorities, which she offers as an explanation of her conduct, not as an excuse" (although the mark for this "mitigating factor" on Count 10 could be either a zero or a numeral 6).

[8] The findings on these mitigating factors are complicated and are set forth at footnote 12 of the Court new trial decision.

66

culpability of the two defendants, and the fact that it was Dustin Honken, and not Angela Johnson, who actually killed the five victims ? Ms. Johnson suggests that the only plausible answer to this question is that the jury bought hook, line, and sinker into the government's persistent, and easily refutable, evidence that Dustin Honken was a studious young man who had no proclivity for violence until he met Angela Johnson. From this evidence, the government argued that Angela Johnson was "egging on and pushing and cajoling and putting [Dustin Honken] in the position of pulling that trigger." (Tr. 4027). *See also* Tr. 4011, 4019, 4026-27 and 4079-80. By this false account, Ms, Johnson, and not Dustin Honkin, was the more culpable party, and since the jury knew (because the defense ineffectively told them) that Dustin Honken had already been sentenced to death for killing the children, it was only "fair" that Ms. Johnson received that sentence as well, not only for the children, but for two of the three adults as well. As we will demonstrate below, evidence undercutting this most important part of the aggravating evidence against Ms. Johnson was readily available and would have completely undercut the major thrust of the government's case in aggravation. Cf., *Paul v. United States*, 534 F.3d at 840 (one factor negating a showing of prejudice was that "[t]he new evidence proffered by Paul would not undermine any of the evidence in aggravation, or the jury's findings on those factors.")

The Court also concluded in its decision: "[i]f I had been the trier of fact and the decision maker in the 'penalty phase,' I would not have imposed the death sentence on this record. The defense presented strong and, in my view, persuasive 'penalty phase' evidence from a myriad of sources, including evidence from numerous expert witnesses and compelling testimony from Angela Johnson's daughters." 403 F. Supp. 2d at 896 . As Ms. Johnson argues below with respect to claim 33, the Court that made this statement had the obvious advantage of a correct view of the law of mitigation and of all the facts presented in the Honken trial, as well as the government's argument in that case as to who the mastermind really was. Ms. Johnson's jury had none of these advantages. If, as in *Carter v. Bowersox*, 265 F. 3d 705, 716 (8th Cir. 2001), the

67

fact that "one juror was at least uncertain of petitioner's guilt" was enough to show that there is "a reasonable probability that the result of the sentencing phase would have been different", then surely the same result must be reached when the judge who heard *all* the relevant mitigating and aggravating evidence from both trials not only was "troubled" by the lack of certainty in the guilt phase, but also affirmatively stated that he "would not have imposed the death sentence on this record."

### 4. The Evidence Of Mitigation That Could And Should Have Been Presented

The remaining portion of this brief is devoted to an exploration of the mitigating evidence that could have been presented in this case. As the Court reviews this evidence, Ms. Johnson asks the Court to keep in mind that the ultimate question here is whether the "undiscovered mitigating evidence, *taken as a whole*, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability" so that "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S.Ct. 2456 (citations and internal quotations omitted)(emphasis added). See also, *Porter v. McCollum*, 130 S. Ct at 453, 454

### COURT CLAIM NO. EIGHTEEN

**Court Claim 18 - Confrontation of Aggravating Evidence: Failure to Present Evidence of BWS to Explain the Relationship Between Petitioner and Terry DeGeus to Rebut the Prosecution's Theory of Her Motive for Killing Him**

At all three phases of the trial, the government asserted that Angela Johnson intended to kill Terry DeGeus out of revenge for what the prosecution agreed was his brutal treatment of her. *See, e.g.,* Tr. 2247-2248, 2474, 4015, 4029-4030. This motive was used not only as evidence to convict Ms. Johnson, but also as evidence supporting the gateway factor of intent, and the statutory aggravating factor of substantial premeditation and planning, as well as a general theme during the penalty phase closing. *Id.*

The defense theory at the merits phase was that Angela Johnson had no intent to kill Terry DeGeus, did not know that Dustin Honken intended to kill him, and was merely present when

68

Terry DeGeus was killed. *See, e.g.,* Tr. 2293, 2316-2317. During the eligibility phase, the defense argued that Ms. Johnson lacked the requisite intent to kill Terry DeGeus. *See, e.g.,* Tr. 2481-2485. And during the penalty phase argument, the defense directly disputed the government's theory of Ms. Johnson's motive. Tr. 4041-4042. Yet, the defense failed to use at any phase readily available evidence that Ms. Johnson did not despise Mr. DeGeus – indeed that she was madly in love with DeGeus despite his brutal treatment – to rebut the prosecution's theory of motive.

Rather, in closing at the merits phase, defense counsel argued only that it was "outrageous" for the government to argue that Angela Johnson killed "a guy she once loved" because "he yelled at her in a restaurant." Tr. 2320-2321. During the eligibility phase, defense counsel simply ignored the issue of Angela Johnson's purported motive for revenge. *See,* Tr. 2478-2498. The defense in neither the merits or eligibility phases did anything to rebut the prosecution's theory.

At the penalty phase, counsel's only rebuttal to the government's theory of retaliation was made during closing argument. Counsel scoffed at the motive and pointed out that Ms. Johnson didn't play much of a part in the murder sitting in the car while Honken killed DeGeus. Tr. 4042-4043. Counsel then acknowledged that at other points in Ms. Johnson's relationship with DeGeus, she might have been legally justified in killing him but that she never did, ending with the statement, "She was afraid of him." Tr. 4043. Without the framework of battered woman's syndrome, by which the jury could grasp that Ms. Johnson *still* loved Mr. DeGeus despite what he had done to her, the defense's argument at penalty packed no punch and, in fact, underscored a motive for the killing, not necessarily retaliation but at least fear.

Yet, trial counsel had at their fingertips everything they needed to mount a robust rebuttal to the prosecution's motive. They had evidence of Ms. Johnson's continued love for Mr. DeGeus, and they had an expert who could testify about what that meant. They chose instead to put on mental health experts who stressed in their direct examinations that they were *not* being

69

asked to provide opinions about Ms. Johnson's mental state at the time of the crime. (Tr. 3307 (Logan); Tr. 3627-28 (Hutchinson)).

Moreover, counsel acquiesced in, and caused, an instructional scheme which explicitly prohibited the jury from considering the experts' testimony for mental state at the time of the crime. The Court told the jury, "You have heard expert testimony concerning Angela Johnson's mental condition. That evidence has not been offered for the purpose of explaining Angela Johnson's mental state at the time of the charged killings, and you cannot consider it for that purpose. You may, however, consider it for any other purpose." (Doc 589, Final "Penalty Phase" Instruction No. 5). Given this restrictive approach, what little the defense experts said about Ms. Johnson's love for Mr. DeGeus was rendered useless.

Defense expert psychiatrist William Logan testified about the horrific brutality Terry DeGeus exacted on Angela Johnson, and that after leaving DeGeus because of that treatment, she spent hours on the phone with him convincing him not to kill himself and then reconciling with him. Tr. 3326-3328. He concluded, "And so there was an aspect that she really loved him and hoped he would change. And this is not unusual in this type of relationship where there's chronic physical conflict in that there's emotional explosions and beatings, and then there's remorse and sorrow and then a hope that things will be better and reconciliations only to have the pattern repeat." Tr. 3328. But he also added at the outset of his testimony that, "there was no intent on the part of the defense to raise mental health issues in relation to the acts that form the basis for her charges themselves." (Tr. 3307).

Similarly, defense psychologist Marilyn Hutchinson testified about Ms. Johnson's impulsivity and attachment problems, pointing to her relationship with Terry DeGeus as evidence of those problems. "That she couldn't let go of Terry DeGeus, . . . . I think part of that also comes from this stage in confusing love and abuse, that if the people who are supposed to love you and that you love and seem like the ones who should love you also abuse you, then it gets very confusing about, well, people who love me abuse me. Tr. 3638-39. As he had done

70

with Dr. Logan, counsel made clear that Dr. Hutchinson was making no "claim that your testimony today has to do with the mental state of Angela Johnson at the time of the homicides for which she has been convicted." (Tr. 3628-29).

What counsel ignored with this misguided approach is that even the prosecution's mental health experts had developed evidence of Ms. Johnson's continued love for Terry DeGeus. In the course of a tape recorded interview by prosecution psychologists Joseph Dvoskin and Daniel Martell on April 23, 2005 and in the defense's possession (Exh. 114, MAR000001-MAR000188), Ms. Johnson described idealized, loving feelings for DeGeus:

> He just took my breath away. I thought he was the sexiest man in the world. I was crazy for him. . . . The minute he walked into my bar, I was like "Oh, my god." . . . . I loved him. I didn't want to be with anybody else. With him I was perfectly happy with him but he was just real jealous about any male friend I had. Most of my friends were guys and he knew that when we first started seeing each other and all of a sudden, he got real possessive and started getting physically abusive, which was a real bummer.

(Exh. 114, MAR000073-MAR000078).

She went on to tell them,

> "I went back . . . and Terry and I got back together because I would forgive him for everything. I did not want to forget him because he was so easy to forget because I loved him so much. . . . Well, he was really sorry. He hated it when he did that and I bruise so easily so when I got a black eye and it would be black forever. And he hated it, he hated it.

(Exh. 114, MAR000079).

Not only did they have the factual evidence, they had the expertise on their team to put on evidence of battered woman's syndrome. Marilyn Hutchinson is, and was, an acknowledged expert in the field. Tr. 3622. In fact, defense counsel selected her as an expert precisely because she was an expert in the field. H.Tr. 2103-2104. Yet, after hiring an expert in the field, trial counsel completely failed to use her expertise and explicitly restricted the scope of her testimony to exclude this important evidence. Had Dr. Hutchinson been asked about battered woman's syndrome, she would not only have testified to the factual evidence of the continued love, she would have supported that factual evidence with research demonstrating the commonality of

71

those feelings in abusive relationships.  H.Tr. 3620-21.  Most critically, what Dr. Hutchinson would have testified to if the defense had provided adequate representation of Ms. Johnson is the implausibility of the prosecution's theory of revenge.  Dr. Hutchinson was asked by habeas counsel, "Based on what you knew then [at the time of trial], putting aside what you know now, did the theory that Miss Johnson participated in the killing of Terry DeGeus as revenge for the beatings that he gave her, does that make sense?"  Dr. Hutchinson responded, "No."  She explained that "in the multiple hundreds of battered women syndrome cases that I've done, they almost always are in the middle of a violent act or an eminent[9] violent act.  They sometimes are immediately after an extremely aggravated event or they are because of some specific predicted future event that makes it all seem different. . . . And necessary. . . . And there wasn't anything like that in this case."  H.Tr. 3629-3630.  Dr. Hutchinson was never even told by trial counsel that the prosecution's theory of Ms. Johnson's motive for participating in DeGeus' killing was revenge, nor did she learn of the theory any other way.  H.Tr. 3630.

The defense had no strategic reason not to present this evidence, as acknowledged by Patrick Berrigan during his testimony before this Court.  He was asked, "Would there be any strategic reason not to present that theme in either the guilt phase in support of your theory that she wasn't the killer or in the penalty phase in mitigation?"  Mr. Berrigan replied simply, "No."  H.Tr. 2106.  He recalled that Ms. Johnson "waxed eloquently about DeGeus and how beautiful he was and how much in love she was with him" during her 2005 interview with Drs. Dvoskin and Martell, and he said that her statements to them were consistent with "how she had communicated with her defense team about Mr. DeGeus certainly in the year or two before the trial."  *Id.*  Mr. Berrigan further testified, "Miss Johnson had a peculiarly romanticized view of Mr. DeGeus that I cannot explain now nor could I then and almost the opposite position regarding Mr. Honken."  He reiterated that he had no strategic reason not to present that dynamic as part of his presentation by Dr. Hutchinson.  "No, there'd be no reason not to.  I think all of us

---

[9] As in the Reporter's Transcript.  Should read, "imminent."

72

who are familiar with battered woman syndrome realize that as sort of counterintuitive as it seems, these women go back time and time again to their abusers. And it's hard to explain in any rational sense, but it's a mental health issue. It's a problem. So that testimony would have been consistent with battered woman syndrome, that she still – despite repeated beatings, some severe, at the hands of Mr. DeGeus still loved him, particularly after he's dead." H.Tr. 2107. See, *Carter v. Bowersox*, 265 F.3d 705, 716 (8th Cir. 2001)("The presumption that counsel's failure to raise the due process claim was a tactical decision, however, is undermined by counsel's affidavit that the instructional error was simply overlooked."); *Roe v. Delo*, 160 F.3d 416, 419 (8th Cir.1998)(same)

Moreover, evidence that Angela Johnson suffered from battered woman's syndrome fit well with her childhood history of trauma and other mental health evidence that should have been presented, *i.e.*, her now-diagnosed brain impairments that made her particularly vulnerable to trauma. *See* Exh. 107, WOD000125-WOD000133. Dr. Woods found that Ms. Johnson's neurologically-derived difficulties[10] weighing and deliberating, understanding context, making decisions, and understanding the big picture are the bases for much of the trauma she has suffered. The multiple types of trauma she has undergone are consistent with chronic trauma, not the single episode trauma simplistically described in the Diagnostic and Statistical Manual IVth Edition Text Revised (DSM-IVTR)." *Id.* at WOD000125. After describing the multiple traumas Ms. Johnson suffered in childhood, and defining complex psychological trauma, Dr. Woods identified the *complex posttraumatic sequalae*: changes of mind, emotions, body, and relationships experienced following complex psychological trauma, including severe problems with dissociation, emotional dysregulation, somatic distress, or relational or spiritual alienation. *Id.* at WOD000128. Dr. Woods concluded, "Angela's inability to effectively weigh and deliberate drew her to Terry DeGeus over and over. Often she would make plans without being able to see the bigger picture, and would become involved with him again." *Id.* at WOD000131.

---

[10] See briefing for Claims 34-36, *infra*.

73

Evidence of battered women's syndrome in the context of a holistic mental health presentation would not only have refuted the prosecution's theory that Angela Johnson participated in the killing of Terry DeGeus for revenge, but would have bolstered the entire mental health mitigation presentation. Failure to present this evidence was thus deficient performance. See, *Dando v. Yukins*, 461 F.3d 791 (6th Cir. 2006)(counsel was prejudically deficient in advising petitioner to plead no-contest without first investigating through expert the possibility of duress defense based on Battered Woman's Syndrome); *State v. Hess*, 207 N.J. 123, 23 A.3d 373 (N.J. 2011)(counsel iwas prejudically ineffective in failing to present Battered Woman Syndrome Evidence that could have been used to establish several mitigating factors). The failure to present this evidence was also prejudicial because the "undiscovered mitigating evidence, *taken as a whole*, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability" so that "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S.Ct. 2456 (citations and internal quotations omitted)(emphasis added).

## COURT CLAIM NO. NINETEEN

**Court Claim 19 - Confrontation of Aggravating Evidence: Failure to Present Readily Available Evidence About Dustin Honken to Refute the Prosecution's Argument that Angela Johnson Was "Worse" than Honken**

At the penalty phase of petitioner's trial, the prosecution elicited testimony that Dustin Honken was a studious young man who had no proclivity for violence until he met Angela Johnson. From this evidence, the government argued that Angela Johnson was "egging on and pushing and cajoling and putting [Dustin Honken] in the position of pulling that trigger." Tr. 4027. *See also* Tr. 4011, 4019, 4026-27 and 4079-80. Specifically, Jeffrey Honken testified that Dustin was "not at all short tempered; that he was not violent, that he had never seen his brother engage in violence "whatsoever" toward anyone; that he was not physical with people and never roughed anyone up or slapped anyone. Tr. 323. Timothy Cutkomp testified that from

74

the time he met Dustin Honken in the early 1990's he did not know Honken to use violence against other people; that Honken was not a physical person who would get into fights during or after high school; and that Honken never hurt anyone until he became involved with Angela Johnson. Tr. 830-31. Rick Held testified that, in his experience, Dustin Honken was not an aggressive or violent person. Tr. 1038. Kathy Rick testified that Honken told her that he was not strong enough to leave petitioner because he knew what she was capable of, and offered her opinion that Honken was afraid of Ms. Johnson. Tr. 2641-42. Rick also told the jury that she never saw Honken use violence or force toward anyone from 1989 until 1993. Tr. 2669. Alyssa Nelson, Honken's sister, testified that she never knew her brother to engage in violence or use force before 1993. Tr. 2672. The prosecution also elicited testimony from Alyssa Nelson about Honken's report to her that he had woken up with Angela Johnson pressing a gun to his head and that it scared him. Tr. 2679.

Patrick Berrigan had advance notice that at Petitioner's trial the government was going to depict Honken as a peaceful, non-violent person. *Id*., 3173-74. He was not surprised at the government change in posture from Honken's trial; it was only "the extent that they did it" that was unexpected. *Id*., 3172. Yet, incredibly, Petitioner's counsel did nothing to dispel the government's false portrayal of Honken.

There was readily available evidence to refute the government's portrayal of Honken as a non-violent, peaceable "bookworm" until the time he became involved with Angela Johnson. At Honken's penalty phase, the government made a proffer of evidence to rebut testimony of Alyssa Nelson that Honken had been coerced into committing a bank robbery by his father.[11] Honken

---

[11] It was proffered that Kenneth Hansen would testify that Honken approached him with a very detailed plan to rob a bank, which included shoving an old lady into a bathroom, securing the door and wearing surgical gloves and masks. Honken Tr. 3678. The prosecutor proffered testimony by Alan Johnson that Honken had shared his bank robbery plans with him. Honken Tr. 3678. The government also proffered Alan Johnson's testimony that Honken asked him to kill Kenneth Hansen, who was to participate in the planned bank robbery, so that they could split the money between them. *Id.*, 3678-79. The prosecution's proffer of evidence it sought to present from Mark Johnson, Alan Johnson's, brother about the plan to kill Hansen was

75

Tr. 3676-79. Trial counsel had the transcripts of Honken trial. Trial counsel knew, or should have known, that substantial evidence existed to refute the false picture of Dustin Honken presented by the government at Petitioner's trial.

Trial counsel ineffectively failed to call Allen Johnson, who would have testified that when Honken was in the eleventh grade, he devised a plan to rob the Britt Bank. H.Tr. 2772. Honken planned to gain entry to the bank by copying his mother's key and the alarm code she kept in her purse. *Id.*, 2773. The plan involved a face mask and black clothing. *Id.*, 2774. Once inside, they would wait for the elderly lady who opened the bank in the morning, get her to open the safe, lock her in the restroom and then escape with the money in a waiting car. *Id.*, 2773-74. Allen Johnson later heard that the Britt Bank was robbed and it sounded like the crime Honken had planned. *Id.*, 2776.

Mark Johnson, Allen's brother, testified that during Honken's senior year in high school, he was with Honken in his bedroom and Honken had one of his father's shotguns. *Id.*, 2797. On this occasion, Honken said he was planning to rob the Britt Bank and had taken his mother's key to the bank and made a copy. *Id.*, 2797. Honken was going to have Kenny Hansen go into the back door of the bank, wait for the lady who opened the bank, make her open the safe, then put her in the bathroom, take the money and leave. *Id.*, 2797. He planned to buy Mark and his brother Allen 30-30 rifles with scopes, and they were to conceal themselves at the hog confinement south of Britt when Honken met Hansen to get the money taken from the bank; once Honken got the money from Hansen, they were supposed to shoot Hansen. *Id.*, 2797-98. Honken was going to get rid of Hansen's body by sinking it in a chemical lagoon, where his

---

even more graphic. Not only did it seek to present evidence that Mark Johnson was also approached by Honken with the bank robbery plan, it sought to introduce testimony that Dustin Honken planned to kill Kenneth Hansen after the bank robbery; that Honken proposed disposing of Hansen's body by throwing it into a manure lagoon, where the chemicals would eat away the remains; and that he wanted to kill Hansen so that they would not have to split the proceeds of the bank robbery with him. Honken Tr. 3679.

76

bones would dissolve in two weeks.  *Id*., 2798.   Honken wanted Hansen dead so he would not have to share the proceeds of the bank robbery with him.  *Id*., 2798.

Timothy Cutkomp, a prosecution witness, could have also testified about Honken's plan to rob the Britt Bank, his plan to kill Kenny Hansen by luring him to a farm and shooting him,  his completed plan to steal a car and dispose of it in a gravel pit, his plan to kill people who were involved in his 1993 criminal case, including Agent Graham and Agent Mizell, his plan to blow up the building where the evidence in that case was stored, and his threats to kill Dan Cobeen. *Id*., 2834-41.

Kenneth Hansen could have testified about the plan to rob the Britt bank, which involved the use of a handgun, latex gloves, ski masks and forcing an elderly bank employee into a bathroom.  *Id*., 2757-60.

Theodore Hovda, the Hancock, Iowa, County Prosecutor, could have testified that when Honken was eighteen years old, he stole a Camaro and disposed of the car in a sand pit; that in 1986, there was an armed robbery of the Britt Bank carried out according to the plan devised by Honken and described by Mark and Allen Johnson, Kenny Hansen and Tim Cutkomp; that he believed Honken to be a devious person who had a hard time telling the truth; that he believe Honken was "hip deep in the bank robbery;" and that Honken used others to carry out his crimes *Id*., 1608- about Honken's theft of

Trial counsel could have, but did not, presented testimony from Allen Johnson that either during or just after high school, Honken talked of going to Minneapolis with prosecution witness Tim Cutkomp to beat and rob homosexuals.  *Id*., 2777, 2784.  In addition, Allen could have testified that while practicing karate with Honken, he got "a lucky shot" and hit Honken in the fact, and that Honken became angry and side kicked Allen's ribs so hard he initially thought they were broken.  *Id*., 2778, 2780, 2787-89.  And, in high school Honken got off the bus before Allen, who was saying something to Honken from a window, and Honken responded by cracking a bull whip at him, ripping the skin off his nose.  *Id*.. 2778, 2785-86.

77

Both Allen Johnson and Mark Johnson described Honken's ability to get others to do his bidding. Allen described him as "a good salesman." *Id.*, 2791. Mark described Honken as a planner and a coward, who would get others to carry out his violent schemes. *Id.*, 2803.

Trial counsel could have, but did not, elicit testimony from prosecution witness Daniel Cobeen that Honken threatened his wife and children; that Honken looked at gun magazines all the time and talked about killing people; that Honken talked about wanting to get rid of a few police officers, including Agent Mizell and Officer Graham; that Honken wanted to get ride of Steve Gomez, a drug dealer who was Honken's competition. H.Tr. 2821-22.

Information about Dustin Honken's penchant for planning violent criminal activity is not confined to the transcript of his trial; the discovery in this case is replete with such evidence. For example, Fred Tokars was an inmate with Honken at the United States Penitentiary in Florence, Colorado. Honken tried to befriend Tokars, a former prosecutor and judge, by telling him that if anyone found out about his former careers he would be dead and reassuring Tokars that because of membership in a powerful prison gang called the Odinists he could protect him. Doc. 26, Exh. 16, at p. 11. Tokars described how Honken, who was "very smart and charming," was able to "manipulate[ ]" this violent prison gang of 30-40 guys who "stab people and kill people and . . . sort of run the prisons." He reported that "after awhile [Honken] became very influential, and because of his skills at manipulating people and because of his brains, he was able to influence these people." *Id.* at p. 11-12. Tokars could also testify about Honken's plan to escape from prison and kill Daniel Cobeen and Dean Donaldson, potential informants against him. *Id.* at 19. Honken planned to intimidate Timothy Cutkomp, so he would not testify at a second trial, and had plans to kill "key witnesses" against him. *Id.*.

Steve Ferguson, who was also housed with Honken in Florence, described Honken's "rage" and "high anger" against anyone who informed on him. Doc. 26, Exh. 17 at p. 10. Honken offered Ferguson $10,000 to go to Iowa and kill Steven Vest, Ronald McIntosh or Fred

78

Vickers. *Id*., at 11. Honken's plan was that Vest would be injected with enough heroin to kill him or a mentally unstable inmate could be goaded into attacking Vest. *Id*., at 12. Honken's goal was to show the informants that even if he was locked up in Colorado, they "weren't safe." *Id.*, at 13. Ferguson describes Honken's attempts to "figure out ways to get out because he wanted to kill some more people that were involved in testifying against him or providing evidence against him, and he talked about that on numerous occasions and did some marshal [sic] arts training to further that." *Id*., at 14-15. Significantly, Ferguson testified that Honken "never showed any sign of remorse or regret" for the murders in Iowa and "blamed it all on the parents." Honken said that he would retaliate against others who provided information against him, by killing them and shooting their children in the face. *Id*., at 17.

William LeBaron, another inmate at USP Florence, told the grand jury that Honken had risen to the upper echelons of a white supremacist prison gang called the Odinists. Doc. 26, Exh. 18 at p. 25. He also described Honken's involvement in a complex escape plan involving multiple federal inmates and an escape from the Woodbury County Jail. *Id*., at 14. Honken planned involvement in bank and armored truck robberies to finance his escape, which was for the purpose of killing law enforcement officials and their families, Tim Cutkomp, and a police chief. *Id*., at 15-16. Regarding the killings in this case, Honken told LeBaron that the five individuals were not killed for revenge, but were killed so that Honken would not have to go to prison. *Id.*, at 31.

Trial counsel also had access the grand jury testimony regarding Honken's plans to kill Angela Johnson. Honken told Mike Llorente that "maybe [Angela] shouldn't be here anymore . . . maybe he should have dealt with her back whenever he had a chance before she could testify on him, like now" and said that he was trying to decide whether or not to have Ms. Johnson "taken out" before she was arrested. Doc. 26, Exh. 19 at p. 6. Another inmate, John Fitzgerald Swanson, told the grand jury that Honken "basically just plotted to do away with Angela Johnson as soon as he got enough money from his meth operation that he had going in his

79

garage."  Doc. 26, Exh. 20 at p. 27.

Trial counsel had access to discovery about Michael Kluver, who told of Honken's plans to kill all the prosecutors in his case as well as Judge Bennett (H.Tr. 2159) as well as discovery indicating that Terry Bregar could testify to planned violence by Honken (*id*., 2967-67).

Patrick Berrigan has admitted that he knew of the witnesses discussed above from reading the discovery and that he sat through Dustin Honken's trial in part and was familiar with the government's themes at that trial.   H.Tr. 2096, 2119-20, 2159-61.  Alfred Willett was also aware of Honken's bank robbery, although he did not recall the testimony of Timothy Cutkomp that Honken had not been violent before he met Ms. Johnson and did not recall whether he asked Cutkomp about bank robbery. *Id.*, 929.  Dean Stowers read the portion of the Honken trial transcript where the government proffered witnesses to a planned armed bank robbery that preceded his relationship with Petitioner. *Id.*, 1266-67.

Trial counsel's failure to call any of the above witnesses to refute the prosecution's argument that it was Angela Johnson, not Honken, who was the driving force behind the crimes was ineffective.  There was no tactical or strategic reason for this omission; as stated by Mr. Berrigan, "[t]o the extent it didn't happen is we just missed it."  H.Tr. 2094; *see also* H. Tr. 2097-98 ("We just missed it.  There was a lot going on in the penalty phase of the trial, and that's an issue that should have received substantially more time and attention pretrial than it did."); H.Tr. 2120 ("I guess you could argue that the testimony of some of these folks might have been helpful"); H.Tr. 2161 ("It was too late to do it.  That's something that had to be arranged before the penalty phase started. . . .  And we had not prepared to put on evidence about Dunsin's background.").

Two related errors by trial counsel compounded the prejudice suffered by Ms. Johnson as a result of her attorney's failure to rebut prosecution's portrayal of her as "worse" than Dustin Honken.  First, Mr. Berrigan has admitted that witnesses called by the defense supported the prosecution's false presentation of Honken.  H.Tr. 2161-62 *See, e.g.*, Pearl Jean Johnson's

80

testimony that Honken was polite, clean cut, very neat but aloof (Tr. 3080); Wendy Jacobson's testimony that Honken was a preppy nerd, highly intelligent, someone totally out of character for petitioner to date (Tr. 3184); Alyssa Johnson's testimony that Honken "seemed like a great individual" (Tr. 3203); Holly Dirksen's testimony that he was "a gentleman, totally unlike someone my sister would ever date . . . very smart and very intelligent" (Tr. 3255); and Lou Ann Hare's testimony that Honken seemed "almost like Opie Taylor, kind of a nerd, kind of geeky" (Tr. 3701).

The second error by trial counsel that exacerbated the prejudice from the failure to rebut the prosecution's evidence that Ms. Johnson was "worse" than Honken was presenting the testimony of Leon Spies, one of Honken's lawyers, that Honken, whom the prosecution argued was Petitioner's pawn, was sentenced to death for the murders of Amber and Kandi Duncan and to life for the Nicholson, Lori Duncan and DeGues killings. Tr. 3093. When asked why he presented this evidence. Mr. Berrigan said "I think our thought was, among other things, that if Honken didn't get the death penalty for killing somebody since he was the principal, how could you give it to Angela Johnson on those counts where he did not get the death penalty for the particular person?" H.Tr. 1489. *See also id*., 2096 (evidence of Honken's verdicts was to show that he received the death penalty only for the children, the disparity, relative culpability, between Honken and Petitioner, in the hope that they jury would not find it necessary to give her death because she was relatively less culpable). Dean Stowers viewed the Honken life verdicts as "favorable" and thought the jury would think Honken death verdicts were "appropriate[] punish[ment]" and that they would "appropriately punish [Petitioner] with something lesser, a life without parole sentence." *Id*., 1490. However, Mr. Stowers has admitted that the rationale for presenting Spies' testimony made sense only if the evidence in fact showed that Ms. Johnson was less culpable than Honken. *Id*., 1491 (if the evidence at trial showed that Ms. Johnson was more culpable than Honken and was dominating Honken, evidence of his death verdicts would not support a life sentence for her but would have the opposite effect). As demonstrated above,

81

there was evidence that Petitioner was less culpable than Honken, but the jury never heard it.

If trial counsel had effectively represented Ms. Johnson by presenting the evidence set forth above, the government would not have been able to argue that Honken never did a violent act until he met Petitioner, and that Petitioner, not Honken, was the driving force behind five murders. The failure to present this evidence was also prejudicial because the "undiscovered mitigating evidence, *taken as a whole*, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability" so that "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S.Ct. 2456 (citations and internal quotations omitted)(emphasis added).

## COURT CLAIM NO. TWENTY

**Court Claim 20 - Confrontation of Aggravating Evidence: Failure to Use the Prosecution's Arguments at Dustin Honken's Trial as Party Admissions to Rebut the Government's Evidence that Petitioner was "Worse" than Honken**

ABA Guideline 10.11 F. requires that counsel consider presenting evidence that would "rebut or explain evidence presented by the prosecutor." Trial counsel were ineffective in failing to offer the prosecution's arguments at Dustin Honken's trial to refute the powerful argument advanced at Petitioner's trial that she solicited and encouraged the crimes by Dustin Honken and was more culpable than Honken, who was a mere pawn under her evil sway. Such closing arguments were admissable, either as party admissions under Federal Rule of Evidence 801(d)(2)) or under the relaxed standard of admissability set forth by this Court in *United States v. Johnson*, 378 F. Supp. 2d 1051, 1058-59 (N. D. Iowa 2005) (statements by Honken to Steven Vest that implicate Ms. Johnson admissible at penalty phase under the relaxed standard of admissibility).[12] See also, *Sears v. Upton*, 130 S. Ct. at 3263 ("[T]he fact that...evidence may have been 'hearsay' does not necessarily undermine its value-or its admissibility-for penalty

---

[12] As indicated above, Ms. Johnson believes that 18 U.S.C. § 3593 (c) should have been applied in this case.

82

phase purposes.")

> The arguments that would have been admissible as party admissions are as follows:
>
> Dustin Honken was the chemist. He was the one with the knowledge that was necessary to building a meth lab and not just some county bumpkin meth lab but a meth lab such as DEA Agent Mizell described, a super lab that produces methamphetamine of a high quality, better than 90% meth.

(Exh. 124, p. 3220).

> I would submit to you that among [Dustin Honken, Tim Cutkomp and Jeff Honken], clearly Dustin Honken was the organizer of this criminal activity. It is he was the chemist. It is he who had the know-how. It is he who actually put together the method of manufacturing methamphetamine. It is he who invited Tim Cutkomp to Arizona. It is he who distributed drugs through Terry DeGeus and through Greg Nicholson.

(Exh. 124, p. 3292).

> Suggested to you [by the defense] that Dustin Honken is merely a chemistry nerd. He's a smart guy. He understands chemistry. He understands organic chemistry. Not a lot of people do. But that doesn't mean he isn't also a criminal schemer and manipulator.

(Exh. 124, p. 3392).

> However, no one in that partnership did more to organize that operation than Dustin Honken. He was the man with the know-how. He was the chemist. He was the one who recruited the other participants. He was the one who told Greg Nicholson about the plans for the future growth of the drug business.

(Exh. 124, p. 3404).

> What kind of man after doing that [killing Greg Nicholson and the Duncan family] and having his own son born three months later can lure Terry DeGeus out to a site knowing what he's done, knowing what the consequences are, and murder another human being and a month later – you saw the video – have a happy Christmas with his family?

(Exh. 124, p. 3903).

> This is somebody who can think long and hard and rationally about how he's going to slaughter people and think about what he did in this case. We know that he literally hunted down Greg Nicholson, that he developed a plan for gaining entry into the house, that they intentionally borrowed Christie Gaubatz's car because they didn't want to be found. That's thinking long in advance about how he's going to do this crime.
>
> We know that he purchased a handgun through his girlfriend Angela Johnson. Now, think about the purchase of that handgun. Angela Johnson was actually the person who bought the gun. But who do you think went in there? Who's the person who gets into guns, who has gun magazines in his locker at work? Who do you think walked

83

into that pawn shop with her and looked over the display and decided that's going to be my murder weapon there?  Do you think Angela Johnson picked it out?  Defendant picked it out.

(Exh. 124, p. 3905-06).

We also know that he thought this out long and hard.  You remember the Poor Man's James Bond Book, at 1991, that was seized from the defendant's house in 1996?  Remember this page from it?  Remember the language on this suggesting that if you really want to do a good job in making sure that you have a more effective gag you stuff a piece of cloth in their mouth and use duct tape across it?  You don't think this defendant was thinking this out far in advance on exactly how he was going to do this?

We know that he buried Greg Nicholson and the Duncan family in a remote site.  This is somebody who thinks these things out in advance.  Do you think after abducting these people that he started driving around looking for a possible spot, or do you think this defendant knew exactly where he was going to bury these people, had it cased out, had found a place that he knew was secluded, some woods that nobody would go to?

(Exh. 124, p. 3906-07).

The defendant plans, schemes, thinks out these things long in advance.

(Exh. 124, p. 3908).

Now, think back about the way this defendant thinks, they way he plans, the way he schemes. [Lori Duncan's] name was in that ring.  Do you think it was accidental, do you think it was accidental that her ring was found downstairs from a dam miles away from the burial site, or do you think this defendant's thinking this out, thinking, I've got to divert the police from any chance of finding this body, so I'm going to throw her ring so that the police can find with her name in it, and I'm going to throw it in this river?

