IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| ANGELA JOHNSON, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | No. 09-CV-3064-MWB |
| | ) | |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

## GOVERNMENT'S POST-HEARING BRIEF IN RESISTANCE TO PETITIONER'S MOTION UNDER 28 U.S.C. § 2255

TABLE OF CONTENTS

I.      INTRODUCTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.     COURT CLAIM NO. 1 – Failure to Pursue a Disposition for a Sentence of Less Than Death.. . .  1

III.    COURT CLAIM NO. 8 – Demeanor and Competence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

IV.     THE PENALTY PHASE CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

V.      COURT CLAIM NO. 18 – Confrontation of Aggravating Evidence: Failure to Present Evidence of
        BWS to Explain the Relationship Between Petitioner and Terry DeGeus to Rebut the
        Prosecution's Theory of Her Motive for Killing Him.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

VI.     COURT CLAIM NO. 19 – Confrontation of Aggravating Evidence: Failure to Present Readily
        Available Evidence About Dustin Honken to Refute the Prosecution's Argument that Angela
        Johnson was "Worse" than Honken. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

VII.    COURT CLAIM NO. 20 – Confrontation of Aggravating Evidence: Failure to Use the
        Prosecution's Arguments at Dustin Honken's Trial as Party Admissions to Rebut the
        Government's Evidence that Petitioner Was "Worse" than Honken.. . . . . . . . . . . . . . . . . . . . . .  42

VIII.   COURT CLAIM NO. 21 – Confrontation of Aggravating Evidence: Failure to Discover and
        Present Information Regarding Dustin Honken's Plans to Kill Prosecutor Reinert and His Family
        and Honken's Membership in a White Supremacist Prison Organization.. . . . . . . . . . . . . . . . . .  46

IX.     COURT CLAIM NO. 22 – Confrontation of Aggravating Evidence: Failure to Address
        Aggravating Evidence at the Merits and Mitigation [sic] Phases of Trial.. . . . . . . . . . . . . . . . . .  51

X.      COURT CLAIM NO. 23 – Confrontation of Aggravating Evidence: Failure to Limit Future
        Dangerousness Evidence to Future Danger in Prison. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53

XI.     COURT CLAIM NO. 24 – Confrontation of Aggravating Evidence: Failure to Object to
        Kathy Rick's Triple Hearsay Testimony About Petitioner's Alleged Possession of a Gun. . . . . .  59

XII.    COURT CLAIM NO. 25 – Confrontation of Aggravating Evidence: Failure to Object to
        Kyla Davis's Testimony That Petitioner Tried to Find Out Where She Lived and What Car
        She Drove.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61

XIII.   COURT CLAIM NO. 26 – Confrontation of Aggravating Evidence: Failure to Correct False
        Testimony at Angela Johnson's Trial Violated the Fifth and Eighth Amendments to the United
        States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  63

XIV.    COURT CLAIM NO. 27 – Prosecution Misconduct: the Prosecution's Violation of Brady v.
        Maryland by Failing to Disclose Dustin Honken's Planned Violent Attack on the Trial Prosecutor
        and His Association With a White Supremacist Prison Organization.. . . . . . . . . . . . . . . . . . . . .  64

XV.     COURT CLAIM NO. 28 – Prosecution Misconduct: The Prosecution's Violation of Petitioner's
        Rights Under the Sixth and Eighth Amendments and the Due Process Clause by Presenting
        Inconsistent Arguments at Her Trial and That of Her Co-Defendant. . . . . . . . . . . . . . . . . . . . .  69

XVI.    COURT CLAIM NO. 29 – Ineffective Mitigation: The Testimony of Holly Dirksen. . . . . . . . . . . .  75

XVII.   COURT CLAIM NO. 30 – Ineffective Mitigation: The Testimony of Doug Book. . . . . . . . . . . . . .  78

i

XVIII.    COURT CLAIM NO. 31 – Ineffective Mitigation: The Testimony of Susan Marsolek. . . . . . . . . .   81

XIX.    COURT CLAIM NO. 32 – Ineffective Mitigation: Failure to Provide Psychiatric Pharmacologist Roswell Lee Evans with Data Regarding Petitioner's Drug History, Rendering His Expert Testimony Virtually Irrelevant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   83

XX.    COURT CLAIM NO. 33 – Ineffective Mitigation: Use of Multi-Faceted, Overly Complicated Yet Incomplete Mitigating Factors for the Jury to Weigh Rather Than Simple, Straight-Forward Facts that Encompassed All of the Mitigation. . . . . . . . . . . . . . . . . . . . . . . . . . .   87

XXI.    COURT CLAIM NO. 34 – Failure to Prepare Mitigation: Failure to Investigate and Present Evidence Regarding Angela Johnson's Mental State at the Time of the Offenses.. . . . . . . . . . .   92

XXII.    COURT CLAIM NO. 35 – Failure to Prepare Mitigation: Failures Regarding Dr. Gelbort.. . . . .   106

XXIII.    COURT CLAIM NO. 36 – Failure to Prepare Mitigation: Failure to Introduce Evidence of, and Give the Trial Experts Records Concerning, the 1996 Diagnosis of Petitioner With Depression and Dependent Personality Features.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   110

XXIV.    COURT CLAIM NO. 37 – Failure to Prepare Mitigation: Failure to Offer Expert and Lay Testimony that Angela Johnson Was Under the Substantial Influence of Dustin Honken. . . . .   114

XXV.    COURT CLAIM NO. 38 – Failure to Prepare Mitigation: Failure to Introduce the Statement of Phyllis Proscovec to Support Residual Doubt.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   123

XXVI.    COURT CLAIM NO. 40 – Failure to Prepare Mitigation: Failure to Impeach Steven Vest by Presenting Evidence That Honken Lied About Petitioner's Role in the Offenses to Support Residual Doubt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   127

XXVII.    COURT CLAIM NO. 41 – Failure to Prepare Mitigation: Failure to Introduce Petitioner's Offer to Plead Guilty as Evidence in Mitigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   129

XXVIII. COURT CLAIM NO. 42 – Failure to Prepare Mitigation: Failure to Present Evidence of Remorse Through Expert Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   132

XXIX.    COURT CLAIM NO. 43 – Failure to Prepare Mitigation: Failure to Elicit Evidence of the Effect of Petitioner's Execution on Her Family Members. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   138

XXX.    COURT CLAIM NO. 56 – The Bureau of Prisons' Method of Carrying Out The Petitioner's Execution by Lethal Injection Violates the Fifth and Eighth Amendments, the Administrative Procedure Act, and the Controlled Substances Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   146

XXXI.   CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   146

Case 3:09-cv-03064-MWB-LTS   Document 325   Filed 10/03/11   Page 3 of 149

## I.  INTRODUCTION

The government resists Petitioner's Motion in its entirety.  This brief, however, is limited to claims Petitioner chose to brief.[1]  The government maintains many of these claims should be denied because they were new claims filed out of time and do not relate back to her original motion.  The government addresses those claims on their merits without waiving its position they should be denied as untimely.

## II.  COURT CLAIM NO. 1 – Failure to Pursue a Disposition for a Sentence of Less Than Death

Petitioner claims her trial counsel were ineffective in their efforts to secure a plea agreement for a sentence less than death.  (PB 5-33).[2]  Petitioner has never admitted

---

[1]  The Court asked the parties to brief whether the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases are deemed by the Courts as setting the standard for reasonable performance by counsel, or are more aspirational.  (H.Tr. 4324-26).  While Petitioner claimed the cases since *Wiggins* have sent "mixed signals" (H.Tr. 4324), the Supreme Court has clearly rejected Petitioner's assertion that the ABA Guidelines constitute "binding standards" (H.Tr. 4325) with which capital counsel must comply.

> To make matters worse, the Court of Appeals (following Circuit precedent) treated the ABA's 2003 Guidelines not merely as evidence of what reasonably diligent attorneys would do, but as inexorable commands with which all capital defense counsel "'must fully comply.'" *Strickland* stressed, however, that "American Bar Association standards and the like" are "only guides" to what reasonableness means, not its definition.  We have since regarded them as such.  What we have said of state requirements is a fortiori true of standards set by private organizations: "[W]hile States are free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented, we have held that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices."

*Bobby v. Van Hook*, ___ U.S. ___, 130 S. Ct. 13, 17 (2009) (internal citations omitted).

[2]  Throughout this brief, the following abbreviations are used: "H.Tr." refers to the transcript from the habeas proceedings held in four stages in 2011; "T.Tr." refers to the

1

to facts establishing she knowingly and intentionally aided and abetted the murders. Petitioner has not demonstrated her attorneys were unreasonable to refuse to comply with the government's condition-precedent of a truthful debrief before any plea agreement could be reached. Finally, Petitioner has not demonstrated the government ever made a plea offer to Petitioner for a sentence of less than death.

### A. Statement of Facts

#### 1. Arrest to Production of Maps Showing Location of Victims

Petitioner was arrested on July 29, 2000. Attorney Al Willett met with Petitioner two days later, on August 1, 2000, and was formally appointed to represent her on August 2, 2000. The immediate issue was Petitioner's detention pending trial. On August 6, 2000, Willett sent a letter to Petitioner, which ends with his expressed hope that she will be seen in something other than a blue jumpsuit in the new future. (Exhibit 53).[3] On August 2, 2000, however, the court ordered Petitioner detained after a hearing.

For at least the first year the case was on file, the government permitted counsel to review discovery only in the government's office. There was a large volume of

---

transcript from Petitioner's criminal trial; "PB" refers to Petitioner's Post-Hearing Brief, Case No. 09-CV-3064, Doc. 314.

[3] Through the course of the hearing in this case and in her briefing, Petitioner has repeatedly referenced this letter as an indication of Al Willett's unrealistic views about winning the merits phase of the trial. The use of this letter for that purpose is misleading. The timing of the letter shows it pertained to her detention. There is nothing suggesting he was talking about the likelihood of acquittal. Regardless, even if one interprets the letter as referencing guilt, Willett wrote this letter four days after his appointment, two days before the detention hearing, long before he had an opportunity to review the government's discovery file, and before Petitioner produced maps leading to the location of the bodies.

2

discovery.  The billing records for Willet and Tom Frerichs reflect they spent many hours prior to October 2000 reviewing discovery.  The problem accessing discovery impeded the attorneys' ability to negotiate a plea.  (H.Tr. 2129).

On October 2, 2000, the government obtained from Robert McNeese maps Petitioner drew leading to the location of the murder victims' remains, along with several handwritten notes regarding details about the murders and the burials.  Prior to the discovery of the bodies, the defense attorneys thought it might be a defensible case.  (H.Tr. 949).  From that point on, Petitioner's value to the government was significantly reduced.  (H.Tr. 1569-70).[4]

### 2.     From Maps through June 2001

On October 13, 2000, defense investigator Ray Cornell interviewed Petitioner about the crimes – she denied any involvement.  (Exhibit A).  On October 16, 2000, attorney Pat Berrigan spoke with Willett, who told Berrigan that Petitioner wants to fight the case.

Petitioner filed a motion to suppress the evidence derived from the maps, including the victims' bodies.  Trial counsel believed, as a matter of strategy, their plea negotiating position would be strengthened if, as happened, the Court suppressed the

---

[4]  Stowers compared the value of disclosing the location of the bodies as worth $100,000, compared to the value of testifying against Honken as worth 10¢.  (H.Tr. 1569).  While Petitioner claims prosecutor Reinert's concerns about the danger posed by Honken constituted a motivation to plead Petitioner's case (PB 14), there is nothing in the record showing the government's plea position was influenced by security concerns.  Moreover, the security measures were taken to negate security concerns to Reinert and there's nothing in the record to show they were inadequate.  Finally, if the danger Honken posed constituted a motivation to work out a plea with anyone, it would have been to work out plea with Honken, not Petitioner.

3

evidence.  (H.Tr. 949-50).

Petitioner's position – denying guilt and expressing no interest in a plea deal – continued into the following year, but her attorneys continued to encourage her to consider the possibility of a plea bargain.  On March 8, 2001, Petitioner wrote a letter to Dustin Honken in which she asserted she "would never do" the acts she was accused of.  (Exhibit OO).  On March 19, 2001, Berrigan sent a letter to Petitioner confirming his understanding she was not interested in a plea, but asking her to keep an open mind.  (Exhibit U).  On April 3, 2001, Petitioner told counsel "no plea bargain [was] desired."  (Exhibit V).  During a visit with Petitioner on July 2, 2001, Petitioner told Berrigan that Dustin Honken told her the location of the bodies and she believed Christy Gabatz was involved in the murders.  (Exhibit B).  On August 3, 2001, trial counsel met with Petitioner, brought up the idea of a plea bargain, and "sought [a] decision re: plea," but the response was negative.  (Exhibit X).  On August 14, 2001, Petitioner wrote a letter to Willett, complaining they all believe she's guilty.  (Exhibit C).

During this time period, the lawyers were continuing to review the discovery file through the limited means available to them.  In June 2001, the Department of Justice policy changed to require the Attorney General's personal authorization before a plea agreement could be reached in a capital case.  (H.Tr. 1158).

Not until October 1, 2001, did Petitioner finally say she was "okay w[ith] beginning discussions re: trial v. plea."  (Exhibit Z).  By December 7, 2001, however, the lawyers were still having a "problem with getting Angie on board" working on a plea.  (Exhibit AA).

4

### 3. Petitioner's Claim She Was Not Present and Rejection of Plea

Moreover, for the next two years Petitioner continued to deny even being present at the murders. On February 13, 2002, Stowers noted during a meeting with Petitioner that "she won't admit to being there when she wasn't there." (Exhibit D). On May 6, 2002, Mary Goody's notes reflect Petitioner never gave a factual basis for a plea. (Exhibit E). Berrigan's notes of a May 8, 2002, meeting with Petitioner about the crimes reflect Petitioner gave a "not-at -all believable story about Dustin [Honken] giving her a map to the Greg Nicholson bodies [sic]." (Exhibit F). During this meeting, Berrigan's notes reflect plea discussions went "nowhere" because Petitioner wanted "murder charges dismissed" and "outright rejects 20 years." (Id.). On July 16, 2002, the attorneys again tried to persuade Petitioner to discuss the possibility of a plea deal and told her the best they could hope for was 20 years, but Petitioner was "not interested." (Exhibit DD, p. 13). On October 24, 2002, Petitioner sent a letter to Berrigan asserting she has never told anyone anything except that she's innocent. (Exhibit G). On February 7, 2003, Nancy Lanoue's notes reflect statements by Petitioner claiming she was not present at the murders. (Exhibit I).

On May 10, 2003, Petitioner sent a letter to her attorneys claiming she was ready to plead guilty and was willing to "confess to killing the Pope." (Exhibit EE). Berrigan and Willett met with Petitioner 12 days later, but Berrigan's notes do not reflect Petitioner admitted to any criminal conduct. (Exhibit FF). Berrigan's notes do reflect Petitioner was willing to testify against Honken and cooperate. (Id.). Nevertheless, ten months later Berrigan's March 13, 2004, notes show the attorneys still "need[ed] to get her off of the 'I didn't do anything' posture." (Exhibit J). On November 4, 2004,

5

Berrigan's notes of another meeting with Petitioner reflect she claimed she was not present at the murders. (Exhibit K). On January 26, 2005, Petitioner told Dr. Logan she made the statements to McNeese to make it sound like she was present at the murders, but she was not. (H.Tr. 3560-61). On February 25, 2005, Petitioner repeatedly told Dr. Hutchinson she was not present at the murders. (H.Tr. 4104-4107).

Willett testified that Petitioner never admitted to him that she participated in the murders, and never moved off her position that she was innocent. (H.Tr. 941). Likewise, Stowers testified Petitioner never admitted to him that she participated in the murders. (H.Tr. 1562).

To be clear, trial counsel repeatedly confronted Petitioner about the facts of the case in an effort to "get her off the 'I didn't do anything' posture." (H.Tr. 3010).

### 4. 20-Year Sentence Proposal

During plea negotiations, trial counsel told prosecutors they were looking to get a 20-year sentence for Petitioner. On one occasion, government counsel told trial counsel a 20-year sentence was unconscionable. (H.Tr. 2143). On other occasions, however, government counsel made statements to trial counsel that made it sound like something around 20 years was not outside the realm of possibility. (H.Tr. 3114). The discussion of a 20-year sentence was part of a negotiating strategy by defense counsel, who recognized the government would never agree to 20 years, but believed it was tactically better to start with a lower number of years with the realization that through negotiation the number would increase. (H.Tr. 1188, 2143, 3014-15).

In any event, counsel had "trouble" or a "battle" to convince Petitioner to consider a plea that would require her to serve even 20 years in prison. (H.Tr. 942; 3011-14).

6

### 5. Whether Willett Was An Impediment to a Plea

During the meeting with Petitioner on October 1, 2001, when she first authorized her attorneys to begin discussions about a plea, Berrigan noted that Willett was an impediment to plea negotiations. (Exhibit Z). Berrigan was a prolific and careful note-writer. (H.Tr. 3090). Berrigan and Willett met with Petitioner multiple times after the October 1, 2001, meeting to discuss plea issues with Petitioner. Berrigan took notes during each of those meetings. Not one of those notes complains of Willett being an impediment to plea negotiations. (Exhibits F, AA, DD, and HH). When Berrigan testified at the hearing in this case, however, he claimed Willett was an impediment to plea negotiations throughout the process. This testimony is unreliable, however, as that is not what he told Petitioner's habeas counsel when they interviewed him. On January 19, 2011, he told habeas counsel "Willett was not resistant to pleading the case, he wasn't an impediment to the plea, he just did not push a plea." (H.Tr. 3105, 4605).

### 6. The Attorney Proffer

Petitioner cites the attorney proffer Berrigan provided to the government during jury selection as evidence she would have admitted the facts necessary for a guilty plea. Berrigan did not involve either of his co-counsel with this proffer. (H.Tr. 946). During the hearing, Berrigan claimed Petitioner agreed the story Honken gave in his proffer was true and was prepared to admit those facts. (H.Tr. 3069-3096). Berrigan's notes from the meeting where he discussed Honken's proffer with Petitioner, however, do not include any entry indicating Petitioner agreed to the facts as alleged by Honken. (Exhibit M). Rather, it reflects that during the 2 hour and 20-minute meeting, Berrigan went over the first 400 pages of the transcript from Honken's trial. After that, they

7

discussed plea negotiations, during which Berrigan explained the possibility of an *Alford* plea being accepted was slim. He expressed his opinion they needed to prepare a counter offer and Honken's "proffer was largely the factual basis that we'd have to go with." Petitioner's response was to say she "hoped to God" the *Alford* plea would be accepted. Petitioner did not tell Berrigan to "go fly a kite," so Berrigan went over Honken's proffer with Petitioner. Petitioner only admitted Nicholson did not know her, and she "quibble[d]" with Honken's claim he didn't bring anything into the house because she could not have carried everything.

Berrigan drafted an attorney proffer he provided to the government which largely tracked Honken's proffer statement and claimed Petitioner would admit the facts stated in the letter. However, Berrigan's notes reveal he did not show Petitioner the letter until three days after he sent it to the government. (Exhibit O). Again, when interviewed by habeas counsel, Berrigan said Petitioner did not see the attorney proffer before it was submitted to the government. (H.Tr. 4606). Indeed, Berrigan told habeas counsel Petitioner "always" said she was not there at the scene of the murders. (H.Tr. 4607).

Petitioner later told Dr. Woods that Berrigan told her she had to be on board with the proffer and she agreed to do it to make a deal for a life sentence. She said she "just gave up" and "[got] bullied into saying whatever you want to do." (H.Tr. 4462).

### 7. Petitioner's Post-Trial Statements Regarding Guilt

Petitioner continued to deny guilt after the trial. On September 22, 2005, Petitioner sent a letter to Berrigan, complaining that she "went along with the mere presence defense," insisting "I NEVER, EVER would stand by and let two innocent little girls be murdered. I wasn't fucking there! Do you hear me Pat?! I wasn't there."

8

(Exhibit RR, p.2, emphasis original). Berrigan met with Petitioner the day before her sentencing and noted she was still exculpating herself. (Exhibit SS). Berrigan's notes of the sentencing hearing reflect that Petitioner "did not drop the 'I'm innocent' argument." (Exhibit TT).

Habeas counsel hired Dr. Woods to examine Petitioner. Dr. Woods met with Petitioner on three occasions. The first time, on August 5, 2009, predated the evidentiary hearing. During that interview, Petitioner told Dr. Woods she was not present at the murders. (H.Tr. 4438-40). During a second interview over a two-day period in June 2010, Petitioner again told Woods she "wasn't there." (H.Tr. 4440-41).

During the hearing on May 5, 2011, the Court identified all the hurdles Petitioner would have to overcome to make an ineffective assistance of counsel claim with regard to plea negotiations, including the fact that Petitioner "was steadfastly maintaining her innocence." (H.Tr. 3298-3301).

According to Dr. Woods, on May 24 and 25, 2011, Petitioner suddenly changed her story, for the first time admitting she was present. (Exhibit 107, p. 47). What Dr. Woods describes as a confession, however, lacks a factual basis establishing Petitioner knowingly and intentionally participated in the murders. Rather, she claimed she did not know in advance of a plan to kill anyone, claimed Honken threatened her life, and claimed she had nothing to do with burying the bodies. She had no explanation for how she was later able to draw the maps and describe the bodies. She denied knowing Honken was planning on killing DeGeus and was "startled" to hear a gunshot.

This "mere presence" explanation is similar to what Petitioner later told Dr. Martell. (Exhibit OOO). Petitioner told Dr. Martell that she believed the purpose of

9

making entry into the Duncan home was for Honken to make a videotape. She claimed Honken threatened her and told her the children had to die, but she denied participating in the murders or acting with an intent to cause the death of anyone. Similarly, she claimed to Dr. Martell that she did not know Honken was going to kill DeGeus, claiming she thought Honken was just going to talk with DeGeus about grand jury. Indeed, she claimed she was fearful something bad was going to happen to DeGeus and claimed she tried to talk him out of going to the site to meet with Honken.

8.      Government's Plea Position

The government raised the possibility of a plea bargain with trial counsel on a number of occasions. The government made it clear any plea deal was conditioned upon Petitioner first providing a truthful proffer to the government. (H.Tr. 3261). Both Berrigan and Stowers believed that requirement was unreasonable because it would have required Petitioner to proffer before the government would make any agreement about what, if anything, the government would offer if the proffer was acceptable. (H.Tr. 3016-17). Counsel also knew they could not agree to a proffer-first deal because Petitioner would not admit to participating in the murders. (H.Tr.944-45; 1578-79).[5]

The government never provided Petitioner with a written plea offer. (H.Tr. 945; 3004-3005; 3261).[6] Trial counsel knew the United States Attorney's Office for the

---

[5]  Petitioner claims there were "indications from the government that such a proffer would in all likelihood secure the approval of a plea from Main Justice in Washington, D.C." (PB at 7). Petitioner gives no record cite supporting this claim.

[6]  In Stowers' words: "The government never offered a damn thing for her willingness to testify against Honken as a stand alone item. It just never offered anything to her." (H.Tr. 1570).

10

Northern District of Iowa did not enter into oral plea agreements, and did not claim the government made an oral plea offer.  (H.Tr. 1572).  After June 2001, it was also clear the government was not authorized to enter into any plea agreement without the personal approval of the Attorney General of the United States.  The Attorney General never authorized the United States Attorney's Office to offer a plea agreement to a sentence of less than death.  (Doc. 308).[7]  Counsel understood that, after June 2001, the local prosecutors had no authority to plead the case out.  (H.Tr. 3012-13).

>    B.    Trial Counsel's Conduct Was Not Defective

Trial counsels' performance was not deficient in their efforts to work out a plea to a sentence of less than death.  Petitioner has not alleged her attorneys failed to advise her about the law or gave her erroneous legal advice.  Petitioner has not alleged her attorneys failed to advise her about facts about the crime or the investigation.  Rather, Petitioner claims her attorneys did not do enough to persuade her to abandon her claims of innocence, abandon her resistance to spending more than 20 years in prison, and did not do enough to persuade the United States to make a plea offer to Petitioner.

The Court is familiar with the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" which applies in habeas proceedings when, with the benefit of hindsight, an attorney's performance is attacked. *Strickland v. Washington*, 466 U.S. 668, 689 (1984).  This presumption is bolstered in

---

[7]  Petitioner claims "[i]f both Honken and Ms. Johnson pled guilty for life sentences the case would have ended."  (PB 22).  To support this factual claim, she cites Berrigan's testimony where he opined what he believed the government might have accepted.  Petitioner does not cite to anything in the record showing the Attorney General would ever have agreed to such a disposition.

11

this case when the experience and past performance of trial counsel are considered. Willett had been practicing law for 21 years and had tried between 20-30 criminal cases, repeatedly obtaining acquittals. (H.Tr. 939-40). The United States Courts thought highly enough of Willett to appoint him as the CJA panel representative, the Advisory Practice Committee for the Eighth Circuit Court of Appeals, and panels to select a magistrate judge and whether to reappoint the Federal Public Defender. (H.Tr. 940). Stowers had been practicing law for 15 years, focusing his practice on criminal defense, and has tried 35-40 cases. (H.Tr. 1069, 1533-34). Berrigan had represented "at least 50 to maybe 60" capital defendants prior to his representation of Petitioner. (H.Tr. 3003). Other than two who committed suicide, Berrigan resolved by a plea all but a dozen of them, and of the dozen that went to trial, obtained a life-sentence verdict in half of them. (Id.).

Failure to advise a criminal defendant of the relevant law "is 'deficient performance' sufficient to satisfy the first prong of the 'ineffective assistance of counsel' analysis." *Wanatee v. Ault*, 39 F. Supp.2d 1164, 1172 (N.D. Iowa 1999). See also *United States v. Hernandez*, 450 F. Supp.2d 950, 975 (N.D. Iowa 2006). Petitioner does not allege, however, that her attorneys failed to advise her of the relevant law.

Rather, Petitioner rests her deficient performance claims on the ABA's Guidelines. Petitioner claims the United States Supreme Court "has observed that the ABA Death Penalty Guidelines establish the 'prevailing norms of practice' that serve to measure counsel's performance under the Sixth Amendment." (PB 5). That is not accurate. The Supreme Court has stated:

12

> The narrow grounds of our opinion [in *Wiggins v. Smith*, 539 U.S. 510 (2003)] should not be regarded as accepting the legitimacy of a less categorical use of the Guidelines to evaluate post-2003 representation. For that to be proper, the Guidelines must reflect "[p]revailing norms of practice," . . . and "standard practice," . . . and must not be so detailed that they would "interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." <u>We express no views on whether the 2003 Guidelines meet these criteria</u>.

*Bobby*, 130 S. Ct. at 17 n.1 (internal citations omitted) (emphasis added).

Even assuming those Guidelines can serve to inform the Court regarding the standard of adequate representation, they are too vague to serve that function with regard to plea negotiations. Petitioner argues the Guidelines "imposes upon counsel 'at every stage' of a capital case the 'obligation to take all steps that may be appropriate in the exercise of professional judgment . . . to achieve an agreed-upon disposition,'" and to "'explore with the client the possibility and desirability of reaching a negotiated position of the charges rather than proceeding to a trial.'" (PB 6, quoting Guideline §§ 10.9.1 and 11.6.1). The record shows trial counsel repeatedly explored with Petitioner plea options and worked to effectuate a plea. Indeed, the record shows counsel never ceased in their efforts to work out a plea agreement, continuing in the efforts into the time of jury selection. (H.Tr. 1571). The Guidelines do not otherwise set forth what "all [the] steps" are that counsel should take. The Guidelines provide no direction to defense counsel on how to deal with a government that refuses to discuss a plea offer until after a defendant provides a debriefing. The Guidelines do not state that, in negotiating a plea counsel are ineffective if they start with 20 years.[8]

---

[8] Petitioner claims certain conduct did not conform with or was not consistent with the Guidelines (Brief at 9 & nn. 5 & 6), but her record references are to witnesses's

13

The reality is counsel were working under several disadvantages making negotiating a plea difficult, if not impossible. First, their client drew a map to the location of the murder victims' bodies, turning a "triable" case into a certain conviction, and surrendering the most valuable asset she had to offer the government to motivate it to negotiate a plea with her. Second, the government insisted on a truthful proffer before making a plea offer. If that was an unreasonable position, it was not of the defense counsels' making. Third, counsel had a client who was wedded to a position that she was innocent and was not even present at the murders, which made the idea of having her proffer untenable. Fourth, they had a client who for years would not even consider spending 20 years in prison, let alone life. Fifth, they were initially successful in suppressing the key evidence of Petitioner's guilt – the discovery, through her hand, of the murder victims' bodies. This initial success, and the delays entailed by the litigation, impinged upon the plea negotiations because it altered the parties' bargaining positions and affected their client's expectations. Petitioner's expert agreed it was a strategic decision for counsel to delay trying to work out a plea pending this suppression litigation. (H.Tr. 4287-88).

Petitioner relies on the testimony of Russell Stetler[9] to assert trial counsel's performance was deficient in five respects. Sean O'Brien joined in to assert trial counsels' performance was deficient. These witnesses premise their opinions,

interpretation of another portion fo the guidelines that speak to the need for the defense team to work together, and not to anything specific to plea negotiations.

