# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA

ANGELA JOHNSON,

               Petitioner,

vs.

UNITED STATES OF AMERICA,

               Respondent.

No. C 09-3064-MWB
(No. CR 01-3046-MWB)

---

## REPLY TO GOVERNMENT'S POST- HEARING BRIEF IN RESISTANCE TO PETITIONER'S SECOND AMENDED MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY, AND REQUEST TO FILE ADDITIONAL BRIEFING

Michael Burt
Law Office of Michael Burt
600 Townsend Street, Suite 329E
San Francisco, California 94103
415-522-1508 (tel.)
415-522-1506 (fax)
Michael.Burt@prodigy.net

Marcia A. Morrissey
Attorney at Law
2115 Main Street
Santa Monica, California 90405
310-399-3259 (tel.)
310-399-1173 (fax)
MorrisseyMA@aol.com

October 21, 2011
San Francisco, California

# TABLE OF CONTENTS

Page No.

I.  Introduction ............................................................ 1

II.  Claims for Relief ....................................................... 20

**PRETRIAL PHASE**

**COURT CLAIM NO. ONE**

Court Claim 1 – Failure to Pursue A Disposition for a Sentence Less than Death ........... 20

    A.    Counsel Did Not Realistically Explain Options to Ms. Johnson Or Otherwise Act Competently Before They Unilaterally Rejected Various Plea Offers .. 21

    B.    Ms. Johnson did not maintain her innocence in a way that undercuts her plea claim ..................................................................... 28

    C.    The Government Did Make Contingent Plea Offers And In Any Event All That Ms. Johnson Was Required to Show and Did Show Was That The Government Was Willing to Extend, or Consider, an Invitation to Commence Plea Negotiations. ....................................................... 34

**MERITS PHASE**

**COURT CLAIM NO. EIGHT**

Court Claim 8 – Demeanor and Competence: Failure to Reduce Petitioner's Medication or to Address the Effects of the Medication on her Demeanor at Trial and her Ability to Participate in her own Defense, in Violation of her Right to Due Process and a Fair Trial .. 35

**MITIGATION PHASE**

**COURT CLAIM NO. EIGHTEEN**

Court Claim 18 – Confrontation of Aggravating Evidence: Failure to Present Evidence of BWS to Explain the Relationship Between Petitioner and Terry DeGeus to Rebut the Prosecution's Theory of her Motive for Killing Him ..................................................... 45

    A.    Trial Counsels Performance Was Ineffective ......................... 45

    B.    Petitioner Was Prejudiced ........................................ 48

i

## COURT CLAIM NO. NINETEEN

Court Claim 19 – Confrontation of Aggravating Evidence: Failure to Present Readily Available Evidence About Dustin Honken to Refute the Prosecution's Argument that Angela Johnson Was "Worse" than Honken . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

## COURT CLAIM NO. TWENTY

Court Claim 20 – Confrontation of Aggravating Evidence: Failure to Use the Prosecution's Arguments at Dustin Honken's Trial as Party Admissions to Rebut the Government's Evidence that Petitioner was "Worse" than Honken . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

## COURT CLAIM NO. TWENTY-ONE

Court Claim 21 – Confrontation of Aggravating Evidence: Failure to Discover and Present Information Regarding Dustin Honken's Plans to Kill Prosecutor Reinert and his Family and Honken's Membership in a White Supremacist Prison Organization . . . . . . . . . . . . . . . . . . . . . . 58

## COURT CLAIM NO. TWENTY-TWO

Court Claim 22 – Confrontation of Aggravating Evidence: Failure to Address Aggravating Evidence at the Merits and Mitigation [sic] Phases of the Trial . . . . . . . . . . . . . . . . . . . . . . . . . 60

    A.     What a Reasonably Effective Counsel Should Have Done . . . . . . . . . . . . . . 61

    B.     Problems with the Government's Response . . . . . . . . . . . . . . . . . . . . . . . . . 63

    C.     Petitioner Was Prejudiced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

## COURT CLAIM NO. TWENTY-THREE

Court Claim 23 – Confrontation of Aggravating Evidence: Failure to Limit Future Dangerousness Evidence to Future Danger in Prison . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

## COURT CLAIM NO. TWENTY-FOUR

Court Claim 24 – Confrontation of Aggravating Evidence: Failure to Object to Kathy Rick's Triple Hearsay Testimony About Petitioner's Alleged Possession of a Gun . . . . . . . . . . . . . . 72

## COURT CLAIM NO. TWENTY-FIVE

Court Claim 25 – Confrontation of Aggravating Evidence: Failure to Object to Kyla Davis's Testimony that Petitioner Tried to Find Out Where She Lived and What Car She Drove . . . . . 74

Case 3:09-cv-03064-MWB-LTS    Document 340    Filed 10/21/11    Page 3 of 83

## COURT CLAIM NO. TWENTY-SIX

Court Claim 26 – Prosecution Misconduct: the Prosecution's Failure to Correct False Testimony at Angela Johnson's Trial Violated the Fifth and Eighth Amendments to the Unites States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

## COURT CLAIM NO. TWENTY-SEVEN

Court Claim 27 – Prosecution Misconduct: the Prosecution's Violation of *Brady v. Maryland* by Failing to Disclose Dustin Honken's Planned Violent Attack on the Trial Prosecutor and His Association with a White Supremacist Prison Organization . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

## COURT CLAIM NO. TWENTY-EIGHT

Court Claim 28 – Prosecution Misconduct: the Prosecution's Violation of Petitioner;'s Rights Under the Sixth and Eighth Amendments and the Due Process Clause by Presenting Inconsistent Arguments at Her Trial and That of Her Co-Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

## COURT CLAIM NO. TWENTY-NINE

Court Claim 29 – Ineffective Mitigation: The Testimony of Holly Dirksen . . . . . . . . . . . . . . . . 84

## COURT CLAIM NO. THIRTY

Court Claim 30 – Ineffective Mitigation: The Testimony of Douglas Book . . . . . . . . . . . . . . . . 91

## COURT CLAIM NO. THIRTY-ONE

Court Claim 31 – Ineffective Mitigation: The Testimony of Susan Marsolek . . . . . . . . . . . . . . 93

## COURT CLAIM NO. THIRTY-TWO

Court Claim 32 – Ineffective Mitigation: Failure to Provide Psychiatric Pharmacologist Roswell Lee Evans with Data Regarding Petitioner's Drug History, Rendering His Expert Testimony Virtually Irrelevant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

      A.      Trial Counsels Performance Was Ineffective . . . . . . . . . . . . . . . . . . . . . . . . . 97

      B.      Petitioner Was Prejudiced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

## COURT CLAIM NO. THIRTY-THREE

Court Claim 33 – Ineffective Mitigation: Use of Multi-Faceted, Overly-Complicated Yet Incomplete Mitigating Factors for the Jury to Weigh Rather than Simple, Straight-Forward Facts that Encompassed All of the Mitigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

iii

## COURT CLAIM NO. THIRTY-FOUR

Court Claim 34 – Failure to Prepare Mitigation: Failure to Investigate and Present Evidence Regarding Angela Johnson's Mental State at the Time of the Offenses ................. 107

    A.          Counsel's Performance Was Not Effective ......................... 108

           1.       Consistency with the Guilt Phase Defense .................. 108

           2.       The Decision Not to Allow Defense Experts to Talk to Petitioner About the Offense ...................................... 109

           3.       The Decision Not to Put on Evidence of Mental State at the Time of the Offense Was Not Reasonable ........................... 114

    B.          Petitioner Was Prejudiced ..................................... 116

           1.       Lack of Consideration of Mitigating Evidence to Support the Statutory Mitigators ........................................ 116

           2.       Lack of Expert Testimony Tying Impairments to Offense ....... 117

           3.       Lack of Evidence of Petitioner's Narrative ................... 118

           4.       Brain Impairments ....................................... 121

           5.       Reweighing the Evidence ................................. 126

## COURT CLAIM NO. THIRTY-FIVE

Court Claim 35 – Failure to Prepare Mitigation: Delay in Hiring Dr. Gelbort, Failed to Follow-Up on His Recommendations, Failed to Instruct Him to Conduct a more Thorough Battery of Neuropsychological Tests, Failed to Retain Another Neuropsychologist When Gelbort Inexplicably Refused to Testify, Failed to Incorporate His Helpful Findings and Diagnosis Into the Testimony of the Experts Who Did Testify and Failed to Conduct Additional Neuropsychological and Neuroimaging Testing of Petitioner ......................... 128

    A.          Trial Counsels Performance Was Ineffective ....................... 128

    B.          Petitioner Was Prejudiced ..................................... 132

## COURT CLAIM NO. THIRTY-SIX

Court Claim 36 – Failure to Prepare Mitigation: Failure to Introduce Evidence of, and Give The Trial Experts Records Concerning the 1996 Diagnosis of Petitioner With Depression and Dependent Personality Features ............................................ 136

    A.          The Government's Argument ................................... 136

    B.          Trial Counsels Performance Was Ineffective ....................... 137

iv

C.  Petitioner Was Prejudiced ....................................... 142

**COURT CLAIM NO. THIRTY-SEVEN**

Court Claim 37 – Failure to Prepare Mitigation: Failure to Offer Expert and Lay Testimony That Angela Johnson Was Under the Substantial Influence of Dustin Honken .................. 143

A.  Counsel's Performance Was Neither Strategic Nor Effective ........... 143

B.  Petitioner Was Prejudiced ..................................... 151

**COURT CLAIM NO. THIRTY-EIGHT**

Court Claim 38 – Failure to Prepare Mitigation: Failure to Introduce the Statement of Phyllis Prosovec to Support Residual Doubt ...................................... 154

**COURT CLAIM NO. THIRTY-NINE**

Court Claim 39 – Failure to Prepare Mitigation: Failure to Offer Dustin Honken's Letters to Impeach the Mitigation Phase Testimony of Steven Vest to Support Residual Doubt ....... 157

**COURT CLAIM NO. FORTY**

Court Claim 40 – Failure to Prepare Mitigation: Failure to Impeach Steven Vest by Presenting Evidence that Honken Lied About Petitioner's Role in the Offenses to Support Residual Doubt ................................................................. 160

**COURT CLAIM NO. FORTY-ONE**

Court Claim 41 – Failure to Prepare Mitigation: Failure to Introduce Petitioner's Offer to Plead Guilty as Evidence in Mitigation ........................................... 160

**COURT CLAIM NO. FORTY-TWO**

Court Claim 42 – Failure to Prepare Mitigation: Failure to Present Evidence of Remorse Through Expert Testimony .......................................................... 164

A.  Trial Counsels Performance Was Ineffective ....................... 164

B.  Petitioner Was Prejudiced ..................................... 169

**COURT CLAIM NO. FORTY-THREE**

Court Claim 43 – Failure to Prepare Mitigation: Failure to Elicit Evidence of the Effect of Petitioner's Excution on Her Family Members ................................. 170

v

## COURT CLAIM NO. FIFTY-SIX

Court Claim 56 – The Bureau of Prisons' Method of Carrying Out the Petitioner's Execution by Lethal Injection Violates the Fifth and Eighth Amendments, the Administrative Procedure Act and the Controlled Substances Act .................................... 176

III.    Conclusion  ............................................... 176

vi

# TABLE OF AUTHORITIES

Page No.

*Abdul-Kabir v.Quarterman,*
550 U.S. 223, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007) . . . . . . . . . . . . . . . . . . . . . . . 106

*Antwine v. Delo,*
54 F.3d 1357, 1368 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Armstrong v. Kemna,*
534 F.3d 857, 866 (8th Cir.2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ayers v. Belmontes,*
549 U.S. 7, 21 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

*Bobby v. Van Hook,*
558 U.S. ——, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009) . . . . . . . . . . . . . . . . . . . 13, 14, 16

*Bond v. Beard,*
539 F. 3d 256, 288 (3rd Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Boyette v. Lefevre,*
246 F. 3d 76, 91 (2nd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Brady v. Maryland,*
373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78, 79

*Brewer v. Quarterman,*
550 U.S. 286 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125

*California v. Brown,*
479 U.S. 538 (U.S. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

*Cardona v. State,*
Fla., 641 So.2d 361, 365 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

*Crawford v. Washington,*
541 U.S. 36 (U.S. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

*Cullen v. United States,*
194 F.3d 401, 404–07 (2d Cir.1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Dando v. Yukins,*
461 F.3d 791 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Diaz v. United States,*
930 F.2d 832, 835 (11 Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Douglas v. Woodford,*
316 F.3d 1079, 1091 (9th Cir.2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Engelen v. United States,*
68 F. 3d 238, 241 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Enmund v. Florida,*
458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) . . . . . . . . . . . . . . . . . . . . . . . 1, 4

*Falter v. United States,*
23 F. 2d 420, 425 (2nd Cir.), cert. denied, 277 U.S. 590, 48 S. Ct. 528, 72 L. Ed. 2d 1003
(1928) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Ferrell v. Hall,*
640 F.3d 1199, 1229 (11th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15, 109, 127

*Florida v. Nixon,*
543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004) . . . . . . . . . . . . . . . . . . . . . . . 16,

*Forsyth v. Ault,*
537 F.3d 887, 892 (8th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 131

*Furman v. Georgia,*
408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) . . . . . . . . . . . . . . . . . . . . . . . . 2, 7

*Giglio v. United States,*
405 U.S. 150, 154 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78, 79

*Gonzalez v. Secretary for the Department of Corrections,*
366 F. 3d 1253, 1282 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

*Green v. Georgia,*
442 U.S. 95, 97 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Griffin v. United States,*
330 F.3d (6th Cir.2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

*Harris v. State,*
352 So.2d 460, 497 (Ala.Crim.App.1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Hernandez v. Martel,*
2011 WL 3809215 * 85 (C.D.Cal. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 19, 120

*Hill v. McDonough,*
   547 U.S. 573, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 176

*Hogue v. Scott,*
   874 F. Supp. 1486, 1509-11 (N.D. Tex. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Holloway v. Arkansas,*
   435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) . . . . . . . . . . . . . . . . . . . . . . 21, 34

*Houston v. Secretary, Dept. of Corrections,*
   2007 WL 1362921 (M.D.Fla. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re Lucas,*
   33 Cal.4th 682, 707, 94 P.3d 477 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*James v. Schriro,*
   __F. 3d __, 2011 WL 4820605 *29-31 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . 12, 117

*Kenley v. Armontrout,*
   937 F.2d 1298, 1304, 1307 (8th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Lalani v. United States,*
   315 Fed.Appx. 858 (11th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Lambright v. Schriro,*
   490 F.3d 1103, 1127–1128 (9th Cir.2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Lenz v. Warden,*
   579 S.E.2d 194 (Va. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

*Leyva v. United States,*
   2010 WL 1334084 (N.D. Ill., March 31, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Link v. Luebbers,*
   469 F.3d 1197 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116, 130

*Lopez v. Ryan,*
   630 F. 3d 1198, 1209-11 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Magana v. Hofbauer,*
   263 F.3d 542, 550 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Mask v. McGinnis,*
   233 F.3d 132, 140 (2d Cir.2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Maye v. Pescor,*

162 F.2d 641, 643 (8th Cir. 1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*McDowell v. Calderon,*
107 F. 3d 1351, 1366 (9th Cir. 1977) (en banc), remanded and superseded in part, 116 F. 3d 364, vacated in part, 130 F. 3d 833 (9th Cir. 1977) (en banc) . . . . . . . . . . . . . . . . . . . 70

*McQueen v. Swenson,*
498 F.2d (8th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Middleton v. Roper,*
455 F.3d 838 (8th Cir. Mo. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Moss v. United States,*
323 F.3d 445 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 34

*Nelson v. Quarterman,*
472 F.3d 287, 310 (5th Cir. 2006) (en banc), cert. denied, 551 U.S. 1141(2007) . . . . . 126

*Padilla v. Kentucky,*
__ U.S. __, 130 S. Ct. 1473 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Panuccio v. Kelly,*
927 F.2d 106, 109 (2 Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Paters v. United States,*
159 F.3d 1043, 1047 (7th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Paul v. United States,*
534 F.3d 832 (8th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Payne v. Tennessee,*
501 U.S. 808. 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991) . . . . . . . . . . . . . . . . . . . . 175

*People v. Stanley,*
10 Cal. 4th 764, 897 P.2d 481, 519 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

*People v. Murtishaw,*
29 Cal. 3d 733, 773, 175 Cal. Rptr. 738, 631 P. 2d 446 (1981) . . . . . . . . . . . . . . . . . 70

*People v. Romero,*
26 Cal.App.4th 315, 337 (Cal. App. 2d Dist. 1992) . . . . . . . . . . . . . . . . . . . . . . . 48

*Pickens v. Lockhart,*
714 F.2d 1455, 1468 (8th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*Porter v. McCollum,*

130 S. Ct. 447, 175 L. Ed. 2d 398 (2009) ................................ *passim*

*Purdy v. United States,*
208 F.3d 41, 45 (2 Cir.2000) ........................................... 26

*Richmond v. Ricketts,*
640 F. Supp. 767, 790-91 (D. Ariz. 1986 ) ............................. 171

*Richmond v. Lewis,*
506 U.S. 40, 43 (1992) ................................................ 171

*Riggins v. Nevada,*
504 U.S. 127, (1992) .................................................. 38

*Ringo v. Roper,*
472 F.3d 1001 (8th Cir. 2007) ........................... 131, 132, 133

*Roberts v. United States,*
445 U.S. 522, 556-57 (1980) ........................................... 72

*Roberts (Stanislaus) v. Louisiana,*
428 U.S. 325, 333, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976) ....................... 3

*Roberts (Harry) v. Louisiana,*
431 U.S., at 637, 97 S.Ct., at 1995. ................................... 5

*Romine v. State,*
251 Ga. 208, 305 S.E.2d 93 (1983) .................................... 171

*Rompilla v. Beard,*
545 U.S. 374, 125 S.Ct. 2456 (2005) ............................... *passim*

*Roper v. Simmons,*
543 U.S. 551, 568, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) ...................... 6

*Sears v. Upton,*
__U.S. __,130 S. Ct. 3259, 177 L. Ed. 2d 1025 (2010) ..................... 11

*Sidebottom v. Delo,*
46 F.3d 744 (8th Cir. 1995) ........................................... 131

*Simmons v. Luebbers,*
299 F.3d 929 (8th Cir. 2002) .......................................... 13

*Sinisterra v. United States,*
600 F.3d 900 (8th Cir. 2010) .......................................... 15

*Smith v. Groose,*
      205 F. 3d at 1052) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Smith v. Mullin,*
      379 F. 3d 919 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Smith v. Texas,*
      543 U.S. 37 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Smith v. United States,*
      348 F.3d 545 (6th Cir.2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Solomon v. United States,*
      2008 WL 5331860 (S.D.Ohio 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*State v. Fox,*
      69 Ohio St.3d 183, 631 N.E.2d 124, 127 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . .

*State v. Mann,*
      188 Ariz. 220, 934 P.2d 784 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*State v. Simmons,*
      944 S.W.2d 165 (Mo.) (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*State v. Stevens,*
      319 Or. 573, 879 P.2d 162 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*State v. Williams,*
      79 Ohio St.3d 183, 679 N.E.2d 646 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*State v. Windsor,*
      110 Idaho 410, 716 P.2d 1182, 1193 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Stephens v. Kemp,*
      846 F.2d 642 (11th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Strickland v. Washington,*
      466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1987) . . . . . . . . . . . . . . . . . . . . .

