**COURT CLAIM 23 – Confrontation of Aggravating Evidence:**
**Failure to Limit Future Dangerousness Evidence to Future Danger in Prison**

Petitioner has alleged that trial counsel were ineffective in failing to limit the scope of evidence of future dangerousness to future dangerousness in prison while serving a sentence of life without the possibility of release. [Doc. 314 at 95-104]. Respondent replies that "controlling authority" in the Eighth Circuit Court of Appeals and split authority from other district courts show that trial counsels' failure to move *in limine* to limit the government's future dangerousness evidence was not ineffective and that Petitioner was not prejudiced by her attorney's error. [Doc. 325 at 55-58].

Guideline 10.11(I) of the 2003 ABA Guidelines require counsel to "carefully consider whether all or part of the aggravating evidence may appropriately be challenged as improper, inaccurate, misleading or not legally inadmissible."[33] (Exh. 1, p. 242). The Guidelines are markers to determining what is reasonably effective representation in a capital case. (*See Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Williams v. Taylor*, 529 U.S. 362, 396 (2000). The government admits that, in 2005, the limitation of future dangerousness evidence to future danger in prison was a subject of litigation in the Court of Appeals and district courts throughout the nation. [Doc. 325 at 54-55.] This was not a novel or cutting edge issue at the time of Petitioner's trial, and there was authority for excluding this very damaging evidence. (*See United States v. Llera Plaza*, 179 F. Supp. 2d 630, 638-39 (E.D. Pa. 2001) ("the jury will be instructed to evaluate the defendants' 'future dangerousness' in the context of life imprisonment and the government will be requested to limit its sentencing phase evidence to that which is relevant to a context of life imprisonment"); *United States v. Sampson*, 335 F. Supp. 2d 166, 219, 223 (D. Mass. 2004) (same); *United States*

---

[33]     *See also* Commentary to Guideline 10.11(I) ("Counsel should carefully research applicable state and federal law governing the admissibility of evidence in aggravation. Where possible, counsel should move to exclude aggravating evidence as inadmissible, and, if that fails, rebut the evidence or offer mitigating evidence that will blunt its impact."). (Exh. 1, p. 293).

*v. Peoples*, 74 F. Supp. 2d 930, 933 (W.D. Mo. 1999) (same); *United States v. Gilbert*, 120 F. Supp. 2d 147, 154-55 (D. Mass. 2000) (striking future dangerousness aggravator because all evidence proffered "lack[ed] any substantial relevance to defendant's dangerousness in a prison setting"); *United States v. Flores*, 63 F. 3d 1342, 1368-69 (5th Cir. 1999), *reh'g denied sub nom United States v. Garza*, 77 F. 3d 481, *cert. denied*, 519 U.S. 825 (1996) (rejecting claim of improper future dangerousness evidence because the government focused its arguments on the danger the defendant would pose in prison; in dicta, stating that evidence of future dangerousness should be restricted to danger in prison in any case where there is little likelihood that defendant would ever be released).

*United States v. Allen*, 247 F. 3d 741 (8th Cir. 2001) (en banc), *vacated and remanded on other grounds*, 563 U.S. 953 (2002), which the prosecution cites as "controlling authority" [Doc. 325 at 54], is readily distinguishable from the present case. There, evidence at issue was relatively restrained; the government argued that defendant posed a future danger because of the "extraordinary planning" of the murder and his lack of remorse. (*Id.* at 788.) In contrast, this case involved the government's presentation of numerous acts of "bad character" that show Petitioner had a bad temper and a propensity to threaten violence while angry. [Doc. 314 at 99-100].

*United States v. Lee*, 274 F. 3d 485, 494 (8th Cir. 2001), is also cited by the prosecution. [Doc. 325 at 54]. However, in *Lee*, it does not appear that there was any objection to evidence of future dangerousness on the ground that it must be limited to future danger in prison. Rather, the issue there was the admissibility of unadjudicated past bad acts by the defendant. The court indicated that these were "probative of Lee's future dangerousness and also relevant to the credibility of Dr. Cunningham's mitigation testimony." (724 F. 3d at 494.) Therefore, *Lee* is not "controlling authority" on the point that was not considered by the court.

*United States v. Edelin*, 134 F. Supp. 2d 59, 80 (D.D.C. 2001), which is also cited by the prosecution [Doc. 325 at 55], did not involve the admissibility of out-of-custody bad acts to

prove future dangerousness in a prison setting. In *Edelin*, the court considered a general objection to allowing any non-statutory aggravating factors and held that the defense was entitled to present evidence that defendant would be incarcerated for life if the jury decides against imposing the death penalty, a proposition that the prosecution did not dispute. (*Id.*) The court further held as follows:

> To the extent that the defendant argues that the government should be prohibited from introducing any evidence of future dangerousness, however, the Court disagrees. The Supreme Court's decision in *Zant v. Stephens*, indicates that a defendant's "predisposition to commit other crimes" is admissible in aggravation. The government may present information to support the finding of future dangerousness as an aggravating factor. The defendant may the rebut the information presented by the government, allowing the jury to make the ultimate determination of whether the federal prison system will adequately limit his future dangerousness.

(*Edelin*, 134 F. Supp. 2d at 80).

The prosecution also cites *United States v. Bernard*, 299 F. 3d 467, 482 (5th Cir. 2002). [Doc. 325 at 55]. However, *Bernard* did not address the issue raised by this claim. There, the defendant argued that the evidence was legally insufficient to support the jury's finding that he was likely to commit criminal acts of violence in the future that would be a threat to the lives and safety of others. The Fifth Circuit held that *Simmons* was correctly applied in *Bernard*'s case, because the jury was informed that he would be ineligible for parole, citing *Allen* as authority for rejecting "a similar *Simmons* argument." (299 F. 3d at 482.)

Finally, the prosecution's reliance on *Hogue v. Scott*, 874 F. Supp. 1486, 1509-11 (N.D. Tex. 1994) [Doc. 325 at 55] is also misplaced. This case involved a § 2254 motion based on a state court death sentence and there was no argument that evidence of future dangerousness must be limited to future danger in prison; indeed, the pages cited by the prosecution involves the court's summary of the evidence received at the penalty phase trial, without reference to the relevance of such evidence. Significantly, much of the evidence that was admitted at penalty phase consisted of the testimony by citizens from Hogue's community who opined that he did not have a good reputation for being a peaceful and law-abiding citizen. (*Id.* at 1509-11).

The government's reliance on *McDowell v. Calderon*, 107 F. 3d 1351, 1366 (9th Cir. 1977) (en banc), *remanded and superseded in part*, 116 F. 3d 364, *vacated in part*, 130 F. 3d 833 (9th Cir. 1977) (en banc), as approving non-custodial conduct to show future dangerousness [Doc. 325 at 55] is also misplaced. In California, the prosecution may not introduce evidence of a defendant's future dangerousness at penalty phase. (*See People v. Murtishaw*, 29 Cal. 3d 733, 773, 175 Cal. Rptr. 738, 631 P. 2d 446 (1981) ("One can imagine few matters more prejudicial at the penalty phase than testimony . . . that defendant, if sentenced to life without possibility of parole, would be likely to kill again."). Therefore, *McDowell* can hardly approve evidence inadmissible as a matter of state law.

The government further argues that trial counsel "did mount the very challenge Petitioner claims they should have made" and suggests that the present claim evinces mere dissatisfaction with "the manner and method of trial counsel's argument." [Doc. 325 at 55]. On this record, however, it cannot be seriously contended that trial counsel adequately raised the inadmissibility of out-of-custody bad acts to prove future danger in prison. Defense counsel waited until June 2, 2005, very near the end of the defense penalty presentation, to raise this issue. (T. Tr. 3025-27). At that point in time, the jury had already heard the prejudicial, inadmissible "future dangerousness" evidence set forth in Petitioner's post-hearing brief at pp. 99-101. Trial counsels' belated recognition that the government had overstepped appropriate boundaries in presenting future dangerousness evidence, without citation to case authority, was far too little and far too late. Moreover, trial counsel failed to move for an instruction that the jury should disregard the evidence at issue; although such an instruction would do little to ameliorate the harm that had been done, it would have been better than nothing.

The prosecution asserts that "the law is not in [Petitioner's] favor and she has not shown that had her counsel moved to limit future dangerousness and the court placed such a limitation of the government, "it would have resulted in at least one juror voting for a life sentence." [Doc. 325 at 57]. However, as discussed above, the law was in Petitioner's favor, and, given the

70

breadth of the "bad act" evidence introduced at trial, it is reasonably probable that if the evidence had been properly limited, at least one juror would have voted for a life sentence. The devastating impact of the government's assault of Petitioner's character during the course of her trial is shown by the fact that only six jurors found, as a mitigating factor, that "if Angela Johnson is incarcerated in a federal penitentiary for life, she would not be a danger to the lives and safety of others." [Doc. 593 at p.4].

Finally, the prosecution argues, without attempting to explain, that the evidence at issue would have been admissible to rebut a number of mitigating factors. [Doc. 325 at 57]. Petitioner cannot, however, understand how the numerous bad acts introduced by the government would have been admissible to rebut the proffered mitigator that she occupied a relatively minor role in the offense (*Id.*); what does her having yelled at Kathy Rick or Jeff Honken have to do with her role in the offense? The same is true for the assertion that the bad acts would rebut the "no prior criminal record" mitigator. (*Id.*) No prior criminal record means just that – no convictions – and the fact is that Petitioner had no prior criminal record before this case. Does the government seriously think it could introduce unadjudicated misdemeanors to rebut what cannot be rebutted? Lastly, the prosecution asserts that the bad acts were admissible to rebut the "others equally culpable but not sentenced to death" mitigator (*Id.*); this is simply nonsense.

Petitioner does not have to show "'that counsel's deficient conduct more likely than not altered the outcome' of [her] penalty proceeding, but rather [she] must establish 'a probability sufficient to undermine confidence in [that] outcome.'" (*Porter v. McCollum,* — U.S. —, 130 S. Ct. 447, 455-56 (2009) (quoting *Strickland v. Washington*, 466 U.S. 668, 693-94 (1984). Trial counsel's error in failing to limit evidence of future dangerousness to future danger in prison is sufficient to undermine confidence in the penalty decision.

71

**COURT CLAIM 24 – Confrontation of Aggravating Evidence:**
**Failure to Object to Kathy Rick's Triple Hearsay Testimony About**
**Petitioner's Alleged Possession of a Gun**

Petitioner has alleged that trial counsel was ineffective in failing to object to triple hearsay testimony by Kathy Rick about her possession of a gun. [Doc. 314 at 103-104]. The government responds that triple hearsay is admissible, that the failure to object was a matter of strategy, and that Petitioner was not prejudiced by her attorney's error. [Doc. 325 at 59-61].

The cases cited by the government for the proposition that counsels' performance was not deficient because the evidence at issue is admissible are inapposite. The prosecution asserts that "the law does not support Petitioner's argument," citing *Green v. Georgia*, 442 U.S. 95, 97 (1979). [Doc. 325 at 59]. However, in *Green,* the defendant sought to introduce the testimony of a witness that another defendant in that case admitted he killed the victim after ordering Green to run an errand the evidence excluded. This evidence was excluded because Georgia's hearsay rules did not recognize an exception for declarations against penal interest. The Supreme Court held that the exclusion of the witness' hearsay testimony denied petitioner a fair trial on the issue of punishment. (*Id.* at 97).

The prosecution's reliance on *Roberts v. United States*, 445 U.S. 522, 556-57 (1980) [Doc. 325 at 60], is equally misplaced. Roberts appealed his sentence on convictions of two counts of using the telephone to facilitate distribution of heroin, arguing that the trial court improperly relied on his refusal to cooperate with the government in deciding his sentence. The Supreme Court held that reliance on failure to cooperate was proper: "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come" in imposing a sentence, with the sole limitation that due process prohibits sentences imposed on the basis of "misinformation of constitutional magnitude." (*Id.* at 556)(internal citation and quotations omitted). The alleged information about Roberts' failure to cooperate was, according to the Supreme Court, "essentially undisputed" and therefore did not violate due process. (*Id.* at 557). The difference between

72

*Roberts* and this case is clear. This is a capital case and the sentencing determination was by the jury. Petitioner's alleged possession of a gun was not "essentially undisputed;" indeed, the government now argues Honken's mother told Ms. Rick that Petitioner "may" have a gun. [Doc. 325 at 61]. Finally, in a capital case, where Petitioner's life hung in the balance, the introduction of equivocal triple hearsay amounts to "misinformation of constitutional magnitude."

The government's suggestion that trial counsel could have made a valid strategic decision not to object to triple hearsay about Petitioner's possession of a gun [Doc. 325 at 60-61], must fail. The 2003 ABA Guidelines require counsel to assert all legal claims potentially available (Guideline 10.8) and to carefully consider whether aggravating evidence may be appropriately challenged as improper or not legally admissible (Guideline 10.11(I)). The prosecution's assertion that trial counsel could reasonably have failed to object because the question did not call for hearsay [Doc. 325 at 60], is also unavailing. The question might not have technically called for hearsay, but trial counsel knew – or should have known – from the discovery "what happened when [Kathy Rick] got to Dustin's mother's house" (T. Tr. 2637): Dustin's mother told Rick that Dustin called to say that Petitioner may be on her way to his mother's house, that she may have a gun, and that they needed to leave. The government's final argument is that trial counsel need not have objected because "the Court overruled trial counsels' hearsay objections when made as to other witnesses." [Doc. 325 at 61]. First, this was not mere hearsay, it was triple hearsay and of doubtful reliability. Second, the ABA Guidelines, cited above, require that trial counsel raise legal claims and preserve legal issues; there are no exemptions from this duty because other hearsay objections have been overruled.

The prosecution argues that Petitioner was not prejudiced by her lawyer's failure to object, because (1) the jury already heard evidence she held Nicholson and the Duncans at gunpoint; (2) the more compelling part of the incident described by Rick was Petitioner's yelling at her and banging on her car windows; (3) Rick's testimony about what Honken's mother told her was "a passing comment;" and (4) there was far more damaging evidence of Petitioner's

73

conduct in connection with the murders. [Doc. 325 at 61]. The prosecution's efforts to minimize the significance of evidence that Honken believed Petitioner had a gun are futile. This evidence, like all the "bad acts" evidence discussed in Claim 23, served to demonize Petitioner and prejudice the jury against her. As this Court has said of other prejudicial penalty phase evidence, "[t]o pretend that such evidence is not potentially unfairly prejudicial on issues to which it has little or no probative value is simply not realistic, even if the court were to give a careful limiting instruction. Rather, such potent, emotional evidence is a quintessential example of information likely to cause a jury to make a determination on an unrelated issue on the improper basis of inflamed emotion and bias." (*United States v. Johnson*, 362 F. Supp. 2d 1043, 1107 (N.D. Iowa 2005).

Petitioner does not have to show "'that counsel's deficient conduct more likely than not altered the outcome' of [her] penalty proceeding, but rather [she] must establish 'a probability sufficient to undermine confidence in [that] outcome.'" (*Porter v. McCollum*, — U.S. —, 130 S. Ct. 447, 455-56 (2009) (quoting *Strickland v. Washington*, 466 U.S. 668, 693-94 (1984). Trial counsel's error in failing to object to Kathy Rick's triple hearsay testimony is sufficient to undermine confidence in the penalty decision.

### COURT CLAIM NO. 25 – Confrontation of Aggravating Evidence: Failure to Confrontation of Aggravating Evidence: Failure to Object to Kyla Davis' Testimony That Petitioner Tried to Find Out Where She Lived and What Car She Drove

Petitioner has alleged that trial counsel was ineffective in failing to object to Kyla Davis' testimony about the alleged steps that were taken by Ms. Johnson to find out who she was, what she drove and where she lived that lacked any foundation as to personal knowledge and was hearsay upon hearsay information from Robert McNeese. [Doc. 314 at 104-05]. The prosecution defends trial counsel's failure to object by asserting that there is no support in case law from such evidence in the penalty phase of a capital case, because the decision about whether to object is a

74

matter of strategy "and should seldom be considered deficient performance," and because the court had previously overruled hearsay objections to the testimony of other witnesses. [Doc. 325 at 62]. Petitioner responds by incorporating, as if fully set forth herein, her arguments as to Claim 24, *ante*.

### COURT CLAIM NO. 26 – Prosecution Misconduct: The Prosecution's Failure to Correct False Testimony at Angela Johnson's Trial Violated the Fifth and Eighth Amendments to the United States Constitution

Petitioner has alleged that the government elicited false testimony at her trial that Mr. Honken was a bookish young man who had never committed a violent act until he met Angela Johnson, to support its theory that Honken was manipulated and encouraged to commit these crimes by Petitioner. [Doc. 314 at 105-107]. The government contends that this claim is procedurally barred and that it lacks merit. [Doc. 325 at 63-64].

The prosecution alleges that this claim is procedurally barred because (1) it was not raised at trial; (2) it was not raised on appeal; (3) there is no claim of ineffective assistance of counsel with respect to the issue; and (4) she does not claim this is newly discovered evidence. (*Id*. at 63). Petitioner responds that this claim was not raised at trial due to trial counsel's ineffective representation. The claim was not raised on appeal because Petitioner's trial counsel became her appellate counsel, and again missed the issue. However, contrary to the prosecution's argument, Petitioner has raised ineffective assistance of counsel in connection with the evidence that is the subject of this claim. See Claims 19 and 20, which allege, respectively, that trial counsel unreasonably failed to correct the inaccurate picture of Dustin Honken by presenting readily available evidence of violent plans and actions that predated his acquaintance with Petitioner, and that trial counsel was ineffective in not introducing the government's closing arguments at Honken's trial as party admissions to contradict its inaccurate portrayal of Honken at Petitioner's trial. Finally, to the extent that the claim is based on evidence trial counsel failed to learn because his investigation was constitutionally inadequate, it is based on newly discovered

75

evidence that Petitioner presented at the evidentiary hearing. (H.Tr. 1607-14 [Theodore Hovda]; 2753-65 [Kenny Hansen]; 2770-92 [Alan Johnson] 2793-2803 [Mark Johnson]; 2808-25 [Daniel Cobeen]; 2833-48 [Timothy Cutkomp]).

The prosecution's argument that the testimony at issue was not false proceeds from the flawed premise Petitioner has not shown that Timothy Cutkomp, Rick Held, Kathy Rick and Alyssa Nelson falsely testified at trial. Petitioner need not, however, allege that these witnesses perjured themselves. The government's duty to disclose false testimony by its witnesses is not "narrowly and technically limited to those situations where the prosecutor knows that the witness is guilty of the crime of perjury." (*United States v. Harris*, 498 F. 2d 1164, 1169 (3rd Cir. 1974).

Petitioner argues that there was abundant other evidence, known to the prosecution, that Dustin Honken was not the peaceable, non-violent person portrayed by his brother, friend, co-worker, girlfriend and sister, and that their selective presentation of evidence on this issue presented a fundamentally inaccurate picture of Dustin Honken.

The prosecution defends its action by raising the fine distinction between plotting and scheming acts of violence and committing acts of violence, and goes so far as to assert that "the bank robbery evidence corroborates the government's assertion that before Petitioner, Honken was a planner and schemer, but a coward." (*Id.* at 64). This was not, however, the portrait of Dustin Honken that the government painted at his trial, where it argued as follows:

> What kind of man after doing that [killing Greg Nicholson and the Duncan family] and having his own son born three months later can lure Terry DeGeus out to a site knowing what he's done, knowing what the consequences are, and murder another human being and a month later – you saw the video – have a happy Christmas with his family?

(Honken Tr. 3903).

> This is somebody who can think long and hard and rationally about how he's going to slaughter people and think about what he did in this case. We know that he literally hunted down Greg Nicholson, that he developed a plan for gaining entry into the house, that they intentionally borrowed Christie Gaubatz's car because they didn't want to be found. That's thinking long in advance about how he's going to do this crime.

> We know that he purchased a handgun through his girlfriend Angela Johnson.

76

Now, think about the purchase of that handgun. Angela Johnson was actually the person who bought the gun. But who do you think went in there? Who's the person who gets into guns, who has gun magazines in his locker at work? Who do you think walked into that pawn shop with her and looked over the display and decided that's going to be my murder weapon there? Do you think Angela Johnson picked it out? Defendant picked it out.

(Honken Tr. 3905-06).

We also know that he thought this out long and hard. You remember the Poor Man's James Bond Book, at 1991, that was seized from the defendant's house in 1996? Remember this page from it? Remember the language on this suggesting that if you really want to do a good job in making sure that you have a more effective gag you stuff a piece of cloth in their mouth and use duct tape across it? You don't think this defendant was thinking this out far in advance on exactly how he was going to do this?

We know that he buried Greg Nicholson and the Duncan family in a remote site. This is somebody who thinks these things out in advance. Do you think after abducting these people that he started driving around looking for a possible spot, or do you think this defendant knew exactly where he was going to bury these people, had it cased out, had found a place that he knew was secluded, some woods that nobody would go to?

(Honken Tr. 3906-07).

The defendant plans, schemes, thinks out these things long in advance.

(Honken Tr. 3908).

Now, think back about the way this defendant thinks, the way he plans, the way he schemes. [Lori Duncan's] name was in that ring. Do you think it was accidental, do you think it was accidental that her ring was found downstream from a dam miles away from the burial site, or do you think this defendant's thinking this out, thinking, I've got to divert the police from any chance of finding this body, so I'm going to throw her ring so that the police can find with her name in it, and I'm going to throw it in this river?

And when did he take that ring off her finger? We know there was spiral fracture of the finger, her ring finger on her hand as testified to by Dr. Steadman. Did he rip it off her hand while she was still alive? Did he rip it off her hand when she was dead?

Incarceration, we know, doesn't deter this defendant. He was incarcerated in the Woodbury County Jail and was still plotting to kill. He's not deterred by law enforcement. He plotted to kill law enforcement officials and their families, plotted to kill witnesses and their families. And then when other inmates in the federal institution turned against him and cooperated with authorities, he plotted to kill them too even within the institution, tried to recruit Mr. Ferguson to help him kill some of those witnesses.

77

The defendant will plan an escape. You know how this defendant thinks now, don't you? You know what he's capable of. You know how intelligent he is. You know how he schemes and plans and thinks.

(Honken Tr. 3912).

Defendant thinks more of his dog . . . than he does of people, and he has no conscience.

(Honken Tr. 3917).

Under *Giglio*, reversal is required "if the judgment of the jury could 'in any reasonable likelihood have [been] affected [by error].'" *United States v. Foster*, 874 F. 2d 491, 495 (8th Cir. 1988) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)). Petitioner was prejudiced by the government's failure to correct the false testimony that Dustin Honken was a nonviolent, placid person until he met her. Despite the fact that Honken personally killed each of the five victims in this case, not a single juror found to be true the mitigating factor that Petitioner's "participation was relatively minor as compared to Dustin Honken's role in these murders." [Doc. 593, at p. 3]. Only three jurors found to be true the mitigator that Dustin Honken, who was equally or more culpable than Petitioner in the murders of Nicholson, Lori Duncan and Terry DeGeus, will not be punished by death. (*Id.*) It is a reasonably likely that the prosecution's failure to correct its false portrayal of Dustin Honken at Petitioner's trial affected the jury's penalty decision.

**COURT CLAIM NO. 27 – Prosecution Misconduct: The Prosecution's Violation of *Brady v. Maryland* By Failing to Disclose Dustin Honken's Planned Violent Attack on the Trial Prosecutor and His Association With a White Supremacist Prison Organization**

Petitioner has alleged that the prosecution violated its obligations under *Brady v. Maryland* by failing to disclose three memoranda that detail Dustin Honken's threats against prosecutor Patrick Reinert and his family, security measures taken as a result of Honken's threats, and investigation of those threats and other planned crimes by Dustin Honken. (*See* Exh. 48, PSLP-000005-6, 000018, 000031). [Doc. 314 at 108-10]. The prosecution argues that the

78

evidence at issue was not exculpatory, was cumulative and was not suppressed. [Doc. 325 at 64-68].

The prosecutor urges that the memoranda at issue contain only Mr. Reinert's "opinions or beliefs," which do not constitute *Brady* material. (*Id.* at 66). However, the cases cited in support of this proposition are distinguishable from this case. In *Lopez v. Ryan*, 630 F. 3d 1198, 1209-11 (9th Cir. 2011), the evidence at issue was a handwritten note, by an unknown author, which set forth facts that were "merely cumulative" of the facts contained in police reports available to the defense. Here, there are facts in the memoranda – not merely "opinions" – that were not in the discovery, i.e., the security measures taken as a result of Honken's threats and the investigation into those threats, all of which is circumstantial evidence of the seriousness with which the Department of Justice viewed Honken's evil plans. This is relevant to the government's argument that Honken was a mere schemer who did not execute his plans without the encouragement of Petitioner; if this was true, Honken's plans to exact murderous revenge on law enforcement would not have been of any moment to the government.

The government cites *United States v. Kohring*, 637 F. 3d 895, 907 (9th Cir. 2010), for the proposition that a prosecutor does not have a duty to disclose strategies, legal theories or impressions of the evidence. [Doc. 325 at 66]. However, the ruling in that case was not as categorical as the prosecution suggests. The court ruled that there "a prosecutor does not have a duty under *Brady/Giglio* to disclose all opinion work product ... '*unless* they contain underlying exculpatory facts.'" (367 F. 3d at 907 (quoting *Morris v. Ylst*, 447 F. 3d 735, 742 (9th Cir. 2006); emphasis original). *See also Kohring* 637 F. 3d at 907-08 ("even some of the facts contained in the opinion work product should have been disclosed"). In this case, the prosecution was required to disclose that the Department of Justice took steps in 1996 to ensure the safety of the prosecutors involved in this the case against Honken (Exh. 48, PLSP-000005); that Honken had become involved in the Odinists network of white supremacists and was one of the leaders of the group at USP Florence (*Id.* PLSP-000005, 000031); that Hoken was viewed as "a serious threat,

79

not only if he escapes, but while he is incarcerated" (*Id.*); and that steps were taken after the 2001 threat to install multiple sophisticated security measures at Reinert's home and on his car (*Id.*, PLSP-000018).

*Boyette v. Lefevre*, 246 F. 3d 76, 91 (2nd Cir. 2001), which is also cited by the prosecution (Doc. 325 at 66), involved a handwritten note from the prosecutor's file that stated "rule out of Boyette;" the court held that this prosecutorial "jotting" does not tend to show that Boyette was not guilty or to impeach any witness who testified against him. In contrast, the memoranda are not mere "jottings," and they tend to impeach the government's position at Ms. Johnson's trial that Honken acted only after being "egged on" and "cajoled" by Petitioner. *Williamson v. Moore*, 221 F. 3d 1177, 1182-83 (11th Cir. 2000) [Doc. 325 at 66], involved the mental impressions of the prosecutor about the case. Petitioner does not argue that Mr. Reinert's mental impressions are admissible, but the government's response to Honken's plans was admissible to prove that Honken had the means to carry out violent acts without any encouragement from Ms. Johnson.

