IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

ANGELA JANE JOHNSON,                     No. C09-3064

          Petitioner,

     vs.                                 TRANSCRIPT OF
                                         2255 EVIDENTIARY
UNITED STATES OF AMERICA,                HEARING

          Respondent.
_____/                Volume 1


          The Hearing held before the Honorable Mark W. Bennett,
Judge of the United States District Court for the Northern
District of Iowa, at the Federal Courthouse, 320 Sixth Street,
Sioux City, Iowa, March 7, 2011, commencing at 8:02 a.m.

APPEARANCES:

For the Petitioner:    MARCIA A. MORRISSEY, ESQ.
                       2115 Main Street
                       Santa Monica, CA 90405-2215

                       MICHAEL BURT, ESQ.
                       Law Office of Michael Burt
                       Suite 329-E
                         600 Townsend Street
                       San Francisco, CA 94103

                       MOHAMMAD ALI HAMOUDI, ESQ.
                       Suite 329-E
                         600 Townsend Street
                       San Francisco, CA 94103

                       NANCY S. PEMBERTON, ESQ.
                       Pemberton & Associates
                       Suite 329E
                         600 Townsend Street
                       San Francisco, CA 94103

For the Respondent:    C.J. WILLIAMS, ESQ.
                       Assistant United States Attorney
                       Hach Building - Suite 400
                       401 First Street Southeast
                       Cedar Rapids, IA 52401-1825

Also present:          John Graham

Reported by:           Shelly Semmler, RMR, CRR
                       320 Sixth Street
                       Sioux City, IA 51101
                       (712) 233-3846

THE COURT: Thank you. Please be seated. Good morning.

MR. WILLIAMS: Morning, Your Honor.

MR. BURT: Morning, Your Honor.

THE COURT: Good morning. Okay. This is United States versus Angela Johnson, and we're here on the -- you correct me if I'm wrong, but I think the most recent corrected amended motion under 2255 to vacate, set aside, or correct sentence was the one filed by the prior lawyers on 1-21, 2010. That's the petition that I'm going off of. Is that right?

MR. BURT: Yes, document 26.

THE COURT: Yes, document 26. And I thought it might be helpful if you could give me a little preview before you call each witness. I don't know if you've organized it this way. And if it's too -- I don't want to spend a lot of time to have you kind of run through the petition to figure out what issue it's relevant to, but if you know and the testimony is kind of not -- is relative to just a couple -- one or more issue, if you could just give me a heads-up, I'd appreciate that.

MR. BURT: Sure. We could do that witness by witness.

THE COURT: Sure, if that's not too much of a burden.

MR. BURT: No, not at all.

THE COURT: Okay. And then I talked a little bit informally off the record with all the lawyers about timing. And tonight we're only able to go till about 5:45. But then for the rest of the week, we'll start at 7 a.m., and then we'll go till 6 p.m. with appropriate breaks. And does anybody have any objection to that?

MR. BURT: No, Your Honor.

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. I don't think I have anything else on my agenda that we need to take up before we start with the witnesses.

Were counsel planning on giving an opening statement? I wasn't planning on receiving one, but, you know, if you've prepared one and you want to give it, that's fine. If not . . .

MR. BURT: Your Honor, I think in light of the fact that we do have witnesses and in light of the Court's schedule that we prefer just to launch right into the witnesses if the Court please.

THE COURT: Yes, that's fine.

MR. BURT: And, Your Honor, our first witness will be Mary Goody, and as the Court may recall, Mary Goody was the mitigation specialist in the case.

THE COURT: Yes.

MR. BURT: She's going to be an overview witness to talk to the Court about the investigation she did and especially as it pertains to her mitigation investigation. She's going to talk about her involvement in the plea process, her preparation of witnesses, her discussions with counsel. And it's going to

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS     Document 347     Filed 11/10/11     Page 1 of 84

**5**

be a chronological development from the time she came into the case until the trial. And it is relevant to more than one claim. But I think it's going to be relevant overall to the plea claim and to the ineffective assistance for failure to investigate and present mitigating evidence.

THE COURT: Okay. And are you ready to go with her?

MR. BURT: Yes.

THE COURT: Okay. Mr. Williams, do you have anything on your agenda before we get started?

MR. WILLIAMS: The only thing is we would invoke the rule, Your Honor, for sequestration of witnesses. It's my understanding that they provided for that at this point, but I just want to make sure I formally move for that.

THE COURT: And -- yeah, I'll be happy to sequester witnesses. That's my practice in every civil and criminal proceeding unless the parties -- unless the lawyers jointly agree otherwise. So -- but it will have to be self-enforcing by the parties because I'm not going to either know or remember who the witnesses are or aren't, so just, you know, every once in a while take a glance to make sure one of your witnesses isn't in the courtroom.

MR. BURT: Sure. Judge, just a couple housekeeping matters.

THE COURT: Yes.

MR. BURT: We had filed a motion -- and I'm not sure

**6**

this was even necessary -- but a motion for the Court to take judicial notice of the transcript and records in the case in chief in both our case and Mr. Honken's case, and I know the Court has already heard both trials, but I do this so that we don't have to introduce as exhibits things that are already in front of the Court in the record in these other cases.

THE COURT: And, Mr. Williams, do you have any problem if I take judicial notice of the transcripts?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay.

MR. BURT: And then, Your Honor, we have, as we indicated to the Court and your staff last week, a number of electronic exhibits that we have reduced to DVDs.

THE COURT: Yes.

MR. BURT: And if I could, I would like to identify and have marked for the record the four DVDs that I think are already loaded on to the Court's computer.

THE COURT: They are. Please proceed.

MR. BURT: Your Honor, we'd ask to mark as defendant's first in order a DVD which is entitled Exhibits ABA Guidelines and Goody. And what this DVD contains is Mary Goody's entire trial file -- I think it's about 6,300 pages -- and the ABA death penalty guidelines which she's going to be talking about. That would be -- we'd ask that this be marked as our first exhibit.

**7**

THE COURT: Any objection, Mr. Williams?

MR. WILLIAMS: I have no objection to the marking of it. Until we see how things come in, I don't know that I want to agree to its full admission at this point. I mean, those exhibits, these DVDs, hold hundreds and hundreds and hundreds of pages of documents. So I'd like to see how this proceeds a little bit.

THE COURT: And -- so I take it the parties really haven't gotten together ahead of time and gone over exhibit lists and agreed on what's in and what's contested.

MR. BURT: We've gone over the exhibit list, but we haven't agreed on what's coming in and what's not because as Mr. Williams says, there are literally thousands of pages we're dealing with. And I don't intend, unless the Court wants it or we can reach an agreement, to just move in wholesale documents. But the witnesses will be referencing certain documents that are in these exhibits. And perhaps at the end of the examinations, we would move in only those portions with the witness that we are using. And for certain witnesses I think the Court will see the relevancy of the entire exhibit.

For instance, Miss Goody's file is relevant to what she did and as documentation of her investigation, not necessarily for the truth of anything stated in the documents, for instance, interviews, but just to show what she did and when she did it.

**8**

And so I think that does or should come in in front of the Court to give the Court a sense of what work she did, what work product she produced and not necessarily for the truth of any statements contained in her work product. We're never going to be arguing to the Court that the Court has before it evidence in these documents unless we put a witness on the stand and afford Mr. Williams the right of confrontation. But I think it is important for the Court to see what the work product is.

THE COURT: So are you intending then at the conclusion of every witness to make an offer of exhibits that the witness referred to?

MR. BURT: Yes.

THE COURT: And do I have a -- did you provide me with a master list of exhibits?

MR. BURT: Yes, we did. And the documents themselves are -- most of them -- there are a couple of exceptions, Your Honor, but I think the vast majority of documents are Bates stamped so that we'll be referencing Bates stamp numbers so the record is clear what we are referring to and where the documents come in on the DVDs that are in front of the Court. So I think we can make a fairly clear --

THE COURT: But I actually don't have a I -- I mean, what you gave me was a grouping, but there's not a -- I mean, it doesn't resemble what I would call a witness list -- an exhibit list.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

**9**

MR. BURT: You mean document by document?

THE COURT: Right, so I can keep track of what's admitted and what isn't.

MR. BURT: Your Honor, we can as we go along I think reference the Bates stamp numbers that we are going to be referring to so that the Court can know what particular document goes in. In other words, I show the witness a document.

THE COURT: Well, except I don't have a list of all the documents.

MR. BURT: Because we're talking about a twenty, thirty thousand-page run of documents here so it's --

THE COURT: Well, I understand that, but if you're going to be moving -- I don't care if we're talking about 2 documents or 20,000. If you're going to be moving the admission of an exhibit, it would be nice if I had a list of all those exhibits, and I don't have that. So how am I supposed to keep track of what I'm admitting and what I'm not if you haven't provided me with an exhibit list?

MR. BURT: Your Honor, I thought that as we went through the exhibits, for instance, I show the witness a document, Bates stamp number 213, and I then move in Bates stamp number 213 --

THE COURT: Then I have to write each one down by hand rather than having a --

MR. BURT: Well, we can certainly --

**10**

THE COURT: -- an actual exhibit list with columns like a --

MR. BURT: And we can certainly -- we have the capability, Your Honor, to prepare that list as we're going so the Court has track of the exact document pages and what comes in and what does not, and we can provide that to the Court on an ongoing basis as we go along.

THE COURT: Well, why don't you provide it to me ahead of time starting with as soon as you can generate it.

MR. BURT: Sure.

THE COURT: Okay.

MR. BURT: We can do that.

THE COURT: That's fine.

MR. BURT: And, Your Honor, for now I'd just -- I'll have this one DVD marked. And then as the other ones become relevant, I'll have those marked as well.

THE COURT: That's fine. Thank you.

MR. BURT: May I approach the clerk so that she has this?

THE COURT: You may. Thank you.

MR. BURT: Judge, I think Miss Morrissey had one preliminary matter and then we'll be done.

THE COURT: Okay. Miss Morrissey?

MS. MORRISSEY: Thank you, Your Honor. With respect to the sequestration of witnesses, we have one individual in

**11**

court, Lesa Watson, L-e-s-a W-a-t-s-o-n, who's an investigator that's been working on the case. She has interviewed and may be called to provide testimony regarding two witnesses, Christi Gaubatz and Peggy Sue Hoover, who both testified at trial. I would ask that she be allowed to remain in the courtroom. I don't think either of those witnesses are going to be present. I don't think that her presence in the courtroom could in any way contaminate what she might --

THE COURT: And she's been your investigator in the case?

MS. MORRISSEY: Yes, she has been, Your Honor.

THE COURT: Yeah. Well, I've always thought the defense -- matter of fact, I published an opinion as I recall years ago saying that the defense investigator was the functional equivalent of the government case agent and that the defense had a right to have an investigator in the courtroom at counsel table if you'd like her at counsel table.

MS. MORRISSEY: Actually I think she's happy in the back, but she would like to watch.

THE COURT: I tend to pick on people in the back, though. No, I'm just kidding.

MS. MORRISSEY: Okay.

THE COURT: Mr. Williams, you don't have any objection, do you?

MR. WILLIAMS: No, Your Honor.

**12**

THE COURT: No. Okay. That's fine.

MS. MORRISSEY: Thank you.

THE COURT: Thanks. Okay. We ready to start?

MR. BURT: Yes. Call Miss Goody, please.

THE COURT: Good morning.

MS. GOODY: Good morning.

THE COURT: Would you raise your right hand, please.

MARY GOODY, PETITIONER'S WITNESS, SWORN

THE COURT: Thank you. Please be seated. Make yourself comfortable.

THE WITNESS: Thank you, Your Honor.

THE COURT: You can adjust the chair and the microphones so you can speak directly into them.

And, Roger, would you get Miss Goody a glass of water.

THE WITNESS: Oh, thank you. Thank you very much.

THE COURT: And would you please tell us your full name and spell your last name for us.

THE WITNESS: My name is Mary Carolyn Goody, G-o-o-d-y.

THE COURT: Thank you.

Mr. Burt?

MR. BURT: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BURT:

Q. Good morning, Miss Goody.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 347    Filed 11/10/11    Page 3 of 84

**13**

A. Good morning.

Q. Miss Goody, could you tell us your business or occupation, please.

A. I'm a mitigation specialist.

Q. And give the Court a little bit of information about your background.

A. I have -- I attended a legal assistant training program at the University of Minnesota. I completed that course work in 1979. I have a B.A. from Stephens College in Columbia, Missouri, in what is called philosophy in law. I became a legal assistant in I guess 1980, and I worked as a legal assistant until I became an investigator in 1985 in Jackson County, Missouri, in Medford -- or Jackson County, Oregon, in Medford. And at that time I started working on my first death penalty case.

And from there I went to Missouri where I worked for the Office of State Public Defender and was the capital case coordinator there for a while until they formed a capital unit. And I became the assistant to the director of the capital unit. And I have been a mitigation specialist in private practice since 1990.

Q. And in your private practice, could you give the Court a sense of the kinds of cases you work on in terms of what states, federal versus state, and your experience in regard to capital case work.

**14**

A. I have worked both at the state level and at the federal level. I have -- I'm working now on my 16th federal capital case. I have worked on state post-conviction cases as well as trial-level cases and also post-conviction at the federal level as well as trial level.

Q. And you said you've worked on 16 federal cases?

A. Yes, I have.

Q. When was the first federal capital case that you did mitigation work on?

A. You know, I don't have information on the year that I did that case, but it was the Sureno case. It was in New Mexico, and I'm guesstimating that it was 1998 or '99, and that was the Oscar Villa case.

Q. And your state case work, what states have you done mitigation work in?

A. I've done mitigation work in Missouri, in Idaho, in Wyoming, in Washington, Oregon, California, Arizona, and New Mexico.

Q. Now, when you were working at the state public defender's office in Missouri, did you have occasion to work with Pat Berrigan?

A. I did.

Q. And tell the Court about your relation -- professional relationship with Mr. Berrigan, when you first started working with him, and how many cases you worked with him and just some

**15**

general background about that.

A. I first met Mr. Berrigan in 1987. At the time I was working for Terry Brummer who was the state public defender. And he had given me the job of coordinating all the capital cases in Missouri. At that time there were a number of offices in Missouri, and there were also private contractors. And it was my job to look at each and every case, the attorneys on the case, who else was working on the team, and help them with any questions that they might have with regard to mitigation or sentencing or really any aspect of the case.

There were at that time and throughout the 4 years that I worked there approximately 60 trial-level first-degree murder cases ongoing at all times, and there were 48 people on death row, and some of them had 2 cases. So there was quite a lot of case work going on. And I met Mr. Berrigan because he worked in the Kansas City office. And for quite a long time I just knew him as someone that I'd talk to about his case work or other case work in the office.

Later we did a case together which was State versus Allen Nicklasson. And we also worked on a case after Mr. Nicklasson's case. I believe it was 19 -- I had just moved to Washington at the time. State versus Nila Wacaser. And then we did Angela's case.

Q. So two state cases before the Angela Johnson case; correct?

A. Yes.

**16**

Q. And you had never worked on a federal capital case with Mr. Berrigan before this case?

A. No.

Q. Can you tell the Court about your -- any experience you've had in training either mitigation specialists and lawyers, and/or lawyers, in how to do mitigation investigation?

A. Well, I have spoken at a number of conferences over the years for the NLADA, the National Legal Aid and Defender Association. I've spoken in Idaho, spoken in Wyoming. I've spoken in Oregon and also Washington.

Q. And do you speak both to mitigation specialists and lawyers, or do you always speak just to mitigation specialists?

A. No, I speak to both lawyers and mitigation specialists. And I've done this at the state level.

Q. And are there standards that guide your work as a mitigation specialist?

A. Yes. In early -- in 1989 the American Bar Association put together some standards for the performance of counsel in death penalty cases. And those first set of guidelines were rather brief, but they talked a great deal about the importance of doing a thorough investigation, the importance of putting together teams of people, particularly not just one but two lawyers, a mitigation specialist, and at least one investigator who would work together on the case throughout the case to determine all aspects of the investigation, not only the guilt

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 347    Filed 11/10/11    Page 4 of 84

**17**

phase investigation but also the penalty-phase investigation.

And then in 2003 those guidelines were greatly expanded upon, and the commentary was expanded also to really focus and emphasize the need for a thorough investigation which covered all aspects of the defendant's background and in particular to look at all the mental health issues that could be gleaned from not only the defendant but from her family or his family and to consult with experts, to develop not only the defense but the theory of the case which would follow from the very inception of the case all the way through to the end of the penalty phase.

Q. So those were the standards that were in place when the Angela Johnson case was tried in the time period between 2000 when she was arrested and 2005 when she went to trial?

A. Yes.

Q. There have been some subsequent standards that are specific to mitigation specialists; correct?

A. Yes.

Q. But those didn't come into existence until when?

A. 2008.

Q. Okay. So we'll talk about the standards that existed just at the time of this trial.

A. Yes.

Q. Okay. Now, you were involved in this case some time ago; correct?

**18**

A. Yes.

Q. And during the course of your work on the Johnson case, did you develop files and paper work product?

A. Yes.

Q. And sitting next to you is four boxes, and they are labelled PB for Pat Berrigan 19, PB 20, PB 21, PB 22.

A. Yes.

Q. Have you gone through those boxes?

A. I have.

Q. Can you tell the Court what those boxes consist of?

A. They consist mostly of all of the work product that I generated from October of 2000 through the end of the penalty phase of the trial which was June of 2005.

MR. BURT: Your Honor, may I approach to --

THE COURT: You may, and you don't need to ask after this.

MR. BURT: Thank you very much.

THE COURT: Thank you.

BY MR. BURT:

Q. Miss Goody, I'm going to show you a DVD which has not been marked yet, but it is entitled ABA Guidelines and Goody. Are you familiar with that DVD?

A. Yes.

Q. And does that DVD contain an electronic version of the four boxes that you've identified as your files?

**19**

A. Yes, along with the guidelines themselves.

Q. The 1989 guidelines and the 2003 guidelines.

A. Yes.

Q. Okay. Have you reviewed the electronic version to see if it corresponds to the paper version?

A. Yes.

Q. Now, in addition -- and have you reviewed those boxes and the electronic version of your files recently --

A. Yes.

Q. -- to refresh your memory on what happened back in the time period?

A. Yes, I have.

Q. In addition to reviewing the work product that's in those four boxes, did you also review the trial transcript?

A. I did.

Q. And was that recently?

A. Yes.

Q. So although the events we're going to talk about took place some time ago, do you feel that after reviewing these documents that you have present recollection to be able to talk to the Court in detail about what you did, when you did it, and why you did it?

A. Yes.

Q. Okay. Now, I want to start if I could by asking you to identify a document that I'm going to put up on the screen, and

**20**

this is MCN00-213. This is from the DVD that we'll identify as a master chronology. Do you recognize this document?

A. I do.

Q. And tell the Court what this is.

A. This is a fax that I received from Pat Berrigan in October, on October 22 of 2000, regarding a request to work on Angela Johnson's case.

Q. So does this document help pinpoint for you the first contact you had on the Angela Johnson case?

A. Yes.

Q. So October 22, 2000, you received a -- that communication from Mr. Berrigan; correct?

A. Yes. I'd like to clarify, though, he may have called me and then sent me the fax or sent me a brief e-mail that we should talk, but that was really the first written contact that I had.

Q. I want to show you another document which is MCN00-0223 which looks like a letter that was written to you from Mr. Berrigan October 31, 2000. Can you identify this letter?

A. Yes.

Q. And tell the Court what this is.

A. This is a subsequent letter after a telephone conversation in which I agreed to work on the case, and he is forwarding to me some documents, newspaper articles, and a rough outline that he prepared.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 5 of 84

**21**

Q. And this was all the information you had on the case at this point; correct?

A. Yes.

Q. And from the context of this letter, I take it that he had not yet applied to the Court to have you appointed on the case but was thinking about doing that.

A. Correct.

Q. Now, that same document -- this is MG1816 -- looks like a document copy of that same letter but with some handwriting on it?

A. Yes, that's my handwriting. I made some notes I believe from my -- from another telephone conversation with him just indicating how old the defendant was, how many children she had, where they were located, where she was located, and that her codefendant and boyfriend was the father of one of her daughters.

Q. And this document makes reference to an outline, a rough outline, which Mr. Berrigan prepared incomplete but I take it to give you some sense of what the case was about based on Mr. Berrigan's review of what information he had about the case; correct?

A. Yes.

Q. And attached to that letter in your file, is it true that there is a hand-paid -- handwritten document which is MG001812 through MG001817 -- I'll just show you what this looks like --

**22**

basically outlining for you in Mr. Berrigan's handwriting what this case involved.

A. Yes.

Q. And the first page talks about who the alleged victims are, has some other background information about the charges; correct?

A. Yes.

Q. The second page of this document gives you some background information, brief background information, about the then potential codefendant in the case, Dustin Honken; correct?

A. Yes.

Q. Summarizes for you what Mr. Berrigan knew at that time about Mr. Honken.

A. Yes.

Q. And then indicates that Mr. Honken is represented by an attorney, Mr. Parrish.

A. Yes.

Q. And that he's not yet been charged at that point in the case.

A. Yes.

Q. Correct? Now, the third page of this document indicates some background about Miss Johnson.

A. Yes.

Q. She's got two daughters, and it also indicates that Mr. Berrigan had some information about an informant in the case

**23**

who had provided some information about Miss Johnson's involvement in the case, a guy by the name of Robert McNeese; correct?

A. Yes.

Q. And the last line of that document says that according to Mr. McNeese Miss Johnson may have assisted in the M's, which I take it to be murders, by taping the victims' hands and putting socks into their mouths; correct?

A. Yes.

Q. And you understood that to be coming from Mr. McNeese.

A. I did.

Q. Mr. Berrigan's source of information. And then page 4 is some background information about Mr. McNeese including that he had been involved in informing on other people.

MR. WILLIAMS: Your Honor, I'd object at this point to leading questions.

THE COURT: Sustained.

BY MR. BURT:

Q. Can you summarize for the Court what information you learned from this page of the document.

A. Well, Robert McNeese was supposed to be doing a life sentence for importing heroin and that he had had access to Angela Johnson in the Benton County Jail and that he had told her that he could help her and he'd already -- using Pat Berrigan's words, he'd already snitched out someone else. And

**24**

so he had experience doing this. And then he talks about a potential conflict that Al Willett might have had by also representing Robert Shultice who was a psychiatrist that Mr. McNeese had snitched out, so to speak. And then he says there's some evidence that it might have been a government plant and that there was a Massiah hearing that would be held within the next two or three weeks from the time that he's writing this to me.

Q. Okay. MG8 -- 1816, what information did you learn from this document, page of the summary that Mr. Berrigan provided you?

A. Well, Mr. Honken had a childhood friend that he had been involved in a meth operation with. Mr. Honken was from Britt. Mr. Cutkomp was his friend who got 4 1/2 on the same charges that Honken got 27 years on. He's explaining that he doesn't know what is going to happen with Dustin's participation in the five murders and we don't know if Cutkomp taped any of the conversations that he had with or about Angela Johnson, and he's explaining that Terry DeGeus who is a victim was supposedly killed by Honken four months after the Nicholson and Duncan murders. And he just is explaining some facts about that and that we don't really know whether or not Angela Johnson was involved at the time he's writing this.

Q. Okay. And then the last page of this document, what information did you learn from this?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

**25**

A.   He's talking about Daniel Cobeen who is a former customer and coworker of Dustin's, and he became an informant and that he probably had a distribution charge that was a federal charge but isn't going into any detail about that, and there are allegedly potential victims in addition to the murders and that these people are the subject of solicitation to commit murder.  So he's filling me in basically on who the players are.

Q.   And so at this point that is October of 2000?

A.   2000.

Q.   That was the extent of your knowledge about this case; correct?

A.   Correct.

Q.   Now, showing you another document which is Mary Goody 1107, this appears to be a letter written to you from Mr. Berrigan on January 17, 2001; correct?

A.   Yes.

Q.   And what information did you learn from this letter?

A.   Well, he's sending me a copy of the motion to hire me. He's also sending me some documents that were prepared by an investigator of Mr. Willett's.  He's explaining who the team is. He's telling me that Angela's being housed in the Linn County Jail.  And he does say although she's doing -- she's getting along fine now, she did have a suicide attempt back in August after she discovered that the man she was pouring her heart out to in the next cell was a government snitch.  So he's, you know,

**26**

telling me there's lots of background information that was prepared by Cornell and that he's already gotten Bill Logan, Dr. Bill Logan, from Kansas City to work on the case.

Q.   Let me ask you this.  As a mitigation specialist, is part of your responsibility to actually assist the lawyers in identifying and hiring experts and specifically mental health experts in the case?

A.   Yes.

Q.   I want to read to you -- you referenced the ABA guidelines 2003.  You're familiar with those guidelines.

A.   I am.

Q.   I want to read to you a section of the guidelines about the role of the mitigation specialist and ask you if this is consistent with the role you generally take in your cases, not this one specifically but does this description identify the role that you perform in cases.  It says mitigation specialist is also an indispensable member of the defense team throughout all capital proceedings.  Mitigation specialists possess clinical and information-gathering skills in training that most lawyers simply do not have.  They have the time and the ability to elicit sensitive, embarrassing, and often humiliating evidence, for example, family sexual abuse, that the defendant may have never disclosed.  They have the clinical skills to recognize such things as congenital, mental, or neurological conditions, to understand how these conditions may have affected

**27**

the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf.  Moreover, they may be critical to assuring that the client obtains therapeutic services that render him cognitively and emotionally competent to make sound decisions concerning the case, his case.

Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team ensures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict.  The mitigation specialist compiles a comprehensive and well-documented psychosocial history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

The mitigation specialist often plays an important role as well in maintaining close contact with the client and

**28**

his family while the case is pending.  The rapport developed in this process can be the key to persuading a client to accept a plea to a sentence less than death.

For all of these reasons, the use of mitigation specialists has become part of the existing standard of care in capital cases, ensuring high-quality investigation and preparation of the penalty phase.  And that's page 959 and 960 of the guidelines.

Are you familiar with that discussion of the role of a mitigation specialist?

A.   I am.

Q.   And is that generally -- does that describe the minimum standard of practice in terms of what a mitigation specialist is supposed to be doing in these cases back in the time period when that was written?

A.   It does.

Q.   Okay.  Now, in this case did you know who Bill Logan was, the psychiatrist who is referenced in this letter that I have back on the screen now?

A.   I did.

Q.   And who is Bill Logan?

A.   Dr. Bill Logan is a psychiatrist from Kansas City.  He was very involved in many of the capital cases that were going on in Kansas City during the time that I worked for the state public defender.  And indeed shortly after I went to work for the state

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 7 of 84

Q. public defender in I believe February of 1987, I was given a caseload because they sort of ran out of people to do the work, and Dr. Bill Logan worked on one of the first cases that I did there, State versus Nila Wacaser. So I have known him since early in 1987.

Q. And give the Court your impressions of his general competency as a forensic expert.

A. Well, I think he's very competent, and I think that he -- he has a very interesting experience because Dr. Logan was in the military, and he worked at the federal prisoners' medical center after he came out of the military. He went from there to the Menninger Clinic in Topeka, Kansas, where he worked for many years and actually became the head of the Law and Behavior Center there before he went into private practice.

Q. And is he a generalist within his profession? In other words, does he -- is he just a general forensic psychiatrist, or is he specialized in any particular mental disorders?

A. As far as I know, he is a generalist because he has both a private practice where he sees private patients in addition to his forensic work.

Q. Now, when the guidelines, these ABA guidelines, talk about the mitigation specialist's role in selecting experts, doing the social history investigation and selecting experts, how does that process normally work? I mean, how do you go about helping lawyers select experts and do social history investigation that

relates to the experts?

A. Well, generally speaking, you know, you have to get out there and do a great deal of leg work before you can really make that determination. You may have people in mind that you think might be good to work on the case based upon your initial impressions of the defendant, the family background, the family situation, the case itself, information that you receive in discovery or from the attorneys.

And so as you go through the case and you discover more concerning things, things that are concerning to you in terms of how the person is functioning, then you may add experts who hopefully will work together and work together with the team to arrive at basically the bottom line of what the problem is with the defendant and what sort of action needs to be taken from that.

Q. Okay. Now, I take it from the context of this letter, the January 17, 2001, letter, that you did not have any hand or any input into hiring Dr. Logan as your psychiatric expert in this case; correct?

A. No.

Q. And is that typically the way it works in these cases either with Mr. Berrigan or with other lawyers, that at the beginning of the case the lawyers say here are the experts and, you know, that decision has been made?

A. No.

Q. How does it typically work?

A. Well, generally speaking, we would do what I just outlined which is we would all get together. We would all spend time with the defendant. We would all get together again as a team and talk about what we're seeing in the situation, and then we would suggest and sort of brainstorm with each other about how we would decide on who we were going to hire.

Q. And in terms of working with Mr. Berrigan, is that the way it worked in your past cases with him?

A. In the Nicklasson case and also in the Wacaser case, the experts were already in place and also in this case by the time I came on board.

Q. And was that a practice that was fairly unique to Mr. Berrigan, or is that something you ran into in your other capital cases?

A. Occasionally I've run into it in other cases, but it seemed to be the case with Mr. Berrigan.

Q. And why was that? Do you know?

A. Actually I really don't. I just know that he has people that he has worked with who are -- he's very comfortable with. Both Dr. Logan and Dr. Hutchinson were people that we had worked with in the Wacaser case, and that case ended disastrously, and so we became very close to them.

Q. Okay. Now, this letter in the first paragraph references some preliminary interviews conducted by -- conducted of Angela

and her siblings by our first-phase investigator, Mr. Ray Cornell. Did you have any hand in recommending or retaining Ray Cornell in the case?

A. No.

Q. Did you know of him? Had you worked with him before?

A. No.

Q. The preliminary interviews that were attached to this letter, were they fairly basic in nature?

A. Yes.

Q. Were they, by your standards, adequate to get you started but nothing more than that?

MR. WILLIAMS: Objection to leading, Your Honor.

THE COURT: Sustained.

BY MR. BURT:

Q. Could you characterize for the Court the nature of these preliminary interview reports which were attached.

A. The reports were not very long. They were kind of meet-and-greet reports. They did take down information that was family history background information, but it was, you know, like a first interview that you would do of someone you were just meeting.

Q. And when the letter refers to our first-phase investigator, is it typical in your experience to have both a first-phase guilt-phase investigator and a mitigation specialist working side by side in the same case?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 347 Filed 11/10/11 Page 8 of 84

A. Yes.

Q. And what is the relationship between the first-phase investigator and you in terms of how you do your work and how the case is divided up just in general? How does it normally work for you?

A. Well, generally the investigator and I work fairly closely together, you know, communicating fairly often outside of team meetings and within ourselves because there are various witnesses that are crossover witnesses. In other words, there are guilt-phase witnesses that are important to a mitigation investigation, and perhaps during the course of a mitigation investigation you learn things that are important to the guilt phase part of the case. So there's a lot of sharing that goes on.

Q. Okay. And this passage from the guidelines I read to you talked about coordinating the two phases of the case. Could you speak to that in terms of how that normally works in terms of coordinating the guilt phase and the penalty phase?

A. Well, it's just very important that there be a unified theme of the defense in the case because there are -- there is always the risk that you'll proceed to a penalty phase. And if there is not continuity that is developed between the guilt and penalty-phase portions of the trial -- and that extends into voir dire and even before -- it's very difficult to try to pick those pieces up in a disjointed fashion and put on a penalty

phase that is meaningful.

Q. Now, I think you alluded to this before, but the guidelines talked about -- I'm referencing guideline 4.1 -- talks about the minimum composition of the defense team in capital cases; correct?

A. Yes.

Q. And it says guideline 4.1A, the defense team should consist of no fewer than two attorneys qualified in accordance with another guideline, an investigator, and a mitigation specialist. And then the second subpart says the defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments.

What was your understanding of who was performing the role addressed in the second subpart there, that is, the person who is qualified to screen for mental impairments?

A. Well, there was no one other than myself as an investigator doing that sort of work.

Q. Okay. And the team at least as it existed in January of 2001 was a guilt-phase investigator -- that was Mr. Cornell -- yourself, the lawyers, Mr. Berrigan, Mr. Willett, Thomas Frerichs -- I hope I'm saying that correctly.

THE COURT: That was correct.

MR. BURT: Thank you.

Q. -- and Dr. Logan; correct?

A. Yes.

Q. Now, did you end up working with the guilt-phase investigators in the case in the way that you normally do in --

A. No.

Q. And why was that?

A. I don't know. I only met Mr. Cornell and I believe his associate, a woman named Rose, on one occasion. And there was another investigator much later on in the case, in 2005 I believe, who kind of became evident to me that he was available to serve subpoenas and that sort of thing. I met him in Dean Stowers' office.

Q. Was that Gordon Gratias?

A. Yes. And I believe he had a son also that was involved.

Q. Was that Scott Gratias?

A. I believe that was his name. But that was my only contact with any investigators in the case.

Q. And typically in the capital cases you worked on, are you receiving as part of your work in coordinating between the guilt and penalty phase the work product of the guilt-phase investigators?

A. I do -- I do -- yes, I do a lot of that. We exchange a lot of information between us. So yes, I have a lot of contact with their work product.

Q. And typically would that consist of investigative reports that you would be sent by the guilt-phase investigator to keep

you abreast of what was being developed guilt phasewise?

A. Yes, and telephone calls. Sometimes we would go and talk to witnesses together, oftentimes do that. And I would share my mitigation information with him.

Q. And did that process take place in this case?

A. No.

Q. Ever.

A. No.

Q. And do you know why that -- why that was?

A. Well, it was my understanding that Mr. Cornell was taken off the case because of some work conflict, and he was never replaced. However, I didn't work on the case after I believe May of 2002, so I didn't have any contact with any investigators at all.

Q. And how about in 2004, 2005 closer to trial?

A. Only the contact with Mr. Gratias where I met him in Mr. Stowers' office and we talked about serving subpoenas.

Q. And serving subpoenas is an administrative task as opposed to interviewing witnesses and producing reports --

A. Yes.

Q. -- in these cases? Did you ever get work product from Mr. Gratias that was of a substantive nature?

A. No. I've been through my entire file, and I don't believe I have any communications from him at all.

Q. Was that fairly unusual?

A. Yes.

Q. Now, the concept of a team as described in these guidelines is a group of people working together, correct, communicating with each other sharing work product?

A. Yes.

Q. Did that happen in this case in terms of the interaction between you and the guilt-phase investigators?

A. No.

Q. Now, this letter references a motion -- attaching a motion to hire you; correct?

A. Yes.

Q. Please find enclosed a copy of the motion to hire you.

A. Yes.

Q. Written January 17, 2001.

A. Yes.

Q. And I'll show you part of the court file in this case which is --

THE COURT: Mr. Burt, do you know how to zoom in? It might be helpful sometimes when you -- yeah. Thank you.

THE WITNESS: Thank you, Your Honor.

MR. BURT: Thank you, Judge.

BY MR. BURT:

Q. Can you identify for us -- this is for the record a file-stamped copy of a motion filed January 23 of '01, a couple of days after that letter that we just reviewed; correct?

A. Yes.

Q. And can you tell the Court what this is.

A. This is a motion to file an ex parte motion to hire a mitigation specialist.

Q. Okay. And attached to this motion is your résumé, correct, as Exhibit A?

A. Yes.

Q. You provided that to Mr. Berrigan.

A. Yes.

Q. And then as Exhibit B a declaration captioned as Exhibit B, an affidavit by you; correct?

A. Yes.

Q. And what was the purpose of this affidavit that was submitted to the Court?

A. This is an affidavit that I really -- I developed in conjunction with another mitigation specialist or two. And it is an effort to put together a coherent explanation of what a mitigation specialist does throughout the case and to determine how many hours and an hourly rate and that sort of thing. But it's really one to educate the Court about what must be done in this investigation.

Q. Now, in some cases when you fill out these kinds of affidavits, do you have a lot of information about the case so that you can accurately estimate what the scope of work is going to be and how many hours it's going to take?

A. Almost always I know little to nothing about the case, I've never met the defendant, I haven't reviewed discovery. So this is just an opening document that would be filed to get me going, so to speak, on my work.

Q. Okay. And you outlined in this affidavit the general nature of what you do as a mitigation specialist?

A. Yes.

Q. Paragraph 5 of the affidavit, could you take a moment to read that and tell the Court what information is being conveyed to the Court in that particular paragraph.

A. This is my estimate on how long it would take to prepare the case, to do the mitigation investigation. It tells the Court what my fees are plus expenses, and I'm estimating that it would take 500 hours to take this case through a penalty phase; however, I state, you know, that I'm totally unaware of any details of Angela's background in this time and that that 500 hours is only a broad-based estimate.

Q. Based on the 16 capital -- federal capital cases you've worked on, is that number high, low, about average in terms of the out-the-door number of hours that you work on a mitigation investigation for a federal case?

A. It's low.

Q. And give the Court some sense of what the numbers are in terms of your other cases that have proceeded to penalty trial in terms of how many hours you end up from start to finish

putting into these cases. And I realize each case is different but just to give us some general sense.

A. It is true that every case is different and it is as individual as the person's DNA in the sense that we never know how many witnesses we will end up with. We never know how large the family is. We never know who the significant other people are when we're beginning our investigation. We don't know how long any kind of a penalty phase would take or the trial or how much will be required of us by the lawyers that we are assisting on the team. And all of those things are just -- you never know. So I would say that ordinarily a thousand hours, 1,500 hours is a rule of thumb.

Q. Now, are there some cases -- and I want to focus on the federal capital cases -- where your role is broader than others in terms of the kind of assistance you provide to lawyers?

A. Yes.

Q. And explain that in terms of what the typical role is versus the unusual role where you're doing more or less than you normally would do.

A. Well, when -- when asked at times, I need to prepare the lawyers -- particularly if we are in a penalty phase or going into a penalty phase, I am asked or I can anticipate that they're going to need me to prepare the witnesses for them, get the witnesses to them, that I will need to write questions, if you will, to help them do their direct exam of witnesses in

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 10 of 84

order to remind them of all the many little stories and nuances and things that because they're so busy and probably tired they're likely to forget. And so I do assist them in preparing exhibits, in making suggestions about exhibits, and really do a lot of trial preparation work.

Q. Is that expanded role a function of the inexperience or incompetency of the lawyers, or is it a function of time? What determines when you take on a greater role?

A. Well, both of those things are important. If the lawyers are unskilled -- and, you know, many times we work with a lawyer who is working on his first death penalty case or witnesses are assigned to lawyers, again, who have never really gone all the way through a penalty phase of a case. And also time is a huge factor, how busy are we, what other problems have arisen during the course of the preparation of the case for trial that would make it necessary for me to come in and assume a greater role.

Q. And could you speak in this particular case what your overall role was in terms of what you normally do in terms of how many tasks you had to take on.

A. Well, when I became involved in the case again in December of '04 and began to again get together with witnesses and the lawyers and particularly Pat, it was clear to me that during the time of my hiatus in this case which was a little over two years that nothing had been done at all by any members of the team to keep up the mitigation work. None of the experts had been

contacted or recontacted. Some of them had never been provided discovery or any of my materials, any of the background materials we developed on Angela.

And so it became clear that I was going to have to do all that work because there wasn't anyone else available to do it. And I was, in fact, asked to do it.

Q. Okay. Now, this motion was submitted January 23 of '01; correct?

A. Yes, the motion to appoint me.

Q. Motion to appoint you. And then I want to show you another order from the Court's file. And this -- could you identify this order which is -- looks like dated July 23 of '01.

A. This is an order signed by Judge Bennett granting me or appointing me to serve as the mitigation specialist and granting me an award of up to $40,000 to do the mitigation work.

Q. Now, this order was entered about six months after the application had been made; correct?

A. Yes.

Q. And was that fairly unusual in terms of how long it takes from the time an application is made to how long an order is made in the case for your services, or is this fairly typical in the federal system again?

A. Well, generally in the federal system it does take some time, but this was quite a while. This was October -- you know, from the time I was first called in October to the motion in

January to the order in July was a while.

Q. Now, do the ABA guidelines speak to the need to act quickly to do the investigation?

A. Yes.

Q. And what do they say about that?

A. Well, there's an emphasis throughout the guidelines that the investigation should be begun immediately and for many reasons and that it should be thorough from the onset and that the team needs to work together to conduct that immediate investigation, and that would be in order to assess the case, to make judgments about whether or not pleas should be -- early pleas should be entertained, whether or not experts need to be brought on immediately, that sort of thing. Many times the case is tried within two years, so that's not a lot of time to do this vast amount of investigating.

Q. Now, are you referencing page 1,023 of the guidelines which state the mitigation investigation should begin as quickly as possible because it may affect the investigation of first-phase defenses, for example, by suggesting additional areas for questioning police officers or other witnesses; decisions about the need for expert evaluations including competency, mental retardation, or insanity; motion practice; and plea negotiations?

A. Yes, exactly.

Q. And part of that concern is plea negotiations; correct?

A. Yes.

Q. Now, the order by Judge Bennett entered in July, were you working the case in the meantime? In other words, you had been contacted in October of 2000. It's now July of '01 when the first-level funding order is granted, and we're going to talk in a minute about what happens afterwards. But were you taking this case on the fly without any promise of reimbursement from October to July?

A. No.

Q. Were you doing work on the case at all?

A. No.

Q. You wouldn't normally do that; correct?

A. No.

Q. Just as a matter of economic livelihood or for other reasons?

A. Well, as a matter of economic livelihood, as a matter of professionalism. I don't think the Court would appreciate my working on the case without funding. There's an order in which you do things, and I try to follow that.

Q. Okay. And so after that order of Judge Bennett was entered in July, was it your understanding that there had to be further review of that order before it actually got implemented?

A. I believe that the circuit had to sign off on that order and --

Q. Let me show --

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 347 Filed 11/10/11 Page 11 of 84

A. And I'm actually not exactly sure of what the order of things is, but there had to be another level I think of approval.

Q. Now we're into January 30 of '02. This is a memorandum filed in the Court's file in this case to the Eighth Circuit from Judge Bennett requesting approval of the $40,000 initial request that had been made back in January of '01; correct?

A. Yes.

Q. And the second page of that order indicates that -- looks like the circuit signed off on it on January 14, 2002?

A. Yes.

Q. So is that really the date when you were funded in this case?

A. I would -- I would -- I mean, I suppose, yes, but I had never seen this document.

Q. Well, do you recall doing any work from the time that you were contacted in October of 2000 through January -- up to January 14, 2002, when you were approved to do work on the case?

A. Yes, I did. I did. January of 2000 -- yes, I started working on this case in October of '01.

Q. October of '01. Okay.

A. So I was originally contacted in October of 2000, but I didn't start work until October of '01.

Q. And at that point apparently you did not have the funding set up to do the work.

A. Well, I was told that I had funding.

Q. Now, I want to go back to your files again and show you a note which is MG6170 through MG6173. And forgive me, but I hole punched the date, but could you verify that the date of this note is 10-1?

A. I can.

Q. Okay. You have the original of that in front of you?

A. I do.

Q. Good. Now, is this 10-1-01?

A. Yes.

Q. All right. And tell the Court what this -- is this note written by you?

A. It is.

Q. Tell the Court what it says in terms of what you're documenting here.

A. This note is actually a four-page note which comprised two telephone conversations with Pat Berrigan. The second -- the first page is October 1, and the second page is October 3. And in this conversation Patrick is telling me that the $40,000 has been approved, and then he says someone did not sign the authorization to get going and now the judge wants a budget of under 25,000. So Pat says we'll just do it and go.

Q. What does that mean, just do it and go?

A. He says he believes that I can bill against the $40,000 and I should get started, and he's, you know, apprising me of the

fact that I can go to work. And he tells me that we have a 2002 trial date, and then he talks some more about the difficulties. Do you want me to go through this whole note?

Q. Yeah. Well, I'm particularly interested in that highlighted entry there about preliminary plea negotiations and what that means in terms of what he's telling you.

A. Well, he tells me that Dustin Honken is now a codefendant and that they are in preliminary plea negotiations. Dustin --

Q. They being Dustin Honken?

A. Dustin Honken's trial team is in preliminary plea negotiations. He tells me Al Parrish from Des Moines is his attorney and Al's only done one other death case which was a federal case. He gives me just some background information about the local U.S. Attorney's Office. He says we have some discovery in Angela's case, not all of it. The U.S. attorney is unwilling to let us copy the discovery on to disks, and the Court at this time is unwilling to intervene. He says he'll do an order so that I can book my travel through National Travel.

Q. And then let's go on to page 2 which is 6171 starting at the top.

A. He tells me -- we talk about where the family is. I've asked him where are the people located, where am I going to have to go. We're talking about travel. And he tells me that the family is in Texas. There's Wendy, her sister, is in Texas. Her brother Jim is in Chicago. It's just we need to get a car,

drive around, talk to all these people. Holly's in Cedar Rapids. And he wants to go -- wants me to come on the 18th and 19th of October.

Q. Now, do these notes reflect that you had a second conversation with Mr. Berrigan shortly thereafter?

A. Yes. On the 3rd then which was two days later I got a telephone call from him, and we discussed -- he discussed something with the magistrate's administrative assistant. I really don't know what that refers to. She's talking to the chief clerk. And then he tells me that I need to submit my travel expenses as part of my bill and it would all go on a CJA voucher.

Q. Okay. And is that the extent of your discussion with him at that time?

A. Well, he tells me who the judge is, who the magistrate is, and the note goes on to a third page.

Q. This is 6172?

A. Correct.

Q. Okay. Tell us what this indicates.

A. He said Angela's not authorized for death by the Department of Justice, that they're going to make a presentation on November 18 and 19, that they had a conference already and that she's been reindicted because of a 1993 statute. He says she's okay but she's depressed.

Q. Referring to Miss Johnson.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 347 Filed 11/10/11 Page 12 of 84

A. Yes. He tells me about her two daughters, and he says that she's depressed because she cannot have contact visits with her daughters, she's lonely, tired of jail, she has an unrealistic view of what's going on.

Q. Did he elaborate on that unrealistic view of what's going on in relation to the case or something else?

A. She had an unrealistic view of what's going on in relation to the case.

Q. Is that atypical for capital clients?

A. No.

Q. In your experience?

A. No.

Q. And elaborate on that if you would.

A. Well, many times when you first go and meet a client they are often adamant that they don't really want any mitigation to be done, that they're innocent, they -- or they played a really minor role and they minimize their role in the case and they often say they don't want -- they want to die, they want to be sentenced to death and let's just get it -- on with it, I'll plead and get sentenced to death so that --

Q. Is that the norm, or is that the exception?

A. Well, I wouldn't call it either the norm or the exception. I would just say that it happens fairly often. It's not unusual.

Q. Okay. Now, the next comment there, still connected to

Dustin, what did he say about that?

A. Well, I believe he told me that she and Dustin had been exchanging correspondence and that she still had a positive view of her relationship with him.

Q. And what else did he say?

A. He said that Dustin -- Dustin had some power over her and that she keeps in contact with him. And then he told me that, you know, that was ridiculous because he had been plotting to have her killed and that was something that everybody knew.

Q. Did he indicate that Angela Johnson knew that at that point?

A. Yeah, he did.

Q. What else did he tell you as reflected on this page?

A. Well, we had done -- you know, I forgot. We did do another case, Pat and I, together, and it was settled early on. And I can't even remember the defendant's last name, but her first name was Maggie. And this was a case we did in Missouri. And she was a very unstable client psychologically, psychiatrically, and we had a lot of problems dealing with her, and he was explaining to me at this point that Angela was not as unstable as Maggie. And then he tells me that Bill Logan's been seeing her, Angela. Bill Logan also saw Maggie.

Q. Okay.

A. And that she has moments when she's emotional. She's despondent but he --

Q. Excuse me.

A. I'm sorry.

Q. We're now at 6173 which is the last page of your notes here. Go ahead. Continue.

A. Angela has moments when she's emotional. She's despondent but she's improved, so -- and he also says that she has a chance to plead.

Q. And did he elaborate upon her chances to plead at that point?

A. He did. He said that the impediment to the plea was lead counsel, referring to Al Willett, because Al was excited about trying the case.

Q. Did he say anything else about that?

A. Well, he said that Angela was the most valuable asset against him, meaning Al, and that she authorized Patrick and Al to negotiate her case.

Q. So did you sense from that discussion that there was some kind of conflict within the team between Pat and Willett and Miss Johnson?

A. Yes, I was worried about that.

Q. And tell me what you were worried about at that point.

A. Well, I worried about it because it represented a definite chasm, if you will, between the way Patrick and I probably thought about the situation or would have approached the situation because no one wants to try these cases, and most

often they plead. And this case was a case that was a very serious case. And so that was concerning. No one wants to tr -- if you really understand capital case work, you don't want to try your case if you can help it.

Q. I've heard expressions at these seminars if you're trying these cases you're losing them. Have you ever heard that expression?

A. Yes, I -- Millard Farmer who is an old and famous and early litigator from the south often -- and actually that was my introduction to death penalty work is that I had an opportunity to work with Millard Farmer and also to hear him speak.

Q. And what was the basic philosophy that he instilled in capital defense lawyers going way back to the '70s?

A. Well, he would rail at them and say if you -- if you go to trial you have failed.

Q. Now, did Mr. Berrigan indicate what Mr. Willett's experience level was in capital cases, or did you have some understanding of what his experience was?

A. I had never met Al Willett. I didn't know anything about him. The only thing that Patrick told me at the time was that Al Willett was a CJA panel attorney and that he had, quote, unquote, picked up the case which to me meant that he was probably next in line on a list to get a felony case with this court and he picked it up.

Q. Was it your understanding he had any capital case prior

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 13 of 84

experience?

A. I don't remember that.

Q. In your experience in these capital cases, is it often the case that a lawyer with death penalty experience gets paired with a lawyer from the local jurisdiction without death penalty experience?

A. Yes.

Q. And is that particularly common in jurisdictions like Iowa that does not have a death penalty and, therefore, does not have a local qualified death penalty bar?

A. Well, I can't speak to Iowa specifically, but I can say that I've worked in other states, particularly one I also didn't mention earlier which was South Dakota, where an experienced lawyer is paired with a lawyer who has never done a capital case, and it is thought of often as an opportunity for a young lawyer or an inexperienced capital case counsel to become death qualified.

Q. Now, Mr. Berrigan's telling you that Mr. Willett is excited about trying the case. In your experience had you run into this situation before where one lawyer is focused on the plea and the other wants to go to trial, is excited about going to trial? Is that an unusual situation?

A. It's not unusual. It happens, hopefully not often.

Q. And what are the motivations generally in that kind of situation? Why is someone excited to go to trial and the other

lawyer is not excited to go to trial?

MR. WILLIAMS: Objection. Calls for speculation.

THE COURT: Sustained.

BY MR. BURT:

Q. Now, what else were you told as reflected in your notes here?

A. Patrick told me that Dr. Logan was going to draft up and send a preliminary report. According to Patrick there's no overt mental illness; she's kind of narcissistic; she's had a tough life; her mother's crazy. There was a great influence about God in her family and that they would do all kinds of weird things with the kids meaning her mother did all kinds of weird things with Angela and her siblings concerning God.

THE COURT: Mr. Burt, normally I save any questions I have till the end, but could I ask a question? Do you have any objection?

MR. BURT: Your Honor can at any point ask questions.

THE COURT: Okay.

MR. BURT: We encourage you to do so.

THE COURT: Okay. Thank you.

Miss Goody, I'm just curious. It seems like odd phraseology, she is most valuable asset against him. And I'm just wondering if the him could refer to Dustin Honken rather than Al Willett. That would actually make a little bit more sense to me, that she would be a valuable asset against Dustin

and they wanted to use that as a bargaining chip in negotiating. But, you know, you're the one that took the notes, so you're going to know. It's just -- I don't understand what that means if it's in reference to Mr. Willett, she is most valuable asset against him.

THE WITNESS: Well --

THE COURT: How did you take that?

THE WITNESS: Well, Your Honor, after -- it's been a long time.

THE COURT: Of course.

THE WITNESS: Been a lot of cases since then. As I'm going back and looking at this, my impression was that he was talking about Al, but even if he was talking about Dustin, it would make sense and would also be a valuable statement. So I can't -- I cannot say other than that was my impression when I went back and reread those.

THE COURT: Doesn't it seem kind of odd to say a valuable asset against her own lawyer? It just seems like odd phraseology to me, and that's why I picked up on it where I could see where she would be a valuable asset --

THE WITNESS: Against Honken.

THE COURT: -- against Honken in plea negotiations but . . .

THE WITNESS: She would be. She would be, yes.

THE COURT: But the point is --

THE WITNESS: I wished I had not said him and said the name of the . . .

THE COURT: Well, you're taking notes during a conversation, so it's hard to -- but anyway, the clear import is that . . .

THE WITNESS: She authorized them to negotiate the case.

THE COURT: And there was one other thing I wanted to ask you about. I always assumed that Mr. Berrigan was lead counsel because when I did the appointment, you know, the statute requires that I appoint learned counsel.

THE WITNESS: Yes.

THE COURT: And that I appoint at least one other lawyer, and I made a decision early on that I didn't think two lawyers were sufficient, so I appointed three lawyers.

THE WITNESS: Yes.

THE COURT: But -- so this is the first time I've heard that Mr. Willett was lead counsel. Can you shed any light on that?

THE WITNESS: Yes, actually I can. And this is a problem that has arisen in the past in another case that I worked on where the local counsel picks up the case and he considers himself to be the lead counsel, and then learned counsel is appointed at a later date and lead -- the initial lawyer continues to assert himself as the lead counsel. And

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

indeed there are probably -- I don't know how many references but many, 25, 30, 50 references, throughout the files in this case where Al Willett has written letters, particularly to Angela, indicating that he is the lead counsel in the case and that he's going to stay the lead counsel in the case so . . .

THE COURT: And is that not uncommon, or how frequent is that where the local lawyer with little or no death penalty experience, in this case no death penalty experience, views himself or herself as lead counsel?

THE WITNESS: That has happened to me once before, and I believe -- you know, I mean, I've had this discussion with other lawyers who are learned counsel that it's a shame that sometimes learned counsel cannot assert lead counsel-type status over the team to organize them and bring them together and make sure that everybody's on the same page all the time. It's really important.

THE COURT: So you may not know the answer to this, but I want to ask. Did you get an impression when you worked on this case that Mr. Willett viewed himself as lead counsel and that Mr. Berrigan was there to consult on kind of technical death penalty legal issues?

THE WITNESS: My impression was that Mr. Willett viewed himself as lead counsel and that Patrick Berrigan was there to assist him in whatever way they decided.

THE COURT: Did you ever get any impression that

Mr. Berrigan viewed himself as lead counsel and that there were two co-lead counsels, or that wasn't the impression you got?

THE WITNESS: No. Mr. Berrigan is a person who is a very involved, hands-on, engaged lawyer so -- and he behaved that way in this case. And so I didn't really think about who -- it's just that Mr. Willett continually said he was the lead counsel.

THE COURT: Okay. Thank you.

Thank you, Mr. Burt.

MR. BURT: Thank you, Your Honor.

BY MR. BURT:

Q. The Court has brought up an important question here that I want to follow up on if I could, and that is a difference in terminology in federal practice and these ABA guidelines. And I put up on the screen here guideline 10.4, and it says when it is responsible for designating counsel to defend a capital case, the responsible agency should designate a lead counsel and one or more associate counsel. The responsible agency should ordinarily solicit the views of lead counsel before designating associate counsel.

Now -- and then the guidelines go on to talk about the qualifications of lead counsel, and the qualification standards for lead counsel in the guidelines mirror the qualifications for learned counsel in federal practice. So in the guidelines the lead counsel -- and correct me if I'm wrong. Isn't the lead

counsel synonymous with learned counsel in federal practice?

A. It's supposed to be, I believe. That's the intention of it.

Q. Because the guidelines speak, do they not, about lead counsel's role as being the manager of the team?

A. Yes.

Q. The person with the experience in death penalty litigation who is going to direct traffic of the subordinate players on the team. And I don't mean a power subordination, but there's -- the idea is there's supposed to be a manager of the team. That manager is supposed to be the lead counsel directing the show basically; right?

A. Yeah.

MR. WILLIAMS: Objection. Leading, Your Honor.

THE COURT: Overruled.

A. Yes, that's right.

Q. Whereas in federal practice doesn't the statute talk in terms of learned counsel which is not -- in some lawyers' minds is not necessarily the same thing as lead counsel?

A. I'm not familiar with the statute. I am familiar with the practice that learned counsel is not the same as lead counsel necessarily. Learned counsel can be the lead counsel, but that is a designation that is made, and the mitigation specialist doesn't really have anything to do with those designations being made. I'm not the responsible agency.

Q. Okay. In federal practice I think the responsible agency would be the Court; right?

A. Yes.

Q. And according to the guidelines, the responsible agency should ordinarily solicit the views of lead counsel before designating associate counsel. In federal language does that mean the responsible agency is supposed to be soliciting the views of the learned counsel?

MR. WILLIAMS: Objection, Your Honor. Asking for speculation. This witness has indicated she doesn't know.

THE COURT: Sustained.

BY MR. BURT:

Q. Okay. Within your understanding of the guidelines, who is -- when the guidelines speak of lead counsel, who are they speaking of? The learned counsel or the other counsel?

A. They're speaking of lead counsel and not necessarily learned counsel.

Q. And in this case Mr. Willett is designating himself as lead counsel.

A. Yes, he does that throughout correspondence and e-mails in the case.

Q. And the guidelines set forth qualifications for lead counsel; correct?

A. Yes.

Q. And do those guidelines provide that you have to -- you

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 15 of 84

have to have experience in capital cases to be lead counsel?

A. Yes.

Q. Mr. Berrigan had that experience. Mr. Willett did not with -- is that your understanding?

A. Yes.

Q. Now -- and just to finish up on this note, explain for us the information down at the bottom if you would.

A. He -- Patrick Berrigan is telling me that he'll get me the phone number of Angela's sister Holly, that her brother Jim is supportive, that we have federal resource counsel assigned to this particular case which was Kevin McNally, and he gives me his e-mail.

Q. Okay. And what was your understanding of the role that federal resource counsel was playing in this case at this particular time in the case?

A. Federal resource counsel is there to follow the process of the -- progress of the case and to assist us whenever we have matters that we wish to discuss, get another bit of input on, and help us with experts and consult with us throughout the case.

Q. And in this particular case Kevin McNally was the resource counsel at least initially assigned to the case?

A. Yes.

Q. Let me show you our next document which is MCN001204. And could you identify for the Court what this document is.

A. This is a letter written to me on October 9 -- or no, to Angela, I'm sorry, on October 9 telling her that I'll be coming to visit her on October 18 and 19 and that Pat is preparing for trial in another federal death penalty case and that starts 20 days from the date of this letter.

And then he mentions that -- in a letter that they -- we, assuming that would be he and Al Willett, told the government that they might be interested in a deal for 20 years. And he says they did not -- he was surprised that they didn't reject the number as being completely out of the question and that there will be future discussions. A plea package is going to be put together for her consideration. And if she finds it suitable, they'll present that proposal to the government.

Q. Now, a couple of things about this letter. First of all, do you know what Mr. Berrigan is referencing here in terms of another federal death penalty case in Kansas City starting October 29?

A. Well, I know that he had two federal death penalty cases that he tried I believe within '01 and '02. One was the Robinson case, and one was the Nelson case.

Q. And those were going on at the same time as the Angela Johnson case was going on?

A. Yes.

Q. And was it your understanding that he was -- what was your understanding about how much time he was devoting to these other

cases versus Angela Johnson's case in this time period around 2001?

A. Well, I don't -- I don't really have any idea how much time he was devoting to those cases, but I'm sure he was quite busy.

Q. Okay. Now, it also in the second paragraph in this letter -- and this letter, by the way, is cc'd to you on the bottom here; correct?

A. Yes.

Q. And he's talking to the client in a letter about plea bargaining. Is that atypical in terms of communicating with a client in a capital case about something like plea negotiations?

A. Plea negotiations are very sensitive types of conversations, and information about them is best conveyed in person.

Q. Now, was part of your role kind of to monitor the interaction between the lawyer and the client? Is that something that you do?

A. Ordinarily, yes. We exchange information about client visits. Either I'm going along, or we talk about it afterwards.

Q. And when you, as a mitigation specialist, see a lawyer conveying information to a client in jail about a plea offer in a federal capital case, is that a red flag to you that there may be an issue that needs to get discussed with the lawyer in terms of how he's interacting with a client?

A. Yes, and I -- at this time I assumed that he had gone to

talk to her about it before he wrote the letter.

Q. That she already knew about it.

A. That this was like a follow-up piece of correspondence.

Q. And what made you think that given the content of that second paragraph?

A. Well, because I thought it was rather unusual to put that kind of information in a letter that he was sending to her at the jail.

Q. Would the normal practice under the guidelines be to discuss issues like that with the client personally?

A. Yes, and in depth.

Q. The guidelines I have in front of you, guideline 10.5, talks counsel at all stages of the case should make every appropriate effort to establish a relationship of trust with the client and should maintain close contact with the client. Are you familiar with that guideline?

A. Yes.

Q. And why in a capital case is it important to establish a relationship of trust with a client and to maintain close contact with the client?

A. Well, this is a very intimate affair, working on a capital case. And the person -- the defendant is someone that we will have to spend huge amounts of time with in order to gain a sense of trust with them so that we can discuss these intimate, difficult kinds of experiences such that Angela Johnson in

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS Document 347 Filed 11/10/11 Page 16 of 84

particular had in her life and also because, as we discussed earlier, clients often don't understand the process. They often don't want to be cooperative in the very beginning. And in order to bring them along and get them to really be an asset to you in the case, you must have a relationship with them, obviously a professional relationship but one where you come to trust them and they come to trust you.

Q. And typically when a client is arrested in a capital case, in your role as a mitigation specialist, is it important for you to get in and see the client and start to build a relationship early on?

A. Yes.

Q. And did that take place in this case?

A. No, it did not.

Q. You're first contacted a year ago. This letter that Mr. Berrigan is writing to you is indicating that -- it's a letter of introduction basically, is it not --

A. Yes.

Q. -- in the first paragraph saying that you're going to make your first visit October 18, 2001?

A. Right. And that was just shy of a year since he had first contacted me.

Q. The commentary to that guideline I just read to you says maintaining an ongoing relationship with a client minimizes the possibility that he will engage in counterproductive behavior,

for example, attempt to drop appeals, act out before a judge, confess to the media. Thus, a failure to maintain such a relationship is professionally irresponsible. Do you agree with that guideline --

A. I do.

Q. -- and do you follow it?

A. Wholeheartedly.

Q. And what was your understanding of when Angela Johnson was arrested in this case?

A. I -- my understanding is that she was arrested in July of 2000.

Q. And obviously since this letter is written in October of 2001, she did not have the services of a mitigation specialist on her team to advise her in that critical early stage following her arrest; correct?

A. Correct.

Q. And do you know what happened to her in terms of who she did turn to in that early period when she didn't have contact with a mitigation specialist, what happened?

A. Well, I believe that Al Willett engaged his legal assistant or secretary, Nancy Lanoue, to see Angela often and have discussions with her about the case and about the information they were getting in the case.

Q. And was there other people that Miss Johnson was turning to in that time period? And I don't mean legal staff.

A. Well, she was communicating with Dustin Honken, her codefendant, and she saw briefly Rose and the investigator.

Q. And how about Mr. McNeese?

A. And -- well, then yes, most assuredly in the jail she was talking to Mr. McNeese. She was hungry to talk to someone.

Q. And wasn't she also talking to other people in the jail? Didn't a number of jailhouse informants surface at trial that all stemmed from her early period of incarceration where she's speaking to people about her case?

A. Yes. I'm really -- I'm familiar that there were a lot of snitch-type people, but I did not attend the trial, and so I did not personally hear their testimony.

Q. Okay. Now, up to this point you're planning a trip to see her on the 18th and 19th; correct?

A. Yes.

Q. And in preparation for that trip, let me show you a letter which is marked MCN01-001208 dated October 11, 2001. Could you describe this letter for the Court?

A. This is a letter written to me by Patrick Berrigan in which he's providing me with Ray Cornell's memos. I think there were maybe five of those memos. I'm not sure how many.

Q. Well, actually doesn't the letter say not included are a series of memos from our investigator which I have somehow misplaced?

A. Oh. Yes. I'm sorry.

Q. So he's actually not providing you with the memos. And is that the same memos he had provided you earlier?

A. He did. And, in fact, there's a series of letters that come kind of one after the other, and they kind of say some of the same things. So he's telling me he can't find the memos so he's going to give me his own little update on Angela's background. He tells me that Dustin is now serving a 27-year sentence in Florence. Alyssa is on her own now, her oldest daughter, and he will get her exact address. There's been little or no personal physical contact between Angela and her daughters. They are her reason for living and the biggest issues in her life. She misses contact with them very much, see letter to Al Willett dated 7-10-01.

And then he tells me about her sisters Holly and Wendy and Angela and Wendy are presently estranged because of Wendy's testimony before the grand jury. He gives me her contact information, tells me about the sister Jamie who lives in Minnesota, the brother in Chicago. And he has enclosed a very short memo concerning Jim from Ray Cornell a year ago.

Q. Okay. And then the second page?

A. He says he can't come along -- woops.

Q. Sorry about that.

A. He encloses his notes regarding Angie's history with Terry DeGeus and Dustin Honken, and he says he can't come to meet with me at this visit because too much is going on in his federal

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 17 of 84

**69**

Q. capital case, and Al will be my host and Al has a closer relationship with Angie than either Dean or Pat.

Q. Okay. Now, he had told you previously that a plea might be possible and that the client was an ally, that Mr. Willett was somewhat of an impediment because he wanted to try the case. And I notice there's no discussion in this letter directing you to have any discussion with Miss Johnson about the plea process. Was there a plan not to discuss it? Was there some communication where you discussed what your role was going to be in that first interview with Miss Johnson?

A. We didn't have a discussion about what my role would be. I was not asked to discuss with her anything about the plea, and I was told not to talk with her about the crime itself.

Q. And why was that? Why would -- if there's plea negotiations in process and, as you said earlier, in capital cases your focus is on trying to get a plea, why wasn't there some discussion by you or by him about, hey, we've got a client who's willing, let's come up with a strategy at this point on how we can make this happen?

A. Well, they -- Pat gave me the impression that they had it under control and that they were doing what they needed to do to be able to get this plea put together and that I just really needed to get going on the mitigation.

Q. Now, that did not conform to the guidelines we read earlier about the team acting together to make the plea happen; correct?

**70**

MR. WILLIAMS: Argumentative, Your Honor, leading.

THE COURT: Overruled.

A. That's correct.

Q. Did not. So is there some reason why you didn't step forward and have the discussion with Pat about we've got an opportunity, a window of opportunity, here, why don't we take advantage of it, and why don't I go in and talk to her about the plea?

A. I did not do that. And there was no discussion about it other than that he was working on it himself.

Q. Okay. And was that in conformance with the guidelines in your looking at it --

A. No.

Q. -- objectively?

A. No.

Q. Was not.

A. No.

Q. Now, the discovery that he referenced, what discovery did you get?

A. I got a one-and-a-half to two-inch packet of discovery which was -- I haven't -- I did not review that, but it's in my files, you know, probably two inches thick, various reports.

Q. What was your understanding of the scope of this case in terms of discovery by the government in terms of the entire constellation of what the government was giving access to the

**71**

Q. defense on?

A. Well, I was told that there was a problem with getting the discovery from the government, that we would not be able to take the discovery out of the building, the U.S. attorney building or the federal building, whatever that was called, and that, in fact, we would only be allowed to review it on site and make our own notes.

Q. Now, in this letter Mr. -- well, strike that.

Did you feel that you had enough of the discovery at this point to really understand the case and to be able to talk to Miss Johnson about the factual circumstances of the case?

A. No. And, in fact, I was told not to talk to her about the case. So I did see the McNeese letters. I did see the reports from the jail concerning her contact with McNeese. And that was primarily what was contained in that early discovery.

Q. Okay. Now, he references in this letter these two girls, meaning Angela's daughters, are her reason for living and the biggest issue in her life. Did that have some implication for the plea process?

A. Absolutely.

Q. And explain that.

A. Well, Angela wrote a number of letters to Al Willett before -- earlier in '01, and Al Willett had sent me copies of those letters. And in the letters is just an incredibly heartfelt anguished sort of plea from Angela for him to be able

**72**

to do something, do something for her in order that she could be transferred into some sort of setting where she could have contact visits with her daughters, get her out. I mean, she was pretty desperate about the lack of contact with those daughters. And obviously for her daughters and herself this was really the reason for living, and they were very important people to consider in terms of a reason why she would plead.

Q. Now, you said you were provided with the McNeese letters as part of this package of discovery.

A. Yes.

Q. Did you review them?

A. I did.

Q. What was your assessment reading those letters on what kind of jeopardy she was in of being convicted of a capital offense at that point just based on those letters and without knowing what other discovery was out there?

A. Well, I was deeply concerned. I felt that this was a very serious case. I thought that the end result of the letters and contact that she had had with Mr. McNeese was unbelievably damaging and -- to her and that this was a case that should plead and needed to plead and that, you know, it was an LWOP case.

Q. Now, the cases, federal capital cases, you've worked on, all potential federal capital cases are serious cases; correct?

A. Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

**73**

Q. In terms of the prospect or the potential of a death penalty, are some cases more serious than others within that pool of cases that you work on?

A. Well, in particular this case involved what appeared to be substantial planning without really commenting on the discovery. There appeared to be substantial planning. There appeared to be an ongoing methamphetamine operation. There appeared to be a great deal of description about things that only she could have known about in the McNeese materials. And even as a snitch taking into account the fact that he may have embellished certain things and he had something to gain by bringing this information to the authorities, the existence of the map was, you know, something that was very damaging.

And as far as Terry DeGeus went, you know, both Dustin and Angela had at first blush a motive, if you will, for his death, and for Dustin it was the drugs and the implication of him testifying against Dustin, and for Angela it was the very severe abuse she had been dealt at his hands and, you know, what -- her feelings that had come from that.

In addition, you know, the number of victims was really disturbing. The length of time between the deaths of Nicholson and Duncan and the children and the death of DeGeus, all of those things were really troubling to me.

Q. Troubling from the standpoint of is this a case that needs to be settled or troubling in some other sense?

**74**

A. Troubling in the sense that this is not a case that needs to be tried.

Q. Okay.

THE COURT: Mr. Burt, would now be a good time to --

MR. BURT: It would, Your Honor.

THE COURT: -- take a break?

MR. BURT: Yes.

THE COURT: But I have one question I'd like to ask while it's still on my mind.

I understand your testimony is that you were told by Mr. Berrigan not to discuss the facts of the crimes that Angela Johnson was charged with with Angela Johnson; is that accurate?

THE WITNESS: Yes.

THE COURT: How unusual is that in your experience?

THE WITNESS: That's unusual. That's a problem because the facts of the crime and the mitigation exist in a continuum, if you will. And, therefore, to separate them out or to not address one or the other is not -- means that the mitigation investigation will be substandard.

THE COURT: Did you ever come to an understanding of why you were told that?

THE WITNESS: I don't recall, Your Honor.

THE COURT: Okay. We'll take a recess until 10:15.

MR. BURT: Thank you.

THE COURT: Okay? Chad, is that going to be enough

**75**

time for the marshals with Angela Johnson, get her to the restroom and everything, or do you need more time?

DEPUTY MCCORMICK: No, that's fine, Your Honor.

THE COURT: Okay. Thank you.

(Recess at 9:56 a.m.)

THE COURT: Thank you. Please be seated.

Mr. Burt, you may continue your direct.

MR. BURT: Thank you, Your Honor.

THE COURT: Oh, before you get going, I just wanted to let you know, speaking of Al Willett which we were just speaking of, he called chambers and says that he's encountered some bad, bad weather but he's on his way.

MR. BURT: Okay.

THE COURT: So I'm sure we have other witnesses we can get to.

MR. BURT: We do. We do.

THE COURT: Thank you.

MR. BURT: Thank you for that.

BY MR. BURT:

Q. Miss Goody, I want to finish up with this one letter we're on which is MCN01-001209 and two aspects of this second page of this letter I want to ask you about. The first is Mr. Berrigan is again indicating to you he's going to be unable to join you during this visit; correct?

A. Yes.

**76**

Q. And do the guidelines speak to workload issues in terms of how many cases you're supposed to be doing at once? Do you recall?

A. Yes. I mean, there -- and there's just kind of a general rule of thumb that I think is incorporated into the guidelines that you shouldn't be doing more than one capital case certainly per year.

Q. Well, the language that I'm referencing is guideline 10.3, counsel representing clients in death penalty cases should limit their caseloads to the level needed to provide each client with high-quality legal representation in accordance with these guidelines. Are you familiar with that guideline?

A. Yes.

Q. Does that also apply to mitigation specialists?

A. It does.

Q. Was that -- complying with that guideline a problem in this case?

A. It was.

Q. For both you and the lawyers?

A. Yes.

Q. Could you explain that to the Court?

A. Well, I think at least certainly in the beginning of the case there were substantial delays between the times I was contacted and asked to work, and during these delays I wouldn't hear from counsel and I would, you know, assume that -- and it

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 19 of 84

happens. People call, and they want you to come and work on a case, and then you don't hear from them ever again. And sometimes you call and say, hey, what happened to this? Is this still something that I need to be thinking about as a live case?

And in this particular case we just didn't have -- we had little or no contact, and I really didn't know that I should be working on the case. And so in addition to that, I had taken other cases, and I had other cases going on when he first called me.

Q. And it sounds like Mr. Berrigan had some other things on his plate.

A. And Patrick had at least two other cases that he was trying during the first two years that we were involved with this case.

Q. And is that a crucial time period, I mean, to go two years without building a relationship with a client? Is that a problem?

A. It's a big problem.

MR. WILLIAMS: Objection, Your Honor, to leading and misstates the lack of contact, doesn't lead to --

MR. BURT: Let me withdraw and rephrase it.

THE COURT: Okay. Thank you.

BY MR. BURT:

Q. In general in a capital case, is there a reason why you want to make sure that you're focused on building a relationship?

A. Yes.

Q. And not waiting for long periods of time to do that?

A. Yes. Long periods of time mean you have to essentially go back and reconstruct what you did initially to be able to progress in your relationship with the client.

Q. Now, the letter also indicates as highlighted there that Al, referring to Mr. Willett, has a closer relationship with Angie than either Dean Stowers, our co-counsel, or myself. Did you have a chance through reviewing correspondence from Mr. Willett to Angela Johnson that was sent to you to see the nature of that relationship?

A. Yes.

Q. And was there anything unusual or striking about that?

A. Well, I believe Mr. Willett's office was just several blocks from where Angela was being held in the jail, and yet he wrote her a great deal of letters. And one of the first things that happened and happened continuously throughout the first part of my working on this case was that I would get large packages with all of his correspondence both to her and to the other attorneys and dealing with matters concerning the case. So yes, I reviewed that.

Q. And did you review one particular letter? This is MCN01-000569, a letter dated February 12, 2001, that you got sent to you?

A. Yes.

Q. Could you read that for us and tell us what, if any, concerns you had about it?

A. It says, "Dear Angela, congratulations. Your door prize for winning the hearing on the joint motion on issues of attorney representation is that you get me as your lead attorney through the conclusion of your case. If you do not wish to accept this door prize, speak now or forever hold your peace. I will be meeting with Pat Berrigan and Bob Rigg in Des Moines on Tuesday to prepare for the Massiah hearing. Respectfully, Al Willett."

I found that very concerning. I thought it was an incredibly flip way to be talking about very serious issues to a client who is facing an incredibly serious road ahead of her with regard to her representation and possibly the loss of her life.

Q. Now, did you after that letter, the earlier one that we talked about before the break, did you, in fact, go see Angela Johnson for the first time on October 18 and 19, 2001?

A. I did.

Q. Now, have you searched your files to see if you have any notes about that?

A. I have, and I do not find those notes in my file.

Q. Can you -- do you have a memory of just the general nature of what you discussed and in particular whether it included any discussion of the crime or any discussion of plea negotiations?

A. I remember going to see Angela. I do. And we did not discuss the crime, and we did not discuss the plea negotiations. I wanted to use that meeting as an opportunity to introduce myself to her and to get to know her and to conduct as much of a mitigation interview as was comfortably possible at that time, and that's what we did.

Q. Now, did you continue after that meeting to get -- strike that.

Did you have any impressions about her general well being state of anxiety or lack thereof at that -- as a result of that first meeting?

A. Yes, I did.

Q. And what was your general impression of her as a client and whether she was somebody you could work with and what concerns, if any, you had?

A. Well, first of all, she was very cooperative. She was very willing to talk with me about whatever I asked her, and she was jovial, and she was a little nervous, and I think she had a tendency to make jokes about things that made her feel nervous. And, you know, she -- she found the mitigation questions very difficult to answer, and at some point during the course of that discussion she just be -- shut down and became incredibly upset and couldn't go on talking about things that were very painful for her.

Q. And what did you -- what tentative conclusions, if any, did

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 347 Filed 11/10/11 Page 20 of 84

you come to about her mental state as a result of that first meeting?

A. Well, as a result of that first meeting, I felt that she very likely had some posttraumatic stress issues from some of the trauma that she had experienced even though I didn't really know exactly what it was.

I also, in the course of talking with her, learned that she had had several head injuries, that she had had very difficult time with her education and, in fact, left school at a very early age, and that she had had a serious drug and alcohol problem that had been fairly longstanding and that the abuse that she had suffered at the hands of Terry DeGeus was abuse that involved head injuries, physical injuries, and that sort of thing.

Q. As a result of that first interview, did you come away with some thought as to what problems, if any, there would be in trying to communicate with Miss Johnson about things like plea negotiations and the facts? Did you think there were some issues that needed to get addressed?

A. Yes, I did.

Q. And in particular what did you think the issues were?

A. Well, I felt the issues were that, you know, she needed to have -- that we needed to hurry and get her -- as many of her background records as we possibly could. I felt that we needed to have neuropsych testing done of her so I could get a sense

and the team could get a sense of whether or not her inability to go forward on these trauma issues was related to her cognitive functioning or whether or not she had any kind of organic deficits or whether it was a psychiatric problem that, you know, would have its basis in things in which I wasn't skilled to diagnose.

Q. Okay. Now, you said you didn't take any notes yourself, but did you review as part of your preparation in this case another document which is MCN01-001246?

A. Yes.

Q. And is this a note that Pat Berrigan wrote on 10-22-01?

A. Yes, it is.

Q. Does it document a telephone conversation he had with you?

A. Yes.

Q. And did that allow you to refresh your memory as to what, if anything, you told Pat Berrigan during that telephone conversation?

A. Yes. I -- did you want me to --

Q. Yeah, if you could tell me based on the note what it is you told him.

A. Okay. So I'm calling him on October 22 which is three days after I last was in Iowa, and I wanted to brief him about what had happened there during my visit, that I'd met with Al and Nancy, that I had two meetings with Angela and it went well, probably talked to her for about five hours, that I went and saw

her mother. I saw her sister Holly, and I met her daughter Marvea and that everyone was great to me and they were very helpful.

Q. Okay. Now, after that conference with Miss Johnson, what did you do in the way of following up on what needed to get done on the mitigation investigation and the next time -- say the next couple of months following that interview?

A. Well, when I first -- when I interviewed her, I tried to get as much information from her as I possibly could about where she'd gone to school, where she'd had medical treatment, whether or not she'd ever been in counselling, just her jail experiences, her drug use, where -- all the places that she had lived and gone to school. And then we attempted to really get to work and get those records gathered up because I anticipated that we would be doing a neuropsych evaluation and that that expert would need those records to inform him about her background and her functioning in her school work up until that time.

Q. And did you, in fact, go about record gathering --

A. Yes, we did.

Q. -- at this point? And just generally tell me the kinds of records you gathered up as part of your investigation.

A. Well, I gathered up school records. I gathered -- I attempted to gather birth records for her. There are a lot of records I attempted to gather that I was not able to gather, but

I got medical records for her, school records for her, counselling records for her, and I -- those are kind of the general categories.

Q. Do you remember getting some records from the Northern Iowa Mental Health Center?

A. Yes.

Q. Concerning some mental health treatment that Miss Johnson got in I believe 1996?

A. Yes.

Q. And do you recall in those records there was some clinical notes indicating that Miss Johnson had what was called dependent personality features?

A. Yes.

Q. Did you do any follow-up on those records to interview the people who were making that diagnosis?

A. Yes, I didn't.

Q. And why was that?

A. Well, at the time I was engaged in doing a lot of record gathering in her case, and I made several trips to Iowa to interview as many people in her family as I possibly could. At the time I was thinking that we would be going in front of the Department of Justice and that we would be making a presentation, and I wanted to get as much gathered as I could for the neuropsychologist. And shortly thereafter -- and I did not interview any witnesses from any of the medical records that

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 21 of 84

Q. I gathered.

Q. At any point in time.

A. At any point in time.

Q. And could you explain to the Court why not?

A. Because I didn't have time to do it.

Q. Would it normally be part of the standard of pra -- minimum standard of practice to not only obtain these records but to follow up and interview the people who are named in the records who might have relevant information about family background and history, mental and physical health, et cetera?

A. Yes, it would be.

Q. And the reason that did not get done by you in this case was simply time pressures?

A. I ran out of time. I did not work on the case from approximately May of '02 until late November of '04. And when I jumped back into the case, I had another penalty-phase hearing that was scheduled in between December 1 of '04 and the end of March of '05. And I did not do this work.

Q. The records that I'm referencing -- I want to show you those now -- it's MG001490 through 1495, and it looks like a fax cover page. Maybe you could explain to the Court what this is.

A. Yeah. My secretaries sent this fax to request the records. Yes. We had gotten parts of the records, but we had not gotten the whole file, so I wanted to see if they had additional records.

Q. But in any event you came into possession of what they sent you in January of 2002; correct?

A. Yes.

Q. Okay. And the last page of these notes -- excuse me, page MG001494 lists a axis II diagnosis of dependent personality features; correct?

A. Yes.

Q. Now, did that partic -- and an axis I diagnosis of major depression.

A. Yes.

Q. Did the axis II diagnosis have particular relevance to this case where Miss Johnson was charged with Mr. Honken?

A. Yes, it did.

Q. And explain to the Court why that had particular significance.

A. Well, Angela Johnson became involved with several men at least in her life that I had inter -- or I had known of who -- who were people that were sort of strong willed and she just very gladly got involved in what they were doing and embraced it and participated in it and was happy to please those individuals. And this dependent personality features refers to that need to be dependent on a stronger person sort of generally.

Q. And this is a diagnosis made back March 25, 1996; correct?

A. Yes.

Q. You actually sat in on the penalty phase of this case; correct?

A. I did.

Q. And were you present to hear how the government characterized the relationship between Angela Johnson and Mr. Honken at Miss Johnson's trial in terms of who was the dominant person and who was in control of who?

A. Yes.

Q. How did you -- as the testimony came out, what were you hearing in terms of how that theme was being presented by the government?

A. I was hearing that Angela Johnson was, in fact, the person who was pushing Dustin Honken to get going to eliminate the Nicholson -- Greg Nicholson and Lori Dunc -- Greg Nicholson and that she also had almost some sort of power over Mr. Honken in the sense that her getting into the car at the time that he had Terry DeGeus out in the field was sort of some kind of signal to him that he needed to finish him off, so to speak.

Q. And would this particular diagnosis have some significance to you as a mitigation specialist in rebutting the themes that you were hearing during the Johnson penalty trial?

A. Yes.

Q. And explain to us how that could have been used in the penalty trial in Miss Johnson's case to rebut that theory.

A. Well, the experts could have utilized this information, and

also the physician who saw her and diagnosed her with this diagnosis could have come in and testified about this very early time when she was seeking counselling and what -- you know, expanded upon what the diagnosis was and how it applied to her specifically.

Q. This clinician was named in the records, was he not? I believe it was Steven Gordon?

A. Yes.

Q. And he's not someone you interviewed.

A. No.

Q. Now, you were also present when Dr. Logan testified in the penalty phase.

A. I was.

Q. Did he make reference to dependent personality features as indicated in those records, do you recall?

A. No, I don't -- I recall that Dr. Logan did not discuss that and that Dr. Logan, in fact, talked about Angela Johnson only as a person who suffered from depression.

Q. And depression in the lay sense of having a bad day or clinical depression? How did it come acr -- how was it presented as you heard it?

A. Well, as I heard it, it was someone who suffered from depression that was caused by events in her childhood that were traumatic; and, therefore, someone who goes through that sort of an abusive kind of traumatic background is going to be subject

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 347 Filed 11/10/11 Page 22 of 84

to depression in adulthood, and that's how it was characterized. And it was tied to -- the way I heard it, it was tied pretty much to those specific events that were told over and over again by all the family and the experts, and he focused mostly on those.

Q. Was there in your opinion a defect in the way that was presented in terms of mental health mitigation?

A. Yes, there was.

Q. And explain why you think so and what it was.

A. Well, the defect was that -- the defect was that Dr. Logan didn't testify about major depression and Dr. Logan didn't testify about PTSD. Now, Dr. Logan's presentation was something that was hastily put together towards the very end of the trial time preparation, and he, I don't think, had an opportunity to review the records and have an opportunity to talk with this particular Dr. Gordon. And, you know, among other things, I think that his presentation came off as being rather as though the depression were kind of something that a lot of people experience.

Q. In this particular case should dependent personality features have been a prominent part of your case in mitigation in your opinion?

A. Yes, uh-huh.

Q. Now, you had some contact with the experts back in this time period 2001, 2002; correct? Let me be more specific. I

want to show you an e-mail which is in your file. It's not Bates stamped, but it is 11-30, 2001, Mary Goody to Pat Berrigan. Do you recall sending this e-mail?

A. Yes.

Q. And indicate to us what you communicated to Mr. Berrigan on that date.

A. Well, I tell him that I've talked to Dr. Logan. We discuss billing issues and that I have a tentative appointment to meet with Dr. Logan in Kansas City in December. I have to go to New York, be there next week. This is just after 9-11.

Q. Okay. And did you -- you indicate you got some medical records on Angie being admitted to the ER for depression, suicide attempt in the 1996 era; correct?

A. Right.

Q. Did you meet with Dr. Logan in December of 2001 and provide him with some records?

A. I do not recall that I saw him in December. I may have. I don't recall it.

Q. I want to ask you about a note. I believe this is in your handwriting from your file. It is MG006160. Do you recognize this handwriting?

A. I do.

Q. Is this your note?

A. Yes, it is.

Q. Now, it's dated 4-19. Can you tell us a year?

A. I believe it's '01.

Q. '01 or '02?

A. '01 or '02. But there's a way to tell for certain, and that is that there's a letter from Angela written to Al Willett indicating that she wants him off her case and that she sent a copy to Judge Bennett and --

Q. Do you have that letter in your file?

A. I have it in my file. I would have to look for it.

Q. We'll come back to that, but what I want to focus on now is what this note reflects in terms of the follow-up to that letter.

A. Okay. This is a telephone call from Angie to me, and she's telling me that she is a hundred percent wanting Al off her case. She doesn't want Al on the case; she wants Dean. And I'm not sure what the first refers to there, and Pat, yes, she wants Pat on the case. She's going to be or has been moved, and she has needs, personal needs. It's so expensive. She doesn't have the money to purchase these items. She's sick to her stomach. She can't eat or sleep. I don't understand the guilt, innocence issues. I don't remember the exact significance of that.

Q. Let me clarify that. When you say you don't under -- is she saying she doesn't understand, or you are saying you don't understand what that means?

A. I'm telling you now I don't really understand what that means.

Q. Thank you.

A. She would like for me to send books to her, and she was charged with simple assault.

Q. Now, off to the side there you have a note next to a phone call-back number to Mr. Willett; correct?

A. Uh-huh.

Q. And what does that indicate?

A. Al Willett called me on the same day or near -- you know, I don't have a date on that message, and he -- and the note on the side -- he says he's not getting off the case. He thinks she's having problems, and then he -- the edge of this is cut off here, but he says DOJ will seek death.

Q. So -- we're looking for the date that the death penalty notice was filed in Miss Johnson's case.

MS. MORRISSEY: April 25, 2002.

Q. If the death notice was filed April 25, 2002, does that refresh your memory as to when this conversation took place?

A. Well, the note is dated 4-19. Would he have known prior to the death notice actually being physically filed that they were going to file it? If that's the case, then I would say this is 4-19 of '02.

Q. You didn't start working on the case till April of '01, correct, approximately?

A. No, I started working on the case in October of '01.

Q. Okay. Do you know what the nature of the problem was that

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS Document 347 Filed 11/10/11 Page 23 of 84

Angela was referencing as to why she wanted Mr. Willett off the case?

A.   I actually don't recall what all of her concerns were, but I think that she felt he wasn't doing anything to help her have more contact with her daughters which she so desperately wanted. I mean, I think that was pretty much the focus of all of her requests to him, the pleas to be moved. There were problems in the jail that she was in. She wanted to be closer to her daughters so that she could see them more often. And additionally, there was a policy in the jail that she could not have contact visits with her daughters because -- or she couldn't have any visits with her daughters because they were under the age of 18.

Q.   In any event, is it true that what you were getting from this conversation with Angela was there was some problem in communication between her and Mr. Willett?

A.   Yes, and that she wanted him off her case.

Q.   And when you as a mitigation specialist see that in a capital case, what does it indicate you should be doing in solving that particular problem?

A.   Well, we need to be getting together as a team and talking about what is actually happening here, and we need to be meeting with the defendant and trying to understand why there is a difficulty in her relationship with this -- with one particular counsel, and we need to be working as a team to try to create

some kind of harmony so that we can work on the case and not on personal problems that exist between members of the team and the defendant.

Q.   And did that happen? Did you get together as a team and sit down and discuss, hey, we got a problem here; we need to solve it?

A.   No.

Q.   At any point in time did that ever happen?

A.   No.

Q.   And when Mr. Willett is calling you and telling you he's staying on the case, did he tell you how he resolved the problem?

A.   He received her letter and immediately wrote -- immediately went to see her is the substance of the letter and ind -- you know, indicated he had met with her and they had worked out their differences, and he wrote a letter to Judge Bennett saying, "This is a heads-up that you're going to be getting a letter from Angela, but she and I have met, and we have already solved the situation." And then that was his phone call to me. And I think that all of that happened pretty much the same day.

Q.   Physically he was closest to the client at this point in terms of proximity?

A.   Yes, within blocks.

Q.   She's calling you on the phone at your office in -- where were you living at the time?

A.   Wyoming.

Q.   And Mr. Berrigan is in Kansas City?

A.   Kansas City.

Q.   Four hours away maybe?

A.   I'm not sure, but it's quite a ways, good drive.

Q.   And Mr. Stowers is in --

A.   Des Moines.

Q.   -- Des Moines, so he's a number of hours away from where she is. She's in Cedar Rapids?

A.   Yes.

Q.   At this point?

A.   Yes.

Q.   Was there a geographic problem in terms of trying to establish the relationship of trust and confidence that the guidelines talk about?

A.   Yes, there was.

Q.   Did that problem extend to you as well?

A.   Yes, it did.

Q.   In what sense?

A.   Well, I had other work. I needed to be a number of different places. I had -- I was a long way away from Angela. It turned out to be kind of an all-day trip to get there, and there were all these sort of fits and starts in the communication with the team, so, you know, I don't think that I paid as much attention as I should have to these issues in the

beginning and partly because of the distance, partly because I felt that Mr. Willett was there and, you know, partly because I just wasn't giving this case the attention I should have given it.

Q.   Now, do you recall engaging in a telephone conference with the team on December 7 of '01?

A.   Yes.

Q.   And did you make some notes of that meeting?

A.   Yes, I did.

Q.   Telephone conference?

A.   Yes, I did.

Q.   Showing you MG6158. Are these your notes from that meeting?

A.   Yes.

Q.   And explain to the Court who was on this conference call if you remember and what was being discussed.

A.   I -- it's my recollection that Al Willett and Pat Berrigan for certain were on the conference call, possibly Dean Stowers. This was a conference call kind of surrounding the DOJ presentation issues, both the local presentation and the national presentation. And I was kind of briefing them on what I felt needed to be done in the case and what I felt my assessment of the case was up till that point. And -- do you want me to tell --

Q.   Yeah. And could you clarify when you say what was needed

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 24 of 84

for the case, are you referencing what was needed to make the presentations, or are you referencing what was needed overall, or are you talking about both?

A.   I'm talking about what my impressions were of the case at that point in time, what we needed to be doing, where I thought we needed to put our energies, and what the problems were with the case itself.  And I'm -- I've made this list, little list, here of things I wanted to discuss with them, and that list included the fact that she had had a number of head injuries, that she had suffered severe abuse, that I have no education but what I'm really talking about is that she didn't -- she had a lot of difficulties with her education.  She suffered from dyslexia.  She did not like school.  She went to school sporadically in the many different locations, and she never had any kind of support or diagnostic work done on her dyslexia, and consequently she just dropped out of school at an incredibly early age and also that she had drug abuse, alcohol abuse, and that, you know, once again, she had needs in the jail.

I was considering that to be one of the things we needed to address, how to deal with these needs that she had because they were basic needs; that I wanted her to take GED classes, to complete her education.  I felt that would be a good thing for her to do in the jail.  It was also something her daughter needed to do, and I thought they could do it together.  She needed to be seen again by Dr. Logan because Dr. Logan had

not been involved in her case since January of '01, and so it's been almost a year.

And I was concerned about some of her mood and emotional issues, and I felt that because she was on medication she needed to be seen more regularly by him, and I wanted to talk about the fact that I had, you know, recommended neuropsych testing in another e-mail or note that Pat has where I gave him the names of three neuropsychologists, gave him their telephone numbers and addresses, and to get him going on that.

And then we talked about, you know, what were the difficulties with the case itself, just how serious it was. And, you know, I felt the McNeese information, the description of the crime, the map were all things that were very serious for her case and that I didn't know that they could be overcome by any kind of other testimony in trial.  I thought it would be very, very damaging.

She had some anger issues that I was concerned about. She was mercurial in her mood, and she would go from being pretty happy or light hearted to being angry about something, and I felt that that needed to be addressed, those mood issues.

I felt that the fact that she had -- I labelled it involvement as a collector in the collector of the gun.  I thought that was a very serious fact placing --

Q.   That she had purchased the gun?

A.   Yes, placing her in, you know, a position of being involved

in planning and that, you know, this was going to be also a very damaging fact in terms of any trial she would be involved in and that as far as DeGeus went that, you know, Honken had a motive to do away with DeGeus and that Angela had this -- a motive that could be characterized from the great abuse that she suffered at his hands.

And it kind of -- if you go down to the bottom of the page, I don't have any discovery really, and I'm saying I need that.  And then I just said my recommendation was that they plead this case and they plead her to LWOP and that I felt that that was a good and doable resolution.

Q.   Now, did you talk about how an LWOP, life without parole, disposition was going to be discussed with and agreed to by the client?  Was there any discussion about how you could implement what you were recommending?

A.   No, there was not.

Q.   Was there any disagreement about what the worth of the case was at that point in terms of her exposure and where you should be in the bargaining process in terms of what kind of number you were going to offer in the plea process?

A.   Well, there was -- there was some disagreement.  I don't really recall the nature of, you know, the exact details of the conversation.  But I know that they were talking numbers and I was saying no, you -- this -- you don't need to be looking at numbers here.  Numbers aren't going to get you anywhere.  This

case should be -- is a life case, and it needs to be pled to that.

Q.   And was that just a bare opinion on your part, or was it based on some substantial experience that you had had in negotiating and being involved in federal capital cases in particular?

A.   It was -- it was based on that and also state cases.  You know, I have a list of cases that I've done federally that we've successfully settled, many of them, and that was the goal, to settle the case as far as I was concerned.

Q.   And what made this a life without case as opposed to, say, a 20-year case?  Why was life without the proper focus?

A.   Well, because there was a terr -- the facts of the case were terrible, as I've discussed previously, and the number of victims in the case and the fact that there were children involved and the fact that she -- that she could be placed in the car with the children, the fact that she purchased the gun, the fact that she was involved in moving the family in the car to the location where they were going to be killed, and the fact that she -- that there were a number of people who would put her in a position of getting Terry DeGeus to go to the actual location of his death.

Q.   Now, you also reviewed in preparation for your testimony Mr. Berrigan's notes of the same meeting; correct?

A.   Yes, but I don't have them with me.

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 25 of 84

Q. And before we get to that, let me finish up on the second page of this which was 6159, MG6159. What else was discussed during the meeting?

A. The Department of Justice presentation was discussed, now, keeping in mind that I've gone to see her in late October, I've tried to do as much work as I could in terms of gathering records. And then early in December we're having this conference about -- just a very beginning conference in what should happen in the case, and they're telling me that they want to keep their DOJ presentation pretty abstract and that they'll talk about the abusive childhood because they've already gathered that information themselves or through the investigator and they'll talk about her lack of education. They don't know what's the status of the discovery.

I'm going to go back to Iowa January 21, and I'm going to go there to review discovery and to meet with Pearl -- Pearl Jean. They inform me that they changed her medication to Paxil. We talk again about the importance of the GED project. And then Pat tells me that he will call the neuropsychologist and set up the evaluation.

Client's being -- we're getting information -- I don't know or remember who Doug Levine is, but he apparently has conveyed information to Pat that the client is difficult at times, she has thoughtful -- she can make thoughtful rational decis -- or she needs to make thoughtful rational decisions in

order to weigh her options. They're telling me she's still loyal to Honken, that she has a strange sense of optimism about the case, and that Honken is going to DOJ next month and has an early 2003 trial.

Q. Okay. Now, in terms of this DOJ presentation and the discussion about keeping the presentation abstract, have you participated in the authorization process both at the local stage and in Washington, D.C.?

A. I have.

Q. Have you actually attended DOJ authorization meetings --

A. Yes.

Q. -- in Washington?

A. Yes.

Q. And presented as part of cases?

A. Yes.

Q. Is that process, that is, presenting to the local U.S. attorney and presenting to DOJ, a foregone conclusion process? In other words, is it a waste of time and energy where it really can lead to no good results either in plea bargaining options or in convincing the government not to seek death?

A. No, on the contrary. It's not a foregone conclusion.

Q. Have you had some experience in being successful in that process both in plea -- in the plea process at that stage and in convincing the government not to seek death?

A. Yes, mostly with convincing the government not to seek

death.

Q. So why would you present -- make a presentation in the abstract as a tactical consideration? What would be the advantage of doing that?

A. Well, I was told that I was not needed to help out with the DOJ presentation and also that this abstract comment is something that Pat -- this was Pat's strategy for the presentation at DOJ, and I think he did believe it was a foregone conclusion that she would be authorized.

Q. Did he indicate it was a foregone conclusion because of the nature of the case or because of some preset idea he had about the whole process in any case?

A. I think he just thought the process was a waste of time.

Q. In other words, there was nothing specific about Angela Johnson's case. He was indicating the process itself was a waste of time.

A. Right. And we -- the work -- because I got started so late, the work that we might have done that might have been helpful to present at DOJ had not been developed.

Q. When you do get involved in the authorization process, do you typically work the case up and present mitigation as you would in a penalty phase at trial setting?

A. No. I think you work the case up certainly with as much time as you have, and then the team meets and discusses what they think are the most important aspects of the investigation

that you have gathered to date, and then you present that information to them. And perhaps there's an overview of all the mitigation, but the mental health information that you present at the Department of Justice meetings is probably the most persuasive information you can present.

Q. Now, you're saying on the first page you had a note there, get neuropsych testing. And the second page, Pat Berrigan is indicating he'll call a neuropsychologist; correct?

A. Yes.

Q. This meeting takes place in December of '01, correct, almost --

A. Right.

Q. Many months after Angela Johnson is arrested.

A. Right. She was arrested in 2000 in July.

Q. And in this particular case, do you recall testimony at the penalty phase by a psychopharmacologist by the name of Dr. Evans?

A. Yes.

Q. From Auburn University? Do you recall her talking about the brain -- the effect on one's brain of long-term methamphetamine use?

A. Yes.

Q. Was there a particular reason in this case why having a neuropsych evaluation early as opposed to in December of 2001 would have been important?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 26 of 84

A. Yes, it would have been important.

Q. And why is that?

A. It would have been important because it would have given -- it would have helped us to understand her, not only understanding her as we were dealing with her in the day-to-day process in terms of her assisting us in working on this case, but it would have made -- in my experience it would have made a big impact in terms of the DOJ presentation.

Q. Would it have had any significance in terms of the effect of drug use prior to -- just prior to her incarceration?

A. I'm sorry? Can you --

Q. Would an early neuropsych exam have had any impact in terms of an early look at what impact drug use was having on her brain?

A. Oh, yes.

Q. So you're -- in the time period from her arrest up until December of '01, she's obviously not using methamphetamine in jail; right?

A. Right. But she's having episodes of emotional upset. Her mood is not -- her mood is labile. She's angry at one family member and then makes up with the family member. She's communicating with Dustin Honken. There are a lot of things that were not -- was not in control, and it would really have been helpful to understand why she behaved that way other than just simply thinking she had been depressed.

Q. When did it -- when, if ever, did a neuropsychological evaluation of any kind ever get done at the trial level?

A. The neuropsych evaluation was done in January of 2005.

Q. So about five years after her arrest.

A. Yes.

Q. Now, do you recall reviewing -- I'm showing you MCN01-001418 through 1420, Mr. Berrigan's notes of that same meeting.

A. Yes, I do.

Q. And he indicated who was on the call, right, you, Al Willett, Dean Stowers?

A. Uh-huh.

Q. And is he in the first part of this note essentially reiterating what you've already told us that you were discussing?

A. Yes.

Q. Head injuries, depression, learning disability, et cetera?

A. Right, brain damage probable, intellect deficiencies, never got her GED till later.

Q. Do you recall some discussion based on that underlying portion of this note that you conveyed to the team about physical and sexual abuse?

A. Yes, that the medical records indicate, you know -- I'm saying here the medical records indicate weird sexually related rashes, infections as early as age 10.

Q. Did you ever follow up on the indications in the medical records of this weird sexually related rash or rashes?

A. No.

Q. And why not?

A. I didn't have time.

Q. Would that have been important mitigation evidence to develop?

A. Yes. All of those medical records, I really neglected to go back and take the medical records and carefully read them and contact the people who had developed the medical records to talk with them about the impact of what they had written about her.

THE COURT: Mr. Burt, Miss Goody, I don't understand your testimony. This was back in 2001. The trial was four years later or three and a half years later.

THE WITNESS: Right.

THE COURT: So when you say you didn't have time, how does that work?

THE WITNESS: Well, I worked on the case, Your Honor, until the Massiah hearing. And then I was asked to stop working on the case until a lot of that was resolved. And as we know, it went on for quite a while with the hearing in the Eighth Circuit or the rehearing and all of that.

And then I was not contacted again by Pat Berrigan until late -- or November of '04 to gear up for trial, so to speak. And during that time another one of my federal cases had

come up for trial and was going to penalty phase in March, and I hadn't -- I hadn't worked on Angela's case the entire time from the Massiah hearing until he called me.

And I was just busy with other work. I was caught off guard. I had to prepare for this other penalty phase. And when I did get back into the case, it became clear to me that the defense team had not done any work whatsoever either with the experts or with the witnesses or with the records that had been previously gathered.

And so I had to basically go back and start all over again with the work that I had previously developed, bring it up to speed, travel extensively with Mr. Berrigan to get him up to speed with the witnesses, work with the experts to just get them the basic things that they needed in the case like discovery, records that I had collected, and then prepare for trial.

And in the middle of that I did the other penalty phase. And I have no excuse. I totally dropped the ball here because I didn't have time to go back and develop new work in the case.

THE COURT: Thank you.

Mr. Burt?

BY MR. BURT:

Q. So you had -- even though you didn't have time to follow up on this indications in the medical records, I didn't see these medical records and the reference to the weird sexually related

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 27 of 84

rashes featured in the testimony of either Dr. Hutchinson or Dr. Logan. Do you recall that that was discussed at all?

A. That they did not utilize those medical records?

Q. Correct.

A. It was not discussed.

Q. Was there some tactical reason why it would not have been discussed?

A. I have no idea. I think that people were operating at the last minute and that many things were missed and there were no team meetings associated with coordinating the experts into the witness testimony other than one which did not involve the whole team, and the experts were at that point just working on their own to get ready. And I think there was some complaint about that.

Dr. Logan complained in his testimony and also in a note to me when I was talking with him in April of '05 saying that he did not have any other information and he had never gotten the discovery, and he was talking about all kinds of items that should have been done that weren't done with -- concerning the neuropsych and his inability to integrate any kind of neuropsychological evidence into his own diagnosis and testimony and also that he hadn't seen Angela for four years.

Q. So there was no tactical reason why information contained in the medical records about sexually related rashes as early as age 10 would have been omitted.

A. No.

Q. In fact, you did help put on what evidence there was of sexual abuse at this orphanage; correct?

A. Yes.

Q. And how much -- and as I recall the testimony of Dr. Logan, the extent of that evidence was that Miss Johnson's sister had been sexually molested at this orphanage but that he didn't recall that Miss Johnson, Angela Johnson, did not recall being sexually molested.

A. That was his testimony.

Q. Did you do follow-up on that orphanage to see if there was evidence, further indications that that was an institution where kids were sexually or physically abused?

A. I did not do investigation on the orphanage. I did locate and talk with Ted Dillow by telephone only. I did not travel to Kansas to look for the property or the site, and I did not -- I did some -- I made some attempts to try to find out whether or not there were -- there was information from the library in the newspapers about the orphanage, but I did not physically go there, and I did not do in depth follow-up.

Q. Was it your understanding from the material that you did get about the orphanage that there were other children in the home, in that orphanage, at and around the same time as the Johnson children had been there?

A. Yes. In terms of the witnesses that I did not locate or

interview, the Dillows had two or three daughters of their own. They also had living in that orphanage three little Indian boys that they had adopted who were mentioned.

Q. Was -- did the name Tim Dillow come up as one of those Native American boys who had been adopted?

A. Wendy Johnson was probably the best historian about that, and she did not know the names of the Indian boys. She did know the names of the daughters of Ted Dillow.

Q. Did you think that those boys were important mitigation witnesses in the case?

A. I do. I did.

Q. And why do you think it would have been important to corroborate that there were other kids inside that orphanage who were being abused?

A. Well, when the penalty phase information was presented, it was presented by family members and by experts. And traditionally there's a concern that if only family members are testifying about a particular piece of information that might be favorable even though it was terribly traumatic and awful to the defendant that there's a self-serving sort of purpose attached to that.

And so it would have been very important to produce witnesses who could corroborate what the family was saying and perhaps add additional details that the family had no knowledge of.

Q. And was the only reason you didn't pursue that investigation further the same time constraints that you just alluded to in your answer to the Court's question?

A. Yes. I really became overwhelmed with just getting done what we had in hand, and I did not advance the investigation really after the preliminary stages of the investigation.

Q. So in this note Mr. Berrigan is indicating hypnosis, question mark, and then it says need a neuropsych, who should we use? Does that refresh your memory as to what was discussed about that topic?

A. Well, I don't under -- I don't know why he wrote hypnosis there. I can't imagine that I would have brought that up. However, needing a neuropsych and who should we use, we definitely -- I believe I gave him -- well, here, Wendy used to hit Angie on the head every day. That was sort of like a daily occurrence.

Q. Was that information you were conveying to the team?

A. Yeah. And meth, cocaine, lots of alcohol, those were since she was young, you know, she had been using drugs and drank, Baileys in her coffee, that sort of thing. So there were multiple reasons. I mean, there's information that her mother strangled her at one point in time and that she lost consciousness from that. There was information that her father had once slapped her so hard that she had ringing in her ears. All of these things were factual pieces of information that

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 28 of 84

contributed to our need, our desperate need really, to have her neuropsyched.

Q. And did that information that you just summarized have implications not only for the need to neuropsych her not only for the mitigation but also have implications for how Angela Johnson communicated with people given that background?

A. Yes, absolutely.

Q. And what implications did it have for you based on your experience?

A. Well, when Angela Johnson -- Angela Johnson presented herself as a pleasant person who, you know, was kind of happy-go-lucky and willing to talk to you about various things, but that was really just kind of a facade, and there was a great deal underneath that. But it was very difficult to get to, and it would have required many, many, many meetings with her hopefully in the sense that we could kind of start to talk about some of the things that kept her from being able to communicate really well.

And it also affected her ability to communicate with a lot of other people, you know, and her breaking down at times was that breakthrough of that terrible emotion that she couldn't express.

Q. Did that implicate -- did that background have implications for her ability to understand what she was confronting in this case in terms of what the evidence was and what her options

were?

MR. WILLIAMS: Object to asking for speculation.

THE COURT: Sustained.

BY MR. BURT:

Q. Now, the next page of these notes -- this is 1419 -- reflects, does it not, that there was actual discussion who might do this neuropsych evaluation?

A. Can you -- could you lower that a little? The top is cut off.

Q. Sure.

A. Thank you. Yes, I gave them -- I gave him four names of people that I felt were competent neuropsychologists and would be able to come and spend the time that was -- really do a thorough and high-quality neuropsych evaluation of her.

Q. And it indicates at the top that the plan at this point was for you to go see Angela in Cedar Rapids on January 21?

A. Right.

Q. Did that happen?

A. Yes.

Q. Okay. And we'll get to that in a minute. And at the bottom there is some indication of some diagnostic impressions. What's the source of that, and can you tell us what that discussion was?

A. I do believe that that comes from a conversation I had with Dr. Logan where he was telling me that he felt that for years

she had presented with a lot of anger towards people and that he was wanting -- he was considering whether or not she had symptoms of PTSD or -- and/or borderline personality disorder, so he was kind of throwing out these diagnoses.

Q. Throwing them out in the sense that he had reached those conclusions --

A. No, that he had --

Q. -- or these were rule out possibilities?

A. He was wanting to rule out these things.

Q. Okay. Now, the last page of these notes -- and then we'll move on -- indicates what?

A. He says, "Discussed DOJ meeting with Mary; short is good."

Q. Is that indicating that you were telling them short is good?

A. I don't think so. I think that I was telling him that I didn't have information developed for them to be able to present, and he was making the comment short is good.

Q. What else is discussed?

A. And Dean brings up the plea, problems with Angie getting on board.

Q. What were -- what problems were discussed with getting Angie on board if you recall?

A. I don't recall anything other than there was conflicts between Angie and the members of the team about a potential plea.

Q. Was there conflicts within the team of lawyers as to what the plea should be and what the terms and conditions were? I mean, you had said you were recommending life without; right?

A. Yeah.

Q. Was there any conflict within the team as to whether that was going to be the unified approach, or did other people on the team say I've got a different idea?

A. Well, they had a different idea.

Q. And what was the idea that --

A. They were clinging to this idea that they could get her a term of years somewhere around 20 years.

Q. Twenty years for five victims. Did they explain to you what that was based on?

A. Well, they may have at the time, but I -- I so disagreed with that that I didn't make any notes about it.

Q. We're going to get to a letter later by one of the prosecutors in the case that describes that plea as unconscionable. Do you agree or disagree with that characterization of a 20-year plea as unconscionable in a case involving five victims?

A. That's a pretty good representation.

Q. Your own position was that the case was worth a life plea.

A. Right, and I didn't think that they would ever get anything less than that for her and I . . .

Q. Now, was there any discussion about whether you would

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 29 of 84

continue to not talk to Angela Johnson about the facts of the case?

A.  I don't remember a conversation about that.

Q.  When you went to see Angela in January shortly after this meeting, did you discuss with her --

THE COURT:  Mr. Burt, excuse me.  What was that document number, the last?

MR. BURT:  It was MCN01-1420.

THE COURT:  Thank you.

BY MR. BURT:

Q.  You did see her in January?

A.  I did.

Q.  And was there any discussion of a plea at that time by you based on the conversation you'd had with the team?

A.  No.

Q.  Was there some reason for that?

A.  No one asked me to engage with her in a conversation about a plea.  Ordinarily that would be something that we would do as a -- in teams or individually or we would have a game plan set up with that.  But my idea of what the plea should be did not agree with their idea.

And so I thought that they -- I really got the impression that they were just wanting to wait on that and that that was kind of the tack that was taken on a lot of issues surrounding conversations about pleas and that sort of thing.

Let's just wait and see.  They were waiting and seeing what was going to happen with particular things.

Q.  And this wait-and-see approach, was that consistent with the guideline team approach and how you had seen that team approach implemented --

A.  No.

Q.  -- in other cases?

A.  No.

Q.  How do conflicts like that get resolved where lawyers -- you know, some lawyers or team members believe a certain plea's appropriate, others believe it should be lower or higher?  How do you typically work out those problems?

A.  Well, I can only say that in my previous work that there -- I have not seen such a disparity between the facts of the case and what the case really represented and the idea that a plea could be had for that short a period of time.  And my only understanding of it was that there had been conversations with the government before death had been authorized that talked about a term of years, but I was not privy to any of those conversations, nor was I involved in team conversations about that.  So they were trying to cling to the idea that they could get the deal that was initially discussed.

Q.  Initially discussed before the bodies were discovered?

A.  Before the bodies were discovered.

Q.  Okay.  And did you know what that discussion was, in other

words, what had been offered before the bodies had been discovered?

A.  Only that there was a term of years and that this 15 to 20 years had been bantered around as an appropriate amount of time that they could get for her with her cooperation.

Q.  Cooperation in finding the bodies?

A.  Well, cooperation in dealing with Dustin Honken's case.

Q.  And was there in your mind a rational basis for saying that a plea offered prior to the discovery of the bodies for a term of years was comparable to the situation you were in in December of '01?

A.  No.

Q.  Because?

A.  All bets are off.

Q.  Because the bodies had been discovered?

A.  Yeah, and because they had McNeese and because they had Christi Gaubatz and because they had her buying the gun and because of the nature and quality of the victims.

Q.  Now, in December of '01 when you had this meeting, was there some discussion -- what was your understanding of the status of the case as it related to the Court's -- Judge Bennett's ruling on the Massiah issue?  Where was the case at that point?

A.  Well, I under -- I don't know.  I'm going -- I'm not sure.  The Massiah hearing was, I thought, in April of '01.

Q.  But do you recall any discussion about the judge's ruling in December of '01 where the status of that whole litigation as it related to McNeese?  So we're looking at -- the Court's opinion on the Massiah issue was rendered April 23, 2002.  So this discussion, this team meeting, the issue of the McNeese statements had not been decided.

A.  Right.

Q.  Okay.  But you mentioned somebody else, Miss Gaubatz.  How did she play into your recommendation that this was an LWOP case?

A.  Well, Angela had purportedly confessed to her in a moment of great anguish and emotion.  She had called her and said, "I need to talk to you," and she had broken down and told her about -- confessed to her involvement in these murders.

And so even if McNeese was suppressed in some fashion which, of course, would have had other big implications in the case, they still had to deal with Christi Gaubatz.  And they still had to deal with the fact that Angela bought the gun.  And in my mind buying the gun was a serious act.  And then when you add that to the confession, you know, it's pretty easy to put two and two together.

Q.  Well, was there some discussion in December that no, that's wrong; if Judge Bennett suppresses the McNeese statement, the whole case is going to go away and we're home free?

A.  Well, there was some talk like that, yes, but I don't

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 30 of 84

## 121

recall the exact statements. But there was a belief that it was likely to be suppressed and it would change the whole nature of the case. And, in fact, you know, it was kind of suggested that then they could not seek death against her and so, therefore, I would be gone. I wouldn't be working on the case anymore. And that was kind of what fuelled this idea that I would stop working on the case for a while.

The other things in '01, there were other things going on in '01. Pat had a trial, another capital murder trial, in April which was the same month of the Massiah hearing. In May the USA recommended death to the Department of Justice.

Q. May of '0 --

A. In August --

Q. May of '01?

A. Yeah. In August Pat had open heart surgery. So it wasn't, you know, until, you know, October of '01 that I'm going to see her for the very first time.

Q. And December when you have --

A. And December we're talking about all of these possibilities, and they've been living with the fact that the Massiah hearing went well in their opinion for -- since April of -- April of that year previous -- or that same year. And I'm just coming into this thing, and so I'm just -- I gotta take their word for how they're feeling about the case.

Q. When you say they, who is expressing the idea that the

## 122

death penalty was going to be off the table if the Court ruled McNeese inadmissible?

A. Well, it was possible, that it was a possibility. Pat was. Al was.

Q. Is that the way it was being presented as if, well, it's a possibility death may go away?

A. Well, yeah, and it's just a discussion we had, kind of an open discussion.

Q. But the upshot of that meeting was was there any coherent plan that came out of that meeting about a plea strategy or about what the next step should be to present to the Department of Justice or to the local prosecutors?

A. No.

Q. Now, you have another note, and it's not dated, but I'll show it to you. It's MG6167 and 6168, and it looks like a -- according to the top, is that meeting or message with Al?

A. Meeting with Al. I was there.

Q. Okay. And was this in January when you went there?

A. I believe it was.

Q. So this would have been January '02, and he's telling you that the trial is set in May?

A. This may have actually been in October when I went to talk to her for the first time and I went to Al's office, and I had a conference with him about the case.

Q. By the way, just to return for a moment to 1420, the last

## 123

sentence of that says that you agree that May 2002 is unrealistic, absolutely no way. What was the discussion about that?

A. Well, they had said that there was a trial date of May 6 in 2002, and they -- and I just told them there was absolutely no way that I could be ready for trial in May when they're just -- I'm just going to work at the end of October of '01.

Q. And the problems that Dean Stowers was discussing about getting Angie on board, you don't remember anything more specific about that in terms of what he saw the problem as?

A. No, I don't.

Q. All right. Now, returning to this undated note, this is a meeting face to face with you and Mr. Willett; correct?

A. Uh-huh.

Q. And I want to show you the second page where there's some discussion about she has never given -- I think that's me a factual basis for a guilty plea. Can you tell me --

A. She has never given Al a factual basis for a guilty plea.

Q. And is that something that Mr. Willett was telling you?

A. Yes.

Q. Can you recall anything else he said about that?

A. No.

Q. And then the second highlighted thing down there, it says DOJ November 19. So this meeting must have taken place before December 19, your meeting with Mr. Willett?

## 124

A. Yes, I'm sure it took place in October.

Q. October of --

A. 18 and 19 when I went to Cedar Rapids for the first time.

Q. Okay. And it says -- what's the underlined part there? Could you tell us what that discussion -- about Al wants?

A. Al wants a full-blown presentation.

Q. Is that in reference to the DOJ presentation?

A. Yes.

Q. And that's different than what was being discussed in December; right?

A. Right.

Q. Did he indicate why he wanted a full-blown presentation?

A. No. He just said that's what he wanted to do.

Q. And the last section of that note?

A. The United States wants a full plea now with cooperation, and Al offered them a 20-year sentence.

Q. Did you have any discussion with him about where he came up with that number?

A. Well, I believe that refers to my statement to you earlier about early on in the case before the bodies were discovered they had talked about coop -- her cooperation and a term of years for that.

Q. Now, referring to the next note here in the sequence, it is MG6161. Now we're in May of '02; correct?

A. Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 31 of 84

Q. And does this indicate the status of the case post the Court's ruling on McNeese?

A. I don't recall when the ruling came, the Court's ruling came.

Q. Well, the first portion of this seems to say government appealed to Eighth Circuit.

A. Oh, yes, I'm sorry. Yes.

Q. Not clear which indictment. Will have to ask the judge. Limbo.

A. We're in limbo.

Q. What is that in reference to?

A. The case is in limbo. We are -- you know, we don't know how long it's going to take for the appeal. We don't know how long it's going to take for a rehearing if necessary, and so it's just -- it was -- they described the case to me as being in limbo. Everything was just kind of at a standstill.

Q. And did that --

A. As far as they were concerned.

Q. And did that include your work on the mitigation phase of the case?

A. Yes.

Q. Was he telling you to stop working at this point?

A. Yes.

Q. And is that what you did? You stopped working at this point?

A. I did. I think I billed some into July working on things that were continually coming in. I think I need -- I think I -- I'm saying here Angie needs -- there's work that needs to be done. In other words, I've not completed my investigation; there's work that needs to be done. They're saying let's wait until we find out what's going to happen with this McNeese thing.

Q. And there's a notation there, Gelbort. What does that refer to?

A. Again, I'm asking them have they contacted a neuropsychologist, and I think Pat is telling me that he wrote a letter to Gelbort, so we're -- you know, I'm trying to follow up with that. They are not sure what's going on in Honken's case. They are going to call Charlie Ross with a list of items they want to discuss, so they had a lot of things that they were doing. You know, they had a lot of unanswered questions about what the status of Dustin's case was.

Q. Now, was it your understanding at this point that these guidelines that we've talked about allowed you to stop working on a case that was potentially capital because a judge had suppressed some evidence? Was that the prevailing standard of practice?

A. No, there's no -- there are no -- there's no information in the guidelines about it being really permissible to stop working on a case once you've started regardless of whether or not there

are appeals going on or whatever.

Q. In fact, the guidelines state, do they not, in guideline 1.1, these guidelines apply from the moment the client is taken into custody and extend to all stages of every case in which the jurisdiction may be entitled to seek the death penalty, including initial and ongoing investigation, pretrial proceedings, trial, post-conviction review, clemency proceedings, and any connected litigation?

A. Yes.

Q. And is it your understanding that the use of that term from the moment the client is taken into custody and the words may be entitled to seek the death penalty would include a situation where there's a interlocutory appeal going on?

MR. WILLIAMS: Objection. Leading.

THE COURT: Overruled.

A. Yes.

Q. In other words, it's still a capital case?

A. It's still a capital case. There still is a team. There's still a defendant in a jail who has ongoing issues, and they need to be addressed.

Q. And what would -- what was told to you about the Court's ruling and the effect of that ruling in this meeting in May of '02? You had alluded to earlier the -- some talk about, well, the death penalty's going to go away. Was it represented to you that the death penalty had gone away or that it was going to go

away and, therefore, you were justified in stopping work?

A. I believe it was represented to me that it was likely to survive the appeal and it was likely to go away.

Q. Did anybody explain to you what was going to happen with the Gaubatz testimony and the testimony about Miss Johnson buying the gun?

A. No, because you can see that further down in the note we still have -- we still don't have discovery. We don't have the complete discovery. We've not looked at it all or read it all, and this is still a problem so . . .

Q. Was it your understanding that Judge Bennett had suppressed the McNeese statements and the bodies in the government's case in chief?

A. Yes.

Q. Did anybody tell you that he had a footnote in his opinion saying nothing prevents the government from using these statements at sentencing if the defendant is tried and convicted?

A. I don't recall anybody telling me that. Obviously I could have read it myself, and I did not have the feeling at that time that this -- that there was going to be that kind of a problem.

Q. And when you say that kind of a problem, would it have been a problem if the case had proceeded to trial without the McNeese statements or the bodies and the government focused just on Gaubatz, the gun purchase, and the other four or five

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 32 of 84

confessions from jailhouse informants they had and got a conviction and then in the penalty phase for the first time the jury heard the McNeese information? Would that have presented some sort of a problem in terms of Miss Johnson's exposure to the death penalty?

A. Well, it would have been, yes, a devastating bit of information for them to learn.

Q. Well, it would have been a disaster in terms of trial strategy, would it not?

A. Yes.

Q. If you had known that -- and apparently you didn't -- would that have affected whether you continued to work on the case or how much you pushed the lawyers to say, wait a minute, I can't stop, I gotta keep working?

A. Well, I would have pushed them, and I did push them at periods -- at different time periods, and there were financial issues that they were concerned about, and at that time in May -- at the end of May of '02, I had nearly exhausted the $40,000 award that had been given to me, and one of the reasons I believe why they wanted me to stop working at the time was because they were concerned about having to go back and ask for money during the time that the McNeese issue was still on appeal.

Q. Now, the guidelines state, do they not, that in terms of funding that counsel, the defense team, should not self-censor?

A. They do.

Q. And what does that mean?

A. It means that they should not assume things about the progress of the case that they don't know, that the case needs to continue to be worked until the case is concluded.

Q. Well, in terms of funding, what does self-censor mean? You alluded to a funding problem.

A. Well, they're assuming that they know that they are not going to get funding when, in fact, they've not even asked for it.

Q. And was the standard of practice in 2000 and 2005 to cut down your request or not make a request based on some anticipation that the Court was going to deny it?

A. Yes.

Q. That you should be not making the request?

A. Right.

Q. That was the standard, in other words, that --

A. Oh, that's not the standard, but that was their thinking I believe.

Q. Okay. That's --

A. That we needed to wait to ask for money until it could be shown to the Court that there was an active need to work on the case. But in truth there always was an active need to work on the case.

Q. Now, you -- around this time, a little bit before this

time, you were still receiving complaints from Miss Johnson, telephone complaints to you, about her custodial situation, were you not?

A. Yes.

Q. And this is MCN02-001791. Is this an e-mail that you wrote to Pat Berrigan about your observations of her progress and problems that she was having in her custodial situation?

A. Yes, always it was an ongoing terrible stress for her that she was having such inappropriate -- or not inappropriate but so little contact with her children and no physical contact with them. And so I really wanted to try to get people engaged in trying to do something about that for her because I really felt that it would help us in moving along towards the plea and resolving the case and just kind of moving forward with our work in the case.

Q. The last notation up there indicates that you were going to hold back for a month to come and see her; right?

A. Right. I said that I would wait until they got the decision from DOJ.

Q. And in terms of building this rapport with Miss Johnson which hopefully ultimately would lead to a plea disposition, was that in compliance with the guideline about building a relationship with a client, to hold back?

A. No.

Q. Was this a time when the team should have been focused on

building a relationship?

A. Absolutely. And I should have been there much more often than I was.

Q. Now, around May when that -- when Mr. Berrigan was telling you to stop work, were you around that time raising again the issue of getting her evaluated by a neuropsychologist?

A. Yes, I was always asking him whether or not he had done that.

Q. And this is MCN02-002003. Is this a e-mail that you sent -- rather that was sent to you from Pat Berrigan?

A. Uh-huh.

Q. And what does it indicate in terms of the status of getting Dr. Gelbort on board to do an evaluation of Miss Johnson?

A. Pat said he called Dr. Gelbort and he was willing to help us out, he was sending him some very abbreviated background information and putting in an authorization request for his services. Dean thought an agenda would be a good idea for a meeting next week. Please e-mail him with suggestions. They're looking at purchasing CaseMap to help organize and retrieve the voluminous documents.

Q. And did that meeting ever take place, the one that he's referencing there?

A. Did it take place?

Q. I think this e-mail was before the telephone call from Pat saying the case is now appeal.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

A. I can't -- I assume the meeting took place. I can't -- I don't have any notes from that meeting.

Q. Pat indicating to you that he had called Dr. Gelbort who was going to make a request for funding. I think you indicated earlier the evaluation never took place until 2005; correct?

A. Yes. Pat --

Q. Even though talking about doing it in 2002; correct?

A. Correct.

Q. Now, you continued to receive records even though you weren't working on the case after this conversation with Pat where he said the case is in limbo.

A. Yes.

Q. And was there some discussion when records would come in about follow-up you should do?

A. There was no discussion about -- about the records or follow-up. It was my practice that when I received records that I would fax the records or mail the records to counsel.

Q. This is a letter -- this is MCN02-002131, a letter from Mr. Stowers to you June 27, 2002; correct?

A. Uh-huh.

Q. And what does this indicate?

A. He's telling me that he's gotten about four inches worth of records from the Linn County Jail and that he hasn't received the Black Hawk County Jail records. Dean got those because they had to be subpoenaed. And he's asking me what do I want him to

do with this material.

Q. And did you resp -- I think in the next page did you respond back to him? This is 002155, MCN02?

A. Yes, I asked him to send it to me.

Q. So is anybody actually reviewing these records and saying, Mary, I got these records, and in the records there's some valuable information I want you to follow up on?

A. No.

Q. Is that typically a dialogue that takes place in a capital case?

A. Yes.

Q. In other words, do the lawyers actually review the records that are coming in and give you input as to what direction your investigation should take?

A. Yes. And in most capital cases that I work on we have regular team meetings where we talk about new documents coming in, relevance, whether or not they should be sent. I have a policy that I don't distribute records or that type of information to experts or anyone else working on the case unless counsel, you know, approves it. So I'm sending them the records, and then I'm not getting any feedback from them.

Q. And typically not only do you get some sort of feedback, but does the team meet and discuss what's in the records, what direction you should take? For instance, the records we referenced earlier, the sexually transmitted reference, would

there be some discussion about the need to follow up on that and some direction from the lead counsel or somebody that would say what's being done and here's what we need to do to --

A. Yes.

Q. And did that ever happen in this case?

A. No.

Q. Now, in July -- this is MCN02-002185 -- did you receive word from Mr. Stowers that there was some issue about funding?

A. Yes.

Q. And what did you learn from this letter?

A. I learned that he needed to know immediately how much I had billed to date and how much I needed to complete the case and whether or not there were any particular issues, and he needed my numbers by tomorrow morning, the next day.

Q. Was that the first indication you had that there was some issue about your hours or funding?

A. Well, that there was going to be a budget prepared.

Q. And I'm showing you MCN02-002187. Was this your answer to Mr. Stowers the very next day?

A. Yes.

Q. What did you tell him?

A. I told him that I had another bill to do so I'm going to give him a number but it's not the complete number, that I've billed $30,821.22, and that money included expense money so air fares, all costs for records which had been well over $1,500.

And then in terms of giving him some feedback about what needed to be done, I needed to do -- I said interviews, interviews, interviews. I have to travel to Minnesota, Wisconsin, and Iowa. And then again, I'm estimating how much time that's going to take me.

Q. Uh-huh.

A. And I'm saying I need at least three weeks of interviewing time at ten hours a day, air fare for three trips, hotel, meals, and time with the experts and then -- and I thought I would need $10,000 more, and that's the best I could do.

Q. Now -- so at this point just to summarize this, this is July of '02. You had been appointed by the Eighth Circuit in January of '02.

A. Uh-huh, yes.

Q. But had started work earlier.

A. Yes, I did.

Q. And you're indicating to Mr. Stowers that although you have expended $30,000 of your budget that a major thing -- a main thing still needs to get done which is interviews, interviews, interviews.

A. Yes.

Q. And is it fair to say that you have records but you didn't do the kind of follow-up that you normally would do in a capital case?

A. That's fair to say, yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 34 of 84

**137**

Q. Okay. Now, around the same time when he was asking you to estimate, you know, how much time you were going to need to take the next step, that is, doing actual interviews, did you tell him that -- and I'm showing you MCN02-002323 -- that you were going to be gone for a certain period of time on personal business, vacations, or whatever?

A. Yes.

Q. And were you, in fact, gone from July 24 through August 20?

A. I think that I was saying that I was going to be gone pretty much from July 24 to August 20, partly for work, a week in Minnesota, and then the pack trip so --

Q. So this is not --

A. -- some work, some pleasure, and I'm telling him I'm going to be available the whole time by cell except for the pack trip.

Q. And while you were gone, was it -- were you working on this case?

A. If issues came up and I needed to discuss things with them, I was available to them, but I was not working on the case while I was gone.

Q. You also asked him in this e-mail whether he had sent the records, apparently referring to the earlier records we just reviewed.

A. Yes.

Q. On to Dr. Logan and Dr. -- you say Belbort. I assume that's a typo.

**138**

A. Yes, that's a typo.

Q. Did you later learn that those records never had been transmitted?

A. Yes, I did.

Q. And when did you learn that?

A. I learned in probably -- possibly January but certainly in April of '05 --

Q. '05.

A. -- that Dr. Logan had never received the jail records or the discovery or any of the other records in -- that I had generated in the case. And I learned that Dr. Gelbort had not received anything at all in January or February of '05.

Q. And in terms of the standards of practice, the guidelines, was that in compliance with the guidelines in terms of how you handle and inform your experts?

A. No, that isn't.

Q. In other words, the experts are supposed to be kept up to speed, are they not?

A. The experts are suppose -- once an expert begins to work on the case, they should be a part of -- in some fashion a part of every team meeting in terms of either them being contacted and brought up to speed about what's going on and talking with them about where they're at and what they need to continue their work or, you know, a conference within the team about how things are going with each particular expert and what is needed to be able

**139**

to further that expert's work and keep them working on the case.

MR. BURT: Judge, how -- this is a convenient stopping point. I didn't know what the Court wanted to do on lunch break, if you wanted me to keep going.

THE COURT: No, why don't we break now. Is an hour sufficient?

MR. BURT: That's fine with me.

THE COURT: Mr. Williams?

MR. WILLIAMS: Yeah, that's fine, Your Honor.

If I could just raise an issue about the exhibits, though, I've never seen it done like this before. What I've been provided are disks with literally thousands of pages of documents on here. They're not marked in a way that I can access them by Bates number. I can't pull them up to locate the documents they're talking about.

Clearly counsel has identified specific documents among the thousands they intend to use as exhibits with witnesses, but they're not marked with exhibit numbers. They're not provided to me as counsel. Basically they've given me disks with thousands of pages.

THE COURT: Right. I mean, they're just organized in like five general categories or something. And maybe it's a cultural difference in districts but -- and I didn't mean to cut you off, but it's very difficult for me to deal with the exhibits because I assumed I would have an exhibit list that

**140**

would have each exhibit on it -- again, I don't care whether there are 2 or 20,000 -- and then the exhibits would be hyperlinked on the CD so that I could just go to that number of exhibit, click on it, and take me right to it which is what I've had for over a decade in every trial I've had where the exhibits are submitted on CD. I mean, we have no way of finding them.

MR. BURT: Well, I can indicate to the Court that I would be glad to run off a hard copy of the exhibits that are being reviewed with this witness, and I'd like to indicate I think it's only going to be a problem with this particular witness because --

THE COURT: And why would you say that?

MR. BURT: Well, because for the other witnesses we have broken them into witness folders that contain all the documents, and the documents typically are a couple of reports or, you know, at most, you know, a hundred pages, whereas this witness's files exceed 6,000.

So it becomes -- I think just with this witness it's really going to be the difficulty. I mean, that's my anticipation. I think as we're going along here we are creating an exhibit list which we can print off for the Court and counsel, more than happy to Xerox a copy of the entire array so that he has the documents that I've referred to in the order in which I've referred to them so that he has them handy. And I can do the same for the Court.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

141

But as a general problem I don't think this is going to be a continual problem. Hopefully it won't be.

THE COURT: Okay. Mr. Williams, I kind of cut you off, but let me ask you -- why don't you -- well, let me ask you and then you can finish. Have you seen anything yet that you really have an objection to?

MR. WILLIAMS: No, it's not so much I have an objection to it coming in as much as it is -- it's impossible for me to weigh the -- what they've given me is organized for me to locate on the disks I have what they're talking about. So for -- the idea for me to come back on cross-examination, find that document, and be able to cross on it, I can't do that.

THE COURT: Yes, and I understand that, and that's certainly a problemo here. So would you be willing to just make your -- I assume you have like a file of the exhibits you're either using with each wit --

MR. BURT: Sure.

THE COURT: -- with Miss Goody or you're planning to use with the other witnesses. In order to expedite things, would you just make that file available to Mr. Williams --

MR. BURT: Absolutely.

THE COURT: -- so he can use it on cross-examination?

MR. BURT: Sure. Did the Court want a copy as well?

THE COURT: No, no, no, that's fine. It's really more for his purposes.

142

MR. BURT: Sure.

THE COURT: Yeah.

MR. BURT: We can do that.

THE COURT: Would that facil -- at least -- it doesn't solve the problem, but it moves us along.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Is that okay?

MR. WILLIAMS: Yes, Your Honor.

MR. BURT: In fact, if there is a machine in the courtroom, I'll just hand him my binder and he can -- I don't know if you have the facility to do it here in the courtroom.

THE COURT: I'm sorry. I was distracted with a note from my law clerk.

MR. BURT: I was just going to say I'm perfectly willing to give him my entire work binder and he can -- or we can copy it ourselves, how ever -- whatever the easiest way is.

THE COURT: Well, I'm not going to have anybody to do -- one, I'm not in the business of copying documents.

MR. BURT: I'm not asking the Court to do it. I thought perhaps the prosecutor had some --

THE COURT: Well, he has the entire resources of the United States government behind him so -- but knowing Mr. Williams, he'll probably wind up doing it himself, so do you have anybody that can copy the exhibits for you?

MR. WILLIAMS: Yeah, we can try.

143

THE COURT: Okay.

MR. BURT: I'll just give him my entire binder then or if you --

THE COURT: Well, you work it out as best you can.

MR. BURT: Sure.

THE COURT: I still think we're going to have a problem with every witness, but I didn't really understand why we're not going to. I mean, you have -- what's the purpose of giving me a CD with 10,000 pages of exhibits on it if you're not going to move either all of them or the vast majority of them into evidence?

MR. BURT: Well, some of them we will. As I indicated, I think there is some relevancy to her entire file. And so I think we will be moving in that DVD. And in terms of the other files, we can certainly be discrete in terms of what we're going to introduce.

THE COURT: Okay. Well, why don't you try and work it out with Mr. Williams.

MR. BURT: Sure.

THE COURT: And then I'll be available if you can't get something worked out to try and resolve it.

The note from my law clerk was Al Willett is in greater Siouxland. That's what we call Sioux City, so apparently he's near the courthouse.

MR. BURT: Excellent.

144

THE COURT: Okay. Okay. We'll see you at one o'clock. Thank you.

(Lunch recess at 12:05 p.m.)

THE COURT: Thank you. Please be seated.

Mr. Burt, you may continue your direct.

MR. BURT: Thank you.

MR. WILLIAMS: Your Honor, if I could just for a housekeeping real quick, as the Court knows, the defense filed a motion for disclosure of documents. The Court ruled on that holding in abeyance categories 2 through 5. Defense counsel have also subpoenaed three attorneys, Mr. Murphy, Mr. Reinert, and Mr. Miller.

We've had conversations with defense counsel about whether on the Touhy regs they will limit the scope of the examination of those witnesses to just communication with defense counsel. They've said no, referencing back to their motion to compel production of documents. They want to go into the same areas.

I'm just assuming the Court's ruling is the same with regard to oral testimony as it is with documents. We're just going to have to kind of see where things are at this point?

THE COURT: Yes, Miss Morrissey?

MS. MORRISSEY: Yes, Your Honor. I indicated that we had filed a motion that the Court had granted discovery of item number 1 but that the remaining items were deferred pending the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

presentation of evidence and that the Court would at some point after hearing evidence on the issue make a ruling on those.

This arose because the government wanted me to add to my affidavit in support of my subpoenas for those witnesses that promised that I would not inquire into the areas on which the Court has deferred ruling, and I indicated that it wasn't for me to give up that at this point, that it was in the Court's hands, and that the matter will be resolved in due course.

But I did not refuse to limit my questions. I simply said that the matter is pending and the Court will make a ruling and we will abide by that ruling.

THE COURT: Okay. Well, let me ask you something. Why are the Touhy regulations binding on me?

MR. WILLIAMS: They aren't binding you on, Your Honor.

THE COURT: Okay.

MR. WILLIAMS: And if I said anything to suggest --

THE COURT: No, but, you know, I'm not exactly sure I even know what they are, but the government's either hid behind them or invoked them depending upon one's perspective on prior occasions, and I've never felt they were binding on me, so that's just kind of what -- between you and your boss is the way I look at it.

MR. WILLIAMS: No, I think that's right, Your Honor. I think that's right. The only -- I just reference them as they came up and we were having communication with them about our

compliance with the Touhy regs. And so -- and I guess all I'm saying --

THE COURT: So when is all this going to come up? When are the lawyers testifying?

MR. WILLIAMS: I believe Wednesday --

THE COURT: Okay.

MR. WILLIAMS: -- is when they were subpoenaed.

THE COURT: And we're taking it up now because?

MR. WILLIAMS: Your Honor, I'm just assuming that the Court's holding that in abeyance as well until we --

THE COURT: Yeah, but I guess I'll have to rule on it probably after I hear their testimony -- after I hear the testimony of the first lawyer, I'm going to decide whether or not to expand the scope.

MR. WILLIAMS: Fair enough.

THE COURT: Probably the easiest way to do it.

MR. WILLIAMS: Fair enough, Your Honor.

THE COURT: Is that okay?

MS. MORRISSEY: Yes. Thank you, Your Honor.

THE COURT: Okay. Thanks.

Mr. Burt, back to you.

MR. BURT: Thank you, Your Honor.

THE COURT: Thank you.

MR. BURT: And, Judge, we did discuss the exhibit situation. I think for today what I intended to do at the end

of the examination of this witness is mark a hard copy of the specific documents that I use to examine her, and then we will produce hard copy files for each of the witnesses to keep the exhibits in order.

THE COURT: Okay. That'd be --

MR. BURT: Better order.

THE COURT: That'd be fine. Thank you.

MR. BURT: If that will work.

THE COURT: Thanks.

MR. BURT: Thank you.

BY MR. BURT:

Q. Miss Goody, I think before the lunch break you were looking at this document that was July 12, 2002, and I want to show you next in order which is MCN02-002332 which is an e-mail from you to the defense team; correct?

A. Yes.

Q. And tell us what this e-mail indicates, what you're asking about.

A. I'm asking them what's the status of the trial date. This is written in July of 2002. I know we discussed it was not going to go -- probably not going to be going in November, but is it truly not going in November? Do we have a new date? Do we have viable Ring motions so that the case might be held in abeyance?

Q. Okay. And I'm more interested in the first part. The Ring

stuff we don't need to discuss.

A. Right.

Q. But why were you concerned of whether the case was going to go in November?

A. Because I wasn't hearing from them, and I needed to know what was going to happen. I needed to continue working on the case or get off the case. You know, I just had no idea what was going on.

Q. And was the reason that you were concerned at this point because you had outstanding investigation that needed to get done --

A. Yes.

Q. -- or was there some other reason?

A. No. I had plenty of outstanding investigation to do, and we still had not had the neuropsych done.

Q. So between May of 2002 and July when this was written, was there any substantial work being done by you on the case?

A. No.

Q. Were you, in fact, devoting your time to another capital case during that time period?

A. I was. I had several other capital cases.

Q. And basically that e-mail was what's going on here and, you know --

A. Right.

Q. -- am I still looking at a November date?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

**149**

A. Yes.

Q. Because obviously if you were you were going to have to take some action pretty quickly.

A. Yes.

Q. Did you ever get a response back from that e-mail?

A. I don't have it in my files. I don't know. I mean, I don't know.

Q. Okay. Now, along those same lines I want to show you another document which is MCN02-002636. Is this another e-mail you sent to them now in August of 2002?

A. Yes.

Q. And what are you asking here?

A. I'm concerned about whether or not vouchers have been signed, and apparently there was a hearing, and I wanted to know what had happened. And again, I was not in the loop on what was happening on a day-to-day basis in the case, and so I'm writing an e-mail saying tell me what happened.

Q. Had you -- did you still think there was going to possibly be a trial in November?

A. I don't know.

Q. Now, did you have some communication with Mr. Berrigan in October about the need to get a neuropsychological evaluation done?

A. Yes.

Q. And showing you MCN02-002728, is that an e-mail

**150**

correspondence you had with him?

A. Yes.

Q. What are you asking here?

A. I'm trying to get this Gelbort thing happening, and so I'm suggesting to him that I'll just call him myself because, you know, I have other cases to talk to him about.

Q. He had indicated to you back in December at that meeting that he'll contact Gelbort; correct?

A. Right. And he had, in fact, written two letters to Dr. Gelbort in like February of '02. And he told him that he would like for him to work on the case. He said that he would go ahead and obtain the necessary funding, and he sent him probably a larger stack of newspaper articles concerning the case, but then nothing had happened since then.

Q. All right. And showing you MCN02-002729, is that an e-mail you sent to him the next day, the 18th of 2002?

A. Yes.

Q. You're indicating here that you'll get in touch with Gelbort.

A. Right.

Q. Did you --

A. I hesitate to retain him and get him going when we aren't getting paid. I asked Al about this, and I am desperately seeking my own payment in the case for the last five months.

Q. Did -- and showing you MCN02-002731, did Mr. Berrigan

**151**

respond to you about your suggestion to contact Gelbort?

A. He did.

Q. And what did he say?

A. He said, "How are you? Don't sign Gelbort up yet. We just need to see if he'll do the evaluation before we put in a request for authorization. I'll talk to Dean and Al today about how to get Judge Bennett to pay you. We've had a lot of trouble with him on the dollar issues, although his legal rulings have been terrific for Angela thus far. Robinson continues, the mountain of evidence piling up against us like so many bodies. We'll finish first phase by the end of next week. Pray for us. I have a cell phone." He gives me the number. "You can reach me during the week. I'll check back with you as soon as we come up for air. Thanks, Mary."

Q. So was the Robinson case another federal case that he was involved in?

A. He was in trial at the time.

Q. Okay. And other than this communication with Pat Berrigan, was anybody else on the team communicating with you about these issues you were raising about Gelbort or funding issues?

A. No.

Q. On the 23rd after that exchange, did you get another e-mail from Pat Berrigan -- and this is MCN02-002748 -- dated October 23, 2002?

A. Yes.

**152**

Q. And what did he say? This is from you to him.

A. I sent this e-mail to Pat saying, "I spoke with Gelbort today, and he will shrink Angela later when we get funds."

Q. So basically when you get the money the work will get done.

A. Right.

Q. Okay. Now, in July of 2003 did you send this e-mail to the team? This is MCN03-003076.

A. Yes. I sent -- I sent this e-mail saying, "Guys, I haven't heard from you for a long while, so I assume not much is happening in Angela's case. I have a big federal trial about to start in September, and I am hoping against hope that Angela's will not also be going on. If it is going to go, please let me know because I'll have to devote a substantial part of July to getting the work completed."

Q. And what case were you referencing there, your big federal case?

A. I believe that was the United States of America versus David Sahakian which was part of the Aryan Brotherhood. He was one of three at that time people indicted in an Aryan Brotherhood case out of the Marion prison in Illinois.

Q. Now, did you receive any response from the guys, from the team at this point?

A. I don't know. I don't have that in my files.

Q. Okay. Let me show you an e-mail dated June 18, same day as the one I just showed to you, MCN03-003078. And it looks like

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 347 Filed 11/10/11 Page 38 of 84

this is a response that Pat Berrigan wrote to you that same day?

A. We are still waiting on the Eighth Circuit's decision on the government's appeal of Judge Bennett's suppression order. Looks extremely unlikely we will try Angela's case this year. January '04 might be an unfortunate possibility. I'll call you soon to check up on the remaining mitigation work. And --

Q. And what did you respond?

A. I said I would look at this on Thursday or Friday and get back to him. I sent him the latest document and witness list. There's really a lot to do. I'll finish up the documents this next month and start back on the witnesses soon. We should go to Texas and see Wendy. Also I need to come back there for a week of work, maybe October. Get it all done before Thanksgiving. What say you?

Q. What was the document, the latest document and witness list that you're referencing there?

A. I have a practice of creating a document that tells all of my -- details all of my attempts to collect documents. It is a document that I use. Whenever I see somewhere in some other document or something I read a lead about an investigation matter, either a document or a witness, I put that in this -- in this particular document, and I make one in every case, and it's my road map to my investigation basically. And as long as I keep it updated, then I know what I have left to do.

Q. And the witness list is a list of witnesses to be

contacted?

A. Yes, but I notate whether or not they've been interviewed and when.

Q. Do you have those lists? Do you know where those are?

A. Yeah, there's one -- there's one in my file here I can put my hands on pretty quickly.

Q. Okay.

A. And it's -- it's not the latest one that we had at the end of the case.

Q. I think I wanted to see if it's the one close in time to when this e-mail was written just so we can get a sense of what the --

A. Shall I do that now?

Q. Yeah, if you could.

A. It is dated 1-11-05.

Q. So this is a later version?

A. Yeah. Usually as we update it and change -- you know, add information, then we discard the old outdated document and witness list.

Q. Can you tell from looking at that list in '05 what the status was then in terms of how many witnesses you thought needed to be interviewed and investigated at that point?

A. Well, I want to make it clear that I did not update this list after January of '05 and --

Q. After January of '05 or January of '03?

A. January of '05.

Q. Okay.

A. And there are witnesses that I've -- that I can clearly see in many of my interview notes that are not on this list. So with that in mind, I would say that on this list there are 57 witnesses, and that does not count any physicians or mental health workers that would be included in the medical records that were gathered.

Q. And that's 57 to be interviewed?

A. This is 57 -- this is like a pool of 57 people that needed to be interviewed at that time.

Q. So can we assume that back in June of -- June 18, 2003, that witness list was larger, the same, or smaller?

A. It might have been slightly smaller. It would have gotten bigger as time went on because I have a practice of keeping track of things that I am adding in to the pool of witnesses, and if a person is going to be taken off the list, generally we leave them on but say that we aren't going to interview a person or we have no further need.

Q. And in terms of the status of your investigation, what did it mean to you that Mr. Berrigan was saying that January 2004 was a possibility in terms of the trial date?

A. Well, it meant that, you know, I needed to get busy.

Q. And did you get busy at that point given what he's telling you, that, hey, we may be in trial in January of 2004?

A. No.

Q. And why not?

A. Because we were -- I was still operating under the belief that we needed to wait for the decision to come from the Eighth Circuit.

Q. So basically this idea that the case is on hold?

A. The case is on hold, the case is in limbo, it could go away, but let's wait and see what happens with the Eighth Circuit decision.

Q. All right. Now, on -- that was in '03. Did you not receive significant word on the case again until November of 2004?

A. That's correct.

Q. Almost a year later.

A. Yeah.

Q. And showing you 4 -- MCN04-004224, is this an e-mail that Pat Berrigan sent you shortly after the verdicts in the Honken case were rendered?

A. Yes.

Q. What did he tell you?

A. I beg your pardon?

Q. What did he tell you through this e-mail?

A. He says, "Forgive me for getting back to you so late. Last week Dustin Honken got life sentences for each of the three murders involving adult victims Lori Duncan, Greg Nicholson and

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 39 of 84

Terry DeGeus but received death from the jurors on the two murders of Amber and Kandi Duncan, Lori's ten- and six-year-old girls. This undoubtedly means that Angela's case will go forward in March, so you and I should talk soon. Can you come to Des Moines some time this month or to Kansas City and we'll drive up together? We have a team meeting in Des Moines on Thursday, 11-4. If you'll be near a phone, perhaps we could conference you in for part of the discussion about mitigation. I've been holding off on getting Michael Gelbort involved hoping that if Dustin got life we'd have a good chance to plead Angela's case. That strategy seems pretty naïve now. Anyway, let's talk."

Q. Now, when you saw that, did you agree that that strategy of waiting until -- to see what happened in Mr. Honken's case was pretty naïve?

A. Yes, I think so given the fact that all of a sudden, boom, you know, we were going to be going to trial in March.

Q. Well, you had talked earlier about the risks and dangers in Miss Johnson's case of her being convicted and sentenced to death given the state of the evidence. Did you have any reason to think that the situation was less as it related to Mr. Honken and his exposure and his potential of getting a death sentence?

A. No, I thought that he was equally at risk.

Q. Did you ever discuss with the team a strategy which hinged on waiting until the Honken verdict came in to follow through on

any plea strategies or any trial preparation strategies that you might have had?

A. No, I didn't. We had no team meetings to speak of at all, and most of my communication, if not all of my communication except in the very beginning when I did meet with Al Willett, came from Pat Berrigan. And I allowed myself to be lulled into this feeling that waiting was okay.

Q. Do you think it was a reasonable defense strategy to wait on the outcome of the Honken case to continue to prepare Miss Johnson's case?

A. No.

Q. Did you think it then?

A. I don't think so. I think that I was just following his lead and I wasn't thinking about my own -- the consequences of my not getting this done, and I was overestimating how long it would take me to do the work that I needed to do.

Q. He hadn't conveyed to you this was his strategy, Mr. Berrigan; correct?

A. Yes.

MR. WILLIAMS: Objection. Leading, Your Honor.

MR. BURT: I'll rephrase.

BY MR. BURT:

Q. Had he conveyed to you?

A. Yes, and it was always just done in sort of conversations, just comments. It was like let's just wait. You know, I can't

really paraphrase the exact comments anymore, but it was always just let's wait and maybe we'll get this case pled and let's wait and see what the Eighth Circuit says and that sort of thing.

Q. Now, at this point you now know that there's a verdict in the Honken case, it's death, and you also know based on this e-mail that you got a trial date in March; correct?

A. Yes.

Q. And where were you at at this point in terms of funding?

A. I had used up approximately -- I believe that I had about $6,000 left of the original $40,000 award that I'd been given.

Q. All right. Now, he had asked you whether you were available to come to Iowa to again now start working on the case.

A. Right.

Q. For the first time since December of '02.

A. Yes, and earlier than that.

Q. Showing you MCN04-004234, is this an e-mail that you sent to Mr. Berrigan in response to his e-mail about when you'd be available to come to Iowa to start working on this case which is now set for March?

A. Yes.

Q. And what did you tell him?

A. I said the week of December 13 is the first time that I can go anywhere for a week. This will also give you time to get the

funding. In the meantime, I will go through my stuff. I will also plan to talk with you on the 4th.

Q. And why was December 13 the first time that you could go anywhere?

A. Well, I had other commitments that were already made in other casework that -- other trips booked, scheduled, meetings with lawyers or witnesses, and I could not put them off.

Q. Now, did you have another case pending or at or in trial in Missouri at that time?

A. I had a case that was going to trial in Missouri in February.

Q. February of '05.

A. Of '05. And I had spent most of -- a lot of the time in September and October preparing for that case with the attorney, Jennifer Herndon.

Q. And did that case go as scheduled?

A. It did. And it be -- he was convicted of first-degree murder, and the case was set for penalty phase in March.

Q. Same time that this case was going to start.

A. Yes.

Q. Okay. Was that case United States versus Cannon in the Western District -- Eastern District of Missouri?

A. Yes.

Q. 101CR00073?

A. I don't remember the number.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 347 Filed 11/10/11 Page 40 of 84

Q. Okay. Did you work full time on that case from the time that it started trial to when a verdict came in?

A. I didn't work full time on it. I worked a lot on it. I had worked a lot on it in the fall because the attorney was having a baby in October, late October, and so she was going to be taking time to work at home and not travel, so we talked on the phone and worked that way.

Q. Do you recall when the -- was there a penalty trial in that case?

A. Yes.

Q. When did the verdict come in?

A. I believe it came in on March 16.

Q. March 16 of?

A. 2005.

Q. Would it be fair to say -- well, let me ask it this way. Did you devote any time to the Johnson case while you were tied up in that other case?

A. Not during the latter part of February and the first half of March I did not devote much time at all.

Q. When was the first time you had a chance to devote any time to the -- or any substantial time to the Johnson case?

A. In January of '05 Pat and I made a trip or February, early in February I believe, and I may have also gone in January to Iowa. And then I stopped working on Angela's case with the exception of receiving e-mails or faxes or people in my office

doing things. And then at the end -- on March 16 I left the penalty phase of the Cannon trial and flew back to my home and then in earnest began to work on Angela's case.

Q. And the trial date set for March was a change somewhat?

A. It had been changed somehow to -- I think it was changed to mid April.

Q. About April 25 I think when the --

A. Yeah, April --

Q. -- jury selection started, thereabouts?

A. Uh-huh.

Q. Back when you sent this e-mail to Pat saying I can -- the earliest I could come out was the 13th, you indicated that will give us some time to get the funding in place; correct?

A. Yes.

Q. Because you only had about $6,000 left. Was that going to be enough to get done what you needed to get done?

A. No, I needed to -- I needed a lot more time.

Q. Now, in line with that e-mail, did you send Mr. Berrigan a declaration about what the needs were going to be? And this is MCN04-004233.

A. Yes.

Q. And this is a cover page saying attached -- well, what does it say?

A. I attached find a dec. I propose for Johnson funding. I just talked to Jennifer. That would be Jennifer Herndon. And

she said that Loken has a terrible -- this is cut off -- terrible habit of cutting the funding as well as taking time to grant it so beware. She has had trouble with him cutting budgets, et cetera, before. With that said I will sign and fax a copy to you. I hope this is appropriate. Feel free to suggest changes.

Q. And you attached at that time an actual declaration; correct?

A. Yes.

Q. And this is MG3359 through MG3361. Is that the decla -- the original declaration? I realize there's more than one here that got submitted.

A. Yes.

Q. Okay. Now, were you attempting here to outline what needed to get done at that point in the case?

A. Yes.

Q. And indicate in item 6 what you were thinking the scope of the work was at that point.

A. Well, I was trying to estimate how much time it would take, and I was trying to break down the tasks and assign a number of hours to them so I could come up with a total. And so in 6 I say that I need to locate and interview the remaining witnesses, and I think up and to I say that I had over 48 witnesses identified at that time but I had only interviewed a quarter of them.

Q. This is in number 3?

A. Yeah, number 3. So in number 6 then under (a), I'm saying I need to locate and interview the remaining witnesses. The witnesses are located in Texas, Illinois, Minnesota, and Iowa. And I need 200 hours to do that. I need to locate and retrieve the remaining background documents, and here I say medical, educational, jail, and school records on siblings, mental health and treatment records of family members.

Q. Why was that important to get the records of siblings?

A. Because I had not done that yet, and that was a big part of what was going on here.

Q. Is that standard protocol to get --

A. Yes, it is.

Q. -- extended family records, educational, medical, psychiatric?

A. Yes, yes.

Q. And you hadn't done that up to this point.

A. No.

Q. You indicate in 5 where you were in terms of what themes you were trying to develop; right?

A. Yes.

Q. And you indicated that your preliminary investigation had shown that she might be able to -- Miss Johnson might be able to avail herself of statutory mitigating factors like substantial impairment, emotional disturbance, duress from the codefendant

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 41 of 84

at the time of the crime.

A. Yes.

Q. So the investigation that you're outlining in 6 is designed to investigate those themes you've got identified up there in 5.

A. Right, and educate the Court about the fact that the money is needed for some very important reasons and that we're not just on a fishing expedition here, we're really going after the heart of the mitigation.

Q. So you're estimating you're going to need 200 hours for the investigation in Texas, Illinois, Minnesota, and Iowa; correct?

A. Yes.

Q. In terms of the record collection, if we could continue to the next page, you indicate you're going to need 10 hours?

A. For record collection and 45 hours for review of those records, inputting that in the chronology, and other document work as generated by counsel.

Q. Now, category (c), what were you contemplating there in terms of what needed to get done at that stage of the case in terms of working with counsel, witnesses, and experts?

A. Well, prior to this moment in time, the experts and counsel had never all sat down in a room together and talked at all about what their findings were or what work they had done or what more they might need from us in terms of completing their work. And we had not met with them in an effort to come up with a refined and unified theory of the mitigation case. So all of

that was something that needed to be done, and it needed -- because counsel had not done any of that work on their own, so we were just starting from square one basically with the fact that they only had the basic information in the case that they themselves had put together. And I don't believe that Marilyn Hutchinson even began her work at all until April of '05.

Q. So you're estimating you're going to need about a hundred hours to do that part of the case; correct?

A. Right.

Q. And how about category (d)?

A. Continue to meet with the defendant, discuss the mitigation investigation, and I only allotted 20 hours for that.

Q. And the last category?

A. Preparing witnesses and exhibits for the penalty phase and attending the penalty phase trial would be 60 hours.

Q. So the last item 7 there, you were tallying up the hours you were going to need; correct?

A. Yeah, and the total was 435 hours.

Q. And with an indication that with leave to return to the Court if that didn't prove sufficient.

A. Yes, definitely because, again, we're just estimating. We don't have any idea what we're going to run into here.

Q. And based on this declaration, would it be fair to say that your state of the investigation insofar as the penalty phase was concerned was in a fairly preliminary stage?

A. Yes.

MR. WILLIAMS: Objection. Leading.

MR. BURT: I'll withdraw that, Your Honor, if I could.

BY MR. BURT:

Q. And return you to item 5 where you refer to -- there are medical and mental health issues concerning Angela herself and members of the family that have arisen during the preliminary investigation in this case. I guess that's what I was referring to. I thought those were your words, not mine. But what did you mean by preliminary investigation of the case at that stage?

A. Well, up until that point in time I had only talked to the major witnesses in the case once or twice. I had spent maybe five or six visits with Angela. I had had no interaction of any real meaningful work with the defense team, and I'd had no interaction with the experts. And the neuropsych hadn't been done yet, so, you know, we're really just going back to the state of things where they were in April or May of '02 and having to pick up from that point and go on.

Q. Now, this -- and had you had any involvement in the plea negotiation process at all up to this point?

A. No.

Q. This number of needing an additional 435 hours, did that then -- was there some negotiation that went on about that number?

A. Yes. The number was -- it was discussed that that was too

much money, something to the effect that we would never get that much money, and that they wanted to keep it to a smaller figure, and so the number was cut.

Q. Let's take a look at that. This is MCN04-004245. Is this an e-mail exchange between you and Mr. Berrigan concerning the issue of taking that 465 hours and somehow cutting it down?

A. Yes.

Q. And start at the bottom there, the notation. It looks like from Keith Goody. That's your husband; correct?

A. Yes.

Q. You're using his e-mail?

A. His computer.

Q. And what are you saying to Pat about the -- about the funding issue?

A. Well, I'm checking with Nancy Lanoue about how much money I actually have left of the original 40,000. And in order to -- in the interest of getting the hours I was going to drop my hourly rate to make it more inviting to get this total number of hours.

Q. Did you think the number of hours you were requesting was necessary?

A. Absolutely, and I thought it was likely that it wouldn't be enough.

Q. And you were trying to cut your own fees in order to ensure that you had enough hours to work the case properly or --

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 42 of 84

169

A. Yes.

Q. -- some other reason?

A. And to show that I was trying to be -- trying to work with the Court or whoever on getting the additional hours. And then Pat responds and says, I've forgotten your usual rate is at $80 an hour. If so, let's go with 70. We're going to need to cut the hours estimated to 275 in order to come in at an additional 20,000 which on our best day is all we could hope for.

Q. So at that point did you modify your declaration?

A. I did.

Q. And did you do that because you didn't think you needed 465 hours or because you were trying to work an accommodation because of financial interests?

A. I was.

Q. Not financial interest to you but financial interest to the Court.

A. Well, at that point I was trying to work to accommodate whatever I needed to do in order to get the hours to do the work. And we had conversations about the fact that I might go over that number of hours and that they would do everything they could they said to get the money for the extra hours. So, you know, I was just in a very bad situation at that point, and I went along with it.

Q. A bad situation in the sense that you had a trial date in March and you had no funding currently set up.

170

A. Right.

Q. And when you say you went along with it, what do you mean by going along -- what options did you have at that point?

A. Well, I could have refused to work any further on the case.

Q. Looking at the guidelines, should you have done that?

A. Yes, I should have.

Q. Why?

A. Well, because there wasn't enough time. In addition to that, I had the other penalty phase that I had to do. I didn't have -- I didn't have a grip on the mitigation investigation. I had no cooperation from the team. I had no help from the team. It was just a bad situation all around, and I should have -- in November of '04 when he called to say, hey, we're going to do this, I should have said no.

Q. Instead you modified your declaration and gave them -- gave up a couple hundred hours, lowered your rate.

A. Yes.

Q. And showing you MG3356 through 3358, is this the -- well, the cover page indicating what?

A. Well, I said that I put it at 265 hours, and then I say in case he wants to cut it, but I'm not sure -- I may have just misspoken there.

Q. Well, you already cut it yourself; right?

A. Yeah.

Q. You started at 465. Now, you have self-censored yourself

171

to 265.

A. I have.

Q. And you submitted the same declaration, did you not, but merely changed the hours that you needed?

A. Changed the -- readjusted the hours and adjusted the hourly rate.

Q. So instead of, for instance, 200 for the witness interviews, you now said you needed 150, and you went through and --

A. Yes, I adjusted the whole thing.

Q. -- discounted your number of hours for each category.

A. Yes, I did.

Q. And ended up with 265; correct?

A. Yes.

Q. Now, is -- do you know when, if ever, the request for that amount of funds got put before the Court?

A. I don't know. No, I don't.

Q. That was on November 4 of 2004 that you sent that; correct?

A. Yes, I believe it was.

Q. Okay. And showing you a document that was received by the Court on February 4, 2005, a couple of months after you submitted that budget proposal, the first category on this budget proposal is your mitigation specialist budget; right?

A. Yes.

Q. Indicating that you had initially been approved 40, you'd

172

been paid 33,330.78, and you were asking additional funding for 18,550; correct? That's what the lawyers were asking for.

A. Yes.

Q. And that was based on 265 hours, your discounted hour rate times 70.

A. Yes, taking into account that there was a balance of $2,819 left.

Q. And you -- you'll see on this document that that budget apparently was approved at the circuit level by Judge Loken January 31, '05.

A. Yes.

Q. So as of that date you've now got funding; correct?

A. Yes.

Q. But you've got a trial date a couple of months away.

A. Right.

Q. Given the amount of work that needed to be done, did you have enough time to get the case prepared for penalty phase?

A. No, I didn't.

Q. And was it a one-person job at that point given the amount of work that needed to get done?

A. No, no, it was not a one-person job.

Q. Did the guilt-phase investigation -- investigators -- was there a team meeting where you all came together and said, you know, we're in a bad situation here; let's use the guilt-phase investigators to do penalty-phase work and divide this work up

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

and get it done?

A. No.

Q. Where did the burden fall in terms of doing all those tasks that you had outlined in your declaration, that is, interviewing the witnesses, working with the lawyers, getting the experts prepared, working to get the trial exhibits in shape, et cetera?

A. I did all that work, and if -- and Pat was -- on the traveling Pat was with me. When I -- when I was talking to the experts, I would talk with him then after I'd spoken to them. The experts, Dr. Logan and Dr. Cunningham I believe, came with Pat Berrigan and I and possibly Dean Stowers to Mason City at one point in I believe late April to meet with as many of the mitigation witnesses as we could possibly get there, and some people called in on the telephone and they inter -- and the experts interviewed them over the phone. But almost all of that was something that I put together.

Q. And were you able to get the job done in your opinion in terms of meeting the minimum --

A. No.

Q. -- standard of practice?

A. It was not.

Q. Can you give me some examples of how you failed?

A. Well, it's a long list. I -- there was a substantial history of mental illness in Angela's family, and it was most evident in -- on the maternal side in her mother and her

grandmother, and I did not get any medical history information on either of those women. I did not investigate her grandmother at all other than to obtain her death certificate.

There are other people in Angela's mother's family that I did not interview. Particularly there was a brother. Pearl Jean had a brother, and she also had a half-sister or a stepsister named Rita Gomez. I did not interview or -- interview those people or attempt to get any background records whatsoever associated with them.

There was a substantial history of dyslexia that was -- actually permeated Angela's family. Her father had it. Angela herself had it. Her sister Wendy had it, and her brother Jimmy had it. Her sister Holly had been in some sort of a foster home or an institution at one point in time. I didn't get those records. I didn't get anyone's school records other than Angela's. I didn't get her mother's school records, and her mother -- this is -- there is a history in this family of people leaving school at an early age because they could not enjoy it and integrate and most likely because they had learning problems.

We did not get the neuropsych done. The neuropsych that -- that was done so late became very troublesome, and I had no idea where to go with it once we got some negative information from the neuropsychologist.

Angela's father had been -- had juvenile problems.

He'd been the youngest person in his state to go to juvenile institution. I didn't get those records. He'd been jailed I believe at one point for domestic violence concerning her mother. And I believe I got those records, but I didn't do anything with them.

As we've discussed before, I did not follow up with any of the medical people who had made records regarding Angela. I didn't spend enough time with Angela. I didn't -- there were a lot of witnesses that I did not talk to that other people had mentioned in my interview notes that I had.

I didn't go to Kansas. I didn't follow up on the Dillow -- the Dillow people. I didn't spend very much time with her aunt Darlene who also reportedly was -- had mental health problems.

Had we continued on with the investigation in a timely manner as we should have, we should have had the experts become involved with all these people in terms of not just talking to them on one occasion for an hour or whatever but to actually meet with them and evaluate them in terms of their own mental illness and the effect that that had upon Angela and her siblings as they were growing up.

And -- oh, it's a long list. There are people, people, Bruce and Donna Mobley. There were the Alexanders. They ran a foster home. It was actually like a Bible camp, but it was sort of a foster home too, and Angela lived there for a

while as a child.

And, of course, the biggest thing that I see now is just that Angie's sister Wendy talked a lot about the casting out of the deaf and dumb demons in terms of Angela being held down in the tire and these experiences they had at home with the exorcisms.

And there's a notation in one of my notes in talking to Pearl Jean where in questioning whether or not she actually had a seizure given the description of Pearl Jean about what had happened to her, and then as Wendy was talked to as the case went on, her description of what caused them to try to cast out these deaf and dumb demons became better. So obviously if you talk to the witness more and you spend more time with them, you get this important information. The witness doesn't always have an idea that they're telling you something important, but she was talking about Angie being unable to attend, unable to answer when people called to her, staring, having staring episodes. And clearly, you know, this is really problematic and needs to be addressed, those symptoms, the symptomatology. And even Carol Mann who was a friend of the mother's talked about Angie watching one of these particular exorcisms and seeing Angie's eyes roll back in her head.

So there really were many, many things that I missed. Angie was a breech birth. Jean had a nervous breakdown. You know, Uncle Skip was described as being really crazy. Was Bob

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS    Document 347    Filed 11/10/11    Page 44 of 84

Klaus really dead, the father of Holly? Angie had severe headaches as a child. She had an out-of-body reaction. They always said she had ADD and dyslexia. She was never treated for any of those things.

Q. When you say that more than one interview wasn't -- one interview was not sufficient, why would you not be covering the bases by, for instance, interviewing the sister or a family member once about things like family background or traumatic experiences? Why isn't that good enough?

A. Well, really that was a great example there. I went to talk to Wendy. I went to her home. I went to Texas. I met with her and her husband. I spent hours with them. We talked about a lot of things, but it wasn't until she was talking to the experts at that meeting that she began to be more descriptive about the casting out of the deaf and dumb demons. But it got mixed up with the casting out of the deaf and dumb demons which was really a dramatic thing. And, you know, I missed it because I was concentrating on what was physically occurring rather than what caused that act to occur.

Q. And the rolling of the eyes back and the blank stares, what should that have suggested to you as a mitigation specialist?

A. That she was experiencing seizures.

Q. And what should you have done with that information at that point?

A. Well, I should have immediately started saying that we

needed to have her seen by a neurologist, we needed to get a better history from all the family members about what they had observed concerning this, a better history particularly from her mother and she nee -- you know, the neuropsychologist needed to be working -- people needed to be working on this case, and they weren't.

Q. And the guidelines speak, do they not, to how extensive the mitigation investigation needs to be?

A. Yes.

Q. Talks about the need to look at an intergenerational approach?

A. Yes, and so was the intergenerational investigation that I did not have time to do, and the guidelines talk about that and they use a word -- I think maybe it's in the Wiggins case -- unparalleled. The mitigation investigation has to be unparalleled.

Q. This is 10.22. Because the sentencer in a capital case must consider in mitigation anything in the life of a defendant which might militate against the appropriateness of the death penalty for that defendant, penalty-phase preparation requires extensive and generally unparalleled investigation into personal and family history. Is that what you're referring to?

A. Yes.

Q. And do you feel that you met that standard in this case given what you're telling us?

A. No, I did not.

Q. Now, the guidelines also speak to the need to investigate aggravating evidence, do they not?

A. Yes.

Q. That the mitigation specialist not only must uncover mitigating evidence but they must investigate what's being offered in aggravation.

A. Yes.

Q. And is one of the witnesses you interviewed in the course of the work that you were able to do a guy by the name of Douglas Book?

A. Yes.

Q. And who was Douglas Book, and why were you interviewing him?

A. He was the chief of police of Forest City I believe. I may -- I don't exactly remember, but he was the chief of police in the town where Angie had made various calls to him to rescue her from the beatings that she was experiencing from Terry DeGeus.

Q. Now, did you actually interview Mr. Book in March of 2005?

A. Yes, Pat Berrigan and I interviewed him together.

Q. And showing you MG5615 through 5617, is this the report of your interview with Mr. Book that was conducted by you and Mr. Berrigan on March 24, '05?

A. Yes.

Q. And without going line by line in this, if you could read it, is it true that in general what the information that's contained in your report relates to what a bad guy Terry DeGeus was?

A. Yes, that he had beat her brutally, that he had left her in a ditch, that the chief came along and found her there, that it was a complicated relationship in the sense that she didn't want to be -- you know, she didn't want to do anything to press charges against him but she was really quite beaten up. Doug Book had had other encounters with Terry DeGeus that didn't involve Angela Johnson in which he had tried to arrest him and there had been a terrible fight, a physical fight, where Terry DeGeus had actually given Doug Book and another deputy a real run for their money. It was a real rodeo.

Q. The first line of your report says Chief Book has known --

A. Yeah.

Q. -- Angela Johnson and Terry DeGeus for a long time but did not know them very well; right?

A. Yes.

Q. And you're interviewing this chief of police because you're contemplating putting a chief of police on the witness stand as a mitigation witness.

A. Yes.

Q. And if you can get a police officer as a mitigation witness, it's not a bad deal; right?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 45 of 84

**181**

A. Right.

Q. Why?

A. Well, because he's, you know, a police officer and he's -- he is going to be -- you know, he carries a little bit more weight than your average lay witness I think, and if he can testify successfully about something, you know, that favors your client, that's a good thing.

Q. Now, although this interview report talks about Terry DeGeus is a bad guy, does it say anything about Chief Book's knowledge of Angela Johnson and anything he may know about her good or bad?

A. Can you put the third page on there, please?

Q. Yeah, sure. So . . .

A. Is there another page to that?

Q. There is.

A. Yeah. Chief Book knew about Angela running the bar, the Silver Bullet bar, and he knew about her mother, and that's what he knew he said.

Q. Now, did you ever -- or Mr. Berrigan ever ask him if he had any negative information about Angela Johnson that might conceivably be harmful in the event that you put him on as a mitigation witness?

A. No, we didn't.

Q. Was that -- did that meet the standard of practice in terms of mitigation investigation?

**182**

A. No, it didn't.

Q. And why not?

A. Well, because you always need to know what is the best and worst thing and everything in between that a witness can say about your client. And in this particular case we wanted to know about the physical violence that went on with Terry DeGeus, and we completely missed the fact that there may have been some other contact.

Q. And you -- based on this interview and not asking him questions about anything negative he had to say, did you and Mr. Berrigan and the team make a tactical decision to put him on the stand as a mitigation witness?

A. Yes.

Q. And did it turn out to be a good move in the end?

A. No.

Q. Why not?

A. Well, because Angela had made some telephone calls to Doug Book's office, and this is something that we didn't know about, we didn't ask him about, and he didn't tell us. He didn't offer that information either. So we were totally unprepared for the fact that there was going to be this kind of devastating end to what we thought was going to be a positive witness.

Q. And the devastating end had to do, did it not, with Mr. Williams bringing out on cross-examination that Angie Johnson had supposedly threatened to kill --

**183**

A. Yes.

Q. -- or to do serious damage to Chief Book.

A. Yes.

Q. And that was done, was it not, in the context of a government penalty-phase presentation that in the Johnson case was trying to make Angie Johnson look as bad and even worse than Mr. Honken?

A. Yes.

Q. And it was coming from a police officer.

A. Yes.

Q. Now, had you have asked the question of Chief Book, hey, by the way, do you know anything bad about Angie Johnson and he had told you during the interview that, oh, yeah, she did threaten to kill me, would you have ever advised the defense to put him on as a mitigation witness?

A. No, I wouldn't.

Q. Did you have other means to prove up Terry DeGeus's badness other than putting on a witness that also could be crossed on threats to kill?

A. Yes, we did, or we thought we did.

Q. That was in March. Back in January -- now, you've got the funding around beginning of March; correct?

A. Yes.

Q. And showing you MCN05-005049, is this an e-mail you wrote to Mr. Berrigan in which you are summarizing basically what

**184**

needs to get done?

A. Yes. At the -- you know, for what we're -- let's see. Yes. We're planning a trip, so we're talking about -- I'm talking to him about what we need to do at that moment in time, what's going on at that moment in time.

Q. And are you referencing the witness list you referred to --

A. Yes.

Q. -- before, the January witness list?

A. Yes.

Q. Now, you say here probably the whole total is around 70. Is that 70 witnesses that should have been interviewed?

A. Yes.

Q. And that -- that's according to performing an unparalleled mitigation investigation per the standards; right?

A. Yes.

Q. Then you say realistically there's about 35 people on here we can pare down for the penalty phase. What was that based on, paring the list from 70 to 35?

A. Well, that there had been people who were interviewed that probably wouldn't make good mitigation witnesses, people with problems like the Doug Book problem which we missed. And so, therefore, you know, I was just kind of thinking that perhaps we would have about 35 people, but I wasn't really basing that on any kind of solid -- I hadn't finished the investigation, and so I was estimating.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 46 of 84

**Q.** Well, you gave the Book investigation as an example. You certainly couldn't eliminate him as a witness in January till you interviewed him; right?

**A.** Right.

**Q.** Because the information you had was he could be favorable.

**A.** Right.

**Q.** If you had asked him the right questions, you could eliminate him, pared the list down to take him off because he had bad information.

**A.** Right.

**Q.** But in January did you in advance of interviewing any of the 70 have any rational basis for eliminating half of those?

**A.** No.

**Q.** Without actually doing the investigation?

**A.** No.

**Q.** Isn't that the point of the standard?

**A.** Yes.

**Q.** You do the investigation first; then you decide what to present and what not to present.

**A.** Yes.

**Q.** You have a notation here you talked to Gelbort today and he's still on board for the 24th. What -- is that in reference to the examination by Gelbort actually getting done?

**A.** Yes. Dr. Gelbort had said that he could come. I'm not sure if it was February or January. He was going to see her

January 24.

**Q.** January 24. And did you talk to him following his examination on January 24?

**A.** I did.

**Q.** And do you have some notes of that conversation which are in your file?

**A.** Yes.

**Q.** Are they dated 2-3-05?

**A.** Yes.

**Q.** This is Mary Goody 004120 through 004123. Are these the notes?

**A.** Yes.

**Q.** Three pages, four pages?

**A.** Uh-huh.

**Q.** What did he tell you he found?

**A.** Dr. Gelbort said he found Angela amusing.

**Q.** Amusing?

**A.** Yeah, he made that comment, that she was amusing, that she had some memory disturbance. And then I just have not there. And the not, the next word would have been not severely impaired. He found her full scale IQ to be 91, her performance IQ -- performance scale IQ to be 102 and her verbal IQ to be 84 which indicated that she had an 18-point differential spread between her verbal and performance IQ which is statistically significant as if one hemisphere is -- one hemisphere of the

brain has damage and the other doesn't.

She's mildly impaired. Her vocabulary is low average. She has low average information and focus. Her abstract reasoning is in the lower average range. She has difficulty seeing I have here, but that does not refer to her sight.

**Q.** What does it refer to?

**A.** I believe that refers to difficulty seeing consequences for her actions.

**Q.** Uh-huh.

**A.** Her intuitive reasoning is mildly impaired. She has low average reading and spelling.

**Q.** By the way, stop there. The term mild impairment, you had had prior experience with neuropsychologists in capital cases; right?

**A.** Yes.

**Q.** Does mildly impaired as you understand it mean not significant?

**A.** No. Mildly impaired is impaired.

**Q.** And is it insignificant impairment or --

**A.** No, it's not insignificant. It means --

**Q.** It's less than moderate?

**A.** It's less than moderate, but it's more than nothing.

**Q.** And moderate can be profound impairment.

**A.** Yes.

**Q.** So it's somewhere between nothing and profound impairment.

**A.** Yes.

**Q.** But not insignificant.

**A.** No, it's not insignificant.

**Q.** In other words, as you were hearing this, were you saying, well, she's only moderately -- mildly impaired so that takes care of this issue? Were you thinking that?

**A.** Was I thinking that she was mildly impaired?

**Q.** No. Were you thinking that because he was telling you she was mildly impaired that he didn't really have anything significant to say?

**A.** No. I was thinking that she had an 18- point differential between her verbal and performance IQ, and to me that meant something.

**Q.** Okay.

**A.** That meant that even though he may have been telling me that she was mildly impaired, especially in her intuitive reasoning, that, in fact, she was -- you know, that translates into being really impaired. So --

**Q.** And that's as you understood it. I'm not asking you to testify as a neuropsychologist.

**A.** No.

**Q.** But we're trying to find out how you read these --

**A.** Right.

**Q.** -- these notes.

**A.** And that means cause for concern.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q. Okay.

A. Need to get more people working, need to call in other people.

Q. On this issue.

A. Yeah.

Q. Okay. What else?

A. She had impaired intuitive reading. She was behind in math. She was poor on --

Q. Impaired intuitive reading or reasoning?

A. Well, intuitive reasoning, that's the previous page. Her intuitive reasoning was mildly impaired. She was low average on reading and spelling.

Q. Uh-huh.

A. And then turning the page, she was -- she had impaired intuitive reading. She was behind in math. She was poor on some learning tasks including visual, spacial. There was a little Swiss cheese there he said.

Q. What does that mean?

A. He's saying that her brain has holes in it, that like cheese, Swiss cheese, has holes in it, so there are areas of her brain that are not working properly and just, you know, they could be dead areas of her brain. Then he says it's not terrible, but it's not normal.

So he says her absolute level of functioning is not too impaired.

In relative terms, if you use her as a baseline -- now, not right scores, I don't -- I don't understand what that note means.

In categories, the categories test, her problem solving was more impaired on intuitive but better on rote. She's not terribly wrong in any one place, but she's not right either.

And then I have an arrow next to this bad judgment. She has bad judgment and not terribly well thought out which is the way the testing looks.

Q. So did that finding, bad judgment, surprise you in light of the contacts you had had with her?

A. No, it fit in quite well with everything that we knew about her.

Q. And was that -- did you read that as bad judgment in areas of communication as well as in other areas?

A. Yes, in intuitive communication and in personal communication and relations with other people, her dealings with other people.

Q. Okay. What else did he tell you?

A. And then the next page, her rote and logical thinking is basically okay in a general sense, but the nuances -- but she's bad on nuances and cannot apply long-term logical thinking. Her insight is not great. And then he commented that she was flirting with him and that it was not appropriate behavior. I'm

a doctor. She's a giggly girl he said. This was strange to him. It bothered him.

The diagnosis that he would give would be cognitive disorder NOS. Learning disabled, I'm asking him is she, and he replies, "Maybe but I don't want to defend that." And then he says she has a mixed learning disability but it doesn't fall squarely into any one specific learning disability.

And then I asked him about this cognitive NOS picture, what happens if you take a lot of meth, and he said if she's under the influence it would have a negative effect. You never quite know what you'll get from her. She doesn't add up numbers the same way twice, and with meth all her symptoms get worse. And then he comments again. He said she had Swiss cheese before the meth and the meth made it worse.

Q. Now, at least on the surface, did that evaluation appear to be the kind of neuropsychological evidence that you would want to present in the penalty phase of Miss Johnson's case?

A. Yes, but I felt I didn't know enough about what tests he had done.

Q. Did he tell you any tests he'd done?

A. He didn't tell me -- he only told me about the category test, and I assume it was the WAIS-III, so this was my first conversation with him since he has done his testing and --

Q. So the correspondence we've covered so far was going back to 2002. We had been talking about doing this evaluation.

A. Right.

Q. Now you're on the verge of trial and you're getting some findings --

A. Now I'm getting the information.

Q. Okay.

A. One of the other things he said was that she was concerned about her own performance on the test and that she really wanted to do well and that she would rush through things sometimes which would cause her to become, you know, unravelled. And I asked him if she was malingering at all, and he said no, she tried really hard.

What were his recommendations? A pharmacology consultation would be useful to touch on how it affects her brain, the meth. I don't know what that means, did not see her. And she's -- and he says she's one that shows a positive finding on a PET scan if there's no downside to it. In other words, we understand that people who are mentally ill or have brain damage or cognitive deficits can actually have scans of one sort or another and they don't -- even though they may have the damage, the scan doesn't always show the damage. And so, therefore, he's saying if you got a positive -- you know, if you got a negative PET scan, you know, there would be a downside to having done it.

Q. Sure.

A. So there was just conversation about that. And then I

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 48 of 84

asked him if he could tell that she had ADD in her childhood, and he said, well, 30 years ago she would have been diagnosed as anything, could have been diagnosed as anything. And he still sticks to this cognitive NOS diagnosis. So that was a lot of information.

Q.   So based on what he was telling you, did you talk to the team about doing some neuroimaging?

A.   I didn't talk to the team. I talked to Pat about this.

Q.   And what recommendations did you make about doing neuroimaging or other testing?

A.   None.

Q.   Why was that?

A.   I don't know.

Q.   And as I understand it, he did not tell you the specific tests he had done.

A.   No.

Q.   So as far as you know, he may have only done a preliminary battery of tests.

A.   That's correct. I don't --

Q.   And if he had done a preliminary battery of tests, then you would want, of course, to do some more thorough neuropsychological testing to see if his conclusions were borne out.

MR. WILLIAMS: Objection. Leading.

THE COURT: Overruled.

A.   Yes, we would have done that. And in addition, you know, based upon what -- the work that I did not do with regard to the potential seizure problem, you know, we would have -- I would have wanted to call a neurologist in.

Q.   All right. Now, after discussing it with Mr. Berrigan, did you then send an e-mail to Dr. Gelbort which is MG004118 asking him to do a report for you?

A.   Yes.

Q.   And at this stage of the case, was there -- was there some sort of looming deadline about expert witness disclosures?

A.   If there was I don't know what it was.

Q.   Sure. What you were asking him to do here was just write up his findings?

A.   We were asking him to write up his findings in a brief fashion along the lines of, Dear Mr. Berrigan, you asked me to see Angela Johnson. I reviewed the following documents before I went to do my evaluation of her. I gave her the following tests, and these are my findings.

Q.   And did he, in fact, write you a report?

A.   If he did, I have never seen it.

Q.   Okay. Now, did eventually Dr. Gelbort go south on you, so to speak?

A.   Yes, he did.

Q.   And showing you MG004128, do you recognize this note?

A.   I do.

Q.   What is this note?

A.   This is a memo that I wrote after not hear -- well, after I finished my work in the Cannon case and came back on the Johnson case, I hadn't heard from Dr. Gelbort, and I tried a number of times to get ahold of him and finally succeeded at that, and that was very late in the game. That was May 12.

Q.   Case is in jury selection at this point; right?

A.   Yes.

Q.   If not testimony.

A.   Yeah, I think test -- well, and he called me back, and he was -- we had a conversation about Dr. Martell and Dr. Martell's potential work on the case. And he said to me, "I don't want to testify." And he said, "There's nothing huge. I just feel like there's something -- there's nothing huge or useful, nothing useful, too much crap," he says.

Q.   Uh-huh.

A.   "In my findings. And it's a good decision not to call me," and I needed his raw data at that point. And I'm like, where else can we go with this? And that was the end of the conversation. He told me he'd been paid on the Cannon case.

Q.   Now, given that he had just told you in that long note that we just reviewed that there were some positive findings, did you think there was nothing huge to go on? In other words, did you think he was being straight with you?

A.   No, I didn't. I couldn't understand what was going on.

His demeanor was curt. He was short with me. He didn't want to talk to me. In fact, he avoided me for a while before I finally did get ahold of him. And at this point in time it was just, you know, too late to do anything else. The lawyers were in trial. The experts wanted Dr. Gelbort's raw data, and it had actually been sent, I believe, to Dr. Hutchinson, the raw data, because she was a Ph.D. psychologist.

And we had no team meetings whatsoever. We did not meet. I called Pat and talked to him about this, and my best recollection is that he said just forget it.

Q.   Did you ever yourself make a strategic decision that because Dr. Gelbort was telling you there was nothing huge that you had exhausted the possibilities and there was really no issue here?

A.   No, I never made that decision. I was always highly bothered by the fact that there was -- you know, the work that he had done yielded some information that indicated that she had some kind of cognitive problem.

Q.   Did you discuss strategies -- well, one strategy would have been to hire a new expert; right?

A.   Right.

Q.   But Pat told you forget it because it's too late or . . .

A.   Well, I think he felt that we could not -- we could not come in at this late date and get another expert, that we would never get the money to get another expert, and that we -- we had

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 49 of 84

**197**

plenty of experts.

Q. Well, you didn't have a neuropsychologist, did you?

A. We did not, and I cannot explain this very bad situation any better.

Q. Did you talk about a back-up plan of maybe let's feed the data through one of the other experts who maybe can just regurgitate what Gelbort found and rely on his data to render some opinions even though it was not from a neuropsychologist?

A. Well, I think -- I think we talked about that, but we decided that we had a lot of difficulties with that, and so he had never written this letter report that he was supposed to write, so we had him send his raw data to Marilyn Hutchinson in the hopes that something would come of that.

But given what was, you know, the huge crush of things that were trying to be addressed and done at that time, I think that this issue just got lost.

Q. Okay. Now, that's Dr. Gelbort. Did you also have some communication with Dr. Logan in terms of trying to get him prepared for testimony?

A. Yes, I did.

Q. And showing you MG4279 --

THE COURT: Mr. Burt, before we get to Dr. Logan, how about a 20-minute recess?

MR. BURT: Thank you, Your Honor.

THE COURT: Okay. We'll be in recess until 2:45.

**198**

Thank you.

(Recess at 2:26 p.m.)

THE COURT: Thank you. Please be seated.

Mr. Burt, you may continue your direct.

MR. BURT: Your Honor, we have a logistical problem that I wondered if I could bring it up with the Court.

THE COURT: Yes.

MR. BURT: We have a witness who's traveled by car nine hours from here to be here today. He has to be back at work tomorrow, and I --

THE COURT: Would you like to take that witness now?

MR. BURT: I've asked Mr. Williams. He has no objection. He'll be relatively brief.

THE COURT: Well, I wouldn't bet on that, but why don't we take the witness. But we can certainly take the witness out of order.

MR. BURT: And it's not by me, so it will be brief.

THE COURT: Oh, okay. But you haven't seen Mr. Williams' cross-examination yet.

MS. MORRISSEY: Your Honor, our next witness would be Tim Dillow.

THE COURT: Okay. Thank you.

If you'd just step forward, I'll swear you in. Good afternoon. Would you raise your right hand, please.

TIMOTHY DILLOW, PETITIONER'S WITNESS, SWORN

**199**

THE COURT: Okay. Please be seated in the witness box there. And you can adjust the chair and the microphones so you can speak directly into them. And scoot that chair up a little bit, and pull the microphones back a little bit. And why don't you tell us your full name, please, and spell your last name for us.

THE WITNESS: Timothy Lee Dillow, D-i-l-l-o-w.

THE COURT: Thank you.

Miss Morrissey?

MS. MORRISSEY: Thank you.

DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Good afternoon, Mr. Dillow.

A. How are you?

Q. Mr. Dillow, where do you live now? Where do you live now?

A. I live in Stella, Missouri.

Q. And do you have a partner in life?

A. Yes, I do.

Q. Is that Theresa?

A. Yes, ma'am.

Q. Is she present now?

A. Yes, ma'am.

Q. Do you have any children?

A. Two of them.

Q. Boy or girl?

**200**

A. A 21-year-old daughter and a 18-year-old son.

Q. Are they at home or --

A. Yes, ma'am.

Q. -- are they grown and out?

A. They're home.

Q. Okay. What do you do for a living, sir?

A. I'm a mechanic.

Q. And where do you now work?

A. Jackson Tire and Auto in Carthage, Missouri.

Q. Have you worked in the past as a mechanic?

A. Good many years.

Q. Did you have any other jobs before you became a mechanic?

A. Certified welder for about 12 years. Then I burnt my eyes really bad. I couldn't weld anymore after that. Welding was my first, and mechanics was my second.

Q. Okay. And can you tell us where you were born, sir?

A. I was born in Sisseton, South Dakota.

Q. That's S-i-s-s-e-t-o-n?

A. I think so, ma'am.

Q. And do you have much memory of your early life?

A. Not very much memory of my early life.

Q. What about -- are you a Native American?

A. Yes, ma'am.

Q. What tribe?

A. I'm a Sisseton Wahpeton Sioux.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

### Page 201

Q. Okay. Is a Sisseton like S-i-s-s-e-t-o-n, and then how do you spell the last part?

A. I'm not for sure. I'm not a very good speller.

THE COURT: Neither am I. We share that in common.

Q. When you were first born -- you said you were born in Sisseton -- did you have a brother? Did a brother come along?

A. Yes, I had a brother.

Q. And what was his name?

A. Paul Carl.

Q. Is he older or younger?

A. Younger than me.

Q. Did something happen in your life when you were about five years old?

A. I was adopted. Me and Paul both was adopted when I was five.

Q. And did you leave Sisseton?

A. Yes, ma'am.

Q. How'd you leave?

A. They put us on a big airplane and flew us to Kansas.

Q. Do you remember who put you on the airplane?

A. I don't recall all of that, just --

Q. Do you remember where you were living before you got on the airplane?

A. No, ma'am, I don't.

Q. And when you got to Kansas, did you meet somebody?

### Page 202

A. Ted Dillow and his family.

Q. And how did you come to be living with Ted Dillow and his family?

A. I have no idea how that all come about. All's I know is I was adopted by him. That's all I know.

Q. Was your brother adopted as well?

A. Yes, ma'am. We both was adopted.

Q. And when you first came to Kansas and started -- were adopted by the Dillows, what town were you living in?

A. We lived east of Chanute, Kansas.

Q. And was that place in Chanute, east of Chanute, Kansas, was that a town or a farm or what?

A. It was just a farm.

Q. Who else besides Ted Dillow and his wife was in the Dillow family when you lived in the farm that was east of Chanute?

A. It was just three daughters and me and Paul, and then a little while later -- I don't know how much later it was, but then he adopted another boy.

Q. And what was his name?

A. John. I don't remember what his middle name was.

Q. Was he older or younger than you?

A. He was a lot younger than me.

Q. Was he younger than Paul?

A. Yes, ma'am.

Q. Was he also Native American?

### Page 203

A. No, ma'am.

Q. Was he a white kid?

A. Yes.

Q. How old was John about when he first came to the Dillows?

A. I really couldn't tell you, ma'am. I don't really remember how old he was.

Q. I'm going to ask you, Mr. Dillow, about your father Ted Dillow. How did he treat you after you were adopted into the Dillow family?

A. How do you mean? What do you mean? He wasn't a very -- very nice person. That's for sure.

Q. Could you tell us, explain to us why he wasn't a nice person.

A. I don't know. Boys will be boys, but I didn't -- I didn't treat my kids anything like he treated me or my two little brothers.

Q. When you say boys will be boys, do you mean that boys can sometimes get into trouble?

A. Yes, ma'am.

Q. And did you as a boy get into trouble?

A. A lot of trouble I reckon by his standards.

Q. What kinds of things would you get into trouble for?

A. Mostly probably for not doing my chores correctly or just -- it was just numerous things.

Q. What about was there something that happened on Wednesdays

### Page 204

and Sundays in the Dillow family?

A. That was church day.

Q. And when church -- when there was church day, did everybody get dressed up?

A. Yes, we had our own set of clothes that we needed to wear for church and school and . . .

Q. And was there -- did Mr. Dillow look at his family before you went off to church?

A. Yes, yes, ma'am, he did.

Q. What kind --

A. We was all made to line up in front and make sure that our clothes was in order, we washed our hands and our elbows and stuff like that --

Q. Did you get --

A. -- make sure --

Q. I'm sorry.

A. Just make sure we --

Q. Are you done?

A. Yes, ma'am.

Q. Did you get into trouble because of your elbows?

A. Yes, ma'am, all the time. He was pretty particular about my elbows. I don't know why. Even now when I'm an older man, my elbows are black. They just stay that way. I washed the hides off my elbows just so he would be all right with it but, you know . . .

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q. Would you get punished?

A. A lot.

Q. Would you get punished every week, every day?

A. Well, just pretty much all day long every day of the week.

Q. And what kind of punishment would you get?

A. Whippings, backhanded, just whatever was convenient I reckon at the time.

Q. When you say whippings, do you mean to say that Ted Dillow used something besides his hand?

A. Yes, ma'am, his belt, his boot, spatula.

Q. His belt, his boot, a spatula?

A. It really didn't matter to him.

Q. What about bridles?

A. That was -- that was later on in life when I was a teenager.

Q. 2-by-4s?

A. Yes, ma'am.

Q. And how badly did he beat you?

A. After a while the beatings was just -- just something that, well, you just get used to them or not really used to them, but you just learn to live with them, and you just -- no matter how hard you tried or even my little brothers, how hard they tried to do right and get things done correctly like he wanted, it just still happened. It was all . . .

Q. Did it seem like you couldn't do anything right?

A. Seemed like it for a long time.

Q. What about your brother Paul? Did he get treated the same as you?

A. Yes, ma'am.

Q. What about John?

A. Not so much. I think mostly it was because I was a lot older than him that I would take most of the punishment because say if something was done incorrectly, he'd want to know who did it, and if nobody would say -- step up to the plate and take the punishment, then everybody got punished. Did that for Paul and John a lot because I was older than them.

Q. Was Paul a strong boy?

A. No, ma'am. He was a scrawny little kid. He was sick a lot. He had a lot of -- his nose ran all the time. His tear ducts in his face, they was never correct. I don't know why they wasn't.

Q. When you were -- as a result of the beatings that you got, did it leave any marks on your body?

A. A lot of marks, some things -- welts, bruises, pinch marks. Sometimes get your ears pinched so hard that your ear lobe would be sore for days.

Q. When you would go to church or to school, would you wear any special clothes because of the black-and-blue marks on your body?

A. We had -- we had our chore clothes and our Sunday clothes

and our school clothes. Our Sunday and school clothes was basically the same things, you know, flannel shirts, turtlenecks, long sleeves. We was never allowed to go out into public with, say, like short sleeves on like I have on now. We'd have to have -- and our shirts would always have to be buttoned up really tight like that right there so . . .

Q. And if you wore short sleeves or if you unbuttoned your shirt, what could be seen?

A. We wasn't allowed to wear short-sleeve shirts and stuff like that out in public.

Q. All right. Did people come and go on the Dillow farm?

A. When I was younger there was -- they came and gone, but I really don't remember anybody all that well. Even when I was a teenager they'd still come and go. But, you know, I can't even remember some of them people. It's just some would stay and some would go, you know.

Q. Do you have any idea why people were coming and going on the farm like that?

A. I have no idea.

Q. Do you remember a time when a woman and three children came to live on the Dillow farm?

A. No, ma'am, I don't.

Q. The woman had one boy and three girls.

A. No, ma'am.

Q. And the woman was pregnant.

A. I don't remember any of them people.

Q. Mr. Dillow, do you know if you've ever seen this woman who's in the orange jumpsuit at the Dillow farm?

A. I don't think so, ma'am. I don't remember.

Q. Okay. Would you tell the Court about the living arrangements on the farm.

A. Well, boys was over here and the girls was over there. I remember we always -- he always had like a big part of the house that seemed like there was bunk beds in them, but I don't ever remember seeing anybody in them bunk beds, or I can't even remember anybody being there in them bunk beds.

Q. Uh-huh.

A. Other than me and Paul and John, you know.

Q. Do you remember building those bunk beds?

A. Not so much the beds. I do remember the building of the add-ons, you know, when we added on.

Q. And do you know why you were adding on with bunk beds?

A. I have no idea. I just thought it was part of the chores. It was just what we was told to do, and we did it.

Q. Would -- Mr. Dillow, would Ted Dillow touch his daughters?

A. Yes, ma'am.

Q. And can you describe how he would touch them?

A. You know, I really didn't see much of the touching going on except for like Sundays and Wednesdays when it was church day, and he was always caressing their shoulders, their necks,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 52 of 84

rubbing their butts, rubbing his hand up their dresses.

**Q.** Were -- it sounds like when you were punished you were punished wherever you happened to be when you did something to be punished for; correct?

**A.** It didn't matter to him where we was at. If he felt like we needed to be punished or I needed to be punished, he just punished us.

**Q.** What about the girls? Were they punished in the same manner as you?

**A.** No, ma'am. I never saw the girls ever get punished.

**Q.** Did you see the girls ever go off to a place with Mr. Dillow, your father?

**A.** There was -- he had a separate room in his house where girls was -- that was the punishment room for the girls when, say, they messed up or did something bad, you know. He really didn't say nothing to them. He just would like -- you know, like point to that door over there, say that's the room over there. He'd just point to the door right there, and they would go in there. And he wouldn't always go in with them right at that time. I really don't know how long they was allowed to -- or how long they stayed in that room or what kind of punishment they got when they was in there.

**Q.** But were there times when he was in that room with them?

**A.** Yes, ma'am.

**Q.** Okay. And were there times that he would stay in that room

with them for hours?

**A.** Wouldn't actually say hours, but -- but then again, when you was a kid, hour seemed like forever, you know.

**Q.** Did you ever hear any noise or screaming or anything coming out of that room?

**A.** Like I said, I never seen or really heard the punishment that the girls got.

**Q.** Punishment to you is being beaten; right?

**A.** Yes, ma'am.

**Q.** Okay. And when you say you never heard punishment to the girls, you mean you never heard them being beaten?

**A.** No.

**Q.** Okay. And you couldn't hear what went on in that room when they were --

**A.** Usually when the punishment went on with the girls, it was -- we had chores to do outside. You know, we'd go do our chores.

**Q.** Did you go in that room when it was empty?

**A.** We snuck in there two or three times, took a look.

**Q.** What was in there?

**A.** Nothing. Just chest of drawer and a bed, belt hanging on the wall but didn't ever look like it was used very much, but it could have been. I don't know.

**Q.** I'm going to ask you a little bit about the farm. Was this a farm where they had animals?

**A.** Yes, ma'am.

**Q.** Okay. What kind of animals?

**A.** We had cows, chickens, rabbits, pigs.

**Q.** Let's talk about the hogs. Did you feed them? Did you participate in their feeding when you were living on the farm?

**A.** Yes, ma'am.

**Q.** And what -- how were they fed?

**A.** Corn mash and water. They was fed just about anything. If, say, like a possum snuck in the hen house and chewed the head off a chicken, we just threw it in there with the hogs. The hogs ate everything.

**Q.** Okay. What about kittens? Were there kittens on the farm?

**A.** There was dogs, cats.

**Q.** And were -- the kittens and the dogs and the cats, were they animals that you liked to play with?

**A.** All kid likes to play with dogs and cats.

**Q.** Would anything happen when you played with the chickens and the dogs and the cats?

**A.** Best not get caught playing with the pups and the cats when chores was supposed to be done.

**Q.** What would happen if you were caught playing with the kittens and the --

**A.** He'd throw them into the pigpen or make us throw them in there or just whatever kind of mood he was in that day.

**Q.** So if you were playing with a kitten, he'd make you throw

it into the pigs?

**A.** Yeah.

**Q.** And then the pigs would eat it alive.

**A.** Yeah, pretty much.

**Q.** Yeah? That's what pigs do; right?

**A.** Yes, yeah.

**Q.** Same thing for the cats?

**A.** Yes.

**Q.** And same thing for the puppies, the dogs.

**A.** Yeah.

**Q.** How did that make you feel?

**A.** I really didn't know at the time, but it was just part of life, you know.

**Q.** Okay. Did you learn how to kill rabbits when you were living on the farm?

**A.** Yes, ma'am. I killed many a rabbit.

**Q.** And did you eat rabbits? Is that why you --

**A.** Yes, ma'am.

**Q.** Was there a particular way the rabbits were killed?

**A.** Yeah, nail them to the barn. Sometimes he would show us different ways to kill things, butcher things. Everything that was killed was butchered. It was for eating purposes, the rabbits and the chickens. I didn't really like butchering the chickens too much. The hot water always burnt me because we had to dip them in there and pluck the feathers out of them.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS    Document 347    Filed 11/10/11    Page 53 of 84

Q. When you said the rabbits -- you said you'd nail them to the barn door?

A. We'd nail them to the barn, the side of the barn, so we'd pull the hide off of them, gut them.

Q. Would you nail them by forcing a nail through their head?

A. Yes, ma'am, with a hammer.

Q. That's how you kill a rabbit.

A. Sounds pretty bad now but . . .

Q. You were used to it.

A. Was doing what I was told to do. I didn't want to get a whuppin' or crack in the head, you know.

Q. Do you remember using -- well, when you were young the first time you killed a hog?

A. Yes, ma'am.

Q. Could you tell us about it?

A. I got a pretty bad whuppin' that time. The shotgun kicked awful hard. I dropped it in the pig manure, but I didn't even -- didn't even -- pig was still alive too.

Q. Who -- who got -- gave you a beating for that?

A. It was just -- I was being the oldest son. It's just what I was -- I was told to do it.

Q. Why do you think you got the beating? Because you didn't kill the pig?

A. More or less because I dropped the shotgun in the hog manure. That's what he kept saying anyways. Never drop a

shotgun or a rifle; don't play with them either.

Q. When you were using the shotgun, how old were you? Were you able to shoot it without any recoil?

A. No, ma'am.

Q. Is that what got you into the hog manure?

A. Yeah. It was -- I can't remember what kind -- what size shotgun it was, but it kicked pretty hard, and I dropped it.

Q. Were you scared of Ted Dillow, sir?

A. When I was littler I was pretty scared of him. When I become a teenager, I guess it -- all the beatings and trying to protect my little brothers really -- I don't know if it really made me stronger, but it made me -- had a lot of hate for that man.

Q. A lot of hate?

A. (Witness nodded head.)

Q. To this day?

A. Yes, ma'am.

Q. Let me just ask you one more thing which is about something that happened. You moved to Yates Center, Kansas; is that correct?

A. Yes.

Q. And did you play -- well, let me just ask you -- somebody just gave me these pictures.

MS. MORRISSEY: May I, Your Honor? I'm going to show them . . . May I approach?

THE COURT: You may.

MS. MORRISSEY: Thank you.

BY MS. MORRISSEY:

Q. I just received this. It's something called Fairfield Memories. Do you recognize that school?

A. Yes, ma'am. That's the grade school I went to.

Q. Okay.

A. That was east of Chanute, Kansas.

Q. And this is from 1974 to 1975; right?

A. Yes, ma'am.

Q. Okay. I'm going to open it to this page. Do you recognize anybody in that picture of second graders?

A. That's me right there.

Q. That's you right there?

A. Yes, ma'am.

Q. Top picture, second from the right.

A. Right here.

Q. Okay. And then I'm going to go over to -- there's two separate ones. This is 1973 to 1974, and here is another Fairfield Memories from 1974 to 1975. Opening it to a page, do you see anybody you recognize there?

A. Yep, me right there.

Q. Is that you on the top row, third one from the left?

A. Yes, ma'am.

Q. Okay.

A. There's my brother Paul right there too.

Q. There's your brother Paul?

A. Yeah, that's Paul right --

Q. Okay. He was in the first and second grade. He's in the third row down, second one from the left.

A. Yes, ma'am.

Q. That's Paul.

A. That's Paul.

Q. Okay. Thank you. I think I was asking -- I think I was asking you when you went to -- you moved to Yates Center, Kansas; right?

A. Yes.

Q. And was that to another farm?

A. It was a bigger farm, lot bigger farm.

Q. Did you attend school?

A. In Yates Center, Kansas, I did.

Q. Did you play football in junior high?

A. Yes, ma'am, I did.

Q. Did you have to shower after football practice?

A. Yes, ma'am.

Q. Did something happen one day involving the authorities?

A. Yes.

Q. Can you explain what happened?

A. One of my coaches, he was -- he was concerned with the bruises that was left on my body all the way from the back of my

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS  Document 347  Filed 11/10/11  Page 54 of 84

knees to the middle of my back and my arms, just thought it was a little too much I guess.

Q. Uh-huh. And what happened?

A. We got pulled out of class, me and Paul did, and we was taken down to the local police station. I want to say police. I don't know if it was the police or the sheriff's department, but we had to go down there and give a statement or testify about why we had bruises on us, and they wanted to see them, mainly just our backs, but still they wanted to see them.

Q. Did you stay at the police station or sheriff's station, or did you eventually leave there?

A. Not very long. It didn't seem like we was there very long but . . .

Q. And who came to get you from there?

A. Bobbi Dillow, his wife, come and got us.

Q. What did she say to you when she come and got you?

A. "Boys, you trouble in now." Took us back to the farm. She was right.

Q. What happened back at the farm?

A. We got accused of telling or showing people our bruises when we should have knowed all along not to let anybody see them bruises. But it wasn't us.

Q. Did you get a beating that night?

A. Yes, ma'am, we both did that night.

Q. You and Paul.

A. Yes, ma'am.

Q. Mr. Dillow, did you eventually leave Ted Dillow's farm?

A. When I was 17 years old I had enough, I couldn't take it no more.

Q. Could you explain a little bit about how it was you came to leave?

A. He was friends with these other farmers down the road, and I'd go help them do chores in the evening time after I got done with my chores at home. And I don't remember why or how -- or how, but there was a pony involved. One day I come home, and the boys, Paul and John, they wasn't doing their chores. They was riding that pony. And they got in trouble for it. And he was whuppin' 'em. I was 17 years old at the time, and they was screaming and hollering, and I guess I just had a bad day that day because that was it.

Q. What'd you do?

A. Picked up a 2-by-4 and -- because he was -- we was adding on again at this other farm in Yates Center, Kansas, and adding on another big part of a house, and he had them boys down there where -- in that add-on part, and he was just whipping the shit out of them, and I couldn't take it no more, and I picked up a board, and he didn't even know I was there. He went to sleep. I laughed because I knew when he come to that he'd be tarring me again for sure.

I loaded up me and my two brothers, and I was getting

the hell out of there and they was going with me, but they started crying and screaming because they didn't want to go, so I dropped them off at the farmer friend's down the road, and I just lit out, and I never went back.

Q. Never at all?

A. I ain't been back to Yates Center, Kansas, since I left.

Q. Since you left the Dillows, could you tell us where you've lived? Have you lived in Missouri? Have you lived in Kansas?

THE COURT: What's the relevancy of this?

MS. MORRISSEY: To where he's been.

THE COURT: Yeah, but what's the relevancy of it to Angela Johnson's claim?

MS. MORRISSEY: I can shorten it up, Your Honor.

THE COURT: Okay.

MS. MORRISSEY: Okay.

BY MS. MORRISSEY:

Q. Since you left the Dillows when you were 17, have you used the name Tim Dillow?

A. All my life.

Q. And have you lived in this area?

A. I lived in Bentonville, Arkansas, when I was 17. And then I met my wife in '87, and she lived in Missouri, and I've been in Missouri the rest of my life.

Q. And in the years 2000 to 2005, did anybody ever contact you and ask you about what happened at the Dillow farm?

A. No, I don't recall.

Q. And if anybody ever contacted you, do you think you would have talked to them about it?

A. No.

Q. Why not?

A. I don't know. It was -- I left -- I left there when I was 17 years old, and in 2005, I'm a grown man. My kids are growed up, you know.

Q. You talked to Ms. Runnels when she came to talk to you; right?

A. 2005?

Q. No, in 2011.

A. Yes, ma'am. I talked to her when she showed up.

Q. It's not something you like to talk about; would that be fair to say?

A. Not very much.

Q. As a result of the way you were raised, did you raise your kids differently?

A. Oh, yes, ma'am. My kids wasn't punished or beat on. My wife -- me and my wife raised my kids good. They're good kids, responsible young adults.

MS. MORRISSEY: Thank you very much, Mr. Dillow.

THE COURT: Mr. Williams?

CROSS-EXAMINATION

BY MR. WILLIAMS:

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

**221**

Q. Just want to try to get some dates on this, sir. My name is C.J. Williams, by the way.

Tell me when was -- when was it that you were adopted by Mr. Dillow? What year was that?

A. I don't know the years, but I was five years old, though. Sometime later when -- a lot later I was a young man, the reservation sent me a letter because my biological father had died, and they sent me all this paperwork, and I don't know what year it was. I was born in '65, so I was 5, so it must have been in '70.

Q. Okay. And then -- so you would have left Ted Dillow's place when? What year was that, sir?

A. I'll say '81, '82 maybe.

Q. Now, how far did you end up going through school then, sir?

A. Junior year. I went junior year and that was it.

Q. Okay.

A. When I left Kansas I was on my own. I went to -- just started working after that.

Q. When you left Ted Dillow's and you were on your own with a incomplete education, what'd you do then at that point?

A. Well, I made it to Bentonville, Arkansas, and I really don't know why I stopped there. But I met this other family down there, and they just kind of took me in, you know. And he was friends with -- he had real good friends that was a roofer, and I roofed houses till -- three or four years, and then that

**222**

was it.

Q. So when you left, you didn't have any other family anywhere?

A. No.

Q. Didn't have anybody you knew you could go to anyplace?

A. I did, but they was Dillows, and I didn't want to be around any Dillows at that time.

Q. The time period that you lived with Ted Dillow sounds like he beat you fairly regularly.

A. It was just part of life. You always tried to do chores correctly, get everything done right.

Q. Difficult childhood, sir?

A. Yes, sir.

Q. Yeah. It sounds pretty horrible what you went through during those years. You watched your little brothers getting beaten as well?

A. As well.

Q. Okay. Now, since you got on your own, you've been married; right?

A. Yes.

Q. You've raised a couple children.

A. Yes.

Q. Okay. Worked steady over the years, sir?

A. All my life, yes, sir, I have.

Q. Okay. Paid taxes?

**223**

A. Yes, sir.

Q. Okay. Gotten in trouble with the law much, sir?

A. Well, I had a drinking problem a few years back, and I got two or three DWIs. Other than that, nothing serious.

Q. Okay. Never killed anybody?

A. No, sir.

Q. Never murdered any children?

A. No, sir.

Q. Were you subpoenaed to come up here today, sir?

A. Yes, sir.

Q. Okay. And what did you understand this hearing was about?

A. About the Ted Dillow orphanage, was it a good place or a bad place.

Q. Okay. Do you think Ted Dillow's in trouble? Do you think this has anything to do with Ted Dillow getting in trouble?

A. No.

Q. Okay. This -- you were asked about family -- a family of a woman with a few kids coming down. You have no memory at all of that; is that right?

A. I don't remember any of that.

Q. Okay. The girls that were in that room, his -- Ted Dillow's daughters, they got punished. You don't know what happened in that room, sir?

A. No, sir, I don't.

Q. Did the girls ever afterwards after they got punished ever

**224**

tell you what happened in that room?

A. No.

Q. So you have no idea at all what happened in there.

A. They just got punished in there. I thought they was getting punished just like us boys was getting punished. The girls was a lot older than we was, a lot older.

MR. WILLIAMS: Nothing else, Your Honor.

THE COURT: Any redirect, Miss Morrissey?

MS. MORRISSEY: No, Your Honor. Thank you.

THE COURT: Okay. You may step down. Thank you for traveling all this way in very bad weather. Good luck driving back.

THE WITNESS: Thank you, sir.

MR. BURT: Thank you very much, Your Honor, for accommodating us.

THE COURT: Sure. I'll try and accommodate that whenever I can so . . .

MARY GOODY, PETITIONER'S WITNESS, PREVIOUSLY SWORN

THE COURT: You can return to the witness stand, and you're still under oath.

THE WITNESS: Thank you, Your Honor.

CONTINUED DIRECT EXAMINATION

BY MR. BURT:

Q. Thank you, Miss Goody, for accommodating us on that.

A. Sure.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q. Appreciate that.

I think you were just starting to talk about preparation of Dr. Logan; correct?

A. Yes.

Q. And I began to show you a note I think from your file, MG004279. Can you tell me, first of all, what date this conversation was?

A. '04.

Q. '04.

A. Uh-huh.

Q. So this is a period of time when you're just getting up and running again.

A. Yes.

Q. And what was the nature of your contact with Dr. Logan November 27, '04?

A. I was trying to make contact with him to just, you know, get going again because I had not talked with him for a very long time.

Q. And what did you learn about his state of preparation in November of '04?

A. I learned that he had not seen Angie since June of 2001 and that he had not heard much about her since and had had little or no contact with anybody on the defense team.

Q. That is essentially what Dr. Logan told the jury in the penalty phase; correct?

A. Yes, he did.

Q. Does that kind of lack of contact in your experience have some impact on a jury hearing an expert's opinion?

MR. WILLIAMS: Objection. Calls for speculation.

THE COURT: Sustained.

BY MR. BURT:

Q. In your experience as a mitigation specialist presenting mitigation evidence in a penalty phase, is it important to you that your experts have substantial and consistent contact with a client?

A. Yes.

Q. Why?

A. Because it shows that they are interested in what they're doing, that they're not just being paid to go in and see the client and have limited contact with her and perhaps review records but not be able to apply what they're reading in the records to their own personal interviews with her. The continuing contact shows that they have a therapeutic of some -- a forensic therapeutic relationship going, and I think the jury appreciates that the expert really knows the person that they're talking about.

Q. And is there also some value in terms of getting the kind of information a mental health expert needs to get at in long-term contact?

A. Yes.

Q. And explain that.

A. Pardon me?

Q. Could you explain that?

A. Well, again, as with any interview, when an expert or an investigator or a lawyer has an initial contact with a client, there's -- that is just the very first hello, how are you, let's talk about what's going on for you, and then can we talk about you.

And in -- particularly in Angie's case, multiple meetings, multiple meetings, were important to have because of her deep sort of retraumatizing of her exper -- you know, talking about her experiences retraumatized her and actually put her in a state where it was very difficult for her to remember what actually happened, to talk about how it affected her, to tell the details surrounding each particular aspect of her life that Dr. Logan as an expert would want to know.

Q. Is it true that what you're looking for as a mitigation specialist are compelling stories to tell to the jury so that the jury can empathize with the client?

MR. WILLIAMS: Objection. Leading.

THE COURT: Can you rephrase it, please?

MR. BURT: Sure.

BY MR. BURT:

Q. Can you tell us just in general when you're doing this unparalleled mitigation investigation, when you're doing the

case properly, what kind of information are you looking for in terms of what you ultimately are going to present to a jury in the penalty phase?

A. Well, you're looking for a number of categories, if you will, of mitigation, and you want -- you do want to get all of the basic background information concerning places, times, events that were occurring, you know, throughout the individual's life. And in particular as in Angie's case, there were incredible stories that came out of interviewing her, and I think that those stories centered largely around how the family and the children tried to cope with the living environment that their mother created for them and early on their mother and father and then later on their mother and grandparents created for them and then tried to survive that environment and then move on into their own sort of adult life.

But there were a lot of disconnects that went on throughout that chronology. It wasn't at all a smooth or -- it was very difficult to get all those events in the right order, the moves, and to get everybody's feelings and impressions about what was going on at those various different times.

And so those major stories became the stories that everyone in our team knew. But they were not all the stories, and there was no background behind the stories. They just kind of existed in time by themselves.

Q. You mentioned earlier based on your review of the medical

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 347    Filed 11/10/11    Page 57 of 84

records a possibility of sexual abuse.

A.   Yes.

Q.   Can a mental health expert get stories about sexual abuse from dropping in to see the client once in 2001 and then seeing the client again on the verge of trial in 2005 in general?

A.   No, probably not.

Q.   What does it take to get those kinds of stories out of people?

A.   Well, unless you have a client who's really needing to talk about that, you're going to have to have a number of meetings with that person, and you're going to have to understand the underlying background around the sexual abuse, and you're going to have to get the person to trust you enough that you can -- that they can tell you these stories that are so difficult to tell and that they will trust that you're not just going to walk out the door and never come back.

Q.   Did you feel that you had that kind of relationship with Angie Johnson?

A.   No.

Q.   Did you feel that anybody on the defense team had that kind of a relationship?

A.   No.

Q.   How about Dr. Logan?

A.   Dr. Logan saw Angela twice.  He did take an extensive history from her.  We have those documents.  But he didn't even

begin to write his notes up from the time that he saw her in 2001 until April of 2005.

Q.   And there was another mental health expert, Dr. Marilyn Hutchinson.  When did she surface?

A.   I had little or no contact with Dr. Hutchinson.  And it's my best recollection that she did not even come on the case until early perhaps in 2005.  I know that we had asked Dr. Gelbort to send his raw data to Dr. Hutchinson, so I know that she was available to receive the raw data.  But whether or not she had actually done any work with Angela at that time I cannot say.

Q.   Based on the funding application that we reviewed, I thought it was your role to interface with these experts and get them the information they needed and to prepare them for testifying.  Am I correct in that assumption?

A.   Yes.

Q.   And in regard to Dr. Hutchinson, was that role fulfilled?

A.   No.  Dr. Hutchinson was brought on board by Patrick just much as he brought Dr. Logan on board, and I didn't have anything at all to do with contacting her or dealing with her in terms of her evaluation of Angela.

Q.   And was there a reason for that?

A.   No, just that Pat was taking care of it.

Q.   So she was kind of compartmentalized from you in terms of your overall function of preparing the experts.

A.   Yes.

Q.   Now, did you have any role in preparing Mark Cunningham?

A.   I had several conversations with Dr. Cunningham.  And they were also in April '05.  I spoke with him on I believe three days -- or two consecutive days, perhaps three.  And during this time period the fact that Dr. Martell and Dr. Dvoskin were going to be involved in evaluating Angela also, this was all going on.  And the lawyers had asked me to do research on Dr. Dvoskin, and I happened to have had some experience sort of peripherally with Dr. Martell regarding the Spivey case which was a federal case.  Mr. Spivey was the codefendant of a client that I -- whose case I worked on, Richard Haworth.  This was a New Mexico case.  And so there was a great deal of material that was generated concerning Dr. Martell, and so I was disseminating this material and talking with the experts about him.

Q.   And just for the record, you got some of that material from me; correct?  You and I had a conversation --

A.   Yes, uh-huh.

Q.   -- about your need to do background investigation on Martell.

A.   Right.

Q.   And I provided you with a disk of material.

A.   Yes.

Q.   Containing some impeachment material on him.

A.   Yes, and Billy Blackburn who's an attorney in New Mexico

provided me with a large box of documents so . . .

Q.   Now, did you participate in any way in formulating the strategy of not having the experts interview Angela Johnson about the offense?

A.   No.

Q.   Did you -- were you aware that that strategy was being implemented?

A.   Yes.

Q.   And do you know why it got implemented and at what stage of the case?

A.   I can only say that I understood that it was something that was implemented very early on in the case so that Dr. Logan when he first went to see her did not talk with her about the case.

Q.   Well, let me show you if I could Exhibit 10 to the petition which is a letter from Dr. Logan -- from Pat Berrigan to Dr. Logan.  Are you familiar with this letter?

A.   Yes, I've seen this letter.

Q.   And is this an initial referral letter from Pat Berrigan to Dr. Logan outlining what he wanted Dr. Logan to do in the case?

A.   Yes.

Q.   And tell us what your understanding was of what he was being told to do in terms of the scope of the work.

A.   He -- Pat Berrigan is saying particularly in the second paragraph that he has spoken with Angela for two hours on November 20 and has spoken to Al Willett about Angela on several

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 58 of 84

occasions, and Patrick is telling Dr. Logan that Angela is not presently psychotic and appears to have no immediate mental health concerns. She did attempt suicide by hanging shortly after receiving the news that the jail inmate she had confided in about her case had turned all of that incriminating information over to the government. This was almost two months ago now, and Angela seems to have recovered fully.

He's giving him some preliminary interviews of Angela's siblings and one interview of Angela and says she has had a trouble -- somewhat --

THE COURT: Excuse me for a minute. You know, we're going to be here till next year if you're going to have a witness read exhibits that I've already read and am very familiar with. So to the extent that you want to ask the witness a question about the exhibit, that's fine. But it's really a waste of everybody's time, not just mine, to have a witness read an exhibit that's attached to the original 2255 petition.

MR. BURT: I tend to agree with Your Honor, and I was trying to avoid the leading question objection, but in light of the Court's ruling, I'd like to get right to the --

THE COURT: Okay. And I'm going to allow you -- you know -- yeah, I'm going to allow you some leeway in leading just so that we can get through the document.

MR. BURT: Thank you.

THE COURT: Without having to have the documents read.

MR. BURT: Thank you.

BY MR. BURT:

Q. I want to direct your attention to two aspects of this letter. First of all, in the bottom paragraph there, he's telling Logan to focus on we need to evaluate Angela's mental state both at the time of the commission of the alleged murders, July and November, and at the time she purportedly made incriminating statements to the government's snitch; correct?

A. Yes.

Q. And he's indicating on the second page of that letter even if Angela does not have significant mental issues that impact upon her first-phase defense which is "I didn't kill anyone," I suspect that you will uncover issues in her family history and growing up that will perhaps show her susceptibility to being dominated by a man as intelligent, forceful, and domineering as Mr. Honken; correct?

A. Yes.

Q. So at least at that point the focus was state of mind at the time of the crime.

A. Yes.

Q. And aside -- and state of mind at the time of the crime within the context of Angela's "I didn't do it" defense.

A. Yes.

Q. Right?

A. Yes.

Q. And also the secondary goal was to look at mitigation especially as it related to dominance by Mr. Honken.

A. Yes.

Q. Now, is that what Dr. Logan testified to?

A. No.

Q. And do you know when in the process the plan changed?

A. No, I don't, and keeping in mind that this letter was written in 2000 before I ever received any materials or worked on the case which was October -- oh, I may have received some things earlier but not this letter. So I don't know how it changed or . . .

Q. Well, you were intimately involved in planning the penalty-phase strategy; correct?

A. Yes.

Q. Did anybody ever sit down with you and discuss this plan to not have the experts address or talk about mental state at the time of the crime?

A. Only to the extent that they did not want to draw another mental examination of Angela. That's my understanding of why that was not allowed. And all the experts clearly testified that they had been told not to talk to her about the crime.

Q. Did that -- as a mitigation specialist, would that kind of strategy have a tendency to lessen the impact of an expert's mental health testimony?

A. Yes, I think so.

Q. Why?

A. Because I think the jury wants to know all the time about why did this happen. This is the point really of doing an extensive mitigation investigation and the point of using experts is because lay witnesses don't always know why something occurred. They may have an idea. But hopefully the experts can get to the bottom of what made -- what made this person become involved in this situation and have this consequence occur.

Q. Now, did -- taking the stance that the defense mental health experts were not going to inquire about the circumstances or mental state at the time of the crime, did that in this case prevent the government examination?

A. No.

Q. In fact, were you given about a five-hour interview that Dr. Martell and Dvoskin did with Angela Johnson?

A. Yes.

Q. And did that interview basically cover everything leading up to the crime including relationships with the two victims, motivation, drug use, everything except the ultimate question of did you do it?

A. Yes.

Q. And so was the strategy of not having your experts address mental state at the time of the crime, did it achieve the goal which was to prevent the examination?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 59 of 84

**A.** No.

**Q.** Were -- was the examination report by Dr. Martell and Dvoskin given to Dr. Logan and the other experts?

**A.** I don't know.

**Q.** If it was, was there some tactical reason for doing that if you're trying to avoid . . .

**A.** I don't know what happened with Dr. Martell and Dvoskin or how ever you pronounce his name. I don't know what happened with those materials. I don't know if they were given to the experts. I myself did not discuss those materials with the experts.

**Q.** And did anybody ever ask your input of whether or not it was a good strategy as a mitigation strategy to not have the experts address mental state at the time of the crime?

**A.** Not that I recall.

**Q.** Did you think it was a reasonable strategy?

**A.** No, I didn't because I didn't think that the jury would appreciate having this vital information missing from their understanding of what had happened in this case. And when they examine the aggravation in the case and look at the mitigation in the case and try to make a decision about penalty, I think they want to know, they want the answer to that question.

**Q.** Was there ever a point in time when the defense team sat down with their experts as a group and talked about what the strategy was in terms of presenting a cohesive mental health

theory to the jury?

**A.** The only time we ever sat down and talked with the experts was on May 13 of '05. Well, no, that's a -- that was a conference call with the experts that we had. And we also met with them in Mason City over a couple of days' time in which we -- they interviewed witnesses pretty much nonstop during that time period.

**Q.** And was there a problem with Dr. Cunningham's testimony in terms of his preparation and presentation of his findings?

**A.** Well, Dr. Cunningham came to town the night before his -- he was to testify first thing in the morning, and Pat was very busy with every task that he had going on, and so Dean Stowers wanted to do the direct exam of Dr. Cunningham. And so we had gotten his slides several days before. And Dr. Cunningham was doing both the mitigation and background slides and also the risk assessment.

And Dean Stowers really didn't have a very good understanding, I don't think, of the information in the slides and how it was developed and what it meant and how it was pertinent to Angie's family. And so he was -- you know, his learning curve was really great in terms of communicating with Dr. Cunningham and talking with him. And we spent an entire evening working on those slides and then the very next morning came to court and Dr. Cunningham testified. And Dean did the direct, and that was all the preparation that there was.

**Q.** And was there some problem in presentation that you observed being in the courtroom in terms of the receptivity of the jury to the information being conveyed?

**A.** Well, I was concerned that there was so much information that was being given that was of a research nature and graphs and statistics and information that wasn't really pertinent to Angie herself or to her family that the jury appeared to be restless, sleeping, not -- you know, it was hard for them to pay attention to all that information.

**Q.** Did you -- do you recall participating in the formulation of the list of mitigating circumstances in this case --

**A.** Yes.

**Q.** -- for instruction to the jury?

**A.** Yes.

**Q.** I'm showing you MG2245 through MG2248. Is this an e-mail, a four-page e-mail, you sent to Pat Berrigan suggest -- using your expertise to suggest the wording of the mitigators in this case?

**A.** Yes.

**Q.** And we're not going to go through all of them, but basically were you suggesting a list of 44 mitigators?

**A.** Yes.

**Q.** Do you know what happened to that list after you suggested the wordings that you were suggesting?

**A.** No.

**Q.** You didn't have any involvement in paring down that list.

**A.** Not that I recall.

**Q.** Have you read the petition in this case?

**A.** I have.

**Q.** Did you see the part where Mr. Lawlor, Mr. Maazel said that the problem with your penalty phase was you had all the notes but none of the music?

**A.** I did.

**Q.** Have you reread the transcript with that criticism in mind?

**A.** I have.

**Q.** Is it a valid criticism?

**A.** I think so.

**Q.** And explain to the Court why.

**A.** Well, we had -- we had -- we didn't have all the notes really, and we had an overview of the mitigation in Angela's life and the background information on her, but we didn't have the historical information that gave context to all of the stories that the family and others testified to.

And if I could just give you a small example, there were several young women who came in from the jail and testified that she had been really helpful to them and that they had engaged in Bible study while they were there at the jail.

Well, Angela was in that jail for a very long time, and I did not go and look for the person who taught the Bible study class who could have verified aside from these other women

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 60 of 84

who may not have been seen in the best light by the jury because they were prisoners themselves and they had been convicted of serious crimes who could have talked about her contribution to the Bible study, her attendance at the Bible study, her desire to really participate in the Bible study which is a small example, but it may have had a big impact on certain people sitting in that box.

Q. Now, you also saw in the petition the criticism that you didn't adequately rebut the aggravation evidence that was being presented by the government, the aggravating evidence and theories; correct?

A. Yes.

Q. And one of those theories, was it not, was that unlike the position the government had taken in the Honken trial that it was really Angela who was the ringleader here, not Mr. Honken?

A. Right.

MR. WILLIAMS: Argumentative, Your Honor. Objection.

THE COURT: Overruled.

BY MR. BURT:

Q. Right?

A. Right.

Q. That you could have done more.

A. Absolutely.

Q. To meet that. Do you think you could have done more to meet that theory?

A. Yes, we could have done more. We could have been a lot sharper. We -- many of the witnesses that testified were kind of blind-sided in cross-examination because the state was much better prepare -- or the government rather, I'm sorry, better prepared than we were in terms of their knowledge of the discovery and each of the witnesses that were going to testify.

Q. One piece of aggravation in particular was the testimony of Mr. Vest; correct?

A. Yes.

Q. He was the government's first witness?

A. Yes.

Q. And through Mr. Vest the jury heard for the first time an accusatory statement by Mr. Honken which placed Miss Johnson right at the center of both killing incidents; correct?

A. Yes.

Q. Now, did you do any investigation prior to trial to attempt to develop impeachment evidence on Mr. Vest?

A. No.

Q. Did anybody ever explain to you that you could have introduced as evidence inconsistent statements to what Honken was telling Vest, inconsistent statements by Mr. Honken?

A. I was never asked to do any work on Mr. Vest which is kind of ironic because I actually worked on his brother's case.

Q. So you had some background information on the Vest --

A. I was familiar with the Vest case and what had happened.

Q. And did you do any investigation into any prior inconsistent statements that Mr. Honken had made that might have been used to impeach the statements he was supposedly giving to Mr. Vest?

A. No.

Q. Were you aware -- did anybody on the defense team make you aware that Honken had given a statement consistent with what he had told Vest and that the government had then hooked him up to a polygraph and he had failed the polygraph test?

A. I believe I did know that.

Q. Was there ever any discussion of trying to offer the results of that polygraph test into evidence at the penalty phase in order to show that the version that Mr. Honken was offering to Mr. Vest was, in fact, false?

A. Not that I recall.

Q. Did anybody ever tell you that Mr. Honken had testified in his 1998 sentencing hearing that he was innocent of the crimes?

A. No.

Q. Did anybody on the defense team ever discuss using Mr. Honken's 1998 testimony under oath to impeach his testimony to Mr. Vest's?

A. Not that I recall.

Q. Did Al Willett ever tell you that shortly after he got into the case on August 30, 19 -- excuse me, August 30, 2000, Mr. Vest -- Mr. Honken wrote him a letter and said Angela

Johnson is innocent of these charges?

A. Yes, he did. He didn't -- he may have told that to me, but he also -- it was also sent to me, a copy of that letter, in some materials that were given to me in probably January of 2002 or so.

Q. So you had a letter in your file written by Mr. Vest indicating --

A. By Mr. Honken.

Q. I'm sorry. Thank you. Written by Mr. Honken indicating that Angela Johnson was innocent.

A. Yes.

Q. After Mr. Vest testified, was there any discussion in your presence of using that letter that was written to Mr. Willett to impeach the version that Honken was giving to Vest?

A. No.

Q. Do you think that you met the minimum standards of practice insofar as it relates to impeaching the Vest testimony?

A. No, I did not.

Q. Do you think that that testimony knowing what it was going -- did you know in advance that Mr. Vest was going to be a potential penalty-phase witness?

A. I learned about it I believe right at the last minute, but I -- I don't know exactly when I learned this.

Q. Did you think that impeaching his testimony was going to be an important part of your job at the penalty phase and the job

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 61 of 84

Page 245

of the defense?

A. At that point I was not focusing on Mr. Vest at all. I was only focused on the experts and the family members and the witnesses that we were trying to get ready to come in.

Q. And would it be fair to say that your activities were exclusively focused on that?

A. Yes.

Q. The mechanics of getting people there.

A. Yes.

Q. Getting them prepared.

A. Getting them -- talking to them, getting all of their information put together in groups of exhibits, gathering photos, trying to update the lawyers on a constant basis, Dean and Pat, about what -- where we were at with all of these people and this impending penalty phase.

Q. One of the things you were doing in all your spare time -- and I'm saying that facetiously -- was actually scripting the direct examination of these witnesses, the mitigation witnesses; correct?

A. Yes, I did, for many of them.

Q. And in your file, especially for the family members, you have extensive direct examination scripts, for instance, for Wendy Jacobson.

A. Yes.

Q. Do you not?

Page 246

A. Yes.

MR. BURT: Your Honor, could I have this marked as a separate exhibit?

THE COURT: Well, that's not how I operate. I mean, you needed to have your exhibits marked ahead of time.

MR. BURT: Sure. I can work around that problem.

THE COURT: You can do it maybe on a break or something, but I'm not taking time for you to mark exhibits.

MR. BURT: Sure.

BY MR. BURT:

Q. Do you recall in these direct examination scripts for the family members that one of the questions you proposed to be -- to Mr. Berrigan or whoever was doing the examinations to ask was, in fact, the final question: What effect do you think a death sentence will have on Angela's children? What about you? Do you recall that?

A. Yes.

Q. Were those questions asked?

A. No.

Q. Was there some strategic reason why they were not asked?

A. No.

Q. In general do you think that the defense team including yourself met the minimum standards of practice under the Sixth and Eighth Amendments and the guidelines that we've discussed in this case?

Page 247

A. No, we did not.

MR. BURT: That's all I have. Thanks.

THE COURT: Would you like to have that exhibit marked now?

MR. BURT: Well, not if the Court doesn't want me to. I can certainly do it --

THE COURT: Well, if you're going to be offering it, I assume you have to lay a foundation for it.

MR. BURT: I'd like to if the Court will --

THE COURT: Okay. Why don't we go ahead and do it. But, you know, for the next days, try and have all your exhibits premarked. My court reporter's not in the business of marking exhibits; neither is my law clerk, but he does have exhibit stickers.

MR. BURT: Thank you, Your Honor.

THE COURT: Thanks.

MR. BURT: Appreciate that. Judge, we had the DVD marked, and we never actually did discuss how the Court wanted -- should it be Plaintiff's 1, Plaintiff's 2? How did the Court want numbered system to run?

THE COURT: Have that all in pretrial orders, but, you know, I don't know.

MR. BURT: Well, maybe if I could just --

THE COURT: You know, I don't get involved in things like that.

Page 248

MR. BURT: All right.

BY MR. BURT:

Q. Could I show you this exhibit which we will identify by content and ask you if you can identify that.

A. Pardon me? Yes.

Q. Can you identify that?

A. Yes. These are the questions I wrote for Wendy Jacobson's direct exam.

Q. And are they similar for the other scripts that you wrote the lawyers?

A. Yes. And there are 71 questions.

Q. And was that done for most of the family witnesses?

A. Yes.

MR. BURT: Thank you. That's all I have. Thank you, Your Honor.

THE COURT: Mr. Williams? Before Mr. Williams cross-examines, why doesn't everybody stand up and take a stretch break.

Thank you. Please be seated.

Mr. Williams, you may cross-examine.

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Miss Goody, you indicated you've read the motion in this case; that's right?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Page 249

A. The petition?

Q. The petition.

A. Yes.

Q. Okay. And what also have you reviewed in preparation for your testimony?

A. I reviewed the contents of my files. I reviewed the trial transcript and then various e-mails and things which were not contained in my files that Mr. Burt had that he showed me.

Q. Okay. How many hours have you worked in prepping for this hearing, ma'am?

A. Many. Over 30 probably.

Q. Okay. And are you getting paid for your time?

A. No. I don't have any intention of charging for that.

Q. When you submitted a declaration back in November of 2004 requesting funding for an additional 435 hours between November of 2004 up through the final trial, did you keep track of how many hours you worked after that time period, after November of 2004?

A. The only way I would have kept track of how many hours I worked is what I billed, what I billed after that time. And I don't remember because I was just working and I just kept on going because I needed to do that.

Q. Okay. Do you know how much you billed after that, how many hours?

A. I have a file that is not up here with me, and I do have --

Page 250

I think I billed slightly over the allotted $20,000 which was the additional award.

Q. Okay. The -- at the same time you're working on this case there was three lawyers working on the case as well; right?

A. Yes.

Q. Okay. They each had paralegals working on the case as well; correct?

A. Yes.

Q. There was some investigators still working on the case; correct?

A. Yes.

Q. Okay. You had several experts working on the case as well; right?

A. Yes.

Q. Okay. So you alone weren't responsible for all the work in this case; right?

A. No.

Q. All right. So when we take to the instance, for example, Miss Hutchinson, okay, there's nothing wrong with Mr. Berrigan taking a lead on working with Miss Hutchinson, is there?

A. Well, I think the point that I was trying to make was that the team should work with all of the experts together at least at certain points within the preparation of the case.

Q. Okay. But there's a need to kind of divide up the work, isn't there, realistically?

Page 251

A. Yes, yes.

Q. Okay. So the reality is is that as much as you say there ought to be a team approach to this, in order to get all this work done, you guys had to go off and do some work on your own; isn't that fair to say?

A. Yes.

Q. Okay. And, in fact, it probably would have been a waste of money and time to some degree to duplicate that effort, wouldn't there?

A. Do you mean to duplicate the effort in terms of having a whole bunch of people go to every single place that we were going and doing the investigation?

Q. Yes.

A. Yes.

Q. Okay. Now, you talked about the guidelines in this case, and I think the bottom line at the end here was that you don't believe you and the rest of the team lived up to the guidelines, the ABA guidelines; all right? So let's talk about that for a little bit.

All morning and into the afternoon you spent time talking about the failures by you and the trial team with regard to what you did on this case between 2000 up through about 2002; right?

A. Yes.

Q. Okay. And then after the break this afternoon we spent a

Page 252

little bit of time talking about what happened after you got back on board the case in 2004; right?

A. Yes.

Q. Okay. So going back to the time period that you talked about all morning and into the afternoon, this 2000 to 2002 time period, you went through and you identified some things that in your view you guys didn't live up to the guidelines; right?

A. Yes.

Q. Okay. And the guidelines were brought up kind of repeatedly as the measure against which we should be looking at your conduct; right?

A. Yes.

Q. Okay. Those guidelines didn't come out until 2003, did they, ma'am?

A. They were codified in 2003.

Q. Okay. So counsel could not have been charged with the responsibility of living up to guidelines in 2000 and 2002 that were not promulgated or codified until 2003; isn't that right?

A. Well, the guidelines were first issued in 1989.

Q. Okay. The guidelines you've been referencing through your testimony -- you established it early on this morning -- were the 2003 guidelines, were they not, ma'am?

A. Yes.

Q. Isn't that what you testified to?

A. Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

**Q.** Okay. And that's the standard against which you've been measuring everybody's performance?

**A.** Yes.

**Q.** Okay. Let's talk a little bit about the investigation going back into some of the fault that you found with the team early on. One of the first things you talked about was the fact that by the time you got on board there was already an investigator hired on the case; right?

**A.** Yes.

**Q.** And you were asked a question, you had nothing to do with the selection of that investigator, did you; right?

**A.** No.

**Q.** And that was one of the things you identified was a problem, right, because according to the guidelines you're supposed to be involved as a mitigation specialist in those kind of decisions? Isn't that what your testimony was?

**A.** Yes.

**Q.** Okay. Angela Johnson was charged in July 30 of 2000. That was actually when she was arrested; right?

**A.** Yes.

**Q.** Okay. You came on board in what year?

**A.** I came on board and actually started working in October of '01.

**Q.** Okay. You're not suggesting for a minute to the judge here that counsel should have waited from July of 2000 until you came

on board before they hired an investigator, are you?

**A.** No, I'm not suggesting that.

**Q.** Okay. In fact, it was a pretty good move by defense counsel to hire an investigator early on; right?

**A.** Yes.

**Q.** And they weren't expected to consult you about who they hire as an investigator, were they?

**A.** No, because they didn't even have me on the case at the time.

**Q.** All right. You criticized the idea that Logan was hired early on and that you did not have any involvement in the selection of Logan. Do you remember that part of your testimony?

**A.** Yes.

**Q.** You testified, again, according to these guidelines a mitigation specialist is supposed to be involved in that decision-making process about hiring of an expert; right?

**A.** Yes.

**Q.** Okay. And you indicated that ideally what would happen is as the investigation goes on you might hire additional experts as time goes on; right?

**A.** Yes.

**Q.** Okay. Again, in this case the defense attorneys didn't wait for you to come on board before they hired an expert; right?

**A.** Correct.

**Q.** They hired one pretty darn quickly after this case came to their attention, didn't they?

**A.** Well, six months later.

**Q.** Yeah, six months after the arrest they already had an expert on board without waiting for you to consult with them; right?

**A.** That's correct.

**Q.** Okay. And again, you're not saying that was a bad move, are you?

**A.** No, they needed to bring an expert on at that time.

**Q.** All right.

**A.** They -- and sooner.

**Q.** Okay. And the reality is that as time went on, just as you said, they hired additional experts, didn't they?

**A.** Yes.

**Q.** You indicated that one of the concerns you had here was that when there's an investigator working the case it's your experience and according to the guidelines you guys should be sharing information back and forth. Remember that part of your testimony?

**A.** Yes.

**Q.** Okay. And you should be getting reports from the investigator; right?

**A.** Yes.

**Q.** Now, you got some in this case, didn't you?

**A.** I did.

**Q.** Okay. And you should be providing copies of your reports to the investigator as well; right?

**A.** Right.

**Q.** And you did that in this case too, didn't you?

**A.** No.

**Q.** Really. You didn't give any copies of your reports to the investigator.

**A.** There -- during the time that I worked on the case, there was not an investigator actively working on the case.

**Q.** All right. And so if -- when the time period you were working on the case there wasn't an active investigator working on the case, it's pretty hard to fault anybody for not having you work hand in hand with the investigator at the time, isn't it? There was no investigator at the time.

**A.** There was no investigator.

**Q.** All right. So your testimony earlier about how this was a bad thing that you weren't working hand in hand with the investigator at the time, there wasn't any investigator at the time, was there?

**A.** No.

**Q.** You complained a little bit about the timing of when you came on board as suggesting that it was -- there was some delay there and ideally you should have been brought on board much

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 347    Filed 11/10/11    Page 64 of 84

Q. earlier in the case, so let's go back and talk about that; all right?

A. All right.

Q. Now, as part of your assistance in this case, are you familiar with the chronology the defense team here has put together on this case?

A. I know they've put one together. I've not seen it.

Q. Okay. Have any reason to believe the chronology this team has put together would be inaccurate for any reason?

A. No, I'm sure it's accurate.

Q. Okay. So let's talk about some of the dates in that chronology. When Angela Johnson was first charged in July of 2000, it was a noncapital charge, wasn't it?

A. Yes.

Q. There was no death penalty charges pending against her, was there?

A. No.

Q. All right. Mr. Berrigan's first appointed on this case in December of 2000, December 11, 2000; right?

A. I'm not sure of the date that he was appointed.

Q. Okay. Any reason to doubt that date?

A. No.

Q. Okay. And you were first contacted by Mr. Berrigan how soon after he got appointed on this case then?

A. I'm sorry. I have to look that up.

Q. That's fine.

A. You probably can tell me quicker.

Q. I don't know if my notes --

A. I thought -- I received -- in October of 2 -- in October of 2000 I received a letter or an e-mail from him talking to me about the fact that he was going to be taking on this case.

Q. Okay. So Mr. Berrigan contacted you before he was even appointed on this case.

A. Sounds like it, yes.

Q. Okay. Now, the first time that Angela Johnson is actually charged with a capital offense is on August 30 of 2001; isn't that right?

A. I'll take your word for it.

Q. All right. And by that time Mr. Berrigan had contacted you, had gotten the paperwork through the system to the Court to have you hired, right, had a budget submitted to the Court for your hiring; isn't that right?

A. I'm not sure that I was actually -- that I was fully signed up until '02, early in '02, but he had begun the process.

Q. He had begun the process already by that time, though. Okay. Now, you actually got involved in October of 2001 was when you first got involved, wasn't it?

A. Yes.

Q. Okay. And so not '02. You got involved in '01, in October of '01.

A. Yes.

Q. Okay. About 30 days after Johnson is charged for the first time with a capital offense.

A. Yes.

Q. All right. And what can you point to the Court today that you can say, Judge, had Mr. Berrigan moved faster and gotten me appointed before October of 2001, I would have found out this evidence and it would have made all the difference? What can you point to that there would have been a difference had you been hired earlier?

A. Earlier than October '01?

Q. Yeah.

A. I think I would have had an opportunity to spend a lot of time with Angela Johnson, and I would have had an opportunity to hopefully establish a working relationship with her, and I would have had an opportunity to see her in her distressed state shortly after her suicide attempt, and I might have had an opportunity to work with Dr. Logan to delve deeper into her background and understanding the nature of her emotional problems.

Q. Okay. And had you had all that opportunity to do that kind of stuff, you would have come up with what in order to present to the jury in this case that would have made all the difference in the outcome of the case?

A. Well, I think actually what we would have come up with was

hopefully enough mental health information to make a presentation to the Department of Justice and perhaps not have death sought in her case.

Q. Okay. You're hopeful that might have been the outcome; right?

A. Yes.

Q. Okay. You have no clue that that would have been the outcome, though, do you?

A. No, I don't.

Q. Okay. And, in fact, Mr. Berrigan, a very experienced capital litigator, had some pretty poor predictions of how this was going to go; right? He did not think there was much of a chance in heck that the Department of Justice, the attorney general of the United States under that administration, with a defendant who was involved with the murder of five people including two little girls was not going to seek the death penalty, did he?

A. That's what he thought.

Q. All right. But you as a mitigation expert, you think you have better judgment than Mr. Berrigan did about that.

A. I don't think I have better judgment. I think I have different judgment about it. I think I have -- but I had not been working on the case long enough to be able to even make any definitive statements about evidence that we could present in front of DOJ.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 65 of 84

Q. Okay. So let's back up for a minute. One of the things you said, that if I would have been on this case earlier I would have been there shortly after her suicide and that would have helped you somehow, okay, dealing with her; okay? When was her attempted suicide?

A. Do you have the date? I don't have it here.

Q. October 13, 2001 -- I'm sorry, 2000, October 13, 2000.

A. Right. And I was first contacted by Mr. Berrigan I believe shortly after that.

Q. Okay. And so in your view, Mr. Berrigan should have done something more to get you on board this case before he was even appointed as counsel in the case so you could have been there closer in time to when she attempted to commit suicide? What would you have had Mr. Berrigan do?

A. I would have had him call Mr. Willett and say, hey, you need to get this Mary Goody person on board because Angela's just had this catastrophic event and it's -- she's had a terrible time dealing with everything that's going on for her right now and let's bring somebody in to talk to her about this and to try to evaluate what's going on for her at this time.

Q. Great. What would you have had Mr. Willett do then?

A. I would have had him hire me to get in there to see her.

Q. Okay. And Mr. Willett would have had to spend -- put the same paperwork through the Court that Mr. Berrigan did; right?

A. Yes.

Q. Okay. And the Court has a process it has to go through in order to evaluate and approve that; right?

A. Yes.

Q. Okay. And it ultimately has to go up to the Eighth Circuit to get approved; right?

A. Yes.

Q. Okay. So in your view Mr. Berrigan should have called Willett. Willett should have put through the paperwork, and they should have had you all on board appointed very shortly after she attempted to commit suicide, and that would have made a difference in this case?

A. I think so. I do.

Q. Now, after you ultimately came on board in October of 2001, you had time to develop that relationship with her; right?

A. I had time to begin to develop that relationship, yes.

Q. Okay. There was nothing preventing you from meeting with Miss Johnson; right?

A. Right.

Q. Okay. You could have met with her as much as you wanted to; right?

A. Yes.

Q. Okay. And you met with her as much as you thought you needed to, didn't you?

A. I don't believe that I met with her as much as I needed to.

Q. I'm not looking back now, Miss Goody. I'm asking you back

then you met with her as much as you thought you needed to because if you thought you needed to more you would have done it, wouldn't you?

A. Yes.

Q. All right. And you would have asked for more time, wouldn't you, and more money, wouldn't you?

A. Yes, and I did.

Q. Okay. I want to talk to you a little bit about the letter that Mr. Willett sent to Miss Johnson about him being appointed as lead counsel; okay?

A. Yes.

Q. And I think you criticized that as being somewhat flippant.

A. I did.

Q. Okay. And so you considered it that way at that time; right?

A. Yes.

Q. Okay. Something that a defense attorney just shouldn't do with his client in your view.

A. Yes.

Q. Okay. Now, did you know what relationship Mr. Willett had developed with his client by this time?

A. I'm trying to remember when he wrote the letter. I don't think I had a lot of information about his relationship with her.

Q. Okay. You don't know whether they had developed a

relationship such that, frankly, that might be a way to communicate with her, do you?

A. No.

Q. All right. So your opinion that it's flippant is kind of ill informed, isn't it, because you don't know what kind of relationship they had?

A. I suppose that's true, but on the other hand, I don't think that's appropriate in correspondence to a client.

Q. All right. So based on your experience and training and education, you thought that was inappropriate, so the first thing you did is you brought that up to Mr. Willett's attention. You said, "Mr. Willett, this is not the way to communicate with Miss Johnson"; right?

A. No.

Q. Well, then you brought it up with Mr. Berrigan. You said, "Mr. Berrigan, I want to bring to your attention that Mr. Willett is sending letters to Ms. Johnson that are just inappropriate," right, because you thought at that time that that was an inappropriate way to communicate with the client?

A. I believe we discussed it.

Q. So you have some notes that reflect that you discussed that with Mr. Berrigan?

A. No, I have no notes on that.

Q. Okay. You've raised a number of issues in this case that you think the counsel were doing wrong; right? I mean, that's

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 347 Filed 11/10/11 Page 66 of 84

Q.   one example, right, sending the wrong letter?

A.   Yes.

Q.   Okay.  You've identified a number of different things you thought they were doing wrong.  Hiring of experts, you thought they delayed too long in hiring of experts; right?

A.   Yes.

Q.   You thought the instruction to the experts not to question Johnson about her state of mind at the time of the offense was erroneous.

A.   Yes.

Q.   Okay.  Now, on each of these occasions you've testified today where you've said counsel was at fault, they shouldn't have done this, they shouldn't have done that, and I thought that at the time, can you give us some documentation that you raised that at the time?

A.   I think I have in my notes.  I think that I've testified about notes that I made that indicate that I -- that things weren't being done.

Q.   Okay.  Now let's take specifics, though.  The idea that you thought it was improper for the counsel to restrict experts about questioning Johnson on her state of mind at the time of the offense, when you found out that that was what was going on and you disagreed with it, you told somebody you disagreed with it; right?

A.   I did not discuss this with the team.  We did not have a

team meeting about this particular issue.  And if I discussed it with anyone, it would have been with Mr. Berrigan.

Q.   Okay.

A.   And it would have been a discussion.

Q.   Okay.  And did you discuss it with Mr. Berrigan?

A.   I believe I did.

Q.   Did you say, "Mr. Berrigan, I disagree with you"?

A.   Yeah.

Q.   Okay.  And do you have some notes that reflect that you had that contemporaneous conversation with him?

A.   I do not.

Q.   Okay.  So all we have right now is your hindsight looking back at this case after the fact saying I thought that was a bad idea at the time; right?

A.   Yes.

Q.   But you don't have anything to point to saying at the time I really thought it was a bad idea.

A.   No.

Q.   All right.  You had Mr. McNally as a resource counsel, didn't you?

A.   Yes.

Q.   All right.  And you could contact him; right?

A.   I could, yes.

Q.   Okay.  There's nothing preventing that.

A.   No.

Q.   Okay.  So how many times did you contact Mr. McNally during your involvement in this case to let him know that you thought the trial team were doing things wrong?

A.   I did not do that.

Q.   Nothing preventing you from doing that.

A.   No.

Q.   Okay.  And, in fact, if, in fact, you really thought at the time these things were being done wrong, you'd agree with me that if we had some kind of contemporaneous writing or something that would suggest that it'd kind of lend some credibility to your judgment; right?

A.   Yes, it would.

Q.   Okay.  Instead of just being a hindsight is 20/20 kind of analysis?

A.   Yes.

Q.   Okay.  And can you give the Court any contemporaneous documents that demonstrate of all the criticism you brought up today that you had raised those issues back then?

A.   No.

Q.   Let's talk about the plea discussions in this case.  Fair to say you were not really involved in plea negotiations with the government; right?

A.   Right.

Q.   Okay.  Are you aware of any plea offer the government ever made in this case?

A.   My -- the only thing I know about any of the plea negotiations is what counsel may have told me in passing.

Q.   Okay.  And did they in passing ever tell you that the government has ever made a plea offer to Angela Johnson in this case?

A.   Yes, I believe they did.

Q.   And what'd they tell you?

A.   I believe -- well, there's correspondence, and I believe that we talked about the fact that there was some sort of deadline to engage in negotiations for the plea and that it was -- there was a deadline of the Massiah hear -- around the time of the Massiah hearing and that Mr. Berrigan decided to hold off on those plea negotiations until he had learned what the outcome would be of the Massiah hearing.

Q.   Okay.  So what you've told me is that you are aware that there was some talk about deadlines and the timing of when we were going to hold off on doing something about those deadlines.  I haven't heard from you that they've ever expressed to you that there was an offer on the table by the government to Miss Johnson at any point.

A.   I don't believe I knew that there was an offer on the table.

Q.   All right.  And to the extent that at one point you -- you opined that life without parole was the way to go in this case.

A.   Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 67 of 84

Q. Right? Okay. And that was your opinion based on your review of the evidence in this case?

A. It was my opinion based upon the evidence as told to me by counsel because we had not -- I had not reviewed discovery at that time and also my review of the articles and Pat Berrigan's handwritten summary of the case.

Q. Okay. Now -- so presupposed within your answer then is the idea that counsel were much more informed about this case than you were; right?

A. Yes.

Q. Okay. You'd agree with me they're in a better position then to assess what the appropriate plea might be if they're more informed than you?

A. Well --

Q. Or are you saying to the judge that less informed than counsel, I know more than they do?

A. No, I'm not.

Q. Okay.

A. I'm saying --

Q. So counsel is more informed about --

MR. BURT: I don't think she finished on that one. She was right in the middle of a sentence when --

THE COURT: Yeah, she was, so next time let her finish.

BY MR. WILLIAMS:

Q. Go ahead. Finish, please.

A. I'm saying that based on my experience in these cases and based upon my review of the evidence and my conversations with counsel it was my personal opinion that this was a case that should be settled with an LWOP plea and that I conveyed that to them, and that was all I could do.

Q. Okay. Well, you could have done more; right?

A. I could have engaged in arguments I suppose, but we had discussions, and they had reasons why they felt that they wanted to take another avenue.

Q. Okay. And these were experienced attorneys; right?

A. Yes.

Q. Okay. They were making their decisions based on their superior knowledge of the case; right?

A. Yes.

Q. Okay. And while you might disagree with their theory, their theory was not irrational, was it?

A. Well, I didn't think it was very -- I didn't think that it was rational. I didn't think that the case would ever settle for a term of years given the facts of the case.

Q. Okay.

A. And the number of victims.

Q. All right. So what you would have had done was what? What would you have done?

A. What would I have done if I could do what I wanted to do or

would have -- we would have worked together as a group, as a team, and come to some strategy for how we would talk to Angela about the benefits of pleading her case. And, of course, they would have to have come to you or to the Department of Justice or how ever that would work and make an overture to come up with a negotiated plea.

Q. Okay. Do you know whether counsel without you ever sat down and discussed with Angela Johnson the pros and cons of pleading guilty in the case?

A. I think they did discuss it with her.

Q. Okay.

A. And I think they discussed it with her in a term of years.

Q. Okay. You don't think they ever discussed it other than a term of years with her.

A. I don't believe so.

Q. Do you know?

A. No, I don't.

Q. All right. And they, in fact, discussed plea with her over -- on a number of occasions, didn't they?

A. I think they did.

Q. You weren't present during those discussions, were you?

A. No, no, I wasn't.

Q. Okay. Were you present at any of the communications with the government about different plea possibilities?

A. No, I wasn't.

Q. All right. Now, in order for the defendant to plead guilty, you're aware, of course, that there was a precondition imposed by the government in this case that she come in and debrief truthfully about her participation in the crime. You were aware that was a precondition before we even started talking about pleas.

A. Yes.

Q. Okay. And that was rejected by Miss Johnson, wasn't it?

A. I actually do not know.

Q. Okay. Well, in these conversations you had with Miss Johnson, did you ever talk to her about her participation in these crimes?

A. No.

Q. Did she ever admit to you that she participated in these crimes?

A. No.

Q. Okay. You, in fact, have seen interview reports, though, of her by some of the investigators in which she claims the contrary, doesn't she?

A. Are you talking about the government's investigators or --

Q. No, no, your investigators, the defense investigators, the Ray Cornell interview, for example, where he interviewed her. Did you ever see Ray Cornell's interview of her?

A. I don't believe I've seen that interview.

Q. Okay.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

# 273

A. I don't know that I have it.

Q. There was a May 2002 interview that was conducted by the three attorneys in the case. Mr. Stowers, Mr. Berrigan, Mr. Willett all interviewed her in May of 2002. Did you see that interview?

A. No.

Q. Okay. Are you aware that Miss Johnson in both of those interviews says she wasn't even present during the crimes? Are you aware of that?

A. I'm aware that she did say that, yes.

Q. Okay. In fact, she says that the way she got the maps and the location of the bodies is because Dustin Honken told her about it at some point in the past; right?

A. Yes.

Q. Okay. She claims not to have even been there that night; right?

A. She did, yes.

Q. Okay. And she continued with that position throughout the time period of your involvement in this case; right?

A. I'm not sure what her position was as time went on.

Q. Okay. Were you aware that as recent as just several months ago when Mr. or Dr. Martell interviewed her that she has maintained that same position --

A. No.

Q. -- that she was not even present during that time period?

# 274

A. I'm not aware of it.

Q. Okay. In order for the defendant to plead guilty and get the opportunity of pleading guilty to life without parole, she would have to admit the facts of the case, wouldn't she, ma'am?

A. Yes.

Q. Okay. And you have a defendant here who to this day has not admitted the facts of the case, don't you?

A. Yes, according to what you're telling me.

Q. All right. So could counsel be faulted for failing to get the defendant to plead guilty when she's refusing to admit that she has any guilt?

A. I think counsel can be faulted as I can be faulted for not working on that aspect of the case as a team.

Q. All right. Working on that aspect. At the end of the day if the defendant says, "I'm not going to admit that I participated in these murders," there's nothing you or any defense counsel can do to make a defendant admit the guilt, is there?

A. Well, I think that there are -- there is a lot of work that can be done with a client. There's a lot of time that can be spent with a client. And I was not included in any of those conversations with her, and I did not have the time to work with her to get us anywhere near to being able to talk about pleas or anything like that.

Q. So can you tell the Court today that had you had all that

# 275

time and involvement in this you would have changed her mind?

A. I can't tell him that I would have changed her mind, but I can tell him that I would have worked very hard on that.

Q. Okay. But you have no way of saying that if you would have had all the time in the world in this case and you would have been involved in every aspect of it that you would have had any influence at all in changing Angela Johnson's mind to come in here and admit that she participated in the murder of two little girls.

A. I think I might have had some influence.

Q. Okay. You might have. You can't say you would have, can you?

A. I can't say that it would have happened, no.

Q. I want to talk to you briefly about this mitigation evidence. You -- one of the complaints you had was that you just didn't have enough time to do all the work that you wanted to do; okay? And there's various numbers. At one point there's 57 witnesses. At one point there's 48 witnesses. At another point there's 70 witnesses that you needed to interview; okay? Do you have a list of all the witnesses that you wish you would have interviewed that you didn't interview?

A. I haven't typed it out, but I can read it to you, and that's not all inclusive, but I can give you a pretty good idea.

Q. Is Tim Dillow one of those witnesses that you wish you would have had an opportunity to talk to?

# 276

A. Yes.

Q. Okay. And were you in here during his testimony at all?

A. No.

Q. Okay. Have you read his interview report?

A. No.

Q. Okay. What do you think that Tim Dillow would have done for the defense in this case?

A. Well, not having talked to him, I think -- and Tim Dillow had two brothers, and he also was -- he was, as I understood it, the adopted son of Bobbi and Ted Dillow who had two or three daughters of their own. So one person leads you to five people. So he would have been an opening to his other two brothers and to the sisters if not other people besides that.

Q. Okay. I understand that he would have been a lead, but at the end of the day what do you think you would have gotten with that lead? I mean, from all those people in the Dillows, what is it that you think you would have gotten?

A. Well, what I think I could have gotten was I could have gotten a life history from him so that I would have understood how he came to be living with the Dillows, could have gotten an explanation of what his life was like with the Dillows, what kinds of daily things he engaged in while he lived there, what sorts of chores they made him do, whether or not he went to school, whether or not he was impaired in any way or how he felt about living there with the Dillows, whether or not he was ever

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 69 of 84

Q. a witness to any kind of abuse that was heaped on the Johnson children or his sisters or himself or his brothers.

I could have discovered what the religious implications were in the family in terms of their having a foster home or adopting children, what kind of a person Ted Dillow was, was he a good man, was he a criminal, was he an abusive person? You know, I -- these kinds of things.

Q. Okay.

A. Whether or not he ever witnessed anything that happened with the Johnson children or with their mother, how -- he could have talked perhaps about whether or not their mother was ever there, the conditions under which they lived, whether or not they truly lived in a shed or a garage-type building.

Q. Okay.

A. That sort of stuff.

Q. And using Tim Dillow as an example then, you said that there was any number of witnesses that you wish you would have had time to interview and locate and so forth; right?

A. Yes.

Q. Okay. Now, with the benefit of hindsight and the fact that we have one, two, three, four lawyers and investigators now working for Miss Johnson and having years since her conviction to dig up this additional information, can you tell the Court what additional information that this new team has come up with with years of work and hours and hours of attorney investigation

and additional investigators, what additional evidence they've come up with that they would say we found this and this is what Mary Goody could have found if she would have had more time that would have made a difference in the end of the case.

A. I don't know anything about their investigation. I don't know who they've interviewed. I don't know what they found. I don't know how many people. I've never seen any reports. I've seen none of their work product. No one's ever discussed it with me. I'm sorry I can't answer your question.

Q. Okay. And that's fine. So you're not the witness who's going to be able to come in here, though, and tell the Court that from a prejudice standpoint the case was prejudiced because we can demonstrate that had I had more time, Judge, we would have found this out. You're not that witness.

A. No, I'm not.

Q. Okay. Would you be surprised to find out that Tim Dillow testified that he has no memory at all of any woman coming to that farm with three kids?

A. No.

Q. Okay. Would it surprise you to have found out that he lived there for years under this guy that beat him on a regular basis and it was a horrible childhood experience he went through?

A. Would I be surprised if he said that?

Q. Right.

A. No.

Q. No, that's kind of what you expected; right?

A. Yeah.

Q. Okay. Miss Johnson was down at that farm for how long, ma'am?

A. I don't know exactly. I don't remember exactly. I want to say it was a school year, maybe a year and a half, a year. That's my best recollection.

Q. Okay. All right. So Mr. Dillow who was there from the point of 5 to 17 years old, right, so 12 years under this man's thumb who beat him regularly, okay, left on his own without family support, anything else, got jobs, got married, raised 2 kids, and has never murdered 5 people let alone 2 little girls; okay? Now, do you think that testimony would have made a difference in this trial?

A. Well, I think that each witness exists on his own and each person has perhaps something within them or someone who has influenced them in a way such that they have support enough so that they're led in the right direction, they're not abandoned in any way, they may not have cognitive deficits. I mean, there's lots of questions that I would have concerning Mr. Dillow's life before I would be able to answer why he did not kill five people.

Q. Doug Book was somebody that you did interview.

A. Yep.

Q. Okay. And with the benefit of hindsight, it's your judgment now that you shouldn't have called him as a mitigation witness.

A. Not -- no, we should not.

Q. Okay. Now, there wasn't anything about the lack of time that led to that decision; right? You had all the time you needed to to talk to Doug Book.

A. Yes.

Q. Okay. You could have asked him the question what bad things could you say about Angela Johnson; right?

A. Yes.

Q. And you just didn't do it.

A. Right.

Q. And Mr. Berrigan didn't do it.

A. Right.

Q. Okay. And you didn't anticipate where the cross-examination was going to go; right?

A. Right.

Q. Okay. And that's human nature, isn't it, ma'am?

A. Perhaps.

Q. All right. We all make mistakes; right?

A. Yes.

Q. Okay. You're not suggesting that the standard by which this Court is to evaluate the performance of these attorneys is they can't make a mistake in their representation of Miss

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 347 Filed 11/10/11 Page 70 of 84

## 281

Johnson? You're not saying that's the standard, are you?

A. No.

Q. All right. And so the fact that you and Mr. Berrigan failed to ask that question in this case, that's just a mistake that you made when you were conducting the investigation; right?

A. That's true, yes.

Q. Have you worked with Mr. Berrigan since this case, by the way?

A. No, I haven't.

Q. You still in contact with him?

A. Occasionally, yes.

Q. You wrote a -- kind of a note to him after the trial while the verdict was out I think that called him a hero; right?

A. (Witness nodded head.)

Q. Yes?

A. Yes.

Q. Okay. In fact, you think Pat Berrigan's a pretty good lawyer, isn't he?

A. Yes, I think he is a good lawyer.

Q. He's a darn good lawyer, isn't he, ma'am?

A. Well, I think he's a good lawyer. I don't know about a darn good lawyer.

Q. Well, he did a pretty good job in this case, don't you think?

A. I think he did a reasonably good job, but I think we made

## 282

some pretty serious errors.

Q. You testified about some issues with lead counsel and knowing who lead counsel is and so forth. Do you remember that questioning?

A. Yes.

Q. Did it make sense to you that the attorneys might divide up the work where one would be kind of the lead counsel for purposes of the guilt phase and then somebody else would be the lead counsel for purposes of the penalty phase?

A. It's my understanding that lead counsel in a death penalty case has the duty to oversee all the phases of the case and that he must understand better than anyone the unified theme and make sure that it's being applied properly even if the work is divided up.

Q. Okay. But it's not uncommon, is it, in capital cases for counsel to divide up the work that way; right?

A. Work is divided up, yes.

Q. Okay. And, in fact, divided up between the guilt phase and the penalty phase; right?

A. To a certain degree.

Q. Okay. And one of the strategies or tactics to be used in trying or defending a capital case is to not have the person handling the penalty phase be the same attorney who is handling the guilt phase; right?

A. Oh, I think that's kind of an old-fashioned way of

## 283

approaching it.

Q. You may disagree with it, but there's a strategy; right?

A. There is a strategy, yes.

Q. There is a school of thought -- okay. You may disagree with it, but there's a strategy by lawyers with reasonable minds who believe that there is an appropriateness to having a division of duties between the guilt phase and the penalty phase; right?

A. Yes.

Q. I want to talk to you a little bit about your assessment of the strength of the case without the McNeese letters; okay? Now, again, you talked about the fact on direct examination that even without the McNeese letters there would be the testimony from Christi Gaubatz and the fact that Angela Johnson purchased the weapon; right?

A. Yes.

Q. Okay. And it's your assessment that based on that evidence alone you would have recommended that the defendant plead guilty to life without parole.

A. Yes.

Q. Let's talk a little bit about Dr. Gelbort here. You indicated that you had this conversation with Mr. Gelbort, Dr. Gelbort, after his analysis of Angela Johnson where he looked at some pages of your notes that kind of summarized what Dr. Gelbort told you; right?

## 284

A. Yes.

Q. Okay. And then at some point after that you have a conversation with him in which he says, "I'm not going to testify."

A. Right.

Q. All right. And what was the explanation he gave for why he was not going to testify?

A. My best recollection is that he said that he didn't have -- he didn't have strong-enough information, he didn't have -- I can get those notes out if you like, but he didn't feel that the neuropsych information that he had obtained from his evaluation of Angela Johnson was strong enough for him to testify about.

Q. All right. So he just thought I don't want to get up on the stand and try to suggest that this woman has major psychological problems. I don't think it's strong enough; right? I don't want to testify.

A. That's what he said.

Q. I don't want to be cross-examined by the government and be shown that I don't have much of a leg to stand on. That's really his position, wasn't it?

A. That was his position.

Q. Okay. And so is there something wrong that defense counsel did in this case by failing to get Dr. Gelbort on the stand to testify about that?

A. Well, there weren't -- there was no -- there was no team

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 71 of 84

conversation with Dr. Gelbort. There was no meeting of a group of people that are working on Angela Johnson's case to talk about this conversation together or to bring the experts in to talk about this problem that we now had and to determine whether or not his testing was even of the quality that we had thought he would administer.

Q. Well, you'd worked with him before; right?

A. I had worked with him only once before.

Q. All right. And so you knew what his quality of work was; right?

A. Actually in the case in which I worked with him, we did not call him as a witness in the penalty phase.

Q. And why not?

A. It didn't have anything to do with his work. It had to do with a decision made by counsel that if he and several other experts were to testify that then it would bring another hostile witness in that she didn't want to testify. And so after a meeting of the three of us who comprised that team at that time or four, we decided that we would not call him in the penalty phase.

Q. All right. Had nothing to do with quality of his work.

A. No, it didn't have anything to do with his work at all.

Q. All right. And so what we have is somebody that you've worked with before. You have no question about quality of his work. Basically he says, you know, I don't have that much to

say that's going to benefit her, and I don't want to testify and be subject to cross-examination. Isn't that the sum of what you got from him?

A. That's what he said.

Q. All right. And, in fact, he warned you that if you did some testing of her, some additional testing, that it may not really help. It may actually come out with results that could hurt her.

A. Are you referring to the PET scan?

Q. Yes.

A. Okay. Well, that's the risk you take with any individual that you give a scan to.

Q. All right. So, again, if you're an attorney facing this, okay, and your mitigation specialist comes to you and says, "I've had this conversation" -- because you talked to Berrigan about this; right?

A. I did, but I'm not an attorney.

Q. Okay. But you went to the attorney, right, and you told him what was going on; right?

A. I called him, yes, and told him.

Q. Okay. And you told him the results of this; right?

A. Yes.

Q. Okay. And he knows that there's a risk in running a PET scan because you may not like the results of the test; right?

A. Yes.

Q. Okay. So that attorney has to make a judgment call at that point about what to do.

A. He does.

Q. All right. There was some testimony you provided earlier about Miss Johnson on a regular basis was contacting Mr. Willett wanting to have contact with her daughters and wanting to be let out and wanting to -- a different jail and so forth. Do you remember that line of testimony?

A. Yes, I do.

Q. Okay. And fair to say that Mr. Willett had developed a relationship closer to Miss Johnson than anybody else on the team?

A. I don't know that that's true.

Q. Who developed a closer relationship on the team than Mr. Willett?

A. I think his secretary did.

Q. Okay. All right. And so after the secretary -- and you're talking about Nancy; right?

A. Yes.

Q. Okay. After that Mr. Willett, or is there somebody else that's closer after Nancy?

A. I don't -- I don't have an opinion about who was closer to her. He was certainly physically closer to her than any of the members of the team.

Q. Okay. The -- you talked at some point about one of the

concerns you had was the failure to look into some potential sexual abuse of the defendant; right?

A. Yes.

Q. Okay. And one of the things you said you would have done was followed up with the psychiatrist or psychologist at the North Iowa Mental Health Center who had initial contact with her and had that vague reference in the medical records about rashes in an inappropriate place; right?

A. Yes.

Q. Okay. Now, that's one thing you could have done. What else is it that you think you or defense counsel should have done to follow up on sexual abuse potential of the defendant?

A. Well, I needed to work more with Angie on that because we -- we had a great deal of difficulty approaching, discussing anything to do with that. And it really was very obvious that she had been traumatized by her experiences in Kansas and that for her it was just something that was very, very difficult for her to talk about. And we made some progress there, but I think if I had spent more time with her I might have been able to get her to open up about that.

Q. You might have.

A. Might have.

Q. You don't know that to be the case, do you?

A. I don't know that to be the case.

Q. Okay. And are you suggesting then that your theory of this

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 72 of 84

is that if she was ever sexually abused it would have been down in Kansas?

A.   That was my -- well, yes, that was one of the -- one of the early experiences, probably the earliest experience that she had.

Q.   Okay.  Are you aware of any evidence that has been uncovered since the trial that would establish that Miss Johnson had ever been sexually abused?

A.   No, I'm not.

Q.   It may not even exist, right, for all you know?

A.   Possibly not.

Q.   All right.  So all the investigation in the world, all the follow-up in the world wouldn't have helped an iota unless this team is going to be able to present some evidence to this Court showing that, in fact, she'd been sexually abused; right?

A.   Yes, and I am -- again, I will tell you that I am not privy to anything that they have done in their investigation.

Q.   At one point you talked about Al Willett having a letter from Miss Johnson wanting to fire him, right, and then he was able to overcome that a little bit?

A.   Yes.

Q.   Okay.  That's not uncommon, is it, ma'am?

A.   No.

Q.   Okay.  It's quite common, in fact, for defendants to have ups and downs with their counsel.

A.   Yes, it is.

Q.   Okay.  Toward the end of your testimony you were talking about a polygraph that was given, and do you remember the context in that testimony?

A.   Yes.

Q.   Okay.  The context as I understood it was that the criticism was that defense counsel should have done more to have attacked Vest's testimony by attacking the credibility of Dustin Honken who mailed the statements to Vest that Vest was then repeating on the stand.

A.   Correct.

Q.   Right?  Okay.

A.   Yeah.

Q.   And the reference to the polygraph failure was a reference to Dustin Honken failing the polygraph; right?

A.   Yes.

Q.   Okay.  And what do you know about that?

A.   Nothing.

Q.   So what did he fail the polygraph on?

A.   I don't know.  I wasn't part of anything to do with a polygraph for Dustin Honken or the results of that and --

Q.   Well, wait a second, ma'am.  In your testimony -- and correct me if I'm wrong, but in your testimony you said that you and the defense team failed to live up to the guidelines by using the fact that Dustin Honken failed a polygraph in

cross-examining Vest in his testimony.  Wasn't that your testimony?

A.   I believe it was, but I think the question was phrased -- the question was phrased to me that this polygraph -- the fact that he failed the polygraph, not what was the content of the polygraph.

Q.   Okay.  But isn't it pretty important to know whether there's a failure in using that polygraph to know really what the polygraph was and what he failed on?

A.   Yes.

Q.   Okay.  So if I told you that in his attempt to proffer to the government at the eleventh hour he minimized Miss Johnson's role in the offense and we had him polygraphed on that because we didn't believe his attempt to minimize her role and that's where he failed the polygraph, do you think that would have been helpful in cross-examining Mr. Vest?

A.   No.

Q.   No.  Miss Goody, when you were making your assessment in this case that the defendant needed to plead guilty, it was based in part on your belief that there was a pretty bad case against her; right?

A.   Yes.

Q.   Okay.  You didn't think there was much of a chance that she was going to beat the charges; right?

A.   Right.

Q.   And you thought that there was a decent chance that once the jury heard the evidence they weren't going to like it; right?

A.   Right.

Q.   Okay.  And while today you can look back four or five years after the trial and say we should have done this and we should have done that and we didn't live up to the guidelines, at the end of the day, ma'am, at the end of the day, this trial was about the murder of five people including two little girls; okay?  Wasn't that the overwhelming thing that resulted in the verdict that came out in this case?

A.   I don't know why the jury made the decisions that they made.

Q.   Ah, okay.  So you don't know then that anything that you or anybody else would have done or should have done or could have done in this case would have made an iota of difference, can you?

A.   No, I disagree with that.  I'm saying that when the jury ultimately made their decision, I don't know that the facts of the case by themselves was the reason why they sentenced her to death.

Q.   And what is it that you believe that if you and the counsel would have done what you now looking back after the fact think they should and you should have done, what is it that you think would have made the difference?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 73 of 84

**293**

A. Well, I would hope that we would have a very strong mental health case in which we could have proved that she had a serious-enough cognitive disorder that it affected her ability to learn, to communicate with people, to interact with people, to make decisions about what -- who she was going to get involved with, and would explain why she became addicted to methamphetamine and how she ultimately ended up being involved with Dustin Honken.

Q. Okay.

A. That would be one of the things that I would hope.

Q. Now, in this case the defense counsel hired a neuropsychologist; right?

A. Eventually, yes.

Q. Okay. But they hired a neuropsychologist --

A. Yes.

Q. -- to analyze Miss Johnson; right?

A. Yes.

Q. And the outcome of that analysis was that it was not even strong enough that that expert wanted to even take the stand to testify in the case; right?

A. That was the outcome of his evaluation.

Q. Okay. And defense counsel hired that expert; right?

A. Yes.

Q. Okay. And I don't think you're saying this, but I just want to make sure. Are you suggesting that defense counsel

**294**

should have hired a different expert to get a different answer?

A. I think that defense counsel, first of all, should have hired that expert in the very beginning of the case, in 2000 if possible, 2001, and that the team should have worked with that expert to determine what the strength of the evaluation was and where we should go from there.

Q. And do you think that it would have changed the expert's mind?

A. No. What I'm saying is I don't think that -- perhaps we hired the wrong expert. Perhaps that expert didn't do the kind of testing that he should have done, but it was too late. And no one was involved with that expert other than me and me conveying to the lawyers what this expert is saying to me. And I am not a mental health expert, so I do my best, but my ability to convey what he's telling me probably would prompt those lawyers to want to talk to him themselves in an effort to make sure that what I was telling them was correct and that perhaps there was something we'd left out in terms of our information to him. I mean, there's a host of things we didn't do with regard to that expert and possibly all the other experts.

Q. And it's your hope that that would have made a difference at the end.

A. Yes.

Q. Okay. You don't know that it would have, but that's certainly your hope.

**295**

A. Well, I can never -- no, I don't know.

Q. Okay. You understand that part of the burden of the defense here is to demonstrate that it would have made a difference, though. You understand that's their burden?

A. I do, and perhaps -- perhaps they will prove that. I hope they will.

Q. Why?

A. Because I think that I -- because I'm ashamed of the work that I did in this case, and I would like to see -- I would like to see it redone, and I would like to see it done right.

Q. Okay. And you also hope there's a difference because you're attached in this case, aren't you, ma'am?

A. Attached? Well, I'm attached to it in the sense that I now -- pardon me. I'm tired. I have now had an opportunity to look back at this work, and I see where I have dropped the ball, and it's very disturbing to me. So I'm not attached to the case other than professionally.

Q. Well, but you are emotional right now, ma'am.

A. I am.

Q. And you are tearing up; right?

A. I am.

Q. Okay. And you believe in Miss Johnson, do you not?

A. I beg your pardon?

Q. You believe in Miss Johnson?

A. Do I believe in her? Believe in her as a person, as an

**296**

individual? I believe she's a defendant who has a right to a constitutionally adequate defense, and I honestly don't believe that the investigation that was done throughout her case was constitutionally adequate.

Q. Okay. And let's talk about the guilt phase of her case then since you've made it very broadbrush here. What was it that the counsel should have done in the invest -- in the guilt phase of her case that you think they didn't do correctly?

A. Well, I don't think they investigated it.

Q. All right. What leads you to that conclusion?

A. Because as far as I knew while we worked on the case, there was not an investigator actively working on looking at all of the discovery, interviewing witnesses, communicating with the rest of the defense team, and then inquiring whether or not we could work together on certain witnesses. And we didn't do that, and for two years I didn't work on this case.

Q. Okay. But let's go back to that. I mean, for those two years that you didn't work on that case, what was happening with the case, ma'am?

A. The lawyers were communicating, doing what they were doing. I don't know. Pat Berrigan was trying other cases.

Q. Well --

A. I don't know what they were doing because I had very little communication with them during that time.

Q. Okay. Fair enough. So number one, it's going to be hard

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q. for you to criticize what they did or didn't do since you don't know what they did or didn't do during that time period; right?

A. True, yes.

Q. All right. Number two is you do know this much: You know that the defense were successful in suppressing evidence that was key evidence in the case.

A. Yes.

Q. Right? And they were litigating that issue in the district court and up to the circuit Court of Appeals; right?

A. Yes.

Q. And that key evidence was going to make a big difference on how this whole case came out; right?

A. Yes.

Q. Okay. And so during that time period, during the two years you were on hiatus as you called it, this key evidence was being litigated through the court system; right?

A. Yes.

Q. Okay. So it does make some sense for the attorneys to wait to see how that ruling's going to come out at the end of the day before they figure out what their case is even going to look like, isn't it?

A. No. I think they had a pretty good idea of what their case would look like because they had Judge Bennett's decision and they knew what his parameters were, and he wasn't suppressing everything in the penalty phase. So, therefore, you know, there

still was a lot of work to do with regard to a potential penalty phase.

Q. And during that time period that this case is going up through the circuit and the case is going forward on Dustin Honken; right?

A. Yes.

Q. Okay. And you made a comment earlier in your testimony that you know how serious the case was against Dustin Honken; right?

A. Yes.

Q. Okay. How did you know that?

A. Well, it was essentially the same case as Angela's case.

Q. Okay. Angela wrote a map directing authorities to the location of the bodies.

A. Right.

Q. Okay. Honken didn't do that, did he?

A. No, but these two people, Mr. Nicholson and Mr. DeGeus, were witnesses, potential witnesses, against Mr. Honken in a federal prosecution, and that's pretty serious.

Q. Let's just do it this way. What part of the discovery file did you look at with regard to Dustin Honken's involvement in the case?

A. I can't tell you exactly. I don't remember. I did not review the entire discovery file.

MR. WILLIAMS: Just a minute, Your Honor?

THE COURT: Sure.

MR. WILLIAMS: Nothing further, Your Honor.

THE COURT: Mr. Burt, redirect?

REDIRECT EXAMINATION

BY MR. BURT:

Q. It was suggested to you that the point you were trying to make in your direct examination was that the lawyers were at fault for not conducting a -- engaging in repetitious work. Is that the point you were trying to make?

A. No.

Q. Totally ridiculous, isn't it, what he was suggesting?

A. Well, I wouldn't call it ridiculous, but I would say that that was not what I was talking about.

Q. Did you at any point in your direct examination say that the problem in this case was that the lawyers should have been doing the same thing, engaging in the same sort of effort repetitiously or that the real problem here was that we all weren't doing the same thing over and over again?

A. No, or at the same time.

Q. I mean, was the problem that nobody was doing what they should have been doing, not that they weren't doing it repetitiously?

A. That's correct.

Q. And did you ever see any indication that the guilt phase of this case was worked up properly to the standards that you

understood were applicable in this case?

A. No, I did not.

Q. You were asked some questions about the standards in 2003 coming into existence and how can counsel be faulted for not complying with standards that didn't exist until 2003; right?

A. Right.

Q. Taking that criticism at face value, if the standards didn't exist till 2003 and the case wasn't tried until 2005, they still had some duties to comply with those standards, did they not, in the pretrial period from the time the standards came into existence until 2005?

A. Yes, they did. And in addition to that, there are many death penalty seminars that are put on in the United States, and they have been in every state and nationally since the death penalty hiatus ended, and many attorneys including Patrick Berrigan attend many of those seminars.

Q. Do those seminars, did they in the time period from 2000 to 2002, suggest that there was some sort of a lax standard in the defense of capital cases in that time period?

A. The seminars?

Q. Yeah.

A. Yes, they always have stressed from the beginning that capital cases need to be worked up using the team concept and a unified theory. These are the least amount of things that they're saying.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 75 of 84

Q. The '89 standards existed even according to the government's argument when Miss Johnson was arrested; right?

A. Yes.

Q. Did the '89 standards pretty much mirror the 2003 standards?

A. Yes, they do.

Q. And the Court can read those and figure that out for itself; right?

A. Yes.

Q. But your understanding of the standards in '89, counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously. Is that anything different than the 2003 standard?

A. No.

Q. The 1989 standard says -- 11.3, 1989, counsel appointed in any case in which the death penalty is a possible punishment should, even if the prosecutor has not indicated that the death penalty will be sought, begin preparation for the case as one in which the death penalty will be sought while employing strategies to have the case designated by the prosecution as a noncapital one.

Under that standard did it matter that the government

had not manipulated the charges into a capital prosecution at the time you started your work in the case?

A. No.

Q. And the fact is she was charged with killing five people as early as August, early August, 2000; right?

A. Yes.

Q. Was this case a potential capital case from the outset under either the 1989 standards or the 2003 standards?

A. Yes.

Q. Did you have some sort of lax obligation to wait until the government manipulated its charges into a capital prosecution to begin work on a case involving five victims?

A. No.

Q. It was suggested to you that since Miss Johnson was not admitting her guilt to her trial lawyers that she would not have admitted her guilt to you or anyone else who was properly building a relationship with her; correct?

A. Yes.

Q. Now, were you aware of the fact that the government secured a conviction and death sentence in this case by presenting evidence to the jury that Miss Johnson repeatedly confessed her involvement in these killings to virtually anyone who would listen in the jail?

A. Yes.

Q. And does the fact -- and are you aware that in regard to

one of those individuals, Mr. McNeese, that Judge Bennett in his opinion concerning the admissibility of Mr. McNeese's evidence said, quote, moreover, McNeese was so persuasive that he was able to convince Johnson to go along with this fabricated plan and reveal incriminating information to him notwithstanding that her attorney who had also represented Dr. Shultice on whom McNeese had previously informed had warned her not to trust McNeese and had described McNeese as an informant? Were you aware that Judge Bennett had made that finding?

A. Yes.

Q. And does that suggest to you if Angela Johnson was confessing to a guy like McNeese that there was no way the defense lawyers, if they were doing their job properly, could have brought her to the same confessions?

A. I think they could have.

Q. Were you aware that the government in the guilt phase of this case presented numerous witnesses all of whom purported to say that Angela Johnson was confessing including Sara Bramow, Peggy Hoover, Peggy Baca, Miss Johnson's own sisters? Were you aware of that, that their theory of getting a conviction here and getting a death sentence was that Miss Johnson freely confessed to all those people?

A. I knew about it. I did not attend the guilt phase.

Q. And do those multiple confessions suggest to you that had counsel been doing their job properly here that perhaps, more

than perhaps, that there is a reasonable likelihood that they could have brought Miss Johnson to a realization of her situation and led her to a guilty plea?

MR. WILLIAMS: Objection. Calls for speculation, Your Honor.

THE COURT: Sustained.

BY MR. BURT:

Q. Now, as I understood the cross-examination about the polygraph, it was that Mr. Honken, in fact, minimized the role of Miss Johnson in his and then flunked a polygraph about her involvement and, therefore, that wouldn't have been mitigating. Did you understand those questions?

A. Yes, I did.

Q. Did you ever read the proffer --

A. No.

Q. -- that Mr. Honken made? This is discovery page RS-3-00118, the 302 report on Mr. Honken's proffer. It says Honken -- this is according to the statement that Honken gave to the investigators. Honken and Angie came up with a plan where Angie would go to Greg's house with a gun and detain Greg in the house until Honken could come in and take control of the situation.

Now, does that sound like Mr. Honken is minimizing Miss Johnson's role in this offense when he says they agreed to a plan to go into the house?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 76 of 84
*to purchase a complete copy of this transcript.*

**305**

A. No.

Q. It says Angie went into Greg's house, but when she went in, Greg was not alone. Greg's girlfriend and her-ten-year-old and six-year-old daughter were present in the house. Angie pulled a gun on all of them and detained them until Honken entered the house.

Does that sound like Honken is minimizing Angela Johnson's role in the offense?

A. No.

Q. He's actually putting her right in the center of it, isn't he?

A. **He is, and he's giving her a position of authority.**

Q. Right. And then when he flunks the polygraph and he flunks it specifically on her role in the offense and the government then takes the position that that is Brady material that has to be turned over to the defense because that's a position they took, wasn't that mitigating?

A. Yes.

Q. The fact that he's pumping up her role and then he fails a polygraph on her role?

A. Yes, yes.

Q. He wasn't minimizing her role, was he?

A. No.

Q. All right. Now, it says Honken -- according to Honken again, Honken -- Angie pulled a gun on all of them and detained

**306**

them until Honken entered the house. Angie -- Honken was not happy with Angie's decision-making process. Honken thought that Angie should have left the house without pulling her gun when she realized that Greg had other people with him in the house. However, Angie made the mistake and Honken could not do anything about it except kill all four people. Honken wanted to kill Greg because Greg was going to testify against Honken regarding Honken's drug activities.

Honken tied Greg and Lori's hands in a shackle-like fashion so they could not free them. Honken also believes that he probably tied their legs in a shackle-like manner. Honken probably told the two that he was tieing them up for safety reasons and that Lori, Greg, and Lori's daughter should be driven to another vehicle.

Honken put Lori and Greg in the back of a pickup truck which had a shell in it, and Angie took the two little girls in the cab of the pickup.

He's indicating Angie took the two little girls into the cab of the pickup. Is that minimizing her role in the death of the two children?

A. No.

Q. And that's the part that he fails the polygraph on; right?

A. **(Witness nodded head.)**

Q. Is that mitigating?

A. Yes.

**307**

Q. Now, he says Angie drove the pickup -- Lori drove the pickup truck to a predesignated spot that Honken and Angie came up with to shoot Greg. There he's got Angie preplanning the location for the shooting; right?

A. Yes.

Q. Is that minimizing Miss Johnson's role in the offense to -- for Honken to say that he preplanned with Angie to pick out the spot where they were going to take these victims?

A. **No, that's putting her right in there.**

Q. Right. And he flunked the polygraph on that part of his statement, did he not?

A. Yes.

Q. All right. Then he says Angie drove to the spot and stopped. Here Angie's driving the car; right? He's not minimizing her role in the kidnapping, is he?

A. No.

Q. It was nighttime and very dark. Honken got Lori and Greg out of the back of the pickup and walked behind -- walked behind the two and made them walk away from the pickup. When Lori, Greg, and Honken walked approximately 50 to a hundred yards, Honken shot Greg from behind and Lori was startled. Honken then shot Lori. Honken then walked back to the cab where Angie and the two little girls were waiting. Honken took the girl first, walked her toward where he shot Lori and Greg. Before they reached the point where Lori and Greg had been shot, Honken, who

**308**

was walking behind the little girl, shot her in the back of the head. Honken then walked back to the truck, got the six-year-old girl, and walked her out to the point close to where he had shot the little girl's sister. Honken, who was walking behind the little girl, shot the little girl in the back of the head as they were walking, then started to dig a grave to bury the bodies. Honken dug one large grave which took approximately three hours to dig. At one point during the digging, Honken became tired and handed the shovel to Angie, and Angie helped dig the grave.

Now, he's got Angie digging the grave for the kids and the adults at this point. Is that minimizing her role --

A. No.

Q. -- in this offense in terms of what that would look like in front of a jury?

A. **No, he's not minimizing.**

Q. All right. And this is essentially the same story that Vest claimed that Honken --

A. Yes.

Q. -- gave; right?

A. Yes.

Q. And then Honken's failing the polygraph on Angie's involvement.

A. Yes.

Q. Again, is that mitigating or aggravating?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 77 of 84

**A.** That's mitigating.

**Q.** All right. Now, it says Angie helped dig the grave. The bodies were a fair distance from where the grave was dug, and Honken and Lori drug the two deceased adults to the grave. Sounds like a mistake in the 302; right?

**A.** Yes, and even in the beginning there's a place where he says Lori drove the pickup, but Lori couldn't have driven the pickup because she's handcuffed and duct taped and everything.

**Q.** Right. So if this is Angie drug the two deceased adults to the grave, he again has her right in the center of this, does he not?

**A.** Yes, he does.

**Q.** Angie had helped Honken drag Lori's body approximately 25 yards when Lori let out a gurgle. This startled Angie, and Angie thought that Lori's spirit had left her body. Angie also helped drag Greg's body to the grave but would not touch the corpses of the children. Now, is that minimizing her role?

**A.** No.

**Q.** Now -- and then it goes on, does it not?

**A.** It does.

**Q.** Now, it -- also in the same interview, he talks about her role in killing DeGeus; correct?

**A.** Yes, he does.

**Q.** And as to that killing, he says some time after the -- shooting these four, Angie and Honken decided that DeGeus had to

die. So again, is he minimizing her role there in terms of the preplanning for this offense?

**A.** No, he's not.

**Q.** Angie did not like DeGeus and feared him. The plan that Angie and Honken came up with was for Angie to lure DeGeus out to a remote location. Angie made contact with DeGeus, and DeGeus met her at the country club. From the country club Angie lured DeGeus out to a remote location.

So again, he's got Angie luring Mr. DeGeus. Not a minimized role, is it?

**A.** No.

**Q.** From the country club, Angie lured DeGeus out to the remote location that she and Honken had planned to kill DeGeus. So, again, preplanning, Angie and Honken; correct?

**A.** Yes.

**Q.** Angie definitely knew that DeGeus would be killed by Honken at that location. Is that in any way, shape, or form a minimization of her role?

**A.** No.

**Q.** He says Angie arrived to the remote location where Honken was waiting with DeGeus. DeGeus approached Honken, and the two started to talk. DeGeus immediately noticed that Honken had a handgun with him and became alarmed. DeGeus told Honken that he would pay the debt. Honken told DeGeus that he was not -- that's not what this was about, et cetera. Honken was having a

hard time bringing himself to shoot DeGeus and talked to DeGeus for several more minutes. He decided to shoot DeGeus and take out his handgun and shot him until the gun was empty. He then went back and got a baseball bat and started beating DeGeus with the bat and then got a shovel and started beating him. Angie was close by when all this happened but did not perpetrate -- participate in this assault that killed DeGeus personally. Angie was relieved that DeGeus was dead of what he had -- because of what he had done to her when they had been dating.

THE COURT: You're now doing what I thought we agreed you weren't going to do. You're reading an entire document. But, you know, you can complete reading it, but let me ask you a question because it's been a lot of years and I just don't recall.

Was this document shown to the jury in the penalty phase of Miss Johnson?

MR. BURT: No, it was never offered.

THE COURT: Okay. Well, had they attacked his credibility by trying to bring in the polygraph, wouldn't this document have come in?

MR. BURT: And it was completely consistent with what was already in front of the jury.

THE COURT: Well, except -- okay. Okay.

MR. BURT: It's the exact duplicate.

THE COURT: That's like cutting off your nose to save

your face, but, you know --

MR. BURT: Well --

THE COURT: To me that's a ridiculous argument that they should have impeached him with the polygraph and then allowed this to come into evidence which would have been overwhelming. You know, it's coming in through three government agents that he debriefed to rather than -- who basically cannot be impeached rather than, you know, a jailhouse snitch who was impeached every which way but Sunday. So, you know, if you think that argument's going to carry the day, not with me.

MR. BURT: Well, it --

THE COURT: Good luck at the circuit, but to me that's just a ridiculous argument. But you can argue about it later.

MR. BURT: Could I respond?

THE COURT: You oughta -- nope, you can't respond. You can respond when you have summation on it, but you really ought to get to things that -- you know, it's the problem. You just want to go down every single path imaginable. It's -- you know, it's just not going to get you anywhere. You've got some good issues, but this isn't one of them.

MR. BURT: I understand, and I'll redirect, Your Honor. Thank you.

THE COURT: You can spend as much time as you want on it, but I'm just telling you had they done what you said they should have done and that they were ineffective for doing, it

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 347 Filed 11/10/11 Page 78 of 84

would have opened the door for incredibly damaging evidence, and that's a -- if anything, that's a strategic decision.

MR. BURT: Well, of course --

THE COURT: And with all due respect, it would have been very poor strategy for them to do what you're alleging they should have done in my humble opinion.

MR. BURT: Well, I do think I have an answer to the Court. I --

THE COURT: Okay. If you want to give it to me now, give it to me now. What's your answer?

MR. BURT: Well, Your Honor, the answer is this which is that the damage had already been done when Vest took the --

THE COURT: I understand that, but this would have been ten times more damaging.

MR. BURT: Ten times in the sense that the statement which they had already heard was being testified to by FBI agents and --

THE COURT: Yes.

MR. BURT: But it was consistent and the imp --

THE COURT: Doesn't make any difference whether it was consistent.

MR. BURT: Well, the important part was government polygraph experts were prepared to testify it was false. That's the important impeachment.

THE COURT: Well --

MR. BURT: So the fact that he was telling the same consistent story --

THE COURT: If you think the jury would have believed a polygraph over -- well, it's just not going anywhere with me. I don't know what else to tell you.

MR. BURT: I understand.

THE COURT: I think it's --

MR. BURT: And I will move on to another topic. It was represented to the Court I believe factually inaccurately that he was minimizing her role. And that, as the Court can see, is simply inaccurate.

THE COURT: Well, I understand that -- yes, I understand by seeing this --

MR. BURT: So I think I do have an obligation to correct the record.

THE COURT: -- he wasn't minimizing her role. I understand that. That gets you absolutely nowhere.

MR. BURT: All right. And I appreciate that. I do think I have an obligation to keep the record factually accurate.

THE COURT: You make whatever record you want to make. I don't disagree with that. And you can read this whole document if you want to.

MR. BURT: No, I don't need to do that in light of the Court's comments. I think I made my point, and I think at the

appropriate time I can -- I can address why I think this is important, and I'll move on.

THE COURT: Okay.

MR. BURT: Thank you.

BY MR. BURT:

Q. Now, this is a slightly different question. What did get put into evidence was not the polygraph results but that Dustin Honken was sentenced to death.

A. Yes.

Q. And what was the strategy behind that?

A. I don't know that I can explain it or that I can be very articulate about it. I think that they wanted originally to talk about the fact that there had been a plea offer for Dustin Honken, and I think that was the purpose of putting Mr. Spies on. You're talking about Mr. Spies' testimony.

Q. Yes, correct.

A. And then I think it opened the door for the information to come in that he had received several life sentences and that he had received death sentences on the children.

Q. But the only thing that came in was Mr. Honken was sentenced to life for the adults and death on the children. How was that mitigating in your --

A. I don't believe that it is. I --

Q. Did you participate in any strategy sessions about why that should or should not be put into evidence?

A. I don't believe I did.

THE COURT: Again, it's a strategic decision, and the jury was going to probably want to hold somebody responsible for the death of the children, and so if they knew that Mr. Honken had received the death penalty, it's a reasonable argument that they might have spared Miss Johnson's life, particularly because the evidence was equivocal as to her precise involvement. So it was a strategic decision. It didn't work, but it certainly wasn't an unreason -- do you think it would have been better to leave the jury thinking that maybe Honken didn't get the death penalty? I guess you do. But it's a reasonable strategy decision for the defense lawyers to have made.

MR. BURT: If the Court has made that --

THE COURT: Do you have an expert witness that's going to come in here and say that that's an unreasonable strategy decision?

MR. BURT: Well, I'm developing that through --

THE COURT: Well, she can't do it. She's not a lawyer.

MR. BURT: It's true she's not a lawyer, but she is a mitigation specialist.

THE COURT: No. I have great respect for Miss Goody and I did from the day I read her résumé attached to the -- for appointment, and we had some discussions that were recorded and they -- I asked why someone from Jackson Hole, Wyoming, and they

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 79 of 84
*to purchase a complete copy of this transcript.*

told me, and I was incredibly impressed, and I'm still incredibly impressed.

But she can't testify to a lawyer's decision to introduce the death penalty of a codefendant as to whether that's a proper strategy. It's just beyond her -- I mean, you can have her testify to it, and I guess she did. But it was a strategy decision.

MR. BURT: Well, I think the cases say, Your Honor, that cloaking -- saying that a decision is strategic doesn't --

THE COURT: I know what the cases say.

MR. BURT: -- end the inquiry.

THE COURT: I know it doesn't end the inquiry.

MR. BURT: And the question is was it a reasonable tactical decision, and if the Court is ruling now that it is, then I certainly am not --

THE COURT: Well, I don't know. Maybe you have more testimony about it.

MR. BURT: Well --

THE COURT: I assume you have a -- you know, you have McNally or some of these incredibly -- lawyers with incredible expertise that are going to come in and give an expert opinion that in their opinion it went beyond strategy.

MR. BURT: Well, the only thing I'm asking the Court at this point is, as you're suggesting you will do, is to not rule out the possibility that it is unreasonable strategy and

perhaps it's not strategy at all. We haven't heard from Mr. Berrigan.

THE COURT: Right.

MR. BURT: We haven't heard from Mr. Willett. If this is an unthinking --

THE COURT: It could be an oversight.

MR. BURT: -- decision or it's not strategic, for instance --

THE COURT: Yeah, but it's -- look, Mr. Burt, you have to bring some common sense. How do you affirmatively call a defense lawyer from a prior death penalty case of a codefendant and put in the fact that that defendant got death if it's not a strategy decision? I mean, you just don't do that. It may not have been a good strategy decision. I understand that. But it wasn't an accident. It wasn't inadvertent, negligent accident. They affirmatively sought to put that testimony in the record.

So the question isn't whether it was a strategy decision. I don't think there will be any evidence that it wasn't. The question is was it a good strategy or was it -- that's not even the question. The question is did that strategy fall below the constitutional minimum of effective assistance of counsel.

MR. BURT: And one factual circumstance that will be in evidence eventually is that there is a letter in the file from Mr. Rogers mid May, thereabouts, which indicates that he

was being subpoenaed by the defense to testify not about the plea but about the fact that the government was making -- that there were plea negotiations, that that was the mitigating testimony.

And somehow that then morphs into putting on Mr. Spies to testify not about the plea negotiations but about -- about the fact that Dustin Honken was sentenced to death, a fact which Mr. Williams seized upon in his closing to argue he got death and we know that Angie Johnson is worse than Mr. Honken, and, therefore, she ought to get death.

THE COURT: But a jury easily could have found that she was less involved.

MR. BURT: They could have if they --

THE COURT: They could have found that on the evidence.

MR. BURT: They could have if the defense had mounted a defense along those lines. So my point to the Court is that you have to take these strategic decisions in context. In other words, the theory of the government was always in the Honken trial that he was the mastermind. They then switched up --

THE COURT: I understand that, and that's --

MR. BURT: -- and said now it's Angie Johnson. Now, if the defense had rebutted that theory and had shown that indeed Mr. Honken was a worse actor, then it made all the sense in the world to put in and he got death because then by contrast

you say justice has been done, the bad guy has been sentenced.

But our argument is in context that's not reasonable because they never refuted the government's what we say is a false theory that she was the prominent actor.

So the only thing I'm saying to the Court is at the end of the day there may be --

THE COURT: Yeah, but they didn't know that at the time that they didn't refute it. That's armchair quarterbacking after the fact. Once the jury decided it obviously they didn't refute it, but they didn't know that when they were . . .

MR. BURT: They didn't know they had not refuted it?

THE COURT: Well --

MR. BURT: Of course they knew it.

THE COURT: Just keep going.

BY MR. BURT:

**Q.** All right. Now, let me address -- and I'm not going to follow up with this in light of the Court's comments, but let me address one issue the Court raises, and that's the issue of hindsight. A lot of the questions that were asked on cross-examination were prefaced by, well, in hindsight your judgment is the following. Are you just relying on hindsight here to say that this case was not litigated to the minimum standard of practice?

**A.** No, I'm not. I'm relying on my memories of going through this experience and, you know, the information in my notes which

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 80 of 84

clearly says that there were fits and starts and things didn't flow properly and that we constantly were trying to get the most important thing done in the case which was to get the neuropsych evaluation done. And, you know, it was requested in '01, and it didn't get done until '05.

Q. Whether you complained about it or not, the fact remains, does it not, that the things you're complaining about did not get done?

A. That's true.

Q. Whether you complain that there was no guilt-phase investigation, the bottom line is there was no guilt-phase investigation.

A. That's true.

Q. And whether you complain about it or not, your mitigation investigation was inadequate.

A. That's true.

Q. The question of whether that's prejudicial is not for you to decide. That's for the Court to decide after hearing the evidence that we produce; correct?

A. Yes.

Q. You're not here to testify that you're aware of what the defense case now is and offer an opinion about prejudice.

A. No, I don't know anything about your case.

MR. BURT: That's all I have. Thank you. Thank you, Your Honor.

THE COURT: Thank you.

MR. WILLIAMS: Nothing further, Your Honor.

THE COURT: Okay. I have just a couple of questions, but I wanted to -- I don't want you to misunderstand what I said. These were my first and only death penalty cases. I had only heard about a mitigation specialist in, you know, kind of passing. And so I read everything I could. And the work that you do is very different than what lawyers do, and I didn't want my comments about you not being a lawyer to be misunderstood. The work you do is probably in many respects more important than the lawyers -- than the work that the lawyers do.

And I wasn't -- in making that comparison, I wasn't trying to marginalize or minimize the role of mitigation specialists in death penalty cases. I think I have a pretty deep understanding of what you do and why you do it, and I didn't want my comments to mean I was minimizing it. There are just certain things I think somebody with a law degree would be better informed about a certain strategy decision than a mitigation specialist. In other respects the mitigation specialist would have far greater expertise and I would give much more weight to his or her opinion than I would to the lawyer's, and I was just drawing a distinction between the two.

THE WITNESS: No, I appreciate your comments, Your Honor, and I never thought that at all.

THE COURT: Well, I --

THE WITNESS: And, in fact, I appreciate that, that you make the distinction between the mitigation specialist and the lawyer.

THE COURT: Because the reason why, as I understand it, your whole specialty has arisen and elevated by the Supreme Court decision in Wiggins is because lawyers weren't doing it and they didn't have the skill, ability, training, know-how, willingness to do what you do, and that's why you exist.

THE WITNESS: That's true.

THE COURT: I do get that part. Now let me ask you a specific question if I may.

THE WITNESS: Okay.

THE COURT: Were you aware that shortly before the trial in this case -- I don't know exactly when in 2004 -- the Federal Judicial Center came out with a study entitled Resource Guide For Managing Capital Cases? It was April of 2004 because I made a little note to myself when I looked it up on the Internet five or six hours ago. Are you aware of that study?

THE WITNESS: I don't believe so, no.

THE COURT: Okay. Well, in it they have a whole section on mitigation specialists, and they say -- now, this is as of 2004, and I'm just paraphrasing it now because I want to get your opinion. They say the range of hourly rates for mitigation specialists are 35 to $75 an hour. Of course, they're talking about as of April 2004, and so they would be looking backwards, so I'm sure some of the cases were much earlier.

But then they go on to say that in the typical federal -- and they're talking about federal death penalty cases now -- a mitigation specialist can be expected to expend between a hundred and two hundred hours. And the whole purpose of this monograph is to give guidance to federal district court judges who are new to death penalty cases and get a sense of what's going on around the country.

So if you do the math taking 200 hours and using your hourly rate of 80 rather than 75 because you're probably better than most of those other people charging lower rates and, you know, those have to be adjusted for national inflation and all, I come up with $16,000. That's the high end. If you use the low end, I guess it's $8,000. You were paid considerably more than that.

THE WITNESS: Yes, I was.

THE COURT: And I know you didn't get as many hours as you wanted. I understand that. But here's my question. Why would -- well, why the huge discrepancy? Do you have any idea why in the average mitigation specialist if the -- I'm just -- if the Federal Judicial Center was right in their analysis, why would a mitigation specialist be able to do their work in 200 hours and you needed so much more than that?

THE WITNESS: Well, I don't believe that it's possible

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 347    Filed 11/10/11    Page 81 of 84

to do a mitigation investigation in 200 hours, and I don't know who put that information together or who they consulted when they -- when they did put it together but, you know --

THE COURT: Well, I think they looked at CJA vouchers and then they talked to federal district court judges who had had death penalty cases.

THE WITNESS: Uh-huh.

THE COURT: Now, I could understand that maybe we all don't approve as much for mitigation as mitigation specialists think that we should. I mean, I understand that. And I understand not only didn't I approve as much as you think I should, I certainly didn't approve it quick enough, and I get that part of it, and that's a self-criticism. You know, and I was asking my law clerk at the first break what happened, why did it take so long to get it approved, because we normally move fairly quickly but not as quickly as most people like, and neither one of us had the memory to figure that out, but it obviously caused me a lot of concern.

So do you have any thoughts as to why these numbers seem -- I mean, they seem very low to me.

THE WITNESS: Well, they do, and I can't explain that to you because, you know, for many, many years now when we do these estimates and prepare these affidavits to get appointed to a case, even after -- after this case I did an affidavit which happens to be in this file for an attorney by the name of Zenon

Olbertz in Pierce County, Washington, in Tacoma, and I raised -- I put a thousand hours in my initial declaration, and I decided, you know, that I needed to -- I really needed to put that out there because it was important for people to know how much time it took.

And certainly travel is a problem, but when you hit the ground running on one of these things, you just have to keep going, and you can't really know in advance which witnesses are going to be the witnesses that will have your information. And it has to be, you know, very comprehensive. And when you start looking at maternal and paternal family systems, you know, you're running into just a heck of a lot of people. And then there's people who are -- who are closer to you than family and know you better than your family does who are people that can just -- just cannot be left out.

So I'm -- I don't know, but I -- if you said to me I'm only going to give you 200 hours to do the Angela Johnson case, I would have said I'm not going to do it because I can't.

THE COURT: But let me ask you this. What efforts did you make -- knowing that I signed an order saying you had $40,000 --

THE WITNESS: Yeah.

THE COURT: -- what efforts did you make to prioritize what you were going to do and focus on the most important things?

THE WITNESS: Well, in the beginning the most important thing is to meet with the defendant and try to establish a relationship such so that you can conduct what is generally a six-hour interview of the person trying to get all the sources of information from them that you need to look into all the places where you need to search for records because in the course of that, just that conversation alone, many, many, many other things come up and you learn many things.

I have for a long time had it happen --

THE COURT: But then once you do that -- I understand that. But once you do that and then you know you have $40,000 worth of time to spend in this case, you have to prioritize because the number of people you could potentially contact is almost boundless. But $40,000 is not boundless, so you have to decide there are certain things we can do and certain things we can't do.

And I kept telling the lawyers that because you don't have unlimited funds. They came pretty close to it. I mean, it was well over a million dollars spent on each of the two cases, well over a million dollars. But I've never understood what efforts you made to prioritize.

THE WITNESS: Well, in the beginning, in the early -- in the '01 time to the time that I -- to the time after the Massiah hearing had occurred, you know, I was prioritizing by I was focusing on her family. I was focusing on those people who

were closest to her, and I was focusing on getting all of the background documents that I knew existed that had anything to do with her medical, school, mental health, all of the background records that I could get on her. So that was like part 1, and I did that.

And then from those interviews came leads to interview other people who had been deeply involved with the family at different times in the places that they lived.

And, for instance, at one point in time when the family lived -- I'm not -- I can't remember if it was Forest City or Clear Lake, but at any rate, there -- the noise from the exorcisms that they -- that Pearl Jean Johnson was trying to do and the noise from Florence Jensen's involvement also with that was so loud that the people in the neighborhood got up a petition to try to force them to move out of that house. And I didn't get that. I didn't have time to look for that information or to find the witnesses who might have been involved in that sort of endeavor.

So I don't know that I can prioritize a mitigation investigation given the fact that -- and that may be what is so unfair about the death penalty and what is so awful about the death penalty is that really and truly you cannot -- you can never be totally done I don't believe.

THE COURT: Okay. I just have one last question for you.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 82 of 84
*to purchase a complete copy of this transcript.*

THE WITNESS: Yeah.

THE COURT: Would you knowingly violate one of my court orders?

THE WITNESS: No.

THE COURT: Okay. Well, then I'm ordering you to submit a voucher for all of the time you've spent in preparing for your testimony today. And that's an order.

THE WITNESS: All right.

THE COURT: Because you need to be compensated for your time.

THE WITNESS: Thank you, Your Honor.

THE COURT: Okay. Any additional follow-up questions?

MR. BURT: Just --

FURTHER REDIRECT EXAMINATION

BY MR. BURT:

Q. The study the Court refers to, when they talk about an average, do you -- and I don't know if the Court knows this, but is that including cases that settle --

THE COURT: No, it's an average of cases that go to trial.

MR. BURT: That go to trial, okay.

THE COURT: Yes, I checked that.

MR. BURT: That's all I wanted.

THE COURT: But you're free to check that resource too, but it was cases that went to trial.

BY MR. BURT:

Q. Was this -- is this an average case in terms of the complexity of the mitigation investigation in the length of the investigation conducted by the government and all -- if you were faithful to the guidelines in terms of investigating aggravation as well as mitigation, is this an average case?

A. Not really. It's very complex.

MR. BURT: Okay. Thanks. That's all I have.

THE COURT: Any follow-up questions?

MR. WILLIAMS: No, Your Honor.

THE COURT: Thank you.

THE WITNESS: Thank you, Your Honor.

THE COURT: Thank you.

Yeah, you can step down.

You want to take up for a minute this issue of your motion to -- whatever it was phrased, to require the government to turn over these documents? And the government I assume has complied with my order and turned over the documents in category 1 but not the 4 through 5 -- not 2 through 5? Weren't there five categories?

MR. WILLIAMS: That's correct, Your Honor.

MR. BURT: They have, Your Honor. I think --

THE COURT: I mean, nobody's really briefed it. I'm pretty familiar with the deliberative process privilege and -- I mean, do you have any reason to believe that any of those

documents actually exist?

MR. BURT: Well, I --

THE COURT: I know that's not the test, but I just wonder if you have any reason to believe that any of those documents actually exist.

MR. BURT: I know based on experience in other cases that there is a requirement of written communication for the recommendation of the local U.S. attorney. I know based on the material that was handed over to us that there was written communication from the Department of Justice and as a matter of common sense there would be in a decision like this. I know that there are internal written documents that go from the capital case unit up the chain to the attorney general.

In terms of the issue before the Court, I think one of the issues is -- as we raised in the briefing that we did submit to the Court is waiver; in other words, have they disclosed the deliberative process already. And I think the Court will be in a better position to determine that issue once you hear from the trial lawyers in terms of what got said by the government lawyers because based on my review, especially of the more recent documents that were just given to us by the government, I think there is a much stronger argument now that they waived any privilege, especially as to communications with DOJ, because there is indications in the documents we got that they were telling the defense lawyers what DOJ wanted and what they were

thinking.

So I think the Court should defer ruling until you've heard from some of the lawyers about that discussion.

Now, one issue that did get raised by the delivery of those documents is our need to call an additional witness because of his role in the plea process that I didn't realize until I saw the government's Honken disclosures. And I think we're going to have to call Mr. Spies who in particular had some conversations where the government disclosed to him some information about the decision-making process.

So I'd ask the Court to defer that issue until you've heard more facts --

THE COURT: That's fine.

MR. BURT: -- in terms of what got said and when.

THE COURT: Sure. Okay. See you all tomorrow at 7 a.m.?

MR. BURT: Thank you.

THE COURT: Okay. Thank you. We'll be in recess.

(The foregoing hearing was adjourned at 5:53 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_S/Shelly Semmler_          3-15-11

Shelly Semmler, RMR, CRR       Date

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 347   Filed 11/10/11   Page 83 of 84

333

## INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| MARY GOODY | | |
| | MR. BURT | 12 |
| TIMOTHY DILLOW | | |
| | MS. MORRISSEY | 199 |
| | MR. WILLIAMS | 220 |
| MARY GOODY | | |
| | MR. BURT | 224 |
| | MR. WILLIAMS | 248 |
| | MR. BURT | 299 |
| | MR. BURT | 329 |

\*\*\*\*\*

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*