IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

ANGELA JANE JOHNSON,  No. C09-3064

    Petitioner,

  vs.  TRANSCRIPT OF
2255 EVIDENTIARY
UNITED STATES OF AMERICA,  HEARING

    Respondent.
_____/  Volume 2

The Hearing held before the Honorable Mark W. Bennett, Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 Sixth Street, Sioux City, Iowa, March 8, 2011, commencing at 7 a.m.

---

APPEARANCES:

For the Petitioner:    MARCIA A. MORRISSEY, ESQ.
2115 Main Street
Santa Monica, CA 90405-2215

MICHAEL BURT, ESQ.
Law Office of Michael Burt
Suite 329-E
600 Townsend Street
San Francisco, CA 94103

MOHAMMAD ALI HAMOUDI, ESQ.
Suite 329-E
600 Townsend Street
San Francisco, CA 94103

NANCY S. PEMBERTON, ESQ.
Pemberton & Associates
Suite 329E
600 Townsend Street
San Francisco, CA 94103

For the Respondent:    C.J. WILLIAMS, ESQ.
Assistant United States Attorney
Hach Building - Suite 400
401 First Street Southeast
Cedar Rapids, IA 52401-1825

Also present:    John Graham

Reported by:    Shelly Semmler, RMR, CRR
320 Sixth Street
Sioux City, IA 51101
(712) 233-3846

---

THE COURT: Thank you. Please be seated.

Ready to proceed with your next witness?

MS. MORRISSEY: Yes, Your Honor, Your Honor. Thank you. We would call Lisa Dahl.

Your Honor, so the Court knows, Miss Dahl is going to testify regarding the claim relating to overmedication of Ms. Johnson at trial as well as to the claim that relates to ineffective assistance in terms of jury selection.

THE COURT: Okay.

MS. MORRISSEY: Thank you.

THE COURT: Would you please stand. I need to swear you in.

LISA DAHL, PETITIONER'S WITNESS, SWORN

THE COURT: Okay. Thank you. Please be seated. Good morning.

Would you tell us your full name, please, and spell your last name.

THE WITNESS: Lisa Marie Dahl, D-a-h-l.

THE COURT: Thank you.

Miss Morrissey?

MS. MORRISSEY: Thank you.

DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Good morning, Miss Dahl.

A. Good morning.

---

Q. Could you tell us, please, what you do for a living.

A. I'm a jury consultant.

Q. And where do you practice?

A. I -- my office is in Lawrence, Kansas, and I practice around the nation.

Q. Have you -- how long have you been in practice as a jury consultant?

A. Since '94.

Q. And do you have any experience, Miss Dahl, in capital cases?

A. Yes.

Q. Do you have experience in jury selection in capital cases?

A. Yes.

Q. Can you tell us about how many capital cases you've participated in in terms of jury selection?

A. Approximately 25.

Q. And have those been in state court and federal court?

A. Yes.

Q. Were you involved in the trial of Angela Johnson?

A. Yes.

Q. Could you describe for us your involvement in that case.

A. I was involved in a venue assessment and testified about that as well as in developing the juror questionnaire and working with the defense in jury selection.

Q. Did you attend the jury selection in this case?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Page 338

A. Yes.

Q. And during the course of the jury selection, were you there every day?

A. Yes.

Q. And did you have an opportunity to observe Angela Johnson who's present in court today?

A. Yes.

Q. Could you describe her demeanor when you saw her during the jury selection process.

A. Yes. She had at times somewhat of a girly or giddish sort of demeanor, twirling of hair. She also at times would have somewhat of a harsh appearance or a judgmental appearance, and so that's the demeanor that I saw.

Q. Was it a demeanor that was in your view as somebody who has been involved in jury selection and jury trials appropriate?

A. There was a sense that her appearance and her affect didn't represent that she appreciated the gravity of the situation. I think it could be read that way.

Q. Okay. Was Miss Johnson, if you remember, engaged in the process of jury selection? That is, did she, you know, attend to what was going on and --

A. Yes.

Q. Okay. Could you describe or tell us what makes you think that she did -- you know, was engaged in jury selection?

A. She had a notepad, and she would take notes about the

Page 339

jurors. We would have some discussions together about her feelings about the jurors and her reactions to the jurors.

And more meaningful perhaps than her written word were these pictures that she would draw of the jurors that would reflect the -- sort of the emotion that the juror was putting out as well as capture some of Angela's emotion, and so she would share those with us, and they were very accurate as to what that juror looked like.

Q. Okay. After the jury selection process, after the opening statement, were you in court?

A. I came back for closing arguments.

Q. And were you there just for closing arguments at the penalty phase?

A. Yes.

Q. I want to give you some hypotheticals and ask you to assume certain facts; okay? Assuming that you have a client in a capital case whose mother hears and sees things that no one else does and whose mother gives special meaning to ordinary things as signs from God, whose mother is involved with her children by the laying on hands and speaking in tongues, mother who believes that there are demons who exist in her children's person, a mother who exorcises demons by ritual of holding down her children and rebuking them to have the demons come out, assuming that there was hyperreligiosity that was going to be evidence in the case like that, would that be something that you would

Page 340

address either in jury selection or in the jury questionnaire?

A. Yes.

Q. Okay. And why would you try to address that in jury selection or the jury questionnaire?

A. There would be a number of reasons. I would want to know the jurors' experiences with religion and with religiosity, and I would also want to know their attitudes and beliefs about certain religions or certain religious practices and how those experiences line up -- how their experiences line up with the client's experiences and if those items that you listed would be meaningful to them or to what extent they would be meaningful as mitigation.

Q. Okay. All right. Thank you.

MS. MORRISSEY: I have nothing further.

THE COURT: Mr. Williams?

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Good morning, Miss Dahl.

A. Good morning.

Q. Did Brett Dillingham work for you or with you?

A. With me.

Q. Okay. Did you participate in the interviews of jurors post verdict?

MS. MORRISSEY: Objection, Your Honor. Beyond the scope.

Page 341

THE COURT: It is beyond the scope. Is there a reason why I should allow you to go beyond the scope?

MR. WILLIAMS: To the extent that they're talking about jury selection and the impact that this could have had, would have had, the fact is Miss Dahl's firm conducted interviews of the jurors afterwards, and to the extent that they have cited those in their petition as grounds for demonstrating that the jury selection process conducted by the attorneys at trial was inadequate as shown by the responses in these questionnaires, I want to find out to what extent Miss Dahl had any involvement in those interviews.

THE COURT: Well, it's beyond the scope, but I'll allow it.

BY MR. WILLIAMS:

Q. Miss Dahl, did you participate in any of those interviews?

A. I did not participate in the interviews.

Q. Did you direct Mr. Dillingham on how to conduct the interviews?

A. I gave him notes about thoughts of the jurors. I did not direct him into specific questions.

Q. Okay. Explain to the judge if you would, how did the attorneys work with you in preparation for the selection of this jury? What did they do? How did they work with you? What did they provide you for information?

A. For the selection of what? I'm sorry.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

**342**

Q. The jury in this case.

A. We met. We discussed aspects of the case. At the time I recall in preparing for the venue study I read media accounts of the case. We discussed various questioning strategies and who would do the questioning.

Q. Okay. You met with them how many times?

A. I do not recall.

Q. More than once.

A. Yes.

Q. More than five times?

A. Yes.

Q. Okay. More than ten times?

A. I don't recall.

Q. Spent hours with them; right?

A. Yes.

Q. Okay. And during that time period that you spent hours preparing for jury selection, you talked about various topics that ought to come out during the jury voir dire; right?

A. Yes.

Q. And you talked about issues that needed to be included in the questionnaire; right?

A. Yes.

Q. Okay. And there was a number of things that you thought were important that be included in the questionnaire particularly dealing with death penalty views; right?

**343**

A. Yes.

Q. And that was the essence of this case really, wasn't it, people's views about the death penalty?

A. It was the essence of part of the voir dire, and it would -- had the potential to become the essence of the trial.

Q. That really was the overriding thing at the end of the day, wasn't it, Miss Dahl, is what the jurors' views were about the death penalty was really the crucial thing that this team needed to know in who they wanted on the jury?

A. That was a large part of it. I wouldn't say it's the only part of it.

Q. Okay.

A. But it was an extremely important part.

Q. Okay. And then there was a number of other things that you wanted to include or wanted them to include in the voir dire or the questionnaire; right?

A. Correct.

Q. And what are some of those things that you all discussed that you thought were important to include in the questionnaire?

A. We wanted to include their knowledge of the case.

Q. Okay.

A. So did they have knowledge of the case?

Q. That was important, sure.

A. Did they have an opinion about guilt or innocence at that point? Did they have an opinion about the defendant based on

**344**

the charges or based on what they had read? We wanted to include information about their views of the death penalty, life in prison without the possibility of parole. Various aggravators as I recall were listed and some mitigators were listed in that section. There were other general background pieces of the person's life that were listed in the questionnaire.

Q. Okay. And then when you went through and you prepped for the actual voir dire, you had similar discussions about what they ought to bring out during voir dire.

A. Yes.

Q. Along those same lines of topics; right?

A. Yes.

Q. Okay. And you actually went through a mock jury selection, didn't you?

A. Yes, a training session.

Q. Right. So you actually helped train these attorneys in selecting a jury; right?

A. The training session was in how to ask questions, not necessarily how to select the jury, so practicing questions.

Q. All right. You brought in some friends and family, and they went through a mock voir dire.

A. Yes.

Q. Okay. Now, as a jury consultant, part of your task is to figure out how to get as much information as possible from the

**345**

jurors to help make the decision of who to either move to strike for cause or to remove by using peremptory strikes.

A. Yes.

Q. Okay. In that process as a jury consultant you'd like to know absolutely everything about those jurors, wouldn't you?

A. Yes.

Q. Okay. And while you have some things you know you've gotta get out, there's other things that, frankly, you just don't always get out of the jurors. So, for example, in this case you had to know what their views were on the death penalty; right?

A. Yes.

Q. Would have been nice to have known a whole lot more of other information about them; right?

A. Yes.

Q. Okay. In this case there was a lot of different facts that in theory could have impacted a jury's decision; right? As with any case, there's any number of facts that could influence it; right?

A. Sure.

Q. It's not possible, is it, to make sure that during either the jury questionnaire or during voir dire that you cover absolutely everything that in theory could impact or be helpful to know how it might impact a juror's decision? In other words, Miss Dahl, you're never going to have perfect information about your juror, are you?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 3 of 85

A. I don't think you could have perfect information as you don't know how things will evolve during trial.

Q. Okay. And you're never going to be able to ask jurors everything you'd like to ask them during voir dire; right?

A. Correct.

Q. And you don't know what information's really going to impact a juror's decision at the end of the day, do you?

A. I think we make assumptions based on experience and research about what may be big influences on a juror's decision.

Q. Okay. Now, when you were working with these attorneys, did they ever talk to you about Miss Johnson's upbringing?

A. Yes.

Q. Okay. They talked to you about the mother?

A. Very briefly.

Q. Okay. You knew about her being hyperreligious.

A. I can't say that I knew about it in those terms.

Q. Okay. What terms did you know about it in?

A. Extremely abusive.

Q. Okay. In what way did they explain to you she was extremely abusive?

A. The two things that I recall being told included Angela being locked in a closet without food and just a very brief statement about that she was held down and perhaps an exorcism.

Q. Okay. So you knew from what they told you that there was a religious theme to the mother's abuse of Miss Johnson; right?

A. It wasn't explained to me that that was a theme or that that exorcism was linked to a hyperreligiosity or that exorcism wasn't a holding down. It was a very brief statement. It wasn't described in depth to me.

Q. I understand that, but the fact is these attorneys explained to you that the mother, among other things, held her down as part of an exorcism; right? And that was something that was important enough for those attorneys to tell you; right?

A. They told me those words but not even with the statement that you put emphasis on in your question.

Q. All right. Well, I'm -- in your testimony you explained that the attorneys explained to you that part of the abuse that Miss Johnson suffered was she was held down as part of an exorcism. Did I get that right?

A. As part of a possible exorcism.

Q. All right. And that they also -- she also locked Miss Johnson in a closet without -- or -- without allowing her to eat, something to that effect; right?

A. Yes.

Q. Okay. They explained to you that was part of a fasting?

A. No.

Q. Okay. All right. Now, there was any number of possible mitigation-type issues in this case; right?

A. Yes.

Q. Did you include every one of those in the questionnaire?

A. I -- I mean, mitigation is very broad, and I did not include everything in the questionnaire, no.

Q. Okay. And you didn't -- and the attorneys didn't include every possible mitigation issue during jury selection either, did they?

A. No.

Q. Okay. There's any number of mitigation issues they could have brought up in voir dire, and they brought up some, and some they didn't bring up; right?

A. I guess I'm not aware of all of the mitigation in the case to be able to -- to match it with what actually . . .

Q. Well, Miss Dahl, you sat through the jury selection process.

A. Yeah.

Q. Right? Okay. You know from your observations that these attorneys when they conducted voir dire did not raise every mitigation issue during voir dire.

A. That's correct.

Q. Okay. The -- your assessment was that this jury pool in northern Iowa was punishment prone.

MS. MORRISSEY: Your Honor, again, I'm going to raise an objection as beyond the scope.

THE COURT: Overruled.

A. Yes.

Q. Okay. Your assessment of the Iowa jury is that they lived

in a stark area of big farms butchering pigs smelling renderings. They were hard core, not well educated, not accepting, and not friendly. That was your assessment of the jury pool up here in northwest Iowa; right?

A. Yes.

Q. And you knew it was going to be hard to win this jury no matter what; right?

A. Yes.

Q. Let's talk about the demeanor here for a few minutes. The -- oh, by the way, going back to voir dire, have you worked with Mr. Berrigan before?

A. Yes.

Q. Okay. You've seen him conduct voir dire before?

A. Yes.

Q. Very talented at conducting voir dire, isn't he?

A. He's very effective.

Q. Okay. And he had not done individual voir dire before.

A. No.

Q. Okay. But that was part of the exercise you went through is to give him an opportunity to practice doing individual voir dire; right?

A. Yes.

Q. Okay. And at the end of the day you have no criticisms of how he conducted the voir dire in this case, do you?

A. I think if we're speaking as the team I -- I would have

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

some criticisms of Mr. Berrigan in particular, not necessarily.

Q. Okay. In other words, I think what you said during the interview by one of the defense investigators or the attorneys is you thought he was at the end as effective in conducting individual voir dire as you had seen him in the past conducting group voir dire.

A. Yeah.

Q. And your assessment in the past is you thought he was incredibly effective in conducting group voir dire.

A. He is very talented in group voir dire.

Q. Now, you observed during jury selection that there was what you've termed here today some inappropriate demeanor by Miss Johnson during jury selection. You talked about twirling hair. I think you said girly or giggly I think in the interview you said. You talked about her appearance was harsh appearance, judgmental appearance all of which as a jury consultant you viewed negatively on how that was going to impact on the jurors' perception of the defendant; fair?

A. Yes, it's a difficult demeanor.

Q. Okay. And did you have conversations with the trial counsel then about your observations of Miss Johnson's appearance during the jury selection process?

A. Yes.

Q. And you expressed to them you had some concerns about how that was going to come off to the jury?

A. Yes.

Q. Did you give them any advice that they ought to give her some instructions about trying to change that appearance?

A. Yes.

Q. And what did you tell them?

A. That particularly about her hair, that we needed to work with her on calming herself in other ways rather than flipping her hair.

Q. Okay. And what other ways did you talk about calming herself?

A. Just specifically not flipping her hair.

Q. Okay. Did you talk about using her drawing as a way for her to calm herself instead of flipping her hair during the trial?

A. I did not talk about her drawing as a way to calm herself.

Q. Okay. What about her demeanor on her face? Did you talk about the attorneys should have a talk with her about trying to maintain composure on her face so she didn't kind of show that aggressiveness or judgmental appearance as you described it?

A. We had discussions about that.

Q. Okay. And in your view that was -- that was something that the attorneys should do. They should talk to her about changing her appearance and becoming more serious.

A. Yes.

Q. All right. Now, during the process, during the jury

selection process, you said Miss Johnson was actively engaged in communicating with the attorneys about their -- her views of the jurors.

A. Yes.

Q. And you had conversations with her yourself?

A. Yes.

Q. Ever have any concerns about whether she was incompetent during that time period?

A. No.

Q. Okay. She was able to communicate with you and the attorneys; right?

A. Yes.

Q. Okay. She was acting rationally during that time period; right?

A. Yes.

Q. Okay. She was understanding the proceedings that were going on around her at that time; right?

A. To the extent that she could understand in a very simplistic way what was going on. I mean, I don't know what she understood in terms of the depth of what was going on.

Q. Okay. And you came back for the penalty-phase closing arguments. Did you have communication with Miss Johnson at that time?

A. I don't recall.

Q. Did you observe her in court at that point?

A. I -- yes.

Q. Okay. And what did you observe about her demeanor in court during the penalty-phase closing arguments?

A. I didn't pay attention to her demeanor at that time. I was sitting behind her for the most part and was more attune to the closing arguments and what was coming out there, and I don't recall her demeanor at closing argument.

Q. Okay. You don't recall her, for example, ever flipping her hair during the closing arguments.

A. At this time I don't recall.

Q. Going back to Miss Johnson's demeanor then, I think in one of the interview you said -- and I'm quoting from the interview -- the essence of Angela Johnson could not be fixed. Do you remember saying that to the investigator?

A. I don't remember those specific words.

Q. Do you remember something along those lines, the essence of Angela Johnson could not be fixed?

A. I don't -- I don't know those words. Perhaps the sentiment, yes.

Q. Okay. What does that mean in your view then? What's the sentiment you were trying to convey whether those were the exact words you used or not?

A. That it would be difficult for a jury to see past what they were seeing in court which was what I felt was the essence of her.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 5 of 85

**354**

Q. Which is what? What did you think the jury was seeing?

A. **I thought the jury would see someone at that point who would be too -- too giddy for the situation and who didn't appreciate her situation or the victims' situation and that that may always be present.**

MR. WILLIAMS: Nothing further. Thank you, Miss Dahl.

THE COURT: Miss Morrissey, redirect?

MS. MORRISSEY: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Miss Dahl, let me just talk about what you're in this case in general. The whole point of what you're in this case is to get information from the jurors; correct?

A. **Correct.**

MR. WILLIAMS: Leading question, Your Honor.

THE COURT: It is, but I'll --

MS. MORRISSEY: Thank you.

THE COURT: Try and do some nonleading.

MS. MORRISSEY: I will do that, Your Honor.

THE COURT: Thank you.

BY MS. MORRISSEY:

Q. Were there any time limits imposed by Judge Bennett on the voir dire in this case?

A. **Not that I recall.**

Q. And were there any restrictions imposed by Judge Bennett on

**355**

the nature of questions that could be asked, for example, mitigation-specific questions?

A. **No.**

Q. So that there was no legal reason that you would not have inquired into relevant mitigation if you knew about it; would that be correct?

A. **Correct.**

Q. And was there, because of the rulings, no time considerations that would have counselled you not to consider in -- not to inquire into relevant mitigation?

A. **No.**

Q. So it was -- the conditions for jury selection in this case were fairly good in terms of counsel's ability to get at the jurors and to find out information.

A. **Yes.**

Q. Okay. Did anyone ever tell you specifically that Ms. Johnson's mother believed she was possessed by the deaf and dumb demons?

A. **No.**

Q. Did anybody ever tell you that his mother -- her mother would hold her on the floor or on the dining room table and then would shake her, scream at her, and chant over her to drive out the demons?

A. **No.**

Q. You mentioned that nobody ever told you that the family

**356**

would fast and there would be no eating from sunrise to sunset.

A. **No.**

Q. And this was a religious fasting.

A. **No.**

Q. Did anybody ever tell you that Ms. Johnson's toys and television as a child were destroyed by her mother and her grandparents because they were craven images?

A. **No.**

Q. Did anybody ever tell you that at one point the family, because the grandmother hallucinated a wolf talking to her, were woken up in the middle of the night, put in the car, and drove around without food and water for four days following a scar on the mother's leg?

A. **No.**

Q. Are those things I just talked to you about rather significant in your mind in terms of a jury selection procedure in a capital case where there's going to be mitigation of that nature?

A. **Yes.**

Q. And are they significant because depending on your own personal experience with Pentecostal religion these things may be on a continuum approached normal or not be abnormal to you if that makes sense?

A. **Could you rephrase the question?**

Q. Okay. Sure. Do you want to know people's experience with

**357**

hyperreligiosity and Pentecostal religion when there is mitigation such as that we've been talking about?

A. **Yes.**

Q. And is that because some people might view this evidence as mitigating and others based on their experience would not?

A. **Yes.**

Q. And this information that we've talked about today is something that you did not have from talking to the lawyers.

A. **Correct.**

Q. Would -- if you had known about that mitigation, would you have put it in the questionnaire?

A. **I would have put questions around religion experiences and beliefs in the questionnaire.**

Q. And would you have counselled or recommended to counsel that they perhaps discuss it in oral voir dire?

A. **Yes.**

Q. You were asked about -- by Mr. Williams about the -- Mr. Berrigan's skill in jury selection; correct?

A. **Yes.**

Q. And let me ask you about the jury selection in this case. Was it conducted just by Mr. Berrigan?

A. **No.**

Q. Who besides Mr. Berrigan participated in jury selection?

A. **Mr. Stowers and Mr. Willett.**

Q. And the jury selection, was it divided up into different

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

portions? Was there a general voir dire and then a death qualification voir dire?

A. Yes.

Q. Who did in most cases the death qualification voir dire?

A. Largely Pat Berrigan.

Q. And what lawyers did the general voir dire?

A. Al Willett did the general voir dire. I can't recall if Dean did any of the general voir dire, Dean Stowers.

Q. Do you have any criticism of either of those lawyers in terms of the jury selection?

MR. WILLIAMS: Objection. Relevance. Nothing in the petition alleges any error with respect to the jury selection during the general voir dire.

THE COURT: You may answer the question.

A. Yes.

Q. And could you explain to the Court what your concerns were.

A. The concerns in the general voir dire that I have include that the type of questions that were asked and the manner in which they were asked were largely closed-end questions when Mr. Willett would be doing the questioning, and I found that difficult.

Q. Why did you find it difficult?

A. For me it's important to find out information about the jurors and find out their attitudes and beliefs in an open-ended manner and that they tell the information, that the juror is

doing the speaking more than the attorney doing the speaking.

Q. And as a result, were there any adverse consequences to the type of voir dire that Mr. Willett did?

A. What I believed was that Mr. Willett's voir dire had the effect of chilling some of the comments of jurors who might be more dangerous for the defense than getting information from those jurors to make judgment calls about them.

Q. When you say chilling the comments of dangerous jurors, do you mean that they -- the danger -- the jurors you believed to have information that was detrimental to the defense did not share that?

A. That they would not openly reveal their attitudes or beliefs or that those attitudes and beliefs couldn't be revealed through a closed-end question.

Q. Let me ask you about legal principles during voir dire. Did Mr. Willett voir dire about legal principles?

A. Yes.

Q. And is that -- in your opinion as a jury selection specialist, is that a good way of conducting voir dire?

A. For me -- for what I need to accomplish in jury selection which is finding out about the jurors' beliefs in the manner in which that part of the voir dire occurred, I didn't find it helpful.

Q. Were there jurors -- and I don't know if you can answer this now. Were there jurors that you believe could have been

challenged for cause but were not as a result of the voir dire that Mr. Willett conducted?

MR. WILLIAMS: And, Your Honor, I'm going to object to the extent that even if she identifies somebody they've not moved to amend their petition. They've not alleged anything in their petition suggesting that there was ineffective assistance of counsel in Mr. voir dire -- in Mr. Willett's voir dire that caused them to fail to exercise a strike. This is far afield.

MS. MORRISSEY: Well, Your Honor, I believe the petition alleges ineffective assistance of counsel in jury selection based on two spec -- the failure to inquire into hyperreligiosity and failure to inquire into Ms. Johnson's particular situation as a woman who was involved in criminal activity. Neither of those things, those two issues that are raised in the petition, are limited to death qualification voir dire. They're specifically matters that would be raised on general voir dire.

THE COURT: I'll allow it.

MS. MORRISSEY: Thank you, Your Honor.

BY MS. MORRISSEY:

Q. And I don't know if that was an intelligible question, Miss Dahl, so please tell me if it wasn't.

A. Could you ask the question again?

Q. Okay. Were there jurors in your mind that could have been or should have been challenged for cause that were not as a

result of Mr. Willett's voir dire?

A. I don't have a memory at this time of a specific juror.

Q. All right. That's fair. When you came back to trial for opening statement -- for closing arguments at penalty phase, were you sitting in this row of seats back here?

A. Not as I recall.

Q. Where were you sitting?

A. I believe I was seated over in that area.

Q. Okay. You mean in the area of the courtroom that is behind where the prosecution is sitting now?

A. Yes.

Q. So you weren't directly in back of Miss Johnson?

A. As I recall -- and I could be mistaken -- for some reason my memory is the defense was at that -- at that table, but I could be recalling that inaccurately.

Q. You are correct. The defense was at this side. And you were in the back?

A. Yes.

Q. Okay. And were you there to hear Mr. Berrigan's closing argument?

A. Essentially, yes.

Q. You were not there to observe Miss Johnson?

A. No.

Q. In any event, when you talked to the lawyers about what you viewed as her undesirable behavior in front of the jury, you

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 348 Filed 11/10/11 Page 7 of 85

**362**

said that you gave them -- you asked them to find some other way to calm her?

**A.** Yes.

**Q.** Let me ask you about that. Why did you think that Ms. Johnson needed calming?

**A.** I think being in front of the jury, for her I worried that they would read her nervous energy as, again, not appreciating the gravity of the situation.

**Q.** And is -- are instructions to a client on how to behave in front of a jury, are those uncommon in a criminal case or a death penalty case?

**A.** No.

**Q.** Okay. And why is that?

**A.** The -- often the person who is accused has no idea how to behave or how to react or what to do with their emotions or their -- their body during the time that they're in front of a jury or any time in the courtroom.

**Q.** And in a capital case, based on your experience, are the emotions of the accused particularly inflamed or high?

**A.** I would say their emotions are generally high.

**Q.** And did you advise Miss Johnson's attorneys to load her up on medication so that she could not show emotion?

**A.** No.

MS. MORRISSEY: Thank you very much. I have nothing further.

**363**

THE COURT: Mr. Williams?

RECROSS-EXAMINATION

BY MR. WILLIAMS:

**Q.** Miss Dahl, you don't recall that the Court imposed time limitations on the attorneys during jury selection during the Johnson case?

**A.** I'm sorry. I don't recall that. That may very well be true.

**Q.** As part of your work on this case including the post-verdict interviews that were conducted, were you able to find that there was any prospective jurors out there that in your view held religious beliefs that had you known about this issue you would have recommended that they be struck either for cause or that the attorneys use peremptory strikes on?

MS. MORRISSEY: Objection, Your Honor. Beyond the scope, lack of foundation. Miss Dahl did not conduct the post-trial juror interviews, so she has no personal knowledge.

THE COURT: Overruled. She had somebody do it on her behalf.

**A.** Could you ask the question again?

**Q.** Certainly. Do you have any knowledge through whatever means of any prospective jurors that were in this case that you would now say, boy, had we known about this hyperreligious issue as a mitigator, I would now look back and I would say we erred by failing to move to strike that juror for cause or we erred in

**364**

not using a peremptory strike on that particular juror?

**A.** That's a very difficult question because I don't know what their views are.

**Q.** Okay. And that's essentially what I'm getting at, Miss Dahl. You can't today point to the judge that there's Juror Number 492 that held Pentecostal views of religion that had I known about this issue I would have recommended that Juror 492 be struck for cause or that the attorneys would have used a peremptory strike? You don't have that information, do you?

**A.** I have information that makes me want to know more information about one of the jurors in particular and their religious beliefs based on what he said to Brett Dillingham in the interview.

**Q.** Okay. But --

**A.** I don't know if they would have led to a cause strike. It might have made a more informed peremptory strike.

**Q.** Okay. But to this -- right now you have no information that you're saying they should have either moved for cause or they should have used a peremptory based on those views.

**A.** I don't have information about his religious views, about the juror I'm remembering, his re -- I don't have information about his religious views in relation to mitigation or in relation to Pentecostal views. I have information about his statement of, you know, praying to God for guidance, and I would want infor -- I guess what I'm trying to figure out is how can I

**365**

get the information that I didn't have in the beginning to make a judgment about him in the end?

**Q.** Okay. But the point is right now you don't have that information to make that judgment; right?

MS. MORRISSEY: Objection, Your Honor. Asked and answered.

THE COURT: Overruled.

**A.** I don't have the beginning information. I just have the ending information. And, you know, had I known about -- more about his religious views, perhaps I could have made a more informed decision about a peremptory, or possibly it could have been a cause strike.

**Q.** Yeah. Possibly.

**A.** (Witness nodded head.)

**Q.** And possibly not.

**A.** Possibly he was very dismissive of a good deal of the mitigation, you know, and I don't know how the judge would have ruled.

**Q.** Okay. You talked about had you known some of this you would have recommended that there be questions about religion in the questionnaire. Do you remember that?

**A.** Yes.

**Q.** There were questions about religion in the questionnaire, were there not, ma'am?

**A.** I don't think there were questions about beliefs, about

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 348 Filed 11/10/11 Page 8 of 85

**366**

their beliefs or their attitudes about religion, about this type of religion.

Q. Okay. There were questions about religion, though, in the questionnaire; right?

A. I don't recall specifically at this moment.

Q. Okay. And during voir dire religious views came up from time to time with different jurors, did it not?

A. In terms of their willingness or ability to consider the death penalty.

Q. Okay. And my point is simply this. Religion was not a topic that was not at least addressed to some degree during jury selection.

A. Religion was -- I'm sorry. Could you . . .

Q. Religion did come up to some degree during jury selection; right? It wasn't completely absent.

A. Correct.

Q. All right. Okay. And to the extent that you have some criticism of Mr. Willett's voir dire and you as a juror consultant would have recommended that he do it in a different manner in order to aid you in your task, right, this isn't the first time you've run across an attorney who has a different style doing voir dire than what you would like to see; right?

A. Correct.

Q. And, in fact, in your experience there's any number of attorneys who in their view, right or wrong, view jury selection

**367**

should be done in a way different than the way you view it should be done.

A. Correct.

Q. Okay. And reasonable minds can differ on that; right?

A. Correct.

MR. WILLIAMS: Okay. Nothing else, Your Honor. Thank you.

FURTHER REDIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Miss Dahl, Mr. Williams asked you about juror interviews that were conducted in this case. Let me follow up on that briefly. I'm going to ask you about somebody identified as Juror Number 55. Do you recall that person?

A. Yes.

Q. Okay. And was he the person that you referenced when you were answering Mr. Williams' questions?

A. Yes.

Q. Okay. Now, did that juror state that he prayed to Him, capital H, to guide me in the right way to go, and I feel that the way He guided me, capital H, to go was this needed to be done because of the kids?

A. Based on the interviews, yes.

Q. So that your -- in other words, he voted after praying to God.

A. Yes.

**368**

Q. Okay. And is that something that is an interjection of religion that you find significant?

A. Yes.

Q. Do you recall that Juror Number 55 made the following statements? Because the mother, Miss Johnson's mother, there were things said by her that really pissed us off, all this about Miss Johnson was such a battered person, there were a couple of us that have been through a hell lot worse than she had. She never was beaten so bad she couldn't sit down for a month. A couple of us, we had it rough, but we didn't turn out to do drugs and kill people.

Is that a statement that you had in mind when you were talking to Mr. Williams about this particular juror?

A. Yes.

Q. Let me also ask you whether or not the following statement by this juror caused you to answer your questions to Mr. Williams in the way you did. When asked what else figured into your decision, Juror Number 55 said they needed to talk to Angela about her attitude. She winked at us the first day when we came in. She kind of snickered like ha, ha, ha. She should have been more sober. She was facing the death penalty right there on the first day of the trial. I wouldn't be smiling or smirking at jurors if I was in that position. Her attitude was the biggest thing. He went on to say after the trial one of my friends said, "I see you wiped the smirk off her face," because

**369**

he had seen pictures of her on the news. I saw them too after trial.

A. Yes.

Q. Okay. And when Juror Number 55 was asked whether her attitude was the biggest thing, do you mean that if she had been more sober that might have changed your mind about the right sentence, he answered, well, it might have added a little compassion?

A. Yes.

Q. Did you have that in mind when you were answering Mr. Williams' questions?

A. Yes.

Q. And another juror, Number 60, did Juror Number 60 --

THE COURT: Miss Morrissey, you know, there is no rule that allows you to ask only leading questions --

MS. MORRISSEY: That's true.

THE COURT: -- on re-re-redirect; okay?

MS. MORRISSEY: I apologize, Your Honor.

BY MS. MORRISSEY:

Q. Was there -- do you remember the interview of Juror Number 60?

A. Is that Juror Number 600?

Q. I'm sorry. Juror Number 600.

A. Yes.

Q. And did Juror Number 600 say something about Miss Johnson's

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

demeanor in the context of remorse?

**A. Yes.**

Q. Okay. Do you remember what he said?

**A. I believe that he -- I don't remember specifically what he said.**

Q. If I read from the report to you, do you think that might refresh your recollection?

**A. Yes.**

Q. Okay. Do you remember the following? The other thing, I think she probably lacked remorse to some extent. I mean, I don't know. That might just be her personality. She doesn't seem like a real emotional kind of person.

**A. Yes.**

MS. MORRISSEY: Thank you. I have nothing further.

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Okay. Miss Dahl, I have a few -- well, maybe more than a few questions but some questions for you. Did you say that you've been involved in 25 death penalty cases?

THE WITNESS: It's -- and it's an approximate number.

THE COURT: It's an approximation, yeah, but I just wanted to make sure I recalled you said 25 or so.

THE WITNESS: Yes.

THE COURT: And would you be able to give me your best judgment as to how that breaks down between state courts and

federal courts?

THE WITNESS: I would say the large majority is state court.

THE COURT: Okay. Because the largest majority of capital cases are in state court; right?

THE WITNESS: Yes.

THE COURT: What's the shortest amount of time you know of in cases you've been involved with for jury selection in terms of number of days?

THE WITNESS: It would have to be one and a half or somewhere around there.

THE COURT: Okay. Have you ever been involved in one of the two or three federal death penalty cases that Judge Gaitan in -- federal district court judge in Kansas City has had?

THE WITNESS: Yes, sir.

THE COURT: And they didn't last more than two days, did they?

THE WITNESS: No, sir.

THE COURT: What's the longest jury selection you've been involved with?

THE WITNESS: I was involved in a jury -- in a federal jury selection, the jury selection began in late February and, though didn't go continuously, the jury wasn't seated until September.

THE COURT: How long did jury selection last in the Angela Johnson case?

THE WITNESS: I don't have a specific recall, but I'm thinking two and a half weeks or -- but I don't have a specific recall.

THE COURT: And in your experience in 25 or so death penalty cases in state and federal courts, where does that rank in terms of length? Is it one of the shortest you've ever seen, average, longer? How would you characterize it?

THE WITNESS: It -- did you say federal and state?

THE COURT: Yes.

THE WITNESS: I would say it would be on the longer side of average.

THE COURT: Now, you said something that was interesting to me, and that was that -- and maybe I misunderstood the testimony, but I thought -- I thought I understood that this was Mr. Berrigan's first opportunity to do individual questioning of jurors in his death penalty practice. Did I understand that correctly?

THE WITNESS: I don't know his whole practice. It would -- I have always done with him group voir dire except for sometimes when he would go to the bench or have, you know, an interview outside the presence of other jurors.

THE COURT: Okay. So in your personal experience with Mr. Berrigan it's always been group voir dire.

THE WITNESS: Yes.

THE COURT: Do you think it's an advantage to a defendant in a capital case for the judge to allow individual voir dire?

THE WITNESS: I would say that allowing individual voir dire is extremely meaningful and important. It depends partially also, though, on the skill set of the lawyer in that case as to whether it has the potential to work.

THE COURT: Okay. But in a general sense would you agree -- well, no. Let's talk specifically about the Angela Johnson case. Would you agree that it was an advantage to Mr. Berrigan and Angela Johnson's team for me to have allowed individual questioning of jurors versus group?

THE WITNESS: I think it was an advantage in that it was something that we could consider at that time. I know I had discussions with Pat about considering which would best match his style, and so it was a luxury to be able to consider -- consider if that would match his style.

THE COURT: As a general matter when you're the jury consultant, regardless of which lawyer you're working with, would you prefer to have some individual questioning of potential jurors rather than just questioning in a group?

THE WITNESS: I would prefer some individual questioning, yes.

THE COURT: That's generally considered to be an

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 10 of 85

**374**

advantage for the defense team, isn't it?

THE WITNESS: I know it would be considered an advantage for the defense team that I work with, yes.

THE COURT: In the 25 or so state and federal death penalty cases that you've been involved with, did all of the judges allow pretrial questionnaires to be designed by the lawyers, approved by the judge, and then sent out ahead of time?

THE WITNESS: No, sir.

THE COURT: Do you think that was an advantage for the defense in this case?

THE WITNESS: Yes, I do.

THE COURT: Was there a single question that the defense wanted that I said no to?

THE WITNESS: Not that I recall, sir.

THE COURT: Now, you correct me if I'm wrong, but as I recall it we sent those questionnaires out very early, had them sent in. The court personnel spent a lot of time scanning them, putting them on a CD so that both sides would have it in electronic fashion. Is that how you recall it?

THE WITNESS: Yes, sir.

THE COURT: Had you ever had that done before by any Court?

THE WITNESS: No, I had not.

THE COURT: Do you think that was an advantage?

THE WITNESS: Yes.

**375**

THE COURT: Do you recall how much you requested in fees?

THE WITNESS: I do not recall.

THE COURT: Those are all the questions I have. Miss Morrissey?

MS. MORRISSEY: I don't have anything further, Your Honor. May Miss Dahl be excused?

MR. WILLIAMS: No questions, Your Honor. Thank you.

THE COURT: Okay. Thank you.

THE WITNESS: Thank you.

THE COURT: Drive safely.

THE WITNESS: Thank you so much.

MS. MORRISSEY: Your Honor, our next witness will be Nancy Lanoue.

THE COURT: Okay. Why don't we take just a short ten-minute recess.

(Recess at 8 a.m.)

THE COURT: Thank you. Please be seated.

Ready to proceed with the next witness?

MS. MORRISSEY: Yes, Your Honor, I am. I'll call Nancy Lanoue.

THE COURT: Good morning. Just please come forward, and I'll swear you in. Would you raise your right hand, please.

NANCY LANOUE, PETITIONER'S WITNESS, SWORN

THE COURT: Thank you. Please be seated in the

**376**

witness box, and you can adjust the chair and the microphones so you can speak directly into them. And when you get settled in, would you tell us your full name, please, and spell your last name.

THE WITNESS: It's Nancy D. Lanoue, L-a-n-o-u-e.

THE COURT: Thank you.

Miss Morrissey?

MS. MORRISSEY: Thank you.

DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Good morning, Miss Lanoue. What do you do for a living?

A. I work for the Federal Public Defender's Office.

Q. And what type of work do you do for the Federal Public Defender's Office?

A. My official title is secretary to federal defender. Doesn't really tell a whole lot about what my duties are, but that's my official title.

Q. Okay. And what are your duties aside from your official title?

A. Well, I mainly, probably about 80 -- 80 percent of my work, I deal with the CJA panel.

Q. And is that in terms of coordinating --

A. Appointments, reviewing the bills, and then the other part I -- other 20 percent, I also am a secretary to Tim Ross-Boon, an assistant federal defender.

**377**

Q. Okay.

A. And I also coordinate all of our CLEs that we put on throughout the year.

Q. All right. And do you -- where do you live and work?

A. Pardon me?

Q. Where do you work? Where is your office located?

A. Oh, it's in Des Moines.

Q. Okay. Thank you. And let me ask you in 2000 to 2005 where were you working? How were you employed then?

A. I was in Cedar Rapids, and I worked for Al Willett.

Q. And what type of work did you do for Mr. Willett?

A. I was a paralegal.

Q. How long did you work as a paralegal for Mr. Willett?

A. Ten years.

Q. Ten years. Could you kind of describe for the Court the work you did for Mr. Willett like just what your daily routine consisted of.

A. Well, it was kind of a one-person office, so I kind of did everything except the billing. I did everything including preparing for trials and assisting him in trial.

Q. How would you -- what would you do to help prepare for trial?

A. We did a lot of federal work, so -- in the Northern District, so a lot of our work would be gathering the discovery, organizing all the discovery, sometimes, you know, talking

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Page 378

Q. with -- going over to the jail and visiting clients and taking discovery over to them. And I did just such a variety of things over the years with him that I pretty much, you know, helped him do everything.

Q. Did you read the discovery yourself?

A. Yes, I did.

Q. And what was your job in terms of reading the discovery? Was there a point to your reading it?

A. Well, part of it is just obtaining the discovery so we could review it. So if we would go over to the U.S. Attorney's Office, we would gather it by typing it up, and he would dictate and just review what they had, the grand jury stuff and the reports. And then I would go back to the office and organize it according to the witnesses and start preparing for trial.

Q. And is there a particular style that Mr. Willett had in terms of defending criminal cases?

A. I would say his -- well, a big part of what I did also was I -- my biggest part was looking for any sort of reasonable doubt in what we were looking for, so I would just constantly look for reasonable doubt in everything I did.

Q. Okay. And you would then, you know, assist Mr. Willett in trials based on your review of the discovery and the possible reasonable doubt that you found.

A. Correct.

Q. All right. Did you work on Miss Johnson's case?

Page 379

A. Yes.

Q. And do you remember when it was that you first became involved in Miss Johnson's case?

A. Yes. Actually I took the initial phone call from the panel administrator at that time asking if Al would accept the case. Al happened to be out of the office that day, so I took that call, and then I was able to get ahold of Al and tell him what was -- what was happening.

Q. What information if you recall did you get about the case when you first took the call?

A. When the panel administrator called me, she said that this was a possible death penalty case.

Q. And was that unusual?

A. Absolutely.

Q. So was it -- when you talked to Mr. Willett -- I take it he was out of the office?

A. Correct.

Q. When you talked to Mr. Willett, did you give him the information that you received about the nature of the case?

A. Yes, I did.

Q. And do you recall approximately when it was that Mr. Willett became involved in the Johnson case?

A. It would have been in 2000, and I believe it was in July of 2000. It was -- it was warm. I'm pretty sure it was July of 2000.

Page 380

Q. And it was a case that had been -- had gotten some publicity; correct?

A. Yes.

Q. Did the case -- you said that the case began as a death penalty case. Did it remain so?

A. Yes. And because it was all new to me, I don't know if it was an actual death penalty case at the time we accepted the appointment, but it was with the idea that there was a possible death penalty sentence to this so . . .

Q. And do you recall being present at a conference call on November 8, 2000, with Judge Jarvey and Mr. Willett and Mr. Frerichs and Mr. Parrish and Mr. Williams that was regarding this case?

A. I can't vividly recall that, but Al always had me very active in a lot of his phone calls, but I can't recall that right off the bat.

Q. I have an exhibit that's been premarked as Exhibit 4. I'm going to put on the ELMO 4A. Do you recognize this as a memo to the file that you did?

A. Yes.

Q. And is this about a conference call with these individuals on November 8, 2000?

A. Yes.

Q. Okay. I'm going to ask you to look at the middle of the first page of this memo. It says death penalty on both adults

Page 381

Q. requested. Was that representation made by a party to this conference call?

A. I'm sorry. I don't understand what you asked me.

Q. Was that statement made -- death penalty on both adults requested, was that statement made by a party to this conference call?

A. Yes.

Q. Okay. And who was that?

A. C.J.

Q. Thank you. Was there another telephonic status conference on November 29, 2000, that you recall?

A. I can't recall right off the bat.

Q. All right. Let me show you on the ELMO what's been marked as part of Exhibit 4 for identification, a memo about an Angela Johnson telephonic status hearing on 11-29, 2000. Do you recall --

A. Yes.

Q. Do you know this document?

A. Yes.

Q. And is this a document that you prepared?

A. Correct.

Q. And there appear to be -- down in the middle it says TPF defense experts. Do you see that?

A. Yes.

Q. Who's TPF?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

A. That would have been Tom Frerichs.

Q. And was he a lawyer who was briefly appointed to represent Miss Johnson?

A. Yes.

Q. And does it appear based on this memo that Mr. Frerichs during the status conference named three or four experts that were going to be retained by the defense?

A. Yes.

Q. And those appear to be what? Could you tell us?

A. Dr. Kirschner who was a pathologist, Wayne Hill who was a ballistic expert, and Richard Fox who was a crime scene specialist.

Q. Now, based on your familiarity with the case, did you ever hear the name of those experts after this conference call on November 29, 2000?

A. No.

Q. I'm going to turn to the next page of this part of Exhibit 4, and at the top there's a statement two jailhouse snitches. Do you see that?

A. Yes.

Q. Do you recall at this point who made that statement?

A. No, I don't.

Q. Was it your understanding that the two jailhouse snitches would be evidence against Miss Johnson or would provide evidence against Miss Johnson?

A. Yes.

Q. Okay. So as early as November 29, 2000, it was known that there were jailhouse snitches in this case; correct?

A. Yes, yes.

Q. Did there come a time, Miss Lanoue, when Patrick Berrigan joined the defense team?

A. Yes.

Q. And do you remember roughly when he joined the defense team?

A. It seemed like it was fairly early on, but I don't have the exact date that he came on board.

Q. And would there be meetings in which you would participate with Mr. Willett and Mr. Berrigan?

A. Yes.

Q. How often would these meetings occur?

A. Not very often.

Q. When -- when you met Mr. Berrigan, did you obtain any information about his position regarding a guilt-phase defense for Angela Johnson?

A. I'm sorry. I'm not real sure I understand your question.

Q. When -- after Mr. Berrigan came on the case, were you present at any meetings when he expressed his position regarding whether there would be a guilt-phase defense for Angela Johnson?

A. Yes.

Q. Okay. And can you tell us what his position was?

A. His position at the defense, he told me that he didn't want to insult the jury and his defense -- the defense they were going to use was mere presence.

Q. Did he say anything about the evidence about Miss Johnson's involvement in the case?

A. Not really, no.

Q. Okay. Did he tell you this -- that, you know, we're going to -- not going to insult the jury and our defense will be mere presence, did he tell you this after he'd been in the case for a while, or, you know, when in terms of his entry into the matter did he give you this information?

A. We were sent down -- our team was sent down to Kansas City for a software program that we were going to be using, and we had gone to lunch. And at that point we realized the discovery was just so voluminous that we needed something to kind of help us along with that. And not a lot of discovery at that point had actually been gathered. We knew there was a lot, but we hadn't actually gathered that much just yet.

Q. So it was at this point before you had gathered a lot of the discovery that he told you that the defense would be mere presence.

A. We had some discovery because we had been working on it trying to gather it for some time, so we did -- we had obtained some, but it took quite a while to gather all of it, but we had -- we did have some.

Q. And it was at this meet -- do you remember when this meeting in Kansas City was roughly?

A. At least maybe a year after -- a year after we took the case roughly.

Q. A year after you and Mr. Willett took the case.

A. Correct.

Q. Was there any investigation into the guilt phase after Mr. Berrigan got on the case?

A. Was --

Q. Yeah, was there any investigation that you knew about --

A. No.

Q. -- after Mr. Berrigan --

A. No, no.

Q. Now, who was lead counsel in this case?

A. My boss, Al Willett.

Q. And what was your understanding of the responsibilities of lead counsel in this particular case?

A. He was -- my understanding was the one to direct how the defense was going to go.

Q. And you've described Mr. Willett as a person who looks for a reasonable doubt; correct?

A. Correct.

Q. Did he do this in this case?

A. No.

Q. And did he tell you why he didn't do it?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 13 of 85

A. No.

Q. Did you spend a significant amount of time with Miss Johnson?

A. Yes, I did.

Q. Okay. And can you tell the Court how you came to spend a significant amount of time with Miss Johnson?

A. After we started looking at the discovery and -- well, I guess shortly after we took the case, Al took me over there to visit and to meet her initially, and part of my job was once we started gathering the discovery was to take it over to her. Because there was so much, it was going to be very time consuming.

So I started taking all the discovery over to her, and we started reading, you know, as it -- sometimes they were gathering and I would just take it over, and while we were reviewing it, they were still gathering more discovery.

Q. So would you basically take it over and give it to Miss Johnson to read and then sit there watching her, or would you read it with her?

A. We both read. We both read.

Q. As a result of this process, how much time did you spend with -- did you spend with Miss Johnson if you can estimate?

A. Over -- it was a lot. I don't have the exact number of hours, but it was a lot of hours.

Q. If I told you that the billings in this case of your time

spent with Miss Johnson reviewing discovery total 355.4 hours, does that sound right?

A. That's probably about right.

Q. As a result of going over with Miss Johnson, taking the discovery and reading the discovery with her, did you obtain information?

A. Absolutely.

Q. And when you obtained information, would you give it to Mr. Willett?

A. Yes. If I found something I thought was significant, I always would come back and relay that back to him.

Q. I am putting on the ELMO part of what's been marked as Exhibit 4 for identification, and this is a memo dated July 12, 2002. It appears to be from you to Mr. Willett. Do you recognize this memo?

A. Yes.

Q. And does this concern part of discovery that you were given in the case?

A. Yes.

Q. And it is an interview with Phyllis Proscovec?

A. Yes.

Q. All right. Did Miss Proscovec provide some information about what she -- back up. Who was Miss Proscovec?

A. We learned that Miss Proscovec was the neighbor of Lori Duncan.

Q. And did she give you -- give the law enforcement some information about what she saw and heard on the evening that Miss Duncan disappeared with her children?

A. Yes.

Q. Okay. And does this memo summarize what -- the information that Miss Proscovec gave to you?

A. Yes.

Q. Okay. So in other words, if -- and did she tell you what she was doing before -- did she tell you something about -- it says something happened before 7:30 or 8:00 on the night -- the last night that Miss Duncan was seen.

A. I'm sorry. I didn't understand your question.

Q. Okay. Did the interview that Miss Duncan -- that law enforcement conducted with Miss Duncan concern what she saw -- Miss Proscovec, excuse me, concern what she saw before 7:30 or 8 p.m. on the last night that she was seen?

A. Yes.

Q. And what did she say she saw?

A. Before, before the 7:30?

Q. Yes, before it says 7:30 or 8.

A. She said that Lori had told her that Greg was gone earlier in the evening and he had to go and do some business with his friends.

Q. And did Miss Johnson provide you any information about where she was that evening about the same -- about 7:30 or 8

p.m., the same time that Miss Proscovec was discussing?

A. Did Angie give me some information?

Q. Yes, yes.

A. Yes.

Q. And what did she say?

A. That she was over -- she was at her house.

Q. Did Miss Proscovec tell law enforcement where she was between 7:30 and 8 p.m.?

A. Yes.

Q. What did she say?

A. She said she had gone over to Lori's house for some cake and coffee.

Q. And about 9 p.m. what did Miss Proscovec say about her whereabouts?

A. Then she went on home.

Q. And what did she do next?

A. She watched the news.

Q. Did anything happen at 10:30 p.m. that Miss Proscovec noted?

A. Yes, she had looked out her window and had noticed that Greg's car wasn't -- wasn't at Lori's house next door.

Q. And did Miss Johnson give you any input about what those facts might have -- about the significance of those facts?

A. Yes.

Q. And what did she tell you?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

**390**

A. Well, she went on to tell me that -- do you want Angie's story about what had happened?

Q. Yes, please.

A. She just had said that --

Q. Okay. Go ahead.

A. She just said that her interpretation was that Nicholson was meeting Dustin and DeGeus that -- that -- at that same time.

Q. What else was her theory?

A. Well, her theory was that Dustin wanted to pay Nicholson off so he would go away because Nicholson was a witness to his drug dealing, and she thought that Nicholson would have agreed to that, so apparently Nicholson had called Lori and called off their relationship and he was going to come back and get his stuff.

Q. Okay.

A. So that's when he came back.

Q. The next part of this memo concerns what Phyllis Proscovec said happened between 11 and 11:30 p.m. on the night that Lori Duncan disappeared; correct?

A. Yes.

Q. And can you tell us what Phyllis Proscovec said?

A. She said that Lori had called her and she was crying because Nicholson had called her and called off their relationship.

Q. And did Miss Proscovec have some further contact with Lori

**391**

Duncan on that evening at around 11:30 p.m.?

A. Yes. Lori had gone back over to Mrs. Proscovec's home and just wanted some comfort from her. She was like a motherly figure to her I guess.

Q. And the comfort that she wanted, was that for a particular reason?

A. Because she was upset because Nicholson wanted to break off their relationship.

Q. Did Miss Proscovec relate observations that she made after 11:30 p.m.?

A. Yes. She said that after Lori had gone back home she looked out her window and noticed that Greg's car was there.

Q. And did Miss Johnson, upon hearing that Greg's car was there at Lori Duncan's house after 11:30, give you a theory of what might be happening?

A. Yes.

Q. What did she say?

A. That Lori was -- Lori talks to Greg and he --

Q. I'm sorry. I messed it all up. Okay.

A. Lori had talked to Greg and apparently had talked him into letting her go with him when they would get out of town.

Q. And what was her theory about what happened then?

A. Lori had gone and gotten her kids out of bed because it was so late at night they were sleeping, and they drove out to where Nicholson -- or where Dustin and DeGeus were at.

**392**

Q. And what happened there?

A. And then he thinks -- we just think that Dustin and DeGeus killed them.

Q. And did Miss Johnson give you more information about her theory on why Mr. DeGeus was involved in this?

A. Yes.

Q. Okay. Could you tell us what she told you?

A. Well, DeGeus owed Dustin a lot of drug money, and Dustin wanted to make a deal with DeGeus to write off that drug deal. And he would write that drug deal off by getting rid of his one witness and write off his drug debt at the same time.

Q. And did DeGeus's involvement in these events have any implications for his -- how Dustin might treat -- might view him in the future?

A. Yes. Then DeGeus would be a witness of the murders.

Q. And as a witness to the murder he was a danger to Dustin Honken.

A. Absolutely. He was the one danger to him at that point.

Q. Now, did you think that this was significant, this information?

A. Absolutely.

Q. And as a result you prepared this memo that we've just been talking about.

A. Correct.

Q. And did you give it to Mr. Willett?

**393**

A. Yes.

Q. Did you in the course of visiting Miss Johnson and reviewing the discovery prepare other memoranda or correspondence for the defense team in this case, not just Mr. Willett?

A. Yes, I did. I constantly was trying to tell them that story.

Q. Okay. I have a memo that's part of Petitioner's Exhibit 4 that I'm putting on the ELMO. Does this appear to be a memo that you wrote to Dean Stowers?

A. Correct.

Q. And why did you e-mail Dean Stowers on July 10, 2002, instead of Mr. Willett?

A. I can't exactly recall why I did that.

Q. How about because Al was currently in Davenport? That's paragraph 3.

A. Oh, okay. I guess that is what I said, but I couldn't recall right off the bat.

Q. And what was the subject of this particular memo on July 10, 2002?

A. Let me read this for just one second.

Q. Sure.

A. I believe this is where she was just very, very uncomfortable. She was having to lay out on a floor, just on a mat all day, and her -- she was having some issues with her back

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 15 of 85

and was very, very uncomfortable.

Q. And was this memo an attempt by you to do something to alleviate the discomfort?

A. Yes, I was trying to help her.

Q. Based -- based on your experience, was Miss Johnson having an easy or difficult time in the jail?

A. I'm sorry. I didn't --

Q. Was she having an easy or difficult time being in jail?

A. Very difficult.

Q. Let's talk a minute about the jail. When she was first arrested, do you know where Miss Johnson was held?

A. I believe when she was first arrested I think they took her to Benton County.

Q. And after being in Benton County, did she move?

A. Yes, she came to Linn County.

Q. Okay. And Linn County, is that -- where is Linn County Jail?

A. It was just basically across the bridge from our office in Cedar Rapids.

Q. So was it easy for you to visit Miss Johnson?

A. Yes.

Q. How long did it take you to get there?

A. I walked over there, and it took three minutes maybe.

Q. Let me ask you about the issue of a plea bargain. Did that become a subject of discussion in your contacts with Miss

Johnson?

A. Yes.

Q. And when did the subject of a plea bargain first arise? Do you remember how early or late in the case that was?

A. It was fairly early.

Q. And if I were to tell you that -- well, back up. Did you submit bills for the time that you worked on this case?

A. Yes.

Q. And those were submitted regularly?

A. Yes.

Q. And were they part of Mr. Willett's billing?

A. Yes.

Q. And in preparing the billing, could you tell us what you did? Did you just -- did you describe what you did on a particular day?

A. As far as my billing?

Q. Yes.

A. As far as when I would go and visit Angie you mean?

Q. Yes.

A. I kept just a notepad, and it was just a running total of all of my time, and I would just basically put the time that I left, and while I was over there visiting her, I would sometimes write notes about what we were discussing or if something came up in the discovery or just to keep track of where we were in the discovery, in our review of the discovery.

Q. All right. And if you had billed for a visit on December 12, 2002, regarding the defense of the case, investigation needed, and plea bargain and a review of Bates number 1550 to 1670, would that accurately summarize what you had done on that particular date?

A. Yes.

Q. And you would make this billing based on notes that you prepared; correct?

A. Yes.

Q. So would it be fair to say that as early as December 2002 you were discussing a plea bargain with Miss Johnson?

A. Yes.

Q. I'm going to show you what's part of Exhibit 4. It's a memo that's dated --

MS. MORRISSEY: Excuse me, Your Honor. May I just have a moment, Your Honor? I apologize.

THE COURT: Sure.

BY MS. MORRISSEY:

Q. All right. I'm going to ask you something because I'm not -- I can't recall the document right now. You --

THE COURT: Well, you can take a few moments if you need to find it.

MS. MORRISSEY: Okay. Thank you, Your Honor. I appreciate it.

THE COURT: Why doesn't everybody just take a stretch

break too.

MS. MORRISSEY: I have it, Your Honor.

THE COURT: Okay. Thank you.

BY MS. MORRISSEY:

Q. Okay. We talked earlier about a memo that you did dated July 12, 2002, about your discussion with Miss Johnson about the Phyllis Proscovec interview; correct?

A. Yes.

Q. Okay. I'm going to put on the ELMO what's going to be part of Exhibit 4. It is a memorandum that says Angela Johnson theory. This time it's dated January 6, 2003, and it's to Mr. Willett.

A. Yes.

Q. Could you look at this, and does it appear to be the same memorandum that you gave to Mr. Willett dated July 12, 2002?

A. Yes, it does.

Q. It's just exactly the same.

A. It looks it to me, yes.

Q. And it has a new date.

A. Yeah.

Q. So basically you were telling him the same thing again.

A. Yes.

Q. Why?

A. Because they didn't seem to be listening to me as to some things that I was reading, and it just kept being the same -- it

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 348 Filed 11/10/11 Page 16 of 85

**398**

just was going over and over in my head, and I just kept trying to reiterate that to them.

Q. When Mr. -- when you would provide a legal memo to Mr. Willett about the case, would he, you know, read it and keep it in his file, or would he have you distribute it?

A. I think he just read it and that was it.

Q. Okay. On January 7, 2003, did you do another memorandum about Phyllis Proscovec and Angela Johnson's theory?

A. Yep.

Q. And is that memo called Angela Johnson expanded theory?

A. Correct.

Q. And essentially is this to supplement Miss Johnson's -- the information she gave you based on reading the Phyllis Proscovec interview?

A. Correct, and we had read more discovery, so she was able to put some more information together.

Q. Okay. And could you just briefly tell us what information you gave Mr. Willett in this particular memorandum.

A. She was remembering this particular day when Honken came over and he was getting real nervous about his upcoming trial, and he kept telling her and her friend who was there that he was going to kill his witnesses that was at his prior case. She said that Honken also had a restraining order against his two witnesses which would have been DeGeus and Nicholson.

Q. Right.

**399**

A. And so he was trying to avoid -- there was a no contact order that he was not to be around them, so he basically used other people's vehicles or other methods to avoid making it look as though he was the one in contact with them, but he did try to get around that.

Q. And did he tell you that -- did Miss Johnson tell you that he asked to use her car?

A. Pardon me?

Q. Did Miss Johnson say he asked to use her car?

A. Yes, he did.

Q. Did she let him?

A. No, she would not let him use her car.

Q. Let me also go back and ask you whether or not -- when Miss Johnson and Gaubatz were --

THE COURT: Miss Morrissey, can I interrupt you for a second?

MS. MORRISSEY: Yes.

THE COURT: If I wanted to find this document on the CD --

MS. MORRISSEY: We've got --

THE COURT: -- how would I do that?

MS. MORRISSEY: We've got a special Exhibit 4.

THE COURT: Oh, so I don't have a copy of this document.

MS. MORRISSEY: It -- it is an exhibit. You will.

**400**

We'll enter it into evidence.

THE COURT: Well, I understand that, but if I want to actually read the whole thing --

MS. MORRISSEY: Oh.

THE COURT: -- while she's -- while you're examining it, I don't have the ability to do that, do I?

MS. MORRISSEY: Yes, you're right, Your Honor. And --

THE COURT: Okay. I just wanted to -- no, I'm just -- I'm not being critical. I just wanted to know -- I couldn't find it.

MS. MORRISSEY: Yes.

THE COURT: Okay.

MS. MORRISSEY: It is on the CD, but the CD is -- it's not -- you know, we can get it.

THE COURT: Well, it's on a CD but not the one I have.

MS. MORRISSEY: It is on a CD of exhibits that were provided to the prosecution in this case.

THE COURT: Well --

MR. BURT: Judge, could I address that?

THE COURT: Sure.

MR. BURT: It is I believe loaded on to the Court's computer.

THE COURT: Well, how would I ever find it?

MR. BURT: There should be a file called discovery given to U.S.A., and within that folder there is a Nancy Lanoue

**401**

subfolder.

THE COURT: And how was I supposed to divine that? I'm supposed to, you know, live inside this CD or put it under my pillow and divine it, or how exactly am I -- I mean, I've never been in a case where I didn't have immediate access to an exhibit where it was so intuitive that even someone with a low IQ like myself could find the exhibit quickly. But it's really not possible in the system -- I mean, you know, if you put somebody in a room and tell them devise the worst system for indexing evidence imaginable, I have a hard time believing they could come up with one worse than yours.

MR. BURT: Well, Your Honor, I hope the Court appreciates that we started with -- about five months ago in this case with a room full of documents, and we have done the best we can to try --

THE COURT: You could have just numbered them consecutively, and then it would have been very easy.

MR. BURT: Well, we tried to actually go beyond that to organize them in a way that the Court could get to them because there's -- we're dealing in excess of I'd say 100,000 pages. So we tried to categor --

THE COURT: Well, I've had cases with a lot more documents than that and a lot more pages. I've had cases with nearly a million pages worth of documents, but it was always very easy to find them.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

MR. BURT: It probably is, Your Honor. And if we had had the time and the resources and the technical ability to work on this case for longer than we have been allowed to work on it, we probably could have provided the best technologically easy way for the Court to access it complete with hyperlinks and everything else.

The fact of the matter is, Your Honor, that we are struggling mightily just to keep up with the hearing schedule in this case and to do the best we can given the circumstances under which we were appointed by the Court. And that's not offered as an excuse but as an explanation to the Court.

THE COURT: But it's mitigation; right?

MR. BURT: It is mitigation.

THE COURT: It's a mitigating factor?

MR. BURT: It is, I hope.

THE COURT: I agree with you.

MR. BURT: Thank you.

THE COURT: Well, I can't find it, but I'll just go with the flow. Thank you.

MS. MORRISSEY: I apologize, Your Honor.

BY MS. MORRISSEY:

Q. Did Miss John -- I'm not sure where we were. Johnson -- Honken is telling Johnson and Gaubatz that he is going to kill his witnesses; correct?

A. Correct.

Q. Did Miss Johnson say anything about whether she believed that or didn't believe it?

A. Actually she said that he commented on this frequently and she did not take him for serious. It was almost like it was a joke. She didn't really think he would ever do that, but he would say that often.

Q. And did she say that Miss Gaubatz was present when these statements were made by Mr. Honken?

A. Yes, yes.

Q. Okay. All right. What else did she tell you about Honken? Whose car did Honken eventually leave in?

A. He eventually -- Angie wouldn't give him her car, but Christi let him take her car.

Q. And where did he go then?

A. He went over to meet Nicholson.

Q. Did Miss Johnson discuss the videotape that Nicholson was to make?

A. Did Angie mention that?

Q. Yes.

A. Yes.

Q. And what did she say about that?

A. That Dustin would have Nicholson make a tape of himself exonerating Honken from his drug case.

Q. Did Miss Johnson have any questions about whether or where the tape was made?

A. Yes, she did question that.

Q. Okay. Did she know of her own personal knowledge?

A. If a tape was ever made?

Q. Yes.

A. No, not that I know of.

Q. Did you talk about the various scenarios for where -- whether a tape would have been made and how it might have been made?

A. Yes.

Q. And is that reflected in the second paragraph of page 2 of this particular memo?

A. Yes.

Q. All right. Did Miss Johnson go further and explain to you a possible scenario for the night the murders took place?

A. Yes.

Q. And could you tell the Court what that is, what scenario she explained to you?

A. She told me that Nicholson was going to meet Dustin and Dustin was going to pay him off so he could leave town and that way he thought he could be rid of one of his witnesses that was against him.

Q. In all of this when this talk -- this information that Miss Johnson gave you about possible things that could happen, could have happened based on Miss Proscovec's interview, did she admit that she was involved in this?

A. No.

Q. Did she -- what did she appear to be doing in kind of giving you these possible scenarios?

A. Just in -- just trying to put the pieces together.

Q. Put the pieces together meaning what really happened?

A. What really happened.

Q. I'm going to next show you part of Exhibit 4, Your Honor, an e-mail that you wrote to Ray Cornell on February 7, 2003. Do you recognize this?

A. Yes.

Q. And PI Raymond, is that the e-mail address for Raymond Cornell?

A. Yes.

Q. Who was Raymond Cornell?

A. He was the first investigator that Al hired for this case.

Q. And did he work on the case for a period of time?

A. Very short time.

Q. Did -- was his responsibility to be guilt-phase investigation if you know?

A. I don't know.

Q. Did you ever see any reports that he prepared?

A. No.

Q. In any event, you sent him on February 7, 2003, this particular e-mail; correct?

A. Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 18 of 85

**406**

Q. And did this concern information that you received from Angela Johnson about the discovery?

A. Yes.

Q. Tell us what information this was.

A. This was regarding DeGeus's murder and what day of the week that that would have happened, and in particular she thought this was a Saturday and that she was at that time into her pregnancy quite a ways, worked at the country club, and worked a double shift that particular day. She told me that Honken who had a no contact order and could not get ahold of DeGeus and he had call -- Honken had called Angie to see if Angie would get ahold of DeGeus to meet him, so Angie did that, and DeGeus came and met Honken at the country club where Angie worked, and they met toward the end of her shift when she was getting ready to get off. And she just worked all day and was tired, and she was ready to go home but helped make them connect, and she was ready to go home.

Q. So she told you that she made a call to Terry DeGeus; correct?

A. Correct.

Q. And that she had him meet Dustin in the parking lot of the restaurant where she worked.

A. Correct.

Q. And it was after her shift.

A. Correct.

**407**

Q. Did she tell you when her shift would have ended if it was a Saturday when this happened?

A. I don't exactly remember the time frame, but I just know she worked two shifts that day.

Q. And it was late.

A. Yes.

Q. And she was how pregnant?

A. I believe she -- her daughter was born in February -- she must have been about seven months along.

Q. Okay. Now, after you received this -- after you received this e-mail from Miss Johnson -- or this -- excuse me, this information from Miss Johnson, you then sent this e-mail to Mr. Cornell.

A. I'm sorry. What was your question?

Q. You sent this e-mail containing this information to Mr. Cornell; correct?

A. Correct.

Q. Did -- why did you do that?

A. I was always trying to get some information out to them that would at least give some reasonable doubt.

Q. And do you know if anything was done in terms of investigation as a result of your sending this e-mail to Mr. Cornell?

A. No.

Q. I notice you didn't send this e-mail to Mr. Willett. Was

**408**

there a reason?

A. I have no recollection as to why. I don't know.

MS. MORRISSEY: Sorry, Your Honor.

Q. Let me ask you whether or not you -- this e-mail that I just put up, is there anything about that that makes you think it was a second e-mail, it was a second e-mail that you sent to Mr. Cornell?

A. Oh, yes, by the subject line?

Q. Yes.

A. Yes.

Q. So we talked about the second e-mail. Let me now put on the ELMO another e-mail dated February 7, 2003, from you to Ray Cornell. Does that reflect information that you obtained from Miss Johnson that you wanted to share with her investigator?

A. Yes.

Q. And it's what Miss Johnson told you during the course of your reviewing the discovery in this case; correct?

A. Correct.

Q. There are references made to Bates numbers.

A. Correct.

Q. And let me ask you toward the end of this did this information reflect some -- does this e-mail reflect some information from Miss Johnson about a search warrant that was issued on her residence on June 11, 1996?

A. Yes.

**409**

Q. And what did she tell you about that search warrant?

A. She was not living at that address at that time. She had moved and was living around the Des Moines area.

Q. So is it correct that the search warrant that was issued on June 11, 1996, apparently resulted in some drug manufacturing stuff?

A. Yes.

Q. And the information that she gave you about that was what?

A. She had no idea what was being kept over there at that house. Even though she owned it, she didn't reside there and was quite a ways away. She lived in Des Moines, so she did not know what was being stored there.

Q. And you wanted -- you sent this information to Mr. Cornell for what purpose?

A. To pass whatever information I could that I thought was important for them to check into.

Q. Do you know whether or not anything was ever done as a result of this information?

A. No.

Q. Did you come to understand that there was a witness against Miss Johnson by the name of Christi Gaubatz?

A. Yes.

Q. And did you and Miss Johnson review the discovery about Miss Gaubatz?

A. Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 19 of 85

Q. Did she give you information about Miss Gaubatz?

A. Yes.

Q. And did you in turn prepare memos for Mr. Willett about the information you obtained?

A. Yes.

Q. I'll show you this memo that's part of Exhibit 4. Do you recognize this? It's dated June 17, 2004.

A. Yes.

Q. And can you tell us what information Miss Johnson gave you about Miss Gaubatz? And you can read this on the screen if you need to.

A. This is -- she was telling me that Christi had -- I guess they thought they were separated, in the process of a divorce, and later Angie had found out that they weren't and just basically to get even with him because they decided to tell him they were both pregnant.

Q. And did they get some money for him -- from him? Did they get some money from him?

A. Yes.

Q. Okay. For what purpose?

A. I believe it was to get an abortion.

Q. And did either of them need an abortion?

A. No, they were not pregnant.

Q. What did they do?

A. They went to the Mall of America and just spent it and had

a good time.

Q. And did this memo also contain other instances or other vignette about Miss Gaubatz that Angela related to you that bore upon her truthfulness?

A. Yes.

Q. And there were two particular elaborate stories that Miss Gaubatz had made up that you related in this memo; correct?

A. Yes.

Q. Why did you prepare this memo and give it to Mr. Willett about Christi Gaubatz?

A. I just wanted them to know she liked to make up elaborate stories that were not true.

Q. Did there come a time when Miss Johnson left Linn County Jail?

A. Yes.

Q. Do you remember about when that was?

A. I don't know how long she was there. Maybe a year before her trial, or I don't know the exact date.

Q. So if it was the year before her trial, it would probably be in 2004?

A. I would think.

Q. And after she left Linn County Jail, where was she housed?

A. Hardin County Jail.

Q. And what effect did that have on your ability to go to visit Miss Johnson and review discovery with her?

A. Well, when she was in the Linn County Jail, she was just a couple of minutes away. I could just walk over there, and I was over there a lot. When she was at Hardin County Jail, I believe it was a two-hour drive. I would leave my house early in the morning and make it a complete all-day visit with her while I was there, and I would visit with her all morning and go to lunch and then come back and visit her until they made me go home.

Q. And when you say you visited her, would you sit and chat?

A. There were times when we would break from reviewing all the discovery and just visit about some other topics, but yes, we were constantly looking through discovery as well.

Q. And could you tell us whether or not there was a change in Miss Johnson's kind of level of anxiety after she left Linn County Jail?

A. I think she became more anxious as it got closer to her trial date.

Q. And as her trial date approached, did you as Mr. Willett's legal assistant see any -- see or hear anything that led you to believe that there was any investigation that was being done into any guilt-phase issue in this case?

A. No, not at all.

Q. When Miss Johnson was at Hardin County Jail, did she write you?

A. Yes, she occasionally wrote me a letter.

Q. I'm going to put on the ELMO a letter that's part of Exhibit 4, a letter that appears to be to Nancy dated August 21, 2004. Do you recognize this?

A. Yes.

Q. Is that a letter from Miss Johnson to you?

A. Yes.

Q. Does it make reference to your visiting her or not visiting her?

A. Yes.

Q. What does it say?

A. Well, she was bummed because I couldn't come to see her as often, and my visits with her at that time were farther in between. That's for sure.

Q. Okay. And did she express any -- express anything about why she wanted to see you?

A. Yes.

Q. What did she say?

A. She says here in her letter that she wanted to hear my take on what's happening in Sioux City right now.

Q. And did she say anything about Mr. Willett?

A. She trusted Al and what he was doing.

Q. And did she express worries aside from that trust?

A. No. She put all of her faith into her attorneys.

Q. Did she consistently take the position that she had faith in her attorneys especially as trial approached?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 348    Filed 11/10/11    Page 20 of 85

A. Yes.

Q. When she said in there that she was so scared and confused, can you tell now what was going on in the case that might have made her say that she was scared and confused?

A. I think as the time approached it just made her very nervous because a lot of things her and I had shared in reviewing the discovery seemed to go unnoticed.

Q. Okay. Nonetheless, she expressed trust in Al.

A. Yes.

Q. I'm going to put on the ELMO as part of Exhibit 4 a letter to you -- it's a very bad-quality copy -- dated October 4, 2004. Do you recognize that?

A. Yes, yes.

Q. Okay. And we've been through this ourselves; right?

A. Yes.

Q. To try and discern what it says. Does -- could you tell us what Miss Johnson is writing to you about the case on October 4, 2004?

A. That she was trying to get ahold of Dean?

Q. Yes. I've been trying to get ahold of Dean -- let me see if I can -- I've been trying to get ahold of Dean for two days. Why do I have the feeling that nobody's been to Dustin's trial last or this week? I'll be upset if McNeese testified without my attorney being there. After all, they told me how important it was for at least one of them to be present every day.

A. Correct.

Q. And that's what this letter says even though it's very hard to read.

A. Yes.

Q. Did it appear to you that somebody had been at Mr. Honken's trial every day?

A. No.

Q. And what makes you say that?

A. I was pretty involved in the case, and I'm sure I would have known if anyone had gone up there, and they would have reported what was going on.

Q. I'm going to ask you next about what's part of Exhibit 4, put it on the ELMO, and see if you recognize this.

A. Yes.

Q. And what is that?

A. This is part of my notepad that I kept of what I did, my time, and what we reviewed when I would take the discovery over.

Q. Okay. And this obviously looks like it was done when you were going to Eldora as opposed to Hardin County -- Eldora as opposed to Linn County.

A. Correct.

Q. Okay. And what you did was you said that you -- these are your notes for billing purposes to show what you were doing?

A. Yes.

Q. And is there anything that Ms. Johnson told you that

particular day that you found significant so that you wrote little stars by it?

A. Yes.

Q. And what was that?

A. She had told me that she has followed Al's advice and only answered the questions that he has asked, and then she said that I knew most of it but not all and that she was just waiting for someone to come and ask her her story from start to finish.

Q. And this was notes that you took during a visit on October 28, 2004; correct?

A. Correct.

Q. And this was -- Miss Johnson's trial was supposed to start in the spring of 2005; correct?

A. Correct.

Q. Did you to the best of your knowledge give this message from Miss Johnson to Mr. Willett?

A. Yes.

Q. Thank you. Going to show you what's been part of Exhibit 4. It's an e-mail from you to -- I believe it's Mr. Gratias, but you can tell me if I'm wrong. It's dated October 14, 2004. Do you recognize that?

A. Yes.

Q. And what is it?

A. This is a memo that -- he had asked me to find out if she was doing drugs while she was pregnant, which I did. I went

over there and asked her, and she told me no and --

Q. He meaning Mr. Gratias.

A. Mr. Gratias.

Q. Did Mr. Gratias replace Mr. Cornell?

A. Yes, he did.

Q. Do you know anything about the circumstances of that replacement?

A. Yes.

Q. What happened?

A. We found out that Ray Cornell did not have a current private investigating license, and upon that, Al fired him.

Q. And Mr. Gratias took his place.

A. Correct.

Q. Now, this memo, aside from answering Mr. Gratias's question about whether Miss Johnson did drugs while she was pregnant, also includes some information about witnesses that Mr. Gratias should interview; correct?

A. Correct.

Q. One is Christi Gaubatz.

A. Correct.

Q. One is Kathy Rick, and one is Tim Cutkomp. Is there Valli Williams?

A. Yes.

Q. Dawn Hanawalt?

A. Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 21 of 85

**418**

Q. Brandy Byrd?

A. Yes.

Q. Linda Burgess?

A. Yep.

Q. And Sara Bramow.

A. Yes.

Q. And were these persons that Miss Johnson was naming saying please go interview these people, they could be my witnesses at trial?

A. Yes.

Q. And do you know whether or not any of those persons were interviewed?

A. No.

Q. Did Miss Johnson give you some more information about Miss Gaubatz --

A. Yes.

Q. -- in this particular -- well, that you related in this memo?

A. Yes.

Q. What did she say about Miss Gaubatz?

A. She was telling me that she was single most of the time and that Dustin would work on Christi's car and that Dustin would borrow Christi's car and Dustin also stored some of his stuff over at Cristi Gaubatz' house. And then the last paragraph, this is the night that the first murders happened.

**419**

Q. Right.

A. That was her --

Q. And what -- essentially what was the point that Miss Johnson was making about that night?

A. Just to discredit Christi in any of her testimony. She just liked to embellish and was very close to Dustin actually.

Q. When she said that she was close to Dustin, did Miss Johnson tell you that she suspected they had a romantic relationship?

A. Not that I recall.

Q. What was the point of this -- if you look at -- what kind of -- what was significant about this information? I think it was about a trip that Miss Johnson took with Miss Gaubatz's child. She brought her child back from Arizona to Iowa.

A. Correct, correct. That would have been after the murders.

Q. Okay.

A. And even if Christi would have had knowledge of Angie being involved in this, she still had Angie and Dustin bring her daughter back, and her daughter spent about a week with Angie coming back from Phoenix to Iowa.

Q. So what was the point? That Angie thought it was strange that this person who allegedly, you know, saw her involved in a murder or suspected her of being in a murder would entrust her child to her?

A. Right. This particular night Christi was supposedly

**420**

Q. babysitting for Angie, and when Angie arrived home, Christi claimed that Angie and Dustin had blood all over them, and that would have been prior to Angie going and picking up her daughter.

Q. I'm going to show you a letter that's dated 1-24-05. It's part of Exhibit 4. It says, "Dear Nancy." Do you recognize this?

A. Yes.

Q. Okay. And is it -- who is it a letter from?

A. It's from Angie.

Q. And does Angie tell you anything about her trial, her witnesses, anything like that?

A. Yes. She was frustrated because nothing was being done following up on her witnesses that she had asked them to.

Q. Did she express her frustration in this particular letter to you?

A. Yes.

Q. She said, "I've tried calling Pat because he didn't follow up on the Holly Christensen issue with Valli"; right?

A. Correct.

Q. She also asked you about people that her lawyers had interviewed at Mitchellville?

A. Yes.

Q. Did she ask you anything about whether -- what had been done by Gordon Gratias?

**421**

A. Yes. There were some -- I believe that was referring to the memo that I had sent Gordy asking him to interview these people.

Q. She said, "Isn't Gordy going by my list of people," and says, "They forgot Mona Lisa Fuller and Tiffany Kelly."

A. Correct.

Q. Let me show you another letter which is part of Exhibit 4. It's addressed to Nancy. It's dated February 1, 2005. Do you recognize this?

A. Yes.

Q. Is this a letter from Miss Johnson?

A. Yes.

Q. Does Miss Johnson express some frustration there in terms of her upcoming trial?

A. Yes, she was getting -- getting anxious.

Q. Okay. And why was she getting anxious?

A. I think she was just feeling anxious because her wit -- her witnesses that she wanted that felt was important to her weren't being interviewed.

Q. And she wrote to you, "I have so much work to do, I don't see how we'll get through it all before my trial. I'm starting to get worried." Did you see her around the time that she wrote this letter to you?

A. Yes. Usually I tried to go see her. When I knew when she was getting anxious, I always tried to go and visit her.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 22 of 85

Q. Does the content of this letter reflect her discussions with you during this period of time?

A. Yes.

Q. During this period of time, would you on occasion have discussions with Miss Johnson about a plea bargain?

A. Yes.

Q. If on February 12, 2012 -- 2005, you billed for a discussion with Miss Johnson about the defense investigation needed and a plea bargain, would that be what you discussed on that particular day?

A. Yes.

Q. Part of Exhibit A is a letter dated March 22 -- March 22, 2005, which I don't have, so let me go on to something else while we can find it. I'm going to show you -- this is part of Exhibit 4. It's a -- looks like a diagram. It's got trial at the top, pros, cons, and halfway through it's got an Alford guilty plea. Let's just look at the top of this. Can you tell us what this is?

A. This was a -- just a diagram that I made when we were trying to discuss some of the pros and cons of which way she could possibly go and what the pros and cons would be.

Q. Okay. So the pros of going to trial could be being found not guilty. That's a good thing; right?

A. Correct.

Q. Okay. And the cons could be guilty.

A. Correct.

Q. Death penalty, life, or a number of years.

A. Correct.

Q. Did you discuss what the -- what possible consequence of a life verdict would be in terms of Miss Johnson's personal --

A. Yes.

Q. -- life? And what was that?

A. If she got life, she would at least be able to have physical contact with her kids and her family.

Q. Was that important to her?

A. Absolutely.

Q. Can you tell the Court how important? I mean, how often did you talk about her kids and her ability to contact her kids?

A. Probably every visit I had with her she talked of her family and her kids.

Q. To your knowledge had she been able to contact her kids, touch her kids since she was arrested on July 29, 2000?

A. No, no physical contact at all.

Q. And would it be fair to say that her lack of physical contact with her kids was a recurrent subject?

A. Yes.

Q. And the physical contact with her kids would have been something extremely important to her.

A. Absolutely.

Q. In there you listed the option here of a number of years

and then the possible life after prison; correct?

A. Yes.

Q. And there was this Alford guilty plea. Actually I think this is cut off. Okay. Let's talk about the Alford guilty plea. Is that something you discussed with Miss Johnson?

A. Yes.

Q. And you discussed the pros and cons of that with her.

A. Correct.

Q. Based on this note that you took, did this reflect actual discussions that you had?

A. Yes.

Q. Is there anywhere on that where Miss Johnson said no, no, no to any option like Alford guilty plea, plead guilty, anything like that?

A. I'm sorry. Say that again.

Q. Did Mr. -- is anything that Miss Johnson said or did during your discussions about a plea indicate to you that she would never, ever plead guilty?

A. No, not at all. She was very willing.

Q. All right. I have a letter that's dated August 23, 2004. I'm going to put -- it's part of Exhibit 4. I'm going to put it on the ELMO. And it's another one of those very bad copies.

A. Yes.

Q. But do you recognize this as a letter from Angie?

A. Yes.

Q. I'm going to go to page 2 of this letter which -- no, it isn't. Take that back. I'm sorry. This is also part of Exhibit 4. It's a letter dated March 22, 2005. Is this a letter you received from Miss Johnson?

A. Yes.

Q. And in this letter did you -- was there a discussion of a guilty plea on page 2?

A. Yes.

Q. What did she write to you?

A. She was just wanting all of this to just be over and was willing to plead guilty, and she just wanted to be with -- see her kids, so that was why she was willing to do whatever it took to move it on.

Q. And did she express some frustration in this letter about her ability to contact the people on her defense team?

A. Oh, yes, uh-huh.

Q. What did she tell you?

A. That she apparently was having some problems getting ahold of us and was just -- had some issues with a calling card.

Q. Was -- meaning that was -- for people that don't know -- get calls from jail, can people in jail just pick up a phone and make a call?

A. No, no. They have to call collect.

Q. And at some jails do they -- is the only manner in which calls can be made use of a calling card?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 23 of 85

Q. And if you're out of calling cards, can you make calls?

A. No.

Q. So this was right before Miss Johnson's trial started; would that be correct?

A. Correct.

Q. And she was frustrated about her ability to contact her --

A. Yes, yes.

Q. -- defense team. But I want to ask you, Miss Lanoue, about just generally the relationship between Miss Johnson and her attorneys. Did she trust them?

A. Yes.

Q. Was she scared of them?

A. She was intimidated by them.

Q. And was there -- did she explain what she meant by that?

A. There was a -- at one visit all three attorneys, Dean Stowers, Pat Berrigan, and Al Willett, came to visit her and sat across the table, and she said they were just sitting there in their business suits and it intimidated her.

Q. Did she compare her ability to communicate to you to her ability to communicate with her lawyers?

A. It was much easier for her to communicate to me.

Q. Now, we talked earlier about you -- your billings indicating 355.4 hours that you spent with Miss Johnson reviewing discovery. Did you feel after spending 355 hours plus

reviewing discovery with Miss Johnson that you knew the details of this case?

A. Yes.

Q. And based on what you saw and heard of the attorneys who represented Miss Johnson, did it appear to you that they knew the details of the case as well as you?

A. No.

Q. When -- would you attempt to share your knowledge of the case with the attorneys who were representing Miss Johnson?

A. Yes.

Q. How were your efforts met?

A. You mean what did they do after I would relay information to them?

Q. Yes.

A. I felt like if I wrote an e-mail or a memo it just kind of got lost in the file. It never went anywhere.

Q. Did the e-mails and memos that you wrote to Mr. Willett and Mr. Cornell and Mr. Gratias, did any of those -- anybody ever e-mail or memo you back saying, "I want it"?

A. I'm sorry. I didn't hear you.

Q. Did anybody ever e-mail you back or write you back a memo saying, "I'll take care of this"?

A. No.

Q. Now, Miss Johnson gave you some information about the killings, the deaths of Greg Nicholson and the Duncans as well

as Mr. DeGeus; is that correct?

A. Yes.

Q. Did she tell you how she knew that information?

A. Yes.

Q. And how did she know it?

A. She told me that Dustin talked about it and at times bragged about it.

Q. Did she tell you what Dustin said about Mr. Nicholson and the Duncans?

A. I'm not real sure I understand what you --

Q. I'm sorry. Did she tell you about how Mr. DeGeus came to be involved in the Nicholson and Duncan homicides?

A. Yes.

Q. And that was why?

A. For DeGeus it was to write off his drug debt.

Q. Did Miss Johnson tell you how she was able to draw a map for Mr. McNeese?

A. Yes.

Q. How was she able to draw that map?

A. Apparently Dustin was afraid that the bodies were going to surface and wanted Angie to go check it out to make sure that they weren't coming to the surface, and he told her exactly where they were.

Q. Did he draw a map for her?

A. Yes.

Q. Did you believe the things Miss Johnson told you?

A. Yes.

Q. Can you give us an example of why you believed her? I mean, let me withdraw that. Would you in particular call yourself a liberal bleeding heart?

A. I don't know. Maybe.

Q. Maybe? Maybe not?

A. I don't know.

Q. But are you an easy sell?

A. No, not at all.

Q. Could you tell us -- give us an example of why you believed Miss Johnson when she was telling you these things?

A. I would actually see her reading some of the discovery, and sometimes it was like a little light bulb would go off, and she would question things that maybe I might know, and she -- was very obvious she didn't know.

And an example of that would be there was a picture of Lori Duncan, and as she was going through some of the pictures, her question, which was a very sincere question, is who is this, and I said that was Lori Duncan, and she had no idea that that was what she looked like. And there was a picture also of I believe her house or around that area. She had no idea where that was at either so . . .

Q. I believe we talked about you sharing your views about the case with the attorneys; correct?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 24 of 85

A. Yes.

Q. Was there -- did Mr. Berrigan have a particular reaction to your sharing your views on the case?

A. Oh, yes.

Q. And what was his reaction?

A. He just kind of blew me off basically, that it didn't really matter what I had to say, that he already knew the route for the defense that he was going to take.

Q. Did you -- Miss Lanoue, did you ever encourage or discourage Miss Johnson to plead guilty in this case?

A. No, I absolutely never would have discouraged her from it.

Q. You never urged her not to take a plea bargain.

A. Absolutely not at all.

Q. Were you at Miss Johnson's trial?

A. Yes.

Q. And how often were you there?

A. I was there every day of the trial. I was not there through the jury selection, but I was there through all the phases.

Q. Could you describe for the Court Miss Johnson's demeanor during her trial.

A. I actually sat behind her, but she was very -- almost like she was kind of drugged, just seemed very out of it.

Q. When you say out of it, what do you mean? Was she talking to herself or what?

A. No. She was very just blah.

Q. Was she emotional?

A. No.

Q. Did she appear jittery or nervous or anything like that?

A. No.

Q. Do you know what Miss Johnson's state of mind was going into her trial based on your extensive contacts with her?

A. Her state of mind?

Q. Yeah.

A. She just left everything in the hands of the attorneys but I think just felt like her fate was in their hands.

Q. At trial since you were there did the prosecution make any comparison of Miss Johnson's culpability vis-a-vis Mr. Honken's?

A. What are you asking?

Q. During the trial did the prosecution ever compare Angela Johnson's culpability in this case to Mr. Honken's? Did they say who they believed was worse or more guilty or more culpable?

A. I believe so. At least I felt that.

Q. And who did you say -- who did they say was worse?

A. Angie.

Q. Based on your review of discovery in this case, did you know that there was evidence to -- did you know if there was evidence to contradict this to show that she wasn't worse than Dustin Honken?

A. Oh, I definitely knew from reviewing the discovery of some

of his past.

Q. And what evidence did that include?

A. He was involved -- there was a bank robbery, and he wanted in the end to kill those witnesses back when he was much -- he was younger like maybe in high school at that time.

Q. Did -- was there any effort made on -- by Miss Johnson's attorneys to present this evidence?

A. No.

Q. Was there any effort made to -- by Miss Johnson's attorneys to show the jury that Miss Johnson was not worse?

A. No.

Q. Than Mr. Honken.

A. No.

Q. Were you there when Miss Johnson was sentenced to death by the jury?

A. Yes.

Q. What happened after the penalty verdict?

A. The attorneys left and went back to their homes, and I stayed overnight, and I went and saw her the next day.

Q. Why did you do that?

A. I cared about her.

MS. MORRISSEY: Thank you. I have nothing further.

THE COURT: Why don't we take a recess until 11:00, and then we'll go for an hour and then take an hour at noon and then come back at 1, and then I just wanted to remind everybody

that I do have a sentencing at 4:00. And it could take a little while. I just don't know how it's going to shake out.

MR. BURT: Did the Court want to break at 4 for us?

THE COURT: Yes, you'll be taking a break at 4.

MR. BURT: No. I mean do you want us to wait around, or do you want us --

THE COURT: Oh, no. We should be done in 45 minutes or so, and then we'll go till 6. Yeah.

MR. BURT: Thank you.

THE COURT: Okay. Thank you.

(Recess at 9:39 a.m.)

THE COURT: Thank you. Please be seated.

MS. MORRISSEY: May I?

THE COURT: Yes.

MS. MORRISSEY: A little unfinished business --

THE COURT: Can you come closer to the microphone, please?

MS. MORRISSEY: Yes, may I move Plaintiff's 4 into evidence?

* * * *

(Plaintiff Exhibit 4 was offered.)

* * * *

THE COURT: Any objection, Mr. Williams?

MR. WILLIAMS: No objection, although I don't have a complete set of 4, but if they can get it to me before the end

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 348 Filed 11/10/11 Page 25 of 85

of the day --

MS. MORRISSEY: We'll get it to you -- we'll get on it right now.

MR. WILLIAMS: They gave me a pretty good version of it, but there were things that were added.

THE COURT: Okay. Well, why don't we wail till Mr. Williams has at least had a chance to see the entire Exhibit 4 before I rule, but I assume it's coming in.

MR. WILLIAMS: I don't think I'm going to have an objection to it at all, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Good morning, Miss Lanoue.

A. Good morning.

Q. Let's talk, first of all, about the demeanor that you observed of the defendant during the trial. You indicated when you were interviewed by the defense team here that you thought that she didn't really show any emotion during the trial.

A. Correct.

Q. And you weren't there during the jury selection, though; is that right?

A. Correct.

Q. Okay. Were you aware whether there was any advice given by the jury consultant about giving instructions to Miss Johnson about trying to be more serious and appear more serious?

A. No.

Q. Okay. Were you aware that there was concerns about her acting giggly and flipping her hair and acting in a manner that the jury consultant viewed didn't show that she understood the seriousness of what she was facing --

A. No.

Q. -- or the gravity?

A. No.

Q. Okay. So if there were instructions given to Miss Johnson that she should act more serious and not show emotion and not be that way, then that would explain why she was acting that way which is a little bit different from what you'd seen before.

A. Possibly some of it.

Q. Okay. Now, you had concerns from the beginning, the first time you came to this court to watch the trial, that this jury had their minds made up already; right?

A. Correct.

Q. Okay. You watched the jury, and in your view they had already decided that Miss Johnson was guilty.

A. Correct.

Q. You spent a lot of time with Miss Johnson preparing for the trial, and you went through discovery with her. You testified about that. One of the things that you talked about was this Proscovec interview.

A. Correct.

Q. Okay. And you all thought -- you all meaning you and Miss Johnson, apparently you thought that was important why?

A. **It explained what happened the night of the murders which seemed to be in contrast in some of the discovery that we were reading.**

Q. Okay. You're also aware because you're intimately familiar with discovery that the testimony of Miss Gaubatz is that Honken and Johnson arrived home at about four or five o'clock in the morning; right?

A. Correct.

Q. Okay. And so even if Miss Proscovec had had contact with Lori Duncan up until 11:30 or midnight, that doesn't rule out the possibility that Dustin Honken and Angela Johnson showed up at the house, kidnapped the people, and murdered them sometime between midnight and 4 a.m. or 5 a.m.; right?

A. **Possibly.**

Q. Okay. So you pointed out some things that might help, right, but it doesn't completely explain away or show that it's impossible; right?

A. Correct.

Q. Okay. And you brought that to the attorneys' attentions; right?

A. Correct.

Q. Okay. Al Willett is an experienced trial attorney?

A. Yes.

Q. Okay. He's tried murder cases before?

A. **Since I've worked with him, there was -- I don't recall ever being involved in a murder case with him.**

Q. Okay. During the time period that you worked with him, he had many jury trials?

A. Yes.

Q. Okay. And this wasn't the first occasion where you would have had thoughts that were different from what Mr. Willett ultimately thought was the right way to go in a case.

A. **Say that again.**

Q. Yeah. This wasn't the first time that you and Al disagreed about how a case ought to go.

A. **We actually were pretty much on the same -- we were pretty much on the same ride most -- I think most of his other cases that we had, but this one -- this one was different.**

Q. Okay. And Al just kind of disagreed with the importance of some of this evidence.

A. Yes.

Q. Okay. And Pat Berrigan clearly disagreed with you on the importance of this evidence.

A. Yes.

Q. Okay. But he was aware of it; right?

A. Correct.

Q. All right. And you indicated that when Pat Berrigan came on board that you had a meeting down in Kansas City and that's

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 3:09-cv-03064-MWB-LTS Document 348 Filed 11/10/11 Page 26 of 85
*to purchase a complete copy of this transcript.*

Q. when he said, "I'm not going to insult the jury by saying she wasn't present."

A. Correct.

Q. Okay. And I think your testimony was that was about a year after you were assigned to the case.

A. That was -- that's approximate. I don't remember the exact date that we were down there at that time.

Q. Right. Fair enough. But it was some time significant, you know, a year after you guys were on board roughly.

A. Yes, yes.

Q. Okay. And that was after the discovery of the bodies; right?

A. Yes.

Q. It was after Angela Johnson is attributed to have drawn maps to the location of the bodies.

A. Yes.

Q. Right? It's after, along with those maps, there were notes that described details about how the people were murdered that were provided to McNeese as part of those maps; right?

A. Yes, yes.

Q. Okay. This is after you were aware of Christi Gaubatz's testimony; right?

A. Yes.

Q. Not only her observations on the night of the murder but also the confession that Angela Johnson had made to her best

friend, Christi Gaubatz, about her participation in the murders; right? You knew about that. You knew about Christi Gaubatz saying that Angela Johnson confided in her.

A. Yes.

Q. Yeah. So -- and about Miss Gaubatz's observations, you felt like you had a really good handle on the details of this investigation?

A. Yes, at that time.

Q. Okay. And there was that one note that the attorney showed you that you were sending to I think Gordy Gratias about Angela Johnson's thoughts about what happened the night of the murders and that there was a reference in there about Christi Gaubatz said that when Angela Johnson and Dustin Honken came home they had blood on their clothes.

A. Correct.

Q. You remember that?

A. Yeah.

Q. That's not really what Christi Gaubatz said, is it?

A. I can't recall exactly what she said, but I must have read something that she had said to write that in my memo.

Q. Okay. Christi Gaubatz, in fact, said that she didn't see anything. She heard them come in, go to the shower. She knew it was them. She didn't see any blood on their clothes, didn't see any dirt on their clothes. She had no observations like that. Isn't that what she really said?

A. I don't recall that at all.

Q. Okay. The reference to the blood on the clothes actually came from an informant that -- from the prison that Dustin Honken had made confessions to when he was explaining what they did when they came home that night. They had blood on their clothes; they went into the shower; they showered, and they let the blood come off, and Johnson and he didn't talk at all. That's where the reference to the blood comes from. It had nothing to do with Christi Gaubatz; isn't that right?

A. Just something that just popped in my head a second ago was that Christi saw them come in and appeared to be sleeping and was just watching them. And it just happened to pop in my mind that's something that she claimed but --

Q. Right. Pretended to be sleeping at the time.

A. Uh-huh. But this -- as I sit here right now, it's hard for me to actually remember those details like that at this moment.

Q. Well, back when you wrote the memo to Gordy, that was back in 2004; right?

A. I believe so.

Q. You were right in the middle of that discovery file at that point; right?

A. Yes.

Q. And you got that wrong, didn't you?

A. Not that I recall.

Q. Okay. You -- in your theory you thought that the defense

should have fought the guilt issue more; right?

A. Yes.

Q. Okay. You didn't think that they ought to go with "she was present" defense.

A. Correct.

Q. You talked to Al Willett about that?

A. Yes.

Q. Okay. Did you have a conversation with Mr. Berrigan about it as well?

A. Yes.

Q. Okay. Dean Stowers was present when you guys had these discussions about that?

A. Yes.

Q. Okay. So this was something that was talked about as a possible way to go is do we or don't we present the "she was present" defense; right?

A. I don't even think it was really discussed. It was just told to me that that's the way they were going to go, and they really didn't listen to what I had to say.

Q. You expressed your views.

A. I tried. I tried and tried, and I didn't feel like they were listening to me at all. They already had decided the way they were going to go, and it wasn't -- what I had to say really didn't matter.

Q. Okay. And your views were influenced by what Angela

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Johnson had told you; right?

A. Partially. Partially from the discovery that I was just reading and putting together in my own head.

Q. Okay. Now, Miss Johnson told you that she was -- wasn't even there; right?

A. Correct.

Q. Okay. Miss Johnson told you that the way she knew where the location of the bodies were is because Dustin Honken had told her.

A. Correct.

Q. Okay. Now, the attorneys thought that that wasn't a believable version of events; right?

A. Correct.

Q. Okay. You disagreed, but they disagreed with you.

A. Correct.

Q. Okay. Ms. Johnson claimed that she called DeGeus to get him over that night to meet Dustin Honken, but then she went home; right?

A. Correct.

Q. Said she wasn't even present when he was murdered.

A. Correct.

Q. Okay. Miss Johnson never at any point in all of the 300 and some odd hours you met with her ever told you that she was actually responsible for these murders, did she?

A. The only thing she felt really guilty about was calling

DeGeus to come and meet Dustin. That part she felt very guilty about that she was responsible for that, for getting him to come and meet Dustin.

Q. Okay. But other than that, she's -- her position to you consistently throughout the 300 and some odd hours you spent with her is she wasn't even present during the murders.

A. Correct.

Q. Didn't participate in them at all.

A. Correct.

Q. Didn't gain entry into Lori Duncan's house that night.

A. Correct.

Q. Didn't help kidnap the adults and the children and take them out to the woods.

A. Correct.

Q. Didn't participate in holding the children as Dustin Honken took the adults and murdered them.

A. Correct.

Q. Okay. Her position was I wasn't even there; right?

A. Right.

Q. Okay. Now, you indicate in your testimony that she was willing to plead guilty.

A. Correct.

Q. Okay. To what?

A. She was going to plead guilty to anything, and that's the truth. She was -- many times would be very just distraught

because she -- the conditions that she was living in at the jail were just unbearable, and she just wanted to just basically face whatever was ahead of her and just be able to get out of the county jail.

Q. And that kind of ebbed and flowed, though, didn't it, a little bit on her willingness to plead guilty?

A. She was -- it was not an easy thing for her to actually plead guilty to such a crime. She wanted her family to know the truth that she wasn't involved, but if that's what it took to get her out of the county jail and to a federal prison, then she was willing to do that and knowing that her loved ones would know the actual truth.

Q. And there are also times where she absolutely maintained her innocence and was not going to plead guilty; right?

A. Say that again. I'm sorry.

Q. There are times she insisted she was innocent and she wasn't going to plead guilty; right?

A. I think in the beginning it -- in the beginning I don't think that was her plan to plead guilty. But over time I think she was just broken down.

Q. Now, for a defendant to plead guilty, they have to come in and raise their hand and swear to tell the truth; right?

A. Correct.

Q. Okay. And they would have to swear under oath that -- to a factual basis that they participated in a murder.

A. Correct.

MS. MORRISSEY: Objection, Your Honor. Calls for legal conclusion.

THE COURT: Overruled.

BY MR. WILLIAMS:

Q. And your testimony is Miss Johnson was consistent with you throughout that she had nothing to do with the murders.

A. Correct.

Q. So if she gave a factual basis under oath sufficient for a guilty plea, she would have to be lying in your view.

A. I think we talked about if certain things were stated that she would agree to that just maybe with some provisions in there. She wasn't maybe going to plead guilty to the murders, but if she was considered an accessory for calling DeGeus knowing that they had a no contact order, then in her mind then she would be guilty.

Q. So she might be willing to plead guilty to something like an accessory after the fact or something?

A. If that's what it took.

Q. Hmm. When you spoke with her about these possible plea issues, did you discourage her from pleading guilty?

A. No, but I talked about it with her, if she was comfortable with that. I really wanted her to be comfortable.

Q. Okay.

A. And so --

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 28 of 85

Q. Did you discourage her, though?

A. No, not at all.

Q. You read the petition in this case; right?

A. Yes.

Q. And they spend some time faulting you saying you had an undo influence on Miss Johnson and you influenced her not to agree to any plea offers. Do you remember reading that part of it?

A. I do know about that, yes.

Q. Okay. And what's your response to that?

A. It is not true.

Q. Okay.

A. I was there. I was involved in my conversations with her. And we -- I decided to do the diagram for her about all the pros and cons of doing -- I just wanted her to be comfortable because 15, 20 years down the road I didn't want her to regret doing something that had such an impact on her life and live with the idea that she had to plead guilty to something like that knowing that her daughters would have to live with that, and I just wanted her to be comfortable with it. And so that was our discussion.

Q. Okay.

A. I never told her not to take the plea ever.

Q. Okay. And when you say not to take the plea, there really was never a plea offer in this case, was there?

A. Never to my knowledge there was ever a plea offer.

Q. Okay. You explored the idea of an Alford plea.

A. Correct.

Q. And on your diagram you have Alford plea, and there was no death penalty underneath it? Do you remember that? It says no death penalty.

A. Correct.

Q. Okay. For there to be no death penalty in an Alford plea, that would have had to have been something the government agreed to, though; right?

A. Right.

Q. Okay. And the government never offered to allow her to plead guilty to an Alford plea and take the death penalty off the table, did it?

A. No, no, there was never a plea at all of any sort.

Q. This is just kind of a theory of different possibilities that might occur.

A. Correct, correct.

Q. Okay. And you're aware that one of the preconditions the government imposed before it was ever even going to get to a point where it was going to make a plea offer in this case is that Miss Johnson had to come in and truthfully debrief with the government about the crime she committed.

A. Correct.

Q. And that was never going to happen in this case, was it?

A. My understanding is they were not going to allow her to proffer without an agreement first.

Q. And one of the primary reasons for that is that she was unwilling to admit her participation in the crimes; right?

A. That I don't know.

Q. Well, it'd be hard for her to come in and truthfully debrief, at least from the government's viewpoint, right, if what she does is come in and tells us what she's been telling you?

MS. MORRISSEY: Objection, Your Honor. Argumentative.

THE COURT: Overruled.

A. I forgot the question.

Q. Yeah. It'd be hard for her to meet the government's precondition of truthfully debriefing if what she's going to come in and say, "I was never present"; right? Government wouldn't accept that as a truthful proffer.

A. I think her idea would be she would tell them what she knew, and whatever they did with it was whatever they wanted to do with it. Whether they were going to offer her anything for that or not, I don't know.

Q. All right. Bottom line again, there just wasn't ever any plea offer on the table in this case, was there?

A. Not that I was ever aware.

Q. Now, you talked a little bit about that Al Willett was the lead attorney on this case?

A. Correct.

Q. Okay. But you also indicated when you were interviewed that once Pat Berrigan came in he took over the reins of the case.

A. Correct.

Q. And all aspects of the case; right?

A. Correct.

Q. And Al deferred to him throughout the case.

A. It appeared to me that way.

Q. Okay. You indicated that there was some evidence that you thought might -- could have been brought out during the Johnson trial about Dustin Honken to make him look -- I guess to counter the government's argument that Johnson was as bad or worse than Dustin Honken and that was the bank robbery. Do you remember talking about that topic?

A. Yes.

Q. Okay. And the bank robbery and Dustin Honken's involvement in planning and so forth, you talked to the defense attorneys about that.

A. Correct.

Q. Okay. And they were aware of that evidence; right?

A. Correct.

Q. Okay. And they just chose not to present it at the penalty phase; right?

A. Correct.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 29 of 85

Q. Okay. And did they explain to you what their reasoning was for why -- aware that they decided in their view it just wasn't something they thought was best to put on during the penalty phase?

A. No, I was given no explanation as to why.

Q. They did put on evidence during the penalty phase of the trial, though, concerning mitigation evidence; right?

A. Yes.

Q. Okay. And you thought in particular that the family testimony was pretty effective, didn't you?

A. Yes.

Q. They put on what? Three experts to talk about her mental problems and her upbringing and that kind of stuff?

A. If you say it was three, I'll believe you. I don't remember exactly.

Q. Okay. Now, your -- in your dealings with Al Willett on this particular case, was he adamant about trying this case no matter what?

A. No.

Q. Was he willing to consider plea possibilities as well?

A. Yes.

Q. Okay. He wasn't rabid about no matter what I just want to go to trial on this case?

A. No, no.

Q. When did Ray Cornell come on to work on this case?

A. Well, it would have been within -- some time within that first year because when we -- typically Al and I would go over to the U.S. Attorney's Office as we did on every case and look at the discovery. We did the same thing starting out on this case as we did all of our other cases.

And it became apparent after that first visit that there was no way I could go through this discovery file by myself. So at that time I said I think we just need to bring in the troops, meaning the rest of the team. Well, we did, and that did include Ray and his assistant. I can't without looking at any of my records know exactly when they came and stayed for a week and we looked all through that discovery that week, but he was there at that time, and he was aware of, you know, the case. But I don't know exactly how much time had gone by from that time till he was first brought on board. It just seemed to me he wasn't on board for very long.

Q. Okay. Put some dates on here. Angela Johnson was arrested on July 30 of 2000.

A. Right.

Q. Okay. Al was appointed shortly thereafter, in August of 2000; okay?

A. (Witness nodded head.)

Q. The bodies were discovered on October 13 of 2000.

A. Okay.

Q. Does it fit with your recollection that Ray Cornell would

have been on board before the bodies were even found in this case?

A. Yes, because I think typically on this case Al would have hired an investigator very soon when he first got the case.

Q. And he continued on to it at least through 2003 when you had the e-mail you sent to Ray Cornell that was shown to you in evidence here earlier; right?

A. Correct.

Q. Okay.

A. And I didn't realize it had even been that long, but I saw that.

Q. Okay. So he was on this case for years, wasn't he?

A. Well, it didn't seem like it at the time. It just seemed like it was maybe a year at the very most, but maybe it was over that.

Q. Okay. And you said you never saw any of his reports. Are you aware that, in fact, he interviewed a number of people?

A. No. In fact, I was really curious as to what -- I didn't see the product at all.

Q. Okay. Do you know whether Al Willett saw the product?

A. I don't know.

Q. Okay. So there may have been things going on with the investigation you weren't aware of?

A. I was really pretty involved, but there could have been a time or two possibly I wasn't around when they did converse, but

at that time I -- Al's office was directly -- there was a wall in between my office and his office, and I could pretty much hear everything he ever said. He has a rather loud voice. So any time he was on the phone, I could just sit there and hear every bit of his conversation.

Q. If there's a number of interview reports by Ray Cornell, you just have never seen those?

A. I'd have to think about that, but I -- I don't recall really anything substantial.

Q. Okay. And to the extent that you're sending an e-mail to Ray Cornell in February of 2003, that was about parts of the investigation on the guilt phase; right?

A. Correct.

Q. Now, you indicate -- you were shown a note on October 28, 2004, of a conversation you had with Angela Johnson where she said that she's answered the questions the lawyers have posed to her, she's told you some but not all of the story, and all she wants is somebody to listen to her entire story. Do you recall that entire note?

A. Yes.

Q. Were you aware that Ray Cornell sat down and interviewed Miss Johnson at length and got her whole story of the events all the way back in 2000?

MS. MORRISSEY: Objection, Your Honor. Assumes facts not in evidence.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 348 Filed 11/10/11 Page 30 of 85

THE COURT: It does, but I'm going to allow it, and we'll see if the facts ultimately come into evidence.

BY MR. WILLIAMS:

Q. Were you aware whether he had done that?

A. I can't say at this point. I just don't have any recollection of that.

Q. Okay. Were you aware that on -- in May of 2002 Al and Pat Berrigan and Dean Stowers, all three, sat down and got an explanation from Miss Johnson about her version of the events? Were you -- have you seen that report?

A. Not that I can recall.

Q. There's testimony you provided about Miss Johnson being anxious about the upcoming trial, and we saw some notes that you had and some letters that she had sent where she didn't think she was -- you know, wanted to be in contact with her lawyers and that kind of thing. Do you remember that line of questioning?

A. Yes, uh-huh.

Q. It's not uncommon, is it, for defendants to get more and more anxious as they get closer to trial?

A. Correct.

Q. Okay. It's not uncommon for clients to complain that they're just not having enough contact with lawyers; right?

A. Sure.

Q. In fact, that's pretty common, isn't it?

A. Sure.

Q. They never think they have enough contact with the lawyer; right?

A. Sure.

Q. Did you ever see any reports by -- or e-mails actually I think it is -- by Ray Cornell to Al Willett being concerned about Angela Johnson being manipulative? Do you remember ever seeing an e-mail like that?

A. I know there was talk about it, but I don't recall any particular e-mail.

Q. What was the talk about it?

A. I think they thought she was manipulating me.

Q. In what way?

A. I just think that they -- because I was on her side and I just totally had my theory of what actually happened based on most of the discovery I was reading, and they just basically blew everything I said off as though it didn't really matter.

MR. WILLIAMS: No further questions, Your Honor. Thank you.

THE COURT: Miss Morrissey, redirect?

MS. MORRISSEY: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Miss Lanoue, you were asked about whether or not -- well, you were asked about whether Miss Proscovec's observations

precluded a kidnapping in the early hours of the morning. Do you recall that question?

A. Yes.

Q. Okay. Did the discovery that you had read, did that tell -- indicate that the prosecution's theory was that some time in the evening, early evening, Miss Johnson made entry into the Duncan home posing as some kind of Avon lady?

A. Yes.

Q. So it wasn't the case -- it was true that the prosecution theory had Miss Johnson entering the Duncan home around the time that Miss Duncan was according -- was talking to Mrs. Proscovec; correct?

A. Correct.

Q. And that's why you thought it was important.

A. Absolutely.

Q. The statements that you recall about Miss Gaubatz saying that she saw blood --

A. Yes.

Q. -- were there people who related -- in the discovery were there people who related to the government things that Miss Gaubatz told them about what she saw?

A. Yes, I do recall she had -- I think there was a lot of contradictions in her testimony at different times.

Q. And, in fact, one of -- one people -- one person was reported to have heard Miss Gaubatz describing coming home and

seeing Angela and Dustin Honken with blood on them; correct?

A. Correct.

Q. And it's also correct that that witness denied ever hearing such a thing from Miss Gaubatz; correct?

A. Correct.

MR. WILLIAMS: Objection. Leading.

THE COURT: Overruled.

MS. MORRISSEY: Thank you.

BY MS. MORRISSEY:

Q. So basically there were -- Miss Gaubatz gave different statements at different times.

A. Correct.

Q. And did she give different statements to different people?

A. Yes.

Q. And all those statements were contained in the discovery; correct?

A. Yes. That's where I was getting my information.

Q. All right. You said that you wanted Miss Johnson to be comfortable with her decision whether she was going to plead guilty or not; is that correct?

A. Correct.

Q. What did you -- how did you convey to her that you wanted her to be comfortable with that decision?

A. I talked to Angie just like I would a friend or my sister or a daughter, and I just -- I knew -- I knew 10 or 15 years

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 31 of 85

**458**

down the road that I didn't want her to regret her decision. And we just talked at great length about that many times about just wanting her to be really comfortable with what her decisions were.

Q. You were asked about this idea of giving a proffer and how that was an absolute requirement for any plea. Do you recall those questions?

A. Yes.

Q. Did you ever talk to Angela Johnson about -- say are you willing to go in there and tell them what you know without a plea being -- without having a plea on the table?

A. No, I didn't talk to her.

Q. Okay. So you don't know what Miss Johnson's views were on the, you know, plea first, proffer first conundrum that seemed to plague this case?

A. You mean which would happen first?

Q. Correct.

A. Yes.

Q. You don't know --

MS. MORRISSEY: We have confidential communications here, Your Honor.

THE COURT: I wasn't that quick.

BY MS. MORRISSEY:

Q. So would it be fair to say you were not in the details of plea versus -- you know, plea bargain first, proffer later,

**459**

proffer first --

A. Correct. I was not involved in that.

Q. And -- but as far as you know, if Miss Johnson were to proffer, she would -- at any point she was going to -- you didn't know what she was going to say. You assumed she would say what she was telling you.

A. Correct.

Q. All right. Did you ever hear of an attorney proffer being submitted in this case by Mr. Berrigan?

A. I'm not real sure I know exactly what you're talking about.

Q. All right. That's fine.

A. I have something in my head, but I don't know if that's what you're talking about.

Q. Okay. You said that you had your own ideas about what happened in this case.

A. Correct.

Q. Okay. And what do you think happened?

MR. WILLIAMS: Relevance, Your Honor.

THE COURT: I'm sorry?

MR. WILLIAMS: Relevance.

THE COURT: Oh, okay. Was your microphone on?

MR. WILLIAMS: It was not. I'm sorry.

THE COURT: Overruled. You may answer.

BY MS. MORRISSEY:

Q. What do you think happened?

**460**

A. On each of the murders?

Q. Yes.

A. Well, just as my memo had said, I believe that the night that it happened, the first murders, that Terry DeGeus and Nicholson -- not Nicholson, Honken, Honken was nervous that he had these witnesses against him, wanted these witnesses to go away, and he -- Terry DeGeus had a drug debt, and Dustin decided to talk DeGeus into getting rid of his drug debt by killing his witnesses, and Terry DeGeus went with that. And that's how that -- that's how that transpired I guess. And Terry DeGeus actually killed these people, and then Dustin decided to kill DeGeus to get rid of him because he was the other witness.

Q. You were asked about whether or not you'd seen any reports by Mr. Cornell which Angela laid out her whole story. Do you recall those questions?

A. Yes.

Q. I'm going to show you two reports if I may, Your Honor, by Ray Cornell which have been previously provided to the government.

MS. MORRISSEY: May I, Your Honor?

THE COURT: Yes.

MS. MORRISSEY: Thank you.

BY MS. MORRISSEY:

Q. Would you take a look at these two reports? They're the same report. Both of them --

**461**

THE COURT: You'll need to move that microphone. That's why it's there. Otherwise the court reporter can't take it down.

MS. MORRISSEY: Yes, you're right. Sorry, Your Honor.

BY MS. MORRISSEY:

Q. Actually they're not two reports. There's one report I put in front of you, and it's not dated, but it begins with the name Sara Bramow.

A. Yes.

Q. And would you look at this report and see if it tells you all the information that you obtained about what happened -- what Angela thought happened from her. Does that report convey all the information you received from Angela during the 355 some hours that you spent with her?

A. Pretty much.

Q. Does it contain background information about her?

A. Background meaning . . .

Q. Yeah. Well, let me withdraw that and ask another question. Does it contain the information about Miss Johnson's theory after reading Miss Proscovec's interview?

A. I believe this would have been prior to Miss Proscovec's interview.

Q. Being known.

A. Exactly.

Q. So there's nothing in here about Miss Proscovec at all.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 32 of 85

A. Nothing at all.

Q. Nothing. And in this interview basically Ms. Johnson says, you know, she's assuming things happened, but she has no firsthand knowledge of what happened in these crimes.

A. Correct.

Q. And that was the position that she took with you.

A. Correct.

Q. Do you -- you were asked questions about whether Miss Johnson was manipulating you. Do you remember that question?

A. Yes.

Q. Do you think that she was manipulating you?

A. Not at all.

Q. Do you think that you were manipulating her?

A. Not at all.

MS. MORRISSEY: One moment, Your Honor, if I may.

Q. Were your sessions reading the discovery, was that -- was one person dictating to the other, or was it an exchange of information?

A. When we were reading the discovery?

Q. Yes.

A. I would take several notebooks sometimes, and she would read a portion and I would read a portion, so we read it on our own.

Q. And if there was something that you discussed that you believed to be noteworthy, you made a note.

A. Correct.

Q. And you -- if it was sufficiently noteworthy, you prepared a memo to share it with the lawyers.

A. Correct.

Q. And so this was an exchange of information, would that be fair to say, between and you Miss Johnson?

A. Yes. If I found something noteworthy, yes, I would draw it to her attention, and we would discuss it.

Q. You told the judge your theory about what happened; correct?

A. Correct.

Q. Did you share those theories with Miss Johnson?

A. Yes.

Q. Did you share those theories with Miss Johnson's lawyers?

A. Yes.

Q. Did Miss Johnson's lawyers when you shared those theories with them appear to consider them?

A. No.

Q. Did they appear to do any investigation based on the theories that you presented to them?

A. No.

Q. Did they appear --

MS. MORRISSEY: Okay. I don't have anything further. Thank you.

THE COURT: Mr. Williams?

MR. WILLIAMS: No further questions, Your Honor.

THE COURT: I have a few questions. Good morning.

THE WITNESS: Hello.

THE COURT: Would you agree with me that Al Willett is a very zealous criminal defense lawyer?

THE WITNESS: Yes.

THE COURT: Have you -- because you worked for him, you know him so well, you've had a lot of time to think about it, do you have a theory as to why he would not want to pursue the Proscovec, if I pronounced that correctly, the next-door neighbor, information that you provided in the couple of memos and that was in the government's discovery file? Why would he not run with that?

THE WITNESS: I can't answer that wholly. However, one of the investigators after Ray Cornell -- I just found out she had died, and so it was before that, though, before she had died, before we knew she had died anyway, it was -- I don't know if they didn't know where -- I don't know if she was at a different home and they couldn't find her, but it was the second investigator. And I just really pursued that because of the time line that it just worked out in my head what would have happened.

And by the time they found out I guess that she was dead, they decided that that information just -- they couldn't confront her in court I guess, so they decided it just wasn't

going to go anywhere, and that's how that ended.

THE COURT: Do you remember how long it was before you discovered what she said about her time line of the events that evening and when she passed away, in other words, when you discovered what she had said and then when she passed away?

THE WITNESS: The time -- the time when I found that out was -- it's kind of vague as to when I found out she died, but it seemed to me there should have been enough time to have investigated it. And our fear -- and Angie and I shared -- we talked about this. She was an elderly lady, and our fear was she's going to die if we don't get her interviewed, and that was our fear, and that happened.

THE COURT: Were you pretty excited when you came -- I want to make sure I understand this because for whatever reason I'm having a hard time finding the exhibits so -- and the lawyers have seen this stuff, but for the most part I haven't. I'm understanding that the government interviewed Proscovec and then put this memo in the discovery file and then you came across it when you were reviewing discovery.

THE WITNESS: Correct.

THE COURT: Is that accurate?

THE WITNESS: Yes.

THE COURT: Okay. I imagine you were pretty excited when you came across the memo.

THE WITNESS: My heart started beating, and I got very

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS    Document 348    Filed 11/10/11    Page 33 of 85

excited. We were just ecstatic. I said wait -- it just -- it just -- it kind of -- it started explaining some things that had happened the night before that just seemed in contrast of everything else, and here was a woman who was just an innocent bystander who was very close to the Duncans and took care of her little girls and was -- you know, was very -- just an innocent party in all of that. And so her story was I'm sure exactly the way it happened. So it didn't jive with all of the other reports about other people's reports of what had happened. It just didn't.

THE COURT: And am I safe in assuming that at least for the ten years you worked with Mr. Willett you looked at a lot of discovery -- government discovery files and you probably never found a nugget this exciting? Would that be a --

THE WITNESS: That's true.

THE COURT: Did you take it upon yourself to -- well, when you found this memo in the government's discovery file, the Proscovec memo, did the defense team have an investigator working for you all at that point?

THE WITNESS: We would have had an investigator. I can't tell you if it was Ray Cornell or --

THE COURT: Mr. Gratias?

THE WITNESS: -- or -- my recollection is Scott Gratias actually was the one that told me that they found out she had died, and that's the best of my recollection. I don't

know if Ray Cornell was on board when I discovered that or not. I think he was, and I just was adamant about him tracking her down. But it wasn't until Scott Gratias came on board that I just said what's happening with this Mrs. Proscovec, and he said that he did find out she had died.

THE COURT: Would you have needed, quote, permission from Mr. Willett or the other members of the defense team, the lawyer members, to call the investigator and say, hey, here's what I found in the discovery file; let's get on this and get her interviewed? Or would you have done that on your own?

THE WITNESS: I wanted to do that on my own, but I -- I did not. I took it to them.

THE COURT: And did they think it was a good idea at least to have Proscovec interviewed?

THE WITNESS: I think it was only at my urging is the way I felt just because I was really shouting out about that that maybe just to appease me they decided to find out about it. But I don't know if they were as excited as I was.

THE COURT: Well, apparently not.

THE WITNESS: No.

THE COURT: But did they ever say no, don't have Miss Proscovec interviewed?

THE WITNESS: No, I don't believe that was ever -- it just didn't seem like they were very excited about it.

THE COURT: Are you critical that they didn't act more

quickly to have her interviewed, or are you just critical that they weren't as excited about it as you were?

THE WITNESS: Maybe both.

THE COURT: And did one of the investigators then ever try and contact Miss Proscovec, or did you learn that she had passed away before you could even try and contact her?

THE WITNESS: I don't know if Ray Cornell -- if he was the investigator at the time that we discovered that, if he tried to track her down and couldn't and just -- it led nowhere, but I was really waiting to get an answer as to what Mrs. Proscovec -- her interview would be from our side, and then I just found out she had died so . . .

THE COURT: Was one of the pieces of information that excited you in the Proscovec interview with regard to the time line, was it the likelihood from kind of common experience that people would not let in an Avon lady after midnight and that we all know that Avon cosmetic sales folks aren't out there knocking on doors after midnight?

THE WITNESS: That's exactly what I was thinking when I read that, exactly. The story just wasn't flying about some Avon lady coming to the door. It just didn't set well with me at all. I just didn't believe it, didn't believe it at all. Or Mary Kay lady I think it was instead of Avon. It was a Mary Kay lady.

THE COURT: Okay. I don't have any additional

questions. Any follow-up questions?

MS. MORRISSEY: Just a few, Your Honor.

FURTHER REDIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Miss Lanoue, we -- on direct examination we established that the first memo you wrote about Angela Johnson theory was on July 1, 2002; correct?

A. Okay.

Q. Okay. Do you -- if you can say, do you remember whether or not you -- how long before that memo was written that you actually saw this interview of Proscovec and discussed it with Miss Johnson?

A. It seems to me it was rather early on in our discovery and the review of our discovery. It was rather early on.

Q. And from rather early on, it -- you first became involved in the case in early August 2000; correct?

A. Pardon me?

Q. You first became in -- Mr. Willett first became involved early August 2000.

A. Yes, and I thought it was actually July but --

Q. It was July 29.

A. Okay. Yes.

Q. And tell us about how you would go about reading discovery in this case. You mentioned earlier that you'd go to the U.S. Attorney's Office with Mr. Willett and read the discovery.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 34 of 85

**470**

A. Correct. That was the way we always did all of his cases. When he would get a case, we would go over there. I would take my laptop, and he would take his dictaphone, and we would just start pounding out the discovery. I would start typing up the grand jury transcripts, the FBI reports, criminal histories, things like that. And just because we were trying to get so much, he would be dictating at the same time other discovery, and it's just a way of getting a quantity.

Q. And this method of discovery by going over and dictating and you typing, did you use that in this case?

A. Yes, we went over there. Initially after he took the case we went over there to see what the discovery was knowing that the murders happened in '93 and this was 2000, so we knew that we had about 7 years worth of investigation. And they rolled it in on a cart, and I -- as usual, I started in on some of the grand jury stuff, and we were there -- I don't know how long we were there, but I said -- I looked at him, and I said there is no way humanly possible that I can do this by myself. This is not your typical case. And he agreed. And I said we need to bring in the troops for this so . . .

Q. So this, you know, process where they -- the prosecution rolled out a cart of discovery, did that include -- did that happen very early on in the case?

A. Yes.

Q. Okay. And is it correct that you can't pinpoint when you

**471**

first learned about Miss Proscovec?

A. I don't know if I can actually pinpoint that date as when I came across that, but it was -- I had reviewed enough discovery to realize that this contradicted some of the other testimony that I had read.

Q. Okay. And were you in a position where you were able to give directions to Mr. Willett's investigator?

A. No, he didn't take my direction at all.

Q. Did you urge Mr. Willett by the memo that we've seen dated July 1, 2002, and by verbal conversations to follow up on this?

A. I'm sorry. I didn't understand your question.

Q. Did you urge Mr. Willett to follow up on the Proscovec interview?

A. Oh, absolutely.

Q. And you found out at some point that Miss Proscovec had died; correct?

A. Correct.

Q. It was -- she died before the trial; correct?

A. Correct.

Q. And before she had been interviewed by the defense.

A. Correct.

Q. But we don't know and we'll determine how long she lived after you pointed this out to Mr. Willett; correct?

A. Correct.

MS. MORRISSEY: Thank you.

**472**

THE COURT: Mr. Williams, any questions?

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Thank you. You may step down.

Ready to call your next witness?

Why doesn't everybody take a stretch break.

Would you raise your right hand, please.

EVA DAWN HANAWALT, PETITIONER'S WITNESS, SWORN

THE COURT: Okay. Please be seated. You can adjust the chair and the microphones so you can speak directly into the microphones. And would you tell please tell us your full name and spell your last name.

THE WITNESS: Eva Dawn Hanawalt, H-a-n-a-w-a-l-t.

THE COURT: Thank you.

BY MR. BURT: Your Honor, our next witness, Miss Hanawalt, is going to give testimony that's relevant to claim 11, ineffectiveness for failure to investigate and present evidence in the guilt phase of the case; claim 12, counsel unreasonably failed to introduce evidence in support of residual doubt; and also briefly on the first claim, the plea claim.

THE COURT: Okay. Thank you.

MR. BURT: Thank you.

DIRECT EXAMINATION

BY MR. BURT:

Q. Good morning, Miss Hanawalt.

A. Good morning.

**473**

Q. Miss Hanawalt, you previously testified in the penalty phase of Miss Johnson's trial; correct?

A. I did.

Q. And did you testify about some kind things Angie Johnson had done for you?

A. Yes, I did.

Q. And you also testified about some -- the effect of methamphetamine.

A. Yes.

Q. Do you recall that?

A. Yes, I did.

Q. And that's all you testified to; right?

A. Yes.

THE COURT: Could we get you to scoot a little closer to the microphones, please? Thank you.

THE WITNESS: Can you hear me now?

THE COURT: Yes, better. Thank you.

BY MR. BURT:

Q. Now, you recall that you testified back in 2005 at the penalty phase of the trial?

A. Yes.

Q. And prior to your testimony in 2005, had you been interviewed by the -- one of the defense lawyers in this case, Pat Berrigan?

A. Yes, I did.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q. And had he interviewed you while you were in custody?

A. Yes.

Q. And do you recall that that interview took place on January 19, 2005?

A. Yes, yes, I do.

Q. And do you recall where you were when that interview took place?

A. I was in Greenville, Illinois. I was in the drug program at the time.

Q. Was that a federal correctional facility you were in?

A. Yes, it was.

Q. Okay. And do you recall what Mr. Berrigan interviewed you about in addition to the two topics I just mentioned, that is, the good deeds that Angie had done for you and methamphetamine use? Was there any other topics of conversation when you spoke with Mr. Berrigan in January of 2005?

A. It was a long time ago. It's hard to remember everything that was said, you know, but . . .

Q. Sure. Do you recall any discussion at all about statements that Angie Johnson supposedly had made to some other inmates while the two of you were housed together in the Linn County Jail?

A. Yes. He questioned me on conversations that had never taken place. He'd asked me if I'd ever heard Angie talking about her case with somebody else, and I told him that she'd

never talked about her case.

Q. So you do recall having that discussion with Mr. Berrigan.

A. Yes.

Q. Okay. Now, is it true that you were for a certain period of time housed with Angela Johnson in the Linn County Jail?

A. Yes, I was.

Q. And do you recall what period of time you were housed with her?

A. I think it was in July of 2002, 2001.

Q. July 2001 was when you -- well, do you recall when you came in and when you left? Let me put it this way.

A. I was there nine months, and I wasn't in the cell with her the whole time, but I was in that cell with her for about three or four months.

Q. Do you recall telling an investigator who interviewed you that you were in there from July of 2001 to April of 2002?

A. I'm not sure of the dates and stuff.

Q. Does that sound about right, though?

A. Yeah.

Q. Okay. And were you in a particular area of the jail when you first came into contact with Angela Johnson?

A. Yeah, we were in a lock-down cell.

Q. Do you remember the name of the lock-down unit?

A. N, N block, N block.

Q. N as in Nancy?

A. (Witness nodded head.)

Q. And is that the first time you ever met Angela Johnson when you came into this N block?

A. Yes.

Q. And who else if you recall was in that unit at the time when you first met Angela Johnson?

A. Brandy Byrd and Mickie Yager.

Q. Now, when Mr. Berrigan came to see you in January of 2005, did he ask you about whether or not Miss Yager could have overheard conversations or heard statements from Miss -- from Miss Johnson?

A. Yes.

Q. And do you recall what you told Mr. Berrigan in January of 2005?

A. I told him of any conversation that would have been talked about in that cell, anybody would have heard it because the cell was very small, and it echoed, and there wasn't a conversation that could have happened in there without anybody in the cell hearing it. And the whole time I was in there, you know, I never once heard Angie talk about her case with Mickie, with Brandy, or with me.

Q. Now, was Mickie Yager in the N unit at the same time as you and Angela Johnson?

A. Yes.

Q. And at any point in time while you and Angela Johnson and

Mickie Yager were in that unit together, did you ever hear Angela Johnson talk about her case to Mickie Yager?

A. No.

Q. Did you ever hear her talk about her case to anybody?

A. No.

Q. Did you develop a relationship with Angela Johnson during the time that you were housed with her in N unit?

A. Yes. She was very kind from the first day I walked in that cell.

Q. And did you -- did your relationship grow as time progressed?

A. Yes.

Q. Do you think that based on your relationship that she would have confided in you information?

MR. WILLIAMS: Calls for speculation.

THE COURT: Overruled.

A. Could I answer it?

Q. Sure, you can answer it.

A. I think that if Angie was going to talk to anybody about her case, I think that she trusted me more than anybody, and I think if she was going to talk to anybody it would have been me.

Q. Did she ever make any admissions to you about her case or say that she was guilty or make any statements at all that indicated to you she was involved in the case that she was charged with?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 36 of 85

**478**

A. No.

Q. Now, when you came into the jail during the time period when you were in unit N, were you aware of who Angela Johnson was before you met her?

A. No. I -- when they booked me in, I told the guard -- her name was Vicki -- that I was just an innocent little farm girl, not to put me in with mean people or murderers.

Q. Is that true? Were you an innocent little farm girl at that point coming in for the first time basically?

A. No, I'd been in trouble, but it's different when you get in trouble in your own town and you grew up with the sheriff and stuff and now you're getting hauled away by marshals and stuff, and, you know, it's scary.

Q. Whole new environment.

A. So yes, in a sense it was. I was an innocent little farm girl, guilty but innocent so . . .

Q. So you're coming into this --

A. I was scared. I was scared. And I'd asked Vicki, you know, to please lock me up with nice people because I knew I was in federal holding and I knew that there was people that they put there that, you know, had done worse crimes than a little farm girl could do.

So she told me that there was only one cell that was opened and that there was murderers in there, you know, and at first I thought she was just picking on me, you know, scaring

**479**

me, but -- so when we got up there and before she locked me in there, you could see through the glass. There was two doors to go into the cell, and you could see through. And she pointed at Angie, and she told me, "Watch out for that one. She's the worst one. That's the worst one."

Q. And as I think you testified at trial, you later learned that that characterization of Angie was wrong.

A. Yeah, she was the nicest one to me in there. The next day when they unlocked our cells and let us come out, you know, Angie had told me I could use her shampoo and creme rinse and told me when commissary was coming and stuff and that I could help myself.

Q. And as time went by, you got to know her true name; right? She introduced herself -- she told you she was Angie Johnson?

A. Yes.

Q. And as you continued to do time there in the jail, did you learn things about her case not from Angie Johnson but from kind of word of mouth or newspapers or anything like that?

A. Yeah, there was newspaper clippings, and then if you would go to Bible study and stuff, girls would talk.

Q. And when you say girls would talk, how much talk was there in the jail around this time concerning Angela Johnson's case and the details of that case?

A. They never really had details. I never learned a lot about the details until after the fact when -- you know, after the

**480**

trial and stuff, I had girls send me and stuff and newspaper clippings, but it was all speculation. The girls would just -- they would tell me that that's who I was in there with and that she was accused of murder.

Q. And was the talk among the girls -- did they get into at least some level of detail? In other words, they knew what particular murders she was charged with?

A. Yes.

Q. What kind of details were floating around the jail?

A. Just that there was two kids involved and that there was three people that she was accused of being -- of killing five people and that's what she was in -- her and her boyfriend.

Q. And did the girls in the jail -- and I'm using girls because you did. I don't mean to be disrespectful. Did the girls in the jail have access to newspapers where her case was discussed?

A. Oh, I don't know if it was letters at home. You know, those questions I never asked.

Q. Okay. But you yourself heard about her case and some of the details of the case not from talking to her but just --

A. When I went to prison, when I left Linn County and went to prison, because I was locked up with her, I wanted to know more about it. So any time there was like -- because Mason City was where she was from and where it happened. There was always big articles, you know, and I still have the articles. I saved

**481**

them. But that's where I learned a lot about the case was through the newspaper.

Q. When you were in Linn County, did the women in that unit have access to newspapers just in general?

A. I don't -- you had visits from family. You had family that -- families that could send in newspaper clippings, you know. You could get it in the mail.

Q. And what was the physical set-up of this N unit? How big was it, and where were the women kept in that area?

A. There was five cells, and it was kind of in an L shape, but -- God, it's been a long time ago. But when you would go in, they would open up the doors and let you out, you know, to eat breakfast, and your doors would be unlocked for an hour. But -- and then you had to be locked in. And then they'd let you out. You had to come out early in the morning, and the only thing that you could bring out of your cell was your towel or toilet paper for a pillow. They had a cold cement floor, and your doors were locked, and you were in the day room. You could bring your stationery or whatnots to write but . . .

Q. So how much opportunity was there for two women, say, to kind of sneak off into somebody's cell during the day and have a little private talk?

A. There wasn't very -- there wasn't opportunity to do that.

Q. Was that because after you got out in the morning they would lock the individual cells?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

A. Yes, because it was a discipline cell. And if you -- if they was able to leave the doors open which it would have been really nice if they would have because then you could have laid on a cot. You're locked out of those cells because that was part of the discipline. You wasn't able to lay on your cot. You had to lay on a cement floor. All we had in there was a hard picnic table, cement steel picnic table, and your cement floor.

Q. So is it true for most of the time during a day all of the women were out in a common area?

A. Yes.

Q. And was there any opportunity in that situation for people to talk privately where the other women could not hear them?

A. It would be really, really hard to have a conversation and not have it heard in that -- in that cellblock.

Q. Was the cellblock monitored, both video and audio monitored?

A. Yes.

Q. So could the guards overhear everything that was being said in there at least as far as you could tell?

A. I have no proof of that, but yeah, I believe so. I mean, Vicki -- you could have heard a pin drop and Vicki -- it seemed like Vicki, you know, heard things. Vicki was the guard, and she was just -- she always tormented Angie.

Q. You're talking about Vicki Kosima, K-o-s-i-m-a?

A. Yes.

Q. She was the main guard who was in this unit; right?

A. Uh-huh, yes.

Q. Now, you told Mr. Berrigan in January 2005 that you didn't think it was possible for inmates to overhear -- for two people to have private conversations without everybody else overhearing it?

A. Yes.

Q. And did he ask you specifically whether Angie would be talking to someone like Mickie Yager?

A. Mickie and Angie got along very well.

Q. Uh-huh. Did you ever overhear a conversation between Mickie and Angie where they were talking about the case, where Angela was talking about her case?

A. Never.

Q. And you told Mr. Berrigan that in January of 2005.

A. Yes.

Q. Did you -- were you aware of the shower set-up in that unit?

A. Yes.

Q. How close was the shower unit to the area where the TV was?

A. About seven feet away from where the TV was.

Q. I believe at trial Mickie Yager testified that she was watching TV and Angie was taking a shower and making admissions to her about her case. Do you ever remember a time when Miss

Yager was watching TV and Angela was in the shower with the shower on and making statements about her case?

A. Never.

Q. Is that even possible in there?

A. No.

Q. Why not?

A. Why would you? Why would you do that? It's -- you're taking a shower. There's so much pressure in the water. There was a lot of pressure in that shower, and you'd have to scream. You'd have to yell to even talk while you're in the shower.

Q. Now, you were in there 2001, 2002; correct?

A. Correct.

Q. Did there come a time when government agents started pulling people out and interviewing them about Angela Johnson's case?

A. Yes.

Q. When was that?

A. I don't know the dates.

Q. Roughly. I mean, was it shortly after you got there or toward the end of your stay?

A. It was more towards the end of my stay in that cellblock.

Q. And did they pull you out?

A. Yes, they did.

Q. And who was it that pulled you out and talked to you about Angela Johnson's case?

A. It was an agent from Mason City, Graham, and Scott Green, an agent from Waterloo.

Q. And what did they ask you about?

A. They wanted -- well, the one agent wanted to know -- match my face with my name because he'd heard my name a lot. And he -- they wanted to know if -- if I was in Angie Johnson's cell, and I told them yes. And they wanted to know if Angie had talked about her case or if I knew anything about the case. And I told them that she was innocent, as far as I was concerned she was innocent, and that I had nothing to say, that I had nothing for them. She never talked about her case.

Q. Around that same time did something happen in Miss Yager's custody status around the time when the agents were pulling people out?

A. The day before -- it was either the day before or two days before that had had happened with me, Mickie had come back -- Vicki had brought Mickie in and said, "Mickie, pack your bags. You're -- we're moving you to another cellblock." And Mickie just acted like she was so surprised and so devastated going, "Why are you moving me? Why are you moving me?" And she told Angie, "I'll do whatever it takes to get back here. I'll do whatever it takes to get back here."

And then when they called me out and questioned, I come back in the cell, and I said, "I guess I know now why Mickie got moved." And I told Angie, "I think that she's lying

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 38 of 85

on you, and I think that she moved -- they moved her out of there."

Q. Why do you think they moved her out of there? For security reasons or for some other reason?

A. Because I think Mickie was lying. You either had to get out -- it was a terrible, terrible place to be. That was one of the worst cells in that place, and people didn't like to be there. I mean, I didn't like to be there either, but I wasn't going to lie on somebody to get out of there. And you'd have to either kite and say that one of the inmates was being really mean, and you had to be sneaky about it to get the kite through and give it to Vicki. Or if somebody was testifying against you, they'll do a separatees, and they'll move the people apart.

Q. And was she moved into a more favorable custodial situation?

A. Yes, she was.

Q. Where was she moved to?

A. I think to the next block over which would have been M block.

Q. M as in Mary.

A. Yes.

Q. And why was that better than where you were, where you and Miss Johnson were?

A. Because you had your -- it was a big open room with your bunks, and you could be on your bed all day long versus a

cement, cold floor because you gotta remember when you're on that cement floor, you got nothing but a roll of toilet paper from your cell for a pillow and a towel. Now, either you're going to lay on the towel to block your body from the cement floor, or you're going to put it over top of you. Either way you're going to be freezing. It was miserable place to be.

Q. Now, while you were in the Linn County Jail, did you become acquainted with, either from reputation or knowing, a person by the name of Peggy Sue Hoover?

A. I met Peggy in a Bible study for the first time was when I seen her, didn't really have much of a conversation with her. I had already known Peggy's name before.

Q. How did you know her name?

A. Because there was a guy that was in prison with my brother, and his name was Gary Winters, and he'd wrote me letters because he was good friends with Peggy on the streets. They ran around. They did drugs together.

Q. What was her reputation for truthfulness within the jail community?

A. She was a liar. She was the kind of person that would be nice to your face and stab you in the back as soon as you turned around. She's the kind of person that if you were, you know, on the streets and doing drugs with somebody you didn't let her use your bathroom because you'd be missing your toothpaste and anything else that she could get her hands on. Peggy was not a

very reliable person, not a very good person.

Q. And was that well known within the Linn County Jail?

A. I was warned about her through letters before I even met her to don't say nothing to her because she was a snitch.

Q. Now, do you know if Angie Johnson was warned about her or knew anything about her?

A. I have no idea.

Q. Was she the type of person that you would share confidences with?

A. No, never. I do know that when Peggy -- when we got to Pekin and Peggy was there there was a lot of talk about Peggy not even ever having a conversation with Angie, never being in the same cell with Angie, and there was a lot of talk about Peggy getting time off of her sentence for saying that -- you know, that she had heard conversations about Angie, and it was all he said/she said stuff, and there was never no conversation between Angie and Peggy because there was a lot of talk in the prisons about how could a person get time off on a testimony that -- from somebody that they never even had a conversation with.

Q. Now, did you also know while you were in the jail there a person by the name of Sara Bramow?

A. I met Sara when I was in Greenville at the end, and Sara had came in.

Q. Do you know if Angela Johnson was friends with Sara Bramow

while they were in the Linn County Jail?

A. No, I don't believe that they were ever friends.

Q. Was Sara Bramow the type of person that Angela Johnson would have been talking to about the facts of her case?

A. I don't believe that Angie would talk to anybody about her case. There was a big -- you know, a big thing, when you get locked up, that's the golden rule, first golden rule: Do not talk about your case, only to your lawyer.

Q. And you had a lot of conversations with Angela Johnson that did not relate to her case; correct?

A. Every conversation was something not related to her case. Angie helped me through my time when I was there.

Q. And one of the things that Angela Johnson helped you with was convincing you to plead guilty in your own case.

A. Yeah.

Q. Correct?

A. Yeah.

Q. Tell me about that. What conversation did you have with Angie, and how did she help convince you that in your case you ought to plead guilty?

A. Because there was a time where my lawyer was not communicating with me very well and it was just getting really stressful and they were wanting me to wear a wire and they were wanting me to do this and they were wanting me to question, and I just -- I was willing to talk about my case and who was

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 39 of 85

## 490

involved in my case and that was it and do a plea agreement. But they wanted to have me admit to things and people doing things that I was not going to -- that I had no knowledge of what they were doing and had nothing to do with me.

And so at that point I wanted to just not do the plea agreement and just take it to trial. And I told my lawyer just put the rope around my neck and hang me and be done with it, I'm done.

And Angie told me, you know, you don't want to take it to trial. We had the conversation. I don't know if it was her that told me or if it was me that had told her, but the conversation had happened about never taking your case to trial because it's a 97 percent conviction rate and if you don't -- if people -- if they don't -- if they don't have people on your case to testify against you, they will find people that don't even know you and put you on the stand and testify against you. They don't lose.

Q. And did that conversation with Angie help convince you that, you know, given 98 percent conviction rate, given the fact that they can basically create witnesses against you that all things considered it's probably a better idea to take the plea?

A. That conversation and along with my brother was in the federal system and he had told me, you know, that that was correct.

Q. Now, did -- was there any kind of discussion about Angie's

## 491

case along the same lines? Did she ever say, "I need some help with trying to figure out" --

A. No.

Q. -- "what I" -- but you do recall this discussion about 98 percent conviction rate.

A. Yes.

Q. And the way the system -- and was there any emphasis on the federal system, or was this 98 --

A. It's the feds. It was the feds. You don't take --

Q. Right, but what I'm asking is was the information that Miss Johnson was giving you tied to the way things work in the federal system, or was it just a general discussion about in any system?

A. It's in the federal system.

Q. Okay. And do you recall when that conversation took place where she --

A. I --

Q. Must have been before your plea obviously; right?

A. Yes.

Q. When did you end up pleaing? Do you remember?

A. I don't know. There was -- I had a long, long stay there because I think that was at the time when they didn't have a judge and Linda Reade was coming in, so we had a presentence investigator come on my case. And, you know, the dates and everything, those were -- I was -- you know, from the time when

## 492

I got arrested and went in, I was pretty messed up on methamphetamines, and all that stuff was just getting out of my system. So it's really hard for me to remember dates and times and months, and I just know that I was there for nine months and it was a long haul.

Q. Now, while you were in the jail, did you have occasion to hear about and to actually interact with a guy by the name of Bobby McNeese?

A. Yes. When we moved me down -- I can't really remember the names of the blocks. It was N block, M block, and then there was another cellblock down further, and I was in that one for a while.

And Bobby McNeese, you know, he would write letters and tell girls in that cell -- you get your numbers, you know. You could -- there was a little window where you could look out, and you could put a piece of paper up there with your name and stuff, and then you could write back and forth. You could correspond back and forth.

And he would tell the girls that he had a lot of money and he would put money on their books, and he'd coerce girls into trusting him like that. And then he would stand there, you know, and do some yucky things with his yucky thing in front of the window for everybody to see, you know.

Q. You talking about a sexual type of thing?

A. Yeah, he would masturbate in the window for the girls to

## 493

see. He was a pretty nasty person.

Q. What was his reputation for truthfulness in your community?

A. He was a jailhouse snitch, and that's what they said. They'd told -- you know, everybody knew there was Bobby McNeese, a jailhouse snitch, and that he was planted in different places.

Q. Now, did you also, when you were in Linn County Jail, come into contact with a guy by the name of Dustin Honken?

A. When I was taken over one time to the federal cage -- sometimes they would haul you back and forth, and it was a federal cage, and there was one cell for the girls and then one cell for the guys. And there was a brick wall in between, and there was bars that went across.

And I was in the federal holding waiting. And he come walking in. They had him shackled, and he had books on top of his hands, and he -- it was just an eerie, eerie feeling because he walked, and he stopped in front of my cell, and he never even looked at me, and he just stood str -- he stared straight ahead. And he stopped in front of my cell, and he asked me, "Do you know Angela Johnson?"

Q. And did he make any follow-up comments?

A. I said yes, and he said, "Tell her to shut her mouth." I said, "Okay."

Q. Was Angie Johnson there threatening him and telling him he better threaten you? Was she influencing him to do that at that point?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 348    Filed 11/10/11    Page 40 of 85

A. I don't --

MR. WILLIAMS: Calls for speculation, Your Honor.

A. I don't see how.

THE COURT: Overruled.

A. I mean --

THE COURT: You can answer.

A. Yeah. What do you mean?

Q. Well, was she there at the scene helping him --

A. No, I was in the federal cage. I was there all by myself.

Q. And he was all by himself.

A. The marshals were bringing him in.

Q. So did there appear to be anyone influencing him to make this threatening statement to you?

A. No.

Q. He's doing it all on his own.

A. He was doing it all on his own. He was giving me the creeps.

Q. Now, when you testified at the penalty phase in Miss Johnson's trial, you talked very briefly about the power of methamphetamine. Do you remember that testimony?

A. Yes.

Q. And you talked about how powerful of a drug it was from your own experience of using methamphetamine; right?

A. Yes.

Q. One thing you didn't talk about was the relationship

between methamphetamine use and boyfriends.

A. Uh-huh.

Q. You had some experience about that, don't you, your own experience?

A. I do. I do. Methamphetamine is a very, very powerful drug, and when you are on it and you're doing it, you know, you just -- you don't never want to run out of it, and if you have a boyfriend that has -- they always called it the power of the pouch --

Q. Power of the --

A. Power of the pouch.

Q. Pouch meaning?

A. Power of the pouch because you get so high you don't care and you just want to stay high and you're going to do anything a guy wants you to do. You're going to love him because he's taking care of you and giving you the drugs.

Q. And when you say anything, would that include criminal activity?

A. Yes. I mean, on a normal basis when you're not under the influence of methamphetamines, there's a lot of stuff that I wouldn't do now that I got all that stuff out of my system.

Q. So this relationship between drugs and boyfriends who have drugs, this power of the pouch idea, that's not something you were asked to talk about, was it?

A. No.

Q. You could have, though, because you've got some of your own experience.

A. I've got very -- I've got a lot of experience with it.

MR. BURT: Thank you. That's all I have.

THE COURT: Mr. Williams, you may cross-examine.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Miss Hanawalt, what is your criminal history?

A. Mostly drugs, driving without a license but . . .

Q. You have the one federal felony conviction; right?

A. Yes.

Q. What else do you have for convictions?

A. They were all drug convictions.

Q. Other felony convictions?

A. I only went to prison once, and that was for methamphetamines.

Q. You spent some time in the Linn County Jail that you discussed with the other attorney here apparently from July of 2001 to April of 2002.

A. Yes.

Q. Does that sound about right?

A. Yeah, that sounds about right.

Q. And for part of that time you were in N block.

A. Uh-huh, yes.

Q. And that was the only time you were celled in the same

location with Angela Johnson?

A. Yes.

Q. Okay. When you came to N block, was Mickie Yager already in N block at that time?

A. Yes, she was there when I got there.

Q. Okay. And when you left N block, was Mickie Yager and Angela Johnson still in the cell together?

A. No.

Q. In N block together?

A. No, they moved Mickie out of there before they moved me out.

Q. Okay. And how about Angela Johnson? Had she already been moved out by the time they moved Mickie Yager out?

A. No, she was still there.

Q. Okay. Now, because Mickie Yager was in the cellblock with Angela Johnson before you arrived, you can't say what may or may not have occurred between them before your arrival; fair?

A. That is correct. I can't say.

Q. Okay. And in your view Angela Johnson wouldn't ever tell anything to anybody; right?

A. My personal belief, no.

Q. Right. Because there's this golden rule you just don't talk about your own case.

A. A smart person would never talk about their case.

Q. Right.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 41 of 85

A. Only with their lawyer. That's why they have little conference rooms that you can go alone with your lawyer.

Q. Okay. But you're aware, aren't you, Miss Hanawalt, that, in fact, people don't necessarily follow that and it's not uncommon for people to talk to other inmates about their crimes?

A. Some do. Some do.

Q. All right. So it's wise not to, but people do it anyway; right?

A. Yes.

Q. Okay. Dustin Honken saw you at one point in the jail or in the holding cell, and he told you -- it was described as a threat, but he told you to pass along to Angela Johnson keep her mouth shut; right?

A. Yes.

Q. That would suggest that she had been talking; right?

A. Yes.

Q. And he didn't say, "Tell her to keep her mouth shut or I'm going to kill her"; right?

A. No, he just --

Q. He didn't say anything he was going to do if she didn't keep her mouth shut; right?

A. Him telling me to tell her to keep her mouth shut was pretty much maybe his own fears because maybe he was scared that she would tell what he did.

Q. Okay. Now, you have the theory that the jailers could

listen in to what was happening in the cellblock; right?

A. Yes.

Q. You don't know that to be the case, though.

A. I don't know that. I have no proof of it, but yeah.

Q. Okay. And you were asked a question about Sara Bramow and whether you think they would have talked while in the Linn County Jail. Do you remember that question?

A. Yes.

Q. Okay. Do you realize that Sara Bramow was actually housed in the Benton County Jail with Angela Johnson before --

A. No, I have no idea.

Q. And you would have no idea then whether they talked or didn't talk in the Benton County Jail.

A. I know that anybody that was friends with Angie would come and say, hey, you know, I was locked up with Angie too, and, you know, and it was -- you'd build a relationship. And Sara Bramow never tried to talk to me once when she came to Greenville. In fact, she stayed away from me because she knew that I was friends with Angie.

Q. Okay. And were you aware at that time that she had already testified against Angie?

A. I had heard. I heard.

Q. Okay. So it kind of makes sense she wouldn't come over talking about being friends with Angela Johnson at that point; right?

A. But why wouldn't she be friends with Angie because Angie was always nice to everybody? Why would someone that was locked up, if she was locked up with Angie, want not -- why not talk to me?

Q. You indicate that you think Mickie Yager was moved to another location because she must have given information on Angela Johnson.

A. I'm pretty sure that Mickie got moved out of that cell because she lied and said Angie talked about her case, and I'm pretty sure that Mickie Yager got a lot of time off her sentence out of pure lies.

Q. Okay.

A. I believe that.

Q. And that's your opinion.

A. I have no proof of that, but that's what I believe in my heart.

Q. All right. And I just want to go back to the movement of her out of the cellblock; right? You're making an assumption that she was moved because she gave information on Angela Johnson.

A. Yes.

Q. You don't know that to be the case.

A. I don't know that to be a case, but things happened in there, and you just pretty much figured out, and you put the puzzles together.

Q. Okay.

A. And pretty soon all the pieces fit.

Q. All right. And you indicated that if people are cooperating against each other in jail there'd be a separatee -- a requirement then where the jailers would separate the people?

A. Yes.

Q. Okay. And that's something the jail decides at that point to separate them?

A. Yes. They had put a separatees between me and Angie one time and wouldn't let us go to Bible study together. They would usually pull people out of the cells, all the cells, and we could see each other in the different cellblocks in Bible study.

And there was a time where Vicki had searched our cell, put Angie in the hole, and put a separatees on us until -- I don't remember if it was -- how it ended up. One of the guards, Jan, had finally looked in the paper because I asked her why can't we go -- why can't Angie come in the Bible study because we had to alternate every other week because of the separatees. And she said she didn't know anything about a separatees, and then she found that there was none, in fact, that Vicki was just lying about it.

So there was several, several times where we couldn't even -- we had to alternate going to Bible study.

Q. You remained good friends with Angela Johnson to this day; right?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

A.   Yes.

Q.   Okay.  You indicated that you care a lot for Angie.  And, in fact, you continue to get letters from her; right?

A.   Yes.

MR. WILLIAMS:  Nothing else, Your Honor.

THE COURT:  Any redirect?

MR. BURT:  Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. BURT:

Q.   Do you know what other women were in N block when you were there?

A.   With Angie?

Q.   Yeah.

A.   One time they threw a heroin addict girl in there.  She was only in there a couple days, and I don't really know what her name was.  But no.  The ones that I only remember are Brandy Byrd and Mickie Yager.

Q.   And were you there when Brandy Byrd and Mickie Yager were there at the same time?

A.   Yes.

Q.   Did you ever hear Brandy Byrd talk to Mickie Yager or Angela Johnson talk to Mickie Yager about some puppet show involving killing a informant doll?

A.   No.

Q.   You ever hear that story at all?

A.   Just from lawyers.

Q.   Lawyers asking you about that; right?

A.   Yeah.

Q.   Did Pat Berrigan when he interviewed you in January '05 ask you if you --

A.   He'd asked me if I'd ever heard anything like that, and I told him no.

Q.   You'd never heard Angela Johnson say anything about a puppet show?

A.   Right.

Q.   And you'd never heard Brandy Byrd say anything about a puppet show.

A.   Yeah.

Q.   Okay.  You said you assume that they moved Mickie Yager because of her cooperation?

A.   Yes.

Q.   Was there something about the timing that made you assume that?

A.   Yes, because it was right at the same time when they pulled me and questioned me.  It was two days -- either one or two days before they pulled me and questioned me, and Mickie had told Angie, "I'll write, and I'll try to get back in here.  I'm going to do what it takes to get back in here."  And then Angie would try to write Mickie, and Mickie would not respond back.  Pretty much knew that Mickie was doing something that . . .

Q.   You said that you saw Sara Bramow in --

A.   Bramow.

Q.   -- Bramow in Greenville did you say?

A.   In Greenville.

Q.   What is Greenville?

A.   Greenville is a drug program facility.  It's -- because I had started my time out in Pekin, and when I got -- my time was getting short, then they moved me to Greenville for the drug program so --

Q.   And that's --

A.   Yeah.  If you're finishing your time, it's pretty much they move you to Greenville to do the drug program or for the very short-timers.

Q.   So it's a short-timer kind of place like you're going to be released?

A.   Yes.

Q.   And do you remember when Sara Bramow showed up at a short-time facility?

A.   It was close to the time that I was leaving.

Q.   And when was that in relation to when you testified in Miss Johnson's case?

A.   I ended up -- when I was in the penalty phase and when I went back, I ended up going and doing three more months because I'd -- it interrupted my drug program.

Q.   Uh-huh.

A.   So it was around three months before I'd gotten out.

Q.   Three months -- but I'm trying to pinpoint when in relation to the trial it was that you saw Miss Bramow in this institution, this minimum security institution.

A.   During Angie's trial you mean?

Q.   Was it after Angie's trial?

A.   Yes, it was after -- it was after -- because Sara -- I was in the penalty phase, and that was the very end.  And then I went back, so her whole thing was over.

Q.   Right.  But is that when you saw Sara?

A.   Yes, yes.

MR. BURT:  Okay.  Thank you.  That's all I have.

THE COURT:  Mr. Williams, anything further?

MR. WILLIAMS:  No, Your Honor.  Thank you.

THE COURT:  Okay.  You may step down.

Ready for your next witness?  Who might that be?

MS. MORRISSEY:  Yes, Your Honor.  We're going to call Melissa Launspauch.

THE COURT:  Good morning.  Would you raise your right hand, please.

MELISSA LAUNSPAUCH, PETITIONER'S WITNESS, SWORN

THE COURT:  Okay.  Please be seated.  You can adjust the chair and the microphones so you can speak directly into them.  And when you're ready, would you tell us your full name, please, and spell your last name for us.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 43 of 85

THE WITNESS: Sure. My name is Melissa Launspauch. The last name is L-a-u-n-s-p-a-c-h.

THE COURT: Thank you.

DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Good morning, ma'am.

A. Good morning.

Q. Could you tell us what you do now?

A. Sure. I work at ITA Group as a corporate event planner.

Q. I'm sorry?

A. A corporate event planner.

Q. A corporate event planner, okay. And how long have you been working there?

A. About five and a half years.

Q. And in 2005 how were you employed?

A. I worked for Rosenberg, Stowers, and Morse for Dean Stowers.

Q. All right. And you were specifically assigned to Mr. Stowers?

A. Not specifically. I did work for two other attorneys in the office also.

Q. Okay. How long did you work for the law firm Rosenberg, Stowers, and Morse?

A. Right. For a year and a half.

Q. And during the time that you worked there, could you

describe for us what your duties were?

A. Sure. I did a lot of legal assistant work for all three attorneys, transcription, typing, witness work, helping with pretrial, evidence, files.

Q. Did you work on Angela Johnson's case?

A. Yes, I did.

Q. And could you tell us, give us a sense of what part of the case you worked on? Was it pretrial, during trial, post-trial?

A. Sure. I worked on both pretrial so when I started in the firm, the case was already at our firm, but I had started to become the witness coordinator shortly before in working with all three attorneys getting the witnesses that we were going to bring in and then working with subpoenas and, you know, contacting them and making sure that they knew the times they were coming.

I also worked in Summation preparing our file so that Dean would have his own copies of discovery and really just pretrial at the beginning working on the files, and then when I came -- I ended up coming for the defense. I think I was here for most of those days and then definitely during the penalty phase and assisting the attorneys with whatever they needed in the evenings and then here in the courtroom with the witnesses.

Q. Okay. So you mentioned that you were -- you worked in Summation and did transcription.

A. Uh-huh.

Q. Did you do that in this case?

A. I did some, yes. I specifically don't remember, you know, whose things I might have done, but I do remember doing some interviews maybe of things that Dean needed to see in writing. I might have typed some old tapes of some sort. I do believe I worked on the jurors' post interviews, some transcription of that. I did type a lot. I just don't, you know, remember specifically all the things I worked on.

Q. Did you come in contact with Angela Johnson herself before the trial started?

A. Yes, definitely on the phone, and I helped get Angela's clothes ready for trial, and so I worked with her family and her trying to get her ready.

Q. And you said that you came up for parts of the trial?

A. I did.

Q. And that was during the penalty phase. Could you describe what your job was?

A. Absolutely. So I watched over the witnesses and made sure that they were here working very closely with Mary Goody and the team, and I also sat in the back and watched the jurors and just kind of kept track of what was going on so that we could discuss that at the end of the day.

Q. By the way, Angela Johnson is the Angela Johnson who's sitting in court today; correct?

A. Yes, it is.

Q. All right. So were you sitting at counsel table during penalty phase, or were you someplace else?

A. No, I was in the back of the courtroom.

Q. So you weren't able to see Miss Johnson's face for the most part.

A. Not during examination, no.

Q. What about when there was not an examination going on?

A. Definitely saw her, you know, leaving to and from the courtroom, and I believe I might have seen her from a distance in the room that she sat in during breaks or lunches.

Q. When you saw Miss Johnson at counsel table during penalty phase, could you see what she was doing?

A. Yes, I could from -- just from behind. I could never see her on front, but I did ask the attorneys what she was doing to -- from my -- what I thought I saw her doing to confirm it.

Q. And what did you think that you saw her doing?

A. I know she's a good artist, and I know she was doodling a lot and, you know, kind of her head down with her paper.

Q. Did you see something that made you think she was drawing?

A. Yeah. My memory as I've thought about this and I've -- often think I remember her having colored pencils or definitely having pencils of some sort on her paper and drawing pictures and maybe writing notes but mostly looked like doodling.

Q. You said her head was down towards her table?

A. I definitely think that there were times that she might

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 44 of 85

have raised up if certain witnesses came in or her family members, but yeah, I would say it looked more as though she were looking down at the table.

Q. And to you as a bystander, somebody looking at the case, did that -- did what you saw make you think that she was interested in what was going on in court or not interested?

A. Hard for me to put my place in her mind, but I would say disinterested.

Q. Did she appear to you when you saw her, you know, coming to and from court to be emotional?

A. Well, her children were here. Her family was here, so absolutely she was emotional. She had not seen them in quite some time and, you know, during the time that I was here, some rough testimony. And I know that there was a picture of her taken after the courtroom -- after she was leaving the courthouse and she had sort of a smile on her face, and I'm sure it was due to the sun, you know, having been out of jail. So she definitely had a lot of emotion.

Q. And you knew -- you saw this emotion in connection with her family; would that be correct?

A. Right. I would -- yes. Let me say that I don't think that it was constant emotion, but I think, you know, she would smile when she saw certain, you know, fellow inmates that she had been friends with or her family but not a consistent emotion throughout the time, just maybe when she first saw them.

Q. Did the jurors indicate appear to be -- or did you see them watching or looking in Miss Johnson's direction?

A. Yes, definitely would take glances at them.

Q. And did you make any observations about their facial expressions?

A. My most vivid memories are during the penalty phase, and I felt as though that they were annoyed would maybe be a word, irritated by some of the things that were being presented and maybe not the emotion that we were hoping for, maybe more of a -- hard for me to say this because it's an opinion but maybe I've already made my decision sort of a feeling like this is just annoying taking my time.

Q. You said that they were irritated at what -- the things they were hearing. Did you observe the things that led you to believe that in the prosecution's case or the defense's case?

A. I was not here during prosecution, so during the defense.

Q. And you heard and saw the evidence in mitigation that was presented to the defense.

A. Yes, I did.

Q. Did you make a comparison in the impact of that evidence that was presented, the impact of that evidence as compared to Miss Johnson's behavior in court? Does that make sense?

A. I'm not sure I totally understand the question.

Q. Okay. Let me ask you another question, and this is -- somebody just gave me this.

MS. MORRISSEY: I have, Your Honor, a -- I'm sorry. I have something from the Globe Gazette. It's globegazette.com. It has three pictures of Miss Johnson in handcuffs appearing to have a smile on her face, and these appear to be taken during the penalty phase of her phase -- of her case.

MR. WILLIAMS: Objection. Pure speculation on the timing of those photos, Your Honor.

THE COURT: Does it have a date on it?

MS. MORRISSEY: It has a date on it, Your Honor. The date is May 25, 2005. I think just because Miss Launspach testified that she saw photos in which Miss Johnson appears to be smiling, and I think these photos fit that description. I just want to show them to her and see if that's what she's talking about.

THE COURT: Go ahead.

MS. MORRISSEY: Thank you.

BY MS. MORRISSEY:

Q. I'm showing you a copy of this. Are those the photographs that you were talking about earlier?

A. Yes. These are the ones.

Q. Thank you. At the penalty phase did the defense introduce any photographs themselves?

A. Introduce -- I'm sorry. What was that?

Q. Any photographs themselves in the penalty phase.

A. Yes, they did.

Q. What photographs did they introduce?

A. I don't know that I recall all of them, but I know that we definitely showed some pictures of her -- I would say they were probably in the '90s when she was very thin. They were some modeling pictures that she'd had taken.

Q. And did you see the jury react to those photos?

A. Some did, and I would say they weren't impressed.

Q. Okay. What about -- let me ask you about a witness. Do you recall Verlene Vanderpool testifying?

A. I do.

Q. Did something unusual happen with her before she testified?

A. She was extremely nervous, and I remember being with her in the room prior to her going out, and she was becoming a little blotchy in the neck. She was very nervous, and I brought it to Pat Berrigan's attention if I remember correctly and just made sure he was aware of it so that they would understand why she was experiencing that.

Q. You said that she was getting blotchy. Was this --

A. Yeah, right here on the front of her neck. She just was extremely nervous and explained to me that that happens to her when she gets nervous.

Q. And when she testified in front of the jury, did you see her condition? Was it the same or worse or better?

A. If I remember correctly, I think Pat might have asked her that question, just, you know, bringing it to the jury's

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 45 of 85

attention right away just so it was brought out in the open.

Q. Did she come -- did she appear to be nervous when she testified?

A. Oh, yes. I mean, she was definitely nervous.

Q. When -- the time that you were up in Sioux City for the penalty phase, did you get a chance to observe the attorneys interacting with one another?

A. Yes, I did.

Q. And how would you describe their interactions?

A. Pat Berrigan and Dean Stowers definitely were on the team approach for sure. Al was definitely excluded from that group for whatever reason. Whether it was his decision or not, he just didn't seem to be on same page as them, and their interaction seemed to be not what I would have expected out of a team.

Q. Did Mr. Willett have any involvement in penalty phase that you recall?

A. To my recollection, no.

Q. Did there appear to be a relationship between Mr. Willett and Angela Johnson?

A. That's a tough question for me to answer because during the penalty phase he didn't necessarily sit by her. I believe Pat and Dean sat by her more, so I don't know that I saw a lot of interaction with her. My reaction would be that she probably did have a relationship with him after all these years, but I

believe she was closer to Nancy, his legal assistant.

Q. What about Nancy Lanoue? Did you come to know her?

A. I did.

Q. And what was her role?

A. She worked for Al Willett and was his legal assistant. She I think accepted the first phone call when this --

THE COURT: Now why isn't this repetitive? Did the government contest Nancy Lanoue's role in working with Al Willett? Is that a contested issue?

MS. MORRISSEY: It probably isn't, Your Honor.

THE COURT: So why are we rehashing --

MS. MORRISSEY: I agree that we've probably heard enough evidence on the issue.

THE COURT: I mean, if there's some reason to rehash it, fine. But there needs to be a reason. Otherwise it's just totally repetitive on an irrelevant matter.

MS. MORRISSEY: I understand, Your Honor.

THE COURT: Okay.

MS. MORRISSEY: I agree with the Court.

BY MS. MORRISSEY:

Q. You didn't have a relationship with Miss Johnson going into the trial.

A. I did. I had spoken with her on the phone. And, you know, yeah, I think I felt closer to her maybe than speaking with her a lot because I had worked with her family.

Q. And in working with her family, did you come in contact with her two children, Alyssa and Marvea?

A. I did.

Q. And were you able to observe them and -- interact with their mother?

A. I do believe Judge Bennett granted some time for Angela to visit her children during the trial. I don't know if that was during the penalty or defense phase. But I did -- I don't think I was standing right there, but I know that it was an exciting time for both of them.

Q. Were her children very important to her?

A. Oh, extremely important to her. That's all she ever talked about.

MS. MORRISSEY: Thank you. I have nothing further.

THE COURT: Mr. Williams?

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Talk first briefly about that photograph that you spoke of that the defense showed the jury during the penalty phase of -- I'm sorry, not that one, ma'am, but the one that --

A. Oh, I'm sorry.

Q. -- Pat Berrigan used during the penalty phase showing her in the '90s and so forth. Did you ever participate in any conversation with the attorneys about the decision to use that photograph during the penalty phase?

A. I was in the office of the hotel that night when we -- I went and made copies of those photos, and I know we had had some discussions of whether or not to use them or which ones to use. So yes, I was involved in conversation.

Q. Okay. So share with us then what was the thought process going on about the pros and cons about using that photo.

A. I think it was -- this is -- it's been a while, but I would say that my memory is that it was to show, you know, we see Angela today, but this is what she was like then to show her body. Maybe what we were seeing at the time this was happening because we're seeing her today, this is what she was probably looking more like at that time. Some of them were, you know, a little bit more -- I mean, they were modeling pictures, short skirts. I think it was just to go to show what we were dealing with in the mitigation process of this is the kind of person we're dealing with here at the time that these incidences were happening.

Q. Were the possible negative ramifications discussed about, you know, the jury may not like these photos?

A. I do believe that, and there was some talk, and I don't know if it was Mary Goody or someone else, but there was -- I know I had some mixed emotions about it, not sure what impact they were -- I didn't know that it would make a difference, and I think there was some talk about that. It was a long discussion about whether or not to use them.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 348    Filed 11/10/11    Page 46 of 85

**518**

Q. Kind of a team discussion there?

A. I don't believe that Al Willett was in the office at that point. I think it might have been more of Pat Berrigan, Dean, Mary, and me.

Q. Okay. And so in any event, you tossed around the pros and cons, and ultimately the decision was made to use them.

A. Yes.

Q. Okay.

A. And I don't know that they used all of them, but they definitely did use some.

Q. Do you remember had anybody talked to Angela Johnson? Had she weighed in on the use of that photograph, of those photographs?

A. My reaction would be no. I want to think that Mary or someone when they came across these photos when they were given to her that they probably showed them to her at some point, but I don't know that at that moment or during that time that they talked to her about using them. I wasn't aware of that conversation.

Q. You just don't know one way or the other on that.

A. I really don't know one way or the other.

Q. You indicated that you were watching the jurors during the defense mitigation presentation and in your opinion it didn't look like it was having a lot of impact on the jury.

A. I would say the majority of that I didn't feel that they

**519**

were very engaged with that examination.

Q. What were your thoughts about the mitigation case that had been put together?

A. I definitely have opinions versus mitigation versus the defense case itself. But during mitigation, I feel they touched a lot of people, but I'm not sure at that point that bringing all that up was necessarily going to make a big difference. I felt like that the case had already -- they'd already made their decision at that point, and I just felt like it was almost salt to the wound at that point.

Q. Okay. I mean, so your judgment as you're watching it come in is that it's not making a lot of impact on the jury, but you were aware of what that mitigation evidence was going to be before it was presented.

A. Yes, I did.

Q. Okay. And your judgment was that there was some pretty good mitigation evidence that was going to be presented.

MS. MORRISSEY: Objection, Your Honor. Misstates the testimony.

THE COURT: Overruled.

A. Can you repeat that?

Q. Yeah. You knew what the evidence was, and before it came in in your opinion it was -- it looked like it was going to be pretty good mitigation evidence.

A. There was a lot of evidence. I wasn't sure exactly what

**520**

would be put out on there, and I definitely think that it was -- I mean, there was definitely some good evidence of Angela's childhood and, you know, the time line leading up to it, so it was good evidence.

Q. Just didn't have the impact that was hoped for.

A. I just don't think it made an impact at that point.

MR. WILLIAMS: Nothing else, Your Honor. Thank you.

REDIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Just a couple questions to follow up. You weren't there at the guilt phase; right?

A. I do not believe I was at the guilt phase.

Q. But do you know what the evidence at the guilt phase was?

A. Do I know what she received?

Q. Yeah, do you know what the case against Miss Johnson was?

A. Yes.

Q. Okay. And is what you're saying that the evidence that was presented that you heard and saw at the penalty phase not enough to make a difference given the outcome of the guilt phase?

A. It's such a tough thing for me to answer because I think that for whatever reason I believe that the decision had been made in the jurors' mind before we got to that point, so it's -- whether or not there was enough evidence, it didn't make a difference to them. They heard what they heard prior to that, and it didn't make a difference in my opinion.

**521**

Q. Okay. And was this the first capital case that you had ever been part of?

A. Absolutely, yes.

Q. Okay. And you haven't been part of one since; correct?

A. No, I have not.

MS. MORRISSEY: All right. Thank you. I have nothing further.

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: I just want to question you about one area, and that was the photographs that were introduced, not the ones in front of you from the Globe Gazette.

THE WITNESS: Yeah.

THE COURT: And it's been five, six years since I've looked at them, and I only looked at them I think during the trial. I don't remember. Maybe on post-trial motions, but I don't really recall. And I do recall one with a strand of white pearls and very kind of professional looking, and then I recall some that I thought were just personally fairly risqué, and I never understood the defense strategy in putting those in. And I actually spent a fair amount of time thinking about it because it struck me as very odd. I could understand the one that I thought made her look very -- I mean, it was a very nice photograph, very attractive, very well dressed. I believe it was a strand of pearls. And I think most people if you'd look

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 47 of 85

just at that photo you'd have a very positive impact.

But the others, it was like -- my reaction was are they trying to make her out to be a professional hooker? I mean, that's what I thought when I looked at the photos, and I never could come up with what their strategy was, and, you know, I'm up here thinking, well, why are they doing this? I mean, I do that all day long in every case. What was their strategy in putting in those I thought very kind of widely different photographs?

THE WITNESS: Pat Berrigan will be a definite person to talk to about that because he was mostly involved in that decision, but my memory is that they were trying to show, you know, here's this woman who has a drug problem, you know, living this kind of life, had -- I think they were trying to show that this is a very different person that we're dealing with today than what you see today, back in that day is a very different individual. And, you know, I can't remember the testimony.

THE COURT: Different how?

THE WITNESS: Someone who was using meth, someone that was -- you know, I'm not an attorney, so I'm not exactly sure where Pat was coming with this. I merely sat in the room and made some comments about the pictures. To get into Pat's mind as to, you know, how a juror might see that is -- I don't have enough experience to know how that would be portrayed.

THE COURT: Nobody does; right?

THE WITNESS: Right.

THE COURT: Right.

THE WITNESS: You never know if it's going to be given a positive effect or a negative effect. And I actually do remember you, Judge Bennett, having -- I remember your faces during that point too when you saw the pictures having that look of, you know, what is this?

THE COURT: Yeah, I'm not going to play professional poker for a living; right?

THE WITNESS: Not -- you weren't that day definitely.

THE COURT: But the point I want to make sure I understand is you raised some concerns and Pat Berrigan was aware of it and there was a discussion about the photographs.

THE WITNESS: Oh, absolutely, yes. And I do believe Mary Goody was involved in those discussions also and Dean Stowers. And I think if you asked both Dean and Pat they will give you a better answer as to why they thought they needed to use those pictures or why one of them disagreed of using them. I think it was Pat's ultimate decision.

THE COURT: Okay. Those are all the questions I have. Any follow-up questions?

MS. MORRISSEY: One question, Your Honor.

FURTHER REDIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Do you know -- have any personal knowledge as to whether or

not Angela Johnson was consulted for her opinion on the use of those pictures?

A. **I actually don't know.**

MS. MORRISSEY: Thank you.

THE COURT: Mr. Williams?

MR. WILLIAMS: Nothing further, Your Honor. Thank you.

THE COURT: Okay. You may step down. Thank you.

We'll see the lawyers back at 1:10, okay, and everybody else too, thank you, that wants to come.

(Lunch recess at 12:05 p.m.)

THE COURT: Thank you. Please be seated.

Ready to call your next witness?

MS. MORRISSEY: Thank you, Your Honor. Yes, we are. Before that, the document that I -- with the photographs of Miss Johnson that I showed the witness who was just on, that's been marked as Plaintiff's Exhibit 6.

THE COURT: Okay.

MS. MORRISSEY: Thank you. We would call Becky Dakus.

THE COURT: Would you raise your right hand.

REBECCA DAKUS, PETITIONER'S WITNESS, SWORN

THE COURT: Thank you. Please be seated. And please adjust the chair and the microphones. And when you're ready, would you tell us your full name, please, and spell your last name.

THE WITNESS: Rebecca L. Dakus, D-a-k-u-s.

THE COURT: Thank you.

Miss Morrissey?

MS. MORRISSEY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Good afternoon, ma'am.

A. **Hi.**

Q. Hi. Could you tell us what you do for a living now?

A. **I'm a legal assistant at a law firm on the Kansas City Plaza called Wagstaff and Cartmell.**

Q. And have you mostly done work as a law assistant -- a legal assistant in the past?

A. **Yes.**

Q. I'm going to ask about October of 2001. Did you start a new job as a legal assistant then?

A. **Yes.**

Q. And could you tell us where you worked?

A. **Yes. I took employment at Watson and Dameron which is in Kansas City, Missouri.**

Q. And is that a firm that has a number of different attorneys associated with it?

A. **Yes.**

Q. And did you come to know a person by the name of Patrick Berrigan at that firm?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

A. Yes.

Q. And did you work with him?

A. Yes.

Q. When you first came to work at the firm in October of 2001, was there a particular trial that you worked on?

A. Yes.

Q. Do you remember the name of the defendant?

A. Keith Nelson.

Q. And what stage of the case was the Keith Nelson case in in October of 2001?

A. They were in trial, and it was a death penalty case, and so I was thrown right into it.

Q. And do you remember what part -- what stage of the trial you were in on the Keith Nelson case when you first started working?

A. It was toward the end.

Q. Okay. It was towards the end. And you said that that was a death penalty case.

A. Yes, my first death penalty case.

Q. Your first.

A. Yeah.

Q. And was there a verdict in that case?

A. Yes.

Q. And what was the verdict?

A. Guilty, and he received death.

Q. And was that a case in state or federal court if you remember?

A. Federal.

Q. In federal court. And that was a case in which Mr. Berrigan was representing the defendant Mr. Keith Nelson.

A. Yes.

Q. After the Keith Nelson case concluded, was there another case that you worked on --

A. Yes.

Q. -- as Mr. Berrigan's legal assistant?

A. Yes.

Q. And what case was that?

A. John Robinson.

Q. What was -- do you remember anything about the charges in the John Robinson case?

A. Yes. He was charged as being a serial killer, multiple killings. He would find women on the Internet and kill them, and we were basically faced with the facts on the Kansas side. It was a two-state.

Q. Was that a case that was in state court or federal court?

A. State I think.

Q. All right. How long after -- if you remember roughly after the Keith Nelson case concluded did you begin work on the John Robinson case?

A. Seemed -- there might have been a case in between that was

minor, but I think it was pretty immediately.

Q. Okay. And what was the verdict in the John Robinson case?

A. He -- it was concluded. He was guilty, and he received the death penalty.

Q. Were there any other cases that you remember Mr. Berrigan being involved in and by extension you were involved in after the verdict on the John Robinson case?

A. Yes. There were a couple of rape cases, kidnapping. That's what I remember.

Q. And did those cases go to trial, or were they resolved without a trial if you remember?

A. The kidnap was a trial. The rape cases, I think they were resolved. I can't remember.

Q. How did you first become aware that there was an Angela Johnson and that Mr. Berrigan was involved in her case? Do you remember?

A. Well, it pretty much comes to my lap to do work, so there were boxes brought in, you know, just the -- that was about what I remember.

Q. And when there were boxes that were brought in, what would happen to the boxes after they arrived in the office?

A. Some were put by my desk in a credenza area, large credenza area, and some were put out in a storage area in the office.

Q. When these Angela Johnson boxes arrived, did Mr. Berrigan get to work on them immediately, or was there a delay?

A. He was involved in so many cases, so I think there was a delay.

Q. But you do remember the boxes arriving?

A. Uh-huh, yes.

Q. At some point did Mr. Berrigan start to work on the Angela Johnson case?

A. Yes.

Q. And if you remember can you give us any idea how -- well, do you remember when that was in terms of when the trial and Miss Johnson's state case actually started?

A. It seemed like we were heavily involved in it for a couple of years.

Q. Okay. When you were working with Mr. Berrigan, would Miss Johnson call him?

A. Yes, sometimes.

Q. And when she called him, would you answer the phone?

A. Sometimes.

Q. Did you have a chance to talk to her?

A. A little bit.

Q. Okay. And based on your phone conversations with her, how would you describe her?

A. She was very sweet and innocent and child-like.

Q. After your phone conversations with her, did you ever -- did you see her in person eventually?

A. Eventually.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 49 of 85

Q. And when was the first time you remember seeing her in person?

A. I think it was at the trial.

Q. Did you travel to Sioux City to help Mr. Berrigan during the trial?

A. Yes.

Q. And so were you in court or in an office doing work or at a motel doing work?

A. We were at a hotel doing work.

Q. And did you attend any part of the trial?

A. The first where the opening statement occurred and the closing.

Q. Let me just ask you, did you ever visit Miss Johnson yourself not connected with your work for Mr. Berrigan?

A. Yes.

Q. Okay. And how many times did that happen?

A. I believe it was once.

Q. Okay. Do you remember when that visit was?

A. It was at the very end of the trial, and I had my daughter here. She was 12. And she wanted to meet her. And I was more than happy to have her come meet her because I knew she had a daughter that age.

Q. So you took your daughter age 12 to visit Miss Johnson.

A. Yes.

Q. Did that visit have an effect on your daughter?

A. Yes.

Q. Could you explain how?

A. To this day she -- she texted me this morning, and she said, "I remember Angela very clearly," and to tell her that she didn't deserve what she got.

Q. I want to call your attention to the weekend before opening statement in this case, the opening statements of the guilt phase. Did something happen that was unusual?

A. Yes. The weekend of preparation where we were all together, the defense team, in putting files together for Pat it came to my knowledge that Al Willett who was in charge of opening statement, he wasn't even prepared. He hadn't even put it together.

Q. And what happened after you found out that he wasn't prepared for opening statement?

MR. WILLIAMS: Objection. Lack of foundation.

THE COURT: Overruled.

BY MS. MORRISSEY:

Q. Go ahead.

A. Pat stepped in, and he took over. I believe he took some of Al's notes and, of course, his information and I believe stayed up all night to put it together.

Q. Okay. And the next -- did -- was that -- did you have a part in preparing -- because you were his legal assistant preparing the opening statement?

A. No. I think Nancy typed everything that Pat needed at that time. I was doing something else.

Q. And were you present when Mr. Willett gave his opening statement?

A. Yes.

Q. Was there anything unusual about how he did that?

A. He just got up and read it, and it came across very monotone, and I could have done it.

Q. Were there any problems that you saw or heard about Mr. Willett aside from the opening statement issue?

A. Yes. There were comments from the other defense attorneys, Pat and Dean, about him not coming through with his portion of what his responsibilities were, and I particularly remember some witnesses he was supposed to handle, and he backed off from that, and they had to take over.

Q. When he backed off, who would have to fill in?

A. I remember Pat took over and Dean Stowers took over.

Q. Now, your understanding of -- let me ask you about your understanding of the roles of these lawyers. What role did Al Willett have in Miss Johnson's trial?

A. It was my understanding he was lead attorney, he'd been with her from the very beginning.

Q. And what about Mr. Berrigan's role?

A. He came in as learned counsel later on. I'm not sure when.

Q. And what about Mr. Stowers?

A. I believe he was in before Pat too. I'm not sure.

Q. Okay. What about the relationship between the lawyers during the trial that you were able to see and hear? Could you describe that?

A. I think there was frustration on Pat's part and Dean's part. There were comments to me. But they weren't -- we would maybe say one statement or two and go on and, you know, not let it affect us too much.

Q. All right. Let me ask you about Nancy Lanoue. Was she Mr. Willett's legal assistant?

A. Yes.

Q. And what was her role in this case?

A. From what I saw, she visited with Angela a tremendous amount of time finding out discovery, going over discovery with her. I mean, I've never seen a legal assistant be with a client that much. She was with Angela more than the attorneys I thought.

Q. And did she appear to you to have a knowledge of the case based on the discovery?

A. Absolutely.

Q. Did there come a time when you were at a meeting with Nancy Lanoue, Mr. Berrigan, Mr. Stowers, and Mr. Willett and Nancy expressed her opinion about Angela's guilt or innocence?

A. Yes.

Q. And what happened when she ex -- well, what did she say to

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 50 of 85

the best of your recollection?

A. That she total believed that Angela was innocent and it was based on the facts that she'd been going over with Angela, and their reaction was they heard her and then they turned and talked amongst them others -- themselves about doing something else.

Q. Was there a difference in Mr. Berrigan in terms of his physical stature at the beginning of the trial and at the end of the trial?

A. Absolutely.

Q. Could you tell us what it was?

A. He had lost a tremendous amount of weight by the end of the trial I noticed, and I did know that he wasn't sleeping or eating well. And I was concerned about his health because he had heart problems. And at the beginning -- I'd say he probably lost 30 pounds by the time of the end of the trial.

MS. MORRISSEY: All right. Thank you very much. I have nothing further.

THE COURT: Mr. Williams, you may cross-examine.

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Ma'am, the -- you talked about Al Willett having to -- not being prepared for some witnesses and both Pat Berrigan and Dean Stowers had to take over. Which witnesses were those?

A. I wished I could remember. I just remember when we were going over the witness list marking things off and changing names beside certain witnesses, you know, and then comments that, you know, Mr. Willett's responsibilities weren't being done, and so they'd have to take over.

Q. Okay. You don't remember how many witnesses?

A. Sorry. No.

Q. Okay. Based on what you knew about how the division of duties had occurred on this team, it was your understanding that Al Willett was primarily involved with the guilt phase of the trial; right?

A. I can't tell you all his responsibilities. I just know that when he didn't do what I knew he was supposed to do it came to me and I saw personally the weekend before trial started.

Q. Okay. Tell me about the opening statement. You said that it somehow came to your attention that Al Willett had not prepared an opening statement. How did you learn about that?

A. I believe it was Pat came to me.

Q. And told you what?

A. And told me that he had not prepared anything and he was upset.

Q. And when was this?

A. I believe it was the night before. It could not have been more than two or three days before because I was only there that weekend before the trial started.

Q. Okay. So you were only -- you were only up here during the weekend before the trial started and watched the opening statements?

A. Uh-huh.

Q. That's a yes?

A. Yes. Sorry.

Q. Okay. And then did you leave after that?

A. Yes, I went back.

Q. Okay. And then you came back for the closing arguments.

A. Yes.

Q. And closing arguments of the guilt phase or the closing arguments in the penalty phase?

A. I think it was the guilt phase. I'm sorry. That's so long ago.

Q. Okay.

A. But I believe it was the very end.

Q. And you stayed a day or two or a week or how long?

A. Uh-huh, two.

Q. Two days?

A. I would say two, yeah.

Q. Okay. And that was the extent of your involvement with the trial team as they were preparing for trial up here in Sioux City.

A. No. I did a lot of discovery and tranned Summation back home, and also I came up to Cedar Rapids and did some typing of

discovery and --

Q. And perhaps --

A. But you're saying trial?

Q. Yeah. Perhaps my question was poor, and let me rephrase it then. I'm trying to establish the extent to which you were present in Sioux City leading up to and during the trial, the extent you would have been in a position to make any observations.

What I have heard from you is you were here for two or three days right before opening statement and you were here for a couple days at the end of some closing argument.

A. Yes. I would have to look back on the records because it is documented on billing, but I believe yes, that's correct.

Q. And to the extent that you have any knowledge of anything about the opening statement, that would have been something you would have learned from Pat Berrigan about Al's not being prepared for opening statement. That's something that Pat told you.

A. I believe he was initially the one that told me.

Q. All right.

A. And then Dean and then the defense team. It was just abuzz. It was there.

Q. Okay.

A. It was -- he was unprepared.

Q. And you watched the opening statement, and Al Willett read

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS    Document 348    Filed 11/10/11    Page 51 of 85

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

538

from it, and you thought you could have done as well.

A. Yes.

Q. And have you seen attorneys give opening statements before where they've read from them?

A. No.

Q. Do you know whether that's sometimes a style of attorneys?

A. Sure.

Q. And that could have been Al's style to read from the opening statement.

A. Could have been, but I knew the rest of the story, so, I mean, if he didn't prepare for it, he'd have to read it.

Q. Did you ask him, "Al, do you normally read your opening statement?"

A. I don't approach attorneys that way. It's not my business.

Q. What about the content of the opening statement? Do you have any criticism what the content was? I understand you didn't like the fact he read it. Do you have a criticism about what the content of the opening statement was?

A. I honestly can't remember. Sorry.

Q. Have you worked on cases where there's more than one attorney involved in the litigation?

A. Yes.

Q. Okay. Have you had other cases where there's been more than one attorney in the litigation where there's been disagreements among the trial team?

539

A. Yes.

Q. Okay. It's not uncommon, is it, when you have multiple lawyers working on a case that there's going to be disputes between the lawyers?

A. I've never seen it like this. There seemed to be arrogance involved on Mr. Willett's part, and it was just weird.

Q. All right. You've seen those kinds of disputes arise, just not to this degree in your view.

A. Uh-huh, correct.

MR. WILLIAMS: I have nothing further, Your Honor.

THE COURT: Any redirect?

MS. MORRISSEY: No redirect, Your Honor. Thank you.

THE COURT: I have no questions, so you can step down.

THE WITNESS: Great. Thank you.

THE COURT: Thank you.

MS. MORRISSEY: Your Honor, we would next call Shannon Eliason.

THE COURT: Just come forward, and I'll swear you in.

MS. ELIASON: Oh, I'm sorry.

THE COURT: That's okay. You can raise your right hand.

MS. ELIASON: I don't know what I'm doing here. Okay.

THE COURT: You're doing fine so far. You even got the right from the left which not everybody gets. Little false start, but you're doing well.

540

SHANNON ELIASON, PETITIONER'S WITNESS, SWORN

THE COURT: Okay. Thank you. Please be seated. And you can adjust the chair and the microphones, and then you can scoot up a little bit so you can speak directly in the microphones.

THE WITNESS: Hello?

THE COURT: Yes. Okay. And would you tell us your full name and spell your last name for us.

THE WITNESS: Shannon Michelle Eliason, last name E-l-i-a-s-o-n.

THE COURT: Thank you.

THE WITNESS: Uh-huh.

DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Good afternoon, Miss Eliason.

A. Good afternoon.

Q. I am going to ask you if you know this lady right here.

A. I absolutely do.

Q. And who is she?

A. Angela Johnson.

Q. How long have you known Angela Johnson?

A. Oh, since I can remember I've known Angie since I was really little, so she's been a big part of my life since then.

Q. Was Angela a friend of your mother's?

A. Yes, a friend of my mother's. I always called her my aunt

541

Angie, and, I mean, she's a woman that I'd spend a lot of time with and all of our kids together, my parents and my mother and her and Christi's kids, and we all were all together so . . .

Q. When you said your mother, is your mother Terrie Eliason?

A. Yes.

Q. T-e-r-r-i-e?

A. Yes.

Q. And you mentioned Christi?

A. Yes.

Q. What's Christi's last name?

A. Well, at the time it was Christi Cole. I'm not exactly sure today what her name is, but that's the original name I would have known.

Q. And you said that you were all kids together?

A. Yeah, we all grew up together. I mean, we all knew each other. Basically it was either mostly Angie or my mother babysitting all of us, but we'd all be together, Alyssa.

Q. And that would mean Angie's daughter Alyssa?

A. Yes.

Q. And did Christi Cole have a daughter?

A. Yes. Lacey and Jamie were her daughters, and they were --

Jamie was a lot more over at our house and things like that when Christi was working, but, you know, it was interchangeable. It'd be mostly all of us together all the time but . . .

Q. Okay. So just to recap, your mom was friends with Christi

Q. Cole and Ms. Johnson; correct?

A. Yes.

Q. And they kind of shared babysitting duties for the kids?

A. Yep, most of the time, and Angie -- or Alyssa was a little older than us, so, you know, at one point then she would be the one babysitting. But most of the time, you know, it would be back and forth or they'd be together so . . .

Q. And this was when you were young enough to need a baby-sitter.

A. Yes, absolutely, yeah, so definitely like under ten, nine, eight, seven, six, five, all the way down so . . .

Q. Did there come a time when Angela had another daughter?

A. Marvea, yes.

Q. And when Angela had Marvea, you were older obviously.

A. Yes.

Q. And at times would you babysit for Marvea?

A. Yes, I would.

Q. When -- where was Angie living when you would babysit for Marvea?

A. Well, mostly that would have been around when I was 13 or 14, and it would have been above when it was the North Beach or the Waterfront -- I mean, that place has gone through so many names, but she lived above there and worked there, and so it made it a lot easier for me to come babysit. I'd just come over after school.

Q. There was a restaurant called the North Beach?

A. Yes, below it, and it was right off the north shore right next to currently the Boat House and the Surf.

Q. All right. And Angela lived with Marvea upstairs.

A. Upstairs, yep, above the business.

Q. And is that where you would babysit for Marvea?

A. Yes.

Q. Now, let me ask you, do you remember when Angela got arrested?

A. Not -- not specifically, but I remember the time that I just stopped babysitting, and it kind of -- you know, it went from there. I didn't really know what exactly had happened so . . .

Q. And when -- after you stopped babysitting, did there come a time when she ended up in jail?

A. I had heard that she was in jail at that point. I'd been informed, but, I mean, I didn't know specifics or anything like that. I just know that I wasn't babysitting for Angie anymore.

Q. Let me kind of bring your attention to the summer before -- the summer before or the months before July of 1993; okay?

A. Okay, uh-huh.

Q. At that time was Angela living up above the North Beach restaurant?

A. No.

Q. Okay. Where was she living if you know?

A. She was living on the -- it's kind of by the Clear Lake High School. It's in a white house down through -- there's kind of like a cul-de-sac back there. It's a dead-end road in a white house.

Q. And were you babysitting for her when she moved to the Clear Lake area?

A. The home I was just speaking of?

Q. Yes.

A. I wasn't babysitting, though, no. I was young, too young to be babysitting at that point.

Q. Too young for that, okay.

A. Uh-huh.

Q. When you were babysitting Marvea, did you ever get any instructions from Miss Johnson about what to do if the phone rang?

A. Well, absolutely. I mean, take messages, you know. Obviously don't identify that you're home by yourself, but if Dustin were to call, Honken -- at the time he was away so to ensure that he was allowed to speak with Marvea and to make sure to answer the phone there, you know, but anybody else, yeah.

Q. So you were supposed to answer the phone while you were babysitting.

A. Yeah, yep.

Q. Okay. Was -- from when you -- did you ever answer the phone when Dustin called?

A. Yes, uh-huh.

Q. And could you tell from the phone that Dustin was in jail or custody at the time?

A. Yeah, yep, I would have to answer the phone. That's why I would have to initiate instead of Marvea because she was younger at the time and then, you know, tell her that he was on the phone and monitor because the phone would cut off and what not when she was talking to him so . . .

Q. All right. And did you answer the phone when it called -- when it rang and it wasn't Dustin?

A. Yep, yes, I would answer the phone.

Q. You mentioned Christi Gaubatz.

A. Yes.

Q. Did you ever answer the phone when Christi Gaubatz called?

A. Yes.

Q. And did this happen more than once or . . .

A. Yeah, you know, and it would just -- she'd just be like, hey, is Angie there, and, you know, she wouldn't have to identify herself as Christi Gaubatz because I've known her since I was young, you know. She just -- it's Christi. Will you let her know I called?

Q. And to tie this down a little bit as to the time, how old was Marvea about when you were babysitting and you would be told to answer the phone in case Dustin called?

A. Three or four, around that area. She was that young. I

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 53 of 85

know she wasn't in school.

Q. Is there any doubt in your mind that you got phone calls at Angela's house from Christi?

A. No doubt in my mind.

MS. MORRISSEY: Thank you. I have nothing further.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Do you remember a girl by the name of Ashley DeGeus, would have been about your age, would have also been --

A. Ashley DeGeus?

Q. Yes.

A. No, I do not remember an Ashley DeGeus.

Q. Okay. That name isn't familiar with you?

A. No.

Q. Okay. The time period that you were babysitting for Angela Johnson would have been what? About nineteen ninety --

A. Nine, two thousand.

Q. Uh-huh. Right in that time period, 1998?

A. Yeah.

Q. Okay. During the time period you were babysitting her daughter, were you aware that Angela Johnson was selling methamphetamine?

A. Absolutely not. I had -- no.

Q. You weren't aware that she was involved with a guy named Rick Summers and Todd Graham and Jimmy Rodriguez slinging methamphetamine?

MS. MORRISSEY: Objection, Your Honor. Relevance.

THE COURT: Overruled.

A. No, I was not aware of anything of that matter at all.

Q. You weren't aware that at the time you were babysitting Angela Johnson's daughter that she had met with two undercover law enforcement agents and attempted to hire those agents to kidnap a drug dealer by the name of Jimmy Rodriguez because he owed her money?

A. No.

MR. WILLIAMS: Nothing further, Your Honor.

THE COURT: Any redirect?

MS. MORRISSEY: Yes, just briefly.

REDIRECT EXAMINATION

BY MS. MORRISSEY:

Q. You just testified in response to a question by Mr. Williams that you were babysitting for her in 1999 to 2000; is that correct?

A. Uh-huh, uh-huh.

Q. And then Mr. Williams said, "Or was it 1998?"

A. Yes.

Q. Okay.

A. He did say that.

Q. Do you remember was it 1999 to 2000?

A. That I can confirm completely, yes, that it was '99, 2000. May have been '98. That I can't confirm.

MS. MORRISSEY: Thank you very much.

THE WITNESS: Uh-huh.

THE COURT: Mr. Williams, any cross-examination?

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Okay. You're excused.

And could the lawyers elucidate for me what the purpose for calling this witness was because it escapes me?

MS. MORRISSEY: I'm sorry, Your Honor. Yes. It was the -- a claim of ineffective assistance in failure to investigate on guilt-phase issues. The testimony at trial was that Christi Gaubatz ended her relationship with Miss Johnson soon after 1993. I believe that these events, the homicides, occurred in 1993. She testified at trial that in the winter of 1994 Miss Johnson made certain admissions to her and that thereafter because of those admissions as well as her husband Scott's disapproval of Miss Johnson she ceased any contact with her.

And the relevance of Miss Eliason's testimony would be to show that Miss Gaubatz was untruthful in that respect, that she didn't cut off all contact with Miss Johnson and, in fact, she was in contact with Miss Johnson until 1999 to 2000 which was, you know, about the time she was -- Miss Johnson was

arrested.

THE COURT: Okay.

Ready to call your next witness?

MS. MORRISSEY: Yes, Your Honor. We would call Mr. Willett.

THE COURT: Good afternoon.

MR. WILLETT: Good afternoon.

ALFRED WILLETT, PETITIONER'S WITNESS, SWORN

THE COURT: Thank you. Please be seated. And you can adjust the chair so you can speak directly into the microphones. And why don't you tell us your full name and spell your last name, please.

THE WITNESS: Alfred Eugene Willett, A-l-f-r-e-d E-u-g-e-n-e W-i-l-l-e-t-t.

THE COURT: Thank you, Mr. Willett.

MS. MORRISSEY: Thank you.

THE COURT: Miss Morrissey?

DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Good afternoon, Mr. Willett.

A. Good afternoon.

Q. You've been waiting for several days.

A. I've been waiting for over 25 hours, Miss Morrissey.

Q. I apologize for that.

A. Thank you.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q. I'm sorry. All right. Mr. Willett, you are an attorney.

A. I am.

Q. Okay. And how long have you been an attorney?

A. I was admitted to the Iowa bar in March of 1984.

Q. And since you were admitted in 1984, what type of practice have you had?

A. Initially in 1984 I was in a law firm as an associate. It was White and Warbasse which eventually became White and Johnson where I did family law and misdemeanor criminal defense. I was there for the first three years of my practice.

Q. And did you go off on your own after that?

A. No. I then went to Iowa Electric Light and Power Company where from 1987 to 1989 I was one of their in-house trial lawyers, and I did commercial collection and workmen's compensation defense. And I also defended a subsidiary of Iowa Electric Light and Power which was the CRANDIC, the Cedar Rapids and Iowa City Freight Railway Company.

Q. At the time you were working with Iowa Electric and Power, had you ever done a criminal case?

A. Not -- well, I had done misdemeanor criminal cases before I went there, but I did not do any criminal defense work when I was in the house for Iowa Electric.

Q. And when you left the house, what kind of work did you do?

A. I went to the law firm of Hines, Pence, Day, and Powers in 1989, and I did plaintiffs' professional malpractice legal and

medical. Hines, Pence, Day, and Powers had some insurance clients. I did some subrogation work. And it was in 1990 when I got on the federal court-appointed list for the Northern District of Iowa in Cedar Rapids.

Q. All right. And --

A. And I was there till 1992.

Q. Okay. And what did you do after that?

A. I joined the law firm of Irvine and Robbins. And I should mention at Hines, Pence, Day, and Powers I still did just a very little bit of family law.

When I joined the law firm of Irvine and Robbins in 2000, I did state criminal defense, federal criminal defense, and plaintiffs' professional malpractice, legal and medical. I think maybe I did one family law case while I was there, and it was strictly a plaintiffs' firm. We had no insurance clients.

Q. Okay.

A. And I was there till 2000.

Q. And what happened in 2000?

A. I left and went into an association of sole practitioners, Terpstra, Epping, and Willett. And at that time I did strictly criminal defense, about half the time in federal court, about half the time state court. And I shouldn't say strictly. I had one noncriminal client. The Coggon Municipal Light Plant hired me to do some work for them occasionally. And I was there till the flood.

Q. And the flood was in 2008?

A. June of 2008.

Q. All right. You became involved in representing Angela Johnson in the present case.

A. Yes, June of 2 -- well, the summer of 2000, I think June, but the summer of 2000.

Q. Had you -- before you represented Miss Johnson, had you ever done a capital case?

A. No. I had done one murder case in state court, but I had never done a capital case prior to that time.

Q. How did you become involved in representing Miss Johnson in this case?

A. I received a call from the deputy clerk of court Patsy Christianson who at that time was one of our deputy clerks of courts at the federal clerk's office in Cedar Rapids. She said that they needed somebody to represent Miss Johnson, that although it was a Western Division case that literally every defense attorney who was on the list had been conflicted out because of Dustin Honken's prior case and they were coming to the Cedar Rapids panel to look for help.

Q. Okay. And did you speak to Miss Christianson -- is that the name -- personally?

A. Yes, I did.

Q. Or did you receive a message?

A. No. Well, I think it took a while for her to find me. She

had called my office. My office had called my wife. My wife knew how to find me. I called Miss Christianson directly.

Q. Okay. And when you got the call from Miss Christianson, did you go see Miss Johnson?

A. I think it was the very next day. I know that I saw Miss Johnson before the detention hearing.

Q. And she was then at Benton County Jail; correct?

A. Yes.

Q. All right. And you appeared at the detention hearing --

A. Yes.

Q. -- with her. Now, this initial representation of Miss Johnson kind of grew into a team; would that be correct?

A. That would be correct.

Q. And the team consisted of you?

A. Yes.

Q. And Dean Stowers.

A. Eventually, not initially but eventually, yes.

Q. All right. And Patrick Berrigan.

A. I believe -- yes, and I can't remember if Mr. Berrigan or Mr. Stowers was first, but there was one other member of the team, Tom Frerichs.

Q. Okay. Was Mr. Frerichs appointed before Mr. Stowers?

A. Yes.

Q. And what -- did you request his appointment?

A. I believe I may have because Tom and I had defended a

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 348 Filed 11/10/11 Page 55 of 85

murder case together in Black Hawk County, State versus Steven Peterson, and I had worked with Tom previously.

Q. And you requested him why?

A. In my opinion he's a good trial lawyer.

Q. And did the complexity of this case have anything to do with it?

A. No. The complexity of the case is what brought me to go searching for Mr. Berrigan.

Q. Okay. But it's true that from the beginning did you know that this was a potential death penalty case or likely to be a death penalty case?

A. Not from the beginning, no. As soon as -- and I don't mean to digress, but if I can explain my answer.

Q. Uh-huh.

A. I had been to a CJA seminar where Kevin McNally spoke who's with the death penalty resource counsel, and I had attended his lecture, and he said if you ever get a capital case the first time the prosecutor whispers death penalty, don't wait, pick up the phone and call me and we'll start finding somebody for you.

First time Mr. Reinert who at that time was the lead prosecutor in the case said death penalty, I called Mr. McNally. He gave me the name of Patrick Berrigan, and he -- and I can't remember the name of the gentleman but a gentleman from Topeka, and it didn't make any sense to me to hire an attorney from the Tenth Circuit when Mr. Berrigan was in Kansas City.

Q. Okay. Was the attorney from Topeka -- was his name Richard Ney?

A. It's been a long time. I'm sorry. I just can't remember.

Q. So you said that it was -- the first time you heard the word death penalty you went to get -- to talk to Mr. McNally; correct?

A. I picked up the phone and called him.

Q. And do you recall when that was?

A. Not specifically, no. It was early in the case, but that's the best I can answer for you.

Q. All right. Thank you.

MS. MORRISSEY: May I just have a moment, Your Honor?

THE COURT: You may.

MS. MORRISSEY: I have a --

THE COURT: You know, when you talk from back there, it's very hard -- so you can either wear a lapel mike or try and remember to come to the podium. I know it's hard, and it's just such a large courtroom, the audio system is great when you're close to the mikes, but when you back away, it drops off very rapidly.

MS. MORRISSEY: I apologize, Your Honor.

THE COURT: That's okay. It's hard to get used to.

MS. MORRISSEY: I've been doing that consistently, and I should --

THE COURT: And then when you lean over and have a

private consult with co-counsel, you need to remember to shut it off because we've had some fairly embarrassing things happen.

MS. MORRISSEY: Yeah. Well, like when he put my note on the ELMO for all to see. Actually it makes it easier. I don't have to squint.

BY MS. MORRISSEY:

Q. Did you -- let me just ask you, did you appear at a telephonic status conference in this case before Judge Jarvey early on in the case?

A. I don't have an independent memory of it. I remember appearing in front of Judge Jarvey in his courtroom on discovery disputes. I do remember that.

Q. What about a conference call on November 8, 2000, with Judge Jarvey, C.J. Williams, you, Mr. Frerichs, and Alfredo Parrish? Do you remember that?

A. Not independently, no. I don't have any reason to doubt you. I'm just -- I don't have an independent memory of it.

MS. MORRISSEY: I have a document, Your Honor, that's been marked 5EE for identification. May I show Mr. Willett this document?

THE COURT: Yes.

MS. MORRISSEY: Thank you.

BY MS. MORRISSEY:

Q. I'm going to show you a memorandum that appears to be from NDL to the file about an Angela Johnson conference call on

November 8. Do you remember that -- do you remember seeing that memo before?

A. Forgive me. I haven't finished reviewing it.

Q. Oh. Sorry.

A. Okay.

Q. Okay. Does that indicate that at least as of November 8, 2000, this was going to be a death penalty case?

A. Yes.

Q. Okay. And do you recall when you first talked to Miss Christianson about the case on the phone regarding your appointment that she told you it was likely to be a death penalty case?

A. I'm not sure.

Q. Did you come to, after your appointment, have an investigator appointed to assist you in the case?

A. Initially and then subsequent investigator was brought in to replace him.

Q. Right. And the first investigator you had was Mr. Cornell?

A. Yes.

Q. And that is Raymond Cornell?

A. Absolutely.

Q. Could you tell us why you chose Mr. Cornell?

A. I had worked with Mr. Cornell previously on prior federal criminal cases and prior state criminal cases.

Q. Okay. And did you feel him to be an experienced

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 56 of 85

investigator?

A. Very.

Q. And with -- who had worked in homicide cases before? Who'd worked in homicide cases before?

A. My understanding was he had worked in homicide cases before. In fact, he had been the investigator in State versus Steven Peterson, the case that Tom and I worked together.

Q. And was he hired as your investigator early on?

A. I'm assuming so. I don't have any independent memory of when.

Q. And did you give any instructions about the investigation that he should be doing if you recall?

A. I don't recall.

Q. Do you recall giving any instructions if you gave instructions whether they would be in writing or orally?

A. Historically a lot of my communications with Ray were oral.

Q. Would it be fair to say that by the end of August 2000 Mr. Cornell was a member of the defense team in this case?

A. That -- yeah, that comports with my memory, yes.

Q. And was -- I have -- was just handed a letter -- thank you -- that's dated August 11, 2000.

MS. MORRISSEY: May I have marked defendant -- Plaintiff's 7 for identification, Your Honor?

THE COURT: Yes.

MS. MORRISSEY: Thank you.

BY MS. MORRISSEY:

Q. I'm going to show you this letter. It appears to be from you to Mr. Frerichs and Mr. Cornell.

A. Thank you.

Q. Does that letter help you remember when Mr. Cornell was appointed to help you?

A. If you can give me just a moment to read the letter.

Q. Thank you. Yes.

A. I've reviewed the letter.

Q. Okay.

MS. MORRISSEY: And actually, Your Honor, I have two more pages that should go with that.

Q. And that letter indicates that Mr. Frerichs was appointed as co-counsel; correct?

A. If you'll give me just a moment, please. Yes, Mr. Frerichs was appointed as co-counsel.

Q. And that Mr. Cornell was appointed as an investigator.

A. Yes, Mr. Cornell was appointed as an investigator.

Q. And that money was authorized for the services of Mr. Cornell.

A. I had made a request in excess of $300, and the amount of the investigative fees was referred to -- at that time Judge Bennett was our chief judge, and it was referred to him for determination.

Q. So by August Mr. Cornell was on board; correct?

A. Yes.

Q. And was there any investigation done regarding the crimes? Just focus on the first period of the case before the bodies were discovered in October of 2000.

A. My memory is Mr. Cornell did two or three witness interviews before it was brought to my attention that there was a problem.

Q. All right. And the two or three witness interviews that he did, were those of family members of Miss Johnson?

A. I want to say yes, but I'm not sure.

Q. If Mr. Cornell had done interviews in this case, would he have provided you a report?

A. Normally, yes.

Q. And if you had been provided a report, it would be in your file; correct?

A. The only exception to that is during the flood I lost one box of material from this case.

Q. And I believe that we -- in talking about that you said that you believe that the doc -- the box that was lost in the flood was your witness file number 5, that is, your internal witness file -- witness box number 5?

A. If I said that earlier, I misstated. My memory is is that it was like government witness box number 5. So my perception was it may have been Jencks material that was lost to the flood.

Q. If it was Jencks material, it's not likely that

Mr. Cornell's investigation reports would be included in the lost materials; correct?

A. Correct.

Q. Aside from the two to three interviews that Mr. Cornell did, was there any investigation basically done into the -- was there any investigation suggested by just the face of the indictment that was issued in this case on July 26, 2000?

A. I don't believe so because my memory is is that my problems with Mr. Cornell surfaced fairly early and he wasn't there very long before I terminated him.

Q. All right. Let me just get the document I'm going to need. After you terminated Mr. Cornell, was it necessary for you to go in and to get a new investigator appointed?

A. Yes.

Q. Okay. And did you do that as soon as you terminated Mr. Cornell?

A. That's my memory, yes.

MS. MORRISSEY: May I have a moment, Your Honor?

THE COURT: You may.

MS. MORRISSEY: Thank you.

BY MS. MORRISSEY:

Q. All right. On January 24 -- January 12, excuse me, 2004, was there an under seal order in this case issued by Judge Bennett that basically stated that the $28,000 that was left from the $55,000 budget for private investigator Raymond Cornell

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 57 of 85

is transferred to Mr. Gordon Gratias and that he is substituted for Mr. Cornell to bill at the court-appointed rate of $45 an hour?

A. I don't remember the order. It appears you have it in front of you. I'm not doubting what you're telling me.

Q. I don't have the order in front of me. I have a summary of the record in this case.

A. Okay.

Q. And it indicates that that was a seal order that was issued on January 12, 2004. We're working on the order itself.

A. I have no reason to doubt it.

Q. Okay. So did you basically say that Mr. Cornell's not involved in the business of private investigations due to recurring health problems?

A. I may very well have said that, yes.

Q. Which was honest at the time.

A. That was certainly part of it, yes.

Q. Yes. Okay. So having your memory refreshed by this order, would it be fair to say that Mr. Cornell wasn't terminated early on?

A. I'm sorry? Was or was not?

Q. Was not.

A. And I'm sorry. The date of the order?

Q. January 12, 2004.

A. That would not be early on in the case. You are right.

Q. All right. So let's talk about the investigation that might have been done based on the face of the indictment; okay?

A. Okay.

Q. Do you remember that the indictment in this case alleged as overt act number 3 that during July of 1993 an associate of Miss Johnson attempted to locate Greg Nicholson by various means including talking to someone named Scott Gahn, G-a-h-n?

A. Do I remember that from the face of the indictment?

Q. Yes.

A. I don't remember that from the face of the indictment.

Q. I'm going to show you a document that's been marked Plaintiff's -- Petitioner's I for identification, Petitioner's I through Petitioner's LL. Would you look at that and tell me if it appears to be the original indictment in this case.

A. It certainly appears to be the original indictment.

Q. And does overt act 3 allege that in July of 1993 an associate of Miss Johnson attempted to locate Greg Nicholson by various means including talking to Scott Gahn?

A. Yes.

Q. Okay. So would it be fair to say that early on Scott Gahn was identified by the indictment as a possible witness in this case?

A. Yes.

Q. Do you remember whether you asked Mr. Cornell to investigate and locate Mr. Gahn?

A. I don't have a memory of doing that.

Q. All right. Could you -- overt act number 4 alleges on July 25, 1993, Ms. Johnson and an associate got a baby-sitter to stay at Miss Johnson's residence?

A. Yes, that's what it says.

Q. And would it be fair to say that based on the face of the indictment the baby-sitter who was at Miss Johnson's residence would have been a potential witness in this case?

A. Yes.

Q. Did you make any attempt to identify the baby-sitter?

A. Was the baby-sitter Sara Bramow?

Q. No.

A. My memory is is that there was an effort to identify the baby-sitter. It's just obviously I have the name misplaced in my memory.

Q. Did you go to Miss Johnson and ask her about the indictment and whether or not she could identify the baby-sitter?

A. I don't remember having a specific conversation with Ms. Johnson regarding whether or not she could identify the baby-sitter. My memory is is that we knew who the baby-sitter was. And I can't remember how we came across that bit of information, but we did know who it was.

Q. When you say we, who are you referring to?

A. Well, I guess I'd be referring to the defense team at the time.

Q. Okay. And to your knowledge was anything done to attempt to interview the baby-sitter whose name you had identified?

A. I don't have an independent memory as I sit here today.

Q. Did you -- between August 2, 2000, when you were appointed and the discovery on October 13, 2000, of the bodies of Greg Nicholson and the Duncan family, had you reviewed discovery in that case?

A. I had reviewed -- I had reviewed some of the discovery. I can't remember exactly when the transfer of the discovery to my office started taking place, and that was a huge, huge fight. It was a huge fight in court. It was a huge fight with the U.S. Attorney's Office once the order was entered. I'm sure that I had gone over at least some aspect of discovery because prior to discovery of the bodies I remember telling Angela about Bobby McNeese and giving her my advice to stay away from him in no uncertain terms.

Q. The initial discovery that you reviewed between August 2 and the discovery of the bodies, did that include discovery regarding Bobby McNeese?

A. No, but I found out he was there, and I think -- the only way I can assume that I found out he was there was by going to visit Angela and having something to show her about the case, whether it be the indictment or early pieces of the discovery, but I found out Mr. McNeese was in the Benton County Jail, and we had that conversation.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 58 of 85

Q. Now, let me ask you about the review of discovery. The U.S. Attorney's Office in the Northern District of Iowa has an open file policy; correct?

A. At that time. And it's been modified with Ms. Rose's appointment as the United States attorney for the Northern District.

Q. And it was an open file policy that had a twist in that it was open at their office.

A. That would be a diplomatic way of putting it, yes.

Q. And that you had to come to them. They wouldn't make copies for you.

A. There were very few things that they would make copies of. Obviously if you could point out to in rule -- Federal Rule of Criminal Procedure 16, you might have some impetus to get copies. The history back then was in a white-collar case you might have a little bit better luck getting copies of documents. But in a traditional street crimes case, if you will, it was come to our office and look at it, and that was a mountain.

Q. And this was my -- this case was not a white-collar case.

A. No, it was not.

Q. So was it -- were you required to go to the U.S. Attorney's Office and review any discovery that you wanted to look at?

A. Initially, yes.

Q. And did you do that with Nancy Lanoue?

A. Initially and -- yes.

Q. And could you explain the process of how you did it?

A. The way I did it was I would take a handheld dictation machine. Nancy would take a laptop computer. We'd start with a notebook. We'd basically open it up, and we'd sort of try to meet in the middle. So I would dictate verbatim what I was reading. Nancy would type verbatim, and that's how we would try to get through it.

Q. And did you do that in this case?

A. Initially.

Q. And then at some point did the policy change and you were able to actually get copies of the discovery?

A. Oh, no. We had to go to court and file a motion, and that was the in-court hearing with Judge Jarvey where we were seeking relief.

Q. And do you recall how soon or late into the case that Judge Jarvey granted you the relief that you were seeking?

A. It seemed to be fairly soon because the discovery came in on a rolling caged cart, and I hadn't seen that much discovery since my participation in the Sons of Silence motorcycle club trial. And it became very evident early on that this was going to be a problem.

I remember one day or one afternoon when a lot of us were sitting in the con -- when I say a lot of us, myself, Ms. Lanoue, I think Mr. Cornell, I think Ms. Nevins, I think Mr. Frerichs, we were all sitting in their long conference room,

their formal conference room, with the caged discovery on wheels trying to get into these notebooks. And we all just sort of looked up and went, this isn't going to work. And that's when we filed a motion for relief.

Q. And you eventually got it.

A. Yes.

Q. And was the discovery subject to a protective order?

A. Yes.

Q. And did that protective order preclude it from being -- the discovery from being out of your immediate possession?

A. Yes.

Q. Did that pose a problem in terms of -- in terms of your ability to share the discovery with your client?

A. Well, yeah, it certainly slowed everything down. And my memory is is I'm not sure that we got a complete copy of everything because I remember having two typists that we had at Terpstra, Epping, and Willett, and I think they were typing either -- they were typing either grand jury or FBI 302s but something that was more investigative reports or investigative interviews. So we didn't get, okay, here's your disk, everything's on this disk, print it off.

Q. In your initial review of the discovery -- and I'm saying this is prior to -- well, in your initial review of discovery, did you find out about the name Christi Gaubatz?

A. Yes, that -- yes, that's familiar.

Q. Okay. And do you recall right now what role Miss Gaubatz played in this case?

A. Well, now I'm wondering if it was Miss Gaubatz who was the baby-sitter, but she -- my memory was she was a close friend of Miss Johnson's. That's my initial memory.

Q. And do you have a recollection that Miss Gaubatz reported to law enforcement that Miss Johnson essentially admitted her involvement?

A. Yes.

Q. In these offenses?

A. Yes.

Q. So you knew that Christi Gaubatz was a significant witness; correct?

A. Yes.

Q. Do you remember any investigation being done regarding Mr. (sic) Gaubatz by Mr. Cornell?

A. I remember Mr. Cornell doing two or three witness interviews before there was a problem, and I can't remember if Miss Gaubatz was at the top of that list or not.

Q. Okay. You also knew in terms of -- this is your first acquaintance with the case -- that the prosecution had -- there were controlled meetings with Miss Johnson in 1998 on 3 separate dates; correct?

A. When you say controlled meetings, I'm thinking controlled buys. Are we talking about the same things?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 59 of 85

Q. Well, controlled buys I think would imply that somebody -- something was purchased at the time.

A. Sure.

Q. Controlled meeting I think is just a meeting without any kind of --

A. I do remember there were some wired conversations.

Q. And those were fairly problematic conversations if you recall?

A. That was one -- that was one of the problems, yes.

Q. Okay. There were evidence of meth dealing?

A. Yeah.

Q. And there were enlisting third parties to collect a debt?

A. That seems very familiar, yes.

Q. Enlisting third parties to put a world of hurt on someone?

A. That phrase is familiar, yes.

Q. Now, before the bodies were discovered, before -- we'll get to McNeese -- did you have an opinion about the strength of the case against Ms. Johnson?

A. Before the discovery of the bodies, it appeared on the surface that at least the case was defensible, and I'm not -- when I describe a case in terms of defending it, I'm not an overly optimistic-type person, so I don't guild the lily or -- but in my mind it was a defensible case which in my mind is about as good a situation as you can have in federal court.

Q. And did you communicate your opinion about the case to Miss

Johnson?

A. That it was defensible?

Q. Yes.

A. I'm sure I probably did. I don't think I would have been overly optimistic with her.

Q. Okay. Was -- if you recall, was there any discussion of a plea before the bodies were found?

A. I can't remember when Mr. Berrigan came on to the scene. When Mr. Berrigan came on to the scene, that was the very first subject that was discussed by Mr. Berrigan. I don't have an independent memory of having that discussion with Miss Johnson because Miss Johnson during my representation of her was adamant that she had done nothing wrong.

Q. She had done nothing wrong in terms of the homicides.

A. In terms of the subject matter of the indictment.

Q. Right.

A. That she had done nothing wrong.

Q. Well, she didn't say that she didn't -- wasn't present at the controlled meetings; correct?

A. True. But in term -- and to be specific where I'm going is in terms of the murders.

Q. Okay.

A. That's where she never admitted guilt to me.

Q. Okay. So we're on the same page.

Would it be correct that it wasn't until after the

bodies were found or at least the bodies found from the Nicholsons -- Greg Nicholson and the Duncans, wasn't until after they were found that Mr. Berrigan came on the case?

A. That seems about right.

Q. Would it be correct that you first talked to Mr. Berrigan about -- on or about October 16, 2000?

A. I don't have any reason to doubt that date. I mean, I don't have an independent memory. But I remember my very first communication with Pat was a phone call because when I called Mr. McNally, he was at some other seminar that Mr. Berrigan was attending with him. And he says, "Listen, I think I've got somebody here, and let me talk to him, and if he's interested, I'll have him call you." Pat called me.

Q. I take it --

THE COURT: Miss Morrissey, can you hold that thought?

MS. MORRISSEY: Sure.

THE COURT: Any objection to taking a 14-minute recess?

MS. MORRISSEY: No, Your Honor. I'd appreciate it.

THE COURT: Okay. We'll be in recess till 2:30. Thank you.

(Recess at 2:17 p.m.)

THE COURT: Thank you. Please be seated.

Miss Morrissey, you may continue your direct examination of Mr. Willett.

MS. MORRISSEY: Thank you. Before we begin, Your Honor, I have two binders that have been marked Plaintiff's Exhibits 8 and 9 respectively. They include billings submitted by counsel and experts in this case.

THE COURT: Just hang on a second, please. Well, is that the same as your case finance binder? Or is this something different?

MR. BURT: No, it's the same.

MS. MORRISSEY: Your Honor, we've abandoned the CD way of delivering discovery to the Court because obviously it doesn't meet the Court's requirements.

THE COURT: Okay.

MR. BURT: But that financial binder, Your Honor, does contain the binders being referenced.

THE COURT: So then these CF-000001 to 000663, is that a number? Is that pagi -- is that an exhibit number? Is it pagination?

MR. BURT: It's a Bates stamp number, Your Honor.

THE COURT: It's a Bates stamp number, okay. So everything in case financial binder which had no exhibit number or letter or way to identify it other than the title is now Plaintiff's Exhibit 8? Is that what you're telling me?

MS. MORRISSEY: Eight and nine, Your Honor.

THE COURT: Eight and nine.

MS. MORRISSEY: Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 348    Filed 11/10/11    Page 60 of 85

THE COURT: Well, on your exhibit list you have the head category case finance binder, singular. Then you have like seven or eight different entries. Then you have a space, and then it goes Stowers billings and then the space and then goes to Willett's billing. So all of that is now Plaintiff's Exhibit 8 and 9. Is that the deal?

MS. MORRISSEY: I'll let Mr. Burt answer that.

MR. BURT: That is the deal, Your Honor. The only correction is that it actually is four binders in -- when we print it all out.

THE COURT: Okay. So we actually now have two exhibit numbers, and even though you said case finance binder, singular, we now have four binders, but it's 8 and 9. Why isn't it just 8?

MR. BURT: I think it should just be 8, Your Honor, because I think it would be clearer given the confusion we've already caused.

THE COURT: Well --

MR. BURT: In other words --

THE COURT: Why are we not on the -- I mean, we're obviously not on the same page on Exhibit 101. You're all very experienced lawyers. Other judges don't expect an exhibit list where they can actually find an exhibit? I mean, is this -- is this, you know, the second coming of Newton's law of gravity or, I mean --

MR. BURT: No, Your Honor, and I think we did submit the request to put the exhibits on DVD. We did that.

THE COURT: Yes.

MR. BURT: And the Court or someone through the Court communicated to us that would be acceptable.

THE COURT: Right. I did. I was contacted, and I said that's great because of the cost of the binders.

MR. BURT: Correct. That was the original idea here was that we had so many documents we didn't want to have to create that many copies. Then we delivered the CDs to the Court prior to the start of the hearing. The DVDs were not premarked because we thought that it would make more sense to have them marked as we addressed when the documents on that exhibit came up.

THE COURT: So --

MR. BURT: And that's the stage at which --

THE COURT: Oh, so you actually thought I was willing to stop everything to have you mark each and every exhibit to introduce it into evidence?

MR. BURT: No, Your Honor.

THE COURT: Is that what you're telling me?

MR. BURT: No.

THE COURT: What are you telling me because I'm not -- we aren't on the same page.

MR. BURT: I think what our idea was was as we're

doing right now, that we would mark the hard copy portion of the record that was at issue, here the billing records, that we would then indicate to the Court that the four volumes we have just marked are contained on the CD as you just indicated so that the Court could follow along per the Bates stamps on the CD so that this exhibit that we're marking collectively as 8 could then be referenced and the Court would have access to the electronic file. That was the original design so that within these four binders if Miss Morrissey referred to a document, for instance, a page of Mr. Willett's billing records, she could reference a Bates stamp number and the Court would have the electronic copy in front of it. And we thought that was a less-expensive way to proceed on these larger run of documents than incurring the costs of duplicating hard copy.

THE COURT: Okay.

MR. BURT: Obviously that --

THE COURT: So do you want it Plaintiff's Exhibit 8 and 9 or just Plaintiff's Exhibit 8?

MR. BURT: No, I think the cleanest way to do it would be Plaintiff's 8 would consist of 4 volumes, 4 binders, designated as volume 1, 2, 3, and 4.

THE COURT: Okay. But, of course, in the exhibit list I have, we don't have binder 1, 2, 3, and 4. We just have case finance binder. So is Exhibit 8 case finance binder?

MR. BURT: Yes.

THE COURT: But now it's in 4 volumes.

MR. BURT: It's been broken up for -- because we couldn't get everything into one binder, yes.

THE COURT: Okay. And you're representing that it contains funding correspondence and pleadings, and then the rest of it is all billing records for Mr. Berrigan, Mr. Stowers, Mr. Willett, and then Mr. Frerichs, Gratias, Cornell, Goody, and then another category called expert billing.

MR. BURT: Correct. And there will -- unfortunately there has been -- since we compiled this run of documents, Mr. Stowers located a set of files that he didn't know or couldn't locate until the hearing started. He's brought those with him. Those are billing records. We're going to have to mark those. We'll have those premarked separately. But other than that --

THE COURT: Okay. That will be like 8A or something or 9 or 8A?

MR. BURT: I think that's the best way to do it. We could just add it into this exhibit and so that this exhibit really would be the finance -- the case finance file which would include all the billings that we were able to --

THE COURT: Locate.

MR. BURT: -- collect.

THE COURT: Yes.

MR. BURT: And I believe I mentioned to this Court on

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 61 of 85

**578**

the record but if not I will which is we had attempted to get the original or copies of the original CJA files from the Court, and we were informed that those files were destroyed in the flood. Apparently they were in the basement in the court, and as a result the billing files we have were reconstructed from the trial counsel files.

So there may be, for instance -- I know for a fact that in the Mary Goody billing records, for instance, there are CJA 30 forms but not the underlying billings, and that's because we couldn't get them from the court and they were not in Miss Goody's file.

But in general, for instance, with Mr. Willett, I think we have a full set of his billings from start of the case to finish.

THE COURT: Okay. Now, you haven't actually offered to my knowledge any exhibits yet which is a whole 'nother problem. But assuming you want to offer Plaintiff's Exhibit 8 now, Mr. Williams, are you going to have any objection to Plaintiff's Exhibit 8?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Would you like to offer Plaintiff's Exhibit 8?

MR. BURT: We would at this time, Your Honor.

* * * *

(Plaintiff Exhibit 8 was offered.)

**579**

* * * *

THE COURT: Okay. Then I'll go ahead and admit Plaintiff's Exhibit 8. Thank you.

* * * *

(Plaintiff Exhibit 8 was admitted.)

* * * *

MR. BURT: And, Your Honor, as long as we're on that topic, the reason we have not offered exhibits up to now is because we had not premarked them, and we've now premarked the first -- the ones that we were involved with on the first day.

THE COURT: Yeah. Maybe we can take that up this afternoon after my sentencing.

MR. BURT: Sure.

THE COURT: Okay.

MR. BURT: Thank you.

THE COURT: Thank you.

BY MS. MORRISSEY:

Q. All right. I'm sorry, Mr. Willett.

A. That's okay.

Q. When we broke I was asking you about when you first discovered that this was a potential capital case.

A. Okay.

Q. And I'm going to ask you whether or not in a billing you submitted to the Court for services on September 13, 2000, you billed for a telephone conference with AUA Reinert re capital

**580**

murder case --

A. I'm sorry. I heard telephone conference, and I didn't hear the rest.

Q. Telephone conference with AUA -- AUSA Reinert re capital murder case?

A. Yeah.

Q. Okay. So at least by September 13, 2000, you had an idea that this could be a capital case.

A. Yes.

Q. And would it be correct to say that you first talked to Mr. Berrigan on October 16, 2000?

A. If that's what the records reflect, then the answer would be yes.

Q. Yes. Okay. Because you billed for a telephone conference with McNally about Mr. Berrigan on that day and then also with -- a teleconference with Mr. Berrigan.

A. Okay.

Q. And when you spoke to Mr. Berrigan the first time on October 16, did you tell him that an offer in the case is not likely and that an offer of life without possibility of parole may be the offer?

A. I don't have a memory of discussing any status of any offer with Pat in that first telephone conversation. It was more sort of a recruitment like would you be on this team, would you help, are you interested, does your schedule allow it.

**581**

Q. I am showing you a set of notes that have been marked Plaintiff's V through Z for identification. Would you take a look at this and see if this appears to be Mr. Berrigan's notes of his teleconference with you on October 16 -- excuse me -- correct -- it was 5. The number of that exhibit is 5.

A. It is his handwriting. I can tell you that.

Q. And does he indicate in his handwriting that you told him that the offer -- an offer is not likely, that life without possibility of parole may be the offer?

A. I'm on the second page of this exhibit. It says offer. There's an arrow going parallel, nothing likely, period. Significant other, 324 months, status, life without parole may be offer, period.

Q. Now does that refresh your memory --

A. Yes, it does.

Q. -- whether or not you discussed a plea with Mr. Berrigan?

A. Yes.

Q. And did you base your opinion that life without parole may be the offer on conversations with any of the prosecutors in this case?

A. My memory is is that those conversations would have been with Pat Reinert, an assistant U.S. attorney, rather than Mr. Williams.

Q. And rather than Mr. Miller or Mr. Murphy.

A. I don't believe I ever had any discussions with Mr. Miller

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 62 of 85

because Mr. Miller showed up very late in the game towards trial. And my memory is is that Mr. Murphy stayed somewhat in the background and let Mr. Reinert and Mr. Williams be out front. So I don't have -- the only time I remember having any discussions or conversations if you will with Mr. Murphy was when we had the televised video conference with DC regarding the death penalty because Mr. Murphy was at that.

Q. Okay. Well, Mr. Williams wasn't involved in this case till later on; correct?

A. Absolutely correct.

Q. And the prosecutor at the beginning of the case for at least a year or two was Mr. Reinert.

A. Right. I don't remember Mr. Williams coming on board till after the Eighth Circuit Court of Appeals' ruling on the Massiah issue.

Q. Now, I want to concentrate on the time before the bodies are found.

A. Sure.

Q. That initial time. Would you agree that before the bodies were found Miss Johnson had a strong bargaining position?

A. It's hard to answer your question because it's so open ended. She certainly had a bargaining position. She never initially in my discussions with her wanted to cooperate against Mr. Honken. That was off the table, and obviously that was something the government was keenly interested in was having

Miss Johnson's cooperation.

Q. And, in fact, is it your opinion that Miss Johnson was indicted in order to get her to cooperate and find the bodies?

A. A cynic would --

MR. WILLIAMS: Calls for speculation.

THE COURT: It does, but I'll allow it.

A. A cynical mind would think so, yes.

Q. And did you have any -- after the bodies were found, did your perspective on the defensibility of this case that you mentioned earlier today, did that change?

A. Certainly.

Q. Okay. Was it a major change?

A. It was an incredibly major change.

Q. Now, I want to talk about your discovery about McNeese; is that correct?

A. Yes.

Q. You knew that Miss Johnson had been arrested and put in Benton County Jail.

A. Yes.

Q. And did you also know that McNeese was there?

A. Not initially, no.

Q. At some point in time before the bodies were found, did you give Miss Johnson a warning about Mr. McNeese?

A. In no uncertain terms, and not only did I tell her about Mr. McNeese, I told Mr. McNeese what -- I told Angela what

Mr. McNeese had done in prior cases.

Q. And did you describe with particularity what he had done?

A. Yes.

Q. And basically he is -- could you describe him?

A. Mr. -- Mr. McNeese is a master at creating crime and then solving it for his own benefit. Mr. McNeese will worm his way into the heart and soul of an individual through various means and then turn on them and rat them out. Mr. McNeese did this to my former client Dr. Shultice. He did this to an individual I previously had worked with, a former private investigator by the name of Mr. Garrett. He had tried to get me off of his case by indicating that during one jailhouse meeting I had with him he had told me everything about his case and, therefore, I should be off the case.

And I told Angela about Dr. Shultice and about Mr. Garrett, and I said don't talk to him, stay away from him.

Q. And at the time you gave Miss Johnson this advice, was Mr. McNeese in Benton County Jail then?

A. That was my understanding.

Q. Obviously for whatever reason she didn't heed your advice; correct?

A. Sadly she did not.

Q. And let me ask you about what your reaction was when you found out that she didn't heed your advice.

A. I think I learned about it by seeing it -- a news report on

TV, and I'm not even sure I was in Cedar Rapids. I may have been in another town on business, but I saw it on TV, and my jaw and my heart fell at the same time. And then, quite frankly, after that I was a little bit mad.

Q. You were furious with Miss Johnson.

A. I don't -- I was furious at her. I don't think I ever lost my temper with her when I met with her. But was I furious at her for this decision? Yeah, that would be fair.

Q. And as a result of this whole situation, did you want to dwell on the McNeese situation, on McNeese's involvement in this case?

A. I'm sorry. I'm not understanding your question. By dwell on it, dwell on it with Ms. Johnson? Dwell on it myself?

Q. No. Did you ever ask Miss Johnson how she was able to draw the maps for Mr. McNeese?

A. I did not have any detailed conversation with Miss Johnson about these maps in the aftermath. I remember going to see her fairly shortly after the discovery, and fairly shortly may be a relative term because I know she was in the Black Hawk County Jail and she committed su -- attempted to commit suicide and was hospitalized.

So my memory is is the first chance I may have had to talk with her about this is when she -- after her hospitalization she was brought to the Linn County Jail because the Black Hawk County sheriff wanted nothing to do with her.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 63 of 85

So I remember going to see her, and I remember somebody accompanying me, and I remember talking to Angela in the context of sort of what's done is done, now we have to discuss the aftermath. I didn't think it was going to benefit our attorney-client relationship for me to be critical or chew her out. I remember her being generally apologetic, but I don't -- you know, I don't think there was any, you know, punishment or criticism. It was like, okay, this has happened, how we gonna handle it?

Q. And as a result you never asked her how she was able to draw the maps that led to the bodies, did you?

A. I didn't ask her that specific question.

Q. Did you consider that there might be an explanation for her ability to draw a map other than her presence at the time of the killings?

A. No. Because of the detail of what I was reviewing in the maps and the notes, no.

Q. And was the detail of what you were reviewing in the maps and the notes consistent with the physical evidence that you knew about?

A. Pretty much, yeah.

Q. Was the detail of Miss Johnson's description of the girls wearing pajamas consistent with the evidence, the physical evidence, that you knew about?

A. I don't think Ms. Johnson ever described to me what these

girls were wearing that I have a memory of.

Q. Did she describe to Mr. McNeese what they were wearing?

A. I'd have to see the notes and the map again. I can't remember as I sit here today.

Q. Did you consider looking at Miss Johnson's alleged statements to McNeese to compare with the physical evidence to determine whether or not there was -- what she said was consistent with the physical evidence?

A. I just have a general memory, Ms. Morrissey, that what I was reading and seeing was consistent with the general evidence. I just have that general memory.

Q. Is it correct -- and tell me if this is wrong -- that you didn't believe there was much room for an alternative explanation of how Miss Johnson was able to draw the map?

A. That would be fair.

Q. Okay. Did you believe the maps were crippling?

A. I'm not sure if I used the word crippling, but this case was no longer a horse race.

Q. And it was not only a horse race, it was becoming a capital non-horse race.

A. That would be very fair.

Q. All right. After the bodies were found, Mr. Berrigan joined the defense team; correct?

A. Yes.

Q. And were you present the first time Mr. Berrigan met Miss

Johnson?

A. I was.

Q. And can you tell us what that visit was like.

A. It went poorly. Mr. Berrigan came in wanting to express to Angela that we need to plead guilty and we need to strike a plea bargain and we need to do it now. And Mr. Berrigan's position and -- on this I think took Angela by surprise. And Mr. Berrigan's insistence on this didn't really jive with Angela's personality. And what I mean by that is I always found Miss Johnson to be an independent lady, a strong-willed lady, and Mr. Berrigan comes in and says we're going to do X, Y, and Z, and sort of jump to the conclusion of we're going to start talking about a plea. And I remember Miss Johnson at one point saying, "Well, don't you want to talk about the facts of the case," and I remember Mr. Berrigan saying words to the effect of we can talk about the facts all day long; it's not going to change the outcome.

Q. Uh-huh.

A. And that really seemed to separate, if you will, Miss Johnson and Mr. Berrigan. They became basically entrenched in their relative positions.

Q. And did that initial meeting between Miss Johnson and Mr. Berrigan, did that affect your ability as her lawyer to resolve the case with a plea?

A. Well, yes, but in all fairness, I -- basically Mr. Berrigan

had that responsibility of trying to negotiate a plea. He was the death penalty-certified lawyer. I was trying to maintain a good relationship with Miss Johnson because I figured, well, somebody has to here. I mean, somebody has to be able to talk to our client and communicate with her. So I left the plea negotiations, if you will, primarily to Mr. Berrigan, and I tried to maintain -- you know, I mean, I guess what I was trying to do was say, well, let's talk about the Massiah issue, let's talk about the motions, let's talk about the hearing.

Q. So would it be fair to say that it didn't -- the relationship between Mr. Berrigan and Miss Johnson didn't get off to a great start?

A. Not at all.

Q. And let's talk about the division of labor in this case. You were -- were you lead counsel?

A. I was lead counsel.

Q. Okay. And as lead counsel -- I believe that one of Judge Bennett's orders describes the job of lead counsel as somebody essentially responsible for investigating the guilt phase of the case, preparing for the guilt phase of the case, examining witnesses for the guilt phase, and presenting -- and cross-examining prosecution witness and presenting a defense; correct?

A. That would be fair.

Q. So that's a big responsibility.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS Document 348 Filed 11/10/11 Page 64 of 85

**590**

A. Sure. I don't remember the order you're referring to, but I'm not disagreeing with your description of lead counsel.

Q. All right. And when Mr. Berrigan came in, you said that he -- the negotiation of a plea became his responsibility; correct?

A. Bless you. Yes.

Q. Thank you. And why did not you as lead counsel have the -- take on the reins of negotiating a plea?

A. I deferred to Mr. Berrigan based upon his prior experience. He had been a assistant state public defender and a state public -- and a county public defender in Missouri for many years prior to his move into private practice. He had tried many death penalty cases in the state of Missouri, and the state of Missouri has the death penalty. And I was deferring to his expertise.

Q. Okay. Was there a discussion among the team, that is, you and Mr. Berrigan and Mr. Frerichs, about a plea outside of Mr. Johnson -- Miss Johnson's presence?

A. I'm sure there would have been. I don't remember a specific incident or event, but I'm sure there would have been.

Q. After the McNeese situation there came -- there became an issue of a Massiah violation; correct?

A. Absolutely.

Q. And did you then pursue litigation of that?

A. We most certainly did. We filed a motion, and we had the

**591**

hearing in front of Judge Bennett.

Q. Now, let me ask you whether or not discussions about a plea continued at least among the team during the time the Massiah violation was being litigated in the district court.

A. I'm not sure that it was, because we believed we had a very strong case for a Massiah violation, and at least at the district court level we were proven out on that fact.

Q. Okay. On March 9, 2001, your billing indicates -- which is Exhibit 8 -- your billing indicates that you billed for a conference with the client re letter from Reinert and plea negotiations for .7 hours.

A. Okay.

Q. Okay? So at least while the Massiah litigation was pending, you at least had a telephone call with Mr. Reinert about plea negotiations.

A. Did you say my billing was for a conference or for a telephone conference?

Q. Conference with client re letter from Reinert and plea negotiations.

A. Okay. I'm assuming I received a letter from Mr. Reinert, and knowing Mr. Reinert the way I do, there was probably a deadline attached to it.

Q. Okay.

A. You know, respond by date certain. And so I would have taken the letter to Angie, and we would have gone over the

**592**

letter together.

Q. Is it correct that Miss Johnson's bargaining position when the Massiah litigation was pending was probably not as good as it was before the bodies but was still better than usual?

A. It -- yeah, I think that's fair.

Q. Because at that point all you knew the government had against her was Mr. McNeese; correct?

A. Correct.

Q. You didn't know about Miss Gaubatz.

A. I can't remember what I knew when about Miss Gaubatz to answer your question.

Q. Did you go to a detention hearing August 2 --

A. I'm sorry. Yes. I would have known about Miss Gaubatz. That would certainly have come up.

Q. Okay. So there was lots of discussion about Miss Gaubatz in the detention hearing.

A. Absolutely.

Q. Okay. So they still had her.

A. Yeah.

Q. And had you found out about any other jailhouse snitches by the time the Massiah litigation started?

A. I may have the time frame wrong, but it seems to me that post Massiah hearing is when we discovered some of the --

Q. Pardon?

A. I may have the time frame wrong, but it seems to me that

**593**

post Massiah hearing is when we learned about some of the female snitches, some of whom had been in the Linn County Jail and maybe -- maybe there was one in the Benton County Jail who were alleging that Angela was making admissions.

Q. Isn't it correct that you knew about the existence of snitches in the jail fairly early on?

A. Oh, that's fair. And I'm specifically thinking of Mr. McNeese when you ask me that question, but . . .

Q. Snitches other than Mr. McNeese.

A. As I said, I can't remember the time frame, but I did become aware of other female snitches, but I can't remember if that was post Massiah hearing or exactly when that was.

Q. The Massiah hearing, your recollection, was April 11, 2001, until April 13, 2001; correct?

A. Yes, it was at the United States Courthouse in Cedar Rapids.

Q. And then there were further discussions on -- or further hearing on the Massiah issue on July 29, 2001.

A. Right. I can't remember why we came back, but something was unfinished, and we took one extra day I think to . . .

Q. Between the time of the taking of the evidence on the Massiah issue and the judge's ruling, was there any discussion of a plea?

A. I don't remember personally any substantive discussions of a plea during that time. I think the belief was we felt

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 348 Filed 11/10/11 Page 65 of 85

optimistic about the case we had presented to Judge Bennett and we were all interested in knowing what his ruling was.

Q. What I'm trying to get at I suppose is did you think that the case was going to go away if you were to prevail in district court on the Massiah issue?

A. It would not have gone away, but it would have gotten back to the original point where the initial belief was that this could be a defensible case.

Q. And in -- all right. I'm going to ask you about a letter from your file -- it's Plaintiff's 5HH for identification -- and ask you to look at it and see if you recognize this letter.

MR. WILLIAMS: What's the date of that letter?

THE WITNESS: June 22 of 2001 it appears.

MR. WILLIAMS: Thank you.

THE WITNESS: If I'm reading the handwriting correctly.

A. Okay.

Q. And what is this letter that's been marked as -- marked as Plaintiff's 5HH?

A. This is a letter addressed to me by my former client, Bob Shultice.

Q. And he was one of -- you mentioned him in connection with Robert McNeese.

A. Yes.

Q. All right. What does this letter tell you?

A. I can read it. I'm not sure what it told me but --

Q. Okay. Go ahead.

A. Dear Al, Brett Farr, the boyfriend of Sara Bramow, said she was just admitted to LCCC -- and I'm interpreting that to mean Linn County Correctional Center -- on drug charges. I suppose last I had heard she, quote, had, unquote, the proffer agreement but I -- but had not signed it. Bob Shultice.

Q. Now, Sara Bramow was ultimately one of the jailhouse informants who testified against Miss Johnson.

A. Yes, she was.

Q. Does it appear from that letter written to you by your former client that you knew that Sara Bramow was a jailhouse snitch in this case as early as June 2001?

A. I'm not sure what I took from Dr. Shultice's letter. Quite frankly if I may, Dr. Shultice was an interesting client in and of himself, and just because Dr. Shultice would represent something to me I would not necessarily accept it.

Q. Well, you knew that Miss Bramow was a witness as to your Massiah claim.

A. Yes.

Q. And that as of -- between April and July of 2001 you were actively seeking Miss Bramow so that she could give testimony to the Court.

A. Yes.

Q. And so she was on your radar.

A. Pursuant to this letter, yes.

Q. Right. And was she on your radar as a possible snitch in addition to a witness on the Massiah violation as a result of this letter from Dr. Shultice?

A. I'm not sure that she was on my radar as a snitch because of the last phrase, quote, had -- or the last phrase, I suppose last I had heard she, quote, had, unquote, the proffer agreement but had not signed it.

Q. And proffer agreement is obvious sign somebody's about to sign on with the government.

A. In the Northern District of Iowa, yes.

Q. On August 3, 2001, you billed for a visit with your client about a plea proposal for 1.8 hours.

A. Okay.

Q. Okay? Do you recall what plea proposal you discussed during that time?

A. No.

Q. Is there anything in your file that records the nature of the plea proposal that you discussed in that jail visit with your client on August 3, 2001?

A. The only thing I can assume is that I may have received another letter from the U.S. Attorney's Office that I went and discussed with Miss Johnson.

Q. If you had received a letter from the U.S. Attorney's Office that you had discussed with Miss Johnson on August 3,

2001, do you think it would be in your file?

A. I'd like to think so.

Q. Okay.

A. The only other possibility, Ms. Morrissey, would be if I went with her just to sort of discuss the status of all this and where she was at. That would be the only other possibility that I could think of.

Q. Okay. On July 10, 2001, did you get a -- take -- a typed letter from Miss Johnson? And I have in front of me what's been marked Plaintiff's 5KK for identification. Let me approach and show you a copy of this letter from Miss Johnson and see if you remember it.

A. And I'm sorry. The conference of 1.8 or 1.7 hours, what date was that?

Q. That was later. That was on August 3, 2001.

A. Okay.

Q. This is a letter that predates that by a little bit. I'm sorry for not going in chronological order.

A. Okay.

Q. Have you read it?

A. I have read it.

Q. Okay. This was a letter basically saying, "I haven't touched my children for a year. Can you do something for me?"

A. She wanted to be moved to a different facility.

Q. And are the sentiments expressed in this letter ones that

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 348 Filed 11/10/11 Page 66 of 85

are familiar with you based on your representation of Miss Johnson?

A. Absolutely.

Q. Being able to be with her children was a theme; correct?

A. A continuous theme.

Q. And were efforts made to do that?

A. We didn't have a lot of options. I know there were places that were looked into. Some of our county -- in the state of Iowa each county correctional facility seems to have their own nuances regarding the visitation of children. And I don't believe any of our county correctional facilities allow contact visits with children.

I know that I received at one time communications from Angela regarding the possibility of sending her to a correctional holding facility in Chicago which I believe she had learned may allow that.

So the problem was is since the marshal -- since in the Northern District we don't have a marshal's holding facility, if you will, and since they have to have contracts with county jails, there really wasn't anywhere that I could take her to satisfy that request. And this wasn't something that -- for example, I knew Michael Carr at the Linn County Jail. This isn't something Mr. Carr was going to allow. The sheriff of Black Hawk County didn't want Miss Johnson back at his jail, so our options were very limited.

Q. What type of a place is Linn County Jail? Is it a particularly nice jail?

A. It's probably on the upper level of county jails in this state. I've been in much worse jails in this state than Linn County. I've been in nicer facilities that are basically newer. But I would say it's in the upper -- upper half of county jails in this state.

Q. And Miss Johnson was there during most of her pretrial incarceration; correct?

A. Yes. Black Hawk County, Benton County, Linn County, and then prior to trial Hardin County in Eldora.

Q. All right.

MS. MORRISSEY: If I may just have a moment, Your Honor.

Q. Mr. Willett, do you recall visiting Miss Johnson in jail on October 1, 2001, with Mr. Berrigan?

A. I don't have an independent memory of it but . . .

Q. Okay. Do you recall being with Mr. Berrigan on that date when Miss Johnson authorized plea negotiations?

A. That has a ring to it.

Q. And it would make sense based on what you've told us that it would be Mr. Berrigan who would get the authorization for plea negotiations; correct?

A. Yes.

Q. Because that was his job.

A. Yes.

Q. Do you recall your position on the issue of a plea at the time of that meeting in 2001 on October 1?

A. The only thing I'm uncertain about is when Judge Bennett's Massiah ruling came down. And if that would have been prior to his ruling in the Massiah hearing, there may have been some discussion as to do we want to wait to see what the ruling is.

Q. If I told you that Judge Bennett's Massiah ruling was issued on May 23, 2002, would that help?

A. Well, it would put a time line to it, yes.

Q. Okay. So at least as of the time of this visit on October 1, 2001 --

A. He hadn't ruled.

Q. -- you hadn't heard from Judge Bennett.

A. Correct.

Q. Okay. So it was still pending. You didn't know which way it would go.

A. Right.

Q. And it was at this point in time that your recollection is that Miss Johnson authorized a plea negotiation by Mr. Berrigan.

A. I don't -- it has a ring of familiarity. I don't have an independent memory as I sit here right now, but I'm not disputing what you're suggesting, Ms. Morrissey.

Q. Okay. And after this October 1 meeting at the jail where Mr. Berrigan was authorized to begin plea negotiation --

MR. WILLIAMS: Objection. States facts not in evidence. This witness has said he has no independent recollection of it.

THE COURT: Can you rephrase the question?

MS. MORRISSEY: Yes, I can. Thank you.

THE COURT: Thank you.

BY MS. MORRISSEY:

Q. Subsequent to your meeting at the jail with Mr. Berrigan and Miss Johnson on October 1, 2001, did you receive from Mr. Stowers who was by then on the case a proposed plea agreement on behalf of Miss Johnson?

A. Do you mean like a letter? When you say a proposed plea agreement, I consider that a term of art. I'm thinking of numerous pages from the U.S. Attorney's Office with paragraph after paragraph, but are you referencing that Dean sent a letter conveying a plea agreement?

Q. Yes.

MS. MORRISSEY: I have, Your Honor, a plea agreement -- a letter to Mr. Reinert that purports to be a memorandum of a proposed plea agreement between the United States Attorney's Office and Angela Johnson that's dated October 8, 2001. It's marked Plaintiff's 5LL. May I approach?

THE COURT: You may.

MS. MORRISSEY: Thank you.

BY MS. MORRISSEY:

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 348 Filed 11/10/11 Page 67 of 85

Q. I'm going to show you this Exhibit 5LL and see if you recognize that.

A. I thought initially that this was in the 1,200 pages that were given to me prior to my arrival to review, but I don't remember it being on this letterhead, so I'm confused at the moment.

Q. Okay. Let me back up and ask you, we gave you the 2255 petition in this case as well as 1,200 pages of material.

A. And an extra 50 pages Sunday morning.

Q. It was our Sunday morning present to you.

A. Yes.

Q. And you've reviewed those.

A. Absolutely.

Q. But you've told us about your file in the case, and would it be correct to say your file was much bigger than the petition plus 1,250 pages of discovery that you've reviewed for this hearing?

A. My current legal assistant, Ms. Jensen, I believe gave us a box count when you and Mr. Burt came to visit me at my office, and I remember her saying I think 47 or 46 boxes with the exception of -- banker's boxes with the exception of 1 lost to the flood.

Q. All right. So we didn't give that to you to review, but looking at it now, does it look familiar? Does it look familiar to something that was in your file without Mr. Stowers'

letterhead on it?

A. I want to say vaguely, but it's the letterhead that's got me confused. I mean, the format is something you would see very similar to what the U.S. Attorney's Office produces on their own letterhead as far as the format and the style. But I'm just confused by the fact that it's on Mr. Stowers' letterhead. And maybe I'm putting too much into that but . . .

Q. Was Mr. Stowers a member of the Johnson defense team by October of 2001?

A. Oh, I think he was, yes.

Q. And so he is purporting at least to write on behalf of your joint client Angela Johnson.

A. And I wouldn't dispute that.

Q. Okay. And so do you have any reason to dispute that this proposed plea agreement was, in fact, written by Mr. Stowers and faxed and mailed to Mr. Reinert?

A. No.

MR. WILLIAMS: May I voir dire on that question, Your Honor, before this exhibit is put into evidence?

THE COURT: Sure.

VOIR DIRE EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Willett, the document that the counsel has shown you is unsigned; right?

A. Correct.

Q. Has no fax line on it, does it?

A. Has no fax line?

Q. No notation at the top that it's been faxed anywhere; right?

A. It just says by fax and by mail, and then there's a 319 area code 363-1990, but I don't know what the fax of your office is.

Q. Okay. But if you actually fax a document, you'll see a line across the top that indicates it's been faxed. There's nothing like that on this document, is there?

A. There appears to be at the top of page 3. And I'm sorry. It's page 2 of the document, but at the very top of page 3 you see it's cut off -- you see what appears to be Rosenberg Law Firm, 515-2430 -- I think that's a 6 --

THE COURT: Mr. Willett, could I interrupt just one sec --

THE WITNESS: I apologize.

THE COURT: Oh, no, no, no, I need to apologize because I'm interrupting you.

How is it that I'm supposed to figure out where to find that document? I mean, I know we're back to this square one about I don't have an exhibit list, but, you know, they're talking about a document that you all have seen. I'm the trier of fact. I have no idea how to find the document. Where would I find it? I called up your -- you know, I mean, I've got these

exhibits here, so I've got about eight subfiles. None of them -- I have no clue where I would find it. So I'm just wondering how you're expecting me to track the evidence.

MS. MORRISSEY: It's a good question, Your Honor, and quite frankly, I --

THE COURT: Because I actually like to read the exhibits that get offered, you know.

MS. MORRISSEY: I understand.

THE COURT: I'm kind of strange that way.

MS. MORRISSEY: No, I understand that you would. And I can't tell you that I know where it is on these CDs.

THE COURT: Okay. Can you tell me what subcategory -- is it in discovery, letters?

MS. MORRISSEY: Can I approach you, Your Honor, with this particular exhibit?

THE COURT: Well, with his copy so now we have to take time, stop everything, and I can read the exhibit while you're questioning Mr. Willett? No, I'm not willing to do that.

MS. MORRISSEY: I agree that that's very --

THE COURT: Yeah. Can you tell me what subdirectory it's in?

MS. MORRISSEY: It should be under the Stowers file, Your Honor.

THE COURT: Well, there is no Stowers file. I have legal pads, 2011.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

MS. MORRISSEY: I think that's the Nancy Lanoue file, but we'll check. October 8, 2001.

THE COURT: Okay. I'm now on the original -- the first listing of subdirectories. Is it in the attorney notes binder?

MS. PEMBERTON: There's a folder marked plea binder.

THE COURT: Yes, I see that now.

MS. PEMBERTON: Okay. It is page 8 of the Stowers letters, RS-11 -- so in the plea binder folder there is a file -- let me just go out --

THE COURT: RS-11-763?

MS. PEMBERTON: Yes, to 804.

THE COURT: Okay.

MS. PEMBERTON: And in that file at page 8 is the letter of October 8, 2001.

THE COURT: Okay. I'm still -- okay. I have it now. So here's what might be helpful. When we have a key document like this, tell me -- that was very clear on where to find it. I was able to find it very quickly. But without that direction, I just -- I have no idea how you organized it, so that would be very helpful because I really do like to read the document, listen to the witness so I'm tracking everything.

MR. WILLIAMS: Your Honor, if I could, the version that was provided to me in discovery has no fax line on it. I'm now being told that there is on page 2 apparently some fax line.

I don't know if there is on the version that's been marked as an exhibit. May I approach the witness to take a look at what he has?

THE COURT: Yes.

MR. WILLIAMS: Thank you, Your Honor.

THE COURT: If there's a fax line on my copy, it's in invisible ink or I'm just not seeing it.

MS. MORRISSEY: Your Honor, it may be that unfortunately when you scan these documents the tops and bottoms tend to get cut off, and we'd have to go to the original, to be honest with you, because as a result of scanning --

THE COURT: You're always honest with me, so you don't have to ever say that again.

MS. MORRISSEY: Okay. I won't. Thank you. I don't know the answer. I mean, it appears to have a fax line on it and the other parts don't so . . .

THE COURT: Okay.

MR. WILLIAMS: If I can, Your Honor, may I continue with voir dire for a second?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Mr. Willett, do you know from that -- apparently on page 2 and there's a partial -- a partial section of it on page 3 that shows I think a little bit of a fax line or what looks like a fax line. Is that an indication that it was faxed to you, or do

you know?

A. It wasn't faxed to me because I would be in the 319 area code, and at the top of page 2 of the document, it's cut off a little bit, but it appears to say Rosenberg Law Firm, 515-243 -- I have to get my bifocals going.

THE WITNESS: I apologize, Judge.

Q. Mr. Willett, that's close enough. It appears, though, that that's a fax line showing that it was faxed from that law firm in Des Moines to someplace.

A. To someplace, yes.

Q. We don't know where it got faxed to.

A. I can't tell that from the document, no.

Q. It's not signed by anybody; correct?

A. There is no signature line and -- no, for anyone that has been executed.

Q. And you don't know that that has ever been provided to the United States, do you?

A. I wouldn't -- I wouldn't know.

MR. WILLIAMS: Nothing further, Your Honor.

CONTINUED DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Had you seen this particular plea agreement that's been marked Plaintiff's 5LL before we showed it to you today in court?

A. I don't have a memory of it. I don't believe this was in

the 1,200 pages given to me to review.

Q. So it is possible that it was part of the materials that you did not receive from us.

A. I don't know.

Q. As lead counsel, would you have been aware of any plea agreements, proposed plea agreements, on behalf of Miss Johnson sent to the government?

A. I'd like to think I was copied in on everything.

Q. And as lead counsel, would you be aware of a proposed plea agreement on Miss Johnson's behalf prior to it ever being drafted and sent?

A. I think I -- I think I was privy to most of the discussions between myself and Mr. Berrigan and Mr. Stowers.

Q. Okay. So it wouldn't be something that you would be intentionally kept out of; correct?

A. No.

Q. I have another letter and perhaps with Miss -- with Miss Pemberton's assistance I'm going to ask you about a letter that you wrote to Berrigan and Stowers on --

THE COURT: Well, before we leave this whatever number you marked this --

MS. MORRISSEY: Be 5LL.

THE COURT: -- 5LL, the October 8, 2001, whatever it purports to be, I do have a question I'd like to ask Mr. Willett.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 69 of 85

MS. MORRISSEY: Sure.

THE COURT: In your experience in the Northern District of Iowa, have you ever seen a plea agreement that was signed by the defense and by the government that did not have a detailed factual basis in it?

THE WITNESS: No.

THE COURT: Does this whatever it purports to be contain a factual basis?

THE WITNESS: No.

THE COURT: Those are the only questions I have about that document.

MS. MORRISSEY: Thank you, Your Honor. Your Honor, this -- actually let me move on.

BY MS. MORRISSEY:

Q. Okay. We've talked about on May 23, 2002, Judge Bennett ruled on the Massiah claim; correct?

A. Correct.

Q. Were there -- among the team, were there discussions about settling the case after the Massiah ruling by Judge Bennett?

A. I think there probably were.

Q. Was this a matter of concern to the defense?

A. Concern in what sense, Miss Morrissey?

Q. Well, did you think that you were in a good bargaining position as a result of the Massiah --

A. We were certainly in an improved bargaining position.

Q. At the same time you did not know how the circuit -- how the Eighth Circuit would rule.

A. Correct.

Q. And a 50/50 chance that you could get back behind the eight-ball.

A. I'm cynical by nature. I'm not sure I would have said we had a 50/50 chance.

Q. Do you recall the nature of any plea discussions that were held between the time of Judge Bennett's ruling and the ruling by the Eighth Circuit?

A. No.

Q. Did Judge Bennett's ruling mean that this case would go away?

A. No. I said that already.

Q. Because even assuming you won in the Eighth Circuit, you would still have to deal with Mr. McNeese at some point; correct?

MR. WILLIAMS: Leading, Your Honor.

THE COURT: Overruled.

A. I guess my answer is if we would have to deal with Mr. McNeese in the future it would be in a much different context and a much more limited context than what he suppose -- what my client -- I'm sorry, your client supposedly communicated to Mr. McNeese.

Q. Okay. Would be our client.

A. Okay. Fair enough.

Q. But Judge Bennett's ruling in 196 F. Supp. 2d 902 was that the evidence of McNeese was admissible for impeachment purposes; correct?

A. Yes. Thank you. Yeah.

Q. And Judge Bennett also ruled that the suppressed evidence provided by Mr. McNeese would be admissible at any sentencing phase.

A. Yes.

Q. So McNeese and the bodies did not evaporate after Judge Bennett ruled.

A. Correct.

Q. Would it be your position that Miss Johnson's team was in a good position to obtain a favorable plea ruling -- plea agreement between the time of Judge Bennett's ruling and the decision by the Eighth Circuit?

MR. WILLIAMS: Asked and answered.

THE COURT: You may answer.

A. I can't remember what authority we had from Miss Johnson during that time period to negotiate a plea, so I can't -- I can't completely say we were in a good position. Theoretically we were in a better position because of the ruling, but I can't -- I don't have an independent memory of what authority our client gave us to negotiate a plea after Judge Bennett's ruling prior to the Eighth Circuit's decision.

Q. Well, she'd given you authority early on during the jail conversation with Mr. Berrigan; correct?

A. Correct, but this was a -- this was a very fluid concept.

Q. Well, would you agree that if at any point after the initial approval by Miss Johnson she had taken back that approval it ought to be reflected in Mr. Berrigan's notes?

A. I'd like to think so.

Q. Okay. And if I told you there was no such withdrawal by Miss Johnson, will you accept that as --

A. I'll accept your professional representation.

MR. WILLIAMS: Objection. Asserts facts not in evidence.

THE COURT: It's already answered.

BY MS. MORRISSEY:

Q. I have a document that's been marked Plaintiff's 5VV for identification, V like Victor, V like Victor, about a jail visit with Angela Johnson. Okay. We'll get this for the Court. These are Mr. Berrigan's notes concerning a jail visit with Angela Johnson on July 16, 2002.

A. Sure. Ms. Morrissey?

Q. Yes.

A. Can I hand these back to you? They were I think from a prior witness.

Q. Oh, yes. Thank you.

MR. WILLIAMS: Counsel, what's the date on that again?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 70 of 85

**614**

MS. MORRISSEY: July 16, 2002. And for the discovery purposes, Miss Pemberton?

MS. PEMBERTON: In the -- on the DVD of the exhibits, there is a master chronology that is subdirectories by year.

THE COURT: Yes.

MS. PEMBERTON: And then it has by month within each year, and it would be in the July 2002 folder. If you scroll down, you will see a file that says 2002-7-16-PB for Patrick Berrigan.

THE COURT: I see it.

MS. PEMBERTON: Jail visit notes.

THE COURT: Thank you.

MS. PEMBERTON: You're welcome.

THE COURT: And it would have taken me years to find it on my own, so thank you.

MS. PEMBERTON: You're welcome.

A. Okay. I reviewed it, Miss Morrissey.

Q. Okay. And this is -- okay. And this is, in fact, notes of a jail visit in which you participated; correct?

A. Yes. It shows that I'm there, and it's in Mr. Berrigan's handwriting.

Q. Right.

A. And it shows that Mr. Stowers was there.

Q. All right. And do these notes name Phyllis Proscovec as a potential defense witness?

**615**

A. Yes.

Q. And that information came from Miss Johnson; correct?

A. Yes, but if I remember right, Miss Proscovec was also in the government's discovery file.

Q. Yes. Did that name -- had you ever heard that name before you heard it during this visit on July 16, 2002?

A. I'd like to think that I had.

Q. And after you heard this on July 16, 2002, did you determine that Miss Proscovec was somebody who was a potential witness in the government's discovery?

A. What I can't remember is when we found out about Miss Proscovec's untimely passing because she passed away, and it was fairly early in the case, but I can't remember when that was.

Q. Was July 16, 2002, the first time the word -- that you were hearing Phyllis Proscovec, or had you heard about her earlier?

A. My memory is is I would have heard about her earlier.

Q. And when you visited Miss Johnson at the jail, did you typically take notes of your conversations with her?

A. Not a lot, not a lot.

Q. So there wouldn't be any notes that would contain a jail visit with you that would include the name of Phyllis Proscovec; correct?

A. I can't say yes or no one way or the other.

Q. In the same Plaintiff's VV, V like Victor, V like Victor, is there a mention of a plea?

**616**

A. Par -- I'm sorry.

Q. And --

A. Paragraph 8, page 3, plea negotiations, there is mention of it, and then there is -- in Mr. Berrigan's notes there's our client's response.

Q. Okay. Well, the notes read, "Told her 20 minimum is best we could hope for, not interested."

A. Yes.

Q. Paren, may want to run 20 by Reinert anyway, end paren.

A. Yes.

Q. Dean will do numbers on drug case. Tell Angie how much time she'd do on drug table.

A. Correct.

Q. Okay. Now, what does that -- all that drug table stuff mean? Is that a reference to the sentencing guidelines?

A. Yes, absolutely.

Q. Okay. Because Miss Johnson was facing some substantial federal time on the drug counts alone; right?

A. Absolutely.

Q. And in rejecting the 20 years which she did that day, you think it was relevant for her to understand what she would get -- what the penalties were if she got convicted on just the drug counts and take away the homicides?

A. Certainly.

Q. Do you know whether Dean Stowers talked to Miss Johnson

**617**

about the numbers, whether he ran the numbers on the drug table?

A. I don't know one way or the other. I can only speculate.

Q. Okay. And you're an experienced federal litigator; correct?

A. I'd like to think so.

Q. Okay. And you are as capable as anyone of doing the numbers on the drug table for what Miss Johnson was charged with.

A. Yes.

Q. And do you recall doing that?

A. I have some memory that her guideline range was above the 20-year statutory minimum, and I'm not sure why I have that memory or from where or when. But I just have that memory.

Q. When you say it was above the 20-year statutory minimum, you mean the 20 that was offered by --

A. That the advisory guideline range was above any statutory minimum, and I may have been -- I may have been wrong in stating the statutory minimum in this case but . . .

Q. Do you have any recollection of what it was vis-a-vis the 20-year deal that was mentioned by Mr. Berrigan?

A. Not specifically, no.

Q. Okay. All right. I have another document that's been marked Plaintiff's 5ZZ for identification I'm putting on the ELMO which Mr. Burt tells me I haven't been doing for a long time and he's correct. This regards a teleconference with Pat

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 348    Filed 11/10/11    Page 71 of 85

Reinert on 8-3-02. Do you recognize that handwriting on that document?

A. No, I -- excuse me. No, I --

Q. If I told you it was Dean Stowers' handwriting, would you have a quarrel with that?

A. No.

Q. And in this teleconference with Mr. Reinert, does Mr. Stowers say in the final paragraph that he wants to resolve the case by plea? Spoke of need to clear any deal with families. He seemed to agree that concept of Rule 11(e)(1)(C) plea to term of years arrived at by reduction for substantial assistance being factored in. Agreed to travel to Des Moines for meeting since this was central location for us.

A. That is what it says, and I do remember a meeting in Des Moines.

Q. That's a pretty hopeful sign that the prosecutor's willing to come to you; right?

A. Yes.

Q. And you just testified that you do remember a meeting in Des Moines.

A. Correct.

Q. Does your file contain any notes of that meeting on August 21, 2002, in Des Moines?

A. It wasn't in the 1,200 pages you submitted to me. I'd like to think I took notes at that type of a meeting.

THE COURT: Can you put that back on for a minute?

MS. MORRISSEY: Yes.

THE COURT: Let me just tell you where I'm a little bit confused. You've represented that this is in Dean Stowers' handwriting?

MS. MORRISSEY: Yes.

THE COURT: Okay. Now, the second paragraph, he asked for time to do -- is it bill of particulars abbreviated?

MS. MORRISSEY: Yeah.

THE COURT: Well --

MS. MORRISSEY: I agree it doesn't --

THE COURT: Doesn't make any sense, does it?

MS. MORRISSEY: No, it doesn't unless --

THE COURT: So if you just read that paragraph, you would think it was Pat Reinert's handwriting, handwritten note, because -- now, I don't know all that much about criminal law, but I think I know that the government doesn't move for a bill of particulars; the defense does.

MS. MORRISSEY: I do too, but the first paragraph says he will be filing new indictment correcting dismissed counts and indicating death penalty factors under Ring. I don't think that would be Mr. Stowers either.

MR. BURT: Judge, could I chime in on that?

THE COURT: Yes, absolutely.

MR. BURT: I think this will be clarified when

Mr. Stowers testifies, but I think at this point in the proceeding the Court had entered an order granting a bill of particulars. Then a new indictment was in the works, and Mr. Reinert -- this is an offer of proof as to what Stowers will say -- Mr. Reinert was required to file I think a bill of particulars by a certain date, and he's asking for more time to comply with that order.

THE COURT: I see.

MR. BURT: In light of the fact he's going to file --

THE COURT: Okay. Now it's starting to make some sense. Thank you.

MR. BURT: Sure.

THE COURT: Now let me just finish reading it. Okay. Thank you.

MS. MORRISSEY: Thank you, Your Honor.

BY MS. MORRISSEY:

Q. I'm going to put on the ELMO a memo 8-21-02 plea discussions. It's been labelled Plaintiff's 5AAA. Can you tell me if you recognize this -- the handwriting on this?

A. That's Mr. Berrigan.

Q. All right. And does this help you remember what happened on -- at the meeting on plea negotiations in Des Moines that was held subsequent to Mr. Stowers' 8-3-02 teleconference with Mr. Reinert?

A. I'm sorry. I should know how to scroll down on this, but I

need to see the rest of the document.

Q. Okay. Sorry.

THE COURT: You can't scroll down.

THE WITNESS: Okay.

THE COURT: Only -- they have to move it.

THE WITNESS: Okay.

MS. MORRISSEY: I guess you could zoom, but I'm not that technical.

THE COURT: Right.

A. Could you scroll down a little further, please?

Q. Sure. I'm sorry.

A. Okay.

Q. Okay. And do these notes refresh your recollection as to the terms discussed in the meeting in Des Moines on August 21, 2002?

A. It comports with my general memory because I remember after this meeting that there was a general sense of optimism.

Q. And this was, in fact, while the Massiah ruling was pending; correct?

A. Yes.

Q. So you had reason to be optimistic. You were in a good bargaining position then.

A. Yes.

Q. And essentially it involves a proffer, possibly a polygraph?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 72 of 85

A. Could you scroll back to the top of the page so I can follow along with you, please?

Q. Yes. Maybe I can -- now nobody can see it; right? Can you read that?

A. Yeah, I just have to get my bifocals working. Yes, a proffer and a polygraph.

Q. Okay. And never specific on months, we're far apart. He claims to want death for Honken and A.J. cooperating, but he can also do a double, slash, joint plea with Dustin getting LWOP. Miller reflected that he and Pat R. had talked early on about offering A.J. 10 to 15 years for info leading to recovery of the bodies. This is pre-McNeese, of course. And then Mr. Berrigan writes, paren, suggests to me that our high teens, low 20s offer not out of whack.

A. Yes.

Q. Correct?

A. Yes.

Q. And had Mr. Berrigan, in fact, made a 20-year offer pursuant to Miss Johnson's agreement?

A. You mean at that meeting or subsequent to that meeting?

Q. Prior to that meeting had he offered 20 years?

A. I can't remember if he made the offer.

Q. Okay.

THE COURT: Miss Morrissey, I'm going to have to break now for the four o'clock sentencing.

MS. MORRISSEY: Thank you.

THE COURT: So we'll be in recess till I've concluded the sentencing.

MR. BURT: Does the Court want us to clear out all this?

THE COURT: No, I think you can leave everything, and I'll just have counsel -- well, I guess we've got the defendant in here. Can you just slide it maybe over to one side?

MR. BURT: Certainly, yes.

THE COURT: Whatever side you want, and then I'll have counsel and the defendant kind of scoot over away from your materials.

(Recess at 3:47 p.m.)

THE COURT: Thank you. Please be seated.

And, Miss Morrissey, you may continue your direct examination of Mr. Willett.

MS. MORRISSEY: Thank you, Your Honor.

BY MS. MORRISSEY:

Q. Mr. Willett, when we broke we were talking about the August 21, 2002, meeting in Des Moines with you, Mr. Reinert, Tom Miller, Stowers, Berrigan.

A. Yes.

Q. Correct? Okay. I'm going to put on the ELMO what's been marked as Plaintiff's 5BBB. It appears to be notes by Mr. Stowers about that meeting on August 21. And they indicate

that there was a discussion about the new administration's death penalty committee, the need to proffer to sell a plea of any kind, multiple counts, lesser sentence than Honken. They would have offered 10 to 15 years prior to recovery of the bodies; correct?

A. Yes, yes.

Q. Are Mr. Stowers' notes of that meeting consistent with your memories of the parameters of the plea that was talked about there?

A. I had no prior independent memory of that meeting before seeing Mr. Stowers' notes.

Q. Okay. When I showed you just before we broke Mr. Berrigan's notes about that meeting, did that -- were those notes consistent with your recollection of what occurred?

A. It refreshed my memory and confirmed my general sense of optimism that we had after that meeting.

Q. All right. In fact, on -- you billed on August 22, 2002, for a teleconference with Miss Johnson re plea negotiations.

A. Yes.

Q. So would it be fair to say that the content of that teleconference with Miss Johnson was the meeting that had occurred the day before?

A. That would be fair.

Q. And do you recall that she -- you don't have any notes of that teleconference; correct?

A. Not that I'm aware of.

Q. Okay. And you don't recall that she did anything to say no, no, no, I'm not going to plead, don't continue?

A. I don't have any independent memory of that phone conversation.

Q. Okay. In your billing for September 13, 2002, you billed for reviewing grand jury transcripts of Baca, Mannion, Summers, and Yager.

A. Okay.

Q. Okay? At least Baca, Mannion, and Yager are jailhouse snitches in that case, correct, in this case?

A. Yes.

Q. So you knew at least as of reading the discovery on September 13, '02, that there were some jailhouse snitches that were going to be around no matter what happened to Mr. Berrigan -- Mr. McNeese, excuse me.

A. Yes.

Q. Not wishing ill to Mr. Berrigan. Okay. I am going to next show you and ask if you've seen it before a letter dated December -- sorry, October 24, 2002, from Miss Johnson to Mr. Berrigan.

A. Okay.

Q. It's marked Plaintiff's 5OOO. All right. And so --

THE COURT: Did you take off your lapel mike?

MS. MORRISSEY: Yes, I did, and I put it right up

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 348 Filed 11/10/11 Page 73 of 85

here.

THE COURT: Okay. Thank you.

MS. MORRISSEY: I'm sorry, Your Honor.

THE COURT: No, that's okay. Thanks.

BY MS. MORRISSEY:

Q. Have you seen this letter before? Was it circulated among the defense team?

A. I haven't seen the remainder of it because it appears that it's a multiple-page letter because of the staple mark.

Q. Right.

A. But could I finish reading it before I respond?

Q. Yes, absolutely. Tell me when you need me to flip the page.

A. Thank you. Could you turn to the next page, please.

Q. Yes. And actually if I can flip through to the second to the last page and I'll save everybody's time, the bottom of the second to last page, does Miss Johnson write, "Can you get me a deal and get me out of here, please? I have not touched my girls in almost two and a half years. I feel like I've already been convicted and am being treated and kept in a worse place than if I were. I want to touch my little girl and hold my granddaughter when she is born. I can't take it in here anymore. Waiting has done me no good as far as I can see. I'll say whatever they want to hear just to leave here. It would be easy to poke holes in these liars' stories, but it's just easier

to believe what they say, isn't it? I have no future anyway; right? All I ask is that you push to get a deal made and get me on my way. Thank you, Angela Johnson."

A. Okay. And that letter was addressed to me?

Q. That letter was addressed to Mr. Berrigan.

A. Oh, okay.

Q. What I think the question was was this something that was circulated --

THE COURT: Is the microphone on next to -- no, the one next to the digital document camera? You had your hand right on it. Was there a light on?

MS. MORRISSEY: Now it's on, Your Honor.

THE COURT: Okay.

BY MS. MORRISSEY:

Q. What I originally started out, was that a letter that you recognized as having been circulated among the defense team?

A. Could I please see all of the letter since it was multiple pages?

Q. Absolutely. Let me show you what is the page 2.

THE COURT: Well, why don't you just hand him the whole letter.

THE WITNESS: Thank you.

THE COURT: I think it'd be faster for Mr. Willett that way.

THE WITNESS: Thank you.

A. There certain -- I'm sorry. There are certainly subjects in here that are familiar to me, for example, Valli Williams. I'm not sure if I remember this letter per se, but there's a lot of subjects in the letter that are familiar to me.

Q. Does the letter continue, "I'm so sick of people lying about me. Why isn't anyone doing any investigation on my behalf? The feds have had two years and three months to collect jailhouse informants to testify against me. Why isn't anyone doing the same thing on my behalf?"

A. That's at the top of the -- that's the first full paragraph at the top of the fourth page of the letter, and that's what it says.

Q. Okay. And does it continue, "What is worse than being lied about? My own attorneys believing them over me. Yes, Al can say he believes me, but it's not clear to me -- but it's clear to me that he doesn't. How about you? Do you believe me? Probably not."

A. And that's what that paragraph says.

Q. Are the expressions in that letter familiar to you, the sentiment?

A. The last paragraph that you just discussed, that is familiar to me.

Q. Miss Johnson's complaint about --

A. What is worse than being lied about, that paragraph seems to be familiar to me.

Q. And was it a theme in the case that Miss Johnson complained that her own attorneys didn't believe her?

A. I wouldn't call it a theme. I think it was a concern from time to time, and I'm not saying it was just Mr. Berrigan, but I know initially there was a lack of trust for lack of a better word between Miss Johnson and Mr. Berrigan. Obviously she's -- obviously Angela is commenting on me in this paragraph that we were just discussing.

Q. I'm putting on the ELMO what's marked Plaintiff's 5III. Do you recognize this letter, Mr. Willett?

A. It's refreshed my memory, yes.

Q. And does this letter concern Phyllis Proscovec?

A. Yes, it discusses Miss Proscovec's passing. Bless you. It discusses Miss Proscovec's passing on August 24 of last -- of the previous year.

Q. 2002.

A. Yes.

Q. And to your best knowledge is the first time that you had -- what was the first time that you asked anybody to go and try and locate Miss Proscovec shortly before February 4, 2003, when you wrote to Miss Johnson telling her that Phyllis Proscovec had died?

A. I don't remember when the first time I asked either Mr. Cornell or Mr. Gordon Gratias's son Scott to check on Miss Proscovec.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 348 Filed 11/10/11 Page 74 of 85

**630**

Q. I'm going to put on the ELMO an exhibit that's been marked as Plaintiff's JJJ. I want you to look at that and see if you recognize that particular letter. Woops.

THE COURT: Now, this is a JJJ with no number in front of it?

MS. MORRISSEY: 5JJJ.

THE COURT: Oh, okay.

A. This was a letter that I do believe was in the 1,200 pages you submitted to me for review, so I would have seen this letter over the course of this prior weekend.

Q. And it's a bad copy of the letter, but the sentiment is clear; would you agree with me?

A. It's copied at an angle, but the content of the letter is clear.

Q. Okay. Miss Johnson said, "I want to be as clear as I can. I want to plead guilty. I do not want to wait for any more rulings, not even the Eighth Circuit. I am asking you to get me the best deal you can and I will cooperate. At this point I will confess to killing the Pope. I have not touched my kids in three years now, and I've had it. Please get me out of here and into a prison as close to my kids as possible. That is all I ask. Thank you," and it's signed Angela Johnson.

A. Yes.

Q. Did you get a letter like that?

A. And this one's addressed to Mr. Berrigan; correct?

**631**

Q. This is a two-page document. The flip side is the same letter, and it was -- it's addressed to Dear Dean.

A. I don't have an independent memory of getting this letter. I -- and I don't have an independent memory as to whether Pat and/or Dean copied me on this letter.

Q. Well, would it be fair to say that the request made in this letter is a fairly significant one in the context of a capital case?

A. That would be fair.

Q. All right. And in this letter -- would you expect that the content of this letter to be at least the subject of discussion among defense counsel?

A. Absolutely.

Q. And to your best recollection was there a discussion about the content of this letter among defense counsel?

A. I don't have an independent memory of a specific discussion regarding this specific letter amongst defense counsel.

Q. All right. All Miss Johnson wanted was a plea and to cooperate at that point.

A. That's what the letter indicates, yes.

Q. She wanted to go to a prison as near to her kids as possible.

A. Yes.

Q. She is not taking a position that she would not testify against Marvea's father.

**632**

A. Correct.

Q. And she would testify, in fact, against Dustin Honken at his trial; correct?

A. It said -- I believe the letter said she would cooperate.

Q. Now, as a result of this letter, did you and Mr. Berrigan go to the jail?

A. Mr. Berrigan and I went to the jail on more than one occasion. I don't have an independent memory if we went to the jail after this letter.

Q. Would it be fair to s -- well, on your billing you billed -- on 5-15-03 you billed for reviewing a letter from the client re plea negotiations.

A. Okay.

Q. We don't know exactly what that letter is, but it appears that it may be in the ballpark for that to represent your review of this particular letter from Miss Johnson.

A. Sure.

Q. And then on that same day, May 15, 2003, you billed .2 for a teleconference with Mr. Berrigan regarding the client's letter.

A. Okay.

Q. Is that correct?

A. If that's what it represents, I'll certainly think it's true, yes.

Q. All right. So it may have been that you got a letter and

**633**

then you called Berrigan immediately to discuss it.

A. That would be the implication of my billings, yes.

Q. And did you go with Mr. Berrigan on May 22, 2003, to the jail to talk to Miss Johnson about this letter saying I want to plead guilty, I want to cooperate, get me outta here?

A. I'm assuming I did.

Q. Okay. Well, your billing records on that date indicate that you billed 1.2 hours for a visit with Miss Johnson.

A. Okay.

Q. And I'm going to put on 5LLL which are Mr. Berrigan's notes about the visit that day. Let me ask you some questions. Says, "Al and I came to Angela to talk about her recent letter, I want to plead guilty, let's go. And then there's the names Richard Arnold, J. Hansen, Richard Bye, ND. What is that reference to?

A. That was our panel. That was the panel that heard the appeal of our -- of Judge Bennett's Massiah ruling.

Q. And then it says -- Mr. Berrigan writes Al the good guy, PJB the bad guy, talked a lot about the Eighth Circuit still sitting on Angie's case and possible effects on plea negotiations. This all for naught as Angela's first and primary concern is having to stay in the Linn County Jail. Willing to testify against Dustin Honken including cooperation.

Do you have any -- are you able to tell us what is -- what it means by that sentence Al the good guy, PJB the bad guy?

A. I am assuming that that would be in reference to Pat again

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 348 Filed 11/10/11 Page 75 of 85

discussing the benefits of a plea agreement.

Q.   Okay.  Well --

A.   And --

Q.   You were doing what?

A.   And I may have been discussing -- I may have been discussing the benefits of allowing the Eighth Circuit to decide the case.

Q.   Well, but at that point isn't it true that Miss Johnson wanted to plead right now and cooperate?

A.   That's certainly what the notes reflect and what her earlier letter stated.

Q.   So wouldn't a good guy be saying let's get in there and work out a plea?

A.   That's not my memory, though.  And here's what -- here's the missing piece for me, Miss Morrissey.  I can't remember when the oral argument was to the Eighth Circuit.  If this -- if this visit would have been before the oral argument, I might have been a more optimistic frame of mind.  I attended the oral argument, and before the ruling came out I became pessimistic after my observations at the oral argument.

Q.   So we'll have to -- we can check on that, when the oral argument is.  I think it's probably a matter of which the Court can take judicial notice.

     Is it correct that you advised Miss Johnson when you saw her at the jail on May 22, 2003, that she should wait?

     MR. WILLIAMS:  Objection.  Leading.

     THE COURT:  Overruled.

A.   I -- depending upon when this oral argument was, I may very well have suggested that she wait because I believe the reference to Al the good guy, Pat the bad guy would be Pat wanting to talk about the plea agreement and me wanting to see the Eighth Circuit result if that was prior to the oral argument.

Q.   Okay.  On --

     THE COURT:  What is the number of this exhibit?

     MS. MORRISSEY:  This is Exhibit LLL.  We have our plea bargain book now, and we can tell you exactly where it is on the --

     THE COURT:  No, that's fine.  I just wanted to make a note of it.  Thank you.

     MS. MORRISSEY:  We're getting there, Judge.

     THE COURT:  No, I know you are.  Thanks.

     MS. MORRISSEY:  Very slowly.

     THE COURT:  Well, you haven't had a whole lot of time in the case.  I understand that.

     MS. MORRISSEY:  We're getting there.  All right.

BY MS. MORRISSEY:

Q.   So this was a note about May 2003.  If I told you that the Eighth Circuit issued its opinion in the McNeese appeal on December 8, 2003, does that help you locate any better, figure

out when there might have been oral argument?  Do you remember it was in the fall or spring or winter?

A.   It had to be in the fall because I remember Ms. Lanoue and I driving up for that oral argument up to St. Paul and the weather was miserable in terms of ice and snow, so, I mean, it had to be in the latter part -- in the last quarter of that year because it was a miserable drive once we got from Waterloo -- once we got to Waterloo up until we got to the Twin Cities.

Q.   I don't know the answer to this question, but does the Eighth Circuit commonly issue opinions pretty soon after oral argument in a case?

A.   Well, it depends upon the case.  I'm not trying to avoid your question, but it depends upon the complexity of the case.  And my memory is is that this took a few months to come out.  I don't think it came out right away if memory serves me right.

Q.   This meaning the decision?

A.   Yes.  I apologize.  The decision.

Q.   Okay.  After the Eighth Circuit issued its ruling reversing Judge Bennett about McNeese and given Miss Johnson's attitude as expressed in her letter to you on May 10 and the jail visit you had on May 22, 2003, what happened in terms of plea negotiations?

A.   My memory is is that after the Eighth Circuit took this away from us is that there was a more serious look at plea negotiations.  Now, that's my general memory, that after the

decision reversing Judge Bennett and knowing all this evidence would come in, then there was a more serious push again towards plea discussions and plea negotiations is my general memory.

Q.   And is it correct that -- I kind of got ahead of myself.  In fact, there were some plea discussions that occurred while the Eighth Circuit had the case; is that not correct?

A.   I think that's correct, yes.

Q.   Okay.  Do you remember a letter dated June 10, 2003, that Mr. Reinert wrote to you and Mr. Stowers and Mr. Berrigan?  And this is for our purposes 5MMM.  Let me put it on the ELMO.  Do you remember seeing this letter written by Mr. Reinert?

A.   Could you please turn the page for me?

Q.   Sure.

A.   Could you turn the page again for me, please.

Q.   Yes.

A.   I believe this was one of the letters submitted in the 1,200 pages that you asked me to review, so this does look familiar to me at least from this past weekend.

Q.   All right.  So let me ask you about this letter.  You don't know whether somebody had contacted Mr. Reinert to encourage -- to produce this letter, whether it was kind of sua sponte on his own.

A.   Could you turn to the first page, please?

Q.   Yes.

A.   From the first paragraph it looks like Mr. Reinert had been

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 76 of 85

talking with Pat and Dean.

Q. Okay. And again, you were not involved in that?

A. No.

Q. As lead counsel you weren't.

A. No.

Q. And basically it says, look, we can work out a plea contingent on the attorney general's approval or we can work out general terms, get agreement in principle reviewed by the AG and, if approved, execute the agreement. And the government intends on pursuing option 2 which is basically what you wanted. You wanted an agreement before you went in to proffer; correct?

A. Yeah, I believe so. I think that's on the second page.

Q. Right.

A. If you could turn to the second page for me?

Q. Okay. Yeah. And he says that he can't make a specific offer at this point in time; correct?

A. Correct.

Q. And you understood that because of the way Washington operates in a capital case.

A. In terms of?

Q. In terms of having kind of a leash on the local prosecutors.

A. I -- this was my first capital case, so I had no prior understanding as to what leash Department of Justice in DC had or did not have on the U.S. Attorney's Office in the Northern

District.

Q. Okay. As part of getting -- working on your first capital case, do you think you would have explored any differences in procedure in a capital case as opposed to a regular federal criminal case?

A. Yes, and I would have relied on my death penalty-certified counsel for that.

Q. Okay. They want full cooperation for sentence of less than death or withdrawal of the notice of intent; correct?

A. Yes.

Q. Did you -- let me just ask a question. Were you aware that once the case had been authorized, once notice of intent had been filed, that the local prosecutors were not allowed to do anything on the case without approval of main Justice in Washington?

A. My impression was that the U.S. Attorney's Office in the Northern District of Iowa still had some flexibility in terms of impacting the decision. That was my general understanding.

Q. By that do you mean that they could recommend something to the attorney general and the attorney general would accept it most of the time?

A. Or at least consider it most of the time.

Q. This letter goes on to say, "We must always remember that Angela Johnson played a part in five deaths, including two children, participated in secretion of evidence, perpetuation of

drug-trafficking network, and by failing to come forward allowing the family of the victims to be subjected to extreme emotional distress; correction -- is that what it says?

A. Yes, it is. Yes, it does.

Q. Yeah. It goes on to say that although there has been a desire for a sentence in the 20-year range you ought -- she needs to assess her conduct meaning counsel needs to assess their conduct -- their -- their plea offer.

MR. WILLIAMS: Objection to counsel interpreting what that means.

MS. MORRISSEY: That's -- I will withdraw that.

THE COURT: Okay.

MS. MORRISSEY: Thank you.

BY MS. MORRISSEY:

Q. And assess her conduct when compared to others and sentences imposed in the federal system for even routine drug crimes. When a routine drug trafficker is not involved in deaths can get 20 to 30 years, is it justifiable for a sentence involved in 5 murders to expect a much lesser sentence? Goes on, I am open to work toward an amicable resolution of this case. And it goes on first is to interview Miss Johnson. Then we will determine whether she is telling us the truth against what we have, and then we determine the appropriate resolution acceptable to DOJ.

Now, based on this letter, what was your state of mind

as to whether or not 20 years was a realistic offer on behalf of Miss Johnson?

A. Was it Mr. Reinert that sent the letter?

Q. It's Mr. Reinert who sent the letter.

A. With Mr. Reinert it was probably not necessarily a realistic option.

Q. Okay. I'm going to show you a letter from your file which you received from Miss Johnson. It's dated -- it's undated, but the fax at the top of it which is barely recognizable at this point indicates 10-21-03.

A. Okay.

Q. And it's been marked as Plaintiff's PPP like Paul for identification, 5PPP. Thank you. Here it is. Do you remember this letter, remember receiving it?

A. Could you turn the page for me, please?

Q. Yes.

A. Or I guess scroll down to the bottom and then allow -- thank you. Could you turn the page, please? Could you scroll down a little bit for me, please? Could you turn the page for me, please. Could you scroll down for me, please.

Q. Yes.

A. Could you turn the page for me, please.

Q. That's it. Oh, wait. No.

A. I do remember this letter from this past weekend. Oh, I'm sorry. I'll keep reading.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 77 of 85

Q. You know, I may --

A. No, there doesn't seem to be a signature or a --

Q. Yeah, there isn't. I may have turned to the -- skipped a page. Did I show you page 2?

A. Well, that's why the letter's familiar to me. I reviewed this letter this past weekend, but the letter was familiar to me because of the comment about wanting to go to the jail in West Union and that was a brand new jail. And so when I saw that letter, it's like, yeah, I remember this letter.

Q. All right. There's also fairly -- an expression that -- of Miss Johnson's depression. She says, "You might not know this or even care, but I've been terribly depressed" -- let me find this for you.

A. It was just at the bottom of the page you were turning.

Q. All right. Thank you. You may not know this or even care, but I've been terribly depressed. And before you ask, yes, I'm still medicated. To be honest, I couldn't care less about this bleep case anymore. I gave up on ever getting out of this belly of hell a long time ago. I really don't care if I spend the rest of my life in prison either. That has been my attitude for quite some time.

Now, would you agree that those are some -- as a lawyer representing a client, those expressions are a little bit -- would cause you some concern?

A. Yes.

Q. Okay. And, again, this is a letter that basically indicates that Miss Johnson has given up; would that be fair to say?

A. I'm not sure I would agree with you that she's given up.

Q. Well, it certainly is a letter that would maybe cause one to pursue plea negotiations that she's previously authorized and cooperation.

MR. WILLIAMS: Objection. Leading, Your Honor.

THE COURT: Can you rephrase it?

MS. MORRISSEY: Yes.

THE COURT: And stay by the microphone or -- I think your hand was covering it. Can you exchange it for one of the others? Maybe the battery's dead. And then if we can put that one in the charger, then we'll make sure it's recharged.

MS. MORRISSEY: Is this better?

THE COURT: Not yet.

MS. MORRISSEY: Not yet? Testing, testing.

THE COURT: Why don't you just use the microphones so we can keep going.

MS. MORRISSEY: Okay. I will. And may I give this one because I think this one needs charging too?

BY MS. MORRISSEY:

Q. Did you go to the jail and talk to Miss Johnson about -- when you got this -- when you got this letter?

A. I'd certainly like to think so. I don't have an

independent memory of my reaction. I see that at the top of page 3 which is on the ELMO that it appears that it was a fax. And I'm not -- forgive me. I'm not all that fluent. I'm not sure if this is indicating that we faxed this out or . . .

Q. Well, it certainly would be a letter that you would fax out to your co-counsel. Do you agree?

A. Yeah, and that's how I perceived that when I saw that.

Q. Okay. So this was in October of 2003; correct? Do you know whether anything has happened on Miss Johnson's statements that she wants to cooperate, she wants to plead guilty, she wants to testify that was expressed in a letter to you in a letter and then at the jail?

A. I don't have an independent memory as I sit here.

Q. I now have been given a full copy of the document. Let me, just so the record's complete, show you the last page that was missing from mine.

A. Could I add one thing to my previous answer when you asked me if I went to visit her?

Q. Yes.

A. When she was in the Linn County Jail, there were certainly times where we also had phone conversations, and I always allowed my clients to call my office collect. So some of my inability to remember is not knowing if -- was it a -- did I have a phone call later with her, or did I go to visit her, and that's what's contributing to my lack of memory is not knowing

which one might have been the case.

Q. In any event, you don't have any notes in your file about what -- what was said to Miss Johnson or what she was said -- she was --

A. I haven't been presented with any. The notes that I was given in the 1,200 pages dealt mostly with the trial.

Q. And would it be correct to say that in the materials that you reviewed in the file after this letter on June 10, 2003, from Mr. Reinert to all three of you there's really nothing done for a full year?

MR. WILLIAMS: Objection. Leading, Your Honor.

MS. MORRISSEY: It is leading. It's getting late, and I'm trying to . . .

BY MS. MORRISSEY:

Q. So let me show you another document. It's a letter dated June 9, 2004, from C.J. Williams to you.

A. Okay.

Q. This is marked as Plaintiff's 5SSS, S like Sam. Could you read that letter, please?

A. Sure. Certainly. Yes.

Q. Okay. And this is nearly a full year after the letter that we had previously talked about from Mr. Reinert to you and Mr. Berrigan and Mr. Stowers regarding a plea bargain in this case; correct?

A. Correct.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 348 Filed 11/10/11 Page 78 of 85

Q. So between June 10, 2003, when Mr. Reinert wrote to you and June 9, 2004, when Mr. Williams wrote to you, do you have any independent memory today about any plea negotiations going on?

A. Not as I sit here right now, no.

Q. And if any plea negotiations went on during that year period, would they be reflected in notes made of the events in your file at or near the time of the events?

A. Not necessarily. I would assume that the more accurate reflection would be if there would be any correspondence between Mr. Berrigan or myself or Mr. Stowers, that it would be copies of correspondence as opposed to copies of notes.

Q. Okay. Do you have any -- did you see any such correspondence in the file, the 1,200 pages, that we sent to you before your appearance in court?

A. To honestly answer that question I'd have to look back because I know that I marked some pages as I went, and I can't remember if they were plea negotiations or what, but I'd have to sit down with my 1,200 pages and quickly look at them to answer your question.

Q. Well, okay. Let me ask you about this letter that's on the ELMO which is Exhibit 5SSS. Mr. Reinert has -- well, would you read it to yourself.

A. Is this the letter from Mr. Williams?

Q. This is the letter from Mr. Williams, yes. I'm sorry.

A. No, I read the letter when you first put it up.

Q. And would it be correct to say that Mr. Williams has a different -- his tone is different than Mr. Reinert?

A. Sure.

Q. And he basically says that Miss Johnson's willingness to proffer is -- must precede any request to DOJ to withdraw the notice of intent or to work out a deal.

A. Yes.

Q. And it also says I -- quote, I understand the defendant has expressed no interest in cooperating, end quote.

A. Correct.

Q. Should she change her mind, we have to give Dustin Honken enough notice to ensure a fair trial. This cannot happen with an eleventh-hour notice that Angela Johnson would be a witness against him. Dustin Honken is to begin trial on August 16, 2004. If Miss Johnson wants to work out a dispo. short of trial, I must be advised of her intent to cooperate no later than the close of business on June 30, 2004.

A. Correct.

Q. Now, this is written at a time when, in fact, Mr. Honken's trial is coming up?

A. Yes.

Q. And it's not unreasonable to call Miss Johnson's decision -- well, call a plea by Miss Johnson as fairly last minute by the time Mr. Honken's trial is pending.

MR. WILLIAMS: Objection. Leading.

THE COURT: Sustained.

MS. MORRISSEY: Okay.

THE COURT: And can you get closer to the microphone?

MS. MORRISSEY: Yeah. I'm sorry.

BY MS. MORRISSEY:

Q. All right. Basically when you got this letter -- and it was sent to you, not Mr. Berrigan; correct?

A. Sent to me and copied to Mr. Stowers and Mr. Berrigan.

Q. Right -- what did you do?

A. I don't have an independent memory. I would like to think that I would have picked up the phone and called Pat to discuss it with him. I do have a memory that there were some attempts at a joint resolution between Mr. Honken and Ms. Johnson and the government prior to Mr. Honken's trial. I do remember that.

Q. I'm going to put Plaintiff's Exhibit TTT on the ELMO. Does this appear to be a letter that you --

THE COURT: That would be 5TTT?

MS. MORRISSEY: 5TTT, sorry.

BY MS. MORRISSEY:

A. Could you scroll down to the bottom of the page, please?

Q. Sure.

A. Turn the page, please.

Q. All right.

A. Yeah, I remember this letter.

Q. So you wrote him -- Mr. Williams the day after he wrote to

you; correct?

A. Yes.

Q. And basically you say, oh, no, it's wrong. Miss Johnson's willing to cooperate including testify against Mr. Honken, and her willingness to cooperate has never been a hurdle in getting a plea agreement; correct?

A. Correct.

Q. But you go on to say what the problem is which is the government's insistence on a pretrial proffer as occurring before they would offer a plea to Miss Johnson.

A. I remember what the concern was in this letter. I mean I remember the context of this letter.

Q. And you cite several instances where the locals have entered into plea agreements only to have the DOJ renege on deals after proffers and you don't intend to add Miss Johnson's name to the list of those who have been -- undergone that process; correct?

A. Correct.

Q. And basically you're saying we will not proffer in the blind hope that a plea agreement can be reached thereafter.

A. Correct.

Q. Now, this is the position that Mr. Berrigan had taken from the beginning; is that correct?

A. Correct.

Q. All right. So it was the proffer only if we have a firm

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 79 of 85

deal that we can get if you like what we're saying.

**A. There was a nuance, though. The concern -- and what I remember the context of this letter being the concern is that I'd worked with Mr. Williams before. I didn't have -- my concern was this, that we could reach an agreement with the U.S. Attorney's Office for the Northern District of Iowa and then be shot down by the Department of Justice. That was the concern.**

Q. Okay. But you knew, didn't you, or Mr. Berrigan told you, didn't he, that it didn't work the way you wanted it to work in a capital case, that you had to -- you had to proffer before you could get a deal because the AG won't approve a pig in a poke?

MR. WILLIAMS: Objection. Leading and misstates the evidence.

THE COURT: Sustained.

BY MS. MORRISSEY:

Q. Okay. That was what -- Mr. Berrigan's position about plea bargaining; correct?

MR. WILLIAMS: Objection. Leading.

MS. MORRISSEY: I'll withdraw it.

BY MS. MORRISSEY:

Q. Let me ask you another question.

THE COURT: Can I interrupt for a second? Are you too tired to continue? I'm not being sarcastic.

MS. MORRISSEY: I'm tired, but I can -- I'd like to finish up this area that I'm in.

THE COURT: Okay. But . . .

MS. MORRISSEY: Am I not making sense, Your Honor?

THE COURT: No, no, it's not that you're not making sense, but I sense you're tired, and we've been at it for a long period of time, and so I can appreciate the fact that you're tired.

MS. MORRISSEY: I am tired.

THE COURT: So only you know whether -- you know, I mean, if it was totally up to me, we'd be going till midnight, but, you know, only you can decide whether you're too tired to keep going.

MS. MORRISSEY: I am tired, Your Honor, and quite frankly, what caused me great concern is I'm going through my outline and I'm -- I know that I'm missing a letter in which Mr. Reinert tells defense counsel that 20 years is unconscionable. I know that letter was written way before 2004, and I'm bothered by the fact that I haven't asked about it. So that's kind of distracting. I can -- you know, I hate to have Mr. Willett come back. How late is the Court going to go?

THE COURT: Well, I was planning on going till six, but I kind of doubt we'll be done with Mr. Willett by six o'clock.

Mr. Williams, is that a fair assumption?

MR. WILLIAMS: I think that's a fair assumption, Your Honor. Thank you.

MS. MORRISSEY: I agree.

THE COURT: So, you know, it'd be one thing if we could finish. I'd like to be able to get Mr. Willett on the road because he's a very busy lawyer, but you need to -- we need to finish the examination. I just don't see it happening by six. And I'm concerned that you're having some difficulty because you're tired, and that's understand -- I'm not being critical. That's understandable. And I don't want that to happen so . . .

You just tell me what -- if you want to keep going for a while, that's fine. If you want to stop --

MS. MORRISSEY: Your Honor, I don't think we can finish before six, and given that, I'm not going to be a trouper and say let's go on.

THE COURT: Okay.

MS. MORRISSEY: That's silly for me to do.

THE COURT: Okay.

MS. MORRISSEY: Okay.

THE COURT: Mr. Willett, we'll see you back at 7 a.m.

THE WITNESS: I'll be here, Judge.

THE COURT: Okay.

MS. MORRISSEY: Are you sure, Mr. Willett?

THE WITNESS: I don't know yet. I've -- I have a family issue tomorrow at two o'clock. And I was told by my wife at the beginning of the week I would need to cover it. I put in

a message to her saying, "Can you cover it?" I've not heard back. Judge, I'll be glad to share -- I've shared with Ms. Johnson's counsel what the problem is. I've not shared it with Mr. Williams. I'd be glad to share it with the Court, but I would prefer to do it off the record.

THE COURT: You don't need to share it with me because, you know, I'm big on those family issues. So I don't need to know what it is. Do you have a solution? I mean --

THE WITNESS: Well, my solution was I would go tonight as late as you set and I would be more than prepared to come back at 7 a.m. to finish, and right now the appointment as it is scheduled is a 2 p.m. appointment in Cedar Rapids.

THE COURT: So you would have to leave here by --

THE WITNESS: Nineish in good weather, and I've heard all kinds of weather reports today. And I could even try calling my wife, Judge, to see if she could cover this tomorrow at two, but it's a matter that somebody needs to be with my son tomorrow at 2 p.m., and I apologize, but it's a serious matter so . . .

THE COURT: Why don't we take a short break. You call your wife.

Here's another option too. I'll authorize a CJA voucher for you to fly to Cedar Rapids if you like and fly back and rent a car when you're back home if you need to. But that's going to be contingent on kind of the weather in Minneapolis

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

about whether it's better to fly than drive, but, you know, I'll be glad to authorize that.

THE WITNESS: Well, Judge, I appreciate it. In this weather you might have to medicate me to get me on the plane. You know, I'd rather take my chances in a snowstorm with my car.

THE COURT: Okay. But I just --

THE WITNESS: If you'll allow me to call my wife and maybe I can reach her.

THE COURT: Why don't we take a five-minute recess, see what you find out. And then, you know, one thing we can always do is go for an hour or two tomorrow or maybe -- maybe not because if the roads are bad you're going to need that extra time. You can't make it in four and a half hours in bad weather, and we'll just bring you back in June when we're scheduled to.

THE WITNESS: That's what I was trying to avoid, Judge. I didn't know if it benefitted any of the parties to bifurcate me from March until June.

THE COURT: I don't want you to be driving back and forth in the same week. That's just too much to -- I've done it, and it's too much to ask.

THE WITNESS: And I appreciate that. The rest of my week was the big problem. That's why I asked to be up front.

THE COURT: Okay. Why don't you make the call, and then we'll go from there.

THE WITNESS: Thank you, Judge.

THE COURT: Okay. We'll be in recess for five minutes.

(Recess at 5:25 p.m.)

THE COURT: Okay. Are we ready to go back on the record?

MS. MORRISSEY: Yes, Your Honor.

THE COURT: What'd you determine, Mr. Willett?

THE WITNESS: That I could stay, that I could -- I could stay as long as you want me to tonight, that I could be here at 7 a.m. tomorrow morning, and that I could stay until you're done with me tomorrow.

THE COURT: But --

THE WITNESS: Maybe I'm being optimistic. I'll assume tomorrow for purposes of our discussion.

THE COURT: Optimism is a good thing for a defense lawyer sometimes.

THE WITNESS: Yeah.

THE COURT: Now, I don't want to delve into your personal situation. On the other hand, there's a difference between getting your spouse to agree that you can be gone and your personal need to be with your son.

THE WITNESS: My -- my personal need to be with my son tomorrow can be delayed based upon the conversation I had with my wife in the last five minutes.

THE COURT: And you're comfortable with that?

THE WITNESS: I am comfortable with that. I still need to address some issues when I return, but the immediate urgent need was resolved by my wife at least in part so that I don't need to be with my son tomorrow at 2 in the afternoon.

THE COURT: Okay. Now Mr. Burt?

MR. BURT: I just wanted to introduce one additional concern, Your Honor, which is we have -- Dick Burr is here. He has to be out by three o'clock tomorrow. And if there still is a urgency issue for Mr. Willett, it may actually make sense to bifurcate his testimony at this point and we proceed with Mr. Burr in the morning because my concern is that even if Mr. Willett is here at 7 that we may not finish with him until noonish. And I don't want to have to bring Mr. Burr back again if I could avoid it.

So I guess what I'm suggesting to the Court if there is still some lingering issue about Mr. Willett's son, I would prefer to err on the side of letting him go and fulfill his family obligations, and then we can proceed ahead and reschedule him in June as the Court suggested.

THE WITNESS: May I, Judge?

THE COURT: Yes.

THE WITNESS: Since this pertains to me.

THE COURT: Yes.

THE WITNESS: I have no lingering issue about the

urgency of my son's situation tomorrow at 2. There's a meeting that needs to take place. It can take place later in the week. I'm not trying to be selfish, but I'm on the stand, and I'd like to complete my obligation.

THE COURT: Finish up? And is Mr. Burr already here?

MR. BURT: He's here.

THE COURT: How long will he take?

MR. BURT: I was hoping to get him on and off in a direct and cross an hour, hour and a half.

THE COURT: Is he in the building?

MR. BURT: I don't believe he is, no. I think he just checked into the hotel when we took the break.

THE COURT: Mr. Willett, how -- Richard Burr, do you know who he is? Yeah, he's a death penalty lawyer from -- I think he lives in Texas, used to live in Oklahoma.

THE WITNESS: Okay.

THE COURT: How would you feel about him going on at 7, you sleeping in? I think Mr. Burt's projections are unduly optimistic about how long Mr. Burr will take, but would you be willing to wait till nine?

THE WITNESS: Judge, I'm here to do the Court's bidding, and I'm here pursuant to a subpoena, so the Court tells me what to do and I'll do it. Judge, at some point it's not my decision anymore so . . .

THE COURT: Mr. Williams, do you care?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 81 of 85

MR. WILLIAMS: No, sir, no dog in this fight.

THE COURT: Well, why don't we start at 7 with Mr. Burr.

MR. BURT: That's fine. I'll have him here at seven.

THE COURT: How realistic is your assessment of an hour and a half for direct and cross?

MR. BURT: Well, I think I can have -- I'm going to have to hurry through it, and I don't know how many questions the Court or counsel will have, but I do have in mind that he committed to being here with the understanding he could be out of here by three o'clock tomorrow. Now, there may be some --

THE COURT: Just -- well, why did you schedule it so tight?

MR. BURT: Well, Your Honor, our schedule was set up with our eight-to-eight schedule in mind and because --

THE COURT: Gotcha.

MR. BURT: We're kind of rejuggling and readjusting, and the plan to have him here was put into place before I realized that we were going to have an adjustment. So we're trying to juggle as best as we can. And I can perhaps talk to him and tell him that we need to finish Mr. Willett and see if he's willing to rearrange. I don't -- I'm not sure it's a court appearance or something else, but I certainly could work with him. But if there is a problem, we'll have him here at seven.

THE COURT: Why don't we have Mr. Burr here at seven,

and as soon as he's done, we'll move back to Mr. Willett.

MR. BURT: That's fine. I'll try and keep it as compact as I can.

THE COURT: Okay.

THE WITNESS: What time do you want me here tomorrow, Judge?

THE COURT: I wouldn't imagine before 8:30.

MR. BURT: Yeah, I think that's safe.

THE COURT: Pardon me?

MR. BURT: I think that's safe, Your Honor, in terms of my --

THE COURT: Okay. Why don't we have you come at 8:30, and hopefully you won't have to wait 24 hours or 25 hours; okay?

THE WITNESS: Thank you, Judge.

THE COURT: Thank you. So, Mr. Willett, you're excused.

I wanted to talk to the lawyers about the exhibits a little bit more. When are you going to start like offering exhibits? I've never really done it this way, so it's very odd to me.

MR. BURT: I usually offer them at the end of the examination, but the Court will recall we had this problem with marking the exhibits.

THE COURT: Right.

MR. BURT: Now they're marked. So Exhibit --

Plaintiff's Exhibit 1 is the Mary Goody DVD with the ABA guidelines, and I'm offering the ABA guidelines because I think they're helpful to the Court. They have been alluded to by Miss Goody. They'll be alluded to by Mr. Burr.

THE COURT: Right.

MR. BURT: And by Mr. Stetler. The Goody file I'm offering not for its truth but to show the Court what her work product is. And so to the extent there was any hearsay objection, I am not offering it to prove any fact that's contained in there but only to show the Court what she did in terms of her work product.

THE COURT: Now, Mr. Williams, have you had an opportunity to even look at those exhibits?

MR. WILLIAMS: Well, if I understand what he's referencing now, I've been provided -- yeah. No, I've seen this, and I have no objection to that.

THE COURT: And that correlates to -- what does that correlate to in terms of the exhibit list that you provided me?

MR. BURT: The exhibit list, Your Honor, the -- there were a number of paper documents that were referenced during the examination of Miss Goody.

THE COURT: Well, that wasn't my question. My question is I have this notice of witness and exhibit lists document that was filed on 3-4-11 where you have these, you know, broad categories, attorneys' notes, case finance binder,

master chronology, plea binder, and transcripts. Where is this in here?

MR. BURT: I understand. And there was then a supplemental list that was filed, so there's a second list that I'm not sure the Court has in front of you.

THE COURT: Nope. I do.

MR. BURT: Should say supplemental list, and on that list it should say reference to this Goody binder.

THE COURT: Okay. So -- and what have you marked this as?

MR. BURT: That is Plaintiff's Exhibit 1, Your Honor.

THE COURT: And you have no objection, Mr. Williams.

MR. WILLIAMS: Correct, Your Honor.

THE COURT: Okay. Plaintiff's Exhibit 1 is admitted. And then at some point, you know, after you all go back to your respective homes, are you going to get me an exhibit list that reflects your numbering of the exhibits?

MR. BURT: Yes.

THE COURT: Okay. So what else have you discussed that you want to offer?

MR. BURT: Your Honor, Plaintiff's 2 is a binder containing the hard-copy documents that were referenced during the examination of Miss Goody. So as the Court will recall, there were a number of letters and notes and other documents that were referenced by Bates stamp numbers. All of those

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 348    Filed 11/10/11    Page 82 of 85

documents have been put into this binder, Exhibit 2, and were testified to by Miss Goody.

THE COURT: And where would I find that on either the exhibit list or the supplemental exhibit list?

MR. BURT: And, Your Honor, that -- because that was generated during the hearing, we created a separate exhibit index that is in the front of the -- of Exhibit 2, and I can show that to the Court.

THE COURT: Well, okay. Mr. Williams, have you looked at Defendant's --

MR. BURT: Two.

THE COURT: Yeah. I guess you're calling yourself -- you said plaintiff because she's the petitioner.

MR. BURT: That's what the exhibit sticker said, so that's . . .

THE COURT: So -- okay. So you're -- okay. So, Mr. Williams, have you looked at Plaintiff's Exhibit 2?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: And do you have any objection to Plaintiff's Exhibit 2?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Plaintiff's Exhibit 2 is admitted.

* * * *

(Plaintiff Exhibit 2 was admitted.)

* * * *

THE COURT: What else?

MR. BURT: And then Plaintiff's Exhibit 3 was the direct examination script that was identified by Miss Goody as the one that she composed for the direct examination of a penalty phase witness.

THE COURT: Any objection to Plaintiff's Exhibit 3?

MR. WILLIAMS: No, Your Honor.

THE COURT: Plaintiff's Exhibit 3 is admitted.

* * * *

(Plaintiff Exhibit 3 was admitted.)

* * * *

MR. BURT: Four is the --

MS. MORRISSEY: It's up in the clerk's -- okay.

MR. BURT: Four is a accordion file containing the documents --

THE COURT: Can you get closer to the microphone, please?

MR. BURT: Four is an accordion binder containing the documents with an index to those documents, and those documents were used by Miss Morrissey in the examination of Nancy Lanoue. So we would move those in as well.

THE COURT: Any objection to Plaintiff's Exhibit 4?

MR. WILLIAMS: In principle, no. Here's the complication, Your Honor.

THE COURT: Okay.

MR. WILLIAMS: They attempted to provide me with a copy of the Exhibit 4 before they used it, but while they were going through the examination of Miss Lanoue, they were talking about portions of Exhibit 4 that weren't in my copy of Exhibit 4, so I'd like to, you know, make sure at least I have a full copy of whatever Exhibit 4 is, review it, and then I don't think I'll have any objection to it, but I want to --

THE COURT: Okay. Yeah, why don't we just defer that till later in the week.

MR. BURT: And then 5 is the series of documents that Miss Morrissey's currently using to examine Mr. Willett. And then 6 is the newspaper article with the photo of Miss Johnson that was referenced by one of the --

THE COURT: Okay. Well, let's take up 6. Do you have any objection to 6?

MR. WILLIAMS: No, Your Honor.

THE COURT: Six is admitted.

* * * *

(Plaintiff Exhibit 6 was admitted.)

* * * *

THE COURT: Five, are you going -- I assume there are more documents to come.

MR. BURT: Yes, and I think Miss Morrissey would move to admit 5 after the examination with Mr. Willett.

THE COURT: Okay.

MR. BURT: And then 7 -- 7 is an August 11, 2000, letter from Mr. Willett to Mr. Frerichs and Ray Cornell regarding Mr. Cornell's appointment.

THE COURT: Any objection to Plaintiff's Exhibit 7?

MR. WILLIAMS: No, Your Honor.

THE COURT: Seven's admitted.

* * * *

(Plaintiff Exhibit 7 was admitted.)

* * * *

MR. BURT: And then 8 is the 4 volumes of the billing records and funding requests.

THE COURT: Any objection to 8?

MR. WILLIAMS: No. I think the Court already admitted that one.

THE COURT: Admitted Plaintiff's Exhibit 8? Okay.

MR. BURT: And I think we're --

THE COURT: Caught up?

MR. BURT: That's where we are.

THE COURT: Okay. Let me ask how are we doing in terms of -- the witness list you filed on 3-4-11, this is what we're going to get through this week? Was that the idea?

MR. BURT: That was the original idea.

THE COURT: Yeah. How do you think we're doing?

MR. BURT: We're behind. The longest witnesses, Your Honor, are obviously going to be Mr. Willett, Mr. Berrigan,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Mr. Stowers, and Miss Goody who we've already done. I think the other witnesses are not going to be as lengthy, but there still are a number of them. We have other attorneys that -- prosecutors coming in, so I think we're doing well, but I'm not sure we're going to finish all the witnesses we have on the schedule in the time that we have allotted. And I may be overly pessimistic. Perhaps we will. I guess it depends in part on whether the Court wants to go on Sunday as well. We currently have that date scheduled.

THE COURT: Well, I don't want to be insensitive to any religious concerns of anyone involved but . . .

MR. BURT: Well, I think the Court --

THE COURT: We could take Sunday off and go Monday and Tuesday. I don't know if you're all available. I just -- it would involve massive moving of my schedule, but they're all things that could be moved.

MR. BURT: I think when you adjusted the schedule the Court also indicated if -- whatever we don't finish now we can spill over into our June sessions.

THE COURT: Yeah, but the problem with that is -- here's the problem with that. How many days do we have set in June?

MR. BURT: I believe we set aside five days.

THE COURT: Okay. What I'm not going to let happen is we get to June and then it spills over into something else.

We're going to finish.

MR. BURT: Sure.

THE COURT: And so that's my concern that with all due respect it will -- if we don't finish it this week, then we can't finish it in June and then I have no time until fall, and I'm not going to continue it till then.

MR. BURT: Sure.

THE COURT: Not going to do it.

MR. BURT: The other option, Your Honor, is to the extent we don't get witnesses done that we've got slated for this segment we -- I think Mr. Williams and I had talked about depositions in lieu of live testimony for the -- and we've discussed this with the Court previously, and the Court indicated you wanted to hear from the experts.

But there are a number of people who are nonexperts who are not I don't think in the category of people that the Court necessarily would need to hear live, and we could certainly between now and June schedule depositions and take video depositions of those people and present those to the Court in lieu of taking the Court's in-court time. And I think we'll be in a better position at the end of this week to know exactly how many of those folks are left.

But I think if the Court would entertain that option we certainly could then make the hearing in June focus solely on the experts and whatever else we needed --

THE COURT: Well, do you have any interest in Monday or Tuesday next week, or is that off the table?

MR. BURT: I certainly have an interest. I would need to talk to my staff here in terms of scheduling of witnesses and whether we can get people here Monday and Tuesday. In other words --

THE COURT: But you had a number of in-custody witnesses.

MR. BURT: We have in-custody witnesses.

THE COURT: Yeah.

MR. BURT: But we also have people that we're putting up in hotels here, and so I would -- I could certainly see what the logistics are involved in that and report back to the Court tomorrow morning as to whether that would be a viable option.

THE COURT: Okay.

MR. BURT: It is for me personally.

THE COURT: Yeah.

MR. BURT: But I'd like to check with Miss Morrissey and the witnesses.

THE COURT: Mr. Williams?

MR. WILLIAMS: Your Honor.

THE COURT: What about -- could you go Monday and -- you know, if we didn't go Sunday, could you go Monday and Tuesday?

MR. WILLIAMS: Yes, Your Honor.

THE COURT: Well, why don't you take it up with your staff --

MR. BURT: Sure.

THE COURT: -- and your scheduling. I know the scheduling's, you know, daunting.

MR. BURT: Sure. In terms of the weekend, Your Honor, I do have one witness who's coming in Friday to be available on Saturday, so if we could have some time on Saturday . . .

THE COURT: Oh, absolutely. We don't necessarily have to go all day.

MR. BURT: Sure.

THE COURT: But we can, you know . . .

MR. BURT: And so I will report back to the Court at 7 tomorrow whether we can do that. And also I'd like to take a realistic assessment at where we are on the witness list and see what we'd have left to do on a Monday, Tuesday session.

THE COURT: Sure. And, you know, the other thing is my job is so much easier than yours. So --

MR. BURT: I don't know about that.

THE COURT: No, I do because I've been both. And I don't want to put undo stress on the lawyers, you know, and maybe making you go seven days in a row is a bad idea. I don't know.

MR. BURT: Well, it is wearing, but we also realize the Court's schedule, and we're willing to put the work into it

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 348   Filed 11/10/11   Page 84 of 85

and do it, and we've devoted some resources to making this happen. So we're committed to using the available time that the Court has set aside, and we appreciate it. And so far I think we've been able to do it. We do tend to get tired at the end of these long days as I'm sure everybody does.

THE COURT: Yes.

MR. BURT: But we're willing to work with the Court.

THE COURT: I'm not, but that's because my job's easier.

MR. BURT: Well, we're willing to work with the Court to try and get this done in the time set aside that the Court has given us.

THE COURT: Okay. Why don't you evaluate things with your team.

MR. BURT: Sure.

THE COURT: And we can chat about it. And I want to try and convey that I'm trying to be flexible.

MR. BURT: I know you are. And we appreciate it.

THE COURT: But this is a very important matter. And, you know, I have a tendency sometimes to rush lawyers. And, you know, it's too important to rush you.

MR. BURT: Well, we don't feel rushed, and we appreciate the time the Court has given us.

THE COURT: Okay. We'll see everybody tomorrow morning at 7. Thank you.

MELISSA LAUNSPAUCH
  MS. MORRISSEY   506
  MR. WILLIAMS   516
  MS. MORRISSEY   520
  MS. MORRISSEY   523

REBECCA DAKUS
  MS. MORRISSEY   525
  MR. WILLIAMS   534

SHANNON ELIASON
  MS. MORRISSEY   540
  MR. WILLIAMS   546
  MS. MORRISSEY   547

ALFRED WILLETT
  MS. MORRISSEY   549
  MR. WILLIAMS   603
  MS. MORRISSEY   608

*****

**EXHIBITS:**

  8   579
  2   662
  3   663
  6   664
  7   665

*****

MR. BURT: Thank you.
(The foregoing hearing was adjourned at 5:54 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

  S/Shelly Semmler     3-22-11
  Shelly Semmler, RMR, CRR    Date

## INDEX

**WITNESS:**           **PAGE:**

LISA DAHL
  MS. MORRISSEY   336
  MR. WILLIAMS   340
  MS. MORRISSEY   354
  MR. WILLIAMS   363
  MS. MORRISSEY   367

NANCY LANOUE
  MS. MORRISSEY   376
  MR. WILLIAMS   434
  MS. MORRISSEY   455
  MS. MORRISSEY   469

EVA DAWN HANAWALT
  MR. BURT   472
  MR. WILLIAMS   496
  MR. BURT   502

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*