IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

ANGELA JANE JOHNSON,        No. C09-3064

     Petitioner,

vs.              TRANSCRIPT OF
                     2255 EVIDENTIARY
UNITED STATES OF AMERICA,    HEARING

     Respondent.

_____/   Volume 3

The Hearing held before the Honorable Mark W. Bennett, Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 320 Sixth Street, Sioux City, Iowa, March 9, 2011, commencing at 7 a.m.

APPEARANCES:

For the Petitioner:   MARCIA A. MORRISSEY, ESQ.
                  2115 Main Street
                  Santa Monica, CA 90405-2215

                  MICHAEL BURT, ESQ.
                  Law Office of Michael Burt
                  Suite 329-E
                    600 Townsend Street
                  San Francisco, CA 94103

                  MOHAMMAD ALI HAMOUDI, ESQ.
                  Suite 329-E
                    600 Townsend Street
                  San Francisco, CA 94103

                  NANCY S. PEMBERTON, ESQ.
                  Pemberton & Associates
                  Suite 329E
                    600 Townsend Street
                  San Francisco, CA 94103

For the Respondent:   C.J. WILLIAMS, ESQ.
                  Assistant United States Attorney
                  Hach Building - Suite 400
                  401 First Street Southeast
                  Cedar Rapids, IA 52401-1825

(Miller testimony only)  SEAN R. BERRY, ESQ.
                  Assistant United States Attorney
                  Hach Building - Suite 400
                  401 First Street Southeast
                  Cedar Rapids, IA 52401-1825

Also present:      John Graham

Reported by:     Shelly Semmler, RMR, CRR
                320 Sixth Street
                Sioux City, IA 51101
                (712) 233-3846

THE COURT: Thank you. Good morning. Please be seated.

Mr. Burt, with regard to the new witness schedule --

MR. BURT: Yes, Your Honor.

THE COURT: -- does the "must" refer to the fact that you must call the witness or you must call the witness on that date?

MR. BURT: On that date.

THE COURT: Okay.

MR. BURT: And, Your Honor, we did discuss last night among the team scheduling and the possibility of Monday and Tuesday, and what we came to the -- we did some paring down. I think we came to the conclusion that if all -- if things go well we should be able to finish Saturday if the Court gives us probably the majority of that day. And if by some chance we don't finish, then we could be available Monday, Tuesday.

THE COURT: Okay.

MR. BURT: But we're really hoping we could do it by Saturday.

THE COURT: Okay. That's fine. And you're going to call Mr. Burr as your first witness this morning; is that correct?

MR. BURT: That's correct, Your Honor.

THE COURT: Yeah. I think most people know this, but I just want to make it clear on the record. I do know Richard

Burr. I don't remember when I first met him. I'm thinking it was 2003 because that's when I was appointed by the chief justice to the Judicial Conference Committee on Defender Services, and I served on that committee from 2003 to 2009. And Richard Burr frequently attended those biannual meetings, particularly when we were discussing issues affecting the death penalty.

And I got to know him, got to know him fairly well, did some things with him socially at those meetings, often went to dinner usually in a group. I remember one occasion he and my daughter and I went kayaking together, but I've never been in his house, he's never been in my house. And other than at either one death penalty conference or Defender Services Committee, we've had very little contact. I think he's called me on occasion. I know I've called him on occasion. He was -- he is a death penalty resource counsel or was.

And so I've talked to him, but that's the extent of the relationship. Wouldn't affect my judgment in any way. But I just thought everybody should know that. I think everybody probably did, but if you don't, you do now.

MR. BURT: Thank you, Your Honor.

THE COURT: Okay.

MR. BURT: We're prepared to call Mr. Burr.

THE COURT: Okay. Would you raise your right hand, please.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

**677**

RICHARD BURR, PETITIONER'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. And you can adjust the chair and the microphones so you can speak directly into the microphones.

THE WITNESS: Looks like there's some exhibits here.

THE COURT: Yeah. I think they're actually for the prior witness who's then coming back.

THE WITNESS: Right.

THE COURT: So -- and would you just tell us your full name, please, and spell your last name.

THE WITNESS: Yes. I'm Richard H. Burr, B-u-r-r.

THE COURT: Thank you.

Mr. Burt.

MR. BURT: Thank you very much.

DIRECT EXAMINATION

BY MR. BURT:

Q. Good morning.

A. Good morning.

Q. For the record, could you tell us who you are and what you do for a living.

A. Yeah. I'm Richard Burr. I'm an attorney. I've been an attorney since 1976. Since 1979 when I handled my first death penalty case, I have devoted virtually all of my practice to death penalty defense. There were a couple years between '79 and '81 that I was doing prisoners' rights work in addition to

**678**

death penalty defense work. But since '81 I've done only death penalty defense work.

Q. And can you tell the Court specifically your experience with federal death penalty work.

A. In the fall of 1997 I joined what was then a two-lawyer project, David Bruck and Kevin McNally, called the Federal Death Penalty Resource Counsel. It was a project created by the Defender Services Committee of the Judicial Conference to assist appointed counsel in federal death cases, consulting and assisting in whatever way was necessary. I became the third lawyer in that project in 1997.

Q. And has the project expanded since you first became involved in it?

A. Yes. In -- I don't remember the years, but over time Judy Clark became a member, you became a member, and then we have another eight or so members now. I think it's virt -- about a 12-person project now. We're all in private practice, and the work we do as resource counsel is part-time work. We're under contract to do that. And in the last year or so, I've dropped my contract pretty low because I have -- am needed to help do resource work in 2254 cases, capital cases, in Texas.

Q. When you say resource work, what generally is the object of projects like the Federal Death Penalty Resource Counsel Project?

A. The mission is to try to help appointed counsel do the best

**679**

they can do in representing their clients. The resource counsel among ourselves have a very extensive body of experience. No one of us is the perfect death penalty lawyer by any means. But together we come up with a tremendous amount of resources and experiences that we can bring to bear to help people with.

So our mission starts with as soon as we learn people are appointed in cases or even prior to their appointment in recommending the appointment of counsel. Our mission is to offer to meet with, talk with, provide documents to, strategize with, assist occasionally in drafting pleadings, assist occasionally in being present in court counsel appointed in these cases.

Q. And does the project oversee all cases in the United States?

A. Well, oversee is probably overstated. We keep an eye -- we try to keep an eye on all federal death cases in the United States and offer assistance. The assistance I offer is accepted or not in varying degrees by counsel.

Q. Is it sometimes a problem either because counsel does not avail himself or herself of the resources of the project?

A. Yeah.

MR. WILLIAMS: Objection. Leading.

A. Yeah, it is.

THE COURT: Overruled. It's foundational.

Q. So in other words, the project is there, but do you

**680**

interject yourself into the case if you are unwanted or if the lawyer doesn't ask for assistance?

A. Right. You know, we provide water troughs, but we can't make the horses drink.

Q. Okay. Now, did you prepare with my assistance a binder of material that you're going to review here as it relates to this case?

A. I did.

Q. And that has been premarked as Defendant's Exhibit Number 9. Do you have that there in front of you?

A. I do in front of me.

MR. BURT: Your Honor, may I approach the Court? I have a -- this is all on the CD, but I thought it'd be easier just to give the Court a copy.

THE COURT: You may. Thank you, Mr. Burt.

MR. BURT: Thank you.

BY MR. BURT:

Q. When a case comes to the project's attention, you say they often get involved in actually helping with the assignment of counsel?

A. Yes.

Q. And what --

A. In recommending counsel through the federal defender generally.

Q. And generally what kinds of lawyers are recommended for

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 349    Filed 11/10/11    Page 2 of 88

appointment in these cases? What does the project look for in making your recommendations?

A. We -- we focus on learned counsel, and that's, of course, the term of art from the statute requiring the appointment of counsel. Learned simply means having enough prior experience in death penalty cases from the beginning of the case to the end of the case, that that person can handle responsibilities effectively in this death case.

So, you know, sometimes both counsel appointed or if more than two a number are learned counsel. Sometimes there's only one learned counsel in a case. But we focus on recommending -- on screening, following the experience of, learning about, getting to know if we don't know them already potential learned counsel for appointment.

Q. We've had some discussion here about the guidelines, the ABA guidelines, both the 1989 guidelines and the 2003 guidelines. Are you familiar with those guidelines?

A. I am.

Q. And the guidelines speak of lead counsel, and it assigns various roles to lead counsel. In your interpretation of those guidelines, when the ABA guidelines talk about lead counsel, are they talking about learned counsel, or are they talking about the non-learned counsel who is, say, first on the case and considers himself lead counsel?

A. I think the ABA guidelines are clearly talking about

learned counsel. They -- I think they assume that whoever is appointed in a death penalty case, you know, even with multiple counsel will be learned.

Q. And the guidelines talk about the role of leading counsel -- lead counsel, and it assigns him a management role as I read them. Do you agree with that?

A. Yes.

Q. And it talks about the team concept.

A. Yes. One of the important features of the experience of learned counsel is being able to work with and lead a team because team defense in capital cases is essential. I mean, it has been a hard experience learned over years. You'd think it wouldn't be so hard learned. But the stakes are obviously the most there can be and in a sense call for perfection because the punishment is a perfect punishment. It's irrevocable.

And so it calls for what -- you know, the best we can do towards aspiring towards no mistakes, and the only way to move towards that is to have a team working together trying to, you know -- we all have weaknesses and strengths so that the best team is one where the blend of weaknesses and strengths work together.

Q. When the guidelines speak of a team approach in the way that you just have explained it, are they talking about assigning two or three lawyers to the case and then contemplating that the lawyers will work independently or that

the lawyers will say, well, there's a learned counsel here; I'm just going to defer to him and let him do everything and run the show?

A. The guidelines and the practice that we encourage and actually look for in the experience of people we recommend for appointment all focus on collaborative work. It is a mistake for a team to become fragmented. And even though you certainly will have areas of emphasis for each person to take on, it doesn't make sense for everybody to do the same thing.

Even all of that is still collaborative. It requires frequent telephone conferences, in-person meetings. And it needs to include the whole team, not just the lawyers: The mitigation specialist, the fact investigator, you know, any paralegals who are working on document collection and review, for example.

Only in a collaborative process can we move towards the goal of not making mistakes.

Q. If you don't have that approach and yet you have individually qualified lawyers in the sense that they meet the technical requirements that they're supposed to meet under the guidelines, can you have representation problems if the team approach is not being followed in these cases?

A. You can. I mean, you don't necessarily, but it is -- all of us acting alone are prone to make mistakes. That's just the nature of who we are as people. And the only way that I know of

and that I think our community standards recognize to minimize the chance of mistake is to have people work collaboratively. We tr -- we can counter each other's tendency to make mistakes that way.

Q. Okay. Now, in the binder there, Exhibit 9, I'm going to direct your attention to the first tab. And I think the first thing in there, should be the first thing in there, is a letter dated September 16, 2002, addressed to Mr. Willett from Kevin McNally. Do you see that in the binder?

A. Yes.

Q. And could you tell the Court, first of all, who is Mr. McNally?

A. Kevin McNally is -- was one of the first two members of Federal Death Penalty Resource Counsel Project. And at some point I think after this letter the project grew in size enough that we needed a director, and Kevin became the director.

Q. Okay. And then the second letter in this group, the next one after that, is a letter that's dated September 19, 2000, almost 2 years before that. Do you see that?

A. Yeah, I do. The letters are actually oddly dated because I think the September 19 letter is actually the first letter that was sent. That's what we call the opening letter.

Q. And what's the purpose of the opening letter, the September 19, 2000, letter?

A. The opening letter is to introduce ourselves and our

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 3 of 88

project, to sort of, you know, preview the kinds of things that we might be able to help with, to ask for some information, initial information, from defense counsel.

Q. And you'll see attached to that opening letter is an index of authorization materials that apparently was provided with the opening letter --

A. Yes.

Q. -- listing a bunch of documents?

A. Yes. This was -- as I recall, this was a little bit before the time that we developed a website, although maybe we had the website by then. I don't see any reference to the website. So there was a time when we provided materials in paper form and then on disk and then by reference to a website that we developed. And so the index that was there I think was probably to paper materials or materials available by CD that we then had.

Q. Okay. And the CD material or the index material that's provided relates specifically to the authorization process.

A. That's right. We divided the materials up sort of by stage of the case.

Q. Now, is it the view -- is it your view that the authorization process is an important stage in a federal capital case both for plea bargaining purposes and for purposes of determining whether or not the case is going to proceed as a capital case?

A. I think it's an absolutely critical part of the case. My plea to lawyers that I work with is -- starts with saying your best chance to avoid death is in the authorization process because -- and this has been true almost no matter who the attorney general was. Only 20 percent of the cases are authorized, so you have an 80 percent chance of getting your case not authorized. That's far better than you're going to -- than you're going to see from every point in the proceeding thereafter. Thereafter the chances of death go up. And so --

THE COURT: But, Mr. Burr, that's in the abstract because if you have a case with five victims, two of whom were children, two of whom were witnesses in a federal case -- and I don't know how this factored in, but the defendants are white which in my view might increase the likelihood of authorization to try and avoid disparity problems -- I don't think you would say given those facts and just those facts alone there's an 80 percent chance under any attorney general that the death penalty would not be authorized.

THE WITNESS: I think that's right, although I don't know that that rule applies to both defendants because in every case or -- well, in virtually every case with multiple defendants there are degrees of culpability. There certainly were here from my review of the case.

And so it is -- while it is -- there's probably a better than 20 percent chance that somebody would be authorized

in this 2-defendant case, the chance of the lesser culpable person being authorized, you know, was better. I don't know if it was still higher than 20 percent. But you're right. That is just general, in general. It obviously varies from case to case.

I represented -- I was one of the lawyers representing Tim McVeigh, and, you know, the chances of authorization there were a hundred percent because, in fact, President Clinton said they were going to seek the death penalty the night this happened.

So it does vary from case to case. But, again, I think when you represent somebody in a multiple-defendant case with -- that's highly aggravated and, you know, probably likely to have somebody authorized, your job as defense counsel is to separate your client from the others and say, you know, this person has lesser culpability and build a whole anti-authorization argument around that theme.

And that -- you know, that works. That works a lot. We -- I mean, and you can't -- there was a 23-body case recently in the Western District of Texas involving drug-related killings, and there were 5 people. There were I think 12 defendants. The government sought authorization for 5. And each of the 5 had varying degrees of culpability in terms of how many murders they were involved in. And there were very effective arguments made by people who had killed 6 people, you

know, saying I didn't kill 15. And some of those -- in fact, nobody was authorized in that case, but certainly the people who, you know, were responsible for five or six deaths made very effective arguments, had -- even had the most culpable person been authorized.

BY MR. BURT:

Q. You mentioned the role of lesser culpability arguments, and you also mentioned your role in the McVeigh case, and there have been some arguments made in the pleadings here and also I think in some questions through cross-examination that since this case, the Johnson case, involves the killing of two children, no mitigation would have made any difference and it -- because of the nature of the case. In your experience from the McVeigh case, was the argument about lesser culpability -- did it have any success in a case that was obviously pretty aggravated?

A. It had tremendous success for the lesser culpable of the two defendants, Terry Nichols. Terry Nichols was authorized but got a life sentence in a federal jury trial and thereafter in a state trial got a life sentence.

And, you know, I don't mean to suggest something that's overstated, but in a rough sense Terry Nichols' degree of culpability compared to Tim McVeigh was at least analogous to Angela Johnson's culpability compared to Dustin Honken in this case in the sense that there was a substantial and not just colorable but a substantial argument that could have been made

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 4 of 88

**689**

about her having a lesser role and, therefore, lesser culpability.

So it didn't work for Terry Nichols in the authorization process, but it did work for him at trial.

So even in, you know, one of the worst -- well, still the worst case that's been tried in the federal courts in terms of the devastation of the crime -- and I'm excluding Zacarias Moussaoui because his role was so tangential in the 9-11 tragedy -- but still the Oklahoma City bombing stands as the worst case in terms of devastation where the people actually responsible were tried. And even in that case, lesser culpability saved Terry Nichols' life.

Q. There were obviously children victim in that case.

A. Oh, there were -- just about all the children in the daycare center in the Murrah building were killed. There were -- I don't remember the number but 20 -- 20 some odd children.

Q. So besides writing these introduction letters and providing the materials, what sorts of things are provided in these -- on the disks that are provided when the case is open? For instance, this memo lists a bunch of authorization materials. Are they case breakdowns? Are they approaches on how to handle authorization or other aspects of the case?

A. It's really -- it's all of that. We -- in the preauthorization process, we encourage people to get whatever

**690**

discovery they can, learn about the government's case to the extent possible. Usually it varies from U.S. Attorney's Office to U.S. Attorney's Office, but most U.S. Attorney's Offices will start making some discovery available at the outset of the case. And so you learn as much as you can about the government's case.

You quickly try to get resources for the beginning of mitigation investigation and the beginning of fact investigation so that you're affirmatively developing your case. And you are looking for -- in multiple-defendant cases, you're always honed in on relevant culpability issues because we know and a lot of the materials we provide about authorization are sample memos and sample letters written on behalf of people. And relative culpability, you know, stands out as a striking argument in many of those documents.

And we just know from experience that relative culpability is, if not the most, one of the most powerful reasons for the government not to authorize somebody if they're the lesser culpable party.

So we provide sample pleadings as it were, letters and memos to the U.S. attorney and to the Department of Justice. We provide some data about themes that seem to have resonated with the Department of Justice in not authorizing cases.

We help people with pleadings about, you know, getting some early discovery where possible and getting resources quickly for the defense and getting those resources on the

**691**

ground and then, you know, getting enough time before the case moves through the authorization process, enough time so that the defense themes can be, you know, pretty well developed before you make your presentation to the U.S. attorney and then in turn to the death penalty committee and the Department of Justice.

Q. Let me ask you a little bit about the educational efforts of the project in addition to making these materials available to federal capital practitioners. The next item in your binder there are some notes captioned at the top Federal DP Conference, Salt Lake City, Utah, November 5 and 6, 2004. And there's going to be some testimony here that these notes are Mr. Berrigan's notes of attending this conference in Salt Lake City and his -- he's going to say that he summarized the lectures that he attended.

And the first one on the first page of that document is a lecture entitled Expanding the Horizons of Mitigation by Dick Burr. And it lists in his notes five pillars.

And I wonder does that document refresh your memory that back in 2004 you appeared as part of a educational conference on behalf of the project and presented a lecture called Expanding the Horizons of Mitigation?

A. Yes, I remember this quite well.

Q. First of all, what educational efforts does the project do specifically in regard to conferences like this in Salt Lake City?

**692**

A. We -- the project began in 1992 I think, either '91 or '92. And from the beginning there was always an annual conference which we call the Strategy Session. It started being called that because the first Strategy Session I think had a dozen attendees because there were so few cases.

It has grown, and it still happens every year. It's always in the fall, varying parts of the country. And it now has and has been for some time -- I'm sure it was in 2004 -- about 200 to 250 people come. We still call it the Strategy Session, but it's a seminar. It's a two-day, now two-and-a-half-day seminar. And we try to -- we do a lot of work planning the seminar trying to make it as timely and relevant as possible for whatever is going on then. And this was one of -- you know, one of those annual seminars.

Since about 2007 or 8 -- I think 8 -- we have also conducted one or two additional seminars each year called Authorized Case Training. And those are smaller conferences where we invite whole defense teams from cases that have been authorized for death and that are, oh, roughly 6 months out or more from trial so that -- and there are usually about 50 or 60 people who come to these conferences, you know, a dozen to 20 defense teams, and they are probably 60 to 70 percent break-out sessions with 2 or 3 teams per break-out working on the cases. And then we have plenaries, short plenaries, in between.

So those are the additional conferences we're doing.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 5 of 88

693

I don't think -- I don't think we -- the Authorized Case Trainings didn't start until well after this case was over.

Q.   Okay.  And just --

THE COURT:  Just so you know, I attended the Salt Lake -- you probably knew that.

MR. BURT:  I did know that.

THE COURT:  I attended it as a representative of the Defender Services Committee, attended the whole seminar.

THE WITNESS:  And, in fact, you gave a lecture.

THE COURT:  I did, right.

MR. BURT:  Very well received I'm told.

THE WITNESS:  Yes.  I recall a fairly long standing ovation.

BY MR. BURT:

Q.   Now, this particular lecture that you opened the conference with apparently, Expanding the Horizons of Mitigation, you were talking about the pillars, the five pillars.  What were you trying to convey to participants like Mr. Berrigan who were in attendance?

A.   The whole effort here was to sort of -- I mean, literally to expand the horizons of thinking about mitigation.  Traditionally and certainly up through this point and even still today most mitigation work is backwards looking.  It's sort of what I call the archeological dig.  You're digging through your client's past, you know, often back to at least one or two

694

generations before the client so that you're looking for vulnerabilities that seem to be passed down from one generation to another.  And that is essential and necessary work in any capital case.

My effort here was to -- you know, to sort of bless that work and talk about how effective and competent we had become at doing that but also to begin looking at other things that we need to develop as well and develop competence in.

One of the things I said was, you know, looking at -- a lot of the backward looking is looking at what went wrong with the client's life.  It's important I think because of the need to humanize and individualize our clients to also look at what went right, you know, what are the things that the client, you know, did that were either admirable or sometimes heroic, you know, in relative terms that showed heart, that showed struggle, that showed aspiration, that showed, you know, kindness, what are all those things, too, to be as sensitive to finding and developing those as we were to the things that went wrong because, again, I think it's -- each one of us including our clients who are also one of us are a complex mix of faults and frailties and strengths.  And so it's to try to get that balance right.

Then the third -- third thing we were talking about is to focus more on how the client is now, what is the client doing in jail pretrial, is there mitigation that comes out of that.

695

And there often is, and sometimes we're blind to it.

There were wonderful examples when we started talking about this of clients teaching other people to read and jails setting up actual, you know, weekly education classes for our clients, some of our clients, to lead so looking at the kinds of things our clients are doing since incarceration and before trial to see what's going on there and to -- and to the extent we can to encourage it and to support it.

The fourth part was to look at the future and not simply to think of the future as something to argue the client won't be dangerous in but also to start beginning to look at what our client might do that's positive in the future.

I mean, the future is all about prediction.  And to the extent that predictions about possible future danger are admissible in court, predictions about possible future positive contributions can also be developed.  Particularly in light of the history that we develop with our clients, we can be helpful in identifying things that the client is interested in, wants to do, could become engaged in, could become enthusiastic about, could sort of galvanize a whole life about.

And, you know, in that part of it I talked a lot about a fella named Wilbert Rideau who is a pretty well-known guy that was on death row in Angola in Louisiana for a number of years, and after Furman his sentence became a life sentence, and he spent another 30-odd years after Furman being in prison and

696

taught himself to write and read better.  He was an eighth-grade dropout when he was arrested, became a journalist, started a wonderful weekly publication called The Angolite which started winning awards, journalism awards, and, you know, became an accomplished journalist so that, you know, you sort of -- the whole theme of that was helping find the Wilbert Rideau in your client.

And then the fifth part of it was to begin thinking about making outreach to the survivors of our clients' crimes in the way that we've developed coming out of the McVeigh case, in a way that respects the rights of survivors that doesn't compete or conflict with the work that victims' advocates and victims' services folk do for the prosecutor's office but that provides an opportunity for a relationship between the survivors and the defense team and ultimately with the client in appropriate cases so that to think of that as a part of the larger mitigation effort.  And so that was the -- those were the things that we addressed.

Q.   Now, apparently if you turn in that same set of letters to page 12, there's apparently a session given on plea discussions under Ashcroft by Skip Gant and Jay T. McCamie.

A.   Uh-huh.

Q.   And the notes that Mr. Berrigan took are the five stages of grief by Kubler-Ross:  Denial, anger, bargaining, depression, acceptance.  And then underneath that he's written Angela made

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

it to depression, her attempted suicide, but not to acceptance. Do you understand what the topic of this note is in terms of this five stages of grief as relates to plea process?

A. Yes.

Q. Would you explain that?

A. I suspect that most people are familiar with the work of Dr. Kubler-Ross and it all comes from the death and dying context. And she identified what's now I think pretty commonly recognized as the five stages that people go through after the death of a loved one.

The application here to our clients I think is apropos because they've been involved likely -- some clients are innocent, but most are not. They've usually been involved in causing the death of a person or more than one person, and so they are responsible for death in some sense.

But they are also, because of the charges they face and the outcome that may befall them and certainly whatever happens at the end, the dramatic cessation of life as they know it, they are faced with the grieving process out of their own circumstances.

And the stages of grief actually do work for our clients. You know, many don't get past denial and anger. You know, some -- some will move through the whole process. And one of the things we've recognized is that most clients -- occasionally a client when you first start working with the

client will be extraordinarily remorseful and ready to do whatever is necessary to take responsibility usually without regard for the sentence. Those clients are few and far between.

Most clients fall somewhere between that and people who are totally denying their responsibility, and occasionally it may be accurate, but a lot of times it's not. It's denial. It's false denial. And so we have to have a framework for working with our clients.

And one of the frameworks that we've recognized that's useful is to recognize that they are in the midst of a grieving process. It's not exactly like the process Kubler-Ross described, but if we recognize that framework as something relevant to their lives, it helps us work with them because part of our job is to -- you know, we're not -- we just don't take our clients as they come to us and leave them there. You know, we are counselors, attorneys and counselors at law, and part of our counselling role is to identify in the course of getting to know this client what's in the client's best interest. And in death cases, you know, defense lawyers have as their duty to take as one of the best interests of the client life instead of death.

And so we have to be able to work in a transformative way with our clients to help them move towards their best interest and away from the sort of shadows that have covered their lives and brought them to where they are. So this is a

very helpful framework for that.

Q. And what is the role of the capital defense team, including the mental health aspects of the team, in dealing with a client who is in a denial stage of the process, a client who says "I didn't do it" when the evidence obviously shows that the client did do it and the client is not communicating on the level that they should be in terms of recognizing the situation they're in and the dangers that they face? What does the team do with a client like that, or what should the team be doing with a client like that?

A. I mean, the team needs to do two things at the same time. One is to develop a relationship of acceptance and trust between the team and the client. And you don't do that by confronting the client from the outset. You have to work -- take the client where he or she is and develop acceptance and, you know, unconditional commitment to working with the client -- that's the most important thing at the very beginning -- and then understand that this client like many of our clients are in denial. It's natural to be in denial. I mean, it is -- it's what people do when death happens or when they face their death. And so you take that with compassion and work with the person from there.

You also try to think -- your first -- among these first tasks is to try to figure out whether the denial is sort of a normal part of a grieving process that can be worked

through or whether it's delusional, you know, whether it has some aspects of being informed by mental illness. And you can't do that without information beyond the client, so your mitigation investigation has to get cranked up pretty quickly. And you need to start figuring out what are all the factors contributing to where the client is now.

And once you've gotten a bit of an understanding of that, then you start developing the tools of working with the client because the goal in every capital defense representation at a minimum is to avoid the death penalty. And if you don't go to trial and you have a plea instead, then that's the surest way to avoid the death penalty. The worst thing that -- the worst situation death penalty defense lawyers can be in is to say ready when the judge announces are you ready for trial. You don't want to be. You don't want to be there.

And so you know from the beginning that one of your major efforts has to be to try to thread the needle for a plea and a sentence less than death, and it's not just the prosecution that needs to be there. It's your client. And so, you know, you're working with both the prosecutor and your client to get to that point of having the thread and having the needle to put it through.

So that's -- that's a long-winded response to a simple question so . . .

Q. Can that process you just described be accomplished by

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 7 of 88

701

delegating to a paralegal, for instance, the task of dealing with a client and then, for instance, letting the lawyer go about his other cases or business?

A. No, no.

Q. Why not?

A. It's a terrible mistake. Working with the client has to be -- there can be nothing more important to the team than working with the client. It -- again, it's one of those aspects of the case that requires everybody's collaboration.

I always encourage teams before they have meetings with the client, whoever's going, to have some discussion beforehand about what this visit's going to be about. You know, sometimes it's social stuff, and that's important to building rapport and relationship, but there's always got to be a focus for the meeting from the perspective of defending the client. And the team needs to -- everybody on the team needs to contribute to that.

Sort of lone rangering by anybody in relation to the client is setting yourself up for problems, doesn't necessarily mean it will happen, but it can mean that the client can start liking somebody better than others and do what's called team splitting, you know, sort of pit people against each other. And that's a natural thing to happen in this kind of situation. It's not a bad comment about clients. It's a comment about the situation and the stress they're under.

702

There can be -- you know, when you're going through this sort of denial and anger and acceptance process, if somebody on the team doesn't have the big picture in mind and focuses on certain aspects of the case, it can give the client a mistaken impression about where the case is going, and the client can get dug in.

So it's crucial that the team collaborate. Doesn't mean everybody goes to see the client every visit. That's not what I mean. It means that the team thinks about every visit and whoever's going goes with the benefit of that discussion and comes back and debriefs with the team. Before the next visit there's at least some discussion about that next visit.

Q. Can the process you described be accomplished under the following scenario which we had testimony about yesterday, that the non-learned counsel takes the learned counsel in for the first meeting with the client and the learned counsel says to the client, "You're going to have to plead," before he said anything else and the client says, "Don't you want to hear my side of the story or the true story what happened," and the lawyer says something along the lines of, "You can tell me if you want, but it's not going to make any difference"? Can the team building -- can the team approach it from that aspect and expect to get beyond the denial stage?

A. I don't -- I don't think so. I mean, it's a strategy that rejects the client's -- the legitimacy of what the client's

703

feeling and the state that he or she is in and challenges the client. You know, any of us that are challenged become more dug in and defensive at least initially, especially when we're under huge stress.

So it's a mistake to start that way for any future relations with the client, but it's a mistake to go -- to do that without having considered what the initial meeting would be about when a new lawyer comes in.

And I don't know whether that was a strategy that was developed between -- within the team. I suspect it wasn't. But if it was a strategy developed, it was a terrible mistake. If it wasn't, then part of the mistake was not talking about that ahead of time.

Q. Can the process you described be accomplished by communicating important information such as plea offers to the client by mail?

A. No. Oh, good heavens, no. You -- pleas are what we as counsel want and what most clients don't want. And so you're -- it is one of the most difficult aspects of the case. And it's a process that has to be done in person. I mean, there can be communications by mail about things that are referenced in a meeting. I don't mean to say you can't communicate by mail. But you certainly -- anything that's, you know, talking about a new topic or, you know, following up on what we talked about before that requires a dialogue cannot be done by anything but a

704

person, an in-person meeting.

Q. And does that -- can it be accomplished in a meeting, or is it a process?

A. Oh, no. It's a process. It is the rare client, as I mentioned before, who is ready to accept responsibility and accept the consequences of responsibility and that has the kind of remorse that gets them to that point at the beginning. I've never had a client that way in the 30 some odd years I've done this work. I've heard about others who have, but I haven't.

And so you know from the beginning it's going to be a process, it's going to take time, it's going to take patience on our part, and it's going to take showing the client that you care about how he or she feels right now and the next time that you're together and, you know, even if the client doesn't make the progress you want him to make, you still care and there's unconditional acceptance of them. It doesn't mean you leave them where they are, but there's always unconditional acceptance.

And so you know this is going to be a process. It's a very difficult process and an arduous process for everybody. But time and time again when we do it the way we know how, it works. You know, we get to the point where we think the client ought to be, and the client gets there herself.

Q. We've had some evidence in this case, correspondence from the client to the lawyers and what not, indicating the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

client's -- an important concern for the client is her relationship with her children. Can the defense team, when it learns of facts like that, use it to its advantage in bringing the client around to realizing that a plea is the best option in a case?

A.   Yes, absolutely.

Q.   How does that process work?

A.   When our clients are charged -- arrested and charged with a capital murder, they feel more alone in their lives than they ever have, even if they've been abandoned from the time they were infants. That experience isolates them from the rest of humanity because it -- it says to them not only I've been caught or I've been charged or maybe accused wrongfully but I've been caught for the most part. And it's like a tidal wave crashes in on you of separating you from humanity. Suddenly you are in a position of being killed by society for something you've done. And it isolates you totally from every other person.

A lot of our clients' families have been integral to who they are in sometimes positive but often damaging ways, but still there is a familial connection and affection that's in kind of an archetype. It almost doesn't matter what a parent has done to you as a child. You are still that parent's child, and there is a bond there that you feel no matter what has happened.

And the same is with children. If you are a parent

and charged, you have that bond with your child. Even if you've been negligent, absent, self-absorbed, not available to your child, you still have that bond.

And so we have to see our clients as somehow nested in families, either ones in which they are parents or ones in which they are children. And those families, no matter what their roles have been in our clients' lives, have to be taken into account and worked with and nurtured and brought into the process of working through this person's life and movement towards life.

You know, sometimes you can't get families to do it. They are just unapproachable. But usually they are in some -- you know, with some work. And what families say can mean a whole lot more than what anybody on the legal defense team says. If your child says to you, "Mom, I want you alive; I don't care where you are; I want to be able to see you and hear you and get your counsel and your advice and your love; and if you're dead, I'm not going to have any of that; I want that," that's the most powerful plea that can come to one of our clients. And it has in many cases been the difference between rejecting a plea and taking it.

Q.   Now, I want to direct your attention now if you move along under the same tab after the seminar notes which end at -- there's page 24, the next group of notes again in Mr. Berrigan's handwriting at 3-17-05 meeting with Dean Stowers and Dick Burr

in Dean's office in Des Moines, Iowa, do you recall attending this meeting?

A.   I do.

Q.   Can you tell me the circumstances leading up to it?

A.   I don't remember them exactly.

Q.   Were you the assigned resource counsel on the case?

A.   I was not. I think this probably happened -- I'm guessing -- well, I have some memory that this happened because the person who had been the resource counsel was no longer in the project, and I think Pat had been, you know -- had been moved by my little presentation at the conference in the preceding fall and wanted to have me work with them on the mitigation case.

I think Mary Goody who was the mitigation specialist was involved in getting me to that meeting as well because the meeting -- it included Mary even though the note doesn't say it was with Mary. I think Mary was there as well. She was either there in person or there by telephone, but I'm pretty sure she was there in person.

Q.   Okay. And what was the purpose of the meeting?

A.   The purpose of the meeting as I understood it was to sort of do an assessment of where they were in terms of preparing the case. There was a trial date coming up. Dustin Honken had been convicted and sentenced to death at this point. There was still some hope by the defense team that a plea might be accepted by

the government. The client was willing to plead by this point. And so it was to sort of immerse me in their case and have me look around and talk with them about what I think they still needed to do.

Q.   And I think at the time this meeting was held the trial date was set for either March or April of '05, so your meeting's fairly close in time --

A.   It was very close to the trial date.

Q.   -- to the trial date, and Mr. Berrigan's notes discuss themes. And were these themes you were suggesting or themes they were running by you of what it looked like from a mitigation s --

A.   They were the themes that they had identified, the mitigation themes, from the work they'd done on the case. And, you know, from my perspective themes are relatively easy to arrive at, and there's not an infinite number of themes. I mean, there are discrete themes that come out of people's lives.

The hard part is being able to integrate those themes into a compelling story about the client and the client's life and circumstances and the crime, and that -- that's the hard part is how you weave those themes into the story that is the client's story. And to be able to do that you have to have a wealth of information from a lot of investigation. And you have to have a really good sense of who your best story-telling witnesses are and even those who can't tell stories well but who

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 9 of 88

have important stories to recount, how you can help them get those stories out and then how that -- how that effort is going to integrate with experts that you've had evaluate the client or to look at other issues in the case, sort of how you blend the lay testimony and the expert testimony in a way that makes the most compelling story about the client.

Q. As you were working through these themes with the team, did you get some sense of where they were in terms of their state of preparation aside from just developing themes? Where were they at this point in terms of implementing those themes with hard evidence?

A. My recollection is that I was worried almost from the beginning about how much evidence they had, you know, how -- how they had really delved or not delved into Miss Johnson's life.

Like I said, it's -- the mitigation themes come out fairly quickly. You know, once you begin to get the contours of a person's life, you can sketch out themes.

But when -- you know, I would always ask who are the witnesses to talk about this and how does this theme fit with, you know, other themes that we were talking about and how are you going to weave these things together.

And in asking those questions, I was very troubled by the inability of the team to talk about how they would do that because they just -- they hadn't gotten to the bedrock of Ms. Johnson's life. That was my -- my sense then and my

recollection now.

THE COURT: Excuse me, Mr. Burr.

Mr. Burt, I have a question for Mr. Burr. Clarification on you were worried from the beginning. The beginning of that meeting?

THE WITNESS: Yes, yes.

THE COURT: Okay.

THE WITNESS: Yeah. No, I really didn't know anything about this case before other than just -- you know, we all talk in conference calls and e-mails, so I knew a little bit -- I knew what it was about. I remember Mr. Honken's case, but it was the meeting I was talking about.

MR. BURT: Your Honor, in a moment I'm going to need one of the trial exhibits. My associate knows where it is. May he approach and dig that out for me?

THE COURT: Absolutely.

MR. BURT: Thank you very much.

BY MR. BURT:

Q. And I think under the tab -- who was resource counsel assigned to this case in the beginning?

A. I believe Skip Gant.

Q. Skip Gant. And if you'll notice under that same tab later on I believe there's one of Mr. Berrigan's notes of a meeting with Skip Gant on March 14, '04, meeting with Skip Gant, Dean, Al, and Pat Berrigan which apparently indicates they did have

some contact before you met with them.

A. Right.

Q. Concerning specifically the plea. And the notes that I have indicate confront Angela with her prior statements. We need to get her off of the "I didn't do anything" posture. It keeps her from testifying in either phase and will make plea negotiations impossible. Read Crawford versus Washington. Could this change Eighth Circuit's decision in McNeese? And then his note on plea, can we get high-low agreement with 15 years on bottom and 40 on top, sentence needs to be left strictly with judge, not U.S. attorney. He mentioned a Nuygen Arizona case, and then at the bottom ask DOJ for reconsideration by letter, then follow up with request for personal appearance before the board.

The second page, get Mary Goody back into the case, need to revisit the witnesses, develop history of abuse, and then DOJ package should focus on new powerful mitigation case. Crawford problems with McNeese's statement and initial appearance with DOJ.

So apparently there was some input from project counsel before you had this meeting; correct?

A. Yes.

Q. And do you know what's being referred to when ask DOJ for reconsideration and present them with new mitigation case?

A. Yeah. Whenever a case has been authorized, we can go back

to ask for reconsideration of the authorization decision, and occasionally the attorney general does reconsider and withdraw authorization. To do that you've gotta have something new some new -- you know, some new evidence, some new development, and it has to be important, so that's what -- I think what Skip -- or what the note's referring to.

Q. There's some discussion in this note of --

THE COURT: Excuse me. Mr. Burr, are you aware of Attorney General Ashcroft ever -- once the decision had been made to seek death to go back in the authorization process and change his mind?

THE WITNESS: I am aware of it, and it seems like in -- among these tabs there may be some data about that.

Is that right?

MR. BURT: Yeah.

THE WITNESS: I think -- I know I've looked -- I've reviewed that.

MR. BURT: Yes.

THE WITNESS: But yes. He . . .

BY MR. BURT:

Q. Could you go to tab 13 I believe is -- tab 12 and 13.

A. Yeah. Twelve I think --

Q. Twelve is Ashcroft guilty pleas 3-8-11, and 13 is a spreadsheet.

A. Right. And some of the guilty pleas under tab 12 were

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 10 of 88

post-authorization. Some were pre-authorization approved by Attorney General Ashcroft.

Then under tab 13, I believe these -- well, these are the cases -- I think it's a tabular listing of the cases that are described under tab 12.

Q.   So let's take a look at the tab 13 in answer to the judge's question, the spreadsheet. And there's listed there 12 cases at the beginning. Are these cases that were originally authorized as death cases and then Attorney General Ashcroft changed his mind and authorized a plea?

A.   I believe that's correct.

Q.   Okay. And are you familiar with some of these cases?

A.   I am -- I mean, I've reviewed all of them in preparation for today. I'm more familiar with some than others.

Q.   And can you give the judge some examples of cases where Attorney General Ashcroft initially authorized a case and then allowed a plea thereafter?

A.   Sure.

THE COURT:  Well, doesn't it look like it's the first 12 on the spreadsheet --

MR. BURT:  Yes.

THE COURT:  -- where Ashcroft had authorized it, but then there was a guilty plea, and we -- I guess we're assuming it wasn't a guilty plea to death.

THE WITNESS:  Yes.

MR. BURT:  Hopefully not.

THE COURT:  Because it doesn't indicate that, but that would be the assumption.

BY MR. BURT:

Q.   Is that, in fact, what these --

A.   That is in fact. Whenever -- whenever there is a guilty plea -- we don't record guilty plea data unless it's part of a plea bargain. And, in fact, I can only think of a couple of cases where people have pled guilty and then gone to a sentencing trial. So guilty pleas --

THE COURT:  But there are some because I'm aware of some.

THE WITNESS:  There are a handful.

THE COURT:  But it's rare.

THE WITNESS:  It's very rare, but there are a handful, and it's been, you know, sort of part of the trial strategy.

BY MR. BURT:

Q.   And the Court is right. The cases are listed there. I guess my question was going more to can you give us some specifics as to what some of these cases are about and the nature of the cases, examples comparable to our case that might be illustrative of the kinds of cases where authorization is originally in place and then withdrawn.

A.   Yeah. Well, under -- both from the table you can -- under tab 13 you can see that there were 62 people who either -- who

were allowed to plead guilty, some before an authorization decision, some after an authorization decision. And the descriptions of those 62 people's cases are under tab 12. These are descriptions from our database that we maintain.

Q.   And did you actually go through some of these cases and pick out a couple --

A.   I did. I don't know if you want me to talk about -- there are five or six that seem to cast -- you know, to help shed light on what might have been done here had timely plea offers been pursued.

Q.   Sure. Why don't you review those just briefly.

A.   The first one was on the -- I guess it's on the second page under tab 12. At the top is a person named Llera-Plaza, L-l-e-r-a, hyphen, Plaza, Carlos Ivan. This is a case involving four murders for hire, drug-related murders, in Pennsylvania and Puerto Rico. And there were -- among the four victims, two of them were innocent. They were -- they were mistakenly killed.

And Llera-Plaza I was particularly interested in because he was the middleman in arranging all of the killings and the shooter in at least one or two of them, the driver in another drive-by shooting.

So he, Llera-Plaza, played a kind of facilitation role that you -- not the same kind of facilitation but a facilitation role in the way that the government's evidence against Ms. Johnson suggested she played some facilitation in this case,

obviously different but nonetheless a facilitator primarily and not the actual shooter primarily but in a case that involved four murders, two of whom were innocent people, innocent in the sense -- in a sense all victims are innocent but . . .

THE COURT:  Can I stop for a second? With all due respect, so far all Mr. Burr is doing is what I could do. I can read the descriptions and make the comparisons to this case because I know a lot more about this case than Mr. Burr does. And I assume he may know a lot more about some of these cases that he's talking about than I do, but so far he's just relying on the description. And I can do that.

MR. BURT:  I understand.

THE COURT:  And the biggest problem with doing this is it doesn't take into consideration the government's evaluation of the strength of their case which is probably a very important factor in determining whether or not to take death off the table.

MR. BURT:  Sure.

THE COURT:  I mean, that's just kind of common sense, that --

MR. BURT:  Absolutely.

THE COURT:  -- when you look at whether you're going to go with death or not, you're going to look at the strength of the case among a variety of other factors. And, of course, tab 12 doesn't do anything about the strength of the case from the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 11 of 88

government's perspective.

MR. BURT: Sure. Can I --

THE COURT: So --

MR. BURT: Can I follow up on that?

THE COURT: Yeah, you can follow up on it, but it's largely not very helpful to me.

MR. BURT: Okay.

THE COURT: I mean, I'm willing to assume that there was some possibility that the death penalty could have been withdrawn, but based on what I know, unless there's evidence that's going to change my mind, I think it's unlikely.

MR. BURT: Well, if -- could I --

THE COURT: Yeah.

MR. BURT: -- follow up on that?

THE COURT: Sure.

BY MR. BURT:

Q. In light of what the Court said, I'd like to focus on whether in light of the data --

THE COURT: Excuse me. And part of the reason I said that was your gross underestimate of how much time you would take with this witness.

MR. BURT: Okay. I hear you.

THE COURT: Not -- you need to fully make your record, but when we're getting to things that I don't find very helpful, I'm going to point it out, and then you can continue -- I want

you to make any record you want to make, so you can continue to go with it. But, you know, we did -- I made a commitment to another witness based on what you told me.

MR. BURT: Sure.

THE COURT: I didn't believe it at the time.

MR. BURT: Well, I think we factored your unbelief into the estimate. I think he's going to be here around 8:30 or so.

THE COURT: Yeah. And I don't think you're -- we're still on -- well, we jumped from tab 1 to tab 12 and 13, but there's a lot of tabs in between.

MR. BURT: Well, actually, Your Honor, all the tabs relate to these plea statistics. We're going to cover those very quickly.

THE COURT: Oh, okay.

MR. BURT: We're not going to -- other than identifying what they are, this part of it is almost complete.

THE COURT: Oh, okay.

MR. BURT: Believe it or not.

THE COURT: That's fine. Okay.

MR. BURT: But -- and then we're just -- the only other thing I was going to do with him was return to this meeting, and then we're done.

THE COURT: Okay. That's fine.

MR. BURT: But I do want to direct the inquiry to what

the Court just raised because I think it's important.

BY MR. BURT:

Q. The first thing the Court said is, of course, these comparisons don't take into account the strength of the evidence. Do you know many federal capital cases that are weak from an evidentiary standpoint, the government evidentiary standpoint?

A. It's hard to answer that in general. In general the government doesn't indict people unless they have sufficient evidence to move forward with the case. I mean, that's just -- that's true. We know that. In multiple-defendant cases, there -- the government's case usually focuses on the most culpable people. Sometimes they seek death against everybody, but they tend to focus on one or two people. And again, in multiple-defendant cases, they very often will try to find some codefendant who's willing to testify against others. And so the less culpable people have an opportunity to become a government witness and to have a plea for themselves.

Again, that's not different from any kind of prosecution with multiple defendants. It is certainly true in these cases. And so there are relative strengths -- there are relatively culpable people in the government's assessment. They tend to go after and seek death for the people they believe are the most culpable, and they are often open to getting the assistance of the less culpable people in doing that.

And so the cases that I've noted among these Ashcroft guilty pleas except for one of them, all of them are multiple-defendant cases where something like that took place.

I can just -- if it'd be helpful to the Court, there are six cases I've noted that I think -- I can just give you the names and --

THE COURT: Well, you know what might also be -- you can do that but might also be helpful, unless I'm missing anything, this doesn't show all of the cases where Ashcroft was attorney general where they didn't allow someone to plead --

THE WITNESS: That's correct.

THE COURT: -- to life without parole.

THE WITNESS: That's correct.

THE COURT: So if I'm trying to look at -- if you're trying to use comparative data to show that there was some reasonable possibility that either had the defense lawyers made a better presentation in the authorization process or gone back, I can't do that without the relative data; right?

THE WITNESS: That's right. And we could -- and that's a very helpful observation. We could very easily do a database run for all of the cases during Attorney General Ashcroft's tenure so that you would have the entire pool against which to --

THE COURT: Well, without knowing that, this data is, at best, exceptionally incomplete.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 349 Filed 11/10/11 Page 12 of 88

THE WITNESS: Well, it's complete in that it portrays the whole -- the realm of cases that he approved of plea agreements, and it's --

THE COURT: Yeah, but it --

THE WITNESS: -- pretty diverse realm.

THE COURT: -- doesn't show the number of times he didn't do it.

THE WITNESS: No, that's true.

THE COURT: Right. One would need to know that.

THE WITNESS: We can provide that data. I don't think we have it in the notebook, do we?

THE COURT: Well, I don't know whether you can provide it or not because today was the day to provide it, but I'm sure I'll --

MR. BURT: Well, we have other witnesses we can possibly --

THE COURT: Yeah, okay.

MR. BURT: If that's what the Court's interested in.

THE COURT: Well, wouldn't you be interested in that if you were looking at it?

MR. BURT: Would I personally be interested in it?

THE COURT: Yeah.

MR. BURT: Yes, and I think that will be provided to the Court.

THE COURT: Okay.

MR. BURT: Glad you brought it up. Thank you.

THE COURT: Okay. I'll give you time to bring it up. I was just being facetious about today's the day.

MR. BURT: I know. Thank you.

BY MR. BURT:

Q. The other point I wanted to make about the strength of the evidence issues is in those cases -- and there are a number of them -- where Attorney General Ashcroft originally authorized the case and then deauthorized either before trial or at trial -- in the Plaza case you mentioned, it was a plea at trial -- do cases typically get authorized that are weak from an evidentiary standpoint?

A. No, no.

Q. So, I mean, is the fact that they are originally authorized some indication that we're not dealing with a case that goes away because of a prosecution weakness?

A. Yeah. One of -- I mentioned that relative culpability is important in the authorization process. Another probably equally important theme is the weakness of the government's case against my client. And again, you don't always know that before the authorization decision is made, but sometimes you do. And that can be a reason for not authorizing a case.

So the fact that a case is authorized and then a plea is accepted and deauthorized by the attorney general means that at least -- at least there's been some change in circumstances

of the evidence known or the government has decided that their case against the most culpable people needs support beyond what they had for authorization. In order to get the brass ring from the government's perspective, they need more help.

Q. And by the way, regardless of strength of the evidence, if the defense for a particular defendant has something that the government wants, is it possible, even when the case is strong, to nevertheless negotiate a plea for life? And I'm having in mind cases like Eric --

A. Eric Rudolph comes to mind too. Eric Rudolph, the Court will remember, was the fella charged in the Alabama abortion clinic bombing. And there was -- I was actually one of the resource counsel in that case. There was no doubt about his guilt in that crime and -- but there were -- the government's investigation led them to believe that there were bomb-making materials that he had stashed out in the world, and they thought it was important enough to forego death for Eric Rudolph in order to get that information from him, and that's what happened.

So there are -- there are other reasons that the government may want to deal with -- to strike a deal with somebody. And again, that's not going to -- that's not going to be reflected in the database reports.

THE COURT: Okay. I have another question about the database. Of the 12 people who the attorney general changed his

mind, the first 12, there's something quite notable, and that is that 11 of the 12 were non-white. They were either black, Asian, or Hispanic. Only one of the 12 was white. What -- and, you know, the government probably objects now that I'm asking you to speculate, and so it's subject to the objection or my own objection, but what do you think the -- do you have an opinion as to what the significance is of that?

THE WITNESS: I don't -- I have some ideas. From the beginning of the federal death penalty, people of color as opposed to white people have been overrepresented as defendants. Roughly 75 percent of the people who have been charged from the beginning with federal capital crimes have been not white -- non-white people.

And so part of -- you know, again, that's -- 11 out of 12 is more than 75 percent, but that's part of the skewing is that the pool of people that come into federal capital prosecution are already racially skewed. And I don't recall the dates of all of these cases. They were all -- well, they were all probably after 2001 when the pleas were entered or accepted.

THE COURT: Well, you can tell from the case filings that they were all filed in either --

THE WITNESS: Yeah.

THE COURT: -- 2000 or 2001, and then the last --

THE WITNESS: Were '03.

THE COURT: -- were '03, and then number 12 was -- I

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 13 of 88

guess that's 13.

THE WITNESS: I think number t -- '04 is actually number 13.

THE COURT: Yeah, right. So '03 would be the last one, right.

THE WITNESS: Yeah. But -- yeah. In 2000 under the Clinton administration, the Department of Justice issued a report about race and the federal death penalty in which they found -- one of the findings was what I just said, that about 75 percent of the people who are charged are non-white people. And there was some concern in that report about some actual further skewing of the racial disparity in the course of processing federal death cases, enough that President Clinton stopped the execution of Juan Garza that was scheduled for I think December of 2000, granted a reprieve to him, and said we've gotta study this some more.

The further study then was picked up by the Bush Justice Department under John Ashcroft, and a supplemental report was issued in 2001, in June as I recall. And that report noted that the pleas that had been approved prior to Attorney General Ashcroft had been further racially disproportionate beyond the 75 percent of the pool -- you know, of the pool.

And it may well be that some of these -- some of this apparent skewing is a result of an attempt to remedy that. I don't know. There was some sense that though -- though black --

black and Hispanic people were 75 percent of the pool they were not 75 percent of the pleas; they were less than 75 percent of the pleas. That's how the skewing appeared to happen so that white people appeared to be getting a greater advantage in pleading cases than people of color. And so this may reflect that. I don't know. It's possible.

I don't know how that -- I don't think it -- I don't think it could reasonably be taken into account in this case because I think by the time the pleas could have happened here -- well, it was in this period of time. There's no question about that.

But I think -- I think the Court's job and the job of all the parties is to really look at whether the Department of Justice was serious in the plea discussions that they were having.

You know, I didn't come prepared to talk about that, but there is certainly some indication that the Department of Justice was interested in striking a deal with Ms. Johnson and that that interest seemed to wane over time. But I think -- I would assume that they were not making false promises or false -- holding out false hope.

THE COURT: Yeah, I'm hearing a lot of testimony about --

THE WITNESS: Yeah, but, I mean, that -- so, again, I don't know how the racial dynamics would factor in here. I

don't think that anybody could --

THE COURT: Anybody really would know.

THE WITNESS: No. But there may have been some effort as the Court has noted here to compensate for the sort of reverse racial disparities in the plea process that had gone on before, before the Ashcroft administration. I don't know.

BY MR. BURT:

Q. And I guess if the plea in this case had been rejected because of some attempt to achieve some racial balancing, that would raise a whole host of other issues.

A. **That would certainly raise a number of issues.**

Q. And the point the Court makes about, well, we really don't know the strength of the case, it's also true that there may be case-specific information which leads the Justice Department to a plea in any individual case, for instance, the need to obtain cooperation against a worse defendant.

A. **Yeah. I mean, I think in general the plea agreements -- certainly the post-authorization plea agreements by the attorney general reflect some view that the attorney general has that this person is less worthy of death than once thought to be. And it may be because the evidence simply shows that, or it may be that the person is willing to cooperate against somebody that the government has come to see as the most culpable. I mean, I think those are probably the two primary reasons.**

Q. There's going to be some evidence in this case that the

codefendant's counsel, Mr. Honken's trial, approached the government with a whole set of reasons for why the death penalty should not be sought against him. And among those reasons, the evidence is going to show, is -- this is from some notes that we're going to hear testimony about -- Paul Martin, Tom Miller Senior and Junior, the victims, and a number of prominent Iowans are all opposed to death in Mr. Honken's case.

Now, those sorts of factual specific reasons such as the victim's family not being opposed to death, can those play a role in creating a reasonable likelihood of a plea?

A. **Oh, yeah.**

Q. Tom Miller Senior I'm told is the attorney general of the state of Iowa, and Tom Miller Junior was the state attorney general assigned to this case I believe.

THE COURT: And just for the record, they're not related. Well, you can ask them that.

MR. BURT: Okay. And I don't know who Paul Martin is, but I assume it's somebody. We'll find out but . . .

THE COURT: I don't know who it is either. I assume it's somebody too. We agree.

BY MR. BURT:

Q. But my point is that these kinds of factors -- you can't just look at the case in the abstract and say this is a child killing case or this is a four-victim case. Case-specific information such as the government's need to obtain cooperation,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

the position of the victim's family, legal issues such as the Crawford issue that's alluded to in Skip Gant's memo, those kinds of things factor into the analysis.

A. I think all of those things and -- you know, and more factor into the government's decision. You -- and that's one reason you can't -- when you're approaching authorization, you have to assume that no matter how aggravated and tragic and misbegotten the crime on the scale of how bad they can be, investigation may change the view of that both by the government and the defense and the Court.

And at least at the point you're in the authorization process, you've got to try to find those things that can allow you to change the view of the case from what it looks like at the outset. And that actually happens all along. I mean, people who are thought to be the most culpable in a five-murder killing may turn out to be thought to be really only culpable for two of them over time, and that can change the authorization picture and the willingness to plead the case.

So -- and certainly the way important actors including the survivors of the murder, what they think about the need for the death penalty is something the Department of Justice has always been sensitive to.

Q. I very much want to quickly wrap up the statistical data. Tabs 2 through 15 are compilations that the federal resource counsel -- compilations or declarations kept by the resource

counsel project; correct?

A. Yes.

Q. And they run the cases in various ways. There are printouts here involving cases involving minors or multiple murder cases or drug cases, CCE cases; correct?

A. Yes.

Q. Bottom line of all these comparisons is that there is a group of cases out there -- it's fairly aggravated cases -- where pleas have been reached.

A. There are -- there are a number of --

THE WITNESS: And just, Your Honor, so you've got the names of people, among -- under tab 12, I mention Mr. Llera-Plaza. I'd also ask the Court to look at Rico Garcia, Guillermo Benitez-Zapata, Darrell Brooks, Brian Rogers, the defendants -- the multiple defendants in the case beginning with Corey Washington and referenced after him, and the Richard Dwight Bernard case.

Q. And based -- is there any particular reason why those cases stand out as comparable or cases --

A. Among the Ashcroft guilty plea cases, these are ones that have one or more attributes that are similar to this case, all except -- there are a couple that are single-defendant cases. But those involve the killing of entire families or, you know, a mom and her child along with a boyfriend who was involved in drug dealing. So there are some attributes of these cases that

are shared with Ms. Johnson's case.

Q. Based upon reading this data, based upon your own experience in federal capital cases, do you have an opinion as to whether it's reasonably probable, not just the possibility, but reasonably probable within the meaning of the Strickland standard that a plea could have been reached in this case had --

MR. WILLIAMS: Objection -- go ahead. Finish. I'm sorry.

MR. BURT: Thank you.

BY MR. BURT:

Q. -- had the lawyers been doing what they should have been doing?

MR. WILLIAMS: I'm going to object for lack of foundation, Your Honor.

THE COURT: You may answer subject to the objection.

A. I do have an opinion.

Q. And could you tell me what it is.

A. I think that among the cases I've just mentioned and the -- really the whole pool of John Ashcroft's guilty plea cases this case had -- a plea for Miss Johnson in this case would have been quite possible. I mean, I don't know that we can say it was probable but certainly more than simply possible.

It is her case and her role in this case as -- from the government's perspective as a facilitator in a variety of ways, from, you know, purchasing the gun to getting in the door

to attracting Terry DeGeus out to where he was killed, you will see through these cases facilitators in multiple-killing cases, it's not uncommon for John Ashcroft to have approved plea agreements for those people playing facilitator roles, sometimes playing, you know, actual killer roles. But a number of these folks were facilitators.

And if there's one -- you know, one term that sort of demarcates Miss Johnson from Mr. Honken, that seems to be it, that she's more of a facilitator than a killer, an actual killer herself. And that seemed to be something, again, within the context of a whole case that John Ashcroft was moved to accept pleas for for those kinds of folks.

Q. Now, I just very quickly want to return to this meeting that you had. You said your sense was they had some themes but they from an investigative standpoint and a witness standpoint were not ready. Is that true?

A. That is true. I think I told them you can't go to trial when you're scheduled to go to trial, and they said, "Do you know Judge Bennett?" And I said, "Well, I think I do. And you may be right." But I said they just -- they weren't going to be ready.

THE COURT: Now, Mr. Burr, how many times did I continue the Angela Johnson --

THE WITNESS: Well, that was the problem. That was the problem.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 15 of 88

THE COURT: Now it's my fault for granting the motions to continue; right?

THE WITNESS: I do think you have your limits, though.

BY MR. BURT:

Q. And, you know, one of their main themes, number one, Angela has been psychologically and often physically abused by domineering men most of her adult life. The significance of this fact is that she seldom has something noted independently -- acted independently from their direction and in their interest even when it is not in her interest. And their examples are Terry DeGeus and Dustin Honken.

Are issues of dominance, male-female dominance, of primary importance in a case such as Miss Johnson's?

A. Oh, they're probably the organizing theme for the case that, you know, you would want to start with in the voir dire -- as we say in Texas the voir dire process. I don't think you say it that way. But I've lost how you do say it.

But from the very beginning of jury selection, you're going to want to be talking about the relationship between your client and the codefendant because that relationship in a multitude of factual ways cuts in Ms. Johnson's favor. And so that -- I mean, it's more than a theme. It's a whole organizing principle for defending a case from start to finish.

Q. And would part of that process of developing these themes be to create and paint a picture of Mr. Donken as a -- Honken as

a domineering, controlling individual?

A. Absolutely. And there are lots of ways that that can be grounded in the everyday experience of jurors. Most people know women who are involved in marriages where they are abused and they can't get out of the marriage. And you think in one set, well, why not? Well, I mean, we've come to know there are a whole variety of attachments and psychological reasons and dependencies and inabilities to act in one's own welf -- for one's own good that keep women in those marriages, and sometimes they end up being killed, or sometimes they end up killing.

But that -- that sort of grounding in human experience in 2005 would have been a very powerful way to connect the jury to Ms. Johnson's life.

Q. And if you didn't develop that theme through evidence -- for instance, they have down here use Dustin's drawings, his meth formulas, his technical books and articles and other physical demonstrative evidence and exhibits to demonstrate the truth of the dominance role -- if he didn't do that, would -- can you conceive of not doing that and at the same time telling the jury that Honken was sentenced to death?

A. No.

Q. Would that be reasonable trial strategy in the absence of developing what the comparative roles were and the comparative fault of each --

A. No. The --

MR. WILLIAMS: Objection again. Lack of foundation. Doesn't have the complete background to render an opinion based on those little facts.

THE COURT: You may answer subject to the objection.

A. Arguments to a jury in the penalty phase, closing arguments, have to be so rooted in the facts that the jury has heard that they almost need nothing but articulation because that's how those -- that's how it works. If jurors are being persuaded to accept something that they haven't already accepted in closing argument, usually they're not going to get there. They are not being persuaded. They are being assisted to marshal what they already know, and that -- so you can't in my view -- you cannot urge upon a jury the acceptance and motivation of -- you know, on the basis of factors that they're not already moved by, and that has to be done in the evidence.

Q. At this meeting that you had with the team, did they show you at all some photos that they were contemplating introducing into evidence? Do you recall?

A. I don't recall it.

Q. I'm not sure if I need to turn this on or if the --

THE COURT: The projector?

MR. BURT: Yes, sir.

BY MR. BURT:

Q. There we go. Specifically did they ever show you what ultimately became -- this was offered in mitigation, Exhibit --

Trial Exhibit Number 2172?

A. I don't recall seeing that.

Q. There's some testimony Judge Bennett actually raised the issue and said I recall some of these photos made Miss Johnson look like a hooker and was questioning whether there was any tactical justification for introducing photos like that. They did not show you that photo and ask you whether it'd be a good idea to introduce that?

A. No. I mean, I would have -- had I been shown that photo, I would have seriously questioned the use of it and tried to understand in what context -- you know, what -- what were they trying to accomplish with the use of that photograph.

Q. And did they show you 273?

A. No.

Q. 2173, I'm sorry. Or Trial Exhibit 2174?

A. No.

Q. Or ask you, well, of these two photos, if we were trying to depict Miss Johnson before she became addicted to drugs, Mr. Burr, which one should we use? 2174 or 2172?

A. Before she became addicted to drugs?

Q. Yeah. In other words, if they had come to you and said, look, one of the things we're trying to do here in mitigation is to show, say, a photo of Angie Johnson when she was booked and makes her look like a drug addict and we were trying to compare her drug-addicted look to what she was before she became

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

**737**

involved in drugs, if that was the purpose of showing photographs and they had come to you and said, well, which of these two photos should we use, 2174 or 2172, is there some reason -- first of all, would you have advised them on that?

A.   I'd certainly say 2174.

Q.   And would there be some particular reason why you wouldn't want to use 2172 as well?

A.   **2172 looks like somebody who if not addicted to drugs could well be and is certainly not a wholesome-looking human being.**

Q.   Does it humanize a client in the way that you were talking about in your lecture back in Salt Lake City or talked about in your testimony here?  Does it create an empathetic picture of the client in the jury's mind?

A.   **Not in my view.  I think the -- part of the task -- a central task of defense counsel in a capital case is to bring our clients back into the fold of humanity because the charge itself puts them out and turns what they have done into a definition of who they are.  And so our effort always is to change -- to reimmerse them into the human community and to put into some perspective the worse thing that they've done and show that that's not a full definition of who they are.  And so you need images of our client throughout their life that help juries do that.**

**And this -- this image does not help the jury do that. It keeps -- it keeps Ms. Johnson on the outside.  The image of**

**738**

**her with the pearls and the smiling face, you know, looks like somebody who could be your sister or your daughter that you're very proud of.  And she was at some point in her life a young woman that anybody could be proud of, including herself.**

MR. BURT:  Thank you.  That's all I have.

THE COURT:  I'd like to give our court reporter a short break, so why don't we take a recess until 9:00 and then come back for cross-examination.  Thank you.

(Recess at 8:44 a.m.)

THE COURT:  Please be seated.

Mr. Williams?

MR. WILLIAMS:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q.   Good morning, Mr. Burr.

A.   **Good morning.**

Q.   You would agree with me in terms of your level of experience, you are not the average death penalty defense attorney in the country; right?

A.   **Well, I've done it a long time.**

Q.   All right.  That's not the answer to my question.  In comparison to the average defense attorney defending capital cases in the federal system, you have far more experience than the average.

A.   **I do.  Most people do not devote their entire practice to**

**739**

death penalty defense work.

Q.   You've been doing defense work on capital cases by your testimony for 30 years; right?

A.   **Thirty -- a little bit more than thirty, yeah.**

Q.   The standard for an effective assistance of counsel by death penalty counsel, we're not requiring every one of them to have 30 years of experience as a death penalty defense attorney to be effective.

A.   **No.**

Q.   Okay.

A.   **I mean, the standards are -- I think the ABA standards are the best consensus statement about what we expect lawyers to do.**

Q.   You'd agree with me that the average defense attorney defending federal capital cases doesn't have the luxury like you do of spending 100 percent of their time working on capital defense cases; right?

(Cell phone rings.)

A.   **Sorry.  I didn't know I had it on.**

THE WITNESS:  I apologize, Your Honor.

THE COURT:  That's okay.  That happens.

THE WITNESS:  Let me get it turned off here properly.

THE COURT:  Unless you think you need to take the call, then don't turn it off.

THE WITNESS:  Nothing's more important than this.  Got it.  Sorry.

**740**

A.   **I'm sorry.  Could you ask -- if you remember your question, could you reask it?**

Q.   I do.  You would agree with me that most defense attorneys who are defending capital cases in the federal system don't have the luxury of spending a hundred percent of their time on capital defense work?

A.   **It's true and not true.  At the time they're doing capital -- a capital case, at least some portion of their time will be a hundred percent spent on that case.  But in general they don't devote a hundred percent of their practice over time to defending capital cases.**

Q.   Right.  I mean, most capital defense attorneys have other cases they have to take care of; right?

A.   **They do.**

Q.   They have maybe rape cases or assault cases they have to take care of.

A.   **They do.**

Q.   All right.  You would agree with me that the standard for measuring the effective assistance of counsel is not WWBD; right?  It's not what would Burr do; correct?

A.   **That's correct.**

Q.   All right.  The Supreme Court's articulated what the standard is for effective assistance of counsel in the Strickland case; correct?

A.   **Yes, and then in a series of cases thereafter.**

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q.   Right.  The standard is the same whether the case is a capital case or a non-capital case.

A.   Yes and no.  I mean, the legal standard of, you know, providing reasonably effective assistance is the same.  What reasonable assistance means does have a distinct meaning in a capital case.

Q.   But the legal standard remains the same for measuring the effective assistance of counsel.

A.   Yes.

Q.   Now, you agree with me that death penalty counsel need not be perfect to be effective assist -- to lend effective assistance of counsel under the Strickland standard.

A.   Of course.

Q.   All right.  And you'd agree with me that defendants are not entitled to perfect defenses.

A.   Absolutely.

Q.   All right.  Now, you did not attend Dustin Honken's capital trial?

A.   I did not.  I was not the resource counsel for Mr. Honken's case, no.

Q.   Okay.  You did not attend Angela Johnson's trial?

A.   I did not.

Q.   You've not reviewed the exhibits entered into evidence in either one of those cases?

A.   I have not.

Q.   You've not read the transcripts of either one of those cases.

A.   I have not.

Q.   You've not reviewed the discovery file in either one of those cases.

A.   No.

Q.   You haven't reviewed the correspondence that occurred between defense counsel for Johnson and the government with regard to plea negotiations in this case, have you?

A.   I've seen only that part of the correspondence that was referred to in the amended 2255 motion.  I have read -- I've read -- I have read the amended 2255 motion and your response to it.

Q.   Okay.

A.   So to the extent it's reflected there, I've seen it, but otherwise I have not.

Q.   Okay.  You've not reviewed the entirety of notes written by the counsel regarding their plea negotiations or their efforts to obtain --

A.   No, I have not.

Q.   You haven't read the notes of defense counsel in which they reflect that the defendant for a number of years maintained that she was not going to enter into any plea agreement.

A.   Again, only as that is reflected in the pleadings in this proceeding.

Q.   And other than the exhibits that were attached to the amended 2255 petition in this case, you've not reviewed any of the other evidence that defense counsel now representing Angela Johnson have accumulated as part of this presentation.

A.   Other than, you know, the documents that I was here to testify about, that's correct.

Q.   You haven't interviewed any of the defense counsel that represented Angela Johnson during her trial, have you?

A.   Not for the purpose of this proceeding or my testimony, no, I have not.

Q.   You haven't run by them questions like why did you do this or why did you do that?

A.   No, I have not.

Q.   Okay.  To the extent that you're opining that you think there was more than a likely -- a poss -- a more than possible chance that effective counsel could have pled this case out, you're basing that on your assessment without ever talking to the defense counsel about their efforts?

A.   Yes, although I don't think that the -- I was not called and did not pretend to be a Strickland expert as it were, you know.  My role really was to talk about what I -- what my project does with respect to counsel.

Q.   That was my understanding too, but the problem is at the end of your testimony you opined that the defense counsel in this case, had they been effective, were more than possible

like -- or they could have -- more than possible chance they could have obtained a plea agreement in this case.  And I'm trying to figure out the factual basis upon which you have rendered that opinion, sir.

A.   I don't think that my -- if the question was as you framed it, then I didn't understand it that way.  I don't think I was rendering opinion about what -- had counsel been effective what they could have accomplished.  The question as I recall it was was there a reasonable probability that Attorney General Ashcroft would have accepted a plea agreement or approved a plea agreement here, and that was what I was meaning to speak to, and that's based on my experience in these cases since 1997 and on my review of the database data from our database about Attorney General Ashcroft's authorization in guilty plea decisions.  So it was really speaking to the prejudice prong of the Strickland test, not to the deficient performance prong.  I --

Q.   That's helpful.

A.   I was not prepared to nor did I intend to speak to -- directly to the deficient performance prong in this case other than by responding to hypothetical questions from Mr. Burt.

Q.   Okay.  That's helpful.  So you're not -- you're not purporting to opine as to whether the defense attorneys in this case lived up to their standard under Strickland.

A.   No.

Q.   All right.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.
Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 18 of 88

A. I wasn't prepared to do that, and I've not done the kind of review of documents or, you know, material that I would have if I were giving that opinion.

Q. All right. So let's move on then to the stats you are relying on, and we'll talk a little bit about that. First of all, let's back up to the authorization process. You are familiar with the requirement by assistant United States attorneys, United States attorneys to submit to the attorney general for review, for authorization any case in which the death penalty is a possible punishment; right?

A. Yes.

Q. Okay. That includes cases even where the defendant is known to be mentally retarded under the Atkins test and, therefore, cannot be subject to the death penalty; right?

A. Yes.

Q. Okay. So among that 80 percent of cases where the department does not authorize, those include cases where everybody knows from the beginning there's no way that case will ever be authorized because the person is mentally retarded under the Atkins standard.

A. It certainly would include those cases. That particular kind of cases is a very small percentage of the whole.

Q. Sure. It also includes cases where the government has a case where they have a cooperator, let's say, who participated in some crimes who could be subject to the death penalty but the

only evidence the government has is his own confession and the government wants to use that person to go after maybe organized crime and they submit a memorandum to the department in which they say death is a possible punishment but we're not even seeking it against this individual and the only evidence we have is this and please don't authorize it. That 80 percent of cases includes cases like that; right?

A. It does.

Q. Okay. That 80 percent of cases includes cases where the government has an incredibly weak case; right?

A. Yes.

Q. All right. So when you're looking at that 80 percent rejection of authorization up front, you're not looking at cases like this one; right? You're not saying 80 percent of the cases where we have what the Court ultimately in this case identified as a tsunami of circumstantial evidence proving guilt of murder of 5 people including 2 little girls, you're not saying that there's an 80 percent chance that that would not have been authorized; right?

A. No, no.

Q. Okay.

THE COURT: And, Mr. Williams, you may remember it better than I, but the tsunami reference was in the codefendant's case.

MR. WILLIAMS: Oh, it was in Honken, yes, Your Honor.

THE COURT: Yes.

MR. WILLIAMS: I'm sorry.

BY MR. WILLIAMS:

Q. The -- now, you talked about deauthorization, and let's just talk about that for a few minutes. There's a difference between deauthorizing a case and approving a plea agreement in a case that's been authorized; right?

A. Yes.

Q. Okay. So when you're talking about deauthorization, what happens there is where you have a case the attorney general's already authorized for the death penalty and the defendant comes back before the attorney general and is able to articulate significant changes in circumstances such that had the attorney general known about those circumstances when he or she originally authorized the death penalty they would not have done so; right?

A. That's --

Q. That's the test.

A. -- the basis for deauthorization, that's right.

Q. And in those cases sometimes when a defense attorney makes that kind of presentation the attorney general will deauthorize the seeking of the death penalty against that defendant; right?

A. Yes.

Q. Okay. That doesn't mean necessarily there's been a plea worked out.

A. No, that's correct.

Q. Okay.

A. The case may proceed to trial as a non-capital case.

Q. All right. Now, going to the 12 cases you identified under tab 13 in which you said these were -- the first 12 were cases where the attorney general deauthorized the seeking of the death penalty, that's not really what happened in those cases, is it, sir?

A. Well, the attorney general approved a plea agreement.

Q. All right.

A. Which inherently involves not seeking the death penalty anymore.

Q. I understand that but --

A. But it is -- the approval of a plea agreement is a different and distinct decision from a decision to deauthorize a case.

Q. Okay. And I'm not trying to quibble with you, but I'm trying to make a distinction here. To the extent there's any allegation the defense attorneys in this case were deficient for failing to make a presentation back to the attorney general to deauthorize that case, you'd agree with me that's a different set of conduct we'd be looking at than whether they were ineffective for failing to obtain a plea agreement in this case.

A. Yes.

Q. Okay. And so none of these cases that you've identified

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 19 of 88

**749**

involved deauthorization other than through the process of the fact that there was a plea agreement. In other words, when we talked about the deauthorization before where the attorney general said, wow, I now know facts I didn't know before, I'm going to deauthorize seeking of the death penalty, that's not what these cases are.

**A.** No. These are all guilty plea approvals. I do believe Attorney General Ashcroft did deauthorize some cases without approving a guilty plea, but I don't have that data at my fingertips.

**Q.** Okay.

**A.** It may be in one of the tabs. I'm not certain, but I -- I'm not sure but . . .

**Q.** And you said you read the amended petition in this case. Do you recall reading in there anywhere that there's a claim of ineffective assistance of counsel for failing to submit a deauthorization request to the attorney general?

**A.** I don't recall it, no.

**Q.** Now, I want to talk to you for a little bit, sir, about the efforts of defense counsel to try to work out a plea in a capital case. You'd agree with me there's any number of factors that can impact the ability to effectuate a plea in a capital case.

**A.** Sure.

**Q.** Okay. Among those factors can include the defendant's own

**750**

position about whether they're willing to plead guilty or not.

**A.** That's always a factor.

**Q.** Okay. And you spoke at some length about the obligation by defense counsel to try to achieve the rapport necessary, to go through the grieving process analysis, to try to persuade defendants to come to terms with what they've done and ultimately enter into a plea agreement. You remember that line of testimony?

**A.** Yes.

**Q.** Okay. That's not always successful, is it?

**A.** Not always, no.

**Q.** Most effective attorney in the world doing everything perfect may not be able to get a defense -- a defendant around to the point where they accept what they've done was wrong and are willing to plead guilty.

**A.** May not be able to.

**Q.** Okay.

**A.** In most circumstances, you know, working the case and working with the client simultaneously in the way I talked about does get -- you know, if there's a plea there, it does get the client there but not in every case.

**Q.** And when you say if there's a plea there. What do you mean by that?

**A.** I mean if there's an opportunity, if the government -- you know, it takes two to tango, so if the government's willing to

**751**

dance, to get -- to get the client to be willing to be a partner in the dance.

**Q.** And are you aware in this case whether the government ever put a plea offer on the table?

**A.** Well, again, my familiarity, that is entirely from reading the petition, the 2255 amended petition. And it appears that at least at one point -- and I can't tell you -- this was closer to trial than further away from trial. I believe there was some representation by the government that they would take life from both defendants. It was life plus life or something like that was the comment I remember quoted in the petition. I think that's probably the closest the government came to making a real offer.

I also know that -- you know, I read the -- there were a couple of block quotes I assume from a letter that you all had written that recounted the need for a proffer before anything could be certain but that certainly as -- if I were the defense lawyer seeing that, I would have some optimism coupled with, you know, a representation on a phone call of life plus life that there would be a way to get there.

**Q.** Okay.

**A.** With the government.

**Q.** And you'd be optimistic, but there's a big difference between negotiations talking about possibilities and an actual plea offer by the government.

**752**

**A.** Yeah, although I do -- again, I don't know the context of the phone call -- I believe it was a phone call -- where you or somebody from your office said, you know, as to both defendants it would be life for both. That sounded like pretty close to -- I mean, it wasn't a -- you know, it wasn't a formal offer. That's for sure. But it sounded like it was pretty close to an offer if both clients had been willing to take life.

**Q.** Among the factors that defense counsel have to deal with in trying to achieve a plea agreement is they have to look at the strength of the government's case on whether a plea is advisable; right?

**A.** Sure.

**Q.** Okay. And among that can be whether the team is having any success in suppressing evidence; right?

**A.** Yes. No question about that in the abstract, yes.

**Q.** Yeah, they need to factor that in; right?

**A.** (Witness nodded head.)

**Q.** And you're familiar in this case that the defense actually succeeded in suppressing some pretty key evidence in this case; right?

**A.** I'm aware that the McNeese testimony as to the guilt phase was suppressed. My understanding is that it was still going to be admissible for penalty-phase purposes if there was a penalty phase notwithstanding any -- you know, anything that happened on the appeal.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

**753**

Q. Among the things that a defense attorney's going to have to deal with in trying to effectuate a plea is also going to be actually getting through the discovery to determine the strength of the government's case; right?

A. That's certainly part of the work that the defense has to do. It's -- I don't see -- I don't think it's reasonable to defer working with your client in movement towards a plea until you've, you know, gotten the discovery. I mean, there are some cases that you know pretty much from the outset with the charge and the initial, you know, information you get informally from talking to assistant U.S. attorneys, you have a pretty good sense of what the government's case is based on. And that's the thing that you need to start working with with your client.

Now, your client -- you have to investigate the government's case both because you're bound to and because your client needs to believe that you believe in the chance of innocence or, you know, whatever, some other outcome. That's part of building rapport.

But you don't do it without a good deal of realism. And realism has to be something that you build into the working relationship with your client, and realism has to be based on your own assessment of the case, both, you know, based on what you know and what you've experienced from other cases.

So it's -- you know -- but never -- I would -- I don't think you should ever wait to work with your client towards a

**754**

plea until you have a certain grasp of the government's case. It can be too late with your client if that's what you're doing.

Q. But you would agree with me that there might be a problem with the effective assistance of counsel to get the client to plead guilty without the defense attorney having a realistic understanding of what the evidence is against the client; right?

A. I think it depends on the nature of the charge and what you know from the outset the government can prove. I mean . . .

Q. And there's nobody in the better position to make that assessment than the defense attorney who's actually representing the defendant in the case, is there?

A. Well, that's certainly true. But -- but you can also examine -- you know, you have to examine why they made the decisions they made at the time they make them.

For example, in this case with this charge, if there were an early offer of something like 10 to 15 years for a case like this, it would be very, very difficult for any lawyer doing their job to not take that deadly seriously and do something with it.

Q. If there was an offer.

A. If there was an offer or something that sounded like an offer. I mean, 10 to 15 years in a case like this would be an extraordinary outcome that you couldn't hope to get by lots of work.

Q. Okay. When you say in a case like this, are you assuming

**755**

that we've already discovered the bodies and we have the evidence that Angela Johnson wrote the note leading to the bodies?

A. No, no. I mean, I -- I think the fact that Angela Johnson was charged with what she was charged with -- and I understand initially it was not charged as a capital crime because of the charging -- the statute it was charged under but that that was going to be remedied and it was remedied. But if this was a live capital case and the, you know, initial exposure to the case in the first month or so that you're the counsel and you get your investigator working and, you know, learning the case, if there's discussion with a U.S. attorney of a plea like that in exchange for information about where the bodies are, that's an extraordinary opportunity to act on with respect to your client.

And again, it may be difficult to get your client there, but it certainly behooves you to roll up your sleeves and spend all of your time that you can make available day and night to work the case and work with your client if that kind of opportunity is there.

Q. If it's there.

A. If it's there. And, you know, "there" is in the eye -- in some ways in the eye of the beholder.

Q. Or in the eye of the defense attorney who knows more about the case than anybody else; right?

**756**

A. Again, that's -- that is a -- that's a conclusion that the lawyer has made that is subject to scrutiny.

Q. Yeah, but it's subject to scrutiny about what the lawyer knew at the time. It's not being Monday morning quarterbacking looking back at what we know now and assessing their performance based on what we now know happened.

A. That's right.

Q. We have to look at it from what they knew at the time.

A. That's absolutely --

Q. At the pressures they were under at the time.

A. That's right.

Q. At the information they had available to them at the time.

A. And what they were doing to develop more information and whether that was reasonable or not.

Q. What their client's position was at the time.

A. And how they were working with the client, that's correct.

Q. Now, you'd agree with me that there's an ethical problem with a lawyer to coerce a defendant who insists that they're innocent into taking an oath in a guilty plea and claiming as true facts that you know your client has told you I -- I am not admitting those facts are true. There's an ethical problem for a lawyer to coerce a defendant to plead guilty under those circumstances.

A. That's right. I mean, the word coerce is -- I'm not sure that a lawyer can coerce a client. A lawyer can, you know, fail

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

to provide effective assistance in working with the client and helping the client understand the opportunity available and the position that he or she is taking. But I don't know how a lawyer can coerce a client in the way that a police officer can coerce a suspect, for example. We don't have quite that power.

Q. Well, and, in fact, they shouldn't coerce --

A. No.

Q. -- a client.

A. I agree with you.

Q. All right. And ultimately at the end of the day it's the client's decision whether to plead guilty or not; right?

A. That's right.

Q. The lawyer can advise and counsel, but it's ultimately the defendant's decision whether to plead guilty.

A. That's right. The question for this Court I think and any court looking at a case like this is whether the lawyer's advising and, you know, advice to the client is effectively in -- is it informed effectively by investigation and fact development and is it informed effectively by a realistic appraisal of the government's case.

Q. Now, you -- in talking about trying to get a client around to the point of pleading guilty and accepting responsibility, you used the phrase that one of the -- something to the effect that one of the major efforts the defense attorney has to do is try to thread that needle to get the plea; right? You remember

saying something to that effect?

A. Yes.

Q. And that implies that this is something not easy to do; right? You're threading a needle. You've got to get the government to come over to your side. You've got to get the client to accept responsibility. You recognize that trying to obtain or get a plea in a capital case is not an easy thing to do.

A. No. That's right. It requires really effective representation both, you know, with respect to negotiating and working with the government and working with the client. But there are a lot of moving parts that need to be attended to.

Q. The meeting that you had with Pat Berrigan and Dean Stowers in March of 2005, did you render any advice to them during that meeting?

A. I don't remember the specific -- you know, the specific nature of all the things we discussed. I do remember saying to them on a number -- with respect to a number of areas of their case that they needed to investigate more. We -- I recall us identifying people to talk to, relationships to examine, matters to understand that they did not yet understand because they needed some more expert assistance or they just needed more information. I remember those kinds of things happening.

I cannot tell you specifically what one of them was because I don't remember that. I just don't remember. But I do

remember having those kinds of discussions with them, that they needed -- there was -- there was information they didn't have. When I asked how they were going -- who were the witnesses that were going to carry the story-telling burden of a particular part of the case, there were often times when they said they weren't sure yet.

Q. You indicated in response to one of my questions here that your testimony is based on the statistics that you have gathered as part of your role as resource counsel.

A. And my experience in working with defense teams for the last number of years.

Q. All right. And the Court inquired of you about the essence of every case is going to be factually different; right?

A. Certainly.

Q. Okay. And you'd agree with me that to compare statistics based on what you find to be somewhat analogous cases -- and you named six cases that you thought were somewhat analogous -- to really figure out whether they were analogous cases, we would have to dig into those cases to learn the entirety of the facts of those cases to find out whether they're really analogous to this case, wouldn't we?

A. Yes. I mean --

Q. We can't go off of the summary that you put into --

A. No, but what you can know from the summary is that -- Judge Bennett asked me early on when I was talking about the, you

know, 80 percent chance of not having case authorized, though it's not 80 percent when you look at a case like this where there were 5 murders, 2 of whom are little girls, and I agreed with that.

But what is important I think about the data is that there are other cases you can see from this data that at least when you look at it, you know, from the farthest view they look pretty similar.

And so what it means is that the kind of case, the kinds of victims, the number of victims are not necessarily a stumbling block to getting a plea from John Ashcroft. You know, that's not an end of game set of facts. And you can draw that from this data, is that there are cases that at least when you look at them from sort of the furthest view away, what kind of case is it, who were the victims, how many were there, what does it look like the murders happened for, you know, why did the murders happen, when you look at it from that perspective, there are cases like this one from that perspective where John Ashcroft approved guilty pleas.

And so it was not out of the realm of possibility. And, in fact, I think it's -- it moves past the realm of possibility towards something stronger than that when -- and again, when you then start delving into the facts that I do know about this case, again, based on the pleadings where it appears there were very serious plea discussions going on from very

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 22 of 88

early on in the case that at the point at which the McNeese information became available to you the nature of the discussions changed, but there were still discussions.

And really only after Dustin Honken's trial and verdicts did your interest become almost nonexistent or even nonexistent so that that's all this data can help us with is it gets -- it says the lawyers were in the ballpark and then the facts of this case need to -- you know, we need -- the Court needs to assess what the defense counsel did and what the discussions were and whether reasonable counsel could have brought the plea home had they been performing effectively.

The data shows that that could have been done unless something else got in the way, or at least that's -- that's what I think it shows.

Q.   The -- one of the examples that was used when you were testifying about even though children were killed there can still be a plea or non-death verdict and you used the Terry Nichols and Timothy McVeigh case; right?  Okay.  Using that as an example here, to really assess cases, you need to look beyond just the macro view, though, don't you?  Timothy McVeigh and Terry Nichols case involved Timothy McVeigh setting off a bomb of a -- that took down a federal building and killed some children in a daycare center.  There was a question even in McVeigh's case about whether McVeigh even knew there were children present in the building; right?

A.   There was.

Q.   Okay.  There was a huge question with Nichols if Nichols even had any idea that there was going to be children present; right?

A.   Yes.

Q.   Okay.

A.   I'm not as familiar with the Nichols evidence in that respect as I am with the McVeigh evidence, but there was certainly question about whether they knew.  I mean, Tim McVeigh surveilled the building.  Terry Nichols did not.  He was not a part of the surveillance.  So it's probably less likely that he would have known.

Q.   Okay.  You'd agree with me that there's a difference between Terry Nichols' involvement with the killing of children where he might not have even had any idea children would be present and a case like this where the evidence that the government presented was that Angela Johnson held the two little girls while Dustin Honken took their mother out into the woods and murdered her and then handed off the children to Dustin Honken so he could go out and kill them.  You'd agree with me there's a significant difference in the quality of the evidence with regard to the murder of children between those two cases that you analogized.

A.   There's certainly a difference in the respect that you have just articulated.  It may be countered by the difference in

Terry Nichols helping to gather the materials for and plan the detonation of a bomb in front of that building.  That -- the magnitude of that is certainly far greater than the magnitude of anything that Angela Johnson was accused of doing or proved to have done.

Q.   And --

A.   So, you know, difference in the case.  I mean, I was not trying to set that up as some specific analogy to this case.  But, I mean, your point is right, is certainly right about the actual acts taken with respect to children.  Whether, you know, with Terry Nichols that aspect of the case was overwhelmed by something else is certainly a fair -- a fair possibility too.

Q.   And there might be any number of facts we'd want to look at in the Terry Nichols case to figure out whether there was a realistic chance, for example, of getting a plea offer in that case; right?

A.   Yep.

Q.   Okay.  We'd want to really dig into the facts of that case to try to figure out what the possibility of working out a plea was; right?

A.   (Witness nodded head.)

Q.   Okay.  And so my point is when you're looking, as you say, with a far-away look at these cases to look at the -- what you opine is a more than a mere possibility that there was a plea option in this case, you're doing that without looking at those

critical underlying details of the case that make a huge difference on whether there's really a plea possibility in a case.

A.   That is certainly true.  What -- and I think the course of this hearing will be examining those specifics and particularly the specifics of what the defense knew in the course of their discussions with you about a plea, how they were working with their client and how they were working the case.  I mean, those are the factors that ultimately have to be determinative of the decision I think.

Q.   Certainly.

A.   The data -- I mean, I think you could take the McVeigh and Nichols case as prima facie evidence that if you're involved in some direct or indirect way in the killing of 168 people you're going to get authorized and you're not going to get a plea.  You know, there is certainly a lesser number -- a lesser magnitude of destruction and damage that allows for pleas to take place.  And this case is well within that realm under John Ashcroft or any other attorney general for that matter, but John Ashcroft was the one who counted here.

So, you know, McVeigh and Nichols are non-plea cases.  Anybody who's involved in something like that, there's no prayer of a plea.  There's no prayer of not being authorized unless the person has mental retardation or something like that.  But when you get well below that level of that magnitude, then -- and you

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 23 of 88

get to cases that are similar magnitude to this case, then a plea is a realistic goal for a defense team.

Q. So --

A. And it was then.

Q. Are you purporting to predict that if we have another case where 168 or more people are killed that based on that fact alone your prediction is the attorney general will never authorize a plea and will authorize death? That's your prediction based on one case, Timothy McVeigh case, without knowing any of the details of the facts or the role of the defendant in the case or the mitigating circumstances that existed? You're predicting off of one case what the attorney general's going to do in another case down the road?

A. Point well taken. I mean, if I were the lawyer in the case or the resource counsel in a case, I would certainly try to find every opportunity for something like that to happen. I would be astounded if that opportunity presented itself. You know, I'm not astounded by the opportunity presenting itself in cases like this one even though these cases have a huge visceral negative response by anybody who looks at them.

Q. How long was the meeting you had with Dean Stowers and Pat Berrigan, sir?

A. It lasted all day. I'm not -- I think we started about ten or so in the morning and probably went till four or five in the afternoon. And we did -- we took -- we ate lunch together, but

we kept talking about the case, so it was pretty much all day.

Q. The conference that Pat Berrigan attended back in November of 2004 which you were a speaker, there was another speaker that spoke on litigating new Rule 12.2 mental health issues. Do you remember that lecture at that presentation?

A. I don't remember the lecture, but I -- that's certainly a topic that we often address.

Q. Did you help --

A. Do you remember who --

Q. The names are David Bruck, Julie Brain, and Lisa Greenman it looks like?

A. Yeah, I do sort of remember that presentation.

Q. All qualified people to --

A. Oh, yeah.

Q. -- lecture on that topic?

A. Yes, yes.

Q. The Court asked you about the race issue in this case, and you spoke about the study that was done in 2000 and the further study that was done that came out in June of 2001 with regard to the racial makeup of defendants subject to the death penalty. Do you remember testifying about that topic?

A. Yes.

Q. Okay. That same report that came out in June 2001 adopted a methodology within the department where they kept track of racial statistics, but that information was submitted -- in

every case is to be submitted to the capital case unit under separate submission and that information about the race of the defendant is not to be provided to the attorney general or the capital case review committee; isn't that the way it works?

A. That's certainly what the protocol said, that's right.

Q. Okay. And do you have any reason to believe that protocol was not followed?

A. I don't.

Q. You were asked some questions about the theme I guess, if you will, of dominance of a male over a female and how that played out or may have played out in this case. Do you remember that line of questions?

A. Yes, yes.

Q. Okay. We talked before. You've not really looked at the facts of this case, the evidence of the case; right?

A. Right.

Q. Okay. And so you don't know, for example, that Angela Johnson after Dustin Honken was off in Florence doing time was herself still involved in distributing methamphetamine? You didn't know about that?

A. I -- I -- I remember some references to it in something I've read recently, but I don't -- no, I don't know it.

Q. Okay. You don't know that when Dustin Honken's off in prison and Terry DeGeus is dead and buried that on her own she, in an undercover meeting with two law -- a law enforcement and a

confidential informant, attempted to hire them to kidnap a drug dealer who owed her money and put on a, quote, unquote, world of hurt on him? Were you aware of that?

A. I'm not aware of that.

Q. Are you aware of any male dominance there that's affecting her behavior at that point, sir?

A. No.

Q. Are you aware of Angela Johnson threatening a law enforcement officer?

A. At what point in time?

Q. This would have been -- well, it's hard to say. I can't remember the timing on this. Threatening Doug Book at some point in time, a chief of police of a town, left a threatening message on his voicemail. Do you remember that?

A. I remember reading either in the Eighth Circuit opinion or your pleading or -- I remember reading her making a number of threatening comments to people. My sense was that those mostly happened when she was still connected to Mr. Honken. I don't know if that's accurate. You know, I have no doubt that she was capable of doing that kind of thing. I suspect it was more likely for that to happen when she was in the relationship with Dustin Honken than it was otherwise, but, you know, the facts would show whatever they show.

Q. Okay. And I guess the point is that, again, you're not here to try to opine on what the facts are in this case and what

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 349 Filed 11/10/11 Page 24 of 88

the defense attorney should or should not have done with those facts.

A. No.

Q. That's not what you're attempting to do.

A. No, no, it's just I am exposed to the facts enough to -- and both from reviewing what I've reviewed recently and from the meeting that I had with Pat and Dean to know that the relationship between her and Dustin Honken was crucial to understanding her behavior and to understanding her psychological -- the psychology of that relationship. So that seemed to be a critical -- a critical theme back then when I met with them, and I think it was a theme that we all -- it was one of the themes that I thought needed to be fleshed out better.

Q. Okay. But you're not in a position today where you're opining whether they did or did not effectively flesh that issue --

A. No, I don't know how they presented that at trial.

MR. WILLIAMS: Nothing further, Your Honor.

THE COURT: Mr. Burt?

MR. BURT: Just a couple of points.

REDIRECT EXAMINATION

BY MR. BURT:

Q. Mr. Burr, first of all, was there a particular reason why you did not take on the role of a Strickland expert in this case?

A. Yes.

Q. Could you explain to the Court what that is?

A. Yes. We -- as a policy matter within our project, we try not to do that because we do not -- we don't want to give the appearance or the substance to trial counsel that we're trying to set them up for something like this. And so generally we don't do that. I mean, I'm -- if I was asked a question I was uncomfortable responding to, I would say that, but that's why.

Q. So you weren't available to do that in this case.

A. That's right.

Q. You said in cross-examination that one -- that whether a plea can be brought to fruition is informed by a number of factors including the issue of whether the lawyers are taking a realistic appraisal of the government's case; right?

A. Yes.

Q. Based on what you read in the case in terms of the offer, you're aware of the fact that the defense kept insisting on 20 years here.

A. Yes.

Q. Is that a realistic appraisal of the case in light of the number of victims and the nature of --

A. Not --

MR. WILLIAMS: Objection, Your Honor, before he answers. Objection. Lack of foundation. This witness has testified he is not opining about whether the defense counsel

acted in a reasonable manner in this case. He's not fully informed of the facts in order to render that opinion.

THE COURT: I'll take it subject to the objection.

A. Simply based on my experience with other cases, it is rare -- it is relatively rare certainly these days and I think back in the mid 2000s as well, early to mid 2000s, for the government to agree to any plea less than life. You know, if it's less than life, it's usually 30 or 40 years, and that's generally for a person in a more-than-two-defendant case where the person that gets a plea like that is at the bottom of the rung of the ladder of culpability.

And in a case like this with only two defendants with the destruction and the nature of the victims involved, it -- again, based on my experience, 20 years was not a place to start if you're doing a realistic plea negotiation. That's the basis for my view.

Q. And in terms of doing a realistic plea negotiation, you're familiar with plea negotiations in the federal system based on your own practice; correct?

A. Yes.

Q. Have you ever heard of a case, either your own or supervising cases of resource counsel, where the Department of Justice in Washington has delivered a plea offer absent a proffer, in other words, a situation where the lawyer -- defense lawyer says -- the government says we may offer you something

here if you give us a proffer and the defense lawyer in response says I will not give you a proffer until you give me what the -- what the number is before I give the proffer? Is that the way the system works in the federal capital system?

A. There are -- there are -- there are some cases on the fringes where the government doesn't want a proffer. They're -- they -- because of information as it develops they are willing to plead cases without proffers. Their reassessment of the case leads them to that.

The majority of cases are somewhere in the middle where the government is interested in a proffer and at least considering whether the person making the proffer is a witness they might like to have. And in those cases in my experience, the proffer always precedes any serious offer of a plea. I mean, there may be discussions about possibilities, but there is no offer of any sort until the proffer happens.

Q. Let me give you a hypothetical. Suppose the government comes to a defense lawyer in a federal capital case involving five victims and says we're interested in a plea here, we'd like your client's cooperation, we want a proffer so we can see what the client's going to say because if the client's willing to cooperate and we can use her in the trial of a more culpable defendant, we'd like to be able to do that and if we like what we're hearing, we're willing to offer you something less than death and, furthermore, we're willing to take a proffer to a

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 25 of 88

taint team so that you're protected from having that proffer used against you in the event that negotiations fail. Is it ever reasonable in that kind of a hypothetical situation to say to the government I will not give you a proffer and I will not accept anything less than 20 years in a case involving 5 victims, 2 of whom are children?

A. I can't imagine why you would not pursue that. The typical proffer situation does not have those protections. The proffer is generally made to the trial team, and, you know, there may be some verbal representations that, you know, we'll not do anything with this, but there's never a formal structure and there's never what Mr. Burt referred to as a taint team, that is, a team of prosecutors separate from and sealed off from the trial team.

That is unusual, and it seems to offer all the protection you could ask for in terms of anything negative coming from the proffer assuming that nothing positive comes of it for your client.

So it's hard for me to imagine why you would not pursue that. I mean, I suppose counsel can tell you if they have any reason for not doing that, but it's hard for me to imagine a reasonable basis for not pursuing that, and it's very unusual. I can't think -- I mean, I don't remember what I used to be able to remember, but I can't think off the top of my head of that process being available to anybody else I've ever worked

with.

Q. The bottom-line point being made by the cross-examination was facts matter and each case must be judged by individual facts; correct?

A. Yes.

Q. And you agree that there are a multitude of facts that can tip even a bad case in the direction of a plea if they're worked properly.

A. Yes.

Q. We're going to hear evidence later today from Mr. Murphy who's one of the AUSAs involved in the case that he had a discussion with the Honken lawyers on August 12, '04, and he made a notation of that conversation in which he wrote the only wild card is the judge; he's probably not pro death penalty, so there's a risk of evidentiary rulings. The judge can have an impact on how a case proceeds.

That's the prosecutor. Now, that's the kind of fact that the government weighs into what are we looking at here in terms of what the eventual outcome can be; correct?

A. Yes. It's a fact that we would almost never know about.

Q. Unless they made a statement like this in a meeting that they were thinking along those lines. Whether it's true or not is not the point.

A. Yeah.

Q. The point is the government has an idea in their mind. You

want to exploit it. If they bring that up in discussions as he did here, that's something you could perhaps use as a fact-based reason. Of course, you could argue, you know, the judge has ruled against you on the Honken -- on the McNeese. There could be other rulings like that. That's a risk the government has to weigh. That becomes part of the process, does it not?

A. It does certainly.

Q. And the government alluded in their cross-examination to the implication that because Judge Bennett characterized the evidence tsunami of evidence that this was not a case that could be plea bargained, but let me ask you this.

In Judge Bennett's ruling in Miss Johnson's case denying the motion for a new trial after he had heard all the evidence, he wrote, quote, I remain gravely concerned about the imposition of the death penalty on Angela Johnson. If I had been the trier of fact and the decision maker in the penalty phase, I would not have imposed the death sentence on this record. The defense presented strong and in my view persuasive penalty-phase evidence from a myriad of sources including evidence from numerous expert witnesses and compelling testimony from Angela Johnson's daughters. I'm also troubled more on a personal and philosophical level than a legal one by the lack of certainty in the record concerning the precise involvement of Angela Johnson in these crimes. For me this haunting uncertainty alone is sufficiently mitigating to foreclose my

vote for the death penalty.

What does that tell you about the circumstances of this case and the possibility of exploiting uncertainty earlier in the process to achieve a plea bargain?

A. Well, it suggests that in the face of all the evidence, the impression that -- I think that any reasonable defense lawyer would have had at the beginning of the case, that is, my client, Angela Johnson, is far less culpable than Dustin Honken, survived. I mean, that -- in the face of all the evidence, that -- that factual conclusion remained as articulated there. And that tells you that that was a theme not only apparent at the beginning but deeply rooted in the case that should have -- and I don't know whether it did or not. I'm not opining. But it should have informed everything the defense did. And if it didn't, it did not, then there's a real question.

MR. BURT: Okay. That's all I have. I would move 9 into evidence.

* * * *

(Plaintiff Exhibit 9 was offered.)

* * * *

THE COURT: Any objection to Plaintiff's Exhibit 9?

MR. WILLIAMS: No, Your Honor.

THE COURT: Nine's received.

* * * *

(Plaintiff Exhibit 9 was admitted.)

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 349    Filed 11/10/11    Page 26 of 88

* * * *

THE COURT: Recross?

RECROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Sir, you indicated that you cannot imagine why you would not pursue a proffer first pre-condition to a plea. Do you remember that testimony?

A. Yes.

Q. Okay.

A. Under the circumstances here where the proffer would be made to a separate team that was sealed off from the trial team.

Q. Okay. What if under the circumstances at the time your client is maintaining innocence and you knew that if taken into a proffer what they would say is "I wasn't even present at the time of the crime"?

A. If that's where you were, then that is certainly reason not to undertake the proffer. The question is why is the client there at that -- if that's where the client was at that point, why?

Q. Okay.

A. And to what extent does counsel bear responsibility for that?

Q. But that's a whole different question about whether there was a reasonable basis to say we're not going to proffer first if, in fact, at the time you knew your client would say I wasn't

even present.

A. If you knew the client would say that, then a proffer would be pointless. That's true. I agree with that. But, again, that doesn't answer the question of whether counsel is -- bears some responsibility for why the client is at that point if that's where she was.

Q. It does answer the question, though, that there is now a situation you can imagine --

A. Yeah.

Q. -- where you would reject a pre-condition of a proffer.

A. I must say that when I said that, I was thinking of a defense team that had done their job with respect to the client.

Q. Now wait a second, though, Mr. Burr. The defense team doing their job with the client, we talked before that a defense team doing the best job in the world may not be able to convince a defendant to plead guilty.

A. That's true.

Q. All right.

A. And if that's what they've done and that's where the client is and the client if proffering would say, "I don't know what you're asking me about, I don't know anything about this," then counsel in that hypothetical would have performed effectively under the law.

MR. WILLIAMS: Nothing further, Your Honor.

MR. BURT: Just one question.

FURTHER REDIRECT EXAMINATION

BY MR. BURT:

Q. Showing you Exhibit 7 from the petition, how about if at the point in time when the negotiations are taking place that was just referenced the client is writing you a letter saying, Dear Defense Lawyer, I'm going to be as clear as I can. I want to plead guilty. I do not want to wait for any more rulings, not even the Eighth Circuit. I am asking you to get me the best deal you can, and I will cooperate. At this point I will confess to killing the Pope?

Do you have any ethical dilemmas in that situation, that hypothetical situation, or the kinds of problems that he just alluded to?

A. No. If that's where the client was at the time this taint team proffer process was available, then the hypothetical Mr. Williams set out is not reflective of this case. You know, his hypothetical presumed that the client did not want to plead and would maintain innocence. And this letter certainly seems to contradict that part of his hypothetical.

MR. BURT: Thank you. That's all I have.

THE COURT: Mr. Williams?

MR. WILLIAMS: Nothing, Your Honor.

THE COURT: I do have a couple areas of inquiry. And we can start with that last letter actually because -- you can put the letter back up because I've read it several times, but

Mr. Burr hasn't. Would the opinion that you just gave be different if the client had for several years said that they were absolutely not guilty and the lawyers knew that there was no way she was going to give a factual basis for a plea? I mean, just because somebody wants to plead guilty doesn't mean that they're willing to admit to the elements of the offense. So if the client was saying, "I'm not guilty, and I can't admit to the elements of the offense without perjury, but I want to plead guilty," that still creates a problem for the defense lawyers, doesn't it?

THE WITNESS: Oh, it does, and I don't know if that's what the facts were here or not.

THE COURT: I know that. I know you don't know. Right.

THE WITNESS: I'm not sure you know yet. Maybe you do.

THE COURT: Yeah. No, I'm not sure I know completely.

THE WITNESS: I mean, she does say, "I will confess to killing the Pope," which suggests that she would confess to whatever she needed to. Whether that would be perjury or not I don't know.

THE COURT: Right.

THE WITNESS: That's the part of this letter that's unclear.

THE COURT: And this leads me to the inquiry that I've

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

been waiting to ask you about, and that is in a death-eligible case, do you know of any attorney general at any stage of the proceedings that has ever authorized the Department of Justice to accept an Alford plea?

THE WITNESS: No.

THE COURT: And that would be true before the death penalty is authorized; correct?

THE WITNESS: Yes.

THE COURT: And it would also be true after the death penalty is authorized.

THE WITNESS: My -- the reason I answered so quickly is I may be wrong because I sometimes am -- I very often am -- but based on my experience in the death pen -- the Federal Death Penalty Resource Counsel Project, I know that at times, you know, I have raised questions with my colleagues about whether an Alford plea would be accepted, and the answer was absolutely and categorical no, that they don't -- will not accept Alford pleas in capital cases.

THE COURT: So in looking at this case and whether or not defense counsel fell below the constitutional minimum, looking at whether or not the Department of Justice would accept an Alford plea, if the client was unwilling to admit to the elements of the offense is something that needs to be explored, isn't it?

THE WITNESS: Yes.

THE COURT: Now, I may have misunderstood your testimony in one regard, so I want to ask you about it, and I guess I could have searched it on my realtime, but I just want to make sure I understand it, and that's this issue of in the -- and I hope I have this right, and the lawyers will correct me if I have it wrong. But in the penalty phase in this case the defense lawyers told the jury that Honken had received the death penalty on the counts involving the children. And did I understand your testimony to be critical of that move?

THE WITNESS: I'm not sure I was asked that question.

THE COURT: I thought it came up, and I took a note about it.

MR. BURT: I did ask him hypothetically whether if you did not develop the theme of dominance and had no factual basis that your client was less culpable, in that situation would it be reasonable to then put in the death sentence, and I believe he said it would not be.

THE COURT: Okay. That's how I understood it. Now, let me ask you this. Are you able to -- if the defense thought that the jury would want to hold someone responsible for the killing of the two children by giving them the death penalty -- let's just assume that that's what the defense thought.

THE WITNESS: Uh-huh.

THE COURT: -- and they're representing Angela Johnson

and we've already had Dustin Honken's trial and he received the death penalty on the two counts involving the children, can you say it was an unreasonable strategy for them to let the jury know that rather than to have the jury wonder is anybody getting the death penalty and we don't know so we're going to make sure Angela Johnson gets it? I mean, it might not be the strategy that you would choose.

THE WITNESS: Sure.

THE COURT: But you're kind of the pl -- you're not the gold standard. You're the platinum standard. But is it an unreasonable strategy?

THE WITNESS: I think that the Court -- I agree with your sense that --

THE COURT: That you're the platinum standard.

THE WITNESS: No, no, no.

THE COURT: You're too modest for that.

THE WITNESS: No, I think I'm maybe the lead standard. No. I think that it is reasonable to want the jury to know that the codefendant's been sentenced to death for that aspect of the crime because I think -- I think you're -- it is reasonable to think that if the jury does not know that then they may be more retributive to my client than they otherwise might be. I think that's all reasonable thinking.

Where -- and again, this is sort of the difference between strategizing at a thinking level and developing your

trial evidence. In order for that to work, you're -- it's sort of two edged. You're letting them know on the one hand maybe to allay their need to sentence your client to death somebody's already been sentenced to death. But we also know that juries can in those circumstances say -- take a kind of license in a sense to have the awful burden of imposing death be slightly relieved because somebody el -- another jury has said those are death-worthy pieces of behavior.

So it's not an easy decision, and it is two edged. And if you make that decision and it is a reasonable decision, you have to take into account what do I put on in the evidence to keep it from being two edged so that it is a relief for the jury and not permission for the jury?

And I think the only way that -- again, not putting myself in their shoes and saying what I would do but reasonable thinking would say, well, how do I do that, how do I diminish the chance of giving them permission rather than increasing that chance?

And I do think as I responded to Mr. Burt's question, if you have developed her lesser culpability all over the case, you know, in every respect possible, not just their relationship but also the things she actually did -- and again, I'm assuming that in the government's case her lesser culpability even in their case was apparent. I don't know if that's right, but let's assume that it was -- whatever you do as a defense counsel

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 349    Filed 11/10/11    Page 28 of 88

has to be emphasizing at every possible juncture her lesser culpability.

And so if you're able to do that and do it effectively with the evidence and your -- you know, not just plan to do it but it actually comes out that way, then you're probably -- it's a reasonable decision to make. Again, I'm not sure I would do it because I might feel the balance cut the other way against -- it might be --

THE COURT: But it would be a judgment call.

THE WITNESS: It'd be a judgment call but a judgment call that would have to be informed by a strategy for minimizing the risk of giving them permission and then how does that strategy play itself out in the evidence and the argument. If there is a good strategy played out in the evidence, then I think it's within the realm of reasonable behavior.

THE COURT: And wholly independent of the decision to inform the jury that Honken got the death penalty on the counts involving the children, wouldn't you assume that the defense lawyers in Johnson would do everything they could to minimize the culpability of their client at least in the penalty phase?

THE WITNESS: I would assume so.

THE COURT: I mean, that's like self-evident; right?

THE WITNESS: It is.

THE COURT: You don't need some major flashbulb to go off in your mind that knowing that Honken received the death

penalty or even if there was never a Honken, you want to try and minimize your client's involvement in order to increase the likelihood, once they found her guilty --

THE WITNESS: Sure.

THE COURT: -- that she would get life.

THE WITNESS: Sure. The question is did they do the investigation and the preparation and did that get carried out in the presentation in a reasonably effective way. I agree with you.

THE COURT: Right. But the motivation to do what you're suggesting they do would be self-evident really to any lawyer I would think in the case. Whether they did it or not is ultimately one of the things I have to decide, but the motivation to do it is not some hidden secret that you have to go to 15 death penalty seminars to figure out.

THE WITNESS: Not at all. I mean, I do think that understanding that that kind of evidence is two edged is an important realization, that that could at least inform how you present and how you talk about the evidence of lesser culpability. I mean, particularly you'd want to have some evidence of lesser culpability with respect to the children. You know, did -- that was the first set of murders. I mean, when Terry DeGeus or De -- I don't know how you say those names.

THE COURT: DeGeus.

THE WITNESS: DeGeus. When he was murdered, she had

reason to believe -- you know, reason to know what was going to happen, you know, when she helped -- helped get him out where she got him. With the children, it is at least possible -- and this is something the evidence -- you would want to exploit in the evidence, whether the evidence could support a reasonable view that she really didn't know what was going to happen to the children. Now, at the point at which the -- Nicholson and their mom was killed, she probably did know, but did she know before that, and did she have reason to believe?

THE COURT: Well, let me ask you this. If there was no evidence in the record that Angela Johnson pulled the trigger and that the only evidence about how the children were killed was that Dustin Honken executed them at close range, do you think that's a sufficient difference as a strategy decision to put in the evidence that Dustin Honken got the death penalty?

THE WITNESS: I don't know, because I would want -- as the lawyer facing that, I would want to know what are the inferences the jury's going to have about my client's mental state and whether she was, you know, completely in agreement with what he did, whether she was shocked by it, whether she was troubled by it, whether she flinched, you know. I would want some evidence that suggests she was not of one mind with him and --

THE COURT: But you're not prepared to say that just on those facts alone that I've given you that it would be an

unreasonable strategy.

THE WITNESS: No, I can't. Just on those facts I can't.

THE COURT: Okay. I don't have any more questions, but I'm sure the lawyers might have some follow-up questions.

MR. BURT: Yeah.

FURTHER REDIRECT EXAMINATION

BY MR. BURT:

Q. And just continuing on the same line of thought of the judge and bringing me to an issue that the judge and I discussed yesterday, in that context, you know, there was evidence in this case the first penalty-phase witness in the case was this jailhouse informant Steve Vest. Are you aware of that --

A. Yes.

Q. -- and his testimony? And he put Miss Johnson in a more involved role in both of the killings than had theretofore been apparent from the record. In other words, he put Angela Johnson doing something in relation to the first murders and certainly the second that was more than just a passive participant.

In the hypothetical that we discussed earlier about whether you put in the death sentence for Mr. Honken, would it be important if you had testimony from a guy, Vest, who says Honken told me the way it went down, and Honken's version implicates Miss Johnson in the death of the children? In that situation would you want to do everything possible to rebut the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 349 Filed 11/10/11 Page 29 of 88

**789**

version that was being offered that put Miss Johnson in a more involved role?

A.   Yeah.  I mean, my -- my experience is that it's hard to impeach somebody like Mr. Vest, I mean, who's recounting something that a codefendant has said.

Q.   Right.

A.   That the real job is to impeach what the codefendant said to him.  That -- that's the thing that hurts.  You know, trying to impeach Vest's credibility is far more difficult than -- or at least less important than impeaching what he says was said to him because he has no idea whether it was true or not.  Only the person who said -- only what Honken said to him.  He may simply be a tape recorder, you know, playing out what --

Q.   And that's what he said in his testimony.  He said, "I don't know whether it's true or not.  This is just what he told me."

A.   And it's hard to impeach the messenger in that kind of situation.  The task is to try to impeach the message.

Q.   And you're aware because I told you that one piece of impeachment evidence they had is that Honken gave essentially the same story to case agents and then failed a polygraph on the specific issue of whether he was telling the truth on Miss Johnson's role.

A.   Yeah.

Q.   And would you as part of a strategy of putting in -- assume

**790**

you had decided I'm going to put in the fact that the jury sentenced Honken to death.  Could you do that and at the same time ignore this polygraph evidence and hope that that strategy was not going to backfire on you?

A.   I think that's pretty questionable.  I mean, it -- again, I don't -- I know the rules of evidence don't apply in the penalty phase, and I don't know whether you would have admitted polygraph evidence but -- and polygraph evidence generally is not admissible, but in a penalty phase where you've got the most hurtful fact recounted by Vest impeached by a polygraph of Mr. Honken, I would want the jury to know that.

Q.   And similarly, there's going to be some evidence that Mr. Honken at the very beginning of the case wrote Mr. Willett in writing and said, "I'm here to help you.  Angie Johnson is innocent."  Could you conceive of putting in the death verdict as to Honken and not introducing that evidence to impeach Honken's version to Vest?

A.   No.

Q.   There could be no tactical reason.

A.   I can't think of a tactical reason.  You know, if you have an arguable evidence -- arguable theory as to why something is admissible in the phase that it's adm -- you know, that you're trying to get it in, you try.  I mean, it is -- you don't act in bad faith, but you -- you know, you may try to stretch the limits.

**791**

Q.   Well, here the theory of admissibility would have been impeachment of a hearsay declarant.

A.   Right.

Q.   With a prior inconsistent statement.

A.   It all gets to be sort of fictional at some point because the declarant's not there.

Q.   Right.

A.   But yeah.  I mean --

Q.   In other words --

A.   -- what needed to be impeached was the out-of-court statement by Dustin Honken.

Q.   Right.

A.   And so doing it by his other out-of-court statements certainly seems like it would be fair game and very powerful.  That together with his failing a polygraph suggests that he was telling the truth in his letter.

Q.   And similarly, there was evidence that in 1998 Mr. Honken had testified in his own sentencing hearing under oath that he was innocent of the murders, again, another inconsistent statement this time under oath, can you conceive of a tactical reason which would justify not putting that evidence in if you had decided you were going to put in the guilty -- the death verdict and you had heard evidence from Vest in which Honken had --

A.   I'm not sure.  There's a point at which impeaching Honken

**792**

with inconsistent statements can destroy your message.  I mean, in the role -- if the job here is to impeach what hurts you the most, that is, his statement that Angela Johnson was more culpable than she was --

Q.   Right.

A.   -- then I think you want to rivet on that, and you want his letter to the coun -- to counsel which says she really is inn -- you know, she's not very culpable, you want that to be the truth.  And so if you're starting to say -- give the impression that whatever he says is not true and you can't trust anything he says, then that thing that he did send in his letter that is helpful to Miss Johnson gets impeached too.

Q.   Doesn't that then emphasize the importance of this polygraph evidence?

A.   Absolutely.

Q.   Because he's failing on the specific --

A.   The polygraph evidence seems to me to provide a very powerful basis for arguing when you put the letter in front of the jury he wrote the truth here.  He wrote the truth because you're -- you know, you're working him in consistent directions that way.

Q.   And this is not a defense polygraph expert.  This is the government's expert saying that Mr. Honken lied about her involvement.  Powerful evidence, isn't it?

A.   Very powerful.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

MR. BURT: That's all I have. Thanks.

THE COURT: Mr. Williams, would you mind if I asked a couple questions? And everybody's going to get a chance to ask all the questions, but I think it just might be easier.

Do you think the lawyers, the defense lawyers in this case, should have filed a Rule 104 motion prior to trial or at least prior to the penalty phase to determine whether or not I would admit the polygraph evidence before making the decision to put in the evidence of the fact that Honken was given the death sentence by the jury on the kids' charges?

THE WITNESS: I'd sure like to know that, yeah. I mean, it all -- you know, it really all kind of fits together because what you're -- the essential fact here is whether she was really less culpable. And that's what -- if I can -- if I am fairly confident that the jury will believe my client is really less culpable, then I'm better with putting in the fact that he got sentenced to death for the worst aspects of the crime because that does give them some comfort and I will feel more confident they won't use that as permission to sentence my client to death.

So the key question is do they really believe that she's less culpable. And --

THE COURT: Well, that's not really the question. The question is do they really believe they can try and convince the jury that she's less culpable.

THE WITNESS: Sure. And so yes, I would -- I would like to know -- you know, if I'm seeing all of -- how all of these pieces fit together, I would like to know -- the most powerful situation for me is if I do get the polygraph in and I've got the letter in that Honken wrote to me because those things to me work very strongly together. And so if I know I'm going to get the polygraph evidence in, I know I'm going to get -- I'm likely to get the letter in and, therefore, letting them know this clearly more culpable guy got death, take it easy is going to work. Yes, I -- I would --

THE COURT: Of course, the letter's not really very probative.

THE WITNESS: No, but with the failed polygraph, it becomes more probative.

THE COURT: Yes. But the letter by itself --

THE WITNESS: No.

THE COURT: -- I mean, Honken saying --

THE WITNESS: No. I mean --

THE COURT: -- my girlfriend's innocent is not --

THE WITNESS: Without the polygraph evidence, I think it's not going to do much. You know, then you're in the position of just trying to make -- you know, bring in all the inconsistencies you can find with Dustin Honken so that you have sort of general questions about whether he ever tells the truth.

THE COURT: I mean, if your -- if your penalty phase

depends on the letter being truthful, you're in a world of hurt.

THE WITNESS: You're in a world of hurt. It does appear to be truthful, though, with the polygraph evidence.

THE COURT: Or at least there's a greater argument.

THE WITNESS: Yeah.

THE COURT: Oh, I know what I was going to ask you. Do you know of any judge in state or federal court that has ever admitted a polygraph in a penalty phase? I mean, if there's a reported decision, I'm confident I'll find it, or I should say my law clerks will find it.

MR. BURT: I have --

THE COURT: And -- see, I don't have to look that far, but I was just wondering if you knew.

THE WITNESS: He's better prepared. I was going to say I think that it has been admitted in a penalty phase, but I can't tell you when or where or how I know it, but maybe Mr. Burt can. You know, it's something -- there are list serves that are -- you know, run around in the capital defense community, and I think I've seen something on a list serve about that.

THE COURT: Okay. Well, we'll --

THE WITNESS: But it's never been an issue that I've researched or had to consider.

THE COURT: Okay. So you can tell me about that later.

MR. BURT: Sure.

THE COURT: I want to give Mr. Williams a chance to now ask any and all of the questions he has.

MR. WILLIAMS: Thank you, Your Honor.

FURTHER RECROSS-EXAMINATION

BY MR. WILLIAMS:

Q. You're being asked to give an opinion at this point based on a hypothetical; right?

A. **It depends on which opinion, but I assume that's right.**

Q. All about whether you should have put in this polygraph stuff; right?

A. **Yes.**

Q. He's posed to you a hypothetical; okay?

A. **Yes.**

Q. And a hypothetical is limited by the facts that this defense attorney has provided to you to render that opinion; right?

A. **Yes.**

Q. Now, in order to really know whether that was a wise decision or not, you really need to know all the facts; right?

A. **I would certainly need to know if there are any facts that -- you know, that draw into question -- if there are facts that I don't know about which would make me reconsider my opinion, I'd like to know what they are. But simply saying you need to know all the facts, if all of the facts support the**

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 31 of 88

conclusion, then there are some facts I don't need to know if you . . .

Q. I understand -- I understand your intellectual --

A. So give me -- if there are some facts you know about that will draw into question my opinion, give them to me.

Q. Well, here's what I'm not going to do is I'm not going to attempt to provide to you all the facts in this case known to defense counsel they had throughout this case in order to make the judgment call at the time of the penalty phase to decide whether or not to put in that penalty. And without all those facts, you would agree with me they're in the better position to make that judgment call than you are based on the hypothetical where the defense counsel has provided you with a minimum number of facts.

A. They might be.

Q. All right. Let me give you just one hypothetical fact to add to that. What if prior to that letter that was sent by Dustin Honken to Al Willett there was a recorded phone call by Angela Johnson to Dustin Honken in prison saying, "You better get me out of this, do something," and that follows -- or that precedes a letter to counsel saying she's totally innocent; okay? You've got that hypothetical additional fact.

Now, let's add to that the idea that if the defense attorney puts in the polygraph at that point then the government's going to be in the position to call the agents who

were present who got that confession from Honken and have them testify, so now we're not relying on Steve Vest repeating what Dustin Honken said. Now we have law enforcement officers saying I got this directly from the horse's mouth and this is what they said this woman's involvement was on this case. Do you think under those circumstances those are additional facts that are important in the analysis of determining whether to put in the polygraph is a wise or not wise decision?

A. I don't think the fact that law enforcement agents would come and say the same thing that Steven Vest said -- testified to is material because I'm assuming that Steven Vest is relatively unimpeachable, that he is, you know, presenting -- that the jury's going to believe that Honken said what he says Honken said, you know.

THE COURT: Well, excuse me. Why would you assume that?

THE WITNESS: Well --

THE COURT: He was one of the most impeachable witnesses I recall ever seeing.

THE WITNESS: I think it's --

THE COURT: I mean, he was not -- you know, this was not an eag -- do you know anything about Steven Vest?

THE WITNESS: I know something about his case.

THE COURT: His cases, yeah. Well, he's hardly an Eagle Scout.

THE WITNESS: Yes. No, I understand that.

THE COURT: He's hardly somebody most of us in this room would rely on --

THE WITNESS: No, but --

THE COURT: -- in making important decisions in our life.

THE WITNESS: When -- when an inmate in prison recounts something that somebody else said, another inmate said, everything else about that person's life is not necessarily going to be persuasive to anybody. The fact that in general this guy is a reprehensible human being is not necessarily going to suggest that he's lying about this thing. I mean, the thing that helps you -- that makes you think people are lying is whether the fact of giving the testimony is helping them in some way or enabling him to hurt somebody else in some way. You know, if he's got some ulterior motive for testifying, then that's certainly relevant impeachment evidence. The fact that he has been convicted of doing terrible things and lived a reprehensible life doesn't necessarily mean that you're going to disbelieve him in this --

THE COURT: Doesn't necessarily mean you're going to disbelieve him, but you know he's probably not doing it to get a Boy Scout truthfulness merit badge.

THE WITNESS: No, that's true, but the question is can I persuade -- can I present something that is credible

impeachment evidence of him. And so -- and I don't know whether they were able to or not. So I may be wrong about that, but I am -- if it is -- if it is -- if my assessment is accurate that what had to be impeached was what Honken said rather than the conveyor of that information, then it would not matter whether the conveyor was an agent or Mr. Vest. Again -- and there's some assumptions.

THE COURT: You're saying it wouldn't m -- you can say to a reasonable degree of professional certainty it wouldn't matter to a jury?

THE WITNESS: Perhaps -- perhaps any -- if there were a real question of whether Vest was telling the truth about what Honken said to him, sure, it would matter. I don't know whether there were -- the defense was able to develop any real question about that. But absolutely.

Now, if -- if Vest was impeachable as to his account of this information, then surely it would matter, and that would be something you'd have to take into account. But your real concern would have to be how you could impeach what Honken said.

THE COURT: The underlying information, right.

THE WITNESS: What Honken said.

THE COURT: Yeah.

THE WITNESS: And --

THE COURT: I'm tracking you. Thank you. Sorry to interrupt.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 32 of 88

A. There was another part of the phone call from Angela Johnson.

Q. Right.

A. That's not hypothetical. That's actual, and the jury knew that?

Q. I'm posing it to you as a hypothetical because, frankly, you don't know what the facts are in this case.

A. No, I don't but if --

Q. And so I'm not going to --

A. -- if that happened and it were recorded and you knew about it and the defense knew about it and knew that it could come in in connection with their reliance on that letter, then it's -- certainly something else would go into the calculus.

You know, I -- it still seems to me that that letter coupled with failing the polygraph on the very same subject matter of the letter, if I'm accurate about that, is very powerful. Those two facts fit together very powerfully. If, you know, he's -- if he's trying to tell the truth and a machine says he's not about her involvement in the crime and he's written a letter previously, no matter what his motive was for writing the letter, that he's written a letter previously that the failed polygraph now suggests was truthful and accurate, then I'm not sure I'd be terribly concerned about why he wrote the I -- you know, what his motive was for writing the letter at the time he did. You know, I'd have -- I'd certainly

have to know more about it.

And you're right. It's a fact that you'd have to take into account just as you would have to take into account whether putting on the polygraph evidence would then open the door to agents coming in and testifying to what he said.

Q. Just as you'd have to take into account on whether you thought you could impeach Vest's credibility that he simply fabricated the entire story. I mean, you're making the assumption that the jury's going to believe that Dustin Honken really told Vest that; right?

Dustin Honken -- the tactic by the defense could be Dustin Honken never said anything to Steve Vest, Steve Vest read newspaper articles in which he is now fabricated this thing that Dustin Honken allegedly said, and we're going to impeach Steve Vest on the fact of what his underlying crimes are, the fact he's a snitch, the fact that he's looking for a reduction in his sentence. There's any number of those things.

A. I'm the first person to agree that the defense ought to do everything it can to impeach and destroy the credibility of a snitch. I mean, there's no question about that. Snitches are one of the primary causes of wrongful convictions. We know that, you know, from all the studies of wrongful convictions these days.

And so if there were a way to persuade the jury that Vest was simply making this up out of thin air and that the

conversation with Honken never happened or he changed what Honken said for some reason and that -- you really would have confidence of destroying Vest, then that may be where you'd leave it.

Q. It's kind of a judgment call by the defense attorney.

A. It is a judgment call. But again, every judgment call made by a defense attorney has to be informed by enough investigation. And if there's enough investigation, whatever's enough is sort of, you know, peculiar to the situation. But if you've done a reasonable investigation and you reach a conclusion that's based on a reasonable investigation, the courts almost all the time say that's fine, that's reason -- you know, that's effective assistance.

So again, the whole hypothetical we're talking about depends on what the lawyers did to give rise to the strategy that they pursued.

MR. WILLIAMS: I understand. Thank you.

THE COURT: Mr. Burt, anything further?

MR. BURT: No, Your Honor.

THE COURT: You may step down. Thank you.

THE WITNESS: Thank you.

THE COURT: Good to see you again.

THE WITNESS: Good to see you. Thanks.

MR. BURT: Judge, before we get off topic, did the Court want the cites for the cases on that issue? We'll be glad

to brief it.

THE COURT: Yeah, why don't you just -- yeah, there's going to be briefing.

MR. BURT: Sure.

THE COURT: You can send me a letter between now and June with a copy to opposing counsel.

MR. BURT: Be glad to. Thank you.

THE COURT: I have a note that I was going to ask you to brief that question anyway, so it might wait briefing.

MR. BURT: Sure.

THE COURT: Why don't we take a 15-minute recess until 10:55 and then come back and take up Mr. Willett.

(Recess at 10:38 a.m.)

THE COURT: Thank you. Please be seated. Okay. You want some blinds closed I've been informed. How's that? You want more? How's that?

ALFRED WILLETT, PETITIONER'S WITNESS, PREVIOUSLY SWORN

THE COURT: Well, Mr. Willett, we're right on time for you. Your watch says 8:30, doesn't it?

THE WITNESS: It was Pacific time, wasn't it, Your Honor?

THE COURT: That's right. Please come forward. I apologize. Everybody apologizes to you. You're still under oath.

THE WITNESS: Thank you, Judge.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS Document 349 Filed 11/10/11 Page 33 of 88

THE COURT: And thank you for being -- I don't know that you were being patient, but thank you for just not skipping out on us.

THE WITNESS: I wouldn't do that, Judge.

THE COURT: I know you wouldn't. Thank you.

CONTINUED DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Good morning, Mr. Willett.

A. **Good morning.**

Q. When we left off last night we were on plea negotiations in 2004. But I would like to digress on two matters very briefly.

A. **Okay.**

Q. The first is Phyllis Proscovec. Do you remember when we were speaking about her --

A. **Yes.**

Q. -- last -- last time we were here? I have an exhibit that's been marked as 5CCCCC, and I'm going to put it on the ELMO and ask if you recognize this document which appears to be a fax transmission to you from Dawn at the office of Tom Frerichs.

A. **I recognize the cover page.**

Q. Okay. And this was dated September 19, 2000?

A. **Yes.**

Q. All right. And opening the document, it appears from the document, does it not, that Mr. Frerichs had dictated basically

a summary of the investigation in this case based on discovery provided by the prosecution?

A. **That would certainly appear to be so, yes.**

Q. Okay. Let me -- and do you remember receiving this particular fax from Mr. Frerichs?

A. **Not independently as I sit here, no.**

Q. Okay. If this was a fax that came to your office and was from your file, do you think that there's any reason to doubt that you received the fax?

A. **I'm not doubting that I received the fax.**

Q. Thank you. I'm going to flip to the end of the document which appears to be an index of discovery summarized by Mr. Frerichs on page 3. It's actually the last page of the document. Do you recognize the name of Phyllis Proscovec?

A. **Yes.**

Q. So does it appear that at least as of September 19, 2000, you were aware or you had discovery that showed you that Phyllis Proscovec was a potential witness in this case?

A. **I would agree that we had discovery that she was a potential witness in this case.**

Q. Okay. And would you agree that you had that discovery available to review for your purposes for the context of representing your client at least as of September 19, 2000?

A. **It would have at least been available through the U.S. Attorney's Office. I can't remember when the transfer of**

documents started occurring to my office.

Q. All right. Well, this exhibit, Exhibit CCCCC, was actually not a government document but a summary of a government document prepared by your co-counsel.

A. **Correct.**

Q. And it appears that your co-counsel utilized the same method that you described about going into the U.S. Attorney's Office and reading discovery and then dictating the contents.

A. **I agree.**

Q. Thank you. Okay. The next digression would be to 2001. You testified that there was in 2001 -- I'm sorry -- yes, 2001, on October 1, 2001, there was a meeting with you, Mr. Berrigan, Mr. Reinert, Mr. Williams, and Rich Murphy that concerned plea negotiations. Do you recall that?

A. **Is that the Des Moines meeting we were talking about yesterday, or is that an earlier meeting?**

Q. This is an earlier meeting.

A. **Okay.**

Q. And at that meeting there -- what we talked about there was an offer by Mr. Berrigan of settling the case for 20 years.

A. **Yes.**

Q. Correct? All right. I am going to show you then a document that's marked as DDDD for identification, put it on the ELMO.

THE COURT: 5DDDD?

MS. MORRISSEY: 5DDDD. Thank you, Your Honor.

THE COURT: And if the ELMO could speak, it would correct you. ELMO is actually brand specific.

MS. MORRISSEY: Oh.

THE COURT: This is a digital document camera. It's actually made by Wolf. Years ago we did have an ELMO; okay?

MS. MORRISSEY: Okay. What should I call it?

THE COURT: Digital document camera.

MS. MORRISSEY: Digital document camera, thank you, Your Honor.

BY MS. MORRISSEY:

Q. I'm putting on the digital document camera Exhibit 5DDDD.

A. **Could you magnify that in any way possible, please?**

Q. Certainly.

A. **Thank you so very much.**

Q. All right. Do you recognize this as a letter that you received from Mr. Reinert?

A. **Could you scroll down for just a second, please?**

Q. Yes.

A. **Yes, I do.**

Q. And does this letter concern the meeting that you had on October 1, 2001, with Mr. Berrigan and the rest of the individuals associated with this case including the prosecutors?

A. **Yes, it does.**

Q. And does Mr. Reinert make any -- make any statements to you

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 34 of 88

Q. about the offer that was made by Mr. Berrigan of a negotiated settlement for 20 years?

A. In the middle paragraph, yes. Mr. Reinert shares his opinion.

Q. All right. He says, "In the right circumstances, our office may not be opposed to negotiating a settlement to this case which could include a sentence other than the death penalty or life imprisonment. However, in my opinion, a 20-year term which equates to only 4 years per murder is unconscionable."

A. That's what it says.

Q. And you received that letter from Mr. Reinert?

A. Yes.

Q. And it is presumed that Mr. Berrigan received it also because he was cc'd?

A. Yes.

Q. Now, after this letter, did the subject of a 20-year settlement in the case cease to be a topic of discussion?

A. My memory is it did not.

Q. In fact, I have an exhibit marked EEEEE, 5E, excuse me, that I'm going to place and see if -- ask you to look at and see if you recognize it as a letter that was written to Angela Johnson by Mr. Berrigan with a copy to you, Dean Stowers, and Mary Goody dated October 9, 2001. And does this letter which she received make any statements to Miss Johnson about a 20-year deal?

A. The middle paragraph.

Q. Mr. Berrigan writes as follows: I want to mention briefly that we told the government we might be interested in deal for 20 years. Much to my surprise, they did not reject our number as being completely out of question. I expect we'll have some future discussions.

Then it goes on to say Dean is going to put together a sample package together for consideration. If it's suitable, we can present a written proposal to the government.

Does it appear based on this letter dated October 9 that Mr. Berrigan got the message that 20 years was no longer a point of negotiation?

A. It would appear that Mr. Berrigan's letter's in conflict with Mr. Reinert's letter.

Q. Okay.

THE COURT: Excuse me. What was the date of the Reinert letter?

MS. MORRISSEY: The date of the Reinert letter was the 10th of October, so there is -- 2001. So there is some overlap, but we'll get there.

THE COURT: Wait a minute. Pat Reinert's letter is dated October 10?

MS. MORRISSEY: And this is October 9, the day before.

THE COURT: Okay. So there's no conflict here.

MS. MORRISSEY: There's no conflict. We're going to

get --

THE COURT: Right. Okay.

MS. MORRISSEY: We're going to get down that road.

BY MS. MORRISSEY:

Q. All right. So at least as of October 9 Mr. Berrigan is writing to Miss Johnson and telling her 20 years is in the ballpark; right?

A. Correct.

Q. And by October 10 you knew, didn't you, that that was not the case?

A. We knew that was Mr. Reinert's opinion.

Q. Well, Mr. Reinert was the prosecutor with whom you were dealing on plea negotiations; correct?

A. Correct.

Q. Was there any other person whose opinion mattered on the issue of a 20-year negotiated disposition?

A. I assume Mr. Larson's opinion mattered. I assume Mr. Murphy's opinion mattered. I assume Department of Justice opinion mattered.

Q. Okay. Is it correct that if a local prosecutor sends a plea agreement to the Department of Justice with a cover letter saying this is unconscionable probably the DOJ isn't going to sign on to the plea?

MR. WILLIAMS: Objection. Leading, asking for speculation.

THE COURT: You may answer.

A. I would have no idea.

Q. All right. When we broke off last night when I became incomprehensible, we were talking about this idea, the proffer deal conundrum that arose during the course of the plea negotiations in this case. Do you recall?

A. Yes.

Q. Could you explain to us what is the practice regarding proffer and plea timing in the Northern District of Iowa?

A. At that time or now?

Q. At that time.

A. That a proffer was a prerequisite to a cooperation plea agreement.

Q. And did you -- when Mr. Berrigan and Mr. Stowers took the position that they would not proffer until they were offered a plea, did you advise them about the local practice?

A. They were aware of the local practice. Part -- part of the problem was -- with a proffer is that historically up until the very recent future, this United States Attorney's Office would not consider United States Sentencing Guideline 1B1.8 in a proffer.

Q. The question that I asked is did you inform your co-counsel that that was not the practice in the Northern District of Iowa?

A. Mr. Stowers would have known that, and I'm sure it was communicated to Mr. Berrigan.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 349    Filed 11/10/11    Page 35 of 88

Q. Did you communicate it to Mr. Berrigan?

A. I don't have an independent memory of it. I would certainly think I would have done so.

Q. And would -- you say Mr. Stowers would have known that. Why do you say that?

A. Because Mr. Stowers practiced not only in the Southern District but the Northern District.

Q. Okay. And when you basically told them that's not the way it's done here, we're going to have to proffer before we get a deal, do you remember what their reaction was?

A. No.

Q. Did it stop them, the advice that you gave them, from taking the position that they would not proffer until they had a firm deal in place?

A. No.

Q. All right.

THE COURT: I'm sorry. I'm confused about your last question. Did it stop them, the advice that you gave them, does the them refer to Mr. Berrigan and Mr. Stowers or to the department -- or to the prosecutors?

THE WITNESS: I took it to mean Mr. Berrigan and Mr. Stowers, Your Honor.

THE COURT: Okay.

BY MS. MORRISSEY:

Q. In other words, they continued to maintain their no proffer

before a plea despite your advice that we don't do that here.

A. That's my memory, yes.

Q. Okay. And did you ever discuss with Miss Johnson the wisdom of the approach that Mr. Berrigan, Mr. Stowers were taking with respect to this plea offer?

A. I probably did not, no.

Q. Okay. And why would you not tell her that if you really want to plead we're not going about it the right way?

A. I would -- I don't have an independent memory of this. I would think I would have sat down with Angela and said this is how the proffers work in this district, that you have to sit down and cooperate first before there's a plea agreement. I'm sure I wouldn't have taken a divisive approach and said let me tell you what I think contrary to what your co-counsel are doing. I would not have done that.

Q. You don't have a specific recollection of sitting down with Miss Johnson and actually going through this issue of, you know, what happens here in the Northern District.

A. I don't have an independent memory.

Q. And do you have any personal knowledge because you've -- personal knowledge of Mr. Berrigan and/or Mr. Stowers explaining to Miss Johnson what they were doing in terms of this position of we're not going to proffer until we get a plea?

A. Not unless it's reflected in their notes.

Q. Okay. So as far as we know, nobody went to Miss Johnson

and said here's what we're doing in terms of your proffer and whether you get a plea bargain before or after you proffer.

A. I can't answer that question one way or the other.

Q. Well, if there's no indication in your file that you did it and there's no indication in Berrigan or Stowers' file that they did it, do you think it would be fair to say that nobody had that conversation with Miss Johnson?

MR. WILLIAMS: Objection. Asking for speculation.

THE COURT: Overruled.

A. I don't know what indication there is or is not in my file because I know there's somewhere in excess of 40 banker's boxes. I don't believe it was in the 1,200 pages you submitted to me, and I can't speak to Mr. Berrigan's files or Mr. Stowers' files.

Q. I have an exhibit. It's 5TTT. I'm going to show it to you, sir. Is this a letter that you wrote dated June 10, 2004, to Mr. Williams?

A. I believe we discussed this yesterday, didn't we?

Q. Oh, did we? I apologize. Then we don't have to do it again certainly. Okay. I know where we were yesterday.

I'm going to put Exhibit 5UU before you. Is that a letter that you received that was written by you to Patrick Berrigan and Dean Stowers dated January 26, 2002? And could you take a look at the letter and see if it appears -- does this letter concern plea negotiations?

A. I don't believe it does. I believe it -- it discusses the

negotiations we were trying to resolve with discovery before Judge Jarvey had to enter an order.

Q. Okay. So that when -- the letter says that Pat Reinert called me to voice his concern about the status of the negotiations yesterday afternoon. In all honesty, I no longer have the time to resolve his concerns between him and us before my two trials. And then it basically talks about scheduling.

A. The reason I say that, Ms. Morrissey, is the next to last sentence in the last paragraph, obviously the goal is to have a discovery order signed since we told Jarvey that we did have some agreement between the parties.

Q. Okay. I just wanted to clarify that this is about discovery and not about plea negotiations; all right?

Okay. Exhibit 5VVV which is a letter to you dated August 12, 2004, is this a letter you recognize as coming from your case file?

A. If you'll give me a chance to look at it, please.

Q. Sure.

A. Could you move your hand, Ms. Morrissey?

Q. Yes. I'm sorry.

A. I'm sorry. I'm on that paragraph. Could you scroll down, please?

Q. Yes.

A. And turn the page, please. And could you scroll down just to the bottom of the page, please.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS Document 349 Filed 11/10/11 Page 36 of 88

Q. Yes, sir.

A. Thank you.

Q. Okay. This is basically a letter regarding what was a global plea proposal involving Honken and Miss Johnson; correct?

A. Correct.

Q. And the offer that was proposed as to Miss Johnson was a guilty plea for 20 years; correct?

A. By the government?

Q. No, by the defense.

A. Yes.

Q. Okay. Now, do you know or can you tell us, explain why after Mr. Reinert's letter in 2001 Mr. -- Miss Johnson's counsel is proposing 20 years in 2004?

A. My memory is that the mandatory life sentence was something that was unacceptable to Miss Johnson and that we were always trying to start with a term of years in the discussion. And I don't profess to be the best negotiator in the world, but I do know that whatever point you start from you're probably going to have to compromise your position. So it was start at 20. We knew Miss Johnson wouldn't accept life and see if we could get to a term of years that Miss Johnson would find acceptable.

Q. Now, let's talk about why -- your statement that Miss Johnson would not accept life. What do you base that on?

A. My memory is that a life sentence to her was not acceptable until very close to the beginning of her trial. And up until

then it was always try to get a term of years. That's my memory.

Q. And do you base that on conversations that you had with Miss Johnson on the subject?

A. At least in part, but I think I'm also basing it on conversations with Mr. Berrigan.

Q. And your conversations with Miss Johnson on this subject, did they occur in person or on the phone?

A. It could have been either.

Q. Are there notes in your file reflecting your conversations with Miss Johnson on this subject?

A. I don't know. I don't have a memory.

Q. Do you think that in your normal habit and practice as a lawyer discussions with a client regarding the acceptability of a sentence of life without the possibility of parole were reduced to writing so that you had some record to go back to?

A. My normal habit and practice regarding notes at that time would be if it was an in-person conference there would have been notes unless somebody else was there taking notes. For example, if the conference was between Miss Johnson, Mr. Berrigan, and myself and Mr. Berrigan was taking notes, I may not have taken notes. If it was a phone conversation, there probably would have been fewer notes than an in-person conference. On a subject matter like this, if there would be an in-person conference just between Miss Johnson and myself, I'd like to

think that somewhere there would be notes reflecting that.

Q. All right. And would you agree with me that probably you would not be having a telephone conversation with your client about whether she would be willing to accept a sentence of life without parole?

A. It would not have been long conversations. I mean, it might have been a situation where Miss Johnson calls and says this is what I'm thinking, but I would not -- even though with the Linn County Jail there was supposed to be attorney-client privilege when a client used the phone, I'm sure I would not have wanted to have had a detailed or prolonged telephone conversation regarding that kind of subject matter.

Q. But even if it was a telephone conversation, do you think that your practice of recording important contacts with your client should -- would have included a subject such as her willingness to accept a potential sentence in this case such as life without parole?

A. Depending on the length of the call, maybe.

Q. And if I told you that in your -- in your records there is no note of any kind regarding any personal conference or telephone conference with Miss Johnson about the subject of her not taking life without the possibility of parole, would that change your testimony that you discussed it with her?

A. I don't know.

Q. One of the other things that was said in this letter is

what we predicted, that this proposal will be formally rejected by the DOJ later in the day; correct?

A. Yes.

Q. Okay.

A. Well, later in the day. The next day at 2 p.m.

Q. Or tomorrow, okay. Now -- but then it goes on, the defense position is that Miss Johnson will cooperate against Mr. Honken but attorneys have concerns about submitting a formal proffer before the DOJ approves a plea proposal. It goes on to say that in order to forego the death penalty in this case you're going to have to change -- show a change -- a substantial change of circumstances in order for the case to be deauthorized. Do you remember that?

A. Yes.

Q. Okay. And it goes on to advise you that a newfound willingness to plead guilty isn't enough to get a case deauthorized.

A. You must be on the first page, Miss Morrissey.

Q. Yes, I am. A newfound willingness to plead guilty isn't enough for the DOJ to deauthorize a death case.

A. That's what the letter says, yes.

Q. And then Mr. Murphy essentially at this point in time says that -- gives you kind of a two-minute warning that time is running out. Do you recall that?

MR. WILLIAMS: Objection. Argumentative.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 37 of 88

MS. MORRISSEY: I'll withdraw it, Your Honor.

A. He gave a very short deadline to respond.

Q. Well, how about this paragraph that I'm going to highlight? In light of the above and the impending trial of Dustin Honken, I thought it prudent to determine one last time whether there are any terms to which we can agree to have your client plead guilty and cooperate. As you know, if Honken is found guilty and the death penalty is imposed, it will be too late for your client to request the Department of Justice to forego the death penalty against her.

A. What was the date of this letter, Miss Morrissey?

Q. The date of this letter was August 12, 2004.

A. We had negotiations continuing with the U.S. Attorney's Office right up through the beginning of Miss Johnson's trial, and we didn't get a final answer until about one week into jury selection.

Q. Well, I'm not talking about that. I'm asking you about whether or not this paragraph at the top of page 2 of this exhibit conveyed to you a sense of urgency.

A. Certainly there's a sense of urgency. What I was trying to point out was that there wasn't one last time.

Q. I'm talking about the time we are at right now, August 12, 2004, and your state of mind based on the representations that are made in this particular letter; correct?

A. There was a sense of urgency.

Q. Yes. Because once Dustin Hoffman (sic) started his trial and was convicted and was found guilty, you had no bargaining power with respect to Miss Johnson; correct?

MR. WILLIAMS: Leading. Argument.

MR. BURT: I'll withdraw it, and I can rephrase it.

THE COURT: Okay.

BY MS. MORRISSEY:

Q. Did you, once Mr. Honken had gone to trial and been convicted, have any bargaining power with respect to your client Angela Johnson?

A. I don't believe I can answer that question. That's a question Mr. Berrigan can answer, but I don't believe that's a question I can answer.

Q. Why isn't -- why is it that you can't answer that question, Mr. Willett?

A. Well, because Mr. Berrigan was in charge of the plea negotiations and because, as I explained earlier, plea negotiations continued after the Honken verdict up through the first week of jury selection in the Johnson trial.

Q. This letter was sent by Mr. Murphy to you; correct?

A. Yes, ma'am.

Q. It was only cc'd to your co-counsel; correct? Actually it wasn't even cc'd to your co-counsel. It was just sent to you.

A. I don't know what's been blacked out here by my name. I don't know if that's another fax number or what so -- but

there's no cc at the end of the letter pertaining to Mr. Berrigan or Mr. Stowers.

Q. Just so you know, I made some notes on there, and when it was going to be used as an exhibit, I blocked out my notes. So does this letter tend to indicate that at least the prosecution thought that you were in charge of plea negotiations?

MR. WILLIAMS: Objection. Calls for speculation.

THE COURT: Sustained.

BY MS. MORRISSEY:

Q. When you got this letter, did you immediately contact Berrigan and say that -- about its contents?

A. I would certainly think I did.

Q. And there was a deadline for this letter of August 13, 2004; correct?

A. At 2 p.m., yes.

Q. 2 p.m. Now, you indicated that it was -- I think earlier that it was a very short deadline?

A. The next day at 2 p.m.

Q. Given the fact that you had been actively discussing a plea since at least 2001, do you think that the ongoing nature of these plea negotiations may have played into the fact that you had a deadline of the next day at 2 p.m.?

MR. WILLIAMS: Calls for speculation.

THE COURT: Sustained.

BY MS. MORRISSEY:

Q. Okay. Did it come as a surprise to you that there would be a deadline imposed of the next day given the immediacy of Mr. Honken's trial?

A. Knowing Mr. Murphy as I have and for as long as I have, I was not surprised by his determination that there was a sense of immediacy. Now, that may not relate to the length and history of these negotiations. Mr. Murphy's the type of man who wants an answer and he wants it now.

Q. Did you, when you read this letter, think that this was something that needed to be acted on by the defense immediately?

A. Most certainly.

Q. And, in fact, did you have a teleconference with all defense lawyers on that very same day as this letter was written?

A. I don't have an independent memory, but I would certainly think I communicated with at least Mr. Berrigan if not Pat and Dean.

Q. I'm going to show you -- let me withdraw that. Do you remember a meeting that you had the next day with Mr. Rogers, Mr. Spies, Mr. Parrish, Mr. Stowers, and Mr. Murphy -- I'm sorry, it was held that same day with those individuals?

A. A meeting or a telephone conference?

Q. A teleconference, excuse me.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 38 of 88

A. And it would have been myself, Mr. Berrigan, Mr. Parrish, Mr. Spies, and Mr. Rogers from Kansas City?

Q. Yes.

A. The meeting I remember was closer to the beginning of the Honken trial, and my memory is that we saw -- we saw them in Des Moines, but I'm not saying that meeting didn't occur. I'm just trying to get my meetings in order here in my memory.

Q. Do you remember at that point any discussion of whether or not Mr. Murphy had any authority to make an offer?

A. I have no memory of that.

Q. All right. Do you have any notes in your file about this particular teleconference that you participated in?

A. I don't know one way or the other.

Q. Did you review them in the context of reviewing the 1,200 pages that were sent to you?

A. The handwritten notes that I had in the 1,200 pages didn't have any of my -- what I would call my notes file in any f -- the way I organize -- if I can answer your question by elaborating for a moment?

Q. Sure.

A. The way I organize a federal case is an Expando file with multiple subfiles, and I have a notes file, I mean a specific notes file, and none of the material submitted to me in the 1,200 pages contained, to my memory, any of my notes. I mean, I had numerous handwritten pages, but they were notes from trial.

They were witness outlines. They were notes from jury selection. They were notes from the penalty phase. I didn't see anything that reflected what I would call my notes file.

Q. You're referring to the materials that you received from us; correct?

A. Absolutely, the 1,200 pages and then the 50 additional.

Q. Okay. Well, if I told you that we had received all of the -- we had provided you all the notes that were in your file, would that help you answer this question?

A. I would --

MR. WILLIAMS: Objection. Calls for speculation. Assumes facts not in evidence.

THE COURT: Overruled.

A. I would disagree that all the notes in my file were submitted to me in those 1,200 pages.

Q. On August 13, 2004, you billed for a visit with Miss Johnson regarding plea negotiations for 1.5 hours.

A. Okay.

Q. Is that correct? Do you remember the subject matter of that meeting with Miss Johnson?

A. I could only presume the subject matter of the meeting was Mr. Murphy's August 12 letter.

Q. Do you recall any more than that, what you presume?

A. I don't have an independent memory as I sit here today.

Q. Okay. And on that same date, August 13, you also billed

for a teleconference with Mr. Berrigan and Stowers re breakdown in plea negotiations and reviewing a letter from Murphy regarding conclusion of negotiations and drafting a letter to Ms. Johnson re the same.

A. Okay.

Q. Okay. Now, the -- reviewing a letter from Murphy re breakdown of negotiations, is that in reference to the August 12, 2004, memorandum or letter, excuse me, that is marked Plaintiff's 5VVV for identification?

A. That's Mr. Murphy's letter?

Q. Yes.

A. I can only presume that it would be.

Q. Okay. You indicated on this date that you drafted a letter to Miss Johnson about the breakdown in plea negotiations reflected in the Murphy August 12, 2004, letter; correct?

A. Correct.

Q. And do you -- your office was in Cedar Rapids at the time?

A. Yes.

Q. And that was about three minutes away from the Linn County Jail where Miss Johnson was held?

A. Maybe a five-minute walk depending upon the traffic signals.

Q. Okay. So it wasn't that hard to visit; correct?

A. No.

Q. Is there a reason why you wrote Miss Johnson a letter about

the breakdown in plea negotiations instead of going down -- over to the jail to talk to her about it?

A. Did I understand your questioning earlier that there was a conference the next day and then there's the draft of the letter?

Q. No. I'm talking to you about your billing on August 13, 2004, where you billed for teleconference with Berrigan and Stowers re breakdown in plea negotiations.

A. Okay.

Q. Reviewing of a letter from Murphy re conclusion of negotiations which we take to be the August 12, 2004, exhibit that's Plaintiff's 5VVV.

A. Okay.

Q. Correct? And drafting letter to Miss Johnson re the same.

A. Okay. I thought you had told me earlier that there was a one-and-a-half-hour conference or a conference of some length with her August 12 or August 13.

Q. You billed for a conference with her at the jail re plea negotiations on that date.

A. On August 12.

Q. That's correct.

A. Then I assume the purpose of my letter was to confirm that there was this breakdown in plea negotiations, and I'm assuming that must have centered in somewhat based upon my discussion with Miss Johnson on the 12th. Do you understand my answer,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 349 Filed 11/10/11 Page 39 of 88

**Miss Morrissey?**

Q. I understand your answer. You had a telephone conference with her on the 12th; correct?

A. I thought you said it was a conference but . . .

Q. You had a conference with her on August 13. You had a teleconference with her -- I'm sorry. You didn't have any teleconference with her on the 12th.

A. Okay.

Q. Okay. You had a conference with her.

A. So I would have went to see her the next day. What I don't know, Miss Morrissey, is when Mr. Murphy faxed this letter to me. Obviously I must have received it by fax. I'm not doubting that, but I don't know at what point of the day I received the telefax. I'm assuming what happened is is I got the fax at what time I don't know. I went to see her the next morning to review this letter. There was a discussion with -- regarding the letter. There was a follow-up conversation with Mr. Berrigan and Mr. Stowers, and then there's a letter confirming basically the results of that conference back to my client.

Q. That's your assumption. But we have no way of knowing that, correct, without a paper trail?

MR. WILLIAMS: Objection. Argumentative, Your Honor.

THE COURT: Overruled.

MS. MORRISSEY: I'll withdraw it.

BY MS. MORRISSEY:

Q. Is there any way we have of knowing that it's the correct chronology based on your file?

A. I can only do that based upon the billing that you recited to me, and you haven't shown me a confirmation letter or a letter that I drafted post August 12.

Q. Okay. If there was one, I would be showing it to you.

A. Fair enough.

Q. You characterized in your billing for your conversation with Berrigan and Stowers this letter as a breakdown in plea negotiations. Is that fair to say?

A. Would you repeat the question?

Q. On August 13, 2004, you billed for teleconference with Berrigan and Stowers re breakdown in plea negotiations.

A. Okay.

Q. Okay. Would it be fair to assume that the breakdown in plea negotiations is represented by this letter dated August 12, 2004?

A. I think that'd be a fair assumption.

Q. Okay. Now, in this letter Mr. Murphy basically said, "I'm open to plead; we gotta do something about it before Mr. Honken's trial starts, and you got a deadline to get back to me"; correct?

A. Correct.

Q. And that -- that to you was a breakdown in plea negotiations.

A. I'm assuming that the breakdown in plea negotiations must have been what occurred during my conference with Miss Johnson.

Q. You had a conference with Miss Johnson, Mr. Willett, not alone but with Mr. Stowers; correct?

THE COURT: Before we get there, I hate to interrupt, but I want to make sure I understood this letter because I had to read it very quickly when it was up there. Isn't the government taking the position in this case that the only thing they would plead to -- that the only thing they would allow Angela Johnson to plead to is a life sentence?

MS. MORRISSEY: That's what it says, yes.

THE COURT: Okay. Well, when you asked Mr. Willett about the breakdown, you left that fact out. I mean, you implied they were willing to negotiate, but yeah, they were willing to negotiate but only to a life sentence.

MS. MORRISSEY: That's correct.

THE COURT: Okay. Well, I just wanted to make sure we're on -- I didn't know if you read the letter differently, that you thought the government was open to something other than a life sentence.

MS. MORRISSEY: No. It is at this point a life sentence and cooperation. That's where we are in the negotiation.

THE COURT: Yeah. I just wanted to make sure we're all on the same page. That's all.

MS. MORRISSEY: No, I didn't suggest that it was anything --

THE COURT: No, you didn't suggest that it was anything other than that, but you didn't include those facts in the question you asked. So I was wondering if I had misread the letter, if you had misread the letter, if Mr. Willett had misread the letter, and that's why I raise it, just to make sure we're on the same page. I was more worried about me misreading it because I don't have it; or if I have it, I don't know where it is.

MS. MORRISSEY: Thank you.

BY MS. MORRISSEY:

Q. Now, I am going to show you a letter that Mr. Berrigan wrote to Mr. Murphy on August 13, 2004, if I can find it regarding his proposal. But I can't find it, so I'm going to have to ask you about it. Did you remember that particular letter that Mr. Berrigan sent and cc'd to you?

A. I don't have an independent memory of it, no.

Q. Thank you. Here we go. Let me mark this as Plaintiff's Exhibit 5J just tentatively. I'm going to put this on here and ask if you recognize it as Mr. Berrigan's response to Mr. Murphy's letter of August 12.

A. Could you scroll down to past the signature line, please? And I'm sorry. What was the date of Mr. Berrigan's letter?

Q. Mr. Berrigan's letter is dated August 13.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 40 of 88

A. Okay. Thank you. And then if you could scroll down again to the bottom, I'd like to see the footnote. Thank you.

Q. Am I correct that Mr. Berrigan's response focuses on the plea proffer issue; correct?

A. And our concern that we could have a deal with the local U.S. Attorney's Office and have it rejected by DOJ in Washington, D.C.

Q. Okay. So Mr. Berrigan's response was not that we will not plead for a life sentence, negotiations are over; is that fair to say?

A. I think our position is articulated in the first sentence of the second full paragraph. For the record, our client is willing to plead guilty and cooperate with the government including giving testimony at trial in the prosecution of Dustin Honken in return for a sentence of less than death.

Q. But the paragraph before that ends as follows, does it not? The senselessness of this proposal seems so evident to us that we must assume you are not seriously interested in pleading this case even to a life sentence.

A. That's what the sentence states.

Q. And the -- it further goes on to say that Miss Johnson cannot agree to begin the process on the mere prayer that her willingness to plead guilty and testify against the father of her child to aid the government's effort to execute him will be considered and perhaps rejected?

A. And that goes to the point I was stating earlier, our concern that we could have a deal with the U.S. Attorney's Office for the Northern District of Iowa to have it subsequently rejected by Department of Justice.

Q. So does this -- you've indicated that this deadline imposed by Mr. Murphy was not the end of plea negotiations despite the fact that he said, you know, if you don't do it now, you're not going to get a plea; is that correct?

A. Correct.

Q. So you and your co-counsel considered to -- continued to attempt to proffer.

A. Attempt to proffer?

Q. Attempt to negotiate the case, excuse me.

A. Mr. Berrigan continued to attempt to negotiate the case.

Q. Do you recall what the next step is in the negotiation process as to Miss Johnson?

A. No.

Q. Did things calm down or did negotiations stop during the trial of Dustin Honken?

A. My memory is they slowed down, that -- I'm not sure negotiations ever stopped up until the point we were finally rejected the first week into jury selection of our case. But my memory is is they slowed down because during Mr. Honken's trial Mr. Berrigan and Mr. Stowers and myself occasionally would come to Sioux City to observe portions of Mr. Honken's trial relating

to specific witnesses.

Q. Well, that doesn't have anything to do with negotiations continuing, your attendance at the trial. Do you agree with me?

A. I was trying to explain it in the context of that's why I believe the negotiations slowed down because we were focusing our attention in part on Mr. Honken's trial.

Q. All right. And do you remember now when Mr. Honken's trial ended?

A. I believe Mr. Honken's trial started in August and ended in October of, I believe, 2004.

Q. All right. Did -- I have a document that I'm going to ask to be marked as -- I'll mark it as Plaintiff's WWW for identification. This is a letter from -- 5WWW for identification. This is a letter from Mr. Berrigan to the prosecutors that was cc'd to you and Miss Johnson and Mr. Stowers. And it's dated February 17, 2005. Do you recognize this letter?

A. This was in the material I reviewed this previous weekend. I would like to look at it again if I could.

Q. Certainly. Tell me when you need me to push it up.

A. Turn the page, please. Okay.

Q. This is essentially an offer of an Alford plea for Miss Johnson; correct?

A. Correct.

Q. Were you involved in the decision to offer to an Alford

plea at this point in time?

A. I'm not sure if I was involved in the decision, but it made perfect sense to me.

Q. Are Alford pleas common in the Northern District of Iowa?

A. They're not common. They have been done depending upon the judge you are in front of.

Q. And in this case before Judge Bennett was an Alford plea for Angela Johnson realistic or unrealistic in your professional view?

A. I can only say that my memory is that prior to the Angela Johnson case I have a memory of doing an Alford plea in front of Judge Bennett in a prior case. I'm not sure it ever got to the point of approaching the Court or at least the government to see if an Alford plea might be received. And what I mean by that is this: When I've had Alford pleas in federal court in the Northern District, if the government's willing to agree, at some point sort of a feeler is sent out, if you will, saying, Judge, you know, we might have an agreement, but it would be in the form of an Alford plea, and what is the Court's take on that?

Q. Okay. And, again, did you have any sense that -- what the Department of Justice policy was on Alford pleas in capital cases?

A. None.

Q. Did it make sense to you to determine what the Department of Justice policy was on Alford pleas in capital cases prior to

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 41 of 88

your team making this proposal?

A.   I would have relied upon Mr. Berrigan for that.

Q.   Do you recall discussing with Mr. Berrigan whether the DOJ is likely to accept an Alford plea in a capital case?

A.   I don't have a memory of that.

Q.   Mr. Willett, you took the -- you stated earlier that it was Pat Berrigan and not you who was in charge of negotiating the plea in this case; correct?

A.   Correct.

Q.   I'm going to mark Plaintiff's 5XYZ for lack of a better -- put it on the ELMO.  See if you recognize this letter you wrote dated December 15, 2004.

A.   I saw that letter this weekend, and I thought that was a strange letter because plea negotiations really don't seem to describe what is being relayed in the letter.

Q.   Okay.  Well, let's back up.  This is before the Alford plea that was proposed by Mr. Berrigan; correct?

A.   Correct.

Q.   And this is basically a letter from you to the prosecutor.

A.   Yes.

Q.   Confirming a telephonic conversation.  And basically you want a waiver of the death penalty on all counts and you would consent to a change of venue to trial being in Cedar Rapids contingent upon Judge Bennett continuing to preside; is that correct?

A.   Correct.

Q.   You wrote this letter?

A.   Yes.

Q.   Obviously it made sense to you at the time; correct?

A.   In the context of the second paragraph, yes.

Q.   And the context of the second paragraph is that you were negotiating for the government to file a waiver of the death penalty notice in this case.

A.   On the condition that venue would -- that we would consent to venue being in Cedar Rapids.

Q.   Did you discuss this proposal with the lawyers, the other lawyers on the case?

A.   I'm sure I would have.

Q.   Do you have any -- did you know at the time you wrote the draft of this letter whether or not the prosecution could waive death penalty in exchange for you consenting to venue in Cedar Rapids?

A.   I don't know.

Q.   I'm going to direct your attention to the proffer that was made by Mr. Berrigan in this case, the attorney proffer.  Do you -- are you familiar with that?

A.   In general.

Q.   And did you have any role in writing it?

A.   No.

Q.   Was your state of mind at the time that Miss Johnson would

agree to the facts set forth in that proffer?

A.   It was represented to me by Mr. Berrigan that she would.

Q.   That she would, in fact, enter into a plea and -- under the factual scenario set forth in the proffer.

A.   That Mr. Berrigan had prepared.

Q.   Do you have any memory of being present at any discussion with Miss Johnson and the issue of her agreement or disagreement with the proffer?

A.   I don't.

Q.   So that was something that would have been handled by Mr. Berrigan; correct?

A.   To the best of my memory, yes.

Q.   And Mr. Berrigan continued to be in charge of the negotiations until in the final analysis when trial was already started your offer to plead guilty for life without parole was rejected.

A.   We were about one week into jury selection if memory serves me right when we received news that that offer had been rejected.

        THE COURT:  Miss Morrissey, would now be a good time to take our noon recess?

        MS. MORRISSEY:  Yes, it would.  Thank you.

        THE COURT:  Okay.  We'll be in recess until one o'clock.

        (Lunch recess at 11:53 a.m.)

        THE COURT:  Thank you.  Please be seated.

        Miss Morrissey, you may continue your direct examination.

        MS. MORRISSEY:  Thank you, Your Honor.  I want to indicate for the record the exhibit that I tentatively marked as 5J should be 5XXX like X-ray.

BY MS. MORRISSEY:

Q.   Good afternoon, Mr. Willett.

A.   Good afternoon.

Q.   I'm going to move on to another subject other than plea negotiations, specifically Dustin Honken.  Did you receive letters from Mr. Honken early on in this case?

A.   Yes, I did.

Q.   And I have an exhibit that is now labeled Plaintiff's Number 10, 10, I'm going to show you.  Is this the first letter you received from Dustin Honken?

A.   Could you please scroll down?

Q.   Yes, certainly.

A.   Could you please turn the page?  There's nothing beneath his signature line I take it.

Q.   No, there's nothing except a cc to the file.  I'm not sure -- which is Mr. Honken's legal file apparently in the penitentiary.

A.   Yes.

Q.   All right.  Is this an accurate copy of the letter that you

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 42 of 88

Q. received from Mr. Honken in August of 2000?

A. It appears to be so.

Q. That was very early on in your representation of Ms. Johnson; correct?

A. Very.

Q. Okay. And basically Mr. Honken tells you that his priority is to ensure that Ms. Johnson is safe, well represented, going to walk; correct?

A. That's what Mr. Honken represents.

Q. All right. Prepared to do whatever must be done to bring out the truth of her innocence; correct?

A. That's what's stated in the letter.

Q. That he has a silver bullet for Miss Johnson.

A. That's what he represented.

Q. That he will cooperate as a defense witness.

A. That's what he articulated.

Q. That he will debrief on government witnesses.

A. That was in his letter also.

Q. And that he will -- his knowledge will be invaluable to Miss Johnson's defense.

A. That's what he represents.

Q. And he also asks that you get a copy of his sentencing transcript from Parrish. Do you understand that to be his attorney?

A. I know Mr. Parrish.

Q. Okay. Now, you -- did you send a carbon copy of this letter to Mr. Frerichs who was your co-counsel and Mr. Cornell?

A. I may have based upon his invitation to come see him in Colorado because that was not anything that I was contemplating on doing.

Q. And did you write Mr. Honken back after you received this letter some time after August 13?

A. I'm not sure if I wrote Mr. Honken back. I know at some point either after this letter -- and my memory is there may have even been a second letter from Mr. Honken to myself -- I communicated with Mr. Parrish because it's my understanding he was still being represented by Mr. Parrish basically saying, listen, ethically I don't think I should be talking to your client; tell him to stop sending me letters.

Q. We'll get there. Did you do anything to respond to this particular letter from Mr. Honken?

A. I'm not sure that I sent him a response. I don't -- my memory is is I did not send him a response.

Q. And as a result of getting this letter, did you contact Mr. Parrish and get a copy of Mr. Honken's sentencing transcript?

A. I would have contacted Mr. Parrish with a request to have your client stop communicating with me, but I did not ask for a copy of Mr. Honken's sentencing transcript.

Q. Did you ever get a copy of Mr. Honken's sentencing

Q. transcript?

A. I'm trying to remember if we got it at some point prior to going to trial with Miss Johnson. That's what I cannot remember.

Q. Okay. But you did not get it as a result of obtaining this particular letter from Mr. Honken.

A. I certainly did not do it in August of 2000 or immediately thereafter.

Q. And your best recollection is you did not respond to this letter from Mr. Honken.

A. Not to him directly, no.

Q. I'm going to show you next a memo that's been marked as Plaintiff's Exhibit 11 for identification. This is a memorandum. Appears to be to you and Mr. Cornell regarding the Angela Johnson file from your co-counsel Mr. Frerichs. Do you recognize this?

A. If I could read it first, please.

Q. Sure.

A. Could you scroll down, please?

Q. Yes.

A. Could you turn the page, please.

Q. Actually if you want to read all of it, you can, but -- well, go ahead.

A. Could you scroll down, please? Could you turn the page, please? Okay. I remember the memo.

Q. And in this letter Mr. Frerichs who -- let me back up. Mr. Frerichs obviously received a copy of the letter from Dustin Honken that's dated August 13; correct?

A. Yes.

Q. And in this memo to you Mr. Frerichs suggests that you should jump at the opportunity to interview him; correct?

A. That's Mr. Frerichs' suggestion, yes.

Q. Okay. And that this is a window of opportunity that may close in a hurry; correct?

A. Correct.

Q. And he expresses a concern that if we -- if you and he ignore Mr. Honken and he becomes desperate he may take his dog and pony show to the government in an attempt to avoid the death penalty.

A. That's what Tom said, yes.

Q. And he may decide to cooperate at some point with a death sentence hanging over his head, and an early interview of him could severely minimize the potential for later damage as a result of a decision by Honken to cooperate.

A. Correct.

Q. And then he goes on to talk about issues that arise if you decide to interview him; correct?

A. Correct.

Q. Let me ask you about Mr. Honken. Your understanding was that he had been convicted and sentenced and there was an appeal

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 43 of 88

of his sentence by the government; correct?

A. Correct.

Q. And by the time he wrote this letter, had that appeal concluded? Had Mr. Honken's appeal of his sentence been concluded?

A. I don't know if it had or not.

Q. Was he represented on appeal?

A. I think by Mr. Parrish, yes.

Q. Do you know that?

A. My memory is is that he was represented by Mr. Parrish because I can tell you what hung me up about Tom's memo was the second paragraph. I considered Mr. Honken to still be represented by Mr. Parrish, and I thought it would be unethical to do anything regarding Mr. Honken without first contacting Mr. Parrish since I considered him to be his counsel.

Q. Let's back up a bit. Did you verify that Mr. Honken was represented by Mr. Parrish as of August of 2000?

A. At some point I remember having a telephone conversation with Al Parrish where based upon my memory of the conversation it was my understanding that Al was still representing him, and my message to Mr. Parrish was tell your client to quit contacting me.

Q. Did you verify that he was represented by Mr. Parrish around the time you received this letter in August of 2000?

A. I cannot remember the time frame, but I remember having a

telephone conversation with Mr. Parrish.

Q. And you indicated that you thought that you had an ethical obligation to notify Mr. Parrish about your intent to interview Honken; is that correct?

A. Yes.

Q. All right. And you base that on your knowledge of the case law that concerns -- the case law in the context of the duties of law enforcement regarding interviewing people who are represented by counsel in case A if they want to interview that person about case B.

A. No. It was my belief that if he was represented by counsel I should not be contacting him directly, that I should ethically work through his counsel. That was my belief.

Q. Okay. It was not based on any case law regarding government agents and whether or not they're interviewing somebody on case B when they're represented by counsel on case A invokes protections of the Sixth Amendment --

MR. WILLIAMS: Asked and answered.

Q. -- raises Sixth Amendment concerns.

THE COURT: You may answer.

A. No. My decision not to contact him directly was based upon my understanding of my professional ethics in contacting an individual who did have representation of counsel.

Q. All right. Well, Mr. Honken was inviting you to contact him; correct?

A. Correct.

Q. And he was saying that he could essentially walk your client out of the courtroom; correct?

A. That's exactly what he was saying in his letter.

Q. And do you think that you had an ethical obligation to your client to take some steps to follow up on this letter from Mr. Honken?

A. I had an ethical obligation to represent my client, but in doing so I had to conform my conduct to what I understood to be my professional sense of ethics regarding another individual who was represented by counsel.

Q. And did you consider the fact that Mr. Parrish, if he had represented Mr. Honken at that time, if you had called him would have agreed to let you go talk to Mr. Honken?

A. Well, I remember having a telephone conversation with Mr. Parrish, as I stated earlier.

Q. Do you know when you had that telephone confirmation -- conversation with Mr. Parrish?

A. No.

Q. And if you had a telephone conversation with Mr. Parrish, would it be in your file? Would there be notes of that reflected in your file?

A. I don't know one way or the other.

Q. And if you had a telephone call with Mr. Parrish, did he tell you during that telephone call that he represented

Mr. Honken?

A. That's my memory, yes.

Q. And did you ask him during that telephone call if you could interview his client Mr. Honken?

A. I have a general memory that this letter was discussed with him and the invitation that he was making and from that point on nothing happened.

Q. Did you ask Mr. Parrish in this telephone call whether he would permit you to interview his client Mr. Honken who was offering information to help your client?

A. I don't have a specific memory of the details of the conversation.

Q. So you will admit, though, that if Mr. Parrish who represented him had said to you go ahead, talk to my client, you had an ethical obligation to do that.

A. That's not my memory, though. I mean, my general memory is is Mr. Parrish telling me that he represented Mr. Honken, the discussion of the letter, and from that point nothing went forward. So I'm taking from that that there was no, "Sure, Al, go ahead and travel to Colorado and see my client."

Q. Do you recall specifically asking him whether you could go to Colorado and see his client?

A. I think the conversation was in the context of, "Mister, your client has made this invitation to us," and then from there I have this general sense that that wasn't being agreed to.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 44 of 88

Q. Did you ever ask him if you could go interview his client?

A. I don't have an independent memory of asking that particular question.

Q. Do you agree with me that zealous representation of Miss Honken (sic) would entail a request to go interview Mr. Honken given the content of this letter?

A. Yes.

Q. And then I'm going to ask you to look at Plaintiff's Exhibit 12 which is a letter from Mr. Honken to you dated August 29, 2000. Do you recall receiving this letter?

A. Yes.

Q. And when you received the letter -- well, did you cc this to your co-counsel?

A. Could I read the letter first?

Q. Sure.

A. Could you scroll down, please?

Q. Yes.

A. Could you turn the page, please.

Q. Yes, sir.

A. Could you bring the top part of the page down because there's some names cut off?

Q. I'm sorry. Yes. You're right.

A. Thank you. And if you could turn back to the first page. Okay. Thank you.

Q. Is this a letter that you received some time after August

29, 2000?

A. Yes.

Q. Okay. This is a letter in which Mr. Honken expresses that he hasn't heard from you as a result of his letter dated August 13; correct?

A. Correct.

Q. And that's because you hadn't written back to him?

A. Correct, because he was represented by counsel.

Q. By the way, if you had contacted Mr. Parrish after you received Mr. Honken's August 13 letter, would you have billed for that telephone conversation?

A. I'd like to think I would have.

Q. Okay. Because that's a legitimate case activity; correct?

A. In my opinion, yes.

Q. And would you have made notes of your telephone conversation with Mr. Parrish?

A. Usually when I'm -- usually when I'm doing telephone conversations my notes are less frequent than in-person conferences, so I don't know if I would have or not.

Q. All right. So here we have Mr. Honken is telling you that he has been in contact with your client via a third party; correct?

A. Which concerned the daylights out of me, yes.

Q. And did you talk to Miss Johnson about that?

A. I have a memory that I did because I know that alarmed me

when I read that in the letter.

Q. Do you recall whether you did this by letter, over the phone, or by personal visit to the jail?

A. I don't think I would have done something like that by letter. I would think I would have done something like that either by a visit or by a phone call.

Q. All right. Do you have notes of that visit to Miss Johnson as a result of receiving this letter in your file?

A. I don't know if I have notes or not.

Q. All right. He basically talks about some of the evidence in the case and the people that are cooperating against him; is that correct?

A. Correct.

Q. He also gives you the names of various witnesses who will be able to impeach the credibility of those persons who are giving evidence against him.

A. Yes, starting at the bottom of page 1 and continuing on to the top of page 2.

Q. All right. And he actually acknowledges that your obligation is not to him but to your client.

A. Correct.

Q. And you agree with that.

A. Absolutely.

Q. And he says that he has spoken to his attorney about this matter and that we feel that the arrest of Miss Johnson is a

ploy to get her to cooperate; correct?

A. That's what he says.

Q. And his responsibility is to do as much as he can to make sure she goes home.

A. That's what he states.

Q. Did you contact Mr. Parrish after receiving this letter dated August 29?

A. My memory is that I did.

Q. Was that a second contact to Mr. Parrish regarding letters from Mr. Honken, or was that your first?

A. No, my memory is is that it was a second contact because my memory is I -- there was a communication saying, "Listen, he's still contacting me. Tell him to stop."

Q. All right. And I'm going to show you an exhibit that's been marked Plaintiff's --

MS. MORRISSEY: Just one moment, Your Honor.

Q. I'm going to show you something that's been marked Plaintiff's 12 for identification. Sorry. I take that back. Plaintiff's 13 for identification. Is this a letter that you wrote to Dustin Hoffman (sic) dated September 5, 2005 (sic)?

A. Could you scroll down, please?

Q. Yes.

A. Turn the page, please. Yep, that's my letter.

Q. All right. Now, based on this letter that you sent to Mr. Honken in which you inquire of him if he is represented by

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 45 of 88

## 853

Mr. Parrish, do you want to reconsider your testimony that you called Mr. Parrish after you received the first letter and verified the fact that he represented Mr. Honken?

A.   This letter's accurate.

Q.   This letter is accurate, okay.  So basically when -- after receiving the two letters from Dustin Honken, you wrote in September -- on September 5 to, you know, ask if he is represented by Mr. Parrish, that you need to ethically make that inquiry and may -- you would have to notify Mr. Parrish of any direct communication that you had and you also expressed concerns about being approved for his visitor list because you don't want to go all the way up there and not be able to get in; correct?

A.   You can't get into a federal prison without being on their visitors' list.

Q.   Okay.  Well, that's -- legal visits are different.

A.   No, ma'am, not in my understanding.

Q.   Okay.  My experience is different.  In any event, so this is your response to the two letters from Mr. Honken.

A.   Yes.

Q.   And nothing ethically at this point based on the information you've received from Mr. Honken would prevent you from going up to interview him; is that correct?

A.   Well, no, I disagree with you because I wanted to know what the status of Mr. Parrish's representation was.

## 854

Q.   Couldn't you have called Mr. Parrish and asked?

A.   I know that I spoke with Al at some point in time.  Obviously based upon this September 5 letter I must have spoken with Al after I authored this letter, but I remember speaking with Al.

Q.   And couldn't you visit Mr. Honken if Mr. Parrish gave his permission?

A.   If he did, but my -- but that's not my memory.  I don't have a memory of a positive affirmation from Mr. Parrish go ahead and see my client.

THE COURT:  Excuse me.  Miss Morrissey?

MS. MORRISSEY:  Yes.

THE COURT:  Doesn't the second letter from Honken to Mr. Willett indicate that he and Mr. Parrish are already working on the case should he be indicted?

MS. MORRISSEY:  Yes, it does.

THE COURT:  Well, doesn't that indicate he's being represented?  I mean, how else would you interpret it?

MS. MORRISSEY:  It does.

THE COURT:  Okay.

MS. MORRISSEY:  It does.

THE COURT:  Yeah.

BY MS. MORRISSEY:

Q.   All right.  Now, in -- as a result of your letter to Mr. Honken dated September 5, he then wrote you back on

## 855

September 12, did he not?

A.   I think you're probably right.

Q.   Okay.  I've got Plaintiff's Exhibit Number 14 on -- put up in front of you.

A.   Could you scroll down, please.  Turn the page, please.

Q.   Okay.

A.   Okay.

Q.   All right.  So Mr. Honken at this point writes you back and says, well, I've cleared you so that you can come in.  In fact, he sent you the papers with this letter, the forms to fill out to get in to visit him in USP Florence; correct?

A.   That's what his letter states.  I don't have a memory, but that's what his letter states.

Q.   Now, regarding -- does this appear to be the form that he sent you?  Yeah.  And I'm going to ask that this be marked as Plaintiff's 41.

A.   Yes.

THE COURT:  Well, you don't have to ask -- I don't understand your question.  You've already marked it.

Q.   Yes, mark it as Plaintiff's 41.  Do you see this visitor information form from USP Florence?

A.   Yes.

Q.   It's filled out by you and signed by you.

A.   It's signed by me.  I'm not sure it was filled out by me, but it's certainly signed by me.

## 856

Q.   Okay.

A.   Well, no.  It would have to be.  It would have had to have been, the typed answers.

Q.   Okay.  So -- yeah, because -- let's go back to Exhibit 14.  Did Mr. Honken's letter of September 12 answer your questions about his representation?

A.   No.

Q.   Well, did he tell you that Alfredo Parrish is not currently retained by me?

A.   That's what he said.

Q.   And did he tell you that he, Alfredo Parrish, is going to ask the Court for reappointment to my case since there are no current criminal charges pending against me -- since as there are no current criminal charges pending against me I doubt the Court will do it?

A.   That's what his letter says.

Q.   Mr. Parrish does still answer questions if I write him, but as far as I know, he is no longer appointed to represent me because of lack of criminal proceedings; correct?

A.   That's what the letter says.

Q.   Okay.  So according to Mr. Honken, there isn't a pending case, he doesn't have appointed lawyer and -- am I correct?

A.   That's what he's stating.

Q.   Okay.  And based on Mr. Honken's representation to you that he didn't have a current case and wasn't represented, did you

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

feel like you could ethically go speak to him in pursuant -- pursuant to your duties to represent Miss Johnson?

A.    Not yet.

Q.    And what ethical impediment remained to your going to see Mr. Honken who was then unrepresented and without a pending criminal case?

A.    I wasn't accepting what Mr. Honken said just because he put it in his letter.  My memory is is that I wanted to communicate with Al Parrish to see what Al Parrish said.

Q.    And when you got this letter, did you communicate with Mr. Parrish to see whether Mr. Honken was being truthful in his writing to you?

A.    My memory is that I had a couple of conversations with Al at different points in time.

Q.    Do you know whether or not you spoke with Mr. Parrish before you received this letter from Mr. Honken?

A.    I don't know if I did it beforehand, no.

Q.    And as a result of this letter to Mr. -- as a result of this letter from Mr. Honken, you testified that you didn't believe this made his visit by you something that was ethically permissible.

A.    I wasn't accepting of his representations to me yet.

THE COURT:  Well, with all due respect, as long as we've got it up there right now, he says, "Al Parrish is not currently retained by me."  Well, he was never retained in the

sense of how I understand that word.  He was court appointed. And so -- and while he's currently not court appointed, that doesn't mean that there's not an ongoing attorney-client relationship because neither being retained nor court appointed are synonymous with an attorney-client relationship.  You can have attorney-client relationship and not be retained, and you can have an attorney-client relationship and not be appointed so . . .

MS. MORRISSEY:  That's correct.

THE COURT:  So your characterization in your earlier question that he wasn't representing him I take exception with. I don't know whether he was representing him or not.  But this does not indicate to me that there was no attorney-client relationship between Honken and Parrish at the time -- even assuming that one would believe what Honken wrote, even assuming it's true, it doesn't establish that there's no attorney-client relationship in my view.

MS. MORRISSEY:  Well, I think that the ethical obligations of one lawyer, a defense lawyer such as Mr. Willett, to represent his client in this case when he is offering -- offers information, there's a tension between those and whatever ethical rules prohibit a party with representing another part -- another party who is represented.  I think it gets to be a complicated question whether the representation concerns an unrelated case.  At this point the case was unrelated.

Mr. Honken didn't have any charges.  I think that if --

THE COURT:  Unrelated?

MS. MORRISSEY:  Well, he didn't.

THE COURT:  Excuse me.

MS. MORRISSEY:  He had no pending criminal case.

THE COURT:  Only in your mind was it unrelated.

MS. MORRISSEY:  Well, I understand, but, Your Honor -- and I don't mean to be disingenuous, but if you apply to Mr. Willett the rules that are applicable to police officers, they could go up and see Mr. Honken --

THE COURT:  We're not talking about that.  We're talking about what was then the Iowa code of professional responsibility and the lawyer's obligation not to speak to a party that is -- that could be represented.  That's got nothing to do with your analogy to law enforcement.

MS. MORRISSEY:  Right.  Well, it -- this goes down kind of a long ethical road, but my questions to Mr. Willett simply concern at this point whether or not he has an ethical duty to represent his client to make prompt inquiries of Mr. Parrish and determine whether or not --

THE COURT:  Okay.  So keep asking those questions.

MS. MORRISSEY:  Okay.  Thank you.

BY MS. MORRISSEY:

Q.    You did not as a result of this letter interview Mr. Honken; correct?

A.    Correct.

MR. WILLIAMS:  Leading.

THE COURT:  Overruled.

MS. MORRISSEY:  Thank you.

BY MS. MORRISSEY:

Q.    Did you ask Mr. Cornell, your investigator, to interview Mr. Honken?

A.    It was discussed, but I never sent him there.

Q.    Okay.  Did Mr. Cornell ask you to authorize him to take a trip to Colorado to interview Mr. Honken?

A.    It -- I'm sorry.  Repeat the question one more time, please.

Q.    Did Mr. Cornell ask you for permission to take a trip to Colorado to interview Mr. Honken?

A.    It would have been discussed, but I don't think I would have given my -- I don't believe I gave my permission.

Q.    And did -- now, I'm going back to Exhibit 41.  This is the visitor information form from Mr. Honken that you signed.  The date on this form is December 12, 2000; correct?

A.    September 12, 2000, yes.

Q.    Yes.  And that is the same day that Mr. Honken wrote to you after receiving your letter dated September 5.

A.    Correct.

Q.    And because you signed this document, is it fair to say that you were at that point contemplating a visit?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 47 of 88

**861**

A. I'm not sure.

Q. Do you know why you signed the document that's Exhibit 41?

A. Probably to have the form ready if it was ever used.

Q. And the date this form was signed was the same day you received the letter from Mr. Honken; correct?

A. Can you scroll --

MR. WILLIAMS: Leading, Your Honor.

A. Can you scroll back to the top? I don't know if it is --

THE COURT: It is, but I'm going to allow a little bit of leading.

A. I don't know if it was the same date. The date of his letter and the date of this form is September 12. But I don't know -- well, now -- could I see the letter again?

Q. Certainly.

A. Okay. There's the date of his letter. Could I see the form, please? The date of the letter and the date of the form are the same.

Q. Yes, they are.

A. So what I don't know -- if you'd scroll down, please, on this form, I don't know what date I signed this form. That's what I don't know.

Q. Well, we do know that you did, in fact, fill out the information in this form; correct?

A. It certainly looks like I filled out some of it because I don't believe Mr. Honken would have known what vehicle I was

**862**

driving back in September of 2000.

Q. That's correct. You had a 2000 Impala silver; correct?

A. At that time, yes.

Q. Now, Mr. Willett, you billed on November 8, 2000, for a teleconference with Mr. Parrish. Do you recall doing so?

A. Do I recall billing, or do I recall the conversation?

Q. Well, either one. Do you recall having a conversation?

A. If there -- I said all along that I remember having two conversations with Al.

Q. All right. Do you remember having a conversation with Mr. Parrish on November 8, 2000?

A. Not independently on that date, no. I remember having two conversations with Mr. Parrish.

Q. November 8, 2000, is a bill -- your billing indicates that you had a teleconference with Parrish who says that Dustin Hoffman (sic) may be able to provide Angela Johnson with a defense if he could negotiate a life sentence in his case.

A. I'm sorry. What are you referring to?

Q. A entry from your billing and your file about a teleconference with Mr. Parrish on November 8, 2000.

A. Could you show that to me, please, because my billings are not that detailed.

Q. Yes. I have as an exhibit November 8, 2000. It's a memo to the file from Mr. Willett.

A. Okay. Okay.

**863**

Q. And is this a memo that you wrote to your file after your conversation with Mr. Parrish on November 8?

A. Yes.

Q. And he had apparently faxed you a letter of November 7, 2000?

A. That's what my memo to the file says, yes.

Q. And do you have any memory now of the content of that letter of November 7?

A. Not as I sit here at this moment, no.

Q. Okay. And I have a document that has been marked as Plaintiff's 42. Let me show this to you. Does this appear to be a letter from Mr. Parrish to you dated November 7, 2000?

A. Yes.

Q. And is that the letter that prompted your memo to the file of November 8?

A. I would certainly think so, yes.

Q. And in this letter Mr. Parrish tells you that Dustin Honken contacted me and asked that I speak with you concerning Angela Johnson's position in this case. Will you please call me at your convenience or schedule a time when you will be available to meet briefly in Cedar Rapids.

A. Yes.

Q. And there's a copy to Mr. Honken and Mr. Spies; correct?

A. Yes.

Q. All right. Let's look at Plaintiff's 15, your

**864**

communication with Mr. Parrish. By the way, I don't see in Plaintiff's 42 -- it doesn't appear there was any dis -- there had been any discussion about Mr. Parrish's current representation of Mr. Honken. Would that be correct?

A. Could you put the letter back on the --

Q. Sure.

A. -- digital camera, please. Based upon my reading of the letter, it's implied from the contents of the letter.

Q. Okay. And did you -- do you recall requesting permission of Mr. Parrish to speak to his client as a result of his client's two letters to you or three at that point?

MR. WILLIAMS: Objection. Misstates the record, and it's been asked and answered already.

THE COURT: Overruled. You may answer.

A. I have a clear memory in one of the conversations after learning that Al was representing him saying, you know, I don't want your client communicating with me.

Q. Mr. Willett --

A. I'm trying to -- I'm trying to think so I can answer your question, Miss Morrissey. I realize the question was did I ask him could I visit him. I'm assuming I did, but I don't have a memory as I sit here.

Q. And do you have a memory of what he told you regarding visiting his client who was asking you, pleading with you, to come and visit him?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

A. I'm assuming that the answer was no because it just didn't go anywhere from there, that I could not visit his client.

Q. Okay. Well, this letter that's Exhibit 42 that was sent by Mr. Parrish is basically contacting you at the request of his client; correct?

A. Yes.

Q. And the memo to the file regarding your --

THE COURT: Wait a minute. I thought there wasn't an attorney-client -- I thought you were taking the position there was no attorney-client relationship. Now you're saying it's at the request of his client. So which is it?

MS. MORRISSEY: Your Honor, I think the record is unclear as to whether there was an attorney-client relationship between --

THE COURT: Well, you just said his client, so it obviously was pretty clear to you that he was representing him at this time.

MS. MORRISSEY: I'm sorry. I misspoke then.

THE COURT: Is that a Freudian?

MS. MORRISSEY: I misspoke.

BY MS. MORRISSEY:

Q. Mr. Parrish -- well, Mr. Parrish communicated with you in the manner of somebody who was representing a client; correct?

A. That was my perception and my understanding from reading the letter that there was an implied understanding that

Mr. Parrish was still representing Mr. Honken.

Q. All right. And you made -- your memo to the file in this case basically said that you are not about to reveal Angela's position regarding her case until you found out what information it was that Mr. Honken might have for us in regards to this case.

A. Absolutely.

Q. And Mr. Parrish explained that Mr. Honken might be able to provide Angela a defense if he could negotiate a sentence of life in the case.

A. Correct.

Q. And then you said, in other words, I think he has a defense for Angela; correct?

A. That would be at least the implication from . . .

Q. I need to communicate that to Angela in person. Please copy me on this memo so I can be reminded to do that tomorrow; correct?

A. Yes.

Q. All right. So it sounded like this was fairly significant information from the perspective of a defense lawyer.

A. It could be. It had the potential.

Q. Because a defense to a capital case is no small potatoes as they say.

A. Correct.

Q. Did you ever contact Mr. Parrish to find out what

Mr. Honken may be able to say?

A. Mr. Parrish invited us to schedule a meeting, and what I'm trying to remember is I'm trying to remember a meeting.

Q. Do you recall scheduling a meeting?

A. I don't have any independent memory of a meeting as I sit here.

Q. So you can't say that you scheduled one or ever took a meeting with Mr. Parrish.

A. Correct.

Q. Did you do anything further than this memo to the file on November 8, 2000, to pursue the lead suggested by Dustin Honken's correspondence to you?

A. I'd like to -- I would like to think that I spoke with Angela about it since I put that in the memo to the file.

Q. Well, you put that in the memo to the file that you need to speak to Angela in person.

A. Yes.

Q. Do you recall doing so?

A. I don't have an independent memory as I sit here today.

Q. Okay. Let's talk about the investigation that was done in this case concerning the guilt phase; okay?

A. Okay.

Q. You retained an investigator named Mr. Cornell early on; correct?

A. Yes.

Q. And did you assign him to do any particular investigation after he was -- after funds were authorized for him?

A. He interviewed two or three witnesses, and I cannot remember off the top of my head who they were, but I remember him doing two or three interviews.

Q. And did he do two or three interviews during the whole time he was on the case, or was that just the beginning?

A. I can't remember the time frame because I know we -- it seems like we discussed this somewhat yesterday, but there came a time when I realized he had a problem with his license, and I terminated him the same day I found out about the problem.

Q. Let me just take you through his billing -- the billing records on this. On October 25, 2000, did you visit with Mr. Frerichs and Mr. Cornell and Ms. Johnson at the jail?

A. If that's what my billing records show, then yes.

Q. For about an hour; correct?

A. If that's what my billing records show, yes.

Q. And if the jail records indicate that Ms. Nevins was present also, does that make sense to you?

A. Yeah, it could, yes.

Q. Who is Rose Nevins?

A. She was an associate of Mr. Cornell's.

Q. And I'm going to show you Plaintiff's Exhibit Number 17. This is a November 8, 2000, memo from Mr. Cornell about Angela Johnson. This indicates that three memo -- memos of three of

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 349 Filed 11/10/11 Page 49 of 88

Angie's siblings were enclosed. Do you remember which memos those were?

A. As far as the siblings who were interviewed?

Q. Yes.

A. No. I do remember -- the sensitive nature sort of sparks my memory, but as far as the exact siblings, no.

Q. Now, is it correct that these interviews -- these interviews were done because there was a probable mitigation hearing required in this case?

A. That's what Mr. Cornell's memo says, yes.

Q. So would you agree that the nature of these interviews that were done by Mr. Cornell is more penalty investigation than it is guilt-phase investigation?

A. Without seeing the memos, I would agree or the -- excuse me, without seeing the interviews, I would agree.

Q. Did you ever ask Mr. Cornell to see if he could recommend any experts for you to retain in this particular case?

A. No.

Q. I'm going to show you Plaintiff's Exhibit 18 which is a mem -- a letter to you from Mr. Cornell. Could you look at that and see if you --

A. I stand corrected. I guess there was discussion regarding a firearms expert.

Q. And this is a memo from him basically telling you the issues that need to be addressed in terms of the firearms

forensic evidence in the case.

A. Correct.

Q. Okay. And he's basically saying, look, if we can get a sample of the melted metal recovered from the ditch, I can tell you whether or not it came from a Tec-9 or the SKS or another type of weapon.

A. Correct.

Q. Do you recall whether you did any follow-up regarding the issues addressed in Exhibit 18?

A. If I could read the letter again for just a second, please.

Q. The letter from --

A. No, if you keep that letter there, please.

Q. Oh, sure.

A. I just want to read it in full. And I'm sorry. Your pending question was?

Q. Good question. Do you recall whether you ever identified an expert to address the issues raised by Mr. Cornell?

A. I don't recall that I did, no.

Q. Okay. I'm going to put on display Plaintiff's 19. Do you recognize that as a memo that was prepared for you by Nancy Lanoue?

A. Could you scroll down just a little bit, please? I'm sorry.

Q. Oh, this way.

A. Thank you. Now I'm there. Thank you. Could you scroll

down, please. Could you turn the page, please. Okay. Thank you.

Q. Does that memo refresh your recollection as to whether or not any additional experts were obtained or consulted in this case?

A. In regards to the innocence versus guilt stage of the case?

Q. In regards to the guilt, yes.

A. No, it does not.

Q. Mr. Frerichs was your co-counsel at the time?

A. Yes.

Q. And you had a telephonic status hearing on November 29, 2000?

A. Absolutely.

Q. And looks like according to this memo Mr. Frerichs named three, possibly four defense experts.

A. Correct.

Q. Do you dispute the accuracy of the memo prepared by Miss Lanoue?

A. No, not at all.

Q. And do you disagree that Mr. Frerichs named defense experts at that hearing?

A. No, not at all.

Q. Did you not contact any of those four potential experts that were named by Mr. Frerichs at the hearing?

A. The only thing -- the only thing I can think of is that I

would have -- since Tom had come up with this list that I would have asked Tom to contact these experts.

Q. Okay. You didn't contact them yourself.

A. No.

Q. When did Mr. Frerichs get off the case because of his conflict?

A. It -- okay. It was pursuant to a court hearing. That was when Professor Rigg came in and made a -- sort of a cameo appearance regarding this issue of conflicts of interest, but I can't remember the date of the hearing, but there was a federal court hearing on the issue that Professor Rigg not only participated in but briefed.

Q. All right. But you don't recall when it was.

A. No.

Q. And do you recall making a funding application for a firearms expert in this case such as that suggested in the letter to Mr. -- in the letter from Mr. Cornell?

A. I don't recall one way or the other.

Q. Do you recall making a funding application for any of the four experts that were cited by Mr. Frerichs at this telephonic status hearing?

A. Could you turn the page for me, please. I'm not sure that any request was made at the time of the hearing because of the reference to judge -- could you turn back, please?

Q. Oh, I'm sorry.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 349 Filed 11/10/11 Page 50 of 88

**873**

A. -- of the reference to judge which would be Judge Jarvey in this case need to know ASAP of pathologist cost, so it may have been a situation where no motions were filed yet because the court was inquisitive of the cost of retaining such experts or one of those experts.

Q. Did you -- were you required to submit a budget with respect to the guilt-phase litigation in this case?

A. Yes, the defense team did. That wasn't a responsibility I handled, though.

Q. All right. Did you make any recommendations concerning the budget that was submitted by somebody else that any firearms, pathologists, ballistics, or crime scene experts be included?

A. My memory is is that the budget was prepared by Mr. Stowers with a great deal of input from Mr. Berrigan.

Q. Did you make a recommendation that Mr. Stowers include in the budget a firearms expert, pathologist, ballistics, or crime scene expert?

A. I don't have a recollection of that one way or the other.

Q. I am going to ask you whether or not you -- whether you recall the first time that you had identified Christi Gaubatz as a potential or probable witness against Miss Johnson.

A. We talked about this yesterday, didn't we?

Q. We probably did. Do you know when it was?

A. Well, I believe you refreshed my memory yesterday that I would have been aware of her at the time of the detention

**874**

hearing.

Q. And if I told you that on April 19, 2002, you billed for reading Gaubatz' grand jury testimony, would that sound correct to you?

A. Sure.

Q. Okay. So you knew that Gaubatz would be a witness with whatever happened in this case in the Eighth Circuit; correct?

A. Correct.

Q. And did you do any investigation as a result of your knowledge about Gaubatz's role?

A. I have a memory that there was an investigative interview done of her. Now, I may be confusing individuals. I'm not sure.

Q. You have a memory that one of your investigators, either Mr. Cornell or Mr. Gratias, interviewed Gaubatz?

A. Yes.

Q. And that interview would have generated a report that would be in your file?

A. Normally, yes.

Q. When you received on July 1, 2002, what's marked as Plaintiff's Exhibit 21, the letter from -- memo from Nancy Lanoue re Angela Johnson's theory, you knew certainly by the time you got this that Christi Gaubatz was an important witness; correct?

A. What you are showing me here makes reference to Phyllis

**875**

Proscovec. I'm assuming there must be some reference to Miss Gaubatz later on in this memo.

Q. You don't now remember what the relationship between Miss Proscovec and Miss Gaubatz was?

A. If -- and I believe we talked about this yesterday, but Ms. Gaubatz was the baby-sitter.

Q. Right.

THE COURT: Do you think it might be easier if you actually hand him the exhibit?

MS. MORRISSEY: Okay.

BY MS. MORRISSEY:

Q. Here's Plaintiff's Exhibit 21, Mr. Willett.

A. Thank you. Okay.

Q. Okay. Was any -- did you request that any investigation be done as a result of your review of that memo?

A. I can't remember.

Q. Do you recall yesterday seeing an expanded -- an Angela Johnson expanded theory dated January 7, 2003?

A. I'm sorry. If you can show it to me.

Q. Okay. This is Plaintiff's Exhibit 22.

A. Thank you. I don't remember seeing this yesterday because I don't remember seeing the pen editing.

Q. All right. Do you want to take a look at that now, please?

A. Please. Thank you. Okay.

Q. Did you initiate or ask any investigation to be done as a

**876**

result of receiving that particular memo dated January 7, 2003, from Nancy Lanoue?

A. I don't remember.

Q. I'm going to put up on the screen because this is a shorter thing, do you remember this memorandum -- it's dated October 9, 2003, from Nancy Lanoue -- basically listing persons who are in the jail who might be able to provide information?

A. If you could continue to scroll down, please.

Q. Okay. Thank you.

A. And turn the page, please. And scroll down. Thank you. And it looks like there's another page.

Q. Yes, there is.

A. Okay.

Q. Okay. Did you receive this memo?

A. Yes.

Q. And as a result of receiving this memo, did you request any investigation be done?

A. I don't believe that I would have, not at that time.

Q. And why wouldn't you have done that at that time?

A. If what was being represented by these ladies was indeed accurate, obviously the government can go interview potential witnesses just as well as we can. And I'm not sure based upon the timing of this memo that there was any sense of urgency. I mean, we knew where most of these ladies were, so I just don't have a sense of doing anything at that moment.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q. Well, for example, Mona Fuller is in jail, and she told Angie that either Reinert and/or C.J. Williams came to the jail and wanted to talk to her about Angie, and Mona said that they told her we can make your 10 grams go up to 100 grams very easily. Mona told them she had nothing to say.

A. Yes.

Q. Now, this is information that would be helpful to the defense of somebody who is facing evidence of jailhouse snitches; isn't that true?

A. Correct. I remember Ms. -- I do believe -- if I'm remembering this correct, I believe Miss Marsolek was a witness for the defense at trial.

Q. I'm asking you, Mr. Willett, about Mona Fuller.

A. Sure.

Q. And she was not a witness for the prosecution at trial.

A. Okay.

Q. She was a witness that your client was telling you please -- had information that could help her; correct?

A. That's what's represented in the memo, yes.

Q. And she was also in jail on state heroin charges; correct?

A. Correct.

Q. And the prosecution is not likely to follow up on this information because it benefits the defense, and we're presuming they wouldn't have it.

MR. WILLIAMS: Objection. Leading and presu --

and . . .

MS. MORRISSEY: It's leading.

THE COURT: Rephrase, please.

MS. MORRISSEY: Yes.

BY MS. MORRISSEY:

Q. Is the information about Miss Fuller something that would interest the government in pursuing?

A. I'm sorry. Is the information regarding Miss Fuller what?

Q. Something that would be pursued by the government.

A. One would not think so since Ms. Fuller didn't wish to speak to the government.

Q. Well, Miss Fuller said the government threatened her and that she told them she had nothing to say.

A. I'm sorry. I thought your question was was Miss Fuller somebody the government would be pursuing information on.

Q. I'm sorry. Let me back up because you -- I'm asking this question because you testified that you didn't follow up on this because it was something the government could do themselves or you found -- said there was no sense of urgency. Is that --

A. There was no sense of urgency, and obviously what I meant to say if it wasn't clear earlier is the government has -- I mean, the government can go interview witnesses just as we can go interview witnesses.

Q. Okay. And my question to you is is this woman, Mona Fuller, with the information that she has to provide a witness

that the government would likely pursue assuming the government knew about it?

A. One would not think that the government would pursue Miss Fuller as a witness because she says she told the government she had nothing to say.

Q. All right. You weren't interested in following up by an interview of Mona Fuller to see if there were pressures put on jail inmates to testify or give evidence against your client.

MR. WILLIAMS: Objection. Leading.

THE COURT: Overruled.

A. I don't have a memory, so I can't say that I was uninterested or disinterested. I don't have a memory.

Q. Do you know whether or not you conducted -- you or the team conducted any investigation of Sue Marsolek?

A. I know we did because she was a defense witness at trial.

Q. All right. What about Valli Williams? Do you know if you did any investigation about Valli Williams?

A. I think eventually we did, but it wasn't in the context of this memo.

Q. Okay. And what about Shelly Jenney? Did you do any investigation regarding Shelly Jenney?

A. I just don't remember Miss Jenney. That's just not a name that's sparking any memory in me.

Q. I'm going to show you Plaintiff's 24, a letter from you to Patrick Berrigan.

A. Okay.

Q. This indicates that you copied the memorandum that's been marked as Plaintiff's 23 to Mr. Berrigan basically saying based on these comments that were supposedly made to our client's Linn County Jail cellmates I believe that we may need to do some investigative work and start being aggressive in regards to who the government is approaching in this case.

A. Yep.

Q. And at least on October 9, 2003, that was your reaction to seeing Miss Lanoue's October 9 memo.

A. Yes.

Q. And is there -- you were lead counsel in this case; correct?

A. Yes.

Q. You were in charge of the guilt phase; correct?

A. Yes.

Q. Why would you be telling Mr. Berrigan that you may need to start investigating and being aggressive in regards to who the government is approaching in this case?

A. It was -- to a certain extent it was a team approach. Mr. Berrigan had vast more experience in murder cases than I did, and I wanted his input and his counsel.

Q. Okay. Do you know whether or not Mr. Berrigan did anything as a result of your memorandum to him?

A. I don't have an independent memory as I sit here what his

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 52 of 88

response to my letter was.

Q. The guilt-phase investigation at the time this -- well, at least in 19 -- 2004, the guilt-phase investigation was taken over in spring of that year by Mr. Gratias; correct?

A. If that's the time frame. I have no reason to doubt you.

Q. And who supervised Mr. Gratias's activities in this case? Was it you, or was it Mr. Berrigan?

A. Mr. Gratias would always report to me. Now, there may have been tasks given to him by myself or Mr. Berrigan, but Mr. Gratias would always at least keep me in the loop and report to me.

Q. Okay. And that was because you were the lead counsel in this case; correct?

A. And based upon our long history together of working in previous cases.

Q. And because you were responsible for the guilt phase of the case.

A. Yes.

Q. I'm showing you Plaintiff's Exhibit 25. Mr. Gratias wrote a letter to you and the others, the other lawyers, April 23, 2004, basically said, "I've completed a small amount of investigation in this matter. If you have anything that you want investigated, background checks or people contacted, please give me a list of things you want done, and I'll do them."

Do you recall anybody providing Mr. Gratias with a

list of things to do in response to this letter?

A. I specifically recall -- and this isn't a list, but I specifically recall an event where Mr. Berrigan, Mr. Stowers, myself, and Mr. Gratias rode in Mr. Stowers' vehicle to Mason City to walk the two crime scenes.

Q. Okay.

A. And the Mason City Country Club and a home that Angie used to live in. I believe it was in Clear Lake, and we basically took a half day or a little more than a half day and toured those different locales.

Q. And that is your recollection, your best recollection, of the investigation that was done as a result of Mr. Gratias's letter in essence saying please contact me; I'm available.

A. That's one example that I can give you that I have a memory of.

Q. Okay.

A. I'm not saying that that's the sum and substance response to his request in his letter.

Q. I'm going to show you a letter from Mr. Gratias that's Plaintiff's 27. Could you look at this letter and see if you recognize it? Have you seen it before?

A. Could you scroll down, please?

Q. Yes.

A. Could you scroll down, please? I assume there's a second page? Could you -- I need to see the top of the letter if I

may.

Q. I'm sorry.

A. Okay.

Q. All right. And this letter which is Plaintiff's 27 essentially lists quite a number of witnesses that Mr. Gratias obtained from a visit to Angela Johnson; correct?

A. Yes.

Q. And obviously if a client in your -- in a case, even a non-capital case, even gives you a list of witnesses, your obligation as a lawyer is to check out that list; correct?

A. Yes.

Q. Do you know whether or not there was an attempt made to interview each of the witnesses named on this list dated July 12, 2004?

A. As I reviewed the list, it seemed to me that some of those people may have been individuals that Mary Goody interviewed. So I'm not sure how the list was split up and who Mr. Gratias may have seen and who Ms. Goody may have seen.

Q. Do you know whether anybody interviewed Nancy Bradshaw?

A. Could I see the memo to see what the reference was to her?

Q. Sure.

A. I see it. Thank you.

Q. Okay.

A. I don't have a memory of Ms. Bradshaw.

Q. Carol Meters.

A. I don't have a memory of Miss Meters.

Q. Shelly Jenney.

A. Waterloo. The name's familiar, but I can't remember the context.

Q. What about Terrie Eliason?

A. I'm not sure about Terrie Eliason.

Q. What about Mona Fuller?

A. I'm not sure.

Q. What about Eva Hanawalt? I'll withdraw that. That was -- she testified at trial. What about Lisa Hovden?

A. I'm not sure.

Q. What about Lenette Riley?

A. Is she on the next page?

Q. Yes.

A. Could I see the reference, please?

Q. Up here.

A. That name is familiar to me, but I cannot remember the context.

Q. What about Linda Lunning?

A. Again, based upon the description that they're friends of Angie's and they worked together both from Mason City, there's a familiarity there to me, but I'm not remembering the context.

Q. What about Bruce and Donna Mobley?

A. I don't have a memory.

Q. What about Tim Cutkomp?

A. Well, he testified in trial obviously as a government witness, and I can't remember -- I can't remember if any effort was made to speak to him. We had grand jury testimony from Mr. Cutkomp. There would have been interviews of Mr. Cutkomp in the discovery file. I can't remember if there was an independent effort to interview him.

Q. Okay. I'm going to show you Plaintiff's 28 which is a letter from Mr. Gratias to Mr. Berrigan. Was this letter cc'd to you? Do you recall seeing it?

A. Can you show me the bottom of the letter, please?

Q. It doesn't have a cc on it.

A. Okay. Okay.

Q. Okay. Let me ask you, this letter says that he also wrote to Al. It is my recollection that Nancy has spent quite a bit of time with Angela and she was going to put her conversations in writing and Al was going to get -- going to get that forwarded to us. I have not yet received -- I've not received that yet, and Dean says that he has not either. I wrote Al and asked him to forward that to us.

Do you recall any correspondence to you regarding obtaining Nancy Lanoue's notes about her conversations with Miss Johnson?

A. Not as I sit here at this moment.

Q. Do you recall whether or not you asked Miss Lanoue to write up her notes and share them with the defense team because they

might contain information?

A. If I would have received an inquiry like that, I would like to think I would have responded to it and had Nancy do that and have her go ahead and forward that out.

Q. Because it's true that -- it's correct that Ms. Lanoue was spending a lot of time with Ms. Johnson.

A. That is correct.

Q. I'm going to show you Plaintiff's 29 which is an e-mail from Nancy Lanoue to Gordon Gratias.

A. Could I see the top of the e-mail, please?

Q. Yes.

A. Thank you.

Q. Did you see this? You don't appear to be cc'd on it.

A. Could you scroll down, please?

Q. Yes.

A. Turn the page, please. Thank you. And the question was had I seen a copy of this memo.

Q. Yes.

A. I'm not copied on it. I'd like to think that I did, but I'm not copied on it.

Q. Do you recall whether or not the investigation that Miss Lanoue relays from Miss Johnson to Mr. Gratias was ever done? That is, was Christi Gaubatz interviewed, Kathy Rick interviewed? Was Tim Cutkomp interviewed? Was Valli Williams interviewed? Was Dawn Hanawalt interviewed? What about Brandy

Byrd, Linda Burgess, Sara Bramow?

A. I believe Christi Gaubatz was. I believe Kathy Rick was. I'm not sure about Mr. Cutkomp. Valli Williams, I'm not sure that she was interviewed because that became problematic later because of my client conveying information to Ms. Williams. I believe Dawn Hanawalt was a defense witness at trial. Brandy Byrd was most certainly a defense witness at trial. I can't remember if Deputy Burgess testified at trial, but I remember Sergeant DeSotel, another Linn County deputy correction -- sheriff and correctional officer -- could -- thank you -- testified at trial. Sara Bramow testified at trial.

If you want to scroll down, please. I'm sorry. Could you -- I need to see the bottom of the page that you have there right now. Thank you so very much. Okay. Now if you'd turn the page for me. Okay. I think I answered your questions regarding the itemized -- or the listed individuals there.

Q. Okay. But the question was were these people interviewed, investigated? Was Kathy Rick interviewed, investigated by you?

A. My memory is yes.

Q. Okay. Was Tim Cutkomp interviewed, investigated by you?

A. I'm not sure. My memory on Christi Gaubatz is yes.

Q. Okay. And Valli Williams and Dawn Hanawalt and Brandy Byrd we've talked about. What about Linda Burgess? Was she investigated by you?

A. I think Deputy Burgess was spoken to, but -- but it was --

but I'm not sure she was a witness at trial. I remember Sergeant DeSotel being here.

Q. We're talking about investigation regarding Linda Burgess. Your answer is that you think she was.

A. Yeah. Can you do me a favor? You've either gotta hand me that exhibit or leave it up there because I'm trying --

Q. Okay. I'm sorry.

A. I'm really trying to answer your questions, and I'm trying to catch a moving target.

Q. I apologize.

A. Thank you. Now, did I answer your questions, Ms. Morrissey?

Q. Yes, you did.

A. Okay. Thank you.

Q. Mr. Willett, did you ever tell Mr. -- Ms. Johnson that she should only answer questions that she's asked and never volunteer information?

A. In what context?

Q. In the context of talking about this case.

A. Well, I'm sure that I told her before Bobby McNeese not to be talking to anybody about this case except her lawyers, and I'm sure I repeated that advice time and time again when we'd see references to jailhouse snitches and other female cellmates saying Angela told me this or that.

Q. The question was did you ever tell Miss Johnson that she

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 3:09-cv-03064-MWB-LTS Document 349 Filed 11/10/11 Page 54 of 88
*to purchase a complete copy of this transcript.*

## 889

should only answer the questions that you asked.

MR. WILLIAMS: That wasn't the question, Your Honor, and the context of the question is vague at best, and I object to it.

THE COURT: Yeah. You asked a question different, so why don't you start over again and ask your question.

MS. MORRISSEY: All right. May I just have a moment, Your Honor?

THE COURT: Yes.

MS. MORRISSEY: I'm going to go on to another topic, Your Honor, for the time being. Sorry.

THE COURT: That's fine.

BY MS. MORRISSEY:

Q. Okay. I'm going to show you Plaintiff's Exhibit 43. Would you look at this and see if you recognize it.

A. Yes. That's the trip I was referring to earlier.

Q. Yes. This is the trip you made to the various scenes in the case; correct?

A. Yes.

Q. What I'd like to ask you about is the following. Our specific investigative request is due to Gordon by 10-25-04 so he can organize for our trip and plan on which witnesses should be interviewed when.

Do you recall an investigative request being submitted to Mr. Gratias?

## 890

A. By me or my -- by me?

Q. By you.

A. I don't believe so.

Q. Okay.

A. What was important to me was to be able to view these scenes.

Q. But do you recall yourself submitting an investigative request to Mr. Gratias?

A. No. And in this context, I've known Gordy long enough, I would have just picked up the phone if I did that.

Q. All right. Well, it appears from this exhibit that at least Mr. Berrigan was contemplating a specific investigation request to be submitted to Mr. Gratias; correct?

A. Correct.

Q. And your testimony is you didn't do that.

A. I don't have a memory of doing that.

Q. As lead counsel in charge of guilt investigation, would that have been something that you would do?

A. My memory of this trip -- and I'm trying to answer your question. My memory of this trip is what was important to me was to view these scenes, and I'm not sure if I had a wish list for witnesses on that trip or not. I have a memory that we may have very well spoken to -- she had an unusual name. It was Angie's supervisor at the Mason City Country Club, Ms. Vanderlene?

## 891

Q. Vanderpool.

A. Vanderpool. Thank you so much. My memory is we may have talked to her when we were touring the Mason City Country Club on that visit. But what was important to me on that trip was to view these scenes.

Q. If there had been an interview of Ms. Vanderpool, would there have been a report generated?

A. I would like to think so.

Q. Oh. This also indicates Mr. Berrigan's comment that he was somewhat encouraged that the jury was out two days on Dustin's first-phase verdict. This may bode well for him in his penalty phase.

A. That's what it says.

Q. Okay. Did you share that sentiment?

A. I'm pess -- I'm pessimistic by nature, so I don't know if I shared that sentiment.

Q. All right. All right. I'm going to . . .

MS. MORRISSEY: May I have a moment, Your Honor?

THE COURT: You may. Would a short recess be helpful?

MS. MORRISSEY: It would. Thank you.

THE COURT: Okay. It is 2:30. We'll take a 15-minute recess until 2:45. Thank you.

(Recess at 2:30 p.m.)

THE COURT: Thank you. Please be seated.

MS. MORRISSEY: May I, Your Honor?

## 892

THE COURT: You may.

MS. MORRISSEY: Thank you.

BY MS. MORRISSEY:

Q. Mr. Willett, we found what I was looking for. I'm going to put Plaintiff's 44 before you. Is this -- do you recognize this to be the handwriting of Nancy Lanoue?

A. It's Lanoue.

Q. Lanoue, excuse me.

A. Could you start with the top? Thank you.

Q. Yes.

A. Okay. Yes, that's Nancy's handwriting.

Q. And this -- at the top appears to be her travel notes of time spent traveling to Eldora to see Miss Johnson?

A. Right.

Q. And then it's a review of government discovery file, disk Z whatever; right?

A. Yes.

Q. Miss Lanoue is very careful and kept notes of the discovery that she reviewed with Miss Johnson; correct?

A. Yes.

Q. At the bottom of this there are a series of stars, and then it appears that Angie tells Nancy she may -- she has followed Al's advice and only answered questions he has asked. N.D.L. -- that's Nancy D. Lanoue; right?

A. I can't remember Nancy's middle name, but it's Nancy D.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Lanoue, yes.

Q. Okay. Knows most but not all. Angie says she is just waiting for someone to come and ask her story from start to finish. Do you remember getting information to that effect from Miss Lanoue?

A. No.

Q. All right. Okay. Those notes were dated October 28, 2004. On November 4, 2004, did you and Mr. Berrigan visit Miss Johnson in jail for about 1.8 and 1.7 hours respectively?

A. Which jail?

Q. In the Hardin County Jail.

A. My memory is that Mr. Berrigan and I made a trip there, yes.

Q. Okay. And did you both take notes during that trip and have those notes transcribed?

A. Transcribed by a typist?

Q. Transcribed by a typist.

A. I don't remember if I took notes. I would think Pat would have. It seems unusual to me that the step would have been taken to have a transcriptionist type up our handwritten notes.

Q. I'm going to show you what's been marked Plaintiff's 30 and ask you if you recognize this, these -- this transcription of notes of what appears to be a jail visit with Angie, Pat Berrigan, and Al on 11-4-04.

A. Okay. Now I see how you're using transcription. I was

thinking of something much more formal.

Could you scroll down the page, please.

Q. Yes.

A. Could you turn the page, please. Could you turn the page, please, if that --

Q. No, there's a little bit more.

A. Okay. Thank you. Okay. Turn the page, please. Could you scroll down the page, please. Is there another page?

Q. Yes, there is.

A. Okay.

Q. All right. Does it appear based on Exhibit 44, just this, and 30 --

A. Could you put 44 back up for a second, please?

Q. Yes. This is the one --

A. Okay. Thank you.

Q. Okay -- that Nancy related Angie's message to you on -- that she received on October 28 and then on November 4 you and Pat Berrigan were both down at the jail to talk to Miss Johnson about her story from start to finish?

A. It certainly appears to be a chronology of events.

Q. Okay.

THE COURT: And where would I find this document on my exhibits?

MS. MORRISSEY: It -- on your exhibits this would be in the Russ Stetler file which is RS7--

THE COURT: Just hang on here. What's the first subfolder?

MS. MORRISSEY: Tab 7.

THE COURT: No, the first subfolder.

MR. HAMOUDI: Master witness folder.

THE COURT: No, that's -- no. Master chronology binders?

MR. BURT: Judge -- it's --

THE COURT: I can't hear you, so let's just -- hold it. You're not familiar with the subfolders?

MR. BURT: Judge, it's the plea binder.

THE COURT: Okay. That's the first subfolder, plea binder. Then?

MR. BURT: And this is -- RS7383.

THE COURT: RS7383?

MR. BURT: Correct.

THE COURT: Thank you.

MR. BURT: You're welcome.

THE COURT: You can continue your examination.

MS. MORRISSEY: Thank you.

BY MS. MORRISSEY:

Q. All right. And let me just ask you, I'm putting up here Plaintiff's Exhibit 31. Have you ever seen this before which appears to be Pat Berrigan's transcribed notes about the visit with Angela on November 4, 2004?

A. My memory is that I have.

Q. Do these exhibits, 30, 31, and 44, refresh your recollection as to whether or not Nancy Lanoue told you that Miss Johnson followed your advice and only answered questions that you've asked?

A. That's -- that's the one part that does not track with me, and I don't understand the context, and I don't understand the reference. And so that's -- I can't -- I can't agree with that or -- that doesn't make sense to me.

Q. All right. The second part of that message that Angie says she is just waiting for someone to come and ask her her story from start to finish, based on the Exhibits 30 and 31, does it appear that you received that message from Miss Lanoue?

A. Yes.

Q. On January 21, 2005, you billed for a conference with Gordon Gratias regarding innocence/guilt-phase witnesses to interview for .8 hours.

A. Okay.

Q. Do you remember -- have any memory of the subject matter of that meeting with Mr. Gratias?

A. Not as I sit here at this moment, no.

Q. And a team meeting on January 28, 2005, in which you participated. Do you recall a discussion of defense witnesses to interview?

A. And I'm sorry. The billing reference was January 28, 2005?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 56 of 88

Q. January 28, 2005.

A. And what was the description?

Q. Well, this was a meeting for which we have notes by Mr. Berrigan that Al, Dean, Scott Gratias, Nancy Lanoue, and Berrigan were present.

A. And you're asking if I have a memory of defense witnesses being discussed at that meeting.

Q. Yes.

A. Not as I sit here, no.

Q. Let me show you Exhibit 34 and see if this helps you remember this particular team meeting on November 28, 2005. Specifically does it name defendant's witnesses Sara Bramow and Christi Gaubatz?

A. Yes.

Q. Were they defendant's witnesses in this case, or were they prosecution witnesses?

A. I'm not sure as to either one. My memory is they both testified during the course of the trial. I can't remember in whose case in chief they came in under.

Q. Well, Sara Bramow was a jailhouse snitch. She wouldn't have been somebody you called; right?

A. Correct, so I believe both of those ladies would have been government witnesses.

Q. Was your strategy in terms of defending the guilt phase to rely on discovery instead of presenting an affirmative

guilt-phase defense yourself?

A. I guess I'm confused by what you mean by affirmative. I mean, I understand what you're saying by discovery, in reviewing the government's discovery file, but what do you mean by affirmative?

Q. Well, by calling defense witnesses.

A. Well, I believe we did call defense witnesses.

Q. At guilt phase?

A. I guess I'd have to see.

Q. If I told you that you didn't call any defense witnesses at guilt phase, would that help?

A. Not necessarily.

Q. If you had known of a helpful guilt-phase witness, would you have put that witness on?

A. Certainly.

Q. Now, the discovery in this case consists of tens of thousands and thousands of pages; correct?

A. Indeed it does.

Q. And you indicated that you trusted Nancy Lanoue to review this discovery with Miss Johnson.

A. Yes.

Q. And Nancy was a competent person?

A. Absolutely.

Q. And she was not overbearing?

A. That is not her normal personality, no.

Q. And is she or is she not a bully?

A. I've never considered Mrs. Lanoue to be a bully.

Q. And is it correct that Mrs. Lanoue spent more time with Mr. -- Miss Johnson than any of her lawyers did?

A. That would be true.

Q. If I told you that her billings for her review of discovery with Miss Johnson total 335.4 hours, does that sound about correct to you?

A. I wouldn't be in any position to dispute it.

Q. And do you know approximately how much time you spent reading discovery in this case?

A. No.

Q. If I told you you billed for 91 hours, would that -- does that sound correct?

A. I would think so.

Q. Can you happen to have any estimate as to the time, total time, you visited Miss Johnson in the jail in this case?

A. I have no idea.

Q. If I told you it was 59.3 hours, does that sound about right?

A. I would have no reason to dispute it.

Q. And what about telephone calls from Miss Johnson? Can you estimate the total time you spent on the phone with her?

A. No.

Q. If I told you it was 24.2 hours, does that sound about

correct?

A. I have -- again, I have no reason to dispute it.

Q. Were any motions in limine found in the case -- filed in the case?

A. There was -- and I remember this from going over the material this weekend. There were a couple issues where we filed motions in limine, but there was not what I would call a traditional motion in limine filed prior to the beginning of this case.

Q. Was there a reason for that?

A. Yes.

Q. And what was the reason?

A. Mr. Williams had the advantage of trying this case once already. It was a team decision that by filing a traditional motion in limine we might be giving some indication as to where the defense was going, and we didn't want to do that.

Q. Did you agree with that joint defense decision?

A. Eventually.

Q. What about jury selection? Was that a effort of all three lawyers?

A. Yes.

Q. And were there any disagreements that arose during jury selection?

A. There was one.

Q. And what was that?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 57 of 88

A. That was a disagreement between me and Mr. Berrigan.

Q. About what?

A. Mr. Stowers participating in voir dire.

Q. And did you want his participation or not want his participation?

A. I did not.

Q. And did -- why was that?

A. I didn't think Mr. Stowers was connecting with the jurors during voir dire.

Q. What do you mean he wasn't connecting?

A. His personality.

Q. And for that reason you didn't want him to do voir dire?

A. And he seemed to exhibit some inexperience.

Q. And what was Mr. Berrigan's position on Mr. Stowers' participation?

A. That the jury would be seeing Mr. Stowers during the penalty phase and for selected witnesses during the innocence-versus-guilt phase and the jury needed to get to know Mr. Stowers.

Q. And did you go along with Mr. Berrigan's judgment?

A. After a period of discussion I acquiesced.

Q. And I believe you said that -- and maybe I'm wrong -- that Mr. Berrigan because of his experience in death penalty cases took the lead at least in jury selection in this case.

A. Yes, that would be true. He was basically the lead

attorney during jury selection.

Q. And let me ask you about -- there was a change of venue motion filed in this case; correct?

A. Yes.

Q. Was that motion or did you consider re-raising that motion during or after jury selection?

A. It was discussed early on, and then the decision was made that we were satisfied with this jury and the motion was no longer pursued.

Q. Okay. So your testimony is that you did not believe that there were any problems with selecting an impartial jury based on the responses that you heard in court.

A. I wouldn't say that there weren't any problems. There was a collective decision made that we had the best jury panel that we could have achieved, and it was decided that the motion for change of venue would no longer be pursued.

Q. Were there a couple of days during jury selection where you didn't seat any jurors at all?

A. Two consecutive days where not one juror was impanelled.

Q. And not one juror was impanelled because they were disqualified for issues of case knowledge, bias, prejudgment.

A. Many issues. I can't -- but many issues.

Q. Let's -- you gave the opening statement; is that correct?

A. Yes.

Q. And was that a -- who prepared the opening statement?

A. I think I had an initial draft and then Mr. Berrigan assisted me with rewrites.

Q. Okay. And when was it prepared? Was it, you know, waiting for jury selection to end, or was it a last-minute thing?

A. It wasn't last minute. It was certainly somewhere in between, but it was not a last-minute job.

Q. Okay. And you delivered the opening statement?

A. Yes.

Q. And was it an opening statement that you had produced physically, or did Mr. Berrigan produce it and give it to you?

A. No. I think it was one of those things where I had an initial draft. He had suggested revisions. I would incorporate those, so, I mean, I had Nancy here with me then. Nancy would have been typing the revisions.

Q. Okay. So that Mr. Berrigan gave you suggestions, and you incorporated them.

A. I think for the most part. I don't think there were too many that I -- I don't remember too many times where I would turn something away and say, no, let's not bring that up.

Q. As a matter of work product, was the opening statement largely yours or largely Mr. Berrigan's or a collaborative effort?

A. It was a collaborative effort.

Q. In the opening statement you announced your mere presence defense; correct?

A. Yes.

Q. And I believe you testified that Angela had never admitted being present at the scene; is that --

A. If that's what the transcript shows.

Q. Well, no. This is Angela Johnson's discussions with you, her lawyer. Did she ever admit to you to being present at the scene?

A. Okay. I'm confused by the question. First your question was about my opening, and now we're switching to what Angela told me, so I want to make sure I answer your question correctly.

Q. That's correct. I'm switching. You announced a mere presence defense in opening.

A. Yes, yes.

Q. And what I'm asking you now is whether or not Miss Johnson ever told you that she was merely present.

A. My -- and I can't remember what I said in my opening, but my memory from day one has been Ms. Johnson never admitted her guilt in any of those five murders, never, ever.

Q. What about her presence?

A. I can't remember.

Q. To the best of your knowledge, Mr. Willett, was Miss Johnson advised before opening statement that the defense in her case was going to be mere presence?

A. As far as I know, yes.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 58 of 88

Q. Did you advise her?

A. I don't remember how it was done. I don't have an independent memory as I sit here.

Q. So you don't have an independent memory of advising her yourself.

A. Not as I sit here.

Q. At --

A. The only thing I can tell you is I remember there were some jailhouse visits with Ms. Johnson at the Woodbury County Jail before trial, and I'm assuming those types of issues would have come up at that time.

Q. Well, who visited her at the Wood (sic) County Jail before trial?

A. I remember there was one occasion that I can think of where Mr. Berrigan and I were there.

Q. And was there any other visit that you remember that could have resulted in this disclosure to Miss Johnson?

A. Not as I sit here at this moment.

Q. Let's talk about the division of labor at guilt phase. I believe you -- correct me if I'm wrong that there was a division of lawyer -- division of responsibilities between lawyers; correct?

A. Yes.

Q. And were -- was the division of responsibility fairly equal?

A. I tried very hard to make it so, yes.

Q. Okay. So you're the one that assigned the tasks to the various lawyers?

A. And there was certainly discussion back and forth. I mean, it was a democracy if somebody wanted to suggest something. There were basically three categories. I had cops and snitches. Mr. Berrigan had anybody that was -- basically could potentially be a witness that he might see again in the penalty phase so, for example, family members, victims. Mr. Stowers was basically experts.

Now, there was give and take. There was give and take to those categories, and, you know, it wasn't -- for example, I made the decision that Mr. Berrigan should cross-examine Bobby McNeese, and that was a switch.

Q. And you said that you did that because you felt you had too many -- had a personal animus towards Mr. McNeese that might interfere with your ability to be effective?

A. Yeah, I was afraid I'd lose my temper and not have a focused cross-examination.

Q. Now, there were approximately 50 -- there were 50 witnesses who testified at the guilt phase.

A. Okay.

Q. You accept that?

A. I'll accept that.

Q. You ended up cross-examining nine witnesses.

A. Okay.

Q. Do you accept that? Stearns, Mizell, Christi Gaubatz, Cobeen, Graham, Cutkomp, Bramow, Hoover, and Baca.

A. Okay.

Q. Okay. How did it come to pass that you cross-examined only 9 of 50 witnesses?

A. I'm not sure.

Q. It was just the luck of the draw?

A. I wouldn't say it was the luck of the draw, no, but I don't know how it ended up that I had 9.

Q. You cross-examined Christi Gaubatz; correct?

A. Yes.

Q. Did you ask Miss Gaubatz on cross-examination about the occasion she attacked Miss Johnson over Martin Cole in June of 19 -- that she attacked Miss Johnson over Martin Cole?

A. I don't have an independent memory as I sit here.

Q. Do you have an independent memory if there was discovery showing Miss Gaubatz attacked Miss Johnson physically and then attacked her husband Martin Cole and then had Martin Cole arrested?

A. I remember discovery that -- and I think I've got the scenario right. Miss Gaubatz had been formerly married to Martin Cole; correct?

Q. Yes.

A. Martin Cole had a relationship, if you will, with Miss

Johnson; correct?

Q. Yes.

A. What I remember the -- the reason I remember it is Ms. Gaubatz then became friends with Ms. Johnson notwithstanding Miss Johnson's relationship with Mr. Cole which contributed to the breakup of Ms. Gaubatz's relationship with Mr. Cole.

Q. Yes. Did you ask Miss Gaubatz about the fist fight that she had with Miss Johnson during the period of time where she was seeing Mr. Cole?

A. I don't have an independent memory as I sit here today.

Q. When you cross-examined Miss Gaubatz on the issue of Dustin Honken, did you ask her whether she genuinely disliked Honken and believed that Honken genuinely disliked her?

MR. WILLIAMS: Your Honor, I would object. Counsel started this hearing two days ago with asking the Court to take judicial notice of the transcripts of this trial. The exercise of asking Mr. Willett without the benefit of having that transcript in front of him what he recalls his cross-examination frankly is a waste of time. The record will say what the record says about what he did.

THE COURT: I'm going to sustain the objection, but I'm going to allow you to ask him why he didn't do certain things, but to expect him to remember everything he did in cross-examination is kind of unrealistic.

MS. MORRISSEY: I agree, and I --

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 349 Filed 11/10/11 Page 59 of 88

THE COURT: But I think you're certainly entitled to explore with Mr. Willett anything that the current defense team thinks he should have done that he did not do.

MS. MORRISSEY: Thank you. And the Court's --

THE COURT: And if he actually did it, I'll figure that out when I go back through the transcript.

MS. MORRISSEY: Right, right. And I --

THE COURT: Is that an okay --

MS. MORRISSEY: That is perfectly fine, and it will take less time.

THE COURT: Okay.

MS. MORRISSEY: So I thank you for it.

THE COURT: I just think it's unrealistic to expect a lawyer to remember a cross-examination that long ago. He's had many, many, many, many, many cross-examinations since then.

MS. MORRISSEY: I agree.

BY MS. MORRISSEY:

Q. Okay. Do -- and the Court's suggested way of asking that question was did you ask a question about -- I --

THE COURT: Here's a way that I think you could -- you know, there are many, many ways you could do it. But just to kind of move things along, you could say based on your review of the transcript of his cross-examination, you don't recall him doing X. Now, if he recalls that he did X, then he can say that, and then you can ask him why he didn't do it.

MS. MORRISSEY: Okay.

THE COURT: And then whether he did it or not I'll sort out.

MS. MORRISSEY: Okay. Thank you.

THE COURT: But I'm not dictating that that's how you have to do it. I'm just suggesting that as one option.

MS. MORRISSEY: I think it's a good way.

BY MS. MORRISSEY:

Q. Did you have a reason why you didn't ask Gaubatz on cross-examination about her strong dislike for Mr. Honken and Honken's dislike for her?

A. My memory is is that did come up on cross.

Q. Do you recall why -- do you know why you didn't ask Miss Honken about -- Miss Gaubatz about her view that Dustin Honken was evil?

A. I may be wrong, but I have a memory that it came up, but it may have been objected to by the government, and maybe I'm wrong, but that's my memory.

Q. Okay. Do you recall -- did you have a reason why you didn't ask Miss Gaubatz on cross-examination that Honken was jealous over the influence that Gaubatz had over Miss Johnson?

A. I'd like to think that that came up in cross, but as I sit here I don't have an independent memory.

Q. Do you recall why you didn't ask Gaubatz that Honken -- ask her about Honken wanting all of Miss Johnson's attention above

hers?

A. Again, I'd like to think that that did come up during cross, but I don't have an independent memory.

Q. Do you have a reason why you didn't ask Miss Gaubatz about Honken's having Maced her German shepherd?

A. I don't have an independent -- I don't have an independent memory of that line of cross-examination.

Q. Do you recall if there's a reason why you didn't ask Gaubatz whether Honken told Miss Johnson in her presence to keep Gaubatz under control or he was going to Mace Gaubatz?

A. I'm sorry. That sounds familiar, but I don't have an independent memory.

Q. Do you recall that -- why you didn't ask Miss Gaubatz on cross-examination about Honken's threat against Gaubatz with pepper spray and Miss Johnson's intervention and prevention of Miss Gaub -- Mr. Honken from pepper spraying Gaubatz?

A. I don't have an independent memory as I sit here.

Q. Is there a reason why you didn't ask Miss Gaubatz about her prior grand jury testimony that she had no firsthand knowledge of Miss Johnson getting drugs from Honken?

A. I would have liked to -- I would like to think that I did cross-examine her on that if she had prior grand jury testimony.

Q. Did -- do you have a reason why you didn't ask Mr. Honken on cross -- Miss Gaubatz on cross-examination whether or not Honken completely dominated Tim Cutkomp?

A. I don't have an independent memory of that.

Q. Do you have a reason why you didn't ask Gaubatz on cross-examination about her grand jury testimony that she stored things for Duncan H -- Dustin Hoff -- Hoff -- Honken at her house in the summer and fall of 1993 after the trip to Arizona, that these were things that Honken couldn't store at his mother's and that Angela Johnson didn't have room for, that this was more than one box, quite a few boxes, under her stairway, that the boxes were there for five or six months and that Tim -- Dustin Honken and Tim Cutkomp came to her house to remove the boxes?

A. I don't have an independent memory one way or the other.

Q. Do you have a reason why you didn't ask Gaubatz on cross-examination about her grand jury testimony that she never said anything at Miss Johnson's house that made her think there was a meth lab operating there?

A. I'd like to think that anything that was covered in grand jury I covered with her. The underlying thought that I have to that question is since they were also trying to prove up drug charges against my client, but I don't have an independent memory one way or the other.

Can I add one thing?

Q. Yes.

A. Just -- and I want to be clear on this. When you say can you tell me why you didn't ask, I'm not agreeing with you that I

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 349    Filed 11/10/11    Page 60 of 88

did not. I want to make that clear.

Q. I understand.

A. I'm just trying to tell you what I can remember and what I cannot remember.

Q. We understand that.

A. Okay.

Q. If I'm wrong, I'm going to be wrong. I'm trying not to be.

If -- did you have a reason why you didn't cross-examine Gaubatz about her grand jury testimony that when she and Honken fought Miss Johnson would come to Gaubatz's house as a refuge?

A. Again, if there was grand jury testimony, I would like to think that I did speak about it.

Q. Do you recall why you didn't ask Gaubatz about grand jury testimony that Dustin Honken would bring Kathy Rick's baby to Miss Johnson's house, that Kathy Rick's baby's presence at her house would upset Miss Johnson but nonetheless she wouldn't say anything to Honken about it?

A. If I didn't say anything about that, I'm assuming maybe I thought that wasn't relevant.

Q. Wouldn't you think that it would relevant to the issue of whether or not Donken (sic) had control or influence over Miss Johnson?

A. By the bringing of the baby?

Q. By bringing in the baby which upset her and she wouldn't do

anything.

A. No, I would not necessarily agree with you on that point.

Q. Do you have any reason why you didn't cross-examine Miss Gaubatz about her grand jury testimony that the relationship between Miss Johnson and Honken was an emotional roller coaster?

A. Again, anything pertaining to the grand jury I'd like to think that I brought up on cross.

THE COURT: Excuse me, Miss Morrissey. I'm a little bit late in raising this, and I'm sure you're much more familiar with the corrected amended motion to vacate, set aside, and correct sentence. But where was the failure to adequately cross-examine Gaubatz raised in the . . .

MS. MORRISSEY: It's raised in a fairly general claim, Your Honor. I believe it's II 10 and 11 alleging ineffective assistance of counsel at both phases of the trial in failure to present evidence that was -- discover and present evidence that was helpful to the defense, and the related claim is failure to introduce evidence to support a residual doubt at the penalty phase.

THE COURT: Well, in support of issue number 11, there's exactly one paragraph, and there's no mention of inadequate cross-examination. I mean, gee whiz.

MS. MORRISSEY: Well, I think that to the extent that cross-examination failed to reveal facts that were helpful and were known or should have been known to the attorneys, that the

failure to do so is relevant to that particular claim of failure to present helpful evidence at both phases of the trial.

THE COURT: Well, no, I take that back. It does say that would have cast doubt on the credibility of Christi Gaubatz, so it was raised. Okay. Thanks.

MS. MORRISSEY: Thank you.

BY MS. MORRISSEY:

Q. All right. Let me ask you whether or not you cross-examined Miss Gaubatz about her failure to recall where the alleged admissions by Miss Johnson to involvement in Terry DeGeus's killing, where those admissions occurred. That is, was she home? Was she driving around in a car? Were they at the movies?

A. If I failed to ask her that question, I'm assuming I didn't want to hear her reaffirm what she had previously stated on direct.

Q. Let me ask you if there was a -- there were reasons for your failure to cross-examine Miss Gaubatz about her ending -- there are different statements about ending her relationship with Miss Johnson and when that occurred, and let me ask you specifically. Gaubatz testified that her relationship with Miss Johnson ended in 1995. And she also testified that Miss Gaubatz -- that Miss Johnson called her six months later crying. She also testified that there was no contact between her and Miss Johnson after October of 1995. That was at the grand jury

in 1997. In 2000 she testified that she broke up ties with Miss Johnson shortly after she was called -- she received a phone call about the agents which was about one year ago, i.e., 1999. She also testified in 1999 that they hadn't talked for two years, i.e., since 1997. And in 2000 she said she last saw Miss Johnson four years ago after her interview by the DEA agents which would have been in 19 -- 1996. And she also testified that she ended her friendship with Miss Johnson when she used that -- when she learned that Miss Johnson was verbally abusive to her daughter. So those were different --

A. Several conflicting versions is what you're trying to suggest to me.

Q. Yes.

A. I don't have an independent memory.

Q. Okay. Was there a reason why you didn't cross-examine Mr. Gaubatz -- Miss Gaubatz about not going to the police even though she knew these admissions from Miss Johnson because she wasn't sure where the bodies were buried and she couldn't do anything to give the victims a proper burial?

A. I don't have an independent memory.

Q. Do you remember not cross-examining her that she thought the information that she -- not cross-examining her about her statement that she thought the information wouldn't be of value to law enforcement because she didn't know where the bodies were?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 61 of 88

A. I don't have an independent memory.

Q. Is there a reason why you didn't cross-examine Gaubatz about Miss Johnson's great fear of Mr. DeGeus?

A. If I didn't do that, it was probably in relation to the fact that I wouldn't want to highlight a reason why Miss Johnson might want Mr. DeGeus eliminated.

Q. And is there a reason you didn't cross-examine her about there was -- grand jury testimony that there was never a time Gaubatz saw DeGeus when he didn't ask about Johnson?

A. It's one of two things. If it's grand jury testimony, I'd like to think I went over it, but it may go back to the answer I just gave you which is not wanting to highlight a reason why Ms. Johnson might want Mr. DeGeus eliminated.

Q. Did you -- was there a reason why you didn't cross-examine Miss Gaubatz about grand jury testimony that there was an incident at Miss Johnson's house when Terry DeGeus was bouncing off walls like a pinball like he was having an epileptic seizure as a result of meth use?

A. I don't have an independent memory.

Q. And is there a reason why you didn't ask Miss Gaubatz about her prior testimony -- or her testimony at Dustin Honken's trial that in late 1992 Angela Johnson wanted to end the relationship with DeGeus, she was very afraid that he would do something to harm her, and that DeGeus was violent and possessive?

A. Again, it gets back to my thought that I might not have

inquired on that subject not wanting to highlight something that would give Miss Johnson a reason to have Mr. DeGeus eliminated.

Q. Did you cross-examine Miss -- is there a reason you didn't cross-examine Miss Gaubatz about the incident in which DeGeus stopped Gaubatz who was driving in a car and allegedly showed her a slip of paper with Greg Nicholson's name on it, okay, about during that conversation Gaubatz testified at the grand jury in 1997 that DeGeus wasn't making a lot of sense to her during this encounter?

A. I don't have an independent memory.

Q. Did you ask -- is there a reason why you didn't ask Miss Gaubatz why -- about her Dustin Honken trial testimony that after the meeting at Kentucky Fried Chicken which she observed Miss Johnson and Terry DeGeus from -- through a window Miss Johnson came back and said that she was very scared because she thought DeGeus knew she was pregnant and he couldn't be around anymore for this reason?

A. I wouldn't want to cross-examine on that because I wouldn't want to highlight that testimony.

Q. And I'm going to ask you about some information and whether or not you discovered it. This was information that's relevant to impeach Gaubatz. Did you discover that in July of 1993 when Miss Gaubatz said she visited on the night that Greg Nicholson and the Duncans disappeared Brooke Jacobson was staying at Angela Johnson's residence?

A. I'm not sure.

Q. Did you discover -- investigate and discover that when Brooke Jacobson was staying at Angela Johnson's residence Brooke and Alyssa slept on a couch in the living room, the same couch that Gaubatz said she was sleeping on when Johnson and Honken came home early in the morning?

A. I'm not sure.

Q. Did you discover evidence that Christi Gaubatz continued to have relationship with and to call Miss Johnson until the time Miss Johnson was arrested?

A. I think I knew that.

Q. Did you discover and cross-examine Miss Gaubatz on evidence that she was led to believe by the government that she would not be prosecuted for the -- for lying to the police and for two times perjury before the grand jury as a result of her testimony against Miss --

MR. WILLIAMS: Objection. States facts not in evidence, not supported by the record.

MS. MORRISSEY: I expect, Your Honor, we'll try and prove it up.

THE COURT: That's what I was thinking you were going to say, so the objection's overruled. I'll take it subject to the objection.

MS. MORRISSEY: Thank you.

BY MS. MORRISSEY:

Q. Did you ever discover evidence that Scott Gaubatz whose disapproval of Miss Johnson caused, in Gaubatz's testimony, to end her friendship with Miss Johnson was himself a meth manufacturer and user in 1993 to 1997?

A. Scott Gaubatz?

Q. Yes.

A. I believe I knew that Scott Gaubatz was involved with meth.

Q. Okay. And did you ask Miss Gaubatz about her husband's involvement in meth?

A. I don't have a memory as I sit here at this time.

Q. Did you ask -- or did you investigate and discover and present evidence that Gaubatz made a false accusation of battery against her ex-husband Martin Cole?

A. I don't have any memory of that.

Q. Did you investigate, discover, and present Gaubatz's reputation as a liar?

A. I'd like to think I did.

Q. I'm going to ask you about Peggy Sue Hoover. She was one of the jailhouse informants who testified against Miss Johnson. Did you do any investigation regarding her credibility from jail informants or people who knew her?

A. Not that I can remember as I sit here today.

Q. Did you talk to Angela Euans about her?

A. That name is familiar.

Q. Did you find out from Angela Euans that Miss Johnson never

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 62 of 88

talked about her case, that Miss Johnson -- that she never saw Miss Johnson talk privately with Hoover, and that if Miss Johnson had talked privately with Hoover she, Miss Euans, would have seen or heard it?

A.   That line of discussion seems familiar to me.

Q.   Eva Dawn Hanawalt, did you investigate and interview her regarding the credibility of Peggy Sue Hoover?

A.   I'm uncertain as I sit here today.

Q.   You didn't find out, therefore, that on the particular block that they were on they were locked down at night and cannot talk to each other and that in the day room where they went when they weren't locked down there was no ability to have a private conversation, that Hoover was known as a snitch in jail and that Hoover had a reputation as a liar?

A.   I can't comment on that one way or the other, but I -- well, I can't comment on that one way or the other.

Q.   Did you investigate and discover a person called Erin Heffron Bockoven who was a close friend of Hoover who would testify that Hoover is a liar, that you couldn't believe anything that she said, and that her reputation in the community was that of a liar?

A.   Is Erin a male or a female?

Q.   Erin is a female.

A.   So E-r-i-n?

Q.   E-r-i-n.

A.   And the last name is?

Q.   Heffron, H-e-f-f-r-o-n, Bockoven, B-o-c-k-o-v-e-n.

A.   That name's just not familiar to me.

Q.   Did you investigate and discover that someone called Tim Legg who had a child with Hoover and dated Hoover will testify that Hoover was a chronic liar?

A.   Tim Lake?

Q.   Legg, L-e-g-g.

A.   I don't have an independent memory of that.

Q.   Did you investigate and discover a person named Cimi, C-i-m-i, Reibseman, R-e-i-b-s-e-m-a-n, who would have testified that Hoover said, admitted, that she testified against Miss Johnson because she was promised a sentence reduction?

A.   That name is not familiar to me.

Q.   Did you investigate and interview Melvin Hoover, an ex-husband of Miss Hoover, who would testify that she is a liar and has a reputation for being untruthful?

A.   I don't have a memory as I sit here today of Melvin Hoover.

Q.   Did you investigate and discover James Ethan Johnson who had a relationship with Hoover, who Hoover asked during a jail visit if -- asked him if she should testify against Miss Johnson and Mr. James Ethan Johnson said what do you know, Miss Hoover, and Hoover in response said she heard about what Miss Johnson did, that James Ethan Johnson advised Hoover that she shouldn't testify if Angie Johnson hadn't told her anything and in

response Hoover said that everybody in the jail was talking about the case and Mr. James Ethan Johnson will also testify that Hoover is a pathological and habitual liar?

A.   The only James Johnson that I can think of immediately was Angela's younger brother which is not James Ethan Johnson.

Q.   Sara Bramow was another person who was a jailhouse informant against Miss Johnson; correct?

A.   Correct.

Q.   And basically she testified that no one promised her anything for testifying against Miss Johnson but the Lord was in her life, something she had to do, with God in her life she had to correct the past.

A.   That sounds familiar.

Q.   Okay.  You had an investigator working on the case named Ray Cornell who worked with a woman named Rose Nevins; correct?

A.   Correct.

Q.   And at your direction did Rose Nevins interview Miss Bramow in 2001?

A.   I would have directed Mr. Cornell, and if he would have assigned Ms. Nevins, that would have been his call.

Q.   And did Ms. Nevins produce a handwritten notarized statement from Miss Bramow?  I'm putting up --

A.   My memory is yes.

Q.   Yeah, Exhibit 38.  That's a handwritten statement by Bramow dated June 7, 2001.  Now, in that statement did Miss Bramow talk

about advice she received from her lawyers that she shouldn't talk with anybody connected with Angela Johnson's case because if she did she would piss the feds off and she needed to keep her charges state and if she helped Angela in essence she would be prosecuted federally?

A.   That's what the note reflects.

Q.   Okay.  And in cross-examining Miss Bramow, did you question her about her notarized statement to impeach her testimony that God was leading her to the path of testimony against Miss Johnson?

A.   I don't have a memory of that.

Q.   Okay.  And in -- on May 21, 2001, were you present at an interview of Sara Bramow along with Rose Nevins at the Benton County Jail?  This is Plaintiff's 1 -- Plaintiff's 40.  It's not a great copy.  Do you recognize that?

A.   Yes.

Q.   All right.  And I don't know if you want me to look at the whole thing.  It's basically -- it appears to be a document that is -- it appears to be an interview that proceeded to parse a government report about an interview with Miss Bramow line by line.  Is that fair to say?

A.   On the first page, yes.

Q.   Okay.  And during the course of that particular interview with Miss Bramow, she testified at trial that she didn't read the newspapers or hear anything on TV about Miss Johnson's case.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 63 of 88

Did you ask her to impeach her about her statement in the interview on May 21 that she read newspapers about the -- newspaper articles about the case that Miss Johnson's sister sent to Miss Johnson in jail?

A. I don't have an --

MR. WILLIAMS: Judge, we're kind of back to asking him if he remembers what he did on --

MS. MORRISSEY: I am, and it's poorly worded, and I will --

THE COURT: What's the exhibit number on this?

MS. MORRISSEY: This is Exhibit 40 which is -- we can locate it on the electronic discovery? Should be in the witness file under Sara Bramow. We'll locate it for you, Your Honor.

We found it, Your Honor.

MR. BURT: Master chronology binders, 2001.

THE COURT: Can you turn your microphone on, please?

MR. BURT: 2001.

MS. MORRISSEY: Master chronology binders.

THE COURT: Right. 2001, I'm there.

MR. BURT: May 2001, and then 2001, 5-18 PB memo re -- 5-21 RC memo to Bra -- re Bramow.

THE COURT: I'm not finding it, so just keep going.

MS. MORRISSEY: Okay.

BY MS. MORRISSEY:

Q. In that Plaintiff's 40, the interview on May 21, 2001, is

there a -- Bramow testified -- Bramow said that she read newspaper articles about the case that Miss Johnson's sister had sent her. Is there a reason why you didn't ask her about that?

A. I don't have an independent memory.

Q. And is there a reason why you didn't ask Miss Bramow about her statement that Miss Johnson never discussed a field with her?

A. I don't have an independent memory.

Q. Is there a reason why you didn't state -- didn't question her about the fact that not only did Miss Johnson never discuss a field with her, she read about a field in Dustin Honken's trial papers?

A. I don't have an independent memory.

Q. Did she -- did you question her about her failure to -- her affirmative statement that Miss Johnson never got mad at her when she was talking on the phone about the case at the jail when people would suggest that she should roll on Dustin Honken?

A. I don't have an independent memory.

Q. Did you question her about her statement in May of 2001 that Miss -- or is there a reason why you didn't ask her in 2001 that Miss Johnson did not say that she would never roll on Dustin Honken?

A. I don't have an independent memory.

Q. Is there a reason why you didn't ask her why -- of her prior statement that she never heard Angela Johnson threaten

anyone?

A. I don't have an independent memory.

Q. Is there a reason why you didn't testify -- ask Miss Gaubatz about her statement in May of 2001 that Angie's mind was scattered when she was in the jail with Bramow?

A. I don't have an independent memory.

Q. Did you do any investigation to determine people who might be familiar with Bramow's credibility?

A. I don't have an independent memory.

Q. Did you talk with other inmates who were in the jail with Angela and Miss Bramow?

A. Well, we got the chance to talk to Bobby McNeese.

Q. This is --

A. In court proceedings.

Q. Right. This is other inmates who were in jail with Bramow and the snitches and who could potentially impeach the snitches.

A. I don't have an independent memory.

Q. We've also talked about Eva Dawn Hanawalt. You didn't investigate her; correct?

A. I don't have an independent memory.

Q. Would you say, Mr. Willett, that you did a good job of going after Dustin Honken at the trial in this case?

MR. WILLIAMS: Excuse me. That question doesn't make sense, Your Honor.

THE COURT: Yeah. I . . .

MR. WILLIAMS: Vague I guess would be the objection.

THE COURT: Can you rephrase the question?

MS. MORRISSEY: Yes, I can.

THE COURT: Yeah.

BY MS. MORRISSEY:

Q. At the penalty phase the position that was taken by the prosecution is that Miss Johnson was more culpable, deserving of a harsher punishment than Mr. Honken. Do you recall that being the government's position?

A. Yes.

Q. Okay. And in attempt to show that the government was not correct in that position, did you present any evidence of wrongdoing by Duncan -- Dustin Honken?

A. My memory is that there was evidence towards that in the penalty phase of the case.

Q. Okay. And do you recall -- now it's perhaps an unfair question -- what that evidence is?

A. Well, they certainly knew through the testimony of Mr. Spies what the result of Mr. Honken's murder trial was.

Q. Did you discuss the possibility of calling the evidence about Mr. Honken's bank robbery before he ever met Miss Johnson?

A. I'm not trying to avoid your question, but I think that would be a question better suited for Mr. Berrigan.

Q. Okay. You did read the transcript of Mr. Honken's trial; correct?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 349 Filed 11/10/11 Page 64 of 88

**929**

A. I did not read the entire trial transcript of Mr. Honken's trial, no.

Q. Okay. And you did not know that the following witness testified to a prior bank robbery by Mr. Honken before he ever met Angela Johnson? That's Kenneth Hansen.

A. I was aware of Mr. Honken's prior bank robbery.

Q. Mark Johnson, did you know that he was one of the witnesses who testified?

A. The name Mark Johnson is familiar, but I don't remember the context.

Q. How about Alan Johnson, Mark Johnson's twin brother?

A. That name is familiar also.

Q. Okay. Now, you cross-examined Timothy Cutkomp at the trial; correct?

A. Yes.

Q. And Mr. Cutkomp testified that he had no idea that Duncan -- Dustin Honken could have been violent, had ever been violent before he met Miss Johnson in 1993. Do you recall that testimony?

A. Not really.

Q. Do you recall whether you asked Mr. Honken -- Mr. Cutkomp about Dustin Honken's bank robbery?

A. I don't have a memory of doing that.

Q. Did -- were you surprised when the prosecution decided to portray Miss Johnson as worse than Dustin Honken at her trial,

**930**

at her penalty phase?

A. I'm not surprised by anything the prosecution does.

Q. Given your lack of surprise, did you consider presenting evidence that could have shown that that theory wasn't correct?

A. I think that comes back to my earlier reference to evidence in the penalty phase.

Q. Okay. And do you agree that -- well, are there examples of Dustin Honken manipulating and controlling Cutkomp that were available through Cutkomp's testimony at Mr. Honken's trial?

A. I believe there -- at Mr. Honken's trial?

Q. Mr. Honken's trial.

A. I wouldn't be able to answer that question for you.

Q. Because you didn't read all of the testimony at his trial?

A. Correct.

Q. And you didn't read the testimony of Mr. Cutkomp.

A. I remember reviewing selected portions of the trial transcript of United States versus Honken. But as I sit here today, I can't remember what those selected portions were.

Q. And you can't remember that you reviewed Mr. Cutkomp's testimony given the fact that you cross-examined him at trial in this case.

MR. WILLIAMS: Leading, Your Honor.

THE COURT: Overruled.

A. I'd like to think that I did, but I don't have an independent memory of that as I sit here today.

**931**

MS. MORRISSEY: Thank you. May I just have a moment, Your Honor?

THE COURT: Yes.

BY MS. MORRISSEY:

Q. Did you yourself or did co-counsel make a funding application to the Court to allow you access to get the Dustin Honken transcript?

A. My memory is that we did.

Q. Okay. And obviously you couldn't get that unless it was represented to the Court that it was necessary to the defense of Miss Johnson's criminal case.

A. True.

Q. Okay. And if it was necessary to the defense of her case, you ought to have read it; correct?

MR. WILLIAMS: Argumentative, Your Honor.

THE COURT: Overruled.

A. Theoretically, yes.

MS. MORRISSEY: Thank you. I have nothing further.

THE COURT: Why doesn't everybody take a stretch break.

Thank you. Please be seated.

Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

**932**

Q. Mr. Willett, do you know why -- what the decision-making process was for what documents the defense team here provided to you in order for you to prepare for your testimony?

A. I have no idea.

Q. Did they, for example, provide you with the entire investigation file done by Ray Cornell so that you would be able to answer some of the questions posed to you today?

A. No.

Q. Did they give you the Gordon Gratias investigation file so you would know whether some of those people were interviewed or not?

A. No.

Q. Did they let you -- or provide you or let you review the Mary Goody file to determine which people she interviewed as part of the investigation in the case?

A. No.

Q. Were you available last two days here to review all those documents had they provided them to you today?

A. I was readily available.

Q. The documents that have been handed to you today as exhibits, did they give you an opportunity to look at those beforehand?

A. Over the course of the past two days, some of the documents that have come into evidence and I have reviewed were in the 1,200 pages, but I can't say the majority of the documents that

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 65 of 88
*to purchase a complete copy of this transcript.*

have been presented to me were in the 1,200 pages.

Q. You were asked a question, for example, about whether you ever reviewed the sentencing transcript or whether anybody reviewed the sentencing transcript of Dustin Honken back on his sentencing in 1998. Do you remember that question?

A. Yes.

Q. They did not show you that in Gordon Gratias' file that they -- Gordon Gratias actually -- I'm sorry. I think it was Ray Cornell drafted up a lengthy line-by-line summary of the sentencing transcript from Dustin Honken's sentencing?

A. No.

Q. Would that have been helpful for you to know in order to answer some of the questions today?

A. Certainly.

Q. Let's go to the last part of the examination of you about what you did and didn't do in cross-examining witnesses. Now, Mr. Willett, when you make decisions about cross-examining witnesses, just give a brief idea what do you do as a lawyer? What goes into your mind about what questions to ask and what questions not to ask?

A. Well, you try not to highlight the parts of the government's -- government witnesses' case that has put your client in a bad light. I'm not going to -- if there's a bad -- you know, if there's an answer that hurts my client, I'm trying not to have it repeated. I'm trying to point out the

inconsistencies in the witness's testimony on direct. If I have impeachment materials, I'm trying to take care of that, criminal history, plea agreements. If there are inconsistent statements between prior grand jury and present trial testimony, I'm trying to point out that. I'm not sure that list is inclusive, but that's off the top of my head.

Q. And those are some of the factors that any lawyer goes through in determining what kind of questions to ask during cross-examination; is that fair?

A. Correct.

Q. Now, in this case is it your recollection that when you were preparing for the cross-examination of the witnesses assigned to you that you reviewed all the material that you had available to you in order to prepare for your cross-examination?

A. To the best of my knowledge, yes.

Q. And did you make decisions as a lawyer about which issues you were going to bring up and which issues you were not going to bring up?

A. Certainly.

Q. And were those judgment calls by you on which issues you might bring up and which you might not?

A. Yes.

Q. Now, defense counsel has pointed out that perhaps there were some other witnesses that existed out there that you could have talked to that might have brought in some impeachment

evidence of some of those witnesses. You remember that line of cross-examination?

A. Of direct, yes.

Q. I'm sorry. Of direct examination. You're right. What's your response to that? You know, why didn't you go down there and track down all those people and have all that information available to you?

A. It's hard for me to answer that question because I feel a little bit like I'm in a vacuum and a lot of the people that were referenced I'm just not sure -- the question you asked me earlier did I have access to Mr. Cornell's file, no. Did I have access to Mr. Gratias's file? No. If I did, I might be able to better answer those questions, and that's the problem I'm having is the lack of -- my lack of memory is at least in part based upon the lack of being able to review information that might help refresh my memory.

Q. And let's look at another angle of that. When you're -- I mean, did you and your team conduct an investigation into possible holes in the government's case that might lead for you to have some evidence to produce during the guilt phase?

A. I believe that we did.

Q. Okay. And in the process of doing that, you ultimately did not call any witnesses during the guilt phase.

A. Yeah, I'm remembering that now.

Q. Okay. Do you recall, for example, that -- I may be wrong

on that. Is there a judgment call that lawyers go through in trying to figure out whether to put on a defense case or not to put on a defense case?

A. Certainly.

Q. And what is that analysis that a defense lawyer goes through?

A. Well, obviously you need to figure out, first of all, can your client take the stand or not. I think that's probably the first call you make, then what defense witnesses may be available to you or can you turn the prosecution's witnesses; in other words, is there witnesses that the government is calling that you hope to make your own or think you can make your own. I mean, you can't create defense witnesses out of paper mache and paste. But those are some of the preliminary analyses.

Q. Is there a problem with presenting a weak defense case versus presenting a no -- no witnesses? I mean, is there an analysis you go through on that?

A. One of the things that Mr. Berrigan and I talked about in this case is that even though the jury's instructed by the Court that the burden of proof is always on the government, that if you start putting a defense case up subtly with the jury there's a slight shift and even though we're the defense and even though we tell them we don't have to prove anything, if you start putting witnesses up, I believe there really is a jury belief that, okay, well, these are your witnesses, now we're going to

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 66 of 88

see if you can prove something to us. And that was one of the conversations Mr. Berrigan and I had, that there was some concern that if we put up bad witnesses, weak witnesses, average witnesses and they failed that that would come back to roost.

Q. And as part of the analysis you and Mr. Berrigan went through and ultimately the decision not to call any witnesses?

A. Yes.

Q. One of the lines of cross-examination that you had was with regard to presumably your failure to seize upon the opportunity of Dustin Honken to come in and cooperate and exonerate Miss Johnson. Do you remember that line of questions?

A. Early on, yes, the letters from Mr. Honken.

Q. Right. And you explained that you had some concerns about his representation and your ethical ability to make contact with the -- with somebody who's represented by counsel. You recall that?

A. Right.

Q. Okay. And do you remember being shown what was marked as Exhibit 15 which is this memo about your conversation with Alfredo Parrish?

A. Yes.

Q. Okay. And there was apparently some question in the defense mind anyway about whether Mr. Honken was actually represented at that time. I want to show you a document that has already been admitted into evidence by Miss Johnson's team

as Exhibit 4A. And do you recognize this to be a summary by Miss Lanoue of a hearing in which you were present, Alfredo Parrish was present concerning the Angela Johnson case?

A. Yes.

Q. Does that lend weight to your assessment that at least the court believed that Alfredo Parrish represented somebody in this case?

A. Absolutely.

Q. Going back to this question on cross-examination, why you didn't ask certain questions and so forth, one of the examples you gave for why you would not go in to Terry DeGeus, for example, was you did not want to point out that your client had a motive to kill; is that right?

A. Correct.

Q. And is that an example of one of the things that you go through in your mind in deciding which questions to ask and which not to ask?

A. Yes.

Q. How many times, Mr. Willett, have you watched another attorney conduct a cross-examination?

A. Well, I was admitted to the Iowa Bar in 1984. I would certainly say hundreds. I don't know if it amounts to thousands, but I would certainly say hundreds.

Q. How many times do you think that as watching somebody else conduct a cross-examination you thought to yourself, boy, I

could do a better job and I would have asked different questions?

A. Probably numerous times out of those hundreds of times. One of the things -- if I may add, one of the things I learned as a young lawyer from Clemens Erdahl in cross-examination that less can be more.

Q. And the point there is that sometimes it's more effective on cross-examination to identify a few specific points you want to get into, get into those questions, and get out. And that's a way of conducting cross-examination that is taught and suggested as an acceptable way.

A. Yeah, sometimes better to jab and move as opposed to stand in the middle of the ring and exchange slugs.

Q. Well, let's talk a little bit about your experience. You went over it a little bit early on. As of the time that you tried the Angela Johnson case, do you have a rough idea of how many trials you had tried by then, sir?

A. Oh, I was appointed to the federal CJA list in Cedar Rapids in 1990, and that's really about the time it started taking off. And I think I was averaging a couple trials a year either in federal court or state court. So by 2005, somewhere between 20 and 30 cases.

Q. And you mentioned during your direct examination that one of those cases was a murder case?

A. State versus Steven Peterson.

Q. How'd that case come out?

A. He was convicted at trial. On appeal he was given a new trial because of the law enforcement agent's Sixth Amendment violations, and then when he was given the new trial he was pled down to a charge of less than first degree murder, and Steven is now out.

Q. Have you obtained acquittals in your representation of criminal defendants over the years?

A. In federal and state court.

Q. Have you served the Court in various capacities over the years, sir?

A. Yes, I have. I've been the CJA panel rep. for the Northern District of Iowa. I've served on the CJA court-appointed list at various times in Cedar Rapids, Sioux City, and Davenport. I've served on the Advisory Practice Committee for the Eighth Circuit Court of Appeals. I've currently been asked by Eighth Circuit Court of Appeals, Judge Melloy, to serve on the committee that would look at the reappointment of Nick Drees as our federal public defender, and I hope I get to do that.

Q. I hope you do too.

You also served on a committee to appoint a magistrate, right, at some point?

A. Thank you for reminding me of that. I sat on the commission that appointed United States Magistrate Jon Stuart Scoles to the Northern District of Iowa.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 349 Filed 11/10/11 Page 67 of 88

Q. Now, as part of your representation of Angela Johnson in this case, do you recall, while you did not go talk to Dustin Honken because of your ethical concerns, that there was some follow-up on some of the information he provided you? Do you remember that?

A. Well, I remember it in the sense that some of these -- there was a reference in one of his letters to some of my fellow inmates are going to be sending you affidavits. I remember that as follow-up that I got two or three different affidavits from various cellmates of Mr. Honken in Colorado.

Q. And do you recall by chance that you had Ray Cornell kind of follow up on some of those inmates, where they were, what their background was, that kind of thing?

A. Yes.

Q. You testified earlier that Angela Johnson has never admitted to you participating in the murders in this case.

A. Correct.

Q. Is that correct? Did she ever move off of that position, sir?

A. No.

Q. Now, you were asked questions earlier on in your testimony -- I think it was yesterday -- that the defense showed you a letter from Angela Johnson saying basically I would agree that I killed the Pope, I want to plead guilty. Do you remember that reference?

A. Yes, yes.

Q. It was in August of 2001?

A. Yes.

Q. And they've asserted that that was authorization for you to plead her out from that point forward. Do you recall that's how it was represented to you?

A. I do.

MR. BURT: Just for the record, I think he misstated the date there. It's not August 2001.

THE COURT: Well, first of all, if you don't turn your microphone on, it's very hard -- I couldn't hear what you said. Apparently Shelly got it down.

MR. BURT: Sorry. It was an objection that there was a misstatement of the evidence as to the date. I believe he said '01, and I believe the letter is '03.

MR. WILLIAMS: '03, okay.

BY MR. WILLIAMS:

Q. Do you recall that in your contact with Ms. Johnson that there was a long period of time from your initial representation of Miss Johnson up until about '03 where she was adamant that she was not interested in a plea agreement?

A. Absolutely.

Q. Not even a plea agreement to 20 years.

A. And -- correct. And part of it was not wanting to cooperate against the father of Marvea.

Q. And do you recall having a conversation with her about the idea of -- that the government's going to require a proffer up front?

A. Boy, I'd sure like to -- I'd sure like to think I did, yes. I'm having a hard time having that independent memory, but I'm sure liking to think that we had that conversation.

Q. And you had a conversation about that among counsel, didn't you, about that being a requirement that the government had?

A. Right. And I mean, as I said earlier, Mr. Stowers was aware of that, and we -- you know, Mr. Berrigan had to be advised of the local practice of your office. But that issue of a proffer became very problematical.

Q. And you mentioned at one point but you didn't really finish your answer, you talked about the practice the Northern District had at that point about the 1B1.8 protection.

A. Yeah.

Q. Was that a factor?

A. Yes.

Q. And explain why.

A. Just a general understanding of 1B1.8, that in a proffer situation or a cooperation situation if you give information that can tend to, for lack of a better description, worsen your position in sentencing, it can be -- it can -- 1B1.8 sort of absolves you from that. In other words, you can -- the classic example would be I come in with a client and we think he's a

small-time marijuana dealer. What you don't know is he's a real drug kingpin. And 1B1.8 sort of acts as protection from that if he makes his or her position worse. But historically your office would ignore 1B1.8 and not allow that protection into the proffer agreement, and that was a concern.

Q. And there was another concern that was reflected in the correspondence that even if you reached an agreement with the local U.S. Attorney's Office that main Justice would reject it.

A. And that was a very real concern. We had a belief that we could work with you to come to an agreement, but we were concerned that whatever agreement at that stage, if it went up the ladder, that they'd reject it and we'd be in a very bad situation.

Q. And wasn't another really major factor that went into the analysis that there was no way you could proffer up front pre-condition to an offer from the government was Miss Johnson flatly refused to admit any guilt?

A. That was a problem.

Q. You knew that if you brought Ms. Johnson in to us as part of a proffer agreement with the anticipation that we would get -- that we would make an offer and her statement to us was that she wasn't even present during these crimes, you knew that that wasn't going to go anywhere, didn't you?

A. I was concerned that the proffer would not go well. I had that concern.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 349 Filed 11/10/11 Page 68 of 88

Q. And that concern was based in large part because your client was unwilling to admit any guilt.

A. And she never did admit any guilt to me.

Q. Now, do you recall the government ever made a plea offer to Miss Johnson?

A. Did they ever make one?

Q. Yes.

A. Now, when you say plea offer, I think of the multi-page plea agreement that comes from your office, and I don't ever re -- I don't believe I remember that. I mean, there were a lot of letters. There were a lot of discussions, but I don't ever remember the standard multiple-page document coming from your office saying here it is.

Q. And you do recall, though, that throughout all those discussions and letters and so forth there was always the pre-condition that Angela Johnson had to debrief before any offer was going to be made.

A. Always.

Q. Now, at some point late in the representation and close to trial, in particular February of 2005, there starts to be -- there started to be some references to an Alford plea. Do you recall that?

A. Yes.

Q. Okay. In an Alford plea, the benefit for your client at that point is she wouldn't have to admit guilt.

A. Correct.

Q. Is that right? But in order for an Alford plea to have any benefit to your client, you would have to have gotten the government to agree to take death off the table in exchange for an Alford plea.

A. That I believe was in Mr. Berrigan's letter, yes.

Q. And did the government ever agree to do that?

A. To take death off the table?

Q. Yes, sir.

A. I don't believe that that was ever part of the negotiations until the very end when the agreement -- or when the proposal was sent up to DOJ and it was rejected about one week into jury selection. My memory is is that at that point it was life if I'm remembering right, but that was rejected by DOJ.

Q. You were asked questions about that proffer letter that was submitted by Pat Berrigan on March 19, 2005, and you did not participate in the drafting of that proffer letter?

A. No.

Q. You're not aware of a note then that reflects that Pat Berrigan actually didn't show that proffer to his client until two days after he sent it to the United States?

A. I'm not aware of that.

Q. Okay. That would suggest to you that when Pat Berrigan gave that to the government it wasn't something that Miss Johnson had even signed off on at that point.

A. That would be the implication.

Q. Now, some argument might be made --

MR. BURT: Excuse me, counsel. I move to strike that without a foundation and personal knowledge. He's speculating without even looking at the document that's being referenced to and helping the government here with no personal knowledge. I know he's willing to do that, eager to do it, but he has no personal knowledge until he's seen the letter.

THE COURT: Well, first of all, a couple things are coming into play here. I don't -- and you wouldn't know this, but I don't have World Federation of Wrestling tag team rules with regard to objections. And what I mean by that is when there are multiple lawyers, the lawyer doing the direct examination then has to do the objection.

MR. BURT: I didn't realize that.

THE COURT: Yeah, you don't get -- you know, you have seven people there at counsel table I think or six at various times. I'm not sure who some of them are. I don't know if they're lawyers or not. But you don't all get an opportunity to object to the other side's questions.

MR. BURT: I didn't understand that.

THE COURT: Yeah. That's okay. But I assume your co-counsel will adopt your objection, and it's overruled. I'll take it subject to the objection.

MR. BURT: Thank you.

THE COURT: Thank you.

BY MR. WILLIAMS:

Q. I was about to ask, Mr. Willett, that it might be argued that you had an obligation to coerce your client into pleading guilty in order to seize the benefit of this case and if you needed to you'd coerce her to say whatever she needed to say in order to get --

MS. MORRISSEY: Your Honor, I'm going to object because that hasn't been an allegation made by petitioner. It's not relevant to the claims.

THE COURT: I'll take it subject to the objection.

A. I don't think we had an obligation to coerce. There has to be -- if it's not an Alford plea, there has to be a factual basis for a guilty plea which can only come from the client. I don't believe I've ever been one of these lawyers who look at a client and say, wink, wink, nudge, nudge, it's a great deal, just take it so we can get out of here. If the client can't give a factual basis, then we talk about an Alford plea which, you know, is, quite frankly, in my mind a great way to break an impasse at times when you have a client who wants to take the benefit of a deal but for some reason is either trying to save face or can't quite say the magic words depending upon the charge. They just have to be able to agree that a fact finder could find them guilty.

Q. And would you agree with me that it would be, frankly,

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 69 of 88

unethical for a lawyer to persuade a client who was insisting in their innocence to admit the facts that that client had told you they don't believe to be true?

**A.** Absolutely.

**Q.** Now, before the bodies were found in this case and before your client drew the maps, what was your assessment on the viability of a defense in this case?

**A.** That it was at least initially a defensible case.

**Q.** And that changed after the discovery of the bodies.

**A.** Certainly.

**Q.** Okay. But then you had a motion to suppress at that point.

**A.** Yeah.

**Q.** And what impact did that pendency of that motion to suppress have on the pursuit of a plea in this case?

**A.** I think it slowed the pursuit of plea negotiations down.

**Q.** And why is that?

**A.** Because there was optimism that we had a strong Massiah argument to the district court and we wanted to see how Judge Bennett would rule.

**Q.** And you had those conversations with your -- with Miss Johnson about the pros and cons of waiting and seeing what was going to happen.

**A.** Yeah, and I think it's reflected by the notes that they showed me, Pat Berrigan's notes, where it says Al good guy, Pat bad guy, and it showed who our panel was for the Eighth Circuit

after we had the favorable decision. I think it's sort of, you know, substantiated there.

**Q.** There was a note -- part of the allegation is the ineffective investigation in this case, and do you recall that there was an interview of a neighbor of the Duncans by the name of Proscovec?

**A.** I'm not sure she was ever interviewed before she passed away.

**Q.** Okay. But you remember that line of questions you were asked about Proscovec?

**A.** Yes, absolutely.

**Q.** All right. And when you learned about Proscovec, was that also at the same time you learned about any number of any other potential witnesses as well?

**A.** Yes.

**Q.** And did you do what you could then to figure out who needed to be investigated and who -- interviewed and so forth?

**A.** I'd like to think I did. That's another situation where I don't have an independent memory of who I was prioritizing.

**Q.** Do you know what Miss Proscovec's health condition was at the time that you would have first found out about her statement?

**A.** No.

**Q.** The allegation's made that you all were ineffective for failing to somehow secure her testimony before she died. Are

you familiar with that allegation?

**A.** Yes.

**Q.** Okay. And what's your response to that?

**A.** I wish I would have interviewed her before she died. And I guess that's my initial response.

**Q.** Well, and had you interviewed her before she died and then she died, do you think you could have used that interview in -- at least in the guilt phase?

**A.** I'm sure the government would have been objecting.

**Q.** You were asked about your opening statement and the preparation for that opening statement. You weren't asked about reading your opening statement. And when you gave your opening statement in this case, how did you present it?

**A.** There was a lectern right there. I had it typed out triple spaced, and I -- I tend to sort of stick to the script, if you will, when I give my opening statement.

**Q.** And why is that?

**A.** I'm nervous. I wanted to make sure especially in this case that what I had on the printed page I was able to convey to the jury. I'm glad I had a script because I remember there was a group of school children who were led in during the middle of my opening, and I completely lost my place and had to restart, so I was glad I had the script or the statement printed out in front of me.

**Q.** And, Mr. Willett, that's frankly your style, isn't it,

to -- when you give opening statements and closing arguments in any case, you tend to work off of the printed page when you present that argument?

**A.** Yeah. I'm getting better on closings because I tend to have a bullet-point outline, so I tend to be able to be a little more interactive, but I guess maybe when I'm giving an opening maybe it's a little more like a sermon and a little less interactive.

**Q.** All right. So the fact that you read your opening in this case wasn't something unique to this particular case.

**A.** No, absolutely not.

**Q.** And, in fact, you've read your opening on the cases where you've obtained acquittals; isn't that fair?

**A.** I have.

THE COURT: May I interrupt for a second --

MR. WILLIAMS: Yes, Your Honor.

THE COURT: -- while it's still fresh? And you tried a case in my court last month, and you had a script for both your opening and closing argument.

THE WITNESS: Correct, Your Honor.

THE COURT: And, in fact, in every trial you've ever had in my court, I believe you have -- because I have such a good view and I can see it, I believe you have a script.

THE WITNESS: Correct.

THE COURT: And that's just how Al Willett does it.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

## 953

THE WITNESS: That is, Your Honor.

THE COURT: Okay.

THE WITNESS: And I've had an acquittal in your courtroom.

THE COURT: Yes, you have.

BY MR. WILLIAMS:

**Q.** Mr. Willett, do you recall being asked questions about what evidence was presented about Dustin Honken during the penalty phase in this case?

**A.** Yes.

**Q.** Do you recall that line of questions? And the defense team ultimately decided to introduce into evidence the fact that Dustin Honken had received the death penalty.

**A.** Absolutely.

**Q.** Can you share with us what the process was, thinking process was, that went through the decision by the defense team to introduce that?

**A.** Mr. Berrigan may be able to speak to it just a little bit better than I, but we wanted this jury to know what -- because Mr. Honken's name had come up so much, we wanted this jury to know what the outcome in his case was, and we were hoping that that would give us a benefit in terms of the fact that, well, listen, this jury already found a culpable actor who's been given the death penalty on these counts, you know, regarding -- and with Mr. Honken I remember it was the two children that he

## 954

received the death penalty on. And we were hoping that by the jury seeing, well, somebody else got punished for this that this would benefit Angela.

**Q.** Did you recognize there was a risk in putting that evidence on?

**A.** Sure.

**Q.** And did you make a strategic decision to put it on based on your analysis of the pros and cons?

**A.** Again, I think Mr. Berrigan's in a little bit better position to answer that question, but I would say yes.

**Q.** Do you recall during the penalty phase that photographs of Angela Johnson were introduced into evidence?

**A.** Yes.

**Q.** And some might be argued to be risqué, a picture of her?

**A.** I wouldn't say they were risqué. I would call it a glamor shot.

**Q.** Okay.

**A.** But my -- and maybe I have a liberal definition of risqué. I wouldn't call it risqué. I would just call it a glamor shot. But in my mind it presented her in an attractive light.

**Q.** And why do you think that? I mean, did you recognize that some jurors might look at that and say, oh, boy, that's too risqué or I don't like that?

**A.** I didn't. And I realize juries in this part of the state are conservative, but I -- in looking at the photo, as I

## 955

described it, to me, it was a glamor shot. It's -- you know, it was the type of shot that a girlfriend might get for her boyfriend or a wife might get for her husband, but it wasn't like she was partially clothed or anything. She was wearing appropriate clothing. It just sort of put her in a fashionable light in my mind.

**Q.** Okay. So you considered the pros and cons of putting that photograph in?

MS. MORRISSEY: Your Honor, I'm going to object. Mr. Willett's prior testimony is that he had no involvement at all in penalty phase, and now he's --

THE COURT: Your microphone's not on.

MS. MORRISSEY: Oh. I apologize.

THE COURT: And you can remain seated.

MS. MORRISSEY: I apologize. Mr. Willett's testimony on direct examination was that he had no involvement at all in penalty-phase decision making and deferred everything to Mr. Berrigan. Now after deference to Berrigan throughout direct examination he suddenly becomes actively involved in the decision-making process.

THE COURT: Well, but they may have discussed it. And there's a difference I think.

MS. MORRISSEY: But the question was -- the question involved a decision-making process, a discussion. You know, Mr. Willett's position during direct examination was he

## 956

didn't -- he wasn't responsible for penalty phase, he didn't make decisions at penalty phase.

THE COURT: I understand that, but the question was so you considered the pros and cons. Now, I guess it means what "you" means because he wasn't apparently making the decisions, but he might be aware of whether it was discussed in the team. And so your objection's overruled, and you're free to do your redirect or -- on it and ask him more about it.

**A.** May I clarify that answer since we're here?

**Q.** Please.

**A.** I was certainly privy to certain discussions. Pat was the decision maker, but I was certainly privy to certain discussions regarding certain aspects of the penalty-phase case.

**Q.** And so you were aware because you were privy to those discussions that there was some analysis that went through in that decision making about whether to put on those photos and whether not to.

**A.** Right, but I think the consensus of the defense team was the photos put Angela in an attractive light and not a risqué light or an offensive light or anything like that.

**Q.** You were asked about cross-examination and the fact that you only crossed 9 witnesses out of the 50 witnesses. Do you remember that line of questions, sir?

**A.** Yes.

**Q.** Now, did the government's witness list have more than 50

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 349    Filed 11/10/11    Page 71 of 88

**957**

individuals on it?

**A.** I think so, and it changed. And I remember a better example from the penalty phase than I do from the innocence phase. I remember in the penalty phase I was only given three -- or I was only assigned three witnesses by Mr. Berrigan, and before each one of those witnesses came to the stand, the government decided not to call them. So the three witnesses I was assigned I never got a chance with. Now, I don't know if that's the answer for the innocence-versus-guilt phase, but I do know the witness list changed.

**Q.** Right. And that assignment was -- those assignments of who was going to take which witnesses and so forth, was that made on the run, or was that made prior to trial?

**A.** By the defense?

**Q.** By the defense.

**A.** Not on the run. Prior to trial.

**Q.** And based on what the government's witness list was at the time before you went to trial.

**A.** Correct.

**Q.** Now, you talked about the penalty phase and you were assigned some witnesses. Do you remember you were asked questions about why you didn't put on evidence, why the defense didn't put on evidence of Dustin Honken's bank robbery activities? Do you remember that line of questions?

**A.** Yes.

**958**

**Q.** Okay. Did the defense team discuss the fact that that existed and you could put it on?

**A.** I think that -- I think those discussions were held during the penalty phase.

**Q.** And do you remember what the analysis was by the defense team about whether to put that on or not?

**A.** No. I'm sorry. I don't.

**Q.** You talked about the fact that at one point you handed off McNeese witness to Mr. Berrigan because of your animosity toward Mr. McNeese.

**A.** Best decision I made.

**Q.** Do you recall handing off any other witnesses like that to other attorneys during the -- during the trial?

**A.** I'm not saying I didn't, but I just don't remember.

**Q.** Did you prepare outlines of your examinations of the witnesses you did cross-examine?

**A.** Yes. My outlines are a little bit different, but in the 1,200 pages I was given, in the very first volume, some of those handwritten notes are witnesses that I had, and they're points that I wanted to bring up. When I was a very young lawyer, the questions were pretty much scripted. And then I tried to sort of go to topical outlines. And then some of the time when there's numerous different resources as far as materials, in this case I was hand writing out different portions not so much as a question or as a topic but just to make sure I remembered,

**959**

okay, in this grand jury this was said, in this report this was said which would act as sort of a memory jog for me.

**Q.** And is that the style you use on every case for how you prepare for cross-examination?

**A.** It depends. I'm not -- I try to have sort of topical outlines is what I really strive for, but it just depends on the case and it depends upon the amount of detail and what I'm working with.

**Q.** Now, there's an allegation in the petition that the defense team failed to consider plausible explanations for how Angela Johnson came up with the maps to the location of the bodies other than that she drew them from memory.

**A.** Yeah.

**Q.** Did the defense team consider whether there was plausible explanations for that?

**A.** I'm not sure that ever came up. I remember when I went to see Angela after the discovery at the Linn County Jail, I just -- you know, I didn't get into it with her because, you know, I was just really afraid that I might lose my temper or say something critical and damage our relationship. I remember there being a general sense of her being apologetic but a general sense of it, but I didn't go in there going, "Why in the world did you do this?" I didn't do that.

**Q.** Do you recall at some point, though, that she gave an explanation for those maps saying something to the effect that

**960**

she went to visit Dustin Honken in prison, at some point he explained to her where they were and that's how she remembered in order to draw the maps? Do you remember that kind of explanation?

**A.** Yeah, I do now, yeah.

**Q.** Did you view that as a viable explanation to present to the jury in this case?

**A.** Personally, no.

**Q.** And why not?

**A.** I just tend to be a little cynical by nature, and I just -- I had a hard time accepting it. And to articulate that to the jury, one of two people would have to take the stand, either Dustin Honken or Angela. And Angela wasn't going to take the stand in this case.

**Q.** Why not?

**A.** Because I thought she would harm herself. Part of that was because of prior grand jury testimony that she had given before my representation. Part of that in all candor was I didn't think she could stand up to either your or Mr. Miller's cross-examination skills. And I wasn't about to let her take the stand.

**Q.** The strategy that was adopted for the defense theme was that she was merely present. And why don't you explain why you felt as an experienced trial attorney that was a viable defense in this case.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 349 Filed 11/10/11 Page 72 of 88

A. The primary thrust of the government's indictment was that she was an aider and abettor, but we were trying to keep her away from being the trigger puller. Now, obviously she can be convicted as an aider and abettor without pulling the trigger, but we were hoping that if we ended up at a penalty phase that would help us. And, of course, in a conspiracy, mere presence is a defense. You know, in -- and in an aider and abettor situation mere presence can be a defense. And we thought that was the cleanest argument that we had available to us.

Q. And in your view was merely being present, would that necessarily mean she was guilty of the offense?

A. No.

Q. And your tactic was that she was merely present because she got brought along by Dustin Honken but didn't know that -- what Dustin Honken had in mind. Wasn't that kind of the theory you guys had as a defense in the case?

A. Right. For example, knowing that she and Mr. Honken were going to Greg Nicholson's house but having no idea what Mr. Honken's plans were for these witnesses once she got there. And I know with Mr. DeGeus it was a little bit of a different discussion because there was some -- I think there was some evidence to suggest that maybe she wasn't there at all, but we didn't think it was as compelling evidence or as a compelling argument, so then it was, okay, she was there, but, again, she was merely present.

Q. Now, during the prep for this trial, do you recall there was an occasion where you all were -- that you did a mock jury selection?

A. Yeah. I'm trying to remember where we did that. Boy, I hadn't thought of that in a long time. I'm remembering it, but it's not coming into focus yet. I'm sorry.

Q. Do you remember Lisa Dahl, the jury consultant?

A. Absolutely.

Q. She was based out of Kansas City.

A. Yeah.

Q. Do you remember the group of people that was used for this exercise were friends and family of Pat Berrigan's? Does that ring a bell with you?

A. Yeah, and it was down in Kansas City.

Q. Took place in Pat Berrigan's wife's courtroom?

A. Yes, okay. I'm there.

Q. Okay. And do you recall that during that mock jury selection process that there was kind of training on the idea of asking questions of the -- of the jurors in individual voir dire? Do you remember that?

A. Yes.

Q. Okay. And did you go through your mock voir dire down there with Miss Dahl as well?

A. I don't think so. I think we were so concerned about the death penalty and Missouri was a death penalty state that that

was what we wanted to present to them because my voir dire here was sort of the traditional issues you would hear in any criminal law case.

Q. And Pat Berrigan's the one who did the voir dire as it pertained to the death penalty in this case.

A. Correct. And he took on the pretrial publicity issues.

Q. Now, when jury selection took place in the trial in this case, do you remember Lisa Dahl raising with you and the other members of the trial team that she had some concerns about Miss Johnson's behavior, the twirling of the hair, that she was acting in a way that wasn't sufficiently showing the gravity of what was going on? Do you remember that being raised?

A. I'm not sure if I remember Ms. Dahl -- the twirling of the hair sounds familiar. I'm not sure who it came from. But I remember us discussing with Angela that, you know, she had to be appropriate, that, you know, she had to have sort of what I call a good poker face. Ms. Johnson's voice is similar to mine in that it tends to carry, and we were worried that she might react audibly to something that could be overheard. And, you know, we didn't want any mannerisms that might put her in a negative light, rolling of the eyes, guffawing, something audible that the jury could overhear.

Q. In fact, you had experienced some of that in other hearings, right, where she had talked -- you know, stage whisper, if you will, but everybody could hear it, that she was

rolling eyes. I mean, you had experienced that she sometimes exhibited that kind of behavior before.

A. Some of the time when Miss Johnson would get exasperated she might say something under her breath and think she said it quietly, but in these federal courtrooms with these microphones, you know, if you're near a live mike, what you think is quiet is not.

Q. So did you or other members of the trial team give instructions to Miss Johnson about how to behave in the courtroom and how to look?

A. Yes.

Q. And what instructions were those?

A. At least for me it was that she should try to maintain her composure, that, you know, we gave her paper and pen if she wanted to write notes, that we didn't want, you know, audible comments, we didn't want rolling of the eyes, physical reaction to things that she may not agree with, to try to have a good poker face.

Q. Now, during jury selection Angela Johnson drew pictures of the jurors. Do you remember that?

A. Yeah, I think I do, yes, yes.

Q. And to some degree that was helpful in jury selection, wasn't it, because that took three weeks to select the jury and you had to kind of think back about what you had as jurors?

A. That's right, because she would draw pictures of the jurors

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 73 of 88

next to the number, so like if it was number -- and I'm just picking a number. If it was number 500, she might have a little profile of a man or a woman, and yeah, it was helpful.

Q. And did Angela Johnson continue to participate in the trial throughout the trial?

A. In the 1,200 notes I was given, 1,200 pages I was given, there's one page where there's a hand -- there's the copy of my trial note page. There's a copy of a Post-it sticker superimposed on the page, and it's -- and it's a question that certainly appears to be from Angela and then a copy of another Post-it sticker underneath that says, "This is a good question. Ask Al." And I remember that distinctly.

Now, there's a few other Post-it stickers where it's a little unclear who the Post-it is from, but there's one that looks like, okay, I think this was Angela's question.

Q. And is that consistent with your memory that she was an active participant in her defense during the trial?

A. Yes.

Q. Now, you've had other clients that are constantly bothering you, constantly passing you notes; right?

A. Yes, yes.

Q. That wasn't Angela Johnson.

A. No, no.

Q. But she also wasn't completely absent from participating in her defense, was she?

A. I didn't think so.

Q. At any point during the trial did you ever have the sense that she was incompetent in any way?

A. I never picked up on that, no.

Q. Did you ever observe any change in her behavior that made you think that she's not tracking or not able to follow what's going on in court?

A. I did not pick up on that, no.

Q. Now, were you aware of what her medication was during trial?

A. No. Well, let me correct that. I was aware generally that she was receiving some medication during trial. And I may have been told at the beginning what it was. But I'm not aware of any dosages. I'm not aware of any changes. That was never made -- I was never made aware of that.

Q. And you did not observe, though, any change in her behavior from the beginning of the trial to the end of the trial.

A. Well, I mean, there were times where it was appropriate in the sense that if there was particularly emotional testimony I think there were times when she had tears well up or there may have been times when she was quiet. I mean, if her emotions changed, I always considered them to be appropriate.

Q. Yeah, and that was a poor question I asked. And I guess what I was getting at, did you ever observe a change in her behavior that bothered you that made you concerned that she was

overly medicated during the trial?

A. Not that I perceived.

Q. Okay. And you said that there were times where she demonstrated what you consider to be appropriate emotions in response to some of the evidence or testimony.

A. Correct.

Q. She's been described as being completely stone faced during the trial. Do you recall, though, that when certain testimony came in, particularly like from her family and so forth, sometimes she would smile at the people she knew and had a relationship with? Do you remember that?

A. Yes.

Q. And at some points you said she would cry.

A. Yes.

Q. Now, was she drawing during trial?

A. My memory is yes.

Q. Okay. And did you have any concerns about her drawing during trial?

A. No.

Q. Now, at some point did you receive a note or did the Court receive a note from the jury concerning their ability to see Miss Johnson?

A. It was either near the conclusion or right after the conclusion of the innocence-versus-guilt stage.

Q. And what do you remember about that note?

A. They couldn't see her and they wanted to see her.

Q. And what decision did you as a trial team make in response to that?

A. After the innocence-versus-guilt stage, we switched to that table which was closest to the jury box.

Q. And did you have a discussion with Miss Johnson about the decision to switch so she would be closer to the jury and be more easily observed by them?

A. I don't remember being privy to that. I think -- and I'm not trying to avoid, but I think that might be a question better suited for Mr. Berrigan.

Q. The decision ultimately was made to move her closer to the jury so they could observe her, though.

A. Yes.

Q. What is your assessment of the performance by Pat Berrigan as defense counsel in his representation of Miss Johnson?

A. Mr. Berrigan is the best trial lawyer I've ever tried a case with in my career, period, same side of the table, opposite side of the table. I would try a case with Mr. Berrigan again tomorrow, any case.

Q. Did you find any fault in his representation of Miss Johnson?

A. No.

Q. How about Dean Stowers? What's your assessment of his performance as an attorney representing Miss Johnson?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 74 of 88

A. I like Dean, and initially his involvement on the team was he was sort of -- I kept referring to him as the appellate lawyer. I think Mr. Stowers has one of the brightest academic minds of -- I think he's right at the top in terms of criminal defense lawyers in terms of his academic ability. I mean, if I had to name five lawyers, I think he'd be in the top five.

I think Pat -- Pat's experience was at trial. My experience was at trial. Really Dean's experience was more of his work in front of the Eighth Circuit or the Iowa appellate courts.

So I don't find fault with him, but I think, you know, if I had an issue with how he did voir dire or something like that, it was more maybe inexperience because his strength was with judges and appellate courts as opposed to juries.

Q. And you looked into -- a little bit into his history, and he had a pretty good success record on appeal cases, didn't he?

A. He had a very impressive record in front of the Eighth Circuit. I was flabbergasted in terms of the percentages of cases he had where he had obtained relief in some form. I was amazed.

Q. Now, you did indicate during direct examination you had some concerns about his skill in doing jury selection, and you may have had other concerns about how effective he was as a trial lawyer from your comments here. Did you observe anything that you felt jeopardized the defense -- any performance by

Mr. Stowers that you felt fell below the reasonable standard for an attorney, a defense attorney, representing Miss Johnson?

A. I never saw him do anything that I felt jeopardized the defense. I mean, if I saw things I took issue with, it's like, well, maybe I'd have done that differently but never anything where I was going, oh, my God, that's a problem.

Q. The assertion's been made in the petition that Nancy Lanoue, your former legal assistant, had an inappropriate relationship with Angela Johnson and was a interference, a stumbling block, in getting Miss Johnson to come around to the idea of accepting responsibility and pleading guilty. Do you have an opinion about that observation or that allegation?

A. If I had to do it over again, Nancy spent more time with Angela than was necessary. I still would have used Nancy as a funnel to get her discovery, but in retrospect in looking at it with 20/20 hindsight, I should have been there more and Nancy should have been there less.

Now, as I sit here today, I'm not sure what the percentage is or what the split is. If I had to do that over again, that I would do differently.

Q. The assertion's been made in the petition that Nancy Lanoue is the one who persuaded Miss Johnson to maintain her position of innocence and had influenced her inappropriately. Do you think that occurred?

A. I would disagree with that assertion. I would say that

based upon Nancy's meetings with Angela and based upon the friendship that grew from those meetings -- and I don't mean this to sound critical. If it does, that's not the tone I'm taking -- but I believe Angie was able to convince Nancy of her innocence and she would relay those thoughts back to myself. And I'm sure she shared those -- you know, Nancy's not afraid to share her opinion. I'm sure she shared those opinions with Pat and Dean when she had the opportunity.

Q. And you had mentioned earlier that Miss Johnson had maintained her position of innocence from the beginning to the very end; is that right?

A. Correct.

Q. Including during her allocution before the Court at sentencing.

A. Yeah, yeah, I think you're right, yes.

Q. At the end of the day, Mr. Willett, without intending to offend you in any way, the reality is the defense team in this case lost. The defendant was convicted, and the jury sentenced her to death. If there wasn't error by counsel, what do you attribute that loss to?

A. There were two things I felt very badly about. I felt very badly that we could not convince the Court to switch venue to the District of Minnesota because we were coming to the same venue where the Dustin Honken case had been tried. And I felt very badly about that.

And I feel very, very strongly that during the penalty phase this jury shut down on us. Now, I don't -- I don't know if that's error of the lawyers or what it is. But I sat in the counsel table immediately behind your case agent, and I normally sat towards the inner side of the counsel table where I could watch the jury. And I just felt as the penalty phase progressed less and less people were listening with the exception of when Angela's two daughters testified. That got their attention.

Those are the two things I feel besides the result -- I mean, I feel worse -- the worst about the result, but in terms of the case, those are the two things that really have stayed with me.

Q. And I think you'd agree with me that the overriding issue throughout the trial was that we have two dead little girls.

A. Yes.

Q. And you thought at the time that you put together the mitigation case that you had put together a decent mitigation case; right?

A. I thought we put together in my mind at that time an excellent mitigation case. I thought Mary Goody did a tremendous job. I thought a lot of the family witnesses came off very well. I think some of our expert witnesses -- I mean, if I had to do it over again, some of those people I would use and some of those people I would not use. But I thought at the time we put together a very strong case for a life sentence.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 75 of 88

Q. What's your experience with the Iowa jury receptivity of experts in the area of mental health issues?

A. It's not real receptive.

Q. So as good of a case as you thought you could put on during the mitigation phase, your observation was it just wasn't selling to the jury.

A. Right.

Q. Do you attribute that to any fault by you or any of the other attorneys in what decisions you made in the case or how you presented the case?

A. I don't know if I can answer that question. I mean, I'm here as a fact witness, and I don't know if I can answer that question. I can say that we did the best job that we could do with the cards that we were dealt and the cards we played. None of us -- none of us wanted to see Miss Johnson sentenced to death. None of us still do. But we -- we did the best with the decisions we made and the cards we were dealt and the cards we were played.

MR. WILLIAMS: No further questions, Your Honor.

THE COURT: Let me ask my court reporter. Can you continue for a while, or do you need a break?

THE REPORTER: No, I'm fine, Judge.

THE COURT: Thank you. You may examine Mr. Willett, Miss Morrissey.

MS. MORRISSEY: My microphone's on.

REDIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Mr. Willett, when we sent you the 1,200 pages of discovery as well as the petition, did we tell you if you wanted to see anything or read anything more to let us know, we had lots more stuff?

A. If you did I didn't retain it. I won't sit here and say you didn't say that to me, but I -- if you said that to me, I didn't retain it.

Q. In fact, you were not naturally eager to undertake a review of these documents; is that correct?

A. I didn't do it immediately upon their receipt, no.

Q. In fact, you waited until the weekend before the hearing started to review the documents.

A. Yes, at least in part because I wanted them to be as fresh in my mind as they could be.

Q. But even though you don't remember it, if you had really had a need to see any additional case documents, you know you could have called us. You had our numbers. And we would have provided them to you; correct?

A. I'm sure that would have been the case.

Q. Okay. But, quite frankly, understandably, rehashing this case is probably not on the -- your list of favorite things to do.

A. There's a lot of memories I've tried to suppress.

Q. Now, you indicated that you thought that you did enough investigation to dig holes in the prosecution's case; is that correct?

A. I'm not sure when I said that, but if I said that earlier, I won't dispute it.

Q. Mr. Williams asked you that you -- asked you whether you investigated to try to, you know, dig holes in the prosecution's case.

A. Okay. Okay.

Q. And you said that you did investigate but you decided not to put on anything that you found. Would that be correct?

A. I'm not -- I'm not sure that's correct. There was a decision made not to go with any defense witnesses. I think that would be the most accurate thing I could say.

Q. Did you have any defense witnesses at the time you made the decision not to go with any? Did you have any in mind?

A. I'm not thinking of any as I sit here right now.

Q. Do you agree you can't make a reasonable decision not to present a defense unless you investigate to discover what defense there is to present?

A. That would certainly be true.

Q. That investigation is a prerequisite for a tactical decision on presenting a defense; correct?

A. Certainly.

Q. All right. You were asked about the status conference at

which Mr. Parrish participated in November of 2000. Do you recall that?

A. Yes.

Q. Okay. The letters that you got from Mr. Honken were right after Miss Johnson was arrested, in fact, in August of 2000; correct?

A. Yes.

Q. So that there was at least that period of time from August until November when I believe you had your first teleconference with Mr. Parrish that the issue of his invitation to visit him was outstanding; correct?

A. You mean Mr. Honken's invitation to come visit him was outstanding?

Q. Yes.

A. Yes.

Q. Okay. Now, you indicated that you shied away from doing anything about Terry DeGeus's abuse of Angela because you didn't want to give the government -- you didn't want to give Angela a motive as to Terry DeGeus; is that correct?

A. That's my memory.

Q. Okay. Let me ask you, wasn't the government's theory that that was precisely the motive for the Terry DeGeus killing, that she was -- you know, it was payback for years of abuse?

A. Sure, but I didn't want to highlight it in cross.

Q. Well, if you don't do anything to rebut it, I mean, how do

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 76 of 88

**977**

Q. you defend your client? It was their theory, and you didn't do anything to repeat their theory, but you didn't do anything to rebut their theory either.

A. Is that a statement or a question, Miss Morrissey?

Q. That's a question. Did you do anything to rebut that theory?

A. And that was through the testimony of who again? I'm sorry.

Q. Did you -- well, you said that you made a decision that you didn't want to present any evidence of Terry DeGeus's abuse of Miss Johnson because you didn't want to give her a motive.

A. But didn't that come out of the cross-examination of a certain witness? Isn't that how this discussion arose?

Q. Well --

A. And I guess if that's how this discussion arose, my answer to your question would be I would obviously try to cross-examine or impeach on other points.

Q. Okay. Did you present any evidence that you remember to rebut the prosecution's attribution of abuse of Miss Johnson as a motive for her to kill Terry DeGeus?

A. I don't have an independent memory as I sit here today.

Q. You indicated that you did follow up on Mr. Honken because you received two to three affidavits; correct?

A. Yes.

Q. Now, the affidavits were nothing that you went out and

**978**

sought.

A. No.

Q. In fact, they arrived in the mail.

A. Yes.

Q. Okay. And once you received them, what you did was just essentially verify that the inmates who said they were inmates were, in fact, inmates.

A. Correct.

Q. And that was the extent of the investigation you did into Honken.

A. I'm not necessarily going to agree with you about what I -- that the only thing I did with the affidavits was verify that these gentlemen were inmates. I can't remember, but there's something else. I want to disagree that the only thing I did was take the affidavits and shelve them away, but I'm not remembering.

Q. Is it fair to say -- would you say that either that Mr. Cornell might be able to assist us in any -- if any investigation was, in fact, done?

A. I would think Mr. Cornell would be primary. I don't think Mr. Gratias would have had anything to do with that based upon the timing of his entry to the case.

Q. You indicated that in the Northern District you -- as you told us, you knew you had to give a proffer before you got a deal; is that correct?

**979**

A. Yes.

Q. And that your position -- the position of this team despite your own knowledge of what really went on here was we aren't going to proffer.

A. Correct.

Q. Okay. But ultimately there was a proffer.

A. There was a proffer prepared by Mr. Berrigan.

Q. There was a last-minute Hail Mary, here, we're going to do something we've always said we wouldn't do, proffer.

MR. WILLIAMS: Argumentative, Your Honor.

THE COURT: Overruled.

A. I wouldn't describe it in the way you described it, but it was certainly a proffer that was at the -- towards the conclusion just before trial.

Q. And did you attend any capital defense training sessions during the five years that you were on this case?

A. Yes, I went to Memphis.

Q. You went to one in Memphis.

A. Yes.

Q. What year was that?

A. It was before the trial.

Q. Okay.

A. And my memory was I went there with Mr. Berrigan, and I believe Mr. Stowers was there also. No, I know Mr. Stowers was there also. And I want to say it was in the spring.

**980**

Q. Okay.

A. So I'm thinking 2004, 2003?

Q. All right. You said that you rejected this -- this was you, you were a part of the team, and you, the team, rejected the requirement that you submit a proffer as something that would get you into a really bad situation.

A. Correct.

Q. Okay. But ultimately you got yourself into a really bad situation by doing a proffer without a plea.

MR. WILLIAMS: Objection. Leading and argumentative, Your Honor.

THE COURT: Overruled.

A. I don't know how to -- well, if you're saying a really bad situation based upon the result of the trial, if that's where you're heading . . .

Q. No. You testified when asked on cross-examination that you rejected the idea of doing a proffer before a plea agreement because it would get you into a really bad situation if the government didn't believe the proffer and you had to go to trial.

A. Sure.

Q. Okay. And yet you did that -- you did it despite your fear that it was a really bad -- it would get you into a really bad situation.

MR. WILLIAMS: Misstates the evidence, Your Honor.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 349 Filed 11/10/11 Page 77 of 88

Miss Johnson didn't ever proffer. There was an attorney proffer which is different.

THE COURT: Right.

MS. MORRISSEY: Okay. That was --

THE COURT: Yeah. Well, it's a very important difference, particularly in this district.

BY MS. MORRISSEY:

Q. Okay. So the attorney proffer conveyed what Miss Johnson would say if she proffered; correct?

A. Yes, that was my understanding.

Q. Okay. So it was one step removed from an admission by Miss Johnson; correct? It just couldn't be attributed -- held against her -- let me withdraw that.

Would you expect litigation if Miss Johnson testified contrary to a proffer at a trial?

A. Yes.

Q. Okay. So it was more than just an attorney's word that didn't mean anything; correct?

MR. WILLIAMS: Argumentative, leading.

THE COURT: Overruled.

A. I'm sorry. I'm not sure how to answer your question. I'm not trying to be obtuse but . . .

Q. I know. It's been a long day. How worse a situation could you be in than what happened ultimately in this case which is the death penalty?

MR. WILLIAMS: Argumentative, Your Honor.

THE COURT: Overruled.

A. There is no worse situation than to have your client sentenced to death.

Q. Okay. Now, you said that you were concerned that you didn't think that any proffer by Miss Johnson would go well; is that right?

A. Correct.

Q. Now, what -- Miss Johnson had some information, didn't she? At least when you first met her, she had confessions by Dustin Hoffman (sic) to five homicides; correct?

A. Yes.

Q. And she knew where the bodies were.

A. Yes.

Q. Correct?

A. Yes.

Q. That's a lot to be able to present to the government.

A. Yes.

Q. And yet you didn't go to the government when you had this information that I think you'll admit would have been very attractive to them; correct?

A. Correct.

Q. And actually she had the information consisting of admissions by Dustin Hoffman up until the moment she was found guilty -- or she had that up until the moment he was found

guilty. That could have been available to the government; correct?

A. Ms. Morrissey, I wasn't smirking, but you keep saying Dustin Hoffman, and I keep thinking of the actor and not the criminal Mr. Honken.

Q. Can we just -- I wish we could just stipulate that I'll misspeak constantly and that if I misspeak we'll just insert the correct name.

A. And I apologize, but every time you say Hoffman, I'm imagining somebody else, so I'm --

Q. I know. I'm sorry.

A. Could you repeat your question one more time, and I'll think Honken if you say Hoffman.

Q. Okay. Up until the moment that Dustin Honken -- get it right -- was convicted, Miss Johnson had something that would have been valuable to the prosecution in the admissions that she had from Dustin about his involvement in five homicides.

A. Yes.

Q. And she would have proffered to that; correct?

A. That's the $64,000 question.

Q. She would have gone in and said, "I knew about this because he admitted it to me."

A. I'm not willing to admit that point to you or concede that point to you. That was the great unknown, Ms. Morrissey.

Q. Well, but she told you when you and Mr. Berrigan finally

went in in November of 2004 when you got the note from Miss Lanoue, you got that information, didn't you?

A. Yes.

Q. The mere pr -- you talked about your discussion of the mere presence defense and you thought it worked -- it would help you about the first -- the four homicides; correct?

A. Yes.

Q. And then you said, well, as to the Terry DeGeus homicide, there was evidence suggesting that she wasn't there --

A. Yes.

Q. -- at all, but we decided to go with the mere presence defense at that point.

A. Yes.

Q. Okay. The mere presence defense really didn't work very well with the Terry DeGeus homicide, did it?

MR. WILLIAMS: Argumentative and wonderful hindsight.

THE COURT: Overruled.

BY MS. MORRISSEY:

Q. Did it because of -- she was there the first time, the theory of defense?

A. It was -- it was problematical when the jury found her guilty of the first four murders; then it became problematical in relation to the last murder.

Q. Do you think it was a bad idea to abandon a defense of she was not there in favor of a mere presence defense that was

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 349 Filed 11/10/11 Page 78 of 88

doomed to failure from the outset?

MR. WILLIAMS: Argumentative, Your Honor.

THE COURT: Sustained on that one.

BY MS. MORRISSEY:

Q. Did you think given the fact that there was a mere presence defense to the four first homicides that you were likely to be successful in raising that defense on the second?

A. If we had been successful on the first four, then there's the argument that we certainly could have been successful on the last murder.

Q. Is there -- well, no. But because of -- because of the -- Miss Johnson, according to the defense theory, had been present at the time of the four homicides but didn't know anything that was going to happen, okay, doesn't that weaken her ability or your ability to defend her on mere presence as to DeGeus because how could she be in the same innocent state of mind that she was at the -- before the four homicides? Do you get what I'm saying?

A. It is, but you're -- it's a tighter walk to walk, but -- that's the best answer I can give you, Miss Morrissey.

Q. Now, the mere presence defense -- let me mark this as 45. Do you recognize these as Mr. Berrigan's notes -- actually this is going to be Exhibit 45 -- of the jail visit -- oh, of a jail visit at which you were present on May 8, 2002? After you've looked at it and see -- had a chance to look at what the exhibit

is, I'm going to take you to a certain portion of the interview.

A. These are Mr. Berrigan's handwritten notes.

Q. Now, I'm going to take you to page 4 which I have up, and this paragraph says mere presence defense discussed by Al, denies being present even with McNeese information presented to her.

A. Yes.

Q. Okay. Now, how as a lawyer do you present a mere presence defense given the fact that your client is absolutely involved being present -- denies being present? What is --

A. If I had a copy of the jury instructions, I could probably answer the question.

Q. If you had a copy of the jury instructions?

A. The Eighth Circuit model jury instructions, I might be better able to answer the question.

Q. Well, I mean, the -- isn't there an ethical issue of presenting a defense that your client has specifically told you isn't correct? Your client -- I mean, if I -- for example, if you had a client who says I wasn't there and was charged with a homicide, says I wasn't there and you decide that he's crazy as a loon and you better present a mental health defense, are there ethical concerns with presenting a defense that your client has denied?

A. What was the timing of these notes? May I see the very front page?

Q. These notes were on -- for a meeting on May 8, 2002.

A. Okay. What I don't know the answer to is what shift there may have been between May of 2002 and the date of trial.

Q. Well, do you have any reason to believe there was a shift in this position?

A. I can't answer the question one way or the other.

Q. Do you have any notes indicating she ever said she was present at any point in time?

A. Ms. Morrissey, I haven't seen my handwritten notes since the conclusion of this trial.

Q. You don't know whether you have any notes.

A. I don't know because no one's presented me with my notes file.

Q. Well, the 1,200 pages contained all of your -- contained a lot of notes; is that correct?

A. But they were notes relating to witness outlines. They were notes relating to jury selection. They were notes relating to the trial, and they were notes relating to the penalty phase. I have not seen my notes file prior to this trial.

Q. Well, Mr. --

A. Since the conclusion of the trial.

Q. Mr. Willett, if I were to say that nobody else has seen your notes file either, where would you suggest we start looking?

A. I know there was one box lost to the flood, and I don't

know if they're there or not.

Q. And this whole idea that maybe her position changed about mere presence, let me talk about that.

A. Sure.

Q. Didn't you testify on cross-examination that Ms. Johnson never, ever, ever admitted being involved in these crimes?

A. She never, ever admitted to the killings.

Q. She never, ever, ever admitted being involved in the crimes, did she?

A. Are we talking about the drug counts? What --

Q. We're talking about the homicides.

A. Yeah, she never, ever admitted killing any of these people.

Q. Did she ever admit being present at the time these people were killed?

A. There was discovery where other people said she had made admissions to them that she was present.

Q. My question is did she ever -- did your client ever admit to you that she was present at the time of these crimes?

A. I don't have a memory one way or the other except from what you've just shown me.

THE COURT: But, Mr. Willett, don't you think -- I realize it's been a long time and you don't have the benefits of your notes. But don't you think if your client told you she was present at the scene of the murders that's something you might remember?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS Document 349 Filed 11/10/11 Page 79 of 88

THE WITNESS: Yes, Judge.

THE COURT: And do you ever remember your client telling you that?

THE WITNESS: Judge, not as I sit here today.

THE COURT: Okay. Thank you.

BY MS. MORRISSEY:

Q. Thank you, Mr. Willett. Would it be fair to say that Ms. Johnson was a handful to be with in court?

A. No, that's being too critical of Miss Johnson. I wouldn't agree with that.

Q. Okay. Well, you said that she would make -- twirl her hair and make --

A. No. I apologize for cutting you off. Please finish your question.

Q. Did you -- oh, I'm s -- you said that you didn't recall hair twirling but you were worried about audible reactions at prior hearings; is that correct?

A. Right. My memory to answer -- I'm sorry. Were you done with your question?

Q. Yes.

A. My memory is after we talked to her about having a good poker face she did. And I remember maybe one or two instances where maybe Pat Berrigan had to remind her or maybe it was Dean or maybe it was me, but after that basically beginning lecture she was pretty much fine.

Q. And did you wait until the jury was there to counsel her about a poker face?

A. No, I don't think we did. And I remember it came up early on because there was some news -- and this was during jury selection I believe, but there was some news video capturing her leaving the courthouse and smiling and waving at the cameras. And we sort of had a "what in the world were you thinking" discussion.

Q. More than what in the world are you thinking, it's crazy, don't you think?

A. No, I'm not going to agree with you that that's crazy.

Q. You don't think that's behavior that raises mental health issues.

A. I'd be in no position to render an opinion on that.

Q. Was it easier for you with Miss Johnson being quiet and drawing rather than speaking?

A. I wouldn't say it was easier one way or the other. I mean, I want my clients to communicate with me. I want them -- here's the guideline I always have for my clients. I always give them pad and pen because I'm not one of these attorneys who can react to somebody pulling on my sleeve and whispering in my ear while I'm trying to listen to what's being -- taking place on the witness stand. So I always ask my clients please write down, you know, anything you want us to know.

Now, for a large part of the trial Angela was not

sitting next to me. I was sitting in the seat where Mr. Burt has his laptop. Then it was Mr. Berrigan. Then it was Angela. And then it was Mr. Stowers sitting on the end where that hand cart is. So I was not always next to her. One of my practices is also to try to confer with my client before I conclude a witness. Now, in this case I may have been conferring with Pat saying is there anything else.

Q. Do you remember -- you talked about criticisms you had of the case that was presented. You were, in fact, very critical of Mr. Stowers' presentation with Dr. Cunningham; would it be correct to say?

A. Yeah. Was it Mark Cunningham?

Q. Yes.

A. I was.

Q. And you thought that it was dragged out and long and it did not advance your position; correct?

MR. WILLIAMS: Objection. Leading.

MS. MORRISSEY: It is leading.

BY MS. MORRISSEY:

Q. What did you think of Mr. Stowers' presentation with Dr. Cunningham?

A. Dr. Cunningham's presentation was repetitive in large part of other experts who'd already testified for the defense case. It was too long, and the jury looked mad.

Q. Okay. And your position as a jury viewer during penalty

phase, you were sensitive to their reactions.

A. I had a front-row seat.

Q. And did you share that with Mr. Stowers?

A. Well, I remember I think I said this at a break because since he lasted an hour and a half, I think there was a break, and I -- the discussion we'd had the night before was Dean was laying out what Dr. Cunningham was going to testify to, and I remember saying is there some way this could be cut down, this seems repetitive of prior experts, and he said -- and basically an acknowledgment that's a good idea, and then we get -- we get into this and it's full blown, and I remember saying what's going on, and basically the answer was Dr. Cunningham wanted to do it this way.

Q. So you did discuss it with Mr. Stowers, and he told you he was doing it the way Dr. Cunningham wanted to do it.

A. Yeah, that's my memory.

Q. Who controls the presentation of defense? Lawyers or experts?

A. One would hope the lawyer.

Q. At that point did you think it was too late to try and intervene and stop it?

A. I wasn't going to tell Mr. Stowers how to conduct the examination of the witness.

Q. But wouldn't it have been in Miss Johnson's best interest to advise him that he was doing something that made the jury

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

angry or look angry?

**A. Well, I believe I did communicate that to him.**

Q. That was before you saw the jury actually react with anger.

**A. They were looking frustrated and tired and annoyed.**

Q. And you said that you were in this place to notice the jury's reactions from the beginning of penalty phase?

**A. Yes.**

Q. And did you notice problematic reactions by the jury at the beginning of penalty phase?

**A. No.**

Q. It was just with Dr. Cunningham?

**A. No, it was an evolution in terms of my comment about the jury shutting down.**

Q. And did you discuss the jury shutdown with the other lawyers in the case?

**A. I have a memory of when we were awaiting the jury's verdict sitting in this little cloakroom off of the third-floor lobby and we were sort of discussing what we all thought, and I remember expressing concern at that time.**

Q. Okay. Would you agree with me, Mr. Willett, that as the jury's out, at the time the jury's out deciding penalty, it's a little bit late to discuss concerns?

**A. Certainly.**

Q. Now, when we contacted you first about this case in January, did we tell you that Judge Bennett had entered an order

that you could be reimbursed for any review of the file prior to this hearing?

**A. Sure.**

Q. Okay. And that's, in fact, why we presumed to give you 1,200 pages because we thought it wouldn't be burdensome and you could be reimbursed for it.

**A. Yes.**

Q. Okay. And do you remember recently when you spoke on the phone to Mr. Williams that you told him you had not yet reviewed the materials?

**A. Right. That was the Thursday before this last weekend.**

Q. Okay. And do you think that as lead counsel in this case you have a continuing duty to Miss Johnson to show up for this hearing prepared?

**A. I believe I have showed up for this hearing prepared.**

MS. MORRISSEY: May I just have a moment, Your Honor?

THE COURT: Yes.

BY MS. MORRISSEY:

Q. In your -- do you recall writing a note to Mary Goody expressing surprise about what Dr. Cunningham was testifying to?

**A. Yes.**

Q. Okay. And were you surprised about Dr. Cunningham's testimony because you weren't there the night before when he was being prepared by Mr. Stowers?

**A. It's not that -- you're right. I wasn't there the night**

**before when he was being prepped. What I was surprised by was when I left it was my understanding that the testimony would be narrowed and then the next day it was full blown.**

Q. Okay. So you weren't there the night before. You were there the day before?

**A. I was there the night before. I wasn't there during the time frame when Mr. Stowers was prepping Dr. Cunningham.**

Q. Where were you?

**A. When I had this discussion with Dean?**

Q. No, when Dean was prepping Dr. Cunningham.

**A. I may have been upstairs in my own hotel room.**

MS. MORRISSEY: Thank you. I have nothing further.

THE COURT: Mr. Williams?

RECROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Willett, I just have one line of questions to ask you here.

**A. Okay.**

Q. You were asked the questions about, boy, didn't Miss Johnson have something to offer early on? She had the confession from Dustin Honken, she had the location of the five bodies. Do you remember that line of questions to you?

**A. Yes.**

Q. Okay. Up until McNeese got the maps from Miss Johnson and gave them to the government where we found the bodies, had Miss

Johnson told you, "Hey, by the way, Mr. Willett, Dustin Honken has made confessions to me, and I know where the bodies are"? Did she ever tell you that?

**A. No.**

Q. Okay. So you did not have up until we found the bodies information to know that your client even knew where bodies were located.

**A. That's my memory.**

Q. She never told you that, did she?

**A. That's my memory, correct.**

MR. WILLIAMS: Nothing further, Your Honor.

THE COURT: Miss Morrissey?

MS. MORRISSEY: Yes.

FURTHER REDIRECT EXAMINATION

BY MS. MORRISSEY:

Q. You didn't know that, Mr. Willett, because you didn't ask her, did you?

**A. Correct.**

MS. MORRISSEY: Thank you. I have nothing further.

THE COURT: Mr. Willett, I do have a couple questions for you. It might be a few more than a couple.

THE WITNESS: That's okay, Judge. I'm not counting.

THE COURT: Thank you, because I do. I'm a little bit confused about whether you read the entire Cutkomp direct and cross from his testimony in the Honken trial or not when you

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 81 of 88

were preparing to cross-examine him in the Johnson trial.

THE WITNESS: I have some memory of reviewing that transcript. I just don't have a specific memory as to how much. But I have some memory of reviewing -- when I stated earlier I reviewed portions of the trial transcript, Cutkomp was one of the people I was thinking of. I just -- Judge, I'm sorry I can't give you the specific answer.

THE COURT: That's okay, and that's kind of what I wanted to know. Did the portion refer to portions of the entire transcript of the Honken trial or portions of Cutkomp's direct and cross-examination?

THE WITNESS: My memory is when I reviewed selected portions it was of selected witnesses so if I took a witness I took it all; okay? That's my memory.

THE COURT: And -- okay. We'll leave it at that. Okay. Let me move to another area. It's a slightly different phraseology of what Mr. Williams asked you. He asked you if you had any concerns about Angela Johnson's competency during the trial, and I want to parse it a little bit differently. Did you have any concerns about her ability to assist any of the defense lawyers during the trial?

THE WITNESS: No.

THE COURT: Do you have an opinion -- well, let me phrase it differently. Do you agree or disagree with me that Mr. Berrigan's direct examination of Marvea was perhaps the finest piece of lawyering you've ever seen?

THE WITNESS: That would be one of many examples during the course of the trial. I would agree with the Court.

THE COURT: Were you -- you know, you're being criticized for what you didn't do, and I'm not going to ask you about what you didn't do. But based on what you did do, were you aware of any other potential defense other than mere presence other than a general denial?

THE WITNESS: Sure. Not that I can think of, Judge.

THE COURT: And this is something that I'll probably need to ask Mr. Berrigan about, but because you may have been present at discussions, I'm going to ask you, and then I will ask Mr. Berrigan.

This individual named Proscovec -- and I may not be pronouncing it correctly.

THE WITNESS: No, it is.

THE COURT: -- neighbor of Lori Duncan.

THE WITNESS: Yes, Phyllis Proscovec.

THE COURT: And your legal assistant prepared several memos that included information about her testimony and the government's interview of her where the time line that she gave the government is kind of -- is in my view inconsistent with the government's theory of its case.

THE WITNESS: Absolutely.

THE COURT: Are you tracking me?

THE WITNESS: Absolutely.

THE COURT: Okay. What I want to know was was there any discussion about trying to get the government memo into evidence or the individuals who interviewed her even though it would be hearsay in the penalty phase on the issue of residual doubt?

THE WITNESS: Not that I remember.

THE COURT: And to a certain extent it's inconsistent with a mere presence defense, but once you've lost that, I'm just curious as to whether you explored trying to use that, because I did give residual doubt after a lot of thought. I think I actually wrote an opinion about it, if I recall correctly, as a mitigator. I just want to know if you recall any discussion about that.

THE WITNESS: I don't recall any discussion, Judge.

THE COURT: I don't have any additional questions. Miss Morrissey, any follow-up questions?

MS. MORRISSEY: I really have one.

FURTHER REDIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Mr. Willett, do you agree that a lawyer can do the best job in the world of doing a direct examination of one witness and still be ineffective?

A. Can still be ineffective?

Q. Yes.

A. It's theoretically possible.

MS. MORRISSEY: Thank you.

THE COURT: What's more important, Miss Morrissey, I believe that, without expressing any view in this case.

MS. MORRISSEY: Thank you.

THE COURT: But I've often cited his direct examination of Marvea as the single best piece of lawyering I've ever seen. And when I saw her name on the defendant's exhibit I -- witness list, my own initial reaction was they're making a huge mistake by calling her, that it was absolutely going to backfire. And I thought it was the most powerful -- I can't imagine more powerful mitigation than that direct examination. I just thought it was -- I mean, to me it was the Rembrandt of direct examination. I've never seen anything finer. And I've seen a lot of good directs. I've seen a lot of horrible ones too but -- so any follow-up questions?

MS. MORRISSEY: No. Thank you.

THE COURT: Mr. Williams?

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Guess what. You can go home.

THE WITNESS: Thanks, Judge.

THE COURT: And you wouldn't knowingly violate one of my court orders, would you?

THE WITNESS: Never.

THE COURT: Okay. Then you're going to submit a CJA

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

voucher, aren't you?

THE WITNESS: I will, Judge.

THE COURT: Okay. Thank you.

THE WITNESS: Thank you.

THE COURT: And sorry about the scheduling.

THE WITNESS: That's . . .

THE COURT: I know how busy you are. But I know how important this is too.

THE WITNESS: This is more important than my schedule.

THE COURT: Thank you. And thanks for being so gracious about accommodating our inability to accommodate you.

THE WITNESS: Okay, Judge.

THE COURT: Now, Mr. Willett's free to leave. Now that I see we're actually quite a bit ahead of schedule, tongue firmly in cheek, here's my dilemma. I've already told people we're not going on Sunday, so we're obviously way behind schedule. Would you -- can we agree on that, Mr. Burt?

MR. BURT: Yes.

THE COURT: And we're unlikely to catch up by Saturday; is that right?

MR. BURT: I wouldn't rule that out yet, Your Honor.

THE COURT: Okay. Well, we're going to go on Saturday, but I've already -- I had to kind of tell people whether we're going on Sunday or not, and I thought based on yesterday we're not going on Sunday.

MR. BURT: We had assumed we were not.

THE COURT: Okay.

MR. BURT: And if we were going to spill over, it would be Monday, Tuesday.

THE COURT: Okay. So the plan is to spill over on Monday and Tuesday, and that's okay with everybody.

MR. BURT: Yes.

THE COURT: And then if we don't finish, we'll find some more time hopefully in that June time frame, so I realize travel from your respective cities is quite burdensome. But you want to go with your next witness?

MR. BURT: I do, Your Honor. It will be Mr. Miller, one of the prosecutors. He is going to be relatively brief, but I'd like to get him on today because he's been here and has other commitments.

MR. WILLIAMS: Your Honor, as much as I'd like to get him on too, the Court has not ruled on the issue -- I anticipate again that the defense may try to get into questioning into areas that the government believes is attorney work product, attorney opinion work product, and areas that we think are privileged that they can't get into. Court's not ruled on that, so I'm not sure where we are with regard to Mr. Miller.

MR. BURT: I think that's a question-by-question issue, and I do not intend actually to get into areas of what Mr. Miller said to DOJ or what Mr. Miller said to his

compatriots. What I was going -- until the Court has ruled on that issue.

THE COURT: Okay. Well, here's what -- let's talk about that. We need to get Mr. Miller on and off because we're stopping at six.

MR. BURT: Yes.

THE COURT: Okay.

MR. WILLIAMS: And, Your Honor, just so you know, Mr. Berry is going to be present in case he believes by the department he has to invoke some privilege.

THE COURT: Sure.

MR. WILLIAMS: I've asked Mr. Berry to do that if that's okay.

THE COURT: Would you like him to sit at counsel table with you? Sure. Get close to a microphone, Mr. Berry.

MR. BERRY: Thank you, Your Honor.

THE COURT: Okay.

Would you raise your right hand, please.

THOMAS MILLER, PETITIONER'S WITNESS, SWORN

THE COURT: Okay. Thank you. Please be seated. Adjust the chair and the microphones so you can speak directly into them. And would you tell us your full name, please, and spell your last name.

THE WITNESS: My full name is Thomas Henry Miller, last name spelled M-i-l-l-e-r.

THE COURT: And one question before I turn it over to counsel. I represented to counsel that you were not related to the attorney general. Was I wrong?

THE WITNESS: No, you were correct.

THE COURT: Okay. Thank you.

THE WITNESS: Very common name.

DIRECT EXAMINATION

BY MR. BURT:

Q. Good afternoon.

A. **Good afternoon.**

Q. Could you for the record tell us what your relation to the case of Angela Johnson is.

A. **Special assistant United States attorney.**

Q. And were you assigned to this case from the beginning?

A. **I was assigned approximately in November of 1999.**

Q. And were you with the case until the end, through the penalty phase?

A. **Yes, sir.**

Q. Were you also involved in the trial of the codefendant, Mr. Honken?

A. **Yes, sir.**

Q. And during the course of your involvement in the case, did you have occasion to engage in plea discussions with both the Honken team and the Johnson team?

A. **I specifically remember one incident with the Johnson team.**

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 83 of 88

Q. Okay. And that's what I'd like to focus on is statements that you recall making to the Johnson team during the course of plea discussions.

A. Sure.

Q. Okay? I've had marked as Plaintiff's next in order a memorandum. Before I show you that, I want to ask you, did you during the course of your plea discussions with either the Johnson team or the Honken team make any contemporaneous notes of what the conversations were?

A. No, sir.

Q. Okay. Showing you Exhibit 46 which is a note that will later be identified as a note written by Miss Johnson's trial counsel Pat Berrigan, and you'll see the indication at the top of this document is that it's a memo reflecting a plea discussion that took place on August 21, '02.

A. Yes, I see that.

Q. Okay. At the very bottom of the page -- and just on the top the people present in Dean Stowers' office were Dean Stowers apparently, Mr. Reinert, and yourself. Do you recall that you were present for such a meeting?

A. Yes, I do. I believe Mr. Berrigan was present as well if I'm not mistaken.

Q. Yeah, he's the one taking the notes, so he's not listed up there. At the very bottom of this note by Mr. Berrigan is a notation which says Miller reflected that he and Pat R. had

talked early on about offering A.J. 10 to 15 years for information leading to recovery of the bodies.

Do you recall making such a statement to Mr. Berrigan and the other defense lawyers during this meeting?

A. I don't have a specific recollection of making that specific comment. However, I remember the conversation, and I well may have made that comment.

Q. And what would that comment have been based on at that point?

A. I had been -- we had been informed by defense --

MR. BERRY: Your Honor -- excuse me, Your Honor. This may get into privileged material. It's a broad question, what would that be based on. The witness certainly can testify --

THE COURT: Well, if it gets into privilege, you can make an objection.

MR. BERRY: Okay. I will object to the --

THE COURT: Well, no. You can make an objection if it gets into privilege. You can't make an anticipatory objection that it might get into privilege. If it gets into privilege, make your objection, and I'll rule on it. I mean, you can make any objection you want, but I'm not --

MR. BERRY: Understood.

THE COURT: -- going to sustain the objection until he gets into privileged matters, and then I'll have to decide it.

MR. BERRY: Understood.

BY MR. BURT:

Q. You can answer.

A. I had been surprised at the suggestion of a 15-year prison sentence at that time considering the fact that the bodies had been found, and I did not consider that that was realistic. I do remember specifically feeling that a 15-year discussion was not a realistic basis for resolution discussions at that point having found the bodies. And it's -- I don't doubt -- I don't have a specific recollection, but I don't doubt that I would have commented to Mr. Berrigan and Mr. Stowers that that train had long since left the station since the bodies had been discovered.

Q. Are you saying that the context for the comment which you I think have generally said you may have made was that the defense had offered you a -- I think you mention a 20-year number that they had put out there?

A. I recall the number 15. I don't remember anything in the form of an exact offer. I just remember that they were suggesting that that was the area where they'd be willing to discuss, and I felt that was unrealistic, and I very well may have -- and according to Mr. Berrigan's notes, which I would defer to him since he apparently made a contemporaneous recording -- that I did comment to defense counsel that that was not something that after finding the bodies was realistic.

Q. Now, I want to show you another exhibit which I'll premark

as 47. And this one is not identified as such, but there will be testimony here that this is Mr. Stowers' handwriting of the same meeting. Discussion re new administration death committee. And at the bottom, it says they would have offered 10 to 15 years prior to recovery of bodies.

Now, does that refresh your memory that that specific statement was made, that you or the Department of Justice or the U.S. Attorney's Office would have offered 10 to 15 prior to recovery of the bodies?

A. Mr. Burt, again, I don't have a specific recollection of having made that comment. It's possible that I made such a comment. I felt it was important to convey to Mr. Berrigan and Mr. Stowers that now that the grandparents knew what had happened to their children and the bodies had been recovered and the cases were much stronger that discussions in the 15-year range were no longer realistic. If I made a comment that they would have been considered realistic or discussed or even offered prior to the discovery of the bodies, that's possible I made that comment.

Q. And correct me if I'm wrong, but I think the context in which you may have made that statement is to essentially convey clearly to the defense lawyers at this point that in your words the train had left the station and an offer in the 15-year range was just not going to cut it.

A. Absolutely. And apparently it was an unsuccessful measure

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 84 of 88

on my part to convince them of that fact, but that was my feeling and the reason for my conveying that to counsel if I did.

**Q.** And were you the only one who spoke along those lines, or did Mr. Reinert sort of second you and make it clear to the defense that, look, you're out of line here with that number?

**A.** I'm sorry, Mr. Burt. I don't recall specifically much more of the discussion. I just remember the suggestion by the defense team of 15 years and being considerably surprised that they thought that would be something that would cut the mustard during that stage of the proceedings. Certainly I think we spent some time together that day, and obviously it wasn't just a two-minute meeting. But I did not make a notation and I don't have a specific recollection again of counsel -- I don't deny I may well have said that if counsel made a contemporaneous notation to that effect. Again, it was from an effort to convince defense counsel that simply was not a realistic basis for discussion at that stage.

**Q.** Okay. And returning to Mr. Reinert's -- excuse me, returning to Exhibit 46 which are Mr. Berrigan's contemporaneous notes, he writes here, Reinert never specific on NOS which I take to mean numbers, but we are far apart. He claims to want death for Honken and A.J. cooperating, but he can also do double, slash, joint plea with Dustin getting LWOP.

Do you recall Mr. Reinert making the statement that's memorialized in that paragraph?

**A.** I don't have a specific recollection of that.

**Q.** Do you recall yourself saying something along those lines?

**A.** No, sir.

**Q.** In terms of a joint disposition?

**A.** No, sir.

**Q.** Do you deny that such a statement may have been made?

**A.** No, sir.

**Q.** You just don't have any recollection?

**A.** That's correct.

**Q.** Okay. Thank you. Do you recall anything else that was discussed during the course of that meeting about sentencing?

**A.** No, sir.

**Q.** Now, I want to ask you about some other documents that were just recently received.

MR. BURT: And, Your Honor, next in order premarked is Exhibit Number 48 which is a binder containing correspondence and notes that were given to us by Mr. Williams to reflect correspondence and other documents that do not -- on this privilege issue, it doesn't reveal necessarily communications between the local prosecutors and DOJ, but it does reflect communications between the two defense camps just to identify that this is -- these are the documents that were received recently by Mr. Williams.

**Q.** And I want to if I could direct your attention to -- within this binder there is a tab 27. Tab 27 is a note of some kind. Is this your handwriting?

**A.** No.

**Q.** Okay. So did you in any way participate in a phone conversation with Mr. Berrigan that you recall on June 7, '03?

**A.** Not that I recall, sir.

**Q.** Thank you. Within this same exhibit binder, tab number 29, are those your notes?

**A.** That's not my handwriting.

**Q.** And do you recall any discussion with the Johnson defense team June 3 -- I'm sorry, June 10, '03?

**A.** No, sir.

**Q.** Do you recall attending a meeting with the -- we're at tab number 38, some notes of a meeting which apparently took place on July 12, '04. And present at the meeting were Tom Miller, yourself; R.L.M. which I take to be Richard Murphy; and C.J. Williams and the Honken defense team. Do you recall that?

MR. BERRY: Your Honor, I'd like to address the Court on the subject matter. As the Court's aware, there are Touhy regulations in which require counsel to let the government know the topics of the anticipated testimony or the questions that are going to be asked. And in this case the government was told that they would be asked about plea negotiations in this case. These are plea negotiations that apparently have taken place in a different case. They haven't told us they were going to ask about this; and, therefore, the department has not granted permission for this witness to testify about plea negotiations in another case.

THE COURT: I'm not bound by your regulations.

MR. BERRY: I understand that, Your Honor.

THE COURT: So what's your objection? I should follow your regulations?

MR. BERRY: No, it's not an objection, but I will direct the witness not to answer questions about plea negotiations in another case.

THE COURT: Well, I'm directing the witness to answer the question.

MR. BERRY: I respectfully direct the witness not to answer.

THE COURT: I'm instructing the witness to answer the question. So, Mr. Miller, it's up to you. What are you going to do?

THE WITNESS: Your Honor --

THE COURT: I hate to put you in this position.

THE WITNESS: Yeah, I realize that, Your Honor, and I -- based on direct orders from the United States Department of Justice, I respectfully decline.

MR. BERRY: Your Honor?

THE COURT: Yes.

MR. BERRY: Before we go further, perhaps let -- could

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 85 of 88

I have the question --

THE COURT: I think you're really precipitous with this and you're getting into a fight that you don't want to get into, but go ahead.

MR. BERRY: No, and I understand the Court's -- I understand what the Court's saying. Could I have the question repeated just so I can be clear what was asked?

THE COURT: Sure. I don't think you -- well, I don't think you have the authority to instruct a witness not to answer a question in a federal court.

(The requested portion of the record was read.)

MR. BERRY: Your Honor, may I have a moment to look at the exhibit which I've not examined before?

THE COURT: Sure.

MR. BURT: Just indicate we did obtain these from the government, so I assume they have --

THE COURT: I understand that. I don't know how you can turn around and give them the exhibits and then claim the Touhy -- I mean, that's ridiculous. You shouldn't have given them the exhibit if you thought it was protected and privileged. You've waived any objection.

MR. BERRY: Your Honor, I -- this is not a fight that I want to have. I understand --

THE COURT: Well, go ahead and have it, but you waived -- you waived it in my view by giving them the documents.

Now, if you want to instruct him not to answer after I held that you've waived any objection that you have, go right ahead. But I'm going to have you brief the issue, and we'll be back tomorrow morning. And, you know, then I'm going to give the defense an opportunity once they receive your brief, and then I'm going to rule on it.

MR. BERRY: All right. If I could just explain my position.

THE COURT: Sure.

MR. BERRY: Yeah. I under -- I'm not asserting a privilege. What I'm saying is that for the Touhy regs to be --

THE COURT: Well, wait a minute. The only way you can instruct a witness not to answer is if you're asserting a privilege. There's no federal rule that allows you to instruct a witness not to answer unless you're invoking a privilege that's recognized by the Federal Rules of Civil Procedure -- Criminal -- well, Federal Rules of Evidence, excuse me, that I know of. Now, I could be wrong, but that's my understanding of the law. I could very well be wrong, but that's my understanding.

MR. BERRY: Could I have a moment to talk with defense counsel?

THE COURT: Well, yeah, but let me ask you this. How can you give the documents over to the defense and then claim they're subject to a privilege or instruct the witness not to

answer questions about documents you voluntarily turned over? I didn't compel you to turn those over.

MR. BERRY: Understood. Understood.

THE COURT: Well, how can you do that?

MR. BERRY: I think it's two separate things that I'm trying to talk about.

THE COURT: Okay.

MR. BERRY: The one is documents were produced in discovery, and I'm not saying that they shouldn't have been. The Touhy regulations require the defense to tell us what they want to ask federal employees about. And then what we do is we take that, and we take it to Department of Justice, and we say this is what they would like the witness to testify about. They've done that. And what they said is they would like them to talk about, the witnesses to talk about, the plea negotiations, quote, in this case. And so that's been back to the department.

It may be that the department is all right with -- but -- all right with further testimony about this. I'm not asserting that it's privileged. I'm saying that the Touhy regulations haven't been complied with. I'd like to work to have them complied with.

THE COURT: Well, except that there were -- there's all kinds of evidence about plea negotiations that crossed over into both cases. You weren't objecting to that earlier today

and yesterday.

MR. BERRY: Well, they weren't federal employees testifying, Your Honor.

THE COURT: Yeah, I hear you.

MR. BERRY: Yeah.

THE COURT: Okay. Well --

MR. BERRY: If I could have just a moment to talk with them?

THE COURT: What would you -- yeah, you want that, or you want to -- I doubt if there's anybody that -- is there anybody you can contact this evening?

MR. BERRY: I bet I can rouse someone up. And if I could talk to counsel and flesh out --

THE COURT: Okay. Because I'll be glad to give you overnight to contact the Department of Justice.

MR. BERRY: I would appreciate that very much.

THE COURT: And we can take it up tomorrow morning because we're not going to finish this witness in the next five minutes.

MR. BURT: I thought there was a problem with Mr. Miller appearing tomorrow, so that's why I was trying --

THE COURT: Well, there isn't a pr -- what's the problem?

THE WITNESS: I'll be here, Your Honor.

THE COURT: Okay.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 86 of 88

THE WITNESS: I'll be here if necessary.

MR. BURT: I didn't understand. Sorry.

THE WITNESS: No, I appreciate you putting me on the stand but I --

THE COURT: Yeah, I assume he didn't want to be here tomorrow.

THE WITNESS: I have -- I have a subpoena. I'm here.

THE COURT: Right. You're going to be here.

THE WITNESS: Right. Understood.

THE COURT: I mean, you can always come back. If there's something you need to attend to tomorrow, we can bring you back later in the week.

THE WITNESS: No, I can stay another day if necessary, absolutely.

THE COURT: Okay. But why don't you talk to them and see if you can resolve it, but we've got exactly six minutes to finish this witness.

MR. BERRY: Thank you.

THE WITNESS: Your Honor, would it be okay if I fetch a glass of water for myself?

THE COURT: Sure. Matter of fact, my law clerk will get it for you.

MR. BERRY: Your Honor, if it's all right with the Court, counsel will -- counsel and I will discuss their request with regard to these notes and other things perhaps in the other

case. I'm going to get somebody on the phone, and we'll go from there.

THE COURT: That's fine. Thank you.

MR. BERRY: I appreciate that.

THE COURT: Mr. Burt?

BY MR. BURT:

Q. Okay. Do you recall being present for this meeting July 12, '04?

A. I don't have a specific present recollection. There were many meetings.

THE COURT: Isn't that the same thing he just objected to?

MR. BERRY: I believe it is, Your Honor.

MR. BURT: My understanding is he's not going to object and we're going to work out the paperwork later. Is that not where we're going?

THE COURT: No, my understanding is you can't get into this area until he's had a chance to see if there's an objection.

MR. BURT: Oh, okay.

MR. BERRY: That's right.

THE COURT: Is that accurate? Right.

MR. BURT: I got it. Okay.

THE COURT: Because otherwise the cat's out of the bag.

MR. BURT: Right. I do want to state, Your Honor, that we did attempt to comply with these Touhy regulations at a point in time when Mr. Williams had not provided us with these documents about the Honken meeting that we're discussing here.

And second of all, as the Court has alluded to, these were joint plea discussions. So it's artificial to say that we're talking about a separate case.

THE COURT: Well, I think it's totally artificial.

MR. BURT: If they want to jump through these hoops, that's fine.

THE COURT: Matter of fact, it was the same case until I severed it. The government didn't indict it separate --

MR. WILLIAMS: We did actually, Your Honor.

THE COURT: Well, you did, but then wasn't it consolidated?

MR. WILLIAMS: You know, I --

THE COURT: Because --

MR. WILLIAMS: I think Your Honor may be better in mind on that. I think you're right. I think there may have been a point where they were consolidated.

THE COURT: Because I severed it because of the Bruton problems. So yes, you obviously indicted them separately because Miss Johnson was indicted first, but I assume either you moved to consolidate it or I on my own moved to consolidate it. I consolidated it because then I severed it at some point.

MR. WILLIAMS: I'd forgotten they were consolidated.

THE COURT: Because we looked at all kinds of ways to have a joint trial, having two different juries. Yeah, so it was one case at one point, but it started off as separate cases, and it ended as separate cases. So let's not argue over what case means because Mr. Berry's of good faith and he's going to try and get this resolved tonight. How's that?

MR. BERRY: Yes, Your Honor. Thank you.

THE COURT: Okay.

MR. BURT: My -- most of my questioning does relate to the contested issue.

THE COURT: Well, your time --

MR. BURT: But I --

THE COURT: Time's up.

MR. BURT: Time's up anyway.

THE COURT: You have two minutes. Time's up.

The next time -- this is just a heads-up. The next time the Department of Justice instructs a witness not to answer in my courtroom based on your interpretation of the Touhy regulations, you better have it briefed ahead of time, and I'm not saying you don't have the authority to do it. I'm just saying I don't like it and I resent it, but I'll follow the case law if I have to. So I'd like you to brief it.

MR. BERRY: We'll do that, Your Honor.

THE COURT: Because it's probably going to come up at

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 349   Filed 11/10/11   Page 87 of 88

1021

some point.  And, you know, if you have time -- I'm sure the Department of Justice has some canned briefs on the issue.

MR. BERRY:  I will have something for you, Your Honor.

THE COURT:  And you know what?  If you have -- and I don't mean that pejoratively, but if the Department of Justice has previously briefed this issue, for my own edification, I'd like to read it because it's likely to come up perhaps with a lawyer that isn't as knowledgeable about the Touhy regulations as you are.

MR. BERRY:  Thank you, Your Honor.

THE COURT:  And in order to try and avoid this kind of conflict, it'd be good for me to know what the law is.

MR. BERRY:  Very well, Your Honor.

THE COURT:  I'm not going to like it, but it'd be good for me to know what the law is.

Okay.  We'll see everybody at seven o'clock tomorrow morning?

MR. BURT:  Yes, sir.

THE COURT:  Okay.  Thank you.

(The foregoing hearing was adjourned at 6 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

 

  S/Shelly Semmler          3-24-11

Shelly Semmler, RMR, CRR          Date

---

1022

**INDEX**

| WITNESS: | PAGE: |
|---|---|
| RICHARD BURR | |
| MR. BURT | 677 |
| MR. WILLIAMS | 738 |
| MR. BURT | 769 |
| MR. WILLIAMS | 777 |
| MR. BURT | 779 |
| MR. BURT | 788 |
| MR. WILLIAMS | 796 |
| ALFRED WILLETT | |
| MS. MORRISSEY | 805 |
| MR. WILLIAMS | 931 |
| MS. MORRISSEY | 974 |
| MR. WILLIAMS | 995 |
| MS. MORRISSEY | 996 |
| MS. MORRISSEY | 999 |
| THOMAS MILLER | |
| MR. BURT | 1004 |

*****

**EXHIBITS:**

| 9 | 776 |
|---|---|

*****

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*