IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

ANGELA JANE JOHNSON,                     No. C09-3064

          Petitioner,

     vs.                            TRANSCRIPT OF
                                    2255 EVIDENTIARY
UNITED STATES OF AMERICA,           HEARING

          Respondent.
_____/          Volume 4

          The Hearing held before the Honorable Mark W. Bennett,
Judge of the United States District Court for the Northern
District of Iowa, at the Federal Courthouse, 320 Sixth Street,
Sioux City, Iowa, March 10, 2011, commencing at 7:02 a.m.

APPEARANCES:

For the Petitioner:    MARCIA A. MORRISSEY, ESQ.
                       2115 Main Street
                       Santa Monica, CA 90405-2215

                       MICHAEL BURT, ESQ.
                       Law Office of Michael Burt
                       Suite 329-E
                          600 Townsend Street
                       San Francisco, CA 94103

                       MOHAMMAD ALI HAMOUDI, ESQ.
                       Suite 329-E
                          600 Townsend Street
                       San Francisco, CA 94103

                       NANCY S. PEMBERTON, ESQ.
                       Pemberton & Associates
                       Suite 329E
                          600 Townsend Street
                       San Francisco, CA 94103

For the Respondent:    C.J. WILLIAMS, ESQ.
                       Assistant United States Attorney
                       Hach Building - Suite 400
                       401 First Street Southeast
                       Cedar Rapids, IA 52401-1825

(Miller testimony only)  SEAN R. BERRY, ESQ.
                       Assistant United States Attorney
                       Hach Building - Suite 400
                       401 First Street Southeast
                       Cedar Rapids, IA 52401-1825

Also present:     John Graham

Reported by:      Shelly Semmler, RMR, CRR
                  320 Sixth Street
                  Sioux City, IA 51101
                  (712) 233-3846

THE COURT: Good morning. Thank you. Please be seated.

I just wanted to say before we get started that, Mr. Miller, I wanted to apologize to you. I think I put you in an awkward position.

MR. MILLER: No, no, Your Honor. In fact --

THE COURT: And I didn't handle it very well. In an ideal world, I would have anticipated, had read the Touhy regulations again, and looked at the case law. I did have an opportunity to do that last night and again early this a.m., and I'm much better versed with it and the procedures for --

MR. MILLER: Your Honor, if I may say, I came here expecting to be in an awkward position so . . .

THE COURT: Well, I didn't see it coming, so I didn't expect that you were going to be in an awkward position, and I didn't expect that I was going to be in this position. But, you know, in hindsight I should have been able to anticipate it on my own, and I didn't.

MR. MILLER: But with all due respect to the U.S. Attorney's Office, I think they put me in an awkward position as much as the Court did, so it's no hard feelings either way.

THE COURT: Well, good. That's good.

Are we ready to proceed this morning?

MR. BURT: We are, Your Honor.

THE COURT: Okay. Thank you, Mr. Burt. You may proceed.

THOMAS MILLER, PETITIONER'S WITNESS, PREVIOUSLY SWORN

CONTINUED DIRECT EXAMINATION

BY MR. BURT:

Q.   Good morning, Mr. Miller.

A.   **Good morning, Mr. Burt.**

Q.   I think when we broke off we were talking about this exhibit which is from Plaintiff's 48, tab 38, and there were some notes of a meeting that apparently took place with you, Mr. Murphy, Mr. Williams, and Honken defense team, and I think I'd asked you whether or not you recalled this meeting.

A.   **I don't specifically recall that meeting. I don't doubt that it happened.**

Q.   Okay.

MR. WILLIAMS: Just for the record, Your Honor, I don't think I was present. I don't think that's reflected on there. I think suggesting Mr. Williams was present, I think that's C. Larson at the end there, C --

THE COURT: Yeah, Charles W. Larson?

MR. WILLIAMS: Yes, not C.J.W.

MR. BURT: Thank you. I wasn't clear, and thank you for clarifying that.

THE WITNESS: And for my edification, R.L.M. is Rich Murphy?

MR. WILLIAMS: Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

MR. BURT: I believe so. Is that correct?

MR. WILLIAMS: Yes.

BY MR. BURT:

Q. Okay. I want to direct you -- and these, again, are not your notes; correct?

THE COURT: Now, whose notes do these purport to be?

MR. BURT: They're either -- if they're not Mr. Miller's, I believe they're going to be Mr. Murphy's. I do not believe they're Mr. Larson's.

THE COURT: Okay.

MR. BURT: So these were documents I received from the Department of Justice.

THE COURT: But you don't know whose they are actually.

MR. BURT: I don't.

THE COURT: Okay.

MR. BURT: I'm suspecting Mr. Miller (sic) will probably say this is his handwriting.

THE COURT: But the group of suspects are pretty small.

MR. BURT: At this point they are, yes.

A. Thanks.

Q. Thank you. Just to let you know, these notes purport to attribute various statements to various people. You'll see at the top it says Al and then Rogers referring to Charlie Rogers,

and what I'd like to do is direct your attention to a statement that is -- was attributed to you and ask you if you remember making the statement. I'll give you a little context. It says, "Al, early on even before entering appearance, they made clear they had no objection to return of bodies. Johnson's counsel were the ones that objected." And supposedly you at that point made some statement that the family had no misunderstanding about that.

First of all, does that refresh your recollection as to some discussion you were having with the Honken lawyers about the Johnson team's objection to releasing the remains of the family and how it related to plea bargaining in the case?

A. I apologize, Mr. Burt. That does not refresh my recollection. I -- obviously this was after the discovery of the bodies.

Q. Right.

A. And there may have been discussion about whether or not there was a need for preserving those for independent forensic analysis.

Q. Do you recall at some point in the litigation that there was a request made by you -- and by you I mean the office of the U.S. attorney -- to the defense lawyers to release the remains and that the Johnson team objected to that but the Honken team did not?

A. I don't doubt that happened, that I seem to have a vague

recollection of something along those lines, but I apologize I don't have a clear recollection on that.

Q. Sure. Many years ago so it's . . .

A. Yeah, and there were a lot of aspects of this case, but I have a vague recollection of we had a concern naturally. One of the many considerations in any criminal case is the respect owed to the victim survivors, and they did have many years' longstanding desire to try to put some closure on the loss of their loved ones.

Q. Sure, understandably. And do you recall having a discussion with the family of the victims indicating to them that the Johnson defense team was objecting to the release of the remains?

A. I don't recall that conversation.

Q. Okay.

A. I don't deny it. I don't recall that.

Q. Sure. Now . . .

A. There would be legitimate reasons for any defense team to want to conduct whatever forensic examinations were appropriate.

Q. Uh-huh. Okay. And I think that was all I wanted to ask you about that meeting, but you don't have any independent recollection of that meeting.

A. I'm sorry, sir. No, I don't have any independent recollection. I don't deny it. I don't have any independent recollection.

Q. Now, the next group of notes I want to show you is from tab 42 from that same exhibit. And this -- again, we don't know whose notes they are, but someone in the U.S. Attorney's Office wrote these notes, and it purports to memorialize a discussion between Mr. Willett, Mr. Spies, Charlie Rogers, Dean Stowers, Pat Berrigan, and whoever is taking the notes. I believe it's going to be Mr. Murphy and Steve Badger who is taking notes as well and Al Parrish. And I don't believe you were at this meeting, but there are some statements attributed to you that I want to ask whether or not you . . .

And I'll give you, again, some context for this. Mr. Parrish apparently said one factor is -- and this is in the course of a discussion about a plea disposition. One factor is judge and what rulings will be made throughout the matter. When discussing -- discussions first started two weeks ago, Judge Bennett and C.J. wanted to know where we were with discussions. And then it says T. Miller told he had direct discussions with Paul Martin, local county attorney. Tom Miller put this case together in his office.

Q. Does that refresh your memory as to a discussion you may have had with Paul Martin about the disposition of this case?

A. Vaguely, yes. I do remember speaking with Paul.

Q. Now, who is Paul Martin?

A. Paul Martin's the county attorney of Cerro Gordo County.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 2 of 80

Although we certainly would have no reason to require his input on involvement in a case where we were invited by the U.S. Attorney's Office, we traditionally serve as a -- as a resource for local county attorneys, and in any case that arises out of a particular county, I feel it's a matter of protocol for me to contact the county attorney and get his authority, permission, and encouragement to participate in the case.

Paul Martin was county attorney in Cerro Gordo at the time. I felt he had obviously jurisdiction as well as the federal authorities. I familiarized him with the request that we'd had from the U.S. Attorney's Office and asked for his thoughts on my involvement in this case, and he encouraged me to participate.

Q. And was -- as part of the encouragement, was there any discussion about the death penalty or his desire to seek or not seek the death penalty?

A. I'm -- and again, some of this is reasonable inference on what the context was, not specific recollection. But I do and I am sure that I obviously informed Paul that the death penalty was a potential in the federal system whereas obviously it's not in the state system. More likely what we discussed was the fact that this crime arose out of a federal court situation and the murder of federal witnesses and it was most appropriately a federal prosecution.

Q. Okay. Now, these notes go on to say on that same page --

this is at the bottom of the page -- that Al had discussions with Parrish who is friends of his. Tom has made it clear throughout that Iowa only has legit interest in life, slash, life. Then it says Big Tom Miller has outlined what Little Tom Miller will do in penalty phase, no role in penalty phase.

Does that refresh your memory about some discussion that you may have conveyed to the defense lawyers at some point that on behalf of the Iowa Attorney General's Office your only legitimate interest was in a life, slash, life disposition of this case?

A. It does, not so much my own discussions with Al and Leon as much as what I heard that they had discussions with my -- with my employer, Attorney General Tom Miller.

I parenthetically -- pardon me -- object to the reference of big as opposed to little. But other than that, it's --

Q. Are you supposed to be little or big?

A. I consider myself above average. But the reference to Big Tom Miller is occasionally a way of distinguishing the two of us, and it's to my knowledge secondhand that Al and Leon had on possibly two occasions approached Tom in efforts to ask that he remove me from the prosecution of the case. I wasn't present during either. Tom I believe has made it clear that he is not a proponent of the death penalty and though he did ultimately agree with my participation in the prosecution and proof of the

murders that he preferred that I not participate in the penalty phase.

So that's the gist of it. Whether it came from me or directly to Al and Leon through my employer I couldn't say.

Q. And that was a fairly unique aspect of this case, that you as the -- one of the U.S. attorneys involved was apparently instructed not to participate in the second phase of the case or the third phase here if it reached that phase; correct?

A. Yes.

Q. And I take it from what you say then that the views of the attorney general opposing the death penalty were part of the plea discussions. In other words, that was something that was being discussed to be factored in with a lot of other facts.

A. I'm not sure whether they were part of the plea discussions. They may or may not have been. Again, all I can say is that -- and I don't know whether he's opposed to it, but he's certainly not a proponent of the death penalty. And whether that's for practical, economic, or moral grounds I do not know. But he did indicate to me that he preferred that I not participate in the penalty phase, and I advised the U.S. Attorney's Office. And it was my understanding throughout that my participation was sought purely for the fact that I have some experience in prosecuting murder cases, not that any of us had any particular experience in prosecuting penalty phase, and that that was understood and expected and considered appropriate by

everybody concerned.

Q. Okay. Now, I want to direct your attention to a statement. And I, again, apologize for the derogatory characterization of you as little.

A. Again, bigger than average as far as anybody here knows.

Q. Okay. Says Little Tom Miller has met with the grandmother who is acceptable and agreeable to Angie being in prison until 69 or 70. Does that refresh your memory that you had some discussion with a grandmother I'm assuming connected with the victims' family and discuss with her whether she would be amenable to a disposition of the case which would involve Angie Johnson being in prison until she was 69 or 70 years old?

MR. WILLIAMS: And, Your Honor, I would just impose an objection. That evidence would not be admissible at a penalty phase at trial. And to the extent that counsel's attempting to, if you will, reconstruct what evidence would be presented had this case gone to trial, I would have objected to the views of the victims' families about the appropriateness of the death penalty in this case.

So I'm not sure what this is coming in for, but if that's what it was at trial, I would have objected to it, and so I'm objecting to it coming in for that purpose now.

THE COURT: Okay. I'll take it subject to the objection.

MR. WILLIAMS: Thank you.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 350    Filed 11/10/11    Page 3 of 80

**1035**

THE COURT: Thank you.

MR. BURT: Thank you.

BY MR. BURT:

Q. And then right underneath that, just to give it a little more context, it says Little Tom Miller said this was agreeable to him. Does that refresh your memory as to, I guess, two discussions, one with the grandmother and then second within the context of this plea discussion?

A. It truly does not. However, I would point out that I've never, ever engaged in plea discussions without consulting with the victims' family or the victim in the case, so that's consistent with what I would have done.

Q. And do you have any recollection that any of the victim family members were consulted and, in fact, agreed to a disposition of less than life for Angela Johnson?

A. I don't remember --

MR. WILLIAMS: Again, Your Honor --

A. I'm sorry.

MR. WILLIAMS: -- if I could just interpose the same objection.

THE COURT: Same ruling. Thank you.

A. And I don't recall the specific conversations. I don't know who made these notes. If they were made contemporaneous, I would consider that to be a better record of what happened than my recollection five years later. Again, all I can say is that

**1036**

without ever giving a victim's relative a veto over what we do, I also consider it my obligation to consult them and get their opinion.

Q. So just to be clear on it, you're not denying -- you're not saying this conversation didn't take place with the grandmother. You're just saying you have no present recollection of it?

A. That's correct, Mr. Burt.

Q. And that your normal policy would be to consult the victims' family to see what their views are about punishment.

A. Yes.

Q. In fact, were you aware at the time the negotiations in this case were going on that the protocol, the death penalty protocol, the Department of Justice death penalty protocol, required you to consult with the victims' family?

A. I don't recall that. It's just SOP to me.

Q. Sure. Now, there is a notation right underneath that that they met with Bob Ray who has told Mr. Larson his concerns about death penalty. First of all, do you know who Bob Ray is?

A. Well, the only Bob Ray I know is a former government of the state of Iowa, former governor.

Q. Was he governor at the time --

A. No.

Q. -- these negotiations were taking place?

A. No.

Q. Do you recall any discussion that you had with Mr. Ray

**1037**

about his views on whether the death penalty should be sought in this case?

MR. WILLIAMS: Objection again for the relevance for the same objection.

THE COURT: I'll take it subject to the objection.

A. Not only do I have no recollection, I'm sure if I had met with Mr. Ray, I would have a recollection.

Q. And as to whether somebody else may have met with him on the team, you don't know.

A. I do not.

Q. Or if the defense approached him through somebody, you don't know that either.

A. I do not know.

Q. Do you have any recollection of Mr. Ray's views being discussed during plea negotiations?

A. I do not.

Q. Okay. That's -- just very briefly two other topics. I'm showing you Exhibit 48, a letter addressed to you and Mr. Williams March 17, 2005. Dear Tom and C.J., we were informed last week that the Department of Justice declined the defense plea proposal of February 17. No explanations were given as to why or whether some provisions were agreeable and others not. Nonetheless, the defense is determined to resolve this case short of trial if we can. Accordingly, we are amending our plea proposal as follows. Angela Johnson will

**1038**

enter guilty pleas to the currently pending murder charge in return for life sentences. Do you recall getting this letter?

A. I honestly don't, Mr. Burt.

Q. And then I'm going to show you one more exhibit which is Exhibit 50. And 50 is -- see, the plea letter is March 17. And then there's an e-mail apparently sent by you to Mr. Berrigan on the same day concerning jury selection issues. And then at the bottom it says, P.S., I've not had an opportunity to visit with C.J. about it, but your faxed letter re the plea proposal looks good and should get the DOJ ball rolling ASAP, I think.

Is that your e-mail to Mr. Berrigan?

A. It certainly appears to be. I would have no reason to doubt it.

Q. And do you recall -- does that refresh your recollection that after receiving a plea proposal from Mr. Berrigan that you reviewed it and determined that it looked good from your perspective?

A. Well, it looks good. I mean, it looks -- it looks -- it may have been that it looks appropriate from my perspective. It certainly looks good from the standpoint of getting a final answer from the Department of Justice in D.C. which I think was the ones who were necessary to make any final approval about any settlement agreement.

Q. Did it also look good from the aspect of what you were looking for in terms of a disposition as to a life sentence

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 350    Filed 11/10/11    Page 4 of 80

1039

versus a 20-year offer that had been discussed up to that point?

A. Well, frankly, yeah. I'd have been -- I'd have been perfectly happy with that. I was not a person with authority to speak for the United States Department of Justice on this, but I felt at least to my knowledge which was incomplete I was not aware of all of the discussions that had been had between the defense and the Department of Justice or the U.S. Attorney's Office. I felt as long as there was a possibility that the case could be resolved without trial I always consider it to be my responsibility to at least explore those possibilities.

And I have a specific recollection following the Honken trial about thinking perhaps this case could be resolved with a life sentence. But again, I was not in a position to offer that. I was certainly in a position to support it and let counsel know that I would have no objection to it.

I think it was clear from all involved that it was something not even Cedar Rapids could approve but rather would require the approval of the Washington, D.C., Department of Justice but get the ball rolling with them. If there was any possibility that this case could have been resolved without trial, I felt that the letter from Mr. Berrigan was the appropriate way to commence those discussions.

MR. BURT: That's all I have. Thank you very much, Mr. Miller. Appreciate it.

THE WITNESS: Thank you, Mr. Burt.

1040

THE COURT: Mr. Williams?

MR. WILLIAMS: No questions, Your Honor.

THE COURT: Thank you, Mr. Miller. I have no questions.

THE WITNESS: Thank you, Your Honor.

THE COURT: Thank you.

Thank you, Mr. Berry.

MR. BERRY: Thank you, Your Honor.

MR. BURT: Your Honor, for the record, what I identified as Exhibit 48 is actually 49, and I apologize for that.

THE COURT: Okay.

MR. BURT: I just had a numbering error.

(Sean Berry exited the proceedings.)

THE COURT: Who's your next witness?

MR. BURT: Miss Val Williams. And, Your Honor, Miss Williams will be testifying about the plea issue, not about mitigation.

THE COURT: Okay. Thank you.

Good morning. Would you raise your right hand, please.

VALLI WILLIAMS, PETITIONER'S WITNESS, SWORN

THE COURT: Thank you. Please be seated in the witness box. And you can adjust the chair and the microphones so you can speak directly into them. And would you tell us your

1041

full name, please, and spell your -- spell your first name and --

THE WITNESS: Valli, V-a-l-l-i, middle name Jo, J-o, last name Williams.

THE COURT: Okay. And can you scoot a little closer to the microphones? Thank you.

Mr. Burt?

MR. BURT: Thank you.

DIRECT EXAMINATION

BY MR. BURT:

Q. Good morning.

A. Morning.

Q. Where do you live?

A. Rockford, Illinois.

Q. And did you -- were you in custody back in -- around the time period 2000 to 2005, some time in that time period?

A. That's correct.

Q. And do you recall where you were in custody?

A. I was initially arrested in Detroit, Michigan. I was transferred to Linn County in Cedar Rapids, Iowa, for 10 months, and then I spent 11 1/2 months in Pekin, Illinois.

Q. And what were you in custody for?

A. I don't know the -- I can't remember the exact charges, but it was a theft charge from a corporation. It involved fraud.

Q. Okay. Now, at some point did you meet Angela Johnson?

1042

A. Yes, I did, at Linn County.

Q. And were you housed in the same housing unit as Miss Johnson?

A. Yes, in block M.

Q. M as in Mary?

A. M as in Mary initially.

Q. Can you give me a time frame of when you first met her and how long you were acquainted with her?

A. It would have been about July 5, 2001, and I transferred out -- I think it was around March, end of March of 2002 -- no, I'm sorry, April. I could be a little off, but it was about ten months.

Q. So 2001 to 2002.

A. Yes.

Q. Okay. And during the period of time when -- and were you housed with Miss Johnson during that entire period of time?

A. Yes, I was.

Q. Pretty much?

A. (Witness nodded head.)

Q. Did you share a cell or share a common living area?

A. There were different arrangements. We were in block M, N as in Nancy, and L as in Larry, three different places. All of them included a common area. Most of the time was an area where there were no single rooms, so you were with anywhere from 14 to 24 people in a single room.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q. And during that time did you develop a relationship with Miss Johnson?

A. Eventually, yes.

Q. And how would you characterize the relationship? Was it casual, close?

A. Initially it was nothing. She kept everyone at an arm's length. When I initially went in, I was met with people who gave me an impression of her that was different than the one I formed after I got to know her. She was very wary. It took a long time before I would even speak to her, and I'm not sure she knew what to think of me or I knew what to think of her.

But over time there were discussions. Eventually we talked about growing up. She hadn't finished high school, and I said, "Why don't you use the time to do that," and we arranged for GED materials to come in.

And during that time I felt very close to her. And I learned a lot more about the person that defied the image that I initially had of her. I would call her a friend. You'd have to ask her what she'd call me.

Q. And did you as time went by and you learned more about her start to hear from Angela Johnson about her family background?

A. Her family background, her childhood, in particular her children.

Q. Now, was there some special interest that Miss Johnson expressed concerning her children and the need to take care of

her children?

MR. WILLIAMS: Calls for hearsay, Your Honor.

THE COURT: Overruled.

A. I'm sorry. Could you repeat the question?

Q. Sure. As you talked to Miss Johnson, developed a relationship with her, was there some special concern that she expressed for her children and taking care of her children?

A. That was probably the thing that initially drew me to her was seeing a side of a person that was so concerned about her children, was so creative in the way she kept in contact with them. It was obvious just observing her drawing pictures for them, sending things out to them, calling them, finding ways to keep in contact with them. And so I had a daughter. We definitely had that in common. She was very concerned about what would happen to her children now that she was incarcerated.

Q. At some point did she develop an idea of writing a book not about her crime but about her background in order to support her children?

A. Yes, she wondered if I could write a book for her, and it would have concerned -- I believe her words were -- I don't know what her words were, but the idea was that she didn't feel people were depicted the way they actually were and maybe somebody would be interested in her life. I found it to be interesting when she talked about her background and growing up, and she felt maybe that would be a way if someone were

interested in it to make some money for her daughters. I absolutely told her that she could not benefit from anything that would have anything to do with issues that came out of why she was incarcerated.

Q. By the -- just for the record, you used to be a lawyer; right?

A. That's correct.

Q. You weren't giving her legal advice, but you were -- were you telling her what you knew about --

A. Right. I certainly wasn't any expert in that field, but I had read that people couldn't write things about any of their crimes and benefit from that, so that's what I passed on to her. Whether it was correct or not, that's what I told her. It wasn't legal advice, and I definitely told her to take it as two cents' worth.

Q. Now, did -- was part of your plan to elicit details about her family background would be included in this book project?

A. That would have been the crux of it. I never spoke with her about the reason she was incarcerated. It was all about her background when she was growing up, her children.

Q. Did you eventually determine that this book plan was not going to work?

A. It became very difficult. Publishing a book is not something you can easily do, but probably for me the biggest obstacle was I didn't have access to Angela. I would ask her

questions in letters, and she wasn't comfortable answering them in writing, and I didn't have access to her to talk about things to fill in a lot of the details that would have been needed. And as I say, it's just not that easy to do anyway.

Q. And did there come a time where she indicated to you that she did not want certain sensitive areas about her background revealed anyway, about her family and bad things that had happened to her like sexual abuse?

A. She might have allowed that, but I think probably the -- as I recall, the biggest stumbling block was I would have wanted to bring out things about -- I'm sorry, but her mother, and she said, "Valli, I've forgiven my mother. I have a relationship with her. I don't want to lose that."

Q. Don't want to lose it by revealing her background --

A. By revealing anything that might hurt her mother.

Q. -- in a public forum.

A. Correct.

Q. Now, I want to show you Petition Exhibit 7 which is a letter that Angie wrote to her lawyers in '03. This is after the period of time when you were housed with her, but I want to ask you about whether she expressed a similar sentiment. And the letter says, "I am going to be as clear as I can. I want to plead guilty. I do not want to wait for any more rulings, not even the Eighth Circuit. I'm asking you get me the best deal you can, and I will cooperate. At this point I will confess to

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 6 of 80

killing the Pope. I have not touched my kids in three years now, and I've had it. Please get me out of here and into a prison as close to my kids as possible. That is all I ask."

Q. Was any sentiment -- any of the sentiments expressed in this letter ever expressed to you?

MR. WILLIAMS: Objection. Calls for hearsay, Your Honor.

THE COURT: What's the relevance of all this?

MR. BURT: The relevancy of it is that the government's position is that this letter that Miss Johnson wrote to her lawyers was a temporary momentary blip on the radar, that her consistent position other than this one incident was to maintain her innocence and fight this case. And I think this witness has --

THE COURT: Well, why isn't it hearsay?

MR. BURT: Well, it goes to her state of mind as to the plea. It's not offered -- it shows her consistent longstanding desire to resolve this case as opposed to what the government is contending which is that this did not express her long --

THE COURT: Okay. She can answer.

MR. BURT: Thank you.

BY MR. BURT:

Q. Did she ever express any of the sentiments that are expressed in this letter to you?

A. Yes.

Q. And can you tell me what she expressed to you in that regard?

MR. WILLIAMS: And just a standing objection if I could, Your Honor.

THE COURT: That's fine.

MR. WILLIAMS: Thank you.

A. I probably received a letter that was almost verbatim, and I received more than one letter. She corresponded to me, and when I spoke with her on the phone, she made it very clear that she would do anything, say anything, she wanted out, she wanted a plea agreement.

Q. And did you also have discussions with her while you were in custody with her?

A. Not while I was in custody with her. It would have been after that.

Q. And did you notice that her attitude about her case declined over time in terms of her enthusiasm for fighting it versus this desire expressed in this letter? Is that something you noticed?

A. Yes. Her attitude towards her case, I saw her go from hanging up the phone after attorney conversations and being angry to crying to expressing disappointment to almost becoming resigned. And I would say by the time I left Linn County she was almost -- oh, I don't know. I guess I would call it

depressed. And I'm trying really hard to remember if she said anything while I was in Linn County. I don't believe she'd reached the stage where she said I want a plea agreement yet, but I'm not sure.

Q. But after that period --

A. She just was resigned.

Q. Resigned when you left her in 2002.

A. Correct. It was after that that I received letters and talked to her about a plea agreement.

Q. And did her position then remain constant that she did want this plea agreement?

A. I never heard her say anything different. If I had a graph, I would have a very consistent line of what she wanted to do.

Q. And when you say she was possibly depressed and despondent when she was in c -- what was she depressed about? Did she express that?

A. No one was responding to her. She wasn't -- she would call and get put off. The phone conversations would be very short, and she'd hang up, and she would be very frustrated, and over time she just said, "Why do I call them?"

Q. Them referring to?

A. Her attorneys. And I'm sorry, I don't even know the names of her attorneys. Her defense counsel. She had more than one.

Q. So she was expressing frustration over not being able to

communicate or for some other reason?

A. Not getting responses she wanted in terms of -- I can't tell you the details except that she said, "No one's getting back to me. No one's doing what I'm asking them to do."

MR. BURT: That's all I have. Thank you very much.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Miss Williams, you were convicted for embezzling money in your capacity as a lawyer.

A. That's correct.

Q. Okay. From a corporation in Cedar Rapids?

A. Yes.

Q. Okay. And what was your sentence, ma'am?

A. I don't remember the exact sentence. I spent ten minutes -- 10 months in county and 11 1/2 months at Pekin federal camp. I'm sure that the record would show exactly how much that is.

Q. And then during the time period you were talking about receiving letters from Miss Johnson, what time period was it that you assert you received these letters that contained these sentiments about wanting to plead guilty?

A. It would have been in correspondence after I left in -- around April of 2002 I suppose until her trial.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 350 Filed 11/10/11 Page 7 of 80

**1051**

Q. Okay. And prior to that time you said you had no conversations with her like that in Linn County.

A. I can't remember any specific thing about trial strategy at that time.

Q. And in particular about plea at that time either; right?

A. I can't recall exactly when they took place. I'm sorry.

Q. Well, I think your testimony was, though, pretty clear that never in person did she talk to you about that kind of stuff in Linn County, that this all came in letters that you received from her after you left.

A. That's why when he asked me the second question I backed and said you know what, I don't want to say never because I might be mixing up time frames.

Q. Now, when she sent you these letters, there was a period of time where she marked them as legal papers going to you; isn't that right?

A. I have never received anything from Angela marked legal papers.

Q. The time period that you were with her in jail, did she ever confess to you that she had participated in these murders?

A. No.

Q. In any of the letters you ever got from her, did she ever confess to you that she participated in these murders?

A. No.

Q. Has she ever since admitted to you that she participated in

**1052**

these murders?

A. I'm sorry. Has she ever what? Oh, since.

Q. Since.

A. No.

MR. WILLIAMS: Nothing further, Your Honor.

THE COURT: Any redirect?

MR. BURT: No, Your Honor.

THE COURT: You may step down.

MS. MORRISSEY: May I come to get one of the lapel --

THE COURT: Sure.

MS. MORRISSEY: Thank you.

Your Honor, we would call Sara Ewing.

THE COURT: Would you raise your right hand, please.

SARA EWING, PETITIONER'S WITNESS, SWORN

THE COURT: Okay. Please be seated. Please adjust the chair and the microphones so you can speak directly into the microphones. And when you're ready, would you tell us your full name, please, and spell your last name.

THE WITNESS: Sara May Ewing. That's E-w-i-n-g.

THE COURT: And is it Sara with no h?

THE WITNESS: Correct.

THE COURT: Okay. Thank you.

Miss Morrissey?

DIRECT EXAMINATION

BY MS. MORRISSEY:

**1053**

Q. Good morning, Miss Ewing.

A. Good morning.

Q. What do you do for a living?

A. I'm an outpatient mental health therapist.

Q. And where do you work?

A. I work at the Range Mental Health Center in Virginia, Minnesota. It's a community mental health center.

Q. And how long have you worked there?

A. I just -- I just got that position in January this year, so not even two months yet.

Q. Can you tell us what you did before you got that position?

A. I've worked with people with disabilities, mostly developmental disabilities, from the time I was about 18 years old.

Q. And what education qualifies you for your present position?

A. I have a doctorate in clinical psychology.

Q. Do you know Angela Johnson?

A. I do.

Q. Could you tell the Court when you first met Angela Johnson?

A. I met Angela in sixth grade when her family moved to Forest City. We were 11.

Q. You were both the same age?

A. Uh-huh.

Q. And you said that her family moved to Forest City. Were you living in Forest City?

**1054**

A. My family lived on a farm close to Forest City. We went to school together.

Q. And what's your mother's name?

A. Maxine.

Q. Did you come to meet the rest of Miss Johnson's family?

A. I did. I went over to Angie's house and -- Angela's house and met her mother and her youngest sister.

Q. And what's her youngest sister's name?

A. Holly.

Q. Were there other members of the family that were living there at the time?

A. Yeah. At that moment, though, the first meeting was just with Jean and Holly.

Q. Did there come a time when you developed -- or your family and Miss Johnson's family became closer?

A. Yep. My mother actually divorced my father and moved in with Angie's mother.

Q. What -- do you remember when it was that your mother divorced your father?

A. That same -- in a couple of months after first meeting Angie and the Johnson family. It must have been right at the beginning of the summer, right at the end of that school year.

Q. So you're indicating that -- just to summarize, you met Angie and went over to her house.

A. Uh-huh.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q. And then at some later point your mother became acquainted with the family; correct?

A. Yeah.

Q. How did that happen?

A. I'm not sure about that.

Q. Can you tell the Court about -- well, about what happened once your mother became acquainted with Angela's mother?

A. My mother actually left my father, sort of left all of us, my sister, my brother, and I, and moved in with the Johnson family. Then I actually remember looking for my mom and finding her and telling her that I needed to live with her as well, and that's how I ended up living there.

Q. Before your mother met Mrs. Johnson -- was her name Pearl, Pearl Jean?

A. Correct, Pearl Jean, but everyone that knew her called her Jeannie, so that's how I refer to her. Sorry.

Q. Before your mother met Jeannie, was she a religious person?

A. No.

Q. And after your mother --

A. She was a Catholic.

Q. After your mother met Jeannie, was there a change in her religion?

A. Yes.

Q. Could you tell us about it?

A. I don't know that there's a correct term for it, but I call

it holy roller, very much interested in, you know, reading the Bible and being extreme to the Bible and Jeannie, Jeannie's religious ways.

Q. Now, you told us that you -- your mother left the family but you went to your mother and you said you need to be with her; is that correct?

A. That's correct.

Q. And was she living with Jeannie?

A. Yep.

Q. And did you move into the house?

A. I did.

Q. Could you tell us what it was like living in the house.

A. It was very, very crowded --

MR. WILLIAMS: I'm sorry, Your Honor. Could we have a time frame for this maybe?

A. Yep. The summer the end of my sixth grade. I would have been 11, be -- August would have been 12. I was born in 1964, so that would have been seventy -- help me -- six, five, six, something like that.

Q. All right. Could you tell us what it was like? Were there a lot of other people living there?

A. It was very crowded.

Q. Could you tell us who was living there?

A. When I -- when we first moved in, it was Jeannie; her five children, Wendy, Angie, Jamie, Jimmy, and Holly; my mom Maxine;

myself. My sister Anna came and went. She's a year and a half older than I am. She came for a while and left and came back and left. She just didn't -- didn't want to live there. And then there was -- and Jean's mother. I don't know her name. Grandma. And there were two male borders and one female border.

Q. And were -- these two male borders and the one female border, were they relatives or . . .

A. I didn't know them. I remember one's name, David. I don't remember the other two. I know it was a man and a woman.

Q. You called Angela's mother Aunt Jean. Is that how you commonly referred to her?

A. Jeannie.

Q. Aunt Jeannie.

A. I didn't say -- I meant "and" like a-n-d.

Q. Oh, sorry. Okay. All right. What was it like -- well, let me back up. Let me ask you about Jeannie's mother.

A. Yes.

Q. Could you tell us about her?

A. I don't know that I could actually get a mental picture of her in my mind. I didn't see her very much. I just know she was there. She was in the basement in a room in the back and pounding a tire and wailing, you know, just (demonstrating) like this all the time and wailing.

Q. Pounding or --

A. I think she had a bat or a stick or something that she

pounded a tire, and you could hear it in the house even upstairs so . . .

Q. So you could hear pounding, and you could hear wailing?

A. Uh-huh. I'm not going to demonstrate that wailing.

Q. Thank you. And was this -- how often did you hear this?

A. A lot. I don't know. It was probably most of the time while she was there.

Q. And did you ever speak to this grandmother?

A. I don't think I did.

Q. What was it like for you as a child to live in the house?

A. It was chaotic. Rather be out of the house than in the house.

Q. Were --

THE COURT: Just a second. Where are we going with this, that the defense should have called this person as a witness and it would have made a difference in the outcome of the trial?

MS. MORRISSEY: Yes.

THE COURT: It's borderline frivolous in my judgment.

MS. MORRISSEY: I will --

THE COURT: But you make whatever record you want.

MS. MORRISSEY: Thank you, Your Honor.

THE COURT: But, you know, on witnesses like this, we could have just not called them. You could have made an offer of proof as to what they would have said.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 9 of 80

MS. MORRISSEY: All right. Thank you, Your Honor.

THE COURT: That's fine.

MS. MORRISSEY: Thank you, Your Honor.

THE COURT: That's -- you know, you know, you have some arguments that have some merit, but you seem unable to distinguish between the borderline frivolous arguments and the ones that have some merit. I know you feel you have to turn over every stone, but, you know, I am not going to rule that had they called this witness or 50 other witnesses like this it would have made any difference in the outcome of the trial.

MS. MORRISSEY: Your Honor, I appreciate that and --

THE COURT: And, you know, but I know you have a job to do and you have an incredibly difficult and daunting task, and you've done an amazing job, and I have great admiration for your entire team. I'm just telling you how I view this type of evidence.

MS. MORRISSEY: Thank you. And I appreciate what the Court's telling me. We don't know what the Court is thinking which is why, of course, we're calling this. If I may just finish?

THE COURT: No. And you make whatever record you need to make because I'm not going to be the last word on this issue. We all know that.

MS. MORRISSEY: Yes, that's --

THE COURT: Yeah. But I think I'd be doing you a

disservice if I told you I thought this was your best issue and I'm just riveted by it and I've, you know, been debating in my mind about whether I would be granting relief based on this type of witnesses. I just -- I'm not going to.

MS. MORRISSEY: I understand, Your Honor, and we will proceed accordingly.

MR. BURT: Can I have one comment?

THE COURT: Absolutely.

MR. BURT: Thank you very much. Judge, the only thing I wanted to add -- I appreciate what the Court is saying, and it's often difficult to see where a particular witness, especially when you're talking mitigation themes, fits into the big picture. And so it's -- we're trying as best we can to present to the Court a concrete --

THE COURT: I understand that, but the sister did a great job of describing how -- you know, I don't recall all of the mitigation testimony, but there was no question that she had -- she was exposed to extreme things in her life that most of us couldn't even begin to comprehend. I mean, there wasn't any question about that. I don't think anybody on the jury disbelieved the testimony from the sister about what went on in the orphanage and what her early life was like. But I think they felt it was largely irrelevant. I mean, we don't know that but -- and my own judgment is it wouldn't have made a difference in the outcome.

MR. BURT: We appreciate the Court's remarks. We also appreciate the Court allowing us to make the record.

THE COURT: Well, absolutely, because I'm not the final word. And an appellate court could view it very differently than I do. But I don't think it's -- I just didn't want -- I just thought I should tell you how I'm viewing it. Now, could I change my mind? Yeah. But I doubt it, not on this issue. It would be highly unlikely.

MR. BURT: The other thing that we --

THE COURT: But I think you have some excellent issues, but it's frustrating for me that, you know, we're spending time on issues that have very little likelihood of success, but you don't know that but . . .

MR. BURT: The other proposal I think that we had earlier floated with the Court and I again raise it here because it does directly address the Court's concerns is that this type of mitigation evidence certainly could lend itself to a deposition procedure where we could do all of this outside your presence and save the Court an enormous amount of time, and the -- keeping these witnesses here for days, producing them --

THE COURT: Well.

MR. BURT: -- the amount of energy it's taken us to get these folks here has been tremendous.

THE COURT: But they're here so . . .

MR. BURT: Well, they are.

THE COURT: Might as well hear as many as we can.

MR. BURT: Okay.

THE COURT: And then the ones we don't reach, you and Mr. Williams can decide how you want to deal with that --

MR. BURT: Great. Thank you.

THE COURT: -- for June. But they're here.

MR. BURT: Sure.

THE COURT: And you need to make your record, and I appreciate that, and I want you to make your record.

MS. MORRISSEY: Thank you, Your Honor.

BY MS. MORRISSEY:

Q. Miss Ewing, could you talk about your mother's religion when she was living in the home of Jeannie?

A. They didn't have a church. They just prayed all the time about everything. They used holy water and spoke in tongues. They enjoyed exorcisms, and Jeannie would often say that she would get picked when she'd had an idea about something and she wanted everyone to think that came from God.

Q. When someone became -- had a cold, were -- was there a religious treatment for it?

A. You get prayed on. You know, they'd lay their hands on you, pour the blood of Jesus over you.

Q. And what was the blood of Jesus?

A. I'm not sure, just something they would say a lot.

Q. And you said that they would -- describe what they would do

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 10 of 80

in their religion. Did they just keep this in between themselves, or were the children involved?

A. No, most all the residents of the home were involved. So everyone would gather, and there would be a prayer fest, and they would pray over whatever problem you were having, and that would fix it.

Q. Did you mention rebuking as part --

A. Oh, yep, there was a lot of rebuking, yep. Any time a person would have an issue that wasn't agreed with, it was rebuked.

Q. And could you tell us what a rebuking was?

A. Sometimes, you know, there would be hands put to the head and I rebuke you in the name of Jesus, and, you know, the person was to kind of fall to the floor and have a little mini seizure-type activity, and then it would be better.

Q. And what if the person didn't fall to the floor and have a mini seizure-like activity?

A. The rebuking would continue, and sometimes that would lead to the exorcism.

Q. And was the exorcism something different than rebuking?

A. Yeah. That would be a little, you know, more severe and intense and holy water and lots of praying and shouting out, and the person that was being exorcised would need to be usually held down so she could continue their exorcism.

Q. And what about Angela Johnson? Was she subject to rebuking

more or less than the other people in the house?

A. Angela's had a very strong will since I've known her and was not really interested in joining in with that religious practice, so she was often rebuked and exorcised as was my sister Anna. I just kept my head down.

Q. What about fasting? Was that a part of the religion?

A. Fasting was a major theme. If you wanted something, you were to fast and pray about it.

Q. And what kind of fasting was it? For hours? Days?

A. You'd start with, you know, the first fasting, and if you didn't get what you were after, you'd have -- you'd be advised to continue fasting until you got what you wanted or until you were asleep.

Q. Did you try to leave this home?

A. I would get up and try to go as much as I could out of the house all day long. Angela and I would spend a lot of our time away from the house together hanging out in town, going to the swimming pools if we could, visiting others, just away.

Q. When you went -- well, who was taking care of you and the other kids that were living there?

A. The kids were taking care of the kids.

Q. Did your mother or Jeannie fulfill any kind -- any motherly role that you saw?

A. No. I think the motherly role was the house.

Q. And did there come a time when your mother and Jeannie had

a restaurant?

A. Yep. They purchased the White House Cafe in Thompson, Iowa, at the end of that same summer, at the beginning of my seventh grade year.

Q. When you say they purchased it, did you ever see Jeannie work?

A. No.

Q. And when your mother and your father divorced, was there a settle -- property settlement?

A. Yes. My mom received -- I don't know about the monetary part. I was 11 or 12. But she did receive a home in the town of Forest City as part of the divorce.

Q. Did you live in that home?

A. Very briefly. She sold it right away, and then we were moved to Thompson, Iowa, which is just, you know, 18 miles away or something. And we lived in a trailer, and the Johnson family lived in a trailer next door to our trailer, and we had the restaurant.

Q. And did you have any role in the restaurant?

A. I worked in the restaurant quite often. I'd get up in the morning and work and then go to school, often walk home at lunchtime, had a study hall at the same lunch hour so I could help with the lunch rush.

Q. And what about Angela? Did she do the same?

A. Yep. We all would pitch in.

Q. Okay. Is that because you wanted to work before school and during lunch?

A. I don't know that there was question of want. I think it was just the way it was. I really would have probably preferred not to, but I don't know that I had a choice at that time.

Q. Did you ever see Angela Johnson hurt herself when you were growing up?

A. Yep, I sure did.

Q. And could you tell us what you saw.

A. I have distinct memories of her inserting straight pins into her arms, and I think substance abuse probably started very young for -- I consider that self-abuse as well.

Q. And when she stuck the pins into her arm, would she just stick them in and take them out or . . .

A. No, no. There was a little ritual, you know, of getting the pin through the skin so it wouldn't bleed and then slamming it down and leaving it in there.

Q. How old was she when she did this?

A. Twelve, thirteen, something like that. Can't quite remember. Twelve.

Q. Did there come a time when you left Thompson?

A. Yes. The White House Cafe was sold, and they bought another cafe in the next town south called Leland, Iowa. It's about three miles north of Forest City. And at that time my sister and I went to live with a cousin in another town, Klemme,

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.
Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 11 of 80

and I believe that's when Jeannie bought another house in Forest City.

Q.  Jeannie bought a house?

A.  I think so.  There was one.  I'm not sure if it was purchased or rented, but there was another home there.

Q.  When was the last -- what was the last contact that you had with Angela Johnson?

A.  Saw Angie in 1998 at her sister's home in Faribault, Minnesota.

Q.  Did anybody from Miss Johnson's trial team contact you?

A.  No, not until 2008.

Q.  Just one last question.  Were there times when Miss Johnson seemed to -- I don't know how to say it -- drift off, disassociate?

A.  I don't know as a young person I could make that statement.

Q.  All right.

A.  I don't know.

MS. MORRISSEY:  May I just have a moment, please?

THE COURT:  Yes.

MS. MORRISSEY:  Thank you, Your Honor.  I have no further questions.

THE COURT:  Thank you.

Mr. Williams?

MR. WILLIAMS:  I have no questions, Your Honor.

THE COURT:  You may step down.

THE WITNESS:  Thank you.

THE COURT:  Thank you.

Ready to call your next witness?

MR. BURT:  Be Mr. Stowers, Your Honor.

THE COURT:  Okay.

MR. BURT:  Your Honor, Plaintiff's Exhibit 51 is a binder of Mr. Stowers' attorney notes, and it's on the Court's electronic file under attorney notes, Stowers.  I'll be using the overhead so the Court will be able to see these notes.  They're fairly brief and easy to follow.

THE COURT:  Okay.  And I have them up.  Thank you.

Mr. Stowers, if you'll come forward, I'll swear you in.  Good morning.  Moment in the sun.  Would you raise your right hand, please.

DEAN STOWERS, PETITIONER'S WITNESS, SWORN

THE COURT:  Okay.  You were only here for a couple months, so finding the box seems rather daunting.

THE WITNESS:  Well, for some reason I thought it was up here the last time I was here.

THE COURT:  Nope.  Would you tell us your full name, please, and spell your last name.

THE WITNESS:  Dean Alan Stowers, S-t-o-w-e-r-s.

THE COURT:  Thank you.

Mr. Burt?

MR. BURT:  Thank you.

DIRECT EXAMINATION

BY MR. BURT:

Q.  Good morning.

A.  Morning.

Q.  Are you an attorney here in Iowa?

A.  Yes.

Q.  Could you give the Court your educational background and experience as it relates to litigating criminal cases.

A.  My background educationally, I went to the University of Wisconsin at Madison, received a bachelor of science degree in 1986; went to Drake Law School in Des Moines, graduated in 1989; then took the Iowa bar, passed the Iowa bar; went to work at the United States Sentencing Commission in Washington, D.C., in the summer of '89 till late summer of 1990.  During that time I also took the Pennsylvania bar exam and passed that in the fall of 1989.

And then in August of 1990 I started -- I returned to Iowa to work at a law firm that I had clerked at when I was in law school which is -- was then known as the Rosenberg Law Firm, R-o-s-e-n-b-e-r-g, and then -- and I worked in that same location for -- till -- in Des Moines until the summer of 2009, and the firm changed membership and things over those years.

The firm was primarily focused on criminal defense, and the senior person in the law firm was an attorney, Raymond Rosenberg, who was widely regarded as the best criminal defense

lawyer in the state of Iowa for many years, sort of the dean of criminal defense lawyers I would say he was.  And I worked very closely with him, tried a number of cases with him over the years, and then over time started to develop my own trial practice and criminal practice with Ray independent of him and also with him and tried a number of cases in federal and state court.  And also another part of the practice in addition to trial work was appellate work which I have always enjoyed doing.

Q.  And as your career progressed, did you gravitate more toward the appellate research and writing end of things, or would you characterize yourself as a jack of all trades-type lawyer?

A.  Well, not a jack of all trades.  I -- different than a lot of lawyers, a lot of lawyers who do criminal defense see themselves as trial-only type lawyers and they don't like to do appeals or they don't do appeals or they don't take a particular interest in the legal issues of a case and developing potential error for appeal.  I do.  I really like that.  You know, I like to do both the trial and the appeal when the trial doesn't go so well.  I'd rather win the trial obviously, but I like to develop issues in a case and work them through and see them through the case and then develop the issue for appeal because I think that's always something that I learned from Ray Rosenberg was that you always want to try to develop error if you can so that you have potentially an insurance policy in the event the trial

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 12 of 80

doesn't go so well.

So that was kind of my approach to it, and I learned that from him primarily. And he always did trials and he did his own appeals which isn't necessarily what a lot of people do. A lot of people hand off the appeal. But I've always found it to be a better way to do things that way.

Q. Now, according to the docket in this case, you were appointed to represent Miss Johnson on April 13, 2001; is that correct?

A. I remember the first time I appeared in the case was during the suppression hearing in Cedar Rapids. If that was on April 13, that's fine. I think that the judge had done the order perhaps on that date but it had a -- it was backdated or it was effective as of a prior date because I had I think started doing a few little things before that, a couple weeks perhaps.

THE COURT: How about nunc pro tunc rather than backdated?

THE WITNESS: Oh, okay. I don't mean the order was backdated.

THE COURT: Quite a difference. I don't backdate orders, but I do occasionally sign nunc pro tunc orders.

THE WITNESS: Yeah.

THE COURT: There's quite a difference.

BY MR. BURT:

Q. Yeah, I think the nunc pro tunc order was to March 1 is

when the order states, and so apparently you started working on the case before you were actually appointed.

A. Yes.

Q. Now, who first contacted you about this case? I notice from the docket that it was Mr. Willett who asked for your appointment. Had you had a prior relationship with Mr. Willett?

A. No, I didn't know him, and I was contacted by Judge Bennett by phone.

Q. And do you remember what Judge Bennett indicated to you in terms of why he needed you or what the issues were that he was contacting you about?

A. At the time that I got the contact I think I had had a prior death penalty case up in the Northern District that Judge Bennett had appointed me to or it was a potential death penalty case. And then -- and I think that was appointed by Judge Bennett, and then I think he reached out to me because as he explained it he felt that he needed somebody who was good on legal issues and research and writing. And a comment I remember being made was that Al Willett wasn't much on research and writing and that his briefs were like headnotes or something put together in a brief format. I remember that.

Q. So when you were appointed, you had not had a prior relationship with Mr. Willett at all; correct?

A. That is correct.

Q. And how about Mr. Berrigan? Had you ever worked with him

before?

A. No.

Q. Now, at the point in time when you were appointed on this case, what prior experience, if any, in capital litigation did you have?

A. You know, we had the one prior case that was considered a capital prosecution simply because of the nature of it, and that was a -- my client in that case was Ben Alden, A-l-d-e-n, I believe.

Q. Was that a Northern District case?

A. Yeah, it was a case that was in the Northern District, and it was before Judge Bennett. There was a number of defendants.

THE COURT: Was that the Gregory Sky Erickson case?

THE WITNESS: Yes, yes.

A. And that was the name of the victim was Erickson. And that case had potential death penalty ramifications to it, and so under the protocols or whatever at the time as I remember it I got a call -- I think it was again from Judge Bennett -- he said, you know, "I've got this case. We're looking for lawyers for the various defendants," because there were many, "and I'd like to appoint you to one of them with a local Sioux City lawyer."

So that was my experience in capital cases, but it never became a capital case because when I got involved in it for my client, I rapidly determined that we needed to work our

client's case out and resolve it, and that's what we did and got him out of the way of greater harm I guess.

Q. That's interesting. So you settled the case quite early in the process to avoid the death penalty?

A. Well, candidly I don't think he was really ever going to be a candidate for the death penalty because in the context of that case factually he was not present at the scene of the actual killing. He had participated I believe in the kidnap portion of that case, and then I think he had had a firearm in his possession as well and was involved in that part of it, and then he dropped out along the road, if you will, because they kidnapped him in one city, and then they took him across the border to Minnesota where he was killed by some of the other defendants. And then they lit the barn or the house on fire as well as his body.

Q. What year did you settle that case?

A. I have a hard -- I'm not sure when that case got resolved. I don't remember.

Q. And did you resolve it by way of a proffer and then after making a proffer the government indicated what they would agree to?

A. I can't answer that because I don't remember.

Q. Do you recall back when you were first assigned to this case what the procedure was in the Northern District for plea bargaining in terms of how it worked?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS Document 350 Filed 11/10/11 Page 13 of 80

**A.** In this case?

**Q.** Well, I guess I'm asking just generally what the procedure was, not in this case. We'll talk about this case, but tell me first what your understanding of the procedure was in the Northern District of Iowa for plea negotiations and how it worked.

**A.** Well, it kind of depended on the case I always felt. I never felt that there was a hard and fast rule about how it was done. But it typically would start off with trying to obviously reach out to the prosecutor and talk about the case, figure out, you know, what the viability was of various pleas and sort of come -- I always like to have a target in mind before I would really start discussing too much, and I'd like to know what the sentencing guidelines provided which during the time periods that we're talking about here the guidelines were still binding, and they were generally -- well, highly -- high percentage of the time the guidelines were followed as the sentence, and the government was very -- in the Northern District was always pretty -- pretty adamant about having a guideline sentence as part of any plea agreement, so you always had to work within that framework.

And so you'd get ahold of them and reach out and work out some -- some terms if you could. And if the case involved a proffer, that was always -- or a desire on the part of the government to receive a proffer, then that was always something

that was discussed as well and typically included either in the plea agreement or in a separate proffer agreement or both.

**Q.** Now, when you came into this case, what was your understanding of your role in terms of what you were going to be doing?

**A.** After I got appointed or after I got contacted I should say, I had explained to Judge Bennett that since I didn't know Al Willett and he was con -- the judge was contacting me, I was a little hesitant to simply say yeah, just appoint me because I felt like it should be done with some communication between me and Al particularly since -- since he was being said to be sort of the lead lawyer I guess.

And so I then contacted him and discussed sort of what the perception of my role was. I think Judge Bennett must have already, if I remember right, contacted Al as well and sort of let him know that he was in contact with me and that he was wanting to appoint me. And then Al and I visited, and then Al sort of wanted me to be the research and writing attorney.

**Q.** Did you feel from the outset that Mr. Willett was underutilizing your skills in the case?

**A.** In the beginning of the case, no, because in the beginning of the case it was really this huge suppression issue with this Massiah situation, and there was a -- it was a major -- a major, major issue in the case. And I put -- and that was really -- when I parachuted into the case, if you will, that was the point

in time when that was really needing to be worked up a lot better legally than it had been before. And so at that point, no, I didn't feel that way. And that would have been, you know, 2001.

**Q.** The hearing was still in progress I think in April of 2001 when you got appointed?

**A.** That's true, and then we actually I think reopened the record in the spring or the early summer as well because we had some new evidence.

**Q.** Why did you need to reopen the record? Why wasn't the evidence -- I believe it was Miss Bramow's testimony; right? According to the motions filed, you filed a motion to reopen, said the defense had discovered a new witness, Sara Bramow. Why wasn't she discovered during the first hearing and presented to Judge Bennett?

**A.** Well, I think it was two witnesses. It was Mr. Flowers who I thought -- Anthony Flowers, I remember him. And I remember her as well. She was Angela's cellmate for much of the time period when the McNeese situation was going on.

And to be honest with you, I think that there was no actual -- there was no actual defense factual investigation that was independent of discovery as it related to the circumstances at the jail. I think there was very, very little done to investigate from independent witnesses, namely other inmates in the county jail, what was really going on there with regard to

McNeese, Angela, and that sort of thing. And it was really a hearing that was largely based almost -- almost exclusively on government evidence that they produced and disclosed which there was a good deal of. And there was more than enough there to, you know, win the motion based on everything, but -- because it was pretty outrageous what happened but . . .

**Q.** So let me see if I understand this. You -- Miss Johnson is indicted in July of 2000. When you come into the case, the case had been pending for quite some time, correct, April of 2001, and when you come into it, you're in the middle of an important evidentiary hearing; correct?

**A.** Yeah.

**Q.** And you're telling me that at that point when you first became involved and you started looking at what was going on there had been no independent investigation into this issue of Mr. McNeese and the admissibility of the statements and what was going on inside that jail?

**A.** No, and I remember asking about it because I was thinking to myself, you know, you would go out and get certain types of things and you'd want to interview as many of those inmates that were in the jail at the time as you could to find out what was going on, and that seemed to me to be a problem, and it was one of the things after I got involved I remember Ray Cornell and I having a visit about that as well as his assistant Rose Nevins and sending them up to the Benton -- Benton County Jail or

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 14 of 80

Q. So Nevins and Cornell are still involved in the case in April of 2001 when you got on board.

A. Yeah, and I think they were involved some --

Q. Because I think Mr. Willett told the Court that he very quickly determined that Mr. Cornell did not have a license and let him go before he did any investigation. What you're telling me is contrary which is he was still in the case in April 2001.

A. Oh, absolutely he was in the case. Actually we -- no, he was in the case, yeah. He was in the case for quite a while after that until the licensing issue surfaced.

Q. That came way later, though, didn't it?

A. I think it was quite a long time later. I can't give you -- I mean, I'm thinking it was over a year, and I think it was the reason that Gratias ultimately got appointed or took over the role of investigation.

Q. That was 2004, though, wasn't it?

A. I don't know. I mean, the orders would speak for that. But yeah, I mean, he came in later, quite a bit later, Gordon did.

Q. So it's not true that the investigator was -- this problem with Cornell was found out quickly, he was let go and a new person came on right away.

A. No, that's not true.

Q. Now --

A. I don't know when Cornell had the licensing problem either, so I just don't know.

Q. Now, when you came on, did you begin to direct Mr. Cornell and Miss Nevins?

A. As to that limited area, yes, but I was told not to by Al.

Q. Why did he tell you to do that?

A. Well, because he and Cornell had had historically some kind of a working relationship over the years on different cases, and he -- Al wanted me to really be this research and writing lawyer, and he didn't want me to be involved in things much beyond that unless he delegated or assigned them if you will.

Q. Well, isn't part of research and writing developing the facts that are going to go into your legal arguments to the Court in developing an evidentiary record?

A. Well, I agree, yes.

Q. And is what you're telling me that he was saying research and write the motions but do not direct the investigation in any way unless you get my express permission?

A. Right, yeah. He was kind of trying to parse out the work almost like giving assignments for a period of time. That was the way he wanted to do it initially.

Q. Did that strike you as odd?

A. Well, just not the way I work. I don't know if it was odd or not odd. It's just I could see a thousand things to do, you know, on the case. It's one of the things I do I think is I like to sort of look at the monster and find things to work on and -- that are potentially needing to be done so that when you get down the road on a case you've already identified the issues, you aren't scrambling to catch up, and so you forecast, you know, as much as you can. And it seemed to me that when I got involved that wasn't going on, and it just -- it wasn't the way I do a case. That's what I can say.

Q. Well, was he an efficient assigner of tasks? In other words, did he take on the role of I'm going to assign tasks, I'm going to direct the show, and did he then proceed to do it efficiently?

A. Oh, I don't -- you know, efficient, I don't know about efficient. I know that it wasn't very long let's say before I just decided that I was going to do what I felt I needed to do in terms of the work-up of the case because it was apparent to me that I needed to do what I needed to do whether he was telling me to do it or not because there was a lot to do.

Q. Now, when you came into the case, what was the state of the discovery organization?

A. Well, as I remember it, the discovery up to that point in time which, you know, March, April, would have been in the

wherever Sara Bramow was at that time, interviewing her regarding things. And somewhere along the line we ran into Anthony Flowers as well. I don't know if he just wrote a letter spontaneously to one of the attorneys or if that was the result of investigation. But yeah, I remember that.

possession of the government at their offices in Cedar Rapids and not in the possession of the defense, uncopied, mostly unreviewed if reviewed at all except for materials relating to the Massiah issue and McNeese, much of which had been copied and provided as part of the suppression proceedings.

But everything else was basically under lock and key at the U.S. Attorney's Office such that it had to be reviewed physically there and could not be copied but it could be dictated and notations made, et cetera. I think there might have been an arrangement whereby binder by binder Al had worked out something whereby they could check out certain portions of materials to review but return them either at the end of the day or within a day or something so that they could be reviewed at the jail with Angela.

Q. And you said that at this stage in April of 2001 much of the discovery had been unreviewed. Did I hear that correctly?

A. Oh, yeah, I'm sure of that, yeah.

Q. And why are you sure of that?

A. Well, be -- because I got involved in the case, and when I got involved in the case, the main part of the discovery was at the U.S. Attorney's Office and it was not -- it was clear it hadn't been reviewed. One of the reasons we wanted to get copies of it so that the lawyers could efficiently review it. Pat was in Kansas City, I was in Des Moines, and Al was in Cedar Rapids. But no, it had not been reviewed, and that was -- no,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 15 of 80

it hadn't been reviewed. There was portions of it that had been reviewed.

Q. Now, when you first got on the case, did Mr. Willett present you either electronically or through hard copy summaries of what he and his paralegal had done in the way of discovery review and interviews with the client and mitigation investigation up to that point?

A. No.

Q. Was there any sort of work product that got produced to you or that was available to you when you first came into the case in April of 2001?

A. No, I don't believe there was anything provided to me like that.

Q. Did you ask for it?

A. At that --

Q. That would be logical; right? You're coming into a large death penalty case. You'd want to know right off what's been done, let me see discovery work product, et cetera.

A. Well, initially, like I say, the issue in the beginning was this Massiah issue and getting my arms around that and what the record was and wasn't on it and whether or not potentially the record could be improved and doing the necessary research on that project.

The other issue I started to work on right away was whether or not the death penalty was even available under the

initial indictment and -- because of the timing of the murders in relation to the Federal Death Penalty Act. The murders occurred prior to that being passed into law.

Q. Was that an issue that had been identified by Mr. Willett and Mr. Frerichs up to that point? We're now July of 2000 to April 2001. Had the issue of the possible inapplicability of the death penalty to a 1993 offense been explored when you came into the case?

A. No except ironically by McNeese who wrote some kind of a note to Angela containing his legal analysis of why potentially the ex post facto clause precluded the death penalty for the Title 18 witness murder charges.

Q. This guy McNeese sounds like he should have been part of the defense team. He was pretty sharp legally, wasn't he?

A. He had a lot of history in the criminal justice system as the record shows, so I think he had some knowledge. I don't know where he would have gotten the information about death penalty ex post facto, et cetera, unless it came from the government who was working with him at that time. I have a hard time believing he came up with that on his own.

Q. Now, I don't mean to be insulting, but is -- did you get the idea from him? Did you read the note and say, hey, he's got something here?

A. No, I looked at it to start with, and I was -- it was within -- you can look at my billing statements. It was right

away. And I said is this even a death penalty case? How do you get the death penalty when -- the death penalty came into effect I believe in 1994, and the crimes were in 1993, and I'm like how does that work, you know?

Q. What did Mr. Willett say when you told him that there may be a very fundamental problem with this capital prosecution?

A. I don't remember that he really said anything, but -- no, I don't remember what he would have said about that.

Q. Well, was he surprised? Was he shocked?

A. His reaction a lot of times on the legal issues was disinterest in them. It wasn't that he was surprised, not surprised, or anything else. He sort of saw that as legal stuff and he was the lead counsel preparing to go to trial on the case; and, therefore, you know, all that legal stuff kind of was secondary to whatever he said he was doing which was supposedly trying to defend the case factually.

Q. You said his stance was always preparing for trial. Is that sort of the way he approached the case, that it was going to be tried and he was preparing for trial?

A. That was his thinking, and I could never, you know, get my arms around why he was thinking that way other than, you know, it seemed like he wanted to do that.

Q. Now, when you first came into the case, did you take steps to familiarize yourself with the death penalty protocol and how that operated, or was that not part of your job?

A. I don't think I really had much to do with that. That process was underway when I got involved, and I think it was going on in first part of 2001. I was generally aware that that was -- something was going on, there was going to be a meeting with -- of some kind with the people that decide that at main Justice between Berrigan and them, and maybe Al was involved. I'm not sure. I wasn't involved.

THE COURT: Mr. Burt, could I interrupt for a second?

MR. BURT: Yes, sir.

THE COURT: I have a question just to try and clarify.

MR. BURT: Sure.

THE COURT: Mr. Stowers, your memory is much better than I because I had forgotten that I had called you, but once you said that, you know, it triggered. So I'm just trying to get the sequence of the lawyers in the case. When you joined the case, were you in a sense replacing Tom Frerichs, or had he been out of the case?

THE WITNESS: I think he was already gone, Judge, and I think really more it was Bob Rigg. Bob Rigg was doing some work as you remember.

THE COURT: But he was never -- was he appointed, or was he just volunteering?

THE WITNESS: Well, I think he was working without billing, and I don't know if he was technically appointed or not. I just remember that he worked at the legal clinic and he

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 16 of 80

**1087**

was doing --

THE COURT: He was a professor at the Drake Law School legal clinic at the time.

THE WITNESS: Yeah.

THE COURT: And I think he had some students helping, and he was as I recall doing briefing on the Massiah issue.

THE WITNESS: Yeah. And then I think his decision was that this thing was going to be too big for he and his people to really work on to the extent it was going to need to be able to get work done. And he had, you know, a clinic job and everything else, and this was going to be a little too much. And he was involved in the Massiah hearing itself. Frerichs was not at the Massiah hearing in April. The lawyers that were there were Berrigan, Willett, and Rigg, and then I showed up.

THE COURT: When you were appointed, was Al Willett -- he was counsel of record; right?

THE WITNESS: Yes.

THE COURT: And Pat Berrigan was counsel of record.

THE WITNESS: Yes.

THE COURT: And you were the third appointed CJA lawyer in the case.

THE WITNESS: Right.

THE COURT: But Tom Frerichs had been on the case for a while.

THE WITNESS: I thought that he had had to withdraw to

**1088**

a disqualification earlier, but, you know, the record in the court file's going to show that, so I can't -- but I just remember --

THE COURT: But he wasn't actively involved in the case when you were appointed.

THE WITNESS: No. My recollection is he was already out.

THE COURT: He was out, okay.

THE WITNESS: Yeah.

THE COURT: I just wanted to try and get the --

THE WITNESS: Yeah.

THE COURT: It's been a long time ago.

THE WITNESS: Yeah.

THE COURT: And I don't have much recall of the sequence of lawyers. Matter of fact, when Frerichs' name came up the other day, I was surprised because I hadn't really remembered that he was in the case, and then it kind of came back to me that he was but . . .

Could we take a recess now?

MR. BURT: Yes, sir.

THE COURT: Okay. We'll be in recess until nine o'clock. Thank you.

(Recess at 8:42 a.m.)

THE COURT: Thank you. Please be seated.

Mr. Burt, please continue with your direct of

**1089**

Mr. Stowers.

BY MR. BURT:

Q. Mr. Stowers, when you came into the case in April of 2001, did you review the Court's orders and opinions up to that point in the case just to kind of familiarize yourselves -- yourself with what had taken place?

A. Pretty sure I did, yes.

Q. Okay.

A. I would have gathered them all, and we started to assemble a pleading file we did from day 1, and then they would have been reviewed as they came in to the extent they had any pertinence to the present time.

Q. Now, at the point in time when you came into the case, there had been a published opinion written by Judge Bennett on February 9, 2001, some months prior to your appointment, concerning the issue of Mr. Willett continuing to represent Angela Johnson because of his relationship with Mr. McNeese. Do you recall that that had taken place?

A. I don't remember that. I remember there was a issue of conflict of interest that was raised.

Q. Yeah, this is the opinion I'm referring to.

A. Yeah, and I don't remember so much about Al. I just remember I thought that was why Mr. Frerichs was disqualified or ceased working on the case.

Q. Right. The opinion references that Mr. Frerichs was

**1090**

voluntarily stepping down, had been appointed in August of 2000 and now February 9 the judge is indicating he's stepping down. The opinion also indicates in a footnote the Court appreciates the thoroughness and care with which Mr. Rigg undertook Johnson's representation in this matter which included the filing of a comprehensive memorandum of law and participation in the hearing both on very short notice.

So apparently there had been another research and writing person brought in prior to you on very short notice, and he had performed well, and this had produced this opinion about Mr. Willett's representation, whether there was a conflict or not.

A. Now that you tell me that, I do remember talking to Bob, Bob Rigg, who I know very well about the fact that he got involved at the time of the conflict issues, and that was how he got involved in the case. Now that you tell me that, I remember that.

Q. Okay. And do you recall either from reading Judge Bennett's opinion dated February 9, 2001, or from maybe some other material that at this hearing on representation that McNeese had testified that Willett had given him confidential communications and Willett had testified directly contrary to that that he did not and that Judge Bennett in his opinion resolved that conflict in favor of Mr. Willett's version of the facts?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

A. No, I don't remember that.

Q. Do you recall ever having any discussion with the defense team or doing any research on your own as to whether you could use Mr. Willett's testimony to impeach Mr. McNeese, in other words, that Mr. McNeese had testified under oath that he had had confidential communications with Mr. Willett and Mr. Willett testified at this hearing and he testified again here yesterday very adamantly that he never had any conversations with Mr. McNeese? Was there any discussion about, gee, you know, Al Willett may be a witness in this case because if McNeese is going to be a central part of it and McNeese lied under oath, we might want to put Al on as a witness to show that this guy's a liar under oath?

A. I don't remember ever considering that issue.

Q. Did Mr. --

A. And I'm not really sure what my level of knowledge was of that particular situation. I have a vague remembrance that there had been some kind of communications between McNeese and Willett, but, you know, I don't -- beyond that as I sit here today I don't know if there was any -- I just don't think there was any evaluation of that.

Q. Okay. And did Mr. Willett share with you as the legal research and writing person, you know, Dean, there is an issue here as to my being a witness against McNeese's false statements in court, and we ought to do some research on that and figure

out if there's either a evidentiary issue in terms of whether I can help Miss Johnson or maybe possibly even a conflict of interest issue as to Mr. Willett's representation?

A. No, I don't think that was raised. I seem to -- I was present at the suppression hearing when McNeese testified, and I remember McNeese was examined by Mr. Berrigan as opposed to Willett if I recall correctly at the suppression hearing. And one of the reasons for that had something to do about the issues between Willett and McNeese, and I don't remember the details, and I was just sort of, like I say, dropping into the case at that point.

Q. Right.

A. And picking it up. So that may be why Berrigan was examining him as opposed to Willett, and I think there was some discussion along those lines that there was some reason that Al didn't want to do it or Al was too close to the issue or something of that nature if I recall correctly.

THE COURT: Would you mind if I ask a question now?

MR. BURT: Any time, Your Honor, any time.

THE COURT: I didn't actually recall any of this, but from a trial strategy point of view, if you're going to try and impeach McNeese, wouldn't it have been better to try and put that portion of my opinion into evidence where there's a federal judicial finding rather than calling Willett as a witness? I mean, it apparently was never discussed, but from a strategy

point of view, wholly apart from whether -- you know, the conflict that would be created by calling Willett as a witness which may or may not actually be an ethical conflict -- I mean, it's always a potential for a conflict, but there are some exceptions about when a lawyer can testify in a case and not have to withdraw.

But setting that aside for a moment, trial strategy, wouldn't you rather have a judicial finding by a federal judge that McNeese was found not to be credible on something than having Willett testify, kind of he said/I said?

THE WITNESS: If it's admissible, probably I agree with that. I just don't know if that would be admissible. I never thought about it. I don't know if the Court's opinion that a witness in a proceeding was not credible would be admissible as -- you know, it's almost a hearsay issue I guess in some ways. Is that -- I've never dealt with that issue I guess I would say in the context of a jury trial. Certainly I think you could do that in a sentencing and other type of things, but I don't know about whether or not that could be used that way in a jury trial. I haven't ever looked at that, but that's an interesting question.

THE COURT: Okay. Thanks.

BY MR. BURT:

Q. And along those same lines, I guess in the penalty phase of this case, the defense asked Judge Bennett to instruct on

lingering doubt; correct?

A. Yes, uh-huh. Well, yeah, and I think he was going to do it since he had done it in the Honken case, and I think he was pretty well settled on giving that, but we did get that instruction and ask for it.

Q. And you were aware from your research and also from the painful rulings of Judge Bennett that the rules of admissibility -- the rules of evidence did not necessarily apply at the penalty phase; right? I mean, there had been some adverse rulings against the defense allowing in some pretty damaging testimony in the penalty phase on the theory that the rules of evidence and in particular the hearsay rule did not apply to the penalty phase.

A. Right, I agree with that, yeah.

Q. And so one issue to be explored there would be could you get in Judge Bennett's judicial findings on McNeese's credibility or lack of credibility on the issue of lingering doubt.

A. Okay. Yes. I guess that's true.

Q. And so that is not an issue that got explored.

A. I don't remember ever exploring it, no. I don't think I did actually.

Q. Now, one of the issues you did explore in the -- when you first dropped into this case in April is one of the issues you were looking at at that time was whether there was some

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS Document 350 Filed 11/10/11 Page 18 of 80

potential to raise an issue of interference with the right to counsel based on Mr. McNeese's communications with Angela and his derogation of Mr. Willett in some letters that you looked at that have been provided in discovery.

A. Yeah, I kind of felt the way -- yeah, I started researching that along with the Massiah issue as it's been coined I guess. And the way I was thinking about that issue if I can explain . . .

Q. Sure.

A. Okay. Was that what happened was more than just McNeese eliciting some information factually from Angela Johnson. He, along with, you know, the help of Mr. Reinert in working with him, had come up with a specific game plan of how they were going to approach Angela and how McNeese would approach her and -- at a time obviously when she was represented by counsel.

And the game plan that they came up with included legal advice that McNeese purported to be giving to Angela about such things as whether or not she could actually get the death penalty and advising her that she could not based on, as I think I referenced earlier, this ex post facto argument and that you couldn't get a death penalty for a 1993 murder under 1512, the most anybody could get was life; and, therefore, we'd have this individual who was the same name as the defendant in a Northern District case -- Long I think his last name was. We'd have him plead because he's already doing life, so we'd sort of set this

up that we'd feed this story, we'd get it down to this guy who I think was in Leavenworth named Long who was already doing a life sentence in a Northern District case, and he would take the rap for it, get life, and Angela would walk free and potentially I guess under the most fanciful version sue the government and collect lots of money from the government.

And I felt that that kind of conduct went beyond just eliciting information from her and that what it really did was it kind of took over a role of advising Angela Johnson and interfered with the role that her lawyers should have been playing and were supposed to be playing and were assigned to play which was they were her legal advisors. The government shouldn't be directly or through its informant advising Angela Johnson on how she might be able to use this very, very valuable information, that is, the location of five human remains, that she shouldn't be getting advice about how to do that from the government.

And so it went beyond just eliciting information, but it went into advising her on how she could benefit from that information being shared in this manner which would facilitate her, I guess, getting out of prison. And I felt like that went well beyond just eliciting and -- information from her, and it got into an area of sort of contradicting lawyer advice that would be sound and substituting their own advice through their informant for that of her counsel.

And as a -- I felt like what had happened was they got themselves in between Willett -- based on what I could see, between Willett and Angela, and they got in there with McNeese and sort of disrupted whatever their attorney-client relationship was. When she should have been sharing that information with her attorney, she instead is sharing it with the government's agent based upon this advice and scheme that was being given to her including advice that she could not get the death penalty that they were giving her. And then they turn around, of course, and change the indictment and seek the death penalty under a statute 848 that allowed for it. And I had a lot of -- it's really -- to me I've never seen anything like that occur in a case, and I felt it was one of the most outrageous things I've ever seen done.

Q. Now, you also knew from reviewing the McNeese discovery that not only was McNeese advising her on legal issues but he was derogating her attorneys basically saying don't trust your attorneys, don't -- you know, he's a lousy lawyer, words to that effect.

A. Yeah, there was a lot of those letters where he -- where he made statements like that. I think there might have been even some where he said the opposite so -- but I think he was really working her pretty hard in the jail at Mr. Reinert's request.

Q. Now, Judge Bennett's comprehensive opinion on the McNeese admissibility issue has a footnote, footnote 25, and it says the

government also argues that evidence that McNeese made statements to Johnson telling her that she should not trust her lawyer and containing disparaging remarks about her lawyer should not be suppressed because there was no showing that Johnson suffered any injury to her Sixth Amendment right to counsel as a result of McNeese's intrusion upon her relationship with her attorney. However, such evidence does not plainly relate to a Massiah violation. It does not appear to the Court that Johnson has ever asserted any other kind of Sixth Amendment claim premised on such statements, nor does it appear that Johnson has ever asserted that such evidence should not be admissible. Moreover, at this point the Court does not see how such evidence will be relevant to proof of the crimes charged against Johnson. Therefore, the Court will not evaluate the admissibility of such evidence further here leaving that question for later when the necessity of reaching it has been shown.

And as far as I could see in the record, that issue was not explored further. And were you thinking in terms of an admissibility issue or more maybe a motion to dismiss based on intentional interference with the attorney-client relationship?

A. I know that we looked at it. It was raised. Whether it was raised as part of the initial elicitation Massiah-type motion, the briefs will bear that out. But I think it may very well have been raised at the point in time when the government

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 19 of 80

wanted to use that information under the second indictment. And if I remember correctly, I think we raised that issue more directly then, and there's almost no law on that type of a subject where the government disrupts, if you will, the attorney-client relationship --

Q. Yeah.

A. -- in a way that impacts what happens with regard to the defendant and then she shares information that the government wants to use as a result of that disruption or interference, whatever you want to use for the word.

But I don't think there's like -- if I remember correctly, we didn't find much more law on that kind of a subject other than the very general concept that an attorney can be ineffective because of things that they do or don't do themselves, or they can be rendered ineffective by virtue of something the government does that causes it. And I think that might be the chronic case or something.

Q. And your theory here was the government had caused an interference with the attorney-client relationship by inserting a guy like McNeese into that relationship and having McNeese say that Willett was not to be trusted and making disparaging remarks about.

A. That and the legal advice.

Q. Right.

A. Which I found particularly troubling.

Q. Sure.

A. Especially since they later chose to file a separate indictment and pursue the death penalty when they had through their informant told her she could only get life.

Q. So if that issue was raised, that would be borne out by the record.

A. Yeah, it would have to be.

Q. Do you believe you might have raised it in connection with the second level of McNeese litigation having to do with whether the suppression order would extend to the 848 charges; right?

A. That's right.

MR. WILLIAMS: Your Honor, I just object to the line of questioning. I don't recall anything in the defendant's petition claiming ineffective assistance of counsel for failing to raise a motion along these lines.

THE COURT: Yeah, I was just going to ask that question. Do you think that's raised in the -- I call it the petition, but I guess it's technically a motion -- in the 2255 -- I'm going to call it a petition. In the 2255 petition or motion, do you -- I hate to hesitate -- I mean I hate to guess because last time I guessed I was absolutely dead wrong, so I'm done predicting what was in there and what isn't because I haven't combed it as carefully as you have, but do you think it's been properly raised?

MR. BURT: Not specifically, but I think there may be

some general allegations in there under which we could argue that it is raised. I certainly would say to the Court if I had pled this petition it would have been pled differently, but I do think --

THE COURT: Well, having said that, was there anything that prevented you from amending it?

MR. BURT: Well, my understanding from reading the Court's order, there is a scheduling order which says that the Court will allow amendment to conform to proof following the hearing.

THE COURT: Oh, okay. So you still have a right to amend.

MR. BURT: Yeah, I was proceeding on that assumption.

THE COURT: Yeah, okay. And I was going to ask you that. What would prevent you from amending to the proof so --

MR. BURT: No.

THE COURT: So I'm going to --

MR. BURT: So that order was in place, and I actually was relying on it.

THE COURT: Yes. Is that order in place, Mr. Williams?

MR. WILLIAMS: Yes, Your Honor, I believe it is.

THE COURT: Okay. So I'm going to overrule your objection to the --

MR. BURT: Thank you.

THE COURT: Okay. Thank you.

BY MR. BURT:

Q. So your recollection is that that issue was an important one and it's preserved probably in that second range of litigation.

A. That's what I -- that's what I'm saying. And it could be either that it was first raised at the trial court in connection with the effort to have the suppression order ruled inapplicable to the second indictment, or it was raised after the case came back from the interlocutory appellate remand following all that activity at the Eighth Circuit or both. So -- and I think -- I'm going to suspect it's both. That's what I'm going to say, but I could be wrong.

Q. Okay.

THE COURT: Mr. Burt, can I ask you a question now, and it's kind -- it's a legal question but . . .

MR. BURT: Yes.

THE COURT: As I recall -- and it's been a long time since I read it -- didn't the Eighth Circuit say that I misapplied their precedent with the bright line rule -- I think it might have been United States versus Moore -- that in order for there to be a Massiah violation the government actually has to formally direct the informant to do what McNeese did, and didn't they say there wasn't sufficient evidence, that I erred in finding that there was sufficient evidence or I guess I erred

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 20 of 80

in kind of sidestepping Moore?

And so if -- given the Eighth Circuit said that, if that's, in fact, what they said, why would any of this make a difference? Do you see what I'm saying about -- you know, if, in fact, McNeese did interfere with the attorney-client relationship and did, in fact, offer advice and did, in fact, drive a wedge between Miss Johnson and her counsel, if the government didn't direct him to do that, how would it be a Sixth Amendment violation?

MR. BURT: Because I think the rules and policies may be different --

THE COURT: Different.

MR. BURT: -- as it relates to the attorney-client relationship than as it does to the admissibility of incriminating statements.

And it seems to me a good argument could be made that the government cannot take a guy like McNeese who it knew or should have known was going to be doing the kinds of things he was doing and whether they give him instructions or not knowingly place her in proximity to Miss Johns -- and for all of reasons you explored in your opinion --

THE COURT: But aren't they both Sixth Amendment violations? So it seems odd that there would be a different standard. But, you know, I guess this is one of the things we're going to -- one of many that we're going to take up in

briefing; right?

MR. BURT: Yes.

THE COURT: Yeah, but it was just on my mind so I -- yeah, and there may, in fact, be a difference, and I guess that's the best answer you can give at this point; right?

MR. BURT: It probably is.

THE COURT: Yeah. Okay. Thanks.

MR. BURT: Sure.

BY MR. BURT:

Q. When you got into this case, you had mentioned your mentor there schooling you in the notion that one of the important things a defense lawyer does is to preserve issues; correct?

A. Yes.

Q. And that advice I guess applies in any criminal case whether the client is facing a drunk driving or a homicide prosecution.

A. Yes.

Q. And when you got in the case, did you have a chance to review the guidelines for capital representation that were then in place in 2001?

A. **I know -- I know that I got a copy of them at some point during the representation which obviously went on for years but -- and I know I'd looked at them, and I attended one or more capital seminars to try and at least get some insight from other lawyers and people that are in the know in this area.**

Q. And one of the -- I want to ask you whether you're familiar with this guideline. This is from the 1989 guidelines, ABA guidelines, that were referenced with Miss Goody. It's guideline 11.5.1, the decision to file pretrial motions. Counsel should consider filing a pretrial motion whenever there exists reason to believe that applicable law may entitle the client to relief or that legal and/or policy arguments can be made that the law should provide the requested relief.

Counsel should consider all pretrial motions potentially available and should evaluate them in light of the unique circumstances of a capital case including the potential impact of any pretrial motion or ruling on the strategy for the sentencing phase and the likelihood that all available avenues of appellate and post-conviction relief will be sought in the event of conviction and imposition of a death sentence.

Then it goes on to list a bunch of things the lawyer should consider as potential motions. Were you generally familiar with that standard?

A. **Yeah. I mean, that's pretty much the standard I use in my practice.**

Q. Okay.

A. **You know, tempered a little bit about, you know, what seems strategically wise to do in a particular case.**

Q. Okay. And you tried to adopt that standard in this case; right? I mean, you were looking broadly at all the issues. You

knew in the event of a conviction there was going to be appellate review and post-conviction review, and you were trying as best you could to preserve all possible legal issues.

MR. WILLIAMS: Objection, leading.

A. **Well -- oh, I'm sorry.**

THE COURT: Just a second. Can you rephrase the question?

MR. BURT: Sure.

BY MR. BURT:

Q. Were you attempting in this case to abide by the standard that I just read to you?

A. **I believe I was, and I filed a whole bunch of motions in this case. I can tell you we tried to file as many motions as we could think of that had some arguable merit, and I think probably there are some issues that we missed, but I think we filed a lot of motions relating to these various issues.**

Q. Now, quite apart from the legal -- your legal analysis about the interference with the attorney-client relationship, you knew from the McNeese letters and the litigation concerning them that Miss Johnson had been getting information from outside lawyer -- from outside sources, namely McNeese, that her lawyers could not be trusted, right, her lawyer, Mr. Willett, could not be trusted?

A. **I found that out in the hearing on the Massiah issue when I saw McNeese testifying and they were going through the various**

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 21 of 80

exhibits.

Q. And was there any discussion among the team about how the team might overcome whatever suspicions or mistrust Miss Johnson might have toward Mr. Willett or other members of her defense team as a result of information she was receiving from outside sources?

A. Well, I don't remember that issue being specifically thought through, no.

Q. Was there -- in terms of client relations, client contact and building trust and confidence, was there a geography problem in this case?

A. Oh. Yeah. I mean, it's hard. I mean, Des Moines is 125 miles or something from Cedar Rapids. Kansas City is further obviously, maybe 300 miles. And Angela was in the Linn County Jail for most of the case. I think she spent time in -- she had a pretty good tour of the county jail system, but she was in the Linn County Jail; she was in the Black Hawk County Jail. At one point she was in the Hardin County Jail closer -- I believe closer to the period before trial, and then she was in Benton County.

So that created travel issues for the lawyers. It was -- logistically it was a huge challenge which is one of the reasons that, you know this policy of the government on discovery was such a difficult thing to deal with because the discovery was warehoused, you know, in their office, and then

you couldn't physically have it to review it at your leisure or whatever until we got those things worked out through a lot of effort so that we could actually get physical copies of the stuff.

And that took a long process and a lot of effort and a bunch of wasted time as far as I was concerned trying to get copies of discovery. And it was a big distraction in 2001 to try and get that worked out.

Q. Is one result of these geographic problems that your primary contact with the client was through phone or written correspondence?

A. Yes. I would say that's true.

Q. And do you recall making a statement to Mr. Williams and I when we were talking to you pretrial here that once you got in trial you got to know Miss Johnson a lot better?

A. Yes.

Q. And that your perception of her changed when you actually got to know her. Do you recall that comment you made?

A. Yeah, I think that's true.

Q. Could you explain what your perception was and how it changed.

A. Well, to the extent -- to the extent that I had a perception of her, I kind of felt like -- I had an impression that was -- of Angela was that she was a very troubled person, that she was not -- in some ways I felt she had some emotional

stability issues from the few meetings I had with her. I felt that she was very, very entrenched in her positions on things. And, you know, I had that impression.

At the same time I felt that she was kind of also kind of focused on things that didn't really relate directly to the circumstances of her case and what was going on in reality. She was focused on things like getting contact visits with her kids and what not which, you know, I understand the importance of that and everything else, but I don't want to, you know, treat that as -- we filed motions relating to that, but it was a very -- focus was sort of over to the side of the case, a lot of it, and I felt it wasn't really dealing with the case and the circumstances. I thought it was a little bit avoidant on her part.

But then, you know, as we got closer and closer to trial and then during trial, the difference for me was Angela actually has a really complete kind of personality. She's enjoyable to be around as a client, and she was easy to converse with as a client about things.

And I felt like, frankly, there was like a person there that I didn't really know was there. I hate to say that, but, I mean, she was -- she was a good person to be with in the courtroom and elsewhere during the trial despite, you know, some exceptions to that, but, I mean, she -- I felt that she was a lot more of a -- what's the word I want to use? -- she was more

of a normal client than I had perceived before the trial, and I felt like I wish I had gotten to know her better and worked with her closer or had the opportunity to do that earlier on in the case just because I felt like we had a good communication, she and I did, and she also developed a better relationship with Pat Berrigan too during the trial. And ironically she sort of shifted to being more personally involved with Pat and I and distanced herself more as things progressed from Al Willett.

Q. And do you recall as you developed this relationship with her in trial for the first time that you had some regrets about had this relationship been developed earlier on in the process you could have gotten to her and convinced her to take a plea in this case?

A. Well, it's always hard to say what would have happened in the situation, but I -- you gotta believe, you know, that if you're doing your job as a lawyer, the first thing you gotta do is get to know your client on a personal level, develop a rapport with them, and gain their trust in you as the lawyer. And part of that, you know, is gaining their trust so that you can be honest with them about what their predicament is and give them advice they don't want to hear and they'll listen to it and they'll follow you. And it just didn't happen in this case.

Q. Until it was too late.

A. Till trial, and then yeah, it was too late.

Q. Okay. Now, do you recall your first contact, first

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 22 of 80

Q. personal contact, with Miss Johnson? And I want to show you -- first of all, let me ask you to identify this book that I've had marked as Exhibit 52. And for the record it begins as DS_1-000001 through DS_2-000333. Do you recognize that binder and what it contains?

A. Well, I hate to say this. This is the first time I've seen this binder, but I'm going to say that the contents of it, there's a lot of my handwriting in here. There's my correspondence in here, a lot of notes and correspondence of mine.

Q. Okay.

A. As well as some other items that may not be my documents, but they may have been provided to me and included in the file.

Q. Okay. And you recall that I sent you an electronic version of these notes some time ago; right?

A. Right. That was two months-ish, around the time -- yeah, about two months ago.

Q. And I also provided you -- or actually you provided me and brought with you today some billing records that you just recently dug out of storage; right?

A. Right. I was told that the file apparently had been taken out in the flood over in Cedar Rapids, and so I was asked in the interview that I did with C.J. Williams and yourself to see if I could locate the old billings, and that was found in archives. We shipped the original to you, and then you copied it as I

understand it.

THE COURT: Mr. Burt, is it 51 or 52?

MR. BURT: Yes. 52 is the file, and 53 is going to be the billing records.

THE COURT: Well, what's 51?

MR. BURT: 51 is -- oh, you're right. It should be 51. The attorney notes that I just showed to him are 51.

THE COURT: Okay.

MR. BURT: And 52 will be the billing records. Thank you, Your Honor.

THE COURT: You can thank my law clerk for e-mailing me about the discrepancy.

BY MR. BURT:

Q. So is -- 52 is a copy of your --

A. Yeah, this is the binder that contains I hope all of the billing records on the case. I'm not sure it includes any billing in relation to the interlocutory appeals, but -- I'm not sure about that. It may. But otherwise I believe it includes everything including the billing of the direct appeal to the Eighth Circuit and the -- following the -- following the sentencing.

Q. Okay. Now, I want to ask you in 51 -- it's DS-000005, and it I believe is a note concerning a contact that you had with Miss Johnson April 3, '01. Have you reviewed this note, and is this in your handwriting?

A. Yes, that's my handwriting.

Q. And it indicates Pat Berrigan at the top. Was Mr. Berrigan with you at this time?

A. I can't say for sure. I think that that was the first time I met with her. If I looked at 52, I could probably tell you that.

Q. Sure. Do you want to do that?

A. Yeah. On my billing statement, it shows on April 3, 2001, trip to and from Cedar Rapids to meet with client, and then it says -- yeah. And conference with client and Al Willett on that same day. So I suspect that if -- unless I didn't include Pat Berrigan in that meeting, then he would not have been present. I think that was the first time that I met her which was sort of I felt appropriate to do since I was going to be working on her case that I would meet her at the beginning, and I met her with Al at the jail, and maybe Pat was there, but I'm not certain.

Q. Now, do you recall telling myself and Mr. Williams that you have a very vivid memory of this first meeting because there was an emotional reaction that Miss Johnson had?

A. Now that I'm -- at that time I didn't have the billing statement. The meeting that was very emotional I remember Berrigan was also present. If he was present at the 3rd of April, then yes, but it could have been a subsequent meeting with her, but it was in the Linn County Jail, and I know that the three defense lawyers were there meeting with her.

Q. Okay. Well, let's talk about this meeting. Then we'll get to the emotional meeting. This apparently your first meeting, and you've got three notes there. Met Angela Johnson at jail, emotional, attempted suicide, no plea bargaining desired, asked questions -- asked various questions, showed photos -- show photos of girls and first boyfriend.

Does that refresh your memory as to what your first conversation with Miss Johnson was?

A. Not tremendously, but I'm not a big note taker, so that's pretty apparent from these notes. But I remember meeting her that first time, and I had a recollection that Pat was there, so I'm not remembering that meeting all that well. But I remember she was very emotional, and if this was the one meeting that I had described to you on the phone where she was in her chair sort of rocking like this --

Q. You're sort of rocking back and forth with your hands on your lap?

A. Yeah, and she was looking down and rocking back and forth in the chair as Pat was confronting her with -- with the facts of life. But I'm not certain that that was on April 3 as I sit here at this moment right now. It was one of the early meetings.

Q. Okay. So one of the early meetings she's rocking back and forth with her head down, and Pat is confronting her with the facts of life. What do you mean by that?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

**1115**

A. Basically that the case was going to be tough to win if it could be won, that she was in deep trouble, that whatever her story was at that time about, you know, denials was not a -- was not a flyer, it wasn't going to go, it wasn't believable, it wasn't credible, and he thought it was bullshit basically. I'm -- he may have used that word actually. And he was somewhat confrontational with her, and her reaction was as I've described. And I remember in the meeting that Al sort of launched to her defense somewhat which I think Angie responded to favorably because -- I just remember that.

Q. And when you say he kind of sided with her defense, defense of what? Was he advocating a position? Was he saying, "Please, Pat, don't attack Angie"? Give me some more detail on that if you could.

A. Okay. Al was -- Al wanted to go to trial on the case. That was kind of his thing. I was informed of that very, very early on that he was kind of sort of -- you know, he told the government to go pound sand, you know, early on in the case, you got no bodies, no evidence, you know, this kind of thing, this kind of bravado if you will.

And then the client was responding to that. You know, Angela really loved that talk, you know, because it gave her this hope that gee whiz, you know, I'm going to go to trial with this great trial lawyer Al Willett, and I'm going to be, you know, walking out of the courtroom seeing my kids and being with

**1116**

my kids soon.

And in the meeting that was kind of the -- well, Angela, you know, I know you want to go to trial, and we're going to go to trial, and I'll be there for you, and I'll be there to defend you and this sort of thing was where Al was coming from. And it was at cross purposes with where -- in my mind at least where things needed to be as far as the defense team and as far as the approach to the client.

Now, that's not to say that, you know, Pat Berrigan's sort of a little bit heavy-handed approach with her was the best either, but I don't know that he had a rapport with her that was sufficient at that time to be able to go that way because he hadn't really been with her enough as far as I knew it. He'd certainly been with her a lot more than I had been.

But it -- it was apparent throughout the case, not just that time, that there was different views as to what message the client should be receiving about where she needed to be in terms of her thinking about her situation and the case.

Q. Let me ask you this. Dick Burr who I think you know and met with in this case; right?

A. Yeah. We conferred with Dick Burr a number of times.

Q. Well, he was here the other day or yesterday, whenever it was -- I'm losing track of time -- but he was talking about the need to kind of plan out in advance of client meetings what was going to get said and what the message was that was going to get

**1117**

conveyed to the client. Did that process take place in this case?

A. Not formally, no. And -- no, not formally, no.

Q. How about informally?

A. I think I would say in terms of what message we would convey to the client, no. I would say that Pat and I were kind of of the same mind, and so we would talk. And we wouldn't have any question about where we wanted to be in terms of things like that. I didn't have that many meetings with Angela to start with. But he and I were of the same mind.

Al was -- I don't want to be unfair to Al, but, I mean, I think he wanted to be a hero. I think he wanted to go to trial, and I think he wanted to -- I think he wanted to try and win the case at trial for the client and for, you know, whatever other reasons he had.

Q. And you said when you first described his stance that he was kind of this blustery go pound sand kind of approach, we're going to try this case and win it? Would that be a fair --

A. That's what was described -- there was told about an early meeting that he had with --

MR. WILLIAMS: Your Honor, I'm going to object to foundation. It sounds like this is calling for hearsay at this point.

MR. BURT: Well, it goes to his state of mind in terms of how he approached the client.

**1118**

THE COURT: Overruled.

MR. BURT: So the information he receives I think is --

THE COURT: It's overruled.

A. I'm sorry. I was told about an early meeting that Al had with -- I believe it was Pat Reinert, and I believe Pat Reinert was the one that told us, told me about it or told Pat and I about it at one point when we were trying subsequently to -- after -- after the bodies were recovered, we were trying to get into some discussions about plea.

And there was some kind of a early-on conversation that Reinert had conveyed that -- from Al that, you know, there wasn't going to be any plea in this case, we're going to trial, and there's no point in having any discussions because I remember when we first made the overture after I got involved there was -- that was kind of where he was coming from, Reinert, that is, is that, you know, he'd been informed there wasn't going to be any plea and this sort of thing.

And so once we got involved or I got involved and then -- and Pat became more involved as time went on, we had discussions in an effort to work towards a plea if that was going to be possible after everything that had gone on.

Q. Okay. Now, Exhibit 53 consists of 4 binders, and they are the plea binders that the Court has electronically. And from volume 1 of 53 I want to show you a letter which is dated August

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

6, 2000. It's a letter from Mr. Willett to Angela Johnson. And he says -- apparently in reference to a question that Miss Johnson had raised about her right to a speedy trial, he says obviously based upon the complexities of this case, we need more time to prepare your defense so that you are able to go home to your children and then goes on to discuss some other issues. And at the very end of the letter he says, "As always, I look forward to seeing you in the future. Hopefully I'll be able to see you in something other than a blue jumpsuit in the near future."

So this message being conveyed to Miss Johnson in August that she's going to be able to go home to her children, she's going to be out of a jum -- I believe a jumpsuit in the near future, is that the kind of message that he was sending to the client?

A. Well, I hadn't seen that letter before, and I don't remember that kind of language from him. But when he was engaged talking to the client in front of us, he was certainly more reserved than that.

But that communication to the client is a long way from, you know, where I had understood initially from the case when I walked into it which was after the bodies were found obviously that there was any reason to be thinking about. In other words, I mean, I just can't imagine that being his position at that time.

And that's why when I got involved with it to hear him even suggesting to her that, you know, we can go to trial and all this stuff in '01, talking to her, 2001, like that when the bodies had been recovered, all the notes were out there, we hadn't had a ruling on suppression yet until a year from then, I mean, I thought it was just -- I thought it was just irresponsible really to be talking to her like that because I -- you know, there's just no way in my mind given where that case was at the moment that I started it that he should have been talking to her like that. And I can't imagine, you know, talking to her like that in August either before the bodies were found because that was the time that case, you know -- it -- it was certainly a different case evidentiarywise at that point, but it was not a case to be thinking about trial on.

Q. When you first came in to the case --

THE COURT: Mr. Burt, can I interrupt for a second?

MR. BURT: Yes, sir.

THE COURT: What was the exhibit number of the last letter from Al Willett to Angela Johnson?

MR. BURT: Your Honor, it is Exhibit 53.

THE COURT: Okay. It's --

MR. BURT: And it's a letter that is --

THE COURT: And what's the Bates stamp number?

MR. BURT: Bates stamp number on it is . . .

THE COURT: Well, you can get it for me on a break or

something.

MR. BURT: I apologize, Your Honor. I just had it in my hand.

THE COURT: Yeah, it's always harder when, you know, you're waiting on somebody to find something. So you just find it later, and that will be fine. I can find it. I know it's in Exhibit 53 so . . .

BY MR. BURT:

Q. You just alluded to something about the state of the case before the bodies were found. When you came into the case, did you -- did it become pretty apparent to you that an opportunity had been missed?

A. Oh. That's an understatement for sure. Yes.

Q. And what was the opportunity that had been missed that you very quickly assessed that there --

A. Well, it's kinda hard to even recount it because it's been so upsetting over the years to think about this, but to -- look, she got charged with five counts of murder. They had evidence that formed the basis for that charge. It's clear the bodies had not been recovered. It's clear that they wanted her to be a witness against Dustin Honken, and they wanted her to facilitate their investigation of him, the indictment of him, and the prosecution of him and that she was really indicted, frankly, you know, as somebody that they wanted to flip or turn as a witness for the government against him.

And -- and she obviously had information. She gave it to McNeese as opposed to her lawyer. And had she and her lawyer been strategizing on how best to use that information for her benefit, not to her detriment, she'd -- you know, frankly, she'd probably not be in custody today on this case. We were told as much later by the prosecutors that prior to the bodies they would have -- they would have made an offer to resolve her case in the 10- to 15-year area. That was a statement that either Reinert or Miller or both of them made at a meeting that we had in I think it was 2001, maybe 2002.

And it was just so distressing to even know that she's got a lawyer, no offense, but filling her full of poop and false hopes and encouraging her to kind of like beat the case when it really shouldn't have been going that way. It should have been at that point she had the strongest defense. She had the most value in her information which meant she could get the best deal on day 1 or day 30 and that that should have been a clearly defined objective was at least to find out what the government would be willing to do at that point in time for a plea, pre -- call it the pre-body phase, and it wasn't done.

And as I said, they were told to go pound sand basically, we're not pleading, we're going to trial, she's going to walk out a free woman and be reunited with her family and all this happy baloney. And I just think it was dead wrong to tell her that.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 350 Filed 11/10/11 Page 25 of 80

Q. And one of the reasons it was dead wrong to tell her that is because you had reviewed the detention hearing, and it was clear to you there was enough evidence there to hold her into this case; right?

MR. WILLIAMS: Objection. Leading, Your Honor.

A. Well, I --

THE COURT: Over -- just a second.

THE WITNESS: I'm sorry. I'm sorry.

THE COURT: I'll take it subject to the objection.

A. Well, I had reviewed the detention record, and, you know, to me you got a case with five homicides and they're appealing the order of detention. I mean . . .

Q. Kind of unrealistic.

A. Well, the whole thing was unrealistic. This letter, you know, that he's writing to her is crazy, you know. I just can't imagine sending a letter like that to a client telling her you're going to be out, you know, soon. In the letter he even says he hasn't reviewed the discovery yet, and he's telling her, you know, hope to get you out soon. It just -- I can't imagine what the thinking would be.

Q. In terms of the state of the case before the bodies were discovered, I want to show you another exhibit in Exhibit Number 53. It's Bates stamp number RS_1-0001 through 0007. And this is a piece of discovery that apparently was sent to you in 2002 by Nancy Lanoue who is Mr. Willett's assistant; right?

A. Yes.

Q. Six pages, and it's a report that got compiled in 1996 apparently, several years before the indictment of Miss Johnson in 2000.

A. Okay.

Q. And it reviews the state of the investigation up to that point. And at the very end of it it says subsequent investigation has not revealed any evidence about the whereabouts or the status of these missing persons. It is the opinion of this reporting agent that if anyone might have information to implicate Honken into the suspicion of death of these persons it would be Angela Johnson. However, she has not been forthcoming in efforts to obtain information from her. It is hopes, however, that based upon the results of a search warrant of her Clear Lake, Iowa, residence pursuant to a warrant that sufficient evidence of her and part of a conspiracy to distribute such a controlled substance should be anticipated and that is she was so charged -- I think that's supposed to be "if" -- they might then consider cooperating with law enforcement. However, until such time as a person with direct knowledge to the circumstances of the disappearance comes forward, efforts to locate these people remain stymied.

Now, when you read this when it was sent to you, did this kind of bring into sharp focus the position Miss Johnson was in before the bodies were discovered?

A. Well, don't need this document to know that that's what was going on when she was first indicted. I mean, it's facially obvious to any lawyer with experience in federal court that she was indicted in this case based on whatever the evidence was that they had at the time but at the same time that she was not the target and that Honken was. There were articles if I remember right in the newspapers about this in the long-term investigation of these missing persons and how they were trying to find them, et cetera.

And it just is obvious to anybody with experience in federal court that she was indicted and she had the chance to flip and testify against Mr. Honken and provide information against him that would have -- at least the government thought she had information against him. And according to the discovery file, she had made statements to other people saying she did.

So the question is what's the value of that to the government and how do you cash in on that best, and that's what, you know, you need to explore in the beginning of a case like this so that you can know what your options are. You got option A, 10 to 15 years. Option B, you can tell them to pound sand and potentially go to trial on a death penalty case. Is that -- you know, those are your two options, Angie. You know, I mean, that's kind of what this case was on day one, you know, and by the way, Angie, they might not have much evidence now, but you know how these cases go. They're going to have more by the time

it gets to trial in a year, two years, or in this case almost five years.

So to suggest that, you know, we're going to trial in August of 2000 is irresponsible I think and is just inexplainable by any reasonable explanation that I can think of.

Q. And I guess by the time you got on board it was too late. The train had left the station, right, because the bodies are discovered in October of 2000? The golden opportunity you're alluding to was gone.

A. Yeah, that's true.

Q. Did you think that -- well, you put in your note here that I had up here earlier of your meeting with Miss Johnson 4-3-01, no plea bargaining desired. Was that in your opinion a direct result of the kind of information that Mr. Willett was feeding her in terms of her -- she's going home soon, et cetera?

MR. WILLIAMS: Asking for speculation, Your Honor.

Q. Your assessment, not speculation.

A. Well --

THE COURT: Overruled.

THE WITNESS: Sorry.

A. That was already something that had been settled upon between her and Al before the meeting that that was the posture that the case was in and that the two of them were in. I mean, when I first got the case and first met with her, obviously that was something that immediately came to mind was what can be done

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 26 of 80

**1127**

to get out of the way of this freight train, and that's why that would have been something noted in the first meeting with the client that I had. It wouldn't have been something that would have been an afterthought or brought up, you know, a year later or a month later. It was in this initial meeting to figure out where is this case because this sure doesn't look good right now, and it needed to be addressed. And that's where the posture was at that moment so . . .

Q. Now, did you learn -- you talked about the communication problems that you had in terms of the geography issues. Did you learn that there was another communication problem as it related to Mr. Willett's use of a paralegal to work with the client?

A. Well, apparently what -- this was the practice that he had apparently employed in this case. Maybe he's done it in other cases. I don't know. But he had his legal assistant taking, you know, these binders like these exhibit binders over to the jail of discovery unfiltered by him or any other lawyers before him and going through it with her, Nancy Lanoue and Angela going through page by page tens of thousands, I guess, of pages of discovery. And that's not a practice that I find to be a good one.

Q. Why not?

A. Well, because clients aren't equipped to filter that raw data, particularly in a case like this where you have a lot of stray leads that they had followed up on over the seven plus

**1128**

years that these folks were missing. There's a lot of false leads. There's a lot of speculative information. They get some tip about somebody saying somebody's buried in a well down in, you know, this town or that town and if they'd go down there, they'd do a search and see what they could find.

And that kind of information unfiltered and just presented to the client to me isn't -- isn't appropriate. I think the lawyers need to go through it first, master it, and then control the flow of that information and the message that goes with it. That's always been my practice.

Obviously the client, at least in my view, has a right to look at the raw discovery. But I don't think it's appropriate for them to be given that raw discovery without appropriate editorial comment from the lawyers. And I certainly think the lawyers need to go through it first, master it, and be able to present it to her in a way that will be effective in advising her on what it all means. And that wasn't being done.

And what came to occur was -- and it wasn't -- it was a long time before this was really kind of figured out. But what happened was Nancy was going over there meeting with Angela, and Nancy's really a smart and diligent worker, and I think she was taking a lot of notes of what Angela was telling her, but I think she was kind of -- she was drinking the Kool-Aid that Angela was giving her, and she bought into what Angela was telling her completely even when things didn't seem

**1129**

to be viable that she was saying and giving feedback to Angela that would be -- you know, letting Angela think, hey, you know, okay, I understand, so you this and you that and okay. And she'd be accepting of her version and believing of it and communicating that she was believing of it which created, you know, the next problem which is trying to get the client back out of that position to a different position which would be one that she would need to be in if she was ever going to work out a plea agreement and effectively be able to proffer.

Q. And this process of Miss Lanoue meeting with Angela Johnson is apparently going on just between the two of them. In other words, there's no lawyer supervision there?

A. No, I don't believe there was. For the most part that was just Nancy over there with discovery with Angela sharing the materials with her and receiving commentary as she went. I think she put together some memos of those meetings and Angela's comments, but I don't believe those memos were ever shared with me or Pat Berrigan.

Q. I remember -- and we're going to have some evidence about this later -- there's a letter from Gordon Gratias who comes in in the case in 2004, and he's writing a letter to Mr. Willett and saying, "Hey, you promised to share all this information that Nancy Lanoue is developing. I haven't seen it. Please send it." And he's going to testify he never got it.

Did you ever have a similar interaction with

**1130**

Mr. Willett where you're saying what information is being developed from these interviews and where are the notes, where are the memos, I want to see it?

A. I don't know if it was specific quite like that. I remember -- there's a part of me that said, you know, based on what I knew that Nancy and Al were indicating was what they believed the defense was, if you will, that it was kind of -- I don't know how to explain it, but it was -- to me it was kind of silly and it was --

Q. The defense that they were formulating?

A. Yeah.

Q. What was the division of labor here in terms of what he was -- what Mr. Willett was supposed to be doing, what Mr. Berrigan was doing? I mean, we heard a lot of testimony from him where he was saying, well, he was deferring to Mr. Berrigan for this, that, or the other thing. What was your understanding of what he was doing and what Berrigan was doing and what you were doing?

A. Well, it varied over time. But Al characterized himself as the lead counsel and repeatedly made that known. I was often referred to as the research and writing attorney. And then --

Q. Is that sort of the lower beam below a realtor? You're making it sound like it's a derogatory --

A. I kind of felt that it was. Al didn't really want me involved in the sort of defending the case part of the case.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 27 of 80

Q. I think he's made that pretty clear.

A. And I think what he wanted is he wanted me to write memos and file motions and this kind of thing without really getting involved in the -- you know, the meat of the case, if you will. And I think he had that kind of concept that I was sort of like a super law clerk and that he was going to be the trial lawyer who stood up in court and sort of saved her life and walked her out a free woman.

And so I think he had built that up for himself as his role based on everything he said. And then my role was sort of this, you know, briefcase-carrying research and writing guy. And he held on to that posture for a long time, you know, and it was a slowly -- you know, it slowly eroded and eroded and eroded to the point where he wound up basically taking largely a backseat in many aspects of the case.

Q. I noticed at the trial there were 50 some witnesses. He examined eight or nine of them. How did that happen? He was the lead counsel.

A. Well, he was the lead counsel by his own proclamation because he had been appointed first. And he called himself that.

Q. Would he tell whoever would listen that he's -- you had a funny story.

A. Well, it was funny, but it was weird. We went out to lunch in Cedar Rapids during one of my first times there, he, I, and

Pat Berrigan. And the waitress, some waitress, comes up to the table, and he introduces himself, "Hi, I'm Al Willett, and I'm here with the Johnson defense team," like the waitress was going to know what that was, "And this is my death penalty counsel Patrick Berrigan from Kansas City, and this is Dean Stowers, a research and writing lawyer from Des Moines."

And it was like -- it was the oddest thing, but he had identified himself as -- with the case so much and he had sort of taken it on as his identity that it was just something that he carried around with him. He might as well have, you know, carried a placard up that said, "Johnson defense team, Al Willett, lead counsel," you know, as he walked around Cedar Rapids. And he would tell people -- it was just the strangest thing I thought, and I thought it was really -- it just told me a lot about where his mind was.

Q. I guess all that's okay if he's actually leading. Was he?

A. No. I mean, he was -- he had a title, but the problem was I don't think Al really had ever had a case that was of this magnitude. I had never heard of Al Willett before I got involved in this case. That's not that I've heard of everybody that's ever practiced law in the state of Iowa, but I never heard of him, and I do a lot of criminal defense work, and I had done a lot of criminal defense work, and I'd worked with a lot of lawyers in the criminal defense community in Iowa.

And when I got involved in it, I was trying to figure

out who this guy was because I didn't ever hear from him before. And to hear him tell it, you know, he was the greatest trial lawyer in the state of Iowa in criminal defense work. And it was a -- it was a great show, but it wasn't -- it wasn't what proved out.

Q. One of the things that you said to Mr. Williams and I was that this case required something more than just showing up. Do you recall that comment?

A. Yeah.

Q. What did you mean by that?

A. Well, Al -- Al didn't believe in -- best as I could tell in -- he wanted -- you know, maybe it's not fair, but it was always like it was a grandstanding kind of a thing with Al and, you know, like he's got a hearing and he's going to stand up in court and now he's here for the Angela Johnson defense team as the lead counsel and -- but the work and the back-up wouldn't be there preceding the court appearance, and it was always being done by everybody else in terms of the actual labor and the actual analysis and the actual thinking and decision making.

And Al was kind of like propped up there for the most part disinterested in the legal issues, disinterested in the motions, dis -- very light even on the factual preparation of the case as far as knowing what the facts of the case were and what was in the discovery file and almost kind of oddly detached from what needed to be done to do the case but at the same time

more than glad to stand up and say he was the lead counsel.

And I was just petrified at how this was going to go when the case, if it ever went, you know, a lot further including to trial. And I'd warned Pat. I said, "Pat, you gotta know this guy -- you know, he's telling you all this, but this is going to be a problem down the road because I don't think he's going to be there, and I don't think he knows how to put a case like this together, and you need to -- you know, you need to get more involved."

And it was just -- and I couldn't do it on my own because I was just the research and writing attorney, and I wasn't going to take on the lead counsel and sort of try to get involved to that degree. And I felt that was really something that Pat should have been doing more of earlier. He did more of it later as he began to realize what some of the issues were with Al.

Q. Early on was Pat kind of preoccupied with other business or . . .

A. Well, yeah, I would say. I mean, he was in Kansas City. He had other cases. He -- he couldn't get up there as often as probably he should have to Cedar Rapids to see Angela. And it was a problem to have him at that distance and then have Angela, you know, in Cedar Rapids at the Linn County Jail sort of under the sphere of influence of Al and Nancy because it was putting her in a position where her feedback was all coming from the two

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 28 of 80

of them. In that case, you know, at that point it was going to trial still and we're going to walk you out of there and Dean is such a great lawyer on appeal after the Massiah ruling that he's going to get that Eighth Circuit to affirm Judge Bennett, and so you'll be -- you'll be okay on that, and, you know, we don't need to be pushing too hard for a plea and this sort of thing. And it's just cross purposes.

Q. Your assessment was that winning the Massiah ruling in the district court was not the thing that was going to open the heavens up and she was going to walk out, that you still had some hurdles.

A. Well, especially when I saw who the panel was, you know, the panel on the circuit. But the bigger thing for me was when we won it, I felt great. Now we can go back and take another run at getting the case resolved on a plea basis because there's uncertainty there for the government, there's uncertainty for the defendant, and the record was pretty darn good in favor of the ruling that Judge Bennett had issued. There was a whole bunch of evidence of deliberate elicitation by McNeese and that he was acting under some directives as their agent for at least the main part of the period of time.

So it was my belief that the government was going to be receptive at that point to maybe giving a little better plea agreement to her in light of the fact that they had this suppression order. So there was an effort made during that time

period of the interlocutory appeals to try and get something figured out by way of a plea agreement.

Q. And what -- at the same time you realized this is a window of opportunity, did you also realize that the ruling itself, because you were facing you alluded to the particular panel you were dealing with in a case involving an order where Judge Bennett had suppressed bodies and statements in a five-victim case, that this is not going to be an easy road in the Eighth Circuit?

MR. WILLIAMS: Objection. Leading.

THE COURT: I'll take it subject to the objection.

A. Well, it was a remarkable situation that occurred with the government going after Angela Johnson that way. And it was remarkable that there was actually a judge who would call them on it, you know, because I gotta be honest with you, having been through enough cases and seen enough bad things done by the opposing parties, you know, generally there aren't many judges with enough backbone to actually grant that motion even if it should be granted.

And in this case I thought it was very clear that it should have been granted, and the record was strong, and Judge Bennett stood up and said you shouldn't have done that, you were wrong, and I'm going to throw that evidence out, and I'm going to follow the law and the facts to where -- to where that's the result. And he didn't -- he didn't hesitate in doing that.

But the reality is is the circuit is a very, very conservative circuit, so I had a lot of concerns that we're going up to the Eighth Circuit now, and, you know, it was going to be another ballgame up there. And, you know, the outcome was far from certain. So there was a lot of concern that we wouldn't hold on to the ruling in whole or in part, in part or in whole.

Q. Did that concern that you just expressed get conveyed directly to Angela Johnson either by you or in your presence?

A. Yeah.

Q. And who conveyed that to her?

A. Oh, I think I told her that, and then it was followed up by Al Willett. Well, if anybody can do it, you -- you know, Dean can, you know. He's a great -- great lawyer and all this pumping me up as the great appellate lawyer which I think I'm a good lawyer and I'm a good appellate lawyer. But, you know, I wasn't going to -- I don't ever tout that to the client as part of their decision making because I try to -- it doesn't really have anything to do with who the lawyer is. It has to do with the reality of the circumstances of the case and the law and the other variables that play into those things.

And in this case it was a monumental order to suppress the human remains of five people. And if the circuit could find a way to reverse that, I was fairly assured that they would do that. And if they couldn't, you know, find a legitimate way,

they'd -- no offense to the circuit, they'd do what they did which is find an illegitimate way to reverse him because I still think their ruling is just dead wrong on their -- on their points.

Q. So it sounds again like a situation like mixed signals are being conveyed to the client. You're telling her here's my assessment, and he's telling her don't worry, Dean will pull it off or some notion like that.

A. Yeah. I mean, it's another example of sort of the double-edged sword of the whole thing. You know, you win the motion. That's great. Then the client thinks you can walk on water as a lawyer, and it creates a problem, you know, of client management again that you have to tamp down all those false or other expectations that they would have that that's going to be what happens thereafter, and you've gotta be very, very candid with them, particularly if you're trying to steer them in a direction of resolving the case. You don't want her thinking that she's going to win that appeal and, you know, that sort of thing because you're just -- again, it's a client control issue, and you can't control the client by giving them hopes of a different outcome than what might occur in the event of a plea.

So what you're trying to do with a client is control their thinking and the way they perceive things in an honest and candid way but still for their best interest. And you don't want to fill somebody who is prone to latch on to false hopes

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

with a bunch of hopeful talk because all it does is feed into all of the things you're trying to get the client to go away from which is all those false hopes and all those optimistic things.

And you've gotta really work towards getting them into a position where you can counsel them and they will listen to you and they will follow your advice about what you think is the appropriate thing to do in your best professional judgment.

Q.   You talked about the uncertainty of the situation when it was going up to the Eighth Circuit.  Uncertainty was good, right, from a bargaining perspective?

A.   It was good from a bargaining perspective because, you know, we could use it with the client if we used it properly. It also made the government theoretically more amenable to working something out.

Q.   Why do you think that didn't happen?

A.   Well, there is some correspondence in there that I think you had me review during that time period where we made some efforts to start the process again, and I think it just didn't -- it didn't get off the ground very far.

Q.   Okay.  We'll look at some of those.

MR. BURT:  Your Honor, I have located that letter, the Al Willett see you soon in a --

THE COURT:  Yeah, we've already got it.

MR. BURT:  You got the Bates number --

THE COURT:  Yeah, thanks.

MR. BURT:  -- quicker.  Thanks.

BY MR. BURT:

Q.   Okay.  Now, you mentioned some efforts that were made to resolve the case with Miss Johnson.  I want to take a look at DS-13 which is a note -- one of your notes.  Part of the note that I'm interested in is -- well, the first part apparently there's some discussion about contact visits.  I think you mentioned that was a topic that Miss Johnson was very much interested; right?

A.   Yeah.

Q.   And this note apparently if we look at the bottom it shows you drove to Cedar Rapids, you -- CW is --

A.   Conference with.

Q.   Conference with Al and Pat.  Then you were over at the U.S. marshal's from 7:45 to 8?  Am I reading that right or no?

A.   Yes, United States Marshal's Service, U.S.M.S., yeah.

Q.   And then you met with the U.S. attorney that day for about 45 minutes?

A.   Yes, and the U.S. Marshal's Service.

Q.   And then about an hour with Miss Johnson.

A.   That's -- yes.

Q.   And then you have a note there about the middle of the page which says -- apparently referencing your meeting with Miss Johnson that you sought decision re plea.  What does that mean?

A.   Well, I'd have to piece that together with some other materials, but obviously we were talking about a plea in that window there.  There would be presuppression ruling, August of '01.

Q.   Okay.  Do you know what efforts were underway at that point?

A.   Not specifically.  I think I know what my notes mean but . . .

Q.   What do you think they mean?

A.   Well, I think that the concept that was being discussed at that time was that there'd be a plea to life, she'd substantially assist the government and wind up at the end of the day at 25 years as her final sentence.

Q.   Now, do you recall when your authorization meeting was in this case?

A.   I didn't participate in that, so I think it was before this.  I think it was maybe in May or June of 2001, but I don't -- I didn't participate in it.

Q.   And you don't know at this point what -- the 25-year thing means what?

A.   That -- if I remember correctly, sometimes when you -- depending on how you structure the particular plea agreement, you'd start off with a plea, but you'd have to basically -- so she'd start off with a plea where her sentence would be life which is I believe what was required by statute at the time.

And then she would substantially assist the government in prosecuting obviously Honken and then receive a reduction of sentence to 25 years.

Now, that was either an estimate or that was going to be something that we were going to structure into the agreement, that if she provided substantial assistance then she would get a -- it'd be like sort of option 2 on the plea agreement.  I don't know how to explain it other than that.

But basically if she substantially assisted her sentence would be reduced to 25 years and that would be something that the parties would stipulate to and agree to and attempt to bind the Court to if we could get the Court bound by that, by the plea agreement.  I think that's what we were thinking at that time as a concept because there was a -- there was a need on the government's part I think to start at a higher sentence than where -- where we wanted to wind up and where Angie wanted to wind up in the end.  And they weren't willing to start at a point without her earning her way to that point if you will.

Q.   Well, do you recall that some time before this meeting that the government had been sending you some correspondence and basically telling you that the message was we're getting close to the time when the case is going to be authorized; if you're going to settle this case, you better settle it now because once it's authorized for the death penalty you're going to have a

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 30 of 80

much tougher time of it?

A. Well, there was correspondence that I've seen between Reinert and Berrigan that I was copied on in the spring of the year, April, May, June, that window, where they were setting some deadline or the government was for submissions relating to that as well as suggesting that if we're going to work something out we need to do it now as far as -- I think that was in April, May. There's some correspondence in there that you've shown me before that I remember.

Q. Right. I think this is from the plea binders which are 53, RS-13-000832 and 833, letter from Mr. Reinert to Mr. Berrigan in response to Mr. Berrigan's letter regarding resolution of this matter short of trial. In your letter you indicate that the Court's ruling on the Massiah issue would not be received by the April 15 deadline.

A. Uh-huh.

Q. Although that may be true, resolution of this matter by plea is not contingent upon any particular ruling by the district court on that issue. With or without the evidence which is the subject matter of the Massiah hearing, the case can appropriately be tried as a capital case. Although you do not desire to have a firm deadline, I believe having deadlines and beginning a meaningful discussion early can resolve cases expeditiously. If your client desires to resolve this matter short of this office seeking the capital penalty, we need to

begin a meaningful dialogue. In light of your request for additional time, I will give you an additional two weeks to resolve this matter.

And then it goes on to talk about confidentiality concerns and says at the end please discuss this matter with your client at your earliest convenience so we can explore a possible resolution of this case short of the death penalty.

Now, was that letter cc'd to you, or did Pat explain to you that, hey, the government is imposing some deadlines here in terms of whether we're going to make an offer or not?

A. Well, I don't know that I saw that letter anywhere near that time period. I don't think that I would have been involved in that because I think my first meeting with the client was April 3. And I don't show any -- let me just look at my billing statements if that's okay.

Q. Sure.

A. The first item that I billed was March 28. It says just reviewed documents and drafted appearance and correspondence to client regarding appointment and then April 3, conference with client and Al Willett.

So I don't -- I don't see anything in here indicating that I got that letter, but, you know, it's possible.

Q. Well, let's go back to your initial meeting with the client where April 3 -- this is shortly after that letter was received by Mr. Berrigan. Do you recall any discussion -- I mean, you

got a notation here no plea bargaining desired.

A. Uh-huh.

Q. Do you recall any discussion during that meeting on April 3 where you're telling Miss Johnson, hey, the government has given us a deadline, and if this case goes to Washington, D.C., and they authorize it as a death penalty case, we are going to have much harder problems trying to settle it, and here's why we should settle it and sort of an extended discussion in light of this pending deadline that the government is imposing?

A. No, I don't -- I don't think there was discussion of that letter in that meeting.

Q. So when you wrote in your notes no plea bargaining desired, do you remember how that topic came up? Was it you, Mr. Berrigan, Al Willett?

A. I'm not -- I think I've said before, I guess you'd have to check Pat Berrigan's billing records because he was a lot -- you know, he kept good billing records I think -- to see if he was even at that meeting on April 3. But I was there, and Al Willett were there. I'm not certain that Pat Berrigan was at the April 3 meeting.

Q. You're not sure what?

A. I'm not sure -- I don't have -- other than his name on there -- that could just be that it was identifying who the other lawyer was -- I'm not sure he was at the meeting, so we'd have to look at Pat Berrigan's billing records to determine

that. I don't -- I don't -- my billing record just says conference with client and Al Willett. It doesn't have Pat's name in there. And from the other entries in my billing records, I typically would have included the names of all the people present. So I just don't know that he was there at that meeting.

Q. And you don't recall any discussion with the client yourself or with Mr. Willett. You're pretty sure Mr. Willett was there.

A. No, he was there, yeah. I remember we had the first meeting and I was introduced to the client by Al Willett, and that's when I went up and met with Al after Judge Bennett and I had the conversation. I had talked to Al on the phone and everything, and then the decision was made I'd go up there, meet the client, and start the process of getting involved in the case.

And the plea bargaining notation, I'm confident that just to get the lay of the land I would have asked that question because it's just sort of a obvious question to be asking.

Now, it could be that I was aware of some efforts made by the government that might have prompted that. I just don't know right now. But, I mean, it's the kind of thing that I would have brought up to figure out what's going on here with this case, you know. Is there any plea discussions underway, et cetera? So I guess that's my answer to that.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 31 of 80

Q. Now, were you present shortly after that letter Mr. Reinert was written at a meeting? I'm showing you RS-10-000558, apparently a meeting with the U.S. attorney, Pat Reinert, and C.J. Williams, some discussion of -- looks like this may be the local presentation. Were you present at that in the authorization process?

A. I don't have anything on my billing records that indicate that I was.

Q. Was there some decision to exclude you from the authorization process and the meeting with -- the local authorization process and the meeting in Washington, D.C. -- meeting with the Washington, D.C., folks? I realize it was a video conference.

A. I think it was -- A, I just got into the case. I don't think I would have been able to contribute much to the meeting. B, it was really an area that Pat had some involvement and experience in doing based on him being the capital-qualified counsel in the case.

So I didn't have anything to do with it. I don't think I was excluded. I certainly wasn't, you know, invited specifically to participate. But I don't think excluded -- that would be too strong. I think it wasn't something that I was going to have a role in because I was just on the case starting right then.

Q. I think this is around the same time that the Massiah

hearing was going on, right, 4-11, 4-12, 4-13, around that time period?

A. Let me just see something. It shows on my billing statement that I made a trip to Cedar Rapids on April 12 and that I attended the hearing on the 12th for suppression and departed back for Des Moines on the 13th after the hearing -- apparently the hearing was also on the 13th of April so . . .

Q. Were you doing the examination at the hearing?

A. Oh, no, no, no.

Q. Who was doing that?

A. Al and Pat, and maybe I think Bob Rigg may have done some, one or two witnesses or something. Yeah. I think that's right.

Q. Seeing this note I have up there at the very bottom it says, "We're interested in a plea. Will be much more difficult after official DOJ death penalty sanction is imposed."

A. Yeah. I don't know -- whose handwriting is this? I don't even know.

Q. There will be testimony that these are Mr. Berrigan's notes.

A. Okay.

Q. Mr. Berrigan's going to testify that the "we are interested, we're interested," was referring to the prosecutors.

A. Oh.

Q. They were saying they were interested.

A. Okay.

Q. Was it ever conveyed to you around this time that the prosecutors were indicating they were interested in a plea and that it was going to be much more difficult for you after DOJ authorized the case as a capital prosecution?

A. Okay. Well, I -- I was aware of different things at different times, so I can't say specifically about this particular moment.

Q. Fair enough.

A. Yeah, I'm sorry.

Q. In any case, it does not sound like you were actively involved in the plea neg -- whatever plea negotiations were taking place, sounds like you were not that actively involved. Would that be a fair characterization?

A. Well, not at that time. Later, yes.

Q. And . . .

THE COURT: Mr. Burt, would now be an okay time to take a short, maybe a ten-minute recess?

MR. BURT: That'd be great. That'd be really much appreciated. Thank you.

THE COURT: Okay. Well, why don't we take a -- by that sigh, I could tell maybe you'd like a little longer recess. Why don't we take a 15-minute recess until 10 minutes after 11; okay?

MR. BURT: Thank you very much.

THE COURT: Thank you.

(Recess at 10:54 a.m.)

THE COURT: Thank you. Please be seated.

You may continue your direct examination, Mr. Burt.

MR. BURT: Thank you.

BY MR. BURT:

Q. Mr. Stowers, I want to show you a letter that's out of the plea binder, RS-13-000837. It's a letter from Mr. Reinert to Mr. Willett June 6, 2001, indicating U.S. Attorney's Office has made the recommendation to the Department of Justice regarding the death penalty in your client's case, indicating that the matter's under review. Were you cc'd on this letter? Do you recall?

A. Let me look at my bill, see if it's possibly noted in there. I don't see any notations of it on my bill.

Q. Were you informed by Mr. Willett that he had received a letter indicating that the case was now moving up to the Department of Justice at this point or made aware of that somehow?

A. I think I was aware, you know, generally that this process was going on, yeah, and that there was -- you know, the death penalty approval process was going on during that time period.

Q. Were you part of any discussion where the team got together and said, you know, let's organize and start investigating and getting our information together to present to the Department of Justice in Washington to do a mitigation presentation?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 32 of 80
*to purchase a complete copy of this transcript.*

A. No.

Q. Do you know if any such meetings took place outside your presence?

A. Well, I don't think they did any pre-approval investigation of mitigation to any meaningful degree as compared to what was eventually done.

Q. Did anybody talk to you about maybe working up a legal -- a written presentation which would address the applicability of aggravators and mitigators as outlined in the death penalty protocol or suggest that you would be a good person maybe to write up that part of the presentation because it involved legal analysis?

A. No.

Q. Was there a written presentation made to the Department of Justice concerning the death penalty?

MR. WILLIAMS: Your Honor, again, I'm going to object. I recognize that the order -- or -- yeah, the order allows the defense to amend based on the evidence, but it's gotta relate back to some claim raised in the original petition. And there's no assertion that there was ineffective assistance of counsel in failing to make a proper, adequate submission to the Department of Justice in mitigation. And so I think this is far outside the field of any claim raised.

THE COURT: Mr. Burt?

MR. BURT: Your Honor, it's our position that this

authorization process, as I think Mr. Burr alluded to when he was testifying, is part of the plea negotiation process. It's an opportunity to meet with the decision makers and to get information in front of them that ultimately could lead to a resolution of the case.

So we're not claiming per se at this point that it's a separate ineffective assistance claim that relates to failure to advocate in front of the Justice Department except insofar as it relates to the plea process, and it is part of that process, so I think it is relevant in terms of what efforts were made to present and to resolve the case at this stage when they were going to be in front --

THE COURT: Okay. Mr. Williams' point is well taken. You know, I think it's really stretching it to say it's part of the plea process. I mean, it would be impossible for me to ever decide had they done more, the outcome would have been different. I mean, I can do that for a trial because I'm kind of trained to do that, but I would have no idea.

So it's so marginally relevant to the plea process, I -- you know, again, it's part of my frustration. You have good issues, but you seem unwilling, unable to distinguish between them. And so, you know, charge ahead.

MR. BURT: I'll move along, in light of the Court's comments to keep it focused on where I think the Court is interested hopefully.

BY MR. BURT:

Q. Showing you again the DS-13 note of your meeting with Miss Johnson, this is after that letter I just showed you, and you're apparently discussing a plea with Miss Johnson at this point; correct?

A. Yes.

Q. And explain to me again how these numb -- you know, you have life and something under -- s-u-b-s-t which maybe means substantial assistance and then 25 years.

THE COURT: You don't mind if I zoom in a little bit?

MR. BURT: Sure.

THE WITNESS: That helps me too.

A. I'm sorry?

Q. Yeah. What -- can you -- looking at this note, does that refresh your recollection on what the specific discussion was with Miss Johnson at this meeting about the plea and about her options?

A. Well, I think I've said already that the concept that I believe these notes reflect was that there would be a plea entered, that the starting sentence would be life, that she would substantially assist the government in investigating and prosecuting other people, mainly, you know, Honken, and wind up at the end of the day after all that was done and she received a motion for substantial assistance with a final sentence of 25 years.

Q. And how did you compute that? Was that just based on your experience or based on a guideline computation, or how exactly did you put that 25-year number together?

A. Well, you know, I don't know how I came up with that number or how we came up with it as a group, but it was -- I don't know if by then the government had already told us, hey, we would have done 10 to 15 beforehand. It was a number that was big, but it wasn't a number that was so big that it might not have been something that would have enticed Angela to enter into the agreement because it would have given her a chance to get out within her lifetime and -- which was obviously something that was important.

Q. And apparent -- how extensive a discussion was this at this point? Do you recall?

A. Well, it says we met for an hour.

Q. And apparently at the end of it she said she'll call you Monday?

A. That's what it says.

Q. And was that to call to make a decision, or was it for some other reason?

A. I'm going to say it was to call for a decision, but let me see if there's any indicator that she called. I'm looking at my bill here.

Yeah, I'm not seeing anything in my billing statement indicating that she called. I don't know what day of the week

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 33 of 80

the 3rd of August was but . . .

Q. Do you recall if Mr. Willett was present at this meeting?

A. Well, I'm having a problem here because I can't even find anything in my billing statement that indicates that I actually met with her on that day. So either I didn't -- either it somehow got lumped in with -- I just don't show . . .

Q. Sure you're in the right year?

A. Let me just check. Oh. Yeah. Okay. Yeah, I did meet with her on that day. It's on a -- it's on the bill with a date of August 7, 2001, page 2 of that.

Q. Does it indicate who was present at the meeting?

A. Yeah, it says counsel, the U.S. marshals, client. It says conferences with U.S. marshals, client, and counsel, total of three hours. If you show me the bottom of this I think -- okay. It looks like I was sort of taking some notes of what my time was that day, and it looks like Al and Pat for one hour and then met with the client at the jail on August the 3rd for an hour between nine and ten. So apparently we met, Pat and I and Al met, and then we met the client at the jail as well. We met with the marshal's service. I think that had to do with these detention-related issues. And -- yeah.

Q. And could this be the meeting where she's rocking back and forth and --

A. Now that you're telling me that, I think this was that meeting, and -- because Pat was present at this meeting. I

think this is probably -- yeah, this is -- I'm pretty confident that's the meeting that she was rocking back and forth and Pat was confronting her and Al was sort of jumping to her defense. So yes, I would say that's the meeting. It was not the April 3 meeting.

Q. And does your billing indicate whether she contacted you on Monday with a decision?

A. And I don't see any indication of a contact from Angela, no.

Q. Were you aware when this meeting took place that a couple of months before this meeting the Department of Justice had changed their death penalty protocol in June of 2001?

A. I knew that they changed it. I don't know the date. I don't know if it was changed more than once during the case, but I know that they -- there were changes.

Q. Were you aware specifically when this meeting took place that one of the changes was that once the death penalty was authorized the local U.S. attorney could no longer deauthor -- could no longer enter into a plea agreement without the approval of the attorney general?

MR. WILLIAMS: I don't believe that's an accurate statement of the protocol. I think the protocol indicates that on any death-eligible case the U.S. attorney cannot enter into a plea agreement without authorization of the attorney general whether it was authorized or not.

THE COURT: I don't know, so I can't help you out.

MR. BURT: Well, I don't think I said anything differently. If I did --

THE COURT: Yeah, I think you did.

MR. BURT: -- I might have misspoken.

THE COURT: Why don't you try and rephrase the question. We'll see if there's a continuing objection to it.

MR. BURT: Sure.

BY MR. BURT:

Q. Were you aware of a policy change that took place on June 7, 2001, where now there was going to have to be attorney general approval of any plea agreement after a death notice had been filed?

MR. WILLIAMS: Again, I would object. And I could be wrong on this, but I don't think that's an accurate statement of the protocol.

MR. BURT: I do, so -- I mean, we can provide --

THE COURT: Well, you can -- I guess you're entitled to ask the question the way you want to and then --

MR. WILLIAMS: Can I have a standing objection that it misstates the evidence?

THE COURT: Yeah. Mr. Williams is entitled to object to it, and I'll take it subject to the objection.

A. Well, I remember there was a change in the protocol as to the authority of the U.S. attorney locally to -- to deal on a

death penalty case whether it had to do with when it was authorized or before it was authorized. I don't remember specifically. But there was a time when there was pretty free authority on the part of the local U.S. attorneys to dispose of these cases, that being a death-type case, without having to go to main Justice.

And then it became changed at some point during the pendency of this Angela Johnson case that they had to go through main Justice in order to do it because they wanted to get some uniformity, if you will, to the decision making on who -- who was pursued for death and who wasn't. That's kind of the way I remember it, Mr. Burt.

Q. And do you recall whether there was any discussion with Miss Johnson that, look, this case is now in Washington; they haven't made a decision yet, but they now have this policy that once they authorize the case there's going to be this oversight and now's the time to act?

A. I don't know that that was a specific point of discussion with her. If it was, I don't remember it.

Q. Okay.

A. I don't remember one way or the other on that I guess.

Q. All right. Thank you. Now, were you -- you mentioned the client rocking back and forth, and I think in your first meeting with the client you had a notation that there was a suicide attempt, and I want to show you another note from your file.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

This is DS-17, apparently a conversation with Mary Goody, and you've written here evidence of head injuries and loss of consciousness, depression present, possibly brain organic issues, damage, learning disability, personality disorder likely from physical and sexual abuse and drug use extensive, meth and coke.

Do you recall having a discussion with Mary Goody in which she was conveying this information to you?

A. Yes, generally, but I don't have any idea when this would be. Is there a date on this?

Q. There's no date on it, so I can't help you there.

A. Oh, okay.

Q. From Mary Goody and from your own observations of Miss Johnson and from your knowledge of the fact that she had attempted suicide, was it your belief that Miss Johnson had some mental health issues?

MR. WILLIAMS: Objection. Leading, Your Honor.

MR. BURT: I'll rephrase it.

BY MR. BURT:

Q. What was your understanding as to any mental disorders or problems that Miss Johnson may have had based on your discussions with her and what you were learning from the other team members?

A. Okay. Well, I think she had been -- you know, I knew she attempted to hang herself and commit suicide, and I knew that

Dr. William Logan who's a psychiatrist had been seeing her I believe prior to the time that I got involved and that she had been prescribed some medications relating to depression and/or mental health issues. And that's what I remember.

Q. Do you recall whether there was ever any discussion at any point in the pretrial phase of the case of enlisting some mental health expert or experts to assist you in communicating with Miss Johnson regarding plea negotiation issues?

A. Not on that topic, no.

Q. How about other topics?

A. Well, yeah. As I say, Logan was I think appointed on defense application, Dr. Logan, and I think that started in the fall. And he had been seeing her periodically, not frequently. And he kind of had a little bit of a crossover role as I remember it between treating a little bit and also diagnostic work. So -- yeah. But we didn't employ a psychiatrist or a psychologist to help us communicate with her to get a plea agreement worked out.

Q. Did not do that.

A. No.

Q. Now, do you recall a meeting with Miss Johnson -- and this is DS-00022 -- telephone conference I should say February 13, '02, in which she told you she's not taking a deal and she wasn't there at the time and won't admit to being there when she wasn't.

A. That sounds familiar.

Q. Do you recall the context of this telephone conversation?

A. Let me look at my billing. I really don't know the context of that. I really don't know. You know, it could be -- I don't remember when Judge Bennett's ruling was on the suppression, but it was in first part of '02. This might have some time relation to that. That's about the best I can . . .

Q. Judge Bennett's ruling was April 23, 2002.

A. Okay.

Q. So it's pre-ruling.

A. Uh-huh.

Q. And do you -- I mean, we had that note back in August of '01 when she said she's going to call you.

A. Right.

Q. And this is many months later. Had there been some meeting right before this, or was this kind of out of the blue?

A. There's notation in here of a letter from her on February the 4th, 2002. That may have some relationship to it. But during that time period in the end of January we were working heavily on trying to get the discovery file into our custody, and we had traveled -- traveled up there in the end of January, a whole group of us had, to kind of make a crash attempt at getting this discovery under control and to make a showing to Judge Jarvey that we were going to spend tens of thousands of dollars having an army of people typing all this discovery.

And I'm sure that during that time period we would have met with Angela and probably had some discussions with the government about -- about the case, not only the discovery issues but possibly resolving things on a plea agreement.

There was also a -- the motion to suppress was argued on January 16 before Judge Bennett I believe, and so I think that, you know, there was probably some discussion of whether or not this might be a good time to see if we could figure something out before we found out what Judge Bennett was going to rule.

I remember we did talk about that because we weren't sure how he was going to rule. And having that issue open and uncertain at that point did give some reason to be thinking about possibly working it out because it created uncertainty for both sides, and obviously if she would have lost that ruling at that point any benefit she had out of the -- out of the motion, if you will, would have been -- would have largely been lost at that moment.

So I think we probably were talking to her in that context during that time pre -- pre-ruling from Judge Bennett about trying to figure something out that we might be able to do to work her case out without a trial.

Q. And at this stage of the case, you realized that there was evidence other than the McNeese statements that you had to deal with; right?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

MR. WILLIAMS: Objection. Leading.

THE COURT: It is, but I'll take it subject to the objection.

A. Well, yeah. There was other -- there was a host of other stuff. Particularly Christi Gaubatz was one of them.

Q. And you also had some other jailhouse informants who were surfacing around this time; right?

A. I don't have a time table on that, but there was jailhouse informants trickling in throughout the case, yes.

Q. You also had the purchase of the gun by Miss Johnson?

A. Yeah, that was a fact out there from the beginning, yes.

Q. And you also had the false statements she made to the grand jury.

A. She testified in front of the grand jury a couple times. It was the government's position that she wasn't truthful in her testimony. Obviously once she drew the maps to where the bodies were, then it was pretty evident that some of her testimony could not have been true. So, you know, we were aware she had testified, and we had the grand jury testimony.

Q. So when Mr. Reinert wrote to Mr. Berrigan back in March with or without the evidence which is the subject matter of the Massiah hearing, this case can appropriately be tried as a capital case, you agreed with that; right?

MR. WILLIAMS: Leading, Your Honor.

Q. Did you agree with that statement in Mr. Reinert's letter?

A. Well, at that time she was indicted under Title 18, and one of the first things I did when I got in the case was to research whether or not, in fact, that was correct because I had this ex post facto issue in my mind that it probably could not be tried as a death penalty case for that reason.

And there was a case called Dobbert versus Florida from the U.S. Supreme Court that kind of suggested maybe it could be if you viewed the death penalty procedures as merely procedural and then somehow even though the death penalty wasn't operative at the time of the crime it nevertheless became operative when they passed the provisions.

And I think that was a little more of an issue in early '01 than it became under a few subsequent U.S. Supreme Court cases I think later in '01 and then into '02 when it was decided that certain -- the gateway factors were actually elements of the offense; and, therefore, without the gateway factors being in the statute prior to -- at the time of the killings that since they didn't exist and the statute wasn't in existence they -- those additional elements which made her eligible for the death penalty probably were subject to ex post facto.

We ultimately filed a motion on that, and I think ultimately what became of that was I don't think there was ever a final ruling on that question, but it was -- that indictment ultimately was dismissed or those counts were.

Q. When you were doing your research, did you happen to look at 848 and see it had been enacted prior to 1993?

A. I don't know that anybody was thinking about 848 including the government in the spring of 2001. That indictment followed in August or September. And I'm not sure when that was first contemplated by the government as something they were looking at charging. But I don't know that I was thinking about it at the time. I always felt that they filed that because of the Massiah issues and they were trying to set up the argument that they eventually made regarding Texas versus Cobb, Cobb versus Texas, whatever the case name is.

Q. Well, you realized, didn't you, when you were researching that issue that if you somehow succeeded in the argument that the specific statute under which she was charged was not a death-eligible offense, that the government would look for another offense in which she was death eligible?

MR. WILLIAMS: Asking to speculate, Your Honor.

Q. Based on your research and your experience with federal practice.

A. I think really to be honest with you I don't know that I was thinking about 848 at the time. I really -- I just don't think I was really contemplating it in the first couple three months that I was involved in the case. And then starting about August I see in my billing records there were some notations regarding CCE, and that's when I think that issue may have first

come up. The government may have told us we're looking at indicting her under this provision and going from there.

So I -- I can't really answer it any other way than that. I think I don't remember talking or thinking of CCE at the time. I remember that I felt initially that the government had charged her with participating in killings in retaliation for these people being potential witnesses for a past crime which was the drug activity that Honken was charged with in state court originally and then ultimately in federal court and then that the CCE required the criminal offense, the drug offense, be continuing in nature. And really the 1512 theory was that they were killed based upon their availability or willingness to testify about a past crime.

And so I kind of -- at one point I sort of thought, you know, they're not going to try to pursue that as a theory that will go too far, but they're going to put a place holder on that with their new indictment I guess. I had real problems with that part of their case because I always felt it was inconsistent with their theory under 1512 but . . .

Q. So during this conversation in February with Miss Johnson, she's telling you she doesn't want to take a deal and she wasn't even there at the time and she's not going to admit to being there when she wasn't; right?

A. Correct.

Q. Is that the first time you'd heard her say that in terms of

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 350    Filed 11/10/11    Page 36 of 80

Q. her not being present?

A. Oh, I think I knew that. I mean, I think that was maybe the first time conceivably that she personally said that to me. But, I mean, that was the -- that was what she had been saying, and I was aware of that going back for -- from the beginning basically.

Q. And up to the point when the opening statement was made at trial, did she ever indicate a contrary idea as to her presence or nonpresence?

A. Not personally to me.

Q. You realize that Mr. Willett stood up in opening statement and said to the jury that this was a case about guilt by association after the government had said -- detailed all the confessions Miss Johnson had made, and then he said that she was merely present. Do you know what the origin of the mere presence defense in this case was, when it first got put into place, who decided on it?

A. Well, as we were going through things, particularly after the Eighth Circuit ruled on the interlocutory appeals and the evidence of the bodies and all that was going to come in, it was pretty apparent that the version, you know, I wasn't there, didn't have nothing to do with it, et cetera, at least it was apparent in our judgment, at least Pat and I, Pat Berrigan and I, that it was not plausible. You couldn't go in there and tell a jury that basically with a straight face in our view anyway

and that you would wind up in a situation where you'd lose credibility with the jury taking that position.

And so -- but at the same time there was indicators that she was involved but only to a certain point, and that's really kind of where the genesis of that came from.

Al Willett, on the other hand, was kind of taking this other tact, he and Nancy were, that Angela found out about all this stuff after the fact. I called it the -- I think he called it the after-acquired knowledge theory which is that she wasn't involved, she didn't know nothing at the time but she found out afterwards when she visited Honken somewhere in some jail and he drew a map for her as to where these bodies were located, and Al wanted to run with that theory.

And he actually -- when we went down to Kansas City, he -- and we had a session with a mock jury down there with Lisa Dahl, the three of us were down there, Pat and I and Al. And Al started to do a voir dire of these prospective, you know, jurors who were I think probably not a complete cross-section of anything, but they were -- they were selected. There was about ten of them that we had come in. And he started to talk about this theory to them in voir dire to get their -- you know, bounce it off them.

And the reaction was 100 percent, you know, are you off your rocker, who's going to believe that, you know, how does she know, well, how did this happen again, how did -- you know,

and it was a -- first of all, I was embarrassed for him because he was up there trying to sell this to these people, and they were -- they were not listening, and they were not believing, and they were more or less sort of telling Al what Pat and I had been trying to convince him of for quite a while which is this is just silly and complete B.S., and it's not going anywhere, and it's not credible to take that position, and if you get up there in front of a jury and try to say that, it's just going to be a disaster.

Q. Was the purpose of this practice voir dire to present the theory that was being formulated for trial, or was the purpose to sort of test out different theories to see what might fly and what might not fly?

A. I think it was theme testing a little bit, and I think it was also Lisa wanted to kind of work with Al because he was going to be involved in -- or she was going to be involved in working with the jury, and part of her role was not only the jury selection role but somewhat trying to see how Al was going to be communicating with the jury when he was talking to them and what type of things might be more helpful to say than not because he was an unknown quantity to both Pat and Lisa and me.

And so that was kind of the purpose of why we were doing that was that, but it was quite a -- it was kind of a surprise to me when he was up there doing his presentation to the group who were assembled in an area kind of like this in a

classroom I think the arguments that he was trying to float to them, that, you know, they just were not salable.

THE COURT: Mr. Burt, would now be an okay time to take our noon recess?

MR. BURT: Yes, Your Honor.

THE COURT: Okay. We'll be in recess until one o'clock. Thank you.

(Recess at 11:50 a.m.)

THE COURT: Thank you. Please be seated.

Mr. Burt, you may continue your direct examination of Mr. Stowers.

MR. BURT: Thank you very much.

BY MR. BURT:

Q. Mr. Stowers, I want to put in front of you a portion of Plaintiff's Exhibit Number 51, Bates stamp number 00032, and it looks like it's a memo to you from Becky -- can't read the last name, but do you know who Becky is that wrote this memo?

A. That could be Pat Berrigan's legal secretary, but I'm not -- I don't know that I remember her last name.

Q. And --

A. I'm not sure.

Q. And the caption of this memo is "found some interesting things for you," and looks like it's dated 5-24-02, and it proceeds to list dates of the killing and then some information relating to the time line of the case, when various people like

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 37 of 80

Page 1171

the neighbor Olson saw Greg and Lori carrying a child. Terry told parents and daughter that he had to talk to Angie. Angie was heard arguing with Terry while on break. Angie worked till midnight. Do you remember receiving this time line?

A. Actually I don't. Can you show me the top of it?

Q. Yeah.

A. I think it had some -- huh. Hmm.

Q. It looks like it's somebody within your law firm because it's --

A. Yeah.

Q. -- written on your stationery.

A. I don't remember there ever being a Becky Voogt working for me so I --

Q. Does this appear to you to be some attempt to set forth a time line relating to the time of the killings and where Angie -- Angela Johnson was in relation to those times?

A. Apparently. I don't know why -- I honestly don't remember this document, and I don't know who the author of it is.

Q. Yeah. I don't see in that time line -- there has been some testimony here about a woman named Phyllis Prilosec (sic) who apparently was a neighbor of Lori Duncan's, and there's been reference made to a police report, investigative report, setting forth her seeing the victims after a time when the prosecution was contending that they were killed. Does that refresh your memory as to a police report pertaining to a witness named

Page 1172

Phyllis Prilosec?

A. Well, I remember that witness. She was the neighbor lady to Lori Duncan.

Q. Were you perhaps having somebody in your firm, a law clerk or somebody similar to what Mr. Willett was doing, go through discovery and kind of writing you memos like this setting out a time line and how things sort of were put together?

A. I -- this is very confusing. I'm not sure this is somebody that worked for me. It may be somebody that was -- I wonder -- it could be -- Gordon Gratias's office was -- I'm just -- I'm thinking this may be a woman that worked for Gordon Gratias.

THE COURT: Well, how would it wind up on your letterhead?

THE WITNESS: Because their office is next door to ours, and we had a set of the discovery in our office, and we had to retain it in our office. And they may have come over and looked at it. But I -- I don't remember anybody by that name ever working for me. That's why it's confusing. It's obviously on some kind of a form that we had in our office at one time for notes and things.

BY MR. BURT:

Q. Yeah.

A. Or little handwritten memos. But I just don't -- I don't recognize it, and I don't recognize the person, but I -- you know, the subjects that are covered in here, I was familiar with

Page 1173

those, yeah.

Q. Okay. And were you actively involved in trying to construct the time line that might show through the discovery that Angela Johnson was not present and did not commit this crime?

A. No, I don't think that was -- I think we were looking at one point at whether or not she might have an alibi for the -- for at least some of the time periods. There was always a little bit of fuzziness as I remember it about precisely when the abduction of the four people occurred. If I remember, there was a little lack of certainty on the time when that happened exactly. So -- and I think we -- I know we looked at the issue of whether or not there was some explanation of her whereabouts. My recollection was that there was a better explanation for her whereabouts with regard to the DeGeus disappearance and killing because she had worked at the country club that night than there was as to the first four, the people that were abducted.

Q. And did I hear you say you were familiar with this police report concerning this witness Phyllis Prilosec who was a neighbor of Lori Duncan's?

A. I was aware of that, and apparently I was aware of it around this time if I saw this.

Q. And do you recall doing any investigation to try and locate Miss Prilosec or to fit her into this time line that's constructed here?

Page 1174

A. I don't think so. I don't think I tried to locate her. I think she was living in the same place as when the killings occurred if I'm not mistaken. I'm not sure about that. I wasn't -- that wasn't really sort of my aspect of the case in 2002.

Q. Whose aspect of the case was it?

A. Well, that would have been part of the factual sort of defense part of the case that Al was really in charge of and working on. And this is more related to that. That's why it's sort of confusing to me.

Q. Confusing in the sense that it seems to relate to some investigation -- some investigative tasks which you weren't responsible for?

A. Yeah, yeah, yeah. But obviously it's addressed to me so . . .

Q. Did anybody on the defense team ever express to you an urgency to find this woman Phyllis Prilosec?

A. No. She passed away somewhere during the case. Was she deceased by that date or not? I don't know.

Q. Well, I think the evidence is going to show she was deceased August 24, 2002, perhaps.

A. Oh, okay, so a few months after this.

Q. Did anybody ever ask you to research the issue of whether you could get into the penalty phase -- get into evidence in the penalty phase the investigative report relating to the

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 38 of 80

Q. information that Phyllis Prilosec had?

A. To specifically research it?

Q. Yeah.

A. That specific question, I don't believe that was specifically sought, or at least I don't have any notes that specifically address that.

Q. And no recollection that anybody ever asked you to do that.

A. Not specifically as to that item, no.

Q. Okay. I think you said that one of Miss Johnson's preoccupations was her living conditions there in the jail; right?

A. Right.

Q. And was that the case from the very beginning, in other words, that she was complaining about lack of contact with her daughters and other complaints about the living conditions?

A. Can you ask me that again? I'm sorry. My mind is . . .

Q. Yeah, no problem. Was she complaining from the beginning of the case about her living conditions and her lack of contact with her daughters?

A. Why she did that?

Q. No. Was she?

A. Was she, yes.

Q. Was she, yes.

A. Yeah, that was a continuous ongoing thing, frankly, all the way through the trial. It was continuous.

Q. And do you remember when you first -- if there was a time you turned your attention to addressing what seemed to her to be a very important concern?

A. I think it was in 2001 somewhere. I think I actually wound up -- I think some of the entries that we talked about earlier involve conferences with the attorneys and U.S. Marshal's Service which that would have been one of the topics we discussed in one of those earlier handwritten notes of mine.

Q. Right.

A. Yeah.

Q. Where you're meeting with the marshal's office?

A. Yeah, that would have been one of them. And then eventually, you know, marshals were fairly -- if you would ask them personally, they'd say, you know, we don't really have a problem with it but then we got rules and we can't have any certain kinds of visits, couldn't have contact visits and that kind of thing. And then -- and they felt constrained to follow their rules. We attempted to get some help from the Court on that by filing a couple of different filings relating to conditions of confinement.

Q. And was that in 2002 that you did that? Specifically I'll show you a page from your notebook here, DS-00026. Looks like a letter dated April 15 from you to Mr. Berrigan asking him to ask Angie about her current jail conditions when he visited her and then a bunch of handwriting which looks like your handwriting on

this letter; right?

A. No, handwriting is probably -- that looks like Pat Berrigan's handwriting.

Q. Okay.

A. It's not my handwriting. The typed portion would have been from me, and there would have been something filed around that time. I think there was also something filed earlier than April of 2002, and I think there was some filed even after that, and I remember we even brought it up during the trial with Judge Bennett and he actually allowed Angela Johnson to hug her daughter for a period of time. I think he prevailed on the marshal's service to allow that to occur in the courtroom.

Q. In your opinion was that distracting to Miss Johnson in her pretrial incarceration phase, these conditions of confinement?

A. She was very attached to her -- to her daughters, and yeah, it was. It was something that she was very focused on was her family, you know, connection with her daughters. And talking to them on the phone and seeing them through glass wasn't -- you know, wasn't very humane from -- you know, from her point of view, and it was not something that made her feel good.

Q. Now, I'd asked you earlier if you had done any sentencing computations, and this is another page from your notes. This is DS-00035. Looks like your analysis of the indictment as it existed at that time; correct?

A. Yeah. I think it's sort of a -- just a synopsis in shorthand.

Q. And somewhere in the notes I saw there was a team meeting, and it said that Dean was going to do a guidelines computation and then it was going to be discussed with Miss Johnson. Do you recall doing that, actually doing a computation and figuring out what her exposure was?

A. No, not for the guidelines, no.

Q. So at no point in time was that done as far as you remember.

A. Well, I did look through my billing statements. I guess I didn't specifically look for that item, but I don't think I ever did a guideline calculation in this case because of the -- it'd be a little surprising if I had done that I guess.

Q. Right. Why would it be surprising?

A. Well, because I think it was a life case, so I don't know why that would have been done. I mean, if there was discussion of it, it may have been in a little -- I don't want to -- I don't want to guess. I'm not -- I don't think that I would have done that because I don't think it really -- really bore on any of the issues particularly.

Q. Was there ever any discussion with Miss Johnson that she was exposed in the first indictment not only to murder charges but also to separate charges which carried their own penalties and consequences, for instance, Count 6 and Count 7?

A. Did we discuss that with her?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q. Yeah. In other words, along the lines of even if you beat the murder counts --

A. Oh.

Q. -- we still got two other counts here to deal with, Angie?

A. No, I don't think I was thinking about that, no. I don't think we really talked about it. They were sort of throw-in counts, I mean. Penalties for those two offenses, 371 is a 5-year maximum. I don't know about 373 off the top of my head but -- I mean, those were -- you know, last thing I'd be worrying about is what the guidelines would say about those two offenses if they were the only thing that she was convicted of.

Q. Did she have some exposure to some drug conspiracy counts here?

A. Eventually, and that would have been when the 848 count -- counts I should say were made. There was a -- there was the potential that I think she could have received a sentence based on drug quantities and that sort of thing.

Q. Right. And that exposure just on the drug quantities was significant, was it not?

MR. WILLIAMS: Leading, Your Honor.

Q. Was the exposure on the drug counts significant?

A. Depends on perspective I guess. You know, it would have carried -- under the counts as it was pled it would have carried a ten-year mandatory minimum. I don't think Angela had any prior drug felony convictions, so I think she would have been

subject to a ten-year minimum. CCE has a 20-year minimum if you're convicted of the CCE count but not the murder aspect of it, so -- if I'm remembering this correctly.

So I think, you know, that's significant to most people. I hate to say it. You know, there's a lot of cases in federal court where people -- you know, the drug quantities in this case honestly weren't that huge as compared to many drug cases in federal court that I see. So, I mean, the drug quantity wasn't -- wasn't really a big factor to me. It was more the other conduct that was alleged.

Q. The homicides.

A. Yeah.

Q. So was there ever any discussion about exposure on non-homicide counts or potential counts?

A. Yeah. I think -- I think there probably was that, you know, even if you could beat the murders you're going to get 10 or 20 years or something like that.

Q. When you say there probably was, do you have a recollection that you specifically sat down with her and did the computations and said here's the quantities we're dealing with, here are the potential exposures, I want you to be clear that this is not just about these homicides? Although those are significant, you got some other issues here?

A. Yeah, I'll be hon -- I don't think it was really ever that explicit. It was such a secondary thought to be honest with

you.

Q. Sure. And did you ever discuss with her her exposure on state cases for the homicides or for other charges?

A. I don't believe so.

Q. Now, do you recall sending this letter which is DS-00038 to Mr. Berrigan in June 2002 indicating you had gotten a letter from Mr. Willett enclosing a letter from Dustin Honken expressing Honken's desire to help Angela and inquiring of Mr. Berrigan whether he heard anything from Charlie Rogers I guess concerning a joint plea strategy?

A. And your question is?

Q. The question is do you recall receiving this letter?

A. A little bit, not a lot. I don't remember the contents in a Honken letter right now, but there was -- yeah, I mean, I remember that was a topic that we were talking about doing a joint strategy, and we actually pursued it a little bit on a couple of occasions if I'm not mistaken.

Q. Was this the first time that this issue came up when he sent you this letter and it looked like Honken may have been willing to work some kind of a joint disposition?

A. I'm going to say yes.

Q. Okay.

A. Around that time period.

Q. And do you recall that in August of '02 you had a telephone conversation with Pat Reinert in which the issue of plea

negotiations were discussed?

A. Oh. Yeah. No. We did have -- yeah, we had more than one conversation with Pat Reinert about trying to resolve the case by plea agreement.

Q. Well, in this particular case, did he tell you that he wants to resolve the case by plea?

A. Yeah, he said that more than once.

Q. And on this particular conversation did he give you the information that is contained in this note here, that is, that he spoke of the need to clear any deal with the families and he seemed to agree with the concept of a Rule 11(e)(1)(C) plea to a term of years arrived at by reduction for substantial assistance being factored in?

A. Right. And I think this relates back a little bit to the other note that I had earlier, the same concept which is you start off with basically a joint understanding that the sentence for the offense would be -- would be life but that assuming there was substantial assistance provided that it would be reduced to an agreed-upon term of years that the parties would agree to. And then the reference to 11(e)(1)(C) would have been to the rule relating to pleas that would be binding on both the defendant and the government as well -- and the Court would have to agree to those terms as well.

Q. According to this note, he's not talking about a life sentence, is he? He's talking about a plea to a term of years

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 40 of 80

is what you wrote down.

A. He was open to it, yeah. And, you know, it was obvious that -- first of all, I mean, if she's going to plead and she's going to cooperate, she's not going to plead to the death penalty; right?

Q. Hope not.

A. So she's going to plead. She's going to cooperate. She'd plead to life, cooperate, and then get some discount off the life sentence, and that was the working understanding for a long time with Reinert.

Q. Now, was he the one that you were dealing with primarily in these plea discussions? Had Mr. Williams surfaced as somebody to deal with on this issue at this point?

A. I'm not sure. There was some point in time when C.J. sort of, quote, took over the case, if you will, from Reinert post the suppression ruling and all that debacle and -- but I don't know the date of that. There's a letter to that effect, though, from Mr. Williams indicating that, you know, basically don't talk to that Reinert guy anymore, talk to me, I'm in charge now, sort of the Al Haig letter.

Q. Do you agree that this notation you have is accurate as to what Mr. Reinert said to you?

A. Yeah.

Q. You wrote it down just as he said it.

A. No. I've already -- first of all, I don't take a lot of

notes, but when I take notes, they're usually about something that I think is noteworthy and significant, and this would have been an important conversation that we had. Whether it was -- it says TC, so it would have been by telephone and -- telephone conference so -- and he was getting ready to file the 848 indictment. He was going to correct it to take into account the Ring case and the need to indict for the specific factors that Ring said you have to indict for in order to pursue the death penalty which is the case I referred to this morning not by name but otherwise.

So yeah. And there was an issue that had arisen with the initial -- perhaps with the initial version of that indictment which -- oh, I'm sorry. Okay. I'm off by a year. The initial version of the indictment for 848 I think was in 2001, so he was going to adjust the language in there to take into account some bill of particular issues that we had raised that the Court had ruled upon. And he was going to add some specificity to the indictment such as naming of the other participants and the specific underlying offenses that were part of the series and a couple other things I believe because the original indictment was pretty open ended, and that's what the second paragraph of this note was about.

Q. And this was not the first time that Mr. Reinert had expressed the willingness to resolve the case for a term of years, was it?

A. Well, there was an earlier ruling -- or discussion that we had before the suppression ruling.

Q. Right. And showing you what's from the plea binder RS-13-000847. It's a letter from Mr. Reinert in October of '01 in which he is indicating that the negotiations -- that he may not be opposed to negotiating a settlement to this case which could include a sentence other than the death penalty or life imprisonment. Do you remember seeing this or at least discussing it?

A. I mean, I'm familiar with those discussions and the 20-year number, yeah.

Q. And are you familiar with the fact that he reported to Mr. Willett on October 10, 2001, that the team's proposal of 20 years was unconscionable?

A. I'm sure I've seen this letter. I can double-check to see if it was mailed to me. Does this exhibit show --

Q. It's not in your binder, no. It's in the plea binder which is --

A. Does it show that it was copied to me, though? Otherwise I would have gotten it from somebody else possibly.

Q. Well, I see it's not cc'd to you, but I guess my question is did Willett and/or Berrigan convey to you, hey, you know, that 20-year proffer we were making, the AUSA thinks it's unconscionable? Were you aware of that?

A. Hold on one second. Well, all I can say is I know that

they didn't think that the 20 years would fly, and I knew that. Whether or not the word unconscionable was a word I knew of, I can't answer that. I don't remember that.

Q. Well, did you think that at this stage of the -- that is, in October 2001, that there was any reasonable chance that you could get a 20-year term on a case involving this many victims?

A. Actually, yes, I did think we had a chance of doing that.

Q. And tell me why you thought that.

A. Because of the earlier conversations that we were aware of where they had talked about a 10- to 15-year term before the bodies were recovered and because Reinert was looking at a term of years, whatever --

Q. That was in August he was looking for a term of years back to your conversation with him?

A. Well, that was always on the table. He never -- he never -- he was open -- he understood that in order for her to work this case out with assistance against Honken that we'd be talking about a term of years. Now, what was the number? Twenty is at the bottom end of the range. Maybe 30's the top end. They're talking 20. In this proposal we were getting that out there to test the waters as much as anything. Maybe it was going to wind up being 25. Maybe it was going to wind up being 30. But this was a viable thing, and it was never said by the government that it was not viable. They, in fact, were encouraging discussions about a plea to a term of years in these

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 41 of 80

early couple of years when I was on the case.

**Q.** Well, that October letter when he says 20 years is unconscionable, that pretty much is an indication saying that's not going to fly, isn't it?

**A.** Twenty?

**Q.** Yeah, he said 20 is unconscionable.

**A.** Okay.

**Q.** That didn't indicate to you that there's not a lot of room to move on that number?

**A.** He would write a letter, Mr. Reinert would, that would say one thing, but the conversations were much softer, if you will, than what he would write on paper. And so there was always a little bit of a tension between his written words and what he'd tell you in a meeting among counsel. And some of his written words were different than what he'd say in person oftentimes on several occasions.

And it was a little bit challenging to kind of figure out what the real deal was with Reinert in terms of willingness to do a deal. This could have been posturing on his part. I don't know. As far as saying 20 years is too low, yeah, when you talk about it 20 years for 5 murders is 4 years per body, you know, I mean, that kind of thing, sure, that sounds like 20 years was completely unreasonable.

On the other hand, Sammy the Bull Gravano gets a five-year sentence, and what'd he kill? Seventeen people

himself with his own hands?

So to say that a 20-year sentence for somebody who wasn't even a principal for the offense, we d -- I didn't feel that it was unreasonable. I thought it was low, but I thought it was viable. And I also thought because they had said 10 to 15 given the fact that Reinert got caught with his hand in the cookie jar, he might be a little bit more willing to negotiate than would somebody else, particularly since he was a little bit exposed on his whole situation with McNeese and the issues there.

**Q.** Now, that 20-year number was not -- did not come from Angela Johnson, did it?

**A.** I'm pretty confident that it was a number discussed with her at any number of meetings, and it may have been a dream number. Looking back on it now, maybe it was. But I'm pretty confident it was discussed with Angela that 20 years, you know, that would be good.

**Q.** But was it discussed as something that you, the attorneys, thought was what the case could be negotiated for, or was it a situation where she was insistent on 20 years and no more?

**A.** It was a negotiation position. I think, you know, if they would have come back and said 25 years, you know, we'll do it for 25, you know, it would have been something we would have twisted her arm to do. It wasn't like 20 years or forget it. It wasn't a drop-dead number that was given to the government.

It was a number for starting these discussions again to try and get the case worked out. That's what the number was. It wasn't -- you know, nobody's negotiating position that I've ever known about ever winds up being their final position.

**Q.** I understand that it was a flexible number in negotiations. What I'm trying to get at is was it a fixed number in her mind? In other words, was she saying to you, "I will not do a day over 20, don't even think about it," or were you coming to her and saying, you know, "Angie, I think we can get you about a 20-year term, we'll do what we can, and we'll get back to you"?

**A.** I think it was more aspirational. Put it that way.

**Q.** On her part.

**A.** Yeah.

**Q.** But she never dug her heels in and said 20 or nothing?

**A.** I don't bel -- no, I don't think so. Eventually she was willing to do more but . . .

**Q.** Yeah, we'll get to that.

**A.** And let us -- and let's propose it, you know, affirmatively.

**Q.** Sure. Now, it says at the end of this letter, 8-3, that the prosecutors were going to come to Des Moines to meet, discuss this further; right?

**A.** Uh-huh.

**Q.** They're coming to you.

**A.** Right.

**Q.** Seemed like they had a willingness to make this happen at this point, did they not?

MR. WILLIAMS: Objection. Leading, calls for speculation.

THE COURT: Sus --

BY MR. BURT:

**Q.** Did they in your view --

MR. BURT: Withdraw it.

THE COURT: Okay.

BY MR. BURT:

**Q.** Did they in your view have a desire to make this happen?

**A.** Well, we were told they did, yeah.

**Q.** Now, DS-00043 is a note of your apparent meeting shortly thereafter on 8-21-02 where you met with Mr. Reinert and Mr. Miller; correct?

**A.** Right.

**Q.** And according to your note, there was a discussion regarding the new administration's death committee. Do you recall what that discussion was?

**A.** Boy. No, I don't.

**Q.** Says underneath that need proffer for ability to sell plea --

**A.** Of any kind.

**Q.** -- of any kind, multiple counts, lesser sentence than Honken, and then there's sort of a little diagram down there

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

with some years and some numbers, 12, 6, 7. Can you tell us what that represents?

A. I wish I could. I don't know that those numbers are much more than doodling to be honest with you.

Q. Okay.

A. They could have had something to do, but I don't think so.

Q. But the part above that, need proffer for ability to sell plea of any kind, I assume that that was said to you by Mr. Reinert and/or Mr. Miller?

A. I think they would have said that. I know they've said that, and if they said that on that occasion, then I noted it. It wasn't something that I would have been advocating.

Q. So based on that do you think they said that to you or not?

A. Oh. Yeah. I mean, I know they've said it a number of times, and they probably said it on this occasion.

Q. Okay. And at the bottom of the note it says they would have offered 10 to 15 years prior to recovery of bodies. Did you write that down?

A. That's my handwriting, and that's --

Q. What's that in reference to?

A. Well, it's what I've described which is that they -- in this instance Reinert and Miller, one or the both of them, had said we would have offered 10 to 15 years prior to the discovery of the bodies, a sentence in that area or plea agreement in that area. And they said it in this meeting which is why I noted it.

I think they may have said it one other time at least or documented it in some way. I think I wrote them a letter because I thought that was pretty darn significant. I think I wrote them a letter recounting that.

Q. Yeah, we'll get to that.

A. Okay.

Q. And did they -- do you remember which one said it, Reinert, Miller?

A. See, I thought it was Reinert because that's my memory on it is that it was Reinert because although Miller was involved in a lot of these things, he was not really as much the decision maker as was the U.S. Attorney's Office and Reinert at the time, and it was pretty apparent that he was sort of second chair, if you will, and really didn't have the ability to -- I think it was made pretty clear he didn't have the ability to make a deal happen like Reinert would have.

Q. Did you know what the position of the attorney general of the state of Iowa was in regard to the death penalty in this case?

MR. WILLIAMS: Relevance, Your Honor.

THE COURT: You may answer.

A. At some point I became aware of it.

Q. At this point you didn't know what it was?

A. I can't say that. I know I became aware that there was a difference between the stated position of the attorney general

regarding death penalty which was opposed to it and involvement of the attorney general's office in the prosecution where the death penalty was being sought. And then eventually they thought that they had resolved that conflict by having Mr. Miller not participate in certain aspects of the case.

Q. Did you ever attempt to use any opposition the attorney general of the state of Iowa might have to the death penalty in the plea negotiations in your case?

A. It was used. I think that was really a strategy that Parrish and the Honken people were really pushing in this summer of 2002 period. And I think that's right around this window here that we're talking about in the summer of 2002 is when Al Parrish was really working Miller over. I think they might live by each other or something.

And he was really pushing Tom Miller, not Tom Miller the attorney general but Tom Miller the prosecutor on the case, and then working him to get to Tom Miller the A.G. to try to pressure an outcome and then it was going to be a packaged-up deal because Al Parrish and I talked about it where both defendants would be avoiding the death penalty. Honken might get a life sentence and Angie would get something in a term of years, and that was kind of the concept that was being pursued in the summer of 2002.

And Al Parrish had a lot of optimism that it would happen and felt that Miller was going to advocate for it being

the way it should go. And he expressed that to me, and I was skeptical, frankly, but we tried to pursue that strategy jointly with them at that time, but it didn't go -- didn't go through, and it didn't happen.

Q. When you say 2 -- are you meaning 2002 or 2004, because this meeting you're having with them is in August of '02?

A. No, I think it was in '02.

Q. All right.

A. In the summer. And I remember I was driving across from Minnesota to Rhinelander, Wisconsin, my hometown, in the summer on Highway 8, and my phone starts ringing with Al Parrish, hey, you know, you gotta do all this, and you gotta get on this, I got Tom Miller, they're going to do this, and they're going to do that and -- about this plea issue, and I'm confident it was during the pendency of the interlocutory appeal and summer of 2002, and I think that's what this is all kind of in that -- in that period of time.

Q. And when he said you gotta get on it, what did he want you to do to bring forward your end of this?

A. He wanted us to push from our side for that package deal.

Q. And did you do that?

A. I believe we did to the extent we were able to. I'm not sure that I can -- I'd have to think a little bit about exactly what happened when we did that but -- I'm not -- I'm not recalling exactly.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 350 Filed 11/10/11 Page 43 of 80

Q. Now, this statement you wrote, they would have offered 10 to 15 years prior to recovery of bodies, can you give me the context in which that statement was made?

A. Well, I mean, we were talking about getting a pretty nice plea agreement. You know, you don't start off talking about 20 years, you know, out of thin air but -- in this kind of a case, and, you know, once we started to talk about that, they started to poo-poo it, Miller and Reinert, you know, saying, well, gee whiz, you know, we would have offered 10 to 15 years prior to the recovery of the bodies and sort of saying implicitly we could never do that now. And if you go to the top of this note -- and then eventually I think -- this is August 21. Then eventually they kind of went backwards in some of their positioning on it.

Q. Well, the context then was the prosecutors were telling you that 10 to 15 might have been a reasonable number prior to the discovery of the bodies, but we're not prior to the discovery of the bodies, and, therefore, your number of 20 was unreasonable. Wasn't that the context in which that comment was made?

A. I'd have to look at that other note that you had up just a little bit ago to see -- what was the date on the other note? August 3 -- or the letter from Reinert was August what?

Q. Well, October '01 Reinert is saying 20 years is unconscionable.

A. Oh.

Q. August 3, '02, he's telling you he wants to resolve the case by a plea to a term of years.

A. Right. Well, you gotta also relate this into the ruling on the suppression motion. That's the difference here I think. Pre-ruling on suppression motion, 20 years unconscionable. That's what Reinert says. Post-ruling on suppression motion, he starts to show more flexibility, okay. So this is when we're trying to use the suppression ruling, trying to use this joint strategy, anything we can to kind of -- to put this deal together, and there's some more flexibility post-suppression ruling sounding anyway in the verbal discussions, that, you know, candidly saying, well, gee whiz, we might have done 10 to 15 years before discovery of the bodies; can't go back there now but something more than that.

Q. All right.

A. Okay?

Q. In other words, not a life sentence.

A. But a term of years.

Q. Not 20 but somewhere in between was the way you read it or --

A. I actually thought they may have been softening a little bit from the October '01 position of unconscionable to go to 20 years because of the suppression ruling which sort of changed things a little bit for them. And then they may have been open to rethinking the 20-year deal.

And so when they were talking about 10 to 15, they're saying something more than 10 to 15. 20 would be more than 10 to 15 by my calculations, and it could have been 25. It could have been 30. But in that zone of 20 to 30 years, it seemed to me that this was a viable resolution of this case at that time based on conversations with Reinert and Miller over the time period up till then.

Q. Okay. So at least on the government end of things you had a receptive audience.

A. Yeah. They were receptive.

Q. And that was in August 21, '02. And then if we take -- fast forward a little bit to a note in your file -- this is DS-00049, also Exhibit 7 to the petition, Dear Dean, 5-10-03. And Miss Johnson is -- do you remember receiving this letter?

A. I do, yes.

Q. And did this come out of the blue, or was there a discussion that you had with her prior to this which prompted this or the team had with her, or do you know one way or the other how this letter got sent to you?

A. Let me look at my billing records from that time if I can; okay?

Q. Sure.

A. I think I would have gotten this letter on the 15th of May, 2003, and I don't know when the Eighth Circuit first ruled on the suppression appeal.

Q. Apparently not yet as of this letter; right?

A. I don't know that for sure.

Q. Or at least Miss Johnson didn't -- wasn't aware of it.

A. Well, I don't know that. Even after the Eighth Circuit issued its initial ruling, there was a subsequent ruling from the Eighth Circuit because they completely overlooked half of the appeal, frankly, and then we had a rehearing and that sort of thing, so I don't know when the first ruling was from the Eighth Circuit. If I knew that, it might relate to that.

THE COURT: It was July 31, 2003, it was filed. And then the rehearing decision was filed December 8, 2003 -- nope. Rehearing -- yeah, September 8, 2003, rehearing and rehearing en banc denied February 10, 2004.

MR. BURT: So the initial ruling is December 8, 2003?

THE COURT: No, I think it was -- as I read it, it was -- says filed -- submitted February 13, 2003; filed July 31, 2003. Rehearing granted October 9, 2003, and rehearing -- and then the opinion on rehearing was filed December 8, 2003.

MR. BURT: Thank you.

THE COURT: Miss Morrissey, did I get that correct?

MS. MORRISSEY: Yes, Your Honor, you did.

THE COURT: Well, it's pretty easy when you're reading off the Westlaw version so -- it's not that I have some great time line or anything.

A. Well, in light of that, that might help a little bit. It's

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 44 of 80

around the time apparently that I would have argued the case in St. Louis, and she may have just been frustrated and at an end to the waiting and the sitting in a cell in the Linn County Jail which, you know, I think she was despondent.

Q. And did you take this letter as soon as you got it and fax it to Mr. Berrigan? This is the next page, correspondence from client. Looks like you sent it --

A. Yeah.

Q. -- on the 15th which is when you received the letter?

A. Correct.

Q. Did you shortly thereafter visit Angie Johnson to discuss this what seems like a fairly significant breakthrough in the case?

A. I'm looking. No, it doesn't appear that I did talk to her.

Q. When is the next time your billing records reflect that you met with Angie Johnson in person after that letter was written on May 10, '03?

A. Well, what -- I'm sorry. What was the date of that last item?

Q. That last item being the note that Angela Johnson wrote to you? May 10, '03.

A. Okay. Some -- something's a little bit off here. I don't know what it is. Maybe it's the Westlaw. But in my billing statement for the appeal, it shows that I argued the case on February the 13th of 2003 to the Eighth Circuit and it was in

St. Paul.

Q. February 13, '03; right?

A. Yeah, not May.

THE COURT: Well, that's the date it says submitted on the original written opinion --

THE WITNESS: Right.

THE COURT: -- of the 338 Fed. Supp. 918. It says submitted February 13, 2003, and usually if there's oral argument that's the submission date.

THE WITNESS: Right.

THE COURT: And then the opinion's filed July 31, 2003.

THE WITNESS: Okay.

A. Sorry. I lost track. After the note that she wrote in May of 2003 --

Q. When did you next see her?

A. I'm sorry.

Q. That's all right.

A. I'm going to say that it -- that when the opinion came down I would have talked to her, and that would have been in -- no later than August the 18th, but I -- yeah, I think that's sounding like that might have been roughly the first time I would have talked to her again after that according to the billing records.

Q. Well, I'm a little unclear when you say no later than the

18th.

A. Well, that's the first entry I can find in a billing record.

Q. August 18?

A. Of 2003, yeah, uh-huh.

Q. Okay. So the first billing entry from May 10, 2003, onward, the first one you have is August 18, 2003; correct?

A. That's what I found, right.

Q. Do you have any phone -- telephone contact with her between May and August where she calls --

A. That was phone.

Q. That was phone, okay.

A. Yeah, and it appears I talked to her about the ruling.

Q. And when is the first in-person visit following receipt of that letter?

A. I don't know how far you want me to go through, but I'm in August 2004. I haven't seen anything where I personally put down on my billing statements that I talked to her on the phone or traveled to Cedar Rapids to meet with her.

Q. Okay. So you're at least a year into the billings beyond that letter; right?

A. Yeah. I think that's -- that's what the billings would tend to indicate, yes.

Q. All right. And do you know why she sent this letter to you as opposed to lead counsel Al Willett?

A. No. I just note that I just actually found on August 13, 2004, conference with client, trip to and from Eldora which I guess she had been moved by then to Eldora and I met with her up there for an hour and a half on August 13, 2004.

Q. So this is about a year -- a little bit more than a year later.

A. Correct.

Q. Now --

A. There's indicators in my billing, just so you're aware, Mr. Burt, of correspondence to me from Al Willett's office of conversations they had with Angela.

Q. Sure.

A. Yeah, in that time period.

Q. I'm not saying they didn't.

A. Yeah.

Q. I'm just trying to focus on your aspect of this at this point.

A. Right. I understand.

Q. She wrote this to you on May 10, '03. You told me I think you argued the case in the circuit on February 13, '03; correct?

A. Yes.

Q. And when you came out of the argument, it didn't go well, did it, I mean, in term -- and by -- I don't mean you didn't do well, you weren't brilliant, but you didn't get the feeling coming out of there that this order was going to hold up, did

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS Document 350 Filed 11/10/11 Page 45 of 80

you?

A. They were -- two out of the three judges being Judge Richard Arnold and Judge David Hansen were also on the decision, the panel decision, in the case U.S. versus Moore. And apparently during oral argument which is recorded, they made comment on a certain federal district court judge from Sioux City's analysis of that opinion in which they apparently did not believe was giving full deference to what they had written in that opinion on what was required to make McNeese a government agent.

And I think they were very much on that issue in oral argument as if that were the be all and end all of everything and as if the U.S. versus Moore case had settled all law for all times on that topic when it was more of a -- frankly, it was a passing reference more than anything to a principle from other circuits that they had quoted in their opinion. But really it wasn't any part of any real analysis in the opinion and -- but they felt that Judge Bennett had overstepped his bounds by sort of saying that they didn't mean what they meant -- what they wrote in their opinion anymore so -- and they made comment on that I believe in the opinion as well.

Q. Well, I mean, you're an appellate specialist of sorts. Sometimes you can go into these arguments and you come out and you say I'm not sure how it's going to come out. Did you have that sort of not really knowing what's going to come out, or did

you come out of the argument saying we're toast?

A. Well, you know, on that issue I thought, you know, they're going to -- they're going to -- they're going to reverse Judge Bennett on that issue.

But just so it's clear, I think it needs to be explained a little bit that the government -- there was two separate case numbers, and there were two separate interlocutory appeals, and I think I explained this to you maybe last night. But in the first case number there was -- the government's interlocutory appeal was limited, and it was limited to seeking to have the Eighth Circuit overturn Judge Bennett only as to statements made before McNeese was given the so-called listening post instructions. And Judge Bennett had suppressed those all the way back to the initial placement of McNeese and Angela next to each other in the Benton County Jail.

The Eighth Circuit took and said that those pre-listening post instruction statements that were attributed to Angela by McNeese were not subject to suppression because he had not been given specific instructions to elicit from Angela Johnson at that time.

The government did not challenge the subsequent stuff, that is, from the listening post forward, the listening post instructions forward. And so all of that evidence that was the fruit of the listening post instructions statements, at least those that postdated that, which would have included the bodies

and everything was still excluded under the -- even under the government's interlocutory appeal on the first case. It was the ruling on the second indictment under 848 that -- that was -- was what got completely -- that's what completely devastated us.

Q. And I'm not sure you answered my question yet which is did you come out of that argument not very optimistic of having Judge Bennett's order withstand scrutiny by the Eighth Circuit?

A. In that opinion, I felt we were probably going to lose that part of it, that is, on the pre-listening post stuff.

The other part of the case, if I remember, it was hardly even discussed, this whole Texas versus Cobb issue, in the arguments. And, frankly, the Eighth Circuit I thought amazingly didn't even address the issue in their original opinion and just issued a ruling overturning only the pre-listening post instruction part. And then the government asked for rehearing because they wanted the Eighth Circuit to advise on that question of whether or not the statements could be used in their entirety, even those post-listening post in the 848 case. And they gladly accommodated the government and distinguished the Texas versus Cobb case on untenable grounds and said it's all coming in.

Q. Was there any discussion with Angela Johnson between the oral argument on February 13, '03, and the rendering of the opinion in July of 2003 about what your predictions were of what the Eighth Circuit was going to do and how that might affect her

plea options if the Eighth Circuit decided adversely to her interests?

A. Well, that was the whole reason that we, you know, undertook the effort to resolve the case in 2002 after the interlocutory appeals were filed because we were making an effort because of the uncertainty of the circuit and, you know, the fact that the circuit is particularly conservative.

Q. Sure. But your 2002 efforts were pre-argument; right? That August meeting was --

A. Yeah.

Q. -- before they had argued it. And my question is really focused on the information which you gleaned from the oral argument and whether anybody went back into Angie Johnson and said, you know, we're in trouble here; this does not look like it's going to hold up, and we need to -- before they come out with the opinion and while there's still some uncertainty, we ought to be getting in there and really pressing forward on these plea negotiations?

A. I don't think that there was a specific discussion like that. I probably gave her a general sense that the arguments -- you know, there could be some issues with the arguments, but I didn't -- I didn't go back to the well on that issue with her, no.

Q. Okay. Now, after you received her letter saying "I want to plead guilty" in May even though the opinion was still pending,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 46 of 80

you did have a written communication with her some months after that which I'll show you now, DS-00052. It's a letter written to Miss Johnson from you enclosing a copy of the government's motion for rehearing and a letter dated August 11 from C.J. Williams regarding plea options and indicating in the letter that you want -- you've made two attempts to call her at the jail and you want her to call you at your earliest -- her earliest convenience; right?

A. Right.

Q. And the letter that you enclosed in that correspondence with Miss Johnson is in the plea binder at RS-13-00899. It's a letter from Mr. Williams dated August 11, 2003; right?

A. Let me just look at it for a second. Right. This is the -- this is the Al Haig letter I call it. I'm in charge now, and my name is C.J. Williams.

Q. Okay. And now he's speaking from a position of power, right, because you've got the Eighth Circuit ruling at this point?

A. Correct.

Q. And he's basically laying down the law here; right?

A. Yeah, differently than history, but he's saying what -- you know, he was emboldened by the ruling, yeah.

Q. But still he -- this is post-ruling, pre-Honken trial, and he is leaving you an option here, is he not?

A. Well, the option was walk in, confess, and we might be able

to make a plea offer.

Q. Uh-huh.

A. Otherwise go to trial. That was different than previous discussions.

Q. All right. And there had been -- this letter actually refers to some prior correspondence, right, that you had written about some ambiguity in Mr. Reinert's prior correspondence?

A. Right.

Q. And let me if I could show you that, again, from the plea binder RS-13-00896 through 898. This is a letter you received on June 10, 2003, from Mr. Reinert; correct?

A. Yeah, I would -- it's dated June 10, that's correct.

Q. Okay. And it references some contact with Mr. Berrigan and with you regarding a desire to explore plea discussions.

A. That's right.

Q. And it references a -- apparently a telephone conversation you had with Mr. Reinert on June 10, 2003.

A. Right.

Q. What do you remember about that conversation?

A. Okay. Yeah. This is the conflict. The concern that I had and I think that Pat Berrigan shared was that to do a proffer without some understanding of if -- of where you'd be if the proffer was successful, in other words, without having agreement essentially on the table or agreement in principle, that would be to basically take your client in there and have them, you

know, confess to the government, provide them a wealth of information that they may not otherwise have and perhaps, you know, impact a whole series of other things about the way the trial could be conducted and what restrictions the lawyers might have on them and, frankly, would -- would have been just a host of problems doing that without some understanding of where we were going to wind up at the end of the day if it was successful.

So what the understanding was and the way I've done it on many cases is, you know, you reach an understanding as to where you're going to be with the agreement before or contemporaneous with doing the proffer and that you try to pre-negotiate that.

And then in order to get that agreement fully entered into and effective, you would -- you'd have to proffer. And then upon satisfactory completion of the proffer, the agreement would be executed and entered into. And that would be kind of the way you'd do it.

So it's a way of overcoming the hurdle that the government frequently attempts to place in the way of getting a case resolved which is this proffer first, deal after. You kind of do it in principle and then do the proffer based upon the understanding among counsel who theoretically are supposed to be acting in good faith, and then you get the agreement entered into after the proffer. And so it kind of gets you over that

hump of the proffer issue by having some understanding of where you're going to wind up at the end because otherwise you're just proffering without anything.

Q. Well, was it your understanding that's the way it worked in the Northern District because your lead counsel's testified that's not the way it worked in the Northern District?

MR. WILLIAMS: Objection. Stating facts not in evidence. Hearsay.

THE COURT: Yeah. I'm going to sustain the objection. He can testify to what he understood.

MR. BURT: Sure.

BY MR. BURT:

Q. What was your under -- had you ever seen a -- in a capital case a plea structure -- a plea proposal structured along the lines you just discussed?

A. Well, this being the only real capital case I ever did other than the prior one -- I remember doing the prior case with Mr. Alden where we negotiated the terms of what his plea agreement would look like and then did his proffer contemporaneous roughly with that agreement being reached in principle, and then it was just a matter of the process of getting it fully approved within the U.S. Attorney's Office is the way I remember that worked.

So I don't -- I guess I don't think that there's a hard and fast rule in the Northern District on needing to

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 47 of 80

proffer absolutely unequivocally first, so I don't -- don't really agree with that. It's always been something you can work around. Like any other issue, you know, if you just get creative enough, you can figure out a way around it.

Q. Were you having in mind that your client had just instructed you to -- that she wanted to plead guilty and she wanted you to get the best deal you could get for her?

A. Well, are you referring to her May letter?

Q. Yeah.

A. Okay. My take on the May letter was that it was not much more than a frustrated client writing saying, "I want out of here. Get me out of here," you know, and that was my take at that point on that letter to be honest with you. I didn't take it as I'll proffer to anything, I'll plead to anything. I know she said she'd implicate the Pope and everything else, but, you know, I didn't take it that way, and I'm pretty confident that somebody would have spoken to her after that. It wasn't me that I can remember, but somebody would have spoken to her about that letter. It wasn't . . .

Q. Well, did you -- you were operating on an assumption here that she didn't really mean what she wrote, and yet you didn't talk to her about it.

MR. WILLIAMS: Argumentative. That's not even a question.

THE COURT: Overruled.

A. The only thing I'll tell you is I don't believe that -- well, my billing records don't show that I talked to her personally about it. That is correct. Did I talk to her about it or not? I don't remember a specific discussion with her about it, but I know that it was a topic that was communicated with her about at that time, roughly around that time. And, you know, I'm suspecting since I wasn't in Cedar Rapids that it was Al or Nancy that would have visited with her.

Q. Well, you I think have told us previously that you thought that Al and Nancy were sending her the wrong messages; right?

A. Well, yeah, and it might be a mistake to have them talk to her about that.

Q. It might be a mistake or it was a mistake, a big mistake?

A. I can't answer that. I'm not trying to be defensive. I just remember getting the letter. And if you get a client that writes you a letter that says I'll implicate the Pope and I want outta here which, first of all, I couldn't have accomplished anyway in short order, it just wasn't -- I don't think the letter was really, you know -- I don't think it was taken with the gravity maybe that -- you know, that maybe it should have been or maybe I took it with the right amount of gravity. I don't know.

I just remember getting it, and I didn't think that the letter was -- you know, I thought it was a client who's stuck in a dang jail and she's frustrated at waiting around for

these rulings from these various courts and she wants out of there and she'll do anything to get of there because she's going nuts locked up in the Linn County Jail.

Q. Well, she didn't not just say she wanted out of there. She wanted into a prison, not out on the streets, not some unrealistic dream but get me the best deal you can and I will cooperate and get me out of here and into a prison. She wasn't asking you to set her free, was she, in this letter?

A. No.

Q. And because you didn't visit her or communicate with her, you really don't know how firm her commitment was at this point in terms of whether she wanted you to act; correct?

MR. WILLIAMS: Leading.

A. Well, I don't know how firm in her own mind she was. That's true.

Q. Okay.

A. I mean, the letter says what it says. I took it lightly. I did pass it along to Pat Berrigan, and that's what I can say about it. I don't know -- I don't have any recollection of talking to her specifically about it, that's true so . . .

Q. And you had one piece of information that maybe the other lawyers didn't that you might have conveyed to her personally which was how this circuit argument had gone; right? You were supposedly the law and motion guy. You were the guy that, in fact, Willett had pumped you up to her, had he not, as somebody

who was -- you know, who had a real expertise in working with the Eighth Circuit?

MR. WILLIAMS: Objection. Leading again, Your Honor.

THE COURT: It is, but you can answer.

A. I appeared in front of the Eighth Circuit a lot of times including before this argument. And I don't remember if I shared much of the argument with her. I don't know that there's any time records of me talking to her about how the argument went. And I don't remember doing that. I don't think I issued a written letter. If I did, you'd have it saying, oh, the arguments went terrible and get ready to get dunked.

In all candor, I didn't really feel that she was going to get completely dunked in the appeal. I thought she was going to lose out on the first part of those statements pre-listening post and that the second issue relating to the Title 21 indictment was -- you know, wasn't something that there was an impression that I got out of the argument.

So I didn't really feel that the argument went well on the one issue on the first indictment, but I didn't really have a strong feeling that it was -- that she was dead in the water if you will.

Q. You thought the argument was stronger on the Title 21 indictment than on the Title 18 indictment?

A. I think that there wasn't a lot of discussion at the circuit on that issue, and I felt that we had a pretty good shot

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 48 of 80

at prevailing at the circuit on the issue of whether or not the same murders charged under two different statutes and the evidence obtained in violation of the Sixth Amendment on the first batch under the one statutory scheme, you know, that the ruling would apply to the second indictment.

Q. In response to this letter of June 10, 2003, or when this letter was written, your idea I think you said was you want to get an agreement in principle before you proffer. Was that the idea?

A. Right.

Q. And what agreement in principle were you having in mind at this point?

A. Well, I think we were still -- you know, we've talked about these variants where you'd have a life, it would be reduced for substantial assistance to a term of years and that type of an agreement. As to what that number was going to be was what I think was still being discussed during that window in there.

Q. Right. So this was still pre-decision.

A. Yeah, the pre-decision period we were term of years if I remember correctly.

Q. And what Mr. Reinert was proposing was I'm not in a position to make any specific offer regarding terms in any plea agreement at this time. However, there are a number of options and issues which need to be considered during the course of examining the potential for a plea. And he then outlines that

the U.S. would require full, complete cooperation; correct?

A. Right, and that was always a -- yeah. That was always going to be part of any meaningful adjustment in a plea agreement to her sentence.

Q. Second, he was indicating to you that the agreement would require an admission of her wrongdoing; right?

A. Right.

Q. Did you read that as there's not going to be any Alford pleas?

A. Well, yeah. She couldn't have done an Alford plea and made this work out to where she could have gotten her sentence down to a term of years. It just wouldn't have -- wouldn't have worked.

Q. And in terms of where he was at this point, he then says to you, "Although your client has expressed a desire for a short term of imprisonment in the 20-year range, I believe your client needs to fully assess her conduct when compared to the conduct of others and sentences otherwise imposed in the federal system even for routine drug crimes. When a routine drug trafficker who has not been involved in the deaths of any individuals can receive sentences of 20 years, 30 years, and life imprisonment, is it justified or reasonable for a defendant involved in the murders of five individuals to expect a much lesser sentence?"

Was there any ambiguity in that sentence, or was he just blustering at this point in your opinion?

A. Well, it was different than our verbal conversation which is why I wrote the follow-up letter some time later saying, you know, you're all over the map in your -- in your statements here, what the heck are you talking about basically. That's different than what we talked about so . . .

Q. He in the conclusion here says, "I am open to engaging in discussions to work toward a resolution in the case," and then he indicates the first step is going to be an interview with your client to determine the nature and extent of her information and her ability and willingness to cooperate; correct?

A. Right, which is a little different than what he said earlier in the same letter which is about an agreement in principle and this and that, you know.

Q. Then he's saying once that step's completed we'll then be able to place her information in context with the information we otherwise have available against Honken and attempt to perform an evaluation; right?

A. Right.

Q. Now, your response to that letter is RS-11-00788. You wrote right back to him, didn't you?

A. Yep.

Q. And could you read that for us.

A. The ambiguousness and open endedness of your discussion is disconcerting. You might recall from the meeting Pat Berrigan

and I had with you and Tom Miller in my office last fall that either you or Tom said prior to the discovery of the remains that the government was contemplating making an offer of 10 to 15 years. In your letter you are all over the place.

As I understand it, your letter pre-conditions any plea discussions about our client first completing a full proffer. Our position is that there will be no proffer without a written proposal on the table. You should assume that the proffer would be satisfactory and that our client would fully cooperate. These would, of course, be conditions of the plea agreement as would attorney general approval. Doing a proffer based upon vague discussions among counsel would not give us any comfort in light of past experience. I really think the only way this could work is if the proffer is done after the parties have gotten to a near final draft of a plea agreement that would be acceptable to both parties assuming the proffer goes as anticipated.

I really don't think the proposed course of action outlined in your June 10 letter will further discussions. If it represents the government's position, then we're likely at an end of discussions.

Q. So at this point you're kind of drawing a line in the sand, right, which is if you're going to insist on a proffer, we're at the end of discussions?

A. If they're going to insist on an open-ended proffer with no

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 49 of 80

understanding, that's what I was intending to communicate to them because I felt strongly that we needed to have something that we could take to Angela and say this is where you're probably going to wind up at the end of the day. And if we hadn't gotten that, we wouldn't be able to get her on board with giving a good proffer. We needed that for ourselves and for her because she wasn't going to give an open-ended proffer without any understanding of where she was going to wind up. That was my impression of the limited dealings I had with her. And we needed to have something to incentivize her to give a meaningful proffer.

Q. Well, at this point we didn't have a ruling, right, from the Eighth Circuit? This is pre-ruling.

A. Correct.

Q. And that letter, was that written as a team, or was this something you did on your own?

A. No, we would have -- can you look at the bottom of the letter?

Q. Yeah.

A. There might be copy to others. Okay. It doesn't show that it's copied, but it undoubtedly would have been copied to Berrigan. Let me just check my billing statement. I don't show anything on here and, frankly, don't even show any time being billed for this letter being drafted. So I do show the June 10 phone conference with the U.S. attorney and Pat Berrigan, but I

don't show anything beyond that.

Q. Do you show any sort of team meeting or team telephone discussion concerning writing this letter or any telephone conversations with Miss Johnson?

A. It's not on here, but I know it happened because Pat and I both were upset that he wrote that letter which was very much different than our conversation, Pat Berrigan, that is. I remember this particular exchange.

Q. Because it seemed to you he was doing something that he hadn't done before?

A. Well, he's very slippery fella, this Pat Reinert. You know, you'd have a conversation with him and using the same native language, English, you'd have a conversation using the same words, and you'd think you had an understanding whether it be about discovery or any other issue.

And then he'd go back to his office and either try to come up with what he construed as the agreement that you had and put it together in writing. Or he'd write a confirmatory letter, and it wouldn't be the discussion that we were participants in or that I was, at least according to my understanding of the English language.

So he was very -- one of the reasons, you know, that we had a problem was this very situation with Mr. Reinert not fulfilling on the verbal representations and commitments that he would make and then backing out of them inexplicably and denied

ever having made them. He's very dis -- very disingenuous and a very dishonest attorney as far as I was concerned, and I didn't trust him any farther than I could throw him.

But when he's telling you that he's willing to work out a deal, I took that as real but then -- and do it for a term of years, I took that as real. But then he turns around and says she has to fully confess first and give me a full proffer before I'll tell you what your deal is, you know, that's pretty hard for me as a lawyer to tell the client, oh, you need to trust this Pat Reinert guy, the guy who was over there sending his informant in to pump you for information illegally. You know, I just -- I felt like it was a bad mix.

Q. And did you -- was that a institutional suspicion on your part? In other words, did that suspiciousness extend beyond Mr. Reinert to the entire office you were dealing with, or was it specific to him?

A. At that time he was the lead guy on the case, so it was directed at him. The office up here in the Northern District has had a checkered past in my experience of behaviors and conduct and fulfillment of promises and obligations. And they've historically been difficult to trust and rely on and count on with some very notable exceptions, but it was -- you know, it's been a historical problem with the Northern District U.S. Attorney's Office, and they've got some very unique policies and practices and things that make it very difficult

for lawyers to actually practice law up here and take people at their word.

Q. Well, they -- eventually Mr. Murphy I think came up with a solution to address your suspiciousness, did he not, in the way of an offer to proffer to a taint team?

A. I think that was pretty late in the game, but yeah, I think that came up late probably just before the Honken trial.

Q. Right, still prior to the Honken trial. Did that address the concern you had that maybe the office was not going to -- not going to abide by its agreements and its statements to you that you could proffer to a independent taint team, AUSAs from another district, be fully protected, and at the same time move this forward at a point in time when it mattered, that is, before the Honken trial?

MR. WILLIAMS: I would -- excuse me. Objection. I don't know that that's completely accurate. I don't know it's terribly relevant, but I don't think there was an idea of a proffer to the U.S. attorney from a different district as I recall. I think it was just a proffer to a taint team, so I think it just slightly misstates what the letters --

THE COURT: I thought the taint team was from Missouri.

MR. BURT: They were from Missouri was my understanding but . . .

MR. WILLIAMS: Your Honor, we had a taint team from

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 350 Filed 11/10/11 Page 50 of 80

Missouri in connection --

THE COURT: But not for purposes of this --

MR. WILLIAMS: Right.

THE COURT: Yeah.

MR. WILLIAMS: The taint team from Missouri wasn't established until much later, and it was in relation to mental health issue. I think what Mr. Murphy was suggesting is we'll get a taint team, and it could be created from the office. Again, I don't know that that's terribly important.

THE COURT: Yeah, and I wouldn't have been privy to any of those discussions. I was privy -- I had knowledge of a taint team from Missouri, and now that you remind me it was on the mental health issues. And I had no knowledge that any of these plea discussions were going on nor should I have nor did I know about any proposal with regard to a taint team. So I'll just take the answer subject to the objection. You might want to rephrase the question to help Mr. Stowers out.

And you know what? I'm going to give -- we're going to take a 20-minute recess until 3:05 and then come back. Thank you.

(Recess at 2:43 p.m.)

THE COURT: Thank you. Please be seated.

Mr. Burt?

BY MR. BURT:

Q. Mr. Stowers, over the break we found the letter to

Mr. Murphy that was referenced; correct?

A. Yes.

Q. And the letter is RS-13-00906 and 907, a letter Mr. Murphy wrote to Mr. Willett on August 12, 2004; correct?

A. Right.

Q. And this is a letter memorializing a phone conference that took place between not only your team but the Honken team on the morning of the 12th; correct?

A. Right.

Q. And they are -- Mr. Murphy's documenting that the Johnson team and the Honken team had submitted a joint proposal under which Mr. Honken would receive a life sentence and you would be -- Miss Johnson would be sentenced to 20 years; correct?

A. Yes.

Q. Now, this was the same 20-year offer that had been made earlier in the process; right? Nothing had changed in terms of the number you were looking for.

A. Yeah, I think that's -- the other dates were in -- were they 2001 and 2 where that number was floated?

Q. Right.

A. Right.

Q. So the number hadn't changed, but the circumstances had changed, right, because now we are post-decision by the Eighth Circuit?

A. Correct.

Q. And based on the admissibility of the evidence which had previously been suppressed, did you personally think you had any sort of a chance of walking Miss Johnson out the door given the evidence against her including the evidence which the Eighth Circuit said could be used?

MR. WILLIAMS: Your Honor, objection. Argumentative. He used the term walking her out the door. That's not what the terms of the agreement is.

THE COURT: Okay. Can you be more -- I think I understand what that means, but it's ambiguous.

MR. BURT: Sure, I'll be glad --

THE COURT: And so could you be more specific?

BY MR. BURT:

Q. Did you have -- and I'm not referring to the plea process. I'm referring to your assessment of the trial worthiness of the case.

A. Right. No, I understood what you were saying. No, no, she wasn't anticipated to be in a position to get acquitted, no. That wasn't going to happen in my estimation. You know, it wasn't -- it wasn't really truly a case where if you had any way to avoid it that you'd be going to trial at that point for sure just based on the evidence, so it wasn't a trial case. It was a plea case if you could plead it, you know.

Q. Yeah. And you knew in terms of what her exposure was was that if she went to trial at best, at best, she was looking at

life.

A. If she went to trial she was going to get life. I think that was pretty clear.

Q. At best, and at worst it was going to be a death sentence.

A. Correct.

Q. Now, this letter memorializing this plea proposal is indicating to you by Mr. Miller in the first paragraph, "As we discussed, I anticipate this proposal will be formally rejected by the Department of Justice later today or tomorrow." Had there been a discussion in the meeting in which he had said, look, I know you're floating this 20 years and life, but it's not going to work in Washington?

A. Well, I think it was the total package. In other words, there was two -- it was a package deal if you will. Both defendants life and 20 years would be the package. And at that point they were anticipating it wouldn't go down.

Now, was that specifically discussed that it was because of the 20-year portion aspect of the deal? I -- I don't think it was specifically said that that was going to be the hang-up.

Q. Do you remember Mr. Murphy at the meeting saying DOJ wants life, slash, life?

A. I don't remember that, no, not specifically.

Q. All right. Now, in the second paragraph he says although he anticipates a proposal's going to be rejected, says in an

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 51 of 80

**1227**

effort to determine whether we may be able to agree to another resolution of this case, we spoke by phone. As we have discussed, you have stated in your previous correspondence that your client would be willing to cooperate with the government in the prosecution of Honken including testifying. However, we have had concerns about your client submitting to a formal proffer to our office extending a form -- extending a f -- prior to our office extending a formal Department of Justice-approved plea proposal to your client. And that hearkens back to your letter of June of '03 saying if you're going to insist on a proffer, our discussions are at an end; right?

A. Yeah.

Q. And the other thing you had expressed in your letter of June was that not only were you uncomfortable with a proffer but you didn't like the open-ended nature of it. You wanted a agreement in principle to a sentence instead of an open-ended type of agreement where they would approve or not approve based on the proffer.

A. Right.

Q. Okay. Now, on page 2 of the letter Mr. Murphy says, "I discussed with you the possibility of having your client submit to a full proffer to a taint team. Under such an agreement, your client would submit information which could not be used against her. She would also have to agree to a polygraph, the results of which could not be used against her. This proffer

**1228**

and polygraph would be done pursuant to a second agreement."

Then he says, "If we were satisfied your client had provided complete and truthful information, we would be willing to submit for the department's approval a proposed plea agreement for your client's consideration. The basic terms of the agreement would require your client's plea to guilty to a group of charges which would carry a mandatory life sentence."

Now, putting aside for the moment whether a life sentence was the type of number you were looking for, did that part of this letter satisfy the concern about the open-ended nature of the agreement? Was that what you were looking for I guess is what I'm asking in terms of a --

A. Oh, a taint team, another taint team?

Q. No, not -- not -- we'll talk about the taint team, but I'm talking about the part of the letter that says if we like what your client is saying in the proffer we will recommend to Justice a life sentence.

A. Well, that type of concept of what he's saying in there is what I was trying to get at with Reinert.

Q. Okay.

A. Which is that, you know, proffer, but what are we going to get for it. Here he's saying proffer, we're going to remove death penalty if proffer is successful. So that gives you some certainty as to where you're going to wind up, or at least it gives you something closer to some degree of better certainty

**1229**

than you would have had under proffer and then we'll see, which was sort of the Reinert version in the one letter that we looked at a little bit ago.

Q. Yeah. And so that was -- and again, I'm not talking about whether you liked the number, but in terms of how this was structured, this was what you were looking for.

A. Right, and that's, frankly, what Reinert had seemed to have agreed to verbally and then wrote this letter which said multiple different things.

Q. And in terms of your suspiciousness of Reinert in particular and perhaps even the office in general, Mr. Murphy was suggesting to you the possibility of having your client submit a full proffer to a taint team. He didn't say whether it was going to be in district or out of district, but it sounds like that was at least negotiable at that point; right?

A. Correct.

Q. Would that have satisfied the concerns you raised about your suspiciousness of Reinert and the Northern District office?

A. It would have -- oh, I'm sorry. It would have -- it would have gone a long way towards getting us closer to a situation where the proffer could be -- the proffer could be done in a more protective manner than what was previously sort of suggested by Reinert. Sort of the traditional open-ended proffer to one of the case agents which is typically how a proffer would be done would be to agents involved in the

**1230**

investigation. This arrangement would have been -- would have been to people that were strangers to the case as I understood it and only disclosed to, you know, a select group.

Q. So it seemed that in terms of your concerns at this point in the process you were almost there but not quite because you still had Miss Johnson to deal with; right?

A. That's true.

Q. And would seem that given the structure of this proposal what you would have had to have done at this point was to convince Miss Johnson to accept a life sentence and to proffer to the government in a way that was going to be credible and would perhaps get by a lie detector test.

A. And have her be willing to testify in the trial in an effort to put the father of her and his child to death, to death.

Q. Right. Something she had expressed in June -- May of '03 that she was prepared to do; right?

A. She did say she was prepared to do it, but it was an ongoing dilemma in her mind from discussions with her.

Q. Well, how do you know that an ongoing dilemma if -- I think you said there was a year period of time, more than a year, where you didn't talk to her?

A. Well, this would be from other attorneys on the case.

Q. And would that be Mr. Willett or who else?

A. I think it would have been mostly from Pat Berrigan.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 52 of 80

Q.   So Pat Berrigan told you that it was an ongoing concern with her to cooperate or not to cooperate?

A.   **The issue was if she had -- as I understood it -- and, you know, probably best to ask Pat, but as I understood the concern, it was she would have to come in, testify against Dustin Honken in open court, give the version of the offense completely in a case where the government was still going to seek the death penalty, and that was something that she had expressed that she was willing to do but very reluctant to do would be what I'd say.  And I think there was a lot of internal tension within Angela about that issue, and it was an issue that came up more than -- more than once with her.**

Q.   And -- but looking at, you know, from the perspective of when you got to know her in trial --

A.   **Right.**

Q.   -- do you think it was a realistic thing that could have gotten done if somebody had worked with her properly?

MR. WILLIAMS:  Objection, Your Honor.  That's not the test is looking back with hindsight.  It's what his thoughts were at the time.

THE COURT:  Well, you're correct, but I'll allow the answer.

Q.   And I was careful to limit it to the information which you got at the time of trial.  I'm not talking about hindsight now.  I'm talking about the first moment when you got to know Miss

Johnson and work with her on a personal basis, did you think after going through that process that, you know, had I started this process earlier you really could have brought this case to --

THE COURT:  Mr. Burt, why isn't that just the rankest of speculation?

MR. BURT:  Because it's based on his development of a relationship.

THE COURT:  Yeah, but you're trying to predict something that didn't happen, and it's -- I mean, if it's not speculation, what is it?

MR. BURT:  Well, it's addressing the reasonable probability language of Strickland is what it is.  I mean, everything to a certain extent is a prediction.  We have to predict whether it's re -- under the test whether it's reasonably probable I think is the language that --

THE COURT:  Well, that's what I ultimately have to decide is a mixed question of fact and law, but it's rank speculation it seems to me for him to give his opinion, but I'm going to allow it.  I'm going to allow it, but I was just curious why you thought it was anything other than speculation.

MR. BURT:  I think the answer is because it is based on an actual interaction with the client at a point in time close in time to when these events are taking place.  In other words, this isn't a mental health expert or a lawyer coming in

years later and saying, well, I met with Angie Johnson in 2010 and I worked with her for a couple of months and I now can tell you she would have taken the plea.  That I think enters the realm of speculation.  But we're dealing here with her -- shortly after this letter is written.  In other words, his contact with her in trial, personal contact, begins in April of '05.  This letter is written in August of '04 and --

THE COURT:  Let -- okay.

MR. BURT:  That's why it's not rank speculation.  There may be a speculative element to it, but it's not just making it up as he's going along.  There is some foundation for it.

THE COURT:  Some foundation for the speculation.

MR. BURT:  No, some foundation for a factually based opinion as to what could have happened had we pursued certain relationships here before it was too late.

MR. WILLIAMS:  And, Your Honor, I'll just have an open objection to this.  I mean, we're in 2011 predicting based on hindsight what he thought he -- might have been viable back in 2005 based on his prior conversation -- I'm sorry, in 2004 based on what he then knew in 2005 but --

THE COURT:  Yeah, I would think if you opened up the dictionary this would be a relatively decent example of what speculation is, but I'm sure there are -- I agree with you there are ranker speculizations, if that's even a word, than this one.

But I said I'd allow it, and I'm going to allow it, and I'll take his opinion, and you're doing your job by asking it.

MR. BURT:  For whatever it's worth.

THE COURT:  Right.

MR. BURT:  Sure.

A.   **Okay.  The question -- okay.  I understand what the question is.  I guess I'll answer it this way.**

**You know, the only thing I could say, I worked with a lot of clients.  I mean, I -- and difficult, difficult clients over the years.  And one of the things that I've always prided myself in doing is representing the difficult clients.  I -- over the years I remember Judge Wolle when he was active in Des Moines, he'd appoint me when I was sort of the last attorney he was going to appoint for a defendant who'd gone through three or four attorneys.  And then he'd say, "I'm going to call Stowers up and dump this person on him.  If nobody can deal with this client -- if he can't deal with this client, nobody can."**

**And so, you know, the reality is is that the whole -- our practice in law is exactly that.  You've gotta develop the rapport to start with with the client on a personal and professional level, and you have to build the trust with the client, and you have to develop that relationship from the very beginning in establishing credibility and controlling their expectations and all of that.**

**And, you know, if -- if -- I -- maybe I can't say**

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 53 of 80

this, but I really do feel that if I had been involved in the case at the very beginning I would have identified precisely what the government's goal was here which is to flip her and have her testify against Honken, and I would have very, very quickly moved towards that and tried to cash in on her information with the government and see what that was worth to them. Apparently at the time 10 to 15 years.

And I remember at the time of these events and hearing that from the government prosecutors all the way back in 2001 that they were looking at 10 to 15 years and knowing that Al had told them basically to go pound sand and that he was going to walk her out of jail and return her to her children, it just made me sick, and it's bothered me, you know, for ten years now to think about that because it just seems to me to be a -- very, very reckless and bad and irresponsible advice to have given her at the time, and I think it encouraged her to turn elsewhere for help. And she turned to McNeese.

THE COURT: Well, Mr. Stowers -- I'm sorry. I had my microphone off. Well, why didn't you do something about it when you got into the case when you were first appointed and sized it up and after you had a suppression ruling in your favor that might have given you some leverage and then there was some period of time before it got reversed by the circuit? Why didn't you jump in and say, "Gee, we're going down the wrong path. I'm going to develop a relationship with Angela and see

if we can still get her to plead"? I mean, I don't hear you saying you did anything.

THE WITNESS: I made efforts starting in 2001.

THE COURT: Well, I thought you said you didn't get to know her until trial.

THE WITNESS: That part of it is true. The efforts that I was making -- the problem was is the role issue. I had this sort of limited role at the beginning.

THE COURT: Well, now wait a minute. The appointment didn't say you were appointed to be a research and writing lawyer. You're counsel of record. And I realize that you apparently feel you were cast in a role. But you're an independent lawyer. You can't -- you can take charge and change the direction of how the case is going if you wanted to.

THE WITNESS: Well, I think that was one of the problems with having three lawyers working together that had never worked together before and not having a clear delineation of, frankly, who was officially in charge, and I think it was sort of a systemic problem.

THE COURT: That sounds like a rationalization to me.

THE WITNESS: No, it was a problem, Judge.

THE COURT: No, I don't doubt that it was a problem. But you could have -- couldn't you have taken affirmative steps to do something about it?

THE WITNESS: It would have been difficult with me

being in Des Moines and her being in Cedar Rapids two hours away, and I would have had to be up there to see her very, very frequently.

THE COURT: Seems to me you were getting paid to do that.

THE WITNESS: Well --

THE COURT: Why did you take the appointment if you weren't willing to spend the time with the client to develop a rapport?

THE WITNESS: It was made clear to me early on that I was brought into the case to deal with some of these legal issues particularly dealing with this Massiah issue which was very hot at the time that I got into the case as you know. And then as things progressed, I morphed into additional roles. But it was a -- it was clear from the very beginning that Al was the lead counsel and that's what he said he was, that's what everybody understood he was. That's what he -- that was his role to control the conduct of the defense, and I was there to assist as a secondary lawyer on it. I was not the primary lead counsel, and I was never told that's what I was going to be or anything else.

And we had gotten a number of indicators, you know, over the time period of the representation that we weren't to be duplicating efforts and that sort of thing. And so we had to do some division which reasonably the Court expected us to do, and

I'm not complaining about that.

THE COURT: That was the quid pro quo for the third lawyer, wasn't it, that I expected some division of labor?

THE WITNESS: Yeah, I think that was important to you to know that you weren't going to be just multiplying the bill again by 50 percent or whatever it would be if you added a third lawyer and -- on to the case, and it was -- it was a point where various times, you know, we were aware of that and I was consciously aware of it that you didn't want duplication, which is understandable, of effort and overlapping of things.

THE COURT: Yeah, I understand all that. But your primary obligation was to be a zealous advocate for your client. It wasn't to please me. It wasn't to please your lead counsel.

And with all due respect, it's awful easy to sit there today, you know, eight, nine years after the fact and be an armchair quarterback. But you're not a shy, retiring individual. You raise cutting-edge legal issues, and you're aggressive. And if it was as bad as you claim it is in hindsight, either you didn't realize that or you didn't fulfill your zealous obligation to represent your client or there's some other explanation.

But I don't really understand -- I don't -- personally I don't buy the explanation I was just the research and writing lawyer even though that was a role that I had envisioned for you and you were probably cast in. You understood as well as

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 54 of 80

anybody that you had a zealous obligation to Angela Johnson. If the course was going the wrong direction, it didn't make any difference whether you were the third or fourth lawyer appointed in the case, you had an obligation to right the course, particularly when something like life or death is at stake. Am I missing something there?

THE WITNESS: If I could have --

THE COURT: Absolutely.

THE WITNESS: Yeah, if I could have.

THE COURT: If you could have. Well, I just thought you just gave the opinion you could have. But I wondered why you didn't do it back then if you thought you could have.

THE WITNESS: No, because by the time I got involved in the case, the opportunity to cash in as I call it on the information she had which was the location of five people was gone. I got in in '01. Those --

THE COURT: Yeah, that was gone, but you still had some leverage.

THE WITNESS: Well, we tried to play it as much as we could, and that's what we were trying to do by seeking 20 years, and it didn't work out. And we got stopped, you know. It didn't go.

THE COURT: Well, you know, it's not that often I agree with the government, but their characterization of 20 years as -- I don't remember the word, something like

ludicrous -- is pretty accurate at the point you got in the case at least. You couldn't have expected a 20-year plea. I mean, Reinert's right. You know, three Thanksgivings ago I think I gave out three life sentences in that week on drug cases. I mean, that's pretty standard fare in the Northern District, so to expect 20 years on a case like this is . . .

THE WITNESS: Yeah, and that may be. When -- in the conversations that we were having with Reinert, that wasn't the impression we got, and then he writes a letter that says it's ludicrous. So, you know, it was -- you know, I mean, you gotta remember when you start this case off she's indicted with 5 counts of murder and they're saying they're willing to do 10 to 15 years on 5 counts of murder so -- and that was before the bodies were found understandably, but she was still indicted with 5 counts of murder, and they were talking about --

THE COURT: And they also never told you that until after the fact, and it could have just been puffery or rationalization or could be a whole lot of things. But as I understand the facts, that was never told to defense counsel until after the fact. They said, well, we might have given her 10 to 15 years, but there was never, ever an offer of -- or any effort by the government to try and convey an offer to that at the time they claim they would have taken it. I mean, it could just be pure puffery after the fact or a way to try and rationalize why they want 20 years or more. I mean, there's no

solid evidence that I've seen yet that that was an offer that was ever conveyed to the defense at the time or that had the defense made an inquiry that actually would have been offered. That's I think pretty speculative.

THE WITNESS: I just know what I was told, you know, that discussions were shunned or pushed off by Al and -- with a statement that, you know, we're going to go to trial basically, and there was no effort made in that early phase to resolve it in any other way.

THE COURT: Well, did you ever make an effort to approach Berrigan and try and gang up on Al in saying this whole approach is, you know, going to lead to disaster, how ever you want to phrase it, and try and change Willett's mind, or did you ever go to Willett and try and change his mind about that?

THE WITNESS: It was an evolving process over many years. As you know, this case had a lot of arms to it.

THE COURT: Yes.

THE WITNESS: And it evolved to that as we approached, say, the final year or so of the case prior to trial. And so during that time period it did start to morph into the situation where it was increasingly apparent that we needed to change captains.

But I was -- you know, I understand your view, but the only person that was going to be able to do it within the dynamic of the three lawyers was Pat Berrigan. And he didn't

step up and do that until during the trial, and then it happened. And just factually that's what happened.

Should it have gone that way? I can't, you know, defend it. Maybe I should have done something more. Maybe I should have raised some issue, but as these things happened, there were just corrosive events that over time they occurred, and then eventually they manifested themselves into a bad situation that was pretty irreparable.

THE COURT: Well, it's always easier to analyze it in hindsight.

THE WITNESS: Well, yeah, yeah. And, you know, when you look back, you see things. And, you know, at the time these things were happening, I was saying things to Pat at different times like, Pat, you don't know what you're dealing with, you gotta get involved, you know, and things like that. And he -- he didn't until late, and then, you know, it was maybe too late.

THE COURT: Okay. Mr. Burt?

BY MR. BURT:

Q.   You know, one -- is it true one general comment you made to Mr. Williams and I when we were speaking to you and were asking you about persuading Miss Johnson was that a good lawyer can persuade a client to do pretty much anything?

A.   I believe that's true.

Q.   But you gotta put the work into it to make that happen; right?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 350    Filed 11/10/11    Page 55 of 80

A. Yeah.

Q. When this meeting happened with Mr. Miller that's referenced in that August 12 letter, you actually took a note of that meeting which I'll show to you, DS-57, and it says yesterday had -- yesterday had not heard from Ron Murphy, hadn't been reviewed at DOJ, less than life for Angie, virtual life was Miller's view, release at age 69. What does that refer to? Was there some discussion about virtual life?

A. In reviewing my billing statements during this time period, there was -- in a few cases I found it helpful to look at mortality tables. And I see in my billing statements that I did some research during this general summertime period on mortality tables as part of a way to present a less-than-life proposal. And Tom Miller was -- was acceptable with that.

And age 69 was a figure that was discussed. In other words, you'd calculate out the sentence from 2004, whatever Angela's age was at that time -- I'm going to say it was 41 -- so she would have received a sentence which after you credit all the good times and everything she'd be coming in at 69. So she would have served another 28 years roughly which, you know, you take whatever that would work out to, 33 years or something, as an imposed sentence and then with good-time credits and everything else she'd be out at 69 which was not something that seemed out of the reach based on the phone conference that we had, although we wanted to float the 20 years up to DOJ. And I

think Pat was pretty insistent on that, getting that number floated up to DOJ, which was, you know, quite a bit lower than release at age 69.

Q. Now, after Mr. Murphy sent you that letter saying that you could use a proffer procedure and we will give you a number in principle, did you approach Miss Johnson -- I'm going to show you DS-74 and 75, and this is a cover letter. Enclosed please find a copy of the statement signed by Angela Johnson dated August 18, 2004. That's DS_1-00074.

A. Uh-huh.

Q. And 75 is a handwritten note which says, "Dustin, I want you to agree to testify truthfully if that is what it takes to resolve your case." Can you tell the Court the context of this letter and how it got sent to Mr. Berrigan or why it got sent to Mr. Berrigan?

A. Can you give me the date that I forwarded this to him again?

Q. You forwarded it to him on the 19th, so you obtained it on the 18th or she wrote it on the 18th, and you sent it to Mr. Berrigan on the 19th.

A. Oh, yeah. Yeah. My billing records help a little bit on this. August 13 I made a trip up to Eldora where Angela was being housed at that time. I think it's the Hardin County Jail.

Q. Uh-huh.

A. Purpose of that visit was to discuss with her some plea

ideas that were being floated and sponsored largely by Honken's group of lawyers.

And one of the considerations for Honken was that he wanted to know whether or not his providing a proffer or testimony would be something that would be okay with Angela. Don't know why that was, but it seemed important to him. And he was unwilling to do a proffer or agree to testify in the absence of something personally signed by Angela Johnson.

So I actually went up there on the 13th, and I acquired this statement after conferring with Honken's counsel. Then on the 16th I went up to -- of August, 2004, I went up to Sioux City where Honken was having his final pretrial I believe and met with him and his two -- two or all three of his attorneys, maybe all three of them, in the U.S. marshal's holding area down the hallway here from the courtroom and presented them with this signed document. I believe I showed it to them but not give them a copy to keep so that Dustin could see that this was Angela Johnson's wish.

And that was the reason for that was to facilitate the effort to kind of try to jointly resolve the case or -- or have him separately resolve it and perhaps give some information that might be helpful to Angela.

Q. Well, you explained to her this was in the context of an attempt to jointly resolve the case that would involve both her and Miss Johnson (sic) pleading guilty under this proposal that

you had in mind.

A. I'd have to go back to the earlier letters. This was all happening like within a very few days in that week, and there was the 20 years plus life put up to the main Justice. Then we were told that was a no-go.

Q. Right. August 12 Miller's telling you I anticipate this proposal of life and 20 is going to be formally rejected within the day or tomorrow -- today or tomorrow.

MR. WILLIAMS: It's actually from Murphy.

THE COURT: I think it's Murphy, not Miller.

MR. BURT: I'm sorry.

THE COURT: That's okay.

MR. BURT: Thank you.

A. Yeah. And -- let me just see. It was either rejected on the 12th or the 13th, and at that point, you know, her agreement was a no-go. He still was going to shoot for a separate life deal which would have required him to proffer first to a taint team. And I think in doing that at that point I needed to have that handwritten statement that you just had up on the screen. Yeah, there it is. And I see it's dated 8-18-04, but it was actually signed by her on the 13th. I don't know who put that date on there on the upper right-hand corner, but it was signed on the 13th in the Hardin County Jail.

THE COURT: Mr. Stowers, what does it say above the date? Can you make that out?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 56 of 80

MR. BURT: I think it says client communication.

THE WITNESS: Yeah. It looks like something's cut off there.

THE COURT: I bet it says attorney-client communication, but that's just a guess, that e-y there.

MR. BURT: Yeah, looks like that way.

THE COURT: It's a guess. It's speculation.

MR. BURT: It's informed speculation --

THE COURT: Yes.

MR. BURT: -- because there's e-y.

THE COURT: Yeah, and it follows client infor -- yeah. Informed speculation.

MR. WILLIAMS: I'll stipulate that it's not rank speculation.

THE COURT: No, we can agree on that.

A. Yeah, that could have been something -- I don't know when it was sent to Pat Berrigan's office.

Q. Uh-huh.

A. But there's a cover letter that this went with if you --

Q. Right.

A. Was it sent on the 18th?

Q. It was sent on the 19th which is this letter. Dear Pat, enclosed please find a copy of the statement signed by Angela dated August 13.

A. Okay.

Q. So at this point Miss Johnson is cooperating in your plea strategy, right, whatever that might have been? She is providing information you needed to further your plea goals here.

A. Yeah. I think I have the chronology correct on that. I'm just looking at my billing statement. I'm sorry, Mr. Burt. But on the 18th I have a billing thing that says drafted statement for client to sign, so -- and then I had a discussion with the Honken attorneys regarding resolution as well as death penalty resource counsel Skip Gant, Pat Berrigan, and Al Willett as well as a conference with the client. So it may be that it was not -- but I know that I had the thing with me and I showed it to Honken in the bullpen down the hallway. I thought it was on the earlier date that I mentioned, though.

Q. Now, at this point we're very close in time to Mr. Honken's trial; right?

A. That's true.

Q. And the case unfortunately did not get resolved prior to the start of Miss Johnson's trial -- or Mr. Honken's trial; correct?

A. That's correct.

Q. Now, did you attend some of the Honken trial?

A. I think I attended maybe a few days. My billing statements are going to reflect that.

Q. And did you think what was going to be developed in the

Honken trial was going to be of significance in your trial?

A. Oh, yeah, there'd be common witnesses, common evidence. The transcript, you know, would have included, you know, prior witness statements that would be important to be able to have for our trial.

Q. Did you help draft a motion which requested that the Court prepare for your team the Honken trial transcript on the theory that it was necessary for your preparation of Miss Johnson's case?

A. I know -- I know we asked for that and we got authority to get it. The Court approved it, and it was transcribed, and we had the transcript of the trial.

Q. And do you recall reading that transcript at some point?

A. Yeah.

Q. Do you recall when you read the transcript that there were statements by Mr. Williams which placed Mr. Honken as the principal and the primary mover in these two homicides -- well, these five homicides?

A. Correct.

Q. Two incidents, five homicides.

A. Yes.

Q. And did you at some point become aware that they switched theories on you in the Johnson case, that is, that they took the exact opposite position as to who the dominant party was?

MR. WILLIAMS: Objection. Leading and argumentative.

THE COURT: Overruled.

A. Well, Mr. Burt, I think that what actually happened was we had filed a motion to prevent them from doing that, and then I believe be -- shortly before trial or something. I think the Court denied that, and then I think there was -- during jury selection or just after it or right at the end of it the government was allowed to amend the indictment by removing the allegation that she was the principal and leaving the case charged as only her being the aider and abettor.

Then we -- I think we reurged the Court to preclude the government from arguing or offering any evidence or suggestion that she was anything other than the aider and abettor. I believe that was denied as well.

Then the government during the trial offered some testimony, and then there was argument I think by Mr. Miller that suggested that maybe she really wasn't just the aider and abettor and that she was more the principal. That included then ultimately in the penalty phase I think Honken's sister who testified that -- ambiguously somewhat that her information from her brother was that Angela was sort of forcing him to do whatever it was that he did in terms of these activities and that she was far more involved in that. So I think that was kind of the overall sequence of what happened there on the role issue.

Now, is that a change in the position of the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 57 of 80

government? I thought that they were making strategic maneuvers to deal with problems that they encountered during jury selection initially because during jury selection there was a good number of jurors that said that they would not consider anything other than the death penalty for somebody who was the principal in killing five people including two kids. And we were successful in getting almost -- I think all those folks removed on disqualification.

But then the government amended the indictment to avoid that issue by claiming she was only the aider and abettor. Then they put on evidence that she might have been the principal and actually made some suggestions that that's what she probably was.

So I -- you know, I thought it was problematical.

Q. So your memory is that you made a motion in limine to preclude the government from arguing inconsistent theories.

A. Yeah, that was --

Q. And the Court denied that motion?

A. Right. I think initially the Court didn't -- the rulings are going to reflect what -- but I think that the way the Court looked at it was that the Court didn't really see it as inconsistent theories the way some of the inconsistent theory cases recognized inconsistent theories as being impermissible, put it that way.

Q. Do you recall reading the penalty-phase argument of

Mr. Williams in which he said Angela Johnson was a person who bought the gun, but who do you think went in there? Who's the person who gets into guns, who has gun magazines in his locker at work? Who do you think walked into that pawnshop with her and looked over the display and decided that's going to be my murder weapon? Do you think A.J. picked it out? Defendant picked it out.

Do you recall reading that statement in the Honken penalty-phase transcript?

A. Not specifically.

Q. As the government progressed in its penalty-phase presentation in the Johnson case and proceeded to paint Angela Johnson as the dominant person and, in fact, someone who was -- put Mr. Honken in fear and really was the motivator here, did you consider strategies of using the government's arguments in the Honken case, for instance, as party admissions to be introduced in the penalty phase of your case?

MR. WILLIAMS: Argumentative, Your Honor.

THE COURT: Overruled.

A. I don't remember that being done, no.

Q. So there wouldn't have been as far as you remember any tactical reason why you wouldn't have done that -- why you wouldn't have offered that kind of evidence had you thought of it?

A. I don't remember specifically considering that as a

strategy.

Q. Okay. You have a note in your file DS-0002 --

THE COURT: Mr. Burt, can I interrupt for a second?

MR. BURT: Yes, sir.

THE COURT: What pages of the transcript of the closing argument by Mr. Williams in the Honken case were you referring to?

MR. BURT: 3905.

BY MR. BURT:

Q. This is a undated note in your file, Mr. Stowers, 000213. Says inconsistent theories with Honken preclude argument.

A. Right.

Q. Blindness to discovery material deemed exculpatory. Polygraph exam, rules of evidence at sentencing, indictment does not something connections and jury instructions including theory of defense. Can you tell me what this relates to? Are these issues you're thinking about that need to be explored? What exactly is this?

A. Oh. Yeah. These may have been -- yeah. These were a series of issues that in the period of time before the commencement of the trial I was identifying as needing to be evaluated and looked at and researched to the extent there was a research element to it. That's what this is.

Q. Okay. And do you recall -- I think we've talked about the inconsistent theories part of this. You did apparently present

an argument to preclude argument but not -- did not pursue the idea of trying to admit the government's prior arguments; right?

A. Right.

Q. And insofar as a polygraph exam, do you know what that relates to?

A. Well, Honken as part of his proffer had submitted to a polygraph exam. And we got the polygraph -- or the proffer reports and materials I'm going to say maybe a month or so before trial, maybe six weeks as a result of a motion that we filed to recover it so that we could see what he had actually said because we were very hopeful it would be favorable, and he had submitted to a polygraph.

So we wanted to know -- at one point we looked into the issue of whether or not his polygraph results which were negative for truthfulness could be -- in other words, he wasn't being honest about her involvement is the way I remember it -- whether or not we could use that in some manner or preclude it in some manner in a sentencing depending on which way we wanted to go with using or not using his proffer. That's what I remember about that at least.

Q. Okay. And do you remember doing some research into that issue?

A. Yeah, we did a fair amount of research and found some law I believe on it. There isn't a ton of law. It's a very --

Q. Some what kind of law?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 350    Filed 11/10/11    Page 58 of 80

A. Some.

Q. Oh, some.

A. S-o-m-e.

Q. S-o-m-e, sorry.

A. But there isn't a ton of law on it. At the time there was maybe a few cases in the relaxed standards for sentencing. I think our conclusion was that if we wanted to do it we probably could have been able to do it as defense evidence, but we also might have had it the other way. We could have probably prevented the government from using polygraph evidence if we wanted to under some reliability theory. So I think there was law on both sides of that issue, and I think the Court had a lot of leeway on it.

Q. Do you remember in the course of researching that issue coming across a case, Rupe, R-u-p-e, versus Wood, 93 Fed. 3d 1434, a Ninth Circuit case from 1996?

A. No, but whatever cases that we would have found and printed out and things should have been in the materials that we provided to Lawlor's office whenever this thing all got started.

Q. And --

THE COURT: What was the page cite? I got the volume but not the --

MR. BURT: Oh, sorry, Your Honor. It's 1434.

THE COURT: Thank you.

MR. BURT: 1996 decision.

BY MR. BURT:

Q. So did you based on your research decide to present that issue to the Court in an in limine motion to get the Court in the penalty phase to allow you to use this polygraph to impeach Mr. Honken's version of events?

A. I -- the whole -- the whole issue of the Honken proffer was -- was kind of a tangled web, and the timing of it was a problem in terms of dealing with it and everything. And there were -- there was just a host of issues, and we were vacillating on that issue for almost the whole time that we had it. But it was a problematical issue from a lot of angles, and I don't remember specifically considering using the proffer to impeach -- or I'm sorry, using the polygraph to impeach the proffer statements that he made. I don't think we really thought about that at all specifically.

I think what we were looking at with the -- initially was I think we were -- if I remember this right, we were going to keep the polygraph out but get the proffer in without the -- if I remember that right, I think that was kind of what we were trying to do was keep the polygraph out but get the proffer statements in unimpeached because I think Pat's initial assessment pretrial was it put her in the aider and abettor role and they had originally, you know, at that time charged her as both principal and aider and abettor. And, you know, the statement was not -- it was better than her being the principal,

but it wasn't much better.

Q. It was better than being the principal, I'm not sure I'm following that.

A. As opposed to the aider and abettor.

Q. It made her out to be the principal?

A. No, it was better than her being the principal --

Q. Oh.

A. -- the trigger person who pulled the trigger and shot five people.

Q. Well, didn't it put her in a position of preplanning, agreeing to the conspiracy to kill, burying -- picking out the grave site in advance?

A. Yeah. I haven't read it for years, but it's not -- it's not -- we eventually -- during the actual penalty phase, I remember being in the hotel where Pat and I worked. He came out of his room into the work room that we had in between the two sleeping areas of the hotel, and he says, "I don't know what I was thinking thinking this proffer was going to be any good for us. We can't use this. We're not going to use this." And so we cancelled the witnesses.

Q. But was there then some discussion about, okay, the proffer really puts her in a bad role; if we could show that the role that it puts her into is false, that actually might be mitigating and this polygraph might do it for us? Was there any discussion along those lines?

A. I don't think so. I don't think we were thinking about -- we just wanted to get rid of the proffer issue because we thought the proffer was horrible at that point given where we were in the evidence as it wound up. We kind of felt pretty good at that moment about the jury's finding that there was no substantial planning or premeditation. They did not find that was proven in the second phase of this three-phase trial. And that was very encouraging to us, maybe wrongly so.

But we felt that -- the assessment of that was that this jury must have kind of accepted the idea that we were sponsoring which is that she probably didn't really engage in planning and premeditation on the first four killings and, therefore, they had largely perhaps thought that the government had not disproven our basic theory that she really maybe got hooked up in something that she was not a full knowing participant in that was really something that Honken had been planning to do or had done when things went wrong in the course of the videotaping of the Nicholson statement.

Q. Well, how long was this jury out in the guilt phase of the case?

A. Boy, I don't know. It wasn't very long.

Q. Pretty quick, wasn't it?

A. I think so, yeah.

Q. Okay. And how long were they out in the eligibility phase?

A. I don't know that either, but it was, you know, half -- a

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 59 of 80

few hours maybe if I remember. I'm not sure.

Q. And most of the aggravators were found to be true, were they not, in the eligibility phase? Vulnerable victim?

A. Well, that was a -- yeah, there was --

Q. You didn't contest that one, did you?

A. You couldn't. I mean, there wasn't anything to contest. I mean, I think -- yeah, I guess the verdict forms say what they say.

I mean, as to the issues that we thought we had something to talk about on, which substantial planning and premeditation was a pretty big deal, at least in our minds, in terms of giving us an insight into where we were in terms of our case with the jury. Maybe we were wrong about that, but we felt like the jury was kind of accepting the idea that the government hadn't proven that Angela was involved in preplanning and premeditating.

Q. Now, going into the penalty phase you knew from the government's penalty-phase witness list that Vest was going to testify, right, Steve Vest?

A. Yeah, he was listed and -- yeah, he was listed and -- yeah.

Q. And you knew that Vest's version of what Honken said to him was pretty -- pretty much tracked what Honken had said in his proffer, didn't you?

A. Again, this is partly the division of labor on the case. He was a witness that was a Pat Berrigan witness. I don't know

that I actually reviewed all of his prior statements and everything. I think I had an understanding that his version was along the lines of what Honken had asserted in his proffer, but I don't know about the level of congruence, if you will, between those.

Q. Well, do you remember being present at a hearing where Mr. Williams raised the issue of the need to show the Honken proffer to the victims' family and Mr. Berrigan responded that there was no need to do so because the proffer was substantially similar to what Honken had said to Vest and they could learn all they wanted to learn from the Vest statement and didn't need to see the Honken proffer and Mr. Williams agreed that they were substantially similar? Do you remember that discussion?

A. That was during the trial I think.

Q. Right. Pretr -- prior to trial.

A. It was?

Q. It was in March of '05.

A. Oh, okay. I don't have a clear recollection of that, but it sounds vaguely familiar, but I don't remember that specifically.

Q. And are you saying as to this polygraph issue, the admissibility of it, that you do not remember any discussion of whether you should use that affirmatively to impeach Vest?

A. I don't think that was ever -- no, I don't think we considered doing that. I don't remember talking about that

ever.

Q. You did put on the record or Mr. Berrigan put on the record that you were not going to use the polygraph. Do you recall that, that there was a discussion about it, that Judge Bennett brought it up and --

A. When was that? I don't . . .

Q. Well, on May 31 the Court says, "Okay" -- this is at 2449 of the transcript -- "I did want to clarify one thing that we talked about. I don't remember whether it was on the record or off the record. I was led to believe at some point about the Honken proffer that there was also a polygraph examination. I don't know whether there was or there wasn't. Somebody said that there was, and I've never seen it. I don't know anything about it, and I believe at some point I asked you, Mr. Berrigan, because that's a little bit different issue than just submitting the Honken proffer." And Mr. Berrigan says, "I think -- Mr. Williams and I have spoken about this as well, Your Honor, and we're in agreement -- at least we believe we are -- that there will be no mention of polygraphs even during Mr. Honken's proffer."

Do you recall that discussion that apparently there was a -- Judge Bennett suggesting that perhaps that was going to be used and inquiring whether it was?

A. Again, I don't recall that specifically. There were some times during the trial when there were issues taken up with the

Court that all the defense attorneys did not attend because we were doing other things. And it could be that that was what happened then. I'm not sure. I could have been there. If I was there, then obviously I heard it. I wasn't sleeping through it. But I just don't remember that specifically. Yeah, I don't remember that specifically.

Q. Now, on this issue of inconsistent theories and whether you anticipated that, do you recall -- this is Exhibit 54 -- receiving a e-mail from Pat Berrigan -- I'm sorry, a fax from Pat Berrigan which said, "Dean, saw this on Saturday in the National Law Journal, and it reminded me that we need to prepare to meet the possibility that Williams and Miller might try to pull this crap on us. Thanks, Dean. Pat." Attached to that was a article by a commentator entitled Two-Faced Arguments.

A. Uh-huh.

Q. And exploring some of the legal issues about the legal implications of inconsistent theories. Remember receiving this?

A. Yeah, yeah.

Q. So it looks like you were thinking -- based on having read the Honken transcript, you were thinking well in advance of trial that this issue was going to surface.

A. Well, we filed a motion. We cited that case that's in this article, Smith versus Groose, G-r-o-o-s-e, in our filing. I remember that case specifically because it's a little different name. It's Eighth Circuit. And, you know, we made the argument

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

that they shouldn't be allowed to do that. And the ruling was what the ruling was on that. And then, you know, things progressed from there as I described earlier.

Q. Okay. But at least you'd agree with me that this is an issue that surfaced. In other words, it wasn't a surprise -- it wasn't you got blind sided by these prosecutors standing up for the first time in your case and saying -- switching an emphasis or coming up with these inconsistent theories. You knew going into it that there was a good possibility they were going to do that.

A. We wanted to stop it, and we couldn't and weren't successful in trying to stop it through court assistance. So what we were left with was objecting and what not. And I think we did that for the most part and made our record and the Court ruled as it did.

Q. Now, going into this trial, was there a problem that developed in regard to preparation of Mr. Willett both for the opening statement and for the examination of witnesses?

A. Yes.

Q. And can you tell me what the nature of the problem was?

A. Well, starting a few months before trial, we had met over more than one occasion, and the parties had to exchange witness lists and that sort of thing. And we -- the three attorneys met and were dividing up witnesses, who was going to be responsible for this witness, that witness, this sort of thing.

And Al wanted to do the lead counsel role as he continued, you know, to perceive it, and he wanted -- and assigned unto himself for the most part almost all of the major witnesses in the first phase of the trial, although, you know, tried to talk him out of it, tried to wrestle witnesses from him, but he was very unwilling to do that. And we couldn't get the witnesses wrestled away from him, but he assured us that he'd be ready.

And I cautioned him. I said, look, Al, you're talking about major witnesses back to back coming up in this trial, how you going to be able to handle it when you've got three, four major witnesses coming in which in this case was unusual because you've got -- on a lot of these witnesses you got multiple grand juries, you might have prior trial testimony, you've got multiple interviews over the years, you've got other things that other people have said about the witnesses or statements attributed to them. And when you get a case like that, you know, there's a lot of complexity to preparing to examine those witnesses effectively on cross. And it's a lot of work to do it right. And he insisted on that, taking a lion's share of those things, of the major witnesses.

And then when we got to trial, it became apparent that he had not prepared and he was preparing or attempting to prepare literally during the trial for the examination of these witnesses, and that was a huge problem.

Q. Now, before the case actually started and actually before the jury selection, did the team get together and settle on what the defense was going to be and how -- and by defense, I mean guilt-phase defense -- and how that guilt-phase defense was going to mesh with the penalty-phase defense?

A. We had multiple meetings. I think one of the -- one of the things that we did that jury with Lisa Dahl down in Kansas City with -- I think that might have been in December of 2004, months before the trial. One of the reasons we did that was to kind of get ourselves narrowed down to where we were going with this thing.

And then as we progressed up to trial, we continued to try and work our way away from this -- what I call the after-acquired knowledge theory because it seemed to be nonviable, you know, in our best judgment, and Pat and I had been of that view for a long time. And Al was still stuck on that to a great extent. He really was reluctant to let go of it and felt very much like he wanted to present sort of a theory that the information concerning the crime was all acquired from Honken afterwards in some fashion by Angela.

And we went through in a very detailed way to some extent with Al, Pat and I did, how is this going to work? Number one, how you going to present the evidence that she supposedly found this out from Honken, you know? Is she going to testify, you know? Who's your witness to that, you know?

Honken wasn't going to testify and nor was the plan that she would.

So that was a fundamental, you know, error in thinking I think on how you could go with that theory with any evidentiary basis anyway.

So eventually we evolved into this theory of -- loosely stated you can call it mere presence where her role would be, number one, the government was in agreement she wasn't the shooter. Her role would be present but not involved, present but no intent to kill, present maybe knowing that he was going to do this but unable to stop it from occurring because there was one gun and he had it and he was a mad man, present but the situation kind of spun out of control in some manner during the -- during the videotaping situation with Nicholson.

And that was actually kind of plausible to dovetail into a -- into the mitigation case because it kind of -- part of the mitigation case was that she's a very susceptible person in certain respects to a guy like Honken and that sort of thing.

Q. Susceptible to Honken, and was part of the theme also going to be that Honken was a bad guy long before he met Angela Johnson to rebut a counter suggestion by the government that it was really Angela and not Mr. Honken who was the primary mover in these offenses?

A. Right.

Q. And had you read the portion of the Honken trial transcript

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 61 of 80

where the government offered some witnesses to bank robbery activity by Mr. Honken that preceded his relationship with Miss Johnson?

A.   Correct.

Q.   Was there any discussion in the Johnson defense team of using those same witnesses that the government had used to rebut this argument that the government was making that not only was Miss Johnson not dominated by Mr. Honken, she was dominating him?

MR. WILLIAMS:  Your Honor, I'm going to impose an objection at this point.  Took me a while to look this up, but in the petition at page 90, footnote 30, the defendant says that they are not arguing that the government improperly argued inconsistent theories of their case during the two trials.

Their assertion is that the government presented false evidence during trial or evidence it knew to be false in the sense that we put on evidence that made Dustin Honken look good and that that's the allegation.

So to the extent that counsel is continuing to assert that there was improper argument at trial, they have affirmatively said that is not their claim --

THE COURT:  And isn't that a direct appeal issue?

MR. WILLIAMS:  That's the other -- yeah, that's another --

THE COURT:  How is that a 2255 issue?  But I'm sure

Mr. Burt will enlighten me.

MR. WILLIAMS:  Well, it becomes 2255 only if they can allege they should have issued -- or they should've raised it but but for ineffective assistance of counsel, then it --

THE COURT:  Right.  But I thought they raised it and I ruled against them.  So I may have been ineffective, but counsel wasn't.

MR. WILLIAMS:  Except they didn't raise it on appeal maybe.  So that's why I was going back looking under the ineffective assistance looking for it.  I couldn't find it, so I found it here.  So I don't know where they're going with this but --

THE COURT:  Let's find out.  Mr. Burt, what's your theory?

MR. BURT:  Yes, Your Honor.  As I understood that footnote which, again, was not drafted by me, but as I understood the intent, it was we are not raising a independent claim that there's a due process violation in switching theories presumably because that issue was or could have been raised on direct appeal since it's apparent from the face of the record.

What was being raised and is raised in the petition is the failure to investigate and present evidence supporting the theory of dominance and negating the government's factual assertions that he was -- he was not the prime mover.

THE COURT:  So you're not arguing -- yeah, you're not

arguing as an independent claim.

MR. BURT:  Right.

THE COURT:  You're simply trying to establish that in your view the defense was ineffective for failing to put on evidence that was available to them, at least some of which they knew about and discussed but didn't use or should have known about to show that the government's inconsistent theory was actually inconsistent with some of the evidence.

MR. BURT:  Correct.

THE COURT:  Am I tracking it?

MR. BURT:  Exactly.

THE COURT:  Yeah.

MR. WILLIAMS:  And that's fine where they're going right now.  It's completely inconsistent with what he was doing with Mr. Stowers earlier in which he was faulting Mr. Stowers for failing to do something about the -- what he argued was an inconsistent argument the government made between the two trials in which he cites from the Honken closing argument and faults Mr. Berrigan -- or Mr. Stowers for not doing something about it.  So I understand where they're going now.

THE COURT:  Okay.

MR. WILLIAMS:  But to the extent he continues to assert --

THE COURT:  I didn't understand that he was faulting Mr. Stowers.

MR. BURT:  No, I was saying that, again, part of what mitigation could have been presented was an argument that Mr. Williams' statements was an admission by a party that could have gone into evidence in the penalty phase to rebut the evidence he was presenting.  That's mitigation evidence.  It's not -- I don't really see the problem, but in any event, he's not stating --

THE COURT:  I don't actually see the problem either, so that's why you can continue.

MR. BURT:  Thank you.

THE COURT:  Thanks.  No.  I understand what you're using it for now.

MR. BURT:  Thank you.

THE COURT:  And I think Mr. Williams was just -- well, I think he wanted to clarify what that footnote meant, and I think we've done that.

A.   Did you have a question?  I got lost in that.

Q.   If so, I long have forgotten what it was.  I think --

THE COURT:  Well, you know what?  How about -- would now be a good time for another break?

MR. BURT:  It would, yes.

THE COURT:  Okay.  I see some affirmative nods.  Why don't we -- we'll be in recess until 4:45.

(Recess at 4:26 p.m.)

THE COURT:  Thank you.  Please be seated.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 62 of 80

Mr. Burt?

MR. BURT: Judge, we have some witnessing -- witness scheduling problems.

THE COURT: Okay.

MR. BURT: And we've discussed with Mr. Williams the possibility --

THE COURT: Well, we're not behind, are we?

MR. BURT: No, but we have a number of lay witnesses who if we could get them on very quickly would remove a lot of our scheduling problems, and I don't think they're going to be lengthy. Mr. Williams is okay with that.

THE COURT: Sure.

MR. BURT: Mr. Stowers is going to have to be back tomorrow anyway.

THE COURT: Anyway, yeah.

MR. BURT: Yeah.

THE COURT: Okay. That's fine.

MR. BURT: Is that okay?

THE COURT: Sure, sure.

MR. BURT: Thank you.

MS. MORRISSEY: Your Honor, the first witness we're going to call is Winnie Jergenson. And so the Court knows, Mrs. Jergenson is going to be testifying as to claims A-10 and 11 as to the penalty phase, and we will keep it brief.

THE COURT: Okay. Thank you.

Good afternoon. If you'd just come forward, I'll swear you in. That's good. Would you raise your right hand, please.

WINIFRED JERGENSON, PETITIONER'S WITNESS, SWORN

THE COURT: Okay. There's the witness box.

THE WITNESS: Right there?

THE COURT: Right there. And you can be seated and adjust the chair and the microphones so you can speak directly into the microphones. And scoot that chair up a little bit, please. Thank you. And would you tell us your full name.

THE WITNESS: Winifred June Jergenson.

THE COURT: And could you spell your last name for us.

THE WITNESS: J-e-r-g-e-n-s-o-n.

THE COURT: Thank you.

Miss Morrissey?

MS. MORRISSEY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Good afternoon, Mrs. Jergenson.

A. Good afternoon.

Q. Ma'am, are you a relation to Angela Johnson?

A. Yes, I'm her aunt.

Q. Okay. And which means you are the sister of her father?

A. Yes.

Q. And her -- her father's name is -- you know her father as

Jimmy.

A. Jim, yes.

Q. Yes. All right. Where are you living now, ma'am?

A. Excuse me?

Q. Where are you living now?

A. In LaCrosse, Wisconsin.

Q. And did you grow up and raise your kids in Iowa?

A. For the most part, yes.

Q. Okay. How many kids did you --

A. I have five.

Q. All right. And where in Iowa did you live?

A. We lived in -- well, it was Cuba City, Wisconsin. It's, you know, across the bridge from Dubuque, in that area.

Q. Okay. And that's the area where you raised your kids?

A. For the most part, uh-huh.

Q. Now, did -- your brother is Jim Johnson.

A. Yes.

Q. Did there come a time when you met Pearl Jean, someone who became Jean Johnson?

A. Yes. Right out of high school when we lived in Mason City, Jim brought her home and was his girlfriend.

Q. And did they eventually marry?

A. Yes, uh-huh.

Q. And did they eventually have four children?

A. Yes.

Q. And Angela is the second of those.

A. Yep.

Q. Okay. Could you tell us just briefly about Jean, Angela's mother.

A. She's quite different.

Q. How is she different?

A. She has like a split personality.

Q. Okay. What do you mean by that?

A. Well, she's either real religious or she's totally opposite, you know. And when she was younger, she didn't think anything of going downtown and, you know, having a cocktail and a drink.

Q. Let's talk about the religious part of her. Could you describe how she was very religious?

A. Well, she took me to a Bible church thing once.

Q. Yes.

A. And she told me now don't wear any lipstick and, you know, just shut your eyes and stuff. So it was like a big tent, and we went in there, and everybody was dressed pretty plain. The women had a lot of long hair. And, well, the men up in front and stuff, they would talk in like foreign tongue and spit and roll their eyes around, and we were all supposed to keep our eyes shut, but I did the best I could.

Q. Was it noisy?

A. Well, sort of, yeah.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 63 of 80

**1275**

Q. Okay. And how long did you stay at this tent?

A. As -- I just stayed until I had to, and then we left.

Q. Did you go back?

A. No, never.

Q. Okay. And to your knowledge was that Jean's church?

A. Yes. It's the Church of an Open Bible. I call it the holy roller church. I don't know what exactly the name of it is.

Q. And did Jean during the time that you know her attend that church to your knowledge?

A. Oh, I think so. I think her mother belonged to the same church.

Q. All right.

A. So . . .

Q. Did you ever meet Jean's mother?

A. Yes.

Q. And what was Jean's mother's name?

A. Florence.

Q. Do you remember her last name?

A. Not really, no.

Q. Does Gomez Jensen sound right?

A. Yes, but I think Gomez is Jean's maiden name, isn't it?

Q. (Nodded head.)

A. Okay.

Q. How would you describe Florence?

A. She was a taller woman, gray hair, kind of strawy and kinda

**1276**

different looking.

Q. What do you mean different looking?

A. Well, she didn't look like a pleasant grandma or anything like that. She almost would scare you, you know, rather than . . .

Q. Did you have occasion to talk with her?

A. Not really. If I was over there it was just, you know, visiting.

Q. And do you know whether or not she had any religious beliefs, Florence?

A. Florence? Oh, yes, I'm sure, you know, yes.

Q. And what were her religious beliefs?

A. The same church that Jean took me to.

Q. Now, you said that Jean had a split personality and one was very holy. Have we talked about that?

A. Yeah.

Q. What was the other one?

A. Well, you know, like I said, she'd either be real holy quoting quotes from the Bible and this and that. Otherwise, you know, she'd doll herself up and, you know, she'd go downtown.

Q. And where would she go downtown? Did you ever see her when she was all dolled up?

A. Yes, I did, uh-huh.

Q. And where did you see her?

A. In a bar where there was music.

**1277**

Q. And this is at the same time where she was going to this tent church?

A. No, that was probably a couple years later because we were back in Eau Claire, and in Eau Claire it's pretty cold, so they don't have the tent churches around there.

Q. All right. And what did you see her -- when you said she had makeup and was out, what was she doing?

A. Oh, kind of flirting with the guys in the band.

Q. Did you ever know the children -- Jean's children to have to do any strange practices?

A. The kids have confided in me through the years and stuff like this that they had to do a lot of stuff. And after her and Jim got divorced, she just -- she was like a gypsy. She'd go from town to town and church to church, and the kids, you know, they couldn't even have a relationship with -- you know, new schools. They couldn't bring any kids home because they never knew how their mother was going to act. It was just . . .

Q. Let's just talk about when -- when was it that Jean and Jim divorced?

A. Well, when they were in Eau Claire. Little Jimmy was -- I don't know -- maybe a year old or something, so that'd be about 43 years ago.

Q. This is when they were in Eau Claire when you saw her in a bar or tavern?

A. Uh-huh, uh-huh.

**1278**

Q. Is that yes?

A. Yes.

Q. And after they divorced, did the kids go with one parent or the other?

A. Yes. Jean got full custody. Years ago, you know, it was pretty proper to give the kids to their mother.

Q. Okay. And after Jean -- after they got divorced and Jean got full property of the kids, did you see the kids often?

A. No, I didn't see them very often.

Q. Do you know whether or not your brother was able to go and see his children wherever they might be?

A. He could if he could find them, if, you know, somebody would tell him where they were. Or if the kids needed something or other, she'd call.

Q. If -- well, were you contacted by anybody who represented Angela Johnson in 2000 -- from 2000 to 2005?

A. No.

Q. If you had been contacted, would you have come to court and talked about the things you've talked about today?

A. I suppose, uh-huh, yes, you know, because it was really too hard for me to believe.

MS. MORRISSEY: Okay. All right. Thank you very much.

THE WITNESS: Uh-huh. Am I done?

THE COURT: Not yet.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

**1279**

MS. MORRISSEY: Not yet. Almost.

THE COURT: We're going to see if --

THE WITNESS: All right.

THE COURT: -- Mr. Williams has any questions.

Do you have any questions, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

THE COURT: Okay. Now you're done.

THE WITNESS: All right. Thank you.

THE COURT: Thank you.

THE WITNESS: My first time.

THE COURT: Mine too. Just kidding.

MS. MORRISSEY: Your Honor, if we could have James Johnson Senior come in.

THE COURT: Okay. Thank you.

MS. MORRISSEY: And Mr. James Johnson Senior will be testifying as to claim A-1 which is the plea.

THE COURT: Mr. Johnson, if you'd come forward, I'll swear you in. There is good enough. Would you raise your right hand, please.

JAMES JOHNSON, PETITIONER'S WITNESS, SWORN

THE COURT: Okay. You can be seated in the witness box over there, and you can adjust the chair so you can speak directly into the microphones. And can you scoot that chair up a little closer to the microphones? Thank you. And would you tell us your full name, please.

**1280**

THE WITNESS: James Jeffrey Johnson.

THE COURT: And is there a senior or junior or anything that goes with it?

THE WITNESS: No, no.

THE COURT: Okay. Thank you.

DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Good afternoon, sir. Are you the father of Angela Johnson?

A. (Witness nodded head.)

Q. Yes?

A. Yes.

Q. You have to answer out loud.

A. Oh. Yes.

Q. And did you testify, sir, at your daughter's trial in this courtroom back in 2005?

A. Pardon?

Q. Did you testify at your daughter's trial back in 2005?

A. Yes, I did.

Q. All right. I'm going to ask you about whether from, say, 1990 to the year 2000 you were in touch with your daughter Angela.

A. Yes.

Q. Did you see her often?

A. Not a whole lot, just when we'd visit once in a while. She'd come up or I'd go down.

**1281**

Q. After Angela was arrested in 2000, did you begin seeing more of her?

A. I visited her in jail in that Iowa and Cedar Rapids and wherever.

Q. Okay. And let me ask you some just -- the one question that you're here for. If Angela's trial lawyers had approached you and said that we want you to help us convince Angela to plead guilty in this case to avoid having to go to trial and a possible death sentence, would you have joined them and convinced -- help try to convince your daughter that she should plead guilty instead of go to trial?

A. Yes, I think yes, I would.

Q. Why?

A. Because I wouldn't want her to have the death penalty.

Q. Okay. And did anybody ask you to do that?

A. No.

MS. MORRISSEY: Thank you. I have nothing further.

THE COURT: Thank you.

Mr. Williams, any questions for Mr. Johnson?

MR. WILLIAMS: No, Your Honor.

THE COURT: Thank you.

MS. MORRISSEY: Thank you, Your Honor. We would next call Verlene Vanderpool. And, Your Honor, Miss Vanderpool will be testifying as to claim A-10 and A-11 again as to penalty phase.

**1282**

THE COURT: Okay. Thank you.

Miss Vanderpool, if you'll come forward, I'll swear you in. This way. Straight ahead. Would you raise your right hand, please.

VERLENE VANDERPOOL, PETITIONER'S WITNESS, SWORN

THE COURT: Okay. Thank you. Please be seated in the witness box there. You can adjust the chair and the microphones so you can speak directly into the microphones.

THE WITNESS: Who am I speaking to here?

THE COURT: Well, we'll get to that. Just scoot up. Okay. You're good. And would you state your full name, please, and spell both your first name and your last name.

THE WITNESS: Verlene Vanderpool, V-e-r-l-e-n-e, Vanderpool, all one word, V-a-n-d-e-r-p-o-o-l.

THE COURT: Okay. Thank you. And now Miss Morrissey, the lawyer at the podium, she's going to have some questions for you. And then when she's done, the gentleman seated at the other counsel table there, Mr. Williams who's a federal prosecutor, he may have some questions for you.

DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Good afternoon, Mrs. Vanderpool.

A. Uh-huh.

Q. Did you testify at Angela Johnson's trial in 2005?

A. Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 65 of 80

Q. Okay. Are you sure?

A. Yes. I'm a little confused on what exactly I've testified at.

Q. Okay. I'm just going to ask you some questions. If you don't understand them, let me know; okay? All right. We're not going to repeat what you testified to at trial.

A. Correct.

Q. I'm going to ask you -- take you back to 1993. Did you know Angela?

A. Yes.

Q. Okay. And did you share a condition in 1993? Were you pregnant at the same time?

A. Yes, we were. We were pregnant at the same time.

Q. All right. And how -- was Angie working for you then?

A. Correct, uh-huh. She started I believe in '92.

Q. And where was that?

A. Mason City Country Club.

Q. Now, was there anything about Angela's pregnancy that caused you concern?

A. Initially very just not happy with being pregnant.

Q. And what did she say or do that made you think she was not happy with being pregnant?

A. Verbally commenting on that, just generally not what you would expect.

Q. Did you know who the father of the baby was?

A. Yes.

Q. Okay. And that was Dustin Honken; correct?

A. Correct, uh-huh.

Q. And were you concerned because she seemed unhappy about being pregnant?

A. Oh, definitely.

Q. Why was that?

A. For the love of the child.

Q. Were you present after Marvea was born, just after -- let me back up. Did she have a child named Marvea?

A. Yes.

Q. Okay. And after Marvea was born, did you see Angie and Marvea together?

A. Yes.

Q. And did you have any question about the feelings that Angela had for her daughter?

A. No.

Q. When -- when you first met Angela, was she involved in a relationship with a man?

A. I am really --

Q. What about Terry DeGeus? Did you ever hear about him?

A. Yes, she had mentioned Terry, yes.

Q. Okay. And did you encourage her in her relationship with Terry?

A. No, because of a lot of the negativity of the comments she

made of their relationship.

Q. Did you ever see Terry be abusive to her yourself?

A. No, no.

Q. When she was pregnant with Dustin's child, did she ever talk to you about whether or not she still cared for Terry?

A. I think she held a torch.

Q. How did you feel about Dustin when you first realized that he was going out with Miss Johnson?

A. Real positive, I mean, I was like a -- I was pushing her to -- I mean, looking at a normal looking, you know, polite when I -- on the occasions that I had met him, so I was very much an advocate of, Angie, this looks like a normal guy to be dating.

Q. And did there come a time when you came to have a different opinion about Dustin?

A. Not until in Urbandale.

Q. Okay. And that was in Urbandale, Iowa?

A. Correct.

Q. And was it in 1995?

A. Correct.

Q. Okay. And how did you come to have a different opinion of Dustin?

A. Just a week after she moved down to work for me, she brought a newspaper article from the Globe Gazette with him on the front cover with drug-related problems.

Q. And why did she bring that to you?

A. She said she didn't want me to hear it from anybody else, that she wanted to be up front and say this is what's going on with Dustin.

Q. What was your reaction given the fact that --

A. Shock.

Q. How about -- how did you feel in view of the fact that you said you encouraged Angie to have a relationship with Dustin?

A. Just shock, I mean, truly. I just had no idea.

Q. I'm going to ask you, Miss Vanderpool, about a -- one time that you were subpoenaed to testify before the grand jury in Cedar Rapids. Do you remember that?

A. Yes.

Q. And did anything unusual happen while you were waiting to testify?

A. It wasn't while. It was after I testified.

Q. It was after you had testified?

A. It was after I testified.

Q. All right. What happened?

A. I was just sitting on the bench waiting for Mikell to finish, and a DCI agent was sitting there next to me and just making -- initially just small talk I thought about the fact that where do you live, how many kids do you have, do your kids play in the front yard, backyard, you know, just stuff like that. I thought it was just small talk. And then he proceeded to be more strong about saying you don't know what this is all

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 66 of 80

1287

about, you need to really watch for your children, you know, you don't know everything about this case, you need to be cautious.

Q. And you were there to testify about a case that was being investigated against Miss Johnson; correct?

A. Correct.

Q. And how did you feel when this DCI agent told you that you needed to watch your children?

A. Well, as any mother would, I was on the phone to my husband, and I said, "You call this guy. He scared the pants off me or whatever. I want to know exactly, you know, any details that you can, you know, find," because I was -- it -- of course you'd be worried.

Q. Did you -- did it change your relationship with Angela Johnson?

A. Yeah, definitely.

Q. Why? How?

A. Because I did not know. I mean, being a mom, are you going to take a chance?

Q. And when you testified -- you testified at the trial in this case; right?

A. Yes.

Q. Okay. And when you testified at trial, were you still in the same state of mind as you were when the DCI agent talked to you after the grand jury? That is, were you still scared to be involved in this case?

1288

A. I don't know. I don't recall.

Q. Okay. Were you comfortable testifying at trial?

A. I -- yeah, yeah. I mean, I'm not your world's best speaker, but I would think I was comfortable.

Q. I want to ask you about when Angie was working for you when she was living in Urbandale.

A. Yes.

Q. Was -- did her moods -- did her behavior change?

A. Yes.

THE COURT: Can we back up because I'm a little bit confused. I just -- you know, I've had hundreds of trials since then.

MS. MORRISSEY: Okay.

THE COURT: And I thought she said she worked -- Angie worked for her at the Mason City Country Club, and then -- and then Angie moved to Urbandale, but I never understood that this witness went from -- I think maybe she went maybe from the Mason City Country Club down to the Urbandale Country Club, but I'm confused.

MS. MORRISSEY: I'll clear it up, Your Honor. I'm sorry.

THE COURT: I'm confused.

BY MS. MORRISSEY:

Q. Okay. After you worked at the Mason City Country Club, did you get another job?

1289

A. Yes, my husband had a job in Des Moines that took us to Des Moines in 1995.

Q. And in 1995 did you move to Des Moines?

A. Moved to Des Moines, and then I was employed manager at the Urbandale Country Club.

Q. Okay. And when -- as manager of Urbandale Country Club, did you hire Angela Johnson?

A. Yeah, I solicited -- I solicited a lot of my help. They followed me down there.

Q. Okay. And was Angela Johnson one of those people?

A. Yes.

Q. Okay. I'm going to ask you about Angela's behavior when she was working for you at Urbandale Country Club. Did it change?

A. Yes.

Q. Could you tell us how it changed?

A. There was just -- there was a gradual whole change in her demeanor. Extreme highs, extreme lows. One of the -- not one of my employees but one of the existing employees at Urbandale Country Club just pointed out the fact that -- and liked her very well but made the comment that she thought -- or he thought that she was bipolar because of -- and new terms to me too, okay, looking it up and thinking, okay, the highs, manic-type things and then the extreme lows.

Q. Well, Angela -- would it be fair to say she'd always been

1290

kind of an energetic effusive person?

A. Oh, definitely. That's probably why I hired her at Mason City because she was like a entertaining -- the membership loved her at both places. She was a hard-working person, funny. You know, it made it fun to be at work if it could be.

Q. And the moods that you're talking about in 1995, were those different than what you saw --

A. Oh, yeah.

Q. And you said that she was -- you thought she was bipolar. Was there anything else going on that you remember? Did she seem to be paranoid?

A. Yes. Towards the middle to latter period, definitely paranoid.

Q. Can you give an example?

A. There was an employee that I hired. Her name was Bambi. I mean, this is about as paranoid as I think -- you know, my idea is is that she was telling me that Bambi was a plant, that -- of this investigation or, you know, her apartment was being raided, things like that. She was just very uncomfortable and telling me not to give Bambi a key or just -- you know, get rid of her or whatever. It was just an interesting relationship between the two.

Q. Did you know that there was an investigation going on regarding Miss Johnson when she was working for you in 1995?

A. There had to be something going on because her apartment

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q. was being raided I think to the tune of like four times or searched or whatever you want to call it.

Q. And did anybody ever come to talk to her while she was at work?

A. Yes.

Q. Did Angela's attendance at work suffer in 1995?

A. There was a gradual down, definitely.

Q. And could you explain -- did she -- were there --

A. She would call into work. I was very lenient with her as far as not having her come in. You know, I would just give her some slack because I knew what she was going through. And most of it at that time for me was related to just that whole being just -- you know, being whatever you want to call it, down about her apartment being searched so many times and her questioning that.

Q. Was there ever a time when she was worse than just simply down?

A. Definitely. I suggested that she really needed to go and seek some medical treatment because there was times when she would not come to work that we were concerned. I was concerned. Couple other staff employees, I believe one or two, we would go over there and make sure she was fine. I was concerned for her well being. I didn't know what she was capable of doing because her low was so low.

Q. And to your knowledge did Miss Johnson seek medical

treatment?

A. Yes, and I did suggest she needed to go check this out. I just thought maybe she was suffering from something. I'm not sure.

Q. Did she improve?

A. No, I don't -- no.

Q. Okay. You were friends with Miss Johnson. I mean, aside from being her employer --

A. It was a peculiar relationship, yes. It was friends, yes.

Q. Would you confide in one another?

A. Yes.

Q. And I'm going to ask you about a particular occasion. Did Angela tell you that she had been molested when she was young?

A. Yes.

MR. WILLIAMS: Calls for hearsay, Your Honor.

THE COURT: You may answer.

A. Yes.

Q. Do you remember if she gave any more details than that?

A. No.

Q. Miss Vanderpool, you -- if -- you were interviewed and testified in 2005; correct?

A. Uh-huh.

Q. Did you answer the questions that you were asked?

A. You know, at the interview part I'm still a little cloudy on.

Q. Okay.

A. Whether it was from -- I know from you guys or from Mary Goody or I know that part, but if there was a part in there from the prosecution, I don't recall somebody calling me. That's a little fuzzy right there.

Q. Okay. Obviously you testified at Miss Johnson's trial and you answered the questions that were asked to you.

A. Yes.

Q. If I had asked you or if you had been asked the questions you were asked today in 2005, would you have testified to what you've talked to --

A. Oh, definitely.

Q. -- talked about today?

A. Yes.

MS. MORRISSEY: All right. Thank you very much. I have nothing further.

THE COURT: Mr. Williams, any cross-examination?

MR. WILLIAMS: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Good afternoon, ma'am. Do you recall during the trial that you testified -- you were asked this question appearing at page 3712, volume 20 of the trial transcript, you were asked the question, did you happen to notice, ma'am, during the time that Miss Johnson was working for you at the country club -- and this

was in reference to the Mason City Country Club -- did she use any illicit drugs at least in your presence? And you remember you answered no.

MS. MORRISSEY: I'm going to object as beyond the scope.

THE COURT: Overruled.

A. What's that mean?

Q. That means you can go ahead and answer. Do you remember answering no to that question?

A. I don't know if I remember answering no to that question, but I -- but my answer is no.

Q. Okay. Now, when you were interviewed by somebody from this team here recently on February 19, 2011, you were asked again about drug use by Angela Johnson during the time period she was working at the Mason City Country Club. Do you remember being asked questions about that again during your last interview?

A. Yes.

Q. Okay. And this is a time period when she was pregnant with her daughter; right?

A. She started working for me prior to the pregnancy. I mean, I believe she started working in '92. Her pregnancy was in '93. She had the baby in '94.

Q. And she continued to work for you while she was pregnant as well; right?

A. Correct.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 68 of 80

Q. And during -- throughout the time she worked for you, she was energetic worker; right?

A. From the very git-go she came in there. I wasn't in need of help. She sat down and said, "I really need a job. I'm not going to let you down," and she says, "I'm a hard worker." Boom, I'm in this kind of business that, you know, I need somebody like that.

Q. And I think you described her as having exuberant personality, almost like -- almost manic-like behavior; right? She was just that much of a go-getter all the time.

A. Yeah, and very -- and very theatrical, very -- very entertaining.

Q. Okay. And you also told somebody from this team on February 19, 2011, that you now know looking back after 30 years and your exposure to drug use --

A. Correct.

Q. -- that that was an indication to you that you now recognize that she was using drugs during that time period. Isn't that what you told the investigators?

MS. MORRISSEY: Objection, Your Honor. Vague as to time period. We're dealing with about three years now so . . .

THE COURT: Overruled.

BY MR. WILLIAMS:

Q. Ma'am, isn't that what you told the investigators is that you now recognize that manic, ener -- exuberant behavior that

you saw in Miss Johnson was an indication that she was using methamphetamine?

A. Let me put it like this. If anyone mistook what I said incorrectly, this is what I truly mean.

Q. Okay.

A. After being in this business for 25 to 30 years, I now can look back and see the symptoms of someone or the actions of someone being on marijuana, meth, or whatever it is. In my type of employment, I mean, I see -- I can recognize the symptoms.

Now, whether I can honestly say a hundred percent that she at that point in time -- I feel more Urbandale with that. Mason City --

Q. She was more on drugs in Urbandale.

A. Yeah, I feel that more -- I feel that it was more manic-type things or weird behavior in Urbandale than in Mason City.

Q. Okay. Well, let's go with that. Let's talk a little bit about the Urbandale behavior. You indicated that when she came down to Urbandale she showed you a photograph of Dustin Honken on the front page of the newspaper having been arrested.

A. Correct.

Q. Okay. And this was in about 1995; right?

A. I moved there in '95. I believe she came in the spring of '95. Is that correct?

Q. I -- whatever your recollection is is fine. Some time in

1995. Okay. And in 1995 she tells you that Dustin Honken still has criminal charges against him; right?

A. By showing me the newspaper article.

Q. Okay. And you talk about her being kind of depressed at times?

A. You know, it was a progression. It was not -- it was a progressiveness of it.

Q. Okay. She was being investigated by law enforcement at that time; right?

A. Yeah. Again, it wasn't just like right off the bat. It was like some situations down the road maybe through that next year. But it seems like her apartment-type things were pretty close together when they were searching her apartment.

Q. Okay. And you don't really know what was causing -- other than you think your observation is she was using drugs, but you don't really know what was causing her to kind of be depressed during that time period, do you, ma'am?

A. I really firmly believe that the whole apartment searching thing was putting a toll on her. We would sometimes sit on the front steps of the Urbandale Country Club and just -- and she'd have a release of, you know, why are they doing this to me and all this kind of thing.

Q. Do you think if she was involved in the murder of two little children and was also being investigated by law enforcement that might contribute to her being just a little bit

depressed?

MS. MORRISSEY: Objection, Your Honor.

THE COURT: What's the objection?

MS. MORRISSEY: Objection, Your Honor. Improper cross-examination. Calls for speculation.

THE COURT: It does, but, you know, what's good for the goose is good for the gander, so you can answer the question.

THE WITNESS: Can I ask you a question?

THE COURT: No. You know, here's how it works. You can't really ask Miss Johnson questions.

THE WITNESS: No, no, no, not --

THE COURT: Yeah. Well, no, but you did that earlier on when she worked for you.

THE WITNESS: Oh, I'm sorry.

THE COURT: You don't get to ask questions. That's how it works. It's strange. It's weird. I understand that. But only the lawyer at the podium and myself get to ask you questions. You don't get to ask questions.

A. Can you repeat your question, please?

Q. No. I'll tell you what, that's good enough.

MR. WILLIAMS: Thank you for your time this afternoon.

THE COURT: Miss Morrissey?

MS. MORRISSEY: Thank you.

THE COURT: Now Miss Morrissey gets to ask you some

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 350 Filed 11/10/11 Page 69 of 80

questions.

REDIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Did Miss Johnson tell you why she moved to Urbandale from Mason City?

A. No, other than I had a job for her.

Q. Okay. And do you -- did you observe the behavior that you've described, this manic bipolar-type behavior, when she was working for you in -- from 1992 to 1993?

A. No.

Q. Okay. Do you have any reason to believe that she was using drugs when she was pregnant with Marvea?

A. No, no.

MS. MORRISSEY: Thank you. I have nothing further.

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: Nothing further.

THE COURT: Okay. You may step down. Thank you.

THE WITNESS: Thanks.

MS. MORRISSEY: Thank you, Your Honor. We would call Carol Meter.

THE COURT: That's good. Thank you. Can you raise your right hand, please.

CAROL METER, PETITIONER'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box there.

THE WITNESS: Here?

THE COURT: Yes. And you can turn that chair around and sit in it and then scoot it up towards the microphones.

THE WITNESS: Okay.

THE COURT: Okay? And -- yeah, get a little closer. And then why don't you tell us your full name and spell your last name, please.

THE WITNESS: Okay. I'm Carol Meter. And my last name is M-e-t-e-r.

THE COURT: Okay. Thank you. Miss Morrissey's now going to ask you some questions, and then when she's done, Mr. Williams, the prosecutor, will get to ask you some questions.

THE WITNESS: Thank you.

THE COURT: And I may ask you some too; okay?

THE WITNESS: Okay.

THE COURT: Thanks.

DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Hello, ma'am. What do you do for a living now?

A. Well, I'm retired now.

Q. What did you do before you retired?

A. Before I retired I did a lot of years of education and social services.

Q. And what is the educational background that you have to

equip you for that occupation?

A. Well, just, you know, edu -- a college degree in education and then some extra training in what's called a family worker, family support worker, from University of Iowa and then some training with substance abuse.

Q. Okay. And before you retired what was the job that you held?

A. About the last eight and a half years that I worked, I worked at ASAC which is Area Substance Abuse Council, and I did a lot of work with adults in a whole variety of ways. And the last -- the one that I'm probably -- that you want me to say is that I worked at Linn County Jail and did a weekly program there.

Q. All right. So you worked at -- did a weekly program at Linn County Jail for how long?

A. Oh, you know, I think it was probably like four or five years at least.

Q. And during the four or five years that you worked at Linn County Jail during this weekly program -- well, back up. Was that a substance abuse counselling program?

A. You know what? It really wasn't substance abuse counselling because I'm not a substance abuse counselor, but I'm a substance abuse educator. And so it was -- what we worked with is kind of trying to -- well, I did some parenting stuff and especially talking with women at jail about, you know, how

to stay connected with your kids and trying to just pass along some parenting kinds of ideas.

And the other stuff that we did was to look at -- look at our lives and see how to -- and to look at ourselves, how to make those things more the way we want them to be.

Q. Did you know Angela Johnson as a result of the class that you conducted at Linn County Jail?

A. Uh-huh. Angie --

Q. Is that a yes?

A. Yes, I do. Angie came really regularly.

Q. All right. And do you remember how long Angie came to your class at Linn County Jail?

A. You know, when I retired, I don't have any of those records to look stuff up, but I'm thinking, you know, two, two and a half years, something like that.

Q. Now, you said that she attended regularly; correct?

A. Uh-huh, right.

Q. Okay. Could you tell -- tell us what you learned about her or your observations of her during the time that she attended your weekly classes.

A. You know what I really learned about Angie through the years is that she was a very strong woman and she was looking to see -- she was looking at herself, you know, how -- just to see -- to gain a little insight into herself and insight into not her -- well, kind of like her relationship with her kids and

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

stuff like that.

What I learned about Angie is how dearly she loves her kids, and that came out so many times just -- and I learned honestly what a caring person Angie was. She did a lot of really nice things for people that were in the group, and I'm going to say that the group was voluntary. She didn't have to come to the group. It was she could come when she wanted to and not come when she didn't want to, and she came.

Q. Now, you said that it's a voluntary group so she didn't have to attend.

A. Right.

Q. And you said that she was a caring person. Can you give us an example of something you saw or heard that makes you say that she was a caring person.

A. There were actually several different things, and one of them was that Angie would -- Angie would kind of care for other people by giving them -- she did art stuff for other people. She made things for people. The thing that really stands out in my mind is that there was a woman in Linn County Jail the same time Angie was that didn't have a friend in the world.

Q. Do you remember her name?

A. Yes, I do. Brandy was her name. And Angie really, really kind of became her mother. I mean, she didn't have anyone anywhere that even cared that she was alive, and Angie cared that she was alive, and Angie tried to help her by just being a

caring person with her and reminding her not to say things in group, you know, you shouldn't be talking about your case, you shouldn't be saying things that will get you, you know, in even more trouble because she cared about that person.

Q. Did Angela Johnson talk about her case that you were able to see or hear?

A. No, she didn't.

Q. What about Miss Johnson's stress level? Were you able to evaluate whether she seemed to be calm, emotional, particularly stressed?

A. What I noticed is that sometimes Angie would be -- you know, there was always -- there was always a level of stress there. And, of course, there was because there was a lot going on in her life. But there was also a calmness in her too, but you could always just feel that it was just so much to deal with everything that she had to deal with. She -- but she always -- she always maintained just that -- she was, like I said, a strong woman, and it just -- and it just felt like that always with her.

Q. Okay. Would the subject of childhood, what the women that were in your class experienced as children, did that come up during sessions?

A. You know what I thought was really interesting is like lots of -- lots of us, lots of people, want to talk about, oh, my family did this or my family did that, and that was -- I think

that's valid conversation in a group where you're trying to understand yourself. But Angie would -- I saw her once or twice start to say something, and then she would pull herself back and she didn't -- she didn't share any of that stuff at all. I have just maybe just like two little tiny memories of her doing that, but she was really taking the responsibility on herself for her stuff even though I think there's -- you know, you understand your life by seeing what's happened to you, but Angie -- Angie wanted to, you know, bear that responsibility herself.

Q. As an educator with your background, do you find that Angie's failure to talk about her childhood is significant?

A. You know, I think it probably is because oftentimes we just -- sometimes I think things are too painful, and you don't want to see -- let people see -- don't want us to see, you know, people seeing us as weaker or whatever it is and also just being protective of -- I don't care who our parents are or what they've done, we usually try to protect them because they're our parents and . . .

Q. Was Angie -- did she express feelings of gratitude towards her family?

A. Oh, yes, she did. And actually I saw a little bit of Angie's family today and said they -- you know, Angie just appreciates everything that you guys have done for her. At that time Angie's kids were younger. Her -- you know, Marvea was just a little girl, and she was just so grateful for her sisters

and the people that were helping care for her kids, and really that was just over and over and just the gratitude, you know, from that.

Q. Okay.

A. And also there was some worry about are they -- really quite a bit are they okay, are -- you know, because when Marvea had to, you know, move, she was just -- you know, she was thankful for the move but also scared for the move and -- so she thought about her children a lot.

Q. And you've said that her children were important to her; correct?

A. Really important to her.

Q. Did anybody from Angela Johnson's defense team contact you in -- from 2000 to 2005?

A. No, huh-uh.

Q. If somebody had come to talk to you, would you have told the jury in her case the same things that you've talked about today?

A. Well, of course.

MS. MORRISSEY: Thank you very much.

THE WITNESS: Uh-huh.

MS. MORRISSEY: I have nothing further.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 71 of 80

BY MR. WILLIAMS:

Q. Ma'am, during the time period that you worked or did these classes at the Linn County Jail, did you go to different parts of the jail? Did you see different parts of the jail?

A. Well, I moved through the jail, you know. I'd come in the jail through the port thing and then, you know, come up into the building and stuff like that. We basically stayed in the -- in the -- this one small room, but, you know, there are windows on the room. You can see people going and walking by. And then, you know, I'd be not -- there was just a certain path that I could be on. I couldn't be like all over the jail, no.

Q. Okay. And what did -- what'd this room consist of? What was in the room?

A. It was a -- what it used to be was a chapel before it was a meeting room. And it had -- so it was the church room and the education room for people that came there for a variety of reasons. It was a very small room, maybe -- I don't know -- maybe like 10 by 10 or something like that with 12 chairs in it and then maybe one more for me and a little thing up in the front for when they had church services.

Q. And then your -- what would happen during these classes just generally speaking?

A. Generally, you know -- generally we would do something like we'd start the -- start the group with going around. People would say, you know, what's going on and let people just have a

little bit of time to share, you know, just to kind of -- just to be people, just to share what's -- you know, who they got a letter from, who they're thinking about, that kind of stuff. And then we'd do some sort of an education.

And bec -- like I said, because I'm retired, I don't have that stuff anymore. You know, I used to keep, you know, records of what I did and all, but I don't have that anymore. But we'd, you know, just do some sort of an education lesson, and there'd be like a lot of -- lots of give and take between me and the people that were in the group.

Q. Ever been on cellblock N?

A. Which one is that?

Q. Just one of the cellblocks at the Linn County Jail.

A. I don't know if I have or not.

Q. Okay. All right.

MR. WILLIAMS: No further questions, Your Honor.

THE COURT: Miss Morrissey?

MS. MORRISSEY: I don't have anything further. Thank you, Miss Meter.

THE WITNESS: Uh-huh.

THE COURT: Miss Meter, thank you. You can step down now.

MS. MORRISSEY: And, Your Honor, our next witness will be Martin Cole.

THE COURT: Okay. Why doesn't everybody take a

stretch break.

Mr. Cole, if you'll come forward, I'll swear you in. That's good. Would you raise your right hand, please.

MARTIN COLE, PETITIONER'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. And you can adjust the chair and the microphone so you can speak directly into the microphones. Scoot that chair up a little bit, please. And would you tell us your full name and spell your last name for us.

THE WITNESS: Martin Edwin Cole, C-o-l-e.

THE COURT: Miss Morrissey.

MS. MORRISSEY: Thank you.

DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Good afternoon, Mr. Cole.

A. Hello.

Q. I'm going to ask you whether you know somebody named Christi Cole.

A. Yes, ma'am.

Q. And what relationship are or were you to Christi Cole?

A. She was my wife for a year.

Q. And do you know whether Christi Cole is now known as Christi Gaubatz?

A. I think so.

Q. When did you get married to Christi Cole?

A. I want to say it was around 1991.

Q. And when did you divorce Christi Cole, or when were you divorced?

A. I'm not even sure. Maybe '93, '92.

Q. Where were you living in 1993 or '92?

A. In '92 I was in Clear Lake, Iowa. And in '93 I was in California I believe.

Q. Okay. Is there a particular reason why you went to California in 1993?

A. My mom was having back surgery. I had to help her out with some bills.

Q. Now, during your marriage to Christi Cole, did you have a child together?

A. Yes.

Q. And after you separated, who got custody of the child?

A. We shared custody. I got her in the summers, and, well, she got her in the winter.

Q. Okay. And what was your baby's name?

A. Jamie.

Q. Jamie? I'm going to ask you to remember back to 1993. Did you have custody of Jamie for the summer of 1993?

A. Yes.

Q. And I think you said you were living in California then.

A. Yes.

Q. And where was Christi living if you know?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

A. I think Mason City.

Q. All right. Were there arrangements made for you to get physical custody of Jamie?

A. Yes, she met me in Phoenix.

Q. Pardon?

A. She met me in Phoenix.

Q. All right. Christi met you in Phoenix; correct?

A. When I picked her up, yes.

Q. And was Christi with anybody when she met you in Phoenix?

A. I'm not -- I don't think so but I -- I think so, but I didn't see him.

Q. Does the name Tim Cutkomp sound familiar?

A. Maybe.

Q. In any event, she met you in Phoenix, and she gave you Jamie.

A. Yes.

Q. And then did you take Jamie for a period of time?

A. Until August or September.

Q. Okay. And was there -- how was Jamie's health when you first received her, when you --

MR. WILLIAMS: Objection. Relevance.

THE COURT: Overruled.

BY MS. MORRISSEY:

Q. How was Jamie's health when you got her from Christi in the summer of 1993?

A. There was a little neglect. I mean, her eyelashes were infected with crabs, and, I mean, she was healthy otherwise, but that was a lot of work.

Q. Okay. You said that you -- in August of 1993 you -- Christi was to go back to her mom --

A. Yes.

Q. -- or Jamie was to go back to her mom?

A. Yes.

Q. And how was that accomplished?

A. Well, she said that Angie was going to be in Phoenix or Phoenix area anyway and I would just drop her off to Angie and Angie would bring her back to her.

Q. And did you drop her off to Angie and bring her back?

A. Yes.

Q. Okay. I have an exhibit, Plaintiff's 55. I'm going to put this up for you. Can you tell me if you recognize these pictures that are in Exhibit 55?

A. Yes. I mean, I never seen the pictures until the other day, but I know Jamie's in the picture.

Q. Okay. Jamie is the child?

A. Yes.

Q. And are you in two of the pictures?

A. I'm not, no.

Q. You're not. Who is in the picture?

A. I don't know.

Q. Okay. Where were these taken? Do you know?

A. It has to be Arizona someplace judging by the cactus. I'm not 100 percent sure, though.

Q. Okay. And is there anything that is in the picture that makes you think this was taken in 1993?

A. Yeah, the haircut.

Q. What about the haircut?

A. Well, Jamie lopped off a bunch of her hair, and I had to give her the mullet to make it work.

Q. Okay. And is there anything else that makes you be able to date this picture to 1993?

A. Yes, I bought her that outfit.

Q. All right. Did you buy her that outfit when she was in California with you?

A. Pardon me?

Q. Did you buy it for her when she was in California with you?

A. Yes.

Q. All right. Mr. Cole, let me ask you, you were married to Christi for some time; correct?

A. Yes.

Q. And you had a child with her.

A. Uh-huh.

Q. Do you have an opinion based on your relationship with Christi as to whether or not she is an honest or truthful person?

A. Sometimes she is; sometimes she isn't.

Q. Okay. And what kind -- is there a particular situation in which she would be honest or wouldn't be honest?

A. She lied to me about being pregnant, and she's lied to me -- well, she lied to me a few times.

Q. Okay. Is there -- would she lie for a reason? I mean, would she lie to benefit herself?

A. To benefit her, yes.

Q. Okay. Would she lie just to be mean?

A. Maybe.

Q. Would she lie to get even?

A. Yes.

MS. MORRISSEY: All right. Thank you. I have nothing further.

THE COURT: Mr. Williams?

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Cole, when she lied to you about being pregnant, Angela Johnson lied to you about being pregnant at the same time; right?

A. Right.

Q. All right. And they both lied to you about being pregnant because you were having an affair with both of them at the same time; right?

A. Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 73 of 80

Q. Okay. And they lied to you about being pregnant because they told you they needed money for an abortion; isn't that right?

A. Yes.

MR. WILLIAMS: All right. Nothing further.

MS. MORRISSEY: I don't have any questions.

THE COURT: Okay. Thank you, Mr. Cole.

Who's next?

MS. MORRISSEY: James Ethan Johnson, Your Honor.

THE COURT: Okay.

MS. MORRISSEY: Mr. Johnson, go right up there.

THE COURT: Good evening. Would you raise your right hand, please.

JAMES ETHAN JOHNSON, PETITIONER'S WITNESS, SWORN

THE COURT: Thank you. Please be seated in the witness box. And you can adjust the chair and the microphones so -- you can scoot the chair up so you can speak directly into the microphones, and then tell us your full name, please.

THE WITNESS: My full name is James Ethan Johnson.

THE COURT: Okay. Thank you.

DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Mr. Johnson, where do you live?

A. I live in Mason City, Iowa.

Q. And what do you do for a living?

A. Currently I run a shift at Graham Manufacturing. I'm the predominant plant and lead.

Q. Do you have any children?

A. Yes, I have three children.

Q. And do your children live with you?

A. One of them does. The other two are grown.

Q. What's the name of the child that lives with you?

A. My youngest son is Ethan Allen Johnson.

Q. Do you know somebody by the name of Peggy Sue Hoover?

A. Yes, I do. That would be the mother to my youngest son.

Q. So she's Ethan Allen Johnson's mother.

A. Correct.

Q. Did you have a relationship with Peggy Sue Hoover?

A. Yes, I did.

Q. And how long did your relationship last?

A. Approximately two and a half to three years.

Q. Were you arrested in the year 2000?

A. Yes, I was.

Q. And were you -- what were you arrested for?

A. I was arrested and charged with distribution of methamphetamine.

Q. And after you were arrested were you held in custody?

A. Yes, I was.

Q. Where were you held in custody?

A. I was held in custody in Linn County Jail in Cedar Rapids.

Q. Were there state or federal charges that were filed against you?

A. At that time they were federal charges.

Q. Okay. And did they remain federal charges?

A. Yes.

Q. And what were the charges?

A. Distribution of methamphetamine and possession of firearms as a user.

Q. Okay. Did you have a codefendant in that case?

A. Yes, I did. Peggy Sue Hoover was my codefendant.

Q. And was she charged with the same things that you were charged with?

A. Yes. She was also charged with a possession of firearms as a felon.

Q. Okay. Was Miss Hoover detained after you were -- well, were you both arrested at the same time?

A. Yes, we were both arrested and indicted at the same time. At that time, though, they released her back on her own custody on to the street.

Q. And when they released her back on to the street, did you have any discussion with somebody in law enforcement about that?

A. Yes, I did. I had agreed to cooperate -- fully cooperate with the government, and one of the things that came about was Lori Lewis with the DCI had wanted me to try and aid her in setting up some controlled buys using Peggy as -- basically as a

cooperative agent. And I informed Mrs. Lewis that that most likely wouldn't work because of Peggy's lack of mental abilities.

Q. Was -- did Miss Lewis take your advice?

A. She did. She tried to have Peggy do some various controlled buys, and then later on in another debriefing she'd said she understood what I was talking about as far as Peggy not really being capable of, you know, doing much of anything as far as controlled buys are concerned.

Q. Now, was Hoover detained at the same time that you were, or was she released?

A. Well, at that time she was briefly detained for I believe it would be our arraignment. And then she was released. It was later on that she violated her pretrial release agreement and was brought back into custody into Linn County.

Q. And when she was brought back into custody in Linn County, were you still there?

A. Yes, I was.

Q. Okay. Now, I'm going to ask you whether or not you were convicted of any crimes as a result of the case that we're talking about.

A. Yes, I was convicted and originally sentenced to ten years for the distribution of meth and the firearms charge.

Q. Okay.

A. However, there was a -- I can't remember what the statute

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 74 of 80

**1319**

is for cooperation with the government, but it was pending based on my continued willingness to cooperate with Mr. Williams and the federal government.

Q. Was Mr. Williams your prosecutor?

A. Yes, he was.

Q. And what judge were you in front of?

A. Judge Bennett.

Q. And were you ultimately sentenced to less than ten years?

A. I did originally get the ten years, and then about four and a half years into it there had been a couple of different cases that had come about where either -- and/or either my threatened testimony was beneficial for the government. I also did a grand jury against one Jerry Avis that did not provide (sic) to be fruitful, but C.J. saw fit to file the motion for me to get a sentence reduction.

THE WITNESS: And, Your Honor, you gave me three years, eight months off on my sentence.

Q. And how have you done since you've been released?

A. I've been pretty active in -- I've been mentoring people on the street helping aid people in their efforts to stay off drugs. I also have some speaking engagements and stuff on it, Prairie Ridge. And I've been kind of basically diligently staying drug free ever since I got a second chance at life so . . .

Q. So the system worked for you.

**1320**

A. I believe so. I think that I had the appropriate amount of time, you know, that I had served to really get a look at my life and get myself straightened out so -- and I was grateful for Your Honor giving me a second chance and giving me an opportunity.

The company that I got started working for, they saw the skills that I had and the people management skills I had, and they -- you know, they used that to their advantage, and now I run -- you know, I manage 35 people. So it's actually like one of the best success stories probably that's come out of your court in a long time, and I'm pretty proud of it.

THE COURT: You should be. So am I.

Q. Mr. Johnson, you -- when did you begin your relationship with Miss Hoover?

A. Basically we started seeing each other when I was dealing drugs. I started dealing drugs roughly around 1996, and she had had prior drug involvement with a couple of different dealers that she had mentioned. And, you know, I advised her of the risks of getting involved, and she didn't really seem to have a problem with it.

And I did -- basically I think it was right around 1997 or so that, you know, she and I started seeing each other. And I was predominantly, you know, going out purchasing and running around selling drugs, and she was maintaining the household business, if you will.

**1321**

Q. By the household business, do you mean she was selling drugs?

A. Yeah, yeah.

Q. Okay. And I take it you've ended your relationship with her.

A. Yeah. Well, I still have a -- we still have a son together, so she's been in and out back and forth out of prison. She's currently in Beje Clark halfway house, and I have spoke to her. As part of the custody agreement that we have, she's allowed to have phone contact with my son. But at this time I'm not allowing her anything other than supervised visitation with him and that pending her getting furloughs to the -- someplace.

MR. WILLIAMS: Your Honor, I would just -- as I understand, this is being presented for what would have come into evidence had they called this witness back in 2005. And it appears we're getting into information about events that would have occurred after 2005. So I just want to pose an objection to anything that's going to postdate the trial.

MS. MORRISSEY: I'll try and tighten it up, Your Honor.

THE COURT: Okay. Thank you.

MS. MORRISSEY: You're welcome.

BY MS. MORRISSEY:

Q. When you were at -- well, do you have an opinion based on your relationship with Peggy Sue Hoover that began in 1996 as to

**1322**

whether or not she is a truthful person?

A. Okay. There's not a real short answer to that, but I'll try and keep it as brief as I can based on time allowed.

Q. Okay.

A. One of the occurrences that happened while she was released and I was held in 2000 was her claim that she was pregnant again by me. However, I knew for a fact that she wasn't because my mother had purchased feminine hygiene products for her and the fact that she was also seeing somebody else.

Q. So this was --

A. So she continued to lie to me and try and tell me that this child was mine when there was no way possible it could be.

And also she had used our son who was under guardianship with my mother and father in order to get a HUD house or a HUD apartment and was claiming that she had a place all set up for she and I.

There was just countless occurrences of that nature where she just repeatedly would, you know, not -- it's not that she just wouldn't -- even if she can tell -- the ability to tell the truth was there, but she just would refuse not to be honest.

Q. And what are some of the reasons why she wouldn't be honest?

A. Well, she was diagnosed as being bipolar, severely bipolar. Some of the different occurrences that I had where, you know, there was no reason for her not to be honest about things, she

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 350    Filed 11/10/11    Page 75 of 80

would lie anyhow, either lie by omission or just say something completely off the wall out of the -- out of subject and character of what we were trying to discuss.

Q. Let me interrupt and ask you a question. Were you both at Linn -- were you and Miss Hoover both at Linn County Jail for some period of time back after your 2000 arrest?

A. Yes, yes, we were.

Q. And were you able to communicate with Miss Hoover when you were at Linn County Jail?

A. Because we were codefendants, we were allowed to send letters back and forth, but we also used the law library as a means of communication, putting letters in the books there and communicating back and forth. So yes, we were able to communicate.

Q. And while you were at Linn County Jail, did Miss Hoover approach you about Angela Johnson?

A. Yes, she did. She specifically asked me what she should do as far as the different information that she had heard about Angela and from listening in on various conversations.

Q. And what did you do? Did you ask her what she knew about Miss Johnson?

A. Yes, I did. I asked if she knew anything specifically or if the information that she was hearing was -- whether or not it was, you know, like just jailhouse gossip or, you know, something that -- you know, if she knew something specific

because the reason being she was asking me -- and this goes back to part of the bipolar -- she was asking me to tell her specifically what she should do, and I would not give her an answer to that. I just -- you know, I didn't feel comfortable telling her to -- you know, to rat on somebody or tell on somebody about information, but she wouldn't tell me specifically what she had heard either, just that, you know, everybody was talking.

Q. Did you ask her specifically whether she had gotten any information from Miss Johnson?

A. Yeah, I did. I told her -- I said I would -- in order to give a -- give her any kind of solid answer on that, I told her -- I said I needed to know specific information. And she did not or could not produce any. She wouldn't be -- she wouldn't tell me anything.

Q. Did she say -- did she tell you that she had herself talked to Miss Johnson and obtained information?

A. No, she didn't.

MS. MORRISSEY: All right. I have nothing further. Thank you.

THE COURT: Mr. Williams?

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Johnson, how are you, sir?

A. Good.

Q. It's been a while since I've seen you.

A. I appreciate seeing you on better pretenses than the last time that we -- occasion to speak.

Q. Likewise. You're all done distributing drugs?

A. Absolutely.

Q. I'm happy for that, sir. I just have a few questions for you.

You talked about Miss Hoover's truthfulness. You remember that line of questioning?

A. Yes.

Q. Now, when you and Miss Hoover were both arrested back in -- whenever it was, 1997 or when it was, you both cooperated against some of the same defendants at that time; is that fair?

A. I think you guys kind of took her in a different direction than where I was because she didn't really have the intimate knowledge of some of the same people that I did.

Q. How about Stoltenberg? Do you remember --

A. Stoltenberg, she had minimal involvement with him, but she did have some involvement with him, yes, yeah, so that would be one that we had in common so . . .

Q. All right. And the information she provided on Stoltenberg was the same basic information you provided. You had more detail, but she provided the same type of information.

A. That's correct.

Q. And her information was accurate on Stoltenberg.

A. Yes.

Q. All right. You talked about her using your son to get a HUD house. I'm just curious. What was the timing, time frame, of when that incident --

A. That would have been shortly after -- after we were both indicted and she was released on pretrial. She had obtained a HUD apartment.

Q. Okay. Now, you talked about Ms. Johnson having some contact with you in the Linn County Jail about Angela Johnson. Now, first of all, you were cooperating at that time with law enforcement?

A. Yes.

Q. Did you raise that with law enforcement that Miss Hoover had information about Miss Johnson? Do you remember ever bringing that to --

A. No, because I just felt like the information that she was giving me was so vague that, you know, I mean, that's what I meant by, you know, I told her -- I said, "Well, look, you need to -- you know, you need to have something more specific before you -- you know, because otherwise you're going to get yourself, you know, hemmed up in something, you know, I mean."

Q. Okay. And so let's get some context for this. You guys are -- you're not communicating by sitting down across the table talking to each other.

A. That's correct.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q. Okay. Your communication is, you know, by letters and by putting a note in a law library, and she comes and gets the note and that kind of stuff; right?

A. Right, that's correct.

Q. So it's kind of hard to communicate between the two of you at that point; fair?

A. Right. It was difficult, yeah.

Q. Okay. And to the extent that she would put something specific in a law library book, somebody could find that; right?

A. That's correct.

Q. Okay. And so what you're saying is you were trying to communicate, trying to get a sense of what information she had, and she just wasn't telling you the specifics of what information she had at that time.

A. I think that would be fairly accurate except that the letters that she was allowed to write to me she would be, you know, more specific in regards to some of the things that were going on and stuff on her side of the cell, if you will, so . . .

Q. Okay. But as to Angela Johnson, you said you were asking for specifics, and she just didn't ever give you the specifics.

A. Yeah. And it was my understanding or my feeling that she -- she couldn't give them to me, and I don't know why.

Q. Okay. That's a feeling you have, though; right, Mr. Johnson?

A. Well, yeah, in essence.

Q. And fair to say you don't know what she may have gained after the exchange of these letters from Miss Johnson either; right?

A. That would be a fair assessment.

Q. Okay. So it could have been the case that she was maybe hearing rumors up front. She has this exchange of communication with you, and after you guys are done communicating, she actually gets some direct information from Miss Johnson.

A. Yeah, and I agree with that. However, I do believe that because of the nature of how she is that she would have still -- if once she found out an answer to the question that I had for her that she would have sent it to me, and this is where my belief lies is that she would have sent that in a letter, you know, mailed through the regular mail system in the prison to let me know that she did substantiate, you know, something or have something more. And I never received that from her.

Q. Okay. And so because she didn't send you specifics, you're -- and I'm not -- I'm not being critical, Mr. Johnson.

A. Right.

Q. But you're just saying because you didn't receive something your conclusion from that is that she didn't have it.

A. Right, and I would also like to point out too that Peggy and I continued to correspond throughout the whole entire time that she and I were in prison, so it wasn't just the time that

we were in Cedar Rapids corresponding through the law library and the county -- the county mail system. We still had the regular mail system because we were codefendants and we had a child.

And she did talk to me more at length about some of her testimony and stuff against a guy named Kenny and a few other things.

So I guess that's why my belief is as strong as it is that if she did have something more she would have sent it to me because I had asked for it, you know, because I -- I don't know. I was still trying to help her, you know, in her situation as best I could.

Q. Do you -- and I don't know this to be the case. Do you think there's a chance that if she had something that was extremely valuable to the government that she may not want to give it to you because then you could provide it to the government and she wouldn't get the benefit of it?

A. No, I don't think she'd withhold something from me like that. I understand what you're saying, but I even still to this day, you know, I mean, I think that, you know, if I had asked for it that she would give it to me, you know.

But there again, you know, comes some of the bipolar. There was times when like just before she got revoked this last time she came to her daughter's -- daughter's birthday party just smashed to the hilt on dope, and I kept insisting that she,

you know, come clean with me now that she's been revoked and sent back to prison. I said just admit that you -- you know, that you were high and that -- you know, so that we can move forward because we have a son together, you know, and I'm trying to establish visitation, I'm trying to establish trust so that there again you get the dishonesty and she just still to this day will not admit, you know, that she was, you know, high on drugs when it was extremely obvious, so there's a lot of instability.

So I'm not trying to get too long winded on your question. There is -- there is, you know, kind of a gray area there where if she did decide that she didn't want to -- or somebody had told her to keep her lips shut about it where she might not have forwarded me that information.

Q. I see your point.

MR. WILLIAMS: Okay. Thank you very much.

THE COURT: Miss Morrissey, anything else?

MS. MORRISSEY: No, Your Honor. Thank you.

THE COURT: Mr. Johnson, I think I just have one question for you. Any relation to Angela Johnson?

THE WITNESS: Not this one, but I'm married to one.

THE COURT: There you go.

MS. MORRISSEY: That's the truth.

THE COURT: Great answer. I don't have any other questions, but I just wanted to congratulate you. You know, we

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 77 of 80

don't have many graduates of our court that do as well as you do and so --

THE WITNESS: Yeah, I actually had a thought when I came in here that you told me you didn't ever want to see me in your courtroom again.

THE COURT: And who knows; right? This isn't -- this is an okay situation. Yeah. I just didn't want to see you back on supervised release. Yeah. Are you still on supervised release, or are you off?

THE WITNESS: I discharged on August 23.

THE COURT: Oh. Well, great, great.

THE WITNESS: I had -- I had a presumptive positive on my last UA from my allergy medication, and you can -- you can rest assured that your POs were definitely up my hind end even though I had four days of paper left and -- but yeah.

THE COURT: Wow.

THE WITNESS: So --

THE COURT: Well, way to go. Keep doing great things. I really appreciate it. It's really inspiring when somebody does so well.

THE WITNESS: You know, and I think when you're dealing with somebody who has a drug addiction and you're looking at a five-year sentence or somewhere around that range, I think it's really the necessity. I can honestly say had I only done a year or two years on a state bit I probably wouldn't

have turned my life around but . . .

THE COURT: You know, Mr. Johnson, I'll just share something with you. In the last 2 years I visited 226 inmates in 10 different federal prisons that I personally sentenced. And I've heard that so often.

THE WITNESS: Yeah. It takes --

THE COURT: And the range is like -- you know, they usually say four to five years. It's so interesting.

THE WITNESS: Yeah, it takes some time to realize your mistakes and come full circle and know that you were distributing poison and destroying people's lives, you know. As long as a guy keeps blaming it on that one over there, he's always going to go back. You know, you have to realize the responsibility for your own and what you did and where you were at on it.

THE COURT: Where'd you wind up serving your time?

THE WITNESS: I ended up in Duluth.

THE COURT: In Duluth, okay.

THE WITNESS: Cold but nice.

THE COURT: Okay. Well, congratulations, and good luck to you.

THE WITNESS: Thank you, Your Honor.

THE COURT: Thank you.

Does that conclude the evidence for today? Or do you have one more short witness?

MS. MORRISSEY: Your Honor, I have one really short witness if the Court would . . .

THE COURT: Okay. Is that in terms of length of testimony or height?

MS. MORRISSEY: Actually if I remember correctly with this witness, both.

THE COURT: Both, okay. Who is the witness?

MS. MORRISSEY: Her name is Kelly Burke. Maybe she's not that short in stature. I was wrong. Oh, no, I'm wrong. I'm wrong.

THE COURT: No eyewitness IDs for you.

MS. MORRISSEY: No eyewitness IDs for me.

Come on in.

THE COURT: Hi. Just come forward. I'll swear you in. Good evening. Would you raise your right hand, please.

KELLY BURKE, PETITIONER'S WITNESS, SWORN

THE COURT: Okay. Please be seated. And you can adjust that chair and the microphones so you can speak directly into them. And would you tell us your full name, please.

THE WITNESS: Kelly Ann Burke.

DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Ms. Burke, when I interviewed you this morning, were you sitting down?

A. Yes.

Q. Okay. I explained that you -- I thought you were short in stature, and I had to correct myself.

Do you know Angela Johnson who's in the courtroom?

A. Yes.

Q. How do you know her?

A. We were in Linn County Jail together.

Q. Okay. And when were you in Linn County Jail together?

A. In 2000.

Q. What were you doing in Linn County Jail, Miss Burke?

A. I was in federal holding.

Q. And what were you in federal holding for?

A. For being charged with manufacturing.

Q. Manufacturing what?

A. Meth.

Q. And how long were you in Linn County Jail?

A. I was in Linn County for about four months.

Q. During the time you were in Linn County Jail, did you meet Angela Johnson?

A. Yep.

Q. Were you housed in the same area as her? Could you describe how you had contact with her?

A. Well, it was one big room. We all just had bunk beds, and we all ate together every day, and we were together day in, day out so . . .

Q. So it was one big room.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 350   Filed 11/10/11   Page 78 of 80

## 1335

A. And then we all had our bunk beds.

Q. All right. And did you share a bunk bed with Miss Johnson?

A. No.

Q. And so you were in with her for, did you say, three months?

A. About three or four months, yeah.

Q. And do you remember when this was?

A. From November until I think about February.

Q. Of what year?

A. 2000 to 2001.

Q. 2000 to 2001, so November of 2000 to February of 2001.

A. Yeah, I mean, because they brought me back here a couple times, so I wasn't there the whole time.

Q. Now, during the time -- the months that you were in custody with Miss Johnson in this setting, did you ever hear Miss Johnson talk about her case?

A. No.

Q. Did you ever see her talking -- see or hear her talking to other inmates about her case?

A. No.

Q. Did she ever talk to you about her case?

A. No.

Q. Were you convicted as a result of your arrest in 2000?

A. Yeah, I pled guilty to it.

Q. Okay. And are you on supervised release now?

A. No.

## 1336

Q. Okay.

A. I got off early for good behavior.

Q. Good. What did you plead guilty to?

A. To manufacturing.

Q. And were you ever contacted by anybody from the years 2000 to 2005 about Miss Johnson?

A. Yeah, a couple -- I think they were detectives tried to contact me, and I told them I didn't want to talk to them, but then my supervised release person told me that I had to talk to them.

Q. And did you talk to them?

A. Yeah. They came and picked me up from work, and we went driving around in a car.

Q. And what did they ask you about?

A. They just -- you know, kind of the same stuff you're asking, if she had ever talked about her case, stuff like that, you know.

Q. What did you tell them?

A. No, same stuff I've told you.

Q. Did anyone from Miss Johnson's defense team contact you in the years 2000 to 2005?

A. Nope.

Q. If they had contacted you, would you have told them what you've told us today?

A. For sure.

## 1337

MS. MORRISSEY: All right. Thank you.

THE COURT: Mr. Williams, any cross-examination?

MR. WILLIAMS: None, Your Honor.

THE COURT: You may step down.

Does that conclude the evidence for today?

MR. BURT: It does, Your Honor.

THE COURT: Okay. How you all holding up?

MR. BURT: We're fine.

THE COURT: You sure?

MR. BURT: Yes.

THE COURT: Okay. Starting at 7 a.m. tomorrow?

MR. BURT: We'll be here.

THE COURT: Okay. What hours do you want to go on Saturday?

MR. BURT: I think right now we have -- we have three witnesses scheduled. Two of them will be -- we have a Strickland expert, so he's going to take the bulk of the time, probably about three hours I would think, and then the other two, probably an hour and a half for one of the investigators, and I'm not sure about the other one.

THE COURT: Who's your Strickland expert just out of curiosity?

MR. BURT: Russell Stetler.

THE COURT: Okay. We're cleared to go all day Monday. We're cleared to go Tuesday until I believe 2:30.

## 1338

MR. BURT: Okay.

THE COURT: I have kind of a complex crack/powder cocaine case that involves the new law, and there's been amicus briefs filed, and it's been scheduled and got people coming in and real important matter. And so we're probably going to knock -- that starts at 3, so we'll probably knock off at 2:30 because I was able to move -- my secretary was able to move four other sentencings that day, but this one was just too daunting to move.

MR. BURT: And in terms of our travel plans, after that time the Court is not free, and we're going to spill over into June if we need to.

THE COURT: Right.

MR. BURT: Got it.

THE COURT: Yeah.

MR. BURT: Thank you.

THE COURT: Well, if we need to? Oh, you mean --

MR. BURT: Well, on the witness -- we have other witnesses scheduled, but I mean on whatever we have left of the group that's here would spill --

THE COURT: Yeah, we'll spill over into June.

MR. BURT: Right.

THE COURT: Gotcha.

MR. BURT: Thank you.

THE COURT: Anything else we need to talk about?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

1339

MR. WILLIAMS: I don't think so.

THE COURT: At some point if you'd remind me, I need to have a CJA ex parte meeting with you all.

MR. BURT: Yes.

THE COURT: That won't take very long.

MR. BURT: Sure. At the Court's convenience.

THE COURT: Okay. Let's try and maybe do it tomorrow.

MR. BURT: Fine.

THE COURT: Okay? Great. Okay. Thank you so much. We'll see you tomorrow morning at 7. Thank you.

(The foregoing hearing was adjourned at 6:17 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

   S/Shelly Semmler      3-28-11

Shelly Semmler, RMR, CRR     Date

1340

**INDEX**

| WITNESS: | | PAGE: |
|---|---|---|
| THOMAS MILLER | | |
| | MR. BURT | 1026 |
| VALLI WILLIAMS | | |
| | MR. BURT | 1041 |
| | MR. WILLIAMS | 1050 |
| SARA EWING | | |
| | MS. MORRISSEY | 1052 |
| DEAN STOWERS | | |
| | MR. BURT | 1069 |
| WINIFRED JERGENSON | | |
| | MS. MORRISSEY | 1272 |
| JAMES JOHNSON | | |
| | MS. MORRISSEY | 1280 |
| VERLENE VANDERPOOL | | |
| | MS. MORRISSEY | 1282 |
| | MR. WILLIAMS | 1293 |
| | MS. MORRISSEY | 1299 |
| CAROL METER | | |
| | MS. MORRISSEY | 1300 |
| | MR. WILLIAMS | 1307 |
| MARTIN COLE | | |
| | MS. MORRISSEY | 1309 |
| | MR. WILLIAMS | 1314 |
| JAMES ETHAN JOHNSON | | |
| | MS. MORRISSEY | 1315 |
| | MR. WILLIAMS | 1324 |
| KELLY BURKE | | |
| | MS. MORRISSEY | 1333 |

*****

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*