IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

ANGELA JANE JOHNSON,                    No. C09-3064

          Petitioner,

     vs.                                TRANSCRIPT OF
                                        2255 EVIDENTIARY
UNITED STATES OF AMERICA,               HEARING

          Respondent.
     _____/         Volume 5

          The Hearing held before the Honorable Mark W. Bennett,
Judge of the United States District Court for the Northern
District of Iowa, at the Federal Courthouse, 320 Sixth Street,
Sioux City, Iowa, March 11, 2011, commencing at 7:03 a.m.

---

APPEARANCES:

For the Petitioner:     MARCIA A. MORRISSEY, ESQ.
                        2115 Main Street
                        Santa Monica, CA 90405-2215

                        MICHAEL BURT, ESQ.
                        Law Office of Michael Burt
                        Suite 329-E
                          600 Townsend Street
                        San Francisco, CA 94103

                        MOHAMMAD ALI HAMOUDI, ESQ.
                        Suite 329-E
                          600 Townsend Street
                        San Francisco, CA 94103

                        NANCY S. PEMBERTON, ESQ.
                        Pemberton & Associates
                        Suite 329E
                          600 Townsend Street
                        San Francisco, CA 94103

For the Respondent:     C.J. WILLIAMS, ESQ.
                        Assistant United States Attorney
                        Hach Building - Suite 400
                        401 First Street Southeast
                        Cedar Rapids, IA 52401-1825

Also present:      John Graham

Reported by:       Shelly Semmler, RMR, CRR
                   320 Sixth Street
                   Sioux City, IA 51101
                   (712) 233-3846

---

THE COURT: Thank you. Please be seated. Good morning. And we're continuing with the direct examination of Dean Stowers.

MR. BURT: Judge, before we do that, I had a scheduling issue if it please Court that I'd like to take up.

THE COURT: Yes.

MR. BURT: We have Mr. Berrigan here prepared to testify. We have other -- we have Mr. Stowers to finish. Then we have a number of family witnesses and Mr. Frerichs. That's going to take us, I would suspect, well into the afternoon.

And Mr. Berrigan has been here for a number of days. He has a situation comparable to Your Honor's situation in that his son apparently is coming in from college. He wanted to know whether it would be okay for him to leave. If he did that, it would be possible that we could run out of witnesses this afternoon because I had anticipated we were going to start with him if we got through the other witnesses. It's a little hard to predict with Mr. Stowers. He actually may run through the morning. And if that's so, then we probably would fill the afternoon with our other witnesses.

THE COURT: And -- and then when would we take Mr. Berrigan?

MR. BURT: And then -- there are two options there and a further complication which is he is available Monday morning, and he can -- we can have him here and we could use the entire

---

day to do him. I'm hopeful we could do him in one day, although it may spill over if -- into a second day. If it does, he has a conflicting court appearance for Tuesday morning. So if we don't finish him in one day, he's not going to be available to be here on Tuesday. We can certainly try and finish him up in one day, and the Court's heard a lot of testimony from the lawyers, so I think it's conceivable we could finish him in one day.

THE COURT: Well, what would you like to do?

MR. BURT: And I guess the third alternative would be to schedule him in June when we come back so that we can ensure to get him on and off in one session. That would be the other option. But if we did that, then we wouldn't be taking advantage of the time the Court has set aside for us.

Now, we have one other witness coming in on Monday who's going to take probably an hour, hour and a half, so we'd -- we would start with him at 7. That's Mr. Gratias. And we would probably be done with him no later than nine. And then we'd put Mr. Berrigan on from nine until how ever long the Court wants to go. And if we did it that way, then Tuesday I don't believe right now we have anybody else scheduled because we anticipated that Mr. Berrigan would take the time the Court had set aside for us up to 2:30.

THE COURT: Well, couldn't you put Mr. Berrigan on -- you don't think he'll take all day Monday? -- and then put

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 351    Filed 11/10/11    Page 1 of 71

Gratias on Tuesday morning?

MR. BURT: I could do that. In other words, start with Berrigan. I think that's possible we could do that as well and take the full day with Pat, and hopefully we'd finish with him.

THE COURT: If you don't mind doing it, does -- Mr. Berrigan doesn't mind coming back?

MR. BURT: No, he doesn't.

THE COURT: He'd rather come back Monday than go tomorrow?

MR. BURT: Yes.

THE COURT: Okay.

MR. BURT: Because he wants to spend his time with his son.

THE COURT: Yeah, that's fine.

MR. BURT: He has no problem coming back Monday morning.

THE COURT: Okay. That's fine with me. Government have any objection?

MR. WILLIAMS: No, Your Honor.

THE COURT: Yeah. That's fine.

MR. BURT: So I'll release him for the day.

THE COURT: And, you know, I understand scheduling witnesses is extraordinarily difficult, and so if we run out of witnesses, we run out of witnesses. It's not going to break my

heart actually surprisingly because I've got a few other cases I'm working on too.

MR. BURT: I understand that.

THE COURT: I've got two big trials back to back I'm trying to get ready for, civil cases.

MR. BURT: That's fine. And also we have an expert witness coming in for tomorrow morning. So if we had some additional time to prepare him, we might save some . . .

THE COURT: That's fine. Thank you.

MR. BURT: Thank you very much.

DEAN STOWERS, PETITIONER'S WITNESS, PREVIOUSLY SWORN

CONTINUED DIRECT EXAMINATION

BY MR. BURT:

Q. Good morning, Mr. Stowers.

A. Good morning.

Q. I think when we were ending up yesterday we were just starting to talk about going into trial and the preparation that led to that. Do you recall that?

A. Yes.

Q. And I'm not sure if the screen is on yet --

THE COURT: Let's see. Roger, did you turn the power on by any chance?

MR. MASTALIR: Oh, shoot.

THE COURT: That's okay. I will. I just did. We'll cancel each other out if we both do it so . . .

It's going to take a minute to . . .

MR. BURT: Sure. I can do some other stuff.

BY MR. BURT:

Q. Could you tell me what preparation meetings there were prior to the actual start of the trial in terms of the defense lawyers getting together and discussing what the defenses in both phases of the case -- case was -- in the penalty and guilt phase of the case was going to be?

A. Well, somebody may want to locate if I need to refer to it my billing records, but the -- we had a number of meet -- it depends on how you look at it. I mean, the case was going on for five years, so there was a lot of stops and starts along the way. And then there was a lot of disruption with the interlocutory appeal.

But the last trial date, of course, was the one in spring of 2005 and -- following the Honken trial. So it really was in that period of time really following -- during and following the Honken trial that we started to really focus on getting down to what I'd call trial, trial prep, I mean real trial prep as opposed to sort of just general preparation for the potential of trial.

Q. And so the real trial prep would have taken place after the Honken verdicts came in?

A. I would say that's true, yeah, yeah, the real trial prep. And I think it really in a lot of ways would have started, if

you want to have a marker for lack of a better one, would be the trip to Kansas City when we met with Lisa Dahl and went through the jury -- the mock jury kind of a thing.

Q. And what was the date of that? Do you remember? I --

A. I think it may be in December of 2004. I want to make sure if you want me to check.

Q. Well, that's close enough. You think it was December '04?

A. Yeah. Let me just verify. May have been the first part of December. Well, I could be wrong now. I wish I was right. That would have been easier.

Q. Well, it would have been after the Honken trial; right?

A. Oh. Let me just see. Here we go. End of -- yeah. Let's see. I show here December 1, 2004, conference with Al and Pat and jury consultant and mock jurors. And that -- excuse me. Yeah. So it would have been in that time frame, early -- beginning of December 2004.

Q. And is it your testimony that that's when trial preparation really began in earnest in this case around that time period?

A. Yeah, as I think of trial preparation.

Q. Sure.

A. Yeah.

Q. And did that trial preparation extend to investigative efforts? In other words, was this a period of time when you were sort of stepping back and saying we got a lot of investigation to do and began to do it?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 351 Filed 11/10/11 Page 2 of 71

**1349**

A. I -- for the death penalty portion that Mary Goody was doing, I'm going to -- she would make trips out here to the Iowa area and wherever else she needed to be doing her work so -- and I know she's testified, so I don't want to cross myself with her because I wasn't always aware a hundred percent of what she was doing since she was largely working under Pat's direction, although I'd often be informed that she was doing -- you know, she was making a trip for a week or whatever to do mitigation investigation. So I'm not really in a position to really say when she was doing what she was doing.

Gordon Gratias would have been at that point I believe -- I think Cornell was out of the picture by then and -- Ray Cornell, so I would -- I think that that would have been a time period where after many stops and starts the file would have been picked up again and we would have started to look into things.

Now, was there investigation done to speak of? We did make a trip to Mason City and tour some of the locations that were pertinent to the case just for informative purposes to kind of get a feel for things. And Gratias went along on that, and I'm sure that's reflected in my billing statements. But, you know, there wasn't a ton of fact-based investigation relating to the guilt/innocence portion of the case.

Q. At any point in time.

A. At any point, no.

**1350**

Q. And why was that?

A. Well, I guess what I'd say is that, frankly, there didn't seem to be a lot to investigate there in great detail, and I think that was kind of the general thinking. Particularly as things sort of jelled in the end after the suppression rulings of the Eighth Circuit and it came back, it seemed like getting into a good deal of fact-based investigation appeared not likely to be very meaningful or productive and wasn't going to be something that led to something to work with at trial.

Q. Let's look at that. In August of '04 -- this is DS-00076 which is from Exhibit 51, your attorney notes on the case -- you have a sheet of paper in there which looks to be you're sketching out potential defenses; right?

A. Correct.

Q. And was this -- does this note reflect a team meeting, or is this sort of just your ruminations about possible defenses to the case?

A. Well, let me look at my billing, see if there's something that happened on that day.

Hmm. Well, I don't see anything that would help me know why I was writing that note at that time, but that's what it is if you will. And it probably -- either it was simply me putting together thoughts on paper or conversation with others involved in the case to kind of come up with sort of an outline of what our potentials were for legal and factual issues if you

**1351**

will.

Q. And under defenses you have after-acquired knowledge and then mere presence, slash, knowledge, slash, associates. I understand because you've explained it what after-acquired knowledge is, but what is -- and I understand what mere presence means, but what does the slash, knowledge, slash, association mean?

A. Well, under the law there's principles that apply in the context of certain offenses where mere knowledge that somebody else was going to commit a crime or had committed a crime in the past, that sort of thing, would not be sufficient to establish that the person who had the mere knowledge was guilty of the offense. And the same would be true, the mere association, for example, of Angela Johnson and Dustin Honken would not be sufficient to establish her guilt as an aider and abettor, et cetera. Mere presence at the scene of an offense, et cetera, would not do it. And there's even case law that says mere presence, knowledge, and association in combination I think wouldn't be enough.

So all three of those things were obviously going to be issues. They're part of the uniform -- in part they're part of the uniform, I believe, instruction on aider and abettor liability in the Eighth Circuit. But there's also additional more defined or more refined applications of those in particular contexts, and those were things that we worked on. We prepared

**1352**

and presented some proposed instructions with some authorities on those issues as well as many others.

Q. And where in the evidence that you had reviewed up to this point was there support for the mere presence argument, in other words, that she was present at these crime scenes but had done nothing to facilitate the actual commission of the crimes?

A. I think it was a reasonable construction of some of the evidence that the jury could have reached, and that was that there was a particular witness whose name I'm not going to be able to remember right now -- it might have been Gaubatz who was really kind of an important witness -- who the witness indicated that -- well, number one, the purpose of going over to the Duncan house was to make a video. It wasn't to go over there to kill anybody. That was seemingly a fair construction of the evidence, that when they got there albeit at gunpoint or whatever the particular circumstances were, that when they got there or after they had been there for some period of time or as they were leaving or after they had left something had, quote, gone wrong I think was the witness's recollections of what Angie had said to the witness according to the witness which would tend to support the idea that she was present, didn't have knowledge or -- that he was intending to kill anybody before it happened, hadn't planned it, that she was there to facilitate the videotape of Nicholson in some fashion by gaining access to the house and that sort of thing. And that was really where it

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 351    Filed 11/10/11    Page 3 of 71

was.

The evidence, as you know, in this case was capable of many different, I would say, constructions of what actually occurred with regard to the four killings. And it was very -- there was a lot of ambiguities in the evidence as to what precisely happened with regard to that.

And so it was clear to me that we were going to need to be looking at that issue based on everything I was seeing.

Q. Sure.

A. Yeah.

Q. Now, I notice on this list you do not have listed that she was not even present at the time of these killings, and I think yesterday you had a note in your file where Angie Johnson had told you she was not present. Is there some reason why at this particular time that potential defense was not listed?

A. Well, that's actually the first after-acquired knowledge. That's sort of embodied within that concept.

Q. I see.

A. That she didn't know about it at the time but she found out afterwards.

Q. And so part of the after-acquired knowledge component of that defense would be that she was elsewhere at the time of the crimes? In other words, it was a combined alibi/after-acquired knowledge?

A. I don't know about alibi on that. We didn't really have an

alibi, although we looked into that.

Q. Well, alibi in the sense of not being present at the time of the crimes.

A. I think that -- yeah, at the time of the killings. Yeah, I think that's true.

Q. Okay. So that was still on the table at this point in terms of potential defenses. And would you agree that that particular defense, that is, the after-acquired knowledge defense, would have a factual investigation component to it?

A. If you were going to establish that defense, you'd have to have some evidence of it, and you'd have to find the evidence of it, and to find it when it wasn't there, you'd have to locate it and investigate where it was if it was in existence.

So yeah, that's true. It was not something that was coming from any independent source or anything that the government had in its discovery or any evidence that the government was going to present would not have allowed for anybody to reasonably argue I don't believe anyway -- and that was the assessment -- that that was a viable position to take at trial.

Q. Now, at the time you wrote this note, the 2003 ABA guidelines had been in existence for about a --

THE COURT: Before we get to the guidelines, can I just clarify something?

MR. BURT: Yes, sir.

THE COURT: Mr. Stowers, isn't there a difference between a defense of not being present and a defense of alibi? And here's how I think about it. Not being present you could always argue whether you have any affirmative defense or not because it's the government's burden to show that you were present at the scene.

But alibi indicates I wasn't present and I was somewhere else. At least that's what it indicates to me. And you probably have to have -- you know, if you're going to try and convince somebody that she was at the movies or at a baseball game or somewhere else, you probably have to have affirmative evidence of that but -- so there's a difference between arguing they weren't present and then arguing they weren't present because they were at X and we can offer some evidence that they were at X. So they're not really the same, are they?

THE WITNESS: I don't think they're the same. This issue came up pretrial when the government early on in the case had made a motion to require us to give them notice of an alibi. We had taken the position that because the time of the crimes was uncertain that we should not be in a position where we had to declare her whereabouts at every moment during the period of days, for example, or what not because the offense was not specific in time and place. Court overruled that. We never put on any alibi. I don't believe we gave notice of any actual

alibi defense or alibi witnesses. It isn't a defense you have to give notice of anyway.

THE COURT: But that wouldn't preclude you from arguing she wasn't present at the scene.

THE WITNESS: No, no, no, no, it wouldn't. No, that -- yeah, that's always part of their proof, and you don't have to do anything independent as I understand it to just say she wasn't there.

THE COURT: You don't have to give notice of a "I'm not present at the scene" defense.

THE WITNESS: No.

THE COURT: You only have to give notice if you're trying to prove that she was actually somewhere else, I mean, if you have a true -- what's considered I guess a true alibi defense.

THE WITNESS: Right, and if you're going to offer your alibi through witnesses other than the defendant.

THE COURT: Right.

THE WITNESS: I don't believe you have to give notice of the defendant under the alibi rule as your witness.

THE COURT: I don't recall. Okay. Thank you.

MR. BURT: Thank you.

BY MR. BURT:

Q. So had you decided at some point that you were going to rely exclusively on the failure of the government's proof to

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 4 of 71

show her presence as opposed to an affirmative going forward with evidence that not only had they not shown she was present but we can show she was somewhere else?

A. Well, I know it was looked into what her whereabouts were by the -- by the defense. There was an effort made particularly on the DeGeus killing to ascertain -- she worked at the country club in Mason City. She worked on the evening of his so-called disappearance into the night hours. I don't remember the exact. We had pretty good evidence on that in the record. But after she left work is when the claim was that this occurred if I remember the facts correctly. So that was not -- you know, we played with the time table on that one a little bit more than we did on the first four.

And then I'm not sure what we wound up doing investigationwise on the first four other than there was a -- there was a time table that was known for the day of the disappearance up to a certain point in time by the government based on their investigation and the evidence and then after that the folks were not seen anymore who -- who ultimately were found killed.

And then there was that neighbor, Prilo -- Prilosec, or is that a medication? Anyway . . .

Q. I think it's both.

A. That may be her name, Prilosec. That's what I remember it as. I could be saying it wrong. She could have helped on the

time table on that, but, of course, she was deceased by the time of trial, so that was not helpful.

Q. So before you decided on a defense theory, in other words, that it was going to be mere presence based on a failure of proof versus mere presence based on an alibi, you think some investigation was done to sort of decide which of those directions you were going to go?

A. Well, I think this all kind of came up during this time period when the pleadings relating to the alibi notice were filed, and that was relatively early on in the case as compared to trial. And we looked into what we'd be able to show with regard to her whereabouts, and I think that was -- I'm going to say that was 2002. But, you know, the docket's going to show when they filed their motion, when we litigated that issue, et cetera.

Q. And so are you saying that before the period of time when you were required to file your notice of alibi that it was decided that you weren't going to go in that direction based on investigation?

A. Well, the problem was the one I kind of explained before in response to Judge Bennett's questions is we didn't have the ability to reconstruct from -- what would it have been? -- 10 years previous her precise whereabouts for every hour of the day in the 2003 windows of opportunity that these crimes were alleged to have been committed within. And we had some limited

specificity, but it really all came from the government's mostly or relatively contemporaneous investigation of the disappearances of these five people.

So we were not really probably by the time we got to the charge which was filed seven years after the disappearances to find much information that would have really tied this all together, and we were kind of handicapped by the passage of time if you will.

But at the same time to the extent we could, we looked into it in sort of a -- I would call it a limited way. We didn't do a full-blown investigation into alibi defense in the sense that maybe some people would if they were going to put on an alibi defense and they had a specific alibi.

So I agree with that if that's the point of your questions on this. We didn't do that. But what we did do is we looked into it. I felt sort of enough to be able to say that we weren't going to be able to affirmatively show that she wasn't there, but we could cross-examine their evidence and show that it was not clear 100 percent that she was there for all aspects of everything.

And then as time went on and we evaluated things and the suppression ruling came out, we kind of stepped back from even that theory because it seemed pretty darn untenable in light of all the evidence.

Q. You stepped back from that theory without doing independent and thorough investigation?

MR. WILLIAMS: Objection, Your Honor.

A. I think that's -- I think that's true. I think we investigated it to the extent that we did. But it was not -- it wasn't as much as it probably could have been or perhaps somebody will tell me as it should have been. But I felt like we were -- I thought we had a good understanding of that time period.

Q. And, you know, in terms of what you should have been doing, when you got on the case in 2001, the guidelines, 1989 ABA guidelines, said counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously. The investigation for preparation of the guilt/innocence phase of the trial should be conducted regardless of any admission or statement by the client concerning facts constituting guilt. The investigation for preparation in the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered. And this investigation should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.

And then in 2003 the guidelines pretty much stayed the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 5 of 71

same, did they not? Counsel at every stage have an obligation to conduct a thorough and independent investigation relating to the issues of both guilt and the penalty, and the subsections go on to pretty much state the same.

A. Right. No, I agree with those principles, yeah.

Q. And do you think that from an investigative standpoint that those principles were adhered to in this case? I'm not asking whether you adhered to them, but I'm asking did the team adhere to those standards.

A. Well, I think it was lacking in, you know, factual investigation, and it's hard to argue it wasn't. I don't know how much money was spent on fact investigation looking for witnesses, et cetera, or how much of that was, you know, really done.

It was more of, you know, Mary Goody was -- she did a heck of a lot on mitigation, and I'm not in a position to criticize her.

But, I mean, on the first phase of the trial if there was -- if there was a lack of investigation in that area, I would -- you know, I would kind of agree with it because we didn't -- probably didn't pursue it as well as we, you know, should have independently of what the government had done already. You know, the government, you know, over the seven years before indictment had interviewed and talked to a lot of people. People had been in front of the grand jury. There were

a lot of interview reports, friends, family of the victims. And there was a whole lot of investigation that had been done.

Maybe, you know, under the standard it's supposed to be independent by the defense. I understand that. Maybe we weren't supposed to be relying to some extent on what the government had already done with regard to a lot of the people they contacted and interviewed. Some of those we contacted through our investigator or subsequently independent of that.

But I -- I mean, I think it's a fair criticism that we didn't do enough factual investigation of the crime to find out if there was maybe something under, you know, some rock that we didn't turn over, you know. I -- you know, I agree with that, I mean, to some extent, but I just don't -- in the context of the case where it was, it just seemed to be something that -- you know, it was probably unlikely to be fruitful, and I know that's not a -- you investigate to find something out; right?

Q. Right.

A. So that's not -- you know, it's not an explanation other than that. That's what I can say about it.

Q. Well, in terms of what you requested from the Court, this is from Exhibit 8, and it's CF-000640 through 645. This is a funding request that your team submitted to Judge Bennett in February 2005. This would have been after this jury selection session, correct, in Kansas City?

A. Yes.

Q. And in this request you were asking for 18,550 additional dollars for Mary Goody, and you're indicating in February 2005, a couple of months short of trial, that she has -- she initially identified 95 potential mitigation witnesses and through her investigation and hard work that number has been culled to 57, and most of these witnesses live in various states.

A. Uh-huh.

Q. And you're asking for additional funds for her to investigate those additional witnesses; correct?

A. Right.

Q. Okay. And then you're also asking in February of 2005 -- excuse me, December of 2004 which is when this letter was written for a guilt-phase investigation in the amount of $25,000; correct?

A. Right.

Q. And you're representing to the Court here it is always difficult to guess at the amount of time that a particular criminal investigation will take, particularly when the government doles out discovery in a piecemeal fashion over a period of years as was done in this case. The initial estimate made over 2 years ago, 1,000 hours, has proven a poor guess. Discovery, particularly law enforcement investigative reports, grand jury transcripts, and jail records, have identified literally hundreds of persons who have some connection to this case. As previously mentioned, the discovery alone amounts to

some 9,000 pages to say nothing of the physical exhibits and evidence. The alleged criminal activity being investigated extends from Iowa to the state of Arizona over a period of at least several years and involves a drug conspiracy whose members come and go. There were five dead victims at two different burial sites, the bodies having been buried seven years before their recovery. This is a complicated, intricate case, and the investigation has been and continues to be voluminous. Defense counsel estimates that they will exhaust the current investigative funds before the end of January.

THE COURT: Could you slide it up a little bit because you've read beyond --

MR. BURT: I'm sorry, Your Honor.

THE COURT: That's okay.

BY MR. BURT:

Q. Additional monies will be shortly needed in order to complete the witness interviews including interviews of prison inmate witnesses in Greenville and Marion, Illinois, and Mitchellville, Ohio (sic).

So at least in terms of what you're representing to the Court on December 23, 2004, there was a substantial amount of independent investigation which your team contemplated at this point; right?

A. Who is the author of the letter, or who signed it anyway?

Q. The author of the letter -- it's on Mr. Berrigan's

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 351    Filed 11/10/11    Page 6 of 71

stationery.

A. Okay.

Q. And it is signed by him with cc's to your defense team as well as Miss Johnson. So it's being represented to the Court and to Miss Johnson that there is substantial amount of factual -- guilt-phase factual investigation that needs to get done and that substantial amount of funds is necessary to do that investigation.

A. No, I --

THE COURT: Excuse me. What's the exhibit number?

MR. BURT: Your Honor, it's Exhibit 8, and the Bates number on that is CF-000640, Exhibit 8.

A. I'm sorry. What's your question?

Q. It was being represented to the Court and to Miss Johnson who received a copy of this that there was a substantial amount of guilt-phase investigation which at least at this stage in December of 2004 was being contemplated by your team.

A. We were going to run out of money, and in order to convince the Court, not only Judge Bennett but also Judge Loken, of why this was necessary, statements in support of the application had to be made.

Q. Uh-huh.

A. There may be a little bit of over-the-top statements there a little bit by Berrigan to sort of justify the funds that were needed.

Q. Over the top in the sense of --

A. Well, I mean, when you're trying to advocate for funds, you're not going to say something less than what, you know, you think you need to say to get the Court to approve it for what you need it for. And we had a lot of things we needed to do that we could have done. We needed to explain it, and Judge Loken was very tight fisted at the circuit with dispensation of CJA funds. He was somewhat typically slow in approving things. And when we got into these type of issues, we were always cognizant of that. And so we had to really load up our requests when they were going to go up to Loken to make them salable. And it's -- you know, frankly, it's some overstatement, I'll say that, by Pat.

Q. Okay.

A. But, I mean, we needed more money to do investigation from that point to the date of trial. I'm not disputing that. It's just that it may be a little bit of overstatement contained in Pat's letter.

Q. All right. Well, let me parse this out a little bit. This sentence, this is a complicated, intricate case, that's not overblown, is it?

A. No, it was a complicated and intricate case factually on the certain levels.

Q. And the second part of that sentence, and the investigation has been voluminous, that certainly was overblown, wasn't it,

because it hadn't been voluminous?

A. I think Mary Goody did a heck of a lot of work.

Q. Well, we're talking -- you've categorized in this budget request the mitigation as a separate request. This is a section of your letter that is focused on guilt-phase investigation. So you're representing or Mr. Berrigan's representing to the Court here that your investigation, factual investigation, guilt-phase investigation, has been voluminous. And that is an overblown statement; isn't it true?

A. Oh, it -- well --

Q. Because it had not been voluminous at this point.

A. Okay. Well, this is his letter, but -- I don't believe I had a role in drafting this letter but --

Q. I'm not saying you did, and I'm not trying to attribute this to you. I'm just saying -- I'm asking for your knowledge as a team member of this case.

A. All right. Let me answer you.

Q. Okay.

A. There wasn't a lot of fact-based investigation done by Gratias or Cornell. It might seem that there was, but if I'm reading this, I'm not sure I fully appreciate the (a), (b), (c), (d), (e) lines because it says the total approved was 55, and then it says total pending circuit approval was 49 and the prior payments were 35,000 which adds up to 84,000 if those are to be added. But then it says balance of 19,000. I don't understand

the math, frankly, but -- and then they're asking for additional funds of 25,000 for a total of 80 which wouldn't even cover -- the math doesn't work for me, but my father was a mathematics instructor, and I --

THE COURT: Generation-skipping gene?

A. Yeah, I don't -- yeah, I'm not sure I got the math on that. I -- well, let me say this. I think probably what it means if I'm interpolating this, I think I know what that means. I think what happened was they had submitted bills for 49,000. I'm going to say this is what it was. They withheld roughly 14,000 of that amount from payment, but they had actually paid 35,000. So the balance that was stated by Berrigan is actually the balance of monies that have not yet been paid out, not what was billed to date. And there was only roughly $6,000 of investigation money left at that point.

And I think that's -- I think they were doing withholding on the investigator payments as they do sometimes under CJA. We had that originally on this case as well, and then I think that changed at some point. And so they wanted another 25 or we did which would have given us $31,000 of new work from the date of this letter forward to work with. That -- okay. Now I understand the -- I think I understand what the numbers mean.

Q. Okay. Putting the numbers aside, what I'm trying to focus on is your representation that the investigation has been and

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 7 of 71

continues to be voluminous.

A. Well --

Q. That was not true; right? It had not been voluminous, and it did not from this point continue to be voluminous just on the guilt phase. I'm not talking about mitigation.

A. No, it wasn't -- it wasn't voluminous at all, and it wasn't -- to say it was voluminous isn't probably the good use of the English language. It wouldn't be the word I'd use. Or I would have said -- if I was going to use that word, I'd say extensive. I don't think it was extensive either, but it was -- there wasn't a lot of fact-based investigation.

Q. Truth be told, what should have been said was we haven't even begun the process of independently investigating all the facts and circumstances of this case as is required by the guidelines.

MR. WILLIAMS: Objection. Leading and argumentative, Your Honor.

THE COURT: It's leading. I don't find it argumentative. You can answer.

A. I think I am not sure what was done up to that point in time, so I don't think I can answer that, Mr. Burt.

Q. Okay.

A. I can just tell you what I've told you before is there was not a lot of fact-based independent defense investigation of the offenses themselves. There just wasn't.

Q. Now --

A. And it was something that I know Gordon wanted to do more of, but it just wasn't. And I remember him sending letters to Al saying, you know, tell me what you need me to do. Tell me what you need me to do because he -- the way it was set up is the same way it was with Cornell is that he was taking his marching orders from Al Willett on the fact-based, you know, guilt/innocence portion of the trial since Al was principally taking the lead on that portion of the case, and that's kind of where it was.

Q. Okay. And is it true that because of the role that Mr. Willett put you in you were not yourself independently running either the mitigation investigation oversight or the mitigating, guilt or mitigation, that that was assigned -- guilt-phase investigation responsibility was Mr. Willett and penalty-phase investigation responsibility was Mr. Berrigan and your domain was the legal research and writing?

A. Well, in this time period, my role was increasing more, and it had throughout the course of the case. So by this time I was more involved, but I wasn't -- certainly wasn't lead counsel within the utilization of that term amongst the three attorneys.

And I had given some work to Gratias with Al's approval and had had conversations with Gratias, had shared some discovery information with them. I remember them looking at things in the office there since I had a set of the discovery.

So I had contact with them. Their office was immediately next door to mine I believe at this time on the same floor of the building.

So I had contact with them, but I was not giving them assignments because we had very little investigation money that we had, number one, requested initially or had available to use. And it was needing to be handled very sparingly, if you will, simply because we didn't have a lot of money to work with as you can see here. Even $80,000 was -- in total for the whole case seems to be -- if you were going to do a full-blown factual investigation of these five killings as well as the underlying drug offenses which all, you know, were remote in time, you'd need -- you know, it'd be a hell of a lot of work. It'd be a lot more than that.

Q. Right. Well, did anybody ask for the money?

A. No.

Q. I mean, when you say you had little -- you didn't have enough funds to work with, is that because you asked for what was needed and the Court denied the funds, or was it because you never articulated to the Court exactly what you needed from an investigative standpoint?

A. Well, I'm saying that we didn't -- well, let me just say this. We prepared a budget, a proposed budget, in the case.

Q. Uh-huh.

A. Which is in the court file. If we asked for 55,000 and got

it, that's all we asked for. If we asked for more and got less, then that will be reflected in there. I don't think that this case was probably ever perceived as a case where the investigation was going to be -- at least from my point of view was going to be fact based relating to the offenses themselves, at least not from the defense point of view. That's not the way I perceived it.

Q. And why did you perceive it as not a defense that was going to be fact based?

A. Well, by the time I got into it and then eventually when we had all these issues with the maps and the bodies and everything, it -- and eventually that evidence coming in, it seemed as though in all candor it wasn't going to be all that productive to go down that road. And there was already a lot of information in the government's discovery file itself of information that was relating to the disappearances and to some degree relating to the offenses, et cetera. So it seemed like we had a pretty good sense of all that but that we didn't need to be focusing a ton of attention on the actual circumstances of the offense. That was the view I had.

Now, at the same time, you know, Al Willett was -- was really caught up in this sort of what I call the after-acquired knowledge theory. And that was something that he was really interested in all the way through this August two thousand -- or whenever those notes were that I had written. He was in that

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 8 of 71

all the way into December of 2004 and had very little done that would have supported that theory. And it seemed to be a nonviable theory. As we got closer and closer to trial, it became more and more obvious that it was nonviable. And part of the reason it was nonviable, if there was evidence to support it, we sure didn't see anything of that. And that's kind of where we were on it.

Q. The original amount requested was -- for guilt-phase investigation was $25,000; right?

A. Well, I --

Q. According to this?

A. For guilt phase?

Q. Yes.

A. I think we asked f -- well, this says we asked for 55,000.

Q. So let's go back for a minute. This, again, is Exhibit 8.

A. Then we wanted an additional 25 in this letter that you just showed me.

Q. Exhibit 8, CF-000181 through 189 is your original budget request in July of 2002; right?

A. Correct.

Q. This letter is being written in response to your order of June 24 directing Angela Johnson's defense team to submit a litigation budget.

A. Right.

Q. And the team participated in putting together this budget

request; right? This was not just Mr. Berrigan, you -- in fact, this is written on your letterhead, is it not?

A. No. There was a lot of work put into going through the budgeting process which I think initially there was no budget if you will. And then this is something that we were asked to do at some point maybe by the Court. And we took -- because the Court was seeing vouchers come in every month from the lawyers and everybody else, and it was getting to be a concern to the Court how much money it was being asked to expend without any -- without any information as to, you know, where this thing was going to wind up economically from a funding perspective.

Q. And this at this point we're two years into the case; right? Miss Johnson's arrested in July of 2000. This is two years down the road; correct?

A. Correct, yeah.

Q. So this is a point in the case where a substantial amount of discovery has been reviewed and the defense is in a position to articulate to the Court what the needs are in terms of funding; correct?

A. This was a long budget request that I think we went through a lot of the things that were going on in the case at the time as well as before. We -- I believe we hadn't even gotten the documents put into a database yet that we could work with as of July 2002 because we hadn't gotten the documents physically until the spring of 2002 from the government, the discovery

documents if I remember correctly. And that was a result of a lot of wrangling with the government over adjustments to the discovery order and everything else and a whole lot of effort. But eventually we got the materials. And then we were in a position at that point to actually meaningfully start the review which is incredible really. It hadn't been done for almost -- almost two years in a meaningful way.

Q. What had been done according to what you're representing to the Court in this budget letter is transcriptionists have transcribed approximately 2,000 Bates-stamped pages of agent reports of witness interviews. Our most recent page count shows that there remain approximately 4,000 pages of additional reports to transcribe.

A. Right.

Q. So apparently someone on the defense team had transcribed approximately 2,000 pages at this point, right, that you had possession of? You do identify one of the problems here is the government's refusal to provide copies of material.

A. Right.

Q. But then you go on to say that your transcriptionist has apparently reviewed and transcribed approximately 2,000 pages of discovery. So I assume from that that transcriptionist goes in, reviews the discovery, transcribes it, and then you're in possession of that discovery or of those transcriptions.

A. Right. That's -- yes.

THE COURT: Can I ask a question here? It's just kind of a clarification.

Didn't Judge Jarvey at some point work out an agreement or enter an order -- I don't know which -- where you actually then got the discovery and it would obviate the need for the people to transcribe it?

THE WITNESS: Right. And we had a hearing with him where we had -- basically we brought a small army of people up to Cedar Rapids sort of to make a showing for a week I think it was or several days that, okay, we can do it this way or they can give us the paper. And we had a hearing with Judge Jarvey where that issue was discussed. And then in --

THE COURT: Well --

THE WITNESS: -- in early 2002 we then commenced a negotiation process with Reinert primarily and Judy Whetstine got involved I believe as well because she tends to be reasonable.

THE COURT: But let me cut you off for a minute.

THE WITNESS: Yeah.

THE COURT: When you finally did get the discovery, were you allowed to copy it, or did you still have to have people read it in your office or Mr. Willett's office and then transcribe it and then you could take the transcribed material to show the client or to work with? Or were you allowed to actually just physically copy the documents?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 9 of 71

So, for example, if you had a document, an investigation of a particular witness, and you wanted to show that to Angela Johnson, could you just copy it and take it, or did you have to transcribe it?

