IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

ANGELA JANE JOHNSON,                    No. C09-3064

            Petitioner,

      vs.                               TRANSCRIPT OF
                                        2255 EVIDENTIARY
UNITED STATES OF AMERICA,               HEARING

            Respondent.
_____/              Volume 6


      The Hearing held before the Honorable Mark W. Bennett,
Judge of the United States District Court for the Northern
District of Iowa, at the Federal Courthouse, 320 Sixth Street,
Sioux City, Iowa, March 12, 2011, commencing at 7 a.m.

APPEARANCES:

For the Petitioner:    MARCIA A. MORRISSEY, ESQ.
                       2115 Main Street
                       Santa Monica, CA 90405-2215

                       MICHAEL BURT, ESQ.
                       Law Office of Michael Burt
                       Suite 329-E
                         600 Townsend Street
                       San Francisco, CA 94103

                       NANCY S. PEMBERTON, ESQ.
                       Pemberton & Associates
                       Suite 329E
                         600 Townsend Street
                       San Francisco, CA 94103

For the Respondent:    C.J. WILLIAMS, ESQ.
                       Assistant United States Attorney
                       Hach Building - Suite 400
                       401 First Street Southeast
                       Cedar Rapids, IA 52401-1825

Also present:          John Graham

Reported by:           Shelly Semmler, RMR, CRR
                       320 Sixth Street
                       Sioux City, IA 51101
                       (712) 233-3846

THE COURT: Thank you. Good morning. Please be seated.

You know, I neglected to tell everybody yesterday that we could have been very casual today so -- but it's a little late now, and I was at home, and I left my iPad, and I didn't have everybody's e-mail address, and I was working on a Title 3 search warrant that got laid on me late yesterday that I'm going to do at noon today, and I just didn't let you know.

But if you want to -- if the guys want to take off your ties and jackets, I'm not sure how that transfers to the women, and I want to be equal here so I don't get accused of sex discrimination. But you're more than welcome to be casual.

MS. MORRISSEY: Thank you, Your Honor.

THE COURT: And if you want to go across the street and get coffee from the coffee shop on a break and bring that in, that's certainly fine.

Okay. Who are we starting with today?

MS. MORRISSEY: Your Honor, with Brooke Jacobson. If I can just step out, Your Honor.

THE COURT: Sure.

MS. MORRISSEY: I apologize, Your Honor. They're on their way. She's on her way.

THE COURT: Now, on her way.

MS. MORRISSEY: Yes.

THE COURT: And I don't -- you know, could be on their

way from Chicago or on their way from --

MS. MORRISSEY: On her way from the ladies' room.

THE COURT: Okay. So in the building and on the way. That's good news.

MS. MORRISSEY: Yes, in the building.

THE COURT: If you'd just come forward, I'll swear you in. Good morning. Would you raise your right hand, please.

BROOKE JACOBSON, PETITIONER'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box there. And you can adjust the chair and the microphones so you can speak directly into them. And tell us your full name, please, and spell your last name for us.

THE WITNESS: Brooke Jean Jacobson, J-a-c-o-b-s-o-n.

THE COURT: Thank you.

DIRECT EXAMINATION

BY MS. MORRISSEY:

Q.   Good morning, Mrs. Jacobson.

A.   Good morning.

Q.   How old are you?

A.   Twenty-eight.

Q.   And where are you living now?

A.   Irvine, California.

Q.   Are you working?

A.   Yes.

Q.   What do you do for a living?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

A. Personal trainer.

Q. Are you related to Angela Johnson?

A. Yes, she's my aunt.

Q. And is -- you mean your mother is her sister?

A. Yes.

Q. What's your mother's name?

A. Wendy Jean Jacobson.

Q. Where did you grow up, Miss Jacobson?

A. I grew up in Wisconsin.

Q. Where in Wisconsin?

A. Fond du Lac.

Q. And did you go to school there?

A. I did.

Q. Would you have a routine about leaving Fond du Lac during the summer when you were growing up?

A. Yes.

Q. Could you explain what that was.

A. Every summer I spent -- I went down to my aunt's in Iowa, whole summer.

Q. And when typically would you leave to come down to -- well, by your aunt, do you mean your aunt --

A. Angie.

Q. -- Angie? All right. And where was Angie living in Iowa?

A. She lived in Clear Lake, Iowa, Clear Lake, Iowa.

Q. So typically when would you leave to come down to visit

your aunt Angela?

A. I would come down after my birthday in June, so typically the first week of July.

Q. When is your birthday?

A. June 23.

Q. So you'd spend your birthday up in Fond du Lac, and then you'd come down here after that; correct?

A. Yes.

Q. And how long would you typically stay in Clear Lake?

A. Till after Alyssa's birthday August 7. Usually school would start the end of August, so I would typically stay the most part of August as well.

Q. And Alyssa is your aunt Angela's child?

A. Yes.

Q. Okay. How old are you in relation to Alyssa? Who's older?

A. I'm older by a year and a few months.

Q. And you said that Alyssa's birthday was August 7?

A. Yes.

Q. So typically you would be in Clear Lake for Alyssa's birthday and then return after that.

A. Yes.

Q. And did you do that every summer?

A. Every summer.

Q. That you can remember?

A. Yes.

Q. And I put on the machine some pictures that we've looked at. This is Plaintiff's Exhibit 59. Do you recognize these pictures? Let me go to the bottom first.

A. Yes.

Q. What is this a picture of?

A. Alyssa's birthday. Looks like that -- it looks like it was her sixth birthday.

Q. Okay. Can you see yourself in that picture?

A. Yes.

Q. Would you point it out?

A. Right here. Can you see me when I do that?

Q. I see. That's -- okay. The blond child.

A. Oh, yes, that's me.

Q. And can you see Alyssa?

A. Yeah, she's right next to me.

Q. Could you just point to her?

A. Oh, yeah.

Q. That's Alyssa, okay. Now, this photo here, is that the same day?

A. Yes.

Q. Okay. And do you see your aunt Angela in there?

A. Yes.

Q. Are you still in there?

A. Yes.

Q. Is that you with the blond hair?

A. Yep.

Q. And Alyssa's with the cake.

A. Yep.

Q. All right. I'm going to show you Plaintiff's Exhibit 60. Whoa.

THE COURT: Do you know how to remove the markings?

MS. MORRISSEY: Clear I expect it would be; right?

THE COURT: Yeah. Well, it's actually on the monitor, so I guess you don't.

MS. MORRISSEY: I guess I don't. On the top?

THE COURT: No.

MS. MORRISSEY: No?

THE COURT: Mr. Williams?

MR. WILLIAMS: I don't think this monitor's on, Your Honor.

MS. MORRISSEY: Okay. Thank you.

THE COURT: Thank you.

BY MS. MORRISSEY:

Q. All right. Do you recognize these photos in Exhibit 60?

A. Yes.

Q. And who is that? Who are those two young ladies?

A. Alyssa and me.

Q. Are you facing your back to the camera?

A. Yes.

Q. All right. Do you -- and then on the bottom part of the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 352 Filed 11/10/11 Page 2 of 72

picture, who's in that?

A. Marvea, me, and Alyssa and her bird.

Q. Now, based on Marvea's age, apparent age, do you know about how old you were at the time this picture was taken?

A. I'm sorry. How old I was?

Q. Yeah. If Marvea was born in 1994 in February.

A. So it was -- I would have been 12 then.

THE COURT: What number exhibit was that?

MS. MORRISSEY: This was 60, Your Honor.

THE COURT: Thank you.

BY MS. MORRISSEY:

Q. All right. Now, I'm going to ask you about a particular year, Miss Jacobson, 1993. Have you looked at something to help you remember what you did that summer?

A. Yes.

Q. And what did you look at?

A. Videos.

MS. MORRISSEY: Your Honor, I have Plaintiff's Exhibit 62 which is a video of Miss Jacobson's birthday in Fond du Lac.

Q. Correct?

A. Yes.

Q. And a 4th of July parade in Clear Lake held on July 5, 1993.

A. Yes.

Q. And did you also look at Plaintiff's 63 which is a video of

Alyssa's birthday in 1993?

A. Yes.

Q. Okay. So where did you celebrate your birthday in 1993?

A. Fondy Sports Complex in Fond du Lac, Wisconsin.

Q. All right. And then did you travel down here and go to a 4th of July parade on the 5th of July, 1993?

A. Yes.

Q. And how do you know it was 1993?

A. The videotape records the date on the videos.

Q. Okay. And then on Exhibit 63, it was Alyssa's birthday in 1993?

A. Yes.

Q. So that would be August 7, 1993?

A. Yes.

Q. And could you tell from looking at the video where Alyssa's -- where physically you were on Alyssa's birthday?

A. Yes.

Q. Where were you?

A. Some park, outdoor venue.

Q. Okay. And was that in Clear Lake?

A. Yes.

Q. All right. When you came to stay at your aunt Angela's, where did you and -- where did you sleep typically?

A. On the couch in the living room.

Q. And did you sleep there alone or with somebody?

A. With Alyssa.

Q. Okay. Did Alyssa have a room in the house?

A. Yes.

Q. And why didn't you sleep in Alyssa's room?

A. There was no TV in there.

Q. Okay. And when you -- the living room, the couch in the living room, was there a TV in the living room?

A. Yes.

Q. Now, was there also a place to sleep in the basement?

A. Yes.

Q. Okay. Would you tend -- would you sleep in the basement? Was that your favorite place to sleep?

A. Not typically.

Q. Why not?

A. There was no TV down there.

Q. Okay. Do you remember -- in 1993 when you visited here from July to just after August 7, do you remember ever having a baby-sitter?

A. No.

Q. I'm going to show you an exhibit marked 64 and see if you recognize those photos.

A. Yes.

Q. Who are those sleeping beauties?

A. Alyssa and I.

Q. And I'm going to turn this over and flip it over, see if

you recognize if there's a date -- yeah, there it's coming into -- see if you can see if there's a date on the back of that.

A. Yeah, it reads April 1994.

Q. Based on the date on the back of it and the way you and Alyssa appear in terms of agewise, do you -- can you tell us whether or not this was a picture taken in 1993 when you were visiting during July and August of that year.

A. Yeah, this was in '93.

Q. Okay. Do you know somebody, Miss Jacobson, named Christi Gaubatz, Christi Cole?

A. Like what do you mean do I know her?

Q. Are you familiar with the name?

A. I'm familiar with the name.

Q. Okay. And do you know the person that I'm talking about when I say that or --

A. Yes.

Q. Can you envision a person?

A. Yeah.

Q. Okay. And do you remember that person babysitting for you in 1993?

A. No.

Q. Do you remember a night when you went to sleep in 1993 with Brooke, would have to be in the basement, when Christi Gaubatz was babysitting you and was on the couch upstairs?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 3 of 72

**1636**

A. No.

THE COURT: I think you misspoke. You said went to sleep with Brooke. She is Brooke, so I think you meant Alyssa.

MS. MORRISSEY: Oh, I did misspeak. Thank you.

BY MS. MORRISSEY:

Q. With Alyssa in the basement when there was a baby-sitter upstairs.

A. No.

Q. All right. If -- were you contacted by anyone from your aunt Angela's defense team in 2000 to 2005 to ask you about --

A. No.

Q. -- what happened in July of 1993?

A. No.

Q. If you had been contacted, would you have told them what you've told us here today?

A. Yes.

MS. MORRISSEY: Thank you. I have nothing further.

THE COURT: Mr. Williams?

MR. WILLIAMS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. I'm a little confused, ma'am, on this photograph. You say this has to be in 1993, but the back of the photograph says 1994. Can you clarify why you're convinced this is 1993 if the back of the photograph says 1994?

**1637**

A. Yeah, because it's the date the film was developed.

Q. And how do you know that?

A. Because it's dated on the back of the picture.

Q. Okay. But how do you know that -- I guess I'm just really confused on how you know that the photograph was taken in '93 if the back of the photo says '94. I mean, you can tell by looking at your picture that that was taken in '93 versus '94? Is that what you're saying?

A. Yeah.

Q. Okay. What are you sleeping on there?

A. A hide-a-bed.

Q. And where is the hide-a-bed located?

A. In the basement.

Q. The basement that you didn't sleep in that often?

A. Right.

Q. Now, Christi Cole was a pretty good friend of your aunt's during that time period in 1993; right?

A. I don't know.

Q. She was -- spent a lot of time with your aunt, didn't she?

A. I don't know.

Q. She'd be over at the house a lot?

A. I don't remember her.

Q. Your aunt would be over at her house a lot?

A. No.

Q. Do you remember them hanging out together?

**1638**

A. No.

Q. You're not saying that you know where you were on July 25, 1993, are you?

A. What do you mean?

Q. Well, you understand the purpose of your testimony here today? I mean, did they explain to you the significance of why they were putting you up as a witness?

A. As in can you be more specific?

Q. Yeah. Essentially what they're trying to do is establish an alibi. Do you understand that?

A. Yes.

Q. All right. Now --

MS. MORRISSEY: Objection, Your Honor. Calls for a legal conclusion and reading my mind.

THE COURT: Overruled.

BY MR. WILLIAMS:

Q. And you understand that the murders in this case took place on July 25, 1993.

A. No.

Q. All right. You don't know where you were on July 25, 1993, do you?

A. At my aunt's house.

Q. Okay. Are you saying you know where you were on that particular night? In other words, are you saying you have specific memory of July 25, 1993? Let me do it this way.

**1639**

A. No, I mean.

Q. What you're saying is you know because of the -- your pattern of activity and reviewing that film that in 1993 you would have been down in Iowa because that was the way you did things; right?

A. Right.

Q. Okay. And you've testified about typically what you guys would do and where you would typically sleep and you would typically try to sleep on the couch upstairs because it had the TV and that was generally what your testimony was.

A. Yeah.

Q. Are you with me so far?

A. Yes.

Q. Okay. And you're not purporting to say that you have specific recollection of what happened on the night of July 25, 1993, are you?

A. On a specific day?

Q. Right.

A. No.

Q. Okay. And let's just make sure we're clear on the record. You're not purporting to say you know what happened exactly on July 24, 1993, either, are you?

A. No.

Q. Okay. What you're testifying to is generally how things happened back then.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

A. Yes.

Q. Okay. And the term baby-sitter has been used through your direct testimony, and you don't recall a baby-sitter. You remember Christi Cole, though, don't you?

A. No.

Q. On direct examination you said you were familiar with the name.

A. Yes.

Q. And you know who that is.

A. I'm familiar with the name.

Q. Okay. But you said on direct examination you can picture who that is. Can you not picture who that is now?

A. I can now because now I know who she is.

Q. Okay. You were five years old in 1993, ma'am?

A. No.

Q. Six?

A. No.

Q. How old were you in 19 --

A. Eleven.

Q. You're 28 years old now?

A. Yes.

Q. And how old was Alyssa then?

A. She was nine.

Q. So in the picture we're looking at on the monitor right now which you say you were -- your assessment is this was taken in

1993, you were 11 years old in that picture?

A. Yes.

Q. Okay. And do you know who these girls are?

MS. MORRISSEY: Your Honor, I'm going to object.

A. I don't.

MS. MORRISSEY: I suspect I know who these are. This is improper cross-examination.

THE COURT: Overruled.

BY MR. WILLIAMS:

Q. Let me tell you, ma'am, those are the murder victims, two of the murder victims in this case. The oldest one there is 9 years old. The youngest one there was 6 years old in 1993 on July 25 when they were murdered.

THE COURT: And the relevancy is?

MR. WILLIAMS: The relevancy from this standpoint, Your Honor, is had -- if what they're attempting to do in this case is show what would have been presented in evidence during the penalty phase of the trial, this is what I would have shown in evidence in the penalty phase of the trial as well.

MS. MORRISSEY: Your Honor, that's why I objected. This is not penalty-phase evidence. It's guilt-phase evidence.

THE COURT: Well, it could be both. It could be guilt phase, and it could be penalty phase on residual doubt, so it could be both.

MS. MORRISSEY: Well, I think we would have presented

it, if I had been there, at the guilt phase and argued it as residual doubt at the penalty phase.

THE COURT: Yeah, well -- well could be, so -- so the r -- I'm still -- the relevancy is?

MR. WILLIAMS: The relevancy is to the extent that they would put up photographs like this to engender sympathy and so forth, I think it'd be appropriate to remind the jury that we have murder victims that are about the same age at that same summer when they're sleeping over. I think I would have made that point with the jury.

THE COURT: You might have made that point with the jury, but it would have been with a different trial court judge.

MR. WILLIAMS: Okay. Understand, Your Honor.

THE COURT: Thank you.

BY MR. WILLIAMS:

Q. During the summer of 1993, Miss, you're not saying --

THE COURT: Let me -- let me interrupt.

MR. WILLIAMS: Yes, Your Honor.

THE COURT: You could have made that point in closing argument. You couldn't have made it with this witness because it's not relevant in my view to her direct examination, so I just wanted to clarify.

MR. WILLIAMS: Thank you, Your Honor.

BY MR. WILLIAMS:

Q. I want to make sure I'm clear with your testimony. You're

not -- you're not purporting to testify that in the summer of 1993 that every single night Angela Johnson was with you, stayed with you and Alyssa, are you?

A. Say the first part again.

Q. Sure. You're not purporting to say that in the entire summer of 1993 every single night Angela Johnson was there with you and Alyssa.

A. Are you asking that I can't say that or --

Q. Well, let me -- during the summer of 1993, there were nights when Angela Johnson would go out; right?

A. I don't -- I mean, I can't say specifically if it was a grand event that would make me remember.

Q. Uh-huh.

A. But specifically can I say, I can't say that I . . .

Q. Well, when you were interviewed by investigator in this case on February 28, 2011, you indicated that there would be nights -- or mornings when you and Alyssa would wake up and Angela Johnson, your aunt, would have left notes for you; right?

A. Yes.

Q. Okay. Meaning that she was gone at some point during that night; right?

A. No, meaning that she would have left for work that morning.

Q. Okay. You don't know what time she would have left, though, because you were asleep; fair?

A. Yes.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 5 of 72

**1644**

Q. Okay. And it's true, isn't it, that during the summer of 1993 there would be nights that -- or different times that Angela Johnson would be gone; right?

A. You're asking is it fair to say that?

Q. Yeah.

A. I wouldn't say that because I don't -- I can't --

Q. You can't remember.

A. I just can't say that.

Q. Because you can't remember every single night in the summer of 1993, can you?

A. No.

Q. And if you went to -- what time would you and Alyssa typically go to sleep?

A. It would -- we would typically go to sleep in the early mornings of -- I mean, it was after Beavis and Butthead so . . .

Q. I'm not familiar --

A. Twelve, one o'clock.

Q. -- with what time that was on back in 1993, so can you enlighten us a little bit?

A. I would say like twelve, one, two o'clock in the morning. It was our spring -- summer break, so we would stay up very, very late.

Q. Did your aunt have a job in 1993?

A. Yes.

Q. And what job was that?

**1645**

A. Waitress.

Q. Where?

A. I don't know. Country club maybe.

Q. And what were her hours?

A. I can't even tell you. I don't know.

Q. Do you remember if she worked nights?

A. Yeah. I mean, specifically to say did she work nights? I would say mostly days that I remember we were home alone during the daytimes. She worked nights. I don't know.

Q. You just don't remember.

A. Yeah.

MR. WILLIAMS: I have nothing else, Your Honor.

THE COURT: Miss Morrissey?

MS. MORRISSEY: Thank you, Your Honor. Just a couple questions.

REDIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Miss Jacobson, you testified that Exhibit 64 is on the bed in the basement; right?

A. Yeah.

Q. Okay. So if you were to come in here and lie, you'd say that was on the pullout couch in the living room; right?

MR. WILLIAMS: Excuse me?

MS. MORRISSEY: Never mind. I'll withdraw it.

BY MS. MORRISSEY:

**1646**

Q. You said that you and Alyssa would go to sleep late or early in the morning depending on what --

A. Yeah.

Q. What was Beavis and Butthead?

A. It was a cartoon, very raunchy, you know, late night on MTV.

Q. And your memory is that you would stay up to watch Beavis and Butthead.

A. Yes.

Q. And if you were watching -- staying up watching Beavis and Butthead, would you have to be upstairs or down in the basement?

A. We'd have to be upstairs.

Q. All right. And you indicated that you know that your aunt Angela worked as a waitress at a country club during that summer; correct?

A. Yes.

Q. And you -- and I think you've told us you believe that she worked days because you and Alyssa were home during the day?

A. Yes.

Q. And what about nights? Do you remember her working nights or you can't -- you can't say?

A. I can't say. I don't remember.

Q. Do you recall that on most nights you saw her?

A. Yes.

MS. MORRISSEY: Thank you. I have nothing further.

**1647**

THE COURT: Mr. Williams?

MR. WILLIAMS: Nothing further, Your Honor.

THE COURT: I have a few questions for you, Miss Jacobson. The photos that are on the screen now, who did they kind of belong to? Were they your photos, your mother's photos, Miss Angela Johnson's photos? Do you know the origin of them?

THE WITNESS: Aunt Angie's, Alyssa's.

THE COURT: So they were the ones that were in possession of them as far as you know.

THE WITNESS: Yes.

THE COURT: And do you have any knowledge as to how those photos got to the lawyers to present them to you?

THE WITNESS: No.

THE COURT: Okay. Thank you. That's all I have. I'm going to see if the lawyers have any follow-up questions.

MS. MORRISSEY: No, Your Honor. Thank you.

MR. WILLIAMS: None, Your Honor. Thank you.

THE COURT: Would you hold on for one minute, please? Do you have any recollection, Miss Jacobson, of how long in the summer of 1993 you had been a Beavis and Butthead fan?

THE WITNESS: How long had we been a fan?

THE COURT: Yeah.

THE WITNESS: Probably not very long. I would say it was very new, very hip at that time. MTV was just, you know, very recently -- I don't know, new to us, so it was very cool.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

THE COURT: Okay. Thank you. Any follow-up questions?

MS. MORRISSEY: No, Your Honor. Thank you.

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: You may step -- well, you know, before you leave, I just -- I should disclose when I do this. I always try and do it. I just Googled it, and, you know, my source is Wikipedia, and it says Beavis and Butthead aired from March 8, 1993, to November 28, 1997. Now, I'm not saying it aired in Mason City then. I wouldn't have any knowledge of that. But it appears to be, based on Wikipedia, that the witness's recollection is quite accurate that it was relatively new.

Okay. So if you want to ask any follow-up questions based on what I was looking at -- whenever I look at an outside source, I like to disclose it.

MS. MORRISSEY: No, I don't have any further follow-up questions, Your Honor.

THE COURT: Mr. Williams?

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Thank you.

THE WITNESS: Thank you.

MS. MORRISSEY: We'd next call Alyssa Johnson. Your Honor, obviously that was relevant to the ineffective assistance and failure to investigate based on A.10 and 11. Miss Johnson's testimony is going to be as to claim A.10 and 11, the guilt

phase, and also as to claim A.4, the medication issue.

THE COURT: Good morning. Hi. Would you raise your right hand, please.

ALYSSA JOHNSON, PETITIONER'S WITNESS, SWORN

THE COURT: Thank you. Please be seated. And you can adjust the chair and the microphones, and would you tell us your full name, please, and spell your first name for us.

THE WITNESS: Alyssa Dale Johnson, A-l-y-s-s-a.

THE COURT: Miss Morrissey?

MS. MORRISSEY: Thank you.

DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Good morning, Miss Johnson.

A. **Good morning.**

Q. Do you know this lady who's sitting here?

A. **I do. That is my mother.**

Q. And your mother Angela Johnson; correct?

A. **Yes.**

Q. Okay. I'm going to ask you about when you were growing up where did you live?

A. **Growing up majority I would say Clear Lake, Iowa.**

Q. And a particular town in Iowa?

A. **Forest City as well as Clear Lake. We moved around kind of often.**

Q. Do you have a cousin by the name of Brooke Jacobson?

A. **Yes, I do.**

Q. And is Brooke the daughter of your mother's sister Wendy?

A. **Yes, that is correct.**

Q. Now, would you and Brooke -- did you -- did Brooke have any kind of routine about coming to visit you during the summertime?

A. **Absolutely. It was quite frequent on summers she would come and visit. It would be right after her birthday and after my birthday generally right pushing it for school starting because we just had so much fun together.**

Q. And when is your birthday?

A. **August 7.**

Q. Okay. And when is Brooke's birthday?

A. **Be June 23.**

Q. So if I'm correct -- tell me if I'm not -- some time between June 23 and -- after June 23 and after August 7 is when you would see -- let me start over. That didn't make sense.

Brooke would come down here after June 23; correct?

A. **Correct.**

Q. And she would leave to go home after August 7.

A. **Yes.**

Q. All right. And I'm going to show you Plaintiff's 59. Do you recognize these pictures?

A. **Yes, it appears to be a birthday party of mine.**

Q. Okay. And can you count the candles? Can you tell how old you might have been?

A. **Looks like I was six.**

Q. Okay. Do you see your cousin Brooke in these photographs?

A. **Yes, I do. She is sitting right next to me with the pink stripes.**

Q. The pink like suspenders almost?

A. **Right.**

Q. Okay. And in the top picture, do you see your cousin Brooke?

A. **I do.**

Q. And is she still in the same place next to you?

A. **Yes, she is.**

Q. Is your mother in that photograph as well?

A. **Yes, she is.**

Q. All right. I'm going to show you Plaintiff's 60. Who are the two young ladies in that top photograph?

A. **That is myself and my cousin Brooke.**

Q. And do you -- and in the bottom photograph, who's in that one?

A. **That is again myself with my cousin Brooke and Marvea.**

Q. All right. Marvea appears to be a young baby; correct?

A. **Yes.**

Q. And based -- do you remember when Marvea was born?

A. **She was born February 14, 1994.**

Q. And based on Marvea's age as it appears in that photograph as well as the way you and your cousin Brooke appear, do you --

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

can you tell when that photograph was taken, what year?

A. Yes. I would be confident in saying that that is going to be in 1994, the summer of.

Q. Okay. Now, Miss Johnson, where -- these photographs that I've put up that are in 59 and 60, are they yours? Do they belong to somebody else? How did I get them?

A. These were actually in a photo album that I acquired that my mother had put together quite some time ago, and I've just always held on to them and provided them to you.

Q. And did I give you the original -- the original pages from the photo album back night before last?

A. Yes, you did.

Q. And do you have those now?

A. I do in my vehicle.

Q. Okay. Did -- were you asked to look for photographs from the summer from your -- the summer -- summer visits with Brooke in Clear Lake?

A. I'm sorry. Could you repeat the question?

Q. Were you asked to look for pictures showing Brooke visiting you in Clear Lake?

A. Yes.

Q. And did we ask specifically if you could find any pictures from 1993?

A. Yes.

Q. And as a result of looking through the pictures, are these

the ones that you gave us?

A. Yes, they are. I gave quite a few pictures of summers of when Brooke came to visit.

Q. Now, I'm going to -- did -- well, did Brooke visit in 1993 which would be the year before Marvea was born in the summer?

A. Yes, she did.

Q. And have you looked at any videos to help you say that she was there in 1993 in the summer?

A. Yes, I have.

Q. And I have for you -- I'm just going to -- I have Plaintiff's Exhibit 62. Have we looked at this together? This is a video that begins with Brooke wearing a blue outfit in Fond du Lac, Wisconsin, and then it continues on to a July 4 parade in Clear Lake held on July 5.

A. Yes, we did.

Q. Are you in that parade?

A. I am.

Q. What were you doing in that parade?

A. I participated with drum and bugle, and I was a pom pom girl.

Q. And did we also -- and by the way, is the -- are -- the dates in 1993, do they appear on the photos, on the footage in this Exhibit Number 62?

A. Yes, they do.

Q. So you don't have to guess about the date; correct?

A. That is correct.

Q. And did we also look at a photograph -- a DVD of pictures taken at your birthday on August 7, 1993, which is 63?

A. Yes, we did.

Q. Okay. And at your -- does this show your birthday party itself?

A. It does.

Q. And does it show your cousin Brooke being here?

A. Yes, it does.

Q. Now, I'm going to ask you to think back to 1993 and ask you whether or not in the summer your mother was expecting a new baby.

A. Yes.

Q. Was she very pregnant if you remember?

A. No.

Q. Okay. Can you see her in the Exhibit 63?

A. Yes, you could tell that there was a beginning pregnancy in my opinion.

Q. Now, during the summer of 1993 when Brooke was staying with you and you were in the parade, do you recall an evening where Christi Gaubatz, Christi Cole then, babysat for you and Brooke?

A. No, I do not.

Q. You know who I'm talking about when I say Christi Cole or Christi Gaubatz.

A. Yes, I do.

Q. Who was she?

A. Christi Cole was actually a friend of my mother's for a period of time.

Q. And was she a close friend?

A. I believe so.

Q. Okay. By the way, Miss Johnson, when you -- when Brooke was visiting you in the summer, where would you typically sleep?

A. Typically we would sleep on the hide-a-bed upstairs.

Q. That would be upstairs in the living room?

A. That is correct.

Q. Was there any other place you could sleep? What about your room?

A. My room had like a single bed, and there wasn't really room for a bed on the floor if I wanted to make her sleep on the floor anyway, so generally it was the hide-a-bed where the TV was.

Q. And was there another place you could have slept?

A. Yes. There was also a hide-a-bed downstairs in the basement.

Q. I'm going to show you Exhibit 64. Do you recognize those young ladies?

A. I do. That is me and my cousin Brooke.

Q. Where are you sleeping?

A. We are sleeping on the hide-a-bed downstairs.

Q. I'm going to turn Exhibit 64 over and see if you can read

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 8 of 72

Page 1656

Q. the back of this. Does that appear to be a date in April of 1994?

A. Yes, there does.

Q. Based on everything you've looked at and your memories, what's your best -- what's your best estimate as to when Exhibit 64 was taken?

A. I would say it would had to have been the summer of 1993 for the fact that I don't recall them ever coming down during any winter breaks for school.

Q. All right. That's based on the fact that this appears to have been developed in April of 1994; correct?

A. Correct.

Q. Was there ever a night in 1993 when Brooke was visiting you that you recall that Christi Gaubatz came and babysat during the night?

A. No, there's not.

Q. You don't recall having to go down in the basement to sleep because Christi wanted to rest on the couch upstairs.

A. No, I do not.

Q. I'm going to kind of shift gears and ask you back in 2005 whether you went to your mother's trial.

A. Yes, I did.

Q. Were you there every day or not every day?

A. Not every day.

Q. The days you went to your mother's trial, did you have --

Page 1657

where did you sit?

A. I would sit behind her at an angle so I could maybe see some of her face.

Q. And the days that you attended the trial when you sat beside your mother at an angle so you could see her face, could you tell us what you observed.

A. She would just sit there with a very blank expression on her face. To me it didn't seem like she was maybe hearing everything coming through, understanding and taking in the actual proceeding itself.

Q. Now, was this -- what you observed, was that different than the mother that you knew?

A. Absolutely.

Q. How was it different?

A. Mom has very -- always been a -- you know, a very happy-go-lucky, upbeat, always tries to keep a good sense of humor, you know.

Q. And what would -- was your mother doing anything? I mean, you said that she seemed to be a blank expression, said she was not hearing everything that was coming in?

A. Right. I know that she was provided with colored pencils and what not that she was often using.

Q. Now, were you able to visit with your mom during the course of her trial?

A. Yes, I was.

Page 1658

Q. And were those visits just in the marshal's office?

A. Yes, they were.

Q. And what about during your visits in the marshal's office? Was your mom the same way, or was she different?

A. She was different.

Q. And how was she different in the visits with the marshal's office?

A. She almost immediately, you know, pepped up a little bit, just, you know, how are you, it's so good to see you. It didn't seem as though she had just walked out of a courtroom in session for her trial.

Q. Did she talk to you about what was going on in court?

A. Very minimal.

MS. MORRISSEY: All right. Thank you. I have nothing further.

THE COURT: Mr. Williams?

MS. MORRISSEY: I might have something further, Your Honor.

THE COURT: Okay.

MS. MORRISSEY: I'm sorry. Miss Pemberton reminds me.

BY MS. MORRISSEY:

Q. You were obviously around in 2005 when your mom went to trial.

A. Yes.

Q. And you were there -- you were around before the trial

Page 1659

started.

A. Yes.

Q. Did anybody ever come to you and ask you about 1993 or whether you had a baby-sitter that year? Did they ask you to produce photographs, anything like that?

A. No.

Q. Did -- if they had asked you for photographs, would you have given them photographs?

A. Absolutely.

Q. And if they had asked you about whether you had a baby-sitter, would you have told them that?

A. Absolutely.

Q. And would you have come into court and testified like you testified today?

A. Yes.

MS. MORRISSEY: Thank you. I have nothing further.

THE COURT: Mr. Williams?

MR. WILLIAMS: Just very briefly, Your Honor.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. You were also interviewed by counsel in 2009; right? Do you remember that? They typed up a multi-page kind of declaration by you that you ended up signing.

A. I believe so. I've signed a couple of those.

Q. Okay. And the counsel you understood that were talking to

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

you in 2009 were working on this proceeding here, this what we call a habeas or a 2255 petition?

A. Could you re -- I'm sorry, repeat that question.

Q. Yeah. Did you understand those attorneys were working on what this hearing's about today? They were working on this kind of motion for new trial if you will?

A. Yes.

Q. Okay. And they interviewed you at length about a number of things during that interview in 2009. They talked to you about your observations of your mother that you testified about today; right?

A. Yes.

Q. Okay. They talked to you about other things as well, but they never asked you anything about where you were in 1993; right?

A. Not that I recall.

Q. Okay. They never asked you about photographs like you've testified about here today.

A. In 2009?

Q. That's correct.

A. No, I do not believe they requested photographs.

Q. They never went over this testimony you gave today about where you and Brooke slept and all that kind of stuff. They didn't ask you that in 2009 either, did they?

A. Not that I recall, but I would almost feel comfortable

reviewing that before I answer questions. It's been two years.

Q. Sure. I understand.

MR. WILLIAMS: Nothing further, Your Honor.

THE COURT: Miss Morrissey?

MS. MORRISSEY: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. MORRISSEY:

Q. It's getting to be a obstacle course back there. All right.

I have a declaration that I'm -- let's see. It's going to be 61. Is this the declaration that you were asked about on cross-examination that you signed in 2009?

A. Yes, it does appear to be.

Q. Do you want to look through this?

MS. MORRISSEY: May I, Your Honor?

A. Okay.

Q. Because you were asked some questions about it, so just take a quick look to make sure you understand that you know where it is -- that you know what's in it.

All right. So that's the declaration that you signed in 2009; correct?

A. Yes, it is.

Q. And in 2009 when somebody came to you and asked you to sign that declaration, did anybody ever ask you the questions about July of 1993 that you talked about today?

A. Not that year specifically, no.

Q. In fact, the first time anybody came to talk to you about July of 1993 and what you did in the summers was when you talked to Miss Runnels on February 21, 2011; right?

A. That is correct.

Q. And when you were asked the questions, you gave the answers; correct?

A. Yes.

MS. MORRISSEY: Thank you. I have nothing further.

THE COURT: Mr. Williams?

MR. WILLIAMS: Nothing, Your Honor. Thank you.

THE COURT: Miss Alyssa Johnson, I have a few questions for you. If you can remember back in the summer of 1993 when Brooke Jacobson was visiting, how late did your mom let you stay up at night?

THE WITNESS: Well, we generally would stay up late and sleep in late is what our theme -- as far as a time frame, I mean, it could have been as late as 11:00 if not later.

THE COURT: Okay.

THE WITNESS: It was the summer.

