IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

ANGELA JANE JOHNSON,                    No. C09-3064

          Petitioner,

     vs.                                TRANSCRIPT OF
                                        2255 EVIDENTIARY
UNITED STATES OF AMERICA,               HEARING

          Respondent.
_____/            Volume 7


     The Hearing held before the Honorable Mark W. Bennett,
Judge of the United States District Court for the Northern
District of Iowa, at the Federal Courthouse, 320 Sixth Street,
Sioux City, Iowa, March 14, 2011, commencing at 7 a.m.

APPEARANCES:

For the Petitioner:    MARCIA A. MORRISSEY, ESQ.
                       2115 Main Street
                       Santa Monica, CA 90405-2215

                       MICHAEL BURT, ESQ.
                       Law Office of Michael Burt
                       Suite 329-E
                         600 Townsend Street
                       San Francisco, CA 94103

                       NANCY S. PEMBERTON, ESQ.
                       Pemberton & Associates
                       Suite 329E
                         600 Townsend Street
                       San Francisco, CA 94103

For the Respondent:    C.J. WILLIAMS, ESQ.
                       Assistant United States Attorney
                       Hach Building - Suite 400
                       401 First Street Southeast
                       Cedar Rapids, IA 52401-1825

Reported by:           Shelly Semmler, RMR, CRR
                       320 Sixth Street
                       Sioux City, IA 51101
                       (712) 233-3846

THE COURT: Thank you. Please be seated. Good morning.

Is Mr. Berrigan next?

MR. BURT: He is, Your Honor. We thought -- we have I think two or three short witnesses that we'd put on before him because he's going to take the bulk of the day, so we'd like to clear up these other folks if we could.

THE COURT: Sure. Who's next then?

MS. MORRISSEY: Your Honor, Karl Todd would be next. And Mr. Todd will be testifying as to claims A.10 and 11, penalty-phase ineffective assistance.

THE COURT: Thank you. If you'd just come forward, I'll swear you in. Would you raise your right hand, please.

KARL TODD, PETITIONER'S WITNESS, SWORN

THE COURT: Okay. Thank you. Please be seated in the witness box. And you can adjust the chair and the microphones so you can speak -- woops. Kind of a common problem. And you can take that other microphone too and bring it over there. Yeah. Okay. And tell us your full name, please, and spell your last name.

THE WITNESS: Full name is Karl Matthew Todd III. The Todd is T-o-d-d.

THE COURT: Okay.

Miss Morrissey?

MS. MORRISSEY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Good morning, Mr. Todd.

A. Morning.

Q. I am going to -- well, where do you live?

A. Pueblo, Colorado.

Q. Pueblo, Colorado?

A. Yes.

Q. Okay. And do you work?

A. I'm retired.

Q. What kind of work did you do before you retired?

A. Telecommunications. I started off with Mountain Bell in 1970.

Q. And what sort of work did you do for Mountain Bell?

A. I installed phones and worked on the lines.

Q. In 1970 when you were working for Mountain Bell, where were you living?

A. I was living at home with my mother.

Q. And where was that?

A. That was on the south side of Pueblo.

Q. Did you meet in 1970 a woman by the name of Jean Johnson?

A. Yes, I did. My partner and I were driving down the street on a job, and we saw a woman struggling with four kids and a bunch of bags of groceries, so I jumped out and helped with the groceries while he parked the truck and then came and helped.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 353    Filed 11/10/11    Page 1 of 86

**1915**

Q. And was that woman Jean Johnson?

A. That woman was Jean Johnson with her four kids, yes.

Q. Were one of the -- Jean Johnson's children, was one named Angela?

A. Yes, Angela Jane.

Q. Okay. And do you see Angela Jane in court today?

A. Yes, I do.

Q. Have you seen her since --

A. Since December of 1970, no.

Q. Okay. Tell us about what -- you assisted Miss Johnson with her groceries; correct?

A. Right. And we were invited back which initially I did not, you know, take her up on. But then we were working in the alley behind the -- where she lived, the apartment, and ran into her again, and she seemed sincere, so I dropped by one evening and got invited in. And she sat down on a chair surrounded by four little faces, and I sat on the sofa, and one of the little faces named Jamie Jo came over, crawled up on my lap, looked at me, and said, "Are you going to buy me a birthday cake?" And, I mean, everybody looked shocked except me, and I said, "Well, certainly. When's your birthday?"

And from there the race was on. There was an apartment there that opened up. It was a converted house. And I moved in to that apartment shortly thereafter. Jeannie and I started dating. I saw them and the kids every day. The kids

**1916**

came over at will to visit, and, you know . . .

Q. Let me ask you a question. Did you have an opportunity to make observations of what Jean was like as a mother?

A. Well, at first I was kind of blind. I was excited. But as time went on, I was kind of concerned because, you know, she seemed disinterested, neglectful, even incompetent. I never saw her have a one-on-one conversation with her daughters, never really got involved playing with them. I mean, she cooked, she cleaned, but that was it, you know.

Q. When you say neglectful, do you have any particular incident in mind?

A. I think it was -- it was just in general. She sat and watched TV, and they did what they want. But one specific one was I was working in the neighborhood, and I was driving down the street, and I looked over, and I saw Jimmy and Jamie sitting in the gutter playing, filling a egg carton with dirt. And that was -- you know, they lived on 12th. That was on 11th. I knew they didn't belong there, and I was really concerned.

So I drove around real quick, went upstairs, and she was watching soaps on TV, and I said, "Where's Jimmy and Jamie?" And she said, "Oh, they're right outside." And I said, "No, they're not." And she got up. We went outside. She saw they weren't there, so I took her around and showed 'em where they were.

And, you know, that -- before it was done at one point

**1917**

I had a conversation with her trying to point out that she really didn't know or understand her daughters. Jamie Jo idolized her, and Jeannie had facial expressions, hand gestures, and Jamie Jo mimicked them perfectly. I used to laugh to myself every time I saw her do it, but I mentioned that to Jeannie as part of the conversation, and she just simply said Jamie's a funny little girl, and nothing changed.

Q. Was there a difference in the way the girls versus Jimmy, the boy, was cared for?

A. Yes. The girls were pretty much left on their own. She was very protective of Jimmy. I had very little contact with Jimmy because he spent all his time up with her, and I was with the girls.

Q. What about school work? Can you tell us whether or not it was a problem with Angela?

A. Okay. The -- Wendy, you know, was fun. Wendy's gregarious, assertive, and she was always bragging about, you know, how she got A's and how easy it was. And Jamie never said much of anything.

But out of -- in like October out of nowhere it came out -- and I'm pretty sure it was Wendy that mentioned it -- that Jamie -- or Jamie. Angela had trouble in school. And back about ten years before near the end of seventh grade, myself and another seventh grader went down every day to the first grade and worked with the slow learners. So I immediately volunteered

**1918**

to work with Angie and see what I could do.

So, you know, the next week every night when I came home from work, Angie would be waiting for me, and we'd go up and we'd spend up to an hour in the apartment going over her school work. And, you know, at first it was fun for her, but I was depressed from the git-go because she needed help. She struggled every bit as much as the ones did that I'd worked with years before. And I knew it was going to be tough. I knew it was going to take time and unfortunately about two weeks in had a major unexpected event that shut it down, and it never got started again, at least by me.

Q. What about Jeannie? Could you talk about her religious -- the religious side of her?

A. Well, there were times I felt it was more convenience. When she wanted to justify something, then she'd come up with something out of the Bible. The problem was if you got into a -- tried to get into a serious discussion with her about how she was mistaken about what she was saying, she didn't go for it at all, didn't much care about it, you know, would at best say uh-huh and then go on about her business. But I felt like if she wanted to shut someone out religion came up and, you know, drove a wedge in between so . . .

Q. Did Jeannie ever work during the time that you knew the family?

A. Never, never did, no.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q. How did she support herself?

A. It was my understanding she was on ADC, Aid to Dependent Children.

Q. How did your relationship with Angela Johnson's mother end?

A. Well, like I said, it was an unfortunate event. A friend -- an old friend of hers named Nicki came to town and had been there about a week or so, and, you know, suddenly things seemed to be changing between myself and Jeannie. And I was, you know, starting to be left out. I, you know, was pretty sure that Nicki and Jeannie were going out, and then one -- on a Sunday evening I was --

Q. Let me just interrupt if I may and ask you was Nicki a man or a woman?

A. Nicki was a woman, a girlfriend.

Q. A girlfriend of Jeannie's.

A. Right.

Q. And when you say they were going out, what do you mean by that?

A. Well, turned out to be to bars. Nicki, that was something Nicki enjoyed doing, and I thought, you know, Jeannie was just going along as a friend. But like I say, on a Sunday night I was headed in, and there was a guy headed out, and I was pretty certain that he wasn't there for Nicki since Nicki's car wasn't there. And I -- you know, I said something about, you know, wasn't a good idea to be hanging around a bar, that it wasn't a

good idea for Jeannie to be hanging around a bar with four kids at home. And she said she was an adult, she could do what she wanted and said something else. I responded to that, but evidently Jeannie was watching upstairs because she threw open the window, said I was making a scene. I looked around. I didn't see anybody but us. Nobody was looking out windows or anything. It was well after dark, but I didn't argue. He went to his car. I went inside.

The next day when I came home from work, Angie should have been there, and she was. But instead of being happy to see me, she ran down the stairs and blurted as she flew by, "We can't see you anymore," and she headed out the door.

Then --

Q. Well, let me break up and ask you another question if I may. After Angie said that and basically headed out the door, did you ever see Jeannie again after that?

A. Okay. I did. And what happened was -- and I'm -- this I'm not a hundred percent certain of, just what I pieced together over time. I was -- you know, it was my first real affair with anybody. I was, you know, in love, thought I was going to get married. And it came crashing down. I had visited with the kids' uncle, her brother Skip, up in Brighton with them a couple times.

Q. What is Skip's last name?

A. I honestly do not know. I only knew him as Skip.

Q. And where did he live?

A. In Brighton, Colorado. He lived and worked there.

Q. Brighton, B-r-i-g-h-t-o-n?

A. Yes, yep. But they'd been up there, you know, once or twice. I had brought Angie and Wendy down and spent a night or so with them while Jeannie stayed up there. That's the kind of confidence at the time that seemed to be had in me.

But anyway, a friend had always wanted -- had questions for Skip because of the line of work he was in and -- or hobby he had. I don't remember which. It had to do with weapons. But we drove up, and I had a conversation with him. I told him, you know, about Nicki. He knew Nicki, and he did not much care for her, and he wasn't surprised with what happened, but he said nothing he could do about it, nothing I could do about it, I should just forget about it and go on with my life.

And so we talked a little more. I went home, and that's what I did. I started to get on, you know, and then the following Sunday out of nowhere I was invited over or asked over to meet the kids' grandparents.

Q. Okay. And did you go over to meet the grandparents?

A. Yes.

Q. Could you describe briefly for the Court what Angie's mother was -- what Jeannie's mother was like.

A. It seemed to be a matriarchal situation. She dominated the conversation. She was in charge. But it was -- see, they were

Pentecostal, and I'd never -- you know, I'd been Baptist, Methodist, you know, Catholic, but I'd never been around a charismatic religion, but every sentence she ended ended with praise Jesus, praise the Lord, praise God, and the only thing you ever heard out of the stepdad was amen or a nod of the head.

But this, you know, conversation went on for an hour or so, and then it got quiet, so I slipped away and went back home. And, you know, it later occurred to me that most likely -- because all this time I'd never seen them, never heard that they had any interest in coming or anything. But then they showed up at that time out of nowhere, and I wondered why, and then it hit me that most likely Skip had called his mother and told her about Nicki and her mother didn't like it and had come to get Jeannie to go back to Mason with them.

Q. Did Jeannie, in fact, leave Colorado some time after that?

A. Well, like I say, I went back over to my place, and I wasn't invited to change anything, so I just stayed there. But the following Friday -- this had taken place on a Sunday. The following Friday I was asked to come over again. And when I came over, they asked if I would take Nicki's car and go to some town in Kansas and pick Angie up, and that was, you know, the first I heard that Angie was gone.

And it became my understanding that originally they thought that they were going to go back and Angie had gone ahead. And I did not agree with Angie being the one to go since

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS  Document 353  Filed 11/10/11  Page 3 of 86

Angie needed her schooling so much, but she was the one. I think it was because Angie was the easiest to deal with. She was shy. She was quiet. She -- you know, whatever she was told she did, never put up a complaint. You know, Wendy and Jamie were more assertive, more independent. You know, if they didn't want to do something, you at least got an, "Aw, Mom, do we have to?" out of them but never got that out of Angie.

But anyway, Wendy was sent with me, and we met them wherever it was about two o'clock in the morning and --

Q. You met who?

A. The grandparents and Angie.

Q. Okay. So that you went to Kansas and met with the grandparents and Angie.

A. Right.

Q. And then you drove Angie back to Colorado.

A. Right, yeah, and Wendy was there for the trip.

Q. All right. And after you returned Angie to Colorado, did the family stay there, or did they move?

A. Okay. What happened after that was got back. You know, I'd not been informed anything had changed, so I went back over to my place, but the next morning I got a -- you know, somebody came over and said, you know, Jeannie wanted to talk to me.

So I went over. And we sat at the kitchen table, and she told me that how everybody had told her that her kids all minded me better than her, she didn't like it, and it had to

change. So her plan was I could see the kids, I could tuck them in at night, but that was it. She was going to be in charge.

And at that time Nicki was still there, but within a week, you know, Nicki had found a boyfriend and gotten involved with him. So Jeannie was left alone. So it seemed like Jeannie was starting to be interested at least in visiting again, but unfortunately, you know, emotional fatigue or whatever, I had started to get distant.

Q. Uh-huh.

A. And about a week or two later, Nicki left, and I don't know whether she disappeared with her boyfriend or went back home or what, but again, Jeannie was all alone, and two or three weeks after that out of nowhere Jeannie announced that she was headed back to Iowa, and I ended up helping load them up.

Q. And after you helped load them up, did you ever see any of the family again until you came to Sioux City to testify in this case?

A. No, I did not. However, it was very near Christmas, and, you know, I loved the kids very much. That hadn't changed. So I managed to find four brand new bikes, and I got them on a bus, and I got it sent to them for Christmas.

And I heard from Jeannie twice within a month or so. One was a call. I don't remember much about it. It was in the middle of the night. The other was a letter, and in the letter she mentioned Angie and how Angie had been rebaptized. And, you

know, I kind of cringed. I -- you know, because she went on to say that Angie had been dunked three times and it was on the third time she came up and she spoke in tongues. And that was one of the few things we talked about, and I tried to clarify to her that the way the Pentecostal did it did not follow what the Bible said. And when I thought of Angie being dunked three times, you know, at first just thinking of Angie, you know, made me feel good, but then thinking about what she had to go through and knowing that, you know, she'd most likely just babbled, it really saddened me.

But that was the last contact I had until I got a knock on my door asking if I knew them. And that was, what, last fall.

MS. MORRISSEY: Okay. Thank you. I have nothing further.

Q. I do have one additional question. If Angela Johnson were to be executed, would her death have an impact on you?

A. It already -- the thought of it already has, yes, very much. I don't see justice in it at all having known her, knowing what an innocent child she was, knowing that -- you know, I have two sisters that easily could have been here. A child is what their mentors make them to be. And, you know, we act like we believe that somewhere along the line magically they become full-fledged adults capable of making the correct decisions and that they should be held accountable as such. But

I've not seen it.

See, my degree is in philosophy, and I know full well the concept of a fully autonomous decision. And ethics is something that I've very much always been interested in. And, you know, my perception of the way humans function is, you know, based on a lot of observation, a lot of courses, a lot of reading. And I see no good that would be served for anyone, not even the state, by something like that. And yes, I would be very much affected and depressed by it.

MS. MORRISSEY: Thank you. I have nothing further.

THE COURT: Mr. Williams?

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Sir, I didn't get a sense for how many months this contact was. How long did you actually have direct contact with Angela Johnson and her family?

A. It was over a period of approximately six months. Like I say, there was a couple weeks there where I was excluded from her life.

MR. WILLIAMS: Nothing further, Your Honor.

THE COURT: Miss Morrissey, anything further for this witness?

MS. MORRISSEY: Yes, Your Honor.

THE COURT: And I'm confused. Was he a witness in the trial or he wasn't because --

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS Document 353 Filed 11/10/11 Page 4 of 86

MS. MORRISSEY: No, he was --

THE WITNESS: No.

THE COURT: Okay. Okay. But -- okay.

THE WITNESS: I would have been had I known. I would have --

THE COURT: Well, there's no question pending.

THE WITNESS: Sorry.

THE COURT: That's okay.

REDIRECT EXAMINATION

BY MS. MORRISSEY:

Q. And that's probably what -- the questions I didn't ask. Did anyone contact you between year 2000 and 2005 about Angela Johnson?

A. No. When I was contacted, it was explained to me -- you know, I was really bummed that I hadn't heard. It had been -- see --

Q. Let me ask you a question. So nobody contacted you when Angela's trial was going on; correct?

A. No, no.

Q. And you indicated the first time somebody came knocking at your door was around -- in the winter, Christmas?

A. No, last -- it was last fall.

Q. Last fall.

A. Right.

Q. Okay. If somebody had contacted you after 2000 and asked

you the questions that you've been asked today, would you have answered them in the same way you've answered them today?

A. Oh, exactly the same way, yes.

Q. Thank you.

A. I'd like to -- there's something I would kind of like to say if I could.

THE COURT: Go ahead.

A. I've got a -- I need a second to try to remember.

THE COURT: Sure. Why don't you just take --

A. Oh, okay. What it was, when -- see, I lived in Pueblo or -- for a time, but I went to Denver, and when I'd come down to Pueblo, if I was feeling at all melancholy, I would drive by where we used to live and just think about, you know, the great times we had. And I'd always hoped that somewhere along the line that one of them would remember me and, you know, try to contact me online or whatever and tell me all about how things had gone for them and I'd get to hear all about them. I always missed them.

And it -- come to find out talking to the investigator that the reason they didn't was that they had been told that I was dead. But my name kept coming up in their conversations, so it had been suggested by one of her new team that since Jeannie didn't always -- wasn't always accurate with the truth that maybe they should try to locate me. And they had tried, but unfortunately they needed someone like the -- I guess it's clerk

who understood that Karl could be spelled with a K because once they looked for Karl with a K, they found me.

Q. Okay. It sounds like you had contact with the Johnson children for a relatively brief period of time. Would that be fair to say?

A. Well, at the time it seemed like a lifetime but I -- you know, in hindsight, yes, most people would consider that a short period of time.

Q. Despite the short period of time, would you say that they had -- those children had an impact on your life?

A. Very, very much. Like I say, I -- you know, any time I was blue and around Pueblo, I went by to remember them and the good times, and I thought about them even when I wasn't in Pueblo. I wondered about them, hoped all was well, you know.

Q. All right.

A. I under -- well, I understood how much I loved them. I knew they were kids and that, you know, their feelings for me probably wouldn't be quite the same, but it didn't change how I felt about them.

MS. MORRISSEY: Thank you very much.

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: I have a couple questions. Did you ever -- did you go on and have any biological children of your own?

THE WITNESS: I have a daughter and a son, sir.

THE COURT: Okay. And I was a little bit confused about the living arrangements.

THE WITNESS: Okay. It was a converted house, and it was kind of unusual. There were two apartments upstairs. Downstairs I'm not a hundred percent certain because, you know, it was like there was a door -- there was two doors downstairs, but you never, ever saw anybody go in one of the doors. But access to the upstairs apartment, the one where Jeannie lived and the one where I lived, were totally separate. There was a wall in between. You went through a door. You went up the stairs. The door to one side was downstairs on the left on my side, but I went up the stairs. There was a landing there. I went into my apartment. There was a wall in between.

When you went into Jeannie's side -- and I take it back. I had gone through the door. I never seen anybody on the one side, but when you went in Jeannie's side, you were -- you went upstairs, but there was no door. It was immediately a part of her apartment. But there was a wall. It was like, you know, two totally separate things. You didn't have to see each other or have anything to do with each other.

THE COURT: Okay. Thank you.

Any follow-up questions?

MS. MORRISSEY: No, Your Honor. Thank you.

THE COURT: Mr. Williams?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

1931

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Okay. Thank you.

THE WITNESS: Thank you, Your Honor.

MS. MORRISSEY: Your Honor, we would next call Rose Nevins.

THE COURT: On a housekeeping matter, did a subpoena ever get issued? There wasn't really anybody around this weekend to issue it, so is she going to need a subpoena to get paid and all that?

MR. BURT: We told her we had one or one was going to be issued.

THE COURT: Okay. So you can take care of that?

MR. BURT: Yes.

THE COURT: Okay.

Hi. Please come forward. Would you raise your right hand, please.

ROSE NEVINS, PETITIONER'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness box. And when you're settled in, adjust the chair and both microphones and tell us your full name and spell your last name, please.

THE WITNESS: Okay. Can you hear me?

THE COURT: Yeah. Why don't you pull the microphones a little closer. There you go. There's another one right over there. Thank you.

1932

THE WITNESS: Okay. My name is Rose Nevins, N-e-v-i-n-s.

THE COURT: The questions do get a little tougher after this.

THE WITNESS: Okay.

THE COURT: Okay.

Miss Morrissey?

MS. MORRISSEY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Good morning, Miss Nevins. How are you?

A. I'm good, thank you.

Q. Are you working now?

A. No.

Q. Are you disabled?

A. Yes.

Q. As a result of a car accident?

A. Yes.

Q. Where are you now living?

A. In Des Moines.

Q. In Des Moines. All right. Back in the year 2000, how were you employed?

A. How what?

Q. How were you employed? What did you do?

A. I was employed with Cornell and Associates private

1933

investigators.

Q. And what kind of work did you do for Cornell and Associates?

A. I was his lead investigator.

Q. And Mr. Cornell is Ray Cornell?

A. Yes.

Q. And at some point in time did Mr. Cornell -- was Mr. Cornell retained to work on behalf of Angela Johnson?

A. Yes.

Q. And do you remember who the attorney was who retained Mr. Cornell to work on Angela Johnson's case?

A. Al Willett.

Q. Had you worked with Mr. Willett before?

A. Yes.

Q. Do you recall another attorney being involved in Miss Johnson's case at some point in time?

A. Yes.

Q. And what was that attorney? Who was that attorney?

A. Tom Frerichs.

Q. Had you worked with Mr. Frerichs before?

A. Yes.

Q. Now, at some point did Mr. Cornell make a suggestion that you meet Angela Johnson?

A. Yes.

Q. And did he tell you why?

1934

A. Yes. He thought that I would relate to her.

Q. Did you meet Angela Johnson after that?

A. Yes.

Q. And where did you meet her? Where did you go to see her?

A. I believe the first time was in the Benton County Jail.

Q. And was she at another jail after that?

A. Linn County.

Q. Now, do you understand that we can't find any billing records for Cornell and Associates?

A. Yes.

Q. Did you meet with Miss Johnson more than one time?

A. Yes.

Q. Can you estimate the number of times you went to the jail to talk to Ms. Johnson?

A. I would estimate it to be approximately five or six times.

Q. And can you estimate about how long total you spent with Miss Johnson?

A. I'd say about eight or nine hours.

Q. And I'm going to ask you, well, based on your contact with Miss Johnson to describe her. What about her self-esteem? Did she seem to have a sense of herself or not?

A. I think she had very low self-esteem.

Q. And did you find her easy to talk to or difficult to talk to?

A. She was easy to talk to.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q. Was she particularly gullible?

A. I don't know about gullible. I'd say she was an easy mark.

Q. Okay. When you say she was an easy mark, what do you mean?

A. I think from what I had found out from the interviews that she made bad choices with men and that her need to be loved and cared for was stronger than her sensibility.

Q. Okay. In your interaction with her, did she respond appropriately for a young woman in her 20s?

A. No, not always.

Q. Could you tell us about that?

A. Sometimes she would be -- the best way I could describe it is like a giddy teenager, laughing when it wasn't really needed to be laughed at.

Q. Okay.

A. And she had very childlike manner.

Q. Was she easily focused, or was it difficult to get her to focus?

A. It was hard to get her to focus. I had to keep bringing her back to what we were actually talking about.

Q. Did you have any suspicions as to whether or not there had been some abuse in her past?

A. Yes.

Q. And what did you suspect?

A. I suspected that she'd been physically and emotionally abused, and I also suspected that she might have been sexually

abused.

Q. And what did you base those suspicions on?

A. That's kind of like what my past is, and I know that I had the same type of difficulties for quite a while as she did.

Q. Let me just ask, Ms. Nevins, do you have any notes or reports of the interviews that you did of Angela Johnson?

A. Me? No, I don't.

Q. All right. So you're describing this based on your recollection now some years after the fact.

A. Right.

Q. Would you describe Miss Johnson as somebody who is strong willed?

A. No.

Q. Would you describe her as stubborn?

A. No.

Q. What about her children? Did they seem to be important to her?

A. Yes. She was devoted to her children, loved them very much.

Q. And do you recall, Ms. Nevins, that you did any work to locate somebody called Phyllis Proscovec in this case?

A. I really don't remember.

Q. The name doesn't sound familiar to you now?

A. No.

Q. Is it possible that you did some work but you do not

remember?

A. Very possible.

Q. You're not saying you didn't do any work.

A. I'm not saying I didn't do it. I'm just saying I don't remember doing it.

MS. MORRISSEY: Thank you. I have nothing further.

THE COURT: Mr. Williams?

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Miss Nevins, you estimated you spent maybe eight or nine hours with Angela Johnson. Did you do other work on this investigation as well?

A. Yes, I did.

Q. Do you have an idea of how many hours you would have spent doing other work on this investigation?

A. I would have to estimate how many hours, but I know that I turned in two or three billings on it at least if not more.

Q. And give us a sense what does that mean? If you turned in two or three billings, does that mean you would have worked two or three months? Do you do a billing a month? Or, you know, give us a sense if you would on just the extent of work you did.

A. Okay. I really did -- I would keep track of everything that I did as well as having Mr. Cornell keep track of what he did. And then when he felt that it was necessary for us to go ahead and get a bill in because we were getting a lot of hours,

and I would do a billing. He didn't like to get too far behind on the payment because it caused us a problem. It's easier to get a $10,000 bill paid than a $30,000 bill paid.

Q. So sitting here today, you don't really have an estimate of how many hours you would have spent on this investigation?

A. I really don't know because I had travel time, and I was on the case for quite a while. I just really wouldn't want to estimate how many hours.

Q. Let's just do time period then. How many months do you think you worked on this case?

A. I'm going to say around 20, 24 months, maybe more.

Q. And did your work involve both attempting to locate witnesses and interviewing witnesses?

A. Yes.

Q. And who did you take direction from?

A. Ray Cornell.

Q. You talked about Cornell and Associates and indicated you were the lead investigator for him. Were there other investigators that worked for Ray Cornell?

A. Not at the time, no.

MR. WILLIAMS: Nothing further, Your Honor.

THE COURT: Anything further, Miss Morrissey?

MS. MORRISSEY: Yes, just one question.

REDIRECT EXAMINATION

BY MS. MORRISSEY:

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 7 of 86

**1939**

Q. Miss Nevins, during the time you worked on this case, the 20 to 24 months, would you say that you did a complete investigation regarding the guilt phase of this matter?

A. No.

Q. Okay. And had you ever worked on a death penalty case before?

A. Yes.

Q. Had you -- would you be able to say that you did a complete penalty-phase investigation in the time that you worked on the case?

A. Yes.

Q. You did a complete penalty-phase investigation?

A. Oh. No, not a complete penalty phase, no.

Q. Okay. All right. So it was a work in progress --

A. Right.

Q. -- at the time you left; correct?

A. Right.

MS. MORRISSEY: Thank you. I have nothing further.

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: No, Your Honor. Thank you.

THE COURT: Okay. You may step down.

MS. MORRISSEY: Your Honor, our next witness is Wendy Kinsman.

THE COURT: How do you spell the last name of the witness?

**1940**

MS. MORRISSEY: K-i-n-s-m-a-n I believe. I think it's spelled like it sounds.

THE COURT: Am I missing something, but the witness isn't on your witness list?

MS. MORRISSEY: She's probably on it as Wendy Jacobson.

THE COURT: Oh, okay. There she is.

Good morning. Would you please raise your right hand, please.

WENDY JACOBSON, PETITIONER'S WITNESS, SWORN

THE COURT: Okay. Please be seated in the witness stand. And you can adjust the chair and the microphones so you can speak directly into the microphones. Scoot that chair up a little bit. And tell us your full name and spell your last name, please.

THE WITNESS: Wendy Jacobson, J-a-c-o-b-s-o-n.

THE COURT: Thank you.

Miss Morrissey?

MS. MORRISSEY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. MORRISSEY:

Q. I announced that I was calling Wendy Kinsman.

A. That's hyphenated.

Q. That's your what?

A. Hyphenated.

**1941**

Q. Hyphenated, okay.

A. I only use that when necessary.

Q. Are you married to Mark Kinsman?

A. That's correct.

Q. Okay. So I wasn't totally off base.

A. No, you weren't.

THE COURT: So which way is it hyphenated? Jacobson-Kinsman --

THE WITNESS: Yes.

THE COURT: -- or the other way?

THE WITNESS: Jacobson-Kinsman.

THE COURT: Okay. Thank you.

BY MS. MORRISSEY:

Q. Miss Jacobson, do you know the last witness who testified -- or Karl Todd, the first witness who testified this morning?

A. Yes, I do.

Q. And how do you know him?

A. He was our father image when we were growing up.

Q. Now, you say he was your father image. If I told you that he was in your lives for a brief period of time, not even a whole year --

A. That would be correct.

Q. Okay. And yet he was your father figure; is that correct?

A. That's correct.

**1942**

Q. And you believe that today?

A. That's correct.

Q. Did you get any information from your mom about Karl Todd after you left Colorado?

A. He was dead.

Q. She told you that.

A. That's what we learned. I tried to find him, and we were told he was dead.

Q. And when you heard that he was dead, did you discontinue any efforts to find him?

A. That's correct.

THE COURT: Excuse me. You said, "We were told that he was dead." Who do you include in the "we"?

THE WITNESS: My siblings.

THE COURT: All of your siblings?

THE WITNESS: And -- basically my sister Angie and Jamie.

THE COURT: Thank you.

BY MS. MORRISSEY:

Q. Who told you he was dead?

A. My mother.

Q. Do you remember getting bicycles from him one Christmas?

A. Yes.

Q. All right. You are Angela Johnson's sister; correct?

A. Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q. Are you older or younger an Angela?

A. I'd like to say I'm younger, but I am older.

Q. But it wouldn't be true; right?

A. That's correct.

Q. And is -- Brooke Jacobson, is she your daughter?

A. She's my youngest daughter.

Q. When Brooke was young, say, you know, 10 or 11 years old, where were you living?

A. In Wisconsin.

Q. Where in Wisconsin?

A. Fond du Lac, Wisconsin.

Q. And when Brooke was growing up, would you visit your sister Angie in the summer?

A. Yes.

Q. Was there any kind of routine that developed over the years?

A. Every June I'd go down there with my daughter, and we'd stay until -- through August after Alyssa's birthday. And then I visited frequently.

Q. So was there any kind of event that would trigger your departure for Iowa?

A. School -- oh, after my daughter's birthday.

Q. And when is your daughter's birthday?

A. June 23.

Q. And when would you normally return from visiting in Iowa?

A. Myself or Brooke?

Q. Brooke.

A. Brooke would stay there through Alyssa's birthday, and so the next weekend we would bring her back.

Q. And when was Alyssa's birthday?

A. August 7.

Q. Now, how would Brooke get down to Iowa?

A. We'd drive her.

Q. Who would drive her?

A. I would.

Q. And when you drove her down to Iowa, would you sometimes stay there yourself for a period of time?

A. Yes, I would.

Q. Would you visit Iowa during the time that Brooke was staying there other than when you went to drop her off and --

A. Yes, I would.

Q. And was there any routine to your visiting Iowa during this time?

A. Other than staying overnight? I'd stay overnight upstairs. We'd kick the kids out of the upstairs couch, and I'd sleep upstairs. They'd have to go to the basement.

Q. When you say kick the kids out of the upstairs couch, could you describe what was the upstairs couch?

A. It was a champagne style pit group with a hide-a-bed that set directly across from the television in the upstairs living

room.

Q. Okay. And you said you would kick the kids out from the upstairs. Did they like to sleep up there?

A. Yes, because there was a TV there, and they played the Galaga game there, and it was a fold-out bed, so they could both sit there and . . .

Q. What was the -- what was available for them to sleep in downstairs?

A. Small -- it's a small couch, small couch bed, hide-a-bed, real little, not adult size.

Q. Was there a television down there?

A. No, there was not.

Q. Well, when you would come to visit Angie during the course of a summer, would you come by yourself, or would somebody else . . .

A. Sometimes Mark was with me, and sometimes I was by myself.

Q. But when you came, whether it was with Mark or without, you would sleep upstairs; correct?

A. That's correct.

Q. Now, have you looked at anything to help you remember what happened during the summer of 1993?

A. Yes, I have.

Q. What have you looked at?

A. The home movies that we made while we were there.

Q. And does that include what's been identified -- what is

Exhibit 62? It's been marked as that in this case which is a video of Brooke's birthday party in Fond du Lac and then a 4th of July parade on July 5 in Clear Lake.

A. Yes.

Q. And did you also look at what we've marked Exhibit 63 which is a video of Alyssa's birthday in Clear Lake on August 7, 1993?

A. Yes.

Q. Do you see yourself in the -- either of those videos?

A. One of them.

Q. Which one?

A. I believe it's Alyssa's birthday.

Q. In the summer of 1993 was there anything unusual about Angela's condition?

A. She was pregnant.

Q. And was she showing?

A. I noticed it right away.

Q. Were you interviewed, Miss Jacobson, by Patrick Berrigan prior to your sister's trial in 2005?

A. Yes.

Q. And I'm going to ask you about February 7, 2005. Do you remember being interviewed by him and Mary Goody?

A. Yes.

Q. Female investigator?

A. It's cloudy, but yes.

Q. It's cloudy? Okay. If there were notes by Mr. Berrigan

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 353 Filed 11/10/11 Page 9 of 86

indicating that you told him that your daughter Brooke stayed with Miss Johnson, quote, when all this stuff was going on, end quote, in other words, the summer of 1993 --

A. Yes.

Q. -- would those notes be consistent with your memory of --

A. Yes.

Q. -- what happened in 1993?

A. Yes.

Q. Did anybody ever ask you to look for -- ask you about what you did in 1993, whether you visited Angela that --

A. No.

Q. -- summer, whether Brooke was there, anything like that?

A. No.

Q. In other words, you told them that Brooke was staying with Angela, but nobody ever followed up.

A. That's correct.

Q. Do you remember, Miss Jacobson, when you met Patrick Berrigan for the first time?

A. I do -- I can remember part of the conversation, but I can't remember exactly where it was.

Q. Was it early on after your sister's arrest?

A. That's correct.

Q. And did he say something to you the first time you met him that you remember today?

A. Yes.

Q. What did he say?

A. She was guilty.

Q. Did you testify at the penalty phase of your sister's case?

A. Yes.

Q. And who was asking you questions?

A. Pat Berrigan.

Q. The night before you testified, did you meet with Mr. Berrigan to talk about what you were going to say in court the next day?

A. No, I did not.

Q. Pardon?

A. No, I did not.

Q. Okay. Did somebody give you a reason?

A. He was ill.

Q. When you testified at your sister's trial, did you answer the questions that were asked to you?

A. Yes.

Q. And would it be fair to say that if you weren't asked a question you couldn't have answered?

A. That's correct.

Q. If you had been asked the questions I've asked you today in 2005, would you have answered them as you have in court now?

A. That would be correct.

Q. Were you able to sit through your sister's trial? Were you able to come in court for most of it?

A. No.

Q. And you indicated that you testified. Were you -- obviously when you were in court testifying you were able to see your sister; correct?

A. That's correct.

Q. And after you testified were you allowed to remain in the courtroom after that?

A. Yes.

Q. And did you also visit with your sister during the course of the trial?

A. That's correct.

Q. Where did you visit? What sort of arrangements?

A. We visited in the marshal's office here and at the jail. They let us.

Q. So let me ask you about your sister's demeanor during the course of her trial. Could you describe it for us?

A. I would say she was not aware of what our trial -- what the trial -- what the intensity or the magnitude of this trial was about. She seemed to be scribbling circles on the paper during the trial. And it was pretty -- it seemed that it was -- she was working below -- I mean, acting below her age, you know, in a -- she just didn't understand or comprehend what was going on.

Q. Well, when you testified, do you remember seeing her doing that scribbling?

A. Yeah, she was scribbling on a piece of paper. It looked

like she was just going like -- a kindergarten drawing.

Q. Like making a --

A. You know how they make circles and kind of scribble? That's what it looked like.

MS. MORRISSEY: Indicating, Your Honor, a circling motion.

A. Motion.

Q. And did she look at you during your testimony?

A. Yes.

Q. And was there anything unusual about that?

A. She smiled frequently. She did not seem to be concerned about what was going on with her. She didn't seem to understand that this was a very serious matter. She blew me kisses and smiled frequently.

Q. This was during your testimony?

A. This was during my testimony.

Q. Okay. And did you think that was appropriate or inappropriate?

A. Well, I didn't feel like she should have -- I didn't feel like the Court would think it was appropriate.

Q. Okay. During your visits with her in the marshal's office, could you describe what she was like then?

A. She didn't seem to comprehend what was going -- she didn't understand what was going on.

Q. Well, did she talk about her trial? Did she say -- talk

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 10 of 86

about the witnesses or anything?

A.   She seemed -- she just seemed real uncon -- unconcerned. I don't know.  Confused?  She wasn't really aware of what was going on.  It just -- she was kind of in a state of -- a childlike state.

Q.   Did she in your opinion act in a manner that is appropriate for somebody who is on trial literally for their life in a death penalty case?

A.   No, she did not.

Q.   Did Angela's lawyers tell you that the government had a strong case against her?

A.   No, they did not.

Q.   Did they tell you that if she went to trial she was likely to be convicted of a capital offense?

A.   No, they did not.

Q.   And did they tell you that given the facts of this case a death sentence was certainly within the realm of possibility?

A.   No, they did not.

Q.   If you had been told this information, if you knew what Angie's chances were at her trial, would you have encouraged her to enter a plea to avoid the death penalty?

A.   Yes, we would have.

Q.   You weren't asked at Miss Johnson's trial whether or not her execution would have an impact on you.  Could you share with us how -- how her execution might affect you?

A.   It would affect me greatly be -- and she's --

MR. WILLIAMS:  Your Honor, I would object to "and had this been offered during trial."  Execution impact evidence is -- some courts have held is inadmissible.  I would object to the admissibility of execution impact evidence.

THE COURT:  You may answer subject to the objection.

BY MS. MORRISSEY:

Q.   Yes, you can answer.

A.   Yes, it would affect me.  Her situation that she's in now is the reason I went back to school because I want to help her.  And it's already -- it's affected me from the beginning.  It will affect me through the end of my life.  It affects not just me, but it affects everybody because her situation shows that she's fallen through the cracks.  There's nobody out there to defend people that are in her position.  And I don't want to see that for her, her family, my family, or anybody else.

MS. MORRISSEY:  May I just have a moment, Your Honor?

THE COURT:  You may.

BY MS. MORRISSEY:

Q.   Now, during Angela's trial, you said that you were -- attended the trial and visited her during the day; correct?

A.   Yes.

Q.   Were there any other family members who were involved at the trial who attended the trial?

A.   My sister Holly, Alyssa.  My mother was there, my father

and my stepmother and my daughter Brooke.

Q.   Are those individuals that in your view you could have enlisted to talk to your sister if you had known her situation to convince her to take a plea to --

A.   Oh, definitely.

Q.   And would you have enlisted them as well?

A.   I would have.

MS. MORRISSEY:  Thank you.  I have nothing further at this time.

THE COURT:  Mr. Williams?

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q.   Miss, did you believe your sister to be guilty of the offense?

A.   I did not, no.

Q.   And do you believe her to be guilty of the offense today?

A.   I do not.

Q.   It's my understanding from the interview you gave to some investigators here recently that during the breaks where you would have an opportunity to speak with your sister in the marshal's holding cell area she just didn't really talk about the trial or the offense, period.

A.   No, we don't talk about that.

MR. WILLIAMS:  All right.  Nothing further, Your Honor.

THE COURT:  Miss Morrissey?

REDIRECT EXAMINATION

BY MS. MORRISSEY:

Q.   Had you received any instructions from Miss Johnson's lawyer not to talk about what she was on trial for?

A.   Yes, we did.

MS. MORRISSEY:  Thank you.  Nothing further.

THE COURT:  Mr. Williams, anything further?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Miss Jacobson, I do have some questions for you.  At the time of the trial in 2005, were you still living in Fond du Lac?

THE WITNESS:  Yes.

THE COURT:  And had you read much about the case?

THE WITNESS:  No, I was not living in Fond du Lac.

THE COURT:  Where were you living?

THE WITNESS:  I was living in Texas.

THE COURT:  And where in Texas?

THE WITNESS:  Mesquite.

THE COURT:  And did you have a computer in your home?

THE WITNESS:  Yes.

THE COURT:  And did you have access to the Internet?

THE WITNESS:  Yes.

THE COURT:  Did you read much about the case?

THE WITNESS:  Of course.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

1955

THE COURT: Well, you knew she was facing the death penalty, didn't you?

THE WITNESS: I did not know she was facing the death penalty, I mean, other than --

THE COURT: How could you not know that?

THE WITNESS: Well, I read some -- I was sick during that time too, so, I mean, I read some things, but I didn't know -- I knew it was a possibility after reading it on the Internet. I had no clue that that would be something -- because the lawyers never told us that, hey, this really could happen. I thought it was media slant because they had printed a lot of things that were not true in the paper.

THE COURT: Well, I understand that, but didn't most articles mention the fact that it was the first death penalty case in Iowa in, you know, 50 years and no woman had been executed in the federal system since 1958? I mean, that was -- wasn't that a repeated theme in the articles that you read?

THE WITNESS: Yes, it was.

THE COURT: So you knew there was a possibility she was facing the death penalty.

THE WITNESS: Well, I thought that was all the paper sensationalizing this because of her situation. I did not realize that this could really happen.

THE COURT: Did you know she was charged with five murders?

1956

THE WITNESS: No, I -- in fact, I thought Dustin was charged with them and they found her as an accomplice.

THE COURT: Well, you knew before her trial that Dustin Honken had been given the death penalty.

THE WITNESS: Well, yeah, but didn't he do it?

THE COURT: Well, you're just going to be evasive so . . .

THE WITNESS: No, I --

THE COURT: Yep, you are.

THE WITNESS: I'm going to -- that's why I went to school because I --

THE COURT: What level of education do you have?

THE WITNESS: I am going to graduate with an associate's and --

THE COURT: What'd you have back in 2005?

THE WITNESS: I did not have -- I did not have any degree or any --

THE COURT: Did you have a high school education?

THE WITNESS: I had a GED.

THE COURT: Okay. And you're telling me that when you read the newspaper articles you didn't realize that a potential penalty for your sister was the death penalty.

THE WITNESS: I thought it was sensationalizing it because of all the things they were writing.

THE COURT: That isn't what I asked you. I realize

1957

you thought it was sensationalizing it. Did you realize that she had the potential of getting the death penalty?

THE WITNESS: I was not sure. I'm -- I have -- I did not know for sure.

THE COURT: Well, when you testified in the penalty phase of her trial, what did you think a penalty phase was for?

THE WITNESS: For people to tell how they felt about --

THE COURT: Well, what penalty did you think your sister was facing?

THE WITNESS: Well, I thought she had -- I didn't know that she had death penalty or -- I thought she was going to get life in prison.

THE COURT: I know that's what you thought. That wasn't my question. What potential penalties was she facing in the penalty phase? And maybe you didn't know.

THE WITNESS: I didn't know there was one or the other. I mean, I thought there was more than one option.

THE COURT: What were the potential options? That's legitimate. What were the potential options?

THE WITNESS: From what I read in the paper, they did say the death penalty or life in prison.

THE COURT: Was there ever another option discussed in the newspapers?

THE WITNESS: I thought it was life in prison or the

1958

death penalty.

THE COURT: Okay. So when you came to testify at the trial, those were the only two options you were aware of.

THE WITNESS: Well, I didn't -- I wasn't even sure that they were all the options because the lawyers never confided to us what they were going to do or seek.

THE COURT: Did you ever ask the lawyers what the potential penalties were?

THE WITNESS: They would never call back.

THE COURT: Well, when Mr. Berrigan first came to see you, did you ever ask him what the potential penalties your sister was facing?

THE WITNESS: No.

THE COURT: That wasn't something you were interested in?

THE WITNESS: We didn't know because --

THE COURT: Well, that's precisely why you would ask him, because you didn't know. If you knew, there'd be no need to ask him; right?

THE WITNESS: That's true.

THE COURT: So if you didn't know and it's your sister and you love your sister, you wouldn't be curious about what her potential penalties would be?

THE WITNESS: At the time I met him it was so soon after it all started, we didn't -- we were hoping they would

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

1959

find her innocent of the charges so . . .

THE COURT: I understand that. But if she wasn't found innocent, she would face penalties; correct?

THE WITNESS: Yes.

THE COURT: And you weren't at all interested in what the penalties were?

THE WITNESS: We hadn't discussed it with him to that point. We didn't know --

THE COURT: I understand that's your testimony. But you weren't interested enough to ask him?

THE WITNESS: When I talked to him at that time, I didn't know that that was something we had to ask right then.

THE COURT: Well, you didn't have to ask. But at any time did you pick up the phone and call Pat Berrigan and say, "Is my sister looking at the death penalty?"

THE WITNESS: No, I did not.

THE COURT: Okay. After you read the newspaper articles that repeated I don't know how -- how many articles do you think you read?

THE WITNESS: I don't know how many.

THE COURT: We talking two, twenty, fifty, a hundred?

THE WITNESS: It could have been 20, but I didn't know we could -- when we did call --

THE COURT: Just a second. Did virtually every article mention the fact that it was a death penalty case?

1960

THE WITNESS: Not every article.

THE COURT: Well, did any of the articles mention the fact that your sister Angela was potentially facing the death penalty?

THE WITNESS: Yes.

THE COURT: When you read that for the first time, did you call Patrick Berrigan and say, "What's going on here? Is my sister really facing the death penalty," or something like that?

THE WITNESS: I did call them a lot of times to discuss this case with them and to offer some insights and find out what was going on, and my calls were not responded to. They kind of -- they kept us in the dark. They didn't tell us what was going on. They didn't return calls. It was really -- we didn't know anything about what was happening with my sister because nobody would call us back, and I had all these numbers that I called, and nobody would get back to me.

THE COURT: Did you ever write Mr. Berrigan a letter and say --

THE WITNESS: No, but I wrote Al Willett a letter.

THE COURT: Let me finish my question. Did you ever write Pat Berrigan a letter and ask about the likelihood that your sister would receive the death penalty?

THE WITNESS: No.

THE COURT: Tell me about the letter you wrote to Al Willett.

1961

THE WITNESS: I wrote a letter to Al Willett because the lawyer -- not lawyer, the detective Ray told me that he was trying to get us to pay $10,000 to get Al kicked off the case because he was having marital problems with his wife and because he had never handled a capital murder case before and he wanted us to pay to Tom Frerichs money so that he could take the case instead.

THE COURT: Well, you told us that in the very first meeting with Pat Berrigan -- and the time frame as I understood it was, you know, some time in the first year or so after she was arrested -- that Mr. Berrigan told you she was guilty. Is that your testimony?

THE WITNESS: Yes. But he didn't say what she was guilty of at all, just she's guilty.

THE COURT: I don't have any additional questions. Any follow-up questions by counsel?

MS. MORRISSEY: Yes.

FURTHER REDIRECT EXAMINATION

BY MS. MORRISSEY:

Q. Miss Jacobson, were you -- did you closely follow news accounts of your sister's case?

A. I followed them -- I can't say how much I followed them, but I did read when I was down there to keep up with what was going on.

Q. When you were down where?

1962

A. In Texas.

Q. Okay. So you were in Texas, and you would read about your sister's case in the papers from Iowa?

A. Yes.

Q. Okay. Did you clip the papers and save them?

A. I had clipped a couple of them, but I think I gave them up to the attorneys.

Q. And how did it feel to read about your sister's case? How did that make you feel?

A. I felt like they were writing things to sell papers because there was so many times that I had written -- I had talked to the newspapers I had read and said, "Listen, you've got wrong information here," and it didn't seem like anybody cared. I just felt like they were writing things to sell papers.

Q. Did you know from what you read in the papers and from the lawyers that this was a potential death penalty case?

A. I did not realize that this was a death penalty case because I thought the newspapers were sensationalizing everything.

Q. But did you read it at some point? Whether or not you thought it was sensational, do you remember reading it?

A. Yes.

Q. Did you believe it?

A. I did not. I just really thought they were trying to sell papers.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

**1963**

Q. Do you think that it is easy to have a younger sister who is facing the death penalty?

A. No.

Q. How did that make you feel?

A. Stressed, worried, concerned for her welfare. I wanted -- I felt helpless because I wanted to be able to help her, and I didn't know what to do. I tried to interact with the lawyers to find out what was going on, and nobody would respond to my calls.

Q. Would you say that you were maybe persistent in calling the lawyers?

A. Yes. I would offer information that I would find that I thought might be helpful and . . .

Q. Would they be appreciative?

A. No, they wouldn't respond.

Q. Was that frustrating for you?

A. Yes, it was.

Q. Did they ever -- did the lawyers -- and there are two different lawyers, so let me ask you different questions. Mr. Willett was first appointed to represent your sister; correct?

A. That's correct.

Q. Did you speak with him?

A. When we went for the sibling meeting.

Q. Could you tell us what the sibling meeting was?

**1964**

A. That is when Ray -- all of our siblings except for Jamie, they called us down there to --

Q. Down where?

A. To Cedar Rapids, and they had us go to Al's office. We had to tell about our childhood. Ray wrote it all down in a book, and that was basically our sibling meeting. We didn't know the extent of what was going on.

Q. Did -- the sibling meeting, did anybody tell you your sister's prospects?

A. No.

Q. And did Mr. Willett ever talk to you about the strength of the case against her?

A. No.

Q. Now, there was -- you mentioned a lawyer named Frerichs; correct?

A. Yes.

Q. Mr. Frerichs, was he also one of the lawyers representing your sister?

A. At the time.

Q. This was early on.

A. Yes.

Q. Did Mr. Frerichs ever talk to you about the strength of the case against your sister?

A. No.

Q. What about Mr. Cornell?

**1965**

A. Well, Ray Cornell.

Q. Ray Cornell. Did he talk to you about the strength of the case against your sister?

A. No, he did not.

Q. Now, you mentioned something about somebody -- Ray saying pay $10,000 to get Al off the case?

A. Yes.

Q. Could you explain what happened?

A. Ray was drinking. We had talked to him on the phone. And he said, "Listen, Al's never handled a case like this. You and your brother, can you get $5,000, your brother get $5,000, and pay Tom Frerichs $10,000. He can do the case. I'll help him investigate it." And he also said he wasn't getting any money from the government for his investigation work that he was doing. So I'm assuming that was why he wanted -- started in with this money thing.

Q. Did you or your brother to your knowledge ever pay in any money?

A. No.

Q. How did that advice that you got from Mr. Cornell make you feel about the people whose -- in whose hands your sister's fate?

A. I was very worried and upset because there was no unity within the team. They -- you know, I have this alcoholic detective making -- talking about my sister when he'd been

**1966**

drinking, and, you know, telling me that the lawyers handling her case are incompetent to do so and that he was able to -- he said, "I will not let your sister die," because he had some motorcycle case that he had done and got the guy off a death penalty and . . .

Q. Was this a stressful time for you and your family?

A. Yes, it was very stressful.

Q. When Mr. Berrigan came on the case, did the stress of it end?

A. No. In fact, I didn't even know he was like -- I just thought he was -- I didn't know he -- was he like the full p -- all I knew was Al Willett was always the full one. He never talked. Then there's this Dean thing. I don't know how he came into it. All of a sudden there's this Pat into it and all these people we didn't know.

Q. The family didn't know them.

A. Nothing. We knew nothing.

Q. How did that make you feel?

A. Very frustrated.

Q. You knew this was a potential death penalty case, didn't you?

A. I wasn't sure. I just wasn't sure.

Q. Do you think that you might have not wanted to be sure?

A. I could have been. I'm just -- could have been.

MS. MORRISSEY: Thank you. I have nothing further.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 14 of 86

MR. WILLIAMS: No questions, Your Honor.

THE COURT: Well, Miss Jacobson, let me ask you this. If you thought Angie was not guilty and you still believe she was not guilty, why in the world would you try and get her to plead guilty?

THE WITNESS: If they would have told us that she had a choice between life or death, we would still want her with us.

THE COURT: Well, she didn't have the choice. The jury had the choice.

THE WITNESS: But we didn't know that.

THE COURT: You couldn't tell that from reading the articles?

THE WITNESS: But the articles, they were not accurate. They were trying to sell -- in my mind they were trying to sell papers and they didn't care what they said in order to sell the papers. And so I didn't believe what the papers were saying.

THE COURT: Okay. Thank you. Any follow-up questions?

MS. MORRISSEY: Yes.

FURTHER REDIRECT EXAMINATION

BY MS. MORRISSEY:

Q. There's some Kleenex right there, Miss Jacobson. Have you heard of something called denial?

A. Have I?

Q. Yes.

A. (Witness nodded head.)

Q. Is that yes?

A. Yes.

Q. And what's denial?

A. Refusal to believe something.

Q. Okay. Do you think that has something to do with your attitude towards this case?

A. Could.

Q. Do you feel guilty because you didn't want to think this case was a death case?

A. Probably. Very frustrated. I'm so frustrated with this legal process that . . .

Q. Okay. Let me just ask you questions. Did anybody ever come to you and say your sister says she's innocent, but she's likely to be found guilty, and if she's found guilty, there's a good chance of a death sentence in this case?

A. No, nobody told me that.

Q. Okay. Now, you believe your sister is innocent; correct?

A. Yes.

Q. If you were told that you could do something that would avoid possibility of her sitting here as she is now which is under a sentence of death, would you have done that? Would you have helped the lawyers do that?

A. Yes.

Q. Even though it involved telling your sister to plead guilty to a crime that you didn't think that she committed?

A. Yes, even -- because it would be better to have her with us than not.

Q. Okay. Did anybody -- did a lawyer ever sit down with you or your family before trial and explain the strength of the evidence against your sister?

A. No.

Q. Did anybody ever sit down and explain to you the legal concept of aiding and abetting?

A. No.

Q. Did you understand that if somebody -- that somebody who didn't pull a trigger, okay, where five people were dead, Angela didn't pull the trigger, that she could nonetheless get a death sentence?

A. No.

Q. Why -- I guess you didn't believe this yourself despite everything you read in the papers.

A. No, because papers write things to sell papers. If they -- and they were writing things that -- they weren't including the whole story. They weren't telling -- they were like telling partial stories. They weren't -- they were inaccurate in their information. And it was all because this is like this big north Iowa thing.

Q. Could you talk to your sister about this case, I mean, when

she was in jail?

A. No, the lawyers told us not to.

Q. So you couldn't ask your sister what was going on; correct?

A. No.

Q. And your only source of information was the paper.

A. Yes.

Q. And you chose not to believe the paper.

A. Correct.

Q. And the lawyers weren't very good at communicating.

A. No, they weren't.

MS. MORRISSEY: All right. Thank you. I have nothing further.

THE COURT: Mr. Williams, anything further?

MR. WILLIAMS: No. Thank you, Your Honor.

THE COURT: Thank you, Miss Jacobson.

Is Pat Berrigan your next witness?

MR. BURT: Yes, Your Honor.

THE COURT: Why don't we take a recess before that. We'll be in recess until 8:45. Thank you.

(Recess at 8:25 a.m.)

THE COURT: Thank you.

Ready to call your next witness?

MR. BURT: I am, Your Honor. It'd be Mr. Berrigan.

THE COURT: Good morning.

PATRICK BERRIGAN, PETITIONER'S WITNESS, SWORN

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 15 of 86
*to purchase a complete copy of this transcript.*

**1971**

THE COURT: Thank you. Please be seated. And we all know who you are, but why don't you tell us for the record. State your full name, please, and spell your last name.

THE WITNESS: My name is Patrick Joseph Berrigan, B as in boy e-r-r-i-g-a-n.

THE COURT: Thank you.

Mr. Burt?

DIRECT EXAMINATION

BY MR. BURT:

Q. Good morning.

A. Good morning, sir.

Q. Mr. Berrigan, I wonder if we could begin by just having you identify your relation to the case of United States versus Angela Johnson.

A. I was learned counsel in a three-attorney team that represented Angela at trial.

Q. And we're going to talk in detail about what you did in this case and why you did it, but before we do that, I want to tell the Court a little bit about your recordkeeping system in this case in terms of what you did to document what was happening at the time things were happening in the case. Could you just give us an overview of how you went about documenting your connection to this case?

A. I took notes, handwritten notes -- I'm not computer literate -- during most, if not all, meetings that I'm involved

**1972**

in or really any proceedings that involve the case. There are some exceptions, but I'd say the vast majority of the time I have handwritten notes that document whatever I'm involved in.

Q. And would you characterize your note-taking habits as fairly compulsive as opposed --

A. Well, I wouldn't because I've always done that. Some other folks have -- might characterize them that way.

Q. And just for the record, you have cooperated fully with the present legal team in bringing the information that is being submitted to Judge Bennett; isn't that true?

A. I hope so.

Q. Okay. I want to identify for the record the notes that you took and I've had premarked as Exhibit 72A, a binder which is entitled Berrigan PB-1 through PB-859. Is that some of your notes in this case? I think you'll see they're Bates stamped PB-1 and then 859 pages.

A. That looks like all of my handwriting.

Q. Okay.

A. Yes, sir.

Q. And then 72B is another run of documents which begins PB-2, 1 through 433. Is this another set of your handwritten notes in this case?

A. Yes, sir.

Q. And PB 72C is a run of documents entitled PB-2, 1 through 433. Is that also a set of your notes in this case?

**1973**

A. Yes, sir, although it looks like it includes some notes that are related to the case. For example, the first page is a federal death penalty conference I attended in Salt Lake City, Utah, November the 5th and 6th of 2004 which obviously wasn't part of the case, but there were ideas related during the conference that I made note of that I thought would be helpful in Miss Johnson's case.

Q. Okay. And then 72D, is this another run of documents containing your notes? This is PB-3, 1 through 433.

A. Yes, sir.

Q. And then lastly, one last set, a binder containing a run of documents PB-3, 434 -- 434 through 867.

A. Those are my notes in this case as well.

Q. Okay. Then in addition to those notes, did you also prepare and review in preparation for your testimony today your billing records which are contained in a binder previously marked as Plaintiff's 8 under a tab called Berrigan Billing?

A. I reviewed a copy of my billing records that I received last evening. I don't know if they exactly correspond to this document, but to the extent this contains my billing records, I did sort of flip through those last evening.

Q. Now, in the course of your representation of Miss Johnson up to and including when she was convicted and sentenced to death and throughout the appellate process, did you also maintain in addition to those notes boxes of material related to

**1974**

this case?

A. Yes, sir.

Q. And how many boxes if you recall roughly are we talking about?

A. I'd say it was somewhere in the neighborhood of 30 boxes give or take 5 boxes.

Q. Now, did you transfer your boxes and also collect from other trial participants boxes that they had for purposes of transferring those boxes to the prior habeas team in the case?

A. I did transfer my boxes, and I may have also included some boxes that I obtained from either Mr. Stowers or Mr. Willett. I don't frankly recall.

Q. All of your files, though, got transferred over to the --

A. Everything that I had I sent to the habeas team.

Q. Now, I have a -- I want to go somewhat in chronological order here, and I've had premarked as Exhibit 56 which is one of the exhibit numbers we had missing a binder containing the dockets from both this case, the Honken case, and some other cases that we're going to talk about. And in 56 is a docket for the original Angela Johnson case. I want to ask you about the entry in that docket. And this is from Case Number 00CR-03034. Is it your understanding that was the first case filed against Miss Johnson?

A. Yes, sir.

Q. Okay.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 16 of 86

THE COURT: Mr. Berrigan, you should be able to see it on the monitor right in front of you.

THE WITNESS: Oh, thank you.

THE COURT: That's okay.

THE WITNESS: Thank you, Your Honor. I didn't even notice.

THE COURT: You're not the first witness to miss that.

THE WITNESS: Appreciate it.

BY MR. BURT:

Q. And does looking at this document and the first entry of it, July 26, 2000, refresh your memory that the indictment in this case, in the first case that got filed against Miss Johnson, was filed on July 26, 2000?

A. I don't dispute that. I was not involved in the case at that time, but that's my understanding.

Q. All right. And you'll see that the eighth -- the ninth entry in the docket is order for appointment of counsel by Chief Magistrate Judge John Jarvey for Defendant Angela Johnson appointing FPD with Al Willett assisting. I realize you came into the case later, but do you know what happened to the public defender in this case, why --

A. I never knew the public defender's office was involved in the case at all.

Q. Okay. And do you recall that your appointment in the case did not take place until December of 2000?

A. I frankly don't recall when my appointment took place. I do recall when I first became involved in the case.

Q. Okay. I want to show you from Plaintiff's Exhibit Number 8 which is the funding folder in the case an order of appointment of counsel, and the order is dated December 12, 2000. Indicates on the first page that the Court is considering appointing learned counsel under 18 U.S. Code section 3005, indicates that Albert (sic) Willett, Tom Frerichs are currently representing Miss Johnson and that neither of these attorneys meet the specific qualifications required in this capital case of being learned in the law applicable to capital cases. Do you see that?

A. Yes, sir.

Q. Then on the second page --

THE COURT: Can you scoot it down so I could actually re-read it?

MR. BURT: On the first page, Your Honor?

THE COURT: No, on the second page, go to the -- so I can see the top.

MR. BURT: Sure.

BY MR. BURT:

Q. It indicates that -- and I'll return to the first page just for a moment. It says pursuant to 18 U.S. Code 3005 and upon the recommendation of the Federal Public Defender, the Court appoints Patrick Berrigan as co-counsel for Miss Johnson and

concluding that you are learned in the law applicable to capital cases. Do you see that?

A. Yes, sir.

Q. And, in fact, at the time that appointment was made, you were learned in the law within the meaning of the statute; correct?

A. Well, people could debate that, but I think within the meaning of the statute, yes.

Q. And just give the Court the background in capital representation that you brought to this case when you were first appointed in October of 2000 -- or December of 2000.

A. I was a public defender in Kansas City, Missouri, for 14 years beginning in 1984. I had my first capital case appointment in 1986, two years out of law school. I handled a number of capital cases between 1986 and 1990. In 1990 I was transferred to the capital defense unit of the public defender's office in Kansas City, Missouri, and did exclusively capital cases in the state of Missouri from 1990 to 1997. 1997 I was terminated from the public defender's office and began my career in private practice. And between 1997 and this appointment I continued to do capital cases primarily in state court in Kansas but also had had a couple of appointments in federal court in Kansas City, Missouri.

Q. Okay. Are you familiar with a case called United States versus Tello, T-e-l-l-o?

A. Yes.

Q. And could you tell the Court what connection, if any, you had with that case.

A. I was learned counsel for Plutarco Tello in the capital prosecution against him and two codefendants, Mr. Hinnesteres and a Mr. Ortiz, O-r-t-i-z -- Hinnesteres is H-i-n-n-e-s-t-e-r-e-s -- in a trial that took place -- I think it was in 2000 before the Honorable Gary Fenner who's a federal district judge in Kansas City, Missouri.

Q. And was it in about May of 2000 that you completed the trial in that case?

A. I don't recollect the dates, but that sounds about right.

Q. And that was a case that was tried from start to finish through the penalty phase?

A. Yes, sir.

Q. You got a life verdict in that case, did you not?

A. We did -- Mr. Tello did, yes, sir.

Q. Well, you did as his learned counsel.

A. Well, yes.

Q. He didn't get it by himself.

A. No. Our team received a life verdict for Mr. Tello.

THE COURT: But as I understand it, Mr. Berrigan didn't have to serve it.

THE WITNESS: Exactly.

THE COURT: Which is I think the point he was trying

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 353 Filed 11/10/11 Page 17 of 86

to make.

THE WITNESS: My point exactly, Your Honor, right.

BY MR. BURT:

**Q.** That's right. What other federal capital experience did you have prior to your appointment in this case besides the Tello case?

**A.** I was appointed to United States versus Keith Nelson I believe in 2001. I could be mistaken about the dates. And that was the only other federal capital appointment that I had before. I guess that was after Miss Johnson. But that case went on sort of concurrently with Miss Johnson's case.

**Q.** Right.

**A.** And then I was also appointed in a case United States versus Jamal Shakir in the Middle District of Tennessee. I'm not sure, but I think that was some time in 2000 -- in late 2004, early 2005. Again, I think it was before the trial of Miss Johnson's case.

**Q.** Appointed before the trial of Miss Johnson's case. When did that case, the Shakir case, go to trial?

**A.** It didn't start trial until February 13 of 2007.

**Q.** So you came from this case, the Johnson case -- was your next capital trial after Johnson the Shakir case?

**A.** I believe so, Mr. Shakir 's case, yes.

**Q.** Now, so just to make sure I have this clear, the Tello case would have been your solo federal case prior to the appointment

in this case.

**A.** I believe so.

**Q.** All right. Now, was there also a -- strike that.

When, if it did, did the Nelson case go to trial in relation to the Johnson case?

**A.** I think Mr. Nelson's case went to trial in the fall of two thousand -- 2001.

**Q.** Okay. And was there another state case that I see reference to in the notes, a state case, State versus Robinson, in Missouri that was also tried during the time period when you were representing Miss Johnson?

**A.** Represented Mr. Robinson case, State of Kansas versus John Robinson. That trial I believe was in the fall of 2002 is my recollection.

**Q.** Now, besides doing those two capital cases, that is, Nelson and Robinson, during the pendency of this case, did you have other substantial commitments in the way of noncapital trials, either federal or state trials, civil or criminal?

**A.** I had capital case appointments in the state of Kansas during this time, but they -- one case went to trial, State of Kansas versus Gordon Martis. That was a life verdict. I don't recollect the dates exactly. I had probably two other Kansas death penalty appointments neither of which resulted in trials.

In addition to that, I have a fairly active criminal practice and did then handling primarily felony cases in state

and federal court in the Kansas City area.

**Q.** Okay. So would it be fair to characterize your practice during this time period between 2000 and 2005 as fairly busy?

**A.** Yes, sir.

**Q.** Now, could you tell the Court how you first got connected with this case, where the first call -- when the first call came in and who your first contact was.

**A.** I was attending a seminar in Kentucky when Mr. Kevin McNally who is the death penalty resource center, in fact, in Frankfort, Kentucky, called me about this case pending in Iowa and asked me if I would contact Mr. Willett, if I was interested in participating in the case. And I did that. I called Mr. Willett on -- I think Mr. McNally called me on a Saturday or Sunday. I called Mr. Willett on Monday, the 16th of October of 2000.

**Q.** And you know you called him on the 16th because it's reflected in your notes.

**A.** Exactly.

**Q.** By the way, these notes which we're going to talk about, do they help you reconstruct what was going on at the time the notes were made as opposed to trying to look at it from a position of hindsight?

**A.** I have a very poor long-term memory unfortunately. And without these notes, it would be very difficult for me to recollect things that happened five years ago, ten years ago.

**Q.** And is it true that some of these notes contain your thinking about strategy? Why you did or did not do something is actually reflected in your notes that were contemporaneous with your thought process at the time.

**A.** Sometimes. Some of these notes are fairly free-flowing, spontaneous thoughts which can be embarrassing to read later, but that's primarily how I do it.

**Q.** Do you do appellate work as well?

**A.** I do, yes, sir.

**Q.** And did you do capital appellate work?

**A.** I have done capital appellate and habeas work.

**Q.** You're familiar with the Strickland case --

**A.** Yes, sir.

**Q.** -- and the standards for ineffective assistance of counsel.

**A.** Yes, sir.

**Q.** And you know from your appellate or habeas work that we're supposed to be eliminating the effects of hindsight.

**A.** Yes, of course.

**Q.** You think you can do that in your answers here by reference to your notes and what you remember from taking place at the time of the trial as opposed to looking at it backwards and trying to second guess yourself.

**A.** Well, to the extent that my notes reflect my thinking at the time, that was my thinking at the time, and I have no reason to doubt anything that I wrote in my notes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q. Do you think that is important just -- you've reviewed those notes recently; correct?

A. I have, yes, sir.

Q. Do you think that looking at those notes, reviewing them, that you put in your notes important things that happened in the sense that if something really important happened it typically would be reflected in your notes?

A. I tried. I think there are probably a lot of exceptions to that. There are a lot of notes.

Q. Uh-huh.

A. And there are times where particularly if I'm the person that's communicating, for example, in trial where I'm doing the examination, I'm not writing notes because it's important to maintain eye contact. That's sometimes true even with meetings with Miss Johnson where it's much more important to have a rapport with the person we're speaking to than to be jotting down notes.

But I think in large measure I try to take thorough notes and note down things that are important.

Q. Now, in your other capital case work -- were you appointed as learned counsel in the Tello case?

A. Yes, sir.

Q. And were you associated in that case with a local counsel?

A. I was, two local lawyers, Tom Bradshaw and Dan Herrington who work for a law firm called Armstrong Teasdale.

Q. And were you familiar with those gentlemen before you got involved with --

A. I did not know either one of them personally, although I knew Mr. Bradshaw by reputation as an excellent criminal defense attorney.

Q. In your other capital cases that you were involved with around this time, did you have occasion to work in teams? And by teams I mean groups of people, other lawyers, mitigation specialists, experts.

A. Always in capital cases we work in teams.

Q. Did you have a -- going into the Johnson case based on your prior experience certain people that you kind of went to as -- based on your past experience with them as people you could rely on in a team context?

A. Yes, sir.

Q. And in this particular case, did you have any prior knowledge or working relationship with the first person you were teamed with, Al Willett?

A. No, sir.

Q. The order that's in front of you on the screen there says, "Moreover, in the circumstances of this case, the Court deems it appropriate to retain the services of both of the attorneys originally appointed to represent Miss Johnson along with Mr. Berrigan. The Court finds that the exceptional circumstances of this case, including scientific and forensic

evidence issues and other complex and unusual legal issues and/or good cause presented by these and other circumstances of the case, warrant the appointment of three lawyers."

In your experience prior to this case, had you been in situations where three lawyers had been appointed to represent?

A. Mr. Tello's case involved three lawyers. I had a capital prosecution, at least one that I can vividly recall, in -- during my tenure as a public defender where we had three lawyers. In multiple murder cases it's not particularly unusual.

Q. All right. Now, the Court's statement about this issue -- this case being an exceptional case, did you agree with that assessment when you first came into it, this is a fairly exceptional case?

A. Yes, sir.

Q. And explain why you thought that if you --

A. Well, number of reasons. Obviously there are five people that have been killed. That alone makes it exceptional. Then there was the time period that had elapsed between the murders and the discovery of the bodies and the prosecution. Then there was a significant time period between the first four murders and the murder of Mr. DeGeus. There were a number of factors that right off the bat indicated this would be a fairly exceptional, unusual, complex case.

Q. Now, it sounds like most of your work was -- death penalty

work had been in Missouri?

A. Yes, sir.

Q. Which is a death penalty state.

A. It sure is.

Q. Was there geographically in Iowa something about this case in terms of the non-death nature of this state that made it also unusual?

A. Well, I knew Iowa was a non-death state. I was also well familiar with the attorney general at that time, John Ashcroft, who had formerly been the attorney general in the state of Missouri and was familiar with his thinking about the death penalty nationwide, that he was pursuing a number of death penalty prosecutions at the federal level across the country in states that did not have the death penalty. And Iowa obviously was one.

Q. Okay. Now, the Court also indicates that this case was exceptional in the sense that it included scientific and forensic evidence issues. In your experience prior to the appointment in this case, do capital cases often involve complex scientific and forensic evidence issues?

A. Most of the time they do, yes, sir.

Q. And what, if any, scientific and forensic evidence issues were involved in this case from your perspective?

A. Well, there was the whole idea that these bodies had been in the ground for seven years and determining cause of death,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 19 of 86

for example, particularly with Mr. DeGeus who had some significant skull fractures and how the forensic evidence sort of fit into the government's allegations surrounding his murder. Those were significant forensic patho -- pathology issues, forensic pathology issues.

There were also other forensic issues. All death penalty cases involve fairly extensive investigation into psychological, psychiatric history of the client and whether or not there are mental health issues. Those almost always involve the use of forensic psychiatrists, psychologists, sometimes neuropsychological evaluations, PET scans, all kinds of things.

In addition, because of the elapse of time, there were going to be significant problems in this case in terms of factual investigation. Those are just a few problems that come to the top of my head.

Q. Okay. Now, the last sentence of the Court's order here says the attorneys are cautioned to maintain an appropriate division of labor and assignment of tasks to Mr. Frerichs to reduce as much as possible any duplication of effort with a third attorney.

Was that an unusual aspect, or is that something you've seen before in terms of --

A. No, I think most federal district judges are concerned about the costs of this type of litigation. It's extraordinarily expensive typically. And no federal judge that

I know wants to waste the taxpayers' money paying attorneys to duplicate their efforts. So I don't think this portion of the order was at all unusual.

Q. Did it become apparent to you shortly after you got into the case that this case was going to involve a codefendant or a second person who might be charged in a separate indictment?

A. Yes, sir.

Q. And was that Dustin Honken?

A. Yes, sir.

Q. You from the Tello case had been involved in multi-defendant capital cases before?

A. Mr. Tello's case and many others, although I hadn't been involved in a joint capital prosecution until I got to federal court. That's not common at all in state court in Missouri.

Q. Are there some capital defense multi-defendant cases you've been involved with where everybody's interests were similar and you could do some joint investigation and there was a certain amount of sharing of investigative expert assistance between groups of defendants?

A. I think that's relatively rare, frankly. I think in capital cases attorneys need to be very careful about sharing information. In many capital cases, there's the great potential that one of the defendants will end up reaching an agreement to plead guilty perhaps for reduced charges and end up testifying against codefendants, and we have that first and foremost in our

minds right at the initiation of the prosecution. I can't say that I've been involved in capital cases where we've shared much information with codefendants, none that I can recall.

Q. And the issue of cooperation, is that especially prevalent in the federal system based on your experience?

A. Yes. It's much more of a problem in the federal system at least as compared to the state system in the state of Missouri.

Q. Aside from the Tello case, what percentage of your practice coming into this case was federal criminal practice?

A. The appointment in Plutarco Tello's case was the first federal appointment that I had received as an attorney.

Q. And aside from that case, had you had extensive negotiation practice in federal noncapital cases?

A. No.

Q. Drug cases or --

A. No, I -- I had done very little federal work at all between leaving the public defender's office in 1997 and starting with Mr. Tello's case. I don't recollect the date of the appointment in Mr. Tello's case, but it had to be 1998 or so. So I had no federal criminal trials before Mr. Tello's case went to trial, none.

Q. And so this would have been your -- the Johnson case would have been your third tr -- third federal trial.

A. Right, exactly.

Q. Nelson -- Tello, Nelson, and then this case.

A. Mr. Nelson's case, the Court should know, was a guilty plea, that is, that Mr. Nelson shortly before his trial was scheduled entered a plea to capital murder. There was a jury trial solely on the issue of the punishment. To the extent that matters, that was the situation.

THE COURT: Yeah, and I do recall knowing about that.

THE WITNESS: Yes.

THE COURT: At some point.

BY MR. BURT:

Q. That actually was an issue that was explored here at one point late in the case, was it not?

A. Yes, late in this case, yes.

Q. Yes, in the Johnson case.

A. Yeah, Mr. Williams and I had discussions very shortly before Miss Johnson's case went to trial about the possibility of her entering a plea or pleas to capital murder and then proceeding in sort of an abbreviated fashion with just the penalty phase, and our discussions included which witnesses might the government present in that scenario and so on.

And I think pleading Mr. Nelson before his trial turned out to be one of the most significant mistakes in my legal career, and I'll never do it again, and that factored significantly into my discussions with Mr. Williams.

Q. What was your idea --

THE COURT: Could I interrupt here --

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS Document 353 Filed 11/10/11 Page 20 of 86

MR. BURT: Yes, of course.

THE COURT: -- as long as we're on the topic?

THE WITNESS: Yes, sir.

THE COURT: Would a critical factor in a strategy about pleading guilty to the merits phase and going to trial on the penalty phase be your -- the confidence that you would have in the ability to limit the government's evidence of guilt in the penalty phase, because I imagine it's such a murky area and there's going to be a lot of overlap and the government's going to be arguing for a very expansive view about what they could be -- put in, and I assume the defense is going to be arguing for a much more narrower view, and you're not going to know what the judge is going to do in all likelihood because we can't give advisory opinions? And so would that be a real serious consideration about the uncertainty of your ability to limit the government's evidence in the penalty phase?

THE WITNESS: Absolutely, Your Honor. It's one of the most significant things.

The other is whether or not the benefit in pleading guilty to the extent that the client's accepted responsibility and that that shows remorse, how significant is that in the eyes of the jury.

But to your point, Mr. Williams and I had very frank and open discussions about limiting the government's evidence, and he was quite candid in telling me both orally and in writing

that the government, number one, was going to seek the death penalty just as vigorously if Angela Johnson pled guilty to the merits phase as if she did not. Number two, that he was going to put on a broad range of evidence, perhaps not quite as broad as he might have with the merits phase trial.

But in my view, based on our exchange of information including a list of witnesses, it was pretty much a very similar case. And that had been my experience with Mr. Nelson, that essentially to the extent I thought by pleading guilty we might limit the focus of the trial to penalty-phase issues, that's not what happened, and essentially the same evidence in my view came in in Mr. Nelson's guilty plea that would have come in had we had a merits-phase trial.

And there were several drawbacks to the process, not the least of which is the manner in which voir dire was conducted as a result of the guilty plea in the merits phase. We finished an entire voir dire in a single day. I was limited to 20 minutes --

THE COURT: Was Judge Gaitan the trial judge?

THE WITNESS: Judge Gaitan -- 20 minutes a panel to voir dire 12 people. There were many instances where I did not even question some of the members of the jury panel for lack of time.

So it in essence was a disaster, and it did affect my thinking in our discussions with Mr. Williams.

THE COURT: And just one last area of inquiry on this. Do you recall whether or not before you made a final decision about not pursuing the strategy of pleading guilty on the merits and going to trial on the penalty phase, did you have a chance to discuss that with your co-counsel?

THE WITNESS: I'm not sure. I'm sure I spoke -- I'm sure I did speak with co-counsel about the discussion. I don't want to pretend that the decision not to pursue that route was one that we reached jointly. I felt that was particularly my responsibility.

THE COURT: Because of your expertise as learned counsel.

THE WITNESS: And my experience in Mr. Nelson's case.

THE COURT: And neither one of those two had ever been through a capital case.

THE WITNESS: Yes, sir.

THE COURT: Right. Okay. Thank you.

THE WITNESS: Yes, sir.

THE COURT: From time to time I'm going to interrupt and ask questions.

THE WITNESS: That's fine. Yes, sir. Of course.

THE COURT: Thank you.

BY MR. BURT:

Q. Now, the Court's order referenced avoiding duplication of effort. How in this case did you folks on the team do that

among the three lawyers who eventually became the core defense team, Stowers, Willett, and yourself?

A. Well, right from the beginning Mr. Willett was lead counsel. To the extent that term needs some definition, that was that he was responsible for the guilt-phase investigation and procedures in that part of the trial.

I met Mr. Frerichs, but we really had fairly limited contact. Professor Rigg was appointed I believe at or about the time that I became involved in the case, and his role, my recollection is, was to primarily assist in research and writing, and there were some significant legal issues obviously that came up during the course of this litigation, and he was very helpful in that role.

He later asked to withdraw, and I think the Court granted that motion, and my recollection is that the Court suggested Mr. Stowers as a replacement. I did not know Mr. Stowers, but that role was one taken over by Mr. Stowers. At least up until -- roughly up until the time of trial, he was our, quote, unquote, research and writing attorney. And my role as learned counsel was to focus primarily on the penalty-phase investigation and that part of the trial.

THE COURT: Could I interrupt for another inquiry?

MR. BURT: Sure.

THE COURT: This whole notion of Mr. Willett being lead counsel --

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 21 of 86

THE WITNESS: Yes.

THE COURT: -- do you know how that came about?

THE WITNESS: Other than his appointment, Your Honor, all I can tell you is that when I first met Mr. Willett in our initial dealings together he was kind enough to introduce me to a number of lawyers and I think Judge Jarvey in Cedar Rapids. I'd never been to Cedar Rapids before. Always those introductions included my role as his death penalty counsel and his introduction as lead counsel.

And frankly, I was comfortable with that. I didn't know Mr. Willett. I felt confident that if the Court had appointed him in such a significant case that that was justified, and certainly in our initial dealings with him and his discussions about his trial experience and his successes in court, I felt my confidence was justified that he was perfectly capable of that role.

THE COURT: Would you have an opinion as to at what point in the proceedings, if any, I became aware that he was self-appointed lead counsel?

THE WITNESS: I have no idea. You know, I didn't realize -- it's been so long -- in looking back that Judge Jarvey had appointed Mr. Willett. In my mind's eye I thought that you perhaps had. My recollection was that you had been involved in the appointment of the Honken defense team, and I don't know why I thought that was the situation with

Mr. Willett, but that's what I thought.

THE COURT: Did you get the sense at least -- well, did you get the sense early on in the case after you came into it that I considered you lead counsel because wouldn't I almost always ask you first?

THE WITNESS: I think --

THE COURT: Didn't I treat you as you were both learned and lead counsel or not?

THE WITNESS: I certainly felt that the Court has always without exception given me an inordinate amount of respect and deference. I never attributed that to a particular role other than I knew that the Court had not had the opportunity to do any capital cases, and so I figured that was part of it. But perhaps you thought I was more experienced and learned than I actually am. But --

THE COURT: I thought you were both.

THE WITNESS: I never -- I never really thought about that in terms of lead counsel or not lead counsel. Many of the issues we addressed with the Court did concern the penalty-phase aspects of the case.

THE COURT: Or death penalty-related issues.

THE WITNESS: Exactly.

THE COURT: There were a lot of what I -- issues that would only arise in a death penalty case.

THE WITNESS: I think the vast majority of our

litigation involved the death penalty issues and not the merits phase of the case. Others certainly were some significant issues but --

THE COURT: So I might have treated you as kind of lead counsel because I knew you were the one more than anybody else in the courtroom probably more familiar with those issues.

THE WITNESS: Yes, sir, perhaps, yeah.

THE COURT: Do you recall ever me -- ever -- do you recall at any time me recognizing Al Willett as lead counsel?

THE WITNESS: No, I don't think -- I don't recollect the Court ever calling Mr. Willett lead counsel, using that term. There were issues that Mr. Willett litigated. There were issues that Mr. Stowers litigated, quite a number, and there were issues that I was involved in. And I think the Court showed us pretty much equal amounts of respect. And I never felt like I was treated much differently than the other lawyers, although I would agree with you that many of the issues involved death penalty matters, and so you'd question me about that. And I'd had some experience in that area, so that made sense to me.

THE COURT: Okay. Thank you.

THE WITNESS: Yes, sir.

BY MR. BURT:

Q. I want to make sure I understand. Within your team the term lead counsel was being used by Mr. Willett and yourself to describe the guy who was going to run the guilt phase.

A. Right. I don't -- I don't use that term myself, but yes, Mr. Willett's role in the defense team was the guilt phase of the case, that investigation and presentation at trial.

Q. Okay. Now, you're familiar with the ABA guidelines, both the '89 guidelines and the 2003 guidelines?

A. Yes, sir.

Q. Those guidelines refer to a lead counsel designation as someone who is qualified by training and experience and has done prior capital cases and who is defined as a manager of the case, not just running the penalty phase but someone who has overall responsibility for the other members of the team in making sure that the whole thing is working properly.

A. Right.

Q. Is that in your view the learned counsel in federal practice, or is it the guy who says, "I'm going to run the guilt phase"?

A. No. The term is described in the guidelines as absolutely applied to learned counsel, and, you know, frankly, that was a problem.

Q. Explain what you mean, the problem.

A. It wasn't until the trial really started that I took over the role of I guess lead counsel and learned counsel. That perhaps should have happened much sooner in the process, but that's when it happened. I did let Mr. Willett handle the role that he had initially indicated he was interested in handling

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 22 of 86

which was that guilt phase of the trial.

Q. Let's take a look if we could at your first phone conversation with Mr. Willett and the information you learned about the case, and I'm going to refer you to PB-1, page 3 through PB-1, page 5. Do you recognize this as your notes of a telephone call you had with Mr. Willett? And would this be your first telephone call with him on October 16 even before you were appointed?

A. Yes, sir.

Q. Okay. And you see I've highlighted certain things that I want to focus on here. Did Mr. Willett tell you during the very first conversation you had with him that this case involved a known snitch and that Al had told Angela about this -- about it?

A. Yes.

Q. Would you give me some more context for what he told you about the snitch and his role and what he said to Miss Johnson at that point?

A. Mr. Willett had represented a psychiatrist I believe by the name of Shultice, S-h-u-l-t-i-c-e.

Mr. Shultice was in jail in Benton County charged with murdering I believe his wife -- I could be mistaken -- or trying to murder her. And Mr. Willett had been retained to represent Dr. Shultice.

While Mr. Shultice was in the Benton County Jail, fella by the name of Robert McNeese -- I'm not sure I knew

Mr. McNeese's name at that time, at the time of this conversation -- had solicited information or received information from Mr. Shultice, ended up recording some information about Mr. Shultice's case, and turned that over to the government. And that had happened before Miss Johnson came to the jail and Mr. Willett was appointed to represent her.

So when Miss Johnson arrived at the Benton County Jail after Mr. Willett's appointment, I believe he told me that he had spoken to Miss Johnson about Mr. McNeese and cautioned her because of the situation that had occurred with Mr. -- Dr. Shultice.

Q. Did he also tell you that Miss Johnson had made admissions to what you later learned was Mr. McNeese?

A. Yes, sir.

Q. And did he tell you that four of the five bodies that were missing had been found just very recently?

A. That's what he told me.

Q. Now, did he also tell you that Miss Johnson had tried to hang herself just the Friday before this conversation took place?

A. Right.

Q. What did that tell you about Miss Johnson and what you were going to have to start looking at right away?

A. Well, obviously she was depressed and was at risk for perhaps additional suicide attempts and she needed psychiatric

assessment right away.

Q. Now, you'll see the name on this note Ray Cornell, Tom -- you put I think Farris.

A. Yes, that's Tom --

Q. Did you know Ray Cornell, the investigator that Mr. Willett mentioned?

A. No, sir.

Q. Had no prior dealings with him as an investigator?

A. I had not.

Q. Do you typically in your capital cases before this one -- did you typically in capital cases before this have a guilt-phase investigator that you liked to work with, that you trusted and knew the job would get done when you had that person on?

A. I have an excellent investigator -- his name is Dan Grothaus -- that I've worked with for many years in Kansas City, G-r-o-t-h-a-u-s.

Q. In this case had that decision as to the guilt-phase investigator already been made by the time you got involved?

A. Yes.

Q. Did you think at any point in time of changing investigators, suggesting to Willett this guy's not who I think can get this job done?

A. Well, we eventually did change investigators, but that was some time down the road. At the time that I had this discussion

with Mr. Willett, I was just beginning to get involved with the case, and I had no reason whatsoever to question the competency of Mr. Cornell.

Q. One thing as learned counsel coming into these situations with a local lawyer who hasn't done any work, is it sometimes a sensitive issue to sort of push your authority, especially at the outset of the case, on issues like who the investigator's going to be and selecting other members of the team?

A. Yeah. Well, I -- to be honest, I had not had this experience before, even in Kansas City with the Tello case. I was involved in the case at roughly the same time as the other two appointed counsel, so decisions about the investigator, psychiatrists, other experts were decisions that I participated in if didn't make myself. These decisions had been made because the case had already been pending. They were made before I was involved. And so I didn't question Ray Cornell as an investigator. I'd have no reason to do that.

Q. All right. Now, at the very bottom here it says four of five bodies found, may be DP case. I assume DP means death penalty?

A. Yes.

Q. And who made this statement? Was this Willett indicating to you it may be a death penalty case or you indicated to him?

A. Well, I would have gotten that from Kevin McNally. Mr. McNally as the federal death penalty resource counsel would

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 23 of 86

Q. not have called me to begin with if he didn't have some concern this was a death penalty case.

So as to that specific writing, I don't know if that's Mr. Willett telling me that or I already knew it, but I already knew it. Mr. McNally made that clear.

Q. And aside from what Mr. McNally told you, when you learned the case involved four or five bodies, did it become immediately apparent to you that this was a real death penalty case as opposed to one that was going to go away without the death penalty?

A. Well, if it had been in Missouri, I would have immediately said yes. In Iowa I wasn't as sure. Iowa had no history, not recent history, with the death penalty. And although this was a federal case, I had no familiarity with the U.S. Attorney's Office in Iowa either in the Northern or Southern District. So I honestly didn't know. Mr. McNally's concern was enough for me.

Q. Now, is one of the things that a good defense lawyer does is to sort of keep track of what prosecutor is saying in the media about the prospects of the death penalty?

A. We try, try to do that, sure.

Q. And do you recall after you got on to the case that there was ever a point in time when -- either when the case first broke in July of 2000 or later on that the U.S. attorney, at that time I guess Stephen Rapp you have down at the bottom, or

anybody working under him was stating publicly that because of the heinous nature of this case it was going to be a death penalty case?

A. I think there were discussions in the paper that it might be a death penalty case, that the government was certainly considering the death penalty. I think maybe even Mr. Williams may have been in the paper with comments similar to that. I don't recollect a definitive statement this would be a death penalty case probably because that decision is typically not made locally.

Q. You realize that in some cases, for instance, the McVeigh case, the prosecutors from the very beginning came out and said we're going to seek death. In fact, I think President Clinton came out and said this is a death penalty case.

A. There are some cases such as that, probably the recent shooting in Fort Hood, that on the face of things appear to be death penalty cases, this case in Arizona, but they're in the minority.

Q. Now, I'm going to show you what we're going to re-mark as 73A, a couple of articles taken from your trial file. One of them is dated September 6, 2001. Honken, Johnson could face death penalty with a quote from Mr. Williams, the indictments are among the predicate offenses for seeking the death penalty. It doesn't mean the death penalty will be requested or granted. But the charges are covered under the statute for the death

penalty.

Do you recall collecting and reviewing media like this that was contained in your trial file?

A. Yeah. I can't say that I remember seeing this particular article, but this is consistent with my recollection sort of generally of the U.S. Attorney's Office public position.

Q. And similarly as part of this same exhibit an article that appeared on the next day, September 7, '01, again quoting Mr. Williams. The indictments are among the predicate offenses for seeking the death penalty; it doesn't mean the death penalty will be requested or granted. Was that essentially the message that was being conveyed by the prosecutors --

A. Yes, sir.

Q. -- to the media around the time these articles were written?

A. Yes.

Q. So did you think this was a case where the decision to seek death was a foregone conclusion and that there was nothing you or anybody else could do to prevent that?

A. Well, to be perfectly honest, it didn't matter. The fact that it might be a death penalty case was sufficient in my mind to prepare for it being a death penalty case. So I can't tell you what I was thinking about regarding whether it was definitely a death penalty case in October 2001, but it wouldn't have made any difference to me -- or 2000, I'm sorry.

Q. On that first conversation -- this is PB-1, page 4 continuing on with your notes -- you've got on the next page of your notes, looks like Pat Reinert, lead. It's cut off.

A. Prosecutor.

Q. Prosecutor.

A. P-r-o-s, period.

Q. And then client wants to fight, what -- what was said in that regard?

A. That she wanted a trial.

Q. She wanted a trial?

A. That's what Mr. Willett was relating to me if this is part of my original notes.

Q. And then underneath that I've highlighted there minimum life sentence, offer, nothing likely, significant other and then 324 looks like month status, LWOP may be offered?

A. That should be statutes.

Q. Statutes.

A. Yes, sir.

Q. Could you explain the context of that discussion as you recollect it?

A. I believe that Mr. Willett had done some calculation regarding the time under the federal sentencing guidelines given the drugs that were allegedly involved. That's my vague recollection of that. These are all notes indicating facts that Mr. -- or opinions that Mr. Willett had relayed to me.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 24 of 86

Q. And he was indicating to you that life without parole was a maybe offer in his view at that point.

A. Right.

Q. And that's all you really knew about the case based on this conversation.

A. I believe that -- I believe that Mr. McNally had faxed to me in Kentucky a newspaper article that had come out perhaps that weekend regarding the discovery of the bodies. I have a vague recollection that I had a newspaper clipping about that. Maybe it came right after I spoke to Mr. Willett, but it was about the same time.

Q. And then the last page of these notes -- this is PB-1, page 5 -- did Mr. Willett indicate to you that he knew Mr. Reinert well and he respected him and trusted him at arm's length?

A. Yes, that's what he told me.

Q. He didn't indicate any suspiciousness of Mr. Reinert or say anything derogatory that made you think you were dealing with some sneaky prosecutor.

A. No, quite the contrary. He had a high regard for Mr. Reinert.

Q. At the bottom of this page there is also a notation about -- looks to be two forensic experts. You have forensic pathologist Dr. Lindsey Thomas and then Mike S-w-e-o, crime scene expert. Who mentioned those names?

A. Mr. Willett.

Q. Did it seem to you when he mentioned those names that this is a guy who obviously knows what he's talking about in homicide defense if he's talking about a forensic pathologist and a crime scene expert?

A. My impression from Mr. Willett was that he'd actually worked with these people before. So I -- yes, I did think that was a great start.

Q. Was a forensic pathologist ever hired on this case?

A. No, I don't believe so.

Q. Do you know why?

A. I interviewed the pathologist that testified in the case whose name escapes me at his office in Des Moines, but I don't recollect -- and that was some time later, perhaps two or three years later.

Q. Uh-huh.

A. I don't recollect why we never hired a forensic pathologist. I think the primary forensic issues regarding pathology had to do with Mr. DeGeus as opposed to the four murders in July. But no, I -- I can't say why.

Q. Now, how about a crime scene expert? Did Mr. Willett ever hire Mike Sweo or any other crime scene expert in the case?

A. No, not that I know of.

Q. And was it your understanding after you got into the case a little bit that you really were dealing with two -- three crime scenes here? The place where Mr. DeGeus was killed, right --

A. Right.

Q. -- was one crime scene?

A. Right.

Q. You had a house where supposedly a gun was pulled on --

A. Lori Duncan's house.

Q. Lori Duncan's house.

A. Right.

Q. And then you had some burial sites, actually four crime scenes.

A. Well, the burial sites for Nicholson, Lori Duncan, and the two children were essentially the same location. And then Mr. DeGeus was buried where he was killed. So there were really just two burial sites in my view, but there were certainly more than two crime scenes.

Q. Now, at some point in time you asked Mr. Willett to send you the detention hearing in the case; correct?

A. Yes, sir.

Q. Which would have given you some sort of overview of what the government's case was about.

A. Right.

Q. And do you recall in that detention hearing that Mr. Willett was asking the investigator, Mr. Basler, whether they had conducted any DNA testing at Lori Duncan's house and he said no or he had conducted it and it hadn't produced any incriminating results?

A. I think Mr. Willett told me that there had been no DNA testing or no DNA results. I can't remember which.

Q. And do you recall that in that same detention hearing Mr. Willett asked them if they had ever fingerprinted the house?

A. I don't recollect that specifically one way or the other.

Q. Did you ever think about producing a crime scene expert who, although he couldn't look at the crime scene like Lori Duncan's house, could testify about what could have gotten done to process that scene to see if the version that was being attested to by McNeese and other informants, in fact, had taken place?

A. I didn't, no.

Q. And was that a responsibility that because of your delegation of responsibilities here was really within Mr. Willett's domain?

A. It was, although I don't want to pretend that I wasn't interested in those matters. I mean, I went out to the burial sites myself. I was familiar with where these bodies had been buried. I didn't ever enter the Duncan house. I don't know that anybody made an attempt to do that, frankly, because of the time that had elapsed. But I did not make any effort to hire a crime scene expert myself.

Q. Okay. And this 324-month calculation that Mr. Willett had done, do you know what that was based on?

A. No, I don't, frankly. I presume it had something to do

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 353    Filed 11/10/11    Page 25 of 86

**2011**

Q. with Mr. Honken's drug quantities, but I don't know.

Q. You did not participate in the detention hearing, right, because that occurred long before you became --

A. Yes, sir.

Q. You were involved.

A. Right.

Q. At some point you did read it, though; correct?

A. Yes.

Q. And do you recall when you read it Mr. Reinert -- this is a detention hearing of August 2, 2000 -- Mr. Reinert saying to the court in opposition to a motion to have Miss Johnson released, "Your Honor, this is a" -- quote, "Your Honor, this is a very serious offense, crime of violence. In fact, there are five mandatory life terms set forth. The type of offenses are witness-tampering offenses. It's a strong circumstantial case." Do you recall --

A. Yes.

Q. -- him making that statement?

A. Yes, sir.

Q. So based on that and your own knowledge, was this a case where even before the 848 indictment got filed that Miss Johnson was facing a minimum mandatory life sentence?

A. Five murders, that's -- yes, that's going to be a mandatory minimum life sentence. And there are somewhat unusual cases in federal court. They're taken very seriously.

**2012**

Q. And you see Mr. Reinert expressing the view this is a strong circumstantial case. And did you also notice in that transcript that Mr. Willett said to the court, "As far as the defense is concerned, we're not overwhelmed or impressed by the fact that there's seven felony counts or that five of them deal with the aiding of first-degree murder or that five of the counts carry a mandatory life sentence"? Do you recall reading that?

A. Yes, sir.

Q. And do you recall his statement that there was a lack of physical evidence connecting my client to the disappearance of the victims?

A. Yes.

Q. There's a lack of physical evidence connecting my client to the disappearance of Mr. DeGeus?

A. I do recollect those statements.

Q. Do you recall when you reviewed that -- and I assume your review took place fairly early on after you got into the case.

A. Yes, sir.

Q. Do you recall in answer to those arguments the court who heard the evidence in a hearing indicating, quote, "The government's motion for detention is granted. The nature of the offense supports this finding. It's the ultimate, of course, crime of violence. The strength of the evidence, there is compelling evidence, circumstantial and direct, of her guilt.

**2013**

Her purchase of the alleged murder weapon; the fact that it was a Tec-9, a gun without a legitimate sporting purpose; her subsequent lie to the police about the purchase of that weapon; her consistent efforts to assist Dustin Honken either known or unknown in efforts to employ and assist a reported hit man in this case; her communication regarding the need for the 380-caliber handgun; her attempt to bond out, knowing or unknowing, the hit man; her admissions in the participation of the murders, and her intimate knowledge of the details of them; her threats against witnesses Cobeen and those at the sentencing; her express desire to an undercover police officer to be a killer all support the finding by clear and convincing evidence that the release of this defendant would pose a serious danger to the community"? You read that.

A. Yes, sir.

Q. And you also read the actual evidence that was presented through the testimony of Inspector Basler.

A. Yes, sir.

Q. And you knew from that testimony that there were -- that there was substantial evidence against Miss Johnson even before the discovery of the bodies and her confession to Mr. McNeese.

A. That's true. But by the time I read that transcript, I knew about the map and the discovery of the bodies which --

Q. Sure.

A. -- frankly was the most significant piece of evidence

**2014**

against Miss Johnson. So I knew -- I knew it was much worse than the detention hearing transcript.

Q. Right.

A. Because I didn't get the detention hearing transcript for some time after initially being involved.

Q. And I guess what I'm trying to do is sort out other than McNeese that there was a substantial amount of evidence against her that had been detailed as early as August and it had nothing to do with McNeese.

A. I'd agree that's absolutely true.

Q. And it was evidence of such a nature that the judge hearing this detention hearing had called it compelling evidence.

A. Yes.

Q. You had to agree with it based on what you were looking at from the perspective of how will this play out in front of a jury?

A. It's always different when you're reading it as opposed to seeing live testimony, but when you read it, it's an impressive account of the government's evidence at that point. Of course, it got much worse.

Q. Including that she had purchased the gun shortly before Honken was scheduled to enter his plea on July 30. They apparently have documentation that she had purchased this Tec-9 on July 7.

A. She had filled out the permit is my recollection.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q. So it seemed like they were going to be able to tie her to a weapon purchased shortly before Honken was scheduled to plead guilty.

A. Right, exactly.

Q. The evidence in the detention hearing detailed that they had witnesses to indicate that efforts had been made by Honken and Angela Johnson to find the Duncan victims, that they were somehow surveying them.

A. **Well, Greg Nichol -- they were looking for Greg Nicholson. It was just extraordinarily bad fortune that Lori Duncan had gotten into this relationship with Mr. Nicholson.**

Q. And you saw from the detention hearing that the timing didn't look so good in the sense that the victims were last seen on July twenty -- the Duncan victims, Nicholson victims were last seen on July 25, 1993.

A. Right.

Q. And on the 30th Honken shows up and says, "I'm not going to plead anymore; you got no evidence," apparently produced this video --

A. **The tape, video.**

Q. -- tape to his lawyers.

A. **Right, exactly.**

Q. So that was revealed during this detention hearing.

A. Yes, sir.

Q. You knew from the detention hearing that Angela Johnson had

been called before a grand jury on October 27, 1993, and that she had lied to the grand jury about her knowledge of Terry DeGeus and Honken and their relationship.

A. Yes.

Q. You knew from the detention hearing that on November 5, 1993, Angie Johnson had left a message with Terry DeGeus's mother indicating that she wanted to see him.

A. Yes.

Q. So there was a witness who could testify to that fact.

A. Yes, sir.

Q. And you were aware from Detective Basler's testimony that according to him witnesses had stated to Basler or other law enforcement officers that Angie Johnson told friends and law enforcement witnesses conflicting stories about whether she had seen DeGeus on the night when he supposedly was coming to see --

A. Yes, sir.

Q. That didn't look too good either.

A. No, sir.

Q. You knew from that transcript that according to Basler a witness who you later find out was Christi Gaubatz had seen a firearm in Miss -- in her house that had been apparently left there by Miss Johnson.

A. Right.

Q. And you knew that according to Miss Gaubatz the firearm had been picked up by Dustin Honken and then taken to another

witness, Tim Cutkomp, and melted down.

A. Right.

Q. You knew that -- from that transcript that according to Basler three boys had found Lori Duncan's school ring in a river in Fertile, Iowa.

A. **Right. They had found the purse and taken some things out and I think threw it back in the river, and it disappeared is my recollection.**

Q. And you eventually learned that Fertile, Iowa, was near Clear Lake and that Angela Johnson's sister, one of her relatives, lived near Fertile, Iowa, did you not?

A. Yes, sir.

Q. That didn't look too good either.

A. No, sir.

Q. You learned from that transcript that according to Basler law enforcement had been told by witnesses that after Honken got out of prison Angela Johnson was an investor and had control of his drug operation.

A. Yes.

Q. And that they had learned this from a guy by the name of Dan Cobeen who apparently was cooperating and was going to provide evidence not only against Mr. Honken but against Miss Johnson.

A. Yes, sir.

Q. You learned from that detention hearing that according to

Cobeen Angela Johnson had threatened him at a traffic incident in which Angela Johnson allegedly had made a motion indicate -- with a gun type of thing to Cobeen after Cobeen was known to be cooperating with law enforcement.

A. Yes, sir.

Q. You knew further from that detention hearing that a guy by the name of Rick Held said he had been asked to purchase a gun for Honken.

A. Right.

Q. And that at least at that time according to Basler it was Angie Johnson who had called him up and said Dustin no longer needs the pup.

A. Right.

Q. Referring to --

A. **I think that was consistent with his trial testimony as well.**

Q. You knew from that transcript that Honken had approached Dean Donaldson to kill Cutkomp and Cobeen and that Angie Johnson was somehow connected with that effort.

A. Somehow.

Q. You knew that there was another guy out there according to the detention hearing by the name of Dennis Putzier who Honken was trying to get to escape and connect with Angie to do some other illegal activity connected with eliminating witnesses.

A. **I have a vague recollection of that.**

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Q. And you also knew looking at page 22 of that transcript that according to Basler Honken was making admissions to numerous inmates that were not only implicating him but implicating Miss Johnson.

A. Right.

Q. And you knew from reading that that the government could potentially get those statements of Honken into evidence as co-conspirator statements.

A. Potentially, yes, sir.

Q. Okay. And you knew that those statements were coming from Dean Donaldson and a guy by the name of Anthony Altimus among others.

A. Originally from Mr. Honken through those witnesses, right.

Q. You also knew from that transcript that Honken was planning with some inmate out at ADX to find somebody to meet Angela Johnson and rebury the bodies.

A. Vaguely recall that.

Q. You didn't know who that was at the time.

A. No.

Q. It wasn't referenced by name, but it was apparently some inmate who was being asked to contact somebody outside to team up with Angie Johnson to rebury the bodies.

A. (Witness nodded head.)

Q. And you also knew that a witness later identified to you as Cindy (sic) Gaubatz indicated to Basler that Angie Johnson had

confessed to the killings.

A. Yes.

Q. To both killings.

A. Right.

Q. You also knew from that transcript that in 1998 Angela Johnson had told a state undercover agent who later testified at the penalty phase in this case that she wanted certain drug debts collected on behalf of Mr. Honken.

A. Yes, from Mr. Rodriguez I believe.

Q. And further had made the statement to him that her great desire was to be a hit woman.

A. She did mention that in a conversation in a restaurant, right.

Q. You also knew from that transcript that there was evidence that one of the victims in this case had been abusive to Angela Johnson, that is, Terry DeGeus.

A. Yes, absolutely.

Q. And you realized that that evidence, although it might be helpful as penalty-phase evidence, also had a double-edged nature to it in the sense that the government could and eventually did turn it into a motive for the killing of DeGeus.

A. Of course, right.

Q. Based on your review of that detention hearing transcript, did you think this was a weak case from an evidentiary standpoint aside from the McNeese statements?

A. No, I never thought it was a weak case from an evidentiary standpoint. But I have to admit I didn't compartmentalize the case pre-McNeese and post-McNeese. McNeese was part of the case when I arrived, and he never went away.

Q. Would it be fair to say that at some point in the litigation that the defense team sort of got tunnel vision on this McNeese issue and didn't properly consider all this other evidence I just detailed in terms of assessing the strength of the case?

A. We got --

MR. WILLIAMS: Objection. Leading, Your Honor.

THE COURT: Sus -- it is, but you can answer.

A. We got a little caught up with this Massiah issue because it was a good issue as the district court itself felt. And we -- we wasted, frankly, I think a lot of time waiting for the Eighth Circuit to make a decision, time that might have been more productively used investigating the case in the vain hope that the district court ruling would be upheld. So we did focus a lot on that, but it was an important -- it was an important issue, no question about it.

Q. It was an important issue. And -- but you realized reading the district court opinion, specifically the footnote at the very end of the opinion saying that this evidence is coming in in the penalty phase regardless of what --

A. Yes.

Q. -- happens in the Eighth Circuit.

A. That's right.

Q. And you also knew that the worst of all worlds was if you got into a penalty phase and the jury learned for the first time the McNeese evidence.

A. That's true. But, you know, had the Court -- Court's ruling been upheld, I think that would have dramatically improved our posture regarding negotiations. So from my perspective that was the significance, not that it wasn't coming into the trial, but if the government doesn't have that for the first phase, that's very helpful, not that they didn't have a strong case anyway. But this map with the bodies was devastating, absolutely devastating. And to keep that out of the first phase in my view would have greatly enhanced our negotiating position.

THE COURT: And can I interrupt for a second? Didn't you also know because I had no prior experience in death penalty cases that I might have been wrong about my footnote and you would have had an opportunity to try and convince me that that evidence wasn't going to come in?

THE WITNESS: Yes, we would have absolutely tried, Your Honor, but I didn't question, frankly -- I mean, I thought your analysis probably was right. In the penalty phase in my experience it's almost anything goes large -- in large measure. And -- so, you know, maybe it's coming in. Would we have tried

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

to keep it out? Absolutely. You bet. We would have done our very best. But again, I think from the way I was looking at the case, I wanted to get a negotiated plea, and I thought that would be a very helpful development.

THE COURT: And just because I wrote something in an opinion which, you know, I wrote many things in many opinions, it was never my impression that you rolled over and agreed with it.

THE WITNESS: No.

THE COURT: When it was adverse to your position.

THE WITNESS: No, no, no, that's right. But quite candidly, at least in my experience reviewing the Court's orders, they've been very thoroughly researched and well written, and I wasn't holding out some great hope that if the Eighth Circuit went with you this isn't coming in the penalty phase. I don't want to pretend like I was. From my perspective, that would have been tremendous value, tremendous, if we could have just kept that out of the first phase. In negotiating with the government that would have been a real gem. It didn't happen.

BY MR. BURT:

Q. When it didn't happen, the nature of this case changed dramatically, did it not?

A. Yes.

Q. From that --

A. Absolutely.

Q. -- perspective of what your negotiating posture was and also what the strength of the evidence was.

A. There was no way we could really rationally explain what had happened with McNeese in any defense that was consistent with innocence, not in my view, not realistically explain it. So that changed the picture, the landscape, dramatically.

Q. Okay. Now, I want to ask you about your first contact with Angela Johnson, and I think I've identified it as reflected in this note which is PB-1, page 7, 11-20 of 2000. Is this a documentation of your first meeting with Angela Johnson?

A. Apparently it is.

Q. And where did this meeting take place?

A. It would have taken place at the jail. I think she was in Linn County at this time.

Q. And tell the Court what you recall from that first meeting by looking at these notes.

A. I can tell you what I've written. She was fighting with Holly. There were some problems with Marvea. Throughout the litigation, Angela was concerned first and foremost with the health, safety, and well being of her two daughters. That was always without exception the most important topic that we discussed. And so that frequently starts many of these interviews. And there was some concern about Marvea's situation. Marvea did not go to Uncle Jim's as far as I know.

Uncle Jim would be Jim Johnson, Angela's brother. Arlyn Johnson is A.J. Johnson, her former husband, who lived in Forest City. I'm not sure what that note reflects.

She wanted off suicide watch which is very common for individuals who are on suicide watch because it's very, very restrictive. Frequently they're not allowed to wear even jail uniforms. They have paper gowns. I'm not sure if that was the situation here.

I'm not sure what ICC stands for as I'm sitting here. Dr. Saffire's a psychiatrist, but he's not one that's familiar to me. I think he was the jail psychiatrist at the Linn County Jail. She was taking sleeping medication every night. I made a note of what they were. Serzone I feel sure is misspelled, C-e-r-z-o-n-e. Mild antidepressant is what I wrote down. She said she didn't need her meds except for sleeping pills. We discussed medication frequently during my visits with Angela, and this was no exception. That was the first meeting that I think we had.

Q. And Dr. Saffire I think you mentioned your understanding was he was a jail psychiatrist who had been seeing her in connection with the suicide?

A. These jails -- and Linn County I think is in this category -- contract with local psychiatrists or psychologists to perform services at the jail, and I believe that was Dr. Saffire's position. He wasn't an employee. He was a

contract psychiatrist with the Linn County Jail.

Q. Do you recall having any conversations with him in term --

A. I never spoke to him that I recall.

Q. Do you know if Mary Goody ever spoke to him?

A. I do not.

Q. Do you know if anybody ever obtained the jail medical records including any reports or notes that Dr. Saffire may have written?

A. If anybody obtained the jail medical records, that would have been Miss Goody.

Q. Now, the second page of those notes -- this is page 8 from PB-1 -- looks like on the top you have R. Cornell, investigator in Des Moines. Sara -- and I can't read what you've got written there -- cellmate out of jail?

A. Sara Bramow.

Q. Uh-huh.

A. That was my phonetic spelling of her name.

Q. Is this something Miss Johnson is indicating to you?

A. I think that we were talking about here of potential government witnesses. Miss Bramow had been a cellmate. She was now out of jail living in Cedar Rapids and then, of course, Mr. McNeese, and he had a money-laundering case pending which is why he was in jail. My recollection is that Mr. McNeese was also in Linn County but not at the same time as Miss Johnson. That's all I can tell you about that note.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 353 Filed 11/10/11 Page 29 of 86

Q. Now, at the bottom there off to the side you've got call Logan, psych, Dr. Logan, need retainer and hourly rate. What does that refer to?

A. That refers to calling Dr. William Logan who is a forensic psychiatrist whose office is in Kansas City. He was one of three board-certified forensic psychiatrists in the state of Missouri when I first met him. We had worked on a number of cases over many years, and I had confidence in his abilities and thought that we needed to contact him regarding an evaluation of Angela.

Q. We'll talk about that in a minute. The next page of these notes has some biographical information. Apparently some of this is coming from Miss Johnson, who her daughter is, Alyssa Johnson, age, and Marvea --

A. Yes.

Q. -- Honken, six.

A. Right.

Q. And then under Terry DeGeus I've highlighted the words "lured him." Whose words were those?

A. I don't recollect. I can't recall whether Miss Johnson was describing the allegations regarding Terry DeGeus. I wouldn't have put that in quotation marks if they were my words, so I suspect that was something that she said. I suspect it was in response to questions about what the government was alleging, but I don't honestly know.

Q. So you wouldn't be able to say whether she was saying to you "I lured Terry DeGeus" versus saying "The government alleges I lured" --

A. No, I'm quite confident I can tell you without any reservation that she did not tell me that she lured Terry DeGeus to his death during our first meeting. That didn't happen. So whether those have to do with allegations or what somebody else said, I'm not sure.

Q. Okay. And those last page of those notes, just to make sure I'm not missing from that first discussion -- some reference to Professor Rigg I guess, two law students who are working for him, and then something about exotic dancer. I guess that came from Miss Johnson indicating she had been an exotic dancer?

A. Yes. And this suggests to me some of these notes I, don't think Miss Johnson would have known who the law students were for Professor Rigg. So some of this information that's in these notes is not from her directly.

Q. Okay. So no discussion at this first meeting at least as reflected in your notes about pleas or what the state of the case was or what --

A. No.

Q. -- what your assessment was of the death penalty prospects or anything else.

A. I would not have discussed that with her in the first

meeting, and my notes reflect that I did not.

Q. Now, was Al Willett present during this first meeting?

A. If you could go back to the beginning of the notes, that would tell me.

Q. Yeah.

A. Typically if I was with anybody, right after meeting with Angie, it would be initials or whoever else was present. This leads me to believe that I was by myself. I don't have a specific recollection either way, but I feel confident that if Al was with me I would have noted that on my notes.

Q. Okay. Was one of the things you were concerned about from the start of the case the state of the discovery issues?

A. We had no discovery at the time, and I had no experience with the prosecutor's office in the Northern District of Iowa, so discovery was a concern, particularly given my discussions with Mr. Willett about discovery.

Q. And what were those discussions? What did he tell you?

A. That it would be difficult, that we were going to have some challenges ahead in getting the discovery.

Q. Returning for a moment to Exhibit 56, the docket from the Johnson case that I showed you earlier, did you at some point realize that there was a stipulated discovery order that got entered in this case on August 8, 2000?

A. Yes, sir.

Q. And did you review that order?

A. I'm sure I did at the time, but as I sit here I can't tell you what it said other than we didn't have any discovery.

Q. Showing you PB-1, 14 through 16, is this a note of January 2, 2001?

A. Right.

Q. And I'm not sure what those initials mean?

A. Thing -- TTD is things to do Angela Johnson. This is a note to myself about tasks I felt I should be doing in preparing Miss Johnson's defense.

Q. And this would have been what? A month or so after your appointment, you're starting to look now at discovery issues and what you need to do to get going on this.

A. Well, it's a month after my appointment, but in my mind the significant date is October the 16th as far as I'm concerned is when I started working on the case, so I've been involved in it now for more than three months and needed to get some of these things done.

Q. And basically again trying to look at this from how the information's coming to you, at this point you don't have a copy of the detention hearing, but you're saying that's something I gotta get.

A. Yes.

Q. You're taking a look at this stipulated discovery order, and you're seeing that it's not -- there are going to be some issues you're going to have to resolve. For instance, you have

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 30 of 86

a note there disclosure of witnesses five days from trial with an exclamation point.

A. Right.

Q. And why the exclamation point in the context of --

A. Well, I mean, you know, realistically it's impossible. That would be virtually impossible to prepare a defense if that was realistically going to be the position the government would disclose witnesses five days before trial. In capital cases it just cannot work that way, it does not work that way. I realize in typical drug conspiracy cases and other types of federal cases that might be sufficient, but it's wholly inadequate in a capital case, and I've never had the experience of having witnesses disclosed five or ten days from trial. It doesn't work.

Q. Was the volume of discovery in this case large in light of the number of years that the case was under investigation or for any other reason?

A. You know, my recollection is that it was around 10,000 pages which I don't think probably is -- it's a large amount of paper, no question about it, but probably not extraordinary given the time that had elapsed and the number of murders that had taken place and the extent of the government's investigation. It had gone on for a long time.

Q. I notice on the second page of these notes -- this is PB-1, page 15 -- you have a notation there that says getting Rule

17(b) subpoenas out to all law enforcement agencies involved in the case. Get sample motion request from --

A. Dan, slash, Kelly first.

Q. What does that refer to?

A. Well, as I'd mentioned earlier, I'd not had experience in federal trials at all up until the Tello case, but we did use Rule 17(b) subpoenas in that case and served on several law enforcement agencies in the Kansas City area, as a result received discovery that the government had not received and was extraordinarily helpful. It's also something that could be done without waiting for the discovery dispute to get resolved, although I understand local practice is various to the applicability or the availability of a Rule 17(b) subpoena for that purpose.

Q. Now, you actually provided an example to Mr. Willett, faxed him a sample motion or a sample proposed Rule 17 motion, did you not?

A. I think so. I think I was able to obtain one from my co-counsel and get it to Al.

Q. And at least based on my review of the docket I didn't see that it was ever filed. Do you know if it ever -- any attempt was ever made to seek law enforcement records by way of a Rule 17 subpoena?

A. No, but I honestly don't -- you know, Al might have informed me that that's not the practice or that that wasn't

available. I don't know why we didn't do that other than there aren't any.

Q. Now, was it made known to you fairly early on that the local practice was that the discovery would be made available in a room that you could go to and look at the discovery?

A. I think that's something we negotiated with the U.S. Attorney's Office, although maybe that was part of the original discovery order. I do know we spent, boy, I think a couple weeks, maybe a week at a time, sitting in a conference room in the U.S. Attorney's Office, six or eight of us either dictating or typing the government investigative reports.

Q. Do you remember at some point in the litigation that the defense team felt that that process wasn't working too well and you actually had some litigation about the discovery aspects of the case?

A. Well, it's -- you know, in light of the Court's goal to at least efficiently use the funds that are available to defend these cases, I can't think of a more inefficient process than what we were engaged in. It was a complete waste of time in terms of efficiency. We were getting the material, but it was so difficult and it was going to take forever literally. I'm not sure how many pages we got through in 2 weeks, but we were a long way from 10,000.

Q. Do you recall -- and unfortunately, we don't have a transcript of this, but we do have your notes. Do you recall

attending a conference with the magistrate on January 24, '02, concerning discovery issues among others?

A. I do.

Q. And this was a conference attended by Mr. Stowers, Mr. Willett, yourself, and Mr. Reinert; correct?

A. That's right, yes, sir.

Q. Do you recall that the topic of discovery came up in terms of what you didn't have and you documented in your notes at that point what you didn't have as late as January 24, '02?

A. Yes.

Q. And tell us what you didn't have as reflected in your notes.

A. Well, as you can see what I've written, grand jury notebooks. There were over 40 witnesses, maybe 50. We didn't have copies of the grand jury transcripts, and there was no agreement that we get any. We had none of the FBI 302s or the DEA 6s. The DNE reports is the Division of Narcotic Enforcement reports the state of Iowa investigation had revealed. We had none of those. And then the largest file Al had ever seen which was I think -- I think what Al was telling me, this file was larger than some cases he had been involved in previously including the Sons of Silence case and a couple other notorious cases, none of which I'm personally familiar with.

And then I have notes about what the government was paying us to sit in a room and dictate or type these

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 31 of 86

investigative reports and that we're not making a dent in it. So that was my assessment of the discovery process at that time.

Q. I notice that you put in your notes a comment that Mr. Willett made to the Court, "I'm not being critical of Mr. Reinert in any way whatsoever." Is there any particular reason why you noted that?

A. Well, I was -- I was very critical of Mr. Reinert. I couldn't believe that the government was taking this position in such a case. It seemed ridiculous to me. And so Al's sort of gratuitous comment struck me. It's not personal, but the government was making it as difficult as they could for us to do our jobs, and I took some offense at that. Al obviously didn't, and this is a note that we weren't exactly on the same page regarding the government's position regarding our discovery problem.

Q. But was this the only example of where that happened where you and Mr. Willett and Mr. Stowers are not on the same page?

A. No. It happened. It happened throughout the course of the preparation, not always, but there were times and issues upon which we had disagreements, and this was a pretty serious one in my view.

Q. Court made a good point the other day which is isn't disagreement good and shouldn't we have disagreements within teams and talk about them and resolve them. Did that happen here in regard to this discovery issue? In other words, did you

get together before this phone conference with the court and say, look, this is a pretty egregious situation; we really gotta take a hard stand on this in terms of the unfairness with what was going on with this procedure where the government was saying if you want the stuff you have to come to us and read it and can't copy it?

A. Well, I'm sure we had talked about this because we had already spent a lot of time trying to dictate and type up these reports and it was a very frustrating experience. So we had talked about it. Whether we met just before this hearing I don't recall. If I have a note that reflects it, I defer to that.

But the point of this note here is it's Al sort of trying to divorce the prosecution's position from Mr. Reinert personally, and in my view that wasn't the case. Mr. Reinert was fully supportive of the prosecutor's position, and in my experience the local prosecutor's office, even the U.S. Attorney's Office, has a great amount of discretion in how they want to handle discovery. And so I took this as very much Mr. Reinert's decision, perhaps in conjunction with his colleagues, but a decision that they could have easily changed, and they were choosing not to. And it was surprising to me that Al went out of his way not to criticize Mr. Reinert, that it wasn't a position I would have taken. Again, nothing personal, but we needed this discovery, and we weren't getting it, and

time's going by, and we're not getting our work done.

Q. Now, you indicated apparently you -- and correct me if I'm wrong -- somebody indicated that one of the reasons you needed this discovery was because the client needs to learn about the discovery.

A. Right.

Q. And had that been a problem up to this point?

A. It's a huge problem, yeah.

Q. You couldn't really take in the raw discovery to the client if it was in some room that she didn't have access to.

A. Well, the detention hearing's a perfect example. There are these pieces of evidence that certain witnesses, unnamed witnesses, had said this or that or this or that, but there's no identifying information. There's no context in which the statement was made. There's nothing in writing to show the client this is the evidence, this is it right here, this is what you're going to see at the trial, not what Pat Berrigan says you're going to see or Al Willett or Dean Stowers. This is the investigation.

And we weren't able to do that because we didn't have it. It's not the same as saying "I read in the discovery" versus showing the client in black and white there's what it is. That's what we should be doing. And that was a problem.

Q. Now, when it came time for Mr. Reinert to speak according to your notes, the first thing he said was the defense has not

spent a great deal of time with the discovery in this case.

A. Right.

Q. In other words, he's making the point that, hey, it's here, it's available, but these guys are just not coming to look at it.

A. Yeah, and I think from his perspective that might be absolutely true; that is, that might be his view. You know, it was a 202-mile drive for me to get to Cedar Rapids. It was two hours for Dean Stowers. If anybody was looking at the discovery, it was Mr. Willett, and I don't know whether he was looking at the discovery. But I could say for myself I was woefully inadequate at this point in terms of looking at discovery in large measure because it took five hours to get to Cedar Rapids.

Q. Sure.

A. So yeah, from his perspective, I could see him -- I could see that being a valid position. But we had spent a couple of weeks sitting around in his conference room, I think six or eight of us. I brought my secretaries. We had paralegals trying to absorb this material and get it in writing, and he may not have thought that was a lot of time.

Q. He further made the point that the Rule 16 material, he was going to give that up but that defense counsel Al Willett hadn't done that either.

A. Right.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 353 Filed 11/10/11 Page 32 of 86

Q. Was that a fair criticism as far as you knew at that point?

A. As far as I know, I had no reason to doubt that. I don't think Mr. Reinert misrepresented the government's position. It was just a different position than we had.

Q. And you certainly were not supervising Mr. Willett's review of discovery --

A. No.

Q. -- at that point? And correct me if I'm wrong, but the division of labor was the guilt-phase investigation was his. You were the penalty-phase guy, and so whatever needed to get done in terms of reviewing this discovery as it related to the guilt phase was really within his domain as you divided the case up?

A. That's partially true, but, you know, the truth is I want to get a plea. I want to get a negotiated plea, and I can't do that without the discovery. No matter what Al Willett wants to do with it regarding the investigation, I need to know the case. I need to be able to sit down with Miss Johnson and say here's the evidence, Angie, and look at the discovery, and these are the reports. That's not happening with this process. It just wasn't happening. So that was at least as much a concern to me as having the reports available to do a first-phase investigation.

THE COURT: Mr. Burt, could we take a recess at this time?

MR. BURT: Of course, Your Honor.

THE COURT: Okay. We'll be in recess for 20 minutes until 10 minutes of 11. Thank you.

(Recess at 10:31 a.m.)

THE COURT: Thank you. Please be seated.

Well, it looks like I caused a technology problem. I was just trying to change the time on my panel to be consistent with daylight savings, and apparently when we did that, it knocked out your all control panels, but both Roger and I can pretty much do anything you could do from there. So just let us know if it's a problem.

MR. BURT: Sure.

THE COURT: And then at noon they're going to try and troubleshoot it some more.

MR. BURT: Great. Thank you.

BY MR. BURT:

Q. Mr. Berrigan, we were talking about this problem with discovery. Did you think that these problems we just discussed before the break were impeding your ability to investigate and negotiate the case at this point?

A. At that time, yes.

Q. And in your notes here you've got a little dialogue quoted. I think "A" is supposed to be Pat Reinert -- correct me if I'm wrong -- in this discussion that's taking place between the Court and whoever "A" is.

A. The "A" is Pat Reinert. The court is Judge Jarvey.

Q. And the court is asking Mr. Reinert, "But you are allowing defense to dictate all the 302s and DEAs." He says, "Yes." The court then says, "So the problem is a format problem, not an information problem." And you indicate, "Roundabout, yes." And then he continues on with witness security issues; right?

A. Right.

Q. Was it a format problem only, or was it really something beyond that?

A. Well, it was much more of a format problem for us. I understand and I did then Mr. Reinert's concern is that if these reports were to get into the wrong hands in the form that they are prepared in they have greater validity and trustworthiness than they do in the format that we would prepare them in.

And so, for example, a DEA report in the hands of a prison inmate is a pretty valuable document because when he says to another inmate this guy's a snitch, there's the report.

Q. Right.

A. So I get it. I understand he has security concerns. But, you know, we have concerns also, and our concern is to be able to defend our client effectively. And this format isn't working for us. So is it a format problem from his perspective? Roundabout, yes. What he means to say is he's giving us the information which is true. I mean, we can go through the 10,000 pages, but we're literally retyping the documents or in my case

dictating so that somebody else later has to retype it, and that's just not the same as having the actual report.

Q. And as you noted earlier in your notes of this conversation, you need the raw discovery because the client needs to see it.

A. There's just a number of reasons. You need it for the -- we did need it for the information. Sometimes you need to show people what it is they purportedly said to an agent such as Mr. Basler. You also need it for the client. You also need it down the road for impeachment if there's a hearing or a trial. You can't show a witness your sort of summary of the report, although admittedly we might get them later.

But there were just a number of reasons. From my perspective personally the most important concern I had is I need to be able to show Angela these documents or at least have them available to show her. If I'm not doing it, somebody needs to be doing it.

Q. From your perspective when you got into the case and started looking at the details, these detention hearing transcripts and whatever discovery summaries you had, did you assess very early on in the case that this is a case that had to be pled if Angela Johnson's life was going to be saved?

A. As I previously mentioned, at the time and to this day I've never heard a good explanation as to how Angela Johnson could draw a map to bodies that had been in the ground for seven years

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 33 of 86

without implicating herself in the murders. That alone in my view made this a case that needed to be pled.

Q. And was that view shared by all the defense team members?

A. Well, they can each speak for themselves, but my perspective was that Mr. Stowers and I were probably more aligned than Mr. Willett on that issue. That was my own perspective of our team dynamics.

Q. Do you recall -- this is from 53A -- receiving -- when you were reviewing the file after you got involved, do you recall seeing this letter, Mr. Willett to Angela Johnson, early on where he indicates obviously -- and this is a letter dated August 16, 2000, and this is RS-6-000281 from the plea binder. The highlighted portion there, obviously based upon the complexities of this case, we need more time to prepare your defense so that you are able to go home to your children. And the second page of that, as always, I look forward to seeing you in the future. Hopefully I will be able to see you in something other than a blue jumpsuit in the near future.

Do you ever recall -- well, first of all, have you ever seen this letter before?

A. I'm sure I did.

Q. And the sentiments that I've got highlighted here, that is, that Miss Johnson was going to be going home fairly soon, did you hear Mr. Willett express that view to Miss Johnson on more than one occasion?

A. I don't know that he ever definitively said you're going home, but certainly there was always -- part of the discussion had to do with that goal. You know, that was Angela's goal, to go home. You know, in light of what happened at the detention hearing, in my view this is a little unrealistic, but sometimes lawyers engage in these conversations merely to build a rapport with the client so that they're on the same page. And Mr. Willett is showing Angela that he has the same concerns that she does. You know, it's always hard to tell whether this is something Mr. Willett believes in his heart and mind or he's just saying this to sort of appease Miss Johnson. But in Mr. Willett's case, this was a view, this idea about going to trial at least was a view, that persisted throughout the duration of the case preparation.

Q. And did that create some problems for you in terms of what you perceived the needs of the case were in terms of the need to plead her?

A. That was the biggest problem is that we were not presenting a consistent and unified front on the issue of plea versus trial. And to the extent I was advocating for a plea, Mr. Willett I felt was not -- didn't have the same position. And so when Miss Johnson has the choice between those alternatives and one is couched in this idea that you could win, that's an impediment for me because when we're talking about a plea we're talking about a significant period of time

incarcerated which is not anybody -- it's not anything anybody looks forward to.

Q. Have you ever been involved in a capital case where the client's ultimate goal was something other than to walk out a free person? I mean --

A. There are clients who take a more realistic approach to their cases. There are some very bright individuals who early on recognize that the best they can hope for is a life sentence, sometimes life without parole. There are other clients such as Miss Johnson that have a much more unrealistic perception of their situation. So it would vary from client to client.

Q. Did you feel that Miss Johnson's unrealistic views of this situation were driven in part by her mental illness problems?

A. I think yes, to give the short answer. There are many notes where when I visit her in jail we're having discussions and she's behaving erratically, either overly emotional. Sometimes she engaged in this rocking back and forth behavior that was a little disconcerting. Sometimes she had difficulty focusing on the issues that I really wanted to discuss. And throughout her stay I think in most of these jails, maybe not all of them, she's on some type of antianxiety medication. So she was anxious about her situation. All clients are anxious in this situation, but she was extremely anxious.

Q. Now I want to show you -- in reference to what you just said, one of your notes in your file is a note concerning a jail

meeting you had with Miss Johnson fairly late in the process in relation to the date you got appointed. This is August 21, '03, a jail meeting you had with Miss Johnson; correct?

A. Yes, sir.

Q. And just to put this note in perspective, is this at a point in time when Judge Bennett has issued his ruling suppressing the McNeese statements and maps and the case is now pending in the Eighth Circuit on appeal when you come to see Miss Johnson?

A. I think the Eighth Circuit's made its decision at this point, and I say that only because that's what my first note says. Eighth Circuit decision and motion for rehearing. So I think the Eighth Circuit had come down adversely to our interests and that we were preparing a motion for rehearing, but the record will reflect whenever the Eighth Circuit rendered its decision.

Q. And you are conveying to Miss Johnson per this note that in terms of a trial date it's looking like your trial date is going to be March 2004?

A. Yes.

Q. Following Honk -- following the Honken trial at this point or --

A. I believe that's right. I mean, if we're taking his date, that means he's pushed back. He wasn't moved up.

Q. You're informing her that Pat Reinert is no longer on the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 34 of 86

case and Mr. Williams has taken over?

A. Yes, and that Tom Miller from the State of Iowa Attorney General's Office was going to be the second chair, or I have probably. I'm not sure where I got that information but . . .

Q. Next item here, you were informing her that the defense has rejected the government's proffer first position; correct?

A. Right, right.

Q. I take it this is the first time you're telling her that we've rejected this proffer requirement that the government is proposing?

A. I don't know if it's the first time, but if my notes reflect it, then I would stand by that.

Q. All right. And at this point why had the defense decided to reject the proffer first position?

A. Well, the government's position on this proffer was go ahead and make a proffer, and, you know, maybe we'll make an offer, maybe, maybe not.

Q. Uh-huh.

A. Given what the proffer was going to involve which is essentially the admission to five murders, that seemed an insufficient position in my mind, that the government needed to tell us that if the proffer was accepted then their position would be life, not maybe. That was of particular concern given, you know, Attorney General Ashcroft's enforcement of the death penalty in non-death states. So that was a big problem for me

in negotiating a resolution of this case, and the government seemed intent on sticking with it.

Q. Now, in taking that position, had you had a discussion with Mr. Willett or Mr. Stowers about what the local practice was in terms of how things worked in this particular district?

A. I'm confident I talked to Mr. Willett about it. I think that the local practice was exactly what the government's position was here, that they took proffers and then maybe they would deal with you as a result and maybe they would not. That was not my experience in Kansas City, although my experience was fairly limited. And it seemed, frankly, at least at this point a pretty dangerous position to take, that we would go ahead and proffer without any deal on the table.

Q. Did you know at this point when you rejected this proffer first position that what the -- how it worked in Washington in terms of how they were going to need certain things done before they would sign on to whatever it was you were negotiating at the local level?

A. I can tell you what I knew, and you can decide whether it was very much. I knew that the local office would make a recommendation to the DOJ committee in Washington regarding what the local office thought was a fair disposition of the case, presumably life or death, and that the DOJ committee would review the case and make a decision thereafter. What their criteria was for that position, what they based it on, how

seriously or how much weight they gave to the local U.S. Attorney's Office decision or recommendation, the other factors that weigh into the committee's decision, I have no clue about what they were.

Q. Did you know what their position was about proffers? In other words, did you know, for instance, that, well, there are lots of cases where the committee in Washington has signed on to a plea agreement without requiring a proffer at the local level?

A. I didn't know what their position was, but I certainly presumed that the local office could make a recommendation for life based on a proffer that they had received, so in other words, that the process would be first convince the local office that there should be a recommendation this is what the deal's going to be. I understood there might be an issue with the attorney general's office. That seems like particularly at this time that that was a real issue. But I didn't know if the DOJ committee required a proffer, didn't require a proffer. All I knew is what the local office was telling us: They required a proffer.

Q. Did you have some perception at this point in the case, that is, August 21, '03, that you still had some bargaining leverage here? Even though you had lost in the Eighth Circuit, that there was still something that the government wanted that you had and could deliver?

A. Sure. I certainly didn't think this was the end of the

negotiations. I wasn't throwing in the towel on getting the case resolved.

Q. What did you think you had that might be of use or benefit to the government at this point?

A. Well, always the testimony against Honken. My view of the government's position was that Dustin Honken was really the principal actor here and that they would want him to receive the death penalty almost at all costs and if that meant negotiating with Angela Johnson they were willing to do it.

Q. And did you do any research to see if the Ashcroft administration had offered concessions in a situation similar to yours, that is, in a case where they were not claiming that the heavy in the case, if you will, in a case where they were claiming that your client was not the heavy, was not the shooter, was not the actual killer but rather an aider and abettor, that the government wanted and desired the testimony of the aider and abettor to secure a death sentence against somebody they perceived to be of greater culpability?

A. Well, I could not imagine that the DOJ committee would refuse a plea offer that involved testimony against Dustin Honken if the recommendation from the local office involved that, but I didn't research prior decisions that the DOJ committee had made, no.

Q. But based on your own experience, as you said, you couldn't imagine they would reject it if you delivered as they were

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

requesting you to do.

A. Exactly. I mean, there are five dead people. There's two little girls. This is a guy they want the death penalty for desperately. And that just made sense, common sense, to me.

Q. Now, item 6 on this list here says miscellaneous stuff, trial clothes, and then it says Al Parrish let's talk letter. What is the Al Parrish let's talk letter?

A. That's a vague, vague reference to Mr. Parrish or I should say really the Honken defense team and our team talking about some negotiated disposition. I did not deal with Mr. Parrish personally at all, but I dealt quite a bit with Charlie Rogers, their learned counsel. Charlie and I have known each other at least since I started practicing law. We were in the same public defender's office together. And so they were interested in disposing their case by way of a negotiated plea as were we, and I think there were some overtures made. Mr. Parrish had written a letter about the two teams talking.

Q. Basically let's get together and see if we can't work something out that would benefit both clients.

A. I believe so. I don't remember seeing this letter specifically, but that's what I think the reference is to.

Q. Now, you have a parenthetical here under item 6. I wonder if you could describe what's indicated here and whether reading that refreshes your memory about the context in which you wrote this parenthetical.

A. This is -- yeah, this is sort of indicative of what I had mentioned earlier. When I got to the jail -- I'm not sure why I was there before Al, but I got there a little bit before him, and she is doing this (demonstrating) back and forth, is shaking back and forth.

Q. Indicating rocking from front to back sort of in a rocking chair kind of motion?

A. Rocking -- right, rocking, and she sometimes hugs herself like this. Sometimes she has her hands down like this, but it's obvious that she's in some distress. And so the first ten minutes that we're talking this keeps up. And it wasn't uncommon. I didn't always note it, but this would happen, particularly when we're -- she and I are talking about the government's evidence. When I'm confronting her with the government's evidence, she's doing this rocking.

And then Al arrived, and then she was fine. She seemed markedly more relaxed. I didn't make a note that the discussion changed or that the subject discussion changed, but I suspect it did. And then I wrote down I pretty much tried to shut up as a result. And I think probably I was talking about this plea. She was getting upset. So I stopped.

Q. Well, do you recall what you were -- I mean, other than saying that we have rejected their proffer first position, what other plea discussions were you having with her in terms of what the next step was or where we're going from here?

A. I cannot tell you specifically. I can tell you with confidence that as I already testified to I wasn't giving up on the plea negotiations, and I'm sure that I told Angie, look, we're going to need to consider this; we're going to need to consider proffering or doing something to move the ball forward because right now we're sort of in an impasse. But beyond that, I can't tell you specifically what the discussion was.

Q. And did she indicate no, I'm not going to do that or . . .

A. No. I think this shaking told me all I needed to know, that she didn't really want to, you know, talk about it that much. This was not a subject that she eagerly embraced at this point in time.

Q. Well --

A. It was difficult for her to contemplate. I mean, what we were talking about, you know, is spending decades in prison, and she's got these two daughters, and it just -- it just wasn't something that was a subject of light conversation.

Q. Do you recall prior to this point -- and I think we'll get to this in detail in a moment -- but was the discussion generally at a very general level, or were you in there with discovery and actually going through similar to what I did with you on the detention hearing testimony --

A. Right.

Q. -- where you're sort of detailing and amassing the evidence in the way that a good prosecutor would amass it to convince the

person you're talking to that we got some real problems here?

A. Well, in this particular meeting, I'm not going through reports with her only because I don't note that, and I think I would have. If we had gone through some particular discovery, I would have made a note of it. But in terms of talking about plea negotiations, I always have to sort of remind her what the evidence is. And so we may have been talking about it more generally, but I -- not -- not in this meeting.

Up until now, I don't know -- without looking at my notes, I couldn't tell you kind of how far along we had gotten in the discovery. My recollection is that we had discovery at this point or at least some discovery. Maybe I'm mistaken. But I think in large measure we had left that to Al and Miss Lanoue particularly to bring the discovery over.

Q. What was the role of Miss Lanoue in that discovery process? What was she doing, and was that an effective thing she was doing or not?

A. Well, at the time what I thought she was doing was taking the discovery which we had in notebooks over to Miss Johnson and going through it with her page by page, all 10,000 pages, without any screening or anything of that nature. I thought she was just letting Angie read it; if she had questions, she'd answer them.

It turns out, you know, sort of in the -- I learned much later that there was much more than that, that there were

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 353 Filed 11/10/11 Page 36 of 86

really much more substantive discussions about the case between Angie and Miss Lanoue than this discovery process. But at the time my understanding was Al was sending her over with the notebooks to go through the discovery, that's it.

Q.   When in this case did you learn that it was something else other than what you first described?

A.   I'm not really sure to be honest.

THE COURT:  Before we get to that --

THE WITNESS:  Yes, sir.

THE COURT:  -- what was your reaction to Al Willett delegating -- I think that's an accurate word.

THE WITNESS:  Yes.

THE COURT:  -- to Nancy Lanoue going over the discovery with Angela Johnson?

THE WITNESS:  I recognize that Mr. Willett might not be as available as Miss Lanoue to go over. I took that as a given. But it needed to be a shared responsibility, and certainly I didn't realize Miss Lanoue's sort of answering questions about the case. Sort of she's evaluating the discovery herself. I have the highest regard for Miss Lanoue. She's a smart, bright, intelligent woman, and she's got a great heart, but she's not a lawyer. And her perspective is not one who's tried these cases and knows what this discovery means in terms of what impact this is going to have on a jury. That's just not her role. And she doesn't have the training for that

and probably not even the acumen. So that was a great concern after I learned it.

But, you know, Judge, I didn't know it at the time. I should have known it. When this trial was over, Mr. Willett, Mr. Stowers invited me to give a talk at Iowa Criminal Defense Lawyers' meeting in Des Moines about this case, and the topic of my presentation for 45 minutes was the failures that had happened in this case. That was number one, that we had let Miss Lanoue essentially have the most important and prolonged contact with our client of anybody on the defense team. And this was a woman who believed our client was innocent. Talk about counterproductive. It was -- it was amazing.

THE COURT:  Would -- do you -- do you have any -- well, I'm trying to think how to ask it. Let me just try it this way. With 10,000 pages of the discovery to go over and a case budget in place at some point, from your perspective was it unreasonable to have Nancy Lanoue go over the discovery with Angela Johnson if that's all she was doing?

THE WITNESS:  No, no.

THE COURT:  Should I expect a lawyer to go over the entire discovery file in a capital case?

THE WITNESS:  I think what you should expect a lawyer to do is to be there if the client has any questions about the discovery or what it means, what does it involve. And if Miss Lanoue's showing Miss Johnson the discovery and Miss Johnson has

questions, she should not take it upon herself to answer those questions. I'm sure it's very tempting, and I'm sure a lot of the questions are innocuous and probably not particularly harmful or meaningful. But there are going to be questions that are significant questions. And Miss Johnson's tendency from my own meetings with her would be to question the discovery that was provided even in black and white.

And so I have the ability to confront her based on my experience. You can say whatever you want, X, Y, or Z; this is the evidence; this is what the jury's going to believe. I can say that with some authority. Miss Lanoue's not only not doing that, but she's incapable of doing that. She's buying X, Y, and Z.

While I would have argued that's ridiculous, Miss Lanoue wants to believe it because she has developed a relationship with this woman and really cares for her and she wants to believe it. And this is all going on unmonitored which is not just Mr. Willett's fault. I don't fault -- we all share that, probably me more than anybody. To not know this is even happening is unforgivable, but it happened and --

THE COURT:  Well, why do you say you more than anybody?

THE WITNESS:  Well, because I -- my role, as I perceived it, is not only to prepare the penalty-phase case, but I'm the one that needs to get this case negotiated to a plea.

Now, these guys haven't -- they've, I'm sure, had lots of pleas, and they've negotiated lots of dispositions but nothing like this. And I thought I was uniquely, at least amongst the three of us, the most qualified to do this.

And so my principal goal was being subverted unbeknownst to me and quite innocently by Miss Lanoue, and I'm not even aware that that's going on. I don't know how I couldn't know that. I should have known that, absolutely should have known it.

THE COURT:  Now --

THE WITNESS:  I knew how Miss Lanoue felt about Miss Johnson, and I should have put two and two together, but I just -- I didn't. I don't know why.

THE COURT:  Now, have you used legal assistants before to go over discovery with defendants in capital cases?

THE WITNESS:  I haven't -- yes, to a limited extent, yes, sir, I have, but nothing like this. To be perfectly honest, usually the government lets us bring the discovery over to the client; they can review it. I give them envelopes sometimes to mail it back to me after they've had a chance to read it themselves. We don't have this, you know, you need to keep control of it, Berrigan; they can't keep the documents. Again, I understand their concern, so -- but this isn't an experience that I've had very often. I have had situations where I cannot see the client for some particular reason; I'll

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 37 of 86

send somebody over to look at the discovery or bring the discovery with them but not to answer the questions. I mean, it's pretty clear what their role is, just as a messenger for Pat Berrigan because I can't be there.

THE COURT: And then you would check in periodically with the client --

THE WITNESS: Right.

THE COURT: -- to answer any questions about the discovery.

THE WITNESS: Exactly, right. I mean, the whole purpose is not only for her to be reading the discovery but to understand the significance of the discovery. And that we didn't do. Nobody's really doing that as far as I can tell.

THE COURT: And in your view that's something you just cannot delegate to a legal assistant.

THE WITNESS: You cannot delegate to a legal assistant, no.

THE COURT: Okay.

THE WITNESS: And with all due respect to Miss Lanoue -- and I think she's incredibly capable -- that's not only not her job, but it shouldn't be her job, and it's not something she's capable of doing.

THE COURT: Did -- okay. Now -- I'm done for now. Thank you, Mr. Burt.

BY MR. BURT:

Q. As you were answering that question, I'm wondering what role the mitigation specialist played or should have played -- let's start with should have played -- in this process you're describing of dealing with a client in a realistic way about what the discovery is. How should the mitigation specialist be working with the lawyer as opposed to the paralegal in conveying what the client needs to hear, particularly with a mentally ill client?

A. Well, I think Miss Goody's particularly good at this. I didn't -- to answer your first question, I don't rely on Miss Goody or any mitigation investigator to try to persuade the client as to what the plea should be. That isn't their job either frankly. Certainly mitigation investigators are at least in a better position than somebody like Miss Lanoue if they've had trial experience to say, look, here's what the penalty-phase evidence is; here's what the mitigation evidence is. And you need to know, for example, that there are going to be crying family members up there talking about birthday parties and Christmas parties, and maybe we'll have videos, and maybe we'll have poems. And let me tell you how incredibly powerful that is because they know that and they've seen, and they can convey those things. But I don't rely on the mitigation investigator to negotiate a plea with the client. That's not their job.

In terms of the mental health issues regarding the client, the mitigation investigators that I've worked with are

much more adept than I am typically at not only discovering those issues but sort of informing me as to what they perceive to be the problems and what steps we should be taking to address them, not that I haven't had experience doing that. I have quite a bit. But I don't pretend to be a psychologist. I've had no mental health training, and somebody like Miss Goody's particularly sensitive to those issues and is usually very, very good at it.

Q. For instance, on this date you've got a client who you're discussing some very unpleasant facts of life with.

A. Right.

Q. And the client is rocking back and forth and obviously in a distressed manner.

A. Right.

Q. In this kind of context, can the mitigation specialist be of some aid in assisting you in how to relate to a client like this who is in some distress?

A. Yeah. Well, I may be misperceiving this all together. I mean, my view of the situation here is Angie with her daughters is just stressing out. You know, this is just stressful, very, very painful. I don't know that I looked at it as a mental health issue, that this rocking back and forth means there's something mentally going on there that's bad. She's a mother. I don't -- we don't typically have a lot of female capital defendants, frankly. I think I've had maybe two or three. And

then when they have children on top of it, that relationship is just -- it's inviolate. They don't think of anything else. So I'm sort of looking at it as she's worried about leaving her children. Maybe that's not how Miss Goody would look at it or somebody who has mental health training.

Q. Now, what role, if any, do the mental health -- should the mental health experts play in this process of trying to deal with a client who is distressed either because of mental illness or because of family pressures? Is there a role that your mental health experts plays in this process?

A. Yes, yeah. There are a number of roles. One is that they assess the client's sort of present competency, you know. Are they getting it? What's their medication level? Are they on medication that's helping them, or is it a hindrance? Is it sufficient? They can tell me whether or not clients sort of have -- and it's not terribly unusual. Clients will have fluctuating mental health situations, sometimes very depressed; other times they seem to be fine. And sometimes they're depressed and I don't recognize it and a mental health person can recognize that. Bipolar people are particularly difficult, just as an example, to sort of assess. And this is a woman who's had some mental health history, you know. Not everybody tries to kill themselves, even people in her situation. So -- and she's on medication for antianxiety, so she's got some -- she's got some issues, no question about it. Mental health

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 353    Filed 11/10/11    Page 38 of 86

people can assess it and address it much better than I can.

Q. My reading of the billing records -- correct me if I'm wrong -- and specifically Dr. Logan's billing records indicate that he came in very early on, assessed the client, and then the next contact he had with the case is right on the eve of trial in '05.

A. Right.

Q. Is that also your --

A. I think that's probably right, yeah.

Q. And why was that? I mean, is that typically the way it goes?

A. No, but typically we don't have 200 miles between the mental health expert and the client. I know Dr. Logan's done some work in Iowa. But in hindsight, I'm not sure -- even if Dr. Logan had been on the case, we probably should have had somebody locally that could get over there more frequently. We're not -- this isn't a -- I know the situation's never ideal. It's hard to find qualified people that can do this work. But what we needed to have was somebody to just go over to the jail, take a look at her once in a while and see if, you know, we're even conveying the message, we're even getting through to her.

Q. Does the mental health expert like the lawyer need to build a sustained and trusting relationship with a client if you're going to get the kind of information you're going to need to present in the penalty phase?

A. Yes. If the mental health expert is a person who potentially has the possibility of testifying, that's absolutely right, yeah.

Q. And is the advantage of building that relationship over time not only because it gives the expert more credibility in front of the jury, in other words, this is not just a drive-by evaluation, but it also allows the mental health expert to monitor the client's progress at any point in the process including the critical points such as these plea negotiations?

A. Yes.

MR. WILLIAMS: Objection. Leading.

THE COURT: It is, but I'll allow it.

A. That's true, but as importantly, there's a rapport, there's a trust that develops between the mental health expert and the client that if they're not seeing them, that's difficult to establish.

Q. Was there any particular reason why there was this lapse of contact between Logan -- other than geography, this lapse in contact between Logan from his first contact early on and then not until the eve of trial?

A. There's us waiting for the Eighth Circuit decision, and I don't recall what the budget was for Dr. Logan, but there's some -- there's always some concern. We don't want to have to go back to the Court hat in hand asking for more money and more money and the Court says, "I gave you what you asked for last

time. What are you -- why are you back here?" So that's an issue. It may not be foremost, but it's always -- it's always there.

Q. Isn't it the normal way to work the money issue for mental health experts to get some money, do some investigation, show the Court that you've developed some leads on the mental health front, and convince the Court that more funds are needed to further the mental health evaluation?

MR. WILLIAMS: Objection. Leading.

THE COURT: You may -- overruled.

A. That's typically how it's done, yes.

Q. And is it true that in some cases when you go through that process you come up empty? There's -- you know, there's no prior mental health history, and you go back to the Court and you try and convince the Court to have the Court authorize more funds but because you haven't shown anything you don't get the funds?

MR. WILLIAMS: Objection. Leading.

THE COURT: Overruled.

A. Yeah. And in many cases we don't ask for more funds because they didn't see anything. I mean, evaluation's usually going to be done anyway. As a practical matter in a capital case that's going to happen. Not all evaluations necessarily lead to, you know, mental health issues. And so sometimes we don't come back to the Court because we don't need to so . . .

Q. Was this a case where Miss Goody was doing some preliminary investigation and discovering some psychiatric history on Miss Johnson that extended before this suicide attempt which in itself was some indication we're dealing with a mental illness here?

A. Her whole history is replete with examples of horribly abusive behavior, a lot of drug use. There's a lot of self-medication, depression, bad choices in men. There are all kinds of mental health issues in her background. I think Miss Goody recognized that. We did make a referral to Dr. Gelbort at one point for a neuropsych evaluation. I don't remember when that was. And then we have the issues at the jail where she's on medication all the time so . . .

Q. So the jail staff are evaluating her as someone in need of medication?

A. I presume they're evaluated before they give her medication, but I never spoke to any of them.

THE COURT: Can I interrupt for a second?

MR. BURT: Yes.

THE WITNESS: Yes.

THE COURT: Mr. Berrigan, if I was unfair to the defense team in terms of authorizing experts, case budgeting, granting new requests for additional funds, or in not approving attorney fee vouchers, would you tell me, because I'm -- no point in asking you if you wouldn't tell me.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 353 Filed 11/10/11 Page 39 of 86

2067

THE WITNESS: No, I -- and I think we did, although the only example I can remember really had to do with trial expenditures, not pretrial, that there were expert witnesses who submitted vouchers for monies that they were billing as a result of their trial testimony, their preparation and trial testimony that the Court questioned. But that was during trial.

I don't remember -- and there were some attorney voucher issues I think regarding my co-counsel but not me. There wasn't a single penny that I recall the Court ever deducting on any voucher that I submitted, not a single time.

THE COURT: And as I recall -- I may be wrong -- I believe the only cut I made on Al Willett was a $12.50 movie that he billed the Court for during trial or some pretrial proceeding --

THE WITNESS: Yeah, I don't remember --

THE COURT: -- in the hotel room.

THE WITNESS: Right. And I don't remember -- I think the Court may have been concerned -- there was one visit to Kansas City where -- maybe it was Mr. Stowers stayed in a hotel on The Plaza that seemed a little exorbitant, and there was a situation -- I think it was just before trial -- where the Court in my presence addressed Mr. Stowers regarding some billing quite extensively, but I didn't know of any particular cuts regarding Mr. Willett at all.

So I have no doubt what you're saying's accurate, Your

2068

Honor. It wasn't an issue for me. We did negotiate. As you'll recall, I thought it was important for the Angela Johnson defense team to come and see Dustin Honken's trial, and we had some discussion about that, and you wanted to know why we needed to do that, and I think I tried to explain that. There was concern about, you know, two lawyers being here at the same time and the travel to get to the trial and those things. And we I think negotiated an agreement about that.

So not to say it didn't come up, but I'm not sitting here testifying complaining that the Court didn't authorize funds that we requested. I think it was a concern is all I'm suggesting. It's a concern in a lot of cases. It was a concern in this case. I think that the Court made every effort to accommodate us on all the requests. But it's always a concern. These cases are expensive.

THE COURT: Thank you.

BY MR. BURT:

Q. Miss Goody's role, for instance, I think -- this is from Exhibit 2. You submitted a request -- and the Court initially -- this is an order by Judge Bennett July 23, 2001, appointing Miss Goody and authorizing up to $40,000. That's -- you know, in your experience in a capital case, that's certainly in the ballpark of what --

A. That's a -- that's a reasonable request. I've had mitigation investigators spend a great deal more money than

2069

$40,000. And I -- now that I see this order, I do recall there was some discussion about Miss Goody's bill as well and the Court questioning how much time would really be required for her investigation to be sufficient and adequate. So this might be one area where we did have some disagreements, but I think, again, the Court eventually approved what was requested. I don't know what happened on the trial bill. Miss Goody never complained to me. So I presume she was paid.

Q. You did have some issues, did you not, about timing? In other words, I think there's been some testimony and I think the record shows that you submitted this application for Miss Goody's services in January --

A. Right.

Q. -- of 2001?

A. Right.

Q. And Judge Bennett approved it in July.

A. Right.

Q. And again, from that same exhibit, the circuit did not sign on to it until January of 2002.

A. Right.

Q. So, I mean, that's of -- it's not the amount, but because of this requirement of circuit approval, it took you, did it not, a long time to get this up and running?

A. Yeah. I mean, Judge Bennett is a very busy district judge, and six months is not inordinate to be honest. I mean, it's --

2070

it's not fast, but it happens. It's not like he doesn't have anything else to do.

One year for the circuit, that seems like a long time. I don't know what happened there.

Q. I don't mean to imply any criticism of Judge Bennett or the circuit.

A. Right.

Q. But the reality is you can't let a year go by in one of these cases and not have your investigation up and running.

A. I can't ask the investigator to be working at that time without the prospect of getting paid, so yes.

Q. And similarly with Dr. Logan, I believe the initial request is about $25,000. Was that in your view certainly enough to get him up and running and to review what he needed to review and at least have a few visits with Miss Johnson even if he did have to travel and give you a foundation to go back to the Court if you needed to and get more funds for him to evaluate her?

A. Yes. There's no way that's getting us through trial. But -- and particularly given the distance involved with him, but in terms of an initial forensic evaluation, that should have been sufficient.

Q. And do you have any reason to believe that had you gone back to the Court and said, you know, we've got a client here who's on antipsychotic, antidepressant medications, we have a history of at least one and I believe more than one suicide

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

attempt, right, based on the record you --

A. Right.

Q. Also Miss Goody I think testified about a prior psychiatric counselling where they had a axis I disorder and a dependent personality feature disorder on axis II. That kind of information, would there be any reason you couldn't take that to a court and say, "Look what we've developed. We need to continue to develop this, and we're also having difficulty in this plea process, and we need to get a mental health expert involved that can really help us sort out whatever it is that's troubling Miss Johnson"?

A. There's no reason we couldn't have done that. And I seriously doubt Judge Bennett would have denied such a request had we have presented it. I mean, we would have had to have made a record obviously, but on the occasions we did that we were granted the money.

Q. Now, I want to talk to you a little bit about what the game plan was with Dr. Logan, and I want to show you Exhibit 10 from the petition which is a letter that you wrote shortly after your first contact with Miss Johnson that we talked about earlier this morning. Do you recall this letter?

A. Yes.

Q. This is the referral letter, is it not, that you wrote to Dr. Logan right after seeing your --

A. Right after I saw Angela.

Q. And you indicate in this letter that in the second paragraph she did attempt suicide by hanging shortly after receiving the news that the jail inmate she had confided in about her case had turned all of that incriminating information over to the government. Then you indicate this was almost two months ago now, and Angela seems to have recovered fully. What was that opinion you gave to him based on, that she seems to have recovered fully?

A. Just my interview with her on the 20th. You know, she didn't seem to be depressed. She was in fairly good spirits. We were able to communicate I thought pretty well. I just didn't see this depression that I associate with suicide attempts.

Q. Okay. And I think you also indicate in the letter that in your view, although she's had a somewhat troubled upbringing, that she is not psychotic. Do you recall writing that?

A. Yes.

Q. And what was that view based on?

A. Well, psychotic is just a -- you know, it's a break. It's a break from reality. Those are folks who, you know, they're hearing voices, they've got auditory hallucinations or grandiose thoughts, or they're not sort of dealing in -- in the present. She's oriented times 4. You know, she's able to carry on a conversation. There was no evidence during my visit with her that she was psychotic.

Q. And you're conveying this -- your impressions to Dr. Logan.

A. Right.

Q. You also indicate to him in this letter that you don't believe she's incompetent to stand trial.

A. Exactly.

Q. You said you're familiar with the guidelines. Are you familiar with this portion of the guidelines which says -- this is at 956 of the 1993 guidelines -- counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions, for example, posttraumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation, that could be of critical importance?

A. Yes.

Q. Are you familiar with that?

A. Yes, absolutely.

Q. So -- and that was the very reason you were consulting with Dr. Logan; right? You weren't going to rest on your own assumptions that she's not competent -- or that she is competent, she's not psychotic, she's not suicidal anymore. You're asking him to get involved to assess those very issues.

A. This is -- yeah, these are my views of one meeting with the woman, the first one. And the reason I thought it was important to let him know this is sort of a time thing. If she had been psychotic or she had seemed to be depressed or I thought, you

know, she needed immediate psychiatric treatment, I would have needed to get him up there right away or get somebody else over there, and that's all I'm really trying to convey. I'm not pretending based on one meeting that I know whether or not this woman has psychiatric problems or she's suffering from PTSD or fetal alcohol syndrome or anything like that. But it was a question of immediacy. I'm only conveying to him that I don't think you need to rush up here day after tomorrow and visit with her. That's all.

Q. Okay. And in that last paragraph you say we're going to need a competency determination, although, frankly, that does not seem to be an issue presently. Then you say more importantly, we need to evaluate Angela's mental state both at the time of the commission of the alleged crimes, July and November of 1993, and at the time she purportedly made incriminating statements to the government's snitch, Robert McNeese; right?

A. Right.

Q. So at least at this point in the case your plan was to have Dr. Logan evaluate her for mental state at the time of the crime.

A. Yes.

Q. Per this letter.

A. Right.

Q. That changed later on in the case, didn't it?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 41 of 86

A. Yes.

Q. Could you explain to me, first of all, when it changed?

A. I can't tell you when. Unless I have some note that reflects that, as I sit here, I couldn't tell you exactly when that changed. I know that part of that problem or part of that assessment when you're talking about mental state at the time of the commission of the murders obviously involves a discussion about the murders. And so at some point down the road I decided that's a discussion I didn't want Dr. Logan to have with Miss Johnson which was consistent with our trial position and the government's efforts to get a psychiatric evaluation of Miss Johnson. But in terms of when the decision was made, I don't recall.

THE COURT: Could I interrupt here for a second?

MR. BURT: Of course.

THE COURT: I recall several rulings that I had to make on really challenging issues regarding the disclosure and the mental health experts.

THE WITNESS: Right.

THE COURT: And do you know whether your change in opinion about having Dr. Logan ask her about her mental state at the time of the murders was in any way tied to any of my rulings? Or did you make that change before I had to rule?

THE WITNESS: I think -- I think, Your Honor, that I made that decision before your rulings because I had had this

experience with Mr. Nelson so I could anticipate some of the potential problems. And as you'll recall, I think 12.2 was really either a new rule or it was a val -- it was sort of in transition at that point. There had been an important Eighth Circuit decision -- the case escapes me right now -- that had sort of led to Rule 12.2. But I knew that, you know, the government is going to have their ability to conduct an evaluation.

I can't honestly say as I sit here that caused me to make this decision or that the Court's rulings caused me to make that decision. I think that was independent of the Court's ruling. We had already made that determination.

THE COURT: Thank you.

THE WITNESS: I don't know when.

THE COURT: Thanks.

Mr. Burt?

BY MR. BURT:

Q. So based on what you just said, that the decision to not have Dr. Logan evaluate her at the time of the crime was made both before the Court's decisions and before the government indicated it was going to try and propose --

A. Yes.

Q. -- a counter expert?

A. Right.

Q. So the decision was not made out of some fear associated

with a particular expert that the government hired or any concern on your part that that particular expert was going to present a problem.

A. No. I mean, I don't want to say that's not a problem.

Q. Yeah. We'll get to that.

A. That is devastating testimony, but the government gets to go last, and they put on these expert witnesses in capital cases who've talked to the defendant about what happened at the time of the murders, and it's often not conveyed in a very favorable light.

But that's not -- I'm not saying that's what triggered this decision, not at all, no. It's a problem, absolutely. It's a problem in all of these cases where mental health testimony's going to be elicited, the government's opportunity to rebut that.

Q. And let me see if I can understand your reasoning. Was part of your reasoning in reaching the decision not to have Dr. Logan or anybody else evaluate her mental state at the time of the crime because of your concern of what Angela Johnson would say about the crime?

A. You know, I don't think -- for a long time we didn't discuss what she would say about the events at the time of the crime. We just didn't get there. And I think the failure to get there was a big concern. I wasn't sure what she was going to say, to be perfectly honest. So I think that was part of the

problem. We never made sufficient progress to sort of address that issue. And then we had the Honken trial. We had our plea negotiations.

I guess at the end of the day I could have changed the decision and flipped back. I'm sure the Court would have allowed the government to go ahead and question her about the events at the time of the crime right up until the time of trial and present that evidence, but I never did, never did change my decision.

Q. Now, was there ever a point in time when your strategic thinking about the mental health experts was being driven or influenced in any way by some confession evidence that you feared that Miss Johnson might blurt out or give to these experts?

A. I don't know the answer to that. I can't say that I wouldn't have considered that. Of course I would have. What is she going to say to them? Obviously that's going to be a concern, yeah, absolutely, yeah.

Q. So did you ever see this as a case where Miss Johnson was going to testify, where she was going to be presented in either the guilt phase or the penalty phase other than through perhaps a uncross-examined allocution statement which I believe --

A. No.

Q. -- you made a motion to have her do?

A. No. We never contemplated putting her on the witness stand

at all.

Q. And why was that?

A. I think there were a number of reasons. There was some concern just about how she would kind of come across, that she -- and this turned out to be sort of a self-fulfilling prophecy in the penalty-phase case. But, you know, she's a very attractive woman, and in looking at her, I don't think most people wouldn't think she's capable of participating in these crimes in any fashion.

But it would -- you know, if she testifies, there's going to be cross-examination about a lot of behavior in the past that's going to suggest she's more than capable. And I wasn't sure how she's going to react to some of this stuff because sometimes she's a little volatile. You know, she's a little emotional. There's no telling whether she's going to just break down and start crying or get angry and start yelling, and that could be disaster at the trial. She starts getting in an argument with Mr. Williams and Mr. Miller during cross-examination, we're done, game over. And I never felt really confident I had any control over that. So that was a big problem.

And then, you know, what is she going to say? I mean, I sort of knew what she was going to say based on the plea negotiations near the end. And I don't know how helpful that was. Didn't seem to be particularly helpful. You know, in

terms of the defense not helpful.

Q. Okay.

A. So there wasn't any reason to put her on certainly in the merits phase.

Q. Now, the proffer that you just referenced, you're referring to an attorney proffer which I think arose post-Honken trial; correct?

A. Right, right.

Q. And that was a proffer which you wrote, and did you write it yourself or --

A. Yes, I wrote it.

Q. Did you discuss it with her --

A. I did.

Q. -- at some point in time? And was she agreeable to the statement of facts in that proffer?

A. Yes.

Q. Up to that point in time, had she ever given you that sort of detailed explication of what had happened in these two homicides?

A. No.

THE COURT: Well, excuse me. That question actually assumes something, that she's the one that gave him the details rather than he came up with the details and asked her.

MR. BURT: That's true. I'll withdraw that. I'll withdraw it.

THE COURT: So either I'll do it or you can do it, but I prefer you do it.

MR. BURT: I'll do it.

THE COURT: Okay.

BY MR. BURT:

Q. Let's step back for a moment. Did she explicate for you the facts in that proffer, or did that proffer come about by some other method?

A. It came about as a result of discussing Mr. Honken's proffer. And Mr. Honken made a proffer, as the Court undoubtedly knows by now, about what he alleged the facts of the case to be, and we were in the heat of plea negotiations with the government at this point. I went over the Honken proffer with her, and we talked about what -- you know, we're going to make a proffer. This is -- this is the detail we need to talk about. You know, it's gotta be this step by step by step.

And so that's kind of when we got to it. It was late in the game. I want to say March of '05 and not before then. But that's how it arose, Your Honor. It wasn't spontaneous. She didn't say let me tell you what happened, nothing like that. It was all in the context of the plea negotiations. This is what it's going to take, Angela. This is what Dustin Honken did. This is what you're going to need to do if you want to have a chance at a life sentence. And that's -- that's what happened. Then I went back, typed it up, sent it.

THE COURT: So can I ask you did -- I assume -- well, I'm assuming maybe you didn't ask her if those facts were true. You just asked her if she was -- if it came to a plea proceeding if she could stand up in court and say that those facts were true.

THE WITNESS: Yeah. I mean, just like every other plea I've had in 26 years. I mean, you know, it's not my job, quite frankly, to discover the truth. I'm an advocate for my client. The truth-finding faction -- function is somebody else's job. I don't ask clients whether or not the factual basis is true. They're going to raise their hand and say it's true, that's good enough for me.

And so it's not at all uncommon for me to tell a client, look, this is the plea agreement. If you want to take it, this is what you need to say. They can say to me, "I can't say that. That's not what happened. I'm innocent," or, you know, a myriad of positions. And one of them is they get up there and they say it.

I may have questions in my own mind about, well, is that exactly what happened? Sometimes there are slight variances between the truth and a plea. It happens. Maybe it's a dispute about the amount of drugs or the amount of money. Could be a little thing. But we're not going to argue about a plea, an entire agreement, over that. So yeah, I don't -- you're right, I don't question her is this the absolute truth.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 353 Filed 11/10/11 Page 43 of 86

I don't -- I don't do that.

THE COURT: Do you --

THE WITNESS: There's a --

THE COURT: Let me ask you this, and you may not want to answer, but I'm going to ask you. Did you have any serious professional reservations about whether or not if your client Angela Johnson did proffer as outlined in your March 19, 2005, letter that it wasn't true?

THE WITNESS: In my opinion it was true. I had no reason to doubt that. The only issue and the only one -- and it was a critical one, I'll admit -- is what happens when they leave the house and they get to this killing field where these horrible murders took place, and did she know exactly what was going to happen to those children. You know, that was a question I had in my mind for a long time. And the sad truth is I think she did know, and that's what was in the proffer, and that's what she was willing to say. So that's what we propounded to the government.

I didn't -- I didn't want -- you know, nobody likes to believe those things. It's a tough deal, but it happened. And she was willing to testify to that at a plea.

MR. BURT: Would this be a good place to stop, Your Honor?

THE COURT: Yes. Would you -- how much break would you like?

MR. BURT: Can we have an hour and 15 as we did the last time we were here?

THE COURT: Yes. Any -- Mr. Williams, any objection to an hour and 15?

MR. WILLIAMS: None, Your Honor.

THE COURT: Okay. We'll see you back here at 1:15. Thank you.

(Lunch recess at 11:59 a.m.)

THE COURT: Thank you. Please be seated.

Mr. Burt, you ready to proceed?

BY MR. BURT:

Q. Mr. Berrigan, returning again to this referral letter you wrote to Dr. Logan, one -- at least at this time, November 22, 2000, and showing you this document from the petition, that is, Exhibit 10, one purpose of the evaluation was to evaluate her mental state at the time of the crime; correct?

A. Yes.

Q. Another was to evaluate her competency.

A. Yes.

Q. Right? And then on the second page you said, "I'm very much looking forward to working with you. Even if Angela does not have significant mental issues that impact upon her first-phase defense, paren, which is I didn't kill anyone, I suspect that you will uncover issues in her family history and growing up that will perhaps show her susceptibility to being

dominated by men as intelligent, forceful, and domineering as Angela's boyfriend and codefendant, Dustin Honken."

A. Yes, sir.

Q. So at least as of this day, you were conceiving of a mental state defense which would address Angela Johnson's claim of I didn't kill anyone because you've got that as that was her story at least as you understood it, and you were asking him to go ahead and assess her mental state defense even though she's saying I didn't kill anybody.

A. Right, because that, of course, may not fly at trial, and we could be in a penalty phase so --

Q. Right.

A. -- obviously it would be important to address potential penalty-phase mental health issues.

Q. And did you necessarily see any contradiction in her story that I didn't do it and your asking this mental health expert to nevertheless assess her mental state at the two times of the crimes that she was being charged with?

A. No, of course not. There are clients who consistently maintain their innocence in the face of overwhelming evidence to the contrary. We proceed to trial and need to be prepared to present penalty-phase evidence including mental health issues, and you certainly can't start that investigation during the trial. So this was not an unusual position.

Q. And did -- ultimately when you came to the decision of

deciding not to have Dr. Logan or anybody else evaluate mental state at the time of the crime, was part of your thinking that you might be able to avoid a government mental health examination all together?

A. Not if -- not if we were going to present any mental health evidence at all. I felt confident that the government would be able to present some rebuttal testimony to our mental health evidence. What exactly that might be I couldn't be sure, but presumably and as it turned out, if we did not address certain issues, the government would not be allowed to address those as well.

Q. And as I understood the way that played out with litigation on the issue in front of Judge Bennett in his opinions, the ultimate conclusion that was reached by the opinions was that you may be able to not put her mental state in issue and you may be able to -- may but -- not necessarily but may be able to restrict the government from inquiring about her mental state at the time of the crime. But if you did that, you were going to pay a price, and the price was that you were not going to be able to rely on any of the statutory mitigating factors that related to emotional disturbance or mental illness at the time of the offense. Do I have that right in terms of where that litigation came out in the end?

A. I'm not exactly sure I understood your question.

Q. I guess the question is what is your understanding of what

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 44 of 86
*to purchase a complete copy of this transcript.*

Q. limitation, if any, Judge Bennett imposed upon you as a result of the 12.2 litigation? Where did you end up at the end of that process?

A. Well, Judge Bennett didn't impose any limitations on us. We chose the parameters of the testimony which would be everything except a discussion about her mental state at the time of the offense. Our position was, which the judge adopted in his rulings, that if that's what the defense did, that's what the prosecution would be allowed to do. In other words, if the defense did not address her mental status at the time of the murders, then the government wouldn't be allowed to go there either. So that turned out to be the parameter of the Court's ruling.

The second part of your question having to do with what effect that would have on maybe some other penalty-phase mental health issues is the part I'm not sure I understood.

Q. Yeah. In other words, was it your understanding that if the government was restricted in examining mental state at the time of the offense that you would nevertheless be able to get submitted to the jury a mitigating factor instruction which would say that they could find that her mental state was impaired at the time of the crimes?

A. Oh, we were hopeful I think because the context of that would be, you know, this is her mental state on a continuum. She didn't suddenly change. For example, if she's suffering

from major depression, just as an example --

Q. Yeah.

A. -- for a period of time before the murders, we don't discuss that at the time of the murders and then it's clear she's still suffering from major depression after the murders, you could draw a conclusion that she was suffering from depression at the time of the murders. Whether the judge would give us -- allow us to present that as a mitigating factor I suppose was an open question, but I think we tried to present some mitigating factors pertaining to her mental state generally.

Q. Well, didn't Judge Bennett's -- and the record will speak for itself on this, but didn't Judge Bennett's order specifically say that if you did it in the way that you were proposing you were not going to get a mitigating mental state factor as a mitigator?

A. I think anything that said -- any mitigator that said at the time of the offense would be precluded certainly.

Q. Okay.

A. Yes.

Q. And once you saw that ruling, did you reweigh in any way whether that was worth the cost of admission in terms of what you were going to be losing if you put in mental state but you weren't going to get any instruction that said that the evidence you were putting in had anything to do with the crimes,

especially these crimes?

A. I didn't reweigh that.

Q. Okay.

THE COURT: Mr. Burt, just because we're kind of on this now -- and I'm sure you probably know the record and Mr. Williams and maybe Mr. Berrigan recalls, but I certainly don't -- when it came time for either preliminary instructions on the penalty phase or the final instructions, did Mr. Berrigan or anyone else on the defense team try and say, well, you know, there isn't any expert testimony on this issue, but there's enough evidence from lay witnesses on her general mental health during this time period that you should ins -- give some mental health mitigator that would include her mental state at the time of the offense or something even remotely like that?

MR. BURT: No, because the way the litigation progressed was that the government came in and requested that you explicitly instruct that anything they were offering did not relate to mental state at the time of the offense, and the defense in response said they would make that clear with the expert witness testimony. So for each expert they explicitly made it part of the direct examination that nothing the expert was saying --

THE COURT: Well, I understand that, but that wasn't my question actually.

MR. BURT: I'm sorry.

THE COURT: And it was probably a horrible question.

MR. BURT: No, I --

THE COURT: But what -- I realize that there wasn't any expert testimony about her mental state at the time of the offense for the reasons that Mr. Berrigan indicated. And I track that. And then I said the government couldn't do it either. I understand that.

But my question is did the defense ever come to me on the instructions and say, well, yeah, there's no expert testimony on that because we asked that our experts not look at it, but there's enough from lay witnesses that we're entitled to some instruction about her mental state at the time of the offense?

MR. BURT: I understand, and my recollection is no, that they did not do that.

THE COURT: Well, are you claiming they should have?

MR. BURT: I think that is part of our claim. The other part of it is that they should have never been in that position to begin with. But certainly if there is evidence in the record, nonexpert evidence, that related to her mental state at the time of the crime, our argument would be that would be mitigating evidence that related to it. And without an instruction, it would be meaningless for the jury to consider it.

THE COURT: Well, they could have raised that issue on

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 45 of 86

direct appeal, that -- I mean, I don't know whether they asked for it or not, but -- and I didn't give it, but, I mean, the expert testimony and the lay testimony are really two different matters.

MR. BURT: I agree. I understand the distinction.

THE COURT: Okay. I'm glad I at least made that part of it clear. I mean, they could have raised on direct appeal the failure of me to give a instruction on mitigation about mental health at the time of the offense based on lay testimony about her mental state or something.

MR. BURT: Yes.

THE COURT: Yeah. And they didn't do that; right?

MR. BURT: They did not.

THE COURT: So now you're alleging it's ineffective assistance of counsel.

MR. BURT: That's the claim.

THE COURT: But are you also alleging that it wasn't a strategy decision? I'm switching gears now. Let's go back to the experts.

MR. BURT: Yeah.

THE COURT: Are you alleging that it was a -- it wasn't a legitimate strategy decision with regard to their self-imposed limitation of their own experts?

MR. BURT: That's what we're trying to establish, and the key word in the Court's question I think is legitimate. In

other words, I think --

THE COURT: It was a strategy decision, right.

MR. BURT: Yeah, I was going to say it was strategy. The question is was it reasonable in light of what they had and how they implemented it. And part of my argument is the way that they implemented it didn't make any sense in terms of what they were trying to do so --

THE COURT: And just one follow-up question. Are you going to have a Strickland expert on that or --

MR. BURT: Yes, yes.

THE COURT: Okay. Good. Thanks.

THE WITNESS: There was -- if I might interrupt, Your Honor.

THE COURT: Sure.

THE WITNESS: And I perhaps am mistaken, but I do recall that there was litigation about one mitigator that had to do with whether or not Miss Johnson was under the substantial domination of Dustin Honken at the time of the murders. I thought that we litigated that issue. To the extent it relates to mental health, I suppose it's worth mentioning.

THE COURT: Well, I know I gave that instruction in the preliminary instructions, but I think it changed in the final instructions.

THE WITNESS: That's right. The Court --

THE COURT: But I don't have any direct recall of

that. I was talking to my law clerk about it the other day, that something triggered it in this hearing, so I'm sure they'll -- I'm sure Mr. Burt's going to address that with you at some point.

BY MR. BURT:

Q. Part of this letter, the referral letter, had to do with that topic you just mentioned, namely, that you wanted Dr. Logan to assess her susceptibility to be dominated --

A. Right.

Q. -- by a guy like Honken. Now, did you ever intend to restrict his testimony on this issue, that is, the domination issue?

A. No. At this time, at the time I'm writing to him, I'm not intending to restrict his testimony in anything.

Q. Right.

A. This is November 2000. I just visited her two days before.

Q. And I guess my question was poorly worded. I think what I was trying to ask is your strategy on the mental state at the time of the crime changed over time. Did your strategy on the domination theme also change?

A. No. As I mentioned, my recollection -- and the record will reflect what it reflects -- is that we attempted to get an instruction on that very issue in the penalty phase of the trial.

Q. Right. But did you attempt to have your mental health

experts address that issue?

A. I don't -- I don't recall whether we addressed it in the direct examination or not, frankly. I don't know why I wouldn't have wanted to address it.

Q. In other words, there would have been no strategic reason for not addressing it.

A. No, not at all, and I don't think that would have violated the strictures that we were under regarding mental health testimony at the time of the offense. In other words, that was a longstanding relationship that did not rely on that single day to make that determination.

Q. And there would have been -- and you certainly thought that the domination theme was factually supported.

A. Yes.

Q. You had no strategic reason for failing to offer as much evidence as possible on the domination theme, both expert and lay evidence.

A. No.

MR. WILLIAMS: Leading, Your Honor.

A. No.

THE COURT: Overruled.

THE WITNESS: Sorry.

Q. Did not.

A. I did not have any strategic reason not to get that in. Quite the contrary.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 353 Filed 11/10/11 Page 46 of 86

Q. And when you say quite the contrary, was part of what you realized in your penalty-phase strategy in particular was that whether Angela Johnson got the death penalty or not was going to depend in large part on how the jury assessed her relative culpability as compared to Honken's?

A. Right.

MR. WILLIAMS: Objection. Leading. Can I --

THE WITNESS: I'm sorry, Your Honor.

MR. WILLIAMS: Maybe I could just have a standing objection to leading questions, because I understand the Court's going to want to hear this.

THE COURT: Yes.

MR. WILLIAMS: And I don't want to keep interrupting but --

THE COURT: That's fine. You can have a standing objection. And my view is that I have great discretion under the rule on leading questions. And Mr. Berrigan is at times adverse to one party and at times adverse to the other. He's certainly not hostile by temperament or personality. But I'm going to allow some leading, so I appreciate it, and you can have a standing objection to all of the leading questions.

MR. WILLIAMS: I won't interrupt anymore. Thank you.

THE COURT: Thank you.

MR. BURT: Thanks.

A. That's correct. I mean, the whole reason for putting in

Dustin Honken's verdicts is an example, to show that he received the death penalty on the children only. And then to show the disparity, relative disparity, between he and Angela, it was in the hope that the jury would not find it necessary to give her death on these children. She was relatively less culpable. So that was the theme that was prevalent throughout the penalty phase.

Q. And in furtherance of that theme, you and your colleagues were careful to obtain and review the transcript from the Duncan (sic) Honken trial, were you not?

A. Well, we obtained the transcript. As I mentioned earlier, we sat through the trial, not each of us, but in shifts we sat through the entire Dustin Honken trial.

Q. And before your own trial, not only had you sat through it and actually seen the witnesses live to get some sort of impression of them, but you had the transcripts at your trial to work with in case you wanted to impeach any witnesses or call any witnesses.

A. Right, that's correct.

Q. And would there have been any str -- and did you also realize from the Honk -- from sitting in and reading the transcript of the Honken trial that the government's goal in that case was to make Mr. Honken look as bad as possible?

MR. WILLIAMS: Calls for speculation about the government's goal.

THE COURT: You may --

BY MR. BURT:

Q. Just your perception, not what their intent was.

A. Yeah, I don't -- I don't know what the government's goal was, but if that was the goal, they achieved that result. Sitting there as an observer, I thought that certainly was what happened.

Q. And --

A. That Mr. Honken looked as bad as possible, particularly as relating to Angela Johnson.

Q. And, in fact, were there parts of that transcript where, for instance, on the purchase of the gun where the government was arguing that even though Angela Johnson bought the gun that it was really Honken pulling the strings and making the choice as to what weapon so he could choose his murder weapon?

A. Yes. I didn't recollect that until I looked at the transcript again, but yes.

Q. And would there have been any tactical reason for not offering any evidence that got developed in the Honken trial that would have placed Mr. Honken in a dominating role vis-a-vis your client?

A. There's no strategic reason not to do that. To the extent it didn't happen is we just missed it.

Q. Just missed it.

A. We just missed it. There was a lot going on in the penalty

phase of the trial, and that's an issue that should have received substantially more time and attention pretrial than it did.

Q. All right. Now, the strategy on the mental health experts, did you choose to -- in the direct examination of your mental health experts to bring out that they weren't asked to assess mental state, or was that something you felt was imposed by the Court's rulings?

A. No. I chose to bring it out. It was coming out. It was going to come out in cross-examination, and it did. There was no reason to wait for cross-examination for that fact to come out.

Q. And did you think that having that fact out there either on direct or cross, that is, the fact that your mental health experts were explicitly asked not to address mental state at the time of the offense, did you think that fact in combination with the failure of the Court to instruct on mental state mitigating factors diminished your mental health evidence in this case?

A. Well, that fact did. We hadn't addressed the mitigating factors yet, and we were still putting on the testimony, so we hadn't gotten to the instruction conference obviously. But that's not a good fact. I mean, it's not helpful during the course of the direct examination of the mental health expert to say, "And by the way, Dr. Logan, you were explicitly asked not to talk to Miss Johnson about the offenses, the murders."

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 353 Filed 11/10/11 Page 47 of 86

That's not a -- that's not a good thing to have happen, not at all.

Q. All right. Now, another aspect of this is that as I understood the strategy you were trying as much as possible to limit the scope of the government's rebuttal expert examination.

A. Well, given -- yes. Given our decision, absolutely. Given our decision not to go into this area, I sure didn't want the government going into it. And the Court had already made that ruling so . . .

Q. And did you at some point become informed that it was going to be Daniel Martell and his partner that were going to do this examination?

A. Yes.

Q. Had you gotten some background information on Dr. Martell from Mary Goody or other sources which had indicated that there was an issue with Dr. Martell's compliance with court orders in a case in New Mexico?

A. Yes. He was at a party, and there was some type of communication that was improper. I don't remember the specifics, but we did have some impeachment material regarding Dr. Martell's failure to follow a court order.

Q. And did you know about that background before he actually did the evaluation?

A. Yes.

Q. Was there some attempt to monitor his evaluation, make sure

that he was, in fact, going to comply with the Court's restrictions?

A. Well, my recollection is that we asked to be present. I think there was a compromise reached that the evaluation would be audio taped. That was the court order. Whether that was a compromise or not the Court would know, but I think that was the result.

Q. And do you recall at some point in time being provided with an audio tape and -- which was transcribed of a -- about a five-hour interview that Dr. Martell and Dvoskin conducted with Angela Johnson?

A. I don't remember the transcription. I vividly remember listening to the audio tape because I got that very shortly after the interviews were conducted.

Q. And do you recall after listening to the audio tapes that the interview ranged far and wide during the course of that five hours?

A. Yes, of course.

Q. And specifically did it pretty much include everything about Angie Johnson's relationship to the victims in this case other than asking her the ultimate question of whether she actually was involved in the killings?

A. Yes.

Q. And do you recall during the course of the examinations that Dr. Dvoskin and Martell, although they didn't ask her

whether she was involved, they would ask questions like, "Well, I can't ask you about the killing of the children in this case, Miss Johnson, but tell me in general how you feel about killing children"? What -- do you recall that?

A. I don't recall a specific, you know, question and answer, but I do recall it was a very broad-ranging discussion and got pretty close to the line on whether they could ask questions about the murders.

Q. Do you recall that they asked extensively about her drug history?

A. Yes.

Q. Including when she first started taking drugs, where she got her drugs, what the relationship of drug taking was to these two men in her life, DeGeus and Honken, et cetera?

A. There was very extensive questioning about her illicit drug use and her prescription medication.

Q. And illicit drug use in connection with her connection to Honken.

A. Right.

Q. And you understood that one of the charges in this case had to do with a drug consp -- a fairly wide-ranging drug conspiracy.

A. Yes.

Q. Was any effort made to exclude the testimony of Martell and Dvoskin on the grounds that they had violated the Court's order

by ranging far and wide in the areas that related to the drug conspiracy she was charged with?

A. No.

Q. And, in fact, you ended up giving the interview and the reports of Martell and Dvoskin to your experts, did you not?

A. Yes.

Q. Can you tell me the strategy behind that?

A. Well, the government's experts were going to comment upon the evaluations our experts had done. They had copies of those reports. I thought it would be helpful for our experts to also be familiar with what the government experts had done and to the extent it might be helpful to incorporate whatever favorable aspects of the interviews they thought they could incorporate into their testimony.

Q. Did you work with your experts to make as part of their direct examination any helpful aspects of the Martell-Dvoskin five-hour interview?

A. I honestly do not remember.

Q. One of the experts you called was a Dr. Evans.

A. Yes.

Q. A psychopharmacologist?

A. Yes.

Q. Somebody you'd worked with before?

A. Yes, Lee Evans.

Q. And Lee Evans testified in the abstract, did he not?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 48 of 86

A. He did.

Q. He explicitly said he did not interview Angie Johnson for the purpose of determining her drug history?

A. That's correct.

Q. And he did not apparently receive any records about her drug history.

A. That's right.

Q. Was there some reason why you did not at least provide the drug history that you provided to the other experts so that Dr. Evans could be in a position to say that I know what this person's drug history is and here's what I can say about what effect drug use would have on her given her history?

A. I just didn't think to do it.

Q. Okay. Did you in general think that presenting testimony in the abstract like that was less desirable than presenting it in a case-specific way?

A. It's always less desirable to talk in the abstract as opposed to testimony that relates specifically to the client.

Q. Now, was Dr. Hutchinson hired to do something different than what Dr. Logan was working on?

A. Dr. Hutchinson sort of specializes in psychological issues surrounding women and particularly women who've been abused either physically or sexually or psychologically or any other manner. That's sort of her special area of expertise. And based on my prior experience with her in capital cases, I

thought she was particularly strong in cases that had involved clients who had been physically abused, women who'd been physically abused. And I had used her in that capacity previously.

So she's also a psychologist and not a psychiatrist, but she brings sort of a different perspective to her work than Dr. Logan brings to his. And she testifies quite differently. I think some people that may not be receptive to Dr. Logan or as receptive to Dr. Logan are particularly receptive to Dr. Hutchinson and vice versa. And she could concentrate on those areas where she was strong on, particularly the abuse and effects of abuse on women that Dr. Logan as a male isn't as effective in communicating, frankly.

Q. And when did Dr. Hutchinson get involved in the case?

A. I don't remember.

Q. Was it fairly late in the --

A. Yes, it was late.

Q. Was there some reason for that?

A. No good reason. I think probably I made a decision to get her on board when the Eighth Circuit decision had come back, it looked like we were going to go to trial. But I don't recall specifically the day.

Q. Now, part of the guilt-phase strategy as I understood it was that Angela Johnson was innocent of the DeGeus murders; correct?

A. Yes, that's right.

Q. And was part of the government's response to that defense theory that on the contrary, because of the abuse relationship Angela Johnson hated DeGeus and wanted to eliminate him?

A. That was the theory -- that's one of the government's theories as why DeGeus was killed, the other being, of course, he's a potential witness against Honken in a drug conspiracy.

Q. And was there something as I recall in the McNeese letters that gave credence to the abuse motivation theory and specifically as it related to some comment Angela Johnson made about him being on his knees just like he used to do to me, something along those --

A. There was something to that effect. Without looking at the letter, I can't tell you exactly what it was.

Q. But there was --

A. There was a specific reference to Mr. McNeese.

Q. That seemed to bolster this theory that she had a particular hatred for --

A. She was certainly there, right.

THE COURT: Excuse me. I think Mr. Berrigan misspoke. I think you said Mr. McNeese, and you meant --

THE WITNESS: DeGeus. I'm sorry. I did say McNeese.

THE COURT: Yes.

THE WITNESS: Yes. I'm sure in hindsight she would have liked to have killed McNeese, but no, I was speaking about

Mr. DeGeus, Your Honor. Sorry. And I'm just joking. The record might not reflect that.

THE COURT: No, and I understood it that way.

BY MR. BURT:

Q. Did you discuss with Miss Hutchinson the potential theme that like other abused women the fact that Miss Johnson was abused by DeGeus did not necessarily mean that she hated him and wouldn't go back with him?

A. I don't recall my specific discussions with Dr. Hutchinson. Whatever my notes would reflect, I'd have to stand by those.

Q. Would there be any strategic reason not to present that theme in either the guilt phase in support of your theory that she wasn't the killer or in the penalty phase as mitigation?

A. No.

Q. Okay. And do you recall that during the course of the Martell interview that Martell and his partner asked Angie Johnson about her feelings for DeGeus and her feelings for Honken?

A. Yes.

Q. And do you recall during the course of that interview that she waxed eloquently about DeGeus and how beautiful he was and how much in love she was with him?

A. Yes. That's consistent with how she had communicated with her defense team about Mr. DeGeus certainly in the year or two before the trial.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 353 Filed 11/10/11 Page 49 of 86

Q.   And did you also notice in that Martell interview that when asked to characterize her relationship with Honken it was he's my dope connection but I don't have the same kind of connection to him that I have or had with Mr. DeGeus?

A.   Miss Johnson had a peculiarly romanticized view of Mr. DeGeus that I cannot explain now nor could I then and almost the opposite position regarding Mr. Honken.  It was like nothing there other than they had a daughter together so -- at least that was, again, as we're sort of closer to trial, the last -- maybe the last couple of years in the case.

Q.   And looking at it at the time of trial, would there have been a reason why you would want to present that dynamic, that is, the DeGeus versus Honken feeling that she had, as part of your presentation by Miss Hutchinson in terms of the dynamics of battered women and how they operate?

A.   No, there'd be no reason not to.  I think all of us who are familiar with battered woman syndrome realize that as sort of counterintuitive as it seems, these women go back time and time and time again to their abusers.  And it's hard to explain in any rational sense, but it's a mental health issue.  It's a problem.

So that testimony would have been consistent with battered woman syndrome, that she still -- despite repeated beatings, some severe, at the hands of Mr. DeGeus still loved him, particularly after he's dead.

Q.   Would presenting that theory through, say, an expert like Dr. Cunningham have provided you at least some lingering doubt in the penalty phase?

A.   I don't know the answer to that question.  I don't see any downside from that perspective of lingering doubt.  The argument would be, well, she wouldn't have killed him because she loved this guy despite the fact that he abused her and abused her and abused her and abused her because the government's position obviously was the opposite of that.

Q.   Right.

A.   That she killed him because he did abuse her and abuse her and abuse her.  So that's a different -- that's a different take on the situation certainly.

Q.   And how was the relationship characterized by Hutchinson if you recall?  I mean, better question --

A.   Well, certainly abusive.

Q.   Okay.

A.   But I don't remember specifically how she characterized that relationship.  Romanticize is my term.  I don't know what she said about it.

Q.   Now, do you recall -- and I'll show you a document I'll have marked here which is 74 which is the -- do you recall that that report of Dr. Logan was the report that was provided to the government?

A.   This one is not signed, but I wouldn't quibble with it.  I

don't remember having multiple reports from Dr. Logan, so I suspect that was it.

Q.   Dr. Logan's report, 74, says that he is relying on taped interview, transcript and report of examination of Dr. Dvoskin and Martell; correct?

A.   Yes.

Q.   And by the way, once you provided those reports and the interviews, he was open to be cross-examined on those reports and interviews, and the government would not even have had to call their experts; right?

A.   Well, again, I've never been an assistant U.S. attorney, and I wouldn't presume to speak for Mr. Williams.  But the first part of the question's true.  Dr. Logan relies on them, he's absolutely subject to being cross-examined about them.

Q.   So providing those reports to the government certainly meant at a minimum that you were risking the reports of Martell and Dvoskin to come in through cross.

A.   I didn't think they were that bad.  I wasn't particularly worried about the reports.  So yeah, that's part of the decision of giving them to Dr. Logan, but I didn't have any grave concerns about them.

Q.   In other words, reading the report and the interviews themselves, there was nothing in either of those that you were worried about in terms of how you were going to present your mental state.  There was no -- you didn't restrict your mental

state because you -- mental state defense evidence because you were afraid of rebuttal coming in through these experts or their reports.

A.   No.  Their reports were more favorable than I expected them to be.  And that wasn't just my assessment.  I suspect -- the government didn't call these experts either, and I spoke to -- I don't know if it was Martell or Dvoskin after the evaluation.  I talked to them on the telephone, maybe both of them but at least one of them, and we had a discussion about the materials that had been provided.  And I asked him whether he thought he was going to be testifying.  And he didn't think so.  You know, that was his assessment without I think yet even having spoken to the U.S. Attorney's Office.

So I think that was sort of a general assessment, that these reports, the evaluation by the government mental health experts, was not harmful to Miss Johnson.

Q.   Did you even think further that not only were they not harmful but there were aspects of them that were favorable?

A.   There were aspects of them, but I didn't think -- I wasn't going to call the government experts to testify.  I mean, I felt our experts could address whatever harm -- whatever helpful aspects of the interview that they thought were helpful.

Q.   And do you think that they did that?

A.   I don't recall.  I'm sorry.

Q.   Okay.  Now, the report -- and I think this is consistent

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 50 of 86

with what Dr. Logan testified to at trial -- sort of lists the factors that he's going to be talking about, and the first one on there is multiple broken relationships with men including Steve Hugo, Arlyn Johnson, Kirby Thompson, Terry DeGeus, Dustin Honken, and Rick Summers. Was that what you had in mind when you wrote the referral letter and said you wanted him to be talking about the domination by Honken?

A. No, not that particular paragraph that you just read. She had had a series of relationships. She was married at a very, very young age. There was a history of men abusing not only her but her sisters. She had told me I thought it was her sister Wendy was sexually abused by an older man at a very young age, when she was in sixth grade. This is some stuff that had gone on in this family for a long time. That wasn't the kind of domination I was talking about. That had to do specifically with Mr. Honken's domination. But, you know, this is not inconsistent with anything along those lines.

Q. Not inconsistent, but it's not -- I mean, do you see anything in this list, in this report, that really addresses that -- the issue of dominance by Mr. Honken?

A. No.

Q. And did you discuss that fact with Dr. Logan and attempt to reenforce and give to him whatever information he needed to comment on dominance and control issues?

A. I do not recall discussing that with him.

Q. How about with Dr. Hutchinson?

A. No.

Q. Or Dr. Cunningham.

A. No.

Q. I'd like to go back if I could to talk about a different topic now which is the investigation. Were you -- is it fair to say that the guilt-phase investigation in this case was directed entirely by Al Willett?

A. Primarily. There were portions of the guilt-phase investigation that Mr. Stowers and I participated in. For example, as I previously testified, we went to the scene of the murders. There were some measurements about distance between Lori Duncan's house and the murder scene, and the government had done some testing about how long that drive was. There were things about the guilt-phase investigation that the three of us participated in but very limited.

Q. Do you recall that there was a woman who's mentioned in some police reports that was a neighbor of Lori Duncan's?

A. Yes.

Q. What do you recall about the neighbor?

A. She had -- she had seen a note -- this is my vague recollection. She had seen a note on Lori Duncan's door that said that she had left to go somewhere, would be back at a certain time. I think she claimed to have seen the family or at least Lori Duncan and the children at a time that was

inconsistent with the government's time line on the events. I don't remember specifically what the interview of her said.

Q. Showing you what I've had premarked as Exhibit 75, do you recall reading when you were reviewing discovery this particular report by the Iowa Division of Criminal Investigation?

A. I do.

Q. Concerning an interview with a name Phyllis Proscovec?

A. Yes.

Q. And do you remember when you reviewed this report?

A. I don't remember when, but I do remember that this lady passed away some time before we were able to interview her, and I think that that was at least two or three years into the case.

Q. What was -- if there was, what was the importance of what she had to say? And if you need to refresh your memory, I'll show you the first page which says during the interview Proscovec stated that she lived in the house directly north of the house being rented by Lori Duncan. She remembered the time when Lori disappeared quite clearly, remembering that on Monday morning at approximately 7:50 a.m. Proscovec had gone over to Lori's house to get the kids up for school which she normally did. She went on to state that Lori would leave early to go to work and Phyllis would go over to get the kids up and get them off to school. Do you recall --

A. My recollection is the government's theory was the murders had taken place on Sunday.

Q. In when?

A. Sunday, before -- before this observation.

Q. And this report goes on to say that on the Monday morning she knocked on the door, got no response. Lori's car was parked out in the front; correct?

A. Right.

Q. She pushed on the front door. It opened. She went in and found nobody home.

A. Yes.

Q. Last paragraph, she stated that she last saw Lori on the Sunday evening prior to Lori's disappearance, stated that she had been invited over to the residence that evening for coffee and during the visit Lori commented that Greg Nicholson wasn't home due to the fact that Greg had to go do some business with some friends of his; correct?

A. Yes.

Q. And it goes on to say that Phyllis stated that she had gone over to Lori's that evening between 7:30 and 8 and had stayed for approximately an hour.

A. Yes, I see that.

Q. And went on to state that after she went -- returned home she went to bed after watching the news and noticed that Greg's car had not yet returned and that shortly thereafter she stated that Lori called on the telephone and asked if Lori could come over to Phyllis's house which she did. And when Lori arrived,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 353 Filed 11/10/11 Page 51 of 86

**2115**

Phyllis stated that she was crying and commented that Greg did not want her anymore and Phyllis went on to state that Lori stayed for a while longer and then went home at which time Phyllis looked out of the window and noticed that Greg's car was parked behind the house; correct?

A. Yes.

Q. Said that on Monday when Lori disappeared she returned home, found a note between her front door and her storm window which said, "Phyllis, had to leave on short notice, will be in touch shortly. Love, Lori," and that a copy of the note was actually recovered and attached to the interview report that you read.

A. Right, I do remember that.

Q. Now, what was the importance of this interview to the government's theory?

A. Well, my recollection is this was inconsistent with the government's theory, this whole conversation that she had had on Sunday night. I don't remember the dates, but my recollection was that that's when the government alleged that these murders had taken place.

Q. And do you recall having any conversation with the investigators yourself about needing to run this down because it appeared to be inconsistent with --

A. I recall we had at least conversations amongst the three of us, the attorneys, and I thought there was a discussion with

**2116**

Mr. Cornell. But again, I'd have to rely on my notes to tell you that specifically. But this was an issue because it was so inconsistent with the government's theory. It was sort of markedly different. By the time we got around to trying to find this woman -- and I don't know if it was Mr. Gratias or Mr. Cornell that went out to find her -- we learned that she had died, yeah.

Q. After -- you realize that in the penalty phase of the case the Court allowed in some hearsay on the government's side of the case.

A. Well, Mr. Vest quite notably, yes.

Q. Okay.

A. I think we had some argument about that is my recollection, but yes, that happened.

Q. Did you consider at any point in the penalty phase trying to introduce your own hearsay in the form of this report to try and get in front of the jury this interview with Miss Proscovec that was inconsistent with the government's guilt-phase theory?

A. By the time the penalty phase came around this was probably the furthest thing from my mind.

Q. Would there have been any factual reason why you wouldn't have presented this, assuming Judge Bennett would have let it in?

A. No. I mean, it helps towards residual doubt. That would be the argument for putting it in even though the jury had made

**2117**

a determination that she was guilty.

Q. And this person was unconnected, your understanding, with Angela Johnson.

A. Didn't know -- yeah, as far as we knew she didn't know Angela Johnson at all.

Q. And the police had the note.

A. They had the note, right.

Q. So from the standpoint of creating reasonable doubt, would this have been a good piece of evidence, a not so good, kinda --

A. Well, obviously it would have been much more helpful to have talked to the woman and assessed her credibility. I mean, all we have is the report.

Q. Yeah.

A. And none of us interviewed her, so Agent Basler would be in the best position to know how great of a witness she was or how poor. But just on paper, you know, it looked pretty good.

Q. Do you remember making some investigative notes in the case fairly early on? I'm going to show you PB-1, 17 through 19. Is this a memo -- do you remember compiling these notes on January 12, '01?

A. I don't remember doing this, but I know I did it looking at them.

Q. This apparently is your review of the government's brief in support of the magistrate's detention order?

A. Yes, sir.

**2118**

Q. Were you involved in putting together that brief? Apparently you're now moving to review the magistrate's order of the detention hearing?

A. No. This was my review of the government's brief. The government filed a 12-page brief to affirm the previous order of detention which we were challenging.

Q. Was that a realistic goal at this point in the litigation, or was this something that was being done --

A. No, probably not, but our client, Miss Johnson, certainly wanted us to do it, and there was no downside to making the effort other than I suppose some might view it as a waste of resources. But we didn't spend a lot of resources doing it. And it was at a stage still, you know, early on in the investigation. We were trying to continue to build rapport with Miss Johnson, and this was the thing that was most concerning to her was her inability to see her children.

So I was fine with the idea, but that's what the memo is about, my review of the government's brief, not our own brief.

Q. You're basically saying that that brief which was based I guess on that August detention hearing --

A. Right.

Q. -- pre-McNeese --

A. Right.

Q. -- was a mini script of the government's case against

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

**2119**

Angela Johnson.

A. Correct. That's what I wrote.

Q. And as you're reviewing this, you're making some investigative decisions here like at the bottom you say we need to establish the identity of the gun shop person maybe and interview --

A. Gun shop owner --

Q. Gun shop --

A. -- and interview him and any other relative witnesses.

Q. Was that ever done, do you know?

A. I don't know. I never interviewed him or any of the witnesses surrounding the gun purchase, and I didn't direct anybody to do so.

Q. Down at the bottom there, you have under 6, "We obviously need to speak with," and then you've got a long list of people.

A. Right.

Q. Do you know if the people on that list were ever spoken to?

A. I didn't speak to them, and I didn't direct any investigator to speak to them, and I never have seen any defense investigative memos concerning any of those people, so I doubt that we spoke to them.

Q. Some of those people, according to your review of the government's brief, had bad things to say about Dustin Honken; right?

A. Right.

**2120**

Q. Like Donaldson was claiming that Honken had solicited him to murder witnesses.

A. Yes. I don't --

Q. And that he had done so at a point in time when he was in custody away from Angela Johnson's evil influences.

A. Yes. None of these were favorable witnesses for the defense.

Q. For the Honken defense.

A. Right, or either defense I think.

Q. Well, wasn't one of your themes to try and develop evidence of how bad Honken was in comparison to --

A. Yes, I suppose for that -- from that perspective I guess you could argue that the testimony of some of these folks might have been helpful.

Q. So to the extent they didn't have anything bad to say about Angela Johnson but could cast a bad light on Mr. Honken, they would be helpful to your theme of showing who really the bad person was.

A. Right. But they're not -- you know, none of these witnesses are, you know, alibi witnesses or excluding her from participation in the crime, right.

Q. Right.

A. Right.

Q. But these are people that you think could have been -- could have been interviewed to provide information on the --

**2121**

A. Relationship.

Q. -- relationship.

A. Yeah, the relationship between Dustin Honken and Angela Johnson and the relative sort of disparity in who was running the show.

Q. Now, the other person you have listed at the bottom there is -- and I think part of this is cut off -- Rick Held?

A. Yes.

Q. He's the guy who Honken had asked to get the 38?

A. Right.

Q. And supposedly talked to a girlfriend who said he doesn't need the gun --

A. Right, presumably Angela, right.

Q. Did you interview him or direct somebody else to interview him?

A. No.

Q. Next page you have Hugo potential witness, and I can't read the rest. Maybe you can help me.

A. Potential witness is the inmate Honken approached about killing Angela as sole witness to the murders of Nicholson and DeGeus. This is a guy that Honken was going to try to get to kill Angela or he at least told -- Honken told Hugo that he wanted Angela killed because she was a potential witness.

Q. And did you interview him?

A. No.

**2122**

Q. Or direct anybody to interview him.

A. No.

Q. Number 7, we need to identify and interview witness who claims to have seen defendant and Honken return home very late and immediately shower on the night of 7-25-93. Is that Christi Gaubatz?

A. Yes, of course.

Q. Did you interview her or direct somebody to interview her?

A. You know, I think we -- no, I didn't interview her. I can't say for sure we didn't try to find her, but I don't -- I'm sure I didn't interview her.

Q. She was an important witness in this case, was she not?

A. She was.

Q. From the perspective of you had a group of people who were jailhouse informants, people who had at least on the surface some incentive to cast blame or gain benefit from testifying against Miss Johnson?

A. Right.

Q. Did Miss Gaubatz seem to fit in that category?

A. No, she was Angela's friend and did not seem to fit the category of somebody Angela just met in jail.

Q. In your plea discussions with Miss Johnson, did you ever reach a point where you went in with her and said, look, these jailhouse informants, we can trash them until the cows come home, but we got a real problem in this case with Miss Gaubatz,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 353 Filed 11/10/11 Page 53 of 86

and we've interviewed her, and we tried everything we can to impeach her, and it's just not there?

A. I'm sure -- well, I don't remember interviewing her, so the answer would be no. But in terms of confronting Angela with her expected testimony, I'm sure at some point that came up based on the reports that we had.

Q. But were you ever in a position to say you would have done a independent and exhaustive investigation of Gaubatz's credibility --

A. No.

Q. -- and as a result of that investigation you could assure your client that there was not a lot of room to move on her?

A. We did not talk to her as far as I'm aware.

Q. Okay. Now, at some point you had a -- you had a presentation that you made to the local U.S. attorney about whether the death penalty should be sought in this case; correct?

A. We were invited to participate in a presentation that was being made, yes.

Q. And showing you PB-1, 87, do you recall drafting out in advance of that meeting a memo to yourself which outlined the theme which you were going to strike with the local folks in terms of the death penalty?

A. Yes.

Q. And is this a memo you drafted on March 16, '01?

A. Yes.

Q. And in that memo, is it true that really your focus here is on Bobby McNeese and Bobby McNeese only?

A. If I could have just a second.

Q. Sure.

A. In terms of the government evidence, yes, that would have been the argument I suppose, right.

Q. And was there some reason why in your own mind you were thinking this case was about just him in terms of the government's evidence?

A. No. I mean, I knew -- I knew otherwise. As I've previously mentioned, however, I thought Mr. McNeese's testimony was particularly damaging.

Q. Okay. And do you recall that you -- after drafting that memo you did meet with the local U.S. attorney and have a discussion about not only authorization but about plea possibilities in the case?

A. We did.

Q. And showing you PB one eighty-nine and one ninety, is this the note from your meeting?

A. Yes.

Q. Which took place according to your notes on April 11, '01?

A. It says 9 a.m. scheduled and we might have started a little later than that. Looks like we started at 9:31.

Q. And the meeting was with Mr. Williams, Mr. Reinert, and the

U.S. attorney at the time, Mr. Rapp?

A. Yes.

Q. Would you explain to me what that first part of your memo means when it says forego presentation to persuade, and then you list a bunch of factors there?

A. Yeah. My thinking was there were a number of points that I thought the government was well aware of that we didn't need to try to persuade them about, and this is sort of a listing of those. Not sure why I bothered to write it out, to be perfectly honest. But anyway, that's what it is.

Q. I mean, the points you essentially made with them are they know the case a lot better than you do.

A. Right.

Q. But did that relate to the discovery status at this point?

A. Well, yes. I mean, it's typical. At this point here we are, now we're a year in, we're still fighting about the discovery. There was no question the government knew this case better than anybody on the defense team.

Q. And did you tell them the second point there which is that they knew how difficult it was going to be to get the death penalty against a woman?

A. I don't know if we told them that. I mean, that seems to me to be fairly obvious. I don't know why I'd tell the government that, so I'm not sure why I wrote that down. I wouldn't have to tell any of these gentlemen that it would be

more difficult, but perhaps I did.

Q. Was the third point you made that the defense is going to have significant mitigation evidence of her being under the domination of Dustin Honken?

A. Well, I think I was hopeful. I don't think at this point we had developed that evidence, but I think I was hopeful we would have that evidence.

Q. In other words, as you're stepping back and sort of, look at, what are the things that are really going to be important here in mitigation, this was the one that you mentioned to the local U.S. attorney as being something that you thought was going to carry some weight with them and ultimately with the jury if they proceeded.

A. And this is the one factor. I mean, at this point I didn't know very -- hardly anything about Dustin Honken's background, if anything at all. I don't know if he had an abusive childhood or whether he was sexually molested or what.

But this factor is the one mitigating factor that separates him from Angela Johnson relatively speaking. No matter what his history is, as to these murders, she's under his domination, not the other way around, which makes her less culpable which means her penalty should be less severe. That was the significance of that mitigator.

Q. And some of the other things, it only takes one to hang up a death --

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 54 of 86

A. Yeah. Again, boy, if I said that, that was naïve at best. I think these are very bright, capable government attorneys and would know -- they know that.

Q. Of course, you're speaking to a group of prosecutors who are in a state where there's not been a death penalty; correct?

A. Right. That's true.

Q. And you don't know what their knowledge base is in terms of doing capital cases generally or federal capital cases in particular.

A. No, I don't. But this seems a little presumptuous to be perfectly honest. But maybe I -- maybe I said that.

Q. And then you indicate that they know that they need Angela to get the death penalty against Honken. Is that a theme that you stressed at this point that you were well aware of?

A. Yes. I felt strongly that that was a very important motivating factor to get our case along to a plea.

Q. And lastly that there was some legal issue having to do with Dobbert versus Florida.

A. Yeah. I thought there was a legal issue perhaps at that time, but that really wasn't much of an issue.

Q. Well, in fact, at the bottom there they kind of indicated to you that it just was going to require a little maneuvering, didn't they?

A. Right, exactly.

Q. Recharge it as an 848, and they got the problem solved.

A. Problem solved, right.

Q. Right?

A. Right.

Q. Now, the highlighted portion there says, "We're interested in a plea, will be much more difficult after official DOJ death penalty sanction is imposed." Is that something you said, or is that -- was that the response to your presentation?

A. No, I think this is something I'm trying to convey, that we should be able to get this worked out amongst us locally before -- without having to involve the Department of Justice, not that the Department of Justice isn't going to review any recommendation towards a plea. But it's a lot easier to negotiate with a local U.S. Attorney's Office.

Q. And do you remember what you said about it being much more difficult once DOJ got involved or once the death penalty sanction is imposed, which I assume what you were meaning here was once DOJ authorized the case?

A. Right.

Q. Because they don't impose the death penalty.

A. Exactly.

Q. They'd like to, but they don't; right?

A. Right.

Q. So --

A. My impression at the time and not so much from my own cases but from discussions with people like Kevin McNally and

attending Life in the Balance and the death penalty seminars that I'd attended, that once that authorization process takes place, it's a tougher negotiating position, and there should be an effort made to dispose of the cases early on if that's a possibility, if realistically you can do that. That was -- that was tremendously hampered in this particular case by discovery issues and other issues, but that was the goal.

Q. Now, at the time you made this presentation in April, were you aware of what the policy of the Department of Justice was as it related to the need to clear plea agreements with main Justice before --

A. On nonauthorized cases? No.

Q. No, on authorized cases.

A. Yeah, on authorized cases I knew main Justice would have to approve the plea agreement, yeah, absolutely, because Ashcroft had failed to do that on a number of occasions.

Q. Were you aware that that policy did not go into effect until June 7, 2001?

A. I wasn't aware of that. I wasn't.

Q. And that prior to June 7, 2001, the U.S. attorney was authorized to accept a plea even without the approval of Justice in an authorized case.

A. I was not. I specifically remember writing a letter to Mr. Reinert during our plea negotiations pointing out to him that Attorney General Ashcroft on many occasions -- I want to

say 30 or so times -- had reversed plea proposals by the local U.S. Attorney's Office, so that's what I'm relying on. But perhaps that was later than 2001.

Q. Did you think, although those statistics existed, that the thing that was going to prevent that from happening in your case was this factor right here, that the government knows they needed Angela to get the death penalty against Honken?

A. I thought that the local U.S. Attorney's Office would very much want Angela Johnson to cooperate against Dustin Honken in order to get the death penalty against Honken and that that was the primary reason that they would be willing to deal with her on a plea.

Q. Do you remember that around the time that this meeting took place that you and Mr. Reinert were exchanging some letters that I think are in the record in which Mr. Reinert was imposing deadlines for acceptance of a plea and you're writing back basically telling him slow down here?

A. There were a series of letters in I want to say February, March, and April of 2001 that had to do with this process of authorization coming up and Mr. Reinert really wanting to get the case resolved before then if we could. And so he set a deadline. I don't remember what it was. March 15, April 15, something of that nature.

Q. Right.

A. At that time we had not received a ruling from the Court,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 353    Filed 11/10/11    Page 55 of 86

from Judge Bennett, on the Massiah motion. I told Mr. Reinert we really needed to know what was going to happen before we could intelligently make a decision about the plea and that we're also having some discovery issues, and I asked him for an extension of his deadline which he granted, although the extension that I wanted I think was several weeks or months, and he gave us an additional 15 days.

Q. And is it true that you did need to know the outcome of the McNeese litigation in order to make a plea decision in this case?

A. Well, no, perhaps not. I mean, this would be the point where if you looked at the evidence presented at the detention hearing alone absent the McNeese evidence, you'd have to make an assessment that maybe a plea was a good idea nonetheless. But Robert McNeese sealed -- he -- that sealed the deal. If those maps are in, this -- as I've said before, the game is up, and we need to plead the case.

It would have been helpful, frankly, for plea purposes not that we wanted an adverse decision -- we didn't, not at all -- but from a plea perspective, you know, things work the opposite way around. The worse the case is for the defense, the stronger it is for the government, the better the prospect of getting a client to see the light.

And so I suppose if Judge Bennett's decision came down and said, hey, no problem with McNeese, then maybe that would

have hastened the discussions.

Q. Now, after you had this exchange with Mr. Reinert concerning the timing of any plea proposal, do you recall writing this letter to Angela Johnson? It's PB-1, page 88.

A. Yes, yes.

Q. And was the reason you were communicating with her in writing about this plea process that's reflected in this letter that you were in Kansas City and she was out in Iowa?

A. Yes. I mean, I would have -- this is the kind of thing you'd much rather visit your client in jail and convey personally but --

Q. And why is that? I mean, why do you want to convey information about plea discussions in person?

A. Well, for a number of reasons. You know, there's the confidentiality aspect but -- not that I was terribly worried about Linn County opening mail. We had -- we'd had some issues. But it's just these are very important decisions. They're huge, and the client's going to have questions, and one of the things they're going to want to know is why -- what's your position? What's your position, Berrigan? I mean, why should I do this? Well, why shouldn't I? What's the upside or the downside? And you can't answer those questions in a letter. You know, this isn't a back-and-forth discussion. So that's the main thing.

And in person I would be able to assess what her concerns were, if there are aspects about a plea proposal that

weren't going to work, can we work on them, what are they, what are the problems. Maybe it's not the time. Maybe it's making the admission. Maybe it's the other way around, that I can make the admission, I can't do that time, who knows, none of which we can convey in correspondence.

Q. This letter states that you're well -- you very well know that you are not present -- not -- I think you're missing a word there, not presently interested in discussing a guilty plea; right?

A. Yes.

Q. Is that what you meant to convey?

A. Yes.

Q. How did you know at that time that she was not presently interested in discussing a plea?

A. That's based on I think my previous -- probably my most recent discussion with her, whenever that was. You know, frankly, she was kind of up and down on plea negotiations consistent with her somewhat erratic emotional state at the jail. So some days she was opposed to it, and other times she was fine and not -- you know, not that we didn't have issues about how much time is involved and things of that nature. But she was not always unequivocally opposed to a plea agreement. That wasn't her position.

Q. Were there some times when she not only was not opposed to it but was actively saying to you "I want a plea agreement"?

A. Yes, and there was an occasion where we were talking about where she might be housed. I sent her some materials from a federal prison handbook which is a little paperback that's composed by a guy named Alan Ellis in San Francisco. And it's really pretty good, and he has information in there about all of the various prisons including the women's prisons. And she was interested in knowing, well, where am I going to end up, what it's going to be like, that kind of thing.

So I had my secretary -- I was in Cedar Rapids -- photocopy the documents and fax them up to Cedar Rapids. I think that's how we did it. Anyway, she was interested in that kind of a thing. You don't talk about where you're going to be housed unless we're talking about a disposition.

Q. Do you remember when that was?

A. I don't, but I know it's in my notes.

Q. I'll show you PB-1, 283 and 284. It's a visit --

A. Right.

Q. -- April 16, '02.

A. Right.

Q. And you've written in your notes photocopy women's prisons from federal prisoners and send ASAP.

A. Right, with note.

Q. So was this where -- in the context of Angie Johnson discussing where am I going to go if I plead?

A. Right. This is a jail visit with Angela and I, and these

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 56 of 86

are the issues we talked about. That was the third one. Just under two-hour visit, and I wrote a note, call Becky, who's my secretary, about this, getting the information copied out of the book and faxed up to me in Cedar Rapids.

Q. And the second page of your note --

A. Or mailed. I'm not sure but . . .

Q. It appears that this is a situation, the same visit --

A. Right.

Q. -- where you're actually going over some of the discovery yourself, not a law -- not a paralegal, but you're sitting down with her and going through some of this material.

A. Well, you can see we have the grand jury testimony now, so -- and we had that in the books, and we went through book 2. I can't tell you what book 2 involved as I sit here, but whatever it is, that's what we went through. She read her family's testimony, so that was in book 2, Wendy's, Jim's, Alyssa.

I read her some grand jury testimony and few other witnesses, talked a bit, and these were two good visits, and then I have parentheses, no Al, which meant Al wasn't there.

Q. Was there in your view a relationship between having two good visits and no Al?

A. Unfortunately, yes, yeah.

Q. And could you explain that?

A. Well, I'm -- I felt I was making progress to getting Angela

to a realistic appraisal of her case from the perspective that I thought a jury would see it, and that was a more difficult task when Mr. Willett was with me unfortunately. And so that was my feeling at the time that one of the reasons these were good visits was that Al wasn't there. So that's what I wrote.

Q. Now, were you able from this point forward to kind of sustain this relationship with Angela Johnson and get in there by yourself and continue this discussion?

A. I mean, I would say there weren't setbacks because occasionally there would be. Something would happen. She might have a particularly bad day at the jail or something would happen with Marvea where, you know, there was this whole thing about Dustin trying to get custody. So there were periods where she'd regress, but generally speaking, if it was just she and I, I did a lot better with her than if there were other people involved.

Q. Do you remember after this visit where you were discussing with her placement issues -- and this is from Exhibit 67 which is the chronological reports. I'm showing you MCN02-002743 through 46. Do you remember, again, in 2002 writing this letter to Miss Johnson?

A. Yes.

Q. And at this point it says you're tied up in a trial in Kansas having begun our sixth week on Monday; right?

A. Yes, yes, that's correct.

Q. And at this point you're in what trial? Is this Robinson now or --

A. State of Kansas versus John Robinson.

Q. Was that a complex death penalty case or pretty straightforward?

A. There were -- there were six murders that he was accused of. He had lured women on the Internet to participate in sadomasochistic sexual activity. There's a whole community I learned that does this type of thing. And then in some instances he killed these women and put them in barrels, metal containers, some of which he stored in storage areas in Missouri and Kansas. There were some women that were killed, at least two and I think maybe three, whose bodies were never recovered. So there were essentially nine murders in that case that occurred over a period of years, six of which were actually charged. So it was a complex case.

Q. And were you in trial for -- how long did that trial last?

A. I think the trial went about three months is my recollection.

Q. Now, this is a period in Angela Johnson's case where you've made your local presentation and your Washington presentation; correct?

A. It's already happened, right.

Q. And has death been authorized at this point?

A. I don't recall. I don't know.

Q. You indicate here you're actively pursuing efforts to procure the services of a neuropsychologist.

A. Right.

Q. And was that Dr. Gelbort?

A. Yes.

Q. In fact, when did Dr. Gelbort finally get on board and evaluate Miss Johnson?

A. Well, I don't recall, but obviously it was some time after this.

Q. Was it January of 2005?

A. It may have been that late. It was pretty late.

Q. In the second paragraph you talk about some delay in services, but then you also talk about some discovery you've just received concerning a jailhouse informant by the name of Holly Christensen.

A. Right.

Q. And attached to the letter, do you outline for Miss Johnson what you believe the harmful nature of Miss Christensen's testimony is?

A. Right.

Q. And basically in the letter are you warning her that, hey, you've already gotten into enough trouble with McNeese; how come you're generating conversations with Miss Christensen?

A. Right.

Q. Now, Miss Johnson responded to this letter, did she not?

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 57 of 86

**2139**

A. She did, yes, she did.

Q. And I want to show you again from that same exhibit MCN02-002749 through 2753. Is this a letter she wrote to you?

A. Yes, yes, sir.

Q. And in the letter she says, "I received your letter today concerning this Holly Christensen. I've never met her, don't know who she is." And then does she proceed point by point for a number of pages to refute the summary that you had included with your letter?

A. Yes.

Q. And at the end of that summary does she say to you, "You want to know what kind of inmate I am? Want to see if I told about my case for real? Ask the people I've done this time with a long time, Shelly Jenney, Val Williams, and Brandy Byrd."

A. Yes.

Q. Are those three people that you eventually interviewed?

A. I specifically remember interviewing Valli Williams and Brandy Byrd. I don't remember interviewing Shelly Jenney, although I may have.

Q. And then she says, "What is worse than being lied about? Your own attorneys believing them over me."

A. Right.

Q. Yes, Al can say he believes me, but it's clear to me that he doesn't. How about you? Do you believe me? Probably not. I almost don't care -- even care anymore. Can you just get me a

**2140**

deal and get me out of here, please? I have not touched my girls in almost two and a half years.

Now, that last sentence where she says, "Can you get me out of here and get me a deal," is she asking to be released or --

A. No.

Q. What is she asking you to do?

A. No, she means get me out of this jail. You know, these county jails, this is hard time. There's no recreation to speak of. They never get out of jail. That is, they don't get to go outside. They're designed for people to be there pretrial typically far less than a year. And here she is now in her second year. This is going to go on. She can't have any contact with her kids. It's tough. It wears on you.

Q. So does she also say, "I feel like I've already been convicted and am being treated and kept in a worse place than if I were. I want to touch my little girl and hold my granddaughter when she is born. I can't take it in here anymore. Waiting has done me no good as far as I can see. I'll say whatever they want to hear just to leave here. It would be easy to poke holes in these liars' stories, but it's just easier to believe what they say, isn't it? I have no future anyway; right? All I ask is that you push to get a deal made and get me on my way"?

What did that tell you about her receptivity at this

**2141**

point to actually settling this case and getting out of this county jail situation?

A. Well, obviously it speaks for itself. I mean, she's very frustrated with in particular these women who she's being housed with turning around saying she said this or said that. But, you know, we've already had our discussion about the prisons and what they're like, and it's not the same. They're not the same as county jails. So I don't know why it took my complaint about Holly Christensen to kind of get her going along, but she seems as ready here as ever to plead the case.

Q. Well, sometimes when you confront a client with evidence, for instance, as you were doing here with Holly Christensen --

A. Right.

Q. -- the harmful nature of that evidence was this was yet another jailhouse informant who was going to say that Angie Johnson confessed.

A. That's part of it, and part of it is as she indicated, you know, it's -- you guys would rather believe Holly Christensen than me, and -- you know, and she's tired of that. She's just tired of it. And so let's go. Let's get this case going.

Q. And you know from your perspective your ego's not involved in this. Do you see in this letter sort of her complaining about you, you don't believe me?

A. Yes, of course, yeah.

Q. From the perspective of what you're trying to accomplish,

**2142**

is the main point of importance of this letter to you that here's somebody who's receptive to pleading this case at this --

A. Right, and this comes in the context of our -- you know, the hang-up at this point, part of it, is this whole proffer situation. And the other thing she's telling me here is I don't care. You guys are arguing about this proffer stuff and should we make a proffer first, and I don't care. That's your -- let's just go; let's get going. So that's what I read when I read this letter.

Q. And the other thing besides a proffer that was going on, there was a number that had been tossed out.

A. Right.

Q. Twenty years. Do you remember the discussion?

A. Right.

Q. You said 20. Reinert comes back, says it's unconscionable. Whose number was that?

A. Well, you know, initially that wasn't his position, Mr. Reinert, when I say his position. You know, when we initially tossed out 20 years, he didn't reject that out of hand. The government admitted during plea negotiations that before the bodies had been recovered they would have offered her 15 years. To get the bodies, they would have done hardly anything. Obviously that had changed. But if you analyze it from the perspective of you committed these murders and we're going to give you 15 years, it wasn't such an outrageous

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

position then.

Later 20 was unconscionable, but that wasn't their initial position. And 20 is -- 20 is a light sentence. I wasn't expecting we'd get 20, but from a negotiating perspective, I wanted us to be talking about numbers, not a life sentence.

Q. Well, but that number was your number; right?

A. Right, oh, absolutely.

Q. In other words, Angie Johnson didn't come to you or the other defense team members and say can't do a day over 20 or 20 is what I'm going to settle for. This is a number that you took to her and said this is where I think we should be at.

A. Right, but I discussed it with her. I mean, I didn't -- yes, that's true. Twenty's my idea. But I ran it by her.

Q. Yeah.

A. I mean, I didn't, you know, just float it out there.

Q. You've been in situations, especially with experienced convicts, who come to you with a number.

A. Yeah, of course.

Q. And they say this is my number, and I'm sticking to it.

A. Right.

Q. That was not the situation.

A. No, that wasn't the position, no.

Q. She was pretty much a rookie in the system, was she not?

A. Very much so, at least at this level.

Q. And was she dependent upon you and your other team members to kind of tell her what the case was worth from a bargaining standpoint?

A. Well, I think all clients are. Even the experienced clients, you know, they're not experienced in capital murder cases, so, of course, they rely on their lawyers for this type of advice. That's what we're there for.

Q. And you before this letter was written in which she says, you know, get me a deal, you'd met with Reinert -- and I'm showing you again from the PB series PB-1, page 321.

A. Right.

Q. You'd met with Reinert back in August of '02; right?

A. Right.

Q. Had a plea discussion with him.

A. Right.

Q. You indicate here Reinert never specific, but we are far apart. He claims to want death for Honken and A.J. cooperating, but he could also do double joint plea with Dustin getting LWOP.

A. Right.

Q. And in terms of what he wanted for Angie, you wrote down at the bottom Miller reflected that he and Pat had talked early on about offering A.J. 10 to 15 years for information leading to recovery of the bodies. This pre-McNeese, of course, but suggests to me that our high teens, low 20s offer is not out of whack.

A. Right.

Q. Where'd that high teens number come from?

A. Well, from me. I think Al Willett had told me about this discussion at some point, the 10 to 15 years. I don't recall specifically when. I don't think we ever went to the government with it, high teens, although perhaps we did. But the point of this note is, you know, the government's later saying it's unconscionable. You've got 5 murders, so how could you possibly get 20 years? Well, that wasn't their position early on.

And I understand obviously to get these bodies they'd go a long way in terms of negotiation. But these were numbers that at one time were on the table for the very same crimes that we're still litigating, the same crimes. We're not in the same position, but they're the same crimes.

Q. The unconscionable letter was in October of '01. Do you recall that?

A. I don't recall the date specifically.

Q. So you had put 20 on the table. They had said, you know, unconscionable because in a drug case you can get way in excess of 20.

A. (Witness nodded head.)

Q. Isn't that what he told you?

A. I know -- I know at some point they described it as unconscionable. That was the term they used.

Q. And now in this meeting which takes place sometime after

that October letter from Reinert --

A. Right.

Q. -- they're telling you, according to your notes, that, well, we were going to offer you 10 to 15 before McNeese, and the interpretation you're placing on that is sounds like we're in the ballpark?

A. Well, yes. At least it wasn't outrageous. With the numbers we're talking about, they aren't immediately rejected. At least my notes don't reflect that. I wish I had something after that LWOP about what we were discussing about Angela, but the idea was she would get something less than Dustin Honken who was going to get life without parole.

MR. BURT: Judge, this would be a good place to stop if the Court please --

THE COURT: Yes.

MR. BURT: -- because the marshals tell me that we have two prisoner witnesses. We'd like to clear those out if we could if --

THE COURT: Okay. So you want to take -- we'll take a break and then come back and do two inmate witnesses and then come back to Mr. Berrigan?

MR. BURT: I think for the convenience of the marshals that would be really much appreciated.

THE COURT: Well, I'm a little bit more concerned about Mr. Berrigan's situation than I am the in-custody

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 59 of 86
*to purchase a complete copy of this transcript.*

witnesses.

MR. BURT: I don't see we're going to finish --

THE COURT: Because they won't be going back for a while the way that works.

MR. BURT: Right.

THE COURT: So, I mean, I'll do it that way, but why would I -- I think we ought to accommodate Mr. Berrigan. I mean, he --

MR. BURT: Sure.

THE COURT: -- made a trip here last week, and then he had to go back.

MR. BURT: No, that's true.

THE COURT: And, you know, I mean, the marshals haven't said anything to me about it. These guys aren't going anywhere.

MR. BURT: All right. That's fine if the Court wishes to do it that -- I had just been approached by them, and they told us they were here today, and we're trying to work it. But I have no problem with that. I guess I just question whether we're going to finish with Mr. Berrigan today anyway.

THE COURT: Well, we're not but -- I doubt, but why not finish with him and then take the inmate witnesses because they're not going anywhere? What? They have some appointment they need to get to this afternoon, or what am I missing here?

MR. BURT: I don't know where they're from.

THE COURT: Yeah, and it's not that I don't want to accommodate them too.

MR. BURT: Right.

THE COURT: But accommodating an officer of the court or --

MR. BURT: Sure.

THE COURT: -- federal inmates, I'm probably going to accommodate the officer of the court.

MR. BURT: We appreciate that, Your Honor.

THE COURT: Because I know -- and I'm saying that only because I know about how long the transport system takes right now. And I've got some inmates I sentenced in February that we're trying to get to a prison camp in Duluth, and they're still sitting in Woodbury County, and so -- and the marshals told me they're not going anywhere soon.

MR. BURT: I'm not familiar with all this.

THE COURT: Yeah.

MR. BURT: But I guess I brought it up because I was led to believe that it would be --

THE COURT: Mike, do you know anything about it, why I should be accommodating these fellas?

DEPUTY FULLER: No, Your Honor. It's just they were brought in Friday, and we just had them here today prepared to be -- to testify.

THE COURT: Okay. But you're not planning on letting

them go, are you?

DEPUTY FULLER: Absolutely not.

THE COURT: Okay. So they'll be here tomorrow or June if we don't get to them.

MR. BURT: Thank you. And I apologize to Mr. Berrigan. I thought I was being --

THE WITNESS: No, I --

MR. BURT: -- told by the marshals to get these folks in. And I'm sorry.

THE WITNESS: No.

THE COURT: No, that's okay.

THE WITNESS: I'm fine, Your Honor. How ever you want to do it.

THE COURT: No, I --

THE WITNESS: I had sort of heard you to say we'll finish with me and then we'll put on the inmate witnesses.

THE COURT: Yeah, I know how I want to do it, and that's how we're going to do it so . . .

THE WITNESS: That's how we'll do it.

THE COURT: Yeah.

MR. BURT: I can continue if you want or --

THE COURT: It won't be the toughest decision I'm going to make in this case, I guarantee you that. So we'll be in recess until 3:05. Thank you.

(Recess at 2:48 p.m.)

THE COURT: Thank you. Please be seated.

Mr. Burt?

BY MR. BURT:

Q. Mr. Berrigan, showing you from Exhibit 72A PB-1, page 232, do you recall sending this letter to Miss Johnson on October 9, 2001?

A. Yes.

Q. Indicating to her that you're going to be in a federal death penalty case in Kansas City, starts in October that's going to keep you busy till Thanksgiving; correct?

A. Yes, sir.

Q. And is that the Nelson case?

A. That's Keith Nelson's case.

Q. In the second paragraph you say, "I wanted to mention briefly that we told the government that we might be interested in a deal for 20 years. Much to my surprise, they did not reject our number as being completely out of the question." As far as you know, is this the first mention of this 20-year number to Miss Johnson?

A. I don't honestly know. If my notes have information in there about it earlier, then I'd rely on my notes, but that sounds about right.

Q. And it indicates that Dean's going to put a sample plea package together for your consideration. If it's suitable, we can present the written proposal to the government.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

**2151**

A. Right.

Q. Do you recall that, in fact, Mr. Stowers did put together a plea proposal and send it to you?

A. I don't recall it, but I expect he would have.

Q. This is a -- from Exhibit 53C. It's a fax page to you dated October 9, right around the time of that letter that you just indicated, and it says proposed plea agreement, and attached to that is a draft plea agreement from the defense to Mr. Reinert.

A. Yes.

Q. Do you recall receiving this and reviewing it?

A. Yes, yes, sir.

Q. Do you recall whether or not you discussed this plea agreement, proposed plea agreement, with Miss Johnson?

A. I don't recall whether I discussed it with her or not.

Q. And do you recall whether or not the plea agreement, proposed plea agreement, got sent to Mr. Reinert?

A. I don't. If it was sent, Mr. Stowers sent it. I didn't send it.

Q. Okay. Other than reviewing it, did you take any action with regard to this plea agreement?

A. I think I spoke to Mr. Stowers about it on the telephone. Beyond that, I don't recall doing anything with it.

Q. There is no factual basis in this plea; correct?

A. No, there would not be.

**2152**

Q. You would not have put that in there?

A. I would not expect it in there.

Q. Now, I think you said -- you sent that -- you got that letter in October, and then I believe you said you had your local meeting in April of '01; correct?

A. We had one of our meetings in April of '01.

Q. And do you recall that after your local meeting that your Washington meeting -- there was some discussions about scheduling your Washington meeting?

A. I recall that there were some issues about getting that scheduled, some correspondence about it.

Q. And do you recall sending this letter to Mr. Willett in August of 2001 in which you said that you had -- and this is PB-1, page 209 -- that you had serious reservations as to the productivity of this meeting?

A. Yes.

Q. What were your serious reservations about the presentation to the folks in Washington?

A. Historically my experience was limited, but it was generally thought of in the federal death penalty defense community that these meetings with the Department of Justice were usually not particularly helpful or productive and that the Department of Justice was using them largely as a method by which to gain a preview of the defense mitigation evidence and take steps to begin to refute that.

**2153**

Q. Was that your experience in the Tello case, or was that something you just heard from other folks?

A. Well, we had had that experience in the Tello case, but I -- my recollection is, again, based on my attending seminars and communicating with people in this area of practice that this was sort of a widely held view, one I shared.

Q. And had you made a presentation in Washington on the other case?

A. No, we did it by video. We had a videoconference on Tello's case.

Q. And that case had been authorized.

A. That case was authorized.

Q. Did you have any other firsthand experience of it other than that one case?

A. I can't remember -- at this time probably not. Mr. Nelson had a similar authorization process, but I think it may have been after Angela's.

Q. Even though you had reservations about it, do you remember -- and this is PB-1, page 256 -- that on December 9 you actually started to work on your presentation?

A. Yes, of course.

Q. And then on the 10th you drove to Mr. Willett's office, did more preparation for the hearing, and then actually conducted the hearing by way of videotape for about an hour on that day --

A. Yes.

**2154**

Q. -- is at the bottom there. And are the notes that follow this, that is, 257 and all the way through 255 (sic), are those of your presentation outline?

A. Yes, that's my presentation outline, right.

Q. You're basically outlining Miss Johnson's social history?

A. Yes.

Q. And indicating to the committee that the oral argument is set on the Massiah hearing for January 16?

A. Yes.

Q. And in the upper right-hand corner on page PB-1, 260 you've written the word "waste of time"; right?

A. Yes.

Q. Was that in reference to your contemporaneous assessment of the value of that meeting with the decision makers in Washington?

A. I believe so, although I'm not sure.

THE COURT: Can I ask a question here? Mr. Burt, you said videotape, so I'm wondering if it was -- you videotaped it and sent it to them, or was it a videoconferencing?

THE WITNESS: Videoconference, Your Honor.

THE COURT: So it was interactive.

THE WITNESS: Yes, sir.

THE COURT: Okay.

THE WITNESS: That's why I might have written waste of time.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 61 of 86

THE COURT: Right.

MR. BURT: I apologize to the Court.

BY MR. BURT:

Q. They're on the other end. The local U.S. attorneys are on the videoconferencing?

A. I think this is how it was being done generally at this time rather than flying to Washington. They were videotaping these -- videoconferencing these meetings all over the country.

Q. Was plea proposal discussed during the meeting with the decision makers in Washington?

A. If my notes reflect it, then I would say yes, and if not, then I would say no.

Q. I don't see anything on -- this looks like background information.

A. Then if it's not in my notes, I don't expect it was discussed.

Q. And again, the second page, more background information. I don't see any discussion there. Talking about her being sexually abused at age 8 at an orphanage?

A. Yes, sir.

Q. How did you know that mitigating fact at that time?

A. I'm not sure.

Q. Do you recall there being some indication that Miss Johnson lived at an orphanage where some Native American boys were also raised?

A. Oh, absolutely. We presented some testimony at trial about it, but I'm not sure at this particular time where I'd gotten that information, whether it was from Angie or other sources.

Q. When you presented information about the orphanage, do you recall what efforts, if any, you made to find the Native American boys who were living at the orphanage?

A. I don't remember making any efforts to find the Native American boys. I do believe we made some effort to find Mr. Dillow or the couple that ran the orphanage, but in terms of other occupants of the orphanage, I don't recollect making any effort to find them.

Q. Let me ask you a hypothetical question. If you had found -- if you had looked for and found Native American -- a Native American boy who was brought up in the same orphanage and said, "I don't remember Angela Johnson specifically, but I can tell you how much I was abused around that time period," same time period roughly that Miss Johnson was there, would there have been any tactical reason for not presenting that evidence?

A. No. I mean, Jim Johnson testified I thought quite powerfully about this orphanage and the horrific experiences that the children had there. I thought that was some of the most powerful testimony in the trial.

So to the extent other people would have been able to testify about similar experiences, that would have just bolstered his credibility and the fact that Angie had had those

experiences.

Q. In putting on mitigation evidence from family members, is it your general practice to try and corroborate family member accounts of things like abuse?

A. Of course, because --

Q. And why would that be?

A. Well, family members are always suspect because they're family members. They typically love the family member that's on trial, would do whatever they could within their power to help them, and so their testimony is frequently called into question by prosecutors on that basis. So to have corroborating evidence from people that aren't associated or related to the defendant is a very helpful thing.

Q. Now, I don't see anything going through these pages of discussion of plea negotiations. Would there have been any particular reason why you wouldn't want to broach that topic with the decision makers at that time given the pendency of this appeal?

A. None other than perhaps we hadn't settled on a specific proposal.

Q. 261 shows that you did apparently discuss with them the Honken domination theme; correct?

A. Yes.

Q. So again, this is a theme you thought was very important in your mitigation.

A. Yes.

Q. Did you have that theme factually developed at this point, or were you just kind of throwing out issues?

A. I don't think we had developed that at all other than some discussions with Angie, perhaps some discussions with family members that were familiar with Dustin, but most people that observed him from a distance thought he was a pretty sort of intellectual kind of laid-back guy, not such a dominating personality.

Q. Based on your review of the discovery, did you think that that image of him as a laid-back kind of guy was a truthful image?

A. Not -- not vis-a-vis Angela Honken (sic). I mean, they had a child together. He may have been a laid-back guy with other people but not with her.

Q. Did your review of the Honken testimony, of his interactions with other people, indicate that he was a laid-back guy?

A. Well, no, certainly not his thoughts being hatched from the jail. There was nothing laid back about his ideas to kill people. I don't recollect him, you know, getting into fights. He's not a physically imposing kind of a character like Mr. DeGeus. He doesn't strike you upon observing him as a guy you'd say this is one tough son of a gun. But we know from his actions that appearances can be deceiving, and that was true in

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 353 Filed 11/10/11 Page 62 of 86

his case.

Q. Do you remember from the Honken trial or from reading discovery that there was information that Honken was telling prison inmates that he was going to escape, go to Canada, do some survivalist training, come back, and kidnap and torture the prosecutor, Mr. Reinert, and --

A. Well, it was more than Mr. Reinert. I mean, I think there were a number of people he was going to kill, kill their families. It was quite a bizarre plot that he had hatched when he was in ADX.

Q. Do you remember the testimony of a guy in the Honken case, Michael Kluver, who told about Mr. Honken's plot to kill all the prosecutors, to kill Judge Bennett --

A. Right.

Q. -- to kill --

A. Yeah, that's what I'm referring to. I don't remember which of the inmates specifically testified about that, but I certainly remember the testimony.

Q. Now, in terms of the image that actually got presented at the -- at your penalty phase, it was very much different than the picture that you would get from reading the kinds of inmate interviews I just alluded to; would you agree?

A. Yes. We did not present any of those inmates.

Q. For instance, through Kathy Rick, the government asked her -- this is at page 2630 of your penalty phase -- "So from

1989 until March of 1993, explain to the jury what was Dustin like as a man." And you understood from that question March of '93 was when he met Angie Johnson; right?

A. Yes, sir.

Q. And she testified he was a good friend, he tried to help other people, he was involved with my children, he was good to them, he was going to school, to college, after he didn't work at Wellborn anymore and then eventually moved to Arizona. And the prosecutor asked, "Is he much of a reader?" Yeah, he liked to read. And what kind of things did he read? Books and magazines. I don't specifically recall what he was reading.

How about the relationship between you and Dustin Honken? What was that like as far as did one dominate the other? Did you tell him what to do and he jumped, or did he tell you what to do and you jumped? Explain that to the jury. She says, "I don't think either person controlled the relationship." Was he violent with you? No. Did he ever threaten you? No. Do anything -- was there ever a point where he made you do anything you didn't want to do? No.

Was that the Dustin Honken that you knew from reading the Honken trial transcript?

A. Well, to the ex -- no, not that testimony. He was manipulative even in regards to Miss Rick but not domineering and overly aggressive.

Q. Well, how about the violence, putting into issue his

character for violence and saying he wasn't a violent person? Did you happen to read the testimony from the Honken trial in which he was involved in a bank robbery which --

A. Yes, yeah.

Q. -- preceded --

A. At a relatively early age is my recollection, although I don't recall how old he was, but he had plotted a bank robbery.

Q. Was there any particular reason why when this image of Dustin Honken was being presented through testimony like I just read you that you didn't counter that with evidence of the bank robbery and other evidence that was presented in Honken's trial?

A. It was too late to do it. That's something that had to be arranged before the penalty phase started. Some of these witnesses gave testimony -- I think his sister is another one, you know, who talked about, oh, he was never violent and nice guy and not until he met Angela Johnson was he violent. You know, that was not testimony that we anticipated. And we had not prepared to put on evidence about Dustin's background.

Q. Well, you actually produced some evidence which supported that clean-cut image, did you not? Do you remember putting on Pearl Jean Johnson and having her say at page 3080 of the trial transcript that Dustin Hoffman -- Dustin Honken was, quote, polite, clean cut, very neat but aloof?

A. Yes, that was the image that he presented to Angela's family.

Q. And you put on testimony from Wendy Jacobson, Miss Johnson's sister, at page 3184 that Dustin Honken was, quote, a preppy nerd, highly intelligent, totally out of character for A.J. to date. Do you remember that?

A. Yes, right.

Q. And you put on testimony from Arlyn Johnson at page 3203 in which he said, quote, I felt he seemed like a great individual?

A. Yes.

Q. Did he seem like a great individual based on the information you knew about him?

A. Well, to those people I think he did. They didn't know him. He was very deceptive and manipulative. But no, I mean, what we knew of him was quite to the contrary.

Q. You put on testimony from Holly, Angela's sister, at 3255 he was very nice. He was a gentleman, totally unlike someone my sister would ever date. He was very smart and very intelligent.

A. Right, exactly.

Q. And you put on testimony from Lou Ann Hare, page 3701, to me he seemed almost like Opie Taylor, kind of a nerd, kind of geeky.

A. Right.

Q. Is that the image you were trying to get across in support of your dominance --

A. No, that's not the image that leads to dominance, but that is the image he projected. This is a guy who despite that

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*to purchase a complete copy of this transcript.*
Case 3:09-cv-03064-MWB-LTS Document 353 Filed 11/10/11 Page 63 of 86

**2163**

image, Terry DeGeus is afraid of Dustin Honken, and it's not because Dustin Honken's going to beat him up. That's not going to happen.

Q. Right.

A. It's because Dustin Honken isn't going to have a fight with Terry DeGeus. He's going to take out a gun and shoot him. This is a guy who doesn't -- he doesn't fool around. So his image, this image that he has, as sort of a, you know, graduate student is belied by the fact that he's not at all reluctant to, you know, kill people to advance his objectives.

Q. Now, in trying to rebut that image of vas -- the image of Honken that was being created by the government, did you carefully compare the testimony that was developed in the Honken trial versus what was being presented in your trial?

A. No.

Q. Did you ever give any thought to trying to -- trying to put into evidence the admissions of the government in the Honken trial as to their position on his dominant role?

A. No. The only consideration I think that ever crossed my mind is that I remembered Mr. Williams' closing argument -- I'm trying to think if it was -- it had to be in the penalty phase of the Honken trial where he portrayed I thought quite vividly quite a different portrait of Honken than he had presented in our case. But I hadn't given it any more than a passing thought.

**2164**

Q. Now, you cross-examined Mr. Vest in your trial; correct?

A. Yes.

Q. And do you recall this passage from your examination or the direct examination of Mr. Vest? This is at page 2565 of the trial transcript. Vest says in answer to a question, "Well, he said that he was looking at ten years, going away for ten years, and the only way he could do something about that is if they got rid of Greg. And Angela said, 'Okay, I'll help you.'"

Question, "And when he said get rid of Greg, did he indicate that he told her that getting rid of him meant killing him?" Answer, "Yes."

"And so he told you that there was an agreement from the beginning to kill Greg Nicholson." Answer, "Yes, there was."

Question, "And Angela Johnson agreed to assist him." Answer, "Yes."

Do you recall that testimony?

A. I don't other than, you know, you reading it now. But yes, I'm sure that's the testimony.

Q. And do you recall in the Honken trial Mr. Vest had said at page 1805 he told her that he was looking at ten years if he gets convicted of this crime, and the only way he could get to -- you know, out of it is to kill them, and she agreed to help him. She said, "Okay. I'll help you"?

Do you recall that's the way it came out at the Honken

**2165**

trial?

A. I don't recall, but I don't dispute the transcript.

Q. Do you recall in your trial at page 2569 Mr. Vest was asked, "Did he indicate what happened with the bodies of the murder victims after they were shot?" And his answer was, "They buried them."

Question, "And when you say they buried them, what did he tell you about the burial itself?" Answer, "He didn't say anything about that burial. He just said that they buried them. That's all he said."

Do you recall that?

A. Vaguely.

Q. And in the Honken transcript do you recall that passage of his testimony went as follows at page 1808? What happened with the bodies? He didn't say. He buried -- he said he buried them. That's all he said he did. That was it.

Did he tell you whether it was one grave, multiple graves, any details? No.

Did he tell you what Angie Johnson's involvement was, if any, in the burial? Answer, "No."

A. Uh-huh.

Q. Do you see any inconsistency there?

A. Yes, obviously.

Q. Was there some thought given to trying to use that inconsistency in showing that Mr. Vest across time or, rather,

**2166**

Mr. Honken who's giving these statements or Mr. Vest who's relating them was now changing what he was saying in terms of what Mr. Honken said, changing it from saying that Honken did the burial to saying that it was Honken and Angela?

A. No. I think if I had recognized the inconsistency at the time there'd be no reason not to use it. So I don't think that I caught that at the time of Mr. Vest's testimony.

Q. When you say you didn't catch it, is it true that this was a very long, physically draining, exhausting trial for you and everybody that was involved in it?

A. Yes, it was a long trial, no question.

Q. And how long had you been involved in this trial at the point in time when you were cross-examining Mr. Vest?

A. I think Mr. Vest was the first penalty-phase witness by the government is my recollection.

Q. Was your original plan in this case for you to distance yourself from the guilt phase to conserve your energy for the penalty phase and also to maintain some credibility from the guilt-phase lawyering in the case?

A. More the latter than the former. I wasn't concerned about my stamina so much, but in these capital cases it is important to have a clear line of demarcation between the guilt phase and the penalty phase.

Lawyers have learned in trying these cases over time that frequently we lose the first phase of the trial. And if

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 353 Filed 11/10/11 Page 64 of 86

there's an affirmative defense or even if there's not, even if the defense is my client didn't do it or my client wasn't there, it's not particularly helpful after the jury has determined otherwise for that same lawyer to get up at the beginning of the penalty phase and now attempt to argue -- present the case on behalf of the defendant after their credibility has in essence been determined to be lacking.

Part of a guilt-phase verdict, although it's certainly not personal, is that this lawyer, the first-phase lawyer, told the jury A, and they didn't believe him. And so it's helpful to have a different lawyer be able to stand up and say, you know, I don't know what Jim or Joe or Bob was thinking, but I have the case now, and let me tell you about my client's life. And they're not burdened by the fact that the jury's already determined their credibility to be lacking.

And so the whole trial is geared around this premise, and so the death penalty questioning is typically done by the penalty-phase lawyer because that's the lawyer that's dealing with the penalty-phase issues, and the jurors associate that lawyer almost immediately with the penalty phase. They associate the other lawyers that are doing the voir dire on the guilt-phase issues with the guilt phase. And to the extent you can separate those two phases distinctly with different lawyers, that's the standard of practice in this field. That's what we do.

So that was the idea initially with Angela's trial was that I would do the penalty-phase voir dire and then the penalty-phase opening, evidence, closings, et cetera.

Q.   Did you think that strategy was particularly important in this case in light of the weakness of your guilt-phase defense?

A.   Yeah, the guilt phase was -- I don't think any of us had illusions about how this was going to go. So this was a penal -- what we call a penalty-phase case. We'll be in the penalty phase, not much doubt about it.

And so that strategy was important because it's going to happen, and if Mr. Willett and Mr. Stowers were going to be in the guilt phase, then I didn't want them associated with the penalty phase and vice versa. I didn't want to be involved in the guilt phase if I could avoid it. I say the guilt phase. I mean the merits phase or the first phase.

Q.   And did something happen during the course of the trial that thwarted that strategy?

A.   I think there was a number of things that happened. Probably one of the notable instances was Mr. McNeese, that I became involved in his cross-examination. And I hadn't planned on doing that because he was a principal witness in the first phase. And so the lawyer cross-examining him really needs to try to blow him up, you know, really get after him. And I didn't want that role. That was inconsistent with my penalty-phase responsibilities. But I ended up doing that.

Q.   How did you end up -- first of all, did you get together ahead of time and split up witnesses?

A.   We did. We did.

Q.   And did it generally follow along the lines of the strategy you just outlined?

A.   Yes.

Q.   Meaning that Mr. Willett would be the guilt-phase person and you would stick with the penalty phase?

A.   That's right, although Mr. Willett did concede some witnesses to Mr. Stowers I believe before the trial. And when we had a session and we sat down and Mr. Willett chose his guilt-phase, first-phase witnesses, there were some witnesses that were reserved for Mr. Stowers, not many, and they weren't particularly important, but I think he did have some witnesses.

Q.   But your thought was that it was important for you to remain in the background while they fronted this not-so-great guilt-phase defense?

A.   Right, exactly, right.

Q.   And that would give you some credibility when you stood up and said that was then and this is now and we're going to talk about a whole new phase.

A.   Yeah, I -- not only that, but I wouldn't be sort of saddled with the decision in the first phase. I wasn't advocating -- I was never in front of the jury advocating that Angela Johnson was not guilty. I didn't do that. So when I come up in the

penalty phase and we're talking about, you know, we respect your verdict but now we need to move on, that should have more credibility than if either Dean or Al was doing it.

Q.   Now, you ended up taking a much more active role in the guilt phase than you had contemplated.

A.   I did, yes.

Q.   And tell the Court how that came about.

A.   There were a number of things. The first thing I can recollect I guess was the opening statement. The voir dire went as planned. Mr. Willett and Mr. Stowers did the merits-phase voir dire. I did the death penalty questioning. Then the trial started. Mr. Willett was scheduled to do the opening statement. He prepared an opening statement. He was kind enough to let me look at that before he gave it, and I -- I rewrote the whole thing. I got rid of it, the whole thing, and spent a day --

Q.   What was wrong?

A.   It was a general discussion about reasonable doubt basically. It really didn't pertain specifically to Miss Johnson's case at all, didn't really discuss any of the factual allegations of the defense. It was just basically a discussion about reasonable doubt and what that means and how important it is and that the jurors should reserve judgment and things of that nature, all good arguments but not an opening statement in my view.

And so I wrote -- rewrote the opening statement.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 65 of 86
*to purchase a complete copy of this transcript.*

Mr. Willett reviewed that, and he gave the opening statement that I read -- I mean that I wrote. But I did spend a good deal of time getting that ready that I hadn't really planned on. But that was fine, and he gave it.

And then the testimony began. I think we were going along okay Mr. Willett handling his witnesses. There were some -- there were some problems occasionally with different witnesses, but it wasn't until Mr. McNeese came up that we had a sort of serious problem. Mr. Willett planned on cross-examining Mr. McNeese and indicated he was really looking forward to it, he had spent a lot of time preparing for it.

By the same token, Mr. Willett was in solo practice at that time, unlike Mr. Stowers and myself. He was the only one, the only lawyer in his office, that was available to kind of keep his cases going. And I think the Court was giving us Fridays off is my recollection. And Mr. Willett was leaving on Thursday afternoon to try to get back to Cedar Rapids so he could maintain his practice on Fridays. And so he was not here on the weekends. And so, you know, I wasn't sure what he was doing.

But on this particular weekend Mr. McNeese was scheduled to testify on Monday. We had an agreement with the government that we would disclose to each other the witnesses for the next day which is, you know, common. It's a courtesy, professional courtesy. So Mr. Williams had told us Mr. McNeese

was coming up on Monday. We knew that on Thursday, Thursday evening at least.

Mr. Willett came back on Sunday, the day before Mr. McNeese was scheduled to testify, and informed me that he had decided that he was too personally invested, or that's not quite the right term. He was too personally tied into Robert McNeese that he felt that he wouldn't be effective doing that cross-examination, the message being that he was so angry and upset about Mr. McNeese's conduct that he didn't think he could effectively cross-examine him. I'm not exactly sure why, but that was his explanation.

And so I took Mr. Willett's materials regarding Mr. McNeese, and I think this was late Sunday morning, maybe Sunday afternoon, started working on that cross-examination. I had not spent any time with Mr. McNeese's file, although I had listened to his testimony at the Massiah hearing, and I had even done a little bit of the cross-examination at one point of Mr. McNeese I believe at a pretrial hearing some years before.

Anyway, it took a long time for me to absorb the materials. There was at least a boxful of stuff with Mr. McNeese's name on it including prior convictions. He had had an inordinate number of convictions and had spent time in various federal facilities, and he was involved in a lot of cases. And we requested permission of Judge Bennett I think on Monday morning -- I think I just came into court and asked him

if I could be excused for the day so that I could continue the preparation of Mr. McNeese.

Q. Did he not go on Monday morning as planned?

A. He did not go on Monday morning, that's right. You know, I don't think the government had to move the witnesses around. I think that there was some hitch with Mr. McNeese, but Mr. Williams could speak to that. I don't know why there was a change, but they -- maybe they did it at our request. I don't recollect that being the situation, but maybe they did.

But in any case, Mr. McNeese didn't testify until Tuesday afternoon I believe and -- or maybe even Wednesday, but I was out of court on Monday and I think half of Tuesday working on that cross-examination which may have been more time than some lawyers would have needed to do it, but it was the time I needed to do it, so, you know, that's time I really should have probably been in court. We made a record. There was an extensive record. Miss Johnson consented to my absence, but it was an unfortunate turn of events to say the least.

Q. Now, when you went about picking up the McNeese cross-examination materials, were they prepared and ready to go, or did you have to --

A. Well, they were -- they were there. They were in a box.

Q. Right.

A. There weren't any notes or there -- no, they weren't organized, you know, in a fashion here are exhibits, for

example, with Mr. McNeese, here's prior criminal history. It wasn't compartmentalized. But they weren't -- the pages weren't out of order or anything like that. I mean, but they hadn't -- I didn't see any indication that Mr. Willett had begun a cross-examination of Mr. McNeese that I could sort of pick up and run with.

Q. When you say had not begun a cross-examination, you mean some sort of a cross-examination outline or some sort of work product that --

A. Yeah, some notes, you know, like something where maybe he had some ideas about areas he wanted to explore with Mr. McNeese that I could just kind of pick up. I'm not sure that would have worked. Maybe I would have had to redo it anyway, but in any case, there were no attorney notes in the file at all.

Q. Uh-huh.

A. And there weren't any highlighted documents, for example. You know, we use highlighters frequently to indicate significant passages or significant phrases or impeachment material or maybe some sticky notes on the side, you know, Post-its or something.

There was nothing like that. It was just the discovery was photocopied including significant records regarding his prior convictions, and that was in a box. I think it was one box. It could have been a box and a half. I don't honestly remember. But it was a pretty good size of material.

Q. Now, was that some sort of a red flag to you in terms of

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

his general state of preparation, or was this just one mishap?

A.   No, there were other problems. There were -- I want to preface my comments by saying I personally like Al Willett. He's one of the nicest guys I've ever met. He really is. And his practice I think and his experience has been different than mine and perhaps Mr. Stowers'.

But what -- I think what Mr. Willett might think in terms of preparation, sufficient preparation, might be different than my own ideas about that.

And so some of these cross-examines were a little disturbing that we -- it started in jury selection. We had -- we had some jurors that I thought should be struck or certainly candidates to be struck for cause on issues like the defendant not testifying, you know, which was a significant issue in this case because she wasn't going to testify. And instead of leading that juror down the primrose path, as we defense lawyers would like to say, to a motion for a strike for cause, Mr. Willett would rescue the juror and bring him back by pointing out how important it was to not make that determination, you know, the kind of thing you'd see in an instruction.

And so a juror who was having reservations about the defendant not testifying as perhaps being indicia of guilt, instead of being set up for a motion for cause that Judge Bennett might potentially sustain, he was arguing with the juror

about their position. You know, that was a red flag to me. And I did change the voir dire a little bit as a result and giving Mr. Stowers more responsibility than initially planned on how the voir dire would be done.

And Mr. Willett and I had one pretty serious argument or discussion about that where he was a little bit resentful that I had directed Mr. Stowers to do more panels, more of the general voir dire, than we originally planned to have Mr. Stowers do. But, frankly, Mr. Stowers was doing a better job than Mr. Willett. And so I changed that a little bit.

And then there was one incident -- and the judge might recollect it. I don't recall the specific witness. But Mr. Willett was attempting to impeach a witness with a portion of his grand jury testimony. It was something to the effect that the guy had said in the grand jury "I don't always tell the truth" or "people have called me a liar." I don't -- I didn't review the transcript to tell you about it.

The reason the Court might remember it is that Mr. Williams or Mr. Miller successfully objected four consecutive times to the question that Mr. Willett was posing in this effort to impeach to the point where the Court took a recess and we had a little talk with Mr. Willett as to how this should go. You know, these -- Al, these are the questions you need to ask for this to happen. And it was an embarrassing moment for Mr. Willett. It was a sad sort of situation.

And it's not something I would have expected from a lawyer of his stature and experience. It just happened. Maybe he was having a bad day. I don't honestly know. But it was -- it was the kind of mistake I -- got my attention. I thought, wow, this is a concern.

Q.   Now, in terms of your overall plan to distance yourself from the guilt phase, I'm trying to figure out when these problems got your attention because when you go through the witness list, the first witness was Frank Stearns. Willett -- this is the guilt phase. Willett cross-examined him. Second witness, Peggy Christensen, jailhouse informant, Stowers cross-examined 'em. Third was Debra Davis. Stowers again cross-examines. David Mizell who is an agent I believe, case agent, Willett did. And then Leslie Olson you did.

A.   (Witness nodded head.)

Q.   David Thinnes who was the lawyer for Mr. Honken back in '93, you did that one as well.

A.   Right.

Q.   Aaron Ryerson, the next witness, you did that examination. And then Jeff Honken Stowers did. These are in order again. Kevin Pals, Stowers. Lisa Asbe, you. Cindy Hicok, you. Marge Milbrath, you. Paul Bush, Stowers. JoAnn DeGeus, you. Ashley DeGeus, you. Wendy Jensen, you. Robert Gerdes, you. Christi Gaubatz, Willett. Dan Cobeen, Willett. John Graham, Willett. Tim Cutkomp, Willett. Lori Lewis, Stowers. Nila Bremer,

Stowers. Rick Held, Stowers. Basler, Stowers. Michael Merino, Stowers. Robert McNeese, Berrigan.

And then Sara Bramow, Willett. Gary Licht, Stowers. Kevin Boldt, you. Peggy Hoover, Willett. Basler, you. Peggy Baca, Willett. Mickie Yager, you. Wendy Jacobson, you. Shelly Johnson, you. J.D. Smith, Stowers. Michael Hochrein, Stowers.

Does that refresh your memory as to when these problems surfaced, because it looks to me from that list like very early in the guilt phase you're right in the middle of it which seems contrary to what --

A.   My recollection is -- I could be mistaken -- most, if not all, of the witnesses you mentioned that I had on the first phase were also penalty-phase witnesses.

Q.   David -- the lawyer, Honken's lawyer, was not a penalty-phase witness, was he?

A.   No, he was not. I guess there are some exceptions, but a lot of those names seem to be penalty phase as well. It seemed inconsistent to have different lawyers doing the same witness twice, but other people might look at that differently.

Q.   But the people you're saying that are penalty-phase witnesses, they were not testifying as -- on penalty-phase issues in the first --

A.   No, no, that's true. That's absolutely true. Their penal -- they're talking about first-phase testimony or guilt testimony. You're right.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 67 of 86

Q. And as I understood the way you were explaining your strategy, standing up and participating in the guilt phase was somehow sending a message to the jury that you were vouching for this guilt-phase defense, something you didn't want to do.

A. That's true.

Q. So how does this pattern of witness examinations fit into that strategy?

A. Only what I mentioned. I think that we just divided them by witnesses. So if it happened that the penalty-phase witness was also a witness in the first phase, I took them. Nobody else -- I'm sure I didn't ask Dean or Al to do them. I think some of the family members, at least my recollection is, I didn't think they were significant first-phase witnesses. There could be some exceptions to that as well.

Q. Aaron Ryerson was not a penalty phase. He was a convict, right, who was testifying to incriminating statements?

A. Right, and I'm not sure why I would have had Ryerson as one of my witnesses.

Q. Does that sequence of witnesses indicate to you that these problems with Willett surfaced much earlier? I mean, I know you mentioned jury selection, but wasn't there also some concerns when you were doing your mock jury selection about whether he was on the same page you all were on?

A. Yeah, those were different issues, but they were problems, absolutely.

Q. What were the problems that surfaced during --

A. Well, there were a couple of things. The mock jury -- we did a mock jury session in Kansas City. I got some, I think, law students that we asked to volunteer. We bought them pizza or we might have -- the law firm might have paid them 10 or $20. I don't recollect.

But part of that was to practice the voir dire because I was a little bit concerned that the -- I hadn't had any trials with either one of these guys. The voir dire's the most important part of the case in my opinion, and I wanted to do a little practice with the voir dire. And we addressed some areas of concern that we had with the testimony sort of generally.

And there were some issues that Al raised during that mock jury session that were problematic, but without looking at my notes, I can't specifically remember what they were.

THE COURT: Do you recall physically where this took place in Kansas City?

THE WITNESS: It took place in a courtroom, Your Honor. My wife is a circuit judge, a trial judge at the state level, and has been for 17 years.

THE COURT: See, I didn't know that, and one of the previous witnesses said it was in your wife's courtroom.

THE WITNESS: Yes.

THE COURT: And I was wondering why your wife had a courtroom --

THE WITNESS: Yes.

THE COURT: -- other than perhaps she was a judge. That's the only reason I could figure out --

THE WITNESS: Exactly.

THE COURT: -- why a spouse would have a courtroom.

THE WITNESS: Right. That's right.

THE COURT: So unless she was trying to make sure you didn't stray too far, go back to the office every night so you had one in your house or something but --

THE WITNESS: Yeah.

THE COURT: Okay. That makes sense to me now.

THE WITNESS: So it was available to me on the weekends as long as we made arrangements with the courthouse security, and I use it frequently for this type of a thing. I'm fortunate to have it available. But that's where it took place.

There was -- you know, the only thing I can specifically remember was Mr. Willett was advocating a theory that perhaps the victims had been duct taped after they were killed. That sort of sticks in my mind because it was so strange.

Anyway, there were some -- there were some concerns that developed during that practice session. Without looking at my notes, I can't tell you specifically what they were. And that may have contributed to me taking more witnesses than I originally planned. Yeah.

So it was -- it was unfortunate, but I thought it was necessary.

THE COURT: Can I ask kind of a clarifying question?

THE WITNESS: Yes, sir.

THE COURT: When -- when you wound up doing the cross-examination of some guilt-phase witnesses who you knew were also going to be penalty-phase witnesses, that wasn't a result of any deficiencies in your co-counsel.

THE WITNESS: Not those witnesses, right.

THE COURT: Okay.

THE WITNESS: Right.

THE COURT: You felt that that was still consistent with your kind of separation from guilt-phase lawyering and credibility issues.

THE WITNESS: Yeah. I think it's on this theory, Your Honor, that my recollection of those witnesses is that they weren't particularly critical first-phase witnesses. But that's about it, to be honest.

THE COURT: And that you weren't going to antagonize any jurors with your cross-examination.

THE WITNESS: No, exactly right, right. These weren't going to be vigorous cross-examinations. And I dare say there may have been some witnesses I didn't cross-examine at all or very briefly.

THE COURT: Thank you.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 68 of 86

BY MR. BURT:

Q. Now, I'm trying to figure out from a prejudice standpoint if you then picked up his cross-examination of McNeese --

A. Right.

Q. -- and did a good job of it, is there -- are you saying there's still some prejudice from the fact that you had to abandon your game plan of getting involved with somebody as directly involved with a guilt-phase defense as --

A. Well, McNeese didn't fall into this category. I mean, he was not an inconsequential -- not that the family members are inconsequential. I don't mean to belittle the impact of their testimony. Their testimony had impact for other reasons. They were emotionally upset, naturally, but they were -- they were particularly distraught as you would expect. And so that was -- that was the import of much of their testimony. Despite the fact it was first phase, they were -- it wasn't like they were any less distraught in the first phase than they were in the penalty phase.

But Robert McNeese was a different character all together. I mean, this was one of the principal guilt-phase witnesses against us. That testimony, as I've said many times, was the most damaging piece of evidence against Miss Honken in the trial in my opinion, certainly in the merits phase. And that shouldn't be my role is to be cross-examining him.

But, I mean, I think there were other problems with

that. Not being in court for a day and a half while your client's on trial for her life is not a good situation. I don't know what message that conveys to the jury. There was no good way to explain that. I don't -- I think we may have said something to them. I don't remember what it was.

THE COURT: I think I did -- well, the record will speak for itself, but in a situation like that, I'm fairly confident I would have said, "Here's what I'd like to say."

THE WITNESS: Right.

THE COURT: And do you have any problem with me saying it because I think I better say something like it's not uncommon for lawyers not to be there throughout the trial or something like that.

THE WITNESS: Right.

THE COURT: To try and obvi -- you know, whatever I could do to lessen any negative impact about --

THE WITNESS: Right.

THE COURT: -- Mr. Berrigan from Kansas City isn't going to be here for the next couple days; right?

THE WITNESS: Right. No, I think we're all concerned about it.

THE COURT: Yeah.

THE WITNESS: And justifiably so. I guess that's my point. None of us know what they're going to think. Why would the lawyer be gone? You know, Mr. Williams' mother died, and he

was here for the trial. I mean, he was here. So that's hard to explain.

The other thing is because I'm gone I don't know what's going on in the courtroom maybe that I should know about. I'm not looking at the other witnesses that are testifying, so I don't know kind of how that's going or what the tone of the trial has been during the day and a half I'm not there or whether there was something said that I need to address later, maybe in the penalty phase deal with it. You know, you're out. You're just not there.

So it wasn't a good situation. And in all candor, I'm not sure a day and a half preparation for Mr. McNeese was sufficient. I did the best I could in the time allotted, but I'm not going to get any awards for that cross-examination. I thought Mr. McNeese probably came across as a pretty credible witness for the government. And that wasn't a good way to prepare his cross-examination.

BY MR. BURT:

Q. Now, as I understand from that cross-examination, you were cast in the role of someone who was trying to show that the confessions that Miss Johnson gave to McNeese were not true, were not something the jury should rely upon.

A. Right.

Q. And did that really put you at the center of this guilt-phase defense that you were trying to distance yourself

from?

A. Well, it did in my own eyes. It's hard to tell what the jurors thought. But as I've said, he was, you know, easily in the top three witnesses. He was a devastating witness for us, and the fact that he had the maps in addition to his oral testimony, you know, it was tough. If somebody was going to go down with Mr. McNeese's ship, I didn't want it to be me. Let it be Mr. Willett or Mr. Stowers. Anyway, that's not what happened.

Q. And do you remember that one of the problems you confronted in attacking the credibility of Mr. McNeese was that the government had a piece of forensic evidence in connection with that testimony that made it more credible, namely, the handwriting analyst?

A. The handwriting analysis?

Q. Yeah.

A. Yeah, yeah. You know, certainly that helped, but, you know, where else would he have gotten these maps was the -- was the more disconcerting aspect of that evidence.

Q. We have marked as 76, do you remember --

THE COURT: Before we get to that, can we go back just for a minute to the decision for you to pick up from Mr. Willett the McNeese cross-examination?

THE WITNESS: Yes, sir.

THE COURT: Did you and Mr. Willett give any

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 69 of 86

consideration to having Mr. Stowers do it?

THE WITNESS: I didn't. I don't know if Mr. Willett did.

THE COURT: And can you tell me why you didn't?

THE WITNESS: Mr. Stowers I believe had witnesses already scheduled, and I didn't. I think it was as simple as that. And he needed to work on his own witnesses, and I didn't have witnesses scheduled at the time Mr. McNeese was coming up to testify. And so I felt like I needed to do it.

BY MR. BURT:

Q. Is one of the things you do as a good lawyer during a long trial like this to kind of track the media to see what the perception is of the case as it's being presented?

A. We try, but I think it was difficult in this case because, you know, they're long trial days just like this hearing, and we have things to do. I'm not racing back to the motel to try to catch the six o'clock news, but if I can get it, I'd like to know what's going on, sure.

Q. One of the articles in your trial file -- this is 76 -- is an article that was published on May 13, 2005. And the headline is Expert Links Johnson to Burial Maps and talks about the testimony of Gary Licht of the DCI who was the handwriting expert in the case. Do you recall that?

A. Yes, sir. I recall his testimony. I don't specifically recall this article, but if it's in our file, obviously we got

it.

Q. Okay. Is it true that in general any time the government can corroborate one of its informants with forensic evidence it presents a -- an additional hurdle for the defense to overcome?

A. Sure, yeah, absolutely.

Q. Because aside from the forensics, what the government had here were a lot of informants and they had this one piece of evidence from McNeese which purported to be in the handwriting of Miss Johnson; correct?

A. Yes.

Q. And at least as it's being portrayed in the public's mind, she's being linked to these burial maps by the expert; right?

A. Well, the expert and Mr. McNeese, right.

Q. So one -- I mean, the expert is corroborating the version of McNeese, and you're in there on fairly short notice trying to destroy McNeese's credibility.

A. Right.

Q. Correct?

A. Yes.

Q. But you also had this expert coming in and saying, you know, this handwriting is your client's.

A. Right.

Q. Was there any thought given to try and attack in any way, either through admissibility objections, Daubert objections to the handwriting expert, or putting on a counter expert to the

science of handwriting analysis to try and put something in there to raise reasonable or lingering doubt on this expert who was corroborating McNeese since your main strategy seemed to be to attack McNeese?

A. Not by me. Whether Mr. Willett gave that some consideration or not, he didn't share that with me. But I didn't consider an expert or really -- I can't remember if Mr. Stowers or Mr. Willett cross-examined Mr. Licht but -- who did it, frankly, but I don't -- I don't think we gave any thought to a Daubert motion on his testimony.

Q. Did you directly ask Miss Johnson whether she wrote these maps?

A. No.

Q. And if she told somebody else on the defense team or your investigator that she wrote those maps, would there be any -- in your mind an ethical proscription from attacking the science of handwriting analysis as long as you weren't going to put her on the stand?

A. No, of course not. You know, sometimes clients will tell you things that are incriminating. Doesn't relieve us of our obligation to make the government prove their case beyond a reasonable doubt.

Q. If you knew of an expert who would come in and say, you know, this handwriting stuff is just not science, would there have been any tactical reason why you wouldn't want to put that

on in the guilt phase?

A. No. If I had that kind of testimony, there's no reason I could think of not to put it on.

Q. Okay. Now, in the penalty phase --

THE COURT: Well, can I ask you about that?

THE WITNESS: Yes, sir.

THE COURT: Might you not lose credibility because if you don't have a great explanation for where the maps come from --

THE WITNESS: Yes, sir.

THE COURT: I mean, did they just, you know, vaporize and then reappear in Mr. McNeese's cell? If you don't have a great explanation for the maps, wouldn't you might not antagonize a jury by putting on expert witness testimony challenging something that at least you believe they're 100 percent going to find based on the record that was made in the trial and that is that they're going to conclude that Angela Johnson wrote the maps?

THE WITNESS: I think there are two different issues, Your Honor.

THE COURT: Okay.

THE WITNESS: They may be very much interrelated. I wouldn't quibble about that point. But if you -- theoretically if you had gone to another expert and he said, I don't think that's Angela Johnson's handwriting or an expert couldn't say

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS    Document 353    Filed 11/10/11    Page 70 of 86

that, that is of some help even if you don't have an explanation as to how Mr. McNeese got the maps because if it's not her handwriting or you could raise that issue, then there's an issue, well, whose is it? And I don't know that we necessarily have to answer that question. Sure, it would be nice, absolutely. But that would cast some doubt I think at least on the government's theory that it was Angela Johnson.

I agree. I can't think of an explanation now and I couldn't then as to how do we explain these maps. But if I had some expert testimony that said she didn't write them, well, why not put that in?

THE COURT: Oh, right. But what if your expert testimony was, you know, this handwriting expert, Gary Licht, that's just hocus pocus? Oh, you really can't tell based on the information he had. Nobody could really give an opinion who wrote that map. Would that have been beneficial to you?

THE WITNESS: It's hard to say. It really is. I'd have to analyze that expert and, you know, what's the basis of that testimony and how hocus pocus is it and why is it hocus pocus? I mean, if the guy's just outright making it up as he goes, you know, maybe you put it on just to show how desperate the government is that they're going to this extreme. That's a different scenario, I'll grant you that. That would have been a tougher call, absolutely, tougher call.

BY MR. BURT:

Q. Well, the strategy which you did adopt was to attack McNeese's credibility, to suggest that he was lying when he said that your client confessed and wrote these letters.

A. Yes.

Q. And --

A. It's the confession part that -- I mean, I don't -- I don't want to quibble about Mr. McNeese's testimony. But as to the two issues, the maps and the confession, the confession's much more damaging than the maps, not to negate the problem with the maps. But, I mean, there's a number of ways you could know or learn how those bodies came to be where they are without participating in the murders theoretically. Confessing, well, that's a problem.

Q. Well, you didn't -- given the strategy you adopted, you did not have any way or at least you didn't put on anything to suggest that she got her knowledge -- the knowledge that was in those maps --

A. Right.

Q. -- and the knowledge that was in those confessions, you didn't put on some explanation for how she got them.

A. That's right.

Q. Early on some -- you actually explored that theory, did you not?

A. We did, yes.

Q. This after-acquired knowledge theory?

A. Right, exactly.

Q. And how did you explore that issue? Did you do it through investigation, or was it just sort of a common sense nobody's going to buy this and let's forget it?

A. I remember talking to Miss Johnson about it at least on one occasion if not more than that. Probably we talked about it with the defense team. I never really -- I don't recollect a credible explanation as to how you -- how that would work. As I sit here, I just don't remember. If I have some notes about it, then I'd stand by them.

Q. Okay. Well, let me see if I can -- if I could have one moment here, I'll find that.

Do you remember a fairly long discussion with Miss Johnson on -- this is again from 72A, PB-1, 154 through 166, a jail visit with Angela Johnson in which you talked about a number of topics?

A. Yes.

Q. And you have at the beginning here you came up to see Angela yourself. Was there some particular reason why you were seeing her by yourself at this point?

A. This was pretty early on. I don't think there was any particular reason. Mr. Willett may have been engaged elsewhere. I'm not sure.

Q. Okay. And one of the things you discuss with her was this topic of after-acquired knowledge. Do you recall that?

A. I will when you get to it in the notes.

Q. Okay. Let me make sure I can -- I've got it pinpointed here. Should be on this page. I think at the very bottom of this page which is 165, claims it's true, and could you read that?

A. Yes, sir. This has to do with a letter that Mr. Reinert had turned over to Mr. Willett that was recovered from the Linn County Jail. They were, you know, screening her mail. And it was sent to Dustin Honken in Angie's handwriting by this other person, Sophie Jensen. And so we gave it to Angie. She read through it. She claims the contents were true, that she really believes Christi was involved -- this is Christi Gaubatz -- and she really wants to know why Dustin told her where the bodies were, advised Angie as to the unhealthiness of this task. She is crying and . . .

Q. Task or tack?

A. Tack, tack, I'm sorry. Tack, yeah, unhealthiness of this tack.

Q. And what was the tack that you were advising her was unhealthy? Are you referring to the after-acquired knowledge idea?

A. Yeah, this -- I believe the letter -- I think the contents of the letter suggest that Christi Gaubatz was involved in the murders, not Angie, and that either Christi had told Angie where the bodies were or Dustin had told her afterwards. I don't

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 71 of 86

remember what the contents of the letter were. It had something to do with Christi Gaubatz being involved in the murders.

Q. Okay. And you indicate on the second page that she's pretty emotional on several issues at this point?

A. Yes, yeah. This is a point -- you know, this is a point in time where she's taking this medication as I discuss in the notes, and I question whether it's enough. I mean, she's not functioning well, crying and -- and this whole discussion was irrational. Frankly, this whole idea that Christi Gaubatz was involved in the murders was preposterous. So she wasn't -- she just wasn't acting right.

This note on the top, she seems upset, this whole idea she thinks by writing these crazy letters that people are going to believe this, I mean, it's -- you know, it's hocus pocus. And she's really much brighter than this. So I thought there were some problems. I . . .

Q. Mental problems.

A. Mental problems, right.

Q. In her ability to rationally perceive what was going on here.

A. Yeah, this is -- this is almost like Martians did it. You know, it's that far out there that I -- and then I confront her with that, this is crazy, and she's bawling her eyes out. You know, it just wasn't a very -- it wasn't a rational discussion, and it made me question her medication.

Q. And it says ask -- check with Logan, see what he says. Did you check with Logan and see --

A. I don't know. I'd have to rely on my notes. I have no idea.

Q. Okay. Well, you have your billing records there. Is there -- could you check to see around this time, that is, 7-2-01?

A. Sure.

Q. It's under the Berrigan tab there whether you had a discussion with Dr. Logan; if so, whether the billing refreshes your memory as to what you discussed.

A. I'm looking at my billing entries for July of 2001, and I do not see anything in here about any telephone calls with Dr. Logan.

Q. Now, that interview where she was upset took place July 2, '01; correct?

A. Yes, sir.

Q. Back up just a minute to another interview that you had with her, this time with Mr. Willett and with Dean Stowers. This is on May 8, '02, and it's PB-1, 286 through 292. And she says on the first -- she's relating this information to the defense team at this point; correct?

A. Yes, that's right.

Q. And according to what you wrote down here, as soon as Dustin got there, meaning the crime scene, I bolted, got in my

car and go; right?

A. Right. She's talking about -- this is the Terry DeGeus murder, not the Nicholson --

Q. Yeah. She's upset. She called Terry DeGeus and lured him there.

A. Right.

Q. So she's admitting to you here that she lured DeGeus there. She's not talking about the government's allegations. This is information she's directly relating to you about luring DeGeus to where Honken killed him; right?

A. Right.

Q. Now, she also says -- or you wrote -- write in your notes, "Has a not-at-all-believable story about Dustin giving her a map to the Greg Nicholson bodies."

A. Yes.

Q. And could you read the rest of it because I'm not sure I could.

A. Sure. Allegedly gave it to her while he was in federal prison in Florence, Colorado. Why, question mark? So she could go check on the bodies for him, parentheses, i.e., make sure they were still buried, end of parentheses. No longer has the map. Purportedly McNeese map would be from her recollection of Dustin's map, question mark?

Q. And when you wrote not at all believable, you're making an assessment there that that just is -- this after-acquired

knowledge theory is just not going to fly. This is your assessment?

A. That's my assessment, right.

Q. Okay. Was that assessment made before you did any investigation to check out whether there was any credibility to this story, or was it sort of --

A. Well, what's the date of this note?

Q. This note is May 8, '02.

A. Oh, we'd been on the case more than a year and a half at this point, so I'm not sure what investigation we had done. But, frankly, if she had told me this story very early on, I would have found this hard to believe.

Q. And did you tell her so at the time? In other words, as she's relating this after-acquired knowledge theory, did you indicate in some way, shape, or form that's bull, B.S., and we know it?

A. I'm not sure if I did it in this meeting, but I certainly conveyed that opinion to her on more than one occasion.

Q. Uh-huh. Now, she told you she'd been doing drugs for years; correct?

A. Yes.

Q. And she indicates on the next page that she told you that Dustin was going to see Nicholson. He wanted me to get him in the house.

A. Right.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 72 of 86

Q. So she's admitting to you that Dustin wanted her to get Nicholson in the house and that she apparently was present when this killing took place.

A. Right, because Nicholson's not going to let Dustin Honken in that house anywhere near him.

Q. But she also says on the next line she refuses Dustin had talked about killing Nicholson apparently beforehand? She's saying she didn't have any knowledge beforehand?

A. Right. She refuses -- I'm not sure if there should have been a period there or not. Dustin had talked about killing Nicholson. I'm not sure I can add anything to what I wrote down.

Q. Then down there where I've got a highlight, I was either at home or at work at dinner hour, paren, time of Nicholson shooting. Thinks she was at work.

A. Right.

Q. So she's giving you an alibi at this point; right?

A. Yes.

Q. What investigation, if any, was done to check out that alibi?

A. None. We spoke to -- we did speak to or attempt to speak to some folks at her workplace, but my recollection of that was that it was for penalty-phase purposes, not first-phase alibi purposes. I don't recall discussing with any of those folks this theory.

Q. Is one of the ways a good lawyer gets clients off fantasy defenses by actually investigating them and coming back to the client and saying, look, we checked this out --

A. Sure.

Q. -- there's absolutely no factual basis for it?

A. That is one way you could do it.

Q. That process was not done in this case?

A. No, not in respect to this anyway.

THE COURT: Mr. Berrigan, wouldn't it have been a relatively simple matter to get her timecards from where she worked on that night, I mean, if she was at work and what the timecards reflected?

THE WITNESS: Yes, sir. That would have been a relatively a -- presumably, I mean, we could subpoena them probably, yes, sir.

THE COURT: And the reason why you didn't do that was?

THE WITNESS: Well, part of this, Your Honor, is I don't want to convey the impression that I'm even close to believing this. You know, clients can run you all over the earth with these theories sometimes, and it's important sometimes, not all the time -- it's very much a case-by-case basis and day to day. But sometimes I want to convey the impression that's nonsense, I don't believe it, and I'm not going to waste one iota of time investigating this ridiculous proposition. It dies now.

I'm not saying that's what happened here because I don't remember that. But -- and maybe the smarter course undoubtedly would have been get the timecards and go back and say, well, what -- what -- give me your next guess. But, you know, that's not what happened. I suspect I confronted her I don't believe it. I never did believe this theory. That may not have been the intelligent way to handle it.

THE COURT: But your -- your -- the strength of your disbelief of the theory wasn't based on any independent investigation that your defense team did, was it?

THE WITNESS: No, not on this, not on the alibi, that's right. I mean, the Nicholson situation is very different than -- I mean, sorry, the DeGeus murder is very different than the Nicholson, Duncan murders. There's no map here. There's really nothing physically tieing her to this situation. So that may have warranted investigation. Perhaps this should have been investigated differently, or at least this alibi defense seems to be potentially more credible.

THE COURT: Well, there is a map here --

THE WITNESS: Right.

THE COURT: -- because it relates to the Nicholson and Duncan killings.

THE WITNESS: Yes, that's right, right.

THE COURT: Yeah. DeGeus is where the map doesn't relate to; right?

THE WITNESS: That's what I'm saying.

THE COURT: Yeah.

THE WITNESS: Right. We're talking -- oh, you're right.

THE COURT: Yeah, we're talking about Nicholson.

THE WITNESS: I'm sorry. No, we're talking about Nicholson here, and I was back on DeGeus.

THE COURT: Well, and let me go back to one other thing you said because that's kind of floating around in my mind.

Why was Angela Johnson's statement to you that Christi Gaubatz was involved in the murders preposterous?

THE WITNESS: I don't -- looking back now, it's hard to know what we discussed at the time. But it was not only that Miss Gaubatz was involved but then she's involved with Dustin Honken and then Honken was sending a map to Angela, not to Gaubatz but to Angela to go check on the bodies. It didn't -- it didn't make any sense to me. Maybe preposterous was too strong of word. It was certainly illogical. We hadn't spoken to Miss Gaubatz, and I'm not even sure at that point what discovery we had respecting her statements to investigators.

THE COURT: Well, was it any more illogical than the Proscovec time line that the government had that was inconsistent with the government's own theory?

THE WITNESS: No, no, no. You're right. That's an

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 73 of 86

excellent point.

THE COURT: Mr. Burt?

BY MR. BURT:

Q. Backing up just for a minute, you have a note here on page 2, PB-1, page 287, discussed Dustin's confession to her. Quote, oh, I know what happened, end quote. And then you wrote, "Shifty eyes but sounds fairly credible." What sounded fairly credible?

A. Whatever -- whatever it is she told me about Dustin's confession to her.

Q. And that played directly into the after-acquired knowledge theory; right?

A. This is absolutely after-acquired knowledge, right. He confesses to the murders after he's committed them.

Q. And I guess you're indicating there she's telling this story, her eyes are a little shifty or are shifty, but she's sounding fairly credible.

A. Right.

Q. And then down below on the next page, you have written he told me he shot them all and buried or burned them?

A. Buried them.

Q. Buried them.

A. Yes, sir.

Q. Where they couldn't be found. Dustin didn't own a video camera. A.J. admits she knew about Dustin's court date coming

up, threatened to kill Nicholson. She's admitting something in relation to a threat to kill Nicholson, but I'm not clear from that note what it is she's admitting.

A. Knew -- I believe that note reflects that she knew that -- I'm not sure. I want to say that she knew that Honken had threatened to kill Nicholson, but that's not exactly what the note says, so I'm not sure what that means.

Q. Okay. And then right below that, the part I've got highlighted, mere presence defense discussed by Al.

A. Right.

Q. She denies being present even with McNeese information presented to her.

A. Right. We're talking about the Nicholson, Duncan murders here.

Q. Right. Now, the mere presence defense did eventually get presented; right?

A. Yes.

Q. Did she ever come off this position that's expressed here that she was not there and she -- she was not merely present? Did she ever indicate anything contrary other than I want to plead guilty?

A. In the context of plea discussions, of course, she did.

Q. Right. So here she's saying I wasn't merely present but at some point in time as I understand it you got her to agree to this proffer in which she was not only present but actually

participating enough to make her liable for the murders.

A. Right, exactly, right. She came around and got off of this I wasn't there.

Q. And do you recall during that same discussion there was some discussion about pleas? This is at page 291. She started off friendly but got very testy and argumentative when confronted with contrary grand jury and other testimony.

A. Yes, sir.

Q. And so you're testing her here with the evidence.

A. Right.

Q. Plea possibility discussed. This goes nowhere. A.J. --

A. Wants murder charges dismissed.

Q. Outright.

A. Rejects 20 years.

Q. Okay. And the 20 years is something you were discussing at this point?

A. Right. This is '02. I mean, we had talked about it before this. As you recall back in '01 there was a discussion about 20 years. But on this day, this particular day, that was out of the question.

Q. And in terms of how she's dealing with the witnesses, it sounds like she's just saying they're lying, no reasons why they're lying, but they're just lying.

A. Right. I have it right here. This is the situation. When I put quotes, that's her in quotes. I'm not worried about Tim

Cutkomp, quote. He's lying. Goes on about the lying witnesses against her, not too realistic today. That's my impression of this discussion. She's out to lunch today. This is a bad day. Wants to deal with evidence by denying its credibility and/or existence.

Q. Actually if you tap the screen on the side there --

A. Can't really explain it, can't really explain it. Teary eyed at the end. She's having a breakdown here.

THE COURT: Mr. Burt, I think you can clear the screen from there.

MR. BURT: Oh, I can do it from here? Thank you.

BY MR. BURT:

Q. Your notation not too realistic today, again, I think you've alluded to this, but you're saying that other days she was more realistic.

A. Right. And again, I'm asking her about her medication because she's emotional and irrational.

Q. We covered the later letter to you in which you sent her the Christensen material, and she then writes back --

A. Right.

Q. -- get me a deal.

A. Right.

Q. Do you remember getting this letter sent to you from Dean Stowers, Exhibit 7 to the petition, which is the May 10, '03, letter where she's indicating what her desires are at this

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
to purchase a complete copy of this transcript.

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 74 of 86

point?

A. Yes.

Q. And did you receive this letter shortly after it was sent to Mr. Stowers?

A. I don't frankly remember when Mr. Stowers gave it to me, but I doubt he would have delayed its transmission.

Q. Okay. And do you recall that shortly after you received this letter that you went to visit her?

A. Yes.

Q. Is that reflected in this note which is PB-1, 352?

A. Yes.

Q. Tell us what the discussion is based on this note if this refreshes your memory.

A. Al and I -- as I've written, Al and I came up to see Angela to talk to her about her recent letter, the letter to Mr. Stowers, I want to plead guilty now, let's go. There's a discussion about -- these are the Eighth Circuit -- I think this is the Eighth Circuit panel. I'm not sure why that's come up, to be honest. Al the good guy, P.J.B. -- that would be me -- the bad guy. Talked a lot about the Eighth Circuit still sitting on Angie's case, possible effects on plea negotiations. This all for naught as Angela's first and primary concern is having to stay in the Linn County Jail. Willing to testify against Dustin Honken including cooperation. And I have exclamation marks behind that as you can see.

Q. Now, could you explain what the good guy approach was and what the bad guy approach was in the context of this meeting?

A. Yeah. This was consistent with my role I think throughout the representation with Angela. I was the bad guy in terms of I wanted to push -- push the plea proposition, the idea of the case is bad, the government's going to bury us, we're going down, let's plead this case.

Q. Uh-huh.

A. And Al a more optimistic view of the evidence and prospects which is what I perceived Angela wanted to hear.

So in her assessment, in my view, Al was the good guy and I was the bad guy. That's what I have in my notes.

Q. And what was all for naught? The discussion about the Eighth Circuit in terms of possible -- you say talked a lot about the Eighth Circuit and the possible effect on plea negotiations and then this is all for naught. Is the discussion about the Eighth Circuit for naught because she now wants to plead?

A. I'm not sure. I do think that note is reflective of what was going on with her at the time is that the prolonged incarceration at the Linn County Jail was driving her out of her mind, and she wanted to get out of there.

This is -- this note in May of '03 is very consistent with the previous correspondence in the fall of '02. She is sick and tired of this situation and wants to plead guilty,

cooperate. She's going to do whatever she can. Let's get on down the road. I don't know -- the this all for naught, I don't know specifically what that's about.

Q. Did she make it clear to you in this interview that she was willing to testify against Honken?

A. Yes.

Q. And did she indicate that including whatever cooperation the government wanted?

A. That's what my exclamation marks mean.

Q. Okay.

A. That was a significant step.

Q. Now, at this stage of the game the Eighth Circuit is still not decided; right?

A. Yes. It says sitting -- the Eighth Circuit's still sitting on her case. I presume that's the initial decision as opposed to the motion for rehearing, but I don't remember when the Eighth Circuit came back.

Q. So now you've got a willing client and you've got an ambiguous legal situation at this snapshot of the case; right?

A. Yes.

Q. So why aren't you in there the next day talking to the government saying, "How do we make this happen?"

A. I'm not sure. I'm not sure. I think we were waiting. We were waiting for the Eighth Circuit. In hindsight that doesn't seem to make a lot of sense, but I think that's what was going

on.

Q. Well, did -- put aside hindsight because we're not supposed to be using hindsight.

A. Right. No, I understand.

Q. I mean, putting yourself back in the position that you were in as reflected in this note, namely --

A. Right.

Q. -- a client who's willing to cooperate, client who's just written you I want to plead guilty, was there any tactical reason given that situation and given that the Eighth Circuit may have gone against you why you weren't rushing in there and saying, "How do we make this happen?"

A. This discussion about possible effects on plea negotiations, that isn't pertaining to Miss Johnson. She's clearly on board.

Q. Uh-huh.

A. That has to do with what effect would the Eighth Circuit decision have on the government. In other words, if the government goes with Judge Bennett's decision, as I had previously mentioned, I thought that strengthened our position.

THE COURT: You mean if the Eighth Circuit did.

THE WITNESS: If the Eighth --

THE COURT: Yeah.

THE WITNESS: -- Circuit did, right. If they upheld your ruling, even if the evidence came in in the penalty phase,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

I still felt that decision would have been a tremendous asset to us, and I wanted to wait for it. That -- you know, it's the Eighth Circuit. What was I thinking?

But be that as it may, that possible effects on plea negotiation, that's not Miss Johnson, because she's okay. But I was hopeful that this would help us with the government.

THE COURT: Mr. Berrigan, do you recall at this precise time, did you have some concerns about being able to establish a factual basis for a plea, or did you always think that wasn't going to be a big problem notwithstanding your client telling you she wasn't present?

THE WITNESS: I did not think it was a problem, Your Honor. It's not unusual, again, for clients to, you know, take inconsistent positions as the litigation goes on.

THE COURT: But at some point they have to change their mind.

THE WITNESS: Absolutely, right.

THE COURT: Yeah.

THE WITNESS: But to be honest, the typical practice is let's establish the parameters of the plea, what's going to happen to me. And then we get to the discussion about, well, let me tell you what a guilty plea involves and what questions you're going to be asked and what the Court's going to want to know, not just whether or not the plea's intelligently made and voluntary, but you're going to have to stand up there under oath

and say you did this. That's what's going to happen. And you're going to have to do it in a public courtroom on the record for all the world to know.

And, you know, we have that discussion in every case. Sometimes the client has a problem with that. Sometimes they don't. Frequently the problem is not making the record. It's admitting that to their family. As inconsistent as she may have been with me, I can guarantee you she wasn't inconsistent with her family. I guarantee you every discussion was I didn't do this, I didn't do this, I didn't do this. And this was a family that was very supportive. They had some issues, but they were supportive of her.

And when you're in jail facing the prospect of life without parole and never getting out again, family support's more important than at any other time in her life. These are the people that are going to be responsible for caring for her children.

And so she's not going to be easily persuaded to turn around and have to say to them I did this. And so we have to have a long discussion about that, but that's in the future. That's not now. I can get that done. I've done it for years. I've had well over 50 capital cases, and the vast majority of those resulted in guilty pleas, and it's not an easy process frequently, but I was confident I could get it done with Miss Johnson.

So we hadn't had that discussion. I'll admit we weren't even close to it at this point, but we were making significant steps. This cooperation with Mr. Honken, against Mr. Honken, was a big deal. This was the government's motive, the reason to deal with her in a fashion that we might be able to live with.

THE COURT: Let me ask you this as kind of a follow-up. I'm assuming that most of the capital cases where you had represented defendants they were male.

THE WITNESS: Yes, sir.

THE COURT: And some probably had -- I mean, probably had the whole range of relationships with children.

THE WITNESS: Yes, sir.

THE COURT: Some were absentee fathers and never probably spent much time with their kids or paid child support, and others were, you know, better parents; right?

THE WITNESS: Yes, that's right.

THE COURT: Was it going to be a harder sell in this case precisely because Angela Johnson's number-one concern was always her kids?

THE WITNESS: You know, at the end of the day, I thought that was a plus, not a minus because the truth is she's much more worried about these kids than she is herself. And so particularly after Dustin got the death penalty with Marvea, I mean, we made this argument to the jury, you know, one of that

child's parents is going to die.

And so I think that she would have been fine with life in prison, certainly a long, long time in prison, as long as she could be assured that her children were going to be okay. That was it. I really thought that if we got the children to the point where they're saying -- maybe not Marvea because she was too young -- but Alyssa, "Mom, this is what I want you to do," I don't think there's any way on God's green earth she would have been able to resist that.

THE COURT: Do you think she was conflicted, though, about testifying and cooperating against Marvea's father and maybe being the nail in the coffin literally, not figuratively, of him getting the death penalty?

THE WITNESS: I don't -- you know, that may have been the case initially. I think that changed pretty early on, and then Mr. Honken was constantly engaged in behavior that made it very clear that he had no interest in her at all. He's talking about contracting people to kill her. He's trying to take her daughter away. That was as upsetting to her as anything. It became clear to her and as we've discussed earlier, her romanticized version of Mr. DeGeus contrasted sharply with her view of Mr. Honken. I don't really think that was the problem.

Would it have been difficult for her to get up and say I participated in the murder of two children having two of my own? You bet. That would have been much, much more difficult

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 76 of 86

than knowing that Mr. Honken's getting the death penalty as a result.

But no, I think at this point really not far into the litigation I don't think her concern about Mr. Honken was the impediment.

THE COURT: Thank you. Would now be a good time to take a break?

MR. BURT: Yes, sir.

THE COURT: Okay. We'll be in recess until 5:05, and then we're going to go till 6. Thank you.

(Recess at 4:45 p.m.)

THE COURT: Thank you. Please be seated.

Mr. Burt?

MR. BURT: Thank you.

BY MR. BURT:

**Q.** The judge asked you about this potential dilemma about the fact that the father of Angela Johnson's younger child was Dustin Honken; correct?

**A.** Yes.

**Q.** And was one answer to that issue that whatever Angela Johnson did was not going to prevent the death sentence against Mr. Honken?

**A.** Yes.

**Q.** In other words, whether she cooperated or not as subsequent events played out and it probably could have been anticipated

from the point in time that you were having this discussion with her on May 22, the evidence both in the guilt phase and the penalty phase against Mr. Honken was fairly strong without her testimony.

**A.** Right. I think the Court's point was, at least as I took it was, you know, this was nail-in-the-coffin stuff. If she gets up and testifies, he's going down and getting the death penalty. Would that have happened absent her testimony? Obviously it did. But, you know, maybe that would have been a factor for her. I was merely pointing out I don't think so. I don't think it was a problem at all. But I understood the point to be slightly different than what you're asking me.

**Q.** Okay. And the second theme, you had learned from going back way as far as the detention hearing that the government had inmate witnesses who were claiming that Honken was confessing to them and those confessions were implicating Angela Johnson.

**A.** Yes.

**Q.** Could those confessions have been used to persuade Angela Johnson that Dustin Honken is no friend of yours?

**A.** You mean if this had arisen as a problem?

**Q.** Yes.

**A.** Sure, right. But she knew, she learned, Dustin Honken was no friend of hers. He was, you know, trying to kill her.

**Q.** And in the time period where this conversation takes place, May 22, '03, was there -- were there some developments on the

child custody front which were turning Angela Johnson even further away from Dustin Honken and more in the direction of saving her children?

**A.** I have some notes, obviously not this visit, or at least I don't see it here, but I have some notes that specifically pertain to the child custody situation and how upset she was about that regarding Marvea.

**Q.** And do you recall actually calling the prosecutors and telling them that -- I believe do you recall calling Mr. Reinert at that time?

**A.** Yes, I did call Mr. Reinert to talk about this situation. I thought it was an opportunity for us to move forward on plea discussions.

**Q.** Okay. Let me see if I can find that note. This conversation with Miss Johnson where she's saying she's willing to testify including cooperation, this is in Exhibit 48, and it's PLSP page 41. These are apparently Mr. Reinert's notes, phone call with Pat Berrigan, conditional plea, use of information at penalty if no deal. And then it says PBX, A.J. and Dustin fighting over Marvea. A.J. very upset, willing to cooperate. They would like 20-year sentence. We need proffer first.

Does that note by Mr. Reinert refresh your memory that now that you had authorization from Miss Johnson -- you had earlier authorization according to the other letter, but does it

refresh your memory that you called up Mr. Reinert and renewed your 20-year offer?

**A.** Right, yes, it does.

**Q.** I'm curious at this point why you're putting 20 years in front of him again since he had already clearly said no back in '01 and Angela Johnson is saying to you at this time get me the best deal possible and let's wrap this up?

**A.** The short answer is I'm not sure. But my previous notes with Miss Johnson just before the conversation with Mr. Reinert, I didn't discuss any numbers with her. There's nothing in there about 25 or 30, and without having had that discussion with her, I wasn't in a position to put anything on the table other than what I had already discussed with her which was 20. So that's the only explanation I can proffer for that.

**Q.** In this discussion with Miss Johnson on the 22nd, either you or Mr. Willett were -- somebody was conveying the idea that perhaps we should wait until after the Eighth Circuit decides because if we win our position will change, will become even better.

**A.** Right.

**Q.** She, on the other hand, was saying, "I don't want to wait. I want to get this done now."

**A.** Yeah, she doesn't care about the Eighth Circuit or waiting for the Eighth Circuit to decide. She just wants to get it done.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 353 Filed 11/10/11 Page 77 of 86

Q. And do you recall, I mean, who, if anybody, was advocating a position that we should wait and see what the Eighth Circuit does?

A. I don't know. I can say this. I called Pat Reinert, so I wasn't waiting. And there's only the two of us, so I think by process of elimination, that falls to Mr. Willett. I called Mr. Reinert shortly after -- this is on May 22. Looks like I talked to him within a week or so to try to get this ball moving again.

Q. Okay. And in terms of Mr. Willett's vision of reality, do you recall receiving a letter -- this is from 53C, RS-00832 way back in March of '01 where Mr. Reinert said to you with or without the evidence which is the subject matter of the Massiah hearing, this case can appropriately be tried as a capital case?

A. Yes, I believe that Mr. Reinert felt genuinely that that was the truth.

Q. And you agreed with that assessment, right, based on the detention hearing analysis and the evidence which was disclosed therein? There was no doubt in your mind that even if the McNeese evidence went away that what Mr. Reinert was saying here way back in March of 2001 was, in fact, true?

A. Right, absolutely, sure.

Q. Now, did you have any -- given these difficulties that were going on in the child custody arena, given the fact that Mr. Honken was apparently trying to kill Angela Johnson, had

made incriminating admissions against her, did you think it was going to be a hard sell for you to convince her to cooperate against Mr. Honken especially in light of the fact that she is telling you in a letter and now is repeating to you in person, "I will testify against Dustin Honken"?

A. No, that's -- that's not a question mark. That's an exclamation mark. That's her telling me she's willing to do that.

Q. And is the exclamation mark to convey your surprise at that or to convey her adamant nature in how she was conveying this?

A. I don't know. I mean, I think that's my exclamation mark, not hers. I just thought this was a significant development. I think we had had this discussion in the fall, but as I pointed out earlier, occasionally there would be bad days where she'd kind of get off track. But we were back on track. This is exactly what needed to happen to get a plea done. There wasn't going to be a plea without testifying against Dustin Honken.

Q. Okay. And around the same time that this discussion was taking place, you were having conversations with Charlie Rogers relating to the possibility of a joint disposition.

A. I did have those discussions with Mr. Rogers, but without looking at my notes, I couldn't tell you exactly when.

Q. This conversation with Angela Johnson was on May 22, and this is a note from the plea book which is RS-1-000634. This is your telephone (sic) with Charlie Rogers a couple months back;

right?

A. Right.

Q. And he's indicating to you he met with Honken last Friday. He will do anything he can to help out Angela short of copping out for the death penalty. He's okay with LWOP and will do what he can for Angela even indicating that he would testify for her if she went first. She didn't do this, she didn't do that, et cetera. That's what he was telling you.

A. Yes, sir.

Q. So at this point you've got Honken who's willing apparently to make a joint disposition. You've got your client on board as of, you know, at least May when you have that conversation with her, and are you now beginning to talk about a joint disposition at this point?

A. I'm not sure. I mean, I think Mr. Rogers was certainly interested in that. It enhanced his client's position. It was helpful to Mr. Honken to have a joint disposition, and it certainly was not contrary to our interests as long as we had a deal that we could -- we could live with.

Q. Now, do you remember after receiving that letter and after speaking to Miss Johnson in May you got this letter from Mr. Reinert? This is from 53C again, RS-13-000895, letter dated June 9.

A. Yes, I remember this letter from Mr. Reinert.

Q. And basically he's documenting a telephone conversation he

had with you on the 7th.

A. Right.

Q. Regarding Miss Johnson.

A. Right.

Q. In which you indicated that she had a preliminary willingness to cooperate in the trial of Dustin Honken and in which you indicated your client ultimately desires to receive a sentence of a term of years in the 20-year range.

A. Right. This is consistent with Mr. Reinert's note and my conversation with him on the phone.

Q. And this 20-year range number again was not something that Angela Johnson had put on the table during a conversation on May 22, '03.

A. The number wasn't her idea. It had been discussed with her, but it was my number, not hers.

Q. Her position as reflected in that May 10 letter, I want to plead; get me the best deal possible.

A. Right.

Q. And then when you met with her on the 22nd, there was no discussion of I'll plead but I gotta have 20.

A. No, there's no discussion about numbers at all there.

Q. She's leaving it to her professional counsel to get the best deal possible.

A. Right.

Q. And you thought at this point that the government would be

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 353 Filed 11/10/11 Page 78 of 86

receptive to something in the 20-year range as long as you were cooperating.

A. I wanted the government to start talking about numbers. By that I mean terms of years, not life. They eventually came up with 40 years which was the substantial equivalent of life. I didn't necessarily think they'd accept 20, but I thought we'd at least engage in a dialogue about what an acceptable number would be.

Q. And in the second paragraph here he indicates that you had indicated to him that the government commit to a position of what sentence they would find appropriate and would recommend to the department prior to any proffer.

A. Right.

Q. That was something that you were insisting on at that point because of why? What was the reason at this particular point when the client has said get me the best deal possible that you're going in and saying I want -- I want 20 and I don't want to proffer?

A. This is -- their position, the U.S. Attorney's Office in the Northern District of Iowa, their position was inconsistent with my experience, number one. And number two, it didn't really make sense to me. The proffer's going to be I participated in the murder of five people. I don't know exactly what they were looking for in terms of this proffer. But at the end of the day, that's what it is. And Dustin Honken

participated in these murders.

Q. Uh-huh.

A. What is it that she needs to say other than that? There wasn't any specific discussion about that. And if she's going to plead guilty, she has to say that. So this idea that she has to sort of make this proffer before they're willing to say what an appropriate disposition was didn't make any sense to me, and it seemed to me sort of a -- oh, tricky situation. I questioned why they couldn't make a commitment if they knew that the plea would involve admission of five murders. What's the problem? I don't get it. And it was inconsistent with my experience, at least dealing with the U.S. Attorney's Office in Missouri, and certainly my long experience as a public defender. So that was of concern to me. I didn't understand what the problem was.

Q. Okay. Based on what -- that explanation you just gave, it was not part of your concern any suspiciousness of Mr. Reinert; right? You weren't saying, well, I do it normally, but Mr. Reinert is not -- you know, is not somebody we can trust?

A. No, not -- no, not at all. If anybody in the U.S. Attorney's Office I thought was interested in pleading this case, Pat Reinert was the one. Nobody else over there seemed to be as interested in getting this case disposed of.

Q. And, in fact, Willett had told you in your first conversation with him that Reinert was a stand-up guy and somebody --

A. Right. You know, in my dealings with Mr. Reinert, we had gotten along fine. I didn't get along fine with everybody in that office, and I didn't have a high regard for Mr. Murphy based on one little meeting that we had. But Pat Reinert seemed to me to be a straight shooter, and he seemed to be interested in getting the case resolved.

Q. Did you think that perhaps the reason the government would not just take a simple representation by you that the client was going to admit to it, because they wanted to know exactly what she was going to say about Honken out of fear that perhaps she'd exonerate him in some way that might not be consistent with their goal of getting a death sentence against --

A. Well, that's fine. But if that's their position, why not say that? Why not just say, "What is she going to say about Honken," instead of this sorta you gotta make a proffer, you gotta make a proffer, you gotta make a proffer, and then we'll decide whether or not we're going to make an offer? Why not just say, "What is she going to say about Honken"? I'm telling them she's going to cooperate against Honken, she's willing to testify against Honken. What does that mean? She's going to go in and say he wasn't there? You know, that's ludicrous.

So I don't -- I didn't understand the reluctance to engage in a firm agreement absent this proffer to start with.

Q. Well, did Mr. Willett inform you that that's the way we do business here?

A. Yeah, that's exactly what he said. Right. That's the way they do business. But, you know, I learned the way they do business with discovery. That doesn't mean it was acceptable. I don't know how these defense lawyers live with that if that's -- if that's their position with discovery. I don't know. I don't know what the defense bar's doing up there in the Northern District of Iowa.

But that seemed to me to be an unreasonable position for the government to take whether it was consistent with what they normally did or not.

Q. Well, if there's any logic to assigning a local lawyer to be part of this defense team, I presume it would be because he's going to have some feel for how things actually work in the particular jurisdiction that you work in; right?

A. Yeah, absolutely. And if Mr. Willett were more interested in a plea, maybe I would have taken that suggestion more to heart.

Q. Uh-huh.

A. But I didn't. That wasn't my perception. And so this issue became a much bigger problem than it should have been.

Q. Now, was this discussion kept all internally to the team? Was there any effort to reach out to somebody like Kevin McNally or Dick Burr to say, "Look, here's a situation we're in. What is the practice in Washington? Where should we be going in this? Should we be getting the prof -- giving them the proffer,

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 353 Filed 11/10/11 Page 79 of 86

**2227**

and what does the project advise on this?"

A. Not at that time. There was a point in the litigation where Mr. Willett, Dean Stowers, and I were at a Life in the Balance death penalty conference. I don't remember even where it was, but we scheduled a meeting with Skip Gant who is a noted death penalty attorney. I think he was in Nashville at the time. We discussed Miss Johnson's case, and I think this may have been part of the discussion, at least plea negotiations. But I honestly don't know when that was, and I know we didn't call Kevin or Dick Burr which we eventually did to get their advice on the plea negotiations at this point in time.

Q. After that letter was written by Mr. Reinert, the very next day he sent you another letter, RS-13-896 from 53C, in which he now is discussing terms of a -- how this -- how this arrangement's going to work; correct?

A. Yes.

Q. And basically he's telling you that what's going to be required to make this happen is, first of all, full, complete cooperation from the client.

A. Yes.

Q. And second, he's indicating that any guilty plea if somehow the deal fell through would be a factor in mitigation. That doesn't really relate to --

A. Yeah.

Q. -- the plea, does it?

**2228**

A. He says that.

Q. And then he says in relation to your offer of 20 years, although your client has expressed a desire for a short term of imprisonment, in the 20-year range, I believe your client needs fully to -- to fully assess her conduct when compared to the conduct of others and sentences otherwise imposed in the federal system even for routine drug crimes. When a routine drug trafficker who has not been involved in the death of any individuals can receive sentences of 20, 30 years and life imprisonment, is it justified or reasonable for a defendant involved in the murders of 5 individuals to expect a much lesser sentence?

That was really just a echo of his position way back in October of '01, that 20 years was unconscionable; right?

A. Yes. I think this was a regression from more recent discussions we had had, but it is consistent with his position back in 2001.

Q. Regressions -- what was the more recent discussion where he --

A. Well, when I was talking about the 20 years, even on the telephone, you know, his response was not you're out of your mind or that's unconscionable or anything to that effect.

And we've already discussed the fact that for these same crimes at one point the U.S. Attorney's Office was willing to negotiate a plea perhaps as low as 10 or 15 years, admittedly

**2229**

before the bodies were found but for the same murders. And now all of a sudden, you know, he's equating these murders with a routine drug trafficker essentially suggesting not only is 20 years unreasonable but 30 years perhaps might be unreasonable. I didn't think this was a favorable response to the recent discussions that we had had.

Q. In the recent discussions you're saying he expressed some acceptance -- he didn't reject out of hand 20, and that indicated to you that he was in favor of 20?

A. No, no, not at all. I don't want to suggest that at any time Mr. Reinert ever said 20's going to be sufficient. But that's a little -- our earlier discussion when I told him, for example, that Angela was interested in pleading, would cooperate against Dustin, was happy to testify or at least willing to testify -- he reflected that conversation in his notes -- there wasn't anything in his notes nor in our telephone conversation to suggest you're out of your mind with 20 years, it's never going to happen. This letter takes a much more strident position.

Q. Well --

A. And the second paragraph is particularly disconcerting.

Q. Let's back up for a minute here because this is a letter that was written just in that same time period, MCN03-003025. Here you're writing to Angela June 7 --

A. Right.

**2230**

Q. -- a couple of days before that letter, and you say you spoke briefly with Pat Reinert about your offer to cooperate against Dustin including the idea that you were willing to testify against him in a capital murder prosecution. I also advised Reinert that we would want in return a sentence of less than 20 years. And then you say consistent with his previous pronouncement, Reinert was very noncommittal wanting to get a proffer statement from you on the record about what happened before making a decision as to what position the U.S. Attorney's Office would take regarding sentence. He also voiced an opinion that the Department of Justice would not authorize a sentence below life imprisonment for you even if you were cooperating against Dustin.

I told Reinert I would discuss these matters with you but that I was pessimistic about an agreement unless the proposed sentence was substantially below life imprisonment. Hopefully if we win in the Eighth Circuit the government's position will change in our favor.

Does that letter accurately reflect the discussion you had with Reinert?

A. Yeah. If I wrote it, that's what we said.

Q. Okay. So you're again putting 20 out there. He's saying the Department of Justice would not authorize a sentence below life imprisonment even if she did cooperate.

A. Exactly what I've written is what he told me.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 80 of 86

Q. And at that point Miss Johnson had told you get me the best deal possible. The best deal possible that could have been signed, sealed, and delivered at that point was a life sentence if you provided what they were asking for in terms of a proffer and if the proffer satisfied their concerns for whether it was going to be useful in the case against Honken.

A. Yes.

Q. Right?

A. That's right.

Q. Okay. Now, you're advising Miss Johnson that you then responded that it was Miss Johnson's position that there couldn't be an agreement unless it was substantially below life imprisonment?

A. Right.

Q. She never said that.

A. She didn't say that, no.

Q. All right. And then you then put out the idea of the Eighth Circuit again to her. Hopefully if we win in the Eighth Circuit the government's position will change in our favor.

A. Right.

Q. And then I guess the other part that could have been put in that letter which wasn't is one of these lawyer on the other hand: If we lose in the Eighth Circuit, the government may not be willing to engage in the kind of offer that they seem to be holding out to her at this point.

A. Yeah, that's always a possibility, because Dustin Honken had not gone to trial at this point so . . .

Q. He's not going to trial --

A. He's not gone to trial.

Q. Right.

A. I wouldn't have believed that the government -- even if the Eighth Circuit, as they did, came back, reversed the trial court's decision on the Massiah issue, I didn't think that would have foreclosed the possibility of plea negotiations thereafter given that Mr. Honken had not yet gone to trial.

Q. Right. So it's not really the Eighth Circuit that is going to help her get this settled. It's going to be the government's desire to use her in the Honken trial.

A. Well, that's the primary motivating -- in my opinion -- the government can speak for themselves. But that's the primary motivating, I think, factor for them. They want her to cooperate against Dustin Honken, use her testimony in his trial.

Q. And backing up to what you told her on the 22nd and what you're again telling her about the Eighth Circuit, had you gone to the Eighth Circuit oral arguments?

A. No.

Q. Had Dean Stowers expressed to you what he thought was going to be the outcome of that after the argument?

A. I don't know that he expressed his thought about the outcome. We talked about the oral argument after it had taken

place. I don't remember what those discussions were, but I was interested in how it went. I don't know -- if Dean had a prediction about what was going to happen in the Eighth Circuit, I don't recollect what it was. He may have been very pessimistic for all I know.

Q. You made some comment sort of in jest earlier this was the Eighth Circuit.

A. Yeah.

Q. And you had your own experience with the Eighth Circuit; right?

A. Right. As I previously mentioned, I have had federal death penalty habeas experience in the Eighth Circuit. At one time I did an investigation and discovered they had not granted certificates of appealability in 20 percent -- 20 percent of the capital cases historically. That's a remarkable figure. 20 percent of capital prosecutions, death sentences that had come before them they had not given a certificate of appealability after a habeas proceeding.

Q. To even be heard.

A. So there isn't a circuit in the country that can match that statistic, and they had the fastest disposition rate of death penalty cases than any other circuit in the country. So it's a conservative circuit. I think anybody that practices in this area of the law knows that.

Q. You weren't, for instance, in the Ninth Circuit where

things might have been a little bit more --

A. No, no. There are other conservative circuits. The Fifth is conservative. The Fourth is conservative. But the Eighth is a conservative circuit. I'm not saying that to be critical. It's just a fact.

Q. And by the way, you knew that even -- if somehow you squeezed out a victory in the Eighth Circuit the government wasn't going to let it sit there; right?

A. No, they're not going to drop the prosecution, not going to dismiss the case.

Q. Well, not only that, was it guaranteed that they would not take the case up to the Supreme Court?

A. No, no. As I've said earlier, I was hopeful that it would change their posture because I viewed it as a different case without the maps in the first phase, you know. I think that was a different case. Could they have, you know, been unsuccessful? Was that going to be a big problem for them? Probably not.

Q. Was it ever conveyed to Angela Johnson the realities of Eighth Circuit practice in death penalty cases?

A. Well, not by me.

Q. So this letter that he writes to you on the 10th is now trying to reduce this to terms and indicating to you that, again, as he told you in your phone conference -- conversation it was not going to be 20, but then he says, "I'm open to engaging in discussions to work toward an amiable resolution and

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 81 of 86

that the first step is going to be you're going to have to bring her in for an interview."

A. Right.

Q. Now, at this point you responded and told him what?

A. Forget it. I don't know. Whatever the letter says it says.

Q. Yeah.

A. But I didn't accept the proposition.

Q. And before you wrote that letter and said forget it, was there a discussion with Miss Johnson, or were you the one that rejected it?

A. No, I rejected it. As we've already alluded to, Miss Johnson's trusting me to get her the best deal possible, and I thought this idea of proffer first was ridiculous.

Q. I believe at that point there were some further attempts by the government to meet your concerns, were there not?

A. There may have been. I don't specifically recollect.

Q. Do you remember that Mr. Murphy sent a letter in which he said, look, if the problem here is a confidentiality one, that we can address that by having you proffer to a taint team?

A. There was some correspondence about a taint team.

Q. And was that proposal rejected as well?

A. Yes.

Q. And could you explain to me why that proposal was rejected?

A. That wasn't the concern. It wasn't the -- the concern

wasn't, well, they're going to learn as a result of the proffer what her role was in the offense. It was that they were insistent on the proffer before they were willing to negotiate an agreement.

Q. Well, didn't Mr. Miller's (sic) letter -- this is -- I lost my -- oh.

THE COURT: It looks like the light went out or something.

MR. BURT: Yeah, it looks -- I don't see a light on my screen. I don't know if the bulb --

THE COURT: You broke it? No. Maybe the bulb just burned out, so unfortunately our IT people are gone for the day by over an hour, so just muddle through, and we'll see if we can get something done soon.

MR. BURT: Sure.

BY MR. BURT:

Q. Do you recognize this letter? This is RS13-906.

A. I do. It was sent to Mr. Willett, but I recognize it.

Q. It got sent to you at some point; right?

A. Yes.

Q. There we go.

A. I read it. I don't know if Mr. Willett sent it to me or I saw it in his office or what the deal was.

Q. Now, at this point there's been a joint proposal made; correct.

A. At least discussed, yes.

Q. Well, the first paragraph says, "We spoke by phone with all counsel this morning. We discussed a pending global plea proposal submitted by counsel for Honken and on behalf of your client. That proposal would allow Honken to plead guilty and receive a life sentence, allow your client to plead guilty and be sentenced to 20 years"; correct?

A. Right.

Q. So that was a global plea proposal that had been made that was currently pending in D.C.?

A. Apparently. I mean, my recollection of this is not that there was a written proposal but that we had had discussions, a meeting with the assistant U.S. attorneys involved in the case and this had been the substance of the discussion. I don't recollect a written proposal, but there may have been one.

Q. Yeah. Do you recall that Mr. Rogers had written a proposal in which they had said that you were in complete agreement and you were offering 20?

A. Yeah. Mr. Rogers might have submitted a proposal.

Q. In which -- including you saying --

A. Yeah, I don't doubt for a minute that's accurate, right. Twenty years, we would have been delighted to get that.

Q. Now, do you recall during the discussion that's alluded to in this conference that Mr. Murphy indicated that what DOJ wanted was life and life?

A. Yes.

Q. He told you that?

A. I don't know if he told us that during the discussion, but that's in the letter, right.

Q. The letter says in an effort -- and he indicates, "I anticipate the life and 20 proposal will be formally rejected by DOJ later today or tomorrow."

A. Right.

Q. So you knew from this letter that your 20-year offer again was going to be rejected.

A. He believed it would be. Mr. Murphy believed that.

Q. And yet he's saying in an effort to determine whether we may be able to agree to another resolution, we spoke by phone, and we being who at this point? Murphy and Willett?

A. I presume, yes. He's talking -- the letter's addressed to Mr. Willett. I didn't have any discussions with Rich Murphy that afternoon that I know of.

Q. And it's documented that Willett apparently told him that Miss Johnson would be willing to cooperate against Honken including testifying against him.

A. Yeah. Well, they knew that already, but yes, he wrote that in the letter.

Q. And it indicates that you, meaning Mr. Willett, had expressed concerns about the client submitting to a formal proffer.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 82 of 86

**2239**

A. Right.

Q. And then they go on to repeat what they'd been telling you in previous letters which is until you proffer we're not going to be able to make a deal here.

A. Amongst other things.

Q. Right.

A. Right.

Q. And on the second page he says he discussed with Mr. Willett the possibility of having your client submit a full proffer to a taint team. Under such a proffer your client would submit information which would not be used against her and also have to agree to a polygraph. Did Mr. Willett discuss that taint team proposal with you?

A. I don't recall.

Q. In any event, you wouldn't have accepted it because that was not really your concern.

A. Right.

Q. The concern was the proffer arrangement.

A. Right.

Q. And the other concern was that you needed to have an agreement in place before you proffered because that was what you were concerned about, the open-ended nature of the arrangement.

A. Exactly, yeah.

Q. Doesn't he say in the next paragraph if we were satisfied

**2240**

your client had provided complete and truthful information, we would be willing to submit to the department -- for the department's approval a proposed plea agreement for your client's consideration; the basic terms of the plea would require your client's plea of guilty to a group of charges which would carry a mandatory life sentence? Isn't that exactly what you were asking for which is a number, if you will, of what they were willing to agree to if the proffer was satisfactory?

A. Well, not exactly. I mean, that's progress. That's certainly better than Mr. Reinert's earlier letter where he says, you know, hey, maybe even if the plea agreement doesn't work that plea will be evidence of your client's remorse because today she hasn't evidenced any. That position was ridiculous. This is better. They're at least saying, well, we'll recommend to DOJ a life sentence if we believe what your client's telling us which is progress.

But is that what I wanted? No. I wanted them to say, go to DOJ, this is what she's going to say, we want a life sentence. She's going to testify against Dustin Honken, so we're going in knowing what's going to happen, not this ambiguous maybe it will happen. You know, if you're lucky with DOJ, they're going to give you life. That -- you know, that was a concern. You know, as it turned out, that was as good as it was ever going to get.

Q. Right. And what would the downside have been to actually

**2241**

comply with their proffer conditions under the terms and conditions they were suggesting? If they were saying you're going to be fully protected on this proffer, nobody's going to use it, in fact, you can keep it away from the trial prosecutors, would there have been a downside in submitting that to see if main Justice would accept it given what you thought was their ultimate goal here which was to have Angela Johnson testify against -- against Mr. Honken?

A. No. There wasn't any downside other than, A, life is the sentence. That's the best it's going to be. That's the -- that's the agreement. B, Angela's going to have to go through that process without knowing what's going to happen. That's a difficult situation.

Q. Now, explain to me how ultimately you did provide a proffer not to a taint team but to the trial prosecutors because there if your concerns were, you know, not submitting proffers that you don't have a plea in place, you did submit a proffer and you didn't have a plea in place.

A. That's right.

Q. Could you explain your thinking there?

A. Yeah. I gave up. I gave up on the idea that we could get it done without a proffer. It's as simple as that. I still don't understand why it was necessary that we -- I mean, we did an attorney proffer. That seemed to be sufficient. Why did they need this proffer to make this decision? But I gave up

**2242**

eventually on insisting that we not do the proffer because it wasn't going to happen. They maintained this position basically from here forward.

Q. Okay.

A. And, in fact, it was worse because here at least they're saying we'll recommend life. You know, that really wasn't even their position at the end of the day. At least that's my recollection.

Q. End of the day --

A. When we're --

Q. -- Honken had been convicted.

A. Right.

Q. And they weren't even willing to say they were going to support the plea.

A. Exactly.

Q. In fact, they didn't support the plea, did they, as far as your information?

A. Yeah. I don't -- you know, I don't have any firsthand knowledge. I never saw the letter to DOJ, but that's what I was told.

Q. Who told you that?

A. I can't remember if it was Mr. Williams or Mr. Miller or Mr. Reinert. I don't think Mr. Reinert was involved at that point so . . .

Q. But basically what you were told was after Honken was

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 83 of 86

convicted and sentenced to death and you then came forward with a proffer that the locals were not going to support that arrangement at main Justice.

A. Well, this -- yeah, this is in March now, March of '05. Mr. Honken's case had taken place the previous fall. And here we are coming up for trial in April, and so their position was basically, you know, too late, too bad. That's where we were.

This opportunity had dissipated by the time we got to March of '05.

Q. And was there any reason why you couldn't have avoided the whole proffer problem by offering what the government said they wanted on the joint disposition which is life and life?

A. Well, I don't -- I don't recollect -- I guess proffer wasn't part of that proposal. But I don't think we ever got to life and life or even life until March of '05.

Q. Well, if they were both pleading, there'd be nobody to proffer --

A. No reason to proffer, right.

Q. No reason to proffer; right?

A. That's right.

Q. So was it your understanding that Honken was going to plead and take life and that if your client had pled and taken life that would have been the end of the case?

A. In a global disposition, certainly.

Q. And did you think a global disposition was an attractive

proposition for the government in terms of not having to go through --

A. Obviously, right, absolutely. I didn't think life and life was fair. I don't think to this day that Angela Johnson shares equal culpability with Dustin Honken for these murders, and I'll never believe it. But the government treats them exactly the same.

Q. Well, the case changed as time went on; right? I mean, when the Eighth Circuit overturned Judge Bennett's order, your position was weakened in the plea process, was it not?

A. Sure. And when Dustin Honken was convicted and the jury recommended death, the whole motive for the government wanting to cooperate with Angela dissipated significantly. I mean, there was still a motive. They don't have to go to trial and, you know, have a three-month trial. But the opportunity for her to testify against Dustin Honken evaporated when he went to trial and we didn't have a deal.

Q. Do you remember in November '04 sending an e-mail to Mary Goody in which you said, "I got some bad news. Honken has been convicted, sentenced to death. We were waiting to see what happened to him and were thinking that if he didn't get death we'd be in a better position," and your comment that I guess that was pretty naïve? Do you recall that?

A. Yes, the part about Dustin Honken not getting death. The part about we'd be in a better position if he got life, that

wasn't naïve. I don't believe the government would have sought the death penalty in Angela Johnson if Dustin Honken had gotten a life sentence. Now, I could be completely wrong about that, but I don't believe it.

Q. Now, did you have a strategy from fairly early on in the case of who should -- who should be going to trial first in terms of your client's interests?

A. Dustin Honken.

Q. Just explain to me why that was your strategy.

A. Well, we can't testify against him unless he's going to trial first, and it's as simple as that. We go to trial first, then I suppose we could do that. But if Angela was convicted, you know, that substantially weakens her credibility if she's now decided, well, you know, I'm going to testify against Dustin Honken because I got death after going to trial. That's not an attractive position to be in, hurts her as a witness for the government. So we wanted Dustin Honken to go to trial first because that provided incentive for the government to deal with us on his case.

Q. Do you also remember a note in your file indicating whoever goes second's going to get a change of venue?

A. I believed that. It turns out not to be the case, but I did believe that.

Q. Now, did you have discussions with Mr. Willett about your strategy of wanting to go second?

A. I'm sure we did, but, you know, in terms of when and where I don't -- I couldn't tell you that. I would find it hard to believe that Al didn't know -- and this isn't rocket science -- that we wanted Dustin to go first. That just is -- that's really sort of common sense.

Q. Well, there was a trial setting conference June 17, '02. You weren't present, but Mr. Stowers and Mr. Willett were present. And during that status conference or trial setting conference the transcript shows the following: Mr. Willett, what trial setting does Dustin Honken have with Mr. Parrish and Mr. Spies? The Court, that's a great question, and I'm not -- C.J., do you recall? Did we even set a trial date? I'm not sure a trial date's been set. Let me see here. Now I'm seeing here it looks like March 10 of 2003. Mr. Willett, pardon -- pardon me? March 10 of 2003? And are they scheduled for sort of the same four-week approximate block that we were? Court said, let's see here. Yeah, it's scheduled for a month. Mr. Willett, why can't we have their trial date and then bump Dustin Honken? The Court, well, you could. You know, I really have some reservations whether actually the circuit would resolve all this by then, but, you know, maybe they will. But I think we have set a realistic trial date. Then if the circuit either -- I don't get my work done in time or the circuit doesn't, we'll have to move it again. I hate to keep moving it because on the civil side I rarely move trial dates. C.J., what

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS   Document 353   Filed 11/10/11   Page 84 of 86

do you think about setting -- taking Honken's trial date, March 10? Mr. Williams says, I think that sounds fine. I guess the only concern I would have -- I'm trying to think. It's like playing chess. If we lose on the second prong of this motion to suppress and we take the entire case up on interlocutory appeal, then I could see that delaying everything in such a way that, frankly, we're more prepared -- and the Court breaks in -- go with Honken first? Williams says right. The Court says right.

Mr. Williams, I guess my thought would be for the present time maybe the thing to do is to put them both for the March trial date. The Court, and see which one's ready to go. Mr. Williams, and who's ever ready to go by March goes. And, you know, by the first of the year, we'll have a more realistic idea of who needs to be moved off, you know, if either one does. The Court, it makes a lot of sense to me. What does the defense think of that? And Willett says, can we have the number-one slot as opposed to the 1A slot? And Mr. Stowers says, I prefer to go after Honken. The Court, pardon me? Stowers, I think we'd probably rather go after Honken. Mr. Willett, that's never been my sense of it, but defense counsel will agree essentially. And the Court says, I'm not going to make a decision on who it's better strategy for.

Had there been a discussion prior to that court appearance about, you know, what you described as common sense in terms of what made sense for Angela Johnson and who should be

going first?

**A. The conversation would suggest otherwise, but I find it hard to believe that we hadn't discussed the order of the cases going to trial. I admit that doesn't seem to suggest that in this -- this transcript you just read.**

**Q.** Would there have been any reason to volunteer to take Angela Johnson's case to trial before Honken went to trial?

**A. None that I can fathom. At the very least, we had the opportunity to see what the evidence was before we had to face it. That was the big benefit in Mr. Honken's trial. But from my perspective, the benefit was if Honken goes first, then the government, if they want us to cooperate and testify against Honken, that's the opportunity. We lose that if we go first.**

**Q.** Does it seem here in that passage I read to you that Mr. Willett is thinking strategically about this case?

**A. Well, if he has a strategic thought, it's not evident from that conversation. He may have some strategy in mind. I don't know what it could possibly be.**

THE COURT: Well, couldn't one possible strategy be you go to trial first and if you lose then you roll over? Now, the government may be less interested because you've been convicted and you have something more to gain, but you always had something to gain, and that was getting out from under a death sentence.

THE WITNESS: Sure. But why not do that after? I

mean, is there some benefit in going first? I guess that your -- the position --

THE COURT: Not that I'm aware of.

THE WITNESS: No. I get it. I mean, if you get convicted, then you could go to the government hat in hand and say, hey, can we have another try? We'll testify against Dustin Honken. That's a -- that's a strategy.

THE COURT: Well, there's some benefit in the sense she'd get a shot at trying to prevail on Al Willett's optimism on the guilt phase and --

THE WITNESS: Sure.

THE COURT: -- and your skill in the penalty phase and if things go worst-case scenario then you roll over. So, I mean, it's not implausible that that could be a decent strategy.

THE WITNESS: I -- yeah.

THE COURT: I mean, there are pros and cons to both, aren't there, really?

THE WITNESS: There are pros and cons to both but not -- not really relative -- of relative weight, Your Honor. I get what you're saying. I'm not sure how receptive the government would have been to that idea after we were convicted. Now what? We're under a sentence of death and, hey, let me tell you the real truth about Dustin Honken. I mean, I -- I think that might have been a problem.

But first and foremost, I mean, we really wanted to

plead the case. I wanted to plead the case. And I think Miss Johnson did too, and the best opportunity to do that was Mr. Honken goes first. That's the way it's gotta go which is I'm sure what Mr. Stowers is suggesting. I didn't talk to Mr. Willett about that conversation. I wasn't there. And I can't explain his thinking, so I'll just leave it at that.

MR. BURT: Did the Court want to stop?

THE COURT: Could we stop now?

MR. BURT: Yes, because I'm going to move on to another topic, not now --

THE COURT: Oh.

MR. BURT: -- but next time we meet.

THE COURT: Which would be seven o'clock tomorrow morning?

MR. BURT: Yes.

THE COURT: Right?

MR. BURT: The Court understands that Mr. Berrigan cannot be here tomorrow. We have other witnesses who are going to take --

THE COURT: Oh, no, I had either forgotten that or --

MR. BURT: Yeah, we did explain he has court appearances on Tuesday.

THE COURT: Yeah, you did say that. So we're going to finish Mr. Berrigan in June?

MR. BURT: Yes.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

THE COURT: This June with 45 days to it?

MS. MORRISSEY: Yes.

THE COURT: Yeah, that June. Haven't quite found that one on the calendar yet but that June. Okay.

MR. BURT: Judge, I did want to bring up one issue with the Court in terms of timing.

THE COURT: Yes.

MR. BURT: And it relates to briefing. I wanted to let the Court know that the Supreme Court has granted cert. in a circuit case in a state case on ineffective assistance of counsel in plea cases. And those case -- cert. was granted in those two cases on the same day in January of 2011, and there were issues presented in the cert. petition, and it's one of those situations where the Supreme Court added an additional question.

THE COURT: And what was the question they added?

MR. BURT: The additional question was in addition to the question presented by the petition, the parties are directed to brief and argue the following question: What remedy, if any, should be provided for ineffective assistance of counsel during plea bargain negotiations if the defendant was later convicted and sentenced pursuant to constitutionally adequate procedures? And that's a puzzling question because the circuit's -- and I know the Court knows the law on this.

THE COURT: Because I wrote an opinion on it.

MR. BURT: You wrote an opinion, but as far as I know, the circuits are pretty much in agreement that there is a remedy in that situation even if there has been a fair trial.

But I'm concerned that the Court, given the pendency of these cases, may -- this may be a situation where the Court -- I know the Court's anxious to conclude this in June, and I'm not sure when a decision's going to be rendered in this ca -- the case is --

THE COURT: Long before that gets argued.

MR. BURT: Yeah.

THE COURT: Yeah.

MR. BURT: Well, I'm not sure when it will be argued.

THE COURT: Well, it's not going to be argued -- you know, if they're granting cert. now, it's not going to be argued till later in the term, you know, certainly after the first of 2012, and I guarantee you you'll have my opinion quite a while before that. So if the question is am I willing to wait on the resolution of that case, no.

MR. BURT: I'm not asking that.

THE COURT: No, okay.

MR. BURT: I just wanted to let the Court know that that issue is --

THE COURT: I'm pretty comfortable in how I ruled on the previous issue.

MR. BURT: Sure.

THE COURT: And, you know, Supreme Court may adopt it. They may not. But if we get that far, I'm going to use the same remedy I did in that case.

MR. BURT: Okay.

THE COURT: But I appreciate you raising that because I wasn't aware of it.

So we'll see you tomorrow morning at seven?

MR. BURT: We'll be here.

THE COURT: Okay. Thank you.

(The foregoing hearing was adjourned at 6:02 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

    S/Shelly Semmler        4-10-11

    Shelly Semmler, RMR, CRR      Date

**INDEX**

| WITNESS: | | PAGE: |
| --- | --- | --- |
| KARL TODD | | |
| | MS. MORRISSEY | 1914 |
| | MR. WILLIAMS | 1926 |
| | MS. MORRISSEY | 1927 |
| ROSE NEVINS | | |
| | MS. MORRISSEY | 1932 |
| | MR. WILLIAMS | 1937 |
| | MS. MORRISSEY | 1938 |
| WENDY JACOBSON | | |
| | MS. MORRISSEY | 1940 |
| | MR. WILLIAMS | 1953 |
| | MS. MORRISSEY | 1954 |
| | MS. MORRISSEY | 1961 |
| | MS. MORRISSEY | 1967 |
| PATRICK BERRIGAN | | |
| | MR. BURT | 1971 |

*****

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov to purchase a complete copy of this transcript.*

Case 3:09-cv-03064-MWB-LTS Document 353 Filed 11/10/11 Page 86 of 86