And when did he take that ring off her finger?  We know there was spiral  fracture of the finger, her ring finger on her hand as testified to by Dr. Steadman.  Did he rip it off her hand while she was still alive?  Did he rip it off her hand when she was dead?

Incarceration, we know, doesn't deter this defendant.  He was incarcerated in the Woodbury County Jail and was still plotting to kill.  He's not deterred by law enforcement.  He plotted to kill law enforcement officials and their families, plotted to kill witnesses and their families.  And then when other inmates in the federal institution turned against him and cooperated with authorities, he plotted to kill them too even within the institution, tried to recruit Mr. Ferguson to help him kill some of those witnesses.

The defendant will plan an escape.  You know how this defendant thinks now, don't you?  You know what he's capable of.  You know how intelligent he is.  You know how he schemes and plans and thinks.

(Exh. 124, p. 3912).

Defendant thinks more of his dog . . . than he does of people, and he has no

84

conscience.

(Exh. 124, p. 3917).

There was no strategic or tactical reason for trial counsel's failure to present this evidence. Mr. Berrigan sat through Dustin Honken's trial in part and knew the government's themes at his trial. (H.Tr. 2096). Counsel submitted, and the Court, gave a mitigating factor of relatively culpability to the jury for its consideration. (Doc. 593, 01-CR-3046-MWB, filed 6/20/05).

Dean Stowers presented evidence through Mr. Honken's attorney, Leon Spies, that the jury had sentenced Mr. Honken to death for the killings of Kandi and Amber Duncan. (Tr. 3093). Mr. Stowers reasoned that, "if Honken didn't get the death penalty for killing somebody since he was the principal, how could you give it to Angela Johnson *on those counts* where he did not get the death penalty for the particular person." (H.Tr. 1489 (emphasis added). When questioned whether that strategy focused only on the adult victims, not the children, Mr. Stowers acknowledged that life verdicts on some of the counts would not matter because "I'd agree she could only be put to death once." (H.Tr. 1490). Stowers then explained that the other reason was that if the jury knew that "a pound of flesh" had been taken from Dustin Honken, who was the principal, the actual killer, and had the motivation to kill the victims, then the jury might conclude he had been appropriately punished and she should be appropriately punished with a life without parole sentence. (H.Tr. 1490). He acknowledged, however, that it could be "argued the opposite way as well." (H.Tr. 1490). He also acknowledged that his theory hinged on "the jury concluding based on the evidence . . . in mitigation and the entire package of evidence in the case that, in fact, Angela Johnson was less culpable than Honken." (H.Tr. 1491). "[Y]eah, you know, you'd want to have as much evidence to support the rationale as we could." (H.Tr. 1491). In light of Mr. Stowers' testimony, it would have been incumbent on trial counsel to scour all sources of information they possessed to find evidence of Mr. Honken's higher degree of culpability.

Yet, Mr. Stowers was also asked whether there was a reason why he did not identify

85

evidence and argument about Honken's dominant role vis-a-vis Ms. Johnson from the Honken

trial and seek to introduce that evidence and argument as admissions by a party at penalty phase.

He answered as follows:

> Okay. Some reason that wasn't done. Well, I don't remember even really thinking about it in that kind of detain and getting down to the particular points or argument that the government would have made and thinking about whether or not that point of argument in the Honken trial might be different than a point of argument in the – in Angela's trial. I didn't really look at it from that point of view. Don't ask me why because I just didn't – I didn't do it. I guess I didn't think that thought, as so I didn't do that.
>
> Secondly, the other part of your question was why didn't we offer those parts of the record. Well, the reason is the same. I didn't think about that approach as a method to sort of impeach the government's positions. We filed the motions on inconsistent theories and arguments basically, and I think it was denied unequivocally, and they were allowed to go forward and argue their case based on whatever the evidence was in our record. And I never went back and revisited that issue until after they amended the indictment. Then I think I re-raised it again. And then I think it just dropped from the radar screen if you will.

(H.Tr. 1493)

Pat Berrigan, when similarly asked whether he considered trying to present evidence of

the admissions of the government in the Honken trial as to Honken's dominant role in the

crimes, responded as follows:

> No. The only consideration I think that ever crossed my mind is that I remember Mr. Williams' closing argument – I'm trying to think if it was – it had to be in the penalty phase of the Honken trial where he portrayed I thought quite vividly quite a different portrait of Honken than he had presented in our case. But I hadn't given it more than a passing thought.

(H.Tr. 2163).

Counsel failed to consider using party admissions by the prosecutor in support of their

theme that Ms. Johnson was less culpable than Mr. Honken. They failed to do so despite having

made a decision to introduce Mr. Honken's death sentence into evidence, which required them to

develop Ms. Johnson's "lesser culpability all over the case, you know, in every respect possible,

not just their relationship but also the things she actually did . . . whatever you do as defense

counsel has to be emphasizing at every possible juncture her lesser culpability." (H.Tr. 784-785

(Burr testimony)). The failure was completely unreasonable.

86

Petitioner was prejudiced by trial counsel's error and omission in not introducing evidence of the prosecution's arguments at Honken's trial to refute their entirely inconsistent argument at petitioner's trial it was she – not Honken – that was the catalyst for these crimes.  There is a reasonable probability that the penalty phase would not have resulted in death verdicts but for the ineffective failure to trial counsel to present the evidence set forth above.

Petitioner was prejudiced by trial counsel's error and omission in not introducing evidence of the prosecution's arguments at Honken's trial to refute their entirely inconsistent argument at petitioner's trial it was she – not Honken – that was the catalyst for these crimes. The failure to present this evidence was  prejudicial because the "undiscovered mitigating evidence, *taken as a whole*, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability" so that "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S.Ct. 2456 (citations and internal quotations omitted)(emphasis added).

COURT CLAIM TWENTY-ONE

**Court Claim 21 – Confrontation of Aggravating Evidence: Failure to Discover and Present Information Regarding Dustin Honken's Plans to Kill Prosecutor Reinert and his Family and Honken's Membership in a White Supremacist Prison Organization**

As discussed at Court Claim 19, at the penalty phase of petitioner's trial, the prosecution elicited testimony that Dustin Honken was a studious young man who had no proclivity for violence until he met Angela Johnson.  From this evidence, the it was argued that Angela Johnson had manipulated and encouraged Honken to commit the charged crimes.  *See* Tr. 4011, 4026-27, 4049 and 4079-80.[13]

At Honken's trial, however, the prosecution argued that Mr. Honken would pose a danger to the community and to prison inmates if sentenced to life in prison without possibility of release:

---

[13] The facts and argument set forth as to Claim 19 are incorporated as if fully set forth herein.

87

Incarceration, we know, doesn't deter this defendant. He was incarcerated in the Woodbury County Jail and was still plotting to kill. He's not deterred by law enforcement. He plotted to kill law enforcement officials and their families, plotted to kill witnesses and their families. And then when other inmates in the federal institution turned against him and cooperated with authorities, he plotted to kill them too even within the institution, tried to recruit Mr. Ferguson to help him kill some of those witnesses.

Honken Tr. 3912.

The prosecution had good reason to believe Honken was dangerous even while he was confined to a jail or federal prison. while in custody. On March 8, 2001 Assistant United States Attorney Patrick Reinert wrote an internal memorandum to District Security Manager Steve Badger, entitled, "Renewed Threat on AUSA and Agents." Exh. 48, PLSP-000005-6. In that memorandum, Reinert summarized previous threats made by Honken against law enforcement, specifically, his plans in 1996 to kill a DEA chemist, Mr. Reinert, drug agents and other cooperating individuals, and noted that the Justice Department took steps at that time to ensure the safety of the AUSAs involved in the case. *Id.*, PLSP-000005. Reinert also detailed a report from a federal inmate at USP Florence who was housed with Dustin Honken, and described Honken's then-current plans as follows:

Once Honken became convinced that he would be charged for his involvement in the murders, he approached other inmates at USP Florence and developed a plan to have those inmates travel back with him as potential witnesses at his trial. Honken's plan was for those prisoners to escape from the county facility where Honken anticipated that they would be housed, by killing the guards. Honken developed an elaborate plan, which included robbing a bank to obtain money and fleeing to Canada where he would obtain false identification to allow him to re-enter the country at will. Honken told inmates that when he re-entered the country after his escape, or if he is ever released from prison, one of the first things he plans to do is murder this AUSA, along with others, including former AUSA Steve Colloton, a state narcotics agent, and a state homicide agent. . . . However, Honken has taken steps from prison to locate addresses for agents and others using the Internet. Honken indicated he intends, upon entering this AUSA's home, to kill the children immediately and then tie up this AUSA so the AUSA could be forced to watch while Honken tortures and murders this AUSA's wife. After torturing and killing this AUSA's wife, Honken plans to kill and decapitate this AUSA and take the head with him back to Canada. Honken states his reason for removing the head from the body was to ensure that the AUSA's family never had closure and would be forever emotionally distraught due to the murder. Honken told inmates that he plans on making a bowl out of the skull of this AUSA.

*Id.*, PLSP-000005-6.

88

AUSA Reinert's memorandum also informed the District Security Manager that "[w]hile incarcerated, Honken has become involved in the Odinists movement, a network of white supremacists with ties in and out of prison. Honken is one of the leaders in the Odinists group at USP Florence." *Id*., PLSP-000005. *See also*, *Id*., PLSP-000031.

Mr. Reinert and Justice Department took these threats seriously. Reinert wrote, "I believe he is a serious threat, not only if he escapes, but also while he is incarcerated." *Id.* Steps were taken after both the 1996 threat and the 2001 threat to install multiple sophisticated security measures at AUSA Reinert's home and on his car. *Id.*, PLSP-000018.

Through discovery, the defense was aware of Honken's threats against Mr. Reinert in 1996. Timothy Cutkomp reported Honken's expressed wish that Reinert had not returned from Korea. Exh. 95, A803. In conversations recorded by Cutkomp, Honken expressed his frustration with Mr. Reinert. *See, e.g.*, Exh. 95, G000127 and G000178. In 1997, informant Dean Donaldson told law enforcement agents that "Patrick Reinert is definitely the prosecuting attorney that Honken said he was going to kill. Exh. 95, A859. Also in 1997, informant Terry Bregar reported to law enforcement that Honken wished to get out of jail for a week in order to kill Reinert and his family, and that Honken knew where Reinert lived. Exh. 95, A1331.

The defense was also aware, through discovery, that Honken had threatened to kill Assistant United States Attorney Reinert and Assistant United States Attorney Colloton, as well as their families. Steven Vest told Agents Basler and Graham that Honken initially intended to kill the two prosecutors as they walked to court, but subsequently changed his plan to murder them in their homes along with their families. Exh. 95, A1426-27.

Honken's participation in the Odinists was also made known through discovery. *See, e.g.,* Exh. 95, R000936, detailing information from informant Ron McIntosh about a packet that Honken had made on witnesses, informants and others he targeted, and his use of white supremacist groups, including Odinist Church, Aryan Brotherhood, and Dirty White Boys, to disseminate the packet and carry out the mission. The government also provided in discovery a

89

roster from the Federal Bureau of Prisons of known Odinists. Exh. 95, A-003433-35. Honken's mother was asked about the Odinists in her Grand Jury testimony, and she testified that she believed it to be a religious group. Exh. 96, CC001932. Prison informant Wayne Byerly testified that the Odinists were a religious group that met regularly in prison, that Honken was a member, and that Honken invited Byerly to attend Odinists meetings. Exh. 96, CC000132. Other prison informants testified that the Odinists either were a religious group made up of white supremacists, or posed as a religious group but were actually a prison gang of white supremacists. *See, e.g.*, Patrick Gibson's Grand Jury testimony (Exh. 96, CC000387); William LeBaron's Grand Jury testimony (Exh. 96, CC000713); Ron McIntosh (Exh. 96, CC000779).

The information provided in discovery came almost exclusively from jailhouse informants, with the exception of the roster of Odinists. Despite having this discovery, defense counsel never requested discovery informally or formally about whether the government actually believed the jailhouse informants, and the basis for the government's belief. Moreover, the defense never asked for discovery regarding what steps the government took to protect its personnel against such threats. Such information would have been exculpatory as to Ms. Johnson, because it would have directly contradicted the prosecutor's assertion at her penalty phase that it was Ms. Johnson, not Mr. Honken, who was the instigator of violence. The information would have demonstrated that Mr. Honken had the skill and intelligence to plan violent acts, and the means, including contacts within and without the prison, to carry them out, without the encouragement or support from petitioner. As such, the information was subject to disclosure pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

Defense counsel had no reason not to seek this information, and their failure to do so rendered their assistance ineffective, as can be seen by the weak use made of the information at trial. The only use defense counsel made of this information was during the cross-examination of Steve Vest at petitioner's penalty phase. Defense counsel asked Vest only a few questions about the Odinists:

Q. Tell the jury what is the odinists.

A. It's a religious group.

Q. Religious group.

A. Uh-huh.

Q. What kind of religion to (sic) the odinists practice?

A. It's an old-style religion like a pagan religion.

Q. Isn't it a white supremacy group posing as a religious group?

A. Well, that's what they say.

Q. Well, there aren't any African Americans in there, are there?

A. No.

Q. And they have some really strong views about African Americans, don't they?

A. Yes.

Q. Would it be unfair to characterize the odinists as a white supremacy group? Would that be unfair of me?

A. No.

Q. But they claim they're a religious group?

A. Yes.

Q. And they practice some – what did you say? It was old-time religion?

A. Yeah, something like the pagans.

Q. Do they have odinist priests or spiritual leader?

A. Somebody does the ceremony, but he's just a regular –

Q. Just a regular old white supremacist?

A. He's a regular inmate, whatever, nobody off the street.

Tr. 2583-2584.

A little later in his cross-examination of Vest, defense counsel asked a few more questions about the Odinists and Honken's plans of escaping, taking a woman hostage, robbing a

91

bank, killing the hostage, and then going to Canada to train. Although trial counsel attempted to tie the Odinists to Honken's plan, he was unsuccessful.

> Q. And you were going to hide out. This group of people were going to hide out for a year and train.
>
> A. Yeah.
>
> Q. What does that mean.
>
> A. Artie and Dustin were going to train.
>
> Q. Train. This kind of the white supremacist odinists group in Canada?
>
> A. I wouldn't say that, but it's just a – I don't know. Just they were into that stuff.
>
> Q. Yeah. Did the odinists have a branch in Canada that you know?
>
> A. No. Not that I'm aware. I don't know.

Tr. 2616-2617. Then, trial counsel asked Vest about the threats against law enforcement:

> Q. So after the training, then the group is coming back to wreak more havoc on the criminal justice system; isn't that right?
>
> A. I wouldn't say the group. It was just Dustin as far as I know.
>
> Q. Okay, Dustin, what was he supposed to be doing after –
>
> A. He was going to come back and kill everybody that testified against him.
>
> Q. Didn't he – it was more than that. He was going to come back and torture people and torture their families; right?
>
> A. Yes.
>
> Q. He was going to cut people's heads off and keep them in bags.
>
> A. That's what he said.
>
> Q. Didn't he talk about taking the skulls and making bowls out of these people?
>
> A. Uh-huh.
>
> Q. And the people we're talking about were prosecutors?
>
> A. Prosecutors and FBI agents.

92

Q. FBI agents?

A. Yeah.

Q. He went on at some length about this too, didn't he?

A. Yes.

Q. And think this was very credible story, Mr. Vest? Pretty wild stuff, isn't it?

A. Yeah, but I do not know.

Q. Who knows?

A. Yeah.

Tr. 2617-2618.

Imagine the impact had the defense called Assistant United States Attorney Reinert to testify about the actions the government took in light of Honken's threats – a federal prosecutor testifying that he found Honken's threats so credible that he and the Department of Justice instituted sophisticated security measures to thwart any potential attack by Honken; a federal prosecutor testifying that, in his opinion and the opinion of the Security Division of the Department of Justice, the Odinists were not the benign religious group Vest portrayed but a white supremacist gang with contacts in and outside the prison that were capable of helping to carry out Honken's threats. *See* H. Tr. 2949 - 2534, Mr. Reinert's evidentiary hearing testimony on these issues. Such testimony would have completely undercut the prosecution's testimonial evidence of Honken's bookwormish nature and the prosecutor's argument that but for petitioner, Honken would not have been spurred to actual violence.

Defense counsel's failure to seek discovery of the government's response to Honken's threats and the government's actual characterization of the Odinists constituted ineffective representation. If trial counsel had effectively represented Ms. Johnson by discovering the memoranda identified above (Exh. 48, PLSP-000005-6, 000018, 000031) and by presenting the testimony of Patrick Reinert, there is a reasonable probability that at least one juror would have voted against death, particularly since petitioner's jury was told that Honken's jury did not return

93

death verdicts for the killings of the adult victims.  Tr. 3093. The failure to present this evidence was prejudicial because the "undiscovered mitigating evidence, *taken as a whole*, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability" so that "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S.Ct. 2456 (citations and internal quotations omitted)(emphasis added).

**COURT CLAIM NO. TWENTY-TWO**

**Court Claim 22 – Confrontation of Aggravating Evidence: Failure to Address Aggravating Evidence at the Merits and Mitigation [sic] Phases of the Trial]**

At both the merits and penalty phases of her trial, the prosecution elicited testimony that petitioner behaved in a bizarre and threatening manner before and after the time of the offenses.[14]  During the testimony of Agent Michael Mittan, the prosecution introduced audio tapes and transcripts of petitioner issuing grandiose, profanity-laden plans to recover a drug debt. (Tr. 2726).  Jeffrey Honken testified that he received a telephone call from petitioner in which she threatened that if Dustin Honken was not going to see his kids then Jeffrey Honken would not see his children either.  (Tr. 369).  Daniel Cobeen testified that petitioner made a shooting type gesture at him while passing by in a car.  (Tr. 708-10).  Kathy Rick testified that petitioner confronted her when she was driving with her children, "screaming and yelling," and that she took this behavior to be a threat.  (Tr. 2637-38).  Rick also testified that petitioner once came to her house early in the morning, and screamed and banged on her door, looking for Dustin Honken, and about another occasion when her car was vandalized and the letter "A" scratched in its surface.  (Tr. 2638-40).  Doug Book testified about "screaming, irate and out of control" voice messages left by Angela Johnson after he executed a search on Rick Summers' house and served a subpoena on Holly Dirksen.  (Tr. 3613-14).  Alyssa Nelson, Honken's sister, reported that Honken told her that petitioner was "angry" and "flies into rages."  (Tr. 2678).  She also testified

---

[14] Petitioner contends that this evidence was not admissible in the first instance. *See* Claim One, subsection R.

94

that Honken told her that once he woke up with petitioner pressing a gun to his head and that this scared him.  (Tr. 2679).  Nelson described bizarre behavior by petitioner at Honken's sentencing hearing in 1998 when she called a female law enforcement officer a "chick with a dick."  (Tr. 2682-83).

Trial counsel ineffectively failed to have their three mental health experts – Dr. Logan, Marilyn Hutchinson, Ph.D., and Mark Cunningham, Ph.D. – address the evidence described above.  There is an explanation for this behavior other than that urged by the government, that petitioner was a violent woman who inspired and encouraged violence by Dustin Honken.  Dr. Woods will explain at the evidentiary hearing that the behavior set forth above – profanity, extreme mood lability, grandiosity and hyperactivity – is a manifestation of petitioner's malfunctioning brain and not a matter of a personality deficit.  There is a reasonable probability that, but for trial counsel's failure to address this evidence in aggravation, the balance of aggravating and mitigating factors would have tipped in petitioner's favor and she would have been sentenced to life.

<b>COURT CLAIM NO. TWENTY-THREE</b>

**Court Claim #23 – Confrontation of Aggravating Evidence: Failure to Limit Future Dangerousness Evidence to Future Danger in Prison]**

One of counsel's many duties in relation to the penalty phase is set forth in Guideline 10.11(I) of the 2003 ABA Guidelines: "Counsel at all stages of the case should carefully consider whether all or part of the aggravating evidence may appropriately be challenged as improper, inaccurate, misleading or not legally admissible." (Exh.1, p. 242). The Commentary to this Guideline states: "Counsel should carefully research applicable state and federal law governing the admissibility of evidence in aggravation. Where possible, counsel should move to exclude aggravating evidence as inadmissible, and, if that fails, rebut the evidence or offer

95

mitigating evidence that will blunt its impact." (Exh. 1, p. 293.[15]

Contrary to this Guideline, trial counsel ineffectively failed to seek to limit the scope of evidence of future dangerousness in this case, to their client's severe prejudice. There was no tactical or strategic reason for not seeking to limit future dangerousness evidence to future dangerousness while serving a sentence of life in prison without possibility of release, and there is every reason to think that such an effort would have been successful in excluding extremely damaging evidence.

More specifically, the overwhelming weight of authority at the time of Ms. Johnson's trial was that where the only sentencing options are death or life in prison without possibility of release, evidence of future dangerousness must be limited to evidence of the danger posed by the defendant while serving a sentence of life in prison with no possibility of release. *See e.g., United States v. Sampson*, 335 F.Supp.2d 166, 219, 223 (D.Mass.2004)(limiting evidence of future dangerousness to danger in prison and suggesting that "it may be timely for the Supreme Court to reconsider whether jurors can ascertain future dangerousness in a particular case with sufficient certainty to satisfy the heightened need for reliability in the determination that death is the appropriate punishment in a specific case [under the Eighth Amendment].")*; United States v. Gilbert*, 120 F. Supp. 2d 147, 154-55 (D. Mass. 2000) (striking non-statutory aggravating factor of future dangerousness in its entirety because all evidence proffered by the government, including information about defendant's prior history of poisoning others and breaking and

---

[15] In support, the Commentary cites a number of cases that are relevant to the present claim, including *Smith v. Stewart*, 189 F.3d 1004, 1010 (9th Cir. 1999) (concluding counsel was ineffective in part for failing to challenge the state's use of prior rape convictions in aggravation as prior violent offenses where both of the convictions occurred when Arizona law did not include violence as an element of rape), cert. denied, 531 U.S. 952 (2000); *Parker v. Bowersox*, 188 F.3d 923, 929-31 (8th Cir. 1999) (concluding trial counsel was ineffective for failing to present evidence to rebut the only aggravating circumstances), cert. denied, 529 U.S. 1038 (2000); *Summit v. Blackburn*, 795 F.2d 1237, 1244-45 (5th Cir. 1986) (concluding trial counsel was ineffective for failing to argue the lack of corroborating evidence of the sole aggravating factor when under state law a defendant cannot be convicted based solely on uncorroborated confession and the only evidence supporting the aggravating factor was defendant's confession).

96

entering into the home of a former lover, "lack[ed] any substantial relevance to defendant's dangerousness in a prison setting"); *United States v. Cooper*, 91 F. Supp. 2d 90, 111-12 (D.D.C. 2000) ("The government will be permitted to introduce evidence of future dangerousness only as it pertains to any threat Cooper may present if he is sentenced to life imprisonment without the possibility of release."); *United States v. Peoples*, 74 F. Supp. 2d 930, 933 (W.D. Mo. 1999) (finding evidence of burglaries and possession of a weapon during an auto theft irrelevant to defendant's dangerousness in a federal prison); *United States v. Flores,* 63 F. 3d 1342, 1368-69 (5th Cir. 1999), *reh'g denied sub nom United States v. Garza*, 77 F. 3d 481, *cert. denied*, 519 U.S. 825 (1996) (rejecting claim of improper evidence of future dangerousness because the government focused its arguments on the danger the defendant would pose while in prison; in dicta, stating that the government's future dangerousness evidence should be restricted to defendant's danger while in prison in any case where there is little likelihood that a defendant would ever be released)

In the face of these cases, it is beyond belief that lead defense counsel waited until near the end of his penalty presentation on June 2, 2005 to say anything at all about the issue of future dangerousness, and then raised, after it was too late and the jury had already heard a vast amount of prejudicial evidence, an oral motion, supported by no caselaw, not that such evidence was inadmissible to begin with, but only that the government had failed to prove the factor and thus that it should be stricken. (Tr. 3026-3030). The Court denied the motion. (*Id.* 3030). But what is of particular relevance to the present claim is counsel's argument in support of the motion to strike for insufficient evidence. After reviewing the meager evidence presented of Ms. Johnson's in-custody behavior, Mr. Berrigan said

> Every other piece of evidence that the government has elicited is her mouth saying this or that without anything happening to anybody at any time. Even this drug evidence, this Jimmy Rodriguez, Duane White stuff, nobody gets hurt. She doesn't make any specific threats to anybody, go out and kill somebody or do this or that. *And most importantly, the only options that are available involve her being in jail.* So to the extent that even that might be relevant to some issue if she were on probation or outside of a penal institution, *in our view it's not relevant to whether she's a threat to people in*

97

> *jail because that really is the test at this point in terms of that nonstatutory aggravator, is she going to be a threat to the lives and safety of others if she lives essentially.* So the defense moves the Court to strike the nonstatutory aggravating circumstance of future dangerousness on the basis that there's just wholly insufficient evidence to support a finding of that nonstatutory aggravating circumstance even in a light most viewed favorably to the government.

(Tr. 3026-3027)(emphasis added)

The was no motion for an instruction to inform the jury that it should disregard all the evidence the defense claimed was irrelevant, but in any event such an instruction would have come to late to undue the damage of prejudicial and irrelevant evidence the jury had already heard. If trial counsel had performed effectively, the government would not have been permitted to introduce in support of its future dangerousness allegation a substantial amount of inadmissible, prejudicial evidence at petitioner's trial.[16]

---

[16] The tools for challenging this testimony were certainly well established by the time of Ms. Johnson's trials. In addition to the cases cited above, 18 U.S.C. § 3593(c) provided, in part, that "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." By contrast, identical to Rule 403, 21 U.S.C. § 848(j) provided, in pertinent part that "information may be excluded if its probative value is *substantially* outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. In this case, 18 U.S.C. § 3593(c) should have been applied to Ms. Johnson's trial even though she was charged under 21 U.S.C. § 848(e)(1)(A). See, *United States v. Pepin*, 514 F.3d 193, 196 (2nd Cir. 2008). As *Pepin* points out, "the test in section 3593(c) gives the court greater power to exclude prejudicial evidence than does the test in section 848(j) or Rule 403..." *Id.* at 203 n. 13. See *also,United States v. Fell*, 360 F.3d 135, 145 (2d Cir.), cert. denied, 543 U.S. 946, 125 S.Ct. 369, 160 L.Ed.2d 259 (2004)("[T]he balancing test set forth in [section 3593(c) ] is, in fact, *more stringent* than its counterpart in the [Federal Rules of Evidence], which allows the exclusion of relevant evidence 'if its probative value is *substantially* outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.' Fed.R.Evid. 403.... Thus, the presumption of admissibility of relevant evidence is actually *narrower* under the FDPA than under the FRE."); *United States v. Lee*, 374 F.3d 637, 648 (8th Cir.2004)("We agree [with *Fell*] that the FDPA standard provides a level of protection that ensures that defendants receive a fundamentally fair trial and that it is not unconstitutional."); *United States v. Sampson*, 335 F.Supp.2d 166, 177 (D.Mass.2004) (noting that FDPA standard is more restrictive than Rule 403)(limiting evidence of future dangerousness to evidence showing defendant would be dangerous in prison).

In the only motion the defense made in this case challenging the admissibility of any penalty phase evidence, the defense did not argue that this case was governed by § 3593(c) or the

98

This evidence is set forth below:

● Jeff Honken's testimony that during his brother's sentencing in 1998, petitioner called him and "yelled over the phone very loudly that if Dustin wasn't going to be able to see his kids she was going to make sure we weren't going to be able to see ours." Tr. 369.[17]

● Kathy Rick's testimony about Ms. Johnson following her in her car, banging on the car window, and yelling and screaming at her and her three children. (Tr. 2636-37). Rick's testimony that after this confrontation, she drove to Dustin Honken's mother's house, and that his mother told her that Dustin called and said that Angie may be on her way to the house, that

---

heightened standard of reliability mandated by the Eighth Amendment that is discussed in *Sampson*. See, Doc. 529 (Motion In Limine Re: Steven Vest). Consequently, in its ruling allowing the admissibility of Mr. Vest's testimony, this Court ruled that " § 848(j)... establishes the relaxed evidentiary standard for capital sentencing proceedings under the Continuing Criminal Enterprise statutes ..." and it did not mention the Eighth Amendment at all. *United States v. Johnson,* 378 F.Supp.2d 1051 (N.D.Iowa 2005). Nonetheless, citing *Fell* and the Due Process Clause, the Court did conclude that "admissibility of evidence over a Due Process Clause challenge turns on the 'reliability' of such evidence", and that "judges retain their gatekeeper function under § 848(j), as they do under § 3593(c), to exclude any type of unreliable or prejudicial evidence that might render a trial fundamentally unfair. " 378 F.Supp.2d at 1066-67, 1069. All of these arguments could have been used to exclude improper future dangerousness evidence in this case. Indeed, as early as January 7, 2003, this Court put the defense on notice that it was "leav[ing] the door open to reconsider the admissibility of any specific "information" under § 848(j) and constitutional standards at the time of the penalty phase hearing, should this case ever reach that point." *United States v. Johnson*, 239 F.Supp.2d 924, 946 (N.D.Iowa 2003). See also, *United States v. Johnson*, 362 F.Supp.2d 1043, 1106, 1108 n. 19 (N.D.Iowa 2005)(finding that there was "substantial merit to Johnson's contention that she would be 'unfairly prejudiced' if the jury hears evidence of 'non-statutory' aggravating factors before the jury decides whether the 'gateway' and 'statutory' aggravating factors have been proved beyond a reasonable doubt", but also noting that "nothing the court says here should be taken as suggesting that the court will otherwise limit the admissibility of 'victim impact' information or information of other 'non-statutory' aggravating factors in the proper context of penalty *selection-at least not without a further assessment of whether, in that context, the probative value of the information is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury*.")(emphasis added). The ball was clearly in the defense's court, but they never returned it until it was too late.

[17] This evidence was admitted as a result of trial counsel's failure to file a motion in limine to exclude the testimony. Tr. 258-59.

99

Angie may have a gun, and that they needed to leave. (Tr. 2636-37). Rick's testimony that Angela Johnson came to her house at five or six in the morning, banged on the door, screaming to get in; and that Dustin Honken advised her to call the police. (Tr. 2638-39). Rick's testimony that her car was vandalized in early or mid-1999, with four slashed tires, damage to the inside and outside of the car, and scratching on the hood that "could resemble an A." (Tr. 2639-40).

● Doug Book's testimony that Angela left a screaming, threatening message on his home answering machine after the execution of a search warrant at Rick Summers' house in 1998 (Tr. 3613) and his testimony about a screaming, irate and out of control message on his home answering machine that petitioner left after he served a subpoena on Holly Johnson (Tr. 3614-14).

● The testimony by Alyssa Nelson that petitioner was "making implications towards the prosecutor at [the] time [of Dustin Honken's sentencing], something [like] Angie's coming for you". (Tr. 2682). Ms. Nelson's testimony that at Dustin Honken's sentencing, petitioner told a female law enforcement officer "Well, you're just a chick with a dick anyway." (Tr. 2682-83). The testimony of Alyssa Nelson that petitioner started taking pictures of people sitting on the courthouse steps during her brother's sentencing. (Tr. 2680). Ms. Nelson's testimony about Honken's statements to her about petitioner's "horrible temper" and "rages," and petitioner's having woken him by pointing a gun to his head. (Tr. 2678-79).

● Jennifer Rinden's testimony that during Dustin Honken's sentencing hearing, petitioner uttered profanities and said something to the effect of 'you'll be sorry." (Tr. 2697-98).

● The testimony of Michael Mittan, and related tape recordings and transcripts, regarding petitioner wanting to "put a world of hurt" on someone (Tr. 2721); using duct tape to tie people up (Tr. 2728); instructing the undercover operatives to "do whatever it takes" to get money from Jimmy Rodriguez and, if he can't produce the money to bring him to her (Tr. 2736); petitioner's having smuggled or attempting to smuggle methamphetamine into the federal correctional facility in which Honken was housed in Colorado (Tr. 2739); and her desire to be a

100

"hit woman" for the Mafia (2740). Trial counsel's failure to properly limit the scope of future dangerousness evidence was devastating to petitioner. The prosecution, under the guise of future dangerousness, was allowed to demonize Ms. Johnson by evidence of numerous acts of "bad character," in violation of both 21 U.S.C. § 848(j), 18 U.S.C. § 3593(c), and the heightened standard of reliability' demanded in capital cases under the Eighth Amendment and then Due Process Clause. This evidence prejudiced Ms. Johnson, and had the effect of proving she had a bad temper and a propensity to threaten to commit or commit violence while angry. For example, the prosecutor argued as follows at the penalty phase: It allowed the prosecution to argue as follows:

> Let's talk about future dangerousness. At Honken's sentencing, you remember you heard testimony from Honken's sister and then also from this clerk about her threatening law enforcement officers in this very courtroom at Honken's sentencing. This is a woman who, after Honken is sentenced hires what she believes to be a couple of thugs to collect drug debts in whatever manner was necessary.
>
> Now, that was a unique opportunity for you to see what this woman was like. Remember that videotape? Remember her in that hotel room? This is a woman, number one, who was in control. She was in control. She was hiring these people to go out and use violence.
>
> Number two, she was violent. She had no problem, no qualms with talking about violence. Remember her talking about that young girl that was less than 18 years old that she had to put sin her place? Remember her talking about that, saying something to the effect that that's pleasure and pleasure isn't profit? And ths is a woman who was willing to haves these two guys go out and kidnap Jimmy Rodriguez and bring him to her.
>
> Now, ask yourself when you watch that woman on that videotape knowing what you do about her, knowing what you know about what she's done in the past and what she was capable of doing, do you have any doubt in your mind if they would have brought Jimmy Rodriguez to her what would have happened to him? Any doubt in your mind what she would have done with that duct tape she had?

(Tr. 4018-19). In its final closing argument, the prosecution continued this theme:

> Defense has talked to you about lack of future danger in this case, and, you know, the best predictor of future behavior is past behavior. So just look at this case and think about the past behavior this defendant has engaged in. [¶ ] She has a history of violence.

(Tr. 4082).