[9] Stettler is a mitigation specialist who has never been licensed to practice law, has never personally negotiated a plea agreement for any client, and in preparing for his testimony never spoke with Willett or Nancy Lanoue. (H.Tr. 3217-18, 3234).

14

however, upon conjecture and speculation.

They claim Nancy Lanoue allegedly persuaded Petitioner to maintain her innocence, but Petitioner never testified to this at the hearing. Nor is there anything in the record to support that she ever said as much to her trial attorneys, experts, or anyone else. Lanoue denied this (H.Tr. 446), and Willett testified it was the other way around – Petitioner was able to convince Lanoue of her innocence. (H.Tr. 970-71). Thus, they can only speculate about what occurred between Lanoue and Petitioner. They claimed if the attorneys had enlisted the assistance of family members or mental health professionals, it would have made a difference with Petitioner. Again, that did not come out of Petitioner's mouth and there is nothing in the record supporting the supposition that Petitioner's position would have changed as a result.[10] They claim a more consistent front by the attorneys would have persuaded Petitioner to work out a plea, but this is rank speculation.

In the end, Petitioner's criticism of trial counsel's performance comes down to criticism of their negotiating strategy. Trial counsel's strategy did not fall so far short of an objective standard of reasonableness as to constitute deficient performance under the first prong of *Strickland*. See *Leyva v. United States*, 2010 WL 1334084, * 2-3 (N.D. Ill., March 31, 2010) (unpublished) (finding trial counsel's performance was not deficient where counsel explain options to the defendant, defendant maintained his innocence, and the government never made a plea offer).

_____

[10] Indeed, even when Dr. Woods finally got Petitioner to make some statement about her involvement in the crime, it resulted in a wholly unbelievable and inconsistent claim she was "only present" at the scene of the murders and did not act knowingly and intentionally to assist in the murders.

15

C.    Petitioner Suffered No Prejudice

Regardless of whether trial counsels' performance was deficient, Petitioner cannot establish she was prejudiced.  For Petitioner to prove she was prejudiced by her attorneys' alleged deficient performance in negotiating a plea, she must show three things: 1) the government made a plea offer; 2) Petitioner would have accepted the plea offer; and 3) Petitioner could have performed the conditions placed on the plea by the government.  *Wanatee v. Ault*, 101 F. Supp.2d 1189, 1200-1201 (N.D. Iowa 2000).

It is abundantly clear the government never made a plea offer.  Nevertheless, Petitioner claims she has met the first prong of the test.  First, Petitioner cites a letter from the government dated October 10, 2001, which said "our office may not be opposed to negotiating a settlement in this case, which would include a sentence other than the death penalty or life imprisonment."  By no stretch of the imagination can it be claimed this letter constituted a plea offer.  It did not set forth any terms of a offer.  It did not even state an offer would be made.  It said the government "may not be opposed to negotiating" a plea.  Petitioner then cites a series of notes by defense counsel regarding discussions of possible terms of a plea agreement.  (PB at 28-29).  None constituted a plea offer and it was clear the government did not make oral plea offers. (H.Tr. 1572).  Moreover, all of these discussions took place after June 2001, when only the Attorney General of the United States could approve a plea agreement in a capital case.  The Attorney General never authorized the United States Attorney's Office for the Northern District of Iowa to offer a plea to a sentence of less than death.  (Doc. 308).  Finally, Petitioner cites a letter dated August 12, 2004, which states that if Petitioner provided a truthful debrief satisfactory to the government, then the United

16

States Attorney's Office would be willing to ask the Attorney General to make a plea offer for a life sentence. It was in response to this that Berrigan provided the government with the attorney proffer, which was forwarded to the Attorney General, and promptly rejected. The government made no counter-offer.

Because Petitioner failed to establish the first prong of the test, the Court need go no further. Regardless, Petitioner has also failed to establish the next two prongs of the test as well. The second prong requires a showing Petitioner would have accepted a plea offer. Of course, Petitioner was eventually willing to serve a life sentence, but only after Honken's conviction. Prior to that time, during the time period when Petitioner claims her attorneys' performance was deficient for failing to negotiate a plea agreement, she was unwilling to serve even 20 years in prison. This is unlike the defendants in *Wanatee* and *Hernandez* who testified about what they would have done; in this case, Petitioner did not testify, so her habeas counsel are left with conjecture about what she might have done.

The third prong requires Petitioner show she would have been able to perform the conditions of the plea offer.[11] It was clear that before the government would make any plea offer in this case, the Petitioner had to provide a truthful proffer to the United States about her involvement in the murders. If what she told Drs. Woods and Martell is what she would have told the government during a proffer, it would never have sufficed. As the government demonstrated during the cross examination of Dr. Woods, Petitioner's story was completely inconsistent with the evidence. It contradicted what

---

[11] In her post-hearing brief, Petitioner does not address this prong of the test.

17

she told Christy Gabatz and Robert McNeese in material ways. Her claim she did not participate and was not even present during the burials is contradicted by the maps she drew and the detailed descriptions she gave about how the victims were buried. Further, her "proffer" would have been rejected because Petitioner still refuses to admit she knowingly and intentionally participated in the murders. She continues to insist she was "merely present" and did not know in advance Honken was going to murder the victims.

Accordingly, regardless of trial counsels' performance, Petitioner's claim of ineffective assistance of counsel for failing to negotiate a plea in this case must fail because she cannot demonstrate prejudice.

## III. COURT CLAIM NO. 8 – Demeanor and Competence

Petitioner claims her attorneys were ineffective for failing to monitor Petitioner's medications, and she was prejudiced because her medications were increased to the point it affected her demeanor and competence. (PB 34-49).

### A. Statement of Facts

Trial counsel were concerned about Petitioner's behavior and how her demeanor would appear before the jury. (H.Tr. 3136-37). They were concerned about her acting out (H.Tr. 3136-37, 3139), her voice carrying, and of her gaffawing or rolling her eyes (H.Tr. 963). Counsel had experienced Petitioner behaving in this manner on other occasions. (H.Tr. 963-64). In general, they were worried about her demeanor coming off negatively to the jury. (H.Tr. 963).

During a jury selection session, the lawyers' concerns were reinforced. The jury consultant described Petitioner's demeanor during jury selection as "at times somewhat

18

of a girly or giddish [sic] sort of demeanor, twirling of hair.  She also at times would have somewhat of a harsh appearance or a judgmental appearance . . ..” (H.Tr. 338).  The jury consultant was concerned because Petitioner's demeanor "didn't represent that she appreciated the gravity of the situation."  (H.Tr. 338, 350).  The jury consultant spoke with trial counsel about her observations and concerns.  (H.Tr. 350-51).  The consultant advised counsel to work with Petitioner to calm her, and to instruct her to "maintain composure on her face" so as not to appear aggressive or judgmental.  (H.Tr. 351).  Based on this advice, counsel instructed Petitioner to maintain her composure, not to roll her eyes or make audible comments, and to generally maintain a poker face.  (H.Tr. 964).

Later, during trial, the jury sent a note to the Court indicating jurors were having difficulty seeing Petitioner.  In response to this, the lawyers instructed Petitioner not to glare at witnesses, "try to have a pen in your hand and a notepad and appear to be interested in what's going on."  (H.Tr. 1557).  Given the location where Petitioner was sitting relative to the jury, it appeared like she was taking notes during the trial, which counsel found appropriate behavior.  (H.Tr. 3139).

During the penalty phase, Petitioner "was much more attentive.  She often would sit up.  She would smile at witnesses.  She was emotional, cried many times, and that sort of thing during the penalty phase . . .."  (H.Tr. 1559).  Her emotional reactions changed appropriately depending on the testimony.  (H.Tr. 966-67).

On May 6, 2005, two days after opening statements, Petitioner's prescription for Zoloft was increased to 300 mg daily.  Petitioner claims this increase in her Zoloft caused her to suffer from a serotonin toxicity, which causes side effects such as

19

agitation, irritability, increased depression and suicide ideation. (Exhibit 107). Dr. Cunningham interviewed Petitioner for five hours a few days after the change in medications and did not observe anything that made him believe she was sedated, aggitated, or otherwise over-medicated. (H.Tr. 3865). Dr. Woods admitted he does not know for certain the change in the Zoloft prescription caused a change in her demeanor. (H.Tr. 4499). He admitted he was "relying on [Petitioner's] description of her change of mental status" to support his claim that the increase in Zoloft affected her. (H.Tr. 4494).

Petitioner claims there was a dramatic change in her demeanor after the change in her medication.[12] Testimony by her witnesses, however, did not establish there was a change in demeanor in connection with the timing of the change in her medications. Rather, their testimony pertained to changes they saw in her demeanor from how she normally appeared, how it changed during the penalty phase, or general observations about her demeanor. (PB 35-36). Moreover, what those witnesses reported observing was someone allegedly disinterested, looking down, drawing. No one claimed her demeanor was consistent with side effects of Zoloft over-medication such as agitation or irritability. Petitioner presented no evidence the increase in her Zoloft prescription exacerbated her depression or caused her suicidal ideation.

Petitioner's lawyers saw more of Petitioner than anyone else during the trial.

---

[12] Petitioner claims as fact the "medication altered her demeanor and presentation in the courtroom . . ., made her so calm and sedated as to appear cold, unfeeling and lacking in remorse, and rendered her incompetent to stand trial." (Petitioner's Brief at 37). There is nothing in the record to factually support the conclusion Petitioner "appeared cold, unfeeling and lacking in remorse." No witness who saw her described her that way.

20

Petitioner's lawyers did not see any change in her behavior during the course of the trial. (H.Tr. 966). Petitioner did not appear to her attorneys to be over-medicated during trial. (H.Tr. 966-67). None of the trial attorneys had concerns about Petitioner's competency, her ability to understand what was occurring during trial, or her ability to assist counsel during the trial. (H.Tr. 964-67; 997; 1559; 3136-3139).

Finally, Petitioner did not present any evidence establishing she actually took the medication prescribed to her, and there is serious reason to doubt she did. First, Petitioner was a drug dealer. Second, in August 2004, Petitioner was reported to have been hoarding her medications and passing them to other inmates. (Exhibit 108, page 26). Dr. Woods admitted it was possible, given that history, she did not consume the medications. (H.Tr. 4482-83). Dr. Woods also admitted what bystanders observed as a change in Petitioner's behavior from her normal demeanor was consistent with instructions from her attorneys about maintaining a poker face. (H.Tr. 4483).

B.     Counsels' Performance Was Not Deficient

Petitioner argues trial counsel should have been aware of the medications she was taking during trial and what effect they could have on her demeanor, and explained to the jury she was medicated and the effect they were having on her demeanor. (PB 44-46). Petitioner also suggests trial counsel should have revealed to the jury that they had given her instructions on how to behave. (PB 46).

To the extent Petitioner is claiming her lawyers were ineffective for failing to reveal to the jury their instructions to her about her demeanor, this is an untimely new allegation untethered to her claim they were ineffective for failing to monitor medications she asserts affected her demeanor and competency. Nevertheless,

21

counsels' decision not to reveal the instructions to the jury was reasonable. Had counsel revealed to the jury they had instructed Petitioner to conceal her true emotions, a jury could have taken offense at the attempt to mask from them Petitioner's true demeanor. Moreover, the juror's speculation about Petitioner's true demeanor likely would have been far more harmful than Petitioner's poker face. Regardless, because Petitioner did not testify, it would have been improper for the attorneys to comment about her demeanor. Cf. *United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008) (non-testifying defendant's courtroom demeanor is "not 'in any sense legally relevant to the question of his guilt or innocence of the crime charged.'") (quoting *United States v. Wright*, 489 F.2d 1181, 1186 (D.C. Cir. 1973)).

Nor were counsel ineffective for allegedly failing to monitor her medications and presenting evidence regarding the effect of those medications. Whether doctors treating Petitioner changed her medications was not as important as the effect any such change caused Petitioner. Trial counsel are not educated in medicine such that they could understand the theoretical effects a change Petitioner's medication could have. They are qualified to observe Petitioner and assess whether she is able to understand the proceedings and assist her counsel, and whether there was a change in her demeanor. Trial counsel saw no change in her demeanor and unanimously testified they had no concern she was unable to understand the proceedings or assist in her defense.

C.    Petitioner Was Not Prejudiced

Petitioner claims she was prejudiced because the change in medication 1) altered her demeanor, and 2) rendered her unable to assist counsel. (PB 40).

22

Regarding the first alleged prejudice, Petitioner claims the increase in her medication caused a change in her demeanor. Petitioner's evidence falls short of the mark. She had not established she even took the medication. The demeanor her witnesses describe is consistent neither with the side effects of Zoloft over-medication nor with the timing of the change in her medication. Dr. Cunningham testified he saw no signs of over-medication, and Dr. Woods testified he does not know the change in medication actually caused a change in her demeanor. What the evidence does show is that during jury selection Petitioner was exhibiting a demeanor the jury consultant thought could be damaging, and pursuant to her advice the lawyers instructed Petitioner to adopt a poker face. The evidence further shows her demeanor changed during the penalty phase, in an appropriate manner, when she became more responsive to the testimony, crying and smiling at appropriate times. After providing her the instructions, her lawyers never observed a change in her demeanor that caused them concern.

Petitioner states as fact "the jury . . . believed she lacked remorse." (PB 38). There is no admissible evidence of what the jury believed. Dr. Woods admitted that, absent testimony from jurors, he is just guessing what the jurors thought, or did not think, about Petitioner's demeanor. (H.Tr. 4485). Petitioner claims the medication caused her "to be unable to show her remorse, pain, and intense suffering." (PB 39). Petitioner did not testify in the hearing, and did not present evidence proving she had remorse, pain, or suffering as a result of her participation in murdering five people. Nor was there evidence the medications prevented her from showing emotion.

Petitioner implies the government commented on Petitioner's demeanor in its

23

closing argument when it said there was no evidence of remorse.  (PB 46).  To the extent Petitioner claims the government was making an argument based on her demeanor, she is wrong and her argument is misleading.  The government never once commented on Petitioner's demeanor.  The government's argument referenced the lack of evidence of remorse, not Petitioner's demeanor showing a lack of remorse.  (T.Tr. 3968-76 – Court commenting on lack of any evidence showing remorse).

Petitioner's claim that the change in her medication caused her to be unable or unwilling to assist counsel is contradicted by the testimony of all three lawyers.  Each testified Petitioner was able to assist during trial.  None had concerns about her competence.

In her final paragraph on this issue, Petitioner engages in hyperbole, making factually inaccurate and unsupported allegations in a bid to claim she was prejudiced.  Petitioner claims:

> In this case had counsel discovered and properly addressed the medication issue, there is a reasonable probability that when the jury looked at Angela Johnson, they would have seen a profoundly disturbed person whose body and brain were so unable to control her moods and emotions that she required extremely high doses of medication, a person racked with insomnia that was gorging on caffeinated candies to stay awake, a person likely re-experiencing the traumas of her childhood and trying to protect herself from them, and a grown woman in whose hand counsel had to put a crayon to keep her from breaking down.  But the jury never had a chance to see the real Angela Johnson.

(Defendant's Brief, at 49).  Very little of this is supported by the record.  There was no evidence Petitioner was "unable to control her moods and emotions."  There was no evidence she was suffering from insomnia during the trial.  There was no evidence her consumption of candy was tied to an effort to stay awake.  There was no evidence she

24

was experiencing any traumas of her childhood or was "trying to protect herself from them." There was no evidence she was given a crayon. There was no evidence she was using a crayon to keep from breaking down.[13] But, there was evidence the jury saw "the real Johnson" – they saw Petitioner during jury selection, prior to a change in her medication, and she had a "girly or giddish [sic] sort of demeanor," was "twirling [her] hair," and wore a "harsh" or "judgmental appearance." (H.Tr. 338). By instructing Petitioner to control her demeanor, pursuant to the advice of their jury consultant, trial counsel neutralized Petitioner's adverse demeanor.

Petitioner's claim that her trial counsel were ineffective because they failed to remedy an alleged change in her demeanor caused by a change in her medication is factually and legally unsupported, and should be denied.

## IV.     THE PENALTY PHASE CLAIMS

In her brief, Petitioner provides an "overview" of her ineffective assistance of counsel claims relating to the penalty phase of the trial. (PB 50-68). Some of the points she raises therein require a response.

First, Petitioner asserts the trial team admitted their guilt and penalty phase investigations were "not full, thorough, complete, or timely." (PB 52-54). A thorough examination of her citations to the record, however, reveals the vast majority of the

---

[13] The words "crayon" or "crayola" do not appear anywhere in the 4,936 pages of hearing transcript.

references either are not admissions of fault[14] or reference the guilt phase of trial only.[15] Further, so-called admissions of failures by members of the trial team must be heavily discounted where, as here, they are unsupported by contemporaneous statements or the record.  See, e.g., *United States v. Streater*, 70 F.3d 1314, 1321 (D.C. Cir. 1995) (allegations made in support of a § 2255 motion need not be accepted "when trial counsel's documented contemporaneous statements show the contrary"); *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999) (allegations which are contradicted by the record do not warrant relief).  Further, the Court should consider the bias of these witnesses when determining whether to credit their testimony rendered six years after the trial.  Respectfully, Goody and Berrigan are dedicated opponents to the death penalty and the reliability of their testimony should be weighed in light of that opposition.

Second, Petitioner is correct that in determining whether she has proven she was prejudiced by alleged errors of counsel, the Court must "consider 'the totality of the available mitigation – both that adduced at trial, and the evidence adduced in the habeas proceedings' – and 'reweigh it against the evidence in aggravation.'"  *Porter v. McCollum*, 130 S. Ct. 447, 453-54 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000).  Petitioner is in error, however, when she claims this means the Court may consider cumulative error by combining all the claimed errors in relation to the penalty phase of trial.  The Eighth Circuit Court of Appeals has clearly held an error

---

[14]  For example, Petitioner cites testimony by Mary Goody that she was overwhelmed because of time constraints, but this is not an admission the time constraints caused the investigation not to be full, thorough, complete or timely.

[15] For example, all references to testimony by Stowers, Cornell, and Nevins address only the guilt phase investigation.

26

must establish on its own that relief is warranted.  <u>See</u> *United States v. Brown*, 528 F.3d 1030, 1034 (8th Cir. 2008).  Thus, while the Court should take into account, the totality of the penalty phase evidence in assessing whether Petitioner has demonstrated prejudice, Petitioner may not combine each of the alleged errors by counsel to argue their conduct fell below an objective standard of reasonableness.

Third, in assessing prejudice, the court must take into account the aggravating evidence presented at trial.

> We recognize that the jury's findings do not preclude the possibility that more detail about Paul's difficult and abusive childhood or his compassionate character may have caused the jury to give more weight to mitigating factors that some or all of the jurors already found, but we must consider the incremental benefit of the proffered evidence in the context of the entire record.  Nothing that Paul offers detracts from the government's strong case in aggravation, and the weight of this evidence is a proper and significant factor in considering whether Paul has established prejudice.

*Paul v. United States*, 534 F.3d 832, 843 (8th Cir. 2008).  While Petitioner purports to summarize the aggravating evidence presented during the penalty phase of this trial (PB 57-65), her rendition is incomplete, inaccurate in places, and fails to convey the significance of the aggravating evidence.  The Court saw the aggravating evidence presented at trial and the government will not here attempt to summarize the evidence. Not only does a complete review of the transcript of the aggravation evidence demonstrate a compelling presentation, the Court knows from witnessing the live testimony the enormous impact that evidence had at trial.  The evidence showed Petitioner participated in killing five people (including more than one person in a single episode), bound and gagged (with one of the girl's socks and duct tape) the two adult victims, slaughtered two innocent little girls (ages 6 and 10), shot and beat Terry

27

DeGeus to death several months later, and irrevocably devastated the lives of the victims' family members.  The jury found the government proved the following aggravating factors beyond a reasonable doubt:

1)      The defendant committed the offense in question in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse of the victim (as to all adult victims);

2)      The victim was particularly vulnerable due to her young age (as to both children);

3)      The defendant obstructed justice by preventing the victim from providing testimony or by retaliating against the victim for cooperating with authorities (as to all victims);

4)      The defendant intentionally killed more than one person in a single criminal episode;

5)      The effect of the crime upon the victim's family was injurious.

(Doc. 593).  In this case, the aggravating evidence was overwhelming.  There is no reasonable likelihood the additional mitigating evidence Petitioner claims her trial attorneys could have presented would have altered the outcome of the penalty phase of the trial.

Petitioner claims her guilty phase defense was "absurd" "which no doubt contributed illegitimate weight to the government's case in aggravation at the sentencing phase."  (PB 58).  The guilt phase defense was anything but absurd; indeed, it was the only viable defense and one that appears to have been accepted, to some degree, by the jury.  The fact the jury did not find substantial planning and premeditation in the murders of Nicholson and the Duncan family strongly suggests the jury "bought" the defense argument that she did not know Honken was going to kill everyone when she helped him gain entry into the Duncan house.  Further, it was a

28

guilt phase defense that did not conflict with a mitigation presentation like it would have had her defense been, for example, she was not present. This was not a "I didn't do it" defense followed by a "I'm sorry I did it" mitigation presentation.

Petitioner attempts to minimize the weight of the so-called "gateway" intent element and eligibility stage aggravating factors, asserting they "are entitled to some weight." (PB 65). Petitioner minimizes the weight of the gateway intent factor by arguing the government asserted "only" one of the four gateway factors, but the truth is the jury may only find one factor in any event. (PB 61). Petitioner argues the government asserted "only" three statutory aggravating factors, as if the number of aggravating factors was more important than the weight of the factors. (Id.). The aggravating factors alleged, including "committing the offense in an especially heinous, cruel, or depraved manner" and "vulnerable victims" are particularly weighty factors, especially based on the evidence presented in this case. While there are other possible statutory aggravating factors, murdering victims in a heinous, cruel or depraved manner is a compelling aggravating factor. In this case, the evidence showed Nicholson and Lori Duncan were bound and gagged (with one of the children's socks), and that DeGeus's skull was crushed by repeated blows from a baseball bat after he had already been shot multiple times. And, as the government argued at trial, all the mitigating evidence in the world cannot overcome the weight of the aggravating factor of slaughtering two beautiful, innocent little girls.

Petitioner claims the aggravating evidence "could have been diminished significantly" had trial counsel presented "overwhelming mitigating evidence" that "it was Dustin Honken, and not Angela Johnson, who was the mastermind behind, and who

29

actually carried out the killing and torture of all five victims, and who, according to the government's theory in the Honken trial, was also responsible for manipulating Ms. Johnson into her aiding and abetting involvement in these offenses." (PB 62). First, as discussed in more detail below, the government's evidence in both Petitioner's and Honken's trial established Honken was the mastermind behind the plans for all the murders, and he actually carried out the killing of all the victims. Second, during Honken's trial the government never argued Honken manipulated Petitioner into participating in the crimes. Indeed, neither the word "manipulate" nor any of its derivations appear in the government's closing argument in the Honken trial.

Petitioner claims the "substantial planning and premeditation" aggravating factor and the commission of the offense in an especially heinous, cruel, or depraved manner should have been eliminated because both of these factors require proof the "defendant," as opposed to a "co-defendant," committed the acts. (PB 62-63). First, this is a new untimely claim of ineffective assistance of counsel never previously raised and clearly outside the time limit. It does not relate back to any claim previously raised and should be dismissed. Second, it fails on its merits. With regard to the Nicholson and Duncan family murders, the evidence showed Petitioner was involved in the planning and premeditation of the murders, and participated in heinous, cruel and depraved conduct. Petitioner purchased the murder weapon, a weapon which by its very nature was obviously not designed for self-protection. Petitioner repeatedly went with Honken on drives at night hunting for Nicholson, and her comments to a fellow inmate about Lori Duncan being a bad mother for leaving her children at home alone shows she specifically conducted surveillance on the murder victims. Petitioner

30

planned with Honken how to make entry into the home and hold the victims hostage until Honken's arrival. The evidence showed Petitioner and Honken gathered in advance items to be used in binding and gagging the victims, and assisted in either holding the gun on the victims while Honken bound and gagged them, or vice versa. The evidence showed the location for the murders had been planned in advance (Petitioner was alone in the cab of the truck driving the victims to the murder site while Honken was in back with the adult victims). The evidence also showed Petitioner and Honken dug the graves the night of the murders, which necessarily meant they prepared in advance to bring a shovel for use in digging a grave deep enough to hold four bodies. With regard to the DeGeus murder, the evidence likewise showed Petitioner was personally involved in executing the plan for his murder, luring DeGeus to a meeting with her at a remote location where Honken was waiting. Again, they came prepared in advance with a shovel with which to dig his grave. Petitioner participated in the cruel and depraved manner of DeGeus's murder, handing Honken the baseball bat with which Honken crushed DeGeus's skull. (T.Tr. 2572). Thus, trial counsels' representation was not ineffective because the evidence supported submission of these aggravating factors against Petitioner based on her own conduct.

Petitioner asserts the "only plausible" explanation for her jury returning death verdicts on more counts than the Honken jury "is that the jury bought hook, line, and sinker into the government's persistent, and easily refutable, evidence that Dustin Honken was a studious young man who had no proclivity for violence until he met Angela Johnson." (PB 67). This argument has no merit. First, Petitioner plays fast and loose with the facts about what the government argued. The government never argued

31

Honken had no "proclivity" for violence. As explained in more detail below, the government argued, and the facts showed, Honken never personally engaged in an <u>act</u> of violence until <u>after</u> he met Petitioner. The government consistently alleged Honken planned and plotted violence, but never personally committed a violent act until after he met Petitioner. Petitioner produced no evidence at the hearing showing the trial testimony was false, despite her repeated, hollow assertions to the contrary. Second, there is any number of explanations why the jury returned more death counts for Petitioner than Honken. The juries were made up of different individuals, with different backgrounds, views, and judgments. Petitioner's jury may have returned a death verdict on the same, or more, counts had it been Honken's jury. Perhaps different verdicts resulted from the government improving its presentation of essentially the same evidence in a second trial. There is no way to know what caused Petitioner's jury to return more death counts than Honken's jury. What is certain is there is more than one plausible explanation having nothing to do with counsels' performance.

## V. COURT CLAIM NO. 18 – Confrontation of Aggravating Evidence: Failure to Present Evidence of BWS to Explain the Relationship Between Petitioner and Terry DeGeus to Rebut the Prosecution's Theory of Her Motive for Killing Him

Petitioner claims in "all three phases of trial, the government asserted Petitioner intended to kill Terry DeGeus out of revenge for what the prosecution agreed was his brutal treatment of her." (PB 68). Petitioner argues her counsel were ineffective for failing to rebut this with "evidence that Ms. Johnson did not despise Mr. DeGeus" but was in love with him. (PB 69). She further asserts trial counsel failed to present evidence she suffered from Battered Women's Syndrome, and had they done so the

32

jury would have understood she would not have been motivated to kill DeGeus even though he beat her.  (PB 69-74).

A.     Trial Counsels' Performance Was Not Deficient

Petitioner's argument starts with the premise she was not motivated to harm DeGeus because of her past beatings or fear of future beatings.  That premise is faulty. To begin with, the government argued at trial that the fact Petitioner and Honken brought a bat to the DeGeus murder can be explained by a motive to beat DeGeus, not just shoot him.  Further, in addition to the maps Petitioner drew showing the locations of the murder victims' bodies, she also wrote some notes, one of which was a note describing the manner in which DeGeus was buried.  That note specifically said DeGeus "was buried on his knees like he would make me be when I would beg for my life." (Exhibit 312C).  This strongly suggests Petitioner felt some sort of revenge satisfaction from DeGeus's murder.

Petitioner argues, among other things, that expert testimony on Battered Women's Syndrome would have established the implausibility of that motive as an explanation for the murder.  (PB 72).  Dr. Hutchinson testified "in the multiple hundreds of battered women syndrome cases that I've done, they almost always are in the middle of a violent act or [imminent] violent act.  They sometimes are immediately after an extremely aggravated event or they are because of some specific predicted future event that makes it all seem different . . .  And necessary.  There wasn't anything like that in this case." (H.Tr. 3629-30).  Well, actually there was.  At the time of DeGeus's murder, Petitioner was pregnant with Honken's child.  She expressed fear of what DeGeus would do should he find that out.  This continued fear of a beating from DeGeus again

33

shows she would have had a secondary motive to kill him because his past beatings of her led her to believe he would beat her again when he found out she was carrying Honken's child.  (T.Tr. 591, 626, 641).