*Summerlin v. Schriro,*
      427 F.3d 623 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Summerlin v. Stewart,*
      341 F.3d 1082 (9th Cir. 2003), rev'd on other grounds in Schriro v. Summerlin, 542 U.S.
      348, 124 S.Ct. 2519, 159 L.Ed.2d 442. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Sumner v. Shuman,*
  483 U.S. 66, 107 S.Ct. 2716, 2724 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Tennard v. Dretke,*
  542 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Tison v. Arizona,*
  481 U.S. 137, 107 S.Ct. 1676, 95 L. Ed. 2d 127 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Allen,*
  247 F.3d 741 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Arteca,*
  411 F.3d 315 (2ⁿᵈ Cir 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Bagley,*
  473 U.S. 667 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Bakshinian,*
  65 F. Supp. 1104 (C.D. Cal. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Bernard,*
  299 F. 3d 467 (5ᵗʰ Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Cordell Nichols,*
  2011 U.S. Dist. LEXIS 20432 * 11 (Dist. Kansas March 1, 2011) . . . . . . . . . . . . . . . . . . .

*United States v. Day,*
  969 F.2d 39 (3d Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Edelin,*
  134 F. Supp. 2d 59 (D.D.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Fell,*
  372 F. Supp. 2d 773 (D. Vt. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

United States v. Fell,
  2005 WL 1634067 (D.Vt. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Flores,*
  63 F.3d 1342 (5ᵗʰ Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Foster,*
  874 F. 2d 491 (8ᵗʰ Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. GAF Corp.,*

928 F. 2d 1253 (2ⁿᵈ Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Garza,*
77 F.3d 481 (5ᵗʰ Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Gilbert,*
120 F. Supp. 2d 147 (D. Mass. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Gordon,*
156 F.3d 376 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Harris,*
498 F. 2d 1164 (3ʳᵈ Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Hernandez,*
450 F. Supp. 2d 950 (N.D. Iowa 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Honken,*
541 F.3d 1146 (8ᵗʰ Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Johnson,*
362 F. Supp. 2d 1043 (N.D. Iowa 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Johnson,*
403 F. Supp. 2d 721 (N.D. Iowa 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Johnson,*
495 F. 3d 951 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Kattar,*
840 F. 2d 1188 (1ˢᵗ Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Kohring,*
637 F. 3d 895 (9ᵗʰ Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Lee,*
274 F.3d 485 (8ᵗʰ Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Llera Plaza,*
179 F. Supp. 2d 630 (E.D. Pa. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Logan,*
210 F.2d 820 (8ᵗʰ Cir. 2000), cert. denied 531 U.S. 1053 (2000) . . . . . . . . . . . . . . . . . . .

*United States v. McKeon,*
738 F. 2d 26 (2ⁿᵈ Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Mendoza,*
522 F. 3d 482 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Peoples,*
74 F. Supp. 2d 930 (W.D. Mo. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Salerno,*
937 F. 2d 797 (2nd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*United States v. Sampson,*
335 F. Supp. 2d 166 (D.Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Wanatee v. Ault, (Wanatee I)*
39 F. Supp. 2d 1164 (N.D. Iowa 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Wanatee v. Ault, (Wanatee II)*
101 F. Supp. 2d 1189 (N. D. Iowa 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Ward v. Norris,*
577 F. 3d 925 (8th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*White v. Roper,*
416 F.3d 728 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Wiggins v. Smith,*
539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Williams v. New York,*
337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949) . . . . . . . . . . . . . . . . . . . . . . . . .

*Williams (Terry) v. Taylor,*
529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Williamson v. Moore,*
221 F. 3d 1177 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Willis v. Cockrell,*
2004 WL 1812698 (W.D.Tex.2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Winfield v. Roper,*
460 F.3d 102 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Wishon v. State,*
562 P.2d 931 (Okl.Cr.1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Wolfs v. Britton,*
        509 F.2d 304 (8th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Wong v. Belmontes,*
        --- U.S. ----, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Woodard v. Sargent,*
        806 F.3d 153 (8th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Woodson v. North Carolina,*
        428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Zant v. Stephens* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
        456 U.S. 410, 102 S. Ct. 1856, 72 L. Ed. 2d 222 (1982)

## I. Introduction

This <u>Reply</u> will address the Government's <u>Post-Hearing Brief In Resistance To Petitioner's Motion Under 28 U.S.C. § 2255</u>. [Doc. 325]. The <u>Reply</u> follows the organizational scheme of Ms. Johnson's <u>Corrected Post-Hearing Briefing In Support Of Second Amended Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody, and Request to File Additional Briefing</u>. [Doc. 314]. Although all of the government's factual and legal contentions will be addressed in detail, this Introductory section will focus on certain fundamental misunderstandings which taint the government's analysis of each of the claims briefed in Ms. Johnson's post-hearing brief.

Perhaps the government's most important misunderstanding is the notion that "all the mitigating evidence in the world cannot overcome the weight of the aggravating factor of slaughtering two beautiful, innocent little girls." [Doc. 325, p. 29][1] If Ms. Johnson herself had "slaughtering two beautiful, innocent little girls," the government's argument might stand on firmer ground. But the government itself concedes that "the government's evidence in both Petitioner's and Honken's trial established Honken was the mastermind behind the plans for all the murders, and he actually carried out the killing of all the victims." (*Id.*, p. 30). The government also concedes that "(t)he fact the jury did not find substantial planning and premeditation in the murders of Nicholson and the Duncan family strongly suggests the jury 'bought' the defense argument that she did not know Honken was going to kill everyone when she helped him gain entry into the Duncan house." (*Id.* at 28). These two concessions significantly undercut the weight of the aggravating facts relied upon by the government. *See Enmund v. Florida*, 458 U.S. 782, 798, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (The Court noted that the focus in imposing the death penalty must be on the defendant's culpability, "not on that of those who committed the robbery and shot the victims, for we insist on individualized

---

[1] At various points in its Resistance, the government accuses defense counsel of engaging in "hyperbole." Throughout this Reply, the defense will attempt to resist the temptation to make the same accusation against the government.

1

consideration as a constitutional requirement in imposing the death sentence.")(internal quotation omitted). *See also, Pickens v. Lockhart*, 714 F.2d 1455, 1468 (8ᵗʰ Cir. 1983), a jury instruction which provided that an accessory shall be punished "as if he were a principal" violated the Eighth Amendment because it directed the jury to assess an accessory's punishment as if no mitigating elements of the offense existed."); *State v. Windsor*, 110 Idaho 410, 716 P.2d 1182, 1193 (1985), holding less culpable female co-defendant's death sentence disproportionate even though more culpable male co-defendant also received death sentence ("While we are not suggesting that the death penalty is always inappropriate in a case where the defendant did not actually wield the murder weapon, we do conclude that this fact when combined with Windsor's background and individual characteristics serves to make the death penalty excessive in the present case.")

Given these two concessions and the clear command of *Enmund*, the government's argument quickly degenerates into an appeal to this Court to use a subjective, *ipse dixit* approach to the question of prejudice. "The Court saw the aggravating evidence presented at trial," says the government, and "the Court knows from witnessing the live testimony the enormous impact that evidence had at trial." (*Id.* at 27). Indeed, this Court *did* see the aggravating evidence at trial, and the Court concluded as follows: "[i]f I had been the trier of fact and the decision maker in the 'penalty phase,' I would not have imposed the death sentence on this record." (403 F. Supp. 2d at 896). The government's beseeching of the Court to remember its own reaction to the aggravating evidence thus does not advance the government's cause.

More fundamentally, the government's argument that no amount of mitigating evidence can ever matter in a case involving the murder of two innocent child victims is at odds with Eighth Amendment jurisprudence going back at least to the 19ᵗʰ century. As the dissenting Justices in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) noted, the 19th century movement away from mandatory death sentences was rooted in the recognition that "individual culpability is not always measured by the category of crime committed." (408 U.S., at 402, 92 S.Ct., at 2810, Burger, C. J., joined by Blackmun, Powell, and Rehnquist, JJ., dissenting).

2

In *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976), the Court condemned North Carolina's mandatory death penalty statute in sweeping language that definitively refutes the government's reasoning in Ms. Johnson's case:

> A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.

In *Roberts (Stanislaus) v. Louisiana*, 428 U.S. 325, 333, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976) the Court struck down a mandatory death penalty statue that was much narrower than the statute condemned in *Woodson*. Again, the Court's reasoning is directly responsive to the government's argument in this case:

> The futility of attempting to solve the problems of mandatory death penalty statutes by narrowing the scope of the capital offense stems from our society's rejection of the belief that "every offense in a like legal category calls for an identical punishment without regard to the past life and habits of a particular offender." *Williams v. New York*, 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949)....
> The constitutional vice of mandatory death sentence statutes lack of focus on the circumstances of the particular offense and the character and propensities of the offender is not resolved by Louisiana's limitation of first-degree murder to various categories of killings. The diversity of circumstances presented in cases falling within the single category of killings during the commission of a specified felony, as well as the variety of possible offenders involved in such crimes, underscores the rigidity of Louisiana's enactment and its similarity of the North Carolina statute. Even the other more narrowly drawn categories of first-degree murder in the Louisiana law afford no meaningful opportunity for consideration of mitigating factors presented by the circumstances of the particular crime or by the attributes of the individual offender.

In *Sumner v. Shuman*, 483 U.S. 66, 78-79, 107 S.Ct. 2716, 2724 (1987), the Court struck down a mandatory death penalty statute aimed at the poster child of capital punishment, the life term convicted murder who kills again while in custody. The Court concluded that even these extremely aggravated factors

> ... do not provide an adequate basis on which to determine whether the death sentence is the appropriate sanction in any particular case. The fact that a life-term inmate is convicted of murder does not reflect whether any circumstance existed at the time of the murder that may have lessened his

3

responsibility for his acts even though it could not stand as a legal defense to the murder charge. This Court has recognized time and again that the level of criminal responsibility of a person convicted of murder may vary according to the extent of that individual's participation in the crime. See, e.g., *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987); *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). Just as the level of an offender's involvement in a routine crime varies, so too can the level of involvement of an inmate in a violent prison incident. An inmate's participation may be sufficient to support a murder conviction, but in some cases it may not be sufficient to render death an appropriate sentence, even though it is a life-term inmate or an inmate serving a particular number of years who is involved.

In a footnote to the last sentence of this passage, the Court endorsed a dissenting opinion in *Harris v. State*, 352 So.2d 460, 497 (Ala.Crim.App.1976), in which the dissenter concluded that a life term murderer who again committed murder did not deserve the death penalty, in part because " '[w]hatever the extent of Harris's participation in the killing ..., the avowed ring leader of this affray was another prisoner.... He was implicated from beginning to end by each of the witnesses who testified." (483 U.S. at 80 n. 8).

Turning to the fact that the statute was aimed at the recidivist murderer, the Court wrote:

> Past convictions of other criminal offenses can be considered as a valid aggravating factor in determining whether a defendant deserves to be sentenced to death for a later murder, but the inferences to be drawn concerning an inmate's character and moral culpability may vary depending on the nature of the past offense. The circumstances surrounding any past offense may vary widely as well. Without consideration of the nature of the predicate life-term offense and the circumstances surrounding the commission of that offense, the label "life-term inmate" reveals little about the inmate's record or character. *Even if the offense was first-degree murder, whether the defendant was the primary force in that incident, or a nontriggerman like Shuman, may be relevant to both his criminal record and his character. Yet under the mandatory statute, all predicate life-term offenses are given the same weight-a weight that is deemed to outweigh any possible combination of mitigating circumstances.*

(*Id.* at 81) (emphasis added).

The Court continued

> Not only do the two elements that are incorporated in the mandatory statute serve as incomplete indicators of the circumstances surrounding the murder and of the defendant's criminal record, but they also say nothing of the "[c]ircumstances such as the youth of the offender, ... the influence of drugs, alcohol, or extreme emotional disturbance, and even the existence of circumstances which the offender reasonably believed provided a moral

4

justification for his conduct." *Roberts (Harry) v. Louisiana*, 431 U.S., at 637, 97 S.Ct., at 1995. In Shuman's case, a sentencing authority may likely find relevant his behavior during his 15 years of incarceration, including whether the inmate murder was an isolated incident of violent behavior or merely the most recent in a long line of such incidents. There is no reason to believe that several of the mitigating circumstances listed in Nevada's current guided-discretion statute could not be equally applicable to a murder committed by a life-term inmate. Hence, the mandatory capital-sentencing procedure pursuant to which Shuman's death sentence was imposed "create[d] the risk that the death penalty w[ould] be imposed in spite of factors which may call for a less severe penalty."

(*Id.* at 81).[2]

Contrary to these pronouncements, the government urges the Court to return to the law as it existed in the 18th century, when the only thing that mattered was the abstract nature of the crime.[3] The Court is asked to ignore the conceded fact that the avowed ring leader of this affray was Honken. It is asked to ignore the fact that Ms. Johnson was not the primary force in the murders and was instead a non-triggerperson. It is asked to ignore the fact that the offenses for which she was convicted were isolated instances of violent behavior in a life that was otherwise free of serious criminal conduct. It is asked to ignore the influence on her of drugs, extreme emotional disturbance, mental illness, and the existence of circumstances which she reasonably or unreasonably believed provided her with some justification for her conduct based on her fears for herself and her children. But it is too late to turn back the clock and pretend that these mitigating facts have no relevance or weight. The Supreme Court has announced in the foregoing

---

[2] See also, *Wishon v. State*, 562 P.2d 931 (Okl.Cr.1977) (striking down, under *Woodson* and *Roberts,* a mandatory death sentence imposed under a statute which made it first degree murder to kill a child)

[3] "At the time the Eighth Amendment was adopted in 1791, the States uniformly followed the common-law practice of making death the exclusive and mandatory sentence for certain specified offenses. Although the range of capital offenses in the American Colonies was quite limited in comparison to the more than 200 offenses then punishable by death in England, the Colonies at the time of the Revolution imposed death sentences on all persons convicted of any of a considerable number of crimes, typically including, at a minimum, murder, treason, piracy, arson, rape, robbery, burglary, and sodomy. As at common law, all homicides that were not involuntary, provoked, justified, or excused constituted murder and were automatically punished by death." *Woodson v. North Carolina*, 428 U.S. at 289.

5

cases and in many others that "[c]apital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' *and whose extreme culpability makes them 'the most deserving of execution.' " Roper v. Simmons*, 543 U.S. 551, 568, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (emphasis added).

Not only has the Supreme Court mandated that capital punishment must be so limited, but capital juries for the most part have abided by the Court's restrictions, focusing not only on whether "a narrow category of the most serious crimes" has been committed, but more importantly, on whether a particular offender's conduct in relation to those crimes, considered in conjunction with his or her character and background, shows that the offender is one "whose extreme culpability makes [him or her] 'the most deserving of execution.'"

Even when the law mandated a mandatory death sentence for conviction of a capital crime, juries refused to follow the law and rejected the death penalty in a significant number of first degree capital murder cases.[4] "The history of mandatory death penalty statutes in the United States thus reveals that the practice of sentencing to death all persons convicted of a particular

---

[4] As noted in *Woodson v. North Carolina*, 428 U.S. at 290-291:
> Almost from the outset jurors reacted unfavorably to the harshness of mandatory death sentences. The States initially responded to this expression of public dissatisfaction with mandatory statutes by limiting the classes of capital offenses.
> This reform, however, left unresolved the problem posed by the not infrequent refusal of juries to convict murderers rather than subject them to automatic death sentences. In 1794, Pennsylvania attempted to alleviate the undue severity of the law by confining the mandatory death penalty to "murder of the first degree" encompassing all "wilful, deliberate and premeditated" killings. Pa.Laws 1794, c. 1766. Other jurisdictions, including Virginia and Ohio, soon enacted similar measures, and within a generation the practice spread to most of the States.
> Despite the broad acceptance of the division of murder into degrees, the reform proved to be an unsatisfactory means of identifying persons appropriately punishable by death. Although its failure was due in part to the amorphous nature of the controlling concepts of willfulness, deliberateness, [and] premeditation, a more fundamental weakness of the reform soon became apparent. Juries continued to find the death penalty inappropriate in a significant number of first-degree murder cases and refused to return guilty verdicts for that crime.

6

offense has been rejected as unduly harsh and unworkably rigid." (*Woodson v. North Carolina*, 428 U.S. at 292-293).

The result has been the same under modern discretionary death penalty statutes. As noted in *Woodson v. North Carolina*, 428 U.S. at 295-296: "[v]arious studies indicate that even in first-degree murder cases juries with sentencing discretion do not impose the death penalty 'with any great frequency.' . . . The actions of sentencing juries suggest that under contemporary standards of decency death is viewed as an inappropriate punishment for a substantial portion of convicted first-degree murderers."[5]

The same trend exists in the administration of the federal death penalty. As one circuit judge noted two years before Ms. Johnson's case was tried, "[w]hen the Attorney General decided to order federal death penalty prosecutions in a far wider range of cases and places than ever before, juries responded by expressing the 'conscience of the community.' Since General Ashcroft has launched his expanded federal death penalty campaign, sometimes over the objections of local federal prosecutors, juries have returned 21 verdicts. In 20 of them they have voted for life rather than death." *Summerlin v. Stewart*, 341 F.3d 1082, 1123 (9th Cir. 2003)(Reinhardt, J., concurring), rev'd on other grounds in *Schriro v. Summerlin*, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442. By definition, all 21 of these cases included aggravating circumstances.

In this case, Exhibit 9, Burr-011, p. RB-000114, indicates that of the 467 federal defendants whose cases had been approved by the Attorney General for a capital prosecution as of January 6, 2011, only 60 (12.8 %) had been sentenced to death, with 137 life sentences being imposed by a jury and 2 life sentences being imposed by the judge. Exhibit 9, Burr-004, indicates

---

[5] "Data compiled on discretionary jury sentencing of persons convicted of capital murder reveal that the penalty of death is generally imposed in less than 20% of the cases. See *Furman v. Georgia*, 408 U.S., at 386-387, n. 11, 92 S.Ct., at 2802-2803 (Burger, C. J., dissenting); *Id.* at 435-436, n. 19, 92 S.Ct., at 2827 (Powell, J., dissenting); Brief for Petitioner in *Aikens v. California*, O.T. 1971, No. 68-5027, App. F (collecting data from a number of jurisdictions indicating that the percentage of death sentences in many States was well below 20%). " *Woodson v. North Carolina*, 428 U.S. at 295 n. 31.

7

that of the 134 defendants receiving a life sentence from a jury as of July 21, 2009, 74 defendants (55.2 %) were convicted of multiple murder, and 29 of the 74 were given a life sentence despite being convicted of murdering five or more victims. Exhibit 9, Burr-008, pp. RB 00098-000109 indicates that of the 47 federal defendants accused of murdering one or more minors as of February 22, 2010, only 6 (12.7 %) were sentenced to death. This group includes four defendants (Coleman Johnson, Tommy Edelin, Chevy Kehoe, and Joseph Minerd) who were convicted of killing multiple child victims and who were nevertheless sentenced by a jury to life imprisonment.

In addition, as Richard Burr reminded the court, two defendants of the 74 discussed above, Terry Nichols and Zacarias Moussaoui, were convicted as aiders and abetters in the killing of a multitude of innocent children, yet received sentences of life imprisonment from juries. (H.Tr. 688-689). In Mr. Nichols case, in which Mr. Burr participated, Mr. Nichols received a life sentence in a federal capital trial and thereafter received a life sentence in a state trial. (H. Tr. 688). In Mr. Burr's opinion, "lesser culpability saved Terry Nichols' life", and "Terry Nichols' degree of culpability compared to Tim McVeigh was at least analogous to Angela Johnson's culpability compared to Dustin Honken in this case in the sense that there was a substantial and not just colorable but a substantial argument that could have been made about her having a lesser role and, therefore, lesser culpability." (H.Tr. 689). Thus, it is simply not true that all the government needed to do in his case was prove that somebody " slaughter[ed] two beautiful, innocent little girls", and a death sentence for Ms. Johnson was guaranteed. Courts have " held consistently that even in cases involving particularly heinous murders, a defendant can be prejudiced by an attorney's failure to investigate and present mitigating evidence." *Lambright v. Schriro*, 490 F.3d 1103, 1127–1128 (9th Cir.2007) (collecting cases). *See also, Smith v. Mullin*, 379 F. 3d 919 (10th Cir. 2004) (penalty phase prejudice found in a case where defendant was convicted of murdering five victims, including four children); *Douglas v. Woodford*, 316 F.3d 1079, 1091 (9th Cir.2003) ("The gruesome nature of the killing did not necessarily mean the death penalty was unavoidable."); *Hendricks v. Calderon*, 70 F.3d 1032,

8

1044 (9th Cir.1995) (concluding that "despite ...substantial evidence of aggravation, ...the failure ...to present mitigating evidence rendered the sentencing hearing neither fair nor reliable"; the evidence in aggravation included "a generally unremorseful client who confessed on tape to several murders, and when on the stand confessed to yet another uncharged murder, and loudly recounted his merciless crimes for the jury over his attorney's vain attempt to beg for mercy.); *Hernandez v. Martel*, 2011 WL 3809215 * 85 (C.D.Cal. 2011)("The brutal nature of the crimes does not foreclose a finding of prejudice.")