The argument that this evidence was cumulative [Doc. 325 at 66-67] is without merit. There was no information in the discovery about the actions taken by Mr. Reinert and the Department of Justice as a result of the threats made by Honken against law enforcement. There was no discovery describing the security measures that had been undertaken in 1996 and 2001 as a result of the threats against Mr. Reinert and his family or the investigation that was undertaken by the FBI regarding Honken's threats. And there was no discovery its case at Honken's trial was not inconsistent with its case at Petitioner's trial about the true nature of the Odinists or Honken's leadership role in that organization.

Finally, the prosecution's argument that the evidence was not suppressed is without merit. The evidence was indeed suppressed; it is not disputed that the memoranda were not provided to trial counsel.

Petitioner was prejudiced by the prosecution's failure to disclose the material at issue. Not one juror found to be true the mitigating factor that Petitioner's participation was relatively

80

minor as compared to Dustin Honken's role in these murders. [Doc. 593, at p. 3]. As to the mitigator that Dustin Honken, who was equally or more culpable than Petitioner in the murders of Nicholson, Lori Duncan and Terry DeGeus, will not be punished by death, only three jurors found this to be true. (*Id.*). There is a reasonable probability that, had the evidence at issue been disclosed to the defense, the result of Petitioner's penalty trial would have been different. (*United States v. Bagley*, 473 U.S. 667, 684 (1985).

**COURT CLAIM NO. 28 – Prosecution Misconduct:  The Prosecution's Violation of Petitioner's Rights Under the Sixth and Eighth Amendments and the Due Process Clause by Presenting Inconsistent Arguments at Her Trial and That of Her Co-Defendant**

Petitioner has alleged that the prosecution's inconsistent, factually contradictory theories at her trial and that of Dustin Honken violated her rights under the Fifth, Sixth and Eighth Amendments and that this claim is not procedurally barred. [Doc. 314 at 111-14]. The government argues that its case at Honken's trial was not inconsistent with its case at Petitioner's trial and that the claim is procedurally barred. [Doc. 325 at 69-74].

Trial counsel raised this claim at trial, in a Motion in Limine Re: Evidence that Defendant Was a Principal. [Doc. 454, 454-2]. The Court denied the motion, stating, *inter alia*, that "there is no suggestion here, pre-trial, that the government will select among differing versions of events *from the same witness*, and present only one such version in the trial to secure a conviction of Johnson, as well as Honken, which was the fundamental due process failing in *Smith v. Groose*, 205 F. 3d 1045 (8th Cir.), *cert. denied sub nom. Gammon v. Smith*, 531 U.S. 985 (2000). [Doc. 463 at 6](emphasis original). At Petitioner's trial, her attorneys failed to renew their motion in limine when the government elicited, from witnesses called at Honken's trial, evidence about Honken that was inconsistent with its position at his trial in order to secure her conviction. On appeal to the Eighth Circuit, Petitioner's counsel, Patrick Berrigan and Dean

81

Stowers, did not raise the prosecution's inconsistent arguments.[34] (*See United States v. Johnson*, 495 F. 3d 951 (8th Cir. 2007). Predecessor counsel raised this claim in the Corrected, Amended Motion Under § 2255, but disavowed that it was "arguing that the Government improperly argued inconsistent theories of their case during the two trials." [Doc. 26 at 90-93 & n. 30]. Petitioner's present counsel have raised this claim, arguing that prior habeas counsel were ineffective in not raising and in disavowing the claim.

The prosecution incorrectly cites *Ward v. Norris*, 577 F. 3d 925, 932 (8th Cir. 2009), for the proposition that "claims of ineffective assistance of habeas counsel are prohibited." [Doc. 325 at 70]. That case involved proceedings under 28 U.S.C. § 2254, which specifically provides, in subsection (i), that "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." Petitioner's motion is pursuant to 28 U.S. § 2255, which does not contain a prohibition against raising ineffective assistance of post-conviction counsel.

The prosecution urges that it did not present inconsistent evidence at the trials of Honken and Petitioner because:

> Petitioner has not shown, for example, that the government presented evidence in one trial that Petitioner was the shooter and in the other trial that Honken was the shooter. Petitioner does not claim that the government presented evidence Honken engaged in violence prior to 1993 in his case, but presented contrary evidence in Petitioner's trial. Rather, her claim is premised on the theory the government's arguments based on consistent evidence were inconsistent. They were not.

[Doc. 325 at 70].

The evidence at Petitioner's trial was *not* consistent with that at Honken's trial. At Petitioner's trial, the government elicited testimony from Jeffrey Honken that Dustin was "not at all short tempered; that he was not violent, that he had never seen his brother engage in violence

---

[34] The factual basis for the inconsistent theories argument required reference to the record in the Honken trial. However, both cases were pending in the Eighth Circuit, and a request for judicial notice of the Honken record would have enabled counsel to raise the present issue.

"whatsoever" toward anyone; that he was not physical with people and never roughed anyone up or slapped anyone. (Tr. 323). Timothy Cutkomp testified at Petitioner's trial that from the time he met Dustin Honken in the early 1990's, he did not know Honken to use violence against other people; that Honken was not a physical person who would get into fights during or after high school; and that Honken never hurt anyone until he became involved with Angela Johnson. (Tr. 830-31). The prosecution also elicited testimony from Cutkomp that he was worried Petitioner was pushing Honken to carry out his plans for killing people (Tr. 914) and that he (Cutkomp) believed that absent Petitioner pushing Honken he might not go through with his plans to kill people (*Id.*, 915). Rick Held testified that, in his experience, Dustin Honken was not an aggressive or violent person. (Tr. 1038). The prosecution elicited testimony from Alyssa Nelson about Honken's report to her that he had woken up with Angela Johnson pressing a gun to his head and that it scared him. (Tr. 2679).

*None of this evidence was presented at Honken's trial.* Therefore, the prosecution's argument that this claim is "premised on the theory the government's arguments based on consistent evidence were inconsistent" [Doc. 325 at 70] must be rejected. The evidence at Petitioner's trial was not consistent with the evidence at Honken's trial, nor were the prosecution's arguments at her trial consistent with its arguments at Honken's trial. The government elicited evidence at Petitioner's trial that it did not adduce at Honken's trial, and it made arguments at Petitioner's trial that it did not make at Honken's trial. The reason the government omitted the evidence and argument at issue from Honken's trial is that it would have reduced his culpability and responsibility for the crimes. However, having obtained death sentences for Honken, the government then set out to, and obtained, death sentences for Petitioner by abandoning its depiction of Honken at his trial and portraying Petitioner as the catalyst for the crimes. This violated the Fifth, Sixth and Eighth Amendments.

In this case, there was "an inconsistency [that existed] at the core of the prosecutor's case against defendants for the same crime." (*Smith v. Groose*, 205 F. 3d at 1052). Petitioner was

83

prejudiced. The prosecution's use of inconsistent theories fatally infected the sentencing phase of the trial and rendered that proceeding fundamentally unfair. (*Id.*, at 1049). Not a single juror found to be true the mitigating factor that Petitioner's participation was relatively minor as compared to Dustin Honken's role in these murders. [Doc. 593, at p. 3]. As to the mitigator that Dustin Honken, who was equally or more culpable than Petitioner in the murders of Nicholson, Lori Duncan and Terry DeGeus, will not be punished by death, only three jurors found this to be true. (*Id.*). There is a reasonable probability that, but for the prosecution's use of inconsistent theories, the result of Petitioner's penalty trial would have been different. (*Id.*)

## COURT CLAIM NO. 29 – Ineffective Mitigation: The Testimony of Holly Dirksen

Trial counsel were ineffective in calling Holly Dirksen at the penalty phase of Petitioner's trial. Dirksen added little to the mitigation presentation and was made into a prosecution witness in aggravation by the government's cross-examination. Trial counsel acted unreasonably in failing to prepare for Ms. Dirksen's testimony, failing to identify the damaging information that she would provide and in calling this witness.[35] [Doc. 314 at 115-18]. The prosecution argues that the decision to call Dirksen "does not rise to the level of being objectively unreasonable" and urges that she provided "valuable mitigating evidence." [Doc. 325 at 75-78]. According to the government, the Ms. Dirksen provided evidence in support of Mitigating Factor 3 (strong bond between Petitioner and her children); Mitigating Factor 6 (Petitioner's abuse as a child by unusual religious practices); Mitigating Factor 8 (Petitioner's lack of future dangerousness if

---

[35]    The government states that Petitioner has inconsistently alleged that counsel were ineffective "for failing to have Dirksen testify about additional matters." [Doc. 325 at 75 n. 30]. This is not correct. The point Petitioner made is that Holly Dirksen had helpful information **that could have been presented to the jury by the mental health experts**, but trial counsel did not adequately investigate and did not know this information, making the decision to call this witness all the more unreasonable. [Doc. 314 at 116 n. 24].

84

incarcerated)[36]; Mitigating Factor 9 (Petitioner's having been raised by an unstable mother resulting in her susceptibility to drug abuse and unhealthy relationships); Mitigating Factor 10 (Petitioner's physical and emotional abuse by DeGeus); Mitigating Factor 11 (Petitioner's loving relationship with her family); Mitigating Factor 13 (Petitioner is loved by her daughters); Mitigating Factor 15 (Petitioner is loved by her family); Mitigating Factor 18, (Petitioner supported her daughters); and Mitigating Factor 20 (Petitioner has been a good mother). [Doc. 325 at 76 n. 31].

The following is an outline of evidence supporting the Mitigating Factors given by witnesses other than Holly Dirksen, which shows that the scant mitigating evidence provided by Dirksen was cumulative and that the government's assertion that trial counsel was not ineffective in calling her because she provided "valuable mitigating evidence" must be rejected.

**Mitigating Factor 3, the Strong Bond Between Petitioner and Her Children:**

- Wendy Jacobson testified that Petitioner has a strong bond with her children (Tr. at 3187).

- Jamie Hayes testified that Marvea maintains contact with Petitioner by letters, visits and phone calls and that Petitioner is active in Marvea's life and talks to her a lot. (Tr. 3391-95).

**Mitigating Factor 6, Petitioner's Abuse as a Child by Unusual Religious Practices:**

- Pearl Jean Johnson testified that she and her stepfather and mother would anoint Petitioner's arms and head with oil, hold her arms and pray over her with loud voices so that the evil spirit would come out of her. (Tr. 3048-50).

- Pearl Jean Johnson testified that her mother, Petitioner's grandmother, burned the children's toys because they were making them "an idol." (Tr. 3055-57).

- Mrs. Johnson testified about leaving the house in the middle of the night because they

---

[36]    Contrary to the prosecution's argument, Ms. Dirksen did not testify regarding Petitioner's lack of future dangerousness.

were convinced that it was the end of the world.  (Tr. 3058).

- Wendy Jacobson testified about violent exorcisms of Petitioner by her mother, grandmother and step-grandfather.  (Tr. 3149-51, 3152-54).

- Ms. Jacobson testified about her mother and grandparents waking the children up in the middle of the night and then driving around for three days and nights without food or water because they were convinced the world was ending.  (Tr. 3155-56).

- Jamie Hayes testified that there was a lot of praying and screaming in the house and that she remembers Petitioner being subjected "treatment" in a private room, that her grandparents saw things in Petitioner's personality they did not like, that they tried to get it out and that Petitioner was terrified when they were holding her down.  (Tr. 3770).

- Ms. Hayes testified that Petitioner and Wendy were terrified of the basement and that the children had to go through exorcisms.  (Tr. 3374).

- Ms. Hayes testified that the children fasted from morning until night every week when they lived in Thornton, Iowa (Tr.  3374).

- Ms. Hayes testified that she remembers their toys being smashed in front of the them.  (Tr. 3377).

- Ms. Hayes testified that they never brought friends home because their mother would proselytize people and that the children were treated differently than the other kids at school.  (Tr. 3382).

- James Johnson, Jr., testified that they all were exorcized and that after a exorcism the kids would come out crying, beat and worn down, and that during an exorcism he could hear a body getting thrown against walls, loud noises and speaking in tongues.  (Tr. 3441-42).

- David Neiman testified that he saw Pearl Jean attempt to cast out the devil from her children and that the children hated it.  (Tr. 3556).

**Mitigating Factor 9, Petitioner's Having Been Raised by an Unstable Mother, Resulting in Her Being Susceptible to Drug Abuse, Unhealthy Relationships, Etc.:**

- Pearl Jean Johnson testified that she abused her children.  (Tr. 3042-44)

- James Jeffrey Johnson, Petitioner's father, testified that Pearl Jean did not show affection toward the children, always had a paddle or a belt and got more satisfaction out of whipping them than letting them be children. (Tr. 3101-02, 3118).

- Mr. Johnson testified that his ex-wife would not care for her children very well (Tr. 3129).

- Ms. Jacobson testified about Pearl's whipping them with a belt and paddles and causing welts.  (Tr. 3160-61).

86

- Jamie Hayes testified that their mother would beat them with a belt. (Tr. 3375).

- Jamie Hayes testified that she remembers a pig ate a kitten in Kansas. (Tr. 3379).

- James Johnson, Jr., testified that their mother would beat them with a belt, a paddle or her hands, hard enough to leave welts. (Tr. 3437-38).

- James Johnson, Jr., testified that he does not remember his mother being with the children in Kansas; that he remembers hogs eating kittens, Ted Dillow making him touch an electric fence, and seeing a cow butchered on a table; and that he has recurring nightmares from the time they spent in Kansas. (T.Tr. 3445-47).

**Mitigating Factor 10, Petitioner's Abuse by Terry DeGeus:**

- Ms. Jacobson testified about Petitioner's abuse by Terry DeGeus. (Tr. 3183-84).

- Alyssa Johnson testified that DeGues was loud and violent towards Petitioner, on one occasion raped Petitioner, and that she was devastated when DeGeus would come back into her mother's life. (Tr. 3914-16).

- Lou Ann Hare testified that DeGeus was physically and verbally abusive to Petitioner, that she saw Petitioner with two black eyes and a broken nose, and that Petitioner left town for a few months after that beating. (Tr. 3692-93).

- David Neiman testified that he saw Petitioner walking down the highway after DeGeus had beaten her, thrown her from the car and left her to walk home. (Tr. 3563-65).

- Arlyn Johnson testified that he noticed Petitioner had a lot of bruises and would wear sunglasses inside when she was dating Terry DeGeus. (Tr. 3199-01).

**Mitigating Factor 11, Petitioner's Loving Relationship with Her Daughters:**

- Jamie Hayes testified that Marvea has maintained contact with Petitioner by letters, visits and phone calls and that Petitioner is active in Marvea's life and talks to her often. (Tr. 3391-95).

- Alyssa Johnson testified that she visits her mother in jail, and they write letters and talk on the telephone. (Tr. 3923-25).

- Marvea Johnson Honken testified that she talks to Petitioner once or twice a week. (Tr. 3408).

- Marvea testified that Petitioner tells her she loves her and she believes that she does love her. (Tr. 3421).

- Theresa Milton testified that Petitioner loved her children unconditionally. (Tr. 3538).

- David Neiman testified that Petitioner has a really good relationship with her daughters. (Tr. 3568).

87

- Arlyn Johnson testified that Alyssa and Petitioner have always had a good relationship. (Tr. 3204).

**Mitigating Factor 13, Petitioner Is Loved by Her Daughters:**

- Jamie Hayes testified that Marvea has contact with Petitioner by letters, visits and phone calls and that Petitioner is active in Marvea's life and talks to her a lot. (Tr. 3391-95).

- Marvea Johnson Honken testified that she would call her mother every day if she could. (Tr. 3408).

**Mitigating Factor 15, Petitioner Is Loved by Her Family:**

- Alyssa Johnson testified that Petitioner's incarceration has been hard and she misses her mother. (Tr. 3926-27).

- Pearl Jean Johnson testified that she talks to Petitioner on the telephone each week, writes to her, and will keep writing and talking to her. (Tr. 3084).

- James Johnson, Sr., testified that he and Petitioner have become closer since she has been in jail, that she writes him and telephones him, and that he will be there for her until the day he dies. (Tr. 3140).

- Wendy Jacobson testified that she will continue to support Petitioner if she is incarcerated. (Tr. 3186).

**Mitigating Factor 18, Petitioner Has Supported Her Daughters:**

- Alyssa Johnson testified that her mother worked and she always has everything she needed. (Tr. 3910-11).

- Alyssa Johnson testified that Petitioner attended her school events and teacher conferences. (Tr. 3913).

- Arlyn Johnson testified that Petitioner kept a clean house, that Alyssa was clean, well fed and never complained. (Tr. 3197).

**Mitigating Factor 20, Petitioner Has Been a Good Mother:**

- Alyssa Johnson testified that Petitioner has always been very affectionate with her and was not neglectful. (Tr. 3914-16).

- Wendy Jacobson testified that Petitioner has a strong bond with her children. (Tr. 3185).

- Arlyn Johnson testified that Petitioner did a good job of mothering Alyssa and that he was pleased with her parenting even after their divorce. (Tr. 3192, 3197).

88

• Eva Hanawalt testified that Petitioner taught her to be a better mother. (Tr. 3239).

The prosecution urges that trial counsel's decision to call a witness "must be viewed as of the time it was made." (*Winfield v. Roper*, 460 F. 3d 1026, 1033 (8th Cir. 2006). [Doc. 325 at 77]. Petitioner agrees. At the time Holly Dirksen was called, trial counsel knew or should have known, based on the discovery provided by the government, that she would do more harm than good. Petitioner is not, as suggested by the prosecution, invoking "the benefits of hindsight," but simply doing what trial counsel should have done, i.e., a cost-benefit analysis, based on the discovery, of calling Holly Dirksen as a witness.

Finally, the prosecution asserts Petitioner was not prejudiced by the error of her trial counsel in calling Holly Dirksen and "overemphasizes the effectiveness of the government's cross examination," because "Dirksen denied almost everything," other witnesses testified Petitioner distributed methamphetamine, and Dirksen's attempt to persuade Nedved not to cooperate "went to Dirksen's bias, but did not directly attack Petitioner." [Doc. 325, at 77]. The record belies the government's arguments.

Holly Dirksen described a relatively benign childhood. She testified that her mother prayed for her at church (Tr. 3251); disciplined her by putting her in a corner or "grounding" her (Tr. 3253); and attended her school conferences (Tr. 3254). She contradicted testimony of the other witnesses about the religious abuse and Pearl Jean's neglect of her children. For example, Ms. Dirksen testified that she could not recall being hit by her mother (Tr. 3253); that she did not know anything about her maternal grandparents, who died before she was born (Tr. 3249); that she did not recall any of her toys being burnt (Tr. 3250); and did not recall a night where her mother forced the children from their beds to drive around because the world was ending (Tr. 3251). The events that Ms. Dirksen did remember – her mother's exorcisms (Tr. 3247) – had already been described by Pearl Johnson and Wendy Jacobson (Tr. 3040-46, 3143-73).

It was on cross-examination that the prosecution was able to make this nominal mitigation witness a witness in aggravation. The government elicited a prior inconsistent

89

statement describing the relationship between Petitioner and Dustin Honken as "normal." (Tr. 3271). It established that in 1993, Ms. Dirksen lived in Fertile, Iowa, the town where property belonging to Lori Duncan was found in 1995. (Tr. 3272). Ms. Dirksen testified that petitioner told her that Terry DeGeus was missing before the body was ever found. (Tr. 3272-73). Dirksen admitted that she was friends with Leslie Nedved, and was questioned about whether she told Nedved that DeGeus was buried, in a pit, right under the nose of the police (Tr. 3273-74), and that "they" "took care of" DeGeus (Tr. 3274); although she denied making these statements, the devastating impact of the questions is clear. Dirksen admitted she told Nedved that she (Nedved) did not know petitioner, was not involved in the investigation into the disappearance of DeGeus, and there was no reason for her to make herself involved (Tr. 3274) and that she advised Nedved she had a right not to talk to law enforcement. (Tr. 3275). Dirksen was asked if she told an acquaintance, Amy Wonsmos, that Aaron Ryerson, a guilt phase witness for the prosecution, would end up like Terry DeGeus if he didn't watch his mouth. (Tr. 3276); her denial of doing so did not erase the specter of yet another witness killing raised by the question. Dirksen also admitted that when she learned that her sister Wendy testified before the grand jury about petitioner's statement that she "lured" Terry DeGeus to his death she became very upset with her, because she did not understand why she said that and did not believe what she said to be true. (Tr. 3277). Finally, Dirksen was asked – and denied – that she threatened to kill her sister Wendy because of her grand jury testimony about Petitioner's statement that she "lurd" DeGeus to his death. (Tr. 3277).

Petitioner does not have to show "'that counsel's deficient conduct more likely than not altered the outcome' of [her] penalty proceeding, but rather [she] must establish 'a probability sufficient to undermine confidence in [that] outcome.'" (*Porter v. McCollum*, — U.S. —, 130 S. Ct. 447, 455-56 (2009) (quoting *Strickland v. Washington*, 466 U.S. 668, 693-94 (1984). Trial counsel's error in calling Holly Dirksen to testify at penalty phase is sufficient to undermine confidence in the penalty decision.

90

As a result of trial counsel's decision to call Chief of Police Douglas Book, the prosecution elicited evidence in aggravation that trial counsel knew, or should have known, would be admitted because of their decision to call this witness. [Doc. 314 at 118-121]. The prosecution counters that the decision to call a witness is presumed to be one of trial strategy and that Petitioner was not prejudiced by her attorney's error in calling Book. [Doc. 325 at 79-80].

These contentions must be rejected.  A decision to not call a particular witness is presumed to be one of strategy "'unless clearly shown to be otherwise.'" (*Winfield v. Roper*, 460 F. 3d 1026, 1033 (8th Cir. 2006) (quoting *Rousan v. State*, 48 S.W. 3d 576, 582 (Mo. 2001)).  The government has cited no case authority that the same presumption applies to a decision to call a witness.  Moreover, the record before the Court shows that trial counsel's decision to call Douglas Book was an unmitigated disaster.  The prosecution's defense of trial counsel's performance – an assertion that Petitioner's manipulation and abuse by other men was "[c]entral to Petitioner's mitigation" [Doc. 325 at 79] – ignores the fact that there was abundant evidence that DeGeus abused Petitioner from numerous other witnesses.  (*See* Tr. 3183-84)(Wendy Jacobson's testimony that DeGeus abused Petitioner); (Tr. 3914-16)(Alyssa Johnson testified that DeGeus was violent towards Petitioner, that he raped Petitioner on one occasion, and that she was devastated when DeGeus would come back into her mother's life); (Tr. 3692-93)(Lou An Hare testified that DeGeus was physically and verbally abusive to Petitioner, that she saw Petitioner with two black eyes and a busted nose, and that Petitioner left town for a few months after that beating); (Tr. 3692-93)(David Neiman testified he saw Petitioner walking down the highway after DeGeus had beaten her, thrown her from the car and left her to walk home); (Tr. 3199-01)(Arlyn Johnson testified that he noticed Petitioner had a lot of bruises and would wear sunglasses when she was dating Terry DeGeus); (H. Tr. 183) (Mary Goody tesified that DeGeus' abuse of Petitioner could have been shown by witnesses other than Douglas Book).

91

The prosecution faults Petitioner "for failing to tell [counsel] she threatened Book." (*Id.* at 80). There is no evidence that trial counsel ever told Petitioner about their decision to call Book, much less consulted her on the wisdom of doing so. And, as explained in Claim Eight, during her trial Petitioner was suffering severe side effects of toxic doses of prescribed medication. According to Mr. Berrigan, Petitioner was "spacing out during the trial." (H.Tr. 3137, 3168). "She had some lucid moments and other times she didn't apear to be with it, so she was kind of in and out." (H.Tr. 3136-3168). On this record, Petitioner cannot be faulted for her attorney's misstep.

The government also argues that there is "no factual support" for Petitioner's statement that counsel's deficient performance as to Book was a result of the haste with which the penalty phase was put together. (*Id.* at 80). However, the record is replete with evidence that this was a hastily put together, ill-conceived penalty phase presentation. For example, Mary Good testified that many of the defense penalty phase witnesses were "blind sided in cross-examination" because the government was so much better prepared in knowledge of discovery and the witnesses. (H.Tr. 241-43). (*See also id.*, at 184 (we "missed the Doug Book problem")). She also testified that their handling of Mr. Book did not meet the minimum standard of practice because she had not asked him whether he had any negative information about Petitioner.[37] (*Id.* at 181-183). (*See also id.*, at 280)(we should have asked Book if he had negative information but we did not do it).

As she explained, "we wanted to know about the physical violence that went on with

---

[37] The government argues that Dean Stowers' testimony that he asked Chief Book if he had "anything adverse to say" about Petitioner and received a negative response "has no credibility" because it is "unsupported by any contemporaneous notes, is inconsistent with the testimony that Berrigan was surprised by the cross examination, and is inconsistent with the failure to confront Book with a prior denial had it occurred." [Doc. 325 at 79 n. 33]. However, Petitioner has argued trial counsel was ineffective whatever version of the events regarding Douglas Book is credited. It was ineffective to call book without asking him if he had anything negative to say about Ms. Johnson. If he was asked this question and lied, it was ineffective not to impeach him with his prior statement that he had nothing negative to say about Ms. Johnson.

Terry DeGeus, and we completely missed the fact that there may have been some other contact." (*Id.*, at 182). There was no excuse for "missing the fact," because the discovery provided by the prosecution showed that Chief Book was likely to be a hostile witness. (*See, e.g.,* Exh. 95, A000041-44) (Book was investigating this case as early as March 23, 1993); (Exh. 95, A000474 and A1115)(Book investigated Petitioner's involvement in Terry DeGeus' disappearance); (Exh. 95, A000675)(Book involved in controlled meetings with Agent Mittan); (Exh. 95, H000168 and H000174-75)(Book assisting North Central Iowa Narcotics Task Force in surveillance of Ms. Johnson).

The government argues that Petitioner was not prejudiced by counsel's having called Book as a witness because (1) his testimony supported the mitigating factor of her abuse by DeGeus and (2) "the absence of Book's testimony about being threatened by Petitioner would not have made any difference in the outcome." [Doc. 325 at 80]. However, as discussed above, there were other witnesses who could, and did, testify about DeGeus' abuse of Petitioner. And it cannot be said that Book's testimony did not make a difference in the outcome of the case. Ms. Goody described the prosecution's cross-examination of Book as a "devastating end to what we thought was going to be a positive witness." (H.Tr. 182). The government's penalty phase dehumanization of Petitioner was materially enhanced by this witness called by her own lawyer. There is a reasonable probability that, had counsel not called Chief Book, at least one juror would have struck a different balance in determining penalty. (*Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

### COURT CLAIM NO. 31 – Ineffective Mitigation: The Testimony of Susan Marsolek

Petitioner has alleged that trial counsel was ineffective in calling Susan Marsolek at the penalty phase of her trial, because the mitigating evidence that she provided was far outweighed by the harm she did to his client's defense. [Doc. 314 at 121-23]. The government argues that

93

counsel's performance was not deficient and that Petitioner has not demonstrated she was prejudiced by the decision to call Ms. Marsolek. [Doc. 325 at 82-83].