And what I'm trying to get at is, you know, depending on what your agreement was, you may still have had to transcribe it. The only advantage is you're getting to transcribe it because it's physically located in your office rather than during limited hours in the U.S. Attorney's Office. You following what I'm saying, or did I confuse you?

THE WITNESS: Yeah. No. I mean, it was -- my recollection was there were limitations as to exactly what could be done. I think they had to be kept in an iron-clad lockbox or something.

THE COURT: So if you wanted to take something to show Miss Johnson or to show Gratias, they couldn't -- you couldn't just copy it and give it to them? You had to --

THE WITNESS: No.

THE COURT: -- like summarize it.

THE WITNESS: It was a limitation on dissemination in the order. The particulars of that I can't tell you. I remember that every single page of paper had one of these water marks on it, and I think it -- somebody can correct me. You probably have seen some of it. It said confidential discovery of Dean Stowers or something on my copy and everything, and the

government was kind of paranoid that these materials would be distributed in some way, and they stamped every page in a way that made it so you couldn't hardly . . .

THE COURT: Well, in a case where witnesses had been killed, I wouldn't exactly call it paranoia.

THE WITNESS: Yeah, I know. It just -- there was -- there was a lot of ordinary material that didn't seem to need any confidentiality.

BY MR. BURT:

Q.   So in this request you asked the Court to authorize expert investigative services which at this point in the case included Dr. Logan, Dr. Gelbort, Dr. Cunningham, Mary Goody, jury consultant, and for the first-phase private investigator you asked for 25,000; right? You I mean the defense team.

A.   Well, yeah.

Q.   Okay. And then in terms of the need for that money, you articulated that witness interviews, this category takes into consideration that counsel must prepare for what are essentially two trials, the guilt phase and the penalty phase. Normally these two trials involve completely different groups of witnesses and present vastly different themes. In addition to finding and interviewing numerous guilt-phase witnesses, counsel typically must locate and interview 20 to 50 potential penalty-phase witnesses.

And then in a section of your report under

investigator, guilt-phase investigator, you say this category covers the time and expenses of a guilt-phase investigator. This individual will identify, locate, and interview both government and defense witnesses. The investigator will also work closely with counsel to keep counsel updated on the investigation and to develop theories of the case. Counsel have found the process of locating witnesses to be very time consuming especially in a case such as this where the crime occurred nearly ten -- two years ago. In addition, the discovery of one witness inevitably turns up leads to other witnesses or potentially relevant information.

Because it appears the government will use snitches against Miss Johnson, investigation into these individuals' background and credibility will be necessary. Investigative tasks can be handled in the most cost-efficient fashion by a trained investigator who will not only charge a lower hourly rate than counsel but who is also trained in how to most efficiently get the job done. And you say counsel will make a detailed and specific request for a certain investigator in the future.

So at this point in the investigation or at this point in the case it is being contemplated that you would do substantial amount of guilt-phase investigation including investigating the background and credibility of all these informant witnesses that the government was lining up against

Miss Johnson; correct?

A.   **Well, I don't think $25,000 is a substantial investigation. And so the language, you know, that you've just read doesn't really pair up with the $25,000 request. But that was the amount requested at the time.**

Q.   Well, wasn't -- wasn't the strategy to do this incrementally? In other words, you asked for 25,000. You then expend that amount, and you go back and you show the Court what leads have been developed and what needs to get done.

MR. WILLIAMS: Objection. Leading again, Your Honor.

THE COURT: You may answer.

A.   **Well, I don't know if that was a strategy or not at the time. I think we were just -- I think this was new money as well from this point forward. So there had been some work done by Cornell before, and then we were just trying to alert the Court that we were going to need some money for investigation but that we'd be coming back later for more and a more specific request and that that wouldn't cover the totality of what we were going to need. And that's I think what that last sentence in that paragraph you read was all about.**

Q.   Now, in terms of your assignment in this case, Mr. Willett has testified that you were in charge of the experts. Is that --

MR. WILLIAMS: Objection. Leading and stating facts not in evidence. He's quoting another witness. It's hearsay.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 10 of 71

MR. BURT: Let me rephrase it if I could.

THE COURT: Thank you.

MR. BURT: Thank you.

BY MR. BURT:

Q. Were you in charge of managing the expert witness portion of the case? And by expert witnesses, I mean cross-examining the government's forensic experts.

A. Eventually those became the witnesses that I think I questioned at the time of trial. That wasn't something that was decided until we started dividing up witnesses pretrial and assigning who was going to be responsible for prepping to examine those witnesses. That's the way I remember it.

Q. Okay. Well, in 2002 -- we're again back at CF-000182 -- it was represented to the Court that Al Willett will be dedicating the bulk of his time preparing for the factual defense during the first phase of trial. Mr. Willett will be the primary client contact, will direct the investigation, and will be the primary cross-examiner of most government witnesses. Mr. Willett's legal assistant will continue to bring discovery to Miss Johnson at the jail so that Miss Johnson can read it. And then on the next page says Mr. Willett will continue to oversee the progress of discovery production.

Then it outlines your anticipated role. Dean Stowers will direct all legal research and writing on this case, will prepare all motions and briefs in consultation with other

counsel, will do any necessary presentations on the motions where appropriate, et cetera, and will bring substantial -- and will present substantial portions of the defense case in chief as well as cross-examine selected government witnesses.

So do you know more particularly what your role was in terms of presenting substantial portions of the defense case in chief and cross-examining select government witnesses, at least as it was contemplated?

A. I don't know what I meant by that other than if we had defense evidence that we were going to present I guess what I was intending to communicate at the time was that I'd present substantial portions of that testimony or evidence and that I'd do some of the government witnesses. I think this is in 2002, and at that time I was going to have a role in the case at the time of trial, but I was going to have a more limited role than either at or -- Al or Pat, and that's kind of what we were talking about there in the budget request.

Q. You knew from your review of the discovery that in terms of forensics the government had a pathologist certainly.

A. Yeah.

Q. And you knew they had a forensic anthropologist?

A. Right.

Q. You knew that they had a firearm examiner expert.

A. Yes.

Q. Handwriting expert.

A. I don't remember the handwriting, but if there was one that testified, they did. I don't remember that.

Q. And was there some discussion in your -- within your team as to who was going to handle the government forensic part of the case in terms of finding out what you were going to need in the way of independent experts and preparing for and conducting the cross-examination of the forensic experts?

A. As the case went on, there was some discussion of possibly wanting one or more experts on the same subjects as their people. I don't remember if that was the ballistics or other expert. There was some discussion of that, and we never did it because I think we weren't taking on that part of their case.

Q. And you weren't taking on that part of their case. When did that strategic decision get made?

A. Well, it was over a period of time, you know, including, you know, during the -- during the trial.

Q. Well, was there ever an intent made to independently investigate the forensic evidence in the case by retaining independent experts and having independent experts examine and look at the physical evidence and then advise you as to whether the government's case could be challenged from a forensic standpoint?

A. No.

Q. I notice from the transcript you ended up cross-examining a lot of the government experts.

A. That's the way it worked out, yeah.

Q. And how did that come about, that you ended up cross-examining the government forensic experts?

A. Well, partially it was -- this was decided during the portion of the preparation when we were having meetings in early 2005 when we were dividing up witnesses on the witness list that the government had provided to us. And since that was an area of the case that we were not planning to really contest and merely, you know, make sure the evidence was clear, I think Al was comfortable in having me do that part of the case as opposed to more of the snitch-type witnesses or witnesses that were more relating directly to the circumstances of the offense or things that Angela had supposedly told to these people.

Q. Was it one important goal of the defense to impeach the credibility of the informant witnesses as much as possible?

A. Yeah. There was -- you know, that was important in the case.

Q. And was one of those informant witnesses whose credibility you wanted to impeach as much as possible Mr. McNeese?

A. Yeah. He was going to be by all advertisements a major, major witness in the case obviously because of the situation with the maps and the notes and the statements that he was attributing to Angela from -- that we were aware of from the -- from the suppression hearing. So there was going to be a great need to -- he was probably the single -- in the case he was

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 351 Filed 11/10/11 Page 11 of 71

probably -- on the guilt portion of the case, he's probably the single-most important witness in the case.

Q. And the maps and written drawings that Miss Johnson allegedly drew were important and significant evidence too, right, because you had made substantial efforts to suppress that evidence?

A. Saying it was significant would be an understatement. It was kind of the most important part of the government's case was that she knew enough to be able to indicate to McNeese where the bodies were buried which was highly, highly, highly incriminating of her.

Q. And you recall McNeese's testimony that Angela Davis wrote those notes and those maps and gave them to him.

A. Angela Johnson?

Q. Angela Davis. Angela Johnson.

A. That she wrote the maps and gave them to him?

Q. Yeah.

A. That was my understanding.

Q. And did you think that the testimony of Mr. Licht who was the handwriting expert identifying Angela Johnson's handwriting identifying the maps and notes that Mr. McNeese provided as being written by Angela Johnson was some evidence that tended to corroborate Mr. McNeese's version of events?

A. Oh, yeah. You know what? Now that you tell me about that, I remember that witness, and I examined that witness. He had

these big charts with the handwriting examples.

Q. Right.

A. Now I remember, yeah. And he was testifying as to the handwriting that was coming from McNeese that was attributed to Angela Johnson, yeah, as I remember it.

Q. Right. And I notice in your cross-examination of Mr. Licht, you didn't challenge the science or the methodology of his handwriting analysis. Do you recall that?

MR. WILLIAMS: Your Honor, I'd object just for the relevance. The defense in their petition, again, has not identified or argued that there was any prejudice resulting from the failure to challenge the science behind the handwriting in this case.

Now, while they've made kind of broad-based failure-to-investigate allegations, they have not even alleged that the defendant was prejudiced because they can now show that the handwriting was defective or something to that effect so . . .

THE COURT: I don't think they have to allege the prejudice in the motion.

MR. WILLIAMS: They don't even challenge the handwriting. I'll withdraw my objection. This is --

THE COURT: Well, yeah. And is it okay for me to disclose to Mr. Williams what I talked to you about this morning because --

MR. BURT: Absolutely.

THE COURT: Yeah. And I don't even know if you know that I denied their request to have the handwriting expert. I don't know if you knew that or not.

MR. BURT: I told him that.

THE COURT: Okay.

MR. BURT: Because just for the record, I had noticed to Mr. Williams the declaration by Michael Saks, indicated initially he was going to be a witness based on the Court's first order, funding order. And then when the Court changed its mind, I told him that he was -- Mr. Saks was not going to be a witness, so that's where we're at at this point in terms of . . .

THE COURT: And keeping in mind that consistency is the hobgoblin of small minds, I've now changed my mind again, and I'm going to let him -- and that's what I was talking to him this morning about. I am going to let him have the handwriting expert. We were going to make a record of it today, but I think this is a sufficient record.

And Mr. Burt indicated he was going to give you notice of it and -- so, you know, you'd have time to -- if you -- to get an expert report and then to get your own expert. You know, I'm not sure June has enough days in the month now to what we're putting off into June. But that's going to be a June matter, so there was going to be plenty of time for you to deal with it.

MR. WILLIAMS: No. That's helpful, Your Honor.

THE COURT: Okay.

MR. WILLIAMS: And they gave me notice of Michael Saks and gave me notice that he wasn't approved fast enough that I didn't even read Michael Saks stuff to realize he was a handwriting expert, so I didn't even realize that was the direction they were headed on that.

THE COURT: Okay.

MR. WILLIAMS: Thank you.

THE COURT: Thank you.

BY MR. BURT:

Q. I notice in your cross-examination of the handwriting expert, Mr. Licht, you did not challenge his methodology at all; right?

A. I just defer to what the transcript shows because I don't remember it that way. I remember that -- I don't want to say what I remember. I don't remember that much about it. I remember I asked him some questions on cross-examination details of which -- boy, I can't remember beyond that.

Q. Do you recall that the thrust of your cross-examination was what was not included in the notes?

A. Right.

Q. In other words, that while she didn't say that she did this, she didn't say she did that, it was not an attack on the handwriting analyst as much as trying to emphasize what the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 12 of 71

**1389**

notes did not contain.

A. Well, and I think the one particular note that he was analyzing may have been torn. It was not a full sheet of paper.

Q. Uh-huh.

A. As I remember it now. There was some issue with that and what the remainder of the paper might have contained and that sort of thing. Beyond that I can't tell you much as far as what I -- you're asking me to recite the trans -- I can't . . .

Q. Sure. I'm just asking if you remember the general thrust. I don't want you to recite the transcript. I don't expect you to.

A. That would have been something that I would have done. That would be kind of common in that kind of a scenario.

Q. And I notice that you didn't -- you had a deadline for filing Daubert motions in the case and you didn't file any challenging handwriting -- the admissibility of handwriting evidence or any other Daubert motions; correct?

A. I'm pretty sure we didn't, no.

Q. And was there some tactical reason for not filing a motion challenging handwriting evidence?

A. By Daubert?

Q. Yeah.

A. There's no tactical reason I guess, no.

Q. Did you do any research on that issue, for instance, Judge Gertner's opinion in Hines case or the whole line of cases that

**1390**

stem from Hines which was decided I think in 1999 challenging the scientific reliability of handwriting analysis?

A. No, huh-uh.

Q. So there would have been no tactical reason not to have done that. It simply was not done.

A. No, it wasn't done.

Q. Well --

A. And there was no -- it wasn't a strategy. It was just -- I guess I wasn't aware there was an issue with regard to handwriting analysis being admissible as so-called expert testimony. And I guess that's -- I wasn't aware of whatever those cases are you're talking about from Judge Gertner.

Q. And I guess the same questions for the firearm examiner testimony. You didn't do any research and didn't bring any Daubert motions on the admissibility of that evidence either; correct?

A. No. I'm pretty confident we didn't.

Q. And no tactical reason for not doing that. In other words, if there was case law out there at that time suggesting there may have been a Daubert issue with respect to handwriting, with respect to firearms identification, there would have been no tactical reason not to bring those cases to the attention of the Court in a motion seeking to exclude that evidence.

A. Right.

Q. Now, I notice that you also took on the responsibility of

**1391**

cross-examining the chemist who was called to identify substances as methamphetamine. Do you recall that?

A. Yeah.

Q. And I notice that you did cross-examine her about her methodology and tried to suggest that perhaps her testing was flawed because she didn't follow her protocol. Do you remember that?

A. Nila Bremer was the lab person I believe.

Q. That may be correct. I don't recall the name. I recall the expert.

A. Okay. Yeah, I remember that.

Q. Okay. And I think you also actually subpoenaed -- issued a defense subpoena according to the docket for her gas chromatograph thin layer chromatography records. Do you remember that?

A. Not specifically, but it wouldn't surprise me.

Q. And from what you did do with her, I assume that part of your defense strategy was to challenge the either reliability or methodology of her drug identification opinion.

A. Yeah. We were -- I think my thinking on the issue was that one of the elements that the government had to prove under one of the sets of counts was that the offense involved a requisite amount of methamphetamine I believe to get them over the penalty level for 841(b)(1)(A). And the analysis that was done was done of the methamphetamine that was seized from Nicholson I believe

**1392**

in early 1993. And there was -- and it was no longer in existence, and there was -- the substance wasn't. It had long ago been destroyed.

And I was -- and I'd have to go back and refresh a little more than this, but to get to the 841(b)(1)(A) levels, I think the government was relying on the purity of the substance that had been tested by the lab. And I've dealt with that issue before in some different cases and contexts and felt that that was an area that at least could be sort of half explored. It probably wasn't going to go anywhere, but, you know, it was something to talk about. I think she was one of the first witnesses that they called.

Q. Well, do you remember also cross-examining on possible flaws in her mass spec. analysis of the drugs?

A. Not specifically, but I know that they have a protocol that they use to test for quantitation. And one of the protocols involves -- the final portions of the test involve using the gas chromatograph mass spectrometer to get a reading of the purity of the substance that they're testing.

Q. And did you retain and consult with an expert in that area of forensics?

A. I have on other cases.

Q. How about on this case?

A. No.

Q. Do you recall that there was a issue about whether the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

remains of the victims should be released for proper burial and that the Johnson defense team objected because they represented they were going to do some forensic analysis of the remains?

A.   There was a motion made by the government to release remains I believe in the court file. I think we may have preliminarily wanted to think about whether or not we were going to do any kind of testing of our own, and then I think we eventually decided we weren't going to, and then I think we consented to have them released, but I could be wrong about that. Does that -- I mean, I don't -- the record's going to show that. I don't remember.

Q.   Well, I guess what I'm interested in is whether the team hired an independent pathologist to advise the defense and examine remains on issues of forensic pathology.

A.   No.

Q.   And did the defense hire and consult with an expert in forensic anthropology which was another area of forensics --

A.   No.

Q.   -- that the government -- did you think that the forensics, especially the forensic pathology aspects of the case, might be important to impeaching the credibility of the informants in the case and the credibility of some of the statements that were being alleged to be made by various people as to exactly what happened during the offense?

A.   No, I didn't really think that would be important in the

sense of trying to establish something different than what they were testifying to.

Q.   Well, for instance, if you had a forensic pathologist who was saying these victims were murdered in a certain way and that conflicted with what the informants were saying that Angela Johnson said or in the penalty phase what Vest was claiming that Honken was saying about the way the murders took place, would that have been a significant piece of evidence that you would have wanted to present?

A.   Well, yeah. If we could have offered evidence that showed that the crimes were committed in a way different than Angela was allegedly admitting they had been committed, that would have been helpful to do, would have been nice to do. I guess I'd say that.

Q.   In your budget request here in 2002 Mr. Berrigan's role is described as learned counsel who will focus primarily on the preparation and presentation of the potential penalty phase of this case. Was that the assigned role that he had when this document -- and I'm referring to CF-183 -- when this document was prepared back in July of 2002?

A.   That was -- that was a description of his role, and that was anticipated to be his general role in the case was really focusing on the penalty aspects of the case. Because it was a capital case, you have to have learned counsel. He was the learned counsel. And that was his area of expertise.

Q.   And was there some discussion about the need in this case to harmonize as much as possible the guilt phase and the penalty-phase aspects of the defense?

A.   Right. Yes, there was.

Q.   And tell me just in general what was discussed about that topic.

A.   Well, we wanted to be able to have something of a consistent theme from the guilt phase or the innocence phase to the penalty phase. And it was important to us to do that because we wanted to maintain some credibility with the jury on our presentation. So you wouldn't go, you know, for example, and present a sort of flimsy alibi-type defense and then -- in phase number 1 and then come in in phase 3 and expect, you know, to convince the jury, for example, that there was remorse or that there was some other thing that would be mitigating in existence.

Felt that I guess the thinking was from Pat, from myself, particularly Pat and me, that -- and, frankly, I think Al eventually signed off on this was that you gotta have some kind of a coherence that -- to the whole presentation that starts off, frankly, with the opening statement and carries through the whole case, and you gotta have a theme because by the time you get to the penalty phase of the case which we were fully anticipating we'd be there, you're going to have to be in a position where what you're going to do then makes sense in the

context of what you did before so that the jury does not simply reject the presentation at that time and that they'll have already started to form conclusions in, you know, the initial phase about what her role, participation, et cetera, was all of which are relevant to penalty.

Q.   Right.

A.   And so you gotta have a coherence and continuity to it.

Q.   You were aware of the guidelines. This is the 2003 guidelines, 10.10.1. As the investigation mandated by guideline 10.7 produce information, trial counsel should formulate a defense theory. Counsel should seek a theory that will be effective in connection with both guilt and penalty and should seek to minimize any inconsistencies. You're aware and were trying to follow that standard in this case; correct?

A.   That's what we were trying to do.

Q.   And was part of the way you were trying to do -- to comply with this standard by dividing up responsibilities so that Mr. Willett would put on the guilt-phase defense and Mr. Berrigan would be isolated from what in your view was a somewhat flimsy guilt-phase defense so he would retain credibility as a penalty-phase lawyer?

MR. WILLIAMS: Objection. Leading, Your Honor.

THE COURT: It is, but, you know, this witness could be considered a hostile witness in some respects. I'm not sure hostile to who now. But I've allowed some leading, and I'm

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

going to continue to allow some leading.

A. Well, there was -- there was talk about trying to have Pat sort of not have a major role in the first-phase presentation for that reason that you described. That was discussed, and it was something that we -- you know, was contemplated as much as was reasonably, you know, possible.

Q. And did that plan, game plan, go out the window because of Mr. Willett's dropping the ball on his part of the case?

A. Well, out the window probably overstating, but it was not able to be carried out as had been planned and discussed before trial because Pat had to jump in and cover bases that were not being covered by Al Willett and that I couldn't pick up and cover or that people didn't want me to cover.

Q. Was this a minor problem or a major problem?

A. Well, at the time it happened, just the number-one example of this would be the whole situation with McNeese and the fact that Al had wanted to examine McNeese. He had coveted that opportunity prior to trial. It was his witness. It was a massive witness based on all of his criminal record, all of his prior statements, all the issues with the writings between he and Angela and the statements he was attributing to Angela, all of his prior testimony. He was a massive witness. I think his file, witness file, was actually a full banker's box by the time that we got to trial.

And these assignments for witnesses, you know -- I think I said this yesterday -- were made well in advance of trial for the very reason that you couldn't -- there was no way you were going to be able to prepare for some of these folks on the spot in the evening before like you might in a two-, three-day trial, you know, where you might have generally, you know, a single crime or a single short fact pattern. This wasn't that kind of case, and the investigation and the materials were so enormous that you really had to be well down the road for your examination, preparation, and analysis of all the prior statements of the witnesses before trial, you know, maybe fine tune things obviously during trial.

And so what happened was we were in trial and the government, as they did, would tell you who they were going to call a day or two beforehand or they'd give you a schedule generally if I recall of the rough sequence of their witnesses. And they stuck to that pretty well. So we had -- we had some advance notice that McNeese was coming up.

Q. Uh-huh.

A. And so discussion, you know -- and prior to that Al had done a few witnesses I believe, and the three lawyers were there, and we observed to what was going on. And on a couple of occasions he would open the witness file, and the materials in the file were undisturbed. In other words, they didn't appear to have been read. And that was deeply disturbing given that he was the guy that was supposed to be doing that for those

witnesses and we didn't have a backstop. In other words, nobody else was -- we didn't have like a second chair on each witness, if you will, because of the way we had delegated things. There wasn't a second person preparing the same witness, you know.

Q. And I think you mentioned this yesterday, but correct me if I'm wrong. I may be confusing it with something you told me in conversations when we were talking with Mr. Williams. Did you say to Mr. Willett you're taking on too much, that he would --

A. That was.

Q. -- take all these witnesses on and you had some discussion telling him there's no way you're going to get prepared for all these witnesses; let's divide them up a little bit better here?

A. Yeah, and that was in advance of trial, and that was in my office when we were going through the government's witness list dividing people up and he kept assigning unto himself every major fact witness in the case. And from experience I knew this could be a huge problem if there was a breakdown there in prep or performance.

And so I tried to convince him. Pat talked to him a little bit about it but wasn't very aggressive about it. Why don't you unleash -- let the strings go on a few of these people so we can have better coverage of the witnesses.

So what eventually happened to sort of wrap up my answer from before is with McNeese we then confronted Al after trial when we knew McNeese was coming up, Pat and I did, and we

said, Al -- this is Pat. Pat had a way of being able to talk to Al because Al I think respected Pat and knew that he was a good lawyer. So Al was always the one -- or Pat was always the one that would go to Al and say, look, Al, Houston, we got a problem; okay? Where are you on McNeese because he's coming up? And he vacillated around a little bit, Al did, and then eventually said, "Well, I want to do him. I want to do him. I want to do him." But are you prepared, because, you know, we've noticed you aren't prepared on some of these folks? What's going on here?

And Pat had to go up to Al's room on the next floor up in the hotel which is a whole other story as to the arrangements there in the hotel, but in any event, the -- he went up there and wrestled the McNeese file away from Al, brought it down to the work room that we had set up over at the Marina across the river, and Pat opened the box up, and nothing had been disturbed in the box containing all of the prior statements and stuff of the witness. There was no notes of any proposed examination. There was no summaries of the prior statements of the witness. Nothing had been done. And Pat had examined McNeese in the pretrial hearing.

And so it was decided that Pat would be in a better position to pick that witness up in the middle of the trial. But to do that we had to -- Pat had to take -- because of the timing of all of this, Pat had to absent himself from the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 15 of 71

**1401**

courtroom during the trial for a day and a half I believe. And we made a short record that he was doing something else without telling the Court that what he was doing was preparing for McNeese because Al had not done his work in advance of trial.

And so the capital counsel had to be excused which I think under the statute if I remember correctly that was another issue that Angela had to basically waive her right to have her capital counsel present during her capital trial so that her capital counsel could be preparing the examination of the first-phase witness that the lead counsel had failed to do. And it was just something I'll never forget to be honest with you. And it just -- I think it's just unforgivable.

Q. And the problems with Mr. Willett had surfaced before the McNeese examination, had they not?

A. Well, there were -- yeah, there were ongoing issues including in jury selection.

Q. What were the issues in jury selection?

A. Well, this was going to be a long trial, and we had a need to -- I don't remember if there were 600 or 800 jury questionnaires. Lisa Dahl had an army of students and interns inputting data and scoring all these jurors under the system that -- that's been used for that. I can't remember the name of the scoring system. I think you rate them on a 1-to-6 scale or a 1-to-5 scale.

Q. Wymore?

**1402**

A. Wymore, yeah, the Wymore scale. And then as we were given panels of jurors by the -- I think the Court would distribute those, and it was a little chaotic in that regard, but we'd get those for each week so we'd have a good idea who was coming in for that week if there was going to be 6, 8, 10, 12 people or how ever many. Some days we had very few because of the way the striking was being done both formally on the record and then also informally between counsel.

But in any event, when we got ready to go with the jury selection, we needed to go through once again with every juror their questionnaires. And the lawyers needed to do that to reconfirm the scoring and familiarize themselves with each of the jurors because of the way the jury selection was being done.

And Al -- and that was being done primarily on the weekends because we had a lengthy questionnaire that we had circulated to all the jurors, and we had one questionnaire for every juror.

And you had to -- basically it was -- I've never done jury selection like this myself before. It was a fascinating process. But you had to basically be in a position where you were conducting an examination of every one of the jurors, almost like -- frankly, the way it was being done was kind of like examining -- if you had 12 jurors that day, you'd examine 12 witnesses that day. It was both individually and then also as a group. And that's a lot of work if you think about it, 12

**1403**

people.

Now, Al had -- for whatever reasons, personal or whatever, had decided that he would not spend the weekends here in Sioux City and that he would travel either to Cedar Rapids or Des Moines.

Q. Didn't he live in Cedar Rapids?

A. He -- yeah, he did.

Q. What would he be traveling to Des Moines for on the weekends away from the case?

A. You know, I don't really want to say.

Q. Okay.

A. But in any event, he would travel there after court at the end of the day during the week, and he'd leave promptly at the end of the court day, and he'd come back on Sunday probably around dinnertime most often. And during the weekends I and Pat and Lisa Dahl who was here for jury selection would go through all the panels for the week, and it was a laborious process, just a huge, huge process. And we'd tried to re-score all the panels, make sure we had them all scored right, identify the jurors that we wanted to seek to get off the panel for cause, strategize about how we might do that with each juror.

Q. And you're saying the lead counsel was not part of this process --

A. No.

Q. -- which took place on the weekends?

**1404**

A. No. He'd come back to town and say, "Where are we with the jury panels for this week? I've looked at some of them." And he'd have his own independent thoughts, but he wasn't part of the thinking of the group and wasn't privy to the reasoning that was being made.

And so we'd take some time to sort of tell him these are the panels, these are the people we want to get rid of, and here's why. And that was -- that was the process.

Q. And would that process involve his input and changing of the evaluations to comport with his evaluation?

A. No. I mean, he really took -- it was weird because he kept calling himself the lead counsel. Then we get during the trial, and then he's taking a backseat on almost all the major decisions, and he has no views of his own that he's really voicing or expressing. And so we get to trial, and he's sort of now lead counsel in name, but he's sort of acting like he's detaching from responsibility if you will.

Q. Now, wasn't he assigned to do the opening statement in the guilt phase of the case?

A. He -- yeah, he was going to do the opening and the closing.

THE COURT: Before we go any farther, would now be an okay time to take a break?

MR. BURT: It'd be perfect, yes.

THE COURT: Okay. We'll be in recess until 9:20. Thank you.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

(Recess at 8:57 a.m.)

THE COURT: Thank you. Please be seated.

Mr. Burt, you may continue your direct of Mr. Stowers.

MR. BURT: Thank you, Your Honor. May I take up with the Court one administrative matter?

THE COURT: Yes.

MR. BURT: In anticipation of concluding this hearing on Tuesday, we are packing up the ton of paperwork that we have not only in court but also back at the hotel. We thought it might save some money if we could rent a small storage locker here in town because we're going to be back here in June instead of shipping all this material back to California, $55 a month for the time between now and June. Would that be something that the Court would consider?

THE COURT: Well, would you want to store it here at the courthouse?

MR. BURT: Well, if there's someplace here, that's even better, but I didn't know if that was --

THE COURT: Yeah. How much stuff is there?

MS. PEMBERTON: Your Honor, that's probably --

THE COURT: I can't hear you. I'm sorry.

MS. PEMBERTON: I'm sorry. Nancy Pemberton, Your Honor. I think there's probably at most 20 boxes.

THE COURT: And is it all here -- oh, some of it's back at the hotel?

MR. BURT: Yes.

THE COURT: Well, what would be easier for you to do? To store it here or store it in your private --

MR. BURT: I think --

THE COURT: What would you prefer?

MR. BURT: -- our only concern would be getting access to it and, you know, if the court's going to be closed when we get here at a time when we need access. But we -- our preference would be to do the cheapest possible thing, and obviously if the Court's got room here, it would probably make sense to keep it here. But if that's going to create any problems and we're talking about $55 times how ever many months it is between now and then . . .

THE COURT: Well, whatever your preference is is going to be -- it's a very minor amount of money in the whole scheme of things.

MR. BURT: It's probably easier for us to just rent a locker and store it off site.

THE COURT: I just thought it might be actually technically a little safer here but . . .

MR. BURT: Well, that's true.

THE COURT: You might have concerns --

MR. BURT: That's true.

THE COURT: -- about maybe access to it --

MR. BURT: That's true.

THE COURT: -- and people who aren't authorized. So whatever you're --

MR. BURT: So is there a room? Who should --

THE COURT: Well, we'll find out. I suspect there would be. About 20 banker boxes?

MR. BURT: Yes.

THE COURT: Yeah, we'll find out.

MR. BURT: Okay.

THE COURT: Okay. Thanks.

MR. BURT: Thank you.

BY MR. BURT:

Q. On this topic of jury selection, was there discussion among the team during these weekend meetings about who you were going to strike and who you were going to attempt to challenge for cause and issues such as that?

A. Yes.

Q. And if Mr. Willett was not there during these meetings, did that create certain problems for his conduct of the jury selection process when he got back in court on Monday morning, say?

A. I'm not sure if it's because he wasn't at the meetings, but during jury selection on several occasions he -- Pat and I and the jury consultant noted that he was attempting to rehabilitate jurors that we were in agreement were going to be people that we were going to try and get off for cause.

And I don't know if this is a function of his personality or what, but he -- he uses I think a technique that wasn't really conducive to selection of a juror the way this was being done which the technique I would call it is he wants to get the jury to like him for lack of a better way to say it.

And so he found himself in -- he had a hard time basically -- if he had a juror to a point where they were going to -- they were on the edge of being pushed off the cliff, if you will, for cause, he would throw them a life line, and on several occasions this happened in voir dire. And a life line would be, oh, but, you know, but you can be fair; you can set it all aside. He'd ask them the set-aside question or the "but you can be fair anyway," you know. And it'd be like -- we'd be back here like what's going on here, you know? We're trying to get rid of this juror, and you got them on the edge. They've already kind of said that they would have a problem being fair, and then he'd rehab them by saying but if the Court told you this and that and the other thing, you could be fair, couldn't you? And it'd be like no, you're going the wrong direction. We're trying to get this person off, and you're rehabbing them.

And at that point was when Pat visited with Al privately again, said, hey, look, Al, we gotta get Dean involved in this jury selection, and that's when I started to participate more in some of the jury questioning.

Q. Did Mr. Willett take exception to you being involved in

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 17 of 71

jury selection?

A. He -- yes.

Q. Did you feel there was good communication within the team as to who should be struck as a juror? And by good communication, I mean good communication between the lead counsel and the other members of the team, lead counsel Al Willett, not Mr. Berrigan.

A. No.

Q. Do you recall reading in Judge Bennett's order denying your motion for a new trial -- this is footnote 16 which says, quote, it appeared to the Court that several of the potential jurors that Johnson used her peremptory challenges to strike would have been excellent jurors for the defense. Therefore, the Court was perplexed at the time and remains so now by the defense team's rapid use of Johnson's on-the-fly peremptory challenges, end quote. Is that a fair criticism that the Court makes? In other words, were you striking because of lack of communication jurors that really should have been saved?

A. The peremptories? I'm trying to remember how the process went. I think we had some very -- I think it was almost like a Rubik's cube, but we had a process where I think we did some peremptories as we proceeded through the panels if I remember correctly. And then we also had some that were sort of the reserve peremptories for those that survive that process. And then -- if I remember correctly.

And if we used a peremptory to strike a juror, it would have been based upon the best judgment of Lisa Dahl and Pat and the scoring system that I've already kind of described and the fact that we couldn't get that person off for cause. I don't think it would have been attributable on the peremptory issues, that particular comment that the judge made. He may have had a perception of his own as to who he would have liked on a jury if he was defending the case, Judge Bennett may have, that was different than what the method was that was being used to select the jury that we were trying to select based on the criteria that we were using.

Q. But as I understood it -- and correct me if I'm wrong -- the method of peremptory strikes was based on a scoring system.

A. It was based on a scoring system, that's true.

Q. In other words, if a juror got a -- I forget whether it's high or low, but if a juror got a low rank like a 1, that's a bad juror that everybody agrees either has to go for cause or if you lose a challenge for cause has to go on a peremptory; right? It's basically the way the system works. And then people at the high end of the scale, say a 6, are people that you want to keep at all costs.

A. Right. And what would happen, frankly, is between counsel for both parties throughout the process we went through the questionnaires and the jurors, and it was clear from the questionnaires that a number of jurors were either at one end of

the spectrum, never -- I could never impose a death penalty on another human being, or they were at the other end which for some reason or another they were -- they were so pro death penalty that they were going to be removed based on the answers in the questionnaire.

I think we really didn't have too many people that survived that would have been scored as a -- I think it was a 1-to-6 scale or it might have been a 1-to-5. But we eliminated those people before the process as much as we could based on questionnaires, so they were jointly agreed to be stricken without any questioning beyond the questionnaires. Then we were dealing with the remainder.

Q. Right. Which were the 2 to 5s in your ranking system.

A. Yes, as far as we could tell based on questionnaires.

Q. And the rankings were made during these team meetings on the weekend that Mr. Willett was not present at; correct?

A. That's true.

Q. So he was not giving his input as lead counsel as to whether a particular juror should be a 2 or a 5 if I'm understanding correctly what the problem here was.