THE COURT: Yes. That's all I have.

Any follow-up questions?

MS. MORRISSEY: No, Your Honor. Thank you.

THE COURT: Mr. Williams?

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Okay. I'm going to sua sponte -- we're going to take a short recess, and I'm going to instruct the marshals to allow Alyssa to have a brief contact visit with her mom right at counsel table for a short period.

MS. MORRISSEY: Thank you, Your Honor.

THE COURT: For five minutes or so.

THE WITNESS: Thank you.

(Recess at 7:55 a.m.)

THE COURT: Thank you. Please be seated.

Oh, we have a new witness. Would you raise your right hand, please.

RUSSELL STETLER, PETITIONER'S WITNESS, SWORN

THE COURT: Okay. Thank you. Please be seated.

MS. MORRISSEY: And, Your Honor, I'm about to sit down and Mr. Burt's going to take over. I'm going to move into evidence Plaintiff's 59 to 64, and also Miss Johnson has asked me to thank the Court for that visit.

* * * *

(Plaintiff Exhibits 59 through 64 were offered.)

* * * *

THE COURT: You're welcome. And any objections to 59 through 64, Mr. Williams?

MR. WILLIAMS: I believe 61 is the declaration by Alyssa Johnson. I have no objection to it coming in except not for the truth of the matter asserted. It's hearsay.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 10 of 72

THE COURT: Correct.

MR. WILLIAMS: But as a -- I guess to what she was interviewed or not interviewed about, I have no objection for that purpose.

THE COURT: Okay. 59 through 64 are admitted, and 61 is admitted for the limited purpose indicated by Mr. Williams.

* * * *

(Plaintiff Exhibits 59 through 64 were admitted.)

* * * *

THE COURT: Mr. Burt, are you ready to proceed?

MR. BURT: I am, Your Honor.

THE COURT: Okay. Would the witness please tell us your name and spell your last name for us.

THE WITNESS: Yeah. My name is Russell Stetler, first named R-u-s-s-e-l-l, last name S-t-e-t-l-e-r.

THE COURT: Thank you.

DIRECT EXAMINATION

BY MR. BURT:

Q. Good morning, Mr. Stetler.

A. Good morning.

Q. Could you tell the Court how you're employed?

A. I'm employed by the Federal Public Defender system as the national mitigation coordinator for the federal death penalty projects.

Q. And the federal death penalty projects, which projects are

you specifically referring to?

A. Well, the main projects are the trial project which is known as the Federal Death Penalty Resource Counsel Project and then the Habeas Assistance and Training Counsel Project which provides comparable assistance to lawyers appointed on federal cases, capital cases in federal court on habeas under section 2254, 2255.

Q. And what are your duties and responsibilities as the national mitigation coordinator?

A. Well, I consult with appointed lawyers and lawyers from federal public defender offices and their mitigation specialists, investigators, and experts, brainstorm their cases, consult with them on issues of putting together their budgets and, you know, generally advising on standard of practice in the area of preparing, developing mitigation evidence.

Q. Where are you geographically based?

A. Located in the Northern District of California in their Oakland office.

Q. Do you spend a significant amount of time on the road?

A. I do.

Q. How long have you had your present position?

A. Since 2005.

Q. And before taking your present position, have you held other positions that relate exclusively to death penalty cases?

A. Yes, I have.

Q. And what were your duties and responsibilities at these other positions?

A. Similar duties and responsibilities. From 1995 to 2005 I was the director of investigation and mitigation at the Capital Defender Office in New York. That was a state agency that was created under the statute that reinstated the death penalty in New York. And that office had a mandate to provide both direct representation and assistance to assigned counsel to assure that indigent defendants received effective representation in capital cases. So again, I consulted with lawyers, their investigators, mitigation specialists, and experts on the development and presentation of mitigation evidence.

Q. And for what period of time did you hold that position?

A. 1995 to 2005.

Q. And before that?

A. The preceding five years I was the chief investigator at the California Appellate Project in San Francisco. That was a nonprofit law office established by the state bar of California, again, to provide assistance to lawyers appointed in the state and federal courts in California who were representing death-sentenced prisoners on habeas corpus either in state or federal court. And again, that office was not doing direct representation, but we provided assistance and consulting to people who were developing claims in post-conviction.

Q. And before working at the California Appellate Project as

the chief investigator there, what did you do?

A. For the 10 years before that from 1980 to 1990, I worked in a private firm in San Francisco doing general investigation in criminal defense, and a large part of that practice was homicide cases, and about a quarter or a third of the cases were death penalty cases.

Q. Did you have a life before you became an investigator?

A. I did.

Q. And what did you do professionally?

A. Mainly journalism, worked in both radio and print.

Q. What's your educational background?

A. I have a bachelor's in philosophy from Haverford College in Pennsylvania and then graduate work at the New School in New York with no degrees.

Q. Have you attended continuing education programs dedicated to the defense of death penalty cases?

A. Yes.

Q. For how long have you been doing that?

A. About since 1980. I should say that as soon as I began working in the investigative field, within the first couple of weeks, I had my first exposure to a death penalty case.

Q. And what year was that?

A. 1980.

Q. And how many death penalty cases did you work in your private practice from 1980 until you went to the California

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS    Document 352    Filed 11/10/11    Page 11 of 72

**1668**

Appellate Project?

**A. Somewhere between, you know, 25 and 35. I don't have a precise count. And they were mostly trial-level cases.**

**Q.** Trial death -- at that time was it state death penalty cases?

**A. Yes, it was.**

**Q.** Now, in your work with all of these organizations, California Appellate Project, New York defender's office, and then with the -- your present position as national mitigation coordinator, is this office work, or is it hands-on work with lawyers and other people who were on capital defense teams?

**A. It's hands-on work.**

**Q.** And do you actually get involved in the cases working with the experts, investigators, and lawyers in individual cases?

**A. Yes. I'm not working in the field. I'm not -- I'm not interviewing large numbers of witnesses. I can't work on individual cases in that sense, but yes, I am actively consulting with defense teams and their experts.**

**Q.** And are you here as a paid expert or as a volunteer?

**A. No, it's part of my job.**

**Q.** You mentioned attending continuing education programs dedicated to the defense of death penalty cases. How long have you been attending those kinds of seminars?

**A. Very regularly since 1980.**

**Q.** Have you served as faculty in continuing education programs

**1669**

dedicated to the defense of capital cases?

**A. Yes, I've done a great deal of continuing education presentation since 1990.**

**Q.** Roughly how many programs have you participated in as a lecturer?

**A. Over 300.**

**Q.** And in what geographical areas?

**A. All over the country, both national training programs and regional or state-based training programs, so in most of the death penalty jurisdictions and, of course, under the auspices of the Administrative Office of the U.S. Courts. I trained at the Army's death penalty defense training program, so it's pretty wide and varied.**

**Q.** Do you train at the programs put on by the trial federal resource counsel, the Strategy Sessions that are held yearly?

**A. Yes. In fact, I just came from one of those programs in Denver ten days ago.**

**Q.** Was that a yearly conference that you just attended, or was it --

**A. We have an annual program called the Strategy Session, and then we also do very intensive interactive programs that are essentially case consultations, and both of those occur on an annual basis.**

**Q.** What in general do you yourself lecture on at these CLE programs? You said over 300 of them. What generally are your

**1670**

topics when you talk to lawyers and other people on defense teams?

**A. Well, the main focus is on the investigation and presentation of mitigation evidence, but it includes the relation of that investigation to other areas including mental health issues in death penalty cases and, of course, the use of the mitigation investigation to resolve cases. So I've also done lectures on plea negotiations.**

**Q.** Have you taught at death -- what are called death penalty colleges?

**A. Yes. There are two principal death penalty colleges. One is at Santa Clara University in California, and I've been on that faculty every summer for probably a dozen years. And when I have time I also do the DePaul University Death Penalty College in Chicago.**

**Q.** That's a Clarence Darrow --

**A. Yes.**

**Q.** And how long have you been involved with death penalty college work?

**A. Oh, I'd say about 15 years.**

**Q.** Do you keep abreast of publications relating to capital defense preparation such as defense bar magazines, law review articles, and capital defense manuals?

**A. Yes, absolutely, list serves as well.**

**Q.** For how long have you been keeping up with what's out there

**1671**

in terms of literature?

**A. Well, I've tried to keep up with it since I began working on death penalty cases since 1980, so subscribing to the main defense bar magazines, looking at law review articles that are in this area and certainly capital defense manuals.**

**Q.** Have you published anything relating to capital defense, particularly mitigation investigation?

**A. Yes.**

**Q.** Can you give the Court some examples of your publications?

**A. I published a series of articles in the magazine of the National Association of Criminal Defense Lawyers which is called The Champion. I did an article on mitigation evidence generally in death penalty cases, another on mental disabilities in mitigation, another article on working with victims' families in death penalty cases, another article for the National Legal Aid and Defender Association on why capital cases require mitigation specialists. Those are the kind of defense bar magazines. And then I've written a few law review articles on some of the same themes.**

**Q.** What about publications relating specifically to plea negotiations in death penalty cases?

**A. Yes, I did an article in the 2003 issue of Hofstra Law Review where they revised American Bar Association guidelines for the appointment and performance of defense counsel in death penalty cases, was published in the summer. I was asked to do**

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 12 of 72

1672

an article on that section of the guidelines dealing with counsel's duty to seek an agreed-upon disposition.

Q. Showing you what I've had premarked as Exhibit 65. This is a commentary on counsel's duty to seek and negotiate a disposition in capital cases, ABA guideline 10.9.1, authored by you. Is this the article you were referencing?

A. Yes, it is.

Q. And was that published in what year?

A. 2003.

Q. So while the present case was pending.

A. Yes.

Q. And besides publishing on this article, are -- and as preparation for publishing that article, did you become familiar with whatever else there was out there in terms of publications on plea negotiations in capital cases around that time period 2003?

A. Yes. I mean, I think -- I drew more on personal experience than published articles. There was not a great literature in that area.

There's an important article by Professor Steven Zeidman, Z-e-i-d-m-a-n, commenting on a Second Circuit case from the late 1990s, Boria v. Keane, B-o-r-i-a, I believe it is, but there's not a great literature in the area of plea negotiation. What I was writing from was much more based on my personal experience.

1673

One other article which I think I cite in the Hofstra Law Review is an article by Kevin Doyle who was my colleague at the Capital Defender Office in New York, and his article was published in The Champion magazine. I don't recall the exact -- the exact title, but, you know, something like Ten Keys to Resolving Death Penalty Cases, something like that.

Q. We'll talk a little bit about that later on.

Have you provided testimony by affidavit or declaration on standards of practice and prevailing norms in death penalty cases?

A. Yes, I've done that a number of times.

Q. Where and on what sorts of issues?

A. By live testimony in the state and federal courts of California; Middle District of Tennessee; the District of Arizona; and state courts in Pennsylvania, Alabama, Arkansas, Colorado, Texas, and Wyoming. And some of the testimony has been about the present prevailing norms, standard of practice. Sometimes it's been about funding issues, for example, what -- what sort of funding is needed for mitigation investigation. Sometimes it's been in a, you know, systemic context. Other times it's been about the historic prevailing norms in the post-conviction context in assessing performance of trial counsel in light of the norms that prevailed at the time of trial.

Q. Are you familiar with these two publications, the American

1674

Bar Association Guidelines For the Appointment and Performance of Counsel in Death Penalty Cases in 1989 and the revised guidelines, Guidelines For the Appointment and Performance of Death -- Defense Counsel in Death Penalty Cases Revised Edition in February of 2003?

A. Yes, I am.

Q. Are any of your publications cited in the ABA guidelines?

A. Yes. I think in the 2003 revision, the commentary cites to a number of my publications in The Champion magazine.

Q. Are you familiar with the prevailing professional norms on capital defense at the time of Angela Johnson's prosecution?

A. Yes, I am.

Q. And in particular the standards relating to mitigation investigation and the plea negotiations?

A. Yes, I am.

Q. What were you asked to do in this case specifically?

A. Well, I was asked to address what those prevailing norms were, how those norms related -- how the norms in relation to plea negotiations related to the mitigation investigation in particular, and then to review the plea issues in this case in light of those norms.

Q. And you were not asked to review the work of Mary Goody and provide an opinion as to whether her mitigation investigation was sufficient or insufficient; correct?

A. No, I was not asked to do that, and, frankly, I wouldn't

1675

have had time.

Q. Your understanding is that other experts will address that issue.

A. Yes, that's correct.

Q. You said there were standards relating to mitigation investigation and plea negotiations. Could you tell the Court how those two subjects relate to one another?

A. Yes. Sometimes there's a sort of misunderstanding that suggests that mitigation investigation is simply to develop evidence for presentation in the punishment phase of a capital trial. In fact, it's an integral part of plea strategies in death penalty cases as well because it -- the mitigation specialist is usually the person who is skilled in the area of screening for mental disorders and impairments, the person who spends the most time with the client and observes the client longitudinally over the long life of the pretrial representation, builds rapport and trust, identifies the client's loved ones, the people who matter most to her in life, the people who may motivate her to want to live and care about avoiding execution.

That investigation will also identify the support systems that are in place, that is to say, the people who will take the collect phone calls, put money on a client's books, provide visits and a long-term relationship long after the capital defense team is gone.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 352 Filed 11/10/11 Page 13 of 72

So it's an integral part of a plea strategy to factor in what one's learning from the mitigation investigation.

Q. Now, is part of your job keeping up with developing case law as it relates to mitigation?

A. Oh, yeah, absolutely.

Q. And do you keep up on Supreme Court opinions offering guidance about objective evidence of what constitutes reasonable attorney performance?

A. Yes, in this narrow area. I don't hold myself out as a Supreme Court scholar, but in the area of mitigation evidence, yes, I pay close attention.

Q. And what recent guidance is out there or was out there around the time this case was tried?

A. Well, there were three important Supreme Court decisions on ineffective assistance. Williams v. Taylor which was in 2000, Wiggins v. Smith in 2003, and Rompilla v. Beard in 2004 all talked about -- all those cases found counsel ineffective for failing to conduct a thorough mitigation investigation.

Williams v. Taylor embraced broad principles of what constitutes relevant evidence in mitigation.

Wiggins v. Smith addressed the issue where counsel had focused instead on lingering doubt and failed to conduct a thorough mitigation investigation. And in that case the court not only cited the ABA guidelines for the appointment and performance of counsel in death penalty cases but also

acknowledged the role of the nonlawyer who had actually gathered the mitigation evidence in the post-conviction presentation.

And Rompilla v. Beard was on a slightly different issue. There it talked about the importance of gathering records that any reasonable attorney would have known were important either to rebut aggravating evidence that might be coming in or to identify the red flags that should be pursued in the mitigation investigation. So those were three significant cases at the time of this trial.

Last year there were a couple of more, Porter v. McCollum and Sears v. Upton, both per curiam cases that affirmed similarly the duty to conduct thorough investigation.

And then a noncapital case at the end of the last term, the Padilla v. Kentucky case about the immigration consequences of criminal convictions, has a very detailed summary by Justice Stevens writing for the majority about the kinds of objective indicia of prevailing norms that we can use as a template for evaluating the reasonableness of counsel's performance. And there Justice Stevens talks about the publications of the American Bar Association, defense bar publications. He mentions in particular The Champion magazine and the National Association of Criminal Defense Lawyers as well as law review articles, capital defense manuals, and the training materials that are used at continuing education programs. So it's a very concise summary of what the court

looks to.

Q. You mentioned defense -- capital defense manuals. Have you published or participated in capital defense manuals?

A. Yes. In the -- California has two defense bar organizations, one of the private bar called California Attorneys For Criminal Justice and the other for the public defender systems, the California Public Defender Association. And they have jointly published capital defense manuals for 30 some years. And in the 1990s they devoted a whole volume of their four-volume tome to mitigation evidence in death penalty cases. And I helped shape and edit that volume from the mid '90s.

Q. Are you also on planning committees for actually planning these conferences that try and educate lawyers how to conduct capital defense work?

A. Yes, absolutely. I've served on the planning committees of several national programs including those of the National Association of Criminal Defense Lawyers and the National Legal Aid and Defender Association. I continue to be involved in the annual California conference, California Attorneys For Criminal Justice and California Public Defenders Association Capital Case Defense Seminar. I was the cochair of that planning committee in 2009 and this year and will continue to serve for 2012.

Q. Is the California conference that you just alluded to a regional conference?

A. It began as a regional conference, but increasingly it has -- draws participants from all over the country because it is the most comprehensive conference, has the largest faculty. This year's program was attended by over 1,200 attorneys and allied professionals, and I think we had a faculty of about 125 presenters.

Q. Can you succinctly summarize for the Court what the prevailing norms required of capital defense counsel in preparing for the penalty phase of a death penalty trial in the time frame of this case, that is, 2000 and 2005?

MR. WILLIAMS: Objection. Relevance. This expert has been tendered as an expert on plea negotiations, not on mitigation. He specifically indicated he was not testifying as to the performance of Mary Goody in mitigation. So what his views are on the duty of attorneys in presenting a mitigation case generally is not relevant to his testimony.

THE COURT: Well, I think he's testifying about the relationship between the two as well, so I'm going to take the testimony subject to the objection.

MR. BURT: Thank you.

A. Well, and let me try to limit it to the standards in relation to the investigation and not deal with presentation issue.

Q. Sure.

A. I think the key to investigation in this time frame

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 14 of 72

succinctly is always a two-track investigation. On the one hand, interviewing the significant figures in a client's life, a multi-generational investigation of the family that the client comes from and identifying people who knew the client throughout the developmental years, childhood, adolescence and so forth, so it kind of starts with the client and radiates outward to other family members, other caretakers, other people who were in relationships with parents and other caretakers, teachers, neighbors, classmates, then into adulthood people who knew the individual in her work life, coworkers, employers, neighbors, and so forth.

So it's people on the one hand and on the other hand gathering the documentary evidence, that is, all the pieces of paper that provide evidence relevant to the development and functioning of the individual. And that inquiry includes gathering records about family members as well as the record-gathering process is also a multi-generational investigation to see if there are disorders and impairments that run in the family, family scripts and patterns of behavior.

So it's a doubly focused investigation that's intended to humanize the client, find out all the things that -- what are the -- what are the things that makes this person human, what are the relationships that he or she has with other people that are significant but also to identify the frailties, disorders, and impairments that have disadvantaged the individual and which

may evoke empathy on the part of the decision makers.

Q. Now, you've put that all into about a one-minute answer or less than one minute. Is this a tedious process? Is it something that you can wrap up in a short period of time?

A. No, it's a very labor-intensive process because, again, it begins with a relationship with a client. The client's an important source of information but on the other hand not always the best historian. You're going to find out information unknown to the client, things that happened before he or she was born, things that are not registered in memory. And those things you need to extract from the documentary records that you'll gather and from, you know, all of those individuals that you interview.

And, you know, one of the pioneers in this field was a mitigation specialist from Florida named Lee Norton, and writing in 1992 in The Champion magazine, she described the cyclical nature of the investigation as the interaction between the records-based evidence and the interviews. And she says, you know, you're going to need hundreds of hours -- and this is writing, again, back in 1992. You'll need hundreds of hours, and you need to keep going until the information becomes redundant because you'll interview people who will tell you about records that you haven't gathered. You'll read records that identify witnesses who are unknown to the family but may be important historical professionals who evaluated the client or

case workers who knew something about the family because they conducted inquiries for social services.

And so what she described is that interaction back and forth between the records-based investigation and the interviews. So it's a very long process.

And again, the interviewing I should point out is not like interviewing percipient witnesses about an event. It's not like interviewing somebody about a criminal offense. I mean, that's a finite event, and often you're focused on, you know, what somebody saw in a very limited period of time and what were their powers of perception, whereas when you're interviewing life history or mitigation witnesses, you're interviewing them about potentially periods of years, in some cases the whole life of the client. And you're having to overcome barriers to disclosure of sensitive life history information both with the client and with their loved ones and intimate family members.

We all have psychological barriers that make it awkward to discuss intimate things about our lives with strangers. That applies to everybody. And in the pressure of a capital defense prosecution, all of those barriers are intensified, and the barriers of -- also include cultural barriers, issues of gender, politics, social values. All those things may be issues that have to be overcome as the mitigation specialist builds a relationship of trust with a client facing capital prosecution.

Q. Is this a process that can be done in one interview typically with a particular witness?

A. Rarely. I mean, depends on the importance of the witness, but for those people who are most knowledgeable, the client herself and family members, typically you need multiple in-person, face-to-face, one-on-one interviews.

Q. Is it a process that safely can wait to begin until the verge of trial?

A. No. In fact, the -- one of the first cases I referred to, Williams v. Taylor, specifically makes that point that, you know, too little too late is not going to work in a death penalty case.

Q. Do the guidelines address the issue of how expeditiously this mitigation investigation you referred to should begin?

A. Yes. They make clear that counsel needs to put together the team that can do this work and begin the investigation upon appointment.

Q. Now, you mention the prevailing norms in regard to mitigation investigation. Can you also succinctly kind of summarize what the standards were relating to resolving capital cases through plea negotiations in the time period 2000 to 2005?

A. Well, interestingly, in that time frame, the American Bar Association revised its guidelines, so both of the iterations of the ABA's death penalty guidelines are relevant to that point.

The 1989 guidelines have a discussion of the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 15 of 72

**1684**

importance of seeking an agreed-upon disposition in death penalty cases. But the guidelines are not as long as those that are ultimately published in 2003. But they recognize that often the prudent course in a death penalty case is to seek a nondeath resolution. So yeah, this is the 1989 guideline.

Q. And I put up for the record guideline 11.6.1 entitled The Plea Negotiation Process from the 1989 guidelines. This is the guideline in place when this case began.

A. And so this guideline kind of lays out the mechanics of the plea negotiation process. In fact, I mean, that title kind of sums it up. I mean, it's about the process, whereas in the 2003 guidelines there's much stronger language emphasizing counsel's duty in this area. And you'll see under 11.6.1B, the 1989 guidelines say counsel should ordinarily obtain the consent of the client before entering into plea negotiations. That actually changed in the 2003 guidelines because it's so important just to get that discussion begun early. And often at the beginning of the case it's the worst possible time to seek that consent. And so the 2003 guidelines make the point that you've gotta begin the dialogue as -- with the prosecution as early as possible and then over time bring the client into it.

Q. Is there a comparable guideline to 11.6.1 in the 2003 guidelines?

A. Yes, there is.

Q. And is that --

**1685**

A. 10.9.1.

Q. That was the subject of your law review article; correct?

A. Yes.

Q. Let me see if I can put that in front of you.

A. And if I could just make one other point about these guidelines, they're intended to summarize prevailing norms, not to set out an aspirational goal for the future. So although the revision was published in 2003, really what it does is reflect the practices that had evolved in the 14 years since the original publication of the death penalty guidelines in 1989.

Q. Well, that's a good point. This revised guideline came out in February of 2003. But what you're saying is it obviously was based on norms that preexisted February 2003.

A. Yeah. The process of writing, editing, and revising these guidelines is lengthy. I mean, I was subsequently involved in development of supplementary guidelines to the mitigation function of defense counsel or defense teams in death penalty cases, and that was over a three-year process of drafting and circulating drafts to the relevant stakeholders in the community.

Q. The "A" guideline, counsel at every stage of the case have an obligation to take all steps that may be appropriate in the exercise of professional judgment in accordance with these guidelines to achieve agreed-upon disposition, similar but a little bit stronger than the '89 guidelines; right?

**1686**

A. Yes.

Q. And --

A. Yeah, there's continuity between them, but the language is certainly stronger in 2003. And, you know, part of that reflects what had happened in the world in the intervening time. The number of executions had risen considerably. It peaked I believe in 1999 at 98 executions nationwide. The size of death row had grown considerably in that period of time, and so I think the emphasis upon the importance of plea resolutions was more prominent by the time of the 2003 revision.

Q. Right when those guidelines came out you began your article, Exhibit 65, the size of today's 3,525 prisoner death row might have been greatly diminished if a simple warning sign had been posted in the mid '70s, warning, capital trials can be hazardous to your client's health and may involve a grave risk of death. What did you have in mind in starting the article with that warning?

A. Well, I think the same kind of point, but by this point executions were a reality in multiple jurisdictions. They were soon to be a reality in the federal system.

And one of the things that we realized is that many of the people who had been executed had, in fact, had plea offers and had turned them down. And I think for people who had witnessed executions of those clients it was agonizing to recognize that but for the failure to accept a resolution that

**1687**

that client might have been spared execution.

Q. You mentioned witnessing executions. We're going to talk a little later about how witnessing executions can play into the plea negotiation process. You yourself had the job at one point of witnessing and videotaping an execution, did you not?

A. That's correct.

Q. When did that happen?

A. April 21, 1992.

Q. Was that in California?

A. It was. It was the first post-Furman execution in California.

Q. And how is it that you came about witnessing an execution?

MR. WILLIAMS: Relevance, Your Honor.

THE COURT: Overruled.

A. The -- there was a 1983 suit filed challenging the method of execution in California at that time which was the gas chamber. And it was filed on the Friday before the scheduled execution. The execution was scheduled for one minute after midnight so the first minute of Tuesday morning.

Throughout that weekend, there was litigation -- there was a temporary restraining order granted in the district court based on the 1983 filing which had an extensive collection of exhibits about the -- from observers of death penalty -- of gas chamber executions from various scientists, medical experts, and so forth.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

So the district court had granted a preliminary injunction to prohibit the execution from going forward. That injunction was lifted by the circuit court, but then there were stays and lifting of stays back and forth throughout the weekend.

And on Monday -- and so that afternoon, the Monday afternoon, we filed a motion to preserve the evidence of the execution in the event that it went forward and to preserve it by videotape. And so, you know, that was not something that we had planned in advance. But when that was filed, I was asked to do the videotaping.

THE COURT: Mr. Burt, I need to call a federal judge in another jurisdiction. We have an 8:45 appointment. So --

MR. BURT: How ever long the Court needs.

THE COURT: Yeah. We didn't take much of a break.

MR. BURT: Yeah. And just to let the Court know, I don't think we're going to be able to go to six o'clock today. I anticipate this witness will go beyond noon. Then we have another witness. But I don't think we'll fill a whole day, so if the Court needs additional time to do other things --

THE COURT: Okay. That's good to know.

MR. BURT: Yes.

THE COURT: But we'll be in recess. I think 20 minutes will be sufficient.

MR. BURT: Sure.

THE COURT: So we'll be in recess until 9:05. Thank you.

(Recess at 8:47 a.m.)

THE COURT: Thank you. Please be seated. And sorry for the interruption.

MR. BURT: No problem.

THE COURT: Thank you, Mr. Burt.

BY MR. BURT:

Q. You talked about witnessing an execution. What is the relationship, if there is one, between using knowledge like that, witnessing an execution, and the plea process?

A. Well, I think it's something that is often useful to share with clients and sometimes share with lawyers who have not had that experience. You know, I know in California we had gone a long time with a death penalty system that had not resulted in any executions, and so a lot of lawyers tended to think someone gets a death sentence and they go to prison and they don't think beyond that. And I think once the reality of executions is present, it does alter the way you need to think about the desirability of resolving a case, particularly when a plea option is potentially available.

Q. Have you been involved based on your experience of witnessing an execution as an outsider who comes into a defense team for the specific purpose of bringing some reality to the process?

A. Yes, absolutely, numerous times in New York. Of course, in New York there had not been executions for a long, long time. So many -- many lawyers brought me in specifically to help talk about those issues with clients.

Q. How does -- I mean, what can you bring to bear with that experience with clients? How does that -- give me an example of how that kind of information can be helpful with reluctant clients.

A. Well, you know, sometimes clients imagine that this is a macho moment of glory going out in a blaze of glory. And when they understand the reality of what happens in an execution, potentially being diapered and losing your bodily functions, you know, it's just something that they need to think about.

Q. In the time period in which this case was tried, was execution a reality in the federal system?

A. Yes, there were three executions during the pendency of this prosecution.

Q. And what were they?

A. Well, in 2001 the execution of Timothy McVeigh and shortly thereafter Juan Garza. I believe 2003 was the execution of Louis Jones out of Texas.

Q. Now, talked about mitigation investigation, asked you in general about the role of the mitigation specialist in the plea process. First of all, what is a mitigation specialist? What do they do? What is the standard practice in federal capital

cases regarding mitigation specialists?

A. Oh, I think it's well established that a mitigation specialist is part of the team. The Spencer Report in 1998, the subcommittee of the Judicial Conference that looked into cost issues in federal death penalty cases, had an interesting discussion of the importance of mitigation specialists outlining the skills that they typically bring to bear noting that the work they do can't be delegated simply to a paralegal, legal assistant, or traditional guilt/innocence investigation and is otherwise work that had to be done by a lawyer.

But I think the fundamental point was that mitigation specialists have their own skill set, something special to bring to the table. So it was well established by the time of this case that that was part of the core team.

Q. And what does a competent mitigation specialist bring to the table in terms of skill sets?

A. Well, the ability to gather and analyze the life history documents that I referred to earlier, the knowledge of trauma, mental health signs and symptoms, an ability to screen for psychological disorders and impairments, so, you know, not a mental health expert who's going to testify about those or who's going to prescribe medication but somebody who's going to be able to say to the lawyers, you know, I think I see a potential issue here. Based on what I've learned in the investigation, there are several instances of closed head injuries with loss of

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 17 of 72

consciousness. We may have some brain damage here, or I've looked at the school records, and I see the following indications of learning disability and impairments so, you know, somebody who's going to be a close reader of those documents and a skilled observer of signs and symptoms when they're interacting with clients.

Often what you get -- what a mitigation specialist gets from spending time with clients isn't just Q and A, what you get from interviews but what you're observing under the pressures of a capital trial, is somebody decompensating, how are they responding to anniversary events and other stressors over the course of the litigation. And so it's a highly skilled set of eyes that's going to make those observations. I think of them as kind of observational caretakers.

Q. How would mitigation specialists or how should mitigation specialists typically spend their time in these federal capital cases?

A. Well, a significant part of the time should be spent with the client who's again -- a person with those skills needs to be in that intimate relationship with the client, needs to have the client's trust but also needs to gather the firsthand information that will then inform any mental health experts who are ultimately consulted. A mental health expert is typically not going to spend a lot of time, and mental health experts are very expensive. But if you've got a mitigation specialist who

has met with the client even if it's once a month over a period of a couple of years, that's a large body of observational knowledge that can be shared with other professionals.

Q. Now, mitigation specialists typically conduct social history investigations; correct?

A. Correct.

Q. And what should that investigation include in terms of what they should be looking at?

A. Well, it's a multi-generational inquiry to see all of the factors that influenced and made the person who she is, and so that -- that's, you know, what's encoded in the DNA, what is running in the family, what patterns of behavior are passed from one generation to another, what exposure did the individual have to risk factors that increase the likelihood of negative outcomes in life. And that can be anything from poverty and instability in the home to exposure to neurotoxins or early exposure to alcohol and substance abuse, negative interactions with peers, you know, falling under negative influences in adolescence, all of those sorts of considerations.

And at the same time it's -- you know, one's not just looking for an inevitable path to doom. One's also looking for the tensions in an individual's life, what are the strong points, what are the positive pro social things that really help to humanize a client, what are the positive qualities that are recognized in their relationships with loved ones and friends,

what are the -- what are the struggles that if only they'd been under the wing of another family member or if only a teacher or a coach had taken more interest in this person, things might have turned out differently. So you're trying to find that story, that narrative that might echo in the minds of jurors.

Q. Now, did -- should the mitigation specialist typically be involved in assisting with mental health experts in these cases?

A. Absolutely.

Q. And what role do they perform in relation to the mental health experts?

A. Well, they're going to gather a lot of the raw material that the experts should have at their disposal, all the medical records, all the school records, all the employment records that, you know, document somebody's life. If there are multi-generational mental health issues, if there are signs and symptoms of disorders or diagnoses of disorders that are disclosed either in interviews or in records of other family members, you know, they're going to provide that family tree to the expert, and they'll take the bare outline of the family tree and often color code to say -- so that the expert can see all the people that are circled in red have histories of substance abuse. That's something that's running in this family or all the people who are circled in violet have been exposed to domestic violence.

Whatever your mitigation themes are that relate to

trauma or substance abuse are going to be absolutely vital to a mental health expert. It's so much more than they can get themselves in a more limited set of interviews with the client and a small number of family members.

Q. Now, before we turn to the specifics of this case, I'd like you if you would to just outline in general terms how a capital defense team at the time of Miss Johnson's case should have approached the issue of a negotiated disposition.

A. Well, I think in the most general terms you look at the seriousness of the charges, that is to say, the number of victims, the vulnerability of the victims, the exposure that the client has not just under the capital charges but under any other offenses, how many years this person may do regardless of conviction in the homicide charges, what is the interest of the state prosecutor in the case supposing the federal charges went away, is there still a high degree of exposure in state court.

Then obviously you need to assess the applicable legal theories of defense. You need to look at the weight of the evidence, the strength of the proof, not just, you know, reading it and evaluating it but testing the evidence in pretrial litigation and investigating out there in the world, talking to witnesses to see whether they confirm what you're learning in the discovery documents.

So you make that assessment. And then, you know, probably the most important thing is for the team to have a

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 18 of 72

**1696**

Q. consensus about what's desired here. If the team reaches a point of consensus and every one on the team speaks with one voice, that's probably the single-most important factor in communicating effectively with the client and providing the client with an informed basis for grappling with a very, very tough decision.

Q. When you say unified message, are you referring to the need to avoid conflicting signals to the client from different team members?

A. Absolutely. There's nothing worse than mixed messages, and, you know, it makes perfect sense from a client's point of view to want to hear from everybody, often want to get them all in the room at the same time and go around the room and, you know, talk to each person that they spend time with and say what do you think about this plea issue? I've had that experience many, many times.

And if there's any dissent within the room, that is devastating to the possibility of resolution because a client understandably will focus on that and cling to a more hopeful belief about the evidence if anybody sounds that.

Q. In other words, if a lawyer in a group meeting is in there saying I think we can win this case, I think I can walk you out, lawyer A, lawyer B says you're in deep trouble here, you gotta plead, are you saying that's not a good situation?

A. That's the worst.

**1697**

Q. Who decides whether a plea is reasonable or not --

A. Well --

Q. -- in these cases?

A. -- you know, I think counsel has gotta make that ultimate call about whether that's the best hope of avoiding a death sentence. And if that's -- if that's counsel's ultimate conclusion or the conclusion of the team but ultimately the decision of the learned counsel, then I think everybody on the team has gotta be on board to help communicate that effectively.

Q. And how does the team reach that decision? I mean, is there meetings about it, discussions? How does that --

A. Well, let me back up. The most important thing about a team is that it needs to be a functioning team in the sense of having regular meetings with an agenda. And even when the team members are geographically disparate as they frequently are in federal cases, sometimes the meetings will have to be by telephone. You'll have a couple of people in person but everybody else at least getting involved on the phone on some regular basis.

And there's no hard and fast rules about how many meetings they have to be, but it has to be on some kind of regular basis so that everybody is up to speed on what else we have learned on the case, what new discovery has been produced, what has the guilt/innocence investigator found, what insights has the mitigation specialist developed about the client's

**1698**

mental health and functioning. And putting that all together on a regular basis then helps form a consensus of where the case should go.

Q. When and how should a capital defense team discuss possible dispositions with a client?

A. Well, you can't -- you know, one problem is raising plea issue too early. I think you have to have some relationship of trust. It's not the first thing you do. How do you do? I'm your defense lawyer. Have I got a deal for you. It's life without parole. I mean, that's a bad way to start off with clients. No matter how concerned you are about the seriousness of the charges and the potential weight of the evidence, you have to first demonstrate to clients that you're willing to challenge the evidence, that you're willing to listen to them, that you're not dismissive of what they're saying.