101

The prejudicial nature of this evidence and argument is obvious. The fact that not a single juror found the future dangerousness aggravating factor to be true underscores the unfairness of using this factor as a Trojan horse for a more general assault on Ms. Johnson's character. And the fact that no juror found the factor true does not render it any less prejudicial. As this Court said with respect to an analogous category of prejudicial penalty phase evidence, "[t]o pretend that such evidence is not potentially unfairly prejudicial on issues to which it has little or no probative value is simply not realistic, even if the court were to give a careful limiting instruction. Rather, such potent, emotional evidence is a quintessential example of information likely to cause a jury to make a determination on an unrelated issue on the improper basis of inflamed emotion and bias...". *United States v. Johnson*, 362 F. Supp. 2d 1043, 1107 (N.Dist. Iowa 2005) See also, *United States v. Traveras*, 424 F. Supp. 2d 446, 463 (E.D. N. Y.2006) (Weinstein, J.), *aff'd on this point in*, *United States v. Pepin*, 514 F.3d 193 (2nd Cir. 2008)(excluding evidence of child abuse and child endangerment conviction on issue of future dangerousness under 21 U.S.C. § 848(j) because of the "great likelihood that defendant, if convicted and spared death, will spend the rest of his life in prison" and therefore his dangerousness to minor children and women is of little relevance, while at the same time it is likely that the evidence would "so inflame the passions of the jurors as to inhibit their careful consideration of the future dangerousness factor." )("While future dangerousness has been held to be an appropriate factor for a jury to consider when recommending a sentence...particular care must be exercised to ensure that evidence admitted in its support is relevant to this factor and not unduly prejudicial."); *United States v. Taveras*, 436 F.Supp.2d 493, 502-503 (E.D.N.Y.2006)( "The more stringent standard of admissibility provided for by title 18's FDPA strengthens the basis for the ruling that this evidence is inadmissible." ).

For all of these reasons, the failure to challenge this evidence was deficient performance. The failure to challenge this evidence was also prejudicial because once this evidence is removed from the aggravating side of the balancing scale the conclusion is

102

compelling that the "undiscovered mitigating evidence, *taken as a whole*, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability" so that "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S.Ct. 2456 (citations and internal quotations omitted)(emphasis added).

## COURT CLAIM NO. TWENTY-FOUR

Court Claim 24 – **Confrontation of Aggravating Evidence: Failure to Object to Kathy Rick's Triple Hearsay Testimony About Petitioner's Alleged Possession of a Gun**

At penalty phase, Kathy Rick testified regarding an incident that began when she left Dustin Honken's residence in her car and was followed by Angela Johnson. Eventually, Rick pulled over and Ms. Johnson got out of her car, went to Rick's car and banged on the windows. When Rick rolled her window down, Ms. Johnson yelled and screamed at her. (H.Tr. 2636-37). Rick said that she left the scene of this confrontation and drove to Dustin Honken's mother's house. She testified, without objection, that when she arrived, his mother told her that Dustin had called and said that Angie may be on her way to his mother's house, that Angie may have a gun, and that they needed to leave. (*Id.*, at 2637).

Even under the relaxed evidentiary standard applicable to federal capital sentencing proceedings, hearsay upon hearsay is not admissible, especially when it has no indicia of reliability and where, as here it is more prejudicial then probative. See generally *United States v. Johnson*, 378 F.Supp.2d 1051 (N.D.Iowa 2005) and cases and discussion in Claim 23 briefing, supra . Trial counsel unreasonably failed to object to testimony by Rick that Dustin's mother said that Dustin had called her and indicated Angie may be on the way there and may have a gun and that they needed to leave as a result. As discussed in the context of Claim 23, which is incorporated as if fully set forth herein, this was incompetent, inadmissible and severely prejudicial "bad character" evidence. Effective counsel would have objected to this evidence.

103

The failure to do so was prejudicial because once this evidence is removed from the aggravating side of the balancing scale the conclusion is compelling that the "undiscovered mitigating evidence, *taken as a whole*, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability" so that "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S.Ct. 2456 (citations and internal quotations omitted)(emphasis added).

**COURT CLAIM NO. TWENTY-FIVE**

**Court Claim 25 – Confrontation of Aggravating Evidence: Failure to Object to Kyla Davis's Testimony that Petitioner Tried to Find Out Where She Lived and What Car She Drove**

At penalty phase, Kyla Davis, a dispatcher with the Benson County Sheriff's Office, testified that she reprimanded Angela Johnson for not correctly wearing her jail clothes. (H.Tr. 2776-77). Ms. Johnson's response was to tell her that "I'll find out who you are; you're dead." (*Id.,* at 2777). Ms. Davis was shocked and took this as a serious threat. (*Id.,* at 2778). The prosecutor asked Ms. Davis whether she was aware that "after that occurrence any steps were made by anybody to find out who you were or where you went?" (*Id.*). Ms. Davis' response was: "I later found out that they were. I didn't know at the time, but I found out later that she did try to find out who I was and what I drove and where I lived." (*Id.*).

Trial counsel was ineffective in failing to object to Kyla Davis' testimony about the alleged steps that were taken by Ms. Johnson to find out who she was, what she drove and where she lived. There was no foundation for this testimony; even under the relaxed evidentiary standard at penalty phase, hearsay upon hearsay upon hearsay is not admissible.[18] As discussed

---

[18] It appears that the source of this information was Robert McNeese, who told Detective Wright that petitioner was trying to learn the dispatcher's name and what kind of car she drove – but not where she lived. *United States v. Johnson,* 196 F. Supp. 2d 795, 816 (N.D. Iowa 2002). It is unclear whether Detective Wright gave this information to Ms. Davis or whether she learned about it in some other fashion. What is clear is that, in the context of the *Massiah* litigation, this

104

in the context of Claim 23, which is incorporated as if fully set forth herein, this was incompetent, inadmissible and severely prejudicial "bad character" evidence.    Effective counsel would have objected to this evidence. The failure to do so was prejudicial because once this evidence is removed from the aggravating side of the balancing scale the conclusion is compelling that the "undiscovered mitigating evidence, *taken as a whole*, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability" so that  "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S.Ct. 2456 (citations and internal quotations omitted)(emphasis added).

## COURT CLAIM NO. TWENTY-SIX

**Court Claim 26 – Prosecution Misconduct:   the Prosecution's Failure to Correct False Testimony at Angela Johnson's Trial Violated the Fifth and Eighth Amendments to the United States Constitution**

At Angela Johnson's trial, the government elicited testimony that Dustin Honken was a studious young man who had never committed a violent act until he met Angela Johnson to support its theory that Honken was manipulated and encouraged to commit these crimes by Angela Johnson.[19]   Jeffrey Honken testified that his brother Dustin was "not at all" short tempered; that he was not violent; that he had never seen his brother engage in violence "whatsoever" toward anyone; that he was not physical with people and never roughed anyone up or slapped anyone.  (Tr. 323).  Timothy Cutkomp testified that from the time he met Dustin Honken until the early 1990's, he was not aware of Honken using violence against other people; that Honken was not a physical person who would get into fights during or after high school; and that he was not aware of Honken hurting anyone up to the point when he became involved with Angela Johnson.  (Tr. 830-831).  Rick Held testified that in his experience, Dustin Honken was not an aggressive or violent person.  (Tr. 1038).  Kathy Rick testified that Honken told her that

---

Court made findings that McNeese's testimony was not credible.

[19] The prosecution's arguments in support of its theory that it was Angela Johnson, not Honken, who was the driving force behind the crimes are at Tr. 4011, 4026-27, 4049, 4079-80.

105

he was not strong enough to leave Johnson because he knew what she was capable of, and offered her opinion that Honken was afraid of Ms. Johnson. (Tr. 2641-42). On redirect examination, without objection, the prosecution elicited testimony from Ms. Rick that she never saw Dustin Honken use violence or force toward anyone from 1989 until 1993. (Tr. 2669). Alyssa Nelson, Dustin Honken's sister, testified that she never knew her brother to engage in violence or use force before 1993. (Tr. 2672). The government also elicited from Ms. Nelson testimony that Honken told her he had once woken to find Angela Johnson pressing a gun to his head and that it scared him. (Tr. 2679).

The testimony repeatedly elicited by the government regarding Dustin Honken's non-violent nature prior to his acquaintance with Angela Johnson was false, and the government knew this testimony was false. This is apparent from the government's proffered penalty phase evidence at Dustin Honken's trial. There, the government sought to rebut the testimony of Alyssa Nelson that Dustin was coerced into committing a bank robbery by his father with a proffer of testimony by Kenneth Hansen, which included: Honken's approaching Hansen with a very detailed plan about robbing a bank, which included shoving an old lady into a bathroom, securing the door and wearing surgical gloves and masks. (Honken Tr. 3678). On the same issue, the prosecutor proffered testimony by Alan Johnson that he had detailed discussions with Honken about the same bank robbery. (Honken Tr. 3678). The government proffered Alan Johnson's testimony that Honken asked him to kill Kenneth Hansen, who was to participate in the bank robbery, so that they could split the money between them. (*Id.*, 3678-79). The prosecution proffered even more graphic testimony on the killing of Hansen by Mark Johnson, Alan Johnson's brother. Not only did it seek to present evidence that Mark Johnson was approached by Honken with the plan for a bank robbery, the prosecution sought to introduce testimony by Mark Johnson that Dustin Honken asked him to help kill Kenneth Hansen after the bank robbery; that Honken proposed disposing of Hansen's body by throwing it into a manure lagoon, where chemicals would eat away the remains; and that he wanted to kill Hansen so they

106

would not have to split the proceeds of the bank robbery with him.  (Honken Tr. 3679).

The government's  elicitation of testimony that it knew to be false runs afoul of the long-established principle that the government has an affirmative duty to correct false testimony.  In *Napue v. Illinois*, 360 U.S. 264 (1959),  the prosecution's key witness, Hamer, testified that he had received no promise of consideration for his testimony.  Following Napue's conviction, the prosecutor filed a petition alleging that he had promised Hamer that a recommendation for a reduction of his sentence would be made if he testified against Napue.  The Supreme Court held that the State's failure to correct false evidence required reversal.  *Id*., 269.  The Court wrote that "[t]he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction [is] implicit in any concept of ordered liberty".  *Id.*   The Court then quoted *People v. Savvides*, 1 N.Y. 2d 554, 557, 154 N.Y.S. 2d 885, 887, 136 N.E. 2d 853, 854-55:

> "A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth.  * * *  That the district attorney's silence was not the result of guilt or a desire to prejudice matters little, for its impact was the same, preventing, as did, a trial that could in any real sense be termed fair."

79 S. Ct. at 269-70.    *See also United States v. Bigeleisen*, 625 F. 2d 203, 208 (8th Cir. 1980) (reversing where a witness falsely testified that he had no agreement with government concerning his cooperation, even though the government, in opening statement, told the jury that witness' cooperation would be made known to sentencing judge); *United States v. Sanfilippo*, 564 F. 2d 176, 178 (5th Cir. 1977) (witness testified to only part of his cooperation agreement; reversal required because "[t]he government knew that testimony was false, but did nothing to correct it").[20]

---

[20] The prejudice to Petitioner from the government's failure to correct testimony it knew to be false is compounded by counsel's unreasonable failure to correct the fundamentally inaccurate picture of Dustin Honken by the presentation of readily available evidence of his violent and aggressive nature that predated his acquaintance with petitioner. *See* Court Claim 19 and 20, which are incorporated as if fully set forth herein.

107

## COURT CLAIM NO. TWENTY-SEVEN 27

**Court Claim 27 – Prosecution Misconduct: the Prosecution's Violation of *Brady v. Maryland* by Failing to Disclose Dustin Honken's Planned Violent Attack on the Trial Prosecutor and His Association with a White Supremacist Prison Organization**

As set forth in Court Claim 21, Assistant United States Attorney Patrick Reinert wrote three memoranda to various law enforcement agents regarding the threats Dustin Honken made against Mr. Reinert and his family. (Exh. 48, PLSP-000005-6, 000018, 000031). The first two were to the District Security Manager; the third memorandum was to FBI Agent Scott Jennings. In the first memorandum, Reinert summarized previous threats made by Honken against law enforcement, specifically his plans in 1996 to kill a DEA chemist, Reinert, drug agents and other cooperating individuals, and noted that at the time of these threats, the Justice Department took steps at that time to ensure the safety of the prosecutors involved in the case. (Exh. 48, PLSP-000005.) Reinert also detailed a report from a federal inmate at USP Florence who was housed with Dustin Honken in which the inmate said that Honken knew where Mr. Reinert and his family lived, and outlined Honken's gruesome plan to kill the prosecutor's children, torture and murder his wife, then kill and decapitate Reinert and make a bowl out of his skull. (Exh. 48, PLSP-000005-6).

The second memorandum reported an upcoming meeting with the United States Marshals Service to discuss security of Mr. Reinert's home and family. The memo described the security that had been installed after Honken's first threats against Mr. Reinert and his family, and reported what steps he had taken to increase the security in light of the more recent threats. (Exh. 48, PLSP-000018).

The third memorandum to FBI Agent Scott Jennings outlines what has been done to investigate Honken's threats, and suggests that a broader investigation into a conspiracy to

108

murder witnesses and other individuals be undertaken in light of Honken's anticipated indictment and return to the Northern District of Iowa. (Exh. 48, PLSP-000031).

The government failed to disclose these three memoranda to Petitioner's counsel. At the penalty phase of the trial, the government's strongly stated position was that Angela Johnson had manipulated and encouraged Honken to commit the charged crimes. *See, e.g,* Tr. 4019 ("This was a woman, number one, who was in control. She was in control."); Tr. 4026 (This is a person who is manipulating and pushing Dustin Honken."); Tr. 4027 (Tim Cutkomp testified he was "most afraid of Angela Johnson, not Dustin Honken . . . the guy who killed. . . . And why? Because she's pushing Honken to kill again); *Id.* (" . . . don't accept their premise that the person who pulls the trigger is more morally culpable than the person who's egging on and pushing and cajoling and putting the person in the position of pulling that trigger"); Tr. 4079 ("[Angela Johnson] has kept pushing Dustin Honken after he was caught in 1996 to kill again . . . .") Tr. 4080 (. . . ask in your own mind what picture do you see? Angela Johnson, the unwitting innocent person who gets duped into killing or the Angela Johnson who's violent, who's pushing, who's cajoling Dustin Honken to commit these crimes?").

The memoranda about Dustin Honken's plans to kill Mr. Reinert – and the fact that Reinert credited those plans[21] – contravened and undermined the prosecution's penalty phase arguments that Ms. Johnson manipulated and pushed Honken into committing violent crimes. This material was material and it was exculpatory, in that it contradicted the prosecution's theory at penalty phase that Ms. Johnson was more culpable than Honken and spoke volumes about the government's view of Honken's propensity for violence. The government was therefore obligated to disclose the memoranda to trial counsel. *Brady v. Maryland*, 373 U.S. 83 (1963).

Without the memoranda, defense counsel were hamstrung in their ability to contradict the prosecution's theory that Ms. Johnson was more culpable than Honken. Defense counsel

---

[21] Mr. Reinert and others in the Department of Justice took Honken's threats extremely seriously. They took steps to protect Mr. Reinert and his family. They investigated the reports of Honken's plans, and they sought the assistance of the FBI to expand that investigation.

109

were left with the tepid cross-examination of jailhouse informant Steve Vest described in Court's Claim 40,[22] rather than a vigorous examination of Mr. Reinert, a federal prosecutor who would have told the jury just how serious he took Honken's threats, what steps he took to protect his family and his home, and what further investigation he asked the FBI to conduct because he believed reports of Honken's threats to be so credible. See, *United States v. Cooper*, __ F.3d __ 2011 WL 3559929 (10th Cir. 2011 * 12 ("[S]uppressed evidence that significantly enhanc[es] the quality of the impeachment evidence usually will satisfy the materiality standard. For example, [e]vidence that provides a new basis for impeachment is not [considered] cumulative and could well be material. Merely because other impeachment evidence was presented does not [necessarily] mean that additional impeachment evidence is cumulative....")(internal quotations and citations omitted); *Clemmons v. Delo*, 124 F.3d 944 (8th Cir. 1997)(failure to disclose an internal government memorandum that contained exculpatory material was reversible error even though defendant had other means to present his case) .

The prosecution's failure to disclose these memoranda violated petitioner's Fifth Amendment right to due process of law and her Eighth Amendment right to a fair and reliable determination of penalty. The good faith or bad faith of the prosecution is irrelevant. Evidence is "material" if there is a reasonable probability that, had the evidence been disclosed, the outcome of the trial would have been different. *Fero v. Kerby*, 39 F.3d 1462, 1472 (10th Cir. 1994) (*citing United States v. Bagley*, 473 U.S. 667, 682 (1985)). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence [s]he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Here, the prosecution's theory was that petitioner was the driving force behind the homicides, and painted a picture of Honken as a bookworm with no proclivity for violence until he met petitioner. Disclosure of the memoranda would have led defense counsel to presenting

---

[22] *See* Tr. 2583-2584, 2616-2618.

110

the true Dustin Honken – a man with a violent and scheming nature.  Disclosure "to competent counsel would have made a different result reasonably probable."  *Kyles*, 514 U.S. at 441.

COURT CLAIM NO. TWENTY-EIGHT

**Court Claim 28 – Prosecution misconduct: The prosecution's violation of Petitioner's Rights Under the Sixth And Eighth Amendments and the Due Process Clause by Presenting Inconsistent Arguments at Her Trial and that of Her Co-Defendant.**

At the penalty phase of petitioner's trial, the prosecution elicited testimony that Dustin Honken was a bookish, peaceable young man who had never been violent (much less short tempered) until he met Angela Johnson.  From this evidence, the government argued that Angela Johnson was "egging on and pushing and cajoling and putting [Dustin Honken] in the position of pulling that trigger."  (Tr. 4027l; *see also* Tr. 4011, 4019, 4026-27 and 4079-80).[23]  Specifically, Jeffrey Honken testified that Dustin was "not at all short tempered; that he was not violent, that he had never seen his brother engage in violence "whatsoever" toward anyone; that he was not physical with people and never roughed anyone up or slapped anyone.  (Tr. 323).  Timothy Cutkomp testified that from the time he met Dustin Honken in the early 1990's he did not know Honken to use violence against other people; that Honken was not a physical person who would get into fights during or after high school; and that Honken never hurt anyone until he became involved with Angela Johnson.  (Tr. 830-31).  Rick Held testified that, in his experience, Dustin Honken was not an aggressive or violent person.  (Tr. 1038).  Kathy Rick testified that Honken told her that he was not strong enough to leave petitioner because he knew what she was capable of, and offered her opinion that Honken was afraid of Ms. Johnson.  (Tr. 2641-42).  Rick also told the jury that she never saw Honken use violence or force toward anyone from 1989 until 1993.  (Tr. 2669).  Alyssa Nelson, Honken's sister, testified that she never knew her brother to

---

[23]     The government initially charged Angela Johnson as a principal but subsequently elected to proceed on the theory that she was an aider and abettor.  (Doc. 449.)

111

engage in violence or use force before 1993. (Tr. 2672). The prosecution also elicited testimony

from Alyssa Nelson about Honken's report to her that he had woken up with Angela Johnson

pressing a gun to his head and that it scared him. (Tr. 2679).

At Honken's trial, the government painted a strikingly different picture of Dustin

Honken. There, Honken was portrayed as the master manipulator, the organizer, and Angela

Johnson as the compliant dupe. For example, the prosecution argued at Honken's trial:

> What kind of man after doing that [killing Greg Nicholson and the Duncan
> family] and having his own son born three months later can lure Terry
> DeGeus out to a site knowing what he's done, knowing what the
> consequences are, and murder another human being and a month later – you
> saw the video – have a happy Christmas with his family?

(Honken Tr. 3903). Honken's planning and premeditation of the Nicholson/Duncan homicides

was also emphasized:

> This is somebody who can think long and hard and rationally about how he's
> going to slaughter people and think about what he did in this case. We know that
> he literally hunted down Greg Nicholson, that he developed a plan for gaining
> entry into the house, that they intentionally borrowed Christie Gaubatz's car
> because they didn't want to be found. That's thinking long in advance about how
> he's going to do this crime.

(*Id*., at 3509). Honken's manipulation of Ms. Johnson was a government theme at his trial:

> We know that he purchased a handgun through his girlfriend Angela Johnson.
> Now, think about the purchase of that handgun. Angela Johnson was actually the
> person who bought the gun. But who do you think went in there? Who's the
> person who gets into guns, who has gun magazines in his locker at work? Who
> do you think walked into that pawn shop with her and looked over the display
> and decided that's going to be my murder weapon there? Do you think Angela
> Johnson picked it out? Defendant picked it out.

(Honken Tr. 3906). And Honken's intelligence, as well as his penchant for evil-doing, was noted

by the government:

> The defendant will plan an escape. You know how this defendant thinks now,
> don't you? You know what he's capable of. You know how intelligent he is.
> You know how he schemes and plans and thinks.

(Honken Tr. 3912). Finally, the prosecution stressed Honken's utter disregard for his victims

and lack of conscience:

112

> Defendant thinks more of his dog . . . than he does of people, and he has no conscience.

(Honken Tr. 3917).

The government's theory of culpability at Honken's trial was completely at odds with its presentation at Ms. Johnson's trial. In fact, as explained in Claims 19, 20 and 37, the government's evidence and argument at Honken's trial should have been presented by Petitioner's attorneys to rebut the prosecution's theory that she was "worse" than Honken and as evidence of, *inter alia*, her substantial domination and significantly lesser culpability than Honken.

The prosecution's use of inconsistent, factually contradictory theories at the separate trials of Honken and Ms. Johnson violated Petitioner's Fifth Amendment right to due process of law, her Sixth Amendment right to a fair trial, and her Eighth Amendment right to reliable, non-arbitrary fact finding. In *Smith v. Groose*, 205 F. 3d 1045 (8th Cir. 2000), the Eighth Circuit held that the Due Process Clause forbids the use of inconsistent, irreconcilable theories to secure convictions against two or more defendants arising out of the same event. The starting point for the Court's analysis was "the government's fundamental interest in criminal prosecution: 'not that it shall win a case, but that justice shall be done.'" (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). *See also United States v. Agurs*, 427 U.S. 97, 111 (1976) (although a prosecutor must prosecute with earnestness and vigor and "may strike hard blows, he is not at liberty to strike foul ones").

In *Smith v. Groose*, the same prosecutor tried both Smith's case and that of his co-defendants, Lytle and Cunningham. At Smith's trial, the state claimed as the "truth" a version of the facts it argued was "false" in Cunningham's case. 205 F. 3d at 1050. The Eighth Circuit concluded that:

> The State's use of factually contradictory theories in this case constituted 'foul blows,' error that fatally infected Smith's conviction. Even if our adversary system is 'in many ways, a gamble,' *Payne v. United States*, 78 F. 3d 343, 345 (8th Cir. 1966), that system is poorly served when a prosecutor,

113

> the state's own instrument of justice, stacks the decks in his favor. The State's duty to its citizens does not allow it to pursue as many convictions as possible without regard to fairness and the search for truth.

205 F. 3d at 1051. *See also Thompson v. Calderon*, 120 F. 3d 1045, 1058-59 (9th Cir. 1997) (en banc), *vacated on other grounds*, 523 U.S. 538 (1998) (due process violation where prosecutor argued at Thompson's trial that he alone committed the murder while arguing at the subsequent trial that another defendant actually committed the murder).

In the present case, the prosecutor "stack[ed] the decks in his favor" and, in violation of due process, pursued a death sentence for Ms. Johnson "without regard to fairness and the search for truth." *Smith v. Groose*, 205 F. 3d at 1051.

The Court has invited briefing on Petitioner's having raised the present claim in her second § 2255 motion (Doc. 263, at 138-40) when she disclaimed raising such a claim in her first § 2255 motion (Doc. 26, at 90 n. 3). (Doc. 291). While present counsel are not able to read the mind of predecessor counsel, we suspect that the disclaimer of an inconsistent theory argument was based on counsels' having raised the inconsistent theory issue before trial – albeit somewhat obscurely, in a motion in limine regarding evidence that Ms. Johnson was a principal (Doc. 454, at 2) – but failing to raise the issue on appeal the Eighth Circuit. *See United States v. Johnson*, 495 F. 3d 951 (8th Cir. 2007). Present counsel urge that (1) trial counsel was ineffective in failing to clearly raise this issue in the trial court; (2) trial counsel was ineffective in failing to re-raise the issue during the trial, when the full extent of the inconsistent positions taken by the prosecution became apparent; (3) appellate counsel was ineffective in failing to raise the issue on appeal; (4) predecessor 2255 counsel were ineffective in failing to raise the inconsistent theories of the government as a substantive claim; and (5) that he present claim relies on facts that were set forth in the original motion and involves conduct by the government of the same time (trial) and type (inconsistent theories as to Petitioner and Honken), does not significantly alter the nature of this proceeding by injecting a new and unanticipated claim but rather expands upon facts previously alleged. *See* 6A Wright & Miller § 1497, at 84. Therefore, it relates back to the

114

original motion.

**COURT CLAIM NO. TWENTY-NINE 29**

**Court Claim 29 – Ineffective Mitigation: The Testimony of Holly Dirksen**

At the penalty phase, trial counsel called Ms. Johnson's sister, Holly Dirksen. The prosecution's cross-examination elicited evidence in aggravation that the government would not otherwise have been able to present. The government was able to do his because of trial counsel's woefully inadequate preparation and apparent ignorance of the discovery provided by the prosecution. Trial counsel knew, or should have known, that Ms. Dirksen would provide information harmful to their client. Had defense counsel performed competently, and adequately prepared before calling this witness, they would have known of the harm that this witness could do to their client's defense. Trial counsel acted unreasonably in failing to prepare for Ms. Dirksen's testimony, failing to identify the damaging information that she would provide, and in calling this witness.

Holly Dirksen is Ms. Johnson's younger sister. She, along with siblings James Johnson, Jr. (Tr. 3434-3458) and Wendy Jacobson (Tr. 3143-3186) testified at penalty phase. Ms. Dirksen, who is six years younger than James Jr. (Tr. 3246), was unable to recall most of the events about which she was questioned. For example, Ms. Dirksen testified that she could not recall being hit by her mother (Tr. 3253); that she did not know anything about her maternal grandparents, who died before she was born (Tr. 3249); that she did not recall any of her toys being burnt (Tr. 3250); and did not recall a night where her mother forced the children from their beds to drive around because the world was ending (Tr. 3251). Ms. Dirksen was unable to confirm most of the testimony of her older siblings about the horrific abuse Petitioner suffered at the hands of her mother. (Tr. 3250). The events that Mr. Dirksen did remember – her mother's

115

exorcisms (Tr. 3247) – had already been described by Pearl Johnson and Wendy Jacobson (Tr. 3040-46, 3143-73).

In contrast to the dreadful upbringing described by James Johnson, Jr., and Wendy Jacobson, Holly Dirksen described a relatively benign childhood. She testified that her mother prayed for her at church (Tr. 3251); disciplined her by putting her in a corner or "grounding" her (Tr. 3253); and attended her school conferences (Tr. 3254). In sum, Ms. Dirksen's direct testimony added little to the mitigation case presented by the defense.[24]

[24] Holly Dirksen did have helpful information that could have been presented to the jury by the mental health experts, but trial counsel had not adequately investigated and did not know this information, making the decision to call this witness all the more unreasonable. For example, Ms. Dirksen could have described Ms. Johnson's deteriorating mental state in 1993, which she called "the worst year of Angela's life":

> Angela was shattered and stepped out of herself in 1993; she was literally insane that year. Angela always had little ability to control her emotions which were up and down, happy for five seconds and then totally different. . . . [¶] It got worse in 1993. Living with Angie was like living in a rant all the time. She could not control her emotions. . . . [¶] Angie grew crazier by every minute she spent with Dustin Honken. She and I were very close and spent a lot of time together. Her mood swings got worse. She was always paranoid and had to sleep with lights on, but she also believed that others were out to get her. Her pregnancy made everything worse. Angela lived in absolute terror that Terry DeGeus was going to kill her when he found out she was pregnant, but she was convinced she could not do anything about it. She was just as worried, if not more, about Dustin. She was pregnant with Dustin's child and worried that he was not going to end his relationship with his other pregnant girlfriend, who called and taunted her frequently. Angela was never any good with finances, but her debt grew way beyond her ability to pay it because Dustin convinced her to give her money to him. She was pregnant and her hormones seemed to push her over the edge. She had to stop doing drugs because she was pregnant, and she became terribly depressed and barely able to move off the couch at times. The slightest thing irritated and overwhelmed her. . . . [¶] Angela was never realistic and always gullible; she had no judgment about people at all. . . . Angela was never able to live independently and on her own; she always depended upon friends, her family, or men to help her. She always needed someone to make things work for her and she did not want to be alone. Even though she needed other people to be around her, she was the one who always worked. Angela worked twice as hard as everyone else and never expected to do otherwise. . . ." (Doc. 26, Exh. 29, 1 - 4).

116

On cross-examination, the prosecution was able to elicit extremely damaging testimony from Ms. Dirksen. Specifically, Ms. Dirksen was a drug addict and petitioner supplied her with methamphetamine. (Tr. 3255-56, 3272-73). The prosecution elicited a description of the relationship between petitioner and Dustin Honken as "normal." (Tr. 3271). Ms. Dirksen lived in Fertile, Iowa for a period of time in 1993, the town where property belonging to Lori Duncan was found in 1995. (Tr. 3272). Ms. Dirksen testified that petitioner told her that Terry DeGeus was missing before the bodies were ever found. (Tr. 3272-73). Dirksen admitted that she was friends with Leslie Nedved, and was questioned about whether she told Nedved that DeGeus was buried, in a pit, right under the nose of the police (Tr. 3273-74), and that "they" "took care of" DeGeus (Tr. 3274). Dirksen was asked about her behavior after Nedved was contacted by law enforcement officers and subpoenaed before a grand jury, and testified that she told Nedved that she (Nedved) did not know petitioner, was not involved in the investigation into the disappearance of DeGeus, and there was no reason for her to make herself involved. (Tr. 3274). Dirksen also testified that she advised Nedved she had a right not to talk to law enforcement. (Tr. 3275). Dirksen was asked if she told an acquaintance, Amy Wonsmos, that Aaron Ryerson, a guilt phase witness for the prosecution, would end up like Terry DeGeus if he didn't watch his mouth. (Tr. 3276). Dirksen also admitted that when she learned that her sister Wendy testified before the grand jury about petitioner's statement that she "lured" Terry DeGeus to his death she became very upset with her, because she did not understand why she said that and did not believe what she said to be true. (Tr. 3277). Finally, Dirksen was asked – and denied – that she threatened to kill her sister Wendy. (*Id*).

Had trial counsel been familiar with the discovery, they would have known about the facts elicited by the prosecution on cross-examination. *See* Exh. 95, Bates No. R000869-871; R000677-680; 706-709; A1115-1122; C000846-857; C000840-843. They would have realized that Ms. Dirksen's testimony would be cumulative and, upon cross-examination, would have turned into evidence in aggravation, and that this witness should not be called. The calling of this

117

witness, without discovering and presenting her helpful testimony, was deficient performance. The ineffectiveness was prejudicial because once the harmful evidence is removed from the aggravating side of the balancing scale and the helpful evidence is put on the mitigating side of the scale, the conclusion is compelling that the "undiscovered mitigating evidence, *taken as a whole*, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability" so that "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S.Ct. 2456 (citations and internal quotations omitted)(emphasis added).

**COURT CLAIM NO. THIRTY**

**Court Claim 30 – Ineffective Mitigation:  The Testimony of Douglas Book**

At penalty phase, trial counsel called Chief of Police Douglas Book.    The prosecution was able to elicit evidence in aggravation from Chief Book, as a direct result of trial counsel's inadequate preparation.  Trial counsel knew, or should have known, that Chief Book would provide information harmful to their client.  Had defense counsel performed competently, and adequately prepared before calling this witness, they would have known that the mitigating evidence that he could provide was far outweighed by the harm he would do to their client at this critical stage of the proceeding.  Trial counsel acted unreasonably in failing to prepare for this witness, failing to identify the damaging information that he would provide, and by calling the witness.

Douglas Book was the Chief of Police at Forest City, Iowa, since 1974.  Trial counsel called Chief Book to testify that he found Angela Johnson laying on the side of the road, injured and bloody, as a result of a beating administered by Terry DeGeus.  He also testified that petitioner did not want law enforcement involved, did not want to go into an ambulance, did not want to talk about the incident, and did not want to file  charges.  (Tr. 3600-01).   Chief Book testified that later that night he encountered Terry DeGeus, who had abrasions on his knuckle but was defiant and would not admit anything about the altercation with Petitioner.  (Tr. 3602).

118

Chief Book testified about another incident, involving his arrest of Terry DeGeus for a traffic violation, in which DeGeus hit him and broke his wrist (Tr. 3607) and that DeGeus wore a t-shirt that said "Fuck Doug Book" (Tr. 3608). Finally, he testified that in 1985 petitioner was a nice looking young lady with a good figure. (Tr. 3603).

On cross-examination, the prosecution questioned Chief Book about an investigation he conducted into drug activity by petitioner and Rick Summers. (Tr. 3609). After a search warrant was executed at Rick Summers' home in 1998, petitioner left a message on Book's home answering machine telling him to "back-off" or he "could get hurt," that he was in over his head, and that this was bigger than he could handle. (Tr. 3613). Chief Book also described a threatening message that petitioner left on his home answering machine after he served a subpoena on Holly Dirksen, which told him to leave her family alone, he did not know what he was getting into, and he could get hurt. (Tr. 3614). He described Ms. Johnson's message as "screaming, irate, [and] out of control." (*Id.*)[25]

By calling Chief Book, the defense made it possible for the prosecution to elicit evidence of petitioner's continued involvement in distributing drugs and her threatening behavior towards law enforcement. There was ample evidence in the discovery that Chief Book would likely be a hostile witness. *See, e.g.,* Exh. 95, A000041-44 (Book was investigating this case as early as March 23, 1993); Exh. 95, A000474 and A1115 (Book investigated Petitioner's involvement in Terry DeGeus' disappearance); Exh. 95, A000675 (Book involved in controlled meetings with Agent Mittan); Exh. 95, H000168 and H000174-75 (Book assisting North Central Iowa Narcotics Task Force in surveillance of Ms. Johnson).

Mr. Berrigan testified that he interviewed Book before he took the stand and that

---

[25] Defense counsel objected to the introduction of the threatening phone messages left by Ms. Johnson on Chief Book's answering machine as outside the scope of direct examination (Tr. 3610), but the Court overruled this objection based on the relaxed standard of evidence at penalty phase (*Id.*, 3611-12).

119

Book's testimony was "markedly different than what we expected."[26] (*Id.*, 3026-27). Mary Goody testified that, in her zeal to call a police officer as a mitigation witness, she failed ask Book whether he had any negative information about Johnson. (H.Tr. 179- 185; *see also* Exh. 1, MG005615-17). Dean Stowers has a different recollection than Goody and Berrigan. He has stated that he interviewed Chief Book before he testified, with "another person in the office" (*Id.*, 1588), Mary Goody (*Id,* 1589), and/or Patrick Berrigan (*Id.*). According to Stowers, Book was asked whether he had "anything adverse to say" and answered in the negative. (*Id.*, 1588). Mr. Stowers' believes that Book deliberately lied to him and conspired with the prosecutor to sabotage the presentation of mitigating evidence:

> And then on cross [Book] gets into new areas that he obviously had been prepped on by [C.J. Williams] and was allowed to testify to some damaging stuff on cross-exam that was essentially, you know, not revealed to us in the prep interviews I think deliberately by him to set up a situation where we'd call him so that you could get his testimony in in the manner that you did. [¶] That's the only way I could explain how he could tell us what he said in his interview the night before he testified and what happened in trial.