Petitioner's argument further depends on her showing trial counsel failed to present evidence rebutting this revenge motive.  Contrary to Petitioner's claim that her attorneys did not do "anything to rebut the prosecution's theory" (PB 69), the record shows trial counsel presented significant evidence to rebut a revenge motive.  Petitioner presented evidence through several witnesses that Petitioner loved DeGeus, even after beatings.  (T.Tr. 3076-77 (Pearl Jean Johnson); 3265-66 (Holly Dirksen); 3326-28 (Dr. Logan); 3571 (David Nieman); 3638-39 (Dr. Hutchinson)).  Counsel elicited testimony from Chief of Police Doug Book that Petitioner was repeatedly abused by DeGeus, she refused to press charges against him, and that it's "quite common for whatever reason for women in those situations not to want to press charges against the battering individual."  (T.Tr. 3603).  Further, trial counsel had Dr. Hutchinson testify at some length about battered women's syndrome.  (T.Tr. 3664-3667).  She described the relationship between Petitioner and DeGeus, why Petitioner was attracted to an abuser, why she stayed with her abuser, twice used the term "battered women," and referenced research on battered women.  (T.Tr. 3666).  She specifically rebutted the revenge theory by responding that there was no evidence Petitioner ever responded with violence to any of the abuse she suffered at the hands of DeGeus.  (T.Tr. 3667).  Petitioner complains trial counsel should have introduced evidence Petitioner was a battered woman because it "fit well with her childhood history of trauma and other mental health evidence," but Dr. Hutchinson did this, premising her entire discussion of

34

Petitioner being a battered woman on "how [Petitioner's] childhood and adolescent experiences." (T.Tr. 3663).

### B. Petitioner Has Not Demonstrated She Suffered Prejudice

Petitioner devotes a single conclusory sentence in her brief to argue she's shown prejudice. (PB 74). Petitioner's argument rests on the premises that: 1) the government's argument was Petitioner helped murder DeGeus out of revenge; 2) the argument was aggravating, not mitigating; 3) evidence Petitioner loved DeGeus and suffered Battered Women's Syndrome would have negated the motive; and 4) without the motive, the outcome of the death verdict would have been different. Her premises fail upon examination.

Petitioner inaccurately recounts the government's argument, which substantially undercuts the very premise of her claim she suffered ineffective assistance of counsel. The government argued Petitioner's primary motive for murdering DeGeus was to further the drug enterprise. Petitioner was charged with aiding and abetting murders in furtherance of a Continuing Criminal Enterprise. The focus of the government's arguments, considered in their entirety, demonstrates the government argued, and the jury found beyond a reasonable doubt, she aided and abetted the murder of DeGeus for that primary motive. To the extent the government argued revenge for past beatings as a motive for DeGeus's murder, it was clear the government argued it was an additional, secondary motive. In the guilt phase closing argument, after arguing the drug-related motive for the murders, the government stated:

> And finally as to Terry DeGeus there's a secondary motive. In addition to the fact that his continued existence endangers the freedom of her new boyfriend, Dustin Honken, in addition to the fact the Terry DeGeus's

35

> continued existence on this planet is a threat to the continued drug business that Angela Johnson shares with Dustin Honken, there's also more than a bit of revenge.

(T.Tr. 2247). In the eligibility phase argument, the government mentioned revenge only to the extent it offered an explanation for why Petitioner and Honken brought a bat when they murdered DeGeus. (T.Tr. 2471-72). In the penalty phase closing argument, the government mentioned revenge as a motive only in rebuttal closing argument in response to a defense asking in closing argument how the government can ask for the death penalty for DeGeus's murder when the Honken jury did not impose the death penalty for his murder. The government responded, in part, by asking the jury to consider who, between Honken and Petitioner, had the greater motive, asserting revenge for past beatings as a secondary motive. (T.Tr. 4083).

That the government argued, and the jury found, Petitioner aided and abetted the murders for the motivation of furthering a Continuing Criminal Enterprise, means that whether the jury believed Petitioner harbored a secondary motive for killing DeGeus is immaterial. The verdict did not turn on whether Petitioner was motivated to murder DeGeus out of revenge. Indeed, were that her only motive for the murder, it would not have constituted a federal offense. Thus, regardless of the jury's determination whether Petitioner had a secondary motive to kill DeGeus, it found the primary motive was drug related. Therefore, there was no prejudice.

Moreover, arguably the fact DeGeus repeatedly beat Petitioner, and the government's argument that those beatings constituted a secondary motive for the murders, was a mitigating factor, not an aggravating factor. Had Petitioner's only motive for killing DeGeus been to further the drug enterprise, it would suggest she

36

operated on wholly greedy and selfish grounds.  If, on the other hand, she was motivated even in part to revenge past beatings, a jury could sympathize with her for having suffered at the hands of her victim.  Thus, even if counsel did not effectively counter this motive, Petitioner cannot demonstrate she suffered any prejudice because the evidence mitigated her moral culpability.

## VI. COURT CLAIM NO. 19 – Confrontation of Aggravating Evidence: Failure to Present Readily Available Evidence About Dustin Honken to Refute the Prosecution's Argument that Angela Johnson was "Worse" than Honken

Petitioner claims the government elicited testimony that Honken had no "proclivity for violence until he met Angela Johnson" and "[f]rom this evidence, the government argued that Angela Johnson was 'egging on and pushing and cajoling and putting [Dustin Honken] in the position of pulling the trigger.'" (PB 74).  Petitioner then summarizes testimony from Jeff Honken, Rick Held, Kathy Rick, and Alyssa Nelson. (PB 74-75).  Petitioner claims her trial counsel were ineffective because they "did nothing to dispel the government's false portrayal of Honken."  (PB 75).  Petitioner then summarizes evidence of Honken's plans for a bank robbery when he was in high school (PB 75-78), and plans Honken had for violence after his 1996 arrest (PB 78-80).

### A. Evidence Regarding Honken's Violent Conduct

Petitioner misrepresents the government's argument, and makes a baseless and factually unsupported accusation the government presented "false" evidence.  First, the government did not argue Honken had no "proclivity" toward violence until he met Petitioner; the government argued Honken did not engage in acts of violence until he met Petitioner.  Second, while Petitioner makes the bald assertion the evidence the government presented was "false," she has presented no evidence to establish the

37

testimony by Jeff Honken, Rick Held, Kathy Rick, and Alyssa Nelson was false.  None of those witnesses recanted their testimony.  Petitioner offer no evidence proving the testimony was false.

Rather, she recites evidence that before Honken met Johnson, he planned a violent bank robbery.  Petitioner cites no evidence Honken personally engaged in any acts of violence.  Indeed, the word "plan" in some form appears 21 times in her brief as Petitioner recounts the bank robbery plot.  (PB 76-80).[16]  Petitioner's reference to Honken kicking another while practicing karate and hitting a friend with a whip is without merit.  Hansen testified he hit Honken, and Honken hit him, and hitting each other was part of them practicing karate.  (H.Tr. 2785).  As for the whip, Kenny Hansen could not remember the context and could not say that Honken intentionally hit him with the whip.  (H.Tr. 2786).

Petitioner then cites more "plans" Honken made after his arrest in 1996 to blow up a building where evidence was stored and to kill witnesses, agents and others.  There are two problems with Petitioner's reliance on this evidence.  First, it again involves Honken planning – but no action.  Second, it all involves events occurring <u>after</u> he met Petitioner, so it is worthless for rebutting the government's argument that Honken engaged in no acts of violence until after he met Petitioner.  Mark Johnson put it best when he said Honken was a planner, but a coward.  (H.Tr. 2803).[17]

---

[16]  Additional words reflecting intent instead of conduct, also appear through out the recitation of evidence Petitioner claims her attorneys should have presented.  (PB 77 ("talked of"); 78 ("threatened," "wanted to"); 79 ("goal," "would retaliate," "plotted")).

[17]  Petitioner references evidence of other crimes Honken committed, like stealing a car and a "theft of" something (Petitioner failed to complete the sentence in

38

Petitioner also minimizes the nature of the testimony regarding Honken's lack of violent conduct before he met Petitioner. The most compelling testimony of this issue came from Tim Cutkomp, Honken's best friend since childhood, and his co-conspirator. No one knew Honken better. Cutkomp testified that, from the time he met Honken until the early 1990s, Honken did not use violence against or hurt other people and did not get in fights. (T.Tr. 830-31). Cutkomp testified that until 1993, Honken did not use violence in connection with his methamphetamine operation, did not carry any weapon, and did not hurt or try to hurt distributors working for him. (T.Tr. 856-67). Cutkomp testified that when he told Honken he wanted to quit his involvement in the methamphetamine operation, Honken did not threaten him, or his family. (T.Tr. 858).

B.      Counsels' Performance Was Not Deficient

Trial counsels' performance did not fall below an objective standard of reasonableness because the government's argument was based on violent conduct by Honken, and there was, and is, no evidence to show he ever engaged in a violent act prior to meeting Petitioner. None of the witnesses recanted their trial testimony about Honken's violence prior to meeting Petitioner. At the hearing in this matter, Petitioner produced no evidence showing Honken ever engaged in an act of violence before he met Petitioner.

Petitioner faults her counsel for calling witnesses who supported the government's description of Honken. (PB 80-81). These witnesses included Petitioner's mother, sisters Wendy and Holly, her daughter Alyssa, and Lou Ann Hare.

---

her brief). (PB 77). These are not violent acts.

First, several of these witnesses were very important to Petitioner's mitigation case and trial counsel would have been ineffective had they failed to call these witnesses. That the witnesses corroborated the government's evidence about Honken's personality only goes to show it was true. The truth is, Honken was polite, clean cut, very neat, preppy, nerdy, highly intelligent, and acted like a gentlemen. It was also true that, until he met Petitioner, he never engaged in acts of violence. Trial counsel were not ineffective for their inability to alter the facts.

Petitioner faults her trial counsel for having Leon Spies testify Honken was sentenced to death for killing the children. (PB 81). Petitioner recounting of the testimony from Berrigan and Stowers regarding this decision shows it was a strategy decision. Trial counsel reasoned that if the jury understood Honken, the principal offender, received the death penalty only for the children's murders, a jury would not be inclined to sentence Petitioner, an aider and abetter, to death. (H.Tr. 1489-91; 2096). This was not an unreasonable strategy. Contrary to Petitioner's assertion (PB 82), the jury did hear evidence that could have supported the jury finding as a mitigating factor that Petitioner had a minor role.[18] The evidence showed, and the government argued, Honken was the principal and Petitioner was the aider and abetter. The evidence showed, and the government argued, Honken was the one who planned the murders. The evidence Petitioner claims her attorneys should have presented had nothing to do with her role in the murders, and was consistent with the government's position Honken

_____

[18] Indeed, the jury may well have found Petitioner occupied a minor role, but concluded it was not mitigating, much like if must have found Petitioner had no criminal history, but nevertheless found it was not mitigating.

40

planned violent crimes, but without someone like Petitioner pushing him, he was a coward who did not act upon those plans.

C.      Petitioner Has Failed to Show Prejudice

Petitioner claims that had counsel presented the evidence she summarized in this claim, "the government would not have been able to argue that Honken never did a violent act until he met Petitioner, and that Petitioner, not Honken, was the driving force behind five murders." (PB 82). Presenting that evidence would not have prevented the government from making the same argument. As explained above, there is nothing in record proving Honken ever committed a violent act before he met Petitioner. Indeed, the evidence Petitioner argues counsel should have presented would have reinforced the government's argument. Despite planning a bank robbery, Honken did not commit it himself. Despite planning and plotting violence after his arrest in 1996, Honken never engaged in any acts of violence. Honken was, and remained, a man capable of planning the most evil violent acts, but a coward. As to Petitioner's assertion the government argued she was the "driving force" behind the murders, that simply is not true. Nowhere in the government's argument did it ever use that language.

Petitioner argues that failure to present the evidence "was also prejudicial because the 'undiscovered mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability.'" (PB 82, quoting *Rompilla v. Beard*, 545 U.S. at 393) (Petitioner's emphasis omitted, emphasis added by government). This was not "undiscovered" mitigating evidence. Petitioner admits her attorneys were aware of the evidence. Further, the evidence would not have assisted Petitioner's claim regarding relative culpability. Rather, the evidence would have

41

corroborated the pattern of Honken's behavior – absent someone like Petitioner to give him courage, Honken did not engage in acts of violence.

**VII.    COURT CLAIM NO. 20 – Confrontation of Aggravating Evidence: Failure to Use the Prosecution's Arguments at Dustin Honken's Trial as Party Admissions to Rebut the Government's Evidence that Petitioner Was "Worse" than Honken**

Petitioner claims her trial counsel were ineffective for failing to offer the government's closing argument in Honken's trial as an admission of a party opponent. (PB 82-87).  Petitioner claims she was prejudiced because the government's "arguments at Honken's trial [would have] refute[d] their [sic] entirely inconsistent argument at Petitioner's trial it was she – not Honken – that [sic] was the catalyst for these crimes" and Honken "was a mere pawn under her evil sway."    (PB 82, 87).[19]

A.    Admissibility of the Government's Closing Argument

Petitioner asserts, without citation to authority, the government's closing argument from Honken was admissible against it in her trial.  That is not necessarily so.

Courts have admitted portions of a government's closing argument from the same or a related case, but only where the statements in the argument were: "(1) 'assertions of fact' that are the 'equivalent of a testimonial statement by the [client];' (2) 'inconsistent with similar assertions in a subsequent trial,'" and; (3) an innocent explanation for the inconsistency does not exist. *United States v. DeLoach*, 34 F.3d 1001, 1005 (11th Cir. 1994) (quoting *United States v. McKeon*, 738 F.2d 26, 33 (2nd Cir.

---

[19]  Again, Petitioner engages in hyperbole.  At no point did the government ever claim Honken was a mere pawn under Petitioner's evil sway.

42

1984).[20]  But see *United States v. Bakshinian*, 65 F. Supp.2d 1104, 1108-09 (C.D. Cal. 1999) (rejecting the *McKeon* test and determining admissibility of statements made by the government in a closing argument like any other admission by a party opponent). Even when admissible as an admission of a party opponent under Rule 801(d) of the Federal Rules of Evidence, the court must still find the probative value is not substantially outweighed by the danger of unfair prejudice under Rule 403.  Where these conditions have not been met, courts have found admission of statements from a closing argument inappropriate.  See, e.g., *United States v. Perez*, 2008 WL 2503641, * 8 & n.11 (11th Cir., June 24, 2008) (unpublished) (finding the government's statements were not inconsistent and the district court did not abuse its discretion in barring admission under Rule 403); *DeLoach*, 34 F.3d at 1006 (finding prosecutor's statements were neither statements of fact nor clearly inconsistent with its position in the instant case); *Johnson v. Horel*, 2010 WL 4722634, * 15-16 (N.D. Cal., Nov. 12, 2010) (unpublished) (in state habeas case, finding trial court did not abuse its discretion in denying admission of statements from the government's closing argument because the statements reflected the inferences or conclusions the prosecutor sought the jury to make versus statements of fact); *United States v. Stephens*, 2007 WL 3005216, * 4 (M.D. Ga., Oct. 12, 2007) (unpublished) (holding the government's closing argument from companion case was inadmissible because there was an innocent explanation for inconsistencies).  Though the rules of evidence are relaxed during the penalty phase of

---

[20]  While citing *McKeon*, the *DeLoach* Court left off the third prong of the test announced in *McKeon*, "[p]erhaps because this third and final requirement was inapplicable to the case before" it.  *Stephens*, 2007 WL 3005216, at *4.

43

a capital trial, the Court retains a gate-keeping function. <u>See</u> *United States v. Montgomery*, 635 F.3d 1074, 1091-92 (8th Cir. 2011) ("During the penalty phase of a capital trial, '[i]nformation is admissible regardless of its admissibility and the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusion of the issues, or misleading the jury.'") (quoting 18 U.S.C. § 3592(c)).

Petitioner quotes 10 passages from the government's closing argument in Honken. Only portions are statements of fact. The language Petitioner presumably finds most compelling – regarding culpability – are not statements of fact, but, rather, conclusions the government sought to persuade the jury to adopt from the evidence. So, for example, when the government called Honken an "organizer," "schemer," "manipulator," and asserted he thought "more of his dog . . . than he does of people, and he has no conscience," these are not statements of fact, they are inferences from the evidence.

Further, there is nothing inconsistent in any of these statements with the government's argument at Petitioner's trial. Petitioner does not provide the Court with any passages from the trial transcript she asserts shows an inconsistency. In Honken's closing argument, the government asserted Honken was an organizer and schemer, he thought a lot, was intelligent, and did a lot of planning. No where in the passages did the government argue Honken manipulated Petitioner. The reference to the purchase of the gun was not an argument Honken manipulated or lied to Petitioner about the purchase of the gun. Rather, the government argued the circumstantial evidence proved Honken was involved in the purchase even though his name was not on the

44

paperwork. In Petitioner's trial, the government did not deviate from the assertion Honken was the planner and schemer. Rather, it argued Petitioner was equally culpable, even though she did not pull the trigger, because she was the one who egged him on and pushed him to follow through with his evil plans. (T.Tr. 4004; 4026-27).

Petitioner claims the government's theme in its closing argument in Honken's trial was that Petitioner was less culpable than Honken. (PB 86). None of the passages cited by Petitioner deal with the relative culpability of the two. Petitioner provides no transcript cites supporting her contention the government argued she was less culpable than Honken

### B. Counsels' Performance Was Not Deficient

Trial counsels' performance did not fall below an objective standard of reasonableness. Petitioner has not established statements made by the government in Honken's closing argument would have been admissible in Petitioner's trial. The statements Petitioner focuses on were inferences and conclusions the government asked the jury to make from the evidence, not statements of fact. Further, there was nothing inconsistent between the quoted passages from Honken's closing argument and the government's closing argument in Petitioner's trial. Therefore, trial counsel were not deficient for failing to move those statements into evidence.

Moreover, Petitioner's entire argument is premised on hindsight, knowing what the government argued in her case. To evaluate the performance of trial counsel, the Court must view their decisions with the knowledge the attorneys had at the time. Even if the government's argument in Petitioner's trial was inconsistent with its argument in Honken's trial, counsel would not have known it until they heard it. They cannot be

45

faulted for failing to move for admission of the Honken argument before they heard the government's argument in Petitioner's case.

### C. Petitioner Has Failed to Demonstrate Prejudice

Petitioner claims she was prejudiced by her trial counsels' performance. Petitioner thrice simply asserts, as fact, that she was prejudiced, without offering any explanation of how she was prejudiced. (PB 86-87). Petitioner ultimately claims she was prejudiced "because the 'undiscovered mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability.'" (PB 82, quoting *Rompilla v. Beard*, 545 U.S. at 393) (Petitioner's emphasis omitted, emphasis added by government). Again, this was not "undiscovered" mitigating evidence. Petitioner admits her attorneys were aware of the government's argument in Honken. Petitioner's conclusory assertion that admission of the argument would have changed the outcome of the case is pure unsupported speculation and fails to account for the opportunity the government would have had to more fully explain to the jury that Honken was an evil schemer, but a coward, who acted only when combined with someone like Petitioner who pushed him to carry out his plans.

## VIII. COURT CLAIM NO. 21 – Confrontation of Aggravating Evidence: Failure to Discover and Present Information Regarding Dustin Honken's Plans to Kill Prosecutor Reinert and His Family and Honken's Membership in a White Supremacist Prison Organization

Petitioner claims trial counsel failed to discover and present information regarding Honken's plans to kill prosecutor Reinert and his family, and Honken's membership in a white supremacist prison organization. Petitioner alleges her counsel should have also sought "discovery regarding what steps the government took to

46

protect its personnel against such threats" on the theory that the information would be "exculpatory" "because it would have directly contradicted the prosecutor's assertion at her penalty phase that it was Ms. Johnson, not Mr. Honken, who was the instigator of the violence." (PB 90). Petitioner further asserts the evidence would have shown "Honken had the skill and intelligence to plan violent acts, and the means, including contacts within and without the prison, to carry them out, without the encouragement or support from petitioner." (Id.). Petitioner further suggests trial counsel should have called Reinert as a witness to elicit "his opinion and the opinion of the Security Division of the Department of Justice" that "the Odinists were not the benign religious group Vest portrayed but a white supremacist gang with contacts in and outside of prison that were capable of helping to carry out Honken's threats." (PB 93). Petitioner then repeats prior language asserting she was prejudiced because presentation of the undisclosed evidence might have influenced the jury. (PB 93-94).

A.     Counsels' Performance Was Not Deficient

It appears Petitioner has abandoned the initial premise of her argument – that her trial attorneys failed to discover information regarding Honken's plans to kill prosecutor Reinert and his family, and Honken's membership in a white supremacist prison organization. In her brief, Petitioner now acknowledges that, "[t]hrough discovery" trial counsel were aware: 1) Honken made threats against Reinert; 2) Honken made threats to kill prosecutors Reinert and Colloton; 3) Honken planned to kill the prosecutors' families; 4) Honken participated in the Odinists; and, 5) the Odinist was considered a white supremacist group used to target cooperators. (PB 89-90). Thus, Petitioner concedes all of the factual assertions contained in the internal security

47

memos authored by Reinert were in the government's discovery file and trial counsel were aware of them.[21] Accordingly, this is not a case of trial counsel failing to investigate or know of these facts.

Petitioner is left, therefore, with the assertion that trial counsels' performance was deficient for failing to seek discovery of internal government security measures adopted by the government to protect prosecutors. Petitioner cites no authority to support the proposition she would have ever been entitled to discovery of that information. The security measures adopted by the government are inherently confidential, the disclosure of which would jeopardize the very measures taken. Moreover, there is nothing exculpatory about the security measures adopted. The same can be said of Reinert's personal opinion about the threat Honken posed to him and his family, or his opinion of the Odinists. Reinert's opinion is irrelevant. It is not fact. It does not exculpate Petitioner.

Petitioner claims the information would be "exculpatory" "because it would have directly contradicted the prosecutor's assertion at her penalty phase that it was Ms. Johnson, not Mr. Honken, who was the instigator of the violence." (PB 90). First, the government never claimed Petitioner was the "instigator" of the murders. Further, none of the information in these memoranda, including the steps taken to protect Reinert, or his opinion about the danger, or the Odinists, addresses who instigated the murders in

---

[21] For that matter, this Court issued two pre-trial, published decisions in which it outlined the government's evidence regarding Honken's use of the Odinists as a front for violent conduct and Honken's plans to kill agents, prosecutors and others. See *United States v. Honken*, 378 F. Supp.2d 970, 1008-1009 (N.D. Iowa 2004) (Odinists); *United States v. Honken*, 278 F. Supp.2d 880, 887-88 (N.D. Iowa 2004 (plans to kill agents, prosecutors, and others).

48

1993.  All the factual information referenced in the memoranda addresses planning and preparations by Honken <u>after</u> the murders and his incarceration in 1996.

Similarly, whether the evidence would have shown "Honken had the skill and intelligence to plan violent acts, and the means, including contacts within and without the prison, to carry them out, without the encouragement or support from petitioner," (PB 90), is irrelevant because Honken's abilities in this regard were not in dispute.  The evidence at trial showed, and the government argued, Honken was skillful and intelligent and capable of planning violent acts, but prior to meeting Petitioner, did not commit acts of violence.  Second, that Honken later, years after the 1993 murders, had contacts within and without the prison to carry out additional acts of violence does not address the roles of Honken and Petitioner in the 1993 murders.  Third, the truth is that, while Honken had the skill and intelligence to plan, and perhaps even the means to carry out acts of violence, without Petitioner he never did so before or after the murders.

Trial counsels' performance was not deficient regarding discussion of the Odinists.  There is no question Odinism is a religion.  <u>See, e.g.</u>, *Lindell v. Capserson*, 360 F. Supp.2d 932, 951-52 (W.D. Wis. 2005) (citing an authority describing Odinism as the oldest religion in the world).  Whether Honken was using meetings of Odinists to plot additional violence does not mean it is not a religion.  Trial counsel elicited from Vest that the Odinist is considered a white supremacist group.  (T.Tr. 2583-84). Counsel elicited, at length, all the plans Honken had for escaping and killing prosecutors and law enforcement personnel.  (T.Tr. 2616-18).  This was effective cross examination and use of the information to paint Honken as an evil schemer.

49

Finally, Petitioner suggests counsel should have called Reinert as a witness to elicit "his opinion and the opinion of the Security Division of the Department of Justice" that "the Odinists were not the benign religious group Vest portrayed but a white supremacist gang with contacts in and outside of prison that were capable of helping to carry out Honken's threats." (PB 93). First, the opinion of Reinert or others about the Odinists is not admissible evidence. Reinert had no personal knowledge of the group. What Reinert thought about the group is irrelevant. Second, Petitioner implies Vest was untruthful in his description of the Odinists, but Vest made it clear he was not a member of the group. Vest admitted it was known as a white supremacist group. Further, Vest readily testified about all the evil planning Honken was doing with members of the group.

B.      Petitioner Has Failed to Demonstrate Prejudice

Petitioner cannot demonstrate prejudice. Petitioner's entire theory of how any of this information is allegedly exculpatory is premised on her theory it would "undercut the prosecution's testimonial evidence of Honken's bookwormish nature and the prosecutor's argument that but for Petitioner, Honken would not have been spurred to actual violence." (PB 93). Trial counsels' performance was not deficient because none of this contradicts the evidence showing Honken was a quiet, intelligent, bookish man who did not engage in an act of violence until he met Petitioner. Moreover, again, all of the information referenced in the memoranda took place years after the 1993 murders. Even if Honken later joined a white supremacist prison gang with reach outside the prison walls capable of harming a prosecutor, it does not rebut evidence about Honken's lack of violent conduct before he met Petitioner in 1993.

50

**IX. COURT CLAIM NO. 22 – Confrontation of Aggravating Evidence: Failure to Address Aggravating Evidence at the Merits and Mitigation [sic] Phases of Trial**

Petitioner claims the government elicited testimony that Petitioner behaved in a "bizarre" and threatening manner before and after the murders. (PB 94). Petitioner recounts testimony by Mike Mittan, Jeff Honken, Dan Cobeen, Kathy Rick, Doug Book, and Alyssa Nelson, all of whom testified about various threats or threatening behavior by Petitioner. (PB 94-95). Petitioner claims her attorneys were ineffective because they should have had her three experts "address" the evidence.[22] Petitioner ends this section of her brief with a conclusory assertion that she was prejudiced. (PB 95).

A. Counsel's Performance Was Not Deficient

Petitioner claims the testimony about her threatening behavior was "bizarre." There was nothing bizarre about it. It was fairly consistent behavior by Petitioner to threaten others.

Nevertheless, trial counsel did elicit testimony from Petitioner's experts addressing this behavior in an attempt to explain it resulted from her abusive childhood and mental impairments. Counsel elicited testimony from Dr. Hutchinson that Petitioner came to the conclusion it was better to be feared than loved, and explained this was a defense mechanism to Petitioner's abusive childhood. (T.Tr. 3646, 3667-68). Counsel also elicited testimony from Dr. Hutchinson that Petitioner's methamphetamine use

---

[22] It appears Petitioner then cut a paragraph from her original motion and pasted it into her post-hearing brief, because Petitioner goes on to claim there was an explanation for this behavior that "Dr. Woods will explain at the evidentiary hearing." (PB 95) (emphasis added). Petitioner does not cite to any testimony by Dr. Woods regarding this issue.

51

(which Dr. Hutchinson said was a consequence of her abusive childhood and the resulting mental impairments) "promotes extreme mood lability in terms of fluctuations in mood and explosive irritability." In addition, trial counsel elicited testimony from Dr. Logan that Petitioner's abusive childhood "predisposed" her to being "mentally ill, to really struggling during life, to having a lot of anger, resentment, depression . . .." (T.Tr. 3323). Counsel also mitigated Petitioner's history of making threats by eliciting testimony from Dr. Cunningham that, though Petitioner made threats and used profanity at guards, she did not carry out the threats and did not lock her down. (T.Tr. 3891-92).

Thus, trial counsels' performance did not fall below an objective standard of reasonableness.

### B.     Petitioner Has Not Demonstrated Prejudice

Though Petitioner does not explain how she was prejudiced, her conclusion rests on the premise that Dr. Woods' testimony would have been available to her in 2005, and his testimony in the habeas hearing about this was materially different from the testimony trial counsel elicited from the other three experts during trial. Dr. Woods' testimony was not materially different. Dr. Woods testified Petitioner's "profanity and verbal threats" is "consistent with [Petitioner's] longstanding neurological, psychiatric, and psychological impairments." (H.Tr. 4485-86). Dr. Woods admitted, however, there are a large number of inmates who use profanity and make verbal threats and "have no mental illness whatsoever." (H.Tr. 4488).

Thus, Dr. Woods' testimony vaguely attributing Petitioner's profanity and verbal threats to her general mental illnesses is not materially different from, or better than, the testimony elicited by trial counsel. Indeed, the experts at trial did a far better job

52

explaining her abusive childhood led to mental illness and a coping mechanism of acting tough, resulting in the use of profanity and verbal threats. Moreover, trial counsel elicited further testimony (not offered by Dr. Woods) tying some of the threatening behavior to methamphetamine use. Further, trial counsel mitigated the impact of Petitioner's threatening conduct by pointing out she did not act on the threats made to jail authorities did not take them seriously enough to lock her down.

Petitioner has simply failed to demonstrate that, even if her counsel had added testimony along the lines provided by Dr. Woods, it would not have made any difference with the jury.

## X. COURT CLAIM NO. 23 – Confrontation of Aggravating Evidence: Failure to Limit Future Dangerousness Evidence to Future Danger in Prison

Petitioner claims her trial counsel were ineffective because they should have obtained a court order limiting the government's future dangerousness testimony to future dangerousness while serving a life sentence. (PB 95-103). Petitioner claims the "overwhelming weight of authority" at the time of trial limited evidence of future dangerousness in that manner. (PB 96). Petitioner concludes that much of the evidence the government presented regarding future dangerousness was inadmissible.