The government's second fundamental misunderstanding is its misreading of *Rompilla v. Beard*, 545 U.S. 374, 392, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). Ms. Johnson cites this case on the issue of prejudice many times in her brief, reminding the Court at page 68 that under *Rompilla* the ultimate question here is whether the "undiscovered mitigating evidence, *taken as a whole*, might well have influenced the jury's appraisal of [Ms. Johnson's] culpability" so that "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S.Ct. 2456 (citations and internal quotations omitted)(emphasis added). *See also*, *Porter v. McCollum*, 130 S. Ct at 453, 454.

Seizing on the word "undiscovered", the government three times asserts that what *Rompilla* means is that unless mitigating evidence is "undiscovered" to defense counsel, there is no prejudice if counsel fails to present it to the jury. *See* Doc. 325, p. 41, 46, 56. This is nonsense.

In *Rompilla v. Beard*, defense counsel failed to unearth a treasure trove of mitigating evidence contained in a court file which indicated, among other things, that the defendant, who suffered from organic brain damage, was beaten often by his alcoholic father. Nothing in *Rompilla* suggests, or even remotely implies, that if counsel had in fact discovered this powerfully mitigating evidence but had failed to present it, he would have been absolved from ineffectiveness and the jury would not have been prejudiced by the absence of this evidence. Common sense suggests that in this scenario, counsel would have been just as ineffective, if not

9

more so, and *Rompilla* itself addresses this issue when the Court states that "once counsel had an obligation to examine the file, counsel had to make reasonable efforts to learn its contents; *and once having done so, they could not reasonably have ignored mitigation evidence or red flags simply because they were unexpected.*" (545 U. S. at 391 n. 8)(emphasis added). *See also, Wiggins v. Smith*, 539 U.S. 510, 525-527, 123 S.Ct. 2527, 2538 (counsel "fell short of . . . professional standards" for not expanding their investigation beyond the presentence investigation report and one set of records they obtained, particularly "in light of what counsel actually discovered" in the records; when evaluating the reasonableness of an attorney's investigation we "must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."); *Sinisterra v. United States*, 600 F.3d 900, 907 (8th Cir. 2010) (evidentiary hearing warranted because defense counsel's affidavit that he was aware of certain mitigating evidence "leaves unanswered a number of questions related to [the] attorney's performance, including whether [he] exercised reasonable professional judgment in refraining from presenting information of which he had knowledge..."); *Kenley v. Armontrout*, 937 F.2d 1298, 1304, 1307 (8th Cir. 1991), cert denied sub nom. *Delo v. Kenley*, 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991) ("We must evaluate the reasonableness of counsel's decision not to investigate further in light of what he knew or should have known"; counsel found prejudicially ineffective in the penalty phase where "[n]one of the information we have discussed was hidden from counsel. References were made to it or it was brought to his attention in the course of his review of materials and his representation of Kenley."); *Stephens v. Kemp*, 846 F.2d 642, 652–53 (11th Cir.1988) (holding that when trial counsel knew that defendant had previously been admitted into a mental hospital for a few days the failure to present any evidence regarding the defendant's mental capacity or health rendered counsel ineffective).

As these cases strongly suggest, the prejudice from the failure to present mitigating evidence remains exactly the same regardless of whether counsel's failure to present the evidence derives from his failure to discover it or his simple failure to present the evidence after he has

10

discovered it. The *Rompilla* prejudice inquiry is centered on "the likelihood of a different result *if the evidence had gone in ...*", not on whether it was initially "undiscovered" to defense counsel. *Rompilla v. Beard*, 545 U.S. at 393 (emphasis added). *See also, Williams v. Taylor*, 529 U.S. 362, 397-398, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (To assess the probability of prejudice, we consider "the totality of the *available* mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceedings"and "reweighed it against the evidence in aggravation.") (emphasis added); (*Sinisterra v. United States*, 600 F.3d 900, 906 (8th Cir. 2010) ("To establish prejudice, Sinisterra must establish a 'reasonable probability that a competent attorney, aware of the available mitigating evidence would have introduced it at sentencing, and that had the jury been confronted with this mitigating evidence, there is a reasonable probability that it would have returned with a different sentence."), citing *Wong v. Belmontes*, --- U.S. ----, 130 S.Ct. 383, 386, 175 L.Ed.2d 328 (2009) (per curiam); *Armstrong v. Kemna*, 534 F.3d 857, 866 (8th Cir.2008)("To conduct this analysis, we are required to add the expected testimony of the three out-of-state witnesses [that counsel was aware of but did not present] to the totality of evidence that was actually presented at trial.") As these cases make clear, the fact that counsel was aware of evidence that was not presented has no bearing on whether the failure to present that evidence was prejudicial. The government's argument to the contrary is baseless.

The government's third fundamental misunderstanding is its belief that all of Ms. Johnson's various arguments about prejudice can be dismissed simply by characterizing them as "unsupported speculation" or "conclusory." [Doc. 325, p. 35, 46, 51, 86-87, 92]. As Ms. Johnson points out in her brief at page 57, the Supreme Court held in *Sears v. Upton*, __U.S. __, 130 S. Ct. 3259, 3266-3267, that proper application of the prejudice standard "will necessarily require a court to 'speculate' as to the effect of the new evidence-regardless of how much or how little mitigating evidence was presented during the initial penalty phase. . . . In all circumstances this is the proper prejudice standard for evaluating a claim of ineffective representation in the context of a penalty phase mitigation investigation." *Accord, Paul v. United States*, 534 F.3d at 839 ("...[A]n evaluation of this contention requires a 'predictive judgment' about how jurors

11

would have weighed the totality of the evidence, including the new evidence that [petitioner] now cites...").

The Court in *Sears* engaged in precisely the kind of speculative and conclusory analysis that the government condemns in this case:

> Finally, the fact that along with this new mitigation evidence there was also some adverse evidence is unsurprising, ..., given that counsel's initial mitigation investigation was constitutionally inadequate. Competent counsel *should have* been able to turn some of the adverse evidence into a positive – *perhaps* in support of a cognitive deficiency mitigation theory. In particular, evidence of Sears' grandiose self-conception and evidence of his magical thinking, ibid., were features, in another well-credentialed expert's view, of a "profound personality disorder." This evidence *might* not have made Sears any more likable to the jury, but it *might* well have helped the jury understand Sears, and his horrendous acts-especially in light of his purportedly stable upbringing.

(130 S. Ct. at 3264) (emphasis added)

As this passage indicates, findings of prejudice in habeas cases are often both speculative and conclusory, or based on the proposition that the failure to present certain categories of mitigating evidence has been recognized as prejudicial in prior cases. *See also, James v. Schriro* __F. 3d __, 2011 WL 4820605 *29-31 (9th Cir. 2011) (" The failure to present evidence of childhood conditions like those James experienced while living with Lora Pannell has consistently been found prejudicial. . . . James was similarly prejudiced in this case. . . .[Counsel] also failed to present evidence of James's mental illness as a mitigating circumstance, a deficiency that has repeatedly been found prejudicial."); *Ferrell v. Hall*, 640 F.3d 1199, 1235 n. 17 (11th Cir. 2011) ("The proposition that the mitigating evidence of Ferrell's mental illness would have measurably weakened the aggravating circumstances found by the jury finds ... support in case law."); *Lawhorn v. Allen*, 519 F.3d 1272, 1297 (11th Cir. 2008) ("Fannin's failure to present a closing argument prejudiced Lawhorn because there is a reasonable probability that, but for his unprofessional error, the result of the sentencing proceeding would have been different." The Court granted writ relief even though state court noted that the "unconflicting" evidence was "overwhelming" that Lawhorn "directly participated in a conscienceless, pitiless,

and torturous murder.")[6]; *Simmons v. Luebbers*, 299 F.3d 929 (8th Cir. 2002) ("[A] a vivid description of Simmons's poverty stricken childhood, particularly the physical abuse, and the assault in Chicago, *may have* influenced the jury's assessment of his moral culpability.") (emphasis added); *Antwine v. Delo*, 54 F.3d 1357, 1368 (8th Cir. 1995) ("Under Missouri law at the time of the offense, Antwine would have automatically received a life sentence if only one juror had refused to vote for the death penalty. . . .An effective presentation of Antwine's mental condition would have required the submission of additional statutory mitigating instructions. Since the jury found only two aggravating circumstances, the balance of aggravating and mitigating circumstances in the penalty phase of the trial would have been altered enough to create a reasonable probability that the jury would not sentence Antwine to death."); *Wolfs v. Britton*, 509 F.2d 304, 311 (8th Cir. 1975) ("The prejudice is clear.")

The Eighth Circuit has gone even further, condemning speculative arguments that the defendant was *not* prejudiced by the failure to present mitigating evidence, while endorsing or making speculative arguments that he *was* prejudiced. See e.g., *Pickens v. Lockhart*, 714 F.2d 1455, 1467-1468 (8th Cir. 1983) ("It is sheer speculation that character witnesses in mitigation would do more harm than good, and that Pickens was not prejudiced by the omission. Here, counsel's default deprived Pickens of the *possibility* of bringing out even a single mitigating factor. Mitigating evidence clearly would have been admissible. The jury would have considered it and *possibly* been influenced by it. We find that Pickens was actually and substantially prejudiced in the penalty phase of the case.") (citations omitted) (emphasis added).

While Ms. Johnson disavows that her detailed and specific claims of prejudice are in any way speculative or conclusory, she asks the Court in light of the foregoing cases not to be seduced by the government's mantra that everything that Ms. Johnson says in her brief can be dismissed as speculative or conclusory.

---

[6] Dissenting from a denial of certiorari in this case, Justices Scalia, Thomas, and Alito claimed that the Eleventh Circuit's prejudice analysis was "an exercise in guesswork", and "lawless speculation." *Allen v. Lawhorn*, __U.S.__,131 S.Ct. 562, 178 L.Ed.2d 575.

The government's fourth fundamental misunderstanding is its belief that because the Supreme Court refused to apply the 2003 ABA Death Penalty Guidelines retroactively in *Bobby v. Van Hook*, ___ U.S. ___, 130 S. Ct. 13, 17 (2009), it has impliedly ruled that neither the 1989 nor the 2003 Guidelines have any application in any case, even cases such as the present one where the Guidelines were in existence at the time of the trial and where numerous experts and trial counsel themselves acknowledged the Guidelines as setting forth the applicable standard of practice in federal capital cases. Doc. 325, p. 1, 12-13. The *Van Hook* case cannot be read so broadly.

In 1985, Robert Van Hook was convicted of murder and sentenced to death. In 2007 the United States Court of Appeals for the 6th Circuit granted Van Hook habeas relief on the grounds that his counsel was ineffective, relying on the American Bar Association's 2003 Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (2003 Guidelines). *Van Hook v. Anderson*, 560 F.3d 523, 525 (6th Cir. 2009). The state of Ohio petitioned the United States Supreme Court for a writ of certiorari. In a per curiam opinion, the Court granted the state's petition and reversed the 6th Circuit's decision. *Bobby v. Van Hook*, ___ U.S. ___, 130 S. Ct. 13 (2009). Although the Court's opinion is critical of the way in which the 6th Circuit applied the Guidelines, it did not overrule prior precedent that favorably cites the Guidelines as "guides to determining what is reasonable." *See Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005).

The Court took issue with the 6th Circuit's application of the 2003 Guidelines to representation that occurred in 1985. The Court emphasized that the Guidelines are useful guides to what reasonableness entails only to the extent they "describe professional norms prevailing when the representation took place." (130 S. Ct. at 16). The Court did not categorically state that the 2003 Guidelines can never serve as guides to the prevailing norms prior to 2003; rather the Court criticized the 6th Circuit for "[j]udging counsel's conduct in the 1980's on the basis of these 2003 Guidelines . . . *without even pausing to consider whether they reflected the prevailing professional practice at the time of trial . . . .*" (*Id.* at 17) (emphasis added). It is

14

reasonable to conclude from this language that even retroactive application may be permissible, provided there is evidence that the Guidelines reflect prevailing norms at the time of representation.[7]

The Court also criticized the 6th Circuit for treating the 2003 Guidelines as "inexorable commands." (*Id.*) Although the Court apparently disfavors this categorical use of the Guidelines, the opinion favorably cites past precedent which has declared that the Guidelines are guides to what is objectively reasonable when assessing claims of ineffective assistance of counsel under the 6th Amendment. (*Id.* at 17) (citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984); Wiggins, 539 U.S. at 524). It reiterated that since *Strickland*, the Court has viewed the Guidelines as "guides to what reasonableness means" (*Id.*) (internal quotations omitted).[8]

The Court's opinion in *Van Hook* does not alter its prior jurisprudence regarding the ABA Guidelines. It merely states what has already been expressed in other cases: defendants are entitled to representation that meets objective standards of reasonableness given the prevailing professional norms of that time. The Court in *Van Hook* favorably cites prior cases which indicate that the ABA Guidelines reflect these norms. *See, Ferrell v. Hall*, 640 F.3d 1199, 1229 (11th Cir. 2011) (citing *Van Hook* for the proposition that ABA Standards "can [be] look[ed] to as 'guides.'"); *Sinisterra v. United States*, 600 F.3d 900, 906 (8th Cir. 2010) ("The Supreme Court recently has reminded us that the ABA [death penalty] guidelines may serve as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing

---

[7] The Court reversed of the 6th Circuit's decision based on its assessment that Van Hook's counsel's performance met the ABA Standards for Criminal Justice, which were published in 1980. Notably, the 6th Circuit relied exclusively on the 2003 Guidelines when granting relief to Van Hook. It is unclear what, if any, difference it would have made if the 6th Circuit had also relied on the 1989 Guidelines which were published much closer to the time of the representation.

[8] The opinion contains a footnote that, somewhat paradoxically, explicitly declines to express a view as to whether the Guidelines reflect "prevailing norms of practice." Yet the opinion cites to precedent which has already held that the Guidelines do reflect these norms.

15

when the representation took place.") (quoting *Van Hook* ).

Moreover, subsequent to *Van Hook*, the Court reaffirmed that "[w]e long have recognized that [p]revailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable." (*Padilla v. Kentucky*, ___ U.S. ___, 130 S. Ct. 1473, 1482 (2010), citing *Bobby v. Van Hook*, 558 U.S. ___, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009) (per curiam); *Florida v. Nixon*, 543 U.S. 175, 191, and n. 6, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004); *Wiggins v. Smith*, 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Williams v. Taylor*, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The Court added: "[a]lthough they are 'only guides,' *Strickland*, 466 U.S., at 688, 104 S.Ct. 2052, and not 'inexorable commands,' *Bobby*, 558 U.S., at ----, 130 S.Ct., at 17, these standards may be valuable measures of the prevailing professional norms of effective representation, especially as these standards have been adapted to deal with the intersection of modern criminal prosecutions and [other] law." (130 S. Ct. at 1482).

The American Bar Association has warned practitioners of the following with respect to *Van Hook*:[9]

- The decision does not categorically prohibit retroactive application of the 2003 Guidelines, but in cases decided prior to 2003, defense counsel should take care to demonstrate that the norms were in effect at the time of trial.

- The Court has not overruled its own precedent, which states that the ABA Guidelines are guides to determining what is professionally reasonable legal representation in capital cases. The ABA Guidelines, therefore, remain important to any ineffectiveness of counsel analysis.

- Nothing in this decision changes the relevance and importance of the 2003 Guidelines to capital trials that were held during or since 2003.

- The ABA Guidelines have never been construed as "inexorable commands." They have always been described as codification of the national standard of care in the defense of capital cases.

- Nothing in this opinion indicates that trial counsel, post-conviction counsel, and judges should not continue to use the ABA Guidelines as important guidance

---

[9] Memorandum of the American Bar Association, November 10, 2009, available at www.americanbar.org/content/dam/aba/migrated/DeathPenalty/RepresentationProject/PublicDocuments/ van_hook_analysis.authcheckdam.pdf.

16

regarding the appointment, funding, and performance of the defense function in capital cases.

In this case, as indicated above, all of Ms. Johnson's experts, as well as the trial counsel themselves, endorsed the ABA Guidelines as setting forth the applicable professional norms at the time of Ms. Johnson's trial.[10] The Eighth Circuit has been relying upon ABA Standards to assess ineffectiveness at least since 1974. *See, McQueen v. Swenson*, 498 F.2d 207, 216 n. 12 (8th Cir. 1974) *Wolfs v. Britton*, 509 F.2d 304, 310 (8th Cir. 1975); *Pickens v. Lockhart*, 714 F.2d 1455, 1460 (8th Cir. 1983). In these circumstances, and in light of the foregoing cases, it is appropriate for this Court to rely on the 1989 and 2003 Guidelines not as "inexorable commands," but as codification of the national standard of care in the defense of capital cases.

Lastly, Ms. Johnson must comment on the government's contentions that the presumption of competency is "bolstered in this case when the experience and past performance of trial counsel are considered", and that the testimony of Mr. Berrigan and Ms. Goody confessing to incompetency should be discounted because they are "dedicated opponents to the death penalty." [Doc. 325, p. 11-12, 26]. As the Eighth Circuit declared long ago, "[t]he mere appointment of counsel, *no matter how able*, for a defendant charged with commission of a crime

---

[10] Mary Goody testified that the 1989 ABA Guidelines guide her work as a mitigation specialist and that the 2003 Guidelines expanded on the 1989 Guidelines. (Tr. 16-17; 26-37; 41-45; 58-60; 74-76; 95;126-130; 138; 170; 178-179; 246; 251-254). Dean Stowers testified that he had a copy of the Guidelines and subscribed to those Standards. (Tr. 1104-1105; *see also,* 1360-1361; 1396). Pat Berrigan recognized the 1989 and 2003 Guidelines as properly defining what it means to be the learned counsel and as outlining counsel's responsibilities with respect to investigating the client's mental status. (Tr. 1998-2000; 2073). Richard Burr testified that 1989 and 2003 Guidelines speak to what lead counsel means, what his role is, and how the team concept should work in death penalty cases. (Tr. 681-684). Russell Stetler testified extensively about the applicability of both the 1989 and 2003 Guidelines and intertwined that discussion with Supreme Court case law. (Tr. 1671-1685; 1747-1748; 1754-1761; 1787-1798; 3262-3282). Lisa Greenman testified as to the applicability of the Guidelines. (Tr. 3785-3787; 3815-3816; 3830-3832). Sean O'Brien testified as to the applicability of the Guidelines. (Tr. 4165-4167; 4190-4192; 4240-4241; 4262-4266; 4272-4274; 4281-4283; 4305-4320). Neither through cross examination nor through its own expert testimony did the government show that the Guidelines did not set forth the applicable standards of practice in capital cases tried in 2005.