The prosecution cites case authority that "[c]ounsel's decision *not* to call particular witnesses during the penalty phase of trial must be viewed as of the time it was made, and his decision is presumed to be one of trial strategy unless clearly shown to be otherwise." (*Winfield v. Roper*, 460 F. 3d 1026, 1033 (8th Cir. 2006) (internal quotation and citation omitted, emphasis added). However, this case involves trial counsel's decision to call a witness and counsel has cited no authority that the same presumption of trial strategy is applicable in this context.

Guideline 10.11 of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, section G, states as follows:

> In determining what presentation to make concerning penalty, counsel should consider whether any portion of the defense case will open the door to the prosecution's presentation of otherwise inadmissible aggravating evidence. Counsel should pursue all appropriate means (*e.g.*, motions *in limine*) to ensure that the defense case concerning penalty is constricted as little as possible by this consideration, and should make a full record in order to support any subsequent challenges.

The Guidelines thus impose upon trial counsel the duty to consider the consequences of calling a penalty phase witness. At a minimum, this requires that trial counsel must be familiar with all of the government reports and records regarding a potential penalty phase witness. The prosecution's contention trial counsel knew what was in the discovery because "the billing records show trial counsel spent many hours reviewing the government's discovery file" [Doc. 325 at 82] is easily answered: no reasonably competent lawyer defending a client in a capital case would have called Marsolek if they had known what was in the government's discovery file. The government argues that "[t]his is not a case of trial counsel failing to investigate and prepare. It is simply a case of trial counsel not being able to foresee with the same clear vision possessed by habeas counsel in hindsight the effectiveness of the cross examination using the information known about the witness." [Doc. 325 at 82]. However, it is clear that, in this case, trial counsel did not adequately investigate and prepare for penalty phase. Trial counsel had five years to

94

prepare for this case; habeas counsel, who labored under considerably more stringent time constraints, read the materials provided by the government and discovered the obvious: Marsolek should not have been called.

The government asserts that Petitioner "understates the significance of the mitigating testimony provided by Marsolek" asserting that it supported "eight mitigating factors found by jurors." (*Id.*) On direct examination, Marsolek, who was in leg irons (*Id.*, 3727), testified about her conviction and sentence for conspiracy to manufacture methamphetamine (*id.*, 3728-31); that she did not testify against anyone to get a reduced sentence (*Id.*, 3731); that she met Petitioner in May of 1998 and they worked together at the Waterfront Restaurant and Lounge for a couple of years (*Id.*, 3731); that Petitioner became one of the better friends in her life, was compassionate and trustworthy (*Id.*, 3732); that they were housed together in M Block at the Linn County Jail for four months, from September 2001 until January 2002 (*id.*, 3734); that Petitioner took her under her wing, like a sister (*Id.*, 3735); that there was a fight in M Block in which Petitioner was not involved (*Id.*, 3736); that she never saw anyone get hurt in a fight and never got in a fight herself (*Id.*, 3737); that she started going to Bible study with Petitioner as well as the law library and the gym (*Id.*); about her own addiction, treatment and present sobriety (*id.*, 3738-39); that Petitioner tried to help others in the jail "as long as they weren't running around acting stupid" (*Id.*, 3739); that Petitioner was a very good caring mother who had boundaries and structure for her children (*Id.*, 3740); and that she has written letters to Petitioner and would like to continue their relationship (*Id.*, 3740-41).

The mitigating evidence provided by Marsolek was not compelling, to say the least. Contrary to the government's assertion, she touched upon only four mitigators: factor (3) (strong maternal bond), factor (8) (no danger if incarcerated), factor (17) (Petitioner can lead a productive life in prison by being helpful to other inmates), and factor (20) (Petitioner has been a good mother). There was evidence on each of these mitigators from other witnesses, so it was not necessary to call Marsolek.

95

The prosecution urges that Petitioner "overemphasizes" the impact of its cross-examination of Marsolek, because she had an explanation for the drug notes that the government did not show was false, she denied Petitioner was in the fight so those questions "had little or no impact," the cross-examination that showed her to be untruthful hurt only Marsolek's credibility and did not directly affect Petitioner, and concludes that "[a]t most, cross examination neutralized the impact of Marsolek's testimony, but it did not become evidence in aggravation." [Doc. 325 at 83]. These contentions are without merit.

The fact that the prosecution did not put on evidence impeaching Marsolek speaks volumes: they did not need to impeach her with extrinsic evidence because she was so obviously lying. Her explanation for the drug notes, for example, was incredible; she denied telling Special Agent Graham that notes found after her arrest, which included petitioner's name, reflected drug debts, denied she got methamphetamine from Petitioner and insisted the notes reflected a debt from a rummage sale purchase. (Tr. 3743-44). Given the evidence of the incident involving Amy Rawhouser (Tr. 2848-51), her denial of Petitioner's involvement in this incident had no credibility and was plainly a lie. The further suggestion that the lies told by this witness "did not directly affect Petitioner" strains credulity; at this most important part of the trial, the defense called an unmitigated liar as a reason to spare Petitioner's life.

Petitioner does not have to show "'that counsel's deficient conduct more likely than not altered the outcome' of [her] penalty proceeding, but rather [she] must establish 'a probability sufficient to undermine confidence in [that] outcome.'" (*Porter v. McCollum,* — U.S. —, 130 S. Ct. 447, 455-56 (2009) (quoting *Strickland v. Washington,* 466 U.S. 668, 693-94 (1984). Trial counsel's error in calling Susan Marsolek to testify at penalty phase is sufficient to undermine confidence in the penalty decision.

96

**COURT CLAIM NO. 32 – Ineffective mitigation: Failure to Provide Psychiatric Pharmacologist Roswell Lee Evans With Data Regarding Petitioner's Drug History, Rendering His Expert Testimony Virtually Irrelevant**

Trial counsel were ineffective in calling Dr. Roswell Lee Evans, the Dean of Pharmacy at the Auburn School of Pharmacy, to testify at petitioner's penalty phase "about methamphetamines, their actions, what do they do, and pretty much from an informational perspective," (Tr. 3580) without providing Dr. Evans with any information about Petitioner's drug history or how it actually affected her behavior and mental health.

### A.     Trial Counsel's Performance Was Ineffective

The prosecution formulates the Petitioner's contention as "trial counsel should have had Dr. Evans interview Petitioner about her state of mind at the time of the offense and should have provided Dr. Evans with information about Petitioner's drug use history." Only the second of those contentions is accurate. Petitioner is not arguing that Dr. Evans needed to interview Petitioner; indeed, as pointed out in the opening brief, most of the information Dr. Evans needed was in the interview of Ms. Johnson conducted by the government experts. The transcript of that interview had been given to the other defense experts; they just were not asked to comment on it at trial. (H.Tr. 4215-4216).

The prosecution argues that providing Dr. Evans with evidence of Ms. Johnson's actual drug use, or her behavior and mental health, would have "hampered the effectiveness of his testimony" because the jury would have learned of Ms. Johnson's continued drug abuse after the homicides although the government fails to explain why this would be aggravating. [Doc. 325 at 84]. This argument, even if rational, cannot excuse counsel's performance because that was not counsel's strategy. (H.Tr. 2103)(When asked why he had not provided Dr. Evans with Ms. Johnson's drug history, Mr. Berrigan responded, "I just didn't think to do it.").

The prosecution further argues that Ms. Johnson's drug abuse was somehow not significant because she maintained employment and raised two children while on drugs, and

97

managed to keep off methamphetamine while pregnant. [Doc. 325 at 85].

Ms. Johnson's history of drug abuse was not insignificant; it was severe and long-lasting. She reported to government experts Drs. Dvoskin and Martell in April 2005 that "I had such a need for meth, and I just wanted to do it everyday for the rest of my life, I just liked the way I felt on it. . . . [it] gave me the that [sic] extra energy to do things and made me feel good about myself, and I didn't have that before, and maybe if I would have been on an antidepressant or something like that, I would have had such a need for crank, and since I've been on antidepressants, I do feel better." (Exh. 114, MAR000056-57). Her methamphetamine use began no later than 1985, several years before the homicides. (H.Tr. 4816), and she was "pretty much high all the time" (Exh. 114, MAR000068). "When I had my bar [which she opened in 1988] I really got into the drugs. It was just continuous." (Exh. 114, MAR000071).

Dr. Martell acknowledged that Ms. Johnson's long-term methamphetamine use predated the crime by a number of years, and based on his knowledge of the literature related to methamphetamine use, she most likely had some brain impairment based on drug use in 1993, when the crimes occurred. (H.Tr. 4816). He also acknowledged that "it could very well, based on her history, have been impairment superimposed on impairments which existed prior to the dug usage." (H.Tr. 4817).

Contrary to the prosecution's assertion, prior to, during, and after the time of the homicides, Ms. Johnson was not able to keep up with the day to day demands of working and raising children; she could not keep a stable home; she was not able to maintain her composure and keep her emotions under control; she was not able to act independently without relying heavily on her family. (Exh. 133, MAR000115-117). Ms. Johnson was not able to keep her business open (Exh. 114, MAR000071); she was not being a good parent (Exh. 114, MAR000072); she became involved with a married man who brutally assaulted her with increasing frequency and later stalked her for years (Exh. 114, MAR000073-76; 81-83); and she continued to be "into crank big time" (Exh. 114, MAR000075). This is not the portrait of a

98

normal, successful life. Dr. Evans could have used Ms. Johnson's own statements to show the effects of her methamphetamine use on her ability to control her thinking, her motion, and her emotions. (*See* T.Tr. 3586-87; 3589, Dr. Evans testifying in the abstract about the effects of prolonged use of methamphetamine).

By the time of the homicides, Ms. Johnson had been using methamphetamine regularly and without any significant periods of abstinence, for five years. The government points to her report that she stopped using methamphetamine during her pregnancy. [Doc. 325 at 85]. Had Dr. Evans been able to tie Ms. Johnson's methamphetamine use to her behavior in 1993, he could have explained that her abstinence did not mean that she stopped suffering the effects of her methamphetamine abuse. (*See* T.Tr. 3588-89, Dr. Evans testifying in the abstract to the residual effects of prolonged use of methamphetamine).

**B.     Petitioner Was Prejudiced**

At best, trial counsel squandered an opportunity to provide a cohesive defense presentation, using Dr. Evans as one pillar of that presentation, to explain how and why Ms. Johnson ended up involved with Dustin Honken in five homicides. Dr. Evans's testimony, if tied to Ms. Johnson as it easily could have been, would have shown that her drug addiction exacerbated her symptoms of mental illness and made her less able to think rationally and deliberate, to exercise good judgment, and to control her emotions. Had trial counsel used Dr. Evans effectively, he would have been a major contributor to the portrayal of a sympathetic explanation of Ms. Johnson and her participation in the homicides. Dr. Evans's testimony was rendered completely irrelevant by trial counsel's thoughtless decision not to provide him with Ms. Johnson's drug history. In its seminal study of the decision-making process of capital juries, the Capital Jury Project found that jurors dismissed expert testimony that was not tied to the case. Sundby, Scott, *The Jury as Critic: an Empirical Look at How Capital Juries Perceive Expert And Lay Testimony*, 83 Va. L. Rev. 1109, 1125 (1997).

Professor Sundby could have been referring the *Johnson* case when he wrote,

99

"Sometimes the expert's failure to blend into the overall orchestration was due to causes as shockingly simple as not demonstrating that her testimony applied to the defendant's situation. In one case, a juror at first favorably noted that the defense psychiatrist was "educational. [We] learned a lot about crack," but then proceeded to classify that very same testimony as backfiring because there was no evidence presented at the trial that the defendant had been using crack at the time of the offense. Thus, the juror concluded, the expert's testimony was a "futile effort, [and] the prosecutor picked up on it." (*Id.* at 1139)(footnote omitted). Dr. Evans' testimony was a "futile effort" because of the "shockingly simple" failure to tie his testimony to Ms. Johnson's own circumstances.

The prosecutor minimizes the devastating effect of counsel's ineffective performance by understating the way in which he was able to exploit it at trial. The prosecutor modestly states that "the government was able to limit the impact of this testimony to some degree by pointing out that Dr. Evans's testimony was not based on direct information about Petitioner." [Doc. 325 at 84]. The prosecutor is too modest. As Professor O'Brien testified, the cross-examination "was an effective one that you could see coming for a while, and it was a good one. It was a good one." (H.Tr. 4216).

The prosecutor was able to exploit Dr. Evans' ignorance by asking questions such as, " . . . you know that there are people involved in the drug trade who are out there for profit, not for the drug use?" (T.Tr. 3592); and "And other people can kind of use it to some degree recreationally? They can stop, they can start, they can stop, they can start." (T.Tr. 3592-93). Those two questions, answered in the affirmative, left jurors with the impression that Ms. Johnson was involved in the drug trade for profit despite her report to the government's experts that she sold only enough to buy for herself (Exh. 114, MAR000070), and that she was a casual, recreational user when in fact her drug use was so significant, it "ruined" her life. (Exh. 114, MAR000057).

The last question in this series, "So the people that are involved in this drug trade for

100

profit are actually contributing to this horrible epidemic of methamphetamine in our culture, aren't they?" was answered, "Absolutely." That question, followed by the questioning quoted in Doc. 314 at 124 about Dr. Evans' lack of knowledge of Ms. Johnson's own drug use history, was the final nail in Ms. Johnson's coffin. The prosecutor successfully turned Dr. Evans into his witness, leaving the jury with the impression that Ms. Johnson was a scourge of society, not the mentally and emotionally impaired self-medicating methamphetamine abuser she actually was.

We know that four jurors, even without evidence of the extent of Ms. Johnson's drug abuse and the impact of that drug abuse on her life, found it to be mitigating. [Trial Doc. 545 at 6]. Had the jury been given an accurate and complete portrayal of Ms. Johnson's substance abuse and the effects of that abuse on her through the testimony of the defense expert Dr. Evans, it is reasonably probable that at least one juror would have voted for life.


**COURT CLAIM NO. 33 – Ineffective mitigation: Use of Multi-Faceted, Overly-Complicated Yet Incomplete Mitigating Factors for the Jury to Weigh Rather than Simple, Straight-Forward Facts that Encompassed All of the Mitigation**

The government asserts that Ms. Johnson's nine page discussion of this claim at pages 131-139 of her brief and the claim itself are both "vague" and "broadly stated." [Doc. 325, p. 87-92]. The claim and the discussion of it may be broadly stated but they are certainly not vague. The government was very quickly able to discern that Ms. Johnson is "claiming not only that certain instructions were poorly worded, but other mitigating facts should have been added and others not included." [Doc. 325, p. 88].

The government also erroneously asserts that Ms. Johnson "never provides a draft of the mitigating factors as they allege they should have been drafted." [Doc. 325, p. 87-92] Ms. Johnson explains clearly in her discussion of this claim how the convoluted and overly complicated instructions that were submitted could and should have been broken down into discreet parts, and she also specifically alleges that defense counsel should have used the list of

101

44 simple, declarative mitigating factors submitted to them by mitigation specialist Mary Goody. [Doc. 324, p. 133, 136]. As the government well knows, that list is in evidence at Exhibit 103, pp. 108-110.

The government asserts that Ms. Johnson has not demonstrated that trial counsels' drafting of the mitigating factors fell so far below an objective standard of reasonableness as to constitute ineffective assistance. [Doc. 325, p. 88]. But surely the documentary, expert, and other evidence before the Court, including the ABA Guidelines and the testimomy of *Strickland* expert Sean O'Brien demonstrate deficient performance for all of the reasons outlined in Ms. Johnson's brief.

The government complains that "there is no case law or guidance stating that the manner in which [the instructions] were drafted in this case was inappropriate. (H. Tr. 4263-65)" [Doc. 325, p. 88]. This criticism, to use one of the government's favorite words, is "vague." If the government means that no case law or ABA or other Guideline has addressed the specific instructions in this case, the government is right, but the absence of such case specific guidance is the norm in every unadjudicated case. If the government means that no case law or guideline has set down any general legal principles or any practical or specific guidance by which the instructions in this case can be judged, the government is obviously wrong, as demonstrated by Sean O'Brien's testimony and by Ms. Johnson's discussion of the ABA Guidelines relating to penalty phase jury instructions and the relevant case law. The government's citation to an isolated portion of the cross examination of Mr. O'Brien, in which he did say, without having the Guidelines in front of him, that "[t]here's not a specific guideline that says you should do A, B, C, and D in your mitigating instructions" must be considered in conjunction with his testimony on re-direct where he read into the record Guideline 10.11 of the 2003 ABA Guideline, which is very specific regarding counsel's duty regarding penalty phase jury instructions. He also referenced case law on this topic, including the decision of the Virginia Supreme Court in *Lenz v. Warden*, 579 S.E. 2d 194 (Va. 2003) (holding trial counsel ineffective for failure to object to

102

defective penalty phase verdict forms) (H. Tr. 4263-65, 4304-4307).

If, as is insinuated in footnote 36, the government is simply complaining that it wants to see additional cases involving penalty phase instructional claims, that concern can be easily met. In addition to the cases cited in her brief, Ms. Johnson calls the Court's and the government's attention to *Woodard v. Sargent*, 806 F.2d 153 (8th Cir.1986), revd on other grounds in *Perry v. Lockhart*, 871 F.2d 1384 (8th Cir.1989) , where the Eighth Circuit held that it was prejudicially ineffective assistance for defense counsel to fail to request an instruction that "the defendant has no significant history of prior criminal activity" – when there was no evidence in the record indicating a prior criminal history. The court found the omission "serious and important," noting that "[t]he whole question of the death penalty depends, under Arkansas law, on the jury's discretion in weighing aggravating and mitigating circumstances." (*Id.* at 157). The court concluded that where there was record support for such an instruction "we can conceive of no possible tactical reason for such an omission." *Woodard*, 806 F.2d at 157.

On the issue of prejudice, while the court acknowledged that "impossible at this point to say with certainty what the jury would have done if it had known that one statutory mitigating circumstance existed," it nevertheless concluded that "[w]e believe there is a reasonable probability, in the *Strickland* sense, that the outcome of the case would have been different had the jury known of this clearly applicable mitigating circumstance." (*Id.* at 157-158). Importantly for the handling of the mitigating factors in this case, the court also concluded that " in view of the record in this case, containing no evidence whatever of prior criminal activity on Woodard's part, it seems that he would have been entitled to a peremptory instruction from the trial court directing that the jury find the existence of this mitigating circumstance." (*Id.*). See also, *Pickens v. Lockhart*, 714 F.2d 1455, 1468 (8th Cir. 1983)( a jury instruction which provided that an accessory shall be punished "as if he were a principal" violated the Eighth Amendment because it directed the jury to assess an accessory's punishment as if no mitigating elements of the offense existed; counsel was ineffective for failing to challenge the instruction.).These cases, as well as

103

the others cited in Ms. Johnson's brief provide the general guidance which the government erroneously claims is lacking.

The government next asserts that the fact that only six 6 jurors found the shortest mitigating factor ("Angela Johnson does not have a prior criminal history") to be true indicates that drafting other mitigating factors in a similar manner would have produced the same result. [Doc. 325, p. 88]. The prosecutor in this case well knows that the rejection of this factor by six jurors had nothing to do with the wording of this factor but was based instead on the prosecutor's argument "urg[ing] the jury to accord no weight to the fact that Johnson had no prior criminal record...because there was evidence that Johnson had committed various crimes for which she had not been arrested or charged." *United States v. Johnson*, 495 F.3d 951, 966 (8th Cir. 2007)

The government next asserts that Ms. Johnson's claim that trial counsel did not carefully prepare the mitigation factors is without factual basis. (H. Tr. 89). The government further assets that Ms. Johnson's use of Mr. Berrigan's statement at trial that "I've kind of cobbled these together" is misleading because according to the government the word "these" refers to the ordering of the factors as opposed to the instructions themselves. (T. Tr. 2148-2149). While it is conceivable that the government may be correct in its interpretation of what Mr. Berrigan meant, a consideration of the fuller context in which this statement was made conclusively refutes the government argument that there is no factual basis to the claim that trial counsel did not carefully prepare the mitigation factors

Thus, it appears that this Court first asked Mr. Berrigan when his penalty phase instructions would be forthcoming on November 17, 2004. Mr. Berrigan put the Court off, admitting four years into the case that "frankly, we're not settled all together on some of the mitigation evidence that's going to be presented." (Transcript of November 17, 2004 Proceedings, p. 38). We now know from the testimony of Ms. Goody and Mr. Berrigan just how unprepared the defense was at this point.

On Thursday May 12, 2005, well into the guilt phase of the case, the Court again asked

104

when the penalty phase instructions would be forthcoming, reminding the defense that a two week deadline was now up. (T. Tr. 1431). Mr. Berrigan responded, "I'm hoping to have those to you – I even have a typist coming Sunday – hoping to have those to you on Monday." (*Id.*)

On Friday, May 13, 2005, the defense generated its first work product on penalty phase instructions, Mary Goody's list of 44 mitigating factors.

Monday, May 16, 2005 came and went without the instructions being produced. On May 17, 2005, at 4:43 pm, the Court stated, "I really need your list of mitigators. It's way overdue. It was technically due before the trial started pursuant to my pretrial order. So,...it's way overdue. It's beyond every deadline I've sent. It's beyond the deadline you committed to, so I'm going to press you. When am I going to have it?" Mr. Berrigan responded, "I suppose I can have it by tomorrow morning." (T. Tr. 1950).

On the morning of May 17, 2005, the parties discussed the Court's proposed penalty phase instructions. Mr. Berrigan had a number of criticisms in response to which the Court inquired, "Did you submit your own penalty phase instructions with all these suggestions? Mr. Berrigan responded: "No, sir." Asked why not, he responded, "I don't know....I had not dealt with those preliminary instructions before in my career, so I'm very unused to that....We usually take them up after the evidence, and we do not submit proposed instruction [until] after the evidence but obviously the process is different here." (T. Tr. 1975-1976).

At the end of the day on May 18, 2005, the Court and the parties first discussed the defense's recently submitted proposed list of mitigating factors. It was during this discussion that the topic of the grouping of the the mitigators came up and Mr. Berrigan advanced his theory of how they should be grouped and stated "that's the theory under which I've kind of cobbled these together." (T. Tr. 2148). Again, while it is conceivable that Mr. Berrigan could have been referring to cobbling the factors as opposed to cobbling the instructions, it is simply not the case that "the transcript shows Mr. Berrigan put a sigificant amount of thought into the mitigating factors ..." [Doc. 325, p. 89]. Instead as Sean O'Brien testified, "these jury instructions look like

105

they were [and in fact were] thrown together without a lot of foresight." [38] (H. Tr. 4246)

The government also contends that Ms. Johnson "claims trial counsel should have accepted the Court's invitation to redraft the mitigating factors to reduce them 'to about 7.' (PB 135)." [Doc. 325, p. 90]. The government has misread Ms. Johnson's argument, no doubt because the argument was not phrased as clearly as it should have been. The statement referenced at page 135 states: "Although the Court noted that it 'could get them [the mitigating factors] down to about 7,' (Tr. 3986), the Court also told counsel, 'I think you're for the most part entitled to your language unless I have a serious objection to it.' (Tr. 2152). The Court's invitation should have been a godsend to defense counsel." The "godsend" that counsel was referring to was the invitation to use "your language", not the invitation to limit the number of mitigators to 7. Counsel apologizes for creating this ambiguity.

The government misconstrues another of Ms. Johnson's arguments, but this time the argument is clearly stated. Ms. Johnson clearly claims that trial counsel "offered [two] mitigating factors they completely failed to prove." [Doc. 314, p. 139]. The government erroneously treats the claim as one in which Ms. Johnson asserts that the particular mitigating factors should not have been given. [Doc. 325, p. 90-91]. The thrust of the claim is rather that counsel was deficient for failing to offer evidence in support of then factors.

Lastly, on the issue of prejudice, the government again raises the now familiar argument that Ms. Johnson is speculating about the effect counsels' multiple instructional deficiencies had upon the jury. This topic is generally addressed in the Introductory section of this brief. Suffice it to say here that under the Eighth Amendment penalty phase jury instructions are "necessary ... [to allow] the jury [to] give meaningful effect to a defendant's mitigating evidence." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 253 n. 13, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007). The importance of such instructions is highlighted in *Woodard v. Sargent*, 806 F.2d 153 (8th Cir.1986), where the

---

[38] Mr. Berrigan admitted to the Court at trial that the defense instruction were "kind of cobbled...together." (Tr. 2149)

Eighth Circuit found prejudice in counsel's failure to submit a single mitigating factor. Here, counsel's performance implicates multiple and significant mitigating factors, including mental health and reduced culpability factors. As in *Woodard*, while it is "impossible at this point to say with certainty what the jury would have done if it had [been properly instructed]", there is "a reasonable probability, in the *Strickland* sense, that the outcome of the case would have been different had the jury known of [the] clearly applicable mitigating circumstance[s]." (Id. at 157-158)

**COURT CLAIM NO. 34 – Failure to prepare mitigation: Failure to Investigate and Present Evidence Regarding Angela Johnson's Mental State at the Time of the Offenses**

The government contends counsel's performance was not ineffective for three reasons: (1) presenting mental state at the time of the offense evidence in the penalty phase would have been inconsistent with the guilt phase defense of mere presence; (2) counsel made a strategic decision to bar his experts from questioning Ms. Johnson about the offenses; and (3) counsel made a strategic decision not to have his experts testify about mental state at the time of the offense. (Doc. 325 at 92-97).[39]

The government argues that Ms. Johnson was not prejudiced for essentially two reasons: (1) the jury heard a lot of mental health evidence; and (2) the experts called at the evidentiary hearing have credibility problems.

---

[39] The prosecution contends that Petitioner's argument that the strategy was not effective can be known only with the benefit of hindsight. (Doc. 325 at 96, n. 42). The prosecution mis-reads Petitioner's position. The purported strategy – to prevent the government's experts from discussing the crime with Ms. Johnson – failed before trial, not after. During the government's pretrial interview with Ms. Johnson, they repeatedly elicited statements from Ms. Johnson about the crime and her remorse. (*See* Doc. 314 at 154-155; 197-202; *see also* Claim No. 42, *infra*). Trial counsel never re-considered the strategy in light of Ms. Johnson's statements to the government experts.

107

**A.      Counsel's Performance Was Not Effective**

**1.    Consistency with the Guilt Phase Defense**

The government's first contention – that evidence of Ms. Johnson's mental state at the time of the offense was inconsistent with the guilt phase presentation – fails on two counts. First, by reading each A.B.A. Guideline in isolation, the government turns A.B.A. Guideline 10.10.1 on its head. While consistency between the two stages is crucial, it is the case in mitigation that should drive the train, not the case for innocence. "Ideally, the theory of the trial must complement, support, and lay the groundwork for the theory in mitigation." (Commentary to A.B.A. Guideline 1011L., text accompanying note 271 (citation and internal quotations omitted)). Professor O'Brien's article, cited by the prosecution (Doc. 325 at 93, n. 38) is not to the contrary.