A. Well, he wasn't involved really in the detailed analysis that the three of us, Pat, I, and Lisa Dahl, were going through on the weekends with each of the panels that were slated to come in for the following week.

Q. And looking at it from Miss Johnson's perspective, she was

being deprived at that point, was she not, of the independent judgment of her lead counsel in evaluating these jurors under the scoring system you were using?

A. That's true.

Q. Now, I want to return just for a moment to this business about McNeese. Did Mr. Willett ever say to you that the reason that he -- as I understood what you said this morning, it was not that Mr. Willett was volunteering not to do McNeese. It was that you and Pat Berrigan determined that he was not going to do McNeese. Do I have that right, or is that not right?

A. It -- based upon -- yeah, that's correct. I mean, it was that the case was -- the witness was removed from his list by majority vote of three attorneys.

Q. Two to one.

A. Over his objection. I mean, it wasn't a vote, but, you know, basically it was pretty clear that he was over his head.

Q. And did Mr. Berrigan break the news to him and tell him and get the boxes from him?

A. Yeah, he went up to his room and came back eventually with the banker box of the McNeese witness file which, you know -- and he brought it back down to our suite, and we both looked at it, and we said, oh, my God, he hasn't done anything.

Q. So was there ever a point in time when Mr. Willett came to you and Pat Berrigan and said, "I'm ready, willing, and able to cross-examine McNeese, but because I have a personal dislike for

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 351 Filed 11/10/11 Page 18 of 71

this gentleman and out of a very commendable need to maintain objectivity, I'm going to step aside and allow you to take this witness in order to maintain my distance from something that might interfere with my ability to cross-examine"? Was there any discussion -- you're laughing, and I'm serious, though. Is there any discussion along those lines?

A. N -- not any, no.

Q. It didn't happen that way.

A. No.

Q. Now, did -- the problems that you were describing in jury selection, did they carry over into the opening statement phase of the case, or were there similar problems?

A. All right. Well, as -- what happened was, you know, as we -- I tried to warn Pat about all this before trial, that, you know, I felt there was a reason to be concerned, and there was a situation down in Kansas City in December that -- on the jury selection, you know, that created reason to be concerned. And -- or the mock jury.

And -- so that we insisted on Al having his opening statement which apparently his -- I guess it was his practice as I was told by him anyway that he would typically have it written up or typed up or something of this nature. He would have a prepared statement.

So he provided us a draft of what he was planning to say to the jury. And Pat and I reviewed it prior to opening

statement and wound up having to deposit it in the garbage and start it over because of the fact that it was not consistent with what we had discussed strategically or with what -- with what would have been an opening that would have gotten the themes out there that we wanted to carry through the case.

And there's a fair amount of time that's reflected I think in my billing statements of editing and reviewing and -- et cetera, on the opening statement that I noted when I went through this, my billing statements. And that would have been starting on the 25th of April there's an entry, the 1st of May, May 2.

Q. Had you indicated what amount of time you were spending?

A. May 3. Well, some of -- some of those entries are lumped with other entries, so it's a little hard to tell, but there were hours and hours spent.

Q. Well, what was wrong with it? I mean, every lawyer can do a closing argument differently. Were these stylistic things? When you say you threw it into the garbage, I mean --

THE COURT: But we're talking about opening statement now. You said closing argument.

MR. BURT: I'm sorry.

THE COURT: That's okay.

MR. BURT: Thank you.

BY MR. BURT:

Q. What I meant to say is is it true that every lawyer has

different styles -- every lawyer can have legitimately a different style of presenting opening statements?

A. Oh. Right. No, I agree with all that.

Q. Why wasn't this just a stylistic issue as opposed to something else?

A. Trying to remember the details of what was in or not in his opening statement that made it deficient other than it seemed that he was still attempting to leave open some areas that we didn't want to have a jury thinking we were contesting because we didn't want to have that cross-purpose situation where we were doing one thing in phase one and then another thing in the penalty phase.

And the effort was -- the opening was kind of -- as I remember it, it was kind of what I'd call a generic opening that you'd give in a case where you don't know what the evidence particularly's going to be, and it was very open ended.

Q. One of these keep an open mind kind of opening statement?

A. It was -- yeah, it was not -- it didn't get our theme out there the way that we felt we wanted to have it out there from day one opening statement.

And so, I mean, Pat and I put together the opening statement which incorporated all the theories and themes that we wanted to have in there and the points that we wanted to have the jury have deposited into its mind as it was getting ready to consider evidence in what was going to be a fairly long

government presentation. And we didn't want to wind up only bringing in our themes, if you will, until after the government had brought in all its evidence because by then there was a sense that it may be too late. I don't know if you -- I think I've answered your question.

Q. Sure.

A. I could go on, but I don't think I need to.

Q. But in your opinion these were not stylistic issues. They were something more substantial.

A. Right. I mean, there's a lot of jury studies that show contrary to what juries are told and everything that many jurors start to form their conclusions upon hearing the opening statements, and there's jury studies to that effect that are fairly disappointing to lawyers and judges I'm sure because we all like to think that jurors are going to just wait till they hear all the evidence, and I'd like to think most jurors do that in the end. But there's many that you could probably -- I think it's very important to have your position out there up front to the extent you're able to when you can in a case. Otherwise you wind up in a situation where a jury by the time they get around to hearing from you, it's just too late to have them switch their mind-set.

Q. And were you and Mr. Berrigan able to remedy the problem by rewriting it and giving it to him to deliver?

A. Right. We actually put a bunch of time -- and I don't have

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 19 of 71

Berrigan's bills or anything, but we put hours upon hours into actually writing the opening statement and then having it typed up I believe by Nancy Lanoue who's Al's legal assistant, and she was doing sort of the secretarial functions, if you will, for the defense team during the case. So she typed it up on basically, you know, 8 1/2-by-11 paper in large type size essentially like a script. And Al delivered it like a champ from the podium. He apparently has some acting background and things, and he's got a big booming voice, and I thought -- I thought he did a very good job, and I thought the opening statement in my mind was -- it was pretty -- I felt it was pretty effective in getting our themes out there in the end.

Q. Now, I notice that in the opening statement one of the first things that Mr. Willett said was guilt by association is the government's principal evidence against Angela Johnson and it violates her presumption of innocence. Whose idea was it to include that statement in there?

A. I'm not sure, but, I mean, it was something that we put together.

Q. Well, did you think this case could fairly be characterized as one based on guilt by association in light of the evidence that you knew was going to be presented and in light of the state's opening argument detailing confessions and other evidence implicating Miss Johnson? Is that a good way to start out an opening statement in this case in terms of your

credibility with this jury?

A. Oh, I think that that may be one of the statements that was in the opening. I think there was more in there about presence too late to stop these kinds of things. That was really -- maybe that was the wrong place to have that statement in there as far as the opening commentary from, you know, the lawyer on opening. But overall we were trying to go with those themes on that note from earlier about mere presence, mere knowledge, mere association, too late to get out, got trapped into a situation, et cetera. And that was kind of the thematic part of the case that I think the statement overall -- I think it was pretty good and covered those points.

Q. Well, he said in the opening that she was aware that there were witnesses that were going to testify against Honken, yet she personally did not know any of the Duncans or Greg Nicholson and she did not know beforehand that there was the intent to kill any of these individuals. Angela Johnson would learn of this plan the day that the murders took place and without enough time to change it.

Whose idea was it to include in the opening statement the theme that Angela Johnson learned of the plan to kill the day of the murders?

A. I think that was a passage that Pat put together, but we all signed off on it.

Q. So you were -- there was an agreement that you were going

to concede in the opening that Angela Johnson had knowledge that these murders were going to take place and she gained that knowledge on the day of the homicides.

A. I think that's correct, yeah.

Q. And the argument was going to be although she had knowledge that these murders were going to take place she did not facilitate the killings because she was merely present. Was that the theory?

A. We had a lot of discussion about how far to go in opening short of giving up, you know, the first phase. And so the problem -- the problem was how do you deal with the evidence obviously.

Q. That's always the problem.

A. And, you know, there was -- it was a problem, and so we just -- we went to the edge, the outer boundaries, of where she could be without still being found guilty under the legal principles that we ultimately had the Court instruct the jury on.

Q. Now, this one theme that you're sounding here, Angela Johnson would learn of this plan the day that the murders took place and without enough time to change it, the second part of that, without enough time to change it, was some theme that although she had knowledge the murders were going to take place she had no ability to change it; right?

A. Right, and I think there's another passage in the opening

that I remember about it was too late to stop or something to that effect or too late to stop him or too late to stop it or too late to turn back or something.

Q. And you've testified this morning that there was a hope and an attempt to coordinate the guilt-phase and the penalty-phase themes; right?

A. Right.

Q. And it's true, is it not, that during the penalty-phase argument Pat Berrigan said something unexpected that really cut against whatever attempts you were making to build consistent defenses? Is that true or no?

A. Yes.

Q. Tell us about that.

A. Well, much to my, frankly, shock during his closing, he told the jury that Angela Johnson could have saved the two g -- the two children.

Q. In other words, that she did have --

A. Yeah.

Q. -- the ability to change things. The opening was not enough time to change what happened, and now you're saying that in the closing Mr. Berrigan's telling the jury she did have the ability to save the kids.

A. Right.

Q. How did those two theories go together in terms of building a consistent message here?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 20 of 71

**1421**

A. I don't -- I don't know what happened with Pat on that statement. I was very upset and told him that afterwards that he had said that. He argued with me.

Q. Argued with you after the fact or before the fact?

A. Yeah. And I was like, well, Pat --

Q. Well, wait a minute. Yeah --

THE COURT: Which is it?

Q. The question is which was it?

A. Oh, after.

Q. After the fact.

A. Yeah, it was after he had done it, and I was fairly critical. I said, "I can't believe you said that." I remember Lisa Dahl was kind of like her eyes opened up. She was here at the closing argument at that point as well, and it was kind of a stunner to me that he did that because I -- explain how his closing argument was put together if you want but . . .

Q. Yeah. I mean, how did that come about that that theme was in there and that you were taken by surprise by it? Wasn't there some preview of the closing and some discussion of how it should be structured and how to keep consistency?

A. What happened, there was a break in the trial before the final, final death-penalty closing arguments of about -- I think it was about a week which -- it was very disruptive to the ability to maintain any kind of continuity. Pat went back to Kansas City. I went back to Des Moines because there was no

**1422**

sense in being here for a full week prior to doing arguments.

But we returned. The plan was that we were going to return over the weekend and meet back up on Saturday and that when we met up I believe it was on Saturday that we were going to do this. When we met up, Pat was to have his closing argument ready to present to all of the people who were involved in Angela's defense who had come back for the purpose of being here at that time to, you know, be here for the final argument on penalty and also the outcome.

So I think Mary Goody was here; Lisa Dahl was here. You know, we had -- the three lawyers obviously were here. There may have been others here as well. But we had sort of the whole team here. And he was to have had his argument done and be in a position where we would do some runs through it so that everybody could make their commentary and give their input on it.

He got here, and it wasn't done, and he was struggling to put it together. And having, you know, worked with him for three months on this case, you know, and lived in a hotel room, you know, across from him with an adjoining area that was the work room, I got to know Pat really well, and I think he's a great guy. I really like him. But I could see that he was not -- he just wasn't himself. I don't know. He seemed like he was under a tremendous amount of stress at that time, and I think it was -- the whole magnitude of everything at that point

**1423**

I think was the first point in the whole case where I think it was really weighing on him. And I think it was interfering with his ability to put together his argument.

And we never did get to the point where he had an argument that he presented to anybody for anybody's input. And because of the amount of stress and strain he was under, at least by my observation, I essentially left him alone because I felt like I can't -- he's gotta work through this and he's gotta get his statement done or his closing argument done.

And there was -- he needed to be able to sort of cope with his own psyche, if you will, during that time.

And he put together his closing on Sunday into the evening and delivered it the following morning, but it was not reviewed by the defense team or myself.

Q. Was he having some physical problems around this time? I know he -- or Miss -- maybe somebody mentioned that he had some heart issues and --

A. Well, he's had a history of heart disease and coronary, you know, heart disease and has had a number of heart surgeries over the years. I think he had one during the pendency of this case and . . .

Q. What kind of procedure did he have during the pendency of this case?

A. I think he can tell you that. I think it was an angioplasty. I think he had one after as well. I think he had

**1424**

one -- yeah, he had one in late summer 2005, early fall, and then he had -- he had one, at least one, during the pendency of the case. Apparently he's had a long history of heart issues.

Q. So you didn't get a chance to preview it. And is the portion that you are referencing here that took you by surprise -- this is on page 4040 of the trial transcript where he says Honken comes back, and he takes the girls. Should she have gotten out of there? Absolutely. That's the reason she's sitting in that chair. Absolutely. She was weak. She could have saved them. There's no doubt about that.

A. Yeah. That -- that was just terrible. I -- and it's easy to sit here, you know, today and look back on things, but, I mean, I thought that was just wrong. Frankly I thought it was wrong to even try to sequence the killings as the adults, then the children. There was really no evidence as to the sequence in which people were killed in the first four.

And I -- you know, the evidence of what exactly happened -- I think this was pointed out in the post-trial ruling of the judge -- was very, very ambiguous as to what precisely occurred with regard to the four killings, sequence, where was Angela when they were physically shot. There was a lot of indicators that Honken had killed them some 75 or more yards from the vehicle where it was parked on that little side road or field entrance road.

There's just a lot of ambiguity. And it was not clear

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

what transpired and just as easily could have been that what actually occurred was Angela didn't know the first two people even got shot and came back to the vehicle, Honken did, with a gun alone and she thought she may be next, and then he took the others and killed them and she was not in a position to stop. That could have been -- there's like a lot of different scenarios that could have occurred.

And I don't think that it was helpful for Angela's lawyer in a case where she didn't testify where her lawyer is obviously in communication with her to be declaring on her behalf that she was able to save the children. I thought that was really bad. And I just -- boy, I just -- I didn't like that, and I really felt that was a mistake that was pretty substantial in his argument. He argued with me about that afterwards. He got upset with me for criticizing, but, you know, I don't really hide my opinions --

Q. I noticed that.

A. -- too well.

Q. I did notice that, yes. And you say it's easy to criticize today, but you criticized him back then. In other words, this is not hindsight. This is something that registered with you at the time and that you voiced to him contemporaneous with this argument.

A. Yeah, yeah. I mean, and I told Lisa I can't believe he said that. She goes -- you know, she sort of made a face like I

can't believe it either, you know, because it was pretty -- obviously the children in this case was a major -- you know, that was where the -- in a lot of ways the biggest risk was, and Angela being a mother, being pregnant at the time, and then saying that she, you know, could have saved them, there's no doubt about that, boy, I think there was a lot of doubt about that in my mind, and that's the way I argued the middle phase was that there was -- frankly, there was a lot of confusion. Who knows what happened? And the jury said no substantial planning or premeditation on the first four killings.

So, you know, I think the jury was willing -- to the extent you could say this, read anything into a verdict, you know, that's just what it is, but I think the jury was willing to accept the idea that she may have been in a situation, got caught up in it, and not been able to stop the situation and may not have been a full participant certainly in the killings and that sort of thing.

Obviously she'd already been convicted of killing the kids but -- or aiding and abetting in doing that. And, you know, it's just -- I just felt that was going way too far, especially with the absence of evidence.

Q. Now, you're familiar with this idea that all of the penalty-phase mental health experts were instructed not to inquire as to Miss Johnson's story at the time of the crime and that the defense made explicit to the jury in its direct

examinations of all these witnesses that everything they were going to hear from these experts had nothing whatsoever to do with Miss Johnson's mental state at the time of the crime.

A. Right.

Q. Tell me what kind of team discussion there was about whether to pursue that strategy or not pursue that strategy.

A. Which part of the strategy?

Q. Well, let's talk, first of all, about the idea that none of your mental health experts should ask Angela Johnson the question of what her story was or should opine about her mental state on the days of the crime, crimes, days of the crimes.

A. That was a judgment call that -- that principally was Pat -- Pat's call. I deferred to it, and the part about not interviewing her about the offense, obviously one of the concerns would have been that then the government would do the same in their -- in their evaluation or examination of her, and then if we went forward with our mental health evidence, then they'd be able to present that as well.

So that was a problem that Pat didn't want to deal with in the sense that he did not sense that whatever Angela would say regarding the offense which was basically a denial would come off well with the jury on the issue primarily of remorse.

Q. Let me look at that for a minute. When you had conversations with Angela Johnson, she was always saying to you

she wasn't there, she didn't do it; right?

A. In all candor, I probably didn't talk to her about the offense more than a couple of times after learning her position on that and after talking to her. And it became apparent, you know, that that position had largely not changed throughout almost the entire case, although there was expressions on her part that she'd be willing to plead guilty and cooperate and testify, so it was inconsistent.

But asking her in the absence of a plea agreement what had occurred was pretty futile I thought because she was in a denial mode at that point in that context. You know, in a plea mode she was saying I will testify, so I always figured she had more to say than she was saying but she wasn't going to say it unless there was a reason to. Does that make sense? I don't know if I'm explaining myself, Mr. Burt.

Q. You only talked to her a couple of times and -- in the entire time that you were preparing the case. I understood that part.

A. Yeah.

Q. And what I'm hearing you say is you really never delved into the question of whether her claims of innocence were valid or not in terms of dealing with her and questioning her and delving deeply into the issue of whether her story made any sense that she was not present.

A. Right.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q. But your understanding was that she had talked to other people including Mr. Willett and Mr. Berrigan, and what they were telling you was that she's not admitting her guilt.

A. Correct.

Q. Of course, there were counter indications such as her letter to you saying, "I want to plead guilty." The word guilty would imply that she is claiming she's guilty and is willing to plead.

A. Right.

Q. Did the defense -- insofar as a strategy about the mental health experts, was there some fear that she would all of a sudden when she's questioned by a mental health expert say, you know, what I told the lawyers is not right, I really did do it, and here's the way it went down?

A. I don't think we had any fear that she would say that.

Q. And it's true, is it not, that the original plan was to actually have the mental health experts inquire as to her mental state at the time of the offense?

A. The original plan?

Q. Right.

A. I'm not sure about that. I have to say just so you know, I wasn't really involved extensively particularly in the early parts on this issue until later. Then I started to get more involved in it. But in the initial parts of it, Pat was really heavily involved in this mental health evidence and the decision

making on it. I was not as involved in that. He, frankly, did most of the research, most of the writing on those issues as well. And just so it's clear that that's my involvement and that's the context of anything I say about it.

Q. Sure.

A. Yeah.

Q. Have you ever seen this letter? This is Exhibit 10 to the petition. It's a letter November 22, 2000, from Mr. Berrigan to Dr. Logan. And it's the initial referral letter to him in which he indicates at the bottom of the page here we need to evaluate Angela's mental state both at the time of the commission of the alleged murders, July and November, and at the time she purportedly made incriminating statements to the government's snitch, Robert McNeese. Had you at some point seen this letter, this referral letter, to Dr. Logan?

A. I don't remember seeing it, and I don't know that I saw it. It certainly predated my involvement.

Q. This letter would seem to suggest that at least the original game plan with respect to the defense mental health experts was to have Dr. Logan interview Miss Johnson about the circumstances of the offense; right?

MR. WILLIAMS: Objection. Leading, lack of personal knowledge.

THE COURT: You may answer.

A. Well, that's what it says.

Q. And do you know when the plan changed in terms of the strategy on having the experts review mental health issues?

A. Well, I'm sure it was changed before the defense experts did their exams of her, but I don't now remember when that was.

Q. You said you deferred to Mr. Berrigan on this issue. Do you mean by that that you did not exercise any independent judgment or influence on Mr. Berrigan in terms of evaluating this issue and giving him the benefit of your views one way or the other?

A. Well, as to the scope of the examinations?

Q. Yeah.

A. No. As to --

Q. No, you did not give him the benefit of your independent judgment?

A. That's right. And then -- that's correct. And then as to how this was playing out as it was winding its way through various rulings of the Court and also during -- even during trial with these discussions of a limiting instruction and this sort of thing being given when the defense experts were going to testify, that part of it, we had a lot of discussions, Pat and I did, about that particular decision making and the choice that had been made and how this was all going to play out in the record in front of the jury because it was -- I've called it the doughnut hole, you know. I mean, it was like -- you know, a jury wants to know about the offense. They want to know on

mitigators even though it's not required that the relationship between what you say is mitigating and the offense, even though a mitigator doesn't have to relate to the offense directly, generally I think a jury's looking for that, and I think most people would agree with that.

And in this case we had all this evidence is all around like the doughnut, and then there was a lot of commentary and inference about the doughnut hole in these various limiting instructions and also emphasizing with each of the experts that you were not asked to talk about the doughnut hole and you aren't here to talk about the doughnut hole and that sort of thing. And I was never really -- and I made it clear to Pat that I never really liked the evidence. It just didn't . . .

Q. The evidence referring to the mental health evidence as it was presented?

A. Yeah, because of the -- it just was -- it just -- there was a hole in it, and the hole, you know, was the doughnut hole. That's what I call it.

Q. And when you say you made it evident to Pat that you didn't like it, did you advocate for your not liking it in the way that Judge Bennett alluded to yesterday when he was questioning you and asked you whether -- you know, he said you're not a shy guy and how come you weren't in there advocating or pointing out these problems to the other team members?

A. Well, no, I --

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 23 of 71

Q. I'm trying to get some sense of -- I mean, it's one thing to say, well, you know, Pat, I'm not crazy about this. But did you tell him this is a mistake, you're going to denigrate your mitigation by doing it this way? And was there a debate about it and a meaningful strategic decision, or did you just go with the flow?

A. Well, I didn't just go with the flow, and there was discussion about it between Pat and I. And we had some really high-quality -- I would call them high-quality -- experts who the Court had allowed us to utilize in the case. These people had really impressive backgrounds and credentials.

And even -- you know, the balance was, okay, is there enough good stuff there that -- you know, on the doughnut part that it made sense to put the doughnut on without the hole, you know, without filling the hole of the doughnut?

And, you know, I made it clear I was uncomfortable with it. I didn't like it. You know, I just felt like it was problematical. I didn't like the way the issue was handled from a -- you know, a legal perspective because it seemed to me that if she had the right not to talk about the crime under the Fifth Amendment and yet put on mental health evidence relating to things other than the offense, okay, then it should not have been something that anybody was commenting on was the fact that she did not talk about the crime because essentially if she's exercising her right to remain silent on the crime in her mental

health interviews, then to emphasize that she wasn't talking about those or to comment affirmatively on that seemed to me to be a commentary on her silence.

Q. Was that argument ever presented to Judge Bennett as a reason why the -- neither the defense nor the government should be commenting on the lack of connection between mental state and the crime?

A. The record will bear out what was argued. That is the issue on these examinations and their scope. There's an opinion I think out of Judge Saris I believe maybe in Boston that was -- maybe at the time was kind of a leading opinion on this area. There's -- and what I remember about it is that Pat was really on top of that issue, and there was a number of hearings that he had where he was the only counsel involved in them with the Court and opposing counsel and the taint team I guess it was at that time.

Q. Was Mr. Willett giving his input as lead counsel here on this important issue?

A. No, not really. He was -- no, not -- no. That was an area that, you know, was over with Pat Berrigan.

Q. With no input from him as to the pros and cons of this particular strategy.

A. No, I don't think he gave any input on it, no.

Q. Since the client was claiming she was innocent, what would the downside have been in allowing mental health examiners to

ask her what her version of the offense was and she says, "I didn't do it"?

A. Well --

Q. What were you afraid of if that's what she was going to say?

A. Well, it was that, sort of the denial, which would be going against the concept of remorse.

Q. Well, let's stop there. She was pleading not guilty to the charges. She was claiming sh -- that she was present and innocent of these charges. And you had no evidence in any phase of the case that she was expressing remorse to anybody, did you?

A. There was very limited evidence presented on that question, but there was some evidence of her recounting to Christi Gaubatz the -- Christi Gaubatz's testimony where Angela was breaking down crying as she recounted what happened to Christi Gaubatz according to Christi Gaubatz.

Q. Now, restricting the experts to not examining her about the crime did not prevent an order allowing the government to examine her, did it, which I guess would have been -- if you could have prevented the examination of the government experts all together, that might have been a benefit, but you couldn't do that, could you?

A. Well, again, this isn't the issue that I was particularly intimate with, but my understanding is if you're going to offer mental health evidence of the defendant whether it's about the

crime or for any other thing, under that particular rule in the Federal Rules of Criminal Procedure dealing with this, then the government has the right to do an examination that is basically equally extensive as is the defense exam, and I think that's kind of where the Court came down on it, and I think that's what the law was on that topic.

Q. And eventually after litigating that, Judge Bennett decided he would allow a government mental health examination but at least unless the government could show otherwise and unless you open the door the government experts could not ask her whether she committed the offense; right?

A. It's my understanding it was limited on issues other than the offense. The details of exactly what the order said I'm not sure.

Q. Were you monitoring the actual examination that took place?

A. No.

Q. You eventually were provided with a transcript of that examination which lasted for about five hours; correct?

A. There was -- I don't know if it was a verbatim -- I think it was recorded and there may have been a verbatim transcript of it. I don't know that I ever really saw it to read it. I'm not sure.

Q. You weren't involved in reviewing that or monitoring to make sure that the government experts had abided by the Court's order?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 24 of 71

A. No. I'm going to say I wasn't, no.

Q. Whose job was that?

A. Well, I mean, I think if there's a court order that limits them, I mean, first and foremost it'd be the party who was doing the exam and the attorneys for the government who, you know, were working with their experts to admonish them about the limitations of the Court's order so that they didn't violate it. And then secondly, I don't think that the defense was physically, you know, going to be able to be present at the exam if I remember correctly. I'm not sure.

Q. Wasn't there a video feed order that said that you couldn't be present in the room but you could be present outside to monitor the examination?

A. Was there? I mean, this is beyond my knowledge.

Q. Okay. This is not something you were involved in.

A. No.

Q. But you were the research and writing guy; right? I mean --

A. Yes.

Q. -- you were the --

A. Thank you.

Q. Assistant lawyer or how ever you want to designate yourself. And would it be a legal issue as to whether the government examiners had abided by the limitations that Judge Bennett had imposed?

A. Well, it could be a legal issue, yeah.

Q. In other words, if in the course -- and we'll hear evidence about this later, and I'll represent the evidence is going to show that in the course of a five-hour examination these government experts ranged far and wide over the relationship between Miss Johnson and Mr. DeGeus, the relationship between Miss Johnson and Mr. Honken and asked her her entire drug history and did not ask the ultimate question of whether she pulled the trigger but did everything up to that point. Were you aware of that?

A. The allowable areas did not exclude those things as I remember it.

Q. Why is that? She was charged with conspiracy counts which included selling drugs, and why wasn't her relationship with Mr. Honken, Mr. DeGeus off limits?

A. No, it was -- I'll call it -- the doughnut hole as I call it was pretty small but that it was really only concerning the killings themselves and the actual murders. And the government expert and the people involved in that that were from the government were part of one of several taint teams that existed on the case.

And the way it worked was there was I think an attorney from Kansas City whom Pat was familiar with who was sort of the government taint team attorney. They had an expert who did the examination, and all of that stuff was not to be

shared and could not be shared with trial counsel for the government until or unless defense went forward I believe and was going to use our evidence in which case then they would have the right to gain access to the material. So it wasn't something that they had the right to access in the first two phases of the trial or even in their own case in chief in the penalty phase if I remember.

Q. Right.

A. It could only come up as rebuttal at the conclusion of our presentation of that evidence which opened the door.

Q. Right.

A. And then eventually they didn't even call the person anyway so . . .

Q. Right. But you did open the door. You did represent that you were going to call these mental health experts. Did you call them -- the government -- the trial prosecutors did get their own expert's report, did they not?

A. I think they did and they didn't call them.

Q. Okay. And even though they didn't call them, they wrote a very lengthy report; right?

A. There was a report of some length. I don't remember the length of it.

Q. And the defense team gave that lengthy government report, mental health examination report, to your own experts. Do you recall that?

A. No, I don't recall -- well --

Q. Was there any talk --

A. I'm not sure.

Q. -- as to whether it would be a good idea to give the government expert report to your experts and, therefore, subject them to cross-examination on material that they had been given?

A. I don't remember that happening, and I don't remember discussing it. It would not be something that I would do for that reason unless I had a pretty good reason for it. Sort of the presumption would be that you don't give them something that is not at that time in evidence or available to the other side without opening that whole can of worms.

Now, it could be that there was some addressing of that particular topic in some of the discussions with the other side that I'm not privy to. But, you know, sometimes it could be that it was allowed to be shared with them but was not going to be an area that the government could go into or whatever. I just don't remember that particularly.

Q. There's going to be evidence here that that five-hour examination included a question by the government expert along the lines of, now, although I can't ask you about the offense, Miss Johnson, I can ask you in general how you feel about the death of kids. Do you remember that? And Miss Johnson's answer was, "I feel extremely bad about the death of these kids." Do you recall that being in the government mental health

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 351    Filed 11/10/11    Page 25 of 71

examination reports that were sent to your experts?

A. No, I don't remember that.

Q. Was there any discussion about whether you should use the answer to that question which was I feel bad as expressions of remorse by Miss Johnson since remorse presumably was the whole reason you were limiting this mental health evaluation in the way that you did?

A. I don't remember ever discussing that -- that whole -- no, I don't remember that.

THE COURT: Mr. Burt, could I interrupt for a couple reasons?

MR. BURT: Yes.

THE COURT: I'm just trying to remember. Didn't I ultimately not give remorse as a mitigator because I didn't feel there was any evidence in the record to support it? Or do you recall?

MR. BURT: I think that's right, but I'd like to double-check.

THE COURT: Oh, yeah, you'll have time to double-check.

MR. BURT: Yeah.

THE COURT: But I was just trying to get clear in my own mind. I think that was maybe the only mitigator I didn't allow, but I'm not sure. There may have been others that I didn't think there was any evidence of, but I remember that one.

Miss Morrissey, do you recall?

MS. MORRISSEY: Yes, it was given. Three jurors found it as to Mr. Nicholson and Lori Duncan, five jurors as to the children, and four jurors as to Mr. --

THE COURT: Oh, okay. So I did give remorse as a mitigator.

MS. MORRISSEY: Yes.

THE WITNESS: I could answer that from my memory too.

THE COURT: Okay.

THE WITNESS: You -- when we were here on the Sunday night beforehand I think before the final arguments, we had a discussion about that very issue. I think you were concerned that there wasn't any evidence of remorse. I think you were thinking about not giving that instruction, and then we talked you into giving it, and you gave it.

THE COURT: Because I think I recall you were arguing that the sister's testimony about the meeting she had and Angela started crying that that constituted remorse, but I didn't see any connection between her crying and the crimes, and I think we had a discussion about that, but it's been a lot of years. But anyway, the bottom line is I gave the mitigator.

Now, I've got a matter I need to attend to that I just found out about, so can we take a 15-minute recess or I guess 16 minutes until -- well, why don't we just take 20 minutes until 20 to 11; okay?

MR. BURT: Thank you.

THE COURT: I'm sorry, until 10 to 11. That would be a 20-minute recess, 10 to 11. Thank you.

(Recess at 10:28 a.m.)

THE COURT: Thank you. Please be seated. Sorry I'm running late.

THE WITNESS: Actually you're early, Your Honor.

THE COURT: Oh, am I? Oh, did I say -- I'm sorry. I never remember the time I say so . . .

If you need three minutes, you can have them.

MR. BURT: No, I'm ready.

THE COURT: Okay. Well, as long as you're ready.

BY MR. BURT:

Q. Do you recall from reading the -- or hearing about the government expert evaluation that the government experts evaluated Angela Johnson's drug history in detail?

A. I don't believe so. I don't remember reading about that.

Q. In the penalty phase of the case, the defense presented a psychopharmacologist who testified about the effects of methamphetamine?

A. Right.

Q. However, that expert had never interviewed Miss Johnson and knew nothing about her drug history. Do you remember that testimony that was elicited from her on direct examination?

A. Correct.

Q. And how -- did you have any hand in formulating how that expert testimony would be presented in terms of whether you were going to have this expert testify in the abstract or whether she should go -- he should go in and since he was going to talk about the effects of methamphetamine, interview Miss Johnson, find out what her drug history is, and relate his abstract discussion of methamphetamine abuse to her specific history?

A. I don't think that expert was that kind of an expert. I don't think he was -- I don't think he was somebody who -- I think he was purely pharmacology if you will. I think he was a pharmacologist from Missouri or somewhere.

Q. I think Auburn University?

A. Okay.

Q. And just to refresh your memory, his testimony was essentially that methamphetamine can cause long-term damage --

A. Correct.

Q. -- to the brain but that he had not examined Miss Johnson or determined what her drug history was.

A. No. I -- yeah, I remember that. I don't think he was the kind of an expert who was the type of an expert who would be able to testify on the subject that you're talking about which would be sort of a diagnostic kind of a thing. I think he was more there to talk about the known effects of methamphetamine on people who use it to varying degrees, and that's the way I remember it.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 26 of 71

Q.   Was there some discussion about whether you needed to retain an addictionologist or someone who was proficient in diagnosing someone with substance abuse problems so that you could individualize the drug presentation to Miss Johnson and her particular drug history?

A.   I mean, I don't think we had anybody testify on that specific thing that I can recall.  There may have been testimony on that subject matter a little bit from Logan and -- Dr. Logan, and then there might have been -- I just don't -- I don't recall who else may have talked about that type of a thing.  But there was I think some evidence from one or more of the experts on that sort of generalized subject matter, and then there was lay witnesses who talked to some degree about her substance usage.

Q.   As far as you know, would there have been any tactical reason why you would not have presented individualized drug addiction expert testimony?

A.   I don't think it was tactical.  I just think it was something that between the testimony and the one expert from Auburn who I thought was from Missouri, you know, it was in evidence, but I don't think it was particularized to her.

And there again, we'd run into the same doughnut hole issue that you couldn't offer it to show that she was under the influence of drugs at the time of the offense.  So it would create some of the same issues that we had with all the other evidence on her mental state, that sort of thing.

Q.   Now, you met and conferred with Mary Goody throughout the course of this case; right?

A.   I met her somewhere into the case.  I don't remember exactly when it first would have been where we would have been in the same place at the same time, but I met her and I conferred with her, and we did work more closely together as we got closer to trial and during trial.

Q.   In your funding request for Mary Goody, there was mention of her role as a possible mitigation witness.  Do you recall that?

A.   I think that that was always a possibility that she might be a witness, particularly to talk about things that she had gathered in her investigation and that sort of thing.

Q.   How about as a story teller of Miss Johnson's social history?

A.   I don't know that that was thought about.

Q.   Well, this is from Exhibit 51 and it's DS_1-000112.  And this looks like your note.  It's undated.  But the first question on the note is what about having Mary testify.  Do you recall -- and underneath that, estimated total cost to do this approaching $100,000, witness interviews on government forms.  Can you tell me what you were thinking here?

A.   No, not -- not with any certainty.  I don't want to guess too much.

Q.   Well, apparently one thing you were thinking about is what

about having her testify; right?

A.   I think she was the only Mary in the case that I can think of that we would have thought about possibly having testify, so I would say that is a reference to Mary Goody.

Q.   Now, did you think that Mary Goody was the type of penalty-phase witness that would have a high degree or a low degree of credibility with an Iowa jury?