And often, you know, you're doing that by, you know, getting your investigator out in the real world talking to witnesses and reporting back to the client what they're learning. So, again, there's no hard and fast rule. Sometimes it's advisable to resolve a case as early as possible before the prosecution is more heavily invested timewise. But at the same time, there is that tension. You can't just prematurely tell a client that you want them to plead guilty because their first reaction is going to be, well, you haven't done any work on this case yet, and it may look through the client's eyes that the

**1699**

lawyer is just trying to avoid the serious hard work and challenge of the case.

So there is that tension. You gotta earn some respect and show the client that you're working on the case but at the same time factor in the other considerations of, you know, whether an early resolution is going to get the best result.

Q. You wrote in your article, Exhibit 65, counsel should also take care not to broach the subject of plea prematurely. Waiver of constitutional rights and other legal remedies such as the right to appeal or to seek parole or commutation of sentence, acceptance of responsibility and agreement to a life sentence involve the gravest decisions a client could ever be asked to make, and the discussion can only commence when counsel has established a relationship of trust. The barriers to trust between capital clients and counsel typically include race, class, age, gender, nationality, religion, social values, sexual orientation, and political views. Overcoming these barriers takes patience above all else. Do you remember writing that?

A. Yes, absolutely.

Q. And speak for a moment about the barriers you're referencing here and why it's not a good idea to come in, meet the client, and say, "I'm your lawyer, and you're going to plead."

A. Well, you know, typically the members of the defense team come from a different social class. They have the benefits of

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 19 of 72

education. They have the luxury of going home every night. They're not staying in the jail. And so all of those badges that we wear of who we are, our status in the community, our political, religious, social views, all of those may be things that the client doesn't share and may make the client uncomfortable. So you've gotta overcome and bridge those differences between team members and the client and establish the basic trust.

Q. And the guidelines speak, do they not -- in a separate guideline from the plea bargaining guideline, they talk about building a relationship with a client. Counsel at all stages of the case should make every appropriate effort to establish a relationship of trust with the client and should maintain close contact with the client. Was that a duty that existed long before these guidelines were promulgated in February of 2003?

A. Yeah, absolutely. And I would say it's relationship with the client and the people who are important to the client, the client's loved ones, family members.

You know, when we had capital case assignments in New York, we had what we called a beachhead protocol where we immediately, you know, had one lawyer go out and meet the client the mo -- you know, even before an arraignment in court, as soon as we were assigned to the case, go and meet them at the jail and begin to establish that relationship and get somebody else on the team out to meet the client's family just to begin to

establish that rapport and let them know the seriousness of the situation.

Q. Now, in the years when you were the chief investigator in New York, you had a fairly unique system there, did you not, in terms of -- that led to a situation where you actually had to approach the negotiation process fairly early in the stage of the case; correct?

A. Yes.

Q. Tell the Court about that.

A. Under that system the prosecutor had 120 days from arraignment in the trial court to make a decision as to whether they were going to go forward seeking a capital death penalty prosecution. And in that 120 days we had an opportunity to provide input about why we thought the case should not proceed as a death penalty case or why the case should be resolved. So that was an absolutely critical period.

And we don't have the same fixed numbers in the federal system, but we have a similar opportunity to provide input to the local U.S. Attorney's Office and then ultimately to the Department of Justice for the same sort of reasons.

Q. And how successful were you in that New York system in resolving potential capital cases by plea in that narrow window of time from the time of arraignment to 120 days out?

A. We sometimes resolved cases in that time frame. We certainly consistently took advantage of the opportunity to

present evidence to the prosecutors and often persuaded them that this case was not right for the death penalty, showed them some evidence that might have altered their perception that this was a slam-dunk death penalty decision.

In any event, we always took advantage of that opportunity, and we very, very frequently resolved cases. The overwhelming number of the cases in New York were settled without trial or without a -- at least without a capital prosecution.

Q. And were you personally involved in that process with clients putting in the hard work with negotiating with clients under these kind of time pressures?

A. Absolutely. I mean, I think I was involved in all the cases where our office did direct representation, and I frequently was called upon to assist private lawyers as well. Unless there was a conflict where our office represented a codefendant, I provided assistance on virtually every case that was resolved by plea after a death notice.

Q. You talked about the need to build a relationship of trust and confidence of the client. Is that a duty that can be delegated under the guidelines? In other words, can a lawyer say, "Well, I'm too busy. I'm going to let a paralegal go in there and handle a client primarily"?

A. No, it's ultimately counsel's responsibility. Sometimes the mitigation specialist develops a particular rapport and they

spend more time with the client than the lawyer, again, because it's cost effective and because that person has some mental health skills. But the ultimate responsibility is with the lawyer, and the lawyer's gotta invest that time.

Q. Are you familiar with this language in the guideline which is the guideline 10.5, duty to build a relationship with the client? Although ongoing communication by nonattorney members of the defense team is important, it does not discharge the obligation of counsel at every stage of the case to keep the client informed of developments and progress in the case and to consult with the client on strategic and tactical matters. Some decisions require the client's knowledge and agreement. Others, which may be made by counsel, should nonetheless be fully discussed with the client beforehand. Are you familiar with that language?

A. Yes.

Q. And why isn't it a good idea to just delegate your communication obligation to a nonlawyer, say, a paralegal?

A. Well, you know, some lawyers refer to client relations as hand holding, and it just isn't that in a death penalty case. You need contact with somebody who is fully knowledgeable in the law, somebody who can address the issues of the seriousness of the case, and it's ultimately going to be counsel's guidance that's going to allow the client to make an informed decision.

So, you know, the assistance of other people is

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 20 of 72

important, but you can't delegate some responsibilities. I've actually written about this as well I think subsequent to this case, but I have an article in The Champion on mitigation issues as a duty that can't be delegated.

Q.   Is this a process that takes some time in terms of building that relationship?

A.   Sure, absolutely.

Q.   You wrote in your article quoting your boss I guess, Kevin Doyle, who had written an article in 1999 called Heart of the Deal, Ten Suggestions For Plea Bargaining, and you cite that in this article you wrote; correct?

A.   Yes.

Q.   And you quote Kevin Doyle advising lawyers as early as 1999 you earn the trust of your client primarily by working your case and secondly with patience. Be ready to spend hours and days with a client to persuade him to save his life, to make the right decision for himself and to own it fully.

Filibuster, plead, argue, cajole. Sometimes cry. Sometimes just sit and wait out your client's angry silence. Don't get frustrated. Don't give up.

If you're in a rush, forget it. You'll only confirm what your client suspects: That you don't care, that you want the plea to save you work, not to save his life.

Was that the prevailing standard in regard to how much time and how you spend time with your client at the time Angela

Johnson case was tried?

A.   Yeah, and I think that was a consistent message at training programs in that period. Both Kevin Doyle and I gave presentations on pleas. And, you know, you referred to him as my boss. That's true. But we worked together on a number of pleas, and he was somebody who was very hands-on and with all his responsibilities as the head of the office would invest the time that was needed. Many times we had day-long visits with clients when there were critical plea discussions underway.

Q.   And how should a team discuss possible disposition with a client? What's the content of broaching this important topic?

A.   Well, I think, you know, everybody on the team needs to be -- needs to be heard, and you need to resolve the differences of opinion. And, you know, when there are factual issues that are -- where there's disagreement on factual issues, those have to be researched and addressed. But you want to bring the team to consensus. And, you know, you can't move forward in a capital case with, you know, a dysfunctional team where people just have different views of what's appropriate. You have to have a common strategy. That's why you put a team together.

Q.   And what do you do, for instance, with a client who is giving the team investigative leads, in other words, comes to a meeting with the lawyer and says, "Here are the people that I think are important you need to talk to"? And say the lawyer looks at this and says, "Well, I just don't think these

witnesses are relevant." How do you handle that kind of situation when the client is insisting on certain lines of investigation?

A.   Well, you certainly need to demonstrate to the client that you are taking suggestions seriously, you're not just dismissive, you are checking out facts. And it's a relatively modest investment to send an investigator out and talk to some witnesses, even if you don't think that they're going to be particularly productive.

And it's much more effective to come back and demonstrate to the client that it wasn't productive, that the witnesses didn't say what the client hoped they would say. But to have that interactive dialogue with the client is often critical to building the relationship or testing forensic evidence, whatever it may be. Rather than just accepting what we've got and saying we're stuck with it, you need the client to see that you are actively challenging the proof, that you're doing the best to analyze what the proof is.

And then once you have, you know, litigated those issues or consulted with experts or conducted the investigation in the field, you're going to have a lot more credibility in giving a client advice about what you think is the best pathway to the best result.

Q.   You gave me an example last night when we were talking about a specific experience you had involving a case I think of

a child sexual assault and murder, murder of a young child, that you successfully negotiated in the New York system by going through that process with a client?

A.   Yes. That was an Ulster County case. Defendant's name was Larry Whitehurst. It was the first case I think that had received an actual death notice, an authorization to proceed as a death penalty case. And at a certain point after considerable pretrial litigation, a plea offer was made, and we spent hours and hours and days and days with Larry Whitehurst to bring about that resolution.

And I frequently had the experience of leaving him at the end of the day with his agreement that a plea was the best way to proceed and returning in the morning to find that he had changed his mind. That was a normal part of the process. And sometimes he would say, you know, I don't think this witness could have seen what he says he saw. And, you know, if it was as simple as that, I would actually go back to the location, look at the police report, maybe even take photographs from where the witness was and come back and show him in the morning that yes, the witness could see what he said he saw.

So it may have seemed like a wild goose chase, but it was time well spent in ultimately answering his concerns and helping him make the decision that ultimately did resolve the case.

Q.   So doing investigation has a relationship to addressing the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 21 of 72

client's concerns even when the client may be off base in terms of their focus in the case.

A. Sure, absolutely.

Q. Now, the example you just gave related to fact investigation. How does, if it does, mitigation investigation relate to plea discussions with a client?

A. Well, mitigation investigation is important for a number of reasons. I mentioned earlier that you're going to identify the motivating people in someone's life for whom they're going to want to live, also the support systems who are going to be part of the client's life down the road 5 years, 10 years, 20 years into the future, who will visit the client in prison, take their collect phone calls, send them packages if that's allowed or put money on their books but be part of their continuing life relationships.

You're also going to learn things that are -- in the course of the investigation that may be embarrassing or even shameful to the family, and the client has to assess the impact on the family of having all that information disclosed in the penalty phase. And so sometimes that's part of the calculus in deciding that, you know, I don't want to expose members of my family to some of this information that will have to come out if we proceed to a punishment phase.

So in all those different ways mitigation spec -- mitigation investigation is significant.

Q. You -- we're going to get into the specifics of this case in a minute here, but you had an example of that very process in this case, did you not, in terms of the relationship between the client's concerns for putting on mitigation and her desire to plead?

A. Yes, absolutely.

Q. Tell the Court about that.

A. Well, I think there are instances in the work product of the attorneys in this case where, you know, the client was very concerned about, you know, family secrets or family dysfunction that would be exposed in the event of a penalty-phase presentation, and so that was one of her motivating factors in considering a plea might be the best way for everyone.

Q. And is timing important in doing that investigation and beginning a dialogue with the client as to what the mitigation case is going to look like in order for the client to take advantage of plea offers at certain times in the case?

A. Sure. No, time is always very important. You know, the mitigation investigation typically takes a lot of time. Gathering the records is a slow process. Extracting records from bureaucracies can take months, but also building up relationships of trust with key witnesses isn't a quick process, and putting it all together, synthesizing it just takes time.

Q. Now, on these defense teams, these capital defense teams, if more than one team member's seeing the client, who should be

discussing possible dispositions? Whose responsibility -- tactically who should be doing the talking on a plea issue?

A. Well, you know, lead counsel has the ultimate responsibility, and I think that's the person who ought to be leading that discussion. I think other people can chime in. And particularly if the client wants to get everyone in the room at the same time to hear their views, I think that can be very helpful. But the primary responsibility has gotta be with lead counsel. It's gotta be in person.

Q. Why does it have to be in person?

A. Well, I think that's -- you know, that's the opportunity for the client to look the lawyer in the eyes and communicate all the concerns and hear what is the best advice from the legal professional here and answer all -- you know, that's the opportunity for the client to, you know, get answers to all the questions that are running through his or her head.

Q. Why can't the lawyer -- for instance, a lawyer gets a plea proposal from the prosecutor. Why can't the lawyer just write a letter to the client and say attached please find a plea proposal from the government? Is that -- why isn't that communication?

A. Well, it's not an interactive process again. And, you know, we're often talking about clients with limited education. Sometimes the language of a plea proposal is going to be very, very baffling to a layperson.

But most importantly, clients are just going to have questions, and they're going to think about it. They're going to misunderstand. You need to talk these things through, clarify and respond to whatever concerns the client has. There's just no substitute.

Q. If the client shows some receptivity to a plea, for instance, say a client hypothetically writes a letter to a lawyer and says, "I want to plead," and hypothetically say the lawyer gets that note, doesn't see the client for over a year. Is there some problem with that process?

A. Yes. I mean, that's an opportunity that counsel must not neglect. When you see -- I mean, my -- my homily on this issue is that you can't plead all the cases all the time. And when there is an opportunity to plead a case when a client is most receptive, you have to engage the client at that point and try to help the negotiation move forward.

Q. Now, how do mental health issues affect plea discussions with a client?

A. Well, mental health issues are -- that's a broad concept. It ranges from the neurocognitive issues that affect how somebody processes information, how they understand what's being communicated. But it also includes moods and reality testing. It includes the effects of medication, and so all of those can have an impact on how a client is responding to a plea discussion.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 22 of 72

**1712**

And so if you've got neurocognitive issues, for example, if you have a -- as in this case a huge gap in -- between the performance and verbal IQ and so you know somebody's got some difficulties with verbal processing, then you have to think about other ways of communicating about this, more pictures. Maybe you want to do a mock jury presentation and videotape that and show it to the client because the client's going to understand information better if it's communicated in a visual fashion.

And in the same way if you've got a client who has got a history of depression or other mood disorders, you need to have some insight into how that's affecting response to plea discussions. And if the client is medicated, you want to be monitoring, you know, what is the medication that a client is on, is the client taking that medication, is the amount of medication being increased or decreased. All of those things can affect somebody's everyday functioning and affect our ability to communicate effectively.

Q. And how typically does a defense team become informed on the types of issues you just mentioned?

A. Well, again, the mitigation specialist is going to usually have some base level of knowledge about those issues. But, you know, that's why you also consult with the real mental health professionals, the psychologists, psychiatrists, neuropsychologists. All of those have something to contribute

**1713**

in this area.

Q. And this area meaning plea area?

A. Yes. You know, we frequently have the situation of going to a consulted mental health expert and say," Help me, Doctor. How can I best communicate about this with this client who's got this particular problem or dysfunction?"

Q. Now, in your experience what's the most common response from clients the first time that this subject of plea negotiations comes up in these?

A. It's usually crossing his arms because most clients are male and saying, "I'm not interested in the plea. You know, free me or fry me. Walk me out of here or I don't care." I mean, that's a common response, and it's denial. I mean, you're talking about somebody who is confronting the two most harsh punishment that our system offers, and a plea is typically going to be a plea to a sentence of life without the possibility of release.

And so the first time somebody's confronted with that, you know, the Hobson's choice, the typical reaction is just like, you know, what Dr. Kubler-Ross described in On Death and Dying. It's denial. You know, I don't want to think about this. I don't want to consider that those are the only options. There's something wrong here. There's gotta be a different answer. And that's a normal response. That's what we get in 90 percent of the situations no matter how carefully we have

**1714**

cultivated a relationship up to that point. It's a -- I guess a normal human response. Nobody wants to hear that the situation is that bad. And, you know, we respond the same way when we have difficult diagnoses from our doctors. And so we've gotta get past that point and to the other areas of acceptance and negotiation.

Q. Doesn't -- isn't the plea decision up to the client, and doesn't the defense team have an obligation when the client reacts the way you just indicated, I don't want to plead, isn't that the end of the matter?

A. Well, it is ultimately the client's decision. But the uninformed first response is not the end of the matter. Again, it's a typical response, and, you know, it's just -- it's a starting point in the conversation. The bad choices are not going to go away, and so you need to talk through what the realities are in the case. You need to explore the issues that the client thinks you should be exploring. You need to, you know, gain that trust and maybe challenge the evidence that can be challenged. Maybe there's pretrial litigation that will show your client that you're willing to fight on these issues, but you gotta get past that initial denial. And typically you do.

Q. Isn't it enough just to advise the client that a plea might be available and then just leave the client to his or her decision?

A. No. Again, you know, we have a very high incidence in the

**1715**

capital client population of intellectual limitations, poor education, other mental health issues. And all of those factor in as I think giving counsel more responsibility to provide solid professional guidance and counsel.

Q. Who else besides the team influences clients who are considering pleas just in general?

A. Everybody that they interact with so the people at the jail, family members, visitors. And so you need to know who all those people are, and you need to identify which are the toxic influences and which are the -- who are the Alpha personalities that may be positive influences, who are the family members that, you know, have the most successful, stable lives, maybe the most education, people that may be the wise members of the family who may be allies in helping clients with this decision.

And, of course, they're not going to reach the point of endorsing the suggestion unless they're acquainted with the seriousness of the charges and the weight of the evidence. So you have to invest some time with them, sometimes share with them, you know, some of the evidence that you're going to be confronting if you -- if you go to trial.

But the jail influences are a huge problem. I mean, I think 90 percent of the influences at the jail are toxic and not just other inmates but often -- often staff. Staff may like somebody and want to give them hope and encouragement. And staff, of course, are -- correctional officers have -- know

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

**1716**

nothing about the evidence in the case, and so they're making a very uninformed statement to a client if they say, you know, I think jurors are going to like you, I think you're going to do fine. That's just their way of, you know, trying to give encouragement to somebody that they like in the jail, but it can be a very, very negative influence in a plea discussion.

So I think all the time that you're not spending with a client they're exposed to potentially bad influence. And so you have to factor that in to your discussions with them.

Q. How does counsel go about identifying what the influences are and trying to meet those influences?

A. Well, couple things. One, you ask a client who you're talking to, and clients are often just going to tell you, well, I talked to my father last night and he doesn't think I should take a plead -- plea. Or I talked to these people at the jail or here are some people who came to see me. And, of course, you know, you don't need the client to tell you who the visitors are. The visitors' logs at the jail are important. They're a source of potential mitigation witnesses anyway or potential harmful witnesses if -- you know, you don't know who -- what they are until you identify them and talk to them. But that's all part of the broad investigative responsibility in the case.

Q. Now, you in this case -- and we're going to get to what you reviewed in a minute, but in this case you asked to look at some jail visitor logs; correct?

**1717**

A. Yes, absolutely.

Q. And what was the purpose in asking to look at those?

A. Well, again, they're all important witnesses. And Ms. Johnson had a large number of visitors, a couple of dozen people who visited her multiple times and couple dozen more who visited her once. And all of those people may be either helpful or harmful witnesses. So you want to know something about them and talk to as many of them as you can.

Q. Showing you what I premarked as Exhibit 66, do you recognize this document?

A. Yeah, that's just a --

Q. Angela Johnson personal visits?

A. Yeah, that's just a spreadsheet of the witnesses named -- or the individuals named in the various jail logs that we had an opportunity to review.

Q. And multiple meaning multiple visits while she was --

A. Yes.

Q. So is part of the mitigation specialist's duty to identify who these people are who are communicating with a client and then to begin to address with them what kinds of information they're giving to the client and negotiate with them in the same way you're negotiating with a client in terms of educating them on what the case is all about?

A. Yes.

Q. And does that include not only the people the client is

**1718**

visiting but perhaps people like jailhouse informants who are giving the client information either about how bad the lawyer is or you're going to beat this case or giving the client advice about you can't be subject to the death penalty because of an ex post facto issue --

A. Jailhouse informants and jailhouse lawyers, similar kinds of problems, yes.

Q. Does a lawyer need to identify who those folks are and get the client away from those --

A. Yes, absolutely.

Q. Now, in your experience just in general, do capital defense teams sometimes enlist help from outside the team in plea discussions?

A. Yes, absolutely.

Q. And who's enlisted and why do -- what do they add to the process of negotiating a case?

A. Well, it can be somebody who is a part of the client's life. It can be -- a spiritual advisor may play that role. It can be an outsider from the capital defense community, somebody who has expertise in a different area from what the trial team has as its own expertise. Sometimes you bring in a post-conviction lawyer to talk about the disappearance of appellate and post-conviction safety nets so that the client has a clear idea that no, we're not going to win this case on appeal.

**1719**

For example, at the time of this trial, I forget how many federal death penalty cases had been appealed to the circuit courts, but there was a very, very high affirmance rate, I think in excess of 85 percent, and so that's -- you know, that's just a small piece that some outsider may have provided.

Or it may be somebody who's lost a client to execution, somebody who talks about the reality of executions or somebody who's got expertise on the prison system and what it's like to function in the likely location where the client might be sent. I mean, where somebody's going to be housed is often a very critical issue. And particularly for somebody who hasn't been incarcerated before, they're going to want to know what's my day-to-day life going to be like. And so sometimes you bring in a former prisoner. It will take a court order to get that person in, but there are people who play that role very effectively to talk about what life you can make for yourself in the setting of incarceration. So there's a wide range of potential additional allies that may help facilitate the plea process.

Q. Just as an example, did you and I recently participate in a case involving a young African American client charged in California with a federal gang -- several gang-related homicides?

A. Yes.

Q. Tell the Court about the process of bringing outsiders in

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

on that case to convince a reluctant client to ultimately plead guilty.

A. Well, I think that was a client who felt there were a lot of injustices in the case and felt that his potential sentence was unfair because of other dispositions that other equally culpable players had been made, so he was kind of stuck in his negotiations with good lawyers about this issue of unfairness.

And I think my coming in provided a basis for talking about some of the other issues, talking about, you know, how old he was and how people's perspective changes as they get older. I talked about my experience with people on death row who had changed their attitude about whether they wanted to live or die ten years later and now we're fighting almost hopelessly in their post-conviction cases. I believe we talked about executions in that discussion as well.

And it was just I think a way of changing the dynamic of the conversation, getting the client to think about things from a different perspective and have, you know, played that role in a few of your cases and many, many cases when I was in New York. I was often brought in at the very, very end of discussions just to provide some piece of information that the assigned lawyers didn't have themselves but to answer questions that the client had.

Q. And in the California case you referenced, were other people brought in, not just you but a whole team of outsiders?

A. Yes, absolutely.

Q. For instance.

A. A mental health professional; Wilbert Rideau, formerly death-sentenced prisoner who spent 44 years in Angola who helped counsel this client about what a life he had made for himself. He had gone into prison at a similar age. I think he went in at age 18 or 19, and so he was able to talk about how he had changed and grown up and educated himself in prison. And, you know, all of that's a different part of the calculation.

Q. And was that an atypical experience? You said you did it in that case and several others. Were you doing that kind of bringing in or participating as an outsider back in the time period that this case was tried?

A. Oh, absolutely, yeah.

Q. Was that the prevailing way of doing business in cases where there --

A. Yeah, and that's certainly what we talked about at training programs. I mean, enlist allies. Who can you bring in that will, you know, be a catalyst for a different and more effective conversation?

Q. Did you see any indications in this case -- and we're going to get to what you looked at in this case, but did you see any indications in this case that that process of bringing in outsiders was ever attempted?

A. No.

Q. At my request have you reviewed a great deal of material relating to the plea negotiation process in Miss Johnson's case?

A. Yes, absolutely.

Q. And can you tell the Court what you reviewed and how you decided what material to review.

A. Okay. You know, I had a limited amount of time when I was contacted about this case in -- you know, about a little over a month ago. I tried to acquaint myself with the broad parameters of the case by looking at the direct appeal opinion from the circuit court and the -- just the dockets from both the 2255 motion and the criminal case that preceded it.

I asked for the billing records of the trial team principally to see how much time various members of the team actually had contact with the client; jail records as an additional source to the extent that, you know, they reflected any other contact, although people are pretty scrupulous in their billing records about documenting their time. And when I say the trial team, I mean the three principal lawyers, the two lawyers who had been on the case earlier, the guilt/innocence investigator Mr. Cornell and his successor Mr. Gratias, and the mitigation specialist, of course, Mary Goody, and the mental health professionals who were involved pretrial.

Then in addition, I asked for correspondence and work product that related specifically to the plea issue. You provided me with, frankly, an overwhelming amount of material on

CD in that area and then a more focused compilation of about a thousand pages of specific work product notes and correspondence that was directly relevant to the plea issue.

So those are the -- those are the principal materials that I reviewed. And then in addition I joined you at your office for an interview with mitigation specialist Mary Goody and joined you and Miss Morrissey on telephonic interviews with Mr. Stowers and Mr. Berrigan.

Q. And in addition, did you also review some of the mental health evidence in the case?

A. Yes.

Q. Either reports or testimony?

A. Yes, exactly.

Q. Tell the Court what you reviewed in that regard.

A. I reviewed the reports and testimony of Dr. Logan, Dr. Hutchinson, the two psychologists who were involved in the case; Dr. Gelbort, the neuropsychologist who did some testing in 2005; and Dr. Cunningham who also testified at trial.

Q. And in addition, did you review a chronology of events?

A. Yes.

Q. And did you review what is Exhibit --

MR. BURT: May I approach the witness, Your Honor?

THE COURT: You may.

MR. BURT: Thank you.

BY MR. BURT:

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 352 Filed 11/10/11 Page 25 of 72

Q. -- 48 which is a binder containing some supplemental plea material that was recently provided by the government relating to documentation of plea discussions in both the Johnson case and the Honken case?

A. Yes.

Q. Did you review this material which is Exhibit 53A, B, and C and they're entitled Russ Stetler Plea Binders tabs 1 through 53A, B, and C containing 3 binders of material relating to the plea process, notes, correspondence, et cetera?

A. Yes. I was given a single extremely large volume that contained all this material without all the individual tabs.

Q. Okay. And if you'd step down for a minute, I'm going to ask you whether you reviewed what is premarked as 67A through J which are 10 volumes of material that are on -- on the Court's CDs as MCN?

A. Yes, I had the same CD I believe of miscellaneous correspondence and notes, and I think all of these materials come from within those volumes.

Q. Now, before we actually review what actually happened in this case concerning the plea discussions, let me ask you to step back a little bit and identify any other factors in this historical time frame we've been talking about, that is, from the time of Miss Johnson's arrest in 2000 until her trial in 2005, that made capital defense teams in federal death penalty cases more focused on the importance of plea negotiations.

A. Well, I think I've mentioned most of them. There was a rising number of executions generally nationwide peaking at nearly a hundred executions in 1999. There were the specific federal executions in 2001 and 2003. There was the disappearance of the appellate and post-conviction safety nets. Some of that was the natural process of the longer the statutes had been around the clearer the law was going to be and there would be fewer and fewer reversal but some of it also the changing composition of courts and the enactment of the Anti-Terrorism Effective Death Penalty Act which imposed shorter deadlines on the filing of habeas petitions. And then in addition, the rate of authorization of federal death penalty cases went up about 50 percent between the Reno years and the Ashcroft years. So I think all of those things were factors that put the importance of pleas on people's radar.

Q. Now, based on your review of those documents which we're going to talk about, could you summarize for the Court the deficiencies that you identified in trial counsel's performance vis-a-vis their failure to resolve this case by means of negotiated disposition?

MR. WILLIAMS: Your Honor, I'd object. I was provided by counsel with a summary report by this expert in advance of this hearing, and he was asked to opine on two issues, one of which is what were the prevailing professional norms concerning counsel's duty to seek an agreed-upon disposition in death

penalty cases at the time her case was proceeding to trial and, two, what is the interplay between counsel's duty to seek a negotiated disposition and the presence of mental disorders or impairments that might affect the capital client's capacity to make an informed decision about whether to accept the disposition.

And the opinion and the summary of the opinion reflects opinions on those two issues. It does not appear that he was ever asked to provide an opinion about the deficiencies of counsel in this case and what they did or did not do correctly. And if he has, I've not been provided with any report that reflects that opinion in this case.

THE COURT: Mr. Burt?

MR. BURT: Well, Your Honor, at the time that this summary was provided, it was just that, a summary, and it was still a work in progress in terms of where this witness was at in terms of his conclusions and his review of the case. I think it's apparent from the summary that he's going to talk about this case, though.

THE COURT: Wasn't apparent to me when Mr. Williams read it. But let me ask you this. Was it -- I just don't recall because I -- well, I just don't recall. Was it something that I ordered or that you agreed upon?

MR. BURT: No, we had a agreed-upon deadline for witness disclosures. We didn't really talk about what the

content of any disclosures was. And I tried to err on the side of giving Mr. Williams as much material as possible. And I gave him the summary. I also gave him all of the records that Mr. Stetler had been provided, so it was evident from that he was going to be talking about this specific case. The summary was more in the -- for the purpose of telling him what his background information was and what the general topic of his conversation --

THE COURT: And when did you provide the underlying records?

MR. BURT: At the same time I provided the summary which was on -- our agreed-upon date I believe was the 21st of February. So all of these documents that Mr. Stetler was provided were provided to Mr. Williams in a file, a folder, electronic folder, which was a Russell Stetler folder which included his declaration, the jail records, the correspondence files, and everything else he had relied upon.

So I think it was readily apparent that he was going to be talking about his review of this material. And I didn't hear any complaints from him about the sufficiency of the notice. We didn't have any --

THE COURT: Well, that's maybe because he thought he was just giving general opinions and not specific opinions about the case. But let's find out.

Mr. Williams, when you were provided apparently

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 26 of 72

electronically all the various exhibits from -- case specific to Angela Johnson -- you're a very bright guy -- wouldn't that have put you on notice that -- or at least on inquiry notice that maybe you ought to be calling Mr. Burt and saying, gee, the summary is general, but we've got all these specific documents; I'm wondering if you're going to have him testify specifically about this case?

MR. WILLIAMS: I guess I took the notice at face value. I mean, there's nothing in the language of this report that suggested that he was going to be doing anything other than speaking in general terms. There's nothing in there suggesting that this might be supplemented. I was never advised he was going to expand the scope of what his expert testimony is going to be today. I wasn't told until this morning that he had interviewed two of the attorneys in this case.

So no, I don't think there's anything in what I was provided that would have put me on notice that this expert was going to render an opinion about whether the attorneys lived up to that performance.

In an effort not to slow things down today --

THE COURT: Well, I'm not too worried about that. It's already so much slower than what I had originally expected, I'm over that hurdle, so let me ask you this. Let me just kind of jump ahead. Assuming I agree with you, what relief are you requesting? In the ideal world, not worrying about -- don't

worry about slowing things down -- what relief are you requesting?

MR. WILLIAMS: The relief I'd request is to not be compelled to conduct my cross-examination today and give me a chance given that I'm now apparently going to hear a whole different line of expert testimony to actually prepare for that cross-examination because that's not the cross that I was prepared for today. And so I would ask we be able to bring Mr. Stetler back in June after he renders his opinion here today so I can cross him at that time.

THE COURT: And how do you feel about having him -- well, I'm not going to ask you that. I'm going to ask the other side that. Let me ask you this. If your choice is between having the witness give his direct now and then Mr. Williams would have months to prepare the cross for June, would your -- assuming I grant him relief, would you rather have that option, or would you rather bring the witness back in June and have him give his case-specific testimony and then have the cross at that time?

MR. BURT: I wondered if the Court would allow me a brief recess to talk to the witness about scheduling issues because that's one concern I have so that I could address that with him and let the Court know. I mean, I don't have any problem myself in proceeding with the direct examination because we're prepared to do it.

THE COURT: Well, I just wondered if you thought that would give the government an unfair tactical advantage in cross-examination.

MR. BURT: Well, it may, but there's a tactical advantage to us which is all this evidence that the Court has heard from the past week is clear in the Court's mind, and I think it's important for me to address certain issues. And the Court's going to hear from Mr. Berrigan on Monday.

So I have a tactical reason for proceeding because I want the Court to be listening to the attorney testimony with some knowledge of what people like Mr. Burr and Mr. Stetler are going to say. It may give the government an unfair advantage. But, frankly, I think what Mr. Stetler has to say is pretty irrefutable, and I want to give the government as much time as possible that they think they need to cross-examine him.

I will say this, Your Honor. I made clear to Mr. Williams -- and he took advantage of it at least in regards to Mr. Stowers and Mr. Willett -- that I have no objection to him interviewing these -- anybody. So it wasn't a situation where I was intentionally attempting to sandbag him. In fact, I think --

THE COURT: No, I don't think that's the case. That wasn't even on the radar screen.

MR. BURT: Well, I just wanted the Court to be clear that he did receive this material in a timely fashion. There

was -- and I made clear to him that everybody was available with the exception I think of Mr. Berrigan who had a position that was different than everybody else. But without exception, I think everybody has been available.

And I -- in Mr. Williams' defense, there has been a tremendous amount of information that got conveyed to him. We have tried to put this together under tremendous pressure in terms of meeting the deadlines that we had agreed to impose upon ourselves. But the size of this case, the strength -- I mean, in an ideal world, I would have summarized every opinion the witness was going to give, but that just wasn't going to happen within the time limit. So all that --

THE COURT: I understand that.

MR. BURT: -- being said, my preference would be to proceed with the direct today as long as there's no scheduling problems with Mr. Stetler, bring him back in June at the Court's convenience to do the cross. That's fine with me.

THE COURT: Okay. Here's what I'm going to do. And, you know, I'm fairly confident, Mr. Burt, that there are two kinds of lawyers, intentional sandbaggers and nonintentional sandbaggers, and everything I've seen from you since you've been in this case would put you in the nonintentional sandbagger category. So I wasn't even -- that wasn't even actually on my radar screen, and I generally have a pretty suspicious and wide-ranging radar screen when it comes to lawyers, but it

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 27 of 72

wasn't even crossing my mind, and it's not crossing my mind.

Here's what I suggest we do: We go ahead and do the direct examination. And then Mr. Williams, as you have seen, is a pretty skilled cross-examiner. So you can then decide -- and I'm not suggesting that you should do this -- whether you want to proceed with cross-examination which you may elect to do or you may not. And then we'll just defer it till June, and there's no harm. I mean, I wouldn't be the least bit upset if we defer it till June.

I'm trying to figure out -- I was just looking at the calendar to verify. June does have only 30 days. And, you know, I was hoping maybe, you know, I'd been wrong all these years and it had 45 or 50 days in it, but I double-checked, and it does not.

So -- you know, but that's a separate problem, how are we going to get everything in in June, and is it going to be June and July or August, and, you know, we'll deal with that later on in the proceedings.

But do you have any objection to proceeding that way? And I'm not suggesting that you should cross-examine today. I'm just saying that if you decide you want to that's fine. If you decide you don't want to, we'll put it off till June.

MR. WILLIAMS: That's fine with me, Your Honor. And just so I can make a record, I don't -- I did not mean to intimate in any way that Mr. Burt intentionally did anything

wrong.

It struck me here that it was a case where this expertise has kind of evolved over the last couple weeks, and I just wasn't aware of it, and I at no point -- Mr. Burt's been nothing but professional throughout this representation. I did not think he was intentionally putting me at a disadvantage. I recognize it evolved. I just wasn't alerted to it and given a new summary. So I'm fine with proceeding in that manner, Your Honor.

THE COURT: Okay.