(*Id.*) When Stowers was asked if he considered calling Goody, the "other person" or Berrigan to impeach Book with his prior inconsistent statement, he answered: "No. I don't remember how the cross went after he dumped that in our laps, but I think we might have brought it out during his testimony." (*Id.*, 1589-90). *See also Id.*, at 1590 ("I think we might have brought it out during his testimony. I'm not sure, though."). He admitted that if Book's prior inconsistent statement was not introduced, there was no strategic reason for not doing so. (*Id.*) The record shows that Book was not impeached with a prior inconsistent statement to

---

[26] Mr. Berrigan's statement about Doug Book was in response to inquiry as to whether he had a sense of what witnesses were going to say based on interviews by "law enforcement or somebody else." (*Id.*, 3026). Mr. Berrigan testified that:

> I'm thinking of Doug Book as an example. We had police reports, and when we actually, you know, go to interview him or he testifies on the witness stand, his testimony's markedly different than what we expected. That's why you interview people. [¶] So I don't want to pretend to you that I would rely on the police reports as preparation for calling witnesses to testify. I would not do that. (*Id.*)

120

counsel or Ms. Goody in his pre-testimony interview.  *See* Tr. 3615-17.

Whatever version of the events regarding Douglas Book is credited, trial counsel was ineffective.  It was ineffective to call Book without asking his if he had anything negative to say about Ms. Johnson.  And, if he was asked this question and lied, it was ineffective not to impeach him with his prior statement that he had nothing negative to say about Ms. Johnson.  There was abundant evidence from a multiple sources other than Mr. Book that DeGeus had been violent and abusive with Ms. Johnson.  However, because of the haste with which this penalty phase was put together, Book was called, with disastrous consequences for Ms. Johnson.  The calling of this witness was deficient performance. The ineffectiveness was prejudicial because once this harmful evidence is removed from the aggravating side of the balancing scale the conclusion is compelling that the "undiscovered mitigating evidence, *taken as a whole*, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability" so that  "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S.Ct. 2456 (citations and internal quotations omitted)(emphasis added).

**COURT CLAIM THIRTY-ONE**

**Court Claim 31 – Ineffective Mitigation: The Testimony of Susan Marsolek**

Trial counsel called Susan Marsolek at penalty phase, and, as a result of trial counsel's inadequate preparation, the prosecution was able to elicit evidence in aggravation.   Trial counsel knew, or should have known, that Ms. Marsolek would provide information harmful to their client.  Had defense counsel performed competently, and adequately prepared before calling this witness, they would have known that the mitigating evidence that she could provide was far outweighed by the harm she would do to their client's defense.  Trial counsel acted unreasonably in failing to prepare for this witnesses, failing to identify the damaging information that she would provide, and by calling the witness.

Susan Marsolek, a halfway house resident who appeared in court in leg irons and a

121

prison uniform, testified for the defense at penalty phase. (Tr. 3728). During direct examination, defense counsel elicited evidence that Marsolek did not cooperate in her own case (Tr. 3731); that she worked with Ms. Johnson at the Waterfront Restaurant and Lounge and became good friends with her (Tr. 3731-32); that petitioner was compassionate, trustworthy and loyal (Tr. 3732); that she was housed with petitioner in M Block at Linn County Jail, where petitioner took her under her wing (Tr. 3734-35); that petitioner had never been in a fight while they were housed together in Linn County Jail (Tr. 3736); that methamphetamine is one of the worst drugs (Tr. 3739); and that Ms. Johnson was a good mother (Tr. 3740).

On cross-examination, Marsolek was throughly discredited and turned into an aggravation witness, based on discovery that was readily available to defense counsel. *See, e.g.,* Exh. 95, A000754 (Marsolek, aka Sue Paulson, was a known drug user and dealer); Exh. 95, Bates A3674-3682) (Marsolek agreed to provide, and provided, information about methamphetamine manufacturing to the government); Exh. 95, E001098 (Marsolek statement regarding jail incident involving Petitioner and Amy Rawhauser).

Marsolek had been prosecuted by C.J. Williams, who elicited testimony that she told numerous lies to law enforcement after her own arrest. (Tr. 3741-43). Marsolek denied having obtained methamphetamine from petitioner, denied telling Special Agent Graham that notes found after her arrest, which included petitioner's name, reflected drug debts, and insisted that she owed petitioner for items bought at a rummage sale. (Tr. 3743-44). In fact, trial counsel had these "pay and owe" notes in their discovery files. (Exh. 95, A003671). Then the prosecution attacked Marsolek's testimony that petitioner had never been in a fight at the Linn County Jail by introducing a statement made by Marsolek during the investigation of that incident and suggesting that a videotape of the fight existed. (Tr. 3745).

On redirect, defense counsel characterized the fight that Marsolek insisted never occurred as a "big fight" (Tr. 3743) and elicited testimony that Marsolek was not a "snitch" and was not the type of person who would ever be a "snitch." (Tr. 3749). On re-cross examination,

122

the prosecution was able to elicit evidence that Marsolek had in fact been a snitch, and testified against Michael Vieth in exchange for a reduction of her sentence. (Tr. 3750).

Marsolek was called by the defense to provide tepid mitigation evidence, despite its possession of a discovery file that contained abundant information that Marsolek should not be a witness. First, the defense knew, or should have known, that Marsolek gave a statement about the "big fight" in the jail that was the centerpiece of the prosecution's future dangerousness argument, because it occurred in custody. Marsolek's testimony that the fight never occurred did not advance petitioner's cause; rather, it proved Marsolek to be the liar she admitted to be on cross-examination. Had defense counsel read the discovery, he would have known that Marsolek was arrested with drug "pay and owe" notes that featured petitioner's name. Finally, Marsolek's testimony that she was not a snitch was yet another lie; if trial counsel had bothered to read the discovery, they would have discovered that she testified against her co-defendant, the very sort of behavior she adamantly denied.

It was objectively unreasonable for trial counsel to call Susan Marsolek. She did not provide compelling mitigation testimony and the evidence adduced by the prosecution on cross-examination was devastating to Ms. Johnson at a proceeding in which her life hung in the balance. The ineffectiveness was prejudicial because once this harmful evidence is removed from the aggravating side of the balancing scale the conclusion is compelling that the "undiscovered mitigating evidence, *taken as a whole*, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability" so that "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S.Ct. 2456 (citations and internal quotations omitted)(emphasis added).

### COURT CLAIM NO. THIRTY-TWO

**Court Claim 32 – Ineffective mitigation: Failure to Provide Psychiatric Pharmacologist Roswell Lee Evans With Data Regarding Petitioner's Drug History, Rendering His Expert Testimony Virtually Irrelevant**

123

Trial counsel called Dr. Roswell Lee Evans, the Dean of Pharmacy at the Auburn School of Pharmacy, to testify at petitioner's penalty phase "about methamphetamines, their actions, what do they do, and pretty much from an informational perspective." (Tr. 3580). At the outset of his testimony, Dr. Evans acknowledged that he did not know Ms. Johnson and had never seen her before; that he had not been provided any material concerning her case; that he was not going to testify about her state of mind at the time of the commission of the offenses; and that he was "just asked to talk about methamphetamine." (*Id.*). At the conclusion of the case, the Court, pursuant to the defense's flawed restrictions on mental health evidence, instructed the jury that it could not consider Ms. Johnson's mental health testimony for the purpose of determining her mental state at the time of the charged killings. (Doc. 589, Final "Penalty Phase" Instruction No. 5.)

The prosecutor was able to exploit Dr. Evans' lack of knowledge about Ms. Johnson. He began his cross-examination by getting Dr. Evans to agree that some people are involved in the drug trade not because they are using methamphetamine, but for profit. (*Id.* at 3592). Dr. Evans also agreed that methamphetamine can have different effects on different people, and that while some people are highly addicted, others use it recreationally and can start and stop using it. (*Id.* at 3592-3593). Dr. Evans admitted that, although there is a psychiatric diagnosis for drug dependency, he did not know whether Ms. Johnson had been given such a diagnosis. (*Id.* at 3593). The prosecutor pointed out that Dr. Evans "really do[es]n't know anything about this particular case," wasn't "asked to present any testimony about this case," and that "there's nothing stopping [Dr. Evans] from evaluating the defendant. [He] just [wasn't] asked to do it." (*Id.*).

Most notably, Dr. Evans had to admit that he knew absolutely nothing about Angela Johnson's drug usage during any time period:

Q.      You don't know how often she used methamphetamine.

A.      No.

124

Q. You don't know what quantity of methamphetamine she used.

A. I do not.

Q. You don't know during what time period she used methamphetamine.

A. No, I don't.

Q. You would have no reason to dispute the report that she quit using methamphetamine during her pregnancies.

A. No.

Q. So you'd have no reason to dispute that during the time period of July of 1993 and November of 1993 when she was involved with murdering five people she wasn't using methamphetamine during that time period.

A. I have no idea.

Q. You'd have no idea whether the methamphetamine use she was involved with had any impact on her ability to function in day-to-day society.

A. No, I don't.

Q. And in substance you're here to educate this jury on the effects that methamphetamine could have, but you have no basis to suggest to this jury that any of these effects you've talked about, any of these possible long-term damage to the brain, any of these physiological effects has any application whatsoever to Angela Johnson?

A. That's true.

(Tr. 3594-3595).

The only redirect examination after the devastating cross-examination of Dr. Evans

consisted of two questions:

Q. Doctor, what do we know from the experience and research of methamphetamine regarding its rate of addiction versus other illicit drugs as well?

A. Right. (Sic.)

Q. What do we know about that?

A. We know that the exposure to methamphetamine has a very high likelihood leading to addiction, especially with its repeated use.

(*Id.* at 3595.)

At the evidentiary hearing, Patrick Berrigan was asked, "Was there some reason why you

125

did not at least provide the drug history that you provided to the other experts so that Dr. Evans could be in a position to say that I know what this person's drug history is and here's what I can say about what effect drug use would have on her given history?" His answer was, "I just didn't think to do it." (H.Tr. 2103).

In the absence of any connection between Dr. Evans' generalized information about the effects of methamphetamine and Ms. Johnson, the jurors were left scratching their heads as to why Dr. Evans was even called to testify. As Professor Sean O'Brien testified at the hearing before this Court,

> Q. Following up on that point in how the government responded to the mitigation case, you're aware that the defense did put on a psychopharmacologist, Dr. Evans I believe, who was asked to speak in the abstract about the effects of meth -- long-term methamphetamine.
>
> A. Right.
>
> Q. And the government's cross-examination was essentially you don't know anything about Angela Davis (sic), you weren't asked to opine about Angela Davis, you don't even know her drug history from the records essentially. Do you recall that?
>
> A. I do recall that.
>
> Q. And do you recall also that the government experts, Drs. Martell and Dvoskin, had conducted an extensive interview of Miss Johnson which included a detailed drug history?
>
> A. Yes, I did see that.
>
> Q. And that those -- that interview was given to all the defense experts, but nobody commented on the drug history. In particular Dr. Evans wasn't asked to comment on that. Is that an effective or even a reasonably minimally competent way to present that aspect of the case?
>
> A. Again, it suffers from the same problem as not having your other experts address competence or mental status or mental state, emotional state at the time of the offense is that Dr. Evans' testimony was pretty effectively neutralized on cross-examination. Well, you're not really talking about Angela Johnson, are you? And he says no all the way down the line. And so I'm not sure that the jury at that point gave any weight to Dr. Evans' testimony. It was a very effective cross-examination that you could see coming. I mean, not to

126

> take anything away from Mr. Williams, I wouldn't call it a
> brilliant cross-examination, but it was an effective one that
> you could see coming for a while, and it was a good one. It was
> a good one. And so that really is the issue when what could
> have been brought was really tremendous.

H.Tr. 4215-4216.

Not only was Dr. Evans' testimony neutralized by his lack of knowledge of Angela Johnson's drug history, it likely led to at least some jurors viewing Angela Johnson's drug history as aggravating, *i.e.,* that Angela Johnson's drug use was recreational, and that she did not suffer the devastating effects of methamphatamine use. Otherwise, why not give him the drug history that had been given to Dr. Logan, Dr. Hutchinson, and Dr. Cunningham, all of whom testified that she had a history of drug abuse? *See, e.g.,* Tr. 3338-3341 (Logan testimony); Tr. 3650, 3669 (Hutchinson testimony); Tr. 3876-3879 (Cunningham testimony).[27]

Instead, defense counsel squandered multiple opportunities to give the jury the truth about how methamphetamine ruled Angela Johnson's life and how, coupled with her organic brain impairments and psychiatric history, it led to her behavior in the instant case. As Mr. O'Brien told the Court, had the jury been given "all of the data regarding Ms. Johnson's drug use and background and history more of them might have found it mitigating." H.Tr. 4212-4213.[28]

Dr. Evans could have been, but was not, given the same information that the other experts were given: that Angela Johnson had a significant history of methamphetamine use. Ms. Johnson told the government's experts in April 2005 that, "And then I did crank. Oh, my new love. I loved it, and I wanted to do it everyday for the rest of my life." (Exh. 114, MAR000054.) She reported that Dr. Logan had told her she was self-medicating, and that "maybe if I would have been on an antidepressant or something like that, I wouldn't have had such a need for crank and since I've been on antidepressants, I do feel better." (Exh. 114,

---

[27] Significantly, none of the defense experts who knew her history were asked to testify about the extent of her addiction or its impact on her behavior at any time, including during 1993 when the crimes occurred.

[28] Professor O'Brien referenced Jury Project data supporting his conclusion, that jurors "tend to find drug abuse mitigating if it's accompanied by mental health evidence." Tr. 4213.

127

MAR000057.)  She described to the government's experts how much and how often she used:

A.    When I had my bar I really got into the drugs.  It was just  continuous.  I had it for – I only had the bar for a year . . . .  yeah, it got to be a party fest and I knew after a year I couldn't do that again.  So I closed up shop and got another job.

Q:    So when you say you really got into the drugs you told me that you were pretty much high all the time before that so it got worse. Were you – did you stop sleeping?

A.    I didn't sleep every night.

(Exh. 114, MAR000071.)  She also reported that she did drugs both before and after her pregnancy with Marvea, and that she got pregnant with Marvea in June 1993. Exh. 114, MAR000097.)   She started up again because "[c]rank was a part of my life."  Exh. 114, MAR000097.)  Dr. Evans could have used Ms. Johnson's statements to the government experts to explain how addicted Ms. Johnson was, and tied the effects of that addiction to the time of the homicides.

Dr. Evans could also have used the trial testimony of Eva Dawn Hanawalt to bolster his testimony about the addictive power of methamphetamine use, and to rebut the prosecution's theme that Ms. Johnson's drug use was not a significant factor in her life.  Ms. Hanawalt testified at penalty phase:

Q.  Did you have a problem with methamphetamine?

A.  Yes.  I think, you know, anybody that starts doing meth from the very beginning you might as well just sell your soul to the devil because you're just -- it's a one-way ticket to hell, and the only way of coming back through it is either incarceration or death.  It's the devil's drug.

Q   What do you mean by that?

A.  It's so powerful.  It's so addicting.  You know, there was -- I didn't want to be addicted to it.  I didn't want it to control my life like it did.  You know, many times I prayed to God to help me with it, but I couldn't.  And the only way I would have ever been able to get off it is being separated from it, incarceration and not just -- I mean, I tried treatment a couple times, but 14 days ain't gonna cut it.  You need that stuff out of your system for a long time.  It's been four years since I've done it, and I still have dreams about it.  It takes over your mind, your choices, your responsibilities, your priorities.

128

Everything changes.

Tr. 3233.

Moreover, had trial counsel properly investigated the case, Dr. Evans could have used the information later developed by habeas counsel to tie Angela Johnson's drug use to her behavior, particularly in 1993, in support of the defense theories regarding the mitigating nature of her drug abuse and her mental state at the time of the offense. Ms. Johnson's sister, Holly Dirksen reported:

> I visited Angela often in 1992 and 1993, and moved in with her in 1994, when my daughter was a little more than a year old. It was the worst year of Angela's life. Angela was shattered and stepped out of herself in 1993; she was literally insane that year. . . .
>
> It got worse in 1993. Living with Angie was like living in a rant all the time. She could not control her emotions. She stayed in bed for days and then worked nonstop. She was always moving, shaking, talking, working, and doing something just for the sake of moving. Angie was unpredictable. I moved out in the spring of 1995 because it was too insane trying to live with her. Anything could set her off, and she stayed irritated and upset, angry with everyone and everything for little or no reason.
>
> Angela grew crazier by the minute for every minute she spent with Dustin Honken. She and I were very close and spent a lot of time together. Her mood swings got worse. She was always paranoid and had to sleep with lights on, but she also believed that others were out to get her. Her pregnancy made everything worse. Angela lived in absolute terror that Terry DeGeus was going to kill her when he found out she was pregnant, but she was convinced she could not do anything about it. She was just as worried, if not more, about Dustin. She was pregnant with Dustin's child and worried that he was not going to end his relationship with his other pregnant girlfriend, who called and taunted her frequently. Angela was never any good with finances, but her debt grew way beyond her ability to pay it because Dustin convinced her to give her money to him. She was pregnant and her hormones seemed to push her over the edge. She had to stop doing drugs because she was pregnant, and she became terribly depressed and barely able to move off the couch at times. The slightest thing irritated and overwhelmed her.

(Exh. 133-29, pp. 1-2).

Ms. Johnson's daughter, Alyssa Johnson, confirmed the reports of Ms. Dirksen:

> All of my mother's emotions were intense. There were times my mother lost all control of herself and could not think clearly. Sometimes it was over little things, like when we lost car keys, she lost her purse, the dishes weren't done, or something in the house was misplaced. She flew into rages that made no sense over insignificant things, screaming, crying, and stomping

129

around until she exhausted herself. She stayed mad and upset for a long time. When she was sad, she cried and sobbed because she could not fix things and make it better for us. Sometimes, when she was happy, she was on cloud nine, as if she were the luckiest person in the world. She was obsessed with keeping everything in order and could not handle it if anything was out of order. She was more than neat and scrubbed everything like there was no tomorrow, staying up all night to clean the house.

My mother had terrible episodes of depression in between her times of activity. When she was depressed, she could barely move or do anything. She stayed in bed, in her room, or on the couch, as if she were so sick she had no energy. I worried about these moods when they came over her, but just did my best to be there for her.

(Exh. 133-30, pp. 1-2)

Eva Hanawalt's testimony at the habeas hearing supported Dr. Evans' opinion about the wide-ranging effects of methamphetamine abuse. She testified about the relationship between methamphetamine addiction and boyfriends, what she called the "power of the pouch" that the boyfriend has when he is the supplier. "Power of the pouch because you get so high you don't care and you just want to stay high and you're going to do anything a guy wants you to do. You're going to love him because he's taking care of you and giving you the drugs." H.Tr. 495. The power of the pouch, Ms. Hanawalt testified, is so strong, that you will do anything, including criminal activity, that you would not do if you were not addicted. H.Tr. 495.

Had Dr. Evans been armed with the facts about the extent and impact of Ms. Johnson's drug abuse, he could have, as Dr. Woods later did (Exh. 107, WOD000142), diagnosed Ms. Johnson at the time of the offense with an Axis I disorder of drug dependency, a diagnosis that the prosecutor suggested did not exist. That diagnosis, coupled with Dr. Evans' testimony about the long-term effects of methamphetamine, would have underscored for the jury how methamphetamine took over Ms. Johnson's life and supported the testimony of the other mental health experts about the extent and impact of Angela Johnson's impairments. That testimony, taken together, would have aided the jury in understanding Ms. Johnson's behavior in 1993, and mitigated the crimes for which she was convicted. Four jurors found Ms. Johnson's methamphetamine use mitigating, even in the absence of any real evidence of the extent and

130

impact of that use. (Doc. 545 (mitigating factor (16)). Had the jury been presented with the evidence of the extent and impact of Ms. Johnson's methamphetamine abuse through the testimony of Dr. Evans, it is reasonably probable that at least one juror would have voted for a life sentence. The failure to properly prepare and present Dr. Evans' testimony was prejudicial ineffectiveness because the "undiscovered mitigating evidence, *taken as a whole*, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability" so that "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S.Ct. 2456 (citations and internal quotations omitted)(emphasis added).

COURT CLAIM NO. THIRTY-THREE

**Court Claim 33 – Ineffective mitigation: Use of Multi-Faceted, Overly-Complicated Yet Incomplete Mitigating Factors for the Jury to Weigh Rather than Simple, Straight-Forward Facts that Encompassed All of the Mitigation**

United States Supreme Court precedent pre-dating Ms. Johnson's trial "firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007)(collecting cases). Jury instructions or other rules or practices "inhibiting the jury's ability to give meaningful effect to such mitigating evidence" are constitutionally suspect, and a "constitutional defect" occurs "not only when a jury is 'precluded from even considering certain types of mitigating evidence,' but also when 'the defendant's evidence [i]s placed before the sentencer but the sentencer ha[s] no reliable means of giving mitigating effect to that evidence.' " 550 U.S. at 246, 260, *quoting*, *Graham v. Collins*, 506 U.S. 461, 475, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993). See also, *Id.* at 253 n. 13 ("The rule that we reaffirm today—a rule that has been clearly established since our decision in [*Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)]—is this: Special instructions are necessary when the jury

131

could not otherwise give *meaningful effect* to a defendant's mitigating evidence." (Emphasis in original). See also, *Penry v. Johnson*, 532 U.S. 782, 799-800 (2001) (instructions and verdict form prevented jury from giving effect to mitigating evidence of defendant's intellectual disability)

In order to implement these constitutional rules, Guideline 10.11 of the 2003 A.B.A. Death Penalty Guidelines (Exh. 1, pp. 241-253), entitled "The Defense Case Concerning Penalty," addresses a myriad of issues regarding the preparation and presentation of the mitigation case. Guideline 10.11 K. provides,

> Trial counsel should request jury instructions and verdict forms that ensure that jurors will be able to consider and give effect to all relevant mitigating evidence. Trial counsel should object to instructions or verdict forms that are constitutionally flawed, or are inaccurate, or confusing and should offer alternative instructions. Post-conviction counsel should pursue these issues through factual investigation and legal argument.

The Commentary to this Guideline stresses that: "It is essential that counsel object to evidentiary rulings, instructions, or verdict forms that improperly circumscribe the scope of the mitigating evidence that can be presented or the ability of the jury to consider and give effect to such evidence....At the same time, counsel should request instructions that will ensure that the jury understands, considers, and gives

effect to all relevant mitigating evidence.") *Id.* at 252, citing three empirical studies demonstrating that jurors do not understand jury instructions regarding aggravating and mitigating evidence, the differing burdens of proof, and the issue of unanimity. S*ee also* H.Tr. 4267-4268 (O'Brien testimony discussing a seminar attended by Mr. Berrigan in which these studies were discussed.) Thus, a critical part of the presentation of the mitigation case is to ensure that the jury instructions are comprehensible to jurors and encompass all relevant mitigating evidence. Even the most powerful presentation of mitigation is doomed if the jury does not have the decisional tools to consider the evidence.

As Mr. O'Brien explained to the Court, "the lawyer is the only person in the courtroom charged with the responsibility of serving that vital function. So that's the starting point. [¶]

132

The[n]...the next step is whether or not the instructions that are submitted are adequate to do that, and it's the lawyer's obligation to do the best job possible under the circumstances." (H Tr. 4265-4266). Drafting constitutionally adequate instructions is "absolutely critical" to the defense function in a capital case. (*Id.* 4248). Like every other aspect of capital defense, it should be a team effort, and "in a case like this the opportunity to have your experts help shape what mitigating instructions do to the jury is a fabulous opportunity that should have been taken advantage of." (*Id.* 4246) The best instructions are "straightforward, simple sentences, nonargumentative that call...for a yes answer." (*Id.* 4247).

In this case, Mr. OBrien reviewed the instructions that the defense proposed and the Court gave. (*Id.* 4246). It was his professional opinion that "these jury instructions look like they were thrown together without a lot of foresight[29]....I don't see this as the product of a reasonable decision to put together this instruction packet. It's too complex and too nuanced and...too qualified." (*Id.* 4246). The Court added: "There are too many qualifiers in almost every one of the mitigators." (*Id.*) How did this happen ?

Originally, on May 13, 2005, trial counsel had a list of 44 simple, declarative statements prepared by mitigation specialist Mary Goody that they could have, and should have, offered as the mitigating factors for the verdict form. (H.Tr. 239-240; Exh. 1, MG002245-2248; Exh. 103, GRN 000108-000114.) Ms. Goody's list encompassed facts that supported "an understanding of the client's extended, multigenerational history [] necessary for an understanding of [her] functioning." Commentary to 2003 A.B.A. Guideline 10.11.

Ms. Goody's factors were written in simple, straight-forward, non-judgmental language, regarding, *inter alia*, Ms. Johnson's unstable and abusive childhood, problems in her family, the religious practices of her mother and grandparents, her methamphetamine addiction, her depression and low self-esteem, her relationships with men. (Exh. 1, MG002245-MG00246).

---

[29] Mr. Berrigan admitted to the Court at trial that the defense instruction were "kind of cobbled...together." (Tr. 2149)

133

Each of those individual facts was proven by the defense, and each would have been found true by every juror. Even if some jurors did not find all of these factors proven, all the jurors would have found at least some of these factors true, and those findings would have allowed the factors to be weighed as mitigators. None of the 44 factors were based on statutory factors, and none of them explicitly mentioned mental state at the time of the crime or d, although a few of them came close. See, Exh. 103, GRN 000108-000114, factors 33, 35.[30]

On May 17, 2005, Mr. Berrigan submitted to this Court a list of 27 "expected mitigation factors." (Exh. 103, GRN 000121-000124). This list eliminated many of the 44 factors that Ms. Goody had formulated and it included statutory mitigation factors, including duress (factor 1), committing the offense under severe mental or emotional disturbance (factors 6 and 25), lack of substantial capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law (factor 23), conduct. Many of the instructions are long and confusing, with many qualifiers. There was no reasonable tactical advantage to removing the many mitigating factors that Ms. Goody had suggested.

At an instruction conference on May 18, 2005, in direct violation of Guideline 10.11 (L), Mr. Berrigan took the position that "we'd rather not have the jurors with preliminary instructions to evaluate the evidence as its coming in in terms of whether certain mitigating or aggravating factors have been met..." (Tr. 1962-1963). The Court disagreed. After then listening to several of Mr. Berrigan's criticism's of the Court's proposed penalty instructions, the Court reasonably asked, "Did you submit your own peenalty phase instructions with these suggestions ?" (Tr. 1977). Mr. Berrigan replied, "No, sir ." The Court responded, "Okay. Why not ? Isn't that your obligation ?" Mr. Berrigan replied: "Well, we–I ddon't know. I mean, my__I had not dealt

---

[30] On March 7, 2005, Mr. Berrigan had represented to the Court that the defense would not be relying on mental state at the time of the crime or duress. (Exh. 103, GRN 00071). On March 17, 2005, the Court ordered that "*based on her representations*, Johnson is now foreclosed from asserting any offense-specific mental condition mitigating factor in the 'penalty phase'..." *United States v. Johnson*, 383 F.Supp.2d 1145, 1165 (N.D. Iowa 2005). Importantly, the defense never questioned this ruling or sought to narrow it.

134

with these preliminary instructions before in my career, so I'm very unused to that." (*Id.*).

On the subject of mitigating factors, it is important to stress that it was not the Government that insisted on limiting the number of factors or combining multiple facts into a single factor. The Government told the Court, " In my view I think the defense is – let me put it this way. I don't think I want to be in a position of impacting what they claim to be mitigators." (Tr. 2154).

Nor was it the Court that insisted on limiting the number of factors or combining multiple facts into a single factor. Although the Court noted that it "could get them [the mitigating factors] down to about 7," (Tr. 3986), the Court also told counsel, "I think you're for the most part entitled to your language unless I have a serious objection to it." (Tr. 2152).

The Court's invitation should have been a godsend to defense counsel. When asked whether this was a position that defense counsel would want to take advantage of, Professor O'Brien responded, "I mean, you want to get your theory of mitigation instructed in the best possible language, and having that opportunity, most capital defense lawyers would welcome that." H.Tr. 4226.

Indeed, the Court sought to simplify some of the defense's proposed mitigating factors. On May 18, 2005, after trial counsel had submitted the defense's first list of mitigating circumstances, the Court suggested removing statutory language from three factors because the Court thought "it'd just be confusing." (Tr. 2149-2151).

On May 19, 2005, Mr. Berrigan submitted an amended list of 25 mitigating factors. (Exh. 103, GRN 000121-000124) The amended list eliminated the duplication between factors 6 and 25 on the first list. It also, without tactical justification, eliminated factor 3 on the first list ("Angela Johnson could not reasonably have foreseen that her conduct in the course of commission of the murders, for which she was convicted, would cause, or would create a grave list of causing death to any person."). The list was otherwise the same as the first list, with some modification in wording and a reorganization of the factors, but with the same problems as the

135

first list. For example, the defense submitted as factor 11 and the Court gave in its Preliminary Instructions as factor 10 [Doc. 544], the following mitigating factor:

> "Angela Johnson was raised in a single parent household by an emotionally unstable mother who subjected her children to unusual fasting practices, long periods of abandonment and physical detachment, and occasional physical abuse, resulting in Angela being far more susceptible to escape through illicit drug use, a series of unhealthy relationships with men, and chronic feelings of abandonment and poor self-esteem."

(Exh. 103)

Only five jurors agreed that this mitigating factor had been proved. Counsel's single mitigating factor included too many facts and required jurors to reach a specific conclusion about the impact of those facts. The consequence was that none of those facts – (1) that Angela Johnson was raised in a single parent household; (2) that Angela Johnson's mother was emotionally unstable; (3) that Angela Johnson's mother subjected her to unusual fasting practices; (4) that Angela Johnson suffered long periods of abandonment and physical detachment; (5) that Angela Johnson suffered occasional physical abuse; (6) that Angela Johnson was susceptible to escape through illicit drug use; that Angela Johnson had a series of unhealthy relationships with men; (7) that Angela Johnson had chronic feelings of abandonment and low self-esteem – were considered or weighed by seven of the jurors.

Mitigating Factor (10) in the preliminary Instructions was not the only factor that suffered from encompassing too many facts and drawing overly-specific conclusions. Another example is, "(11) Angela Johnson was physically and emotionally abused as an adult by Terry DeGeus, her former boyfriend, and this abuse drove her, in party, into the relationship with Dustin Honken from which the underlying murders sprung". [Doc. 544] That factor, in a slightly modified form ("Angela Johnson was physically and emotionally abused...causing her great fear and traumatic stress"), was found by only four jurors, despite the fact that Mr. DeGeus' physical abuse of Ms. Johnson was not in dispute and, indeed, was proven by the prosecution in the merits phase. [Doc. 593] Because trial counsel insisted on coupling the abuse by Mr. DeGeus with the consequences of "great fear" and "traumatic stress," eight jurors did not consider or

weigh Mr. DeGeus' abuse as a mitigator at all. Given the prosecution's argument that the consequence of the abuse was to provide a motive for Mr. DeGeus' killing, this was an especially egregious error.

Trial counsel also failed to submit any mitigating circumstances that dealt with the evidence of Angela Johnson's parents' upbringing. Evidence of Ms. Johnson's multi-generational history had been introduced and should have been included in the mitigating circumstances pursuant to A.B.A. Guideline 10.11 and the Commentary to the Guideline. Mary Goody had included those circumstances on the list she emailed to trial counsel. (Exh. 1, MG002245.) Trial counsel had no strategic reason to exclude such circumstances, and neither the Government's arguments nor the Court's rulings prevented trial counsel from doing so.

Trial counsel also had no strategic reason to omit factors from his already narrow list of mitigating factors, but he did so. For instance, on May 27, 2005, the Outside Taint Attorneys filed a request that pursuant to the Court's order of March 17, 2005, the jury should be instructed that "You have heard mitigation evidence presented by the defendant as to her mental condition. The defendant does not claim that this mental condition affected her thinking or behavior at the time of the offenses." (Exh. 103, GRN 000237). Without waiting for a ruling or seeking in any way to limit the government's proposal, the defense voluntarily withdrew its factor (23)("Angela Johnson committed the offense under severe mental and emotional disturbance.") (*Id.* GRN 000244).[31]

On May 30, 2005, the defense, again without any attempt to get a ruling or to refine its

---

[31] Ultimately, although the defense did oppose the government's suggested language, it (not the government) crafted the disastrous instruction that the Court ultimately gave as Final Penalty Phase Instruction No. 5 ("You have heard expert testimony concerning Angele Johnson's mental condition. This evidence has not been offered for the purpose of explaining Angela Johnson's mental state at the time of the charged killings, and you cannot consider it for that purpose. You may, however, consider it for any other purpose"). At the time the defense (not the government) proposed this language, the defense assured the Court that it would submit a supplemental instruction explaining the words "for any other purpose." (Tr. 3516- 3519) It never did, thus leaving the jury without any guidance as to the purpose of the defense mental health presentation.

137

concessions about the ental health factors, withdrew its factor (21)(lack of capacity to appreciate the wrongfulness of her conduct due to strees, illicit drugs, and/or substantial domination), but illogically replaced it with a watered-down version of the same instruction which still focused on mental state at the time of the crime. (Exh. 103, GRN 000246).

In addition, trial counsel failed to notice that the mitigating factor of Ms. Johnson's post-traumatic stress, proven through the defense mental health experts, had been erroneously removed from proposed mitigating factor 14 (factor 12 on final verdict form). (H.Tr. 4256-4259 (O'Brien testimony regarding the change.)) That failure meant that the jury was not even given the opportunity to consider the evidence of post traumatic stress as a mitigator.

Responsibility for ensuring that the correct instructions are submitted to the jury lies with defense counsel. (H.Tr. 4259). The jury were left with only depression and anxiety as mental illnesses to consider, illnesses that have nowhere near the impact of traumatic stress. "[P]osttraumatic stress is a much, much different and qualitatively more meaningful diagnosis. You wouldn't deliberately leave it out." (H.Tr. 4259). Proof of Professor O'Brien's opinion about the comparative nature of trauma versus anxiety and depression can be found in the jurors' vote: not a single juror found the mitigating factor as submitted. (Doc. 593, 01-CR-03046-MWB, filed 6/21/2005).

Trial counsel's proposed mitigating circumstances did not "ensure that jurors will be able to consider and give effect to all relevant mitigating evidence" as required by A.B.A. Guideline 10.11. Instead, trial counsel offered "inaccurate" and "confusing" mitigators (*Id.*) that undermined their already inadequate mitigation presentation. Dean Stowers recognized the problem and expressed his concern to Mr. Berrigan. "I -- yeah, I did express some concern but -- because I thought it was weird and I think the judge was commenting on them as well that they were -- they were argumentative maybe is part of it. But the other part of it is that they were burdensome on us in the sense that to get a juror to check the box or fill out the form as to whether or not they found it was established, you had to prove all these components of it. And it

138

seemed like -- I kind of agreed with some of the judge's criticism of that, you know, but Pat --

you know, he was the death penalty -- you know, he's the capital guy on the case, and he says

this is the way he's done these things in other cases, and he's done a number of death penalty

cases." (H.Tr. 1508-1509).