### A. Counsels' Performance Was Not Deficient

Petitioner claims the "overwhelming weight" of authority at the time of her trial held that when the only sentencing options were death or life in prison without the possibility of parole, evidence of future dangerousness must be limited to evidence of the danger posed by the defendant while serving a life sentence. (PB 96). In support of this contention, petitioner cites four district court decisions from other districts, and

53

dicta from a Fifth Circuit Court of Appeals case.  (PB 97).

Petitioner fails to cite controlling authority in existence at the time of this trial.  In *United States v. Allen*, 247 F.3d 741 (8th Cir. 2001) (en banc), <u>vacated and remanded on other grounds</u>, 536 U.S. 953 (2002), the Eighth Circuit Court of Appeals rejected a challenge to submission of future dangerousness evidence in a capital case where the only options were the death penalty or life in prison without the possibility of parole.  The Court held that "[b]ecause the jury was informed of [defendant's] ineligibilty for parole," there were "no statutory or constitutional problems with arguing . . . [an] aggravating factor of future dangerousness [not limited to the prison setting] in support of a death sentence."  *Allen*, 247 F.3d at 788-89.  The Court reasoned that "[a] defendant in prison for life is still a risk to prison officials and to other inmates, and even though a life sentence without the possibility of parole greatly reduces the future danger to society from that particular defendant, there is still a chance that the defendant might escape from prison or receive a pardon or commutation of sentence."  (Id.).  In *Allen*, the government argued the defendant posed a future danger based on the "extraordinary planning" of the murder committed during a bank robbery and on his lack of remorse.  (Id.).  Further, in *United States v. Lee*, 274 F.3d 485, 494 (8th Cir. 2001), the Eighth Circuit Court of Appeals affirmed admission of evidence the defendant abused a girlfriend and assaulted his sister (along with other evidence of assaults while incarcerated) to support the aggravating factor of future dangerousness.

Moreover, while Petitioner baldly asserts the "overwhelming weight of authority was that . . . evidence of future dangerousness must be limited to evidence of the danger posed by the defendant" while in prison, she cited only four cases and no

54

contrary authority.  In addition to *Allen*, several other courts had held the evidence is not so limited.  See, e.g., *McDowell v. Caleron*, 107 F.3d 1351, 1366, remanded and superseded in part by 116 F.3d 364, vacated in part, 130 F.3d 833 (9th Cir. 1997) (en banc) (upholding sentencing jury's consideration of defendant's lewd and lascivious conduct conviction and unadjudicated rape as an adult with regard to whether he posed a future danger); *United States v. Edelin*, 134 F. Supp.2d 59, 80 (D. D.C. 2001) (holding the defendant's predisposition to commit crimes in the past was admissible to prove future dangerousness; defendant could rebut the evidence by arguing the prison system will limit his future dangerousness); *Hogue v. Scott*, 874 F. Supp. 1486, 1509-11 (N.D. Tex. 1994) (court admitted defendant's prior violent conduct, like rape, assault, and child abuse, as evidence proving future dangerousness).  See also *United States v. Bernard*, 299 F.3d 467, 482 (5th Cir. 2002) (agreeing with *Allen* in dicta).

Given the controlling authority in the Eighth Circuit Court of Appeals, and the fact the authority from other district courts was split, trial counsels' performance did not fall below an objective standard of reasonableness for not attempting to limit the government's evidence of future dangerousness to Petitioner's danger in prison. Regardless, trial counsel did mount the very challenge Petitioner claims they should have made.  Petitioner acknowledges Berrigan argued the only relevant evidence was whether Petitioner was a threat to people in prison.  (T.Tr. 3026-27).  While Petitioner faults the manner and method of trial counsel's argument, asserting he should have cited legal authority and asked for a limiting instruction, the fact remains counsel did attempt to limit the government's evidence on future dangerousness.

55

### B.    Petitioner Has Not Demonstrated She Was Prejudiced

Petitioner does not explain how she was prejudiced.[23]  Petitioner claims the "prejudicial nature of this evidence is obvious," then goes on to assert that "[t]he fact that not a single juror found the future dangerousness aggravating factor to be true underscores the unfairness of using this factor as a Trojan horse for a more general assault on Ms. Johnson's character."  (PB 101).  Petitioner is simply wrong.  To find an aggravating factor, a capital jury must agree unanimously as to that factor.  The verdict form will then reflect whether the jury found the factor unanimously or not.  How many jurors voted to find the aggravating factor is not known, unlike the mitigating factors.  Thus, Petitioner's claim that not a single juror found Petitioner posed a future danger is baseless.  For all anyone knows, 11 of the 12 jurors found Petitioner posed a future danger.

Likewise, Petitioner's assertion the government used future dangerousness as a "Trojan horse" to introduce otherwise inadmissible evidence is an unwarranted and unsupported attack on the prosecutors' ethics.  The government introduced the challenged evidence in part to show future dangerousness.  As the government argued, past conduct is the best predictor of future conduct.  (T.Tr. 4082).  When a defendant has not spent a lot of time in a prison setting, past conduct outside prison is often the only evidence upon which a jury can evaluate whether the defendant will pose a danger while inside prison.  Further, when, as here, the only time the defendant has been

---

[23]  Petitioner repeats the same prejudice language previously cited, quoting from the *Rompilla* decision, which includes a phrase about the evidence being "undiscovered."  (PB 102-103).  As discussed above, there was nothing "undiscovered" about this evidence.

56

incarcerated is while awaiting a capital trial, his or her conduct while "on display" is hardly indicative of future conduct. Petitioner knew from the government's death penalty notice it was alleging she posed a future danger and needed to be on her best behavior. Shortly after the trial, when it no longer mattered, she bragged to her trial counsel how she "punched that ugly, black . . . whore so hard my hand was bruised," referring to assaulting another inmate. (Exhibit RR).

In order to show prejudice, Petitioner must demonstrate the law was in her favor and had her counsel made the arguments she urges she would have prevailed, and then further show that had the Court placed such a limitation on the government's evidence, it would have resulted in at least one juror voting for a life sentence. This she has failed to do. As set forth in the first section, the law is not in her favor. Petitioner has not established the Court would have limited the future dangerousness evidence even if counsel had argued this issue in the manner suggested by habeas counsel.

In any event, the evidence would have been admissible to rebut a number of Petitioner's mitigating factors. Petitioner claimed among other mitigating factors that: 1) she occupied a relatively minor role; 2) she did not have a prior criminal record; 3) Honken was equally or more culpable than Petitioner and was not sentenced to death for murdering the adults; and, 4) she would not pose a danger if sentenced to life in prison. Petitioner's violent, threatening conduct prior to her incarceration in 2000 was relevant to rebut these mitigating factors.

The government argued Petitioner's role was aggravating, she was at least equally culpable as Honken, because she pushed and egged Honken on to follow through with his evil plans. Therefore, evidence showing Petitioner was threatening to

57

others, including law enforcement officers, supported this argument. Testimony by Alyssa Nelson that Honken told her about Petitioner's temper, rages, and pointing a gun at his head went directly to her role relative to Honken. (T.Tr. 2678-79). Moreover, the evidence Petitioner was involved in hiring an undercover agent to "put a world of hurt" on one of her drug dealers, at a time when Honken was far away in prison, was relevant to show her participation in the crime was not solely because of Honken's influence, but showed she was in control. (T.Tr. 4018-19). It showed Petitioner was not "the unwitting, innocent person who gets duped into killing," but, rather, was a "violent" and "pushing" person who urged Honken to commit the murders. (T.Tr. 4079-80). This evidence also corroborated the evidence the government presented of the danger Petitioner posed while in a prison setting. It was consistent with her later conduct, while incarcerated, of controlling her cell block, threatening others and getting in fights.

Petitioner also relied on her lack of criminal record as a mitigating factor. The government rebutted this by pointing out she engaged in criminal conduct but was simply not caught. (T.Tr. 4028). The government pointed out, for example, Petitioner's conduct in hiring the undercover agent as evidence of her criminal conduct that was never charged. (Id.).

Thus, Petitioner was not prejudiced because even if the Court had limited the jury's consideration of future dangerousness to the danger Petitioner could pose to others while serving a life sentence, the evidence was still admissible to rebut Petitioner's mitigating factors. Petitioner's threatening, violent, hot-tempered conduct was directly relevant to the role she played relative to Honken in the murders. It showed she was a controlling, violent person unintimidated by others, including law

58

enforcement officers, and not afraid to push Honken.  Petitioner's criminal conduct,

including threatening to harm others, engaging in vandalism, and hiring an undercover

officer to harm another person, rebutted the mitigating factor that she had no criminal

history.  The evidence was properly admitted, even if it did not go directly to whether

Petitioner posed a danger to others while in prison.

**XI.    COURT CLAIM NO. 24 – Confrontation of Aggravating Evidence: Failure to Object to Kathy Rick's Triple Hearsay Testimony About Petitioner's Alleged Possession of a Gun**

Petitioner claims her trial counsel was ineffective for failing to object to a

statement by Kathy Rick that Petitioner "may" have a gun.  (PB 103).  She claims this

was inadmissible double-hearsay evidence.  (Id.).  As for her prejudice argument,

Petitioner parrots the same language from the *Rompilla* decision about undisclosed

mitigating evidence.  (PB 104).

A.    Counsels' Performance Was Not Deficient

Petitioner acknowledges the Federal Rules of Evidence do not apply in federal

capital sentencing proceedings,[24] but then proclaims, without citation to authority, that

"hearsay upon hearsay is not admissible."  (PB 103).  The law does not support

Petitioner's argument.  In *Green v. Georgia*, 442 U.S. 95, 97 (1979), the Supreme Court

reversed a conviction in a capital case where the trial court barred the defendant's

---

[24]  See *United States v. Montgomery*, 635 F.3d 1074, 1091-92 (8th Cir. 2011) ("During the penalty phase of a capital trial, '[i]nformation is admissible regardless of its admissibility and the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusion of the issues, or misleading the jury.'") (quoting 18 U.S.C. § 3592(c)).  Petitioner was tried under the same provisions then in effect under 21 U.S.C. § 848(j).

double-hearsay evidence during the sentencing phase of the trial.  See also *Roberts v. United States*, 445 U.S. 552, 556 (1980) (holding hearsay is admissible at sentencing, even in capital cases, without violating the constitution, making no distinction between hearsay and double-hearsay).  Indeed, when it suits her purposes, in another portion of her brief Petitioner cited *Sears v. Upton*, 130 S. Ct. 3259, 3263 (2010), for the proposition that "the fact that . . . evidence may have been 'hearsay' does not necessarily undermine its value – or its admissibility – for penalty phase purposes." (PB 188).  Only when the hearsay amounts to "misinformation" does it violate the Constitution and require exclusion.  *United States v. Tucker*, 404 U.S. 443, 446-47 (1972).  Accordingly, Petitioner cannot establish trial counsel was in error for failing to object to admissible evidence.

Further, the decision whether to object to testimony is one of strategy, left to the judgment of the trial lawyer.  *Jenner v. Class*, 79 F.3d 736, 739 (8th Cir. 1996) (trial counsel's failure to object to questioning was well within the range of professionally reasonable judgement and does not constitute ineffective assistance of counsel); *Bruner v. Dunning*, 731 F.2s 527, 528 (8th Cir. 1984) (affirming district court's finding that trial counsel's decision not to object to evidence was a tactical choice rather than dereliction of duty); *Wiley v. Puckett*, 969 F.2d 86, 102 (5th Cir. 1992) (finding trial attorney "could reasonably have decided not to risk antagonizing the jury by objecting"). That is especially appropriate where the question did not call for hearsay[25] so counsel could only have voiced an objection after the jury had already heard the testimony.

_____

[25]  The question was: "And what happened when you got to Dustin's mother's house?"  (T.Tr. 2637).

60

Further, the Court overruled trial counsels' hearsay objections when made as to other witnesses.  (T.Tr. 2640, 2710).

Trial counsel also effectively cross-examined Rick on this testimony.  Counsel got Rick to admit she never called the police about the matter.  (T.Tr. 2651).  Counsel established Honken's mother only said Petitioner "may" have a gun, not that she had a gun.  (T.Tr. 2652).  Finally, counsel got Rick to admit she had never seen Petitioner with a gun, and Petitioner had never threatened Rick with a gun.  (Id.).

### B.    Petitioner Has Not Demonstrated Prejudice

Petitioner cannot demonstrate she was prejudiced by admission of this evidence. The jury had already heard evidence Petitioner had possession of a gun before – indeed, she held Nicholson and the Duncan family hostage at gun point.  Further, the more compelling testimony preceded this hearsay statement.  Evidence Petitioner followed Rick, banged on her car windows, and yelled and screamed and threatened Rick while children were in the car, was the pertinent, compelling evidence.  (T.Tr. 2636-37, 2651).  Rick's repetition of what Dustin told his mother was a passing comment, not further discussed, and not mentioned in closing argument.  Moreover, the jury heard far more damaging evidence of Petitioner's conduct in connection with the murders themselves, rendering immaterial Rick's passing reference about Petitioner possibly having a gun.

### XII.    COURT CLAIM NO. 25 – Confrontation of Aggravating Evidence: Failure to Object to Kyla Davis's Testimony That Petitioner Tried to Find Out Where She Lived and What Car She Drove

Petitioner claims her trial counsel were ineffective for failing to object to testimony by Kyla Davis, a jail dispatcher, about alleged steps Petitioner took to find out

61

who she was, what vehicle she drove, and where she lived.  (PB 104).  Petitioner claims there was "no foundation" for the testimony and it was inadmissible because it was "hearsay upon hearsay."  (Id.).  As for her prejudice argument, Petitioner parrots the same language from the *Rompilla* decision about undisclosed mitigating evidence.  (PB 105).

A.  Counsels' Performance Was Not Deficient

As set forth above, Petitioner's argument that double-hearsay is somehow barred from the penalty phase of a capital case is unsupported by the law.  Further, as argued above, whether to object to testimony is a strategy call to be made by counsel during the rough and tumble of a trial and should seldom be considered deficient performance.  By the time Davis testified, the Court had previously overruled trial counsels' hearsay objections made during the testimony of other witnesses.  (T.Tr. 2640, 2710).

B.  Petitioner Has Not Demonstrated Prejudice

Even assuming trial counsels' performance was deficient, Petitioner has failed to demonstrate admission of the testimony caused her prejudice.  The testimony that Davis heard Petitioner tried to find out about her was of little import.  No more testimony was elicited about this subject.  There was no testimony that Petitioner found personal information about Davis or took steps to harm her.  In contrast, the clearly admissible testimony that Petitioner threatened the dispatcher's life merely for enforcing jail rules was very probative.  It once again showed Petitioner as someone not cowed by others, who threatened others, and who posed a future danger even in a prison setting.

62

### XIII.  COURT CLAIM NO. 26 – Confrontation of Aggravating Evidence: the Prosecution's Failure to Correct False Testimony at Angela Johnson's Trial Violated the Fifth and Eighth Amendments to the United States Constitution

Petitioner claims "the government elicited testimony that Dustin Honken was a studious young man who had never committed a violent act until he met Angela Johnson to support its theory that Honken was manipulated and encouraged to commit these crimes by Angela Johnson."  (PB 105).  Petitioner boldly claims this testimony "was false, and the government knew this testimony was false."  (PB 106).  Petitioner argues "[t]he government's elicitation of testimony that it knew to be false runs afoul of the long-established principle that the government has an affirmative duty to correct false testimony."  (PB 106-107).

Petitioner never raised this issue at trial or on appeal, and is therefore procedurally barred from raising this issue now.  She does not assert ineffective assistance of counsel as a way to evade the procedural bar.  Nor does Petitioner claim this is newly discovered evidence – indeed, Petitioner claims the basis for proving the evidence was false was the testimony presented at Honken's trial.  Accordingly, the Court should deny this claim without reaching its merits.

Nevertheless, this claim is without merit.  Petitioner claims the testimony was "false" but fails to provide any evidence to prove it so.  Petitioner has not, for example, provided a shred of evidence to establish that Jeff Honken did believe Honken was short tempered, or thought his brother was violent, or had seen his brother engage in a violent act, be physical with or slap someone.  Petitioner provided no evidence to show anything Jeff Honken, Tim Cutkomp, Rick Held, Kathy Rick, or Alyssa Nelson said was false.  None recanted their testimony.  No evidence proved their testimony false.  More

63

important, Petitioner has provided no evidence to establish the government knew the testimony was false. Even imagining, for example, Petitioner presented evidence that Jeff Honken, contrary to his testimony, once saw Dustin Honken slap someone, Petitioner must show the government knew of the evidence and permitted Jeff Honken to testify to something it knew to be false. Petitioner has made no such showing.

Petitioner again points to the government's evidence of Honken's involvement planning a bank robbery when he was in high school as evidence purportedly showing the testimony by Jeff Honken, Cutkomp, Held, Rick and Nelson was false. (PB 106). As previously explained, there is nothing about Honken's involvement in planning and plotting a bank robbery that established he ever engaged in an <u>act</u> of violence before he met Petitioner. Petitioner's description of the evidence is replete with words like "plan," "discussions," and "proposed." This was Honken – the evil planner and schemer, but the coward unable to act on his plans without someone like Petitioner to push him along. Far from showing the testimony to be false, the bank robbery evidence corroborates the government's assertion that before Petitioner, Honken was a planner and schemer, but a coward.

## XIV. COURT CLAIM NO. 27 – Prosecution Misconduct: the Prosecution's Violation of *Brady v. Maryland* by Failing to Disclose Dustin Honken's Planned Violent Attack on the Trial Prosecutor and His Association With a White Supremacist Prison Organization

Petitioner claims the government committed a *Brady* violation when it did not disclose internal memoranda drafted by Pat Reinert. (PB 108-110). Two of the memoranda discuss some facts about the danger Honken posed to Reinert and others, and all three discuss Reinert's impressions regarding those facts and security

64

measures he took, or believed needed to be taken, in response. Petitioner asserts the memoranda was exculpatory to her during the penalty phase because it would have shown Honken was relatively more evil and deserving of the death penalty.

To prove a *Brady* violation, Petitioner must establish: 1) the evidence was favorable to her; 2) the evidence was material; and 3) the government suppressed the evidence. *United States v. Jeanpierre*, 636 F.3d 416, 422-23 (8th Cir. 2011). There was no *Brady* violation. The facts mentioned in the memoranda regarding the danger Honken posed were provided in discovery, so the memoranda were cumulative as to that evidence. The memoranda themselves did not constitute *Brady* material because Reinert's impressions and plans for security measures did not constitute exculpatory evidence.

### A. The Evidence Was Not Exculpatory

The factual information about the threats Honken made, his membership in an Odinist group, and his plans for future violence, were not exculpatory. Petitioner's theory for why the evidence exculpates her is that it would have "contravened and undermined the prosecution's penalty phase arguments that Ms. Johnson manipulated and pushed Honken into committing violent acts." (PB 109). None of the factual information referenced in the memoranda addressed whether Johnson manipulated and pushed anyone, or whether Honken was susceptible to being manipulated. Further, they referenced planning, not conduct, by Honken, years after the murders. Far from being exculpatory, they reinforce the government's evidence that Honken may plan violent conduct, but only committed violent crimes when he was with Petitioner.

Other than the underlying facts, the memoranda otherwise simply reflect the

65

prosecutor's opinion and belief Honken posed a danger to the prosecutor and others and his beliefs for the need, and steps taken, to protect against that threat. The mental impressions and opinions reflected in the memoranda were not independently exculpatory. A prosecutor's opinions or beliefs do not, themselves, constitute *Brady* material. See, e.g., *Lopez*, 630 F.3d at 1210 ("a prosecutor's opinions and mental impressions of the case are not discoverable under *Brady* unless they contain underlying exculpatory facts.") (internal quotation and citation omitted); *United States v. Kohring*, 637 F.3d 895, 907 (9th Cir.2010) ("a prosecutor does not have a duty to disclose his or her strategies, legal theories or impressions of the evidence") (internal quotation and citation omitted); *Boyette v. Lefevre*, 246 F.3d 76, 91 (2nd Cir. 2001) (document reflecting prosecutor's inadmissible hearsay impression that victim's description of her attacker did not match defendant had no independent exculpatory value and was therefore not *Brady* material); *Williamson v. Moore*, 221 F.3d 1177, 1182-83 (11th Cir. 2000) (prosecutor's notes of witness statements contained mental impressions which were not themselves exculpatory, nor would they have led to exculpatory evidence).

B.     The Evidence Was Not Material Because it Was Cumulative

"Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Ladoucer*, 573 F.3d 628, 636 (8th Cir. 2009). Where the government fails to disclose evidence that is merely cumulative of other disclosed evidence, it is not material for purposes of establishing a *Brady* violation. See *United*

66

*States v. Quintanilla*, 25 F.3d 694, 699 (8th Cir. 1994) (though government failed to disclose evidence that could impeach one of its witnesses, there was no *Brady* violation because it would have been cumulative of other impeachment evidence).

The facts Reinert referenced in the memoranda at issue all came from the government's discovery file, and Petitioner concedes counsel knew of the evidence. Accordingly, Reinert's repetition of those facts in the memoranda was merely cumulative of the evidence already possessed by Petitioner. In *Burton v. Dormire*, 295 F.3d 839 (8th Cir. 2002), the Court found no *Brady* violation when the government disclosed one plea agreement with a cooperator, but did not disclose a second plea agreement. The Court held that "[e]vidence of a second plea agreement is purely cumulative for impeachment purposes, and 'when the [state] does not disclose a potential source of evidence but the evidence available from that source is cumulative of evidence already available to the defendant, it has committed no *Brady* violation.'" *Burton*, 295 F.3d at 847 (quoting *United States v. Zuazo*, 243 F.3d 428, 431 (8th Cir. 2001). See also *Lopez v. Ryan*, 630 F.3d 1198, 120-1211 (9th Cir. 2011) (finding no *Brady* violation when government failed to turn over a handwritten note because all the factual information reflected in the note was otherwise disclosed in police reports).

Regardless, the evidence referenced in the memoranda regarding Honken's plan to kill a prosecutor and others was cumulative of other similar evidence. Petitioner was aware Honken plotted to rob a bank and kill a participant in the bank robbery. She was urging Honken to kill witnesses, as reflected in the undercover tapes between Honken and Cutkomp. She was aware Honken tried to escape from the Woodbury County Jail.

67

Petitioner was aware Honken was attempting to bond others out of jail to kill witnesses and government agents. Thus, even if the government had not already disclosed the evidence of Honken plotting to kill Reinert, Petitioner was aware of plenty of other evidence showing plans by Honken to harm others. The evidence about Honken planning to kill Reinert was merely cumulative of this other evidence.

### C. The Evidence Was Not Suppressed

Petitioner concedes "[t]hrough discovery" trial counsel were aware: 1) of Honken's threats against Reinert; 2) Honken's threats to kill prosecutors Reinert and Colloton; 3) Honken's plans to kill the prosecutors' families; 4) Honken's participation in the Odinists; and, 5) the Odinist was considered a white supremacist group used to target cooperators. (PB 89-90). Thus, all of the factual assertions contained in the internal security memos authored by Reinert were in the government's discovery file and trial counsel were aware of them.[26]

Therefore, Petitioner has failed to show a Brady violation because the information in the memoranda was not exculpatory, was not material because it was cumulative, and was, in any event, not suppressed because it was in the government's discovery file.

---

[26] For that matter, this Court issued two published decisions in which it outlined the government's evidence regarding Honken's use of the Odinists as a front for violent conduct and Honken's plans to kill agents, prosecutors and others. See *United States v. Honken*, 378 F. Supp.2d 970, 1008-1009 (N.D. Iowa 2004) (Odinists); *United States v. Honken*, 278 F. Supp.2d 880, 887-88 (N.D. Iowa 2004 (plans to kill agents, prosecutors, and others).

68

**XV. COURT CLAIM NO. 28 – Prosecution Misconduct: The Prosecution's Violation of Petitioner's Rights Under the Sixth and Eighth Amendments and the Due Process Clause by Presenting Inconsistent Arguments at Her Trial and That of Her Co-Defendant**

Petitioner claims the government presented a "strikingly different picture of Dustin Honken" during his trial, allegedly portraying him "as the master manipulator, the organizer, and Angela Johnson as the complaint dupe." (PB 112). Petitioner asserts it "theory of culpability at Honken's trial was completely at odds with its presentation at Ms. Johnson's trial." (PB 113). Petitioner argues the "prosecution's use of inconsistent, factually contradictory theories at the separate trials of Honken and Ms. Johnson violated Petitioner's Fifth Amendment right to due process of law, her Sixth Amendment right to a fair trial, and her Eighth Amendment right to reliable, non-arbitrary fact finding." (Id.). Later in her brief, Petitioner asserts this is an ineffective assistance of counsel claim, asserting both trial and appellate counsel were ineffective for failing to "clearly raise" and litigate this issue. (PB 114). Further, Petitioner claims "predecessor 2255 counsel were ineffective in failing to raise the inconsistent theories of the government as a substantive claim. (Id.).

In her original motion, and first amended motion, Petitioner not only did not raise this issue, she specifically disavowed it. Petitioner argues that the claim relates back to her original claim because it relies on facts related to conduct "of the same time (trial) and type (inconsistent theories as to Petitioner and Honken)." (Id). The claim does not relate back. It cannot relate back when she specifically disavowed it. Moreover, it does not relate back simply because it arose out of the same trial, and the claims are not of the same "type." Petitioner claim in her original motion was that the government

presented false evidence.  She made no claim that the government's argument violated her rights, or that her counsel were ineffective for failing to object.  Finally, habeas counsel's reliance on arguing predecessor habeas counsel was ineffective is frivolous because that argument cannot establish grounds for relief.  See *Ward v. Norris*, 572 F.3d 925, 932 (8th Cir. 2009) (noting that claims of ineffective assistance of habeas counsel are prohibited).

Furthermore, this claim is procedurally barred, however, as she could have raised it before the district and appellate courts and failed to do so.  Only to the extent Petitioner pins this claim to an ineffective assistance of counsel argument can she evade procedural default.

Regardless, Petitioner's claim fails its merits.

A.      The Government's Case Was Not Inconsistent Between Trials

Petitioner has not shown the government presented inconsistent evidence at the two trials.  In other words, Petitioner has not shown, for example, the government presented evidence in one trial that Petitioner was the shooter and in the other trial that Honken was the shooter.  Petitioner does not claim the government presented evidence Honken engaged in violence prior to 1993 in his case, but presented contrary evidence in Petitioner's trial.  Rather, her claim is premised on the theory the government's arguments based on consistent evidence were inconsistent.  They were not.

In the closing argument during the penalty phase of Honken's trial, the government argued Honken "developed a plan" for the murders (Honken Tr. 3905), and "planned out" how to kill DeGeus (Honken Tr. 3907).  The government argued Honken

70

"plans, schemes, thinks out these things long in advance."  (Honken Tr. 3908).[27]  No

where during the closing argument did the government argue Honken engaged in

violence prior to the murders in 1993.  The government never argued Petitioner was not

violent or impulsive.  The government never argued Honken manipulated Petitioner into

participating in the crimes.  Neither the word "manipulate" nor any of its derivations

appear in the transcript of the government's closing argument in Honken's trial.  The

government argued Petitioner participated in the murders and the luring of Terry

DeGeus to his death.  The government said "they [meaning Honken and Petitioner]

used Angela Johnson and his [Terry DeGeus's] affection for Angela Johnson as a

method to do that [lure DeGeus to a remote site to kill him].  (Honken Tr. 3907)

(emphasis added).

In the closing argument during the penalty phase of Petitioner's trial, the

government of course emphasized Petitioner's conduct but did not present an argument

inconsistent with its argument in Honken's case.  In its closing argument during the

"eligibility" portion of Petitioner's bifurcated penalty phase of the trial, the government

argued: "Ask yourself absent both of them coming together, Dustin Honken being the

planner in this case and obviously with the motivation to kill and Angela Johnson who

was someone who acts, whether without her intentional conduct and prodding along

Dustin Honken whether this murder would have happened."  (T.Tr. 2465).  The

government argued Petitioner got herself to the top of Honken's drug organization

---

[27]  See also Honken Tr. 3910 ("Now, think back about the way this defendant thinks, the way he plans, the way he schemes."); Honken Tr. 3912 ("You know how he schemes and plans and thinks.").

71

through manipulation (T.Tr. 4011), and used manipulation to lure DeGeus to his death (T.Tr. 4015).[28] The government argued Petitioner "was violent" (T.Tr. 4019), the jury should not "jump to the conclusion that the person who pulls the trigger is the person who's the most morally culpable for the crime," and Johnson was violent, impulsive, "egg[ed]" Honken on and "push[ed]" him to commit the crimes (T.Tr. 4026-27). In rebuttal to Petitioner's closing argument, the government argued it was up to the jury to determine if it believed the evidence showed "Angela Johnson [was an] unwitting, innocent person who gets duped into killing or [an] Angela Johnson who's violent, who's pushing, who's cajoling Dustin Honken to commit these crimes?" (Johnson Tr. 4080). The government did not allege Petitioner planned the murders.[29]

The government's arguments in the two trials were not inconsistent. Petitioner claims the government's argument in Honken's trial that he was the "master manipulator" of Johnson was inconsistent with its argument in her trial. (PB 112). First, the government never argued in Honken's trial that he manipulated Petitioner. Second, even if it had, Petitioner's argument presumes that only one of them could be manipulative. Both Petitioner and Honken were capable of manipulating other people. Honken manipulated his father into committing the bank robbery, and manipulated his brother to fund the methamphetamine operation and Tim Cutkomp to be his helper, while Petitioner manipulated Honken and Terry DeGeus. The government argued in

---

[28] See also Johnson Tr. 4017 (pointing out Johnson "was the one in a position to manipulate Terry DeGeus to appear and put himself in a position where he was going to be murdered.").