17

without opportunity to consult, advise or to make such preparation for arraignment and trial as the facts of the case fairly demand would be a travesty and would not satisfy the requirements of the Fifth and Sixth amendments." (*Maye v. Pescor*, 162 F.2d 641, 643 (8th Cir. 1947) (emphasis added). "The most able and competent lawyer in the world can not render effective assistance in the defense of his client if his lack of preparation for trial results in his failure to learn of readily available facts which might have afforded his client a legitimate justiciable defense." *McQueen v. Swenson*, 498 F.2d 207, 217 (8th Cir. 1974). *See also, Bond v. Beard*, 539 F. 3d 256, 288 (3rd Cir. 2008)("We do not doubt that the prospect of representing a defendant at a capital penalty phase hearing can overwhelm even experienced lawyers. ...But that does not excuse trial counsel's failure to prepare for the penalty phase prior to the handing down of the conviction. These attorneys, particularly in the face of a record so full of testimony calling for a first-degree murder verdict, should not have waited until the eve of the penalty phase to begin their preparations.") "We recognize that there is and should be a presumption that counsel is competent, which must be overcome by the petitioner in order for an ineffective assistance of counsel claim to lie.... But here the requisite showing has been made." *McQueen v. Swenson*, 498 F.2d at 216.[11]

---

[11] Ms. Johnson also points out that regardless of Mr. Willett's claimed expertise in securing acquittals in non-capital cases, he consistently in his testimony disavowed any responsibility for plea negotiations or for the preparation and presentation of the penalty phase, claiming that that phase of the case was Mr. Berrigan's sole responsibility. (H. Tr. 588-590) At the same time, as "lead defense counsel," Mr. Willett made it clear to Dean Stowers, who was also an experienced lawyer, that he "didn't really want [him] involved in the sort of defending the case part of the case." (H. Tr. 1130) Mr. Berrigan, in turn, while a very experienced capital litigator, was under the burden of a crushing capital trial schedule in Kansas City and was suffering from severe health problems during the course of his representation of Ms. Johnson. (*See* H. Tr. 1760-1760) (Testimony of Russell Stetler opining that "both Mr. Berrigan and Ms. Goody...had too much on their plate" and indicating that Mr. Berrigan tried two other capital cases and was appointed on a third while he was representing Ms. Johnson, and that "he had health issues as well. He had triple bypass surgery in August of 2001.")(*See* H. Tr. 534, testimony of Berrigan's legal assistant that "[h]e had lost a tremendous amount of weight by the end of the trial I noticed, and I did know that he wasn't sleeping or eating well. And I was concerned about his health because he had heart problems. And ...I'd say he probably lost 30 pounds by the time of the end of the trial.")

18

The fact that Mr. Berrigan and Ms. Goody are death penalty opponents is of no moment. Rejecting an identical claim that *Strickland* experts were biased because they were "well-traveled professional opponents of capital punishment," the California Supreme Court pointed out that "[t]he basic message of the witnesses—that the prevailing professional norm in capital defense at the time of trial was that defense counsel should secure an independent, thorough social history of the accused well in advance of trial—was confirmed by respondent's own expert witness, retired Judge Parkin, and is consistent with standards referred to by the United States Supreme Court in *Wiggins*, supra, 539 U.S. at pages 522–523, 123 S.Ct. at pages 2536–2537 and other cases." *In re Lucas*, 33 Cal.4th 682, 707, 94 P.3d 477 (2004). Here, unlike in *Lucas*, the government opted not to call its own *Strickland* expert, but the testimony of Mr. Berrigan and Ms. Goody is certainly consistent with and is bolstered by the standards referred to by the United States Supreme Court in *Wiggins*, as well as by voluminous testimony from other witnesses and documentary evidence. Furthermore, they risked their professional reputations by testifying under oath that they failed Ms. Johnson. Their testimony was credible and the Court should so find.

Having made these introductory comments to the government's brief, Ms. Johnson now turns to the government's response to the individual claims briefed in her post-hearing brief.

---

As was recently pointed out in *Hernandez v. Martel*, 2011 WL 3809215(C.D.Cal. 2011), "[i]t is still the case that counsel's serious illness during trial preparation, trial and sentencing does not stand alone as a basis for habeas relief. However, counsel's illness does help explain the many deficiencies at trial... Moreover, many court's have recognized that an attorney's physical or mental illness may impair counsel's judgment." (*Id.* at 86) , citing, *Tippins v. Walker*, 77 F.3d 682, 686 (2nd Cir.1996) (recognizing that the effectiveness of counsel depends in part on the attorney being present and attentive); *Gravley v. Mills*, 87 F.3d 779, 786 (6th Cir.1996) (recognizing that many of counsel's mistakes may be attributed to medication and that counsel's illness "had to have been a major distraction" during trial). *Cf. Dillon v. Duckworth,* 751 F.2d 895, 897, 901 (7th Cir.1984), cert. denied, 471 U.S. 1108, 106 S.Ct. 2344, 85 L.Ed.2d 859 (1985) (counsel had recently divorced, his brother was paralyzed in an accident, and his father had undergone emergency heart surgery, all of which prompted him to attest to his own professional incompetence).

## II.     Claims for Relief

### PRETRIAL PHASE

### COURT CLAIM NO. 1 – Failure to Pursue a Disposition for a Sentence of Less Than Death

The thrust of the government's response to the plea claim is that Ms. Johnson "has not demonstrated" various facts that the government believes must be demonstrated in order to show deficient performance, and that she cannot "establish" she was prejudiced by any deficiency. [Doc. 325, pp. 2, 16].

The government does not specifically discuss its view of what standard of proof governs the plea claim, but it implies throughout its discussion of this claim that Ms. Johnson's burden is quite high. It is not. *See, Magana v. Hofbauer*, 263 F.3d 542, 550 (6th Cir. 2001) (State court unreasonably applied clearly established Supreme Court precedent when it concluded in a plea case that petitioner must demonstrate that the petitioner "would have" accepted a plea offer; correct standard is that petitioner must show by less than a preponderance of the evidence "(1) that his counsel's performance was objectively deficient, and (2) that but for his counsel's erroneous advice, there is a *reasonable probability* that he would have accepted the plea." (emphasis in original). *See also, United States v. Day*, 969 F.2d 39, 42, 45 n. 8 (3d Cir.1992) (noting that defendant who claims that his counsel's gross underestimation of his sentence led him to reject state's plea offer must meet the "reasonable probability" standard to prove prejudice, and that "*Strickland v. Washington* does not require certainty or even a preponderance of the evidence that the outcome would have been different with effective assistance of counsel; it requires only 'reasonable probability' that that is the case"); *Mask v. McGinnis*, 233 F.3d 132, 140 (2d Cir.2000) (concluding that state trial court which failed to employ "reasonable probability" standard when evaluating claim of ineffective assistance of counsel during plea

20

negotiation unreasonably applied clearly established Supreme Court precedent).

The government's response to Ms. Johnson's post-hearing briefing of her plea claim does not take issue with Ms. Johnson's analysis of the law. Like Ms. Johnson, the government cites this Court's decisions in *Wantatee v. Ault*, 39 F. Supp. 1162 (N.D. Iowa 1999), *Wanatee v. Ault*, 101 F. Supp. 2d 1189 (N. D. Iowa 2000), *Wanatee II*, aff'd 259 F. 3d 700 (8th Cir. 2001), and *United States v. Hernandez*, 450 F. Supp. 2d 950 (N. D. Iowa) as authoritative on the law governing the plea claim in this case. [Doc. 325, p. 16]. The only other plea case cited or discussed by the government is *Leyva v. United States*, 2010 WL 1334084 (N.D. Ill., March 31, 2010) (finding trial counsel's performance was not deficient where counsel explain options to the defendant, defendant maintained his innocence, and the government never made a plea offer). [Doc. 325, p. 15].

*Leyva* is easily distinguished because in this case, contrary to the government's contentions, counsel did not realistically explain options to Ms. Johnson and otherwise act competently before they unilaterally rejected various plea offers, the defendant did not maintain her innocence in a way that undercuts her plea claim, and, as Ms. Johnson demonstrates at pages 30-32 of her brief, the government did make contingent plea offers within the meaning of *Wanatee II*, and in any event under numerous cases cited in the brief at pages 30-31 all that Ms. Johnson was required to show and did show under authority of *Holloway v. Arkansas*, 435 U.S. 475, 488, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) was that "the government was willing to extend, or consider, an invitation to commence plea negotiations." *Moss v. U.S.*, 323 F.3d 445, 465 (6th Cir. 2003).

Ms. Johnson will review each of the factors discussed in the *Leyva* case cited by the government to demonstrate that that case has no applicability to Ms. Johnson's plea claim.

A.     **Counsel Did Not Realistically Explain Options to Ms. Johnson Or Otherwise Act Competently Before They Unilaterally Rejected Various Plea Offers**

It appears quite clearly from the evidence before the Court that certain defense lawyers in this case, contrary to the ABA Death Penalty Guidelines, isolated Ms. Johnson from those

21

members on the defense team who could have built a meaningful relationship with her and realistically apprised her of her options and the deadly peril she was in.[12]

Mary Goody, a highly qualified mitigation specialist, told the defense team early in the case that based on her review of the discovery, her recommendation was that "they plead this case and they plead her to LWOP."[13] (H.Tr. 70, 72, 99, 270) In response, before Ms. Goody's

---

[12] The government asserts that the ABA Guidelines are too vague to inform the Court regarding the standard of adequate representation with regard to plea negotiations. [Doc. 325, p. 13]. However, there is nothing vague about Guideline 10.5 of the 2003 Guidelines [Relationship with the Client]:

> Counsel at all stages of the case should make every appropriate effort to establish a relationship of trust with the client, and should maintain close contact with the client....Counsel at all stages of the case should engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case, such as ...potential agreed upon disposition of the case.

[Exhibit 1, p. 205]

There is nothing vague about the Commentary to this Guideline:

> Establishing a relationship of trust with the client is essential both to overcome the client's natural resistance to disclosing the often personal and painful facts necessary to present an effective penalty phase defense, as discussed in the text accompanying notes 101-04 supra, and to ensure that the client will listen to counsel's advice on important matters such as whether to testify and the advisability of a plea. Client contact must be ongoing.

[Exhibit 1, p. 206]

There is nothing vague about Guideline 10.9.1 [The Duty to Seek an Agreed-Upon Disposition], which sets forth detailed standards governing counsel's specific obligations during the plea negotiation phase of the case. [Exhibit 1, p. 228-233]

[13] The government paints a picture of a defense team that was supposedly stymied in their efforts to learn about the strength of the case by the government's discovery policies. However, Mr. Willett testified that the government had an open file policy although the policy initially required the defense to view the discovery at the United States Attorney's Office. (H.Tr. 566). Mr Willett also testified that he was present at the detention hearing held on August 2, 2000, where the case against Ms. Johnson was laid out in some detail (H. Tr. 592). Although the defense may have had some initial logistical problems in copying the discovery, these problems cannot explain or justify why the defense could not assess the strength of the case up to the point in time

22

first meeting with Ms. Johnson, Mr. Berrigan instructed her not to discuss a plea, and not even to discuss the facts of the crime with her. (*Id.*, 69). Thereafter, Ms. Goody never discussed a plea with the petitioner. (*Id.*, 117). She explained that "[n]o one asked me to engage with her in a conversation about a plea. Ordinarily that would be something that we would do as a – in teams or individually or we would have a game plan set up with that. But my idea of what the plea should be did not agree with their idea." (*Id.*, 117-118). According to Ms. Goody, the lawyers "were clinging to this idea that they could get her a term of years somewhere around 20 years." (H. Tr. 116). The testimony of Drs. Logan, Hutchinson, and Cunningham also establishes that they were never asked for assistance in relation to the plea process. Both Russell Stetler and Sean O'Brien explained to the court how mitigation experts and mental health professionals can be instrumental in bringing about a disposition in a capital case.

In this case, involving a mentally ill and suicidal client, isolating Ms. Johnson from Ms. Goody and from the mental health professionals on the team was deficient performance with respect to plea negotiations, the government's contention to the contrary notwithstanding. [Doc. 325, pp. 11-15]. Although the government claims the ABA Guidelines are too vague, they address the precise point being considered:

> Many capital defendants are... severely impaired in ways that make effective communication difficult: they may have mental illnesses or personality disorders that make them highly distrustful or impair their reasoning and perception of reality; they may be mentally retarded or have other cognitive impairments that affect their judgment and understanding; they may be depressed and even suicidal; or they may be in complete denial in the face of overwhelming evidence. In fact, the prevalence of mental illness and impaired reasoning is so high in the capital defendant population that "[i]t must be assumed that the client is emotionally and intellectually impaired."…. In many cases, a mitigation specialist, social worker or other mental health expert can help identify and overcome these barriers, and assist counsel in establishing a rapport with the client.

(Commentary to Guideline 10.5, Exhibit 1, p. 206)

Even more harmful then isolating Ms. Goody from the plea process was exposing her to the false and unrealistic hopes generated by both Mr. Berrigan and Mr. Willett. Mr. Stowers,

---

in October 2004, when Mr. Honken was convicted and sentenced to death.

23

who testified that he had a lot of experience with difficult clients, but that he never developed a

rapport with Ms. Johnson until trial when it was "too late," forcefully testified that had the proper

relationship with Ms. Johnson been established and had she not been given "very reckless and

bad and irresponsible advice" as to the probability of acquittal by Mr. Willett, the case could

have been settled. (H. Tr. 1110, 1233-1243)

Attorney correspondence and other communication to Ms. Johnson certainly indicates

that Mr. Willett was improperly encouraging Ms. Johnson to think she might be acquitted and

that  and Mr. Berrigan was improperly encouraging her to believe that a 20 year sentence was a

realistic offer in a homicide case involving confession evidence and five victims, two of whom

were children:

- August 16, 2000 Letter to Ms. Johnson from Mr. Willett [Exhibit 53, p. RS-9-282-283] "Obviously, based upon the complexities of the case, we need more time to prepare your defense so that you are able to go home to your children. ... As always, I look forward to seeing you in the future. Hopefully, I will be able to see you in something other than a blue jumpsuit in the near future."[14]

---

[14] The government takes issue with Ms. Johnson's use of this letter,  claiming that "[t]he timing of the letter shows it pertaining to her detention", that "[t]here is nothing suggesting he was talking about the likelihood of acquittal," and that "[r]egardless, even if one interprets the letter as referencing guilt, Willett wrote this letter four days after his appointment, two days before the detention hearing, long before he had an opportunity to review the government's discovery file, and before Petitioner produced maps leading to the location of the bodies." [Doc. 325, p. 2 n. 3]. The government has the facts and the chronology wrong and the letter quite plainly refers to her defense, not her detention. The government says that the letter was written on August 6, 2000, "two days before the detention hearing." The government correctly notes that the detention hearing, at which Willett was present and heard a summary of all the incriminating evidence against Ms, Johnson, including the confession to Ms. Gaubatz, occurred on August 2, 2000, which is before August 6, 2000, not two days after it. In any event, the letter shows on its face that it was written on August 16, 2000, long after the appointment of Mr. Willett and long after he had ample opportunity to assess the strength of the evidence he heard at the detention hearing. When Mr. Berrigan was appointed and read the detention hearing transcript he concluded that there was a lot of evidence against petitioner even before the McNeese maps came into the possession of the prosecution. (H.Tr. 2013-20). Mr. Stowers testified that "I can't imagine...talking to her like that in August...before the bodies were found because...it was certainly a different case...at that point, but it was not a case to be thinking about trial on." (H. Tr. 1120) The defense did not need a lot of discovery to make this assessment, which was apparent from the transcript of the detention hearing, as well as from the 1998 sentencing transcript pertaining to Mr. Honken.

24

- October 9, 2001 Letter to Ms. Johnson from Mr. Berrigan [Exhibit 53, p. RS-9-482] "[W]e told the government that we might be interested in a deal for 20 years. Much to my surprise, they did not reject our number as being completely out of the question."

- February 7, 2002 Letter to Ms. Johnson from Mr. Berrigan [Exhibit 53, p. RS-9-484 "Pat Reinert... indicated that the Government was not wed to their requirement that you plead guilty to a life sentence, but would instead consider a sentence of 40 years as sufficient, with pre-agreed downward departures if certain conditions were met. I informed Reinhert that 40 years was indeed a life sentence and that this would also be unacceptable. We would need to be closer to 20 years with a guaranteed scenario which would not subject you to additional time.")

- June 7, 2003 Letter to Ms. Johnson from Mr. Berrigan [Exhibit 53, p. RS-9-490] "I spoke briefly to Pat Reinert about your offer to cooperate against Dustin Honken, including the idea that you are willing to testify against Dustin in a capital murder prosecution seeking death. I also advised Reinert that we would want in return a sentence of *less than* 20 years in the Bureau of Prisons. Consistent with his previous pronouncements, Reinert was very noncommittal, wanting to get a proffer (statement from you on the record about what happened) before making a decision as to what position the U.S. Attorney's Office would take regarding sentencing. He also voiced an opinion that the Department of Justice would not authorize a sentence below life imprisonment for you, even if you were cooperating against Dustin. I told Reinhert that I would discuss these matters with you, but that I was pessimistic about an agreement unless the proposed sentence was substantially below life imprisonment. Hopefully, if we win in the Eighth Circuit, the government's position will change in our favor."

The ABA Guidelines pinpoint exactly and precisely why such letters were a disservice to Ms. Johnson: "In many capital cases... the prosecution's evidence of guilt is strong, and there is little or no chance of charge bargaining. In these cases, a guilty plea in exchange for life imprisonment is the best available outcome." (Commentary to Guideline 10.9.1, Exhibit 1, p. 232). Consequently, counsel is obligated at every stage of the case to "explore with the client the possibility and desirability of reaching an agreed-upon disposition. In so doing, counsel should fully explain the rights that would be waived, the possible collateral consequences, and the legal, factual, and contextual considerations that bear upon the decision." (Guideline 10.9.1, Exhibit 1,

---

Most importantly, this letter was not an isolated incident. Mr. Stowers testified that after he entered the case in April 2001, it was a problem having Mr. Berrigan so far removed in Kansas City because that put Ms. Johnson under the sphere of influence of Mr. Willett and Ms. Lonoue who were still talking about "going to trial...and we're going to walk you out of there and Dean is such a great lawyer on appeal...that he's going to get the Eighth Circuit to affirm Judge Bennett, and so you'll be...okay on that, and...we don't need to be pushing too hard for a plea and this sort of thing. And its just cross purposes." (H. Tr. 1135)

25

p. 228). Counsel did not fulfill their obligations under the Guideline by sending letters of the type quoted above. *See also, Purdy v. United States*, 208 F.3d 41, 45 (2 Cir.2000) ("As part of this advice, counsel must communicate to the defendant the terms of the plea offer, ... and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed . . . .")

In addition to sending letters of this type, Ms. Johnson's lawyers failed her by letting important plea deadlines pass without fully informing Ms. Johnson of the consequences of such inaction. For instance, on March 30, 2001, Mr. Reinhert wrote the defense a letter giving the defense an April 30, 2001 deadline to resolve the case prior to its being forwarded to Washington and asking that the lawyers "[p]lease discuss this matter with your client at your earliest convenience so we can explore a possible resolution of this case short of the death penalty." [Exhibit 53, RS-13-834]. Mr. Stowers testified that he and Mr. Willett met with Ms. Johnson on April 3, 2001, and briefly discussed plea negotiations, but that Mr. Reinhert's letter, and the implications of letting the deadline pass, were never discussed. (H. Tr. 1143-1146).

On August 13, 2004, Mr. Berrigan wrote a letter rejecting Mr. Murphy's final offer to settle the case in exchange for cooperation against Mr. Honken and setting a deadline to respond. [Exhibit 53, RS-9-491]. The letter indicates on its face that Mr. Berrigan rejected the offer unilaterally, while Mr. Stowers and Mr. Willett were still in conference with Ms. Johnson.