More importantly, however, the prosecution is just wrong when it claims that evidence of Ms. Johnson's mental state at the time of the offense would in any way be inconsistent with the guilt phase defense.   Rather, evidence of Ms. Johnson's impaired capacity would have at least provided some plausible explanation for Ms. Johnson's failure to understand what Dustin Honken intended.[40]

This is not a case like *Middleton v. Roper,* 455 F.3d 838 (8th Cir. Mo. 2006), cited by the prosecution. In *Middleton*, the defendant insisted he was present and explicitly told trial counsel he did not want a diminished capacity defense. In post-conviction, he claimed that his counsel should have argued reasonable doubt about his *presence* while also asserting a diminished capacity defense in the guilt phase of the trial. The court in *Middleton* unsurprisingly concluded that trial counsel's decision not to present conflicting alternative theories during the guilt phase was reasonable. *Id.* at 847-849.

Here, however, as Petitioner pointed out in her Post-Hearing Brief, trial counsel in this

---

[40] See also, *infra*, at 2. regarding Petitioner's statements to Dr. Woods and Dr. Martell.

108

case took the position that Ms. Johnson *was* present.[41] "Trial counsel's factually unsupported, so-called defense was built on the absurd assertion that although Ms. Johnson was admittedly present at the Nicholson/Duncan crime scene and admittedly facilitated all five murders by her conduct, she was nevertheless not guilty because she did not act with the purpose of causing the victims' deaths, even Terry DeGeus' death, where 'the credible evidence in this case does not support the conclusion that Johnson was aware that Dustin Honken intended to kill Terry DeGeus when she called Terry DeGeus to meet him much less that Angela Johnson was present when Terry DeGeus was killed by Dustin Honken.' (H.Tr. (sic)[42] 2292-2297; 2316)." (Doc. 314 p. 58). *See Ferrell v. Hall*, 640 F.3d 1199, 1232 (11th Cir. 2011) (finding ineffective performance where counsel relied on residual doubt in the penalty phase but actually argued "mercy-despite-guilt strategy" without putting on mitigating evidence).

### 2. The Decision Not to Allow Defense Experts to Talk to Petitioner About the Offense

The prosecution's second contention – that it was a reasonable strategy for counsel to instruct his experts not to discuss the offense – also falters on a misreading of defense counsel's obligations. Trial counsel was forced into this absurd position because no one on the team developed a relationship of trust with Ms. Johnson.[43]

The analysis of the government's argument must begin with counsel's ineffective performance in establishing a "relationship of trust with the client . . ." (A.B.A. Guideline 10.5A), and to get his fellow team members and defense experts to establish a similar

---

[41] The devastating impact that this unsupported defense had on the penalty phase is thoroughly discussed in Petitioner's Post-Hearing Brief (Doc. 314, pp. 57-61).

[42] The citation should be to T.Tr., the Trial Transcript, not the Hearing Transcript.

[43] The prosecution correctly notes that Mr. Berrigan testified he was concerned about what Ms. Johnson would say. (Doc. 325 at 153). Mr. Berrigan also testified that "You know, I don't think -- for a long time we didn't discuss what she would say about the events at the time of the crime. We just didn't get there. And I think the failure to get there was a big concern." (H.Tr. 2077). That failure is part of this Claim.

109

relationship of trust. "Establishing a relationship of trust with the client is essential both to overcome the client's natural resistance to disclosing the often personal and painful facts necessary to present an effective penalty phase defense, . . . , and to ensure that the client will listen to counsel's advice on important matters such as whether to testify and the advisability of a plea." *Commentary* to Guideline 10.5 at footnote 178. *See also,* Welsh S. White, *Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care,* 1993 U. Ill. L. Rev. 323, 338-339 (1993). "Whether or not they are recognized, a capital defendant's mental problems will significantly impair the attorney-client relationship. Establishing a relationship of trust with an individual whose view of reality is very different from that of most other people often will be difficult. This problem is dealt with best by consulting mental health experts to better understand the defendant's impairment and then seeking to empathize with the defendant's view of reality." *Id.* at 339.

No one on Angela Johnson's trial team, neither attorneys nor the mitigation specialist, developed such a relationship of trust. They did not have enough contact with the client (*see* H.Tr. 1739-1740 and Exh. 68), they did not use that time effectively, and they did not even attempt to get Ms. Johnson to the point where she was willing to talk honestly to the defense experts about the crime.[44]

Ms. Goody was explicitly instructed **not** to discuss the facts of the crime with Ms. Johnson. (H.Tr. 69 (Goody). Even Mr. Berrigan never really engaged Ms. Johnson in discussing the crimes, other than in the most superficial manner. He testified, "I wouldn't have questioned her about the specifics . . . . I wouldn't have done it. I didn't do it with her. I don't do it as a matter of practice. It's pointless, frankly. I don't need to know that. And it would -- it poses particular problems later, potentially ethical problems, if we end up going to trial." (H.Tr.

_____

[44] *See also* discussion of client communications about her role in the offense at Doc. 314 at 9-12.

110

2921).[45]

This is not a reasonable tactic in a capital case. Professor O'Brien explained why. ". . . I think in capital cases there's no case for the coy approach of I don't want my client to tell me what happened; I don't want to know; I don't want to have that discussion because it might tie my hands." (H.Tr. 4172).

Trial counsel's strategy not to allow his experts to discuss the crime with the mental health experts was completely unreasonable in light of his own unreasonable decision not to discuss the offense with her in any details until just before trial when they discussed the proffer. (H.Tr. 2081).

Moreover, this was not a reasoned strategy that trial counsel made based on the particular circumstances of Ms. Johnson's case. As Professor O'Brien told the court, ". . . I think that Pat is stuck at a certain stage in capital representation that's about 15 or 20 years old as far as the defense and the approach to mental health experts and the use of mental health experts. [¶] And his – he is primarily motivated – and I think it may have to do with a case he handled many years ago. His primary motivation is to avoid a government evaluation. And I think that he elevates that above all else including good judgment in an individual case. I'm not saying there isn't a case in which you would avoid mental health issues for fear of the government's experts getting a crack at your client. But that is kind of Pat's approach on every case, how can I pull this off in a way that prevents the government from getting a bite at the apple by bringing in their mental health experts. (H.Tr. 4220).

Professor O'Brien explained further why this strategy is unreasonable. "And when you try to walk that fine line, you put your experts in a bad position of, you know, staying away from issues that you know they usually address, they want to address, even the client expects them to

---

[45] Trial counsel's reference to potential ethical problems at trial presumably refers to his ethical obligation not to present knowingly perjured testimony. That problem was not an issue because, "[h]e never contemplated putting her on the witness stand at all." (H.Tr. 2078-2079).

111

address and will start talking to them about it, and then the expert might have to say, 'No, I don't want to talk about that.' And then you get the expert in this dilemma about, oh, I found out some data about something I was supposed to stay away from; what do you do with that? [¶] I just think it's an untenable approach to decide you're going to do this very finely nuanced splitting of your experts into something that may involve her current mental state, may involve her past mental state but leaves this big hole at the time of the crime." (H.Tr. 4220-4221).

A decision not informed by the particulars of the case, but only by a practice that is out of step with the standard of care at the time of the trial, is not strategic, is unreasonable and is undeserving of any presumption of regularity. *Cf. Strickland v. Washington*, 466 U.S. 668, 695 ("the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.")

The prosecution further argues that trial counsel's decision was based on trial counsel's concerns about opening the door to questioning by the government under Rule 12.2. Counsel's concern about Rule 12.2 was unreasonable, given the weight of the aggravating nature of the crimes in the case. How could the mitigation case been less persuasive than failing to explain[46] how the Ms. Johnson's mental and emotional impairments led her to become involved with Dustin Honken and participate in these crimes?

The reasonableness of trial counsel's decision must be viewed in light of what would have happened if trial counsel had not unreasonably failed to develop the relationship of trust and confidence with Ms. Johnson that habeas counsel subsequently did. Ms. Johnson would have given trial counsel's experts the description of what happened that she gave Dr. Woods (Exh. 107, WOD000144-146) and Dr. Martell (Exh. OOO). That description is generally consistent with the merits phase defense, and the concessions made by counsel in the penalty phase closing

---

[46] The prosecution incorrectly contends it would have been an "excuse." (Doc. 325 at 95).

112

argument. (Tr. 4035-4043).[47]

It is not only the defense experts who could have used Ms. Johnson's statements to weave a compelling story of reduced moral culpability. Even the government's own expert, Dr. Martell, said that he "could have provided the jury with an expert opinion which would have linked [Ms. Johnson's] brain impairment caused by either drugs or child abuse or whatever to whatever role she played in these offenses," and it "could have been some explanation for how she did whatever she did to be involved in these two homicides, especially the second one where, as the Court indicated, she obviously could have had some awareness, should have had some awareness of what was going on," and that testimony could have been mitigating. (H.Tr. 4912). He also agreed he could have provided helpful [to the defense] testimony "in explaining how her relationship with Mr. DeGeus, specifically a battered person, battered woman relationship, could have been mitigating in terms of how she could have gotten involved in killing Mr. DeGeus." (*Id.*) And Dr. Martell agreed that he could have provided helpful testimony "explaining how – if the threats that she was perceiving from Mr. Honken would have been especially poignant for Miss Johnson in light of her history of first abuse in childhood and then her history of abuse by Mr. DeGeus. (*Id.* at 4912-4913).

With Ms. Johnson's narrative, defense counsel's mental health experts could have developed a powerful case for the statutory mitigators of impaired capacity, duress, and severe mental disturbance (§3592(a)(1), (2) and (6)) rather than the hollow, untethered presentation they did make and that the jury was instructed to exclude from any meaningful consideration.

---

[47] Ms. Johnson also told Dr. Woods the proffer was truthful. Her inability to provide a complete narrative is explained by Professor O'Brien. "It's that she has a package of disabilities and impairments that make it very difficult to come in contact with it. For her to conjure up a conscious memory of having seen what happened to these children and what happened to Terry DeGeus and then to have to talk about it and articulate it and respond to that, that level of self-examination is very difficult for her." (H.Tr. 4222) Had habeas counsel and their experts had as much time as trial counsel had to develop a relationship of trust, Ms. Johnson would have been even more forthcoming than she was.

113

### 3. The Decision Not to Put on Evidence of Mental State at the Time of the Offense Was Not Reasonable

The prosecution baldly asserts that trial counsel's belief that it was "counterproductive, in many circumstances, for the defense to put on evidence of mental health at the time of the commission of the murders," (Exh. 121, p. 984) was an unassailable strategic decision, citing to a discussion between trial counsel and the Court regarding the consequences of trial counsel instructing Ms. Johnson not to answer questions from the government's experts about the crime. (Doc. 325 at 95).

The government points weakly, and incorrectly, to Dr. Cunningham's testimony as support for the reasonableness of trial counsel's decision not to put on any evidence of mental state at the time of the offense. (Doc. 325 at 95, n. 40). Dr. Cunningham was discussing whether experts should testify about a defendant's mental state at the time of the offense. He was explaining that experts might not want to rely on a particular diagnosis, which could "degenerate into a debate between experts about diagnostic minutia that largely goes over the head of the jury and causes them to set all of it aside."[48]

What Dr. Cunningham did say about the jury's role at sentencing demonstrates how unreasonable that decision was. Dr. Cunningham explained that, "[a]t sentencing we're dealing with another issue, not is she responsible but rather what is her moral culpability, not a term that's mine but one that's in landmark Supreme Court case law, Woodson and Penry and Lockett and many cases. [¶] Now we're at the sentence phase, and we're no longer looking at this right standard of could she control herself. Now we're talking continuums. What diminished the

---

[48] The government also asserts that Petitioner's reference to Richard Burr's meeting with trial counsel is misplaced because Mr. Burr did not talk about connecting mental health impairments to why she participated in the crime. (Doc. 325 at 97). Mr. Burr told trial counsel that Ms. Johnson's history "makes you do things without that a person without that life history wouldn't even come near to doing," and how her life experiences "scarred her and disabled her." (Exh. 106, OBR000212-213). That describes precisely the need to tie mitigation to the client's mental state at the time of the offense.

114

control that she could bring to bear, not did she have a choice but what shaped and framed her perception of the choices that she had, not did she know right from wrong but what framed and shaped her morality and her value system. [¶] Now, that's critically important if the jury upon taking the information that they're provided by the defense in the sentencing phase is, in fact, going to make some sort of informed analysis of it and answer it in terms of moral culpability and not criminal responsibility." (H.Tr. 3903).

As Justice O'Connor explained in *California v. Brown*, 479 U.S. 538 (U.S. 1987) (O'Connor, J., concurring), "This emphasis on culpability in sentencing decisions has long been reflected in Anglo-American jurisprudence. . . . *Lockett* and *Eddings* reflect the belief that punishment should be directly related to the personal culpability of the criminal defendant. Thus, the sentence imposed at the penalty stage should reflect a reasoned moral response to the defendant's background, character, and crime rather than mere sympathy or emotion." *Id.* at 545.

Because the jury's duty during the sentencing phase is to weigh the defendant's moral culpability for the crimes that same jury decided she committed, the jurors' attention is already laser-beam focused on "the commission of the murders" (*See* Exh. 121, p. 984). And to be sure, the prosecution's goal during the penalty phase is to make sure the jurors' focus stays on the crime and its impact on the victim's families. And the judge's responsibility is to instruct the jury about how to assess the defense evidence in light of the aggravating circumstances of the crimes. Thus, any strategy that is based on diverting the jurors' attention away from the its duty to assess the defendant's moral culpability for having committed the crimes is not only doomed for failure; it is completely illogical and absurd. The A.B.A. Guidelines command counsel,

> In deciding which witnesses and evidence to prepare concerning penalty, the areas counsel should consider include the following:
>
> 2. Expert and lay witnesses . . . to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state and life history that may *explain or lessen the client's culpability for the underlying offense(s)*. . . .

A.B.A. Guideline 10.11F. (emphasis added).

115

Counsel's decision was not based on a serious assessment of whether presenting mental state evidence would be productive *in Ms. Johnson's case.* It was a knee-jerk, childish notion that if the defense didn't talk about the crimes, they would go away. That is not a strategic decision entitled to any deference. *See* A.B.A. Guideline 10.8 Duty to Assert Legal Claims (Counsel should "consider all legal claims potentially available; and thoroughly investigate the basis for each potential claim before reaching a conclusion as to whether it should be asserted"); *Cf. Link v. Luebbers*, 469 F.3d 1197, 1203 ("[H]is attorneys had discussed various options, a finding that suggests . . . the decision to forgo additional testing was the product of thought and deliberation.").

**B.      Petitioner Was Prejudiced**

Counsel's unreasonable decision to remove from the jury's consideration of Ms. Johnson's mental state at the time of the offense prejudiced Ms. Johnson in four ways. First, it deprived Ms. Johnson of having her jury consider *any* of the mitigating testimony, lay and expert, through the lens of the statutory mitigating factors of impaired capacity, duress, and severe mental disturbance. Second, it prevented the jury from hearing and considering expert testimony tying Ms. Johnson's mental and emotional impairments to the offense.   Third, it prevented the jury from hearing Ms. Johnson's narrative of what occurred, which would have strengthened the ties between Ms. Johnson's impairments and the offenses, and allowed the defense to use the government's expert as a mitigating witness. Finally, because counsel also unreasonably terminated his investigation into Ms. Johnson's brain impairments, the jury could not consider Ms. Johnson's, and the impact those brain impairments had on her mental capacity, her emotional capacity, and her mental state at the time of the offense.

**1.      Lack of consideration of mitigating evidence to support the statutory 1mitigators**

In the penalty phase of a capital case, the prejudice inquiry is not a rote cataloguing exercise where a court merely ensures that counsel presented some testimony on each potential area of mitigation.  Rather, a court must examine "the entire evidentiary" picture presented to the

116

jury, *Strickland v. Washington*, 499 U.S. 668, 696, and ask whether that picture would have changed if counsel had conducted proper mitigation investigation and presentation. *See Wiggins v. Smith*, 539 U.S. 510, 538. That entire evidentiary picture perforce must include whether the jury was allowed to consider the evidence in the context of the instructions that explained how the evidence was relevant to the discharge of their duties.

The government argues that Ms. Johnson suffered no prejudice because the jury heard essentially uncontested evidence of Ms. Johnson's traumatic life and mental health evidence. This argument, however, ignores a critical point of the prejudice Ms. Johnson suffered. The jury was not instructed to consider this evidence in the context of the statutory mitigating factors. The government has no response to this argument because Ms. Johnson was, in fact, prejudiced, particularly in light of the aggravating nature of the crimes. *Woodard v. Sargent*, 806 F.3d 153 (8th Cir. 1986) (failure to ask for instruction regarding no prior history of criminal activity was prejudicial under *Strickland*.)

### 2. Lack of expert testimony tying impairments to offense

The government also argues that the testimony Ms. Johnson's experts would have given is not materially different than what was presented. Even if this were true, which it is not (*see* Post-Hearing Brief, Doc. 314 at 161-162), the argument again fails to address the critical issue: that trial counsel specifically disavowed any connection of this evidence to Ms. Johnson's mental state at the time of the offense. Because the jury was explicitly told **not** to consider this evidence in connection with the crimes at all (Final Penalty Phase Instruction No. 5), the jury could not give the evidence appropriate mitigating weight under the law.

As the Ninth Circuit explained in the just-decided case of *James v. Shriro*, "Without any indication that [the expert's] diagnosis was mitigating in nature because it affected [the defendant's] volitional capacity, the sentencing court would have not have afforded [defendant's mental impairments] appropriate mitigating weight under state law." *James v. Schriro*, 2011 WL 4820605 *31 (9th Cir. October 12, 2011). Although the state in *James* argued that the new

117

evidence was cumulative, the Court of Appeals rejected that argument because of the nature of the evidence that was before the sentencing court, including the credibility of the source of the evidence. *Id.* at *33.

As in *James*, the experts' evidence at issue here is not cumulative. The trial evidence was completely undermined by its detachment from the offenses, and the experts' credibility was demolished by the devastating admissions that they were instructed not to consider their opinions in connection with the crimes.

### 3. Lack of evidence of Petitioner's narrative

The government argues that Ms. Johnson's narrative of the offense was not helpful because it was "full of lies." (Doc. 325 at 105). Specifically, the government argues that "Dr. Woods could not explain" how Ms. Johnson could describe details of the Nicholson/Duncan burials if she were not present at the burial. In Dr. Martell's interview, Ms. Johnson provided that explanation: it was based on what Mr. Honken told her. (Exh. PPP-P13). The prosecution's star witness – Steve Vest – claimed that Honken told him, "they buried them" but did not say anything more about the burial itself, including whether the grave was dug ahead of time or whether the burial site was selected beforehand." (Tr. 2568-2569). This vague reference to "they" from a jailhouse informant about hearsay from Dustin Honken is hardly strong evidence contradicting Ms. Johnson's explanation for how she knew details about the burial.

The truth is that the government does not know what the truth is. The government has drawn inferences it wishes to draw, and because of trial counsel's ineffective performance perhaps even convinced the jury to draw them, but it cannot point to any evidence that categorically depicts Ms. Johnson's role in the offenses. Indeed, the Court itself was troubled "by the lack of certainty in the record concerning the precise involvement of Angela Johnson in these crimes." *United States v. Johnson*, 403 F.Supp.2d 721, 896 (N.D. Iowa 2005).

Ms. Johnson's narrative would have strengthened the mental health experts' testimony, explaining how Ms. Johnson's deficits impaired her ability to withstand the threats of Dustin

118

Honken, to appreciate the wrongfulness of her conduct, and caused her severe emotional and mental disturbance.[49]

The government further criticizes Dr. Woods for relying on Ms. Johnson's reports of being threatened by Mr. Honken because she didn't mention those threats to Christi Gaubatz, Robert McNeese, in her suicide notes, or in her proffer. The government claims Ms. Johnson concocted the threats in "desperation, which came during the middle of a prolonged habeas litigation, after Petitioner knew her attorneys had claimed trial counsel erred in not presenting evidence of dependent personality disorder." (Doc. 325 at 106).

Dr. Martell said that Ms. Johnson "essentially repeated what she had previously told Dr. Woods" in his June 2011 interview with her." (Exh. PPP-11). He wrote, "However, the version of events she provided was inconsistent at several points, both internally and with what she told Dr. Woods, and what she allegedly told Christy Gaubatz, Sara Bramow, and Robert McNeese."[50] Dr. Martell wrote that Ms. Johnson reported to him that Mr. Honken threatened her during his June 2011 interview. Notably, he did not report in this section that she had told him about the threats in 2010.[51]

More importantly, Dr. Martell has never reported that in 2005, Ms. Johnson told Dr. Martell and Dr. Dvoskin, "Dustin mindfucked me. He was constantly manipulating me, you know, at least when Terry hit me, I knew where it was coming from and knew the results with Dustin [sic]. Everything that came out of his mouth was a lie." (Exh. 114, MAR000091.) She also reported that she moved to Clear Lake because "I couldn't stay anywhere near Dustin. I

---

[49] *See also infra*, Claim No. 42.

[50] Dr. Martell acknowledged at the evidentiary hearing that he relied entirely on triple or quadruple hearsay based on summaries prepared by ex-FBI agents to determine what the correct version of events were. H.Tr. 4727-4732.

[51] Elsewhere, Dr. Martell used that earlier report to explain away any PTSD diagnosis prior to the homicides. (Exh. PPP-P08).

119

wanted him out of my life. Without him realizing that, I just wanted him out of my life, you know." (Exh. 114, MAR000093). Dr. Dvoskin cautioned her that he does not want to violate the judge's order and Ms. Johnson responded, "Right. There were other reasons I wanted Dustin out of my life besides he was a lying, manipulating cheat, but we can't talk about that." Dr. Dvoskin added, "You can talk about anything you're not charged with." Ms. Johnson replied, "We can't talk about that then." (*Id.*).

That is not a late fabrication made only in the course of habeas litigation, the government's argument to the contrary. It was objectively reasonable for Dr. Woods to rely on Ms. Johnson's statements.

Before proceeding to the next section, a digression about Dr. Martell's credibility deserves discussion.

First, Dr. Martell repeatedly disavowed portions of his 2005 report when they were scrutinized under the light of cross-examination, blaming his co-expert Dr. Dvoskin any misrepresentations. *(See, e.g.* H.Tr. 4705-4709; 4723-4732.) He blamed his lawyer for language in a letter to the Department of Justice complaining of being removed from cases, causing him to lose significant income and hindering the work of prosecutors "who are relying on me for assistance in their cases." (H.Tr. 4716-4717). He listed documents that he relied on in his report that he never reviewed (H.Tr. 4725). He violated the Forensic Specialty Guidelines by relying on FBI summaries of prosecutorial memos which in turn rely on police reports without ever independently verifying any of the information in the summaries. (H.Tr 4732-4733, Exh. 136 at 662). He made several misrepresentations on his resume. (H.Tr. 4844-4853).

Second, a week after Dr. Martell's testimony in this case, the district court for the Central District of California issued its ruling in *Hernandez v. Martel*, 2011 WL 3809215 (CD Cal. August 16, 2011). The court devoted seven pages of its 130-page opinion to criticisms of Dr. Martell's role in the case, retained by the state for the state court proceedings. The criticisms by a psychiatrist retained by petitioner ran the gamut from questioning of his methodology, his

120

failure to know prominent literature, his offering opinions in areas with which he had no experience, to, notably for this case, his failure to explore or address "the many instances in which petitioner provided Dr. Martell with information suggestive of bipolar disorder, which Dr. Martell either did not explore or address. (*Id.* at *23).

A psychologist retained by petitioner catalogued similar criticisms. Again, notably for this case, the psychologist was "quite perturbed" by the whole, tape-recorded interview of petitioner. "It was not a clinical interview. . . . It was almost designed to hide any sign of psychopathology, which is the opposite of the purpose of a clinical interview." (*Id.* at 24).

Based on the wealth of material calling into question Dr. Martell's qualifications and neutrality, the court gave "little weight to Dr. Martell's testimony." (*Id.* at *26).

### 4.    Brain Impairments

The government argues that the evidence of Ms. Johnson's brain impairments would have been impeached because of the post-crime methamphetamine abuse and suicide attempt.

To give that argument any validity, the government must ignore the seven years+ of Ms. Johnson's heavy methamphetamine abuse **prior** to the crimes. (H.Tr. 4816). It also requires the government to ignore the findings of Dr. Young, that her testing of Ms. Johnson showed evidence of impairments that had have existed in childhood. (H.Tr. 4537-4539). The testing was borne out by Dr. Woods' clinical examination and clinical history. In his clinical examination, Ms. Johnson was unable to perform functions that she should have learned in childhood and, if learned in childhood, would not have been affected by her drug abuse. (H.Tr. 4407-4410). The school records were further evidence of early impairments. (H.Tr. 4412-4415). Dr. Gelbort's preliminary testing in 2005 was also confirmatory of early impairments. (H.Tr. 3437-3438.) Finally, the government's argument fails to explain why, if Ms. Johnson's impairments are solely related to methamphetamine abuse, she scored well on memory tests, when memory is one of the areas which methamphetamine is likely to impact, and scored poorly on frontal lobe/executive functioning tests in 2010, another area which methamphetamine is likely to impact, long after she

121

had stopped using methamphetamine. (H.Tr. 4410; Exh. PPP-P18).

The government argues that there is no evidence of childhood or pre-methamphetamine impulsivity, poor judgment, and inappropriate behavior. (Doc. 325 at 100). Actually, there is. Ms. Johnson told the government's experts she got into trouble at school for fighting and smoking. (Exh. 114, MAR000042). She also told them, "I got into trouble a lot." (Exh. 114, MAR000046). She dropped out of school in ninth grade; she got married when she was 16 and broke up nine months later (Exh. 114, MAR000047); she got unintentionally pregnant at 19 (Exh. 114, MAR000051); she had an affair while married to A.J. Johnson (Exh. 114, MAR000054). Although she had no criminal convictions, she had a lengthy history of traffic violations for speeding and was charged as an habitual violator twice (Exh. 114MAR000064). The government's argument is simply based an ignorance of the facts.

The government next attacks Dr. Merikangas's credibility. Because Dr. Merikangas's credentials are unassailable, the government argues he was biased due to his association with Dr. Woods and further claims that his "testimony should be rejected." (Doc. 325 at 101). Dr. Merikangas' "association" with Dr. Woods consisted of "hearing Dr. Woods present at conferences," meeting "him at various conferences around the country," and working on "at least one other case together." (H.Tr. 4060). That is hardly the type of association that would lead a jury to reject Dr. Merikangas's testimony outright.