A.   I didn't even think about it, frankly.

Q.   Why not?

A.   Well, I guess I didn't -- I don't like think that Iowa juries have particular predilections that way.  Mary's actually a very presentable person, and she's a sweetheart, frankly, and I think she probably would have been a good witness in front of the jury.  I don't know that I would have ever even considered that she wouldn't be.  I guess whether it's the jury from Iowa or from, you know, Alaska or wherever, I think she'd be a good witness wherever.

Q.   Okay.

A.   You know, others may differ on that, but the only reason she wouldn't be a good witness would be because she's on the payroll, she was paid a good deal of money -- I don't know what it wound up costing for her work, but she was paid a good deal of money, and she would have been considered as closely aligned with the defense, so those would be impeaching points that the government would probably have on her.  But nevertheless, you

know, I think she's the kind of person that would be a good witness most generally, yeah.

Q.   And did you -- I think you said you attended lectures after you got this case about how to present penalty-phase evidence?

A.   There was a seminar that I remember attending in Memphis that was put on by the federal --

Q.   Resource counsel?

A.   Yeah.  They were the orchestrators of it along with the defender services division and -- of the Administrative Office of the U.S. Courts, and then -- and that was a several-day conference, and there were topics on all sorts of things.  It was more of a -- it wasn't in the traditional sort of big-room lecture type.  It was more small group, and then you picked off the menu of the various things that you wanted to attend as I remember it.

Q.   The things that you attended, is one of the things you learned, either at that seminar or elsewhere, that in order to be effective in the penalty phase you needed a good overall story teller, someone who is going to tell a story of the client's wife -- life in a way that was going to be compelling?

A.   I think that's -- yeah, I think that's true.

Q.   Did you think that Mary Goody could have been a good story teller of the client's life through her investigation and the way that she presents?  Could she have been a good, effective witness?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 27 of 71

A.   I think she could have been a good -- I would consider that to be kind of like a summary witness if you will?

Q.   Right, kind of like the way the government does their drug experts, but this time you're talking --

A.   Yeah. No, I think that's a good -- I mean, I think that's a good idea. I think she could have been a good summary-type witness to bring it kind of all together in a cohesive kind of overall way. We did a little bit of that with Cunningham in some ways maybe focused a little differently.

Q.   Uh-huh.

A.   That was a little bit of the concept of his presentation. But yeah, I mean, I think she could have -- she could have maybe done what we did through a whole lot of witnesses who were family members and what not. She could have maybe been more of a summary-type witness and might have been pretty effective at that.

Q.   Was there any tactical justification why you didn't use her as a witness?

A.   I don't -- you know, I mean, I could think of 12 tactical reasons why we didn't, but I don't think we had any at the time. I just think --

Q.   Yeah, I'm not asking you to dream up tactical justifications you didn't rely on. I'm asking you did you have any at the time that the decision was made not to put her on?

A.   No, I don't think so. No, I don't think we really -- I

don't think it was part of any plan that we had. I mean, somebody can go back and check our witness list. I don't know that we ever even listed her in any list we gave to the government as somebody we were going to call, but, you know, go back and check. I just don't think it was something we were thinking about doing in the penalty phase.

Q.   Well, somebody, specifically you, was thinking about doing it because you got a note here in your file that says what about having her testify; right? So somebody thought of it.

A.   Well, I'm not -- I want to be honest with you. I don't know that that relates to the thing. It could be -- there was a point in time when we were having some issues with funding for the mitigation investigation, and I'm not sure this note relates to that. But it could be that we were thinking of having Mary testify as to why she needed more funding so that we had the judge in a position where he'd be able to ask her questions and have a better appreciation of why she was needing the funding or we were needing it for the defense of the case. And that may be what the testify line in this note was referencing. Or it could be, as you say, testify at the penalty-phase hearing.

So I can't really say, but the fact that I have a note in there about cost approaching $100,000 may, you know, weigh in favor of that being something that was being written up in connection with a funding issue for Mary because I remember we had to go back to the Court on that a couple times to get her

enough money to complete out the work she needed to do because it was just overwhelming amount of work to get the mitigation thing done. It was just huge.

Q.   Sure.

A.   There was a ton, ton of work, and she worked her tail off, and there was just -- and funding was an issue. I remember that.

Q.   Why did you think it was going to cost $100,000 to put her on the stand? I mean --

THE COURT:  He didn't testify to that.

MR. BURT:  I'm sorry. Maybe I misunderstood.

THE COURT:  Yeah.

A.   I'm not --

THE COURT:  Well --

A.   I'm sorry.

THE COURT:  No.

A.   I --

Q.   What did you testify to about the hundred thousand dollars?

A.   I think that that reference is to some aspect of a funding request that would have been made potentially with regard to Mary Goody where we were getting either -- you know, thinking about how we were going to present this to Judge Bennett or the Eighth Circuit or whoever it was, and it obviously had to be Judge Bennett if we were going to have potentially testimony. Her number may have been adding up to 100,000 or we were

projecting 100,000 through trial or something like this. And I'm just guesstimating what this note means. I don't want to say that's a hundred percent what it means.

Q.   Sure.

A.   And I don't -- you know, I just don't know for sure, but I'm remembering that there was an issue about that. I remember that Mary was struggling at various points with payment issues, and we also needed more money for her late in the game, and we knew that the Court was conscious of the budget.

And there was I think some discussion of possibly just having her explain what the heck she was doing because I don't think Judge Bennett even had had an opportunity to meet Mary Goody or get to know her in any way. She was a name on a voucher asking for money who was said to be something called a mitigation specialist. And I think it would have been helpful given Mary being who she is -- and she's testified here in court -- she's very competent and very good, and she would have been able to explain to Judge Bennett and satisfy him why it was that we needed more money for her and why she needed more money.

And that's why I think this note, now that I'm thinking more and more about it, that's what I think it probably means, but I'm not certain, so I don't want to say for sure.

Q.   Okay. You mentioned that you did compile a penalty-phase witness list; correct?

A.   There was a penalty-phase witness list that we had. The

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 28 of 71

government had one as well.

Q. And this is document 403. Do you recognize this document from the trial, application for subpoenas and fees without payment by defendant for defendant's penalty-phase witnesses?

A. Okay.

Q. Okay. And the second page, you listed a number of witnesses that at least as of that date were on your penalty-phase witness list; right?

A. Well, was this for the penalty phase only, this list here?

Q. Yeah, the caption is application for subpoenas and fees without payment by defendant for defendant's penalty-phase witnesses.

A. Oh, okay. Oh, I see that. Okay.

Q. So --

A. All right. Tell me what you were . . .

Q. And so did you have a hand in comp -- writing this particular application to the Court?

A. Can you look at the signature line on it? Okay. Is there another signature page on there or just one?

Q. All three of your signatures are on this.

A. Oh. Hmm. Well, if we knew who e-filed it, that would probably tell me more, but I probably -- I was probably involved in preparing it, but I don't remember specifically. We had compiled a long list of people. When was this filed in relation to the trial date? I don't know.

But in any event, this was, you know, a long, overly inclusive list of people that we were contemplating calling for the penalty phase, and then it was going to have to be potentially pared down as we got into the case and made final decisions.

Q. Now, do you know if this list got compiled from people you had interviewed or people that were going to be interviewed, or was it a mix of both? In other words, had you interviewed all the people on this list?

A. I had not interviewed them all, no.

Q. When I say you, had the defense team, someone on the defense team, contacted these people and found out what they had to say?

A. I'm going to say a lot of them yes, probably some of them no.

Q. Okay. So these were people -- some of them were people on your list to be interviewed and you were putting them on the list out of an abundance of caution? Would that be a fair characterization?

A. This list probably was compiled with Mary Goody involved in deciding who we were going to put on for mitigation witnesses so . . .

Q. Okay.

A. You know, I'm going to say that I'm not certain who all on here was interviewed. I know we interviewed groups of these

people over in Mason City during a weekend in the trial. Pat and I traveled over there to interview a slate of witnesses with Mary over a two-day or three-day period, some of whom are on here.

Q. In general is it true that you were going to put on as many mitigation witnesses as you could find if -- once you determined that, in fact, they had mitigating evidence to offer?

A. That we were going to put on as many people as we could find?

Q. Yeah, that had mitigating evidence, not just randomly throw them up there, but once you determined that they had something mitigating to say, was it your general trial strategy to put on as many people as you could to support your case in mitigation?

A. I would say no.

Q. And why was that?

A. Well, I think some of these people were going to say the same thing. So you don't want to wear your welcome out, you know, with the jury. And we would have wanted to use the best people to testify on the points where we had more than one option of a witness. So you wouldn't want to call three witnesses to prove the same fact if you didn't need to and you try to select out of that one or two that were really good on that point rather than cover the same thing three, four, five times over with the same witnesses.

Now, at the same time, we probably covered the same

turf with some of the family members over multiple times, but it was all from individualized perspectives, and I think there's a little difference in that regard between a family member of the client and maybe a nonfamily member witness just because family member I think is important to have in front of the jury, and I think that was something we decided. We wanted her family there to testify so that the jury knew who they were and that they were going to be impacted personally.

Q. They were going to be what?

A. Impacted personally by the outcome. But we wouldn't have wanted to call like every -- every witness we could find on mitigation. There was some effort made to assess the quality of the witness and how important what they were saying was in relation to other witnesses and whether or not they were repetitious and that kind of thing.

Q. All right. And would you be able to go down this list -- I've -- those are my notes on this list -- as to who was called and not called? Would you be able to go down this list and tell me why you did not call each of these people that were not called? Angela Johnson, that's kind of an easy one.

A. Sort of surprised that we have her on the list. I think she was planning to be here anyway.

Pam Cookie Johnson was not called. She is Jim Johnson, Angie's father's, wife. I think it was decided that she did not have a sufficiently close relation with Angie to be

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 29 of 71

offering significant additional new information to have her also testify in addition to the other family members.

Brooke Jacobson, I'm not sure who she is. I assume she's like a niece or something of Angela. I don't know why she was not called.

Q. I think you said there was value in calling family witnesses to create the impression with the jury that people were going to be affected by Angela Johnson's execution; correct?

A. Right. And she would be -- if she's -- if she's Angela's niece, I just don't remember the assessment being made on that witness as to why she ultimately was not presented, so I can't say why.

Steve Hugo, remember the name; don't remember why he wasn't called, and I don't remember what he would have said if he was called.

Is Arlyn Johnson -- I thought he testified.

Q. Says called. The "not" is crossed out.

A. Okay. Kimberly S-w-a-l-v-e, the name is vaguely familiar. Don't know why she wasn't called.

Mikell Olson, no recollection.

Norm Olson, no recollection.

Axiotis, the two Axiotises, I don't know anything about them.

Shelly Jenney, I don't remember anything about that

person.

Ron Finch, no recollection.

Kathy Rick, I remember her being a girlfriend of somebody or an ex-wife. Was Kathy Rick an ex-wife of somebody or a girlfriend of somebody?

Q. I believe of Mr. Honken.

A. Yes.

Q. Why was she on the list?

A. Don't remember.

Q. Could it be to show that Mr. Honken was a bad guy?

A. Could be. Don't remember.

Q. Was that an important theme that you wanted to further through evidence, that Mr. Honken was a -- of the two people here, that Mr. Honken's background and conduct made him more culpable than Miss Johnson?

A. Yeah, if we could have -- if she would have helped in that, sure. That was part of the theme that we would have liked to have gotten across to the jury.

Friesenborg is another girlfriend of somebody. Maybe she was the more recent girlfriend of Honken. I don't remember why she was not called.

Q. First girlfriend in Arizona of Mr. Honken?

A. That's right, yeah. She was the Arizona girlfriend. That's right.

Q. Again, these witnesses would have gone to the dominance

role between Honken and Miss Johnson.

A. Well --

Q. These are past relationships that Mr. Honken had, and presumably they're on here because they could have testified to what kind of a character Mr. Honken was and how he operated with women. Would that be fair or no?

A. I don't -- I don't necessarily know that that would have been why she was listed. I think she could have been potentially listed sort of for something like that, but I don't want to guess. I know somebody talked to her. I don't remember who. I think Mary may have reached out to her and gotten ahold of her.

George Barlas, I remember him. I don't remember what -- where he fit into the case, and I don't know why he wasn't called.

Q. Employer of Miss Johnson?

A. Oh, yes.

Q. That refresh your memory?

A. That's right. Yeah. He was scratched very late.

Q. Did he have good things to say about Miss Johnson? What did --

A. I thought so if I remember correctly, but I don't remember what the reasoning was for not calling him in the end.

Q. Okay.

A. So I have to bow out on that one.

Q. Sure.

A. Carol Mann, I thought she did testify.

Q. I believe that's right.

A. Yeah. Janet Nieman, don't recall.

Elsa Dirks, I remember the name but don't recall.

Wayne Hopp, don't recall.

Terry Olson, don't recall.

Winifred Baker, I don't recognize that one, and I don't recall.

Q. Okay. And then last page of that.

A. Oh, wow. Let me just make it easier. I'll just tell you the ones that I recall something about.

Q. Sure.

A. Because there's going to be a lot fewer of those.

Val Williams I thought we made an assessment that she would be a bad witness for us because of the book deal issue.

Q. Let me stop you there.

A. Yeah.

Q. What was the issue regarding the book that made you think that was going to be a bad penalty-phase witness?

A. I think if I remember there was some connotation that Angela may have been contemplating making money off of her story if you will.

Q. Story of the crime or in the story about her life?

A. My understanding was that it would have included the crime

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 351 Filed 11/10/11 Page 30 of 71

**1461**

and the -- yeah, the crime.

Q. And was that understanding based on an interview with Miss Williams or some other source?

A. Well, there was correspondence between the two of them that the government intercepted that we successfully were able to keep out, first of all, because we had contended that Ms. Williams was an attorney or held herself out as an attorney and that Angela had addressed the materials to her in her capacity as an attorney. So there was that evidence which was out by pretrial ruling.

And then I know that Williams was in contact with -- I'm pretty confident Pat talked to her personally more than once. She was kind of trying to stick her nose in the tent, if you will, into the defense of the case, and we felt uncomfortable with her and felt she was a little bit of a wild card as to what she would do if she were to testify and involve herself in the case and that this was really something that she was pursuing to garner some monetary advantage for herself in writing some kind of book or something at Angela's expense. I felt it was -- she was -- and she had a prior -- I think she was previously prosecuted and had a prior felony fraud or something offense.

Q. Lots of people in this case had --

A. Well --

Q. -- prior contact, didn't they?

**1462**

A. Yeah, but she was -- anyway, she was a -- she was a very difficult witness. I know we talked about her and we scratched her for all the reasons I've just described.

Q. Sure.

A. She was just a problem witness --

Q. Okay.

A. -- from a lot of perspectives, so we made a call on that one that she ain't coming into the courtroom.

Alfredo Parrish, yeah, we chose during the course of the case -- I think we had listed Leon Spies and Alfredo Parrish for the purpose of getting into the Honken proffer issue and -- since one or the both of them were present during it.

Same with Charlie Rogers I believe.

Q. When you say the proffer, what part of the proffer were you contemplating putting in? Was it the proffer itself, or was it that the government was offering life sentences at some point or both?

A. I think we had -- we were thinking about both things at different points, but do you want me to finish this first, and then do you want to go into that whole topic?

Q. Absolutely. Go ahead.

A. Which I know you wanted to talk to me about anyway.

Gelbort, Michael Gelbort, I think he did the neuropsych, and I think it showed nothing that was of value.

Q. You had a report from Gelbort?

**1463**

A. My recollection was that there was some kind of report from Gelbort that he had done a neuropsych on Angela. Does that sound -- I mean, I'm remembering --

Q. Yeah, that's right.

A. -- the best I can, but I think there was a neuropsych on Angela that he had done, a neuropsychological exam, and the report came back that -- and it was sort of not very strong in any direction, so there wasn't really that valuable --

Q. Did you ever talk to Mary Goody about a conversation, fairly detailed conversation, she had had with him and about what her -- what his findings were?

A. I don't remember doing that.

Q. Let me see if I can refresh your memory. Do you ever remember having a conversation in which Mary Goody told you that Gelbort was saying that Angela Johnson's brain was like Swiss cheese, that Angela had a scatter in her verbal and performance IQ that was statistically significant? Remember something along those lines?

A. I don't remember that.

Q. That she had a diagnosis of cognitive disorder NOS, not otherwise specified?

A. I think I remember the diagnosis.

Q. Was there any team discussion about that information and what you could do to develop a cognitive disorder, brain impairment type of mitigation presentation, other -- either

**1464**

through Dr. Gelbort or by using someone else to advance that theme?

A. I think the reason that he was selected in the first place was for that reason.

Q. Uh-huh.

A. And that's why the evaluation was done by him was for that reason.

Q. Right.

A. And then -- so yeah, that was evaluated in the context of having her evaluated for that reason, and then we opted out of that apparently during the final stages of the trial, if you will, or the final preparation portions of the trial. I don't know when he was scratched exactly. I just remember we did discuss it and opted out of him.

Q. Okay. The next witness, Evans, was called.

A. Yeah, that's the --

Q. That was the psychopharmacologist.

A. Right, yeah, now I remember the name.

Steve Badger, Ray Fielder, I think those are agents of the government if I'm not mistaken.

Q. Were they the agents that took the proffer from Honken?

A. Could be. They were there to, you know, back up the attorney witnesses for Honken.

Q. The attorney or the proffer witnesses? In other words, were these the guys that took the proffer statement, wrote the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 31 of 71
*to purchase a complete copy of this transcript.*

302 report on Angela's -- on Honken's proffer where he failed the polygraph?

A. I think that's who they were.

Q. Or was one of these guys the actual polygraph operator?

A. I'm not sure, not sure.

Linda Burgess, I don't remember that witness so . . .

Q. Jail nurse on Miss Johnson's attempted suicide? Does that refresh your memory?

MR. WILLIAMS: I don't think that's accurate actually. I think she's a jailer at the Linn County Jail.

MR. BURT: What?

MR. WILLIAMS: Jailer at the Linn County Jail.

BY MR. BURT:

Q. Jailer at the Linn County Jail, does that . . .

A. Hmm. I don't remember enough about that. I kind of vaguely remember we had maybe more than one jailer come and testify. Maybe she didn't. I'm not sure. I can't say much about her.

Q. And the rest of these witness -- I think Mr. Williams is correct. The rest of these witnesses all relate I believe to the attempted suicide. Do you recall why those witnesses weren't put on?

A. I thought that DeSotel -- I thought he was at Linn County and he testified, but I could be wrong. Anyway, I'd have to think back and figure out what evidence was put on regarding the

suicide attempt to be able to recall that. I remember there was a good deal of evidence that -- that was put on about it through one or more people who witnessed her hanging by the sheet around her neck, and there was a good deal of detail provided on that, that it was a genuine suicide attempt which was the main point of concern, that we wanted to make sure the jury didn't think this was sort of a fake suicide attempt but that it was real and genuine. And that was my memory on that. I don't know why we wouldn't have called others to testify beyond that other than maybe we thought it might be cumulative or something. I'm not sure.

Q. So let's back up to Mr. Parrish, Spies, Charlie Rogers, and Judy Whetstine. Did all of those witnesses relate to the Honken proffer?

A. I think that would be true, that general topic.

Q. Now --

A. And maybe also the effort to work out a plea. That might have been part of the thing.

Q. So --

A. We had contemplated that at one point.

Q. So let me see if I understand the three issues that were involved with this group of witnesses.

One was the proffer of Mr. Honken; correct?

A. Yeah, what he said in his proffer would have been one area of potential evidence that we were looking at presenting.

Q. Another potential area would have been that he failed the polygraph as to Angela Johnson's specific participation.

A. That would have been another one.

Q. And another area would have been that Mr. Honken had been sentenced to death for the killing of the children; right?

A. Oh, that's right, yeah. And I think we offered that evidence.

Q. And then the fourth area would have been that the government at one point had indicated that they wanted less than death for Miss Johnson.

MR. WILLIAMS: I don't know if that's accurate, Your Honor. I'll just object it misstates the evidence.

THE COURT: Okay. You can answer subject to the objection.

BY MR. BURT:

Q. Or I'll rephrase that slightly, that your understanding of the plea negotiations was that at one point the government was offering something less than death for these crimes as to Angela Johnson.

MR. WILLIAMS: Again, I'll just object it misstates the evidence.

THE COURT: You can answer subject to . . .

A. I think it was maybe that part, but the other part was a willingness to plead on her part to the offense and the government's -- I think it was the expression of some support

for a life sentence for her that would have been something else that I think we looked at potentially presenting as mitigation. I think we did look at that.

Q. Now, you did do some research on whether you could use the defendant's offer to plead as mitigating evidence; right?

A. Right. I did some research on that according to my billing statements.

Q. And what did you determine as a result of your research?

A. My recollection is that it was admissible, you could present it as theoretically mitigating evidence under the -- under the case law. That's the way I remember it.

Q. I have a letter premarked as 57 which is a fax to Jennifer Gill from Charlie Rogers dated May 31, '05. And attached to it is a letter from Mr. Rogers to the Johnson team, and it says, "Mr. Stowers telephoned me on Friday, May 27, about testifying during Miss Johnson's penalty phase regarding the ultimately fruitless negotiations between Mr. Honken and the government which took place during the beginning days of Mr. Honken's trial. Mr. Stowers indicated that this testimony would be needed some time during the week of June 6. When I first advised him that I had scheduled my vacation, he told me that Mr. Spies would be an acceptable substitute." And then it goes on to talk about scheduling issues.

Does this letter refresh your memory that at least as of around the time this letter was written that you had

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 32 of 71

contacted Mr. Rogers about testifying regarding the fruitless plea negotiations?

A. Yeah.

Q. And so what -- at least at this point was it contemplated that that was going to go forward, that you were going to put the -- either Mr. Rogers or, because of his scheduling problems, Mr. Spies on to testify about the negotiations?

A. Yes, and we had some record made with the Court about this very issue and the issue of which of the attorneys would appear and whether or not we needed to re-subpoena Mr. Spies, et cetera. And I think that was addressed on the record in the transcript of whatever happened at that time in the court with Judge Bennett.

Q. And the topic, at least as of this point, was not that Honken had received death but rather that there was fruitless negotiations during which I presume but correct me if I'm wrong part of that idea was fruitless negotiations during which the government had offered something less than death for this case.

MR. WILLIAMS: Again, objection to the -- misstates the evidence.

THE COURT: You can answer subject to the objection.

A. Well, we were thinking about having one of the -- their attorney -- one of the Honken attorneys testify as to the statements and positions of the parties regarding potentially resolving the case without the death penalty and the willingness

of Honken and Angela Johnson to do so and -- and the indications from the government, at least the local U.S. Attorney's Office, that they were stating at least through Mr. Murphy that he would be supportive of a life plus life -- life for both defendants kind of a plea agreement and that they could present that in a favorable light to the Department of Justice, the group that decides those things in death penalty cases.

Q. And Mr. Spies ultimately did testify, correct, in the case?

A. Yes.

Q. However, what he testified to was not about plea negotiations but about the fact that Honken had received the death penalty for the kids and a life sentence for the adults; right?

A. Right. It was limited --

Q. How did that morph into something other than what we're talking about in this letter?

A. You're asking me why we dropped the potential of offering something about the plea negotiations?

Q. Yeah. In other words, your research had determined in your view that it was admissible and -- but it never got put on, and the question is why?

A. It wasn't forgotten. I don't remember the rationale for not bringing it in through Leon. I know we did -- it was discussed, but I don't remember what the reasoning was why we opted out of that course of action, so I can't tell you why we

did it, but I know we had a reason. I don't know if it was a good reason, a bad reason, or whatever. I can't remember why. I just don't remember why.

Q. Let me ask you this. Assume for the moment that you had a tactical reason. You don't know what it is now, but just assume for a moment that you did have a tactical reason for not presenting that. Would you have had a tactical reason not to have fronted that issue with Judge Bennett on an admissibility issue to see how he would rule and thereby preserve an issue for Miss Johnson in the event that he ruled it inadmissible? Would there have been any reason not to do that?

A. You know, I'm remembering the research was favorable on the aspect of a defendant's willingness to plead guilty. I'm not -- you know, you could offer that as mitigation, that fact.

Now, could you offer evidence that the government had given indications that they were willing to go to life, that maybe was something -- I don't specifically remember looking at that particular point that way, but, you know, we didn't present a pretrial issue to the Court, and I don't know why we didn't. So -- you know, or a motion issue to the Court, tell us whether or not you're going to let us do this, you know, preliminarily. I'm not sure -- my memory was it was pretty clear that we would have been able to do for sure the part about our client's willingness to plead to life. I don't think that was really going to be controversial if I remember. But the other part I

don't know, that is, the government's position. I'm not sure where we were on that on the law or anything else.

Q. As the research and writing attorney in the case as defined by Mr. Willett, did you understand your role -- one of your roles to be to preserve legal issues for appellate review as it related to the penalty phase of this case?

A. Yeah.

Q. And did you understand and appreciate that the more issues you preserved at the penalty trial the better off Miss Johnson was just in general?

A. If they were good issues, sure, yeah.

Q. And did you realize from reading the case law that penalty-phase issues regarding the admissibility of mitigating evidence was a fruitful topic of appellate review?

A. Well, yeah, that was -- you know, when you start excluding mitigating evidence, you get into -- it's pretty favorable standard of review for erroneously denying a defendant the opportunity to present mitigating evidence.

Q. So would it have been an important part of your role as research and writing and motions lawyer to have fronted as many issues about the admissibility of mitigating evidence that you could in good faith present to the Court?

A. Yeah, I guess so, yeah.

Q. And is this one area where that should have been done, do you think?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 33 of 71

**1473**

A. Well, my memory was it wasn't an issue. I don't want to presuppose what -- and I'm not -- you know, I don't have the legal research in front of me, but my memory was that it really wasn't an issue as to whether or not we'd be able to do it, and my impression was that it didn't have anything to do with the fact that we were afraid that Judge Bennett wouldn't let us do it.

As to why we didn't present it, it was that we had some other reason which I'm not remembering what it was, but I remember it was a choice we made not to do it. It wasn't because of a fear that it was inadmissible. If we were afraid that it wasn't admissible but thought we had an argument, I would have presented it I guess is what I'm saying.

Q. Right.

A. Yeah.

Q. I thought you had said a couple minutes ago that there were certain aspects of this proof as you conceived it that, in fact, were controversial and that it wasn't so clear under the case law you were going to be able to put in things like the government's position, things of that sort.

A. I think that may be overstating what I said a little bit, just a wee bit, but not too much. I mean, I didn't specifically look at it as a discrete issue, what if the government said to the defendant we would accept a life plea from you? Would that in and of itself be admissible sort of as a piece of evidence?

**1474**

I don't know that I researched that particularly, although I think it probably -- just in having thought about it, if you can present evidence that the defendant proposed pleading guilty to life and the government said no, that means the government's position was that the defendant should get death and, therefore, the government's position would be admissible as would the defendant's proposal to plead to life.

So I kind of think it wasn't really an issue. That's why I say it wasn't a question of admissibility in my mind as much as we had some other reason why we chose not to go down that road. And I'm not recollecting what that was.

Q. All right.

A. So I'm sorry I can't help you on that. I just can't remember what it was. I just -- I don't recall right now.

Q. Let's talk about the proffer aspect of this group of evidence. Was there a decision made not to put in the proffer at some point?

A. That's true.

Q. And do you recall what the tactical reason was for not putting in the proffer?

A. Well . . .

Q. I'm not asking you to dream one up now.

A. No.

Q. I'm asking you did you have -- did you have a tactical justification at the time, and, if so, what was it?

**1475**

A. Okay. I think I started to describe this -- did I testify yesterday? Yeah. Yesterday I was describing how when we were getting down to the final portion of our evidence in mitigation -- I mean, this would be I believe after the government was done with their case even -- Pat and I were -- you know, we were the ones doing that portion of the case, and Al was uninvolved in that aspect of the case and wasn't particularly involved in decision making or discussions on any of these issues during the penalty-phase evidence. So it would have been Pat and I.

But anyway, we're over at the hotel, and I distinctly remember Pat -- you know, we were talking again about this proffer and bouncing it off each other again one more time, and Pat comes out of his -- of his bedroom which is connected to the work room and says, "I don't know what I was thinking wanting to use this proffer," something to this effect. And that's when the decision was made not to use it.

Q. And did you agree with that decision that the proffer really wasn't a helpful piece of evidence if you read it?

A. Yeah, particularly, you know, after the other witness testified, Vest, yeah.

Q. Because it was a consistency between what the proffer was saying and what Vest claimed that Honken was saying; right?

A. They were pretty -- I think there was a lot of consistency there, and that would have -- in some ways it would have been

**1476**

bolstering what the government had presented through Vest as what Honken told Vest in jail. So that was -- that was a concern.

Q. Unless you could somehow show that both of those consistent statements were not true; right?

A. Right, yeah, but I -- jeez, you know, it was a mess. I mean, that issue got screwed up. I hate to say it but . . .

Q. What do you mean it got screwed up?

A. Well, what happened was because of the nature of the proffer and the fact that it was sensitive, we got it before the trial. We then had to make some kind of election on whether or not we intended to use it before the trial which we said we're going to use it.

In retrospect, you know, that was probably unfortunate that we did that or at least had to make the election before trial as to what we were specifically going to do with that proffer because it kind of boxed us in and --

Q. Boxed you in in the sense that Judge Bennett then used that in his ruling on Vest -- the admissibility of Vest's testimony?

A. I don't know if he specifically referenced to it in his ruling on Vest, but there was representations -- well, we wanted to exclude Vest, first of all, because it seemed like his testimony about what Honken was telling him in jail was rank hearsay, to use that word again, but it was really kind of the worst kind of hearsay you could ever have.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q. Right. But in his ruling Judge Bennett said the key issue in this case as posited by the defense is whether there is a dominant role by Honken over Miss Johnson which you had put in as a mitigator.

A. Yeah.

Q. And because that was the key issue, the Honken hearsay comes in. Isn't that what he reasoned?

A. Well, his reasoning's in his --

Q. Among other parts of his reasoning there?

A. His reasoning's in the opinion there, but I have always felt that had we not noticed the Court with using the Honken proffer before that issue was addressed by Judge Bennett in his ruling, that is, the Vest issue, that he probably wouldn't have let Vest testify because of the reliability concerns and the circumstances over it.

But knowing I think prior to the ruling that we were going to use the Honken proffer which was a Honken statement out of court made to law enforcement to advantage himself that the Court I always felt was influenced by the fact that if you're going to offer those statements, they ought to be able to offer the other ones of Vest.

And then I remember a hearing in court when we were batting this issue around with Judge Bennett and everything. And I think there was some -- I think it was a hearing on whether or not the information could be closed to some of the

family members of the victims by the government because they didn't want to have that coming out in court for the first time. And Pat told Judge Bennett in that hearing that, gee whiz, we don't need to do that because it's the same thing that Vest told -- says that Honken told him which undermined kind of the whole issue of whether or not what -- you know, the reliability issue.

So now you're going to have the judge thinking about this in terms of Vest saying that Honken said these things; then Honken says the same things in his proffer. And the judge looking at that in sort of a fairness way is going to say you can't, you know, kind of have it both ways. And so we kind of got -- the sequencing was really bad on that and . . .

Q. And how did the polygraph issue, if that had been thrown into the mix, in other words, if you had gone in and said we have not elected to use the Honken proffer yet, but we would like a ruling from the Court that if we do use that we get to put in the polygraph to show that this evidence, this statement by Honken, is not truthful, how would that in your view have affected the Vest admissibility issue if all those issues had been fronted in that way?

MR. WILLIAMS: Calls for speculation, Your Honor. Objection.

THE COURT: You may answer.

A. I just -- I think the polygraph issue was another issue

and -- with the proffer of Honken, and I thought that -- I think we kind of screwed up our decision making on that one point when we elected too early to definitely use the Honken proffer at a point in time before the trial when we were, you know, expecting certain evidence to be a little bit different, particularly from McNeese, than what came out.

And it just -- we made a decision based on that circumstance, then stuck with it, and then it was -- it was something that wasn't very easy to get us back on the right track with, because I think we kind of got off kilter.

Q. How -- I'm not sure I understand when you say McNeese. McNeese had testified in the guilt phase; right?

A. Right, but he had --

Q. March 1 Judge Bennett had handed over to you the proffer and had given you a deadline in which to notice whether or not you were going to use it or not. You read the proffer presumably and then filed the notice, so how does the McNeese situation fit in to that chronology?

A. Well, the way I remember it, when the government presented McNeese as a witness after Berrigan spent a day and a half going through a banker's box of stuff preparing for a massive cross-examination of McNeese, the government presented what I would call a skinny -- a skinny examination of McNeese. They did not go through everything that McNeese had alleged Angela had said or written to him. And they left out substantial

portions of things that he had previously either testified to or said she authored in writings.

And some of the stuff that he had said would have been, as I remember it, a fair amount more indicative of Angela's involvement than what the evidence came out at trial because they narrowed down their presentation of him so much.

Q. Can you give me an example of a single fact that would have been worse than what Honken was saying happened to Vest?

A. You know, I can't tell you specifically. I just remember thinking that they did us a favor on McNeese by not having him get into every single thing and that the evidence that came out of his mouth from the witness stand was -- was quite a bit less than what it could have been and what it had been before in the earlier proceedings.

And so I was -- but we had already by the time that occurred elected that we were going to -- or had to give notice that we were going to use the Honken proffer which there was -- it either contradicted some things McNeese was claiming or was in some ways a better version than what he was saying. And then so we got stuck into a -- but we didn't revisit the Honken proffer until later in the trial when we're getting ready to go down the road of using it actually in our presentation, and that's when we decided, oops, we don't want to use this anymore.

Q. Well, as I understood what you told me about Pat Berrigan coming out of the room and saying, "I don't know why I was

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q. thinking I wanted to use this," his rejection of that evidence had to do with the content of the proffer, not anything having to do with McNeese, unless I missed something.

A. My memory is that what it was had to do with the content of the proffer in relation to the evidence as it was then existing before the jury. That's kind of the way I remember it.

Q. Well, did he say to you, you know, if we put this proffer in as good as it is, it's going to open the door to worse evidence by McNeese?

A. No, no, no, no.

Q. That was never a discussion.

A. No, because McNeese wasn't coming back. He was gone.

Q. And the letters that he claimed to have gotten from Angela Johnson, those weren't coming back. That was not part of the discussion either, was it? He never said to you we can't use this proffer because look at this letter that McNeese claims that Angela Johnson wrote and whereas Honken is saying that Angela helped him plan the killings and picked out the graves in advance, there's something much worse than that in some document that McNeese attributed to Miss Johnson.

A. No, no.

Q. Or some statement he attributed to Miss Johnson.

A. Right. No, I -- no, that wasn't the discussion. It was I'm not going to use this because it -- it was a -- it was -- in the context of the case as it sat at the moment that that decision was made, it was not favorable, and it was more -- you know, the balance of factors would be that it was pretty unfavorable. And that's the assessment we had at the time, and that was Pat's assessment when he came out holding it in his hand I remember.

Q. Now, was there some tactical reason why you did not front the polygraph issue with the Court before the Court ruled on the admissibility of the Vest statement or even after he ruled on the admissibility of the Vest statement?

A. Front the issue. Well, I think it was discussed.

Q. As in put it in front of the judge that because the Court was thinking about allowing Vest to testify, the defense was moving in limine for admission of a poly -- government polygraph examination which showed that Honken had failed on the precise issue of Angela Johnson's involvement in order, first of all, to get a ruling on that issue to preserve it for appeal and, second of all, perhaps tactically to back Judge Bennett off what then would look like maybe an area where he didn't want to go?