MR. BURT: And, Your Honor, could I ask Mr. Stetler if there's a scheduling problem for him in particular in the week I believe of the 13th which is -- is that the -- the week June 13?

THE WITNESS: Could we take a brief break and I could check my schedule?

MR. BURT: If there is a problem, we, of course, could make arrangements, but I didn't -- I wanted to make the Court aware that we had not anticipated this issue, and I obviously did not check with him. But we have plenty of other evidence, so if there is a problem --

THE COURT: You know, there's always a possibility too of doing his cross by video conferencing.

MR. BURT: Sure.

THE COURT: Wherever he's at. We could do it in the evening so it would obviate any scheduling problem that

Mr. Stetler would have in all likelihood. So I'm pretty certain we can solve this minor blip.

MR. BURT: Fine. Thank you.

THE COURT: Okay?

BY MR. BURT:

Q.   So, Mr. Stetler, could you summarize for me the deficiencies that you identified from your review of this record of trial counsel's performance vis-a-vis their failure to resolve this case by means of a plea?

A.   Yeah. I think there are five broad areas. One was really simply the failure to assemble a functional as opposed to a dysfunctional team. And I think that had an impact in multiple ways but the most important of which was a team that spoke with many different voices and which did not distribute contact with the client appropriately. I can develop all these areas in detail.

The second area was within the team I think there was a failure to analyze the risk of a death sentence in this case. And in multiple ways the team itself, you know, and ultimately counsel just did not make a full professional assessment of the high-risk stakes of trying this case.

Third, I think the team did not adequately apprise Ms. Johnson of the applicable law and the weight of the evidence, didn't give her the raw material for making a fully informed decision.

And then fourth, they did not integrate the mitigation investigation into a strategy to resolve the case.

And fifth, they did not take advantage of the insights of the mitigation specialist or the mental health professionals about how best to communicate effectively with Miss Johnson about the plea.

Q.   So let's take a look at each of these areas in detail. First of all, the failure to establish a functional capital defense team, what led you to the conclusion that Miss Johnson's team was dysfunctional?

A.   Well, I think on paper this looked like a dream team. You not only had two lawyers but you had a lawyer who was experienced in death penalty cases, and ultimately you had a third lawyer. And I'm, you know, forgetting about the earlier lawyers who were in and out of the case, but I mean the core team of Mr. Willett, Mr. Stowers, and Mr. Berrigan gave three lawyers with, you know, different degrees of experience but all, you know, very experienced people.

You had a fact or guilt/innocence investigator, Mr. Cornell initially and ultimately his successor, Mr. Gratias. And you had a mitigation specialist.

So there was the appearance that they had all of the constituent elements. But these were like wheels on a car that were pointed in different directions. They were not functioning together, and they were not functioning consistently. The team

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

was not meeting. They were not meeting telephonically. They were almost never in the same place at the same time.

And so over the long pretrial life of this case, although you had, you know, again, on paper a lot of skills and experience, they just were not functioning as a capital defense team.

Part of the problem, of course, was geographic. Part of the problem was I think what one of the lawyers, either Mr. Stowers or Mr. Berrigan, referred to as a shotgun marriage. We had people that didn't know one another who were strangers and were thrown together in the case, so they were not used to working with one another.

But I think those problems could have been solved if they had simply exercised the discipline of saying we need to function as a team, we need to have regular meetings, you know. And there's no inexorable commands about how often you have to meet, but it has to be regular. And you need to have the key, most-experienced people investing a significant amount of time with the client.

One of the things that really struck me on looking at the billing records and the jail visits was how little time the mitigation specialist spent with Ms. Johnson and that the most client contact was with Mr. Willett's legal assistant who had absolutely no training and experience in death penalty cases.

Q. Did you actually go through the billing records and do an

analysis of the amount of time that each of the players in this team spent with Miss Johnson?

A. Yes.

Q. And showing you what has been premarked as Exhibit 68 -- I'm going to have to zoom out here a little bit -- tell us what this is.

A. Well, that's just a bar chart of the hours of client contact. And that includes not just jail visits but telephonic contact which was, of course, initiated by Ms. Johnson rather than counsel. But if the -- if they billed for, you know, two-tenths of an hour of taking a telephone call, that's all captured in this graph.

And what you see most dramatically is that Mr. Willett's legal assistant or secretary, Miss Lanoue, was the person who had overwhelmingly the most contact, almost 400 hours, and --

THE COURT: Could I interrupt for a second?

MR. BURT: Yes.

THE COURT: Do you have the raw numbers that perhaps you could go through with the witness --

MR. BURT: Sure.

THE COURT: -- and write on top? I mean, I can see, for example, that Mr. Willett approaches 100, so it's probably in the high 90s or something. But it's a little bit harder to tell with Stowers and Goody and Frerichs and Cornell. And I

assume that data's readily available because it would have been impossible to do the chart without it.

MR. BURT: Right.

THE COURT: And so it could just be kind of helpful for me to do that.

BY MR. BURT:

Q. Do you have the numbers?

A. I don't have them with me, but I'd be happy to provide --

THE COURT: Okay. Why don't you do this. Are they back home?

THE WITNESS: No, I probably have it on a flash drive.

THE COURT: Okay. Well, at some point why don't you provide them to Mr. Burt, and then he can go over them with Mr. Williams, and then they can -- if they can agree, they can just provide them to me.

THE WITNESS: And I would also have to add, Your Honor, that there's a little bit of approximation because some of the -- some of the billing was less precise and --

THE COURT: Sure. It's block billing where --

THE WITNESS: Exactly.

THE COURT: So you have to make your best judgment.

THE WITNESS: Yeah.

THE COURT: Yeah. Let me just ask you when you did that, were you cons -- how would you describe your approach? Were you conservative, or did you give the lawyer the benefit of

the doubt kind of on how much time --

THE WITNESS: Tried to give him the benefit of the doubt.

THE COURT: Sure.

THE WITNESS: And I think the lawyers were the most precise. You know, they're -- they're used to the decimal system of billing. I think Ms. Goody was more inclined to -- you know, if she was in Iowa and spent X number of hours with all the different lawyers and maybe a couple of witnesses and Ms. Johnson, I maybe had to guess and say it was an hour or two.

THE COURT: Okay. Thanks.

THE WITNESS: Does that make sense?

THE COURT: Yes, absolutely.

BY MR. BURT:

Q. So on the left-hand side here, you've got -- those are hours? In other words, Mr. Willett's billing is about a hundred hours?

A. Yes.

Q. And client contact, Mr. Berrigan's looks to be about half than that, a little --

A. I think it's a little more. I think it's 70 something.

Q. Okay. And how about Mr. Stowers?

A. Mr. Stowers is maybe 12 hours, something like that. And Ms. Goody I remember is a little under 20 hours.

Q. Now, you're a mitigation investigator or you were, still

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 29 of 72

are I guess. Twenty hours for a mitigation investigator, is that about in the ballpark in terms of client contact?

A. Well, it's a very low number, particularly over the long life of this case. When you think of it as a five-year period, it's a very, very small number.

Q. The Court on examination of an earlier witness made reference to a study, a Federal Judicial Center study, in 2004 I believe that sort of talked about the average number of hours that is spent by a mitigation investigator not only on interviewing but on the entire case, and if my memory serves me correctly, I think it was 200 hours?

THE COURT: It said a hundred to 200 hours as I recall it.

Q. Okay. Are you familiar with that study?

A. I'd say vaguely. This is something subsequent to the first Spencer Report?

THE COURT: Yes, it followed the Spencer Report, but it cites the Spencer Report in it.

A. Okay. And, you know, correct me if I'm wrong. I think that study, however, was largely based on the first group of federal death penalty cases, maybe the first 20, something like that.

Q. Uh-huh.

A. And I think those numbers are extremely low probably reflecting the jurisdictions in which the cases were prosecuted.

THE COURT: And certainly pre-Wiggins.

THE WITNESS: Yes, absolutely pre-Wiggins.

THE COURT: Which probably would have had a huge influence.

THE WITNESS: Certainly. But again, it's also I think reflecting the practices in state court in some --

THE COURT: No, they were actually just looking at federal cases.

THE WITNESS: No, no, I'm saying but to the extent they took place -- that the federal prosecutions took place in western Missouri and Texas and Virginia where there was not a historical tradition of strong mitigation investigation, I think that's unfortunately what's captured in those numbers.

Again, I refer to the article by Lee Norton, a mitigation specialist from Florida and now based in Tennessee. She published in 1992 so almost 20 years ago an article saying gotta be hundreds of hours, and she didn't put a precise number on it in part because you can't. Every case is different. It depends whether a case is completed in a year or two or extends on for five years like this one. But I would say that amount of client contact is extremely low.

BY MR. BURT:

Q. What based on your experience in doing mitigation work in this time period, 2000 and 2005 -- and again, I understand each case is different, but 200's too low. What would an average

number -- if the case was being done properly, a federal death penalty case involving mitigation investigation that extended to several states geographically, looks like many, many witnesses --

A. I would say conservatively several hundred rather than 200.

Q. Okay.

A. And again, I've avoided putting a precise number as a benchmark because there's so many variables in a case, but I'd say typically several hundred cases -- several hundred hours in particular.

THE COURT: Mr. Stetler, I'm going to ask you because several hundred hours to me means 200 hours. You know, several means maybe --

THE WITNESS: No, I mean six or seven hundred.

THE COURT: Okay. I -- there you go.

THE WITNESS: Literally several hundred.

THE COURT: Well, 200 can be several hundred.

THE WITNESS: Yeah.

THE COURT: Yeah. But you're saying, you know, 600.

THE WITNESS: The upper hundreds, yes.

THE COURT: Okay.

BY MR. BURT:

Q. Okay. Now, showing you what's been premarked as 69, can you tell us what's depicted in this?

A. Yeah, that takes the same -- the same data and just turns

it into a pie chart to show the percentage of the total amount of client contact by the various team members. So, again, it's showing that overwhelmingly of all the time invested by the team it was the legal assistant's time that was, you know, the largest part. And you'll see Miss Goody's fraction is just 3 percent of the total time, so that's an extremely low number.

Q. Now, you talked in your article, Exhibit 65, about the need to overcome barriers to communication, and you talked in that connection about the need to have at least someone on the defense team who's identified with the client culturally, racially, gender, whatever. I think the example you used in your article is most of the players in the system are white. Most of the clients are people of color, and it's important if you're going to communicate a plea to a client to have somebody the client can identify. What's wrong with using Miss Lanoue, a female, to communicate with Miss Johnson? Why isn't that --

A. Well, I think gender is an important issue. I think the problem with Miss Lanoue is she had absolutely zero capital training or experience, and she understood her job to be apparently, you know, to review discovery and look for reasonable doubt as opposed to, you know, exploring mitigation issues or discussing potential resolution.

Q. And who should -- I mean --

A. And I'm basing that on the interview you did with Mr. Berrigan who said essentially, gee, if we could have gotten

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS    Document 352    Filed 11/10/11    Page 30 of 72

her on board for a plea, this case would have turned out differently.

Q. So would one method that could have been used, should have been used if Miss Johnson had a close relationship with Miss Lanoue was to, in your words, get her on board?

A. Yes. And I think, you know, again, you had five years in the life of this case. I mean, this is no disrespect for her. I'm sure she was a talented person in her own way. She just did not have either training or experience. So she needed exposure to capital defense training. There were multiple opportunities that she could have been sent to if she was going to be the primary contact person. They could have sent her to a couple of the conferences that Mr. Berrigan himself attended including the Federal Strategy Session and the National Legal Aid and Defender Association's Life in the Balance. So you could have made an effort to educate her.

But my sense is that instead, you know, she was just doing what she traditionally did with Mr. Willett's clients which was looking for sources of reasonable doubt poking holes in the prosecution's case.

THE COURT: Can I ask some questions here?

MR. BURT: Certainly.

THE COURT: Would you agree, though, that Nancy Lanoue because she was female and did not have a law degree might -- very well could have developed a better relationship with Angela

Johnson than Al Willett could have?

THE WITNESS: Yes, absolutely.

THE COURT: And would you agree that in terms of capital training and experience Al Willett and Nancy Lanoue were equal?

THE WITNESS: Yes, zero equals zero.

THE COURT: And --

THE WITNESS: I can do that math.

THE COURT: Yes. And I wanted to ask you about the geography problem.

THE WITNESS: Yeah.

THE COURT: In a state where the -- where I don't think any lawyers are currently alive who ever -- were alive in 2000 that had any death penalty experience, would you agree with me that it's virtually impossible to find a lawyer in Iowa that would have had death penalty experience?

THE WITNESS: Absolutely, and it's true in a number of other jurisdictions where there have been federal prosecutions.

THE COURT: Right, where they don't have the state death penalty.

THE WITNESS: Yes. Puerto Rico, New England, Michigan. So it's a problem that we've seen in the federal system many times.

THE COURT: And -- but I under -- I understood that -- well, let me ask you this. Do you know of any experienced

capital defense lawyers with federal court experience any closer to Sioux City, Des Moines, and Cedar Rapids than Mr. Berrigan was?

THE WITNESS: I don't think so. I'd have to look at a map, but I think that's -- he probably was the closest one.

THE COURT: And would the geography problem -- was that -- was that curable in this case?

THE WITNESS: Well, I think it's curable in all cases. I think it's just a reality when you bring death penalty prosecutions in states that have not -- don't have a local death penalty statute, you're going to have to bring in mitigation specialists and lawyers from other places, and I think that happens all the time.

Mr. Berrigan himself did a trial a little later in Nashville where the client had grown up in southern California, the case was being prosecuted in Tennessee, and there was local counsel and Mr. Berrigan and a very skilled mitigation specialist from out of state. And, you know, I think things worked very differently and very effectively in that case.

THE COURT: Well, let me ask you this. Just on the geography problem in this case --

THE WITNESS: Yes.

THE COURT: -- which I recognized --

THE WITNESS: I recognize too having flown here.

THE COURT: And I want you to second guess me. Do you

think there's anything I could have -- setting aside the specific lawyers that were selected -- I have no recollection of being involved in Mr. Willett's selection. I do have a recollection of being involved in Dean Stowers', and I don't think I was involved in Mr. Berrigan's selection because I'd never heard of him. Is there anything that I should have done differently to improve the geography problem in this case?

THE WITNESS: You know, I haven't looked at funding applications and whether they had any impact in the case. That would be the only thing that would occur to me if you were saying, you know, to Miss Goody, you know, you can't come to Iowa as frequently as you've asked to come, something like that.

But no, I think when the country -- point I was trying to make, Your Honor, because that's a very good question is that I think from the bench it looked like you had appointed exactly the team that the ABA guidelines said you should appoint: An experienced death penalty lawyer, an experienced lawyer in federal practice, somebody else who would cover law and motions. You'd given them funding for a guilt/innocence investigator, and you'd given them funding for mitigation specialist. And when they asked for mental health funding, you signed off on that as well. So I think the appearance was that they had all the people that they were supposed to have. I think the problem was unfortunately within the team.

THE COURT: Well, and -- have you gone back and looked

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 31 of 72

at the ex parte CJA telephonic conferences? Have those been transcribed and provided? I mean, I wouldn't know, but did you do that?

MR. BURT: Yes, we did look at them, and what we have in that regard, Your Honor, is they are not transcribed with some exceptions, but they are -- what is existing is in the funding binder. And it consists of Miss Lanoue's notes, transcribed notes, of what was taking place. So we do have a couple of those telephone dialogues. It's not official transcripts, but there's -- and also Mr. Berrigan kept meticulous notes of virtually everything including when he would park the car he'd make a notation that he walked half a mile, I mean, just incredible detail in his notes. So we do have some sense of some of those phone conferences, and they are included in this chronology that we've provided.

THE COURT: Well, here's where I'm going with this. I was putting a -- as I recall, a fair amount of pressure on the lawyers not to duplicate efforts because, of course, it was my first capital case. And I appointed one more lawyer than was minimumly required, and I wasn't even sure about my authority to appoint a third lawyer, but I know we looked at it.

But I was thinking in my own mind kind of the quid pro quo for a third lawyer was that you could delegate things and there would be discrete tasks. And it was never my expectation that there would be a tremendous amount of team meetings and

that every decision in the case would be made by a team. That was never my expectation. I did nothing to encourage that. I probably did in hindsight more than I should have to discourage it.

So I wonder if you can a -- because, you know, I think I was very generous, my own view is -- of course, you know, we all have inflated views of how we do things. I thought I was being generous. I don't -- I'm not sure I ever said no to an expert witness, but I was also concerned about the cost because I was on the Defender Services Committee at the time and we were talking about case budgeting, and I felt like -- and that's why I did a case budget here. I felt like I'm a hypocrite. You know, we're making policy on case budgeting, and I'm not even doing it.

THE WITNESS: Your Honor, I came from Washington on Thursday, and all I heard about was budget so . . .

THE COURT: Yeah. But, you know, case budgeting didn't make a whole lot of sense to me. And after the fact it even made less sense precisely because I rarely said no. So, you know, I wasn't going to stick them with the case budget because it's their best guess and things change, and, you know, you can't impose it rigidly but . . .

THE WITNESS: And I did not mean to suggest that the team had to meet physically in the same place on a regular basis. My point instead was you get everybody together

telephonically so that they're all at least talking to one another. And it doesn't have to be all day. It doesn't have to be four hours, but just on some regular basis bringing everybody up to speed I think would have made a huge difference.

THE COURT: My recollection is -- and I may be wrong but -- and I don't know if the defense team has looked at this -- that I didn't do any cuts in their billing for too many team meetings or anything like that. But, you know, I did put -- I did put pressure on them to try and delegate discrete tasks to each lawyer to try and minimize duplication. And I guess from -- that really doesn't bode well for your team concept, does it?

THE WITNESS: Well, I think, again, if the team is on the same page, then that works very well. There is a division of labor, and everybody's working toward the same goal. But, I mean, tellingly, one of the -- one of Mr. Berrigan's notes said after a couple of visits with Ms. Johnson, "These are the best visits I've had. Al Willett wasn't here." I think that was -- that was much more the problem, that they really were not on the same page of the same mind about where the case should go.

THE COURT: But isn't part of the reason why you have more than one lawyer -- well, the amount of work is too much for one lawyer. That's obvious, probably in most cases too much for two, make a good argument it may be too much for three. I don't know.

But, you know, you keep talking about they have to be on the same page, but don't you kind of want the independent professional judgment of each lawyer that may disagree? So are you talking about when they approached the client they should be on the same page, but what if they're not? I mean, that's -- that's a virtue it seems to me that you get three independent views and they may not all agree. I mean, it's like sitting on the Court of Appeals which I've done recently. You know, we don't always agree.

THE WITNESS: Right.

THE COURT: But that doesn't mean if I write a dissent I'm a lesser judge or I haven't done my job because I disagree. I just have a different view of the case.

THE WITNESS: Sure.

THE COURT: And isn't that one of the benefits of having multiple lawyers so that the client can get the benefit of different views and then ultimately decide among those different views what to do?

THE WITNESS: I think that's right, but I think if the lawyers have reached agreement that a plea is the appropriate and most prudent resolution of the case, then I think you don't want dissents in your client meetings any longer. And if that's -- you know, if that's a disagreement that they can't resolve, then I think that's a problem for the team. I don't think you --

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 352 Filed 11/10/11 Page 32 of 72

**1752**

THE COURT: It's not necessarily a kind of a bad thing that they might disagree on how to resolve the case. One lawyer might think it's better to go to trial, and one lawyer might think it's better to plead as long as they disclose that to the client and the client gets to weigh the benefit of the judgment of each lawyer and then make a decision. I mean, that's not a bad thing that they might not be on the same page as to how to resolve the case, is it?

THE WITNESS: Well, I think it depends on timing. I think early in the case I'd agree, but I think after the lawyers had an opportunity to assess the weight of the prosecution's case, the strength of the proof, the -- and the risk of trial, I think at a certain point it becomes very dangerous to have, you know, what we call team splitting which is, you know, confusing the client about what we think is good professional advice and what's the best course here.

THE COURT: Okay.

THE WITNESS: Particularly when you have, you know, one person with death penalty experience and no one else with that experience.

THE COURT: Why don't we take a 15-minute recess until 11:10 and then come back and we'll go till noon, and then I have -- we'll take an hour; okay? Thank you.

THE WITNESS: Thank you, Your Honor.

(Recess at 10:53 a.m.)

**1753**

THE COURT: Thank you. Please be seated.

Mr. Burt?

MR. BURT: Thank you.

BY MR. BURT:

Q. Mr. Stetler, you and the judge were talking about geography, but that wasn't the only problem in this case in terms of client communications; right?

A. No, that's correct. Geography is a concern in multiple cases, and usually it gets satisfactorily solved.

Q. I mean, in terms of the financial issues the judge was talking about, this was a multi-defendant case, was it not?

A. Yes, two-defendant, yes.

Q. And is it a common problem in federal capital cases that judges concerned with the cost of these cases organizes defense teams in multiple-defendant situations so that there is some pooling of resources just in order to save costs?

A. Yes, that's frequently possible. If you have common issues and they're generally guilt-phase issues, you can share experts on those common concerns.

Q. Share investigation, for instance?

A. Yes.

Q. Here there was a lot of overlap --

A. Yes.

Q. -- between Honken and --

A. Yes.

**1754**

Q. -- the Johnson witnesses in terms of who was going to testify.

A. Yes.

Q. And did you see in the files you reviewed any interaction between the two teams in terms of getting -- the Johnson lawyers getting together with the Honken lawyers and saying, look, we got hundreds of witnesses here, let's decide where we got some common interests here and split up the investigation, save some money there, and use the money we save to do more important things like communicating with the client?

A. No. And, in fact, you know, the -- I don't recall seeing any references to saving money, and there were a couple of jokes in the notes on the contrary, a note from Mr. Berrigan to Mr. Stowers saying, "I hope you billed the hell out of that motion."

Q. Okay.

A. I mean, unfortunately, you know, this is perhaps a side issue, but there are no financial incentives to resolving cases, and I'm not suggesting that people are going to trial in order to bill these cases. I'm not suggesting that at all. But it is a reality that there is no reward financially to an early disposition.

Q. One of the things the guidelines talk about is the appointing agency conferring with the lead counsel about who the associate counsel are; correct? Isn't there a provision in

**1755**

there?

A. Yes, in the ABA guidelines, yes.

Q. Okay. So the responsible -- the appointing agency here is the Court and apparently some issue of finding out who the lead guy can work with.

A. Yes. Well, and, in fact, identifying who is the lead guy because I think there was some ambiguity in this case as to whether Mr. Berrigan as learned counsel assumed that role or whether Mr. Willett put himself forward as first appointed and, therefore, lead counsel.

Q. Under the guidelines when they talk about lead counsel, in your view are they talking about learned counsel?

A. Yes, absolutely.

Q. The person -- as the team manager the person who's supposed to be overseeing this?

A. Yes, and is the ultimate decision maker and the person who's ultimately responsible if things go sideways.

THE COURT: Mr. Burt, could I interrupt for a second?

MR. BURT: Of course.

THE COURT: Did I designate a lead counsel?

MR. BURT: No, Your Honor. What happened was that you never appointed Mr. Willett. He was appointed while the case was noncapital, and there was no designation of lead. You appointed -- in fact, there's an order in which you indicated Mr. Willett was not qualified to be lead counsel and you

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 33 of 72

appointed Mr. Berrigan as learned counsel. There was never any designation that so and so's lead. Learned counsel was a term of art under --

THE COURT: The statutory scheme.

MR. BURT: -- 2005, so Mr. Berrigan was clearly appointed as learned counsel, but the Court never designated somebody as a lead counsel in the sense that we're talking about here.

THE COURT: Was I supposed to?

MR. BURT: I don't think so, but I think my point in referencing the guidelines is the guidelines inform -- you know, have certain responsibilities, and they talk about lead counsel, but what they're really referring to if you read it is learned counsel.

So I think once the Court appointed learned counsel, that should have made clear to the defense team who was the ultimate person in charge of managing this team. And I think part of the confusion here was I don't think Mr. Willett ever understood that because he, of course, was always asserting "I'm the lead counsel." And that's a very confusing aspect of this case I think.

THE COURT: Do you know at what point either did I or -- because I have no recollection of it -- did I or should I have been alerted to the fact that Mr. Willett was asserting himself to be lead counsel?

MR. BURT: I don't think you were ever informed of that until -- my recollection is at the beginning of trial there was some discussion of who was going to be speaking for the team as lead counsel, and I think Mr. Willett stepped forward and said, "I'm lead counsel." And then during jury selection there was a discussion in which Mr. Berrigan said, "For purposes of jury selection I'll be lead counsel," so that there was, again, this continual sort of confusion of who was the learned, who was the person in charge of managing this case.

THE COURT: And at most of the hearings we had, didn't I always assume -- I mean, I -- I always assumed that Mr. Berrigan was lead counsel.

MR. BURT: That's absolutely right. The pretrial hearings, the Court -- Mr. Berrigan was speaking for the team.

THE COURT: Team.

MR. BURT: And most of the discussion the Court had was with Mr. Berrigan as the leader of the group.

THE COURT: And I was surprised in this hearing to find out that Mr. Willett was lead counsel, but then I think there was some CJA correspondence where maybe that was indicated, but I don't think I ever picked up on it. So maybe I should have known that at some point. But I know when we went into the hearing on Monday I had always assumed that Mr. Berrigan was lead counsel. Maybe I shouldn't have assumed that but --

MR. BURT: Well, I think the problem was not with your assumptions but with the dispute within the team of who was running the show here, and that really was the problem because Mr. Willett was assuming he was the leader.

THE COURT: I wonder why they didn't come to me about it, but that's -- I don't know.

MR. BURT: Well, I -- it's a problem.

THE COURT: Okay. Yeah.

BY MR. BURT:

**Q.** I want to show you from Exhibit Number 53B a letter that Mr. Berrigan wrote to Angela Johnson February 7, 2002. And it is RS-000483. Are you familiar with this letter?

**A. Yes, and actually there are a couple of these. There's another one almost exactly a year later I believe where Mr. Berrigan has made a trip all the way up here but hasn't bothered to see the client.**

**Q.** So the first letter -- the first sentence of this letter says, "It is an absolute shame that in two and a half days spent in Cedar Rapids I was not able to get to see you in the jail." Now, this is not a problem of geography, correct, because he's coming here to Cedar -- he's coming to Iowa. He's presumably billing for it, so it's not any -- he's present in the very location where the client is. This is a problem other than geography, is it not?

**A. Absolutely.**

**Q.** And could you expound on that a little bit?

**A. Yes. I think this is really dropping the ball in a big way. You know, if lead counsel is going to be the ultimate responsible party in the plea negotiations, the person who is ultimately responsible for the guidance to the client, to neglect to see her when he's here for more than two days, has a responsibility to renew that relationship, to hear her concerns, to bring her up to speed on what has happened, and that's true for any client at all facing capital charges.**

**And it's, again, you know, I think particularly important for a client who has vacillated in terms of attitudes towards disposition in trial, to a client who has had limited educational background.**

**Again, you need to sit down and be sure that everything is well understood. Say it again. Ask the client to say it back so you're sure that she understands everything that we've been talking about and also just to, you know, build that human connection with the client so that the, you know, client understands that you really care about her.**

**Q.** Now, here not only has the lawyer not seen the client when he had the opportunity to do so, but he's informing the client that he was here and didn't see her. What kind of message does that send Angela Johnson about her learned counsel?

**A. Well, that she and her well being are not the top priority, that he's busy with other things and he'll see her when he's got**

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 34 of 72

**1760**

time for that, and, you know, that's kind of standing the priorities on their head I think.

Q. Now, in terms of the breakdown of this team, was one of the things that you identified not only a geographic problem but also a overwork problem on behalf of some of the team members?

A. Yes. Well, Mr. Berrigan in particular. I'm less attentive to the schedules that Mr. Willett and Mr. Stowers had, but the two people with capital experience, both Mr. Berrigan and Ms. Goody, frankly, had too much on their plate. It's not something that we've called attention to, but it's another issue that's discussed.

It's so important in the -- that the ABA guidelines mentions the workload issue twice both from the point of view of the appointing authority or the institutional defender office if the person is part of that office and again from the point of view of the individual practitioner, you know, that you've got an obligation to be sure that your workload is not preventing you from providing the high-quality representation that a capital client deserves.

Q. Showing you guideline 6.1, workload. Is this one of the guidelines you're referencing?

A. That's one of them. That's from the point of view of the appointing authority.

Q. Basically that the appointing authority should make sure to appoint counsel who have the time to do the case properly.

**1761**

A. Right, correct.

Q. Then there's another guideline about counsel's duty not to take on a case unless they know they can do it, have the time to do it.

A. Exactly. So when you look yourself in the mirror you know am I just too overextended to give this case what it needs.

And, you know, Mr. Berrigan did two -- at least two capital trials during the first couple of years of his representation, the federal death penalty trial in the Western District of Missouri in United States versus Nelson and then another death penalty trial several months later in Kansas. I think that's the Robinson case. And so, you know, all of those cases need a lot of undivided attention and --

Q. Each one of them.

A. And none of them was getting it.

Q. Are death penalty cases like drunk driving cases that the lawyer can do volume and expect to do any individual case well?

A. No. They really need at least a chunk of time of undivided attention.

Q. And you said that Mr. Berrigan, while this case was underway, tried two other death penalty cases?

A. That's correct, and he was appointed in at least one more. And I'm not sure what else he had in his state court practice.

Q. While this case is pending, he was appointed in which case? Do you know?

**1762**

A. Yes. He was appointed in United States versus Shakir, S-h-a-k-i-r, in the Middle District of Tennessee. Actually he was appointed in the Nelson case also when he was already appointed in this case or around the same time. I forget the exact appointment dates of either one. But he came into that case in the beginning of 2001, and it went to trial in the fall of 2001. And, of course, he had health issues as well. He had triple bypass surgery in August of 2001, so this was a very busy -- very busy man.

Q. Did you see reference in the files that you reviewed to him reporting in to the other team members that he could not be present for certain things that were occurring in the case, he was involved in other trials?

A. Yes, yeah. There are multiple references to his other obligations as well as to the health issues.

Q. Now, this letter that I referenced before, RS-483, he appears to be commun -- first paragraph is I was in town, couldn't get in to see you. But then he is conveying a plea discussion information to the client by way of letter.

A. That's correct.

Q. And is that in compliance with the standards of practice relating to --

A. Well, again, these are the most important decisions a client could ever have to possibly make. And you don't just inform a client by letter. You need to engage them in a full

**1763**

consideration of these discussions, get their input. It's their decision ultimately. And so I think a letter just does not substitute.

And so this -- that second paragraph provides the context of why he's in Cedar Rapids. I mean, that's a very important development that he's conveying, and, you know, to think that he left town without sitting down with the client and discussing that in detail is really surprising to me.

Q. And this is a -- according to the content of the letter, while he was in Cedar Rapids, Pat Reinert approached him briefly about a plea discussion and indicated that the government was not wed to their requirement that Angela Johnson plead to a life sentence but instead would consider a sentence of 40 years as sufficient with pre-agreement downward departures if certain conditions were met.

Is that kind of information, that is, that a prosecutor has approached Pat Berrigan and indicated to him that a 40-year sentence might be a possible disposition, the kind of information which is important to convey to the client in person and to get some interactive process going on what the client's --

A. Absolutely.

Q. And you'll see he also informed -- indicates in the letter that he informed Reinert that 40 years was indeed a life sentence and that this would be unacceptable.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

## 1764

A. Yes, and he did that obviously without communicating with Miss Johnson about it.

Q. And --

A. So he's removing her from the interactive process. He's engaged in discussions with the government but not involving the client in, again, the toughest decision a client ever has to face.

Q. Now, one of the other things he says here is we would need to be closer to 20 years with a guaranteed scenario which would not subject you to additional time. That was the extent of our discussion.

You had a conversation with Pat Berrigan in preparation for your testimony; right?

A. Yes.

Q. And was one of the issues you explored where this 20-year number came from?

A. Yes.

Q. And what did you learn?

A. He said, "That was my number, not hers."

Q. And is that -- is that the way it normally should go in a plea negotiation process where the lawyer comes up with a number and then says to the client this is the number we're shooting for and -- without any sort of discussion with the client?

A. No. I think you have to have that discussion with the client, and in addition I think in this case when there is also

## 1765

correspondence where the same prosecutor could not have been clearer in saying 20 years is unconscionable, that's 4 years per homicide, you know, to continue to assert that that's an appropriate number I think was extremely unrealistic.

Q. Now, you mention the financial disincentives to pleaing a case. And do you recall -- and I think you alluded to this, but I just want to make sure. This is in the plea binder, RS-14-000924. Do you recall reviewing this e-mail?

A. Yes. That's the one I was referring to. It's an e-mail from Mr. Berrigan to Mr. Stowers saying, "Nice job on the change of venue. Hope you did it all and billed the hell out of it."

Q. And, of course, lawyers who are interested in billing the hell out of a case, they lose a certain ability to do that if the case is pled; correct?

A. Yes. And they'll often actually imagine what the billing is going to be over a period of time and just factor that in as expected income.

So again, it's not a conscious decision of I'm going to make as much money as possible from this case and not consider a plea, but you just fall into this expectation that the case is going to be worth such and such income for such and such a period of time. And I think that actually disincentivizes resolution.

Q. I want to show you from . . .

THE COURT: Mr. Stetler, did you by any chance add up

## 1766

the total amount of fees each of the lawyers were paid in this case?

THE WITNESS: No, I didn't, Your Honor.

THE COURT: Okay.

THE WITNESS: I saw your comments about the overall magnitude, but I didn't -- I didn't sum them up myself.

BY MR. BURT:

Q. Along those -- along those lines I'm showing you from 67 -- this is MCN02-002449. Did you review this letter that was sent by Judge Bennett to Mr. Stowers in August of 2002?

A. Yes.

Q. It says, "This letter is being written to you ex parte because it concerns payments under the Criminal Justice Act to counsel and others for fees and expenses. I am annoyed at your July 31, 2002, fax letter and your repeated hounding of my office with calls concerning payment in this case. As you may know, since February I am the only full-time Article III judge in the district. I now have over 1,100 cases and have been working 90-, 100-hour weeks 7 days a week. I have not taken a single day of vacation this year nor do I expect to do so. In addition to my crushing caseload, I am responsible for all the administrative duties in the district including the construction of our new courthouse. I do not anticipate having time to address either the submitted budget or the pending requests for fees and expenses in this case until the later part of August.

## 1767

I would remind you that the three attorneys in this case have been paid to date more than I make in a year."

"I would sp -- I would spend as much time" --

A. If you would spend --

Q. "If you would spend as much time on the mediocre briefs that you have filed in this case as you have pestering our office about payment, your client's interest would be well served."

When you read that, did that relate to your discussion of the financial disincentive issue that you --

A. Yes, I -- I mean, in fact, that's probably what really brought it to my attention and then underscored the inappropriateness of some of those remarks in e-mails about having a boondoggle in Kansas City or hope you billed the hell out of it. I'd have thought twice about writing that if I'd received a letter of that sort.

Q. There was some testimony -- from that letter is it fair to say that Mr. Stowers was fairly and even overly fairly diligent in billing the Court and following up with phone calls to the Court about where his payments were?

A. That's what it seemed to indicate, yes.

Q. And in this case I think there was some testimony that Miss Johnson sent a letter to Mr. Stowers and the next time -- about pleading guilty, a letter that said, "I want to plead guilty." Mr. Stowers indicated in his testimony that it was over a year

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 36 of 72

**1768**

before he visited Angela Johnson concerning that letter or anything else. Is that an appropriate way to respond when a client indicates a desire to engage in plea negotiations to simply not respond?