In addition to the mitigating factor regarding anxiety and depression discussed above,

trial counsel offered other mitigating factors they completely failed to prove: (a) that Angela

Johnson's role in the offense was relatively minor compared to Dustin Honken's (Mitigating

Factor (1)),[32] and (b) that Angela Johnson's pregnancy with Dustin Honken's daughter put her in

a disadvantaged position to resist Dustin Honken (Mitigating Factor (19)). These failures

violated counsel's obligation to present evidence of all mitigators submitted.

Defense counsel's multiple errors with respect to jury instructions fell below the

minimum standards of effective assistance of counsel. See, *Carter v. Bowersox*, 265 F. 3d 705

(8th Cir. 2001)(appellate counsel was prejudicially ineffective because he failed to challenge a

defective penalty phase jury instruction.); *Lenz v. Warden*, 579 S.E. 2d 194 (Va. 2003) (holding

trial counsel ineffective for failure to object to defective penalty phase verdict forms)(cited in

Commentary to Guideline 10. 11 K). Counsel's deficiencies prejudiced Ms. Johnson because the

confusing, overly qualified, and underinclusive instructions they proposed and the Court gave

provided a constitutionally inadequate vehicle for jurors to consider and give effect to the

mitigating evidence Ms. Johnson had presented. See, *Tennard v. Dretke*, 542 U.S. 274, 124 S.Ct.

2562 (2004); *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Had

counsel not performed deficiently as outlined above, and had they proposed simple, declarative

mitigating factors like those suggested by Ms. Goody, that gave effect to *all* the relevant

mitigating evidence, and could have been found true by the majority if not all the jurors, it is

---

[32] Failure to prove this mitigator had disastrous consequences as it was the defense's
putting this factor into issue that led the Court to admit the extremely prejudicial testimony of
Steve Vest. See, *United States v. Johnson*, 378 F.Supp.2d 1051 (N.D.Iowa 2005)

139

reasonably probable that at least one juror would have voted to spare petitioner's life.[33]

**COURT CLAIM THIRTY-FOUR No. 34**

**Court Claim 34 – Failure to prepare mitigation: Failure to Investigate and Present Evidence Regarding Angela Johnson's Mental State at the Time of the Offenses**

ABA Guideline 10.10.1 A. commands that:

As the investigations mandated by Guideline 10.7 produce information, trial counsel should formulate a defense theory. Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies.

Trial counsel chose a "mental state at the time of the offense" defense at the guilt phase, in which they asserted, but offered no proof, that Ms. Johnson was present at the killings of Gregory Nicholson and Duncans but did not have the requisite intent, and that she was not present at the DeGeus homicide and did not have the intent to kill him when she placed the calls

---

[33] On the issue of prejudice, it is significant that in the decision denying Ms. Johnson's motion for a new trial this Court commented that it "remain[ed] gravely concerned about the imposition of the death penalty on Angela Johnson", and that "[i]f I had been the trier of fact and the decision maker in the 'penalty phase,' I would not have imposed the death sentence on this record. The defense presented strong and, in my view, persuasive 'penalty phase' evidence from a myriad of sources, including evidence from numerous expert witnesses and compelling testimony from Angela Johnson's daughters." *United States v. Johnson*, 403 F. Supp. 2d 721, 896 (N.D. Iowa 2005). The Court added: "I am also troubled (more on a personal and philosophical level than on a legal one) by the lack of certainty in the record concerning the precise involvement of Angela Johnson in these crimes. For me, this haunting uncertainty alone is sufficiently mitigating to foreclose my vote for the death penalty." The Court that made this statement had the obvious advantage of a correct view of the law of mitigation and of all the facts presented in the Honken trial, as well as the government's argument in that case as to who the mastermind really was. Ms. Johnson's jury had none of these advantages. If, as an *Carter v. Bowersox*, 265 F. 3d at 716, the fact that "one juror was at least uncertain of petitioner's guilt" was enough to show that " there is a reasonable probability that the result of the sentencing phase would have been different had petitioner's jury been properly instructed", then surely the same result must be reached when the judge who heard *all* the relevant mitigating and aggravating evidence from both trials not only was "troubled" by the lack of certainty in the guilt phase, but also affirmatively stated that he "would not have imposed the death sentence on this record."

140

arranging for him to meet Dustin Honken.  Having chosen to present a mental state at the time of the offense defense at the guilt and eligibility phases (Tr. 36-39 (merits phase opening statement); 2293, 2296-97, 2310-2312, 2314-2316 (merits phase closing argument); 2483-2485 (eligibility phase)), there was no tactical or strategic reason not to introduce evidence of Ms. Johnson's mental state at the time of the five homicides.

In fact, Federal Death Penalty Resource Counsel Richard Burr had given them a road map on how to present mental health evidence to explain Ms. Johnson's participation in the crimes.  Mr. Burr met with Pat Berrigan and Dean Stowers on March 17, 2005 to discuss case strategy, and part of the conversation was tape recorded. (Exh. 106, OBR000280-226).   He talked about how evidence of the "excruciating stuff of her childhood" will give the jurors a visceral sense that she's "all fucked up."  (*Id.*, OBR000210), that despite her childhood, she does her best to support her one child, that she exercises "an amazing amount of responsibility for somebody who had no sense of responsibility instilled in her growing up.  No sense of self-esteem.  No sense of self-worth."  (*Id.*).  That her addictive vulnerabilities led her to drug abuse, that her drug taking was "of necessity," and that the drug use must be part of a "whole life context explanation," which over time "can create the potential for really clouding your judgment." (*Id.,* OBR000211).  That she gets pregnant, creating "an attachment to Honken that she might not have had otherwise," and that having a child "floods her back with all her own childhood stuff and how horrible it is to be a child in her family.  And that makes her want to cling to Honken and make him be somebody he probably could never be."  (*Id*. OBR000211-212).  Her "relationship with Honken [] has been formed by . . . all the relationships she's had in her whole life.  Many of which have been horrible."  (*Id.,* OBR000212).  He discusses how all of her relationships with people who "are supposed to protect you and care for you and love you" turn out to be just the opposite which "creates [] this enormous need to have somebody treat you well," and that clouds your judgment and "makes you do things that a person without that life history wouldn't even come near to do."  (*Id.* OBR000213).  "Because of who she was and what

141

she had gone through and endured and survived through her life.  And how it scarred her and disabled her.  That seems to me a more *powerful explanation*." (*Id.*, emphasis added).

Trial counsel rejected that theme – of connecting Ms. Johnson's impairments and vulnerabilities to the reasons she participated in the crime, gullibly responded to Robert McNeese – and instead unreasonably chose to present a mitigation case that was overly restrictive, flaccid, and doomed from the outset to failure.

### A.      Defense Mental Health Testimony at Trial

Pat Berrigan was appointed to Angela's case as learned counsel in death penalty cases in October 2000.  He moved quickly to enlist the help of mitigation specialist Mary Goody. Approximately a month after his appointment, Berrigan made the trip to Cedar Rapids to meet his client.  (Exh. 8-CF-000666) He spent two hours with her, and upon the conclusion of that interview, Mr. Berrigan wrote to William Logan, M.D., a psychiatrist who would testify at the penalty phase.  The letter stated, in part, that he had met with Angela Johnson and, despite her recent suicide attempt, she did not appear to be presently psychotic or have any immediate mental health concerns, that she seemed fully recovered.  He told Dr. Logan that they needed to evaluate Ms. Johnson's mental state at the time of the crimes and at the time she made statements to Robert McNeese; that it will be important to have a preliminary indication by the time of the *Massiah* hearings whether her mental state made her unusually susceptible to coercion and/or enticement by McNeese, and that even if Ms. Johnson does not have significant mental issues that impact her first phase defense, he suspected Dr. Logan would uncover a family history and childhood that could show her susceptibility to being dominated by a man as intelligent, forceful and domineering as Dustin Honken.  He  (Exh. 133-10).  Mr. Berrigan's plan, at the time he wrote to Dr. Logan, was to have Dr. Logan evaluate Ms. Johnson's mental state at the time of the offense.  (H.Tr. 2074).

After his letter to Dr. Logan, trial counsel changed his mind about exploring petitioner's state of mind at the time of the offense.  (H.Tr. 2075).   Before Dr. Logan's  second

142

interview with Ms. Johnson, he was instructed to not interview petitioner about, or address in any way, her mental state at the time of the offenses. (Exh. 1, MG-004292).

On January 19, 2001, Dr. Logan visited with Ms. Johnson and Mr. Willett. (Exh. 101, LOG000036). He visited her again six months later for three hours. *Id.* He wrote a lengthy report of his interview, in which he revealed a number of red flags of brain impairments in Angela and her family. The report noted Angela's mother's "religious disorder" and that Angela's grandmother "believed she was a prophetess." Logan noted that Angela attempted to "block out" her childhood, and indicated severe and continuing abuse. He reported that Angela failed in school, had trouble getting along with peers, and beginning in adolescence used alcohol, marijuana, speed, and acid. She had many failed relationships and moves. Dr. Logan further described Angela's feelings of worthlessness. Dr. Logan noted that Angela had been treated with a variety of psychotropic medications including Prozac, Zoloft, Paxil, Serzone, Elavil, Tradazone, and Celexa. He also reviewed investigator Rose Nevins' interviews of Angela's sister, Wendy Jacobson, in which she described her mother and grandparents holding Angela down to cast out the "deaf and dumb demon." (Exh. 101, LOG000100-LOG000117).

Afterward, he expressed an interest in coordinating with investigator Raymond Cornell and mitigation specialist Mary Goody in developing a report for sentencing. Dr. Logan made it clear to Mr. Berrigan that he did "not want to try to obtain collateral interviews and records at the last minute."[34] (Exhibit 1, MG-004131). However, Dr. Logan would not work on the case or see Angela Johnson again until January 26, 2005, almost four years after his first visit. Exh. 101, LOG000044).

In the meantime, counsel bumbled their way through the requirements of Fed. R. Crim. P. 12.2. Deadlines were repeatedly set and extended. In October 2004, the defense still had not

---

[34] Yet this is precisely what happened in this case. On April 13, 2005, one day after jury selection started, Dr. Logan complained that he had not received all of the records about petitioner that he had requested. (Exhibit 1, MG-004205)

143

provided the Government any notice regarding its intent to use mental health testimony. Two months later, approximately four and a half years after Angela's arrest, counsel provided a handwritten notice to the Government that it intended to offer mental health testimony from Drs. Logan, Hutchinson, and Gelbort, although the notice indicated that no testing had yet been done. *United States v. Johnson*, 362 F.Supp.2d, 1043, 1074.

It was also not until the very beginning of 2005 that any mental health professionals visited Angela Johnson again for any purpose. Michael Gelbort administered neuropsychological testing on January 25, 2005 (Exh. 8, CF000864), Marilyn Hutchinson, Ph.D., evaluated Ms. Johnson on February 23 and 24, 2005 . (Exh. 8, CF-000901-902). Trial counsel also instructed Dr. Hutchinson that she was not to interview petitioner about the offenses or her mental state at the time of the murders. (Exh. 102, HUT000070-HUT000083; H.Tr. 3608).

Mark Cunningham first interviewed petitioner on May 8, 2005, after her trial had started. (Exh. 8, CF-00915). Like Drs. Logan and Hutchinson, his area of inquiry was limited; he was told not to question petitioner about the offense, to evaluate her to determine the presence or absence of risk factors in the Department of Justice study on predictors of youth violence[35] and to assess her ability to adjust to life in the Bureau of Prisons. (Exhibit 1, MG-004472-4478).

Both Dr. Logan and Dr. Cunningham knew the fact that Angela's brain was not normal, but they were restricted by the limitations that counsel had placed on them and frenzied time constraints. Dr. Logan tried to tell counsel about Angela's brain. He told Mary Goody in April 2005 that, "as a result of PTSD, she has a damaged nervous system." (Exh. 101, LOG000186). He knew that Angela exhibited symptoms of bipolar disorder, a functional impairment of the

---

[35] Hawkins, J.D., Herrenkohl T. I., Farrington, D.P., Brewer, D., Catalano, R. F., Harachi, T. W. & Cothern, L. (April 2000) Predictors of Youth Violence. Juvenile Justice Bulletin, United States Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

144

brain, and he suspected that Angela's problems were at least to some extent inherited. (Exh. 101, LOG000186-LOG000189). Dr. Logan recognized that Angela's mother was "psychotic" at times. (Exh. 101, LOG000187). These conversations, however, took place with Mary Goody while counsel was in the course of picking a jury.

Dr. Cunningham also recognized symptoms of brain impairment which manifested themselves as a presentation of bipolar disorder, and said that a PET Scan would show "little bitty pockets of dead brain." [36] (Exh. 104, CUN000277). But it was for naught. It was too late to look at pictures of her brain. Trial had already begun. Counsel had already decided that no matter how many holes were in Angela's head, they were not going to tell the jury that they had any role in Angela's actions in 1993.

So, at the last the minute, counsel took the information that they had about the horrific trauma Angela had suffered as a child and an adult, the treatment she had received for mental health problems in the past, and trotted their half-muzzled experts onto the stand to try to thread the needle between saying Angela was impaired, and how these impairments affected her life in general, but not saying how these impairments affected her ability to participate in what would be the two most earth-shattering days of her life.[37]

At penalty phase, Dr. Logan testified that he had not been asked to look at Ms. Johnson's mental state at the time of the offenses, but simply to examine "generally what her life experiences had been and how that affected her emotional composure, stability, and life adjustment." (Tr. 3307). He concluded that petitioner's life experiences rendered her "predisposed to depression," but did not address whether there was an organic component to this

---

[36] Michael Gelbort, Ph.D., who had been retained by trial counsel and who conducted an incomplete battery of neuropsychological testing on January 24, 2005, also recommended a PET Scan. (H.Tr. 192, Exh. 2, MG004120)

[37] Not only were the experts half-muzzled but, because they were brought in so late the process (or, in the case of Dr. Logan, brought in early but allowed only preliminary investigation until late in the process), they did not have the foundational basis of many hours with the client and a rich mining of the records that would have bolstered the credibility of their opinions. *(See*, H.Tr. 4198-4199 (O'Brien testimony); H.Tr. 175 (Goody testimony)).

145

disorder.  Dr. Logan described the bizarre religious rituals to which petitioner was subjected and many other elements of the dysfunction in her life history, such as her abuse by Terry DeGeus. (Tr. 3308-25, 3326-28).  He described her jail suicide attempt (Tr. 3298-99, 3334-3337, 3343),[38] her history of depression, anxiety and post-traumatic symptoms (Tr. 3300), and the fact that methamphetamine withdrawal could cause a severe rebound depression (Tr. 3340).  He testified that in "children exposed to that kind of pyrotic trauma, there have been known to be shrinkage in certain areas of the brain where it's possible for memory integration."  (Tr. 3321).  He explained that trauma can cause problems with maturation, concentration and early drug use.  As a result of the limitations placed on Dr. Logan by trial counsel, he could not say how the brain changes caused by trauma and the depression and mood impairments would have created the trajectory that landed petitioner with Dustin Honken at the crime scenes.

The prosecution exploited the limitations of Dr. Logan's evaluation of petitioner:

Q:     You are not providing any opinion whatsoever that her depression affected her thinking or her behavior at the time of the offenses involved in this case are you?

A:     No, I'm not.

Q:     In fact, you were specifically instructed not to question her about what her thinking and behavior and mind set was at the time she committed the offense.

A:     That's right.

Q:     So it's fair to say you're not offering any opinion about whether the defendant's mental capacity to appreciate the wrongfulness of her conduct or conform her conduct to the requirements of law was significantly impaired or not impaired at the time she committed the offense, are you?

A:     No, I'm offering no opinion about that area at all.

Q:     You're not offering any opinion about whether she was under any form

_____

[38] An additional constraint on Dr. Logan was that he had initially been retained to assess whether Angela Johnson was well-enough adjusted to get off suicide watch, and he determined she was.  That role, as a treating advocate, limited his credibility with the jury who heard that he found her not suicidal during his January 2001 interview, thus minimizing the seriousness of her depression.  (Tr. 3343; H.Tr. 3502-3503, Exh. 101, LOG000092-LOG000093).

146

of duress or pressure or anything else at the time she committed these
offenses?

A: That's right.

(Tr. 3354-55).[39] Trial counsel's redirect examination reinforced the point made by the government:

Q: And, in fact, weren't you told that the defense wasn't claiming that, you know, she was nuts at the time of the offense or that that was some kind of defense?

* * *

A: Right, there was no claim in that area.

Q: Okay. And so you didn't make any inquiry in that area.

A: No. It just wasn't my issue. That wasn't the task I was charged with.

(Tr. 3357).

Dr. Hutchinson testified that she was not told that the defense was claiming that Ms. Johnson was suffering from a mental disease or defect that might exclude responsibility for the crimes for which she was charged, that she was given explicit instructions that she was to address only mitigation, that she was not told the defense was claiming insanity or that mental illness prevented Ms. Johnson from understanding the nature and quality of her conduct, and that she did not ask her about the homicides charged against her. (Tr. 3627-28). She described what she believed her task to be as follows:

What I was looking for was from my point of view an understanding of how this tragedy could have occurred . . . I'm investigating her mind and her point of view, her way of looking at the world to say how this could have happened and how does it make sense because I think the world makes sense if we know all the pieces.

(Tr. 3628-29). Trial counsel quickly reminded Dr. Hutchinson that she was making no "claim

[39] Mr. Berrigan chose to elicit the limitation on Dr. Logan's evaluation of Ms. Johnson on direct examination, because "[i]t was going to come out in cross-examination . . . and there was no reason to wait for cross-examination for that fact to come out." (H.Tr. 2098). He acknowledges that the fact that his experts did not address mental state at the time of the offense in combination with the absence of an instruction on mental state mitigating factors diminished the mental health evidence he presented, and that it is "not helpful" and "not a good thing" to elicit the limitation imposed on his experts on direct examination. (H.Tr. 2098-99).

147

that your testimony today has to do with the mental state of Angela Johnson at the time of the homicides for which she has been convicted." (*Id.*).

Dr. Hutchinson testified about how the kind of abuse and neglect in Angela's childhood could lead to impulsivity, attachment problems, rootlessness or inhibition, poor self esteem and poor social skills. (Tr. 3637, 3640, 3644). She explained that Angela's abuse lead to post-traumatic stress disorder, that petitioner was "looking for boyfriends to rescue her" (Tr. 3642) and developed an attraction to "bad boys" (Tr. 3646). As an adolescent, petitioner had an anxiety disorder, was promiscuous and never wanted to be alone. (Tr. 3650). Dr. Hutchinson described the resultant post-traumatic stress disorder, stating that : "It can be physiological distress, so your body reacts if you see or think something that's similar to it." (Tr. 3653). PTSD sufferers try to numb or otherwise escape from recurring traumas, which can include a foreshortened sense of the future and they can demonstrate paranoid hypervigilance, irritability, and sleep disturbances. (Tr. 3654-55). Those who, like petitioner, suffer from childhood violence "end up with a brain chemistry that is significantly different than children who don't grow up with that." (Tr. 3669).

Ms. Johnson's impulsivity, disassociation from stressors and inability to envision a future for herself were critical for the jury to consider when contemplating her moral culpability for these crimes. However, as he had with Dr. Logan, the prosecutor was quick to remind the jury that they could not do so. Dr. Hutchinson had to concede she could have asked Ms. Johnson questions about the offense had she not been instructed otherwise; that she was not offering an opinion that Ms. Johnson's PTSD had any effect on her thinking or behavior at the time she committed the offenses; that she was not opining on whether Ms. Johnson was acting under duress; that she was not saying that Ms. Johnson acted from any form of mental defect affecting her ability to recognize right from wrong; that she was not saying Ms. Johnson was unable to understand what she was doing when she purchased the assault weapon; that she was not saying Ms. Johnson was unable to understand what she was doing when she assisted Dunkin Honken in

148

entering the Duncan residence and tying and gagging the victims; that she was not indicating that Ms. Johnson did not know what she was doing and that she [did not] act with free will when she participated in the crimes; and that free will has a place in society, and can make choices within our biological and psychosocial histories.  The prosecutor hammered on that theme: "Q: Just so we're clear, you're not asking this jury to conclude that Angela Johnson somehow suffered mental defects that affected her ability to make choices, A: Yes, I've said that."  (Tr. 3679-82).

Dr. Cunningham was the last mental health expert to testify.  He spoke about how the trauma and other setbacks in Angela's life combined to weigh against the likelihood she would be successful in her life, about "what formed her, not about her mental state at the time of the offense."  Tr. 3796.  Although, like Dr. Hutchinson, he seemed to struggle with not being able to draw the most powerful mitigating conclusions from the evidence he had reviewed.  He referred several times to "moral culpability," which is most directly affected by factors pertaining to what was actually in the heart and mind of the defendant at the time of the crime.  He said that:

> an issue that developmental psychology and forensic psychology are critically concerned with that is also relevant to these evaluations of moral culpability in a capital cases is how does this person get over here [criminal act] and how does that happen?

Tr. 3808.   The focus of his presentation was whether petitioner was on as even a playing field as others and her ability to make "choices," but he was unable to address her ability to choose at the time of the crimes.[40]  He explained that the trauma and other setbacks in petitioner's life combined to weigh against the likelihood that she would be successful in her life, about "what formed her, not about her mental state at the time of the offense."  (Tr. 3796).   He addressed petitioner's "genetic predisposition to psychological disorder," attention and learning difficulties and childhood onset psychological disorder.  (Tr. 3853-54).  He repeated the history of family abuse, dysfunction, substance abuse and other social history data discussed by the other experts

---

[40] Dr. Cunningham was additionally handicapped because he was precluded from testifying about relative culpability between Angela Johnson and Dustin Honken due to his previous work on behalf of Mr. Honken; a condition of Mr. Honken's waiver prevented him from doing so. (H.Tr. 3851-3852.)

149

and linked those factors to the Department of Justice study.   (Tr. 3815-79).

The government, in closing, emphasized the failure of the defense to explain what was

impacting petitioner's thoughts, decisions and reactions at the time of the crimes.  The

prosecutor argued:

> Now, they had experts.  They had a multitude of experts come in and talk
> about her mental state.  Not one of them testified that her mental state was
> such at the time of these murders that because she was pregnant somehow she
> didn't have the ability to control her actions or that her judgment was
> impaired or that somehow she could turn him in or walk away or save those
> children, not one of them.  There is not evidence of that, not a shred.

(Tr. 4028).

> There wasn't – the second thing is there wasn't any evidence – because their
> experts were specifically instructed not to talk to her about these crimes, there's
> no linking of any of this abuse to have anything to do with what her mental state
> was at the time of the murders, no evidence to suggest she wasn't fully capable
> of making that choice, no evidence to suggest she was under duress, no evidence
> to suggest she was somehow mentally impaired when she decided to pull that
> gun out in the Duncan household and condemn Lori Duncan and those girls to
> death.

(Tr. 4031).

> But you know what the defense did not do and they had the opportunity to do it
> with all those experts?  They never once put an expert up there to explain how
> any of this affected her state of mind whatsoever at the time she engaged in these
> murders.  They gave you a bunch of statistics.

(Tr. 4080).

The penalty phase instructions emphasized the limitations of the presentation by

the defense.  The jury was told:

> You have heard testimony concerning Angela Johnson's mental condition.
> This evidence has not been offered for explaining Angela Johnson's mental
> state at the time of the charged killings, and you cannot consider it for that
> purpose.

(Doc. 589 at p. 15).

Trial counsel were able to identify themes in mitigation, which is the easier part, but

they failed in the "hard part [which] is being able to integrate those themes into a compelling

story about the client and the client's life and circumstances and the crime, and that -- that's the

150

hard part is how you weave those themes into the story that is the client's story. And to be able to do that you have to have a wealth of information from a lot of investigation." (H.Tr. 708) (Richard Burr testimony)). To integrate the themes into a compelling story required not only a thorough mitigation investigation that the defense team did not complete[41] but also an explanation of why Ms. Johnson participated in the homicides. The decision not to present evidence of mental state at the time of the offense completely precluded such an explanation.

### B. Trial Counsel's Rationales Were Not Reasonably Tactical or Strategic

Mr. Berrigan made a decision, at some unknown point in his representation of Ms. Johnson, that he did not want his mental health experts to testify about Ms. Johnson's mental state at the time of the murders. (H.Tr. 2075). Trial counsel did not consult with his mitigation specialist, Mary Goody, about his decision before making it. (H.Tr. 232.) She was told about the decision, and she understood that the decision was made to preclude "another mental examination of Angela." (H.Tr. 235.) He did not consult with his testifying experts; rather, he simply instructed them not to discuss the crime with Ms. Johnson. (H.Tr. 3525, Logan; H.Tr. 3609, Hutchinson; H.Tr. 3956, Cunningham). Mr. Berrigan acknowledged that this decision was a horrible mistake. "The mental health evidence, that was a tough call about not talking about the offense, but I think that was a mistake. The truth is after the finding of guilt it didn't matter. Really -- that was such a glaring omission, I didn't realize it until it happened. I didn't predict how bad that was during the cross-examination -- well, I had to do it in the direct examining my own witnesses and saying you weren't -- you weren't asking her anything about the murders. As I'm asking it, I myself am thinking, well, why are you up here? I thought that was a huge problem, and I think the credibility of those witnesses was severely, severely damaged by that decision." (H.Tr. 3178-3179.)

### 1. Diverting the Jury's Attention

---

[41] *See, e.g.,* testimony of Mary Goody at H.Tr. 173-177, testimony of Richard Burr at H.Tr. 709-710.

151

Mr. Berrigan stated to the court before trial that, "I think it's counterproductive in many circumstances for the defense to try to put on evidence of mental health at the time of the commission of the murders. It only brings the jury's attention back to the commission of the murders when in the penalty phase of the trial at least the defense is very much trying to concentrate on the other mitigating circumstances that might exist regarding the defendant and her background character." (Exh. 121 at 984 (telephonic hearing of March 7, 2005).)

Mr. Berrigan's rationale that the jury would be diverted from considering the crime during the penalty phase was not a strategic decision; it was magical thinking. Ms. Greenman explained why. "[T]he jurors are sitting in the jury box and back in the jury room making a decision about sentencing for a capital crime. To think that you're going to somehow in the sentencing phase distract them from thinking about the offense makes no -- it just -- it makes no sense." (H.Tr. 3826) Professor O'Brien agreed. "The jury -- I mean, they're hungering for an answer to this question. It's what they want to know. And I can't remember now who said it. There was somebody involved -- was it Mr. Stowers who said that there was a point at which they lost the jury. You could tell from sitting in the back of the courtroom that the jury was gone. And it would not surprise me if it was the point at which the jury hears the defense expert saying, 'I was asked not to look at that,' and then there's a very effective cross-examination about that. And so, you know, I think -- I think you lose everything at the point. You know, the big concern here is credibility, and you have no credibility if you don't offer the jury the thing they most want to hear. . . ." (H.Tr. 4219)

Professor O'Brien also described the futility of Mr. Berrigan's rationale this way: "It's like not talking about the elephant in the room. That's why the jury is here, and they're going to hear testimony from the victims' family. They're gonig to hear – you know, it's an ostrich approach. It's just not going to work because it's not going away. The circumstances of the crime are very compelling, very powerful, and very traumatic for the jury to have sat through. They're not forgettin it during the presentation of the case." THE COURT: So the extent that the

152

strategy was based on that rationale, in your judgment was it unreasonable?  THE WITNESS: That would be unreasonable, yes.  It's not going away and not in a case like this, your Honor. (H.Tr. 4227-28).

<h3>2.      Avoiding government experts questioning petitioner about the offense</h3>

At the evidentiary hearing, trial counsel testified that his decision not to address mental state at the time of the offense was "consistent with our trial position and the government's efforts to get a psychiatric evaluation of Miss Johnson."  (H.Tr. 2075).  This decision was made before, and independent of, the Court's rulings on issues of disclosure and mental health experts and before the government announced it was going to seek an examination by its own expert. (*Id*., 2075-77).  This decision was based on Mr. Berrigan's experience in another case and his knowledge that, under Rule 12.2, the government was going to have the ability to conduct an evaluation of Ms. Johnson.  (*Id*.; *see also* H.Tr. 3117-3120).

This decision was not based on a concern about what petitioner would say about the events at the time of the crime;  Mr. Berrigan testified that:

> I wasn't sure what she was going to say, to be perfectly honest.  So I think that was part of the problem.  We never made sufficient progress to sort of address that issue.  And then we had the Honken trial.  We had our plea negotiations. [¶] I guess at the end of the day I could have changed the decision and flipped back. I'm sure the Court would have allowed the government to go ahead and question her about the events at the time of the crime right up until the time of trial and present that evidence, but I never did, never did change my mind.

(*Id*., 2077-78).

Mr. Berrigan's decision was not driven by the thought that he might be able to avoid any government mental health evaluation of Ms. Johnson: he was "confident" that if he presented any mental health evidence the government would be able to present some rebuttal testimony.  (*Id*., 2086).  He thought, however, that "if we did not address certain issues, the government would not be allowed to address those as well."  *Id.*

This rationale, that the defense could avoid government experts asking Ms. Johnson about mental state at the time of the offense, was neither strategic nor particularly successful.

153

Rather, it eviscerated the mental health evidence that was presented, something that Mr. Berrigan recognized during trial:

> "The truth is after the finding of guilt it didn't matter. Really -- that was such a glaring omission, I didn't realize it until it happened. I didn't predict how bad that was during the cross-examination -- well, I had to do it in the direct examining my own witnesses and saying you weren't -- you weren't asking her anything about the murders. As I'm asking it, I myself am thinking, well, why are you up here? I thought that was a huge problem, and I think the credibility of those witnesses was severely, severely damaged by that decision."

(H.Tr. 3177)

Federal Public Defender Lisa Greenman, who had lectured on the topic of Rule 12.2 in November 2004 at a seminar attended by Mr. Berrigan, told her audience of capital defense attorneys that they needed to take care with what you allow your defense expert to discuss with the client, but she did not suggest "that the way you address the government evaluation is by setting as off limits what's pretty invariably the essential question a jury has to decide which is what's the relationship between the mental health evidence and the conduct they're judging. . . . [T]he lesson was not don't go into the mental state at the time of the offense, I mean, that would be absurd." H.Tr. 3793

 As Professor O'Brien stated so well,

> Well, beginning first with mental state at the time of the offense, I see it as a huge error to fail to investigate Ms. Johnson's mental state at the time of the offense. I don't see it as a matter of strategy because it's strategy that's not based on investigation. . . . . But, you know, knowledge is power in this situation, and having knowledge about the case is better than not having knowledge about the case. And mental state at the time of the offense is a critical issue in this case. So I don't know how you in a credible way, in a way that has some credibility with the jury and the decision maker, involve mental health experts in your case and don't have them on some level address the client's mental and emotional state at the time of the offense because the jury sees that as an obvious hole in the case. Why are we not hearing this? And if the experts, all they can say is, well, I wasn't asked to look at that, and then the jury concludes, well, because the defense doesn't like what the answer's going to be if they look at that.

(H.Tr. 4207-4208)

Not only was the strategy unreasonable, it failed to prevent the government's experts from asking Ms. Johnson about crime-related information. In their lengthy 2005 interview with

154

Ms. Johnson, they basically covered everything leading up to the crime including relationships with two of the victims, motivation, drug use, everything except the ultimate question of did you do it.  (H.Tr. 236, 2100-2101; *see also* Exh. 114, MAR000001-MAR000189 (transcript of interview)).  Mr. Berrigan made no effort to limit the interview or exclude the testimony of the government's experts on the grounds they violated the Court's order.  (H.Tr. 2101-2102).  In fact, Mr. Berrigan gave his own experts the transcript of the interview but then apparently did not work with them to extract beneficial information about Ms. Johnson from the interview for use in their testimony.  (H.Tr. 2102).

Moreover, the strategy put Mr. Berrigan's own experts's reputations and credibility at grave risk during their testimony.  Dr. Logan testified at the evidentiary hearing that Angela Johnson had talked to him about the crime.  She told him she was not present and she did not admit her guilt to him.  (H.Tr. 3560-3561.)   Had the prosecutor asked the right question at trial, presumably Dr. Logan would have testified truthfully, completely undermining trial counsel's attempt to exclude Ms. Johnson's statements from the jury, destroying both defense counsel's and Ms. Johnson's credibility,[42] and leaving that statement out there with absolutely no explanation.

Even more egregiously, Mr. Berrigan, knowing that Ms. Johnson had spontaneously made statements about the crimes to Dr. Hutchinson, had Dr. Hutchinson remove references to those statements from her notes.  (H.Tr. 2987-2988; 4091-4092; 4102-4111).   Counsel put Dr. Hutchinson in an extremely uncomfortable and compromising situation.  (H.Tr. 4151-58).  When asked by trial counsel whether she had discussed the homicides with Ms. Johnson, Dr. Hutchinson said no.  (Tr. 3628.)  Counsel took Dr. Hutchinson perilously close to perjury with that question.  (*See* H.Tr. 4151-4158 (Court's questioning of Dr. Hutchinson about redacting

---

[42] As Professor O'Brien explained, in a different context: "[W]hen the jury rejects the innocence defense. . . , you don't regain your credibility by bringing in a different lawyer to take over as first chair, because it is actually the client's credibility, it's the client who is perceived controlling what the defense is."  (H.Tr. 4177).

155

notes.)). Had the government asked her whether Ms. Johnson had volunteered any information about the homicides, Dr. Hutchinson would have had to answer yes, completely undermining the credibility of Dr. Hutchinson, defense counsel, and, most importantly, Ms. Johnson.

Professor O'Brien testified that what Mr. Berrigan did was a "disaster" that no reasonably competent counsel should ever do. (H.Tr. 4136-4137). He pointed out that a denial is evidence of lack of remorse and "to hear it through an expert in that context would be absolutely devastating. It was a very risky thing to do." (H.Tr. 4137-4138).

Rather than spend the time throughout the pendency of the case developing a relationship with the client, getting her to the point where she could discuss the crime with her defense team and her experts, trial counsel engaged in a high-stake, indeed the highest-stake, game of "Betcha he won't ask that."

Trial counsel were bound by ABA Guideline 10.5 to develop a rapport with the client that would promote the free flow of information between the client and the defense team. It is "rapport in the mental health sense. Kaplan and Sadock's Comprehensive Textbook of Psychiatry describes rapport as a relationship of warmth and mutual trust in which information flows freely." (H.Tr. 4165 (Testimony of Sean O'Brien).) Professor O'Brien explained to the prosecutor, "The guidelines say very clearly, even the criminal justice standards, that you communicate with the client, you acquire all the information that you can from the client. And, you know, the death penalty defense guidelines pick up on that and expand it a little bit. But I'm not aware of any guideline that says it's okay not to talk to your client about what happened." (H.Tr. 4181-4182). Unfortunately, that is what trial counsel did for most of their representation.