[29] The only reference to planning asserted Petitioner was in on the plans. (Johnson Tr. 4011, 4017).

72

both cases Honken was the planner and schemer, but Petitioner was not ignorant of the plans and knowingly participated.  Honken was not a violent person prior to the murders, and the government never argued to the contrary in his trial.  In contrast, Petitioner was impulsive and violent before and after the murders.  Separately, each defendant was bad enough, but together they made a lethal combination.

The authority upon which Petitioner bases her claim does not help her. Petitioner cites *Smith v. Groose*, 205 F.3d 1045 (8th Cir. 2000), for the proposition that habeas relief was granted when the government presented inconsistent theories at separate trials.  (PB 113).  In *Smith*, the government argued in one trial that Smith was guilty of felony murder because one of his associates killed the victims during a robbery, but in a subsequent trial, argued that another person killed the victims prior to Smith and his associates arriving at the house.  *Smith*, 205 F.3d at 1048.  Thus, it was not simply a case where the government argued allegedly inconsistent theories. Rather, the government presented factually contradictory theories about who committed the murder and when the murder was committed, both of which could not be correct. *Smith*, 205 F.3d at 1050-51.  The *Smith* Court went on to state, however, that "we do not hold that prosecutors must present precisely the same evidence and theories in trials for different defendants.  Rather, we hold only that the use of inherently factually contradictory theories violate the principles of due process."  *Smith*, 205 F.3d at 1052. In this case, the government did not present inherently factually contradictory theories.

Petitioner also cites *Thompson v. Calderon*, 120 F.3d 1045 (9th Cir. 1997) for the proposition that the prosecutor violated the defendant's due process rights when it

73

argued at Thompson's trial he alone committed the murder but argued at a subsequent trial that another defendant committed the murder. (PB 113-14). *Thompson* is factually similar to *Smith*, in that the government presented evidence and argued in two separate trials first that one man killed the victim before the second man arrived, and in the second that the second man killed the victim. *Thompson*, 120 F.3d at 1055-58. These were factually irreconcilable inconsistent theories. That did not happen in the trials of Petitioner and Honken.

Here, the government's presentation of evidence and argument in the two trials was not improper or in any way inconsistent. The "government's theory in Honken's case was that Honken and Johnson acted in concert, perhaps with varying degrees of direct involvement, in the killings of all five individuals." *United States v. Johnson*, 377 F. Supp.2d 689, 693 (N.D. Iowa 2005). The government's position during both trials was that Honken was an evil planner and schemer who personally killed five people, including two little, innocent girls, and for that, he deserved to be executed. Its theory then and today is that it is unlikely either defendant would have committed the horrendous murders but for the participation of the other. Honken was the planner, the schemer, the organizer, and the evil genius behind the murders. He planned violence, threatened violence, and prepared to engage in violence. He had not personally, however, committed any act of violence himself. Petitioner, however, was a controlling, short-tempered, and violent woman who pushed Honken to carry out his evil plans. Petitioner was Lady Macbeth and Honken was Macbeth.

74

**XVI. COURT CLAIM NO. 29 – Ineffective Mitigation: The Testimony of Holly Dirksen**

Petitioner claims her trial counsel were ineffective for presenting testimony of her sister, Holly Dirksen. (PB 115-118). Petitioner claims Dirksen's direct examination "added little to the mitigation case," but that there was other helpful information she could have provided. (PB 116 & n. 24). Petitioner further claims the cross examination was "extremely damaging" and asserts trial counsel should have been more prepared for cross examination because the information was in the government's discovery file. (PB 116-17).[30]

A.    Dirksen's Testimony

On direct examination, Holly Dirksen testified about Petitioner's childhood which Petitioner then, and now, claims was relevant to explain her violent conduct. Dirksen testified about "unusual religious practices" and "exorcisms" performed by Petitioner's mother. (T.Tr. 3247-53). Dirksen testified about how supportive Petitioner was of her, and helped provide for her. (T.Tr. 3257-59). Dirksen testified about DeGeus beating Petitioner. (T.Tr. 3265-67). Dirksen also testified about the close relationship Petitioner had with her children. (T.Tr. 3269-70).

On cross examination, Dirksen testified she and Petitioner "experimented" "a few times" with methamphetamine supplied by Petitioner. (T.Tr. 3272-73). Petitioner inaccurately claims Dirksen testified on cross examination she was a drug addict, citing the transcript at 3255-56 and 3272-73. (PB 116). First, the testimony at 3255-56 was

---

[30] Petitioner's argument is inconsistent. She claims counsel were ineffective for calling Dirksen, but then claims they were ineffective for failing to have Dirksen testify about additional matters.

75

on direct examination, not cross examination. Second, Dirksen never testified she was addicted.  Third, at pages 3255-56, Dirksen was testifying about her use of marijuana and alcohol, not methamphetamine.  Fourth, when testifying about her experimental use of methamphetamine on cross examination, she specifically testified "[i]t was not a habitual thing."  (T.Tr. 3272).  There are other inaccuracies in Petitioner recantation of the alleged cross examination testimony.  Dirksen did not testify the relationship between Honken and Petitioner was "normal," but, rather, the government impeached her testimony with a prior inconsistent statement that it was normal.  (T.Tr. 3271).  Dirksen denied making the statements to Nedved about DeGeus's body or about testifying in the grand jury, but did testify she told Nedved she did not have to talk to law enforcement officers.  (T.Tr. 3274-75).  Dirksen denied making a statement to Wonsmos about Ryerson.  (T.Tr. 3276).  Dirksen did testify she was upset with her sister Wendy for testifying Petitioner told Wendy she "lured" DeGeus to his death because she did not believe it was true.  (T.Tr. 3277).

B.    Counsels' Performance Was Not Deficient

Petitioner's criticism of her trial counsel for calling Dirksen is unwarranted and that decision certainly does not rise to the level of being objectively unreasonable. Dirksen provided valuable mitigating evidence in support of multiple mitigating factors.[31]

_____

[31] Mitigating Factors: 3 (strong bond between defendant and her children); 6 (defendant was abused as a child through unusual religious practices); 8 (defendant would not be a danger to others if incarcerated for life); 9 (defendant raised by unstable mother, resulting in defendant being susceptible to drug abuse, unhealthy relationships, etc.); 10 (defendant was physically and emotionally abused by DeGeus); 11 (defendant has loving relationship with family); 13 (defendant is loved by her daughters); 15 (defendant is loved by her family); 18 (defendant has supported her daughters); 20 (defendant has been a good mother).  (Doc. 593).

76

Trial counsels' decision to call a witness "must be viewed as of the time it was made." *Winfield v. Roper*, 460 F.3d 1026, 1033 (8th Cir. 2006). Whether and which witnesses to call are fundamentally a strategy decision to be made by trial counsel. *Winfield*, 460 F.3d at 1033 (decision whether to call witnesses is presumed to be one of strategy). See also *Hanes v. Dormire*, 240 F.3d 694, 698 (8th Cir. 2001) (witness selections are left to counsel's judgment). With the benefits of hindsight, Petitioner now claims her trial counsel should have foreseen the extent and nature of the government's cross examination and made a different judgment not to call her sister as a witness. Absent the benefits of hindsight, trial counsels' performance cannot be found to have fallen below an objective standard of reasonableness. Dirksen provided testimony beneficial to Petitioner and advanced the mitigating factors. Indeed, all 12 jurors found factors (3), (13), and (20), and at least one juror found each of the other mitigating factors about which Dirksen testified.

### C. Petitioner Has Failed to Demonstrate Prejudice

Petitioner simply repeats the quote from the *Rompilla* case as an explanation for how she was prejudiced by counsels' alleged error in calling Dirksen as a witness. (PB 118). This is insufficient. Petitioner overemphasizes the effectiveness of the government's cross examination. Dirksen denied almost everything. That Petitioner distributed methamphetamine was already established by other witnesses, and whether she distributed drugs was of little or no import on whether the jury should impose the death penalty. Dirksen's attempt to persuade another person not to cooperate with law enforcement officers went to Dirksen's bias, but did not directly attack Petitioner. That testimony had nothing to do with Petitioner and whether the death penalty was

77

appropriate, but rather, addressed the witness's credibility as a way of mitigating the impact of her testimony. Petitioner has simply failed to demonstrate she was prejudiced by her counsels' decision to call Dirksen as a mitigation witness.

## XVII. COURT CLAIM NO. 30 – Ineffective Mitigation: The Testimony of Doug Book

Petitioner claims her trial counsel were ineffective for calling Chief of Police Doug Book as a witness because the "prosecution was able to elicit evidence in aggravation from Chief Book, as a direct result of counsel's inadequate preparation." (PB 118). Petitioner asserts trial counsel knew "or should have known" Book would provide harmful testimony. (PB 118).

### A. Doug Book's Testimony

Book testified DeGeus was in excellent physical condition and was "very strong." (T.Tr. 3598). Book testified about one incident in 1985 where DeGeus resisted arrest and fought with police. (T.Tr. 3597-98). Book also testified about a confrontation where DeGeus broke Book's wrist. (T.Tr. 3607). Book testified about how it took two officers to get DeGeus under control. (T.Tr. 3607-08). Book testified he and other law enforcement officers had responded to "a number of what we refer to as domestic abuse incidents" involving Terry DeGeus abusing Petitioner. (T.Tr. 3601). Book testified about finding Angela Johnson on the side of the road after DeGeus had beaten her. (T.Tr. 3600-01). He testified about confronting DeGeus later that night, seeing DeGeus had abrasions on his knuckles, and DeGeus denying the beating. (T.Tr. 3602). Book testified Petitioner did not want to press charges, and agreed "[i]t's quite common for whatever reason for women in those situations not to want to press charges against the battering individual." (T.Tr. 3603).

78

On cross examination, Book testified he received a threatening phone call from Petitioner after he conducted a search at Rick Summers' house in 1998. (T.Tr. 3609-3614). Trial counsel attempted to object to Book's testimony about the threat, but was overruled. (T.Tr. 3611-12).

B.   Counsels' Performance Was Not Deficient

As stated earlier, the decision whether to call a witness is presumed to be one of strategy. *Winfield*, 460 F.3d at 1033. Central to Petitioner's mitigation, then and now, is that she was manipulated and abused by other men.[32] Petitioner also asserts her trial counsel should have done more to emphasize Petitioner was a battered woman who, because of that, was not likely to harm DeGeus, but, rather, to suffer the abuse without retaliation. (Claim 18). The testimony from Book significantly supported this mitigating factor and supported her battered woman theme.

Counsel interviewed Book prior to calling him as a witness, but did not know about Petitioner's threat and did not ask Book about it. (H.Tr. 3026-27).[33] Petitioner, however, knew she threatened Book and knew her attorneys were going to call Book as

---

[32]   Petitioner alleged, and four jurors found, as a mitigating factor that she had been physically and emotionally abused by DeGeus. (Case No. 01-cr-3046, Doc. 593).

[33]   Petitioner recounts that, while Mary Goody and Pat Berrigan testified they never asked Book about negative things he might say about Petitioner, Dean Stowers claims they did and Book denied having anything negative to say, and accused the government of conspiring with Book. (PB 120). Goody's notes support her testimony, and Stowers acknowledged that they could have called Goody to show Book lied, had he done so. (Id.). Petitioner now asserts failing to call Goody was ineffective, but that claim fails because Goody would not have supported Stowers's version. Moreover, Stowers's version has no credibility. It is unsupported by any contemporaneous notes, is inconsistent with the testimony that Berrigan was surprised by the cross examination, and is inconsistent with the failure to confront Book with a prior denial had it occurred.

79

a witness, yet did not warn them.  Counsel were agents for Petitioner, and Petitioner cannot lay at their feet her own fault for failing to tell them she threatened Book.

Petitioner claims that the allegedly deficient performance was caused by "the haste with which this penalty phase was put together." (PB 121).  There is no factual support for this assertion.  Counsel had time to interview Book before he testified.  Petitioner has offered no evidence to show the trial would have ended with a different result had counsel interviewed Book earlier.  Petitioner has not shown, for example, she would have warned her trial counsel about having threatened Book's life had they interviewed Book a week earlier, a month earlier, or a year earlier.

C.      Petitioner Has Failed to Demonstrate Prejudice

As to the prejudice prong of the *Strickland* test, Petitioner merely asserts it was prejudicial because "once this harmful evidence is removed from the aggravating side of the balancing scale the conclusion is compelling that" she was prejudiced, again parroting the language from the *Rompilla* decision.  (PB 121).  Petitioner is wrong.  Book's testimony supported her mitigating factor about being abused by DeGeus, and supported her position she was a battered woman who, like other battered women, suffer their abusers without seeking retaliation.  Moreover, the absence of Book's testimony about being threatened by Petitioner would not have made any difference in the outcome.  There was a significant amount of other evidence already admitted about Petitioner threatening others, including some recorded on a videotape.

80

**XVIII.  COURT CLAIM NO. 31 – Ineffective Mitigation: The Testimony of Susan Marsolek**

Petitioner claims her trial counsel were ineffective for calling Susan Marsolek as a mitigation witness.  (PB 121-123).  She claims her trial counsels' "inadequate preparation" allowed the government "to elicit evidence in aggravation."  (PB 121).  She claims her counsel knew or should have known the benefits of calling Marsolek would be outweighed by the detriments.  (Id.).

A.      Susan Marsolek's Testimony

On direct examination, Susan Marsolek testified she worked with Petitioner in Clear Lake in the late 1990s.  (T.Tr. 3731-32).  Marsolek described Petitioner as "very compassionate," a "loyal friend," and "trustworthy."  (T.Tr. 3732).  Marsolek testified she and Petitioner were later housed in the Linn County Jail together and Petitioner did not get in fights at the jail.  (T.Tr. 3734-3736).  Marsolek testified during direct examination that Petitioner was involved in Bible study.  (T.Tr. 3737).  She described Petitioner as trying to help other inmates, taking them "under her wing" to care for them.  (T.Tr. 3739).  Marsolek also testified Petitioner was a "very good mother" and cared about her daughters.  (T.Tr. 3740).  This testimony supported multiple mitigating factors in support of Petitioner's theory of defense during the penalty phase.

On cross examination the government questioned Marsolek about her own truthfulness, reminding her of false statements she made in her own case and about Marsolek's prior statement about Petitioner's involvement in a fight.  (T.Tr. 3742-45).  Marsolek denied memory of the fight.  (Id.).  The government also asked Marsolek if notes seized from her that included Petitioner's name were drug notes, but she denied

81

it.  (T.Tr. 3743-44).  On redirect, Marsolek said she would not be a snitch (T.Tr. 3749).

On re-cross, the government rebutted this with evidence Marsolek received a reduction

in her sentence for testifying against another person.  (T.Tr. 3750).

> B.        Counsels' Performance Was Not Deficient

As mentioned previously, the decision whether to call a witness is presumed to

be one of strategy.  *Winfield*, 460 F.3d at 1033.  While Petitioner now claims Marsolek's

testimony provided "tepid mitigation evidence" (PB 122), her testimony in fact supported

eight separate mitigating factors found by jurors.[34]  Trial counsel effectively elicited

testimony on redirect designed to rehabilitate Marsolek's credibility.

Petitioner asserts trial counsel had not read the discovery file containing the

information about Marsolek used in cross examination,[35] but there is nothing in the

record to support this.  To the contrary, the billing records show trial counsel spent

many hours reviewing the government's discovery file.  This is not a case of trial

counsel failing to investigate or prepare.  It is simply a case of trial counsel not being

able to foresee with the same clear vision possessed by habeas counsel in hindsight

the effectiveness of the cross examination using the information known about the

witness.

---

[34]  The jurors unanimously found mitigating factors 3 (strong bond between defendant and her children), 13 (defendant is loved by her daughters), 17 (defendant can lead a productive life while incarcerated), and 20 (defendant has been a good mother).  At least one juror found each of the following mitigating factors which were supported by Marsolek's testimony: 8 (defendant would not be a danger to others if incarcerated for life); 11 (defendant has loving relationship with family); 15 (defendant is loved by her family); and, 18 (defendant has supported her daughters).

[35]  For example, Petitioner wrote "[h]ad defense counsel read the discovery file" and "if trial counsel had bothered to read the discovery . . .."  (Petitioner Brief, at 123).

82

## C. Petitioner Has Failed to Demonstrate Prejudice

Petitioner's hindsight view of the effect of Marsolek's testimony has been blurred because her habeas counsel did not see this live testimony. Petitioner understates the significance of the mitigating testimony provided by Marsolek, which supported eight mitigation factors found by jurors. Further, she overemphasizes the impact cross examination had on the case. Cross examination about the alleged drug notes was not effective because Marsolek denied it and had an explanation for the notes the government did not show was false. The questioning of Marsolek about the fight had little or no impact as she consistently denied Petitioner's involvement in the fight. The government attorney's questions were not evidence, and therefore no evidence of any value was obtained through the cross examination of Marsolek. Finally, to the extent the cross examination showed Marsolek to be untruthful, it only hurt Marsolek's credibility and did not directly affect Petitioner. At most, cross examination neutralized the impact of Marsolek's testimony, but it did not become evidence in aggravation supporting the death penalty.

## XIX. COURT CLAIM NO. 32 – Ineffective Mitigation: Failure to Provide Psychiatric Pharmacologist Roswell Lee Evans with Data Regarding Petitioner's Drug History, Rendering His Expert Testimony Virtually Irrelevant

Petitioner claims her trial counsel were ineffective in presenting the testimony of expert Dr. Roswell Evans. (PB 123-131). Petitioner claims her trial counsel should have had Dr. Evans interview Petitioner about her state of mind at the time of the offense and should have provided Dr. Evans with information about Petitioner's drug use history so he could tie his testimony about the effects of methamphetamine to

83

Petitioner.  (PB 124-126).

A.  Counsels' Performance Was Not Deficient

Trial counsel called Dr. Evans to establish the effects methamphetamine can have on people.  He testified methamphetamine is "incredibly addictive" and has become "an epidemic."  (T.Tr. 3581-82).  Dr. Evans testified about what occurs in the brain of a user to make it so addictive.  (T.Tr. 3585-86). He also testified about the long-term effects of prolonged methamphetamine use, including damage to "receptor sites" in the brain.  (T.Tr. 3587-88).  Dr. Evans testified this long term damage impacts a person's ability "to control outbursts, control anger issues, control perhaps even some memory issues . . . " and increases a person's "propensity for becoming psychotic . . .." (T.Tr. 3589).  He also testified methamphetamine use caused physical problems, like "cardiovascular problems."  (T.Tr. 3589).  Petitioner's other experts had not diagnosed her with a drug dependancy disorder, but there was no dispute the evidence showed Petitioner regularly used methamphetamine for years.  This presentation was not deficient.  Four jurors found Petitioner's methamphetamine addiction affected her judgment.  (Doc. 593).

On cross examination the government was able to limit the impact of this testimony to some degree by pointing out that Dr. Evans's testimony was not based on direct information about Petitioner.  However, evidence Petitioner used methamphetamine for years was not in dispute.  Moreover, having Dr. Evans testify about Petitioner's methamphetamine use history would have hampered the effectiveness of his testimony.  The manner of the presentation kept from the jury details about Petitioner's continued methamphetamine use for seven years after the

84

murders.  While some of the information came out from other witnesses, her prolonged use of methamphetamine long after the murders did not mitigate her involvement in the murders.

Petitioner argues her counsel should have had Dr. Evans examine her about her state of mind at the time of the offense and in order to establish she had a diagnosis for drug dependency.  (PB 124).  Petitioner alleges "Dr. Evans could have used Ms. Johnson's statements to the government experts to explain how addicted Ms. Johnson was, and tied the effects of that addiction to the time of the homicides."  (PB 128).  Petitioner claims "[h]ad Dr. Evans been armed with the facts about the extent and nature of Ms. Johnson's drug abuse, he could have . . . diagnosed Ms. Johnson at the time of the offense with an Axis I disorder of drug dependency . . . ."  (PB 130).  These claims are baseless.  First, Dr. Evans had a doctorate degree in pharmacology and was not a psychiatrist.  (T.Tr. 3574-75).  He was not qualified to examine Petitioner about anything, including her state of mind at the time of the offense.  He was not qualified to diagnose Petitioner with anything.  Second, Petitioner consistently claimed she did not use methamphetamine while pregnant in 1993 (PB 128), and she was pregnant at the time of both murders.  Third, Petitioner had only been using methamphetamine for a few years at the time of the murders.  Petitioner has produced no evidence proving her methamphetamine use up to the time of the murders caused any brain damage.

Petitioner claims Eva Hanawalt's testimony at the habeas hearing would have supported Dr. Evans' opinion about the wide-ranging effects of methamphetamine abuse.  (PB 130).  That is a separate claim from whether trial counsels' performance was deficient for failing to supply Dr. Evans with details about Petitioner's drug use, and

85

is a claim not pled in Petitioner's motion.  Moreover, the government's cross examination did not call into question the accuracy of Dr. Evans' testimony about the effects of methamphetamine abuse.  Hanawalt's testimony about the effects of methamphetamine on others was not more compelling than Dr. Evans' testimony because neither was tied to the effect methamphetamine use had on Petitioner.

B.      Petitioner Has Failed to Demonstrate Prejudice

It must be remembered Petitioner's ineffective assistance of counsel claim here is that trial counsel should have provided Dr. Evans with information about the history of Petitioner's methamphetamine use.  With that in mind, Petitioner has failed to show his testimony would have been any different had he been provided with this information.  While Petitioner purports to claim what Dr. Evans could have done, she did not call him as a witness at the evidentiary hearing in this matter, or submit a declaration from him about his purported testimony.  Petitioner can only speculate as to what Dr. Evans could, or could not, testify about had he been provided details about her methamphetamine use history.

Petitioner's claim of prejudice is also pure speculation when she purports to predict the impact on the jury.  Petitioner speculates Dr. Evans' testimony "likely led at least some jurors viewing Angela Johnson's drug history as aggravating, i.e., that Angela Johnson's drug use was recreational, and that she did not suffer the devastating effects of methamphetamine use."  (PB 126-27).  Petitioner has no idea how the jury interpreted Dr. Evans' testimony.  Further, providing Dr. Evans with details about Petitioner's drug usage would not have negated this view, even if it existed.  Her drug history shows she was able to stop using methamphetamine when she was pregnant.

86

Her drug history showed that during the time she used methamphetamine she maintained full employment, was raising two daughters as a single mother, and was distributing methamphetamine at the same time.

Likewise, even if Dr. Evans was provided details of Petitioner's drug abuse history, it would not "have aided the jury in understanding Ms. Johnson's behavior in 1993 . . .." (PB 130). Again, Petitioner was not using methamphetamine at the time of the murders. Moreover, she had only been using methamphetamine for a few years prior to the murders. Petitioner has no evidence showing her brain was damaged at the time of the murders as a result of methamphetamine use.

Similarly, it is pure speculation for Petitioner to claim "[h]ad the jury been presented with the evidence of the extent and impact of Ms. Johnson's methamphetamine abuse through the testimony of Dr. Evans, it is reasonably probable that at least one juror would have voted for a life sentence." First, as outlined above, Dr. Evans was not qualified to testify about the impact of Petitioner's drug use in a psychological sense. Had Dr. Evans bolstered his testimony about the effects of methamphetamine use with information about Petitioner's own methamphetamine use, it would not have meant he could testify about whether Petitioner suffered from a drug dependancy disorder.

## XX. COURT CLAIM NO. 33 – Ineffective Mitigation: Use of Multi-Faceted, Overly Complicated Yet Incomplete Mitigating Factors for the Jury to Weigh Rather Than Simple, Straight-Forward Facts that Encompassed All of the Mitigation

Petitioner claims her trial counsel were ineffective in the manner in which they drafted the mitigating factors for consideration by the jury. (PB 131-139). Petitioner's

87

criticism is vague. Petitioner claims the instructions should have been more "simple, straight-forward" and should not have used judgmental language" (PB 133), but Petitioner never provides a draft of the mitigating factors as they allege they should have been drafted. Petitioner's attack is also broadly stated, claiming not only that certain instructions were poorly worded, but other mitigating factors should have been added and others not included.

A. Counsels' Performance Was Not Deficient

Petitioner has not demonstrated trial counsels' drafting of the mitigating factors fell so far below an objective standard of reasonableness as to constitute ineffective assistance of counsel. While habeas counsel and their expert, with the benefit of hindsight, believe there was a better way to draft them, there is no case law or guideline stating that the manner in which they were drafted in this case was inappropriate. (H.Tr. 4263-65).[36]

How to word mitigating factors is inherently a strategy decision calling for the exercise of judgment and subject to the wide variation in writing styles among attorneys. As counsel Stowers acknowledged, he "could see a theory for why you would do it this way." (H.Tr. 1509). The way the mitigating factors were drafted told a story and explained why the facts were mitigating, rather than leaving it to argument or the jurors' deductive reasoning. While short, factual, instructions may have been easier for jurors to find the mitigating factor was factually proven, it does not follow they would have

---

[36] Petitioner cites some cases at page 139 of her brief, but none of them address whether mitigating factors should be drafted as done by trial counsel or whether they should be drafted as argued by habeas counsel. Several of the cases address constitutionally defective jury instructions, which is not at issue here.

88

found the factor mitigating.  For example, the shortest mitigating factor said "Angela Johnson does not have a prior criminal history," (Doc. 593, factor (2)), and while the fact she had no criminal history was uncontested, only 6 jurors found it to be mitigating.

Petitioner's claim that trial counsel did not carefully prepare the mitigation factors is without factual basis.  In his zeal to support Petitioner's cause, Professor O'Brien was merely speculating about how the defense counsel prepared the mitigation factors, stating the instructions "look like they were thrown together without a lot of foresight." (H.Tr. 4246).  There was nothing preventing O'Brien from asking Mr. Berrigan how he prepared the mitigating factors, or habeas counsel from asking Mr. Berrigan the same question during his two days of testimony – but they never did.  Moreover, Petitioner's use of a Berrigan quote – that the defense instructions were "kind of cobbled . . . together" – is misleading.  Petitioner pulled that quote from a discussion regarding the order of the mitigating factors,[37] not how or when the mitigating factors were drafted, or how much thought went into the process.  Indeed, a full reading of the transcript shows Mr. Berrigan put a significant amount of thought into the mitigating factors, including their order on the verdict form.  Indeed, the Court commented that Mr. Berrigan had been "very thorough" on the mitigating factors.  (T.Tr. 3986).

Petitioner is also in error in claiming trial counsel did not work as a team on the mitigation factors.  (PB 132).  The record reflects other members of the defense team reviewed the proposed factors and had input into the wording of them.  (T.Tr. 2152;

---

[37]  The transcript clearly shows the Court was discussing with Mr. Berrigan the order of the mitigating factors.  Mr. Berrigan stated he "specifically did not want to group them" because he believed the jurors would give each mitigating factor more individualized attention if not grouped by topic.  (T.Tr. 2148-49).

H.Tr. 1498, 1508-09).

Petitioner claims trial counsel should have accepted the Court's invitation to redraft the mitigating factors to reduce them "to about 7." (PB 135). The Court, though, stated it did not "have a problem with the number of mitigators." (T.Tr. 3986). Indeed, the Court recognized there is some benefit in the jury having a larger number of mitigating factors to consider during the weighing process. (Id.).

Petitioner claims counsel were ineffective for "coupling abuse by DeGeus with the consequences of 'great fear' and 'traumatic stress,'" which she claims was an "especially egregious error" "[g]iven the prosecution's argument that the consequence of the abuse was to provide a motive for Mr. DeGeus' killing . . .." (PB 136). First, as set forth in an earlier claim, the government did not argue Petitioner's primary motive for the murder of DeGeus was his abuse. Further, this criticism makes little sense. Petitioner does not explain how this coupling was inappropriate. Petitioner provides no explanation about how she believes this mitigation factor should have been written. There was no question the evidence showed Petitioner had great fear of DeGeus and, as the Court commented, the evidence showed Petitioner suffered traumatic stress from the relationship. (T.Tr. 3967).

Petitioner claims trial counsels' performance was deficient as well for proposing mitigators (minor role and pregnancy putting her at a disadvantage) not proven at trial. (PB 139). Petitioner still maintains her role was minor compared to Honken, and she was charged as an aider and abetter. Had trial counsel failed to submit minor role as a mitigator, habeas counsel would be rightfully screaming the failure to do so was deficient performance. Nor was submission of the pregnancy mitigator unreasonable.

90

There was no dispute Petitioner was pregnant and it would have been a reasonable inference for a juror to conclude that being pregnant with Honken's child put Petitioner at a disadvantage with him.