Again, the guidelines are helpful in addressing this very issue: "Counsel should keep the client fully informed of any negotiations for a disposition, convey to the client any offers made by the prosecution, and discuss with the client possible negotiation strategies." (Guideline 10.9.1, Exhibit 1, p. 230). Counsel failed to comply with this Guideline.

Another troubling issue stemmed from a team meeting at which it was decided that Mr. Stowers "was going to do a guideline computation and then it was going to be discussed with Miss Johnson." (H. Tr. 1178-1180). Mr. Stowers testified that he never did the computation on the non-homicide charges because "[i]t was such a secondary thought to be honest with you." (H.Tr. 1180-1181. It was a "secondary thought", in Mr. Stowers' view, because he mistakenly

26

thought that Ms. Johnson's exposure on the 848 CCE non-homicide count was 20 years. (H.Tr. 1179-1180.) In fact, that count carried a maximum of life and the Sentencing Guidelines permitted the Court to upwardly depart to a life sentence, if the Court found that "as a part of the enterprise the defendant sanctioned the use of violence." (Commentary to § 2D1.5 of the Federal Sentencing Guidelines). Mr. Stowers testified that there was "probably" some discussion about exposure on non-homicide counts or potential counts, but that the discussion was that "even if you could beat the murders you're going to get 10 or 20 years or something like that." (H.Tr. 1180). He also testified that he never discussed with Ms. Johnson her exposure on state charges for homicide or non-homicide counts." (H.Tr. 1181)

The Guidelines address this issue as well: "Counsel should know and fully explain to the client...the maximum penalty that may be imposed for the charged offense(s) and any possible lesser included or alternative offenses." (Guideline 10.9.1, Exhibit 1, p. 229). Counsel failed to comply with this Guideline.

Finally, Ms. Johnson must address the misleading way in which the government responds to her contentions regarding Mr. Murphy's August 12, 2004 plea proposal. The government writes:

> Finally, Petitioner cites a letter dated August 12, 2004, which states that if Petitioner provided a truthful debrief satisfactory to the government, then the United States Attorney's Office would be willing to ask the Attorney General to make a plea offer for a life sentence. It was in response to this that Berrigan provided the government with the attorney proffer, which was forwarded to the Attorney General, and promptly rejected. The government made no counter-offer.

[Doc. 325, p. 16]

What is left out of this description is that Mr. Murphy's letter was written while Mr. Honken's case was pending and at a time when Mr. Murphy indicated the government needed Ms. Johnson to get a conviction and death sentence against Mr. Honken. [Exhibit 53, RS-13-907-908]. What is also left out is that: (1) Mr. Murphy set a firm deadline for acceptance or rejection of his "offer" ("If your client is interested in attempting to resolve this matter in accordance with this letter, it is critical that you so notify me by not later than 2:00 p.m. tomorrow, August 13,

27

2004. If I have not heard from you by that time, I shall consider this offer to have been rejected and it should be deemed to have been formally withdrawn."); (2) Mr. Berrigan rejected the offer on August 13, 2004 without consulting with Ms. Johnson [Exhibit 53, RS-9-491]; (3) Mr. Honken was convicted and sentenced to death in October of 2004; and (4) Mr. Berrigan did not send the requested proffer until March 19, 2005, long after Ms. Johnson's bargaining leverage had disappeared with the conviction of Mr. Honken. [Exhibit 52, RS-9-517].

When these additional facts are added, what looked from the government's description like perfectly reasonable advocacy becomes patently unreasonable and untimely advocacy. As Ms. Johnson stressed in her brief, the fact that the Attorney General rejected the late proffer in these circumstances is irrelevant because "[t]he proper question is what [the Attorney General] would have done had he been properly [and timely given the proffer the government requested.]" (*Wanatee I*, 39 F. Supp. 2d at 1174). To return once again to the words of the Guidelines: "'Death is different because avoiding execution is, in many capital cases, the best and only realistic result possible'; as a result, plea bargains in capital cases are not usually 'offered' but instead must be 'pursued and won.'" (Commentary to Guideline 10.9.1, Exhibit 1, p. 231, quoting Kevin McNally, *Death Is Different: Your Approach to a Capital Case Must be Different, Too*, THE CHAMPION, Mar. 1984, at 8, 15.)

Other derelictions are explored in Ms. Johnson's post-hearing brief at pp. 7-24. Suffice it to say that Ms. Johnson strongly disagrees with the government's contention that "trial counsel's conduct was not defective." [Doc. 325, p. 11].

### B. Ms. Johnson did not maintain her innocence in a way that undercuts her plea claim

The government favors the Court with a survey of each and every time Ms. Johnson has proclaimed her innocence in an attempt to show that she would not have accepted a plea offer and could not have performed the conditions placed on the plea by the government. [Doc. 325, pp. 2-10, 16].

The government also broadly asserts that "[p]etitioner has never admitted to facts

28

establishing she knowingly and intentionally aided and abetted the murders." [Doc. 325, p. 2]. The government has apparently forgotten, or has decided to ignore, the numerous detailed confessions of Ms. Johnson that the government produced in evidence and relied upon to establish her guilt and get her sentenced to death. While the government *now* claims in response to the plea claim and with the benefit of hindsight that Ms. Johnson "never" confessed her involvement in the crimes that certainly was not the government's position at trial when its interests were in establishing just the opposite of what it now claims. *See e.g.*, T.Tr. 617 ("Q. Mrs. Gaubatz, the individual who was your good friend back in those days who confessed to you her involvement in the killings of Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus, is that individual present here in the courtroom? ") Ms. Johnson's numerous pretrial confessions refute the government's contention that she was "wedded to a position that she was innocent." They demonstrate a reasonable probability that, but for the ineffectiveness of her lawyers, she could and would have performed the truthful proffer condition placed on the plea by the government, as evidenced by the fact that she unequivocally expressed her desire to plead guilty on more than one occasion, and she did, in fact, eventually, but belatedly, provide an attorney proffer of her involvement in all five murders. [Doc. 325, p. 14].

Pointing out that the petitioners in *Wanatee* and *Hernandez* had both testified in support of their plea claims, the government faults Ms. Johnson's habeas lawyers for failing to have Ms. Johnson testify six years after the fact "about what [she] would have done," and concludes that absent such testimony "her habeas counsel are left with conjecture about what she might have done." [Doc. 325, p. 17]. Of course, if Ms. Johnson had testified, the government would be claiming that her testimony was "self serving" and must be rejected on the ground that she would now testify to anything to get out from under her death sentence. Indeed, the government insinuates that Ms. Johnson's May 24 and 25, 2011 confession to Dr. Woods should be discounted for this very reason.[15] [Doc. 325, p. 9]

---

[15] Alternatively, and somewhat contradictorily, the government asserts that Ms. Johnson did not really confess to Dr. Woods, but only "admitted she was present." [Doc. 325, p. 9, 15 n.

29

In *Wanatee I*, this Court concluded that the fact that the record indicated that Mr. Wanatee did not want to plead guilty "is irrelevant to whether counsel was ineffective for failing to inform Wanatee of the facts and law applicable to case in order to allow him to make an informed choice about accepting or rejecting a plea agreement. (39 F. Supp . 2d at 1173). On the issue of prejudice, the Court similarly observed that the fact that Wanatee was unwilling to cooperate and claimed to have been intoxicated at the time of the assault "is not very probative of the question that properly obtains on [the] second prong of the ineffective assistance claim actually makes: The proper question is what Wanatee would have done *"had he been properly advised."* (39 F. Supp. 2d at 1174) (Emphasis in original).

The Court in *Wanatee I* also observed that "[t]he record includes Wanatee's direct, unequivocal assertions that he would indeed have pleaded guilty to second degree murder, and would indeed have provided testimony identifying others..."[16] Importantly, this Court, in reliance on *Engelen v. United States*, 68 F. 3d 238, 241 (8th Cir. 1995) ruled that direct, unequivocal assertions "alone are not enough." (39 F. Supp . 2d at 1174). The Court went on to conclude that the circumstances in Wanatee's case were "distinguishable from those found insufficient to establish a question on prejudice in *Engelen* because the record here is not 'completely barren of any evidence that [Wanatee] would have acknowledged his guilt prior to trial." (*Id.*, quoting *Engelen*). That precisely describes the state of the record in Ms. Johnson's case.

---

10]. If this is true, then it cannot be the case that Ms. Johnson's statements to Dr. Woods were a crafty attempt to meet this Court's criticism that she has "steadfastly maintained her innocence." (H. Tr. 3298-3301). In truth, she did confess to Dr. Woods because "[s]he ... indicated that the proffer prepared by Mr. Berrigan was truthful...", and the proffer in turn indicates her guilt as an aider and abettor to all five murders. [Proffer of March 19, 2005, Exhibit 67, pp. 5655-5656 (MCN 05-005642-005643);Woods Report, Exhibit 107, WOOD 000145 n. 83]. As Dr. Woods indicates in his report at n. 83, Ms. Johnson's confession to her involvement in the crimes was produced not in response to the Court's concerns but because Dr. Woods and her present defense team, like Robert McNeese, had built a relationship of trust and confidence with Ms. Johnson, something her trial team never did in violation of the clear and specific mandate of the ABA Guidelines.

[16] It is unclear from *Wanatee I* and *Wanatee II* whether the petitioner testified.

30

Numerous courts have held that a defendant's post-conviction testimony that he would have accepted the plea is insufficient to establish prejudice. Instead, those courts have required the defendant to come forward with additional objective evidence to prove that the defendant would have accepted the plea offer. *United States v. Arteca*, 411 F.3d 315, 322 (2nd Cir 2005) (colleting cases); *Paters v. United States*, 159 F.3d 1043, 1047 (7th Cir.1998); *Diaz v. United States*, 930 F.2d 832, 835 (11 Cir.1991); *United States v. Gordon*, 156 F.3d 376, 381 (2d Cir.1998).[17] Here, there is such objective evidence, contrary to the government's assertion that absent Ms. Johnson's testimony she is left with conjecture about what she might have done.

There is, first of all, the obvious and gross disparity between the life (or even less) sentence that the government was holding out in the plea negotiations and the death penalty which Ms. Johnson faced. The significant disparity between the prison sentence under the plea offer and exposure after trial lends credence to petitioner's plea claim. (*See Smith v. United States*, 348 F.3d 545, 552 (6th Cir.2003) (collecting cases for the proposition that "the disparity between the plea offer and the potential sentence exposure [is] strong evidence of a reasonable probability that a properly advised defendant would have accepted a guilty plea offer," *See also, Griffin v. United States,* 330 F.3d 733, 737-38 (6th Cir.2003) (" [A] substantial disparity between the penalty offered by the prosecution and the punishment called for by the indictment is sufficient to establish a reasonable probability that a properly informed and advised defendant would have accepted the prosecution's offer.") We know from the evidence that Ms. Johnson's lawyers erroneously believed that their worse case scenario at trial was a life sentence. (H.Tr. 1788, 2590-2591). Had Ms. Johnson been properly advised that the worst case scenario was not a life sentence but a death sentence, there is every reason to believe that she would have pled guilty along the lines set forth in the attorney proffer she eventually adopted.

Second, as in *Wanatee I*, the record here is not completely barren of any evidence that Ms.

---

[17] The Sixth Circuit has "declined to adopt such a requirement." *Griffin v. United States*, 330 F.3d 733, 737 (6th Cir.2003). However, neither *Griffin* nor any other case has held that petitioner must testify in order to establish a plea claim.

31

Johnson would have acknowledged her guilt prior to trial. We have more than one direct, unequivocal, and most importantly, contemporaneous indication that she wanted to and would have plead guilty and would have and did provide a truthful proffer to the government. This contemporaneous evidence, surveyed in Ms. Johnson's brief at 15-25, is much more persuasive and compelling than anything Ms. Johnson could have said on the stand and anything she told Drs. Woods and Martell years after the plea discussions.[18] *See, Panuccio v. Kelly*, 927 F.2d 106, 109 (2 Cir.1991) (a defendant's testimony after the fact suffers from obvious credibility problems).

Lastly, as this Court concluded in *Wanatee I*, it is simply not true that claims of innocence, or statements that the defendant did not want to plead or cooperate can defeat a plea claim. In *Griffin v. United States*, 330 F.3d 733, 738 (6th Cir.2003), the Sixth Circuit held that the petitioner's "repeated declarations of innocence do not prove, as the government claims, that he would not have accepted a guilty plea." Later, in *Smith v. United States*, supra, the Sixth Circuit reversed the district court's refusal to hold an evidentiary hearing on a plea claim even though the district court found that Smith was aware of the plea offer, rejected it, and maintained his innocence throughout the proceedings, including to the point of testifying under oath at trial that he did not engage in the conduct described by his accusers, which earned him a two-point enhancement of his offense level for obstruction of justice at sentencing. The *Smith* court, citing language from *Griffin* , stated:

---

[18] For this reason, the government's focus on the statements to the doctors is misplaced. The government asserts that "[i]f what she told Drs. Woods and Martell is what she would have told the government during a proffer, it would never have sufficed." [Doc. 325, p. 17]. But we need not speculate on what "she would have told the government during a proffer" because we know what she did tell the government in her March 2005 proffer. As demonstrated above, it is reasonably probable to conclude that this proffer was rejected not because it was insufficient to satisfy the government's needs but because it came too late.

32

> [I]t "does not make sense to say that a defendant's protestations of innocence belie his later claim that he would have accepted a guilty plea.... These declarations of innocence are ... not dispositive on the question." (*Id.*) Protestations of innocence throughout trial are properly a factor in the trial court's analysis, however they do not, by themselves, justify summary denial of relief without an evidentiary hearing.

(348 F.3d at 552)

Other circuits have agreed with this analysis. *See, Lalani v. United States*, 315 Fed.Appx. 858 (11th Cir. 2009) ("In this case, the Petitioners challenged their convictions, in part, on the basis that they were innocent. The district court held that because they maintained their innocence after their trial they could not show prejudice. We find the Sixth Circuit's opinion in *Griffin* persuasive with respect to the prejudice prong of *Strickland*."); *Cullen v. United States*, 194 F.3d 401, 404–07 (2d Cir.1999) ("The Government seeks to avoid the need for any further hearing as to whether Cullen would have accepted the plea bargain because, in its view, Cullen's insistence on his innocence, at trial and even now, precludes a finding of prejudice. Though Cullen's insistence on his innocence is a factor relevant to any conclusion as to whether he has shown a reasonable probability that he would have pled guilty, it is not dispositive. Moreover, if he had been properly informed of the significant difference between the likely sentencing ranges after trial and under the offered plea bargain, Cullen might well have abandoned his claim of innocence.")

In light of all of the foregoing, the Court should reject the government's argument that Ms. Johnson's plea claim is undermined by her claims of innocence. Under a correct interpretation of the facts and law, it should be concluded that Ms. Johnson has carried her burden of showing by less than a preponderance of the evidence that there is a reasonable probability she would not have accepted a plea offer and would have performed the conditions placed on the plea by the government.

**The Government Did Make Contingent Plea Offers And In Any Event All That Ms. Johnson Was Required to Show and Did Show Was That The Government Was Willing to Extend, or Consider, an Invitation to Commence Plea Negotiations.**

As Ms. Johnson demonstrates at pages 30-32 of her brief, the government did make contingent plea offers within the meaning of *Wanatee II*, and in any event under numerous cases cited in the brief all that Ms. Johnson was required to show and did show under authority of *Holloway v. Arkansas*, 435 U.S. 475, 488, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) was that "the government was willing to extend, or consider, an invitation to commence plea negotiations." *Moss v. United States*, 323 F.3d 445, 465 (6th Cir. 2003). *See also, Solomon v. United States*, 2008 WL 5331860 * 6 (S.D.Ohio 2008) ("[T]he petitioner must demonstrate that the government was willing to accept or extend an invitation to plea negotiations."); *Houston v. Secretary, Dept. of Corrections*, 2007 WL 1362921 *3 (M.D.Fla. 2007)(same). *See also, United States v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998) (defendant suffered prejudice, even though the government had not made a formal plea offer, because "he did not have accurate information upon which to make his decision to pursue further plea negotiations or go to trial" due to counsel's errors).

The government does not discuss or take issue with any of these cases, and it is conspicuously silent on Ms. Johnson's contention that the government did make a contingent plea offer within the meaning of *Wanatee II*, other than its conclusory assertion that "[i]t is abundantly clear the government never made a plea offer." [Doc. 325, p. 16].[19] Ms. Johnson

---

[19] The government does discuss *Wanatee II*'s requirement that petitioner must show that she could have performed the conditions placed on the plea by the government. The government claims that "[i]n her post hearing brief, Petitioner does not address this prong of the test." [Doc. 325, p. 17 n. 11]. The government has overlooked the discussion of this very issue at page 29-30 of Ms. Johnson's brief where she argues that the fact that "Ms. Johnson ultimately agreed to plead to a life sentence and provide the government with a proffer is strong evidence that had she been properly advised she would have agreed to and could have complied with the plea offers which were repeatedly held out to her counsel at a time when she had considerable leverage in the case. *See also, Wanatee I*, 39 F. Supp. 2d at 1175 (trial counsel's efforts to reopen a plea offer, ultimately rejected by the government, was evidence which indicated a reasonable probability that the petitioner would have accepted an earlier plea); *Wanatee II*, 101 F. Supp. 2d at 1200 (requiring that the court consider whether the petitioner has shown that he 'could have performed' the plea agreement.)"

34

respectfully disagrees with this conclusion for all the reasons stated in her brief.

There are two aspects of the government's discussion of this issue which must be responded to. First, one important issue is how much plea leverage Ms. Johnson had in the case after the bodies were discovered. Citing some flippant comments by Mr. Stowers, the government's view is "not much." [Doc 325, pp. 3 n. 4, 10 n. 6]. However, Mr. Willett testified that during the McNeese litigation her bargaining position was "better than usual." (H.Tr. 592). As this Court commented, after the bodies were discovered, the defense "still had some leverage." (H.Tr. 1239)

Second, the government asserts that "if the danger Honken posed constituted a motivation to work out a plea with anyone, it would have been to work out a plea with Honken, not Petitioner." [Doc. 325, p. 3 n. 3]. Really? A federal capital defendant can threaten to execute and torture a United States Attorney and his family and the Department of Justice, led by John Ashcroft, would have been cowered into offering a plea which would have sent Honken back to a prison where he made the threat in the first place? Hardly.

In sum, nothing in the government's lengthy response to the claim undermines the meritoriousness of this claim. Because Ms. Johnson has established both deficient performance and prejudice, she is entitled to relief on her plea claim. The appropriate relief in this case is that Ms. Johnson should be resentence to life imprisonment, the sentence she would have received had her lawyers performed effectively in the plea process. (*See also, Wanatee II*, 101 F. Supp. 2d at 1214.)

## MERITS PHASE

### COURT CLAIM NO. 8 – Demeanor and Competence: Failure to Reduce Petitioner's Medication or to Address the Effects of the Medication on her Demeanor at Trial and Her Ability to Participate in Her Own Defense, in Violation of Her Right to Due Process and a Fair Trial

Ms. Johnson was very clear in her briefing that in light of the Court's comments about her competency claims, she was going to focus exclusively in her discussion of Court Claim 8 on

35

the issue of the effect of medication and mental illness on Ms. Johnson's demeanor as it related to the penalty phase, not as it related to guilt phase, and not as it related to her competency in either phase. [Doc. 314, p. 34 n. 1] Despite this clear delineation, much of the government's discussion of this claim seems to conflate the issues of demeanor and competency, with the result that many of the government's factual assertions, some of which are not supported by the record, are not responsive to Ms. Johnson's briefing. There are also other issues with the government's factual recitations and some problems with the government's legal analysis.