The prosecution also argues that Dr. Merikangas's testimony was not consistent with the written reports of the doctors interpreting the EEG and PET (Doc. 325 at 101) but fails to note that his testimony was consistent with the report of the doctor interpreting the MRI. (H.Tr. 4022). Dr. Merikangas explained that, based on the written reports, it appeared that the PET/CT scan referral was "seizure disorders, so this radiologist was keyed into looking for areas of hyperactivity or too much activity which might indicate epilepsy. He wasn't looking for cognition or dementia or Alzheimer's or other kinds of questions that will be asked." (H.Tr. 4036). *See also* H.Tr. 4062 to similar effect regarding the EEG scan.

122

Moreover, Dr. Merikangas's findings on all three scans "fit together" and they "fit together" with the results of Dr. Young's neuropsychological testing. (H.Tr. 4045).

The government also asserts that the technology Dr. Merikangas used was not available in 2011 so his testimony should be rejected. Dr. Merikangas testified that the MRI machine used in this case existed in 2005, PET side of the scanner existed back in 2005, and the EEG has been around for "probably a hundred years." (H.Tr. 4061-4062).

None of the government's contentions are sufficient to discount Dr. Merikangas's testimony. *Porter v. McCollum*, ___ U.S. ___; 103 S.Ct. 447, 454-455 (2009).

Finally, the government attacks Dr. Woods' credibility, first because of his opinions that Petitioner was incompetent at the time of trial and was "unable to appreciate the wrongfulness of her conduct at the time of the murders." (Doc. 325 at 102). The government misreads Dr. Woods' opinion on the wrongfulness of her conduct. Dr. Woods never said that Ms. Johnson was "unable" to appreciate the wrongfulness of her conduct (H.Tr. 4518); he said only that her ability to do so was "significantly impaired." (Exh. 107, WOD000099; WOD000143). Dr. Cunningham agreed with Dr. Woods' opinion. (H.Tr. 3962-3967). Dr. Woods explained his opinion in detail during the evidentiary hearing, testimony that the government ignores. (H.Tr. 4517-4522).

The government also attacks Dr. Woods' diagnoses of Cognitive Disorder NOS, bipolar disorder, and dependent personality disorder, and faults Dr. Woods for having evolving diagnoses. At the time of Dr. Woods' first report, he did not have the testing results from Dr. Young. (Exh. 112, YNG000024-YNG000038). Thus, he did not have the underlying data he needed to make the diagnosis of Cognitive Disorder NOS in 2009.

Regarding the diagnosis of bipolar disorder, Dr. Logan found in 2005 that Ms. Johnson's symptoms were consistent with bipolar disorder. Although he could not rule out hypomania from methamphetamine use, Dr. Logan did not have the statements from Ms. Johnson's family that Dr. Woods did. In those statements, Wendy Jacobsen said that "Angie was always very

123

emotional. Her moods switch from high to low, happy to depressed, and okay to terrible in a minute. Sometimes she cries and laughs at the same time, but both are intense. She never was able to control her emotions and did not seem to understand that her emotions were so much different from everyone else's." (Exh. 133, Exhibit 28 at 6). Ms. Jacobsen does not limit her description of Ms. Johnson's mood swings to her periods of methamphetamine abuse. Rather, she casts them in terms of "always" and "never." Similarly, Holly Dirksen described Ms. Johnson "stay[ing] up for days – even when she wasn't on drugs like when she was pregnant – and make things, things that you could make during regular day time hours." (Exh. 133, Exhibit 29 at 5).

Dr. Woods discussed in his report the maternal history of bipolar-like behavior (Exh. 107, WOD000106); Ms. Johnson's history of migraine disease which has a "high co-morbidity with both bipolar disorder and aberrant electrical activity" (Exh. 107, WOD000113); Dr. Martell's description of Ms. Johnson's "labile" mood, a description he noted was "most often used in bipolar disorder." He also noted that Ms. Johnson exhibited other symptoms consistent with bipolar disorder, as well as temporal lobe dysfunction. (Exh. 107, WOD000122-123). Dr. Woods cited literature finding a high co-morbidity between mood disorders and chemical dependency. (Exh. 106, WOD000135). The government's argument does not undermine Dr. Woods' diagnosis of bipolar disorder.

As discussed *infra* at Claim No. Thirty-Six, the DSM-R-IV-TR specifically discusses the potential difficulties diagnosing dependent personality disorder and why it can take time.

The Court told Dr. Woods, "I don't have a problem with any of your diagnosis (sic). . . . That's – that's not where the problem is. And believe me, I've had a lot of problems with diagnosis by psychiatrists and psychologists over the years. But, you know, I went through any one – every one of your diagnosis (sic) and got my DSM-R-IV-TR out, went through it. And, you know, you probably did a better job of applying the DSM than 90 percent of the psychiatrists

124

I've seen. So I don't have any problems with your diagnosis (sic)."[52] (H.Tr. 4512). The government's argument that Dr. Woods' diagnoses were not credible must fail.

The government's next attack is on Dr. Woods' diagnosis of temporal lobe dysfunction. To do so, he must attack the credibility not only of Dr. Woods, but that of Dr. Gelbort, Dr. Merikangas, Dr. Young, and even, *sub silencio*, the observations of the Court.

Dr. Gelbort's IQ testing using the WAIS-III showed a disparity between Ms. Johnson's verbal score (IQ 84) and performance score (IQ 102), indicating a disparity in functioning between the dominant and non-dominant spheres of her brain. (H.Tr. 3364-65). (*See also* H.Tr. 4121-4122 (Dr. Logan) and H.Tr. 4045-4046 (Dr. Merikangas). Dr. Martell notes that the disparity seen in Dr. Gelbort's testing "were no longer seen" in Dr. Young's testing. (H.Tr. PPP-P10) He has no explanation for why that might be so and, indeed, Dr. Martell reviewed Dr. Gelbort's testing in 2005 and had no problem with his work then. (Exh. 114, MAR000220-221). In fact, Dr. Young's testing was not comparable with Dr. Gelbort's testing because the WAIS-IV which she used does not generate separate verbal and performance IQ scores. (H.Tr. 4831).

The government next attacks Dr. Woods' "claim" that Ms. Johnson's left leg shook uncontrollably, arguing that only Dr. Hutchinson noted it but attributed it to anxiety, and Dr. Martell observed it in 2005 and 2011 but not in 2011, and he said she did so in 2011 when she was "upset or distressed." Dr. Martell's own observations in 2005 were that "[h]er motor behavior was remarkable for intermittent restlessness and nervous shaking of the right leg and foot, which she was aware of and which she attributed to anxiety." The problem is that the Court noticed it. "I'm just saying I have never once observed somebody's leg twitching let alone as violently as she did. On the other hand, it's not something I look for. I think I might notice it, but I easily could not. So to me it seemed so unusual, and it was so violent at times, and it didn't seem to be related to when the testimony was going poorly for her or when it was going well for

---

[52] The Court went on to say, "But I have a problem with your conclusions because in my view, particularly your competency one, it's just not well supported. I don't see it." (H.Tr. 4512).

125

her or that she actually had all that much interest in either." (H.Tr. 4887). The government's attempt to portray Dr. Woods' observations as lacking credibility fails.

Dr. Woods' diagnosis of temporal lobe dysfunction is unassailable, for the reasons discussed above.

### 5. Reweighing the Evidence

Trial counsel's numerous failures in investigating and presenting Ms. Johnson's mental impairments in the context of her mental state at the time of the offense prevented the jury from considering and giving effect to the full measure of Ms. Johnson. *Brewer v. Quarterman*, 550 U.S. 286 (2007); *Abul-Kabir v. Quarterman*, 550 U.S. 233 (2007); *Smith v. Texas*, 543 U.S. 37 (2004); *Tennard v. Dretke*, 542 U.S. 274 (2004). That failure cannot be excused by the government's attempts to balkanize and attack the weight of the evidence before this court (as opposed to the jury) under its own distorted view of mitigation. *See Nelson v. Quarterman*, 472 F.3d 287, 310 (3rd Cir. 2006) (*en banc*), *cert. denied*, 551 U.S. 1141 (2007) ("Weighing the evidence in this manner violates the Supreme Court's express admonition in *Tennard* that we not substitute our own interpretation of the evidence for that of the jury or assess the strength of the mitigating evidence presented except 'insofar as evidence of a trivial feature of the defendant's character or the circumstances of the crime is unlikely to have any tendency to mitigate the defendant's culpability.' . . . Rather, the only question we may ask regarding the jury's interpretation of the mitigating evidence presented at trial is 'simply whether the evidence is of such a character that it '*might* serve as a basis for a sentence less than death.'") *quoting Tennard v. Dretke*, 542 U.S. at 286-287 (emphasis in original).

The aggravating nature of the crimes here cannot suffice to tip the balance against a finding of prejudice. As in *Smith v. Mullin*, 379 F.3d. 919, the government's case in aggravation was strong. Yet, that court, relying on *Wiggins*, found that "had the jury been able to place Mr. Smith's . . .compelling *explanation* for his behavior . . . on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Id.* at

126

943 (citations and internal quotations omitted). *See also Williams v. Taylor*, 529 U.S. 362 (finding prejudicial ineffective assistance where Williams had "savagely beaten an elderly woman, stole two cars, set fire to a home, stabbed a man during a robbery, and confessed to choking two inmates and breaking a fellow prisoner's jaw" *Id.* at 418 (Rehnquist, C.J., dissenting)); *Ferrell v. Hall*, 640 F.3d 1199, 1235 (11th Cir. 2011).

Evidence of Ms. Johnson's brain impairments was compelling and should have played a central role in the case in mitigation. Courts have repeatedly held that failure to present evidence of brain impairment is prejudicial. *See, e.g., Porter v. McCollum*, 130 S. Ct. at 454 (brain abnormality and cognitive defects); *Rompilla v. Beard*, 545 U.S. at 392 ("organic brain damage" and "extreme mental disturbance significantly impairing several of [the defendant's] cognitive functions"); Summerlin v. Schriro, 427 F.3d 623, 641 (9th Cir. 2005) ("lack of impulse and emotional control and organic brain dysfunction"); *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004) (finding that evidence of mental deficiencies "garners the most sympathy from jurors."). When coupled with her other mental and emotional impairments and the ability to tie that evidence to the statutory mitigating factors, it is reasonably probable that one juror would have voted for life.

"We do not require a defendant to show 'that counsel's deficient conduct more than likely than not altered the outcome' of his penalty phase proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.'" *Porter v. McCollum*, 130 S.Ct. 447, 455-56 (quoting *Strickland v. Washington*, 466 U.S. at 693-94).

This Ms. Johnson has done.

**COURT CLAIM NO. 35 – Failure to prepare mitigation: Delay in Hiring Dr. Gelbort, Failed to Follow-Up on His Recommendations, Failed to Instruct Him to Conduct a More Thorough Battery of Neuropsychological Tests, Failed to Retain Another Neuropsychologist When Gelbort Inexplicably Refused to Testify, Failed to Incorporate His Helpful Findings and Diagnosis Into the Testimony of the Experts Who Did Testify and Failed to Conduct Additional Neuropsychological and Neuroimaging Testing of Petitioner**

The government argues that trial counsel's performance was not ineffective because (1) the results of Dr. Gelbort's evaluation were not particularly helpful; (2) trial counsel's decision not to call Dr. Gelbort was reasonable; (3) trial counsel was not obligated to conduct further testing; (4) trial counsel was not obligated to search out another expert; and (5) the testing and evaluations by habeas counsel's experts were not significantly different. [Doc. 325 at 107-109].

The government argues that Petitioner suffered no prejudice because (1) she cannot show that it is reasonably probable that experts she claims trial counsel should have hired would arrive at the same diagnosis; and (2) she cannot show that it is reasonably probable that the outcome would have been different. [Doc. 325 at 109-110].

A.       **Trial Counsel's Performance Was Ineffective**

The government argues that Dr. Gelbort's findings were not particularly helpful, referencing the notes that Mary Goody took during a telephone conversation with Dr. Gelbort (Exh. 1, pp. 4398-4401 (MG004120-4123). While that is the government's opinion, it is not what Mr. Berrigan thought. He understood that "mild impairment" was significant; that the disparity between her verbal and performance IQ scores was consistent with mild impairment; and that if Dr. Gelbort said Ms. Johnson's brain was like "Swiss cheese," that would have been very helpful. (H.Tr. 2982). Ms. Goody agreed. (H.Tr. 188).

The government points to a single comment made by Mr. Berrigan during the evidentiary hearing in support of its argument that Mr. Berrigan made a tactical decision not to call Dr. Gelbort. (H.Tr. 2977-78) That comment came with a significant qualifier – "in light of the lack of supporting evidence" – a qualifier that underscores that the decision was not made after a reasonably thorough investigation. (*See Wiggins v. Smith*, 539 U.S. 510, 528; 123 S. Ct. 2527;

128

156 L. Ed. 2d 471 (2003) ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.") (internal citations and quotation marks omitted). In fact, Mr. Berrigan had every intention of calling Dr. Gelbort to testify; in March 2005, he wrote Dr. Gelbort a letter asking him for any dates he would be unavailable to testify. (Exh. 100, GEL000025).[53]

Mr. Berrigan knew that Dr. Gelbort's testing was only preliminary screening, and he acknowledged that complete testing was not done only because the defense team did not ask Dr. Gelbort to do it. (H.Tr. 2985). Mr. Berrigan did not have a tactical reason not to do that. Rather, he testified that if a full battery of psychological testing had been done and the results were favorable, there would been no tactical reason not to present those results. (H.Tr. 2985).

Mr. Berrigan was on notice from both Dr. Logan and Dr. Gelbort that neuroimaging could be helpful. Although the prosecution seizes on Dr. Logan's concession that neuroimaging carries some risk in a legal setting because there might be normal results despite the neuropsychological test results (H.Tr. 3571-72), Dr. Logan does not know why counsel did not neuroimaging done. (H.Tr. 3506-3507). Dr. Logan's rationale does not justify Patrick Berrigan's inaction. Patrick Berrigan testified that neuropsychological testing was something that should be done early in a case, and that may be followed up with neuroimaging. (H.Tr. 2980-2981). Ms. Goody could not explain why she did not recommend to Mr. Berrigan that neuroimaging be done, nor why it was not done. (H.Tr. 193). Given how close to trial counsel actually had even a preliminary screening of neuropsychological testing done, it would have been difficult at that late date to get a complete neuropsychological battery done and then arrange neuroimaging.[54] As Dr.

---

[53] Mr. Berrigan testified that he has very poor long-term memory, which is why he takes such extensive notes. (H.Tr. 3034). His trial notes did not reflect his conversations with Ms. Goody about Dr. Gelbort.

[54] Dr. Gelbort also suggested retaining a psychopharmacologist. (Exh. 1, p. 4401, MG004123). Counsel did follow this recommendation but failed to provide his expert with any information relevant to Ms. Johnson. [*See* Doc. 263, pp. 116-120, Doc. 314, pp. 123-130.]

129

Cunningham testified, "If additional testing like neuroimaging is required, that may take many months to secure the orders and set that up and accomplish it and that kind of thing." (H.Tr. 3856).

The prosecution also points to Dr. Gelbort's apparent unwillingness to testify, based on the testimony and notes of Ms. Goody. (H.Tr. 194-197). The conversation between Ms. Goody and Dr. Gelbort occurred on May 12, 2005, after trial had begun. The problem is that trial counsel never had this discussion with Dr. Gelbort; trial counsel did not independently inquire and assess whether Dr. Gelbort had information that was helpful and needed to be presented. When Ms. Goody informed Mr. Berrigan of her conversation, his only reply was "just forget it." (H.Tr. 196).

Unlike the events in *Link v. Luebbers*, 469 F.3d 1197 (8th Cir. 2006) which led the court to note it was not deficient performance for a team of *attorneys* to divide the workload, (*Id.* at 1203, n. 2), it is patently unreasonable for an attorney to delegate counsel's duty to oversee the work of, and determine whether to call, an expert to a non-attorney without appropriate supervision or, indeed, any involvement in the oversight and decision. (*See* A.B.A. Guideline 10.11F. describing counsel's duties to decide what evidence to present and what witnesses to call; *see also* A.B.A. Model Rules of Professional Conduct Rule 5.3, Responsibilities Regarding Nonlawyer Assistants and Comment[55] ("The measures employed in supervising nonlawyers should take account of the fact that they do not have legal training and are not subject to professional discipline."). The reasonableness of trial counsel's decision not to call Dr. Gelbort "founders in this case on the rocks of ignorance." *(White v. Roper* 416 F.3d 728, 732 (8th Cir. 2005).

The government argues that "[t]rial counsel were not obligated to search out a different

---

[55] Available at www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professio nal_conduct/rule_5_3_responsibilities_regarding_nonlawyer_assistant/comment_on_rule_5_3.ht ml

expert to get a better opinion." [Doc. 325 at 108.] In each of the cases the government relies on, however, the court found that the defense had done a sufficient investigation to justify the decision. *Forsyth v. Ault*, 537 F.3d 887, 892 (8th Cir. 2008) (Four mental health experts found defendant competent to stand trial; counsel not required to continue shopping for favorable opinion); *Winfield v. Roper*, 460 F.3d 1026, 1041 (8th Cir. Mo. 2006) (State and defense experts concluded defendant was not "suffering from a mental or emotional illness at the time of the crimes and informed penalty counsel of their conclusions. Penalty counsel therefore chose not to put on mental health evidence."); *Sidebottom v. Delo*, 46 F.3d 744, 753 (8th Cir. 1995) (trial counsel entitled to rely on a recent mental health evaluation finding no mental illness after finding that family members could not provide information contradicting evaluation or suggesting other mental diseases or defects).

Petitioner is not arguing that trial counsel should engage in that kind of expert "shopping." Here, as discussed above and in Petitioner's Post-Hearing Brief [Doc. 314 at 171-177] counsel had significant evidence of mental impairments from three mental health experts, and recommendations from two of them to pursue further avenues of investigation that trial counsel did not pursue. That one of those experts who counsel believed needed to do more work subsequently decided not to testify was a woefully insufficient reason to end the inquiry, particularly when counsel took no steps to determine why the expert balked.

Petitioner's case is much closer factually to the facts in *Ringo v. Roper*, 472 F.3d 1001 (8th Cir. 2007) than the cases referenced above. *Ringo* involved an appeal from the district court's denial of relief in a §2254 petition. There, trial counsel did not follow up on the "mild recommendation" of a neuropsychologist to retain a clinical psychologist because the client had elevated scores on an MMPI-2 related to PTSD. (*Id.* at 104). Trial counsel testified that, by the time she realized she should hire a consultant, it was too close to trial to do so and she did not think she could get a continuance. (*Id.*) The Eighth Circuit, citing *Wiggins v. Smith*, 539 U.S. 510, 526, 527-28, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003), found that "a good argument could

131

be made" that reasonable counsel should have retained the expert and suggested it would have done so if it were in the position of the Missouri Supreme Court. It was only because the federal court's actions "are tightly circumscribed by AEDPA," that the Court could not conclude that the state court had applied *Strickland v. Washington* in an objectively unreasonable manner. (*Id.* at 1006).

In Petitioner's case, trial counsel's actions were based on "inattention, not reasoned strategic judgment," and his performance was unreasonable. Trial counsel "abandoned his investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Wiggins v. Smith*, 529 U.S. at 526; *Ringo v. Roper*, 473 F.3d at 1004.

### B. Petitioner Was Prejudiced

The government argues that Petitioner cannot show that it is reasonably probable that experts she claims trial counsel should have hired would arrive at the same diagnosis as Dr. Gelbort. The government's argument places an overly-simplistic and narrow reliance on Dr. Gelbort's oral report to Ms. Goody that he thought Cognitive Disorder NOS would apply, was justified, and was defensible. (H.Tr. 3399).

A comparison of portions of Dr. Gelbort's testimony and Dr. Young's testimony demonstrates that they found the same impairments. Dr. Gelbort testified that many of the "numbers on my protocol are in the normal range or even above average. But there's more information about the patient's limitations in the few weak scores." (H.Tr. 3444). Dr. Young testified that her testing showed that the "entire brain was affected. But some of the areas of the brain are really functioning . . . very normally and are in the average range, some even above average. Then there are other areas of her brain . . . that are significantly impaired and would significantly affect her daily functioning." (H.Tr. 4541). Dr. Gelbort found that Ms. Johnson's "intuitive reasoning" was the source of the problem, that she was mildly impaired (H.Tr. 3392), and that "her nuances were bad" and "her insight was not great." (H.Tr. 3396). He also found

that she was mildly impaired on a test of "higher-level reasoning and problem-solving abilities." (H.Tr. 3391).

Dr. Young similarly testified that Ms. Johnson was impaired in "her ability to think, to reason, to anticipate consequences, to change actions based on information she's getting from the environment, to develop a plan, to maintain some impulse control." (H.Tr. 4542-4543).

Dr. Gelbort's conclusions were also borne out by the MRI that habeas counsel had done. Dr. Gelbort testified that he thought Ms. Johnson's brain would look like Swiss cheese. He explained, "Swiss cheese is riddled with little holes. It's an interesting analogy. . . . [¶] But there are different types of issues that affect the brain and brain functioning where the whole area's not ablated or destroyed or not working but rather the area just isn't working as efficiently as it out to or as it does with normal individuals. . . .[¶] . . . [I]f you lose 20 percent of the connections it now only has 800, it still works, but it doesn't work as well or as fast or as accurately or as consistently. And it gives rise to cognitive dysfunction that is akin to having Swiss cheese." (H.Tr. 3393-3394).

Similarly, Dr. Merikangas testified that the MRI showed hyperintensities in the frontal lobe of the brain, areas that "have to do with executive function, judgment, and impulse control. ... People with this generally have bad judgment and bad decisions and react strongly and inappropriately to any kind of situation." (H.Tr. 4025).

The opinions of Dr. Gelbort, whom trial counsel retained but did not call to testify, and Dr. Young and Dr. Merikangas, whom habeas counsel retained, were quite consistent with each other. Petitioner has shown that "it was reasonably probable that if counsel would have retained the type of experts she claims they should have, they would have reached the same diagnosis." *Ringo v. Roper*, 472 F.3d 1001, 1006 (8th Cir. 2007).

Finally, the government points to Dr. Martell's testimony to demonstrate that Ms. Johnson is not able to show that there is a reasonable probability the mental health evidence would have altered the outcome of the penalty phase because "Dr. Martell testified that Dr.

133

Gelbort's testing showed Petitioner had only minor impairments in abstract reasoning and arithmetic achievement." [Doc. 325 at 110].

The prosecution's attempt to attack the weight of evidence before this Court (as opposed to the jury) is misplaced. *See, Nelson v. Quarterman*, 472 F.3d 287, 310 (5th Cir. 2006) (*en banc*), *cert. denied*, 551 U.S. 1141(2007) ("Weighing the evidence in this manner violates the Supreme Court's express admonition in Tennard that we not substitute our own interpretation of the evidence for that of the jury or assess the strength of the mitigating evidence presented except 'insofar as evidence of a trivial feature of the defendant's character or the circumstances of the crime is unlikely to have any tendency to mitigate the defendant's culpability.' . . . Rather, the only question we may ask regarding the jury's interpretation of the mitigating evidence presented at trial is "simply whether the evidence is of such a character that it '*might* serve as a basis for a sentence less than death."'), *quoting Tennard v. Dretke*, 542 U.S. 274, 286-287 (2004) (emphasis in original).

Even so, a review of Dr. Martell's testimony shows the folly of the prosecutor's argument. Absent from the prosecution's Response is reference to Dr. Martell's testimony that Dr. Gelbort should have done a more complete battery of testing (H.Tr. 4798), in essence agreeing with trial counsel's assessment that Dr. Gelbort had done only preliminary screening. The government's own witness agrees that more investigation needed to be done.[56]

Moreover, Dr. Martell's conclusion of Dr. Gelbort's preliminary testing rests solely on his controversial use of the Heaton norms. (H.Tr 4775-4776). Dr. Gelbort was questioned at length about the determination by Dr. Robert Heaton and others in the neuropsychological field that use of the norms "are not recommended to identify or characterize possible acquired impairment in capital punishment cases." (H.Tr. 4783; Exh. 140). Although Dr. Gelbort attempted mightily to distinguish his (mis)use of the norms in Ms. Johnson's case, his attempts

---

[56] Had Dr. Gelbort done complete testing in 2005, as reasonably effective counsel would have had him do, his results would have shown impairments and deficits, as discussed *infra*.

134

were repeatedly found to be wrong. For example, he claimed the critique referenced in Exhibit 140 only related to the use of "race corrections" despite the article's specific reference to "education." (H.Tr. 4783-4784).

Dr. Martell had to acknowledge that the research (Exh. 141) showed that the Heaton norms misclassified older and/or less educated individuals normal more frequently than younger and/or more educated individuals, and that, in this case, he used an education adjustment on a person who is less educated. (H.Tr. 4787). He also had to agree that the research showed the tendency of Heaton norms to produce false negatives in populations of mild to moderate impaired individuals, *i.e.*, to identify people with impairment as normal. (H.Tr. 4788). When asked whether that is what he did in this case, Dr. Martell then said, "No, I identified her as having deficits." (H.Tr. 4788). He did not answer the question of whether his use of the Heaton norms on Dr. Gelbort's data created a false negative, which is what the research found tends to happen. (Exh. 141).

The prosecution's reliance on what Dr. Martell would have testified to regarding Dr. Gelbort's testing ignores what a complete work-up would have shown. Dr. Martell testified that his own testing and his review of Dr. Young's testing demonstrated that Ms. Johnson "shows a pattern of problems with math, low vocabulary and some abstract reasoning," (H.Tr. 4812); that her abstract reasoning deficits were the same as when Dr. Gelbort tested them in 2005 (H.Tr. 4813); that these deficits were longstanding, dating back to adolescence (H.Tr. 4813); that the testing showed mild to severe impairments in some frontal lobe functions, some of which are attributable to her history of methamphetamine abuse (H.Tr. 4813-4814), and some which overlap with impairments predating her drug abuse and subsequently exacerbated by her drug abuse (H.Tr. 4814). Dr. Martell agreed with Dr. Young's findings made in conjunction with her administering the Delis-Kaplan Executive Functioning System tests that Ms. Johnson had "significant impairment." (H.Tr. 4859). He also agreed with Dr. Young's findings from her CATS testing that showed "severe frontal lobe impairment." (H.Tr. 4860). That evidence would

135

have been available to trial counsel had Dr. Gelbort completed his examination, and it would

have been uncontested by the government's own expert.

Failure to present evidence of brain abnormalities, cognitive deficits, organic brain

damage, and severe mental disturbance significantly impairing several of the defendant's

cognitive functions has been found repeatedly to be prejudicial. *See, e.g., Porter v. McCollum*,

130 S.Ct. 447, 454; *Rompilla v. Beard*, 545 U.S. 374, 392; *Summerlin v. Schriro*, 427 F.3d 623,

541 (9th Cir. 1995). Ms. Johnson has demonstrated similar prejudice in this case.