A. I don't think that was looked at in that way. There was some research done on the admissibility of polygraphs in the penalty phase of a trial, and I think I said yesterday that I don't think the law was very clear on that at the time that we researched it but that if we had wanted to use it we could have made a good case that we should be able to. We could also make a good case that if the government wanted to use it that -- that

they shouldn't be able to.

So, I mean, it was one of those issues, you know, if you were going to go that way, you know, you could -- you could argue both sides of it.

Q. Did you think if you had offered the polygraph as mitigating evidence that Mr. Williams would have let it in without objection based on the way things had gone up to that point?

MR. WILLIAMS: Calls for speculation, Your Honor.

THE COURT: You may answer.

A. Well, I don't know, I mean, what his position would have been.

Q. Did you think about the benefits of preserving that issue for appeal regardless of what you were going to do with it? In other words, maybe you hadn't tactically decided which way to go with it, but did you think, you know, whatever I do here, I should get a ruling on the admissibility of this polygraph evidence because say Judge Bennett excludes it, I preserved an issue for appeal. If he admits it, then we know we're going to be able to get it in, and maybe we can then think about whether to use it or not?

A. Do you -- you know, it would help me because you've been characterizing what -- what the polygraph results were in your questions, and I don't remember them quite explicitly as what you're saying.

Q. Well, perhaps over the lunch break I could have you review that.

THE COURT: Would now be a good time to take a break?

MR. BURT: It would, yes.

THE COURT: In light of you're going to be reviewing some documents, how about an hour and 15 minutes?

MR. BURT: That'd be great. Thanks.

THE COURT: Okay. Why don't we come back at 1:15. Thank you.

(Lunch recess at 12:02 p.m.)

THE COURT: Thank you. Please be seated.

Mr. Burt, you may continue.

MR. BURT: Thank you.

BY MR. BURT:

Q. Mr. Stowers, over the lunch break you had a chance to review the proffer and also the polygraph report; correct?

A. Yes.

Q. How could the proffer and the polygraph results have been used to attack Honken's credibility, not Vest's credibility but Honken's?

A. Well, as I remember it, the Vest testimony about what Honken told him in the prison was -- had a lot of consistencies with what Honken said in his proffer. They were very close to the same version, if you will, of events.

And so on the face of it those two statements would

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

seem to corroborate each other. But then when you look at the results of the polygraph exam done by the polygrapher of Honken after his proffer was completed wherein they asked him the questions about whether or not he had told the complete truth regarding Angela's involvement and whether or not he had made up any part of his statements regarding her involvement, the polygrapher said that the answers to the both of those questions, first that the answer to the made up any part question was no, he had not made up any part and the second one was did he give a complete disclosure -- was his proffer complete as to her involvement, completely truthful, he said it was. And as to both of those things, he had been determined by the polygrapher to be deceptive.

So if -- if one had wanted to, I guess, impeach what Vest was saying Honken had said to him and whether or not that version was true, what you'd do is you'd offer the proffer and then impeach it with the polygraph results which would also have the effect I suppose of impeaching what he had said to Vest potentially.

Q. Now, you actually observed Vest testify; right?

A. Yes.

Q. And you observed Mr. Berrigan cross-examine Vest.

A. Yeah.

Q. Did you feel at the end of the cross-examination that Vest's credibility as opposed to Honken's had been placed

seriously into issue?

MR. WILLIAMS: Relevance, Your Honor.

THE COURT: Overruled.

A. Well, my assessment was that Vest was actually -- as a witness I thought he was fairly credible. Even though he had a horrible record and that had been elicited, it seemed like he was fairly believable in his testimony about what he was recounting Honken had said to him and -- yeah, that would be -- I thought he was fairly believable in that as a witness testifying as to what he says occurred. So I thought he was fairly credible.

Q. And was there a discussion either before or after Vest testified about the need to do something else to impeach Honken's version to Vest in light -- in light of your assessment that Vest came across as fairly credible?

A. Well, I think that -- in all candor, I thought that -- actually I thought that Berrigan's questions of Vest about Honken's situation, that is, not wanting to be labelled a child killer in prison because of the ramifications that would flow from that -- I remember that was part of the cross-examination -- and the other part of it being that Honken was making these statements contemporaneous with events going on in -- as I remember it in Angela's case which were detrimental to Honken, namely unearthing five human remains that had been buried for seven years that Honken certainly didn't want to see

resurface, so he had a great deal of motivation to be implicating Angela in his conversations with others. And I thought that -- really I thought that was a fairly effective way to impeach what it was that Honken would be motivated to say falsely about Angela from prison.

Q. And in considering this issue of whether he -- the version by Honken had been impeached, did you take into account at all Judge Bennett's analysis in the ruling allowing Vest's testimony into evidence, namely that there were indicia of reliability in that statement because it was against Vest -- against Honken's penal interests and that that statement by Honken was corroborated by the forensic evidence? Did that enter into any assessment you or the other defense team members were making as to where you were with impeaching Honken?

A. No, not really. I mean, I thought those were the judge's observations of things that he felt supported the legal decision to allow the testimony. I didn't . . .

Q. Well, did you make any -- did you have any doubt in your minds that Mr. Williams would be making the same kinds of arguments in support of the Honken statement, namely that those statements were corroborated by the forensic evidence, they were corroborated by the fact that Honken was speaking against penal interest, they were corroborated by other confessions that had been introduced by the government in the guilt phase of the case and by the other failure really to impeach the version that

Honken was offering other than this theme that you're saying that Pat Berrigan covered?

In other words, were you weighing what was already out there and what was likely to be out there on this crucial issue and calculating that on balance it makes sense not to offer the polygraph or any other impeaching evidence on this crucial issue of Miss Johnson's role in this offense vis-a-vis Honken?

A. I -- that's a long question, but I think my answer is there was no consideration specifically of trying to use the proffer as evidence to impeach it with the polygraph.

Q. There was no consideration.

A. That wasn't something that we ever talked about or were thinking about doing.

Q. All right.

A. We were -- going into the penalty phase, the game plan as I remember it -- and I think this is what the record would bear out -- is we were going to use the proffer independently without the polygraph to impeach it. And as I say, that changed once we got into the final part of the penalty phase where we were putting on our evidence.

Q. Changed because when you actually read the proffer you realized it doesn't impeach Honken, it actually is a consistent statement.

A. That and the way the evidence had stacked up as I said earlier.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 37 of 71
*to purchase a complete copy of this transcript.*

**Q.** Okay.

**A.** You know, at that point in the trial.

**Q.** Now, let's talk for a moment about the death sentence of Honken that got put into evidence in lieu of what the Charlie Rogers letter referred to as the plea negotiations. I think you said you didn't remember how you eliminated not putting in the plea, but do you recall how you ended up deciding to put on the death verdict of Honken through Leon Spies? What was the tactical decision there?

**A.** I think our thought -- and I gotta tell you I don't remember which killings as I sit here today Honken got the death penalty for other than the two children. But I think our thought was, among other things, that if Honken didn't get the death penalty for killing somebody since he was the principal, how could you give it to Angela Johnson on those counts where he did not get the death penalty for the particular person? That was one thought.

**Q.** That was a thought that was being narrowly focused on the counts charging the adults; right?

**A.** Correct, yeah.

**Q.** The goal here was to avoid a death sentence; right?

**A.** On those counts as well as all the counts.

**Q.** Right. In other words, you couldn't accom -- do you agree that your goal -- your ultimate goal in this case was to save Angela Johnson's life?

**A.** Well, yeah, I'd agree she could only be put to death once. I'd agree with that.

**Q.** And your strategy, you were doing everything you could to prevent a death verdict, a single death verdict.

**A.** Correct.

**Q.** And so could you accomplish that ultimate goal by focusing on the counts involving the adults?

**A.** No, but that's why I was going finish my answer. But that was one of the reasons we wanted to use the verdicts was for the what we perceived as favorable verdicts rendered in the Honken case on certain of the victims in our case.

But the other reason that we were thinking about that was that there was a theory, although it can be argued the opposite way as well, that if the pound of flesh, if you will, had already been, you know, taken from Dustin Honken, he'd already received the death penalty, that there might be a reasonable argument made that that was sufficient and you should distinguish between him and her in assessment of penalty because he was the principal, she was the aider and abettor, she did not pull the triggers, certainly this was his situation that he was dealing with and he had involved her in some way and, therefore, he has already been appropriately punished and you should appropriately punish her with something lesser, a life without parole sentence. And that was the thinking on that.

**Q.** Did that thinking only make sense if the jury believed that she had a lesser role? In other words, did that theory hinge on the jury concluding based on the evidence that you were presenting in mitigation and the entire package of evidence in the case that, in fact, Angela Johnson was less culpable than Honken?

**A.** Right. Well, that was the -- that was the rationale for doing it, so yeah, you know, you'd want to have as much evidence to support the rationale as we could.

**Q.** Because if the evidence that got put in actually showed or supported an interpretation that Honken was not only not less culpable but that your client was more culpable and was dominating Honken, leading him astray, putting in a death verdict that he received would actually have the opposite effect, wouldn't it, from what you intended?

**A.** Well, yeah, yeah. Following the logic, if there is any, in the reason we did it in the first place, yeah. I mean, it would go in the other direction then. That same rationale would go in the other direction.

**Q.** Now, yesterday -- and so, therefore, wasn't it important to make sure that the evidence was not left in that state where the jury could make the conclusion that really of the two of them Angela was more -- more culpable, the dominant role, the principal in the offense?

**A.** Right. I agree with that.

**Q.** Okay. Now, we had discussed a little bit yesterday about the motion you filed on inconsistent theories. Remember that discussion?

**A.** Yeah.

**Q.** And the brief that you filed in support of your motion to exclude that evidence was not based on evidence from the Honken trial where Mr. Williams had made statements such as the one I quoted yesterday from the transcript where he was saying that the gun, although Angela Johnson purchased the gun, he was there, it was his decision, he picked out the gun. Your motion was sort of an abstract they claim that Johnson was an aider and abettor in the Honken trial. They should not be permitted in the abstract to argue that she's a principal here; right? And I've got the brief if you want to look at it.

**A.** Right. I think that's -- I think that the motion was based on what I'd call legal -- the consistencies in legal theory of guilt.

**Q.** And was there some reason why you didn't comb the record in the Honken case and pull out every instance where Mr. Williams had either argued or presented evidence making Mr. Honken the dominant person here and argue that he should not be taking a position inconsistent with those factual assertions and arguments and not only should he not be permitted to take that position, those factual assertions and arguments should come into evidence at the penalty phase as admissions by a party?

**A.** Is there some reason --

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

**1493**

Q. Yeah, is there some reason why that was not done?

A. Okay. Some reason that wasn't done. Well, I don't remember even really thinking about it in that kind of detail and getting down to the particular points of argument that the government would have made and thinking about whether or not that point of argument in the Honken trial might be different than a point of argument in the -- in Angela's trial. I didn't really look at it from that point of view. Don't ask me why because I just didn't -- I didn't do it. I guess I didn't think that thought, and so I didn't do that.

Secondly, the other part of your question was why didn't we offer those parts of the record. Well, the reason is the same. I didn't think about that approach at the time as a method to sort of impeach the government's positions. We filed the motions on inconsistent theories and arguments basically, and I think it was denied unequivocally, and they were allowed to go forward and argue their case based on whatever the evidence was in our record. And I never went back and revisited that issue until after they amended the indictment. Then I think I re-raised it again. And then I think it just dropped from the radar screen if you will.

Q. Did you think that that was -- that that issue of inconsistent defenses was one of the most, if not the most, unfair aspects of the trial against Miss Johnson?

A. I thought it was very unfair. I don't know about the most.

**1494**

I don't know if I've gone through and ranked the things that I thought were -- you always think about cases afterwards. I think it was one of the points of the case that I thought was very -- I thought it was really troublesome to have that happening in the trial and the little innuendos that, you know, were brought out either in evidence or arguments about, well, all we know is, all we've alleged is she's the aider and abettor. You know, that's all we know. We don't know, you know, sort of what else she might have done and this sort of thing. I thought it was very improper, you know.

And I -- there wasn't a lot of it, but there was enough. There was the one statement from the one witness that Angela said "take her out" or "I took her out" as to Lori Duncan. According to the witness, Angie had said that.

There was the comments by Miller in his closing about, you know, something to the effect that I described about that -- it just seemed to me that it was something that we could have used some help from the Court on. We asked for it, and the Court said no, I'm going to let them try their case and present the evidence and argue the evidence under the legal theories that they've now gotten down to. And that was kind of where it got left. And I thought the government took advantage of the leeway they were given by the Court there, but that's kind of where it was left.

Q. Now, you heard the discussion between counsel and the Court

**1495**

about whether the inconsistent theory defense was alleged in the present petition and me arguing to the Court that prob -- it probably was not because it either was or could have been alleged in the direct appeal?

A. I remember your discussion about that, yeah.

Q. Last night I went back and looked at the Eighth Circuit opinion, and I saw that that issue was not raised. And I'm wondering in light of what you just said about the unfairness why that issue was not front and center in your new trial motion or in your brief to the Eighth Circuit.

A. I'd have to read the brief that we filed with the Eighth Circuit on the appeal to verify that we didn't raise it versus they didn't address it in their opinion explicitly.

Q. So --

A. That -- yeah.

Q. Assume for the moment that I'm accurate, that it wasn't raised and it wasn't addressed. Would there have been a tactical reason for not raising that issue?

A. Well, I did the appeal, so I was aware of the issue. You know, I'd have to -- I'd have to -- I haven't thought about that issue, Michael, so I can't say too much about it other than my recollection was that, for example, I don't think we even objected -- I'm saying that; the record will show -- I'm not even sure we objected to the Miller comment during closing in the first phase where he had inu -- you know, insinuated that

**1496**

her role may have been greater than aider and abettor but . . .

Q. But you filed your brief in support of your motion to exclude inconsistent theories, and that motion was substantially denied, right, by order of the Court?

A. Right. I just don't know why we didn't raise it. I don't know what the record became beyond what I've already described during trial, and I'm not sure that it was as preserved as it maybe should have been through additional objections and record.

THE COURT: I mean, Mr. Burt, you're free to brief that obviously, but I doubt if that motion preserves any error with regard to things that actually happened in trial that they failed to make a contemporaneous objection to, but I could be wrong about that.

MR. BURT: That's something we'll look into.

THE COURT: Yeah.

BY MR. BURT:

Q. Did you have any role in drafting the list of mitigating factors that eventually found their way into the Court's preliminary jury instructions?

A. Not really. That was something that Pat worked on pretty much exclusively, although I, you know, reviewed them and was aware of them. It seemed to me to be kind of a unique death-penalty kind of a thing that I didn't have any familiarity with or experience in dealing with.

Q. Let me show you a document from Exhibit 2 which is the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 39 of 71

binder of Mary Goody material. And within Exhibit 2 there's a document that is marked MG002245 through 2247 which is a list of mitigating factors which was sent to you by way of e -- you and Mr. Berrigan by e-mail May 13, 2005. Do you recall seeing this?

A. Well, I remember Mary Goody assisting in sharing her -- at least her thoughts on what she perceived to be the mitigating factors that there were in the case, so I remember that. Do I remember the specific e-mail and its contents? No. But I know that she was communicating and putting together such lists as this as well as witness lists and other types of things that she would communicate with us about.

Q. And did you notice that when she gave you this list that it consisted of fairly short declarative sentences which were not argumentative but had some factual content like Angela Johnson did not know her father as a child or a teenager; Angela Johnson was singled out by her grandparents --

MR. WILLIAMS: Objection.

Q. -- that --

MR. WILLIAMS: I'm sorry. Are you done?

MR. BURT: Yeah.

Q. Et cetera.

MR. WILLIAMS: Objection. Leading, and the question itself is argumentative.

THE COURT: Overruled.

A. What was the que -- you're asking me if I remember reading

the --

Q. Yeah, how these -- when you got this e-mail, did you notice that how these mitigation -- mitigating factors were framed in terms of their simplicity and straightforward nature?

A. Well, I don't remember specifically the e-mail, and so the answer to that's no.

Q. And do you remember that the list actually consisted of 44 mitigators?

A. No.

Q. Do you recall reading the Court's -- or helping draft in any way the Court's preliminary penalty-phase jury instructions which is document 544?

A. I would have been involved in that --

Q. Okay.

A. -- record making, in reviewing the drafts that the Court would have circulated, in reviewing and having -- or being present for discussion with the Court and Berrigan on what the mitigators were going to be. There was a lot of overlap of mitigators that had been put together in a very long list much like Goody's but only a little different format and style by Berrigan that was submitted to the Court by Berrigan. And then those had to be sort of consolidated, shall we say, I think into a set of mitigators that didn't really overlap and were a little bit more individual and separate or distinct from one another.

Q. Well, did you also notice that the final product at least

as proposed by the defense and as submitted to the jury tended to be much more argumentative in nature than what had been proposed by your mitigation specialist?

For instance, number 20, on the date of the murders of Gregory Nicholson, Lori Duncan, Kandi Duncan, and Amber Duncan, Angela Johnson was under the substantial influence of Dustin Honken and then which caused in her unusual stress, anxiety, and an impairment of her normal judgment. Now, a factor like that, did you think about whether the jury was going to be more likely to accept a mitigator that was phrased in that kind of sort of -- I don't know how to describe it -- argumentative fashion which asked them to really take -- accept much more as mitigating than perhaps just a simple statement like Angela Johnson was under the influence of Dustin Honken?

MR. WILLIAMS: Your Honor, so I can understand where we're going with this, to what part of the petition because they've not raised that there was error in submitting jury instructions, so I'm trying to figure out to what part of the petition this goes.

MR. BURT: I think it goes --

THE COURT: You're raising it as ineffective assistance of counsel for failure to simplify and have nonargumentative mitigators kind of?

MR. BURT: It goes to the claim of presentation of mitigating --

THE COURT: Yeah, but it's an ineffective assistance claim.

MR. BURT: Yeah. Oh, yes, absolutely.

THE COURT: Because that's what you have.

MR. BURT: Yeah, right. That's what it's relevant to.

THE COURT: Does that help, Mr. Williams, or not?

MR. WILLIAMS: It's in the ine -- say it again, Michael. Ineffective assistance and the what?

MR. BURT: It goes to the presentation and development of mitigating evidence in the penalty phase, in other words, how was it presented and argued --

THE COURT: Excuse me, Mr. Burt. I think you misspoke. I think you said in terms of presentation of evidence in the penalty phase. I think what you mean is in terms of drafting the jury instructions --

MR. BURT: That is what I mean.

THE COURT: -- on the mitigating factors.

MR. BURT: Yes.

THE COURT: But I don't mean to put words in your mouth.

MR. BURT: No, the Court is right.

MR. WILLIAMS: I would --

THE COURT: You also have that other argument which is independent that they didn't put on sufficient mitigation evidence.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 40 of 71

MR. BURT: Right.

THE COURT: But here your argument is that they didn't adequately explain -- they didn't adequately either request of me to explain to the jury in simple terms the mitigators or they failed to object to the way I ultimately submitted it.

MR. BURT: Correct.

THE COURT: Or both.

MR. BURT: Or both.

THE COURT: Or both.

MR. WILLIAMS: If I could interject here.

THE COURT: Yes.

MR. WILLIAMS: I think Mr. Burt was correct the first time. I think he's trying to shoehorn in this argument into the failure to present sufficient mitigating evidence because that's the only part, that's the only claim, they've raised in their petition. There's no place in their petition where they've alleged the ineffective assistance of counsel in drafting jury instructions, in submitting jury instructions, in objecting to jury instructions.

So the only way this becomes relevant is if somehow this goes to whether the counsel was effective or ineffective in the evidence presentation of mitigation that I can see.

THE COURT: Because your argument is they haven't sufficiently raised the fail -- any argument with regard to mitigating jury instructions that -- any ineffective assistance

argument with regard to the instructions at all I guess.

MR. WILLIAMS: Right, because there's a whole area of law that deals with whether counsel's effective or ineffective in submitting jury instructions. None of that's been briefed. None of that's been raised. That's not part of what I understood the petitioner's claim, and I don't see that this relates back but . . .

THE COURT: Well, let -- where is it in the petition?

MR. BURT: Well, I think Mr. Williams is right. To the extent that this relates to any claim, it's to the mitigation investigation. But I go back to our discussion yesterday which was the scheduling order which was the Court would permit amendment to conform to proof. And this claim certainly is related within a Rule 15 sense to a claim which is pled, and that claim is the present -- the investigation and presentation of mitigating evidence.

Now, presenting evidence in the abstract without adequate jury instructions to explain it --

THE COURT: Well, only with regard -- n -- wait a minute. It might relate b -- well, we're probably putting the cart before the horse, but it seems to me it might relate back only if you're arguing first that they failed to offer X in mitigation and then had they done that which is a little -- kind of a goofy argument, then they also failed to request a jury instruction on that mitigation because that relates to the

failure to introduce evidence of mitigation.

But you have the flip side of that. Your argument is -- I think what you're arguing is based on the evidence they did introduce or the evidence -- or inferences from marginal evidence that I was willing to submit mitigators on, you're not satisfied with how they characterized the phraseology of it. I mean, that's a very different argument.

MR. BURT: Well, I think the first part of what the Court said, you certainly can say that if they presented this as their mitigators and then they failed to introduce evidence --

THE COURT: No. Let me give you a specific example.

MR. BURT: Sure.

THE COURT: Your argument is they failed to call Carol Meter as a mitigation witness.

MR. BURT: Yes.

THE COURT: Okay. So fairly related to that would be that they failed to request a jury instruction that Carol Meter's evidence was mitigating. But you can't argue -- so that's all related to the failure to adduce mitigation evidence.

MR. BURT: Well --

THE COURT: But that's not what you're arguing here. You're arguing that you don't like the way in which I either phrased it or the lawyers submitted it to me on what -- on the existing mitigation evidence that there was in the record, and that's a very different argument.

MR. BURT: I think what I'm arguing, Your Honor, is -- and the petition argues that they failed -- for instance, in regard to the factor I'm questioning on, number 20, that they failed to produce any evidence that Miss -- Miss Johnson was under the substantial influence of Dustin Honken and that they failed to produce any evidence which would show that whatever influence there was caused in her unusual stress, anxiety, and impairment.

THE COURT: Yeah, it can hardly be error for me to submit a mitigator upon which there wasn't sufficient evidence. Do you have any authority that that's error or that that's ineffective assistance of counsel for the judge to bend over backwards to give a mitigating instruction upon which there's actually no evidence but maybe there should have been?

MR. BURT: No, I think --

THE COURT: Isn't that what you're saying?

MR. BURT: No.

THE COURT: Okay.

MR. BURT: What I'm saying is to the extent they produced any evidence on what the Court has described -- and the ruling on Vest is the crucial issue in the case, in the penalty phase, which was who was the dominant party here -- were they ineffective in not putting on more evidence in combination with submitting a jury instruction like this which is phrased in such a way as to take on more of a burden than it should have taken

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 41 of 71

on for each of these factors? For instance, on this factor it's taking on the burden of not only showing that there was evidence of substantial -- substantial influence, why not just influence --

THE COURT: Well, okay. I --

MR. BURT: -- and -- and the burden of showing that that influence caused in her unusual distress, anxiety, not even "or," and an impairment of her normal judgment.

So the combination of those two things, the failure to present weak or nonexistent evidence on this crucial issue and then submitting this sort of a jury instruction which took on a high burden I think, a very interrelated type of issue, because it means that the little evidence they did produce could never have mitigating effect because they submitted a jury instruction which has elements in it which are so high that they could never be reached in light of the evidence that they produced.

THE COURT: Well, I understand your argument, but you didn't -- that's not pled in the petition I don't believe.

MR. BURT: Well, I think what I started by saying is that it was related in a Rule 15 --

THE COURT: Well, I guess we'll -- why don't we just keep going and we're going to sort that all out among hundreds of other issues as we go; right?

MR. BURT: That's what I was going to suggest is that's --

THE COURT: Okay.

MR. BURT: If the Court rules it's not related, then it becomes irrelevant but --

THE COURT: Yeah, I don't know -- no, I don't know whether it's related or not, but I -- I think you have some reasonable argument with regard to this mitigator. But, for example, with regard to why they didn't use language that Mary Goody suggested --

MR. BURT: Right.

THE COURT: -- that's not fairly raised in the petition.

MR. BURT: Now, let me tell you another reason why I think this is relevant. We have pled lots of ineffective assistance claims, and there have been various opinions offered by Mr. Willett, some have been offered by Mr. Stowers that they were acting tactically; in other words, we did this because we were acting tactically like good lawyers should.

To the extent that I can show that they are globally making decisions without real thought and with no tactical considerations in mind, I think it casts doubt on their -- their testimony that they did act tactically in the areas they testified about and gives rise to the argument that what they're really doing, especially as to Mr. Willett, is making up justifications after the fact when the trial record shows that at each and every phase of the case they are blundering and not

making tactical decisions. And I think for that reason as well that this sort of thing is relevant.

But I think the primary reason is that it is intimately -- on this factor -- and I'm only going to question him on this factor -- why in the world they would phrase this factor in this way if they --

THE COURT: Well, why did you precede it by showing him the Mary Goody factors then?

MR. BURT: Because the Mary Goody factors were teaching them how you frame mitigating factors. And in light of the fact she's a specialist, she's telling them how to frame it in these simple statement type of things, why would they phrase it in the kind of argumentative and element-laden way that they've done here? Unusual stress, anxiety, and an impairment of her normal judgment. Why wouldn't you put in "or," and why would you have that stuff in there anyway? The point is she was under substantial -- and why would you have substantial? I would have said Angela Johnson was under the influence of Dustin Honken, period.

THE COURT: Yeah. Well, you know, okay. That's how you would have done it, but --

MR. BURT: Yes.

THE COURT: -- that's not the issue, right.

MR. BURT: Yeah, and that's how Mary Goody would have done it. It's not the issue.

THE COURT: Yeah.

MR. BURT: But an important issue --

THE COURT: Maybe they felt that just mere influence wasn't going to work with the jury and that they had -- in order to have the jury consider it as a real mitigator they'd have to show substantial.

MR. BURT: Right. And that's why I'm asking the question. What was --

THE COURT: Okay. Well, why don't we just proceed with your questions. I think that'd be more productive.

BY MR. BURT:

Q. Sure. What was the reason, if there was one -- first of all, did you express some concern about this issue to Pat Berrigan, the way in which these mitigators were framed?

A. I'm sorry. I was just remembering -- it's like déjà vu all over again. Anyway, I think that . . .

Q. Did you express some concern to Pat Berrigan about the way in which these mitigators, especially this one I'm focusing on, were framed?

A. Well, I -- yeah, I did express some concern but -- because I thought it was weird and I think the judge was commenting on them as well that they were -- they were argumentative maybe is part of it. But the other part of it is that they were burdensome on us in the sense that to get a juror to check the box or fill out the form as to whether or not they found it was

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

established, you had to prove all these components of it.

And it seemed like -- I kind of agreed with some of the judge's criticism of that, you know, but Pat -- you know, he was the death penalty -- you know, he's the capital guy on the case, and he says this is the way he's done these things in other cases, and he's done a number of death penalty cases. I don't know how many he's done, but he's done many death penalty cases, and apparently he has done this, and this methodology that he has used has apparently worked for him in other cases, although apparently in other cases it hasn't. I -- there's a rationale that he could provide as to why he would do this this way. I think he attempted to explain it during the debates about these mitigators with the Court.

But I'm not in a position to say why he would use this methodology to do it. I intuitively -- just sort of from my noncapital counsel perspective, I thought it was awkward would be a good word for it. I thought it was an awkward way to present what would be something that you were trying to ask the jury to find in your favor so they could put it over on your mitigation side of the scale and weigh it against death because the more you heap into the factor as something you have to prove then you get into this position where maybe they don't find you proved it.

Now, I -- you know, but that's -- you know, I mean, I could see a theory for why you would do it this way. It was

unusual. That's what I can say. It was odd to me. I'm not familiar with that.

It's kind of like the jury selection. I didn't -- the whole process of jury selection was different than any way I've ever done jury selection before. But, you know, it's a different kind of case because you got -- the jury's going to do the sentence, and you don't usually have that in a case.

Q. So on these instructions, is it your testimony that although you had some concerns you -- this was an area where you again deferred to Mr. Berrigan's judgment?

A. He was the learned counsel in the case. I think that's where his judgment was to be prevailing. I wasn't the learned counsel; that's for sure, you know. And I was trying to learn as I went through the case and in advance of the case and still learning today so . . .

Q. Now, when you got done with this case, was there some discussion among the defense team about what was and was not going to get disclosed or how you were going to handle dealing with the habeas aspect of this case?

A. Well, it started before the end of the case where Pat and I said -- or Pat said to me, you know, we're going to need to document our file on these situations with Willett, you know, because this is going to come up if this case doesn't go well. And we'll need to do that before we forget things.

And then afterwards there were occasions when the

three of us ran into each other and when I would have run into Al separately wherein -- including before the 2255 was filed where we would have discussed the concerns.

Q. Did you appear with Mr. Berrigan at some seminar here in Iowa in which he presented a lecture entitled something along the lines of "Ten Mistakes We Made in the Johnson Case" or something like that?

A. I was at the seminar in Des Moines that he spoke at where he discussed I guess the failings of the defense to succeed in getting a nondeath verdict.

Q. And when was this timewise?

A. Well, it was -- let's see. I think it was the fall of 2005. In November there was a Criminal Defense Lawyer seminar in Des Moines. I believe that was it. And if it wasn't that year in the fall, then it was the following year in the fall. But he made a presentation to the Criminal Defense Lawyers' Association and -- on the issues that he perceived as failures, if you will, on the part of the defense.

Q. And what were they?

A. Well, the primary one was should have never been a trial; you know, in other words, should have got the case figured out sooner. That was the number-one variable.

Q. And did he attribute that to any particular aspect of the representation or just we should have worked it out?

A. He attributed that to -- largely to himself not -- not

being able to develop a rapport with Angela early enough and substantially enough so that he could have been more influential in how things proceeded and that that was one of the main themes I guess of his discussion was, you know, we should have never been in trial type discussion.

Q. What else?

A. Well, there was no attorney-specific criticism that he lodged against anybody. He just -- that wouldn't be probably his style anyway to do that publicly.

Q. Now, I want to show you what's been marked as 58 which is a note from Mr. Berrigan's trial file. It's dated 7-26-05, and it's MCN05-006122 and 006123. And at the bottom of this note, it says, "Discuss many issues with Bruck, but big one in my mind was the Al Willett issue. David saw no advantage in presenting this as an issue in MNT," which I assume means motion for new trial. "We could only do it half. Couldn't really testify, for example, about Al's defects. Nothing waived according to David in not raising IAC claim now. He says better to let new team handle it. Dean and I agreed to separately write up or dictate our thoughts on this issue so that we have a record to rely on five years from now when we testify at the habeas hearing."

It's actually been a little more than five years but close enough. And that's dated shortly after the trial concluded but before the new trial motion; correct?

THE COURT: And excuse me. Could I just ask the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 351 Filed 11/10/11 Page 43 of 71

**1513**

exhibit number?

MR. BURT: Yes, Your Honor. That's Exhibit Number 58, and it's Bates stamp number MCN05-006122 and 006123.

BY MR. BURT:

Q. First of all, do you -- does that memo from Pat Berrigan refresh your memory of a discussion you had with Mr. Berrigan before the new trial motion was filed regarding talks with David Bruck?

A. Yes.

Q. And tell me what you remember about that discussion.

A. Well, after the verdicts on the end of June, Pat was pretty much emotionally devastated by the verdicts. He took off to Kansas City some time after the verdicts and then went to a family vacation to Ireland for a couple weeks I believe to kind of get his bearings back if you will. And I stayed and did my best to catch, you know, the remnants of what remained to be done including various issues after trial. And then he returned from Ireland. I had gone on a vacation myself for about a week in the first week or so of April to -- that I had planned some time earlier.

And when I got back and he was back and he was in a position to talk, we had conversations about the need to get some advice from the death penalty resource counsel of which Bruck was one. We'd been obviously in contact with Dick Burr, I think also Skip Gant during the pendency of the case.

**1514**

And it was our thought that what we would do would be to get their counsel on how we should handle this issue of what we both knew had transpired during the trial with Al Willett. So that was done.

I believe Pat talked to Bruck separately. I don't know that I talked to him directly at that time. I know I talked to Bruck earlier on in the case once or twice. But it was something that -- you know, Pat reported back to me that he had had this conversation. And then as indicated, we had both talked about creating a memo, if you will, or notations or whatever of our recollections of what had occurred.

I could never really bring myself to do it for a lot of reasons.

Q. Just because of out of sight, out of mind or for some other reason?

A. It's too upsetting, I mean, to be honest with you to actually go back and think about it.

Q. Yeah. The Al Willett issue, you've identified certain things like the handling of McNeese, the opening statements, the failure to participate in jury selection. Were there other defects in his representation as lead counsel? And specifically you mentioned a witness, Christi Gaubatz, and characterized her as important. Was -- the way in which he handled the cross-examination of Miss Gaubatz, in your mind did it meet minimum standards of representation?

**1515**

A. Hold on one second.

THE COURT: Mr. Stowers, would you like a short recess?

THE WITNESS: Yes, please.

THE COURT: Why don't we just go ahead and take a 20-minute recess until 2:30.

(Recess at 2:11 p.m.)

THE COURT: Thank you. Please continue, Mr. Burt.

MR. BURT: Thank you.

BY MR. BURT:

Q. Mr. Stowers, my last area of inquiry here you'll be pleased to note is whether this Al Willett issue as it's framed in this memo from Mr. Berrigan extended beyond the cross-examination of McNeese and the other issues you spoke of, namely the jury selection and the opening statement.

A. It did.

Q. Was it a pervasive problem, or was it a small problem in terms of putting the guilt phase of this case in?

A. Well, the guilt phase, it was a -- it was a problem of, you know, unknown, you know, dimension, if you will, because we didn't have anybody else, meaning, you know, of the attorneys reviewing the witness files for the witness, the witnesses I should say, that Al was cross-examining during the trial. So we had no safety net. It was he either performed and caught the things that were to be caught or he didn't.

**1516**

Same would be true for most all of our witnesses during the -- during the case except for the most part as to witnesses that Pat or I had for the most part we would discuss somewhat our examinations or if we had -- he had a question about something, he'd bounce it off me; or if I had a question, I'd bounce it off him. But that wasn't going on with Al.

Q. And did that problem extend to all of the witnesses he examined which I think are about seven or eight in the whole trial?

A. I remember -- the problem of not communicating? Yeah. There were --

Q. How about the preparation problems?

A. There were -- I can remember two witness files that he took up to question witnesses on during the trial, and the witness files would consist of, you know, the prior testimonies, prior statements and interviews of the witnesses, other relevant materials relating to the witness, and those would have been all compiled into a witness file for that particular witness. And as to at least two witnesses, I saw the files that he went up to the podium -- I think the arrangement was basically like this for the trial -- and the files had not been -- the documents in the files had not been gone through. They appeared to be undisturbed, and he had what appeared to be little in the way of any notes or anything else that would constitute a -- what you would see ordinarily with a lawyer who had prepared a

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 351 Filed 11/10/11 Page 44 of 71

cross-examination of a witness.

Q.   There was one witness in particular you mentioned as an important witness in this case, Cindy -- Miss Gaubatz.  Who cross-examined her?