A. No, I think a response was called for, and he was relatively local. I don't know exactly what the distance is from his office to the jail, but it shouldn't have taken him a year to get in to have that conversation.

Q. And the Court criticizing him for spending his time on filing mediocre briefs, could the same criticism have been levelled about his failure to respond to his client who is reaching out to him in particular?

A. Yes.

Q. As a member of the team.

A. And again, when I looked at the time spent with clients -- with the client, some portion of that was client initiated. It was client telephone calls, reaching out because she had things that she needed to talk about. And then, of course, there are also these letters asking for visits.

Q. So was this a situation where the lawyers, Mr. Stowers in particular, seemed to be impeded by financial constraints in doing something that could have been productive on this case?

A. No, no, on the contrary. That was billable time to go see her.

Q. Now, is there another document in the line of exhibits I

**1769**

just referenced, that is, Exhibit 67 at 005545, where the judge in March of '05 writes, quote, I know --

A. The emergency motion? Yes.

Q. Yeah. I note despite paying three lawyers hundreds of thousands of dollars you didn't even bother to file a brief on your last emergency motion about her Fifth Amendment right in the government's psychiatric interview.

A. Yes, I'm familiar with that.

Q. And does that indicate to you that there was substantial sums of money being expended for this defense team?

A. Yes. Again, I didn't add them up, but I -- that's my reading of the correspondence.

Q. And could some of that hundreds of thousands of dollars have been expended in the plea negotiation process?

A. Yes, and indeed it should have been.

Q. Now, is there anything else you want to say about -- well, were there time problems with other members, key members, of the defense team besides Mr. Berrigan? You said he was involved in other capital cases. How about Miss Goody?

A. Miss Goody had a very, very heavy caseload.

Q. And were there some constraints imposed on Miss Goody because of some funding issues where she initially got into the case and then was out of it for a certain period of time?

A. Yes. I think the initial authorization took a long time, but then in addition she was sort of put on the shelf during the

**1770**

time that the Massiah issue was on appeal and then brought back into the case belatedly as it was moving toward trial. So there's a long, long gap where there's just no consistent work on the mitigation aspect.

Q. Now, Miss Goody is a very skilled mitigation investigator; would you agree with that?

A. Oh, absolutely, yeah.

Q. And Mr. Berrigan's a skilled defense lawyer.

A. Yes, no question.

Q. But no matter how much skill you have, you still need to devote the time and have the resources to do the case properly?

A. Yeah. And again, some of it is just your own decision to say this is how many cases I can realistically handle when a client's life is on the line.

Q. Now, is there anything else you wanted to say about the breakdown of the -- failure to establish a functional capital defense team?

A. No. I think the main points have been made.

Q. Now, the second area that you mention was their failure to exercise reasonable professional judgment about the likelihood of a death sentence. I wonder if you could speak to that.

A. And again, I don't know whether I used the word likelihood, but I think the risk is the way I put it. You know, I think from the very beginning of the case -- forget how much discovery had been reviewed or how much the case has been independently

**1771**

investigated, but just the fact that this was a case involving a large number of victims and involving children as victims told you that it was a high-risk case, not an automatic death penalty because there is no such thing but a case where there was a harsh risk of a -- a high risk of a harsh jury reaction. There was social science literature that supported that proposition and plenty of everyday experience. So that's -- that's one issue.

They also needed to make a clear assessment of what the client's exposure was on other charges and what was the risk of a state prosecution in the event that the federal charges somehow were disposed of.

So I think they needed to factor all of that in, and they needed to consider some of those sort of historical context factors that I mentioned earlier, the disappearance of appellate safety nets, the increased numbers of executions.

And I think, you know, they needed to say very, very early on that this was a -- an extremely serious case. And so that imposes I think two obligations. One -- maybe three. To investigate thoroughly the factual evidence about the capital allegations, develop the most thorough mitigation investigation possible because this is not just an ordinary case, and, third, to work particularly hard towards resolution if that's a potential option.

Q. And instead what kind of signals were being sent to the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 37 of 72

Page 1772

client?

A. Well, I think, you know, very -- very mixed signals. I think Mr. Willett from the beginning had, you know, what we sometimes refer to as trial psychosis, the belief that in spite of everything we're seeing in discovery that somehow this is a case that can be tried. And that was reenforced by his assistant.

And then, you know, Mr. Berrigan had a different -- a different belief. I think he recognized very early on the seriousness of the charges but seemed to have the view that the risk of death was not -- was not so high and that somehow a -- an offer of a 20-year plea would be an acceptable resolution. And I think the government could not have been clearer in its correspondence saying that that was not going to be acceptable.

Q. Now, in terms of the mixed messages, did you have a chance to review in the plea binder RS-6-00281 which is a letter that Mr. Willett sent to Angela Johnson at the beginning of the case, August 16, 2000?

A. Yeah. I mean, and this kind of sets the tone for I think what became their relationship over a long period of time. There's not only the sentence here that you've highlighted but the conclusion of that letter that says, you know, I hope to be seeing you soon not wearing a prison jumpsuit, creating the expectation in her mind that, well, this lawyer's going to get me out of here and get me home to my kids. When you're sending

Page 1773

that signal and sticking to it, you know, that really I think is a dangerous misassessment of the seriousness of the charges.

Q. And I think you alluded to this before that Mr. Berrigan's assessment based on his interview with you was that Miss Lanoue, the legal assistant, was reenforcing the message that's contained in this letter.

A. Yes, absolutely.

Q. And she's the one having the most contact with the client.

A. Yeah.

Q. So on the one hand, she's hearing this "we're going to walk you out" message.

A. Yes.

Q. And you said that the mixed part of that was what Mr. Berrigan was telling her which was what?

A. Well, Mr. Berrigan very early on was telling her that a plea was the best outcome and at the same -- so on the one hand, he was saying that a plea was a good idea, but on the other hand, he was creating the unrealistic expectation that it might be a plea to a -- by capital standards -- and this is different from perhaps everything else but by capital standards a relatively low plea of 20 years.

Q. Now, did you review some correspondence indicating that there were some team meetings about this issue?

A. Yes, I did.

Q. And specifically did you review RS-000573 which are

Page 1774

Mr. Berrigan's notes of a jail visit with Angela Johnson on October 1, 2001?

A. Yes.

Q. And at the very bottom there, there's a notation about plea negotiations; correct?

A. Yes. No, that's a very important one. And again, this is before Mr. Berrigan is -- no, I'm sorry. It's the fall of 2001. So it's a relatively early indication that they talked about plea negotiations. The client is okay with beginning discussions, and he's, of course, offering that low number which he says was his, offering 20 years. But then he says in brackets, "Al a real impediment to this discussion, tells Angela he thinks we will be in trial."

Q. And then there's -- it continues on, right, the next page?

A. It launches into discussion about choices, changes of venue. This gets A.J., referring to Angela Johnson, thinking trial, not plea, counterproductive. And there's a similar note in Miss Goody's file a couple of days later making precisely the same point, that the main impediment to resolution is Mr. Willett's insistence that they're going to trial.

Q. Now, the Court in its questioning of you used the Court of Appeal analogy that judges on a Court of Appeal don't always agree. But in a Court of Appeal context, the opposing sides stand in front of a bench of appellate lawyers and each side gives their opposing view, and then the judges, fully informed,

Page 1775

not suffering from any mental illness, then do their own research --

THE COURT: That you know of.

MR. BURT: That you know of.

THE WITNESS: Any diagnosed disorder, yeah.

THE COURT: Or any diagnosed and disclosed.

BY MR. BURT:

Q. Then the judge or judges in their -- with the help of their research and writing staff and reading the law and the facts, they make a decision between competing views. And as the judge pointed out, sometimes there's conflicts.

And the process he described, is that comparable to what should be taking place in the context of a client? And you'll see on this note Berrigan has noted she's being medicated for depression. Is the client in this -- and especially a mentally ill client in the same position as an appellate judge who is hearing in this meeting opposing arguments from competing sides, Mr. Willett telling her, you know, let's talk trial, Mr. Berrigan talking about a 20-year plea? Is that client in the same position as an appellate -- I'm not talking about educational requirements, but does the analogy work in that situation?

A. No, I think it breaks down, and I think you've got an obligation to convey consensus professional advice to capital clients and particularly when one of the options is the sort of

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 38 of 72

magical thought that maybe all this will go away, we'll go to trial and go home. I think that's really the difficulty with that particular point. I mean, that's a hope that anyone would want to cling to, and it's -- you know, I think Mr. Berrigan appropriately characterized it as a major impediment.

Q. Now -- and I think you -- not only did he recognize it as a major impediment, but I show you from Exhibit 67 MCN01-1163, one of Mary Goody's notes. Is this the note you're alluding to where she says chance to plead -- well . . .

A. Impediment is lead counsel excited about trying case. And I believe this is dated just a couple days after that meeting that you referred to a moment ago.

Q. So if two of the most experienced members of the team at this point are assessing that there is a chance to plead, that the client is willing to plead but the impediment is lead counsel who's talking about let's go to trial and seeing the client not in a blue jumpsuit anymore, what should have been done at that point? I mean, who should have taken the reins here and steered this in the right direction?

A. Well, I think, you know, Mr. Berrigan and Ms. Goody should have assumed a much more significant role with the client. I mean, this note is very interesting. It goes on to say she, that is, Miss Johnson, is most valuable asset against him, referring to Mr. Willett. She authorized us to negotiate. I mean, that is -- that could not be clearer. And so what you

want is to get the two people who are capitally experienced and who can talk about all the issues I've been talking about this morning, giving her, you know, the appropriate reality check about the serious risks that this case poses.

Q. Now, Mary Goody at the bottom has noted who at this point is the resource counsel, Kevin McNally. Did you see any indication in the correspondence and the records that you looked at that the defense team reached out to the resource counsel and said, you know, we've got a problem here; we've got a client who's authorized us to negotiate; we've got a prosecutor who looks like he's willing to negotiate; but we've got a lead counsel or one of the lawyers in the case telling the client -- sending the client a mixed message?

A. No, I saw no indication of that. And, in fact, one of the things that was striking to me was how little contact there was with the resource counsel project over the long life of the case. I mean, there's a fax to the project early on with Mr. Berrigan's résumé in support of his appointment. There's a meeting with Isaiah Gant, G-a-n-t, relatively late in the case. I believe that's 2004, you know, where he is urging resolution and telling them they need to get Ms. Goody back into the case, and there's another discussion a year later with Richard Burr. But that's really minimal over a five-year period.

And in addition, you know, again, Mr. Berrigan particularly documented his days very meticulously. Whenever

he's thinking about the case, he's writing things down it seems to be. And there's, you know, no indication of discussions or brainstorming with other lawyers with capital defense experience. So it isn't just ignoring the resource counsel. I don't see any real attempts to get advice from anybody in the capital defense community.

Q. Now, you said on one hand you had Mr. Willett who's talking about reasonable doubt and then on the other hand Mr. Berrigan's perception of the case. Was it a realistic perception in terms of what the case was worth given his level of experience in capital litigation?

A. I'm sorry. I --

Q. Yeah, the question is was he taking a realistic -- was he making a realistic assessment of the case given his experience in capital litigation?

A. No. I think his assessment was unrealistic in two ways. I think he underestimated the high risk given the nature of the case, the number of homicides and the vulnerability of the victims. And in addition, he very seriously underestimated what it would take to resolve the case even though the government repeatedly spelled out that a 20-year offer was not -- not in the ballpark.

Q. In terms of his thinking on that issue, I want to show you RS-00481. Did you review this letter August -- October 9, 2001, to Miss Johnson?

A. Yes.

Q. And the second paragraph there is, again, conveying by letter information to Miss Johnson about plea negotiations; correct?

A. That's correct.

Q. What did this tell you about where Pat Berrigan was in terms of his assessment of the case and what it was worth?

A. Well, he's been involved in the case almost a year, and he is stuck on this number of 20 years. And then he says, "Much to my surprise, they did not reject our number as being completely out of the question." So he's kind of treating some silence as kind of a adoptive admission that 20 years might work. But, you know, I think that is at odds with all the other indications in the file. I don't think the government was at that point 2001 or any later point at all entertaining that kind of number as a possible resolution.

Q. But was that even -- you know, given the nature of this case, the killing of two children and the killing of other -- another innocent --

A. Three adults.

Q. Three adults.

A. Two separate incidents, yes.

Q. Was that a realistic assessment based on --

A. No, I think Mr. Reinert hit the nail on the head when he said, you know, that's four years per murder, and, you know, his

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 352 Filed 11/10/11 Page 39 of 72

1780

view was that that was unconscionable.

Q. Now --

A. I mean, I could add that, you know, there's other references in the file where other members of the prosecutor's office indicated that they would have to confer with the surviving family members of the victims. I mean, that's a whole other area that was completely ignored by this team.

And, in fact, in the 2002 time frame where I believe that point was explicitly made by one of the government lawyers, in I think it's August of 2002, Mr. Reinert is writing to the defense team about release of the remains, I mean, you know, the most elementary courtesy to the victims' surviving family members, and the letter says something to the effect that, you know, if you haven't hired an expert to examine these remains, please do so now because these people need some closure.

And I think that's just another area where the team was insensitive to how they were, you know, putting obstacles in the path of resolution rather than doing everything they could to facilitate.

Q. What role does the victims' family play in bringing a case to disposition by way of a plea?

A. Well, you know, their views are often going to be considered by the prosecutors, and that was explicitly indicated in some of the correspondence here and something I discuss in the Hofstra Law Review article that, you know, the four

1781

significant players in all of these plea resolution cases, counsel themselves, clients, prosecutors, and the victims' -- victims' family members. They're all stakeholders in the process.

THE COURT: And I notice when I read that you didn't include mitigation specialists, and you didn't even include them as part of the team in the discussion of the four most important players.

THE WITNESS: Right. I guess what I would say in that regard, Your Honor, is that the ultimate responsibility is counsel's, and the mitigation specialist is kind of subsumed as part of the defense team. But you're right. I should probably have taken some time to address that issue.

THE COURT: Do you recall when you've gone through the CJA matters -- I have some recollection of approving a victim outreach coordinator, but then the circuit did not approve it?

MR. BURT: Yes, and I was just going to talk about that. I'll tell the Court my understanding of that situation. The Honken defense team approached you and asked you to appoint a victim liaison. You did approve it, and it was then rejected at the circuit level.

THE COURT: But that was in Mr. Honken's case.

MR. BURT: Correct.

THE COURT: Did the defense lawyers in this case --

MR. BURT: No application was ever -- no application

1782

was ever made.

THE COURT: Okay.

MR. BURT: And --

THE COURT: Would now be a good time to break?

MR. BURT: Sure.

THE COURT: Did you want to ask a --

MR. BURT: No.

THE COURT: Okay. Now okay? Okay. How much time would you like? Is an hour good, or would you like a little more than that?

MR. BURT: Judge, if we could, that would be help -- like maybe an hour and 15?

THE COURT: That's fine.

MR. BURT: Would that be appropriate?

THE COURT: Mr. Williams, any objection?

MR. WILLIAMS: None, Your Honor.

THE COURT: Okay. We'll see you back here at 1:15. Thank you.

MR. BURT: Thank you very much.

(Lunch recess at 12 p.m.)

THE COURT: Thank you. Please be seated.

BY MR. BURT:

Q. Mr. Stetler, I think we're on the second factor that you mentioned, the failure to exercise reasonable professional judgment about the risk of a death sentence. And in your review

1783

of the material, did you see instances where the government was conveying information to Mr. Berrigan about their position and Mr. Berrigan was simply not listening to what he was being told?

A. Yes, there were numerous examples of that.

Q. Okay. And showing you RS-10-623, at the very bottom of this note by Mr. Berrigan which is dated 8-21-02, did you review that note, and could you explain to us the significance of the notation on the bottom?

A. Yes. The last paragraph indicates that Mr. Miller reflected that he and Mr. Reinert had talked early on about offering Ms. Johnson 10 to 15 years for information leading to the discovery of the bodies, this pre-McNeese, of course. And then parenthetically, Mr. Berrigan writes, "Suggests to me our high teens, low 20s offer is not out of whack."

Now, I think that's a real misreading of that information. So my understanding is that here two years into the case Mr. Miller makes an offhand remark that they had talked about a low-sentence plea before the bodies were found when their whole focus was on prosecuting Mr. Honken, and that certainly was a time when the case might have been resolved for a much more favorable disposition.

Q. Was or was not?

A. Was.

Q. Was a time had it been acted upon.

A. Absolutely. And that's consistent with -- you know,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

**1784**

there's another -- a 1996 investigative communiqué from one of the Iowa law enforcement agencies that discusses their frustration after three years of not being able to find the bodies or accumulate enough evidence to charge Mr. Honken, and they specifically say in that memo that was provided to the defense early in this case I believe that -- you know, that putting pressure on Miss Johnson was their best hope of getting the information that they were looking for.

So clearly at that early time there was a much more favorable negotiation position, but I think Mr. Berrigan's inference that now in 2002 offering the high teens or low 20s was a reasonable offer is completely in conflict with what he has otherwise been told by the government in no uncertain terms.

Q. Now, you saw the letter from Mr. Reinert in October of '01 indicating that 20 was unconscionable.

A. Yes. I don't recall the date offhand, but yes, I saw that letter.

Q. And here we are 6 months or so later, and Berrigan is apparently thinking not only 20s, now he's talking high teens.

A. High teens, yes.

Q. Which, I mean, you talked about trial psychosis. Is there --

A. It's a plea --

Q. -- such a thing as --

A. Plea psychosis.

**1785**

Q. Plea psychosis.

A. It's magical thinking.

Q. And I think we've had testimony here from Mr. Miller that the comment about we would have offered 10 to 15 was made in the context of a discussion that 20 was too low and that he made that absolutely clear that that was the context in which he was discussing it. If that, in fact, is the testimony -- and I'm asking you to assume hypothetically that's true -- was Mr. Berrigan abiding by minimal standards in interpreting what he is being told as high teens, low 20s is in the ballpark?

A. I think he's just not hearing what they're really saying, and that's the way I read this memo in the first place.

Q. Okay. Now, you mentioned this morning the insensitivity issue to the victims' family by not consenting to the release of the bodies. There are cases, of course, where the defense has a legitimate need to examine bodily remains --

A. Yes.

Q. -- hire experts, retain experts to perform forensic analysis of bodily remains, aren't there?

A. Absolutely.

Q. You're not suggesting that --

A. Even cases where bodies have been exhumed, and I know that's very difficult for the victims' families.

Q. Did you see any indication that the Johnson defense team, in fact, retained experts to examine these bodily remains?

**1786**

A. No. And again, there's the letter I saw from Mr. Reinert which expresses real frustration -- I believe it's in August of 2002 -- saying, "Have you retained an expert? If you haven't, please take care of that promptly so that these family members can have some closure."

There's also notes in the communications between the government and Mr. Honken's lawyers which actually clarifies the distinction. Mr. Honken's lawyers made clear that they didn't object to return of the remains, that it was entirely Ms. Johnson's lawyers who were responsible for that resistance.

And in addition, Mr. Honken's lawyers had offered the services of their mitigation specialist, Lisa Rickert, who had been trained in victim outreach. They'd offered those services as an overture to the victims' family. I don't know that anything came of it, but there was a clear distinction between the two teams on that issue.

Q. Showing you from defense Exhibit 48, the supplemental plea material provided by the government, and this is PLSP-00058 through 66, notes of a conversation between the Honken defense team and the prosecutors on July 12, '04. Did you review this as part of your review?

A. Yes, yes.

Q. And on the bottom of the -- page 61, it says -- this is from Leon Spies apparently during the conversation, says defense previously made application to have mitigation specialist,

**1787**

independent person to contact victim families. Bennett approved, Loken denied. And then there's a question mark, Ms. Rickert has been working with --

A. With Honken.

Q. -- with Honken and family a lot and has special insight to convey to victims. And then it continues, Charlie Rogers adds contact with families by independent party is restorative justice concept. Duncan family knows they weren't the reason for delay of return of remains. Trial is not a healing process. And then Al Parrish says early on even before entering the appearance they made clear they had no objection to return of bodies. Johnson's counsel were the ones that objected. And Tom Miller apparently adds in the family has no misunderstanding about that.

A. Yes.

Q. What does that dialogue tell you about what the Honken team is trying to do here compared to what the Johnson team is doing in the plea negotiation process?

A. Well, I think the Honken team is recognizing that the victims' family members are important stakeholders in this process and a potential obstacle to resolution, and they're trying to remove any implication that they are insensitive to their needs. And in contrast, I think the -- Miss Johnson's counsel just seemed to be oblivious to those concerns.

And again, this isn't something that just comes from

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 352    Filed 11/10/11    Page 41 of 72

Q. Now, in terms of where the Johnson defense team was at this point, if you take a look at the previous page, page 61 -- this is a comment by Charlie Rogers who says Charlie had lunch recently with Johnson's death penalty counsel who told Charlie if there is a package deal with Angie and Dustin Angie would take 20 years. Angie won't do life. They view that as their worst case at trial. Now, is this a realistic view of their worst case at trial?

A. No. Obviously the worst case at trial is a death sentence and execution.

Q. And as late as July '04, is it your assessment that the Johnson team is still stuck on this 20-year number?

A. If that's the date of this memo, yes, absolutely.

Q. Yes.

A. Yes.

Q. Right.

A. Yeah.

Q. July 12, '04.

**my own experience or views. If you look in the ABA guidelines discussion of resolving cases, the importance of -- there's a section where they talk about the importance of knowing what local practices are in relation to plea discussions but also knowing about the attitudes and concerns of the victims' family. So there's specific guidance on this issue in the ABA guidelines.**

A. **Yes, and that's long after the government has made clear that 20 years is absolutely out of the question.**

Q. And was it your understanding that the Johnson team persisted in this 20-year offer as part of this joint package?

A. Yes.

Q. In other words, that Honken's offering life and Johnson is sticking with -- the Johnson team is sticking with their 20 years?

A. Yes.

Q. Did you review some subsequent notes which indicated that what Justice really wanted in this case was life and life, in other words, life for both?

A. Yes, I did, yes.

Q. Okay.

A. **And I believe it was Mr. Miller or Mr. Murphy added that that was not just the view of Justice but also the view of the Iowa authorities, that any plea -- or any result in this case that was less than life would result in an Iowa state prosecution that would likely result in a life sentence.**

Q. Now, is there any indication in the communications you reviewed that any of that information was conveyed to Miss Johnson and that there was some sort of dialogue in which it was explained to her what the situation was and what her options were?

A. No, there's no -- no indication that that was conveyed.

Q. And by the way, I alluded to this this morning, but is it true that Mr. Berrigan in particular was a meticulous note taker --

A. Yes.

Q. -- about every aspect of the case and everything he did in the case and that could even marginally be related to the case?

A. **Yes, he's -- you know, I think the term of art is OCD. He writes it down.**

Q. Okay. And just based on his record note taking habits, do you think if he had had the kind of discussion that you referred to this morning as the kind of discussions that should take place in this plea negotiation process it would have been reflected in his notes?

A. **Yes. And I'd add that I don't believe he conveyed -- the remarks about the state of Iowa settling for nothing less than life, I don't think that was ever even conveyed in a letter.**

Q. Why would that have been important information? In other words, here's Angela Johnson with -- talking to Mr. Willett and to Nancy Lanoue about reasonable doubt and walking out. Why should she have known at a minimum what the state of Iowa was interested in?

A. **Well, there was a convergence, you know, from main Justice and the state of Iowa indicating that they were interested in, you know, very, very long imprisonment as the minimum punishment in this case. And that was something that should have been very**

**soberly explained.**

Q. In light of that issue being interjected into the proceedings, was the 20-year -- was the insistence on a 20-year offer even more unreasonable?

A. **Yeah, absolutely unrealistic.**

Q. Now --

A. **And again, the ABA guidelines address specifically the importance of understanding what any mandatory sentences might be and what the exposure was with any additional authorities besides the one that was involved in the immediate prosecution.**

Q. Now, you mentioned this morning there are various actors in the plea bargaining process. One important actor, of course, is the prosecutor.

A. **Absolutely.**

Q. Unless the prosecutor offers something, a deal is not going to happen.

A. **That's correct.**

Q. Now, are there things that defense lawyers can do in general to enhance the chances that an offer is going to be forthcoming from the government, or is it just a matter of sitting back and waiting for the government to put something on the table?

A. **No. I mean, there's a lot that can be done including aggressive litigation.**

Q. And the defense did do some aggressive litigation here, did

they not, in terms of the McNeese --

A. Yes, yes, they did.

Q. Did that --

A. Of course, that created a potential opportunity which was not utilized.

Q. And could you explain that?

A. Yes. I mean, you know, in a sense the case just seemed to go on hold while the Massiah issue was on appeal, and that was a time of uncertainty. No one knew in advance which way the Court of Appeals would rule. That was a time when, you know, perhaps the case was most ripe for a productive resolution, productive negotiations.

Q. You said that it's not unusual in your experience to see clients whose initial stance is they are not going to plead.

A. It's the most common initial stance.

Q. And in this case as part of your review, did you review the Exhibit 7 to the petition, a letter from Miss Johnson in May of '03 while the case was pending in the Court of Appeal?

A. Yes.

Q. Did this letter indicate to you that the client was receptive to pleading at this point and not only pleading but cooperating?

A. Yes. It says in part, "I want to plead guilty," and in another part, "I will," underscore, "cooperate."

Q. Now, what should have happened at this point when this

letter is sent by Miss Johnson to Dean Stowers shortly after -- couple of months after the case is argued in the Court of Appeal at a point in time when, according to Mr. Stowers, he had a fairly pessimistic view of how this McNeese issue was going to be resolved?

A. Well, I think that was an important invitation to go and meet with Ms. Johnson and work on this plea. And so I think Mr. Stowers had two duties. One was to communicate this letter to the entire team but also to follow up directly with Ms. Johnson.

Q. And did that happen?

A. No, I don't think he saw her for almost another year.

Q. Did that meet minimal standards of representation insofar as the plea process was concerned?

A. No, that is a lost opportunity.

Q. And at this point is this a reluctant client who is stubbornly insisting on not negotiating who is taking a "walk me or fry me" kind of attitude?

A. No, on the contrary. It's a client who says in the most uncertain terms I want to plead; I'm willing to cooperate.

Q. Is this an isolated instance based on your review of the record of Miss Johnson's attitude?

A. No.

Q. And could you explain what else you saw in the record that indicated to you that --

A. Yes, there -- well, we go back to the earliest notes of Mr. Berrigan's discussion where she is authorizing the beginning of plea discussions, and there are multiple examples like that where plea is something that she is clearly willing to consider, and there are other letters like this one saying explicitly I want to plead.

There are also statements to the contrary, but I think that's, you know, in many ways a reflection of the different advice and, you know, different versions of reality that she was being offered by different members of the team.

Q. Now, besides insisting on 20 years, were there other impediments that the defense was throwing up in the plea bargaining process in terms of conditions that they were insisting upon?

A. Yes. In a sense every time the government explicitly outlined its requirements, the defense rejected them. The government said we will need a proffer, and the defense said, we're not making a proffer unless you tell us in advance that you are authorized to make a specific deal. And it just was not going to work that way, but that's something that the defense insisted upon throughout.

And the government, in fact, responded. I guess concerns had been expressed about the confidentiality of a proffer, and the government said, fine, we'll have a taint team. You could proffer to people that are not involved in the case.

But we need a proffer in order for us to formulate our recommendation to the Department of Justice. And, you know, that's negotiation. That's an attempt to work out differences and move the case towards resolution. But it was rigidity on the part of the defense that kept that negotiation from flowing.

Q. Did you see any indication that the defense team was communicating to Miss Johnson that these conditions were being laid down by the defense and any discussion about why they were insisting on these conditions?

A. No. I mean, at best they're letters that say, you know, we're not going to go do this, we're not going to do that, but there's no real dialogue with Ms. Johnson about it.

Q. Do the guidelines speak to the necessity for defense counsel to take into account what local practices are in plea negotiations?

A. Yes, that's explicitly discussed.

Q. And do the guidelines speak to the need for defense counsel to be aware not only of the local conditions for plea negotiations but also the conditions that exist in Washington, D.C., in regard to the group of people who are the final decision makers?

A. Yes. And actually that goes back to another area where there was a missed opportunity to communicate to Washington.

The Department of Justice, of course, has a review protocol for -- that gives defense counsel in potential death

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 352    Filed 11/10/11    Page 43 of 72

**1796**

penalty cases an opportunity to engage directly in a discussion and explanation of why they think the death penalty would not be appropriate in this case.

And this -- Miss Johnson's defense team did not make a trip to Washington, did not put anything in writing about reasons why they thought a notice of intent to seek the death penalty should not be filed.

And again, that's a very important opportunity to open the negotiation at the highest possible level or at least to state your case in the clearest possible terms and to put it in writing so that it's your words that are going to be conveyed to all the decision makers back in Washington as opposed to someone else's summary. So I think, you know, that's a critical opportunity and should not have been lost.

Q. Did you ever inquire of Mr. Berrigan why he didn't take advantage of that opportunity?

A. Well, he seemed sus -- yes, I believe that was discussed in the interview, and he was just suspicious that the information -- that there would be a premature disclosure of mitigation that the government was not otherwise entitled to and that whatever might be used -- might be presented could be used against him in the litigation.

Q. During the time period of this trial, did you attend and participate in defense penalty seminars in which the topic of the authorization process was discussed?

**1797**

A. Yes, I did.

Q. And did -- the instructions and guidance that was out there, was the prevailing wisdom that this authorization process was simply a discovery gambit by the government and that the defense should hold their cards close to the vest and not take advantage of it?

A. No. The training, on the contrary, was to use this opportunity to make your -- make your best case and if you could avoid authorization, then that completely changes the landscape.

Q. And --

A. And, of course, I should also say that we had a comparable situation in the New York state system. It was not as explicit as in the federal system. There was not a -- an explicit protocol, but we took every opportunity to make a presentation to prosecutors during their statutory decision-making period.

Q. During this time period, were cases, even bad cases, being not authorized?

A. Yes, certainly.

Q. And were --

A. They're all bad cases.

Q. Well, they're all bad cases. Some are worse than others; correct?

A. Yes.

Q. But were even extremely aggravated cases being not authorized?

**1798**

A. Yes. Some were not authorized, and others were resolved.

Q. And were some cases in this time period, 2000 to 2005, authorized but then deauthorized because of a plea agreement?

A. Yes.

Q. Now, you're familiar -- when you give that opinion, are you familiar with the material that was provided to the Court through Richard Burr a couple days ago, some plea statistics?

A. Yes, generally.

Q. And after Mr. Burr testified, did I contact you and Mr. McNally and indicate the judge wanted some additional data that he thought might be helpful?

A. Yes, that's correct.

Q. Did you help get a -- Mr. McNally to compile the statistics that the judge wanted to look at?

A. Yes. And, in fact, I had seen Mr. McNally two weeks ago and had drawn his attention to some of the information that was on the Federal Death Penalty Resource Counsel website that would be useful to incorporate.

Q. Now, you didn't have -- have you had a chance to actually review the data that the judge requested?

A. No.

Q. But you nevertheless --

A. You know, I opened the file. It's 168 pages with roughly 4 entries per page, so it's a lot of material.

MR. BURT: And, Your Honor, with the Court's

**1799**

permission, I'd like to mark this binder as 9A which would be an attachment to the Richard Burr exhibits which contains the --

Q. Well, you tell me what your understanding is of what it contains.

A. Yes. My understanding is that this contains data on all the potential capital cases which were reviewed by Attorney General John Ashcroft so not just those which were not authorized or resolved by plea but all the cases that he reviewed during his tenure.

Q. And that's you said about 168 pages of case summaries?

A. Yes, it's 168 pages. Again, as I said, most pages are about 3 or 4 cases per page. So it's over -- over 600 cases that were reviewed under Attorney General Ashcroft.

Q. Now, in this case after Mr. Honken was convicted and sentenced to death, did Mr. Berrigan finally change his position with regard to this no proffer and 20 years?

A. Yes, in stages, but ultimately offering longer terms and ultimately offering a proffer but at a point when it was really too late.

Q. And why was it too late at that point?

A. Well, I think, you know, the defense had lost the opportunities that existed before the conviction of Mr. Honken. They no longer had anything to offer in terms of cooperation.

And I should add that the government clearly made overtures up to the very last minute in -- as Mr. Honken was

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 352    Filed 11/10/11    Page 44 of 72

**1800**

approaching trial. And once that opportunity was lost, it was really a completely different situation. And they also lost the opportunity that came during the Massiah litigation. As long as that appeal was pending, that was another important moment that might have been seized.

Q. Did you review an e-mail that Mr. Berrigan wrote to Ms. Goody right after the Honken -- or shortly after the Honken verdict came in in which he -- Mr. Berrigan indicated we were waiting to see the outcome of the Honken trial to see if he got less than death and something like I guess I was pretty naïve?

A. Yes, I think that's his exact words. He apparently imagined that if Mr. Honken received a life sentence in spite of all these circumstances that then an even lower sentence would be appropriate and perhaps recommended for Miss Johnson. But I think, as he said, it was naïve. And as he told us when you interviewed him by telephone, he found the victim impact testimony in that case particularly powerful. And I think he, you know, had no -- no reason to be surprised at the verdict when it came in.

Q. Now, the third area that you talked about is the failure to provide Miss Johnson with appropriate professional guidance and counsel. And I wonder if you could just speak to that issue.

A. Well, you know, I think it relates back to the second area. They're closely connected. But there really was a need to explain all that we've been talking about. What are the

**1801**

government's demands? What are the realistic expectations of the government in their consideration of a potential resolution? What kind of term of years are we looking at? What kind of exposure does Ms. Johnson have on the -- on the drug charges, for example? What kind of exposure does she have on state charges? You really needed to educate her about all of those factors so that she could kind of understand the reality of potential realistic outcomes in the case.

Q. Did you see a notation in the file indicating that Mr. Stowers was assigned the task of doing some sentencing computations?

A. Yes.

Q. And as far as you could see, was that ever done?

A. I don't believe it was ever done. There's no indication in the file it was done, and Mr. Stowers had no particular recall of having done it. And again, you know, that's something you do at the beginning, not -- not at the end of the case because, I mean, that's baseline information that everybody on the team needs to understand. What is the exposure here not just on the capital murder charges but everything else that has been alleged?

Q. Now, the fourth area you talked about is the failure to conduct a thorough mitigation investigation or to use what was learned in that investigation to develop a plea strategy and facilitate resolution. Could you explain to me what you had in

**1802**

mind there?

A. Yeah. And, you know, I should be clear that, you know, I have not had the time and opportunity to do a complete review of the mitigation investigation that was done in this case. I have not read all of Ms. Goody's reports and the penalty-phase witness presentation.

But what I mean is mainly the failure to engage in -- engage the mitigation investigation in the plea strategy to identify the family members and other loved ones who would be positive influences, to factor into the mitigation investigation all the people who might influence a decision about whether Miss Johnson was going to accept a negotiated plea, to track down the people that were directly influencing her in the jail. I mean, you want to know the people who were visiting her anyway because they're witnesses to positive things that were happening with her, you know, her pursuit of her graduate equivalency diploma and, you know, her Bible study courses. All of those people were potential witnesses to the positive, redemptive things that were occurring in her life at that point. But they're also key, key figures who can be influences for good or ill in this process of determining whether she was going to accept a disposition.

Q. In your review of the correspondence and especially the correspondence from Miss Johnson to her defense team, did you see what concerns were motivating her throughout the course of

**1803**

the case?