They failed miserably to develop a rapport with Ms. Johnson. Between August 2000 when Ms. Johnson was arrested and December 31, 2004, five months before trial, each of her attorneys spent, on average, less than 14 hours per year communicating in person or by phone

156

with Ms. Johnson. (Exh. 93, p. 4).[43] Most of that contact was with Al Willett. (Exh. 93, p. 20 (graph by year)). Learned counsel averaged less than 10 hours per year with Ms. Johnson. (Exh. 93, p. 11). During the year 2003, Ms. Johnson saw or spoke by phone with her attorneys for a grand total of only 10.4 hours. (Exh. 93, p. 4). Each trial lawyer spent vastly more time traveling than they did with their client. Although a legal assistant spent significant amounts of time with Ms. Johnson, the responsibility for developing a rapport with the client cannot be delegated. "You need contact with somebody who is fully knowledgeable in the law, somebody who can address the issues of the seriousness of the case, and it's ultimately going to be counsel's guidance that's going to allow the client to make an informed decision." (H.Tr. 1703 (Russ Stetler Testimony).)

They did not use the resources available to them – neither their mitigation specialist nor their mental health experts – to assist them in getting Ms. Johnson to a place where she could discuss the facts freely. (H.Tr. 74 (Goody testimony); H.Tr. 3633 (Hutchinson testimony); H.Tr. 4229-4230 (O'Brien testimony)).

They did not use their investigators to follow the leads provided by Ms. Johnson, leads that would have bolstered her protestations of innocence or demonstrated that she did not have an affirmative defense. (*See*, H.Tr. 1705-1706 (Stetler testimony: "Well, you certainly need to demonstrate to the client that you are taking suggestions seriously, you're not just dismissive, you are checking out facts. And it's a relatively modest investment to send an investigator out and talk to some witnesses, even if you don't think that they're going to be particularly productive.)) (*See also* H.Tr. 429-430 (Lanoue testimony); H.Tr. 1843-1844 (Cornell testimony); H.Tr. 2351 (Gratias testimony)).

Ms. Johnson was not the one who obstructed the development of a rapport. (H.Tr. 80 (Goody testimony); H.Tr. 412 (Lanoue testimony); H.Tr. 1934-1935 (Nevins testimony); H.Tr.

---

[43] The total number of hours billed for interviews and conferences with client during the period August 2000 to December 31, 2004 was 175.45. That number, divided by 3 lawyers, then by 4.4 years, is 13.3 hours.

157

3519 (Logan testimony); H.Tr. 3658 (Hutchinson testimony). Professor O'Brien, in his review of the case, concluded that Ms. Johnson "was cooperative, open, often reaching out to her defense team, not just waiting for them to show up but contacting them by phone, not obstructing the mitigation investigation in any way. (H.Tr. 1807).

Indeed, even in the midst of those difficult relationships, Ms. Johnson admitted her participation in the crimes and agreed to the facts as Mr. Berrigan described them in a proffer to the government. (*See, e.g.,* H.Tr. 3070-3072; H.Tr. 3098-3094).

"The ultimate goal [of establishing the kind of rapport ABA Guideline 10.3 ], of course, is to help the client avoid execution, to help the client avoid the death penalty. And then there are minor, you know, shorter-term goals in between. And the first is to enable the client to share critical aspects of the client's life history because there are many things that are difficult for clients to talk about, painful childhood memories, abuse, things that might not reflect well on a mother or on siblings or on a spouse or significant other or codefendants. There are many, many barriers to the disclosure of that kind of information. [¶] There's a similar set of barriers to disclosure of information about the offense. Some of those are real and intentional. The client doesn't want to talk about it, doesn't want to admit guilt for obvious reasons, but there are also psychological barriers to the client's ability to confront this horrible thing." (H.Tr. 4167 (O'Brien testimony)).

Instead of developing a relationship of warmth and trust, learned counsel set the tone for his communications with Ms. Johnson by insisting she plead guilty during their very first meeting. (H.Tr. 587-588). He did not ask or expect Ms. Johnson to confide in him about the facts of the crime. (H.Tr. 2920-291). Because of trial counsel's unreasonable failure to establish a rapport with Ms. Johnson, he backed himself into the unreasonable decision to preclude his experts from discussing the crime with Ms. Johnson. (*See*, Declaration of Sean O'Brien, Exh. 106, OBR000024-OBR000027.)

> **3.** **Relying on a mental state defense without presenting mental state at the time of the offense**

158

Even if one assumes that trial counsel, with their experts, could not have built the relationship to get Ms. Johnson to talk about the offense, they were not precluded from presenting mental state at the time of the offense.

Mr. Berrigan, however, operated under the mistaken assumption that he was precluded from doing so. He told the Court on March 7, 2005 that the defense experts were instructed not to question Ms. Johnson about the alleged commission of the murders or her mental state at the time of the murders. He went on to concede a much broader issue: that the mental health evidence will only relate to her past and her present as mitigating factors, that she did not intend to rely on duress or lack of capacity, and that she would not argue for mitigation on the basis of any offense-specific mental condition. *United States v. Johnson*, 383 F.Supp. 2d, 1145, 1164. He also conceded that "the government might be entitled to impeach her experts with why they did not ask her about her mental state at the time of the offenses, if the government makes some showing that such questions are relevant to a proper evaluation of her mental condition mitigating factor." *Id.* at 1165, n.1.[44]

Indeed, Mr. Berrigan hoped the jury would come to the conclusion on its own, without any direction from his presentation of the mitigation evidence. He thought he would still be able to get a mitigating factor instruction regarding impaired mental state at the time of the crime, because "mental state is on a continuum" and if a mental disorder that existed before the murders and after the murders "you could draw a conclusion that she was suffering from [a mental disorder] at the time of the murders. (*Id*., 2087-88).

Counsel's concessions were apparently based on a misplaced conflation of two ideas: if the experts cannot discuss the facts of the crime with the client, they also cannot talk about her mental condition at the time of the offenses. In answer to the Court's question about why the defense experts were precluded from talking about domination or battered women's syndrome,

---

[44] In fact, the government did impeach the defense experts in that manner, without objection, despite the fact that the defense was not putting on mental state at the time of the offense evidence.

159

or Ms. Johnson's relationship with Mr. Honken, Ms. Greenman explained, "Because he . . . so limited the questions to them so when he's doing his questioning to them, he keeps saying, 'And I don't want you to tell me her mental condition at the time of the offense.' He doesn't understand that having – having made a decision . . . to not let his experts talk to her about the offense, he then thought that the inevitable consequence of that decision was that the experts could say nothing – THE COURT: About her mental state at the time of the offense. THE WITNESS: Right, which it eviscerated the heart of mitigation. I mean, there was nothing left." (H.Tr. 3804-3805).

Yet, when the Court, in reliance on Mr. Berrigan's mistaken concessions, ruled on March 17, 2005 that, "based on her representations to the court and the taint attorneys, Johnson is now foreclosed from asserting any offense-specific mental condition mitigating factor in the penalty phase," *United States v. Johnson*, 383 F.Supp.2d 1145, 1167 (N.D.Iowa 2005), Mr. Berrigan did not object, nor did he re-weigh his decision not to present evidence of mental state at the time of the offense. (H.Tr. 2088-89). Instead, he plowed ahead, resulting in a presentation that did not in any way tie Ms. Johnson's impairments, dysfunctions, and disorders to the one thing the jury cared about: why she participated in five homicides.

The result of this unreasonable decision was not only to prevent counsel from asserting any of the statutory offense-specific mental condition mitigating factors but to draw an instruction that specifically prohibited the jury from considering Ms. Johnson's mental health testimony for the purpose of determining her mental state at the time of the charged killings. Doc. 589, Final "Penalty Phase" Instruction No. 5. This was the final stake in the heart of the mitigation.

In this case, counsel decided to pursue a factually unsupported mental state guilt phase defense. Putting aside the unreasonableness of such a defense, once counsel affirmatively asserted that Ms. Johnson lacked the requisite mental state to be found guilty, they left themselves no choice but to offer an explanation as to what was going on in her mind at that

160

time.  It was ineffective to limit the evaluation of petitioner in the manner chosen by trial counsel.

### C.     The evidence that could have been presented

#### 1.          Evidence known to the mental health experts in 2005

Dr. Hutchinson testified at length during the evidentiary hearing about what she could have said, even without interviewing Angela Johnson about the crime itself,  about Ms. Johnson's mental state in conjunction with each of the three statutory mitigating factors (18 U.S.C. § 3592(a) (1), (2), and (6)) of impaired capacity to conform her conduct (H.Tr. 3610-3611, 3645) or to appreciate the wrongfulness of her conduct (H.Tr. 4067-4071), duress (H.Tr. 3611-3625, 4072-4078), and severe mental or emotional disturbance (H.Tr. 3625-3636, 3650, 4076-4077), based on her own evaluation and the evaluations of Dr. Gelbort and Dr. Logan.

Dr. Logan testified that, although he had been told not to discuss the facts of the crime with Ms. Johnson (H.Tr. 3515-3516), it is possible to develop mental state defense evidence from confessions to others even if the client is maintaining her innocence.  (H.Tr. 3596-3597). He could have testified about (a) his possible diagnosis of borderline personality disorder, which is marked by a number of symptoms in Angela Johnson's history, including detachment from reality, dissociation, paranoia, rage, emotional volatility, self-abusive behavior, and drug abuse (H.Tr. 3530), (b) her symptoms consistent with affective spectrum disorder, including bipolar disorder, of very impulsive behavior and extreme emotional volatility (H.Tr. 3545), (c) her inability to see bad consequences (H.Tr. 3547), and her symptoms of PTSD leading to a damaged nervous system, inadequate coping skills, and a predisposition to bipolar behavior (H.Tr. 3547).  He was not asked, however, about any of these symptoms; he was only asked about depression and he was not even asked to address the severity of her depression.

Dr. Cunningham agreed with Drs. Hutchinson and Logan that he could have discussed

the defendant's conduct at the time of the crime in relation to mitigating factors without interviewing Ms. Johnson about the crime by "focusing my attention on factors that are – that are static or that are part of the interaction of this person or that are context based."  (H.Tr. 3956-3957).   He explained what his role at sentencing should have been in this way: "At sentencing we're dealing with another issue, not is she responsible but rather what is her level of moral culpability, not a term that's mine but one that's in landmark Supreme Court case law, Woodson and Penry and Lockett and many cases. [¶] Now we're at the sentencing phase, and we're no longer looking at this bright standard of could she control herself. Now we're talking about continuums. What diminished the control that she could bring to bear, not did she have a choice but what shaped and framed her perception of the choices that she had, not did she know right from wrong but what framed and shaped her morality and her value system." (H.Tr. 3903)

He discussed the numerous factors in Ms. Johnson's life that led to Ms. Johnson being impaired in her ability to appreciate the wrongfulness of her conduct, touching on the research that supported his opinion,  and the evidence of her inability to do so in other contexts.  (H.Tr. 3962-3967).  This testimony was given as an example of what Dr. Cunningham could have done in conjunction with mental state at the time of the offense; Dr. Cunningham could have addressed other mitigating factors related to mental state at the time of the offense if asked to do so.  (H.Tr. 3960-3961).

Dr. Cunningham also went through the power point presentation he had prepared for Ms. Johnson's case and showed the Court all of the testimony that defense counsel had stripped from his presentation – testimony that would have tied the risk factors he was discussing to specific events and people in Ms. Johnson's life to demonstrate how she personally was at risk. (H.Tr. 3904-3934; 3937-3951; 3955; Exh. 104, CUN000738-CUN000800).   He could have, but was not asked to, discuss how these life circumstances impacted her behavior at the time of the crimes.  (H.Tr. 3956).

<strong>2.          Evidence that reasonably effective counsel should have developed</strong>

162

Because trial counsel did not follow up on the suggestions of Dr. Logan, Dr. Gelbort, and Dr. Cunningham to do more investigation into possible brain impairments, none of the mental health experts who testified were able to present evidence of those brain impairments. Habeas counsel did that investigation through the work of Myla Young, Ph.D., James Merikangas, M.D., and George Woods, M.D. Had that work been done, additional evidence of Ms. Johnson's mental state at the time of the offense could have been introduced.

Dr. Young conducted neuropsychological testing of Angela Johnson in early 2010. She found evidence of brain dysfunction, with her greatest weakness in mental ability to be her ability to process information into memory and then formulate a response to that information, scoring in the 13th percentile on the working memory index. (Exh. 112, YNG000033). She demonstrated some level of impairment across all brain functions, with the greatest impairment in the pre-frontal cortex, temporal cortex, and limbic cortex structures, as well as significant impairments in all connecting systems among these brain structures. (Exh. 112, YNG000033-YNG000034).

Dr. Young opined that these type of brain impairments impair the ability to assess situations, problem solve, act according to plan, and to change actions when the plan is not working. People with these types of brain impairments frequently use poor judgment, are labile, and are unable to develop insight into their actions. (Exh. 112, YNG000035).

She further opined that, under reasonably simple, reasonably structured situations which provide reasonable interventions when needed, people with these types of brain impairments can function adequately. In complex or highly stressful situations, however, they are quite likely to act in uncontrolled, unreasoned, and inappropriate ways. They are frequently unable to change their actions, even with appropriate interventions. If able to change their actions, they are frequently unable to sustain that change. They often misunderstand situations, over respond, are unable to remember and associate past experiences and consequences with the current situation, therefore acting impulsively. They are more vulnerable to future trauma, and

163

subsequent incidences of trauma predictably result in greater consequence than is anticipated for the normal brain.  (Exh. 112, YNG000035).

Dr. Young identified four likely etiologies for Ms. Johnson, given the information that was currently available: severe childhood abuse; drug abuse, including alcohol abuse at a young age of 12-13 years old; psychiatric disorder, including mood disorder, psychotic disorder, and/or PTSD; and closed head injury, occurring in childhood, at the age of 20, and the age of 23.  (Exh. 112, YNG000036-YNG000037).

During her testimony, Dr. Young pointed out that she knew Ms. Johnson suffered brain impairment in her childhood because of the scores on many of the tests, called "hold" tests, that remain stable in the face of  severe neurological damage or severe psychiatric impairment. (H.Tr. 4537-4539).  Not all of the tests Dr. Young gave were "hold" tests but most of them were. (H.Tr. 4540).  Two examples of hold tests she gave Angela Johnson are the vocabulary comprehension and matrix reasoning subtests of the WAIS-IV.  (H.Tr. 4541).  Ms. Johnson showed impairment on both those tests, and had she been tested at age nine, she would have shown the same impairment on those tests.  (H.Tr. 4540-4541).

Dr. Young explained that, although the field of neuropsychological assessment and brain functioning have developed since 2005, the specialty of neuropsychology was well-established in 2005 and the testing she did in 2010 used instruments most of which were available in 2005.  Testing at that time would have provided similar results.  (Exh. 112, YNG000035).  She also noted that the four etiological factors she identified as well as toxin exposure were known for Angela Johnson in 2005 and should have alerted her counsel to the possibility of brain dysfunction and the need for comprehensive neuropsychological testing. (Exh. 112, YNG000037).

In February 2011, Ms. Johnson was also given a series of neurological tests: an MRI, a PET/CT Scan, and an EEG which were interpreted by James Merikangas, a board certified neurologist and psychiatrist.  (H.Tr. 4016; Exh. 107, WOD000082-WOD000085; Exhs. 109-

164

111). Dr. Merikangas identified on the MRI images where he saw evidence of brain damage or injury. The MRI showed bilateral subcortical hyperintensities that might have been caused by demyelinating of the axons. (H.Tr. 4022). Childhood infections such as encephalitis can cause this, as well as methamphetamine abuse. (H.Tr. 4022). The hyperintensities could been seen on the periventrical space on the tip of the lateral ventricles, on the frontal lobe of the brain which controls executive functioning. (H.Tr. 4025). People with impairment of the frontal lobe have bad judgment, make bad decisions, and react strongly and inappropriately to situations. (H.Tr. 4025).

The MRI also showed a misshapen left temporal lobe, which is the area of the brain that is important for memory, thinking, and language. (H.Tr. 4026). Epilepsy or seizures stem from this area of the brain. Temporal lobe seizures are frequently what is called psychic phenomena, such as auditory and visual hallucinations, strange religious delusions, and can progress to convulsions but not necessarily. (H.Tr. 4026). The MRI shows a loss of tissue or a malformation of Ms. Johnson's left temporal lobe. (H.Tr. 4026- 4027). The MRI also shows a general loss of brain in the left hemisphere. (H.Tr. 4028). Although Dr. Merikangas could not say to reasonable degree of medical certainty, it is likely that the hyperintensities were caused by her methamphetamine use and were present in 1993, and it is likely that the temporal lobe malformation is congenital or developmental, present for her entire life. (H.Tr. 4030). The MRI showed a loss of tissue in both parietal lobes, and Dr. Merikangas cannot say whether that loss was historical or more current. (H.Tr. 4031). He noted that atrophied brain tissue can occur in childhood and will result in reduced intellectual function. (H.Tr. 4032). The degree of atrophy in Ms. Johnson's brain is not normal for a 47-year-old woman. (H.Tr. 4032).

Dr. Merikangas explained that a PET/CT Scan assesses brain functioning while an MRI is an anatomical view. (H.Tr. 4038). His review of the PET/CT Scan led him to conclude that "there was a reduced amount of brain activity in the left temporal lobe primarily and also in the frontal lobes compared to the rest of the brain." (H.Tr. 4036). He showed the Court the scan data

165

he relied on to make that conclusion, (H.Tr. 4037-4038). Although the abnormalities on the MRI and abnormalities on the PET/CT Scan do not correlate directly because the tests are looking at different things (anatomy v. function), the information does run together. (H.Tr. 4038). Although the atrophied brain seen on the MRI and the impaired brain functioning of the EEG have some correlation, Dr. Merikangas opined that Ms. Johnson's lifelong history of psychiatric and emotional and behavior problems correlated more closely with the EEG results. (H.Tr. 4039). Dr. Merikangas acknowledged that, "I can just say that the behavior's abnormal, but I can't put any particular label on either the cause of it or the exact consequences of it. For that you need the other data, the behavioral history, the neuropsychological testing, and various laboratory tests." (H.Tr. 4039).

Dr. Merikangas also reviewed the EEG. In doing so, he noticed that the theta slowing, which could be caused by drowsiness or epileptic activity, in the left temporal lobe was slower than in the right temporal lobe. (H.Tr. 4043). To Dr. Merikangas, "To me this was indicative of an abnormality that would go along with what was seen on the PET scan and also on the psychological testing." (H.Tr. 4043). Dr. Merikangas pointed out to the Court where he saw the abnormality, which he described as subtle. (H.Tr. 4044-4045).

Dr. Merikangas found that the data on the three scans correlated well with the results of Dr. Young's neuropsychological testing, as well as with an impaired score on the Halstead-Reitan category test and a statistically significant difference between verbal and performance scores on an IQ test with an overall score of 92. (H.Tr. 4045-4046).

Dr. Merikangas agreed with the prosecutor that he had used technology that did not exist in 2005 to view the data (H.Tr. 4047-4048) but the machines that were used to do the tests either existed in 2005 or were virtually identical to machines that existed in 2005. (H.Tr. 4061-4062).

George Woods, M.D. was also retained by habeas counsel. He did a comprehensive neuropsychiatric evaluation of Angela Johnson, and produced two reports, one dated October 5,

166

2009 (Exh. 107, WOD000058-WOD000081), and a supplemental report dated May 26, 2011, with an errata dated June 9, 2011 (Exh. 107, WOD000098-WOD000188).  In addition to his own clinical and forensic evaluation, Dr. Woods relied on the work of Dr. Young and Dr. Merikangas, as well as the reports, testing, and evidentiary hearing testimony of the defense experts retained by trial counsel (Exh. 107, WOD000186; H.Tr. 4330-4331).

Based on his comprehensive evaluation (described in Exh. 107, WOD000101-WOD000143), Dr. Woods concluded that "Ms. Johnson's mental diseases/defects have affected every part of her life, including her mental state at the time of the offenses in the present case." (Exh. 107, WOD000100).  He diagnosed her with temporal lobe disease, on both sides of her brain (*Id.*) and found that she demonstrates cognitive deficits more global than temporal lobe dysfunction.  (*Id.*)  Neuroimaging and neuropsychological testing revealed deficits in her frontal and parietal lobe functioning, as well. (*Id.*)  Dr. Woods concluded that the neurological deficits impair her ability to adequately weigh and deliberate, sequence her thinking and actions, and understand and respond to social cues.  (*Id.*) They also made her vulnerable to dissociative periods, a vulnerability that is neurologically mediated and environmentally induced.  (*Id.*)

Dr. Woods also diagnosed Ms. Johnson with Complex Post Traumatic Stress Disorder at the time of trial, concluding that her brain impairments were causative stressors and contributed significantly to her inadequate and destructive coping mechanisms.  (*Id.*)  He found that the exploration of Ms. Johnson's traumatic history at the time of trial failed to adequately address the reasons why the trauma occurred, and underestimated and incompletely presented the impact of the trauma. (*Id.*) He also found that Ms. Johnson's cognitive deficits were not elucidated, and the impact of the brain impairment and trauma on Ms. Johnson's decision making was not explained. (*Id.*)

Dr. Woods concluded that the foundation of Ms. Johnson's problems rest on her cognitive deficits, especially the temporal lobe deficits, but also including the significant deficits in the other regions of the brain. (*Id.*)

167

Dr. Woods reviewed the extensive evidence of brain impairments and their consequences beginning in childhood, some of which had been developed by the trial defense team and government's experts in 2005, but including additional evidence that had been uncovered by habeas counsel's investigation (*see, e.g.,* footnotes 9-13, 15-16, 18-24 Exh. 107, WOD000106-WOD000114).  He next reviewed the evidence and consequences of Complex Post-Traumatic Disorder, again relying on a combination of evidence developed prior to trial as well as evidence uncovered by habeas counsel.  (Exh. 107, WOD000125-WOD000134).  Similar reviews were conducted regarding Ms. Johnson's methamphetamine abuse (Exh. 107, WOD000134-WOD000136), dissociation (Exh. 107, WOD000136), and dependent personality disorder (Exh. 107, WOD000137).

Finally, Dr. Woods reviewed the results of his mental status examination (Exh. 107, WOD000137-WOD000139) and the observations of government experts in 2005 that were consistent with Ms. Johnson's temporal lobe dysfunction, behavioral and medical problems from childhood, and abuse to her head.  (Exh. 107, WOD000139-WOD000140).

With the added benefit of Ms. Johnson relating her recollections of her participation in the crimes (Exh. 107, WOD000143-WOD000147), Dr. Woods was able to opine about Ms. Johnson's mental state at the time of the offense.  He diagnosed her at the time of the offense as suffering from the following Axis I disorders:  bipolar mood disorder, secondary to a general medical condition of temporal lobe dysfunction; cognitive disorder NOS; PTSD complex, severe and chronic; and chronic methamphetamine abuse.  (Exh. 107, WOD000142).  He also diagnosed her with the Axis II disorder of dependent personality disorder, and several Axis III disorders, including dysexecutive syndrome secondary to frontal lobe impairment and parietal lobe dysfunction.  He diagnosed her as having the Axis IV disorder of extreme intimidation inter-personal relationships.  (Exh. 107, WOD000143).

Those clinical formulations led him to several forensic formulations, which could have been presented at trial.  Dr. Woods found that the combination of Ms. Johnson's medical and

168

neurobehavioral disorders, and her child and adult history of extreme and prolonged trauma, produced both brain damage and psychiatric disorders that substantially impaired her capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law. (Exh. 107, WOD000143).

Dr. Woods further found that Ms. Johnson was incapable of understanding and predicting outcomes of situations in a normal way, due to her impairments in judgment and insight and her inability to plan and predict consequences. He found, however, that she may have understood the potential consequences of aiding Mr. Honken after the deaths of Mr. Nicholson and the Duncans. (Exh. 107, WOD000149).

Dr. Woods also concluded that Ms. Johnson suffered from severe mental and emotional disturbances. (Exh. 107, WOD000149). Finally, he found that she was under unusual and substantial duress when she aided and abetted Mr. Honken. (Exh. 107, WOD000149-WOD000162).

Over the course of many hours, Dr. Woods was also able to build the rapport with Ms. Johnson that trial counsel had so miserably failed to do, and consequently was able to get Ms. Johnson to discuss her involvement in the offense, and to personally observe her expressions of remorse. As discussed more fully in Court Claim No. 42, *infra*, evidence of remorse offered through expert testimony can be very powerful mitigation. "You know, if you have an expert say she described the offense to me, and she was very tearful and can describe the recounting of it, and the sobbing and the tears and if that also occurs, you know, that's – juries accept that. (H.Tr. 4224 (O'Brien testimony)).

Dr. Logan, Dr. Hutchinson, and Dr. Cunningham agreed that the information in the reports of Dr. Young and Dr. Woods, and the neuroimaging, as Dr. Logan testified, "could have shown that brain impairment was a part of the difficulty she had throughout her childhood, may have explained why she got a disproportionate amount of abuse from her mother, could have explained some of her difficulties with learning, could have explained some of her difficulties

169

with emotional control and decision making and judgment," (H.Tr. 3552) as well as her dysfunctional relationships with Dustin Honken and Terry DeGeus. (*Id.*). The diagnosis of temporal lobe epilepsy and frontal lobe damage would have been evidence of her difficulties with problem solving and explained why she did not drive away with the two children when she had the opportunity to do so. (H.Tr. 3591), and the evidence of intimidation by Dustin Honken would have helped explained why she felt trapped in the situation. (H.Tr. 3591-3592). (*See also* H.Tr. 3629 (Hutchinson testimony that the information in Woods' report would have strengthened her testimony); H.Tr. 3935-3937 (Cunningham testimony regarding how the information in Woods' and Young's reports, and the neuroimaging, could have been incorporated into his presentation)).

All of this testimony, even if rebutted by government experts Dr. Daniel Martell and Dr. Joseph Dvoskin, would have provided a persuasive explanation to the jury of the question that was in the forefront of their minds: Why did Angela Johnson participate in these crimes? By instructing the trial mental health experts not to explore Ms. Johnson's mental state at the time of the offense and not doing so themselves, trial counsel cut off the investigation that would have led to the evidence to save Ms. Johnson's life. *See* Declaration of Sean O'Brien, Exh. 106, OBR000031. They did so without a reasonable strategic or tactical reason, and their unreasonable decisions led to a woefully impoverished presentation that the jury visibly rejected.

### D.     Prejudice

The prejudice to Ms. Johnson from trial counsel's decision to limit the evaluations of his experts was severe.   The limitation Mr. Berrigan imposed on his experts undermined and diminished their credibility and the persuasiveness of their testimony. Any mitigator based on mental state at the time of the offenses was precluded, as was a proposed mitigator based on petitioner's being under the "substantial influence" of Dustin Honken at the time of the crimes because counsel failed to develop evidence to support it.

170

Despite trial counsel's consistent position that no evidence of what was going on in petitioner's mind at the time of the offenses was to be presented, counsel, at the last minute, violated his own rule by arguing that she "could have saved" the children but did not because "she was weak." (Tr. 4040).

As *Strickland* expert Sean O'Brien stated, "[T]rial counsel performed deficiently by failing to acknowledge clear realities in the communications with Ms. Johnson, and in pursuing a defense of innocence in the face of overwhelming evidence and without exploring the critically important issue of her mental state at the time of offense. In spite of the terrible nature of the crimes in which Ms. Johnson played a key role, adequate performance could have enabled her to avoid the death penalty. (Exh. 106, OBR000031).

Counsel's pervasive ineffectiveness on mental state issues was prejudicial because the "undiscovered mitigating evidence, *taken as a whole*, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability" so that "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S.Ct. 2456 (citations and internal quotations omitted)(emphasis added).

## COURT CLAIM NO. THIRTY-FIVE

**Court Claim No. 35 – Failure to prepare mitigation: Delay in Hiring Dr. Gelbort, Failed to Follow-Up on His Recommendations, Failed to Instruct Him to Conduct a More Thorough Battery of Neuropsychological Tests, Failed to Retain Another Neuropsychologist When Gelbort Inexplicably Refused to Testify, Failed to Incorporate His Helpful Findings and Diagnosis Into the Testimony of the Experts Who Did Testify and Failed to Conduct Additional Neuropsychological and Neuroimaging Testing of Petitioner**

Mr. Berrigan testified that the first step in a capital case is neuropsychological testing for brain impairment, followed by an MRI or PET scan or other diagnostic tests. (H.Tr., at 2980-2981). Dr. Logan recommended neuroimaging and neuropsychological testing as early as February 5, 2001, when he wrote to Mr. Berrigan that "[a] psychiatric evaluation of Ms. Johnson would involve the following procedures . . . .IV. Coordination with psychologist to

171

obtain approval for appropriate tests including neuropsychological tests if indicated.  V. Coordination with other medical specialties to obtain indicated physical, laboratory and x-ray examinations such as EEG, MRI, CT scan, PET scan." (Exhibit 1, MG004228-4233).  On December 7, 2001, mitigation specialist Mary Goody alerted  to the need for neuropsychological testing of Ms. Johnson.  (H.Tr. 104).   Mr. Berrigan noted, on May 29, 2002, that he needed an "ex parte motion on [neuropsychologist] Dr. Gelbort – ASAP!  Al to send him a letter!!" (Exh. 67, MCN02-002025).   Yet later in 2002, Mr. Berrigan responded to Goody's offer to contact Dr. Gelbort by instructing her not to "sign [him] up yet."  (H.Tr., 151).

On October 23, 2002, Mr. Berrigan contacted Dr. Gelbort and obtained a promise that he would evaluate petitioner when funds were acquired for this purpose.  (H.Tr. 151-52).[45]  On September 1, 2004, Berrigan's notes include "[t]alk to Michael Gelbort about evaluation, w/o talking to AJ about." (Exh. 67).   After the jury in Dustin Honken's case returned death verdicts, Mr. Berrigan wrote Mary Goody that "I've been holding off on getting Michael Gelbort involved, hoping that if Dustin got life, we'd have a good chance to plead Angela's case.  That strategy seems pretty naive now." (Exh. 67, MCN-04-004224).

Despite trial counsel's early recognition of the need for a neuropsychological examination of Ms. Johnson, Dr. Gelbort did not see petitioner until January 24, 2005.  (Exh. 8, CF-000865).   Mr. Berrigan admitted that this was "pretty late" into the case.  (H.Tr. 2183).

Mitigation specialist Mary Goody spoke to Dr. Gelbort on February 3, 2005, shortly after he concluded his testing.  According to her notes, Dr. Gelbort told her that  Ms. Johnson "had some memory disturbance;" that she had an 18-point differential spread between her verbal and performance IQ, which is statistically significant and indicates that one hemisphere of the brain had damage and the other does not;[46] that she has "difficulty seeing consequences for her

---

[45] Mr. Berrigan did not obtain funding for Dr. Gelbort until February 4, 2005. (Exh. 8, CF-0006400).

[46] Mr. Berrigan also understood that the difference between petitioner's verbal and performance IQ scores was significant because it supported a diagnosis of mild neurological impairment.  (H.Tr. 2983).

172

actions;" that "her intuitive reasoning is mildly impaired;" "that her brain has holes in it, . . . like cheese, Swiss cheese, has holes in it, so there are areas of her brain that are not working properly and just, you know, they could be dead areas of her brain;" that "[i]n . . . the categories test, her problem solving was more impaired on intuitive but better on rote;" that "[s]he has bad judgment and not terribly well thought . . . in intuitive communication and in personal communication and relations with other people, her dealings with other people;" that "she's bad on nuances and cannot apply long-term logical thinking;" that "[h]er insight is not great;" that "she really tried hard on the tests," but "would rush through things sometimes which would cause her to become . . . unravelled;" that "the diagnosis he would give would be cognitive disorder NOS;" that "with meth all her symptoms get worse;" that "she had Swiss cheese before the meth and the meth made it worse;" that [a] pharmacology consultation would be useful to touch on how it affects her brain, the meth;" and that "she's one that shows a positive finding on a PET scan if there's no downside to it."and translates into petitioner being really impaired. (H.Tr. 188-92).

Dr. Gelbort found petitioner to be mildly impaired. (H.Tr. 186-87). In the context of neuropsychological testing, mild impairment does not mean insignificant impairment. (H.Tr. 186-88; 2982-2983). Mild impairment is not insignificant. (H.Tr. 188).[47]

Although Dr. Gelbort subsequently told Ms. Goody that he did not want to testify because "there's nothing huge or useful, nothing useful, too much crap," clearly Dr. Gelbort's own preliminary test results called for a fuller neuropsychological and neuroimaging work-up of the case as Ms. Goody herself acknowledged. (H.Tr. 194-97). Ms. Goody testified that Dr. Gelbort's findings indicated the need to call in other experts. (H.Tr., 189). She talked to Mr. Berrigan about neuroimaging, but she did not recommend that neuroimaging or other testing be

---

[47]At the time Dr. Gelbort tested Ms. Johnson and talked to Ms. Goody about the test results, he had not seen any materials about petitioner or this case. Ms. Goody testified that it was not until April of 2005 that she learned trial counsel had not provided any case materials to Dr. Gelbort. (H.Tr. 138). Mr. Berrigan testified that he delegated the task of sending materials to Dr. Gelbort, setting up his interview of petitioner, and finding the results of his testing to Ms. Goody, because she had previous experience with Dr. Gelbort and he did not. (*Id*., at 2981-2982). Ms. Goody had worked with Dr. Gelbort once before petitioner's case. (H. Tr. 285).

173

done. (*Id*., 193). After her discussions with Mr. Berrigan about Dr. Gelbort's testing, Ms. Goody e-mailed Dr. Gelbort asking him to write a brief report of his findings. (HT 194). If Dr. Gelbort prepared a report, Ms. Goody has never seen it. (*Id*.).

Ms. Goody testified that she did not know the specific tests that Dr. Gelbort had administered to petitioner. As far as she knew, he may have only performed a preliminary battery of tests; if this was the case, additional neuropsychological testing was necessary. (H.Tr. 193-94). Mr. Berrigan also understood that Dr. Gelbort did a preliminary screening battery of tests; he spent a couple of hours with Ms. Johnson and left. (H.Tr. 2984-2085). He cannot recall why he did not ask for a more thorough neuropsychological testing given Dr. Gelbort's preliminary testing results; he does not believe that Dr. Gelbort was unwilling to follow-up, but they never asked him to follow-up. (*Id*., 2985).

From February 3, 2005 until May 12, 2005 Ms. Goody had no contact with Dr. Gelbort. When she spoke to him on May 12th, Ms. Johnson's trial had already started. (*Id*., at 195). Dr. Gelbort told her that he did not want to testify; that there was nothing "huge" or useful in his findings; and that he did not think it was a good decision to call him. (H.Tr. 194, 284). Ms. Goody did not understand what was going on with Dr. Gelbort; his demeanor was curt, he did not want to talk to her and had avoided her for some time before they spoke. (H.Tr. 196).