### B. Petitioner Has Failed to Demonstrate Prejudice

Petitioner repeatedly claims jurors' failure to find mitigating factors was caused by what she now claims were poorly worded instructions. (PB 135-136). Petitioner also claims that had the mitigating factors been properly worded, "each would have been found true by every juror" or at least some jurors would have found them true and would have allowed each of the jurors to weigh them as mitigating factors. (PB 133). Petitioner has failed to prove this. First, Petitioner cannot possibly know why particular jurors found mitigating factors and others did not. The fact that at least one juror found 18 of the factors mitigating suggests the wording of the factors did not prevent jurors from finding them. Second, and more fundamentally, whether the facts set forth in any mitigating factor was true does not mean the juror considered it mitigating. For example, the evidence was undisputed that Petitioner did not have a criminal history, six jurors did not find it mitigating. (Doc. 593, factor (2)).

Petitioner claims counsels' failure to include a mitigating factor for post-traumatic stress disorder caused her prejudice because "depression and anxiety" as mitigating mental health illnesses "have nowhere near the impact of traumatic stress." (PB 138). Petitioner bases this assertion on the testimony of Sean O'Brien, but O'Brien had no authority for that assertion and cited none in his testimony. (H.Tr. 4259). He is simply speculating about how a jury might interpret different mental illnesses and cited no studies, research, or any other authority for that assertion. That no juror found

91

Petitioner's anxiety and depression mitigating does not support the conclusion that jurors would have found another mental illness mitigating.

In the end, Petitioner has nothing to offer but speculation that the outcome of the trial would have been different had the mitigating factors been drafted in a different manner.

## XXI. COURT CLAIM NO. 34 – Failure to Prepare Mitigation: Failure to Investigate and Present Evidence Regarding Angela Johnson's Mental State at the Time of the Offenses

Petitioner claims her trial counsel were ineffective for failing to investigate and present evidence of Petitioner's mental state at the time of the offense, and for instructing her experts not to examine her about her state of mind at the time of the offense, and claims she was prejudiced by that conduct.  (PB 140-171).

### A.      Counsels' Performance Was Not Deficient

This is not a case where trial counsel failed to investigate Petitioner's mental health, or failed to present mental health evidence.  Petitioner's claim is limited to criticism of the nature of the investigation and manner of presentation.  Those criticisms do not rise to the level of showing trial counsels' performance fell outside the wide range of objectively reasonable conduct by trial counsel.

Petitioner is wrong when she argues trial counsel did not comply with the ABA Guideline 10.10.1.  (PB 140).  That guideline recommends adopting a penalty phase theory that is consistent with the guilt phase theory.  Trial counsel did that.  Trial counsel presented a guilt phase defense that Petitioner was only present at the murders and did not know of Honken's intent to kill.  Contrary to Petitioner's assertion, this was not a case where counsel conceded she committed the acts and claimed she

92

"lacked the requisite mental state to be found guilty." (PB 160). The defense was that Petitioner did not act to assist Honken and did not know what Honken planned. Therefore, the only state of her mind relevant to this defense is whether she knew of Honken's murder plans. Whether Petitioner suffered mental illnesses that would affect her decision-making ability to assist in those plans, or affect her ability to formulate an intent to aid and abet the murders, was irrelevant because the defense was that she did not make a decision to do anything.

Indeed, had trial counsel presented evidence in the penalty phase suggesting her mental problems at the time of the murders were relevant to her conduct, it would be inconsistent with the guilt phase defense. The ABA Guidelines advise that "[c]onsistency [between the guilt phase and penalty phase presentations] is crucial because, as discussed in the Commentary to Guideline 10.10.1, counsel risks losing credibility by making an unconvincing argument in the first phase that the defendant did not commit the crime, then attempting to show in the penalty phase why the client committed the crime." ABA Guidelines, § 10.11 (commentary) (further noting that a guilt phase defense denying involvement is more likely to be inconsistent with mitigation evidence of mental illness, domination by a co-defendant, substance abuse, or trauma).[38] Thus, it would have been an inconsistent presentation for trial counsel to

---

[38] Indeed, Petitioner's expert, Sean O'Brien, authored an article in which he wrote: "Therefore, if the defendant has presented a strong claim of innocence at the guilt state, experienced capital defense attorneys will be less likely to introduce mitigating evidence designed to explain why the defendant committed the crime because it may lead the jury to view the defense as disingenuous." Sean D. O'Brien, Capital Defense Lawyers: The Good, The Bad, and the Ugly, 105 Mich. L. Rev. 1067, 1077 (April 2007) (internal quotation and citations omitted).

93

present a guilt phase defense of claiming innocence, followed by a penalty phase defense of admitting guilt, but then claiming her mental illnesses made it impossible for her to act intentionally during the murders.  Moreover, it would undermine Petitioner's residual doubt mitigator.  By presenting evidence, however, showing Petitioner suffered mental health problems, without attempting to excuse her participation in the crimes, trial counsel avoided presenting an inconsistent argument while still allowing the jury to take into account Petitioner's mental illnesses in arriving at a just punishment.

Where a defendant maintains she wasn't present at a murder, trial counsel are not ineffective when they make the strategic decision not to present a mental health defense in conflict with a claim of innocence.  *Middleton v. Roper*, 455 F.3d 838, 848-49 (8th Cir. 2006) (holding trial counsel was not ineffective for not presenting a duress mental health defense when the defendant claimed he was not present at the murder scene).  Courts must "give great deference to counsel's informed strategic decisions . . . [and] must resist the temptation to second-guess a lawyer's trial strategy."  *Middleton*, 455 F.3d at 848-49 (internal quotation and citation omitted).  See also *Strong v. Roper*, 2011 WL 2600241, * 35 (E.D. Mo., June 29, 2011) (holding trial counsel was not ineffective when presenting evidence during penalty phase would have been inconsistent with guilt phase evidence, creating a danger of incensing the jury).

Further, Berrigan testified he made a strategic decision to bar the experts from questioning Petitioner about her state of mind at the time of the offense.  Even habeas counsel admits trial counsel's decision to instruct Petitioner's experts not to question

94

her about the crime was a strategic decision. (H.Tr. 2091-92).[39] Petitioner just claims this was an unreasonable strategy decision. It was not.

One reason counsel did not want to have the experts testify about Petitioner's state of mind at the time of offense was that he did not want to draw attention to the crime and wanted the penalty phase to be more focused on the client. (H.Tr. 4288). Berrigan explained he believed

> it's counterproductive in many circumstances for the defense to try to put on evidence of mental health at the time of the commission of the murders. It only brings the jury's attention back to the commission of the murders in the penalty phase of the trial at least the defense is very much trying to concentrate on the other mitigating circumstances that might exist regarding the defendant and her background character."

(Exhibit 121, at 984). This was not an unreasonable strategy.[40] Trial counsel wanted the jury to feel compassion for Petitioner, despite the crime she committed. When the mental health evidence was not sufficient to mount a defense in the guilt phase, it was reasonable to divorce the presentation of mental health evidence that might persuade a juror to have compassion for Petitioner from attempting to introduce mental health evidence as an excuse for Petitioner committing the crime.

A second reason for the strategy was that Petitioner refused to admit she was even present at the murders and if questioned about it she might say something

---

[39] Accordingly to Dr. Logan, he may have received similar instructions on other occasions. (H.Tr. 3597-98).

[40] Indeed, Petitioner's expert Dr. Cunningham explained it is not always productive to present expert testimony about a defendant's mental health diagnosis "because it goes over the head of the jury," but what is productive is providing expert testimony about how damaged the defendant is and how that bears on her moral culpability. (H.Tr. 4002-4003). Trial counsel presented this type of expert testimony.

95

"horribly damaging" along those lines.  (H.Tr. 3123-24, 3562-63, 4289).[41]  Petitioner's

expert admitted "[i]t could very well be" a legitimate strategy for a lawyer to instruct

experts not to question a defendant about the offense when the defendant refuses to

admit being present.  (H.Tr. 4290).[42]  Petitioner's expert admitted that if a jury heard a

capital defendant claim not being present at the murder, after the jury found the

defendant guilty, it would be the opposite of remorse and would harm the case.  (H.Tr.

4291).  Pat Berrigan was concerned that, under Rule 12.2,[43] if defense experts asked

Petitioner about the crime, it would open the door to the government experts doing the

same thing.  (H.Tr. 2086, 3117-19).  This was based in part on a lecture Berrigan heard

---

[41]  Petitioner claims "[t]his decision was not based on a concern about what petitioner would say about the events at the time of the crime," but then quotes a portion of Berrigan's testimony in which he stated not knowing what she was going to say "was part of the problem."  (PB 153).

[42]  Petitioner claims the decision was "neither strategic nor particularly successful."  (PB 153).  Petitioner reiterates the strategy "failed to prevent the government's experts from asking Ms. Johnson about crime-related information."  (PB 154).  Whether it was successful or not is known only with the benefit of hindsight. Effectiveness of counsel must be judged at the time the decision is made, not in view of whether the strategy was successful.  In any event, the strategy was successful – while government experts asked Petitioner generally about her views concerning harm to children, they did not delve into her state of mind at the time of the offense.  Petitioner also claims the strategy was "risky" because Dr. Hutchinson did talk to Petitioner about the offense, despite instructions to the contrary.  (PB 155-56).  While Berrigan's conduct in secretly redacting a document produced to the government is disturbing, it is irrelevant to the legal analysis.  Whether it created a risk or not, the issue did not arise and Petitioner was not prejudiced by Dr. Hutchinson asking her about the offense or Berrigan's redaction of her notes.

[43]  Rule 12.2 was a fairly new rule at the time this case went to trial.  (H.Tr. 3118).  As of March 2005, the Court's ruling in this case on Rule 12.2 was only the second reported decision on the Rule.  (H.Tr. 3795-96).

96

during a death penalty conference. (H.Tr. 3120-22).[44] Furthermore, Petitioner maintained she was not even present at the murders, so even Petitioner's expert admitted it would be inconsistent to assert a mental health defense about Petitioner's state of mind at the time of the offense under those circumstances. (H.Tr. 3573).

Petitioner claims Federal Death Penalty Resource Counsel Richard Burr "had given [trial counsel] a road map on how to present mental health evidence to explain Ms. Johnson's participation in the crimes." (PB 141). Petitioner claims Burr presented a "theme – of connecting Ms. Johnson's impairments and vulnerabilities to the reasons she participated in the crime . . .." (Id.). No where in the recitation of that advice, however, does it reflect Burr gave any advice regarding the use of experts. Nowhere in that advice did Burr talk about connecting mental health impairments to reasons why she participated in the crime. Rather, that advice referenced use of lay testimony about Petitioner's abusive childhood, pregnancy, and drug use to explain her behavior. In fact, trial counsel presented evidence on all the issues raised by Burr.

B.     Petitioner Has Failed to Demonstrate Prejudice

The first step in determining whether Petitioner has demonstrated prejudice is to take into account the mental health presentation trial counsel did make. Trial counsel presented testimony from three experts who examined Petitioner and testified to her various mental health impairments. This included testimony she suffered an abusive

---

[44] Petitioner called Greenman to testify and she claimed she did not mean to suggest the strategy adopted by trial counsel. (H.Tr. 3793). What she intended is irrelevant. She lectured trial counsel should limit the scope of their experts' examination in order to limit the scope of the government experts' examinations. (Exhibit JJJ). It was not unreasonable for counsel to understand this strategy could effectively bar the government from examining Petitioner about the crime.

97

childhood, had an abusive relationship with Terry DeGeus, and abused methamphetamine, which led to mental impairments of depression, anxiety, and Posttraumatic Stress Disorder. (T.Tr. 3644, 3650, 3653, 3655, 3670). The experts testified for hours (if not days) at trial that these impairments affected her relationship with men, her decision-making abilities, her judgment, her impulsiveness and temper, her ability to make choices, and her perception of consequences for her conduct. (Dr. Logan – T.Tr. 3307-3343, 3359; Dr. Hutchinson – T.Tr. 3628-72, 3682-86; Dr. Cunningham – T.Tr. 3799-3902). The government did not even cross examine Dr. Cunningham. While it did cross-examine Drs. Logan and Hutchinson, Petitioner's expert testimony went uncontested by the government. Against the presentation of this mental health evidence, the jury had before it all of the aggravating evidence in this case, including the brutal and inexcusable slaughter of two innocent little girls. All this must be taken into account when determining whether additional or different mental health testimony would have changed the outcome of the trial.

Petitioner's claim she was prejudiced by instructions to her experts not to question her about the murders is not supported by the evidence. Petitioner concedes the instructions would not have prevented her trial experts from offering testimony about Petitioner's state of mind at the time of the offense. (PB 161). Indeed, Dr. Woods rendered his opinion about Petitioner's state of mind at the time of the offense even though Petitioner denied any involvement in the crime.[45] Regardless, the instructions

_____

[45] Dr. Woods rendered his opinion after his first interview of Petitioner, during which she denied being present at the murders. Dr. Woods testified the only change in his diagnosis after Petitioner finally admitted being present during the murders was to add an Axis II diagnosis of dependant personality disorder. (H.Tr. 4404).

98

did not prevent Petitioner from telling both Dr. Hutchinson and Dr. Logan that she was not present at the murders. (Dr. Hutchinson – H.Tr. 4104-4107; Dr. Logan – H.Tr. 3563).

Moreover, the testimony Petitioner's experts would have allegedly provided, had they been allowed to testify about her state of mind at the time of the offense, was not materially different from the testimony provided at trial. Dr. Hutchinson admitted she testified at trial that Petitioner was impulsive, unable to get out of the relationship with DeGeus, a battered woman, suffered childhood abuse, tried to please people, suffered from depression and anxiety, and addressed many other topics which Petitioner claims trial counsel should have elicited. (H.Tr. 4112-18). Dr. Hutchinson only claimed she would have talked about these topics in more detail. (Id.). Dr. Logan agreed that at trial he testified about Petitioner's religious upbringing, exorcism, and beatings by DeGeus. (H.Tr. 3567, 3576). Dr. Logan testified he could have testified about PTSD (H.Tr. 3547), but admitted he did not diagnose her with PTSD. (H.Tr. 3576).[46] Dr. Logan also agreed that participating in murdering five people could be a traumatic event, and could have predisposed her to having a bipolar or depressive disorder. (H.Tr. 3577). In response to questioning by the Court, Dr. Logan admitted there is nothing he has learned since the trial that would have changed his trial testimony, unless one "accept[s] Dr. Woods' diagnosis that she had temporal lobe epilepsy . . .." (H.Tr. 3591). Finally, Dr. Cunningham testified at length during the habeas hearing and showed a number of additional slides he claims he would have presented, but all that was

---

[46] Regardless, Dr. Hutchinson testified Petitioner suffered from PTSD. (T.Tr. 3644-70).

99

cumulative to his already lengthy trial testimony.  In any event, none of Cunningham's slides were cut or his testimony limited because of restrictions on talking to Petitioner about her state of mind at the time of offense.

Further, any testimony by the trial experts about Petitioner's state of mind at the time of the offense would have been impeached.  Methamphetamine use can affect the results of mental health testing.  (H.Tr. 3429-32).  Petitioner was a heavy user of methamphetamine for seven years after the murders.  Further, Petitioner attempted to commit suicide, cutting off oxygen to the brain, which also can affect test results.  (H.Tr. 3435-36).  Thus, any tests results could, and most likely would, have been different as a result of these intervening events, making it impossible for any expert to state whether Petitioner's mental health impairments had any impact on her state of mind in 1993.

Petitioner's reliance on Dr. Young's examination is misplaced.  According to Dr. Young, she claimed all the mental impairments she found in Petitioner existed prior to age 14.  (H.Tr. 4548-49).  These mental impairments would have manifested themselves as impulsivity, poor judgment, and inappropriate behavior.  (Id.).  The problem with this, however, is that Petitioner did not exhibit these behaviors as a child.  She did not have behavioral issues in school.  (H.Tr. 4416).  She did not get into trouble with the law as a juvenile.  (H.Tr. 4418; T.Tr. 3677).  Indeed, Petitioner's behavior as a young adult did not support Dr. Young's conclusion that she was unable to control herself because of mental disorders.  Petitioner always maintained employment while raising a child as a single mother, and was never convicted of a crime.  (T.Tr. 3678).  Petitioner's conduct in life simply does not support Dr. Young's claim she suffered mental impairments since childhood that affected her judgment or decision-making.

100

Petitioner's reliance on the neurological tests is unavailing. Dr. Merikangas agreed the MRI images showed damage from methamphetamine abuse, and admitted Petitioner's continued use of methamphetamine for seven years after the murder made it impossible for any expert to know what her brain looked like at the time of the murders. (H.Tr. 4053). Moreover, Dr. Merikangas testified there was no way to claim any brain damage from methamphetamine use reflected on the MRI scans can be said to have caused Petitioner to exercise bad judgment. (H.Tr. 4055). The EEG and PET scans were deemed normal by the medical doctors who conducted the tests. (H.Tr. 4051). Dr. Woods had his associate, Dr. Merikangas, give a second opinion when he did not like the opinions of the doctors who performed the tests. (H.Tr. 4048). Dr. Merikangas then, not surprisingly, claimed to see things on the images that the other doctors did not. This testimony should be rejected. To begin with, Dr. Merikangas used 2011 technology, not technology available in 2005, and the technology today "has changed such that [one] can see subtleties better now than with the computer technology than [one] could have five years ago." (H.Tr. 4048). Further, his opinion lacks credibility because of his association with Dr. Woods and the manner in which he was hired and because it is inconsistent with the findings of two other medical doctors with no motivation in this case.

Finally, Petitioner's reliance on Dr. Woods does not help her. The credibility of Dr. Woods' findings in their entirety is called into question by his "outlying"[47] opinions that Petitioner was incompetent at the time of trial and was unable to appreciate the

---

[47] Dr. Logan agreed Dr. Woods' opinion that Petitioner could not appreciate the wrongfulness of her conduct as an "outlier." (H.Tr. 3590-91).

101

wrongfulness of her conduct at the time of the murders.[48]  Dr. Woods conclusion that

Petitioner was incompetent at the time of trial is completely unsupported by the

evidence, including the testimony of all three of her trial attorneys.  Similarly, Dr.

Woods' opinion about Petitioner's state of mind at time of offense is pure speculation.[49]

Even Petitioner's expert Dr. Logan admitted, in response to questioning by the Court,

he could not defend Dr. Woods' conclusion about what was in Petitioner's mind at the

time of the offense.  (H.Tr. 3470-71).

A review of Dr. Woods' various and evolving diagnosis further demonstrates his

testimony lacks credibility.  Dr. Woods initially diagnosed Petitioner with having suffered

seizures and loss of consciousness, but later retreated from that claim, apparently

because it was unsupported by the other experts and the brain imaging.  (H.Tr. 4430-

4433).  Between his report dated October 5, 2009, and his amended report dated May

26, 2011 (the latter drafted during the middle of the habeas litigation), Dr. Woods added

a diagnosis of cognitive disorder NOS.  (Exhibit 107).  Neither Dr. Woods' report nor his

testimony distinguished this diagnosis from the cognitive impairments he asserted led to

his bipolar diagnosis.  Rather, it appears Dr. Woods added this diagnosis because it

---

[48]  Another reason to question the reliability of Dr. Woods' opinions is that his diagnosis of Petitioner's current condition was significantly at odds with the testimony of her treating psychologist from the bureau of prisons.  (H.Tr. 4621-38).  Dr. Kempke testified Petitioner was "usually one of the most well-put-together people there" (H.Tr. 4645), and diagnosed Petitioner has only suffering from dysthymia, which is a very low level of depression.  (H.Tr. 4626-27).

[49]  Dr. Logan admitted there was nothing about Petitioner, even if she suffered frontal lobe damage, that would have prevented her from understanding the wrongfulness of murdering five people.  (H.Tr. 3587-89).

102

was Dr. Gelbort's provisional diagnosis.

The evidence does not support Dr. Woods' diagnosis that Petitioner is bipolar. Petitioner's psychiatrist in 1996 did not diagnose Petitioner as bipolar. None of Petitioner's trial experts diagnosed her as bipolar. Dr. Young did not diagnose her as bipolar. Only Dr. Woods did so. A bipolar diagnosis requires one or more manic episodes lasting some time period. (H.Tr. 2126). In making the diagnosis, however, Dr. Woods failed to identify any manic episode. Dr. Hutchinson conceded there were no manic episodes other than when Petitioner was using methamphetamine, which can cause manic behavior. (H.Tr. 4126-28; 3579-80). Dr. Martell testified there was no evidence of a manic episode that would support a bipolar diagnosis. (H.Tr. 4691-92). That leaves Petitioner with only the depression side of a bipolar disorder diagnosis. Petitioner suffered no prejudice, therefore, because trial counsel elicited expert testimony that Petitioner suffered from depression.

Dr. Woods attributed the bipolar disorder to the medical condition of temporal lobe dysfunction. He based this conclusion on: 1) IQ test results showed disparity between the left and right sides of Petitioner's brain; 2) claims Petitioner's left leg shook uncontrollably; and 3) brain imaging as interpreted by Dr. Merikangas. The unreliability of the last basis for attributing Petitioner's alleged bipolar disorder to temporal lobe dysfunction was addressed above. Further, Dr. Martell testified there was no evidence to support the diagnosis. (H.Tr. 3693). The alleged IQ test disparity does not support the diagnosis either. The disparity found by Dr. Gelbort when he provided some tests to Petitioner disappeared when Dr. Young tested Petitioner. (Exhibit PPP, pp. 9-10). Finally, the evidence Petitioner's left leg shook uncontrollably is, at best, unreliable. Dr.

103

Gelbort did not note any leg shaking when he met with her. (H.Tr. 3435). Petitioner did not elicit testimony from Dr. Logan, Dr. Cunningham, or Dr. Young that they observed Petitioner's leg shaking during their examinations, and their reports have no such reference. Dr. Hutchinson noticed Petitioner's shaking her leg at one point during one of her interviews, but admitted it could be a result of anxiety. (H.Tr. 3649). Dr. Martell observed Petitioner shook her leg intermittently when he interviewed her in 2005, did not observe her do it when he interviewed her in 2010, and observed she shook her leg "at times" during the interview in 2011 when she was "upset or stressed." (H.Tr. 4767). Dr. Martell concluded this was anxiety-driven behavior and not indicative of an underlying neurological problem. (H.Tr. 4767, 4885-87)).

Dr. Woods diagnosed Petitioner as having Posttraumatic Stress Disorder. Petitioner suffered no prejudice, however, because trial counsel presented testimony that Petitioner suffered PTSD. (T.Tr. 3644, 3650, 3653, 3655, 3670).[50] In any event, this diagnosis has problems as defense experts admitted that participating in the murders of five people could cause "trauma" giving rise to PTSD. (Dr. Hutchinson – H.Tr. 4128; Dr. Logan – H.Tr. 3577). Further, Petitioner's report of what caused her trauma varied widely over the years. Dr. Martell did not diagnose Petitioner with PTSD when he examined her in 2005. (H.Tr. 4681). In 2011, Petitioner claimed the source of her trauma was the threats made by Honken to kill her if she resisted the murders.

---

[50] Petitioner may claim there is a significant difference between Dr. Hutchinsons' trial testimony that Petitioner suffered PTSD and Dr. Woods' testimony that Petitioner suffers from "complex" PTSD. If so, that does not help Petitioner because Dr. Hutchinson testified she could have, but did not, diagnose Petitioner with complex PTSD in 2005, and did not bring this diagnosis to the attention of trial counsel. (H.Tr. 4114-15).

104

(H.Tr. 4681-82).  Even assuming Petitioner told the truth to Dr. Martell, it would have not assisted her mitigation presentation because she could not have been suffering from PTSD at the time of those murders – the alleged traumatic event occurred simultaneous to the murders.

Dr. Woods also diagnosed Petitioner as having a dependant personality disorder.  No other medical professional has ever diagnosed her with dependant personality disorder.  Indeed, Dr. Woods did not diagnose her with this disorder until after his third interview (which took place after the habeas litigation was under way and where habeas counsel were present) during which Petitioner allegedly admitted her involvement in the murders.  (H.Tr. 4404).  The ground upon which Dr. Woods built this opinion is made of shifting sands.  Dr. Woods admitted Petitioner has a history of lying.  (H.Tr. 4400-4401).  He further admitted that self-reporting by defendants in capital cases is the least reliable source of information there is.  (H.Tr. 4494).  Moreover, Petitioner's alleged "admission" to Dr. Woods was full of lies.  One glaring example is that Petitioner claimed to have no involvement in the burial of the murder victims' bodies and to have not even seen where they were buried, but Dr. Woods could not explain how it was she later drew maps showing the location of the bodies and wrote detailed descriptions of the order and manner in which the victims' lay in their graves.  (H.Tr. 4456).  Critical to Dr. Woods' diagnosis of dependant personality disorder, however, is his crediting of Petitioner's claim that Honken threatened to kill her and her daughter if she resisted his actions.  This claim by Petitioner carries no credibility.  Petitioner confessed her involvement to her best friend, Christy Gaubatz, but never once mentioned being threatened by Honken.  Petitioner confessed to Bobby

105

McNeese, but never once claimed Honken threatened her.  Petitioner left suicide notes for her family, but never mentioned she was threatened by Honken.  Petitioner alleges she agreed Honken's proffer statement was a correct version of the events, but that version says nothing about Honken threatening to kill her.  The claim Honken pressured her and threatened her to stand by and not resist the murders is a fabrication born of desperation, which came during the middle of a prolonged habeas litigation, after Petitioner knew her attorneys had claimed trial counsel erred in not presenting evidence of dependant personality disorder.  For Dr. Woods to base a diagnosis on this incredible story falls below an objective standard of reasonableness for a medical professional.

Finally, in determining whether Petitioner suffered prejudice requires the Court to consider the implications had trial counsel elicited testimony about Petitioner's state of mind at the time of the offense.  As explained above, Petitioner's defense at trial was that she was merely present, did not act to aid and abet Honken in the murders, and did not know of his intent to murder anyone.  Had Petitioner presented testimony focused on whether she had mental impairments that affected her ability to make decisions in relation to the murders, it would have been completely inconsistent with her guilty phase defense that she was merely present.  It would have jeopardized any credibility her attorneys had and would have undercut her residual doubt mitigator.

## XXII.  COURT CLAIM NO. 35 – Failure to Prepare Mitigation: Failures Regarding Dr. Gelbort

Petitioner claims trial counsel were ineffective in their employment and use of Dr. Gelbort.  (PB 171-77).  Petitioner claims counsel delayed too long in hiring Dr. Gelbort,

106

failed to instruct him regarding the tests he should have performed, failed to follow his recommendations, failed to retain another neurologist when Dr. Gelbort refused to testify, and failed to have other experts use Dr. Gelbort's findings.  (Id.).

A.    Counsels' Performance Was Not Deficient

Counsel retained the services of a neuropsychologist, had him examine Petitioner, and received an oral report that was not helpful.  Dr. Gelbort indicated many of Petitioner's scores were "normal" and, although she had a "few weaker scores," her "absolute level of functioning was not too impaired."  (H.Tr. 3444, 3449-50).  Dr. Gelbort did not even reach a diagnosis for Petitioner; at most, he said the "data would lead to a diagnosis of cognitive disorder NOS."  (H.Tr. 3442).  While he hypothesized her brain would look like "little Swiss cheese," even then Dr. Gelbort said it was "not terrible." (H.Tr. 189).  When asked to produce a report reflecting his findings (H.Tr. 3440), he only sent a letter indicating when and how he examined Petitioner, but omitting any findings.  (H.Tr. 3440-41).  When contacted about testifying at trial, Dr. Gelbort was unwilling to do so, stating "there's nothing huge or useful, nothing useful, too much crap."  (H.Tr. 194-97).[51]  Counsel made the decision not to call Dr. Gelbort because "in light of the lack of supporting evidence I didn't think that finding was sufficient to warrant introducing him as a witness."  (H.Tr. 2977-78).  Gelbort's results were discussed with Petitioner's other experts.  (Dr. Logan – H.Tr. 3505-06, 3538-40, 3550;

---

[51]  Dr. Gelbort's testimony at the habeas hearing that Mary Goody just misunderstood him (H.Tr. 3444) is simply not credible.  First, his unwillingness to testify is corroborated by the fact he refused to provide his written findings, even when asked. Second, Goody was fully capable of understanding whether an expert was willing or unwilling to testify, and wrote contemporaneous notes that support her testimony.

107

Dr. Hutchinson – H.Tr. 3634-35; Dr. Cunningham – H.Tr. 3929-30, 3976).[52]

Trial counsel were not obligated to search out a different expert to get a better opinion. See, e.g., *Forsyth v. Ault*, 537 F.3d 887, 892 (8th Cir. 2008) (holding the Sixth Amendment does not require trial counsel to shop for favorable experts, and finding no ineffective assistance of counsel where trial counsel hired a mental health expert and chose to cut off the investigation without hiring additional experts or seeking further opinions); *Winfield*, 460 F.3d at 1041 ("Counsel is not required to shop for experts who will testify in a particular way, and penalty counsel's decision not to investigate this issue further was reasonable given the two concurring opinions of different doctors."); *Sidebottom v. Delo*, 46 F.3d 744, 753 (8th Cir. 1995) (holding mere fact trial counsel did not shop around for experts with more favorable opinion does not mean trial counsel was ineffective).