Starting first with the facts, the government asserts that "[n]one of the trial lawyers had concerns about Petitioner's competency, her ability to understand what was occurring during trial, or her ability to assist counsel during the trial. (H. Tr. 964-67; 997; 1559; 3136-3139)." Although this statement may or may not be true, it has very little to do with the demeanor issue being raised by Ms. Johnson. Thus, Mr. Berrigan testified that incompetency in the sense of an "inability to understand the proceedings" was not a concern. (H. Tr. 3138) But he also testified on cross examination by the government:

> But, you know, in front of a juror, the littlest little thing can be huge. A smile at an inappropriate moment or a comment that they might overhear or even their perception that she's not paying attention as she should have or doing something wrong can be – can be disaster.

(H. Tr. 3139).

Mr. Berrigan also testified on the *relevant* issue of demeanor that "[s]he had some lucid moments and other times where she didn't appear to be with it, so she was kind of in and out." (H. Tr. 3137). He also testified that "[s]he was zoned out either voluntarily or involuntarily, but she was not paying attention to the proceedings going on." (H. Tr. 3138) "She wasn't paying attention to what the witnesses were testifying to, didn't seem to be paying attention." (H. Tr. 3169) Importantly, he testified that during the testimony of the victim's family "[i]t was way too painful for her [s]o she...wasn't listening. She was – I don't know what she was doing, just

36

drawing pictures and eating candy." (H. Tr. 3138-3139).[20] Asked by the government whether she

---

[20] The government's brief emphasizes and selectively quotes from the testimony by Mr. Stowers as follows: " During the penalty phase, Petitioner 'was much more attentive. She often would sit up. She would smile at witnesses. She was emotional, cried many times, and that sort of thing during the penalty phase...' (H. Tr. 1559)." [Doc. 325, p. 19]. What the government left out from its quote of Mr. Stowers' testimony is the underlined words : "She was emotional, cried many times, and that sort of thing during the penalty phase, and that was when, you know, a lot of family members and people whom in many instances she hadn't seen for a long time." In terms of *harmful* demeanor evidence, the fact that Ms. Johnson reacted appropriately and emotionally to the presence of her family is obviously of less interest and importance to the jury than how she reacted to the government's guilt and penalty phase witnesses, especially the victim impact witnesses. Indeed, it was during the government's case-in-chief in the guilt phase that a juror sent the Court a note which stated: "I noticed that jury box cannot see Angela. We cannot see her reactions. Are we allowed to see her reactions ? " (T. Tr. 720) In response to this note, the Court first indicated that it would respond, "yes, you're allowed to see her reactions. To the extent that some jurors can see her, that's fine. To the extent that others can't, that's just the parameters we work in in the courtroom." (*Id.*) Both sides indicated no objection to such an instruction, but Mr. Berrigan stated that "we'll give some thought to how to cure the problem". The Court responded: "Well, we're not going to be able to cure the problem. ...**And it's to your advantage probably not to cure the problem"** (*Id.*) Although the defense did not ask the Court to elaborate, It's hard to imagine how keeping Ms. Johnson from the view of some of the jurors would be to her advantage unless the Court had observed something negative and harmful about the way she was responding to the government's proof.

After a recess, the Court indicated to the parties that " her reactions are not evidence" and asked the parties whether he should so instruct. Mr. Berrigan indicated that "we agree with you" but then asked for time to think about the issue. (*Id.* at 721). The court then instructed:

> I did get a jury note. It basically talked about not every juror can see the defendant's reactions, and I'm just going to comment about it this way. That's just one of the problems with the way the courtroom was designed, with the presentation of the evidence presentation cart, and so some of you can see better. Some can't. The tables really don't belong to the government and the defendant. My position has always been anybody can sit at any table. The early bird gets the worm. But for whatever reason, the government always seems to have that table in criminal trials, and so that's the best I can tell you.

(H. Tr 722).

The effect of this instruction was to allow the jury to continue to use demeanor evidence at trial. Although the defense agreed that Ms. Johnson's reactions were not evidence and were on notice that the Court apparently was seeing something in her demeanor that was harmful, they never asked for the instruction which the Court said it would give that. His was certainly ineffective assistance.

37

was able to respond to counsel's questions during trial, Mr. Berrigan responded, "Yeah. When I asked her questions, she was able to answer them. She came to. What was going on in between the questions, who knows, you know? I don't know." (H Tr. 3139) He also specifically acknowledged that he never discussed with Ms. Johnson whether her "spacing out" condition was due to the unpleasantness of the situation or some other reason such as medications. (H. Tr. 3168).

Yet a defense lawyer in a capital case "must not only consult with the client but also monitor the client's personal condition for potential legal consequences. For example, actions by prison authorities (e.g., ... administration of psychotropic medications) may impede the ability to present the client as a witness at a hearing [or in court], and changes in the client's mental state ...mat bear upon his capacity to assist counsel....In any event,...maintaining an ongoing relationship with the client minimizes the possibility that [she] will engage in counter productive behavior (e.g. ,...act out before a judge ...).Thus, the failure to maintain such a relationship is professionally irresponsible." Commentary to 2003 ABA Guideline 10.5, Exhibit 1, p. 209, citing *Riggins v. Nevada*, 504 U.S. 127 (1992) (defendant was constitutionally entitled to have administration of anti-psychotic drugs cease before trial). See also, *Sell v. United States*, 539 U.S. 166, 179, 123 S.Ct. 2174, 2184, 188 A.L.R. Fed. 679, 156 L.Ed.2d 197 (holding that the "the Constitution permits the government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely o have side effects that may undermine the unfairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.")[21]

In this case, Mr. Berrigan was clearly on notice from his own experience that "in front of a

---

[21] As was emphasized in *Sell*, "[w]hether a particular drug will tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions are matters important in determining the permissibility of medication to restore competence." 539 U.S. at 186.

38

juror, the littlest little thing can be huge" and that "even their perception that she's not paying attention as she should have ... can be disaster." (H.Tr. 3139). He knew from his observations at trial that Ms. Johnson was harmfully "zoning out", drawing pictures, eating candy, and not paying attention during the testimony of key prosecution witnesses such as the victim impact witnesses. (H.Tr. 3138-3139) He knew that the trial judge for some reason thought it would be to Ms. Johnson's advantage not to be observed by some of the jurors. (H.Tr. 720-721). Finally, he knew from his pre-trial experience that:

> We had a woman who tried to kill herself. She's on medication the entire time she was at the jail. We have sort of erratic behavior during at least my visits with her. She's acting very emotionally sometimes when it wouldn't be called for. Yeah, there were indications she was having mental difficulties and a long history of abuse going back to when she was a child.

(H.Tr. 3168).

Yet suddenly, during trial, the emotion is gone and he's got a "zoned out" client who is preoccupied with drawing pictures, eating candy, and not paying attention. Reasonably competent counsel in these circumstances would have investigated the clients change of mental state and would have thereby determined that the client was being overmedicated. In response to this information, reasonably competent counsel would have taken one or more of the actions suggested at page 44-45 of Ms. Johnson's brief.[22] Instead, Mr. Berrigan did no investigation into the cause of his client's harmful demeanor and concluded, contrary to his own experience about the harmful effects of client's drawing in the presence of the jury, that he would continue to allow her to draw her pictures in a zoned out state. (H.Tr. 3139). Although the government claims that counsel's performance was not deficient, the remedy of inaction and of continuance of the status quo that counsel choose was unreasonable even by counsel's own standards.

The government also asserts that "Petitioner's lawyers did not see any change in her behavior during the course of the trial. (H.Tr. 966). Petitioner did not appear to her attorneys to be over-medicated during trial (H.Tr. 966-67). " [Doc. 2351, p. 21]. The record citations are to

---

the testimony of Mr. Willett, and although it is perfectly understandable why the government is relying throughout its brief on a government-friendly witness like Mr. Willett, it is still the case that Mr. Willett can only attest to what he saw, not what the other lawyers saw.

A more subtle but important point is that Mr. Willett was asked by the government, "did you ever observe a change in her behavior that bothered you that made you concerned that she was overly medicated during the trial ?" (H.Tr. 966-967). His answer was: "Not that I perceived." (*Id.*) And immediately prior to giving this answer he admitted that although he was "aware generally that she was receiving some medication during trial", he was "not aware of any dosages. I'm not aware of any changes....I was never made aware of that." (H.Tr. 265). The fact that Mr. Willett, a lay person, did not perceive a change of demeanor in Ms. Johnson due to drug toxicity, does not mean that such a change did not take place. As the 2003 ABA Death Penalty Guidelines point out, "[c]ounsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions...that could be of critical importance." Commentary to Guideline 4.1, Exhibit 1, p. 168). Even the government concedes that "[t]rial counsel are not educated in medicine such that they could understand the theoretical effects a change Petitioner's medication could have." [Doc. 325, p. 22] Ms. Johnson agrees. That is exactly why the defense team was obligated to consult with a mental health expert when the most experienced member of the team observed the client "zoning out" during the testimony of witnesses and all members of the team, including Mr. Willett, knew the client's mental health history and heard the Court's comment about the advantage of keeping Ms. Johnson from the view of some of the jurors.[23]

---

[23] It is also true that Mr. Willett may not have "perceived" things that his co-counsel and other witnesses saw in relation to Ms. Johnson's demeanor because he was preoccupied with the demands of the trial. Something was certainly going on with his powers of perception during the trial or he was just plain incompetent. Although the government heaps praise on Mr. Willett as a master trial lawyer, in the following passage he was unable to "perceive" a basic lesson in the law of evidence that the Court and the government were gracious enough to try to give him:

Q.          And you testified to the federal grand jury in April of 1996 that–

40

| | |
|---|---|
| MR. WILLIAMS: | Objection, Your Honor, hearsay. |
| THE COURT: | Sustained. You can ask him the question, and then you can use the grand jury transcript -- |
| MR. WILLETT: | Thank you, Judge. |
| THE COURT: | -- to impeach him if the answer is different than the question. |
| MR. WILLETT: | Thank you. |
| THE COURT: | But it's hearsay if you ask him what he testified to in the grand jury. |
| MR. WILLETT: | Thank you. I'm clear now. Thank you, Judge. |
| THE COURT: | You looked momentarily surprised, and I know you know the process so . . . |
| MR. WILLETT: | Thank you again. |
| THE COURT: | I appreciate it. Thank you. |
| MR. WILLETT: | Q. You did testify to the federal grand jury in April of 1996. |
| | A. I think that's the right date, yeah. |
| | Q. And you did testify that you were a real good liar. |
| MR. WILLIAMS: | Objection again, Your Honor. Hearsay. |
| THE COURT: | Sustained. I'll tell you what. Why don't we take our afternoon break... (The jury exited the courtroom.). Here's the problem. You can ask him, When you were younger, were you a really good liar? He either says yes or he says no. If he says no, you can impeach him with the grand jury transcript, but you can't ask him what he testified to in the grand jury because that's hearsay. |
| MR. WILLETT: | And, Judge, I apologize. I'm getting myself caught up in asking the preliminary question before I get to the heart of the matter, and that's what's causing me to false step so -- and I apologize.... Thank you for your tolerance of my limits. |

(T. Tr. 718-719).

41

The government next asserts that this claim must fail because supposedly Ms. Johnson "did not present any evidence establishing she actually took the medication prescribed to her, and there is serious reason to doubt she did." [Doc. 325, p. 21]. This argument is a red herring if there ever was one. The psychiatric technician who originally increased Ms. Johnson's Zoloft medication to 300 mg wrote in her report that it was Ms. Johnson who came to her seeking an increase in her medication because "she wanted help because her stress level is too high as she is currently on trial. She is specifically asking for her Zolaft to be increased because she believes it will help her stress level and help her get through her trial. When asked why the Zoloft was originally prescribed, Angela states, "I've been on it for years because I have been in jail a long time. I've been terribly depressed and have been having a hard time even helping in my own defense." [Exhibit 108, p.1] Ms. Johnson was on trial for her life. She thus had a powerful incentive to take the increased medicine which she herself requested in order to combat the crippling effects of anxiety and depression so that she could defend herself.

The government relies for a contrary conclusion on a couple of considerations. First, it cites a one paragraph file entry in a jail medical record which states in its entirety:

> On 8-14-04 at 1840 hrs. Inmate Angela Johnson was removed from B cell and placed in C cell per your request. I stated to Inmate Johnson that she had been moved for a couple of reasons. First, that it had been reported that she had been hoarding her meds and passing them to other inmates. Also, that tensions between the females in B cell had been escalating, possibly involving her. I told Inmate Johnson that I had no personal knowledge of these events but that I was acting solely on the instructions of the jail administrator. I also stated to Inmate Johnson that she would stay in C cell alone until she had spoken to the administrator and that he would decide if she could return to B cell. Inmate Johnson was instructed that if these reports continued she could very well be transported back to Linn Co. She assured me that none of these reports were true and that she would be on her best behavior.

[Exhibit 108, p. 26].

There is no follow-up or other report in any of the hundreds of jail and prison medical records before the Court to show that this particular allegation of drug hoarding, or any other,

42

was ever substantiated. There is, however, in evidence, daily jail medication administration logs for the months of May and June 2005 which show that for virtually every day in those two months Ms. Johnson's 300 mg dose of Zoloft was given to her, as opposed to being "held", as indicated by initialed entries for each time the medication was given. [Exhibit 119, pp. 140-141].

The second item relied upon by the government is its spin on Dr. Woods testimony. The government alleges that "Dr. Woods admitted it was possible, given that history, she did not consume the medications." [Doc. 325, p. 21]. What Dr. Woods actually said was: "Well that certainly could be a possibility. I think...you would have to take that into consideration since she had mentioned it before. However, what you see with Miss Johnson is a change in mental state, and that change in mental state is consistent with an increased level of antidepressant, of Zoloft." (H Tr. 4483). The government also points to Dr. Woods' self evident and eminently reasonable testimony that "he does not know for certain the change in the Zoloft prescription caused a change in her demeanor." [Doc. 325, p. 20]. As stated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590, 113 S.Ct. 2786 (1993), 125 L.Ed.2d 469 "Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science."

The government also relies on its spin of Dr. Cunningham's testimony. According to the government, "Dr. Cunningham interviewed Petitioner for five hours a few days after the change in medications and did not observe anything that made him believe she was sedated, agitated, or otherwise over-medicated." [Doc. 325, p. 20]. But as Ms. Johnson points out in her brief, Dr. Cunningham also testified that with a drug like Zoloft, "two days later is too soon to know what the full effects of this increased dosage will be." (H.Tr. 3864)

Turning briefly to the government's legal analysis, the government has chosen to misconstrue the remedies offered by Ms. Johnson. In a classic straw man argument the government contends that since under *United States v. Mendoza*, 522 F. 3d 482, 491 (5th Cir. 2008) a non-testifying defendant's courtroom demeanor is not in any sense legally relevant to the question of guilt or innocence, the defense could not have informed the jury that they had

43

"instructed Petitioner to conceal her true emotions." [Doc. 325, p. 22]. A fair reading of Ms. Johnson's brief at pages 44-47 will reveal that Ms. Johnson never proposed as one of her remedies that counsel could have informed the jury that they had instructed her "to conceal her true emotions."

The government's broader point that *Mendoza*'s ruling as to the impropriety of a prosecutor's comment on a non-testifying defendant's guilt phase demeanor would have precluded a court at a capital trial penalty phase from remedying the problems caused by the over-medicated client is a stretch at best, particularly considering the authorities cited at pages 47-50 of Ms. Johnson's brief and in view of the fact that *Mendoza* was not even decided at the time of Ms. Johnson's trial.

Moreover, if, as the government admits, a non-testifying defendant's demeanor is an illegitimate factor upon which a jury may rely, then Ms Johnson should be permitted to proffer and does proffer juror interviews and testimony that such illegitimate factor was considered by the jury. See Federal Rule of Evidence Rule 606 (b). *See also, United States v. Honken*, 541 F.3d 1146, 1167-1169 (8th Cir. 2008) ("The plain language of Rule 606(b) permits a juror to testify as to 'whether extraneous prejudicial information was improperly brought to the jury's attention [and] whether any outside influence was improperly brought to bear upon any juror...'"")

As Ms. Johnson documented in her first motion to vacate [Doc. 26], Juror #55 has stated in an interview that, during trial, he was "mainly paying attention to what she [Ms. Johnson] was doing, and to what was on the witness stand, in the box." [Doc. 26, Ex. 13, at 5]. Juror # 797 has stated that "the only ... time we saw any emotion [from Angela] was when her own family was up there. How could she listen to those grandmothers and not show any emotion? The men on the jury were grabbing for their handkerchiefs, but she could just sit through it." In Doc. 26, Exhibit 11 at p. 2. Juror # 600 stated that "I sat very close to her during the 2nd and 3rd phase of the trial – it looked like she was kind of distant from anything that happened." Doc. 26, Exhibit 14 at p. 1.

Based on statements such as these and in light of the cases and empirical studies cited by Ms. Johnson in her brief of this claim, this Court should readily conclude that the jury was

44

exposed to illegitimate evidence which counsel could have prevented or neutralized had they taken appropriate action. Further, because "there exists a reasonable possibility that the external influence or information affected the verdict." *United States v. Honken*, 541 F.3d at 1169 prejudice is readily established under the circumstances of this case. *See also, Willis v. Cockrell*, 2004 WL 1812698 (W.D.Tex.2004) (finding prejudicial ineffectiveness because counsel failed to discover and remedy fact that client's trial demeanor was caused by psychiatric medications.)

## MITIGATION PHASE

### COURT CLAIM NO. 18 – Confrontation of Aggravating Evidence: Failure to Present Evidence of BWS to Explain the Relationship Between Petitioner and Terry DeGeus to Rebut the Prosecution's Theory of Her Motive for Killing Him

The prosecution argued at trial that Ms. Johnson was motivated by revenge to kill Terry DeGeus. Petitioner contends that it was ineffective of her defense counsel to rebut that argument by presenting evidence of Battered Women's Syndrome.

### A. Trial Counsel's Performance Was Ineffective

The government argues that Ms. Johnson's trial counsel put on a lot of evidence that Ms. Johnson was a battered woman. The glaring problem with that argument is that trial counsel also explicitly and repeatedly told the jury that none of the evidence presented by its Battered Women's Syndrome expert was relevant to the crimes. Dr. Hutchinson was asked a series of questions by trial counsel about the instructions he gave her at the outset of her examination: the defense was not claiming any mental disease or defect excluded her responsibility for the crime, nor was the defense claiming that Ms. Johnson was insane or that mental illness prevented her from understanding the nature or quality of her actions, that Dr. Hutchinson was not to discuss the homicides with Ms. Johnson because she was to address "mitigation only." (T.Tr. 3627-3628). When Dr. Hutchinson testified that she was looking "for an understanding of how this tragedy could have occurred," (T.Tr. 3628), defense counsel hastened to make sure the jury did

45

not think Dr. Hutchinson had anything to say about that.

Q.        Dr. Hutchinson, I just want to be crystal clear about this, okay, crystal clear. Are you making some claim that your testimony today has to do with the mental state of Angela Johnson at the time of the commission of the homicides for which she has been convicted?

A.        No.

Q.        Okay. We're clear about that.

A.        We are very clear about that.

(T.Tr. 3629).

Just in case the jury didn't grasp trial counsel's unreasonable limitation on the use of Dr. Hutchinson's testimony, the prosecution continued the persistent drum beat of irrelevance.

Q.        And so you are not here offering any opinion whatsoever concerning whether this mental condition of posttraumatic stress disorder that you've diagnosed her with had any effect on her thinking or behavior at the time that she committed these offenses, are you, ma'am?

A.        I've been very clear that I'm not saying that that contributed to it.

Q.        You are not suggesting in any way that she was acting under any form of duress at the time that she committed these murders?

A.        I have not asserted that.

Q.        You are not asserting that she acted under any form of mental defect that affected her ability to recognize that what she was doing was wrong when she participated in the murders of five people.

A.        I wouldn't be – I would have been in the other phase of the trial had I been doing that, yes.

Q.        So the answer to my question is you are not giving that opinion.

A.        That's correct.

Q.        You are not asserting that she was unable to understand what she was doing when she went out and purchased an assault weapon for Dustin Honken.