> **COURT CLAIM NO. 36 – Failure to Prepare Mitigation: Failure to Introduce Evidence of, and Give The Trial Experts Records[57] Concerning, the 1996 Diagnosis of Petitioner With Depression and Dependent Personality Features[58]**

ABA Guideline 10.11 F. 2. obligates counsel to consider using "[e]xpert and lay

witnesses along with supporting documentation . . . to provide medical, psychological,

sociological, cultural or other insights into the client's mental and/or emotional state . . ."

That obligation necessarily requires that counsel not only obtain the supporting documentation,

but that counsel also fully investigate the leads provided in the documentation, provide the

documents and results of the subsequent investigation to their experts, and use the experts to

present information from the documents and the subsequent investigation that supports their case

in mitigation.

**A.      The Government's Argument**

The government argues that the diagnosis of dependent personality features was before

---

[57] This heading, taken from the Second Amended Petition, is incorrect in that the trial mental health experts were provided the records and testified to the diagnosis of depression but not the diagnosis of dependent personality disorder features.

[58] In Ms. Johnson's opening brief, counsel inadvertently included the language from the Second Amended Petition on this Claim rather than the post-hearing argument counsel intended to include. The argument is included in this Reply.

the jury because the 1996 report was admitted into evidence, and Drs. Logan and Hutchinson "testified about them." [Doc. 325 at 111]. It further argues that the trial experts used the records as best they could because "Dependent Personality Features" was not a diagnosis, and the psychiatrist who saw Ms. Johnson in 1996 was unaware of her methamphetamine use, which could have misinformed the diagnosis. [Doc. 325 at 111]. Finally, it argues that Ms. Johnson did not suffer any prejudice because the provisional diagnosis did not make reference to Dustin Honken and the trial experts did not diagnose her with dependent personality disorder.

Petitioner will address each of these issues in the argument below.

### B.        Counsel's Performance Was Ineffective

On March 25, 1996, Ms. Johnson was seen at the Northern Iowa Mental Health Center by Dr. Lassise, who concluded that she had an Axis I diagnosis of depression and an Axis II diagnosis of dependent personality features.[59] [Exh.1, MG001494]. This diagnosis is consistent with Ms. Johnson's personal history of involvement with strong-willed men, and refers to the need to be dependent on a stronger person. (H.Tr. 87-88). The physician who saw Ms. Johnson in 1996 could have testified about this earlier diagnosis, expanded upon the diagnosis, and explained how it applied to Ms. Johnson. (H.Tr. 88).

A diagnosis of Dependent Personality Disorder was relevant to rebut the prosecution's theory that petitioner was the person pushing Honken to eliminate Greg Nicholson and Terry DeGeus. (H.Tr. 87). It would also have explained Ms. Johnson's relationships with Mr. DeGeus and Robert McNeese. *See* H.Tr. 3638-3639 (Hutchinson testimony); H.Tr. 4194 (O'Brien testimony).

Testimony regarding Dependent Personality Disorder could have bolstered the defense's theory that Dustin Honken substantially dominated and influenced Ms. Johnson (*see* Claim No. 37), that she was not motivated by revenge to kill Terry DeGeus (*see* Claim No. 18), and that she

_____

[59] The prosecution argues that this is not a diagnosis. That is correct: as Dr. Lassise explained, he made a "provisional diagnosis" dependent personality disorder. (Exh. 131 at 3).

137

was less culpable than Mr. Honken (*see* Claim Nos. 19-20).

Although Ms. Goody came into possession of these records in January 2002 (H.Tr. 86), she did not interview the clinician who arrived at the diagnosis and he was not called to testify at petitioner's trial. (H.Tr. 85). Ms. Goody explained that she did not work on petitioner's case from May 2002 until late November 2004, and that, due to time pressures, once she resumed work in late 2004 she did not interview Dr. Lassise. (H.Tr. 85).

Mr. Berrigan testified that he does not "recall [the 1996 records] at all." (H.Tr., 2979). The conclusions reached by Dr. Lassise are consistent with petitioner's behavior before she was arrested, while she was in jail, and most of her life. (*Id.*). Also, "the depression, personality disorder certainly fits with our theme that she was dominated by Dustin Honken." (*Id.*).

Mr. Berrigan did refer to, and introduce into evidence, the 1996 records from the Mental Health Center of North Iowa. (Tr. 3329-3331, 3357-3359)(Logan testimony and admission of records); (Tr. 3684) (Hutchinson testimony)). He confined the testimony, however, to the Axis I diagnosis of depression. (*Id.*). This was, in Ms. Goody's opinion, a defect in the presentation of mental health mitigation. (H.Tr. 89). Ms. Johnson's dependent personality features should have been a prominent part of the case in mitigation. (H.Tr. 89).

Had Ms. Goody contacted Dr. Lassise, she would have learned that his diagnosis of "dependent personality features" was a provisional diagnosis of dependent personality disorder [Exh. 131, p. 3], and that it was provisional because Dr. Lassise had not gathered enough information in his single session with Ms. Johnson to make a definitive diagnosis. She would have further learned that, in Dr. Lassise's opinion, Ms. Johnson's dependence on others was not particular to her daughter, although that was the presenting reason for her seeking treatment, but was more generalized. He considered Ms. Johnson to be "dependent on others in her decision making." [Exh. 131, p. 2-3].[60]

---

[60] The government objected to the admission of this declaration, and asked the court not to consider it. [Doc. 325 at 118, n. 59]. Rule 7, Rules Governing Section 2255 Proceedings,

Dr. Lassise's provisional diagnosis, coupled with the information from an interview with him, could have been used by Dr. Logan and Dr. Hutchinson in their evaluations and testimony. Dr. Hutchinson testified that dependent personality disorder "a strong correlate of battered women or abuse survivors. It also informs I think on why people make some of the decisions they do and why their needs for that kind of personal support can override judgment and can override what some of us would say would be larger issues, that it is a weakness that comes from childhood, so it's – it's asking someone to be an adult in a way that they don't have that adult part inside of them." (H.Tr. 3638-3639).

The government argues that neither Dr. Logan nor Dr. Hutchinson diagnosed Ms. Johnson with dependent personality disorder, and that Dr. Woods did so only after his third interview with her. [Doc 325 at 118-119].

Both Dr. Logan and Dr. Hutchinson identified in Ms. Johnson symptoms that are consistent with Dependent Personality Disorder. Dr. Hutchinson identified the following consistent symptoms: repetition of sadism/masochism patterns that Ms. Johnson had experienced in her childhood, low self-esteem, attachment disorder, exaggerated independence/dependence, lack of interpersonal skills, and coping skills deficits. [Exh. 102, HUT000357]. Dr. Logan found that Ms. Johnson was vulnerable to, *inter alia*, chronic relationship difficulties as an adult, and that "she sought protection from men she initially perceived as strong and reassuring." [Exh. 101, LOG000395]. He found that, in childhood, she "felt isolated from her peers, had poor self-esteem, and was chronically anxious and depressed." In adulthood, she had a "series of broken relationships, yet has formed attachments to others who

---

permits the court to expand the record with materials, including affidavits. *See also*, Liebman, James and Hertz, Randy, *Federal Habeas Corpus Practice and Procedure*, Third Edition, Vol. 2 (Lexis Law Publishing 1998) at 1598; *United States v. Cordell Nichols*, 2011 U.S. Dist. LEXIS 20432 * 11 (Dist. Kansas March 1, 2011) (District court may, but is not required to, consider hearsay statements). The government does not dispute the accuracy of the contents of the declaration.

139

have remained supportive of her." [Exh. 101, LOG000402]. These symptoms are consistent with the diagnosis of Dependent Personality Disorder, and consistent with Dr. Lassise's provisional diagnosis of Dependent Personality Features.

That Dr. Woods did not diagnose Ms. Johnson with Dependent Personality Disorder until he had seen her several times and taken a full history from her and other informants is completely within the professional standards of his profession.[61] "The diagnosis of Personality Disorders requires an evaluation of the individual's long-term patterns of functioning, and the particular personality features must be evident by early adulthood. . . . The clinician should assess the stability of personality traits over time and across different situations. Although a single interview with the person is sometimes sufficient for making the diagnosis, it is often necessary to conduct more than one interview and to space these over time. Assessment can also be complicated by the fact that the characteristics that define a Personality Disorder may not be considered problematic by the individual (i.e., the traits are often ego-syntonic). To help overcome this difficulty, supplementary information from other informants may be helpful." *Diagnostic and Statistical Manual of Mental Disorders*, 4th Ed. Text Revision (American Psychiatric Association 2000) at 686.

Dr. Lassise was also careful not to make or rule out the diagnosis too early. In his interview with Nancy Pemberton of May 25, 2011, Dr. Lassise explained that he provisionally diagnosed her with "dependent personality features" because he did not have a full history, and had not seen her enough to make a diagnosis of "dependent personality disorder." [Exh. 131].

Reliance on the government's expert is misplaced. Dr. Martell in 2005 "deferred" any Axis II diagnosis. [Exh. 114, MAR000224]. He did not have Dr. Lassise's report in 2005, and Dr. Martell did not discuss the contents of that report in his 2011 report. In 2011, Dr. Martell

---

[61] The Court told Dr. Woods, "But, you know, you probably did a better job of applying the DSM than 90 percent of the psychiatrists I've seen. So I don't have any problem with your diagnosis." (H.Tr. 4512).

140

relied on unreliable computerized interpretive reports and never addressed the supplemental information he received from outside sources. (H.Tr. 4855).

Dr. Martell's computer did spit out results that suggested "bits and pieces of a personality disorder but no real diagnosis for any particular personality disorder." (H.Tr. 4858). Dr. Martell did, however, find that "cumulatively it's my opinion that there's enough there to say she has a personality disorder not otherwise specified." (H.Tr. 4859). Although Dr. Martell asserted his testing did not show signs of Dependent Personality Disorder, his claim that she did not show clinical evidence of it (H.Tr. 4686) cannot be credited because he did not do the investigation necessary to diagnose the disorder in the first place.

Moreover, Dr. Martell and Dr. Dvoskin omitted from their 2005 report significant information Ms. Johnson told them about her relationship Dustin Honken. Ms. Johnson told the government experts that her relationship with Dustin Honken "was the worst relationship I ever had," worse than Terry DeGeus even though he was physically violent with her. "Dustin mindfucked me. He was constantly manipulating me, you know, at least when Terry hit me, I knew where it was coming from and knew the results with Dustin (sic). Everything that came out of his mouth was a lie." [Exh. 114, MAR000091]. Ms. Johnson also told them she had to "get away from" Honken so she moved to Des Moines. [Exh. 114, MAR000092-93]. She said that their relationship was solely for Honken's benefit. [Exh. 114, MAR000094). She further told them, "There were other reasons I wanted Dustin out of my life besides he was a lying, manipulative cheat, but we can't talk about that." [Exh. 114, MAR000093]. They did not inquire further because of the admonition not to discuss the case. None of these statements made it into the government's May 27, 2005 report nor was this aspect of Ms. Johnson's and Mr. Honken's relationship included in their opinion, not even to suggest it warranted further investigation. [*See* Exh. 114, MAR000214-215]. None of this was referenced in Dr. Martell's 2011 report. The omission of this critical information calls into question both the thoroughness and the neutrality of the government's experts.

141

Trial counsel, through his mitigation specialist, should have conducted the thorough investigation required by ABA Guidelines 10.7 and 10.11, and should have presented the evidence from the 1996 records and any subsequent investigation through his mental health experts as described by Dr. Hutchinson and Dr. Woods during the habeas proceedings.

Had he done so, the jury would have been able to reject the aggravating evidence of Ms. Johnson's desire for revenge against Mr. DeGeus, and to give effect to the mitigating circumstances of substantial influence by Dustin Honken and her relatively less culpability than Mr. Honken.

## C. Petitioner Was Prejudiced

The government argues that no prejudice has been shown because Petitioner has not shown what Dr. Lassise would have said. The record does show what Dr. Lassise would have said [Exh. 131]; the government just does not want it considered.

The government also argues that the records show only a provisional diagnosis, and that the trial experts did not diagnose Ms. Johnson with Dependent Personality Disorder. That is correct, but it is also correct that counsel could have had, but did not, his trial experts testify to their conclusions supporting the diagnosis. Their own reports contained information that was consistent with the diagnosis. Trial counsel had no reason not to do so; he just didn't do it.

Finally, the government claims that the provisional diagnosis was not made in the context of the relationship between Mr. Honken and Ms. Johnson, so it would not have supported her claim of domination by Mr. Honken. This takes entirely too narrow a view of the evidence. The defense was entitled to introduce circumstantial evidence of Mr. Honken's domination. Dr. Lassise concluded that Ms. Johnson was "thought content dependent, *i.e.*, dependent on others to make her decisions, generally, not only in the context of her relationship with her daughter.

Evidence of a diagnosis of Dependent Personality Disorder, even if provisional, would

142

have underpinned that theme.[62] The failure to present this evidence was prejudicial because "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S. Ct. 2456 (citations and internal quotations omitted).

### COURT CLAIM NO. 37 – Failure to prepare mitigation: Failure to Offer Expert and Lay Testimony That Angela Johnson Was Under the Substantial Influence of Dustin Honken

The government argues that (1) trial counsel made a strategic decision not to introduce evidence of Dustin Honken's domination of Angela Johnson; (2) that the evidence of Dustin Honken's domination of others was not relevant to domination of Angela Johnson; (3) that the evidence of Dustin Honken's domination of Angela Johnson did not include evidence of domination over her during the crimes; (4) that Angela Johnson was "prone to manipulate others" according to Dr. Martell; (5) that evidence of Ms. Johnson's mental impairments was not relevant to her susceptibility to manipulation; (6) the diagnosis of dependent personality disorder is either not admissible or not credible; and (7) the decision to introduce Dustin Honken's sentence was a reasonable strategic decision. We address each of these arguments in turn.

### A.      Counsel's Performance Was Neither Strategic Nor Effective

Trial counsel had no strategic reason not to present expert and lay testimony that would have shown Dustin Honken's domination over Angela Johnson. Trial counsel initially asked Dr. Logan to assess Ms. Johnson's susceptibility to being dominated by a guy like Honken. (H.Tr. 2093). His strategy regarding presenting a mitigation theory of domination did not change over time. (*Id.*). While Mr. Berrigan did not recall whether he addressed the issue in his direct

---

[62] *See also* argument in support of Claim No. 37, *infra*, which is incorporated by reference here.

143

examination of his mental health experts[63], he testified that he would have had no strategic reason for not addressing it "and I don't think that would have violated the strictures that we were under regarding mental health testimony at the time of the offense. In other words, that was a longstanding relationship that did not rely on that single day to make that determination." (H.Tr. 2094). When asked, "[y]ou had no strategic reason for failing to offer as much evidence as possible on the domination theme, both expert and lay evidence," trial counsel responded, "I did not have any strategic reason not to get that in. Quite the contrary." (*Id.*). This is not a question of second-guessing a strategic decision that counsel made; trial counsel never considered whether to introduce this evidence.

To support its argument that trial counsel made a strategic choice, the government points to evidence that "was enough for a reasonable juror to conclude Petitioner occupied a minor role in the offense." [Doc. 325 at 115]. The problem with this argument is that it clearly was not enough: not a single juror found Ms. Johnson occupied a minor role. [Trial doc. 593 at 3].

The government examines each type of evidence of Dustin Honken's ability to manipulate Ms. Johnson in isolation from the other evidence. This atomistic analysis does not do justice to the way jurors weigh evidence, nor to the way counsel argues evidence. Indeed, the court instructed the jury during the penalty phase to examine the evidence as a whole. The jury was instructed to "consider any evidence that was presented during the "merits phase" as well as evidence that is presented in this "penalty phase" in making its determinations. [Doc. 544 at 11]. That same instruction told the jurors that they should consider "the general reasonableness of that testimony, *and the extent to which the testimony is consistent with any evidence that you believe.*" (*Id.*) (emphasis added). Contrary to the government's argument, evidence of Dustin Honken's ability to manipulate others and evidence of his ability to manipulate Ms. Johnson throughout their relationship must be considered as a whole, and inferences based on that

---

[63] He did not.

144

evidence can logically and legally be drawn.

The evidence of Dustin Honken's ability to manipulate others was plentiful and overwhelming. [Doc. 314 at 183-184]. The government does not dispute that evidence. The available evidence would have shown that Honken was able to manipulate his father, his mother, his sister, his brother, his stepbrother, his best friend, other friends, his girlfriends, jail inmates, and sophisticated criminals who are members of a prison gang, getting many of them to plan, commit and cover up crimes.[64] It is sophistry to suggest that, based on that evidence, a juror could not conclude that Dustin Honken was able to manipulate Angela Johnson.

Similarly, evidence that Honken manipulated Ms. Johnson in circumstances other than the homicides, including manipulating her into going into debt for his drug manufacturing business, could also have been used by jurors to infer that Ms. Johnson was manipulated into participating with Mr. Honken in the homicides. The evidence of Mr. Honken's manipulation of Ms. Johnson was probative of their relationship, and encompassed the period during and after the crimes.

The government argues that acknowledgment that Honken put her into debt would have "corroborated that Petitioner financed the methamphetamine manufacturing operation in the 1993-1995 time period. Admission of this evidence would have undercut Petitioner's residual doubt mitigating factor." [Doc. 325 at 116]. This argument does not hold water: any penalty phase residual doubt concerned her participation in the homicides, not the drug operation. The defense essentially conceded she was involved in the drug business. (T.Tr. 2315-2316). Moreover, evidence that Ms. Johnson was distressed about going into debt for Mr. Honken would have undercut the government's characterization of Ms. Johnson as the "financier" of the operation, a characterization that suggests a much more major role than Ms. Johnson's defense

---

[64] The government states, erroneously, that the only people Dustin Honken manipulated into committing criminal acts were his father and Tim Cutkomp. That's simply false. *See* Doc. 263 at 73-76, detailing Honken's manipulation of others, including his brother, his girlfriends, and Dan Cobeen into, *inter alia*, criminal acts and illegal cover-ups.

145

tried to portray. Evidence of her concern about her credit and the financial straits Mr. Honken's demands put her in would have demonstrated his domination of her.

The government argues that none of the evidence of Mr. Honken's domination went to his domination over her in connection with the crime. This argument also fails to account for inferences. Had the jury known of the extent, depth, and success of Mr. Honken's abilities to manipulate people, they could have drawn the inferences that trial counsel asked them to draw in the guilt phase, inferences that would have supported the mitigating factor of residual doubt: (1) that Dustin Honken manipulated Ms. Johnson into purchasing the gun (T.Tr. 2304-2305); (2) that Dustin Honken led Ms. Johnson into participating in Greg Nicholson's death without her knowledge (T.Tr. 2301-2302); and that Angela Johnson did not know what Dustin Honken intended to do with Terry DeGeus when he asked her to call DeGeus to meet with Honken (T.Tr. 2315-1216).

The government counters Ms. Johnson's argument that her mental impairments made her particularly susceptible to Mr. Honken's manipulation by pointing to a single line in Dr. Martell's 2011 report citing to the computerized interpretive reports of the testing he conducted in 2010 show that she is "prone to manipulating others." [Exh. PPP, P08]. Unfortunately for the government, that is not Dr. Martell's opinion based on a clinical evaluation using multiple sources.

Dr. Martell "in large part" agreed that the basic limitation of the interpretive reports is the "necessarily generic nature of the computerized reports. Their encyclopedic approach to interpretation is overly inclusive combining empirically tested findings with weak correlates and theoretically driven suppositions about the individual being treated."[65] (H.Tr. 4853). He also

---

[65] Habeas counsel objected to the introduction of this evidence under *Crawford v. Washington*, 541 U.S. 36 (U.S. 2004). Given Dr. Martell's acknowledgment that the computerized interpretive report is not reliable, this part of Dr. Martell's report should not be considered.

146

acknowledged that he did not make a thorough investigation of her life history and look at all collateral sources, or talk to independent witnesses. (H.Tr. 4855). Although he initially denied that his conclusion was merely "parroting" the computerized interpretive report, he finally agreed that he was parroting the report, "in part." (H.Tr. 4853-4855). Dr. Martell acknowledged that he relied only on reports summarizing government discovery by ex-FBI agents and asked for no independent information, other than what he asked Ms. Johnson. (H.Tr. 4855-4856). He also acknowledged that significant portions of the report signed by Dr. Dvoskin and himself were copied whole-cloth from the FBI summaries, although he disavowed any responsibility for them because they were in Dr. Dvoskin's portion of the report. (H.Tr. 4861-4862).

Dr. Martell was forced to acknowledge that, although he said Ms. Johnson was prone to manipulating others, none of his other testing showed that she was attempting to manipulate him. (H.Tr. 4856-4857). He also pointed to her "manipulating" prison guards to get things she wanted. (H.Tr. 4857). Yet, when pressed, he had to acknowledge that Ms. Johnson had been completely cooperative in his 2005 contacts with her, that she had made no attempts to manipulate him in 2010 or 2011 when he met her, (H.Tr. 4858), and that he had not pointed to a single bit of evidence other than the computerized interpretive report in making the statement that Ms. Johnson was "prone to manipulating others." (H.Tr. 4858).

A review of the transcript of Dr. Martell's 2005 interview reveals contacts with the guards over (a) getting a coke [Exh. 114, MAR000001]; (b) the "investigator" in the jail telling Ms. Johnson she could lock her down if she tried to run (which she did not) [Exh. 114, MAR000061]; (c) what Ms. Johnson preferred to be called (AJ) and when Ms. Johnson might want lunch [Exh. 114, MAR000062-63]; (d) a trip to the restroom [Exh. 14, MAR000079-80]; and (e) something related to napkins [Exh. 114, MAR000124]. Nothing in those interactions suggest Ms. Johnson was manipulating anyone.

In the March 24, 2010 interview, Ms. Johnson expressed concern that because the guards gossip, she was uncomfortable talking about her case when they were within earshot. [Exh. 114,

MAR000249-250]. She has a single interaction with a correctional officer about lunch [Exh. 114, MAR000280]. Dr. Martell's testimony that he relied on Ms. Johnson's interactions with the guards is simply not credible. His baseless conclusion that Ms. Johnson is "prone to manipulation" in no way undermines the force of the evidence that Ms. Johnson was mentally impaired, making her susceptible to manipulation by Dustin Honken.

The government claims that the defense mental health experts could not testify about Honken's domination of Ms. Johnson because they had not examined Mr. Honken. Clearly, the mental health experts could have done what Dr. Woods did [Exh. 107, WOD000149-162], and that was to look at the evidence in the discovery, the testimony from the government's witnesses in the guilt phase, and the statements of Ms. Johnson to the government's experts in 2005; to review the interviews with Ms. Johnson's family and friends and to query Ms. Johnson about her relationship with Dustin Honken; and to apply their expertise and knowledge of Ms. Johnson's impairments to the question. That evidence is summarized in Dr. Woods' report, and in Doc. 263 at 71-79 and Doc. 314 at 181-185, and is incorporated by reference here.

The government further argues, without citing to any authority, that Ms. Johnson's mental impairments, as described by Dr. Logan, were not evidence that she was susceptible to manipulation. [Doc. 325 at 118]. Dr. Woods, however, opined otherwise. "As a result of Ms. Johnson's multiple brain impairments and psychiatric disorders, she has attempted throughout her life to attach herself to others who can make up for her inability to develop strategies, solve problems, and overcome barriers to everyday living. Her disorders render her susceptible and paranoid, emotionally labile, and unable to think things through. Ms. Johnson's disorders rendered her extraordinarily vulnerable to the influence of a person like Honken, and this domination manifested itself even after he was in jail and the police were telling her Honken was placing her life in danger." [Exh. 107, WOD000149].

There is no reason that trial counsel could not have elicited this same testimony from Dr.

148

Case 3:09-cv-03064-MWB-LTS    Document 341    Filed 10/22/11    Page 82 of 112

Logan and Dr. Hutchinson.[66] [*Cf.* Exh. 114, MAR000197, Report of Joel A. Dvoskin and Daniel Martell dated May 27, 2005] ("Ms. Johnson reported that Dr. Logan told her that was 'always looking for love,' that she was 'easily manipulated by men.'" and "Ms. Johnson reported that Dr. Hutchinson told her that she 'had problems with men stemming from the relationship (she) never had with (her) father.'").

The government argues that the diagnosis of dependent personality disorder was before the jury because the 1996 report was admitted into evidence, and Drs. Logan and Hutchinson "testified about Petitioner's 1996 mental health examination." [Doc. 325 at 118]. A review of the trial testimony cited in the Response belies this assertion. Dr. Logan testified only that the records supported his diagnosis of depression. (T.Tr. 3329-3331, 3357-3359). Dr. Hutchinson's testimony was to the same effect. (T.Tr. 3684-3685). Neither mentioned the Axis II provisional diagnosis of "dependent personality features."

The government further argues that neither Dr. Logan nor Dr. Hutchinson diagnosed Ms. Johnson with dependent personality disorder, and that Dr. Woods did so only after his third

---

[66] The government incorrectly trivializes the information that Ms. Johnson gave Dr. Hutchinson about her relationship with Dustin Honken [Doc. 325 at 116]. Following are examples of what Ms. Johnson told Dr. Hutchinson: "Our whole relationship, Dustin and I, was short and full of lies. All he did was lie to me. And he is such a fucking ass manipulator." [Exh. 102, HUT000093 (typos corrected)). "I told him, having abortion. Not having this kid. Terry will freak out. Dustin was I'll take care of it. Not having abortion. I was going to. He put foot down. . . . He reassured me it would be ok." [Exh. 102, HUT000094] (typos corrected). "Found out about Kathy and she convinced, he was such a fucking, don't know why so gullible and believed every fucking thing. I knew not have kid without him." [Exh. 102, HUT000094] (typos corrected). "He take my credit cards and run them up and promise and never paid off. Had to pay off. Got me in debt." [Exh. 102, HUT000096] (typos corrected). "I just get disgusted when I think back, how controlled I was by the drugs and the men in my life. It makes me sick. For so strong minded, so easily manipulated. Makes me sick." [Exh. 102, HUT000098] (typos corrected). "I knew not want to be with him, Marvea was born. In hospital giving birth to her, not want to be with him. The more I pulled away, the more he tried to be with me. He controlled me. How could he control you? He used fear to control me. Fear of what? Fear for my safety and my children. Fear of going to jail. After told you." [Exh. 102, HUT000099] (typos corrected).

149

interview with her. [Doc. 325 at 118-119]. This issue is addressed in Claim No. 36, *supra*, and incorporated by reference here.