A.   She was a witness that Al Willett cross-examined.  And that witness, I do recall that he had notes that he had taken of what was in the witness file.  But the examination of that witness was troubling.

Q.   In what way?

A.   Well, first of all, he had his notes on a legal pad, handwritten, and just to describe it, they were flowing notes of notes like you would take if you thumbed through the witness file and read all the items in there and then you noted things in each of the items in your notes that you were noting.

His examination consisted of flipping through those notes and asking questions based on didn't you say on this date that this happened.  Then he'd go to the next thing, and there was not a -- there was not a organization to the examination.  And it was more didn't you say this then and then didn't you say this and didn't you say this and didn't you say this.  It wasn't organized by topic or subject matter, if you will, and there was no structure to it.  It was merely a recitation of questions that had been noted on his notes as he had reviewed the discovery which had not been synthesized into what would be considered to be an examination of a witness based upon things

that you were trying to establish through the witness that would be helpful in the overall case.

There was one point where during the exam -- I laugh about it.  It's kind of just to laugh sarcastically really because it was -- Christi Gaubatz had testified in front of the grand jury at some point over the years in this investigation for these missing persons.  She had been asked whether or not Angela Johnson had ever told her anything about these people, whether they're missing, da, da, da, da, da.  And she had answered to those questions no, she didn't know anything, Angie never told her anything in grand jury some years before the trial as I remember it.  And she may have actually testified to that twice.  She at least testified to it once.  Maybe she testified and also said it in an interview or something.

So Al -- and, of course, during the trial she testified that, in fact, Angie had told her a whole bunch of things including a version of events, et cetera.  That was direct by the government, so on cross Al gets up there and when he -- in an effort apparently as best as I could tell to impeach Christi Gaubatz, he -- his method of impeachment was that he elicited from her what she had said to the grand jury, that is, that Angie didn't have anything to do with it, but he elicited it in such a way that he then asked, as I remember the exam, "So you lied to the grand jury when you said that she didn't have anything to do with it."

And really it should have been the reverse.  You swore to tell the truth before the grand jury.  You testified under oath.  You wanted them to rely on your testimony at that time; isn't that true?  Isn't that true?  Isn't that true?  And then she said this.  She didn't say anything to you.  And then you would say but now you've come forward after the government has approached you five more times and now you've decided all of a sudden that she's told you these things.

That should have been sort of the theme of that little point of the exam.  Instead he sort of elicited the prior statement suggesting that it was a lie and what she was telling now was the truth.

And the other thing that happened in the trial was when -- during that witness was when he was trying to use a prior statement again of Gaubatz I believe, and I think he was trying to impeach her with it.  Government made an objection regarding -- regarding the method by which he was doing that, sustained.  I think it got sustained two or three times to the point where Al was flummoxed and didn't know how to -- apparently seemingly didn't know how to impeach the witness with the prior statement.

The Court called a recess.  The jury was excused.  It was a break point.  And I remember Judge Bennett saying to Mr. Willett, he goes, Mr. Willett, I know you know how to do this, something to this effect.  It's undoubtedly in the

transcript.  I remember that very distinctly.  And Al was dumbstruck with Pat and I as to what he was doing wrong and how to use the prior statement or testimony to impeach the witness, and he was very confused as to how to do it, and he was really shaken up, visibly shaken up, over the fact that he had gotten sort of embarrassed in front of the jury by having these objections to sort of standard examination sustained.

Those are the things I remember about that particular witness, and that was -- just seemed to me to be a very bad sign of his legal abilities and his preparation level as well as his thought process as to what we were trying to do in the first phase of the trial.

Q.   Did you ever talk to him about his performance or lack thereof either during the trial or after the trial?

A.   During the trial there were some limited comments, discussions, Al, you know, you're going to need to get ready on these witnesses, how are you looking, you know, in getting ready for them, do you need me to pick anybody up meaning take over a witness or something?

And I believe that I did take over a couple witnesses that I had not originally planned to cross-examine in an effort to, you know, at least lessen the load on him if that was the issue and also to try to, you know, control what damage seemed to be possibly going on.

So that happened, and I did take over a few additional

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 45 of 71

witnesses during the trial which -- and dealt with preparing for them as best I could on the time frame that I had.

THE COURT: Mr. -- oh, I'm sorry.

THE WITNESS: Yeah. No. That's fine.

THE COURT: I just want to know if anybody on the defense team has any tran -- I'm not expecting that you would, but do you have any transcript cites to the example that Mr. Stowers just gave of having the objection sustained and not knowing how to do the impeachment and then taking a break and me telling him something about I know you know how to do it or know what witness it was by any chance? If you don't, that's fine.

MS. MORRISSEY: It was Miss Gaubatz, Your Honor.

THE COURT: Oh, that was with Miss Gaubatz. Okay.

MS. MORRISSEY: I believe so, yes.

THE COURT: Okay. Well, that's fine because I'm going to personally read that whole cross-examination.

MR. BURT: I mean, we have the pages where it's at. We can isolate that for the Court --

THE COURT: That's fine. No.

MR. BURT: -- and even -- even provide it to the Court.

THE COURT: I intend to personally read the whole examination.

MR. BURT: Assumed you would.

THE COURT: Yeah. She was a very critical witness in

my view in the case.

MR. BURT: Yeah.

THE COURT: Yeah. If you couldn't destroy her credibility -- I mean, her testimony alone was enough for the jury to find the defendant guilty with some inferences. So if you didn't do an excellent job of attacking her credibility, you were going to have some serious problems particularly in light of not putting on an affirmative case.

MR. BURT: Right.

BY MR. BURT:

Q. Your opinion is that he did not effectively cross-examine her.

A. From what I saw in the courtroom, I thought it was pretty scary.

Q. Scary in the sense of a performance that was below the standard of practice you would expect of a criminal defense lawyer in a capital case?

A. It was -- yeah, it was way below and just incredible to think for me -- and this was the part that was almost so upsetting as I think about it now that it's hard to even maintain my composure about it because I -- you know, we're talking about what he had indicated in every opportunity that he was the lead counsel in this case, that he was the great trial lawyer, that he was the one that was going to come to trial and cross-examine all these major witnesses effectively, that he

would be prepared, that he didn't need any help, and that he knew what he was doing and he was highly experienced. And, I mean, I had my doubts all along about all that, and they increased over time.

And then to be there in the middle of this, it was just -- it's just -- I don't even know how to explain it, but it was just like such a feeling of abandonment, you know, from him in his role on the case and in his, you know, stated lead counsel role to not come to trial and court prepared to your best, best, best ability and beyond staying up till midnight or one in the morning like, you know, I was doing or Pat Berrigan was doing and working through the weekends and not traveling wherever you chose to go when court got out and putting in the effort. It just was incredible to me.

And then to open a witness file that hasn't been touched during the trial is such a -- to me, I mean, I just think he owed Angela Johnson more than that. I think he owed more than that to the defense attorneys and everybody else working on this case, and I think he owed, you know -- I just think it was just such a betrayal of what he was supposed to be doing and what he said he was going to do and what he agreed to do. It was just terrible.

And it was done with such a cavalier attitude about it all. It was like I gotta go, I'm gonna drive back to Cedar Rapids or Des Moines, and it was the end of the day, and he'd be

packed up and his car would be ready to go and gassed up and he had his priorities which were getting out of town at the end of the trial week and a tremendous amount of detachment from the case and participating as a member of the team that was trying to save, you know, this woman's life. It was just incredible to me.

And I don't even know -- it's been just -- it's just traumatic almost to have to go through it and be there and try to cover for it and figure out how are you going to do -- how are you going to -- how are you going to deal with this. That's the way I was feeling. How am I supposed to deal with this, you know?

And I know Pat was going through the same thing. And it was just -- it was a worry. It was a distraction. It was to the point where at the final phase of the case he sat at the back table over there where government counsel is. I think we actually took over that side of the courtroom at the end of the trial. He sat back there. Pat and I were up front with Angela I believe. And he didn't do a darn thing at that point in the trial. He just sat back there. There was no contributions to the witness examinations, any of the witness prep, any dealing with exhibits, any analysis of any issues, any of the jury instructions issues or anything else. He was merely present in the courtroom for that part of the trial but had no input. He didn't even meet with us in the evenings, didn't help.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 46 of 71

I was over there in the Marina when Cunningham got in late on his flight and I was going to do his exam, and I was up till about two in the morning prepping Cunningham for his exam. I got people, Melissa Launspach, running around trying to make copies of his PowerPoint presentation that he brought at the last minute so the government could have it, and we're running it all over town. And I'm editing his prepackaged presentation.

It was just the most massive amount of work that Pat and I were doing with as much help as we could get while Al was absent. And I just -- and, frankly, in some ways, to be honest with you, it was better off that he wasn't involved because he would have been as much a distraction as a help at that point because we would have had to cater to whatever his needs or desires were, and it just was -- it's so upsetting as I think about it today that -- and it's been that way for years so -- and I told Al. I said, "Look, Al, when this comes up, I'm going to tell what happened just so you know because I am not going to cover for you."

And he was very upset when he got wind that some of these things were being disclosed, and he kind of halfway confronted me about it. I said, "Look, Al, I don't really have anything to say about it other than I'm just going to say what happened, and you know what happened, and I know what happened at that trial. And I'm just going to say what happened because it's not about me, it's not about you. It's about the case and

what happened on the case and historical facts, and I'm not going to go, you know, trashing you unnecessarily, but you were not on your game if you got a game."

Q. I think you've alluded to this before, but did he do any independent investigation relating to the credibility of this key witness Gaubatz as far as you know?

A. Not that I know of.

Q. He rested the case without calling a single witness in the guilt phase, did he not?

A. True.

Q. As far -- if you had been the guilt-phase lawyer in this case, can you think of any reason why you wouldn't put on evidence impeaching a critical witness like Miss Gaubatz, for instance, evidence indicating that she was a liar?

A. I mean, she was a very important witness, you know, and so you'd want to be able to have a effective strategy that you had developed before the trial started to deal with that witness in a way that was, you know, going to be able to work, at least to have a good basis for arguing that she was not being credible.

And, you know, that's a -- she's a major witness, McNeese, major witness, both of the major witnesses for the government that I believe they offered who were the people directly most implicating Angela, both of whom were Al Willett witnesses, both of whom we didn't have backstop on which was maybe our error in judgment, but it's what happened. And the

one witness Berrigan picked up, that being McNeese, and the other one got dropped, and Al handled that exam. And it was what it was.

Q. It was what it was. And what it was was that Miss Johnson did not receive the benefit of a lead counsel to which she was entitled; is that true or not?

MR. WILLIAMS: Objection -- well . . .

THE COURT: You may answer.

A. Oh. Well, he was present. He was asking questions. If that's what the expectation was, then he was there. I think it wasn't the expectation from my point of view, from Berrigan's point of view, or I don't think any other person involved in this case that was concerned about seeing that Angela got the very best representation that could be provided would have expected. It was unprepared. It was unorganized, and it was unstrategized or thought through, and it was not very effective, and it was very weak.

And it -- you know, I just think that in a case of this nature, you know, you gotta be on your -- you know, you gotta have game, and then you gotta have your "A" game, and I'm not -- I know he didn't have his "A" game, but I don't know what his game was. But it wasn't -- he just didn't perform, and he didn't prepare. And that -- for me 99 percent of a trial starts with preparation. And if you don't do that work ahead of time, you can be the flashiest guy in the universe, you can have the

nicest ties, you can have the biggest booming voice, you can read an opening statement that somebody else drafts for you, and you can look real good, but in the end that's not what gets a trial won or lost. What gets a trial won is preparation.

And in this case she needed like 110 percent of everybody to even have a chance, okay, because this was an extremely difficult case, extremely, on a lot of levels. And what she got was her lead counsel was far less than a hundred percent of his ability. If that was a hundred percent, you know, I can't imagine that's his best. I just can't. And he just wasn't -- he wasn't there. He wasn't involved. He wasn't committed. And he wasn't a part of the team.

MR. BURT: Thank you very much. I believe that's all I have. Thanks for your patience. I'm sorry to bring up all these bad memories. And that's all I have.

THE COURT: Mr. Williams?

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Mr. Stowers, let's start off with the fact that you were bitter against Al Willett from the very beginning of this representation by the way he addressed you; isn't that fair to say? He called you the research and writing lawyer, and you took offense at that, didn't you?

A. I thought it was a little bit of a denigration, yeah.

Q. Yeah. And you remain bitter about that denigration to this

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 351 Filed 11/10/11 Page 47 of 71

day, don't you?

A.   No.  I think people know Al and know that he's Al.

Q.   Okay.  And from that standpoint, from that comment, you consider yourself a far better attorney than Al Willett; right?

A.   I think that I am a better attorney than Al Willett in a lot of respects, but I've only tried one case with Al Willett which was the Angela Johnson case, and I've not observed him in other cases.  I don't know anything about his general overall performance in other cases or anything of that nature.  All I can tell you is what I observed was a lawyer who was in far over his head in a very involved case who had his ego in the way and who was not personally committed to doing the work that needed to be done to effectively represent her as part of a three-attorney team and who engaged in a lot of poor practices.

Q.   Okay.  So, Mr. Stowers, why don't you point out to us where you have memorandum in the file or letters to Pat Berrigan or comments to Miss Goody or notes to yourself contemporaneous with your representation of Miss Johnson which would reflect that at that time when you were going through there versus five years later you thought these things.

A.   Things in my file?  I don't physically have my file up here at the witness stand.  I highly doubt that I was notating in my file Al screwed this up, Al screwed that up.  These were the things that were going on during the trial that were discussed between Pat and myself for the most part because we had -- we

were basically roommates, for lack of a better way of looking at it, and Al was up on the next floor in the building where we were staying, in the hotel where we were staying.  And so we would have talked amongst ourselves and went on, and it occurred.

And it was a concern all the way through the trial, and other people would have been privy to it as well.  Lisa Dahl was privy to it.  Mary Goody, I recall talking to her about it.  She was aware of the Al issue as it became known.  It was something discussed with my people in my office at the time who periodically had come up here.  It was something that was also discussed with -- with -- well, I'm aware that Nancy Lanoue was aware of things as well based on things she said.

So, I mean, there was a smorgasbord of people who were aware of whatever was going on with Al Willett during the trial.  And it's not a question of documenting things.  I wasn't, you know, here at trial to sort of document things on my co-counsel.  I'd really rather not have to be here now talking about it to be honest with you.

Q.   Okay.  So your concern was with -- I mean, your testimony is you thought he performed poorly at trial, and that's your conclusion.

A.   He did.

Q.   Okay.  And let's talk a little bit about the cross of Christi Gaubatz.  Are you aware of any evidence, for example,

that Al overlooked that should have been used to impeach her testimony?

A.   I don't think he knew how to impeach her testimony with what he had.  Now, was there something else that was overlooked?  I did not go back at any point in time after she testified and examine that witness file and all of her prior statements, so I can't answer that.  I'm not in a position to do that.  I wasn't asked to do that by anybody.

Q.   Okay.

A.   I didn't do it at the time either so . . .

Q.   All right.  And that's fine, Mr. Stowers.

A.   Yeah.

Q.   I just want to find out you're not saying today that you can point to something that Mr. Willett should have brought up and failed to do.

A.   When?

Q.   During the examination of Christi Gaubatz.

A.   Should have brought up and failed to do.

Q.   Well, let me rephrase that because I want to make sure we're clear.  You're not here to say today that you can point to some piece of impeaching evidence that Al Willett should have brought up during the cross-examination of Christi Gaubatz.

A.   I think I've described the one thing that I was aware of which is her prior sworn testimony that Angela never said anything to her which is a synopsis of it and how he presented

that not as impeaching but as something else.

Q.   Oh, I understand how you gave your testimony.  My question was a little bit different from that, Mr. Stowers.  My question to you is not for you to criticize how he brought up the evidence he did.

My question to you is can you point out to the Court any piece of impeaching evidence against Christi Gaubatz that you believe Al Willett should have brought up and failed to do so during his cross-examination?

A.   Well, I think it's a little bit more than how he brought it up.  He presented it in a way that was --

THE COURT:  Mr. Stowers --

A.   -- was not accurate.

THE COURT:  -- I'm going to cut you off because you're not being responsive to his question.

THE WITNESS:  Yeah.

THE COURT:  We understand that part of your test -- well --

THE WITNESS:  Okay.

THE COURT:  -- I understand that part of your testimony.

THE WITNESS:  Yeah.

THE COURT:  I can't speak for anybody else, but that's not actually what he's asking you about.  You made that point clear, and I understand your position that you weren't happy

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 48 of 71

with how he cross-examined and his method of impeachment, in your view that he didn't know how to do it. That's not what Mr. Williams is asking. Mr. Williams is asking if you know of any evidence that he failed to cross-examine her about.

THE WITNESS: No.

THE COURT: I didn't mean to poorly para -- that was a poor paraphrase of your question, so feel free -- feel free to go back and ask it as you asked it which was better.

MR. WILLIAMS: No. Thank you, Your Honor. I think that answers the question I was trying to get at.

BY MR. WILLIAMS:

Q. With regard to Christi Gaubatz, you were asked the question of wouldn't you have put on evidence to show Christi Gaubatz was a liar. Do you remember that question posed to you?

A. Something to that effect.

Q. Okay. Are you aware of any evidence based on your knowledge of this case as one of the co-counsel that would have shown Christi Gaubatz to be a liar?

A. Well, other than the prior sworn testimony that was directly contradictory. I haven't gone back and reviewed the 30 banker boxes of paper, so I'm not aware of anything as I sit here today. I can't think of anything.

Q. Mr. Stowers, how many criminal cases have you tried?

A. Oh, it's hard to say. Probably -- I don't really count or keep score. Probably 35 or 40.

Q. Okay. And in those cases how many of those do you think that you representing the defendant chose not to put on an affirmative defense during the trial?

A. An affirm -- I don't know that I could give you an estimate, but it's a good percentage I would say. It's quite common not to.

Q. Okay. And quite common among all defense cases for the defense not to put on affirmative case; right?

A. Not to call their own witnesses, yes, that's true.

Q. And in two thousand -- by the time this case went to trial in 2005, you had tried a number of those criminal cases; is that fair to say?

A. A number of what criminal cases?

Q. Of the 35 roughly criminal cases you've tried. I mean, you haven't tried all 35 in the last 5 years.

A. That's true.

Q. All right. So by the time you went to trial --

A. Yeah, I would have -- I would have -- yeah, I would have tried a high percentage of the total number of criminal jury trials that I have ever tried till this date, you know, by the date of this trial, yeah.

Q. Okay. And there was some discussion about the investigation of the guilt phase of this case, and I want to touch briefly on that. As you were preparing for trial and going through the five years of your representation of Miss

Johnson leading up to trial, did you see areas that in your view needed to be investigated on the guilt issue?

A. There were areas that needed to be ruled in and out as areas that you might want to or might not want to present something on or you might want to be able to use for cross-examination. A lot of that had to do with the timing of things. And I think that's one area that I'm thinking of in response to your question, that is, the timing of the offenses and that sort of thing, the time tables, geography, you know, where this was in relation to where the bodies were found, that sort of thing.

And I'd have to -- there's probably some other areas that are not jumping out at me right now. I think there was -- you know, if you wanted to on this case, you could have investigated, you know, all sorts of things because there was a lot -- as you know, there was a lot of leads, if you will, that -- over the time period that the folks were missing that had been developed by law enforcement that would have been followed up on. Some of them -- you know, some of them looked promising and that sort of thing, but then they sort of dwindled on the vine.

But, you know, I think that it just depends on how you wanted to approach things I guess in defense of the case as to what you would have found necessary to investigate.

Q. Well, and you were asked questions, you know, why -- you

know, why didn't you do more to investigate the guilt phase, and I think your response was that it was your assessment based on your knowledge of the case that there just really wasn't going to be much of a defense in the guilt phase, and that was your assessment as an experienced trial lawyer.

A. As the case progressed, that's true. You know, and once -- once the area of evidence relating to McNeese became settled that it was coming in, that became to me more true in a lot of ways.

Q. Okay. And speaking just from an example, you raise the idea there's some different leads that -- I mean, there's lots of leads you could have gone down on who might have done this, that, and the other thing. For example, at one point there was some rumors that Dick DiMarco was responsible for the murder of the five people. Do you remember that being one of the allegations?

A. I don't remember that name or that allegation specifically. I remember there was a lot of those kind of things. They were trying to tie things into Jodi Huisentruit's disappearance. There was searches for bodies in parts of the state and farmland elsewhere. There was people who claimed to have seen one or more of these people after the alleged time when they were -- when they were supposed to have been killed. There was bits and pieces like that out there that were produced in discovery by the government but, you know . . .

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 49 of 71
*to purchase a complete copy of this transcript.*

Q. Sure. But my point is that some of those things you guys as a team did run down. For example, you're aware Gordon Gratias actually tried to run down to find out information about Dick DiMarco. You're aware that that was done.

A. Actually, like I said, I don't remember that name, and I don't remember that part of whatever he would have done.

Q. Okay. Your general assessment was that this was -- as the case went on, your general assessment as an experienced criminal defense attorney was there wasn't going to be much of a factual defense to this case, but when you saw things that you thought needed to get investigated, did you raise those issues?

A. Well, to the extent that we needed to follow up on some of those things, in my view at least, I felt like the limited areas that were of concern to me, I felt like they were followed up with.

Now, were they -- you know, was everything done that could have been done? No, but, you know, I mean, I think there were things that I was interested in knowing like the time table on the DeGeus killing and, you know, when she actually left work that night, et cetera, et cetera, the time table precisely on the Nicholson and Duncan killings. I felt like that was pretty good and important to kind of get a good sense of that to the extent we could and to determine if we'd be able to find some evidence potentially of an alibi, this kind of thing.

And so I think on those points I think we did some

limited review of things to determine, you know, where we were on them. But that was about, you know, it as far as I can recall. There wasn't a great deal of effort put into detailed investigation in that sense of the crime itself, you know.

Q. And one of the reasons for that is because the evidence of guilt based on the facts that you knew from the government's file was pretty overwhelming.

A. I thought it was very strong.

Q. Okay. And, in fact, you said during your testimony this was an extremely difficult case in part because of the evidence against -- lined up against your client; right?

A. Right, and just --

Q. That's one --

A. Yeah.

Q. That's one of the things that made it difficult is there was a lot of evidence pointing to the guilt of your client; right?

A. Right.

Q. Okay. And I think -- and I appreciate you speaking to me a couple weeks ago so I could interview you for this. I think one of the things you said during that interview was that to win this case it required basically a perfect performance by counsel; right?

A. I kind of have that opinion generally about federal criminal cases, that if you're going to have a chance to win

them realistically you can afford as the defense maybe one or two little mistakes but you can't afford any big mistakes to have a real shot at winning just because the cases are generally put together better, they're worked up better by the government and the agents investigating things.

This case was probably to the -- you know, the extreme of that where you couldn't really afford on the defense side to be making really any meaningful mistakes of any kind because of the way it all sort of stacked up, and you really had to kind of -- you kinda had to try pretty much of a -- pretty much of a near -- in what I would consider to be a near perfect case to have a good shot. Now, that's just my, you know, mental impression.

So when I think about going to trial, I'm always thinking about trying the perfect case. That's the goal. That's everybody's goal I would like to think. So, you know, that's what I -- you know, that's the aspirational goal. And you try to get as close to that as you can. And, you know, I just don't think you can afford mistakes in a federal criminal trial. They just seem to have a way to come back and bite you, you know, on the defense side more than the government. So that's my observation over the years.

Q. You indicated when I talked to you the other day that --

THE COURT: Can I interrupt for one second just on a point of clarification?

MR. WILLIAMS: Please.

THE COURT: You were talking about cases are put together better, investigated better. And better is a comparison to something else. So I got out of it you were comparing it to state court, but you didn't say that.

THE WITNESS: That is right. Your inference was correct.

THE COURT: Okay.

THE WITNESS: Yeah, that's what I'm saying, Judge.

THE COURT: Thank you.

THE WITNESS: Yeah.

MR. WILLIAMS: Thank you, Your Honor.

BY MR. WILLIAMS:

Q. You said the other day when we talked that you had -- some observers in the courtroom had after the presentation of the penalty phase thought that there was a good chance that the jury was going to come back for life. Do you remember telling me that the other day when we talked?

A. Oh, yeah, uh-huh.

Q. And I asked you, you know, why do you think then that with that optimistic view by outsiders they came back, and your answer was dead kids. I mean, wasn't that really your assessment that at the end of the day that's what this case was about, we have two dead children?

A. Well, a lot of people said that that was your number-one

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 50 of 71

thing to overcome as the defendant in avoiding the death penalty. And I agree with that. But it was overcomable, if that's a word, but it could have been overcome. But it was a major aggravating factor. Obviously in the jury instructions it was, you know, one of the aggravators. But it was a major aggravating factor, and it probably, as to those counts, weighed more than, you know, almost all the other factors.

Q. You -- going back to the criticism you have of Mr. Willett, one of the things is his absence and the fact that he went home on weekends. Unlike you and Mr. Berrigan, Al Willett was a sole practitioner, wasn't he?

A. He worked in an office with other lawyers. I don't know if he was a sole practit -- I guess he was a sole practitioner at that time.

Q. Okay. And --

A. Yeah. I think -- but he shared office space, and I don't know what their arrangement was as far as sharing or coverage, if you will, of other work.

Q. You -- your belief is that Mr. Willett was not prepared for examinations based on your perception looking at the file that you did not think the file had been touched or cracked or whatever the words that you said; right? I mean, that was your testimony. That was your perception.

A. That's what it was.

Q. Okay.

A. I mean, I saw what happened. I mean, I saw the files. I knew what was in the files, and I knew that they weren't reviewed.

Q. Okay.

A. On the two -- there was two files that I can recall like that, and then there was the McNeese situation which was totally untouched as of the point in time when it was turned over to Pat Berrigan to take over.

Q. And your testimony then is by looking at the file you're telling the judge you know what Al Willett did in order to prepare for the cross-examination? I mean, let's be fair, Mr. Stowers. You don't, in fact, know what Mr. Willett did to prepare for his cross-examination, do you?

A. I think I know what he didn't do which is what I'm talking about. I think when counsel gets up as you have without notes of their cross-examination with a file that appears not to have any highlighting of materials, any notations in the margins of the materials, like I say, it appeared to be untouched. I mean, he -- there was two files like that that I can remember, and then there was the Honken scenario -- or the -- I'm sorry -- the McNeese scenario. That's all I can say about it is that there wasn't any evidence of any preparation.

And he could say he had it all in his head. He's -- you know, fine. It wasn't all in his head. I saw what was going on in the courtroom. It wasn't in his head, and it wasn't

on paper, and he hadn't reviewed the paper so . . .

Q. Based on your belief based on your observations.

A. I saw what was going on, and I saw that he hadn't done the work.

Q. You talked about the fact that during the penalty phase he did nothing in the back of the courtroom. Wasn't there a number of government witnesses assigned to him on the penalty phase but they just didn't end up getting called?

A. If that's true, I don't believe it is. He was never -- as the trial progressed and as we went towards the trial, he was not going to have a role in the penalty phase. That solidified after what was going on in the initial phase to the point where he was put on the back bench in the courtroom literally, physically, and figuratively. And that's why he was seated back there because he was not committed to the case the way that Pat and I were and --

Q. Do you remember -- I'm sorry. I didn't mean to --

A. Go ahead. I'm sorry.

Q. Do you remember Mr. Willett talking to you about the presentation you were going to make with Mr. Cunningham and how it should be cut back?

A. Mr. Willett was not around during that period of time, and that all occurred in the evening hours before Cunningham testified. So Mr. Willett was up in his room on another floor in the motel while I was preparing Mr. Cunningham, and he had no

role in reviewing Cunningham's outlines or anything else. So I don't know -- it just didn't happen.

Q. You were criticized by counsel here for failing to raise issues with regard to the -- putting in the proffer by Dustin Honken and the polygraph. Do you remember that line of questions you got?

A. Yes.

Q. All right. Let's talk about that a little bit. One of the assertions is that the defense, you, should have put in the proffer in order to -- and then the polygraph to show that Vest was unbelievable because Dustin Honken was unbelievable and the polygraph proves that; okay? Do you follow that line of reasoning?

A. No. I understand the argument, yeah.

Q. Okay. Now, do you recognize that if the defense had put in a polygraph saying that Dustin Honken lied about Angela Johnson's role in these murders that that has two views to that?

A. No, that's right. I mean, you could go either way with that. You could either think that he lied in her favor or he lied in a manner to make her look more guilty than she was. So that's correct.

Q. You were criticized for not going with the idea of -- I'm sorry, for submitting into evidence during the penalty phase the fact that Dustin Honken received the death penalty, and you articulated that you considered the pros and cons of that and

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 3:09-cv-03064-MWB-LTS Document 351 Filed 11/10/11 Page 51 of 71
*to purchase a complete copy of this transcript.*

ultimately decided that it was worthwhile putting that in?

A.   That's correct. That was a strategic decision thought out by the attorneys, and we chose to do it that way. And I'm willing to take whatever criticism people want to give about it. I just -- that's what we decided to do. Whether it was right or wrong, I'm not going to -- you know, I'm not in a position to say. I think, you know, we had reasons for it. People can disagree with that. I'm not going to get upset about it. I, you know . . .

Q.   What was your assessment, by the way, of Pat Berrigan's performance? I know you had a problem with the one line he gave during his closing argument and we talked about that. But otherwise, that aside, what was your assessment of how well Pat Berrigan performed?

A.   Well, I -- he worked his tail off on this case, and he worked long. He worked hard. I thought he -- he gave it, you know, his best, and I think overall I think Pat did -- did a very good job on the things that he chose to do and the choices that were made.

Now, I had some qualms about some of the decisions I've talked about, but, you know, I think his performance given what was chosen to be done was very good. You know, some of the choices I had qualms about, and I've talked about that. And then there was that situation in the closing argument I really was bothered by, but, you know, I think it was -- I thought Pat

was -- he's very -- I think he's a very good lawyer. I think he's a very, very good lawyer.

And, you know, I'm not going to not criticize him for things that I think, you know, shouldn't have -- you know, that he did wrong or whatever, but I think he was a good lawyer, and I think he is a good lawyer, and I think he worked his tail off, and I think he was fully committed to Angela's defense, and I think he did everything that he personally could do to assist in doing that.

Were there errors made? You know, we didn't win, so I'm not happy about that, nor is he. And there are reasons for that I can't figure out but . . .

Q.   Well, you recognize, Mr. Stowers, the fact that you lost the case doesn't mean that counsel did not live up to the standard of performing effective assistance of counsel. You agree with me; right?

A.   Oh, no, I agree with that, absolutely, yeah. I understand that.

Q.   Let's go to the comment that you found inappropriate by Mr. Berrigan during his closing argument. You said you had some words with him after that and kind of got in his face. What was his explanation for saying that?

A.   As I remember it, it wasn't really in his face. I said, "Pat, I didn't know you were going to say that. Why did you say that?" It wasn't in his face.

Q.   I'm sorry.

A.   Yeah.

Q.   I didn't mean to use a pejorative description for that. But you confronted him about it, and what was his explanation?

A.   His -- as I recall it, he says, well, he felt that that's what the jury was at that point in time believing anyway; and, therefore, it was, you know, a given, if you will, that that was the circumstance, that is, that she could have saved the kids.

Q.   Okay. You disagreed with that assessment; right?

A.   Yeah, I don't think it was even close to that.

Q.   Okay. That's fine.

A.   I don't -- I mean, it just wasn't.

Q.   But it wasn't a case that he said it because he didn't realize what the evidence was; right?

A.   Well, no.

Q.   His explanation to you is he had thought it through and had made a decision to say it. And while you disagree with it, it wasn't a mistake based on lack of understanding of the evidence.

A.   Well, not as he explained it to me but -- no.

Q.   And you got that explanation from him immediately after he gave the closing argument; right?

A.   I think it was over here in this conference room or after the jury was escorted out in the courtroom that we first talked about it, yeah.

Q.   Pat Berrigan ended up taking over the cross-examination

of --

THE COURT: Before we get there, could I ask a follow-up question on this --

MR. WILLIAMS: Please, please, Your Honor.

THE COURT: -- the statement that Pat Berrigan made in closing argument? Do you think that that was a strategic decision to try and enhance his credibility with the jury when he was going to ask to spare Angela Johnson's life?

THE WITNESS: I don't -- I don't know why he said it. I --

THE COURT: Well, I'm asking based on what he told you.

THE WITNESS: Well, he didn't say it that way to me. He didn't say that I made a choice to -- you know. It was --

THE COURT: But he said that he thought the jury already believed that, so --

THE WITNESS: Yeah.

THE COURT: -- I'm just asking if you thought the jury already believed something and even though you didn't think that they should believe it, do you think it could be a strategy choice to try and make a huge concession, maybe a very high-risk concession, to try and build some extra credibility because they're going to say -- you know, I mean, do you think that could have been his motivation?

THE WITNESS: Oh, I mean, I think that could be a

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 52 of 71

motivation for why he would have done it and -- it could be.

THE COURT: Do you think that was his motivation, though? I mean, we'll be able to ask him, so you can get off the hook, but I'm interested in what you think based on what he told you.

THE WITNESS: I think his reaction when -- when I told him was unusual for him. He was very combative with me because he'd never been that way with me before. And, you know, we critiqued each other, you know, and it wasn't an issue.

This time I brought it up, and I didn't bring it up in a highly negative way. His reaction, it seemed to me, was overly aggressive and overly defensive. And I felt like he -- that reaction to me tended to indicate that maybe he knew he screwed up on that.

But that's what -- you know, I don't know, but I felt like his reaction was -- for Pat it was pretty aggressive and a little angry with me for questioning that one little thing. I know he was under a ton of stress, and I think it was either here or, like I say, in the -- it was right after he completed that and the jury went out, and then we were either in that room or here. But the reaction was not a typical Pat Berrigan reaction that I would have expected.

THE COURT: But let me just ask a follow-up question to that. Did Mr. Berrigan strike you as an individual that if he made a mistake he was probably going to fess up to it?

THE WITNESS: I think he would, yeah. I think he would.

THE COURT: And let me ask it a different way. Would Mr. Berrigan in your view be more likely to fess up to a goof-up than Mr. Willett?

THE WITNESS: Highly more likely, yeah.

THE COURT: I'm sorry to interrupt. Well, I'm not sorry to interrupt.

MR. WILLIAMS: No, I appreciate it.

THE COURT: I mean I'm sorry I interrupted, but I just want to ask the questions while they're fresh in my mind.

THE WITNESS: Yeah.

MR. WILLIAMS: On my behalf, Your Honor, don't hesitate. I appreciate it.

BY MR. WILLIAMS:

Q. You talked about Mr. Berrigan taking over the cross-examination of McNeese for a minute -- I'm sorry. I want to talk to you about that for a minute. Recognizing he took it over, how did he perform on the cross-examination of McNeese?

A. I thought that he did fine with it, you know. I thought it went fine.

Q. You were criticized for failing to do more to challenge the scientific evidence that came into this case. Why didn't you do more to challenge all the science in this, Mr. Stowers?

A. We'd have to almost go witness by witness, but generally

the forensic and other type evidence relating to the human remains, et cetera, was not something in my view and in our decisions about how we were going to try the first part of the case we were going to be taking on and challenging and trying to contradict the forensic-evidence. I mean, the folks were -- the victims were shot to death and killed, and the forensic science showed that. Seemed to me that, you know, we were in that position of people that were shot to death in particular ways that were not really contestable.