A. Well, I think, you know, the overwhelmingly important concern was her desire to be in better contact with her daughters, to have contact visits with them, to be able to touch them. That's explicit in multiple letters she sent to every member of the defense team.

And then ultimately one of the things that they looked at very belatedly was where she might be housed long term, and that's, of course, a very important part of the plea process, identifying an institution which is going to be closest to the support system that she has in the world, closest to the people who are her loved ones so that they could build an enduring relationship and that she could provide the parenting that she was trying to do from the incarcerated settings. All of those were, you know, critical things that should have been developed much, much earlier.

Q. And another motivating factor that I wanted to talk to you about, did you review in the notes of Marilyn Hutchinson, the psychologist, an entry where Miss Hutchinson -- or Dr. Hutchinson was talking to Angela Johnson -- this is right on the verge of trial and after the negotiations were beyond the Honken trial -- that Angela Johnson did not want to have her family abuse secrets told in court?

A. Yes, I do recall that.

Q. Okay. And how could those three factors, that is, the love

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

for her daughters, her need to be close to them, and her desire not to have family secrets be told in court, how could those facts have been used as part of an effective plea strategy at a point in time when it mattered, not on the verge of trial but when she had some bargaining power?

A. Well, I mean, I think those are all things that should have been explored particularly by Mr. Berrigan and Ms. Goody and, you know, in a one-on-one or two-on-one long, patient discussion with Ms. Johnson. Okay. If we go to trial, what's going to happen? If we go to a penalty phase, what are we going to have to present, and how -- how difficult is that going to be for you and your loved ones? How can we work towards a potential resolution of the case that will keep you closer to your daughters? What programs are available at what institutions? Could we negotiate that housing as part of a resolution? Those are all, you know, important considerations that might have been talked about, and there's just no indication that that was ever done.

Q. Now, on the other end of the equation, that is, from the prosecutor's standpoint, did you see any indication in the government communications which indicated to you that had the defense come forward with reasonable terms and conditions that the government at least in this case and at least pre-plea -- pretrial for Honken was simply going to refuse to negotiate?

A. No, on the contrary. There were repeated indications that they needed to get a proffer, they needed to have a real dialogue with the defense about resolution. But they were asking for it.

Q. Now, I think the last area that you mentioned was the failure to seek the advice of the mental health experts and mitigation specialist about how best to communicate with Miss Johnson about a plea strategy. And could you explain how they failed and what they should have been doing?

A. Well, again, so much of the communication by the -- you know, by Mr. Berrigan in particular was by letter in this case, you know, as though this were, you know, a civil client, you're representing a large corporation and you're just keeping them informed of the process as opposed to a life-and-death matter, you know, with an individual who's under tremendous stress and who has had a history of mood disorders, substance abuse, a suicide attempt in the jail.

Multiple mental health experts had been consulted in the case each with different areas of expertise and each with some insight into how disorders and impairments affected Ms. Johnson's everyday functioning. As I indicated earlier, she'd had a limited education, had to leave school early to take a job, so, you know, you don't send letters that are full of legal language and formal plea agreements. You need to break this down and talk in, you know, the most concrete terms.

The neuropsychological evaluation indicated a very significant, one standard deviation difference between performance IQ and verbal IQ. So okay. Verbal IQ is 15 points lower. It's an 85. You know, that's a significant factor for why you don't just communicate by letter. You need to find other ways of conveying information to be sure that your client is fully informed and adequately understanding.

I may have mentioned the hypothetical of maybe you have a mock jury and videotape it and let the client see the videotape and get a direct sense of how real jurors are responding to the facts of the case and the evidence. And this is something that, you know, I've actually had the direct experience of doing in other cases.

Ms. Johnson was medicated, and, you know, I would have wanted to get the advice of the mental health experts about what are the effects of the medication, is she taking the medication compliantly, or is she not taking it sometimes? I'd want to correlate all that information as we're trying to monitor her different responses at different times to the idea of plea.

So, you know, this is a huge area to explore, but I guess my main point is that I just didn't see any indication in the materials that we have that anybody thought of the mental health consultations as anything other than finding some evidence that might be presented in the penalty phase as opposed to understanding the impact of disorders and impairments on everyday functioning including the free flow of communication between the client and the legal team.

Q. Should Miss Goody have been a more active participant in the plea negotiation process in this case given all the issues we've been talking about?

A. Oh, absolutely. I mean, I think that's a -- that's a critical part of the mitigation function.

Q. Was this in your review of the case a hard case from the standpoint of Miss Johnson? In other words, does it appear to you that you have the kind of client here, based on your review of the records and based on your review of her mental health history, where she was dug in and a plea could not have been forthcoming?

A. No, on the contrary. I think she was cooperative, open, often reaching out to her defense team, not just waiting for them to show up but contacting them by telephone, not obstructing the mitigation investigation in any way.

Ms. Goody was very clear about that, that Ms. Johnson was a fully cooperative person, I mean, in contrast to, you know, one of those cases that I mentioned this morning. The Rompilla case in Allentown, Pennsylvania, the Supreme Court says this client was not only uncooperative but sent the lawyers off on wild goose chases and false leads.

So I think, you know, Ms. Johnson was well within the norms of the capital clients I have dealt with over a long, long period of time. And I think with adequate counsel and advice, I

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 352 Filed 11/10/11 Page 46 of 72

think she would have responded appropriately to this tough decision.

MR. BURT: Could I have one moment, Your Honor?

THE COURT: You may.

MR. BURT: I believe I'm done. Just so I don't miss a foundational requirement, I would move 9A into evidence. That's the data that the Court asked for.

* * * *

(Plaintiff Exhibit 9A was offered.)

* * * *

THE COURT: Mr. Williams, have you had a chance to look at it or . . .

MR. WILLIAMS: I have not, Your Honor.

MR. BURT: I have a copy.

MR. WILLIAMS: I'm obviously not going to have a chance to look at 168 pages. I doubt that I'm going to have an objection, but we can -- I think we can take this up at a later time.

THE COURT: Okay. And what is your preference? Would you like to cross now or defer till June?

MR. WILLIAMS: Defer, please.

THE COURT: Okay.

THE WITNESS: And, Your Honor, I have checked my schedule and will do my best to keep that week available if June 13 is the return date for the hearing.

THE COURT: Okay. I've got a question for you. And I wrote it out for you so that everybody can see it. So the question is, because the record can't see it, in your opinion to a reasonable probability, if counsel had performed at or above the relevant ABA standards, when would a plea bargain have been struck, and what would the terms have been?

THE WITNESS: I think the opportunity was clearly prior to the Honken trial. Probably the best opportunity was during the pendency of the appeal to the Eighth Circuit on the Massiah issue, and it probably would have been a life without parole sentence.

THE COURT: Would you agree -- no, no, I'm not going to ask you if you agree. Let me ask it this way. Is there anything in the materials that you've been able to review that would indicate that Miss Johnson would have accepted at that point while the Massiah appeal was pending a plea to life?

THE WITNESS: I don't think there's anything that explicit, but I think that's largely because the government's requirements were never explicitly presented to her.

I mean, what we have instead is these letters saying, you know, I will plead, I will cooperate, but the explicit detail of a life without possibility of release is not in those letters, and it's not in any way of the notes that I recall.

THE COURT: Based on Mr. Willett's testimony and Mr. Stowers' testimony -- we haven't heard from Mr. Berrigan

yet -- my understanding is that Miss Johnson never admitted to either of those two lawyers a sufficient factual basis that would allow a judge to accept a plea. So how does -- assuming for the sake of argument that that's true, how does that factor into your opinion?

THE WITNESS: Well, I guess my opinion is based in part on what Mr. Berrigan said in an interview where he made clear that the content of the proffer which he ultimately made in this case had been cleared with Ms. Johnson.

THE COURT: And I haven't seen that document, so I don't know. Okay.

THE WITNESS: Yeah. And, you know, he was unclear as to whether she had actually seen the physical document and read it word for word. But he said certainly the content of that proffer reflected what had been discussed.

THE COURT: Okay. But didn't that come several years after the Massiah ruling had been decided by the circuit?

THE WITNESS: Yes, absolutely, Your Honor. Yeah, this is -- it's in 2005 I believe.

THE COURT: But in your opinion had the lawyers done everything they should have done --

THE WITNESS: Yes.

THE COURT: -- you think Mrs. Johnson would have come around to both giving a factual basis and accepting a life sentence.

THE WITNESS: Yes.

THE COURT: Have you factored into your opinion that if the plea required her cooperation she would then be asked to assist the government in executing the father of their child?

THE WITNESS: Yes, I've thought about that. That obviously is an extremely difficult decision to make.

THE COURT: And you've had unbelievable experience. I mean, I'm just in awe of the vast experience that you've had. But have you ever had a similar situation that you could recall?

THE WITNESS: I don't think I've had a case involving two parents.

THE COURT: Have you had siblings maybe the closest or spouses or something similar?

THE WITNESS: This is where I need a computer instead of a mind.

THE COURT: There you go. Well, you know what? You're going to have several months to think about it. How's that?

THE WITNESS: I could check some records.

THE COURT: Okay.

THE WITNESS: Yeah. And I think the quick answer is not offhand, but let me give it some thought.

THE COURT: Let me just ask another follow-up question. You may be right in your opinion, but would you agree with me that there -- because there are so many factors that go

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 47 of 72
*to purchase a complete copy of this transcript.*

into a decision to plead that there's a fair amount of speculation in your opinion? Or don't you think that?

THE WITNESS: Well, I don't think it's speculation. I think that, you know, what I've seen in this case is not different substantially from, you know, what I've encountered in so many cases over a long period of time. And I firmly believe that if there had been a real engagement with this client, that is, the mitigation specialist had spent a lot of time, Mr. Berrigan had spent a lot of time, and they had realistically talked about where this case was going, I think this could have been resolved.

THE COURT: My recollection is that at the time of Mr. Honken's conviction he was number 42 on federal death row and that Angela Johnson was number 43. I may be off, but that's my best recollection.

THE WITNESS: That sounds about right. There . . .

THE COURT: And I think now there may be -- the last time I checked was probably 6 months ago and I think was 54 or 55.

THE WITNESS: Yeah, 56 I think right now.

THE COURT: Okay. So that's --

THE WITNESS: We're in the ballpark.

THE COURT: We're in the ballpark.

THE WITNESS: Yes.

THE COURT: Would you know how many of those folks had

an opportunity to plead to life, turned it down, and went to trial at any point before they were given the death penalty?

THE WITNESS: I don't know offhand, and that's a good question, Your Honor, perhaps something I should look into before returning in June.

THE COURT: Because I was thinking that -- well, I have no idea what the numbers would be.

THE WITNESS: And were you thinking just within the Ashcroft period or in the totality?

THE COURT: No, I was thinking in the totality, and here's why it wouldn't make any -- the way I was looking at it it wouldn't make any difference who was attorney general. I was wondering how many people there are that were offered a life sentence but rolled the dice.

THE WITNESS: Yeah, I don't know the specific answer in the federal context. I know in the global context it's a very high number, I mean, in excess of 50 percent.

THE COURT: Who turned down a life sentence?

THE WITNESS: Yes.

THE COURT: And take their chances at trial.

THE WITNESS: Yes.

THE COURT: And, of course, without looking at those cases, you'd have no way of knowing how many of those decisions may have been due in part to the ineffective assistance of their lawyers.

THE WITNESS: Yes. I don't know if I mentioned this earlier, but one of the articles I refer to in my Hofstra Law Review article is by Professor Steven Zeidman who I think then was at the Brennan Center at NYU. And he talked about the spectrum of advice from simply saying this is what the government's offering to what he calls client-centered counselling which he is advocating very strongly. And I think in the death penalty context that is what's needed.

THE COURT: But we do know that there are some people, albeit probably a very teeny percentage of the overall pool, who are competent, give up their rights to appeal, and would rather be executed than take the chances of lengthy appeals and winding up with a life sentence.

THE WITNESS: Yes. I mean, you assumed competency, and so that's kind of a wild card, but we do know there's about 11 or 12 percent of people who have waived appeals and sought their own executions and been executed.

On the other hand, the one empirical study of that population -- and it's now several years ago -- but Professor John Blume at Cornell Law School had an article called Killing the Willing which looked at the mental health background of those people and found I think 88 percent had histories of serious mental illness and/or substance abuse.

So the competency issue is a kind of wild card to the extent it may not have been fully investigated in many of those

instances.

But yes, I would agree with the general point if not for that whole population.

THE COURT: But in this case one thing we know for sure is that Angela Johnson had great love for her children.

THE WITNESS: Yes, and she never said, you know, I'd rather die. That to me is very significant. That puts her in a different category from many of the people who really say, "Kill me. I want to go out in a blaze of glory," all of that stuff.

THE COURT: Would you agree that if -- no. Would you agree that as long as Angela Johnson was maintaining she was not present at the scene and not guilty of the murders that that would present a very difficult barrier to successfully entering a plea in the case?

THE WITNESS: Yes, and I guess what I'm unclear about from all this voluminous documentation is how much she explicitly expressed that position as opposed to having lawyers who were dancing around and never really quite asking or engaging in that -- in that discussion. There are some lawyers who really don't want to know, you know, the kind of "what happened" question.

THE COURT: Yes. And I think my last area of inquiry is -- you know, and this is drawing on your very extensive experiences in death penalty cases. And you may not know enough about this case to have an opinion. But do you have an opinion

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

## 1816

as to whether a prominent reason in Angela Johnson's unwillingness to tell her lawyers she was involved had to do with that would eventually become public and her kids would know that and her family would know that?

THE WITNESS: You know, again, I don't know enough about this case in particular, but that's always a concern. There are many people who -- for whom facing their own families and loved ones is much tougher than facing the Court.

THE COURT: Right. That's what I was thinking.

THE WITNESS: Yes.

THE COURT: Or the lawyers.

THE WITNESS: Yes.

THE COURT: Or anybody in the legal process.

THE WITNESS: Yes.

THE COURT: But having to stand up in open court where your kids are likely to be present --

THE WITNESS: Yes.

THE COURT: -- and admitting to five murders --

THE WITNESS: Yes.

THE COURT: -- that would be a very tough thing to do I would think.

THE WITNESS: It's always hard.

THE COURT: And did you see --

THE WITNESS: Again, I --

THE COURT: -- any evidence that the lawyers focused

## 1817

in on that in this case at all?

THE WITNESS: No, I didn't. And I guess my reaction was that that's why it was so important to integrate the mitigation investigation into that strategy towards resolution to, you know, help with that extremely difficult part of having to reveal to family members that -- you know, that one might be legally guilty.

And I think one of the things that you see in this case is maybe a failure to convey to Ms. Johnson adequately what are the elements of murder, you know, and what's the difference between mere presence and pulling the trigger. All of those subtleties are I think tough things to explain and would be part of what would have to be explained in everyday terms to family members.

THE COURT: Do you know of any reason why Mary Goody wouldn't have isolated these problems and spent time trying to overcome them? I mean, she's very experienced.

THE WITNESS: She's very experienced. I think the biggest problem and something that she feels very bad about was just having too much on her plate, having too many cases, bouncing from one case to another. And, you know, it's a little bit, Your Honor, like airline overbooking. There are a lot -- there are not enough mitigation specialists in the whole country. They're in high demand, and they have their services engaged, and then some cases get put on hold, some get resolved,

## 1818

and then all of a sudden one is going to trial and all your time is needed. And I think it's very, very hard for a mitigation specialist to manage their time, and I think Mary Goody unfortunately just took on too many cases during the pendency of this one.

THE COURT: Particularly I imagine when you're not on a salary.

THE WITNESS: Yes, absolutely.

THE COURT: Because, you know, you're naturally gonna -- is the pipeline full, and then it gets too full.

THE WITNESS: Yes.

THE COURT: And you're worried about if you don't take on the case, then you won't have enough work, but yet you don't want to overcommit because you're conscientious.

THE WITNESS: Yes.

THE COURT: And that's a difficult situation to be in.

THE WITNESS: Yes. And -- and you -- you know, and you may as in this case have lawyers who are saying, well, let's just wait and see. Maybe everything's going to work out. Maybe we're going to get a good ruling from the Eighth Circuit. Maybe Mr. Honken's case is going to get resolved, or maybe he'll end up in a life sentence.

So there were a lot of -- a lot of bad reasons I think that, you know, gave her excuses for not giving the case the attention that it needed.

## 1819

And, you know, I'm not sure -- and again, this is my own failure to, you know, master all of the details of this case. But, you know, I'm not sure how much financial issues were also involved. I mean, I know there were some concerns about the adequacy of the budget, and I know at one point there was a discussion between her and Mr. Berrigan about how many more hours would be needed and, you know, whether he felt comfortable in asking for all those hours as opposed to a lower number. And all those things factor in.

THE COURT: Well, I wouldn't imagine Mr. Berrigan would be shy about a judge saying no. I mean, you're in the wrong profession. I guess you ought to be an undertaker if you're worried about somebody saying no but not a trial lawyer.

THE WITNESS: But, you know, one of the things I see -- and again, not just in this case, but there's self-censorship. Sometimes even the most aggressive lawyers think, well, I've -- my judge is concerned about how much this case is costing; maybe I'm not going to ask for X number of dollars.

THE COURT: Sure, because they want to maintain credibility --

THE WITNESS: Yes.

THE COURT: -- because that's ultimately all a lawyer has. That's your --

THE WITNESS: Exactly.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 49 of 72

**1820**

THE COURT: -- professional calling card.

THE WITNESS: Yes. And maybe they're making a calculation that I need X number of dollars for a jury consultant as opposed to a mitigation specialist. All of that -- all of that plays in.

THE COURT: Did you look at the budget for the -- for Mary Goody in this case?

THE WITNESS: I looked at -- I looked at her bills, and I looked at some notes between her and Mr. Berrigan about, you know, the final request, and that's where I was concerned that there may have been a little self-censorship on Mr. Berrigan's part.

THE COURT: But as I recall -- and I may be wrong about this, and I know the lawyers know it much better than I -- that I initially approved, I think, $40,000. And then I think there was a request for 25,000 more.

THE WITNESS: Uh-huh.

THE COURT: And I believe I approved that, and I believe Chief Judge Loken approved it.

THE WITNESS: I think that's right.

THE COURT: Was that in the ballpark of adequate funding for the mitigation or not?

THE WITNESS: Well, I think more money -- more funds were needed in this case. I would have urged them to ask for more.

**1821**

THE COURT: Well, let me ask you this. Have you ever met a case where you didn't think more funds would have been helpful?

THE WITNESS: Probably not.

THE COURT: Okay. And I understand that.

THE WITNESS: Yes.

THE COURT: I understand that, because that's from your perspective.

THE WITNESS: But I mean from the particulars of this case, you know, to the extent that money was a factor in her not spending time with Ms. Johnson, I think that was really problematic. And if you're having to choose between, well, shall I interview witnesses in Iowa, Wisconsin, Texas, and wherever else or should I, you know, spend multiple days with Miss Johnson, I think that was a Sophie's choice.

THE COURT: But was it in the ballpark of reasonableness compared to other federal death penalty cases of similar complexity? Don't be shy about telling me it wasn't; okay? But I just want to know your honest opinion.

THE WITNESS: No. I would say that -- well, again, you know that in the updated Spencer Report there's a real correlation between budgets and outcomes, and I think, you know, this one was certainly not in the abysmal poorly funded category, but there were certainly many cases with better outcomes that were better funded in the mitigation area. I'm

**1822**

just speaking about that. I'm not looking at globally what was --

THE COURT: I mean, globally I believe it was over a million dollars. I may be wrong about that.

THE WITNESS: Yeah.

THE COURT: But for some reason I have like 1.1 or 1.2 million --

THE WITNESS: I can imagine why that would stick in your mind.

THE COURT: -- floating around.

THE WITNESS: Yeah.

THE COURT: Okay. Those are the questions I have. Thank you.

THE WITNESS: Thank you very much, Your Honor.

THE COURT: You want to ask any follow-up questions?

MR. BURT: Yeah, a couple of follow-ups.

BY MR. BURT:

Q. Assume for a moment that the judge entered an order saying the defense can have all the money it wants. In this case there was testimony that Mary Goody was essentially told to pull the plug in 2005 and that she was -- I'm sorry, 2002 when the McNeese litigation started and that she was not thereafter notified of her services until I believe the e-mail that you referenced in your direct was November of '04.

A. Yes.

**1823**

Q. And then there was a budget process which took until January of '05, and she started out with 465 hours. It was cut, as you say, self-censored, down to 265. But assume that it hadn't been cut and that Judge Bennett and the circuit had said whatever it takes you can do, and assume further the trial is starting in April, March, April, so, you're, you know, four or five months outside of trial, and assume not much work had been done up to that point and especially not much work with the client.

A. Yes.

Q. And further that the -- assume that the opportunity to engage in -- meaningfully engage in the plea process had already passed because by that time Honken is convicted. Would all the money in the world have solved the problem in this case given that hypothetical?

A. **No. I mean, there's no amount of money that can make up for the time that you need.**

Q. And, you know, assume further that Mr. Berrigan was told you can have whatever time -- whatever money he needs to communicate with the client. But assume that instead of doing that he is engaged in these other trials, simply does not have the opportunity and does not, in fact, build a relationship with Miss Johnson. All the money in the world is not going to remedy that problem, is it?

A. **No, that's correct.**

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 352 Filed 11/10/11 Page 50 of 72

Q. Or all the logistical problems is not going to remedy him not seeing and communicating and building --

A. **And in Ms. Goody's case she just was very overextended and had too many other trial commitments.**

Q. Right. But money was one issue.

A. **Yeah.**

Q. But even if she had the money, if she came into this case really to start it in earnest in Nov --

A. **You can't start it in January of 2005 and go to trial in the spring.**

Q. Given the amount of work that any typical mitigation specialist engages in, could she have done that work herself even if she had all the money in the world?

A. **No, not in that time frame.**

Q. And from the plea perspective, it wouldn't have mattered at that point; right?

A. **That's correct.**

Q. Because the train had left the station.

A. **That's correct.**

Q. Right? Now, the Court's question about, you know, what the terms would have been and when it would have been struck, I think you said the best time -- point in time was pre-resolution in the Eighth Circuit.

A. **That's correct.**

Q. Right? And Exhibit 7 which is the letter to Mr. Stowers,

this is a letter that is indicating that she's not only willing to plead but she's willing to cooperate. And by cooperate, did you take that to mean cooperate against Honken in an endeavor that was going to lead to possibly Honken's death sentence?

A. **Yes.**

Q. So the difficult decision of whether to testify against her -- the father of her child, at least at this point, she is indicating in no uncertain terms that she's willing to do that.

A. **That's correct. And the date is cut off here, but I believe it is 2003.**

Q. I think it's 5-10-03.

A. **Yes.**

Q. We have a clear copy in the record somewhere.

A. **Yeah.**

Q. But take my word for it it's 5-10-03. So based on the information you read about Miss Johnson, did she have a long-term relationship with Mr. Honken prior to her incarceration?

A. **No, not a long term. The relationship had ended.**

Q. I mean, the relationship had been ended. They had a child in common.

A. **That's correct.**

Q. But where -- according to your review of the record, where was Miss Johnson's allegiance at this point in her life? Was this a --

A. **It was to her children.**

Q. -- love affair with Mr. Honken?

A. **No, it was to her daughters for sure.**

Q. And if it had been explained clearly to Miss Johnson at this point in the process before the Honken trial started that Dustin Honken is going to get the death penalty no matter what you do, you don't have any control over that process, and if you do not accept the offer the government is willing to give you at this point, be it life without parole or as some indications from Mr. Reinert that it may have been even less than that; true --

A. **Yes.**

Q. -- if you'd gone to her and you'd worked with the mental health experts, somebody who had a relationship with her on the team such as Miss Goody had said to her you cannot change this pr -- even if you don't cooperate, Honken is going to get death and if you turn this deal down and you go to trial in a case where the evidence is, in the judge's words later in his opinion, pretty strong evidence against you, you're going to end up on death row yourself and then your daughter is going to be without any guidance for the rest of her life, is there any way that sort of theme could have been worked with to turn Miss Johnson into a life saver for her child even though it was going to mean sacrificing Mr. Honken? And really it didn't require sacrificing him because she couldn't have affected that process

anyway. Could that have been a pitch to her?

A. **I think that's a very, very hard pitch to make, but I think it's the one that was absolutely needed in this case, and I think had it been made in the context that I've described, it would have been effective.**

Q. In negotiating this difficult issue that the judge raised about how you navigate pleading guilty in open court to crimes that you've been telling your loved ones you didn't commit, are there cases and situations where that can be done successfully and especially in an aiding and abetting situation? Are there two channels of communication, one to the court in open court and one to the family that the defense team often uses to reconcile pleading guilty in open court and telling her family why she is pleading guilty?

A. **Oh, absolutely. I mean, you need to convey to the family the weight of the evidence. You need to help them understand what are the elements of the charge and why it is absolutely essential to resolve the case in this context, and it doesn't necessarily completely alter their view of who the individual is, give them a context.**

Q. Have you ever seen situations where clients have stood up and pled guilty to -- in front of a court and the defense lawyers have said to the family, look, we don't know what happened here, we don't know whether Angela is innocent or guilty, but we do know if she goes to trial she's going to be

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 352 Filed 11/10/11 Page 51 of 72

**1828**

convicted, the system might not work properly, she may end up -- you know, she will end up with a conviction and a death sentence, we have to do what it takes to save her life, and she had to stand up and say to a judge that she aided and abetted these killings, not that she killed these children physically, not that she pulled the trigger, she's guilty of a technical violation of aiding and abetting and that doesn't contradict her claims to you that she did not kill these children, in other words, playing off the legal distinction between a principal and an aider and abettor, letting the family know that she can maintain her innocence to you but for legal reasons she has to stand up in court and proclaim to the judge that she is guilty of the elements of aiding and abetting, is that a viable strategy to get --

A. It happens, no question.

Q. And have you seen situations where the client himself or herself is saying I'll stand up and admit it to the Court, but in my own heart I'll never give up my claim of innocence?

A. A claim of some -- some kind of innocence, yes, where in their mind the elements of murder under the law are not what they believe it means to be a murderer.

Q. Where they say, well, I didn't really do it --

A. Yes.

Q. -- or in their own minds they're working this out.

A. Yes.

**1829**

Q. They're not telling the lawyer I didn't do it.

A. Yes.

Q. They're saying to the lawyer, okay, I did it, but in their own minds, they come to some rationalization. I have to say I did it --

A. Yes.

Q. -- when I really didn't. And they're telling their family I'm just saying I'm doing it -- I'm just saying I did it. I didn't really do it, and besides, I'm not admitting to actually pulling the trigger.

A. Yes, that happens.

Q. I mean, the defense in this case that Miss Johnson presumably did agree to present was that she had knowledge -- she was present on the date of the killings and she had knowledge that the killings were going to take place the day of the homicides but the knowledge of the killings came too late. Is that pretty close to aiding and abetting liability right there?

A. Yes.

MR. WILLIAMS: Objection, Your Honor. I think that misstates what the defense was.

MR. BURT: Well, I think the opening statement is what I'm paraphrasing.

THE COURT: I don't think that's exactly right because -- well, it's a fine distinction, but as I understand

**1830**

the language in the opening statement, it was she learned on the day of the killing. But he actually didn't say she learned before.

MR. BURT: No, the day of the k -- I know.

THE COURT: Yeah, so it could have been simultaneously with the killings because that was on the same day.

MR. BURT: Right. But --

THE COURT: And I think that -- it was not very artfully drafted, but I think that's what he was trying to say.

MR. BURT: Well, what he said I think was that day she learned of the plan to kill but she learned of it too late. So my point is --

THE COURT: But she might not have learned about it until the actual time because that was still on the same day. That's one way of slicing it.

MR. BURT: That's true. And even assuming that's absolutely correct, my point is that's very, very close to admitting to aider and abettor liability. She's admitting she's present. She's admitting to knowledge, although acquired right at the time.

My point is that assuming she was on board with that defense -- and there may be an issue about that. But assuming she was on board with that, that is some indication that they could have gotten her to the point where she could have admitted to a factual basis.

**1831**

THE COURT: I don't know.

MR. BURT: That's my only point.

BY MR. BURT:

Q. Would you agree that that is, you know, given the context of this case, something that could have been worked on?

A. Yes, I think so.

Q. And I think you mentioned the proffer. Just for the record, this is Exhibit 53B, and it's Bates stamp number RS-000516, 517.

A. Yes, and this is certainly what I was thinking of rather than the opening statement.

Q. Right. And this lays out a factual scenario admitting to guilt of both the Nicholson, Duncan homicides and the DeGeus homicides, does it not?

A. Yes, that's correct.

Q. And Mr. Berrigan told you that Angela Johnson authorized this proffer.

A. That's correct.

MR. BURT: I won't take the time to read it because it will be in evidence, but if the Court would like to see this, we certainly would provide a copy so the Court knows what we're talking about here. I don't know if the Court's ever seen this before.

THE COURT: I haven't. That'd be fine.

MR. BURT: I think it is an important document. I'd

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

1832

like with the Court's permission to isolate these two pages, provide it to the Court so the Court has it and knows what --

THE COURT: Sure, and you can give it to my law clerk. He can copy it and then give it back to you.

MR. BURT: Sure. We can actually run a copy for you.

THE COURT: Oh, okay. Mr. Burt, do you have any more questions?

MR. BURT: I don't believe so. Thank you.

THE COURT: I have another line of questions now, and it's a little bit off your -- what you testified about, but you have such expertise in mitigation I want to ask you this.

In the penalty phase -- I mean, I realize the position of the defense is they never should have been in a trial let alone in a penalty phase. But in the penalty phase in this case, isn't the fact of five murders, four on one day, one several months later, and two children and the fact that they were kidnapped, moved, and then shot in the back of the head, that's pretty difficult to overcome, isn't it? I mean, aren't those aggravators very difficult to overcome in terms of a life sentence?

THE WITNESS: They are difficult but I think not impossible.

THE COURT: Well, yeah. But they're very difficult, aren't they?

THE WITNESS: Yes, and I think that's precisely why I

1833

think the team should have been more motivated to resolve the case or to -- and/or to conduct a more consistent and thorough mitigation investigation.

THE COURT: Because you really don't have to be a super-experienced death penalty lawyer or a rocket scientist --

THE WITNESS: No.

THE COURT: -- to figure out that when you've got the death of two young girls and multiple victims in different locations on different days --

THE WITNESS: Absolutely.

THE COURT: -- you've got a very difficult road to hoe.

THE WITNESS: There's a -- Your Honor, you're probably familiar with the Capital Jury Project --

THE COURT: Yes.

THE WITNESS: -- which is a National Science Foundation-sponsored program. One of their early reports by Professor Stephen Garvey at Cornell Law School actually looked at what kinds of cases jurors were most likely to find highly aggravating. And child victim cases were among them. So, you know, it's both common sense and empirically verified. So there's no disagreement on that. I think it's just at the same time mitigation cases succeed in every variety of capital offense.

THE COURT: Yes. How do you think the fact that

1834

Angela Johnson was both a female which usually I think would help in a capital case, everything else being equal, but was also a mother and an expectant mother when there are death of kids, is that, do you think, a more difficult hurdle to get around maybe because she was a mother?

THE WITNESS: I think that's certainly a factor.

THE COURT: But you don't really know how it's going to play out, but it seems to me it can cut both ways.

THE WITNESS: Double-edged, absolutely.

THE COURT: How would you approach that in mitigation?

THE WITNESS: You know, it's --

THE COURT: And that's unfair because you haven't had a chance to think about it.

THE WITNESS: Yeah. I mean, I think, you know, the answer is that you need explanatory mitigation in a case like this, something that addresses directly how this individual reached the situation where she was at the time of this crime, and that's, you know, getting off into other issues in the case and the decision not to have mental health experts talk about her mental state at the time of the crime.

And I think that's something the jurors are hungry for. You know, on the one hand, the law is very clear that some things are inherently mitigating, there doesn't have to be a nexus. You have the Tennard v. Dretke decision that, you know, could not be clearer on that issue.

1835

But the reality is jurors want to know. They want to know why something happened. And I think, you know, what you would try to do in a case like this is answer that, answer that question.

THE COURT: Thank you. That's all the questions I have.

THE WITNESS: Thank you, Your Honor.

THE COURT: Mr. Burt, any additional questions?

MR. BURT: No, Your Honor.

THE COURT: Okay. We'll see you back in June then. Thank you.

THE WITNESS: Thank you very much.

MR. BURT: Could I approach your law clerk to give him this?

THE COURT: Sure.

MR. BURT: Okay.

THE COURT: Defense team, what's next?

MR. BURT: Your Honor, it's Mr. Cornell who was the first investigator in the case. They just went out to get him. And then beyond him, I think we have one other witness, and then we'd be done for the day.

THE COURT: Okay.

MR. BURT: Witness has got an impairment, so it's -- walking impairment. I think he's a little slow. Judge, I actually misspoke. This will be our last witness.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 53 of 72

THE COURT: Oh, okay. Just so you know, I know both Ray Cornell and Gordon Gratias.

MR. BURT: They mentioned that.

THE COURT: Yeah. I know I used Gordon on a lot of cases when I was in private practice. I don't remember if I ever used Mr. Cornell, but I think I knew him way back when he was prison ombudsman as I recall back when I graduated from law school in '75. It's a small state.

Sure. Just come forward a little bit, Mr. Cornell. It's been a long time since I've seen you.

MR. CORNELL: It has, sir.

THE COURT: Yes. Would you raise your right hand, please.

RAYMOND CORNELL, PETITIONER'S WITNESS, SWORN

THE COURT: Okay. Thank you. Please be seated.

Roger, could you get Mr. Cornell a fresh glass of water, please.

MR. MASTALIR: Absolutely.

THE COURT: Would you tell us your full name, please, and spell your last name.

THE WITNESS: Raymond Andrew Cornell, C-o-r-n-e-l-l.

THE COURT: Thank you.

Mr. Burt?

MR. BURT: Thank you.

DIRECT EXAMINATION

BY MR. BURT:

Q. Good afternoon, Mr. Cornell.

A. Good afternoon.

Q. Sir, could you tell me what your business or occupation is.

A. I'm sorry?

Q. Could you tell me your business or occupation.

A. I'm retired now. I was a private investigator for 14 years, and for 11 years prior to that I was the ombudsman for the Iowa prison system.

Q. And back in August of 2000, were you retained to work on the case of U.S.A. versus Angela Johnson?

A. Yes, I was.

Q. And when were you first engaged to work on that case?

A. I don't remember the exact date, but I was contacted by Attorney Al Willett from Cedar Rapids.

Q. And had you ever worked with Mr. --

A. Many times.

Q. And in what kinds of cases?

A. Primarily drug cases, a couple of thefts, but his specialty is federal drug cases.

Q. Federal drug cases? Did he have a subspecialty in homicide cases?

A. Not to the best of my knowledge.

Q. Now, do you know who appointed him on the case?

A. No, I don't, but I would suspect that it was -- no, I'm not

even sure because that was a long time ago.