Ms. Goody told Mr. Berrigan about her conversation with Dr. Gelbort, and her best recollection is that Mr. Berrigan told her to "just forget it." (H.Tr. 196, 286-87). Mr. Berrigan does not recall either Ms. Goody telling him that Dr. Gelbort did not want to testify or that Dr. Gelbort was unavailable.[48] (H.Tr., 2981-2984, 3033).

Ms. Goody never made a strategic decision, based on what Dr. Gelbort reported, that there was "no issue here." (H.Tr. 196). On the contrary, she believed that his work indicated petitioner had cognitive problems. (*Id*.). One strategy at that point would have been to hire a

---

[48] Mr. Berrigan testified that there would have been no reason not to subpoena Dr. Gelbort ; the fact that he did not want to testify would not, in and of itself, be determinative of whether he did testify. (*Id*., at 2984).

174

new expert, but she believes that Mr. Berrigan felt they could not get another expert at that late date, even though they did not have a neuropsychologist to testify. (H.Tr. 196-97). Ms. Goody believes that she and Berrigan also talked about providing Dr. Gelbort's data to another expert for evaluation, but because he had never written a report there were difficulties with that. (*Id*., at 197). According to Ms. Goody, "this issue just got lost" given "the huge crush of things that were trying to be addressed and done at this time" (H.Tr. 197).

Mr. Berrigan testified that he decided not to call Dr. Gelbort because "in light of the lack of supporting evidence I didn't think that finding was sufficient to warrant introducing him as a witness." (H.Tr., at 2977-2978). He did not specifically recall Ms. Goody telling him that Dr. Gelbort described petitioner's brain like Swiss cheese before meth and that the meth made it worse, but acknowledged she may have said this. (H.Tr., at 2983). This testimony would have been very helpful and there would have been no tactical reason not to put on such evidence. (*Id*.). He also testified that, from the standpoint of mitigation, brain impairment is a more favorable diagnosis than non-brain based disorder such as depression or post-traumatic stress disorder because it is more objective. (*Id*., at 2980).

Mr. Berrigan does not know whether Dr. Gelbort's test results were given to Dr. Hutchinson, Dr. Cunningham and Dr. Logan. (*Id*., at 2981). He does not know "why we wouldn't have at least given [Dr. Gelbort's results] to them. They could have determined themselves whether it might have been helpful." (*Id*.). There would have been no tactical reason for not providing Dr. Gelbort's findings to the experts who testified. (*Id*., at 2985). If the findings were not provided, it was a timing issue, because Dr. Gelbort's evaluation came late in the process. (*Id*., at 2981).

Mr. Berrigan testified that there was no tactical reason for not administering a full battery of neuropsychological tests in this case, nor was there a tactical reason for not presenting the testimony of a neuropsychologist at Ms. Johnson's trial. (*Id*., 2984-85). He believes that the mental health issues in this case were not developed to the degree that they

175

could have or should have been. (*Id.*, at 2997-2998). He explained:

> The thing with Gelbort haunts me a little bit even though at the time I – I knew, you know, what his diagnosis was. I just didn't put it in the picture of a mitigation case. And there may have been problems with him coming to trial. I don't frankly remember. Mary probably does. But whatever they were, it's nothing we couldn't have gotten around. The judge would have approved additional funds I think if we needed somebody else or needed more money for Gelbort. I think we could have gotten the money. We didn't – we didn't do it and that was solely my responsibility. That's not Al or Dean.

(*Id.*, at 2998).

Trial counsel's failure to present the findings of Dr. Gelbort to the jury that convicted Ms. Johnson and sentenced her to death, to provide the results of his testing to Drs. Logan, Hutchinson and Cunningham, and to conduct additional neuropsychological testing was ineffective. Counsel had no strategic reason for failing to obtain and introduce this evidence. Counsel's omissions prejudiced petitioner. Myla Young, Ph.D. who administered a complete battery of neuropsychological tests, reports as follows:

> Although her abilities on several tests of neuropsychological functioning were in the average range, [petitioner] demonstrates some level of impairment across all brain functions. . . . sensory motor, attention, memory, psychomotor and executive functioning are all significantly impaired. Diffuse brain impairment which affects all brain regions is indicated, but with the greatest impairment in the pre-frontal cortex, temporal cortex, and limbic cortex structures, as well as significant impairments in all connecting systes among these brain structures. Although both right and left brain hemisphere dysfunction is indicated, the most severe impairment for Angela Johnson is for the left brain hemisphere. Neurological disorder is indicated and temporal lobe seizure activity is a distinct possibility.

The significance of the Dr. Young's testing and the MRI, PT and EE tests administered to Ms. Johnson is explained by Dr. Woods:

> Current neuroimaging reinforces Dr. Young's finding of Ms. Johnson's multiple cognitive impairments. Ms. Johnson underwent Magnetic Resonance Imaging (MRI) and an electroencephalographic (EEG) study at the Tarrant County Hospital on February 8, 2011. She also underwent Positron Emission Tomography (PET), coupled with Cathode Tomography (CT) testing at Radiology Associates of Fort Worth on February 7, 2011. Cutting edge EEG investigation could not be completed since this was a forensic assessment, rather than preparation for neurosurgery or for treatment. Nevertheless, MRI, PET, and EEG studies were all consistent with cognitive impairment.

There is a reasonable possibility that absent trial counsel's errors and omissions with respect to

176

Dr. Gelbort and the neuropsychological and neuroimaging testing of his client, at least one juror would have voted for a life sentence for Ms. Johnson on all five murders. Counsel's ineffectiveness in relation to Dr. Gelbort was prejudicial because the "undiscovered mitigating evidence, *taken as a whole*, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability" so that "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S.Ct. 2456 (citations and internal quotations omitted)(emphasis added).

**COURT CLAIM NO. THIRTY-SIX**

**Court Claim 36 – Failure to prepare mitigation: Failure to Introduce Evidence of, and Give The Trial Experts Records Concerning, the 1996 Diagnosis of Petitioner With Depression and Dependent Personality Features**

On March 25, 1996, Ms. Johnson was seen at the Northern Iowa Mental Health Center by Dr. Lassie, who concluded that she had an Axis I diagnosis of depression and an Axis II diagnosis of dependent personality features. (Exh.1, MG001494). This diagnosis is consistent with Ms. Johnson's personal history of involvement with strong-willed men, and refers to the need to be dependent on a stronger person. (H.Tr. 87-88). The diagnosis was relevant to the prosecution's theory that petitioner was the person pushing Honken to eliminate Nicholson and and DeGeus. (*Id.*, 87). The physician who saw Ms. Johnson in 1996 could have testified about this earlier diagnosis, expanded upon the diagnosis, and explained how it applied to Ms. Johnson. (*Id.*, 88).

Although Ms. Goody came into possession of these records in January 2002 (H.Tr. 86), she did not interview the clinician who arrived at the diagnosis and he was not called to testify at petitioner's trial. (*Id.*, 85). Ms. Goody explained that she did not work on petitioner's case from May 2002 until late November 2004, and that, due to time pressures once she resumed work in late 2004 she did not interview Dr. Lassie. (*Id.*, 85).

Ms. Goody was present when Dr. Logan testified at the penalty phase of Ms. Johnson's

177

trial.  (*Id*., 88).  Dr. Logan did not discuss the dependent personality features referred to in the 1996 medical records, and talked about petitioner only as a person who suffered from depression as a result of her abusive background.  (*Id*., 88-89).

This was, in Ms. Goody's opinion, a defect in the presentation of mental health mitigation.  (*Id*., 89).  Ms. Johnson's dependent personality features should have been a prominent part of the case in mitigation.  (*Id*., 89). And,  Dr. Logan did not testify about major depression or Post Traumatic Stress disorder, so that it appeared that the depression petitioner suffered was a lot like the depression experienced by many persons.  (*Id*.).  Ms. Goody testified that Dr. Logan's presentation was hastily put together towards the very end of the trial preparation time, and that she did not think that he had the opportunity to review the records or talk with the clinician who arrived at the 1996 dependent personality features diagnosis.  (*Id*., 87).

Mr. Berrigan testified that he does not "recall [the 1996 records] at all."  (H.Tr., 2979). He acknowledged, however, that evidence from a pre-offense mental health expert who could have established that Ms. Johnson suffered from depression and a dependent personality disorder would have furthered his case in mitigation. (*Id*.).   First, the existence of these diagnoses before the crimes rebutted any notion that petitioner's mental disorders were constructed after the fact, to mitigate capital crimes.  (*Id*., 2980).   Second, these two particular diagnoses are consistent with petitioner's behavior before she was arrested, while she was in jail, and most of her life. (*Id*.).   Third, "the depression, personality disorder certainly fits with our theme that she was dominated by Dustin Honken."[49]  (*Id*.).

**COURT CLAIM NO. THIRTY-SEVEN**

**Court Claim 37 – Failure to prepare mitigation: Failure to Offer Expert and Lay Testimony That Angela Johnson Was Under the Substantial Influence**

---

[49] M. Berrigan was aware of Dustin Honken's domination of Ms. Johnson very early in the case.  In his first conversations with mitigation specialist Mary Goody, he told her that "Dustin had some power over [Ms. Johnson] and that she keeps in contact with him . . . [and] that was ridiculous because he had been plotting to have her killed and that was something everybody knew."  (H.Tr. 50).

178

**of Dustin Honken**

ABA Guideline 10.11 F. directs defense counsel to consider including in the defense penalty case witnesses and evidence that would relate "the client's life and development, from conception to the time of sentencing, *that would be explanatory of the offense(s)for which the client is being sentenced, would rebut or explain evidence presented by the prosecutor*, . . ., or would otherwise support a sentence of less than death".  ABA Guideline 10.11 F.1. (emphasis added).

### A.      Events at Trial

Title 18 United States Code section 3592 sets out seven specific factors in mitigation. Two of those factors, duress (18 U.S.C. § 3592 (a)(2)) and minor participation (18 U.S.C. § 3592 (a)(3)), could have given effect to the mitigating nature of Dustin Honken's influence over Angela Johnson.  Because of trial counsel's unreasonable decision not to introduce evidence of Ms. Johnson's mental state at the time of the offense (see Claim No. 34, *supra*), the jury was prevented from considering duress as a mitigating circumstance.  They were instructed on the mitigating factor of minor participation but not a single juror found that factor had been proven. (Doc. 593, 01-CR-3046-MWB, filed 6/20/2005).

Additionally, the defense proposed a non-statutory mitigator based on petitioner's having been under the "substantial influence" of Dustin Honken at the time of the offenses; however, at the conclusion of the penalty phase testimony, the Court refused to submit this mitigator to the jury because the defense failed to present any evidence of Honken's substantial influence over Ms. Johnson.  (Tr. 3978-80).

In fact, trial counsel erroneously thought that evidence of Mr. Honken's leadership was itself enough to show domination and, thus, thought circumstantial evidence of Mr. Honken's domination had been introduced.  Unfortunately, evidence of Mr. Honken's leadership was relevant but not alone sufficient.  During argument on which mitigating factors would be sent to the jury, Mr. Berrigan told the Court, "Number 20, substantial influence of Dustin Honken,

179

certainly there's evidence of that." The Court responded, "There is?" (Tr. 3937). In an extended dialogue with the Court, Mr. Berrigan pointed to (a) circumstantial evidence of Mr. Honken's motive for, and planning of, the Nicholson homicide (Hr. 3937); (b) the government's assertions at Mr. Honken's trial that he was "running the show; this is his plan, he's orchestrated it very carefully (Tr. 3938); (c) that Mr. Honken was the actual killer (Tr. 3939); (d) Mr. Honken's jury finding substantial planning while Ms. Johnson's did not (Tr. 3939); (e) Mr. Honken being the "head honcho" and Ms. Johnson aiding and abetting him (Tr. 3940); and (f) Ms. Johnson's confession to Christi Gaubatz that things went awry at the Duncan home, that Ms. Johnson found out too late what Mr. Honken had planned (Tr. 3941). He never pointed the Court to any evidence that Ms. Johnson was susceptible to domination because of her mental and emotional deficits.

The Court was completely unmoved by counsel's argument. In response to Mr. Berrigan's description of the evidence, the Court replied with comments such as, "You must have asked 25 witnesses the relationship between Dustin Honken and Angela Johnson. Not one of them testified that Angela Johnson was under the substantial influence of Dustin Honken." (Tr. 3938); "There's not testimony about that." (Tr. 3938); "Well, he may be the leader, but that doesn't show that she's under substantial influence." (Tr. 3938); "How do you jump – how do you get there? There's not a shred of evidence to support that." (Tr. 3940); "There's no other way to describe it. I don't see the evidence that way. I don't think there's any evidence to support this." (Tr. 3940).

Counsel compounded his failure to introduce any evidence, circumstantial or otherwise, of Mr. Honken's domination and influence over Ms. Johnson with his unreasonable introduction of evidence that another jury had sentenced Mr. Honken to death for two of the five killings.

The Court suggested to Richard Burr that introducing Mr. Honken's death verdict could have been a reasonable strategy to let jurors know that someone got the death penalty for the killing of two children; thus, they do not have sentence Angela Johnson to death. (H.Tr. 782-

180

783). Introduction of Mr. Honken's death sentence, however, without evidence of Mr. Honken's domination and influence over Ms. Johnson to prove her lesser culpability beyond any doubt, gave the jury "a kind of license in a sense to have the awful burden of imposing death be slightly relieved because somebody el – another jury has said those are death-worthy pieces of behavior." H.Tr. 784 (Burr testimony). Mr. Burr explained what was necessary to make the decision to introduce Honken's death verdicts reasonable: "So it's not an easy decision, and it is two edged. And if you make that decision and it is a reasonable decision, you have to take into account what do I put on in the evidence to keep it from being two edged so that it is a relief for the jury [that someone else is getting the death penalty] and not permission for the jury [to give Angela Johnson the death penalty]?" H.Tr. 784.

### B. Evidence Available to Counsel

Early in his involvement in this case, Mr. Berrigan sent a letter to Dr. Logan stating ". . . I suspect that you will uncover issues in her family history and growing up that will perhaps show her susceptibility to being dominated by a man as intelligent, forceful and domineering as Angela's boyfriend and co-defendant, Dustin Honken." (Exh. 133-10, p. 2). Yet in testifying at the evidentiary hearing, trial counsel could not recall discussing the issue of Honken's domination of petitioner with Dr. Logan or asking him to comment on dominance and control issues in their relationship. (H.Tr. 2111). Dr. Logan testified the issue was taken off the table. (H.Tr. 3515). Trial counsel discussed the theme of domination with the prosecutors prior to trial, and identified it as an important mitigation theme. (H. Tr. 2157-58).

Counsel had ample evidence regarding Dustin Honken's calculating nature, and his influence over, and ability to manipulate, Ms. Johnson in the discovery from the government and in trial counsel's own file.[50] As trial counsel conceded, there was no tactical or strategic reason

---

[50] The overwhelming evidence of Mr. Honken's manipulation of Ms. Johnson and others is outlined in the May 26, 2010 supplemental report of George Woods, M.D. (Exh. 106, WOD000149-WOD000162). That report summarizes both the evidence available to trial counsel and additional evidence he elicited from Ms. Johnson. A brief summary of the evidence available to trial counsel is provided here.

181

for trial counsel's failure to present this evidence in support of the mitigating factor. (H.Tr. 2965). Petitioner's attorneys were ineffective in failing to present this evidence to the jury that convicted her and sentenced her to death.

Evidence available to trial counsel of Mr. Honken's calculating nature included characterizations by witnesses who knew him well. Fred Tokars, a fellow inmate at USP Florence and a former attorney and judge, described Mr. Honken "an evil person" and said that he had "never met anyone who can be so charming and evil like that." (Exh. 133-16 (under seal)). Mr. Tokars was impressed with Honken's ability to manipulate a group of inmates, Aryan Brotherhood-types known as the "Dirty White Boys" and the "Odinists." (Exh. 96, C001220) Mr. Honken's drug co-conspirator, Tim Cutkomp, told the grand jury that "[Honken] kind of had a way of manipulating me to do the things he wanted," and agreed with a grand juror that Honken had a way of mesmerizing people, and was "smooth talker." (Exh. 96., C000205 (under seal)). Daniel Cobeen also described Honken's ability to get others involved in his schemes: "He had me doing all the dirty work, so if anything came his way, it would fall on me." (Exh. 96, C000161).

Ms. Johnson reported to the government mental health experts that Mr. Honken lied to her, that he falsely bragged about his prowess as a drug dealer, that he falsely promised to protect her, that she stupidly believed him, that he manipulated her with his lies, that he put her in debt, that she was unable to get away from him, even when she moved away, and that their entire relationship was for Honken's benefit. (Exh.114, MAR000087-MAR000094).

She reported much the same information to Marilyn Hutchinson, the psychologist retained as a defense expert, and added that the more she tried to pull away from him, the more he tried to be with her, that he used fear for her safety and that of her children, and fear of going to jail to control her, and that she believed him when he bragged about the money he would make from writing a book on how to make methamphetamine. (Exh. 102, HUT000093-HUT000099).

182

Petitioner's family members also described her manipulation by Dustin Honken.  Her daughter, Alyssa Johnson, told Mary Goody that Mr. Honken put Ms. Johnson into debt and that Mr. Honken saw her mother as someone he could manipulate. (Exh. 1, MG005451-MG005452). She considered him to be a "bad influence," and she thought he used their daughter, Marvea, as a "pawn." (Exh.1, MG005453).   Holly Dirksen also reported that Mr. Honken was living off Ms. Johnson while supporting the mother of his other child, and that he tried to make Ms. Johnson "feel crazy."  (Exh. 102, HUT000119).

Daniel Cobeen and Timothy Cutkomp confirmed that Honken ran up petitioner's credit card debt. (Exh. 95, C000163, C000197).

After Mr. Honken was arrested and incarcerated, he wrote Ms. Johnson letters full of false flattery and protestations of love for her and their daughter, pulling on Ms. Johnson's obvious heart strings for her children. (Exh. 95, G1179-1184).   The manipulative, controlling nature of those letters was exposed by Mr. Honken's comments to fellow inmate Terry Bregar that he was afraid Ms. Johnson would inform against him. (Exh. 96, G1179-1181).

Mr. Honken's telephone calls to Ms. Johnson contained similar false flattery and assertions of love and desire.  (Exh. 107, WOD000160-W0D000161 (referencing transcripts of tapes provided in discovery)).   Those same telephone calls reflected his concern that Ms. Johnson might turn against him and become a government informant, masked in expressions of concern about her daughter, Alyssa.  (*Id.*).  Mr. Honken's calls with Alyssa Johnson also revealed his true concerns, asking her about Ms. Johnson's mood after a grand jury proceeding and seeking reassurance that Ms. Johnson was still in his control. (*Id.*).

Even after Ms. Johnson's arrest, Mr. Honken continued his efforts to manipulate her, through letters to her attorney, (Exhs. 10, 12, 13), and solicitous letters to Ms. Johnson,  (Exh. 95, A0001284-1289), at the same time telling others of his anger and desire for revenge against her.  (Exh. 96, C000134, C000147).

The defense used none of this evidence to show Mr. Honken's influence over Ms.

183

Johnson.

The discovery was replete with leads to evidence of Mr. Honken's control over others both before and after Mr. Honken's involvement with Ms. Johnson, including his brother and stepbrother, (Exh. 96, C000188, C000198); his father, sister, and several friends, (Exh. 95, A969-970; A50-52; Exh. 96, C000894; Exh. 124, Vol. 20, 3677-79); his mother, (Exh. 96, C001132-33); his co-conspirator Timothy Cutkomp, (Exh. 96, C000186-190, C000195, C000202), and the two other women he was seeing at the same time he was with Ms. Johnson. (Honken Tr. 366-67; Exh. 96, C001046, C000224-25).

Mr. Honken involved inmates in jail and prison in his schemes to kill witnesses (Exh. 95, CC00001-6), including a prosecutor in this case and his family (Exh. 95, A803, A859, A1331, A1426-27); to escape (Exh. 95, CC00001-6); and to create false exculpatory evidence (Exh. 96, C000133-34).

Finally, counsel had his own mental health experts who could have testified about Ms. Johnson's susceptibility to manipulation due to history of trauma, and her vulnerable mental and emotional conditions. Dr. Logan, had he been asked by trial counsel, could have discussed a number of symptoms Ms. Johnson suffered, including detachment from reality, dissociation, emotional volatility (H.Tr. 3530), impulsivity (H.Tr. 3545), inability to see bad consequences (H.Tr. 3547), and inadequate coping skills (H.Tr. 3547). All of these symptoms would have supported a defense theme that Ms. Johnson was especially vulnerable to being manipulated.

Dr. Hutchinson testified that she could have provided the jury with a wealth of information about Ms. Johnson's mental and emotional vulnerabilities that made her susceptible to control by Mr. Honken under the rubric of the statutory mitigating factor of duress (H.Tr. 3611-3625, 4072-4078). Even though counsel did not rely on the statutory mitigating factors, all of that testimony could have been used as evidence of Mr. Honken's domination and Ms. Johnson's unique susceptibility to that domination and influence.

Trial counsel could also have introduced testimony from a psychiatrist in 1996 who

184

provisionally diagnosed Ms. Johnson with dependent personality disorder.  (Exh. 1, MG001490-MG001495; *see also* Exh. 131 (declaration of Nancy S. Pemberton regarding telephone interview with Dr. M.E. Lassise)).  As Dr. Woods found, "Ms. Johnson's dependent traits, as described in a 1996 psychiatric report, define her relationships with others, particularly men, and are the result of long standing abuse and cognitive impairment. [Footnote omitted.] In many circumstances, Ms. Johnson had no choice but to rely on others because she could not make independent, successful decisions."  (Exh. 107, WOD000137).

Ms. Johnson's relationship with Dustin Honken was one in which he controlled her, he dominated her, he manipulated her.  Ample evidence of his influence over her was readily available; there was no strategic reason not to introduce it.

### C.      Prejudice

As noted at the outset of this claim, the Court removed the issue of domination and influence from the jury's consideration because the defense did not offer proof of those mitigating circumstances.  The jury also did not find Ms. Johnson to be relatively less culpable than Mr. Honken, persuaded as they were by the unimpeached hearsay evidence of Steve Vest (*see* Claim Nos. 39 and 40, *infra*) and the prosecution's illegitimate and baseless argument that Ms. Johnson was the impetus behind Mr. Honken's violent acts (*see* Claim Nos. 19 and 20, *supra*).  Because of counsel's deficient performance, the Court and jury did not have before them the wealth of evidence outlined above and in Dr. Woods' report that would have given the Court and jury the ability to "consider and give effect to the mitigating circumstance" of Honken's domination.  ABA Guideline 10.11 K.

Instead, what the jury had, because defense counsel introduced it, was evidence that another jury had found the killings in this case were death-worthy, giving them permission to reach the same conclusion.  The reasonableness of that decision hung on whether counsel had "developed [Ms. Johnson's] lesser culpability all over the case, you know, in every respect possible, not just their relationship but also the things she actually did . . . whatever you do as

defense counsel has to be emphasizing at every possible juncture her lesser culpability." (H.Tr. 784-785 (Burr testimony)).

Had defense counsel affirmatively emphasized at every possible juncture from *voir dire* to closing argument at the penalty phase Mr. Honken's domination and influence over Ms. Johnson and Ms. Johnson's susceptibility to that influence, and not given the jury permission to return a death verdict, it is reasonably probable that at least one juror would have voted against a death verdict. The failure to present this evidence was prejudicial because the "undiscovered mitigating evidence, *taken as a whole*, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability" so that "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S.Ct. 2456 (citations and internal quotations omitted)(emphasis added).

### COURT CLAIM NO. THIRTY-EIGHT 38

**Court Claim 38 – Failure to Prepare Mitigation: Failure to Introduce the Statements of Phyllis Prosovec to Support Residual Doubt**

The Court instructed the jury that they could consider as evidence in mitigation "any residual or lingering doubts . . . as to Angela Johnson's guilt or innocence or her role in the offenses . . . even though those doubts did not rise to the level of 'reasonable doubts.'" (Doc. 589, at 9)    Defense counsel failed in their duty to investigate, discover and present evidence in support of residual doubt in general.[51]   More specifically, trial counsel was ineffective in failing

---

[51]  Trial counsel, who requested that the Court instruct on lingering doubt, did no guilt phase investigation at all.   (H.Tr. 35, 37, 173, 300, 321 (Mary Goody); 385, 405, 412, 463 (Nancy Lanoue); 531 (Rebecca Dakus); 560, 561, 563-65, 589, 868-69 (Alfred Willett); 1515, 1526, 1536, 1595 (Dean Stowers);  1842, 1877-78, 1880 (Raymond Cornell); 1939 (Rose Nevins); 2116, 2189 (Patrick Berrigan); 2352-53, 2368, 2379, 2389, 2405, 2413 (Gordon Gratias); 1349,  2201, 2965 (Patrick Berrigan).   The failure to investigate and challenge the prosecution's guilt phase evidence at trial was the death knell of the lingering doubt statutory mitigator.   As a result of trial counsel's ineffective preparation and presentation at both the guilt and penalty phases in this case, no juror found residual or lingering doubt as a factor in mitigation.  (Doc. 593, at 8).

186

to present evidence of the statements of Phyllis Prosovec at the penalty phase of the trial.

After the disappearances of Greg Nicholson and the Duncan family, law enforcement interviewed Phyllis Proscovec, who lived in a house directly north of Lori Duncan. Proscovec remembered the day the Ducans disappeared quite clearly, because it was a Monday morning and she had gone over to Lori's house at approximately 7:50 a.m. to get her children up for school, her normal routine. On that Monday morning, she knocked on Duncan's front door and got no response, even though she saw Lori's car parked out in front. Prosovec pushed the front door open, went in and found no one home. When she returned to her own home, Prosovec found a note between her front door and her storm window that said "Phyllis, had to leave on short notice, will be in touch shortly. Love, Lori." (Exh. 75; H.Tr. 2113-2115).

Ms. Prosovec told the police that she last saw Lori the Sunday evening before her disappearance. She went to Lori's between 7:30 and 8:00 p.m. that evening and stayed for approximately one hour. During this time, Lori commented that Greg Nicholson was not home because he had to do some business with his friends. Ms. Prosovec returned home and, after watching the news, prepared for bed. Before she retired, she noticed that Greg Nicholson's car had not yet returned to the Duncan home. Shortly thereafter, Lori telephoned Prosovec, asking if she could come to her (Lori's) house. Ms. Prosovec went to the Duncan residence, where she found Lori was crying because Greg did not want her any more. Ms. Prosovec stayed with Lori for awhile, and then went home. After she returned home, she noticed that Greg Nicholson's car was parked behind Lori's house. (*Id.*)

Each of petitioner's trial counsel knew about Ms. Prosovec's statements to the police. Mr. Willett testified, based on a memorandum about discovery prepared by Thomas Frerichs (Exh. 35CCCCC), that he knew Prosevec was a witness no later than September 19, 2000. (H.Tr. 805-06; *see also* H.Tr. 387-92, 398 and Exh. 4 (Nancy Lanoue testimony and memoranda to Willett regarding Prosovec)). Mr. Stowers knew about Phyllis Prosovec at least by May 24, 2002. (H.Tr. 1170-75; *see also* Exh. 51, 00032). Mr. Berrigan reviewed the report, discussed it

187

with Stowers and Willett, and recognized that Prosovec's account of the events on July 25, 1993 was inconsistent with the prosecution's theory of the case.  (H. Tr. 2112-16).

Phyllis Prosovec died on August 24, 2002, without having been interviewed by counsel for Ms. Johnson.  (H.Tr. 2113, 2308).

Under the relaxed evidentiary standard applicable to federal capital sentencing proceedings, information relevant to "mitigating or aggravating factors may be presented by either the Government or the defendant, regardless of its admissibility under the rules governing admission of evidence at criminal trials except that the information may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *United States v. Johnson*, 378 F. Supp. 2d 1051, 1058-59 (N. D. Iowa 2005) (statements by Honken to Steven Vest that implicate Ms. Johnson admissible at penalty phase under the relaxed standard of admissibility).[52] See also, *Sears v. Upton*, 130 S. Ct. at 3263 ("[T]he fact that...evidence may have been 'hearsay' does not necessarily undermine its value-or its admissibility-for penalty phase purposes.")   There was no impediment to the admission of the interview of Ms. Prosovec at penalty phase to establish the non-statutory mitigator of residual doubt.  The interview has indicia of reliability, in that Prosovec was an apparently unbiased witness who was interviewed soon after the events at issue and whose account of the events at issue is corroborated by physical evidence, the note left by Lori Duncan on Prosovec's front door that had been booked as evidence.  (H.Tr. 2117).  Yet trial counsel failed to offer – or even consider – the Prosovec interview as penalty phase evidence in mitigation.  Indeed, Mr. Berrigan testified that "[b]y the time the penalty phase came around [the Prosovec interview] was probably the furthest thing from my mind."  (H.Tr. 2116). There was no tactical reason for not introducing the Prosovec interview at penalty phase;   Mr. Berrigan himself acknowledges that "it helps towards residual doubt."  (H.Tr. 2116).

Trial counsel was ineffective in failing to present the jury with the Prosovec statements,

---

[52] As indicated above, Ms. Johnson believes that 18 U.S.C. § 3593 (c) should have been applied in this case.

188

which would have supported the lingering doubt non-statutory mitigator.  Minimally competent counsel would have realized that residual doubt is the most powerful mitigator in the minds of capital jurors. There is a reasonable probability that, but for counsel's failure to introduce evidence of Phyllis Prosovec's account of what happened on July 25, 1993, at least one juror would have had a reservation about sentencing petitioner to death and the outcome of the penalty phase would have been different. The failure to present this evidence was prejudicial because the "undiscovered mitigating evidence, *taken as a whole*, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability" so that "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S.Ct. 2456 (citations and internal quotations omitted)(emphasis added).

## COURT CLAIM NO. THIRTY-NINE

### Court Claim 39 – Failure to Prepare Mitigation: Failure to Offer Dustin Honken's Letters to Impeach the Mitigation Phase Testimony of Steven Vest to Support Residual Doubt

The Court instructed the jury that they could consider as evidence in mitigation "any residual or lingering doubts . . . as to Angela Johnson's guilt or innocence or her role in the offenses . . . even though those doubts did not rise to the level of 'reasonable doubts.'" (Doc. 589, at 9).   Defense counsel failed in their duty to investigate, discover and present evidence in support of residual doubt in general.[53]   More specifically, trial counsel was ineffective in failing to offer Dustin Honken's letters to impeach the penalty phase testimony of Steven Vest and

---

[53]  Trial counsel, who requested that the Court instruct on lingering doubt, did no guilt phase investigation at all.   (H.Tr. 35, 37, 173, 300, 321 (Mary Goody); 385, 405, 412, 463 (Nancy Lanoue); 531 (Rebecca Dakus); 560, 561, 563-65, 589, 868-69 (Alfred Willett); 1515, 1526, 1536, 1595 (Dean Stowers);  1842, 1877-78, 1880 (Raymond Cornell); 1939 (Rose Nevins); 2116, 2189 (Patrick Berrigan); 2352-53, 2368, 2379, 2389, 2405, 2413 (Gordon Gratias); 1349,  2201, 2965 (Patrick Berrigan).   The failure to investigate and challenge the prosecution's guilt phase evidence at trial was the death knell of the lingering doubt non-statutory mitigator.   As a result of trial counsel's ineffective preparation and presentation at both the guilt and penalty phases in this case, no juror found residual or lingering doubt as a factor in mitigation.  (Doc. 593, at 8).

189

support the lingering or residual doubt mitigator.

The prosecution called Steven Vest to testify at petitioner's penalty phase. Vest was housed with Dustin Honken from 1996 to 2000 in United States Penitentiary, Florence, Colorado. Honken, during the course of his relationship with Vest, made statements implicating both himself and petitioner in the crimes charged. (Tr. 2551-2625).

When hearsay statements, such as those made by Dustin Honken to Steven Vest, are admitted into evidence, the credibility of the declarant may be attacked "by any evidence which would be admissible for those purposes if declarant had testified as a witness." Federal Rule of Evidence 806. Refusal to permit impeachment of a hearsay declarant under Rule 806 may be reversible error. *See, e.g., United States v. Barrett*, 8 F. 3d 1296, 1298 (8th Cir. 1993) (error to bar defense from introducing three-year-old declarant's prior statement). Richard Burr testified that with a witness like Mr. Vest, who recounted what Honken said to him, "the real job is to impeach what [Honken] said to him." H.Tr. 789. *See also Id.*, at 789 ("The task is to try to impeach the message" rather than the messenger); *Id.*, at 800 ("what had to be impeached was what Honken said rather than the conveyor of that information. . . . your real concern would hve to be how you could impeach what Honken said.").

Defense counsel possessed letters written by Dustin Honken to Alfred E. Willett in which Honken declared petitioner's innocence. These letters could have been, but were not, admitted to impeach Honken's inculpatory statements about Ms. Johnson to Steven Vest.

On August 13, 2000, Honken wrote to Mr. Willett that "it is my utmost priority to ensure Ms. Johnson is safe, well represented, and going to walk away from this case. Whatever must be done to bring out the truth of her innoncense [sic], I am prepared to do so." (Exh. 10, p. 1). He continued:

> I have a potential "Silver Bullet" for Ms. Johnson's defense. It is an issue that I have personal knowledge of but I have never discussed it with anyone nor brought it out before. The government has no knowledge of it and I intend to keep it that way until trial, should Ms. Johnson's case go so far. Ms. Johnson has no knowledge of it either, but I am quite sure that the "tables will turn" on the government's case against her should this information be brought out in court

190

properly."

> I am fully prepared to cooperate as a defense witness and I will debrief any and all information on government witnesses, evidence and also myself. I am quite sure that my assistance and knowledge in this matter will be invaluable to Ms. Johnson's defense. I can inform you who is saying what, what problems they have with their credibility, and who else has some strong motives (and modus operandi for making people vanish) in this case. Hopefully my information will save you many hours of working on useless information in the "Discovery File."

(*Id.*, p. 1-2). This letter ended as follows: "[Angela Johnson] has done <u>nothing</u> but be a good supportive girlfriend to me and a wonderful mother to our daughter. I will await your response."

(*Id.*, p. 2; emphasis in original).

On August 29, 2000, Dustin Honken again wrote to Mr. Willett, provided names of witnesses who he believed could help her, and stated as follows:

> I feel it is my responsibility to do as much as I can for [petitioner] to insure that she goes home. As I stated in my last letter to you, my only concern is that she is safe, well represented, and going to go home soon. Absolutely anything that I can do for her I will.

(Exh. 12, p. 2). On September 12, 2000, Mr. Honken again wrote to Mr. Willett. In this letter, he provided names of additional witnesses to help Ms. Johnson. (Exh. 14, p. 2). He closed his letter with the following statement:

> "The <u>only</u> thing that does matter to me is to help Ms. Johnson out of this and whatever I have to do, I will do. If I can be of any further assistance please contact me."

(Exh. 14, p. 2; emphasis in original).