Petitioner asserts trial counsel should have obtained an MRI, PET scan or other diagnostic tests following Dr. Gelbort's examination, as suggested by Dr. Logan. (PB 171). Dr. Logan conceded, however, there is a risk in obtaining such tests when the neurologist reported there was much indication of neurological damage. (H.Tr. 3571-72). In fact, habeas counsel had the testing performed and the EEG and PET scan came back normal, according to the medical doctors who performed the tests. (H.Tr. 4051). Only Dr. Woods was not satisfied with the results, so contacted his associate Dr. Merikangas, who was apparently able to see things in the images the other medical

---

[52] Petitioner faults her trial counsel for failing "to provide the results" of Dr. Gelbort's testing to her other experts, but this overlooks the fact Dr. Gelbort was not cooperating and had refused to provide a written report of his findings.

108

doctors who perform EEGs and PET scans on a regular basis were unable to see. As for the MRI, it showed what one would expect from a prolonged abuser of methamphetamine, which was not helpful because no one can say what her brain looked like in 1993 before she continued to use methamphetamine daily for seven years. (H.Tr. 4053-55).

Trial counsel performed within reason when, based on unproductive mental health testing, they made the decision to stop further efforts in that area. A conscious decision not to pursue or introduce psychological evidence as a matter of trial strategy is "virtually unchallengable" in a collateral attack. *Link v. Luebbers*, 469 F.3d 1197, 1204 (8th Cir. 2006).

B.      Petitioner Has Failed to Demonstrate Prejudice

While Petitioner claims trial counsel were deficient in part because they delayed in hiring Dr. Gelbort, Petitioner had provided no evidence showing prejudice from the delay. Even assuming counsel should have hired Dr. Gelbort earlier, there is no showing the outcome of his examination would have been any different, or the delay prevented counsel from having more tests conducted or hiring a new neuropsychologist.

Petitioner has "significant obstacles" to prove she was prejudiced by trial counsel's decision to cut off further investigation of this part of her mental health issues. *Ringo v. Roper*, 472 F.3d 1001, 1006 (8th Cir. 2007), First, Petitioner has to show it was reasonably probable that if counsel would have retained the type of experts she claims they should have, they would have reached the same diagnosis. Id. Here, Petitioner hired Drs. Woods and Young, who variably diagnosed Petitioner with several different

109

mental health issues, none of which were cognitive disorder NOS.[53]  Indeed, Dr. Logan

testified "there's no real evidence to back up the cognitive disorder NOS."  (H.Tr. 3540).

Further, Dr. Young conducted tests similar to those Dr. Gelbort conducted, but the

disparity between brain hemispheres disappeared.  (Exhibit PPP, pp. 9-10).

Second, Petitioner would have to establish there was a reasonable probability

the mental health evidence would have altered the outcome of the penalty phase.  Id.

Even if Petitioner had presented the testimony of Dr. Young, the government would

have presented rebuttal testimony.  Dr. Martell thoroughly tested Petitioner, and had the

data from testing performed by Drs. Gelbort and Young.  Dr. Martell testified that Dr.

Gelbort's testing showed Petitioner had only minor impairments in abstract reasoning

and arithmetic achievement.  (H.Tr. 4773).  Dr. Martell testified the data shows

Petitioner as average to low average.  (H.Tr. 4774).  Dr. Martell testified that Dr.

Gelbort's test results did not show deficits in executive functioning.  (H.Tr. 4789).

Therefore, Petitioner has failed to demonstrate she was prejudiced by counsels'

alleged deficient performance.

**XXIII.  COURT CLAIM NO. 36 – Failure to Prepare Mitigation: Failure to Introduce Evidence of, and Give the Trial Experts Records Concerning, the 1996 Diagnosis of Petitioner With Depression and Dependent Personality Features**

Petitioner claims in the caption that her attorneys were ineffective because, in

part, they failed to provide her experts with mental health records from 1996.  Petitioner

implies the same allegation in the body of her brief by stating Ms. Goody "did not think

---

[53]  Only in the middle of the habeas litigation did Dr. Woods amend his diagnosis to add this disorder.

110

that [Dr. Logan] had the opportunity to review the records" and "Mr. Berrigan testified that he does not 'recall [the 1996] records] at all.'" (PB 178).  Petitioner further faults her counsel for failing to: 1) call the doctor as a witness; 2) use the diagnoses to "rebut[ ] any notion that petitioner's mental disorders were constructed after the fact," to show "these two particular diagnoses are consistent with petitioner's behavior before she was arrested, while she was in jail, and most of her life," and, 3) use the records to show the diagnoses "fit[ ] with [the defense] theme that she was dominated by Dustin Honken." (PB 177-78).

> A.    Counsel's Performance Was Not Deficient

Trial counsel used the records from Petitioner's brief treatment by a psychiatrist to the extent they could, and they are not as helpful as Petitioner now claims.  First, in 1996 Petitioner was diagnosed with depression, and the reference to a "dependent personality disorder" was provisional – it was not a diagnosis.  Moreover, Petitioner lied to the psychiatrist about her use of methamphetamine, which "could have misinformed that psychiatrist's diagnosis."  (H.Tr. 4401).

Contrary to Petitioner's claim, counsel provided both Drs. Logan and Hutchinson with the records, and both testified about them.  (T.Tr. 3329-31, 3357-58 (Dr. Logan); 3684-85 (Dr. Hutchinson)).  Further, trial counsel introduced the 1996 mental health records as exhibits at Petitioner's trial.  (T.Tr. 3331, Exhibits 2016 and 2020).  Neither Dr. Logan, nor Dr. Hutchinson diagnosed Petitioner with dependant personality disorder, such that the provisional reference to the disorder from 1996 was unsupported by Petitioner's own experts.  Indeed, even Dr. Woods did not diagnose Petitioner with dependent personality disorder until after his third interview of Petitioner.  (H.Tr. 4404).

111

Counsel could not use the records to establish "these two particular diagnosis [sic]" were consistent with her behavior and to "fit[ ] [the diagnosis] with [the] theme that [Petitioner] was dominated by Dustin Honken" (PB 178) because: 1) the reference to dependent personality disorder was not a diagnosis, and: 2) Petitioner's own experts did not diagnose her with dependant personality disorder.  Trial counsel did use the records to corroborate the experts' diagnosis that Petitioner suffered from depression.

Trial counsel were not ineffective because they investigated Petitioner's mental health history, obtained her medical records from 1996, provided those records to their experts, introduced the records into evidence as exhibits at trial, had Petitioner's experts testify about those records, and used that testimony to bolster the experts' diagnoses that Petitioner suffered from depression.

B.      Petitioner Has Not Show Prejudice

Petitioner claims of prejudice are without merit.

First, while Petitioner claims her 1996 doctor "could have testified about this earlier diagnosis, expanded upon the diagnosis, and explained how it applied to Ms. Johnson," (PB 177), habeas counsel did not call this doctor to testify at the hearing in this matter, nor did they secure a declaration from this doctor.  Petitioner called 56 witnesses during the hearing, and the Court granted Petitioner any time she needed to present evidence.  Petitioner has failed to establish what the doctor could have said and her assertion about what could have happened is pure speculation.

Second, Petitioner complains the information was provided in an untimely manner to Dr. Logan, but has provided no evidence regarding when he received the

112

records.[54]  Nor was there any evidence provided showing any delay in getting him the records negatively impacted his use of the records, his own diagnosis, or his testimony. Moreover, Petitioner failed to establish the records were provided to Dr. Hutchinson in a tardy manner, or that it had any affect on her diagnosis or testimony.

Third, while Petitioner claims the records would have been useful to rebut an allegation that her mental disorders were constructed after the fact, there was no such allegation at trial.  Regardless, counsels' introduction of the records and elicitation of testimony regarding them negated any such notion.

Finally, Petitioner cannot show prejudice on the theory these records would have supported her claim she was dominated by Honken.  As explained above, the reference to dependent personality disorder was a provisional diagnosis.  Further, it was not made in reference to Honken.  There is nothing in the 1996 records showing any linkage between the provisional diagnosis and Honken.  Most important, Petitioner's own trial experts did not diagnose her with the disorder.  They had the 1996 records, knew of the provisional diagnosis, had each repeatedly interviewed Petitioner, and knew far more about her and the case than the doctor who saw her in 1996, and yet neither diagnosed her with dependant personality disorder.  Thus, even had trial counsel attempted to push this provisional diagnosis as a ground for asserting it proved Petitioner was dependant on Honken, it would have failed.

---

[54]  Dr. Logan had the records at least as early as January 26, 2005, some five months before he testified, as he references them in a report of that date.  (MG004171, p. 22).

113

**XXIV. COURT CLAIM NO. 37 – Failure to Prepare Mitigation: Failure to Offer Expert and Lay Testimony that Angela Johnson Was Under the Substantial Influence of Dustin Honken**

Petitioner claims her trial counsel were ineffective for failing to introduce evidence she alleges would have shown she was under the substantial influence of Dustin Honken and thereby supported the statutory mitigating factor of minor participant and the non-statutory mitigating factor alleging Petitioner was under Honken's "substantial influence." (PB 178-86). In her brief, Petitioner expands this claim to untimely allege trial counsel should have introduced evidence showing that alleged influence at the time of the offense so as to support the statutory mitigating factor of duress. (PB 179).

A.      Counsels' Conduct Was Not Deficient

Petitioner concedes trial counsel made a strategic decision in their presentation of evidence regarding Honken's alleged influence over Petitioner, acknowledging "trial counsel erroneously thought that evidence of Mr. Honken's leadership was itself enough to show domination . . .." (PB 179). Petitioner is in the position to label the strategy erroneous only with the gift of hindsight. Viewing the decision from trial counsels' position during the trial, the strategy was not unreasonable. The evidence showed, and the government did not dispute, Honken was the leader and Petitioner the aider and abetter. The evidence showed Honken was the organizer and manager of the drug organization, planned the murders, and pulled the trigger on all five murders. Trial counsel elicited further testimony from Steve Vest about Honken's further planning and use of others to plot an escape from custody and murder more witnesses and law

114

enforcement personnel. (T.Tr. 2583-84, 2615-18). This, and other similar evidence at trial, was enough for a reasonable juror to conclude Petitioner occupied a minor role in the offense.

Petitioner claims trial counsel should have introduced "evidence that Ms. Johnson was susceptible to domination because of her mental and emotional deficits." (PB 180). Petitioner asserts "[c]ounsel had ample evidence regarding Dustin Honken's calculating nature, and his influence over, and ability to influence, Ms. Johnson . . .." (PB 181). Petitioner claims this evidence consisted of testimony by Fred Tokars about Honken's conduct in prison (PB 181-82), but this had nothing to do with his relationship with Petitioner and related to conduct long after the murders. Petitioner cites testimony by Cutkomp about Honken's influence over him (PB 182), but that again had nothing to do with whether Honken exercised the same influence over Petitioner.[55] Petitioner cites Cobeen's testimony about Honken's influence over Cobeen (PB 182), but again, Cobeen said nothing about Honken's influence over Petitioner.

Petitioner cites statements Petitioner made to government experts about her views of Honken's alleged manipulation of her (PB 182). None of those statements, however, addressed Honken's influence over Petitioner in committing the crime. Rather, she claimed he lied to her about other women, his drug dealing prowess, protecting her, and paying her back. She did not claim to be under his influence or that Honken coerced her to commit acts against her will. Moreover, evidence Petitioner

---

[55] While the evidence at trial showed Honken manipulated Cutkomp, there was no evidence Cutkomp was manipulative, threatening, or hot-tempered. That he was manipulated by Honken, therefore, does not mean Petitioner was too.

115

complained Honken put her in debt actually corroborated the government's evidence that Petitioner financed the methamphetamine manufacturing operations in the 1993-95 time period. Admission of this evidence would have undercut Petitioner's residual doubt mitigating factor.

Petitioner claims Dr. Hutchinson could have testified about Honken's influence (PB 182). Again, none of the statements cited by Petitioner had anything to do with Honken's alleged influence over Petitioner in committing the offense. Further, in her statements to Dr. Hutchinson, Petitioner only said Honken bragged he would become wealthy writing a book, but did not claim that bragging influenced any of her decisions. Moreover, when Petitioner told Hutchinson about Honken's alleged manipulation of her, it was in relation to Petitioner's claim she was totally innocent of the crimes and that Honken had allegedly manipulated her by telling her the locations of the bodies and so forth. (Exhibit HHH, p. 13).

Petitioner claims her family members could have testified about Honken's manipulation of Petitioner (PB 182-83). This alleged testimony, however, was limited to Petitioner's loaning of money to Honken (again, evidence that corroborated the government's claims) and otherwise vague[56] or speculative opinions.[57] None of this testimony, however, went to whether Honken exercised any influence over Petitioner in the commission of the crimes.

---

[56] Petitioner claims Holly Dirksen would have testified Honken "tried to make Ms. Johnson 'feel crazy'" (PB 182-83), whatever that means. Similarly, Petitioner claims her daughter would have testified she considered Honken to be a "bad influence." (Id.).

[57] Petitioner claims her daughter would have testified she believed her mother was Honken's "pawn," and someone Honken could manipulate. (PB 183).

116

Petitioner claims counsel should have introduced evidence Honken wrote "letters full of false flattery and protestations of love" and made similar phone calls. (PB 183). While Petitioner claims these expressions were false, she has no proof they did not reflect Honken's true feelings at the time. Honken could love Petitioner, while still being concerned she would inform against him.[58] Similarly, Honken's concern about Petitioner's mood after testifying in the grand jury does not mean he did not care for Petitioner.

Petitioner argues trial counsel could have introduced evidence about Honken's influence over other family members, friends, other women, and inmates. (PB 183-84). Petitioner overstates the nature of this evidence, as Honken only influenced his father and Cutkomp into committing criminal acts. While he schemed with other inmates, he did not influence any of them to actually act on his behalf and, indeed, many testified against him. Further, much of this alleged evidence occurred after the murders, and none of it would relate to what the relationship was like between Petitioner and Honken. That Honken was able to influence and manipulate others does not mean he was able to do so with Petitioner.

Petitioner claims Dr. Logan and Dr. Hutchinson could have testified about various "symptoms" they claim Petitioner exhibited which Petitioner then argues "could have been used as evidence of Mr. Honken's domination and Ms. Johnson's unique

---

[58] Calling Terry Bregar for the purpose of testifying Honken was concerned about Petitioner informing on him would have been disastrous. First, it would have further solidified that she knew of the murders. Second, Bregar would have testified Petitioner was involved in Honken's escape plot. (Honken Tr. 1402). The government did not present this evidence at Petitioner's trial, but would have if Petitioner had called Bregar as a witness.

117

susceptibility to that domination and influence." (PB 184). First, neither expert could have testified about Honken's domination as neither examined him. Second, evidence Petitioner was impulsive, had poor coping skills, etc., does not equate to being easily influenced by other people. In any event, had Petitioner introduced expert testimony she allegedly suffered from a dependent personality disorder, the government would have countered with its own expert testimony that Petitioner admitted to Drs. Dvoskin and Martell in 2005 that she has "more than an average temper. I get mad quick. I don't like being fucked (sic) with. I didn't have a temper with Terry, but I did have a temper with Dustin." (Exhibit RRR, p. 22). Dr. Martell would have testified there was no clinical evidence to support a diagnosis Petitioner had a dependent personality disorder. (H.Tr. 4686). Dr. Martell would have further testified that, to the contrary, Petitioner is "prone to manipulating others" (Exhibit PPP, p. 8).

Petitioner claims trial counsel should have used the 1996 mental health records and the provisional diagnosis of dependent personality disorder to support this argument. (PB 184).[59] Trial counsel introduced the 1996 mental health records as exhibits at Petitioner's trial, so the jury was aware of the provisional diagnosis. (T.Tr. 3331, Exhibits 2016 and 2020). Both Drs. Logan and Hutchinson testified about Petitioner's 1996 mental health examination. (T.Tr. 3329-31, 3357-58 (Dr. Logan); 3684-85 (Dr. Hutchinson)). Neither Dr. Logan, nor Dr. Hutchinson, however, diagnosed Petitioner with dependant personality disorder, such that the provisional reference to

---

[59] Petitioner cites to exhibit 131, a declaration by Nancy Pemberton regarding her interview of Dr. Lassise. The government objected to admission of this declaration as hearsay. (H.Tr. 4650-51). It is not a declaration by Dr. Lassise. Petitioner did not call Dr. Lassise as a witness. The Court should not consider exhibit 131.

118

the disorder from 1996 was unsupported by Petitioner's own experts.  Indeed, even Dr. Woods did not diagnose Petitioner with dependent personality disorder until after his third interview of Petitioner.  (H.Tr. 4404).

Petitioner further claims "[c]ounsel compounded [the failure to introduce alleged mental health evidence showing Petitioner was under Honken's influence] with his unreasonable introduction of evidence that another jury had sentenced Mr. Honken to death for two of the five killings."  (PB 180).[60]  Trial counsel made a strategic decision to introduce evidence Honken was sentenced to death for the murders of two adults.  Trial counsel reasoned that if the jury understood Honken, the principal offender, received the death penalty only for the children's murders, a jury would not be inclined to sentence Petitioner, an aider and abetter, to death.  (H.Tr. 1489-91; 2096).  This was a reasonable, strategic decision viewed from trial counsels' perspective at the time of trial, without the benefit of hindsight.[61]

B.      Petitioner Has Failed to Demonstrate Prejudice

Even if trial counsel had done what Petitioner claims they should have done, it would have made no difference because the totality of the evidence shows Petitioner was not dominated by Honken.  Petitioner fails to acknowledge all the evidence showing she was not influenced by Honken – indeed, that she was able to influence him – that she was a hot-tempered, violent, manipulative, controlling person.

The evidence showed Petitioner went around her ex-boyfriend, DeGeus, to his

---

[60]  Petitioner inserted this same argument in Claim 19.

[61]  Petitioner's expert, Richard Burr, conceded as much, acknowledging the decision "is two edged."  (H.Tr. 784).

119

source of supply, Honken, and persuaded Honken she could do a better job selling methamphetamine than DeGeus, whom she claimed was using too much of the product. (T.Tr. 857-58). Petitioner manipulated Gaubatz to use her car and babysit Petitioner's child when she and Honken hunted for Nicholson, and to unknowingly store the murder weapon. (T.Tr. 563, 580-83, 871, 585-86, 599-601). Petitioner manipulated DeGeus into meeting with her and traveling to a remote site, luring him to his death. (T.Tr. 611-614). Kathy Rick testified Honken told her that he was not strong enough to leave Petitioner because he knew what she was capable of, and opined that Honken was afraid of Petitioner. (T.Tr. 2641-42). Petitioner threatened Honken's other girlfriend on several occasions. (T.Tr. 2638-40). Dan Cobeen testified that before Honken could let him help in the methamphetamine manufacturing operation, he had to be interviewed and approved by Petitioner. (T.Tr. 684-88). When Honken was arrested, Petitioner threatened his brother. (T.Tr. 369). After Petitioner learned Cobeen cooperated with law enforcement authorities, she threatened him. (T.Tr. 708-710). Petitioner pushed Honken to kill Cobeen after they learned he had cooperated with law enforcement officers. (Tr. 908-910, 914-15, 929). Alyssa Nelson testified Petitioner had a horrible temper, flew into rages, pointed a gun at Honken, and at Honken's sentencing hearing made threats about "getting" prosecutors and agents. (T.Tr. 2678-79, 2682-83). Petitioner's ex-husband admitted on cross examination that Petitioner was hot-tempered and threatened to harm him over custody of their daughter. (T.Tr. 3210-11). After police searched defendant's ex-husband's house, Petitioner left threatening messages on the police chief's answering machine. (T.Tr. 3613-14).

120

Tim Cutkomp is again one of the best sources of information about the relationship between Petitioner and Honken as he was both Honken's best friend and confidant, and was involved in the methamphetamine operation with Honken and Petitioner.  Cutkomp testified that Petitioner gave him instructions about what to do if questioned by the police.  (T.Tr. 866).  Cutkomp reported that Petitioner gave Honken a "hard time about not being able to manage money."  (T.Tr. 870-71).  After Petitioner invested money in the meth operation, she told Honken to "hurry up and get done" so she could get her money back.  (T.Tr. 890).  When it was learned Cobeen was an informant, Petitioner told Honken to "take care of whatever needed to get done," which Cutkomp understood meant to kill Cobeen.  (T.Tr. 908-909).  Honken told Cutkomp he did not want to involve Petitioner in Cobeen's murder because "she was too much of a hot head and just wants to go do – just do it."  (T.Tr. 909).  When Cutkomp cooperated, he recorded a conversation with Honken during which Honken said it was hard to get Petitioner to do anything and that she was too impulsive, throwing light on what occurred during the murders three years earlier:

> Honken:    Yeah, if I'm in jail, then you're right down at the end of the rope with me. So I can't get thrown back in Linn County or I'm in bad shape. We both are then.  'Cause you ain't going to do nothing.  So, (unintelligible) back to me, obviously.
>
> Cutkomp:    I would, would anyone else?
>
> Honken:    Maybe.  Probably, but it's so hard to get that person to do anything. They're all so bitchy about it.  Well, hurry up.  I ain't gonna fuck around all day.  I'm gonna do it right now, you know.  You know, they will, they just want to go.  I don't want it like that.
>
> Cutkomp:    So she'd just go up and – right there at the door, huh?
>
> Honken:    Yeah, (unintelligible).  Yeah, that person probably would, but I'd be,

121

> I'd be scared with that one. And, uh, that, that one's too bold, doesn't like to plan things out, doesn't like to take time. Likes to hurry, everything right now. That's when you end up in bad shape.

(Exhibits 203 and 203A p. 17; T.Tr. 920-932). Cutkomp testified that, when asked by agents whether he was afraid of cooperating, he responded that he was most afraid of Petitioner because she was pushing Honken to act, and believed that "absent Angela Johnson pushing Honken that he might not go through with" the murders. (T.Tr. 914-915).

Perhaps the best evidence of Petitioner's controlling personality and that she was not under the domination of Honken, however, was the testimony and videotape showing Petitioner hiring an undercover agent to "put a world of hurt" on one of her drug dealers, at a time when Honken was far away in prison. (T.Tr. 2721-2734, and Exhibits 1120 & 1120A).

Finally, all of the evidence of Petitioner's violent, controlling behavior, of course, had to be contrasted with the evidence at trial about Honken being a thin, nerdy, bookish, and (until he met Petitioner) nonviolent man. (T.Tr. 275, 323, 830-31, 1038, 2641-42, 2669, 2672, 3080, 3184, 3203, 3255, 3701).

Therefore, Petitioner suffered no prejudice. Additional attempts by trial counsel to suggest Petitioner was under Honken's domination would have failed, as the evidence simply does not support the contention.

122

**XXV. COURT CLAIM NO. 38 – Failure to Prepare Mitigation: Failure to Introduce the Statement of Phyllis Prosovec [sic][62] to Support Residual Doubt**

Petitioner asserts her trial counsel were ineffective for failing "to present evidence of the statements of Phyllis Proscovec at the penalty phase of trial" in support of a residual doubt mitigating factor. (PB 186). Petitioner's claim is without merit.

A.    Proscovec and Her Statements

Phyllis Proscovec was a next-door neighbor of Lori Duncan and her little girls. More than three and a half years after the Duncan family was murdered,[63] Special Agent Bill Basler interviewed Proscovec. At the time of the interview, Proscovec was 62 years old.[64] Basler testified Proscovec did not seem to be mentally well. (H.Tr. 2750). Basler believed "some of the things she told me during that interview really didn't make a lot of sense." (Id.). For example, Proscovec claimed to remember the day the Duncan family disappeared "quite clearly" because "that Monday morning at approximately 7:50 a.m., Proscovec had gone over to Lori's house to get the kids up for school which she normally did" because Lori had to leave early for work. (Doc. 824-11, page 3). This made no sense because the murders occurred in late July when the children were not in school. It "[w]asn't a very long time" after Basler interviewed Proscovec in February 1997 that she "was placed in a nursing home." (H.Tr. 2751).

---

[62] The correct spelling, Proscovec, will be used in this brief.

[63] Petitioner argues the Proscovec interview "has indicia of reliability, in that Proscovec was an apparently unbiased witness who was interviewed soon after the events at issue . . .." (PB 188) (emphasis added). Petitioner is simply wrong. Proscovec was not interviewed until February 23, 1997. The Duncans were murdered on July 25, 1993, some three years and seven months before the interview.

[64] Case No. 01-cr- 3046, Doc. 824-11 (Proscovec's was born in 1934).

123

Proscovec died on August 24, 2002.

Proscovec stated that on the night before the Duncan family disappeared, she had been invited to Lori's home for coffee and cake. (Doc. 824-11, page 4). Proscovec stated she had gone to Lori's house between 7:30 and 8:00 p.m. and stayed for approximately an hour. (Id., at 4-5). Proscovec went to bed after watching the news, but "shortly thereafter" Lori called "and asked if Lori could come over to Phyllis's house which she did." (Id., at 5).[65] "When Lori arrived, [Proscovec] stated that she [Lori] was crying and commenting that Greg did not want her anymore." (Id.). Proscovec said "Lori stayed for a while longer and then went home." (Id.).

### B. Counsels' Performance Was Not Deficient

Petitioner claims trial counsels' performance was deficient because they should have interviewed Proscovec before she died. This is unreasonable. There was no way for counsel to predict Proscovec would die. She was not elderly and there was nothing in Basler's interview report suggesting she was in bad health. While with hindsight we now know Proscovec would not be around to be interviewed at a later date, there was no reason to know that at the time. There were hundreds of potential witnesses in the case and many with far more knowledge about the case than Proscovec.

Nor was it unreasonable that trial counsel did not introduce Proscovec's statement during the penalty phase of trial. The statement was uncorroborated by any other evidence. Contrary to Petitioner's claim, the note left on Proscovec's door in no

---

[65] Petitioner got this key fact wrong. She claims: "Shortly thereafter, Lori telephoned Proscovec, asking if she could come to her (Lori's) house. Ms. Proscovec went to the Duncan residence . . .." (PB 187). That is not what Proscovec stated.

124

way corroborates Proscovec's statement.  (PB 188).  The note said nothing about fighting with Greg, or referenced their prior conversation that night.  There was no testimony that Lori and Greg were having any relationship problems.  As previously mentioned, Proscovec's statement made no sense when she said she went to Lori's house to get the kids up for school because they were not in school in July.  Finally, the evidence overwhelmingly showed Petitioner participated in the murders.  For counsel to have introduced an uncorroborated, and nonsensical statement from a dead woman and hold it out as exculpatory evidence would have jeopardized their credibility before the jury.

Furthermore, while Petitioner keeps claiming Proscovec's statement contradicts the government's theory of the case, it does not.  Petitioner has yet to provide any explanation for how it contradicted the government's version of events.  The timing of the alleged visit by Lori to Proscovec's house was not inconsistent with the timing of the kidnapping and murders.  Proscovec was not firm in her statement about what time Lori came to her house, other than it was after the news, or about how long she stayed.  The government did not have, or argue, a time-certain when Petitioner made entry into the Duncan home, when the family was kidnapped, or when they were all murdered.  The statements Petitioner and Honken made to others about what happened did not put a firm time on the events – just that it occurred that night.  Christy Gaubatz did not have a firm time either, testifying Honken and Petitioner left at 4:00 or 4:30 p.m. and returned about 5:00 a.m.  (T.Tr. 584-586).  Therefore, it was completely possible for Lori to have gone to Proscovec's house after the news, stayed there a short time, and returned home before Petitioner showed up at Lori's house and stuck a gun in her face.

125

Finally, had Petitioner offered Proscovec's interview during the penalty phase to suggest the murders did not occur as proven by the government, it would have been inconsistent with her guilt phase defense which was premised on an assertion that she was "merely present." See ABA Guideline 10.10.1 (advising "[c]ounsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies.").

### C. Petitioner Has Failed to Demonstrate Prejudice

Though Petitioner first faults trial counsel for failing to interview Proscovec before she died, Petitioner cannot establish Proscovec would have provided more or different information than she provided in the interview with Basler. Nor can Petitioner demonstrate interviewing Proscovec would have led to any other evidence. Petitioner has made no showing of how merely interviewing Proscovec before she died would have caused any change in her case or trial, let alone the outcome of the penalty phase.

That leaves Petitioner with the need to establish that trial counsels' failure to introduce the interview into evidence caused her prejudice. Petitioner cannot do so. First, as explained above, Proscovec's statements about the timing of her visits with Lori Duncan were not inconsistent with the government's evidence of when Petitioner made entry into Lori's home, kidnapped her children, and aided in their murders. Further, the government could have also called into question the reliability of Proscovec's memory regarding the exact timing of the visits by presenting Basler's testimony that Proscovec did not appear to be mentally well.

126

**XXVI. COURT CLAIM NO. 40 – Failure to Prepare Mitigation: Failure to Impeach Steven Vest by Presenting Evidence That Honken Lied About Petitioner's Role in the Offenses to Support Residual Doubt**

Petitioner claims her trial counsel were ineffective because they failed "to offer Dustin Honken's letters to impeach the penalty phase testimony of Steven Vest and support the lingering or residual doubt mitigator." (PB 189). Petitioner claims these letters were exculpatory because Honken claimed Petitioner was innocent, and they could have been used to impeach the testimony of Steve Vest, who repeated incriminating statements made by Honken. (Id.).