A.        I'm not asserting that.

46

| Q. | You're not asserting that she did not understand what she was doing when she helped him gain entry into a house and tie up and gag victims. |
|---|---|
| MR. BERRIGAN: | I'm going to object to this whole line of inquiry. It's been repeated now with the earlier witness, and this witness has made it clear, Your Honor. This is repetitious, and these questions have already been asked and answered several times. |
| THE COURT: | It's getting real close, so you can wrap this part of your cross up. |
| MR. WILLIAMS: | I will wrap it up. |
| THE COURT: | Okay. |
| BY MR. WILLIAMS: | |
| Q. | I do want to make perfectly clear, though, ma'am, you are not in any way indicating that she did not know exactly what she was doing and acted with free will at the time that she participated in the murders of five people. |
| A. | I don't know what she did in relation to those. I haven't discussed them. |

(T.Tr. 3679-3681).

With those admonitions, nothing Dr. Hutchinson said about battered women could, should, or would have been used by the jury to assess the prosecution's theory of motive.[24]

The prosecution also points to testimony from lay witnesses that Ms. Johnson continued to love Mr. DeGeus, even after the beatings, as evidence that the jury had. That's true as far as it goes but, as quoted by the government in its Response, the law enforcement witness who testified about Ms. Johnson's relationship with Mr. DeGeus, told the jury that it's "quite common, *for whatever reason*, for women in those situations not to want to press charges against the battering individual." [Doc. 325 at 34 citing T.Tr. 3603 (emphasis added)]. That, of course, begs the question: What is the reason? And that's the question that Dr. Hutchinson could have, but was prevented from, answering. The answer would have been that battered women do not act out of

---

[24] The defense and prosecution elicited virtually identical testimony from Ms. Johnson's other mental health experts, Dr. Logan (T.Tr. 3306-3307) and Dr. Cunningham (T.Tr. 3796).

revenge; if they become violent toward their abusers, it is out of fear and a belief in the necessity of the violence. (H.Tr. 3629-3630). Fear as a motive bears significantly less moral culpability than revenge. Indeed, Battered Women's Syndrome can provide the factual basis for a complete defense, such as duress or self-defense, to homicide, or an explanation of adequate cause for sudden passion under the definition of voluntary manslaughter. *See, e.g., Dando v. Yukins*, 461 F.3d 791 (6th Cir. 2006); *People v. Romero*, 26 Cal.App.4th 315, 337 (Cal. App. 2d Dist. 1992).

**B.      Petitioner Was Prejudiced**

The prosecution argues that Ms. Johnson was not prejudiced because revenge was only a secondary motive, the primary motive being Ms. Johnson's interest in furthering the drug enterprise. The government then argues, incredibly, that the revenge motive was a mitigating factor not an aggravating factor. [Doc. 325 at 36]. This ludicrous argument is belied by the prosecution's own use at trial of the revenge motive. The prosecution argued that Mr. DeGeus was not just killed, but that he was beaten with a bat, fracturing his skull, because of Ms. Johnson's desire for revenge. (T.Tr. 2471-72). That argument allowed them to tie Ms. Johnson to the decision to take a bat to the crime scene, evidence they otherwise did not have. The prosecution argued, "Somebody brought a bat or club or some object along with them for only one purpose, and that was to use to beat him, beat him in revenge for the times that he beat her when they had a relationship. That's thinking ahead." (T.Tr. 2471). (*Cf.* Testimony of Steve Vest – Mr. Honken brought the bat because DeGeus was known as a "badass around town," (T.Tr. 2572) and Mr. Honken purchased and brought bat (T.Tr. 2612).

The prosecution argued in penalty phase rebuttal that Ms. Johnson was deserving of a death penalty although Mr. Honken had been given a life sentence for Mr. DeGeus' death because she was out for revenge. ("But keep this in mind. You know, with Terry DeGeus, who had the greater motive to kill him? Now, sure, Dustin Honken had a motive to kill him because he was going to be a witness, and so did Angela Johnson. She knew that Terry DeGeus could put her in prison as well as Dustin Honken. But she also had revenge as a motive." (T.Tr. 4083)).

The prosecution's argument that a revenge motive was mitigating is merely a *post hoc*

48

attempt to explain away the prejudice Ms. Johnson suffered by being portrayed as a mean and vengeful woman. Had Dr. Hutchinson been able to explain that there is well-recognized syndrome common to women who are battered, and that when women like Angela Johnson who suffer from that syndrome commit acts of violence, it is out of fear, not revenge, that would have been mitigating. Because of counsel's ineffective performance, the jury did not hear, and were not allowed to consider, that evidence. Only four jurors even acknowledged that Ms. Johnson's uncontested fear of Mr. DeGeus was a mitigating factor. [Trial Doc. 593 at 4].

Mr. Honken, the actual killer of Terry DeGeus, was given a life sentence for his participation in Mr. DeGeus' crime. Ms. Johnson, however, who did not shoot Mr. DeGeus and did not beat Mr. DeGeus with a bat, was given a death sentence. Trial counsel's failure to use readily available factual and expert evidence to rebut the prosecution's aggravating theory of revenge was prejudicial.

### COURT CLAIM NO. 19 – Confrontation of Aggravating Evidence: Failure to Present Readily Available Evidence About Dustin Honken to Refute the Prosecution's Argument that Angela Johnson Was "Worse" Than Honken

Petitioner has alleged that trial counsel were ineffective in failing to confront and to rebut aggravating evidence presented by the prosecution that portrayed Angela Johnson as "worse" than Dustin Honken. [Doc. 314 at 74-8]. The government, in response, states that Petitioner "misrepresents" its argument at penalty phase, complains that she has not presented evidence that the trial testimony by Jeff Honken, Rick Held, Kathy Rick and Alyssa Nelson was "false," that counsel's performance was not deficient, and that Petitioner has not shown prejudice. [Doc. 325 at 37-41].

Petitioner has not, however, argued that the testimony by Jeff Honken, Rick Held, Kathy Rick and Alyssa Nelson was perjurious, but rather that the evidence about Honken that the government elicited from these witnesses was profoundly misleading, given other evidence about

49

Honken that was not presented.[25] The gravamen of this claim is trial counsel's failure to rebut this fallacious portrait of Honken with readily available evidence that would have enabled the defense to counter the government's argument that Petitioner was the catalyst for these crimes because Honken had never committed a violent act until he met her.

The government's accusation that Petitioner misrepresents its penalty phase argument rests on a fine distinction between Honken's planning violent acts and engaging in those acts. The government would have the Court dismiss substantial evidence of Honken's pre-1993 acts of violence and planning of violence as irrelevant because the government says it never argued that Honken did not plan violence before 1993.[26] But the jury did not know about any of Honken's pre-1993 plans for and acts of violence, and therefore could not make the distinction between planning and acting now raised by the prosecution. After-the-fact sophistry by the prosecution cannot excuse trial counsel's failure to introduce evidence of Honken's planning and carrying out violent acts before he met Petitioner; the evidence that the jury did not hear allowed the government free rein to exploit the missteps of defense counsel.

The prosecution's penalty phase arguments demonstrate the prejudice Petitioner suffered from the lawyer's failure to rebut the evidence presented by the prosecution. The prosecutor began by urging that the murders in this case were the result of "a long-term, premeditated decision" "[i]n the context of a drug conspiracy that this defendant knowingly and willfully

---

[25]     In an attempt to defend the actions of trial counsel, the prosecution cites the testimony of Timothy Cutkomp, who allegedly knew Honken better than anyone, that Honken was not violent until 1993. [Doc. 325 at 39]. However, what Cutkomp had to say is not the issue. The issue is whether trial counsel were ineffective in failing to rebut the prosecution's portrayal of Honken as a mere schemer of violent acts, who was never actually violent until he was manipulated and encouraged by Angela Johnson to commit five murders.

[26]     Tellingly, the prosecution's recitation of mere "planning" evidence by Honken [Doc. 325 at 38] fails to address the evidence that could have been, but was not, presented about Honken's admissions to Allen Johnson that he and Cutkomp went to Minneapolis to beat and rob homosexuals. (H. Tr. 2777, 2784).

50

joined, of which she was a vital member." (Tr. T. 4010). Petitioner "saw an opportunity to get herself to the top of this [drug] organization" by "sle[eping] her way to the top" and "betray[ing] her ex-boyfriend." (*Id.*). Petitioner, "through her efforts, through her manipulation, got herself to the top of this organization, partnered with Dustin Honken . . . ." (*Id.,* 4011). Of the Nicholson/Duncan murders, the prosecutor argued "[t]his was a plan from the beginning that [Petitioner] made with Dustin Honken to go kill Greg Nicholson and, toward that end, they plotted." (*Id.*) Regarding the DeGeus homicide, "[Petitioner] has time to think. She has time to contemplate. She has time to reflect upon the conduct that she engaged in . . . [and] she decides to act again." (*Id.* at 4014). He argued that Petitioner "had the power to manipulate . . . a tough man [like Terry DeGeus]," "to bring him to his own death" (*Id.* at 4015) and that "it was not the defendant entitled to determine what punishment Terry DeGeus was to receive for [his abuse of her]. It was not the defendant entitled to make the decision that he should receive the death penalty for his past abuse of her." (*Id.* at 4030). The prosecutor admonished the jury:

> Do not, do not, just jump to the conclusion that the person who pulls the trigger is the person who's the most morally culpable for the crime. Think about what you know about this defendant and her violence, her impulsivity, her ability to manipulate Honken, Terry DeGeus. Ask yourself this question: Is it more morally culpable to pull the trigger, or is it more culpable for someone to egg on, to push?

(*Id.* at 4026).

Petitioner was "a person who is manipulating and pushing Dustin Honken." (*Id. See also, Id.* at 4027) ("So when the defendant talks to you about role in the offense, don't accept their premise that the person who pulls the trigger is more morally culpable than the person who's egging on and pushing and cajoling and putting the person in the position of pulling that trigger."). In closing penalty phase argument, the prosecutor returned to this theme. He contrasted the different pictures of Petitioner painted by the parties and said:

> What I was trying to describe to you is the Angela Johnson who manipulated her way to the top of the Honken organization, who constantly pushed and pressured Honken to get with it and make that methamphetamine so she could get her money back, who has kept pushing Dustin Honken after he was caught again in 1996 to kill again, and that's the image that I ask you to accept.
>
> The defense gets up and gives you a different image of her and what her role is and

that Dustin Honken was the one in charge and so forth. I'm not going to go back over that stuff. That's for you to determine.

But I ask you to look very carefully at the evidence and consider all the evidence and ask in your own mind what picture to you see? Angela Johnson, the unwitting, innocent person who gets duped into killing or the Angela Johnson who's violent, who's pushing, who's cajoling Dustin Honken to commit these crimes?

(*Id.* at 4079-80)

Petitioner has argued that trial counsel compounded the prejudice to Petitioner by the failure to rebut the prosecution's portrayal of her as more culpable than Honken by calling witnesses who supported this inaccurate portrayal of Honken. [Doc. 314 at 80-81]. The prosecution urges that "several of these witnesses were very important to Petitioner's mitigation case and trial counsel would have been ineffective had they failed to call these witnesses." [Doc. 325 at 40]. This sweeping assertion, unaccompanied by any explanation, fails to address the point of this argument, which is that the defense, through lack of preparation and inattention, presented witnesses who assisted the government in painting an inaccurate picture of Honken.

Petitioner faults trial counsel presenting the testimony of Leon Spies about the Honken jury penalty verdicts, because if the jury accepted the government's position that Petitioner was more morally culpable that Honken, the actual killer, the jury would likely impose – and did impose – harsher sentences on Petitioner. [Doc. 314 at 81-82]. The government defends the calling of Mr. Spies as "not an unreasonable strategy." (*Id.* at 40). However, as Mr. Stowers acknowledged, if the jury believed that Petitioner was more culpable than Honken and was dominating Honken, evidence of his death verdicts would not support a life sentence for her but would have the opposite affect. (H.Tr. 1491).

Finally, and quite incredibly, the prosecution argues that "the jury did hear evidence that could have supported the jury finding as a mitigating factor that Petitioner had a minor role," based on evidence that was presented by the government rather than the defense:

The evidence showed, and the government argued, Honken was the principal and Petitioner was the aider and abettor. The evidence showed, and the government argued, Honken was the one who planned the murders.

(*Id.* at 40).

52

The prosecution's closing arguments, however, wholly obliterated the distinction between principal and aider and abettor; according to the government, the aider and abettor became worse than the principal. (*See, e.g.,* T. Tr. 4026 ("Ask yourself this question: Is it more morally culpable to pull the trigger, or is it more culpable for someone to egg on, to push?"). The government did not argue that Honken was the one who planned the murders. (*See, e.g.,* Tr. T. 4100 ("[t]his was a plan from the beginning that [Petitioner] made with Dustin Honken to go kill Greg Nicholson and, toward that end, they plotted."); T.Tr. 4014 (regarding the DeGeus homicide, "[Petitioner] has time to think. She has time to contemplate. She has time to reflect upon the conduct that she engaged in . . . [and] she decides to act again.").

The prejudice to Petitioner from her counsel's error is manifest: not a single juror found to be true the mitigating factor that "her participation was relatively minor as compared to Dustin Honken's role in these murders." [Doc. 593, at p. 3]. Petitioner does not have to show "'that counsel's deficient conduct more likely than not altered the outcome' of [her] penalty proceeding, but rather [she] must establish 'a probability sufficient to undermine confidence in [that] outcome.'" (*Porter v. McCollum,* — U.S. —, 130 S. Ct. 447, 455-56 (2009) (quoting *Strickland v. Washington,* 466 U.S. 668, 693-94 (1984). Trial counsel's error in failing to refute the prosecution's fundamentally inaccurate portrayal of Dustin Honken is sufficient to undermine confidence in the penalty decision.

### COURT CLAIM 20 – Confrontation of Aggravating Evidence: Failure to Use the Prosecution's Arguments at Dustin Honken's Trial as Party Admissions to Rebut the Government's Evidence That Petitioner Was "Worse" Than Honken

Petitioner has argued that trial counsel were ineffective in failing to introduce the government's arguments at Dustin Honken's trial as party admissions to rebut its evidence that Petitioner was "worse" than Honken. [Doc. 314 at 82-87]. In response, the government maintains that its closing arguments in Honken's trial are not admissible under *United States v. McKeon,* 738 F. 2d 26, 33 (2nd Cir. 1984). [Doc. 325, at 42-46].

53

*McKeon (Id.)* considered the admissibility of an opening statement by defense counsel at the defendant's second trial; the Second Circuit held that was could be introduced at his third trial as a party admission in his third trial because the arguments were: (1) assertions of fact that are the equivalent of a testimonial statement by the client; (2) inconsistent with similar assertions in a subsequent trial; and (3) an innocent explanation for the inconsistency does not exist. The *McKeon* test, however, is not properly applied where the defendant in a criminal case seeks to introduce arguments by the government in a prior related trial. In *United States v. Salerno*, 937 F. 2d 797 (2nd Cir. 1991), the Second Circuit considered, and rejected, the application of *McKeon* in the present context. In a bid-rigging prosecution, defendant Auletta argued that the district court abused its discretion by precluding him from using the government's arguments in another prosecution – "the commission case" – describing him as the victim of extortion by "the commission." (*Id.* at 810-11). While the court found that the indictment in the commission case did not constitute an admission of a party-opponent because it is a charge of a grand jury, which is neither an officer nor an agent of the United States (*Id.* at 811 (citing *Falter v. United States*, 23 F. 2d 420, 425 (2nd Cir.), *cert. denied,* 277 U.S. 590, 48 S. Ct. 528, 72 L. Ed. 2d 1003 (1928)), it further stated:

> However, the jury arguments are another story. In *United States v. McKeon*, 738 F. 2d 26 (2nd Cir. 1984), we refused to adopt a *per se* prohibition on the use of prior opening statements in criminal trials. There, in language particularly appropriate to this case, we said:
>
>> To hold otherwise would not only invite abuse and sharp practice but would also weaken confidence in the justice system by denying the function of trials as truth-seeking proceedings. That function cannot be affirmed if parties are free, wholly without explanation, to make fundamental changes in the version of facts within their personal knowledge between trials and to conceal these changes from the final trier of fact.
>
> (*Id.* at 31).

*Salerno,* 937 F. 2d at 811. After considering the government's argument in the commission case and those in Auletta's trial, the court stated:

> Apparently, the government has taken the same evidentiary clay that they used in the commission case and, for purposes of this trial, resculpted Auletta from a

54

"puppet on a string" to a bid rigger. The government was free to choose, for tactical or other reasons, not to join Auletta in the commission case, and to postpone his prosecution until they brought the club case. Even so,

> [t]he jury is at least entitled to know that the government at one time believed, and stated, that its proof established something different from what it currently claims. Confidence in the justice system cannot be affirmed if any party is free, wholly without explanation to make a fundamental change in its version of the facts between trials, and then conceal this change from the final trier of fact.

(*United States v. GAF Corp.*, 928 F. 2d at 1260).

The court concluded as follows:

> Perhaps Auletta was a culpable bid-rigger; perhaps he was a puppet on a string. The government, at different times, has urged both -- and the jury was entitled to know that, because the jury, and not the government, must ultimately decide which he was.

(*Salerno*, 937 F. 2d at 812).

The distinction made in *Salerno* between the use of prior statements by a defendant's attorney and the use of prior statements by the government was noted by the district court in *United States v. Bakshinian*, 65 F. Supp. 1104, 1108 (C.D. Cal. 1999), which held that "*McKeon's* reasoning breaks down when applied to a government prosecutor." The court explained:

> Upon consideration of *McKeon*'s reasoning, it is clear that much of its analysis is restricted to the use of the defendant's prior statements and is thus inapplicable to prior statements of the government. For example, while the possibility of wasting time would apply to the defendant and the government alike, the possibility that the jury will be misled as to the government's burden applies only to the defendant. *McKeon* noted that because the government bears the burden of proving every element of the offense, the defense need not attack each element in each proceeding and can instead focus on certain weaknesses. This may mislead the jury. The government, however, cannot rely on this argument: it bears the burden of proving every element in every proceeding. Therefore, if the government's prior statement weakens its present case as to a certain element, the government cannot complain that the jury may misunderstand the government's burden.
>
> *McKeon* also noted that the admission of prior arguments may deter "vigorous and legitimate advocacy." Again, this argument applies only to the defendant. Because the burden of proof is on the government, the defendant need only argue that the government has not met that burden and that something other than the government's theory might have actually occurred.
>
> Thus, while the defense may not make false statements to the jury, it is entitled to

55

greater leeway than the government because the defense need not prove anything. The government, however, bears the burden of convincing the jury that the particular facts occurred and, moreover, between one trial and another, the government may not take inconsistent positions as to what occurred. Thus, the fact that the government's statements in a previous trial might be admitted in a later trial will not hinder proper advocacy by the government.

(*Id.* at 1107-08) (internal citations omitted).

*See also United States v. Kattar*, 840 F. 2d 118, 127-28 (1st Cir. 1988) (same).[27] Therefore, the government's assertion that its arguments at Honken's trial are not admissible under *McKeon* must be rejected.