Finally, the government argues that trial counsel's decision to admit evidence of Dustin Honken's death sentence was a "reasonable, strategic decision" and asserts that Richard Burr conceded as much. Richard Burr agreed that it could be a strategic decision but only with a major qualifier. "[T]his is sort of the difference between strategizing at a thinking level and developing your trial evidence. In order for that to work, you're – it's sort of two edged. You're letting them know on the one hand maybe to allay their need to sentence your client to death somebody's already been sentenced to death. But we also know that juries can in those circumstances say – take a kind of license in a sense to have the awful burden of imposing death be slightly relieved because somebody el – another jury has said those are death-worthy pieces of behavior." (H.Tr. 783-784). He went on to say, " And I think the only way that – again, not putting myself in their shoes and saying what I would do but reasonable thinking would say, well, how do I do that, how do I diminish the chance of giving them permission rather than increasing that chance? [¶] And I do think as I responded to Mr. Burt's question, *if you have developed her lesser culpability all over the case, you know, in every respect possible*, not just their relationship but also the things she actually did – and again I'm assuming that in the government's case her lesser culpability even in their case was apparent.[67] I don't know if that's right, but let's assume that it was – whatever you do as a defense counsel has to be emphasizing at every possible juncture her lesser culpability. (H.Tr. 784-785)(emphasis added). In response to the court's comment that "it would be a judgment call," Mr. Burr added, "It would be a judgment call that would have to be informed by a strategy for minimizing the risk of giving them permission and then how does that strategy play itself out in the evidence and the argument. *If there is a good*

---

[67] In fact, the prosecution argued vigorously and because of trial counsel's ineffective performance, effectively, that Ms. Johnson was not less culpable. (T.Tr. 4026; Trial Doc. 593 at 3).

150

*strategy played out in the evidence, then I think it's within the realm of reasonable behavior.*"
(H.Tr. 785) (emphasis added).

Here, counsel did not have a good strategy that played out in the evidence. Counsel admitted he had no strategy about the wealth of information that Dustin Honken dominated and manipulated Angela Johnson. (H.Tr. 2094). He squandered opportunity after opportunity to get that evidence before the jury, both through lay and expert witnesses. By doing so, he turned his potentially mitigating evidence of Dustin Honken's death sentence – evidence he knew was dangerous and required a stark contrast between Dustin Honken and Angela Johnson – into an aggravator, which the prosecutor used to his full advantage. "Now, part of the role issue and the mitigators the defense raised was that Dustin Honken got the death penalty for killing the children and not the adults. You are not bound as a jury by the Dustin Honken verdict. In the end, however, Dustin Honken got the death penalty for the same crime. [¶] So I ask you when you deliberate in this case as a jury that you think about the crime that was committed and don't lose sight of that. This is about the crime. This is not about Angela Johnson and her childhood. This is about the murders. This is about the victims in this case. This is about those little girls. So I ask you that when you deliberate you think of all that and you impose the death penalty on this defendant. Thank you." (T.Tr. 4033-34).

Defense counsel's failure to present readily available evidence of Dustin Honken's domination, coupled with his reckless decision to introduce evidence of Dustin Honken's death sentence, was not a reasonable strategy; it was the kiss of death for Angela Johnson.

It cannot be said, under these circumstances that counsel's performance fell within the wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 689-90.

### B.    Petitioner Was Prejudiced

The prosecutor argues that the "totality of the evidence" shows that Ms. Johnson "was not influenced by Honken – indeed, that she was able to influence him – that she was a hot-tempered, violent, manipulative, controlling person." [Doc. 325 at 119].

151

The vast majority of the evidence the government cites is unrelated to the relationship between Mr. Honken and Ms. Johnson. To the extent that it is related to them, the government relies on the most unreliable of informants – Dustin Honken – to demonstrate Ms. Johnson's ability to manipulate others. For example, the statements of Kathy Rick (T.Tr. 2641-2642) and Dan Cobeen (T.Tr. 684-688) are simply regurgitations of what Honken told them. Similarly, everything Alyssa Nelson testified to regarding the relationship between Honken and Ms. Johnson came from the mouth of Dustin Honken. (T.Tr. 2678-2679).

In other instances, the government mischaracterizes the relationship between Ms. Johnson and the witness. For example, the government asserts that "Petitioner manipulated Gaubatz to use her car and babysit Petitioner's child when she and Honken hunted for Nicholson . . . ." [Doc. 325 at 120]. Petitioner did not manipulate Ms. Gaubatz; she told Ms. Gaubatz that she and Mr. Honken were looking for Greg Nicholson and wanted to use her car so they would not be seen in Ms. Johnson's car. (Tr. 581-582). There is nothing "manipulative" about that. Ms. Gaubatz did not say she was lied to, or was persuaded to do something she did not want to do.

The government cites to a number of witnesses reporting that Ms. Johnson made threats against them, none of which were carried out, but it fails to explain how "hot-tempered" equates with "manipulative." *Cf.* Welsh S. White, *Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care*, 1993 U. Ill. L. Rev. 323, 339 (1993) (". . . [M]entally impaired defendants, such as those who are brain-damaged, often exhibit behavior that is mistaken for manipulation or a failure to cooperate rather than recognized as symptoms of mental impairment."); *see also* Doc. 314 at 94-95 and *supra*, regarding Claim No. 22.

Finally, the government cites to Timothy Cutkomp's testimony that Ms. Johnson gave him instructions about what to do if questioned by the police, that she complained to Dustin Honken about not being able to manage money, that she urged Honken into "taking care of whatever needed to get done" when Cobeen's cooperation came to light, and that Honken thought Ms. Johnson was a hothead. [Doc. 325 at 121]. Ms. Johnson did not tell Mr. Cutkomp

152

to lie to the authorities; she simply told him not to say anything, (T.Tr. 866), advice a competent lawyer would have given Mr. Cutkomp. When Ms. Johnson talked about taking care of Dan Cobeen, it was only after Dustin Honken had discussed doing the same thing. (T.Tr. 908). Moreover, Mr. Honken discussed with Mr. Cutkomp killing or eliminating several other people, including one of the agents investigating the case, statements that Mr. Cutkomp took seriously, and statements that did not involve Ms. Johnson. (T.Tr. 909). This is not evidence that Ms. Johnson had any power over Mr. Honken or manipulated him.

As outlined in Petitioner's Corrected Second Amended Motion [Doc. 263 at 75], Mr. Cutkomp also testified about the myriad of ways that Dustin Honken actually manipulated Mr. Cutkomp. Mr. Cutkomp's testimony does not in any way undermine the prejudice Ms. Johnson suffered by trial counsel's failure to present evidence of Dustin Honken's ability to manipulate her.

Without the evidence of Mr. Honken's manipulation, the jury was left with the incorrect impression created at trial that Mr. Honken was merely a "thin, nerdy, bookish" man. [Doc. 325 at 122]. Being thin, nerdy and bookish is not antithetical to Mr. Honken also being what he had always been – at least since high school – a person who manipulates others into doing his dirty deeds. That some of his targets did not succumb to his manipulation only demonstrates that evidence of Ms. Johnson's mental impairments was a necessary component to show her particular susceptibility to his manipulation. It does not demonstrate that Mr. Honken did not manipulate people.

The importance of Mr. Honken's influence over Ms. Johnson to the case in mitigation cannot be overstated. As Richard Burr told this court, the issues of dominance, male-female dominance are "probably the organizing theme for the case. . . . But from the very beginning of jury selection, you're going to want to be talking about the relationship between your client and the codefendant because that relationship in a multitude of factual ways cuts in Ms. Johnson's favor. And so that – I mean, it's more than a theme. It's a whole organizing principle for

153

defending a case from start to finish." (H.Tr. 733). Painting Mr. Honken as a domineering, controlling individual is "absolutely" a part of the process of defending the case, which could have been grounded in everyday human experience that jurors can understand, and "would have been a very powerful way to connect the jury to Ms. Johnson's life." (H.Tr. 734).

Because trial counsel failed spectacularly to paint that picture through readily available lay and expert testimony, Ms. Johnson was sentenced to death. The failure to present this evidence was prejudicial because "the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393, 125 S. Ct. 2456 (citations and internal quotations omitted).

### COURT CLAIM NO. 38 – Failure to Prepare Mitigation: Failure to Introduce Statements of Phyllis Proscovec to Support Residual Doubt

Petitioner has alleged that trial counsel were ineffective in failing to present evidence of the statements of Phyllis Proscovec[68] at the penalty phase of Petitioner's trial to support the residual doubt mitigating factor. [Doc. 314 at 186-187]. The prosecution argues that trial counsel were not ineffective in failing to interview Proscovec and failing to introduce her statements into evidence and that Petitioner was not prejudiced by the shortcomings of her trial counsel. [Doc. 325 at 124-26].

Trial counsel's not interviewing Proscovec – although they were aware of her statements early as September 19, 2000 (H.Tr. 805-06, 387-92, 398) – is not the gravamen of this claim. Certainly, it would have been better to have interviewed her prior to her death, given the significance of what she had to say. An interview would have answered the questions about Proscovec's "mental wellness" first voiced by Agent Basler when he testified on May 2, 2011[69]

---

[68] Petitioner agrees with the prosecution that the correct spelling is "Proscovec."

[69] It bears noting that there is nothing in Basler's report about his interview with Proscovec that reflects any concern that she was not "mentally well" or that what she said "didn't

154

(H.Tr. 2750-51) and cited by the prosecution in its resistance to Petitioner's 2254 motion [Doc. 325 at 123].  And, contrary to the government's argument that it "made no sense" that Proscovec would have gone to the Duncan residence to get the kids up for school because it was July (*id.*), the note left on Proscovec's door tends to show Lori Duncan did expect Prosovec that morning; why would she have left the note if she did not expect Proscovec to come to her home that morning?

The government asserts that trial counsel's failure to introduce Proscovec's statements during penalty phase was not "unreasonable" because her statements were "uncorroberated by any other evidence." (*Id.* at 124).  However, as discussed above, the note itself corroborated Proscovec's report to Basler that she was expected at the Duncan residence early the next morning.  The prosecution next professes not to understand how Proscovec's account of the night of July 25th is inconsistent with its version of the events. (*Id.* at 125).  The answer is that the "Avon lady" ruse to gain entry into the home could not have occurred under the facts set forth in Proscovec's interview.   Proscovec was at the Duncan residence between 7:30 and 8:00 p.m. and stayed for approximately one hour, or until 8:30 or 9:00 p.m.  When she returned home, she watched the news and prepared for bed, and before she retired, she noticed Nicholson's car had not yet returned home.  Assuming that watching the news and preparing for bed would take one hour, this would bring the time to 9:30 to 10:00 p.m.  Shortly after Ms. Proscovec retired, she got a telephone call from Lori Duncan asking if she (Lori) could come to Proscovec's home.[70] Assuming that an hour elapsed between Proscovec's going to bed and Lori Duncan's call and visit to Proscovec's home, this would mean that Duncan did not return home until 10:30 to 11:00 p.m., and that entry was made to the Duncan home some time after that.  It is highly unlikely that at such a late hour, an "Avon lady" would have an appointment and could successfully gain

make a lot of sense." *See* Exh. 75.

[70]      The prosecution is correct that the Petitioner's brief inaccurately states that Proscovec went to the Duncan residence; Lori Duncan came to Proscovec.

155

admittance to the home using this excuse.

The prosecution argues that Proscovec's statements "would have been inconsistent with her guilt phase defense" that she was merely present at the crimes and cites ABA Guideline 10.10.1 (counsel should seek a theory of the case effective with both guilt and penalty and minimize inconsistencies between guilt and penalty phases). [Doc. 325 at 126]. However, the record shows that trial counsel did not consider, and reject, presenting the Proscovec statements on this ground. The record is clear that trial counsel did not even consider offering this evidence, much less have a valid strategic reason for not introducing it. Mr. Berrigan testified that "[b]y the time the penalty phase came around [the Proscovec interview] was probably the furthest thing from my mind." (H.Tr. 2116). Thus, there was no tactical reason for not introducing the Proscovec interview at penalty phase; Mr. Berrigan admitted that "it helps towards residual doubt." (H.Tr. 2116).

Finally, it is argued that Petitioner has not shown prejudice because Proscovec's statements "were not inconsistent with the government's evidence" and because the government "could have called into question the reliability of Proscovec's memory . . . by presenting Basler's testimony that Proscovec did not appear to be mentally well. [Doc. 325 at 126]. The Proscovec evidence was inconsistent with the prosecution's theory of the case, as explained above. Regarding the proposed testimony of Basler that Ms. Proscovec did not appear to be mentally well, Petitioner points out that Basler's opinion about Proscovec's mental health – if it was even admissible – could be impeached. First, there is nothing in his report about Basler that questions her mental health; one would expect that a police officer interviewing a witness who appeared to have mental problems to set forth the observations that caused him to form this opinion in his report, especially in a case as serious as this. Second, if it had been timely disclosed to trial counsel, Basler's lay opinion could be rebutted by evidence of Proscovec's neighbors, family, friends and physicians about her mental state in 1993 and 1997.

Not one juror found the "residual doubt" mitigating factor to be true. [Doc. 593 at 8]. It

is reasonably probable that, had trial counsel performed effectively and presented Proscovec's statements, at least one juror would have voted for a life sentence. Petitioner does not have to show "'that counsel's deficient conduct more likely than not altered the outcome' of [her] penalty proceeding, but rather [she] must establish 'a probability sufficient to undermine confidence in [that] outcome.'" *Porter v. McCollum,* _U.S. _, 130 S. Ct. 447, 455-56 (2009) (quoting *Strickland v. Washington*, 466 U.S. 668, 693-94 (1984)). Trial counsel's failure to introduce Phyllis Proscovec's statements at the penalty phase is sufficient to undermine confidence in the penalty decision.

### COURT CLAIM NO. 39 – Failure to Prepare Mitigation: Failure to Offer Dustin Honken's Letters to Impeach the Mitigation Phase Testimony of Steven Vest to Support Residual Doubt

Petitioner has alleged that trial counsel were ineffective in failing to offer Dustin Honken's letters to Alfred Willett to impeach the testimony of Steven Vest about statements by Honken that implicated Petitioner in the charged crimes. [Doc. 314 at 189-92]. The government argues that trial counsel's performance was not deficient because Honken's letters are not exculpatory and that Petitioner has not demonstrated she was prejudiced by the error made by her trial counsel. [Doc. 325 at 127-29].[71]

The letters written by Honken to Mr. Willett are exculpatory. The prosecution asserts that "Honken never stated in the letters that Petitioner is innocent of the charges" [Doc. 325 at 127], but in fact he did, albeit with faulty spelling: he wrote "[w]hatever must be done to bring out the **truth of her innocense** [sic], I am prepared to do so." [Exh. 10, p. 1] (emphasis added). He insisted that "[Angela Johnson] has done **nothing** but be a good supportive girlfriend to me and a wonderful mother to our daughter." (*Id.*, p. 2) (emphasis in original). He wrote that he wanted to help Petitioner "out of this" [Exh. 14, p. 2] and offered his help to "get her out of this

---

[71]    In the government's brief, this claim is mis-labeled as Claim 40.

mess" [Exh. 67, MCN 01-001063-62].

The prosecution asserts that "to use the letters would have been tactically unwise." (*Id.* at 128). The problem is that trial counsel never considered using the letters, so there could be no reasonable tactical decision not to use them. And Mr. Berrigan has testified that "We could have impeached Mr. Honken – yes, we – exactly. We could have presented Mr. Honken's letters to impeach Mr. Vest if that's what you're asking." (H.Tr. 2972-73). *See also,* H.Tr. 244 (after Vest testified, there was no discussion by counsel in Goody's presence about using Honken's letter to Willett stating petitioner was innocent to impeach the statements of Honken related by Vest); H.Tr. 245 (at the penalty phase, Mary Goody "was not focusing on Mr. Vest at all. I was only focused on the experts and the family members and the witnesses that we were trying to get ready to come in.").

Honken's statements in his letters to Mr. Willett are so strikingly inconsistent with his statements about Petitioner to Vest that there is no question they impeach Honken's credibility. Contrary to the prosecution's argument, the fact that trial counsel had "nothing to back [the letters] up" [Doc. 325 at 128] is of no import; the letters spoke for themselves, and powerfully so. Nor does "the tone of the letters suggest Honken had a plan to evade justice, not do justice." (*Id.*). *See, e.g.,* Exh. 12, p. 2 ("I feel it is my responsibility to do as much as I can for [Petitioner] to insure that she goes home. As I stated in my last letter to you, my only concern is that she is safe, well represented, and going to go home soon. Absolutely anything that I can do for her I will."); Exh. 14, p. 2 ("The only thing that does matter to me is to help Ms. Johnson out of this and whatever I have to do, I will do."); Exh. 67 (MCN01-001063 - 62) ("I have never nor will never do anything to harm Miss Johnson in any way. And, to the contrary, I have through my attorney tried to get her out of this mess and I will continue to do so. If you would work with me instead of against me it might be possible to help Ms. Johnson."). The tone of the letters was that Honken was responsible for the crimes, that Petitioner was innocent, and that he felt great concern for her having been wrongfully charged.

158

The prosecution's assertion that the letters were inconsistent with Petitioner's guilt phase "mere presence" defense [Doc. 325 at 126] is simply untrue. That defense conceded she was present when Honken committed the crimes, but had no involvement herself. Honken's statements in his letters to Willett are consistent with the guilt phase defense.

The government's argument that Petitioner was not prejudiced by trial counsel's failure to offer the letters at penalty phase is unavailing. It is stated that "[e]ven assuming Honken's letters would have persuaded a juror what he told Vest about the murders could not be trusted, it would not have supported a residual doubt mitigator." [Doc. 325 at 128]. The statements by Honken as related by Vest were not, as the government states, merely "useful to clarify Petitioner's role in the offense." (*Id.* at 129). On the contrary, they were the only evidence of Petitioner's role in the offense. The testimony of McNeese, Gaubatz and jail inmates about alleged admissions by Petitioner were lacking in the damning detail supplied by Vest's testimony. The evidence that she bought the murder weapon did not detail her role in the crime and the map drawn for McNeese was consistent with mere presence. Petitioner's jail statements to her sister about "luring" DeGeus to his death did not provide any details about her role in that offense, other than she caused DeGues to be in a place where Honken could kill him. Therefore, the argument that "even if a juror had doubts about the accuracy of Honken's descriptions of the murders, it would not have led a juror to doubt Petitioner's guilt" (*id.*) must be rejected.

Petitioner does not have to show "'that counsel's deficient conduct more likely than not altered the outcome' of [her] penalty proceeding, but rather [she] must establish 'a probability sufficient to undermine confidence in [that] outcome.'" *Porter v. McCollum,* — U.S. —, 130 S. Ct. 447, 455-56 (2009) (quoting *Strickland v. Washington,* 466 U.S. 668, 693-94 (1984)). Trial counsel's error in not introducing Honken's letters to Mr. Willett to impeach Honken's statements to Vest is sufficient to undermine confidence in the penalty decision.

159

**COURT CLAIM NO. 40 – Failure to Prepare Mitigation: Failure to Impeach Steven Vest By Presenting Evidence that Honken Lied about Petitioner's Role in the Offenses to Support Residual Doubt**

The government's resistance does not address this claim, so Petitioner has no reply.


**COURT CLAIM NO. 41 – Failure to Prepare Mitigation:   Failure to Introduce Petitioner's Offer to Plead Guilty as Evidence in Mitigation**

Petitioner has alleged that trial counsel were ineffective in failing to present her offer to plead guilty as evidence in mitigation. [Doc. 314 at 195-96]. The prosecution responds that counsel researched the issue; that "testified the decision not to offer such evidence was a tactical decision;" that the law was not "clear" that an offer to plead guilty was admissible as mitigation; that Petitioner did not offer to plead guilty to a life sentence; and that she was not prejudiced by her attorneys' omission. [Doc. 325 at 129-32].

Dean Stowers did research the admissibility of an offer to plead guilty and concluded that it was admissible. (H.Tr. 1467-68, 1470, 1473-74. 1468-73; Exh. 53 (RS-12-00822)).  However, the prosecution is wrong in stating that Mr. Stowers testified the decision not to offer this evidence was "tactical."  A tactical decision necessarily involves some sort of reasoning and weighing of the pros and cons of a course of action.  There was no such reasoned decision in this case; Mr. Stowers testified that he does not know "if there was a good reason, a bad reason or, or whatever" for not presenting the evidence. (H.Tr. 1470-71, 1474).

The prosecutor's argument that the state of the law was "ambiguous" as to whether an offer to plead guilty was admissible in mitigation [Doc. 325 at 129-30] must rejected.  Mitigation is "potentially infinite" (*Ayers v. Belmontes*, 549 U.S. 7, 21 (2006)), has "virtually no limits" (*Tennard v. Dretke*, 542 U.S. 274, 285 (2004)), and an offer to plead guilty and accept responsibility for a sentence of life in prison without possibility of release is clearly within the realm of mitigating evidence described by the United States Supreme Court.  The fact that *United States v. Fell*, 372 F. Supp. 2d 773, 785 (D. Vt. 2005), was decided on May 26, 2005, the same

160

day the jury returned its guilt phase verdicts [Doc. 325 at 130], does not absolve trial counsel's failure to present Petitioner's offer to plead guilty as evidence in mitigation. Trial counsel were aware that an offer to plead guilty was mitigating because they researched the issue prior to trial. *See* Exh. 53, RS-12-00822.[72] The decision in *Fell* was a confirmation of trial counsel's correct view that the law permitted this evidence in mitigation.

*Gonzalez v. Secretary for the Department of Corrections*, 366 F. 3d 1253, 1282 (11th Cir. 2004), which is cited by the prosecution [Doc. 325 at 130], is not authority for the inadmissibility of an offer to plead guilty. In that case, the Eleventh Circuit did indeed wonder how an offer to plead for a life sentence was mitigating. (366 F. 3d 1282). And, in that case, this comment was appropriate. The Court observed that "the theory may have been that the offer reflected well on [the defendant] Mobley because it demonstrated a willingness to accept some punishment for the cold-blooded murder he committed" and in a footnote stated:

> The defense's mitigation theory was not that Mobley's offer to plead showed any kind of remorse. We know that, because the defense was adamant throughout the sentence hearing that Mobley was a sociopath who could not feel remorse, and for that reason he should not be faulted for acting in a remorseless way during and after the murder.

*Id.* at 1282 n. 14.

The prosecution argues that "Petitioner hardly made an offer to plead guilty to a life sentence." [Doc. 325 at 131]. On the record before the Court, this assertion is utterly lacking in credibility. Angela Johnson, on two occasions in writing, clearly and unequivocally informed her lawyers that she wanted to plead guilty.[73] *See* Exhibit 67 (Bates MCN 02-002750-53); Exhibit

---

[72] Mr. Stowers' notes about issues to "work up" are undated. But the notes are in chronological order; RS-12-000820 is dated August 11, 2004 and RS-12-000823 is dated October 7, 2004. Therefore, it is reasonable to date the "work up" note within this time frame.

[73] Mr. Berrigan received a letter from petitioner dated October 24, 2002, asking "[c]an you just get me a deal and get me out of here please? I have not touched my girls in almost 2 ½ years .... All that I ask is that you push to get a deal made and get me on my way." (H. Tr. 2138-40).

161

67 (Bates MCN 03-002970). Her desire to plead guilty and cooperate was conveyed to the prosecution orally on June 7, 2003 [Exh. 48 (PLSP 41)], in writing on February 17, 2005 [Exh. 48 (PLSP 118-123)], by a proffer dated March 19, 2005 [Exh. 48 (PLSP 128-29)], and in a written offer to plead guilty to all charges in return for sentences of life in prison without possibility of release [Exh. 67 (MCN 05-005546)].

Finally, the government argues that Petitioner was not prejudiced by her trial counsel's failure to introduce her offer to plead guilty because of what it would have done to counter this mitigation. [Doc. 234 at 131-32]. Regarding Leon Spies' testimony about the plea negotiations, the government would "point[] out that Petitioner made no actual plea offer herself at that time and was insisting on a 20-year sentence. (*Id.* at 132). However, the plea offer at that time was authorized by Petitioner and it is clear that the 20 year sentence was her lawyers' number, not hers. *See* H.Tr. 1189, 2143 (Berrigan and Stowers testified that 20 years was their number, not Ms. Johnson's and that she did not tell them there would not be a deal unless she got 20 years). The prosecution argues it would have "contrasted Honken, who at least attempted to make a proffer, with Petitioner who never proffered." [Doc. 325, at 132]. However, Mr. Berrigan, who wrote Petitioner's proffer (H.Tr. 2080), discussed it with Petitioner in advance, told her what was required to get life and she was agreeable to it. (*Id.*, 2080-81). Next, the government asserts that it would have "pointed out that despite Honken proffering and offering to plead guilty, the government rejected it and he was sentenced to death." [Doc. 325 at 132]. The relevance of what

---

In letters dated May 10, 2003, written to Mr. Berrigan and Mr. Stowers, Ms. Johnson stated:

> I want to be as clear as I can. I want to plead guilty. I do not want to wait for any more rulings, not even the 8th crt. I am asking you to get me the best deal you can and I <u>will</u> cooperate. At this point I will confess to killing the Pope. I have not touched my kids in THREE YEARS now, and I've had it. Please get me out of here and into a prison as close to my kids as possible. That is all I ask. Thank you.

(H. Tr. 630; Exh. 67, MCN 03-002969-MCN 03-002970; emphasis in original).

162

happened to Honken's proffer is questionable, but if Petitioner's plea offer was admitted, the jury would obviously know it had been rejected – why else would there be a trial? And the jury knew, through the ill-advised testimony of Mr. Spies,[74] that Honken had received two death sentences. The prosecution states that it "would have further pointed out that Honken's proffer about Petitioner's role was inherently unbelievable and inconsistent with the evidence." (*Id.*). This statement reflects the government's oft-repeated but incorrect view that Honken minimized Petitioner's role in his proffer; in fact, Honken over-stated her role and failed the polygraph because he did so. And the prosecution tellingly fails to explain how such evidence would be relevant at Petitioner's trial; the evidence is clearly inadmissible. The government argues that if Petitioner "had offered Berrigan's letter during jury selection" it would have "pointed out that it was an attorney proffer." (*Id.*). This fact is, however, irrelevant. The mitigator is the offer to plead guilty for a life sentence, which is plainly and unequivocally made in Mr. Berrigan's letter [Exh. 67 (MCN 05-005546)] and was not contingent, at that point in time, on a proffer by Petitioner. The government next argues that it "would have argued the attorney proffer minimized Petitioner's role and was inconsistent with the evidence." [Doc. 325 at 132]. Petitioner's final offer to plead guilty for life was not, however, contingent on a proffer and therefore the government's view of the content of the prior attorney proffer is irrelevant. And, the government also fails to explain how that proffer was inconsistent with the evidence. The prosecution concludes that its response to an offer to plead mitigator "would have emphasized that there was nothing mitigating – that Petitioner had not admitted her role, had not accepted responsibility, and had not expressed any remorse" and urges that when "the full picture" was before he jury, this mitigator "would have no impact on the outcome of the case." However, the evidence that the government argues it would have introduced if this mitigator had been proposed is of doubtful admissibility, as explained above, and, in the end, the prosecution's

---

[74]     *See* Claim 20, Doc. 314, at 85.

163

threatened response to this mitigator must be seen for what it is, a flight of fancy.