And then, you know, we had the benefit of the Honken trial where the same basic evidence was presented. We got to, you know, read the transcripts and observe some of the evidence. I don't know that one of the lawyers was here for the whole thing, but we observed some of the testimony of the witnesses and got to see that, so we had a little bit of benefit out of that.

So it wasn't like -- and, you know, Honken had some really good lawyers representing him in Parrish and Spies and Charlie Rogers who were certainly no slouches. These are some of the best lawyers around. And, you know, we thought the way the evidence came in in that case it was not really something that there was going to be any real headway made on that front. So I think that was kind of where we came down on that forensic stuff.

Now, on the handwriting part, you know, I didn't

even -- I've already testified about that, but it wasn't really something that I saw a challenge to that we were going to make.

Q. I mean, to be fair, Mr. Stowers, I mean, there really wasn't going to be a whole lot of doubt that Angela Johnson drafted those notes, was there?

A. I -- you know, I've heard that that issue's being raised now. At the time of trial I didn't have any reason to believe otherwise.

Q. And in your experience does the defense run a risk of losing credibility with the jury if you present or attempt to present your own experts on issues like handwriting or like on ballistics or on pathology and so forth when in your assessment you don't have much of a case to work with on that area?

A. I think it depends on what you're doing with the experts and why you're calling them and what they have to say. I think a jury understands generally that a defendant, you know, may want to put on their own scientific-type evidence and they'll respect that and listen to it just like they'll listen to the government's.

But if they aren't going to say anything new or different, they probably would wonder why the heck they're being called, and they wouldn't want to be sitting through multiple testimonies about those kind of things that is not developing some kind of an inconsistency or contradiction, and they'd probably wonder why their time was being spent doing that.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 53 of 71

So if you were going to do it, you'd need to target what you were doing in a way that would be helpful to some point you were trying to make that you had not made on cross-examination of the other -- on the state or the government's case.

Q. Well, and this thought process you've just shared with us, Mr. Stowers, I mean, that's the same type of thought process you went through in the Johnson case when you were looking at the forensic evidence trying to make the decision whether or not to present a counter scientific case on behalf of Miss Johnson? You went through the same type of thinking process about the pros and cons and whether to do it.

A. Yeah. I mean, basically that's correct. It's just without the benefit of actually having conferred with the true experts in the field who would have reviewed all of the work product of the state's people and perhaps said something different, but it seemed to us that -- and it seemed to me that any contradictions, et cetera, might not be very material to the real issues in the case. And that was just kind of where our thinking was.

Now, you might say how can you decide that without knowing what the experts would say, but I don't know that there was any great moment to the scientific evidence that the government presented in this case in the sense of it was highly incriminating of Angela Johnson or anything else. You know, it

just seemed to me to be just their scientific testimony about what they found when they unearthed the remains, when they tested the -- inspected the bullets and this sort of thing, you know. It didn't seem to me to be the kind of evidence where they were really saying something that hurt you, you know, and that you needed to respond to it.

Q. And you made this assessment in part. I mean, you've had some experience in the area of scientific evidence in criminal cases before, right, before the Johnson case? This wasn't the first time you were exposed to scientific evidence in a criminal case.

A. No.

Q. No. You had the Esse case; right? You remember that Esse case?

A. Yes, Esse, E-s-s-e?

Q. Esse? Did I mispronounce it? Yeah.

A. Right.

Q. In the Esse case you didn't present a ballistics expert yourself, but in cross-examining the government's ballistics expert, that resulted in an acquittal in that case, didn't it?

A. Well, you shouldn't have asked me about that one because actually he got convicted at trial when I tried the case. It went up on appeal, and it got reversed due to a error in jury instructions. Then it was retried by the public defender who called a forensic expert, and that's when he won his acquittal

was in his retrial with a different lawyer who actually did use a forensic expert so -- sorry.

Q. No, that's all right. I didn't -- I obviously didn't have the facts right on that.

A. Yeah.

Q. The investigation, by the way, we were talking about that a little bit ago. The -- do you remember seeing that one submission that was put up on the board about the number of hours and how much money you were asking for, and I think it was a -- Exhibit 8, February 2005 funding request that was submitted to the Court? Do you remember that?

A. Was that the supplemental investigative stuff?

Q. Right, where they had the request for an additional $25,000 for the guilt-phase investigation. Remember that exhibit?

A. Yes.

Q. Okay. And it indicated that there had already been about $49,000 worth of investigation expenses expended at that point?

A. Right.

Q. Okay. And that was at $55 an hour?

A. I think it said that on the paper. I don't know if that was the number, but it looked like that was the number on the paper or the exhibit that was shown if I remember correctly.

Q. By the way, during the trial where did you sit in relation to Miss Johnson?

A. Good question. Well, I think when we were on that side of

the courtroom --

Q. And you mean the client side closest to the witness -- or to the jury box.

A. Yeah, which was during the penalty -- oh, I'm sorry. I spoke over you. When we were over on the side of the courtroom near the jury, I may have sat next to her for at least some of that time. When we were over here --

Q. On the other side of the courtroom.

A. Yeah -- I think I would have been -- boy. I think I would have been seated where Mr. Burt is, and then I think Angie was more over here because I think we tried to get her down because there was an issue at one point if I remember that maybe the jurors could not see her during the trial, handed a question if I remember about facial reactions or something and they couldn't see her face or something.

So I think she might have been all the way on the left, and I may have been over there during the trial itself for much of it. Now, I probably occasionally would have sat next to her as well.

Q. Let's talk about her facial expressions a little bit. Do you remember you or anybody else on the trial team giving her some instructions on how to behave and how to express herself during the trial?

A. She was -- when that issue came up particularly, there were discussions had with her by us, so yes, I do remember that.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 351    Filed 11/10/11    Page 54 of 71

Q. And what type of instructions were given to Miss Johnson about how she should behave and how she should look?

A. Well, don't make -- you know, don't glare at witnesses. Don't appear to be sort of giving an intimidating stare-down. Try to be interested. Pay attention to what they're doing. Try to have a pen in your hand and a notepad and appear to be interested in what's going on, it's your trial, this sort of thing. That kind of commentary would have been given to her, yeah.

Q. Instructions given to her really any different than you've given to other defendants you've worked with in the past, Mr. Stowers?

A. No, I don't really think it was materially different, no.

Q. Did you have any concerns about how she appeared in front of the jury during the trial?

A. When I heard that from the jurors I was because I didn't know anything, and I was a little concerned that they were trying to, you know, possibly draw some inference from whatever her reactions were or weren't to various evidence. I just thought that was kind of unusual for a jury to -- I mean, not unusual for a jury to have those thoughts. Unusual for a jury to hand a note, you know, out saying, "We can't see her. We want to know what her reaction is," or whatever that note said. You know, I thought that was unusual that they were that open about it when they were.

Q. And how about yourself, though? Did you observe any expression on Angela Johnson's face or any behavior she was engaged in that caused you any concern during the trial based on your own observations?

A. She appeared to be, during portions of the trial, partic -- well, I'd say during the guilt phase particularly because it was over on the side of the courtroom that everybody -- the defense is on now away from the jury box, she most often was looking down and doodling and drawing pictures and this sort of thing in a notepad and appeared to be very detached from the proceedings themselves because, you know, she was doing those things.

Now, did I have concerns about that? Not really because I figured given what the evidence was and the extensive autopsy-related evidence and pictures of human remains and descriptions of things, I could certainly understand why she might want to be, you know, detached from that. There were times when I wish I might have been detached a little more from it in some ways.

But, you know, so it wasn't really a concern because in my mind I was kind of attributing it to her need to keep some kind of psychological separation, if you will, or mental separation from the evidence of the crimes, you know.

Q. And there are times like, for example, during the penalty phase when some of her friends would be called as witnesses that she was more animated. She'd smile at the witness, for example.

A. Right, and that's why I kind of qualified my earlier answer to during the first phase of the trial because that was when the -- you know, the bad evidence was coming in if you will.

And during the penalty phase she was much more attentive. She often would sit up. She would smile often at witnesses. She was emotional, cried many times, and that sort of thing during the penalty phase, and that was when, you know, a lot of family members and people whom in many instances she hadn't seen for a long time testified.

Q. During the trial from time to time did she have interactions with you about a particular witness, maybe a comment or send you a note or something like that?

A. It was very sporadic as far as that went, the note passing or the commentary about witnesses by her to the lawyers from what I observed.

Q. Anything about Miss Johnson's behavior during trial that you think gave you a concern that she was not competent during the trial?

A. No, I don't think so.

Q. Anything that you observed that made it so she could not render assistance to you, you know, understand what the proceedings were and give assistance in representing herself?

A. No, not really.

Q. I want to talk to you a little bit about the plea discussions in this case. This is another area where you have

some criticism of Mr. Willett. I think your testimony was that at least in part one of the things he should have done is gotten in and tried to secure a plea before the bodies were found. Is that accurate?

A. I think that's correct.

Q. All right. Angela Johnson was arrested on July 29 of 2000; is that correct?

A. I don't have the date in my head but . . .

Q. Sounds right, doesn't it?

A. It was in the summer. It may have been within a month of that date. It certainly wasn't August. It was no later than July. I don't remember the exact date.

Q. Why don't you assume with me that she was arrested on July 29, 2000. Al Willett was appointed on August 2, 2000; okay?

A. All right.

Q. All right. There was a detention hearing shortly after her arrest. You weren't representing her at the time, but you know there was a detention hearing; right?

A. Right.

Q. Okay. Witnesses were called at this detention hearing; right?

A. Yes.

Q. Okay. At the time that Mr. Willett was appointed, the government had in its possession thousands of pages of discovery; right?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 55 of 71

A. I don't know if it was ready to go or not ready to go, I mean, in terms of like did you have the discovery ready to provide to the defendants or make available to view. I don't know about that. I just know -- I mean, you would have had I assume a lot of materials that had been collected in the investigation of the whole situation over the many years that the thing was under investigation. So I assume that you did have a lot of materials that would have ultimately wound up in a discovery file.

Q. At the time that this was taking place, the government, obviously premised on this, had no bodies; right? Right? After Al Willett's appointed --

A. Right. No, that's true.

Q. No bodies.

A. Right.

Q. No maps from Angela Johnson.

A. Right.

Q. No written admissions from Angela Johnson.

A. Not -- no, I don't believe there were.

Q. Didn't have Sara Bramow's testimony.

A. Right, because she was a cellmate with her in Benton County.

Q. Right. Didn't have Bobby McNeese's testimony.

A. Right.

Q. Okay. Government didn't have any jailhouse informants at

this point recounting admissions made by Angela Johnson; right?

A. Correct.

Q. Okay. During this time period Dustin Honken sent letters to Al Willett indicating that he had evidence that would exonerate Angela Johnson. You were aware of that.

A. I'm not sure about those. I'm not sure that I saw those.

Q. Okay. You're not aware at any point that Angela Johnson told Al Willett that she was involved in the murders, are you? During this time period between her arrest and Al's appointment and the time that the bodies were discovered, you're not aware that Miss Johnson confessed to Al Willett that she participated in the murders, are you?

A. I don't think that happened.

Q. She never has admitted that to you, has she?

A. That she committed the murders?

Q. Yes, sir.

A. No.

Q. In fact, her position -- as far as you know, her position was and has remained that she was not even present during the murders.

A. Well, I don't know if that's completely correct.

Q. Let me ask you, Mr. Stowers. Has she ever told you anything differently, ever told you anything differently?

A. Oh. Me personally?

Q. Yes, sir.

A. No.

Q. At the time that Mr. Willett was appointed on August 2, Miss Johnson had no prior criminal convictions, did she?

A. I think that's correct.

Q. In order for Miss Johnson to have pled guilty during this time period between when Al Willett was appointed on August 2 and the time that Bobby McNeese provided the maps to law enforcement which was on October 2, 2000, in order to plead guilty, she would have had to have implicated the father of her child in the murders of five people; right?

A. Not necessarily.

Q. Let's do it this way. You testified earlier that implicating her -- implicating Dustin Honken, the father of her child, was a problem in this case, right, a problem for her to do that?

A. It was a hurdle that she had to overcome in her mind, yeah.

Q. Okay. And during this time period between August 2 and October 2, Al Willett wasn't aware that Bobby McNeese was having contact with Angela Johnson; isn't that right?

A. Between -- when was he -- you're asking me what Al was aware of?

Q. Yeah.

A. Oh.

Q. To your knowledge was Al aware that -- between the time he was appointed on August 2 and the time that Bobby McNeese handed

over the maps to law enforcement on October 2, Al wasn't aware that McNeese was having contact with his client, was he?

A. I hope not.

Q. And, in fact, he gave instructions to her just the opposite, didn't he?

A. To not talk to him?

Q. Yes. You're aware that he told Miss Johnson to stay away from Bobby McNeese. You know that happened.

A. I think there's a indication that Angela even told McNeese that, that my lawyer says you're a snitch or something. So I assume that's an accurate indicator of what she was told by Al.

Q. So in the 60-day period between the time that Al Willett was appointed on August 2 and the time that Bobby McNeese handed over the maps on October 2, 2000, your assessment is that Al Willett should have been in the door and getting Angela Johnson pleading guilty to her participation in five murders?

A. My position is that Angela Johnson wanted to tell him where the bodies were, and he told her don't tell me, and instead she was there in the jail with Mr. McNeese who was pumping her for information, and she was able to provide that information to him. Little did she know it was going directly to the government.

And so the benefit that she could have gotten out of not -- or out of providing that information was completely lost and, you know, that's -- that's my understanding of what

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 351 Filed 11/10/11 Page 56 of 71

occurred during that time period. And Al told the government to pound sand as far as working anything out during that two-month time period. So, you know, that's why I've said what I've said.

Q. Well, let's back up to the premise of that explanation you just gave. Your premise at the very beginning was that she wanted to tell Al where the five bodies were and that Al told her not to tell him; okay? I want you to explain what your evidence is that she wanted to tell Al where the five bodies were and what evidence you have to support that Al told her don't tell me.

A. There's correspondence from Al to Angela I believe to the effect that he doesn't want her to tell him anything if I'm not mistaken. That's also something that Al has reported that he advised her when she wanted to talk to him early on more openly about the offense that he told her don't tell me anything, I've gotta go through everything, this sort of thing, we're going to go to trial, I'm going to get you outta here, they got no bodies, this kind of talk; okay? And this is all part of the go pound sand type thing to the government.

And that's the -- that's the opportunity that I see that was lost was the opportunity to work with his own client, Angela Johnson, to learn what it was that she knew, what it was that she would say, what value it may be to the government to be able to provide whatever it was that he knew or that she knew, I should say, to the government. And that opportunity was only

there for a short period of time before the government itself, knowing that that, you know, potentiality existed, exploited the opportunity to get in there and get the information for itself.

Q. Has Angela Johnson ever told you that she wanted to tell Al Willett where the five bodies were?

A. I never asked her that question.

Q. That wasn't my question. My question was has Angela Johnson ever told you that she wanted to tell Al Willett where the five bodies were?

A. No.

Q. Angela Johnson to you has maintained she was not even present during the murders; right?

A. There was the notes that we went over on direct exam to that effect, that's correct.

Q. And when we were talking about this last week or a couple weeks ago, Mr. Stowers, I asked you something to the effect of what would you have done in order to persuade this woman who didn't admit to any guilt that she wanted to -- that it was in her best interest to admit her involvement in the murders, and your response was something to the effect that you can manipulate any client to say anything. Do you remember telling me that?

A. Not in those words.

Q. You don't remember using the word manipulate?

A. Well, maybe I did. I don't know. But I don't remember

using those words. That's all I'm saying.

Q. You don't remember telling me that you can manipulate a client into saying anything that you want them to say?

A. I think that what we were talking about is what I could get her to say if it was in her interest to say it; okay? And I think it's very plausible that had the right incentives been in place just as I've described, you know, over the last two days she would have been willing to fully admit to everything, fully cooperate in investigating and prosecuting Honken, and fully share her version of the offense. But she wasn't going to do it for free without benefit.

Now, it is very possible that clients can be brought around to saying things by a lawyer who uses their position with the client to say things to the client that will be very persuasive to them. And if you want to call it manipulation, it might be perceived that way. Sometimes I think it is manipulation, if you will, of the client's psyche. But it's all in the best interest of the client.

And in a case where you've got a client in this situation, I don't think it would have been a great push to get her to provide the very information she provided to McNeese to her lawyer for her own benefit.

Q. Well, isn't what you told me a couple weeks ago that what you would have done is you would have gotten her to admit to this after-acquired knowledge story and you thought that was

going to be something that you could have sold to the government? Isn't that what you told me?

A. No, I think you're paraphrasing. What I said was in my experience in a case like this if she's in the door first prior to the government having any clear other version, what would occur would be she could probably have a good deal of leeway in what she told the government in terms of her version and whether or not the government would accept it as the truth or not.

And in a case like this where you're talking about the bargaining chip being five human, you know, remains and evidence against the guy who was not indicted, Honken, I think the government would have accepted her version that he told her where these bodies were and everything else as part of a quid pro quo, A, to locate the bodies and, B, to get to Honken and would not have had a lot of qualms about it.

Whether the government actually believed that or not, I think they would have done it. I've seen the government take all sorts of witnesses under its wing over the years in cases with all sorts of incredible stories when they're the first in and the information they're providing is still helpful against a significant target.

So it happens all the time. And I think it would have happened in this case, and I think she could have said he showed me where they were. She may not have only said that. She may have said I know how they got in the ground there, and she may

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 57 of 71

have said exactly what Honken proffered to for all I know. But the question is did she have an incentive to say that? No. Did she ever get a real incentive to say that? Probably only near trial when that was done through the written proffer from Berrigan to you.

Q. Well, she still had an incentive even after the bodies were found, and you talked for a number of hours last couple days over that and regarding her ability to testify against Mr. Honken; right?

A. I'm sorry. I lost you. My brain is going. But go ahead.

Q. Her -- she still had a bargaining chip, if you will, even after the bodies were found because she could testify against Dustin Honken.

A. That was, yeah, a bargaining chip.

Q. Okay. And you're assuming that she might have confessed to Al Willett. She might have come up with the after-acquired knowledge story. She might have told him about the location of the five bodies. You're assuming a lot of things there on Al Willett's -- when you're blaming Al Willett. But the fact is at one point when you're representing her she had the bargaining chip of the fact that she could testify against Dustin Honken.

A. But that bargaining chip was worth maybe 10 cents, and the five bodies were worth about $100,000, you know, in comparison. You can't -- you can't compare those two things as bargaining chips. The government never offered a damn thing for her

willingness to testify against Honken as a stand-alone item. It just never offered anything to her.

Q. And the government never offered anything to her prior to discovery of the bodies either, did it?

A. My understanding is that they were willing to offer her 10 to 15 years, but I don't think they actually made a proposal so far as I know because of the fact that they were told to go pound sand.

Q. My question to you -- I just want to make sure we got it -- is you're not aware the government ever made any offer to Angela Johnson prior to the discovery of the bodies. Any --

A. Well, other than the one they made through McNeese. No.

Q. The answer to that's no.

A. Correct.

Q. Okay. Let's talk about this proffer requirement. It's your assessment that there was this -- or your testimony I think that there was this requirement by the government that before any offer is going to be forthcoming from the government Angela Johnson was going to have to proffer to the government. Remember testifying about that?

A. Yeah, I talked about that.

Q. Okay. And your assessment was that you did not want to have an open-ended proffer because you saw exposure to your client if you did that.

A. Right. That was one of the factors.

Q. Okay. Despite that -- despite that, you continued, though, as representing Miss Johnson to, throughout your representation, try to explore ways to obtain a plea in this case; is that fair to say?

A. Oh, yeah. There was many, many efforts to figure out a resolution without trial.

Q. Okay. And that effort by the trial team to try to resolve this case continued literally up through jury selection or into jury selection in this case; is that -- isn't that fair to say?

A. Yes.

Q. You knew, Mr. Stowers, that regardless of any comments made by Tom Miller or Pat Reinert, by the time you got into this case they had no independent authority to enter into any plea agreement.

A. In April of 2001 I don't know if that's true.

Q. The U.S. --

A. I really -- I don't know.

Q. All right.

A. In April of 2001. Later on it was clear it had to go through main Justice and the death -- the attorney general I guess would have had to -- and I don't know when that change happened exactly; okay?

Q. Well, let's just take any case with the U.S. Attorney's Office. You're aware that there's a approval process that the plea would have to go through in the office.

A. That's correct.

Q. All right. You're not aware of any oral plea agreements entered into by the U.S. Attorney's Office in the Northern District of Iowa, are you?

A. Not -- no.

Q. Okay. And you're not -- and I don't mean to be putting words in your mouth. But you're not purporting to say in your testimony that anybody on behalf of the United States ever made an oral offer, plea offer, to Angela Johnson.

A. I don't think so, no.

Q. There were some plea negotiations that occurred on the eve of Dustin Honken's trial. That would have been August 11 through the 13th. Do you remember that kind of period where there was some plea negotiations along a joint plea proposal going through?

A. Yeah, the joint, and then I think it became individual, but I think it changed over time in a very short time.

Q. Okay. And one part of that was that the defense as part of a joint proposal to the government for resolving the case, Dustin Honken was going to come in and debrief, and if he debriefed satisfactorily, then there was going to be an offer made by the government to accept some type of plea. Do you remember that kind of arrangement on that?

A. Whew.

Q. Well, let me do it this way.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 3:09-cv-03064-MWB-LTS Document 351 Filed 11/10/11 Page 58 of 71
*to purchase a complete copy of this transcript.*

A. I'm not sure that he had -- I guess we could look at the date of his proffer and figure that out, but I thought -- maybe that was all part of the presentation to the DOJ was his proffer and the polygraph.

Q. Okay.

A. Yeah, that might be right I think.

Q. And you remember as part of that you got that note from Angela Johnson to show to Dustin Honken to let him know that it was okay to talk. Do you remember doing that?

A. Yes.

Q. And you actually showed that note to Dustin Honken.

A. Yeah, that's the way I recall it. I went right over here in the marshal's office.

Q. And that was part -- your recollection was that was during the time that there was an attempt to get a joint plea offer going.

A. I don't know if by that time the government had said it's a no-go for the Angela Johnson part of the plea but we're still looking at Honken on life or if it was -- you know, or if it was still at the joint plea part because it changed in there over a period of a few days. And I'm not sure exactly when that happened. I remember being aware that he was going to proffer and that he was insisting on having this permission from Angela Johnson to do so.

Q. Do you remember during the trial there was some testimony

by Dan Cobeen? Do you remember that guy?

A. He -- I remember the name. I think he was one of the people who was distributing drugs for Nicholson, is that correct, and Honken?

Q. Let me see if I can remind you. Honken is arrested in 1993.

A. Yeah.

Q. The murders occur. Ultimately in 1996 the federal charges are dropped. Mr. Graham maintains a new investigation or maintains the investigation, is able to develop a new confidential informant by the name of Dan Cobeen.

A. Oh, okay.

Q. Okay?

A. All right.

Q. And do you remember that Dan Cobeen testified at trial that Dustin Honken took him over to Angela Johnson's house because Angela Johnson had to give permission for Dan Cobeen to participate in the meth operation? Do you remember that testimony?

A. Vaguely, not really very well. I remember something like that but not -- it isn't real clear.

Q. Kind of like the permission that he had to get in order to talk about the crime here in this case; right? Permission slip he had to get from Angela Johnson that you couriered over from jail up here to the marshal's cell.

A. I don't know if it was like it or not like it. I hardly remember that Cobeen testimony that you're talking about so . . .

Q. Show you what the defense has marked as Exhibit 5, I think, LL; okay? In fact, I'm just going to walk it up to you, Mr. --

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may.

BY MR. WILLIAMS:

Q. Mr. Stowers, why don't you take a look at that. It's a lot easier to --

A. Oh, thank you. Hmm. All right.

Q. Do you recognize that document, sir?

A. Well, it's a proposed plea agreement on my letterhead drafted to Pat Reinert, and I was just going to check my billing records if that's okay with you to see if I have some notations of preparing this. Hmm. Okay. Go ahead.

Q. Do you remember preparing that, Mr. Stowers?

A. Not specifically, but I'm sure that I did.

Q. Okay. It's on your letterhead; correct?

A. Yeah.

Q. And if you turn to the last page, there's some lines for some signatures there?

A. Right.

Q. Okay. Are any of those lines filled in with any signatures?

A. No.

Q. And, in fact, there's a couple blanks in that document as well; right? There's a blank on even the counts that the defendant would be pleading guilty to?

A. Yeah, there's blanks, yeah.

Q. Case number's blank on the first paragraph there. See that, first numbered paragraph?

A. Oh, yeah, it's up above in the re section.

Q. Okay. But there's a blank there for the case number; right?

A. Yeah.

Q. Okay. There's no factual basis in that proposed plea agreement, is there?

A. I don't see any.

Q. And you looked at your billing records. Did you see an entry that showed that you drafted that?

A. That's what I was looking for, and I don't -- I mean, I don't see anything. I'm just trying to go backwards and see if I see something. Oh. No. Just on looking at this quickly, I don't see any time that I would have personally billed for drafting this document, this -- what's the exhibit number? Is it 5LL?

Q. That appears to be the number that has been put on it.

A. Okay. Okay. No, I don't see any time that was actually billed for drafting this document on my billing statements in

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 59 of 71

looking at them here. No, I don't see it on here, but it would have been drafted by my office.

Q. Do you have any recollection of ever sending that to the government?

A. I think this agreement would have been a form that we would have been discussing amongst the defense lawyers as sort of an outline of what the agreement would have looked like. And we would have gotten this ready in preparation for presenting it to the government, but I don't see any notations here of this being provided to the government. But I don't see anything showing that it was prepared either. So it could be that I simply did not bill for any of that activity, and I'd have to look at the file to see if there's anything indicating we had faxed it --

THE COURT: Now that would be unusual.

THE WITNESS: Well, so I've heard. But is it too late to submit for this? Is the statute of limit --

THE COURT: Touché.

A. No, I don't -- I actually don't see any record that it was sent to them, sent to Reinert. But, boy, it sure -- you know, it's got the fax number and everything on there, so I'm just a little curious about this. I don't have an answer for you beyond that.

Q. Do you recall that, you know, during the kind of ongoing continuing attempts by the defense team to try to work something out in this case that you would -- that you did draft up kind of

a -- for internal discussions, as you described it, a document that would at least give you something to talk about?

A. I've done this kind of thing on a few cases when we've gotten to difficult times with the government and we seem unable to be able to actually have a meaningful discussion about what an agreement would look like. And that would be what I was doing here was coming up with a form of an agreement using the Northern District of Iowa format that is commonly used which is a letter form with a lot of paragraphs and then tailoring it to the best of my ability to the case that it was being used for to get it out there as a working draft that the parties could negotiate from.

Q. Okay. And my question goes to whether you got it out there to the government.

A. No, I know, and I don't have an answer for you on that.

Q. Okay. And you don't have any independent recollection that you did that.

A. No, I don't have a specific recollection that this actual document was given to the government at or about this time or later.

Q. Now, one of the problems with having Angela Johnson proffer as a precondition to any plea in this case, one of those problems was the fact that she continued to insist that she was not present during the crimes.

A. That was -- that was part of the problem because it was

kind of who's going to go first. You know, is the government going to come forward and give us a number first, or is she going to proffer without knowing, you know, the number first? And -- but it was kind of a given that from very early on that in the right scenario she would give full cooperation, and those things all sound inconsistent, but they really aren't.

Q. I mean, you knew, Mr. Berrigan, that -- Mr. Berrigan -- Mr. Stowers, that if Miss Johnson had to debrief first based on what you knew her story to be that that was not going to fly with the government if she came in and said I was merely present -- I'm sorry, that I wasn't present. You knew that was not going to be an acceptable debrief with the government; right?

A. Oh, yeah, that wouldn't have worked. That was a nonworking position.

Q. You talked a little bit about the various defenses that were contemplated for the guilt phase in this case, and you indicated that the -- ultimately the mere presence defense was arrived upon. Do you remember that line of testimony?

A. Yes.

Q. All right. And you rejected the -- what you've kind of classed as the after-acquired knowledge theory of defense. And I'd like you to articulate again what was it that you thought made that a nonviable defense in this case.

A. Okay. Now, there's a lot of reasons, but number one, it's

the content of the materials from Honken -- or from McNeese. I'm sorry. The content of the materials that were exchanged with McNeese was, you know, a major factor.

Number two, it was a defense that probably would have required some evidence from the defendant. In other words, she would have had to testify as to how she knew where the bodies were and could draw a map to them and how it was that she was able to say the other things that she had apparently written.

So with that and realizing, frankly, that, you know, it wasn't -- you know, we were at a point where it just wasn't going to go. I mean, it was a non -- you know, you could have any defense you want, but if you've got no evidence of it, then you're kind of -- don't have a defense, and you shouldn't be trying to defend the case which was always the issue with that defense was there was no real evidence of any supposed after-acquired knowledge that I knew of or how that would have ever come to happen. It was just unsupported by evidence that was available to establish it I guess would be what I'd say, and it was also just not -- in my view not going to be credible to the jury of 12 people.

Q. In your review of all the evidence in this case as you worked it up for trial, did you look for other possible defenses to the guilt phase of the trial?

A. Other than mere presence and after-acquired knowledge?

Q. Yeah. I mean, did you look to see if there was even a

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 60 of 71

chance of any other defense to it?

A. Well, we looked I guess a little bit into the concept of alibi, you know. And we -- there's always a general denial which isn't, you know, a defense. But it just says prove your case which was an option and not a terrible option in this case. But, you know, those would be the only other ones that I can think of at the moment. Yeah, I think those would be the only other ones.

Q. And was it the judgment of the trial team that the mere presence defense was better than just a prove your case type of defense?

A. We felt sitting back saying prove your case was going to be a problem when you got to the penalty phase since we figured we were going to be there anyway at the end of the day because it would put us into the position where we had not gotten a version out there other than prove it, you know, sort of the denial of the offense and then saying prove it.

And so, you know, trying to weave a theme from the beginning in the opening statement all the way through the first-phase evidence and then into penalty phase where a lot of the case was, you know, going to be presented as well in terms of mitigation and role and those kind of things to the extent we could, that's why we decided on it in the end.

Q. Do you recall during the penalty phase that some photographs of Angela Johnson were presented to the jury, a

photograph of her in a short skirt and so forth? Do you remember that?

A. There was photo -- yeah, I remember some photos, yeah.

Q. Was there discussion among the trial team about the advisability of putting those on?

A. We went -- we went through photos, a variety of photos. We selected from those a limited number that were the ones that I think ultimately were used with the jury in the trial to counteract largely some of the photographic pictures of Angela that the government had to show her as an attractive young woman who would be attractive to somebody like Dustin Honken or other men. And we used those photos to sort of put her in a different state in the jury's mind that might have given a better image of her as far as how she appeared in her best and most attractive state.

Pictures were maybe a little -- few of them were a little more -- they were kind of these glamour sh -- I think it was glamour shot of pictures that were maybe a little sexy poses and things of that nature that, you know, some of them were a lot worse than the ones we used I'd say. But yeah, we used those photos, and we selected them out of everything that we had.

Q. Did -- was there discussion about the fact that the sexy poses might not go over so well with the jury? Did you guys talk that out?

A. You know, I think there was a decision made not to use some of the photos for that reason. Whether or not, you know -- so we didn't use some of the photos for that reason. You know, I -- it wasn't -- frankly, it wasn't an overarching thought in our mind. I mean, I think there was evidence in the record that she had once been a dancer at an adult club and -- a strip dancer I guess. So I didn't think the jury was thinking she was a virginous individual and maybe it would be kind of hard for the jury to picture the Angela Johnson in the courtroom and in the government's booking photos and what not as a dancer without having a perspective that might be a little different of how she might have appeared in better days.

So rightly or wrongly, that -- you know, that was kind of the decision to put in photos that showed her attractive but not the most raciest photos that we had available; that's for sure.

Q. One of the allegations of error alleged in the petition was that counsel failed to proceed with a trial date that would have prevented the government from issuing a timely notice of intention to seek the death penalty. Have you reviewed the petition, by the way?

A. It's been a while, but what was that?

Q. Yeah. That counsel failed to proceed with a trial date that would have prevented the government from issuing a timely notice of intention to seek the death penalty.

A. Okay.

Q. Do you remember that allegation?

A. Vaguely, yeah, uh-huh.

Q. Do you remember there being an issue with the timing of the notice of intent to seek the death penalty? Do you remember that issue coming up at all?

A. No.

Q. The defense team sought some continuances in this case, particularly around the time period of the Massiah hearing and so forth. And why were continuances needed by the defense team?

A. Well, one of the reasons was we couldn't get the government to give us meaningful access to the discovery so that we could be able to review it effectively and analyze it.

Another reason would be that the hearing on the suppression was held in the spring of 2001 and then it was reopened I think in June of 2001, and then it was argued in the fall or something of 2001 or early 2002 and then it was ruled on in the spring of 2002 by Judge Bennett. And there was also a second indictment that was filed under 848 Title 21 August or September of 2001. That created additional, you know, new offenses, new elements, issues with the indictment that we had to work through.

And then, of course, the government eventually filed their notices of interlocutory appeal, so then we went up to the circuit. When that went up on appeal, I think we technically

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 61 of 71

could not have had a trial if I'm not mistaken on the law on that because there was material evidence that had been ruled inadmissible but the government was challenging that ruling. And I don't know that the trial court could have proceeded if I understand the rules on stays and what not. I think the trial court could have proceeded on other aspects of the case, continue to have the parties prepare for trial, but I don't think we could have tried the case when it was on appeal with the evidence excluded while that ruling was on review by the Eighth Circuit, so we had that delay in there.

Then after an extended period of time the case came back from the Eighth Circuit after it first was decided erroneously. Then the government asked for a rehearing to get the ruling corrected. There was -- as you know, there was a long -- if you had a -- you know, a chart to chart the flow of this case, it would go all over the map. But there was a lot of issues.

In the end, you know, that appeal took a long time. It took a couple years out of the case if I'm not mistaken as it went through the appellate process, and eventually we actually sought a review by the U.S. Supreme Court which was not granted. And then, of course, we had the Honken trial interceding in there in August of 2004. And we weren't going to try our case immediately after the Honken trial unless it was going to be moved, so we needed to have a little bit of a -- call it a

cooling-off period in the media so that whatever publicity there was from that trial didn't impact on our trial. So we had a multi-month window of delay in there.

So it was -- you know, oddly enough, it was tried probably not as quickly as it theoretically could have been tried but probably about as quickly as a practical matter it could have been tried. And it's sort of odd to say that on a case that was going on for five years before it got tried, but that's kind of the way it worked out because of all the different issues that arose.

Q. You talked a little bit about the division of duties in this trial, in particular that Pat Berrigan was primarily in charge of the penalty phase of the case. Did you have any role in the selection of the mitigation witnesses? You were shown a chart earlier of all these potential witnesses you got subpoenas for.

A. Yeah.

Q. And some of them were used, and some weren't. Did you participate in which ones were going to be called?

A. Yes.

Q. Okay. Holly Dirksen, do you remember making -- being involved in the decision making of whether to call Holly Dirksen as a witness?

A. She was one of the sisters I believe?

Q. Yep.

A. Yeah, I think I was involved in that.

Q. Okay.

A. Yeah.

Q. And again, in the petition it faults you and co-counsel for calling Holly Dirksen because in balance in the opinion of the drafter of this petition she had more -- the evidence was worse for Angela Johnson than favorable to her. What's your response?