Q. Now, Mr. Cornell, at my request did I ask you if you would check and see if you had a file on this case?

A. Yes.

Q. And were you able to locate any files?

A. Files that I had, what little remained, were destroyed by flooding in 2009.

Q. And did I inform you that we were able to reconstruct your file somewhat from some of the --

A. Yes, sir.

Q. -- documents that the attorneys had in the case?

A. Uh-huh.

Q. Have you reviewed what I have had marked as Plaintiff's 71?

A. Yes, I have.

Q. I've put that in front of you. Does that appear to be a copy of the reconstructed file?

A. Yes.

Q. Have you had a chance to look through that?

A. Yes, I have.

Q. Did looking through that refresh your memory of some of the things you did in this case?

A. Yes, it did.

Q. And can you tell me -- I believe there's a letter here somewhere that indicates that you were first contacted on the case on August 11, 2000, and Mr. Willett was informing you that

you had been appointed. Do you remember approximately that that's the time when you got --

A. That's -- yes, that's close in.

Q. Now, what was it that Mr. Willett initially asked you to do on the case?

A. Initially or --

Q. Yeah.

A. Well, initially on the case, of course, he contacted me and was rather excited, flustered about the case and basically said we're doing this case. And I don't recall that he gave me a particularly lengthy laundry list of things to do on the case at that point. I recall meeting with him a couple of times and suggesting some things. He had a very limited background in doing homicide defenses.

One of the reasons that I was brought into it is that I had done quite a few, and I was concerned with this one from the beginning for a number of reasons. I was trying to figure out where it was going to go. I'd just come off another case that had a tremendous psychiatric aspect to it, and so I had that on my mind, and I talked to him about that.

Also one of my personal prejudices, if you will, arose early in this matter, and that was Miss Johnson's housing in the Benton County Jail.

Q. Tell me what the concern was that you had.

A. Well, frankly, I was never successful at gaining much in

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 54 of 72

the way of confidentiality with any client I ever had at the Benton County Jail. I knew of at least one employee who apparently thought it was part of his job to take down things that were said between inmates and pass them either up the chain of command or possibly even to the county attorney over there.

Q. Take down what inmates said to who?

A. Well --

Q. To lawyers and investigators?

A. Yeah, anything like that. Yeah, I know of at least one time that he took down some stuff that involved me and a client of mine who subsequently ended up in federal prison, by the way, so I was very concerned about that and --

Q. Did you convey that concern to Mr. Willett when you -- right at the beginning of this case that --

A. Yeah, from the git-go.

Q. And what'd you tell him?

A. I told him I was not happy about her being in the Benton County Jail when the case itself was a federal case and there were federal prisoners housed in Linn County and in Black Hawk County. He's in Linn County and, frankly, was three blocks from there, and I couldn't figure that whole thing out.

Q. Did you tell him it was important right from the git-go to get her out of there?

A. I told him why.

Q. And did you tell him he should take some action to get her

out of there?

A. Well, you know, I'm -- I was the investigator, not the lead attorney. I didn't tell him what to do. But given the nature of our friendship, I basically said you ought to get her the hell out of there.

Q. And what -- did he take immediate steps to get her out of there?

A. No, sir, he did not.

Q. Do you know why?

A. No, and I don't recall that he ever responded to me again on that question.

Q. But you're clear you told him in no uncertain terms that there was a problem housing this capital client in the Benton County Jail.

A. Well, actually, you know, it was a little more widespread than that. I had a problem with any client of mine being in the Benton County Jail.

Q. Uh-huh.

A. You couldn't throw a rock in there without hitting a rat, and I'm talking about the two-legged kind.

Q. I got it.

A. And the other thing was that I had some concerns about some employees there who were in my opinion taking on extracurricular activities. There's no question that Al and I talked about this because later on we had some concern about documentation that

was floating around up there, and that's memorialized in my file.

Q. Okay. Now, that was one of your concerns. Did you also have a second concern that you had right from the very beginning about the nature of this case and why it was being indicted and what you should be doing to try and do your job?

A. Frankly, Mr. Burt, my concerns were many about this case. I did a lot of cases over a lot of years, and this is the one that I will go to my grave carrying with me.

Q. Why is that?

A. Because I screwed it up.

Q. And tell me how you screwed it up.

A. Well, I was having severe financial problems at the time. I was having problems getting paid by both the state and most particularly by the federal courts. And as a result I went broke.

Q. Uh-huh.

A. And because I went broke, I couldn't afford to keep my employee, and eventually I lost my license, and I did not complete this case, and that was not typical of the kind of investigator or the kind of person that I was or that I am.

Q. Did you kind of feel like you let the client down in this case because of these financial --

A. I didn't kind of feel that way. I felt that way.

Q. Now -- and when you say you let her down, did these

financial considerations cause you not to investigate the case the way you normally would have investigated a case of this severity?

A. You have to understand how a court appointment works in a situation like this. Essentially the investigator finances the case.

Q. Uh-huh.

A. And that's exactly what happened here. And I was broke. I had a lot of money out, some of which I was able to get in time, some of which I didn't, and that's how I ended up in trouble with my license. But I could not afford to do some things that I would have liked to have done. I also, frankly, after about six months of this became rather demoralized. I had a laundry list of things I thought then and still think should have been addressed much more aggressively than they were.

Q. Could you give me some examples?

A. Well, one of -- as I mentioned a little while ago, one of my concerns about this case and this woman was psychiatric. I'd worked a number of very high-profile and rather, for lack of a better term, unusual cases that involved people's mental health. Within a matter of weeks, I had gained some entrée into Angie's family, primarily through her siblings and her oldest child.

It became obvious to me at that point that we needed to know a lot more about the inner workings of the mind of Angela Johnson. And in reviewing what little I have here that

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 55 of 72

is after my departure, I do not see that that was ever done. That was -- in my mind was and is very critical to understanding this woman and, frankly, what motivates her and what she's capable or not capable of.

Q. Okay. What else?

A. Another concern I had on this case involved the, quote, unquote, codefendant. The codefendant in this case was Dustin Honken. I had no personal awareness of Dustin at that time, although the attorney who represented him, Alfredo Parrish, is an attorney that I had worked with many times on homicide cases. Dustin Honken reached out to the defense team early on in this case and asked for an invest -- an investigator or for Mr. Willett to come to Florence, Colorado, and talk to him. I discussed this at great length with Al Willett. And Mr. Willett and I had a long history, and we did not as a rule disagree on much --

Q. Uh-huh.

A. -- in spite of the fact that he's a Republican. But he and I just could not get on the same page with this. I thought this was a -- an opportunity that simply should not be bypassed. It should have been followed up on, and, frankly, if it -- in the best of all possible defense investigator worlds, it would have been followed up on within literally a matter of days. It never was followed up upon. I filed an application for a visiting privilege there. And, frankly, it all just went away. Never

heard a word.

Q. And how did it just all go away where you didn't get the opportunity to --

A. I have no answer because that was a long period of time before I left the case.

Q. Now, do you recall some discussion about ethical considerations involved in going to see Mr. Honken or discussions about Mr. Parrish was instructing us not to interview him or anything like that?

A. No, I don't recall anything like that. I don't recall anybody telling me that there was an ethical concern about responding to Mr. Honken's request, no.

Q. Well, let me see if I can get some chronology. From your file there do you recall getting this letter August 21, 2000, saying to you and your then co-counsel or Mr. Willett's co-counsel please find enclosed a copy of a letter that I received at the end of last week from Dustin Honken?

A. Yeah, I recall this letter very well.

Q. Okay. And do you recall that attached to the letter was a letter written by Mr. Honken August 13 in which he said --

A. Yeah, I remember this letter too.

Q. -- where he says in the first paragraph, "As you can surmise, it is my utmost priority to ensure Miss Johnson is safe, well represented, and going to walk away from this case. Whatever must be done to bring out the truth of her innocence I

am prepared to do." Did that indicate to you, number one, that he had knowledge about her innocence and, number two, that he was prepared to help you establish her innocence?

THE COURT: Mr. Cornell, you can -- you should be able to see it right on the monitor in front of you there.

THE WITNESS: Oh, thank you.

THE COURT: Sure.

THE WITNESS: It's a new world to me, Judge.

THE COURT: Yes. No, a lot of witnesses tend to want to look back, but it's hard on the neck.

A. Okay. Again, I recall this letter. I definitely recall the strength of the first paragraph, and this letter was what led to my conversations with Al and also to my application to visit Mr. Honken at Florence.

Q. And did this letter seem to you to be a key piece of information at the outset of this very serious case that needed to get followed up?

MR. WILLIAMS: Objection. Leading, Your Honor.

THE COURT: Overruled.

A. Let me answer that this way; okay?

Q. Uh-huh.

A. As I mentioned, prior to my being a private investigator, I was the ombudsman for the prison system here in Iowa for 11 years. I probably read at one time almost any conceivable lie that a human being can put on paper and some that probably were

fairly original. As a result, I have to admit -- and the people who know me will verify this -- that I'm very cynical about almost everything. But this letter caught my attention for a number of reasons, some of which would seem trivial like the fact that the guy tries his best to sound like an attorney and he can't spell worth a damn. But the other thing about it that caught me was that, you know, first of all, this letter was unsolicited. Secondly, he's not asking for something other than for somebody to come and talk to him; okay? Those are important things. This guy's -- you know, he's in a super max prison. It's not like he doesn't have other pressures on him, and he had to know. I thought to myself, okay, maybe what he wants to do is to get somebody from Angie's defense team out there and see what he can learn from us. Well, I been in the business a long time, and he couldn't have gotten much out of me, possibly a cookie recipe. That would be about it. But I wanted the chance to try. And the letter struck me. It's not that common to have somebody who is either an actual or potential codefendant to say, hold on a second, wait here, because essentially if you read between the lines here, what he's doing is he's making an offer to carry the freight on this whole thing and drop her off at the next station down the track. And I'm going to respond to that. I would be

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Page 1848

remiss in my ethical responsibility and in my duty as I think of myself as a human being if I didn't respond to this in some way.

Q. And did you emphasize upon Mr. Willett your feelings about the importance of this letter?

A. Well, yes, I did.

Q. And what was the response?

A. The response essentially was move on to something else; we're not going to talk about this anymore. Like I said, Al and I've known each other for a long time, and we have been friends for a long time, although we're not obviously close anymore. He is a genius at what I would call a wall of silence. If he really doesn't want to respond, he doesn't respond. It ends right there. You know, and that's true both personally and professionally. You know, he's the only person I ever met who could do that as well as he does.

Q. Were you meeting a wall of silence as it pertained to getting instructions from him to you about what you should be doing on this case?

A. Not across the board.

Q. Uh-huh.

A. But there were a couple of things. Like I said, I was very concerned about the psychiatric aspect, and I had a particular psychiatrist in mind that I thought should be brought in early on. And, you know, I understand I'm not the leader of the pack here; okay? But I had the experience, and I wanted to see him

Page 1849

go after a couple things. This letter was another one. You know, there's a third thing, and I'm sure that you'll bring it out in a little bit here -- if you don't, I will -- and that's the question of whether or not we should have been talking to the federal government about this case.

Q. Well, I'm glad you mention that. Why don't you talk about that and what your views were on that.

A. This case did not start in my mind as a case involving the fate of Angie Johnson. It was a case against Dustin Honken. And I as an investigator and I like to think as a person was not divided in my loyalty on this case. And it looked to me like Angie did have some serious problems with this case.

Q. You mean from an evidence standpoint that --

A. Evidence and things that I thought would be really dangerous to her at trial.

Q. Okay. And did you early on start to review some of the discovery in the case?

A. Yes.

Q. And specifically do you remember very early on in the case seeing this document which I'm going to show to you which is Exhibit 53? It's an investigative report, RS-10-0002 through 7. It's dated October 15, '96. It's a summary investigative report. And the last line of the report is what I want to -- last couple of paragraphs here is what I want you to focus on. And tell me if you've ever seen it.

Page 1850

Outlines the case. Then it says subsequent investigation has not revealed any evidence about the whereabouts or the status of these missing persons. It is the opinion of this reporting agent that if anyone might have information to implicate Honken into the suspicion of death of these persons it would be Angela J. Johnson. However, she has not been forthcoming in efforts to obtain information from her. It is hopes (sic), however, that based upon the result of a search warrant of her Clear Lake, Ohio (sic), residence that sufficient evidence of her and part of a conspiracy to distribute such a controlled subject should be anticipated and that -- sufficient evidence on her part of a conspiracy to distribute such a controlled subject should be anticipated and that she was so charged, they might then consider cooperating with law enforcement. However, until such time as a person with direct knowledge comes forward, efforts to locate these people remain stymied.

Do you remember reading this report very early on?

A. Yes, I do.

Q. And what kind of -- if it did, was the impact of this report in terms of your thinking about the case as it relates to negotiations?

A. Well, I will refrain from using the expletives that I used with Mr. Willett when I discussed it, but essentially what I saw was we'll grab this woman, put a hook through her, and use her

Page 1851

as bait to catch what we're really after, and, you know, just generally across the board I found that troublesome to say the least.

I was also interested in the fact that they were saying up front at that point they didn't have anything, and that took me back to where I was going a moment ago which is, Al, let's go talk to them. She doesn't have to do anything, but we ought to go talk to them.

Q. Uh-huh.

A. It becomes sometimes -- rightly and wrongly, I suppose it becomes sometimes in these situations to ask yourself whether doing a few years is better than doing it all, you know, taking away the risk of death, even if you are incarcerated for many years. You know, those are hard choices for any individual to have to make, but we should have been able to lay them in front of her and given her some kind of an idea of what the government would say.

Q. And what reaction, if any, did Mr. Willett have to your suggestion that --

A. Wall of silence.

Q. -- that -- I'm sorry?

A. Wall of silence, same thing.

Q. Did you ever find out what his motivation was in not responding to that suggestion?

A. I spent more time trying to analyze and understand Al's

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 352 Filed 11/10/11 Page 57 of 72

motives in this -- in this stage of the whole thing than I did in some ways in trying to understand the client. I don't understand why we didn't at least open the ball. It harmed nothing. You know, the government does not hesitate to try to get information if they think we'll give it up. And I never saw that as a one-way street. You know, and I know for a fact that Mr. Willett and I at that time had at least cordial relationships with a number of people in the U.S. Attorney's Office.

Q. But no effort was made at that point despite what you were conveying --

A. To the best of my knowledge, no.

Q. Now, did you talk with Mr. Frerichs, co-counsel, and try and break this wall of silence with . . .

A. I don't remember talking to Tommy specifically about that. I might have. We had just -- to understand this particular dynamic, we had just concluded, the three of us working together, on a murder 1 that Tommy was first chair on, and we didn't win at that point, although we subsequently did on appeal. But we did actually work so well together that we received favorable commentary from the judiciary in Black Hawk County. So obviously I thought, well, let's try this. Let's see what we can do. You cannot -- you cannot get answers by simply remaining mute, and that was my problem I guess.

Q. Was that other case you referred to from Black Hawk County

the first homicide case that Mr. Willett had been involved in as far as you knew?

A. Yes, sir, it was.

Q. And you had a positive experience with him in that case; right or no?

A. Well, again, you know, I don't want to tell tales out of school, but yeah, I did. Mr. Willett would be the first to tell you that he considers one of his great areas of expertise as voir dire. And I saw that in that particular case, State versus Peterson, for the first time. And I was mightily impressed. I understand voir dire is not a trial, but it's a major hunk of it.

Q. Uh-huh.

A. And yes, he did an outstanding job with that, and there was a Batson motion as I recall that he also worked on that I -- you know, I'm an investigator. I'm not a lawyer. But I've been in this business -- I was in this business a lot longer than some of the people I was working with back then had been alive, and I can read and write. So I paid attention, and I was impressed with Al's work on State v. Peterson.

Q. Were you impressed with his work on this case, on the Johnson case?

A. Obviously I didn't follow it through to the end.

Q. Just in the time that you were connected --

A. But in the time frame in which I was a participant in this

case, no. I had numerous problems, and some of them were problems that I understood were simply intrinsic to my cases with him, for example, the lack of a paper trail.

Q. What do you mean by that?

A. Because of reciprocal discovery, the understanding was that I would write down virtually nothing.

Q. He told you write down virtually nothing?

A. Those are his words, not mine.

Q. Now, had you ever worked on a death penalty case before this one?

A. One.

Q. When and where was that?

A. That was about five years previous in East St. Louis, Illinois, and I worked on that. I was contacted by an attorney who said, you know, I don't want you licensed. I just want you to come down here because I heard you can -- well, and I don't know who gave me the reference, but it sounded like Alfredo Parrish. You know, I heard that you can go down a rat hole and bring me a rat or a reason, and that's what I did, and I did assist on that case, and it was pled out to a life sentence.

Q. Now, did Mr. Willett ever say to you in connection with this case that, Ray, this is a death penalty case; we gotta be very careful to document everything we do in this case because years from now she's convicted and sentenced to death, those habeas lawyers are going to come knocking on the door, and we

gotta have a paper trail of what we did? Did you ever have any kind of discussion like that?

A. There was never a dialogue like that in my presence with him and Tom, him and me. And again, I readily admit my own fault here. I should have just taken the bull by the horns and kept my own documentation.

Q. He told you just the opposite of what I just indicated; namely, you shouldn't document anything.

A. For the case, yeah.

Q. And did he tell you what his thinking was in terms of why --

A. Reciprocal discovery.

Q. Okay. The -- what other discussions did you have with him about this need to get in there quickly to negotiate this case based on this report that you read or based on anything else?

A. Well, I think that that was touched on two or three times. The last time that I recall would have been fairly soon before the bodies were discovered. And again, it was, you know, the clock's ticking here. Certainly by the time that things -- the wheels really fell off of this case which was all concurrent with those bodies being discovered, I know I'd had that discussion with him at least twice and I think three times.

Q. Why in your mind was the clock ticking? I mean, what was the urgency of getting this done quickly?

A. Back to square one, she's still sitting in Benton County.

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 58 of 72

Q. Uh-huh.

A. And, you know, I've survived a lot of years by being a paranoid. I always assume the worst.

Q. And in this case your assumptions proved to pan out, did they not?

A. Tragically so, yes.

Q. Now, was your motivation in advising Al about the need to get in there and start negotiating some idea that you were in a good bargaining position here and you ought to take advantage of it?

MR. WILLIAMS: Leading, Your Honor. Objection.

THE COURT: Overruled. You can answer.

Q. Go ahead.

A. Yes, not in a sense of having some dominant role, but there'd been a couple of cases in the previous year to a year and a half that had at least left a somewhat favorable attitude in the mind of some of the AUSAs in Cedar Rapids about Mr. Willett and myself, one in particular, a guy who may have been the most obnoxious single client that any of us ever encountered who had gone through seven or eight lawyers and five previous investigators and Mr. Willett and I finally brought the case home, that everybody's like, well, you know, this is good. And I've never felt any hesitation at following up on an advantage on behalf of a client.

Q. Now, did Mr. Willett ever discuss with you that

Mr. Parrish -- that you should talk to Mr. Parrish about approaching Dustin Honken?

A. No.

Q. Was your desire to approach Dustin Honken because he had indicated he had information about Miss Johnson's innocence and you wanted to nail him down on that in terms of getting whatever information he had?

A. Well, I would have no other reason to talk to him.

Q. And did you also have some fear that unless you went and talked to him that maybe he'd be talking to some other people on the other side of the case?

A. It was obvious to me -- again, I read that letter, and it was obvious to me that I was not dealing in the case of Dustin Honken with some mental midget, that this guy had some moxie, he had some brains. So, you know, and I'm sitting there, and I'm thinking, again, strike while the iron is hot. If it falls on its face, there's no harm done, but you never know. And it would not have been that great an imposition for me to drive to Colorado.

Q. Do you recall reviewing subsequent letters by Honken in which he followed up and inquired where are you guys, how come you're not coming --

A. I heard there were. I never saw them.

Q. You heard, though, that he had sent --

A. Yeah, I think I heard that from Tom Frerichs, but I

wouldn't swear to it.

Q. And at no point did you ever follow up on --

A. No, sir.

Q. -- interviewing him.

A. No.

Q. Now, tell me what you did do on the case in terms of interviews and in what period of time --

A. On the case?

Q. Yeah. What period of time did you work? In other words --

A. Well, I think I was in it for about a year and a half. Very honestly and with all due respect, a huge amount of this case and the time that I and my then partner Rose Nevins spent on this case would have been taken up by what has to be called hand holding and head patting. Miss Johnson had no previous experience in the prison system or the criminal justice system and by her very nature is an emotional person and on occasion an emotionally needy one.

That became even more significant to me as I began the process of doing her background with an eye toward possible psychiatric aspects. I started the family interviews. And during the course of those -- and again, I'm not going to say anything here that I haven't said somewhere else at least once -- during the course of those interviews, I discovered what amounts to a family background designed by Stephen King. And I thought then and I think now that there were psychiatric issues

involved with this woman. That was a major part of what I did.

Also we had witnesses flowing out of our ears by then primarily involving, you guessed it, Benton County. And so we're chasing people up and down the entire eastern half of Iowa trying to get interviews about what was said. The -- you know, the whole thing involving the McNeese matter, you know, all of that is just bubbling.

I never felt like I was really in a position to focus my energies on what I saw as the primary aspects of this case because there was so much going on. It was in all honesty a chaotic case.

Q. Now, the interviews that I see in this file that we've been able to reconstruct are some preliminary interviews with Miss Johnson and her family; correct? These are very brief written memos that either you or Miss Nevins conducted first with --

A. Those are get-to-know-you interviews.

Q. Get-to-know-you interviews. You certainly did not exhaust the possibilities in terms of her background.

A. No.

Q. And same with whatever family members you interviewed? These were get-to-know-you kind of interviews?

A. There would have been more interviews, yes.

Q. Well, what I'm trying to get at is the interviews you did with the other family members, first of all, do you remember who specifically you talked to in the family?

A. I talked to her brother who I believe lived and probably still lives in Chicago and a sister who had the interesting profession of a designer of women's lingerie and -- had a great line of jokes about that. But I talked to her. I really, really wanted to talk to her mother, but I was never able to.

Q. Okay.

A. Again, I spent time as did my partner, in my opinion an inordinate amount of time, with Angie going over everything with her on a daily b -- almost daily basis.

Q. And the interviews that you did with Jim Johnson and the other -- Miss Johnson's sister, were those also kind of get-to-know-you interviews?

A. That's what they were.

Q. In other words, in your file you've got fairly brief memos documenting the information they gave you.

A. Well, keep in mind, I've got two reasons for brief interview reports. Number one, I was instructed not to put down anything that I didn't feel I absolutely had to put down.

Q. Uh-huh.

A. And number two, they were, in fact, the initial interviews. On some cases that I've worked on -- you know, I can think of a couple, two, that had some psychiatric aspect -- it wasn't unusual to eventually spend three, four, five hours probing what a person would say just to prepare a report to give to a psychiatrist about the client. It's not unusual to do that if

you do it right.

Q. Now, based on your or your associate's preliminary views with Angie Johnson, did she seem to you to have a rapport with your female investigator Rose --

A. With my investigator?

Q. Yes.

A. I think so, yeah.

Q. And do you think if you would have persuaded Mr. Willett to get in there and talk to the U.S. Attorney's Office about plea that either you or Rose Nevins could have worked with Angie Johnson to bring her to a position where it could have been explained to her why it was important to resolve the case at this early phase of the case?

A. I don't have a crystal ball but --

MR. WILLIAMS: Objection. Calls for speculation.

THE COURT: I'll take it subject to the objection.

BY MR. BURT:

Q. Go ahead.

A. Well, I don't have a crystal ball, but I think I can tell you how that would have worked. If we had gone to her and said we want to go talk to the U.S. Attorney's Office and we're going to discuss the matter of plea, I think Angie probably would have withdrawn into herself for a little while, not long. And within a matter of hours, she would have been on the telephone calling me every possible name that she could invent or that anyone had

ever demonstrated in front of her, and that would go on for a couple three days. And then she would calm down a little bit more, and she would say, what's the advantage for me in this?

And at that point I would have gone up with Rose, and I would have said, okay, you guys kick this around because that's what I did with Mrs. Nevins a lot. I said you guys kick this around, and I would have beat feet out of there and gone down the street and drank coffee in Willett's office.

Q. And why was Rose Nevins a good person that could have been used in that situation?

A. Because this is a battered woman you have as a client.

Q. Who's --

A. This one.

Q. Angie Johnson?

A. Absolutely no question about it. It's well documented. Rose Nevins is probably the single-most battered woman I ever met in my career if not in my life up to including having her husband stab her in the face with a screwdriver. There is a sisterhood -- whether we men like it or not, there is a sisterhood of victims there that does, in fact, have its advantages when you're trying to accomplish something, and I'm not above that manipulation either.

Q. And you think this could have been done based not on speculation but based on your contacts with Miss Johnson and your knowledge of Miss Nevins.

A. I think it would have taken time but it could have gotten done. I think I could have over time, maybe a month, I think I could have gotten her to at least say yeah, I'll talk to them.

Q. And if at that point in the process you had gotten the authorities on board with a -- say a 10-year offer, 15-year offer, could you, working with Miss Nevins, have explained the situation in a way to Angie Johnson where she would have understood the necessity and --

A. At that point --

MR. WILLIAMS: Again, calls for speculation, Your Honor.

THE COURT: You may answer. You can answer.

A. At that point in time I would not have had a problem doing it in exactly the same way I did similar situations with many, many other cases, you know, first of all, pointing out that 10 or 15 or even 30 years is a hell of a lot better than a life sentence.

Q. Probably better than a death sentence too; right?

A. Absolutely.

Q. Now, did you ever discuss with Mr. Willett your desire to engage in that kind of dialogue with Miss Johnson and the need to do so at that time in the case?

A. I did, but I kind of had a problem there because, first of all, at some point for that thing to start rolling, the dynamic I'm describing here, for that to start rolling, it would have

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 60 of 72

Page 1864

involved Al.

Q. Uh-huh.

A. It had to. He had to know that she was at least entertaining the offer. She had to know that he was serious when he said it may help you. Okay. That had to happen before anything else.

Q. And why was that a problem if it was?

A. Because by this point communication between Mr. Willett and Miss Johnson had become anorexic. It was almost not there.

Q. Now, was this pre-body or post-body discovery?

A. As I recall, it started pre-body.

Q. Okay.

A. And post-body it was -- it was very noticeable.

Q. Why did the communication between those two become anorexic?

A. I'm not a psychiatrist, but I think a lot of it has to do with personalities. Mr. Willett is very, very good with certain types of clients. He is not so good with others. I never saw him in my opinion completely successful at representing a female client. That's part one.

Part two is that he does not deal with people who get emotionally explosive. There's no question that Angie is emotionally explosive.

Q. At least during the time that you were connected with her.

A. Yeah.

Page 1865

Q. Okay.

A. It doesn't bother me. I'm the oldest of nine people like that.

Q. And was there another factor?

A. Personality, the explosive acting out, the loud noises, and, you know, and I hate to say this, but I think he was afraid of her.

Q. He was afraid of her?

A. Yeah.

Q. What do you base that on?

A. I had a history with Al about this whole thing about clients. On one occasion he told me that the reason I was sitting between him and his client in that case was so the client had to attack me before he could get to Al. I felt then and I feel now that Al has a certain level -- some people intimidate him.

And I don't suffer from that, and he knew that, and I think -- and I'm not going to portray him as being some snivelling weasel. He's not like that. But I don't th -- and, frankly, I don't consciously think he consciously knows when he does it, but he gives off that aura of this, of being -- not being completely comfortable I guess is what I'm trying to say.

And here you have someone who is charged with a boxful of heinous crimes who is incarcerated, who has an explosive temper and a remarkably loud voice, especially in small rooms --

Page 1866

and I speak from experience here -- and projects herself very powerfully, and I think that made him uncomfortable at all three of those levels.

Now, what I saw him do was interesting because over time he's limiting his contacts with her and increasing his paralegal's contacts, Nancy Lanoue, and also increasing my partner Rose's contacts with her. So now she's got two female conduits to talk to, but she's not talking to the man. She's talking to the conduits.

Q. All right. Now, did Angie tend to -- you know how some people when they first come in tend to get, you know, pretty emotionally distraught. Did Angie tend to settle down as time went on and she developed some relationship with the conduits?

A. Yeah, and she was that way with us and with me a couple of times, but, you know, I don't know. Maybe it's just because I've been through all that stuff a lot of times. I was not impressed, and usually within a matter of five minutes she'd calm down, and then you'd find out what was really bothering her.

She had a lot of trouble in jail. She is not one of those people who jails well.

Q. Now, you learned when the bodies were discovered that just as you predicted there would be an informant problem in the case; right?

A. Uh-huh.

Page 1867

Q. And did you learn that Miss Johnson had supposedly confessed to this guy McNeese?

A. Yes, I did.

Q. And did you learn that he did so by using some persuasive techniques that he apparently was pretty good at?

A. Yes.

Q. Do you think you could have used those same techniques in your discussions with Miss Johnson in terms of this plea negotiation?

A. No doubt about it.

MR. WILLIAMS: Speculation, Your Honor.

THE COURT: You may answer subject to the objection.

A. Actually there's no doubt about it. The techniques are hardly unique on one side of a prison wall or the other. The techniques remain the same. The words and the blandishments and the promises are different. I certainly would not have felt the need to suggest that she and I would be living on an island in the Bahamas which is exactly what Mr. McNeese did, but I certainly would have also had some things to hold out to her like the fact that at least if she's not on death row she could have a con -- have a fairly affirmative relationship with her kids.

Q. Did that seem important to her?

A. Pardon me?

Q. Did that seem important to her based on your contacts with

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 352 Filed 11/10/11 Page 61 of 72

her?

A.   Based on my contacts with her and the conversations I had with her both in person and on the phone and the recitations that I heard from Rose Nevins and from Nancy Lanoue, I would say that ranking her kids as important is an understatement. Her children were at that time the center of her world, almost obsessively so.

Q.   Now tell me this. How much time did you actually spend with her versus how much time Rose spent with her?

A.   I did not spend nearly as much time with her as Rose did, probably 20 percent of what Rose did. Rose saw her a lot, and they talked on the phone a lot.

Q.   Now, besides these preliminary interviews that are in your file there, the only other interview I saw in there was of a woman named Sara Bramow.

A.   Bramow.

Q.   Bramow. And it's a written report; correct?

A.   Uh-huh.

Q.   Did you interview any other people on the case while you were in the case, or were you just getting going when you left the case?

A.   Basically I hit a financial wall --

Q.   Uh-huh.

A.   -- about the time that we successfully located Sara Bramow. We slowed down. I told Al why I was slowing down. He said,

well, it should bounce back. It never did. And eventually he had no choice but to release me from the case, and I understood why.

Q.   When did you get released from the case? Do you recall?

A.   As I recall, it was in February of 2002.

Q.   2002, so you were on the case from August 2000 to 2002.

A.   Right, about a year and a half.

Q.   And how many interviews were you able to do given these financial constraints during that time period?

A.   I really don't know.

Q.   Was it a lot or --

A.   Probably 20 to 25, not as many as I would have done in the normal course of any homicide defense --

Q.   And was that --

A.   -- let alone this one.

Q.   I'm sorry. Was that primarily focused on McNeese and people around McNeese?

A.   I wanted to go after McNeese after all this came to light. I still especially -- you know, I assume that since this is an appeal and it's not a trial I can speak to the suicide attempt.

Q.   Sure.

A.   I wanted even more after that to have an opportunity to have some psychiatric attention paid to this case. And, you know, a suicide attempt and in my opinion a valid one certainly strengthened my opinion about that.

Q.   Now, while you were the -- and besides the Sara Bramow written memo you got in there, there's no other work product in the file. Would that be consistent with what Mr. Willett told you, don't write anything down?

A.   Exactly.

Q.   And could you care -- you said you did maybe up to 25 interviews. Who were you interviewing?

A.   As I recall, there were some people who had also come through the Benton County Jail at roughly the same time she did and McNeese did. Some peripheral information involving Mr. McNeese exploded under my feet, and I followed on that for a little bit before I left that matter aside.

     And as I recall, I had several phone conversations with -- with the siblings. The siblings or the older daughter as I -- I think her name is Alyssa were in touch with me pretty regularly with ideas. But, you know, all that paper would have gone either into the file that I turned over or into what little I kept as working notes which was probably eight or nine sheets. And I don't have them. I don't have the names. That's about all I can tell you.

Q.   Okay. Now, do you recall fairly early on in the case reading a investigative report about a neighbor of Lori Duncan's named Phyllis Prilosec, Prilovec?

A.   Yes, I do.

Q.   And tell me what the investigative report said to you in

terms of what her connection was to the case.

A.   Well, as I recall -- and again, I'm doing this totally by memory, and we're talking about ten years.

Q.   Uh-huh.

A.   As I recall, this woman had seen something that was not consistent with the theory of the prosecution at that time, and I wanted to find her. As I recall, I assigned it to Rose, and Rose just simply couldn't seem to get it. Eventually it went to my successor, the Gratias law firm (sic), several months if not a year later, and they discovered that the witness, in fact, had passed away.

Q.   Okay. Let me see if I can get the timing. When did you review the report on Miss Prilosec? Would that have been right shortly after you got appointed?

A.   I think that probably would have been some time in the fall of 2000.

Q.   Okay. The fall of 2000. And did you or somebody instruct Rose Nevins to start looking for this woman?

A.   I don't recall exactly when, but probably fairly soon.

Q.   Okay. And do you --

A.   I don't even know when she passed away to be honest with you.

Q.   Do you know what efforts Rose Nevins made to find this --

A.   No, I didn't. That would have largely been contained in the file that was passed on to the Gratias firm.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 62 of 72

Q. Okay. Well, the billings -- and I'll show you Exhibit 8, and I'll show you what we got in the way of billings which are not much, but take a look at the billing which goes from April of '01 through May 31, '01, on the first bill. And then there's an earlier bill which goes from February 16, '01, to April 11, '01, and that's it. So there's two billings in there. Take a look at that and see if that reflects any activity in relation to investigating Miss --

A. To this particular witness?

Q. Yeah.

THE COURT: And I think it's Proscovec.

MR. BURT: Proscovec.

THE COURT: Yes. You adopted the Dean Stowers Prilosec which is the over-the-counter medication I think for -- it's an antacid and --

MR. BURT: Yeah.

THE COURT: And there is a difference. But Prilosec's easier to remember.

MR. BURT: It is. It really is.

THE COURT: And I think we all know who you're referring to, too, so it's kind of like the difference I guess between Honken and Hoffman.

Why don't we take a short -- why don't we just take a ten-minute recess.

MR. BURT: Okay. Thanks.

(Recess at 3:38 p.m.)

THE COURT: Please be seated.

Mr. Burt?

MR. BURT: Thank you.

BY MR. BURT:

Q. Mr. Cornell, did you have a chance to review your billing there to see if it reflects any attempts to locate this witness?

A. I did not see anything specifically mentioning Proscovec.

Q. Okay. How much time do you think Rose Nevins spent looking for this woman?

A. Probably a couple of hours, no more.

Q. Probably a couple hours, no more you said?

A. Yeah, at that point.

Q. Now, when you came on the case, did Mr. Willett -- or at any point in time did Mr. Willett give you a priority in terms of who should -- who you should be interviewing and when and who is important and who was -- who you should --

A. No.

Q. At no point did he give you --

A. No.

Q. How about your co-counsel?

A. You mean Mr. Stowers or Mr. --

Q. No, no. I mean Mr. Frerichs.

A. Mr. Frerichs and I talked a lot about what should be done.

Q. But who was giving you, if anybody, direction in this

investigation?

A. I hesitate to say this because it sounds like I'm massaging my ego, and I'm not, but of the three of us at that juncture, the only one who had any significant experience in putting together a defense for a homicide case was me, and I -- as I said, I'd studied at the feet of Alfredo Parrish for several years. We all got into the making suggestions thing, and a lot of phone calls went back and forth. But basically it came down to if you think it's right do it. You decide how important you think it is.