On August 6, 2001, Mr. Honken wrote to Mr. Willett. In this letter, he complains that Willett is telling petitioner that Honken is "throwing her to the wolves" and protests that this is not true. He states:

> <u>Nothing</u> could be further from the truth. If you are so inclined to find out the truth then I implore you to contact Alfredo Parrish and ask him what I have tried to do for her – much to the demise of myself! I have never nor will never do anything to harm Miss Johnson in <u>any</u> way. And, to the contrary, I have through my attorney tried to get her out of this mess and I will continue to do so. If you would work with me instead of against me it might be possible to help Ms. Johnson. . . . In reality, I am the <u>only</u> hope Ms. Johnson has of going home. I know this, you know this and I assume she knows it also. I will do everything

191

> I can to help her but if you will not assist, then I doubt I can do any good. Unfortunately, I'm afraid, it is up to you at this point. Will you continue to try and convince her that I am the enemy and in the long run get her sent to prison or will you work with me in trying to get her home? You make the choice – I am at your service if you wish it so.

(Exh. 67, MCN01-001063 - 62; emphasis in original).

Dustin Honken's statements to Willett exculpated petitioner and they were known to trial counsel. *See, e.g.* H.Tr. 840-41, 850-52 (Willett); H.Tr. 2972-73 (Berrigan); H.Tr. 243-44 (Goody). Yet trial counsel did not utilize these letters to impeach Honken's alleged statements to Steven Vest. Mr. Berrigan has testified that "We could have impeached Mr. Honken – yes, we – exactly. We could have presented Mr. Honken's letters to impeach Mr. Vest if that's what you're asking." (H.Tr. 2972-73). *See also* H.Tr. 242-243 (Mary Goody was not asked to do any investigation to attempt to develop impeachment evidence on Mr. Vest and did no investigation into any prior inconsistent statements by Honken to impeach the statements he made to Vest); H.Tr. 244 (after Vest testified, there was no discussion by counsel in Goody's presence about using Honken's letter to Willett stating petitioner was innocent to impeach the statements of Honken related by Vest); H.Tr. 245 (At the penalty phase, Mary Goody "was not focusing on Mr. Vest at all. I was only focused on the experts and the family members and the witnesses that we were trying to get ready to come in"). There was no valid tactical or strategic reason not to impeach the credibility of Honken, the hearsay declarant whose statements were related by Steven Vest. H.Tr. 244 (failure to use Honken's letters to impeach Vest's testimony does not meet the minimum standards of practice Trial counsel's failure to do so prejudiced petitioner. It is reasonably likely that if Honken's statements declaring petitioner's innocence would have been put before the jury, at least one juror would have voted for life. The failure to present this evidence was prejudicial because the "undiscovered mitigating evidence, *taken as a whole*, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability" so that "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S.Ct.

192

2456 (citations and internal quotations omitted)(emphasis added).

**COURT CLAIM NO. FORTY**

**Court Claim 40 – Failure to Prepare Mitigation: Failure to Impeach Steven Vest By Presenting Evidence that Honken Lied about Petitioner's Role in the Offenses to Support Residual Doubt**

The Court instructed the jury that they could consider as evidence in mitigation "any residual or lingering doubts . . . as to Angela Johnson's guilt or innocence or her role in the offenses . . . even though those doubts did not rise to the level of 'reasonable doubts.'" (Doc. 589, at 9). As a result of trial counsel's ineffective preparation and presentation at both the guilt and penalty phases in this case, no juror found residual or lingering doubt as a factor in mitigation. *See* Doc. 593, at 8. Trial counsel was ineffective in failing to present the jury with evidence that could support the lingering doubt non-statutory mitigator in general, and specifically, in failing to impeach Steven Vest's testimony by presenting evidence that Honken falsely inflated her involvement in the crimes.

As discussed as to Claim 39, above, Steven Vest testified to statements made by Dustin Honken that incriminated petitioner. Trial counsel could have attacked the credibility of Honken's statements to Vest "by any evidence which would be admissible for those purposes if declarant had testified as a witness." Federal Rule of Evidence 806. Trial counsel knew that Honken took a polygraph and was found to be deceptive on two questions: (1) his negative response to a question asking if he made up any part of his story about Angela's involvement in the shooting of these people and (2) his affirmative response to a question asking if he was completely truthful about Angela's involvement in the shooting of those people. (H.Tr. 1253-54, 1467, 1485 (Stowers); H.Tr. 2381, 2643, 2978 (Berrigan).

Honken's statements to Steven Vest mirror the statements made during his proffer. *See* H.Tr. 1484-85 ("the Vest testimony about what Honken told him in the prison was – had a lot of consistencies with what Honken said in his proffer. There were very close to the same version, if you will, of events. [¶] And so on the face of it those two statements would seem to

193

corroborate each other"). Honken's failed polygraph test as to Ms. Johnson's role in the offenses was admissible at penalty phase to impeach Honken, and prove that the version of the events he gave to Vest that concerned Ms. Johnson's involvement was (1) a fabrication and (2) not completely truthful. See *United States v. Johnson*, 378 F. Supp. 2d 1051, 1058-59 (N. D. Iowa 2005) (discussing the relaxed standard of admissibility at penalty phase and Ms. Johnson's right to rebut aggravating evidence). See also, *Sears v. Upton*, 130 S. Ct. at 3263 ("[T]he fact that...evidence may have been 'hearsay' does not necessarily undermine its value-or its admissibility-for penalty phase purposes."); *Rupe v. Wood*, 93 F. 3d 1434 (9th Cir. 1996)(polygraph evidence admissibile at penalty phase).[54] Trial counsel was ineffective in not introducing the results of the government's polygraph examination of Honken to impeach the testimony of Steven Vest. There was no tactical or strategic decision for counsel's failure to impeach Honken's statements to Vest. Mr. Stowers testified that "there was no consideration specifically of trying to use the proffer as evidence to impeach it with the polygraph. . . . That wasn't something that we ever talked about or were thinking of doing." (H.Tr. 1488). *See also* H.Tr. 243 (Goody does not recall any discussion about offering the results of Honken's polygraph test into evidence at penalty phase to show that the version of events Honken related to Vest was false).

Richard Burr testified that given trial counsel's decision to introduce evidence that Honken had been sentenced to death, the decision to ignore Honken's failed polygraph is "pretty questionable." (H.Tr. 789-90). He explained that "in a penalty phase where you've got the most hurtful fact recounted by Vest impeached by a polygraph of Mr. Honken, I would want the jury to know that." (*Id*., 790). *See also id*., at 791 (Honken letters to Willett together with his failing a polygraph suggests that he was telling the truth in his letter); *id*., at 792 (a government polygraph expert saying Honken lied about Ms. Johnson's involvement is very powerful evidence).

---

[54] It is significant that Mr. Stowers had a copy of the *Rupe* decision in his trial file. See Doc. 130.

194

Trial counsel was ineffective in not introducing the results of the government's polygraph examination of Honken to impeach the testimony of Steven Vest. There was no tactical or strategic decision for counsel's failure to impeach, and trial counsel's omission in this respect prejudiced Ms. Johnson. If trial counsel had impeached Honken by his failed polygraph examination, it is reasonably probable that at least one juror would not have voted to impose a death sentence on any count. The failure to present this evidence was prejudicial because the "undiscovered mitigating evidence, *taken as a whole*, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability" so that "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S.Ct. 2456 (citations and internal quotations omitted)(emphasis added).

## COURT CLAIM NO. FORTY-ONE 41

### Court Claim 41 – Failure to Prepare Mitigation: Failure to Introduce Petitioner's Offer to Plead Guilty as Evidence in Mitigation

Angela Johnson clearly and unequivocally informed her lawyers that she wanted to plead guilty. *See, e.g.,* Exh. 67 (Bates MCN02–002750-53); Exh. 67 (Bates MCN03-002970). Her desire to plead guilty was conveyed to the prosecution (Exh. 48 (PLSP 118-121); Exh. 48 (PLSP 118-121)), and culminated in an offer to plead guilty for a sentence of life in prison without possibility of release (Exh. 67 (MCN05-005546)).

Trial counsel was aware that evidence of Ms. Johnson's offer to plead guilty could be introduced as mitigating evidence at penalty phase. H.Tr.1467-68, 1470 (Stowers researched admissibility of offer to plead guilty as mitigation and found that it was admissible);[55] H. Tr. 1473-74 (Stowers testimony that "if you can present evidence that the defendant proposed

---

[1] There is ample authority for the proposition that offers to plead guilty are appropriate evidence in mitigating. *See, e.g., United States v. Rodriguez*, 581 F. 3d 775, 800 (8th Cir. 2009) (district court admitted Rodriguez' offer to plead guilty, in return for a life sentence, as a proposed mitigating factor showing acceptance of responsibility); *United States v. Fell*, 372 F. Supp. 2d 773, 785 (D. Vt. 2005) (willingness to enter into a plea of guilty admitted as mitigating evidence of Fell's state of mind that should be presented to the penalty jury).

195

pleading guilty to life and the government said no, that means the government's position would be admissible as would the defendant's proposal to plead for life. [¶] So I kind of think it wasn't really an issue. That's why I say it wasn't a question of admissibility in my mind . . . ."); H.Tr. 1468-73 (Stowers' telephone call to Charlie Rogers seeking his testimony about the fruitless plea negotiations in this case); Exh. 53 (RS-12-00822) (Dean Stowers' notes of "Issues to Work Up," including "evidence of plea offer or negotiations – gov't offer of life, deft offer of life, gov't willingness to do life for Honken"). In fact, the former prosecutor in this case, Patrick Reinert, told trial counsel that "any guilty plea if somehow the deal fell through would be a factor in mitigation. (H. Tr. 2227).

Although trial counsel had evidence of Petitioner's offer to plead guilty, knew that the evidence was admissible, and had a witness, Leon Spies (*id.*, 1469-71) who could testify as to the negotiations for a plea, this evidence was not presented. There was no reasonable tactical or strategic reason not to present this evidence. Mr. Stowers has testified that:

> [This evidence] wasn't forgotten. I don't remember the rationale for not bringing it in through Leon [Spies]. I know we did – it was discussed, but I don't remember what the reasoning was why we opted out of that course of action, so I can't tell you why we did it, but I know we had a reason. I don't know if it was a good reason, a bad reason, or whatever. I can't remember why. I just don't remember why.
>
> As to why we didn't present it, it was that we had some other reason which I'm not remembering what it was, but I remember it was a choice we made not to do it. It wasn't because of a fear that it was inadmissible. If we were afraid that it wasn't admissible but thought we had an argument, I would have presented it I guess is what I'm saying.

(*Id.*, at 1470-71). *See also id.*, at 1474 ("we had some other reason why we chose not to go down that road. And I'm not recollecting what that was.").

Ms. Johnson was prepared to admit her role in the offenses, take responsibility for her actions, accept a sentence of life without the possibility of release, and spare all parties the anguish of a trial. Yet her attorneys failed to present this mitigation to the jury. Had trial counsel presented evidence that Ms. Johnson had offered to plead guilty, to take responsibility for her actions and to accept a sentence of life in prison without the possibility of release, "there

196

is a reasonable probability that at least one juror would have struck a different balance" at the second stage of the trial. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003). The failure to present this evidence was prejudicial because the "undiscovered mitigating evidence, *taken as a whole*, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability" so that "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S.Ct. 2456 (citations and internal quotations omitted)(emphasis added).

## COURT CLAIM NO. FORTY-TWO

**Court Claim 42 – Failure to Prepare Mitigation: Failure to Present Evidence of Remorse Through Expert Testimony**

Little is of more importance to capital jurors than expressions of remorse from the defendant. In one study, "sixty-nine percent of the death jurors who participated in the study (fifty-four of seventy-eight jurors) pointed to lack of remorse as a reason for their vote in favor of the death penalty. Many of those jurors cited it as the most compelling reason for their decision." Scott E. Sundby, *Remorse and the Death Penalty*, 83 Cornell L. Rev. 1557, 1560 1997-1998. *See also*, Stephen P.Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rv.1538, 1560 (1998) (almost forty percent of death-qualified jurors more likely to impose death if the defendant made "no expression of remorse.")

Trial counsel recognized remorse is a very significant mitigating factor, and lack of remorse is an equally significant aggravating factor. (H.Tr. 2953). In fact, trial counsel submitted a remorse instruction as one of his mitigating factors for the jury to consider. The Court considered not giving the instruction because, ". . . I don't think there's any evidence of remorse." (Tr. 3970). Trial counsel had to argue vigorously, pointing to the prosecutor's concession that Ms. Johnson showed remorse (Tr. 3969), Ms. Johnson's crying during her confession to Christi Gaubatz (Tr. 3970), and Ms. Johnson's nightmares about Terry DeGeus (Tr. 3970). The Court responded, "You had all kinds of opportunities through family member

197

witnesses, through . . . one psychiatrist and two psychologists to put in eviden of remorse, and there's no evidence of remorse." (Tr. 3974).

There was evidence of petitioner's remorse in the discovery provided by the government, but trial counsel ineffectively failed to present this evidence to the jury. During an April 23, 2005, audio taped interview of Angela Johnson by Joseph Dvoskin, Ph.D., and Daniel Martell, Ph.D., petitioner was asked the following questions and gave the following answers:

JD: I have to think about this question for a second. I'm going to ask Dr. Martell to tell me if you think it's (inaudible). I don't want to violate the judge's order. You've been talking quite a bit about your strong feelings about children.

A: Uh-huh.

JD: Now, I don't want to ask – I don't want you to tell me what happened or what you did or what anybody else did over the course of the events that you're charged with.

A: Uh-huh.

JD: I want to ask you how you feel about the fact that children were killed?

A: I feel terrible about it.

DM I wouldn't pursue much deeper than that.

JD: Go ahead and tell me about that.

A: I think children shouldn't ever be a victim of any kind of violence or harm – I never spanked either of my kids – I just don't like to see abuse – children on the street abused by their caretaker. I mean, I will verbally confront someone –

JD: Okay.

A: - if I think it's necessary, and then – I worry that (inaudible) – I don't know.

JD: So you believe – you believe that it's wrong to hurt kids?

A: Absolutely.

JD: Have you ever not believed that?

A: No.

JD: During the time that you had your kids?

198

A: Uh-huh.

JD: Do you think you could have become, for example, angry about that – you would have hurt them or was that just not in you?

A: No. I would never hurt a child.

JD: So if – do you lose your temper sometimes?

A: Yeah.

JD: If you ever lost your temper with your kids –

A: I've never hit either of my two kids.

JD: Okay, you seem pretty certain about that?

A: Oh, I know I haven't.

JD: No, not that you haven't but that you wouldn't have.

A: Huh-uh.

JD: And that's cause you know it's wrong?

A: Yeah, kids are innocent. Just because you're bigger and stronger than them and can inflict pain on them, that is not what I think of as a way to get them to listen or obey you, you know, I mean you look at little kids, and they think "Okay, that person can spank me or cause me pain, so I better do what they say." No, I wouldn't want a child to obey me like that. I want them to do good because they're good kids and do good things. I would never inflict pain on a child to get them to obey me or spank them because they did something wrong. I just don't think that's a good way to teach a child. I'm bigger than you and I can hurt you and don't do that again.

JD: Okay.

A: I can't stand that. I don't like it.

(Exh. 114, MAR000059-MAR000060).

Trial counsel reviewed the Dvoskin/Martell interview of his client and provided that interview to his experts, yet he did not consider presenting evidence from experts as to Ms. Johnson's feelings about the fact that children were killed in this case. (H.Tr. 2955). Nor did trial counsel, after reviewing the Martell/Dvoskin interview, consider requesting that his experts ask petitioner how she felt about the fact that children were killed in that case; he admitted that

199

he did not think about this and that there would have been no tactical reason not to have his experts ask such a question, given petitioner's answers to the prosecution experts.  (H.Tr. 2956).  Trial counsel acknowledged that such evidence might have backfired, but stated that "I don't want to pretend I weighed [the possibility of the evidence backfiring]."  (H.Tr. 2959).

George Woods, M.D., during his May 2011 interviews with Angela Johnson, was able to get Ms. Johnson to talk about her participation in the homicides.  She described her attempts to talk Dustin Honken out of killing the children but he told her "there was no choice, they could be witnesses.  He told her either she was with him, or she was with the victims."  (Exh. 107, WOD000146).  Dr. Woods asked her about her feelings concerning the killings.  She "described recurring dreams of her daughter, Alyssa, being hurt after the Nicholson homicides.  When asked about her remorse, she was initially unable to respond, then cried deeply.  'I think about what I've been part of every day of my life.  The oldest child was my daughter's age.'" (Exh. 107, WOD000146).  Ms. Johnson also told Dr. Woods that she felt the need to tell someone about what she did because she was "so overwhelmed, humiliated, and remorseful."  (Exh. 107, WOD000151).  Dr. Woods characterized Ms. Johnson's remorse as "profound sorrow for the death of all the victims, particularly the children."  (Exh. 107, WOD000152).  He testified that "[s] was very – she was crying.  She was very tearful.  That's what I recall."  (H.Tr. 4445).

Professor O'Brien discussed how trial counsel could have used their mental health experts to show Ms. Johnson's remorse.  "You know, if you have an expert say she described the offense to me, and she was very tearful and can describe the recounting of it and the sobbing and the tears and if that also occurs, you know, that's – juries accept that."  (H.Tr. 4224).   He noted that the jury will also being watching the client carefully see whether they can see "as the experts are testifying about these things that the client did or things that happened to the client and they're looking to the client for emotional response."

Lisa Greenman testified that remorse as a mitigating factor "is enormously important.  It's – in any sentencing whether we're talking about a capital sentencing or the most minor

200

sentencing – forget about sentencings.  I mean, when you have a two-year-old who does something wrong, I mean, it's just absolutely fundamental. . . . I mean, say I'm sorry.  It's absolutely fundamental.  It's what jurors are listening for.  It's what judges are listening for.  It's what probation officers who write presentence reports are listening for. . . . [¶] And again, I mean, this is part of – it's part of counsel's role, and in a capital sentencing it's something that has to be communicated to the jury."  (H.Tr. 3833).

Ms. Greenman further testified that there could be no strategic reason not to put on evidence of remorse.  "I mean, that would be unthinkable.  I can't imagine the strategy in a capital sentencing that would make that a reasonable decision."  (H.Tr. 3834).  She reiterated how fundamental remorse is.  "It would be seen as inhuman not to be deeply sorry."  (H.Tr. 3834).  Ms. Greenman explained that, "[o]ne of the fundamental jobs of capital defense lawyer is to have jurors recognize that it's a human being whose life they're passing judgment on and whose life they may be taking away.  It is easier for jurors to kill someone who they don't think is fully human.  And a woman who kills a child, you know, I think on some level is so different from what we believe women represent and should be and so on that everybody has a visceral reaction to that. . . ."  (H.Tr 3835).

Because Ms. Johnson was pregnant at the time of the killings, "it was important for the defense team to help the jurors recognize her humanity and that in this ability to feel pain for the pain that was cause to other people they needed to be able to see her as a member of the human family.  And not making that possible for her I think deprived her of what has to be for any capital defendant, you know, one of the most potent connections to a sentence other than death."  (H.Tr. 3835.)

When the prosecutor asked Ms. Greenman where her calculation would be different if the evidence of remorse were equivocal, Ms. Greenman responded, "If it's an equivocal statement, I think you would err on the s – I mean there are rejoinders.  Prosecutors have great rejoinders to lots and lots of things, but it doesn't mean you don't put them in.  You hope that your

201

interpretation of them is persuasive, and remorse is such an important thing.  No, I can't imagine if it were equivocal evidence that you would push it aside and ignore it."  (H.Tr. 3842).  On re-direct, habeas counsel read Ms. Greenman the portion of Ms. Johnson's interview with Dr. Dvoskin cited above (Exh. 114, MAR000059-MAR000060).  Ms. Greenman testified that she would include it in a capital presentation and that there would be no tactical reason not to put it in.  (H.Tr. 3847).

As trial counsel recognized, his failure to introduce Ms. Johnson's statements to Dr. Dvoskin, and to not instruct his mental health experts to explore the issue of remorse, was not a strategic decision based on weighing the pros and cons of doing so.  (H.Tr. 2959).  Trial counsel were unreasonable for failing to present evidence of remorse through expert testimony. The failure to present this evidence was prejudicial because the "undiscovered mitigating evidence, *taken as a whole*, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability" so that  "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S.Ct. 2456 (citations and internal quotations omitted)(emphasis added).

## COURT CLAIM NO. FORTY-THREE 43

### Court Claim 43 – Failure to prepare mitigation: Failure to Elicit Evidence of the Effect of Petitioner's Execution on Her Family Members

Trial counsel called ten family members at the penalty phase of this case:  Pearl Jean Johnson (Tr. 2966-3089); James Jeffrey Johnson (Tr. 3095-3143); Wendy Jacobson (Tr. 3144-86); Arlyn Johnson (Tr. 3187-3213); Holly Dirksen (Tr. 3244-79); Jamie Hayes (Tr. 3363-97); Marvea Johnson Honken (Tr. 3398-3421); Shelley Johnson (Tr. 3422-33); James Jeffrey Johnson, Jr. (Tr. 3434-68); and Alyssa Johnson (Tr. 3904-27).   Not one of these ten witnesses were asked to describe to the jury how they would be affected if Angel Johnson were executed.

Both the United States Supreme Court and the Eighth Circuit have recognized that execution impact evidence is constitutionally relevant mitigation under the Eighth Amendment. See,  *Cullen v. Pinholster*, 563 U.S. ——, 131 S.Ct. 1388, 1404, __ L.Ed.2d__ (2011)(Capital

202

counsel not ineffective at penalty phase, in part because he was "prepared to present ...Pinholster's mother in the penalty phase to create sympathy not for Pinholster, but for his mother....Given ... impediments [to the presentation of other mitigation], it would have been a reasonable penalty-phase strategy to focus on evoking sympathy for Pinholster's mother."); *Id.* at 1407 ("Justice SOTOMAYOR questions whether it would have been a reasonable professional judgment for Pinholster's trial counsel to adopt a family-sympathy mitigation defense. ... She cites no evidence, however, that such an approach would have been inconsistent with the standard of professional competence in capital cases that prevailed in Los Angeles in 1984. Indeed, she does not contest that, at the time, the defense bar in California had been using that strategy....[I]it certainly can be reasonable for attorneys to conclude that creating sympathy for the defendant's family is a better idea because the defendant himself is simply unsympathetic."); *Sinisterra v. United States*, 600 F.3d 900, 909 (8th Cir. 2010) ( prosecutor may not argue that the jury may not consider execution impact evidence). The Eighth Circuit has specifically concluded with respect to such evidence that " '[S]entencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future.'" (*Id.* at 909, quoting *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007).

In this case, by the time this case was tried in 2005, the standard of practice for capital cases nationwide was to offer the broadest possible range of mitigation evidence, including most specifically execution impact evidence. See e.g., *Sears v. Upton*, __U.S.__, 130 S. Ct. 3259, 3262, 177 L. Ed. 2d 1025 ("Counsel's mitigation theory...was calculated to portray the adverse impact of Sears' execution on his family and loved ones.")(case tried in 1993); *United States v. Fell*, 2005 WL 1634067 (D.Vt. 2005)("Third party impact testimony may shed light on Fell's background and character by providing testimony about any 'positive qualities,' 'his capacity to

be of emotional value to others' and the nature of his interpersonal relationships.")(case tried in 2005); *Oregon v. Stevens*, 319 Or. 573, 879 P.2d 162, 167-168 (Or.1994) ( en banc )(trial court erred in excluding the defendant's wife's testimony relating to the impact the defendant's execution would have on his daughter because it was relevant to the defendant's background and character.)(case tried in 1988).  See also, 2003 ABA Guidelines, Guideline 10.11(F)(4)("In deciding which witnesses and evidence to prepare concerning penalty, the areas counsel should consider include the following:...4. Witnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones." (Exh. 1, p. 241). The commentary to this Guideline explains that "areas of mitigation are extremely broad and encompass any evidence that tends to lessen the defendant's moral culpability for the offense or otherwise supports a sentence less than death." (Id. at 244). "Family members and friends can ...humanize the client by allowing the jury to see him in the context of his family, showing that they care about [her]..." (*Id*. at 246, citing Wayne A. Logan, *When Balance and Fairness Collide: An Argument for Execution Impact Evidence in Capital Trials*, 33 U. MICH. J.L. REFORM 1, 12-14 (1999).

The trial team in this case certainly realized the importance of developing persuasive execution impact evidence. They proposed, and the Court gave, two separate mitigation instructions on this very topic. [Doc. 544, p. 7, factor (14) ("Angela Johnson is very much loved by her daughters, Alyssa and Marvea, and Angela Johnson's death would have a profoundly disturbing effect on their young lives, now and for years to come."), and factor (16)("Angela Johnson is loved and cherished by her mother, Pearl Jean Johnson, and her siblings, Wendy Jacobson, Jamie Jo Hays, Jimmy Johnson, and Holly Dirksen, all of whom would suffer grievously should Angela Johnson be sentenced to death.").[56] As described in more detail below,

---

[56]  Factor (16) was obviously underinclusive--what about her father and close friends ? And both factors were problematically worded. For example,  factor (16), unlike factor (14), did not really focus on execution impact, but on sentence impact, thus allowing the jurors to reject this factor if they felt, for instance, that the lengthy appeal process in capital cases would lessen the impact of the sentence itself. Also, factor (16) compelled the jury to reject the factor unless it

204

mitigation specialist Mary Goody also prepared detailed direct examination scripts for all of the family witnesses. See, Exh. 1, MG003818-24; MG003465-69; and Index of Goody files following Exh. 1, MG007340. Those scripts expressly addressed execution impact. See e.g., Exh. 1, MG003824(Wendy Jacobson script)("What effect do you think a death sentence will have on Angela's children ? On you ?"). Ms. Goody testified that there was no strategic reason for failing to ask such questions. (H. Tr. 246) Dean Stowers testified that the trial team asked multiple family members to come and testify during sentencing not for cumulative testimony about similar facts but rather for the jury to see, "who they were and that they were going to be impacted personally...by the outcome," of Johnson's sentencing. (Tr. 1455-1456.) In his view, "there was value in calling family witnesses to create the impression with the jury that people were going to be affected by Angela Johnson's execution ." (H. Tr. 1457) Mr. Berrigan recognized that the execution of a parent is devastating to a child. (H.Tr. 2213-14).

Yet, trial counsel failed to elicit this very powerful evidence from any of petitioner's family members during their penalty phase testimony. The result was predictable. Although twelve jurors found true the intuitively obvious mitigating factor relating to the impact of Ms. Johnson's death on her daughters, only four of them found true the factor relating to the impact of the sentence (not the execution) on select family members. [Doc. 593, p. 5-6]. More importantly, these numbers do not tell us what *weight* any juror gave to these factors, although we do know that no evidence was offered in support of them, and eight jurors gave no weight to the second factor. The absence of evidence to support these factors is significant because it means that the emotional quality of execution impact evidence was wholly missing, in contrast to the obviously emotional nature of victim impact evidence which this Court has rightfully characterized as "the most forceful, emotionally powerful, and emotionally draining evidence" that the government can offer. *United States v. Johnson*, 362 F. Supp. 2d 1043, 1107 (N.Dist. Iowa 2005)

---

found that Ms. Johnson was both "loved *and* cherished."

205

The type of execution impact evidence that could have been put in front of the penalty jury is illustrated by the hearing testimony of Ms. Johnson's sister Wendy Jacobson. Asked how she would be impacted by the execution of Angela Johnson, she testified that ""it would affect me. Her situation that she's in now is the reason I went back to school because I want to help her. And it's already – it's affected me from the beginning. It will affect me through the end of my life. It affects not just me, but it affects everybody because her situation shows that she's fallen through the cracks. There's nobody out there to defend people that are in her position. And I don't want to see that for her, her family, my family, or anybody else." (H. Tr. 1952.) Similarly, friend Carl Todd, when asked " [i]f Angela Johnson were to be executed, would her death have an impact on you?", answered, "It already -- the thought of it already has, yes, very much. I don't see justice in it at all having known her, knowing what an innocent child she was, knowing that -- you know, I have two sisters that easily could have been here. A child is what their mentors make them to be. And, you know, we act like we believe that somewhere along the line magically they become full-fledged adults capable of making the correct decisions and that they should be held accountable as such. But I've not seen it....And I see no good that would be served for anyone, not even the state, by something like that. And yes, I would be very much affected and depressed by it." (H. Tr. 1925)

Given the powerful nature of such testimony, which could have been elicited by numerous family members and friends, it is self-evident that the unpresented "mitigating evidence ... might well have influenced" one or more jurors' "appraisal of [Ms. Johnson's] culpability," and therefore that "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla*, 545 U.S. at 393, 125 S.Ct. 2456 (citations and internal quotations omitted).

## COURT CLAIM NO. FIFTY-SIX

**Court Claim #56 – The Bureau of Prisons' Method of Carrying out the Petitioner's Execution by Lethal Injection Violates the Fifth and Eighth Amendments, the Administrative Procedure Act, and the Controlled Substances Act**

206

The merits of this multi-faceted claim are adequately briefed in petitioner's second amended motion, incorporated herein by reference . [Doc. 263, pp. 149-164]. As Ms. Johnson there points out, whether the according to which BOP intends to execute Ms. Johnson is constitutional is constitutional cannot be answered without further discovery and expert review. (*Id.* pp. 161-163). The question the Court requested briefing on is whether this claim is cognizable in § 2255 proceedings. (H. Tr. 4580)

One court in a federal capital 2255 proceeding has addressed the merits of a lethal injection claim, without considering the issue of cognizability. See, *Fulks v.United States v. Fulks*, 2010 WL 3069390 * 80 (D.S.C.2010.). Two other courts in a federal capital 2255 proceeding have concluded that the claim is not cognizable. See, *Mitchell v. United States*, 2010 WL 3895691 * 42 (D.Ariz.2010) ("In Claim V, Petitioner alleges that execution using Arizona's current lethal injection protocol would violate his rights under the Eighth Amendment. However, he acknowledges that this claim is not yet ripe and that he may present it in a separate civil rights action under 42 U.S.C. § 1983. (Doc. 30 at 241.) The Court agrees and therefore dismisses Claim V without prejudice."); *Higgs v. United States*, 711 F.Supp.2d 479, 555 (D.Md.2010)("This claim is not yet ripe for review because the instant Petition and appeals from it remain and Higgs has not yet been given an execution date. Moreover, litigation may modify the Maryland Protocol prior to Higgs' actual execution. Accordingly, there is no direct and immediate dilemma for the parties that compels judicial resolution of the issue at this time.')(internal quotations and citations omitted). Two other courts have reached the same conclusion in 2254 proceedings. See, *Beardslee v. Woodford*, 395 F.3d 1064, 1068-69 (9th Cir.2005) (condemned inmate's claim that California's lethal injection protocol violates the Eighth and First Amendments "is more properly considered as a 'conditions of confinement' challenge, which is cognizable under § 1983, than as a challenge that would implicate the legality of his sentence and thus be appropriate for federal habeas review."); *Riley v. McDaniel*, 2010 WL 3786070 * 59 (D.Nev.2010)("Turning to Riley's as-applied challenge, the court concludes that such a challenge

207

to Nevada's execution protocol is not cognizable in this federal habeas corpus action....It is possible-and, given the amount of time that passes before a death sentence is carried out, it may be likely-that execution protocols will change between the time when a death sentence is imposed and the time when the death sentence is carried out. Therefore, the constitutionality of an execution protocol may change after the judgment is entered imposing the death sentence. Habeas corpus law and procedure have not developed, and are not suited, for the adjudication of such issues.") [57]

The government takes the position in its Amended Resistance that the claim is procedurally defaulted because it could have been raised on direct appeal.[Doc. 27, p. 96]. That is plainly incorrect. See, *United States v.Mitchell*, 502 F.3d 931, 983 (declining to reach the issue on direct appeal and citing *Hill v. McDonough*, 547 U.S. 573, 579-80, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006), which recognized that challenge to execution method may be brought in § 1983 action).

The government response is also inconsistent with its more recent position in the Honken 2255 proceedings that "this claim is not ripe, as Petitioner acknowledges." [Honken v. United States, Doc. 22, p. 183]. Ms. Johnson agrees, for all of the reasons stated in *Mitchell*, *Higgs*, *Beardslee*, and *Riley*. Because her lethal injection claim, when it is ripe, can be brought pursuant to a federal civil rights claim pursuant to 42 U.S.C. § 1983 or, more likely, pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 397, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), because an execution date has not been set, because BOP has recently announced in litigation that it will soon modify its current protocol [58] and could do so again before Ms. Johnson's

---

[57] The Supreme Court has held in *Hill v. McDonough*, 547 U.S. 573, 579-80, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006) that lethal injection challenges may be brought in civil actions such as § 1983 suits (analogous to federal *Bivens* actions) but has not ruled on their cognizability in habeas proceedings. Given the issue of lack of ripeness, infra, this Court need not reach that issue here.

[58] The Government recently announced its intention to change its execution protocol . *Roane v. Holder*, Civil Action No. 1:05-cv-02337(D.D.C. 7/28/11), Doc. 288, p. 2 ("Defendants inform the Court that the Federal Bureau of Prisons has decided to modify its lethal injection

208

execution date is set, and because further discovery on this claim is necessary in any event, Ms. Johnson requests that, as in *Mitchell*, this Court dismiss this claim without prejudice.

## VI.      Prayer for Relief

Based upon all of the above allegations and entire record in this case, petitioner respectfully requests that the Court provide the following interim and final relief:

- That the Court require the government to respond to the allegations made herein;
- That the Court permit petitioner to amend this petition in accordance with law;
- That the Court permit petitioner discovery to the extent necessary to fully develop and identify the facts supporting this motion and any defenses thereto raised by respondent;
- That the Court permit petitioner the opportunity to file appropriate memoranda in support of the relief requested herein;
- That the Court conduct an evidentiary hearing on all disputed issues of material facts;
- That the Court award final relief by vacating petitioner's convictions and/or sentences, including her sentences of death.

DATED this 1st day of September, 2011.

> Michael Burt
> Law Office of Michael Burt
> 600 Townsend Street, Suite 329E
> San Francisco, California   94103
> 415-522-1508 (tel.)
> 415-522-1506 (fax)
> Michael.Burt@prodigy.net
>
> Marcia A. Morrissey
> Attorney at Law
> 2115 Main Street
> Santa Monica, California 90405
> 310-399-3259 (tel.)
> 310-399-1173 (fax)
> MorrisseyMA@aol.com

---

protocol but the proposed revisions have not yet been finalized.").

209

By:    \_/S/_____
       Michael Burt

210

**PROOF OF SERVICE**

I, Michael Burt, hereby certify that on this 1st day of September 2011, I served the forgoing on the following person by ECF filing to the following:

C.J. Williams

Assistant United States Attorney

United States Attorney's Office

Northern District of Iowa

401 First Street, S.E.

Hach Building, Suite 400

Cedar Rapids, Iowa   52401-1825

By:   /s/ Michael Burt

211