A. Counsel's Performance Was Not Deficient

While Petitioner claims the Honken letters are exculpatory, they are not. While Honken purports in the letters to have information that would help impeach government witnesses, to have a "Silver Bullet" for her defense, he does not disclose what any of this information is. He only claimed to have evidence that could be useful. It is clear from the context of the letters that Honken was referencing a series of written statements he solicited from other inmates in prison purporting to attack the credibility of other inmates who would testify about statements Honken made. For some reason, Honken believed these witnesses would help defeat the charges pending against Petitioner. Moreover, Honken never stated in the letters that Petitioner is innocent of the charges. Honken did not state that Petitioner was not involved in the murders. He did not claim someone else committed the murders. The closest thing to an exculpatory statement is when he wrote Petitioner "has done nothing but be good supportive girlfriend to me and a wonderful mother to our daughter." (Exhibit 10, at 2) (emphasis original). Of course, the government would argue Petitioner supported

127

Honken by helping him gain entry into the Duncan house, kidnap and murder four people, and three months later lure DeGeus to his death.

While Petitioner claims "[t]here was no valid tactical or strategic reason not to" use the letters (PB 192), to use the letters would have been tactically unwise. The letters themselves provide no exculpatory evidence – only Honken's claims that he had exculpatory evidence. For counsel to offer the letters, yet have nothing to back them up, would jeopardize the lawyers' credibility with the jury. Indeed, it would suggest to the jury that if there had been anything to back up Honken's vague claims of having evidence, it would have been presented. Further, the tone of the letters suggest Honken had a plan to evade justice, not do justice. They suggest he has some plan to obfuscate the truth, not reveal the truth.

Finally, had Petitioner offered Honken's letters during the penalty phase to suggest the murders did not occur as proven by the government, it would have been inconsistent with her guilt phase defense which was premised on an assertion she was "merely present." See ABA Guideline 10.10.1 (advising "[c]ounsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies.").

B.      Petitioner Has Failed to Demonstrate Prejudice

Petitioner asserts the evidence would have supported the residual doubt mitigator, and had counsel introduced Honken's letters, at least one juror would have voted for a life sentence. (PB 189 & 192). Even assuming Honken's letters would have persuaded a juror what he told Vest about the murders could not be trusted, it would not have supported a residual doubt mitigator.

128

As explained above, Honken's letters did not exculpate Petitioner. On the other hand, the evidence before the jury overwhelmingly showed Petitioner's guilt. Vest's testimony was useful to clarify Petitioner's role in the offense, but was not at all necessary to establish her guilt. In evidence were Petitioner's admissions to Christy Gaubatz, McNeese, and several jail inmates about her involvement in the murders. The jury had evidence Petitioner bought the murder weapon. The jury knew she drew maps to the locations of the murder victim's remains. The jury heard Petitioner admitted to her sister she lured DeGeus to his death. Thus, even if a juror had doubts about the accuracy of Honken's description of the murders, it would not have led a juror to doubt Petitioner's guilt.

**XXVII.  COURT CLAIM NO. 41 – Failure to Prepare Mitigation: Failure to Introduce Petitioner's Offer to Plead Guilty as Evidence in Mitigation**

Petitioner asserts her trial counsel were ineffective for failing to present evidence Petitioner offered to plead guilty as mitigating evidence. (PB 195-96).

A.  Counsels' Performance Was Not Deficient

Trial counsel apparently researched whether an offer to plead guilty was admissible, and concluded it was. (H.Tr. 1467-68). Trial counsel testified the decision not to offer such evidence was a tactical decision. (H.Tr. 1470-71). Thus, counsel did not fail to research or consider using the evidence in mitigation, but, rather, made a conscious decision not to offer the evidence. That decision was not unreasonable.

Regardless of trial counsel's confidence in his research, the law was not at all

clear (nor is it currently clear)[66] that a defendant's offer to plead guilty is admissible as mitigating evidence. Petitioner claims "[t]here is ample authority for the proposition that offers to plead guilty are appropriate mitigating evidence." (PB 195 n. 55). In support, however, Petitioner cites only two cases, *Rodriguez* and *Fell*. In *United States v. Rodriguez*, 581 F.3d 775, 800 (8th Cir. 2009), the reference to the district court's admission of the plea offer as mitigating evidence is dicta – the issue of whether it should have been admitted was not before the Eighth Circuit Court of Appeals. Moreover, that decision was issued four years after Petitioner's trial. The only reported federal case in existence at the time of Petitioner's trial approving admission of a plea offer was *United States v. Fell*, 372 F. Supp.2d 773, 785 (D. Vt. 2005). That case was decided on May 26, 2005, after the guilt phase in Petitioner's case had concluded. On the other hand, in *Gonzalez v. Secretary for the Department of Corrections*, 366 F.3d 1253, 1282 (11th Cir. 2004), the court in dicta expressed skepticism there is anything at all mitigating about a defendant's offer to plead guilty. While there are a few other federal habeas cases which mention, in dicta, that the lower state courts admitted defendants' offers to plead guilty, they turn on state law (such as in Arizona, which specifically provides that an offer to plead guilty is considered mitigating evidence). Thus, the state of the law in the spring of 2005 was, at most, ambiguous as to whether a defendant's offer to plead guilty would be admissible in mitigation.[67]

---

[66] In *United States v. Caro*, 596 F.3d 608, 634-35 (4th Cir. 2010), the Court held a defendant's offer to plead guilty to an offense carrying less than the death penalty was not admissible as a mitigating factor).

[67] Petitioner misleadingly references testimony by Berrigan regarding a letter by Reinert, asserting: "In fact, the former prosecutor in this case, Patrick Reinert, told trial

130

In any event, Petitioner hardly made an offer to plead guilty to a life sentence. It is telling that no where in Petitioner's brief does she identify what plea offer she's talking about. Petitioner references negotiations involving Spies (PB 196), but there the only offer made was by Honken – there was no actual offer by Petitioner. The closest thing to a plea offer by Petitioner was the letter sent by Berrigan which came during jury selection. Up until jury selection, Petitioner was not willing to admit anything and continued to seek an *Alford* plea. While Berrigan provided an attorney proffer in an effort to secure a life sentence, it was not Petitioner's proffer. The government would have, in rebuttal, emphasized Petitioner's half-hearted efforts as demonstrating an absence of acceptance of responsibility and remorse. It would have also opened up the door to evidence by the government of why it rejected Petitioner's "offer," which included its conclusion that Petitioner was unwilling to admit to her true involvement and role in the murders. Thus, had counsel attempted to introduce evidence Petitioner allegedly had offered to plead guilty, it would have unleashed a torrent of rebuttal evidence by the government. (H.Tr. 1473-74 – Stowers recognizing the admissibility of the government's position).

### B. Petitioner Has Failed to Demonstrate Prejudice

Petitioner suffered no prejudice, even assuming counsel should have presented evidence of her alleged plea offer. If Petitioner offered evidence of the attempted joint

---

counsel that 'any guilty plea if somehow the deal fell through would be a factor in mitigation.'" (PB 195-96). Berrigan's testimony referenced a letter from Reinert dated June 10, 2003, which stated that if the defendant actually pled guilty to the murder charges, the fact she pled guilty would be mitigating even if the parties could not reach a plea agreement on the penalty. Reinert did not say an offer to plead guilty, without an actual guilty plea, would be mitigating.

131

negotiations involving Leon Spies on behalf of Honken, the government would have

pointed out that Petitioner made no actual plea offer herself at that time and was

insisting to a 20-year sentence.  The government would have contrasted Honken, who

at least attempted to make a proffer, with Petitioner who never proffered.  The

government would have pointed out that despite Honken proffering and offering to

plead guilty, the government rejected it and he was sentenced to death.  The

government would have further pointed out that Honken's proffer about Petitioner's role

was inherently unbelievable and inconsistent with the evidence.  If Petitioner had

offered Berrigan's letter sent during jury selection, the government would have pointed

out it was an attorney proffer, not anything from Petitioner herself.  The government

would have argued the attorney proffer minimized Petitioner's role and was inconsistent

with the evidence.  Whichever alleged offer Petitioner introduced, the government

would have emphasized there was nothing mitigating – that Petitioner had not admitted

her role, had not accepted responsibility, and had not expressed any remorse.  When

the jury had the full picture of any alleged plea offer by Petitioner, it would have no

impact on the outcome of the case.

## XXVIII.  COURT CLAIM NO. 42 – Failure to Prepare Mitigation: Failure to Present Evidence of Remorse Through Expert Testimony

Petitioner claims her trial counsel were ineffective for failing to present evidence

of remorse allegedly reflected in statements she made in an interview with government

experts.  (PB 197).  Petitioner asserts there was no strategic reason for the decision,

and that she was prejudiced by counsels' deficient conduct.  (PB 200-202).

132

## A.    <u>Counsels' Performance Was Not Deficient</u>

Trial counsels' conduct did not fall below an objective standard of reasonableness because there was no evidence of remorse.  Petitioner's statements to Doctors Dvoskin and Martell did not constitute expressions of remorse.  The question they posed to her was how she felt "about the fact that children were killed," in response to which she said she felt "terrible about it."  Petitioner was not asked "how do you feel about having participated in killing children."  Her response was not an expression of remorse over her conduct.  It was an expression about the death of children in the abstract, divorced from any conduct of her own in causing the death of children.  Further, her subsequent comments – about how she does not believe children should be spanked or abused – are insulting given the evidence of her involvement in killing children.  Jurors hearing this disingenuous claim by Petitioner about her abhorrence of violence against children would justifiably take umbrage at that claim, having just found her guilty of aiding and abetting the horrendous murder of children.  Furthermore, she acknowledged in that interview she knew it was wrong to kill children.  That undermined Petitioner's attempt during the penalty phase of trying to suggest her mental illnesses were mitigating.

This Court readily recognized the alleged "remorse" evidence could backfire.

Court:      Isn't it also true that five words, I feel terrible about it, when two kids were murdered at point blank range and buried for seven years could easily backfire?

Berrigan:   It could.  I think there are some jurors that might consider, well, if you felt terrible about it, there should be more than that.  There should be some other indication.

Court:      Yeah.  And just five words, I feel terrible about it, is so inadequate

133

in terms of expression of remorse that it could easily backfire.

Berrigan: It could, your Honor. . . . Some people might decide, you know, that's awfully too little too late or . . .

Court: Particularly when you're not accepting any responsibility for the murders of the children, to just say –

Berrigan: Yeah.

Court: – well, I feel bad kids were killed –

Berrigan: Right.

Court: – I mean –

Berrigan: Yeah, I agree with you, but I don't want to –

Court: It's a two-edged sword, isn't it?

Berrigan: I don't want – it is.  I don't want to pretend that I weighed that.

\* \* \*

Court: Well, let me ask it this way.  If this is all you had that you didn't put in, I feel terrible about it, would you agree with me even though you didn't weigh it that reasonable defense lawyers handling the mitigation phase in this death penalty case could disagree as to whether or not it was more helpful than harmful?

Berrigan: I agree with that if you'd allow me to add this caveat [that he would have still used it as an additional ground to persuade the court to give remorse as a mitigating factor].  That might have affected that equation where normally if I knew I was getting the instruction and that wasn't something I had to worry about, maybe a defense lawyer might not put in this evidence for the very fear that you're talking about: It could backfire.

(H.Tr. 2958-60).

Petitioner's reference to the alleged "confession" she made to Dr. Woods does not help her.  As explained in response to Petitioner's 1st and 34th claims, the alleged confession to Dr. Woods was false.  Petitioner claimed she was merely present and did

134

not knowingly participate in the murders. She claims she was threatened by Honken, a claim she never made when confessing to her best friend a year after the murders, or to McNeese seven years after the murders.

Petitioner relies on her alleged confession to Dr. Woods in May 2011, and her alleged expressions of remorse, as purported evidence she had remorse and to support her assertion that effective counsel would have hired someone like Dr. Woods to elicit and present evidence of remorse. (PB 199). To be clear, Dr. Woods interviewed Petitioner on August 5, 2009, August 6, 2009, June 16, 2010, and June 17, 2010, and Petitioner not only did not express any remorse, but, rather, flatly denied participating in the murders in any way. (H.Tr. 4438-4441). Only after this Court expressed skepticism of her claim counsel were ineffective for failing to work out a plea, in part because she had never admitted to the crime, and during an interview where habeas counsel were present, did Petitioner purport to admit to participating in the murders in some capacity. (H.Tr. 4441). Moreover, while Dr. Woods claimed in his report that Petitioner expressed remorse, his notes did not support that claim. Thus, the circumstances of this sudden "confession" suggest Petitioner had no real remorse about anything, but, rather, was persuaded by her attorneys she had to "confess" to something if there was any chance at all the Court would rule in her favor on the plea claim.

In any event, while Dr. Woods wrote in his report Petitioner expressed "remorse," that was only Dr. Woods's "impression," and not anything Petitioner said. When asked where in his handwritten notes it reflected Petitioner felt "overwhelmed, humiliated, and remorseful," Dr. Woods admitted "I think that was actually the impression that I received from her rather than the language that I received." (H.Tr. 4443). When asked to show

135

where in his notes it reflected Petitioner "expressed profound sorrow" for the victims, as he claimed in his report, Dr. Woods admitted "[t]hose words are not reflected in my notes, sir." (H.Tr. 4444).

Petitioner relies on the testimony of Professor O'Brien for the proposition that "counsel could have used their mental health experts to show Ms. Johnson's remorse," by having "an expert say she described the offense to me, and she was very tearful and can describe the recounting of it and the sobbing and the tears . . .." (PB 200). The problem with this argument is Petitioner never confessed to anyone of her attorneys or experts, let alone do so with tears and sobbing. The government understands Petitioner's retort is that this was because counsel was ineffective for barring her experts from asking her about the offense. This retort fails, however, for numerous reasons. First, that argument is raised in another claim: whether that decision was right or wrong, the fact remains trial counsel did not have an expert who reported Petitioner sobbed while talking about the offense, so they cannot be faulted with failing to present evidence they did not have. Second, the argument also fails because, though she was not supposed to, Dr. Hutchinson did ask Petitioner about the offense, and she again denied involvement. Third, the attorneys repeatedly asked about the offense, and she denied any involvement. There was no sobbing or tears in Petitioner's recounting of the murders with Dr. Hutchinson. Finally, Dr. Woods met with Petitioner over four days on two separate occasions in 2009 and 2010, during which Petitioner continued to deny participating in the murders. Only after three years, two habeas hearings, a comment by the Court that Petitioner has never confessed to the murders, and a joint meeting with habeas counsel and Dr. Woods, did Petitioner finally admit being present, and

136

allegedly showed some emotion.  This history demonstrates trial counsels' performance was not deficient.

Finally, had Petitioner attempted to introduce evidence she cried while being interviewed by her experts, the government would have presented testimony by Dr. Dvoskin or Dr. Martell.  Each would have testified that when they interviewed Petitioner, the only times she cried was when reported DeGeus raped her, when she talked about not getting to see her children, and when recounting that prospective jurors were being asked if they could "kill her."  (Exhibit RRR, p. 21).

B.        Petitioner Has Failed to Demonstrate Prejudice

Trial counsel presented evidence from which a juror could find Petitioner had some remorse.  Trial counsel relied on government counsel's concession in the guilt-phase closing argument that Petitioner had remorse (T.Tr. 4059), and upon evidence Petitioner cried while confessing to Christy Gaubatz (T.Tr. 3970, 4059), bawling and crying to her sister (T.Tr. 4059-60), nightmares about DeGeus's murder (T.Tr. 4060), and an attempted suicide (T.Tr. 4060).  That type of evidence – admission by the government, tears or sobbing to a friend and family members, and a suicide attempt – is far more credible and persuasive than alleged crying before a hired expert during an interview conducted for the purpose of making a mitigation presentation.

In fact, though neither the Court nor the government believed the evidence showed remorse, 3 jurors found Petitioner showed remorse for the murder of Nicholson and Lori Duncan, 5 for the murders of the children, and 4 for murdering DeGeus.  Though finding remorse, each juror still found death an appropriate sentence.  There is no ground for concluding any juror would have voted for a life sentence if counsel had

137

presented evidence Petitioner made a generalized statement to government experts that harming children is terrible. Indeed, some jurors who found remorse as a mitigator might not have done so after hearing that testimony. Likewise, there is no basis for finding questionable evidence by a defense expert that Petitioner cried when claiming she was merely present at the murders would have convinced any other jurors to find remorse as a mitigating factor, or having done so, would have voted for a life sentence.

## XXIX. COURT CLAIM NO. 43 – Failure to Prepare Mitigation: Failure to Elicit Evidence of the Effect of Petitioner's Execution on Her Family Members

Petitioner claims her trial counsel were ineffective for failing to have her family members testify about "how they would be affected if Angela Johnson were executed." (PB 202). Petitioner asserts such execution impact evidence is admissible, family members would have testified they would be affected, and Petitioner was prejudiced by the failure to present such testimony. (PB 202-206).

### A.     Counsels' Performance Was Not Deficient

Petitioner's premise, that the law clearly provided for admission of execution impact evidence, is flawed. The only federal cases Petitioner cites to support her claim were decided long after this trial.[68] While there are a number of federal cases prior to the 2005 trial which mention, in dicta, that execution impact evidence was offered in mitigation, there appears to be only one reported federal decision actually addressing

---

[68] Petitioner cites the decision in *United States v. Fell*, 2005 WL 1634067 (D. Vt. 2005), but the court issued that opinion on July 5, 2005, after the trial in Petitioner's case. In *Fell*, the district court noted that "[f]ederal courts have not directly considered mitigating evidence relating to the impact a defendant's execution will have on third parties." *Fell*, 2005 WL 1634067, at * 1.

138

whether such evidence is admissible.[69]  For some reason, Petitioner did not cite this case, *Marshall v. Hendricks*, 313 F. Supp.2d 423, 456-57 (D. N.J. 2004), where the court found state trial counsel was ineffective for failing to present execution impact evidence.  This, obviously, was not binding authority on this Court.  Nor did it establish it was the "standard of practice" in 2005 to offer such evidence.

The law since Petitioner's trial regarding the admissibility of execution impact evidence is not as clear as Petitioner portrays.  Petitioner's reliance on *Cullen v. Pinholster* and *Sinisterra v. United States* (PB 202-203) is misplaced, as neither court actually ruled on the admissibility of execution impact evidence.[70]  The Circuit Courts of Appeal appear to be split regarding the admissibility of such evidence.  Compare *United States v. Rodriguez*, 581 F.3d 775, 820 (8th Cir. 2009) (holding execution impact evidence is admissible in mitigation), with *Stenson v. Lambert*, 504 F.3d 873, 891-92 (9th Cir. 2007) (finding no error in denying admission of execution impact evidence, stating "Stenson cannot point to any federal case requiring admission of 'execution impact' testimony because there are no such cases."), and *Jackson v. Dretke*, 450 F.3d 614, 417-18 (5th Cir. 2006) (holding state court's refusal to allow execution impact evidence was not error, noting the Supreme Court has never ruled execution impact evidence is admissible).  District court opinions are similarly split.  Compare *United States v. Wilson*, 493 F. Supp.2d 491, 506 (E.D. N.Y. 2007) (denying government's

---

[69]  The only case Petitioner cites which actually predated her trial was the state case of *Oregon v. Stevens*.  (PB 203).

[70]  For some reason, Petitioner fails to cite *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009), which did hold execution impact evidence is admissible.

139

motion in limine to bar execution impact evidence), *United States v. Caro*, 433 F. Supp.2d 726, 727-28 (W.D. Va. 2006) (denying government's motion in limine to bar admission of execution impact evidence), and *Fell*, 2005 WL 1634067, at * 8 (finding execution impact evidence admissible), with *United States v. Umana*, 2010 WL 3023498, * 15 (W.D. N.C., July 27, 2010) (unpublished) (finding execution impact evidence inadmissible), *United States v. Taylor*, 583 F. Supp.2d 923, 944 (E.D. Tenn. 2008) (holding evidence of execution impact evidence was inadmissible mitigating evidence), *Crawford v. Epps*, 2008 WL 4419347, * 20 (D. Mass., Sept. 25, 2008) (unpublished) (finding court was not required to allow defendant to present execution impact evidence); and *Ayala v. Ayers*, 2008 WL 1787317, * 60-61 (S.D. Cal., April 16, 2008) (unpublished) (rejecting habeas petitioner's claim of error, finding lower court was not required to allow execution impact evidence).

Thus, the law was, and remains, anything but clearly established that execution impact evidence is admissible as mitigating evidence.[71]

Regardless, trial counsel were not ineffective because they presented evidence that clearly, and effectively, demonstrated the impact Petitioner's execution would have on her family. Trial counsel introduced photographs of Petitioner and her family members. (Exhibits 2033, 2037, 2039, 2044, 2045, 2049, 2050, 2068, 2074, 2080, 2081, 2084, 2089-92, 2095, 2097, 2100, 2101, 2103, 2105, 2117, 2145, 2147, 2148, and 2179 - 2183). These were clearly intended to engender sympathy for Petitioner's

---

[71] The government concedes, of course, if this case were tried today, the controlling authority in the Eighth Circuit Court of Appeals would dictate such evidence would be admissible.

140

family and telegraph the impact Petitioner's execution would have on them. Moreover, contrary to Petitioner's claim,[72] trial counsel did elicit testimony about how her execution would impact her family members.

Trial counsel presented testimony from Petitioner's mother about how much Petitioner's daughters loved Petitioner. (T.Tr. 3083). Petitioner's mother testified about how close she was with Petitioner, the "very good" relationship they have had since Petitioner has been incarcerated, how close they are now, and how, if sentenced to life, that would continue. (T.Tr. 3084, 3085-86). Counsel asked Petitioner's mother "how this decision respecting her punishment [whether Petitioner would be sentenced to death or a life sentence] would affect" her, and Petitioner's mother testified it "[b]reaks my heart." (T.Tr. 3084).

Petitioner elicited testimony from Petitioner's father about the impact her execution would have on her.

Q. This decision, you know, that's going to take place here soon, obviously you know what that involves.

A. Yes.

Q. Are you going to be affected by how that goes?

A. Yes, she's my daughter.

Q. If she's sentenced to a term in the penitentiary, are you going to maintain a relationship with her?

A. I'll be there until the day I die.

---

[72] Petitioner boldly claims "trial counsel failed to elicit this very powerful [execution impact] evidence from any of petitioner's family members during their penalty phase testimony." (PB 205). Apparently, Petitioner did not review the transcript.

141

(T.Tr. 3141).

Trial counsel elicited testimony from Petitioner's sister, Wendy, about how close they have been and how that relationship has improved since Petitioner has been incarcerated. (T.Tr. 3186). Counsel then asked about the impact Petitioner's execution would have on her.

> Q. This decision about the punishment, is that something that would affect you?
>
> A. Yeah, it would.
>
> Q. Do you – if she receives a sentence of imprisonment, would you continue to support, maintain contact with her?
>
> A. Oh, yes, yes, and I think at this point in time that's the only fair –
>
> Q. I'm not asking you to comment about the choice, though. Would you continue to maintain, keep close contact?
>
> A. Yes, I would.

(T.Tr. 3186).

Trial counsel called Petitioner's sister Jamie Jo Hayes, and elicited testimony about the good relationship she had with Petitioner, and the fact she was even raising Petitioner's youngest daughter. (T.Tr. 3388, 3392-93). Counsel elicited testimony about how close Petitioner's youngest daughter was to Petitioner, and how they have maintained a relationship despite Petitioner's incarceration. (T.Tr. 3389-92). Counsel also asked about the impact Petitioner's execution would have on her.

> Q. I want to finish by asking you just a couple of questions, ma'am, about the situation we're in here. You understand that this is a sentencing hearing.
>
> A. Yes.
>
> Q. Is this decision going to affect you in any way?

142

Q. Sure, it will.

Q. You said you've maintained contact with your sister. Has that been true over the last five years of her incarceration?

A. Correct.

Q. And do you intend to continue to do that if she's sentenced to a term of life imprisonment?

A. Of course. Of course.

(T.Tr. 3396-97).

Trial counsel called Petitioner's sister-in-law, who testified she has maintained contact with Petitioner despite the distance from her home and Petitioner's incarceration, and how she and her husband (Petitioner's brother) have provided financial assistance to ensure continued contact between Petitioner and her children because "those children need her." (T.Tr. 3433).

Counsel called Petitioner's brother as a witness, and elicited testimony from him about his relationship with Petitioner, their continued contact since she has been incarcerated, and how Petitioner loves her kids, him, and his wife. (T.Tr. 3456). Counsel then asked about the impact Petitioner's execution would have on her brother.

Q. This decision – obviously you understand that there's going to be a decision made as a result of the trial regarding the sentencing. Is that a decision that will affect you?

A. Could you say that again?

Q. This decision about what punishment your sister's going to receive, will that affect you?

A. Absolutely.

Q. If she is sentenced to a term of imprisonment, would you still be in contact with her?

143

Q. How long do you envision that occurring?

A. Until she dies or I die.

(T.Tr. 3457).

Trial counsel presented testimony from Petitioner's daughter, Alyssa, who testified about how close she was to her mother (T.Tr. 3921-25), how she "tremendously" missed her mother since she was imprisoned (T.Tr. 3926-27), and how important to her and her daughter (Petitioner's granddaughter) it was for Petitioner to get a life sentence so they could maintain that relationship (T.Tr. 3927).

Counsel also called Petitioner's youngest daughter, Marvea. (T.Tr. 3397-3422). While counsel never directly asked Marvea about the impact executing her mother would have on her, the way counsel presented her testimony was brilliant, and conveyed that message more effectively than if he had asked the question. The Court stated it has "often cited his direct examination of Marvea as the single best piece of lawyering [it's] ever seen . . . [a]nd thought it was the most powerful – I can't imagine more powerful mitigation than that direct examination. I just though it was – I mean, to me it was the Rembrandt of direct examination. I've never seen anything finer." (H.Tr. 1000).

Thus, trial counsels' performance was not deficient. Indeed, it was very good and effective. Contrary to Petitioner's allegations, trial counsel did elicit testimony about execution impact. And it had an effect. All 12 jurors found Petitioner maintained a strong bond with her children. (Doc. 593, factor 3). Six of the jurors found Petitioner had loving relationships with her mother, sisters, and brother. (Id., factor 11). All 12

144

jurors found Petitioner's execution would have a "profoundly disturbing effect on their young lives, now and for years to come." (Id., factor 13). Four of the jurors found Petitioner's mother, sisters, and brother "would suffer grievously should Angela Johnson be sentenced to death." (Id., factor 15). Though Petitioner now claims trial counsel should have elicited more such testimony, she cannot demonstrate counsels' performance fell below an objective standard of reasonableness.

### B. Petitioner Has Failed to Demonstrate Prejudice

Petitioner claims she was prejudiced because trial counsel did not elicit some additional execution impact evidence. (PB 205-206). The additional alleged testimony from Wendy Jacobson, however, is not materially different from that elicited from family members during the trial. Moreover, Petitioner cites alleged victim impact evidence from a "friend" Carl Todd. There is no legal authority for admission of testimony about the effect a defendant's execution would have on a friend.

Further, Petitioner cannot demonstrate more execution impact evidence would have made any difference. All 12 jurors found Petitioner's execution would have a "profoundly disturbing effect on their young lives, now and for years to come." While not as many jurors found a similar impact on Petitioner's other family members, the impact on the children, especially her youngest child, is far, far more compelling than what impact it might have on her mother and siblings. In any event, four jurors found Petitioner's execution would have a significant detrimental impact both on her children and on her mother and siblings, yet not one of those jurors voted for a life sentence. There is simply no basis to conclude more of the same evidence would have altered any juror's vote.

145

**XXX. COURT CLAIM NO. 56 – The Bureau of Prisons' Method of Carrying Out The Petitioner's Execution by Lethal Injection Violates the Fifth and Eighth Amendments, the Administrative Procedure Act, and the Controlled Substances Act**

This Court lacks jurisdiction to consider an attack on the manner of execution. See *Gravink v. United States*, 549 F.2d 1152, 1153-54 (8th Cir. 1978) (concluding a manner of execution claim is not cognizable under 28 U.S.C. § 2255 and such claim is properly asserted under 28 U.S.C. § 2241 in the district where the movant is in custody).

**XXXI. CONCLUSION**

WHEREFORE, for the reasons set forth above, the United States respectfully requests the Court deny Petitioner's motion.

Respectfully submitted,

STEPHANIE ROSE
United States Attorney

By: s/ C.J. WILLIAMS

C.J. WILLIAMS
Assistant United States Attorney
401 First Street SE, Suite 400
Cedar Rapids, Iowa 52401
319-363-6333
(Fax 319-363-1990)
CJ.Williams@usdoj.gov

CERTIFICATE OF SERVICE

I certify that I electronically served a copy of the foregoing document to which this certificate is attached to the parties or attorneys of record, shown below, on October 3, 2011.

UNITED STATES ATTORNEY

BY:  s/ S. Van Weelden

COPIES TO: Counsel of Record

146