The prosecution's claim that the statements trial counsel should have introduced as party admissions are not inconsistent with its argument at Petitioner's trial [Doc. 325 at 44] lacks merit. At Honken's trial, the prosecution argued that he was intelligent, an organizer and a schemer, and did a lot of planning. (*Id.*) However, at Petitioner's trial, it was Ms. Johnson who was the schemer and planner (*See, e.g.,* Tr. T. 4011) (Petitioner, "through her efforts, through her manipulation, got herself to the top of this organization, partnered with Dustin Honken . . . .") (*Id.*); ("[t]his was a plan from the beginning that [Petitioner] made with Dustin Honken to go kill Greg Nicholson and, towards that end, they plotted."); (regarding the DeGeus homicide, "[Petitioner] has time to think. She has time to contemplate. She has time to reflect upon the

---

[27]    In *United States v. Kattar*, the First Circuit stated as follows:

It is one thing for private counsel to characterize events in contrasting ways in two separate litigations, because the counsel there is required under our adversary system to defend its clients in the most vigorous fair manner possible – counsel is expected to put the best possible gloss on a client's case. The function of the United States Attorney's Office, however, is not merely to prosecute crimes, but also to make certain that the truth is honored to the fullest extent possible during the course of the criminal prosecution and trial. If it happens that the government's original perspective on the events in question is proven inaccurate, such revelation is in the government's interest as well as the defendant's. The criminal trial should be viewed not as an adversarial sporting contest, but as a quest for truth.

840 F. 2d at 127 (internal citations omitted).

conduct that she engaged in . . . [and] she decides to act again.") (*Id.* at 4014); (Petitioner "had the power to manipulate" "a tough man [like Terry DeGeus]," "to bring him to his own death") (*Id.* at 4015); and ("it was not the defendant entitled to determine what punishment Terry DeGeus was to receive for [his abuse of her]. It was not the defendant entitled to make the decision that he should receive the death penalty for his past abuse of her") (*id.* at 4030). Clearly, the prosecution's argument that "[i]n Petitioner's trial, the government did not deviate from the assertion Honken was the planner and schemer" [Doc. 325 at 45], is belied by the transcript.[28]

The government's argument is that trial counsel "cannot be faulted for failing to move for the admission of the Honken argument before they heard the government's argument in Petitioner's case" (*Id.* at 45-56) is without merit. Mr. Berrigan has admitted that "in the penalty phase of the Honken trial [the government] portrayed I thought quite vividly quite a different portrait of Honken than he had presented in our case." (H.Tr. 2136). He has also testified that he "hadn't given [the issue of the using the Honken trial arguments as party admissions] more than a passing thought." (*Id.*) Mr. Berrigan's recognition of the fact that the prosecution was painting "quite vividly quite a different portrait of Honken" in Petitioner's case required him to act to protect Petitioner's rights to a fair trial and reliable determination of penalty. Yet he did not object, nor did he proffer what he recognized to be inconsistent government arguments at Honken's trial; his omissions in this respect were constitutionally ineffective assistance of counsel.

The prejudice to Petitioner from her counsel's error is plain: not a single juror found to be true the mitigating factor that "her participation was relatively minor as compared to Dustin Honken's role in these murders." [Doc. 593, at p. 3]. Petitioner does not have to show "'that counsel's deficient conduct more likely than not altered the outcome' of [her] penalty

---

[28] The prosecution is incorrect in suggesting that Petitioner claims that its theme at Honken's trial was that she was less culpable than he was. [Doc. 325 at 45]. However, as set forth above, the government did argue at Petitioner's trial that Petitioner was more culpable than Honken.

proceeding, but rather [she] must establish 'a probability sufficient to undermine confidence in [that] outcome.'" (*Porter v. McCollum*, — U.S. —, 130 S. Ct. 447, 455-56 (2009) (quoting *Strickland v. Washington*, 466 U.S. 668, 693-94 (1984). Trial counsel's error in not introducing the prosecution's arguments at Honken's trial to rebuts its arguments that Petitioner was "worse" than Honken is sufficient to undermine confidence in the penalty decision.

### COURT CLAIM 21 – Confrontation of Aggravating Evidence: Failure to Discover and Present Information Regarding Dustin Honken's Plans to Kill Prosecutor Reinert and His Family and Honken's Membership in a White Supremacist Prison Organization

Claim 21 raises trial counsel's ineffectiveness in failing to discover and present evidence of Dustin Honken's plans to kill prosecutor Reinert and his family, as well as Honken's membership in a white supremacist prison organization. [Doc. 341 at 87-94].

The prosecution contends that Petitioner "concedes all of the factual assertions contained in internal security memo authored by Reinert were in the government's discovery file and trial counsel were aware of them" and asserts that the only issue is whether trial counsel was ineffective in failing to seek discovery of three government memoranda regarding security issues. [Doc. 325 at 47-48]. This is not correct. There was relevant information in the government memoranda that was not contained in the discovery. This claim raises trial counsel's ineffectiveness in failing to **present** evidence of Honken's various threats and schemes that was in the discovery and failure to **discover and present** the information in the government memoranda. The information in the memoranda went beyond that contained in the discovery. Assistant United States Attorney Reinert found Honken's threats so credible that he and the Department of Justice instituted sophisticated security measures to thwart any potential attack by Honken. In addition, the memoranda demonstrate that Mr. Reinert and the Security Division of the Department of Justice did not view the Odinists as the benign religious group described by Steven Vest; rather, they were a dangerous white supremacist gang with contacts in and outside of prisons that was capable of assisting Honken in making good on his threats. (*See* H.Tr. 2949-2534, Mr. Reinert's evidentiary hearing testimony on these issues).

58

The prosecution claims that the information trial counsel failed to discover and/or present to the jury was not exculpatory because "the government never claimed Petitioner was the 'instigator' of the murders." [Doc. 325 at 48]. This is incorrect. The prosecutor argued at Petitioner's penalty phase that "this was a woman, number one, who was in control. She was in control." (T. Tr. 4019). He argued that Petitioner "is a person who was manipulating and pushing Dustin Honken." (*Id.* at 4026). In fact, Timothy Cutkomp was more afraid of Petitioner than Dustin Honken, "[b]ecause she's pushing Honken to kill again." (*Id.* at 4027). The government told the jury that Petitioner was the person "who's egging on and pushing and cajoling and putting [Honken]in the position of pulling that trigger." (*Id.* at 4027). The jury was told that Petitioner "kept pushing Dustin Honken after he was caught in 1996 to kill again." (*Id.* at 4079). And it urged that Angela Johnson was the one who was "violent, who's pushing, who's cajoling Dustin Honken to commit these crimes." (*Id.* at 4080). The information that trial counsel failed to discover and present clearly portray Petitioner as the instigator of violence by Honken, and therefore it is exculpatory.

The prosecution argues it is "irrelevant" that Honken had the skill and intelligence to plan violent acts, including contacts within and without the prison, and to carry out violent acts because "Honken's abilities in this regard were not in dispute." [Doc. 325 at 49]. However, the arguments by the government set forth above, which stress Petitioner's "control," "manipulat[ion] and pushing" of Honken, diminish his "abilities" and could have been rebutted by the evidence that is the subject of the present claim

The prosecution argues that trial counsel's performance was not deficient because "[t]here is no question Odinism is a religion." (Doc. 325 at 49). Whether or not Odinism is a religion is irrelevant. Assuming *arguendo* that it was a religion, this label did not relieve trial counsel of the obligation to inform the jury of the true nature of that "religion" as well as Dustin Honken's role in the Odinists and his ability to seek assistance from his co-religionists.

The prosecution argues that Mr. Reinert's opinion about the nature of the Odinists is inadmissible. [Doc. 325 at 50]. His opinion is not the issue; what is at issue is the fact that, once

59

Honken's plans and threats were known, security measures were taken to ensure his safety. The seriousness with which Reinert and the Department of Justice took Honken's threats speaks for itself.

Finally, the government argues Petitioner was not prejudiced by the failings of her trial counsel because the evidence that was not presented and/or discovered "does not rebut evidence about Honken's lack of violent conduct before he met Petitioner in 1993." [Doc. 325 at 50]. This evidence would not have been offered for this purpose, but rather to show that the government's arguments about Petitioner's "egging," "cajoling" and "pushing" Honken to commit violent acts were false, because Honken, both before and after 1993, was more than capable of committing and planning acts of violence.

Petitioner does not have to show "'that counsel's deficient conduct more likely than not altered the outcome' of [her] penalty proceeding, but rather [she] must establish 'a probability sufficient to undermine confidence in [that] outcome.'" (*Porter v. McCollum*, — U.S. —, 130 S. Ct. 447, 455-56 (2009) (quoting *Strickland v. Washington*, 466 U.S. 668, 693-94 (1984). Trial counsel's error in failing to discover and present the evidence at issue to the jury that convicted Petitioner and sentenced her to death is sufficient to undermine confidence in the penalty decision.

### COURT CLAIM NO. 22 – Confrontation of Aggravating Evidence: Failure to Address Aggravating Evidence at the Merits and Mitigation Phases of the Trial (Reply)[29]

Trial counsel were ineffective in failing to address the government witnesses' testimony, elicited from Agent Michael Mittan (Tr. 2726), Jeffrey Honken (Tr. 369), Daniel Cobeen (Tr. 708-10), Kathy Rick (Tr. 2637-40), Doug Book (Tr. 3613-14), Alyssa Nelson (Tr. 2678-79,

---

[29] In Ms. Johnson's opening brief, counsel inadvertently included the language from the Second Amended Petition on this Claim rather than the post-hearing argument counsel intended to include. The argument is included in this Reply.

60

2682-83), that Ms. Johnson engaged in bizarre and threatening behavior, including using profanity-laden language to describe grandiose plans; making loud, profanity-laden threats through words and gestures; vandalizing cars; engaging in name calling; and behaving in irate, out of control manners.

## A. What Reasonably Effective Counsel Should Have Done

ABA Guideline 10.11 imposes a continuing duty on counsel to investigate issues bearing on penalty, and to seek information and consider introducing evidence that would rebut or explain the prosecution case in aggravation, including lay and expert witnesses. Guideline 10.11A., F.(1).

Trial counsel ineffectively failed to have their three mental health experts – Dr. Logan, Marilyn Hutchinson, Ph.D., and Mark Cunningham, Ph.D. – address the evidence described above. Counsel should have consulted with them and conducted additional investigation to determine whether Ms. Johnson had impairments that could explain Ms. Johnson's behavior other than that urged by the government, that petitioner was a violent woman who inspired and encouraged violence by Dustin Honken.

Had counsel, through their mitigation specialist and mental health experts, undertaken the requisite investigation, they would have discovered that Ms. Johnson suffered lifelong neurological impairments that affected her functioning, and caused her to act in the manner described by the witnesses.

That investigation would have included a complete battery of neuropsychological testing, as was ordered by habeas counsel and done by Myla Young, Ph.D. (results in her report in Exh. 112, YNG000024-YNG000038, YNG000049-YNG000053). It would have included, as was ordered by habeas counsel, conducting neuroimaging and interpreting the results, as was done by the Tarrant County Medical Center (Exhs. 109-111) and interpreted by James Merikangas, M.D. (H.Tr. 4014-4065). That data would have been incorporated into a comprehensive neuropsychiatric evaluation, as was ordered by habeas counsel and done by George Woods, M.D.

61

(results reported in Exhibit 107, WOD000098-WOD000188).[30]

Dr. Young reported that the behavioral consequences of the brain structures such as that indicated across Ms. Johnson's neuropsychological testing include the individual "over-reacting (or under-reacting) to situations, [being] unable to accurately assess and alter their reactions appropriately, and respond[ing] in unanticipated, inaccurate or inappropriate ways, *sometimes resulting in aggressive or even violent actions*." (Exh. 112, YNG000034-YNG000035 (emphasis added)). Dr. Merikangas also testified that people with impairment of the frontal lobe, such as he had seen in the neuroimaging of Ms. Johnson's brain, have bad judgment, make bad decisions, and react strongly and inappropriately to situations. (H.Tr. 4025).

Dr. Woods found that the neuropsychological testing, "corroborating problems with impulse control, judgment, inhibition, recognition of social cues, as well as [Ms. Johnson's] ability to organize and utilize information to solve a problem; is reinforced by historical information from multiple sources, as indicated above." (Exh. 107, WOD000120). He found that Ms. Johnson's symptom presentation "mimics Bilpolar Disorder(,) and temporal lobe dysfunction shares many of the Bipolar spectrum symptoms. In Ms. Johnson's case, these co-morbid symptoms, or symptoms that could be part of both disorders, are mood lability, impaired judgment, irritability, and significant drug use, and propensity for dissociation. (Exh. 107, WOD000123). He described how her "tough facade" quickly crumbled in the face of minimal tensions, disagreements, or external pressures. (Exh. 107, WOD000137). Finally, Dr. Woods was explicitly asked by habeas counsel to address whether "the defendant's use of profanity and verbal threats consistent with her longstanding neurological, psychiatric, and psychological impairments." (Exh. 107, WOD000173-174). He opined that to a reasonable degree of psychiatric certainty Ms. Johnson's use of profanity and verbal threats are consistent with her longstanding neurological, psychiatric, and psychological impairments, particularly her history of

---

[30] For a thorough discussion of the results of the testing, interpretation, and evaluation, see the argument in Petitioner's Post-Hearing Brief, Claim 34, Doc. 314 at 162-169.

hyperreactivity, hypervigilance, and affective dysregulation. (Exh. 107, WOD000174). At the evidentiary hearing, when asked on cross-examination about this opinion, Dr. Woods explained that these are the result of both type 1 and complex PTSD, as well as the frontal lobe impairments. The symptoms of irritability, exaggerated startle response, numbing of affect, lead to inappropriate responses in one-to-one situations, such as using profanity and making threats. (H.Tr. 4486-4487).

All of this evidence, had it been developed before trial and presented at trial, would have provided an organic explanation for behavior that the prosecutor intended to be seen, and most likely was seen, as aggravating. Dr. Cunningham would have used evidence of brain impairment to describe how the structural integrity of his metaphorical bridge was undermined, so that not only was the span crumbling, the quality of the supports were also impacted. (H.Tr. 3929). Counsel had an obligation to mitigate the prosecution's aggravating evidence. They did not do so, and their failure was neither tactical nor strategic.

**B.      Problems with the Government Response**

The government argues that counsel were not ineffective because trial counsel elicited from the defense experts some evidence that "this behavior . . . resulted from her abusive childhood and mental impairments," and her methamphetamine abuse. He next argues that Dr. Woods' testimony at the hearing was not materially different, citing only to the transcript at the hearing and not his report. Finally, he argues that trial counsel, through Dr. Cunningham, did not carry out threats against guards.

The government's argument fails for three reasons. First, at trial, Dr. Hutchinson and Dr. Logan were not asked, and did not try, to explain the aggravating circumstances that the prosecution had introduced.

When Marilyn Hutchinson testified that Ms. Johnson concluded "it was better to be feared than loved," (Doc. 325 at 51, citing Tr. 3646, 3667-68), it was in the context of (a) being attracted to "bad boys" (Tr. 3646) and (b) protecting her younger siblings and adopting male

63

characteristics such as running a bar and riding a motorcycle (Tr. 3667-68). When Dr. Logan testified that Ms. Johnson had a lot of "anger, resentment, depression," it was in answer to questions about the long term implications of sexual abuse and his answer referred to her becoming, "somewhat more forceful, . . . a protector of some of her younger siblings." Nowhere in the testimony of Dr. Hutchinson or Dr. Logan is there any effort to tie the bizarre[31] behavior of Ms. Johnson, as testified to by the prosecution witnesses, to Ms. Johnson's mental impairments.

Second, Dr. Cunningham's testimony was not offered to explain that her mental impairments affected her behavior in custody. Rather, Dr. Cunningham testified that Ms. Johnson did well for someone – anyone – who was housed for long periods of time in facilities not equipped for long-term confinement. (Tr. 3890).

Third, trial counsel failed to tie Ms. Johnson's profanity and verbal threats to her mental impairments during his closing argument about future dangerousness (Tr. 4049-4059). Dr. Logan's testimony was never mentioned; Dr. Cunningham's testimony was mentioned only in terms of Department of Justice statistics about violence of female inmates and older inmates (Tr. 4054-55).. Trial counsel did mention Dr. Hutchinson's testimony that Ms. Johnson decided to act tough to minimize her chance of getting picked on at school or beat up at home when she was a child, and that "she's a big gal now, but she wasn't always. There she is in her 20s, and we know when she was a child she got all kinds of problems. So she acts tough. And that's not future dangerousness." (Tr. 4056). That is the sum total of trial counsel's reference to his mental health experts' testimony about Ms. Johnson's bizarre and threatening behavior.

Trial counsel's elicitation of the testimony to which the government referred in its Response and his negligible reference to that testimony in closing argument is a far cry from what effective counsel should and would have done to comport with the duty "to seek

---

[31] The prosecutor argues that Ms. Johnson's behavior was not bizarre because it was normal for her. Obviously, the appropriate comparison is to behavior by others not mentally impaired.

information and consider introducing evidence that would *rebut or explain the prosecution case in aggravation*, including lay and expert witnesses." Guideline 10.11A., F.(1) (emphasis added).

### C. Petitioner Was Prejudiced

The government argues that Ms. Johnson was not prejudiced because Dr. Woods' testimony was not materially different than that elicited from the defense experts at trial, and further that the trial experts' testimony was better than Dr. Woods' testimony. (Doc. 325 at 53-54).

The government's characterization of Dr. Woods' testimony is wrong. Unlike the trial experts, Dr. Woods explicitly connected Ms. Johnson's specific behavior (profanity and threats) to specific mental impairments (type 1 and complex PTSD, and frontal lobe impairments), and he tied the behavior to biologically derived impairments, an important component completely missing from the trial experts' testimony. *(See* H.Tr. 4286, Testimony of Professor Sean O'Brien ("And so the jury got a misleading picture of mental health. . . . But the particular focus, of course, is on the biological component, not just flushing out the history better but doing so in a way that supports the neurological, the central nervous system, issues that are contributing here.")

Moreover, even if the trial experts testimony was essentially the same (which it was not), the trial experts' testimony had been rendered completely irrelevant by the fatally unreasonable decision not to allow them to tie their opinions to the facts of the case.[32] The effect of that decision on the jurors' assessment of the worthiness of the experts' testimony is not mere speculation. Sundby, Scott, *The Jury as Critic: an Empirical Look at How Capital Juries Perceive Expert And Lay Testimony*, 83 Va. L. Rev. 1109, 1125 (1997) ("In analyzing juror comments, three consistent criticisms of professional testimony emerge: . . . (3) experts often fail to draw a link between their testimony and the defendant's specific situation.")

---

[32] *See also,* Doc. 263 at 48, Court Claim 34; Doc. 314 at 140-171.

65

In contrast, Dr. Woods' testimony about the neurological source of the impairments and the impact of those impairments on Ms. Johnson's behavior was supported by the findings and testimony of Dr. Young (Exh. 112, YNG000034-35) and Dr. Merikangas (H.Tr. 4025).

Finally, trial counsel did not make use in his closing argument of the limited mental health evidence he had elicited, leaving the jury without any guideposts to tie that testimony to the aggravating evidence the prosecutor introduced and argued was significant. (T.Tr. 4018-4019).

Although the jury did not unanimously find that Ms. Johnson posed a future danger (Trial Doc. 593 at 2), six jurors found the aggravating evidence persuasive enough not to find lack of future dangerousness to be a mitigating factor (Trial doc. 593 at 4). In studies of jurors' understanding of the law, the Capital Jury Project found that 32% of jurors believed that the law required them to impose the death penalty if they believed the defendant would be dangerous in the future. John Blume, Theodore Eisenberg, Stephen P. Garvey, *Lessons from the Capital Jury Project*, Chapter 5 in <u>Beyond Repair? America's Death Penalty</u>, Duke University Press, 144 -77 (2003). This empirical finding underscores that the presumption that jurors follow instructions, *see United States v. Logan*, 210 F.2d 820, 822-23 (8th Cir. 2000), *cert. denied* 531 U.S. 1053 (2000), is not always correct or reliable, and is evidence of how prejudicial the failure to mitigate aggravating evidence of future dangerousness is.

Contrary to the government's assertion that Dr. Woods' testimony would not have made a difference, Petitioner has demonstrated that it is reasonably probable that at least one juror would have voted for life if counsel had effectively used Ms. Johnson's mental impairments to mitigate the aggravating evidence of future dangerousness.

66