Petitioner does not have to show "'that counsel's deficient conduct more likely than not altered the outcome' of [her] penalty proceeding, but rather [she] must establish 'a probability sufficient to undermine confidence in [that] outcome.'" *Porter v. McCollum,* — U.S. —, 130 S. Ct. 447, 455-56 (2009) (quoting *Strickland v. Washington,* 466 U.S. 668, 693-94 (1984). Trial counsel's ineffective failure to introduce Petitioner's offer to plead guilty as evidence in mitigation sufficient to undermine confidence in the penalty decision.

**COURT CLAIM NO. 42 – Failure to Prepare Mitigation:   Failure to Present Evidence of Remorse Through Expert Testimony**

The prosecution argues first that Ms. Johnson's expressions of remorse made to the government experts were not actually expressions of remorse, and introduction of those statements would have backfired.  The government next argues that Ms. Johnson's expressions of remorse to Dr. Woods are of no avail because it was only after his first three visits that Ms. Johnson confessed to the crimes and expressed remorse, and that Dr. Woods' notes do not reflect the words he used in his report.  Finally, he argues that trial counsel did not have an expert who reported that Ms. Johnson had expressed remorse to him or her.

A.      **Counsel's Performance Was Ineffective**

The government cannot rely on its first contention:  that the decision was tactically sound in hindsight because the evidence would have backfired.  Trial counsel's failure to present Ms. Johnson's statements to the government was not a tactical decision.  He simply did not think of it. (H.Tr. 2959).  Similarly, the government cannot rely on its third contention: that trial counsel did not have a mental health expert to testify about remorse for the same reason.  Trial counsel did not think to have his mental health experts ask his client about remorse. (H.Tr. 2955).  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and *to evaluate the conduct from counsel's perspective at the time. Strickland v. Washington,*

164

466 U.S. 668, 689 (U.S. 1984) (emphasis added).

The analysis of the government's argument about Dr. Woods must begin with counsel's ineffective performance in establishing a "relationship of trust with the client . . ." (A.B.A. Guideline 10.5A), and to get his fellow team members and defense experts to establish a similar relationship of trust. "Establishing a relationship of trust with the client is essential both to overcome the client's natural resistance to disclosing the often personal and painful facts necessary to present an effective penalty phase defense, . . . , and to ensure that the client will listen to counsel's advice on important matters such as whether to testify and the advisability of a plea." *Commentary* to Guideline 10.5 at footnote 178. *See also,* Welsh S. White, *Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care*, 1993 U. Ill. L. Rev. 323, 338-339 (1993). "Whether or not they are recognized, a capital defendant's mental problems will significantly impair the attorney-client relationship. Establishing a relationship of trust with an individual whose view of reality is very different from that of most other people often will be difficult. This problem is dealt with best by consulting mental health experts to better understand the defendant's impairment and then seeking to empathize with the defendant's view of reality." (*Id.* at 339).

No one on Angela Johnson's trial team, neither attorneys nor the mitigation specialist, developed such a relationship of trust. They did not have enough contact with the client (*see* H.Tr. 1739-1740 and Exh. 68), they did not use that time effectively, and they did not even attempt to get Ms. Johnson to the point where she was willing to talk honestly to the defense experts about the crime.[75] Mr. Berrigan acknowledged shortly after the trial that he did not develop a relationship with Ms. Johnson, "the kind we needed to," and that "You can't go two months without communicating or three months without communicating to your [capital] client. So that was a big failing." (H.Tr. 2996-2997).

---

[75] *See* discussion of client communications about her role in the offense at Doc. 314 at 9-11 and *supra* at Claim No. Thirty-Four.

165

Ms. Goody and the trial mental health defense experts were explicitly instructed **not** to discuss the facts of the crime with Ms. Johnson. (H.Tr. 69 (Goody); H.Tr. 3516 (Logan); H.Tr. 3608 (Hutchinson)). Had Dr. Cunningham been given permission, he was unable to do so because his waiver from Mr. Honken did not allow him to delve into issues that might relate to Mr. Honken's and Ms. Johnson's relative culpability. (H.Tr. 3851-3852).

Even Mr. Berrigan never really engaged Ms. Johnson in discussing the crimes, other than in the most superficial manner. He testified, "I wouldn't have questioned her about the specifics. . . . I wouldn't have done it. I didn't do it with her. I don't do it as a matter of practice." (H.Tr. 2921).

Similarly, Ms. Johnson reported to Dr. Woods that Mr. Berrigan "did not want to discuss the facts of the case and, at those times when she would attempt to discuss the facts of the case with him, he would yell at her and immediately stop her from talking." (Exh. 107 at WOD000107).

This is not a reasonable tactic in a capital case. Professor O'Brien explained why. ". . . I think in capital cases there's no case for the coy approach of I don't want my client to tell me what happened; I don't want to know; I don't want to have that discussion because it might tie my hands. [¶] . . . [I]n a capital case, one of the objectives is to enable the client when all is said and done either for the jury or the judge to be able to make an effective allocution if you will, to be able to come and given an expression of genuine remorse for the crime. And it's not that it isn't there. It's there, but you have to be able to communicate with the client and bring the client out to the point that he or she can do that." (H.Tr. 4172). That did not happen, and it did not happen because of counsel's ineffective performance.

Had counsel developed the relationship of trust that is required by the Sixth Amendment and the Eighth Amendment, and is given meaning through the A.B.A. Guidelines, Ms. Johnson would have communicated the remorse she felt for her conduct to trial counsel and their mental health experts. That she would have done so is clear from the fact that she was able to do so with

Case 3:09-cv-03064-MWB-LTS   Document 341   Filed 10/22/11   Page 100 of 112

habeas counsel and Dr. Woods.

Although the government criticizes the sequence of events of Ms. Johnson's confession to Dr. Woods (Doc. 325 at 135), Dr. Woods' experience with Ms. Johnson exemplifies the ineffectiveness of trial counsel by demonstrating what happens when capital counsel develop that relationship of trust. As Dr. Woods explained, it was in the fifth interview, after the change in habeas counsel, that he was "allowed [] to look more carefully at the process by which it took Ms. Johnson to tell the truth. That was very important because my experience has been that it will often take, particularly capital clients, a number of times of meeting with someone before they will actually open up not only about the offence but about other issues as well. And so it gave me an opportunity to see that process and to see a real change in Miss Johnson from how she had been working with her previous habeas team. So it was very, very different."[76] (H.Tr. 4405).[77] Had the trial team developed the relationship that the second set of habeas counsel did, the trial team could have convinced Ms. Johnson to make similar expressions of remorse to them.

The government also argues that Ms. Johnson's confessed only to being present at the crimes so any expressions of remorse would not ring true. In fact, Ms. Johnson told Dr. Woods that the proffer prepared by trial counsel was truthful. [Exh. 107, WOD000145, n. 83.] The proffer was a full confession to all the killings. [Exh. 67 at 5655-5656 (MCN-05-005642-43)]. She also told Dr. Woods that Dustin Honken had told her prior to the homicide that he had no choice but to kill Nicholson at some point (H.Tr. 4450-52); that she argued with Mr. Honken about whether he should kill the children (H.Tr. 4454); and that her denial of knowing Terry DeGeus would be killed was because she could not let herself think that would happen (H.Tr. 4460).

---

[76] Ms. Johnson told Dr. Woods that she did not get either support or direction from her trial attorneys or Mr. Lawlor. By contrast, her current legal team and experts "have proven their dedication to her needs as well as her legal proceedings." [Exh. 107 at WOD000147].

[77] Moreover, Ms. Johnson had told Dr. Woods some facts consistent with her confession in prior interviews. (H.Tr. 4406).

167

The prosecution asserted through questioning of Dr. Woods that Ms. Johnson's purchase of the gun was evidence that she knew that Dustin Honken planned to kill Gregory Nicholson well before entering the house. (H.Tr. 4446). That assertion notwithstanding, the prosecution elsewhere conceded that the jury did not find that Ms. Johnson had substantially planned or premeditated the killings of Nicholson and Duncan, strongly suggest[ing] the jury 'bought' the defense argument that she did not know Honken was going to kill everyone when she helped him gain entry into the Duncan house." (Doc. 325 at 28).

The prosecution also criticizes Dr. Woods' conclusion that Ms. Johnson expressed remorse to him. Although Ms. Johnson did not include in his notes the exact words Ms. Johnson used, he testified that his report reflected the impressions he received from Ms. Johnson, that she felt relief when she told him what she had done, that she cried, she was very tearful, as she discussed the crimes. (H.Tr. 4443-4444).

Professor O'Brien explained how Ms. Johnson's impairments impacted her ability to confess and express remorse. "And to me that is – when you cut through all the mental health data and the mental health experts, the issue with Ms. Johnson is not so much that remorse isn't there. It's that she has a package of disabilities and impairments that make it very difficult to come in contact with it. For her to conjure up a conscious memory of having seen what happened to these children and what happened to Terry DeGeus and then to have to talk about it and articulate it and respond to that, that level of self-examination is very difficult for her." (H.Tr. 4222). Given her mental impairments, Ms. Johnson did a remarkable job doing so with Dr. Woods. That could have been explained to a jury, had counsel performed effectively on getting a mental health expert to discuss the crimes and her remorse with Ms. Johnson.

Testimony of a defense mental health expert that Ms. Johnson confessed her participation in the crime and expressed her remorse for the consequences of her conduct would have been immensely powerful. Counsel was ineffective for not considering presenting, and not presenting such powerful evidence.

168

**B.      Petitioner Was Prejudiced**

The government does not deny the power of remorse as a mitigator. The prosecution argues, however, that the expressions of remorse to the government's experts would not have added much to the evidence that the jury did hear. [Doc. 325 at 137-138]. That argument is completely speculative, without reference to a single bit of evidence or case law supporting that position. In fact, neither the prosecutor nor the court thought the evidence presented at trial was even enough to warrant submitting a remorse as mitigation factor to the jury. (T.Tr. 3971-73).

Both Ms. Greenman and Professor O'Brien testified to the importance of evidence of remorse. Ms. Greenman testified on cross-examination that even equivocal statements should not be pushed aside and ignored, and that the statements to Dr. Dvoskin and Dr. Martell should have been presented. (H.Tr. 3842).

The prosecutor similarly speculates that the expressions of remorse to Dr. Woods would not have been enough. (Doc. 325 at 138). The prosecution's attack on Ms. Johnson's expressions of remorse to Dr. Woods are exactly the attacks they would have taken at trial, had trial counsel presented testimony similar to that Dr. Woods offered at the evidentiary hearing. The United States Supreme Court rejected that kind of credibility argument to determine prejudice in *Porter v. McCollum*, ___ U.S. ___; 130 S.Ct. 447; 175 L.Ed.2d 398 (2009). There, the Court found that the Florida Supreme Court unreasonably applied federal law when it found no prejudice by counsel's failure to conduct an investigation of mitigating circumstances because the state court discounted the testimony of the post-conviction mental health expert. The Court held that, despite the perceived problems with the mental health experts' testing, "it was not reasonable to discount entirely the effect that his testimony might have had on a jury or the sentencing judge." *Id.* at 455.

Petitioner has shown, through the work of habeas counsel and Dr. Woods, what evidence could have been developed and presented demonstrating Ms. Johnson's profound remorse, and has demonstrated that such powerful evidence had a reasonable probability to convince one juror

169

to vote for life.

**COURT CLAIM NO. 43 – Failure to Prepare Mitigation:  Failure to Elicit Evidence of the Effect of Petitioner's Execution on Her Family Members**

Petitioner has alleged that trial counsel was ineffective in failing to ask the ten family members who testified on her behalf at penalty phase how they would be affected by her execution. [Doc. 314 at 202-06].  The prosecution argues that the admissibility of execution impact evidence was not clearly established in 2005, that trial counsel were not ineffective in failing to present such evidence, and that Ms. Johnson has not been prejudiced. [Doc. 325 at 138-145].

Contrary to the prosecution's argument (*id.*, at 139), the standard of practice in 2005 required trial counsel to investigate execution impact evidence and present such evidence if it was available.  The ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, published in February 2003 states in Guideline 10.11.F that:

> In deciding which witnesses and evidence to prepare concerning penalty, the areas counsel should consider include the following:

> *   *   *   *

> 4.       Witnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones.

Thus, over two years before Petitioner's trial began, trial counsel were on notice that the standard of care in a capital case included the identification and presentation of witnesses who could testify about the adverse impact of Ms. Johnson's execution on her family and loved ones.

The prosecution urges that "[t]he law since Petitioner's trial regarding the admissibility of execution impact testimony is not as clear as Petitioner portrays." [Doc. 325 at 139].  The relevant inquiry, however, is the law at the time of Petitioner's trial.  Aside from the Guidelines, there was case authority for the admissibility of execution impact testimony.  State courts routinely admit evidence of the impact that a defendant's execution would have on family and

170

friends. *See Richmond v. Lewis*, 506 U.S. 40, 43 (1992) (recognizing Arizona's practice of accepting evidence "of the effect [defendant's] execution would have upon his family" as mitigation evidence); *Richmond v. Ricketts*, 640 F. Supp. 767, 790-91 (D. Ariz. 1986 ) (noting that evidence of the effect of an execution on defendant's mother was considered in mitigation); *State v. Mann*, 188 Ariz. 220, 934 P.2d 784 (1997) (noting that court weighed as mitigating factor the defendant's relationship with his children and the effect on them if he were executed); *State v. Williams*, 79 Ohio St.3d 183, 679 N.E.2d 646 (1997) (noting that defendant's daughter testified that she loved him, would maintain contact with him, and did not want anything bad to happen to him); *State v. Simmons*, 944 S.W.2d 165, 187 (Mo.) (1997) (noting that defense counsel argued the fact that defendant's family wanted him to stay alive was mitigating); *People v. Stanley*, 10 Cal. 4th 764, 897 P.2d 481, 519 (1995) (assuming but not deciding that it is constitutional error to forbid defendant from inquiring of defense witnesses as to whether they want the defendant executed); *State v. Fox*, 69 Ohio St.3d 183, 631 N.E.2d 124, 127 (1994) (admitting evidence that defendant was calming influence on other inmates at the jail for purpose of allowing defendant to argue that executing him would have an adverse effect on prison community and noting that judge on intermediate appellate court found the likely impact of execution on defendant's children to be a mitigating circumstance); *State v. Stevens*, 319 Or. 573, 879 P.2d 162 (1994) (trial court erred in excluding the testimony of the defendant's wife that she believed the execution of her husband would have a negative impact on their six year old daughter); *Cardona v. State*, Fla., 641 So.2d 361, 365 (1994) (allowing defendant to call her children in mitigation and to argue that it would be better for them were she not executed); *Romine v. State*, 251 Ga. 208, 305 S.E.2d 93 (1983) (reversal because defendant, who murdered his parents, was not allowed to present the testimony of his grandfather that he did not wish to see his grandson executed).

Federal capital juries have very often received evidence and listened to testimony from family members about the impact the defendant's execution would have on them and other

family and friends. The list includes the following cases: *United States v. Ramon Molina and John McCullah* (E.D. OK CR No. 1:92-032-S); *United States v. Anthony Walker and Walter Diaz* (N.D. NY CR No. 94-328); *United States v. Dennis Moore* (W.D. MO CR No. 94- 00194-01-12-CR-W-9); *United States v. Phouc Nguyen* (D. KS CR No. 94-10128-01); *United States v. Dean Anthony Beckford* (E.D. VA CR No. 3:96 CR 66); *United States v. Rashi Jones* (E.D. VA CR No. 97 CR 129); *United States v. Raheem and Shaheem Johnson* (E.D. VA CR No. 97-00314-A); *United States v. Gurmeet Singh Dhinsa* (E.D. NY CR No. 97-672 (S-3) (ERK)); *United States v. John Bass* (E.D. MI CR No. 97-80235); *United States v. Plutarco Tello* (W.D. MO CR No. 98-00311-01/05-CR-W-2); *United States v. Willis Haynes* (D. MD CR No. PJM-98-0502); *United States v. Marcus Sanders* (S.D. AL CR No. 98-0056-CB);*United States v. Kristin Gilbert* (D. MA CR No. 98-30044-MAP); *United States v. Khalfan Mohamed* (S.D. NY CR No. S6 98 CR 1023); *United States v. Tommy Edelin* (D. DC CR No. 98-264); *United States v. Xavier Lightfoot* (W.D. MO CR No. 00-CR-395-ALL); *United States v. Coleman Johnson* (W.D. VA CR No. 3:00CR00026); *United States v. Christopher Willis* (E.D. VA CR No. 99-00396); *United States v. Joseph P. Minerd* (W.D. PA CR No. 99-215); *United States v. Carl Haskell* (W.D. MO CR No. 00-CR-395-ALL); *United States v. Tebiah Tucker* (N.D. NY CR No. 00-CR-269-ALL); *United States v. Michael O'Driscoll* (M.D. PA CR No. 4:CR-01-277); *United States v. Jay Lentz* (E.D. VA CR No. 01-CR-150-ALL); *United States v. Cornell Winfrei McClure* (D. MD CR No. 01-CR-367-ALL); *United States v. Johnny Davis* (E.D. LA CR No. 2:01-CR-282-ALL); *United States v. Robert and Michael Ostrander* (W.D. MI CR No. 01-M-639-ALL); *United States v. Luis Gonzales-Lauzan* (S.D. FL CR No. 02-CR-20572-ALL); *United States v. Hernaldo Medina Villegas and Lorenzo Catalan Roman* (D. PR CR No. 3:02-CR-117- ALL); *United States v. Shawn Arnette Breeden* (W.D. VA CR No. 03-CR-13-ALL); *United States v. Brent Simmons* (W.D. VA CR No. 5:04-CR-00014-sgw-ALL) and *United States v. Ishmael Cisneros and Oscar Antonio Grande* (E.D. VA CR No. 04-CR-283-ALL); *United States v. Bruce Webster* (N.D. TX CR No. 4:94-CR-121-Y) - 1; *United States v. Bountaem Chanthadara* (D. KS

172

CR No. 94-10128-01); *United States v. Louis Jones* (N.D. TX CR No. 6-95 CR 0015-C); *United States v. Darryl Johnson* (N.D. IL CR No. 96 CR 379); *United States v. David Paul Hammer* (M.D. PA CR No. 4-96-CR-239); *United States v. Aquila Marcivicci Barnette* (W.D. NC CR No. 3:97-CR-23-P); *United States v. Billie Jerome Allen* (E. D. MO CR No. 4:97 CR 0141 ERW (TCM)); *United States v. Richard Stitt* (E.D. VA CR No. 2:98CR47); *United States v. German Sinisterra* (W.D. MO CR No. 98-00311-01/05-CR-W-2); *United States v. Dustin Higgs* (D. MD CR No. PJM-98-0502); *United States v. Marvin Charles Gabrion* (W.D. MI CR No. 1:99-CR-76); *United States v. Keith Nelson* (W.D. MO CR No. 99-138H-01); *United States v. Richard Jackson* (W.D. NC CR No. 00-CR-74-ALL); *United States v. Gary Sampson* (D. MA CR No. 01-CR-10384-ALL); *United States v. Sherman Fields* (W.D. TX CR No. 01-CR-164-ALL) and *United States v. William Emmett LeCroy* (N.D. GA CR No. 02-CR-38-ALL).

Mitigation specialist Mary Goody prepared detailed direct examination scripts for all the family witnesses in this case, which included questions that expressly addressed execution impact. [Exh. 1, MG 003818-24; MG 003465-69; Index of Goody files following Exh. 1, MG 007340]. Yet trial counsel failed to ask the ten family witnesses who testified about the effect that Petitioner's execution would have on them and other family members. There was no strategic reason for failing to ask questions about the impact of Petitioner's execution on her family members. (Hr. 246).

Petitioner's attorneys recognized the importance of developing execution impact evidence. Mr. Berrigan recognized that the execution of a parent is devastating to a child. (H.Tr. 2213-14). Mr. Stowers testified that they presented the testimony of ten family members at penalty phase in order for the jury to see "who they were and that they would be impacted personally . . . by the outcome" of the sentencing hearing. (H.Tr. 1455-56). *See also* H.Tr. 1457 (Stowers states "there was value in calling witnesses to create the impression with the jury that people were going to be affected by Angela Johnson's execution."). Trial counsel proposed, and the Court gave, two separate mitigation instructions on this issue: (13) "Angela Johnson is very

173

much loved by her daughters, Alyssa and Marvea, and Angela Johnson's death would have a profoundly disturbing effect on their young lives, now and for years to come" [Doc. 593 at 5] and (15) "Angela Johnson is loved and cherished by her mother, Pearl Jean Johnson, and her siblings, Wendy Jacobson, Jamie Jo Hays, Jimmy Johnson, and Holly Dirksen, all of whom would suffer grievously should Angela Johnson be sentenced to death" (*Id.* at 5). Yet, incredibly and ineffectively, trial counsel failed to elicit evidence to support these two important mitigators.

The prosecution argues that trial counsel did present testimony about the effect of her execution on her family members. [Doc. 325 at 140-144]. But the testimony set forth by the government stops short of the impact of Petitioner's execution. "[P]hotographs of Petitioner and her family members" – especially the professional photographs of Petitioner – did not "telegraph the impact Petitioner's execution would have on them." (*Id.*, at 140-41). The testimony of Petitioner's mother that she would continue her relationship with her daughter if she were incarcerated and that the prospect of her daughter facing death or life in prison "[b]reaks my heart" does not constitute execution impact evidence. (*Id.*, at 141). The same is true of her father's testimony that if Petitioner is sentenced to life imprisonment he would maintain a relationship with her. (*Id.*, at 141-42). Wendy Jacobson was not asked about execution impact; her testimony was that "the decision about the punishment" would affect her and that she would support and maintain contact with Petitioner if she was sentenced to life in prison. (*Id.*, at 142). Jamie Jo Hayes testified not about the impact of Petitioner's execution, but that the decision as to punishment would affect her and that she would maintain a relationship with her sister if she is sentenced to a term of life imprisonment. (*Id.*, at 142-43). Petitioner's sister-in-law, Shelley Johnson, testified that she maintains contact with Petitioner and provides financial assistance so Marvea and Alyssa are able to be in contact with their mother (*id.*, at 143), but did not speak to the impact of Petitioner's execution on her or her family.

The government's arguments that Petitioner was not prejudiced because her counsel did present execution impact evidence and because she "cannot demonstrate that victim impact

174

evidence would have made any difference" [Doc. 325 at 145] must be rejected. First, as discussed above, trial counsel did not present execution impact evidence. Second, only four jurors found that Petitioner's mother and siblings would "suffer grievously" if she were to be sentenced to death. [Doc. 593, p. 6]; if trial counsel had presented execution impact evidence, it is reasonably probable that all twelve jurors would have found that mitigator to be true and that at least one juror would not have voted to impose the death penalty. Third, in this case, the jury heard powerful testimony by the victims' families about how they have suffered as a result of the crimes.[78] This emotional evidence can only be effectively addressed by exposing the jurors to the impact of Petitioner's execution on her own family, i.e., by execution impact evidence.

Petitioner does not have to show "'that counsel's deficient conduct more likely than not altered the outcome' of [her] penalty proceeding, but rather [she] must establish 'a probability sufficient to undermine confidence in [that] outcome.'" *Porter v. McCollum,* — U.S. —, 130 S. Ct. 447, 455-56 (2009) (quoting *Strickland v. Washington,* 466 U.S. 668, 693-94 (1984). Trial counsel's error in failing to present evidence of the impact of Petitioner's execution on her family is sufficient to undermine confidence in the penalty decision.

---

[78]    This Court has stated, of the victim impact evidence in this case, that:

> I can say, without hesitation, that the "victim impact" testimony presented in Honken's trial was the most forceful, emotionally powerful, and emotionally draining evidence that I have heard in any kind of proceeding in any case, civil or criminal, in my entire career as a practicing trial attorney and federal judge spanning nearly 30 years. Indeed, I cannot help but wonder if *Payne v. Tennessee,* 501 U.S. 808. 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991), which held that victim impact evidence is legitimate information for a jury to hear to determine the proper punishment for capital murder, would have been decided the same way if the Supreme Court Justices in the majority had ever sat as trial court judges in a federal death penalty case and had observed first hand, rather than through review of a cold record, the unsurpassed emotional power of victim impact testimony on a jury.

*United States v. Johnson,* 362 F. Supp. 2d 1043, 1106 (N.D. Iowa 2005).

175

**COURT CLAIM NO. 56 – The Bureau of Prisons' Method of Carrying out the Petitioner's Execution by Lethal Injection Violates the Fifth and Eighth Amendments, the Administrative Procedure Act, and the Controlled Substances Act**

Citing *Gravink v. United States*, 549 F. 2d 1152, 1153-54 (8th Cir. 1978), the government maintains that a manner of execution claim is not cognizable under 28 U.S. C. § 2255 and that such claim is properly asserted under 28 U.S. C. § 2241 in the jurisdiction where the movant is in custody. [Doc. 325, p. 146]. As Ms. Johnson points out in her briefing of this claim, *Hill v. McDonough*, 547 U.S. 573, 579-80, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006), recognized that a manner of execution claim may be brought in a § 1983 action as well. Regardless, the government's brief does not appear to take issue with Ms. Johnson's assertion that the claim is not procedurally defaulted. It also does not appear to take issue with her argument that for the variety of reasons stated at page 208 of her brief, this Court dismiss this claim without prejudice.

## III.    CONCLUSION

As one district court said in sentencing a federal capital defendant to death in 2004, the defendant's crimes were "despicable." *United States v. Sampson*, 300 F. Supp. 2d 275, 276 (D. Mass . 2004) . However, the court also reasoned that "there is a difference between a murder and an execution. That difference is the fair process by which a jury of citizens from this community [] decided that [Sampson's] death is justified." Id. at 277.[79] It has now been proven that Angela Johnson did not receive the fair process that the Constitution guarantees every woman no matter how despicable her conduct. Therefore, Ms. Johnson must be given a new trial to determine her sentence.

---

[79] On October 20, 2011, the same district court overturned Mr. Sampson's death sentence on the ground that a jury had lied about an important matter during jury selection. See, Doc. 1218, *United States v. Sampson*, D. Mass., No. 01-10384-MLW. In light of this ruling, Ms. Johnson reasserts the request she made in her post-trial brief to brief all of the issues set forth in her second amended motion, including the jury misconduct claims that are quite similar to the successful claim in Sampson.

176

DATED this 21st day of October, 2011.

Michael Burt
Law Office of Michael Burt
600 Townsend Street, Suite 329E
San Francisco, California   94103
415-522-1508 (tel.)
415-522-1506 (fax)
Michael.Burt@prodigy.net

Marcia A. Morrissey
Attorney at Law
2115 Main Street
Santa Monica, California 90405
310-399-3259 (tel.)
310-399-1173 (fax)
MorrisseyMA@aol.com

By:  /s/ Michael N. Burt
     Michael N. Burt

By:  /s/ Marcia A. Morrissey
     Marcia A. Morrissey

177

## PROOF OF SERVICE

I, Michael N. Burt, hereby certify that on this 21st day of October, 2011, I served the forgoing on the following person by ECF filing

By:    /s/ Michael N. Burt

178