A. Well, first of all, I don't remember everything she said. Frankly, I don't remember much of anything that she said, so I can't really say if I agree with that, and I don't remember having that feeling at the time of trial so I . . .

Q. Well, let's do it this way, Mr. Stowers. The assertion is with Holly Dirksen, Douglas Book, and Susan Marsolek trial counsel erred in calling those witnesses because, again, on balance the theory is they -- what they had to say was -- the favorable to Miss Johnson was outweighed by what was unfavorable.

When you were going through the process of trying to determine which witnesses to call and which witnesses not to call, did you look at the balance of the plus and minuses that were known to you about those witnesses?

A. Well, yeah. I mean, that's what -- yeah, that's what you do before you call a witness is you try to figure out what they would say, what they would add, and what they might detract from whatever it is the message is that you're trying to get across

to the jury.

The only, you know, one in there that would be one that I regret is Book, Doug Book. But that's because I was sandbagged on him.

Q. In what sense do you think you were sandbagged on him?

A. Well, he came over. We participated in a meeting with him, interviewed him, asked him all sorts of questions, asked him if he had anything adverse to say, and then he declared no, no, no and then gets up there on the stand. We run through his direct. He says everything.

And then on cross he gets into new areas that he obviously had been prepped on by you and was allowed to testify to some damaging stuff on cross-exam that was essentially, you know, not revealed to us in the prep interviews I think deliberately by him to set up a situation where we'd call him so that you could get his testimony in in the manner that you did.

That's the only way I could explain how he could tell us what he said in his interview the night before he testified and what happened in trial.

Q. And you were present during that interview the night before he testified?

A. I did it with another person in the office.

Q. And you asked him if he had anything adverse to say about your client.

A. Yeah, and he denied it, and then he testified to it.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 351    Filed 11/10/11    Page 62 of 71

**1589**

Q. And do you have notes from that interview?

A. If I do, they'd be in the file. I don't have them personally. I've given all my files to the initial 2255 group for Angela Johnson.

MR. WILLIAMS: One moment, Your Honor.

THE COURT: Yes.

MR. WILLIAMS: Nothing further, Your Honor.

THE COURT: Mr. Burt?

MR. BURT: Just very briefly.

REDIRECT EXAMINATION

BY MR. BURT:

Q. Who is the other person that was present with you during the interview with Mr. Book?

A. Boy, that's testing my memory. It may very well have been Mary Goody. He came -- he came and we met him. Yeah. I think it was Mary Goody or -- gosh, Pat may have even been present when that happened.

Q. And was Miss Goody taking notes?

A. I don't know. I don't remember that.

Q. How about Pat Berrigan?

A. Don't know.

Q. Did you ever consider putting on whoever was present there to impeach Mr. Book with a prior inconsistent statement?

A. No. I don't remember how the cross went after he dumped that in our laps, but I think we might have brought it out

**1590**

during his testimony.

Q. I'm sorry. You think --

A. I think we might have brought it out during his testimony. I'm not sure, though.

Q. If you didn't bring it out, would there have been any strategic reason for failing to bring it out?

A. No, I don't think so.

Q. And you talked about the polygraph, and I neglected to ask you about this particular letter. This is from 32 -- I'm sorry, 53, Exhibit 53, and it's RS-11-000803. Do you recall sending this letter to Judge Bennett on March 17 of '05 indicating to him it was necessary for all counsel to have access to the Honken proffer and the polygraph materials and indicating we anticipate if the plea efforts are unsuccessful we will use this material at trial?

A. Yeah, I remember -- yes.

Q. And so is it fair to say that at least as of this date you were intending on using both the proffer and the polygraph materials at trial?

A. I'm not sure if that's verbiage in my letter or if that's -- I don't want to -- I think it was an issue that was being considered as to what could be done with the polygraph. But the way I remember it is not that we were planning to use the polygraph, but I think we were trying to exclude it, but I could be -- because we wanted to use the proffer and we didn't

**1591**

want to use it -- we were thinking based on our initial assessment and where we thought the evidence was going to wind up at trial that the proffer would be more favorable than the trial evidence; all right? And so we elected initially let's use the proffer under that theory.

Q. Under that theory you wouldn't be using the polygraph, though, would you?

A. No. But my p -- that's why I think the letter may -- when I say use this material at trial, I don't know that I'm referring to using the polygraph because I think there was a decision made contemporaneous with that in discussions I think with government counsel that neither party would bring up the polygraph.

And then -- and then a lot of things changed after March 17 because among other things they modified their indictment to remove the claim that she was the principal, leave her only as the aider and abettor.

And then they also went -- like I said before, they went thin on McNeese. They didn't really present the full McNeese version. And some of the adverse evidence that we sort of anticipated would come in didn't come in.

And so when we went back and looked at the proffer again once we got to our penalty-phase evidence when we took that issue back up, that's when we realized we didn't want it. I hope that helps put the sequence out there a little better.

**1592**

This letter does help a little bit on that.

Q. Okay. Thank you.

A. But we had to make the election on the proffer at a date before trial, and I think that was set by a court order. I don't remember what the date was. And this letter may be the one that was notifying the Court of that, but it was also addressing the issue of the proffer being used beyond the initial limited order allowing it to be used.

MR. BURT: That's all I have. Thank you very much.

THE WITNESS: Thanks.

THE COURT: Mr. Williams?

MR. WILLIAMS: Nothing else, Your Honor.

THE COURT: Mr. Stowers, I have a few questions for you, hopefully not that many. Was there any ever discuss -- was there any ever discussion among the defense team about the ethics of using a mere presence defense when your client wasn't admitting to you all to being present?

THE WITNESS: The ethics of it?

THE COURT: Yeah.

THE WITNESS: I think we decided it was a judgment call, and I think -- I don't think we looked at it as an ethical issue particularly. I think that it was a strategy decision on what defense out of the evidence that we would present. And, you know, did we do ethical research on it? I could check through here and everything else, but I suspect we didn't

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

**1593**

because I think it was pretty clear that we had the right to put on that defense, and the client -- the client was aware of it as well.

THE COURT: Well, and that was my follow-up question. Tell me how Miss Johnson was aware that that was the defense you were using.

THE WITNESS: We had a lot of discussions going into trial and . . .

THE COURT: Were you present at these discussions?

THE WITNESS: Yeah. When she got brought up here to the Woodbury County Jail shortly before the actual jury selection process began, we -- Pat and I -- there's notes in here of the dates, but we would have gone over to the Woodbury County Jail, and I think Al would have been there for some of the meetings. We would have met with her and discussed with her various things about the trial, what we were planning to do, what we were not planning to do.

And then the other thing that I want to make sure you're aware of, there was that proffer that Pat had put out at the beginning, the attorney proffer -- I don't know if that's an exhibit or not -- explaining what she would say which essentially corresponded with the Honken proffer. And that predated our formally presenting the so-called mere presence defense to the jury.

THE COURT: Yeah, and I didn't really frame my

**1594**

question correctly. My question was would there -- I should have asked it this way. Would there have been an ethical problem in your judgment about presenting the defense without disclosing the defense to your client?

THE WITNESS: Interesting.

THE COURT: But anyway, you don't need to answer that question because you're telling me it was disclosed to Miss Johnson.

THE WITNESS: Yeah, I'm confident that she was aware we're going with a -- you know, this is the best defense we can put out here based on the evidence even though, you know, you'd love us to do this other thing, you know.

THE COURT: And I think I just have one other question, and I wrote it out, so I don't normally write out questions. Matter of fact, I don't think I ever have.

If Al Willett had never been appointed and you and Pat Berrigan were the only two lawyers that represented Angela Johnson in this case, do you have any reason to believe, based on everything you know now as you sit there, that the outcome of the guilt phase would have been any different?

THE WITNESS: No, I mean. I don't know how to answer that. I think my issue there would be different than -- I think it goes back to Pat's point. We shouldn't have been in trial. That's all. So I guess there wouldn't have been a guilt phase.

THE COURT: Okay. But had you gone to trial --

**1595**

THE WITNESS: Right.

THE COURT: -- you know, if we take Al Willett completely out of the equation and you and Pat Berrigan were representing Angela Johnson, based on everything you know, do you think the outcome of the guilt phase would have been any different? And what that suggests is you get a do-over. You know, based on everything you know now, had you gotten a do-over with just you and Mr. Berrigan, would the outcome of the guilt phase have been different?

THE WITNESS: You know, part of the problem with answering your question is I don't know that I know enough.

THE COURT: Well, you sat through the trial.

THE WITNESS: Yeah.

THE COURT: And you were counsel of record but . . .

THE WITNESS: No, I know. I mean, it's sort of weird to say that but -- and it's part of this division of labor problem that manifested itself that we've talked about here for two days. But, you know, it's hard to say what -- what was missed or not missed when I wasn't reviewing individual witness files.

THE COURT: No, I understand that. I'm saying based on everything you know now.

THE WITNESS: Yeah.

THE COURT: I'm not saying about the potential universe of things you might have discovered had things been

**1596**

different. I'm just saying -- because that is too speculative. I'm saying based on everything you know now would the outcome have been different on the guilt phase?

THE WITNESS: I really have to think it wouldn't have been just because of the -- primarily because of the maps and McNeese and the Christi Gaubatz element. You know, I just think it was going to be a really, really high bar to get over. I just don't -- I don't know that the jury would have said not guilty just because she would have had two different lawyers. You know, I think the issue is all those little artistic twists that different lawyers put on a case, and that's a little hard to measure I know.

THE COURT: I don't have any additional questions.

FURTHER REDIRECT EXAMINATION

BY MR. BURT:

Q. I just want to make sure I understand your answer to the Court's question. Are you answering that question based on what you investigated and knew at the trial back in 2005? In other words, are you assuming in answering that question that the only available evidence was what was presented as a result of your defense team's investigation?

A. Yeah.

Q. You're not speculating based on something that could have been presented that you're not aware of.

A. No, and part of the -- I also didn't review the witness

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

files of Al Willett unless I took them over and did them to go back and do sort of a hindsight on them, you know what I mean, a look back to see what might have been missed.

So I can't -- I could say based on, you know, what I knew of the case, what I knew of the witness files, et cetera, I don't think it would have necessarily made a difference as much as I think of my own abilities that she would have been acquitted in phase, you know, number one of the trial. That's all. And that would be my best judgment based on the things I've said.

Q. And do you have knowledge today as you sit there of everything that was in those witness files? In other words, do you know impeachment material that was available to you that could have been used, and are you weighing that in to your answer to the Court's question?

A. I'm only weighing what I can know and recall today so . . .

Q. Okay.

A. And I don't -- you know, like I said, I wasn't there on those witness files that were not my witnesses to examine them in great detail to determine how best to examine those witnesses, how they might be able to be examined, what alternative evidence might have been available to contradict them through defense evidence and that sort of thing. I was looking at my witnesses. I was working trying to get ready for the death penalty and that sort of thing.

Q. And you've never sat down after the trial and done a comprehensive analysis of everything that was in hand during the trial.

A. Oh, no, I haven't done -- no.

Q. Or anything that could have been in hand through a comprehensive investigation.

A. No, I don't -- I mean, I can't -- no, I don't know.

Q. So in answering the Court's question, you're not giving any opinion about what the outcome would have been based on evidence that you have not seen.

A. Based on what I knew going into trial, I guess the best I can say is I thought we were going to lose the first phase of the trial; okay? I don't -- you know, if Al Willett had performed as a perfect lawyer, I don't think on the first phase of the trial, you know, he would have been able to get her over the bar to an acquittal if he would have been perfect, you know, in most respects.

The problem, you know, in part is, you know, how do you know that. I don't know that, but, I mean, it was my judgment.

And then part of the problem, though, that I saw is that first phase, you know, that evidence was used later too by the jury in deciding penalty, so there's an impact that goes beyond just that first part of the trial including residual, you know, doubt issues and what not like you've pointed out earlier.

But I'm just not really comfortable giving a -- like a -- sort of an expert opinion about the totality of the evidence that you folks may or may not have developed or what you may have detected by looking back into the files more closely than maybe I did at the time or identifying things. You know, I don't know that I can really say because I haven't sort of had the pile of everything at my disposal for years to be able to do that analysis and give a full-blown I guess expert opinion as to what would have happened. I'm basing it on what perceptions were at the time, and I think it would have been a very, very tough case to win in the first phase. And I just think as bad as Al was I don't know that it would have changed the result on the first phase of the trial.

Q. Do you have a different opinion about the second phase?

A. Well, second phase we didn't have any evidence.

The third phase, you know, I think the problem is that on the third phase I'm going to -- I'm going to take the same position on because I don't know what wasn't presented. I just know how it was presented and what I observed as to those witnesses that Al was working with, and I know we sure could have used more help in the penalty phase getting ready for that, interviewing witnesses, identifying witnesses, evaluating who to call and that sort of thing.

And it was more than enough work for two lawyers. It probably would have been more than plenty for three to be

involved in that with all effort, even with Mary Goody there who's great and everybody else.

It just was -- boy, it was a mountain of work, and I don't -- you know, it was almost -- it was almost overwhelming to the point where, you know, between Pat and myself and even the people that were helping it was just -- it was a mountain of work.

And, you know, we worked -- we worked hard, and we put our all into it as far as we could physically and using our, you know, brains as best we could and trying to make the best judgments. But it was a very, very -- a huge task in the penalty phase especially making a lot of decisions, you know, as you go along. It just -- under that kind of -- I don't know how lawyers do these kind of cases to be honest with you. I mean, it's pretty dang tough. I mean, that's a lot of pressure, and there's a lot of stress. You get tired, and the more help you can get and the more opinions it just helps to keep your mind oriented I guess.

It just was -- it was tough, I'll tell you, to just deal with the just needing to prepare to get to court every day in the evenings, and, you know, it was a very, very rigorous process that we went through, particularly in the -- you know, in the latter phases of the trial. It was pretty -- it was pretty intense.

MR. BURT: Thank you very much. Thanks. That's all I

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 65 of 71

have.

THE COURT: Mr. Williams?

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Actually now that you've gone on I do have a few more questions, so was there any discussion about the length of the trial affecting how many penalty-phase witnesses you would call and any discussion about does the value of calling cumulative penalty-phase witnesses -- you know, the jury had been here a very long time. And I'm just curious if there was any discussion about that in respect to the number of penalty-phase witnesses that you called.

THE WITNESS: I think the length of trial wasn't so much the issue as was I think the jury, you know, would have maybe not been happy. That's overstating it. But they would have sat here through additional evidence on new topic matters and that sort of thing.

But if you get into -- I think that jury, particularly by the time of the end of Cunningham's testimony which admittedly was lengthy, you know, I think the jury was tired, but that wasn't the reason we didn't -- you know, we wouldn't have called witnesses. We would have -- you know, we would have called them and made them sit there just because that's their job and we got our job and everybody's, you know, here and they're adults, and they would have done it, and I'm sure they would have been fine.

THE COURT: Yeah. But if the evidence was just largely cumulative and similar to what they've heard, I was just wondering if you thought about what effect that might have on the jury. That's all.

THE WITNESS: I think we were mindful of the fact that there were -- there were -- the trial was very long. As I remember it, we had a week of mitigation evidence. I think it was a full week if I'm not mistaken. And it ended perhaps on a Friday. I'm not sure about that.

But I think it was just the situation we didn't want to present cumulative evidence, so if the witnesses were going to say things that we felt another witness had effectively testified to, then we didn't put a cumulative witness on with obvious exceptions. You know, there were -- yeah, that was the main consideration.

THE COURT: Do you have any sense that if -- well, let me ask you this. How good of a witness did you think Marvea Honken Johnson was in the penalty phase?

THE WITNESS: I thought she was great. I thought she was, you know, an excellent witness, and I thought she was very -- well, she was very well received I thought. You know, the jurors would have to answer how they felt about it, but that presentation I thought went very well, particularly the playing of the -- of the phone conversation that was recorded when she was talking to her mother at the jail and I think playing the

piano and things. I felt that that testimony was very emotional.

But then it all got lost when we wound up with a break, unfortunately. I think a lot of it was just the air was let out of the balloon, if you will, during that time period, and I think that was -- that was a problem because I thought we built up a lot of steam, if you will, in the mitigation, and then we lost that week in there and then came back and argued it, and it was all -- you know, all the emotion was gone if you will.

And that's, you know, a lot of what we try to do as lawyers is we always talk about the law and the facts, but emotion plays a big part in decision making on juries. And I think -- I think we may have lost a lot of traction with the break.

Thought about that a lot. I always hate to do those things where you have a break before you submit to the jury because you tend to kind of lose some of the steam, if you will, out of the case, a little bit of the, you know, emotion of it.

THE COURT: Mr. Stowers, did you ever ask Al Willett to help in the penalty phase?

THE WITNESS: We actually had elected in light of his absence to not have him help and --

THE COURT: Was that due in part to the Al Willett factor?

THE WITNESS: Yeah, it -- yeah, and really he didn't want to help.

THE COURT: But you never asked him specifically to take this witness or do this or see if he would do any --

THE WITNESS: No.

THE COURT: -- task in the penalty phase.

THE WITNESS: He never -- he never refused anything that we presented to him. It was a question of the way everything had gone and the fact that he was not involved at all in any of those witness interviews over in Mason City or anywhere else, that by that time to throw him in the middle of that with everything else that had gone on was not -- it was going to be more of a distraction than anything unfortunately.

THE COURT: And I have one last area, and it's beyond the scope of the petition, but I've been dying to ask this question, so I'm going to ask it.

I know it would have been a very high-risk strategy, and almost everybody urges against it. I just want to know if you ever considered pleading guilty to the guilt phase and trying to limit the scope of the evidence in the penalty phase and just -- you know, that's it, pleading guilty to the guilt phase and just trying the penalty phase to the jury.

THE WITNESS: Maybe you're reading people's minds, but that actually was considered. There was a proposal with the government on that topic I believe during jury selection, and we

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

**1605**

didn't wind up going that route because --

THE COURT: I don't want to know why.

THE WITNESS: Yeah.

THE COURT: I just want to know if it was considered.

THE WITNESS: Oh, yeah, it was considered.

THE COURT: Yeah. That's all. That's all I wanted to know.

THE WITNESS: Oh, yeah.

THE COURT: And I'm not -- by asking that, I'm not being critical of you not doing it. I just want to know if it was considered.

THE WITNESS: No, it was considered seriously.

THE COURT: Yeah. And if the lawyers want to ask follow-up questions on it, they can. Any follow-up questions?

MR. BURT: Not on that topic. I think Mr. Berrigan's going to address that actually.

THE COURT: Okay. On any other topic that I asked?

MR. BURT: No, Your Honor.

THE COURT: Okay. Thank you.

Mr. Williams?

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Okay. Mr. Stowers, I know you've always taken incredibly seriously your obligations as an officer of the Court, and I greatly appreciate that. I know this wasn't an easy couple days for you but . . .

**1606**

THE WITNESS: No, I appreciate that.

THE COURT: Thank you.

THE WITNESS: Thank you.

THE COURT: Okay. You're free to go. Those words must sound pretty good.

THE WITNESS: Free, free at last.

THE COURT: You know, a day late, but they must sound pretty good.

What would the lawyers like to do? You want to keep going, or you want to call it a day?

MR. BURT: Judge, we have one brief witness who is --

THE COURT: Not short but brief.

MR. BURT: Brief.

MS. MORRISSEY: This one is brief.

THE COURT: Okay.

MS. MORRISSEY: We've sent the rest of them home.

THE COURT: Okay.

MS. MORRISSEY: Because we thought the Court wanted to end early.

THE COURT: Well, not really. I'm willing to go till six if you want to but . . .

MS. MORRISSEY: I think we can make other arrangements.

THE COURT: Okay. Yeah.

MS. MORRISSEY: We'll -- we can finish everything.

**1607**

THE COURT: Why don't we take the brief witness. Who would that be?

MS. MORRISSEY: That would be Mr. Hovda, H-o-v-d-a. His first name is Ted, probably Theodore.

THE COURT: Good evening. Would you raise your right hand, please.

THEODORE HOVDA, PETITIONER'S WITNESS, SWORN

THE COURT: Okay. Please be seated. And would you tell us your full name, please, and spell your last name for us.

THE WITNESS: My name is Theodore James Hovda. My last name is spelled H-o-v-d-a.

THE COURT: Thank you.

Miss Morrissey?

MS. MORRISSEY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Mr. Hovda, I apologize for the wait. You've been very patient.

MS. MORRISSEY: Your Honor, this testimony's relevant to claim A.3 of the petition.

THE COURT: Thank you.

MS. MORRISSEY: Thank you.

BY MS. MORRISSEY:

Q. Mr. Hovda, can you tell us what your occupation is?

A. I'm an attorney.

**1608**

Q. And are you in private practice now?

A. Yes, I am.

Q. Where is your office?

A. In Garner, Iowa.

Q. And is that near the town of Britt?

A. About ten miles away.

Q. Okay. Before you were in private practice, did you hold a different position as an attorney?

A. Yes, I was first assistant county attorney, and then I was county attorney in Hancock County.

Q. All right. And were you an assistant county attorney from 1977 to 1979?

A. That's correct.

Q. And then in 1979 did you become the elected prosecutor of Hancock County, Iowa?

A. Yes, I did.

Q. And you retired from that place in 1998?

A. I didn't seek re-election in the fall of 1998.

Q. All right. Is Britt, Iowa, within Hancock County?

A. It is.

Q. And in connection with your position as county prosecutor, did you have any connection with Dustin Honken?

A. Yes.

Q. Could you explain how you first came to know Dustin Honken?

A. First time I met Dustin was when he was charged with a

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

crime in Hancock County of possession of stolen property. It was a vehicle that was stolen in a different county, brought to Hancock County, destroyed and secreted the evidence.

Q. How did -- was the evidence secreted?

A. They cut off the front part of the clip of the car. It was I believe a Camaro. This is probably in '83 or '84. I don't know what year the car was. But they stored that in a building that his father owned, and they took the rest of the car, and they dumped it into a sand pit.

Q. Okay. They buried it, actually buried the car?

A. Well, it was a sand pit. It had water in it. So they immersed it in water I guess in the sand pit to hide it.

Q. And was there anybody who was with Mr. Honken in this venture with the stolen Camaro?

A. Timothy Cutkomp was one of the co-conspirators, and it runs in my mind that there was another one, but I've tried to think about it for the last couple days, and I didn't come up with the third name.

Q. Was Mr. Honken prosecuted for the theft of the Camaro?

A. He was.

Q. And how old was he at the time of this prosecution?

A. I think he just turned 18.

Q. How did that case end?

A. He pled guilty and was given a deferred judgment, put on probation.

Q. Which means he ended up not having a felony conviction?

A. That's correct.

Q. And did you have any additional contact with Mr. Honken as a prosecutor?

A. He was a suspect in a bank robbery case that took place in 1986.

Q. And was -- could you describe a little bit the facts of that bank robbery?

A. There was a branch bank in Britt, Iowa, that Mr. Honken's mother was a -- an employee at the bank. And the person that opened the bank the morning of I believe it was June 1 of '86 was surprised to find somebody already present in the bank, and the person had a mask on. There was no sign of forced entry, and we always suspected, although I don't think we ever got to the point of proving with enough evidence to charge him, that Mr. Honken had supplied the key off his mother's key ring to his father who was the actual bank robber.

Q. Do you recall, sir, whether the bank robber who hid in the bank and wore a mask had a gun?

A. Yes, he did.

Q. So that was, I take it, a case where you were never able to successfully -- or build a case enough to file a charge.

A. Right. We never -- we never came to the point of filing a charge. Dustin Honken's father was later apprehended and convicted of a bank robbery and sentenced to federal prison.

Q. Now, during the course of the invest -- the first case obviously you had contact with him; correct?

A. With Dustin directly?

Q. Yes.

A. Yes.

Q. Okay. And during the second case, did you have any direct contact with him, or did you just supervise the investigation?

A. Just reviewed officers' reports and . . .

Q. Based on your contacts with Dustin in your official capacity as prosecutor for Hancock County, could you describe for the Court kind of salient features of his personality.

A. I believed him to be a very untrustworthy individual. He was -- couldn't -- had a hard time telling the truth. He was I guess very devious would be a good word to describe him, and it appeared to me that -- you know, that he was hip deep in the bank robbery, although we were never able to establish that beyond a reasonable doubt.

Q. What about his use or involvement of others in crimes? Do you have anything -- did you notice anything about him in that respect?

A. Well, yeah. I mean, he used the others to secrete the evidence. It was a multiple-party transaction. They actually stole the car from a rural route location, and they took it to the place where they cut it up, and they secreted it together.

Q. So he doesn't work alone. Would that be fair to say?

A. I think that would be a fair statement.

Q. Sir, did anyone come to talk to you about Mr. Honken in 2000, 2005, in particular any members of Miss Johnson's trial defense team?

A. No.

Q. If somebody had contacted you, would you have answered questions posed to you by the trial team the same way you've answered those for us today?

A. Certainly.

MS. MORRISSEY: All right. Thank you very much. I have nothing further.

THE COURT: Mr. Williams?

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Good afternoon, sir. You had personal, actual physical contact with Dustin Honken in relation only to the first case. Isn't that what I understood?

A. That's correct.

Q. Okay. And while he was interviewed and you maybe reviewed some interview reports with regard to the bank robbery, you never actually talked to him on the second occasion?

A. Also correct.

Q. Okay. On the first case, how many times did you actually have one-on-one contact with Mr. Honken?

A. At least three.

Q. And on those occasions, that was in court?

A. Two in court, one out.

Q. And what was the other occasion outside of court you would have had contact?

A. At the time of arrest or a -- no, not at the time of arrest. I saw him somewhere before he was charged.

Q. And did you like interview him or --

A. No, no, I didn't participate in the interviews.

Q. Okay. So you just saw him from afar.

A. I may have been in the vicinity of where he was being interviewed, but I don't recall that for sure.

Q. All right. And otherwise you had a couple occasions to see him in court.

A. Correct.

Q. All right.

A. Including the plea and sentencing.

Q. You never charged Dustin Honken with assault?

A. No.

Q. Never charged him with battery?

A. No.

Q. Never charged him with rape?

A. No.

Q. Never charged him with attempted murder?

A. No.

Q. Never charged him with murder?

A. No.

Q. Never charged him with -- that's my list.

MR. WILLIAMS: I have no further questions for you. Thank you.

THE COURT: Miss Morrissey, anything further?

REDIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Mr. Hovda, do you consider robbery of a bank with a firearm to be a violent crime?

A. Certainly. It's a forcible felony.

MS. MORRISSEY: Thank you. I have nothing further.

RECROSS-EXAMINATION

BY MR. WILLIAMS:

Q. In all the evidence you reviewed in connection with that bank robbery, sir, did you ever have any evidence that suggested that Dustin Honken was the person inside the bank with the gun?

A. The evidence was clearly to the contrary. He was not the person inside the bank with the gun.

MR. WILLIAMS: Nothing else, Your Honor.

THE COURT: Miss Morrissey, anything further?

FURTHER REDIRECT EXAMINATION

BY MS. MORRISSEY:

Q. You don't know who planned that particular bank robbery; would that be correct to say?

A. If you're asking if I know, I don't know.

Q. Don't know.

A. Do you want my sus --

Q. Do you suspect who might have planned it?

A. Well, certainly, yes.

Q. Who?

A. Dustin Honken and his father.

MS. MORRISSEY: Thank you. Nothing further.

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Thank you, Mr. Hovda. Safe travels back home.

THE WITNESS: Thank you, Your Honor.

THE COURT: Thank you.

MR. BURT: That would be it for today, Your Honor.

THE COURT: Well, not exactly. I've got some questions for you.

MR. BURT: Okay.

THE COURT: I want to take up for ex -- I know maybe you don't think it's the time to argue, and I'm going to give you all the time you want to argue, but here's kind of -- and it's a chance for you to reframe my thinking.

MR. BURT: Sure.

THE COURT: That's why I'm disclosing because I think that's helpful to lawyers.

MR. BURT: It's very helpful.

THE COURT: I listened to this witness's testimony, and here's my reaction. The jury knew that Dustin Honken killed five people including two kids and was given the death penalty for it. Do you really think that this witness saying he was devious adds anything to the mix?

MR. BURT: Well, it adds two things to the mix. Number one, as the Court said in your ruling on the Vest admissibility issue, the crucial issue in the penalty phase was the relative culpability roles of Honken and Miss Johnson, and we know that the government's first penalty-phase witness was Mr. Vest. We know that Mr. Vest put, through the words of Mr. Honken, the weight of the case on Miss Johnson.

So the fact that a prosecutor would have told them that he is devious I think would have added at least on the issue of lingering doubt and this --

THE COURT: Wait a minute. He somehow kidnaps Lori Duncan, Amber and Kandi Duncan, Nicholson, gets Nicholson to make a videotape, and there's a question he's devious?

MR. BURT: Well, the government is offering his testimony -- or his hearsay statements on the theory that they are reliable hearsay for their truth.

Now, apparently the government didn't see any inconsistency in convicting and getting a sentence of death against Mr. Honken and then turning around and trying to tell the Johnson jury that this is a statement you ought to rely on.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 351   Filed 11/10/11   Page 69 of 71

## 1617

And the Court itself in your ruling said despite full knowledge of Mr. Honken, having sat through a trial with Mr. Honken -- and I wouldn't suspect the Court's any pushover on credibility issues -- you found that there was enough reliability in that statement to allow it to go to the jury.

So what would the jury may have bought that same argument, any evidence which would have tended to show that on the issue of deviousness, dishonesty, that this statement should not have been believed should've been put in front of the jury. Otherwise how are they going to evaluate this hearsay that the Court is allowing?

THE COURT: Yeah, but this is so attenuated in time and circumstance and . . .

MR. BURT: Well, that's the second aspect that I was going to get to which is it's not attenuated from the perspective of the government's theory which was that poor Dustin Honken, Opie Taylor, had been led astray by the evil woman Angela Johnson. And so any criminal activity, deviousness, bank robberies that preceded his relationship with Miss Johnson are, in fact, not remote and in some --

THE COURT: Yeah, well let me ask you about that because now I can't separate the two trials. I remember testimony in rebuttal, surrebuttal about bank robbery --

MR. BURT: Yes.

THE COURT: -- about Dustin Honken's involvement in a

## 1618

bank robbery and maybe threatening the co-conspirators. Was that in his case but not in her case?

MR. BURT: Exactly.

THE COURT: Okay.

MR. BURT: And we're not going to put those witnesses on because we -- I think the Court has granted our motion for judicial notice.

THE COURT: Right.

MR. BURT: So our argument is that since those witnesses had just testified in Honken they should have been put on in our case.

THE COURT: I see.

MR. BURT: This is a witness that didn't testify, but he could have lent credibility to those witnesses.

THE COURT: Because he's in law enforcement.

MR. BURT: He's a prosecutor.

THE COURT: Yeah, right. Okay. Now I'm connecting.

MR. BURT: So --

THE COURT: I'm glad I raised this. Now I see it because my recollection, I just knew there was bank robbery testimony but couldn't for the life of me remember which trial. It would make sense that it would have been in his trial, but it would also make sense maybe that the lawyers should have tried to introduce that in this case. Yeah. Okay. This has been very helpful.

## 1619

MR. BURT: That's why we're here.

THE COURT: Great.

MR. BURT: To be helpful.

THE COURT: Well, you're not here to be helpful. You're here to win your case for your client.

MR. BURT: True.

THE COURT: But to the extent that you can be helpful too, that's not a bad thing.

I have another question for you. Do you think by Tuesday at 2:30 when we break -- or maybe we'll break earlier -- will there be any issues that will have been fully developed factually that I could then impose on you all the burden of starting to brief some of the issues and maybe, you know -- and -- yeah, so that's my question. Are there any issues that are going to be -- that are discrete that will be done -- that you'll be done with by Tuesday?

MR. BURT: Because -- I was going to say that I think the plea issue would be in by Tuesday, but we won't have heard from the prosecutors unfortunately, so that issue I think will not be complete. Could I think about that and report back to the Court in the morning?

THE COURT: Yeah, and what I was going to say -- no, no, no. You've got enough to do. You can think about it -- put it off till Sunday.

MR. BURT: Okay.

## 1620

THE COURT: Okay?

MR. BURT: Sure.

THE COURT: And then you can let me know. It's not critical that you let me know, but it would be helpful to me in terms of how I organize my time on this case --

MR. BURT: Yes.

THE COURT: -- if I knew that. Even whether you brief it or not, you know, I'm not -- I don't wait for the briefing. I -- you know, I'm getting started because I've got a huge, huge, huge amount of work.

And in that regard I just want you to know if you don't think I'm taking this case seriously, I have taken more personal notes than I have in my entire 17 years as a United States District Court judge, more notes than I took in law school, more notes than I took when I was simultaneously in graduate school. I'm not a big note taker. I'm on page 40.

MR. BURT: And I've observed the Court studiously watching and listening to the witnesses, and we greatly appreciate the Court's attention.

THE COURT: Well, this is a matter of life and death, so if you don't take this seriously, what do you take seriously; right?

MR. BURT: Yes.

THE COURT: Okay. And I'm just -- I expect Mr. Williams to be super well prepared because I have a long

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

1621

history with him. I'm just kind of in awe of your team and how you've been able to put this together in what has been the worst time constraints imaginable, and I understand that. But I'm just in awe. Yeah, I'm just in awe of it so . . .

MR. BURT: Thank you.

THE COURT: Okay. What time do you want to start tomorrow? I'm here early on -- Saturdays is my especially early arrival day, so I don't mind starting --

MR. BURT: Seven is fine.

THE COURT: Seven is fine? Great. Is that okay, Mr. Williams?

MR. WILLIAMS: Of course, Your Honor.

THE COURT: Okay. We'll see you at seven, and the plan is we're probably going to go till -- just so I can let people know that work --

MR. BURT: We have I think two lay witnesses. We have Mr. Stetler, and we have one of the investigators, and I think that will take us into the afternoon, probably mid afternoon I would think.

THE COURT: Won't it take us longer? Won't your expert take us all day?

MR. BURT: No, I think the expert's going to be focused on the plea issue. We have two Strickland experts. We may actually not call the second one, but this expert's going to be focused strictly on the plea issue.

1622

THE COURT: Oh, okay.

MR. BURT: So it's not going to be as broad as a full Strickland expert's going to take, at least not this particular witness. And then we're going to assess whether we're going to need that second expert. So we think that the plea issue's important, and we think he has something to say to the Court that would be helpful.

THE COURT: Okay. Great.

MR. BURT: Thank you.

THE COURT: Anything else?

MR. BURT: No.

MS. MORRISSEY: No, Your Honor.

THE COURT: Okay. We'll see you tomorrow at seven. Thank you.

(The foregoing hearing was adjourned at 5:37 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

  S/Shelly Semmler          4-1-11

  Shelly Semmler, RMR, CRR          Date

1623

INDEX

| WITNESS: | | PAGE: |
|---|---|---|
| DEAN STOWERS | | |
| | MR. BURT | 1346 |
| | MR. WILLIAMS | 1528 |
| | MR. BURT | 1589 |
| | MR. BURT | 1596 |
| THEODORE HOVDA | | |
| | MS. MORRISSEY | 1607 |
| | MR. WILLIAMS | 1612 |
| | MS. MORRISSEY | 1614 |
| | MR. WILLIAMS | 1614 |
| | MS. MORRISSEY | 1614 |

*****

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*