I will say this: I never had in any other homicide case I worked on the autonomy that I did on this particular case. I had the freedom to do whatever I wanted. I just didn't have the resources to do whatever I wanted.

Q. Now, did you ever have any contact with Mr. Berrigan after he got into the case?

A. I met and talked to Mr. Berrigan a couple of times was it. He was brought into the case, as I understand it, because he is a, quote, unquote, death penalty lawyer. He basically gave direction to Mr. Willett I think and later to Mr. Stowers, but he did not have a significant role to play in telling me things. I basically continued in my traditional relationship with Willett of daily -- twice daily telephone calls.

The presumption that we worked on was that if it wasn't written down the best thing to do was to make sure that

it got reported accurately and immediately, and that's what we did. It was a standing joke between us that went how can I miss you if you won't go away.

Q. Uh-huh.

A. That was how we worked, and we worked well.

Q. Now, in these conversations, would you give him information and then he would direct you or --

A. No, no.

Q. There was --

A. That was --

Q. -- no direction at all?

A. I'm not saying it never happened. It definitely happened on other cases, but on this case there was no theme of direction. Early on if I may . . .

Q. Sure.

A. Early on I recall having a fairly intense conversation with he and I and Tom Frerichs about a theory of this case and banging around for quite a while on a theory of this case. What was said to me at that time was that we were, quote, unquote, going to use a SODDI defense. That's an acronym for some other dude did it.

Q. Uh-huh.

A. And I was never comfortable with that, but I'd done that type of work-up for Mr. Willett before and on occasion had prevailed, so that's where I started, looking at other people.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 63 of 72

You will find, I'm sure, reflected in some file somewhere the fact that we ran down or attempted to run down information that had at least one of these decedents alive and well and living here and there throughout the United States. We were making inquiries about that. We were trying very desperately to get a contact and information from the family of Mr. DeGeus because that one stood out in my mind. And again, I prioritized that. Al didn't. And so I was after that particular case.

Q.   Where was this woman Phyllis Proscovec on your list of priorities if you had a list?

A.   I don't recall exactly, but at that juncture she could not have been very high.

Q.   And you said Rose Nevins may have spent about two hours trying to look for her. Did you personally spend any time trying to look for her?

A.   No.

Q.   No?

A.   No.

Q.   At some point did you refer the task of looking for her over to Gordon Gratias while you were still connected with the case?

A.   Yes, I did.

Q.   And do you remember sending this memo which is in your file to Gordon Gratias? It's undated, but it says -- actually it's

to Scott Gratias from you, and the final paragraph says, "I've had trouble establishing a contact with Lori Duncan's former next-door neighbor, Phyllis Proscovec. The number on the DCI report appears to be valid as it rings, but there has been no answer to repeated calls. I'm attaching the cover sheet. Can you please confirm this information as I don't really want to drive up there on a wild goose chase."

Now, first of all, at this point when you sent this, I take it you had not driven up to where Miss Proscovec was located.

A.   Clear Lake, no.

Q.   And what you were asking him to do was do some sort of work to see what?

A.   They had computer accesses that my office didn't have.

Q.   So at the time you were investigating the case, you had no computer access to maybe do --

A.   Not that would've gotten me there, no.

Q.   -- locate information on witnesses.

A.   Yeah.

Q.   How did you go about, if you know, or how did Rose Nevins go about trying to locate Phyllis Proscovec without computer access?

A.   Well, as I recall what happened -- and again, Rose isn't here, and I'm reluctant to speak for her, but as I recall what happened was that she had a contact with the Clear Lake Police

Department, called them. And I don't think we got the information -- any information of any significance other than a phone number. Then the number was connected, so she was trying periodically I think over a period of two or three weeks. And then we had to move on to other things. This was not at that time someone who had been prioritized to us.

Q.   Okay. And --

A.   Or by me.

Q.   I just located another copy of that memo in your file, and it looks at the top like it was sent on January 21, 2003; right?

A.   Yeah.

Q.   So this is fairly well into the case at this point; correct?

A.   Yeah, this is literally within a couple of weeks of the time that I went off the case.

Q.   Okay. And do you remember shortly after you sent that, about two days afterwards, getting this letter from Scott Gratias?

A.   Yeah, I definitely remember it because he mistakenly referred to me as a lawyer.

Q.   As an attorney at law.

A.   Yes.

Q.   Okay. And do you remember in this letter that he represented to you on January 23 that Phyllis Proscovec, date of birth 9-21-34, moved to Mason City prior to her death on August

24, 2002?

A.   Uh-huh. I remember that.

Q.   Is that the first you learned of her death?

A.   That was the first I knew of her death, yes, sir.

Q.   Now, prior to that time had Angie Johnson stressed to either you or Rose Nevins the importance of this woman Phyllis Proscovec?

A.   I think she may have to Rose. I don't know that, but I think she may have, not to me.

Q.   Okay.

A.   My communication with Angie was pretty minimal at that point.

Q.   So the contact in terms of people that worked for you, it was really Rose Nevins who had the primary contact with her.

A.   Yeah, especially with this case.

Q.   And in total how much time do you think you spent with Angela Johnson? And you can look at your billing. I didn't see much client contact.

A.   I'm reluctant to try to give you an exact figure of hours, but probably over the life of the case --

Q.   Yeah.

A.   -- 60 or 70 hours I'd say some of which was billable, some of which wasn't.

Q.   You personally spent 60 or 70 hours?

A.   A lot of that would have been hand holding on the phone.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 64 of 72

## 1880

Q. Phone kind of hand holding?

A. Phone contacts.

Q. Okay. Now --

A. She's a phone person.

Q. How much in total did you or Rose Nevins bill on the case? And since we don't have your billings, I can't help you with any billings, but we have some of your billings but . . .

A. Again, I simply cannot say for sure, but I would estimate probably someplace between five and eight thousand dollars.

Q. Total.

A. In total.

Q. And did you think when you left the case that this case had been thoroughly worked up from an investigative standpoint given the stakes that were involved?

A. Did I think it was --

Q. Worked up.

A. -- properly done?

Q. Yeah.

A. No.

Q. Was it even close?

A. In my opinion no.

Q. Now --

A. But who was I going to complain to at that point?

Q. How is it you got off the case?

A. As I said, I went bust financially. I could not afford to

## 1881

renew the bonds that came with my license. That was part one. I was trying to put enough money together to get back on my feet when I made the mistake of taking a case as a favor to someone, and there was a hidden motive there, and they turned around and filed a complaint against me with the Department of Public Safety. I took an Alford plea on that. It was a simple misdemeanor. I took an Alford plea on that and refunded the money, but I've never applied for another license since, and I have no intention of doing so now.

Q. Did you and Al Willett have some sort of a falling out in this case?

A. No, no. He called me and said, you know, "I just talked to the DCI, and they told me what's up, and I'm taking you off the Johnson case." I said, "Okay." And I said, "I've got all this stuff." And he said, "Well, I'll send Gordy or Scott to come get it." And a few days later they came and got it, and I had it boxed up and ready to go for them.

Q. And when you say all this stuff, what did you have that you transferred?

A. I had probably three banker's boxes of information pertaining to this case.

Q. Was it discovery mainly?

A. Some of it would have been discovery, not all of it. There would have probably been several hundred sheets of phone notes, logs like that, because Rose was a great note taker for phone

## 1882

calls. Can't translate them into anything, only she can, but there was paper there. That would have also contained the itemized billings that you referenced to.

You know, I'm speculating on what else might have been in there. There would have undoubtedly been some notes from me about the limited period of time I had to actually examine some of the discovery material involving the unearthing of the bodies which was an area that I was very interested in pursuing because I felt that there were some pretty -- there was some pretty broad latitude in terms of the time lines that were being portrayed.

Q. In terms of these financial issues that you alluded to, when did -- when if there was such a time did you slow down working on the case? When did that start and how --

A. Probably August, September of 2002 I went pretty dormant.

Q. So -- and prior to that time how active had you been in the case? I mean, if your total billing was $8,000 --

A. It was up and down. At some point during there, you know, I know that there were -- I recall very clearly that Tom Frerichs went off the case and you have two other attorneys appearing on the case, one of whom was an attorney who was in another state, Mr. Berrigan, and another was an attorney who in my opinion makes a practice of not speaking to lesser beings.

Q. Who is that?

A. That would be Mr. Stowers. And so we had -- you know, I

## 1883

was still constrained to do what I could with what I had. And what I had was diminishing, little.

Q. So I'm trying to get a sense of the -- was it a gradual tapering off of activity, or was there a point when you just stopped working?

A. It tapered off, and then there was a point where, you know, I just couldn't do it anymore. And Al said, you know, box it up.

Q. But when was that point?

A. I recall it as being in the late winter of 2003, probably early February. I know there was snow on the ground when it occurred. And Scotty Gratias came, and, you know, I told him what he needed to know about what was in there, and that was it. I was done.

Q. And do you feel for the time that you were connected with the case like -- do you feel that the defense team was a functional defense team that was working together on this case?

A. Well, I -- can I answer that in increments?

Q. By all means.

A. Part one, I sure as hell wasn't functional, and I was the, quote, unquote, lead investigator for the defense, and I was not. You know, my mind was not where it should have been on this case, and I would be the first to admit that.

Two, I felt like the level and the quality of the communication between all of us, not just me but between all of

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 65 of 72

us, even toward the end up to and including Mr. Willett who I had enjoyed a very fine, very productive relationship for years prior to this, the communication wasn't there. Nobody's running around saying I'm really mad at you or that you're this or that or the other thing. It's like John Donne's End of the World, not with a bang but with a whimper. And that's how I saw it at the time. In retrospect, I don't see it any differently now.

Q. Okay. You saw it then and you see it now.

A. I see it then and now as falling apart. There was no integration, no game plan, no -- no focus.

MR. BURT: Thank you. That's all I have.

THE COURT: Mr. Williams?

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Good afternoon, sir.

A. Hi.

Q. There was a period where there was some litigation going on over the whole McNeese evidence, wasn't there?

A. Oh, yeah.

Q. Okay. And that was -- there was an appeal up to the circuit Court of Appeals and all that. Do you remember that?

A. Oh, yeah.

Q. Okay. The Dustin Honken communication, now, Mr. Cornell, you recognize that the lawyers do have ethical rules they have to follow regarding contacting people that may be represented by

counsel.

A. Absolutely I recognize that.

Q. Okay. And you recognize that was at least a concern that Al Willett had at that time concerning contacting Dustin Honken.

A. I'm not willing to go that far, Mr. Williams, because today was the first time I ever heard that ethical concern articulated. It was never raised to me.

Q. All right. So it just wasn't brought to your attention anyway.

A. No.

Q. All right. And you said earlier in your testimony you never did go talk to Dustin Honken.

A. Absolutely not.

Q. And so you don't know right now what he would have said to you if you would have gone and talked to him.

A. No, and that letter will always be a mystery.

Q. You recall -- I'm going to show you Exhibit 71.

MR. WILLIAMS: May I approach, Your Honor?

THE COURT: You may. And you don't need to ask.

BY MR. WILLIAMS:

Q. I think you have this in front of you too, but this is Exhibit 71.

A. Okay.

Q. Do you remember seeing this interview here? It says interview of Angela Johnson by Ray Cornell. Do you see that?

A. Yeah, I saw that in the file. I don't remember that because it's nonsensical. I can't make any heads or tails out of it.

Q. Okay. Well, let's look at this.

A. That's me right there.

Q. Okay. What I did was I turned -- at the end of this typewritten report --

A. Uh-huh.

Q. -- there's some handwritten notes that go on for quite a few pages, and that's your handwriting.

A. That is my handwriting.

Q. Okay. And so this is an interview you conduct of Angela Johnson; right?

A. Uh-huh.

Q. Okay. And you agree with me that this interview would have been done some time after the bodies were found, right, because you reference --

A. Yes, that would be logical.

Q. Okay. All right. And then I have one other question back here. You authored a report or a memo to Al Willett and Tom Frerichs dated October 18, 2000. Do you see that, sir?

A. Yep.

Q. Okay. And you indicate here, "As I discussed with you yesterday, I am progressively more concerned about Angela Johnson's manipulation and obvious questionability in the face

of our need to obtain the truth from her." Do you remember writing that to Mr. Willett and Mr. Frerichs?

A. Yes, I do.

Q. Let me just step back here. And what was your concern there? Do you remember?

A. As you see from the memo, I don't articulate anything about a specific matter. At that point I was having some problems getting her in my opinion to simply communicate openly and honestly with me. Not surprising I guess.

Q. Okay.

A. But I felt we needed -- what I was after was a face-to-face confrontation, what I call a come-to-Jesus meeting.

Q. In the interview I had shown you previously, at least I could not find any date on it that indicated when this interview took place. Do you recall, though, was -- the interview that you had with Miss Johnson that I showed you in your handwriting, do you know whether that took place before or after this memo that you would have sent to Mr. Willett and Mr. Frerichs?

A. No, it would have been before.

Q. At the time that -- well, Miss Johnson had never been incarcerated before this occasion; isn't that right?

A. That was my understanding, yes.

Q. Okay. And you agree with me, Mr. Cornell, that selling Miss Johnson on the concept of spending any amount of time in custody was going to be a hard sell for her.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 352 Filed 11/10/11 Page 66 of 72

A. To her?

Q. Yes, sir.

A. Oh, yeah, I agree with that.

MR. WILLIAMS: Nothing further, Your Honor.

THE COURT: Mr. Burt?

REDIRECT EXAMINATION

BY MR. BURT:

Q. I just want to clarify one thing. In regard to this document that was referenced, the interview with Miss Johnson, are the notes attached that he showed to you your notes or Rose Nevins' notes?

A. The handwritten notes, that's my handwriting.

Q. And by these notes, I'm referring to these that I'm showing you right now.

A. The chicken scratches, yes, that's me.

Q. That's you.

A. Uh-huh.

Q. Okay. Is this an interview in which Angela Johnson is telling you what McNeese told her?

A. Well, can you be a little more specific?

Q. Sure. Are you talking to Angela here about the circumstances under which Angela wrote these letters to McNeese?

A. This was the first time that she had revealed to me some of the ins and outs of this particular jailhouse game. And I took a lot of notes and tried to figure it out. There were a certain

number of profanities that went from me to her about incredibly stupid behavior, especially since I had cautioned her early on to keep her mouth shut.

Q. And --

A. But what I wanted there was to find out what the hell was going on because I did not at that point know what I later knew about Bobby McNeese, and I didn't know what this bunny rabbit was up to or where they were going with it.

Q. So was one of the things you were trying to find out here what McNeese was saying to Angela Johnson?

A. Uh-huh.

Q. And on the side of your notes here you've got some -- there's a sentence there. What does that say? I could --

A. Oh. That is a quote of something that was quoted to me as having been said by Mr. McNeese which said, "I would rather get fucked in the ass in the yard than help the prosecution."

Q. That's not something Angie Johnson was saying.

A. Oh, no. That is Bobby.

Q. That's -- Angela Johnson is relating to you what McNeese was --

A. Exactly. This whole thing was an Angie interview, but we t -- you know, I was trying to find out what this guy was com -- where he was coming from. You know, he was circling above my case and my client, and I wanted to know more than I did. And where do you start? You start with the person who's directly in

line to tell you which was her.

Q. You indicated trying to sell Angela Johnson on a plea was not going to be easy. Did you think it was going to be impossible based on your contact with her?

A. I would say it is not impossible. I'm not going to downplay what I saw as the significance of that as an effort. But if I could have found a way to legitimately convince her -- and legitimately, I'm serious about this, you gotta legitimately convince her that it was not just in her best interests but in the best interests of her children -- I think she would have at least participated in negotiations.

Q. That would have been the hook, the children?

A. Absolutely.

Q. And, you know, if you could have gotten a decent deal from the government -- and by decent I mean 10 to 15 years -- and you'd been able to weigh that against what she was facing --

A. I'm reluctant to discuss numbers in a context like that.

Q. Sure.

A. Probably given the fact that the bulk of my experience is Iowa cases, I would have probably looked her in the eyes and said 50 years is a long damn time, but it's not as long as dead, and it's not as long as a life sentence.

Q. Right. And I said 15, 1-5, not 50.

A. Yeah. And I'm saying 50.

Q. You're saying 50.

A. You bet. That's still better than a life sentence.

Q. And I guess my question is if the government had come to you and said we really want to find these bodies as is reflected in that investigative memo, we're willing to give her 10 to 15 years if she can tell us where the bodies are and cooperate in telling us what happened, is that something you could have sold?

A. Well --

MR. WILLIAMS: Calls for speculation, Your Honor.

THE COURT: Sustained, but you can answer it subject to the objection.

A. I'm not the attorney. But I was the guy who did most of Mr. Willett's manipulation. I could have at least gotten her attention as long as she understood that there was an exit somewhere and that it would not harm and might benefit her children.

Q. All right.

A. One of her great fears was her kids ending up in some government-run foster care.

MR. BURT: Thank you. That's all I have.

THE COURT: Mr. Williams?

RECROSS-EXAMINATION

BY MR. WILLIAMS:

Q. I just want to go back to these notes and just make sure we're clear here. As we get to I think on the fourth page of your handwritten notes of that interview, at this point you're

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 352 Filed 11/10/11 Page 67 of 72

**1892**

Q. relating what she's telling you about the map; right?

A. It appears to be that.

Q. Okay. Dustin told her, she's never been there, wanted her to keep -- what is that -- the place between Mason and Clear Lake, denies the saleswoman, denies ever being in the -- what is it? Lori Duncan's house?

A. By this time there were stories floating around.

Q. Right.

A. And bits and pieces of it are contained in this.

Q. Okay.

A. I would question her. She would answer sometimes completely, sometimes not so completely. She was obviously extremely distraught. And as I recall, was anything in writing, Angie? It's all in writing. Did you really draw a map? Drew a map. Dustin told me to keep an eye on a field or something. She didn't. She wasn't very forthcoming because she was really -- she was really in emotional distress.

Q. Mr. Cornell, though, I mean, she tells you she's never been in Lori Duncan's house, though; right? That's her words to you, I've never been in Lori Duncan's house?

A. Denies ever being in Lori Duncan's house, and that's my handwriting, and that's the interview note.

Q. Okay. She was not with him on July 25, 1993, him being Honken; right?

A. I would assume so.

**1893**

Q. Pardon?

A. I would imagine so, but again, that's one of my fragmentary notes.

Q. In any event --

A. I used to write them this way to confuse the U.S. Attorney's Office.

Q. Let me just tell you, Mr. Cornell, you've done a good job in succeeding.

A. Thank you.

Q. In any event, this portion of it is her telling you her version of the story.

A. It is.

MR. WILLIAMS: All right. Nothing else, Your Honor.

THE COURT: Mr. Burt?

MR. BURT: Nothing further.

THE COURT: Mr. Cornell, I just have a few questions for you. About the time that you were retained in this case, how many homicide investigations had you worked on?

THE WITNESS: Oh, probably between 25 and 30.

THE COURT: And were many of those with Al Parrish?

THE WITNESS: A lot of them.

THE COURT: I think that's all I have.

Mr. Burt, any follow-up?

MR. BURT: No, Your Honor.

THE COURT: Mr. Williams?

**1894**

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Okay. Thank you, Mr. Cornell. Good to see you again.

THE WITNESS: Thank you.

THE COURT: Mr. Burt?

MR. BURT: Judge, could I address one procedural issue while it's fresh in our mind?

THE COURT: Yes.

MR. BURT: We had asked for a subpoena for Miss Nevins, and it was denied, but in light of this witness's testimony, I really do think we need her because we don't have the billing in the year 2000, and we need to find out what efforts she made in the -- at any point in time to try and find Miss Proscovec because it does relate to this claim about her, and apparently some work was done. We need to find out when.

THE COURT: Did you look at the CJA vouchers on the investigators?

MR. BURT: Yeah, these are the ones that were lost in the flood.

THE COURT: Oh, I see. So you don't have those.

MR. BURT: We don't have those, and they were not in any of the files that we got from Mr. Gratias or from trial counsel. We were able to reconstruct some of Mr. Cornell's files, but there's no billing in the reconstructed file that relates to the time period from August 2000 up to February of

**1895**

2001. And so we don't know other than what somebody might remember about what she may have done to locate this woman.

So we're going to renew, and I wanted to do it now while it's fresh in the Court's mind as to what this witness had said. I think he did indicate she was the one looking for her.

THE COURT: And would you plan on having her here Monday or Tuesday or . . .

MR. BURT: I think we would try and get her here Monday or Tuesday, and we may be able to serve the subpoena ourselves by making a arrangement with her to take it by way of --

THE COURT: Just pick it up when she gets here?

MR. BURT: Yeah.

THE COURT: Yeah, I'll authorize the subpoena.

MR. BURT: Okay. Thank you.

THE COURT: Any other housekeeping matters?

MR. BURT: No, Your Honor.

THE COURT: Mr. Williams, housekeeping matters or other matters?

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: I've just got a couple of ideas. Would either one of you -- do either one of you have a time line, a detailed time line, that you would be willing to share with the other side and with me to assist me when I have to write an opinion in the case?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 68 of 72

MR. BURT: We have compiled --

THE COURT: Or is there a time line in your materials?

MR. BURT: Yeah. We compiled a chronology which is on the materials. We have a hard copy we can give to the Court now. Mr. Williams has seen it. I don't think he has any -- he's not vouching for the accuracy of all the entries.

THE COURT: No.

MR. BURT: But I don't think he has any objection to the Court using something like that.

MR. WILLIAMS: That's right. What I told Mr. Burt is to the extent if I see anything that I think's erroneous or needs to be supplemented, I'd make it known to the Court.

THE COURT: Sure.

MR. WILLIAMS: I think it could be helpful to the Court.

THE COURT: Okay.

MS. MORRISSEY: Your Honor, I have been updating it. I think the current chron. we have is dated 3-3, 2001. I have one. I need to print it out that's dated today because I've been working on updating.

MR. BURT: Here's the edition before that, and we can provide it to the Court electronically as well.

THE COURT: Well, maybe -- maybe we'll wait until we're done next week, you go back home, any further updating and just send us the most recent updated version you have

electronically with a copy to Mr. Williams. Is that acceptable to everybody?

MR. WILLIAMS: Certainly, Your Honor.

MS. MORRISSEY: That's fine. I will tell the Court that in adding things to the chron. I haven't included every single hours the attorneys worked. I've included the hours that they've worked reviewing discovery. I've included client contact, but, you know, the other things, it just seems to me that it's too much detail for our purposes just so the Court knows that there's not every little fact in the world in there.

THE COURT: No, I would hope it wouldn't be.

MS. MORRISSEY: Yes.

THE COURT: And obviously, you know, if there's any -- anything that you consider work product that you want to take out of it, I totally get that part too so . . .

MS. MORRISSEY: That was done prior to giving it to Mr. Williams.

THE COURT: I would assume so. Okay. Now -- and here's another request. Your -- the chart and the pie graph on the number of hours spent with Angela Johnson --

MR. BURT: Yes.

THE COURT: -- I for years have been doing -- I do a frequent presentation on use of graphics in trials. And that would be one I would like to use --

MR. BURT: Sure.

THE COURT: -- because it's an example of how to use something, kind of an unusual context, a nonjury case. I assume that's an exhibit that's been marked and at some point is going to be offered.

MR. BURT: Yes.

THE COURT: And so it's in the public domain.

MR. BURT: Correct. We have no objection to the Court using it. We can give it to you electronically.

THE COURT: But I'd like it electronically. That's the difference.

MR. BURT: Yeah, we'll send it to you.

THE COURT: And I may ultimately elect to redact the peoples' names or put in, you know, Smith, Jones, and whatever which I can do electronically, or I may not. I don't know. But the way I look at it, it's in the public record.

MR. BURT: We have no objection to the Court using it --

THE COURT: Okay.

MR. BURT: -- for any purpose, and we'll send it to you tonight by way of e-mail.

THE COURT: Or just when you get back or whatever's easiest.

MR. BURT: Sure.

THE COURT: And how -- are you planning on amending the petition between now and June, or are you going to wait till

after June?

MR. BURT: Well, I was thinking about the Court's question yesterday, what are the issues that we could brief before our next court appearance, and I think one thing I thought of was perhaps we could brief the issue of what the law was regarding our right to amend and indicate to the Court what we contemplated up to the -- up to this point. And then, of course, we wouldn't be complete with the hearing, so there may be some further amendments. But it may be a productive thing to do before our next court appearance because that's an issue that I think's important and something that we could brief for the Court.

THE COURT: Well, I think it might be easier to do it this way. You amend, you know, maybe -- I think it's easier for -- maybe it's not, but it seems to me it might be easier for you to amend on the things that we've covered these six days and the things that we'll cover Monday and Tuesday rather than waiting till after June to do it.

MR. BURT: Sure.

THE COURT: So I would suggest that you just go ahead and amend, move to amend, and list everything you want to amend on.

MR. BURT: All right.

THE COURT: Forget about what the law is until you get a response from Mr. Williams and see what, if anything, he

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 69 of 72

1900

resists.

MR. BURT: That's fine.

THE COURT: And then you can brief it at that point. Then I might have to decide how far I'm willing to go on letting you amend.

You know, generally I view amendments liberally, and, you know, this is a death penalty case, and so I can't imagine I would take a very restrictive view of allowing you to amend. I can't imagine that, but, you know, I don't exactly know what the law is in this area, but I know generally I have a lot of discretion on amendments to pleadings. And my history has always been, you know, to exercise that discretion generously to the parties seeking to amend whether it be a plaintiff or a defendant unless I see substantial prejudice.

So why don't we do it that way. And then, of course, after the June hearing, then you'll have a second opportunity to amend but only on the stuff raised in the June hearing I would think.

MR. BURT: That's fine. And when did the Court want the amendment by?

THE COURT: Well, what's reasonable? Thirty days? Sixty days? It's never going to be fresher than it is when you go back.

MR. BURT: No, I agree.

THE COURT: But I don't know what your schedule is

1901

like either.

MR. BURT: Well, I was thinking that it would be nice -- we have requested preparation of the transcripts. I'm not sure how long that's going to take, but it would be good to review that because I think it might be helpful.

THE COURT: That's good news to Shelly's ears.

MR. BURT: Yes, we've discussed that with her. And so if the Court could give us 60 days, I think that would be much appreciated because we also have to now start preparations for the June hearings.

THE COURT: No, I understand that. Yeah.

MR. BURT: Sixty days would be appreciated.

THE COURT: Okay. And then -- well, wait a minute.

MR. BURT: Or is that going to put us into -- is it close?

THE COURT: Well, then I guess --

MR. BURT: How about 45?

THE COURT: Yeah, I think you can do it in 45 days.

MR. BURT: Yeah, that's fine.

THE COURT: And, you know, the petition was very strange to me.

MR. BURT: I couldn't agree more.

THE COURT: I mean, I always thought of a pleading in a federal case, whether it's a civil case or a criminal case, it's not really a novel.

1902

MR. BURT: Right.

THE COURT: It's supposed to be a short, plain, concise statement under, you know, Rule 1, or I guess there are habeas rules that apply. But it seemed like it was more -- it was a mixture of a pleading, closing argument in a jury trial, and a narrative that may be part novel, part accurate. I don't know.

MR. BURT: Okay. I --

THE COURT: But it just seemed -- I've never quite read a federal pleading like that.

MR. BURT: No, I haven't either, and I thought that the Honken pleading put together by the Philadelphia CHU was more in line with what I know to be correct pleading procedure, and I don't know if the Court agrees with that or not.

THE COURT: I do.

MR. BURT: But that I think would be the model, not necessarily the content, but certainly the form used there I think is appropriate and something we would strive to correct because I agree with the Court.

THE COURT: So would you think it would be unduly burdensome, rather than to kind of amend the book, the pleading, just file an amended and substituted petition so that it's all in one style? Do you understand what I'm getting at?

MR. BURT: I do, and I think it would be much easier for the Court and for the government to work through it --

1903

THE COURT: And I think for you too --

MR. BURT: -- if we did that.

THE COURT: -- ultimately.

MR. BURT: So --

THE COURT: Yeah.

MR. BURT: -- we have no problem with that.

THE COURT: Okay. Now, having requested that, is 45 days unrealistic for that?

MR. BURT: Well, if we have -- I don't know if we have 60 days between now and when we're back here, but if we do, we can get it done if there is 60 days. Does anybody have a --

THE COURT: Yeah, there's 60 days, but then we probably won't have it resisted before you're back in June. But that's I guess neither here nor there.

I think given the fact that it's going to be of considerable assistance to have a totally new pleading to work off of 60 days is fine. And then, you know, the under -- obviously the understanding is you'll be allowed to amend it then after the June hearing, but you probably won't have 60 to do it.

MR. BURT: No, and we wouldn't anticipate --

THE COURT: And I wouldn't think you'd need it.

MR. BURT: No.

THE COURT: I would think you could -- a relatively short period of time I would think.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

MR. BURT: And I don't anticipate substantial amendments. I think the larger amendments will come after this session.

THE COURT: Yes. And you kind of know what discrete issues you're raising in June.

MR. BURT: Yes.

THE COURT: Okay. Now, does that work with you, Mr. Williams, and then what do you want? Thirty days, forty-five days to respond?

MR. WILLIAMS: Thirty days I think would be fine, Your Honor.

THE COURT: Okay. Why don't we say 30 days. If you need more time, let me know. And, Mr. Burt, if you need more time, let me know.

MR. BURT: Thank you.

MS. MORRISSEY: Your Honor.

THE COURT: Yes.

MS. MORRISSEY: One question. Do we -- is it 60 days for both the amendment and the substitute petition?

THE COURT: Well, that's one in the same.

MS. MORRISSEY: Okay. All right.

THE COURT: You're amending it by filing a substituted and amended petition.

MS. MORRISSEY: Okay.

THE COURT: So I don't want you to amend this thing.

I want you to start over again with what I think we all are familiar with for a 2255 petition.

MR. BURT: Right.

THE COURT: Now, what do you see happening after the June hearing? Assuming that we can get all the evidence in we need in June -- and maybe we can add a couple days to it. I haven't looked at that. Kind of Jennifer does the scheduling. But what do you see -- what does it look like after we conclude all the -- assuming we conclude all the evidence in June, what do you see happening after that?

MR. BURT: Then I would hope we would have some agreement on what issues need to get briefed and we would get busy right away briefing those issues for the Court while it's fresh in everyone's mind. That's the way I contemplate it. And unless the Court wanted to do it otherwise, we would focus on addressing whatever issues the Court thought that there was a need for briefing on and get that going right away.

THE COURT: Okay. And, Mr. Williams, what do you envision happening?

MR. WILLIAMS: I think that sounds reasonable. I don't -- you know, the Court is going to find the facts. I don't think you need a proposed findings of fact.

THE COURT: I've never accepted proposed findings of fact because I think that's my own independent obligation to find facts, and so I've never -- I've always turned lawyers down

that have offered. I know it's a common practice in state court and, as I learned when I sat on the Ninth Circuit, a very common practice in the district courts in the Ninth Circuit, but it's not a practice that I've ever bought into because I think it shifts my obligation to make findings of fact to the parties. And I'm unwilling, unable, and not interested in doing that because I think it's a very bad appearance of justice in addition to shirking my own responsibilities.

MR. WILLIAMS: Well, yeah. And in light of that, Your Honor, the -- I guess I share Mr. Burt's thoughts that what might be most helpful for us is to know what's most helpful to you. And if you identify areas of law you want to have further researched and briefed by the parties, we'd do it at that point.

If the Court has particular areas that you wanted to entertain oral argument on, we'd be glad to do that as well. I don't see offhand the need for an oral argument session on this -- on the entirety of the petition. But again, if the Court wants to hear argument on particular issues that may be troubling the Court, you want to get the feedback of the attorneys, I think that would be what would be most helpful to us and hopefully most helpful to you.

THE COURT: I'm going to want oral argument at some point, but it's going to be after I've had an opportunity to really hone in on it.

And when I was first appointed in 1994, I experimented

with issuing tentative rulings like 7 days before argument -- and they weren't -- they weren't like outlines; they were 50-, 60-, 70-page rulings -- and then have the parties come in and argue.

And, you know, I got a bad rap for prejudging the cases, you know, as if some judge when they go out to hear a summary judgment ruling doesn't -- summary judgment argument doesn't have a good sense of where they're going. I mean, I guess if you didn't prepare that would be the case, but if you prepared, you have a pretty good idea where you're going.

And so I've abandoned it. But I've always used it in what are called Markman hearings. I would be surprised if either one of you knew what a Markman hearing is, but it's claim construction of patents in patent cases. Average Markman ruling is, what, Roger, 120, 140 pages long. There may be 40 claims the parties want construed in a patent case. We give them a tentative Markman ruling, have the oral argument, and there's usually argument on about 4 or 5 of the real claims because they kind of see where I'm going, and they realize that there are probably only 4 or 5 that are kind of worth arguing.

I'm not sure I'm willing to do a tentative ruling in this case, but I might. And if I were a lawyer, I would like that procedure because you know this is how the judge is going to rule unless you can convince me otherwise. And I have been convinced. I mean, I've made some very significant changes in

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 352   Filed 11/10/11   Page 71 of 72

1908

Markman rulings based on the arguments of the parties, and they've kept me from error in the Markman rulings.

So I'm contemplating doing that, but, you know, I'm -- you know, I guess I want you to think about it and let me know how you feel about that. It would essentially be this is my final work product subject to you changing my mind.

MR. BURT: Right.

THE COURT: And by the time of oral argument, I'll have that anyway, so the real question is do I pretend I don't have it or do I disclose what I have because I don't like to go out for oral argument on anything without having a draft opinion. Now, it's frequently I'll change it completely which, surprisingly, isn't that hard to do actually once you have a draft document.

So I don't know. I don't know. I'm not sure. But I know I don't want oral argument on everything, but I do want oral argument definitely because I'm going to have a lot of questions. I already have a lot of questions, and they're only going to grow as I continue to delve into this thing.

And, you know, I have a lot of mem -- recollection about the case, but I certainly don't know it as well as the lawyers nor could I, I think, reasonably be expected to.

So those are my thoughts. But it's not going to drag out for six, eight months either.

MR. BURT: No, and we're not suggesting to the Court

1909

that you do drag it out.

My initial response to the Court, I think that's a very good possible suggestion. I'm like the Court. I don't like surprises, and if I have some idea of what you're thinking, I think that helps everybody prepare and to focus on exactly what the troubling issues, if any, are for you. So we would welcome that.

THE COURT: Well, there are troubling issues.

MR. BURT: Well, that's good.

THE COURT: Yeah. I don't know how I'm going to resolve them but . . .

MR. BURT: Sure.

THE COURT: Yeah. Anything else?

MR. BURT: No.

THE COURT: Okay. Thank you. We'll see you.

MR. BURT: Monday at seven?

THE COURT: Monday at seven. Great. Thank you.

(The foregoing hearing was adjourned at 4:41 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_S/Shelly Semmler_      4-4-11

Shelly Semmler, RMR, CRR         Date

1910

**INDEX**

WITNESS:                                          PAGE:

BROOKE JACOBSON
        MS. MORRISSEY                             1627
        MR. WILLIAMS                             1636
        MS. MORRISSEY                             1645

ALYSSA JOHNSON
        MS. MORRISSEY                             1649
        MR. WILLIAMS                             1659
        MS. MORRISSEY                             1661

RUSSELL STETLER
        MR. BURT                                 1664

RAYMOND CORNELL
        MR. BURT                                 1837
        MR. WILLIAMS                             1884
        MR. BURT                                 1888
        MR. WILLIAMS                             1891

*****

EXHIBITS:

    59 through 64                                1664

*****

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*